The Sixth Re-Audit and Update of Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation
and
Re-Audit of Suicide Prevention Practices
in the
Psychiatric Inpatient Programs

Lindsay M. Hayes, M.S.
March 1, 2024

## I.    Introduction

This report is submitted as an update to this reviewer's preceding report, "The Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs." ECF No. 7636-1 (filed October 24, 2022).  The preceding report covered this reviewer's findings from a fifth re-audit of suicide prevention practices at 23 selected CDCR prisons, as well as the five psychiatric inpatient programs (PIPs).  That report recommended that prisons which chronically struggled with their suicide prevention programs, as well as almost all prisons that contained Mental Health Crisis Bed (MHCB) units, as well as all of the PIPs, undergo continued re-inspection.  That report also recommended that the defendants continue to work with the Special Master on outstanding initiatives previously committed to by CDCR. The fifth re-audit report was adopted in full by the *Coleman* court on January 6, 2023.  ECF No. 7696.

This report is the seventh overall audit of CDCR suicide prevention practices and covers this reviewer's recent sixth re-audit at 21 selected CDCR prisons and first re-audit of the five PIPs.  The on-site re-audit of selected CDCR prisons began on April 4, 2023, and concluded on November 15, 2023.  The details and methodology of the re-audit/review process are discussed in Part II, below.  Part III summarizes the status of the remaining recommendations not fully implemented by the defendants.  Part IV contains a summary of this reviewer's findings from the facility assessments during this sixth re-audit, including a summary of the initial recommendations contained in this reviewer's initial audit report and the accompanying report by the Special Master.  ECF No. 5258 (filed January 14, 2015).  When appropriate, necessary corrective actions are again offered to accelerate the defendants' full compliance with the initial court-approved recommendation.  Part V summarizes the reviewer's first re-audit assessment of suicide prevention practices within the five PIPs conducted between January 9, 2023 and May 25, 2023.  Part VI covers this reviewer's conclusion and recommendations.  Lastly, Appendix A presents a prison-by-prison discussion of this reviewer's findings at each of the 21 re-audited prisons during the review period of April 2022 through December 2023.  The PIP suicide prevention assessments are found in Appendix B.  Summaries of CDCR Suicide Case Reviews of 36 incarcerated person (IP) suicides during the review period are also included in the appendices.

## II.    Methodology

This reviewer based his selection of 21 CDCR prisons for on-site re-auditing on a variety of criteria, including their operation of MHCB units, findings during previous audit(s) that their suicide prevention practices were chronically problematic, having a significant population of IPs on the Mental Health Services Delivery System (MHSDS) caseload, and/or the facility experiencing multiple suicides during the previous 12 months. As in the previous audits, with one exception, this reviewer's re-audit consisted of a two-day on-site examination of suicide prevention practices at each of the prisons. The one exception was California State Prison, Sacramento (CSP/Sac) which again necessitated a three-day on-site examination.

In addition, at the request of the Special Master, this reviewer conducted a re-audit assessment of suicide prevention practices within CDCR's five PIPs. These assessments, each consisting of two-day on-site examinations, were either conducted separately for three programs (at CHCF-PIP, CMF-PIP, and SVSP-PIP) in January and February 2023 or in conjunction with re-audits of prison facilities (at CIW and SQ) in May 2023. The 21 audited prisons and five (5) audited PIPs and the dates of their on-site assessments were:

1. California State Prison, Sacramento (CSP/Sac): April 4 – April 6, 2023
2. Wasco State Prison (WSP): April 18 – April 19, 2023
3. California Correctional Institution (CCI): April 20 – April 21, 2023
4. California Institution for Women (CIW): May 15 – May 17, 2023
5. California Institution for Men (CIM): May 18 – May 19, 2023
6. San Quentin State Prison (SQ): May 23 – May 25, 2023
7. Mule Creek State Prison (MCSP): June 6 – June 7, 2023
8. California Health Care Facility (CHCF): June 8 – June 9, 2023
9. California State Prison, Corcoran (CSP/Corcoran): June 27 – June 28, 2023
10. California Substance Abuse Treatment Facility (CSATF): June 29 – June 30, 2023
11. North Kern State Prison (NKSP): July 11 – July 12, 2023
12. Kern Valley State Prison (KVSP): July 13 – July 14, 2023
13. Richard J. Donovan Correctional Facility (RJD): August 21 – August 22, 2023
14. California State Prison, Los Angeles County (CSP/LAC): August 23 – August 24, 2023
15. California Medical Facility (CMF): September 25 – September 26, 2023
16. California State Prison, Solano (CSP/Solano): September 27 – September 28, 2023
17. California Men's Colony (CMC): October 10 – October 11, 2023
18. Salinas Valley State Prison (SVSP): October 12 – October 13, 2023
19. High Desert State Prison (HDSP): October 31 – November 1, 2023
20. Pelican Bay State Prison (PBSP): November 2 – November 3, 2023
21. Central California Women's Facility (CCWF): November 14 – November 15, 2023

### Psychiatric In-Patient Programs (PIPs)

1. California Medical Facility (CMF) PIP: January 9 – January 10, 2023
2. California Health Care Facility (CHCF) PIP: January 11 – January 12, 2023
3. Salinas Valley State Prison (SVSP) PIP: February 7 – February 8, 2023

    4.  California Institution for Women (CIW) PIP:  May 15 – May 17, 2023
    5.  San Quentin State Prison (SQ) PIP:  May 23 – May 25, 2023

Consistent with prior re-audit assessments, this reviewer examined each facility's performance with the following suicide prevention measurement tools:

- Thoroughness and degree of privacy afforded during the intake screening process at all facilities, as well as the Reception Center (RC) process at three facilities
- Psychiatric technician (PT) practices in restrictive housing units (RHUs)[1]
- MHCB practices, including verification of required observation of suicidal patients
- Use of suicide-resistant, retrofitted cells for MHCB patients and new-intake IPs assigned to RHUs
- Use of alternative housing for IPs awaiting transfer to MHCBs
- Suicide risk assessments for emergent/urgent mental health referrals and admittance/ discharge from an MHCB or alternative housing
- Safety planning for suicidal IPs/MHCB supervisory review of safety plans
- Appropriate follow-up services provided by clinical and custody staff to IPs discharged from an MHCB or alternative housing
- Custody rounds in restrictive housing units
- Compliance with cardiopulmonary resuscitation (CPR) and suicide prevention training
- Review of meeting minutes, quorums, and required procedures of the local Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

At the PIPs, this reviewer re-audited the defendants' compliance with its "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response," policy (No. 12.11.2104.P1), effective December 31, 2020.  ECF No. 7010.  The assessment included, but was not limited to, examination of suicide prevention training; assessment of suicide risk upon admission, during placement, and upon discharge; observation of suicidal patients; placement of suicidal patients in suicide-resistant rooms; provision of clothing commensurate with the level of suicide risk; provision of out-of-cell activities; and safety planning.

All suicides which occurred during the review period in the audited prisons were reviewed through examination of the patients' health care records via the Electronic Health Record System (EHRS), CDCR Suicide Reports, and Quality Improvement Plans (QIPs).

When the *Coleman* court issued an order adopting this reviewer's fourth re-audit report in full on December 3, 2020, ECF No. 6973, this reviewer's methodology in conducting the suicide prevention assessments was also addressed.  In that order, the court addressed objections by the defendants regarding this reviewer's measurement of compliance with Suicide Precaution and

---

[1] Beginning in November 2023, CDCR began a process of converting administrative segregation units (ASUs), Security Housing Units (SHUs), and Psychiatric Services Units (PSUs) into restrictive housing units (RHUs).  Suicide prevention requirements remained unchanged in these housing units. The terms ASU and RHU are used interchangeably throughout this report.

Suicide Watch observation requirements, and the 90 percent and 100 percent compliance standards recommended by the Special Master for determining compliance with this reviewer's recommendations. In addition, the court addressed the defendants' request for additional guidance from this reviewer regarding the "data and metrics" used during the suicide prevention assessments. The court overruled defendants' objections, stating that this reviewer's "methodology is sound for the purposes of assessing whether defendants are in fact using the tools available to them to cure the longstanding failure to meet the Program Guide requirements for observation of suicidal inmates." ECF No. 6973 at 7. The court further held that its "adoption of the Special Master's recommendation concerning particular percentage compliance standards with respect to individual provisions of the remedy does not violate the requirements of 18 U.S.C., Section 3626 (A)(1)(a) by moving away from the requirement of the Eighth Amendment." *Id.* at 9. Finally, regarding this reviewer providing additional guidance regarding data and metrics, the court found that the exit meetings after each site visit and the "detailed information provided in the report" provided defendants sufficient information to guide them "in the necessary remedial effort required before the start of [the] fifth round re-audit." *Id.* at 10. The court also found that defendants had made no showing that persuaded the court to require a change in this reviewer's "well-established and transparent auditing practices." *Id.*

Finally, although there were no Suicide Prevention Management Workgroups (SPMWs)[2] scheduled during the review period, this reviewer continued to participate in monthly Suicide Prevention Update meetings during which CDCR's Suicide Prevention and Response Unit (SPRU) leadership provided updates regarding implementation of the remaining 15 court-ordered suicide prevention recommendations regarding the prison facilities that remain out of full compliance. This reviewer and several other members of the *Coleman* Special Master team also attended weekly SPRU team meetings and monthly statewide SPRFIT meetings. Finally, at the direction of the Special Master, this reviewer and other members of the *Coleman* Special Master team regularly participated in development and/or review of multiple CDCR suicide prevention-related policies and memoranda during 2023 including, but not limited to, Safety Planning, Suicide Risk Evaluation Mentoring Program, update to Suicide Prevention and Response Focused Improvement Teams, and periodic revisions of the Suicide Prevention On-Site Audit Guidebook.

## III.    Status of Remaining Recommendations Not Fully Implemented by the Defendants

In its September 3, 2020 Order, the *Coleman* court made clear that defendants must "completely and durably implement" this reviewer's recommendations "to allow comprehensive assessment of their efficacy in reducing the ongoing number of foreseeable and/or preventable inmate suicides in California's prison system". ECF No. 6846 at 22.

---

[2] On July 12, 2013, the *Coleman* court ordered the establishment of a Suicide Prevention Management Workgroup (SPMW) to address longstanding suicide prevention deficiencies within CDCR facilities. ECF No. 4693. The SPMW, established by CDCR under the supervision of the Special Master, held periodic meetings from 2013 through 2020.

This reviewer's preceding report, "The Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs," ECF No. 7636-1, found that three recommendations (pre-service suicide prevention training, intake screening consistently provided inside the nurse's office, and IPs housed in alternative housing provided a bed and released with 24 hours) had been fully resolved, with 15 recommendations still not fully implemented. In its order adopting the fifth re-audit report in full on January 6, 2023, the *Coleman* court found that the "defendants do not dispute they have failed to implement fifteen of the court-ordered recommendations sufficiently for Mr. Hayes to report full implementation." ECF No. 7696 at 21. The court then ordered the defendants to "file a brief report with focused updates on the status of all fifteen outstanding court-ordered suicide prevention recommendations as of the end of calendar year 2022." ECF No. 7696 at 22.

On January 19, 2023, the defendants filed "an updated activation schedule focused on those fifteen recommendations as well as a description of CDCR's suicide prevention self-monitoring program and how it will help ensure full implementation of those recommendations." ECF No. 7706 at 3. The defendants also stated that:

> While sustained compliance has not been fully achieved for the fifteen outstanding recommendations, Defendants have developed new, or modified existing, policies, procedures, trainings and other resources to correct noted deficiencies…. During this evaluation stage, Defendants' Statewide Suicide Prevention and Response team members are touring and evaluating institutions quarterly with rounding intervals dependent on severity and quantity of the identified deficiencies.

ECF No. 7706 at 4.

Review of the defendants' activation schedule indicated that not only had full implementation of the 15 recommendations not been achieved, but the schedule simply updated the status of each recommendation with references to updated policies and training, promises of on-going monitoring, expression of "TBD" (to be determined), and/or completion dates projected out later into 2023. Following a status conference on February 10, 2023, the court issued a minute order on February 15, 2023 directing "that within fourteen days from the date of this Order, Defendants shall file a report with focused updates on the status of all twenty-seven actions set out at pages 67-70 of the Fifth Re-Audit Report." ECF No. 7731. The defendants filed the required report on March 1, 2023. ECF No. 7750.

On February 28, 2023, the *Coleman* court found that:

> …further delay in the defendants' full implementation of the required suicide prevention measures is unacceptable. The court therefore sets a final deadline for full implementation of all suicide prevention recommendations and put defendants on notice that failure to come into full and permanent compliance will be enforceable by civil contempt and, if necessary, monetary sanctions.
>
> Mr. Hayes' re-audit reports provide the factual foundation for the court's assessment of defendants' compliance with the court's orders to implement the

required suicide prevention measures.  For the last two re-audit rounds, defendants have not met deadlines for compliance.  The court deferred ruling on the Special Master's request that he be ordered to provide a further re-audit report pending the February 10, 2023 status conference.  The Special Master has now advised the court that, if ordered to do so, Mr. Hayes would start his sixth re-audit at the beginning of April 2023.

Accordingly, defendants shall complete implementation of all outstanding suicide prevention recommendations on or before April 1, 2023 so that implementation is complete before Mr. Hayes starts his sixth round re-audit.

ECF No. 7743 at 3-4.

As previously indicated, this reviewer's sixth re-audit commenced on April 4, 2023 and concluded on November 15, 2023.  With this current assessment, this reviewer is still unable to report that defendants have "completely and durably implemented" the remaining 15 recommendations.  In fact, this current sixth re-audit found that only one (Recommendation 20) of the 15 remaining recommendations has been fully implemented.  As stated in previous reports and continuing herein, many of the overall deficiencies identified by this reviewer during the current assessment continued to be easily observable and should not have been identified for the first time by this reviewer, but rather by the local SPRFITs and/or a viable continuous quality improvement process.

As indicated in Table 1 and Table 2 below, findings from this sixth re-audit of suicide prevention practices continue to be problematic.  Table 1 lists each of the 15 "Suicide Prevention Recommendations Remaining to Be Fully Implemented," as well as a brief summary of their current status following completion of this sixth re-audit:

## TABLE 1

| Court-Ordered Recommendations | Implementation Status |
|---|---|
| **Recommendation 3**:  Ensure that all custody and health care staff receive both pre-service and **annual suicide prevention training**. | *52% (11 of 21) compliance* <br> *Full implementation has __not__ been achieved; there continue to be multiple audited facilities with combined disciplines (custody, medical, and mental health) under 90 percent compliance with annual suicide prevention training. See pages 53-54 of this report for details.* |
| **Recommendation 7**:  The nurse's office should be of sufficient size to conduct adequate **intake screening** and the door to the office (which should contain a large viewing window) should remain closed during the screening process. | *80% (16 of 20) compliance* <br> *Full implementation has __not__ been achieved; there continue to be multiple audited facilities in which **nurses did not always ask all 15 mental health/suicide risk questions** on the Initial Health Screening form.  See pages 15-16 of this report for details.* |
| **Recommendation 8**:  Nurse and officer safety should remain the top priority during the intake screening process.  If an IP's security classification or unknown security status creates a safety concern, the screening should be | *75% (15 of 20) compliance* <br> *Full implementation has __not__ been achieved; there continue to be multiple audited facilities in which intake screening took place in the presence of custody personnel, thus compromising **adequate privacy and confidentiality** for IPs, oftentimes* |

| **Court-Ordered Recommendations** | **Implementation Status** |
|---|---|
| conducted in the least restrictive setting that ensures both staff safety and IP **confidentiality**. | *because TTMs were not available.  See pages 15-16 of this report for details.* |
| **Recommendation 9**:  CDCR should revise its **SRE Mentoring** Program to eliminate its "graduation" component after completion of two adequate assessments, conduct ongoing mentoring throughout the year, and audit clinicians' SREs on a regularly scheduled basis. | *52% (11 of 21) compliance* *Full implementation has **not** been achieved; multiple audited facilities had compliance rates below 90 percent for either the seven-hour SRE training or SRE mentoring training.  See pages 35-40 of this report for details.* |
| **Recommendation 10**:  Each facility's SPRFIT should audit the quality of **completed SREs** on a monthly basis. | *71% (15 of 21) compliance (at 90%)* *Full implementation has **not** been achieved; completion of SRASHEs for IPs presenting as possible risk for suicide by expressing SI and/or engaging in SIB requires 100 percent compliance, and only two the facilities were at 100 percent compliance; six facilities were below 90 percent (or using a non-approved form).  **When 100 percent compliance rate utilized, compliance was only 10 percent (2 of 21)**.  See pages 35-40 of this report for details.* |
| **Recommendation 12**:  CDCR should ensure that there are a **sufficient number of suicide-resistant retrofitted cells** to house newly admitted IPs (i.e., those within their first 72 hours of their housing in the unit) and the IPs of special concern or heightened risk of suicide (e.g., IPs recently released from suicide observation status). | *65% (13 of 20) compliance* *Full implementation has **not** been achieved; despite CDCR's incremental construction project for new retrofitted new intake cells during 2021-2022, seven of the audited facilities continued to struggle with ensuring that all new intake IPs were in suicide-resistant retrofitted cells.  See pages 19-22 of this report for details.* |
| **Recommendation 13**:  CDCR should enforce its existing policy of **housing only newly admitted IPs in retrofitted cells**, and immediately re-house IPs remaining in the retrofitted cells beyond their first 72 hours. | *Same as above.  See pages 19-22 of this report for details.* |
| **Recommendation 17**:  CDCR should adopt the recommendations made in connection with SREs (Recommendations 9 and 10) set forth above, which will also improve **safety planning** contained in the SREs section above. | *10% (2 of 21) compliance* *Full implementation has **not** been achieved; the safety planning model was revised based upon prior problematic practices in plan development (with the new program initiated in February 2023), almost all facilities with MHCB units and/or utilized alternative housing were well under 90 percent compliance with safety planning completion at MHCB discharge, and only one audited facility conducted timely and adequate supervisory review of discharge safety plans.  See pages 40-47 of this report for details.* |
| **Recommendation 18**:  CDCR should develop a specific timetable for the **training** of all of its mental health clinicians on treatment planning for the suicidal IP, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment." | *71% (15 of 21) compliance* *Full implementation has **not** been achieved; multiple audited facilities had compliance rates below 90 percent for safety planning training.  See pages 40-47 of this report for details.* |

| **Court-Ordered Recommendations** | **Implementation Status** |
|---|---|
| **Recommendation 20**: CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits **psych tech practices** during daily rounds of mental health caseload IPs in administrative segregation and during weekly and bi-weekly rounds in the SHUs. | *95% (19 of 20) compliance*<br>*Full implementation has been achieved*; psych techs in almost all audited facilities accurately completed the Psych Tech Daily Rounds Form for MHSDS IPs and/or spoke with non-caseload IPs during daily administrative segregation rounds. See pages 40-47 of this report for details. |
| **Recommendation 21**: CDCR should enforce its Program Guide requirements authorizing only the two levels of **observation** which may be provided for suicidal IPs: (1) observation at staggered intervals not exceeding every 15 minutes on Suicide Precaution, and (2) continuous observation for IPs on Suicide Watch. | *56% (10 of 18) compliance (at 90%)*<br>*Full implementation has <u>not</u> been achieved*; although CDCR developed an automated "Mental Health Observations Reporting Tool" designed to assist nursing supervisors in auditing the observation of suicidal patients in MHCB units, <u>none</u> of the audited facilities with MHCB units achieved the required 100 percent compliance with this measure. In addition, only 56 percent of facilities were over 90 percent compliant with <u>both</u> Suicide Precaution and Suicide Watch rounds. See pages 23-27 of this report for details. |
| **Recommendation 28**: All IPs discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at **30-minute intervals by custody staff**, regardless of the housing units to which they are transferred. | *35% (7 of 20) compliance*<br>*Full implementation has <u>not</u> been achieved*; low compliance rates were found in almost all audited facilities regarding the custody personnel requirement to accurately complete *Page 2* of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. See pages 47-50 of this report for details. |
| **Recommendation 29**: The length of time an IP is observed at 30-minute intervals following MHCB or alternative housing discharge should be **determined on a case-by-case basis by the mental health clinician** and clinically justified in the IP's treatment plan. No other frequency of observation should be authorized. | *25% (5 of 20) compliance*<br>*Full implementation has <u>not</u> been achieved*; low compliance rates were found in almost all audited facilities regarding mental health clinician requirement to accurately complete *Page 1* of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. See pages 47-50 of this report for details. |
| **Recommendation 31**: CDCR under the guidance of the Special Master, should re-examine and revise its local **SPRFIT** model to make the local SPRFITs a more effective quality assurance/improvement tool. | *33% (7 of 21) compliance*<br>*Full implementation has <u>not</u> been achieved*; the SPRFIT process was "rebooted" and several audited facilities continued to have problems maintaining monthly meeting quorums, did not always track Suicide Risk Management Program (SRMP) patients and report their current statuses during monthly SPRFIT meetings minutes. A few facilities did not conduct semi-annual root cause analyzes for serious suicide attempts (or case summaries to be discussed during monthly meetings), and several facilities did not provide documentation for corrective action plans resulting from this reviewer's prior assessment report and/or regional SPRFIT audits. Most facilities had local operational procedures (LOPs) for SPRFIT, "Inmate-Patients Receiving Bad News," CIT, and the SRMP. See pages 50-53 of this report for details. |
| **Recommendation 32**: CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions | *Full implementation has <u>not</u> been achieved*; multiple audited facilities with MHCB units had problematic practices regarding <u>Possessions and Privileges for Inmates in MHCBs</u>, |

| Court-Ordered Recommendations | Implementation Status |
|---|---|
| to address these additional miscellaneous issues: **Possessions and Privileges for IPs in MHCBs, Continuous Quality Improvement, and Reception Centers**. *See* ECF No. 6879 at 24-25 for specific discussion of remaining parts of this recommendation to be implemented. | *ranged from MHCB patients not receiving out-of-cell activities due to their maximum-security custody status, misunderstanding/misinterpretation of COVID-19 quarantine directives, incorrect belief that patients could only receive out-of-cell activities when they were approved for "full issue" clothing, and clinical misuse of safety smocks (see page 32). Regarding* <u>Continuous Quality Improvement</u>*, the Suicide Prevention On-Site Audit Guidebook is revised periodically (most recently in January 2024) and not fully implemented (see page 11). Finally, there were some problems in CDCR's three audited* <u>Reception Centers</u> *regarding diagnostic clinicians consistently reviewing nurses' Initial Health Screening forms, county jail records, and requesting signed release of information forms from IPs for outside medical records (see pages 66-70).* |

## IV.    Summary of Suicide Prevention Practices in CDCR's Prison Facilities

Table 2 below shows a comparison between the fifth re-audit and the current sixth re-audit findings. With one exception (Recommendation 20: Psychiatric technician rounds in restrictive housing units), CDCR has failed to fully implement this reviewer's remaining recommendations. In fact, several suicide prevention practices have even regressed since the prior assessment. Although the current re-audit found modest improvement in some areas, problematic practices continued to fester and remained in various stages of implementation. As indicated in Table 2, slight improvement was found in the observation of suicidal patients and emergent/urgent referrals resulting in suicide risk evaluations, but each area was below the 100 percent threshold for compliance. Other areas, such as clinical and custody follow-up from discharge and SPRFIT responsibilities (e.g., quorums, local operating procedures, tracking of corrective action plans, etc.) showed improvement, but were still below the 90 percent threshold for compliance. Other areas showed regression from the previous assessment, including use of suicide-resistant cells for newly admitted administrative segregation IPs, thorough completion of the intake screening process with reasonable privacy and confidentiality, offering clinically-approved possessions and privileges to MHCB patients, and both suicide risk evaluation and safety planning training.

In addition, although annual suicide prevention training for custody personnel was above the 90 percent compliance threshold, the same training for medical and mental health personnel was not. There also continued to be problems associated with reviewing relevant documents by diagnostic clinicians during the reception center process. The continuous quality improvement process continued to evolve. This reviewer and other members of the Special Master's team continued to view the suicide case review process as being comprehensive. Perhaps most problematic was implementation of the new safety planning model, with the current assessment finding non-compliance at all but two audited facilities.

**TABLE 2: Suicide Prevention Measure Compliance Rate Comparison Table[3] [4]**

| | Suicide Prevention Measure | Fifth Re-Audit Compliance Rate | Sixth Re-Audit Compliance Rate |
|---|---|---|---|
| | Initial health screening and receiving and release unit environment (**Rec. 7-8**) | 78% (18 of 23) | 80% (16 of 20) – Rec. 7 75% (15 of 20) – Rec. 8 |
| | Psychiatric technician (PT) practices (**Rec. 20**) | 86% (19 of 22) | 95% (19 of 20) |
| | Use of suicide-resistant cells for newly admitted IPs in administrative segregation units (**Rec. 12-13**) | 82% (18 of 22) | 65% (13 of 20) |
| | Practices for Observing MHCB Patients (**Rec. 21**) | 15% (3 of 20) | 56% (10 of 18) |
| | MHCB practices for possessions and privileges (**Rec. 32**) | 53% (10 of 19) | 33% (6 of 18) |
| | Mental health referrals and suicide risk evaluations (**Rec. 10**) | 61% (14 of 23) | 71% (15 of 21) |
| | SRE training (**Rec. 9**) | 65% (15 of 23) | 52% (11 of 21) |
| | Safety planning for suicidal IPs (**Rec. 17**) | Not reviewed | 10% (2 of 21) |
| | Safety planning training (**Rec. 18**) | 96% (22 of 23) | 71% (15 of 21) |
| | MHCB and alternative housing and efficacy of five-day clinical follow-up and custody welfare checks (**Rec. 28-29**) | 9% (2 of 23) | 35% (7 of 20) – Rec. 28 25% (5 of 20) – Rec. 29 |
| | Quorums at SPRFIT meetings | 26% (6 of 23) | 52% (11 of 21) |

---

[3] Of note, Section F (Practices for Observing Suicidal Patients) and Section I (Mental Health Referrals and Suicide Risk Evaluations) requires 100 percent compliance, whereas all other sections require a minimum of 90 percent compliance.

[4] Of note, the denominator in columns may vary depending upon on-site findings, e.g., 20 of 21 audited facilities had MHCBs, and one MHCB unit was temporarily closed during the on-site assessment period; one ASU was temporarily closed, one facility did not have any new admissions going through intake screening during on-site assessment, etc.

| | **Suicide Prevention Measure** | **Fifth Re-Audit Compliance Rate** | **Sixth Re-Audit Compliance Rate** |
|---|---|---|---|
| | (**Rec. 31**) | | |
| | LOPs for SPRFIT, Inmate-Patients Receiving Bad News, CIT, and the SRMP (**Rec. 31**) | 87% (20 of 23) | 81% (17 of 21) |
| | SRMP tracking by local SPRFIT (**Rec. 31**) | N/A | 62% (13 of 21) |
| | Local SPRFIT tracking of corrective action plans prior assessments (**Rec. 31**) | N/A | 81% (17 of 21) |
| | Suicide prevention training (**Rec. 3**) | 70% (16 of 23 – custody) 65% (15 of 23 – medical) 78% (18 of 23 – mental health) | 95% (20 of 21 – custody) 62% (13 of 21 – medical) 86% (18 of 21 – mental health) |
| | Continuous Quality Improvement (CQI) (**Rec. 32**) | Not all 19 suicide prevention measures included in either CQI Guidebook or facility CQI audit reports. | *Suicide Prevention On-Site Audit Guidebook* is revised periodically (most recently in January 2024) but not fully implemented; quarterly regional SPRFIT on-site reviews are not always timely and do not always include the required 19 suicide prevention measures. |
| | Reception center suicides (**Rec. 32**) | Review of relevant documents remains problematic. | Review of relevant documents by diagnostic clinicians remains problematic; required audits not reported in SPRFIT minutes of two reception center SPRFITs. |

### Staffing Shortages and Suicide Prevention Efforts

Finally, it was noteworthy that this sixth re-audit of suicide prevention practices was highlighted by this reviewer's continuing discussion with both mental health and custody leadership at most facilities regarding critical staffing shortages. These shortages have resulted in struggles to provide even routine clinical contacts to MHSDS IPs which in turn has resulted in

increasing frustration amongst IPs.  Not surprisingly, and as seen by Table 3 below,[5] there have been increases in mental health crises and/or discord by IPs throughout CDCR prisons, resulting in incremental increases in emergent/urgent mental health referrals, use of alternative housing and subsequent MHCB rescissions, and discharge custody follow-up assessments.  Of note, only MHCB censuses have remained static.



Table 3

---

[5] All data regarding emergent/urgent mental health referrals, use of alternative housing/subsequent MHCB rescissions, and MHCB censuses generated by CDCR's Statewide Mental Health Program.  Data regarding discharge custody follow-up assessments were based on the number of CDCR-7497 packets provided by each audited facility and examined by this reviewer during the fifth re-audit and sixth re-audit assessments.

Such increases have added further strain to already beleaguered staffing resources. The three data points in Table 3 correspond to the month (April 2022) that the fifth re-audit assessment ended, as well as the beginning month (April 2023) and ending month (November 2023) of the sixth re-audit assessment. As shown in Figure 1,[6] during this 19-month period, fill rates (including registry) were consistent at 87 percent for psychiatry, decreased from 73 percent to 60 percent for psychology, and decreased from 82 percent to 72 percent for social work personnel.



As discussed further throughout this report and in recently filed reports of the Special Master, staffing shortages have resulted in decisions by local mental health leadership to prioritize their suicide prevention responsibilities, resulting in a triage system of response (ranging from the highest priority of responding to emergent mental health referrals to the lowest priority of conducting treatment groups). For example, although each facility has designated clinicians to respond to mental health emergencies, full activation of crisis intervention teams (CIT) in at least six audited facilities was "paused" during the sixth re-audit assessment period. IPs requiring suicide risk assessments were infrequently offered the opportunity for private out-of-cell interaction with clinicians. In MHCB units, IDTT meetings were not always held within timelines, and patients on suicide observation status were not consistently being assessed by clinicians on a daily basis in some audited facilities. At CHCF, two MHCB units were closed due to staff shortages, while the MHCB unit at CCWF had a delayed re-opening due, in part, to lack of psychiatric staff. Regarding CQI, several chart audit tool assessments for suicide prevention had either been "paused" or declared as "optional" because of the staffing shortage. Vacancies in mental health supervisory positions also negatively impacted CQI efforts, including

_____

[6] All data regarding fill rates generated by CDCR's Statewide Mental Health Program.

suicide risk evaluation (SRE) mentoring, review (and quality) of safety planning, and SPRFIT. As noted later in this report, suicide case reviews arising from suicides during 2023 found multiple examples of staff shortages causing mental health contacts, as well as IDTT meetings, to occur outside *Program Guide* requirements. In addition, staff shortages negatively impacted compliance with annual suicide prevention training (for medical staff), as well as suicide risk evaluation training, and safety planning training for mental health clinicians.

Two audited facilities symbolized the impact of staffing shortages on the provision of adequate suicide prevention practices. At both the California Medical Facility (CMF) and CMF-PIP, severe shortages in mental health clinicians resulted CDCR permitting utilization of abbreviated suicide risk evaluation (SRE) and master treatment plan templates in both its outpatient and inpatient programs starting in March 2023. At CMF, the MHCB supervisor position was vacant, as were most mental health supervisory positions. Despite only three of 11 MHCB mental health clinical positions being filled, the 50-bed MHCB unit continued at capacity. The presence of only one primary clinician on-site during certain days of the week resulted in initial IDTT meetings being delayed and patients not being seen on a daily basis as required. Required safety planning for patients discharged from alternative housing occurred infrequently and was inadequate for MHCB patients. Required supervisory review of safety plans was also not being completed.

Similarly, at SVSP, the severe staffing shortage was symbolized by the lack of both a SPRFIT coordinator and MHCB supervisor, and adversely affected several suicide prevention requirements, including inadequate safety planning (and lack of supervisory review of safety plans) for both patients discharged from alternative housing and the MHCB unit, missing five-day follow-up assessments, and discharge custody checks. Deactivation of an administrative segregation unit due to a custody shortage resulted in a long-standing and problematic practice of directly placing new restrictive housing IPs into non-intake cells of overflow ASU housing units.

CDCR has acknowledged these statewide staffing shortages by stating in its "2022 Annual Report on Suicides and Suicide Prevention Efforts in the CDCR" that:

> This report on suicides that occurred in CDCR during 2022 would be remiss if it did not discuss the fact that there are significant and persistent staffing shortages that plagued many of the prisons in the CDCR system. While it is difficult to determine a direct nexus between staffing shortages and deaths by suicide in CDCR custody, it is important to recognize the impacts of reduced staffing. Provision of clinical care at levels consistent with the MHSDS Program Guide has been challenging at many institutions. As a result of these difficulties, institutions focus their limited clinical staff on the more acute and emergent needs of their programs.[7]

---

[7] *See* "Notice of Submission of the California Department of Corrections and Rehabilitation's Annual Report to the Legislature on Suicides in CDCR and 2022 Annual Report," ECF No. 8027 at 54 (filed October 18, 2023).

In conclusion, consistent with previous re-audit reports of suicide prevention practices, the following pages provide: (1) a brief summary of each of the main suicide prevention measurement tools and their relationship to this reviewer's original 29 recommendations; (2) current findings related to the implementation status of the remaining 15 recommendations and the reassessment of the 21 audited CDCR facilities; and (3) any further recommendations to remedy outstanding deficiencies.

### A)    Initial Health Screening and Receiving and Release Unit Environment

**Summary**:

The original recommendations (see previous Recommendations 6-8) focused upon two areas of intake screening in receiving and release (R&R) units: (1) the adequacy of the intake screening form and ensuring that all questions were asked during the process; and (2) the adequacy of privacy and confidentiality during the process. The issue of intake screening form adequacy was related to the presence of certain compound questions on the form, as well as the thoroughness of form completion by nursing staff. The issue of privacy and confidentiality was related to the practice of the door to the nurse's office remaining open during the screening process and/or officers stationed inside the office or at the door. In the preceding (fifth re-audit) assessment, 78 percent (18 of 23) of audited facilities had adequate intake screening practices in their R&R units, with problems found at CCI, CSP/Sac, NKSP, PBSP, and WSP. Because intake screening was consistently conducted inside the nurse's office, Recommendation 6 was previously found to be fully implemented.

**Current Findings**:

Problems continued to be found with accurate completion of all 15 mental health/suicide risk inquiry questions on the Initial Intake Screening form (Recommendation 7), and not always providing reasonable privacy and confidentiality during the intake screening process (Recommendation 8). With regard to Recommendation 7, nursing staff at four facilities were observed to not be addressing all 15 mental health/suicide risk questions on the Initial Health Screening form. For example, a CIM nurse inappropriately conflated the two "bad news" questions ("Have you recently received any bad news?" and "Did the patient receive any bad and/or unexpected news during a recent court hearing?") into one question. At SQ, the nurse was observed to not be asking all of the questions on the Initial Health Screening form and subsequently informed this reviewer that all questions were not asked because the IP had already answered affirmatively to several questions and was being referred to a mental health clinician.

During observation of two shifts at CMC, the intake nurse on the 2nd shift was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS; during observation of intake screening during the 3rd shift, that nurse failed to ask two IPs each of the following questions: "Have you recently received bad news?" and "Have you received any bad and/or unexpected news during a recent court hearing?" During intake screening for another IP, the 3rd shift nurse failed to ask the IP any of the required

questions regarding current suicidal ideation and prior history of suicidal behavior. Similar problems were observed at CHCF.

Regarding Recommendation 8, a nurse in the D-Yard nursing office at CCI emphatically stated that the door to the office always remained open during the intake screening progress. At three other facilities (CIM, CIW, and SVSP), the officer remained in the room and/or the door remained open, thus compromising both privacy and confidentiality. During the on-site assessment of WSP, the facility was in the final stages of completing construction of a new reception center building to house medical intake screening and mental health diagnostic testing. As such, and similar to prior assessments, the medical intake screening process continued to be housed in the existing R&R unit area, with five nursing stations in close proximity of each other located in a large corner room. The issue of privacy and confidentiality at WSP will presumably be corrected with opening of the new reception center building, and issues at CCI, CIM, CIW, and SVSP could have been easily averted if therapeutic treatment modules (TTMs) had been located in the nursing offices.

In conclusion, nurses were observed to be asking all 15 mental health/suicide risk questions at only 80 percent (16 of 20) of audited facilities, and adequate privacy and/or confidentiality during the process was observed at only 75 percent (15 of 20) of the audited facilities. In sum, eight audited facilities were observed to have problematic practices of nurses not asking all of the 15 mental health/suicide risk questions (CHCF, CMC, and SQ), not providing adequate privacy and/or confidentiality during the process (CCI, CIW, SVSP, and WSP), or both (CIM).

**Recommendation**:

CDCR should develop CAPs for the eight facilities (CCI, CHCF, CIM, CIW, CMC, SQ, SVSP, and WSP) referenced above related to the intake screening process.

### B) Psychiatric Technician Practices

**Summary**:

According to the MHSDS *Program Guide*, psychiatric technicians (PTs) are required to conduct daily rounds in all ASUs and weekly rounds in SHUs/PSUs "to attend to the mental health needs of all inmates, with documentation of their observations for each MHSDS inmate recorded on a Psych Tech Daily Rounds Form" (*Program Guide* at page 12-7-5). This reviewer's previous audits found inconsistent and problematic PT rounding in these units, primarily related to perfunctory rounds with little interaction with caseload IPs (see previous Recommendation 20). In the preceding (fifth re-audit) assessment, 86 percent (19 of 22) of the audited facilities had adequate PT practices.

**Current Findings**:

The current assessment found that 95 percent (19 of 20) of the audited facilities had adequate PT rounding practices in their restrictive housing units. Only one facility (CSATF) was found to have deficiencies. This reviewer observed two PTs conduct rounds in the STRH unit at

16

CSATF.  The first PT was observed to be appropriately interacting with all IPs, asked all the required questions from the Psych Tech Daily Rounds Form, and entered the information into EHRS.  Observation of the second PT was problematic.  Her interaction with IPs was based upon their demeanor, i.e., if the IPs were cooperative, she asked all the questions; if they were indifferent/uncooperative, she was indifferent and either asked the questions in a compound fashion, e.g., "Any MH concerns, Homicidal, Suicidal" in a very rapid fashion and/or entirely omitted suicide risk inquiry for caseload IPs.  Overall, however, Recommendation 20 was found to be fully implemented.

**Recommendation**:

CDCR should develop a CAP to correct PT deficiencies in CSATF's restrictive housing unit.

### C)    Suicide-Resistant MHCBs

**Summary**:

Previous audits found that, although most MHCBs were suicide-resistant, some were not (see previous Recommendation 32).  Problems found in several MHCB units included rooms with square-shaped stainless-steel sinks protruding from the wall which could be used as attachment points for a noose and thus were conducive to suicide attempts by hanging.  Other hazards included some rooms containing wall ventilation grates with holes that were larger than the industry standard 3/16-inch diameter, allowing for the possibility of being conducive to suicide attempts by hanging, as well as rooms with small gaps between the wall and window frame.  Assessment and findings regarding suicide-resistant MHCB units were part of several miscellaneous issues incorporated into Recommendation 32.  In the fourth re-audit report, this reviewer found that 94 percent (17 of 18) of the audited facilities had suicide-resistant MHCB units.  Because the 90 percent threshold had been met, this reviewer previously determined that this sub-section of the larger Recommendation 32 had been fully implemented.

The lone MHCB unit that remained out of compliance was at CCWF and this reviewer has continued to monitor a planned renovation project to correct physical plant deficiencies.  In November 2021, the MHCB unit at CCWF was closed for renovation, including repair of a designated observation room.  According to the work plan made available to this reviewer, the renovation would include "modification of 10 cells in the B Wing of Building 805 to include epoxy flooring, anti-ligature toilets, ADA (Americans with Disabilities Act) compliant anti-ligature sinks, anti-ligature handrails, modify combi-unit to anti-ligature, updated cell doors, updated security lights, updated electrical cover plates, updated fire sprinkler heads, updated cell window screens, and no-pick caulking."  The project was tentatively scheduled to be completed by June 30, 2022.

Finally, during previous on-site assessment at CCWF during the fifth re-audit, this reviewer determined that a TTM installed in B Wing's multi-purpose program room to address the deficiency of MHCB patients on maximum-security status not having access to out-of-cell activities in the room was not being routinely utilized.  Rather, according to several clinicians

who were interviewed at that time, the TTM was rarely utilized because the program room was utilized for other activities, including interdisciplinary treatment team (IDTT) meetings, group activities, and opportunity for telephone calls (for both medical and MHCB patients). These clinicians indicated that all clinical contacts with maximum-security MHCB patients either occurred cell-front or in a scenario in which the patient's door was opened and the patient was handcuffed and instructed to sit on their bed, with the clinician and officer standing in the open doorway of the cell. Such a practice was obviously very problematic and this reviewer informed CCWF leadership that such a practice needed immediate correction. More than eight months later in May 2022, this reviewer was informed that an additional renovation project to create a confidential interview room for maximum-security MHCB patients was in the early stage of development and an architect was tasked with presenting a preliminary plan for renovation by September 15, 2022.

As a result, the fifth re-audit report contained the recommendation that "CDCR and CCWF should develop an interim solution that could be implemented immediately while awaiting completion of a renovation project that still remains in the preliminary planning stage. Conversion of the large observation room into a program room for maximum-security MHCB patients, to include a TTM, would be a reasonable solution."

**Current Findings**:

The MHCB unit at CCWF reopened on October 16, 2023 after being closed for almost two years (since November 1, 2021) for renovation and lack of psychiatric staff (as stated in SPRFIT minutes of April 2023). During the renovation, all of the cells were renovated, including the aforementioned "observation room." Contrary to this reviewer's recommendation to convert the observation room into a program room for maximum-security MHCB patients, the room was converted into a patient room.

During the recent re-audit in November 2023, this reviewer observed the continued problematic practice of clinical interaction with maximum-security/RHU patients to occur bedside with custody staff inside the patient's cell or in the open doorway. Of note, renovation of a former seclusion room (No. B-68) into a clinical interview room in the B Wing had started one day prior to this reviewer's assessment on November 14. The room, large enough to accommodate a TTM, was scheduled to be completed within the next few months. Given the fact that private clinical space was limited for all MHCB patients, this room should be made available to all MHCB patients, i.e., both non-maximum security and maximum-security custody.

**Recommendation**:

CDCR should develop a CAP to expedite the renovation of the former seclusion room (No. B-68) in the MHCB unit at CCWF into a clinical interview/treatment room. Given the fact that private clinical space was limited for all MHCB patients at CCWF, this room should be made available to all MHCB patients, i.e., both non-maximum security and maximum-security custody.

**D)**     **Use of Suicide-Resistant Cells for Newly-Admitted Incarcerated Persons in Administrative Segregation Units**

**Summary:**

Pursuant to CDCR policy, all IPs initially placed in administrative segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-resistant for the first 72 hours.  This reviewer's previous audits found several problems regarding the housing of newly-admitted IPs in administrative segregation.  Original recommendations offered to address these deficiencies included ensuring there were a sufficient number of suicide-resistant retrofitted cells to house newly-admitted IPs (Recommendations 12) and enforcing existing policy requirements of only housing newly-admitted IPs in retrofitted cells and re-housing other IPs into non-new intake cells (Recommendations 13).

In order to address the insufficient number of new intake cells in administrative segregation throughout CDCR, the defendants began a construction project to retrofit 64 additional new intake cells in May 2021, coinciding with the start of this reviewer's fifth re-audit on-site schedule in May 2021.  The project was delayed for various reasons, including the impact of the COVID-19 pandemic, and was completed on April 27, 2022 which coincided with the conclusion of the fifth re-audit.  That fifth re-audit assessment indicated that 82 percent (18 of 22) of the audited facilities had adequate practices for placing new intake IPs in suicide-resistant cells, a noticeable improvement from the previous (fourth re-audit) assessment that had shown only 65 percent (13 of 20) compliance.

**Current Findings**:

This reviewer continued to find deficient practices in the placement of IPs into new intake cells.  During this current assessment, 65 percent (13 of 20) of the audited facilities were found to have adequate practices, a regression from the previous assessment.  Problems found in seven facilities (CIM, CMC, CSP/LAC, KVSP, RJD, SVSP, and WSP) continued to include IPs being placed in unsafe cells because all new intake cells were occupied (Recommendation 12); in other cases, new intake cells were available, but custody staff had not appropriately relocated the IPs (Recommendation 13).  At CIM, this reviewer observed that only two of the 14 new intake cells were occupied with IPs on 72-hour new intake status, but five other IPs on new intake status were in non-new intake cells.  Of these, three IPs were prematurely relocated from new intake cells earlier that morning (May 19, 2023) prior to the expiration of 72 hours; one IP was placed in an ADA cell (with a  CPAP machine) that was not suicide-resistant; and the fifth IP arrived into administrative segregation two days earlier on May 17 and an emergent mental health referral had been generated based upon the ASU screening indicating bizarre behavior, auditory hallucinations, current depression, and prior history of suicide attempts.  Despite this emergent mental health referral, the IP remained housed in a non-new intake cell located adjacent to an empty new intake cell.  The ASU lieutenant was subsequently notified of these deficiencies.

19

At CMC, this reviewer observed that all 16 new intake cells in administrative housing were empty on October 10, 2023. However, during observation of PT rounds that day, this reviewer noticed a new intake IP housed in a non-new intake cell. The IP was at EOP level of care and arrived on the unit two days earlier on October 8, 2023. He had a recent MHCB admission in September 2023. During the ASU pre-screening process on October 8, 2023, the IP expressed suicidal ideation and the CIT process was activated. He was subsequently assessed as not requiring an MHCB level of care but, inexplicably, remained in a non-new intake cell. Upon discovering the problem, this reviewer recommended to an ASU supervisor that the IP be correctly housed. Several hours later, during mid-afternoon of October 10, 2023, the CIT process was again activated for the IP due to suicidal ideation and safety concerns. This reviewer met the CIT at the ASU and, upon arrival, the IP was still assigned to a non-new intake cell. The CIT clinician and lieutenant were able to resolve the IP's concerns and it was determined that he did not require an MHCB level of care. Following the assessment, this reviewer again requested that the IP be rehoused in a new intake cell. The IP was correctly rehoused a few hours later. A similar incident occurred at RJD whereupon an IP on new intake status was placed into a non-new intake cell, went into crisis and, subsequently, cleared for rehousing, but returned to the same non-new intake cell.

Despite CDCR's efforts to increase the number of new intake cells statewide, some facilities have lost new intake cell availability because restrictive housing units were temporarily closed due to shortages of custody staff. For example, during the fifth re-audit, this reviewer determined that SVSP had 12 new intake cells in the STRH (Z-9) unit and six new intake cells in D-1 unit. During the current assessment on October 12, 2023, this reviewer was informed that the D-1 unit was deactivated in October 2022 and, therefore, the six new intake cells in that unit were no longer available. During inspection, this reviewer found that there were at least three restrictive housing IPs housed in designated "overflow ASU buildings," including D-2 and D-4 units which did not have any new intake cells. Upon closer examination, it was determined that these IPs had been directly placed from the yard into non-intake cells within both D-2 and D-4 units without first being housed in new intake cells within the STRH unit. This reviewer subsequently requested and received a listing of all IPs on restrictive housing status that were placed in ASU overflow buildings at SVSP since October 2, 2023. The data revealed that during the recent 11-day period of October 2, 2023 through October 12, 2023, there were at least 22 IPs directly placed from the yard into non-intake cells in D-2, D-4, D-6, and D-8 units. Each of these IPs should have been initially placed in new intake cells within the STRH unit. Not surprisingly, this reviewer was informed that the practice of daily utilization of overflow ASU housing began shortly after the deactivation of D-1 unit. Finally, this reviewer inspected the STRH unit on both October 12 and 13, 2023 and found that between 6 and 9 IPs housed in new intake cells were beyond the 72-hour requirement for new intake housing and should have been rehoused.

At KVSP, there were seven new intake cells in the ASU-1 and five new intake cells in ASU-2, but ASU-2 (housing GP IPs), had been closed due to under-staffing and scheduled to reopen later in the year. In addition, B-1 Unit was utilized as an overflow ASU for GP IPs and had 16 new intake cells that had been constructed sometime during 2022. Despite the large

number of new intake cells (albeit five were off-line due to temporary deactivation of ASU-2 at KVSP), there were concerns regarding the placement of new intake IPs in non-intake cells within the STRH (ASU 1) unit. This reviewer observed that there were two new intake IPs housed in non-intake cells during the afternoon of July 14, 2023. In the first case, the IP had been admitted into the unit on July 11, 2023 and initially housed with a cellmate until July 13, 2023. Per policy, the IP was required to be assigned a new cellmate or moved to a new intake cell within eight hours. Neither was done and the IP continued to be housed alone in a non-intake cell. The second case was more concerning. The IP had been sent to the STRH unit on July 3, 2023 and almost immediately expressed suicidal ideation and allegedly overdosed on his medication. He was directly admitted into the MHCB unit during the late evening of July 3, 2023. The patient remained in the MHCB unit for nine days before being discharged and returned to the STRH unit on July 12, 2023. Instead of being housed in a new intake cell as required, the IP was placed in a non-intake cell until observed by this reviewer two days later on July 14, 2023. A STRH sergeant informed this reviewer that the unit exceeded the seven new intake cells on a regular weekly basis and needed additional new intake cells.

At CSP/LAC, there were 12 new intake cells in the STRH unit and seven new intake cells in the EOP ASU Hub (D-5) that had been previously retrofitted to be suicide-resistant. During inspection of both units, although this reviewer did not observe any new intake IPs housed in non-intake cells within the EOP ASU, it was difficult to confirm the new intake status of IPs housed in the STRH unit because there were not any "ASU Door Tags" on many of the unit's new intake cells (as well as other cell doors) which designated the start and finish dates of the IP's 72-hour new intake status. Further, inspection of the recently opened C-5 ASU "overflow" unit found that it did not contain any new intake cells. Although a custody supervisor initially informed this reviewer that a new intake IP would never be placed in the C-5 Unit but, rather, would be housed in either the STRH or D-5 units for the initial 72 hours, at this reviewer's request, a subsequent review of SOMS by a lieutenant from the mental health compliance team (MHCT) found there were at least three new intake IPs placed in unsafe, dangerous C-5 cells on August 17-18, 2023 and, following a chart review, this reviewer found a fourth new intake IP placed in an unsafe, dangerous C-4 unit (that was previously utilized for ASU overflow) cell on July 29, 2023. Similar deficiencies at CSP/LAC were found during the fifth re-audit.

Finally, CDCR's Division of Adult Institutions issued an "Updated Process and Procedure for Restricted Housing Unit Program Intake Cell Usage Within California Department of Corrections and Rehabilitation Reporting" on December 1, 2023. The intent of the memorandum was to "provide clarification regarding intake cell utilization and tracking," as well as "streamline the accumulated information into a single document for efficiency and better business practice."

**Recommendation**:

Similar to the previous assessments, CDCR should develop CAPs at CIM, CMC, CSP/LAC, KVSP, RJD, SVSP, and WSP to ensure that newly-arrived administrative segregation IPs assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours

of administrative segregation confinement. IPs on new intake status should never be placed in an "overflow" administrative segregation unit unless that unit has designated new intake cells.

**E)**     **Use of "Alternative Housing" for Suicidal Incarcerated Persons**

**Summary**:

According to the *Program Guide*, an IP who meets the criteria for MHCB admission is required to be transferred to a crisis bed within 24 hours of referral. In the interim, as well as in those cases in which physical transfer does not occur within that timeframe, the IP is required to be placed in "Alternative Housing." The most recent policy enacted following issuance of the *Program Guide* relevant to Alternative Housing is Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), revised May 20, 2021. The policy listed the following preferred locations for housing suicidal IPs pending transfer to an MHCB: Correctional Treatment Center (CTC) licensed medical beds, Outpatient Housing Unit (OHU), OHU overflow cells, holding cells with toilets, holding cells without toilets, Triage and Treatment Area (TTA) or other clinic exam room, and other housing where complete and constant visibility can be maintained. Previous assessments found that suicidal IPs placed in alternative housing were often housed in hazardous, unsafe cells, not always observed on a continuous basis, and housed for more than 24 hours without a suicide-resistant bed and mattress (see previous Recommendation 26). During the preceding (fifth re-audit) assessment, 96 percent (22 of 23) of the audited facilities were found to have adequate practices regarding the use of alternative housing for suicidal IPs, and Recommendation 26 was found to be fully implemented.

**Current Findings**:

As previously indicated in Table 3 above, there was a notable increase in the use of Alternative Housing within audited CDCR facilities during the past year. For example, at CSP/LAC, there were 667 IPs placed alternative housing (an average of seven per day) from May 1 through July 31, 2023, with the overwhelming majority of MHCB referrals being rescinded and IPs returned to their respective housing units. This was a significant increase in the use of alternative housing at CSP/LAC since the previous assessment in April 2022 when 281 IPs were in alternative housing during a comparable three-month period.

Despite this increase, audited facilities (including CSP/LAC) were still able to discharge the vast majority of IPs from Alternative Housing within 24 hours. Problematic practices regarding reasonable provision of privacy and confidentiality when assessing IPs in Alternative Housing, as well as completion of adequate safety plans for IPs discharged back to their housing units, will be discussed in later sections of this report.

Although Recommendation 26 was found to be fully implemented during the previous re-audit and remains intact during this sixth re-audit, a problematic practice related to the placement of IPs in inappropriate Alternative Housing locations at CSP/LAC was noteworthy. During the suicide case review of an IP who died by suicide at CSP/LAC in November 2023, this reviewer found that, several months prior to his death, the IP was placed in Alternative Housing during the very early morning of May 19, 2023. Although initially housed appropriately in a wet holding

22

cell in the C-Yard medical area, the IP was later transferred to the D-Yard gymnasium and placed into a holding cage (referred to in CDCR policy 12.05.301 as "holding cells without toilets" in which the IP only has room to sit or stand). Contrary to CDCR policy which mandates that temporary housing of patients in these holding cells can never exceed four hours, the IP remained in the holding cell for six hours before the MHCB referral was rescinded and he was returned to his housing unit.

**Recommendation**:

No CAP is necessary regarding the incident cited above at CSP/LAC because, at the request of this reviewer, a quality improvement plan (QIP) was initiated as part of the suicide case review.

### F)    Practices for Observing MHCB Patients

**Summary**:

Historically, two issues have been encountered regarding the adequate observation of suicidal patients in the MHCB units. First, previous assessments by this reviewer found inadequate practices in the timely completion of required "Suicide Watch/Suicide Precaution Record" observation forms by nursing staff, including the falsification of observation forms for patients on Suicide Precaution status in the MHCB units (see previous Recommendation 21). CDCR finalized implementation of its EHRS in 2018 and nursing personnel were then required to enter the time into EHRS indicating that they observed each patient on either suicide observation (Suicide Watch or Suicide Precaution) or non-suicide observation status. Second, despite clear *Program Guide* requirements for only two levels of observation (i.e., Suicide Watch requiring continuous 1:1 observation and Suicide Precaution requiring observation at staggered intervals not to exceed 15-minutes), this reviewer observed some suicidal patients being observed in MHCB units at non-suicidal observation levels (e.g., 30-minute intervals) utilizing such terms as "mental health observation." As a result, CDCR reissued a memorandum entitled "Reminder: Level of Observation for Patients in Mental Health Crisis Beds" in April 2018 that specified orders for observation of non-suicidal MHCB patients "shall not be written for a frequency less often than permitted by the program's licensing requirements."

This reviewer has previously stated that observation of suicidal patients must be automatic; therefore, 100 percent compliance is required because failure to observe a suicidal patient can result in death by suicide within CDCR facilities. The preceding (fifth re-audit) assessment found that, although three of 20 (15 percent) facilities (CHCF, CSP/Sac, and NKSP) had minor problems (e.g., a few observation checks of one or two patients that were in excess of required 15-minute intervals) and were able to obtain 90 percent or more compliance with both Suicide Precaution and Suicide Watch observation, practices at the remaining 17 facilities were very problematic, with violations attributable to multiple nursing personnel during multiple days at each facility. None of the 20 facilities were at 100 percent compliance with this measure.

Finally, the California Correctional Health Care Services (CCHCS) developed an automated report in February 2022 that was designed to assist nursing supervisors in auditing the

observation of suicidal patients in MHCB units.  Entitled the "Mental Health Observations Reporting Tool," the automated program provides 1) a summary of a facility's overall rounding compliance rate of patients on Suicide Watch and Suicide Precaution, 2) easy-to-read documentation of each observation for each patient, and 3) a profile for each patient indicating their current and prior observation orders.  Although this reviewer did not formally utilize the "Mental Health Observations Reporting Tool" during the fifth re-audit because it was not available until late in the scheduled assessments, the effectiveness of the Tool was sampled against the time-consuming individual review of documented observation checks in EHRS charts.  This reviewer concluded that the Tool was very useful.

**<u>Current Findings</u>**:

During the current assessment, this reviewer exclusively utilized the "Mental Health Observations Reporting Tool" to measure the accuracy of observation rounds of patients on Suicide Precaution and Suicide Watch status in the MHCB units.  As this reviewer began to utilize the instrument, it was determined that, although the "Mental Health Observations Reporting Tool" accurately determines the percentage of timely compliance with Suicide Precaution and Suicide Watch observation, *it does not always account for every patient housed in the MHCB during a specific time period*.  For example, and as confirmed by CCHCS, if a patient was placed on Suicide Watch and initially housed in Alternative Housing before being transferred to a MHCB unit, that patient might be listed under another "care team" category instead of the MHCB unit within the Mental Health Observations Reporting Tool.

The current assessment found that, although none of the 18 audited facilities were at 100 percent compliance with this measure, eight or 56 percent of the facilities (CCWF, CHCF, CIW, CSP/Sac, CSP/Sol, CSATF, PBSP, and WSP) were able to obtain 90 percent or more compliance with both Suicide Precaution and Suicide Watch observation.  The highest compliance rates were 99 percent at CIW and SVSP for Suicide Precaution status, and the lowest compliance rates were 65 percent at MCSP for Suicide Watch status.  Overall, the compliance rate of 56 percent for <u>Recommendation 21</u> was an improvement from the fifth re-audit (15 percent).

In addition, a few facilities continued to have other unique problematic practices in the adequate observation of suicidal patients in MHCB units, with most problems issues related to suicidal patients being observed at 30-minute intervals.  For example, during the previous fifth re-audit in November 2021, this reviewer observed several IDTT meetings at KVSP in which patients expressed passive suicidal ideation and despite this concerning behavior, remained on Q-30-minute observation with "full issue" clothing.  During this current assessment, a similar practice was found in the medical chart review of several MHCB patients.  In one case, a clinician's progress note dated July 12, 2023 stated that the patient "reports passive SI, makes conditional threats of SH (self-harm)," but remained on 30-minute observation.  In a second case, the same clinician wrote a progress note on the patient on the same day (July 12, 2023) stating "PT reported passive SI with no plan or intent."  The patient remained on 30-minute observation.

At SQ, this reviewer's chart review found a case in which a MHCB patient was downgraded from Suicide Precaution to "behavioral observation" at 30-minute intervals on April 5, 2023 because the psychiatrist determined that the "patient has not exhibited any behaviors to suggest self-injury or suicide." However, the patient continued to be clothed in "partial issue" because "he continues to be confused and may have difficulty articulating his needs." Pursuant to policy, the provider's continued concerns regarding the patient should have resulted in continuation of Suicide Precaution status with partial issue clothing.

The problem was most pervasive at RJD. During the first day (August 21, 2023) of the on-site assessment, 12 of the 13 patients in the MHCB unit were on 30-minute observation. This reviewer examined the cases of several current or recent MHCB patients that remained on 30-minute observation despite consistently expressing suicidal ideation. The following four cases symbolize a concern that patients expressing SI and/or assessed as high risks for suicide were not under suicide observation status. One patient consistently reported suicidal ideation without a plan during his entire MHCB placement from June 28, 2023 through July 6, 2023. When allowed full issue clothing, the patient refused and felt unsafe in anything other than a safety smock or partial issue (t-shirt/ shorts). Despite this behavior, he remained on 30-minute observation. On June 30, 2023, a MHCB clinician stated in a progress note that the patient "believes he can endorse high SI, with no objective signs of distress." Ironically, this same patient was observed by this reviewer three days later during an MHCB IDTT meeting at CSP/LAC on August 24, 2023. He consistently displayed the same behavior within both MHCB placements at RJD and CSP/LAC, yet remained on Suicide Precaution status at CSP/LAC.

In the second case at RJD, the patient consistently threatened to engage in SIB if his needs were not met, but remained on 30-minute observation from August 19, 2023 through August 23, 2023. On August 22, 2023, an Acute ICF Pre-Admission Screening form noted that the "IP is accepted for PIP Acute. He was unable to stabilize in MHCB within 10 days and assessed as a high acute risk for suicide," yet remained on 30-minute observation until transferred. In the third case, the patient continued to be suicidal and assessed as a high acute risk of suicide justifying an APP referral on July 27, 2023, with a clinician stating in a July 27 progress note that: "Although he tends to minimize his sx, he continues to report when being prompted that he still has thoughts about suicide and does not act on them because he does not know how to kill himself…. He continues with HIGH ACUTE RISK for suicide." Of note, the clinician also stated that the 30-minute observation was justified because although continuing to express suicidal ideation, the patient "has denied suicidal ideation with a plan." The patient remained on 30-minute observation from July 18, 2023 through July 27, 2023, the date of APP transfer.

Finally, in the fourth case, this reviewer observed a MHCB clinician having an extensive cell front interaction with a patient on August 21, 2023. The patient had a significant history of SIB. He had recent severe lacerations on his forearms which required sutures. The clinician summarized their interaction in a progress note on August 21 that included the following:

Patient continues to demonstrate poor insight into his self-injurious behaviors and remains a danger to himself as well as others. His desperation to use the phone to

contact his wife has contributed to discord with custody resulting in aggressive posturing, refusal to comply with orders and him being assigned a cuffing chrono for out of cell activities. The distress this has caused has also resulted in self-harm on 08/19 via removal of his staples. He is not cooperative with or receptive to MH interventions and has not participated meaningfully in MH contacts since being admitted. Patient remains a danger to himself and others at this time. He is adamant self-harming behaviors are not with intent to die and identifies himself as a 'cutter.'

Despite such behavior and clinical concern, the patient remained on 30-minute observation.

A common narrative found in progress notes by MHCB clinicians to justify a 30-minute level of observation at RJD was that "IP has denied suicidal ideation with a plan within the last 24 hours. He does not display any acute signs of distress. He is engaging in safety planning and agrees to use call light system if starting to have unmanageable suicidal ideation." However, according to the *Program Guide*, "an inmate with suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precaution or Suicide Watch…When an inmate is in a MHCB because of high risk of attempting self-injurious behavior, but is not in immediate danger, he or she shall be placed on Suicide Precaution." *Program Guide* at 12-10-15. As indicated, the *Program Guide* does not have the prerequisite requirement of a suicide "plan" to justify Suicide Precaution status. Finally, despite repetitive narrative in progress notes that patients were "engaging in safety planning," none of the four reviewed cases contained any documentation to support such a statement.

Finally, although WSP was found to have a compliance rate over 90 percent for the observation of patients on Suicide Precaution and Suicide Watch and had an LOP that appropriately stated patients not on suicide observation status were required to be observed at 30-minute intervals, almost all patients housed in the MHCB unit remained on Suicide Precaution status in "partial issue" (t-shirt and boxers) until the day of their discharge. As such, it was not unusual for clinicians to complete the discharge SRASHE and safety plan one day prior to the anticipated IDTT meeting. Despite an assessment finding low acute suicide risk with recommendations for MHCB discharge, clinicians invariably maintained patients on Suicide Precaution status in partial issue with the following narrative: "Patient is currently on SP w/ nursing checks q11 w/t-shirt and boxers w/full issue for out of cell activities." Following the IDTT meeting, and generally within hours of physical discharge from the MHCB, patients were only then provided full issue clothing.

In summary, although none of the 18 audited facilities were at the required 100 percent compliance with this measure, 56 percent of the facilities were able to obtain 90 percent or more compliance with both Suicide Precaution and Suicide Watch observation, a notable improvement from the fifth re-audit when only 15 percent compliance was obtained. In addition, MHCB clinicians in at least two facilities (KVSP and RJD) were inappropriately placing suicidal patients on non-suicidal observation levels (e.g., 30-minute intervals).

**Recommendations**:

CDCR should develop CAPs for the eight facilities (CIM, CMC, CSP/LAC, COR, KVSP, MCSP, NKSP, and SVSP) that fell below 90 percent compliance with both Suicide Precaution and Suicide Watch observation for MHCB patients (although all CDCR facilities are required to be at 100 percent compliance).

CAPs should be created for both KVSP and RJD to prohibit the inappropriate placement of suicidal patients on 30-minute observation.

### G)    MHCB Practices for Possessions and Privileges

**Summary**:

Previous assessments by this reviewer found disparate practices with regard to privileges provided to medical versus mental health patients within CTCs. Whereas patients admitted into a CTC for medical purposes were generally eligible for recreation, visits, or telephone calls, such privileges were not always consistently available to MHCB patients. Recommendations were provided for CDCR to develop a directive(s) regarding guidance on clothing and allowable privileges for both suicidal and non-suicidal MHCB patients (see previous Recommendation 32).

CDCR subsequently issued multiple memoranda over the years to address issues of clothing, possessions, and privileges (i.e., out-of-cell activities) for MHCB patients. The first policy, CDCR's "State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the Mental Health Crisis Bed and Outpatient Housing Unit," became effective on October 29, 2013, and required male "inmate-patients not on suicide precautions or watch" to be issued "one pair blue denim jeans or one blue chambray shirt, or one jumpsuit…" Another memorandum, "Level of Observation and Property for Patients in Mental Health Crisis Beds" was issued on March 15, 2016. The directive required that "all orders shall detail what specific items may be issued to a patient. Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation."

On June 23, 2016, CDCR issued a memorandum on MHCB privileges entitled "Mental Health Crisis Bed Privileges." The directive stated that "IPs admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT." Out-of-cell activities included, but were not limited to, dayroom, recreational activities, and yard. The memorandum also stated that "The recreational therapist [RT] shall be responsible for facilitating all out-of-cell activity, and is expected to remain with the IP during these activities." In addition, the memorandum stated that MHCB patients were entitled to both telephone access and visiting privileges "unless specifically restricted by the MHCB IDTT." On February 14, 2017, a "Mental Health Crisis Bed Privileges Revision" memorandum was issued to reiterate that "The recreational therapist shall be responsible for facilitating all structured out-of-cell activity, and is expected to remain with the IP during these activities. Custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom." On April 18, 2018, CDCR issued a one-page "Reminder - Level of Observation for Patients in Mental Health Crisis Beds" memorandum that reiterated the frequency of observation for non-suicidal MHCB patients.

Finally, on April 24, 2020, CDCR issued a "Clarification of Allowable Property for Patients on Suicide Watch" memorandum. This one-page directive attempted to clarify "the expectations for allowable property given to patients on Suicide Watch… in all inpatient levels of care." The memorandum authorized licensed clinicians, following documentation of the clinical rationale, to allow patients on Suicide Watch additional items beyond the minimum required property.

Finally, in response to the COVID-19 pandemic and "the need for inmates to be able to maintain communication with family and friends, CDCR issued a "Revised Restrictive Housing, Reception Centers, Psychiatric Inpatient Programs Phone Calls" memorandum on April 13, 2020 that mandated the provision of telephone calls "at least once a week" in these housing units." In addition, Title 15, California Code of Regulations, Section 3044: "Inmate Work Groups and Privilege Groups," states that Privilege Group A and Privilege Group B have "Telephone access during the inmate's non-work/training hours limited only by institution/ facility telephone capabilities under normal operating conditions." The regulations also state that all Privilege Groups above A and B (with Privilege Group D generally assigned to RHU IPs) have "One personal telephone access per week during the inmate's non-work/training hours, limited only by institution or facility telephone capabilities under normal operating conditions."

Despite issuance of the seven memoranda cited above, practices in this area remained inconsistent and the preceding (fifth re-audit) assessment found that only 53 percent (10 of 19) of the audited facilities with active MHCB units had adequate practices regarding possessions and privileges provided to MHCB patients, a regression from the fourth re-audit which had found 67 percent compliance.

**Current Findings**:

The current assessment did not find any improvement in the provision of clothing, possessions, and privileges (i.e., out-of-cell activities) provided to MHCB patients (Recommendation 32). In fact, compliance regressed even further from the previous assessment with only 33 percent (6 of 18) of audited facilities (with active MHCB units[8]) were found to have adequate practices. Most of the deficiencies were found in the offering of out-of-cell activities or privileges. Although the vast majority of MHCB providers (either psychiatrist or psychologist) approved all out-of-cell activities during the first day of placement and documented their orders on an Adaptive Support Form (CDCR 128 C-2) that was required to be displayed on each patient's door, such orders were often ignored or misinterpreted.

In order to assess the offering of out-of-cell activities or privileges, this reviewer examined the CDCR 114-A forms for all MHCB patients in each audited facility. For example, the 114-A forms for 19 current MHCB patients at CHCF were reviewed, with two other forms excluded because the patients had only been on the unit for less than 48 hours. Of the 19 patients, most had been offered showers and telephone calls on a regular basis. However, although all of the patients had been approved for out-of-cell activities by providers, almost none were offered yard and/or dayroom consistent with 10 hours per week. For example, nine

---

[8] CCI did not have a MHCB unit, the MHCB unit at HDSP was temporarily closed for renovation, and there were no MHCB patients at SQ during the current assessment.

patients housed for four to six days were each only offered a total two or three hours yard/dayroom during that time period; two patients housed for 16 days were each offered only three and five hours of yard/ dayroom during those 16 days; two patients housed for 24 days were each offered only 12 and 13 hours of yard/dayroom during those 24 days; and one patient housed for 41 days was offered only 20 hours of yard/dayroom during those 41 days.  (Of note, this reviewer was informed that, regardless of custody status, only one patient was allowed out on the yard at a time in each MHCB unit at CHCF.)

At CIW, there were several problematic reasons why multiple patients were not offered out-of-cell activities, including lack of clinical documentation justifying why the privileges were withheld; one case in which provider orders authorized all out-of-cell activities, but the 114-A form completed by custody staff noted they were disallowed; and yet another case in which provider orders changed every day (no privileges one day, all privileges the next day, visits one day, but no yard/telephone call) despite consistent behavior by the patient during this time period.

In one very troubling case at CIW, a patient attended her IDTT meeting in the Walker Unit on May 16, 2023 clothed in a safety smock, was on Suicide Watch, continued to express suicidal ideation, and appeared very distraught about not being able to reach her mother in order to inquire about the status of her young children who had been taken out-of-state by their father.  Following the IDTT meeting, this reviewer asked the primary clinician why the patient's telephone calls and other privileges were being withheld.  The clinician initially responded by incorrectly stating that patients on Suicide Watch were not permitted telephone calls, but then stated that "this patient was too volatile, custody might have concerns, and a call might trigger worst symptoms."  This response was troubling for several reasons, including the fact that the patient was on constant observation and any adverse reaction to a telephone call would be easily observed by staff, as well as news regarding her children could reduce her depression.  More problematic was the fact that subsequent review of the patient's medical chart indicated that she had, in fact, been cleared for all out-of-cell activity, including telephone calls the previous day.  The patient was subsequently granted telephone access later that day.  (Of note, problems in providing patients access to approved out-of-cell activities in the Walker Unit were raised during the reviewer's fifth re-audit assessment.)

At CCWF, although 114-A forms for 13 current and prior patients housed in the MHCB unit during the previous two weeks indicated that all patients were provided with multiple opportunities for yard and showers during their placement, the 114-A forms did not contain any information regarding the offering of telephone calls.  The review also found that patients on maximum-security/RHU status rarely received the opportunity for telephone calls because the only available telephone was located on a wall of the MHCB unit's multi-purpose activity room that was not accessible to these patients because the TTM was located out of reach on the opposite wall.  In addition, due to scheduling conflicts, the telephones were only available to MHCB patients for one hour each day.

Deficiencies in the reasonable offering of out-of-cell activities in other facilities also included inappropriate use of "modified program" guidelines from a facility's Daily Program

Status Report or the inactive "COVID-19 Mandatory 15-Day Modified Program" memorandum by custody personnel.  For example, this reviewer examined 114-A forms for 18 current MHCB patients at CSP/Corcoran who had been approved for all privileges.  The review found there was a major communication breakdown between the provider orders and offering of out-of-cell activities by custody staff.  In almost all of the 18 cases, the provider orders stated that out-of-cell activities were approved after the first day of MHCB admission.  However, apart from showers which were offered three times per week, very few patients were offered yard/dayroom or telephone privileges during their MHCB placement, with the 114-A forms incorrectly stating that the patient was "Not Cleared."  These findings were similar to that found during the previous assessment in which custody staff were incorrectly denying MHCB patients access to the yard because parts of the facility (not including the CTC) were on "quarantine" status, misinterpreting CDCR's "COVID-19 Mandatory 15-Day Modified Program" memorandum, effective since January 6, 2022, that not only allowed for these out-of-cell activities, but even created exemptions for restrictive housing units, CTCs (including MHCB units), and PIPs.  In addition, custody staff were denying patients yard privileges despite the fact these same patients were allowed out of their cells to attend IDTT meetings and shower (three times a week).

At CSATF, four patients were in the MHCB during a recent 14-day modified program "to conduct an annual mass institutional search of the entire institution," resulting in a Daily Program Status Report (PSR) that was in effect from June 6, 2023 through June 19, 2023.  Under this PSR, showers and visiting remained under normal schedules, with yard, dayroom and telephone calls list as "modified," meaning "normal after daily searches."  Although it remained unclear if patient cells in the CTC/MHCB were searched during this 14-day period, despite being on modified program (i.e., resuming normal activities following searches), review of the 114-A forms for these four patients indicated that none were permitted any out-of-cell activities (except to shower) based upon the misuse or misinterpretation of the PSRs.  This same issue occurred during the fifth re-audit at CSATF and remained unresolved.

Deficiencies were also noted when correctional counselors (CCs) in the MHCB units incorrectly interpreted CDCR policies regarding maximum-security/RHU IPs.  At CSP/Sac, the CC Is were wrongly informing maximum-security/RHU patients during MHCB IDTT meetings that they were prohibited from personal telephone calls except in emergencies.  CC Is in other facilities incorrectly told similarly classified patients that telephone calls were only offered every other week.  For example, during an IDTT meeting observed at RJD on August 21, 2023, the CC I incorrectly informed a patient on maximum-security status that he was only eligible for a telephone call every two weeks.  Following the meeting, a MHCT lieutenant spoke with the CC I to reiterate that, pursuant to Title 15 and CDCR policy, maximum-security patients were generally permitted weekly telephone calls.

During the on-site assessment at CIM, 15 patients were on Suicide Watch, with 13 clinically-approved for out-of-cell activities.  However, during the IDTT meetings on May 18, 2023, the CC I consistently and wrongly told patients on Suicide Watch that they were not eligible for out-of-cell activities until they were cleared from Suicide Watch and approved for full issue clothing.  IDTT clinicians did not correct the CC I during the IDTT meetings on May

18.  Following this reviewer's intervention, the same CC I was observed during IDTT meetings the next day to be correctly interpreting the policy by informing patients on Suicide Watch that they had been clinically-approved for out-of-cell activities.

At PBSP, there was disparity between the policy and practice regarding use of mechanical restraints for non-maximum-security MHCB patients, as well as the availability of telephone calls for certain patients.  In one case this reviewer observed on November 3, 2023, a non-maximum-security (Level 2) patient was escorted into the IDTT meeting in mechanical restraints and placed in the TTM with the door locked.  The restraints were left on the patient. When this reviewer inquired as to the rationale for a non-maximum-security patient to be in mechanical restraints, the CC II responded by stating the patient was a "Level 2 from High Desert" and had not yet been cleared to be a "Level 2 from Pelican Bay."  When the patient left the meeting, the CC II further stated that because "Level 2 inmate workers were working in the CTC, Level 2 and above patients had to be cuffed" until they were classified as "PBSP Level 2." This reviewer had never heard such an explanation at other CDCR facilities, all of whom employed Level 2 IP workers in their CTCs.  This patient had been in the MHCB unit for 16 days awaiting PIP placement and it was unclear when, if ever, he would be cleared to be a "Level 2 from Pelican Bay."

According to CDCR's "Use of Mechanical Restraints in Psychiatric Inpatient Program and Mental Health Crisis Bed, updated September 5, 2023, "Non-Max incarcerated patients shall not be placed in mechanical restraints or TTMs (including unlocked TTMs) as a routine practice while housed in a PIP or MHCB," unless according to Title 15, California Code of Regulations, Section 3268.2, Subdivision (b)(2), "When a person's history, present behavior, apparent emotional state, or other conditions present a reasonable likelihood that he or she may become violent or attempt to escape."  As such, PBSP practices of utilizing mechanical restraints in the MHCB unit were inconsistent with CDCR policy.

Although most MHCB patients at PBSP (with the exception of patients cited above) were offered showers and yard time, many were not being offered telephone calls on a regular basis. This reviewer was informed that it was a local practice at PBSP to offer Privilege Group A patients telephone calls on a daily basis in the MHCB unit, with all other privilege groups offered telephone calls either "once every two weeks" or not at all (due to disciplinary reasons). Given the fact that most patients were only placed in the MHCB unit for up to 10 days, it appeared that most patients would never receive the opportunity for telephone calls unless they were in Privilege Group A.  In fact, the patient described above who was escorted to the IDTT meeting in mechanical restraints complained that he had been in the MHCB unit for 16 days and never offered a telephone call.  As noted above both CDCR's April 13, 2020 memorandum and Title 15, California Code of Regulations, Section 3044: "Inmate Work Groups and Privilege Groups" require either "telephone access during the inmate's non-work/training hours limited only by institution/ facility telephone capabilities under normal operating conditions" or at a minimum of "one personal telephone access per week."  As such, PBSP practices in the offering of telephone calls to many MHCB patients were inconsistent with both CDCR policy and Title 15.

The most egregious example of custody personnel misinterpreting policy regarding out-of-cell activities or privileges was found at CMF. On October 25, 2023, this reviewer examined the 114-A forms for approximately 47 patients admitted into the MHCB unit for at least 48 hours and found that, although many were eventually offered multiple opportunities for yard, shower, and telephone privileges at some point of their MHCB placement, such privileges were not always offered by custody personnel consistent with mental health provider orders. In addition, review of provider orders for these same patients indicated that, although most were clinically approved for out-of-cell privileges within 24 hours of admission, most were not offered these activities by custody personnel in a timely manner.

There were three primary problems identified by this reviewer at CMF. First, custody personnel were wrongly noting on 114-A forms that at least 30 percent (11 of 37) of patients clinically cleared for out-of-cell privileges by providers were "not approved" for those privileges. Second, there was incorrect policy interpretation by a custody officer and a CC1 on separate days (October 25 and October 26) suggesting that patients who were not on "full issue" clothing (i.e., they were only issued a safety smock or t-shirt/boxers) were prohibited from yard and telephone calls. Such a practice was not only problematic because it violated MHCB policy but was the exact poor practice that this reviewer found during the previous assessment. As stated in the fifth re-audit report on suicide prevention practices at CMF in May 2021, "the CC1 incorrectly stated to several patients during the observed IDTT meetings that they needed to be on 'full issue' prior to receiving out-of-cell activities." As such, the daily Adaptive Support Form (CDCR 128 C-2) that appeared on each patient's cell door in the MHCB unit and listing the approved out-of-cell privileges was being ignored by custody personnel. Third, it was noteworthy that, despite this reviewer being informed that 114-A forms underwent supervisory review prior to being scanned into the electronic record management system (ERMS), these poor practices continued to occur in an unabated fashion.

Although most of the above deficiencies were noted in the offering of out-of-cell activities or privileges, despite issuance of the seven memoranda, there were also examples of patients either not being offered privileges because of their clothing issue or unauthorized practices associated with their clothing issue. For example, there was confusion observed at WSP regarding the offering of yard privileges to patients on Suicide Watch and clothed in a safety smock. An RT who attended the IDTT meeting on April 18, 2023 initially stated that patients in safety smocks were prohibited from attending yard. Upon questioning by this reviewer, the RT stated they could be offered a uniform to attend yard. However, another RT wrote a progress note on a second patient that stated: "RT was not able to take out Pt. for treatment because he was still in his blue smock. Pt. asked why he could not come out today? RT told him because he has not been cleared to go out to treatment by clinicians." However, this reviewer's examination of the medical chart indicated the RT was wrong; the patient had previously been cleared for all out-of-cell activities as documented on the Adaptive Support Form (CDCR 128 C-2) generated from EHRS.

At CSP/Corcoran, two patients who had been approved for full issue clothing several days earlier arrived at their respective IDTT meetings on June 27, 2023 in partial issue (boxers/t-

shirt), with one patient stating (and later confirmed) that he only received his uniform to go out to yard. It was also later confirmed that this same patient was also clinically approved for an extra blanket, but the blanket was removed by custody for no justifiable reason. In addition, MHCB patients at CSP/Corcoran had historically not been offered yard privileges within the CTC because the yard attached to the MHCB unit had previously been determined to be unsecure for maximum-security patients. This reviewer first reported this problem in 2014, and CDCR previously responded that funding would be secured to address the deficiency. In the fifth re-audit, this reviewer recommended that CDCR provide verification for funding of a small management yard at CSP/Corcoran in its FY 2022/23 budget, and that such documentation be forwarded to the Special Master. No such documentation was ever received. In "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023, CDCR stated that "The BCP for funding of this request has been submitted and is currently under review through the approval process for FY23/24."

A previous recommendation in the fifth re-audit that "CDCR should issue a memorandum that specifically sets forth strict criteria for use of safety smocks in MHCB units. At a minimum, suicidal patients should never be issued both a safety smock and partial issue clothing (e.g., t-shirt and boxers), and patients on non-suicide observation status should never be placed in a safety smock," was responded to in the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023, as follows: "Statewide Mental Health Program is currently finalizing language of this policy and will route to internal stakeholders for review ahead of release to the field for implementation. This policy will clearly articulate the expectations for how to utilize safety smocks and blankets within MHCB settings." Such a policy was never forwarded to the Special Master.

One positive exception to inadequate practices of offering out-of-activities or privileges to MHCB patients in the re-audited facilities was found at CMC. With the exception of not documenting the offering of telephone calls, this reviewer's examination of 114-A forms for all 44 MHCB patients housed in the MHCB unit during the on-site assessment found that all patients were afforded multiple opportunities to shower, as well as other out-of-cell activities such as yard and dayroom. Of note, CMC had four full-time RTs assigned to the MHCB unit, and their daily availability (1 to 2 RTs per day) allowed for patients to be either in the yard or dayroom on almost a daily basis. The RTs also interacted cell front with patients during book exchange on a regular basis.

In summary, compliance with out-of-cell activities or privileges for MHCP patients continues to regress, with compliance falling from 53 percent in the fifth re-audit to only 33 percent in this sixth re-audit. Chronic poor practices continued to range from patients improperly not receiving out-of-cell activities due to their maximum-security custody status, misunderstanding/misinterpretation of Daily Program Status Reports, and/or incorrect belief that patients could only receive out-of-cell activities when they were approved for "full issue" clothing.

**Recommendations**:

CDCR should develop CAPs for 12 facilities (CCWF, CHCF, CIM, CIW, CMF, CSP/Corcoran, CSP/Sac, CSATF, KVSP, PBSP, RJD, and WSP) to remedy misuse of CDCR policies, including Daily Program Status Reports, and ignoring provider orders documented on daily Adaptive Support Form (CDCR 128 C-2) regarding the provision of authorized out-of-cell activities or privileges.

CDCR should issue a clarifying memorandum that mandates at least once a week telephone access absent any clinical contraindication and/or disciplinary sanction to remedy continued misinterpretation of CDCR policy regarding telephone privileges afforded to both non-maximum security and maximum security MHCB and PIP patients.

CDCR should immediately forward an updated draft policy that clearly articulates the expectations for how to utilize safety smocks and blankets within MHCB settings to the Special Master as pledged in the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023.

CDCR should immediately forward a status update on the BCP funding request of a small management yard (SMY) in the MHCB unit at CSP/Corcoran, as well as expedite construction of the SMY to the Special Master as pledged in the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023.

**H)    30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs, and Condemned Units**

**Summary**:

CDCR's requirement that IPs housed in administrative segregation be observed at 30-minute intervals has been in place since 2006, with IPs housed in SHUs requiring the same level of observation since 2013. Documentation was historically recorded by handwritten housing logs. In 2014, CDCR implemented the Guard One system to electronically verify 30-minute welfare checks of all IPs in administrative segregation during the first 21 days of their stays. Pursuant to a memorandum issued on May 9, 2014, the policy was subsequently revised to extend use of the Guard One system to all IPs in ASUs, SHUs, PSUs, and condemned units at staggered intervals not to exceed 35 minutes for the duration of their stays. This recommendation (found in a miscellaneous section of Recommendation 32) was found to be fully implemented in the fourth re-audit assessment. In the preceding fifth re-audit, found that all 20 audited facilities had adequate practices with Guard One compliance rates well above 90 percent in administrative segregation, SHUs, and PSUs.

**Current Findings**:

This reviewer's most recent assessment found that all (20 of 20) audited facilities with active restrictive housing units had Guard One compliance rates well above 90 percent in ASUs, STRHs, and PSUs. This high rate of compliance was diminished by the fact that four facilities

(CCI, CSP/Corcoran, CSP/Sac, and SVSP) experienced five suicides in restrictive housing between June 2022 and December 2023 in which decedents were either found in rigor mortis or irregularities were found in timely Guard One checks at time of death.

**Recommendation**:

No recommendations are offered related to this issue.

## I)    Mental Health Referrals and Suicide Risk Evaluations

**Summary**:

This reviewer's previous assessments found that, although all emergent/urgent mental health referrals for reported suicidal ideation (SI) and self-injurious behavior (SIB) resulted in an almost immediate response from mental health clinicians, these emergency referrals did not always result in completion of the required suicide risk assessments.  According to the MHSDS *Program Guide*, "Any CDCR employee who becomes aware of an inmate's current SI, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff.  The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation."  (*Program Guide* at 12-10-7).  The suicide risk assessment form currently utilized is entitled the Suicide Risk Assessment and Self-Harm Evaluation (SRASHE).

Further, because the quality of completed SRASHEs had historically been found to be problematic, previous recommendations included revision of the Suicide Risk Evaluation (SRE) Mentoring Program (12.04.201) and SRE Procedure (12.04.201P), effective January 17, 2013, and better auditing of SRE quality on a monthly basis by local SPRFITs.  Specifically, this reviewer's first assessment ("An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, filed on January 14, 2015, recommended that "CDCR should revise its SRE Mentoring Program to eliminate its "graduation" component after completion of two adequate assessments, conduct ongoing mentoring throughout the year, and audit clinicians' SREs on a regular scheduled basis" (see previous Recommendation 9); and "Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis" (see previous Recommendation 10).  The *Coleman* court adopted these recommendations on February 3, 2015.  ECF No. 5271.  Defendants previously agreed with this reviewer's assessments that the quality of completed suicide risk assessments throughout CDCR was problematic and agreed to issue the "Revision to the Suicide Risk Evaluation Mentoring Program" memorandum, last revised on March 10, 2016, and the "Clarification of Suicide Risk Evaluation Training Requirements" memorandum, last revised on March 24, 2016.  The memoranda included requirements for seven-hour SRE training every two years by clinical staff, annual training for clinicians regularly assigned to a MHCB unit, and auditing of at least one of every clinician's SRASHE every six months.

In addition, this reviewer observed that monthly minutes from various facilities' SPRFIT meetings consistently reported full compliance with timely completion of SRASHEs.  Although

35

this reviewer found that SRASHEs were generally completed in a timely manner, much of the data collected and reviewed by SPRFITs simply looked at timeliness and not whether SRASHEs were being completed for all mental health referrals related to SI and SIB.  In addition, while this reviewer has historically reviewed both emergency mental health referrals, as well as urgent mental health referrals (because such referrals frequently refer to SI and SIB and/or an IP expressed SI to a clinician during an urgent referral that had been initiated for other reasons), CDCR has historically only reviewed emergency mental health referrals to assess timely compliance.  See, for example, Defendants' most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed May 31, 2022), in which compliance is measured by "Auditing of Emergent Referrals with SRASHEs."

Finally, it was noteworthy that CDCR began to incrementally initiate crisis intervention teams (CITs) in its prison facilities beginning in October 2018.  Prior to the issuance of a statewide CIT policy, there were a variety of practices observed in the approximately 21 facilities that had initiated the CIT process.  Generally, a CIT encompassed a mental health clinician, nurse, and custody supervisor (often a lieutenant) who responded to, and attempted to de-escalate a mental health crisis.  When clinically indicated, the CIT was required to consult with a psychiatrist.  CITs normally operated during Third Watch (2:00 p.m. to 10:00 p.m.), with those facilities without a formalized CIT process deploying designated clinicians to respond to mental health emergencies.  When the mental health emergency involved an IP presenting with SI and/or SIB, a SRASHE was required to be completed by the CIT clinician.  Following the issuance of this reviewer's preceding (fourth re-audit) assessment, the "Crisis Intervention Teams" policy (12.01.700) became effective on July 8, 2021.

In conclusion, this reviewer has previously stated that completion of SRASHEs for IPs presenting as possible risks for suicide by expressing SI and/or engaging in SIB must be automatic; therefore, 100 percent compliance is required because failure to complete such an assessment can result in death by suicide within CDCR facilities.  The preceding (fifth re-audit) assessment found that only 61 percent (14 of 23) of facilities reached over 90 percent compliance with the required completion of SRASHEs, and only one (SQ) of the facilities was at 100 percent compliance (Recommendation 10).

**Current Findings**:

With input from the Special Master's experts, CDCR released a revised "Suicide Risk Evaluation Program Mentoring Program" policy [12.04.201 (P1)] on June 7, 2023.  The revised policy sought to increase the quality of completed SRASHEs by revamping the SRE training program.  Currently, "mentees" are now required to successfully complete the "SRE mentoring program" once through completion of SRE/SRASHE Core Competency Building 7-hour training, develop up to three adequate SRASHEs within the first 90 days under the supervision of a mentor,[9] be subject to periodic chart audit monitoring if inadequate SRASHEs are developed,

---

[9] According to the policy, "For institutions with a Mental Health Crisis Bed (MHCB) and/or Crisis Intervention Team (CIT), a mentor shall observe at least three departmental suicide risk evaluations, completed by a mentee within 90 calendar days of commencement of the mentoring

and then maintain compliance with annual suicide prevention training, annual safety plan training, and biennial SRE Mentoring Booster training. During this sixth re-audit, the reviewer found that only 52 percent (11 of 21) audited facilities had clinicians who were currently complaint with SRE training [i.e., had completed both the SRE mentoring program and annual or biennial SRE Mentoring Booster training as applicable (Recommendation 9)]. According to local mental health leadership at local facilities, this regression from findings of the fifth re-audit report were not surprising and attributable to systemwide clinical staff shortages and prioritization of other suicide prevention responsibilities.

This reviewer's current assessment also found continuing problems with the required completion of SRASHEs following either emergent or urgent mental health referral for SI or SIB (Recommendation 10). Most of these failures were again related to cases involving urgent mental health referrals. There were also cases in which SRASHEs were not completed when SI and/or SIB was identified during routine clinical contacts or following undocumented referrals in which urgent/emergent referrals were not generated. Although 100 percent compliance is required for this issue, the current assessment found that only 71 percent (15 of 21) of audited facilities achieved over 90 percent compliance with the required completion of SRASHEs. The six facilities under 90 percent compliance were: CHCF, CMC, CSP/Solano, CSATF, NKSP, and RJD. Only two (CCI and SQ) of the 21 facilities were at 100 percent compliance with this measure. This finding was higher than the preceding assessment, which found 61 percent of facilities were over 90 percent compliance.

At CHCF, the reviewer found from a sample EHRS review of 71 emergent/urgent referrals for SI/behavior that clinical staff had completed the required SRASHEs in only 89 percent (63 of 71) of the cases. The chart review of one case was very concerning. During the evening of April 13, 2023, an OHU patient expressed both suicidal ideation and homicidal ideation and was placed on Suicide Watch by an on-call psychiatrist. The following afternoon (April 14), he informed a nurse that was "psychologically overwhelmed" and could not remember anything from the previous day. When the nurse asked him if he was still suicidal and/or homicidal, the patient responded by saying "I am tempted." The patient was then moved to a holding cell on Suicide Watch. A few hours later, a clinician met with the patient in the OHU dayroom and inquired about his suicidal ideation. As noted in a progress note, the patient responded "Look at me. Does it look like I'm suicidal. Does it look like I can hurt myself? I'm paralyzed. Does it look like I can hurt someone if I'm stuck in bed?" The clinician did not complete a SRASHE, and the medical chart did not contain any documentation as to whether the patient was to be discharged from Suicide Watch or placed in the MHCB. Later that same evening (April 14), the same on-call psychiatrist from the previous evening reordered the Suicide Watch and stated in a progress note that:

> IP not seen directly. Care done via consultation with nursing. IP endorsed
> suicidal and homicidal ideations. He has a history of suicide attempt in the past

---

process…. For institutions without an MHCB and/or CIT, a mentor shall observe at least one departmental suicide risk evaluations, completed by a mentee within 90 calendar days of commencement of the mentoring process."

and has been deemed to be a moderate chronic risk of suicide. He was to be seen during the day for appropriateness in placement for crisis bed. Per nursing, he was not evaluated. Discussed with nursing the need to make sure MH assesses him tomorrow to determine if he should be moved to a crisis bed.

During the late morning of April 15, 2023, the patient had still not been assessed by a clinician, but a nursing progress note indicated that "I/P was on Suicide Watch, now place on Suicide Precaution, I/P said he's not suicidal he wanted to being able to go to day room. No acute form of distress or self-harm behavior at this time, will continue monitor for safety." A few hours later on April 15, the patient was seen by a clinician who wrote in a progress note that the patient was stable, denied any current suicidal ideation, and there was "no need for HLOC/MHCB at this time. Treatment team will continue to provide pt with appropriate support. Writer would recommend to consider EOP upgrade if pt experience further worsening of affect regulation and struggle to cope with his health complications."

There were numerous problems with this case, including, but not limited to, the following: 1) a SRASHE was never completed for this patient despite being seen by two different clinicians; 2) the patient was held on alternative housing status for almost 48 hours and never reported on alternative housing data provided to this reviewer; 3) the patient was stepped-down from Suicide Watch to Suicide Precaution apparently by verbal order of a provider and without an on-site assessment by a clinician; and 4) the patient was discharged from suicide observation status without either a safety plan or five-day follow-up assessment.

At KVSP, despite a high 98 percent compliance rate for completed SRASHEs based upon emergent/urgent referrals, there were concerns found in the lack of SRASHE completion in one of the suicides during the review period. During the IP's last clinical contact prior to his death, he confided to a clinician on June 8, 2022 that he had been told his mother was diagnosed with stomach cancer and "if my mom goes, it's gonna be all bad. I know I'd try to hang myself again. I've always had suicidal thoughts since I was a kid." Although not expressing a specific plan for suicide, the IP endorsed passive suicidal ideation, a loss of energy, low motivation, poor appetite, ruminating thoughts, and worsening auditory hallucinations. As the CDCR reviewer in the suicide case review noted, "Given the above concerns, it is unclear why a decision not to complete a SRASHE was made or if a level of care change was considered." The IP died five days later on June 13, 2022.

At RJD, a sample EHRS review of 50 cases of emergent/urgent mental health referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 90 percent (45 of 50) of the cases. However, this compliance rate was offset by the finding that 14 percent (7 of 50) of the reviewed cases incorrectly involved completion of the Columbia-Suicide Severity Rating Scale (C-SSRS) screening form, a violation of CDCR directives.[10] Beginning in

---

[10] Although the C-SSRS form might be appropriate as a screening tool for routine screening inquiry when an individual does not present with any known risk for suicide, the SRASHE is required when an individual expresses suicidal ideation or otherwise presents as a danger to self and requires a comprehensive suicide risk assessment.

March 2020, due to mental health program modifications resulting from COVID-19, clinicians throughout CDCR were temporarily permitted to utilize the C-SSRS screening form as an alternative to completing the SRASHE. This interim emergency practice was only permitted until CDCR resumed normal operations (which occurred in July 2022). Although the CMH at RJD informed this reviewer in August 2023 that the C-SSRS form was only being utilized due to the current staffing shortage at RJD, the CMH was informed that the mental health staffing shortage permeated most CDCR facilities, and all other facilities were no longer permitted to utilize the C-SSRS screening form as an alternative to completing the SRASHE. This reviewer also found that C-SSRS screening forms were sometimes incorrectly completed for IPs assessed in alternative housing at RJD. In addition, there were concerns found in the lack of SRASHE completion in one of the suicides at RJD during the review period.

CITs continued to play a prominent role in the response to emergency mental health crises in audited facilities. The CIT policy (12.01.700) became effective on July 8, 2021 and subsequently revised on July 6, 2022, and 21 CDCR facilities were initially identified to activate a CIT program. The current assessment found that 16 audited facilities had active CITs, with CITs "paused" at four facilities (CCI, CHCF, CMF, and CSP/Corcoran) due to insufficient staffing, and one facility (CSP/Solano) did not have a program. Although a majority (10 of 16 or 63 percent) of the CIT programs did not have any observed problems, there were a few noteworthy problems observed in six other CIT programs. These problems included lack of reasonable privacy and confidentiality during the CIT encounters at two facilities (CSP/LAC and CSP/Sac), lack of adequate record review at one facility (WSP), participation of a PT without an RN, supervising RN, or Senior PT (CSATF), the CIT process could not be assessed because the response was paused until the area was "staged" in preparation for this reviewer's observation (MCSP), and unauthorized use of a C-SSRS screening form to assess suicide risk (RJD).

**Recommendations**:

Although all CDCR facilities should be at 100 percent compliance with completion of SRASHEs for emergent/urgent mental health referrals involving SI and SIB, at a minimum, CAPs should be developed for the six facilities (CHCF, CMC, CSATF, NKSP, CSP/Solano, and RJD) that were under 90 percent compliance during this assessment.

In addition, CAPs need to be developed for the 10 facilities (CCI, CCWF, CHCF, CMC, CMF, CSP/Corcoran, CSATF, CSP/LAC, CSP/Solano, and PBSP) that had completion rates under 90 percent for both the SRE mentoring program and annual or biennial SRE Mentoring Booster training as applicable.

A CAP should be developed for RJD to ensure that clinicians are prohibited from utilizing the Columbia-Suicide Severity Rating Scale (C-SSRS) screening form as an alternative to the SRASHE when IPs present as possible risks for suicide by expressing SI and/or engaging in SIB, as well as when IPs are discharged from the MHCB and Alternative Housing when the reason for admission was danger to self.

It is also strongly urged that all CDCR facilities with a CIT program ensure that referred IPs receive continuous observation prior to the CIT arrival, offering of reasonable privacy and

confidentiality during the encounter, full team participation (by clinician, authorized nurse, and lieutenant/ sergeant), and adequate assessment by the clinician (including SRASHE completion and adequate record review).

     **J)**       **Safety Planning for Suicidal Incarcerated Persons**

**Summary**:

     Safety planning includes a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician can take if suicidal thoughts do occur. This reviewer's previous assessments, including the preceding (fifth re-audit) assessment, found that safety planning to reduce a MHCB patient's suicide risk was observed to be inconsistent during IDTT meetings, and the vast majority of safety plans developed by MHCB clinicians for suicidal patients were grossly inadequate and often simply repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-Day Follow-Up by Primary Clinician, provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the IP's suicide risk. In addition, there was little concordance between safety planning strategies developed within the SRASHEs that justified the discharge from a MHCB unit and subsequent five-day follow-up check notes written by clinicians to indicate that safety plan objectives were being addressed (see previous Recommendations 17-18).

     In an effort to improve the quality of safety planning throughout the prison system, the Statewide Mental Health Program (SMHP) previously implemented a safety plan model entitled "Safety Planning Intervention" (SPI) in August 2019. However, this reviewer's fourth re-audit assessment found that only 11 percent (two of 18) of the audited facilities had adequate safety planning practices. Based upon these poor findings, this reviewer recommended that CDCR decide whether to retain the SPI model or return to the original concept of safety planning, and that such a decision should be made well before this reviewer's scheduled fifth re-audit in May 2021. CDCR subsequently agreed with this reviewer's previous findings that the SPI concept within CDCR was problematic and needed to be replaced, as well as a return to the original concept of safety planning. The revision process was initiated a year later in August 2020, with completion of training and activation of the new safety planning process first estimated to be completed by May 2021. There were subsequently multiple delays in the process and these delays were generally supported by the Special Master's experts so that a durable solution to inadequate safety planning could be found.

     Thereafter, CDCR continued to refine the safety planning template and policy/procedure, as well as develop training curricula based upon feedback received during pilot training. However, according to the defendants' Suicide Prevention Activation Schedules, CDCR notified the Special Master and the *Coleman* court that implementation of the new safety planning program was going to be delayed until September 30, 2022, stating that "The delay is caused by the need to incorporate crucial updates to the training materials, COVID-19-related staffing shortages, and the diversion of resources to other court ordered projects, such as the Unmet Beds

Need Assessment and the Special Master's 29th Round of Monitoring."  ECF No. 7562 at 2 (filed May 31, 2022).

Further, in a separate but related effort to address inadequacies in safety planning, this reviewer recommended in 2017 that CDCR develop a process by which each safety plan contained within the SRASHE of a patient released from a MHCB unit would be reviewed in real time by a supervisor at that facility.  Without interfering with the physical discharge of the patient from the MHCB unit, any safety plan found to be deficient (i.e., not containing a reasonably specific strategy to reduce SI) would immediately be returned to the authoring clinician for revision.  Almost three years later on March 10, 2020, CDCR finally released the appropriate policy to address this issue.  The "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" (12.05.200.P4) required MHCB unit supervisors or designees to review the safety plan section of SRASHEs for patients discharged from a MHCB unit to ensure that the plans include "specific risk reduction strategies."

Due to the prolonged delay in the implementation of the revised safety planning program, this reviewer decided not to formally audit the quality of safety planning during the preceding fifth-reaudit assessment, as well as not audit the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy.  By the end of 2022, this reviewer simply concluded that the process had unnecessarily taken too long and recommended that "The new safety planning model should no longer be delayed."  ECF No. 7636-1 at 43.

**Current Findings**:

In its response to this reviewer's recommendation that the new safety planning model should no longer be delayed, the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023, stated that "Training sessions commenced for the field the week of February 13, 2023, and will continue through March 16, 2023.  The policy and procedure related to the new safety plan was released to the field on February 13, 2023."

The CDCR "Safety Planning" policy (12.07.901), effective February 13, 2023, finally codified this reviewer's previous recommendation that "All patients with an elevated risk of suicide or self-harm, as defined as having a suicide risk level of moderate or high, shall have an individualized safety plan that addresses signs, symptoms, and circumstances in which the patient's risk for suicide is likely to increase, how the recurrence of suicidal thoughts can be reduced or eliminated, and the specific actions the patient and staff will take if suicidal ideation and/or thoughts/impulses to engage in self-harm reoccur."  The safety plan policy applied to all patients released from Alternative Housing when the referral reason was for danger to self (DTS), as well anytime a patient was discharged from the MHCB and PIP when the referral was for DTS and/or the patient engaged in SIB or expressed thoughts of SI/SIB during the inpatient placement.

This reviewer's sixth re-audit commenced in April 2023, subsequent to the defendants' safety plan policy issuance and required completion of training.  Overall, and as shown below, the results were very poor, and the assessment found continuing problems with adequate safety

planning for both patients discharged from Alternative Housing and MHCB units. Specifically, only 10 percent (2 of 21) of audited facilities with an MHCB unit or utilized Alternative Housing demonstrated adequate safety planning (<u>Recommendation 17</u>). The only facilities that demonstrated adequate safety planning were CIW and SQ. Multiple problems were found with safety planning in all other facilities, the most prevalent of which was that many clinicians were simply cutting and pasting the same repetitive narrative into each category of the safety plan grid in EHRS regardless of its relevance to that category. For example, the following safety plan from CSP/Sac was permeated with redundancy that had little to do with specific strategies to reduce suicide risk:

<u>MH Safety Plan</u>

<u>Safety Planning Reason</u>: Discharge from MHCB/PIP or Alternative Housing

<u>Patient Participate - Warning Signs</u>: No

<u>Warning signs - Clinical Impressions</u>: ***I/P has low distress tolerance and is easily frustrated. He would benefit from extra support in PSU, as he will most likely become easily upset. He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

<u>Helpful reducing self-harm - Clinical</u>: ***I/P has low distress tolerance and is easily frustrated. He would benefit from extra support in PSU, as he will most likely become easily upset. He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

<u>Reduce Risk Factors - Clinical</u>: ***I/P has low distress tolerance and is easily frustrated. He would benefit from extra support in PSU, as he will most likely become easily upset. He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

<u>Patient History of Self Harm</u>: Yes

<u>Patient Participate - Self Harm</u>: No

<u>Past concerns resolved - Clinical</u>: ***Due, in part, to his low frustration tolerance, I/P has a Hx of claiming SI in order to get alternative needs met. He would benefit from extra support in PSU, as he will most likely become easily upset. He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

<u>Patient Reduce Risk Factors - Clinical</u>: ***Due, in part, to his low frustration tolerance, I/P has a Hx of claiming SI in order to get alternative needs met. He would benefit from extra support in PSU, as he will most likely become easily upset. He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

<u>Safety Concerns Identified</u>: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: No

Protective Factors - Clinical Impression: ***I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

Enhanced factors - Clinical Impressions: ***I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.***

Other safety plans were assessed as deficient when, after perceiving that the patient's expression of SI or engagement in SIB was primarily motivated by secondary gain (e.g., seeking a housing change, higher level of care, etc.), clinicians failed to develop a specific strategy to address the perceived manipulative behavior.  Both the new safety plan policy, as well as new training curriculum, specifically address this issue, with the "Safety Planning" policy (12.07.901) stating: "Patients with a pattern of threatening suicide or self-harm to affect external changes should have specific interventions developed to help identify the root causes of these behaviors and reduce the incidences of the threats of suicide or self-harm."  The 100-slide "Safety Planning Training" PowerPoint presentation, dated February 17, 2023, provided clinicians with instructions on how to identify "patients who engage in self-harm or threats of self-harm to affect changes in their environment (e.g., housing moves, drug-seeking, interpersonal stressors), as well as how to refocus the safety plan to address such behavior.  In fact, the Safety Plan template embedded into the EHRS has a section entitled "Self-Harm to Affect External Changes (under the "Patient History of Self-Harm" domain) specifically designed to address this assessed behavior.

Further, safety plans developed for patients released from Alternative Housing were also problematic, as demonstrated by the following plan developed at CSP/LAC for a patient returned to their EOP housing:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing

Patient Participate - Warning Signs: Yes

Warning signs - Patient focused: ***Transfer to a prison closer to family***

Warning signs - Clinical Impressions: ***Continue EOP LOC***

Helpful reducing self-harm - Patient: ***Transfer to a prison closer to family***

Helpful reducing self-harm - Clinical: ***Continue EOP LOC***

Reduce Risk Factors - Patient: ***"Keep myself busy"***

43

Reduce Risk Factors - Clinical: ***Continue EOP LOC***

Patient History of Self Harm: Yes

Patient Participate - Self Harm: No

Past concerns resolved - Clinical: ***Continue EOP LOC***

Patient Reduce Risk Factors - Clinical: ***Continue EOP LOC***

Despite the abundance of deficient safety plans, this reviewer also examined a few safety plans that adequately identified patients' suicide risk factors and offered specific strategies to reduce risk. The following example is provided from CHCF:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing

Patient Participate - Warning Signs: Yes

Warning signs - Patient focused: ***Thinking that others are trying to kill me.***

Warning signs - Clinical Impressions: ***Pt appears to struggle with psychosis, delusional thinking, and paranoia that others are out to kill him despite not being attacked for the past 24 years. Pt would benefit from CBT for Psychosis to challenge this unhelpful and inaccurate thinking to improve symptoms and functioning, and to reduce SI.***

Helpful reducing self-harm - Patient: ***Pt stated taking my medication.***

Helpful reducing self-harm - Clinical: ***Pt can benefit from ongoing education about Parole Board and what they look for in an inmate to be released. For example, pt heard from other inmates that if he takes medications or participates in mental health, PBH will not release him from prison. On-going psychoeducation about the importance of maintaining stability and that stability is a quality that PBH officers look for in a viable candidate for release would prove helpful in reducing risk, as pt connected not taking medications to worsened paranoia and past SA.***

Reduce Risk Factors - Patient: ***Take my medication and learn CBT skills.***

Reduce Risk Factors - Clinical: ***Pt appears motivated to program and learn coping skills through CBT for Psychosis to target SI, paranoia, and inaccurate thinking that contribute to SI and past SA. Structured sessions focused on this modality with handouts to which pt can refer addressing the CBT model, Cognitive Distortions, Alternative Thoughts and examples, and the Automatic Thought Record and examples focused on paranoia would prove helpful in reducing risk.***

Patient History of Self Harm: No

44

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: Yes

Protective Factors - Patient focused: ***Talking to my mother and my sister. Preparing for Parole Board Hearing in 2025.***

Protective Factors - Clinical Impression: ***Pt appears to have a close relationship to his family and encouraging virtual or in-person visits would improve functioning, as pt's relatives live nearby.  He appears more euthymic when discussing family.***

Enhanced Factors - Patient focused: ***Teach me CBT or DBT skills.***

Enhanced factors - Clinical Impressions: ***Pt appears motivated to learn CBT and, or DBT, which would be helpful in reframing inaccurate thoughts and teaching pt alternative coping skills to manage paranoid thoughts and distress, as in the case of DBT.  Pt would benefit from ongoing skills training in identifying and challenging distortions, as well as mindfulness meditation skills, as pt states "I can't relax," which suggests he needs practice and can benefit from ongoing review of grounding skills, deep breathing, and meditation, and daily practice to reduce anxiety, improve distress tolerance, and overall functioning.***

The current assessment also included review of the implementation of the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy (12.05.200.P4), effective March 10, 2020.  The policy was developed to better ensure that safety plans were written to include "specific strategies patients can employ" to reduce suicide risk.  The policy requires that "Prior to, or during the clinical discharge Interdisciplinary Treatment Team (IDTT) from the MHCB, the supervisor, or designee, shall review the discharge SRASHE…. After reviewing, if the SRASHE needs to be modified, the MHCB supervisor shall notify the clinician prior to, or during, the discharge IDTT of the changes that must be made."[11]  CDCR's "Safety Planning" policy (12.07.901), effective February 13, 2023, also reiterated the MHCB supervisor (or designee) responsibilities for timely review of discharge safety plans.

Compliance with supervisory review of safety plans for patients discharged from the MHCB was found to be abysmal during the current assessment, with only five percent (one of 19) of audited facilities with active MHCB units found in compliance.  The lone compliant

---

[11] The reviewer was informed that the Statewide Mental Health Program (SMHP) issued an email to the field on February 2, 2023 that the "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" would be in a "momentary pause" until the roll-out of the new safety plan model and chart audit tool (CAT) audit were completed.  The Special Master and this reviewer were not informed of this decision.  On April 5, 2023, following discussion with this reviewer, the SMHP issued a revised memorandum stating that, despite the pause in CAT audit completion, the supervisory review of MHCB safety plans would commence once again.

facility was RJD. There continued to be a myriad of reasons for non-compliance, including, but not limited to non-review or inadequate review because audited facilities lacked MHCB supervisors (e.g., at CMF and SVSP) or MHCB supervisors were otherwise distracted by other responsibilities due to staffing shortages, some supervisors were unaware of policies requirements, inadequate assessment when supervisors incorrectly perceived that safety plans were not required for discharged patients at low acute risk for suicide or when patients refused to participate in process, and reviews were untimely and conducted in anticipation of the chart audit tool (CAT) monthly deadlines rather than prior to or during the discharge IDTT meeting. Of note, despite the abundance of deficient safety plans found during this current assessment, the majority of MHCB supervisors or designees gave "pass" scores to reviewed safety plans, calling into the question the degree to which these supervisors had an adequate understanding of safety planning.

In the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023, CDCR stated that "HQ Suicide Prevention Coordinators continue to monitor this metric during their onsite monitoring tours and work with institutions that demonstrate deficient practices for this expectation and develop attainable corrective action for establishing sustainable compliance." Given the fact that this current assessment found abysmal compliance with the supervisory review of safety plans, the defendants' current monitoring has simply not worked.

Finally, the current assessment tracked compliance with safety plan training and found that only 71 percent (15 of 21) of all audited facilities had completion rates over 90 percent for safety plan training of clinicians (Recommendation 18). This finding is substantially less than found during the fifth re-audit when 96 percent completion of safety plan training was found.

In conclusion, this sixth re-audit assessment found profound problems in safety plan development, supervisory review of safety plans, and compliance with safety plan training.

**Recommendations**:

CAPs should be developed for the 19 facilities (CCI, CCWF, CHCF, CIM, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, and WSP) that were under 90 percent compliance with safety planning completion at MHCB and/or Alternative Housing discharge.

Separate CAPs should be developed to ensure that each of these 19 CDCR facilities with MHCB units are in compliance with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy requiring review and revision (when appropriate) of safety plans prior to, or during, discharge IDTT meetings.

CDCR should hold a one-day "safety planning summit" comprised of each facility's Chief of Mental Health, MHCB supervisor, SPRFIT coordinator, and other clinical representation or designees as the SMHP deems appropriate. The primary purpose of the summit would be to solicit input from the field as to why safety planning has met with poor initial results, clarify policy requirements and expectations, ensure that MHCB supervisors or designees

have an adequate understanding of safety plan development, and make modifications to the current model and training if appropriate.

**K)**     <u>**MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks**</u>

<u>**Summary**</u>:

Consistent with the need for continued safety planning of patients released from MHCB units and alternative housing to mainline, restrictive housing, and other housing units, this reviewer's prior recommendations included strengthening existing procedures for follow-up assessments by mental health clinicians and welfare checks by custody staff (see previous Recommendations 28-29). During the past few years, the defendants developed several memoranda and compliance forms to strengthen the follow-up process. For example, the "Interdisciplinary Progress Note – 5-Day Follow-Up" CDCR MH-7230-B form was released in March 2016, with an accompanying policy ("Release of Revised 5-Day Follow-Up Form") released on May 31, 2016. On January 27, 2016, CDCR released a joint DAI/SMHP memorandum entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." The policy required custody staff to observe an IP at 30-minute intervals for a minimum of 24 hours following MHCB discharge. The policy also required that a clinician perform daily mental health assessments to determine whether the 30-minute discharge checks were necessary beyond the minimum 24-hour requirement (up to 72 hours), or whether the IP required a referral back to a MHCB unit. Beginning in September 2017 and revised again on October 15, 2018, CDCR officials released a slightly revised memorandum ("Updated Mental Health Crisis Bed - Referral Rescission, and Discharge Policy and Procedures") to include IPs expressing SI and referred to, and discharged from, alternative housing.

In addition, a two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form, initiated in January 2016 and most recently revised in June 2021, is required to be completed by both clinical and custody staff. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

Finally, CDCR released the "Revision of Mental Health Crisis Bed Discharge Custody Checks Form and Introduction of Audit Requirement" memorandum on October 19, 2021 as a clarifying directive to require that any decision to discontinue custody checks must be made by as clinician following a face-to-face assessment. The memorandum also introduced a CAT to measure compliance with each component of the "Discharge Custody Check Sheet" (CDCR MH-7497) form process.

The preceding (fifth re-audit) assessment found only 9 percent (2 of 23) of audited facilities were complaint with the "Discharge Custody Check Sheet" (CDCR MH-7497) process by both clinical and custody staff, whereas this reviewer continued to find that clinicians (and nursing staff in their absence) consistently completed "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms embedded in EHRS in all 23 audited facilities.

**Current Findings**:

This reviewer's current assessment continued to find that clinicians were consistently completing the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form in EHRS. However, the assessment also found that only two (CIW and CMC) of 20 audited facilities, or 10 percent, had clinicians and custody personnel correctly complete both pages of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms in 90 percent or more of the cases, a negligible increase from the fifth re-audit report (9 percent). In addition, 50 percent (10 of 20) of the audited facilities had neither clinicians nor custody personnel correctly complete both pages of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms in 90 percent or more of the cases.

During this most recent assessment, problems continued to be found in clinicians not accurately completing the first page; clinicians discontinuing custody checks in less than the required 24 hours; custody checks performed in excess of 30-minute intervals; and long gaps in time of required custody checks. The overall compliance rate for the correct completion of Page 1 by clinical staff was 25 percent (5 of 20) for Recommendation 29, whereas the compliance rate for the correct completion of Page 2 by custody staff was 35 percent (7 of 20) for Recommendation 28. On average, clinicians ordered discontinuation of 30-minute custody checks after either 24 or 48 hours.

As detailed in Table 3 earlier in this report, there has been a significant increase in the use of both MHCBs and Alternative Housing during the past year, resulting in a corresponding increase in the requirement to complete the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) forms. CSP/LAC was one of many audited facilities that experienced a significant increase in the completion of CDCR MH-7497 forms during this time period. For example, during the current assessment, this reviewer was initially presented with documentation of 570 cases of IPs discharged from a MHCB or alternative housing placement that remained at the facility from February through July 2023. During a comparable six-month period during the preceding fifth re-audit report, 337 cases were presented for review. This current review found that only 40 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians at CSP/LAC, whereas only 16 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at CSP/LAC. The review also found that the two-page packets were very disorganized, with many missing sheets.

Based upon its own monitoring, CSP/LAC leadership had been well aware of prior deficiencies in the completion of "Discharge Custody Check Sheet" (MH-7497) forms. As a result, facility leadership recently initiated an "experimental five-day follow-up" pilot program by consolidating non-administrative segregation IPs requiring 30-minute custody checks into one housing unit (C-5). Dated August 4, 2023 and signed by the CMH, CEO, and Warden at CSP/LAC, the memorandum authorizing the pilot program was very brief and simply stated that:

Upon release from Alt. Housing, the IP shall remain in FCB5 in a non-alternative housing cell while being monitored for custody welfare checks and will be provided in-cell therapeutic activities appropriate to their level of care.

This reviewer inspected the C-5 Unit (or FCB5) at CSP/LAC on August 23, 2023. There were nine IPs housed in the unit on "discharge custody checks." Four of the IPs were interviewed, and all were extremely unhappy for the following reasons:

1) All IPs on custody discharge checks in the C-5 Unit were required to remain on this status for the entire five-days [which was contrary to both CDCR policy and "Discharge Custody Check Sheet" (MH-7497) instructions which limit the duration to 72 hours];

2) All IPs on custody discharge checks in the C-5 Unit were locked down in their cell 24 hours a day and prohibited from utilizing the yard or telephone, a clear violation of CDCR policy;

3) All IPs on custody discharge checks in the C-5 Unit insisted they had limited or no access to the shower; and

4) All IPs on custody discharge checks in the C-5 Unit were not permitted any out-of-cell contact with mental health clinicians, rather all contacts occurred cell front, a clear violation of CDCR policy.

This reviewer subsequently conversed with a custody supervisor and line officers assigned to the C-5 Unit. They confirmed that C-5 IPs on discharge custody checks remained in the unit for the entire five days (rather than the 72-hour maximum), and C-5 IPs on discharge custody checks were on a "custody modified program" and prohibited from yard and telephone access, but allowed regular showers. In addition, this reviewer's subsequent review of one IP's medical chart contained a clinical progress note entry from August 23, 2023 confirming that clinicians were required to interact with IPs "cell front due to new process for alt housing all IPs seen cell front in C-5."

In summary, this "pilot" program was ill-conceived, very problematic, and an attempt to thwart perceived manipulative behavior. In addition, placing these IPs on "custody modified program" and prohibiting them from both out-of-cell activities (of yard and telephone use) and out-of-cell contacts with clinicians had nothing to do with increasing compliance with Discharge Custody Check Sheet form completion. The practice was also much more restrictive than conditions found in restrictive housing. Finally, the "pilot program" did not address whether patients returning to CSP/LAC from a PIP or DSH placement would be subjected to the same highly restrictive practices.

**<u>Recommendations</u>**:

Develop CAPs for the 18 audited facilities (CCI, CCWF, CHCF, CIM, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SVSP,

SQ, and WSP) that continued to be below 90 percent compliance with Page 1 and/or Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form.

Without opining on the utility of identifying designated housing units to manage compliance with "Discharge Custody Check Sheet" (CDCR MH-7497) form completion, CSP/LAC should immediately rescind or revise its "experimental five-day follow-up" pilot program memorandum of August 4, 2023 to ensure that all IPs are on discharge custody status for only up to 72 hours, are not locked down in their cells 24 hours a day, and not prohibited from out-of-cell activities such as yard and telephone usage, and not prohibited from out-of-cell contact with mental health clinicians.

### L)    Local Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

**Summary:**

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities, to include ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, safety plans, etc.  Previous assessments by this reviewer found that, although the SPRFIT concept was a valuable tool in CDCR's suicide prevention program, the local process was not functioning as intended and needed to be rebooted.  Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable and should not have been identified for the first time by a Special Master's expert, but rather by the local SPRFIT.  Therefore, one of this reviewer's initial recommendations in 2016 was for CDCR, under the guidance of the Special Master, to re-examine and revise its SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool (see previous Recommendation 31).

Because CDCR did not finalize the revised SPRFIT policy, the *Coleman* court ruled on January 25, 2018 that "[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order."  ECF No. 5762 at 3.  On February 2, 2018, CDCR issued the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum that "clarifies, modifies, and establishes requirements and responsibilities."  It also reemphasized that a meeting "quorum" included all mandatory members or designees.  The revised memorandum became effective on March 1, 2018 and contained 19 responsibilities that included, but were not limited to, monitoring suicide prevention training, safety planning, and five-day follow-up compliance; review the quality of SRASHEs to ensure they are clinically appropriate; conducting semi-annual root cause analyses (RCAs) of serious suicide attempts; providing assistance and coordination for the activities of visiting SMHP and DAI suicide case reviewers following a suicide; and conducting self-assessments related to compliance with suicide prevention items developed by the SMHP's Quality Improvement Unit.  In addition, each SPRFIT was required to develop a LOP that was consistent with the CDCR directive of February 2, 2018; as well as policies and procedures regarding establishment of a local "High Risk Management Program" and identifying

IPs who received "bad news" following return from court and/or Board of Parole Hearings ("Local Operating Procedure for Inmate-Patients Receiving Bad News" memorandum dated April 28, 2021). The High Risk Management Program was subsequently repackaged as the "Suicide Risk Management Program" on July 12, 2021.

Recommendations offered during most prior assessments included a focus on correcting deficiencies identified by this reviewer's assessment reports, as well as sustaining implemented corrective actions, rather than a quantitative exercise of simply reporting out on compliance rates during monthly SPRFIT meetings.

In partial response to this recommendation, CDCR's SMHP and the CCHCS Quality Management Program entered into a partnership with the goal of standardizing operations among all local SPRFITs, increasing access to automated data, increasing the efficiency of SPRFIT meetings, and introducing nationally-recognized improvement techniques. The partnership became known as the "SPRFIT Reboot." Initiated in early 2021, the "reboot" was scheduled for full statewide implementation by December 2021. *See* "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" ECF No. 7024 (filed on January 15, 2021). The revised initiative was subsequently delayed on multiple occasions, from December 2021 to February 2022, and then from February 2022 to June 30, 2022. Most of the delay was based upon refinement of the process following feedback from the field. On May 16, 2022, CDCR notified the Special Master that the SPRFIT Reboot "is now estimated to be completed by the end of December 30, 2022. The delay is caused by scheduling difficulties to have all three disciplines attend training sessions over the span of several days. This difficulty is further exacerbated by the staffing shortages previously mentioned."

The preceding (fifth re-audit) assessment found that 87 percent (20 of 23) of the local SPRFITs had signed and/or dated LOPs that were consistent with the CDCR directive of February 2, 2018, as well as appropriate LOPs for "Inmate-Patients Receiving Bad News" and the "Suicide Risk Management Program," and "Crisis Intervention Teams." In addition, only 26 percent (6 of 23) of the audited SPRFITs achieved meeting quorums.

Recommendations from the fifth re-audit assessment included ensuring that local SPRFITs maintained monthly meeting quorums, and to initiate the long-delayed, self-imposed "paused" SPRFIT responsibility to conduct RCAs for serious suicide attempts, or, in the alternative, clinical case summaries, without further delay. This reviewer also recommended that "The SPRFIT Reboot should no longer be delayed; it should be implemented no later than December 30, 2022."

**Current Findings**:

CDCR finally implemented the "SPRFIT Reboot" in early 2023 and the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan" stated: "All institutions completed their training by the end of December 2022. Statewide Mental Health Program and CCHCS Quality Management are currently working to identify the most effective way to ensure sustainability with the various components introduced during the trainings." ECF No. 7750 at 12 (filed March 1, 2023). In addition, CDCR issued an "Update to

Enhancements to the Suicide Prevention and Response Focused Improvements Teams" on June 14, 2023. This "Update" revised a portion of the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum issued on February 18, 2018 applying to reviews of serious suicide attempts. The new directive now requires "the local SPRFIT Committees to conduct either (a) semi-annual aggregate RCA of serious suicide attempts, *or (2) clinical case reviews of serious suicide attempts*. All other aspects of the February 2, 2018 memorandum shall remain in effect." This revision was consistent with this reviewer's recommendation offered in the fifth re-audit report.

The current assessment focused on five areas of <u>Recommendation 31</u>: 1) the degree to which SPRFITs achieved six consecutive months of meeting quorums for all mandatory members or their designees; 2) the degree to which each SPRFIT conducted either semi-annual RCAs or clinical case summaries of serious suicide attempts when appropriate;[12] 3) the degree to which each SPRFIT tracked IPs in the Suicide Risk Management Program (SRMP) and reviewed them during monthly meetings as required by policy; 4) the degree to which facilities had local operating procedures (for SPRFIT, Inmate-Patients Receiving Bad News, SRMP, and CIT); and 5) the degree to which each SPRFIT tracked prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians. As detailed in a subsequent section of this report, this reviewer also examined whether the three RC facilities adequately collected data and assessed compliance with various RC expectations and reported such findings during monthly SPRFIT meetings as required by policy.

Overall, the current assessment found that only 33 percent (7 of 21) of facilities had adequate practices in all combined SPRFIT audited responsibilities. Individually, only 52 percent (11 of 21) of facilities achieved six consecutive months of meeting quorums, an improvement from the fifth re-audit (with only 26 percent). In addition, 81 percent (17 of 21) of the local SPRFITs had signed and/or dated LOPs that were consistent with the February 2018 CDCR directive for SPRFITs, as well as appropriate LOPs for "Inmate-Patients Receiving Bad News" and the "Suicide Risk Management Program," and "Crisis Intervention Teams." Further, only 62 percent (13 of 21) of the audited facilities tracked and reviewed SRMP IPs in monthly SPRFIT meetings. Finally, 81 percent (17 of 21) of the audited facilities tracked prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians in either monthly SPRFIT minutes or in separate documentation.

However, it remained concerning that this reviewer's findings in this current assessment demonstrated that various corrective action plans from the preceding re-audit had still not been

---

[12] Because the requirement for conducting a clinical case review as an alternative to an RCA became effective with the revised SPRFIT memorandum on June 14, 2023, which was in the midst of the current assessment, this reviewer's audit of this area was more informal than formal. The informal review found that eight audited facilities had serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, and evidence that clinical case reviews consistent with the 7-step "mental health clinical review" format required by the revised SPRFIT memorandum were <u>not</u> included in either monthly SPRFIT minutes or in separate documentation at most of the facilities.

fully implemented.  As described in other sections of this report (including **N) Continuous Quality Improvement** and the facility assessments found in **Appendix A**), many of the overall deficiencies identified during the current assessment continued to be easily observable and should not have been identified for the first time by this reviewer, but rather by the local SPRFIT and/or regional SPRFIT team prior to the on-site audit.

**Recommendations:**

CDCR should develop CAPs for the 10 facilities (CCI, CCWF, CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, PBSP, and SVSP) that did not achieve six consecutive months of SPRFIT meeting quorums for all mandatory members or their designees.

CDCR should develop CAPs for the four facilities (CHCF, CSP/Corcoran, CSATF, and KVSP) that did not have LOPs (for SPRFIT, Inmate-Patients Receiving Bad News, CIT, and/or the SRMP) that were consistent with the SPRFIT memorandum.

CDCR should develop CAPs for the eight facilities (CCI, CIW, CHCF, CMF, KVSP, MCSP, CSP/Solano, and SVSP) that did not track and review SRMP patients during monthly SPRFIT meetings.

CDCR should develop CAPs for the four facilities (CMF, CSATF, MCSP, and NKSP) that did not track prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians in either monthly SPRFIT minutes or in separate documentation.

**M)**    **Suicide Prevention Training**

**Summary**:

Previous assessments of both pre-service and annual suicide prevention in-service training (IST), including the "Mental Health Services Delivery System Instructor Guide," found some concerns regarding content, length of training, and low completion rates for custody, medical, and mental health personnel (see previous Recommendations 1 and 3).  In November 2018, the SMHP received approval from the Basic Correctional Officer Academy (BCOA) to expand the pre-service suicide prevention training from 2.5 hours to four hours based upon this reviewer's previous recommendation.  The training curriculum, entitled "Inmate Suicide Prevention" Lesson Plan (Version 1.0), and 155-slide PowerPoint presentation was finalized and approved for instruction in December 2020.  Recommendation 1 was found to be fully implemented during the fifth re-audit assessment.

In addition, the two-hour annual IST suicide prevention curriculum, entitled "Suicide Prevention," has been revised on several occasions.  The most recent version is Version 4.0 which contains 54 PowerPoint slides.  This version of the annual suicide prevention training curriculum was initiated in CDCR facilities beginning in January 2020.  The curriculum is periodically updated to revise suicide data.  All custody, medical, and mental health personnel are required to complete the annual IST suicide prevention training, and facilities are required to ensure that at least 90 percent of all staff receive the training each year (Recommendation 3).

The preceding (fifth re-audit) assessment found that 70 percent (16 of 23) of the audited facilities had compliance rates for annual suicide prevention training of custody personnel that were above 90 percent for the review period; 65 percent (15 of 23) of the audited facilities had compliance rates for annual suicide prevention training of medical personnel that were above 90 percent for the review period, and 78 percent (18 of 23) of the audited facilities had compliance rates for annual suicide prevention training of mental health personnel that were above 90 percent for the review period.

**Current Findings:**

This reviewer's current assessment found that 95 percent (20 of 21) of the audited facilities had compliance rates for annual suicide prevention training of <u>custody</u> personnel that were above 90 percent for 2022; 62 percent (13 of 21) of the audited facilities had compliance rates for annual suicide prevention training of <u>medical</u> personnel that were above 90 percent for 2022, and 86 percent (18 of 21) of the audited facilities had compliance rates for annual suicide prevention training of <u>mental health</u> personnel that were above 90 percent for 2022. Overall, only 52 percent (11 of 21) of the audited facilities had compliance rates of 90 percent and above for all three disciplines (custody, medical, and mental health). With the exception of suicide prevention training of medical personnel, the compliance rates for custody and mental health personnel were higher than the fifth re-audit findings.

**Recommendation**:

CDCR should develop CAPs for all facilities that had compliance rates below 90 percent for annual suicide prevention training, and specifically for the eight facilities (CIW, CMC, CMF, CSP/LAC, CSP/Sac, CSATF, HDSP, and SQ) that were below 90 percent compliance for suicide prevention training of medical personnel.

**N)    Continuous Quality Improvement**

**Summary**:

By order of the *Coleman* court (ECF No. 4232, filed August 30, 2012; ECF No. 4561, filed April 23, 2013; ECF No. 5092, filed March 3, 2014), defendants were directed to develop an improved quality improvement process by which CDCR could identify issues and improve its performance levels in the delivery of mental health care. The result was the development of a Continuous Quality Improvement Tool (CQIT). During an earlier portion of the Suicide Prevention Management Workgroup (SPMW) process, CDCR agreed to incorporate this reviewer's "Suicide Prevention Audit Checklist" into its overall CQI process (see previous Recommendation 32). The checklist included 19 measures.[13]

---

[13] The measures were: 1) Observation of R&R intake screening by nursing/RC screening by diagnostic clinicians; 2) Confirming R&R/RC screening completeness and privacy and confidentiality; 3) Administrative segregation new intake IPs housed in retrofitted new intake cells for 72 hours; 4) Psych Tech rounds in administrative segregation, SHU, and PSU; 5) Guard One compliance in administrative segregation, SHU, and PSU; 6) SRASHEs required for

Previous review of the suicide prevention related aspects of CDCR's revised "Continuous Quality Improvement On-Site Audit Guidebook," revised multiple times over the years, found it included many, but not all, of this reviewer's 19 Suicide Prevention Audit Checklist measures. During SPMW and All-Parties Workgroup meetings in 2019, CDCR repeatedly stated that all 19 measures would be incorporated into either the CQIT or other CQI processes. At a larger *Coleman* policy meeting with the parties on November 22, 2019, this reviewer was presented with a rebranded version of the "Continuous Quality Improvement On-Site Audit Guidebook" entitled "Continuous Quality Improvement Suicide Prevention: Self-Audit Guidebook." This rebranded version was still dated August 16, 2019 and contained most, but not all, of this reviewer's 19 suicide prevention audit measures. During the meeting, CDCR reiterated that the 19 measures would be gathered by a variety of sources, including on-site CQI audits, chart audits by the SMHP, and utilization of "On-Demand" data. It was further explained that the "Continuous Quality Improvement Suicide Prevention: Self-Audit Guidebook" was designed to be utilized by local SPRFITs in auditing of suicide prevention practices in their respective facilities. At that point, it still remained unclear why all 19 suicide prevention audit measures were not included in the Guidebook. Finally, during that November 2019 *Coleman* Policy Meeting, a SMHP administrator interjected by stating "if SPRFITs were going to be responsible for replicating Mr. Hayes's suicide prevention audits in the future, all of the (19) items needed to be included in the Guidebook."

In the first "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations," CDCR stated that it "continues to work to finalize the template of the CQI-Suicide Prevention tool. Work to complete the language to present to the OSM (Office of the Special Master) is underway and we will schedule consultation meetings with the OSM as we move closer to a complete draft." ECF No. 7024 (filed January 15, 2021). At that time, the project was scheduled to be completed, to include staff training, before April 30, 2021. Nine months later on September 13, 2021, CDCR informed the *Coleman* court and Special Master in the "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" that: "Upon further review, and in consultation with the OSM [Office of the Special Master], Defendants are revising this item to document that full and final roll out of this item is inextricably tied to the SPRFIT Reboot project.....Given this analysis, the revised completion is being moved to 2/28/2022. It should be noted that the development of the manual self-assessment tool for use at the local level is actively being

---

emergent/urgent mental health referrals for SI/SIB/SA; 7) Use of Alternative Housing; 8) Suicide-resistant MHCBs; 9) SRASHEs required for admission/discharge in MHCB and alternative housing; 10) Observation of MHCB patients; 11) Clothing/property/privileges orders for MHCB patients; 12) Safety planning for suicidal patients in MHCBs; 13) Five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and Psychiatric Inpatient Program (PIP) returns; 14) Clinical and Custody 30-minute Discharge Checks for non-ASU IPs returning from MHCB, Alternative Housing, DSH, and PIP (Form 7497); 15) Emergency response equipment in housing units; 16) CPR training for custody and medical staff; 17) Annual suicide prevention training for custody, medical, and mental health staff; 18) SRE Mentoring/7-hour SRE training/Safety Planning training for clinicians; and 19) SPRFIT responsibilities.

utilized by the four test institutions in the SPRFIT Reboot trial implementation.  The full CQIT contains all 19 suicide prevention indicators, as identified by Mr. Hayes, to be used at the regional/statewide level."  ECF No. 7306 at 9.

On February 23, 2022, the Special Master received another version of the "Continuous Quality Improvement On-Site Audit Guidebook," dated February 3, 2022.  Although this reviewer was subsequently informed by CDCR that the Guidebook contained all 19 suicide prevention measures, review of the suicide prevention related portions of this revised version of the Guidebook found that it did not.  Five days later, on February 28, 2022, CDCR again reversed course and informed the *Coleman* court and Special Master in the "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" that:

> CDCR recognizes that continuous quality improvement for suicide prevention requires multiple layers of oversight.  At the institutional level, as part of the SPRFIT Reboot Project (see recommendation 31) a self-assessment tool is under development and is currently being tested with the four pilot institutions.  It is anticipated this self-assessment tool will be finalized simultaneously with the larger SPRFIT Reboot project, by 6/30/2022.  At the regional/statewide level, the suicide prevention coordinators for each region regularly complete site visits to all institutions that mimic an official Lindsay Hayes site visit.  At the outcome of these tours a report is created with findings and any recommendations or corrective action that the institution must act upon to come into compliance with any deficiencies noted.  Given these regional suicide prevention coordinator positions are relatively new, we are continuing to refine the language in these reports and align methodology of audits with those of Mr. Hayes when he conducts his visits.  It is anticipated that these reports, as well as a finalized schedule for ongoing visits to institutions, based upon the size and scope of their mental health mission, will be completed by 6/30/2022.

ECF No. 7480 at 8 (filed February 28, 2022).

As noted above, CDCR hired four regional SPRFIT coordinators during 2021 and they are assigned to each of the four regions and report directly to the Suicide Prevention Response Unit (SPRU) at SMHP headquarters.  Each of these coordinators are also required to provide technical assistance and support to facilities in their region, as well as complete scheduled site visits to assess suicide prevention practices.  These coordinators also prepare each facility for this reviewer's suicide prevention assessments.  Finally, the SMHP hired a permanent chief psychologist for Statewide Suicide Prevention in April 2021 to oversee the regional SPRFIT coordinators and the SPRU.

On May 10, 2022, this reviewer received the first draft of CDCR's "Suicide Prevention On-Site Audit Guidebook."  As subsequently related to this reviewer by SPRU leadership, this guidebook, when finalized, would be utilized internally by the four regional SPRFIT coordinators on an interim basis until the larger "Continuous Quality Improvement On-Site

Audit Guidebook" was finalized and approved by the Special Master and *Coleman* court.  This reviewer's extensive critique of the first draft was returned to SPRU leadership on July 25, 2022.

In conclusion, this reviewer's fourth re-audit assessment recommended that "CDCR immediately: (1) incorporate all of this reviewer's 19 "Suicide Prevention Audit Checklist" measures into any CQI Guidebook; and (2) any CQI audit report of an individual facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures."  In the fifth re-audit report, this reviewer found that all 19 measures had still not been included in either the Suicide Prevention On-Site Audit Guidebook or local facility reports on CQI (e.g., in SPRFIT minutes).

**Current Findings**:

As indicated earlier in this report, although the current assessment found that 81 percent (17 of 21) of the audited facilities tracked prior corrective actions recommended by this reviewer and/or regional SPRFIT coordinators in either monthly SPRFIT minutes or in separate documentation, findings from this current assessment indicate that inadequate suicide prevention practices have continued, suggesting that either corrective actions by local SPRFITs were closed prematurely or new deficiencies surfaced during the past year and were not corrected prior to this reviewer's onsite assessment.  As such, these corrective actions are neither complete nor durable.

In addition, similar to the finding that many of the overall deficiencies identified during the current assessment were easily observable and should have been identified by local SPRFITs prior to this reviewer's onsite arrival, these same deficiencies should have also been previously identified and addressed by the regional SPRFIT coordinators and/or the regional lieutenants from DAI's Mental Health Compliance Team.  Examples of these deficiencies in each region included, but were not limited to, the following:

> 1) There were three primary problems identified by this reviewer at CMF:
> First, custody personnel were wrongly noting on 114-A forms that at least
> 30 percent (11 of 37) of MHCB patients clinically cleared for out-of-cell
> privileges were "not approved" for those privileges.  Second, there was
> incorrect interpretation by a custody officer and a CC1 on separate days
> (September 25, 2023 and September 26, 2023) suggesting that MHCB
> patients who were not on "full issue" clothing (i.e., they were only issued
> a safety smock or t-shirt/boxers) were prohibited from yard and telephone
> calls.  Such a practice not only violated MHCB policy, but was the exact
> poor practice found during the fifth re-audit assessment.  As such, the
> daily Adaptive Support Form (CDCR 128 C-2) that appeared on each
> MHCB patient's cell door and listed the approved out-of-cell privileges
> was being ignored by custody personnel.  Third, despite this reviewer
> being informed that 114-A forms underwent supervisory review prior to
> being scanned into the ERMS, these poor practices continued to occur in
> an unabated fashion.

2) At SVSP, this reviewer observed that there were at least three restrictive housing IPs placed on new intake status in overflow ASU buildings on October 12, 2023, including D-2 and D-4 units which did not have any new intake cells. Upon closer examination, it was determined that these IPs had been directly placed from the yard into non-intake cells within both D-2 and D-4 units without first being housed in new intake cells within the STRH unit. This reviewer subsequently requested and received a listing of all IPs on new intake status that were placed in ASU overflow buildings since October 2, 2023. The data revealed that during the recent 11-day period of October 2 through October 12, 2023, there were at least 22 IPs directly placed from the yard into non-intake cells in D-2, D-4, D-6, and D-8 units. Each of these IPs should have been initially placed in new intake cells within the STRH unit. This reviewer was informed that the practice of daily utilization of overflow ASU housing began shortly after the deactivation of D-1 unit in October 2022, therefore, the improper practice of housing new intake IPs in non-new intake cells had been occurring unabated for over a year.

3) At CSP/LAC, there were multiple problems found in the C-5 Unit. <u>First</u>, a pilot program had been initiated in which IPs placed on discharge custody checks following release from both the MHCB unit and Alternative Housing were consolidated on this unit and required to remain on this status for five days (contrary to CDCR policy which limited the duration to 72 hours). These IPs were also locked down in their cell 24 hours a day and prohibited from utilizing the yard or telephone and were not permitted any out-of-cell contact with mental health clinicians. This "pilot program" did not address whether stable patients returning to CSP/LAC from a PIP or DSH placement would be subjected to the same highly restrictive practices. <u>Second</u>, despite being informed by a unit supervisor on August 23, 2023 that the C-5 ASU overflow unit would never be utilized to house IPs on new intake status because it did not have any new intake cells, this reviewer found that there were at least three (3) new intake IPs placed in unsafe, dangerous C-5 cells on August 17-18, 2023, as well as at least one additional new intake IPs placed in an unsafe, dangerous cell in the C-4 unit (that was previously utilized for ASU overflow) cell on July 29, 2023.

4) At RJD, this reviewer found during the medical chart review that multiple clinicians were utilizing the Columbia-Suicide Severity Rating Scale (C-SSRS) screening form as alternative to the required SRASHE form for emergent mental health referrals, as well as for IPs assessed in Alternative Housing. Although clinicians statewide had been temporarily authorized to use the C-SSRS screening form on an interim basis beginning in March

2020 during mental health program modifications resulting from COVID-19, this interim practice was only permitted until CDCR resumed normal operations in July 2022. Although the CMH at RJD informed this reviewer in August 2023 that the C-SSRS form was only being utilized due to the current staffing crisis at RJD, the CMH was informed that the mental health staffing crisis permeated most CDCR facilities, approval to utilize the form post-COVID-19 had not been solicited or granted, and all other facilities had resumed utilizing only the SRASHE form in July 2022.

The most recent version of the "Suicide Prevention On-Site Audit Guidebook" was last revised on January 18, 2024. Although this reviewer's 19 suicide prevention measures are now adequately addressed in the Guidebook, the measures have not been fully implemented because the Guidebook continues to be periodically revised. Despite its periodic revision, the four regional SPRFIT coordinators began to utilize the Guidebook in their facility audits of suicide prevention practices in 2022. As discussed below, although the template of the regional SPRFIT coordinator reports is more or less consistent with this reviewer's audit reports, the reports are not always comprehensive regarding methodology, particularly in the area of the sample size of medical chart review.

In addition, and as previously indicated, CDCR filed the "Defendants Report on the Status of Outstanding Suicide Prevention Recommendations" on January 19, 2023. ECF No. 7706. In referring to the 15 suicide prevention recommendations that have not been fully implemented and sustained, the defendants stated: "While sustained compliance has not been fully achieved for the fifteen outstanding recommendations, Defendants have developed new, or modified existing, policies, procedures, trainings and other resources to correct noted deficiencies…. During this evaluation stage, Defendants' Statewide Suicide Prevention and Response team members are touring and evaluating institutions *quarterly* with rounding intervals dependent on severity and quantity of the identified deficiencies." ECF No. 7706 at 4 (emphasis added). In addition, both previous and current editions of the "Suicide Prevention On-Site Audit Guidebook" stated that the regional SPRFIT coordinator assessments were scheduled quarterly in facilities "with an inpatient program [mental health crisis bed (MHCB) or psychiatric inpatient program (PIP)], or every six months in facilities "without an inpatient program." The Guidebook also stated that "*there may be other indications for increased frequency of on-site reviews at an institution more frequently than listed above*." (emphasis added)[14]

Based upon the above schedule of quarterly regional SPRFIT coordinator reports, the number of audits of the same 21 facilities audited by this reviewer would be 82 reports during

---

[14] Guidebook examples for the need of more frequent than quarterly assessments at individual facilities would be: "at the request of the institution, at the request of the regional Mental Health Compliance Team (MHCT) or other internal stakeholders, as a result of a Lindsay Hayes audit with identified deficiencies, as a result of a previous on-site audit with identified deficiencies; the frequency of on-site audits can increase to address these deficiencies, as a result of findings that indicate a potential unique trend, necessitating additional review and/or support" (at page 78).

2023.[15]  This reviewer subsequently determined that only 57 (or approximately 70 percent) of the expected regional SPRFIT coordinator reports were completed during 2023.[16]  One of these reports was completed remotely without an onsite review and did not measure all of the required suicide prevention areas.  There were no examples of a facility receiving more than a quarterly review and, in fact, only five of the 21 facilities received even a quarterly review during 2023.  In order to assess CDCR's current continuous quality improvement process for suicide prevention, this reviewer examined all 57 reports and found the following:

- Many regional SPRFIT coordinators did not consistently report whether the regional MHCT lieutenants and/or regional nursing consultants (RNCs) were part of the onsite reviews, consulted during the reviews, or whether MHCT/RNC findings were incorporated into the SPRFIT coordinator reports;[17]

- Because not all regional SPRFIT coordinator reports were quarterly, some regional reports were said to have six-month time frames, whereas the review period for other reports was unclear;

- The lack of quarterly reports in some regions resulted in the inability to audit all suicide prevention practices.  For example, at one facility, the regional SPRFIT coordinator bluntly stated: "Given that this reviewer did not conduct a site review during Q4 of 2022, and that no IDTTs were able to be observed during the Q3 visit, this is the first MHCB IDTT that this reviewer has observed in nearly a year;"

- Two regional SPRFIT coordinators always conducted two-day onsite reviews; the other two regional SPRFIT coordinators often conducted one-day reviews.  When one-day reviews were conducted, there were less opportunity to review critical areas such as CIT responses, multiple IDTT meetings in the MHCB unit, and intake screening by nursing staff.  In one region, for example, the coordinator observed only one IDTT meeting during the one-day site visit, whereas this reviewer observed 11 IDTT

---

[15] The only facility audited by this reviewer that did not have an inpatient program was CCI.  As such, according to the Suicide Prevention On-Site Audit Guidebook, only two assessments per year would be expected.

[16] Available at CDCR's "Mental Health/Coleman" SharePoint site.  Last accessed on February 15, 2024.

[17] According to the Suicide Prevention On-Site Audit Guidebook, "When possible, it is preferred that on-site reviews are conducted as a multidisciplinary team, consisting of the Suicide Prevention Coordinator, Mental Health Compliance Team (MHCT) Lieutenant, and a nursing representative from the respective region…. When the custody and/or nursing representatives are not able to attend the on-site review, they shall provide their evaluation of the compliance measure items by conducting an independent on-site review, and their information will be incorporated into the respective sections of the report" (at page 79).

meetings during a two-day site visit at the same facility. This same regional coordinator was unable to observe intake screening by nursing staff during any of the four one-day onsite reviews of two facilities during the entirety of 2023;

- Generally, there was an over-reliance on OnDemand data and not enough individual medical chart reviews by most regional SPRFIT coordinators. With the exception of one region, the medical chart reviews in other regional reports were sparse;[18]

- When auditing emergent/urgent mental health referrals for danger to self (DTS), several regional SPRFIT coordinators relied solely on OnDemand data for completed SRASHEs, and did not conduct medical chart reviews to determine the extent by which referrals for DTS resulted in completed SRASHEs;

- None of the regional SPRFIT coordinator reports presented separate data for compliance with both Page 1 and Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms; instead, a composite compliance score was presented;

- None of the regional SPRFIT coordinator reports addressed the local SPRFIT requirement to review SRMP IPs during monthly SPRFIT meetings;

- Quorums in SPRFIT meeting minutes for the entire review period were consistently addressed by only two regional SPRFIT coordinators;

- Regional SPRFIT coordinator reports from at least two regions incorrectly suggested that maximum-security MHCB patients were only required to be offered one telephone call per month, with one report stating: "Because all MAX custody inmates are only allowed one phone call per month, some patients understandably had no phone call privileges recorded."

- One regional SPRFIT coordinator consistently stated in reports that, although observation and privilege orders were not discussed during IDTT meetings, "the MHCB team reviews these orders daily during the morning

---

[18] The noted exception in one region was thorough medical chart reviews exemplified by the following two examples: 1) "Observation and Issue Orders – Hayes Item 3 This reviewer conducted a chart audit for 10 randomly selected patients who were completed a full MHCB stay at ___ during the first quarter of 2022, as well as the charts of the 3 patients for whom IDTT was observed during this site review. Each day in which a patient was ordered less than full issue was audited for a total of 79 patient days. Orders were present in the chart on 74 (93.6%) of those days while a note justifying limited issue was present on 67 days (84.8%) and a note justifying observation was present 66 days (83.5%). While still below 90%, compliance is noted to have improved since the last site review (March 2023 for quarter 4, 2022);" and 2) "A random sample of 10 charts for patients who were enrolled in the SRMP program, were reviewed to ensure that measurable treatment plan goals and interventions were documented in the most recent master treatment plan that was completed at ___ and they were in 6 of 10 cases. This demonstrates some level of improvement since the last site review and this CAP item."

huddle."  Such a response ignored the fact that MHCB patients were not participants in the morning huddle and one of the rationales for discussing the issue in the IDTT meetings is for the patient to be aware of their out-of-cell privileges;

- There were inconsistencies regarding the adequate review of safety planning.  A few of regional SPRFIT coordinators were very thorough in their critique of safety plan quality.  Others were not and simply relied upon a facility's CAT self-audit data.  At least one regional SPRFIT coordinator did not review safety plans required for IPs released from Alternative Housing;

- One regional SPRFIT coordinator did not review quality of safety planning because "a new CAT audit specifically for safety planning is currently being developed," a response that was irrelevant and ignored CDCR's April 5, 2023 memorandum stating the MHCB supervisory review of safety planning was still required and did not absolve review by regional SPRFIT coordinators.  In another region, the SPRFIT coordinator simply stated: "The MHCB supervisor provided this reviewer with proof of practice of having conducted reviews of supervisory discharge treatment plans during the month of April," but the report did not identify the results of the supervisor's findings (i.e., percent of pass/fail, timeliness, etc.);

- Regional SPRFIT coordinators rarely opined regarding the lack of privacy and confidentiality offered to patients during crisis responses and assessments following Alternative Housing placements; and

- One regional SPRFIT coordinator reported that "Temporarily, due to the severe mental health staffing shortage, new CAPs pertaining to mental health deficiencies will be deferred.  Instead, all such deficiencies will be listed as recommendations.  When mental health staffing improves, some recommendations will be changed to CAPs."  The rationale for a distinction between a recommendation and CAP was unclear.

In addition, the four regional SPRFIT coordinators were also responsible for auditing suicide prevention practices in the five PIP units.  Utilizing the same "Suicide Prevention On-Site Audit Guidebook," based upon a quarterly audit schedule, a total of 20 audits of the PIP units would be expected of the five PIP units during 2023.  This reviewer subsequently determined that only 10 of 20 (or 50 percent) of the expected regional SPRFIT coordinator reports were completed during 2023.

Overall, except for the above concerns, regional SPRFIT coordinator reports were generally thorough and each coordinator monitored most, but not all, of the measures audited by this reviewer.  In addition, findings from many of the regional SPRFIT coordinator reports confirmed previous deficiencies identified by this reviewer.  There were, however, several clear

examples of deficient monitoring,[19] as well as multiple examples of regional SPRFIT coordinators reporting very disparate findings then from this reviewer for comparable review periods.[20]  In conclusion, regional SPRFIT coordinator monitoring of suicide prevention practices utilizing the Suicide Prevention On-Site Audit Guidebook remains a very promising and evolving process.

**Recommendations**:

CDCR should correct deficiencies and improve consistency in regional SPRFIT coordinator reports based upon the above findings.

CDCR should ensure that regional SPRFIT coordinator reports are completed on a quarterly basis for facilities with a MHCB and/or PIP, and more frequently based upon Guidebook criteria.  Additional resources may be necessary to meet this schedule.

**O)    Suicide Case Reviews**

**Summary**:

As detailed in previous reports, the MHSDS *Program Guide* provides detailed procedures in the event of a death by suicide.  Following a suicide, the Division of Correctional Health Care Services' (DCHCS) SPRU coordinator appoints a Suicide Reviewer to begin reviewing the case. The primary purpose of the suicide review is to try to understand how the death occurred, what was the precipitant(s) to the suicide, as well as any system failures that, once corrected, will allow the agency to improve the suicide prevention program.  The Suicide Reviewer examines all relevant documentation in the case, including, but not limited to, the decedent's central file, health care record, and all relevant CDCR policies and procedures.  The Suicide Reviewer is assisted by both a custody supervisor from the MHCT and a nursing consultant program

---

[19] For example, one regional SPRFIT coordinator reporting the entirety of the new intake cell process as simply: "Intake Cells: During the time of the review, (facility) has 16 designated intake cells which are retrofitted and found to be suicide resistant."

[20] For example, one regional SPRFIT coordinator found "During the February 2023 review, no concerns were identified…. regarding the completion of the supervisor reviews (of safety plans)," whereas this reviewer found during a similar review period that "out of 27 cases, the MHCB supervisor timely reviewed (before or during the IDTT clinical discharge) only five or 19 percent of the cases, with reviews occurring from one to several days following discharge. The MHCB supervisory review also found that only 24 of 27 (89 percent) of safety plans were completed as required, with some clinicians incorrectly stating that a safety plan was not required or there was 'no update to original SPI.'"  In another example, a regional SPRFIT coordinator opined in four separate reviews of the same facility that "Review of 114-As for all MHCB patients indicated that patients that had been cleared were being offered yard, showers, and phone calls," whereas this reviewer found significant problems in the offering of out-of-cell activities at the same facility, stating "The review found that all 23 patients received showers on a regular basis, but only 10 of 23 (43 percent) patients were offered telephone calls, and only 11 of 23 (48 percent) patients were offered yard more than one time during their stay."

reviewer. The review also includes inspection of the decedent's cell and its contents, as well as interviews with select custody, medical, and mental health personnel, IPs, and family members of the decedent, when appropriate. Within approximately 30 calendar days of the suicide, the Suicide Reviewer is required to complete a preliminary Suicide Report that contains relevant findings and recommendations, if any, for any QIP recommendations regarding the suicide. The preliminary report is forwarded to the DCHCS SPRU Coordinator and the report is subsequently discussed at a Suicide Case Review committee meeting. Members of the Committee include SPRU staff, DAI and nursing leadership, MHCT members, and CDCR Office of Legal Affairs representative(s). In addition, leadership from the facility where the suicide occurred is represented at the meeting. Members of the *Coleman* Special Master's team are also invited to observe and participate in the process as necessary. Following the Suicide Case Review committee meeting, the Suicide Report is finalized, and local facility leadership is required to implement any QIPs pursuant to a defined schedule.

**Current Findings**:

A considerable strength of the CDCR suicide prevention program continues to be the Suicide Case Review process. Since at least June 2015, members of the Special Master's team have reviewed each preliminary Suicide Report and observed, as well as often participated in, the Suicide Case Review committee meetings. Although members of the Special Master's team have provided critiques of individual preliminary reports that have resulted in some revision of those reports, overall, Suicide Reports authored by the suicide reviewers have not only been very comprehensive but provided thoughtful and targeted QIPs for correcting deficiencies and improving suicide prevention practices.

During the current assessment period, CDCR experienced 47 suicides in audited facilities between the April 2022 and December 2023 review period, with Suicide Reports developed in each case. This reviewer examined 36 of those 47 Suicide Reports and they are each summarized in the facility assessment sections of Appendix A.[21] As shown below in Table 4, these 36 Suicide Reports generating approximately 240 QIPs and those QIPs were categorized as follows:

**TABLE 4: QIPs From Suicide Case Reviews Compliance Comparison Table**

| | Quality Improvement Plan | Fifth Re-Audit | Sixth Re-Audit |
|---|---|---|---|
| | | | |
| | Missing a variety of mental health documentation/appointments | 53 | 34 |
| | Inadequate/lack of SRASHEs and/or Safety Plans | 29 | 44 |
| | Level of care decisions | 16 | 16 |
| | Diagnostic errors | 2 | 0 |
| | Delay in emergency medical response - CPR, cut-down kit retrieval, other | 19 | 22 |
| | Psychiatry documentation/medication errors | 6 | 6 |

---

[21] Of note, 8 suicides occurred in facilities not audited by this reviewer, and the final Suicide Reports for 3 other suicides during 2023 were not available for review at the time this report was finalized.

| | | | |
|---|---|---|---|
| | Psychiatry missed appointments | 11 | 9 |
| | Administrative segregation deficiencies - new intake cell, supervisory review, other | 6 | 4 |
| | Problems encountered during MHCB/ TMHU/PIP placement[22] | 11 | 13 |
| | Observation deficiencies in MHCB/ TMHU/Alternative Housing/Guard One | 11 | 33 |
| | Nursing documentation (general, including MH referrals) | 10 | 17 |
| | Nursing errors during emergency response | 13 | 11 |
| | Delay in 911 activation | 7 | 8 |
| | Training (suicide prevention/CPR) | 8 | 2 |
| | Miscellaneous (including medical/MH collaboration, unidentified investigation referrals) | 17 | 9 |
| | MH contacts/IDTT meetings cited as being outside program guidelines due to staff shortages | - | 13 |
| | | | |
| | Number of reviewed cases | 42 | 36 |
| | **TOTAL** | **219** | **240** |

Similar to previous assessments, when comparing the fifth and current sixth re-audit report findings from the Suicide Case Review process, the above listed QIPs continued to document significant and repetitive deficiencies in such areas as missing mental health documentation/appointments, inadequate development/lack of SRASHEs and safety plans, level of care decisions, observation deficiencies in MHCB/Alternative Housing, and restrictive housing, delays in emergency medical response, and delays in 911 activation.  Of note, 13 QIPs were generated during the sixth re-audit for deficiencies related to mental health contacts/IDTT meetings cited as being outside program guidelines due to staff shortages.   The strength of the Suicide Case Review process remains the comprehensiveness of each review; a weakness is the repetitive nature of the deficiencies.

**Recommendation**:

No recommendations are offered related to this issue.

P)  **Reception Center Practices**

**Summary**:

This reviewer's previous audits found problematic practices regarding RC intake nursing staff and diagnostic clinicians not always receiving and/or reviewing timely information from local county jail systems, as well as diagnostic clinicians' review of intake nursing screening forms.  The concerns were accentuated by nine RC suicides during 2017.  Previous recommendations focused upon strengthening the RC process to include review of Initial Health

---

[22] Temporary Mental Health Unit was utilized during COVID-19 pandemic as alternative to a MHCB unit.

Screening forms from nursing staff, as well as review of health care information from both county jails and prior CDCR confinement.

In this reviewer's third re-audit report released in November 2018, the following recommendations were offered: (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) reiterate the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent Initial Health Screening forms and any available county jail records prior to and/or during completion of the Mental Health Screening Interview process; and (4) review Chapter 2 ("Reception Center Mental Health Assessment") of the MHSDS *Program Guide* to determine if unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements is in need of clarification (see previous Recommendation 32).

In August 2019, CDCR generated a "Clarification of Mental Health Documentation Review Requirements" memorandum which re-emphasized previously established responsibilities of RC diagnostic clinicians to review documents that included, but were not limited to, initial intake screening forms, county jail records, mental health records, and custody records. The directive also clarified that RC clinicians should request that the IP sign a "CDCR 7385 Authorization for Release of Protected Health Information (or ROI)" form during the Mental Health Screening Interview process if a prior history of mental health treatment is reported.

In this reviewer's fourth re-audit report, although the assessment found that all diagnostic clinicians conducted appropriate screenings in private offices that ensured both privacy and confidentiality, problematic practices regarding consistency in reviewing outside documents remained. The report reiterated that "CDCR should provide verification to the Special Master that all RC facilities (CCWF, NKSP, and WSP) are aware of their suicide prevention responsibilities," including (1) placement of suicide prevention posters in the offices utilized for direct patient care by RC nurses and RC diagnostic clinicians, as well as RC housing unit bulletin boards and RC pill call windows; (2) diagnostic clinicians are required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the EHRS and SOMS for each IP; (3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the IP sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and (4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or IP's behavior suggest a possible current risk for suicide.

On January 27, 2021, CDCR released a "Reception Center Suicide Prevention Reporting Expectations" memorandum to incorporate this reviewer's above recommendations, as well as to

require "proof of practice" that local SPRFIT coordinators from RC facilities ensured that suicide prevention placards were prominently displayed through the facility in required areas, and that the coordinators audited 100 diagnostic screenings each quarter to ensure RC diagnostic clinicians were reviewing the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the EHRS and SOMS for each IP, as well as requesting signed ROI forms from IPs in applicable cases. Local SPRFIT coordinators from RC facilities were also required to report such findings in their SPRFIT meeting minutes.

The fifth re-audit report found that, although privacy and confidentiality were maintained during the process, and thorough assessments by RC diagnostic clinicians were observed at the three RC facilities, the nurse's Initial Intake Screening forms and county jail records were not consistently reviewed by the clinicians and ROI forms were not always requested in applicable cases.

**Current Findings**:

This reviewer observed the diagnostic clinician screening process, as well as reviewed several medical charts for in-coming IPs at each of the three Reception Centers (CCWF, NKSP, and WSP). Similar to the previous assessment, the current re-audit found mixed results. Although privacy and confidentiality were maintained during the RC process at each facility, and suicide prevention placards were found in each clinician's office, there were continued concerns regarding thorough review of nursing Initial Intake Screening forms and county jail records, as well as applicable ROI forms still not always requested (Recommendation 32).

At CCWF, this reviewer observed several diagnostic clinicians separately conducting assessments. The doors to each psychologist's office were closed and the clinicians were observed to be conducting thorough assessments in the completing the required Mental Health Screening Interview forms. Each clinician had access to (and used) the Patient Health Information Portal during the process, as well as SOMS and the county jail transfer sheet. Each clinician also stated they always waited until nurses had completed the Initial Intake Screening form before they completed their Mental Health Screening Interview form, seemingly correcting a problem identified by this reviewer in the previous assessment. However, this reviewer also conducted a chart review which found that another RC clinician completed the Mental Health Screening Interview form before nursing staff had completed the Initial Intake Screening form on at least three cases during the month of October 2023. In each case, the clinician incorrectly stated that the Initial Intake Screening form had been reviewed when, in fact, it had not yet been completed. In addition, county jail records in one of the cases revealed that the IP was a "suicide risk," and such information was not referenced on the clinician's Mental Health Screening Interview form. CCWF mental health leadership was made aware of this issue.

Finally, review of six months of SPRFIT minutes indicated that such data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was not reported as required. Instead, meeting minutes simply stated that the "SPRFIT Coordinator advised that this measure is at or

near goal," with no indication that diagnostic clinicians were reviewing the nurses' Initial Intake Screening forms and completing SRASHEs when appropriate.

At NKSP, this reviewer observed several diagnostic clinicians conduct thorough assessments and complete the required Mental Health Screening Interview form. Each clinician was also observed to have access to (and used) the Patient Health Information Portal during the process, as well as SOMS and the county jail transfer sheet. Each clinician was observed to review the nurse's Initial Intake Screening form. However, this reviewer examined multiple charts of newly admitted IPs and found that, despite RC diagnostic clinicians completing progress notes with boilerplate narrative indicating that Initial Health Screening Forms and county jail records were reviewed, documentation (or lack thereof) found within Menal Health Screening Interview forms indicated these collateral records were not reviewed. These cases also included IPs reporting of prior mental health treatment in which signed ROI forms should have been requested but were not. Two of the four reviewed case examples reported in Appendix A found the following:

In the first case, the IP arrived from the county jail on May 16, 2023, with records indicating that he had been placed on suicide precautions and clothed in a safety smock the previous week. None of this critical information was included in either the Initial Health Screening or MH Screening Interview forms completed at NKSP. On the MH Screening Interview form completed by the RC diagnostic clinician on May 20, 2023, the IP self-reported a prior suicide attempt (date not specified) in which he ingested '29 or 30 by taking 50 Effexor medications. Had a seizure, went into a day coma and had kidney failure.' The diagnostic clinician did not inquire further nor was there any indication that an ROI was requested. In addition, despite this suicide attempt and recent placement on suicide precautions in county jail, the clinician wrote that 'records review did not reveal any acute risk factors.' Two days later during the late afternoon of May 22, the IP threatened suicide and was placed in alternative housing.

In the second case, the IP arrived from the county jail on May 2, 2023 and self-reported depression, paranoia, and auditory hallucinations to the intake nurse. Although not currently suicidal, he also reported six prior suicide attempts. Three days later, on May 5, the IP met with the diagnostic clinician and the completed MH Screening Interview forms listed 'Multiple hospitalizations. Patton, Atascadero, among others. Reported first being hospitalized at age 4, 9, and 16. Multiple hospitalizations.' County jail records also documented the IP's additional psychiatric treatment with a mental health court linkage program, as well as a psychiatric urgent care center. Despite these multiple hospitalizations and treatment settings, the diagnostic clinician noted that the 'I/P did not report outside treatment history. A ROI was not completed.'

Review of SPRFIT minutes indicated that "proof of practice" audits were reported in January, February, and April 2023. However, although the SPRFIT reported that 107 MH Screening Interview forms completed by RC diagnostic clinicians were reviewed during this

three-month period, only one case (less than 1 percent) required that an IP be asked to complete an ROI form based upon prior mental health treatment. Such a finding was far different than this reviewer's examination of RC cases during a similar time period.

At WSP, this reviewer observed three different diagnostic clinicians complete five intakes. Each clinician was observed to be conducting thorough assessments and completing MH Screening Interview forms. The clinicians were observed to have access to (and used) the Patient Health Information Portal during the process, and also observed to be reviewing SOMS, county jail records, and the Initial Health Screening form during each assessment. These good practices were only offset by the circumstances surrounding a suicide at WSP in February 2023 in which deficiencies in both completion of the Initial Health Screening form by nursing and Mental Health Screening Interview form by the diagnostic clinician occurred in close proximity to the death and resulted in several QIPs.

This reviewer's medical chart review found that many diagnostic clinicians at WSP simply used boilerplate language such as "declined to sign ROI" or "clinician described the 7385 (ROI) process and the patient declined to authorize a release of information from prior healthcare providers to CDCR/CCHCS" regardless of whether the IP reported a prior history of mental health services in the community. In several other reviewed cases, documentation indicated that IPs reporting prior histories of prior mental health services in the community were not prompted to sign ROIs by diagnostic clinicians. In a local SPRFIT audit reported in monthly meeting minutes for March 2023, the auditor found that all 26 IPs who reported histories of prior mental health services in the community refused to sign an ROI form during February 2023, a dubious finding. Finally, review of SPRFIT minutes indicated that "proof of practice" audits and subsequent presentation of findings were appropriately reported in both October 2022 and March 2023.

**<u>Recommendations</u>**:

At CCWF, a CAP should be developed to ensure that RC diagnostic clinicians always review the nursing Initial Health Screening form prior to completion of the MH Screening Interview form. The CAP should also address the requirement of "proof of practice" audits and subsequent presentation of findings are appropriately reported in quarterly SPRFIT minutes.

At NKSP, a CAP should be developed to ensure that RC diagnostic clinicians always review the nursing Initial Health Screening form and county jail records, as well as request signed ROI forms in applicable cases.

At WSP, a CAP should be developed to ensure that RC diagnostic clinicians always request signed ROI forms in applicable cases.

V.     **Baseline Assessment of Suicide Prevention Practices in CDCR's Five Psychiatric Inpatient Programs**

<u>**Summary**</u>:

On December 30, 2020, CDCR released its "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1).  *See* ECF No. 7010.  Developed in conjunction with the Special Master's team, this policy promulgated (for the first time) requirements for the identification and management of suicidal patients in CDCR's PIPs.  Such requirements included, but were not limited to, suicide prevention training; assessment of suicide risk upon admission, during placement (whenever a patient making expresses SI and/or engages in SIB) and upon discharge; observation of suicidal patients; placement of suicidal patients in suicide-resistant rooms; provision of clothing commensurate with the level of suicide risk; provision of out-of-cell activities; and safety planning.

This reviewer previously conducted a baseline assessment of suicide prevention practices within the five PIPs between May and October 2021.  The baseline assessment subsequently found significant deficiencies in the delivery of adequate suicide prevention practices in PIPs, resulting in 16 specific recommendations for corrective action.

On January 6, 2023, the *Coleman* court ruled that "There are no objections concerning the baseline audit of suicide prevention practices in the PIPs.  The findings will be adopted in full and the Special Master's request for a court order regarding Mr. Hayes' recommendations for the PIPs will be granted."  ECF No. 7696 at 3.  On January 31, 2023, the parties met with the Special Master and his experts (including this reviewer) to further discuss the 16 recommendations and timetable for converting the recommendations into CAPs.  On February 6, 2023, the parties filed a "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, which included the defendants' proposed implementation schedule.  Review of the implementation schedule found that the defendants "anticipated" full completion of the 16 CAPS during various months during 2023, not to exceed December 31, 2023.

On March 7, 2023, the *Coleman* court stated that:

As required by court order, ECF No. 7696, on February 6, 2023, the parties filed a proposed joint schedule for implementation of corrective action plans (CAP) for suicide prevention in CDCR's Psychiatric Inpatient Programs (PIPs).  After review and good cause appearing, the court will adopt the proposed schedule in full.  The court expects full compliance with the deadlines set in the schedule and will not grant any extensions of the deadlines for completion of these CAPs except on a showing of extraordinary cause.  ECF No. 7754 at 2.

Based upon the dire suicide prevention conditions in the PIPs, including recent patient suicides, this reviewer initiated a re-audit in early January 2023, which was following the *Colemen* court's order that accepted the baseline findings and recommendations in full, but

before the defendants' proposed implementation schedule was released.  Consistent with the baseline assessment, this first re-audit assessment included, but was not limited to, examination of suicide prevention training; assessment of suicide risk upon admission, during placement, and upon discharge; observation of suicidal patients; placement of suicidal patients in suicide-resistant rooms; provision of clothing commensurate with the level of suicide risk; provision of out-of-cell activities; and safety planning.  Each facility assessment is found in <u>Appendix B</u>.  The following is a summary of the major findings.

A)        <u>Intake Screening</u>

Based upon inconsistent use of adequate screening tools for suicide risk inquiry at the PIPs, the prior assessment recommended that CDCR "Develop a CAP to ensure uniformity during the nursing intake screening process within the PIPs whereby all programs utilize the current Initial Health Screening form (which contains adequate mental health and suicide risk questions) or revise either the 'Admission Assessment and History' or 'Acute/ICF Nursing Assessment' forms to include adequate mental health and suicide risk questions."

There continued to be disparate practices observed at most of the PIPs regarding suicide risk identification for incoming patients during the intake screening process.  For example, nurses completed an "Acute/ICF Nursing Assessment Form" on the patient's assigned housing unit at CMF-PIP.  The form does not contain any current suicide risk/suicide history inquiry.  In one observed case, the nurse conducted the screening in the hallway of the housing unit, with other patients and custody staff milling about.  In another case, the screening was conducted in the unit dayroom and, although the door was closed, two officers were straddling the patient during the process.  In addition, a psychiatrist was also in the dayroom and conducted a brief psychiatric assessment in which the patient was asked if they were currently suicidal.  It was unclear why TTMs were not utilized in either of these cases to better ensure privacy and confidentiality during the intake process.

Pursuant to SVSP-PIP practices, nursing assessments were also completed on the patient's assigned housing unit.  In one observed case, the door to the nurse's office was closed, but an officer was stationed inside the office, thus not allowing for both privacy and confidentiality.  When this reviewer subsequently informed a MHCT lieutenant and regional nursing consultant that the current assessment differed from the 2021 assessment of the new admission process in which the nurse's door was closed and an officer was stationed outside in the hallway, both individuals incorrectly stated that the officer probably remained in the room because the patient was on maximum-security classification status.  Regardless of a patient's classification status, there remains a requirement of reasonable privacy and confidentiality and, similar to the R&R units in the prisons, TTMs should be available in the PIPs for any staff, including nursing, who feel uncomfortable interacting with a patient without reasonable safety precautions.

During an observed case at SVSP-PIP, although the nurse asked the patient if the patient had "any thoughts of hurting self or others today," subsequent chart review indicated that the nurse only completed an Acute/ICF Nursing Assessment Form and there was no notation that the

patient denied SI.  Of note, review of medical charts for other patients indicated that nursing staff often completed the Initial Health Screening form which does contain adequate mental health and suicide risk questions.

This reviewer did not have an opportunity to review the new patient admission process at CHCF-PIP, CIW-PIP, or SQ-PIP because there were not any patients admitted during the on-site assessments of those programs.  Pursuant to discussions with nursing staff, CHCF-PIP practices included use of the Acute/ICF Nursing Assessment Form that was completed in the nurse's office.  The form did not include any suicide risk inquiry.  At both CIW-PIP and SQ-PIP, the Initial Health Screening form, which included 15 mental health/suicide risk questions, as well as the Acute/ICF Nursing Assessment Form, were utilized.

In sum, at CHCF-PIP, CMF-PIP, and SVSP-PIP, nursing staff continued to utilize the "Acute/ICF Nursing Assessment" which did not include any suicide risk inquiry.  During observed screening at both CMF-PIP and SVSP-PIP, reasonable privacy and confidentiality during the screening process was not provided.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that "Headquarters nursing is currently in the process of revising the EHRS documentation for intake screenings for the PIPs to include questions related to suicidality and bad news at the time of assessment," with a start date of January 1, 2023 and completion date of October 1, 2023.  As of the date of filing this report, CDCR has missed these deadlines and this reviewer was informed on January 18, 2024 that the process was again "paused."

**B)    <u>SRASHE Completion</u>**

The aforementioned PIP suicide prevention policy (No. 12.11.2104.P1) required that a SRASHE must be completed by a licensed psychologist or psychiatrist for all patients within 72 hours of both admission and discharge from the program.  On October 22, 2021, CDCR issued a memorandum entitled "Completion of Suicide Risk Assessments and Self-Harm Evaluations in Psychiatric Inpatient Program Settings" which required clinicians to also "complete a SRASHE whenever it is determined to be *clinically indicated* (emphasis added), such as when a patient's clinical presentation suggests an increased acute risk for suicide (if the patient presentation is clinically ambiguous, consult a colleague or supervisor)."

Based upon inconsistent practices regarding completion of required SRASHEs, including completion by non-licensed psychologists and social workers, the prior assessment recommended that CDCR "Develop a CAP to ensure that SRASHEs are always completed consistent with the requirements of the PIP suicide prevention policy, including by psychiatry in all programs, as well as by CIW-PIP clinicians on the weekend."

There continued to be a few problematic practices observed at three of the PIPs regarding SRASHE completion pursuant to policy.  Although timeliness of completed SRASHEs improved during the current assessment, completion by qualified providers was problematic.  For example,

at both CMF-PIP and CHCF-PIP, the overwhelming majority of admission SRASHEs were completed in a timely manner, a significant improvement from the prior 2021 review.  (At CMF-PIP, these assessments are now completed by a small cadre of registry psychiatrists.)  In addition, although the overwhelming majority of discharge SRASHEs were completed in a timely manner at both programs, over a third of the discharge SRASHEs at CMF-PIP, and over half of the discharge SRASHEs at CHCF-PIP, were completed by clinical social workers who, pursuant to policy, were not authorized to complete the assessments.  At CHCF-PIP, many of these assessments were completed by unlicensed clinical social workers.  At SVSP, slightly less than 90 percent of both admission and discharge SRASHEs were completed in a timely manner, also an improvement from the prior 2021 review.  However, less than a third of these admission and discharge SRASHEs were completed by licensed psychologists (none by psychiatrists).  The vast majority of the admission and discharge SRASHEs were completed by licensed and unlicensed clinical social workers or unlicensed psychologists.

At both CIW-PIP and SQ-PIP, almost all admission and discharge SRASHEs were completed in a timely manner by licensed psychologists or psychiatrists.  In addition, the previous problem of SRASHEs not always being completed on the weekends at CIW-PIP was corrected.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that "Following their site visits, Regional Suicide Prevention Coordinators to address any noted deficiencies and assist institutions with development of local corrective action…. Institutions will implement corrective action… Regional Suicide Prevention Coordinators will conduct a follow-up site visit to assess compliance with the CAPs developed following the initial site visit and monitor for sustained compliance with the policy," with a start date of March 30, 2023 and completion date of December 31, 2023.  To date, CDCR has not notified the Special Master or this reviewer that these deficiencies have been resolved.

### C) <u>Suicide-Resistant Beds</u>

Similar to the previous 2021 assessment, the current review found all patient rooms designed for suicidal patients at CHCF-PIP, CIW-PIP, and SQ-PIP continued to be suicide-resistant.

Based upon previous findings that not all cells designated to house suicidal patients at both CMF-PIP and SVSP-PIP were suicide-resistant, the prior assessment recommended that CDCR "Develop CAPs at both CMF-PIP and SVSP-PIP to ensure that all cells designated to house suicidal patients are suicide-resistant."

During the current assessment at CMF-PIP in January 2023, this reviewer was informed that the L-1 unlicensed unit was closed in October 2022.  In addition, the 64-bed High Custody Intermediate Treatment Center (HCITC) for ICF patients contained four housing units, and all 32 cells in the A and B Units were retrofitted in July 2022 to become suicide-resistant.  The retrofit corrected several hazards, including metal-frame beds, shelves, and sinks with anti-squirt slit faucets.  Pursuant to CMF-PIP practice, almost all patients on suicide observation status

remained housed in their assigned cells, with the exception of patients assigned to multiple-occupancy cells. In those cases, suicidal patients were rehoused in designated observation cells in the unit. Of note, in response to this reviewer's document request, CMF-PIP staff incorrectly stated the following in the cover page to one of the requested documents on designated housing for suicidal patients: "Dorms and Multi-Person Cells are used only for suicide precaution when there are no limitations on property." This was clearly wrong. Multi-occupancy cells, including dorms, should never be utilized for suicide observation at the CMF-PIP because they are not suicide-resistant, regardless of property allowance or restriction.

At SVSP-PIP, almost all patients on suicide observation status remained housed in their assigned cells within TC1, TC2, C-5, and C-6. Pursuant to practice, the exception was in both TC1 and TC2 where suicidal patients could either be housed in either assigned cells or two observation cells on the units. With the exception of these observation cells, all other cells were previously found to be dangerous and not suicide-resistant. In addition, C-5 and C-6 were two-tiered housing units and there was no fencing above the second-tier railings to eliminate the possibility of suicidal patients jumping from the second tier. [(This type of hazard was previously identified in the 2021 assessment, as well as in this reviewer's "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," ECF No. 5994 at page 35, regarding discussion of a proposed unlicensed MHCB unit at RJD Donovan Correctional Facility.)]

During the current on-site assessment in February 2023, this reviewer was provided with detailed work plans for each of the four housing units at SVSP-PIP. According to those plans, 14 cells would be retrofitted to become suicide-resistant, including two cells in TC1 (243, 245), six cells in TC2 (203, 205, 502, 503, 516, and 517), three cells in C-5 (109, 112, and 131), and three cells in C-6 (102, 121, and 124). According to the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs", ECF No. 7714 at 5, the defendants stated that the renovation of cells would begin in July 2023, with a completion date "to be determined."

Of note, neither the work plans nor corrective action schedule addressed the hazardous two-tiered C-5 and C-6 units and need for fencing or other barriers to prevent patients on suicide observation status from jumping from the second tier of the units. In response to an inquiry from the Special Master regarding hazardous conditions on the second tiers of C-5 and C-6 units, CDCR's Office of Legal Affairs responded on February 6, 2023 that:

> CDCR is actively designing and planning to retrofits cells at SVSP to become suicide resistant for patients who are suicidal. Adding second tier netting to C5 and C6 to prevent jumping is a distinct issue and not part of ensuring that a cell is suicide resistant, in a PIP or elsewhere within CDCR's housing units. CDCR does not plan to make any further changes to its CAP on suicide resistant beds. CDCR understands that additional touring at SVSP PIP is occurring this week. CDCR will revisit the need for netting following the tour.

Despite the above statement to "revisit" the hazardous conditions on the second tiers of C-5 and C-6 units at SVSP-PIP, CDCR never discussed this issue further with the Special Master and/or this reviewer. In addition, as of the date of filing this report, CDCR did not meet the completion deadline for ensuring that all cells designated to house suicidal patients at SVSP-PIP were suicide-resistant.

**D)    Observation of Suicidal Patients**

Based upon previous findings regarding deficiencies in the adequate observation of suicidal patients in the PIP units, the prior assessment recommended that CDCR develop various CAPs surrounding the correct nomenclature for suicide observation (i.e., only Suicide Precaution and Suicide Watch), ensuring that regular nursing rounds were conducted at 15-minute intervals (meant for non-suicidal patients) were never be utilized as a substitute for Suicide Precaution status, and ensuring that suicidal patients were always assessed on a daily basis and adequately observed.

During the current assessment, this reviewer found that, consistent with the "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1), both Suicide Watch and Suicide Precaution statuses were utilized in all five PIP units. In addition, patients not on suicide observation status were said to be observed intervals that ranged from 15-minutes (at CHCF-PIP, CMF-PIP, and SVSP-PIP) to 60 minutes (at CIW-PIP and SQ-PIP). According to the Mental Health Observations Reporting Tool, all of the PIP units were over 90 percent compliance for both Suicide precaution and Suicide Watch status, but none of the facilities were at 100 percent compliance for either observation status during the current assessment.

As first reported during the 2021 assessment and verified again during this assessment, practices regarding the observation of suicidal patients at SVSP-PIP were found to be quite different than other PIP units. Whereas the vast majority of suicidal patients in other facilities were placed on Suicide Precaution, and Suicide Watch only utilized when patients were deemed at imminent risk for suicide, suicidal patients at SVSP-PIP were far more likely to only be placed on Suicide Watch, and Suicide Precaution (if utilized) was only used as a step-down from Suicide Watch for a short period of time (e.g., 24 hours or less). There appeared to be two reasons as to why Suicide Watch was utilized as the preferred observation level for suicidal patients at SVSP-PIP. First, providers were reluctant to place suicidal patients in non-suicide resistant cells without constant observation. Second, providers were relying on nursing personnel to conduct regular rounds at 15-minute intervals (meant for non-suicidal patients) rather than order Suicide Precaution status for a suicidal patient at 11-minute intervals.

At CIW-PIP, the facility continued to utilize two other observation levels: "Enhanced Observation" at 60-minute intervals and "Behavioral" Suicide Watch. Although an LOP stated that "Enhanced Observation" should not be utilized for suicidal patients, it continued to be unclear why a 60-minute level of observation was necessary when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals, and "Behavioral" Suicide Watch continued to be prohibited in the statewide PIP policy. CIW-PIP leadership had

previously informed this reviewer that "Behavioral" Suicide Watch required one-on-one continuous observation and allowed providers to authorize possessions and privileges while on suicide observation status.  Such a level of observation continued to be unnecessary because the PIP suicide prevention policy already allowed providers to provide possessions and privileges based upon documented clinical judgment.

In addition, this reviewer found at least two cases during the medical chart review in which "Behavioral" Suicide Watch was still being utilized at the CIW-PIP, as well as clinicians not always providing assessments of these patients on a daily basis.  In the first case, the patient was on "Behavioral" Suicide Watch from November 12, 2022 through December 14, 2022 and was seen by a clinician for only 17 of the required 33 days or 52 percent of the time.  In the second case, the patient was on "Behavioral" Suicide Watch from April 4, 2023 through May 17, 2023 and was seen by a clinician for 35 of the required 44 days or 80 percent of the time.

Problems related to the daily assessment of suicidal patients were not limited to CIW-PIP.  As discussed in more detail in the next section, CMF-PIP providers were continuing to withhold certain clothing and other possessions from patients discharged from suicide observation status, as well as not always interacting with these patients on a daily basis.  At CHCF-PIP, this reviewer examined the medical charts of 15 patients who were on suicide observation status for more than four days in either November or December 2022.  The review found that patients were not always seen on a daily basis by the provider, with at least missed daily checks in 73 percent (11 of 15) of the cases.  In addition, most daily interactions were cell front and not in the privacy of an interview room.  In multiple cases, there were not any provider notes that justified the discontinuation of suicide observation.  In one case, for example, the patient was on Suicide Watch from November 21 through December 15, 2022, and then downgraded to Suicide Precaution from December 15 through December 21, 2022.  Several daily assessments were missed and provider notes stopped on December 18, 2022, three days before the suicide observation ended on December 21, 2022.  As such, a provider order was entered into EHRS on December 21 to discontinue Suicide Precaution, but the patient was not assessed on that date.  At SVSP-PIP, the chart review indicated suicidal patients were not always seen on a daily basis while on suicide observation, as well as cases in which nurses' notes indicating the providers authorized discharge from suicide observation without actually assessing the patients.

In sum, although no issues were found at SQ-PIP, and all of the PIP units were over 90 percent compliance for both Suicide Precaution and Suicide Watch status (but none were 100 percent compliant), significant deficiencies were to be found at both SVSP-PIP (in rarely utilizing Suicide Precaution) and CIW-PIP (by utilizing an unauthorized "Behavioral" Suicide Watch level), and required daily assessment of suicidal patients were inconsistently found at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that the four CAPs for observation of suicidal patients were at various stages of implementation, with an "anticipated" completion date of December 31, 2023.

To date, CDCR has not notified the Special Master or this reviewer that these deficiencies have been resolved. Of note, the current CAP related to observation of suicidal patients will need to be expanded to also include a current finding of inconsistent daily assessment of suicidal patients.

### E)    Proper Clothing and Possessions

The PIP suicide prevention policy states that patients on Suicide Watch should normally be clothed in safety smocks, with patients on Suicide Precaution normally clothed in t-shirts, boxers, and socks, commonly referred to as "partial issue." However, the policy also stated that "Providers need not to default to providing minimal issues. The psychiatrist or licensed psychologist may authorize additional items if clinically indicated. Additional items must be supported by a thorough chart review and documented clinical rationale."

Based upon disparate practices found in the provision of clothing and other possessions for suicidal patients, this reviewer previously recommended that CDCR "Develop CAPs at CHCF-PIP, CIW-PIP, CMF-PIP, and SQ-PIP to ensure that all provider orders regarding clothing and possessions are clinically justified in medical charts, and that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions."

During the current assessment, each PIP unit was found to have current provider orders (to include level of observation, patient issue, and privileges) placed outside each suicidal patient's door on Adaptive Support Forms (CDCR 128 C-2). However, this reviewer found significant problems at both CMF-PIP and CHCF-PIP.

At CMF-PIP, providers wrote progress notes and "issue" orders that restricted clothing for suicidal patients as an alternative to either 1) placing patients on suicide observation status or 2) discharging patients from suicide observation status but continuing the limited issue orders for safety smocks or t-shirt/boxers. For example, it was not uncommon to read the following provider notes for such patients: "Plan: Will discontinue special precautions at this time, but will continue the safety smock" or "In my clinical opinion, SP is not indicated but limited issue is and being continued as least restrictive measure to prevent danger to self."

At CHCF-PIP, similar to the 2021 assessment, this reviewer continued to find problems with complying with the PIP policy requirement of "documented clinical rationale" for the issuance of clothing and property for patients on suicide observation status. There were very few patients observed in "partial issue" of t-shirt and shorts, with the majority of suicidal patients dressed in "full issue" of blue shirts and pants regardless of whether they were on Suicide Watch or Suicide Precaution status. A handful of patients were in safety smocks. The required "documented clinical rationale" was absent in many reviewed medical charts. In addition, many of CHCF-PIP provider orders and provider progress notes were contrary to each other, as well as contrary to the actual clothing provided to the patient. For example, when touring one housing unit, this reviewer found that, although two particular patients were both clothed in safety smocks, the Adaptive Support Forms (CDCR 128 C-2) on the patients' doors indicated "blues only." This reviewer then asked for clarification by nursing staff on the unit and subsequent review of the patients' medical charts found contradictory provider orders for "issue" by which

there were notations for both "blues only" alongside an order for "safety smock. No blues or whites." A psychiatrist subsequently updated the orders to reflect only a safety smock would be issued to each patient.

In sum, although no issues were found at CIW-PIP, SVSP-PIP, and SQ-PIP, significant deficiencies continued to be found at both CHCF-PIP and CMF-PIP.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that CAPs for adequate provision of clothing and other possessions for suicidal patients were at various stages of implementation at CHCF-PIP, CIW-PIP, CMF-PIP, and SQ-PIP, with an "anticipated" completion date of December 31, 2023. This reviewer's current assessment found adequate practices at both CIW-PIP and SQ-PIP. To date, CDCR has not notified the Special Master or this reviewer that these deficiencies have been resolved at both CMF-PIP and CHCF-PIP.

F)     **Out-of-Cell Activities**

According to the PIP suicide prevention policy, "Consistent with clinical rationale and discretion, follow existing local operating procedures (LOPs) for all PIP patients to continue to provide out-of-cell activities (including yard), telephone use, and visiting for both non-Max and Max patients." When this policy was released on December 31, 2020, there was concern expressed by the Special Master and this reviewer with respect to the lack of specificity in the policy regarding staff responsible for the provision of out-of-cell activities for suicidal patients in the PIPs, particularly for maximum security patients, and the lack of LOPs to address the issue in each PIP. When releasing the PIP suicide prevention policy, CDCR's Office of Legal Affairs informed the Special Master on December 28, 2020, that the provision of out-of-cell activities in the PIPs "is a complicated issue that requires an individualized approach at each institution and that the collaboration necessary between nursing, custody, and mental health to develop the details requested could not be completed by the Court's deadline" (of December 28, 2020). Despite this proclamation, CDCR did not release any further clarification, either through directive and/or LOP template regarding out-of-cell activities, to the PIPs during 2021. In April 2023, the SPRU forwarded LOPs from each PIP unit (some finalized and others in draft form) regarding out-of-cell activities for suicidal patients to this reviewer. The reviewed LOPs did not address the minimum time and frequency of offered showers, yard/dayroom, telephone calls, and visits.

This reviewer's previous assessment found highly problematic practices regarding out-of-cell activities for suicidal patients at several PIP units, including CHCF-PIP, CMF-PIP, and SVSP-PIP. At both CIW-PIP and SQ-PIP, most, but not all, patients were regularly offered out-of-cell activities. The previous audit also found that the automated Non-Clinical Activity Tracking (NCAT) database utilized to track out-of-cell activities of all PIP patients produced unreliable data.[23] The following two recommendations were offered: "Develop a CAP for all

---

[23] Requirements regarding the Non-Clinical Activity Tracking (NCAT) database are contained within Volume 12, Mental Health Services, Chapter 11: Correctional Treatment Center,

PIPs to ensure that suicidal patients have access to out-of-cell activities that are clinically justified, including those on maximum-security status' and "Develop a CAP to improve the reliability of data generated from the  NCAT (Non-Clinical Activity Tracking) database regarding out-of-cell activities."

During the current assessment, this reviewer was informed that the NCAT Report was now considered to be a reliable source of data tracking out-of-cell activities for PIP patients. With the exception of SQ-PIP where NCAT data indicated that patients were offered and received an adequate number of out-of-cell activities each week, problems were found at the other four PIP units.

At CMF-PIP, this reviewer examined 30 NCAT Reports for documentation of out-of-cell activity for patients on suicide observation status during at least part of a seven-day period in December 2022.  All reviewed patients were cleared for all out-of-cell activities by providers. The review found that that 77 percent (23 of 30) of patients were offered yard/dayroom of ten hours or more, only 23 percent (7 of 30) of patients were offered showers three times during the week, 77 percent (23 of 30) of patients were offered at least one telephone call, and none of the patients were offered visits (not surprising given the short time period being reviewed).

At CHCF-PIP, this reviewer examined 62 NCAT Reports for documentation of out-of-cell activity for patients on suicide observation status during a seven-day period in December 2022.  All reviewed patients were cleared for all out-of-cell activities by providers.  The review found that that only 19 percent (12 of 62) of patients were offered yard/dayroom of ten hours or more, 32 percent (20 of 62) of patients were offered showers three times during the week, 55 percent (34 of 62) of patients were offered at least one telephone call, and 3 percent (two of 62) of patients were offered visits (nor surprising given the short time period being reviewed).

At SVSP-PIP, this reviewer examined 28 NCAT Reports for documentation of out-of-cell activity for patients on suicide observation status during at least part of a seven-day period in December 2022.  All reviewed patients were cleared for all out-of-cell activities by providers. The review found that that only seven percent (two of 28) of patients were offered yard/dayroom of ten hours or more, 43 percent (12 of 28) of patients were offered showers three times during the week, 86 percent (24 of 28) of patients were offered at least one telephone call, and none of the patients were offered visits (not surprising given the short time period being reviewed).

At CIW-PIP, this reviewer examined the 38 NCAT Reports for documentation of out-of-cell activity for patients during a seven-day period beginning on April 30, 2023.  Within the PIP, 38 patients were tracked by NCAT during a 7-day period beginning on April 30, 2023.  The review found that 100 percent (38 of 38) of patients were offered yard, 61 percent (23 of 38) of patients were offered dayroom, 100 percent (38 of 38) of patients were regularly offered showers, but only a few of the patients were offered telephone calls documented in the NCAT.

---

Psychiatric Inpatient Program, No. 12.11.1706, Patient Policies: Non-Clinical Out-of-Cell Time Tracking, March 8, 2021, and state that "The NCAT shall be used to track all out-of-cell non-clinical leisure activities offered to PIP patients.  Scheduled and non-scheduled activities shall be tracked using NCAT."

However, this reviewer was informed that because most of the patients had been issued tablets, use of the tablet for telephone calls was not documented in the NCAT and staff theorized that patients were free to make phone calls on a regular basis. With that said, patients on suicide observation status were not issued tablets and, if allowed telephone calls, there was no system to document whether these patients were offered telephone calls without their tablets.

Finally, at SQ-PIP, this reviewer examined the 31 NCAT Reports for documentation of out-of-cell activity for patients during a seven-day period of April 30 through May 6, 2023. The review found that on average each patient was offered: 17 hours of yard/dayroom per week, three showers (five received two showers) per week, and nine telephone calls per week. In addition, two patients received visits during the week. Finally, the two patients on Suicide Watch were offered 14 and 15 hours, respectively, of yard/dayroom, three showers each, and five telephone calls each.

In the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that "Step 1: On December 28, 2022, the Regional Healthcare Executives assumed responsibility for the operationalization and implementation of guidelines around the provision of out-of-cell time for patients who are on suicide watch and precautions. The expectation is that within 30 days the PIP institutions would implement processes to allow for this expectation to occur and within 60 days, the PIPs would have approved LOPs related to the directive," and "Step 2: Regional Suicide Prevention Coordinators will conduct site visits to assess adherence to this policy and work with institutions to develop more targeted intervention if the LOP is not being followed." The "anticipated" completion date of August 31, 2023. To date, CDCR has not notified the Special Master or this reviewer that this completion deadline was met.

**G)    IDTT Meetings**

During the previous assessment, observed IDTT meetings were inconsistent within all of the PIP units. Although there was good treatment team representation, most meetings were problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding suicide risk histories, current suicide risk and observation, clothing/possessions/out-of-cell activities, and safety planning to reduce further recurrence of SI. This reviewer recommended that CDCR develop a CAP for each PIP unit to address these deficiencies.

With exception of SQ-PIP, there were continued problems found during observation of IDTT meetings for suicidal patients at the other four PIP units during the current assessment. At SQ-PIP, ten IDTT meetings were observed during the on-site assessment. Overall, there was very good treatment team representation and participation by multiple teams. Each team member clearly knew each patient. With the exception of diagnoses not discussed in most cases, there were very good summaries regarding reason for admission, course of treatment, medication, observation level, and out-of-cell privileges discussed in each case. Although the meetings tended to be lengthy, interaction between team members and each patient were

conversational, with the patient's first name consistently used during discussions. When appropriate, safety planning was discussed by asking the patient "What coping skills have we been working on?" and "What treatment goals do you have in the next 30 days?" Several patients verbalized learned techniques to decrease suicidal thoughts. Such an approach was far different then IDTT meetings observed by this reviewer in other facilities in which safety planning was vaguely discussed in the context of the primary clinician simply stating that "We have been working on safety planning" or "We will work safety planning," with the patient never being asked to articulate the plan or coping skills that were learned.

Numerous IDTT meetings for suicidal patients were also observed during the current assessments at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP. Overall, although treatment team representation was good at each PIP, many meetings (involving varying clinical staff) were problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), review of diagnoses, little or no discussion about observation level and possessions for those patients currently on either Suicide Precaution or Suicide Watch, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI.

One case was indicative of the problem. The patient was admitted into the APP at CHCF-PIP on January 9, 2023 for danger to self. This reviewer observed his initial IDTT meeting on January 11. The patient was clothed in a safety smock. Questioning was limited to his level of depression (which he rated as "7" out of 10), current suicidal ideation ("yes, I am always suicidal"), and psychotropic medication. There was no case presentation or discussion of diagnoses. There was no discussion regarding his level of observation, issue (other than he was clothed in a smock), or out-of-cell activities. There was no further discussion regarding his current suicide risk and/or history of suicidal behavior. There was no discussion regarding treatment and/or safety planning, preliminarily or otherwise. Following the IDTT meeting, the patient's medical chart was reviewed and found the following contained within the primary clinician's Acute/ICF Master Treatment Plan: "Patient was sent with following treatment outcome expectations: 1) Pt will not endorse active SI for at least two weeks prior to discharge; 2) Pt will report depression at 5/10 or lower for at least two weeks prior to discharge; 3) Pt will appropriately engage in safety planning and identification of coping skills to tolerate future episodes of depression and distress prior to discharge; 4) Pt will participate in at least one hour programming daily for at least three weeks prior to discharge." None of the above treatment goals were discussed with the patient during the IDTT meeting observed by this reviewer.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that the "anticipated" completion date of required CAPs for overall improvement in the quality of IDTT meeting presentations for suicidal patients would be December 31, 2023. To date, CDCR has not notified the Special Master or this reviewer that this completion deadline was met.

**H)**   <u>**Safety Planning**</u>

During the previous assessment, the quality of safety planning was found to be problematic within all of the PIPs.  In addition, the PIP suicide prevention policy (No. 12.11.2104.P1) required that "supervisory review (of safety plans) shall be completed prior to, or during the Interdisciplinary Treatment Team in which the discharging SRASHE is completed." This reviewer previously found that supervisory review of discharging SRASHEs and safety plans were untimely, not occurring at all, or incorrectly determining on occasion that safety plans were not required.

Although the quality of safety planning was not critiqued during this current assessment because CDCR transitioned to a new safety plan model in April 2023, the requirement for both safety plan completion and supervisory review of safety plans remained unchanged and was reviewed.  With the exception of both CIW-PIP and SQ-PIP where applicable safety plans (and the required supervisory review of those plans) were timely completed in most cases, continued problems were found at the other three PIP units.

At CMF-PIP, required safety plans were only completed in 76 percent (32 of 42) of the cases.  At CHCF-PIP, required safety plans at CHCF-PIP were only completed in 71 percent (30 of 42) of the cases.  In both facilities, some safety plans were not completed because the discharge SRASHEs were not completed (in two cases) or assessments incorrectly stated that safety plans were not required due to "low acute risk/not clinically indicated" or patients refused to participate in the process.  At CMF-PIP, this reviewer was informed that the required supervisory review of safety plans contained in discharging SRASHEs was not being completed due to shortages in supervisory staff, and the review process at CHCF-PIP was found to be seriously flawed by missing data and lack of acknowledgement that safety plans were completed by unauthorized clinicians (i.e., licensed and unlicensed clinical social workers).

At SVSP-PIP, required safety plans were completed in 86 percent (25 of 29) of the cases, with the same percentage completed by either licensed or unlicensed clinical social workers (contrary to policy).  This reviewer was initially informed that supervisory review of safety plans was being attempted, but compliance was uneven.  It was also determined that SVSP-PIP utilized a "Discharge Readiness Tool," as well as two other templates contained within EHRS entitled "PIP Supervisor Review" and "Discharge Review."  Following review of numerous discharge SRASHEs within the medical charts of patients discharged from the SVSP-PIP from November 2022 through January 2023, it was found that utilization of these EHRS tools for supervisory review of safety plans was flawed for multiple reasons.  For example, the Discharge Readiness Tool, PIP Supervisor Review, and Discharge Review templates did not document a critique of the safety plan, they simply summarized the care received by the patient at discharge.  Most of the narrative contained within these templates had simply been pulled forward from other documents.  In addition, none of these tools were found in 31 percent (9 of 29) of the cases examined by this reviewer.  Finally, the Discharge Readiness Tool contained language that incorrectly stated that safety plans were required to be completed "no later than seven days prior to the anticipated discharge IDTT," whereas the PIP suicide prevention policy required completion within 72 hours of discharge from the PIP.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that the two CAPs offered to address inadequacies in both safety planning and supervisory review within the PIP units had an "anticipated" completion date of December 31, 2023. To date, CDCR has not notified the Special Master or this reviewer that this completion deadline was met.

### I)    Contracting for Safety

The reviewer's prior assessment found that various psychiatric progress and/or nursing notes at three of the PIP units inappropriately utilized the term "contracting for safety" for partial justification for discharging patients from suicide observation. It was subsequently recommended that CDCR "Develop a CAP to ensure that 'contracting for safety' is not utilized in either the assessment of suicide risk or documentation of decision-making within the PIPs."

As a result, CDCR issued two memoranda on January 23, 2023 and February 17, 2023 entitled "Discontinue Use of Safety Contracts" that were directed to chief executive officers, chief nurse executives, chiefs of mental health, and chief psychiatrists. The memoranda emphasized that "These types of contracts do not produce any benefit to the patient and have been proven, through evidence-based research, not to be an effective approach to reducing self-harm or death by suicide." All prison facilities and PIP units were directed to provide appropriate staff training within 30 days.

In the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that the above references directives would be issued and the regional SPFIT coordinators would audit the results, with an "anticipated" completion date of July 30, 2023. During this current assessment, this reviewer found sparse references to "contracting for safety" in the PIP units. This finding was confirmed by subsequent regional SPFIT coordinator reports completed during 2023.

### J)    CPR Training

High rates of compliance with CPR training for both custody and medical staff continued to be found in all of the PIP units.

### K)    Suicide Prevention Training

During the current assessment, only one facility (CMF-PIP) reported over 90 percent compliance for annual suicide prevention block training during 2022 in each of the custody, medical, and mental health staff disciplines. CHCF-PIP reported over 90 percent compliance for both custody staff and medical staff, but only 83 percent for mental health staff. At SVSP-PIP, 100 percent of custody staff received suicide prevention training, but only 64 percent of medical staff and only 78 percent of mental health staff received annual suicide prevention training during 2022. At both CIW-PIP and SQ-PIP, custody and mental staff were above 90 percent compliance, but medical staff at both facilities were below 90 percent compliance during 2022.

With regard to the SRE mentoring program, seven-hour SRE, and safety plan training, there was wide variation of compliance amongst the five PIP units. At CMF-PIP, only 21 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and 88 percent had completed safety plan training as of December 2022. At CHCF-PIP, only two percent of mental health clinicians had completed the SRE mentoring program, 86 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training as of December 2022. At SVSP-PIP, only 28 percent of mental health clinicians had completed the SRE mentoring program, only 63 percent had received the seven-hour SRE training, and only 70 percent had completed safety plan training as of January 2023. At CIW-PIP, approximately 90 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and only 38 percent had completed safety plan training as of April 2023. Finally, at SQ-PIP, there was between 92 and 100 percent compliance with clinicians completing the SRE mentoring program, seven-hour SRE, and safety plan training as of April 2023.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that individual CAPs for compliance with annual suicide prevention training, as well as SRE mentoring program, seven-hour SRE, and safety plan training at the affected facilities had an "anticipated" completion date of December 31, 2023. To date, CDCR has not notified the Special Master or this reviewer that this completion deadline was met.

**L)    SPRFIT**

This reviewer's prior assessment found uneven and inconsistent continuous quality improvement practices in all local SPRFITS of the PIP units. In addition, meeting quorums were not consistently maintained. The prior recommendation was that CDCR should "Develop a CAP to ensure that SPRFITs at each PIP meet required monthly meetings quorums, and that deficient suicide prevention practices, including those cited in this reviewer's report, are remedied."

As detailed earlier in this report, beginning in 2021, CDCR's Statewide Mental Health Program and the CCHCS Quality Management Program entered into a partnership with the goal of standardizing operations among all local SPRFITs (of both the prisons and PIPs), increasing access to automated data, increasing the efficiency of SPRFIT meetings, and introducing nationally-recognized improvement techniques. The partnership became known as the "SPRFIT Reboot" and was implemented to the field in early 2023 at the same time that this reviewer was beginning the current PIP assessments.

During the current assessment, with one exception (SQ-PIP), quorums of attendance for SPRFIT meetings by all mandatory members or designees for six consecutive months were not achieved by any of the PIP units. For the most part, meeting minutes were unremarkable, and did not address any of the recommended corrective actions from this reviewer's 2021 assessment or identified any of the deficiencies found in the current assessment. At SQ-PIP, the SPRFIT meeting was integrated with the SQ prison and a review of minutes found that meetings typically

included discussion of compliance data, improvement projects, as well as the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT coordinator audits.

Finally, in the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs," ECF No. 7714, dated February 6, 2023, the defendants stated that the "SPRFIT Reboot" was adopted and CAPs to correct the noted deficiencies were being addressed, with an "anticipated" completion date of December 31, 2023.  To date, CDCR has not notified the Special Master or this reviewer that this completion deadline was met.

### M)  Patient Suicides

There were two (2) patient suicides in two different PIP units during the review period.[24] At CMF-PIP, a patient suicide occurred on October 22, 2022, resulting in 18 QIPs distributed amongst multiple facilities with nine QIPs specific to the CMF-PIP.  These nine QIPs included multiple IDTT deficiencies, including an untimely initial IDTT meeting, meetings held without patient or nursing representation; inadequate master treatment planning; contradictory providers orders regarding possessions resulting in the patient being provided with items that caused his death by asphyxiation; inadequate assessment of suicide risk three days prior to his death; inadequate nursing rounds when the patient was previously on suicide  precaution status; and emergency medical response.

At SVSP-PIP, a patient suicide occurred on March 16, 2023, resulting in 13 QIPs distributed amongst two facilities, with four (4) QIPs specific to the SVSP-PIP.  These four (4) QIPs included inadequate discussion of property and observation during IDTT meetings, inadequate documentation of treatment planning, inadequate preservation of the crime scene, and delay in 911 activation.  (Of note, SVSP-PIP also experienced two patient suicides on December 17, 2020 and January 30, 2021, respectively.)

## VI.  Conclusion and Recommendations

As stated in all of this reviewer's previous assessments, it continues to be noteworthy that CDCR, its management team (including the SMHP and its SPRU) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison and PIP facilities assessed during 2023, displayed total cooperation during the assessment process.  However, this reviewer's baseline assessment of suicide prevention practices in CDCR prison facilities began in November 2013 and now, after more than 10 years, CDCR's full and durable implementation of this reviewer's initial recommendations, as well as the correction of existing and often chronic ongoing deficiencies, continues to progress at varying speeds.  In some areas, there has been regression.  This despite the *Coleman* Court stating on February 28, 2023 that the defendants would face "civil contempt and, if necessary, monetary sanctions" if full implementation of all outstanding suicide prevention recommendations were not completed by April 1, 2023.  ECF No.

---

[24] Due to the enormity of deficiencies and QIPs identified in these two cases, summarization of the individual Suicide Case Reviews was not provided in this report.

7743 at 4. In addition, despite the fact that facilities were given several months of advanced notice to prepare for these assessments, as well as periodic audits from regional SPRFIT coordinators, deficiencies continued to be found during the current assessment that were easily observable and should not have been identified for the first time by this reviewer.

This reviewer fully acknowledges that staffing shortages have negatively impacted some of CDCR's suicide prevention compliance efforts. But not all suicide prevention deficiencies identified during this sixth re-audit can be, or should be, explained away by inadequate staffing.

As shown in Table 5 below, there were 30 suicides in CDCR during 2023, representing a significant increase in the number of such deaths from both 2021 and 2022. Approximately 63 percent (19 of 30) of the suicide victims were participants in the MHSDS. As of December 27, 2023, CDCR housed 92,961 IPs (in-state within its institutions and camps) and with 30 suicides, the resulting suicide rate was 32.2 deaths per 100,000 IPs. This rate was higher than the suicide rate of 27 per 100,000 found in state prison systems throughout the country.[25]

**TABLE 5**
**YEAR-END POPULATION, OVERALL SUICIDES/RESTRICTIVE HOUSING**
**SUICIDES, AND SUICIDE RATES WITHIN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**2019 THROUGH 2023[26]**

| Year | Population | All Suicides/Rate | Suicides in RHU/Percent |
|------|-----------|-------------------|-------------------------|
| 2019 | 117,506 | 38/32.3 | 12/31.5 |
| 2020 | 92,141 | 31/33.6 | 11/35.4 |
| 2021 | 96,522 | 15/15.5 | 7/46.6 |
| 2022 | 92,596 | 20/21.6 | 7/33.3 |
| 2023 | 92,961 | 30/32.2 | 6/20.0 |
| **2019-2023** | **491,726** | **134/27.3** | **43/23.1** |

As stated in all previous reports, caution should always be exercised when viewing the above data. Suicide rates are most meaningful when viewed over a sustained period of time and, as stated in all of this reviewer's reports, although the total number of suicides and the

___

[25] The suicide rate in state prison systems throughout the country was approximately 27 deaths per 100,000 IPs in 2019. More recent data not available. *See* Carson, E. (2021), *Suicide in Local Jails and State and Federal Prisons, 2000 - 2019 - Statistical Tables*, Washington DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (BJS).

[26] Source: California Department of Corrections and Rehabilitation.

corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured. The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be: (1) the assessment of suicide prevention practices within each prison, and (2) a review of each suicide in relation to practices in the prison and determining its degree of preventability.

Finally, it is again recommended that CDCR continue their efforts to fully implement this reviewer's previous recommendations, as well as develop CAPs based upon deficiencies found in this most recent assessment. As shown below, most of these critical corrective actions are not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention practices within its prisons. As such, in cooperation with the Special Master and his experts, CDCR should:

- Develop CAPs for the eight facilities (CCI, CHCF, CIM, CIW, CMC, SQ, SVSP, and WSP) referenced above related to the intake screening process.
- Develop a CAP to correct PT deficiencies in CSATF's restrictive housing unit.
- Develop a CAP to expedite the renovation of the former seclusion room (No. B-68) in the MHCB unit at CCWF into a clinical interview/treatment room. Given the fact that private clinical space was limited for all MHCB patients at CCWF, this room should be made available to all MHCB patients, i.e., both non-maximum security and maximum-security custody.
- Develop CAPs at CIM, CMC, KVSP, CSP/LAC, RJD, SVSP, and WSP to ensure that newly-arrived administrative segregation IPs assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement. IPs on new intake status should never be placed in an "overflow" administrative segregation unit unless that unit has designated new intake cells.
- Develop CAPs for the eight (8) facilities (CIM, CMC, MCSP, COR, NKSP, KVSP, CSP/LAC, and SVSP) that fell below 90 percent compliance with both Suicide Precaution and Suicide Watch observation for MHCB patients, although all CDCR facilities are required to be at 100 percent compliance.
- Develop CAPs for both KVSP and RJD to prohibit the inappropriate placement of suicidal patients on 30-minute observation.
- Develop CAPs for the 12 facilities (CCWF, CHCF, CIM, CIW, CMF, CSP/Corcoran, CSP/Sac, CSATF, KVSP, PBSP, RJD, and WSP) to remedy misuse of CDCR policies, including Daily Program Status Reports, and ignoring provider orders documented on daily Adaptive Support Form (CDCR 128 C-2) regarding the provision of authorized out-of-cell activities or privileges.
- Issue a clarifying memorandum that mandates at least once a week telephone access absent any clinical contraindication and/or disciplinary sanction to remedy continued misinterpretation of CDCR policy regarding telephone privileges afforded to both non-maximum security and maximum security MHCB and PIP patients.

- Immediately forward an updated draft policy that clearly articulates the expectations for how to utilize safety smocks and blankets within MHCB settings to the Special Master as pledged in the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023.

- Immediately forward a status update on the BCP funding request of a small management yard (SMY) in the MHCB unit at CSP/Corcoran, as well as expedite construction of the SMY to the Special Master as pledged in the "Defendants' Report on the Status of the Steps Required to Complete Suicide Prevention Corrective Action Plan," ECF No. 7750, dated March 1, 2023.

- Develop CAPs for the six facilities (CMC, CHCF, CSATF, NKSP, CSP/Solano, and RJD) that were under 90 percent compliance for completion of SRASHEs for emergent/urgent mental health referrals involving SI and SIB, although all CDCR facilities are required to be at 100 percent compliance.

- Develop CAPs for the ten facilities (CCI, CCWF, CHCF, CMC, CMF, CSP/Corcoran, CSATF, CSP/LAC, CSP/Solano, and PBSP) that had completion rates under 90 percent for both the SRE mentoring program and annual or biennial SRE Mentoring Booster training as applicable.

- Develop a CAP for RJD to ensure that clinicians are prohibited from utilizing the Columbia-Suicide Severity Rating Scale (C-SSRS) screening form as an alternative to the SRASHE when IPs present as possible risks for suicide by expressing SI and/or engaging in SIB, as well as when IPs are discharged from the MHCB and Alternative Housing when the reason for admission was danger to self.

- Ensure that all CDCR facilities with a CIT program provide referred IPs with continuous observation prior to the CIT arrival, offering of reasonable privacy and confidentiality during the encounter, full team participation (by clinician, authorized nurse, and lieutenant/ sergeant), and adequate assessment by the clinician (including SRASHE completion and adequate record review).

- Develop CAPs for the 19 facilities (CCI, CCWF, CHCF, CIM, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, and WSP) that were under 90 percent compliance with safety planning completion at MHCB and/or Alternative Housing discharge.

- Develop separate CAPs to ensure that each of the 19 CDCR facilities with MHCB units are in compliance with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy requiring review and revision (when appropriate) of safety plans prior to, or during, discharge IDTT meetings.

- Hold a one-day "safety planning summit" comprised of each facility's Chief of Mental Health, MHCB supervisor, SPRFIT coordinator, and other clinical representation or designees as the SMHP deems appropriate. The primary purpose of the summit would be to solicit input from the field as to why safety planning has met with poor initial results, clarify policy requirements and expectations, ensure that MHCB supervisors or designees have a basic understanding of safety plan development, and make modifications to the current model and training if appropriate.

- Develop CAPs for the 18 audited facilities (CCI, CCWF, CHCF, CIM, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, SQ, and WSP) that continued to be below 90-percent compliance with Page 1 and/or Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form.
- Instruct CSP/LAC to immediately rescind or revise its "experimental five-day follow-up" pilot program memorandum of August 4, 2023 to ensure that all IPs are on discharge custody status for only up to 72 hours, are not locked down in their cells 24 hours a day, and not prohibited from out-of-cell activities such as yard and telephone usage, and not prohibited from out-of-cell contact with mental health clinicians.
- Develop CAPs for the ten facilities (CCI, CCWF, CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, PBSP, and SVSP) that did not achieve six consecutive months of SPRFIT meeting quorums for all mandatory members or their designees.
- Develop CAPs for the four (4) facilities (CHCF, CSP/Corcoran, CSATF, and KVSP) that did not have LOPs (for SPRFIT, Inmate-Patients Receiving Bad News, CIT, and/or the SRMP) that were consistent with the SPRFIT memorandum.
- Develop CAPs for the eight (8) facilities (CCI, CIW, CHCF, CMF, KVSP, MCSP, CSP/Solano, and SVSP) that did not track and review SRMP patients during monthly SPRFIT meetings.
- Develop CAPs for the four (4) facilities (CMF, CSATF, MCSP, and NKSP) that did not track prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians in either monthly SPRFIT minutes or in separate documentation.
- Develop CAPs for all facilities that had compliance rates below 90 percent for annual suicide prevention training, and specifically for the eight (8) facilities (CIW, CMC, CMF, CSP/LAC, CSP/Sac, CSATF, HDSP, and SQ) that were below 90-percent compliance for suicide prevention training of medical personnel.
- Correct deficiencies and improve consistency in regional SPRFIT coordinator reports based upon the above findings.
- Ensure that regional SPRFIT coordinator reports are completed on a quarterly basis for facilities with a MHCB and/or PIP, and more frequently based upon Suicide Prevention Guidebook criteria.  Additional resources may be necessary to meet this schedule.
- Develop a CAP for CCWF to ensure that RC diagnostic clinicians always review the nursing Initial Health Screening form prior to completion of the MH Screening Interview form.  The CAP should also address the requirement of 'proof of practice' audits and subsequent presentation of findings are appropriately reported in quarterly SPRFIT minutes.
- Develop at CAP for NKSP to ensure that RC diagnostic clinicians always review the nursing Initial Health Screening form and county jail records, as well as request signed ROI forms in applicable cases.
- Develop a CAP at WSP to ensure that RC diagnostic clinicians always request signed ROI forms in applicable cases.

With regard to the <u>PIP</u> units, in cooperation with the Special Master and his experts, CDCR should:

- Provide verification that the previous CAP to ensure uniformity during the nursing intake screening process within the PIPs whereby all programs are utilizing an intake screening form that contains adequate suicide risk inquiry has been fully implemented.
- Provide verification that all admission and discharge SRASHEs are completed in a timely manner by only licensed psychologists or psychiatrists pursuant to PIP policy.
- Provide verification that all cells designated to house suicidal patients at SVSP-PIP are now suicide-resistant.
- Provide work plans and CAPs that address the need for fencing or other barriers to prevent patients on suicide observation status from jumping from the second tiers of C-5 and C-6 units at SVSP-PIP.
- Provide verification that the previous CAP to ensure that all patients on suicide observation status are always adequately observed at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP has been fully implemented.
- Provide verification that "Behavioral Suicide Watch" is no longer utilized at CIW-PIP.
- Provide verification that suicidal patients are being assessed by a mental health clinician on a daily basis at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP.
- Provide verification that the CAPs to ensure that all provider orders regarding clothing and possessions are clinically justified in medical charts, and that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions at both CHCF-PIP and CMF-PIP have been fully implemented.
- Provide verification that the CAPs to ensure that suicidal patients have access to out-of-cell activities that are clinically justified, including those on maximum-security status, at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP have been fully implemented.
- Provide verification that the CAPs to improve consistency of IDTT meetings for suicidal patients, to include adequate case presentations; higher level of care discussions (during meetings for ICF patients); adequate discussion regarding suicide risk histories; current suicide risk and observation; clothing, possessions, and out-of-cell activities; and safety planning to reduce further recurrence of SI at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP have been fully implemented.
- Provide verification that the CAPs to improve the adequacy of safety planning, as well as supervisory review of safety plans, at CHCF-PIP, CMF-PIP, and SVSP-PIP have been fully implemented.
- Provide verification that SVSP-PIP is no longer utilizing the "Discharge Readiness Tool," "PIP Supervisor Review," and "Discharge Review" EHRS templates in its supervisory review of safety plans.
- Provide verification that the CAPs to ensure that custody, medical, and mental health staff compliance for annual suicide prevention training was above 90 percent, and that mental health clinician compliance rates for SRE mentoring program, seven-hour SRE, and safety plan training was above 90 percent at all PIPs have been fully implemented.
- Provide verification that the CAPs to ensure that CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP CDCR achieved six consecutive months of SPRFIT meeting quorums for all mandatory members or their designees have been fully implemented.

- Provide verification that the CAPs to ensure that SPRFITs at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP tracked prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians in either monthly SPRFIT minutes or in separate documentation have been fully implemented.

In conclusion, as the *Coleman* court clearly indicated in its order dated September 3, 2020, "The twenty-nine recommendations must be completely and durably implemented to allow comprehensive assessment of their efficacy in reducing the ongoing number of foreseeable and/or preventable inmate suicides in California's prison system." ECF No. 6846 at 22.

With this current assessment, this reviewer is still unable to report that all 29 of these recommendations have been "completely and durably implemented."  In fact, this current sixth re-audit found that only one (Recommendation 20) of the 15 remaining recommendations has been fully implemented.  With regarding to the PIP units, although numerous deficiencies in the provision of adequate suicide prevention practices were found in the PIP units, because this first re-audit assessment of those programs occurred in the midst of the defendants' implementation of corrective actions to address this reviewer's initial 16 recommendations, a determination of full and durable implementation is deferred until the next re-audit.

As such, and consistent with previous reports by this reviewer, continuing re-inspection of select CDCR facilities (and the PIPs) which chronically struggle with their suicide prevention programs is necessary and would allow for continued provision of technical assistance to CDCR in achieving complete and durable implementation of these recommendations, a measurement of the sustainability of CDCR's corrective actions, and continued observation of the department's CQI process at individual facilities, leading to decreased future monitoring and hopefully long-term reduction of suicides throughout CDCR.

# APPENDIX A

1)    **California State Prison - Sacramento (CSP/Sac)**

**Inspection**: April 4-6, 2023 (previous suicide prevention audit was on June 16-18, 2021). CSP/Sac housed approximately 1,480 incarcerated persons (IPs) at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the **Intake Screening** process in the R&R unit on April 4 and April 5.  The nurse's office was configured with a long counter against the wall and a TTM in the corner of the far wall.  A previous deficiency of nurses sitting at the counter with their back to IPs, as well as not asking all of the intake questions, had been corrected.  Four intake screenings were observed during the two days, with nurses facing each IP and, with one exception, asking all required questions pertinent to mental health and suicide risk.  (The one exception was a nurse who did not ask a follow-up question after the IP answered in the affirmative to the question – "Has the inmate ever made a suicide attempt?"  The follow-up inquiry, which is critical to determine whether an emergent mental health referral is required for an IP who engaged in suicidal behavior during the past year,[27] was subsequently elevated to CCHCS headquarters for revision of EHRS that would include inquiry regarding timing of prior suicide attempt.)  In each case, the nurse's office door was closed during the process.  Suicide prevention placards (in both English and Spanish) were located inside the nurse's office and visible to IPs during the intake screening process.

Daily **PT Rounds** were observed in several of the restricted housing units, including PSU-A, PSU-B, the STRH unit, and EOP ASU (A-5).  Overall, multiple PTs were observed during the onsite assessment, with rounds appropriately performed and Psych Tech Daily Rounds information entered into EHRS for each caseload IP.

**Housing**: CSP/Sac had two CTCs; CTC-1 had 13 **MHCBs** and CTC-2 had 11 MHCBs.  This reviewer previously found that all 24 patient rooms within CTC-1 and CTC-2 were suicide-resistant.  All rooms in the MHCB units were occupied during the onsite assessment.  Of note, the unlicensed Mental Health Crisis Bed Unit was permanently deactivated by CDCR on October 18, 2022.

There were 17 designated **New Intake Cells** (106-109, 114-121, 217-221) in the administrative segregation EOP unit (A-5) previously found to be suicide-resistant.  In addition, there were 11 designated new intake cells (100-111) in the STRH unit previously found to be suicide-resistant. Overall, this reviewer did not observe any new intake IPs in non-new intake cells in either the administrative segregation EOP or STRH units.

Finally, **Alternative Housing** cells to temporarily house IPs awaiting MHCB placement were used on a regular daily basis and primarily found in the B-7 Unit.  According to the available data, 102 IPs were housed in alternative housing from January 1, 2023 through March 31, 2023, a dramatic increase from the previous assessment when only 18 IPs were held on this status during comparable three-month period.  All IPs were provided beds, required to be observed on a

---

[27] *See* MHSDS *Program Guide*, 12-10-9.

continuous 1:1 basis, and discharged from alternative housing within 24 hours. Only one IP was held for more than the required 24 hours (i.e., 36 hours).

Of note, 16 of 102 (16 percent) IPs classified for alternative housing refused to leave their cells for transport to designated cells, therefore, continuous 1:1 observation was provided at their assigned cell. Two thirds (67 percent) of the 102 MHCB referrals were rescinded and IPs returned to their housing units. This reviewer also examined a sample of 20 EHRS charts for IPs discharged from alternative housing in March 2023 and found that the required SRASHEs were completed in all cases, and 18 of 20 (90 percent) had all daily clinical follow-ups for each of the five required days.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** units. In addition, patients not on suicide observation statuses were observed at 30-minute intervals by nursing staff with documentation of such checks entered into the EHRS. During March 2023, the Mental Health Observations Reporting Tool indicated that 23 patients were on observation status in the two MHCB units, with 95 percent compliance with timely observation of patients on Suicide Precaution and 91 percent compliance with timely observation of patients on Suicide Watch.

Further, a previous deficiency of requiring all patients to remain on Suicide Precaution status and clothed in only boxers and a t-shirt, regardless of their suicide risk (or lack thereof) had been corrected. As noted above, non-suicidal patients are now observed at 30-minute intervals, and this reviewer observed all of these patients were provided full clothing. This reviewer also did not observe any inappropriate use of safety smocks during the assessment.

Finally, a review of **Guard One** data for a recent 24-hour period found an overall combined 95 percent compliance rate with required checks not exceeding 35 minutes in STRH, administrative segregation EOP, and the two PSU units. As detailed below, this high rate of compliance was offset by the fact that an IP who committed suicide in the PSU during June 2022 was found in the state of rigor mortis, an indication that Guard One checks were not adequately completed.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of October 1, 2022 through March 31, 2023. A sample EHRS review of 62 emergent/urgent referrals for suicidal ideation (SI)/self-injurious behavior (SIB) revealed that clinical staff timely completed the required SRASHEs in 94 percent (58 of 62) of the cases.

It was also noteworthy that CSP/Sac has experienced a significant increase in completed SRASHEs during the past five months, with 520 SRASHEs completed in November 2022 and 912 SRASHEs completed in March 2023. This reviewer's chart review found multiple IPs routinely expressing SI, resulting in the completion of multiple SRASHEs during a 24-hour period.

In addition, the **Crisis Intervention Team** was available daily during the third shift on weekdays from approximately 3:00 p.m. to 8:00 p.m., with a crisis clinician responding to referrals during the second shift. This reviewer had an opportunity to observe the CIT process on April 4, 2023.

The IP (SAC 1) allegedly had been harassed by an officer regarding his IEX status and expressed SI out of frustration. Upon arrival, the IP was observed in a holding cell located in a common area of the PSU, with continuous 1:1 supervision provided by nursing staff. The CIT, comprised of a clinician, nursing supervisor, and unit sergeant, inappropriately assessed the IP in the holding cell in full view and hearing distance of other staff and IPs, and without the opportunity for privacy and confidentiality. The clinician's initial assessment was brief, with the IP recanting any SI, but continued to express and anger at the aforementioned officer. The clinician decided not to refer the IP to a higher level of care. Subsequent review of the medical chart indicated that the clinician completed the required SRASHE, assessed the IP as having a "moderate" chronic risk and "low" acute risk for suicide.

Of note, although a nursing supervisor was observed to be a part of the CIT in the above case, review of several medical charts for CIT responses indicated that psychiatric technicians (PTs) were noted to be the sole nursing staff for those responses, a violation of the CIT policy that requires the presence of a registered nurse, nursing supervisor, or senior psychiatric technician when a psychiatric technician is in attendance.[28]

This reviewer observed 16 **IDTT Meetings** in the MHCBs on April 4-6, 2023. Overall, there was good treatment team representation, adequate case presentations and higher level of care discussions, sufficient inquiry into whether patients understood their diagnoses, and appropriate discussion with patients regarding their observation level, property, and privileges. As discussed in more detail below, IDTT meeting discussion involving patients being discharged following placement for danger to self (DTS) displayed varying levels of inadequacy regarding safety planning, with some PCs inappropriately informing patients that they would discuss safety planning following the IDTT meeting.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for the 23 CTC-1 and CTC-2 patients who were housed in the MHCBs for at least three days (and had at least their initial IDTT meeting), with many housed for more than three weeks and awaiting transfer to a higher level of care. Although showers were offered on a regular basis multiple times a week, opportunities for yard were typically offered on average of only once (for an hour) every five days, and telephone calls were offered to only six of 23 patients. Of note, this reviewer observed that correctional counselors (CCs) incorrectly stated during IDTT meetings that patients placed in the MHCB from restrictive housing were prohibited from personal telephone calls except in emergencies.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCBs, this reviewer examined the medical charts of 40 patients discharged from the units between February and March 2023 and remained at CSP/Sac. The review found that required SRASHEs were completed in all cases, with safety plans found in 36 of 40 (90 percent) cases, and 34 of 40 (85 percent) cases had daily clinical follow-ups for each of the five consecutively required days. However, many of the safety plans were viewed as inadequate, see below.

---

[28] *See* CCHCS' "Crisis Intervention Teams" Procedure, No. 12.01.700(P1), dated July 6, 2022.

In addition, the MHCB supervisor reported to this reviewer that they were aware of the responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCBs [pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020].  The policy requires the MHCB supervisor (or designee) to review the SRASHE and safety plan "Prior to, or during the clinical discharge Interdisciplinary Treatment Team (IDTT) from the MHCB…. After reviewing, if the SRASHE needs to be modified, the MHCB supervisor shall notify the clinician prior to, or during, the discharge IDTT of the changes that must be made."  The MHCB supervisor reported they attempted to review the SRASHEs and safety plans on a regular basis until February 2, 2023.[29]  This writer's examination of the MHCB supervisor's review found that 40 of 43 (93 percent) of the safety plans completed in December 2022 and January 2023 received a "pass" score, an indication of adequacy.  This reviewer, however, found that 72 percent (31 of 43) of the safety plans were reviewed by the MHCB supervisor after the patients' clinical discharge from the MHCBs, in violation of the policy.  In addition, many of the safety plans were inadequate and it was dubious that they received a passing score.  For example, in one case, the patient (SAC 2) had an extensive history of self-injurious behavior totaling at least 41 incidents that resulted in approximately 26 MHCB, five ICF, and six APP placements between January 2016 through January 2023.  The patient's following safety plan received a "pass" score in January 2023:

> Step 1 (Warning Signs): "***When I am mad, depressed, I manipulate the system and cut myself."***
> Step 2 (Independent Coping Skills): ***"Talking to friends, peers, watching TV, listening to radio, talk to clinician and psychiatrist."***
> Step 3 (Distracting People & Places): ***"Talking to my girlfriend to calm me down."***
> Step 4 (People to Ask for Help): ***"Girlfriend, kids."***
> Step 5 (Professionals to Contact): ***"Clinician."***
> Step 6 (Means Safety): ***"Talking to my girlfriend, talking to my kids."***
> Step 7 (Reasons to Live): ***"My girlfriend, talking to my kids."***

This safety plan obviously did not include specific strategies to address the recurrence of self-injurious behavior and/or suicidal ideation.

During the onsite assessment, this reviewer examined multiple safety plans that were based upon the new model that became effective on February 13, 2023.[30]  The review found that some

---

[29] As noted earlier in this report, the reviewer was informed that the Statewide Mental Health Program (SMHP) issued an email to the field on February 2, 2023 that the "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" would be in a "momentary pause" until the roll-out of the new safety plan model and CAT audit were completed.  The Special Master and his suicide prevention expert (this reviewer) were not informed of this decision.  On April 5, 2023, following discussion with this reviewer, the SMHP issued a revised memorandum stating that, despite the pause in CAT audit completion, the supervisory review of MHCB safety plans would commence once again.

[30] *See* CCHCS' "Safety Planning" Procedure, No. 12.07.901(P1), dated February 13, 2023.

MHCB clinicians were simply cutting and pasting the same repetitive narrative into each section of the safety plan grid in EHRS.  In one case (SAC 3), for example, the safety plan (based on the new model) was the following:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing

Patient Participate - Warning Signs: No

Warning signs - Clinical Impressions: *I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

Helpful reducing self-harm - Clinical: *I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

Reduce Risk Factors - Clinical: *I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

Patient History of Self Harm: Yes

Patient Participate - Self Harm: No

Past concerns resolved - Clinical: *Due, in part, to his low frustration tolerance, I/P has a Hx of claiming SI in order to get alternative needs met.  He would benefit from extra support in PSU, as he will most likely become easily upset. He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

Patient Reduce Risk Factors - Clinical: *Due, in part, to his low frustration tolerance, I/P has a Hx of claiming SI in order to get alternative needs met.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: No

Protective Factors - Clinical Impression: *I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

Enhanced factors - Clinical Impressions: *I/P has low distress tolerance and is easily frustrated.  He would benefit from extra support in PSU, as he will most likely become easily upset.  He has a Hx of claiming SI out of frustration and no due to actual thoughts of self-harm.*

As shown above, the clinician simply inserted the same response into each category, regardless of its relevance to that category.

Finally, the process by which IPs were provided "**Discharge Custody Checks**" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 90 cases of IPs discharged from a MHCB or alternative housing placement who remained at CSP/Sac and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from October 2022 through March 2023. The review found that only 81 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the errors were attributable to blank forms or custody checks recommended for discontinuation prior to 24 hours by clinicians. Most checks were clinically-ordered for 48 hours. In addition, only 67 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors involving gaps in observation. Of note, there was a compliance rate of only 38 percent for accurate completion of Page 2 of the forms in February 2023.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (September 2022 through February 2023) found that meetings had quorums of all required mandatory members or designees for all six months. Meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits. Meeting minutes included the tracking and brief review of IPs in the Suicide Risk Management Program (SRMP). Of note, although SPRFIT meeting minutes indicated that an "improvement project" was initiated to increase custody compliance with Page 2 of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) forms, as indicated above, this reviewer also found poor compliance by clinicians completing Page 1 of the forms that was not being adequately addressed by the SPRFIT.

Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. Meeting minutes were otherwise unremarkable. A current SPRFIT local operating procedure (LOP) was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**: According to training records, approximately 99 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, 91 percent of custody staff, only 80 percent of medical staff, and 91 percent of mental health staff received IST suicide prevention training during 2022. Finally, as of April 2023, 97 percent of mental health clinicians had

completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 36 percent had received training on the new safety plan model.

**Recent Suicides**: CSP/Sac experienced one (1) suicide during the review period.[31]  The IP (SAC 4) was found hanging from a light fixture by a sheet in his PSU cell during the morning of June 17, 2022.  His body was found in the state of rigor mortis.  The IP entered CDCR on February 21, 2014 to serve a 31-year sentence for two counts of second-degree robbery with use of a firearm and assault with a firearm on a peace officer.  He accumulated an additional 31 years for in-custody convictions involving assault and battery with a deadly weapon on peace officers and IPs.  He was transferred to CSP/Sac on March 15, 2019 and placed in the PSU.  The IP incurred 37 RVRs during his confinement, the most recent of which occurred on January 27, 2022 involving destruction of state property.  Records indicated that he renounced his gang affiliation when he entered CDCR in 2014.  The IP was unmarried and did not have any children.  He had family support, notably by letter and telephone correspondence with both his father and a sister.  There was also a record of family visits between 2016 and 2019.

According to available information, the IP and three siblings were raised by their parents, although there were other widely inconsistent reports indicating he was raised by his mother with occasional visits from his father, was raised by an aunt, was raised in foster care, was placed up for adoption, or was placed in an orphanage.  The IP had an extensive experience of both juvenile and adult criminal behavior, resulting in placement in both the juvenile hall and California Youth Authority (CYA) systems for most of his adolescent and teenage years.  He was known to be gang-affiliated in the community and had an extensive history of substance use.  The IP did not have any employment history but obtained his high school diploma in CYA.  It did not appear that he had a history of either serious mental illness or suicidal behavior in the community.

Upon entry into CDCR in February 2014, the IP was initially placed into the MHSDS at the 3CMS level care based upon his mental health treatment in CYA that included placement on suicide precautions on several occasions.  His initial diagnosis was major depressive disorder (MDD).  The following month on March 17, 2014, the IP was seen following a staff referral for confusion and auditory hallucinations.  He was assessed and subsequently placed at the EOP level of care with a diagnosis of schizoaffective disorder.  During his approximate eight years of CDCR confinement, he was transferred between 27 prisons (often multiple times at the same facility) for court proceedings, restricted housing placement, mental health programming, and several ICF and MHCB placements.  In October 2016, the IP's diagnoses were changed to schizoaffective disorder, depressed type, and antisocial personality disorder (ASPD).  Three years later in November 2019, his diagnoses were changed to attention deficit hyperactivity disorder, MDD, and ASPD.  In December 2021, the IP's diagnoses changed again to unspecified bipolar and related disorder, generalized anxiety disorder, and ASPD.

During his CDCR confinement, the IP inconsistently reported a prior history of suicidal behavior, including "suicide by cop" current commission of the instant offense.  He had a

---

[31] CSP/Sac also experienced another suicide in February 2022 that was summarized in the 5th Re-Audit Report.

significant history of self-injurious behavior during confinement, some of the incidents were serious and included laceration of his forearms and ingestion of razor blades.  However, his reports of SI were sometimes seen by clinicians as disingenuous, and he often reported being suicidal because of frustration with court proceedings, concern about additional prison time, and to affect either housing or his level of care.  SREs or SRASHEs were completed on over 80 occasions, resulting in two ICF and 21 MHCB placements.  He was last assessed at a high chronic and low acute risk for suicide in May 2022.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide.  He did have several medical issues, including asthma and chronic leg pain, but these ailments were thought to be properly managed and not considered proximate causes of his death.  The reviewer concluded that "whether his decision was related to its chronic pain, substance abuse, distressing emotions related to the new criminal case, and fear of disappointing his family, or a combination of these, will remain unknown."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

1) There were concerns noted in six MTPs that demonstrated a consistent pattern of poor documentation.  These were completed on July 15, 2021, October 7, 2021, February 10, 2022, April 7, 2022, and June 2, 2022.  Please see the *Concerns Section* for further details.

2) Psychiatry: While psychiatry clinical notes contained individualized and informative details, some notations lacked a specific 'assessment' or formulation/summary or psychiatric diagnosis.  It is a widespread expectation, both within the department and beyond, that clinical notes contain certain components, including 'assessment' and/or diagnosis.

3) Psychiatry: It is imperative and expected that inmates are seen 1:1 in a confidential setting, per guideline rules.  These rules must be documented and explained why the visit was not performed in a 1:1 setting and instead performed cell side.  It is not possible to obtain a full history and examination in a cell side visit that would allow for a meaningful and comprehensive evaluation that would in turn lead to a thoughtful approach in treatment and formulation of a plan.  In addition, medication changes and any changes in the patient's MSE should be documented and addressed in every meaningful evaluation.

4) While in segregated housing, inmates are to be offered a minimum of three (3) showers per week.  Upon review of the 114-A, Inmate Segregation Record, there were several weeks identified in which the inmate was not offered or staff failed to document the appropriate number of showers.

5) Unit sergeants supervising areas that contain restricted housing are required to do a weekly review of the 114-As Inmate Segregation Record to ensure all inmates are being offered the appropriate privileges and out of cell time.

6) During review of the incident and following the collection of all documents submitted by staff, it appeared that multiple staff members failed to positively identify live breathing flesh when conducting security welfare checks. Medical documentation clearly indicates the presence of rigor mortis in various areas of the inmate's body upon being removed from the cell.

7) During the PT rounds review, at around 0559, PT made rounds in the PSU. The PT documented that the patient did not participate in psych rounds at this time. Patient has white sheet obstructing the view inside the cell. 'Custody notified,' but the PT did not wait for custody to remove the white sheet to visually assess the patient and based on information obtained during the on-site review, it is unclear if custody was notified.

8) During the review, it was noted that the patient had a court date but the out to court return R & R assessment was not found in EHRS.

**Audit Summary**: It was noteworthy that CSP/Sac experienced a significant increase in completed SRASHEs during the past five months, with 520 SRASHEs completed in November 2022 versus 912 SRASHEs completed in March 2023. Relatedly, there was a dramatic increase in the use of alternative housing. Continued improvement and/or steady compliance was found in completion of required SRASHEs based upon emergent/urgent referrals for SI/behavior, PT rounds in restrictive housing units, and (with the exception of annual suicide prevention training for medical staff) suicide prevention and CPR training. Problems corrected from the previous assessment included the intake screening process by nursing staff in the R&R unit (with a concern regarding appropriate follow-up inquiry regarding prior history of suicide attempts escalated to headquarters for revision in EHRS), case presentations during MHCB IDTT meetings, and non-suicidal patients observed at 30-minute intervals and provided full clothing. The lack of privacy and confidentiality during the observed CIT response was problematic, as well as several examples in the medical charts of PT attendance during CIT responses without a nursing supervisor, RN, or senior PT. Safety planning continued to be problematic, as well as MHCB supervisory review of safety plans. Finally, there continued to be low compliance rates for completion of "Discharge Custody Check Sheet" (CDCR MH-7497) forms.

## 2) **Wasco State Prison (WSP)**

**Inspection**: April 18-19, 2023 (previous suicide prevention audit on July 6-7, 2021). WSP housed approximately 3,787 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed multiple new admissions during both the medical **Intake Screening** process and the mental health diagnostic testing in the reception center. Of note, WSP was in the final stages of completing construction of a new reception center building to house medical intake screening and mental health diagnostic testing. This reviewer was informed that the new building was tentatively scheduled to open on May 25, 2023 and will contain five nurses' offices for medical intake screening and three offices for mental health diagnostic testing. In the interim, the medical intake screening process continued to be

housed in the existing R&R unit area, with five nursing stations in close proximity of each other located in a large corner room, separated only by partitions.  Although the partitions were somewhat helpful as sight barriers, they did not effectively reduce sound emanating from any of the nursing stations and, therefore, there was not any privacy and confidentiality during the intake screening process.  Custody officers were also milling about the area.  Suicide prevention placards (both English and Spanish versions) were observed at each nursing stations.  Six (6) medical intake screenings were observed during April 18-19.  Nurses were observed to be asking all required questions pertinent to mental health and suicide risk in each case.

Further, this reviewer observed the **RC Mental Health Diagnostic Testing** process on both April 18-19.  Five intakes by three different RC clinicians were observed.  Doors to the RC diagnostic clinician's offices were closed and all three clinicians were observed to be conducting thorough assessments and completing the MH Screening Interview form.  The clinicians were observed accessing and using the Patient Health Information Portal during the process and reviewing SOMS, county jail records, and the nurses' Initial Health Screening form during each assessment.  Both English and Spanish versions of the suicide prevention placard were observed in each RC clinician's office.

It should be noted that adequate practices observed during this recent audit were offset by the circumstances surrounding a at WSP in February 2023 (see below) in which deficiencies in both completion of the Initial Health Screening form by nursing and MH Screening Interview form by a diagnostic clinician occurred in close proximity to the death and resulted in several QIPs.  In another recent suicide case, the county jail failed to notify WSP that the IP was on suicide precautions the day before CDCR transfer, and he died at WSP the following day.

In addition, RC diagnostic clinicians were required, when appropriate, to request that IPs sign release of information (ROI) forms when they reported histories of prior mental health services in the community.  This reviewer's chart review indicated that many diagnostic clinicians were simply using boilerplate language such as "declined to sign ROI" or "clinician described the 7385 (ROI) process and the patient declined to authorize a release of information from prior healthcare providers to CDCR/CCHCS" regardless of whether or not the IP reported a prior history of mental health services in the community.  In several other reviewed cases (e.g., WSP 1 and WSP 2), documentation indicated that IPs reporting histories of prior mental health services in the community were not prompted to sign ROIs by diagnostic clinicians.  In a local SPRFIT audit reported in monthly meeting minutes for March 2023, the auditor found that all 26 IPs who reported histories of prior mental health services in the community refused to sign an ROI form during February 2023, a dubious finding.

Finally, daily **PT Rounds** in the ASU were observed on April 18.  The rounds were unremarkable and the PT was observed to be conversing with all Ips, with Psych Tech Daily Rounds information entered into EHRS for each caseload IP.

**Housing**:  WSP had an 18-bed CTC, with six (6) cells designated as **MHCBs**.  These cells had previously been found to be suicide-resistant, and all were occupied during the on-site assessment.

The ASU had 12 **New Intake Cells** identified for new intake IPs.  Two ADA cells (117-118) that had been previously retrofitted to become suicide-resistant were no longer identified as new intake cells.  During the on-site assessment, one new intake IP was moved from a new intake cell into a non-new intake cell the previous evening due to a plumbing issue.  The review also found that at least two IPs were housed in new intake cells beyond the initial 72-hour period, and could have been relocated to other cells in order to accommodate the appropriate re-housing of this IP into another new intake cell.  The custody supervisor was made aware of this problem and the new intake IP was subsequently rehoused.

Finally, **Alternative Housing** to temporarily house IPs identified as suicidal and awaiting MHCB placement was utilized on a daily basis.  IPs were primarily housed in various GP units, RC housing, or the ASU (D-6).  From January through March 2023, there were approximately 116 IPs placed in alternative housing.  According to available data, all IPs were provided beds, required to be observed on a continuous 1:1 basis, and were released within 24 hours.  The average length of stay in alternative housing was approximately nine (9) hours.  In addition, 33 percent (38 of 116 cases) of the MHCB referrals were rescinded and IPs returned to their housing units.  This reviewer examined the EHRS charts of the 38 IPs discharged from alternative housing and found that the required SRASHEs and five-day follow-up assessments were completed in all cases, with required safety plans completed in 87 percent (33 of 38) of the cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff.  During March 2023, the Mental Health Observations Reporting Tool indicated that five (5) patients were on observation status, with 96 percent compliance with timely observation of patients on Suicide Precaution and 91 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period in the ASU found 100 percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of October 2022 through March 2023.  A sample EHRS review of 50 emergent/urgent referrals for SI/behavior found that clinical staff completed the required SRASHEs in 94 percent (47 of 50) of the cases, an increase from the 84 percent compliance found during the previous assessment.

In addition, the **Crisis Intervention Team** (referred to locally as a Crisis Response Team) was launched at WSP in May 2019, paused during 2020, and reactivated in February 2021.  According to the current LOP, the CIT was available seven days from 3:00 p.m. until 9:00 p.m., Monday through Friday, and 8:00 a.m. until 10:00 p.m. on Saturday and Sunday.  However, according to CIT supervisors, the Crisis Response Team (CRT) currently is available from 8:00 a.m. until 9:00 p.m., Sunday through Tuesday, and 8:00 a.m. until 6:00 p.m., Wednesday through Saturday.  Crisis responses were available outside of these hours and included a tele-psychiatrist or on-call psychiatrist.  This reviewer had an opportunity to observe two CRT responses on April 19, 2023.  Both cases were responded to on B-Yard, and separate teams included clinicians, nursing supervisors, and custody sergeants.  The CRTs met with the IPs separately in a private

office, and both cases were resolved without the need for MHCB referrals. Although SRASHEs were completed in each case, one of the clinicians confided to this reviewer during the CRT encounter that they had not read the newly arrived IPs outside medical records (WSP 3), and those records were still not referenced in the subsequently completed SRASHE.

Two **IDTT Meetings** in the MHCB unit were observed on April 18. In both cases, the patients had been admitted into the MHCB unit the previous day for DTS. Overall, there was good treatment team representation, adequate case presentations, sufficient inquiry whether patients understood their diagnoses, suicide risk inquiry, and appropriate discussion with patients regarding their observation level, property, and privileges. Because these were both initial IDTT meetings, it was appropriate that there was only brief discussion regarding safety planning. There were concerns regarding patients assessed at low risk for suicide remaining on Suicide Precaution status with orders for partial issue clothing until the day of MHCB discharge, as discussed below.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for six patients placed on suicide observation status during the onsite assessment. The review found that telephone calls, visits, and hours of yard offered to patients were not routinely documented on the forms. Four of the six patients had only arrived on the MHCB Unit within the past day or two, but for the two patients who had been on the unit for six and seven days respectively, the review found that one patient had been offered two showers and yard on multiple days, and the second patient was offered only one shower and yard on multiple days. Neither patient was offered a telephone call during the six and seven days of placement. Of note, this reviewer observed some misunderstanding during the onsite assessment regarding the offering of yard privileges to patients on Suicide Watch and clothed in a safety smock. An RT who attended the IDTT meeting on April 18 initially stated that patients in safety smocks were prohibited from attending yard, then upon questioning by this reviewer, stated they could be offered a uniform to attend yard. However, another RT wrote a progress note on a patient (WSP 4) on February 3, 2023 that stated: "RT was not able to take out Pt. for treatment because he was still in his blue smock. Pt. asked why he could not come out today? RT told him because he has not been cleared to go out to treatment by clinicians." However, review of the medical chart indicated the RT was wrong, the patient had previously been cleared for all out-of-cell activities.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the medical charts of 18 patients discharged from the unit and remained at WSP during January through March 2023. The review found that, although the required SRASHEs, safety plans, and five-day follow-up assessments were completed in all cases, the quality of safety planning was problematic, as discussed below.

In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), this reviewer was presented with data regarding the MHCB supervisor review discharge SRASHEs and safety plans for patients released from the MHCB at WSP from January 10, 2023 through April 13, 2023. The review found that the MHCB supervisor timely reviewed (before or during the clinical discharge IDTT meeting) 97 percent (28 of 29) of the cases, and all of the cases reviewed cases received a "pass" score. However, this reviewer's subsequent review of the safety plans found numerous problems,

including the problematic practice of deferring safety planning to the outpatient EOP clinician. For example, the following case symbolizes the deficiencies found in many of the safety plans that were reviewed. The IP (WSP 5) was admitted into WSP as a reception center IP on March 28, 2023. The following day (March 29, 2023), nursing staff responded to the IP's housing unit following an emergency response that he swallowed 20 keep-on-person (KOP) pills, and superficially cut his forearm. There was also a report that he initially tried to hang himself, but "the light thing broke." The IP was placed into alternative housing and subsequently admitted into the MHCB unit on March 30, 2023. Five days later on April 4, 2023, a clinician completed a discharge SRASHE and determined that the IP was at moderate acute risk for suicide and could be discharged back to the EOP program at CSP/LAC. The safety plan stated the following:

MH Safety Plan

Safety Planning Reason: Clinically indicated based on risk level and self-harm concerns
Patient Participate – Warning Signs: Yes
Warning signs – Patient focused: Getting back to LAC.
Warning signs – Clinical Impressions: ***Patient will be discharged back to EOP. The C&PR's office has been contacted regarding patient returning directly back to LAC. He will return to EOP and treatment will include development of coping skills to manage distress thoughts and emotions.***
Helpful reducing self-harm – Patient: Talking to my mom and girlfriend
Helpful reducing self-harm – Clinical: ***Patient's coping skills include talking with his support system. He has been encouraged to write and call family and support as often as possible. When returning to LAC patient is allowed daily phone calls.***
Reduce Risk Factors – Patient: Engaged in EOP treatment
Reduce Risk Factors – Clinical: ***Patient will be discharged back to EOP. The C&PR's office has been contacted regarding patient returning directly back to LAC. He will return to EOP and treatment will include development of coping skills to manage distress thoughts and emotions.***
Patient History of Self Harm: Yes
Patient Participate – Self Harm: Yes
Past concerns resolved – Patient: Going back to mainline
Past concerns resolved – Clinical: ***Patient will be discharged back to EOP. The C&PR's office has been contacted regarding patient returning directly back to LAC. He will return to EOP and treatment will include development of coping skills to manage distress thoughts and emotions.***
Patient Reduce Risk Factors – Patient: Work with mental health
Patient Reduce Risk Factors – Clinical: ***Patient will be discharged back to EOP. The C&PR's office has been contacted regarding patient returning directly back to LAC. He will return to EOP and treatment will include development of coping skills to manage distress thoughts and emotions.***
Safety Concerns Identified: No
Environmental Concerns Identified: Yes
Patient Participate – Environ. Concern: Yes
Clinical Impact Environmental – Patient: I want to go back to LAC

105

Clinical Impact Environmental – Clinical: ***Patient recent suicide attempt and SIB appear directly impacted by housing and environmental concerns. Patient will be discharged back to EOP. The C&PR's office has been contacted regarding patient returning directly back to LAC. He will return to EOP and treatment will include development of coping skills to manage distress thoughts and emotions.***

Patient Participate – Protective Factors: Yes

Protective Factors – Patient focused: Talking with my mom and girlfriend

Protective Factors – Clinical Impression: ***Patient's coping skills include talking with his support system. He has been encouraged to write and call family and support as often as possible. When returning to LAC patient is allowed daily phone calls.***

Enhanced Factors – Patient focused: Develop more coping skills

Enhanced factors – Clinical Impressions: ***Patient will be discharged back to EOP. The C&PR's office has been contacted regarding patient returning directly back to LAC. He will return to EOP and treatment will include development of coping skills to manage distress thoughts and emotions.***

As detailed above, much of the safety plan narrative was repetitive and deferred "the development of coping skills" to the EOP clinician at CSP/LAC. This deficient safety plan received a "pass" score from the MHCB supervisor.

Further, although WSP had an LOP that appropriately stated patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff, almost all patients housed in the MHCB unit remained on Suicide Precaution status in "partial issue" (t-shirt and boxers) until the day of their discharge, whereupon the discharge SRASHE would invariably state: "Patient is currently on SP w/ nursing checks q11 w/t-shirt and boxers w/full issue for out of cell activities." Following the IDTT meeting, and generally within hours of physical discharge from the MHCB, patients were only then provided full issue clothing.

Finally, the process by which IP were provided Discharge Custody Checks at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 156 cases of patients discharged from a MHCB or alternative housing placement who remained at WSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from October 2022 through March 2023. The review found that 89 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the clinician errors were attributable to discontinuation of checks prior to 24 hours by clinicians or missed days of assessment. When completed correctly, custody checks were

106

recommended for 48 hours in the majority of cases.  In addition, 100 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**:  A review of six months (October 2022 through March 2023) of SPRFIT meeting minutes found that a quorum of all mandatory members or authorized designees was achieved for each meeting.  Meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits.  Minutes also included the tracking and brief review of IPs in the SRMP.  Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required.

In addition, because WSP is a RC, the SPRFIT was required, pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum, effective January 27, 2021, to ensure that: suicide prevention placards were displayed in designated areas (including offices of the RC diagnostic clinicians); diagnostic clinicians were reviewing the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS; diagnostic clinicians were requesting that IPs sign ROI forms when reporting histories of prior mental health services in the community; and diagnostic clinicians complete SRASHEs when IPs present with possible current risk for suicide.  SPRFIT coordinators or designees were required to collect data and assess compliance with these four expectations, as well as report such findings during SPRFIT meetings, on a quarterly basis.  Review of SPRFIT minutes indicated that the required audits and subsequent presentation of findings appropriately occurred in both October 2022 and March 2023.

Finally, a current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, 98 percent of medical staff, and 94 percent of mental health staff received IST suicide prevention training during 2022.  Finally, as of April 2023, 100 percent of mental health clinicians had completed the SRE mentoring program, 98 percent had received the seven-hour SRE training, and only 31 percent had received training on the new safety plan model.

**Recent Suicides**:  WSP experienced five (5) suicides during the review period.  In the ***first*** case (WSP 6), the IP was found hanging from the top bunk by a sheet in his RC cell during the afternoon of April 30, 2022.  The IP entered CDCR a few weeks earlier on April 7, 2022 to serve a 10-year sentence for arson and multiple counts of possession of an explosive device with the intent to harm/injure.  He did not incur any RVRs during his confinement.  The IP was not known to be gang-affiliated.  Records indicated that he was never married, but had one child who

107

was currently 22-years-old. It did not appear that the IP had any contact with his son since confinement in the county jail and had only limited contact with his siblings. However, the IP remained in contact with his mother by telephone on three occasions during his brief CDCR confinement, last of which occurred three days prior to his death.

Very little information was available regarding the IP's background as he had only been incarcerated CDCR for a short time prior to his death. The only available information suggested that he and four siblings were raised by their parents who eventually became separated. His early developmental history was unknown, but based upon prior mental health screening, the IP reported prior sexual abuse perpetrated by a family friend. Although his history of mental illness was unknown until other outside records were received following the IP's death, the reviewer's subsequent conversation with his mother suggested that he might have experienced schizophrenia in his early 20s that was related to extensive substance abuse. The IP did not graduate from high school and had a history of truancy and special education during his youth. As an adult, the IP had sporadic employment that was adversely impacted by his substance abuse.

Upon entry into CDCR, the IP was placed into the MHSDS at the 3CMS level of care based upon mental health treatment and psychotropic medication received at the county jail. Review of prior documentation, as well as initial RC evaluations, indicated that the IP's self-reported multiple psychiatric hospitalizations. He also self-reported that, upon his arrest in 2017, he was experiencing command auditory hallucinations that resulted in his controlling offense. According to available county jail records, the IP had been previously diagnosed with borderline personality disorder and antisocial personality disorder. According to records obtained by the reviewer following his death, more diagnoses were added over the past several years to include major depressive disorder, delusional disorder, other stimulant influenced psychotic disorder with delusions, and impulsive disorder. These records also indicated that in May 2019, the IP was found incompetent to stand trial and subsequently admitted to Napa State Hospital. He was discharged in September 2020 with diagnoses of schizoaffective disorder, bipolar type, severe method amphetamine disorder, and severe opioid disorder. Conflicting information regarding the IP's history of suicidal behavior, ranging from the self-report of several prior suicide attempts resulting in community hospitalization, to one prior suicide attempt self-reported during the initial evaluation by a RC psychiatrist on April 13, 2022. The tele-psychiatrist diagnosed the IP with mood disorder and a rule-out for bipolar disorder. The IP denied any suicidal ideation and, although acknowledging symptoms of depression, he felt hopeful and indicated a decreased need for sleep, and stated the auditory hallucinations were "irritating" but not telling him to do "bad things anymore." His psychotropic medication was continued.

During the evening of April 28, 2022, the IP began to complain to medical staff about severe abdominal pain with vomiting. He was seen in the TTA for evaluation and later returned to his housing unit. Several hours later during the morning April 29, 2022, the IP was seen again on two occasions and subsequently transferred to a local hospital. He was discharged back to WSP during the evening of April 29, 2022. The IP remained in severe pain and stated that he felt like "no one cares." He subsequently expressed suicidal ideation and the CIT was initiated on the morning of April 30, 2022. During interaction with the CIT, the IP also reported fears of returning to his dormitory setting as he felt other IPs were "picking on him." Nursing staff

provided some medications to assist with his abdominal pain, and the custody supervisor agreed to rehouse the IP in a single cell. He then recanted his suicidal ideation, and the CIT clinician completing the SRASHE found a high chronic and moderate acute risk for suicide. The IP died by suicide approximately three hours later on April 30, 2022.

The CDCR reviewer in this case did not find any specific precipitating factors (other than recent abdominal pain and possible conflict with peers) that were known to staff indicating that the IP was contemplating suicide. Although he did not leave a suicide note, there were various writings found in the cell, including journal entries, poetry, and song lyrics that referenced death and suicide. According to the CDCR reviewer, the IP appeared to be "experiencing increased symptoms of depression, suicidal ideation, and possible anxiety. It is likely that the recent transition to prison, perceived interpersonal conflicts with inmate-peers, and reported medical symptoms further exacerbated these symptoms. This may have resulted in the inmate's decision to end his life within 23 days of arrival to CDCR."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) In review, one responding staff member was not in compliance to the required Annual Suicide Prevention Training. A listing of the aforementioned staff will be provided to WSP's Executive Management Team who will schedule the officer for this required training.

> 2) During the review of the Emergency Medical Response timeline, no MAR documentation was found for intranasal Narcan administration.

In the **_second_** case (WSP 7), the IP was found hanging from the top bunk by a sheet in his RC (quarantine intake unit) cell during the afternoon of February 21, 2023. He entered CDCR approximately 11 days earlier on February 10, 2023, to serve a 7-year sentence for infliction of corporal injury to spouse or cohabitant with enhancement for great bodily injury involving domestic violence. He did not incur any RVRs during his brief confinement. The IP was not known to be gang-affiliated. Records indicated that he was married and has one adult son. He was however, estranged from his wife who was thought to be filing for divorce following the instant offense. The IP continued to have contact with both his son and a brother during his county jail confinement that included several visits and telephone calls.

Because the IP had only been incarcerated within CDCR for a short time prior to his death, most of the documentation regarding his social history only became available following his death. According to available information, he was born in Mexico and raised (along with an unknown number of brothers) by parents in a home with problems including domestic violence related to his father's alcoholism. As the IP later told the probation officer," I can't believe I did this to my wife. I never wanted to turn into my father." He graduated high school in Mexico and eventually became a United States citizen through the green card process reportedly, worked as a handyman, and had associated side jobs (including a laborer in the construction field). According to his adult son who was interviewed by the CDCR reviewer following his father's death, the family home was very volatile, and his father had an explosive temper and abused alcohol. His son also described the intersection of his father's domestic violence offenses with

his role in the family and the Jehovah Witness faith as particularly salient to his subsequent suicide.

Although there was little known history of mental illness within his family, the IP reportedly suffered from undiagnosed mental health issues first identified when he attempted suicide at age 21. In addition, the IP experienced financial trouble for several years prior to his incarceration, which likely contributed to his declining mental health and alcohol use. Prior to the instant offense, the IP had several other arrests for domestic violence against his wife. During arrest for the instant offense, the IP was observed with self-inflicted wounds to his chest. During confinement in the county jail, he was diagnosed with adjustment disorder and prescribed psychotropic medication. In addition, the IP displayed dual symptoms of depression and insomnia, as well as misused his prescribed Ambien which he often mixed with alcohol and subsequently resulted in another suicide attempt by overdose in December 2022 in the county jail.

Upon entry into CDCR, the IP remained unclassified during the 11 days leading up to his death. He had minimal interaction with both staff and others during his quarantine period. During the intake screening process, the IP self-reported a history of mental illness that included anxiety as well as a suicide attempt two months earlier in the county jail. During the initial mental health screening by the RC diagnostic clinician on February 15, 2023, although the IP's history of mental illness and psychotropic medication were contained in the MH Screening Interview form, the clinician neglected to review the Initial Health Screening form completed by nursing and include his self-reported prior suicide attempt history on the MH Screening Interview form. As a result, completion of a SRASHE based upon the IP's suicide attempt two months earlier was not done, and he screened negative for any current mental health issues. However, because his psychotropic medication from the county jail was continued at CDCR, the IP did receive a routine referral for placement consideration into the 3CMS level of care.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. He did not have any significant medical issues that were thought to be proximate causes of his death. The IP did not leave a suicide note. According to the reviewer, "a constellation of factors played into Mr. ___' decision to end his life when he did. The factors notable in this case are indicative of tremendous losses experienced in a short period of time coupled with the paucity of coping skills to manage his substantial life changes he was experiencing." These tremendous losses included the breakup of his marriage and the probable decision by Jehovah Witness leadership to separate themselves from him. As a result, the IP's only known coping skills, including the Bible, alcohol, and Ambien, were unavailable.

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

> 1) Mr. _____' MH Screening did not appear to include a thorough review of his EHRS record, per policy. Specifically, suicide history as reported in the Initial Health Screening and county jail records was not clearly incorporated into his MH Screening Interview. Per HQ Memorandum, dated August 22, 2019, entitled, Clarification of Mental Health Documentation Review Requirements: 'This

memorandum clarifies documentation requirements during the reception center mental health assessment process per the Mental Health Services Delivery System Program Guide (2009 Revision), Chapter 2, Reception Center Mental Health Assessment, pages 12-2-5 and 12-2-7. (see Discussion/Conclusions section for additional detail).

2) Mr. _____' 8-page SBCJ Intake Packet, noted, 'Suicide History'. During Initial Health Screening, Mr. _____' endorsed a suicide attempt, '[two] months ago in county.' WSP failed to appropriately review these records and complete a SRASHE, as per CDCR Policy. The Program Guide states in 12-10-9, '*At minimum, a written suicide risk assessment using a SRASHE shall be completed… (8th bullet point): Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats or attempts.*'

3) Mr. _____ reportedly was unable to speak English proficiently (i.e., per SBCJ records 'Interpreter Needed', per collateral contacts he spoke in broken English and was unable to read/write in English). However, he received the CCHCS Healthcare Orientation Manual in English. At each exchange of health care information all incarcerated individuals, per Health Care Department Operations Manual (HCDOM) Policy, must have access to health care services by receiving the necessary accommodation or assistance to reach Effective Communication (EC). Per HCDOM Chapter 2 – Patients' Entitlements and Responsibilities; Article 1 – Provision of Health Care Services; 2.1.2 Effective Communication Documentation; (e) Procedure; (2) Accommodation or Assistance, (D) LEP Services 1. 'Interpretation and translations service shall be provided to patients who have a limited ability to speak, read, write, and/or understand English… 3. LEP services shall be made available through the following…c. Collection of translated forms and documents which have been translated into commonly spoken languages available to staff.'

4) During the review of the Emergency Medical Response details, it was noted that the fourth and fifth intranasal Narcan doses were not documented in the MAR and a nonrebreather mask was utilized on a nonbreathing patient.

5) During the review of Initial Health Screening, as completed by the R&R RN, it was noted the patient responded 'Yes' to 'Has the Inmate Ever made a Suicide Attempt?' but no MH referral was generated.

6) During the review it was noted the request for the 911 call did not take place until approximately five minutes after the emergency was first observed and reported.

In the ***third*** case (WSP 8), the IP was found hanging from the top bunk by a sheet in his RC cell during the afternoon of March 23, 2023. He had entered CDCR exactly one month earlier on February 23, 2023 for a fourth term to serve a 5-year sentence for arson, burglary and possession

of ammunition. The IP did not incur any RVRs during his brief confinement. He was known to be gang-affiliated during previous terms. Records indicated that he was single and had one daughter approximately 13-years-old with whom he had no contact. The IP appeared to be estranged from his family.

According to available information, the IP and six siblings were raised by their father and stepmother. The biological mother had left the family when the decedent was two-years-old. He reported a good upbringing and denied any history of physical, emotional, or sexual abuse during childhood. There was however, a significant family history of alcoholism (all siblings), paranoid schizophrenia (maternal uncle), and suicide (cousin). The IP attended four years of high school, but did not graduate due to behavioral issues that included drugs, alcohol, and gang affiliation. At the time of arrest, he was homeless and unemployed, but had periodic employment in plumbing. The IP had an extensive history of substance abuse that began at age 12. His reported drug of choice was methamphetamine. The IP's first reported mental health symptoms occurred in 1990 which included depression, anxiety, auditory hallucinations, anger, irritability, and mood swings tied to his methamphetamine use. He did not receive any mental health treatment until he was hospitalized in July 2015 following a suicide attempt in the community. He was subsequently prescribed psychotropic medication. The IP also self-reported several other hospitalizations during 2015 for both suicidal ideation and substance abuse.

During prior CDCR terms, the IP was enrolled in the MHSDS at all levels of care, including 3CMS, EOP, MHCB, and PIP. His inpatient admissions were for DTO, DTS, and grave disability. Prior to his most recent release from CDCR in June 2021, the IP was treated at the EOP level of care. During confinement in the county jail prior to the fourth and final CDCR admission, he was diagnosed with bipolar disorder and schizophrenia, and prescribed psychotropic medication. He was also placed on suicide precautions in the county jail on at least one occasion for both suicidal ideation and safety concerns related to gang affiliation.

Upon re-entry into CDCR on February 23, 2023, the IP was placed back into EOP because that was his level of care at the time of his last CDCR discharge in 2021. Several days later on February 28, he was seen by a clinician for the MHPC Initial Assessment. The IP endorsed auditory hallucinations, exhibited signs of bizarre delusions, and his thought processes were served as disorganized. He was diagnosed with unspecified schizophrenia. According to the CDCR reviewer in this case, the MHPC Initial Assessment documentation was problematic because it did not provide any mental health treatment updates from the prior CDCR terms. The IP was subsequently seen by a psychiatrist who prescribed psychotropic medication for the auditory hallucinations and depression. For the most part, he was initially non-compliant with mental health treatment and refused some groups, as well as his initial IDTT on March 1, 2023. Two SRASHEs completed on February 28, 2023 and March 7, 2023 each indicated a moderate chronic and low acute risk for suicide. Another MHPC Initial Assessment completed on March 7, 2023 had similar documentation problems.

During a session with his psychiatrist on March 9, 2023, the IP indicated that "I am doing fine. I would like to continue my EOP program." The following week on March 15, 2023, the IP saw his primary clinician and estimated both his depression and hallucinations were "7 out of 10." He reported that although the auditory hallucinations were distressing, he could distinguish

112

voices from reality.  The IP indicated he was coping well, denied safety concerns, and denied suicidal ideation.  On March 16, he attended his initial EOP IDTT meeting and reported his depression was still "9 out of 10," but manageable.  He denied any auditory hallucinations.  The CDCR reviewer in this case noted that the MH Master Treatment Plan documentation was again problematic, with diagnoses not updated in the clinical summary and case formulation not containing any new information from previous assessments.  The IP's last interaction with his clinician occurred on March 21, 2023, two days prior to his suicide.  He was noted to be medication compliant, attending groups, his symptoms were stable and/or manageable, and his depression was now at "1 out of 10."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide.  He did not have any significant medical issues that were thought to be proximate causes of his death.  The IP did not leave a suicide note.  According to the CDCR reviewer, "information gathered during the course of this review suggests a combination of depression, delusional thinking, auditory hallucinations, anxiety, estrangement from family, possible re-emergence of hypomanic symptoms in the days prior to his death.  Given a previous statement he made to his sister that if he returned to prison, he would not last more than a month, it appears likely he reflected on the situation (a new prison term, lack of family support, feelings of guilt, struggle with mental illness) and made a premeditated decision to end his life after serving exactly one month of his sentence."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

> 1)While the ICC documentation was completed according to policy, there was a discussion regarding comments Mr. _____ made regarding danger to others that resulted in remaining in a single cell that were not documented.  In addition, contradictory information was documented in the ICC progress note and ICC Chrono, which made it difficult to determine Mr. _____'s risk level.  It does not appear that Mr. _____ was assessed for possible need for MHCB placement for danger to others.

> 2) There were multiple concerns with the completion of the MH Initial Assessments on February 28, 2023 and March 7, 2023.  Please see Conclusions section for further details.

> 3) There were multiple concerns with the completion of the MH Master Treatment Plan on March 16, 2023.  First, the EHRS diagnoses were not updated.  Second, the clinical summary and case formulation contained no new information since the Initial Assessment was completed.  In particular, the case formulation question still contained an entry that had not been edited since June 29, 2020.

> 4) Multiple concerns were found with SRASHEs completed on February 28, 2023 and March 7, 2023.  Please see Conclusions section for further details.

In the _**fourth**_ case (WSP 9), the IP was found hanging from the top bunk by a sheet in his RC (quarantine intake unit) cell during the early morning of May 10, 2023.  He had entered CDCR

one day earlier on May 9, 2023 to serve a 2-year sentence for corporal injury on specific person (his former girlfriend) resulting in traumatic condition. He did not incur any RVRs during his brief, one day confinement. The IP was not known to be gang-affiliated. Records indicated he was single with three children that he was reportedly unable to see on a regular basis. He was said to have family support from his parents, but with only one day of confinement, there was no opportunity for telephone calls or letter correspondence.

According to available information, the IP and his sister were raised by unmarried parents who remained together throughout the course of his life. He lived briefly with his grandmother and then an aunt for a year prior to his arrest on the instant offense. He attended high school through the 11th grade, did not have a formal employment history, and had an extensive history of substance abuse that began as a teenager. According to county jail documentation only made available to CDCR following his death, although the IP did not have a history of mental health treatment in the community, while confined in the county jail, he self-reported a history of childhood trauma that resulted in depression, irritability, and an anxious mood. He was diagnosed with post-traumatic stress disorder, major depressive disorder, alcohol use unspecified, and unspecified mood disorder. He was treated with psychotropic medication in the county jail. The IP also reported a history of suicidal behavior that included a 72-hour psychiatric hold in a local hospital in March 2022. In addition, during his confinement in the county jail, he was placed on suicide precautions on April 28, 2023, as well as on May 8, 2023 (the day before his transfer to CDCR) after engaging in self-injurious behavior (head banging).

Upon entry into CDCR on May 9, 2023, the IP received an Initial Health Screening by nursing staff and reported a history of anxiety and depression, as well as diagnoses for both post-traumatic stress disorder and unspecified mood disorder. He denied any current suicidal ideation or history of suicidal behavior. County jail records initially sent to WSP with the IP were sparse, and did not include his recent 72-hour psychiatric hold nor placement on suicide precautions the day before his transfer to the CDCR. Based upon the limited information available and the IP's initial presentation, there was no reason for the intake nurse to initiate an emergent mental health referral. However, the CDCR reviewer noted that a mental health referral should still have been generated based upon his self-report of a mental health history. The IP died by suicide the following morning. He was unclassified at the time of his death.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. He did not have any known significant medical issues that were thought to be proximate causes of his death, and did not leave a suicide note. According to the reviewer, he denied current suicide ideation at intake and "then faced hours alone in his cell unable to access substances to calm himself, lacking additional tools for self-soothing, in an environment entirely foreign to him. With apparent profound psychiatric decline, it would be suggested Mr. _____'s internal resources quickly became overwhelmed, and he reached the extent of his limited coping abilities, ultimately making the decision to end his life."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

1) During the review of the emergency response, it was noted that staff did not adhere to the policy that 'the inmate shall be cut down by cutting above the knot and then loosening the noose. Staff shall enter the area where the inmate is located and immediately proceed to relieve pressure on the inmate's airway by using a stable object for support of the inmate's body or by lifting the inmate's weight off the noose.' On-the-job training was provided.

2) During the review of the EHRS documentation it was noted patient answered 'yes' to MH-related questions during the R&R screening, but MH referral was not generated.

Of note, the Suicide Report indicated that the county jail's failure to provide CDCR with reasonable documentation regarding the IP's mental health treatment in the county jail, including placement on suicide precautions the day prior to his transfer, significantly impacted the lack of an emergent mental health referral in this case. The report also stated that with recent passage of Senate Bill 2526 in January 2023 required a more streamlined process for the transfer of documentation regarding an inmate's mental health treatment between county jails and CDCR. As such, a QIP was not felt necessary and the headquarters' SPRFIT "continues to work with Legal and Legislative Assembly Representatives to find sustainable processes to facilitate compliance."

In the _**fifth**_ case (WSP 10), the IP was found on the shower floor during the evening of December 16, 2023 after ingesting "a lot of pills" in a suicide attempt. He was subsequently pronounced dead at a local hospital three days later on December 19, 2023. The final version of the Suicide Report was not available for review at the time this report was completed.

**Audit Summary**: Adequate practices were found in most areas, including intake screening, PT rounding, alternative housing, Guard One compliance, IDTT meetings in the MHCB unit, SPRFIT meetings, and both CPR and suicide prevention training. There was a concern with one ASU new intake IP being moved from a new intake cell due to a plumbing issue into a non-new intake cell when new intake cells were available for occupancy. In addition, there were some concerns regarding MHCB patients receiving an adequate number of showers and telephone, as well as confusion from RTs as to whether MHCB patients clothed in safety smocks were permitted access to out-of-cell activities. In addition, almost all MHCB patients remained on Suicide Precaution status in "partial issue" (t-shirt and boxers) until the day of their discharge. The quality of safety planning was problematic, as was the MHCB supervisor review finding that 97 percent of safety plans were adequate. In addition, there were concerns with mental health clinicians correctly completing Page 1 of the Discharge Custody Check Sheets.

Finally, although this reviewer observed diagnostic clinicians to be conducting thorough assessments and completing the MH Screening Interview form, there were concerns found during the chart review regarding RC clinicians' failure to consistently request ROI forms be signed by IP's following documentation of prior mental health treatment in the community. In addition, two recent suicides occurred shortly after WSP admittance, with one involving deficiencies in both completion of the Initial Health Screening form by nursing and MH Screening Interview form by a diagnostic clinician, and the other suicide involving the county

jail's failure to notified WSP that the IP was on suicide precautions the day before CDCR transfer.

### 3)    California Correctional Institution (CCI)

**Inspection**: April 20-21, 2023 (previous suicide prevention audit was on July 8-9, 2021).  CCI housed approximately 2,214 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  The facility had nurse's offices located on four yards (A-Yard Clinic, B-Yard Clinic, C-Yard Clinic, and D-Yard Clinic) that were utilized for the R&R **Intake Screening** process.  During the previous assessment, an historically chronic problem of nurses' offices not having doors or remaining open during the intake screening process had been corrected.  However, while inspecting the nursing offices in each yard during this onsite assessment, a nurse in the D-Yard nursing office emphatically stated that the door to the office always remained open during the intake screening progress.  Such a response was problematic.  One intake screening was observed in B-Yard on April 21.  The nurse was observed to be asking all required questions pertinent to mental health and suicide risk in that case.  Required suicide prevention placards (both English and Spanish versions) were observed inside the nurses' offices in all four yards, correcting a previous problem.

Finally, this reviewer observed daily **PT Rounds** in the ASU (B-8) on April 19.  The unit housed GP and 3CMS Ips.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds forms and entering the information into the EHRS for MHSDS IPs.

**Housing**:  CCI had eight (8) of its 16 **OHU** cells designated to temporarily house IPs with mental illness and/or requiring suicide observation.  These OHU cells were designated as alternative housing.  In addition, as observed during previous assessments, IPs awaiting transfer to an MHCB and housed in the OHU on 1:1 observation were not automatically placed in a safety smock.  Rather, because they were required to be observed on a continuous 1:1 basis, pursuant to a LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health"), each IP was "provided with a safety mattress, sheets, safety blanket, state-issued clothing, including pants, shirt, socks, underclothes, reading materials, hygiene items and a prescribed health care appliance as clinically indicated as per Policy 12.05.301."  Such a policy and practice continued to be very commendable.

There was a total of eight (8) designated **New Intake Cells** in the B-8 ASU.  Three of these cells (A103-A105) were previously found to be suicide-resistant.  In January 2022, five additional cells (B101-B105) were retrofitted and, upon inspection, this reviewer found them to be suicide-resistant.  This reviewer did not observe any new intake IPs in non-new intake cells during the onsite assessment.

As noted above, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were primarily located in the OHU.  Alternative housing was rarely utilized at CCI, with only 26 cases reported from January through March 2023.  A review of the data found that all but one IP was housed for less than 24 hours, with the average length of stay

being under 20 hours. Approximately 62 percent (16 of 26) of the MHCB referrals were rescinded and IPs returned to their housing units. This reviewer examined the EHRS charts of all 16 rescinded cases and found that 94 percent (15 of 16) of required SRASHEs, 88 percent (14 of 16) of required five-day follow-up assessments, and only 75 percent (12 of 16) of the required safety plans were completed in the cases.

Several of the reviewed safety plans for IPs discharged from alternative housing were problematic. For example, in one reviewed case (CCI 1), the MHCB referral was rescinded because the IP was assessed by the clinician on March 23, 2023 as a low acute suicide risk, and that the IP's self-report of suicidal ideation was for a "change of scenery, reflecting secondary gain." Of note, the new safety plan model now requires that "patients with a pattern of threatening suicide or self-harm to affect external changes should have specific interventions developed to help identify the root causes of these behaviors and reduce the incidences of the threats of suicide or self-harm (see CCHCSs "Safety Planning" policy, 12.07.901, effective February 13, 2023). As shown below, much of the safety plan narrative in this reviewed case was not only repetitive, but did not offer any specific strategies to reduce SI and/or self-harm, including any specific interventions to address the IP's perceived secondary gain of expressing SI for a housing change (under "Environmental Concerns Identified"):

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing

Patient Participate - Warning Signs: Yes

Warning signs - Patient focused: *IP denied SI/SIB/HI and denied having any triggers to SI/HI/SIB.*

Warning signs - Clinical Impressions: *IP engaged in maladaptive coping and secondary gain and may benefit from continued MH services and treatment.*

Helpful reducing self-harm - Patient: *IP denied SI/SIB/HI and denied having any triggers to SI/HI/SIB.*

Helpful reducing self-harm - Clinical: *IP engaged in maladaptive coping and secondary gain and may benefit from continued MH services and treatment.*

Reduce Risk Factors - Patient: *IP denied SI/SIB/HI and denied having any triggers to SI/HI/SIB.*

Reduce Risk Factors - Clinical: *IP engaged in maladaptive coping and secondary gain and may benefit from continued MH services and treatment.*

Patient History of Self Harm: No

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: Yes

Protective Factors - Patient focused: *IP identified spirituality, family, reading, and participating in mental health services as protective factors.*

Protective Factors - Clinical Impression: *IP's protective factors present as adequate buffers toward risk at this time.*

Enhanced Factors - Patient focused: *IP engaged in maladaptive coping and secondary gain and may benefit from continued MH services and treatment. IP shall participate in MH appointments and be encouraged to become medication compliant.*

<u>Enhanced factors - Clinical Impressions</u>: ***IP engaged in maladaptive coping and secondary gain and may benefit from continued MH services and treatment.  IP shall participate in MH appointments and be encouraged to become medication compliant.***

**Observation**:  Because CCI did not operate a MHCB unit, all suicidal patients were housed in the **<u>OHU</u>** and required to be supervised on 1:1 observation until they were transferred to a MHCB.  No other levels of observation were permitted within the OHU.

Finally, a review of **<u>Guard One</u>** data for a recent 24-hour period found 100 percent compliance with the required checks not exceeding 35-minute intervals in the ASU.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of October 2022 through March 2023.  This reviewer's sample EHRS review of 39 emergent/urgent referrals for SI/behavior found that clinical staff completed the required SRASHEs in all of the cases.  In addition, this reviewer did not review **<u>Discharge SRASHEs and Safety Plans</u>** because CCI did not have a MHCB unit.

In addition, the **<u>Crisis Intervention Team</u>** was launched at CCI in February 2020, paused during 2020, and reactivated in February 2021.  During the previous assessment, the CIT had been available Monday through Friday from 5:00 p.m. until 10:00 p.m.  This reviewer was informed that the CIT program was paused again in August 2022, and would be reactivated again (with expanded coverage of Monday through Friday from 8:00 a.m. until 5:00 p.m.) when additional staff are trained.  Because CCI officials did not identify a staffing shortage as the cause of the CIT suspension, were planning to expand weekday coverage, and had an LOP reissued on February 22, 2023, it remained unclear why the CIT program was still inactive.  Currently, a crisis clinician was required to respond to emergency mental health referrals during regular business hours.

Finally, the process by which IPs were provided Discharge Custody Checks at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 27 patients discharged from a MHCB or alternative housing placement who were returned or transferred to CCI from October 2022 through March 2023.  The review found that 85 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians.  Most of the clinician errors were attributable to discontinuation of checks prior to 24 hours by clinicians, missed days of assessment, or missing forms.  When completed correctly, custody checks were generally recommended for 24 hours in the majority of cases.  In addition, only 70 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute

intervals.  Most of the errors were attributable to gaps in required observation at 30-minute intervals and missing forms.

**Intervention**:  Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**:  A review of six months of SPRFIT meeting minutes (October 2022 through March 2023) found that a quorum of all mandatory members or authorized designees was not achieved for any of the meetings because psychiatry was not in attendance.  Meeting minutes did not include the tracking and brief review of IPs in the SRMP.  The meeting minutes were otherwise very sparce and unremarkable.  There was separate documentation that included the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits, but SPRFIT meeting minutes did not include any corrective actions to address deficiencies in either safety planning or the "Discharge Custody Check Sheet" (CDCR MH-7497) form process.  Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required.

Finally, a current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**:  According to training records, 95 percent of custody and 100 percent of nursing staff were currently certified in CPR.  In addition, approximately 98 percent of custody, 98 percent of medical, and 97 percent of mental health staff completed the annual suicide prevention block training during 2022.  Finally, as of April 2023, 85 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had completed the seven-hour SRE training program, and 95 percent had completed safety plan training.

**Recent Suicides**:  CCI experienced two (2) suicides during the review period.  In the **_first_** case (CCI 2), the IP was found hanging from a ventilation grate by a sheet in his SNY cell during the afternoon of August 30, 2022.  The IP entered the CDCR system a few months earlier on June 7, 2022 to serve a 36-year term for multiple counts of lewd and lascivious acts with child under 14.  The victims were his daughter and two nieces.  He also had an active ICE detainer.  The IP had been transferred to CCI one day earlier on August 29, 2022.  He did not have any RVRs during his brief confinement, and was placed on SNY status due to the nature of his charges.  The IP was not known to be gang-affiliated.  He was unmarried at the time of his death, but previously had a common-law wife and that relationship produced children, both now adults.  He had multiple telephone calls with various family members during his three-month incarceration.

According to available records, the IP and six siblings were raised by their parents in Mexico.  The family subsequently moved to the United States, with his mother dying several years prior to the instant offense.  The IP dropped out of high school during his youth but maintained full-time employment as both field worker through a labor service company and then as a welder.  He denied any history of history of substance abuse other than alcohol.  The IP had several prior

119

alcohol-related driving offense convictions.  Although he received some mental health treatment in the county jail for anxiety and sleeping problems, there was no other documentation that he had a prior history of mental illness or suicidal behavior in the community.

Upon entry into CDCR, the IP self-reported depression and psychotropic medication from the county jail and was placed in the MHSDS at the 3CMS level of care.  He was subsequently given a diagnosis of adjustment disorder with mixed anxiety and depressed mood.  The IP subsequently informed the clinician completing his MHPC Initial Assessment on June 21, 2022 that "he continued to experience moderate depression and moderate anxiety, both of which he rated at 5/10 (10-most severe) and were exacerbated by minimal family support and first and long prison term."  He continued to deny any suicidal ideation.  A SRASHE was completed on June 21, 2022 during the RC process and indicated both a low chronic and acute risk for suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide.  Other than recent complaints about upper and lower back pain, he did not have any other known significant medical issues that were thought to be proximate causes of his death.  The IP did not leave a suicide note.  The CDCR reviewer concluded that "information gathered during the course of this review suggests possible contributors of physical pain issues, depression and anxiety leading to periods of difficulty sleeping, difficulty adjusting his first prison term as a sex offender, and stress over his father's medical issues."  In addition, the CDCR reviewer theorized that "It is quite possible that within those first few hours at CCI, inmate ___ was already asked for his paperwork and/or threatened by other inmates.  This scenario seems the most likely as prior to transfer to CCI, inmate ____ appeared future-oriented during phone calls and had sent visitation paperwork home.  However, the deterioration of his father's health mentioned during a phone call on August 22, 2022 may have exacerbated his depressive symptoms, and ultimately contributed to his death by suicide."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) During review of the MAR, there was no documentation whether the AM medications (sertraline and hydroxyzine) were given or refused by Inmate ___ on 8/30/2022.  However, it was documented in the institutional review that the LVN was informed by custody that Inmate ____ refused his medications.

> 2) On 8/29/2022, the RN utilized a Spanish-speaking officer during the Initial Health Screening.  However, it was not documented in the record if the Spanish-speaking officer used for interpretation was bilingual certified.

In the ***second*** case (CCI 3), the IP was found hanging from a ventilation grate by a sheet in his mainline cell during the morning of December 18, 2023.  The final version of the Suicide Report was not available for review at the time this report was completed.

**Audit Summary**:  Adequate practices were found in PT rounding, new intake cells, alternative housing, Guard One compliance, completion of SRASHEs for emergent/urgent mental health referrals, and both CPR and suicide prevention training.  Concerns were found with one nurse indicating that the door to the nurse's office would always remain open during the intake

screening process, safety planning, adequate completion of Discharge Custody Check Sheet forms, and chronic lack of a psychiatry presence during monthly SPRFIT meetings.

### 4)    California Institution for Women (CIW)

**Inspection**:  May 15-17, 2023 (previous suicide prevention audit was on September 14-15, 2021).  CIW housed approximately 992 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  The **Intake Screening** process was observed within the R&R Unit on May 17, 2023.  Although the nurse's door was closed, the officer remained in the room because the IP was on a maximum custody status, thus compromising both privacy and confidentiality. The problem could have been easily averted if a TTM had been located in the nurse's office. The nurse was observed to be asking all required questions pertinent to mental health and suicide risk.  Required suicide prevention placards (both English and Spanish versions) were observed inside the office.  This reviewer subsequently conversed with a watch commander who suggested that a TTM, located in an adjoining room where the body scanning equipment was located, could be utilized with the officer vacating the room during the nursing screening.

In addition, this reviewer's subsequent chart review found at least one recent case in which an IP (CIW 1) returning to the facility from a court hearing answered "yes" to the question of "received bad and/or unexpected news" from court in which the required urgent mental health referral was not generated.  According to the screening form, the IP had received an additional six-year term (now a 3rd strike).

Daily **PT Rounds** in the ASU were observed on May 16, 2023.  The rounds were unremarkable and the PT was observed to be entering the Psych Tech Daily Rounds information into EHRS for each caseload IP.

**Housing**:  CIW had a CTC with ten designated **MHCBs** previously found to be suicide-resistant.

There were only 3 to 4 patients housed in the licensed MHCB unit during the onsite assessment. In addition, the Walker Unit, a 19-bed unlicensed MHCB unit, contained seven to eight patients during the onsite assessment.  All cells were previously found to be suicide-resistant.  This reviewer had been previously informed that, because the Walker Unit did not have a "special management 'walk-alone' yard," all maximum-custody patients in need of MHCB LOC were housed in the CTC's licensed MHCB which had a "walk-alone" yard.

The ASU for GP and 3CMS IPs contained seven retrofitted **New Intake Cells** for IPs on new intake status.  Due to a low census, this reviewer observed that all of the new intake cells were empty and there were no IPs on 72-hour new intake status.  Of note, this reviewer was previously informed that the EOP Hub had been relocated to the PSU (due to low numbers in both units), and newly admitted EOP IPs were required to be housed in the ASU new intake cells for the initial 72 hours before being transferred to the PSU.

Finally, **Alternative Housing** cells to temporary house IPs identified as suicidal and awaiting MHCB placement were located in the TTA (Cells 103 and 104).  All IPs in alternative housing

were required to be observed on a 1:1 basis and provided beds. Alternative housing continued to be used on a regular basis at CIW, but the length of stay was very short. From February through April 2023, there were approximately 48 IPs placed in alternative housing, with all discharged within 24 hours. There were no rescissions during this period, and all 48 IPs were subsequently placed in a MHCB.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were regularly used in both the **MHCB** units for patients identified as being suicidal. In addition, patients not on suicide observation status were required to be observed at 15-minute intervals. During April 2023, the Mental Health Observations Reporting Tool indicated that 18 patients were on Suicide Precaution and/or Suicide Watch in the licensed MHCB, with 99 percent compliance with timely observation of patients on Suicide Precaution and 94 percent compliance with timely observation of patients on Suicide Watch. Within the unlicensed Walker Unit, there were 15 patients on suicide observation status during April 2023, with 99 percent compliance with timely observation of patients on Suicide Precaution and 96 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period found a combined 99 percent compliance with required checks not exceeding 35-minute intervals in the ASU and EOP Hub/PSU.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals from November 2022 through April 2023. This reviewer's sample EHRS review of 54 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in 93 percent (50 of 54) of the cases.

In addition, the **Crisis Intervention Team** was initiated at CIW in January 2017 and was currently operational Monday through Friday from 2:00 p.m. through 10:00 p.m. This reviewer did not have an opportunity to observe the CIT process during the on-site assessment.

This reviewer had the opportunity to observe seven (7) **IDTT Meetings** in both the MHCB and unlicensed Walker units during the on-site assessment. Overall, there was good treatment team representation in both units, adequate discussion of diagnoses and medication, but uneven case presentations and higher level of care discussions, and inadequate discussion of safety planning for those patients admitted for DTS. As discussed below, there were also problems providing accurate information to patients regarding their observation level and approved out-of-cell activities.

With regard to **Out-of-Cell Time** offered to MHCB patients, this reviewer examined the 114-A forms for 11 patients in both the licensed MHCB unit and unlicensed Walker Unit. The review found that all patients received showers on a regular basis, five (5) patients were not offered other out-of-cell activities allegedly based on provider orders (these patients were on Suicide Watch at the time), three (3) patients were offered out-of-cell activities, and three (3) patients had arrived on the units within 24 hours and did not have opportunities for any out-of-cell activities except for a shower. In the five (5) cases in which patients were not offered out-of-cell activities, there were problematic reasons, including no clinical documentation justifying why

the privileges were withheld, one case in which provider orders authorized all out-of-cell activities, but the 114-A form completed by custody noted they were disallowed, and yet another case in which provider orders changed every day (no privileges one day, all privileges the next day, visits one day, but no yard/telephone call) despite consistent behavior by the patient during this time period.

In one troubling case (CIW 1), a patient attending her IDTT in the Walker Unit on May 16, 2023 clothed in a safety smock.  She was on Suicide Watch, continued to express suicidal ideation, and appeared very distraught about not being able to reach her mother in order to inquire about the status of her young children who had been taken out-of-state by their father.  Following the IDTT meeting, this reviewer asked the primary clinician why the patient's telephone calls and other privileges were withheld, and the clinician responded by first incorrectly stating that patients on Suicide Watch were not permitted telephone calls, and then stating that "this patient was too volatile, custody might have concerns, and a call might trigger worst symptoms."  This response was troubling for several reasons, including the fact that the patient was on constant observation and any adverse reaction to a telephone call would be easily observed by staff, as well as news regarding her children could reduce her depression.  More problematic was the fact that subsequent review of the patient's medical chart indicated that she had been cleared for all out-of-cell activities, including telephone calls the previous day.  The patient was subsequently granted access to the telephone later that day.  Of note, problems in providing patients access to approved out-of-cell activities in the Walker Unit were raised during the reviewer's previous assessment.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB units, this reviewer examined the medical charts of 29 patients discharged from the units between March and April 2023 and remained at CIW.  The review found that required SRASHEs were completed in all but one case (28 of 29 or 94 percent), with safety plans found in 23 of 26 (88 percent) applicable cases, and 28 of 29 (97 percent) cases had daily clinical follow-ups for each of the five consecutively required days.  Most of the completed safety plans were found to be adequate.

In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), this reviewer was presented with data regarding the MHCB supervisor review discharge SRASHEs and safety plans for patients released from the MHCB during April 2023.  The data indicated that, although the MHCB supervisor timely reviewed (before or during the IDTT clinical discharge) all 28 cases, the review was partially flawed because it did not provide "pass"/ "fail" scores.

Finally, the process by which IPs were provided Discharge Custody Checks at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 79 cases of patients discharged from a MHCB or alternative housing placement who remained at CIW and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from November 2022 through April 2023. The review found that 99 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (95 percent) of custody checks recommended for discontinuation after 24 hours by clinicians. In addition, 95 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (November 2022 through April 2023) found that meetings had quorums of all required mandatory members or designees for all months except April 2023. Meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits. There were a few serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period that resulted in case presentations included in the meeting minutes. With one exception, meeting minutes were otherwise unremarkable. The exception was that patients enrolled in the SRMP were not being tracked and reviewed as required by policy during monthly meetings.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**: Due to the small size of the CIW prison and CIW-PIP and, this reviewer was presented with training records that combined data from both facilities. According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, only 69 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of April 2023, approximately 90 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and only 38 percent had completed safety plan training.

**Recent Suicides**: CIW did not experience any suicides during the review period.

**Audit Summary**: Adequate practices were found in PT rounding, Guard One compliance, safety planning, discharge custody checks, and monthly SPRFIT meetings. Intake screening in the R&R unit was problematic, and IDTT meetings were uneven. There continued to be a discrepancy in privileges afforded to MHCB patients housed in the Walker Unit compared to those housed in the licensed MHCB unit. Medical staff compliance with annual suicide prevention training and mental health staff compliance with safety planning were very low.

### 5)    California Institution for Men (CIM)

**Inspection**:  May 18-19, 2023 (previous suicide prevention audit was on September 16-17, 2021).  CIM housed approximately 2,222 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the **Intake Screening** process on May 18, 2023.  A new medical suite had been constructed since the previous onsite assessment to replace the nurses' cubicle in the R&R unit.  The door to the nurse's office was closed, with an officer stationed in the hallway and observing the process through a large window in the door, thus ensuring both privacy and confidentiality.  With one exception, the nurse was observed to be asking all of the questions on the Initial Health Screening form related to mental health and suicide risk and correctly entering information in the EHRS.  The exception was that the nurse inappropriately conflated the two "bad news" questions into one question.  In addition, when this reviewer asked the nurse what the practice would be when a maximum custody IP was screened, her response was that the officer would enter the office for security reasons.  Such a response was problematic, and the issue could be easily remedied by placing a TTM inside the nurse's office.

Daily **PT Rounds** in the ASU (Palm Unit) were observed on May 19.  The rounds were unremarkable, and two PTs were observed to be entering the Psych Tech Daily Rounds information into EHRS for each caseload IP.

**Housing**:  Two units (Stations 1 and 4) of the CTC at CIM contained 34 **MHCBs**.  All of the MHCB rooms had previously been found to be suicide-resistant following renovation in 2018.  Only 26 of 34 beds (76 percent) were occupied during the onsite assessment.

In addition, the ASU (Palm Unit) contained 14 retrofitted **New Intake Cells** that were suicide-resistant.  This reviewer observed that two of the cells were occupied with IPs on 72-hour new intake status, but five other IPs on new intake status were in non-new intake cells.  Of these, three IPs were prematurely relocated from new intake cells earlier that morning (May 19) prior to the expiration of 72 hours; one IP was placed in an ADA cell (with a CPAP machine) that was not suicide-resistant; and the fifth IP (CIM 1) had arrived into the Palm Unit two days earlier on May 17, 2023, and an emergent mental health referral had been generated based upon the ASU screening indicating bizarre behavior, auditory hallucinations, current depression, and prior history of suicide attempts.  Despite this emergent mental health referral, the IP remained housed in a non-new intake cell located adjacent to an empty new intake cell.  The ASU lieutenant was subsequently notified.

Finally, **Alternative Housing** cells to temporarily house IPs awaiting MHCB placement were used on a regular basis, with most IPs housed in Cell 175 located in the CTC.  All IPs in alternative housing were required to be observed on a 1:1 basis and furnished beds.  From February through April 2023, there were approximately 49 IPs placed in alternative housing, with all discharged within 24 hours.  There were no rescissions during this period, and all 49 IPs were subsequently placed in a MHCB.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In addition, patients not on suicide observation status were required to be observed at 15-minute intervals.  During April 2023, the Mental Health Observations Reporting Tool indicated that 68 patients were on Suicide Precaution and/or Suicide Watch in the MHCB unit, with 95 percent compliance with timely observation of patients on Suicide Precaution and 83 percent compliance with timely observation of patients on Suicide Watch.  For reasons that remained unclear, the majority of MHCB patients remained on either Suicide Watch or Suicide Precaution for only one or two days.

Finally, a review of **Guard One** data for a recent 24-hour period found 100 percent compliance in the administrative segregation (Palm) unit with required checks not exceeding 35 minutes.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of November 2022 through April 2023.  A sample EHRS review of 30 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 90 percent (27 of 30) of the cases.

In addition, the **Crisis Intervention Team** was initiated at CIM in 2018.  This reviewer did not have an opportunity to observe the CIT process during the onsite assessment, but was informed that the CIT continued to be operational Monday through Friday from 2:00 p.m. through 10:00 p.m.

This reviewer observed **IDTT Meetings** for 11 patients on May 18-19, 2023, with seven (7) patients admitted for DTS.  Overall, there was good treatment team representation in both units, adequate discussion of diagnoses and medication, but uneven case presentations and higher level of care discussions and safety planning for those patients admitted for DTS.  The meetings would have been more problematic were it not for the presence of, and frequent re-direction by, the MHCB supervisor.  As discussed below, there were also problems regarding adequate and accurate discussion of approved out-of-cell activities.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for 23 patients in MHCBs during the onsite assessment.  The forms of three other patients were excluded because they had only been in the unit for less than 48 hours.  The review found that all 23 patients received showers on a regular basis, but only ten of 23 (43 percent) patients were offered telephone calls, and only 11 of 23 (48 percent) patients were offered yard more than one time during their stay.

In addition, this reviewer found that there was inconsistency regarding interpreting the policy on out-of-cell activities for patients on Suicide Watch by custody personnel.  During the on-site assessment, 15 patients were on Suicide Watch and 13 of the 15 patients were clinically-approved for out-of-cell activities.  However, during the IDTT meetings on May 18, 2023, the CC1 consistently and incorrectly told patients on Suicide Watch that they were not eligible for out-of-cell activities until they were cleared from Suicide Watch and approved for full issue clothing.  IDTT clinicians did not correct the CC1 during the IDTT meetings on May 18.  After this reviewer's intervention, the same CC1 was observed to be correctly interpreting the policy

126

by informing patients on Suicide Watch during IDTT meetings the following day (May 19, 2023) that they had been clinically-approved for out-of-cell activities.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the medical charts of 11 patients discharged from the unit between March and April 2023 who remained at CIM. The review found that required SRASHEs were completed in all 11 cases, with safety plans found in all seven (7) applicable cases, and ten of 11 (91 percent) cases had daily clinical follow-ups for each of the five consecutively required days. Most of the completed safety plans were found to be adequate.

In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), this reviewer was presented with data regarding the MHCB supervisory review discharge SRASHEs and safety plans for patients released from the MHCB during April 2023 who either remained at CIM or transferred to other facilities. The review found that, out of 27 cases, the MHCB supervisor timely reviewed (before or during the IDTT clinical discharge) only 19 percent (five of 27) of the cases, with reviews occurring from one to several days following discharge. The MHCB supervisory review also found that only 24 of 27 (89 percent) of safety plans were completed as required, with some clinicians incorrectly stating that a safety plan was not required or there was "no update to original SPI."

Finally, the process by which IPs were provided Discharge Custody Checks at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 30 cases of IPs discharged from a MHCB or alternative housing placement who remained at CIM and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from November 2022 through April 2023. The review found that only 87 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Of note, the vast majority (93 percent) of the custody checks were recommended for discontinuation by clinicians after the maximum allowable 72 hours. In addition, 90 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the errors were attributable to missing or late clinician signatures on Page 1 and missing custody checks on Page 2.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (October 2022 through March 2023) found that meetings had quorums of all required mandatory members or designees (CIM had not been allotted a correctional health services administrator position) for all six months. Meeting minutes included discussion on compliance data, improvement projects, as

well as the status of corrective actions based upon regional SPRFIT audits.  Although no IPs met the criteria for the SRMP during the review period, meeting minutes included a placeholder template for the program.  The status of corrective actions based upon this reviewer's previous recommendations were separately documented.  Of note, there were at least five (5) serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") by one patient during the review period, and a case presentation and/or root cause analysis (RCAs) was not included in the meeting minutes.  Meeting minutes were otherwise unremarkable.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**:  According to training records, 100 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, approximately 96 percent of custody staff, 97 percent of medical staff, and 96 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of April 2023, 98 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  CIM did not experience any suicides during the review period.

**Audit Summary**:  Adequate practices were found in PT rounds, alternative housing, Guard One, and both CPR and suicide prevention training.  Observed nursing screening in the new medical suite was problematic, as well the provision of out-of-cell activities to MHCB patients.  The observation of five (5) new intake IPs in non-new intake cells within the Palm Unit was very problematic.  Although safety planning was mostly adequate, supervisory review of safety plans was untimely.

6) **San Quentin State Prison (SQ)**

**Inspection**:  May 23-25, 2023 (previous suicide prevention audit was on November 25-27, 2021).  SQ housed approximately 3,930 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed two new admissions during the medical **Intake Screening** process in the R&R unit on May 24.  In the first case, the nurse was observed to not be asking all of the questions on the Initial Health Screening form and subsequently informed this reviewer that all questions were not asked because the IP had already answered affirmatively to several questions and was being referred to a mental health clinician.  In the second case, as well as with the first case, the nurse failed to ask the question whether the IP "received bad and/or unexpected news" from court.  The door to the nurse's office was closed during both screenings, with a custody officer providing security in the corridor.  Both IPs were non-maximum custody status.  When asked about the process for screening a maximum custody status IP, the nurse responded that the IP would remain handcuffed during the process, with the

door closed and custody personnel in the corridor.  Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

In addition, this reviewer had the opportunity to observe required daily **PT Rounds** in the ASU (Carson) on May 25.  The PT was observed to be correctly entering information from the Psych Tech Daily Rounds Form into the EHRS for all caseload IPs.

**Housing**:  The facility had 40 inpatient beds.  Although initially opened to serve the psychiatric needs of condemned patients at PIP levels of care, the program had since been expanded to treat both condemned and non-condemned patients from other CDCR facilities who require acute care.  In addition, the facility reserved two inpatient beds to accommodate condemned patients requiring **MHCB** level of care.  All rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.  There were approximately 36 patients in the PIP during the onsite assessment, and no patients at the MHCB level of care.

The ASU (Carson Unit) contained approximately 30 **New Intake Cells** on the first (108-122) and second (201-215) tiers.  All the new intake cells were retrofitted to be suicide-resistant.  The census was high during the onsite assessment with 143 IPs, but all new intake IPs were observed to be in new intake cells.

Finally, **Alternative Housing** to temporarily house IPS identified as suicidal and awaiting MHCB placement was found in either six licensed medical beds in the CTC (and referred to as "alternative housing flex beds"), TTA cells, or various large holding cells scattered throughout the Central Health Services Building.  Alternative housing was used on a daily basis and IPs were required to be furnished beds and observed on a 1:1 basis.  From February through April 2023, there were approximately 153 IPs placed in alternative housing, with an additional seven (7) IPs removed from the list because they were directly admitted into the MHCB section of the PIP.  All IPs housed in alternative housing were released within 24 hours.  In addition, 97 percent (142 of 146) of the cases resulted in MHCB admissions (almost all to other facilities).  Medical chart review of the four rescinded cases found that SRASHEs and safety plans were completed in each case.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were utilized for suicidal patients at the **MHCB** LOC.  In addition, MHCB patients not on suicide observation status were observed on either "behavioral observation" at 30-minute intervals or regular nursing rounds at 60-minute intervals.  During April 2023, because the vast majority of patients under observation status were in the PIP, the Mental Health Observations Reporting Tool was not reviewed.

Of note, this reviewer's chart review found a case (SQ 1) in which a MHCB patient was downgraded from Suicide Precaution to "behavioral observation" at 30-minute intervals on April 5, 2023 because the psychiatrist determined that the "patient has not exhibited any behaviors to suggest self-injury or suicide."  However, the patient continued to be clothed in "partial issue" because "he continues to be confused and may have difficulty articulating his needs."  Pursuant to policy, the provider's continued concerns regarding the patient should have resulted in continuation of Suicide Precaution status with partial issue clothing.

Finally, a review of **Guard One** data for a recent 24-hour period found 98 percent compliance with required checks that did not exceed 35-minute intervals in the administrative segregation (Carson) unit.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for April 2023.  A sample EHRS review of 37 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in all (100 percent) cases, a considerable improvement from the previous assessment.

In addition, the **Crisis Intervention Team** was initiated at SQ in September 2019.  There was only one assigned CIT clinician, therefore, the CIT was operational from Monday through Thursday from 2:00 p.m. through 10:00 p.m.  Outside those hours, clinicians from the High-Risk Team (HRT) responded to crisis calls.  This reviewer had an opportunity to observe HRT clinicians respond to three (3) crisis calls on May 24-25, 2023.  All the assessments were conducted in a confidential room in the TTA, required SRASHEs were completed in each case, and all three cases resulted in MHCB admissions.

This reviewer observed ten **IDTT Meetings** on May 24-25, 2023.  All of the IDTT meetings were for PIP patients.  Overall, there was very good treatment team representation and participation by multiple teams.  Each team member clearly knew each patient.  With the exception of diagnosis not discussed in eight (8) of ten (10) cases, there were very good summaries regarding reason for admission, course of treatment, medication, observation level, and out-of-cell activities discussed in each case.  Although the meetings tended to be lengthy, interaction between team members and each patient were conversational, with the patient's first name consistently used during discussions.  When appropriate, safety planning was discussed by asking the patient – "What coping skills have we been working on?" and "What treatment goals do you have in the next 30 days?" Several patients verbalized learned techniques to decrease suicidal thoughts.  Such an approach was far different then IDTT meetings observed by this reviewer in other facilities in which safety planning was only vaguely discussed in the context of the PC simply stating that "We have been working on safety planning" or "We will work safety planning," with the patient never being asked to articulate the plan or coping skills that were learned.

With regard to **Out-of-Cell Time** afforded to patients, this reviewer examined the NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for 31 patients during a seven-day period of April 30 through May 6, 2023.  The review found that on average each patient was offered: 17 hours of yard/dayroom per week, three showers (five IPs received two showers) per week, and nine telephone calls per week.  In addition, two patients received visits during the week.  Finally, the two patients on Suicide Watch were offered 14 and 15 hours, respectively, of yard/dayroom, three showers each, and five telephone calls each.  Of note, the NCAT report could not distinguish between PIP and MHCB patients.  There was a minor concern about condemned patients who were issued tablets not being able to use the tablets for telephone calls because the security settings were incorrectly set on the devices (apparently due to their unique custody classification as condemned IPs).  The vendor was made aware of the problem and corrective action was said to be forthcoming.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the inpatient unit, this reviewer examined the EHRS charts of 11 patients discharged from the unit at MHCB level of care between November 2022 and April 2023 who remained at SQ. The required discharge SRASHEs and five-day follow-up assessments were completed in all 11 cases, and required safety plans were completed in all ten applicable cases.

Pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from November 2022 through April 2023. The subsequent review found that the required supervisory review of MHCB discharge safety plans was timely in 73 percent (eight of 11) of reviewed cases.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 32 cases of IPs discharged from a MHCB or alternative housing placement who remained at SQ and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from November 2022 through April 2023. The review found that 97 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. The overwhelming majority (89 percent) of custody checks were recommended for discontinuation by clinicians after the maximum allowable 72 hours. In addition, 88 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: Both the SQ prison and SQ-PIP had an integrated SPRFIT, with one coordinator chairing the committee. A review of six months of SPRFIT meeting minutes (November 2022 through April 2023) found that meetings had quorums of all required mandatory members or designees for all six months. Meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits. Minutes also included the tracking and brief review of IPs in the SRMP.

Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. Meeting minutes were otherwise unremarkable. A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three

CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**:  Due to the small size of the SQ-PIP, this reviewer was presented with training records that combined data from both the SQ-PIP and SQ prison.  According to training records, 99 percent of custody and 100 percent of nursing staff were currently certified in CPR.  In addition, 91 percent of custody staff, 89 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of April 2023, approximately 92 percent of mental health clinicians had completed the SRE mentoring program, 98 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  SQ experienced two (2) suicides during the review period.  In the ***first*** case (SQ 2), the IP was found hanging from the cell bars by a sheet in his Non-Designated Program Facility (NDPF) cell during the morning of September 16, 2023.  His body was found with signs of rigor mortis.  The IP entered the CDCR system on April 13, 2022 to serve an 8-year term for multiple counts of lewd and lascivious acts with child under 14.  The victims were his grandchildren.  The IP had been transferred to SQ on June 10, 2022.  He did not have any RVRs, and was not gang-affiliated.  His housing status was initially classified as SNY, but converted to an NDPF in May 2022.  He was married, had seven adult children and 28 grandchildren, but had not had any contact with his children or grandchildren due to the nature of the instant offense.  In addition, the state of the marriage was unclear, and he only had sporadic contact with his wife via telephone calls and written correspondence.

According to available records, the IP and a brother were raised by their parents in a normal family environment, with no reports of any abuse.  His parents divorced when he was 16-years-old.  The IP graduated from high school, but there was conflicting information as to whether he had had a college degree.  He reported serving in the United States Army during the 1970s and had a stable employment history that included ownership of two convenience stores.  At the time of arrest for the instant offenses, he was a high-ranking member (bishop) in the Mormon church.  The IP did not have any known history of substance abuse, and his mental health history only began upon confinement in the county jail where he was treated for depression, anxiety, and decreased appetite related to the instant offense.  During his county jail confinement, he was initially diagnosed with adjustment disorder and prescribed psychotropic medication.

Upon entry into CDCR, the IP denied any history of mental health treatment, but based upon county jail records indicating a mental health diagnosis and psychotropic medication, he was placed in the MHSDS at the 3CMS level of care.  He was initially diagnosed with assessment disorder that was subsequently changed to depressive disorder in June 2022.  During initial routine clinical contacts, the IP was reported to be stable, programming sufficiently, and appeared capable of managing his depression through medication and individual therapy.  However, in December 2022, he informed his primary clinician that he had stopped taking his medication because he was stable without it, stating "Sometimes I think about what I did to get here, but I don't beat myself up about it.  I'm not depressed, but I do have my bouts with regret for what happened.  On a scale of 1 to 10 my depression is about two.  That's not bad at all."

Several months later on April 26, 2022, the IP informed his primary clinician that he was having increased stress related to health care concerns, stating "Physically, I've lost almost 30 pounds since incarcerated. That's been hard. It has an effect on my mood because I'm concerned about my health. It's not constantly on my mind, but I do worry." He was hoping for a transfer to another housing unit that was more suited to older IPs. He had joined both the church choir and a veterans' group. He continued to deny any suicidal ideation. In July 2023, some of the IP's psychotropic medication was restored due to poor sleep. His last contact with his primary clinician on August 18, 2023 and reported "I'm fine. I'm back on the Remeron now and it's doing its job. I sleep about seven hours a night and I'm not feeling depressed at all. I've lost 40 pounds since I got here, but I've been at this weight for about seven months now. I have a normal diet and eat the food. Physically I feel good." The clinician indicated the IP continued to appear stable and appropriate for 3CMS.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. Due to his age (76), he had numerous medical problems, including diabetes, kidney disease, hypertension, and thyroid issues, but none were thought to be proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that "a loss of familiar support and social system received through his church community, increased interpersonal isolation in the face of an uncertain future and his inability to unburden himself to others by sharing his feelings, coupled with psychic pain and hopelessness, all likely played a role in his decision" to end his life.

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

1) Mr. ____ was seen for a MHPC contact on December 21, 2022, but then was not scheduled again for a follow-up MHPC contact until April 19, 2023. This is outside the routine contact window for patients at CCCMS level of care. Per the MHSDS Program Guide, 12.3.15, "*Face-to-face individual contacts between the PC and the CCCMS inmate-patients in a GP (General Population) setting shall occur as often as clinical needs dictate but at least once every 90 days.*"

2) There were some inaccuracies identified in the MH Master Treatment Plan dated June 22, 2023, and some sections were not appropriately updated. The documentation indicated Mr. ____ continued to be prescribed Remeron. This statement was erroneous as his Remeron had been discontinued in December 2022, and was not re-started until July 21, 2023. The Depressed Mood IPOC was continued although it did not appear to have been regularly updated during the previous year. In the clinical summary and case formulation section, the case formulation had not been changed or updated, and indicated this was an initial contact. Further, the 4 P's (Predisposing, Perpetuating, Precipitating, and Protective Factors) were left blank in the Master Treatment Plan as well. Based on available history and presentation over the previous year, there was adequate background information on case factors to develop a clinical summary and working case formulation.

133

3) Mr. _____ was seen for an individual psychiatry contact on December 7, 2022. The clinical note that resulted from that December contact recorded that the plan included tapering and discontinuing Remeron and 'RTC in 12 wks. or earlier PRN.' The appointment at '12 wks.' (that was referenced in the note dated December 7, 2022) never occurred, and the patient was next seen for a psychiatry appointment on July 21, 2023.

4) 09/16/2023: During the EHRS review, the First Medical responder form indicated that a Cervical Collar was not applied to the patient.

5) 09/16/2023: During the EHRS review, the MAR indicated 0700 AM medication was not administered.

In the **_second_** case (<u>SQ 3</u>), the IP was found hanging from the cell bars by a sheet in his NDPF cell during the afternoon of September 25, 2023. His body was found with signs of rigor mortis. The IP entered the CDCR system on July 17, 2017 to serve a life sentence with parole for first degree murder (of his wife). The IP had been transferred to SQSP on February 8, 2023. He had three RVRs during his confinement, the most recent of which occurred in May 2020 for fighting. He had been gang-affiliated earlier in his prison term. The IP was widowed at the time of confinement (after having been convicted for the murder of his wife), and had a total of five biological and stepchildren, with whom he had no contact. The only family support came from his mother and a sister through both letter and telephone correspondence.

According to available records, the IP and two siblings were born and raised in El Salvador by their parents. He immigrated to the United States in his early 20s. Little was known regarding his early childhood, but in his writings, the IP detailed a traumatic history of physical abuse by his father. He was also exposed to more trauma during the civil war in El Salvador. The IP became a parent at the age of 17 but was later separated from the mother of this child at the age of 19. He graduated from high school in El Salvador and had an employment history that included landscaping, construction, building maintenance, plumbing, and painting. He was later married to another woman for approximately three years until she became the victim in the instant offense. The IP had an extensive history of substance abuse, primarily methamphetamine, that began in his early 20s when he immigrated to the United States. He did not have a known history of mental illness but reported one prior suicide attempt in 2015. Prior to the instant offense, the IP did not have a prior history of either juvenile or adult criminal offenses.

Upon entry into CDCR, while acknowledging the 2015 suicide attempt, the IP denied all current mental health symptoms, screened negative for needing any mental health treatment, and not initially enrolled in the MHSDS. He became involved in various educational services, substance abuse recovery groups, vocational services, and work assignments. The IP also regularly attended religious services, actively played soccer in the yard, and had positive relationships with staff.

The Ip's first mental health contact occurred on February 6, 2020 when he was referred to an MHCB following self-infliction of a deep laceration on his left wrist which required sutures to

close. He later told a clinician that "I cut myself for feelings" and that "everyone left him" and "nobody wanted to help him." According to records, it appeared that most of his family had largely refused to make contact with him due to the nature of the instant offense. Following an eight-day MHCB placement, the IP was discharged back to GP without entering the MHSDS. According to his medical chart, the decision not to include the IP in the MHSDS was a result of not being prescribed any psychotropic medication, his denial of suicidality, and plans to be transferred to a Level II facility.

Several weeks later March 30, 2020, the IP was found unresponsive by custody staff after a reported drug overdose. A SRASHE was completed, and he denied any mental health symptoms, including suicidal ideation. An MHPC Initial Assessment was completed after regional staff expressed concern regarding the patient. It was subsequently recommended that he be included in the MHSDS at 3CMS level of care because of his recent suicidal behavior, ongoing substance use, and concerns related to language and cultural barriers. The IP was given a provisional diagnosis of adjustment disorder but was not accepting of any psychotropic medication. In May 2020, he was included in the integrated substance use disorder treatment (ISUDT) program, including medication assisted therapy (MAT). However, in June 2020, the IP was discharged from the MHSDS after the IDTT determined he was stable, continued to deny all mental health symptoms, including suicidality, and repeatedly requested to be discharged from 3CMS. The IP had only periodic contact with mental health staff during the remainder of 2022 as a result of referrals following confrontations with peers and safety concerns. He continued to deny suicidal ideation and any interest in receiving mental health services.

On January 27, 2023, the IP self-reported experiencing significant symptoms of depression and auditory hallucinations. He also reported recent use of methamphetamine. Most significantly, the IP expressed suicidal ideation with a plan to hang himself. He was admitted into a MHCB, maintained stability during the placement, continued to deny the need for psychotropic medication or need for mental health services, and was subsequently discharged from the MHCB to GP on February 8, 2023.

Several months later in August 11, 2023, an emergent mental health referral was placed by custody staff after the IP was observed to be acting bizarrely in his housing unit. When assessed by a clinician, he appeared disorganized, frequently switching between English and Spanish in conversation, and stating he was having suicidal ideation and needed help. It was speculated that the IP was under the influence of methamphetamine, although he denied any current substance use. He was admitted into the MHCB at CMF. During an initial assessment with the psychiatrist, the IP reported stress related to negative news regarding his family (including the recent death of his granddaughter and his mother's illness) which resulted in difficulties in regulating his mood and emotions. He also admitted that that substance use triggered his auditory and hallucinations but continued to deny any recent use. The IP, however, did agree to start psychotropic medication. His diagnosis was changed from amphetamine-induced psychotic disorder to major depressive disorder with psychotic features. Upon discharge from the MHCB on August 23, 2013, he was placed at 3CMS level of care. A SRASHE noted a high chronic and low acute risk for suicide. Of note, the CDCR reviewer in this case found multiple problems regarding the IP's placement in the MHCB at CMF, including deficiencies in observation, assessment of risk, and safety planning, all of which were related to inadequate staffing.

Upon his return to SQ, the IP was seen for his required five-day follow-up assessments, appeared stable, denied any significant mental health symptoms, and again began refusing his psychotropic medication. He met with a psychiatrist on September 13 and then again on September 20 with another psychiatrist. During both of these encounters, the IP denied any suicidal ideation and continue to refuse psychotropic medication. As such, his medication was changed to PRN. During the last encounter with a psychiatrist on September 20, five days before his death, the IP was described as somewhat guarded, but denied any significant symptoms or stressors.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. There were not any significant medical issues that were thought to be proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that the IP had:

> challenges coping with incarceration as evidenced by current substance use and conflicts with peers. Issues related to safety were a recurrent theme during incarceration, as a result of Mr. ___'s need for mental health services. Additionally, given the nature of his controlling offense, most of Mr. ____'s family refused to have contact with him, further causing stress. Mr. _____ had an identified pattern of using methamphetamine and subsequently going into crisis, including expressing serious thoughts of suicide with an identified plan. Once he was sober in the inpatient setting, he often denied all mental health symptoms and reported a disinterest in mental health services. He also frequently minimized or denied his suicide history, and even when pass attempts required medical interventions. In addition, it is likely there were cultural factors impacting Mr. _____'s reluctance to seek treatment, as his writings discuss a need to be "machismo," and the peer influences dissuading him to seek support.

The Suicide Report contained 12 recommendations for corrective action through a QIP:

> 1) <u>CMF</u>: During the time Mr. ____ was placed in the MHCB in January and August 2023, there were multiple instances where he was not seen daily by a MHPC or MHMD. Per the Mental Health Program Guide, Chapter 5; MHCB; 12-5-13: '*An inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist*.'

> 2) <u>CMF</u>: Mr. ____ was not offered confidential contacts twice while he was in the MHCB in August 2023. These occurred on August 13 and August 19, 2023. During the August 13th contact, Mr. ____ initially requested confidentiality, but ultimately agreed to the cell front contact. Per memorandum dated October 7, 2015, Evaluations in Private and Confidential Settings: '*The purpose of this memorandum is to remind institutions all health screenings and evaluations, including emergency mental health evaluations, shall be conducted in a private and confidential setting.*'

3) <u>CMF</u>: The CMF Suicide Risk Evaluation form was completed on August 23, 2023. The suicide risk formulation consisted of two sentences that acknowledged Mr. ____'s high chronic risk because of his attempt history, however, the Acute risk determination was not discussed, so it is unclear as to why acute risk was assessed as low. Under the acute risk factors section, the clinician checked four acute risk factors (suicidal ideation, current/recent depressive symptoms, current/recent anxiety symptoms, and agitated or angry), so it is unclear how these were considered in determining acute risk.

4) <u>CMF</u>: The MH Safety Plan was completed as a separate form on August 23, 2023. According to EHRS, the clinician initially recorded the patient responses on the form, but left the clinical impression sections blank, and printed a copy to give to the patient. This resulted in minimum information the patient could utilize when in crisis. For example, next to the question 'What are you willing to do to reduce your suicide risk?' it was documented 'program in CCCMS.' Next to the question 'What can you or staff do to enhance (increase) your protective factors?' it was documented 'clinician will talk to me.' This copy of the safety plan was found in Mr. ___'s cell at the time of his death.

5) <u>CMF</u>: The MH Safety Plan was then completed in its entirety on August 23, 2023, however, the narrative was verbatim copied and pasted through multiple sections, not addressing the questions being asked, or including identified clinical interventions. The language 'pt agreed to D/C to CCCMS instead of GP fr [sic] continued support' was copied and pasted at the end of every section completed. There was no documented consideration of Mr. ____'s identified pattern of utilization of substances as a significant trigger for his suicide ideation and past attempts, reported inconsistent family support, limited insight, and continued pattern of instability in 2023.

6) <u>SQ</u>: Mr. Cruz was seen for five-day follow-up contacts August 24-28, 2023. It was observed that the MH Safety Plan completed at the time of discharge from the CMF MHCB, pulled forward without change. There were multiple concerns identified with this safety plan. Please see *Concerns Section* for further details.

7) <u>SQ</u> and <u>CMF</u>: According to the Effective Communication Patient Summary section of EHRS and SOMS, Mr. ____'s identified primary language was Spanish with limited English proficiency identified. His reading level was assessed at 4.0 as of September 14, 2023. Through his treatment across multiple institutions, he was inconsistently provided translation services. Please see *Concerns Section* for further details.

8) <u>SQ</u> Psychiatry: Review of the chart revealed one instance when the timing of an individual psychiatry contact was not in keeping with departmental expectations. Patient ____ as discharged from the MHCB on 8/23/23. He had an IDTT on 8/31/23 and an initial psychiatry appointment in the CCCMS program on 9/14/23. Departmental expectations require that the initial psychiatry contact

occur both within 14 days of transfer to the new program (the CCCMS program in this case) and prior to the IDTT.

9) <u>SQ</u>: During the EHRS review, on 7/17/23, a 7362 was submitted by the patient to see medical for antibiotic due to cut in right eye that may be infected. The patient was not seen until 7/18/23 - next business day despite indication of infection and request for antibiotic.

10) <u>SQ</u>: During the EHRS review, on 2/16/23, a 7362 was submitted for pain in lower back, anxiety, and stress. Requesting medication for the pain. The 7362 was triaged but never scheduled to be seen by a RN or MD to address the complaints. Instead, of schedule to see the RN FTF, 7362 was sent to pharmacy for medication refill instead. A review of EHRS was completed and was unable to identify what medication was refilled.

11) <u>SQ</u>: Review of the Mental Health Observation Reporting Tool identified that during the patient's crisis bed stay period from 01/27/23-01/28/23 at SQ, a late entry for Suicide Watch was identified. Also, for the patient's crisis bed stay period from 08/11/23-8/12/23 at SQ, several late entries for Suicide Watch were identified.

12) <u>CMF</u>: Review of the Mental Health Observation Reporting Tool identified that during the patient's crisis bed stay period from 01/28/23 to 02/08/23 at CMF, several late entries for Suicide Watch were identified and several late entries and non-staggered rounds were also identified. Also, for the patient's crisis bed stay period from 08/12/23 to 08/23/23 at CMF, several late entries for Suicide Watch were identified and several late entries and non-staggered rounds were also identified.

**Audit Summary**: Adequate practices were found in almost all areas, including PT rounds, new intake cells, alternative housing, Guard One compliance, completion of required SRASHEs, comprehensive IDTT meetings, out-of-cell activities for MHCB patients, safety planning, SPRFIT, and required training. Problematic practices were found in intake screening, as well as a chart review finding of a patient clothed in "partial issue" and observed at 30-minute intervals.

### 7) <u>Mule Creek State Prison (MCSP)</u>

**Inspection**: June 6-7, 2023 (previous suicide prevention audit was on February 24-25, 2022). MCSP housed approximately 3,876 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed three new admissions during the **Intake Screening** process in the R&R unit on June 7, 2023. The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. Of note, following two of the intake screening sessions, the regional SPRFIT coordinator needed to intervene and recommend that the nurse elevate the mental health referrals from routine to urgent and emergent, respectively, based upon the IPs' responses. The door to the

nurse's office was closed during the screening, thus ensuring privacy and confidentiality during the process. Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

In addition, this reviewer observed daily **PT Rounds** in the ASU (C-Yard, Building 12) on June 6, 2023. The building housed the EOP Hub, 3CMS, and GP IPs on segregation status. The rounds were unremarkable, and the two PTs were observed to be correctly completing the Psych Tech Daily Rounds Form and entering the information into the EHRS for all caseload IPs.

**Housing**: MCSP had a 10-bed CTC with eight designated MHCBs that were previously found to be suicide-resistant. There were six to eight patients housed in the unit during the two-day assessment.

In addition, there were 13 **New Intake Cells** in the ASU (C-Yard, Building 12) and all new intake IPs were observed to be appropriately housed in the new intake cells.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were primarily found in Building 13 (C-Yard), Building 12 (C-Yard), and wet holding cells within the TTA. Alternative housing was used on a daily basis, and IPs were required to be furnished beds and observed on a 1:1 basis. From March through May 2023, there were approximately 107 IPs placed in alternative housing, and all were released within 24 hours. Approximately 43 percent (46 of 107) of IPs were transferred to an MHCB, with 57 percent (61 cases) of the referrals rescinded and IPs returned to their respective housing units. The EHRS chart review for a sample of 40 rescinded cases found that the required SRASHEs were completed in all (100 percent) cases. Five-day clinical follow-ups were completed in 39 of 40 (98 percent) of reviewed cases. Safety plans were required in 38 cases, with 18 of 38 (47 percent) cases found to be adequate, 15 of 38 (40 percent) cases found to be inadequate, and 5 of 38 (13 percent) cases did not contain the required safety plan.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit. In addition, patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff. During May 2023, the Mental Health Observations Reporting Tool indicated that 10 patients were on observation status in the MHCB unit, with 94 percent compliance with timely observation of patients on Suicide Precaution and 65 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period in the ASU found 97 percent compliance with required checks that did not exceed 35-minute intervals. This high rate of compliance was offset by the fact that irregularities were found in timely Guard One checks for an IP who died by suicide in November 2023, as discussed below.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of December 2022 through May 2023. A sample EHRS review of 57 cases of emergent/urgent mental health referrals for SI/behavior found that clinicians completed the required SRASHEs in 93 percent (53 of 57) of cases.

In addition, the **Crisis Intervention Team** was launched at MCSP in May 2019 and was previously operational seven days a week from 2:00 p.m. until 10:00 p.m., with other clinicians responding to emergency mental health referrals during other hours. However, due to staffing shortages, CIT hours were revised to only Friday through Sunday, 2:00 p.m. to 10:00 p.m., with all other emergent referrals responded to by yard clinicians. This reviewer observed a yard clinician respond to an emergency mental health referral on June 6, 2023. This reviewer could not assess if the patient was being observed 1:1 prior to arrival of the clinician because the response was paused by a mental health supervisor while the area was "staged" in preparation for this reviewer's observation. Upon arrival, the clinician was observed to be assessing the IP in privacy. The required SRASHE was subsequently completed, and the IP was referred to an MHCB. The SPRFIT coordinator subsequently agreed that this reviewer's response to a crisis call should not have been delayed while staff "staged" the area.

One **IDTT Meeting** was observed in the MHCB unit on June 6, 2023. The patient had been admitted into the unit eight days earlier for DTS and was being referred to APP. Overall, there was good team participation, discussion regarding the reason for admission (DTS), diagnosis, medication, observation level, and suicide risk, but little discussion regarding safety planning other than a vague comment that "we will work on coping skills until your APP transfer."

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for five5 of seven patients housed in the MHCB during the on-site assessment. The review of two patients was excluded because they had both arrived on the unit the previous day. The review found that all five patients were afforded opportunities to shower, as well as other out-of-cell activities such as yard and telephone calls.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, the EHRS charts of 26 sampled patients discharged from the unit between April and May 2023 were examined. The review found that all (100 percent) of the cases had completed SRASHEs and five-day clinical follow-ups were completed in 23 of 24 (96 percent) of applicable cases. Of the 18 cases that required safety plans, nine of 18 (50 percent) were found to be adequate and the remaining nine of 18 (50 percent) were found to be inadequate.

Two cases exemplified the problems with adequate safety planning at MCSP. In the first case (MCSP 1), the safety plan below completed on June 5, 2023 did not address any specific strategies (e.g., coping skills) to reduce suicide risk, contained blank sections, and although the clinician alleged that the patient "had an agenda to get referred" to a higher level of care," the safety plan did not contain any specific interventions to address this perceived behavior.[32]

MH Safety Plan
Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing

---

[32] *See* CDCR's "Safety Planning" policy [(12.07.901(P1)], effective February 13, 2023, which states that "Patients with a pattern of threatening suicide or self-harm to affect external changes should have specific interventions developed to help identify the root causes of these behaviors and reduce the incidences of the threats of suicide or self-harm."

140

Patient Participate - Warning Signs: No
Warning signs - Patient focused:
Warning signs - Clinical Impressions: ***Pt started that his daughter getting hit by a car was a trigger (and pt reminded that now he's not ASU he could use the phone more often to check on progress). Other than Pt gave vague reasons of 'being in a dark place' and pt instructed to use metacognition to ID negative thoughts***.
Helpful reducing self-harm - Patient:
Helpful reducing self-harm - Clinical: ***Pt had an agenda to get referred to HLOC so did not ID any MH interventions as affective other than that medication 'helped a little.'***
Reduce Risk Factors - Patient:
Reduce Risk Factors - Clinical: ***Likely to continue to take medication, and half-heartedly agreed to participate more in MH by coming to appointments.***
Patient History of Self Harm: No
Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: No
Protective Factors - Patient focused:
Protective Factors - Clinical Impression: ***Pt has many protective factors such as family involvement, contact on the outside, future orientation, self-efficacy, interpersonal skills, and insight.***
Enhanced Factors - Patient focused:
Enhanced factors - Clinical Impressions: ***Pt protective factors are pretty solid but staff can discuss ways to increase involvement in MH tx and how to decrease antisocial behaviors that disrupt his program***

In the ***second*** case (MCSP 2), the safety plan below completed on May 3, 2023 did not address any specific strategies (e.g., coping skills) to reduce suicide risk, contained blank sections, and simply and inappropriately repeated the same sentence in each "clinical impressions" sections. It was also very problematic that the MHCB supervisor reviewed this safety plan (albeit late on May 9, 2023) and gave it a passing score with no revisions necessary.

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: No
Warning signs - Patient focused:
Warning signs - Clinical Impressions: ***Using DBT, IP will learn emotion regulation to help manage his mood. IP will also learn self-soothing behaviors involving relaxation and mindfulness techniques to help calm himself when feeling overwhelmed.***
Helpful reducing self-harm - Patient:
Helpful reducing self-harm - Clinical: ***Using DBT, IP will learn emotion regulation to help manage his mood. IP will also learn self-soothing behaviors involving relaxation and mindfulness techniques to help calm himself when feeling overwhelmed.***

141

Reduce Risk Factors - Patient:

Reduce Risk Factors - Clinical: ***Using DBT, IP will learn emotion regulation to help manage his mood.  IP will also learn self-soothing behaviors involving relaxation and mindfulness techniques to help calm himself when feeling overwhelmed.***

Patient History of Self Harm: No

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: No

Protective Factors - Patient focused:

Protective Factors - Clinical Impression: ***Using DBT, IP will learn emotion regulation to help manage his mood.  IP will also learn self-soothing behaviors involving relaxation and mindfulness techniques to help calm himself when feeling overwhelmed.***

Enhanced Factors - Patient focused:

Enhanced factors - Clinical Impressions: ***Using DBT, IP will learn emotion regulation to help manage his mood.  IP will also learn self-soothing behaviors involving relaxation and mindfulness techniques to help calm himself when feeling overwhelmed.***

As noted above, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from January through April 2023.  This reviewer was informed by the MHCB supervisor that "Due to critical staffing and coverage needs CQIT No. 13 MHCB/PIP: Supervisory Review of MHCB Discharge Safety Plans were not completed during part of January 2023 through April 1, 2023."  This reviewer's examination of data provided from April 3, 2023 through May 30, 2023 found that the MHCB supervisor reviewed 26 discharge safety plans and determined that all received passing scores with no revisions (including MCSP 2 above).  As found during the previous assessment, the MHCB supervisory review of discharge safety planning continues to be very problematic.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 227 cases of IPs discharged from a MHCB or alternative housing placement who remained at MCSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through May 2023.  The review found that 89 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first and/or second day on the form.

When completed correctly, the majority (65 percent) of the custody checks were recommended for 24 hours by clinicians. In addition, 87 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (November 2022 through April 2023) found that meetings had quorums of all required mandatory members or designees for all six months. Meeting minutes included discussion on various compliance data, improvement projects, but no documentation on the chronic problem of safety planning. In addition, the facility did not provided documentation for corrective action plans resulting from this reviewer's prior assessment report and/or regional SPRFIT audits. IPs enrolled in the SRMP were not being consistently tracked and reviewed in meeting minutes as required by policy. Meeting minutes were otherwise unremarkable.

There was one serious suicide attempt (in February 2023) involving outside hospital treatment (i.e., with a medical severity rating of "3") and subsequent MHCB admission during the review period, and a case presentation and/or root cause analysis (RCA) was not included in the meeting minutes. A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 94 percent of custody staff, 92 percent of medical staff, and only 82 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of May 2023, 97 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 90 percent had completed the safety plan training.

**Recent Suicides**: MCSP experienced three (3) suicides during the review period, two of which occurred two days apart in 2023. In the ***first*** case (MCSP 3), the IP was found hanging from the cell bars by a sheet in his SNY cell during the afternoon of May 31, 2023. His body was found with signs of rigor mortis. The IP entered the CDCR system for his second term on March 12, 2021 to serve a 12-year term for battery with serious injury, discharge of a firearm with drunk negligence, and prior felony conviction of serious offense. He had been transferred to MCSP on May 26, 2021. He incurred three RVRs during his confinement, the most recent occurring on November 11, 2022 for excessive contact during a visit. The IP was not known to be gang-affiliated. He was married and had two children from a separate relationship with whom he had no contact. As reflected in both email and telephone correspondence with his current wife, their relationship was volatile. On the day of his death, the IP placed multiple telephone calls to both his wife and the mother of his children.

According to available records, the IP and two siblings were raised by their mother in a dysfunctional family environment in which she was an active user of both methamphetamine and alcohol. In addition, his mother allegedly experienced mental illness, including delusions and auditory hallucinations. He witnessed domestic violence between his mother and her boyfriends from ages six through eight-years-old, resulting in foster care placement due to neglect. At age 11, he resided with an aunt until he was 16-years-old and then became homeless. The IP self-reported being exposed to additional violence at age 14 when he was kidnapped, put in the trunk, and shot. He did not complete high school, was diagnosed with HIV at age 22, and had only very sporadic employment. The IP had a significant history of substance abuse that included heroin and methamphetamine. He also had both a juvenile and adult criminal offense history, resulting in several juvenile hall and county jail commitments, as well as one previous CDCR term. The IP had an extensive history of mental health treatment in the community that started when he was placed in foster care at age 8-years-old. Symptoms included anger, anxiety, and depression. Mental health treatment continued when he was placed in the juvenile court system, included treatment for attention deficit hyperactivity disorder. In addition, when he was diagnosed with HIV, he received psychotropic medication and counseling for depression and posttraumatic stress disorder. He did not have a history of suicidal behavior in the community.

Upon re-entry into CDCR in March 2021, the IP was placed in the MHSDS at 3CMS having been discharged on parole at that level of care in 2018. He had multiple initial diagnoses, including unspecified depressive disorder, unspecified anxiety disorder, unspecified mood disorder, methamphetamine-use disorder, and antisocial personality disorder. The IP discontinued his psychotropic medication upon reentry into CDCR. A few months later in July 2021, he met with his psychiatrist and reported he had been overwhelmed and depressed since 2018. His diagnosis was revised to major depressive disorder, recurrent, moderate. The IP appeared to function adequately over the next few months at 3CMS. However, in October 2021, he expressed suicidal ideation, but when seen by the CIT, quickly recanted the statement and was returned to his housing unit. The completed SRASHE indicated a moderate chronic and low acute risk for suicide. In the next several months, the IP reported auditory hallucinations and paranoia, with a fixation on being admitted into an MHCB. He appeared to be afraid of other IPs and vacillated between administrative segregation and SNY housing. His clinical presentation was consistent with continued substance use.

During early 2022, the IP admitted to his clinical team that he had been using illegal substances since his arrival into MCSP in May 2021. He agreed to start psychotropic medication but became noncompliant shortly thereafter. The IP continued to report using "whatever drugs other inmates provided him," continued to feel depressed, anxious, and paranoid during an IDTT meeting in December 2022. The team decided to retain the IP at 3CMS, however, there was inconsistent information within the master treatment plan indicating that he would be discharged from the MHSDS.

Between January and March 2023, the IP's poor compliance with psychotropic medication continued. His use of illegal substances increased, resulting in the thoughts of auditory hallucinations and paranoia. On March 23, 2023, the IP's level of care was increased to EOP, with his diagnoses again revised to schizophrenia, psychotic disorder, and amphetamine-induced psychotic disorder. A SRASHE was completed after he reported a history of prior suicide

attempts for the first time. The first of these incidents allegedly occurred "when I was 12 years old, I think I tried to hang myself with a belt in the closet and the beam broke so I took it as God giving me a sign." The IP also reported another incident in October 2021 when he was housed in ASU and he tried to hang himself with a cord, but the cord broke. A third incident occurred in early February 2023 that was triggered by discussing divorce with his wife. The IP reported that he attempted to hang himself with a shirt, but again did not report the incident to staff. He denied any current suicidal ideation on March 23, 2023 and the completed SRASHE indicated a high chronic and low acute risk for suicide.

The IP attended his first initial IDTT meeting at EOP level care on April 4, 2023. He expressed irritability and frustration regarding his EOP placement. He continued to report auditory hallucinations and paranoia, and "some" depression with reduced sleep. The IP continued to have poor compliance with psychotropic medication. During his last individual contact with his clinician on May 25, 2023, the IP reported his mood was "good" and that the auditory hallucinations had decreased. He stated, "some of the stuff I was hearing back in the day, I am not hearing it anymore." Of note, the IP spent the Memorial Day weekend with his wife for overnight family visiting. Records indicated that after his death, IPs in the housing unit reported he had "seemed a little down and upset" after a video telephone call with his wife following the family visit. He died a few days later.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had several medical problems, including HIV, none were thought to be proximate causes of his death. He did not leave a suicide note. The CDCR reviewer theorized that the IP "experienced a long-standing depressive disorder with sensitivity to abandonment with associated feelings of shame and hopelessness. Mr. ___'s chronic drug abuse since adolescence was likely an attempt to numb his negative emotions….. Information gathered during interviews, phone calls, and JPay emails provide strong evidence of a tumultuous relationship between Mr. ____ and his wife, with shared fears and frustrations, and further troubled by Mr. ____'s stability."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) During IDTT on December 7, 2022, the treatment team decided to retain Mr. ____ at the CCCMS LOC. However, inconsistent information was left within the Master Treatment Plan on that date stating, 'IP's level of care to be GP.' Further, the Master Treatment Plan did not include any IPOCs or a treatment plan other than 'continue CCCMS for medication management and PRN MHPC contacts.'

> 2) The MHPC Initial EOP Assessment dated March 30, 2023 included relevant information, but also pulled forward outdated information. For instance, in the History of Present Illness section, it stated, '[Mr. ____] is not currently prescribed psychotropic medication and was last seen by psychiatry on 4/10/2018 at which time buspar was discontinued due to patient preference… He presents today as scheduled for MHMD initial assessment.' Mr. ____ was prescribed Zyprexa and Zoloft at that time.

3) Per the MHSDS Program Guide, individual contacts with the MHPC are to occur every 90 days in CCCMS and every seven days in EOP.  Over the last year, these treatment frequencies were missed on several occasions.  While in CCCMS, Mr. _____ was seen for an individual contact with the MHPC as follows: June 30, 2022, July 13, 2022, December 13, 2022, February 15, 2023, and March 21, 2023.  Based on these dates, there was a five-month span without an appointment.  While in EOP, Mr. _____ was seen for an individual contact with the MHPC as follows: April 6, 2023, April 14, 2023, April 21, 2023, April 28, 2023, May 1, 2023, May 12, 2023, and May 25, 2023.  Three of these dates are past the program guidelines of an individual contact with the MHPC once every seven days.  No case management groups were documented to have occurred in lieu of the individual MHPC contacts.

4) During the review of the Emergency Medical Response details, it was noted that primary and secondary assessment Power Form, and emergent response/TTA RN summary was not completed.

5) During the review of the EHRS, it was noted that patient did not receive the prescribed Direct Observation Treatment medication from May 26, 2023 to May 28, 2023 while the patient was in family housing unit.

In the **_second_** case (MCSP 4), the IP was found hanging from the top bunk by a sheet in his SNY cell during the morning of June 1, 2023.  (Although occurring one day apart from each other, there were no known connections between cases MCSP 3 and MCSP 4.)  The IP entered the CDCR system for his fourth term on December 18, 1997 to serve a 25 years-to-life sentence for possession of explosives in an inhabited area and four counts of child endangerment.  The instant offense involved an explosion at his home while he was under the influence of alcohol, heroin, and methamphetamine.  Various family members were injured.  While incarcerated, the IP received an additional 27 years-to-life sentence for assault with a deadly weapon that occurred in May 1999 when he assaulted his attorney in the county jail while awaiting a child custody hearing.  He had been transferred to MCSP in May 2008.  The IP incurred 31 RVRs during his confinement, the most recent occurring on September 14, 2022 for failure to respond to a notice which resulted in a counseling chrono.  The IP was not known to gang-affiliated.  He had five children from relationships with three women and was unmarried at the time of his death.  Of note, he was informed that one of his children had died of an accidental drug overdose on May 30, 2023, a few days prior to his suicide.  He had periodic letter and telephone correspondence with several of his children, as well as an aunt.

According to available records, the IP and two sisters were initially raised by both parents, who subsequently divorced when he was a teenager.  He was raised in a traumatic and dysfunctional family environment; his father was an alcoholic who verbally and physically abused his mother.  In addition, both his father and one of his sisters attempted suicide.  The IP also reported a family history of mental illness, and he was first diagnosed with conduct disorder following incidents of arson, animal torture, and holding someone at gunpoint in grade school.  He also reported one psychiatric hospitalization at age 14.  The IP self-reported being sexually abused as a child and adolescent.  Although he did not graduate high school, he obtained his GED during CDCR

146

confinement.  The IP had a history of substance abuse beginning at the age of 13, as well as a sporadic employment history.  He had a significant juvenile and adult criminal history, resulting in three previous CDCR terms.

Upon re-entry into CDCR in December 1997, the IP was not initially placed in the MHSDS.  However, in June 2005, he was placed in the 3CMS level of care after presenting with irritability, isolation, impaired sleep, and hopelessness.  His initial diagnosis was mood disorder.  The IP was subsequently discharged from the MHSDS in March 2006.  However, the following year in December 2007, he was admitted into an MHCB for DTS and DTO.  He had threatened to kill his cellmate because he wanted single cell status and also reported passive suicidal ideation due to his life sentence, resulting in depression and hopelessness.  The IP was granted SNY status due to safety concerns as a result of the "R" status from his instant offense (child endangerment).  Upon discharge from the MHCB, he was again placed in 3CMS, stabilized, and was discharged from the MHSDS in September 2009.  Three years later in November 2012, the IP was readmitted into 3CMS.  His diagnoses were mood disorder, borderline personality disorder, and antisocial personality disorder.  He was subsequently discharged again from the MHSDS for the final time in November 2013.

Although not included in the mental health program from November 2013 until his death in June 2023, the IP frequently submitted self-referrals to mental health.  According to the CDCR reviewer, during these contacts, he did not present with, or endorsed, symptoms which would indicate impaired functioning requiring placement back into the MHSDS.  His last contact with mental health staff occurred on April 25, 2023 in preparation for his BPH hearing.  The IP discussed his history of sexual abuse and recent identification as transgender.  He presented as being stable and not at risk of self-harm.  Three previous SRASHEs inconsistently reported a history of suicidal behavior, but he was consistently assessed as being at moderate chronic and low acute risk for suicide.  In preparation for a forthcoming group on childhood trauma, the IP was asked to submit a list of issues he wanted to work on, and he responded in writing that: "I'm institutionalized and actually have anxiety about getting out to start over from nothing," "I need to work on overcoming hopelessness," and "As much as I would like for them (his ex-wife and kids) all to understand the events that occurred – leading up to the day of my life crime - I need to let that go."  The trauma group had not yet started at the time of his death.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, although he had several medical problems, including Hepatitis-C with cirrhosis, none were thought to be proximate causes of his death.  He did not leave a suicide note.  The CDCR reviewer theorized that "Due to his long incarceration, he was institutionalized and struggled with chronic hopelessness.  Although he tried to keep himself active, and possibly distracted from his intense feeling, it was always present.  He noted that suicide was an option in 2021 and, according to his Scientology beliefs, death is not the end of one's being …. He had a history of engaging in serious self-harm when confronted with the pain and trauma he inflicted upon his family.  The death of his son likely triggered the same feelings, that is, he felt responsible for his son's substance abuse and ultimate death due to the trauma he inflicted upon him."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

1) During the review of the Emergency Medical Response details, it was noted that Primary and Secondary Assessment Powerform was not completed.

In the **_third_** case (MCSP 5), the IP was found hanging from the desk and stool by a sheet in his RHU cell during the late evening of November 12, 2023.  He entered the CDCR system for his second term on June 22, 2012 to initially serve a 77 year-to-life sentence for second degree murder and attempted murder, however, his sentence was later commuted and he was resentenced to serve a 16-year term for voluntary manslaughter.  The IP had been transferred to MCSP in December 2022.  He incurred 41 RVRs during his confinement, the most recent occurring on October 4, 2023 for battery on a peace officer.  The IP was known to gang-affiliated in the community.  He was unmarried but had a son and daughter.  The IP had the support of various family members demonstrated by frequent telephone correspondence and visits.

According to available records, the IP and a least one brother were initially raised by both parents in Mexico.  There was limited and often conflicting documentation describing his early childhood and family dynamics, including whether he had one or more brothers and when he first immigrated into the United States.  Records indicated he was deported from the United States on several occasions and had an active Immigration and Customs Enforcement (ICE) detainer while incarcerated in CDCR.  At some point, the IP was only raised by his mother, as his father and a brother spent time in prison for gang and drug-related offenses.  It appeared he was raised in a neglectful and chaotic environment, and experienced extensive physical abuse by his mother and her boyfriends.  The IP reported witnessing significant violence as a youth, including seeing his friend killed in front of him when he was 15.  He also reported being sexually abused when he was five-years-old by a family member while on vacation.  The IP had an extensive history of substance abuse which began at age 11 with marijuana and escalated to crack cocaine, methamphetamine, and heroin throughout his juvenile and adult life.  He did not have a stable employment history, and because of both gang involvement and juvenile arrests, only completed the sixth grade.  The IP had an extensive history of both juvenile and adult criminal histories, resulting in confinement in juvenile hall, California Youth Authority, county jails, federal prison, and one prior CDCR term (ending in 2009).  There was no record of mental health treatment or suicidal behavior in the community.

Upon re-entry into CDCR in June 2012, the IP was not initially placed in the MHSDS.  However, soon after his original sentence was commuted and he was resentenced to a shorter term in early 2014, the IP requested placement on a SNY due to reported safety concerns, specifically, refusing to conduct a "hit" (assault) on another IP and trying to withdraw from gang involvement.  He then began reporting anxiety, depression and paranoia, as well as periodic suicidal ideation.  The IP was placed at 3CMS level of care in March 2014 and given initial diagnoses of adjustment disorder (with mixed anxiety and depressed mood) and polysubstance dependence.  He remained at 3CMS until early July 2018 when he was admitted to the MHCB for the first time.  The IP was then diagnosed with major depressive disorder and opioid use disorder.  He stabilized after seven days in the MHCB, but when the transportation vehicle arrived to transport him to RJD on July 18, 2018, he again expressed SI and was re-admitted into

the MHCB.  He was subsequently placed in the PIP-ICF for several months and discharged to EOP in February 2019.

The IP appeared to program effectively for the next two years without incident, except for a combined MHCB and PIP-APP placement in May 2020.  On April 11, 2021, however, he approached custody staff and again disclosed safety concerns after refusing to assault another IP.  He was placed in restrictive housing.  His safety concerns were eventually resolved, he returned to regular programming in EOP, and enrolled in the MAT program.

The following year on April 6, 2022, the IP was downgraded to 3CMS and his diagnoses were again revised to antisocial personality disorder, opioid use disorder, stimulant use disorder, and substance use disorder.  Two days later on April 8, 2022, he expressed SI and was placed in alternative housing.  The MHCB referral was later rescinded when the IP recanted his SI.  During the next three weeks, however, his behavior deteriorated, with custody staff suspecting he was using illegal drugs.  He presented as guarded, less engaged with staff, and refused to leave his cell.  By April 19, 2022, the IP had missed nine consecutive meals and reported he was on a hunger strike.  He was assessed by mental health and subsequently placed in a MHCB on April 29, 2022 for "being on a hunger strike, missing over 40 meals, refusing MAT medication, regularly boarding up and not showering."  During the MHCB placement, the IP continued to express both safety concerns and SI.  He was subsequently placed in PIP-APP in May 2022 and his diagnoses were revised to schizoaffective disorder, unspecified depressive disorder, and substance abuse disorder.  In July and August 2022, the IP engaged in self-injurious behavior after being informed he was being transitioned from APP to ICF.  His clinician wrote in progress note following an IDTT meeting on August 30, 2022 that stated: "The cutting behaviors seem to be a result of sabotaging discharge secondary to custody issues associated with unlocked dorms."  When told in November 2022 that he would be soon be discharged to EOP, the IP again engaged in SIB, telling a clinician that "I'm sorry doc, I'm afraid.  I'm scared."  His enemy concerns were eventually resolved, and the IP was discharged back to EOP at MCSP on December 1, 2022.  His diagnoses were schizoaffective disorder and opioid use disorder.  A completed SRASHE indicated a high chronic and low acute risk for suicide.

Upon transfer to MCSP, the IP attended his initial EOP IDTT meeting on December 15, 2022.  His treatment goals were identified as learning two new coping skills to reduce suicidal ideation, identify triggers that lead to substance use, and attend more than 50 percent of his mental health treatment.  Due to mental health staffing shortages at MCSP, the IP was not scheduled for his next IDTT meeting until July 27, 2023.  According to the CDCR reviewer in this case, "Within MCSP's Triage Plan developed to assign a hierarchy to EOP and CCCMS treatment requirements, EOP routine IDTTs were to be completed annually.  MCSP's Triage Plan also indicated that EOP routine contacts were to occur at a frequency of once per month."

The IP appeared stable and programmed well for the next two months.  He denied having any mental health concerns and was working in the kitchen and enjoyed his job.  The IP consistently denied any suicidal ideation when seen for "bi-monthly wellness checks due to staffing shortages."  In February 2023, however, he began reporting auditory hallucinations that were "telling him negative things," and was not always medication compliant.  By March 2023, the IP had received an RVR for refusing to report to his assigned work assignment and treating

psychiatrist expressed concern that he "was not doing well" and recommended an MHPC assessment for possible return to the PIP. When subsequently assessed by his clinician, the IP denied having any current mental health concerns, but admitted having passive SI "about every other day" that he controlled through exercise. The clinician did not refer the IP to a higher level of care.

During April 2023, the IP refused most of his scheduled appointments and was seen cell front by mental health staff. Although denying SI and safety concerns, he continued to report ongoing symptoms of depression. On April 13, 2023, the IP requested that all his psychotropic medication be discontinued. He reported an overall good mood with fair sleep and appetite, with continued auditory hallucinations that were minimal and easily ignored. In May 2023, the IP reported he was not always compliant with his MAT medication and had been snorting methamphetamine for a few months. On May 8, 2023, he told the psychiatrist that he was doing "alright" and again repeated his request to discontinue psychotropic medication. He also reported wanting to transition to 3CMS. Several days later on May 11, 2023, a Mental Health Pre-Release Planning Assessment was completed noting his scheduled release date of September 8, 2023. However, although his parole plan expressed a desire to live with his mother, the IP had an active ICE detainer.

When seen by mental health staff twice in June 2023, the IP continued to report he was doing "okay" and experienced auditory hallucinations intermittently but was "coping." He continued to refuse psychotropic medication. The IP told his clinician on June 28, 2023 that he attended some groups, but did not go to yard or dayroom because "I can't afford a write up (RVR). I prefer to watch TV. He reported his mom was sick and he wanted to be home with her." In July 2023, the IP continued to be only periodically compliant with his MAT medication and had been failing to complete several scheduled urine toxicology screens. Although the IP refused to attend his IDTT meeting on July 27, 2023, the team decided to retain him in EOP because he still appeared to benefit from the program and still needed more regular contacts than offered in 3CMS.

On August 5, 2023, the IP received an RVR for act of battery on an IP which occurred during a riot on the EOP yard. He was placed in restrictive housing, and his release date was revised to October 31, 2023. The IP later stated, "I was forced to go out of the building because the porter told me someone wanted to jump on me if I stayed in the building." He was released from restrictive housing three days later on August 8, 2023. A few weeks later on August 26, 2023, the IP received another RVR for possession of contraband, but did not receive an RHU term. On September 14, 2023, the IP reported to a psychiatrist that he was doing "okay" and denied feeling depressed or anxious but was experiencing intermittent auditory hallucinations which were becoming bothersome. He requested that his psychotropic medication be restarted.

On September 15, 2023, the IP was seen by a physician after complaining of weight loss brought about by stress related to his revised release date. The following week on September 21, 2023, he was notified by custody staff that he was being assigned a compatible cellmate. The IP responded that "I'm not taking a cellie. I will move into another empty cell if you need this one, but I'm not taking a cellie." When informed that he would be receiving an RVR, the IP responded that "Okay, I don't care."

The following week on September 22, 2023, the IP informed nursing staff that he was suicidal, stating "I've hurt my family, things are hopeless." He later disclosed to a mental health clinician that he was feeling unsafe about sharing a cell with another IP. Although staff suspected he was only seeking a MHCB placement to avoid receiving a cellmate until parole, he was placed in an MHCB. The IP was clothed in a safety smock for the entire length of his MHCB placement and refused to participate in any offered mental health treatment. He also refused to attend his discharge IDTT meeting on October 2, 2023 where he was discharged back to EOP, with the discharge SRASHE finding both a low chronic and acute risk for suicide. Given his history of self-injurious behavior, multiple inpatient placements, and current risk factors, the CDCR reviewer in this case found the assessment of risk and risk formulation were underestimated.

Despite being discharged from the MHCB to EOP, the IP refused the transfer on October 2, 2023, stating "I'm not feeling good. I am suicidal. I cannot go back to that yard, I need to be away from people." He became despondent, crying, continued to insist "I'm not going anywhere, I have to stay here." The treatment team subsequently decided that it would be best to allow the IP to remain in the MHCB for an additional 72 hours prior to initiating a cell extraction. The IP remained clothed in a safety smock and continued to express SI, but a revised SRASHE based upon continued suicide threats was not completed. Two days later on October 4, 2023, after multiple attempts to convince him to accept the transfer back to EOP, a cell extraction was initiated and resulted in the IP striking an officer in the chest. An RVR for battery on a peace officer was issued and he was placed into the RHU.

While in restrictive housing, the IP was seen by mental health staff as required. He attended his Institutional Classification Committee (ICC) on October 26, 2023 where it was determined he would be retained in the RHU pending the RVR process, and his new release date was again changed to December 30, 2023. Although denying any suicidal ideation, the IP refused all out-of-cell clinical contacts, but attended some groups until the week of November 6, whereupon he began refusing all groups. The IP was last seen by mental health staff, a psychiatrist, on November 9, 2023. The interaction was brief and occurred cell front. He appeared resistant to questions, stating "I don't know" to most, but denying any suicidal ideation. The IP died three days later.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had a few medical problems, none were thought to be related to his death. He did not leave a suicide note. The CDCR reviewer theorized that the IP's suicide was precipitated by "a culmination of depression, limited coping skills, safety concerns in prison combined with an extended parole date, an uncertain future, and likely deportation to Mexico upon his release from prison."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

> 1) Concerns were found related to estimation of risk and risk formulation on the SRASHE dated October 2, 2023. The SRASHE indicated negative responses for acute risk factors that were previously identified and documented. Additionally, chronic risk was underestimated as low which is inconsistent with statewide

guidelines for patients with previous suicide attempts. (*See discussion/conclusions for additional information*.)

2) Upon discharge from the MHCB on October 2, 2023, and prior to being cell extracted from the MHCB on October 4, 2023, Mr. ____ reported he was suicidal and stated it was not safe for him or anyone else if he left the cell. He was tearful and despondent, however a SRASHE was not completed.

3) Mr. ____ was placed in the SRMP during his initial IDTT held on December 15, 2022. Subsequently, he was removed from the SRMP on July 27, 2023, despite non-compliance of his identified SRMP treatment goals. (*See discussion/conclusions for additional information*.)

4) Mr. ____ was seen for an IDTT on December 15, 2022; however, he was not seen again until July 27, 2023. Additionally, Mr. ___ was not seen for EOP individual clinical contacts at least every other week from March 2023 through September 2023. (*See discussion/conclusions for additional information*.)

5) During the review of the Audio Video Surveillance System (AVSS), the integrity and thoroughness of the Guard 1 Security/Welfare checks completed prior to the actual incident time appear to be inadequate.

6) During the review of EHRS of the MHCB admission period of 9/22/23-10/2/23 there were several delayed rounds noted for SP and there were staggered rounds completed that did not adhere to policy guidelines.

**Audit Summary**: Adequate practices were found in intake screening, PT rounding, new intake cell placement, Guard One, alternative housing, MHCB patients receiving out-of-cell activities, and most of the required suicide prevention training. There were several deficiencies found during the assessment that required corrective action, including inadequate safety plans and inadequate MHCB supervisory review of those safety plans, low compliance rates regarding discharge custody check forms by clinical and custody personnel, and SPRFIT reporting.

## 8)    *California Health Care Facility (CHCF)*

**Inspection**: June 8-9, 2023 (previous suicide prevention audit was on July 22-23, 2021). CHCF housed approximately 2,346 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed three new admissions during the **Intake Screening** process in the R&R unit (referred to as the Patient Management Unit) on June 8-9, 2023. The door to the nurse's office was closed on each occasion, with officers providing security from the hallway, thus ensuring privacy and confidentiality. In the first case, the nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. In the second case, the nurse failed to ask the question regarding if the IP "received bad and/or unexpected news" from court. In the third case,

although the nurse did not ask the date of the IP's previous suicide attempt, his answers to other questions did correctly trigger an urgent mental health referral. Subsequent review of third IP's (CHCF 1) medical chart indicated he was not seen timely within 24 hours, but rather five days later on June 13. Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

Daily **PT Rounds** in the ASU were not observed because the ASU (in E-Facility) was temporarily closed due to low staffing.

**Housing**: CHCF had 98 MHCBs in housing units A1A, A1B, and A2B that were previously found to be suicide-resistant. At the time of the assessment, two of the MHCB units were closed, with A1A having a census of approximately 22 patients. As indicated above, although the ASU in E-Facility had five retrofitted **New Intake Cells** designated for new intake IPs, the unit was temporarily closed.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were used infrequently at CHCF. From March through April 2023, only 47 patients were placed in alternative housing, with all released within 24 hours. In addition, only 13 percent (six of 47) of cases were rescinded and IPs returned to their housing units. This reviewer examined the six rescinded cases and found that the required SRASHEs and five-day follow-up assessments were completed in each case. With regard to safety planning, one case was found to have an adequate safety plan, three cases were found to have inadequate safety plans, and two cases did not have required safety plans. Of note, the alternative housing data presented to this reviewer was very disorganized, with several cases incorrectly marked as "recissions" when they were actually MHCB admissions because tele-psychiatrists did not correctly place orders for MHCB LOC into EHRS.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were being used in the **MHCB** units. In addition, patients not on suicide observation status were required to be observed at two-hour intervals by nursing staff as part of regular "nursing rounds." During May 2023, the Mental Health Observations Reporting Tool indicated that 43 patients were on Suicide Precaution and/or Suicide Watch in the MHCB unit, with 97 percent compliance with timely observation of patients on Suicide Precaution and 94 percent compliance with timely observation of patients on Suicide Watch.

Finally, **Guard One** data was not reviewed because the ASU (in E-Facility) was temporarily closed.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals from for the period of January through May 2023. A sample EHRS review of 71 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in only 89 percent (63 of 71) of the cases. Of note, the failure to complete a SRASHE following an urgent referral for danger to self was cited as a problem in a suicide at CHCF in November 2023, as discussed below.

The chart review of one case was very concerning. During the evening of April 13, 2023, an OHU patient (<u>CHCF 2</u>) expressed both suicidal ideation and homicidal ideation and was placed on Suicide Watch by an on-call psychiatrist. The following afternoon (April 14), he informed a nurse that he was "psychologically overwhelmed" and could not remember anything from the previous day. When the nurse asked him if he was still suicidal and/or homicidal, the patient responded by saying "I am tempted." The patient was then moved to a holding cell on Suicide Watch. A few hours later, a clinician met with the patient in the OHU dayroom and inquired about his suicidal ideation. As noted in a progress note, the patient responded "Look at me. Does it look like I'm suicidal. Does it look like I can hurt myself? I'm paralyzed. Does it look like I can hurt someone if I'm stuck in bed.?" The clinician did not complete a SRASHE, and the medical chart did not contain any documentation as to whether the patient was to be discharged from Suicide Watch or placed in the MHCB. Later that same evening (April 14), the same on-call psychiatrist from the previous evening re-ordered the Suicide Watch and stated in a progress note that:

> IP not seen directly. Care done via consultation with nursing. IP endorsed suicidal and homicidal ideations. He has a history of suicide attempt in the past and has been deemed to be a moderate chronic risk of suicide. He was to be seen during the day for appropriateness in placement for crisis bed. Per nursing, he was not evaluated. Discussed with nursing the need to make sure MH assesses him tomorrow to determine if he should be moved to a crisis bed.

During the late morning of April 15, 2023, the patient had still not been assessed by a clinician, but a nursing progress note indicated that "I/P was on Suicide Watch, now place on Suicide Precaution, I/P said he's not suicidal he wanted to being able to go to day room. No acute form of distress or self-harm behavior at this time, will continue monitor for safety." A few hours later, the patient was seen by a clinician who wrote in a progress note that the patient was stable, denied any current suicidal ideation, and there was "no need for HLOC/MHCB at this time. Treatment team will continue to provide pt with appropriate support. Writer would recommend to consider EOP upgrade if pt experience further worsening of affect regulation and struggle to cope with his health complications."

There were numerous problems with this case, including, but not limited to, the following: 1) a SRASHE was never completed for this patient despite being seen by two different clinicians; the patient was held on alternative housing status for almost 48 hours and never reported on alternative housing data provided to this reviewer; 3) the patient was stepped-down from Suicide Watch to Suicide Precaution apparently by verbal order of a provider and without an on-site assessment by a clinician; and 4) the patient was discharged from suicide observation status without either a safety plan or five-day follow-up assessment.

In addition, the **Crisis Intervention Team** was launched at CHCF in March 2019, briefly paused, and reactivated in February 2020. Although the CIT policy stated that the program was operational seven days a week from 7:00 a.m. until 4:30 p.m., this reviewer was informed that CIT was not currently operational due to low staffing. When the CIT was not operational, emergency referrals were responded to by CIT-trained clinicians. Two crisis referrals were observed on June 9. In the first case, a medical patient in the OHU was deliberately trying to

154

throw himself from the wheelchair in protest of his medical care. A crisis clinician responded, assessed the patient in a private room, and out of an abundance of caution, completed a SRASHE that determined the patient was at low risk for suicide. In the second case involving an emergent referral for DTO, the encounter was conducted by a clinician in a holding cell without reasonable privacy because the holding cell door was open and the officer was standing inside the cell and alongside the clinician. The encounter, held in the Patient Management Unit (PMU), could have been easily held in private if the IP had been escorted to another nearby holding cell in the PMU referred to as the "quiet holding cell" because it contained both a holding cell and secure adjoining alcove that was separate from the hallway. The patient was subsequently admitted into the MHCB unit for DTO.

Three **IDTT Meetings** were observed in the MHCB units on June 8, 2023, with a fourth meeting terminated because of the patient's escalating behavior. Overall, there was adequate team participation, discussion regarding reasons for admission (DTS and grave disability), diagnoses, medication, observation level, suicide risk, and some discussion regarding safety planning in two initial IDTTs involving DTS.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for 19 MHCB patients, with two other cases excluded because the patients had only been on the unit for less than 48 hours. Of the 19 patients, most had been offered showers and telephone calls on a regular basis. However, although all of the patients had been approved for out-of-cell activities by providers, almost all patients were not offered yard and/or dayroom consistent with ten hours per week. For example, nine patients housed for four to six days were each offered a total two to three hours yard/dayroom during that time period; two patients housed for 16 days were each offered only three and five hours of yard/dayroom during those 16 days; two patients housed for 24 days were each offered only 12 and 13 hours of yard/dayroom during those 24 days; and one patient housed for 41 days was offered only 20 hours of yard/dayroom during those 41 days. Of note, this reviewer was informed that, regardless of custody status, only one patient was allowed out to the yard at a time.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 20 patients who were discharged from the unit and remained in CHCF between April and May 2023. The review found that the required SRASHEs were completed in 90 percent (18 of 20) of cases, and the required five-day follow-up assessments were completed in all (100 percent) of the cases. With regard to safety planning, the review found that 60 percent (12 of 20) of the cases an adequate safety plans, 30 percent (six of 20) of the cases had inadequate safety plans, and ten percent (two of 20) of the cases did not have required safety plans.

The following is an example of an adequate safety plan, completed on a patient (CHCF 3) on May 22, 2023:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: Yes
Warning signs - Patient focused: ***Thinking that others are trying to kill me.***

Warning signs - Clinical Impressions: ***Pt appears to struggle with psychosis, delusional thinking, and paranoia that others are out to kill him despite not being attacked for the past 24 years.  Pt would benefit from CBT for Psychosis to challenge this unhelpful and inaccurate thinking to improve symptoms and functioning, and to reduce SI.***

Helpful reducing self-harm - Patient: ***Pt stated taking my medication***.

Helpful reducing self-harm - Clinical: ***Pt can benefit from ongoing education about Parole Board and what they look for in an inmate to be released.  For example, pt heard from other inmates that if he takes medications or participates in mental health, PBH will not release him from prison.  On-going psychoeducation about the importance of maintaining stability and that stability is a quality that PBH officers look for in a viable candidate for release would prove helpful in reducing risk, as pt connected not taking medications to worsened paranoia and past SA.***

Reduce Risk Factors - Patient: ***Take my medication and learn CBT skills.***

Reduce Risk Factors - Clinical: ***Pt appears motivated to program and learn coping skills through CBT for Psychosis to target SI, paranoia, and inaccurate thinking that contribute to SI and past SA.  Structured sessions focused on this modality with handouts to which pt can refer addressing the CBT model, Cognitive Distortions, Alternative Thoughts and examples, and the Automatic Thought Record and examples focused on paranoia would prove helpful in reducing risk.***

Patient History of Self Harm: No

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: Yes

Protective Factors - Patient focused: ***Talking to my mother and my sister. Preparing for Parole Board Hearing in 2025.***

Protective Factors - Clinical Impression: ***Pt appears to have a close relationship to his family and encouraging virtual or in-person visits would improve functioning, as pt's relatives live nearby.  He appears more euthymic when discussing family.***

Enhanced Factors - Patient focused: ***Teach me CBT or DBT skills.***

Enhanced factors - Clinical Impressions: ***Pt appears motivated to learn CBT and, or DBT, which would be helpful in reframing inaccurate thoughts and teaching pt alternative coping skills to manage paranoid thoughts and distress, as in the case of DBT.  Pt would benefit from ongoing skills training in identifying and challenging distortions, as well as mindfulness meditation skills, as pt states "I can't relax," which suggests he needs practice and can benefit from ongoing review of grounding skills, deep breathing, and meditation, and daily practice to reduce anxiety, improve distress tolerance, and overall functioning***.

This reviewer's examination of the MHCB supervisory review of discharge SRASHEs and safety plans from December 2022 through May 2023 based upon the CDCR's required "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans (effective March 10, 2020)" found that the documentation was flawed because: 1) data from March through May 2023

failed to include the date of supervisory review which is critically important in determining timely review (i.e., required prior to or during the clinical discharge IDTT meeting); and 2) there were numerous MHCB discharges excluded from the provided data.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 86 cases of patients discharged from a MHCB or alternative housing placement who remained at CHCF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from December 2022 through May 2023. The review found that 93 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with non-compliance mostly related to non-completion of the form on a daily basis. In addition, most of the custody checks were recommended for 48 hours by clinicians. In addition, only 66 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. There was a significant problem of Page 2 forms being initiated one day late, as well as gaps in documentation.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2022 through May 2023) found that meetings had quorums of all required mandatory members or designees for all six months. Meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits. Because there were not any serious suicide attempts involving actual hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. IPs enrolled in the SRMP were not being tracked and reviewed in meeting minutes as required by policy. Meeting minutes were otherwise unremarkable.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure." However, these LOPs remained in draft form.

**Training**: According to training records, 100 percent of custody staff and 99 percent of medical staff were currently certified in CPR. In addition, 97 percent of custody staff, only 87 percent of medical staff, and only 86 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of May 2023, only 38 percent of mental health clinicians

had completed the SRE mentoring program, 94 percent had received the seven-hour SRE training, and 94 percent had received safety plan training.

**Recent Suicides**:  CHCF experienced one (1)  suicide during the review period.  In that case (CHCF 4), the IP was observed to be ingesting a cup full of pills in her EOP cell during the morning of November 23, 2023.  She was pronounced dead a few hours later.  The IP entered the CDCR system on September 27, 1996 to serve a life sentence with parole for first-degree murder, with an additional four-year enhancement for use of a firearm.  She had been transferred to CHCF in September 2019.  The IP incurred four (4) RVRs during her confinement, the most recent occurring on November 17, 2023 for fighting.  The IP was not known to be gang-affiliated.  She was unmarried and did not have any children, but was noted to have family support from a brother through regular telephone correspondence.

According to available records, the IP and two older half-brothers (from her father's side) and two younger brothers were raised by their parents.  Of note, although born male, the IP changed her name during CDCR confinement in 2021 and "she/her" became her pronouns.  The IP was raised in an intact household consisting of her parents and siblings.  There were no records of either domestic abuse or substance abuse in the family.  The IP had a history of head trauma, with at least one incident resulting in a brief loss of consciousness at the age of eight or nine.  She also was diagnosed with epilepsy at age five.  The IP graduated high school and attended a few years of community college.  She reported a history of bullying in school because of her last name and small stature.  The IP appeared to have a record of stable employment in the family business and did not have a prior juvenile or adult criminal history.  She never lived independently from her family and stayed on her father's property from 1970 until he lost the property in late 1994.  The IP then briefly moved in with a platonic friend, who was the spouse of the victim in her instant offense.  There were conflicting reports regarding mental health treatment in the community, but the IP reported brief placement on suicide watch during county jail confinement.

Upon entry into CDCR in September 1996, the IP screened positive for mental health symptoms and placed at 3CMS level of care.  She was primarily placed in the MHSDS because of concerns related to a possible thought disorder, mood disorder, and major depression.  Records described ongoing symptoms of depression, intermittent thoughts of suicide, insomnia, interpersonal challenges, anger regarding sentencing, and a report that her mother died.

The IP had several challenges adjusting to incarceration, primarily because of safety concerns.  In December 1999, for example, she cut the inside of her right wrist with a razor because of reported safety concerns on the yard.  Six months later in May 2000, the IP was placed in restrictive housing due to being the victim of a stabbing attack by an unknown assailant.  In August 2009, she was referred to the Developmental Disability Program (DDP) after reporting memory problems and having difficulties adjusting to new and stressful situations.  The IP was subsequently designated as a DD1.  In August and December 2014, the IP was placed in restrictive housing for additional safety concerns.  In January and March 2017, several PREA investigations were completed following her allegations of sexual harassment.  During 2023, records and peer interviews described ongoing interpersonal conflicts with peers.  Although not

rising to the need for placement in restrictive housing, it appeared she continued to have challenges interacting and communicating with peers.

From 1996 to 2004, the IP cycled through both 3CMS and EOP levels of care, followed by several instances of removal from the MHSDS after short periods of stability. Her first MHCB placement occurred on January 2004 and, following this discharge, the IP remained in the MHSDS, primarily at EOP, during the next nine years until 2013.

The IP's symptom severity increased during 2013 and she was again referred to a MHCB in December 2013 for suicidal ideation. Four months later in April 2014, she was again referred to the MHCB primarily by safety concerns. She appeared hopeless, depressed, was observed hysterically crying, and reported plan to cut her wrists and cut off her genitals as "they have been the cause of all of this." The IP was subsequently placed in the DSH-APP and later returned EOP LOC with diagnoses of adjustment disorder, PTSD, borderline personality disorder, and antisocial personality disorder.

Over the next five years, the IP had four additional MHCB and three PIP (both APP and ICF) placements. According to the CDCR reviewer in this case, these admissions were often triggered by "persistent suicidal ideation with plans to hang or castrate herself within the context of external stressors," safety concerns, PTSD symptoms (nightmares/flashbacks), several incidents of self-harm, and a desire for a single cell. Notably, clinical notes outlined the IP's preoccupation with a desire for sexual reassignment surgery, and frustration regarding those perceived barriers. There were several incidents whereby she threatened to castrate herself and was found with a string tied around her penis. By 2016, her diagnosis was changed to bipolar disorder, gender identity disorder, and antisocial personality disorder. In 2017, the diagnoses were again revised to unspecified anxiety disorder, borderline personality disorder, and gender dysphoria.

In January 2019, the IP was informed that her gender reassignment surgery request was denied, causing significant feelings of anger and worthlessness. According to the CDCR reviewer, she became increasingly angry, impulsive, and dysphoric over the next seven months. Progress notes describe a preoccupation with feeling as though others are not understanding or caring for her needs, and threats such as "I need to get the surgery, but no one listens to me. I am frustrated, I am going to hang myself and then you will see."

In March 2019, the IP was placed in a MHCB for danger to self, and later transferred to a PIP. Shortly after PIP admission, she tied a plastic bag to her face. She was discharged a month later after expressing a strong desire to leave and stating she was frustrated with staff and was simply focused on getting her sexual reassignment surgery. The IP was discharged to EOP, but was returned to a MHCB in August 2019, again for danger to self. While in the MHCB, the IP continued to report suicidal ideation, depression, and feelings of perceived mistreatment by others because of her gender identity. In September 2019, she was transferred to the PIP (both APP and ICF) where she remained until May 2022. During her approximate two and a half-year PIP placement, the IP continued to demonstrate instability, impulsivity, and frustration with peers and staff. At discharge back to EOP, her diagnoses were revised again to major depressive

disorder, PTSD, gender dysphoria, borderline personality disorder, antisocial personality disorder, and adjustment disorder.

In July 2022, the IP received several mental health assessments for a renewed Gender Affirming Surgery (GAS) request. According to the CDCR reviewer, these assessments would be utilized to generate a report that would be sent to the local Institution Utilization Management Committee and the Gender Affirming Surgery Review Committee to ultimately make a decision regarding her request for surgery. (The IP's GAS request was still pending at the time of her death, although she continued to receive Gender Affirming Hormone Therapy.)

During the next several months, progress notes indicated that the IP appeared to be functioning well, but the CDCR reviewer also noted that she was not consistently seen on a weekly basis on EOP. By January 2023, her mental health had deteriorated and she appeared very depressed during one contact that was triggered by chronic medical pain and gender dysphoria. She was seen only periodically from January until March 2023.

On March 10, 2023, an urgent mental health referral was initiated by custody staff after the IP refused all her medications and refused to come out of her cell. The floor of her cell was observed to be littered with trash and food, and she appeared confused and disoriented. The IP was not seen by a mental health clinician until two days later on March 12, 2023. During the contact, she was uncooperative and initially denied suicidal ideation, but then verbalized thoughts of wanting to swallow razors (that she had given back to custody staff earlier in the day). The IP was placed in the MHCB for danger to self and significant impairment due to mental illness. Her discharge IDTT meeting occurred on March 22, 2023. Although a discharge SRASHE was completed, the required safety plan was not. The SRASHE noted a high chronic and moderate acute risk for suicide. The IP's diagnoses were again revised (for the final time) as psychotic disorder, major depressive disorder, binge eating disorder, borderline personality disorder, and gender dysphoria. She was discharged back to EOP and never received another IDTT meeting prior to her death.

There were at least three urgent mental health referrals initiated during the next few months, occurring on April 24, May 1, and June 16, 2023. Each of the referrals were related to the IP yelling and throwing food and other items in her cell, as well as being described as hostile, unpredictable, and exhibiting bizarre behaviors. A higher level of care was considered, but never initiated following each referral.

The IP was not seen at all by a mental health clinician in September 2023, but the month was notable because she went before the Board of Parole Hearings (BPH) on September 8, 2023. The BPH officers ultimately determined that the IP, who had served over 27 years of confinement, did not pose a risk to the public's safety, met the criteria of the Elderly Parole Law, and recommended her for release. Records indicated that a final decision would be made by the BPH, which had 120 days to review the recommendation, and then the Governor's Office had an additional 30 days to review the case. At the time of her death, these reviews had not been completed.

During clinical contacts in October 2023, the IP actively discussed parole planning, including transitional housing and working on her social skills and coping tools. She was described as stable, future-oriented, and there were no recent behavioral outbursts documented. However, in November, 2023, her behavior again escalated and she had difficulty with both staff and peers, resulting in two RVRs for "behavior which could lead to violence" and fighting.

Overall, during at least the last year of her life, the IP was seen by mental health clinicians well outside *Program Guide* requirements for EOP IPs. As noted by the CDCR reviewer in this case:

> One concern that emerged throughout this review was the lack of routine IDTTs and clinical contacts in the past year. Starting November 1, 2022, excluding the 10-day MHCB placement in March 2023, Ms. ___ had a total of 17 outpatient MHPC routine or urgent consult contacts. Her final clinical contacts all occurred at cell-front in late October and November. She had four routine MHPC contacts in the prior three months before death. They occurred in August, twice in October, and cell front in November. She did not receive a clinical contact in the month of September. Additionally, Ms. ___' last IDTT occurred on the date of her MHCB discharge on March 22, 2023, prior to her death in November. CHCF leadership provided memorandums detailing modifications to treatment requirements in response to the severe staffing shortage at CHCF.

In an interview with the IP's primary clinician conducted after the suicide, the clinician told the CDCR reviewer that in the weeks leading up to her death, the IP "had ongoing issues with other transgender peers, and stated two to three of them would gang up on her, and Ms. ___ would escalate and become louder on the unit in response. Overall, Ms. ___ had poor communication skills and interpersonal functioning. The MHPC noted that during their last contact, everything was good. She stated that the RVR was the reason she died, because 'I knew her. She was trying so hard to stay out of trouble.'"

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, she had multiple medical issues, including inflammation of the esophagus, chronic low back pain, hearing deficit, morbid obesity, and seizure disorder. It remained unclear if these medical problems contributed to her decision to end her life. She did not leave a suicide note. The CDCR reviewer theorized that she had "a history of poor coping skills, impulsivity, and emotional reactivity which overwhelmed her ability to rationally process perceived stressors. Given her predisposition to severe symptoms of depression including suicidality, once she was faced with a significant stressor, Ms. ___ reacted quickly. It is clear that her perception of the RVR potentially impacting her parole date was the catalyst for her decision to die."

The Suicide Report contained 13 recommendations for corrective action through a QIP:

> 1) Lack of routine EOP contacts and IDTTs were identified as a concern. Please see *Concerns* section for further details.

2) On March 10, 2023, custody staff placed an urgent mental health consult after Ms. ____ refused all of her medications, refused to come out of her cell, her floor was littered with trash and food, and she appeared confused and disoriented. Ms. ____ was not seen until March 12, 2023. Per the Mental Health Program Guide, Chapter 1, 12-1-5, 'A Urgent referral is to be seen within 24 hours.'

3) On March 21, 2023, a SRASHE was completed in preparation for MHCB discharge. The clinician checked that a safety plan did not need to be completed, however, Ms. ____ was referred to the MHCB for both DTS and SIDMI. Per the Mental Health Services, Safety Planning policy, 12.07.901 'a safety plan must be completed… anytime a patient is discharged from an inpatient setting and the referral included DTS.'

4) On April 24, 2023, Ms.____ was seen for an urgent consult, whereby she made multiple statements that she was going to die and had thoughts of swallowing a large quantity of pills and a razor. Ultimately the decision was made to retain her in EOP, as many of her concerns would be addressed during upcoming medical appointments, but a SRASHE was not completed to further assess the multiple statements regarding suicide Ms. ____ made. Per the Mental Health Program Guide, Chapter 10, 12-10-8 'when an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data.'

5) During this review, concerns related to possible victimization were identified. Please see *Concerns* section for further details.

6) Ms. ____ was seen for urgent consults on November 15 and November 17, 2023. During the November 15 consult she reported ongoing distress because of perceived instances of unfair treatment on the unit. She made statements alluding to possible suicidal ideation and distress, but subsequently denied active suicidal ideation. During the November 17 consult she reported distress related to an altercation with a peer. Despite her statements and reported distress there were no follow-up plans documented, so it is unclear how her concerns were resolved in either consult.

7) Ms. ____ was seen by a clinician for an RVR MH Assessment on November 21, 2023. During this contact Ms. ____ appeared to be in distress and made a statement alluding to suicidality. The available documentation noted that custody described this as 'typical behavior,' however, it was unclear based on available information whether there was an intention to follow-up regarding how the reported distress/threats of self-harm would be immediately addressed by mental health. Per the Mental Health Program Guide, Chapter 10, 12-10-8 'when an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data.'

8) <u>Psychiatry</u>: Review of the chart revealed that psychiatric contacts in the CHCF-EOP setting were not timely or in keeping with policy.

9) Ms. ____ requested gender-affirming surgery in 2022. The 2022 GAS Request Packet was submitted 13 days late and outside of the compliance due date of 90 calendar days from the time of the RFS entry for the requested GAS.

10) <u>HQ</u>: (GASRC and supporting members): Ms. ____ requested gender-affirming surgery in 2022. The GASRC meeting was held 100 days outside of the compliance date of 90 calendar days from the time the GAS Request Packet was submitted related to a significant statewide backlog. This backlog was determined to be a result of PY unavailability to achieve quorum with a frequency that would allow the committee to review cases within a 90-day period after the GAS Request Packet was submitted to HQ.

11) <u>HQ</u>: During this review, concerns related to misgendering of the patient in the health care record (using incorrect honorifics, pronouns, and an indication of describing the patient as male/a man when she was not) occurred frequently. Several items may contribute to this despite Banner Bar notification of the patient's pronouns and honorifics that were derived from the most recent GIQ entered into SOMS:

    a. Mismatched gender/sex fields within EHRS, SOMS, and ERMS create confusion about gender, sex, and gender identity.

    b. EHRS and SOMS lack an accurate way to reflect current legal gender marker and creates confusion in the data keeping records across CCHCS/CDCR.

12) During patient interviews, allegations against custody staff were made pertaining to this incident and have been addressed with the Hiring Authority. As a result of these allegations, a request for a formal investigation via the 989 process will be made by the Hiring Authority.

13) During the EHRS review, for the March 12-22, 2023, mental health crisis bed admission, there were several delayed and missed nursing documentations identified pertaining to suicide watch and suicide precaution.

**Audit Summary**: Adequate practices were found in completion of SRASHEs for alternative housing and MHCB discharges, IDTT meetings, and CPR and suicide prevention training for custody personnel. The closure of the ASU (in E-Facility) negated review of PT rounds, new intake cells, and Guard One compliance. There were concerns regarding intake screening, disorganized alternative housing data, and MHCB patients not consistently being offered yard privileges. Data regarding MHCB supervisory review of discharge SRASHEs and safety plans was problematic. Compliance with Page 2 of the discharge custody check forms was problematic.

**9)    California State Prison - Corcoran (CSP/Corcoran)**

**Inspection**:  June 27-28, 2023 (previous suicide prevention audit was February 9-10, 2022).  CSP/Corcoran housed approximately 3,329 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on June 27, 2023.  The door to the nurse's office was closed, with an officer providing security from the hallway, thus ensuring privacy and confidentiality.  The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS.  Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

Daily **PT Rounds** were observed in the three restrictive housing units (ASU/GP, EOP Hub, and STRH/LTRH) on June 27-28, 2023.  Overall, the rounds were generally unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Form and entering the information into the EHRS for caseload IPs.

**Housing**:  CSP/Corcoran had 24 MHCBs that were previously found to be suicide-resistant.  The census was between 19 and 20 patients during the two-day assessment, with three cells "redlined" for repairs.

In addition, there were five (5) **New Intake Cells** (101-105) located in the STRH unit, five (5) new intake cells (124 through 128) located in the EOP ASU (or Hub), and 10 new intake cells located in the ASU/GP.  During inspection of these units, all new intake IPs were observed to be in new intake cells.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were primarily found in nine designated cells within the 4A3 Unit.  Previously, alternative housing was located in the EOP Hub.  All cells used for alternative housing had beds, and IPs were required to be observed on a continuous 1:1 basis.  There was a tremendous increase in the use of alternative housing during the review period, with four IPs observed in alternative housing each day during the onsite assessment.  During the three-month period of April through June 2023, there were approximately 368 IPs placed in alternative housing, with only 36 percent subsequently admitted into an MHCB.  In addition, 96 percent of IPs were held in alternative housing under 24 hours, with 14 patients held over 24 hours, and 2 IPs held up to 72 hours.

Of note, from data review and discussion with facility staff, this reviewer found that a handful of specific IPs continued to recycle through alternative housing on a daily basis simply to avoid sleeping in the EOP Hub which was said to be very loud at night.  One IP had over 20 SRASHEs completed during the month of June 2023 based upon recycling through alternative housing, a tremendous use of strained mental health resources.

This reviewer's examination of 50 rescission cases found that SRASHEs were completed 98 percent (49 of 50) of the time, and all applicable cases had five-day follow-up assessments. However, only 22 percent (11 of 50) of the rescinded case contained the required safety plans.

This reviewer had the opportunity to observe the assessment of one IP (COR 1) in alternative housing on June 28, 2023.  The assessment was very brief, well under five minutes, occurred cell front, and was later documented in a SRASHE that mostly contained narrative pulled forward from a previous assessment.  When later asked why the IP was not offered an out-of-cell assessment, the clinician provided the following poor explanations: 1) the facility was on a "MH Modified Program," suggesting that shortages in mental health staffing made it difficult to take the IP out of the cell and into the nearby ICC program room (despite the fact that the clinician was already on the unit and could have easily walked to the ICC program room; and 2) the IP was clothed in a smock (which was also nonsensical since the IP could have easily been escorted to the ICC program room which was a short walk from his cell in the same building).

In the review of a medical chart of another patient (COR 2) held overnight in alternative housing on April 2, 2023, a clinician completed a SRASHE the following morning (April 3) that stated: "Due to the lack of confidentiality at cell front, the approach to the completing the assessment was altered.  Contact was cut short as pt. did not have any MH issues he wanted to discuss further." The patient was discharged from alternative housing, and no safety plan was completed.

Review of other progress notes by multiple clinicians cited "MH Modified Program or "Critical Staff Shortage/Workload" as a rationale for why out-of-cell contacts were not occurring.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the **MHCB** unit.  Patients not on suicide observation status were required to be observed at 30-minute intervals.  During May 2023, the Mental Health Observations Reporting Tool indicated that 14 patients were on observation status in the MHCB unit, with 89 percent compliance with timely observation of patients on Suicide Precaution and 72 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period found a combined 97 percent compliance rate in the STRH, EOP Hub, and ASU/GP with required checks not exceeding 35-minute intervals.  As detailed below, this high compliance rate was negated by the fact that the two IPs who committed suicide in restrictive housing during the review period were found in the state of rigor mortis.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period from May and June 2023.  A sample EHRS review of 46 cases of emergent/urgent mental health referrals for SI/behavior found that clinicians completed the required SRASHEs in 96 percent (44 of 46) of the cases.

In addition, a **Crisis Intervention Team** was launched at CSP/Corcoran in October 2018 and had been operational seven days a week.  During the on-site assessment, this reviewer was informed that the CIT process had been revised, date unknown, and a yard clinician currently initially responded alone to the emergency referral and only initiated the CIT process, to include

the full team, if the referral involved a custody and/or medical issue. The most recent CIT policy was dated September 2022 and did not include this revised protocol. There were no crisis responses observed during the onsite assessment.

Seven (7) **IDTT Meetings** in the MHCB unit were observed on June 27-28, 2023, including five patients being discharged. Although there was good team participation and multiple treatment teams observed, the meetings were problematic. Three primary clinicians presented the seven cases and, ironically, the only unlicensed psychologist provided the best case summaries and discussions regarding reasons for admission (DTS), diagnoses, medication, observation level, suicide risk inquiry, and some safety planning. In the other four cases, there were inadequate case summaries, no discussion regarding approved out-of-cell activities, and very little discussion regarding safety planning. In one case (COR 3) involving a patient admitted for DTS and being discharged that day (June 27, 2023), the clinician asked the patient – "Do you know what safety planning is?" and "Do you know what CBT is?" Subsequent review of the safety plan found that it contained a few coping strategies that were never discussed with the patient during the IDTT meeting. In another case (COR 4), the clinician who had completed the discharge SRASHE and safety plan earlier that morning (June 28, 2023), began the IDTT meeting by informing the patient "We are going to work on your safety plan today." The plan was never discussed during the meeting.

The psychiatrist in the first three IDTT meetings stated in the beginning of each meeting that "We don't talk about changing medication during IDTT," but then proceeded to conduct brief psychiatric discharge assessments in two cases, including mental status examinations. In another case, a patient with major depressive disorder was not even asked why he did not want to start psychotropic medication.

Two patients who had been approved for full issue clothing several days earlier arrived for their IDTT meetings on June 27, 2023 in partial issue (boxers/t-shirt), with one patient (COR 5) stating (and later confirmed) that he only received his uniform to go out to yard. It was also later confirmed that this same patient was also clinically-approved for an extra blanket, but the blanket was removed by custody staff for no justifiable reason.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined 114-A forms for 18 of 19 current patients who had been approved for all privileges. The records of one of the patients was not reviewed because he was out to the hospital after swallowing pieces of a razor blade. The review found that there was a major communication breakdown between the provider orders and offering of out-of-cell activities by custody staff. In almost all of the 18 cases, providers had approved out-of-cell activities after the first day of MHCB admission. However, apart from showers which were offered three times per week, very few patients were offered yard/dayroom or telephone privileges during their MHCB placement, with the 114-A forms incorrectly stating that the patient was "Not Cleared."

These findings were similar to that found during the previous assessment in which custody staff were incorrectly denying MHCB patients access to the yard because parts of the facility (not including the CTC) were on "quarantine" status, misinterpreting CDCR's "COVID-19 Mandatory 15-Day Modified Program" memorandum, effective since January 6, 2022, that only

166

allowed for these out-of-cell activities, but even created exemptions for IPs in restrictive housing units, CTCs (including MHCB units), and PIPs. In addition, custody staff were denying MHCB patients yard privileges despite the fact these same patients were allowed out of their cells three times a week to shower and attend IDTT meetings.

Finally, as first reported by this reviewer in 2014, MHCB patients at CSP/Corcoran had historically not been offered yard privileges within the CTC because the yard attached to the MHCB unit had previously been determined to be unsecure for maximum-security patients. CDCR had previously responded to this reviewer's findings by stating that funding would be secured to address the deficiency. In the fifth re-audit, this reviewer recommended that CDCR provide verification for funding of a small management yard at CSP/Corcoran in its FY 2022/23 budget, and that such documentation be forwarded to the Special Master. To date, no such verification has been received.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined a sample of EHRS charts of 23 patients discharged from the unit from March through June 2023, who had been admitted into the MHCB for DTS, and remained at CSP/Corcoran. The required discharge SRASHEs were completed in 96 percent (22 of 23) of the cases, adequate safety plans were completed in 87 percent (20 of 23) of the cases, and five-day follow-up assessment were completed in applicable cases.

This reviewer's examination of the MHCB supervisory review of discharge SRASHEs and safety plans from April and May 2023 based upon the CDCR's required "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans (effective March 10, 2020)" found that the documentation was unhelpful because: 1) it failed to include the date of supervisory review which is critically important in determining timely review (i.e., required prior to or during the clinical discharge IDTT meeting); and 2) there were MHCB discharge cases excluded from the provided data.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 104 cases of IPs discharged from either the MHCB unit or alternative housing who remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from December 2022 through June 2023. The review found that only 88 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form. The majority (59 percent) of custody checks were recommended for 72 hours. In addition, only 85 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional

officers consistently conducting checks at 30-minute intervals, as well as missing custody check forms.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2022 through May 2023) found that meetings did not have quorums of all required mandatory members or designees in January and May 2023 (due to lack of psychiatry attendance). Meeting minutes included discussion on compliance data, improvement projects, as well as thorough documentation regarding the status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits. Patients enrolled in SRMP were consistently documented in meeting minutes.

Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required two CCHCS policies from 2021 related to the SPRFIT: "Crisis Intervention Team Policy and Procedure" and "Suicide Risk Management Program Policy and Procedure." A third required LOP for CCHCS "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021, was not provided.

**Training**: According to training records, 97 percent of both custody and nursing staff were currently certified in CPR. In addition, 97 percent of custody staff, 91 percent of medical staff, and 90 percent of mental health staff completed annual suicide prevention block training during 2022. Finally, as of June 2023, only 68 percent of mental health clinicians had completed the SRE mentoring program, only 62 percent had received the seven-hour SRE training, and only 33 percent had completed safety plan training.

**Recent Suicides**: CSP/Corcoran experienced two (2) suicides during the review period. In the ***first*** case (COR 6), the IP was found hanging from the plumbing chase by a sheet in his ASU cell during the early morning of January 25, 2023. His body was found with signs of rigor mortis. The IP entered the CDCR system for his third term on July 3, 2018 to serve an 11-year sentence for robbery and possession/manufacturing of a deadly weapon. He was transferred to CSP/Corcoran on January 5, 2023, a few weeks before his death. He incurred 16 RVRs during his confinement, the most recent occurring on April 26, 2022 for fighting. The IP was known to be gang-affiliated. He was unmarried and had three children from a prior relationship. He remained in contact with his children, as well as the mother of their children, throughout his incarceration.

According to available records, the IP was born to unmarried parents and raised by his aunt and father, with no contact with his biological mother since infancy. There was little information available regarding his early childhood and family dynamics, although he denied any physical, sexual, or emotional abuse. He was, however, removed from the family home when his father was incarcerated and his aunt was no longer able to care for him. There was inconsistent documentation that the IP had siblings, ranging from having only one brother to three brothers

and four sisters. He did not complete high school and received his GED in the California Youth Authority. The IP had a significant juvenile and adult criminal history beginning in 2007 at the age of 14 and was also gang-affiliated at age 13. He was paroled from his second CDCR term in January 2017. Other than being diagnosed with attention deficit disorder in grade school, the IP did not have any other mental health treatment in the community nor did he have a history of suicidal behavior.

Upon re-entry into CDCR in July 2018, the IP was not placed in the MHSDS, although he was briefly treated at 3CMS level of care during his second term. He was seen by mental health staff on only two occasions, the last of which occurred in September 2022 as a routine contact. Due to his frequent RVR involvement, the IP was frequently housed in either administrative segregation or the SHU. He was most recently released from a 17-month SHU term on January 5, 2023 and transferred to CSP/Corcoran. A few weeks later on January 19, 2023, he was informed by his correctional counselor that he had been put up for transfer to PBSP. The IP died several days later.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had several medical problems, none were thought to be proximate causes of his death. He did not leave a suicide note. The CDCR reviewer theorized that the IP's gang affiliation prohibited him from seeking out mental health treatment for possible anxiety and stress related to his pending PBSP transfer.

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) Based on reports and information submitted by responding staff, Mr. _____'s body was observed to have signs of rigor mortis. This calls into question the thoroughness of the Custody Welfare checks completed prior to discovery.

> 2) During the review of the Emergency Medical Response timeline, AED heart rhythm analysis and advice during the code were not documented. A nasopharyngeal airway was placed but initiation of O2, including the amount given, was not documented. SRN noted an unknown object around the patient's neck; there was also no clear documentation that the ligature was removed from the patient's neck.

In the **_second_** case (COR 7), the IP was found hanging from the ventilation grate by a sheet in his STRH unit cell during the morning of May 21, 2023. His body was found with signs of rigor mortis. The IP entered the CDCR system for his second term on September 8, 2022 to serve a three-year for assault with a deadly weapon. He had been transferred to CSP/Corcoran on April 15, 2023, approximately one month before his death. He incurred four RVRs during his confinement, the most recent occurring on May 14, 2023 for destruction of the property and threatening great bodily injury or death. The IP was not known to be gang-affiliated. He was unmarried and did not appear to have any children, but previously informed mental health staff that he had a girlfriend with whom he shared a three-year-old child. The IP did not appear to

have any contact with this girlfriend during incarceration, but records indicated several recent telephone calls with his mother.

According to limited available records, the IP was raised by adoptive parents as an only child, but subsequently left home as a teenager due to his "parents always fighting" and lived on the streets. He began using marijuana and alcohol at age 15 and began taking methamphetamine and opiates three years later at age 18. The IP had an extensive juvenile and adult arrest history and spent numerous time in both juvenile hall and county jails. He denied any sustained employment history. The IP was paroled from his first CDCR term in September 2021. Although denying any history of mental health treatment in the community, records indicated that he was previously diagnosed with attention deficit hyperactivity disorder from ages 10 to 16. There were also inconsistent reports that he had a prior psychiatric hospitalization "due to family issues," and had been once diagnosed with bipolar disorder. He was not a participant in the MHSDS during his first CDCR term. Although the IP did not have a documented history of suicidal behavior in the community, he self-reported two prior suicide attempts: once by stabbing himself when he was 12-year-old, and then by overdosing on pills while homeless.

Upon re-entry into CDCR in September 2022, the IP screened negative for any current mental health symptoms and was not initially placed in the MHSDS. However, he was seen by a mental health clinician on October 3, 2022 following complaints about auditory hallucinations, mood swings, and depression. The IP denied any current suicidal ideation, was diagnosed with unspecified schizophrenia and unspecified mood disorder, and enrolled in the 3CMS level of care. Although seen timely by psychiatry, he was not seen by his primary clinician at NKSP until December 20, 2022 and then only as a result of a CIT response in which he threatened to cut his neck with a razor if sent back to his dormitory housing. The IP was placed in the MHCB for 10 days, and his diagnoses were revised to mood disorder with anxiety and depression, and schizoaffective disorder. Upon discharge from the MHCB, the IP was returned to 3CMS diagnosis of schizoaffective disorder.

On January 9, 2023, following continued intravenous use of both methamphetamine and opiates, the IP received a substance use disorder treatment screening. Two days later he was transferred to CSP/Corcoran. Although seen timely by psychiatry, the IP was not seen by his primary clinician until February 15, 2023, and completion of the MHPC assessment form was problematic in that his diagnosis was not documented on the problem list and he never received an additional IDTT team meeting. On March 1, 2023, he was seen for a MAT consultation, and subsequently started on a small dose of Suboxone. The IP, however, appeared to be under the influence of illegal substances during subsequent psychiatric and primary clinician contacts.

On April 2, 2023, the IP was placed in alternative housing after reporting suicidal ideation, as well as command auditory hallucinations to kill himself. He was discharged from the MHCB on April 13, 2023, and although a SRASHE was completed, a safety plan was not. His diagnoses were revised to substance induced psychosis, schizoaffective disorder, substance use disorder, and bipolar disorder. Upon his return to CSP/Corcoran on April 15, 2023, all but one of the five-day clinical follow-up assessments were completed, but the documentation continued to omit a safety plan. The IP consistently denied any suicidal ideation.

170

On May 2, 2023, the IP was seen by a clinician following an urgent consult that he was having safety concerns and requested single cell status. He insisted on being placed in restrictive housing so he could stay away from other IPs and wanted to have time to write a book about his life. The IP also thought that a restrictive housing placement would help him stay away from drugs. He was not placed in his desired restrictive housing placement and returned to his housing unit. Several days later on May 13, 2023, the IP was placed in alternative housing for both suicidal and homicidal ideation. When assessed by a clinician the following morning (May 14, 2023), he recanted his suicidal ideation but reported that "I am having safety concerns and need help." A SRASHE was completed, but the required safety plan was not. The SRASHE was also noteworthy in finding a low chronic risk of suicide, whereas previous SRASHEs had consistently found a high chronic risk of suicide. The IP's MHCB referral was rescinded, and his safety concerns were initially viewed as vague. While safety concerns were being reviewed on May 14, he threatened custody staff and damaged property, thus engaging in behavior that expedited his transfer to the STRH unit. All but one of the required five-day clinical follow-up assessments were completed, but the documentation again omitted the required safety plan. The final five-day follow-up note was completed on May 20, 2023, one day before the IP's death, and he denied any current suicidal ideation.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had several medical problems, none were thought to be proximate causes of his death. He did not leave a suicide note. The CDCR reviewer theorized that although the IP "had an upcoming release date, his release back into the community appeared to be a significant stressor and likely contributed to a decision to end his life by suicide. It appears that up until his transfer to STRH, he was ambivalent about his future upon release from prison…. He told his mother on several occasions that if he couldn't move to Reno, he wouldn't make it and he would harm himself…. Mr. ____ would have to wait until he was released and then report to the parole office to confirm he was approved for the interstate transfer. This appears to be a risk he not willing to take."

The Suicide Report contained 10 recommendations for corrective action through a QIP:

> 1) NKSP: Pt was placed in CCCMS by a psychiatrist on October 3, 2022, however Mr. ____ did not have an MHPC Initial Assessment, nor was he seen by a MHPC until December 20, 2022, as a result of a CIT call. Additionally, during two series of 5-Day Follow-Up contact encounters, one day was missed in each series of contacts, April 19, 2023, and May 15, 2023. Please see *Concerns Section* for further information.

> 2) NKSP: Mr. ____ was admitted to the NKSP MHCB on December 20, 2022 due to DTS. During Mr. ___' MHCB stay at NKSP (December 20, 2022, to December 30, 2022, the MHCB MH Master Treatment Plan did not include an IPOC relevant to the patient's suicide risk or risk for self-harm. One IPOC (MH Depressed Mood) was initiated on December 21, 2022, however, no treatment progress was documented during his MHCB stay. Please see *Concerns Section* for further information.

3) <u>COR</u>: Several treatment requirements included in the MHSDS Program Guide (2021) were not met during Mr. ____' recent care.  Specifically, a MHPC Initial Assessment was not held within 10 days of arrival and an Initial IDTT was not held within 14 days of arrival, nor was a MHPC Initial Assessment or Initial IDTT held upon his return to COR from CMF's MHCB on April 15, 2023.  Additionally, during two series of 5-Day Follow-Up contact encounters, one day was missed in each series of contacts, April 19, 2023, and May 15, 2023.  Please see *Concerns Section* for further information.

4) <u>CMF</u>: As part of Mr. ____' discharge from the CMF MHCB, a CMF SRASHE was completed on April 12, 2023.  Although Mr. ____ was admitted to the MHCB for danger to self (DTS), a safety plan was not completed.  It was also identified that the CMF SRASHE does not include a link to the Safety Plan form which may have contributed to this concern.  Please see *Concerns Section* for further information.

5) <u>COR</u>: Mr. ____ was placed on a 5-Day Follow Up following his CMF MHCB discharge when he returned to COR on April 15, 2023.  Although it was identified in a previous concern that the Safety Plan was not completed at the time of MHCB discharge, a Safety Plan was also not completed during any of the five days of the clinical follow up contacts.  Please see *Concerns Section* for additional information.

6) <u>COR</u>: Mr. ____ was placed in alternative housing on May 13, 2023, due to reported suicidal ideation.  Mr. ____' MHCB level of care was rescinded and a SRASHE was completed on May 14, 2023.  The SRASHE noted that Mr. ____ denied suicidal ideation and stated he was trying to go to administrative segregation and told staff he would do anything to hurt himself.  A Safety Plan was not completed at the time of his MHCB recission.  Per the Mental Health Services Safety Plan Policy, February 13, 2023: *A Safety Plan must be completed if one or more of the following scenarios occur: Anytime a patient is released from alternative housing, and the referral reason was for danger to self.*

7) <u>COR</u>: The Acute Risk Factor section of the SRASHE completed on May 14, 2023, was not completed.  Additionally, chronic risk was underestimated as low which is inconsistent with statewide guidelines for patients with previous suicide attempts.

8) <u>COR</u>: Although the clinician indicated they reviewed the Safety Plan with the patient during several 5-Day Follow-Up contacts (May 16, 2023, May 17, 2023, and May 19, 2023) after Mr. ____' MHCB level of care was rescinded, the safety plan had not been completed nor was it updated during any of the follow up contacts.  Per the Safety Planning policy, February 13, 2023; '*Following the discharge of a patient from an inpatient setting, the 5 Day Follow Up procedure must be followed.  During these clinical encounters, the clinician must review the*

172

*safety plan with the patient and determine if any updates are warranted based upon the patient's clinical presentation and current physical environment.*'

9) <u>COR</u>: Based on reports and information submitted by responding staff, Mr. ____' body was observed to have signs of rigor mortis. Specifically, responding medical staff noted, 'stiffness to arms and legs, stiffness to jaw, unable to open mouth.' Furthermore, custody staff noted a 'residue' on the cell door window partially obstructing view into the cell. This calls into question the thoroughness of the Custody Welfare checks completed prior to discovery. CSP-Corcoran is aware of this concern and has taken appropriate action (Confidential Request for Internal Affairs Investigation/Notification of Direct Adverse Action [Form CDC 989]).

10) <u>CMF</u>: During the review of suicide precaution documentation from 4.4.23 to 4.14.23, numerous incidents of documentation not entered timely per MHSDS Program Guide were found. In addition, suicide precaution rounding was not staggered on several occasions.

**Audit Summary**: Adequate practices were found in intake screening, PT rounding in restrictive housing units, new intake cell placement, and SPRFIT. There were several deficiencies found during the assessment that required corrective action, including a high compliance rate for Guard One that was negated by two IPs who committed suicide in restrictive housing and found in the state of rigor mortis, IPs housed in alternative housing and not offered out-of-cell assessments in privacy, problematic IDTT meetings, MHCB patients in partial issue clothing despite provider orders for full issue, MHCB patients not consistently offered yard and telephone privileges, inadequate safety plans and inadequate MHCB supervisory review of those safety plans, low compliance rates regarding discharge custody check forms by clinical and custody personnel, and low compliance rates for SRE and safety plan training for mental health staff.

## 10)    California Substance Abuse Treatment Facility (CSATF)

**Inspection**: June 29-30, 2023 (previous suicide prevention audit on February 7-8, 2022). CSATF housed approximately 4,525 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on June 30. The door to the nurse's office was closed, the IP was placed in a TTM, with an officer providing security from the hallway, thus ensuring privacy and confidentiality. The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

Daily **PT Rounds** in the STRH unit by two PTs were observed on June 30. The first PT was observed to be appropriately interacting with all IPs, asking all the required questions from the Daily PT Rounds Form, and entered the information into EHRS. Observation of the second PT was problematic. Her interaction with IPs was based upon their demeanor, i.e., if they were cooperative, she asked all the questions; if they were indifferent/uncooperative, she was

indifferent and either asked the questions in a compound fashion, e.g., "Any MH concerns, Homicidal, Suicidal" in very rapid fashion or omitted suicide risk inquiry entirely for caseload IPs.

**Housing**:  CSATF had 20 **MHCBs** that were previously found to be suicide-resistant.  During the assessment, there were 16 patients housed in the MHCB unit, with one cell "redlined" for repairs.

The facility had one STRH unit with 3CMS IPs, while GP IPs requiring restrictive housing were often transferred to CSP/Corcoran.  The STRH unit contained ten **New Intake Cells** (100-109) and all new intake IPs were observed to be in new intake cells.  There were an additional eight (8) new intake cells located in the E-Yard (Building 1) that were also utilized for Alternative Housing.  These cells had been properly retrofitted to be suicide-resistant since the previous assessment.

Finally, **Alternative Housing** to temporarily house IPs identified as suicidal and awaiting MHCB placement continued to be used on a daily basis.  Two wet holding cells (i.e., running water in sink and toilet) in the CTC and designated cells in E-Yard (Building 1) were primarily utilized for alternative housing.  All designated cells had beds, with those housed in the CTC holding cells provided stack-a-bunks.

From March through May 2023, there were approximately 186 IPs placed in alternative housing, and all were discharged within 24 hours.  Approximately 62 percent (115 cases) of the MHCB referrals were rescinded and IPs returned to their housing units.  This reviewer examined the EHRS charts of 16 rescinded cases and found that the required SRASHEs and five-day follow-up assessments were completed in all (100 percent) cases.  However, the required safety plans were found to be problematic in all of the cases, with 69 percent (11 of 16) of the cases having inadequate safety plans and 31 percent (5 of 16) of the cases not having any safety plans.

Of note, this reviewer examined several cases in which patients returning after-hours from either a PIP or another facility's MHCB and were ordered by the on-call provider to be clothed in a safety smock and housed in alternative housing until they could be assessed by a clinician the following day.  The placement of an otherwise stable patient in alternative housing clothed in a safety smock was very problematic.  There was no CDCR or local policy that permitted it, and CSATF mental health leadership agreed it was troublesome, but deferred to psychiatry.  However, as of June 2023, there was not a chief or supervising psychiatrist at the facility.  This reviewer was subsequently informed in late September 2023 that the problem had been corrected.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In fact, all patients remained on Suicide Precaution status (at a minimum) throughout their MHCB placement.  The arbitrary practice of continuing suicide precautions status for all patients, including those who were not at risk for suicide, would only be problematic if such non-suicidal patients were not afforded full clothing and privileges.  However, this reviewer's observation of several IDTT meetings, as well as review of medical charts, continued to find that patients were appropriately clothed and authorized for

possessions/privileges consistent with their suicide risk or lack thereof. During May 2023, the Mental Health Observations Reporting Tool indicated that 23 patients were on observation status in the MHCB unit, with 98 percent compliance with timely observation of patients on Suicide Precaution and 91 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period found 100 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently reviewed a listing of emergent/urgent mental health referrals for the six-month period of December 2022 through May 2023. A sample EHRS review of 52 emergent/urgent mental health referrals for SI/behavior (in April and May 2023) found that mental health clinicians subsequently completed the required SRASHEs in only 83 percent (43 of 52) of the cases. Most of the deficiencies were noted in urgent referrals. A low level of compliance was also found during two previous assessments.

In addition, the **Crisis Intervention Team** was normally operational from approximately 8:00 a.m. to 8:00 p.m. Tuesday through Thursday. On other days, a yard clinician would respond to the crisis call. This reviewer was able to observe the CIT process on June 29, 2023. The team comprised a clinician, captain, and PT. The patient was assessed in a private room, and a SRASHE was subsequently completed. Of note, CIT policy does not allow for the PT to be on the team unless they are accompanied by an RN, SRN, or SPT/Unit Supervisor. Review of several other cases found that only a PT was present for the CIT response.

Three **IDTT Meetings** were observed in the MHCB unit on June 29, 2023. Overall, there was good team participation, discussion regarding reason for admission (DTS), diagnoses, medication, observation levels and issue, suicide risk inquiry, and because they were all initial IDTT meetings, there were preliminary discussions regarding safety planning. Patients were each able to pick out a book from the book cart to bring back to their cell following the meetings. However, there was no discussion regarding out-of-cell activities. Most importantly, each meeting was excessively long and case presentations appeared scripted to satisfy this reviewer, exemplified by the presence and interaction by the chief psychologist (who, as verified by several medical chart reviews, infrequently attended IDTT meetings), and the presence of the CTC physician who was asked to attend one IDTT meeting in order to educate a patient on his dormant Tuberculosis and Hepatitis-C diagnoses.

In addition, this reviewer's examination of multiple charts indicated that not all MHCB patients were always seen on a daily basis as required. The reviewed of the medical charts for all 16 patients in the MHCB unit during the on-site assessment found that each patient had at least one day of not being seen by a clinician, including Friday, June 30, the second day of the onsite assessment. For example:

    4 patients not seen for 1 day during their MHCB placement
    7 patients not seen for 2 days during their MHCB placement
    1 patient not seen for 3 days during their MHCB placement
    1 patient not seen for 6 days during their MHCB placement

1 patient not seen for 9 days during their MHCB placement
1 patient not seen for 16 days during their MHCB placement
1 patient not seen for 24 days during their MHCB placement

<u>Total</u>: 16 patients, 76 days of not being seen from May 5 through July 3, 2023

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined 114-A forms for 16 current patients who had been approved for all privileges. Eight patients were admitted within the previous 48 hours and most had only received showers. Four patents were in the MHCB during a recent 14-day modified program "to conduct an annual mass institutional search of the entire institution," resulting in a Daily Program Status Report (PSR) that was in effect from June 6 through June 19, 2023. Under this PSR, showers and visiting remained under normal schedules, with yard, dayroom, and telephone calls list as "modified," meaning "normal after daily searches." It remained unclear if patient cells in the CTC/MHCB were searched during this 14-day period, yet despite being on modified program, i.e., resuming normal activities following searches, review of the 114-A forms for these four patients indicated that none were permitted any out-of-cell activities (except to shower) based upon the misuse or misinterpretation of the PSRs by staff. This same issue occurred during the previous assessment and remained unresolved.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, the EHRS charts of 22 patients discharged from the unit and remaining at CSATF between April and May 2023 were examined. The review found that the required SRASHEs were completed in 91 percent (20 of 22) of cases, and the required five-day follow-up assessments were completed in all (100 percent) of the cases. With regard to safety planning, the review found that only 5 percent (1 of 22) of the cases had an adequate safety plan, 86 percent (19 of 22) of the cases had inadequate safety plans, and 9 percent (2 of 22) did not have required safety plans. The following very problematic safety plan (CSATF 1), written on May 11, 2023, exemplified the problem of repetitive narrative placed in all sections regardless of relevance:

MH Safety Plan

<u>Safety Planning Reason</u>: Discharge from MHCB/PIP or Alternative Housing
<u>Patient Participate - Warning Signs</u>: No
<u>Warning signs - Patient focused</u>:
<u>Warning signs - Clinical Impressions</u>: ***Pt. is no longer in crisis-is now taking his Rx., sx have stabilized. Denied SI/HI/AH/VH., is attending to ADLs, is compliant with treatment and will d/c back to HLOC being EOP which will adequately address his current sx. Pt is aware of this and agreed to the plan.***
<u>Helpful reducing self-harm - Patient</u>:
<u>Helpful reducing self-harm - Clinical</u>: ***Pt. is no longer in crisis-is now taking his Rx., sx have stabilized. Denied SI/HI/AH/VH., is attending to ADLs, is compliant with treatment and will d/c back to HLOC being EOP which will adequately address his current sx. Pt is aware of this and agreed to the plan.***
<u>Reduce Risk Factors - Patient</u>:
<u>Reduce Risk Factors - Clinical</u>: ***Pt. is no longer in crisis-is now taking his Rx., sx have stabilized. Denied SI/HI/AH/VH., is attending to ADLs, is compliant with***

176

*treatment and will d/c back to HLOC being EOP which will adequately address his current sx. Pt is aware of this and agreed to the plan.*
Patient History of Self Harm: No
Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: No
Protective Factors - Patient focused:
Protective Factors - Clinical Impression: *Pt. is no longer in crisis-is now taking his Rx., sx have stabilized.  Denied SI/HI/AH/VH., is attending to ADLs, is compliant with treatment and will d/c back to HLOC being EOP which will adequately address his current sx. Pt is aware of this and agreed to the plan.*
Enhanced Factors - Patient focused:
Enhanced factors - Clinical Impressions: *Pt. is no longer in crisis-is now taking his Rx., sx have stabilized.  Denied SI/HI/AH/VH., is attending to ADLs, is compliant with treatment and will d/c back to HLOC being EOP which will adequately address his current sx. Pt is aware of this and agreed to the plan.*

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from December 2022 through May 2023.  The facility could not provide proof of practice that discharge SRASHEs and safety plans were being timely reviewed by the MHCB supervisor as required by policy.

The process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 195 cases of IPs discharged from either the MHCB unit or alternative housing who remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from December 2022 through May 2023.  The review found that only 74 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form.  The majority (51 percent) of custody checks were recommended for 48 hours.  In addition, 87 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2022 through May 2023) found that meetings had did not have quorums of all required mandatory members or designees for February and May 2023.  Meeting minutes included discussion on compliance data, improvement projects, but documentation for corrective action plans (CAPs) resulting from this reviewer's prior assessment report and/or regional SPRFIT audits were not included in meeting minutes (other than the simply listing of the number of CAPs).  Monthly tracking and discussion of SRMP patients started in February 2023 meeting minutes.  The facility had a serious suicide attempt in January 2023 that involved outside hospital treatment (i.e., with a medical severity rating of "3"), and a case presentation and/or root cause analysis (RCA) was not included in the meeting minutes.  The meeting minutes were otherwise unremarkable.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following two required CCHCS policies from 2021 related to the SPRFIT: "Crisis Intervention Team Policy and Procedure" and "Suicide Risk Management Program Policy and Procedure." A third LOP regarding CCHCS "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021, was not provided.

**Training**:  According to training records, 100 percent of both custody and nursing personnel were currently certified in CPR.  In addition, 94 percent of custody staff, only 79 percent of medical staff, and 91 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of May 2023, only 22 percent of mental health clinicians had completed the SRE mentoring program, only 30 percent had received the seven-hour SRE training, and with the exception of four supervisory clinicians who completed the headquarters' training-for-trainers (T4T) workshop, none of the other mental health staff completed the new safety plan training.  Review of at least one safety plan from one of these T4T clinicians found it to be very problematic.

**Recent Suicides**:  CSATF experienced one (1) suicide during the review period.  In that case (CSATF 2), the IP was found hanging from a ventilation grate by shoelaces in his SNY cell during the afternoon of July 28, 2022 by his cellmate.  The IP entered the CDCR system on January 28, 2021 to serve a 24-year term for two counts of manslaughter and use of a firearm (in the deaths of his father and older brother).  He had been transferred to CSATF on April 28, 2021.  He incurred three RVRs during his confinement, the most recent occurring on March 21, 2022 for theft of state property.  The IP was not known to gang-affiliated and was designated as SNY in February 2021 due to enemy concerns, being a victim of an assault, and other safety concerns.  He was not married but had a six-year-old son from a previous relationship.  At the time of his death, telephone records indicated that the IP's primary support system included his younger brother, his son, and the son's maternal grandmother.

According to available records, the IP and three siblings were reported to be raised in Mexico and immigrated to the United States in 2001.  Although raised by his mother in Mexico, it was unclear who raised the IP when he immigrated to the United States.  There was no reported family history of either substance abuse or mental illness, however, the IP reported a history of sexual abuse by his older brother at the age of ten.  There were inconsistent reports regarding his education history, but he apparently did not graduate high school. His history of substance use

began at age 13 and subsequently included methamphetamine, alcohol, and cocaine. The IP did not appear to have a history of juvenile offenses, and with the exception of the instant offense, most of his adult criminal history was related to minor motor vehicle offenses. The instant offense involving the shooting of his father and older brother with a handgun as they were sitting in a car resulted in a finding of incompetency to stand trial in October 2018. The IP was then transferred to DSH until February 2019. Competency was restored the following month in March 2019, whereupon he received the 24-year prison sentence for the two counts of voluntary manslaughter. Other than this DSH commitment, the IP did not have any documented history of mental health treatment. Although DHS records indicated that he had a suicide attempt in the county jail, there was no documentation of this incident in the available county jail records.

Upon entry into CDCR, the IP was placed in the MHSDS at 3CMS and was prescribed psychotropic medication. His diagnoses were unspecified schizophrenia, methamphetamine use disorder, and unspecified depressive disorder. During his initial assessment in February 2021, the IP reported symptoms, including depressed mood, auditory hallucinations, fatigue, feelings of worthlessness, recurrent thoughts of death (last experienced one year prior to the evaluation), inability to concentrate, anhedonia, insomnia, social withdrawal, psychomotor agitation, and lack of appetite.

The IP was transferred to CSATF on April 28, 2021, and an MH Initial Assessment was completed on May 5, 2021. During this contact, the IP endorsed command auditory hallucinations telling him to hurt himself and other auditory hallucinations telling him that others were going to kill him. He denied any current suicidal ideation. According to the CDCR reviewer, although the required SRASHE was not completed during this contact, "the absence of it did not present as being a nexus to the death, would not have changed the course of treatment or level of care, and was outside the one-year timeline for review for this report." The reviewer also noted that the IP did not always receive timely IDTT meetings, but these policy violations were also outside the one-year timeline for review.

From May 5, 2021 through the date of his death on July 28, 2022, the IP was seen by his primary clinician only three other times on May 19, 2021, August 3, 2021, and November 17, 2021. CSATF mental health leadership subsequently informed the CDCR reviewer that due to severe staffing shortages, clinical contacts were triaged by urgency, therefore, 3CMS IPs were not consistently being seen at 90-day intervals. The IP did not present with any mental health symptoms that would indicate impaired functioning, he consistently denied suicidal ideation, and appeared to be medication compliant during this time period. The IP was last seen by a clinician i.e., a tele-psychiatrist on February 10, 2022 after he began refusing psychotropic medication the previous month. His psychotropic medication was discontinued. The IP's last IDTT meeting was held in absentia due to patient refusal on May 25, 2022. The CDCR reviewer subsequently found that "the clinical summary, case formulation, and transfer/discharge sections did not incorporate any clinical information that was readily accessible in the medical chart nor did the treatment plan address why Inmate _____ had not been seen by a clinician since November 17, 2021."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had several

medical problems and was included in the MAT program, none were thought to be proximate causes of his death.  The IP did not leave a suicide note.  The CDCR reviewer theorized that the IP "likely suffered from psychotic symptoms as a result of his long-term history of methamphetamine use.  Throughout his incarceration, he likely minimized the severity of his symptoms, specifically the command auditory hallucinations telling him to kill himself and paranoid thoughts.…. Due to the lack of mental health contacts in the documentation, it is unclear if he had the skills and/or resources to adequately cope with the guilt, paranoia, and command hallucinations in the months prior to his death."

The Suicide Report contained three (3) recommendations for corrective action through a QIP:

> 1) Inmate _____ had a contact with his primary clinician on November 17, 2021 and subsequently was not assessed by a clinician again prior to his death.  It is unclear why Inmate _____ was not provided another opportunity for a confidential session, which may have provided additional opportunities for mental health and suicide risk assessments prior to his death.

> 2) The treatment plan dated May 25, 2022 had an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding Inmate _____'s functioning and presentation during the review period. More specifically, current information found in other clinical documentation, including but not limited to: frequency/severity of auditory hallucinations, coping tools utilized, programming on the yard, psychiatric medication refusals, sleep disturbance, low energy, and compliance/participation in the MAT program. Additionally, the transfer/discharge planning section did not have any meaningful clinical information, therefore, there was an absence of justification for the level of care.  Per MHSDS Program Guide, 2009 Revision (12-7-12) '*The IDTT shall generally be responsible for developing and updating treatment plans.  This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care*.'

> 3) Psychiatry clinical note authored on February 10, 2022 referenced "Follow up with psychiatry in 90 days.…" The psychiatrist entered scheduling order for 'MH ML CCCMS Routine MHMD Contact … once every 90 days for one year' on February 10th.  Review of the chart reveals no scheduled appointment 90 days after the order was placed on February 10th.

**Audit Summary**:  Adequate practices were found in intake screening, new intake cell placement, Guard One, and completion of required SRASHEs at MHCB and alternative housing discharge.  There were several deficiencies found with one of the PTs conducting ASU rounds, not all MHCB patients being seen on a daily basis as required, MHCB patients not consistently being offered yard privileges, inadequate safety plans and lack of MHCB supervisory review of those safety plans, low compliance rates regarding discharge custody check forms by clinical and custody personnel, and low compliance rates for SRE and safety plan training for mental health clinicians.  In addition, the practice of patients returning after-hours from either a PIP or another

facility's MHCB unit being clothed in safety smocks and housed in alternative housing was very problematic.

### 11)    North Kern State Prison (NKSP)

**Inspection**: July 11-12, 2023 (previous suicide prevention audit was on November 15-16, 2021). NKSP housed approximately 3,738 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed multiple new admissions during both the medical **Intake Screening** process and the mental health diagnostic testing in the reception center on both July 11-12, 2023.  Of note, a new Reception Center (RC) healthcare processing renovation project was recently completed, and the building opened on June 23, 2023.  The new building comprised multiple private interview rooms, including four medical rooms for intake screening and four mental health rooms for diagnostic testing.  At least one additional room contained a TTM that could be utilized by either medical or mental health personnel for the screening of a maximum custody IP or an individual deemed to be aggressive.

In each of the multiple screenings observed of both nursing and diagnostic clinician personnel, doors to each of the offices were closed, with custody personnel stationed outside, ensuring both privacy and confidentiality.  In addition, suicide prevention placards in both English and Spanish were observed on the walls of each office.  Multiple nurses were observed to be completing the Initial Health Screening form, and multiple diagnostic clinicians were observed to be completing the MH Screening Interview form, and correctly entering the information into the EHRS.  With one noteworthy exception, these screening processes were a dramatic improvement from the problematic practices found during the November 2021 assessment.

The exception related to review of collateral information by diagnostic clinicians during the **RC Mental Health Diagnostic Testing** process.  CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was released on January 27, 2021 and required RC diagnostic clinicians to review the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and the Strategic Offender Management System (SOMS); RC diagnostic clinicians were required to request that IPs sign ROI forms when reporting a prior history of mental health treatment; and RC diagnostic clinicians were required to complete SRASHEs when IPs' behavior suggests a possible current risk for suicide.

This reviewer examined multiple charts of newly admitted IPs during May 2023 and found that, despite RC diagnostic clinicians completing progress notes with boilerplate narrative indicating that Initial Health Screening Forms and county jail records were reviewed, documentation (or lack thereof) found within MH Screening Interview forms indicated these collateral records were not reviewed.  These cases also included IPs' reporting of prior mental health treatment in which signed ROI forms should have been requested but were not.

The following four cases were indicative of the problematic practices in which RC diagnostic clinicians were not consistently reviewing county jail records and/or requesting IPs to sign ROI forms based upon previous mental health treatment:

181

In <u>NKSP 1</u>, the IP arrived from the county jail on May 16, 2023, with records indicating that he had been placed on suicide precautions and clothed in a safety smock the previous week.  None of this critical information was included in either the Initial Health Screening or MH Screening Interview forms completed at NKSP.  On the MH Screening Interview form completed by the RC diagnostic clinician on May 20, the IP self-reported a prior suicide attempt (date not specified) in which he ingested "29 or 30 by taking 50 Effexor medications.  Had a seizure, went into a day coma and had kidney failure."  The diagnostic clinician did not inquire further nor was there any indication that an ROI was requested.  In addition, despite this suicide attempt and recent placement on suicide precautions in county jail, the clinician wrote that "records review did not reveal any acute risk factors." Two days later during the late afternoon of May 22, the IP threatened suicide, was placed an alternative housing on Suicide Watch, and assessed by a clinician the following morning.  Although a SRASHE was completed which indicated a low acute risk for suicide, the required safety plan was not completed.

In <u>NKSP 2</u>, the IP arrived from the county jail on May 2, 2023 and self-reported depression, paranoia, and auditory hallucinations to the intake nurse.  Although not currently suicidal, he also reported six prior suicide attempts.  Three days later on May 5, the IP met with the diagnostic clinician and the completed MH Screening Interview forms listed "Multiple hospitalizations. Patton, Atascadero, among others.  Reported first being hospitalized at age 4, 9, and 16.  Multiple hospitalizations."  County jail records also documented the IP's additional psychiatric treatment with a mental health court linkage program, as well as a psychiatric urgent care center.  Despite these multiple hospitalizations and treatment settings, the diagnostic clinician noted that the "I/P did not report outside treatment history.  A ROI was not completed."

In <u>NKSP 3</u>, the IP arrived from the county jail on April 28, 2023, with records indicating an extensive mental health history that included psychiatric hospitalization (most recently in February 2023) and prior suicide attempts.  The intake nurse completing the Initial Health Screening form noted that the IP "answered 'no' despite what CJ states," an indication the nurse had reviewed the county jail records.  Five days later on May 5, a diagnostic clinician completed both the MH Screening Interview form and a progress note that indicated the county jail records were reviewed and that the IP "did not report outside treatment history.  A ROI was not completed."

In <u>NKSP 4</u>, the IP arrived from the county jail on May 12, 2023.  Review of the county jail records indicated that the IP had a history of both depression and suicide attempts.  During the intake screening process, the IP denied both mental health issues and current or prior history of suicidal behavior.  Despite these denials, the nurse indicated that the county jail records indicated a history of suicide attempts and depression, an indication these records were reviewed.  Two days later on May 14, the IP was seen by a clinician after reporting "both mild

anxiety and depressive symptoms. He also reported having auditory hallucinations." The IP was referred to a psychiatrist. Several days later on May 18, a diagnostic clinician completed a MH Screening Interview form that indicated the IP answered "no" to each question and had screened negative for mental health. Despite the fact that the IP had been seen a few days earlier and complained about anxiety and depression, and despite the fact there his county jail records documented a history of depression and suicide attempts, the diagnostic clinician's accompanying progress note on May 18 indicated that the county jail records were reviewed.

Of note, similar problems of RC diagnostic clinicians not reviewing county jail records and/or requesting IPs complete ROI forms when appropriate was found during the previous assessment.

Finally, daily **PT Rounds** were observed in the ASU (D-6) on July 11, 2023. The rounds were unremarkable, and the PT was observed to be appropriately interacting with all IPs, asking all the required questions from the Daily PT Rounds Form to caseload IPs, and entering the information into EHRS.

**Housing**: NKSP had a 16-bed CTC, with 10 designated **MHCBs** that were previously found to be suicide-resistant. During the onsite assessment, the census was between 6 and 7 patients, with one cell redlined for repairs.

The ASU (D-6) contained 11 retrofitted **New Intake Cells**. This reviewer observed that all new intake IPs were housed in new intake cells as required.

Finally, **Alternative Housing** cells continued to be designated in A-4 unit to temporarily house suicidal patients prior to transfer to a MHCB, although some were occasionally held in the ASU (D-6). Alternative housing was utilized on less than a daily basis. During the three-month period of April through June 2023, 71 cases were reported, with all but one IP held under 24 hours. Only 30 percent of the IPs were subsequently admitted to the MHCB, with a rescission rate of 70 percent. This reviewer examined the EHRS charts of 21 rescinded cases and found that the required SRASHEs and applicable five-day follow-up assessments were completed in all applicable cases. However, the required safety plans were found to be problematic in almost all of the cases, with only 5 percent (1 of 21) having an adequate safety plan, 43 percent (9 of 21) of the cases having inadequate safety plans, and 52 percent (11 of 21) of the cases not having any safety plans.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit. Patients not on suicide observation status were required to be observed at 30-minute intervals. During June 2023, the Mental Health Observations Reporting Tool indicated that 10 patients were on observation status in the MHCB unit, with 96 percent compliance with timely observation of patients on Suicide Precaution and 88 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period found 95 percent compliance with required checks not exceeding 35-minute intervals.

183

**Management/Treatment Planning**:  This reviewer requested and subsequently received a list of emergent/urgent mental health referrals for the period of January through June 2023.  A sample EHRS review of 50 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 88 percent (44 of 50) of the cases.  Of note, all of the referrals for SI/behavior that did not result in completion of SRASHEs were labeled as "urgent referrals."  A similarly low level of compliance was found during the previous two assessments.

In addition, the **Crisis Intervention Team** was launched at NKSP in February 2019 and currently activated between 7:00 a.m. and 4:00 p.m.  This reviewer observed the CIT process on several occasions during the on-site assessment.  In each case, the team included a crisis clinician nurse, and sergeant.  All cases were responded to in a timely fashion, held in privacy, and SRASHEs were completed in each case.

Three **IDTT Meetings** were observed on July 12, 2023, including one in absentia due to the patient being out to a medical appointment.  It was noteworthy that although a review of various medical charts indicated that most IDTT meetings averaged six (6) team members, during this reviewer's attendance on July 12, there were nine (9) participants – including the Chief of Mental Health, SPRFIT/In-Patient Coordinator, and one additional clinician.  This number did not include this reviewer and the regional SPRFIT coordinator.  The size of the team was noteworthy because the IDTT room was extremely small and, at least in one of the cases, the session was prematurely terminated because, as noted by the primary clinician, the patient became agitated by the large number of observers.  Although there were adequate case presentations that included reason for admission (DTS), diagnoses, and medication, the presentations appeared very scripted for this reviewer's observation, including inappropriate dialogue by the nurse who stated "we will continue to work with him on his safety plan" in reference to a patient who appeared delusional and uncooperative during his initial IDTT meeting.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined both provider orders and 114-A forms for eight (8) patients who were housed in MHCB unit during the onsite assessment.  The review found that almost all of the patients had provider orders that approved all out-of-cell activities, and the 114-A forms reflected that all patients were offered showers, yard, and telephone access.  This was a notable improvement from the previous assessment when patients were not consistently offered out-of-cell activities because of weather conditions and inappropriate interpretation of Daily Program Status Reports.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined EHRS charts for 15 patients discharged from the unit during May and June 2023, had been admitted into the MHCB for DTS, and remained at NKSP. The required discharge SRASHEs were completed in all (100 percent) of the cases, and five-day clinical follow-up assessments were completed in all applicable cases.  However, with regard to safety planning, the review found that only 20 percent (3 of 15) of the cases had an adequate safety plan, with 80 percent (12 of 15) of the cases viewed as having inadequate safety plans. The following safety plan (NKSP 5), completed on June 4, 2023 and containing the same repetitive narrative in each section, exemplified the problem:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: Yes
Warning signs - Patient focused: feeling isolated and like I don't have support or a reason to keep going.
Warning signs - Clinical Impressions: ***IP was admitted to MHCB for DTS after reporting SI with intent.  IP expressed feeling overwhelmed and hopeless at the time of admission and struggling with feelings of guilt and shame.  IP is facing a long sentence and has not disclosed this to his family.  As a result, IP is feeling isolated and worried about losing connections once he does disclose.  IP is still coming to terms with his sentence and making efforts to find purpose.  IP has been engaging with treatment team in MHCB and has worked on mindfulness and role-playing disclosure as well as goal setting.  IP is encouraged to continue this in EOP setting.  By attending groups IP will be able to establish peer connections and support.  Individual therapy will provide IP support in processing feelings surrounding his sentence as well as working on goal setting such as college courses and journaling.***
Helpful reducing self-harm - Patient: talking to people, thinking about my daughter.
Helpful reducing self-harm - Clinical: ***IP was admitted to MHCB for DTS after reporting SI with intent.  IP expressed feeling overwhelmed and hopeless at the time of admission and struggling with feelings of guilt and shame.  IP is facing a long sentence and has not disclosed this to his family.  As a result, IP is feeling isolated and worried about losing connections once he does disclose.  IP is still coming to terms with his sentence and making efforts to find purpose.  IP has been engaging with treatment team in MHCB and has worked on mindfulness and role-playing disclosure as well as goal setting.  IP is encouraged to continue this in EOP setting.  By attending groups IP will be able to establish peer connections and support.  Individual therapy will provide IP support in processing feelings surrounding his sentence as well as working on goal setting such as college courses and journaling.  IP is also encouraged to maintain contact with family via phone calls and letters.***
Reduce Risk Factors - Patient: write letters, journal, participate in treatment.
Reduce Risk Factors - Clinical: ***IP was admitted to MHCB for DTS after reporting SI with intent.  IP expressed feeling overwhelmed and hopeless at the time of admission and struggling with feelings of guilt and shame.  IP is facing a long sentence and has not disclosed this to his family.  As a result, IP is feeling isolated and worried about losing connections once he does disclose.  IP is still coming to terms with his sentence and making efforts to find purpose.  IP has been engaging with treatment team in MHCB and has worked on mindfulness and role-playing disclosure as well as goal setting.  IP is encouraged to continue this in EOP setting.  By attending groups IP will be able to establish peer connections and support.  Individual therapy will provide IP support in processing feelings surrounding his sentence as well as working***

*on goal setting such as college courses and journaling. IP is also encouraged to maintain contact with family via phone calls and letters.*

<u>Patient History of Self Harm</u>: No

<u>Safety Concerns Identified</u>: No

<u>Environmental Concerns Identified</u>: No

<u>Patient Participate - Protective Factors</u>: Yes

<u>Protective Factors - Patient focused</u>: thinking about my family.

<u>Protective Factors - Clinical Impression</u>: *IP was admitted to MHCB for DTS after reporting SI with intent. IP expressed feeling overwhelmed and hopeless at the time of admission and struggling with feelings of guilt and shame. IP is facing a long sentence and has not disclosed this to his family. As a result, IP is feeling isolated and worried about losing connections once he does disclose. IP is still coming to terms with his sentence and making efforts to find purpose. IP has been engaging with treatment team in MHCB and has worked on mindfulness and role-playing disclosure as well as goal setting. IP is encouraged to continue this in EOP setting. By attending groups IP will be able to establish peer connections and support. Individual therapy will provide IP support in processing feelings surrounding his sentence as well as working on goal setting such as college courses and journaling. IP is also encouraged to maintain contact with family via phone calls and letters.*

<u>Enhanced Factors - Patient focused</u>: encourage IP to maintain familial contact and write letters.

<u>Enhanced factors - Clinical Impressions</u>: *IP was admitted to MHCB for DTS after reporting SI with intent. IP expressed feeling overwhelmed and hopeless at the time of admission and struggling with feelings of guilt and shame. IP is facing a long sentence and has not disclosed this to his family. As a result, IP is feeling isolated and worried about losing connections once he does disclose. IP is still coming to terms with his sentence and making efforts to find purpose. IP has been engaging with treatment team in MHCB and has worked on mindfulness and role-playing disclosure as well as goal setting. IP is encouraged to continue this in EOP setting. By attending groups IP will be able to establish peer connections and support. Individual therapy will provide IP support in processing feelings surrounding his sentence as well as working on goal setting such as college courses and journaling. IP is also encouraged to maintain contact with family via phone calls and letters.*

Of note, the clinician who completed the above safety plan was one of a handful of NKSP staff who received T4T for safety planning and was one of the clinicians responsible for supervisory review of safety planning.

In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from January through June 2023. This reviewer was provided a listing of 36 cases that were the subject of supervisory review between May and June 2023. The documentation was unhelpful because it did not include the date of the supervisory review, therefore, timeliness

186

could not be audited. In addition, the data suggested that only 3 percent (1 of 36) of the audited safety plans needed to be revised, a far different outcome than this reviewer's examination of safety planning during the same time period.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 134 cases of patients discharged from an MHCB or alternative housing placement who remained at NKSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through June 2023. The review found that 81 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority (64 percent) of the custody checks recommended for 48 hours by clinicians. Most of the errors on Page 1 were attributable to clinicians discharging the checks prior to the minimum 24-hour period. In addition, 97 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2022 through May 2023) found that meetings had quorums of all required mandatory members or designees for all six months. Of note, NKSP did not have either a chief psychiatrist or supervising psychiatrist, and incorrectly listed the senior psychologist supervisor as an approved designee for psychiatry. Ironically, the meetings still maintained a quorum because a staff psychiatrist attended all of the monthly meetings (although listed as a "non-voting guest"). This individual should be elevated to a voting member of the SPRFIT. Meeting minutes included discussion on compliance data, improvement projects, SRMP patients, discharge custody check (CDCR MH-7497) forms, and RC diagnostic clinician practices. Of note, the SPRFIT also consistently reported very high (between 95-100 percent) compliance rates for accurate completion of Page 1 of the discharge custody check (CDCR MH-7497) forms, in contrast to this reviewer's finding of only 81 percent compliance for the same time period.

NKSP reported one serious suicide attempt involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period (in April 2023), and although a brief case presentation was provided to the reviewer, the case presentation was not included in the meeting minutes as required by policy. The facility did not provide any documentation for corrective actions resulting from this reviewer's prior assessment report and/or regional SPRFIT audits. A current SPRFIT LOP was in effect, as well as LOPs consistent with the following three required CCHCS policies from 2021 related to the SPRFIT: "Crisis Intervention Team

Policy and Procedure," "Suicide Risk Management Program Policy and Procedure," and "Local Operating Procedure for Inmate-Patients Receiving Bad News."

Because NKSP is a RC, the SPRFIT was required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum, effective January 27, 2021, to ensure that: suicide prevention placards were displayed in designated areas (including offices of the RC diagnostic clinicians); diagnostic clinicians were reviewing the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS; diagnostic clinicians were requesting IPs sign ROI forms when reporting histories of prior mental health services in the community; and diagnostic clinicians completed SRASHEs when IPs present with possible current risk for suicide. SPRFIT coordinators or designees were required to collect data and assess compliance with these four expectations, as well as report such findings during monthly SPRFIT meetings.

Review of SPRFIT minutes indicated that such data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was reported in January, February, and April 2023. However, the SPRFIT reported that 107 MH Screening Interview forms completed by RC diagnostic clinicians were reviewed during this three-month period, with only one case (less than 1 percent) requiring a request to complete an ROI form based upon prior mental health treatment. As detailed above, this was a very different finding than this reviewer's examination of RC cases during a similar time period.

**Training**: According to training records, 98 percent of custody personnel and 100 percent of nursing staff were currently certified in CPR. In addition, 98 percent of custody, 97 percent of medical, and 96 percent of mental health staff completed annual suicide prevention block training during 2022. Finally, as of June 2023, 93 percent of mental health clinicians had completed the SRE mentoring program, 97 percent had completed the seven-hour SRE training, and 93 percent had completed safety plan training.

**Recent Suicides**: NKSP experienced two suicides during the review period, both of which occurred in 2022. In the _**first**_ case (NKSP 6), the IP was found hanging from a ventilation grate by a sheet in his ASU cell during the afternoon of July 18, 2022, by a psychiatric technician. The IP entered the CDCR system for a second term on June 23, 2021 to serve a life sentence for murder, attempted murder, robbery, and multiple charges of assault with a firearm. He had been transferred to NKSP on May 18, 2022. He incurred three RVRs during his confinement, the most recent occurring on February 13, 2022 for battery on an IP with a deadly weapon. The IP was not known to be gang-affiliated. He was not married but had an eight-year-old daughter from a previous relationship. Records indicated that he did not have any telephone calls or visits with family members during his second CDCR term, but one of his sisters placed money on his account.

According to available records, the IP and several siblings were raised by their father after their mother died in a motor vehicle accident when he was approximately 18-months-old. He reported starting to use marijuana at age 9, cocaine at age 14, and both alcohol and methamphetamine until his early 20s. The IP dropped out of high school in the 11th grade and had a sporadic

employment history. He had an extensive history of both juvenile and adult offenses and spent a considerable part of his life incarcerated. The IP was initially paroled from his first CDCR term in 2016 before violating parole and returning to CDCR in 2018. He was subsequently discharged from CDCR in 2019. Other than brief mental health treatment received in county jail in 2014, the IP did not report any other history of mental illness or treatment in the community. He consistently denied any history of suicidal ideation or attempts.

Upon re-entry into CDCR, the IP screened negative for any mental health symptoms and was not admitted into the MHSDS. Other than receiving an additional three-year term for battery on an officer on May 27, 2022, his second CDCR term approximately one year was uneventful. Although this court hearing occurred a few weeks prior to his death, he did not appear to be stressed or upset about this legal outcome. The IP was only seen periodically by mental health staff when confined in restrictive housing and did not initiate any Health Care Services Request Forms during his confinement. He did not have any contact with psychiatry.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had several medical problems, including gastrointestinal discomfort, none were thought to be proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that although the IP consistently denied any mental health symptoms, "handwritten documents in his property indicated thoughts surrounding death in relation to killing other people, the underworld/other side, and inability to fight a curse/destiny. The writings do not reference himself personally, nor were they dated, but could potentially demonstrate depression and/or a thought disorder that Inmate _____ was unable to manage while at NKSP ASU."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) During the review of the Emergency Medical Response details from 1220 hours to 1240 hours, no documentation was found whether an AED shock was advised or not.

In the **_second_** case (NKSP 7), the IP was found unresponsive in his ASU cell during the afternoon of August 1, 2022. During the emergency response, two bars of soap were found lodged in his throat. The cause of death was listed as asphyxiation, with the manner of death being suicide. The IP entered the CDCR system for a third term on May 25, 2022, to serve a 32-month sentence for resisting a police officer, with the instant offense occurring only four months after release from his second CDCR term. He incurred one RVR during his short confinement, the incident occurring two days following admission whereupon he assaulted an officer. The IP was not known to be gang-affiliated. Records indicated that he had some family support evidenced by three telephone calls with his mother and half-sister in June 2022.

According to available records, the IP and at least two siblings were raised by parents in a very dysfunctional environment. Both parents were involved in substance abuse, and his father was frequently absent from the home, served time in prison, and was associated with white supremacist gangs. The IP was reportedly physically abused by several of his mother's partners and sexually abused by his step-grandfather at age 4. He and his brother were removed from the

home and placed with his maternal grandmother. However, while living with his grandmother, he often ran away from home and was frequently absent from school. He never graduated from high school and subsequently obtained a GED in CDCR. The IP began drinking at the age of 12 and this substance use escalated into illegal drugs that included methamphetamine. He did not have a stable record of employment. The IP had an extensive juvenile and adult arrest history and he spent extensive time in juvenile hall, the California Youth Authority, county jails, and two prior CDCR terms. According to scant available records, he was psychiatrically hospitalized as a teenager or a short time "due to family problems" and his "negative conduct." He also participated in a residential drug program in 2015. The IP reported a suicide attempt in either 2018 or 2019 following a breakup with his girlfriend.

Upon re-entry into CDCR in May 2022, the IP was reinstated into EOP level of care where he had been treated upon discharge from CDCR a few months earlier. While he did not endorse any mental health symptoms during his initial screening, his brief confinement at NKSP was marked with periodic symptoms of psychosis despite his compliance with psychotropic medication (through a PC-2602 order). For example, on May 27, 2022, two days after he arrived at NKSP, the IP submitted a Health Care Referral Form complaining of hearing voices. A short time later, he attempted to assault an officer without provocation during the collection of meal trays and was re-housed in the ASU. Progress notes indicated that the IP occasionally exhibited odd behaviors and made odd statements. For example, during an appointment with his psychiatrist, he stated, without context, "I'll take the cross," and exhibited thought blocking. When a nurse came by to check his vitals, the IP inexplicably reached through the food court and grabbed the cord of the blood pressure monitor. He refused to release the cord and was subsequently pepper sprayed.

According to the CDCR reviewer in this case, "Most progress notes completed from June 13, 2022 onwards did not include some standard components, specifically, the patient's subjective report and the interventions applied. In addition, some content appeared to be carried from note to note. Although the content of the notes suggested contacts were completed at cell-front, the notes did not state whether the patient refused a confidential meeting. Because no appointments were made for these contacts, the setting and length of contacts could not be gathered from scheduling information. Lastly, the notes were often not completed contemporaneously."

Three SRASHEs were completed on the IP in June 2022. The first assessment was completed on June 6, 2022 as part of the initial reception center assessment process. The following week on June 12, 2022 while on his 14-day COVID quarantine, the IP expressed suicidal ideation which resulted in activation of the CIT. During the assessment, he became uncooperative, and although continuing to endorse SI, he refused to respond to any follow-up questions other than stating that he could not stay in his ASU cell. The clinician concluded that there was not sufficient information to refer the IP to an MHCB. While still on quarantine status approximately one week later on June 20, 2022, the CIT was again activated following the IP's suicidal threats to a nurse attempting to take his vital signs in the ASU. He was again uncooperative with the CIT clinician and refused to answer any questions, simply stating that "I'm sick of being in the cell, I shouldn't be in here, it's not right." The clinician suspected that the IP was threatening suicide in order to obtain a housing change and decided that a MHCB referral was not appropriate. All

three SRASHEs completed that month assessed the IP at moderate chronic and low acute risk for suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, he did not have any significant medical problems that were thought to be proximate causes of his death.  Although the IP did not leave a traditional suicide note, an undated handwritten note found in the cell had a religious tone and contained emergency contact information for both his mother and half-sister.  The CDCR reviewer theorized: "Although speculative, Mr. ____ may have been experiencing more serious symptoms of psychosis than were apparent and, if so, the symptoms may have been the primary driver of his actions on the day he died.  It is unclear what Mr. ____'s intent was, that is, whether the ingestion was driven by a psychotic rationale unrelated to suicide or whether the ingestion was undertaken with the intent to die."

The Suicide Report contained three (3) recommendations for corrective action through a QIP:

>1) Most of the weekly mental health progress notes completed from June 12, 2022, onwards did not contain some standard components, specifically, the patient's subjective report and the interventions applied.  In addition, some content appeared to be carried from note to note, and although the content of the notes suggested contacts were completed at cell front, notes did not state whether the patient refused a confidential meeting.  In addition, most of the weekly mental health progress notes from June 12, 2022 forward were not completed on the day of clinical contact.  Per the EHRS end-user training for mental health (training module 4: Documentation): "Documentation must be completed at the point of care." Lastly, although Mr. ____ had weekly mental health contacts per the MHSDS *Program Guide*, weekly appointments were not scheduled.  Scheduling appointments is required by the EHRS workflow for Administrative Segregation (specifically, 1100-20 Mental Health Administrative Segregation Unit).  All of the aforementioned issues involved the same mental health clinician.

>2) The request for the Emergency Response Vehicle did not occur until after staff restrained Mr. ____, removed him from his cell, secured him on a gurney, initiated CPR, and transported him outside of the housing unit.

>3) On May 27, 2022, Mr. ____ submitted a CDCR 7362 Health Care Services Request Form that had no triage noted in EHRS.

**Audit Summary**:  Adequate practices were found in the observed intake screening by nursing staff, PT rounds, Guard One compliance, IDTT meetings, out-of-cell activities for MHCB patients, completion of SRASHEs and 5-day follow-up assessments for patients   discharged from both the MHCB unit and alternative housing, and both CPR and suicide prevention training.  There were numerous deficiencies found that required corrective action, including inadequate review of county jail records by RC diagnostic clinicians and failure to request IPs to complete ROI forms in applicable cases, inadequate completion rates for SRASHEs required for emergent/urgent mental health referrals for suicidal behavior, low compliance rates for

completion of safety plans for IPs discharged from alternative housing, inadequate safety plans and faulty MHCB supervisory review of those safety plans for patients discharged from the MHCB, low compliance rates regarding discharge custody check forms by clinicians, and SPRFIT audits resulting in compliance rates different than this reviewer.

### 12) **Kern Valley State Prison (KVSP)**

**Inspection**:  July 13-14, 2023 (previous suicide prevention audit was on November 17-18, 2021).  KVSP housed approximately 2,717 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed two new admissions by two different nurses during the **Intake Screening** process in R&R unit on July 13.  The nurses were each observed to be asking all of the questions on the Initial Health Screening forms and correctly entering information in the EHRS.  The doors to the nurse's offices were closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

In addition, this reviewer observed daily **PT Rounds** in the STRH (ASU-1) unit on July 13, 2023.  The rounds in ASU-1 were unremarkable and two PTs were observed to be adequately conversing with both caseload and non-caseload IPs, as well as entering Psych Tech Daily Rounds information into EHRS for each caseload IP.

**Housing**:  KVSP had a 20-bed CTC, with 12 designated **MHCBs** previously found to be suicide-resistant.  There were 8 patients in the MHCB unit during the onsite assessment, with two cells redlined for repairs.

In addition, there were seven (7) **New Intake Cells** in the ASU-1 and five (5) new intake cells in ASU-2, an increase of two new intake cells from the previous assessment.  ASU-2, housing GP IPs, had been closed due to under-staffing, but scheduled to reopen on July 17, 2023.  In addition, B-1 Unit was utilized as an overflow ASU for GP IPs.  Upon inspection, B-1 had 16 new intake cells that had been constructed sometime during 2022.

There were concerns regarding the placement of new intake IPs in non-intake cells within the STRH (ASU 1) unit.  This reviewer observed that there were two new intake IPs housed in non-intake cells during the afternoon of July 14, 2023.  In the first case, the IP had been admitted into the unit on July 11, 2023 and initially housed with a cellmate until July 13.  Per policy, the IP was required to be assigned a new cellmate or moved to a new intake cell within eight hours.  Neither was done and the IP continued to be housed alone in a non-intake cell.  The second case (KVSP 1) was more concerning.  The IP had been sent to the STRH unit on July 3, 2023 and almost immediately expressed suicidal ideation and allegedly overdosed on his medication. He was directly admitted into the MHCB unit during the late evening of July 3.  The patient remained in the MHCB unit for nine days before being discharged and returned to the STRH unit on July 12, 2023.  Instead of being housed in a new intake cell as required, he was placed in a non-intake cell until as observed by this reviewer two days later on July 14, 2023.

192

This reviewer subsequently conversed with the unit sergeant who initially stated that these two incidents were somehow related to a use-of-force incident with another IP a few hours early on July 14, 2023, but such an incident was unrelated to the requirement to move these two IPs to new intake cells on July 12 and July 13, respectively. The sergeant also stated that the STRH unit exceeded capacity of the seven new intake cells on a regular weekly basis and that the unit needed additional new intake cells.

Finally, **Alternative Housing** cells to temporarily house IPs awaiting MHCB placement could be utilized in designated cells in all four yards but were primarily located in the STRH (ASU-1) unit and C-4 unit. Alternative housing was used on less than a daily basis. From April through June 2023, there were 69 IPs placed in alternative housing, and all were released within 24 hours. Only 54 percent (37 of 69) of the IPs were subsequently admitted into an MHCB, with a rescission rate of 46 percent. This reviewer examined the EHRS charts for 25 rescinded cases and found that the required SRASHEs were completed in 88 percent (22 of 25) of the cases, with five-day follow-up assessments completed in all applicable cases. However, the required safety plans were found to be problematic, with only 40 percent (10 of 25) of the cases having adequate safety plans, 12 percent (3 of 25) having inadequate safety plans, and 48 percent (12 of 25) not having any safety plans.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit. In addition, patients not on suicide observation status were required to be observed at 30-minute intervals. During June 2023, the Mental Health Observations Reporting Tool indicated that 10 patients were on observation status in the MHCB unit, with 97 percent compliance with timely observation of patients on Suicide Precaution and 89 percent compliance with timely observation of patients on Suicide Watch. Of note, the medical chart review found that two of the current MHCB patients were not seen by either a primary clinician or psychiatrist on one day (July 8, 2023) of their placement.

This reviewer continued to find concerning practices regarding use of "Q-30 minute" observation within the MHCB unit. During the previous assessment in November 2021, this reviewer observed several IDTT meetings at KVSP in which patients expressed passive suicidal ideation and despite this concerning behavior, remained on Q-30-minute observation with "full issue" clothing. During the current assessment, a similar practice was found in the medical chart review of at least two current MHCB patients. In one case (KVSP 1) previously referenced above, a clinician's progress note dated July 12, 2023, stated that the patient "reports passive SI, makes conditional threats of SH (self-harm)," but remained 30-minute observation. In a second case (KVSP 2), the same clinician wrote a progress note on the same day (July 12) stating "PT reported passive SI with no plan or intent." The patient remained on 30-minute observation.

Finally, a review of **Guard One** data for a recent 24-hour period found 96 percent compliance in the STRH (ASU-1) unit with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergent/urgent mental health referrals for the six-month period of January through June 2023. A sample EHRS review of 50 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 98 percent (49 of 50) of the cases. Despite

this high compliance rate, there were concerns found in the lack of SRASHE completion in one of the suicides (<u>KVSP 5</u>) during the review period, as discussed below.

In addition, the **Crisis Intervention Team** was launched at KVSP in October 2018 and available seven days a week from 7:00 a.m. to 5:00 p.m.  This reviewer did not have an opportunity to observe the CIT process during the onsite assessment.

One **IDTT Meeting** were observed in the MHCB unit on July 13, 2023.  Overall, there was good team participation, discussion regarding reason for admission (significant impairment due to mental illness), diagnoses, medication, and observation level and issue.  The patient was referred to ICF level of care, therefore, given the reason for admission and ICF referral, discussion regarding safety planning was not applicable.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for the eight patients who were housed in MHCB unit during the on-site assessment.  The review found that all of the patients had provider orders that approved all out-of-cell activities following the first day of admission.  With the exception of telephone call access, each patient was offered multiple opportunities for showers and yard.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 15 patients discharged from the unit during May and June 2023, had been admitted into the MHCB for DTS, and remained at KVSP.  The required discharge SRASHEs and five-day follow-up assessments were completed in all cases.  However, with regard to safety planning, the review found that only 20 percent (3 of 15) of the cases had adequate safety plans, with 73 percent (11 of 15) viewed as having inadequate safety plans, and 7 percent (1 of 15) did not have a safety plan.  The following problematic safety plan (<u>KVSP 3</u>), completed on June 14, 2023 and containing the same repetitive narrative in each section, exemplified the problem:

MH Safety Plan

<u>Safety Planning Reason</u>: Discharge from MHCB/PIP or Alternative Housing
<u>Patient Participate - Warning Signs</u>: Yes
<u>Warning signs - Patient focused</u>: I was never suicidal.
<u>Warning signs - Clinical Impressions</u>: ***Pt has a history of reporting suicidal ideation when his perceived needs are not being met (custody issues) which resulted in him being internally admitted to MHCB, which then resulted in annoyance and frustration.  Pt. has not engaged in any self-harming behaviors and has been observed to be attending yard and RT groups.  Pt. could benefit from learning how his behaviors and choices can create other consequences for himself (admittance to MHCB he notes not being suicidal); identifying distress tolerance and being able to sit in unpleasant environments and negative emotions.***
<u>Helpful reducing self-harm - Patient</u>: Pt reports, 'that's the thing, I was never suicidal, I didn't want to come here.'

194

<u>Helpful reducing self-harm - Clinical</u>: ***Pt has a history of reporting suicidal ideation when his perceived needs are not being met (custody issues) which resulted in him being internally admitted to MHCB, which then resulted in annoyance and frustration.  Pt. has not engaged in any self-harming behaviors and has been observed to be attending yard and RT groups.  Pt. could benefit from learning how his behaviors and choices can create other consequences for himself (admittance to MHCB he notes not being suicidal); identifying distress tolerance and being able to sit in unpleasant environments and negative emotions.***

<u>Reduce Risk Factors - Patient</u>: Pt reports, 'that's the thing, I was never suicidal, I didn't want to come here.' Pt reports looking forward to going back to ASU and finding out his ICC plan.

<u>Reduce Risk Factors - Clinical</u>: ***Pt has a history of reporting suicidal ideation when his perceived needs are not being met (custody issues) which resulted in him being internally admitted to MHCB, which then resulted in annoyance and frustration.  Pt. has not engaged in any self-harming behaviors and has been observed to be attending yard and RT groups.  Pt. could benefit from learning how his behaviors and choices can create other consequences for himself (admittance to MHCB he notes not being suicidal); identifying distress tolerance and being able to sit in unpleasant environments and negative emotions.***

<u>Patient History of Self Harm</u>: No

<u>Safety Concerns Identified</u>: No

<u>Environmental Concerns Identified</u>: No

<u>Patient Participate - Protective Factors</u>: Yes

<u>Protective Factors - Patient focused</u>: daughter and 4 sisters and 2 brothers.  Pt. reported that his family takes 'well care of me,' and is future oriented in returning back to ASU and working on his 602.

<u>Protective Factors - Clinical Impression</u>: ***Pt has a history of reporting suicidal ideation when his perceived needs are not being met (custody issues) which resulted in him being internally admitted to MHCB, which then resulted in annoyance and frustration.  Pt. has not engaged in any self-harming behaviors and has been observed to be attending yard and RT groups.***

<u>Enhanced Factors - Patient focused</u>: Getting a loaner TV.

<u>Enhanced factors - Clinical Impressions</u>: ***Pt has a history of reporting suicidal ideation when his perceived needs are not being met (custody issues) which resulted in him being internally admitted to MHCB, which then resulted in annoyance and frustration.  Pt. has not engaged in any self-harming behaviors and has been observed to be attending yard and RT groups.  Pt. could benefit from learning how his behaviors and choices can create other consequences for himself (admittance to MHCB he notes not being suicidal); identifying distress tolerance and being able to sit in unpleasant environments and negative emotions.***

The above safety plan was concerning for several reasons.  Not only was it inadequate because it kept inappropriately repeating the same narrative throughout most sections, but the clinician had

identified a concern in which the patient "*has a history of reporting suicidal ideation when his perceived needs are not being met.*"  In such cases, clinicians had previously been instructed during safety plan training to identify "patients who engage in self-harm or threats of self-harm to affect changes in their environment (e.g., housing moves, drug-seeking, interpersonal stressors) and refocus the plan to address such behavior."  In fact, the Safety Plan template has a section entitled "Self-Harm to Affect External Changes (under the "Patient History of Self-Harm" domain) to address this assessed behavior.  In the above case, the clinician failed to address the behavior they had identified, as well as failed to offer any possible solutions to the patient's secondary motivation.  Perhaps most importantly and discussed below, this troubling safety plan received a "pass" score during the MHCB supervisory review.

In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from January through June 2023.  Data for 149 safety plans was received.  This reviewer's examination of the data found that, although the supervisory review of all 149 cases was timely, "pass" scores were achieved in 99 percent (148 of 149) of the cases (including KVSP 3 above), in stark contrast to this reviewer's examination of safety planning.

Finally, the process by which IPs were provided Discharge Custody Checks at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 120 cases of IPs discharged from a MHCB or alternative housing placement who remained at KVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through June 2023.  The review found that 87 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with errors noted in clinicians not competing Page 1 each day.  Most of the custody checks were recommended for 48 hours or more by clinicians.  In addition, 85 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or missing check sheets.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2022 through May 2023) found that meetings had quorums of all required mandatory members or designees for all six months.  Meeting minutes included discussion on compliance data and improvement projects, as well as the status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits.  Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3")

during the review period, case presentations and/or root cause analyses (RCAs) were not required. Monthly tracking and discussion of SRMP patients was not included in meeting minutes as required. The meeting minutes were otherwise unremarkable.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required two CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News" and "Crisis Intervention Team Policy and Procedure." Of note, an LOP for the "Suicide Risk Management Program" was not provided to the reviewer. Previously, it had been contained within "Operational Procedure No. 1051: Suicide Prevention," but was not in the most recent version of OP No. 1051 dated March 16, 2023.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 97 percent of medical staff, and 100 percent of mental health staff had completed annual suicide prevention block training during 2022. Finally, as of June 2023, 95 percent of mental health clinicians had completed the SRE mentoring program, 92 percent received the seven-hour SRE training, and 92 percent completed safety plan training.

**Recent Suicides**: KVSP experienced three (3) suicides during the review period, two of which occurred in 2022. In the ***first*** case (KVSP 4), the IP was found hanging from the upper bunk by a shoestring in his Alternative Housing cell during the late afternoon of May 7, 2022. He was on Suicide Watch status at the time of his death. The IP entered the CDCR system for a third term on December 12, 2014 to serve a seven-year sentence for assault with a deadly weapon and vehicle theft. However, he subsequently received a total of 23 additional years for separate assaults on other IPs during the period of 2017 through 2021. The IP was transferred to KVSP on February 5, 2020. He incurred 15 RVRs during his confinement, the most recent occurring on December 18, 2020 for disobeying an order. The IP was considered to be an inactive gang member. He was married and had four children, but the status of his marriage was unclear. The IP had periodic visits from friends and family until December 2021, as well as telephone calls with various family members in the 60 days leading up to his death. Finally, his relationship with a female friend (alleged fiancé) apparently ended during a telephone call on April 23, 2022, a few weeks prior to his death.

According to available records, the IP and three siblings were raised by their parents. His childhood was remarkable for reported sexual abuse perpetrated by his brother. Of note, the instant offense that resulted in the current CDCR term was an assault on his brother that was reportedly in retaliation for the sexual abuse he suffered as a youth. In addition, the IP's mother and two sisters had histories of mental illness and suicidal behavior. He attended school through the ninth grade. The IP began using illegal drugs at age 13 that eventually progressed to methamphetamine and heroin in his 20s. He also had an extensive juvenile and adult arrest history that was precipitated by his local street gang affiliation. The IP had several confinements in the California Youth Authority, as well as two prior CDCR terms. When not incarcerated, he had an approximate 20-year employment history as a forklift operator. However, upon arrest for the instant offense, the IP was on disability for a back injury. Although reporting a prior history of mental illness in the community, he was not aware of his diagnosis. In addition, the IP

reported three prior suicide attempts, also occurring in the community.  He was not a participant in the MHSDS during his two prior CDCR terms.

Upon re-entry into CDCR in December 2014, although initially screening negative for any mental health symptoms and not admitted into the MHSDS, the IP was almost immediately placed in administrative segregation and then began reporting symptoms of fluctuating depression, occasional auditory and visual hallucinations, occasional command auditory hallucinations to harm himself.  He was given a provisional diagnosis of depressive disorder, prescribed psychotropic medication, and enrolled at the 3CMS level of care.

From December 2014 through March 2019, the IP was consistently treated at 3CMS and presented as generally stable, but also reported fluctuating depression and suicidal ideation.  On March 19, 2019, he was seen in the TTA following seven self-inflicted cuts to his left wrist.  CIT was activated and he endorsed suicidal ideation due to family issues, gang concerns, and auditory hallucinations to kill himself.  He was admitted into the MHCB unit.  Approximately 10 days later on March 28, 2019, the IP was discharged to EOP level of care.  In late May 2019, he was again admitted into the MHCB unit or self-injurious behavior.  He subsequently told a clinician that he was engaging in self-harm in order to relieve the stress related to isolation, a pending case for attempted murder, and lack of family contact.  The IP was later discharged back to EOP. His mental health, however, continued to decompensate and he was referred to ICF level of care in August 2019.  The IP's diagnosis was revised to bipolar affective disorder and he was subsequently returned to EOP in February 2020.

During the next several months, the IP appeared to stabilize, but he was again referred to an MHCB due to suicidal ideation in October 2020.  He also appeared to be under the influence of heroin.  The IP eventually returned to EOP and was referred to the MAT program.  Once in the program, the IP began to demonstrate sobriety and was focused on improving his mental health and family relationships.  From November 2020 through April 2022, the IP remained at EOP level of care, with periodic lapses of sobriety.  He did not have any subsequent MHCB referrals and/or incidents of self-harm, and his last SRASHE was completed on October 12, 2021 with a finding of high chronic and low acute risk for suicide.  The IP's last IDTT meeting occurred on April 27, 2022 and his level care was decreased to 3CMS, with the clinical justification of "symptom improvement, positive use of coping skills, active participant treatment, minimal reported symptoms, lack of recent suicidal ideation, and lack of self-harm behaviors."  His diagnoses were revised to major depressive disorder and opioid use disorder.

On the morning of May 7, 2022, approximately 10 days after his last IDTT meeting, the IP was observed to be actively bleeding from his left wrist caused by superficial lacerations.  He was escorted to the TTA and medically treated.  He expressed suicidal ideation and stated he took methamphetamine, an unknown number of pills, and was also experiencing chest pain.  He was subsequently transported to an outside hospital for a higher level of medical treatment.  The IP returned to KVSP during mid-afternoon of May 7 and at approximately 4:26 p.m. that day, the TTA nurse received orders from the chief psychiatrist to place the IP on "Watch 1:1, self-harm behavior and suicidal statements," with the MH Patient Issue order reading "safety, safety smock, safety mattress/regular." The IP was escorted to Alternative Housing for Suicide Watch. He was not seen by any mental health clinicians, and there was no further documentation in the

medical chart until approximately one hour later at 5:34 p.m. when the IP was found hanging in his Alternative Housing cell. A subsequent investigation found that the IP was not on continuous observation while on Suicide Watch status in Alternative Housing.

Prior to May 7, 2022, the CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the IP was contemplating suicide. However, given the fact that the IP was on Suicide Watch status at the time of his death, staff were well aware of his risk for suicide. In addition, although he had several medical problems, none were thought to be proximate causes of his death. The IP did not leave a suicide note, although he sent electronic letters to various family members during the early morning of May 7 indicating that he loved them and instructing them not to respond because he would not have access to his tablet after that day. The CDCR reviewer theorized that: "Throughout his incarceration, his chronic suicidality was documented, along with statements of not planning to grow old in prison. He also spoke to clinicians about the stress and hopelessness experienced as a result of the additional prison time he accumulated. He shared with a fellow inmate that he was under the stress (depressed, paranoid) because of this STG dropout status, long sentence, and belief that he would never go home to his family. Moreover, in the past, he appeared at increased risk of suicide when under the influence of illicit substances. Given his reported use of substances, he likely had the courage to carry out a premeditated plan and his life."

The Suicide Report contained seven (7) recommendations for corrective action through a QIP:

> 1) There were multiple concerns with the completion of the MH Master Treatment Plans on September 8, 2021, December 1, 2021, February 23, 2022 and April 27, 2022. Please see *Conclusions* section for further details.

> 2) On May 7, 2022, at approximately 1626 hours, Inmate _____ returned from the hospital, and as a result of recent engagement in self-harm and reported suicidality, a telephone order for suicide watch was placed by the on-call psychiatrist. Per KVSP leadership, there was not an available crisis clinician to complete the evaluation for suicidality immediately, thus he was transferred to an Alternative Housing unit cell. Given the time he returned from an outside hospital, it is not clear why a clinician was unable to assess him prior to transfer to Alternative Housing, as a face-to-face assessment was warranted.

> 3) Psychiatry: As relates to an individual psychiatry appointments/contacts, there were several instances when the frequency of psychiatry contacts was inadequate; the time intervals between psychiatry contacts were greater than 30 days (which is longer than that allowed by the program guide).

> 4) During the review of the incident, it was identified the activation of the Emergency Medical System (calling 911) did not take place until approximately five minutes after the emergency was observed.

5) During the review, it was noted Inmate _____ was not provided a suicide-resistant bed while in alternative housing as outlined in *12.05.301Housing of Patients Pending Mental Health Crisis Bed Transfer* policy.

6) During the review of the incident, it was noted custody staff was assigned to conduct the 1:1 observation. KVSP Hiring Authority has identified concerns with staff actions prior to and during the actual incident. These concerns will be addressed by the Hiring Authority.

7) During the review of the incident, it was noted custody staff did not remove inmate _____'s personal property (tennis shoes) prior to securing him in Alternative Housing. KVSP Hiring Authority has identified concerns with staff actions prior to and during the actual incident. These concerns will be addressed by the Hiring Authority.

In the ***second*** case (KVSP 5), the IP was found hanging from the ventilation grate by a sheet in his STRH cell during the early morning of June 13, 2022. He entered the CDCR system on April 14, 2010 to serve a 13-year sentence for assault with a deadly weapon. The IP was transferred to KVSP on July 3, 2020. In August 2020, he received an additional two-year sentence for possession of a weapon. He incurred 16 RVRs during his confinement, the most recent occurring on May 12, 2022 for battery on another IP. The IP was considered to be gang-affiliated. He was unmarried but reported having a daughter and step-daughter from prior relationships. The IP had family support through his mother, sister, and a female friend exemplified through visits up through 2021, and periodic telephone calls and letter correspondence with his mother and female friend up until his death.

According to available records, there were inconsistent reports that either the IP was born into an intact family unit consisting of his parents and one sister or born into an unstable environment that involved parental gang involvement, drugs, and criminal behavior. Reports also indicated a family history of mental illness and suicidal behavior. The IP attended school through the 11th grade when he was expelled for assaulting a peer. He had a minimal employment history. The IP began using illegal drugs at an early age, including marijuana, cocaine, and methamphetamine, and records indicated that this drug use continued on a daily basis prior to, and throughout, most of his incarceration. He also had an extensive juvenile and adult arrest history that was precipitated by his local street gang affiliation and resulted in juvenile hall, California Youth Authority, and county jail confinement. The IP's history of mental illness in the community was limited to his report of auditory hallucinations beginning at age 5 when his father allegedly died, and an unrelated diagnosis of ADHD as a teenager.

Upon entry into CDCR, the IP screened negative for any mental health symptoms and was not initially admitted into the MHSDS. However, approximately one month later, he was placed at the 3CMS level of care, and then elevated to EOP shortly thereafter after a finding that he was not attending to his activities of daily living. He was returned to 3CMS in August 2010. From 2010 through mid-2020, the IP appeared stable and functioning well within 3CMS, although he periodically experienced recurrent depression, anxiety, and auditory hallucinations. Diagnoses varied and included schizophrenia, major depressive disorder, mood disorder, polysubstance

abuse disorder, and antisocial personality disorder.  Records indicated he inconsistently accepted psychotropic medication.

The IP had three MHCB placements during his confinement, all for danger to self, with the last occurring in March 2020.  The precipitants to the last admission were on-going substance abuse, low distress tolerance, insufficient coping skills and non-compliance with psychotropic medication.  His last SRASHE (completed in June 2021) assessed a moderate chronic and low acute risk for suicide.  Of note, CDCR reviewer in this case found several deficiencies with this SRASHE, including the recording of incorrect information and underestimation of acute risk.  During the next several months, the IP appeared to stabilize, with his treatment team indicating that he appeared motivated for treatment and was medication complaint.  In March 2021, the IP became enrolled in the MAT program, but continued to struggle with substance use throughout the remainder of the year.  Beginning in July 2020 (and continuing through June 2022), his diagnoses were unspecified schizophrenia and other psychotic disorder, alcohol use disorder, and amphetamine use disorder.  He continued to be treated at EOP level of care.

Beginning in February 2022, the IP's mental health and overall behavior began to deteriorate.  He began to refuse MAT appointments.  The following month, he began to isolate and refused most mental health appointments, stating "that he was dealing with some stuff he didn't want to talk about."  In April 2022, the IP confided to his clinician that his mother had dementia and did not recognize him.  He was fighting with peers, and reported his depression and anxiety at "10 out of 10." On May 4, 2022, the IP reported he did not want to be in the EOP program anymore, and three days later on May 7, 2022, his previous cellmate (KVSP 4) died by suicide.  Five days later on May 12, 2022, the IP was placed in the STRH unit for battery on another IP.  He continued to complain about high levels of anxiety exacerbated by safety concerns related to his gang affiliation.

During his last clinical contact on June 8, 2022, the IP confided to his clinician that he had been told his mother had been diagnosed with stomach cancer and added, "if my mom goes, it's gonna be all bad.  I know I'd try to hang myself again.  I've always had suicidal thoughts since I was a kid."  Although not expressing a specific plan for suicide, the IP endorsed passive suicidal ideation, a loss of energy, low motivation, poor appetite, ruminating thoughts, and worsening auditory hallucinations.  As the CDCR reviewer in this case noted, "Given the above concerns, it is unclear why a decision not to complete a SRASHE was made or if a level of care change was considered."  The IP requested to see a psychiatrist and an appointment was pending at the time of his death five days later on June 13, 2022.

With the exception of presenting with passive suicidal ideation on June 8, 2022, the CDCR reviewer in this case did not find any other precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, although he had several medical problems, none were thought to be proximate causes of his death.  The IP did not leave a suicide note.  The CDCR reviewer theorized that the IP "had a desire to parole and in the weeks preceding his death, during phone calls to a friend, spoke about looking forward to being released, becoming his mother's caretaker and reconnecting with a previous girlfriend and building a future together…..After his transfer to STRH upon receiving information that his

mother had cancer, it appears he became overwhelmed by fear, not only fear of his own life but now his mother's, and may have lost all hope."

The Suicide Report contained seven (7) recommendations for corrective action through a QIP:

1) Problems were identified with the SRASHE completed on June 2, 2021, and the decision not to complete a SRASHE on June 8, 2022. Please see *Conclusions Section* for further details.

2) There were multiple concerns identified in the MH Master Treatment Plans (MTP): May 4, 2022, May 4, 2022, February 9, 2022 November 17, 2021, and September 8, 2021. Please see *Conclusions Section* for further details.

3) Between February and May 2022, documentation suggests Inmate _____ was experiencing increased symptoms, including worsening depression and anxiety, isolation, ongoing drug use and anger. The documentation during the above specified period and on June 8th did not discuss at what point a higher level of care might be considered. The documentation between February and May did not include the Plan/Disposition and Estimate Length of Stay sections of the weekly progress notes due to using the Free Text template rather than the MHPC Note template. Given his worsening mental health symptoms, it is unclear as to why a higher level of care was not considered during these times.

4) As relates to an individual psychiatry appointments/contacts, there were more than several instances when the frequency of psychiatry contacts were inadequate; the time intervals between psychiatry contacts were greater than 30 days (which is longer than that allowed by the program guide). Response to no-shows and refusal should also be reviewed and improved to lessen the interval between psychiatry contacts when the patients do not attend psychiatry appointments. Additionally, while containing mostly adequate individualized information, psychiatry documentation often contained copied and pasted sections from previous notes, including typos; psychiatry documentation must be individualized to reflect the unique interactions/evaluations occurring during each contact.

5) Based on a review of the incident, there are concerns with staff actions prior to, and during the actual incident (related to responding with the required emergency equipment). These concerns are being addressed by the KVSP Hiring Authority for further review.

6) During the review it was noted the activation of the Emergency Medical System (Calling 911), did not take place until approximately seven minutes after the emergency was first observed and reported.

7) During the review of the Psychiatric Technician (PT), on May 12, 2022 no weekly PT notes were located.

In the **_third_** case (KVSP 6), the IP was found hanging from the ventilation grate by a sheet in his SNY cell during the afternoon of September 30, 2023. He entered the CDCR system on October 25, 2013 to serve more than a 34-year sentence for 2nd degree attempted murder and other offenses. The IP was transferred to KVSP on May 17, 2023. He incurred 33 RVRs during his confinement, the most recent occurring on February 16, 2023 for conspiracy to distribute a controlled substance. The IP was considered to be gang-affiliated. He was unmarried but had a daughter from a prior relationship. The IP had family support through visits, telephone calls, and letter correspondence.

According to available records, the IP was the oldest of five siblings born into an intact family unit. He left school in the 9th grade and obtained his GED in CDCR. Beginning at age 13, he began using marijuana and his drug use eventually led to regular use of both methamphetamine and heroin. There was no reported history of mental illness or suicide for either the IP or other family members. He had a significant history of gang involvement that led to both a juvenile and adult arrest history. This gang involvement continued during CDCR confinement.

Upon entry into CDCR, the IP screened negative for any mental health symptoms and was not admitted into the MHSDS. During his incarceration, he was periodically seen by mental health staff as a result of routine contacts during placements in segregation. In addition, he also occasionally initiated mental health referrals in response to increased stress and depression related to his confinement and interactions with peers. In December 2018, the IP was seen by a clinician due to increased stress and, when asked about possible entry into the MHSDS, he expressed a desire "to be able to talk to a clinician regularly and to participate in groups." As a result, the IP was placed at 3CMS level of care with a diagnosis of adjustment disorder with anxiety. Records indicated that he programmed well and stabilized without the need for psychotropic medication. In February 2020, he was discharged from the MHSDS. Of note, the IP consistently denied suicidal ideation during his CDCR term. Two SRASHEs were completed during the course of confinement, each resulting in assessments of low chronic and acute risk for suicide. He did, however, recognize his continued struggles with substance use and agreed to enter the MAT program in April 2022. The IP was only periodically compliant with his abstinence from substance use.

The IP did not see a mental health clinician again until early March 2023 when he initiated a referral after being upset about losing his family visits due to an RVR. He received a follow-up assessment from a clinician on April 19, 2023 after initiation of a hunger strike related to being upset about his property and treatment when admitted into segregation. The IP's next and final contact with mental health occurred on August 30, 2023 after he was observed by a MAT provider to be "anxious, fearful, with loss of interest." He denied any suicidal ideation, and simply stated "the main reason I'm stressed is because I don't have a tablet! I need to talk to my people."

It was noteworthy that although the IP's gang involvement apparently ended in May 2023 when he was transferred to KVSP, a few months later on September 5, 2023, he endorsed safety concerns and was placed in segregation. During the investigation, the IP was unable and/or unwilling to provide identifying details about alleged enemies. On September 14, 2023, he was returned to his SNY housing unit. Two weeks later on September 28, the IP initiated a fight with

203

his newly assigned cellmate, resulting in the cellmate being removed from the cell.  The IP died two days later.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, although he had several medical problems, none were thought to be proximate causes of his death.  He did not leave a suicide note.  The CDCR reviewer theorized that the IP's "early age at incarceration, substance addiction issues, immaturity and impulsivity, as well as perceived safety concerns contributed to his death.  Coupled with anxiety and substance intoxication, the aforementioned factors with his lack of coping skills likely coalesced in his decision to end his life."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

1) Mr. ____ received a cell front contact for a staff referral (MHPC Progress Note; dated: 08/30/2023).  This contact did not appear to adequately address the referral concern associated with him presenting as 'anxious, fearful, [with] loss of interest.'  Furthermore, Mr. ____ did not receive the opportunity to be seen in a private and confidential environment, per policy.  *(See Disc/Conc section for additional information).*

2) Although an appropriate number of staff entered the cell, relieved pressure to the airway by physically lifting Inmate ____, and removed the noose by cutting above the knot, the noose was cut utilizing a pair of trauma shears.  The January 22, 2018, Memorandum titled, 'Response to Suicide Attempts by Hanging or Asphyxiation, Introduction of the Replacement Cut-Down-Tool, and Standardization of the Cut-Down-Kit,' states in part, '…*The inmate shall be cut down by cutting above the knot and then loosening the noose.  If necessary, utilize the ResQHook to remove the noose and/or ligature from the inmate's neck*…'

3) <u>CCI</u>: During the EHRS review, on March 17, 2023: A 7362 was submitted by the patient stating that he broke his hand.  RN triaged and saw the patient the same day.  RN conducted their visit and assessment at the cell front and observed the patient had limited motion of the hand with swelling to the third knuckle and part of the hand.  An order was placed for X-ray with a follow-up after the x-ray.  X-ray did not occur until 3/21/23 and no consult with a provider was noted in the documentation.  The findings were not consistent with the Nursing Protocol (Musculoskeletal-joint pain) and should have contacted a provider.

4) During the EHRS review of the EMR event on September 30, 2023, it was identified that the cervical collar and oropharyngeal airway were not applied to the patient before transferring him to the TTA.

5) During the EHRS review of the EMR event on September 30, 2023, it was identified that 4 doses of Naloxone were administered at 1-minute intervals instead of 2-3 minutes apart.

6) During the EHRS review of the EMR event on September 30, 2023, at 1702 hours, the patient's blood sugar level result was 35.  No interventions were identified to address the low blood sugar.

**Audit Summary**:  Adequate practices were found in intake screening, PT rounding in restrictive housing, SRASHE completion for emergent/urgent mental health referrals, and CPR and suicide prevention training.  There were several deficiencies found during the assessment that required corrective action, including new intake IPs held in non-new intake cells, inadequate or no safety planning for IPs discharged from alternative housing, MHCB patients expressing suicidal ideation continuing to be observed at 30-minute intervals, discharge custody checks, and inadequate safety plans for patients discharged from the MHCB, as well as supervisory review of those safety plans.

### 13)    Richard J. Donovan Correctional Facility (RJD)

**Inspection**:  August 21-22, 2023 (previous suicide prevention audit was on August 10-11, 2021).  RJD housed approximately 3,112 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on August 22, 2023.  There were two nurse's offices available for intake screening.  During the observed intake screening, the door to the office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality.  The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS.  The required suicide prevention placards (both English and Spanish versions) were placed inside each of the nurse's offices.

Daily **PT Rounds** in the B-6 (EOP Hub) and B-7 (3CMS and GP) restrictive housing units were observed on August 21-22, 2023.  The rounds were unremarkable and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload IPs and entering the information in the EHRS.

**Housing**:  RJD had 12 **MHCBs**, as well as two swing beds (for medical patients).  All 14 rooms were previously found to be suicide-resistant.  On August 21, 2023, 13 patients were housed in the unit.

Both ASUs (B-6 and B-7) each contained 12 retrofitted **New Intake Cells**.  During inspection of each unit, although all new intake IPs appeared to be housed in new intake cells, this reviewer examined the case of one IP (RJD 1) who was not placed in a new intake cell upon his entry into the B-6 Unit from the yard on August 12, 2023.  A few hours later, the IP expressed suicidal ideation and was placed on alternative housing status.  He was cleared from alternative housing the following morning (August 13), but as confirmed by SOMS, the IP continued to be housed in the non-new intake cell.

Finally, **Alternative Housing** to temporarily house IPs identified as suicidal and awaiting MHCB placement was extensively used at RJD, with multiple IPs placed on the status each day.  IPs on administrative segregation status requiring alternative housing remained in designated

cells in either B-6 or B-7 units, whereas most non-administrative segregation status IPs were housed in designated cells in Facility C, Housing Unit 15. All IPs were required to be provided bunks and observed on a continuous 1:1 basis. This reviewer was provided data on 600 IPs placed in alternative housing from May 2023 through mid-August 2023, a significant increase from the previous assessment when 216 IPs were in alternative housing during a comparable three-month period. The vast majority (97 percent) of these 600 IPs were housed under 24 hours, with the longest length of stay being 41 hours. There were several reasons why length of stays exceeded 24 hours for the remaining 18 IPs (3 percent), including delay in clinical assessment, low custody staffing resulting in transportation delay, and temporary unavailability of an MHCB. Only 23 percent of IPs housed in alternative housing were subsequently referred to a MHCB, with the vast majority (77 percent) returned to their housing units following rescission of their MHCB referral. This reviewer examined the EHRS files for 20 rescinded cases and found that assessments and five-day clinical follow-ups were completed in all applicable cases. However, only 75 percent (15 of 20) of required safety plans were completed, many of which were problematic.

Finally, on the morning of August 21, 2023, this reviewer observed two different clinicians conduct assessments of IPs placed in alternative housing in the B-6 (EOP Hub) unit the previous evening, as well as observed a clinician on August 22, 2023 assess an IP placed in alternative housing in the B-7 unit the previous evening. All assessments were conducted cell front and none of the three IPs were offered the opportunity for private out-of-cell assessments. All three assessments were very brief, well under five minutes each, and although the required SRASHEs were subsequently found to be completed and MHCB referrals rescinded in each case, the safety plans listed in each SRASHE were never discussed with any of the IPs.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit. In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff. During July 2023, the Mental Health Observations Reporting Tool indicated that 24 patients were on observation status in the MHCB unit, with 97 percent compliance with timely observation of patients on Suicide Precaution and 95 percent compliance with timely observation of patients on Suicide Watch.

In addition, it was noteworthy that 12 of the 13 patients in the MHCB on August 21, 2023 were on 30-minute observation. The reviewer examined the cases of several current or recent MHCB patients that remained on 30-minute observation despite consistently expressing suicidal ideation. The following four cases exemplify a concern that patients expressing SI and/or assessed as high risks for suicide were not under suicide observation status. One patient (RJD 2) consistently reported suicidal ideation without a plan during his entire MHCB placement from June 28 through July 6, 2023. When allowed full issue clothing, the patient refused and felt unsafe in anything other than a safety smock or partial issue (t-shirt/ shorts). Despite this behavior, he remained on 30-minute observation. On June 30, 2023, a MHCB clinician stated in a progress note that the patient "believes he can endorse high SI, with no objective signs of distress." Ironically, this same patient was observed by this reviewer three days later during an IDTT meeting at CSP/LAC on August 24, 2023. He consistently displayed the same behavior within both MHCB placements at RJD and CSP/LAC yet remained on Suicide Precaution status at CSP/LAC.

In the **_second_** case (RJD 3), the patient consistently threatened to engage in SIB if his needs were not met but remained on 30-minute observation from August 19 through August 23, 2023.  On August 22, an Acute ICF Pre-Admission Screening form noted that the "IP is accepted for PIP Acute.  He was unable to stabilize in MHCB within 10 days and assessed as a high acute risk for suicide," yet remained on 30-minute observation until transferred.  In the third case (RJD 4), the patient continued to be suicidal and assessed as a high acute risk of suicide justifying an APP referral on July 27, 2023, with a clinician stating in a July 27, 2023 progress note that: "Although he tends to minimize his sx, he continues to report when being prompted that he still has thoughts about suicide and does not act on them because he does not know how to kill himself….  He continues with HIGH ACUTE RISK for suicide."  Of note, the clinician also stated that the 30-minute observation was justified because although continuing to express suicidal ideation, the patient "has denied suicidal ideation with a plan."  The patient remained on 30-minute observation from July 18 through July 27, 2023, the date of APP transfer.

In the fourth case (RJD 5), this reviewer observed a MHCB clinician having an extensive cell front interaction with the patient on August 21, 2023.  The patient had a significant history of SIB.  He had recent severe lacerations on his forearms which required sutures.  The clinician summarized their interaction in a progress note on August 21 that included the following:

> Patient continues to demonstrate poor insight into his self-injurious behaviors and remains a danger to himself as well as others.  His desperation to use the phone to contact his wife has contributed to discord with custody resulting in aggressive posturing, refusal to comply with orders and him being assigned a cuffing chrono for out of cell activities.  The distress this has caused has also resulted in self-harm on 08/19 via removal of his staples.  He is not cooperative with or receptive to MH interventions and has not participated meaningfully in MH contacts since being admitted.  Patient remains a danger to himself and others at this time.  He is adamant self-harming behaviors are not with intent to die and identifies himself as a 'cutter.'

Despite such behavior and clinical concern, the patient remained on 30-minute observation.

In conclusion, a common narrative found in progress notes by MHCB clinicians to justify a 30-minute level of observation at RJD was that "IP has denied suicidal ideation with a plan within the last 24 hours.  He does not display any acute signs of distress.  He is engaging in safety planning and agrees to use call light system if starting to have unmanageable suicidal ideation."  However, according to the *Program Guide*, "an inmate with suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precaution or Suicide Watch…When an inmate is in a MHCB because of high risk of attempting self-injurious behavior, but is not in immediate danger, he or she shall be placed on Suicide Precaution" (12-10-15).  As indicated, the *Program Guide* does not have the prerequisite requirement of a suicide "plan" to justify Suicide Precaution status.  Finally, despite repetitive narrative in progress notes that patients were "engaging in safety planning," none of the four reviewed cases contained any documentation to support such a statement.

207

Finally, a review of **Guard One** data for a recent 24-hour period found a combined compliance rate of 90 percent in both B-6 and B-7 ASUs with the required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of February through July 2023.  A sample EHRS review of 50 cases of emergent/urgent mental health referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 90 percent (45 of 50) of the cases.  As indicated below, this compliance rate was offset by the finding that 14 percent (7 of 50) of the reviewed cases incorrectly involved completion of the Columbia-Suicide Severity Rating Scale (C-SSRS) screening form, a violation of CDCR directives.  In addition, there were concerns found in the lack of SRASHE completion in one of the suicides (RJD 8) during the review period, as discussed below.

Beginning in March 2020, due to mental health program modifications resulting from COVID-19, clinicians throughout CDCR were temporarily permitted to utilize the C-SSRS screening form as an alternative to completing the SRASHE.  This interim emergency practice was only permitted until CDCR resumed normal operations in July 2022.  Although the CMH at RJD informed this reviewer that the C-SSRS form was only being utilized due to the current staffing shortage at RJD, the CMH was informed that the mental health staffing shortage permeated most CDCR facilities, approval to utilize the form post-COVID-19 had not been solicited or granted, and all other facilities were no longer utilizing the C-SSRS screening form as an alternative to completing the SRASHE.  This reviewer also found that C-SSRS screening forms were sometimes incorrectly completed for IPs assessed in alternative housing at RJD.

In addition, the **Crisis Intervention Team** was initiated at RJD in June 2019.  The CIT was operational seven days a week from 8:00 a.m. through 10:00 p.m.  A review of several medical charts indicated that nursing personnel were sometimes absent from the CIT response.  This reviewer had an opportunity to observe a CIT response on August 22, 2023.  The team comprised a clinician, RN, and sergeant.  The assessment occurred in a confidential setting.  The crisis was adequately resolved and the IP (RJD 6) did not need a MHCB referral, but unfortunately, the clinician inappropriately completed the C-SSRS screening form, not a SRASHE.

This reviewer had the opportunity to observe only one **IDTT Meeting** within the MHCB unit during the on-site assessment.  A second case was held in absentia because the patient refused to attend the meeting.  During the observed IDTT meeting, there was good team participation, discussion regarding reason for admission (DTS), diagnoses, medications, and observation level and issue.  Because it was the patient's initial meeting, the primary clinician spoke briefly about coping skills to be offered in reducing DTS in a subsequent safety plan.

With regard to **Out-of-Cell Time** offered to MHCB patients, this reviewer examined the 114-A forms for 11 patients in the MHCB unit during the onsite assessment.  The 114-A forms of two patients were excluded from review because they had only been in the MHCB unit for two days or less. All 11 patients were cleared for out-of-cell activities by a provider on their first day of admission.  The review found that with the exception of telephone call access, each patient was

208

offered multiple opportunities for showers and yard. With the exception of one patient discussed above (RJD 5) who was provided multiple opportunities to utilize the telephone, most of the other patients had limited or no offering of telephone calls. Of note, during an IDTT meeting observed on August 21, the CC1 incorrectly informed a patient on maximum-security status that he was only eligible for a telephone call every two weeks. Following the meeting, a MHCT lieutenant spoke with the CC1 to reiterate that maximum-security patients were permitted weekly telephone calls.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the medical charts of 20 patients discharged during May through July 2023. The review found that the required SRASHEs were completed in each case, and 5-day follow-up assessments were completed in 90 percent (18 of 20) of the cases. In addition, the required safety plans were completed in 95 percent (19 of 20) of the cases, with two viewed as inadequate.

Further, CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), required MHCB supervisors or designees to review all discharge SRASHEs and safety plans for patients released from the MHCB. This reviewer was presented with data indicating that approximately 31 patients were discharged from the MHCB unit to a lower level of care during June and July 2023. The review found the MHCB supervisor or designee review of discharge SRASHEs and safety plans for patients released from the MHCB to be timely and adequate.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed for each IPs. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented initially presented with documentation of 600 cases of IPs discharged from a MHCB or alternative housing placement that remained at RJD from February through July 2023. An unknown number of these cases included IPs who were transferred to administrative segregation. Due to the large volume, a sample of 20 cases per month was selected, resulting in a total of 119 reviewed cases. The sampled cases excluded IPs transferred to administrative segregation (where observation at 30-minute intervals was required). The review found that only 80 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with a slight majority of cases recommending that custody checks continue for the full 72 hours of observation. In addition, only 74 percent of the "custody checks" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the clinician deficiencies were related to incomplete documentation and/or failure to discontinue the checks beyond 72 hours, whereas most of the custody deficiencies were related to gaps in documentation and/or missing documentation as to when the IP arrived to the housing unit. Of note, there were numerous outdated versions of Page 2 of the CDCR MH-7497 forms (dated January 2016) that contributed to the problem.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (January through June 2023) found that meetings had quorums of all required mandatory members or designees for all six meetings. In addition, meeting minutes included, but not limited to, discussion on compliance data, improvement projects, and monthly review of SMRP data. Documentation regarding the status of corrective actions based upon this reviewer's previous recommendations was not contained in SPRFIT minutes but reported separately. Further, there were two (2) serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, and very brief case presentations were included in the meeting minutes. Meeting minutes were otherwise unremarkable.

A current SPRFIT LOP (dated April 2023) was in effect, as well as local operating procedures (LOPs) consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team," and the "Suicide Risk Management Program Policy." Of note, the current SPRFIT LOP, dated April 2023, failed to identify the associate warden for health care access as a mandatory member of the SPRFIT. (However, the associate warden attended all of the monthly meetings.)

**Training**: According to training records, 100 percent of custody and 91 percent of nursing staff were currently certified in CPR. In addition, 92 percent of custody staff, 100 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of August 2023, 92 percent of mental health clinicians had completed the SRE mentoring program, 94 percent received the seven-hour SRE training, and 94 percent had completed safety plan training. These high rates of compliance were offset by the fact that three officers who responded to a recent suicide (RJD 8) were not in compliance with CPR training.

**Recent Suicides**: RJD experienced two (2) suicides during the review period. In the *__first__* case (RJD 7), the IP was found hanging from the property shelf by a sheet in his ASU cell during the early morning of January 26, 2023. He entered the CDCR system on November 7, 2000 to serve a 12-year sentence for 2nd degree robbery, and subsequently received more than 31 years for additional offenses while incarcerated, including the murder of another IP in 2006. The IP was transferred to RJD on March 28, 2022. He incurred 19 RVRs during his confinement, the most recent occurring on January 12, 2023 for gambling. The IP was considered to be gang-affiliated. He was unmarried and had no children. The IP had family support through visits, telephone calls, and letter correspondence with his mother, brother, and sister.

According to available records, the IP was the oldest of three siblings born into an intact family unit. Their parents separated when the IP was 12, and he was living with his mother at the time of the instant offense. He left school in the 11th grade and obtained his GED in juvenile hall. Beginning at age 14, he began using marijuana and his drug use eventually led to regular use of methamphetamine. The IP had a significant history of gang involvement that led to both a

juvenile and adult arrest history.  This gang involvement continued during CDCR confinement. Although there was no reported history of mental illness or suicide for either the IP or other family members, he did receive treatment for depression in the county jail.

Upon entry into CDCR in November 2000, the IP screened positive for major depression based upon mental health treatment he received in the county jail.  He was diagnosed with dysthymic disorder, enrolled in 3CMS level of care, and continued on psychotropic medication.  By February 2001, however, the IP was refusing his medication and requested to be removed from the MHSDS.  During the next several months, he denied any mental health problems or thoughts of suicide, and continued to request his removal from MHSDS.  In September 2001, the IP's diagnosis was changed to antisocial personality disorder, and he was told the request for removal from 3CMS would be considered in March 2002.  On March 14, 2002, the IP was seen by his IDTT who noted that his mental health symptoms had been in remission for over a year and he would be discharged from the MHSDS.  He remained out of the mental health program for over 21 years, and his only contact with mental health staff was through routine screening following restrictive housing placements.

On March 16, 2022, the IP submitted a mental health request requesting to speak with a psychiatrist at KVSP regarding "self-help."  An appointment was scheduled, but the IP was subsequently transferred to RJD on March 28, and he was never seen by a psychiatrist at either facility.  With this exception, the CDCR reviewer in this case stated that the IP was "noted to be programming fairly well in the years prior to his death.  He was involved in college classes, had recently been involved in vocational welding, and appeared future-focused.  He was looking forward to getting out of prison one day and returning to his family."  In September 2022, the IP joined a coping skills group facilitated by a psychology practicum student.  The group included IPs like himself who were not enrolled in the MHSDS.  The group continued until December 2022 and records indicated that he was an active participant.

According to suicide review and other investigations, the IP's stability changed in the months prior to his death due to a mounting gambling debt that he was unable to pay.  On January 12, 2023, he received an RVR for gambling and was placed into the ASU for safety concerns related to this gambling debt.  He denied any suicidal ideation during the ASU screening process.  The IP died a few weeks later.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, although he had several medical problems, none were thought to be proximate causes of his death.  He did not leave a suicide note.  The CDCR reviewer theorized that there were multiple possible reasons why the IP decided to die by suicide, including "safety concerns over a recent gambling debt, ASU placement creating isolation and disconnection from his normal familial supports, probable drug use impairing rational thought processes and resulting in delusional beliefs, concerns for his family's safety, and the belief he would be released from ASU to the yard on the date he died."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

1) <u>KVSP</u>: On March 16, 2022, Mr. _____ wrote a Health Care Services Request Form (7362) requesting to speak with a psychiatrist at KVSP regarding 'self-help.'  The 7362 was received and appropriately triaged, and a Mental Health Medical Doctor (MHMD) Consult Routine order was placed on March 22, 2022 by a KVSP psychologist.  Mr. _____ had not yet been seen by a psychiatrist when he transferred to RJD.  This consult order was discontinued by a different KVSP psychologist on March 28, 2022, prior to his arrival at RJD, without a new order being placed by that psychologist or working with KVSP schedulers to ensure transfer continuity of the original order.  Thus, the staff at RJD did not know an order existed and the 7362 was never addressed.

2) During the review, it was discovered the responding staff failed to don the appropriate Personal Protective Equipment prior to making entry into the cell of Mr. Olivo, pursuant to Department Operations Manual, Section 51020.12.2, Extractions.

3) During the review it was noted responding staff did not respond with the complete 'cut-down kit.'

4) During the review it was noted Mr. _____ was not within the first 72 hours of initial placement in the housing unit; a review of SOMS indicated his initial placement in Administrative Segregation on January 12, 2023, in Cell B7-246L (non-retrofit intake cell) for approximately 5.54 hours before being moved into Cell B7-228L was out of compliance.

In the ***second*** case (<u>RJD 8</u>), the IP was found hanging from the top bunk by a string in his SNY cell during the early morning of April 20, 2023.  He entered the CDCR system on June 14, 2012 to serve a life sentence without possibility of parole for 1st degree murder.  The IP was transferred to RJD on September 23, 2019.  He incurred five (5) RVRs during his confinement, the most recent occurring on June 5, 2022 for behavior which could lead to violence.  The IP was considered to be gang-affiliated.  He was unmarried and had no children.  He had family support through telephone calls and letter correspondence with his foster parents and sister, as well as letter correspondence with his mother and aunt.

According to available records, the IP and four siblings were born into a dysfunctional family environment.  He was initially raised by his mother, but due to both physical and verbal abuse, as well as neglect, he was removed from the home and placed into foster care where he spent the majority of his early youth.  Records indicated that he had a healthy and nurturing relationship with his foster parents, but his life once again became dysfunctional when he was reunited with his mother at a teenage.  Much to the displeasure of his mother, the IP became involved in a local gang, resulting in further physical and emotional abuse from his mother.  His gang involvement continued, which resulted in dropping out of high school in the 10th grade.  The IP had neither work experience nor employment skills.  Documentation regarding substance use was limited, with some records indicating that he consumed alcohol on a daily basis.  His gang involvement also resulted in a juvenile arrest history beginning at age 17.  The instant offense occurred when he was 19.  The IP's mother had a significant history of mental illness, and his father and a half-

brother were incarcerated at various points in his life.  Although records indicated that he had some counseling while in foster care, the IP did not have a previous history of mental health treatment or suicidal behavior in the community.

Upon entry into CDCR in June 2012, the IP did not exhibit any symptoms of mental illness and was not enrolled into the MHSDS.  Despite having a history of limited work skills and education prior to confinement, he was able to obtain jobs and be involved in educational programs.  He was a porter at time of his death.  Although a gang member in the community, he dropped out of gang involvement in 2013.  The IP had sporadic contact with mental health staff during his confinement.  For example, he initiated a mental health referral in July 2018 and reported "I just needed someone to talk to." During the subsequent assessment, the IP reported "repressed feelings," regretted his life sentence without possibility of parole while continuing to watch other IPs parole.  During another clinical session on October 2, 2018, the IP shared that he was "angry at my mother because she took away my childhood." He did not have any further contact with mental health staff until March 7, 2022, when he was informed that his mother and younger brother had died in an automobile accident eight days earlier.  The IP then informed the clinician that he "didn't care about anything anymore.  My mother and brother are dead and I have nothing to live for.  He was assessed as being at low acute risk for suicide following the clinician's completion of the C-SSRS screening form.

The IP did not have any further contact with mental health staff until February 7, 2023, when he requested that a teacher provide him with lined paper so he could write "a farewell letter to his auntie." Upon further inquiry by the teacher, he denied suicidal ideation, but stated he "was writing his last will and testament." He was subsequently assessed by a clinician and admitted into the MHCB unit.  According to the CDCR reviewer in this case, the MHPC initial assessment completed by a MHCB clinician on February 8, 2023 was problematic because the entire clinical summary tab was pulled forward directly from the MHPC initial contact completed on September 18, 2018.  The IP's three-day stay in the MHCB was uneventful; he consistently denied suicidal ideation, assessed as a low chronic and acute risk for suicide, and discharged back to non-MHSDS status on February 10.

On the final day of his five-day clinical follow-up from MHCB discharge on February 15, 2023, the IP denied any current suicidal ideation, but admitted to the clinician "he had lied during his MHCB admission and does occasionally experience suicidal ideation."  The clinician's progress note indicated that he "expressed willingness to engage in treatment and address his negative thoughts/feelings, though stated he did not want to work with CCCMS clinician due to history of abuse and feeling like the assigned CCCMS MHPC looks like a past abuser."  As noted by the CDCR reviewer in this case, a follow-up appointment for possible MHSDS admission was not scheduled and the documentation seemed to suggest that the IP's discomfort with the 3CMS clinician was the justification for not scheduling any follow-up.  In addition, his previous denial of not ever having any suicidal ideation was part of what informed the assessment of low chronic risk during his MHCB placement.  With this new information, there was no documentation as to why an updated SRASHE was not completed.  Despite not being enrolled in the MHSDS, the IP did attend eight of ten offered coping skills groups between February 22 and April 19, 2023.  He refused to attend the last two groups prior to his death.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had a few medical problems, none were thought to be proximate causes of his death. However, coupled with the deaths of both his mother and brother within the past year, the IP talked to his sister two days prior to his death and she informed him that she was not seeking treatment for a recent cancer diagnosis. The IP did not leave a suicide note. The CDCR reviewer theorized that "The absence of social supports may have decreased, or even eliminated, any hope that Mr. _____ had for the future in light of his LWOP sentence. Mr. _____ ended his own life on the day that would have been his mother's 70th birthday and coincidentally, it was also the final day of Ramadan, which was a time during which Mr. _____ received enhanced support from fellow Muslim peers. The slightly lessened spiritual prohibition against suicide, the additional perceived decrease in support, and possibly symbolism of his mother's birthday likely combined to lead Mr. _____ to make the decision to end his life on that day specifically."

The Suicide Report contained 11 recommendations for corrective action through a QIP:

1) The case formulations section and all four elements of it (predisposing, precipitating, perpetuating and protective factors) of both the MHPC initial contact completed on February 8, 2023, and the Master Treatment Plan completed on February 10, 2023 contained the exact same verbiage as was contained in the case formulation section of the MHPC initial contact that was completed on September 18, 2018. This suggests that this was likely not even reviewed by the MHCB evaluating clinicians or receiving treatment team. Additionally, having originally been written over four years prior, most of the data in the clinical summary tab that was pulled forward was no longer clinically relevant.

2) On February 15, 2023, which was the last day of Mr. _____'s five-day clinical follow-up, Mr. _____ disclosed that he had lied during his MHCB stay when he reported that he had never had suicidal thoughts. He indicated that he does occasionally have suicidal thoughts and expressed a willingness to address his mental health concerns in treatment but was not willing to work with a certain clinician. Nevertheless, a suicide risk evaluation was not completed, there was not a follow-up individual appointment or IDTT scheduled, and the documentation seems to suggest that Mr. _____'s discomfort with the CCCMS clinician was the justification for this.

3) On February 7, 2023, Mr. _____ was assessed as being of moderate chronic risk. In the two subsequent assessments however, his chronic risk was decreased to low and adequate justification for this was not present in the documentation. This may have resulted in an under-estimation of Mr. _____'s chronic risk.

4) During the review, it was noted the primary staff did not wait for responding staff before requesting the control booth officer to open the cell door, therefore rendering the scene unsafe.

5) During the review, responding staff did not respond with the complete 'cut-down kit.'  The complete cut-down kit is required to be present at the incident site and readily available.

6) During the review it was noted, the noose was not loosened or fully removed from the inmate prior to or during CPR.  In reference to the memorandum dated January 22, 2018, 'RESPONSE TO SUICIDE ATTEMPTS BY HANGING OR ASPHYXIATION, INTRODUCTION OF THE REPLACEMENT CUT-DOWN TOOL, AND STANDARDIZATION OF THE CUT-DOWN KIT,' which states in part, 'The inmate shall be cut down by cutting above the knot and then loosening the noose.  If necessary, utilize the ResQHook to remove the noose and/or ligature from the inmate's neck.'

7) During the review it was noted, responding custody staff were not in compliance with the required annual CPR/First Aid Training, and Suicide Prevention Training.  During the review of Richard J. Donovan Correctional Facility's (RJD) In-Service Training reports, three involved custody staff were identified as being out of Compliance with the annual CPR/First Aid Training, at the time of the incident.  A list of the involved staff out of compliance will be provided to RJD's Executive Leadership.

8) Based on multiple discrepancies/concerns identified outside of this review, the team was advised this case would be referred for the Formal Investigation process via 989 submission by the Hiring Authority at RJD.

9) During the EHRS review, it was noted that there were several late entries for Suicide Precaution documentation during 2.7.23-2.10.23.

10) On February 7, 2023, a CIT event occurred that required the patient to be admitted to a crisis bed.  In review of the CIT event, it was identified that nursing was not present at the CIT encounter.

11) In review of the custody EMR timelines, the event at 0118 hours regarding a medical staff cutting the string on the patient's neck was not found in the EHRS documentation to have occurred but was noted in an 837-C by nursing.

**Audit Summary**:  Adequate practices were found in intake screening, PT rounding in restrictive housing, alternative housing, Guard One compliance, IDTT meetings for MHCB patients, regular offering of out-of-cell activities (except for telephone calls) to MHCB patients, safety planning, MHCB supervisory review of discharge SRASHEs and safety plans, and both CPR and suicide prevention training.  Deficiencies included placement of a new intake IP in a no-new-intake cell in one of the ASUs, inappropriate use of Columbia-Suicide Severity Rating Scale (C-SSRS) screening forms by clinicians assessing IPs in alternative housing and in response to emergent/urgent mental health referrals, not offering IPs the opportunity for private settings to conduct assessments following alternative housing placement, MHCB patients expressing SI

and/or assessed as high risks for suicide remaining on 30-minute observation status, and low compliance with discharge custody checks.

### 14)    California State Prison, Los Angeles County (CSP/LAC)

**Inspection**:  August 23-24, 2023 (previous suicide prevention audit was on April 4-5, 2022).  CSP/LAC housed approximately 2,604 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed four new admissions during the **Intake Screening** process in the R&R unit on August 24.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office remained closed, with an officer stationed outside, thus ensuring both privacy and confidentiality.  The required suicide prevention placards (both English and Spanish versions) were found inside each of the nurse's offices.

In addition, this reviewer observed daily **PT Rounds** in both the EOP administrative segregation (D-5) and STRH units on August 23-24, 2023.  The rounds were unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for all caseload IPs.  Of note, numerous IPs on new intake status in both restrictive housing units complained they had not received crank radios.  It was later confirmed by custody supervisors that the radios had been backordered for two months.

**Housing**:  CSP/LAC had a 16-bed CTC, with 12 rooms designated as **MHCBs** that were previously found to be suicide-resistant.  All 12 MHCB cells were occupied during the on-site assessment.

In addition, there were 12 **New Intake Cells** in the STRH unit and seven (7) new intake cells in the EOP ASU (D-5) that had been previously retrofitted to be suicide-resistant.  During inspection of both units, although this reviewer did not observe any new intake IPs housed in non-intake cells within the EOP ASU, it was difficult to confirm the new intake status of IPs housed in the STRH unit because there were not any "ASU Door Tags" on many of the unit's new intake cells (as well as other cell doors) which designated the start and finish of the IP's 72-hour new intake status.

Further, inspection of the recently opened C-5 ASU overflow unit found that it did not contain any new intake cells.  Although a custody supervisor initially informed this reviewer that a new intake IP would *never* be placed in the C-5 Unit, rather they would be housed in either the STRH or D-5 units for the initial 72 hours, at this reviewer's request, a subsequent review of SOMS by a MHCT lieutenant found there were at least three new intake IPs placed in unsafe, dangerous C-5 cells on August 17-18, 2023 and, following a chart review, this reviewer found a fourth new intake IP placed in an unsafe, dangerous C-4 unit (that was previously utilized for ASU overflow) cell on July 29, 2023.

Finally, **Alternative Housing** cells to temporarily house IPs awaiting MHCB placement were found in a variety of designated locations in most yards, as well as the STRH and EOP (D-5) units.  Since early August 2023, C-5 Unit had also been utilized for Alternative Housing, as well

as ASU overflow and an "experimental five-day follow-up program." All IPs were required to be furnished beds and observed on a 1:1 basis. Alternative housing continued to be used extensively at CSP/LAC, and there were more than eight IPs in alternative housing each day of the recent onsite assessment.

From May 1 through July 31, 2023, there were 667 IPs placed alternative housing (an average of seven per day), and all but nine IPs (99 percent) discharged within 24 hours. This was a significant increase in the use of alternative housing since the previous assessment when 281 IPs were in alternative housing during a comparable three-month period. During the current assessment, the overwhelming majority (83 percent) of the MHCB referrals were rescinded and IPs returned to their respective housing units.

This reviewer examined the EHRS files for 20 rescinded cases and found that required SRASHEs and five-day clinical follow-ups were completed in all cases. However, although safety plans were completed in all of the cases, the review found that all of the safety plans were very inadequate. Many clinicians were simply cutting and pasting the same repetitive narrative into each section of the safety plan grid in EHRS, regardless of relevance. One clinician simply inserted the same narrative in safety plans of seven different IP charts examined by this reviewer. For example, in one (LAC 1) of the seven reviewed cases, the safety plan completed on July 21, 2023 stated the following:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: No
Warning signs - Clinical Impressions: ***Despite the utilization of MI, active listening, and providing I/P with ample time, and I/P's report of self-harm gestures yesterday, he did not report intent plan urge or desire to end his life. Throughout recent encounters I/P was noted to be future oriented as evidenced by his request to be referred to a higher LOC. I/P presented coherent, logical, and goal directed. No evidence of psychological distress and/or worsening of MH symptoms.***
Helpful reducing self-harm - Clinical: ***Despite the utilization of MI, active listening, and providing I/P with ample time, and I/P's report of self-harm gestures yesterday, he did not report intent plan urge or desire to end his life. Throughout recent encounters I/P was noted to be future oriented as evidenced by his request to be referred to a higher LOC. I/P presented coherent, logical, and goal directed. No evidence of psychological distress and/or worsening of MH symptoms.***
Reduce Risk Factors - Clinical: ***Despite the utilization of MI, active listening, and providing I/P with ample time, and I/P's report of self-harm gestures yesterday, he did not report intent plan urge or desire to end his life. Throughout recent encounters I/P was noted to be future oriented as evidenced by his request to be referred to a higher LOC. I/P presented coherent, logical, and goal directed. No evidence of psychological distress and/or worsening of MH symptoms.***
Patient History of Self Harm: No

217

Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: No
Protective Factors - Clinical Impression: ***Despite the utilization of MI, active listening, and providing I/P with ample time, and I/P's report of self-harm gestures yesterday, he did not report intent plan urge or desire to end his life. Throughout recent encounters I/P was noted to be future oriented as evidenced by his request to be referred to a higher LOC.  I/P presented coherent, logical, and goal directed.  No evidence of psychological distress and/or worsening of MH symptoms.***
Enhanced factors - Clinical Impressions: ***Despite the utilization of MI, active listening, and providing I/P with ample time, and I/P's report of self-harm gestures yesterday, he did not report intent plan urge or desire to end his life. Throughout recent encounters I/P was noted to be future oriented as evidenced by his request to be referred to a higher LOC.  I/P presented coherent, logical, and goal directed.  No evidence of psychological distress and/or worsening of MH symptoms.***

Other safety plans were simply inadequate, exemplified by the following that was completed on July 11, 2023, upon the patient's (LAC 2) discharge from alternative housing for DTS back to EOP level of care.  The patient was subsequently referred to ICF the following day for DTO:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: Yes
Warning signs - Patient focused: ***Transfer to a prison closer to family***
Warning signs - Clinical Impressions: ***Continue EOP LOC***
Helpful reducing self-harm - Patient: ***Transfer to a prison closer to family***
Helpful reducing self-harm - Clinical: ***Continue EOP LOC***
Reduce Risk Factors - Patient: ***"Keep myself busy"***
Reduce Risk Factors - Clinical: ***Continue EOP LOC***
Patient History of Self Harm: Yes
Patient Participate - Self Harm: No
Past concerns resolved - Clinical: ***Continue EOP LOC***
Patient Reduce Risk Factors - Clinical: ***Continue EOP LOC***

Further, many IPs assessed in alternative housing were found by clinicians to be utilizing the threat of suicide as a secondary motivation to affect changes in their environment, e.g., housing relocation.  Although the Safety Plan template has a section entitled "Self-Harm to Affect External Changes (under the "Patient History of Self-Harm" domain) to address this assessed behavior, few, if any, clinicians utilized this section and simply inadequately completed the safety plan without addressing possible solutions to the IP's secondary motivation.  For example, the following safety plan was completed on June 6, 2023 for an IP (LAC 3) whom the clinician believed was "misusing" crisis services:

<u>MH Safety Plan</u>
<u>Safety Planning Reason</u>: Discharge from MHCB/PIP or Alternative Housing
<u>Patient Participate - Warning Signs</u>: No
<u>Warning signs - Clinical Impressions</u>: ***IP appears to be misusing MHSDS/crisis services to address custody issues.  Continue EOP LOC.***
<u>Helpful reducing self-harm - Clinical</u>: ***IP appears to be misusing MHSDS/crisis services to address custody issues.  Continue EOP LOC.***
<u>Reduce Risk Factors - Clinical</u>: ***IP appears to be misusing MHSDS/crisis services to address custody issues.  Continue EOP LOC.***
<u>Patient History of Self Harm</u>: No
<u>Safety Concerns Identified</u>: No
<u>Environmental Concerns Identified</u>: No
<u>Patient Participate - Protective Factors</u>: No
<u>Protective Factors - Clinical Impression</u>: ***IP appears to be misusing MHSDS/crisis services to address custody issues.  Continue EOP LOC.***
<u>Enhanced factors - Clinical Impressions</u>: ***IP appears to be misusing MHSDS/crisis services to address custody issues.  Continue EOP LOC.***

Finally, during the suicide case review of an IP who died by suicide in November 2023 (see <u>LAC 12</u> below), the review found that the IP was placed in Alternative Housing during the very early morning of May 19, 2023.  Although initially housed appropriately in a wet holding cell in the C-Yard medical area, the IP was later transferred to the D-Yard gymnasium and placed into a holding cage (referred to in CDCR policy 12.05.301 as a "holding cells without toilets" in which the IP only has room to sit or stand).[33] Contrary to CDCR policy which mandates that temporary housing of patients in small holding cells can never exceed four (4) hours, the IP remained in the holding cell for six hours (6) before the MHCB referral was rescinded and he was returned to his housing unit.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In addition, patients assessed as not being suicidal were required to be observed at 30-minute intervals.  During July 2023, the Mental Health Observations Reporting Tool indicated that 19 patients were on observation status, resulting in 83 percent compliance for Suicide Precaution rounds and 68 percent compliance for Suicide Watch rounds.

---

[33] CDCR Policy 12.05.301, "Housing of Patients Pending Mental Health Crisis Bed Transfer," revised May 20, 2021, requires that "Holding cells that are designed for the patient to sit or stand shall be used as infrequently as possible and only as a last option for temporarily housing patients in crisis. These cells shall only be used to temporarily hold patients awaiting mental health emergent evaluation, transfer to alternative housing, or awaiting immediate transfer to the MHCB. These cells are NOT to be designated alternative housing, as placement is a last option and is intended to be used for as little time as possible, not to exceed four hours.  Use of these cells shall be documented on the custody log for holding cells.  Patients shall be transferred out of these cells as soon as possible."

Finally, a review of **Guard One** data for a recent 24-hour period found a combined 98 percent compliance rate with required checks not exceeding 35 minutes in both the STRH and EOP ASUs.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of February through July 2023.  A sample EHRS review of 50 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 96 percent (48 of 50) of the cases.

In addition, a **Crisis Intervention Team** was initiated in May 2018 and its full activation had varied during previous years.  Currently, it was inconsistently operational for only four hours (3:00 p.m. to 7:00 p.m.) on Monday through Friday.  At other times, emergency mental health referrals were normally handled by clinicians assigned to the yard in which the referral was originated.

This reviewer observed a crisis response by an outpatient clinician during the afternoon of August 23, 2023.  The clinician was scheduled to meet with the IP (LAC 4) in the D-Yard gymnasium.  Upon arrival, the IP was observed in a holding cage (referred to as a small holding cell" in CDCR policy 12.05.301) against the wall, located in close proximity to another IP who was a few feet away in another holding cage.  Several other IPs were playing basketball and/or exercising in the area.  Privacy and confidentiality were compromised.  Officers, required to provide continuous observation, were situated at a podium located more than 20 yards from the holding cage.  The clinician began to interview the IP, but the assessment was paused when the IP began to complain of an unknown medical problem and subsequently escorted to the TTA.  This reviewer left the area, but subsequently confirmed through chart review that a SRASHE was completed and the MHCB referral was rescinded.

*The physical environment, absence of continuous observation, and lack of concern for reasonable privacy during a crisis response conducted in the D-Yard gymnasium was an exact replica of crisis assessments observed by this reviewer in the same location more than a year earlier on April 4, 2022, as well as during the August 2019 assessment in the same D-Yard gymnasium.  It continued to be disappointing to observe this grossly inadequate practice.  In contrast, this reviewer saw an IP the following day (August 24, 2023) appropriately being supervised on continuous observation in the D-5 unit while awaiting a crisis clinician to respond the emergent mental health referral.*

Seven **IDTT Meetings** in the MHCB unit were observed on August 24, including four patients being discharged.  Overall, although full treatment team representation was observed, there was inconsistency in quality attributable to the leading primary clinician for each case.  For example, in the first three cases discussed, with the exception of no discussion regarding diagnoses, there were adequate case presentations and discussions regarding reason for admissions, medications, and observation levels and issue.  One of these three cases involved DTS and, because it was an initial IDTT meeting, there was preliminary discussion about safety planning.

The remaining four IDTT meetings were for patients being discharged after having been admitted for DTS. Two other clinicians led these meetings. Although there was adequate discussion regarding reason for admission (DTS), diagnoses (in two cases), medications, and observation level and issue, there were uneven case presentations in all four cases, and either inadequate or no discussion of safety planning. In one case (LAC 5), the clinician asked the patient "What happens when you get stressed, before acting out?" When the patient stated "Nothing," the MHCB supervisor interjected and said, "You do have a safety plan." Yet the safety plan as written in the SRASHE was never discussed. In another case (LAC 6), the patient reluctantly reported that, "I know my coping skills, I don't know how to apply them." There was no response from any team member and the safety plan as written in the SRASHE was never discussed. In a third case (LAC 7), the clinician recited coping skills for the patient as "talking with your mother and working with your EOP clinician." Subsequent review of the patient's safety plan in the SRASHE included phrases such as "IP may benefit from learning DBT-based skills for distress tolerance" and "IP may benefit from CBT-based interventions to modify cognitive distortions resulting in maladaptive coping bxs." Yet these strategies, or even basic explanations of DBT and CBT, were never discussed in the meeting.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for 11 patients in the MHCB unit during the on-site assessment. The 114-A form of one patient was not reviewed because he had been in the MHCB unit for less than 24 hours. All 11 patients were cleared for out-of-cell activities by a provider on their first day of admission. The review found that each patient was offered multiple (and adequate) opportunities for showers, yard, and telephone access during their placement.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 20 patients discharged from the unit during June and July 2023, who had been admitted into the MHCB for DTS, and remained at CSP/LAC. The review found that the required SRASHEs were completed in each case, and 5-day follow-up assessments were completed in only 75 percent (15 of 20) of the cases. In addition, although the required safety plans were completed in all 20 cases, similar to safety planning for IPs discharged from alternative housing, only 35 percent (seven of 20) were adequate. With a few exceptions, including safety plans completed by the clinician who led the first three IDTT meetings observed by this writer on August 24, 2023, most MHCB clinicians simply cut and pasted the same repetitive narrative into each section of the safety plan grid in EHRS, regardless of relevance.

Further, CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), required MHCB supervisors or designees to review all discharge SRASHEs and safety plans for patients released from the MHCB. This reviewer was presented with data indicating that approximately 62 patients were discharged from the MHCB unit for DTS to a lower level of care during June through August 2023. However, the review found the documentation was flawed because the requested data failed to include the date of supervisory review which was critically important in determining timely review (i.e., required prior to or during the clinical discharge IDTT meeting). Of note, similar to this reviewer's findings, the MHCB supervisor determined that 24 safety plans reviewed during June through August 2023

were inadequate and in need of revision, but only 17 percent (four of 24) were subsequently revised by clinicians.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was initially presented with documentation of 570 cases of IPs discharged from a MHCB or alternative housing placement that remained at LAC from February through July 2023. An unknown number of these cases included IPs who were transferred to administrative segregation. Due to the large volume, a sample of 20 cases per month was selected, resulting in a total of 120 reviewed cases. The sampled cases excluded IPs transferred to administrative segregation (where observation at 30-minute intervals was required). Of note, the two-page packets were very disorganized, with many missing sheets. The review found that only 40 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form or missing days for form completion. When completed correctly, a slight majority of custody checks were recommended for 72 hours by clinicians. In addition, only 16 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to missing forms and/or gaps in observation.

As previously stated above, since early August 2023, the C-5 Unit had been utilized for Alternative Housing, as well as ASU overflow and an an "experimental five-day follow-up program." This reviewer was informed by the CMH that the experimental or "pilot" program was initiated in early August 2023 in an effort to improve low compliance rates with two-page Discharge Custody Check Sheet packets by consolidating non-administrative segregation IPs requiring custody follow-up checks into one housing unit. Dated August 4, 2023 and signed by the CMH, CEO, and Warden at CSP/LAC, a memorandum authorizing the pilot program was very brief and simply stated that:

> Upon release from Alt. Housing, the IP shall remain in FCB5 in a non-alternative housing cell while being monitored for custody welfare checks and will be provided in-cell therapeutic activities appropriate to their level of care.

This reviewer inspected the C-5 Unit (or FCB5) on August 23, 2023. There were nine IPs housed in the unit on "discharge custody checks." Four of the IPs were interviewed, and all were extremely unhappy for the following reasons:

> 1) All IPs on custody discharge checks in the C-5 Unit were required to remain on this status for the entire five-days [which was contrary to both CDCR policy and

222

"Discharge Custody Check Sheet" (MH-7497) instructions which limit the duration to 72 hours];

2) All IPs on custody discharge checks in the C-5 Unit were locked down in their cell 24 hours a day and prohibited from utilizing the yard or telephone, a clear violation of CDCR policy;

3) All IPs on custody discharge checks in the C-5 Unit insisted they had limited or no access to the shower; and

4) All IPs on custody discharge checks in the C-5 Unit were not permitted any out-of-cell contact with mental health clinicians, rather all contacts occurred cell front, a clear violation of CDCR policy.

This reviewer subsequently conversed with a custody supervisor and line officers assigned to the C-5 Unit. They confirmed that C-5 IPs on discharge custody checks remained in the unit for the entire five days (rather than the 72-hour maximum), and C-5 IPs on discharge custody checks were on a "custody modified program" and prohibited from yard and telephone access, but allowed regular showers.  In addition, this reviewer's subsequent review of an IP's (LAC 8) medical chart contained a clinical progress note entry from August 23, 2023 confirming that clinicians were required to interact with IPs "cell front due to new process for alt housing all IPs seen cell front in C-5."

*In summary, this "pilot" program was ill-conceived, very problematic, and an attempt to thwart perceived manipulative behavior.  In addition, placing non-restrictive housing IPs on "custody modified program" and prohibiting them from both out-of-cell activities (of yard and telephone use) and out-of-cell contacts with clinicians had nothing to do with increasing compliance with Discharge Custody Check Sheet form completion. The practice was also much more restrictive than conditions found in restrictive housing.  Finally, the "pilot program" did not address whether patients returning to CSP/LAC from a PIP or DSH placement would be subjected to the same highly restrictive practices.*

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (February through July 2023) found that meetings did not have quorums of all required mandatory members or designees for any of the six meetings.  The lack of quorums was most often, although not always, attributable to the lack of psychiatry attendance.  Of note, the meeting minutes incorrectly substituted a senior psychology specialist as the designee for psychiatry.  In addition, meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits.  Required monthly review of SRMP data was sparse.  Further, there were six (6) serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, and case presentations and/or root cause analyses (RCAs) were not included in the meeting minutes.  Meeting minutes were otherwise unremarkable.

A current SPRFIT LOP (dated March 2023) was in effect, as well as local operating procedures (LOPs) consistent with the following required three CCHCS policies from 2021 related to the

SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team," and the "Suicide Risk Management Program Policy."

**Training**:  According to training records, only 49 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, only 85 percent of custody, only 63 percent of medical, and only 75 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of July 2023, only 73 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and only 71 percent had completed safety plan training.

**Recent Suicides**:  CSP/LAC experienced four suicides during the review period.  In the ***first*** case (LAC 9), the IP was found hanging from the light fixture by a sheet in his ASU cell during the afternoon of July 31, 2022.  He entered the CDCR system on April 24, 2014 to serve a 274-years-to-life sentence for 1st degree murder and multiple counts of attempted murder.  The IP was transferred to CSP/LAC on October 28, 2020.  He incurred 30 RVRs during his confinement, the most recent occurring on July 7, 2022 for behavior which could lead to violence.  The IP was considered to be gang-affiliated.  He was unmarried and had no children.  The IP had limited family support through telephone calls with his mother and twin sister.

According to available records, the IP and five siblings were born into a dysfunctional family environment and initially raised by their mother.  He was exposed to domestic and street violence at an early age.  His mother was apparently drug-involved, and his father was absent from the family.  The IP reported being physically abused by his mother's boyfriends and sexually abused by his step-father on a number of occasions.  He was later raised by his grandmother, but she died when he was 13.  The IP became involved with a local gang, and there were reports that other family members were also involved with other gangs, which disrupted his family relationships.  He became involved in the juvenile justice system at age 14 and was confined in the juvenile hall on multiple occasions.  The IP also became involved with substance use that included marijuana, codeine, and later weekly use of methamphetamine.  He left school in the 11th grade and later earned his GED during CDCR confinement.  The IP did not have a significant employment history in the community.  The instant offense occurred when he was 19-years-old.  According to available records, the IP began to experience mental health problems at age 7 that included depression, and anxiety, as well as a diagnosis of ADHD.  He was later said to experience both auditory and visual hallucinations.  There was no indication that he or other family members had a history of suicidal behavior.

Upon entry into CDCR in April 2014, the IP screened positive for mental health symptoms and was placed at 3CMS level of care.  His initial diagnosis was bipolar disorder.  The IP was placed on psychotropic medication and assessed as both low chronic and acute risk for suicide.  Following two MHCB placements in August 2016, the IP was transferred to APP at DSH, and then to ICF, before returning to CDCR at EOP level of care in April 2017.  In 2018, he had two more MHCB placements for danger to self, resulting in elevation to EOP in August 2018.  His diagnoses were changed to depressive disorder and antisocial personality disorder.  Beginning in early 2019, the IP had additional MHCB placements for danger to self.  According to the CDCR reviewer this case, he displayed similar presentations during these admissions: "depressive affect with suicidal ideation response to interpersonal or situations in his surroundings.  He often

claimed that not hearing from his family and poor relationships with female friends outside.  In addition to his mental health issues, he also had numerous infractions involving other inmates and issues with custody staff."

By December 2019, the IP's mental health symptoms had stabilized and his level of care was reduced to 3CMS.  However, a month later in April 2020, he was again placed in a MHCB for suicidal ideation.  He was subsequently discharged to EOP and appeared to be adequately programming at that level of care for over a year.  During a session with his clinician on February 24, 2021, the IP reported: "My anger and my depression...think about all the time I got...I'm trying to stay out of trouble, fighting...to be honest I haven't learned nothing ... I want to make it right...instead of getting hurt, I did it to other people." During this period, his diagnoses were major depressive disorder, antisocial disorder, and substance use disorder.  In a quarterly IDTT meeting of July 28, 2021, the IP reported his on-going family stressors and a reluctance "to process childhood abuse trauma.  Reports recurring impulses to respond to anger with aggression.  Some resistance to processing emotions, but willing to do so at times."  During his quarterly IDTT meeting held on October 21, 2021, the team noted that he was "stable" during the past 90 days, he had made progress in the frequency of his RVRs (accruing only two in the past nine months), and had maintained his kitchen job without any problems.

During a session with his clinician on December 3, 2021, the IP stated that "I just keep thinking I have two hundred seventy years...it's getting to me...I don't know what to do...I don't care anymore...you're not understanding what I'm telling you!"  He became frustrated and abruptly left the session.  Four days later on December 7, 2021, the clinical session reconvened, and the IP's distress appeared to have increased, and he stating "Do you know what it's like to have 270 years?...how do I cope with that?...I don't know how."  He also discussed his twin sister's perceived betrayal and mentioned suicide as an option.  When the clinician inquired about any active plan for suicide, the IP responded that "I don't know."  When the clinician brought up the option of suicide precautions and a higher level of observation, he responded that he did not "…want to go to crisis bed...I'm not letting them put me on suicide watch."  When asked if he would be safe returning to his cell, the IP responded that "I'm all right."  Although the clinician inquired about suicidal ideation, a SRASHE was not completed as required.

Ten days later on December 17, 2021, the IP specifically threatened suicide to a clinician, repeatedly stating "I don't got no hope...I'm better off dead...I'm tired of living...I'm gonna die today...I want to die…nobody understands what I'm going through…I'm better off dead…I'm tired of living…I'm going to die today…I want to die."  He was placed in the MHCB unit and discharged back to EOP on December 23, 2021 with a moderate chronic and low acute risk for suicide.

In February 2022, the IP was appointed as a Men's Advisory Council (MAC) representative for his building, but he was removed from the position the following month after incurring two RVRs.  Several days later on March 15, he set his cell on fire and later told a clinician that his actions were the result "frustration and anger, not as a means to harm himself or others," and due to the loss of his MAC position.  A SRASHE was completed as required and a MHCB referral was not seen as warranted.

On June 22, 2022 the IP's IDTT met and decided to "graduate" him to 3CMS level of care. The rationale provided was that he "has been receiving EOP treatment for 2 years and continues to present [as stable] and there is no evidence of functional impairments (as evidenced by) communicating with family, socializing with other peers, and [continuing] to attend to his ADL's and denies [suicidal and homicidal ideation]." Although the team was concerned that the IP "did not utilize the services being offered at EOP," and was often a "high refuser," he had remained stable enough for a lower level of care. Several hours later during the evening of June 22, the IP again set a fire in his cell. He was placed on Suicide Watch status in Alternative Housing and released back to housing the following morning, with high chronic and low acute risk for suicide assessed in the SRASHE.

Several weeks later on July 11, 2022, the IP expressed suicidal ideation and told the responding clinician that he was angry about an RVR he had received and threatened to set himself on fire if sent back to his cell. He was admitted into the MHCB unit. Two days later, on July 13, 2022, his level of observation was lowered to 30-minute checks, but he was inappropriately placed in "partial issue" clothing. He was discharged from the MHCB unit back to the ASU at 3CMS level of care on July 19, 2022.

Two days later on July 21, 2022, a clinician-to-clinician contact was completed by the receiving ASU clinician. The progress note stated that the IP's previous clinician "reported that [he] utilizes reports of [suicidal ideation] to express his frustration, and to act out his anger about his situation and not 'getting what he wants.' Overall, it was stated that [Inmate _____] has not harmed himself and has no history of doing so. The [self-injurious behavior] in his chart of setting his cell on fire was one of the acting out episodes that was not geared to do self-harm, and the only reason [he] was referred to MHCB was due to his threat of setting fire in his cell if sent back to his cell." On both July 27 and July 29, 2022, the IP expressed suicidal ideation. SRASHEs were completed on both occasions, with findings of low acute risk for suicide. The IP died by suicide a few days later on July 31, 2022.

With the exception of his suicide threats within days of his death, the CDCR reviewer in this case did not find any other precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had a few medical problems, none were thought to be proximate causes of his death. He did not leave a suicide note. The CDCR reviewer theorized that the behavior which led to the IP's suicide "may not have been with suicidal intent. Rather, it may have been the result of extremely reckless behavior performed in an effort to affect his mental health level of care. This does not rule out that at some level of consciousness he harbored suicidal intent, but that his intent to die or desire for death was subsumed by his drive to regain his EOP status…. On the opposite side of this equation is that this may have been a final and impulsive behavior to relieve his pent-up resentment, anger, and sadness about a seemingly hopeless situation…. An individual who displays such recklessness could very well instigate a fatal suicidal act on impulse."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

> 1) During a clinical encounter on December 7, 2021 Inmate _____s' clinician
> wrote that he 'mentioned suicide as an option.' The clinician's documented an

inquiry regarding the inmate's current thoughts, plans and intentions for suicide, i.e., she completed a risk assessment in the moment, but then did not complete a SRASHE as required when an inmate makes suicidal statements. The MHSDS Program Guide, Ch. 10, page 8 requires that when 'an inmate expresses current suicidal ideation … a suicide risk assessment shall be made …' and documented by using the filling out a SRASHE in the EHRS. Although the program Guide allows for clinical discretion when no changes in chronic suicide risk have occurred, the documentation did not include a rationale for why a SRASHE was not completed.

2) A review of eleven suicide risk evaluations from July 2021 through July, 2022 revealed that clinicians appeared to under-appreciate Inmate _____s' level of Chronic risk. In only seven of 11 of these evaluations did the clinician rate his Chronic risk for suicide as high despite ample evidence for that level of chronic risk as noted in the Suicide and Self-Harm History section of the review. The underestimation of chronic risk was also in violation of the statewide Safety plan Intervention training, which indicates, if an inmate has a history of two or more suicide attempts, chronic risk should be assessed as high.

3) While housed in the CSP-LAC MHCB unit on July 13, 2022, Inmate _____s' level of observation was changed to once-every-30-minute checks and he was issued partial clothing. On October 29, 2013 the Divisions of Adult Institutions and Health Care Services issued a memorandum requiring (in part) that 'Inmate-patients not on suicide precautions or watch' receive full clothing issue ('blues') 'unless a clinical determination is made and documented … that there is a clinical reason these items should not be issued.' No such documentation was found in clinical documentation for Inmate _____. The HQ SPRFIT coordinator for Region III is aware of this issue and has a Correctional Action Plan (CAP) in place as there continues to be concerns with this issue.

4) <u>HQ</u> and <u>CSP-LAC</u>: It was documented numerous times in the medical record that Inmate _____ used suicidal language for a variety of purposes. Some of these reasons included: efforts to speak to MH staff, assert his believed need for a higher level of care, or to act out his frustrations associated with his long sentence. However, these behaviors were also accompanied by strong denials of his intent to die. This pattern of behavior, although noted over the years by clinicians, did not become part of treatment plans while Inmate _____ was treated at the EOP level of care. This issue associated with inmates using suicidal behaviors or ideation for an intended secondary gain purpose other than an intent to die has been identified as a statewide issue, and a need for enhanced safety planning training. This identified issue is being addressed in the implementation of the revised safety plan policy, procedure and training in December 2022.

5) During the review of suicide watch/ suicide precaution documentation for July 11-12, 2022 inconsistent intervals for suicide precaution time frames were found. From 2300 (suicide precaution ordered) on July 11 to 0659 on July 12, there were

four instances when suicide precaution was not entered timely per MHSDS Program Guide.

6) During review of the ASU pre-placement assessment on July 19, 2022, the patient refused to answer one of the questions which resulted in a positive screen. Urgent MH Referral was not generated.

In the _**second**_ case (LAC 10), the IP was found hanging from the top bunk by a sheet in his ASU cell during the evening of November 9, 2022. He entered the CDCR system on November 22, 2021 to serve a four (4)-year sentence for carjacking and burglary, and received an additional concurrent four-year term in August 2022. The IP was transferred to CSP/LAC on September 26, 2022. He incurred three (3) RVRs during his confinement, the most recent occurring on September 6, 2022 for battery on another IP. The IP was not considered to be gang-affiliated. He was unmarried and had no children. He had no financial support from his family, but had regular telephone contact, as well as letter correspondence, with both his mother and sister until his transfer to restrictive housing in September 2022.

According to available records, the IP and his sister were born into a dysfunctional family environment and raised by their mother. He never knew his biological father. The IP's mother was apparently drug-involved and he left home at age 15, claiming that "nothing happened, we just didn't get along." Records indicated that there might have been a history of traumatic events in his childhood, but no incidents were verified. It also appeared that he lived with his grandparents for a short period of time after leaving his mother's home. The IP did not have any history of employment and later stated that he engaged in numerous thefts, as well as sold drugs, in order to support himself. He had a significant history of substance use, including alcohol, marijuana, heroin, and methamphetamine beginning at age 16. The IP began Suboxone treatment for opiate abuse in the county jail. He did not have a record of mental illness or mental health treatment in the community, nor did he have a history of suicidal behavior.

Upon entry into CDCR, the IP screened negative for any mental health symptoms and was not initially placed in the MHSDS. He was, however, given a diagnosis of substance use disorder by a medical provider based upon his Suboxone treatment in the county jail. A few months later on February 8, 2022, a correctional officer observed that the IP was exhibiting poor self-control, poor attention span, and had difficulty following directions. He was referred to a mental health clinician who found that the IP appeared "teary eyed," sad with blunted affect, and cooperative though guarded. He also appeared to be "mild to moderately depressed" during the assessment. The IP was subsequently placed in the MHSDS at 3CMS level of care with a provisional diagnosis of persistent depressive disorder with a rule out of major depressive disorder.

On April 1, 2022, the IP was seen by a mental health clinician for an urgent consult after a correctional officer observed "poor grooming, confusion, difficulty following directions, unpredictable, insomnia, and bizarre behavior." The bizarre behavior was described as he "can't stand or sit still, looking around Paranoid." According to the clinician, the IP presented as "rambling with tangential thought process." A similar referral was submitted four days later on April 5, 2022, indicating the IP continued to exhibit bizarre behavior, including paranoia, insomnia, bothering cellmates who are trying to sleep, and has poor attention." During a

subsequent contact with a clinician, he "exhibited poor eye contact, looked irritated and fidgety, guarded, minimized symptoms, appeared confused, depressed and anxious, and eventually terminated the interview early, stating he felt uncomfortable." The clinician opined that the IP might have been experiencing a significant thought disorder, and needed a higher level of care. On April 11, 2022, the IP was moved to EOP and given diagnoses of unspecified depressive disorder, other specified schizophrenia spectrum and other psychotic disorder. He declined to take any psychotropic medication, and subsequently refused many, but not all, of his individual and group EOP interventions.

The IP was out-to-court from late May 2022 through early August 2022. Although he was subsequently sentenced to a concurrent prison term, this additional conviction slightly extended his parole eligibility date. Upon return to CDCR, he denied any suicidal ideation, but complained of irritability and anxiety that was thought to be related to not receiving his Suboxone in the county jail, as well as his continued drug use. The clinician suggested that he would likely need to be re-evaluated for the MAT program. During his IDTT meeting on August 23, 2022, the IP's diagnoses and treatment were reviewed, but according to the CDCR reviewer in this case, it remained unclear why his known history of substance use was not discussed nor listed as an additional diagnosis.

On September 6, 2022, the IP engaged in a fight with another IP, received an RVR for battery, and placed in the ASU. Secondary to this RVR, he was pending a SHU term until May 2023. The IP denied any suicidal ideation and while acknowledging continued drug use, reported that the Suboxone "gets me right." Several weeks later on September 26, 2022, he was transferred to LAC and placed in the ASU-EOP hub. The IP denied any current mental health problems, including suicidal ideation, and appeared minimally cooperative during the assessment.

The IP refused to attend his IDTT meeting on October 5, 2022, and the CDCR reviewer again noted that it was again unclear why a substance disorder diagnosis was not considered by his treatment team given his multiple requests to resume Suboxone treatment. He was placed on an EOP modified program in an effort to improve engagement in mental health treatment. Three days later on October 8, 2022, the IP expressed suicidal ideation and was seen by the CIT. He recanted his suicidal ideation and reported the threat was simply to "advocate for a cell change due to his light not working." He was assessed as low acute risk for suicide and moved to a different cell. He continued to refuse most PC and psychiatry appointments.

On November 7, 2022, the IP was assessed by a mental health clinician because he had been placed on the "high-refuser daily contact list" for his chronic lack of participation in EOP. During this contact, the clinician noticed a laceration on his left arm. Although the IP insisted that the self-injury was not recent, the clinician activated the CIT for further assessment. The IP was permitted to return to his cell without increased observation. He was assessed by a CIT clinician a few hours later, was minimally cooperative, and adamantly denied any suicidal ideation, stating "I have nothing to say to you …this happened months ago…I am fine." The resulting SRASHE indicated the IP was a moderate chronic and low acute risk for suicide. The CDCR reviewer in this case subsequently determined that there was "internal miscommunication among staff on multiple issues: where Inmate _____ was medically evaluated, the severity of his injury, and if a self-harm entry was required as his injury had been described as 'old.' The

229

review found he was medically cleared and returned to his cell without constant observation pending a suicide risk assessment."

As a high-risk refuser, the IP was seen again by a clinician on the mornings of both November 8 and November 9, 2022, denying any suicidal ideation on both occasions. He was found dead during the late evening of November 9, 2022.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had a few medical problems, none were thought to be proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that "It is likely extended prison time, recent inability to access his familial support in ASU, and his friend's recent death, coupled with the prospect of a several-month long SHU term, overwhelmed his abilities to cope, especially when coupled with substance abuse withdrawals/cravings, and largely untreated mental illness."

The Suicide Report contained 12 recommendations for corrective action through a QIP:

  1) <u>NKSP</u>: The MH Assessment for an RVR Inmate ____ received on February 17, 2022 was completed on March 1, 2022 outside of required time frames. Per Volume 12 Mental Health Services Rules Violation Report Mental Health Assessment policy 12.07.601, "*Mental Health staff shall return the completed CDCR 115-MH-A (Assessment) within eight (8) calendar days*."

  2) <u>VSP</u>: Inmate ____ was transferred to VSP on March 17, 2022, but was not evaluated by mental health staff upon arrival to the institution until April 1, 2022 after custody submitted an urgent referral. Inmate ____'s level of care was elevated to EOP at IDTT on April 12, 2022, prior to having been evaluated with a MHPC Initial Assessment or Initial MHMD Assessment, which is not in alignment with policy.

  3) <u>VSP</u> and <u>LAC</u>: a. Despite Inmate ____'s significant history of substance abuse, his MAT treatment history, and related polysubstance diagnosis assigned to him by a medical physician on January 14, 2022, treatment teams across two institutions did not appear to recognize the severity/connection of his substance abuse to his mental illness. Treatment plans dated April 11, 2022 (VSP), April 21, 2022 (VSP), August 23, 2022 (LAC), October 5, 2022 (LAC), and November 2, 2022 (LAC) did not include any substance use/abuse related IPOCs. b. Additionally, multiple treatment teams underestimated Inmate ____'s ongoing noncompliance, or at best, superficial compliance with treatment. It is unclear based on the relevant factors why a higher level of care was not considered.

  4) <u>LAC</u>: No Self-Harm Power Form was completed as per policy, in reference to the November 7, 2022 incident whereby Inmate ____'s PC noted a large cut on his forearm. While the timing of the injury remained unknown, this information was critical as it was the first-time staff observed evidence of serious self-harm on Inmate ____. Per HQ Memorandum dated October 28, 2019, Clarification of

Documenting and Reporting Suicide Attempts and Self-Harm Incidents, when self-harm occurs: "*The designated mental health clinician shall document the determination and self-harm data within the Self-harm Power Form in the EHRS as soon as possible…*"

5) <u>LAC</u>: There were risk justification issues in the September 30, 2022, October 8, 2022 and November 7, 2022 SRASHEs completed at LAC.  Several risk factors were incorrectly marked in the SRASHEs including current/recent substance abuse, history of violence as well as recent violence, recent psychotic symptoms, and safety concerns which may have contributed to an underestimation of risk.  In the November 7, 2022 SRASHE, while the clinician's narrative justifying low acute risk was quite detailed and comprehensive on the surface, the current discovery of recent self-injurious behavior (of unknown date), a diagnosis involving psychosis with odd behavior noted the same day by his PC, agitation, recent RVR for an assault where he fractured the nose of another inmate with resulting ASU placement (increased isolation), and continued withdrawal/ substance abuse concerns secondary to not being re-started on Suboxone, would all suggest his acute risk for suicide was likely higher than estimated.

6) <u>LAC</u>: An active MHMD scheduling order was visible to schedulers, but an individual psychiatry appointment was not scheduled and attempted prior to the IDTT on October 5, 2022.

7) <u>HQ</u>: Multiple clinical concerns were identified in this case including: underestimation of psychotic symptoms, connection of substance abuse and ongoing noncompliance with treatment to Inmate ____'s mental illness, underestimation of suicide risk, lack of consultation between medical and mental health providers, lack of appropriate treatment goals and IPOCs, and unclear review of records.

8) <u>VSP</u> and <u>LAC</u>: Between August 5, 2022 and November 6, 2022 (after return from county jail), Inmate ____ submitted nine 7362s requesting to be placed back on Suboxone. There was no documentation Inmate ____'s case was discussed in any established forum, such as the Primary Care Team huddle. There was no collaborative plan of care or intervention developed to address his overlapping medical and mental health needs.  It is unclear why Inmate ____'s case was not discussed in medical/mental health huddles or other health care appointments to initiate a plan of action for resuming his Suboxone.

9) <u>LAC</u>: On November 7, 2022, at approximately 1300 hours, Inmate ____'s PC observed a cut to his left arm. The PC notified custody and medical staff he would first need to be medically cleared, and then assessed for self-harm by mental health.  Inmate ____ was placed on the crisis line.  Per LAC's Local Operating Policy (LOP) for the Crisis Intervention Team (CIT LOP #30), LOP 31 (Suicide Prevention), and Program Guide, Chapter 10 (Suicide Prevention and Response), it appears there were multiple deviations from these policies during the initiation

of CIT response during the November 7, 2022 incident (*see Discussion/
Conclusions section for additional details*).

10) <u>VSP</u>: During the review of the Electronic Health Record System (EHRS),
NIDA QS was not completed during the Initial Health Screening on 8.3.22.

11) <u>VSP</u>: During the review of the Psychiatric Technician (PT) rounding on
9.14.22 and 9.15.22, it showed incomplete rounding documentation. There was
one instance in which the rounding documented patient on psych medications
when patient was not on any psych medications.

12) <u>LAC</u>: During the review of the Psychiatric Technician (PT) rounds from
9.27.22-11.9.22, it was documented patient on psych medications when patient
was not on any psych medications.  In addition, it was also documented that the
patient participates in the program when the patient did not.

In the ***third*** case (<u>LAC 11</u>), the IP was found to have severe lacerations on both his neck and
arms in his mainline EOP cell during the evening of February 4, 2023.  His cause of death was
exsanguination.  He entered the CDCR system for a second term on April 10, 2014 to serve a life
sentence with parole for 2nd degree murder, great bodily injury, and burglary.  He was transferred
to CSP/LAC on January 19, 2023. The IP incurred 16 RVRs during his confinement, the most
recent occurring on December 14, 2022 for behavior which could lead to violence.  He was
considered to be gang-affiliated. The IP was unmarried and had two adult children (son and
daughter) for which there was no documentation of recent contact.  His last family visit occurred
in 2019, but the IP had recent telephone contact with a half-brother, half-sister, and cousin.

According to available records, the IP was born into a dysfunctional family environment due to
both of his parents being incarcerated during much of his childhood.  He was primarily raised by
his maternal grandmother and maternal aunt.  He had two half-brothers and a half-sister.  He
reported domestic violence throughout his childhood that was caused by his parents' drug use.
The IP dropped out of school in the 11th grade, but later received his GED.  Although he joined a
local gang during his youth, the IP did not have any known history of juvenile arrests.  He did
have a history of adult criminal offenses, including a prior CDCR term which ended in
December 2009.  He did have a history of some employment, but the longest period of
consecutive employment was only two years.  Employment instability was aggravated by several
medical conditions, including chronic lower back pain resulting from a fall from a ladder, and
extensive hand pain resulting from amputation of several fingers in two separate accidents. The
IP had a significant history of substance abuse, beginning at age 12 that included alcohol,
marijuana, and methamphetamine.  His family had a history of mental illness that included his
mother, a half-brother, and half-sister.  One of his half-brothers died by suicide in December
2022.  Both his mother and maternal grandfather had histories of prior suicide attempts. The IP
reported an extensive history of mental illness during childhood that included bipolar disorder,
auditory hallucinations, and ADHD.  He also had multiple psychiatric hospitalizations in the
community for danger to self, as well as mental health treatment during his jail confinement.
The IP was treated at 3CMS level of care during his prior CDCR term.

Upon re-entry into CDCR in April 2014, the IP screened positive for mental health symptoms and was re-enrolled in 3CMS level of care. For reasons that were unclear due to limited documentation, his level of care was elevated to EOP in April 2015. Between 2014 and 2017, the IP's diagnoses were bipolar disorder, PTSD, polysubstance dependence, and antisocial personality disorder. He was compliant with his prescribed psychotropic medication. In June 2018, the IP was admitted into a MHCB unit following a suicide attempt which he claimed was the result of auditory hallucinations. Three months later in August 2018, he complained of feeling "tired all the time," as well as passive suicidal ideation, poor appetite, hypersomnia, and "paranoia" on the yard. The IP's psychotropic medication was adjusted. In June 2020, his symptoms appeared to stabilize, he did not demonstrate any functional impairment, and he was discharged to 3CMS. During the remainder of 2020, however, the IP reported increased depression and hypersomnia because of his ongoing drug use and placement in a lower level of care. In February 2021, his EOP level of care was reinstated.

The IP remained in the EOP program throughout the remainder of his confinement. Although he was not provided with the required IDTT meetings in either February or May 2022 while at RJD, all other PC and psychiatry contacts appeared to be on time and appropriately focused on his mental health symptoms. According to one progress note, the IP's treatment focused on "improving mood while increasing adaptive coping strategies by utilizing DBT skills of distress tolerance and emotion regulation. IP will focus on reframing thoughts and increasing insight as a means of positively impacting IP's behaviors." It was during this time that the IP's behavior began to decompensate. On May 18, 2022, he informed his clinician that he was "coming down from using." On June 22, 2022, a correctional counselor submitted a mental health referral regarding "hostile/assaultive/poor self-control issues," with the IP claiming he "is stressed and angry and about to snap/lash out in school." He was again seen by his clinician and remained at this baseline through most of the next several months.

On December 12, 2022, the IP was transferred to ASU-EOP hub at CSP/LAC due to safety concerns arising from drug debts. He reported worsening depression, anxiety, and hypersomnia. The IP also stated he had been using heroin and fentanyl on a regular basis and requested to again join the MAT program. His new clinician completed an initial assessment on December 15, 2022, and documented that "IP should be considered for CCCMS at this time." Two days later on December 17, 2022, the IP submitted a referral requesting to speak with his PC because his family informed him his half-brother had died by suicide. He was seen for the routine consult two days later on December 19, 2022, with the progress note stating he "appears to be stable" and "future oriented." Two days later on December 21, 2022, he attended his first IDTT meeting at CSP/LAC and the team decided to maintain him at EOP.

On January 10, 2023, the IP was admitted into the MHCB unit at KVSP following a self-inflicted laceration to his left upper inner arm. He informed a MHCB psychiatrist he had received threatening statements from other IPs and was noted to appear paranoid. He also told a MHCB clinician that he wanted to be discharged from EOP or "not go back to that yard," otherwise he would "keep cutting myself and will slice my neck next if I don't get one of those two things." When informed he could not be discharged to 3CMS due to his recent self-harm, the IP stated that "I will just keep cutting myself until I get a DSH referral." A few days later on January 12, 2023, he again told the MHCB clinician that he needed to be transferred to an EOP HUB in

Northern California to be closer to his family in Fresno, and again requested to be moved from CSP/LAC and "certainly off D Yard." The IP was discharged from the MHCB unit on January 19, 2023, and the completed SRASHE noted that he had spoken to the MHCB Sergeant about his safety concerns and they were apparently resolved with an ASU "lock-up order." He was assessed as a high chronic and low acute risk for suicide.  Of note, the CDCR reviewer in this case found several problems with the investigation of the IP's safety concerns while in the MHCB unit at KVSP, including late documentation of the discharge summary, inadequate communication between mental health and custody staff, and the fact that a correctional counselor was unable to attend his IDTT meeting. The reviewer concluded that the IP should not have been discharged from the MHCB unit until his safety concerns were thoroughly investigated and properly documented.

The IP was transferred to the ASU-EOP hub at CSP/LAC on January 19, 2023.  He almost immediately submitted health care requests to change medication ("I want to cancel my medication Abilify, it makes me jumpy & anxious"), to self-report an assault ("the victim of a batterie [sic] with a weapon"), and to restart the MAT Program ("my drug use is getting out of control, I don't want to over dose").  During his IDTT meeting on February 1, 2023, he reported that his safety concerns had been resolved. The following day (February 2, 2023), however, an ICC hearing was held, and he was released from restrictive housing and transferred to a EOP mainline housing unit on D-Yard at CSP/LAC.  The IP died two days later.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, although he had several significant medical issues, including asthma, chronic lower back pain caused by degenerative disc disease, and a recurrence of Hepatitis C due to intravenous drug use, it was unclear if any of these issues were thought to be proximate causes of his death.  He did leave a suicide note that expressed regret for the mistakes in his life and the people, including his two children, that he hurt.  The CDCR reviewer theorized that the IP "was experiencing safety concerns and distrust of unit staff leading up to his death. There appeared to be lack of clarity or agreement among the various staff about the nature and severity of those safety concerns, as well as Mr. ____'s level of distress related to them…. The improvement in presentation from the early time in the MHCB until the conclusion of his stay at ASU EOP, may suggest that Mr. ____ perceived that his safety concerns were alleviated.  However, it appears his hope quickly dissipated once he arrived to the Mainline EOP yard at CSP/LAC and he realized his relations with the other inmates had not changed."

The Suicide Report contained 11 recommendations for corrective action through a QIP:

> 1) RJD: IDTT was not completed between February 2022 and May 2022 while Mr. ____ was at the EOP LOC.  Per policy the MHSDS Program Guide, Chapter 4, page 12-4-9, IDTT for EOP patients should occur at least every 90 days.

> 2) RJD: Between February 2022 and December 2022, Mr. ____ was not regularly offered confidential sessions with the MHPC in EOP and instead seen on the housing unit due to "staff shortages/COVID."

3) RJD: Between February 2022 and December 2022, there was an active IPOC for Depressed Mood, but the MHPC only intermittently made entries.

4) LAC: On December 17, 2022, Mr. _____ submitted a 7362 requesting to speak with his MHPC because his family informed him his middle brother died by suicide. This was triaged as a routine consult despite qualifying as bad news that should have been addressed either as an urgent or emergent consult.

5) KVSP: Mr. _____ was discharged from the KVSP MHCB on January 18, 2023. However, the MHPC Discharge Summary was not completed in EHRS until January 31, 2023.

6) KVSP: The MHCB Discharge SRASHE was completed on January 18, 2023, and listed warning sign of feeling trapped. It was further noted that 'his impulsive behaviors to engage in self-harm to get needs met when feeling trapped may increase his potential risk.' The MHPC at the KVSP MHCB documented Mr. _____ was at low acute risk for suicide due to denial of suicidal ideation. The SRASHE failed to integrate Mr. _____'s warning sign into an accurate assessment of risk.

7) KVSP: Mr. _____ repeatedly reported safety concerns at CSP-LAC D-Yard. He was admitted to the KVSP MHCB on January 10, 2023, following self-inflicted laceration to his left upper inner arm reportedly secondary to safety concerns (i.e., threats from other inmates). Mr. _____ informed the MHPC at the KVSP MHCB that if discharged back to CSP-LAC EOP he would continue to engage in self-injurious behavior. When the MHPC at the MHCB received information that Mr. _____ was concerned about his physical safety at his endorsed institution, this should have been reported to the MHCB Sergeant. The IDTT should have then documented the results of the investigation of safety concerns in Mr. _____'s Master Treatment Plan with specific verbiage as listed in the Revised Mental Health and Custody Staff Reporting and Documentation of Patient Safety Concerns Memorandum. Additionally, the Correctional Counselor was not present in the MHCB IDTT on January 11, 2023 and it does not appear that communication occurred between Mental Health and Custody regarding the proper steps to address Mr. _____'s safety concerns. Please see *Discussion/ Conclusions* section for additional information.

8) LAC: During the review of the incident, it was identified the activation of the Emergency Medical System (calling 911) did not take place until approximately six minutes after the emergency was observed.

9) LAC: During the review, responding staff identified the presence of "copious amounts of blood throughout the cell" prior to making entry. Custody staff did not indicate in their reports whether the appropriate Universal Precautions were used during this response (i.e., Personal Protective Equipment Suits).

235

10) <u>KVSP</u>: During the review of suicide watch documentation on January 10, 2023-January 19, 2023, there were multiple instances when documentation was not entered timely per MHSDS Program Guide.

11) <u>LAC</u>: During the review of the Psychiatric Technician (PT) rounding, there were two incidents of missed PT rounds on January 25, 2023, while the patient was in the Administrative Segregation Unit (ASU) at LAC.

In the **_fourth_** case (<u>LAC 12</u>), the IP was found hanging from the upper bunk by as blanket in his mainline EOP cell during the early morning of November 5, 2023. He also had lacerations on his neck. He entered the CDCR system on December 30, 2005 to serve a 50 years-to-life sentence with the possibility of parole for two counts of 1st murder, driving under the influence of alcohol/drugs causing bodily injury, arson, assault with a deadly weapon, and two counts of gross vehicular manslaughter while intoxicated. He was transferred to CSP/LAC on January 17, 2023. The IP incurred multiple RVRs during his 18 years of confinement, including 38 RVRs over the past 10 years with the most recent occurring on November 5, 2023, the day of his death, for disrespect without potential for violence/disruption. Most of the RVRs were for manufacturing and possession of alcohol. He was not considered to be gang-affiliated. The IP was unmarried and did not have any children. He had family support through regular telephone contact and visiting with both his mother and sister.

According to available records, the IP and a younger sister were raised by both parents in a stable family environment except for alcohol abuse by both parents. His father died sometime during his youth, possibly by suicide. The IP graduated high school and took several college courses. As an adult, he obtained a real estate license and apparently worked for his mother who was also a real estate agent. He worked as a licensed real estate agent from 1988 to 1992 and then ran his own tree-removal company. The IP had a significant history of substance abuse that included cocaine, marijuana, and methamphetamine. He reported starting to drink alcohol at age 10. Although he did not consider alcohol to be his drug of choice, records indicated the IP was often intoxicated in both the community and in prison. He did not have a significant juvenile history, but had several arrests as an adult, including multiple domestic disputes involving threats to kill his mother and grandmother. These incidents were provoked by his struggles with mental illness. During these periods, the IP became homeless. When not homeless, he lived with family members, including his mother and grandmother.

The IP's history of mental illness began at age 13 and involved several diagnoses, including ADHD. He indicated that auditory hallucinations also started around age 13, although other documentation indicated onset of auditory hallucinations began as an adult. He reported a history of nightmares "for most of his life" and paranoid delusions (e.g., tracked by the FBI). The IP self-reported being psychiatrically hospitalized on multiple occasions between 1980 and 1990. In 1996, two years prior to the instant offenses, a court-appointed psychologist diagnosed him with schizoaffective disorder. Following his arrest and county jail confinement for the instant offenses in 1998, he was initially found to be incompetent and admitted to Patton State Hospital (PSH). Once his mental competence was restored, he was returned to county jail, but again psychiatrically decompensated more than two years later while still in county jail and readmitted

to PSH from January 2001 through July 2003 for competency restoration treatment. The IP reported several prior suicide attempts while confined at PSH and the county jail.

Upon entry into CDCR in December 2005, the IP screened positive for mental health symptoms and was enrolled in 3CMS level of care.  His initial diagnosis was depressive disorder.  During his prison term, the records reflected instances of persecutory and grandiose delusional content.  According to the CDCR reviewer in this case, "The delusions surrounded God and the devil, conspiracies involving the Free Masons and 'travelers' (who he believed put contracts out on his life), belief his family and famous individuals (e.g., Bill Gates and Mark Zuckerberg) were paying authorities/organizations (e.g., the Mexican Mafia, the Hell's Angels, correctional officers, and people with knives and guns) to have him retained in prison and to kill him, and non-sensical behaviors pertaining to his father (e.g., he kept in touch with his father through the television, his dad flew over the prison, and his father was part of the government and being targeted by the Free Masons)."  These behaviors resulted in decreased sleep, increased goal-directed behavior (e.g., desire to create lawsuits and change programs) and energy, restlessness and pacing, racing and tangential thoughts, reckless and impulsive behavior.  The IP's reckless and impulsive behavior resulted in multiple RVRs and a significant number of ASU placements.

In March 2009, the IP was placed in a MHCB unit for grave disability and subsequently discharged to EOP.  He remained at EOP level of care until his first of two admissions to DSH-Salinas from November 2010 through July 2011 for grave disability. The IP was diagnosed with schizoaffective disorder, polysubstance dependence, and antisocial personality disorder.  In 2013, he was admitted to the MHCB unit on two occasions for danger to self and grave disability.  He was subsequently discharged back to EOP LOC with his diagnoses remaining intact.  His second DSH-Salinas placement was from June 2013 until October 2013.

From late 2013 until his death in November 2023, the IP vacillated between EOP and MHCB level of care.  Overall, he was referred to MHCB units nine times during his CDCR term, with most referrals based on suicidal statements and/or behavior, often combined with intoxication on alcohol or other illicit substances.  However, according to the CDCR reviewer, "there was minimal mention of specific interventions for addiction that were addressed in therapy.  Mr. ___ was documented to be working with his MHPC on applying his coping skills and increasing his participation in treatment (he sometimes required motivational interviewing to improve his compliance), managing emotions through mindfulness exercises, self-monitoring of thoughts, emotions, and behaviors to improve impulse control, and improving awareness of inner self-criticism and distorted cognitions.  He was documented over the last year to similarly demonstrate intermittent attendance in group therapy." In addition, the CDCR reviewer also found that MH Master Treatment Plans from April, June, and August 2023 were "lacking progress on treatment goals related to substance abuse." He became intermittently compliant with his psychotropic medication several months prior to his death.

During the very early morning of May 19, 2023, the IP was placed in Alternative Housing after custody staff reported to nursing that he had made references to suicidal ideation in a letter to his mother.  He was seen by a clinician later that day and the resulting SRASHE noted a moderate chronic and low acute risk for suicide.  The IP was discharged back to EOP, and his diagnoses later revised to affective disorder, unspecified depressive disorder, unspecified schizophrenia,

alcohol use disorder, opioid use disorder, substance use disorder, and antisocial personality disorder. Review of the safety plan in the SRASHE completed on May 19, 2023 found it to be seriously inadequate, with the clinician copying and pasting two different narratives into all five clinical impression sections of the plan. Further, contrary to policy, the IP was held in a small holding cell (defined by policy as "designed for the patient to sit or stand") for six hours while on Alternative Housing status on May 19, 2023. CDCR policy mandates that temporary housing of patients in small holding cells can never exceed four (4) hours.

During a clinical contact with his psychiatrist on August 15, 2023, the IP reported "that he 'knows' that he will 'eventually die by suicide when I know that I'm never getting out of here'" if he were to be denied parole. His last two clinical contacts on October 26 and October 31, 2023 were conducted cell front due to "custodial staffing shortages and high individual caseloads for clinicians" at CSP/LAC. He was noted to be stable and denied any suicidal ideation. However, the IP had several rambling telephone calls with his mother in October and November 2023, the last of which occurred on November 4, 2023, less than a day before his death. During their conversation, his mother asked him not to call her anymore unless they could have a two-way, mutual conversation rather than his rambling, after which he responded: "This is the last time Mom…I'm not gonna upset you no more. I'm going to be perfect." He ended the telephone call by stating, "I'm gonna [sic] go to crisis center. I'm gonna [sic] go to suicide watch and get some help…I got problems in prison Mom." Early the following morning (November 5), the IP was observed to be yelling and disruptive in the housing unit. As a result, he received an RVR and was found dead a few hours later.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, although he had a few medical issues, including asthma, none were thought to be proximate causes of his death. He did leave several letters to family members which could be interpreted as suicide notes, and they were each rambling in nature and did not contain any narrative regarding precipitants to his death. The CDCR reviewer theorized that the IP "appeared to have a serious psychotic disorder that was exacerbated by chronic alcohol and drug use. During periods of intoxication, he would become actively delusional, paranoid, and angry and aggressive…his thought content was not only paranoid with fears of being killed but filled with despair and hopelessness of life in prison leading to thoughts of death by suicide. The psychiatrist recalled that a few months prior to his death by suicide, Mr. ____ made a statement that he would eventually kill himself when/if the court denied his appeal because he could not tolerate spending the rest of his life incarcerated. It is plausible that Mr. ____ viewed his RVR on November 5, 2023, combined with his RVR from March 2023, as ruining his chances for a Level III override and elderly parole…."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) Records consistently and frequently mentioned Mr. ____' alcohol and drug use continued over his years in CDCR and significantly impacted the severity of his psychosis and mood dysregulation, leading to suicidal statements and behavior. Yet, the three most recent Mental Health Master Treatment Plans dated April 12, 2023, June 28, 2023, and August 23, 2023 did not appear to adequately address

Mr. ____' severe substance use disorders and update treatment progress. See the *Discussion/Conclusion* section for more information.

2) The MH Safety Plan completed as part of the SRASHE on May 19, 2023 was lacking information as required per CAT 14. Specifically, the Clinical Impressions/Interventions sections only included two separate responses, that were then pasted verbatim for different questions. The copied responses did not address the questions being asked on the MH Safety Plan or include any identified interventions. Mr. ____' suicidality and his pattern of utilization of substances as a significant trigger for his psychiatric instability was documented throughout records. Thus, despite his apparent refusal to answer the specific questions on the MH Safety Plan on May 19, 2023, the MHPC had a multitude of information from which to determine what problems were salient for Mr. ____ at that time and suggest strategies to manage his behavior.

3) During the review, it was noted responding staff did not respond with the complete Cut-Down Kit as outlined in the January 22, 2018, Memorandum titled, 'RESPONSE TO SUICIDE ATTEMPTS BY HANGING OR ASPHYXIATION, INTRODUCTION OF THE REPLACEMENT CUT-DOWN-TOOL, AND STANDARDIZATION OF THE CUT-DOWN KIT.' Specifically, the memorandum states in part, '… The cut-down kit shall be transported to the location immediately by custody staff…'

4) During the review, it was noted that on May 19, 2023, Mr. ____ was placed on Alternative Housing status pending MHCB transfer. Upon review of the CDCR 7365 form, Mr. ___ was initially housed in a wet cell in the C-Yard medical area, but subsequently was moved to a holding cell in the 'D' Gym for a period of six (6) hours. Mental Health Services, Policy 12.05.301, states in part, 'Small holding cells that are designed for the patient to sit or stand shall only be used as a last option for temporarily housing patients in crisis. These placements are not considered alternative housing, and use of these cells shall be documented on the custody log for small holding cells. Patients shall be transferred out of these cells as soon as possible and their placement is *never to exceed four hours*.

5) During the EHRS review, for the January 9-17, 2023, Mental Health Crisis Bed admission, there were several delayed and missed nursing documentations identified pertaining to suicide watch and suicide precaution.

**Audit Summary**: Similar to other CDCR facilities, CSP/LAC has been adversely affected by staffing shortages during the past year. As such, some, but certainly not all, of the deficiencies found during this current assessment were attributable to staffing shortages resulting in significant increases in mental health referrals, as well as crisis calls, use of alternative housing, SRASHE completion, and discharge custody checks. Adequate practices were found for intake screening, PT rounding in restrictive housing, Guard One compliance, and offering out-of-cell activities to MHCB patients.

There were multiple deficiencies found in other areas that require corrective action, including placement of new intake IPs in unsafe, non-new intake cells in the EOP ASU, but, more importantly, in the C-5 ASU overflow unit; problematic crisis responses involving compromised privacy/confidentiality in the D-Yard gymnasium; uneven case presentations during MHCB IDTT meetings, inadequate observation of MHCB patients, inadequate safety plans for patients discharged from MHCB and alternative housing, untimely five-day clinical follow-ups for patients discharged from MHCB, low compliance rates regarding discharge custody check forms by clinical and custody personnel, and low compliance rates for most CPR and suicide prevention training.  Finally, the "experimental five-day follow-up program" in C-5 Unit was very problematic, resulting in IPs: 1) remaining on this status for the entire five-days (contrary to the maximum duration to 72 hours), 2) locked down in their cell 24 hours a day and prohibited from utilizing the yard or telephone, a clear violation of CDCR policy, and 3) prohibited from any out-of-cell contact with mental health clinicians, a clear violation of CDCR policy.

### 15)    California Medical Facility (CMF)

**Inspection**:  September 25-26, 2023 (previous suicide prevention audit was on May 27-28, 2021).  CMF housed approximately 2,230 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed two new admissions during the **Intake Screening** process in R&R unit on September 25-26, 2023.  The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

In addition, this reviewer had the opportunity to observe required daily **PT Rounds** in the two active ASUs: I-3 Unit for GP and 3CMS IPs, and M-3 Unit for EOP IPs on September 25-26.  The rounds in both units were unremarkable and the PTs were observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload IP.

**Housing**:  CMF had 50 **MHCBs** located on two wings (A and B) of the CTC that were previously found to be suicide-resistant.  Despite a severe staffing shortage that included only one assigned psychologist per day, the MHCB unit had 44 patients on September 25, 2023, and was at full census of 50 patients on September 26, 2023.  Of note, the current MHCB census was dramatically different from the 2021 assessment when A-Wing was closed due to a low census, and only approximately 20 of 50 (or 40 percent) rooms in B-Wing were occupied.

In addition, there were a total of seven **New Intake Cells** in the ASUs, with two in I-3 Unit and five in M-3 Unit.  A third ASU (Willis Unit) was closed at the time of the assessment. Three new intake cells had been added to M-3 since the previous assessment.  All seven new intake cells were suicide-resistant, and all new intake IPs were observed to be in new intake cells in both ASUs.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were primarily found in MHCB observation cells. Alternative housing was utilized only a few times a week, and IPs were required to be furnished with beds and observed on a 1:1 basis. From June through September 2023, there were 54 IPs placed in alternative housing, with all but six discharged within 24 hours. All of these six IPs were subsequently admitted into a MHCB. Overall, 67 percent (36 of 54) of IPs placed in alternative housing patients were subsequently transferred to a MHCB, with 33 percent (18 of 54) of the referrals rescinded and IPs returned to their housing units. This reviewer examined the EHRS files for all of the 16 DTS rescinded cases and found that required SRASHEs were completed in all cases, with five-day follow-up assessments completed in 90 percent (9 of 10) of applicable cases. However, the required safety plans were found to be very problematic, with safety plans completed in only 31 percent (5 of 16) of the cases. Most of the safety plans were inadequate.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit. In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff with documentation of such checks entered into the EHRS. Of note, a previous problem of providers distinguishing between orders were written as "Q-11, safety," "Q-11, behavioral" or simply "Q-11" for suicidal and non-suicidal patients had been corrected. During August 2023, the Mental Health Observations Reporting Tool indicated that 63 patients were on observation status in the MHCB unit, with 95 percent compliance with timely observation of patients on Suicide Precaution and 95 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period in the I-3 and M-3 ASUs found a combined 98 percent compliance rate with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of March 2023 through August 2023. A sample EHRS review of 50 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in 94 percent (47 of 50) of the cases. Of note, due to the severe clinical staffing shortage, CMF had been granted permission in March 2023 to utilize an abbreviated suicide risk evaluation (SRE) and master treatment plan templates in both its outpatient and inpatient programs.

In addition, the **Crisis Intervention Team** was launched at CMF in December 2018, paused in April 2020 due to COVID-19, reactivated in April 2021, and then paused again in April 2022 due to the staffing shortage. Currently, emergency referrals were responded to by crisis clinicians between 8:00 a.m. and 4:00 p.m., Monday through Friday, as well as varying hours on weekends. This reviewer did not have an opportunity to observe the crisis response process during the on-site assessment.

Four **IDTT Meetings** in the MHCB unit were observed on September 25-26, 2023, including for two patients being discharged following admission for DTS. Overall, there was good team participation, discussion regarding reason for admission (DTS), diagnoses, medication, observation level, and suicide risk inquiry, but inaccurate discussion regarding property issue and

241

out-of-cell activities. The quality of the IDTT meetings were greatly assisted by the presence of the former MHCB supervisor who was the chief psychologist. During the on-site assessment, this reviewer was informed that CMF did not currently have a MHCB supervisor, and only 3 of 11 (27 percent) MHCB clinical positions were filled. (In fact, most mental health supervisory positions at CMF were unfilled.) As discussed below, this staffing shortage not only resulted in patients not receiving their initial IDTT meetings within 72 hours, but patients were also not being seen by primary clinicians on a daily basis as required.

In addition, although safety planning was briefly discussed for the two patients being discharged from the MHCB unit, there was no discussion regarding safety planning for a third patient (CMF 1) who had been admitted the previous week for DTS. This patient's IDTT meeting was also problematic because he was admitted to the MHCB unit on September 19, 2023, but did not receive his initial IDTT meeting until September 25, 2023, well outside the required 72-hour threshold. Review of other medical charts for current MHCB patients found that multiple patients did not receive their initial IDTT meetings with 72 hours of admission.

As mentioned above, this reviewer's examination of multiple charts indicated that not all MHCB patients were always seen on a daily basis as required. For example, one patient (CMF 2) admitted to the MHCB unit on September 1, 2023 was not seen by either a clinician or psychiatrist for 8 of 24 (33 percent) days. Another patient (CMF 3) was placed in the MHCB unit for 22 days from May 3 through May 24, 2023 and also only seen 33 percent (eight of 24 days) of the time by either a clinician or psychiatrist. In addition, the patient had been admitted for DTS and had neither a SRASHE nor safety plan developed upon discharge from the MHCB unit.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for approximately 47 patients admitted into the MHCB unit for at least 48 hours and found that, although many were eventually offered multiple opportunities for yard, shower, and telephone privileges at some point of their MHCB placement, such privileges were not always offered by custody personnel consistent with provider orders. In addition, review of provider orders for these same patients indicated that, although most were clinically approved for out-of-cell privileges within 24 hours of admission, most were not offered these activities by custody personnel in a timely manner.

There were three primary problems identified by this reviewer at CMF. First, custody personnel were wrongly noting on 114-A forms that at least 30 percent (11 of 37) of patients clinically cleared for out-of-cell privileges were "not approved" for those privileges. Second, there was incorrect interpretation by a custody officer and a CC1 on separate days (September 25 and September 26) suggesting that patients who were not on "full issue" clothing (i.e., only issued a safety smock or t-shirt/boxers) were prohibited from yard and telephone calls. Such a practice was not only problematic because it violated MHCB policy but was the exact poor practice that this reviewer found during the previous assessment. As stated in the fifth re-audit report on suicide prevention practices at CMF in May 2021, "the CC1 incorrectly stated to several patients during the observed IDTT meetings that they needed to be on 'full issue' prior to receiving out-of-cell activities." As such, the daily Adaptive Support Form (CDCR 128 C-2) that appeared on each patient's cell door in the MHCB unit and listed the approved out-of-cell privileges was

being ignored by custody personnel. Third, it was noteworthy that, despite this reviewer being informed that 114-A forms underwent supervisory review prior to being scanned into the electronic record management system (ERMS), these poor practices continued to occur in an unabated fashion.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, the EHRS charts of 20 patients discharged from the unit and remaining at CMF between July and August 2023 were examined. The review found that the required SRASHEs were completed in all (100 percent) of the cases, and all of the required five-day follow-up assessments were completed in 17 of 20 (85 percent) of the cases. With regard to safety planning, the review found that only 15 percent (3 of 20) of the cases had an adequate safety plan, 80 percent (16 of 20) of the cases had inadequate safety plans, and 5 percent (1 of 20) did not have the safety plan. Of note, the Suicide Reports for recent suicides [(at SQ prison (SQ 3) and CSP/Corcoran (COR 6)] involved patients placed in the MHCB unit at CMF during April and August 2023 and resulted in several deficiencies in SRASHE development and safety planning at CMF.

The following two cases are symbolic of safety planning with CMF. In the first case, the patient (CMF 4) had an adequate safety plan was completed by an out-patient clinician on September 8, 2023 following their MHCB discharge:

> MH Safety Plan (**Adequate**)
>
> Safety Planning Reason: Other
> Other Reasons for Safety Planning: *Although the pt's acute risk was low (due to denial of current SI), the safety plan was reviewed in order to boost her ability to cope with the distress she experiences in ASU (which leads to reported SI and, in some cases, suicidal behavior).*
> Patient Participate - Warning Signs: Yes
> Warning signs - Patient focused: *'panicking,' 'pacing.'*
> Warning signs - Clinical Impressions: *From review of documentation and interview today, it does appear that anxiety is a major factor in the pt's report of SI and engaging in suicidal behavior. Pacing occurs in response to the anxiety. Other warning signs which have been reported in the past include paranoia, AH, experience of self-judgment, and hopelessness. Today, we addressed the anxiety using CBT skills ('examine the evidence') and discussed coping skills. In the past, we have also addressed the self-judgment (from 'God') using the religious language which the pt herself uses to challenge the judgments.*
> Helpful reducing self-harm - Patient: *Contacting family, reading religious materials, other distracting activities such as listening to the radio or playing games.*
> Helpful reducing self-harm - Clinical: *Contact with family appears to be a strong antidote to the distress which leads to SI or self-harm. I recommended that the pt could write letters even if she does not currently know the addresses, and mail them later when she is able to contact family by phone and obtains the addresses. Encouraged the pt to utilize the coping skills when she notices herself beginning to panic or 'pace' in the cell.*

Reduce Risk Factors - Patient: ***Read the Bible, write letters to sister, listen to radio, play games on tablet, tell custody if she is unable to cope.***
Reduce Risk Factors - Clinical: ***The Pt appeared to be sincere in her statements indicating willingness to engage in these coping activities. She has a history of poor adherence to planned coping activities, so it would not be surprising if she did not follow through. In such cases, she is more likely to seek MHCB than to actually attempt suicide, at least in recent months.***
Patient History of Self Harm: No
Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: Yes
Protective Factors - Patient focused: ***Family contact, rapport with clinicians, religious faith.***
Protective Factors - Clinical Impression: ***These responses are consistent with the pt's past statements, her personality, and orientation in life.***
Enhanced Factors - Patient focused: ***Pt will utilize coping skills rather than reactively report SI when she is feeling anxious. Staff will review coping skills/safety plan to reinforce this, and also explore specific fears and address these.***
Enhanced factors - Clinical Impressions: ***The pt has a history of reporting SI and being admitted to MHCB, then reporting and exhibiting few symptoms while in MHCB. Thus, it appears that she uses MHCB admission as a preferred coping skill to deal with anxiety or other uncomfortable feelings which are elicited by the ASU environment. Thus, a focus on distress tolerance skills is likely to increase her sense of self-efficacy and ability to recall and utilize her protective factors when anxious or otherwise distressed.***

In the ***second*** case, following a 26-day MHCB placement, the patient (CMF 5) had the following inadequate safety plan completed by a MHCB clinician on August 9, 2023:

MH Safety Plan (**Inadequate**)
Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: Yes
Warning signs - Patient focused: ***can't sleep even though tired, anxious, upset with something.***
Warning signs - Clinical Impressions: ***feeling hopelessness/helplessness, depression, safety concerns.***
Helpful reducing self-harm - Patient: ***talk to my clinician or staff.***
Helpful reducing self-harm - Clinical: ***wants PTSD treatment.***
Reduce Risk Factors - Patient: ***call clinician/staff.***
Reduce Risk Factors - Clinical: ***IP reported that walking outside helps his mood when he is upset.***
Patient History of Self Harm: No
Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: Yes

244

Protective Factors - Patient focused: ***family support, Christian, children: 1 son (deceased), 2 daughters, one deceased, coping skills: walk around the track, hear 'oldies.'***
Protective Factors - Clinical Impression: ***make sure IP has tablet, speaking with staff.***
Enhanced Factors - Patient focused: ***'I don't know.'***
Enhanced factors - Clinical Impressions: ***support the IP in finding meaning and purpose in his life.***

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from January through August 2023. Due to the severe staffing shortage and lack of MHCB supervisor, CMF could not provide proof of practice that discharge SRASHEs and safety plans were being timely reviewed by the MHCB supervisor or designee as required by policy.

In addition, this reviewer's medical chart review found that the vast majority of patients discharged from the MHCB unit for DTS between March and May 2023 did not have the required safety plans completed. This time period coincided with the introduction of the abbreviated SRE in March 2023.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 132 cases of patients discharged from a MHCB, alternative housing placement, or other higher levels of care, who remained at CMF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from March through August 2023. The review found that only 48 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with low compliance percentage mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement, forms not being completed, or forms not being completed each day. Most checks were clinically ordered for 24 hours. In contrast, 94 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with only a few errors found related to gaps in documentation during this current assessment.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (March through August 2023) found that meetings did not have quorums for April and July 2023. Due to the

severe staffing shortage, meeting minutes were very brief and included some discussion regarding compliance data on discharge custody checks and training.  Patients enrolled in the SRMP were not discussed, with staff shortages again cited as the reason.  Meeting minutes were otherwise unremarkable.

Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. The facility did not provide documentation for corrective action plans (CAPs) resulting from this reviewer's prior assessment report and/or regional SPRFIT audits.  A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**:  According to training records, 97 percent of custody and 100 percent nursing staff were currently certified in CPR.  In addition, 95 percent of custody staff, only 87 percent of medical staff, and 90 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of September 2023, none of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  CMF experienced one suicide during the review period.  In that case (<u>CMF 6</u>), the IP was found hanging from the ventilation grate by a sheet in his mainline EOP cell during the late afternoon of March 21, 2023. He entered the CDCR system for a seventh term on April 22, 2009 to serve more than a 22-year sentence for multiple counts of robbery, burglary, and assault.  He was transferred to CMF on January 24, 2023. The IP incurred nine (9) RVRs during his confinement, the most recent occurring on February 3, 2023 for battery on another IP.  He was considered to be gang drop-out. The IP was unmarried and did not have any children.  He did not have any family support system; his mother died of breast cancer and a brother died by suicide at Calipatria State Prison in 2012.  In addition, the IP had not seen his father since 1994, and he also lost contact with his two sisters.

According to available records, the IP and three siblings were born into a dysfunctional family environment.  His biological parents separated at some point, but the records were unclear as to when that occurred.  In addition, he was placed in foster care for approximately four (4) years beginning at age 4.  Records also indicated he had a history of physical abuse beginning at an early age by his mother and mother's boyfriend (possibly his stepfather). The IP reported he left home at the age of 13 and lived on the streets, as well as placed in the juvenile hall system on several occasions.  He did not finish grade school, but subsequently received his GED. Beginning when he first smoked marijuana at age 5, the IP developed a significant history of substance abuse that eventually included heroin, cocaine, PCP, methamphetamine, and LSD.  He had a sporadic employment history, including plumbing, roofing and construction, that was severely curtailed by substance abuse and six prior CDCR terms. There was a history of mental illness by his mother, and substance abuse by his mother and other family members.  As indicated above, a brother died by suicide in 2012.  Available records indicated that the IP did not have history of mental illness but reported several suicide attempts in the community.  For

example, he reported the following suicide attempts during CDCR confinement that occurred in the community: "overdose (age 8 and 12), hanging (age 18), hanging (while in county jail in 2004), hanging (2006), and hanging and cutting arm requiring more than 100 sutures (2009 during trial for committing an offense)."

Upon re-entry into CDCR in April 2009, the IP screened negative for mental health symptoms and was not initially enrolled in the MHSDS. Although CDCR medical records were unavailable for review for services rendered between 2009 and 2011, he was placed at 3 CMS level of care in November 2009. The following year in April 2010, the IP's level of care was elevated to EOP for worsening symptoms, including homicidal ideation, with diagnoses of depressive disorder and polysubstance dependence. He continued in EOP until July 2014, and presented with depressed mood, inconsistent group attendance, agitation, impaired sleep, hopelessness, anxiety, and panic attacks. The IP was inconsistently compliant with psychotropic medication during this time period.

On July 24, 2014, the IP was placed in a MHCB unit following superficial cuts on his neck, stating that the cuts were made following rescission of his single cell status. He also threatened to kill any person that was placed in his cell. During this placement, he reported depressed mood, ongoing auditory hallucinations, as well as unremitting suicidal and homicidal ideation. His diagnosis was changed to psychotic disorder. The IP did not stabilize in the MHCB unit, and was transferred to the DSH-ICF program on August 28, 2014 with a diagnosis of schizoaffective disorder, depressive type. In July 2015, he was discharged back to EOP and remained at that level of care until June 2019.

On June 14, 2019, the IP was placed into the ASU due to battery on another IP. While in restricted housing, he presented with labile mood, high depression, increased isolation, withdrawal from treatment, inconsistent medication compliance, increased sleep disturbance and a decline in activities of daily living. He was transferred to the SVSP PIP-ICF on July 25, 2019. During this placement, progress notes indicated he "continued to have a depressed mood, mostly participated in treatment, inconsistently took psychiatric medication, reported ongoing anxiety about single cell status, and endorsed continued auditory hallucinations, paranoia, dysphoria, racing thoughts, and impaired sleep."

The IP was at the SVSP PIP-ICF from July 25, 2019 through May 13, 2022. During this time, multiple suicide attempts occurred in December 2019, February 2020, May 2020, August 2020, January 2021, and March 2021. Two of these suicide attempts were very serious in which the IP lost consciousness and had to be resuscitated. Although records indicated that he did not have any more suicide attempts in the ICF program after March 2021, contacts with his PC and psychiatrist indicated depressed mood, lack of interest, racing thoughts, nightmares, and impaired sleep. Further, the IP "did not present with any behavioral problems, was medication compliant, inconsistently attended group, and periodically refused vital signs."

On May 4, 2022, the IP was observed by nursing staff to be wrapping a ligature around his neck. He was placed on Suicide Watch and subsequently transferred to the CMF PIP-APP on May 13, 2022. During the initial psychiatry assessment, he again reported depressed mood, recent suicidal thoughts, poor sleep, lack of interest, feelings of worthlessness, anxiety, and poor

energy.  During subsequent contacts with mental health staff (many of which were missed), various topics were discussed, such as: "concerns about single cell status, wanting to address legal issues, coping skills, medication compliance, hoping to have an earlier release date, difficulty with transitions, negative interactions with incarcerated peers, chronic suicidal ideation, and misophonia (dislike of sound)." The IP began refusing his psychotropic medication in late June 2022 because he did not like doing "mouth checks," and the medication was discontinued.  According to the CDCR reviewer in this case, he "inconsistently had his weekly treatment teams while at CMF PIP Acute.  Specifically, there were no treatment teams during the weeks of May 30, June 13, June 20, June 27, July 4, July 18, August 1, and August 15, 2022.  The IPOC for danger to self was continued, however, there is no indication that it was charted on during weekly clinician contacts." The IP was discharged from CMF PIP-APP to EOP on August 22, 2022.

Upon arrival at EOP at CMF, his diagnoses were revised to schizoaffective disorder, bipolar type, PTSD; intermittent explosive disorder, and antisocial personality disorder.  A completed SRASHE documented a high chronic and moderate acute risk for suicide.  The IP was placed into the Suicide Risk Management Program.  During this EOP placement, he was inconsistently seen by a clinician on the required weekly basis (either individually or in a clinician case management group).  For example, he was not seen during the weeks of October 17, October 24, November 7, November 21, December 12, December 19, and December 26, 2022, as well as during the week of January 2, 2023.  Similar to cancelled appointments at the PIP-APP, CMH mental health leadership informed the CDCR reviewer in this case that "due to severe staffing shortages, treatment modifications were initiated in the mainline EOP program." When seen, the IP discussed various topics with his clinician, including interpersonal difficulties, coping skills, stressors, distress around loud noises, and history of auditory hallucinations.

During early January through early March 2023, the IP was placed in the ASU on two occasions.  He was seen weekly by either his PC or psychiatry as required.  All of these contacts occurred at cell-front and subsequent progress notes consistently indicated that he did not present with impaired functioning or at imminent risk for suicide.  Upon his return to mainline EOP, he met with a psychiatrist on March 8, 2023 and reported the following symptoms: "depressed mood, high anxiety, anger, feeling delirious, poor sleep, poor energy, poor concentration, distress due to loud noises, command auditory hallucinations to hurt a cellie, visual hallucinations, and paranoia." The IP denied any suicidal ideation, but reported anxiety about his upcoming single-cell review in April 2023.  He continued to decline medication.

The last mental health documentation for the IP occurred on March 16, 2023 in the form of a MHPC Initial Assessment.  However, according to the CDCR reviewer in this case, the initial assessment form indicated that the IP "did not attend the appointment, therefore, various portions of the assessment were not completed.  Additionally, there was no indication in the initial assessment that he was assessed at cell-front for a wellness check or to gather objective information (e.g., mental status exam) in order to complete the assessment." The IP died by suicide five days later.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide.  In addition, although he had a few medical

issues, these issues were not thought to be proximate causes of his death. He did not leave a suicide note. The CDCR reviewer theorized that the IP "was distressed about the potential of losing his single cell status…. Additionally, Mr. ____ was ambivalent about his upcoming parole, most likely exacerbated by the fact that he had been incarcerated for most of his adult life and had no support system on the streets. Mr. ____ had a long history of self-harm and numerous suicide attempts. He was impulsive and used self-harm to cope with his feelings of distress. He was experiencing significant mental health symptoms in the week prior to his death which, in combination with the concerns about his single cell status…. caused him to become overwhelmed and triggered such distress that he made the decision to end his life on March 21, 2023."

The Suicide Report contained 12 recommendations for corrective action through a QIP:

> 1) <u>SVSP PIP ICF</u>: Mr. ____ was not assessed by a clinician during the weeks of April 11 and April 18, 2022. Additionally, the treatment plan dated March 28, 2022 indicated Mr. ____ would be assessed by a recreational/rehabilitation therapist on a weekly basis and there is no documentation these contacts occurred. Subsequently, the treatment plan dated April 28, 2022 indicated Mr. ____ would have daily contacts with a recreational/rehabilitation therapist and there is no documentation these contacts occurred.

> 2) <u>SVSP PIP ICF</u>: Information from the clinical summary for the treatment plans dated March 28, 2022 and April 25, 2022 pulled forward from previous treatment plans and were not updated in a clinically meaningful way.

> 3) <u>CMF PIP Acute</u>: Information from the clinical summary of the treatment plans dated May 27, 2022 and June 7, 2022 were not updated in a clinically meaningful way and did not include updated information on the mental health IPOCs.

> 4) <u>CMF PIP Acute</u>: It is noted CMF PIP Acute has a California Department Public Health Program flex which allows routine treatment teams every 14 business days, rather than weekly, when the anticipated length of stay is 30 days or greater. Based upon this, the weekly treatment teams that occurred on May 27, 2022, July 14, 2022 and July 29, 2022 were late.

> 5) <u>CMF</u>: There is no indication the clinician-to-clinician contact was completed within five business days as required by memorandum *12.11.2101(B) Treatment and Planning Procedures: Discharge Policy and Procedure dated June 30, 2017.*

> 6) <u>CMF</u>: The treatment plan dated February 16, 2023 did not have any IPOCs that were initiated. Additionally, there were multiple individual contacts in which the IPOCs were inconsistently charted on. Per the EHRS end-user MH training (training module 9 – Interdisciplinary Plan of Care), IPOCs are to be included in all treatment plans and be documented at each patient encounter.

7) <u>CMF</u>: There were two level of care changes with no associated treatment team on January 26, 2023 and March 8, 2023. Per MHSDS Program Guide, 2021 Revision (12-4-7), '*all decisions regarding change of treatment level [are] made by the IDTT*.'

8) <u>CMF</u>: The clinician's initial assessment dated February 26, 2023 had significant portions of the form which were not completed. Per MHSDS Program Guide, 2021 Revision (12-4-7), '*The initial clinical assessment involves an interview with the inmate-patient and a review of available clinical records, the Central File, the evaluation of the referring clinician and records from prior institutional placements*.'

9) <u>CMF</u>: The clinician's initial assessment dated March 16, 2023 indicated Mr. ____ refused the appointment and there was no indication the clinician assessed the patient at cell-front in the documentation. However, this clinician reported during the on-site review that Mr. ____ was assessed at cell front and reported and presented with symptoms significant enough to warrant further evaluation.

10) <u>CMF EOP Psychiatry</u>: Shortly after the patient transferred to CMF EOP in late August 2022, patient had an interdisciplinary treatment team (IDTT) on September 8, 2022 and a psychiatry appointment on September 20, 2022. And shortly after the patient transferred to CMF AdSeg in early January 2023, patient had an IDTT on January 17, 2023 and a psychiatry appointment on January 19, 2023. The fact that the IDTT meetings occurred before the individual psychiatry appointments is not in keeping with policy.

11) <u>CMF</u>: During the review it was noted the primary staff member did not wait for responding staff before opening the cell door, therefore rendering the scene unsafe.

12) <u>CMF</u>: During the review of the Emergency Medical Response timeline, CPR was stopped by the physician as patient had a DNR in file. However, the Health Care DOM has exceptions to honoring a DNR, including when the patient's cardiopulmonary arrest is not part of a natural or expected death (e., the patient's condition is a result of an attempted suicide).

**Audit Summary**: Adequate practices were found in intake screening, PT rounds in restrictive housing, utilization of new intake cells, Guard One compliance, and most CPR and suicide prevention training. According to the CMH, due to the staffing crisis, the facility had prioritized emergent mental health referrals and five-day follow-up assessments. As noted above, this prioritization resulted in high compliance rates in these two areas. However, the MHCB supervisor position was vacant, as were most mental health supervisory positions. Despite only 3 of 11 MHCB mental health clinical positions being filled, the 50-bed MHCB unit was at capacity. The presence of only one primary clinician on-site during certain days of the week resulted in initial IDTT meetings being delayed and patients not being seen on a daily basis. Required safety planning for patients discharged from alternative housing was occurring

infrequently and was generally inadequate for MHCB patients. A chronic problem of custody officers not offering out-of-cell privileges to patients approved for such privileges, as well as custody personnel incorrectly prohibiting patients access to yard and telephone privileges until they were clothed in "full issue" continued during the review period.

### 16) **California State Prison-Solano (CSP/Solano)**

**Inspection**: September 27-28, 2023 (previous suicide prevention audit was on October 28-29, 2021). CSP/Solano housed approximately 3,661 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on September 27, 2023. The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. The door to the nurse's office was closed during the screening process. Although a TTM was not located in the office, this reviewer was informed by the nurse that if a maximum-custody IP was being screened, they would be placed in handcuffs, with the door remaining closed and an officer providing security from the hallway. Required suicide prevention placards (both English and Spanish versions) were observed inside the office.

In addition, this reviewer observed daily **PT Rounds** in ASU (Building 10) on September 27, 2023. The rounds were unremarkable and the PT was observed to be correctly entering Psych Tech Daily Rounds information into the EHRS for caseload IPs.

**Housing**: CSP/Solano had nine (9) **MHCBs** that had previously been found to be suicide-resistant. There were 8 patients in the MHCB unit during the onsite assessment.

The ASU (Building 10) contained a total of nine (9) retrofitted **New Intake Cells**. This reviewer observed that all new intake IPs were housed in new intake cells as required.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement was primarily found in Building 10 or the TTA and continued to be used very infrequently at the facility. From March through September 2023, only 21 IPs were placed into alternative housing, all remained under 24 hours, and all but one IP was referred to a MHCB. Although that one IP was not admitted into a MHCB, their level of care was raised to EOP and he was transferred to another facility. The required SRASHE and safety plan were completed in that case. Although all 21 IPs were required to be furnished beds and observed on a 1:1 basis, the data indicated that 24 percent (5 of 21) of the IPs were inexplicably placed on 15-minute observation. The issue was subsequently corrected by the SPRFIT coordinator.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit. In addition, patients not on a suicide observation status were observed at 30-minute intervals by nursing staff. During August 2023, the Mental Health Observations Reporting Tool indicated that 11 patients were on observation status in the MHCB unit, with 97 percent compliance with timely observation of patients on Suicide Precaution and 93 percent compliance with timely observation of patients on Suicide Watch.

251

Finally, a review of **Guard One** data for a recent 24-hour period in administrative segregation found 100 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of March through August 2023. A sample EHRS review of 24 emergent/urgent referrals for SI/behavior found that clinical staff completed required SRASHEs in only 79 percent (19 of 24) of the cases.

In addition, CSP/Solano did not have a **Crisis Intervention Team** and any emergent or urgent mental health referrals were responded to by clinicians assigned to individual housing units.

Three **IDTT Meetings** were observed on September 27-28.  The three patients were admitted for either grave disability or danger to others (DTOs).  Of note, according to the primary clinician, most of patients admitted into MHCB unit at SOL during the past several months from outside facilities had been for either grave disability or DTO, with few admissions for DTS.  Overall, there was good team participation, discussion regarding reason for admission (grave disability or DTO), diagnoses, medication, and observation level; but no discussion regarding property issue and out-of-cell activities.  Of note, at this reviewer's suggestion, the regional lieutenant and nurse consultant in attendance assisted in addressing a patient's concerns regarding location of property and endorsement to a facility based upon a history of Valley Fever.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for the eight patients who were housed in MHCB unit during the on-site assessment.  The review found that all patients received multiple opportunities for showers, yard, and telephone calls on a regular basis.  Of note, the CTC had a full-time recreational therapist (RT).

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined a sample of the EHRS charts of 26 patients discharged from the unit between April and September 2023, and had been admitted into the MHCB for DTS.  Because the level of care for all discharged patients was raised to EOP, all patients were transferred to other facilities upon discharge and, therefore, five-day follow-up assessments were not required to be completed by CSP/Solano clinicians.  The required discharge SRASHEs were completed in 96 percent (25 of 26) of the cases.  With regard to safety planning, the review found that 65 percent (17 of 26) of the cases had an adequate safety plan, 31 percent (8 of 26) of the cases had inadequate safety plans, and 4 percent (1 of 26) of the cases did not have the safety plan.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from January through August 2023.  The examination found that all 26 cases cited above were said to be reviewed by the acting MHCB supervisor or designee, although several reviews were not timely.  In addition, the one case (SOL 1) cited above in which the required SRASHE and safety plan were not completed was inexplicitly marked as reviewed by the acting MHCB supervisor or designee.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement that remained at CSP/Solano and were not transferred to administrative segregation (where observation at 30-minute intervals was required) was reviewed. The facility did not report any cases that met the above criteria for completion of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) during the recent six-month review period.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (February through July 2023) found that meetings did not have a quorum for July 2023. Meeting minutes were very brief and included some discussion regarding a few active improvement projects. Patients, if any, enrolled in the SRMP were not discussed. Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. The facility provided documentation for corrective action plans (CAPs) resulting from this reviewer's prior assessment report.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required two CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News" and "Suicide Risk Management Program Policy and Procedure." Because the facility did not have a CIT program, CCHCS's "Crisis Intervention Team Policy and Procedure," effective July 8, 2021, was not applicable.

**Training**: According to training records, 100 percent of both custody and nursing staff were certified in CPR. In addition, approximately 99 percent of custody staff, 93 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of September 2023, only 73 percent of mental health clinicians had completed the SRE mentoring program, only 38 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: CSP/Solano did not experience any suicides during the review period.

**Audit Summary**: Adequate practices found in most areas, including intake screening, PT rounding in restrictive housing, utilization of new intake cells, Guard One compliance, IDTT meetings for MHCB patients, offering of out-of-cell activities for MHCB patients, and most required training. A few deficiencies requiring corrective action were noted, including future monitoring of inappropriate orders for observing suicidal IPs in alternative housing at 15-minute intervals, low compliance with completing SRASHEs for emergent/urgent mental health referrals based upon DTS, and inadequate safety planning.

### 17)    California Men's Colony (CMC)

**Inspection**:  October 10-11, 2023 (previous suicide prevention audit on December 7-8, 2021).  CMC housed approximately 3,200 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed four new admissions during the **Intake Screening** process in the East Facility R&R unit during two shifts on October 10, 2023.  In the first case, the intake nurse on the 2nd shift was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS.  However, during observation of intake screening during the 3rd shift, that nurse failed to ask two IPs (CMC 1 and CMC 2) each of the following questions: "Have you recently received bad news?" and "Have you received any bad and/or unexpected news during a recent court hearing?"  During intake screening for the fourth case (CMC 3), the 3rd shift nurse failed to ask the IP any of the required questions regarding current suicidal ideation and prior history of suicidal behavior.

Due to the configuration of the R&R Unit, a TTM was located in a vestibule that was adjacent to the nurse's office.  Although nurses did not have direct line of sight of IPs and needed to walk from the nurse's desk to the TTM on several occasions to ask follow-up questions and answer the IP's inquiries, the vestibule's outer doors were closed and an officer stationed outside, thus ensuring privacy and confidentiality during the process.  Required suicide prevention placards (both English and Spanish versions) were observed in the area.

In addition, this reviewer observed daily **PT Rounds** in the ASU (Building 4) on October 10, 2023.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload IPs.

**Housing**:  CMC had 50 **MHCBs** located in two wings (A and B) of the CTC that were previously found to be suicide-resistant.  There were 44 patients in the MHCB unit during the on-site assessment, with six redlined cells.  Of note, beginning in late April 2021, 12 beds in Section B (cells 1 through 12) were designated as "flex" beds to accommodate patients placed at the acute level of care.  However, this reviewer was informed these 12 beds were "flexed" back to MHCB level of care in July 2023.

In addition, there were 16 **New Intake Cells** in the ASU, and all had been previously retrofitted to be suicide-resistant.  The ASU housed EOP, 3CMS, and GP IPs.  Although this reviewer observed that all new intake cells were empty on October 10, 2023, there was a new intake IP (CMC 4) housed in a non-new intake cell.  The case was very problematic.  The IP was at EOP level of care and arrived in the ASU two days earlier on October 8, 2023.  He had a recent MHCB admission in September 2023.  During the ASU pre-screening process on October 8, he expressed suicidal ideation, and the CIT process was activated.  He was subsequently assessed as not requiring an MHCB level of care, but inexplicably remained in a non-new intake cell.  Two days later during the morning of October 10, this reviewer observed the IP in the non-new intake cell during PT rounds and recommended to an ASU supervisor that he be correctly housed.  Several hours later during mid-afternoon of October 10, the CIT process was again activated for the IP due to suicidal ideation and safety concerns.  This reviewer met the CIT at the ASU and, upon arrival, the IP was still assigned to a non-new intake cell.  The CIT clinician and lieutenant were able to resolve the IP's concerns and it was determined that he did not require an MHCB

level of care.  Following the assessment, this reviewer again requested that the IP be rehoused in a new intake cell.  He was correctly rehoused a few hours later.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were found in Building 7, a location formally utilized as an interim unlicensed MHCB unit.  Alternative housing was used on a daily basis, and IPs were all furnished beds and required to be observed at staggered 15-minute intervals (because all of the cells were previously found to be suicide-resistant when it was utilized as an unlicensed MHCB unit).  From July through September 2023, there were approximately 183 IPs placed in alternative housing, with 89 percent (163 of 183) discharged within 24 hours.  There were several reasons why 20 (11 percent) of the IPs in alternative housing remained beyond the maximum 24-hour limit, the most prominent of which was the temporary unavailability of an MHCB.  The majority (65 percent) of all IPs placed in alternative housing were subsequently transferred to an MHCB unit, with 35 percent (64 of 183) of the referrals rescinded and IPs returned to their respective housing units.  This reviewer examined the EHRS charts for 22 rescinded cases and found that the required SRASHEs and five-day follow-up assessments were completed in all applicable cases.  However, the required safety plans for DTS were found to be problematic, with only 45 percent (10 of 22) of the cases having adequate safety plans, 41 percent (9 of 22) of the cases having inadequate safety plans, and 14 percent (3 of 22) of the cases not having any safety plans.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff.  During September 2023, the Mental Health Observations Reporting Tool indicated that 32 patients were on observation status in the MHCB unit, with 98 percent compliance with timely observation of patients on Suicide Precaution and 84 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period in the ASU found 95 percent compliance with the required checks that did not exceed 35-minute intervals.  Of note, multiple missed checks exceeded 90 minutes.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of April through September 2023.  A sample EHRS review of 50 emergent/urgent mental health referrals for SI/behavior revealed that clinicians completed the required SRASHEs in only 88 percent (44 of 50) of the cases.

In addition, the **Crisis Intervention Team** was launched at CMC in April 2019 and operational from approximately 8:00 a.m. to 8:00 p.m. each day.  Two clinicians each worked three 12-hour days, and other CIT-trained clinicians were assigned for Saturdays, vacations, and holidays.  The CIT was very active and responded to multiple calls per day.  As described above, this reviewer had an opportunity to observe the CIT process on October 10, 2023.  The team assembled in the sergeant's office and briefly discussed the case, the intervention with the IP occurred in the privacy of an ASU interview room, the crisis was resolved, and the IP remained in the ASU (but rehoused in a new intake cell), and a SRASHE was completed by the CIT clinician.

Five **IDTT Meetings** in the MHCB unit were observed on October 10-11, 2023, including one patient being discharged following an admission for DTO. Overall, there was very good team participation, discussion regarding reason for admission (DTS or DTO), diagnoses, medication, observation level, suicide risk inquiry, and out-of-cell activities. There was adequate discussion regarding safety planning in cases involving DTS. The quality of the IDTT meetings was assisted by the presence of the MHCB supervisor.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for all 44 MHCB patients housed in the CTC during the on-site assessment. The review found that, with the exception of telephone calls, all patients were afforded multiple opportunities to shower, as well as other out-of-cell time such as yard and dayroom. Of note, CMC had four full-time RTs assigned to the MHCB unit, and their daily availability (1 to 2 RTs per day) allowed for patients to be either in the yard or dayroom on almost a daily basis. The RTs also interacted cell front with patients during book exchange on a regular basis. Finally, review of the 114-A forms found that the offering of telephone calls was not documented for most patients.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 23 patients discharged from the unit during August and September 2023, had been admitted into the MHCB for DTS, and remained at CMC. The required discharge SRASHEs were completed in 96 percent (22 of 23) of the cases, and five-day follow-up assessments were completed in 95 percent (21 of 22) of applicable cases. However, similar to alternative housing data, the required safety plans for DTS were found to be problematic, with only 65 percent (15 of 23) of the cases having adequate safety plans, 31 percent (7 of 23) of the cases having inadequate safety plans, and 4 percent (1 of 23) of the cases not having a safety plan.

The following is an example of an adequate safety plan completed on a patient (CMC 5) on August 27, 2023:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: Yes
Warning signs - Patient focused: *'When I don't feel comfortable with myself.' Pt also reports that traumatic memories can trigger thoughts of SI.*
Warning signs - Clinical Impressions: *Anxiety and fear, either regarding past events or present stressors, appears to be main trigger. He admits that breathing exercises typically do not help. Thus, we focused today on allowing him time to talk through his experience and describe things that have helped him in the past. 1. Pt has started opening up and verbally processing his past experience with staff he trusts. Thus, he has found benefit talking to MHPC in EOP LOC. Today he opened up in MHCB with clinician he had never met before as a sign that he can open up when in non-judgmental space to do so. 2. Patient historically has found exercise to be helpful, but he admits that lately he can't work out due to his medical condition. Until he gets into physical therapy, doesn't feel comfortable working out again. 3. Patient also reports how*

*Journaling and continuing to write down feelings can help, but we discussed that he be mindful it doesn't re-trigger things in a negative way. Should he feel triggered, patient can re-engage with Muslim prayer 5x/day and taking the Prozac regularly (as prescribed by doc) to help with mood.*

Helpful reducing self-harm - Patient: *'re-focusing spiritually,' 'I'm a Muslim.'*

Helpful reducing self-harm - Clinical: *1. Patient reports that his recent decision to fast for spiritual reasons has two benefits (first, that he does not have to eat hospital food which he dislikes and second, that he can re-focus himself on what is most important). He states he plans to engage in Ramadan once the dates are announced this fall . Patient also believes that fasting has improved his mood 'I haven't felt angry in the past 24 hours.' 2. Patient reports how weekly 1:1 sessions with consistent and compassionate MHPC has helped him stay stable and feel supported. Previously he had clinicians develop tools such as positive self-talk and visualization techniques.*

Reduce Risk Factors - Patient: *'Return to Ad-Seg to apologize to my clinician.' Prayer, med-compliance, following up with the chaplain to gain access to Q'uran.*

Reduce Risk Factors - Clinical*: Patient would benefit from psychoeducation on the nature of anxiety and fear, how this disrupts the nervous system, and how he can work to reduce the impact by using cognitive tools (positive self-talk, challenging distorted thinking). Distress tolerance strategies have also proven to be helpful for individuals who have low threshold to manage stress. For instance, distraction tools, visualization exercises, and muscle relaxation in the face of tension/stress can help the body and mind re-train the reactivity of the nervous system and improve resilience. That being said, acknowledging loss/grief may help to process previous losses and build meaning-making toward a purpose-filled future. The types of activities that give I/P _____ purpose seem linked to his friendships and relationships with family. Once he gets access to law books again, he liked to read his law books to help others with their writs, etc.*

Patient History of Self Harm: No

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: Yes

Protective Factors - Patient focused: *close to four siblings (2 sisters, 2 brothers), nieces; 'I want to get better' (embracing the MH model of improving mental and physical well-being); also has goal to get out of prison*.

Protective Factors - Clinical Impression: *Pt sees his growth in his ability to speak out and request support from certain trusted staff. He is also future oriented and has developed long-term goals for himself (Goal-focused to breed pit bulls once he gets released in 21 months). He sees meaning in working with a breed of animal who is often misunderstood. Patient describes his relationship to his family and goals for his future as an important piece in helping him feel like he has purpose. Continuing to develop clear short- and long-term goal-setting and the steps necessary to go through to achieve those goals may help structure his*

> *progress and sense of accomplishment while reinforcing the type of activities that keep him out of ASU.*
> <u>Enhanced Factors - Patient focused</u>: *'need more therapy, maybe twice a week if possible for a month until I can get through all this;' States he writes things down and completes worksheets, journal entries.  Praying five times/day once gets to ASU.  Start eating again in ASU, taking meds.*
> <u>Enhanced factors - Clinical Impressions</u>: *Making plans with sister for when he gets out of prison.  Patient working on strategies to increase communication with sister (writing multiple letters to his grandmother's house).  Continuing working on emotion regulation, CBT, and exploring the triggers that arise with authority, boundary-setting (Building up his skills to better manage conflict without resorting to violence through thought-stopping, counting backwards from 10, etc.).*

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from January through September 2023.  This reviewer's examination of the data found problems with untimely supervisory review and with many of the safety plans reviewed following clinical discharge from the MHCB.  This finding was not surprising given the fact that CMC had only one MHCB supervisor for a 50-bed unit.  Of note, the supervisory review was found to be very thorough, with almost 10 percent of cases receiving a "failing" grade by the supervisor, a much higher score than found in other facilities, yet far lower than this reviewer's current assessment.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 86 cases of patients discharged from an MHCB or alternative housing placement who remained at CMC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from April through September 2023.  The review found that 95 percent had Page 1 "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with the few errors attributable to clinicians not completing the first day of the form.  A majority of the custody checks were recommended for 24 hours by clinicians.  In addition, 92 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with the few errors attributable to gaps in observation.  These findings were an improvement from the previous assessment.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

258

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (March through August 2023) found that meetings had quorums of all required mandatory members or designees for all six months. Meeting minutes included discussion on compliance data and improvement projects, as well as tracking and brief review of IPs in the SRMP. The facility had a serious suicide attempt in June 2023 that involved outside hospital treatment (i.e., with a medical severity rating of "3"), and an adequate case presentation and/or root cause analysis (RCA) was not included in the meeting minutes. Rather, the July 2023 meeting minutes included a brief demographic summary of the patient that was not consistent with the 7-step "mental health clinical review" requirement of a severe suicide attempt contained within the revised SPRFIT memorandum of June 14, 2023. The meeting minutes were otherwise unremarkable. The status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits was contained in separate documentation.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure." Of note, the SPRFIT LOP, dated May 2023, failed to list a senior PT as a mandatory team member.

**Training**: According to training records, 92 percent of custody and 100 percent of nursing personnel were currently certified in CPR. In addition, 93 percent of custody staff, only 81 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of September 2023, only 47 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and 97 percent had completed safety plan training.

**Recent Suicides**: CMC experienced five (5) suicides during the review period, three of which occurred during 2022.[34] In the ***first*** case (CMC 6), the IP was found hanging from the window by a sheet in his mainline EOP cell during the early morning of July 4, 2022. He entered the CDCR system on March 23, 2018, to serve a life sentence without the possibility of parole for two counts of 1st degree murder and one count of attempted murder. He was transferred to CMC on August 3, 2021. The IP incurred five (5) RVRs during his confinement, the most recent occurring on September 17, 2019 for fighting. He was not considered to be gang-affiliated. The IP was unmarried and did not have any children. He had family support through regular letter correspondence and telephone contact with his mother, sister, and grandmother.

According to very limited records, the IP and two sisters were raised by their mother while their father was incarcerated. He denied a history of trauma or abuse and had a normal developmental and educational history. The IP graduated high school but did not have an employment history. His substance abuse began at age 14 and included alcohol, marijuana, and methamphetamine. According to his mother, the IP had a history of mental illness beginning at adolescence when he began experiencing psychotic symptoms in 2015 at the age of 21, and was diagnosed with

---

[34] CMC also experienced another suicide in March 2022 that was summarized in the 5th Re-Audit Report.

schizoaffective disorder. The IP had a history of psychiatric hospitalizations in Oklahoma and was often non-compliant with his psychotropic medications, resulting in decompensation that included poor hygiene and random periods of starvation. The following year in August 2016, he committed the instant offense, an unprovoked shooting of a random woman and her 4-year-old daughter. Following his arrest, the IP was noted to be experiencing signs of possible delusional, disorganized, and paranoid thought process while in county jail. In July 2017, he was subsequently remanded to the custody of the DSH-Patton for determination of his competency to stand trial. Following a one-week stay that included a violent assault on a staff member, the IP was found to be competent to stand trial and returned to the county jail with diagnoses of schizophrenia, antisocial personality disorder, malingering (rule out), and various substance use disorders. He did not have a history of suicidal behavior in the community.

Upon entry into CDCR, the IP screened positive for mental health symptoms and was enrolled in the MHSDS at EOP level of care. He was diagnosed with schizophrenia and refused medication. By the time of his initial IDTT meeting on April 4, 2018, the IP was noted by several individuals, including custody officers and other IPs, as "being malodorous and refusing to take a shower. He also regularly refused food, withdrew socially, and demonstrated some confusion." The IP continued to deteriorate and was placed in the PIP-ICF in May 2018. The following month, a psychiatrist initiated an emergent PC2602 petition for grave disability. He eventually began to consume food. By August 2018, he had progressed to the point in which he had become less withdrawn, had an improved appetite, and was medication compliant. On October 26, 2018, the IP discharged from PIP-ICF and returned to EOP. His diagnosis of Schizophrenia was continued, and a SRASHE assessed a moderate chronic and low acute risk for suicide.

During the remainder of 2018 through August 2021, the IP continued in EOP level of care at CSP/LAC. He continued to demonstrate poor insight into his mental illness, resulting in a poor commitment to treatment and programming. The IP also continued to struggle with his ADLs, particularly his hygiene. On August 3, 2021, he was transferred to CMC. According to the CDCR reviewer in this case, documentation of treatment offered in EOP, particularly by the PC, was problematic. For example, the reviewer noted that "This documentation only minimally acknowledged Inmate _____'s substantial history of poor ADLs and indicated that he did not have any functional impairments." Further, the CDCR reviewer noted that all three contact notes on September 20, October 5, and October 19, 2022, contained the same, or very similar verbiage. For example, in the Current Status of Illness section, it read as follows: "IP was seen in confidential office setting for routine EOP contact. IP denied any current MH concerns. PC encouraged IP to shower and clean his cell. IP reported watching TV and exercising. Clinician encouraged IP to continue to practice adaptive coping skills to help manage sxs." In the Mental Health Assessments section, it read as follows: "I/P appeared stable at this time as he was fully oriented, future-oriented, well groomed, demonstrated a linear and organized thought process, and was articulate. I/P continues to do well to regularly use helpful coping skills to target symptoms. I/P does not require referral to a higher level of care for DTS, DTO, or significant impairment or dysfunction due to mental illness." MHPC contact notes on February 22, and March 8, 2022 by the same clinician were also problematic for utilizing the same verbiage.

The IP received five MHPC contacts in May 2022, with three of the contact notes containing the same or very similar language in the Current Status of Illness and the Mental Health Assessment

sections and no documentation about treatment progress toward the delusions IPOC. He was seen by a clinician for the final time on June 29, 2022. The clinician indicated that he appeared to be functioning at baseline, had adequate hygiene, and denied any suicidal ideation. The IP died the following week.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, he did not have any medical issues that were thought to be proximate causes of his death. He did leave a suicide note, but it did not provide any insight into the reason(s) for choosing to end his life. Following the suicide, there were unconfirmed reports that the IP had been bullied by another IP the day before his death. The CDCR reviewer theorized that he "began to perceive a breakdown in his own coping resources…. Inmate ___ was allegedly threatened and bullied the day before his death and he expressed feelings of hopelessness about this, thereby indicating that he may have perceived, at that point, that this particular protective measure was no longer effective."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) The notes were not individualized from contact to contact over time as noted in the clinical contact notes for the following dates: September 20, 2021, October 5, 2021, October 19, 2021; November 18, 2021 and November 30 2021; and February 22, 2022 and March 8, 2022. The clinical notes contained exactly the same verbiage in the Current Status of Illness and the Mental Health Assessment sections. In the latter two notes, it included Inmate ____'s reports of the amount of time he slept and the number of meals he ate and these remained unchanged. The documentation lacked a discussion of Inmate ____'s treatment progress or psychiatric stability.

In the **_second_** case (CMC 7), the IP was found hanging from the window by a sheet and medical gown in his CTC medical cell during the late afternoon of July 19, 2022. He entered the CDCR system on December 19, 2003 to serve a life sentence with consideration of parole for two counts of 1st degree murder and assault with a deadly weapon (against his estranged spouse and another individual). He was transferred to CMC on June 21, 2022. The IP incurred only one (1) RVR during his confinement, occurring on January 8, 2008, for failure to work. He was not considered to be gang-affiliated. The IP was unmarried and had four children. He had family support through regular letter correspondence with family and friends, and telephone contact with a son, daughter, and sister-in-law.

According to available records, the IP was born and raised in El Salvador and immigrated to the United States in 1989 at the age of 20. During this time, limited information suggested he was attempting to request asylum as a result of fleeing violence in El Salvador. Little is known about the IP's early upbringing, except that he and eight brothers were raised by both parents and exposed to a significant amount of sadness and trauma. He was the victim of physical abuse perpetrated by both his father and teachers at school. In addition, the family lived in squalid housing conditions that included a dirt floor and no electricity, resulting in extremely cold conditions and the deaths of three brothers. The IP also experienced a horrific incident that occurred at some point between the ages of 15 and 17, and resulted in all his male relatives

(father, brother, cousins, uncles) being marched into the woods and executed at gun point.  He reported being shot in the neck and he and his brother were the sole survivors.

The IP was only able to complete the 4th grade, and later enrolled in adult education classes during CDCR confinement.  He reported a consistent work history in construction for approximately nine years prior to the instant offense.  The IP did not have a history of substance use, nor did he have a prior juvenile or adult criminal history.  He did not report any mental health treatment in the community, but there were unconfirmed reports of a chronic history of depression.  According to court documents, the IP had a significant history of exposure to trauma resulting in PTSD.

Upon entry into CDCR in December 2003, the IP reported experiencing symptoms consistent with major depression, with a recommendation that he be referred to a clinician for further assessment.  However, there was no subsequent documentation as to why he was not placed in the MHSDS until May 2005.  In any event, during approximately 19 years of confinement, he was placed in only three institutions and incurred only one RVR.  Overall, the IP appeared to program adequately and was actively involved in adult education classes, self-awareness and improvement groups, and criminal and addictive thinking groups.

In May 2005, the IP was placed at 3CMS level of care with a primary diagnosis of PTSD, with treatment targeting both trauma and depression.  It appeared that all of his treatment contacts were provided with the use of an interpreter or interpreter services.  From 2005 through 2019, the IP appeared stable, actively engaged in treatment, and compliant with psychotropic medication.  He continued to report episodes of insomnia, depression, and recurrent medical concerns resulting from chronic back pain.  By 2013, he was titrated off medication and appeared to function well without it.  By 2018, he continued to present as stable, and there was a goal to reduce his symptoms of depression to a "2" before consideration of removal from the MHSDS.  In February 2019, the IP was removed from the MHSDS.  Although reporting some interest in remaining in 3CMS to work on his past unresolved trauma, the decision was made to discharge the IP from MHSDS because he continued to present as stable and all of his mental health symptoms had been in remission for over a year.

Two years later on both January 26, 2021 and February 5, 2021, the IP submitted Health Services Request forms to mental health, with the latter request stating: "Please I need to see the psychologist [clinician name].  I have prollem [sic] going to sleep and I feel very bad."  There was no documentation that any clinician responded to either of these requests.  He submitted a third request on February 23, 2021, was seen by a clinician a few days later, and reported significant episodes of insomnia, headaches, and feeling nauseous when smelling food.  He denied symptoms of depression and anxiety, as well as any suicidal ideation.  He was also seen by a psychiatrist, restarted on psychotropic medication, and re-enrolled in 3CMS in March 2021.  The IP's diagnosis was unspecified depressive disorder and PTSD.  In June 2021, he met again with the psychiatrist and requested that his medication be discontinued because he no longer needed it for sleep and his mood had improved.  According to documentation from June 2021 through April 2022, the IP consistently made all of his clinical contacts and continued to deny any significant mental health symptoms.  Treatment focused on continued processing of trauma

using cognitive behavioral therapies and completion of written treatment materials.  He consistently denied suicidal ideation or other areas of distress.

The IP had an extensive history of cardiac-related problems, including "coronary artery disease, nonischemic cardiomyopathy, chronic systolic and diastolic heart failure, frequent premature ventricular contractions, and ventricular ectopy." On February 14, 2022, he filed a grievance requesting not to be transferred to another facility as a result of these acute medical issues, stating that "I have established and have a steady positive program here at CTF-central where I can see my family, and get the necessary rehabilitation needed in order for me to obtain parole when available and be a productive member of society.  To transfer me now would only be a disruption in my rehabilitation and a setback for me, so I'm asking not to be transferred and to retain my current program" The IP's grievance was denied "due to the need for specialty services and potential for deterioration of his condition, this patient would be appropriately housed at an intermediate institution."  In a progress note dated April 13, 2022, his CTF clinician stated that "IP has been at CCCMS for 17 years and has many peers that can help him successfully navigate the prison and programming who help with interpretation.  This is especially stressful for IP as he is going to his first parole board hearing at the end of the year and needs to prepare his parole plans in English."

On June 21, 2022, the IP was transferred from CTF to CMC.  His first and only contact with a CMC clinician occurred the following week on June 28, 2022.  The contact was very brief, with the IP denying any suicidal ideation or other significant mental health concerns and stating that the transition from a cell to a dorm setting was "a little weird" but he was willing to give it a try.  According to the CDCR reviewer in this case, neither the required MHPC Initial Assessment nor initial IDTT meeting was completed pursuant to policy.  CMC mental health leadership staff later cited extreme staffing shortages as reasons for the missed appointments, and stated a triage system was utilized to prioritize high-risk patients over routine initial and routine contacts.

On July 9, 2022, the IP reported chest pain and was subsequently transported to an outside hospital.  Subsequent review of his care found that during transfer from CTF to CMC, his "medications got mixed up, and he had not taken his medication for approximately two weeks." He returned to CMC on July 12, 2022, but quickly reported dizziness as a result of "three shocks from his recently placed pacemaker." He was sent back to the hospital and placed in the Intensive Care Unit.  According to the CDCR reviewer, "It appeared that he was shocked six times to attempt to fix his cardiac rhythm with no success."

At approximately 4:18 p.m. on July 19, 2022, the IP was returned to the CMC and placed in the CTC for continued monitoring.  According to the CDCR reviewer, "As part of routine documentation for hospital returns, an Admission Assessment and History power form was completed the RN.  This form does not include any mental health screening questions.  However, per other routine nursing screenings in the Interactive Nursing View section of EHRS, the RN documented that Inmate _____ reported concentration difficulties, specifically paranoia and anxiety.  No further details were documented," including suicide risk inquiry.  Approximately one hour later at 5:29 p.m., the IP was found hanging and later died at an outside hospital on July 20, 2022.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. He had several significant medical issues, including extensive cardiac-related problems and chronic back pain, and it was unclear if any or all of these issues were the proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that he "may have had some underlining mental health concerns, likely as a result of his medical diagnoses/symptoms, which were underreported to those around him. In the months preceding his death there were no acute warning signs evident, however, his medical symptoms had increased resulting in prolonged placement at an outside hospital. It could be speculated that as a result of his acute medical symptoms, medical pain, language barriers which may have impacted his ability to articulate his mental health needs, possible increase in symptoms of depression or anxiety, and additional stressors as a result of his transfer, overwhelmed his normal coping mechanisms resulting in the decision for him to end his life at this time."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

> 1) <u>CTF</u>: Although these incidents fall outside of the year timeframe for QIPs, it involved a significant access to care concern for General Population inmates, thus it is being elevated to a QIP. Inmate _____ submitted two Health Care Services Request forms (January 26, 2021 and February 5, 2021) requesting to meet with a mental health clinician as a result of insomnia which was causing distress. These requests were never responded to, until custodial staff submitted a MH5 on February 22, 2021. Per the Mental Health Program Guide, Program Guide Overview, 12-1-5: '*inmates may also self-refer for a clinical interview to discuss their mental health needs. Inmate self-referrals shall be collected daily from each housing unit, and processed the same way as staff referrals. An Urgent referral is to be seen within 24 hours. A Routine referral should be seen within 5 working days.*'

> 2) <u>CTF</u>: Inmate _____ was seen by an MHMD and placed on psychiatric medications on March 11, 2021. Per the Patient Placement History, Inmate _____ was placed in the MHSDS at the CCCMS level of care on this date as well, however there is no subsequent mental health documentation. An Initial MHPC Assessment was not completed until June 29, 2021, and his initial IDTT did not occur until July 1, 2021. Per the Mental Health Program Guide, Correctional Clinical Case Management System, 12-3-8: '*The PC completes a clinical intake assessment within 10 working days of referral/arrival.*' Per 12-3-10: '*the individualized treatment plan must be completed within 14 working days of referral/arrival by the PC in consultation with other IDTT members.*'

> 3) <u>CTF</u>: Inmate _____ had a significant number of medical concerns that ultimately resulted in his transfer to an acute medical facility in June 2022. He was seen by his MHPC routinely, however, it did not appear his medical concerns were included as part of his mental health treatment, as there is no documentation in routine progress notes or his most recent treatment plan that the potential impact of these concerns on his mental health were discussed, or that there was

collaboration between his MHPC and physician/medical treatment team. Additionally, there is no documentation that medical staff were included/invited to his IDTT. The lack of collaboration and documentation of consideration of medical factors may have impacted treatment and safety planning. It also may have impacted identification of risk factors when he transferred to CMC.

4) <u>CMC</u>: Inmate ____ arrived at CMC on June 21, 2022. Prior to his placement at an outside hospital on July 9, 2022, neither an Initial MHPC Assessment nor an IDTT was completed. Per the Mental Health Program Guide, Correctional Clinical Case Management System, 12-3-8: '*The PC completes a clinical intake assessment within 10 working days of referral/arrival*.' Per 12-3-10: '*the individualized treatment plan must be completed within 14 working days of referral/arrival by the PC in consultation with other IDTT members*.'

5) <u>CMC</u>: During the review, it was noted the onsite responder (Correctional Officer) only retrieved the Res-Q-Hook tool for utilization at the incident site which is inappropriate when responding to incidents involving suicide attempts by hanging.

6) <u>CMC</u>: During the review it was noted staff failed to support inmate ____' body when utilizing the Res-Q-Hook to release his body from the ligature device which is required as part of staff's responsibilities when responding to incidents involving suicide attempts by hanging.

7) <u>CMC</u>: During the review, there appeared to be an approximate 9-minute delay in activation of Emergency Medical System (EMS-911).

8) <u>CMC</u>: During the review of patient's EHRS, the patient stated he had not taken his medications for two weeks because of a movement mix-up. MAR showed the patient only received 5 days' supply of his KOP medications when he transferred to CMC on June 21, 2022 and another 30-day supply of Lisinopril on June 26, 2022.

In the *__third__* case (<u>CMC 8</u>), the IP was found hanging from the cell door by a sheet in his ASU cell during the morning of November 26, 2022. His body was found in the state of rigor mortis. The IP entered the CDCR system for a second term on July 5, 2019, to serve an 11-year sentence for carjacking with multiple enhancements. He was transferred to CMC on January 4, 2022. The IP incurred only one (1) RVR during his confinement, occurring on November 18, 2021, for failure to present for count. He was previously gang-affiliated in the community. The IP was married and had three children. He had family support through telephone contact with his mother, wife, and children.

According to available records, the IP and his brother were raised by their mother. Although their father was at home, he was not involved in their lives other than being physically abusive to his mother and him. At age 11, the IP witnessed his father stab his mother with a pocket knife. Although scared, he remembered trying to fight his father in defense of his mother, but was

thrown through the window of their house. During times of domestic violence, he would often run away from home for days at a time only to return to try to protect his mother from his father's abuse. Despite living in a dysfunctional home, the IP was able to complete the 8th grade and earned his GED during a prior CDCR confinement. His parents divorced when he was 15. At that time, he became involved in the juvenile justice system and spent time in the California Youth Authority (CYA) until the age of 18. The IP had a significant history of substance abuse beginning at 11 when he used methamphetamine stolen from his father. Over the years, he also used marijuana, cocaine, PCP, and began to inject heroin while incarcerated in CYA. His combined juvenile and adult arrest history resulted in juvenile hall, CYA, and CDCR confinements.

Following parole in 2008, the IP witnessed a murder committed by a fellow gang member. Shortly after the incident, he was contacted by investigators regarding identification of the shooter. During the course of their investigation, his own gang attempted to kill him, and his mother's business was set on fire. As a result, he began to experience PTSD and depression, as well as recurring nightmares of the victim. The IP subsequently decided to testify against his fellow gang member and he and his family were relocated under the Witness Protection Program in 2009. He had a sporadic employment history, but later returned to criminal activities. The IP did not report any mental health treatment on the community, and his symptoms of PTSD and depression remained untreated. He did not report any history of suicidal behavior.

Upon re-entry into CDCR in July 2019, the IP screened negative for any mental health symptoms and was not placed in the MHSDS. Although not in the MHSDS, he had periodic contact with mental health staff throughout most of his incarceration. For example, the IP submitted a Health Services Request Form in May 2020 noting he "would like to be enrolled in some form of therapy." He was subsequently seen by mental health staff, denied any significant mental health symptoms, but wanted information about substance abuse treatment. The IP reported continued use of heroin and had been previously placed on the MAT program waitlist. In August 2020, he was seen for a Telemedicine MAT consultation and subsequently prescribed Naltrexone. The IP was also seen again by mental health staff in August and October 2020. During these contacts, he denied any suicidal ideation, reported he had not been using illegal drugs, was frequently speaking with his family, and functioning well.

In January 2021, the IP was endorsed (but not yet placed) to a fire camp and, although not wanting to be a part of either MHSDS or MAT, he continued to request help with "PTSD symptoms regarding his childhood as well as dropping out of his gang 14 years prior to which he received death threats." He was periodically seen by mental health staff throughout 2021 and provided with numerous self-help materials, including CBT workbooks. In early September 2021, the IP was transferred to CRC's Fire Camp. Three months later in December 2021, an urgent mental health referral was initiated after he reported being assaulted. He was subsequently placed in the ASU for safety concerns. The following month in January 2022, the IP was readmitted to the Fire Camp and did not have any further contact with mental health staff. According to the CDCR reviewer in this case, his "desire to attend and remain in the Fire Camp was a driving factor in not wanting to be a participant in the MHSDS and MAT program, nor take psychiatric medication despite early reports of experiencing nightmares and depression….Over the last year, Mr. ____ reported a decrease in overall mental health symptoms

during his contacts and largely appeared to be stable.  Mental health staff may have believed that the benefits of not including Mr. _____ in the MHSDS far outweighed placing him in the program."

During more than three years of confinement, the IP also participated in education programs and held various work assignments.  In addition to his work as firefighter at the CRC Fire Camp, he worked as a porter, dining room worker, and yard worker.  Throughout his incarceration, however, he continued to express safety concerns based upon his previous decision to testify against a fellow gang member in 2009.  In addition to his first ASU placement December 2021, the IP's second and final ASU placement occurred on November 18, 2022 after being told by other IPs "to walk out or be carried out because of my 2009 case on the streets."  He died by suicide the following week.  He had never expressed suicidal ideation and, therefore, never had a SRASHE completed during his CDCR confinement.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide.  He did not have any serious medical issues that were thought to be the proximate causes of his death.  The IP did not leave a suicide note.  The CDCR reviewer theorized that "It is unclear as to the extent of mental health symptoms that Mr. _____ may have experienced leading up to his death.  His immense desire to attend Fire Camp may have resulted in an underreporting of mental health symptoms…. information gathered during the course of this review suggests that Mr. _____'s decision to end his life on November 26, 2022 was related to the distress over the continued pattern of ongoing safety concerns he could not escape and the insurmountable fear he and his family would be faced with for the rest of their lives."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) A review of the ASU Guard 1 "Time Between" report revealed the initial Second Watch (2/W) security/welfare check was conducted at 0611 hours, contradicting the reported 0616 hours incident time documented in staff reports  Additionally, the 'Time Between' report noted the initial security/welfare check (0611 hours) exceeded the 35-minute maximum time from the prior security/ welfare check (0533 hours), resulting in a 38-minute gap between checks.

> 2) Based on reports submitted by responding staff, Inmate _____ was observed to have signs of rigor mortis evidenced by generalized stiffness and dependent lividity throughout his body and face to the extent CPR was not initiated.  These staff reports call into question the thoroughness of the previous Guard One Welfare checks completed during the prior watch.

In the **_fourth_** case (CMC 9), the IP was found hanging from the window by a string in his EOP-ASU cell during the early evening of September 23, 2023.  He entered the CDCR system for an eighth term on October 19, 2010 to serve a 20-year sentence for burglary, kidnapping, indecent exposure, and a parole violation.  He was transferred to CMC on September 13, 2023.  The IP incurred six (6) RVRs during his confinement, the most recent occurring on August 23, 2023 for threatening great bodily harm (on a clinician).  He was considered to be gang-affiliated, but

inactive. The IP was unmarried and had one daughter. He had limited family support through periodic telephone contact with his brother, sister, and a female friend.

According to available records, some of which are inconsistent, the IP and at least two siblings were raised by their parents in a dysfunctional family environment in which he suffered severe physical abuse by his father and witnessed domestic violence of other family members. Although not corroborated by any other source, he self-reported in previous mental health records that he killed his father after he (the father) was abusing his mother and siblings at age 14. Some records suggest the IP was raised by his grandmother during this time period, while other records indicate that he was raised in foster care. During his youth, he did not finish grade school, but later enrolled in adult learning classes, as well as took courses in building maintenance and gardening. The IP never had any stable employment. He began substance use at age 10 by inhaling gasoline and paint, and that led to use of crack cocaine and PCP. The IP had an extensive history of juvenile and adult criminal behavior that resulted in juvenile hall, California Youth Authority, and county jail confinement, as well as seven prior CDCR terms. He had an extensive history of mental illness and mental health treatment in the community, was diagnosed with ADHD at age 6, and self-reported experiencing auditory hallucinations beginning at age 13. The IP also self-reported being psychiatrically hospitalized approximately 10 times in the community. He also reported several prior suicide attempts.

Upon re-entry into CDCR in October 2010, the IP was immediately admitted into an MHCB unit for danger to self and others. Records indicated he had been on suicide precautions in the county jail and threatened to kill himself and his cellmate upon arrival to CDCR. He was subsequently discharged from the MHCB unit and, similar to previous CDCR terms, placed at EOP level of care. He also had previously received treatment at DMH-Patton and Atascadero State Hospital in the early 1990s. In March 2011, the IP attempted suicide by overdosing on Lithium was referred to SVSP-APP. He was discharged in December 2011, with a diagnosis of schizoaffective disorder, bipolar type, and continued to cycle through the EOP, MHCB, and APP levels of care for the next several years. Progress notes indicated that the IP struggled with "intense daily suicidal ideation, command auditory hallucinations to harm himself, and medication non-compliance." He also regularly experienced paranoid thoughts about his food; specifically, that it was being poisoned. This resulted in his frequent refusal to eat.

The IP continued to demonstrate poor insight into his mental illness during the next several years. For example, he regularly refused psychotropic medication and filed an appeal to have his level of care lowered from EOP to 3CMS in June 2021. But his mental health symptoms escalated, and he was subsequently placed in CHCF PIP-APP in July 2021. Several months later in October 2021, he was transferred to the facility's ICF program. Following his arrival at the ICF, the IP was initially resistant to both group treatment and medications, but gradually improved. He began attending small groups and verbalized an understanding into his need for medication. During the next several months, the IP developed improved coping skills, including reading biblical scripture. However, by October 2022, his behavior regressed, and he was placed on Suicide Watch with distressing command auditory hallucinations to hang himself. His behavior stabilized within a few weeks and he was transferred to Coalinga State Hospital (DSH-Coalinga) in November 2022. Upon arrival, the IP requested a single room due to feelings of paranoia. He continued to report command auditory hallucinations while at DSH-Coalinga, but

did not demonstrate objective behaviors consistent with those reports.  In January 2023, he was assessed by a psychologist who believed he was exaggerating his symptoms, opining in a progress note on January 12, 2023 that the IP "appeared motivated to remain in the hospital and as such…Appears to be engaging in fabrication/exaggeration of symptoms and utilizing them systemically for placement at higher levels of care."

In March 2023, the IP was returned to CDCR at the EOP level of care with diagnoses of schizoaffective disorder, borderline personality disorder, and antisocial personality disorder.  He almost immediately endorsed suicidal ideation during the ASU prescreen, with command auditory hallucinations to kill himself.  A SRASHE was completed with a finding of both high acute and chronic risk for suicide.  The IP was placed into an MHCB unit for several weeks, then returned to the ASU-EOP hub where he remained until April 13, 2023.

From April through September 2023, the IP continued to voice suicidal ideation on multiple occasions based on command auditory hallucinations, resulting in 18 SRASHEs and two MHCB placements during this time period.  During an MHCB placement from May 18 through May 30, 2023, the CDCR reviewer in this case cited the lack of written justification for discharge, opining that the discharge occurred "despite the absence of any documentation to suggest that he had achieved his treatment goal of rating his own suicidal ideation as '2 or below.'  As justification for not referring Mr. _____ to a higher level of care at that time, the documentation in the Master Treatment Plan indicated Mr._____ 'remained stable on full issue and has denied any SI or thoughts of engaging in self-harm or desire to die.'  However, this was inconsistent with his presentation during the prior three days."  In addition, the discharge safety plan was problematic, with the CDCR reviewer stating that "There was no discussion in the clinical impressions section about his command auditory hallucinations, despite that being a known warning sign and a symptom that presented itself throughout his MHCB stay.  Additionally, Mr. ___ had identified things he was willing to do to reduce his own risk; however the clinical interventions section was inadequate.  It simply stated that he 'identified treatment goals such as working on his anger management to reduce impulsivity and mood instability' and did not delineate measurable goals or specific clinical interventions.'"

The IP's behavior escalated, as did his expressions of both suicidal and homicidal ideation.  In June 2023, he was placed in Alternative Housing on two occasions.  On July 24, 2023, he was seen by a primary clinician and the progress note stated that, although he liked his new cellmate in the ASU-EOP hub at RJD, he also sometimes had thoughts of killing him.  The IP was not deemed to be an acute risk of harm to others because "the thoughts were not present at the time and he lacked a specific plan."  However, he was again placed in the MHCB unit at CMC from August 16 through August 22, 2023 for both danger to self and danger to others after threatening great bodily harm on his primary clinician at RJD.  He received an RVR for this incident.  The IP also expressed suicidal ideation during this placement and was placed on Suicide Precaution status for several days.  The CDCR reviewer found inadequate documentation to justify downgrading his observation, stating that: "On August 18, 2023, Mr. _____ was provided with full-issue and placed on Q30 minute observation and while the associated MHPC progress note discusses this, the justification is poor.  Specifically, it indicates that Mr. _____ was angry and resistant and continued to endorse suicidal ideation and command auditory hallucinations.  The note does not discuss why the clinician believed that risk was mitigated despite this report."

During the IP's discharge IDTT meeting on August 22, 2023, the team opined that "poor frustration tolerance was at the root of his suicidal and homicidal crises and that he had a tendency to engage in impression management." However, according to the CDCR reviewer in this case: "The discharge summary from that day contains a poor justification for non-referral. Specifically, it indicates that Mr. _____ was 'aware if he reports SI it will get him off the yard and to a higher LOC' and did not contain adequate interventions to address those concerns." The CDCR reviewer also found the safety plan to be deficient, stating: "The clinical impressions sections lacked an acknowledgment of command auditory hallucinations being a trigger for him and enhancement of protective factors was deferred to the outpatient treatment team. Specifically, it was noted that 'IP would benefit from identifying protective factors' and 'staff can assist IP in feeling secure on the yard by…..assisting him in identifying a staff person he can go to when having issues with other inmates.'" Similarly, the safety plan completed on September 16, 2023, following the IP's discharge from Alternative Housing was also problematic, with the clinician stating on the form: "Due to patience reluctance to interact with me during assessment in Alt Housing and superficiality of his rapport with me today I have nothing to add at this time. This needs to be addressed as needed with IP by staff with whom he has rapport." On August 22, 2023, the IP was returned to the ASU-EOP hub at RJD.

On September 13, 2023, the IP was transferred from RJD to the ASU-EOP hub at CMC based upon his threats against the RJD clinician. He was seen by mental health clinicians approximately 14 times during September 2023, the last month of his life. Several of these contacts were in response to threats of suicide, including completion of a C-SSRS screening on September 10, 2023, completion of a SRASHE on September 16, 2023, following another placement in Alternative Housing, and required five-day follow-up assessments. On September 21, 2023, he was observed by an officer to be engaging in bizarre behavior by "pacing back and forth in his cell, rocking back and forth, not responding to his name, refused his tray this morning." The officer also reported that another ASU IP had recently encouraged him to commit suicide. He was seen later in the day by a clinician, with the resulting progress note indicating: "He was tearful, gave one word answers and refused to make direct eye contact with this writer….He appears to be upset about being in ASU, appeared to be stating that he was being accused of something he didn't do." The IP's last clinical contact with a clinician was on September 22, 2023, the day before his death. He was minimally cooperative with the psychiatrist and denied any current suicidal ideation.

In summarizing the IP's mental health treatment during 2022-2023, the CDCR reviewer stated: "In total, within the last year of his life alone, Mr. _____ was at a PIP program once, had three MHCB admissions and was placed on Suicide Watch in Alternative Housing four times. It is unclear from the documentation why, in light of his multiple risk factors and his history of functioning better while at a PIP, Mr. _____ was not at any point referred back to PIP in 2023."

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. He had a few medical problems, including seizures and possible coronary artery disease causing him recent chest pain, and it was unclear if these issues were related to the proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that the IP "experienced seizures and possibly significant

pain and these issues were distressing for him. He refused medical and mental health treatment in the time leading up to his death and offered inconsistent rationale to providers as to the reasons why. This may suggest that he was passively suicidal during that time, or that he was planning on ultimately taking his own life actively…..His behavioral response to these symptoms, angered some of his peers and one encouraged him to commit suicide….This encouragement, in response to the command auditory hallucinations and the other stressors, may have been the final trigger for Mr._____ to make the decision to take his life that same week."

The Suicide Report contained 14 recommendations for corrective action through a QIP:

1) RJD, CIM, and CMC: In 2023, there were approximately eight MH Safety Plans completed as a result of discharges from MHCB, or recissions of MHCB discharges. Upon review of these plans multiple concerns were identified with the quality of these safety plans. Please see *Concerns Section* for further details.

2) CMC and RJD: Multiple concerns were identified with the review of MH Safety Plan during the 5-day follow-up contacts after a return from the MHCB or recission from a MHCB referral. These concerns included not adequately updating the MH Safety Plan when it was clinically indicated and not reviewing the MH Safety Plan with Mr. _____. Please see the *Suicidal/Self-Harm History* for a detailed description of this concern.

3) CIM, CMC, and RJD: Multiple concerns were identified with the decision to not refer Mr. _____ to a PIP level of care throughout 2023. Please see *Concerns Section* for further details.

4) CMC: There was a concern related to the documentation regarding provision of treatment during Mr. _____'s MHCB stay on August 18, 2023. Specifically, the documented treatment modification was that Mr. _____ would be provided with Dialectical Behavior Therapy (DBT), however the inpatient progress notes do not reflect that DBT was ever provided during his MHCB stay.

5) RJD: There were concerns related to the justification of issue and observation during Mr. _____'s MHCB stay on August 18, 2023. Please see *Concerns Section* for further details.

6) CMC: There were concerns with the RVR Mental Health Assessment that was completed on September 19, 2023. Please see *Concerns Section* for further details.

7) RJD: Mr. _____ was seen for an MHPC emergent contact on September 1, 2023, after endorsing suicidal ideation and there were multiple problems with the associated documentation. Please see *Concerns Section* for further details.

8) RJD: There were concerns related to the SRASHE that was completed on June 30, 2023 when Mr. _____ was rescinded from suicide watch. Specifically, suicide

watch was rescinded despite his having been assessed as high acute risk. The SRASHE does not adequately justify rescission in light of the acute risk assessment. The clinician noted that Mr. ____ 'did not present with signs of distress beyond his verbal statements,' however Mr. ____ was engaging in sexually provocative behavior on that day and verbalized concerns about his medical health.

9) <u>RJD</u>: Mr. ____ was seen for an MHPC emergent contact on September 1, 2023, after endorsing suicidal ideation and there were multiple problems with the associated SRASHE. The clinician ultimately opined that Mr. ____ was a low-acute risk, despite the absence of a thorough assessment and adequate documentation to support a low acute risk. Additionally, the SRASHE was modified on September 7, 2023, to remove language that was related to Mr. ____ having requested a confidential contact.

10) <u>RJD</u> Psychiatry and Pharmacy: Communication of quetiapine FDA guidelines and attention to quetiapine FDA guidelines may have unnecessarily influenced the adjustment of quetiapine dosing. As relates to antipsychotic medications, FDA max recommendations were crafted using data collected from clinical trials, for which 'responder' patients were recruited and enrolled. FDA max recommendations or dosing recommendations, as relates to antipsychotic medications, should not guide the treatment of 'chronically-psychotic' or 'refractory' patients.

11) <u>CHCF</u> PIP Psychiatry: Review of the chart revealed that psychiatric contacts were not timely or in keeping with expectations, during the fall of 2022, while the patient was hospitalized at CHCF-PIP.

12) <u>CMC</u>: During the review it was identified upon staff's entrance into the cell, one staff member did so without donning the required safety equipment required for an 'Immediate Extraction,' specifically, a riot helmet with protective face shield, and protective vest with another staff member absent the protective vest.

13) <u>CIM</u>: During the review of the EHRS, no documentation of suicide watch was completed from 2145 on 3.13.23 to 1400 on 3.14.23.

14) <u>RJD</u>: During the review of EHRS, daily PT rounds documentation was not completed on 3.30.23 and 4.10.23 while the patient was housed in ASU.

In the ***fifth*** case (CMC 10), the IP was found hanging from the window by a sheet in a mainline cell during the early morning of December 26, 2023. The final version of the Suicide Report was not available at the time this report was completed.

**Audit Summary**: Adequate practices found in most areas, including PT rounding, Guard One compliance, CIT response, IDTT meetings for MHCB patients, offering of out-of-cell activities for MHCB patients (with exception of telephone calls), discharge custody checks, and most

required training.  Several deficiencies requiring corrective action were noted during the on-site assessment, including inadequate intake screening, improper utilization of new intake cells, low compliance with completing SRASHEs for emergent/urgent mental health referrals based upon DTS, and inadequate safety planning for both patients discharged from alternative housing and the MHCB unit.

### 18)   **Salinas Valley State Prison (SVSP)**

**Inspection**:  October 12-13, 2023 (previous suicide prevention audit was on March 22-24, 2022).  SVSP housed approximately 2,714 IPs during the current onsite assessment.

**Screening/Assessment**:  This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on October 13, 2023.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was open during the process, with an officer stationed in the doorway, thus impacting privacy and confidentiality during the process.  The office did not contain a TTM.  An officer had remained in the doorway because, as observed by this reviewer, the IP had engaged in a prolonged conversation with the R&R unit sergeant regarding his property and safety concerns and appeared agitated prior to the screening process.  The lack of privacy and confidentiality, as well as assurance of safety, could have been maintained if a TTM was located in one of the nurse's offices in the unit.

In addition, **PT Rounds** were observed in the STRH (Z-9) unit on October 13, 2023.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload IP.

**Housing**:  SVSP had a 22-bed CTC, with 10 designated **MHCBs**.  All of the MHCB cells were previously found to be suicide-resistant.  There were 7 patients in the MHCB unit during the onsite assessment, with 2 of the cells redlined.

In addition, there were 12 **New Intake Cells** (100-111) in the STRH (Z-9) unit.  Since the previous assessment, D-1 unit (for non-MHSDS IPs), which contained six (6) new intake cells (116-118, 216-218), was deactivated in October 2022.  On October 12, 2023, this reviewer observed that there were at least three restrictive housing IPs housed in overflow ASU buildings, including D-2 and D-4 units which did not have any new intake cells.  Upon closer examination, it was determined that these IPs had been directly placed from the yard into non-intake cells within both D-2 and D-4 units without first being housed in new intake cells within the STRH unit.

This reviewer subsequently requested and received a listing of all IPs on restrictive housing status that were placed in ASU overflow buildings since October 2, 2023.  The data revealed that during the recent 11-day period of October 2 through October 12, 2023, there were at least 22 IPs directly placed from the yard into non-intake cells in D-2, D-4, D-6, and D-8 units.  Each of these IPs should have been initially placed in new intake cells within the STRH unit.  Not surprisingly, this reviewer was informed that the practice of daily utilization of overflow ASU housing began shortly after the deactivation of D-1 unit.  Finally, this reviewer inspected the

273

STRH unit on both October 12 and 13 and found that between 6 and 9 IPs currently housed in new intake cells were beyond the 72-hour requirement for new intake housing and should have been rehoused. In conclusion, *the current (and apparently long-standing) practice of directly placing new restrictive housing IPs in non-intake cells of overflow ASU housing units was very problematic.*

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were utilized extensively and primarily found in D-2 Unit and TTA cells (114-115). Alternative housing was used multiple times each day, and IPs were required to be furnished beds and observed on a 1:1 basis. This reviewer had an opportunity to observe a clinician assess two IPs housed in alternative housing on October 12, 2023. Each IP was offered, and subsequently accepted, the opportunity for a private, out-of-cell assessment. The clinician subsequently completed the required SRASHE in each case.

During the three-month period of July through September 2023, there were approximately 282 IPs placed in alternative housing, and the majority (82 percent) were released within 24 hours. This represented a significant increase in the use of alternative housing since the previous assessment when 123 IPs were in alternative housing during a comparable three-month period. During the current assessment, of the 18 percent (52 of 282) of IPs held over 24 hours, most were held under 30 hours, with three IPs held for approximately 48 hours. The reasons for IPs being held over 24 hours in alternative housing were attributed to delays in initiating MHCB referrals and custody/clinician staff shortages.

In addition, only 33 percent of IPs on alternative housing status were subsequently transferred to an MHCB, with the majority (66 percent) of cases rescinded and IPs returned to their respective housing units. This reviewer examined the EHRS charts for 20 rescinded cases and found that the required SRASHEs were completed in all cases, but only 65 percent (11 of 17) five-day follow-up assessments were completed in all applicable cases. Further, the required safety plans for DTS were found to be problematic, with only 10 percent (2 of 20) of the cases having an adequate safety plan, 50 percent (10 of 20) of the cases having inadequate safety plans, and 40 percent (8 of 20) of the cases not having any safety plans.

The following is an example of an inadequate safety plan for an EOP patient (SVSP 1) with a high chronic risk for suicide who was discharged from alternative housing on July 1, 2023:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: No
Warning signs - Clinical Impressions: ***Pt reports passive SI yesterday triggered by news that his relative passed. He denies current SI/intent/plan or desire to harm self/others.***
Helpful reducing self-harm - Clinical: ***Pt is in contact with his brother who is a significant support for him.***
Reduce Risk Factors - Clinical: ***Pt is willing to reach out to relatives and MH for support. Pt is willing to meet with his MHPC.***
Patient History of Self Harm: No

Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: No
Protective Factors - Clinical Impression: *Pt has a close relationship with his
brother, denies any issues on the yard and is compliant with MH treatment. He
is compliant with Remeron and Zyprexa.*
Enhanced factors - Clinical Impressions: *Pt can continue to maintain contact
with relatives and adhere to MH treatment.*

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the
**MHCB** unit.  All other patients not on suicide observation status were required to be observed at
30-minute intervals.  During September 2023, the Mental Health Observations Reporting Tool
indicated that 11 patients were on observation status in the MHCB unit, with 99 percent
compliance with timely observation of patients on Suicide Precaution and 80 percent compliance
with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period found 95 percent compliance
with required checks not exceeding 35 minutes in the STRH (Z-9) unit.  Of note, this compliance
rate for Guard One was offset by the fact that an IP (SVSP 2) who died by suicide in the STRH
unit in May 2023 was found in the state of rigor mortis, an indication that the rounds were not
correctly completed.  A similar finding of an IP found in rigor mortis following his suicide in
April 2021 was detailed in the previous assessment.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a
listing of emergent/urgent mental health referrals for the six-month period of April through
September 2023.  A sample EHRS review of 50 emergent/urgent mental health referrals for
SI/behavior revealed that clinical staff completed the required SRASHEs in 96 percent (48 of 50)
of the cases.

In addition, the **Crisis Intervention Team** was launched at SVSP in May 2019 and, pursuant to
policy, was operational seven days a week from 8:00 a.m. until 5:00 p.m., with other clinicians
responding to emergency mental health referrals during other hours.  There were three clinicians
assigned to cover CIT responses during normal business hours.  This reviewer did not have an
opportunity to observe the CIT process during the onsite assessment.

Three **IDTT Meetings** were observed in the MHCB unit on October 12-13, 2023.  Overall, there
was very good team participation and discussion regarding reason for admission (all admitted for
DTS), diagnoses, medication, observation level, suicide risk inquiry, and out-of-cell activities.
There was also adequate discussion regarding safety planning in each case.

With one exception, several issues found during the previous assessment, including patients
clothed in both a safety smock and "partial issue" (t-shirt, boxers, and socks), as well as out-of-
cell activities, had been corrected.  The exception was that although current CDCR policy allows
MHCB providers to assess the appropriateness for out-of-cell activities on a case-by-case basis
for each MHCB patient prior to their initial IDTT meeting, the current practice at SVSP was for
such a decision to be made following the initial IDTT meeting.  Such a practice, inexplicitly

different from the previous assessment, resulted in patients being locked down in their cell for up to 72 hours prior to the initial IDTT meeting. This reviewer was informed by IDTT members that waiting until the initial IDTT meeting allowed the providers more time to assess the patient. Such a rationale was understandable but ignored the fact that these same providers had already assessed the patient on the first full day of admission and clinically determined their level of observation and clothing issue (smock, partial, or full). On a case-by-case basis, extending the clinical decision to include out-of-cell activities during the initial assessment would be more reasonable than having a strict practice of never considering out-of-cell activities until the initial IDTT meeting.

Finally, during observation of the IDTT meetings, this reviewer noticed that a TTM was not situated in the room. When asked what would occur when a maximum-custody patient attended their IDTT meeting, team members responded that the patient would either be handcuffed with two officers straddling the chair, the meeting would be held cell-front, or the meeting would be held in absentia. The CMH subsequently informed this reviewer that a TTM would be requested.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for all patients housed in the MHCB unit during the onsite assessment. Of note, the 114-A forms began to be digitized statewide in early October 2023 and officers were in the process of being trained on inputting data into SOMS. The review found that, despite the above practice of delaying decisions on out-of-cell activities until initial IDTT meetings, all patients appeared to be offered some access to yard/dayroom, showers, and telephone calls, but not as much as if they had been granted access earlier in their MHCB placement. In addition, the reviewer examined provider orders for several patients and found contradictory notations. For example, a provider completed the "MH Patient Issue" order in EHRS for a patient (<u>SVSP 3</u>) on October 9, 2023 with notations stating both "no yard/dayroom/phone until after IDTT on 10/12/23" and "no yard restriction" and "no phone restriction." Adding to the confusion, although this reviewer attended this patient's initial IDTT meeting when the team approved his out-of-cell activities on October 12, 2023, the 114-A form indicated the patient had been offered a telephone call three days earlier on October 9, 2023.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 20 patients discharged from the unit during August and September 2023, had been admitted into the MHCB for DTS, and remained at SVSP. The required discharge SRASHEs were completed in all cases, but all five-day follow-up assessments were completed in only 64 percent (7 of 11) of applicable cases. In addition, similar to alternative housing data, the required safety plans for DTS were found to be problematic, with only 25 percent (5 of 20) of the cases having adequate safety plans and 75 percent (15 of 20) of the cases having inadequate safety plans.

The following is an example of an inadequate safety plan for an EOP patient (<u>SVSP 4</u>) with a moderate chronic risk for suicide who was discharged from the MHCB unit on September 6, 2023 following a 10-day placement:

<u>MH Safety Plan</u>

<u>Safety Planning Reason</u>: Discharge from MHCB/PIP or Alternative Housing
<u>Patient Participate - Warning Signs</u>: No
<u>Warning signs - Clinical Impressions</u>: ***He doesn't really know, but thinks when he got really mad and upset, he acted without thought/impulsively.***
<u>Helpful reducing self-harm - Clinical</u>: ***He has not felt suicidal before his cutting of his arm and getting referred to crisis bed.***
<u>Reduce Risk Factors - Clinical</u>: ***He wants to have his medications adjusted further and possibly go to EOP to have increased follow-up.***
<u>Patient History of Self Harm</u>: No
<u>Safety Concerns Identified</u>: No
<u>Environmental Concerns Identified</u>: No
<u>Patient Participate - Protective Factors</u>: No
<u>Protective Factors - Clinical Impression</u>: ***He reports having good family relationships and peer relationships. Watching TV, exercising, talking to his peers have all been helpful.***
<u>Enhanced factors - Clinical Impressions</u>: ***He reports having good family relationships and peer relationships. Watching TV, exercising, talking to his peers have all been helpful.***

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from April through September 2023. The reviewer found several problems, including untimely supervisory review of safety plans from April through mid-June 2023, with almost all reviews occurring after clinical discharge. In addition, there was no supervisory review of safety plans from mid-June through September 2023, primarily because the MHCB supervisor was out on leave and not anticipated to return until November 2023. Finally, there was not a designee to review safety plans because the facility did not have a SPRFIT coordinator (the typical designee) during this time period.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued for up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of approximately 360 cases of patients discharged from a MHCB or alternative housing placement who remained at SVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from April through September 2023. Due to the large volume of cases, a significant increase since the previous assessment in March 2022 when 212 cases were reviewed during a comparable six-month period, 195 cases were subsequently reviewed during the current assessment. The review found that only 74 percent had Page 1 "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors

attributable to clinicians not completing the first and/or second day of the form. When completed correctly, a majority of the custody checks were recommended for 48 hours by clinicians. In addition, only 62 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to checks being initiated late upon the IP's arrival to the housing unit and gaps in observation.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (October 2022 through March 2023) found that meetings had quorums of all required mandatory members or designees for all but one month (March). In March 2023, a LCSW was incorrectly listed as the designee for the chief psychologist, supervisor or specialist. Of note, the facility did not have a SPRFIT coordinator during the review period, resulting in either the chief psychologist or CMH chairing the monthly meetings (in addition to managing the mental health program at both SVSP and SVSP-PIP). Meeting minutes included discussion on compliance data and improvement projects. Other than to state that "we will not be removing anyone from the SRMP at this time," meeting minutes did not include the tracking and brief review of IPs in the SRMP. Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required. Meeting minutes were otherwise unremarkable. Documentation regarding the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits were provided separately.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure." Of note, the current SPRFIT LOP, dated February 2023, failed to identify the associate warden for health care access as a mandatory member of the SPRFIT. (However, the associate warden attended all of the monthly meetings.)

**Training**: According to training records, only 76 percent of custody staff and 95 percent of nursing staff were currently certified in CPR. In addition, 96 percent of custody staff, 96 percent of medical staff, and only 82 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of September 2023, 100 percent of mental health clinicians had completed the SRE mentoring program, seven-hour SRE training, and safety plan training.

**Recent Suicides**: SVSP experienced two (2) suicides during the review period. In the ***first*** case (SVSP 5), the IP was found to have severe lacerations on both forearms in his mainline SNY cell during the evening of August 3, 2022. His cause of death was exsanguination. The IP entered the CDCR system on March 23, 1989 to serve a life sentence with the possibility of parole for 2nd-degree murder, and an enhancement for being armed with a firearm. During confinement, he received an additional three-year term for battery on an officer. He was transferred to SVSP on September 9, 2021. The IP incurred multiple RVRs during his over 30 years of confinement, including eight (8) RVRs since 2019, with the most recent occurring on August 9, 2021, for

refusal to accept assigned housing. He was not considered to be gang-affiliated. The IP was unmarried and did not have any children. He did not have any known family support.

According to available records, the IP was raised by his mother following his parent's divorce when he was less than a year old. He had a limited relationship with his biological father, who he reported was "a good father," but "let him down" because his father did not want to have any contact or involvement with him when he "got a new family." When the IP was approximately 4, his mother remarried, and the couple had two additional children. His mother was a homemaker and his stepfather was a medical doctor. The IP reported that both he and his mother were physically abused by his stepfather. At 16, he left home and moved in with friends. The IP reported extensive behavioral problems while in school which he attributed to ADHD. He was expelled in the 8th grade for threatening the principal and never obtained a GED. His employment history was minimal as he was unable to maintain a job due to substance abuse. In addition to alcohol, he abused a wide variety of drugs, including methamphetamine, marijuana, inhalants, LSD, PCP, cocaine, and heroin. As a result of intravenous drug use, he contracted hepatitis C. The IP was often homeless and supported himself through stealing and panhandling. He had an extensive history of both juvenile and adult criminal offenses. There was a family history of mental illness and substance abuse that included his mother, father, and paternal grandfather. The IP reported a history of psychiatric hospitalization in the community for suicidal ideation and psychosis secondary to substance abuse. He was diagnosed with depression, schizophrenia, an identity disorder and polysubstance abuse.

Upon entry into CDCR in 1989, the IP did not initially present with any mental health symptoms and, therefore, did not receive any formalized mental health services. However, his adjustment to incarceration was extremely problematic. The IP failed to abide by institution rules and regulations which resulted in numerous RVRs and an overall failure to effectively participate in institutional programming. He was placed in restrictive housing on many occasions and spent a significant amount of his term in the ASU, as well as serving terms in both the PSU and SHU. The IP was often removed from job assignments and educational programming due to performance issues and failure to report.

In December 1998, the IP was placed in the MHSDS at 3CMS level of care. Diagnoses included bipolar disorder, polysubstance dependence, and antisocial personality disorder. He was started on psychotropic medication which eventually led to court-ordered involuntary medication in April 2010 following a MHCB placement for a suicide attempt. While in the MHSDS, the IP received services at all levels of care, including over 20 MHCB placements, as well as ICF and APP treatment. His mental health treatment was primarily focused on depression, recurrent suicidal ideation, safety concerns, agitation/anger, sleep problems, auditory hallucinations, paranoia, and anxiety. The IP's ICF and APP admissions were most often precipitated by self-injurious behavior, suicidal ideation, and/or suicide attempts which he attributed to fear of other IPs/safety concerns and having a life sentence. In recent years, he spent the majority of time vacillating between MHCB, EOP, and 3CMS. On November 14, 2019, the IP was referred to ICF for danger to others secondary to "a fixed delusional belief that he is being harassed and threatened by African-American inmates due to an unpaid drug debt from 16 years ago." He was initially treated at SVPP-ICF, but he was motivated to program by

his desire to transition to less restrictive housing, specifically unlocked dorms. He eventually transferred to the DSH-Atascadero ICF program in May 2020.

The IP was returned to CDCR at the EOP level of care in August 2020 with diagnoses of "unspecified schizophrenia spectrum disorder, unspecified bipolar and related disorder, amphetamine-type substance use disorder, cocaine use disorder, other hallucinogen-use disorder, alcohol use disorder, and hallucinogen persisting perception disorder." On September 10, 2020, he endorsed "suicidal ideation in the context of safety concerns in the building," but was cleared to return to his EOP housing. Two weeks later on September 24, 2020, the IP was sent to an outside hospital after cutting his right forearm and wrist with broken glass. Upon return, he was placed in an MHCB unit at RJD for several weeks before returning to EOP. On February 19, 2021, the IP inflicted three "deep lacerations" and multiple scratches to his left forearm, resulting in transport to an outside hospital. Upon his return to RJD the following day, he "denied suicidal ideation and any intent to harm himself," the MHCB referral was rescinded, and the IP was placed in the ASU due to safety concerns. During an IDTT meeting on March 8, 2021, he reported being "really depressed," but did not want to be in EOP and would "rather transfer to 3CMS or PIP, because he liked it there." The IP remained in EOP.

In June 2021, the IP was transferred to the EOP at SVSP. He refused his initial IDTT meeting, but it was noted that he was recently struggling with isolation due to concerns of others targeting him. In September 2021, the IP was admitted to the MHCB for suicidal ideation. Documentation indicated "recurrent experiences of feeling suicidal and hopeless. He claims periods of anxiety and panic, being fearful and extremely hopeless he associates with a long history of psychosis and depression that is only partly managed with medication. He feels trapped and unable to leave this prison. He feels isolated and unable to trust others and so increasingly withdrawn and powerless." The IP was subsequently discharged back to EOP, but again requested that his level of care be lowered to 3CMS, informing his clinician on September 20, 2021 that "he recently went to MHCB but that he was not really suicidal, and that he did not have any enemies. He stated that he wanted to get out of his building, and he needed a change of scenery." But during his IDTT meeting three days later September 23, 2021, the team noted that his recent MHCB admission indicates the IP "is unstable and should not be moved to CCCMS at this time, but should be evaluated for an additional 90 days."

The IP remained in EOP and continued to deny any major mental health issues except for some sleep difficulties. Documentation indicated that his hallucinations had stopped, his energy level had improved, and he presented as stable. As reflected in a progress note dated January 11, 2022, the IP advocated for himself, stating "that he had not gone to MHCB and that he is staying out of trouble to show the board he is doing better with less interventions." During his IDTT meeting two days later on January 13, 2022, the team approved his request and lowered his level of care to 3CMS, but stated "He will continue to be monitored for worsening symptoms and will be referred to a higher level of care if needed."

Although the IP was discharged from EOP in mid-January 2022, he was not transferred to the 3CMS yard at SVSP until March 5, 2022. He refused to attend his appointment for the MHPC Initial Assessment on February 22, 2022, as well as his initial IDTT meeting on March 16, 2022, neither of which was offered within appropriate timelines. The IP's Master Treatment Plan

stated that he refused his initial appointment but requested to return to EOP despite denying any mental health problems. The CDCR reviewer in this case found significant problems in required documentation following this meeting, including the absence of treatment planning, new symptoms identification, diagnoses, and IPOCs.

The IP had three more clinical contacts before his death: on April 20, June 22, and June 23, 2022 (by a psychiatrist). He denied any suicidal ideation during each contact. (The IP's most recent SRASHE, conducted in March 2022, had found a high chronic and low acute risk for suicide.) During the April 20, 2022 encounter conducted cell front, he reported worsening auditory hallucinations, depression, and paranoia. The primary clinician noticed a smell emanating from his cell and the IP acknowledged not bathing. Although the clinician indicated in the progress note that they would discuss elevating his level of care with the full treatment team, there was no documentation of any further team consultation in the medical chart.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. In addition, the IP had several medical problems, including lower back pain, heart problems, ongoing hip problems, and Hepatitis C, there was not any indication that these issues were related to the proximate causes of his death. The IP did not leave a suicide note. The CDCR reviewer theorized that "the length of Inmate ____s' prison term coupled with an absence of an outside support system or resources (protective factors) left him hopeless and unmotivated to develop a meaningful life in prison."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

    1) Issues with treatment planning were noted on two treatment plans. (See *Discussion/ Conclusions* section for more information).

    2) The MHPC Progress Note, dated April 20, 2022, states that that Inmate ____ requested to be moved back to EOP and reported increased paranoia (causing him to remain in his cell) and worsening AH. His cell was noted to be dark with a smell emanating from it indicating inattention to hygiene. His mood was noted to be anxious. The progress note stated, 'Pt to be discussed with treatment team for elevation to proper level of care'; however, there was no documentation evidencing follow-up.

    3) Lowering Inmate ____' LOC from EOP to CCCMS at the IDTT held on January 13, 2022 may have been premature, with the inmate's preference for change weighing more heavily than recent functioning and history. It's unclear why his level of care was lowered as Inmate ____ routinely evidenced non-compliance with both medical and mental health treatment, and compliance likely should have been considered as a required treatment goal prior to discharge.

    4) After Inmate ____' LOC change to CCCMS on January 13, 2022, neither his initial Mental Health Assessment (February 22, 2022) nor his initial IDTT (March 16, 2022) were held within Program Guide timeframes for CCCMS inmate-patients. Per the MHSDS Program Guide, 'The PC completes a clinical intake

assessment within ten working days of referral/arrival.' [12-3-8]. 'The individualized treatment plan must be completed within 14 working days of referral/arrival by the PC in consultation with other IDTT members.' [12-3-10]. While Inmate ____ did not physically transfer to a CCCMS yard until March 5, 2022, absent the February 22, 2022 MHPC Assessment (which Inmate ____ refused) and accompanying progress note, there was no additional clinician contact or documentation until a routine 90-day follow-up SRASHE was completed on March 15, 2022, followed by the CCCMS initial IDTT on March 16, 2022.

5) Through the course of this review, it was identified that Inmate ____ appeared to have been engaging in an escalating pattern of self-harm, with increasing potential for lethality. Documentation reflects that clinical staff appeared to have not considered this behavior in their clinical conceptualization. Examples that are more recent include November 13, 2016 (overdose on Benadryl), September 24, 2020 (cut himself with glass), February 19, 2021 (deep lacerations and cuts to his left forearm); both laceration incidents required outside hospital treatment. On multiple occasions, including prior DSH and PIP placements, he engaged in similar behavior. Additional symptoms (paranoia, substance abuse, depression and hopelessness, and worsening chronic pain) also appeared to be undervalued in the clinical presentation. Inadequate file review paired with clinicians' heavy reliance on Inmate ____' constant denials of suicidal ideation and intent (even after serious self-injury) likely led to the underestimation of his actual suicide risk.

In the **_second_** case (SVSP 2), the IP was found hanging from the upper bunk by a sheet in his STRH unit cell during the morning of May 3, 2023. His body was found in rigor mortis. The IP entered the CDCR system on November 24, 2003 for a second term under a death sentence for two counts of 1st degree murder (of his mother-in-law and nephew) and felony possession of a firearm. He volunteered for the Condemned Inmate Transfer Pilot Program (CITPP) and was transferred from SQSP to SVSP on September 17, 2021. The IP incurred multiple RVRs during his over 20 years of confinement, including 11 since 2022, with the most recent occurring on April 30, 2023 for threatening staff. He was considered to be gang-affiliated, but inactive. The IP was married and had two children, but did not have any contact with them. He had limited family support through periodic telephone contact with an aunt, uncle, and brother.

According to limited available records, the IP and his brother were raised by their mother and never knew their father. His highest education level was high school, but he did obtain his GED in jail. The IP was last employed as an asbestos remover for approximately 13 years before the instant offense, and he also worked in construction. He began collecting disability after being diagnosed with schizophrenia sometime after leaving the company. The IP reported a history of alcohol, marijuana, cocaine, and PCP use, and supplemented his employment and disability income by selling drugs. Records were limited regarding any criminal history before the age of 19 after which he was confined in the county jail on several occasions. In addition, court records indicated he frequently and severely abused his wife and children during their marriage. He was discharged from his first CDCR term in 1998. Although there was no known family history of

mental illness, the IP was treated for schizophrenia in 2000 and prescribed psychotropic medication.  He did not report a history of suicidal behavior in the community.

Upon re-entry into CDCR in 2003, the IP screened positive for mental health symptoms and was placed at 3CMS level of care.  Medical records for that time period were very limited, but his initial diagnoses were psychotic disorder, polysubstance dependence, and antisocial personality disorder.  It appeared that the IP cycled in and out of 3CMS until 2010 when he was discharged from the MHSDS.  His contact with mental health staff was very sporadic until 2020 when he was referred for odd behavior that some staff suspected was secondary to drug use.  He had other mental health contacts following the death of his mother in February 2020, for refusing insulin, for "frequent requests for MH [mental health] consultation for bizarre behavior," and for "yelling and arguing with neighbors and frequently agitated." Despite these periodic contacts, the IP remained outside of the MHSDS and his adjustment to incarceration remained problematic, with receipt of disciplinary sanctions on numerous occasions.

In July 2021, the IP was observed to be displaying escalating behaviors.  He was initially referred to mental health by custody staff because he appeared angry, agitated, and bizarre.  In addition, medical staff referred him to mental health because he was "Dissatisfied with, and increasingly suspicious of SQ [San Quentin] medical staff," in the treatment of his diabetes and for a sudden series of "man down" incidents involving "pain, chest pain, injuries, and other medical concerns." During his initial IDTT meeting on July 13, 2021, despite resistance to treatment, he was re-enrolled in 3CMS.  In August 2021, the IP began reporting that his medical care was intentionally being withheld and that staff were diluting his insulin.  He was placed in an MHCB unit for five days for severe mental impairment due to mental illness, and his diagnosis was revised to paranoid personality.  Following his MHCB discharge, the IP's diagnoses were again revised to "paranoid personality disorder vs. adjustment disorder (with mixed anxiety and depressed mood, 'partially resolved') and antisocial personality disorder." These diagnoses remained intact until his death.

The IP was transferred to SVSP on September 17, 2021 as part of the Condemned Inmate Transfer Pilot Program.  It was at this point that his mental and medical health began to significantly deteriorate.  He consistently refused mental health treatment, including attendance at IDTT meetings in April and August 2022, although the meetings were untimely.  He received six (6) RVRs in 2022, and spent considerable time in STRH.  During 2023, he received five (5) more RVRs, including several for threatening and/or battery on staff.  Numerous mental health referrals were generated during this time period, including one from custody staff on April 14, 2023 following the display of bizarre behavior in which he was "Constantly yelling out [of] his cell and being violent, he broke the windows of his cell." When the responding clinician asked about the officers' concerns, the IP "defiantly stated, 'Is there any camera footage? I didn't think so.  Then it didn't happen." He repeatedly accused medical staff of mismanaging his diabetes, and the clinician described him as "cynical and frustrated," suspecting his behavior might be attributable to his diabetes rather than to a mental illness.  In the progress note, the clinician indicated that "To err on the side of caution, IP [inmate-patient] is being referred for consideration for EOP [Enhanced Outpatient Program] LOC [level of care] for diagnostic clarification." However, no referral was generated and no subsequent IDTT meeting was held.

In addition, the IP was not consistently seen for required weekly clinical rounds during his STRH confinement.

On April 22, 2023, the IP was escorted to the TTA for treatment of hyperglycemia. Following treatment, he refused to leave because, according to medical staff, he needed his property and "then began to state that he was suicidal and wanted to die." The CIT was activated. During the CIT contact, the IP reported he was "upset about a request to go to an outside hospital for medical evaluation" and did not want to go. He further shared "numerous complaints related to custody and medical issues" and stated, "My issue is I'm not receiving the things I'm supposed to be receiving." The CIT clinician concluded that the IP was "misusing crisis services to meet his various needs." The completed SRASHE assessed a low chronic and acute risk for suicide. The following week on April 30, 2023, the IP returned to the TTA with complaints about chest pain and began threatening staff during the assessment. He was placed in alternative housing for danger to others and received an RVR for threatening staff. The following morning (May 1, 2023), the IP was assessed, denied both suicidal and homicidal ideation, and the clinician concluded that his aggressive behavior was likely due to "low frustration tolerance when his requests are not met." The clinician also concluded that a higher level of care was not indicated and rescinded the MHCB referral. As a result, the IP became verbally abusive toward the clinician when informed that he would be returning to the STRH unit. He died two days later.

The CDCR reviewer in this case did not find any precipitating factors that were known to staff indicating that the IP was contemplating suicide. He had several medical problems, including the aforementioned diabetes, hypertension, and coronary artery disease, but often refused recommended treatment. During the last eight months of his life, the IP lost approximately 62 pounds because of his untreated diabetes. The CDCR reviewer theorized that the IP "felt unable to control his medical care or secure the kinds of support he desired from the medical staff. Moreover, he not only believed that medical staff did not wish to care for him but felt they purposely and continually withheld care as well as colluded with custody staff to deny him medical care. Because these sources of pain were ongoing and in the context of dramatic weight loss, Mr. ____ likely experienced perpetual hopelessness and powerlessness..... The transfer to SVSP was, in retrospect, an extraordinarily challenging stressor that likely exacerbated Mr. ____'s fears and hopelessness."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

> 1) The mental health provider's progress note dated March 22, 2023, lacked standard components, including a mental status review, an assessment of the patient's condition and needs, and a plan of care.

> 2) Some treatment requirements included in the MHSDS Program Guide (2021) were not met during Mr. ____'s recent care. Specifically, an initial IDTT was not held within 14 days of arrival to STRH (p. 12-3-10), weekly contacts in STRH did not occur (p. 12-7-7), and mental health providers were not present at mental health huddles on three of the six days before Mr. ____'s death (p. 12-7-5). These omissions were the result of a critical staffing shortage at SVSP. At the time of Mr. ____'s death, SVSP had treatment modifications in place. The modifications

prioritized critical care over routine care to make the best use of limited staff. (See the attached memorandum, specifically page 5, for a description of the treatment hierarchy in use at the time of Mr. _____'s death.)

3) Given the combination of Mr. _____'s nonadherence to his prescribed treatment for diabetes and his recent substantial weight loss, a mental health treatment plan developed in coordination with medical providers to increase adherence was indicated but not implemented.  As stated above, SVSP had a treatment hierarchy in place to manage a severe staffing shortage.  Covering critical care was necessarily prioritized over treatment augmentation.

4) Upon review of the incident-related documents, there does not appear to be any documentation identifying which staff member called 911.  At the time of review, a request for clarification could not be made because the incident had been suspended pending review.

5) Upon review of AVSS BWC footage, there appears to be a delay in the activation of the alarm response.  The Primary Officer discovered Mr. _____ unresponsive and failed to take immediate action.  Instead, the Officer continued to feed inmates in the neighboring cell.

6) BWC footage of the cell entry appears to show Mr. _____'s body was not properly supported when staff utilized the Res-Q-Hook to cut the ligature from the anchor point.  This omission resulted in Mr. _____'s body falling to the floor.

7) Review of the Guard 1 time between report conducted prior to the time of incident showed a 41-minute lapse between checks (1/W), 6 minutes beyond the maximum 35 minutes allowed between checks.

8) Based on a review of AVSS and BWC footage, Mr. _____ appeared to have obvious signs of rigor mortis as evidenced by generalized stiffness.  Additionally, the BWC footage and evidence photographs depicted Mr. _____'s cell window to be partially obstructed and, in addition, a sheet hung over his bunk.  These obstructions restricted the staff's view from outside the cell.  These discrepancies call into question the integrity and thoroughness of the Guard 1 Welfare checks completed prior to the incident.

**Audit Summary**:  Adequate practices were found in the following areas: intake screening, PT rounding in restrictive housing, Guard One compliance (offset by a recent  suicide in which the victim was found in rigor mortis), IDTT meetings for MHCB patients, offering of out-of-cell activities to MHCB patients (although only after their initial IDTT meetings), high compliance with completing SRASHEs for emergent/urgent mental health referrals based upon DTS, and most required suicide prevention training.  A severe staffing shortage, symbolized by the lack of both a SPRFIT coordinator and MHCB supervisor, had adversely affected several suicide prevention requirements.  Several deficiencies requiring corrective action were noted, including inadequate safety planning (and lack of supervisory review of safety plans) for both patients

discharged from alternative housing and the MHCB unit, missing five-day follow-up assessments, and discharge custody checks. The current and long-standing practice of directly placing new restrictive housing IPs in non-intake cells of overflow ASU housing units was very problematic. The MHCB unit's IDTT should reconsider its blanket practice of only considering the allowance of out-of-cell activities following a patient's initial IDTT meeting. Finally, TTMs are recommended for both the nurse's office in the R&R unit, and in the IDTT room of the MHCB unit.

### 19)    **High Desert State Prison (HDSP)**

**Inspection**:  October 31-November 1, 2023 (previous suicide prevention audit was on April 18-19, 2022).  HDSP housed approximately 2,377 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  Due to scheduling, this reviewer was not able to observe any new admission during the **Intake Screening** process within the R&R unit during on onsite assessment.  Of note, there were not any problems observed during the previous 2022 assessment.  In addition, this reviewer observed daily **PT Rounds** in STRH unit on October 31, 2023.  The rounds were unremarkable, and the PT was observed to be consistently asking about IPs' mental health status and correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload IPs, correcting a problem observed during the previous assessment.

**Housing**:  HDSP had 10 **MHCBs** that were previously found to be suicide-resistant.  Of note, the MHCB unit had been closed since April 2023 for renovation (including installation of new flooring within the entire CTC) and tentatively scheduled for re-activation in January 2024.  In addition, there were 16 **New Intake Cells** (100-111; 196-199) in the STRH unit.  This reviewer observed that all but one new intake cell was empty, and there were not any new intake IPs in non-new intake cells.

Finally, prior to the CTC renovation project, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were found in either the observation room (Room 11) in the MHCB unit or designated medical cells in the CTC.  Room 11 had a suicide-resistant MHCB bed, whereas IPs housed in the CTC medical cells were provided with stack-a-bunks.  However, during the current renovation project, IPs in need of alternative housing were housed in "specialty cells" No. 114 and No. 115 within the TTA.  This reviewer observed two IPs on alternative housing status on November 1, with both provided stack-a-bunks and being observed on a continuous 1:1 basis.

Alternative housing was infrequently used at HDSP.  For the four-month period from July through October 2023, only 31 IPs were housed in alternative housing.  The vast majority (90 percent) of IPs were released within 24 hours, with the remaining IPs (3 of 31) released a few hours later.  In addition, the vast majority (71 percent) of IPs were referred to an MHCB.  Of the 29 percent (9 of 31) of cases that resulted in rescissions, all had the required SRASHEs and clinical five-day follow-up assessments.  However, of the five applicable cases that required the completion of safety plans for DTS, only one safety plan was viewed as adequate, two safety plans were viewed as inadequate, and two cases did not have any safety plans.

The following is an example of an inadequate safety plan for a patient (HDSP 1) discharged from alternative housing on October 27, 2023:

MH Safety Plan

Safety Planning Reason: Clinically indicated based on risk level and self-harm concerns.

Patient Participate - Warning Signs: No

Warning signs - Clinical Impressions: ***Mental Health initial assessment processes should continue with serious consideration for elevation in level of care to EOP.***

Helpful reducing self-harm - Clinical: ***Patient is unhelpful in this regard and presents as potentially acutely guarded or perhaps suffering paranoia.***

Reduce Risk Factors - Clinical: ***Patient denies experience of elevated risk for suicide at this time and recently.***

Patient History of Self Harm: No

Safety Concerns Identified: No

Environmental Concerns Identified: No

Patient Participate - Protective Factors: No

Protective Factors - Clinical Impression: ***Patient is, in the moment, being provided a housing and custody assessment course entirely consistent with stated wants.***

Enhanced factors - Clinical Impressions: ***Continue to remain vigilant and accepting of Patient's communication and apparent need to control such communicative displays.***

**Observation**:  This reviewer did not audit the adequacy of observation of MHCB patients (utilizing the Mental Health Observations Reporting Tool) because the MHCB unit was closed during the onsite assessment.

Finally, a review of **Guard One** data for a recent 24-hour period in the STRH unit found 100 percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the nine-month period of January through September 2023.  A sample EHRS review of 50 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in 94 percent (47 of 50) of the cases.

In addition, a **Crisis Intervention Team** was initiated in December 2019 and operational between 6:00 a.m. to 5:00 p.m. each day.  Although this reviewer did not have an opportunity to observe the CIT process during the onsite assessment, the assessment of two IPs placed in alternative housing was observed during the morning of November 1.  Both assessments were conducted cell front, and neither IP had an opportunity to request that the assessment be completed in privacy.  This reviewer subsequently conversed with a custody supervisor, as well as one of the clinicians who completed an assessment.  The reviewer was informed that all interaction between an IP and mental health clinician had been occurring cell front since the

MHCB renovation project was initiated in April 2023.  As confirmed by the CMH, there were two TTA rooms (No. 165 and No. 167) that could be utilized for these assessments if they were not being utilized by medical staff for emergencies.  Of note, these rooms were empty and available during the morning of November 1, 2023.  In addition, the CMH informed this reviewer that an MHCB supervisor's office (No. 175) could also be utilized.  Finally, subsequent medical chart review of the two IPs placed in alternative housing found that the required SRASHE was not completed for one (HDSP 2) of the IPs.

Because the MHCB unit was closed during the onsite assessment, this reviewer could not assess the quality of **IDTT Meetings**, **Out-of-Cell Time**, **Discharge SRASHEs**, and **Safety Plans** (for patients admitted for DTS).

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued for up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 22 cases of IPs discharged from either the MHCB unit or alternative housing who remained at HDSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through September 2023.  The review found that 100 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, and the majority of custody checks were recommended for 48 hours.  In addition, only 77 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**:  Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (March through August 2023) found that meetings had quorums of all required mandatory members or designees for all six months.  Meeting minutes included discussion on compliance data and improvement projects, as well as the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits.  However, the deficiency of not providing alternative housing IPs with opportunities for private assessments since at least April 2023 (when the MHCB unit was closed for renovation) should have been previously identified by the committee.  Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required.  Although there were no IPs enrolled in the SRMP during the review period, there was a placeholder template in the meeting minutes.  Meeting minutes were otherwise unremarkable.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

**Training**:  According to training records, 97 percent of both custody and nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, only 84 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of October 2023, 94 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 94 percent had completed safety plan training.

**Recent Suicides**:  HDSP experienced one (1) suicide during the review period.  In that case (HDSP 3), the IP was found hanging from the ventilation grate by a sheet in his GP cell during the early morning of September 11, 2023.  He had entered the CDCR system for his third term on November 24, 2021 to serve a 21-year sentence for voluntary manslaughter (of his girlfriend's father) and assault.  He was transferred to HDSP on February 24, 2022.  The IP incurred seven (7) RVRs during his confinement, the most recent of which occurred on February 15, 2023 for refusal to work.  He was not thought to be gang-affiliated.  The IP was unmarried and had two daughters.  Records indicated that he became estranged from his family during 2022 and did not have any recent family support.

According to available records, there was no information regarding the IP's biological parents, and he was raised by "aunts and uncles" beginning at age 2.  He dropped out of school in the 9th grade, and although he took GED classes, there were no records of his receiving a certificate.  The IP had a limited employment history, with some work in landscaping.  He began using methamphetamine and heroin at 13, and marijuana at age 15.  He had a significant juvenile and adult criminal history, with confinement in juvenile hall, county jail, and two prior CDCR terms.  In 2005, he reported receiving treatment for both drug and alcohol abuse in the community, as well as brief in-patient treatment for depression and self-injurious behavior in 2001.  The IP reported passive suicidal ideation while confined in the county jail.

Upon re-entry into CDCR, the IP screened positive for mental health issues and was placed in the MHSDS at 3CMS level of care.  He was diagnosed with schizophrenia, with symptoms of paranoia, informing the clinician that "I do not know who is watching me, spying on me, or following me." The IP additionally reported a history of auditory and visual hallucinations, depression, anxiety, and mood swings.  He began psychotropic medication.  The IP was transferred to HDSP in February 2022, and informed a clinician the following month that he had "anxiety and depression but I'm good for now." He then denied a history of hallucinations, but appeared "guarded." The IP also denied any current suicidal ideation and was assessed as a moderate chronic and low acute risk for suicide on a completed SRASHE.  He was subsequently diagnosed with adjustment disorder and continued on psychotropic medication until May 2022 when his depression was reported to have dissipated.  He then began refusing his regular mental health appointments through November 2022 and, contrary to policy requirements, was not scheduled for any appointments from November 2022 through April 2023.

The IP did not attend his IDTT meeting on March 21, 2023, and the problem list on that date incorrectly listed rule-out adjustment disorder, rule-out schizophrenia, and amphetamine-type substance use disorder.  According to the CDCR reviewer in this case, "The Master Treatment Plan on that date pulled forward information from the prior Master Treatment Plan dated March 9, 2022 that was no longer accurate.  Specifically, the most recent Master Treatment continued to state that Mr. _____ was prescribed Zyprexa and Prozac and 'symptoms appear stabilized by medication,' as well as he 'continues to utilize talk therapy sessions.'  Mr. _____ had not been prescribed any psychiatric medication, nor had he participated in therapy sessions for almost a year." The IP was seen again by a mental health clinician twice before his death on April 4, 2023 and June 19, 2023, denying suicidal ideation on both occasions, and reporting on June 19 "no significant difficulties functioning generally, nor related to mood, sleep, appetite or energy level."

According to the CDCR reviewer, the IP made multiple telephone calls to the Office of Internal Affairs (OIA)'s Sexual Misconduct Reporting Hotlines in the Central, Northern, and Southern Regions in the week prior to his death.  Most of the recorded voicemails were described as unintelligible, muffled, and largely incoherent.  One partial recording stated: "After this recording, I probably won't be alive any longer and I have to say what I have to say…Laos people being victimized, being kidnapped, being killed here in this facility, in High Desert."

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the IP was at imminent risk for suicide.  He did not leave a suicide note and, although he had a few medical issues, none were thought to be contributory to his death.  The CDCR reviewer opined that the IP "experienced return of psychosis (i.e., paranoid delusions) and increased depression following discontinuation of his antipsychotic and antidepressant medication, as well as isolation from his family and associates.  His paranoid delusions could be seen through his writings between July 2023 and September 2023, in which he referenced mass killings and genocide of Laos civilians at HDSP by correctional officers.  He further made multiple calls to a sexual misconduct hotline in which he presented as incoherent."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) There was no MHPC contact documented to have been offered between November 17, 2022 and April 3, 2023.  Per the MHSDS Program Guide 2009 Revision, 'Face-to-face individual contacts between the PC and the CCCMS inmate-patients in a GP setting shall occur as often as clinical needs dictate but at least once every 90 days.'

> 2) The Master Treatment Plan dated March 21, 2023 pulled forward information from the prior Master Treatment Plan dated March 9, 2022 that was no longer accurate in regard to psychiatric medication, therapy, and diagnoses.  Please see *Discussion/Conclusions* section for additional information.

> 3) Even though psychiatry prescribed no medications for Mr. _____ during the previous year, in this circumstance or scenario, a policy memorandum (dated June 23, 2022) requires that an individual psychiatry contact occur within the 90-day

period, prior to the IDTT that occurred on March 21, 2023. Review of the chart does not reveal a scheduling order for a psychiatry contact and subsequent psychiatry contact or attempted contact.

4) During the EHRS review, records indicated that manual immobilization was implemented but did not indicate that a cervical collar placement was applied to the patient.

5) <u>OIA</u>: As a result of the Suicide Case Review for Mr. ____, it was determined he left multiple voicemails on the OIA hotlines including the North, Central, and South regions. At this point, it is undetermined as to the specifics of the calls and the actions taken to address these calls. OIA has initiated and opened a confidential inquiry into this matter. The results of this inquiry will be shared once it has concluded.

**Audit Summary**: Although the MHCB unit was closed during the onsite assessment and IDTT meetings, out-of-cell time, and discharge SRASHEs and safety plans could not be assessed, adequate practices were found in almost all reviewed areas, including PT rounds in restrictive housing, Guard One compliance, completion of SRASHEs upon emergent/urgent mental health referrals for SI/behavior and when IPs were discharged from alternative housing, and CPR and most suicide prevention training for custody, medical, and mental health personnel. Deficiencies were found in safety planning for IPs discharged from alternative housing, not providing alternative housing IPs opportunities for private out-of-cell assessments, and low compliance rates regarding 7497 discharge custody check forms by custody personnel.

### 20)    Pelican Bay State Prison (PBSP)

**Inspection**: November 2-3, 2023 (previous suicide prevention audit was on April 21-22, 2022). PBSP housed approximately 1,604 IPs at the time of the current onsite assessment.

**Screening/Assessment**: This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on November 2, 2023. The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The nurse's office door was closed, with an officer providing security from the hallway. The office contained a TTM.

In addition, daily **PT Rounds** were observed in the Restrictive Housing Unit (RHU)[35] [formerly the STRH (Z-9) unit] on November 2, 2023. The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload IP. Finally, the C-Yard was deactivated on October 27, 2023, and all SHU and

---

[35] Beginning on November 1, 2023, all restrictive housing units within CDCR, including administrative segregation unit, short-term restrictive housing unit, long-term restrictive housing unit, psychiatric services unit, and security housing unit were deactivated and or renamed as "restrictive housing units."

administrative segregation units on that yard were closed.  As such, weekly SHU rounds by a psychologist were no longer required.

**Housing**:  PBSP had 10 **MHCBs** that were previously found to be suicide-resistant.  There were between 6 and 9 patients in the MHCB unit during the on-site assessment.  In addition, there were 11 **New Intake Cells** (112-117; 188-192) in the RHU.  This reviewer observed that all but one new intake cell was empty, and there were not any new intake IPs in non-new intake cells.

Finally, **Alternative Housing** cells to temporarily house IPs identified as suicidal and awaiting MHCB placement were found in either the observation cell (Room 184) or other cells within the MHCB unit.  In addition, alternative housing was used infrequently, and the length of stay was normally very short because all IPs were almost immediately admitted into the MHCB unit at PBSP.  For example, during the six-month period from April through September 2023, only 70 IPs were housed on alternative housing status, and all remained on that status for less than 24 hours.  This reviewer was informed by both the CMH and CNE that, because an observation cell (Room 184) or MHCB cells within the CTC were utilized for alternative housing, all were considered hospital admissions and not subject to recission.  The option of utilizing a non-CTC cell (such as a TTA specialty cell) for alternative housing was not considered at the facility.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  During October 2023, the Mental Health Observations Reporting Tool indicated that 16 patients were on observation status in the MHCB unit, with 97 percent compliance with timely observation of patients on Suicide Precaution and 92 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period in the RHU found 99 percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the nine-month period of January through September 2023.  A sample EHRS review of 50 emergent/urgent mental health referrals for SI/behavior revealed that clinicians completed the required SRASHEs in 96 percent (48 of 50) of the cases.

In addition, although PBSP did not have a **Crisis Intervention Team**, this reviewer had an opportunity to observe the crisis response to an emergency mental health referral for SI on November 2, 2023.  The IP (PBSP 1) had expressed SI secondary to vague safety concerns and desire not to return to his housing unit.  Two separate custody investigations concluded that his safety concerns were unfounded.  The IP had been discharged from the MHCB several hours earlier on November 2, but expressed SI to an officer while being escorted back to his assigned housing unit.  The responding crisis clinician, who was also an MHCB clinician, thoroughly assessed the IP in an MHCB holding cell.  The door was closed, with an officer stationed in the hallway.  The clinician subsequently decided not to re-admit the patient to the MHCB unit, and he was escorted back to his housing unit.  A SRASHE was completed as required and indicated

both a moderate chronic and acute risk for suicide.  The following day (November 3), however, the IP was re-admitted into the MHCB unit.

Three **IDTT Meetings** in the MHCB unit were observed on November 3, 2023, and all were for patients who were admitted for DTS.  One of the IDTT meetings was for a patient scheduled to be discharged a few days later on Monday, November 6 (the IDTT has a reasonable practice of refraining from MHCB discharges on Fridays).  Overall, there was good treatment team representation, adequate case presentations, adequate summaries of suicide risk history and inquiry regarding current SI, and discussion about diagnoses and psychotropic medication. However, there were some concerns found during the IDTT meetings.  First, in the case (<u>PBSP 2</u>) of the patient being discharged from the MHCB, the primary clinician stated during the meeting that "we talked about safety planning this morning," but failed to summarize the safety plan and/or ensure the patient was aware of the plan's detail.

Second, there was a disparity between the policy and practice regarding the use of mechanical restraints for non-maximum-security patients, as well as the availability of telephone calls for certain patients.  PBSP practices regarding telephone calls for MHCB patients are discussed below.  In one case (<u>PBSP 3</u>), a Level 2 patient was escorted into the IDTT meeting in mechanical restraints and placed in the TTM with the door locked.  The restraints were left on the patient.  When this reviewer inquired as to the rationale for a non-maximum-security (Level 2) IP to be in mechanical restraints, the CC II responded by stating the patient was a "Level 2 from High Desert" and had not yet been cleared to be a "Level 2 from Pelican Bay."  When the patient left the meeting, the CC II further stated that because "Level 2 workers were working in the CTC, Level 2 and above patients had to be cuffed" until they were classified as "PBSP Level 2." This reviewer had never heard such an explanation at other CDCR facilities, all of whom employed Level 2 workers in their CTCs.  This patient had been in the MHCB unit for 16 days and it was unclear when, if ever, he would be cleared as a "Level 2 from Pelican Bay." The patient was subsequently admitted into the CMF-PIP three days later on November 6, 2023.

According to CDCR's "Use of Mechanical Restraints in Psychiatric Inpatient Program and Mental Health Crisis Bed, updated September 5, 2023, "Non-Max incarcerated patients shall not be placed in mechanical restraints or TTMs (including unlocked TTMs) as a routine practice while housed in a PIP or MHCB," unless according to Title 15, California Code of Regulations, Section 3268.2, Subdivision (b)(2), "When a person's history, present behavior, apparent emotional state, or other conditions present a reasonable likelihood that he or she may become violent or attempt to escape." As such, PBSP practices in utilizing mechanical restraints in the MHCB unit were inconsistent with CDCR policy.

With regard to **Out-of-Cell Time** afforded to MHCB patients, there was a full-time RT assigned to MHCB patients.  This reviewer examined the 114-A forms of seven patients who had been in the MHCB unit for more than 48 hours and found that, with the exception of telephone calls, most had multiple offerings of showers and yard.

With regard to telephone calls, this reviewer was informed that it was PBSP practice to offer Privilege Group A patients telephone calls on a daily basis in the MHCB unit, with all other privilege groups offered telephone calls either "once every two weeks" or not at all (due to

disciplinary reasons).  Given the fact that most patients are only placed in the MHCB unit for up to 10 days, it would appear that most patients would never receive the opportunity for telephone calls unless they were in Privilege Group A.  In fact, the patient (PBSP 3) described above who was escorted to the IDTT meeting in mechanical restraints complained that he had been in the MHCB unit for 16 days and still not offered a telephone call.

This reviewer also reviewed Title 15, California Code of Regulations, Section 3044: "Work & Privilege Groups," which stated that Privilege Group A *and Privilege Group B* have "Telephone access during the inmate's non-work/training hours *limited only by institution/facility telephone capabilities*" under normal operating conditions."  The regulations also state that all Privilege Groups <u>above</u> A and B have "*One personal telephone access per week* during the inmate's non-work/training hours, *limited only by institution or facility telephone capabilities* under normal operating conditions." As such, PBSP practices in the offering of telephone calls to many MHCB patients were inconsistent with Title 15.

Finally, this reviewer examined provider orders for a few patients and found contradictory notations.  For example, a provider completed the "MH Patient Issue" order in EHRS for patients in which the "special instructions" section either noted "no privileges until seen by IDTT" or "phone calls once every two weeks," but other sections of the same forms stating both "no yard restriction" and "no phone restriction."

In order to assess **<u>Discharge SRASHEs and Safety Plans</u>** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 20 patients discharged from the unit from March through October 2023 who had been admitted into the MHCB for DTS and remained at PBSP.  The required discharge SRASHEs were completed in all cases, and 95 percent (19 of 20) of all five-day follow-up assessments were completed.  However, the required safety plans for DTS were found to be problematic, with only 25 percent (5 of 20) of the applicable cases having adequate safety plans and 75 percent (15 of 20) of the cases having inadequate safety plans.  As described below, the vast majority of reviewed safety plans, completed by three different MHCB clinicians, were not individualized, and contained the following boilerplate narrative:

> ____ would likely benefit from continued medication management; trauma-informed treatment such as Seeking Safety, TF-CBT, etc.; skills-based programs such as DBT with interventions such as 'wise mind,' relaxation regimens, etc.; CBT interventions to help pt identify and adjust maladaptive beliefs, cognitive reframing, chaining; radical acceptance style coping statements.

This and other repetitive narratives were also inappropriately copied and pasted into sections for warning signs, reducing risk factors, clinical impact of safety concerns, protective factors, and enhanced factors.  When conversing with the CMH about this concern, it was further noted by the CMH that safety plans should not contain DBT because such an intervention was not offered at PBSP.

In addition, the reviewer examined the discharge SRASHE and safety plan in the case (PBSP 1) referred to above in which the patient had been discharged from the MHCB unit on November 3,

2023.  The patient had expressed SI on a consistent basis during his 12-day MHCB placement. He was subsequently placed on 30-minute observation because, although he continued to voice SI, the patient had not engaged in self-harm and lacked a plan to commit suicide.  He was viewed as "not at high imminent risk." For example, as noted in a progress note dated October 27, 2023:

> Pt has continued to report SI with no plan, HI without a specific victim, and AVH. Pt has been advocating for inpatient hospitalization but has not been coming out for most MH appointments.  Pt does not want to be at PBSP and may endorse SI/HI indefinitely in an attempt to avoid going out to the yard.  Pt asked for inpatient hospitalization, believing SI was enough to qualify him….
> IDTT agreed to advance pt to q30/Full issue as pt has not engaged in SIB and is reporting/*exaggerating MH symptoms for secondary gains*/to achieve a transfer out of PBSP.

On November 2, 2023, the following safety plan was developed for this patient:

> <u>MH Safety Plan</u>
> <u>Patient Participate - Warning Signs</u>: No
> <u>Patient Participate - Protective Factors</u>: No
> <u>Safety Planning Reason</u>: Discharge from MHCB/PIP or Alternative Housing
> <u>Warning signs - Clinical Impressions</u>: ***Pt has reported that he has not learned how to 'deal with' emotions, which sometimes cause him to be suicidal.  Pt has also reported that being misled by other people has caused him to feel suicidal. Pt's current MHCB admission is for SI, partially due to pt's unexpected transfer to PBSP, which was not what he had been told would happen until shortly before the transfer.  Pt may have a high level of cognitive rigidity which makes unexpected change difficult to handle and cause anger when things don't work the way he wants them to. ____ would likely benefit from continued management of medications; skills-based treatment programs such as DBT with interventions (e.g., 'wise mind,' relaxation regimens, etc.); CBT interventions to help pt identify and adjust maladaptive beliefs, (e.g., cognitive reframing, chaining) and improve cognitive flexibility; radical acceptance type coping statements; trauma-informed treatments such as TF-CBT or Seeking Safety.***
> <u>Helpful reducing self-harm - Clinical</u>: ***In the past, pt has reported that his religious/spiritual beliefs, based on biblical principals, have been helpful in coping.  Currently pt denies anything being helpful.  Pt has limited family support to help him cope. ____ would likely benefit from continued management of medications; skills-based treatment programs such as DBT with interventions (e.g., 'wise mind,' relaxation regimens, etc.); CBT interventions to help pt identify and adjust maladaptive beliefs, (e.g., cognitive reframing, chaining) and improve cognitive flexibility; radical acceptance type coping statements; trauma-informed treatments such as TF-CBT or Seeking Safety.***
> <u>Reduce Risk Factors - Clinical</u>: ***Pt is willing to ask for help from mental health. ___ would likely benefit from continued management of medications; skills-based treatment programs such as DBT with interventions (e.g., 'wise mind,' relaxation regimens, etc.); CBT interventions to help pt identify and adjust***

*maladaptive beliefs, (e.g., cognitive reframing, chaining) and improve cognitive flexibility; radical acceptance type coping statements; trauma-informed treatments such as TF-CBT or Seeking Safety.*

Patient History of Self Harm: No

Safety Concerns Identified: Yes

Environmental Concerns Identified: No

Custody Notified: Yes

Notification of Safety Concerns Made: *Several captains, CCII, CMH, HLOC/ SPRFIT Coordinator; Lt., Sgt.*

Date Patients Concerns Reported: 10/30/2023 PDT

Plan to Address Safety Concerns: *Pt's safety concerns were addressed during his first IDTT, as there had already reportedly been an investigation into pt's safety concerns and they were considered unfounded.  Another investigation was requested on 10/30/23 and completed the same day, again finding that pt's concerns are unfounded.  Furthermore, pt is discharging to an NDPF yard that includes former SNY inmates.*

Patient Participate - Safety Concern: No

Clinical Impact Safety - Clinical: *Pt reports current SI is partially due to an unexpected transfer to PBSP, which was not where he was endorsed to.  Pt requested to be SNY, but was unable to identify specific factors or individuals that pose a threat, nor is there an SNY yard at his level, as all Level 1 and 2 are NDPF yard and any who were SNY are now on NDPF yards.  Pt does not seem to understand this. ____ would likely benefit from continued management of medications; skills-based treatment programs such as DBT with interventions (e.g., 'wise mind,' relaxation regimens, etc.); CBT interventions to help pt identify and adjust maladaptive beliefs, (e.g., cognitive reframing, chaining) and improve cognitive flexibility; radical acceptance type coping statements; trauma-informed treatments such as TF-CBT or Seeking Safety.*

Protective Factors - Clinical Impression: *Per pt's most recent SRASHE, pt has family support, religious beliefs, plans for the future, positive coping/conflict resolution skills, a job/school assignment, and a sense of optimism/self-efficacy.  However, pt's rigid style of interacting with the world causes him greater stress, especially in an environment where he has less control and plans are subject to change without notice.*

Enhanced factors - Clinical Impressions: ____ *would likely benefit from continued management of medications; skills-based treatment programs such as DBT with interventions (e.g., 'wise mind,' relaxation regimens, etc.); CBT interventions to help pt. identify and adjust maladaptive beliefs, (e.g., cognitive reframing, chaining) and improve cognitive flexibility; radical acceptance type coping statements; trauma-informed treatments such as TF-CBT or Seeking Safety.*

The above safety plan adequately summarized the two investigations into the patients' safety concerns, but uses the same repetitive narrative copied and pasted into sections on warning signs, reducing risk factors, clinical impact of safety concerns, and enhanced factors.

Most importantly for this case, the safety plan did not address the patient's perceived secondary gain issues. When a clinical team assesses a patient has utilized the threat of suicide for secondary gain, such as to affect a housing move, the new Safety Plan Model contains a section entitled "Self-Harm to Affect External Changes" that is designed "for patients who engage in self-harm or threats of self-harm to affect changes in their environment (e.g., housing, moves, drug-seeking, interpersonal stressors)."

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from May through October 2023. This reviewer's examination of the data found several problems, including a lack of data for May and June 2023, no indication of "pass/fail" scores, and timely supervisory review in only 82 percent (40 of 49) of the provided cases.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 17 cases of IPs discharged from either the MHCB unit who remained at PBSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through September 2023. The review found that only 88 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing or incorrectly completing Day One of the form. When completed correctly, the majority of custody checks were recommended for 24 hours by clinicians. In addition, 94 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most of the few errors attributable to gaps in observation.

**Intervention**: Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (April through September 2023) found that meetings had quorums of all required mandatory members or designees in only three months. The months of June through August incorrectly designated the CMH, a psychologist, as the psychiatric designee. Meeting minutes included discussion of compliance data and improvement projects, as well as the status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits. Although there were no IPs enrolled in the SRMP for most of the review period, there was a placeholder template in the meeting minutes. With one exception, meeting minutes were otherwise unremarkable. The exception was that a previous corrective action of ensuring that non-maximum custody MHCB patients were not being placed in the TTM had been prematurely "closed" by the SPRFIT in May

2023.  As documented in this current assessment, this deficiency had not been corrected.  In addition, because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News" and "Suicide Risk Management Program Policy and Procedure." PBSP did not have a CIT, therefore, a LOP for that process was not applicable.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 99 percent of custody, 96 percent of medical, and 94 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of October 2023, only 78 percent of mental health clinicians had completed the SRE mentoring program, 94 percent of clinicians had completed the seven-hour SRE training, and 100 percent of clinicians had completed safety plan training.

**Recent Suicides**:  PBSP did not experience any suicides during the review period.

**Audit Summary**:  Adequate practices were found in almost all reviewed areas, including intake screening, PT rounding restrictive housing, Guard One compliance, use of intake cells, completion of SRASHEs and five-day follow-up assessments for patients discharged from the MHCB unit, and most CPR and suicide prevention training for custody, medical, and mental health personnel.  Deficiencies were found in the continued use of mechanical restraints and the TTM for non-maximum security MHCB patients, reasonable offering of telephone use to MHCB patients with Privilege Group B and higher, safety planning for MHCB patients and MHCB supervisory review of safety planning, and completion of Page 1 of 7497 discharge custody check forms.

### 21)    <u>Central California Women's Facility (CCWF)</u>

**Inspection**:  November 14-15, 2023 (previous suicide prevention audit was on October 13-14, 2021).  CCWF housed approximately 2,231 IPs at the time of the current onsite assessment.

**Screening/Assessment**:  This reviewer observed both the **<u>Intake Screening</u>** process in the R&R Unit and the mental health diagnostic testing in the RC on November 14-15.  The R&R nurses were observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS.  The doors to the nursing offices were closed, with the officer stationed outside, thus ensuring privacy and confidentiality.

With regard to the **<u>RC Mental Health Diagnostic Testing</u>** process, this reviewer observed two clinicians separately conducting assessments.  The doors to each psychologist's office were closed and the clinicians were observed to be conducting thorough assessments.  Each clinician had access to (and used) the Patient Health Information Portal during the process, as well as SOMS and the county jail transfer sheet.

During the previous assessment, this reviewer found that it was a common CCWF practice during times of large volume intakes for the nurses' Initial Intake Screening and clinicians' Mental Health Diagnostic Testing to occur simultaneously. On such occasions, RC clinicians would be unable to review the nurse's completed Initial Intake Screening form as required by policy because it was still in the process to be completed. As such, during the current assessment, this reviewer asked each observed clinician if they had an opportunity to review the Initial Intake Screening forms. Both clinicians appropriately answered in the affirmative and stated they always waited until nurses had completed the Initial Intake Screening form before they completed their Mental Health Screening Interview form. In addition, both English and Spanish versions of the suicide prevention placards were found in all the nurses' and RC clinicians' offices as required by policy.

However, this reviewer also conducted a chart review which found that another RC clinician completed the Mental Health Screening Interview form before nursing staff had completed the Initial Intake Screening form on at least three cases (CCWF 1, CCWF 2, and CCWF 3) during the month of October 2023. In each case, the clinician incorrectly stated that the Initial Intake Screening form had been reviewed when, in fact, it had not yet been completed. In addition, county jail records in one of the cases (CCWF 2) revealed that the IP was a "suicide risk" and such information was not referenced on the clinician's Mental Health Screening Interview form. CCWF mental health leadership was made aware of this issue.

Finally, this reviewer had the opportunity to observe daily **PT Rounds** in the restrictive housing unit (Building 504) on November 15, 2023. Building 504 contained GP IPs, STRH, administrative segregation EOP, condemned unit, and alternative housing (for IPs on restrictive housing status). The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload IP.

**Housing**: CCWF had a Skilled Nursing Facility (SNF) in Building 805 with 12 designated **MHCBs** in eight rooms. The MHCB unit reopened on October 16, 2023. It had been closed for almost two years (since November 1, 2021) for renovation and lack of psychiatric staff (as stated in SPRFIT minutes of April 2023). During the renovation, all of the cells were renovated, including a licensed "observation room" that was previously unused because it was not suicide-resistant. The renovation project included installation of "epoxy flooring, anti-ligature toilets, ADA compliant anti-ligature sinks, anti-ligature handrails, modify combi-unit to anti-ligature, updated cell doors, updated security lights, updated electrical cover plates, updated fire sprinkler heads, updated cell window screens, and no-pick caulking."

In addition, the RHU (Building 504) contained 10 retrofitted **New Intake Cells** (123-124; 127-130; 226-229) for IPs on new intake status, and increase of five (5) new intake cells since the previous assessment. During this reviewer's tour of the unit, there were not any new intake IPs housed in unsafe, non-new intake cells.

Finally, **Alternative Housing** cells to temporarily house IPs awaiting MHCB placement were primarily found in Building 503 (RC housing), Building 504 (RHU), and A-73 (a holding cell in the CTC). Alternative housing continued to be utilized on almost a daily basis at CCWF, with

IPs required to be furnished beds and observed on a 1:1 basis.  From August through October 2023, there were 237 IPs placed in alternative housing, with all but 16 IPs discharged within 24 hours.  Most of these 16 IPs held over 24 hours were released within an additional 1-2 hours, with two held for 45 and 54 hours respectively.

In addition, the majority (57 percent) of IPs held in alternative housing were referred to an MHCB.  This reviewer examined 20 cases in which the referrals were rescinded and IPs returned to their housing units.  In those 20 cases, 95 percent (19 of 20) contained the required SRASHEs, and all had the clinical five-day follow-up assessments.  However, of the 20 cases that required safety plans, only six safety plans were viewed as adequate, 11 safety plans were viewed as inadequate, and three cases did not have safety plans.

The following is an example of an inadequate safety plan for an IP (CCWF 4) discharged from alternative housing on September 5, 2023.  She had a significant history of suicide attempts, with a high chronic risk for suicide:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate – Warning Signs: No
Warning signs – Clinical Impression: ***She appeared tired and wanting to return to the yard to speak to the sergeant.***
Helpful reducing self-harm – Clinical: ***She appeared tired and wanting to return to the yard to speak to the sergeant.***
Reduce Risk Factors – Clinical: ***She wanted to speak to the sergeant in order to move into a room that she deemed as safe.***
Patient History of Self Harm: No
Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate – Protective Factors: No
Protective Factors – Clinical Impression: ***Living with her friends.***
Enhanced factors – Clinical Impressions: ***Has an outdate.***

Finally, this reviewer observed a clinician assessing an IP held in the A-73 cell of alternative housing on November 15, 2023.  The IP was offered (and accepted) an out-of-cell contact for privacy.  The MHCB referral was subsequently rescinded, and the required SRASHE, safety plan, and five-day follow-up assessments were completed as required.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the **MHCB** unit.  In addition, all MHCB patients remained (at a minimum) on Suicide Prevention status until discharge because orders were not generated for regular nursing rounds.  For the most recent 30-day period of October 26 through November 25, 2023, the Mental Health Observations Reporting Tool indicated that 23 patients were on observation status in the MHCB unit, with 95 percent compliance with timely observation of patients on Suicide Precaution and 94 percent compliance with timely observation of patients on Suicide Watch.

Finally, a review of **Guard One** data for a recent 24-hour period within the RHU (Building 504) found 100 percent compliance with the required checks not exceeding 35 minutes. It should be noted, however, that this level of compliance was not an accurate reflection of the overall level of observation of IPs housed in Building 504. As detailed in all of this reviewer's previous assessments, Building 504 at CCWF was unique in that it housed the condemned unit containing 22 single cells. Seventeen of the cells were located within an enclosed program area on the first floor of the unit, with five cells located outside the enclosed program area. According to CCWF custody officials and staff, because condemned unit IPs had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were not conducted except during the First Watch. A May 9, 2014 directive from the DAI Director entitled, "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit. In addition, five of the condemned unit cells remained outside of the enclosed program area and adjacent to other ASU cells that were subject to Guard One surveillance. Although there continued to be no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance, it was noteworthy that the condemned unit was in a process of being deactivated and only 11 of 22 condemned IPs remained in the unit during the onsite assessment.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of May through October 2023. A sample EHRS review of 50 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff subsequently completed the required SRASHEs in 92 percent (46 of 50) of the cases.

In addition, the **Crisis Intervention Team** was initiated at CCWF in March 2019 and utilized infrequently. This reviewer did not have an opportunity to observe the CIT process during the onsite assessment, but was informed that the CIT was operational Monday through Thursday from 5:00 p.m. through 10:00 p.m. Yard clinicians respond to crisis calls during all other hours. A medical chart review found that nursing staff were a part of the CIT response in most, but not all, cases.

Three **IDTT Meetings** were observed in the MHCB unit on November 14-15, 2023, including two patients being discharged. Although there was good representation from all required team members, the IDTT meetings were problematic. For example, two of the patients had been admitted for DTS, and neither was asked if they were currently suicidal. In one case (CCWF 3), there was not any discussion as to whether the patient with three MHCB admissions in the past month should be referred to a higher level of care. On multiple occasions during the discharge IDTT meeting, the primary clinician repeatedly stated that "We have limited information about your background," despite the fact that the patient had been in the same MHCB unit at CCWF for placements spanning October 19 through October 27, October 30 through November 8, and November 8 through November 15, 2023. In another case (CCWF 5), there was excessive discussion during the discharge IDTT meeting regarding what the patient should expect when transferred to the RHU, but no discussion regarding her current 7-day placement in the MHCB

301

unit. In addition, there was no discussion during any of the IDTT meetings regarding each patient's level of observation and possessions/privileges.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer found some improvements, as well as continued problematic issues that remained unresolved from previous assessments. For example, two small management yards were finally completed since the previous assessment and available for MHCB patients on either maximum-security/RHU or those still unclassified. In addition, this reviewer was provided a copy of the new digitized 114-A forms for 13 current and prior patients housed in the MHCB unit during the previous two weeks. The data confirmed that all patients were provided with multiple opportunities for yard and showers during their placement. However, the 114-A forms did not contain any information regarding opportunities for dayroom provided by the RT (who was available full-time for both MHCB and SNF medical patients). More importantly, the 114-A forms did not contain any information regarding the offering of telephone calls. This practice was similar to that found during the previous assessment in which telephone calls were either not offered or not documented on the 114-A forms for individual patients.

As discussed during previous assessments, the B Wing of the SNF (Building 805) contained a multi-purpose activity room for both medical and MHCB patients. This room was designed for a variety of activities, including IDTT meetings, group activities, and opportunities for telephone calls (for both medical and MHCB patients). Of note, a temporary holding cell was replaced by a TTM in the activity room in March 2023, but because the telephone was located on the opposite side of the room from the TTM, patients on maximum-security/RHU status who were placed in the TTM were unable to reach the telephone. In addition, due to scheduling conflicts, this reviewer was informed that the telephone was only available to MHCB patients for one hour each day from 12:00 p.m. to 1:00 p.m.

Further, although various members of the IDTT informed this reviewer that the activity room could be utilized for private clinical sessions with both non-maximum and maximum security MHCB patients, chart review and interviews with several patients found a different practice. This reviewer examined the charts of six MHCB patients, and interviewed three patients. The chart review found that almost all of the interactions between clinicians and patients occurred in or at the patient's cell. A common phrase utilized by a psychiatrist in progress notes would be either "I/P seen at bedside with CO" or "IP seen at bedside with rest of treatment team" (see CCWF 6 on November 6, 2023). This reviewer was also informed that the clinical team (including the psychiatrist, primary clinician, and nurse) completed "grand rounds" every weekday morning, with documentation of these rounds made in a progress note by the psychiatrist.

Therefore, it was not unusual to review a chart of an MHCB patient where there were seven psychiatric notes and one primary clinician note during a 7-day placement (see CCWF 7 from November 2 through November 9, 2023). During these grand rounds, custody officers were stationed inside the patient's cell or in the open doorway, thus compromising reasonable privacy and confidentiality. All three patients who were individually interviewed consistently reported that the activity room was limited to occasional RT activities, and that all clinical sessions were conducted at the cell in the presence of custody personnel.

Not surprisingly and similar to what was found during the previous assessment, clinical interaction with maximum-security/RHU patients continued to occur bedside with custody staff inside the patient's cell or in the open doorway. Of note, renovation of a former seclusion room (No. B-68) into a clinical interview room in the B Wing had started one day prior to this reviewer's assessment on November 14. The room, large enough to accommodate a TTM, was scheduled to be completed within the next few months. Given the fact that private clinical space was limited for all MHCB patients, this room should be made available to all MHCB patients, i.e., both non-maximum security and maximum-security custody.

In summary, the current practice of not offering consistent and reasonable private clinical sessions to all MHCB patients remained problematic.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 14 patients discharged from the unit during October and November 2023, had been admitted into the MHCB for DTS, and remained at CCWF. The required discharge SRASHEs were completed in all cases, and all five-day follow-up assessments were completed in all applicable cases. In addition, similar to alternative housing data, the required safety plans for DTS were found to be problematic, with only 14 percent (2 of 14) of the cases having adequate safety plans, 79 percent (11 of 14) of the cases having inadequate safety plans, and 7 percent (1 of 14) lacking the required safety plan.

The following is an example of an inadequate safety plan for a patient (CCWF 7) discharged from the MHCB unit on September 5, 2023. She had a significant history of suicide attempts, with a high chronic risk for suicide:

MH Safety Plan

Safety Planning Reason: Discharge from MHCB/PIP or Alternative Housing
Patient Participate - Warning Signs: Yes
Warning signs - Patient focused: *'Stress' and 'maybe anxiety.'*
Warning signs - Clinical Impressions: ***Pt has history of substance use that may trigger engagement of risky behaviors and SI. She has difficulty managing distress of anxiety with adjusting to the social system of the prison setting, possibly triggering SI.***
Helpful reducing self-harm - Patient: *'take it easy' and 'talk to someone.'*
Helpful reducing self-harm - Clinical: ***Placement in CCCMS, talk to MH tx team/CO/medical staff, remain compliant with medications, work on relapse prevention and sobriety.***
Reduce Risk Factors - Patient: ***Talk to staff, take meds, attend treatment.***
Reduce Risk Factors - Clinical: ***Placement in CCCMS, talk to MH tx team/CO/medical staff, remain compliant with medications, work on relapse prevention and sobriety.***
Patient History of Self Harm: No
Safety Concerns Identified: No
Environmental Concerns Identified: No
Patient Participate - Protective Factors: Yes

Protective Factors - Patient focused: *'laid back and be chill.'*
Protective Factors - Clinical Impression: ***Participate in CCCMS tx, remain compliance with meds, work on sobriety, talk to MH outside of scheduled appointments (via co-pays) to process any distress or difficult emotions, or concerns and potential issues.  Work with staff on pre-release plan.***
Enhanced Factors - Patient focused: *'laid back and be chill.'*
Enhanced factors - Clinical Impressions: ***Participate in CCCMS tx, remain compliance with meds, work on sobriety, talk to MH outside of scheduled appointments (via co-pays) to process any distress or difficult emotions, or concerns and potential issues.  Work with staff on pre-release plan.***

The above safety plan used the same repetitive narrative copied and pasted into various sections, and incorrectly interpreted protective factors by simply stating "laid back and be chill." As noted above, grand rounds were conducted daily each weekday, with psychiatrists providing documentation of patient contact.  As noted above in this case (CCWF 7), there was only one individual contact note by the primary clinician during the 7-day placement, and that lone contact was on November 9, 2023, the date of the discharge SRASHE.  As such, it would certainly be challenging to complete an adequate safety plan for a patient based upon only one individual contact.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB since its re-opening on October 16, 2023.  This reviewer's examination of the data found several problems, including there being no indication of "pass/fail" scores, and timely supervisory review in only 14 percent (2 of 14) of the provided cases.

Finally, the process by which IPs were provided **Discharge Custody Checks** at 30-minute intervals following release from either an MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each IP.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 312 cases of patients discharged from an MHCB or alternative housing placement who remained at CCWF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May through October 2023.  A total of 234 cases were reviewed, and the audit found that 85 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most errors attributed to unsigned forms.  The vast majority (67 percent) of the custody checks were recommended by clinicians for 48 hours.  In addition, 87 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributed to gaps in 30-minute observation.

**Intervention**:  Based upon high compliance rates found during previous assessments, this provision was not assessed.

**SPRFIT Meetings**:  A review of six months of SPRFIT meeting minutes (April through September 2023) found that meetings did not have quorums of all required mandatory members or designees in four (April, May, June, and August) of the six months.  The lack of quorums was attributable to the lack of psychiatry attendance.  Meeting minutes included very brief discussion on compliance data and improvement projects.  The status of corrective actions based upon this reviewer's previous recommendations and regional SPRFIT audits was reported separately.  Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and/or root cause analyses (RCAs) were not required.  Monthly tracking and discussion of SRMP patients was periodically included in meeting minutes.  Meeting minutes were otherwise unremarkable.

A current SPRFIT LOP was in effect, as well as LOPs consistent with the following required three CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News," "Crisis Intervention Team Policy and Procedure," and "Suicide Risk Management Program Policy and Procedure."

Finally, because CCWF is an RC, the SPRFIT was required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum, effective January 27, 2021, to ensure that:  1) suicide prevention placards were displayed in designated areas (including offices of the RC diagnostic clinicians); 2) diagnostic clinicians were reviewing the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS; 3) diagnostic clinicians were requesting IPs sign ROI forms when reporting histories of prior mental health services in the community; and 4) diagnostic clinicians complete SRASHEs when IPs present with possible current risk for suicide.  SPRFIT coordinators or designees were required to collect data and assess compliance with these four expectations, as well as report such findings during monthly SPRFIT meetings.

Review of SPRFIT minutes indicated that such data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was not reported as required.  Instead, meeting minutes simply stated that the "SPRFIT Coordinator advised that this measure is at or near goal," with no indication that diagnostic clinicians were reviewing the nurses' Initial Intake Screening forms and completing SRASHEs when appropriate.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 98 percent of custody, 96 percent of medical, and 98 percent of mental health staff had received annual suicide prevention block training during 2022.  Finally, as of October 2023, only 78 percent of mental health clinicians had completed the SRE mentoring program, 98 percent had received the seven-hour SRE training, and 93 percent had completed safety plan training.

**Recent Suicides**:  CCWF did not experience any suicides during the review period.

**Audit Summary**: Adequate practices were found in almost all reviewed areas, including intake screening, PT rounding in restrictive housing, Guard One compliance, use of intake cells, completion of SRASHEs and five-day follow-up assessments for patients discharged from the MHCB unit, and most CPR and suicide prevention training for custody, medical, and mental health personnel. Continued deficiencies were found in observed IDTT meetings for MHCB patients, telephone calls either not offered or not documented on the 114-A forms for individual MHCB patients, safety planning for alternative housing and MHCB patients, supervisory review of safety planning, and completion of 7497 discharge custody check forms. The practice of not offering consistent and reasonable private clinical sessions to MHCB patients remained very problematic. Similar to the previous assessment, SPRFIT minutes still did not include data or other required "proof of practice" regarding all four compliance areas within CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum.

# APPENDIX B

**California Medical Facility - Psychiatric Inpatient Program (CMF-PIP)**

**Inspection**: January 9-10, 2023 (previous suicide prevention audit was on May 24-26, 2021). Due to mission changes and staff shortages, the bed capacity has changed during the past year. During the current onsite assessment, there were 296 patients, including 121 ICF patients and 175 APP patients.

**Screening/Assessment**: Two new patient admissions were observed on January 10, 2023. Pursuant to CMF-PIP practice, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed on the patient's assigned housing unit. As reported during the previous 2021 assessment, the Acute/ICF Nursing Assessment Form did not contain any current suicide risk/suicide history inquiry. In the first observed case (CMF-PIP 1), the nurse conducted the screening in the hallway of the housing unit, with other patients and custody staff milling about. In the second case (CMF-PIP 2), the screening was conducted in the unit dayroom and, although the door was closed, two officers were straddling the patient during the process. In addition, a psychiatrist was also in the dayroom and conducted a brief psychiatric assessment in which the patient was asked if they were currently suicidal. It was unclear why therapeutic treatment modules (TTMs) were not utilized in either of these cases to better ensure privacy and confidentiality during the intake process.

**Housing**: The CMF-PIP utilized various units for housing both APP and ICF patients. An unlicensed unit (L-1) was closed in October 2022. The 64-bed High Custody Intermediate Treatment Center (HCITC) for ICF patients contained four housing units, and all 32 cells in the A and B Units were retrofitted in July 2022 to become suicide-resistant. The retrofit corrected several hazards, including metal-frame beds, shelves, and sinks with anti-squirt slit faucets. Pursuant to CMF-PIP practice, almost all patients on suicide observation status remain housed in their assigned cells, with the exception of patients assigned to multiple-occupancy cells. In those cases, suicidal patients were rehoused in designated observation cells in the unit. Of note, in response to this reviewer's document request, CMF-PIP staff incorrectly stated the following in the cover page to one of the requested documents on designated housing for suicidal patients: "Dorms and Multi-Person Cells are used only for suicide precaution when there are no limitations on property." This was clearly wrong. Multi-occupancy cells, including dorms, should never be utilized for suicide observation at the CMF-PIP because they are not suicide-resistant, regardless of property allowance or restriction.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the PIP units. In addition, patients not on suicide observation status were said to be observed at 15-minute intervals by nursing staff, but documentation was kept on paper forms and not entered into the EHRS for each patient. The Mental Health Observations Reporting Tool indicated that 97 percent of patients on Suicide Precaution and 90 percent of patients on Suicide Watch were observed on a timely basis during January 2023.

In addition, for those patients placed on either level of observation, current provider orders (to include level of observation, patient issue, and privileges) were placed outside each suicidal patient's door on Adaptive Support Forms (CDCR 128 C-2). However, this reviewer found a significant problem in which providers wrote progress notes and "issue" orders that restricted

clothing for suicidal patients as an alternative to either 1) placing patients on suicide observation status or 2) discharging patients from suicide observation status, but continuing the limited issue orders for safety smocks or t-shirt/boxers.  For example, it was not uncommon to read the following provider notes for such patients:

- "Plan: Will discontinue special precautions at this time, but will continue the safety smock," (see CMF-PIP 3 on August 4, 2022).

- "In my clinical opinion, SP is not indicated but limited issue is and being continued as least restrictive measure to prevent danger to self," (see CMF-PIP 4 on August 20, 2022).

Such orders resulted in the practice of providers not always interacting with suicidal patients on a daily basis, as well as nursing staff not entering their observations into the EHRS of each patient, as required for patients on either Suicide Precaution or Suicide Watch.

The following four cases exemplify this serious issue.  In the first case (CMF-PIP 5), the patient had an extensive history of both self-injurious behavior (SIB) and foreign body insertion (FBI), with approximately 82 documented incidents in CDCR custody between December 2017 and September 2022.  He was known to vacillate between expressing and denying suicidal ideation. In addition, he often did not offer an explanation as to why he engaged in FBI.  On July 25, 2022, the patient was transferred from CHCF-PIP to CMF-PIP for danger to self.  Beginning on August 11, 2022, he swallowed a piece of plastic, as well as batteries from his radio.  When assessed by a psychiatrist, the patient:

> Reports auditory hallucinations described as 'rambling.  I can understand, they talk too fast.  I get upset when I hear the voices.'  IP states 'I been having bad nightmares for the past 3 days.'  IP reports that his grandmother passed away and the services were held 8/7/2022.  However, Dr. ____ contacted the Patient's mother who reported that both his grandmothers are alive and not deceased.  IP is requesting self-help material on meditation.  IP reported to have ingested some plastic pieces and possibly additional batteries on 8/11/2022.  IP states that he passed a battery in his feces and surrendered it to the nursing staff.  IP is requesting some of his property but advised that he is not allowed to have any personal property at this time due to the recent FBI…. IP denies active VH at this time.  IP denies plans for self-harm and denies SI/HI.  IP reports ongoing urges to swallow foreign bodies.

The patient's personal property was removed from his cell, but he was not placed on either Suicide Precaution or Suicide Watch.

Five days later on August 16, 2022, the patient informed a nurse that he had inserted paper from a milk carton into his urethra, and swallowed two more batteries.  He was seen by a psychiatrist and placed in a safety smock.  The patient was not placed on suicide observation status.  The following day (August 17), his full issue was returned.  Five days later on August 22, 2022, the patient expressed SI and informed nursing staff he had inserted carrots into his urethra.  A

309

subsequent order documented "No whites. Blues only," and no property. The patient was not placed on suicide observation status. Three days later on August 25, 2022, the patient was provided with full issue, including whites (t-shirt/boxers).

On September 8, 2022, the patient informed nursing staff that he swallowed pieces of a toothbrush, and then told custody staff he swallowed pieces of an eyeglass frame. He was transported to an outside hospital with orders that he would be placed on Suicide Precaution with limited issue upon return to CMF-PIP. The patient was returned to the facility three days later on September 11, 2022, with confirmation that there were multiple foreign bodies in his stomach and colon. Despite previous provider notes indicating that Suicide Precaution and limited issue would be ordered upon return from the hospital, the patient was placed on full issue and routine observation.

On October 18, 2022, the patient was placed on Suicide Precaution for reasons that were unclear from the medical chart. The orders were continued daily for nine days until October 27, when the Suicide Precaution order was discontinued. The patient was not always seen daily by mental health providers during this time period and, when seen, the provider notes did not address why the Suicide Precaution orders were continued. Of note, according to the Mental Health Observations Reporting Tool, there were approximately 119 violations of nursing staff providing observation of the patient at staggered 15-minute intervals from October 18 through October 27, 2022.

In the _**second**_ case (CMF-PIP 6), the patient with a history of expressing SI for secondary gain was seen by a psychiatrist on December 24, 2022, following a reported suicide threat to nursing staff. According to the subsequent provider note:

> I informed the IP of my decision to limit his property, given his suicidal report today, unreliability, recent suicidal statement and accompanying lacerations to his chest and report of overdose he retracted at an outside hospital-see 12/21/22 notes, his extensive suicidal/self-injurious history and the potential emotional triggers Christmas Eve may hold for him. We then discussed the level of restriction and arrived at the following: All property except TV and Bible, clothes he was wearing was okay. He gave his 'word' he will not act out in anyway and gave hopeful reason for living as fighting his case in which he thinks the sentencing was unfair. Utilized insight-oriented approaches and supportive therapy which appeared helpful. IP declined offered PRN. He was calm, polite and respectful, accepted disappointment well and demonstrated understanding of my clinical decision i.e., consequences of his actions regarding suicidal statements and recent behaviors. He is aware POD may not return his property over weekend. He denied any Suicidal/self-injurious presently.

> Plan partial issue: No property except TV and Bible, clothes he was wearing (per earlier nursing note of December 24, a white shirt and shorts) as least restrictive measure to prevent DTS.

310

The patient was not placed on Suicide Precaution or Suicide Watch status, and not seen by a mental health clinician for three days until December 27, 2022, when all property and possessions were returned.

In the third case (CMF-PIP 7), the patient was placed on Suicide Precaution in a safety smock by a psychiatrist on December 18, 2022 for danger to self and danger to others following an altercation with custody staff. He was seen the following day (December 19) by another psychiatrist who discontinued the Suicide Precaution and safety smock orders, but ordered "partial issue" of a t-shirt and boxers and routine observation. The patient was not seen again by any mental health clinician for review of the partial issue order until December 28, 2022. On that date, a psychologist noted in a progress note that "Concur w/ Dr. ____ that pt is not currently a danger to himself and does not need limited issue or other precaution."

Several weeks later on January 8, 2023, the patient became agitated following a visit and hit his head while jumping up and falling out of his wheelchair. He was treated by medical staff and referred to a psychiatrist after not providing an explanation for his behavior other than "something's bad inside me." The provider noted that "Given the unpredictable and violent behaviors to self and high risk of danger to others," limited issue of a safety smock was provided to the patient. He was not placed on either Suicide Precaution or Suicide Watch. Full issue clothing was provided the following day (January 9, 2023) by another psychiatrist following inquiry by this reviewer.

In the fourth case (CMF-PIP 8), the patient was admitted to the APP at CMF-PIP from the MHCB at CSP/Sac on November 16, 2022 for danger to self and clothed in a safety smock. A SRASHE was completed that same day and indicated both a high chronic and acute risk for suicide. The provider issued the following order: "IP continued on limited issue (in safety smock) as least restrictive measure to prevent/reduce behaviors dangerous to self." The patient was not placed on either Suicide Precaution or Suicide Watch. The accompanying initial psychiatric assessment stated, in part, that:

> Will continue limited issue but given his lack of significant suicide attempts recently, if ever, and his apparent use of mental health housing likely for safety being life affirming, the absence of objective finding of depression and psychosis, not having the 'means' to kill self on limited issue, in my clinical opinion, he does not require a higher level of observations at this time. He appears content having accomplished his goal of readmission to PIP. Will continue current medications and he will be followed up by his treatment team tomorrow.

The patient was seen the following day (November 17, 2022) by a psychiatrist who ordered that he "May have blues. No personnel issue (property and canteen) so that IP may program." Later that same day, he was observed tying his shirt to the ceiling light fixture, but had not tied the ligature around his neck. The patient was placed back into a safety smock, but not placed on either Suicide Precaution or Suicide Watch. He was again seen by a psychiatrist on November 18, 2022, and the order for the safety smock was continued. The patient remained in a smock and was not seen by a provider until three days later (November 21) when the order for the safety smock was renewed. He was seen again the following day (November 22) and the provider note

311

stated: "Will provided blues and treatment materials only for now and advance IP slowly." The patient was seen again on November 23, 2022 and the provider note stated: "May have full issue, personal property, packages canteen." In sum, despite being clothed in a safety smock on almost a continuous basis from November 16 through November 21, 2022, the patient was never placed on either Suicide Precaution or Suicide Watch.

In conclusion, these findings are consistent to those found during the 2021 assessment when the reviewer noted from the chart review "that clinicians rarely utilized Suicide Precaution status, but instead, ordered either Suicide Watch or observation at 15-minute intervals. Suicide Precaution required daily assessment, whereas observation at 15-minute intervals did not." Of note, given the serious problem described above, this reviewer chose not to conduct a separate chart review audit to assess the adequacy of documentation justifying patients' discharge from suicide observation status.

The chief psychiatrist was made aware of this problem and committed to instituting corrective action.

**Management/Treatment Planning**: Fourteen IDTT meetings were observed during the onsite assessment. Overall, although treatment team representation was good, with one exception, each of the meetings (involving varying clinical staff) was problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), review of diagnoses, no discussion about observation level and possessions for those patients currently on either Suicide Precaution or Suicide Watch, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. The one exception was several IDTT meetings led by the primary clinician assigned to S-1 Unit on January 9 in which discussion of suicide risk, identification of coping skills, and safety planning was attempted in each case.

In addition, this reviewer examined 30 NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for patients on suicide observation status during at least part of a seven-day period in December 2022. All reviewed patients were cleared for all out-of-cell activities by providers. The review found that 77 percent (23 of 30) of patients were offered yard/dayroom of 10 hours or more, only 23 percent (7 of 30) of patients were offered showers three times during the week, 77 percent (23 of 30) of patients were offered at least one telephone call, and none of the patients were offered visits (not surprising given the short time period being reviewed). Similar low percentages of patients being offered adequate non-clinical out-of-cell activities were found during the 2021 assessment.

Finally, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission and upon discharge from the PIP. SRASHEs are authorized to be completed by only psychiatrists and licensed psychologists. This reviewer examined the medical charts of 42 patients admitted to, and 42 patients discharged from, the CMF-PIP to a lower level of care (EOP and lower) during October and November 2022. The review found that 98 percent (41 of 42) of <u>admission</u> SRASHEs were completed in a timely manner, a significant improvement from the prior 2021 review which found only 70

percent compliance. Of note, all of the admission SRASHEs were completed by a small cadre of registry psychiatrists.

In addition, although 98 percent (41 of 42) of <u>discharge</u> SRASHEs were completed in a timely manner, only 61 percent (25 of 41) of the assessments were completed by licensed psychologists (or psychiatrists). In fact, 39 percent (16 of 41) of the discharge SRASHEs were completed by licensed clinical social workers who, pursuant to policy, were not authorized to complete the assessments. Further, required safety plans were only completed in 76 percent (32 of 42) of the cases, either because the discharge SRASHEs were not completed (in one case) or the assessments incorrectly stated that a safety plan was not required due to "low acute risk/not clinically indicated" or the patient refused to participate in the process. Finally, contrary to policy and similar to the previous 2021 assessment, this reviewer was informed that the required supervisory review of safety plans contained in discharging SRASHEs was not being completed due to shortages in supervisory staff.[36]

**Intervention**: Although housing units were not reviewed for the presence of emergency response kits during this assessment, units toured during the 2021 assessment all contained an Ambu bag and cutdown tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: A review of five months (July 2022 through November 2022) of SPRFIT meeting minutes found that a quorum was achieved for only one meeting (in October 2022). Quorums were not achieved because either all mandatory members or designees were not in attendance, and/or a unit captain was incorrectly designated for an associate warden. SPRFIT meeting minutes were very brief (three to four pages) and unremarkable. In addition, meeting minutes did not address any of the recommended corrective actions from this reviewer's 2021 assessment or identified any of the deficiencies found above.

**Training**: According to training records, 93 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, 99 percent of custody staff, 90 percent of medical staff, and 93 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of December 2022, approximately 21 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and 88 percent had completed safety plan training.

**Recent Suicides**: CMF-PIP experienced one patient suicide (<u>CMF-PIP 9</u>) on October 22, 2022, resulting in 18 QIPs distributed amongst multiple facilities with 9 QIPs specific to the CMF-PIP. These 9 QIPs included multiple IDTT deficiencies, including an untimely initial IDTT meeting, meetings held without patient or nursing representation; inadequate master treatment planning; contradictory providers orders regarding possessions resulting in the patient being provided with items that caused his death by asphyxiation, inadequate assessment of suicide risk three days

---

[36] This reviewer's current assessment of suicide prevention practices within the PIPs occurred between January and May 2023. Because CDCR was in the process of transitioning from one safety plan model to another during this time period, the quality of safety planning by PIP clinicians was not assessed.

prior to his death; inadequate nursing rounds when the patient was previously on suicide precaution status; and emergency medical response.

**Audit Summary**: With a few exceptions, including the retrofitting of 32 patient cells in the HCITC, over 90 percent compliance with observation of suicidal patients, and timely completion of admission SRASHEs by psychiatry, problematic practices continued to be found during the current assessment. For example, the new admission process was observed to be conducted without reasonable privacy and confidentiality, and the screening form (Acute/ICF Nursing Assessment Form) did not contain any current suicide risk/suicide history inquiry. A significant problem continued to be found in which providers wrote progress notes and "issue" orders that restricted clothing for suicidal patients as an alternative to either 1) placing patients on suicide observation status or 2) discharging patients from suicide observation status, but continuing the limited issue orders for safety smocks or t-shirt/boxers. Whether intentional or not, such a practice resulted in patients placed in safety smocks or partial issue (t-shirt/boxers) without the requirement of being placed on suicide observation status and assessed by a provider on a daily basis. IDTT meetings continued to be problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Patients on suicide observation status were not consistently offered reasonable access to yard/dayroom, showers, and telephone calls. Further, a sizable percentage (39 percent) of the discharge SRASHEs were completed by licensed clinical social workers who, pursuant to policy, were not authorized to complete the assessments. Further, required safety plans were only completed in 76 percent of the cases, and similar to the previous 2021 assessment, the required supervisory review of safety plans contained in discharging SRASHEs was not being completed due to shortages in supervisory staff. SPRFIT meetings did not always meet the quorum, and meeting minutes did not address any of the recommended corrective actions from this reviewer's 2021 assessment or identified any of the deficiencies found above. Finally, with the exception of SRE mentoring program and safety planning, all other required training had compliance rates above 90 percent.

## California Health Care Facility (CHCF) - PIP

**Inspection**: January 11-12, 2023 (previous suicide prevention audit was on July 19-21, 2021). Due to mission changes and staff shortages, both the bed capacity and census changed during the past year. During the current onsite assessment, there were 332 patients, including 254 ICF patients and 78 APP patients.

**Screening/Assessment**: The reviewer did not have an opportunity to observe the intake screening process by nursing staff because no new patients were admitted into the facility during the onsite assessment. Pursuant to practices observed during the previous assessment, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed by nursing staff in the Patient Management Unit (PMU).

**Housing**: During the onsite assessment, several CHCF-PIP units were observed to be closed due to staffing issues and 13 housing units were available and designated for either APP or ICF level of care. Patients on suicide observation status could be housed in any of the APP and ICF beds.

Similar to the previous 2021 assessment, the review found all patient rooms continued to be suicide-resistant.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the PIP units. In addition, patients not on suicide observation status were said to be observed at 15-minute intervals by nursing staff, but documentation was kept on paper forms and not entered into the EHRS for each patient. For those patients on either Suicide Precaution or Suicide Watch, provider orders (to include level of observation, patient issue, and privileges) were placed outside each suicidal patient's door on Adaptive Support Forms (CDCR 128 C-2) and found to be current. Finally, the Mental Health Observations Reporting Tool indicated that 98 percent of patients on Suicide Precaution and 97 percent of patients on Suicide Watch were observed on a timely basis during December 2022.

**Management/Treatment Planning**: Nine IDTT meetings were observed on January 11-12, 2023. Overall, although treatment team representation was good, each of the meetings (involving varying clinical staff) was problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), review of diagnoses, little discussion about observation level and possessions for those patients currently on suicide observation status, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. One case was indicative of the problem. The patient (CHCF-PIP 1) was admitted into the APP on January 9, 2023 for danger to self. This reviewer observed his initial IDTT meeting on January 11, 2023. The patient was clothed in a safety smock. Questioning was limited to his level of depression (which he rated as "7" out of 10), current suicidal ideation ("yes, I am always suicidal"), and psychotropic medication. There is no case presentation or discussion of diagnoses. There was no discussion regarding his level of observation, issue (other than he was clothed in a smock), or out-of-cell activities. There was no further discussion regarding his current suicide risk and/or history of suicidal behavior. There was no discussion regarding either treatment and/or safety planning, preliminarily or otherwise. Following the IDTT meeting, the patient's medical chart was reviewed and found the following contained within the primary clinician's Acute\ICF Master Treatment Plan:

> Patient was sent with following treatment outcome expectations: 1) Pt will not endorse active SI for at least two weeks prior to discharge; 2) Pt will report depression at 5/10 or lower for at least two weeks prior to discharge; 3) Pt will appropriately engage in safety planning and identification of coping skills to tolerate future episodes of depression and distress prior to discharge; 4) Pt will participate in at least one hour programming daily for at least three weeks prior to discharge.

None of the above treatment goals were discussed with the patient during the IDTT meeting observed by this reviewer.

Finally, similar to the 2021 assessment, there continued to be concerns regarding the issuance of clothing and property for patients on suicide observation status. There were very few patients observed in "partial issue" of t-shirt and shorts, with the majority of suicidal patients dressed in "full issue" of blue shirts and pants regardless of whether they were on Suicide Watch or Suicide

Precaution status. A handful of patients were in safety smocks. Pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), patients on Suicide Watch should normally be clothed in safety smocks, with patients on Suicide Precaution normally clothed in t-shirts and boxers. However, the policy also stated that "Providers need not to default to providing minimal issues. The psychiatrist or licensed psychologist may authorize additional items if clinically indicated. Additional items must be supported by a thorough chart review and documented clinical rationale." It also appeared that some providers were still not familiar with the PIP suicide prevention policy terminology of Suicide Watch and Suicide Precaution, with providers often combining the terminology, such as "currently on 1:1 observation suicide watch" with "continue 1:1 observation with suicide precautions/issue restrictions" in the same note (see CHCF-PIP 2) on December 31, 2022). The particular provider in this case also frequently utilized the term "contracting for safety" in their provider notes. It was also not unusual to continue to read provider notes that continued to state: "The writer reviewed IP as he is on enhanced observation (Stagg 10)," (see CHCF-PIP 3 on December 18, 2022).

The issuance of clothing for suicidal patients at CHCF-PIP revealed other concerns. First, review of various patient records found that there was no documentation of any clinical judgement utilized to justify exceptions to clothing and property issuance. Second, many of provider orders and provider progress notes were contrary to each other, as well as contrary to the actual clothing provided to the patient. For example, this reviewer toured an APP housing unit on January 12, 2023 and found that although two particular patients (CHCF-PIP 2 and CHCF-PIP 4) were both clothed in safety smocks, the Adaptive Support Forms (CDCR 128 C-2) on the patients' doors indicated "blues only." This reviewer then asked for clarification by nursing staff on the unit and subsequent review of the patients' medical charts found contradictory provider orders for "issue" by which there were notations for both "blues only" alongside an order for "safety smock. No blues or whites." A psychiatrist subsequently updated the orders to reflect only a safety smock would be issued to each patient.

Subsequent review of one of the patient's medical charts found multiple problems. The patient (CHCF-PIP 2) was admitted into the APP on November 17, 2022 for grave disability. He was placed on Suicide Watch in a safety smock after displaying bizarre behaviors that were not identified but thought to be similar to those displayed at the MHCB level of care and included smearing feces on the walls, maintaining an unkept cell, and being generally uncommunicative. A SRASHE was completed the following day (November 18) and the patient was found to be high chronic and low acute risk for suicide. Despite being at low risk for suicide, the patient remained on Suicide Watch and clothed in a safety smock for the next few weeks and was generally seen by a provider on a daily basis. He continued to be non-communicative, was refusing psychotropic medication, but eating almost all of his meals. A 2602 petition was generated and a hearing was set for December 22. During this time, the patient was observed to be tearing his safety mattress on several occasions, an indication that the mattress was not suicide -resistant.

Beginning on December 5, 2022, nursing staff began to document in progress notes that the patient was observed in "whites" despite a daily order for a safety smock. Two days later on December 7, the patient was observed to be scratching his arm with metal and drinking liquid soap. He was sent out to a local hospital and returned the same day. Another SRASHE was

completed which then rated the patient at high chronic and moderate acute risk for suicide.  The patient continued on Suicide Watch in a smock and rounded daily by providers.  He continued to be non-communicative.  Beginning on December 16, 2022, provider orders for "issue" began to contain the contradictory notation for "blues only" alongside an order for safety smock.  No blues or whites." Although there was not any observable change in behavior, the patient did begin to accept psychotropic medication and was continued on Suicide Watch.

On December 22, 2022, a certified nursing assistant (CNA) wrote the following note: "after reviewing the issue order, special instructions states, 'safety smock, no points, no sharps.'  This writer observed the IP and IP's cell.  IP has on blues, and plastics from food trays which is non-compliance with the issue order.  Custody was notified regarding this issue." On that same day, the 2602 hearing was held in absentia and the petition was granted based upon grave disability.  The patient was continued on Suicide Watch clothed in a safety smock, but with a continuing contradictory issue order of "blues only." On December 28, 2022, a psychiatrist ordered that the patient be provided with full issue clothing, as well as continued Suicide Watch.  Several hours later, another psychiatrist ordered that the patient be placed back into a safety smock after he was observed to be engaging in self-injurious behavior by scratching himself.  Despite the order, the patient remained in "blues" and on Suicide Watch.

The patient continued to be seen almost daily by a provider and, on January 5, 2023, began to selectively speak to both custody and mental health staff, and expressing suicidal ideation.  He remained compliant with psychotropic medication, as well as eating his meals.  The patient also began to attend his IDTT meetings on both January 9 and January 18, 2023, although contradictory narrative in the Acute\ICF Master Treatment Plans for those days indicated they were held in absentia.  Finally, the patient was on maximum custody status and classified for solo programming.  According to his NCAT Report, the patient was only offered the opportunity to shower on six occasions, the opportunity for yard on eight occasions, and no opportunity for telephone calls during the entire month of December 2022.

In addition, the medical chart review of other cases continued to find serious deficiencies in providers completing adequate documentation prior to a patient's discharge from suicide observation status.  This reviewer examined the medical charts of 15 patients who were on suicide observation status for more than four days in either November or December 2022.  The review found that patients were not always seen on a daily basis by the provider, with at least missed daily checks in 73 percent (11 of 15) of the cases.  In addition, most daily interactions were cell front and not in the privacy of an interview room.  Of the 15 reviewed charts, only 67 percent (10 of 15) contained provider progress notes with adequate justification for discharging the patient from suicide observation.  Of the five cases with noted deficiencies, the entirety of the provider's note in one case (CHCF-PIP 5) stated the following on December 14, 2022: "The IP reported that he is doing better and denied any SI, intention or plan.  We agreed to d/c q11observation."

In the other four cases, there were not any provider notes that justified the discontinuation of suicide observation.  For example, in one case (CHCF-PIP 3), the patient was on Suicide Watch from November 21 through December 15, 2022, and then downgraded to Suicide Precaution from December 15 through December 21, 2022.  Several daily assessments were missed and

provider notes stopped on December 18, 2022, three days before the suicide observation ended on December 21, 2022. As such, a provider order was entered into EHRS on December 21, 2022 to discontinue Suicide Precaution but the patient was not assessed on that date.

Further, this reviewer examined 62 NCAT Report forms for documentation of out-of-cell activity for PIP patients on suicide observation status during a seven-day period in December 2022. All reviewed patients were cleared for all out-of-cell activities by providers. The review found that only 19 percent (12 of 62) of patients were offered yard/dayroom of 10 hours or more, 32 percent (20 of 62) of patients were offered showers three times during the week, 55 percent (34 of 62) of patients were offered at least one telephone call, and 3 percent (2 of 62) of patients were offered visits, nor surprising given the short time period being reviewed. Similar low percentages of patients being offered adequate non-clinical out-of-cell activities were found during the 2021 assessment.

Pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission and upon discharge from the PIP. SRASHEs are authorized to be completed by only psychiatrists and licensed psychologists. This reviewer examined the medical charts of 81 patients admitted to, and 42 patients discharged from, the CHCF-PIP to a lower level of care (EOP and lower) during October and November 2022. The review found that 96 percent (78 of 81) of <u>admission</u> SRASHEs were completed in a timely manner, a significant improvement from the prior 2021 review which found only 29 percent compliance. However, contrary to policy, only 49 percent (40 of 81) of the admission SRASHEs were completed by licensed psychologists (none by psychiatrists). The remaining 51 percent (41 of 81) of the admission SRASHEs were completed by licensed and unlicensed clinical social workers.

In addition, although 98 percent (41 of 42) of <u>discharge</u> SRASHEs were completed in a timely manner, only 46 percent (19 of 41) of the assessments were completed by licensed psychologists (none by psychiatrists). In fact, 54 percent (22 of 41) of the discharge SRASHEs were completed by either licensed or unlicensed clinical social workers who, pursuant to policy, were not authorized to complete the assessments. Further, required safety plans were only completed in 71 percent (30 of 42) of the cases, either because the discharge SRASHEs were not completed (in one case) or the assessments incorrectly stated that a safety plan was not required due to "low acute risk/not clinically indicated" or the patient refused to participate in the process. Three completed safety plans were untimely.

Finally, although this reviewer was informed the CHCF-PIP supervisor attempted to review discharge SRASHEs and safety plans in a timely manner, i.e., prior to or during the anticipated discharge IDTT meeting, documentation of such a timely review was not provided. In addition, this reviewer was initially provided with a list of only six patients discharged from CHCF-PIP to a lower level of care during October and November 2022. Sensing that the number was inaccurate, further inquiry by the regional SPRFIT coordinator found that the accurate number of discharges during this two-month period was actually 42 patients. Such a significant discrepancy would indicate that the required supervisory review of discharging SRASHEs and safety plans, if attempted, was not comprehensive. As noted above, a sizable percentage of the discharge SRASHEs and safety plans were completed by either licensed or unlicensed clinical social

workers who, pursuant to policy, were not authorized to complete the assessments, a further indication that the supervisory review process was seriously flawed.

**Intervention**: Although housing units were not reviewed for the presence of emergency response kits during this assessment, units toured during the 2021 assessment all contained an Ambu bag and cutdown tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: CHCF and CHCF-PIP conducted joint SPRFIT month meetings. A review of six months (June 2022 through November 2022) of meeting minutes found that a quorum was achieved in all but two meetings. Quorums were not achieved in August and October 2022 because a unit captain and lieutenant were incorrectly designated for an associate warden. Because monthly meetings were joint, meeting minutes were generally robust (approximately 20-30 pages in length). Agenda items regarding CHCF-PIP were generally limited to completion of SRASHEs at both admission and discharge. Although meeting minutes did list the recommended corrective actions from this reviewer's 2021 assessment, many of the deficiencies found during the current assessment were not previously identified by the SPRFIT and/or corrected. Finally, although the requested documents included a listing of five serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during 2022, none of monthly SPRFIT minutes referenced any case in which a Root Cause Analysis (RCA) or case summary was completed for any of these incidents.

**Training**: According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 99 percent of custody staff, 90 percent of medical staff, and only 83 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of December 2022, only 2 percent of mental health clinicians had completed the SRE mentoring program, only 86 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**: The CHCF-PIP did not experience a patient suicide during the review period.

**Audit Summary**: Apart from the fact that patients on suicide observation status were housed in suicide-resistant cells, over 97 percent compliance with observation of suicidal patients, and high compliance rates for some required training, multiple problems were found in most other areas. For example, although IDTT meeting representation was good, many of the meetings (involving varying clinical staff) were problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), review of diagnoses, little discussion about observation level and possessions for those patients currently on suicide observation status, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. In addition, there was contradictory documentation in medical charts regarding clinical judgement utilized to justify exceptions to clothing and property issuance, provider orders and provider progress notes were contrary to each other, patients inappropriately clothed in safety smocks.

Further, only 67 percent of reviewed cases contained provider progress notes with adequate justification for discharging the patient from suicide observation, and many patients on suicide observation were not consistently seen by a provider on a daily basis. Patients on suicide

observation status were not consistently offered reasonable access to yard/dayroom, showers, and telephone calls. Further, although there were high rates of completed admission and discharge SRASHEs, a sizable percentage of both admission and discharge SRASHEs were completed by licensed and unlicensed clinical social workers or unlicensed psychologists who, pursuant to policy, were not authorized to complete the assessments. Supervisory review of safety plans was flawed and the overall supervisory review of safety planning was broken. Although SPRFIT meeting minutes did list the recommended corrective actions from this reviewer's 2021 assessment, many of the deficiencies found during the current assessment were not previously identified by the SPRFIT and/or corrected.

**Salinas Valley State Prison (SVSP)-PIP**

**Inspection**: February 7-8, 2023 (previous suicide prevention assessment was on August 23-25, 2021). The facility had a bed capacity for 246 ICF patients. During the current onsite assessment, there were 229 patients assigned to four housing units.

**Screening/Assessment**: A new patient (SVSP-PIP 1) admission was observed on February 7, 2023. Pursuant to SVSP-PIP practices, nursing assessments were completed on the patient's assigned housing unit. The door to the nurse's office was closed, but an officer was stationed inside the office, thus not allowing for both privacy and confidentiality. When this reviewer subsequently informed two members (a lieutenant and nursing consultant) of the regional mental health compliance team that the current assessment differed from the 2021 assessment of the new admission process in which the nurse's door was closed and an officer was stationed outside in the hallway, both regional team members incorrectly stated that the officer probably remained in the room because the patient was on maximum-security classification status. Regardless of a patient's classification status, there remained an expectation for reasonable privacy and confidentiality and, similar to the R&R units of the prisons, TTMs should be available in the PIPs for any staff, including nursing, who feel uncomfortable interacting with a patient without reasonable safety precautions.

During the observed new admission process on February 7, 2023, although the nurse was observed to be asking the patient if they had "any thoughts of hurting self or others today," subsequent chart review indicated that the nurse completed an Acute/ICF Nursing Assessment Form that did not contain any current suicide risk/suicide history inquiry. Of note, review of medical charts for other patients indicated that nursing staff often completed the Initial Health Screening form which did contain adequate mental health and suicide risk questions.

**Housing**: The SVSP-PIP had four housing units, including TC1, TC2, C-5, and C-6. Pursuant to practice, almost all patients on suicide observation status remain housed in their assigned cells. The exception was in both TC1 and TC2 where suicidal patients could either be housed in either assigned cells or two observation cells on the units.

As found during the 2021 assessment, none of the cells at SVSP-PIP were suicide-resistant. In TC1, the cells contained metal framed bunks, wall ventilation grates with holes in excess of 3/16 inch diameter, sprinkler heads without caps, perforated communication holes on interior side of

cell door, and light fixtures without security caulking to close gaps between the fixture and ceiling. All of these protrusions could easily be used as anchors in suicide attempts by hanging.

In TC2, the same protrusions were found, with the exception that wall ventilation grates appeared to be 3/16 inch, and some security caulking was found on light fixtures. Further, the observation cells in TC1 and TC2 contained square-shaped sinks and grab bars contained gaps between the bar and wall. The C-5 and C-6 units had similar dangerous protrusions that were conducive to suicide attempts by hanging, including gaps between the bunk and wall, ventilation grates with diameters in excess of 3/16 inches, and lack of security caulking on ceiling light fixtures. Finally, C-5 and C-6 were two-tiered housing units and there was no fencing above the second-tier railings to eliminate the possibility of suicidal patients jumping from the second tier. (This hazard was previously identified in the 2021 assessment, as well as in this reviewer's "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," ECF No. 5994, filed on November 5, 2018, regarding discussion of a proposed unlicensed MHCB unit at RJD.)

During the current onsite assessment, this reviewer was provided with detailed work plans for each of the four housing units at SVSP-PIP. According to those plans, 14 cells would be retrofitted to become suicide-resistant, including two cells in TC1 (243, 245), six cells in TC2 (203, 205, 502, 503, 516, and 517), three cells in C-5 (109, 112, and 131), and three cells in C-6 (102, 121, and 124). According to the "Proposed Joint Schedule to Implement Corrective Action Plans for Suicide Prevention in CDCR's Psychiatric Inpatient Programs" ECF No. 7714, filed on February 6, 2023, the defendants stated that the renovation of cells would begin in July 2023, with a completion date "to be determined." Of note, *neither the work plans nor corrective action schedule addressed the hazardous two-tiered C-5 and C-6 units and the need for fencing or other barriers to prevent patients from jumping from the second tier of the units.*

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the PIP units. In addition, patients not on suicide observation status were said to be observed at 15-minute intervals by nursing staff, but documentation was kept on paper form and not entered into the EHRS for each patient. As first reported during the 2021 assessment, practices regarding the observation of suicidal patients at SVSP-PIP were found to be quite different than other PIPs and CDCR prisons. Whereas the vast majority of suicidal patients in other facilities were placed on Suicide Precaution, and Suicide Watch only utilized when patients were deemed at imminent risk for suicide, suicidal patients at SVSP-PIP were far more likely to only be placed on Suicide Watch, and Suicide Precaution (if utilized) was only used as a step-down from Suicide Watch for a short period of time (e.g., 24 hours or less). Finally, the Mental Health Observations Reporting Tool also indicated that 98 percent of patients on Suicide Precaution and 95 percent of patients on Suicide Watch were observed on a timely basis during January 2022.

As noted during the previous assessment and verified again during this assessment, there appeared to be two reasons why Suicide Watch was utilized as the preferred observation level for suicidal patients at SVSP-PIP. First, providers were reluctant to place suicidal patients in non-suicide-resistant cells without constant observation. Second, providers were relying on nursing personnel to conduct regular rounds at 15-minute intervals (meant for non-suicidal patients) rather than order Suicide Precaution status for a suicidal patient at 11-minute intervals.

For those patients on either Suicide Precaution or Suicide Watch during the onsite assessment, current provider orders (to include level of observation, patient issue, and privileges) were observed outside each suicidal patient's door on Adaptive Support Forms (CDCR 128 C-2). This reviewer's examination of multiple charts for patients under suicide observation status found that provider orders for level of observation was consistent with clothing restrictions.

**Management/Treatment Planning**: Seven IDTT meetings were observed during the onsite assessment. Overall, although treatment team representation was good, each of the four meetings (involving varying clinical staff) for patients admitted for DTS was problematic, with uneven case presentations, review of diagnoses, no discussion about observation level and possessions for those patients currently on either Suicide Precaution or Suicide Watch, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI.

One case was particularly troubling. The patient (SVSP-PIP 2) arrived for the IDTT meeting clothed in a safety smock, however, he had been discharged from Suicide Watch the previous day (February 7, 2023). The initial discussion between the psychiatrist and nursing staff focused on why the patient was still clothed in the safety smock when he was no longer being observed on the Suicide Watch. There was no case presentation and subsequent review of the medical chart indicated that the patient had been admitted on November 1, 2022 for significant impairment due to mental illness. Although there was inquiry regarding current suicidal ideation, which the patient denied, there was no discussion as to why he had placed on the Suicide Watch the previous day. The chart review indicated that the patient had expressed suicidal ideation on February 6, 2023, which several clinicians thought was secondary to problems with his cellmate, as well as clinicians' perception that he wanted to engage in indecent exposure in front of female nurses conducting the 1:1 observation. The patient had been held in an observation room on the unit and provided with only a "stack-a-bunk" for two days because the observation room did not contain a permanent bunk. Safety planning was not discussed during the IDTT meeting, and the patient was discharged from the PIP to EOP level of care.

Review of the medical chart also found that, although a discharge SRASHE was completed, the clinician neglected to complete a safety plan, incorrectly indicating that it was not clinically indicated due to the patient's low risk for suicide. The patient, however, had been placed on suicide observation status on five occasions during his PIP placement. The chart review also indicated that psychiatry staff incorrectly utilized the term "contracting for safety" as one of the justifications for discharge from suicide observation, and the patient was not always seen on a daily basis while on suicide observation. Most interactions between clinical staff and the patient were cell front.

In another observed IDTT meeting case, the patient (SVSP-PIP 3) had been admitted to the PIP on October 26, 2022 for danger to self, danger to others, and significant impairment due to mental illness. He had been classified as DD3 and appeared to be very low functioning. Although there was some discussion regarding the patient's struggles with being taken advantage of by other patients on the unit, there was no case presentation, the patient's diagnoses were unclear, and although he was asked about current suicidal ideation, the clinician did not respond

322

when the patient stated, "I like head-banging." The primary clinician awkwardly handed the patient a copy of what appeared to be his safety plan, but there was no discussion of the safety plan, nor a discussion of any learned coping skills to reduce his head-banging. Subsequent review of the patient's medical chart indicated he had a significant history of head-banging and other SIB, high chronic risk for suicide, as well as placement on suicide observation status on two occasions since October 2022. Several SRASHEs had been completed during his placement, but his safety plan had remained unchanged since his arrival in October 2022. Of note, during an IDTT meeting on February 13, 2023, the patient was clinically discharged to EOP. Contrary to policy, the discharging SRASHE was completed by a licensed clinical social worker and the safety plan remained unchanged.

In addition, the medical chart review of other cases continued to find some deficiencies in providers completing adequate documentation prior to a patient's discharge from suicide observation status. This reviewer examined the medical charts of 15 patients who were on suicide observation status for more than four days in November and December 2022. The review found that almost all patients were seen on a daily basis by the provider, almost exclusively a psychiatrist, but most interactions were cell front and not in the privacy of an interview room. Of the 15 reviewed charts, only 11 (73 percent) contained provider progress notes with adequate justification for discharging the patient from suicide observation, including the following example (SVSP-PIP 4) from November 1, 2022:

> I/P was seen today for unscheduled meeting as he had been suicidal watch. He was seen in a private confidential room. I also gathered collateral information from other providers prior to meeting with him. Patient had no suicidal behavior since being on suicidal watch (SW). Prior to being on SW, he had told us that he intended to perform his annual 'blood ritual' that he does every year on Halloween. However, this year, he was able to substitute worshiping deity of his faith, Baphomet. The team was able to provide me a print out of the half human and half animal deity and he was able to worship it as alternative to offering his own blood to it. During the evaluation, he told me that he has no reason for any self-harm or to perform any such ritual anymore, as the day of Halloween has passed. Throughout the interview, the patient was calm, cooperative and pleasant. He adamantly denied any thought, intent or plan of self-harm. Denied HI/AVH.

However, the remaining four cases (27 percent) either had a nurse's note indicating the provider authorized discharge from suicide observation without actually assessing the patient or, as seen in the following example (SVSP-PIP 5), the provider note did not contain an adequate assessment of suicide risk to justify discharge from suicide observation on November 18, 2022:

> IP was seen at his cell front as he has been on suicide precautions for many days.

> His hallway was loud, other inmates agitated and yelling. IP stated that he was suicidal, when asked to elaborate, IP ignored and continued to yell back at other inmates. IP was informed that he will be placed on one-to-one observation for suicidal ideations. Clinical staff was informed about that. Later on, when preparing IP's room for suicide watch, removing the property IP stated that he was

not suicidal, took a integrating 10 mg of Zyprexa and reportedly came down.
Plan: Discontinue all suicide observations, full issue.  Continue to monitor.

In addition, this reviewer examined 28 NCAT Report forms for documentation of out-of-cell activity for PIP patients on suicide observation status during at least part of a seven-day period in December 2022.  All reviewed patients were cleared for all out-of-cell activities by providers.  The review found that only 7 percent (2 of 28) of patients were offered yard/dayroom of 10 hours or more, 43 percent (12 of 28) of patients were offered showers three times during the week, 86 percent (24 of 28) of patients were offered at least one telephone call, and none of the patients were offered visits, not surprising given the short time period being reviewed.  Given the fact that all four housing units at the facility have yards attached to the units, the low percentage of offered yard/dayroom was troubling.  Similar poor findings were found during the 2021 assessment.

Finally, pursuant to the PIP suicide prevention policy, a SRASHE was required to be completed within 72 hours of admission and upon discharge from the PIP.  SRASHEs are authorized to be completed by only psychiatrists and licensed psychologists.  This reviewer examined the medical charts of 29 patients admitted to the SVSP-PIP during November and December 2022, and 29 patients discharged from the program to a lower level of care (EOP and lower) during November 2022 through January 2023.  The review found that 86 percent (25 of 29) of admission SRASHEs were completed in a timely manner, an improvement from the prior 2021 review which found only 67 percent compliance.  However, contrary to policy, only 28 percent (8 of 29) of the admission SRASHEs were completed by licensed psychologists (none by psychiatrists).  The overwhelming majority, 72 percent (21 of 29) of the admission SRASHEs were completed by licensed and unlicensed clinical social workers or unlicensed psychologists.

In addition, although 86 percent (25 of 29) of discharge SRASHEs were completed in a timely manner, only 52 percent (13 of 25) of the assessments were completed by licensed psychologists (none by psychiatrists).  In fact, 48 percent (12 of 25) of the discharge SRASHEs were completed by either licensed or unlicensed clinical social workers who, pursuant to policy, were not authorized to complete the assessments.  Further, required safety plans were only completed in 86 percent (25 of 29) of the cases, with the same percentage completed by either licensed or unlicensed clinical social workers.

Finally, during the 2021 assessment, SVSP-PIP supervisors freely admitted to this reviewer that the required supervisory review of safety plans contained in discharging SRASHEs was not being completed.  During the current assessment, this reviewer was initially informed that supervisory review of safety plans was being attempted, but compliance was uneven.  This reviewer was also provided with copies of various 2021-2022 suicide prevention audits conducted by the regional SPRFIT coordinator.  In one of those reports dated December 31, 2022, the regional SPRFIT coordinator wrote that "PIP supervisors and designees review each patient's discharge safety plan in conjunction with utilizing the Discharge Readiness Tool and document the results within EHRS.  An audit conducted on 15 charts resulted in all but two cases where documentation was present in the chart which indicated a supervisory review have been completed (at page 2)." This audit would appear to indicate an 87 percent compliance rate with supervisory review of safety plans.

This reviewer learned about the utilization of the above Discharge Readiness Tool for the first time while onsite at SVSP-PIP on February 7, 2023, as well as two other templates contained within EHRS and entitled "PIP Supervisor Review" and "Discharge Review." Following review of numerous discharge SRASHEs within the medical charts of patients discharged from the SVSP-PIP from November 2022 through January 2023, it was found that utilization of the Discharge Readiness Tool, as well as both the PIP Supervisor Review and Discharge Review templates for supervisory review of safety plans were flawed and the overall supervisory review of safety planning was broken for the following reasons:

- The Discharge Readiness Tool, PIP Supervisor Review, and Discharge Review templates did not document a critique of the safety plan, they simply summarized the care received by the patient at discharge.  Most of the narrative contained within these templates had simply been pulled forward from other documents;

- The Discharge Readiness Tool, PIP Supervisor Review, or Discharge Review was not found in 31 percent (9 of 29) of the cases in which patients were discharged from the program from November 2022 through January 2023;

- Pursuant to the PIP suicide prevention policy, 'The supervisory review shall be completed prior to, or during the interdisciplinary treatment team in which the discharging SRASHE is completed.'  In many of the reviewed cases, the Discharge Readiness Tool, PIP Supervisor Review, or Discharge Review templates were completed following the discharge IDTT meeting or the clinician completing the form was not in attendance at the IDTT meeting;

- The Discharge Readiness Tool, PIP Supervisor Review, and Discharge Reviews were often completed by licensed clinical social workers who, pursuant to the PIP suicide prevention policy, were not authorized to complete SRASHEs in the PIPs.

- The Discharge Readiness Tool contained language that incorrectly stated 'Was a discharge SRASHE completed no later than seven days prior to the anticipated discharge IDTT?' As noted above, pursuant to the PIP suicide prevention policy, the discharge SRASHE was required to be completed within 72 hours of discharge from the PIP.

- Excluding the inadequate safety plans reviewed during the on-site assessment, a self-reported compliance rate of 87 percent was dubious when a sizable percentage of discharge SRASHEs and safety plans were completed by either licensed or unlicensed clinical social workers who, pursuant to policy, were not authorized to complete the assessments.

**Intervention**: Although housing units were not reviewed for the presence of emergency response kits during this assessment, units toured during the 2021 assessment all contained an Ambu bag and cutdown tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: A review of five months (July 2022 through December 2022) of SPRFIT meeting minutes found that a quorum was achieved for only two meetings (July and August), and a meeting was not held in November 2022 due to poor anticipated attendance. Quorums were not achieved mostly because a registered nurse was incorrectly designated for the chief nurse executive or supervising registered nurse III, and/or a unit captain was incorrectly designated for an associate warden. SPRFIT meeting minutes did not address any of the recommended corrective actions from this reviewer's 2021 assessment or identify any of the deficiencies found above, and were otherwise unremarkable.

**Training**: According to training records, 100 percent of custody and 97 percent of nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, only 64 percent of medical staff, and only 78 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of January 2023, only approximately 28 percent of mental health clinicians had completed the SRE mentoring program, only 63 percent had received the seven-hour SRE training, and only 70 percent had completed safety plan training.

**Recent Suicides**: SVSP-PIP experienced one patient suicide (SVSP-PIP 6) on March 16, 2023, resulting in 13 QIPs distributed amongst two facilities, with four (4) QIPs specific to the SVSP-PIP. These four (4) QIPs included inadequate discussion of property and observation during IDTT meetings, inadequate documentation of treatment planning, inadequate preservation of the crime scene, and delay in 911 activation.

**Audit Summary**: With a few exceptions, including high compliance rates for CPR certification, current provider orders observed outside each suicidal patient's door, over 95 percent compliance with observation of suicidal patients, and provider orders for level of observation consistent with clothing restrictions, the facility continued to have profound problems in its suicide prevention process. For example, the new admission process was observed to be conducted without reasonable privacy and confidentiality, and some staff (including members of the regional compliance team) appeared confused that reasonable privacy did not apply to patients on maximum-security status. Although construction was scheduled to begin in July 2023, none of the cells utilized to house suicidal patients at SVSP-PIP were suicide-resistant, and current work plans did not address the hazardous two-tiered C-5 and C-6 units and the need for fencing or other barriers to prevent patients from jumping from the second tier of the units.

Further, Suicide Watch continued to be utilized as the preferred observation level for suicidal patients because providers were reluctant to place suicidal patients in non-suicide resistant cells without constant observation. IDTT meetings continued to be problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Only 73 percent of reviewed cases contained provider progress notes containing adequate justification for discharging the patient from suicide observation. Patients on suicide observation status were not consistently offered reasonable access to yard/dayroom, showers, and telephone calls. Further, a sizable percentage of both admission and discharge SRASHEs were completed by licensed and unlicensed clinical social workers or unlicensed psychologists who, pursuant to policy, were not authorized to complete the assessments. Supervisory review of safety plans was flawed and the overall supervisory review of safety

planning was broken.  SPRFIT meetings did not always meet the quorum, and meeting minutes did not address any of the recommended corrective actions from this reviewer's 2021 assessment or identify any of the deficiencies found above.  Finally, low compliance rates were reported for annual suicide prevention, SRE mentoring program, seven-hour SRE, and safety plan training.

## California Institution for Women (CIW)-PIP

**Inspection**: May 15-17, 2023 (previous suicide prevention assessment was on September 13-14, 2021).  The facility had a bed capacity of 41 patients.  During the current onsite assessment, there were 40 patients at APP (2) and ICF (38) levels of care.

**Screening/Assessment**: This reviewer did not have an opportunity to review the new patient admission process because there were not any patients admitted during the onsite assessment.  Pursuant to practices observed during the previous assessment, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed in the nurse's office.  The form did not include any suicide risk inquiry.  In addition, the Initial Health Screening form, which included 15 mental health/suicide risk questions, was also utilized.

**Housing**: The CIW-PIP had four housing wings (A through D).  Pursuant to practice, almost all patients on suicide observation status remained housed in their assigned rooms.  Each wing also had seclusion and observation rooms (which had capabilities for restraint).  Similar to the previous 2021 assessment, the review found all patient rooms continued to be suicide-resistant.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the CIW-PIP.  In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff with documentation of such checks entered into the EHRS.  In addition, the facility had two other observation levels: "Enhanced Observation" at 60-minute intervals and "Behavioral" Suicide Watch.  Although an LOP stated that "Enhanced Observation" should not be utilized for suicidal patients, it was unclear why a 60-minute level of observation was necessary when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals.

CIW-PIP did not have an LOP regarding "Behavioral" Suicide Watch and such a level of observation was not authorized in the PIP suicide prevention policy.  CIW-PIP leadership had previously informed this reviewer that "Behavioral" Suicide Watch required one-on-one continuous observation and allowed providers to authorize possessions and privileges while on suicide observation status.  Such a level of observation was unnecessary because the PIP suicide prevention policy already allowed providers to provide possessions and privileges based upon documented clinical judgment, for example:

> The ordering provider shall…Ensure the issuance of property is individualized based upon the patient's clinical needs.  Providers need not default to providing minimal issues… The psychiatrist or licensed psychologist may authorize additional items if clinically indicated.  Additional items must be supported by a thorough chart review and documented clinical rationale…. Clearly state on the

order which items the patient may have or which specific items the patient may
not have. (at page 6)

Despite the fact that CIW-PIP leadership were previously informed that "Behavioral" Suicide
Watch was not authorized in the PIP suicide prevention policy, this reviewer found at least two
cases during the medical chart review in which this level of observation was still being utilized,
as well as clinicians not always providing assessments of these patients on a daily basis. In the
first case (<u>CIW-PIP 1</u>), the patient was on "Behavioral" Suicide Watch from November 12, 2022
through December 14, 2022 and was seen by a clinician for only 17 of the required 33 days or 52
percent of the time. In the second case (<u>CIW-PIP 2</u>), the patient was on "Behavioral" Suicide
Watch from April 4, 2023 through May 17, 2023 and was seen by a clinician for 35 of the
required 44 days or 80 percent of the time.

In addition, the Mental Health Observations Reporting Tool indicated that 14 patients were on
observation status in the CIW-PIP during April 2023, with 98 percent compliance with timely
observation of patients on Suicide Precaution and 94 percent compliance with timely observation
of patients on Suicide Watch.

**Management/Treatment Planning**: Five IDTT meetings were observed during the on-site
assessment. Overall, there was good treatment team representation, but uneven case
presentations. For example, in one case (<u>CIW-PIP 3</u>), the clinician informed the patient that they
were given three coping skills to reduce self-injurious behavior, but these coping skills were
neither identified nor discussed during the meeting on May 15, 2023. In another case (<u>CIW-PIP
4</u>), the patient had been admitted to the PIP the day before for DTS, but there was no discussion
about safety planning, observation level, or out-of-activities.

In addition, this reviewer examined the NCAT Report forms for documentation of out-of-cell
activity for 38 PIP patients during a seven-day period beginning on April 30, 2023. Within the
PIP, 38 patients were tracked by NCAT during a 7-day period beginning on April 30, 2023. The
review found that 100 percent (38 of 38) of patients were offered yard, 61 percent (23 of 38) of
patients were offered dayroom, 100 percent (38 of 38) of patients were regularly offered
showers, but only a few of the patients were offered telephone calls documented in the NCAT.
However, this writer was informed that because most of the patients had been issued tablets, use
of the tablet for telephone calls was not documented in the NCAT and staff theorized that
patients were free to make phone calls on a regular basis. With that said, patients on suicide
observation status were not issued tablets, and if allowed telephone calls, there was no system to
document whether these patients were offered calls without their tablets.

Finally, pursuant to the PIP suicide prevention policy, a SRASHE was required to be completed
within 72 hours of admission, as well as completed upon discharge from the PIP. This reviewer
examined the medical charts of 14 patients admitted to the CIW-PIP from November 2022
through April 2023. The review found that 100 percent (14 of 14) of <u>admission</u> SRASHEs were
completed in a timely manner. In addition, the medical charts of 14 patients discharged from the
CIW-PIP to a lower level of care (or paroled) from November 2022 through April 2023 were
reviewed. The review found that 93 percent (13 of 14) of <u>discharge</u> SRASHEs were completed
by licensed psychologist (with one completed by non-licensed psychologist). In addition, 89

percent (8 of 9) of applicable cases had safety plans completed as required, and the required timely supervisory review of those safety plans was completed in most cases.

**Intervention**: Although housing units were not reviewed for the presence of emergency response kits during this assessment, units toured during the 2021 assessment all contained an Ambu bag and cutdown tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: A review of six months (November 2022 through April 2023) of SPRFIT meeting minutes found that quorums were not reached in three meetings (December 2022, February 2023, and April 2023). The lack of quorums was mostly attributable to the lack of program director attendance during these months. Further, it was unclear why the senior psychiatric technician and inpatient coordinator were incorrectly listed as mandatory members of the PIP SPRFIT in meetings held between November 2022 through January 2023. Overall, meeting minutes were brief and agenda topics included compliance data for timely observation of suicidal patients, SRASHE completion, and training. Meeting minutes (or other documentation) did not address any of the recommended corrective actions from this reviewer's 2021 assessment or identified any of the deficiencies found above. Finally, there was a brief summary in the December 2022 SPRFIT minutes of the emergency response to a serious suicide attempt involving outside hospital treatment (i.e., with a medical severity rating of "3") in October 2022, but the incident did not result in either a Root Cause Analysis (RCA) or clinical case summary.

**Training**: Due to the small size of the CIW-PIP, this reviewer was presented with training records that combined data from both the CIW-PIP and CIW prison. According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, only 69 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2022. Finally, as of April 2023, approximately 90 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and only 38 percent had completed safety plan training.

**Recent Suicides**: The CIW-PIP did not experience any suicides during the reporting period.

**Audit Summary**: High compliance rates for SRASHE completion at admission and discharge were reported. Most suicide prevention (with the exception of medical staff) and CPR training compliance rates were high. Problems persisted with the continued use of "Behavioral" Suicide Watch, as well as clinicians not always providing assessments of these patients on a daily basis. Some of the observed IDTT meetings were inconsistent and included uneven case presentations. Although PIP patients regularly were offered both yard and showers, many were not offered dayroom, and there was no documentation as to whether suicidal patients were offered telephone calls without access to their tablets.

## San Quentin State Prison (SQ-PIP)

**Inspection**: May 23-25, 2023 (previous suicide prevention assessment on October 25-26, 2021). The facility had a bed capacity for 40 patients, and approximately 36 beds were filled during the onsite assessment with both APP and ICF patients.

**Screening/Assessment**: This reviewer did not have an opportunity to review the new patient admission process because there were not any patients admitted during the onsite assessment. Pursuant to stated practice, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed in the nurse's office. The form did not include any suicide risk inquiry. In addition, a hard copy version of the Initial Health Screening form, which included 15 mental health/suicide risk questions, had been utilized since March 2023.

**Housing**: The 40-bed had previously been found to be suicide-resistant. Although initially opened to serve the psychiatric needs of condemned patients at the APP and ICF levels of care, the PIP had since been expanded to treat both condemned and non-condemned patients from other CDCR facilities who require acute care. In addition, the facility reserved two inpatient beds to accommodate condemned patients requiring MHCB level of care.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the SQ-PIP. In addition, patients not on suicide observation status were observed on either "behavioral observation" at 30-minute intervals or regular nursing rounds at 60-minute intervals. According to both nursing staff and providers previously interviewed by this reviewer, "behavioral observation" at 30-minute intervals was most often utilized for patients who were no longer currently suicidal but were being downgraded from either Suicide Watch or Suicide Precaution statuses. According to the Mental Health Observations Reporting Tool, there were 58 patients on observation status in the SQ-PIP during May 2023, with 96 percent compliance with timely observation of patients on Suicide Precaution and 95 percent compliance with timely observation of patients on Suicide Watch.

**Management/Treatment Planning**: Ten IDTT meetings were observed during the on-site assessment. Overall, there was very good treatment team representation and participation by multiple teams. Each team member clearly knew each patient. With the exception of diagnosis not discussed in eight of ten cases, there were very good summaries regarding reason for admission, course of treatment, medication, observation level, and out-of-cell privileges discussed in each case. Although the meetings tended to be lengthy, interaction between team members and each patient was conversational, with the patient's first name consistently used during discussions. When appropriate, safety planning was discussed by asking the patient – "What coping skills have we been working on?" and "What treatment goals do you have in the next 30 days?" Several patients verbalized learned techniques to decrease suicidal thoughts. Such an approach was far different than IDTT meetings observed by this reviewer in other facilities in which safety planning was vaguely discussed in the context of the PC simply stating that "We have been working on safety planning" or "We will work on safety planning," with the patient never being asked to articulate the plan or coping skills that were learned.

With regard to Out-of-Cell Time afforded to patients, this reviewer examined the NCAT Report forms for documentation of out-of-cell activity for 31 patients during a seven-day period of April 30 through May 6, 2023. The review found that on average each patient was offered: 17 hours of

yard/dayroom per week, 3 showers (5 received 2 showers) per week, and 9 telephone calls per week.  In addition, two patients received visits during the week.  Finally, the two patients on Suicide Watch were offered 14 and 15 hours, respectively, of yard/dayroom, 3 showers each, and 5 telephone calls each.  Of note, the NCAT could not distinguish between PIP and MHCB patients.  There was a minor concern about condemned patients who were issued tablets not being able to use the tablets for telephone calls because the security settings were incorrectly set on the devices (apparently due to their unique custody classification as condemned IPs).  The vendor was made aware of the problem and corrective action was said to be forthcoming.

Finally, pursuant to the PIP suicide prevention policy, a SRASHE was required to be completed within 72 hours of admission and upon discharge from the PIP.  This reviewer examined the medical charts of 11 patients admitted to the SQ-PIP from November and December 2022.  The review found that 100 percent (11 of 11) of <u>admission</u> SRASHEs were completed in a timely manner, and all were completed by licensed psychologists or psychiatrists.  In addition, the medical charts of 18 patients discharged from the SQ-PIP to a lower level of care from December 2022 through April 2023 were reviewed.  The review found that 100 percent (18 of 18) of <u>discharge</u> SRASHEs were completed, and all were completed by licensed psychologists or psychiatrists.  In addition, 94 percent (16 of 17) of applicable cases had safety plans completed, and the required timely supervisory review of those safety plans was completed in most cases.

Although the quality of safety planning was not critiqued in the PIPs because CDCR was transitioning between safety plan models during the review period, the following safety plan (for <u>SQ-PIP 1</u>) developed on April 18, 2023 was particularly insightful:

MH Safety Plan

> <u>Safety Planning Reason</u>: Clinically indicated based on risk level and self-harm concerns
> <u>Patient Participate - Warning Signs</u>: Yes
> <u>Warning signs - Patient focused</u>: *'Not sleeping.  Paranoid.  Not eating.  More panic attacks.'*
> <u>Warning signs - Clinical Impressions</u>: *Normalize the patient's feelings of helplessness and validate the connection between self-harm thoughts and need to escape while helping him find other activities to channel his anxiety while distracting him from CAH, e.g., social involvement, engagement in hobbies/ activities; teach calming strategies (breathing exercises, visualization, meditation) to mitigate panic attacks, as panic attacks appear to often precipitate patient's previous self-harm.*
> <u>Helpful reducing self-harm - Patient</u>: '*Talking with my family.  There's a lot of things you've been giving me that I've been reading.' Pt was referring to treatment materials.*
> <u>Helpful reducing self-harm - Clinical</u>: *Pt. x*
> *ill identify one antecedent to his thoughts of suicidal ideation and using CBT will challenge the associated automatic thoughts during each weekly individual session with his clinician(s).*

<u>Reduce Risk Factors - Patient</u>: *'Everything. I have to become good because my family's waiting for me. I'm really short to go home. Take my meds. I'm here (in the PIP). I come here because I need help.'*

<u>Reduce Risk Factors - Clinical</u>: *Pt has been reporting fear related to safety concerns at his sending institution as well as concern that he will not be successful in outpatient and may relapse. The team will coordinate with custody regarding safety concerns and will submit a referral for MAT program.*

<u>Patient History of Self Harm</u>: Yes

<u>Patient Participate - Self Harm</u>: Yes

<u>Past concerns resolved - Patient</u>: *'I panicked. My thought is I'm not going to let anybody kill me. I'd rather take my life.' Pt was referring to safety concerns at his sending institution.*

<u>Past concerns resolved - Clinical</u>: *Safety concerns were reported to Sgt on 11/11/22. Per CCI, the Pt's concerns were substantiated and he will be redirected to another facility upon discharge.*

<u>Patient Reduce Risk Factors - Patient</u>: *'Everything. There's a lot of things you gave me. I do them every day.'*

<u>Patient Reduce Risk Factors - Clinical</u>: *The Pt has been attending the majority of out of cell treatment activities and is actively engaged in his treatment, has been regularly practicing treatment activities and homework. As a result, he has been reporting a reduction in frequency and duration of panic attacks (decreased from daily to 1x/week), depressive symptoms as measured by PHQ-9 has decreased significantly in the past few weeks (currently 5; previously 22), and suicidal ideation has decreased from daily to 0-1 times per week.*

<u>Safety Concerns Identified</u>: Yes

<u>Environmental Concerns Identified</u>: Yes

<u>Custody Notified</u>: Yes

<u>Notification of Safety Concerns Made</u>: CCI/II were notified in IDTT on 1/10/22. PIP Sgt. notified on 11/11/22.

<u>Date Patient's Concerns Reported</u>: 11/11/2022 PST

<u>Plan to Address Safety Concerns</u>: *Per CCI, the Pt's concerns were substantiated and he will be redirected to another facility upon discharge. Pt is currently level 1.*

<u>Patient Participate - Safety Concern</u>: Yes

<u>Clinical Impact Safety - Patient</u>: *'I am nervous. I feel safe here. I thought I wanted to hurt myself yesterday but I asked to talk to the other doctor. I feel better now.'*

<u>Clinical Impact Safety - Clinical</u>: *Risk appears to be mitigated as the Pt will not return to his sending institution where he currently has safety concerns. However, he has been reporting increased anxiety leading to upcoming discharge, which is expected to decreased once he settles into his new outpatient setting.*

<u>Patient Participate - Environ. Concern</u>: Yes

<u>Clinical Impact Environmental - Patient</u>: *'I panicked. My thought is I'm not going to let anybody kill me. I'd rather take my life.' Pt said this in reference to his suicide attempt in September 2022 that led to his inpatient admission.*

Clinical Impact Environmental - Clinical: ***Pt has since reported a decrease in frequency and duration of panic attacks (decreased from daily to 1x/week), depressive symptoms as measured by PHQ-9 has decreased significantly in the past few weeks (currently 5; previously 22), and suicidal ideation has decreased from daily to 0-1 times per week.***

Patient Participate - Protective Factors: Yes

Protective Factors - Patient focused: **'*My family.  Getting out soon.  I'll always have work.*'**

Protective Factors - Clinical Impression: ***Pt reported he likes his job as a mechanic and it helps him to feel useful to help his kids.  Pt is also an avid programming, and has been practicing breathing exercises, visualization and distraction activities to use to mitigate panic and anxiety, which have historically precipitated his previous suicide attempts.***

Enhanced Factors - Patient focused: **'*Just by listening to me helps me a lot.  I need to talk to someone aside from my family.  It helps me release my tension.*'**

Enhanced factors - Clinical Impressions: ***Staff can remind the Pt of the tools he has used and learned in the PIP, and the action plan he came up with to manage his distress, including: breathing exercises, meditation, physical activities, visualization.  Pt also appears to benefit from support offered through socialization and talking to others.  He does well in groups and is a good programmer.***

**Intervention**: Although the PIP housing unit was not reviewed for the presence of emergency response kits during this assessment, the unit previously contained an Ambu bag and cutdown tool in the same emergency response kit located in the nursing station.

**SPRFIT Meetings**: Both the SQ-PIP and SQ prison continued to have an integrated SPRFIT, with one coordinator chairing the committee.  A review of six months of SPRFIT meeting minutes (November 2022 through April 2023) found that meetings had quorums of all required mandatory members or designees for all six months.  Meeting minutes included discussion on compliance data, improvement projects, as well as the status of corrective actions based upon this writer's previous recommendations and regional SPRFIT audits.  Because there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, case presentations and /or root cause analyses (RCAs) were not included in the meeting minutes.  Meeting minutes were otherwise unremarkable.

**Training**: Due to the small size of the SQ-PIP, this reviewer was presented with training records that combined data from both the SQ-PIP and SQ prison.  According to training records, 99 percent of custody and 100 percent of nursing staff were currently certified in CPR.  In addition, 91 percent of custody staff, 89 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2022.  Finally, as of April 2023, approximately 92 percent of mental health clinicians had completed the SRE mentoring program, 98 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: The SQ-PIP did not experience any suicides during the review period.

**Audit Summary**: Adequate practices were found in all reviewed areas, including CPR and suicide prevention training, observation and out-of-cell activities, IDTT meetings, completion of admission and discharge SRASHEs, and safety planning.