UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | No. 90-cv-0520 KJM DB<br><br>BENCH ORDER* |

Plaintiffs are a class of approximately 33,763 California state prisoners with serious mental disorders. This class – which is growing in numbers -- has been waiting for decades for the state to meet its constitutional obligations to them when it comes to delivery of mental health care. Defendants are officials at the highest levels of California's executive branch: California Governor Gavin Newsom, California Department of Corrections and Rehabilitation (CDCR) Secretary Jeff Macomber, Undersecretary for Health Care Services for CDCR Diana Toche, D.D.S., Deputy Director of the Statewide Mental Health Program for CDCR Amar Mehta, M.D., Director of California Department of State Hospitals (DSH) Stephanie Clendenin, and Director of the California Department of Finance Joe Stephenshaw.

---

* The court read this order into the record at the proceedings in this matter on March 8, 2024.

1

Today, the court is letting defendants know it intends to hold some or all of them in contempt and impose civil fines as sanctions until defendants achieve compliance in delivering critically necessary, long overdue staffing relief for members of the plaintiff class.  As of today, the amount of fines owing is $94,912,929.00, based on the defendants' own reporting.

This is a tentative ruling.  The court is fully prepared to make it a final formal order, but it will provide defendants one last opportunity to demonstrate the ability, the will and the leadership to take decisive action to address the festering problem this case represents.

The plaintiff class has been waiting on the state for more than 28 years.  In 1995, the court first found overwhelming evidence of significant and chronic understaffing among mental health care service provider positions in California's prisons. In 1999, the court ordered defendants to comply with designated staffing ratios.  In 2002, with the violation continuing, the court ordered defendants to maintain staffing levels without exceeding a 10 percent vacancy rate.  In 2009, with the violation still continuing, the court ordered defendants to develop a formal Staffing Plan.  In 2017, the court ordered full compliance with the required staffing levels.

On February 28, 2023, the court issued its order setting out a framework for staffing enforcement, including a system of fines to begin accumulating, on paper, on March 31, 2023.  If fines accumulated for more than three consecutive months the court said it would set the matter for hearing on findings of contempt and actual payment of fines.  On June 12, 2023, the court found fines had accumulated for three consecutive months.  In other words, faced with the threat of fines, defendants still had not complied with their constitutional obligations to the plaintiff class.  The court set enforcement proceedings for September 29, 2023, and took evidence over several days.

Defendants acknowledge they are required to comply with their constitutional obligations to the plaintiff class. Defendants do not dispute the October 10, 2017 order is sufficiently specific and definite as to its terms so as to support enforcement.  They do not, and cannot, contend they have actually complied in full with the October 10, 2017 order.  They instead contend they have achieved "actual and substantial compliance" with the 90 percent fill rate requirement across some classifications in some periods of time, and assert the defenses of substantial compliance

and impossibility. They have not submitted sufficient evidence to meet their burden of supporting those defenses.

One metric is important to clarify up front. The parties dispute whether the October 2017 order itself allows for substantial compliance through defendants' filling of allocated mental health staff positions "to something less than the 90% threshold," as defendants contend it does. The October 10, 2017 order requires "complete compliance with the staffing ratios in the[ ] 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." These requirements mean defendants must allocate 100 percent of the positions required by the staffing ratios in the 2009 Staffing Plan and have no more than a ten percent vacancy rate systemwide in any of the five classifications at issue. In other words, anything greater than a ten percent vacancy rate cannot be considered substantial compliance.

Substantial Compliance

Defendants do say they've "actually complied" in a limited way: they contend that filling some classifications to 90 percent for some periods of time precludes a finding of contempt as to classifications that were filled to 90 percent or above during any part of the relevant period from October 2018 to now. The periods defendants cite are, at best, periods of partial compliance. The question is whether monetary sanctions for contempt should extend to those periods of partial compliance. The answer is no. The fine structure the court has set up does not include sanctions for vacancy rates below the ten percent cap.

Defendants also contend they are in substantial compliance with the 90 percent fill rate required by the court's orders. They say (1) they have achieved at, above, or near a 90 percent fill rate among the five classifications individually for various and significant periods of time; (2) they "have taken all reasonable measures to improve fill rates" where they have fallen short; and (3) their "failure to reach required staffing thresholds, . . . , was the inadvertent result of the COVID-19 pandemic and its lasting changes on the labor economy. The first and third arguments are unavailing: the first because it mistakenly assumes something "near" a 90 percent fill rate can count as substantially compliant, and the third because substantial compliance is a prerequisite to being let off the hook for only technical or inadvertent violations.

The real question is whether defendants have taken "all reasonable measures" to achieve required staffing levels – and it is "all" such measures that are required. Defendants say yes, they have:

- through twice yearly review of staffing allocations – which is commendable but not sufficient;
- expansion of telework opportunities for mental health clinicians – a recent initiative that will take at least two years to make a dent and even if fully successful will not achieve compliance;
- "salary and financial incentives" – while sticking with a policy of offering new hires the lowest salary in classification range regardless of experience or prior pay;
- streamlining processes for hiring – with the goal, among others, of reducing time to hire from 108 to 65 days – still a noncompetitive very long time;
- expansion of marketing and advertising efforts;
- contracting with the leading national recruiter for clinicians;
- and contracting with registry providers, who arrange for expensive privately contracted clinicians, many from out of state, and who have been unable to fill all of defendants' requests.

Regarding salaries, defendants have offered no evidence they have even attempted to analyze what wages and benefits they would have to offer mental health clinicians to fill staffing vacancies. They do not argue or show it would be impossible to raise wages and benefits, or other components of employment packages such as retention bonuses or pension contributions.

Regarding telemental health, in which defendants put much stock, they intend to use the planned expansion of telemental health to help fill existing staffing vacancies in psychologist and social worker positions. At the time of hearing, they planned to start to hire telepsychology line staff early this year and said it "will probably take a couple years" for the program to "reach[ ] its full potential." Rather than adding positions, defendants plan to redirect existing psychologist and clinical social worker positions – on-site positions -- to serve in this new program, filling a maximum of 100 vacancies among psychologists and social workers. CDCR has no policy to

prevent on-site psychologists and social workers from taking redirected telemental health positions, nor has it created a pay differential for on-site psychologists and social workers similar to the one it has for psychiatrists to incentivize on-site clinical services. Bottom line, the number of telemental health positions currently planned will not come close to filling the current vacancies among psychologists and social workers and could further weaken the in-person infrastructure within prisons that is so essential to the required quality of care.

The court finds by clear and convincing evidence defendants have not taken all reasonable steps available to them and so in this respect as well have not substantially complied with the court's October 10, 2017 order.

Impossibility

During his opening statement, counsel for defendants acknowledged impossibility is not a defense to defendants' Eighth Amendment obligations in this case.  Impossibility is a defense to civil contempt, if established.  Specifically, defendants contend that statewide and nationwide shortages of mental health care providers make it impossible for them to comply across all categories of providers with the 90 percent minimum fill rate required by the October 10, 2017 order.  Defendants have the burden of producing evidence that it is impossible for them to comply with the court's order.  To meet this burden, defendants' evidence must show "categorically and in detail" why it is impossible for them to comply.  This "burden is difficult to meet" and may be "particularly strict" in cases where, as here, the needs of a plaintiff class "are urgent."  Defendants have not met their burden.

Defendants rely principally on the testimony of their expert witness, Dr. Greulich, concerning present shortages among mental health professionals. Dr. Greulich did testify to labor shortages among mental health professionals across California and the United States. She also testified, however, that she does not opine it is impossible for defendants to hire psychologists, medical assistants or social workers in the current labor market.

Fundamentally, the record before the court shows it may be more difficult or expensive for defendants to fill existing mental health vacancies sufficient to comply with the 90 percent fill

/////

5

1    rate required by the court's order.  But none of the evidence establishes defendants' compliance
2    with the October 10, 2017 order is impossible.
3        Defendants have not met their burden of showing that compliance with the October 10,
4    2017 order is impossible so as to avoid a finding of contempt.
5        Absence of Key Testimony
6        The court makes an additional observation. Defendants called only one named defendant
7    as a witness, Dr. Mehta, CDCR's Deputy Director for Mental Health Services.  The court has no
8    doubt Dr. Mehta is a highly qualified, dedicated public servant.  At hearing, Dr. Mehta testified
9    he could not think of anything else he could do "at [his] level" and "pursuant to the rules that
10   apply" to him, to fill staffing vacancies to court-ordered levels.  Dr. Mehta also testified on cross-
11   examination that he did not know if it was impossible to fill the vacancies.  All the other
12   defendants in this action are at higher levels of authority within CDCR or the State of California,
13   with more authority than Dr. Mehta and significantly more resources available to them.  The
14   absence of any testimony from any of the other named defendants – those of you here today at the
15   highest level of California's state government -- leaves a gaping hole in the record regarding what
16   all available reasonable steps actually are and what is possible.
17       Summary Regarding Contempt
18       In sum, the court finds by clear and convincing evidence that defendants have violated and
19   continue to violate the court's October 10, 2017 order as modified, that the ongoing violation is
20   not "based on a good faith and reasonable interpretation of the order" and the violation far
21   exceeds what would be necessary for the court to find substantial compliance with the order.
22   Defendants are in contempt of court and the court is prepared if it must to issue a formal finding
23   to this effect.
24       Remedies
25       Given defendants' contumacy, it is for the court to effect compliance. Because these are
26   civil contempt proceedings, traditional equitable principles call for the imposition of coercive
27   sanctions.
28   /////

6

If it makes this order final, the court intends to impose monetary sanctions and require defendants to deposit funds in the Court's Registry to establish a fund for those sanctions. The fund would be used exclusively for steps necessary to come into compliance with the court's staffing orders.

Through the end of September 2023, when the hearing began, a total of $58,224,504.00 in fines had accumulated, and the monthly accumulations had risen steadily. By the end of January 2024, the last report available prior to this order, a total of $94,912,929.00 has accumulated. *See* ECF No. 8142 at 23. This amount directly reflects defendants' failure to comply with the court's orders to remedy constitutionally inadequate mental health staffing levels.

Given the length of defendants' noncompliance and their marked lack of urgency in implementing remedial steps required to achieve compliance, the court currently intends to impose an initial sanction in the amount of the accumulated fines, as of today $94,912,929.00. Upon issuance of the court's order, defendants would be directed to deposit the amount of the initial sanctions into the Court's Registry immediately. Thereafter, the court would order disbursement of funds directed to achieving compliance, subject to procedures to be reviewed with the parties in advance.

Going forward, unless otherwise ordered by the court, defendants shall continue to calculate and report a monthly and accumulating total of additional fines, preparing the amount of fines in accordance with the court's January 23, 2024 Order, ECF No. 8116. Further deposits into the fund would be made as ordered by the court based on these future reports made by defendants.

In Closing

The court recognizes there are many CDCR employees – even if not sufficient numbers of those employees -- working diligently every day to try to provide adequate mental health services to class members. Some of these employees on the front lines testified at hearing: Dr. Alexandra David, Chief of Mental Health at the California Medical Facility; Dr. Kelley Franceschi, Chief of Mental Health at the California Health Care Correctional Facility (CHCF) between April 2021 and September 2023; Dr. Shelly Minor, Chief Psychologist for the Intermediate Program at

1  CHCF; and Angela Reinhold, a Supervising Licensed Clinical Social Worker at California
2  Correctional Institution in Tehachapi.  These witnesses testified to vacancy rates at their
3  respective institutions, delays in hiring, working conditions at their respective institutions, and the
4  impact of staffing shortages on patient care at their respective institutions.  Their testimony is
5  required reading for every named defendant.  Regarding working conditions in particular, some of
6  the accounts are very concerning:  multiple clinicians sharing office space in small windowless
7  closets, and a lack of basic supplies professional staff is entitled to, among other untenable
8  conditions.
9       There is no reason the dedication of these employees and their colleagues cannot be
10 matched – now -- by a commitment on behalf of the administration to effect the policy and
11 operational changes needed to achieve full compliance.  This is court-ordered work.  It is
12 important, hard work that California's top public servants can no longer afford to put off or
13 ignore.
14      I have said this is a tentative order, to be made final only after the defendants have one
15 more chance to demonstrate the will and determination to comply with the court's prior orders.
16 While the court intends to impose fines as described above, it is first referring the question of
17 staffing to a Ninth Circuit Mediator who is available to the court.  The referral is for 60 days
18 initially, until May 8th.  The same people here today are ordered to appear in this courtroom on
19 the dates I've already instructed you to calendar.  I will take your appearances and then remain
20 available to the mediator as needed.  At the end of each session, the Mediator will let me know if
21 the parties and he agree to continue meeting.  I am asking the Mediator to report to me on or
22 before May 8th regarding any agreements the parties may have reached, or not.
23       In the meantime, I am adding compliance with the court-ordered suicide prevention
24 measures to the agenda for the April 26, 2024 status conference, and the parties should be
25 prepared for that matter to be set for enforcement hearing in June of this year.  The same people
26 here today are ordered to attend that hearing.
27