1          UNITED STATES DISTRICT COURT                **ORIGINAL**

2        FOR THE EASTERN DISTRICT OF CALIFORNIA

3              BEFORE THE HONORABLE
     KIMBERLY J. MUELLER, CHIEF DISTRICT JUDGE PRESIDING

4    _____

5    RALPH COLEMAN, ET AL.         )   Case No:
                                   )   2:90-cv-00520-KJM-KJN(PC)
6    Plaintiffs,                   )
                                   )   Status Conference
7              v.                  )
                                   )   Date: 3/8/2024
8    EDMUND G. BROWN, ET AL.,      )
                                   )
9    Defendants.                   )
                                   )
10   _____

11            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                    Pages 1 through 36

13

14

15

16

17

18

19

20   _____
21   OFFICIAL REPORTER:        Abigail R. Torres, CSR, RPR/RMR, FCRR
                               CSR No. 13700
22                             United States District Court
                               Eastern District of California
23                             501 I Street, Suite 4-100
                               Sacramento, California 95814
24
     *Proceedings recorded by mechanical stenography.  Transcript*
25   *produced by computer-aided transcription.*

| | |
|---|---|
| 1 | **APPEARANCES:** |
| 2 | For the Plaintiffs:    ROSEN BIEN GALVAN AND GRUNFELD LLP |
| | 101 Mission Street |
| 3 | 6th Floor |
| | San Francisco, CA 94105 |
| 4 | By:  ALEXANDER ROSS GOURSE, ESQ. |
| | By:  ERNEST GALVAN, ESQ. |
| 5 | By:  JENNY SNAY YELIN, ESQ. |
| | By:  LISA ADRIENNE ELLS, ESQ. |
| 6 | By:  MICHAEL BIEN, ESQ. |
| | -oOo- |
| 7 | PRISON LAW OFFICE |
| | 1917 Fifth Street |
| 8 | Berkeley, CA 94710 |
| | 858-382-1209 |
| 9 | By:  MARISSA HATTON, ESQ. |
| 10 | For the Defendants:    HANSON BRIDGETT LLP |
| | 1676 N. California Blvd. |
| 11 | Suite 620 |
| | Walnut Creek, CA 94596 |
| 12 | By:  PAUL B. MELLO, ESQ. |
| | -oOo- |
| 13 | HANSON BRIDGETT, LLP |
| | 425 Market Street |
| 14 | 26th Floor |
| | San Francisco, CA 94105 |
| 15 | By:  SAMANTHA DERIN WOLFF, ESQ. |
| | -oOo- |
| 16 | HANSON BRIDGETT |
| | 425 Market Street |
| 17 | Suite 2600 |
| | San Francisco, CA 94105 |
| 18 | By:  LAWRENCE MICHAEL CIRELLI, ESQ. |
| | -oOo- |
| 19 | DEPARTMENT OF JUSTICE |
| | OFFICE OF THE ATTORNEY GENERAL |
| 20 | 455 Golden Gate Avenue |
| | Suite 11000 |
| 21 | San Francisco, CA 94102 |
| | By:  DAMON GRANT McCLAIN, ESQ. |
| 22 | -oOo- |
| | CALIFORNIA DEPARTMENT OF JUSTICE |
| 23 | OFFICE OF THE ATTORNEY GENERAL |
| | 1300 I Street |
| 24 | Suite 125 |
| | Sacramento, CA 94244-2550 |
| 25 | By:  ELISE OWENS THORN, ESQ. |

1    **ALSO PRESENT:**

2    Special Master:        PANNONE LOPES DEVEREAUX & O'GARA LLC
                            1301 Atwood Ave.
3                           Suite 215N
                            Johnston, RI 02919
4                           BY:  MATTHEW A. LOPES, JR.

5    David Sapp, Legal Affairs Secretary for Governor Gavin Newsom

6    Jeff Macomber, CDCR Secretary

7    Diana Toche, CDCR Undersecretary

8    Amar Mehta, Deputy Director

9    Stephanie Clendenin, Representative DSH

10   Kari Krogseng, Chief Counsel, Department of Finance

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **SACRAMENTO, CALIFORNIA; FRIDAY, MARCH 8, 2024; 10:12 A.M.**

2                                -oOo-

3        THE CLERK:  Calling Civil Case 90-520.  *Coleman, et*

4   *al., v. Newsom, et al.*  This is on calendar for a status

5   conference.

6        THE COURT:  I'm using a mic for the benefit of the

7   court reporter.  Can the court reporter hear me?  Can you

8   hear me?

9        (Brief pause in proceedings.)

10        THE COURT:  And I'm sitting here because I want to be

11   eye level with the parties and their counsel.  I am going to

12   first call roll and ask a few questions about who is appearing

13   here.

14        So appearing for the Plaintiffs, Ms. Ells, you're

15   serving as lead counsel today?

16        MS. ELLS:  Yes, Your Honor.

17        THE COURT:  All right.  Mr. Bien.

18        MR. BIEN:  Good morning, Your Honor.

19        THE COURT:  Mr. Galvan.

20        MR. GALVAN:  Good morning, Your Honor.

21        THE COURT:  Ms. Yelin.

22        MS. YELIN:  Good morning.

23        THE COURT:  Mr. Gourse?

24        MR. GOURSE:  Good morning.

25        THE COURT:  And Ms. Hatton.

```
 1              MS. HATTON:  Good morning, Your Honor.

 2              THE COURT:  I do have a question and the answer will

 3    become obvious when I'm asking this later, but help me

 4    understand how Plaintiffs' counsel is in touch with the

 5    Plaintiffs?  Are their family members in the loop?  Is there

 6    any relationship there such that if I could understand who the

 7    principals are besides those who are incarcerated, mentally

 8    ill?

 9              MR. BIEN:  It's complex.  I mean, I think that we have

10    communications with family members and different advocacy

11    groups.  But, mainly, we interact with our clients directly

12    through telephone calls and mail and visiting.

13              THE COURT:  All right.  All right.  That's helpful.

14    We'll come back to that.

15              For the Defense, Mr. Mello.

16              MR. MELLO:  Good morning, Your Honor.

17              THE COURT:  Good morning.

18              Mr. McClain.

19              MR. McCLAIN:  Good morning, Your Honor.

20              THE COURT:  Ms. Thorn.

21              MS. THORN:  Good morning.

22              THE COURT:  Mr. Cirelli.

23              MR. CIRELLI:  Good morning, Your Honor.

24              THE COURT:  Mr. Wolff.

25              MR. WOLFF:  Good morning, Your Honor.
```

```
 1              THE COURT:  Appearing for the Governor, Mr. Sapp.

 2              MR. SAPP:  Good morning, Your Honor.

 3              THE COURT:  All right.  Good morning, Mr. Sapp.

 4              And help me understand, so you are the highest-level

 5    representative of the Governor with full authority for all

 6    matters related to this action?

 7              MR. SAPP:  Yes, Your Honor.  I'm the governor's legal

 8    affairs secretary.

 9              THE COURT:  And you talk directly to the Governor

10    about this case?

11              MR. SAPP:  Yes, I speak with the Governor directly

12    about high-profile litigation matters.

13              THE COURT:  All right.  Secretary Macomber.

14              MR. MACOMBER:  Good morning, Your Honor.

15              THE COURT:  Good morning.

16              Undersecretary Diana Toche.

17              MS. TOCHE:  Good morning, Your Honor.

18              THE COURT:  Good morning.

19              Deputy Director Dr. Mehta.

20              MR. MEHTA:  Good morning, Your Honor.

21              THE COURT:  Good morning, Mr. Mehta.

22              The highest-level representative for DSH, Director

23    Stephanie Clendenin.

24              MS. CLENDENIN:  Good morning, Your Honor.  Stephanie

25    Clendenin.
```

1          THE COURT:  All right.  Good morning to you.

2          And Department of Finance Director Mr. Stephenshaw.

3          MS. KROGSENG:  I'm sorry.  This is Kari Krogseng.  I'm

4    the chief counsel for the department of finance, representing

5    Director Stephenshaw.

6          THE COURT:  All right.  And you have full authority

7    for all matters related to this action?

8          MS. KROGSENG:  Yes.

9          THE COURT:  All right.  In terms of the three

10   representatives who are Plaintiffs, is -- this is you as the

11   director of interest?

12         MS. ELLS:  Yes, Your Honor.

13         THE COURT:  All right.  I signaled in the minute order

14   that I was prepared to issue a tentative ruling on contempt and

15   enforcement of staffing orders.  And I'm going to do that by

16   way of a bench order.  I will docket a copy of this in

17   connection with the minutes for this session.  It's relatively

18   concise.  But it's going to take me some time to read it.

19         I think it's important to read it into the record, but

20   a copy will be on the docket.  It's a tentative ruling.  And

21   then once I'm done reading that, I'm going to discuss with you

22   next steps.  And I do anticipate -- we'll take a lunch break,

23   but I do anticipate having you back after lunch.

24         All right.  So this is what the bench order that

25   embodies my tentative ruling -- I should say, I'm sorry,

1   because the special master is present.  Armed with the Court,

2   the Special Master Lopes, and members of this team, and the

3   audience, I see them present.

4        But Plaintiffs are a class of about 33,763 California

5   State prisoners with serious mental disorders.  This class,

6   which is growing in numbers, has been waiting for decades for

7   the State to meet its constitutional obligations to them when

8   it comes to the delivery of mental health care.

9        Defendants are represented here today.  They're the

10  persons of the highest levels of California's executive

11  branch -- the Governor, the secretary of CDCR, undersecretary

12  for Health Services for CDCR, deputy director of statewide

13  mental health programs, director of California state hospitals,

14  and the director of California finance.

15       Today, the Court is letting the defendants know that

16  it does intend to hold some or all of them in contempt and

17  impose civil fines as sanctions until defendants achieve

18  compliance in delivering critically necessary, long overdue

19  staffing relief for the members of the plaintiff class.

20       As of today, defendants themselves calculated the

21  amount of fines owing under the schedule the Court previously

22  has published as exceeding $94 million.

23       The Court's order sets the start date as March.  And

24  so it may only be about $88 million, but it's in that ballpark.

25  No chump change.  As I said, this is a tentative ruling.  The

1    Court is fully prepared to make it final in a formal order with

2    full explanation, but it does intend to provide defendants one

3    last opportunity to demonstrate the ability, the will, and the

4    leadership to take decisive action to address the festering

5    problem this case represents.

6        Everyone here knows the plaintiff class has been

7    waiting on the State for more than 28 years.  In 1995, the

8    Court first found overwhelming evidence of a significant and

9    chronic understaffing among mental health care service

10   positions in California's prisons.

11       In 1999, the Court ordered defendants to comply with

12   designated staffing ratios.  In 2002, with the violation

13   continuing, the Court ordered defendants to maintain staffing

14   levels without exceeding a 10 percent vacancy rate.

15       In 2009, with the violations still continuing, the

16   Court ordered defendants to build a formal staffing plan.  In

17   2017, the Court ordered full compliance with the required

18   staffing levels.

19       Most recently, on February 28, 2023, the Court issued

20   its orders setting out a framework for staffing enforcement,

21   including a system of fines to begin accumulating on paper on

22   March 21st, 2023.  At that time, the Court said that if the

23   fines accumulated for more than three consecutive months, the

24   Court would set a matter for hearing -- set the matter for

25   hearing on findings of contempt and actual payment.

1    On June 12th, the Court had found that fines had

2    accumulated for three consecutive months.  In other words, at

3    that time, faced with the threat of fines, defendants still had

4    not complied with our constitutional obligations to the

5    plaintiff class.

6    The Court set enforcement proceedings for

7    September 29th and took evidence over several days.  Defendants

8    acknowledge they're required to comply with their

9    constitutional obligations to the plaintiff class.  And they do

10   not dispute that the Court's October 10, 2017, order is

11   sufficiently specific and definite as to its terms so as to

12   support enforcement.  They do not and cannot contend they have

13   actually complied in full with that October 2017 order.

14   They do, instead, contend that they have achieved

15   actual and substantial compliance with 90 percent fill rate

16   requirement across some classifications in some periods of time

17   and assert the defenses of substantial compliance and

18   impossibility.

19   But the Court, having sat through the evidentiary

20   hearing, having carefully considered the record now before it,

21   the Court has concluded that defendants have not submitted

22   sufficient evidence to meet their burden of supporting those

23   defenses.

24   One metric is important to clarify up front.  The

25   parties dispute whether the October 2017 order itself allows

1    for substantial compliance to defendants' filling of allocated

2    mental health staff positions to something less than the

3    90 percent threshold as defendants contend it does.

4         That order -- the October 2017 order requires complete

5    compliance with the staffing ratios in the 2009 staffing plan

6    and the maximum 10 percent vacancy rate required by the Court's

7    June 13, 2002 order.  Those requirements read together mean the

8    defendants must allocate 100 percent of the positions required

9    by the staffing ratios in the 2009 staffing plan and have no

10   more than a 10 percent vacancy rate systemwide in any of the

11   five classifications at issue here.

12        In other words, anything greater than a 10 percent

13   vacancy rate cannot be considered substantial compliance.

14   Defendants do say they've actually complied in a limited way.

15   They contend that filling some classifications up to 90 percent

16   for some periods of time precludes -- filling some

17   classifications to 90 percent precludes a finding of contempt

18   as to classifications that were filled to 90 percent or above

19   during any part of the relevant period from October 2018 to

20   now.  And the defendants did hit those marks at times.  The

21   period defendants cite are at best periods of partial

22   compliance.

23        The question is whether monetary sanctions for

24   contempt should extend to those periods of partial compliance

25   and the answer is no.  The fine structure the Court set up

12

 1    anticipated this possibility, and it does not include sanctions

 2    for vacancy rates below the 10 percent camp -- cap.

 3          Defendants also contend they are in substantial

 4    compliance with the 90 percent fill rate required by the

 5    Court's orders.  They say, one, they have achieved at above or

 6    near 90 percent fill rate among the five classifications for

 7    various and significant periods of time.

 8          Two, they have taken all reasonable measures to

 9    improve fill rates where they have fallen short.  And, three,

10    their failure to reach required staffing thresholds was the

11    inadvertent result of the COVID-19 pandemic and its lasting

12    changes on the labor economy.

13          The Court finds the first and third arguments

14    unavailing.  The first, because it mistakenly assumes something

15    near a 90 percent fill rate can count the substantially

16    compliant.  I've already signaled that's not the case.

17          The third argument unavailing because substantial

18    compliance would be a prerequisite to being let off the hook

19    for only technical or inadvertent violations.

20          So the real question the Court has thought through is

21    whether defendants have taken all reasonable measures to

22    achieve required staffing levels.  And it is all such measures

23    that are required under the law.

24          Defendants say, yes, they have and will be

25    distributing in the ways in which they say they have.

1           Through twice-yearly reviews of staffing allocations.

2   Commendable, but not sufficient.  I think allocations were

3   having to go up because the population is rising.

4           Through expansion of telework opportunities to mental

5   health clinicians with a recent initiative that will take at

6   least two years to make a dent, and even if fully successful,

7   will not achieve compliance based on what's currently before

8   the Court.

9           Through salary and financial incentives and, yet,

10  sticking with the policy, as the record shows, of offering new

11  hires the lowest salary in classification range regardless of

12  experience or prior pay.

13          Through streamlining processes for hiring with the

14  goal, among others, of reducing time to hire from 108 to

15  165 days, a noncompetitive very long time.

16          Through expansion of marketing and advertising

17  efforts, which the Court saw.

18          Through contracting with the leading national

19  recruiter for clinicians.

20          And through contracting with registry providers long

21  and part of the solution.  Those providers arrange for

22  expensive privately contracted clinicians, many from out of

23  state.  Even with the registry provider option, however,

24  defendants have not been able to fill all of the positions

25  needed.

1           Regarding salaries, which is the subject of much of

2    the record, defendants have offered no evidence, they have even

3    attempted to analyze what wages and benefits they would have to

4    offer mental health clinicians to fill staffing vacancies.

5           They do not argue or show it would be impossible to

6    raise wages and benefits, or other components of employment

7    packages, such as retention bonuses or pension contributions.

8    That they point to a recent union contract, but that doesn't

9    tell the Court much.

10          Regarding telemental health in which the defendants

11   put much stock, they intend to use the planned extension of the

12   telemental health to help fill existing staffing vacancies in

13   psychologists and social worker positions.

14          At the time of hearing, end of last year, they planned

15   to start to hire telepsychology line staff by early this year

16   and said it will probably take a couple of years for the

17   program to reach its full potential.

18          Rather than adding positions, defendants plan to

19   redirect existing psychologists and clinical social worker

20   positions, on-site positions, to serve in this new program,

21   filling a maximum of -- maximum of 100 vacancies among

22   psychologists and social workers.

23          CDCR has no policy to prevent on-site psychologists

24   and social workers from taking redirected telemental health

25   positions, nor does the record indicate it's created any kind

1    of pay differential for on-site psychologists and social

2    workers similar to the one it has for psychiatrists to

3    incentivize on-site clinical services.  Even if telemental

4    health telepsychology has a role to play, it's impossible to

5    imagine that all services required by the Court in this case

6    can be provided remotely.

7         Bottom line, the number of telemental health positions

8    currently planned will not come close to filling the current

9    vacancies amongst psychologists, social workers, and can

10   further weaken the in-person infrastructure within prisons that

11   is so essential to the required quality of care.

12        So on the question of substantial compliance, the

13   Court finds by clear and convincing evidence that defendants

14   have not taken all the reasonable steps available to them.  And

15   so, in this respect, have not substantially complied with the

16   Court's October 2017 order.

17        Now, there's also the defense of impossibility, which

18   the Court has carefully considered.  During his opening

19   statement, defendants' counsel acknowledged impossibility is

20   not a defense to defendants' Eighth Amendment obligations in

21   this case.  Impossibility is a defense to civil contempt, if

22   that is established.

23        Specifically, defendants contend that statewide and

24   nationwide shortages of mental health care providers make it

25   impossible for them to comply across all categories of

1    providers with 90 percent minimum fill rate required by the

2    October 2017 order.  Defendants here, as well, have the burden

3    of producing evidence that it is impossible for them to comply

4    with the Court's order.

5            To meet this burden, defendants' evidence must show

6    categorically and in detail why it is impossible for them to

7    comply.  This burden is very difficult to meet under the law

8    and may be particularly strict in cases where, as here, the

9    needs of a plaintiff class are urgent.  Have been urgent for

10   years.

11           Here, as well, defendants have not met their burden.

12   Defendants rely principally on the testimony of their expert

13   witness.  Dr. Gruelich, concerning present shortages among

14   mental professionals.  Dr. Gruelich did testify to labor

15   shortages among mental health professionals across California

16   and the United States.

17           She did testify at the same time, however, that she

18   does not opine it is impossible for defendants to hire

19   psychologists, medical assistants, or social workers in the

20   current labor market.  That was an express statement she made

21   on the record.

22           Fundamentally, the record before the Court shows it

23   may be more difficult or expensive for defendants to fill

24   existing mental health vacancies sufficient to comply with the

25   90 percent fill rate that the Court's order requires, but none

1   of the evidence establishes defendants' compliance with the

2   order is impossible.

3          So here, the Court finds defendants have not met their

4   burden of showing that compliance is impossible so as to avoid

5   a finding of contempt.

6          Before I turn to what that means, in terms of the

7   fines, I want to make a couple of observations.  One, is the

8   absence of what would have been key testimony in this

9   proceeding.  Defendants called only one named defendant as a

10  witness.  And that is Dr. Mehta, who is here today.

11         The Court has no doubt that Dr. Mehta is a dedicated

12  public servant.  And he testified -- directly provided the

13  information responsive to the questions posed to him.  He did

14  say in the hearing in response to questioning, that he could

15  not think of anything else he could do at his level, and

16  pursuant to the rules that apply to him, to fill staffing

17  vacancies to Court-ordered levels.  He also testified on cross

18  that he did not know if it was impossible to fill the

19  vacancies.

20         All of the other defendants in this action are higher

21  levels of authority within CDCR or the State of California with

22  more authority than Dr. Mehta and presumably -- not just

23  presumably, obviously, more resources available to them.

24         The absence of any testimony from any of the other

25  named defendants and the defendants represented here today,

1    including the defendant within the box -- leaves a gaping hole

2    in the record regarding what all available reasonable steps

3    actually are and what is possible.

4          So, again, just to -- I've said it, but just to make

5    it perfectly clear, in sum, the Court does find by clear and

6    convincing evidence that defendants have violated and continue

7    to violate the Court's October 10, 2017, order, as has been

8    modified.  But it's -- but that's the order I'm referring to.

9          I find that the ongoing violation is not based on a

10   good-faith and reasonable interpretation of the order.  And

11   that the violation far exceeds what would be necessary for the

12   Court to find substantial compliance.  Defendants are in

13   contempt of Court.  And the Court is prepared, if it must, to

14   issue a formal finding to this effect.  I'm not doing that

15   today.  I'm being as transparent as possible.

16         In terms of the remedy -- given -- given the contempt,

17   it is for the Court to effect compliance.  Do I relish this

18   day?  No.  Do I -- is this something I have wanted to do?  No.

19   But it is my job.  Because there are civil contempt proceedings

20   here, traditional equitable principles call for the imposition

21   of coercive sanctions.

22         I've made clear from the very beginning that this is

23   not a matter of criminal sanctions.  If I do make this order

24   final -- and it's hard to imagine not doing that -- but I'm not

25   today.  If I do, the Court intends to impose monetary sanctions

1   and require the defendants deposit funds in the Court's

2   Registry to establish a funding for those sanctions.  The fund

3   would be used exclusively for steps necessary to come into

4   compliance with the Court's staffing orders.  This is a

5   well-established approach to addressing this kind of contempt

6   in the federal courts.

7        Through the end of September 2023, just to provide

8   some perspective, when the enforcement proceedings began, a

9   total of more than 58 million in fines had accumulated and the

10  monthly accumulations had risen steadily, and they continued to

11  rise.  As I indicated in the beginning, by the end of

12  January 2024, the last report available, the defendants' own

13  calculation of the fines is in excess of 94 million.  It's in

14  that ballpark.

15       This amount directly reflects the defendants' failure

16  to comply with the Court's orders to remedy constitutionally

17  inadequate mental health staff levels.

18       Given the length of defendants' noncompliance and

19  their marked lack of urgency in implementing remedial steps

20  required to achieve compliance, the Court currently intends to

21  impose an initial sanction in the amount of those accumulated

22  fines.  That is the 94 million something.  It will be updated

23  at the time of any final order.

24       Upon issuance of the order, defendants would be

25  directed to deposit the amount of the initial sanctions into

1    the Court's registry immediately.  And, thereafter, the Court

2    would order disbursement directed to achieving compliance

3    subject to proceedings and procedures to be reviewed with the

4    parties in advance.

5         Going forward, just so it's clear, unless ordered

6    otherwise by the Court, the defendants shall continue to

7    calculate and report a monthly and accumulating total of

8    additional fines, preparing the amount of fines, as the Court

9    previously has directed in its January 23, 2024, order.  And

10   it's those reports the Court would refer to in directing

11   deposits into the Registry fund.

12        I want to say some additional words in closing before

13   we talk about next steps.  I acknowledge Dr. Mehta as a

14   dedicated public servant.  I acknowledge dedicated public

15   servants here today.  And I recognize that there are many CDCR

16   employees, even if not sufficient numbers of those employees,

17   working diligently every day to try to provide adequate mental

18   health services to the members of this challenging, needy

19   class.

20        Some of the additional employees on the front lines

21   testified at the hearing.  Just to call out some, Dr. Alexandra

22   David, Chief of Mental Health of the California Medical

23   Facility; Dr. Kelley Franceschi, Chief of Mental Health at the

24   CHCF previously, until September 2023; Dr. Shelly Minor, Chief

25   Psychologist for the Intermediate Program at CHCF; and Angela

1   Reinhold, a Supervising Licensed Clinical Social Worker at CCI

2   Tehachapi.

3          These witnesses testified to the vacancy rates at

4   their respective institutions, delays in hiring, working

5   conditions at their respective institutions, and the impact of

6   staffing shortages on patient care at their respective

7   institutions.

8          The Defense has moved -- or has objected to some of

9   that testimony.  I'll resolve those objections in any final

10  order.  I'll resolve them based on the law.  But I do want to

11  underscore the working conditions point, because some of the

12  testimony at hearing was sobering.

13         Clinicians -- multiple clinicians working in

14  windowless closets without adequate ventilation.  I believe the

15  Defense has objected to the inference that even certain

16  supplies don't necessarily meet the kind of standards a

17  professional would expect.  And the Court has heard just in the

18  last week -- this is not part of the record, it doesn't

19  contribute to anything I'm deciding here, but I've also heard

20  that at the Wasco facility, there is sewage on the floor, and

21  there's ceiling tiles falling down in the work environment

22  where mental health professionals are expected to be doing

23  their job.

24         If I need to go off the record on working conditions,

25  I certainly know how to do that, but I would think that anyone

1    in the leadership position would want to personally inspect and

2    correct any such problems promptly.

3           The Court thinks the testimony provided at the hearing

4    is required reading through every named defendant.  And if

5    those named defendants have not read the testimony of the

6    people I've just identified, I'd ask you, Mr. McClain, to make

7    certain the excerpts of the transcript from the hearing for

8    those witnesses is provided to each named defendant.

9           Can you promise me you'll do that?

10          MR. McCLAIN:  Yes, Your Honor.

11          THE COURT:  All right.  Thank you.

12          There's simply no reason that the dedication of those

13   frontline employees and their colleagues cannot be matched now

14   by a commitment on behalf of the administration to effect the

15   policy and the operational changes needed to achieve full

16   compliance.  This is Court-ordered work.  It is important, hard

17   work that California's top public servants can no longer afford

18   to put off anymore.

19          So once again, I've said, and I mean it, this is a

20   tentative order to be made final only after the defendants have

21   one more chance to demonstrate the will and determination to

22   comply with the Court's orders.  I am taking this step as a way

23   of giving the defendants one more chance.

24          And that is that I'm referring the question of

25   staffing compliance to a Ninth Circuit mediator, who has been

1   made available to this Court.  I sometimes call on Ninth

2   Circuit mediators in particularly complex cases, as I deem most

3   complex case, but someone is available.  And I'm going to

4   arrange for the parties to meet that person this afternoon.

5   We're going to set up a Zoom link.  And that person will appear

6   via Zoom, so the Court can introduce all of you to him.

7          His name is Steven Saltiel.  And I'm going to ask him

8   to convene sessions on the dates in my minute order previously

9   docketed.  So the first one -- the first full session will be

10  March 9th.  Everyone here who is ordered to be here today must

11  be present for that session.  I'm also confirming all -- I'll

12  confirm with him, at least as a placeholder, April 12th and

13  May 10, 2024, at 9:00 a.m.

14         If he is not able to make the April 12th date, because

15  of a personal obligation, he'll identify an alternate date that

16  will take the place of that date.  I'm making a referral

17  initially for 60 days.  I will -- at the beginning of the

18  session, I will be in the courtroom.  I'll take roll.  Make

19  certain everyone is here.  And then I will excuse myself.  I'll

20  remain available in case anything can be memorialized as a

21  result of the sessions along the way.

22         At the end of each session, I will ask the mediator to

23  confirm for me that all parties are participating in good

24  faith.  And at the end of 60 days, I'll evaluate whether or not

25  it is then time to issue the tentative ruling here as a final

1   ruling with full explanation and citations to the record and

2   case law.

3          Just to provide a heads-up as to where we're going

4   next with this case, and then we'll talk more about the session

5   with the Ninth Circuit mediator.  I am adding compliance with

6   the Court-ordered suicided-ordered-prevention measures to the

7   Agenda for the April 26, 2024 status conference.  And the

8   parties should be prepared for that matter to be set for

9   enforcement in June of this year.  And I would order the same

10  people here today to attend that hearing.

11         That is the Court's tentative ruling.  What I'm

12  prepared to do -- we'll take a break now.  We could come back

13  at 11:15.  I'm prepared to hear from the parties, whoever they

14  choose to speak for them, topics for the sessions with the

15  Ninth Circuit mediator.  It's within the aegis of staffing.

16  It's all about staffing.  The obvious first question is:  How

17  can the defendants come into compliance now?  Not two years

18  from now.  Now.

19         I recognize that's a tall order, given the current

20  numbers.  But, still, that's the fundamental question.  Related

21  to that are pieces of the remedy where perhaps a settlement

22  conference is the best format for discussing options truly

23  available to get to the goal sooner, rather than later.

24         So I'll be back at 11:15.  And I will -- I'm going to

25  sit here again.  And then I'll ask you for your list.  I have

```
 1   my own list.  And then we'll take a lunch break, and then
 2   you'll be back at 1:15 to meet Mr. Saltiel.  All right?
 3               Thank you very much.
 4               (Brief recess was taken.)
 5               THE COURT:  All right.  We're back on the record.
 6               Everyone who was previously present.  I guess I
 7   misspoke.  I'm looking right at the date.  It's March 29th, as
 8   much as I'd love to order you here on a Saturday.  I'm sure,
 9   though, I could do that in the future.
10               March 29th at 10:00 a.m., so, then, also in terms of
11   who should be present, then, yeah, typically principals need to
12   be at settlements.  So I understand Mr. Coleman is at CHCF
13   Stockton 79.  Any reason -- I can get him here.  And so that
14   would be my thought, would be to have one principal present.
15               Any reason not to do that?
16               MR. BIEN:  His health has been pretty poor recently.
17   So we'd have to check on that.
18               THE COURT:  Not Mr. Coleman, but another named
19   plaintiff.
20               MR. BIEN:  We could certainly go over our named
21   Plaintiffs and see -- and, again, I would love to have Ralph
22   Coleman here.  I'm in close touch with him.  But I'm just not
23   sure if he'd be able to do it.
24               THE COURT:  All right.  Well, I'll ask you to let the
25   Court know within seven days --
```

1           MR. BIEN:  Okay.

2           THE COURT:  -- who the principal would be.

3           Also, I'm not ordering -- I'm not going to have the

4    Special Master present for the entirety of the settlement

5    session, just so that's clear.  He has much else to do.  He's

6    an arm of the Court.  He will be available to the mediator,

7    however, to provide information as the mediator requests.

8           So I'm prepared to hear from the parties, if they have

9    particular thoughts for me to share with the mediator before

10   you meet him, topics, approaches, any questions about the

11   referral to the mediator.

12          So from the Plaintiff, anything, Ms. Ells?

13          MS. ELLS:  Your Honor, we have considered some topics

14   that we thought might be appropriate for exploration.  I don't

15   think any of them are going to be news to anybody here because

16   we've identified all of them in our briefing as additional

17   steps that we felt were reasonable and could have been taken.

18          So some topics that we would like to explore are

19   population reduction measures for the class, clustering,

20   changes to the hiring process to improve it and make it more

21   competitive and streamlined, recruitment and retention

22   measures, including bonuses and efforts to address working

23   conditions and perhaps hybrid work schedules.  Things that can

24   make these positions more competitive with others on the

25   market.

1          Exploration of additional categories of clinicians to

2    serve the class, including licensed family and marriage --

3    LMFTs.  I actually can't remember what that stands for.

4    Marriage and family therapists.  Yes.

5          Compensation, obviously, and consideration of moving

6    additional functions to the receiver.

7          THE COURT:  Say the last part again?

8          MS. ELLS:  Consideration of removing -- of moving

9    additional staffing-related functions to the receiver.

10          THE COURT:  Ah.

11          MS. ELLS:  A receiver.

12          THE COURT:  The receiver Plata or "a receiver"?

13          MS. ELLS:  I think we are -- we currently would

14    anticipate discussing against the Plata receiver.  But I think,

15    you know, we're open to discussing approaches around that if it

16    makes sense to do something different.

17          THE COURT:  All right.

18          MR. BIEN:  In terms of the compensation kind of

19    things, again, there's a wide range to be explored but

20    including, you know, signing bonuses and finding whatever

21    salary it takes to hire somebody.  In other words, negotiating

22    for market-rate salaries to get people in the door.  And then,

23    you know, things -- a little more creative, like loan reduction

24    programs.  Professionals have big loans, and thinking about

25    those kind of things, both as recruitment and retention.

1            THE COURT:  All right.  All right.

2            For the Defense?

3            THE DEFENSE ATTORNEY:  I'm here for Mr. Sapp.

4            THE COURT:  All right.

5            MR. SAPP:  Thank you, Your Honor.  And, actually, I'd

6    like to start by thanking Your Honor for taking the step of

7    referral.  That was actually going to be my ask of the Court at

8    today's hearing, so you --

9            THE COURT:  Great minds.

10           MR. SAPP:  You saved me a windup to have to get there.

11   And really appreciate the ability to participate with the Ninth

12   Circuit mediator.  I very much appreciate that opportunity.

13           THE COURT:  Quite the mediator.

14           MR. SAPP:  I think the additional -- the topics that

15   the Plaintiffs have proposed all seem reasonable.  I think the

16   additional topic that we would add is Dr. David, whom you

17   referenced during your statements earlier.  Her testimony also

18   referenced onerous documentation and other requirements that

19   are a -- I believe her testimony was that it was a significant

20   impact on retention, which, of course, is a key aspect of

21   staffing challenges, if people don't -- you bring them in, but

22   they don't stay in the door because the way the work is being

23   done isn't allowing them to exercise their clinical

24   judgment and do what --

25           THE COURT:  That dovetails with whether or not there's

 1    medical assistants to help but --

 2         MR. SAPP:  Precisely.  But looking at that as part of

 3    the discussion, as well, we think would be very important and

 4    constructive in moving the case forward.

 5         THE COURT:  All right.  That would -- that's it.

 6         MR. SAPP:  Well, I guess, I would just add on the

 7    salary and pay, I think we would also be bringing to the table

 8    that there are aspects of state law that the legislature has

 9    enacted that govern and sort of talking through what are the

10    constructive uses of fines within the sort of confines that we

11    operate in, in terms of the state law that governs civil

12    service, collective bargaining, and other requirements.  Just

13    to make sure everyone is aware of what those are.

14         THE COURT:  Yeah, I think everyone is.

15         But the Court is aware of that certainly in thinking

16    about what ability I have to make orders.

17         All right.  Well, any other questions or comments

18    about the approach?  Otherwise, I think we could break until,

19    I'm going to say, 1:15.

20         What we're going to do is arrange a Zoom link with

21    Mr. Saltiel.  Ms. Schultz, the courtroom deputy, is working to

22    set that up.  You at least will be able to see him.

23         Has anyone here worked with him before?  All right.

24    So you'll be able to meet with him virtually.  I'm going to

25    relay to him what I've heard from you beforehand.  He'll have a

 1    chance to say whatever he wants, which may not be very much,

 2    about how he will proceed.  And then I'll allow him to be in

 3    touch with you off record to prepare for March 29th.  And he

 4    can tell you, does he want briefing.  That's completely up to

 5    him.

 6            All right.  So I'll see you again at 1:15.  Have a

 7    good lunch.

 8            (Noon recess was taken.)

 9                           -oOo-

1      <u>SACRAMENTO, CALIFORNIA; FRIDAY, MARCH 8, 2024; 1:16 P.M.</u>

2                              -oOo-

3          THE COURT:  All right.  We're back on the record.  And

4   the Court is back on the bench because I'm informed by IT

5   that's the only way Mr. Saltiel can see me.

6          Mr. Saltiel, can you see the Court?

7          MR. SALTIEL:  I can see Your Honor.

8          THE COURT:  All right.  And Mr. Saltiel also can

9   see -- it looks like you can see a few people in the courtroom.

10  But if you want to actually see someone, clearly, we would

11  arrange for them to come to one of the lecterns.

12          Are you clear on that, Mr. Saltiel?

13          MR. SALTIEL:  Yes.  I can see some people.

14          THE COURT:  Yes.  Just so you know, there's a big

15  screen set up in the courtroom, so everyone can see you.

16          MR. SALTIEL:  Oh, okay.

17          THE COURT:  All right.  So everyone who was here

18  previously is present again.  And I think this will be a very

19  brief session.  No settlement discussions are occurring during

20  this session.  The purpose of this short session is to

21  introduce Mr. Saltiel as the Ninth Circuit mediator, who will

22  convene the parties for the settlement discussions we've

23  discussed.

24          The next one is March 29th, beginning at 10:00 a.m.,

25  in this courtroom.  I did have a follow-up phone conversation

 1    with Mr. Saltiel.  I met him previously only by phone and only

 2    today.  But after our session this morning, I did just report

 3    to him the list of topics the parties identified, so he has

 4    that.

 5            I introduced him to the special master as a resource

 6    only, not someone who will be in the sessions.  And at his

 7    request, Court staff is providing two orders, the October 17th

 8    order, and the subsequent order, further clarifying that order.

 9            And then, otherwise, the Court will be available to

10    Mr. Saltiel at his request.  My understanding -- I'll let

11    Mr. Saltiel say whatever he would like, but I believe he

12    contemplates a teleconference shortly now with a small

13    representative group of attorneys.

14            My suggestion to him would be that that be Ms. Ells,

15    Mr. Bien, Mr. Sapp, Mr. Mello, and Mr. McClain, if the parties

16    feel strongly, one way or the other, and if Mr. Sapp wants to

17    delegate for this purpose, initial meeting with the mediator,

18    that would be acceptable to the Court.  But, ultimately, it's

19    up to Mr. Saltiel.

20            Mr. Saltiel, do you wish to make any remarks?  Clarify

21    anything I just said?

22            MR. SALTIEL:  Thanks, Your Honor.  I suppose I'm going

23    to meet everybody, and I look forward to working with you.  I

24    think what would probably be easiest -- can you hear me okay,

25    everybody?

```
1              THE COURT:  Yes.

2              MR. SAPP:  Yes.

3              MR. BIEN:  Yes.

4              MR. SALTIEL:  I think what will probably be easiest is

5    to schedule a pre-mediation teleconference with key counsel,

6    perhaps the individuals that Your Honor just identified, for

7    sometime next week.  And we could -- I think we could do this

8    in two ways.  I could send you an e-mail.  I can get your

9    e-mail addresses from the docket.  I think except for Mr. Sapp,

10   everybody's e-mails are there.  And we could schedule something

11   quickly next week.

12             If you have your calendars now, we could schedule

13   something now, and I could follow up with an e-mail and send

14   either a Zoom link or a dial-in number.  So I think whatever --

15   mediators try to get consensus about process, as well, so

16   whatever you all think would work.

17             THE COURT:  Do you have a time to propose?  We don't

18   need to spend a lot of time on this.  But if you have a time to

19   propose for a first telephone conference, we could just see if

20   folks can confirm for that.

21             MR. SALTIEL:  Sure.  Yes.  I would propose Tuesday,

22   the 12th at 1:30 p.m., if that works.  If not, I have other

23   slots I can provide.

24             THE COURT:  Is there anyone for whom that date does

25   not work?
```

 1          MS. ELLS:  Yes, Your Honor.  Unfortunately, I'm in a

 2   data remediation meeting until 3:00 p.m. that day.

 3          THE COURT:  All right.  Ms. Ells is not available

 4   because of meetings until 3:00 p.m. that day.

 5          MS. ELLS:  I do, however -- I think another person

 6   from our team could join in my stead with Mr. Bien.

 7          THE COURT:  All right.  All right.  Anyone else that

 8   date and time that does not work for?

 9          MR. SAPP:  No, Your Honor.

10          THE COURT:  All right.  Let's go with that date and

11   time, Mr. Saltiel.  And the Plaintiffs will identify an

12   alternative to Ms. Ells.  And then you'll -- you'll have the

13   e-mail information, so you can communicate directly.

14          MR. SALTIEL:  I can do that except for Mr. Sapp.  I

15   don't think that that e-mail address is on the docket, but I

16   assume you all can pass it on.

17          THE COURT:  Defense attorneys can arrange for that.

18          Mr. Sapp is holding up a card, an old-fashioned

19   business card, so we'll add his contact information.

20          All right.  Anything else you want to say at this

21   point, Mr. Saltiel?

22          MR. SALTIEL:  No.  I think we'll take it from

23   there once we talk next week.

24          THE COURT:  All right.  Very good.  Just one other

25   point, I shared with Mr. Saltiel my question about a principal

1    for the plaintiffs attending.  He understands that -- I

2    realized I need the name soon so that I can issue the writ.

3              MR. BIEN:  Your Honor, we would like to see if

4    Mr. Coleman, Ralph Coleman, can attend.  And I've discussed

5    with defendant facilitating that.  And assuming we're meeting

6    here at the courthouse, we'll try to work that out.  I will

7    speak to him about that, but we can assume that that will be

8    our representative at the -- at least the first session.

9              THE COURT:  All right.  I will go ahead and issue a

10   writ.

11             MR. BIEN:  Okay.

12             THE COURT:  The right kind of writ to get him here.

13   But, certainly, there are people here who can help get him

14   here.  We're within the window.  Usually, we try to arrange

15   four weeks, but I see the secretary nodding his head, so thank

16   you.

17             I'll try to issue that writ by Monday.

18             MR. BIEN:  Okay.

19             THE COURT:  All right.  I think that's all we need to

20   do this afternoon.  Let me just ask, any party have anything

21   they want to say?  Any particular question proposed to

22   Mr. Saltiel?  For the Plaintiffs?  For the Defense?

23             MR. SAPP:  No, Your Honor.

24             MS. ELLS:  No, Your Honor.

25             THE COURT:  All right.  That's the sole purpose of

1    this afternoon's proceeding, so we will note that we are

2    adjourned, and we'll see you all here March 29th at 10:00 a.m.

3            I'll take roll, and then excuse myself.

4            All right.  Thank you, again, Mr. Saltiel, very much.

5            MR. SALTIEL:  Thank you, Your Honor.

6            THE COURT:  All right.

7            (The proceedings were adjourned at 1:23 p.m.)

8                            -oOo-

9                    **C E R T I F I C A T E**

10           I, Abigail R. Torres, certify that I am a duly
     qualified and acting Official Court Reporter for the United
11   States District Court; that the foregoing is a true and
     accurate transcript of the proceedings as taken by me in the
12   above-entitled matter on March 8, 2024; and that the format
     used complies with the rules and requirements of the United
13   States Judicial Conference.
                         Dated:  March 12, 2024
14                       /s/ Abigail R. Torres

15                       _____
                         Abigail R. Torres, RPR/RMR, FCRR
                         CSR No. 13700
16                       U.S. Official District Court Reporter

17

18

19

20

21

22

23

24

25