**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

    **Plaintiffs,**

    **vs.**                              **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**

    **Defendants.**

**SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY**

## I.    Introduction

As with the modality of telepsychiatry, the Special Master supports the use of telemental health as one tool to help address the staffing crisis among primary clinician classifications within the California Department of Corrections and Rehabilitation's (CDCR) Mental Health Services Delivery System (MHSDS).[1][2]  Utilization of this modality is not, however, a panacea that can single handedly fix the persistent deficits in recruitment and retention of key mental health staff, deficits which for years have directly contributed to inadequate mental health care for the *Coleman* class.  If telemental health is introduced on an unprecedented scale without

---

[1] *See, e.g.*, Twenty-Ninth Monitoring Round Report – Part C, ECF No. 7715 at 30 ("Far and away the most disturbing development since the filing of the Twenty-Eighth Round Monitoring Report has been the vacancy rate explosion among primary clinicians (psychologists and social workers)"); Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 11 ("Indeed, the mental health staffing crisis identified in the Twenty-Ninth Monitoring Round continued virtually unabated, significantly curtailing mental health treatment and programming across the 15 Enhanced Outpatient Program (EOP) institutions and placing *Coleman* class members at grave and unacceptable risk of harm.").

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system. References to page numbers in the Report are to page numbers at the bottom of each page.

minimal safeguards, there could be unintended collateral consequences inapposite to the objective of bringing defendants into compliance with the court-ordered remedy in this matter.

Currently, the court-approved Telepsychiatry Policy affords defendants the latitude to utilize the telepsychiatry modality to provide psychiatric treatment for the overwhelming majority of the class.  ECF No. 7682 at 5 (Special Master's December 15, 2022 report on telepsychiatry, noting CDCR's Telepsychiatry Policy permitted unrestricted use of telepsychiatry for 3CMS patients, who comprised 76 percent of the MHSDS population at the time of that writing).  The small number of restrictions on its use are predominately focused on ensuring a minimal presence of psychiatrists in the prisons, limiting its use to provide treatment to the most acutely ill patients and ensuring that psychiatrists working remotely have a basic understanding of the correctional environment where their patients are housed.  Critically, four years after the court's preliminary approval of the Telepsychiatry Policy, this common-sense structure has <u>not</u> prevented incarcerated persons with serious mental illness from receiving treatment by telepsychiatrists; to the contrary, its use in accordance with the policy recommended by the Special Master and approved by the Court has been successful overall in reducing vacancies among staff psychiatry positions.  *Id*. at 6.

That is why the Special Master recommends that defendants' Telemental Health Policy contain guardrails modeled on (or in a small number of instances for the reasons described below, slightly more restrictive) those already implemented in the Telepsychiatry Policy.  He makes this recommendation based on his and his experts' assessment that the unfettered use of telemental health could lead to the almost complete replacement of onsite clinicians by those working from home, an approach that to his knowledge based on the vast experience of his experts and his review of the relevant literature, has never been attempted in a large prison

system.  Moreover, the Special Master's proposal aims to ensure an adequate informed consent process whereby patients will understand the implications the use of this modality has for the confidentiality and privacy of the very personal matters typically discussed when meeting with a clinician.

Finally, notwithstanding his strong support for the introduction of the telemental health modality, as he has previously reported, the Special Master is deeply concerned that without reasonable guardrails, the cumulative impact of the telepsychiatry and telemental health policies could leave California's prisons with only a nominal onsite clinical presence, altering the balance between the twin imperatives of custody and treatment.  The history of this case has shown the detrimental impact on the clinical and correctional environment such an imbalance creates. Indeed, the Court noted examples of the then-existing imbalance between custody and mental health in its 1995 decision, including its findings that "mentally ill inmates who act out are typically treated with punitive measures with regard to their mental status," *Coleman v. Wilson*, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995), and that the evidence before the court "demonstrate[d] that at certain institutions, custody staff plays an inappropriate role in decisions concerning involuntary medications."  *Id.* at 1313.

As required by the Court's December 15, 2023 Order, ECF No. 8087,[3] the Special Master offers his proposed policy[4] in support of the use of telemental health to significantly augment onsite mental health care based on his assessment that the minimal restrictions on its use he recommends will promote its success.

---

[3] *See also* March 12, 2024 Order, ECF No. 8151 (granting Special Master's request for a one-week extension to file his report and recommended Telemental Health Policy).

[4] Clean and redline versions of the Special Master's proposed Telemental Health Policy are attached as Appendices A and B, respectfully.

II.    **Background and Relevant History**

   A. **Background: Mental Health Staffing and Telepsychiatry**

   Staffing vacancies among mental health professionals have been a longstanding

impediment to members of the plaintiff class accessing adequate mental health care while

incarcerated in California state prisons.  *See, e.g.*, *Coleman v. Wilson*, 912 F. Supp. 1282, 1307

(E.D. Cal. 1995) ("The overwhelming weight of the evidence before this court demonstrates that

the California Department of Corrections is significantly and chronically understaffed in the area

of mental health care."); *see also* Special Master's Report on the Status of Mental Health

Staffing and the Implementation of Defendants' Staffing Plan, ECF No. 5564 at 28 (noting

defendants' historic efforts to improve mental health staffing proved to be neither "sufficient" nor

"long-lasting").  Indeed, as the United States Supreme Court recognized, the trial record

indicated that vacancies among mental health staff actually "understate[d] the severity of this

crisis because the state has not budgeted sufficient staff to meet demand."  *Brown v. Plata*, 563

U.S. 493, 518 (2011).  Over the course of the mastership, the Special Master has filed more than

two dozen substantive reports[5] on mental health staffing and defendants' efforts to address the

---

[5] *See, e.g.*, Report of the Special Master on Staffing and Use of Force (filed 9/21/98, ECF No. 974); Special Master's Recommendations for Staffing Ratios (filed 11/20/1998, ECF No. 994); Special Master's Report on Staffing Vacancies (filed 5/19/1999, ECF No. 1032); Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation (filed 5/19/1999, ECF No. 1033); The Special Master's Recommendations on Parties' Requests Regarding Staffing Vacancies, a Retention Plan, the Use of Contract Psychiatrists and the Documentation of Transfers (filed 12/23/1999, ECF No. 1102); Special Master's Recommendations on Defendants' Request for Extension of Time to Staff Administrative Segregation and Expedite Transfers (filed 2/8/2000, ECF No. 1131); Special Master's Recommendation on the Development of a Retention Plan for Psychiatrists (filed 4/24/2000, ECF No. 1149); Special Master's Recommendations on Defendants' Second Request to Comply with Court Orders (filed 5/24/2000, ECF No. 1167); Special Master's Recommendations on Defendants' Request for an Extension to Comply with Order on Psychiatrist and Psychiatric Social Worker Vacancies (filed 7/20/2000, ECF No. 1184); Special Master's Report on Defendants' Plan to Restore Recruitment and Retention Bonuses for Remote CDC Institutions (filed 9/25/2000, ECF No. 1205); Special Master's Report on Defendants' Compliance with

problem of mental health staffing vacancies, the most recent of which was his December 15, 2022 Report and Recommendation on a Final Proposed Telepsychiatry Policy.  ECF No. 7682.

After assessing CDCR's mental health staffing vacancies and staff-to-patient ratios early in the case, *see* ECF No. 5564 at 2, the Special Master filed a 2002 report recommending that defendants "be directed to maintain the vacancy rate among psychiatrists and case managers at a maximum rate of ten percent, including contracted services."  ECF No. 1351 at 11.  In its June 12, 2002 Order, the Court adopted the Special Master's ten percent vacancy rate recommendation.  ECF No. 1383 at 4.

---

Staffing Enhancements for Administrative Segregation  (filed 9/25/2000, ECF No. 1206); Special Master's Report and Recommendations on Psychiatrist and Psychiatric Social Worker Vacancies (filed 12/20/2000, ECF No. 1227); Special Master's First Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies (filed 9/26/2001, ECF No. 1304); Special Master's Report on the Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders (filed 2/22/2002, ECF No. 1350); Special Master's Second Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies (filed 2/26/2002, ECF No. 1351); Special Master's Third Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies (filed 7/10/2002, ECF No. 1392); Special Master's Report on Defendants' Schedule of Differential Pay for Mental Health Clinicians in Specific California Department of Corrections Institutions (filed 5/6/2005, ECF No. 1661); Special Master's Report on the Impact of Defendants' Increases in Differential Pay for Mental Health Clinicians in California State Prison, Corcoran (filed 2/15/2006, ECF No. 1762); Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide (filed 6/21/2006, ECF No. 1851); Special Master's Supplemental Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide (filed 7/28/2006, ECF No. 1921); Special Master's Report on Plaintiffs' Response to the Sixteenth Report on Compliance Seeking Salary Enhancements for Department of Mental Health Clinicians (filed 1/30/2007, ECF No. 2121); Special Master's Response to Court's May 17, 2007 Request for Information (filed 5/31/2007, ECF No. 2253); Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (filed, 2/6/2017, ECF No. 5564); Special Master's Report on the Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide (filed 8/2/2018, ECF No. 5872); Special Master's Report on His Expert's Analysis of Psychiatrist Employment Conditions and Compensation at CDCR and DSH (filed 5/29/2020, ECF No. 6695); Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy (filed 12/15/2023, ECF No. 7682).

.

In response to the Court's June 17, 2009 Order to "resolve all outstanding staffing allocation issues" and "complete a staffing plan," ECF No. 3613 at 2-3, defendants filed CDCR's Staffing Allocation Plan [hereinafter 2009 Staffing Plan], which was developed under the guidance of the Special Master, on September 30, 2009.  ECF No. 3693.[6]  The 2009 Staffing Plan set forth staffing ratios for CDCR's mental health programs and provided justification for those ratios.  *See generally id.* at 7-34.

Despite the development of the 2009 Staffing Plan and defendants' attendant efforts to improve mental health staffing in CDCR's prisons,[7] by 2013, the Court again found "[c]hronic understaffing" among mental health staff to be "a central part of the ongoing constitutional violation in this action."  ECF No. 4539 at 62.  Thereafter, the Court ordered defendants to revise the 2009 Staffing Plan "in order to resolve the ongoing problem of mental health staffing shortages and come into compliance with the requirements of this court's June 13, 2002 order (ECF No. 1383) concerning maximum mental health staff vacancy."  June 18, 2014 Order, ECF No. 5171 at 4.

---

[6] The Special Master endorsed the 2009 Staffing Plan on March 4, 2010.  *See* ECF No. 5564 at 31-36.

[7] As the Court noted in its April 5, 2013 Order denying defendants' motion to terminate:

> Prior to development of defendants' 2009 Staffing Plan, expert testimony showed that the state had underestimated its mental health staffing needs.  See Brown v. Plata, 131 S.Ct. at 1932 n.5.  After submitting the 2009 Staffing Plan to this court, defendants, at the end of 2009, submitted a budget change proposal to the California legislature to "fully implement"' the staffing model described in the 2009 Staffing Plan.  The budget change proposal described the critical flaws in defendants' prior staffing model, and represented that the 2009 Staffing Plan "identifies appropriate staffing levels to meet constitutional standards…."

ECF No. 4539 at 55.

In response to the Court's June 18, 2014 Order, defendants filed an update to the 2009 staffing plan, wherein they proposed a "four-prong approach' to address clinical staffing vacancies, one of which was the 'continuance of a statewide tele-psychiatry program.'" *See* Special Master's 2022 Telepsychiatry Report, ECF No. 7682 at 10 (quoting Defendants' February 2, 2015 "Report on Review of Mental Health Staffing," ECF No. 5269 [hereinafter 2015 Staffing Plan Update]).  While CDCR began utilizing telepsychiatry to some degree in the early years of the case, telepsychiatry was used sparingly until recently.  *See* ECF No. 5872 at 2 (Special Master's 2018 Report on the Proposed Telepsychiatry Program Guide Addendum, noting that as of February 2, 2015, CDCR's statewide telepsychiatry program employed 28 psychiatrists).  On May 15, 2015, the Court issued an order directing defendants to move forward with the proposals contained in their 2015 Staffing Plan Update, but highlighted concerns with defendants' "broadening their reliance on telepsychiatry" in the absence of a policy governing its use and while "assessment of [telepsychiatry's] adequacy [was] ongoing."  ECF No. 5307 at 5.

Following all-parties discussions on the status of defendants' staffing plan, defendants developed additional updates to their staffing plan in January 2017, which again included expanding CDCR's use of telepsychiatry.  ECF No. 5564 at 8.  The Special Master issued a comprehensive report on defendants' January 2017 updates to CDCR's staffing plan on February 6, 2017.  *Id*.  At that time, while defendants indicated their "preference…to use on-site psychiatrists whenever possible," their plan allowed for the use of "telepsychiatry at all levels of care with no limitations or parameters."  *Id.* at 15.  In his February 6, 2017 Report, the Special Master recommended "the continued expansion of the telepsychiatry program," *id.* at 17, reporting that his "experts have determined that telepsychiatry is a viable method for the delivery of mental health services."  *Id.* at 15.  However, the Special Master's endorsement of CDCR's

expanded use of telepsychiatry came with recommendations aimed at highlighting the continued

need for on-site mental health providers and establishing parameters under which telepsychiatry

could be used for patients with higher acuity mental illness, as follows:

> Telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and should only be utilized when institutions are unable to recruit psychiatrists to work on-site.  In no circumstances should this method of delivering mental health treatment relieve CDCR of their obligation to continue their efforts of recruiting full-time psychiatrists to work on-site at the facilities. The convenience of telepsychiatry should also not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices. It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry, a concern shared by plaintiffs' counsel.  An example of such a problem would be to allow the use of telepsychiatry at the California Institution for Women and the California Institution for Men by psychiatrists working out of the Rancho Cucamonga offices.   The proximity of those two facilities to the Rancho Cucamonga offices voids any reason for not providing on-site psychiatrists and would undermine the very purpose of the telepsychiatry program.  Similar arguments can be made regarding the use of telepsychiatry at Mule Creek State Prison and the California Health Care Facility given their proximity to Elk Grove, a point plaintiffs raised in their objections to defendants' January 10, 2017 updated staffing plan.

> Telepsychiatry is not clinically desirable as a frontline approach to providing psychiatric services for inmates with the most intensive or emergent needs.  The higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment. For 3CMS level of care inmates, it is an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per year at the designated institutions and more frequently if feasible. Although the efficacy of telepsychiatry for EOP inmates is not clear or recommended as a permanent solution at this time, it would be recommended that a psychiatrist be on-site at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide. The Special Master's experts observed EOP inmates receiving treatment using telepsychiatry and it appeared to function properly, but additional data would need to be examined before further expansion for EOP inmates could be endorsed. The use of telepsychiatry for inmates at the EOP level of care will be monitored by the Special Master during his regular monitoring visits, or more frequently if necessary.

> For inmates at the MHCB level of care, telepsychiatry is not an appropriate method of treatment to be used on a regular basis.  Telepsychiatry for these higher acuity inmates should only be used as a last resort or in emergency situations when an on-site psychiatrist is not available.  On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing and other mental health staff.  This is just not possible with telepsychiatrists. In addition,

> on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates which often has an important impact on diagnoses and treatment planning. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

ECF No. 5564 at 15-17.

Following the Special Master's 2017 Staffing Report, on October 10, 2017, the Court issued an order adopting the Special Master's findings and recommendations (with modification). ECF No. 5711 at 29. In the same Order, the Court set a one-year deadline for "defendants…to come into compliance with the required [2009 Staffing Plan] staffing ratios and the court's June 13, 2002 order [establishing maximum vacancy rates of ten percent for mental health staff]." *Id.* at 11, 30. Finally, regarding telepsychiatry, the Court directed defendants to develop, under the guidance of the Special Master, "an addendum to the Revised Program Guide to govern the use of telepsychiatry and the extent to which telepsychiatrists may provide mental health services in place of on-site psychiatrists." *Id.* at 30. With the clarifications contained in the October 10, 2017 Order, *see id.* at 23, the Court directed that the Special Master's recommendations regarding the use of telepsychiatry "shall form the basis" of the Program Guide addendum governing telepsychiatry. *Id.*

Over the next several years, the parties negotiated the contours of the Telepsychiatry Policy, which the Court provisionally approved on March 27, 2020. ECF No. 6539 at 3. After an 18-month provisional approval and monitoring period, the Special Master issued a Report and Recommendation on a Final Proposed Telepsychiatry Policy on December 15, 2022. ECF No. 7682. In that Report, the Special Master concluded as follows:

> [F]or years the Court, Special Master, and parties have worked to develop and fine-tune CDCR's telepsychiatry policy, balancing the constitutional rights of *Coleman* class members to mental health care not violative of the Eighth Amendment with CDCR's need for flexibility in staffing and operating its mental health program. Through that process, CDCR developed a telepsychiatry policy that allowed

unlimited use of telepsychiatry for *Coleman* class [members] receiving outpatient treatment at the 3CMS level of care, who comprise a majority of the *Coleman* class. In addition, the Provisionally Approved Telepsychiatry Policy permits CDCR to utilize telepsychiatry in residential (EOP), crisis bed, and inpatient settings in the event of vacancies in on-site psychiatry positions as long as certain conditions are met. Moreover, during the provisional approval period, CDCR, for the first time, established compliant or nearly-compliant fill rates for psychiatry staff…

Significant work remains to remedy defendants' staffing-related deficiencies. However, as demonstrated, the Provisionally Approved Telepsychiatry Policy has facilitated a significant expansion of telepsychiatry within CDCR and enabled CDCR to substantially improve its psychiatry staffing levels. The record supports the proposition that despite some concerns around implementation, the Provisionally Approved Policy properly calibrates the use of telepsychiatry across CDCR's various levels of care.

*Id*. at 66-69. Accordingly, the Special Master recommended the provisionally approved Telepsychiatry Policy be adopted as final. *Id.* at 70. On April 12, 2023, the Court adopted the Special Master's recommendation and ordered the provisionally approved Telepsychiatry Policy to be adopted as final.[8] ECF No. 7807.

## B.  Telemental Health Policy: Procedural History

Despite some challenges with implementation, *see, e.g.*, ECF No. 7682 at 37-42, the Telepsychiatry Policy – inclusive of the parameters required by the Court's October 10, 2017 Order – has thus far proven successful in reducing vacancies among staff psychiatry positions. However, for two successive monitoring rounds, the Special Master has reported on the mental health staffing crisis among primary clinician classifications (i.e. psychologists and social workers) which have proven to be hugely disruptive to the provision of mental health care to class members. *See supra* note 1.

---

[8] On May 5, 2023, the parties filed a stipulation and proposed order modifying the Telepsychiatry Policy to permit telepsychiatrists to work from home. ECF No. 7826. The Court issued an order adopting the parties' proposed revisions to the policy on May 9, 2023. ECF No. 7830.

Faced with this primary clinician staffing crisis, defendants began the process of developing and implementing a Telemental Health program (utilizing telepsychologists and telesocial workers) in Spring 2023.  As the Special Master previously reported, defendants first "signal[ed] their intent to expand the use of tele-mental health" to include primary clinician classifications in their June 14, 2021 Report on the Lessons Learned from the COVID-19 Pandemic.  ECF No. 8095 at 46 (citing ECF No. 7196).  While the Special Master did not oppose defendants' initial efforts to utilize telemental health to address the immediate staffing crisis among primary clinicians, he expressed his concern that defendants' Telemental Health Policy lacked "many of the carefully negotiated provisions included in the court-approved telepsychiatry [policy] that were intended to safeguard against the wholesale replacement of on-site services."  *Id.* at 48.

### 1.  Telemental Health Budget Change Proposal

On May 12, 2023, CDCR submitted a budget change proposal to the California legislature to establish a telemental health program to include psychologists and social workers. Exhibit A, Cal. Dep't of Fin., 5225-320-BCP-2023-MR (May 12, 2023) (CDCR Budget Change Proposal entitled: Expansion of the Statewide Tele-Mental Health Program).  Within the Budget Change Proposal, CDCR reported that they would redirect 100 existing psychologist and social worker positions to telemental health.  *Id.* at 3. Of the 100 existing positions, 66-77 would be psychologists, and 30-41 would be social workers.  *Id.* at 4.  In addition, the Budget Change Proposal requested authorization to create 144 new positions by fiscal year 2024-2025 which would serve as the "operational, supervisory, and administrative support for the redirected positions in providing tele-mental health services."  *Id.* at 3.

Below is a chart of the positions and funding requested by year.[9]

| Year | Positions | General Fund Request (in millions) |
|------|-----------|-----------------------------------|
| 2023-2024 | 85 | 11 |
| 2024-2025 | 144 | 17.3 |
| 2025-2026 | 144 | 16.8 |

*Id.* at 1.

### 2.  Joint Statement on the Draft Telemental Health Policy

Following the enactment of the state budget, which included approval of CDCR's Telemental Health BCP, on July 21, 2023, CDCR provided a draft Telemental Health Policy to the Special Master and plaintiffs' counsel.  Exhibit B.  Upon receiving notice of the draft Telemental Health Policy, the Court, on August 3, 2023, ordered the parties to meet under the supervision of the Special Master about the draft policy and to file a joint statement with the court.  ECF No. 7901 at 2.  The parties met and conferred under the Special Master's supervision on August 29, 2023 and August 31, 2023.

On September 5, 2023, the parties filed a joint statement regarding the then "draft" Telemental Health Policy, wherein they noted their agreements and disagreements.  ECF No. 7935.  *See infra* pp. 13-15 (discussing areas of agreement and disagreement).

### 3.  Finalization of the Telemental Health Policy and Related Activity

On September 19, 2023, the defendants notified the Special Master and the plaintiffs that they had issued their Telemental Health Policy to the field that same day.  *See* Exhibit C, Email

---

[9] Among the 144 new positions included in CDCR's Telemental Health BCP were 100.0 Medical Assistants (to serve as telepresenters for the 100 clinicians being shifted from on-site to telemental health); 2.0 Chief Psychologists; 6.0 Senior Psychologist Supervisors; 3.0 Supervising Social Worker I positions; and 1.0 Supervising Social Worker II position.  *See* Exhibit A at 5-6.

from M. Bentz to Plaintiffs and Special Master. Two days later, on September 21, 2023, the defendants provided a different version of the Telemental Health Policy noting that "a non-final version" had been sent to the field and they had provided the field with the correct version that day. *See* Exhibit D, Email from M. Bentz to Plaintiffs and Special Master; *see also* 30th Round Monitoring Round Report – Part C, ECF No. 8095 at 47 n.38.

After defendants issued the Telemental Health Policy, the court discussed the policy during the staffing enforcement hearing on September 29, 2023, reiterating that "it had not closed the door on defendants' expanded use of telepsychiatry specifically or telemental health more broadly." ECF No. 8087 at 1 (Internal quotes omitted).[10]

On December 15, 2023, the court ordered the parties to "meet and confer under the supervision of the Special Master to clarify whether, and if so what, outstanding disputes remain over defendants' Telemental Health Services Policy." *Id*. Further, the court stated "disputes, if any, about defendants' draft Policy must be resolved sooner rather than later." *Id*. at 1-2.

### 4. February 28, 2024 Meet and Confer

The Special Master and plaintiffs each wrote letters in anticipation of the meet and confer process required by the Court's December 15, 2023 Order. In their February 7, 2024 letter, plaintiffs inquired as to the steps defendants had taken to "ensure that the general principles the parties recited agreement about in the Joint Statement were accomplished during Defendants' implementation of the new policy." Exhibit E at 2. As noted in the parties' Joint Statement, the parties' agreements regarding the Telemental Health Policy included:

- Allowing social workers and psychologists who serve as case managers to work remotely has the potential to be an important recruiting tool that helps defendants to address the current staffing vacancies among psychologists and social workers in the CDCR.

---

[10] During the enforcement proceedings, CDCR staff testified that it would take "a couple years" to implement the telemental health program to its "full potential." ECF No. 8013-1 at 224:13-14.

- In person mental health services under the policy shall remain the preferred method of care in Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs.

- The goal is to maintain onsite mental healthcare professionals to provide care to *Coleman* patients.

- Defendants should continue to recruit and hire staff for onsite positions.

- Onsite providers should receive incentives for onsite work that are not available to telemental health staff.

- Clinicians providing telemental health services should be assigned to particular institutions and visit their assigned institutions at least annually.

- Telemental health workers should be permitted to work from home or from hubs.

- Telemental health service providers shall be licensed in California or working towards a California license and shall be license-eligible, and shall work from within the State of California.

- In individual therapy sessions, patients should have the option of requesting to meet one-on-one with the telemental health clinician, without the presence of a third-party telepresenter. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health 'provider's discretion.

- The telemental health policy should include a process for ensuring continuity of care in the event a patient refuses to be seen by the telehealth clinician.  The parties agree that the procedure on page 3 of Exhibit B addresses this need.

ECF No. 7935 at 3.

As noted in their Joint Statement, the parties' areas of disagreement included:

- Whether restrictions should apply to the provision of telemental health services to CCCMS and EOP patients, including in the form of limits on the percentage of primary clinician positions that should be filled through telemental health, requirements to have a certain number of on-site primary clinicians per program, and the requirement to provide notice and a plan if the required conditions are not met.

14

- Whether there should be restrictions on the use of telemental health for certain clinical tasks, including suicide risk evaluations, provision of care in segregation units (restricted housing units), and evaluations under the Prison Rape Elimination Act (PREA).

- The process for obtaining informed consent for telemental health services.

- The use of telemental health for mental-health-crisis beds and psychiatric-inpatient programs when on-site care is not available.

- Whether telemental health services provided cell front to a patient that refused to attend an appointment should count as a Program Guide required clinical contact.

- The frequency and duration of telemental health visits to assigned institutions.

*Id.* at 4.

In his February 27, 2024 letter, the Special Master outlined his five areas of concern and 12 recommendations "to promot[e] the successful implementation of telemental health while creating limited guardrails for its use." Exhibit F at 1, Letter from K. Walsh to M. Bentz and T. Nolan. The five areas of concern were:

1. Comparison of Telemental Health with Community Standard: Confidentiality and Informed Consent;

2. Reasonable Limits for Classifications Acting as Telepresenters;

3. Minimum Number of Clinicians On-site, Titrated by Level of Care;

4. Patient Teams Comprised Entirely of Remote Clinicians;

5. Frequency and Duration of On-site Visits by Telemental Health Clinicians.

*Id*. at 3-10.

The 12 recommendations were:

Recommendation 1: Modification to the telemental health policy to clarify that incarcerated persons can choose an on-site provider and that the informed consent portion of the policy include a discussion of the risks and benefits of this modality of treatment.

15

Recommendation 2: That the telemental health policy place limitations on backup telepresenters as it is not clear from the policy that they must be clinically trained.

Recommendation 3: That nurse practitioners, social workers, psychologists or physicians acting as telepresenters are required to engage in clinical encounters in order for the clinical contact to be considered a joint appointment.

Recommendation 4: Similar to the telepsychiatry policy in the context of an EOP unit, we recommend that telemental health should only be used as a supplement, and not a replacement, for on-site primary clinicians working within the EOP units and telemental health only be used in emergency situations in MHCBs and PIPs.

Recommendation 5: That said, we also recommend that telemental health is a supplement not a replacement to on-site clinicians in 3CMS programs.

Recommendation 6: Assuming plaintiffs' proposals regarding the number and/or percentage of clinicians on-site applies to mainline patients, we find both proposals acceptable, but recommend that there must be a way to ensure a minimum on-site presence of mental health clinicians.  In the alternative, we encourage the use of a hybrid model that allows a primary clinician to provide services both on-site and via telemental health in contrast to solely telemental health.

Recommendation 7: We agree with the plaintiffs' proposed revision regarding good faith efforts to hire.  However, we caution the parties regarding the nature of the plans to address staffing as the plans that have been received thus far have lacked detail and are generally more akin to an update on the staffing situation.

Recommendation 8: We recommend the telemental health policy be modified to ensure that patients have at least the assigned primary clinician or psychiatrist on-site.

Recommendation 9: That telemental health clinicians visit the institution for at least one full week within 30 days of assignment.  Thereafter, they should visit at least twice a year for 3CMS programs and three times per year for EOP programs for at least three consecutive days each visit.

Recommendation 10: That telemental health is not utilized in restricted housing units and not be used to conduct clinician-led groups and should only be utilized to conduct screenings in emergency circumstances in reception centers.

Recommendation 11: That CDCR ensure continuity of care for patients who refuse services through telemental health. These patients should not be seen regularly by varied covering clinicians.

Recommendation 12: That there are on-site clinicians for required on-site contacts such as crisis assessments/CITs, 5-day follow ups, SRASHEs, RVR MHAs, initial assessments, PREA evaluations, gender affirmation assessments and refusals.

*Id.* at 11-12.

On February 28, 2024, under the supervision of the Special Master, the parties conducted their sole meet and confer regarding the Telemental Health Policy pursuant to the Court's December 15, 2023 Order. During the February 28, 2024 meet and confer, the parties discussed the areas of agreement and disagreement outlined in the parties' September 5, 2023 Joint Statement. Regarding the status of telemental health hiring, defendants proffered that they would begin reporting their staffing for telepsychologist and telesocial worker in a similar manner as telepsychiatry and this information would be in the next monthly staffing vacancy report filed with the Court.[11] In addition, defendants indicated that they had not observed a significant migration of staff from onsite positions to offsite. Further, newly hired staff were reportedly visiting prisons within 30 days of hire.

For each of the areas of disagreement, plaintiffs presented specific proposals and defendants responded. Thereafter members of the Special Master team provided guidance or asked further questions. The meeting concluded with defendants indicating they did not agree to any of plaintiffs more specific proposals or the Special Master's recommendations. After one meet and confer, it was apparent the parties had bargained to an impasse.

5. <u>Post-Meet and Confer Correspondence</u>

Following, the February 28, 2024 meet and confer, defense counsel sent correspondence to the Special Master and plaintiff indicating the "recommendations made by Plaintiffs' counsel

---

[11] On February 29, 2024, the CDCR filed their monthly mental health staffing vacancy report. ECF No. 8142. This report included allocated and filled telepsychology and telesocial work positions. *Id.* at Exhibit A and B.

and the Special Master's team were covered by existing policy, were not grounded in evidence or clinical studies, or would substantially interfere with the delivery of care." *See* Exhibit G, Email From M. Bentz to the Special Master and the Plaintiffs. Defendants believed the following were addressed in CDCR's existing policy:

> 1. The ability to request that a telepresenter leave for individual therapy;
>
> 2. The requirement to have a live person (a telepresenter in addition to the telemental health provider) go cell-front to be able to tell if an individual is decompensating or not bathing;
>
> 3. The content of on-site visits; and
>
> 4. Restrictions on the use of telesocial work and telepsychology in the MHCBs and PIPs.

*Id.* In addition, defendants asserted the February 7, 2020 Clinical Contacts and Documentation memorandum addresses concerns regarding clinically significant contacts for joint appointments when a licensed nurse, clinician, and or physician acts as a telepresenter.[12] *See id.* and ECF No. 7333-1 at 636-639.

Regarding "restrictions on the use of telesocial work and telepsychology," defendants noted that they had "requested, but not received, a reference to national standards or peer-reviewed studies or articles that support those restrictions." Exhibit G. CDCR argued it should not be restricted from utilizing telemental health absent "evidence of harm or clinical studies demonstrating that the modality is inappropriate in certain circumstances or interferes with the delivery of care." *Id.*

Although not discussed at the meet and confer, defendants asserted that "minimum standards for the protection of confidentiality and adequate technology and supervision for

---

[12] On January 2, 2024, CDCR reported that the revised draft clinical contacts memorandum was completing internal review. Exhibit H, Email from M. Bentz to L. Ells and M. Shin-Krantz. To date, this revision has not been provided to the Special Master.

telepsychologists and telesocial workers," were already addressed in the Telemental Health Policy and conformed to plaintiffs' agreements regarding telepsychiatry. *Id.*

On March 1, 2024, the plaintiffs responded to the Defendants' February 29, 2024 correspondence. *See* Exhibit I. Plaintiffs made three arguments. Plaintiffs argued that existing policy did not address their concerns and that shifting a prison's entire mental health system from onsite to entirely remote was not grounded in evidence or clinical studies. Further, plaintiffs argued that requesting at least one member of the treatment team see a patient on site does not substantially interfere with the delivery of care, it was simply asking defendants to "not make a radical change in care." *Id.*

### III.    Special Master's Analysis

As discussed, prior to the meet and confer, the Special Master outlined his concerns with CDCR's Telemental Health Policy and offered 12 recommendations to address those concerns. After considering the parties' positions, the Special Master maintains seven, withdraws one, and modifies four of his original 12 recommendations intended to promote the successful implementation of telemental health with limited restrictions on its utilization to ensure a minimal presence of on-site psychologists and social workers. The Special Master's revised recommendations were informed by his experts' review of numerous resources including literature and professional standards[13]. These professional standards reflect a patient-centered

---

[13] These professional standards include but are not limited to the American Psychiatry Association Telepsychiatry Toolkit and Position Statement (Position Statement on Telemedicine in Psychiatry), professional ethical standards, and the American Psychological Association Guidelines for the Practice of Telepsychology to inform the concerns and recommendations. *See* Exhibit I, February 27, 2024 Letter from K. Walsh to M. Bentz and T. Nolan at Attachment E, American Psychiatry Association Position Statement and Attachment F, American Psychological Association Guidelines for the Practice of Telepsychology; *See* also American Psychiatry Association Telepsychiatry Toolkit, available at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English; American Psychiatry Association, Principles of Medical Ethics With Annotations Especially Applicable to

approach to providing telemental health services in an ethical and professional manner.  In applying the results of this review to the correctional environment, the Special Master and his experts also relied on the information obtained from over 28 years of monitoring the provision of mental health services within CDCR, the Special Master's and his experts' collective experience monitoring prison systems across the country, pleadings filed by the parties, correspondence from the parties, and information obtained during meet and confers.

Below the Special Master discusses his expert's literature review regarding the usage of telemental health, outlines the status of his concerns with CDCR's existing policy, and provides an overview of his proposed revisions to the Telemental Health Policy.  ECF No. 8087 at 2 (requiring the Special Master to "include with his report…a proposed Telemental Health Services Policy for the court's approval.").

### A.  Literature Review on the Utilization Telemental Health in Corrections

In his December 15, 2022 Report and Recommendation on a Final Telepsychiatry Policy, the Special Master noted that the scholarly articles defendants cited in support of their proposed expansion of telepsychiatry were "unpersuasive" as they "did not provide enough data to support a recommendation to adopt" defendants' preferred Telepsychiatry Policy.  ECF No. 7682 at 43. With respect to telemental health, it is the Special Master's understanding that defendants rely primarily on the same set of published articles and studies that they presented in support of their proposed (though not court-approved) expansion of telepsychiatry in 2022.  The Special Master's

---

Psychiatry, available at https://www.psychiatry.org/psychiatrists/practice/ethics#section_1; American Psychology Association Ethical Principals of Psychologists, available at https://www.apa.org/ethics/code#:~:text=Psychologists%20strive%20to%20benefit%20those,of %20animal%20subjects%20of%20research.; National Association of Social Workers Code of Ethics, available at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English.

experts have previously reviewed and provided analysis of these 56 articles, which he will not repeat here. *See id.* at 42-46.

To the extent defendants rely on standards related to telepsychiatry to support their telemental health program, the American Psychiatric Association's February 2023 *Resource Document on Telepsychiatry for Adults in Jails and Prisons* is instructive:

> Jails and prisons provide different levels of mental health care depending on, among other things, the type of facility, acuity of patient needs, local/state/federal regulations, and staffing. Care provided to individuals in general population housing is similar, albeit with logistical differences, to the type of care one might receive in an outpatient community clinic. In general population settings, telepsychiatry may be clinically sufficient and comparable to the provision of in-person services.

> For higher levels of mental health care in correctional settings (e.g., residential treatment units, inpatient psychiatry units, crisis units), about which more research is needed and where the most psychiatrically vulnerable patients reside, several factors may be considered when weighing the use of telepsychiatric services and/or in-person services. Such factors include opportunities to interact on a regular and timely basis with correctional officers and other mental health staff; awareness about current milieu issues and risks to patient safety; and control of the therapeutic environment. It is the opinion of the authors that telepsychiatry in higher levels of care be used as a last resort or in very specific situations, for example when in-person recruitment is not successful.

> When telepsychiatric services are utilized in these settings, additional considerations include:

> > 1. The telepsychiatrist periodically coming on-site (depending on the size of the facility and scope of patient coverage) to both provide on-site services and interact with pertinent custody and mental health staff. The frequency of such periodic visits depends on the level of care (LOC). For example, a site may have a telepsychiatrist come in-person annually, at a minimum, for outpatient level of care and quarterly to semiannually for provision of psychiatric care at more intensive levels. More frequent visitation may be necessary if the telepsychiatrist is working in more acute contexts.

> > 2. Recruitment efforts (which should include access to competitive salaries) should be ongoing, including contractual incentives for in-person psychiatry, especially for higher acuity settings....

21

American Psychiatric Association Resource Document on Telepsychiatry for Adults in Jail and Prisons at 4 (available at https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf)

The Special Master's experts conducted a literature review regarding telemental health with a particular focus on its use in correctional settings.[14]  The use of telemental health in the community expanded rapidly during the COVID-19 epidemic.  However, there is little research on the use of telemental health in correctional settings, and experiences from the community are not generally transferable to carceral settings.  ECF No. 7682 at 7-8.  For instance, unlike incarcerated persons, consumers in the community are generally free to change providers if they are not satisfied.

Research into the benefits of telemental health and comparison of telemental health services to in-person service delivery (traditional mental health treatment) has increased in recent years, though it is characterized by the lack of replication of results and minimal research regarding telemental health in correctional settings and/or how it compares to the community.  For example, the research on telemental health has overwhelmingly used community samples, including college students, which are not comparable to incarcerated populations.  In sum, the literature does not provide any definitive answer concerning the efficacy and impact of the widespread use of telemental health to provide treatment to tens of thousands of seriously mentally ill incarcerated persons in a large prison system like CDCR.

While defendants appear to be correct that the literature does not demonstrate specific harm arising from the widespread use of telemental health in a large prison system, nor, as plaintiffs point out, does it demonstrate that its largely unfettered use is safe and effective.  That

---

[14] *See* Appendix C for the list of articles that the Special Master's experts reviewed.

is because studies answering this specific question have yet to be conducted.  Consequently, the Special Master, while supporting its expansion, recommends that CDCR introduce telemental health with the guardrails suggested by his experts based on their experience in monitoring the CDCR MHSDS, their national experience in the field , their review of the relevant literature, professional guidelines, and ethical professional standards and their understanding of the ill-effects on mental health treatment that can result when custody staffs' outlook concerning mental illness does not have a sufficient countervailing force of onsite clinicians.

### B.  The Role of the Psychiatrist and Primary Clinician in CDCR's MHSDS

While CDCR's experience with telepsychiatry is generally instructive, it is important to account for the distinct roles that the psychiatrist and psychologist/social workers serve within the MHSDS.  For instance, the nature of a discussion between a patient and psychiatrist regarding medication management is significantly different than that of a mental health counseling/therapy session which more typically involves discussion of highly sensitive and private matters, handled by primary clinicians.

The significant differences between the staff-to-patient ratios for psychiatrists and psychologists/social workers in CDCR's Staffing Plan demonstrates the difference in responsibilities between these job classifications.  The chart below shows the higher staffing ratio for psychiatrists compared to primary clinicians for 3CMS and EOP patients, which reflects the increased per-patient workload associated with serving as a primary clinician:

|  | Staff Psychiatrists | Primary Clinician |
|---|---|---|
| 3CMS (mainline) | 1:280<br>1:675, not on medication for more than six months | 1:97 |
| EOP (mainline) | 1:120 | 1:26 |

ECF Nos. 3693 at 12,17 and 6978-1 at 3.

In addition, the frequency of clinical contacts required by the Program Guide also evince the distinction between the role of psychiatry and primary clinicians in the treatment team.

Finally, the job descriptions for these respective positions provide further evidence as to each treatment team members' role.  *See* Exhibit J at 3, Clinical Social Worker (Health/Correctional Facility) – Safety Position Description; and Exhibit K at 3, Psychologist – Clinical, Correctional Facility Position Description.

### C.  Special Master's Analysis of Plaintiffs' Proposals to Address Remaining Areas of Disagreement

As the Special Master noted in his February 27, 2024 letter to the parties, he generally shared the concerns expressed by plaintiffs regarding CDCR's Telemental Health Policy.  Both plaintiffs, in their February 7, 2024 letter, and the Special Master recommended revisions to the policy which would address these concerns.  The Special Master's recommendations "generally track[ed] the court-approved telepsychiatry policy" and were "consistent with professional guidelines on the use of telemental health."  As previously reported, defendants rejected each of these proposed policy modifications.  Accordingly, the Special Master discusses the remaining areas of disagreement regarding the Telemental Health Policy below.

#### 1.  Confidentiality and Informed Consent

After meeting with the parties and carefully considering their positions, the Special Master remains concerned about the informed consent process outlined in CDCR's Telemental Health Policy.  For the reasons described below, the Special Master maintains his recommendation that the Telemental Health Policy be modified to clarify that incarcerated persons have the option to choose an on-site provider rather than a telemental health provider and that the informed consent portion of the policy include a discussion of the risks and benefits

of this modality of treatment (Recommendation 1 from the Special Master's February 27, 2024 letter, *see* Exhibit F at 11).

Telemental health provided pursuant to CDCR's policy differs from telemental health delivered in the community for two primary reasons. First, in the community, telemental health does not involve the presence of a third party during the counseling/therapy session (i.e., a telepresenter) which compromises confidentiality and privacy. Second, generally speaking, the use of telemental health in the community is voluntary and provides the right to access covered services through an in-person, face-to-face visit. This paradigm was brought to CDCR's attention prior to the meet and confer. *See id.* at 4-5.

As written, the informed consent process in the Telemental Health Policy is inadequate and requires modification. Several governing bodies have addressed informed consent and privacy by providing model language and/or necessary components for informed consent. First, the California Department of Health Care Servies (CDHCS), which provides health care for over 15.4 million Medi-Cal beneficiaries and is the largest healthcare purchaser in California, provides a model template for the informed consent process (available at https://www.dhcs.ca.gov/Pages/AboutUs.aspx). CDHCS released model telehealth patient consent language which, importantly, includes the "right to in-person services," "voluntary nature of consent," "availability of transportation to access in-person services when other available resources have been reasonably exhausted," and a description to the patient of the "limitations/risks of receiving services via telehealth, if applicable." *See* California Department of Health Care Services, Patient Consent for Telehealth Services, https://www.dhcs.ca.gov/provgovpart/Pages/Patient-Consent.aspx.

Further, informed consent and privacy and confidentiality for psychologists and social

workers are governed by ethical standards germane to each profession.  *See supra* note 13.  For

social workers, the National Association for Social Workers (NASW) is clear that informed

consent includes the ability to withdraw consent and the need to obtain consent at various stages

of interaction with the patient.  The NASW's Code of Conduct states:

> a) Social workers should provide services to clients only in the context of a
> professional relationship based, when appropriate, on valid informed consent.
> Social workers should use clear and understandable language to inform clients of
> the purpose of the services, risks related to the services, limits to services because
> of the requirements of a third-party payer, relevant costs, reasonable alternatives,
> **clients' right to refuse or withdraw consent,** and the time frame covered by the
> consent. Social workers should provide clients with an opportunity to ask
> questions.
> ….
> (f) **Social workers who use technology to provide social work services should
> obtain informed consent** from the individuals using these services **during the
> initial screening or interview and prior to initiating services.**  Social workers
> should assess clients' capacity to provide informed consent and, when using
> technology to communicate, verify the identity and location of clients.
>
> (g) Social workers who use technology to provide social work services should
> assess the clients' suitability and capacity for electronic and remote services.
> Social workers should consider the clients' intellectual, emotional, and physical
> ability to use technology to receive services and ability to understand the potential
> benefits, risks, and limitations of such services.  **If clients do not wish to use
> services provided through technology, social workers should help them
> identify alternate methods of service.**

NASW Code of Conduct at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-

of-Ethics-English/Social-Workers-Ethical-Responsibilities-to-Clients.  (Emphasis added.)

The Special Master agrees with his expert that the defendants' Telemental Health Policy

must be modified to ensure appropriate informed consent is obtained.  In the Special Master's

proposed policy, he proposes modifying the Telemental Health Policy to include an informed

consent process consisting of verbal and written consent.  Further, the informed consent process

would include an explanation of the risks and benefits of telemental health and a discussion of

confidentiality, privacy, and the option of receiving mental health services via an on-site clinician.

Regarding telepresenters, the Special Master's proposed policy states patients will be informed at every session that they can choose not to have a telepresenter in the room during any counseling/therapy session which will be documented in a progress note.  The Special Master's proposal regarding telepresenters is a modification of CDCR's existing policy, which only permits a telepresenter to be absent *at the telemental health provider's discretion*.

Lastly, the Special Master's proposed policy states the patient will be informed that they can choose to receive mental health services from an on-site clinician in contrast to a telemental health clinician unless staffing issues preclude such an option.  The patient will be informed if the choice of an onsite provider will cause a delay in treatment.

### 2.  Reasonable Limits for Classifications Acting as Telepresenters

Related to confidentiality and the use of telepresenters, there does not appear to be disagreement about the need to train backup telepresenters or that nurse practitioners, social workers, psychologists, or physicians acting as telepresenters will engage in a clinically significant encounter such that the appointment is considered a joint appointment.  During the meet and confer, there was, however, disagreement regarding placing language in the policy to clarify this.  After considering the parties' positions, the Special Master has made modifications to the policy to clarify that backup presenters must be appropriately trained and to ensure that joint appointments meet the requirements of the February 7, 2020 Clinical Contacts and Documentation memorandum.[15]

---

[15] These modifications are consistent with Recommendations 2 and 3 contained in the Special Master's February 27, 2024 letter.  Exhibit F at 6-9.

3.   <u>Minimum Number of Clinicians On-site, Titrated by Level of Care</u>

As noted, the parties disagreed as to "[w]hether restrictions should apply to the provision of telemental health services to CCCMS and EOP patients, including in the form of limits on the percentage of primary clinician positions that should be filled through telemental health, requirements to have a certain number of on-site primary clinicians per program, and the requirement to provide notice and a plan if the required conditions are not met."  ECF No. 7935 at 4.[16]  After meeting with the parties and as discussed further below, the Special Master proposes to modify the policy to require *some* onsite provider presence for the 3CMS and EOP levels of care and facilitate a hybrid work model, which would permit primary clinicians to work part time on site and part time remotely.  Regarding MHCBs and PIPs, the Special Master's proposed policy provides that telemental health is to be utilized as a last resort in MHCBs and PIPs, consistent with the Telepsychiatry Policy.

As the Special Master observed in his 30th Round Monitoring Report:

> The history of this case and the Special Master's and his experts' collective experience working in and monitoring correctional mental health departments demonstrate the positive impact on-site mental health clinicians have on their patients' environment of care.  Without the advocacy of mental health clinicians – on-site, fully immersed in the carceral environment their patients reside in, and empathic to the impact of that environment – the daily lives of many *Coleman* class members may likely be very different than it is today.

ECF No. 8095 at 49.

Indeed, "the inevitable tensions created by the distinct needs of custody supervision and the distinct need for mental health care" among the plaintiff class has been a long running

---

[16] As the Special Master previously reported, "compared to the court-approved telepsychiatry policy, the final Tele-Mental Health Policy has no requirement for on-site PCs in EOPs, includes permissive language regarding the use of tele-mental health at higher levels of care (including MHCBs and PIPs), calls for less frequent site visits by tele-PCs, and contains no requirement for CDCR to continue recruiting on-site PCs."  ECF No. 8095 at 48.

challenge in this case.  ECF No. 5131 at n. 5; *see also Coleman v. Wilson*, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995) (finding "mentally ill inmates who act out are typically treated with punitive measures without regard to their mental status...[and] that such treatment was the result of inadequate training of the custodial staff so that they are frequently unable to differentiate between inmates whose conduct is the result of mental illness and inmates whose conduct is unaffected by disease").  Balancing these "distinct needs" requires ongoing collaboration between mental health staff and their partners in custody, for instance, through the Court-ordered Custody and Mental Health Partnership Plan (CMHPP).  ECF Nos. 5916 and 6278.  The Special Master continues to be concerned that the telemental health providers' relative disconnection from their patients' uniquely challenging environment of care will impede the clinicians' ability to positively impact the treatment milieu.  *See* ECF No. 8095 at 49 ("Whether tele-PCs (many of whom will more than likely have never stepped foot in a CDCR prison) can positively impact the milieu in the same manner as their on-site counterparts remains an open question.").

Consistent with Recommendations 4, 5, 6, and 7 contained in his February 27, 2024 letter,[17] the Special Master's proposed policy addresses these concerns by including language indicating: on site psychologists and clinical social workers shall remain the preferred method of care for EOP patients; there shall be a minimum of 20 percent of allocated provider positions for

---

[17] In light of the changes made to address informed consent and privacy, the Special Master declines to adopt the plaintiffs' proposals regarding patients having treatment teams that are entirely remote and withdraws Recommendation 8 (recommending "the telemental health policy be modified to ensure that patients have at least the assigned primary clinician or psychiatrist on-site").

If the informed consent process is adopted as we proposed, it removes the risk associated with having an Interdisciplinary Treatment Team (IDTT) comprised entirely of remote clinicians in the EOP so long as a EOP supervising psychologist attends the IDTT in person.  When applicable, the informed consent process should specifically discuss that *both* the psychiatrist and primary clinician would be remote.

3CMS and 40 percent allocated provider positions for EOP filled by onsite clinicians present at the facility.

>   4.   Frequency and Duration of On-site Visits by Telemental Health
>        Clinicians

One of the remaining areas of disagreement between the parties is related to the frequency and duration of telemental health provider visits to institutions.  During the meet and confer process, plaintiffs proposed a modification to the policy that would require telemental health clinicians' first institutional visit to last an entire week and would require telemental health providers' participation in certain meetings and activities while on-site.  Exhibit E at 5. Defendants rejected plaintiffs' proposed modifications.

After considering the parties' positions, the Special Master does not adopt the plaintiffs' modification and amends his prior recommendation regarding this aspect of the policy.[18] Specifically, the Special Master's proposed policy requires two one-day site visits per year for 3CMS telemental health providers, four one-day site visits per year for EOP telemental health providers, and requires (rather than permits) telemental health providers to see patients in person while on-site at the institution.  The frequency of site visits contained in the Special Master's proposed policy is consistent with the requirements of the court-approved Telepsychiatry Policy. ECF No. 7826-2 at 6.

>   5.   Cell Front Telemental Health

In their Joint Statement, the parties noted their disagreement about whether "telemental health services provided cell front to a patient that refused to attend an appointment should count

---

[18] In his February 27, 2024 letter, the Special Master included his Recommendation 9, as follows: "That telemental health clinicians visit the institution for at least one full week within 30 days of assignment.  Thereafter, they should visit at least twice a year for 3CMS programs and three times per year for EOP programs for at least three consecutive days each visit."  Exhibit F at 12.

as a Program Guide required clinical contact." ECF No. 7935 at 4. Plaintiffs proposed a policy modification whereby a patient refusing a telemental health contact would be assessed at cell front by an on-site clinicians. Exhibit E at 5. Defendants rejected plaintiffs proposed modification during the meet and confer.

First, the Special Master concurs with plaintiffs that a cell-front telemental health contact should not count toward Program Guide compliance. This is consistent with the court-approved Telepsychiatry Policy.

Also related to refusals, the Special Master had previously recommended CDCR take steps to ensure continuity of care for patients who refuse telemental health contacts. *See* Recommendation 11, contained in Special Master's February 27, 2024 letter. The Special Master's proposed policy includes language requiring the assigned telemental health provider to follow existing CDCR policy in response to patient refusals. If the assigned telemental health provider cannot see the patient cell front, the Special Master's proposed policy requires an on-site clinician to see the refusing patient cell front. Finally, the Special Master's proposed policy includes requirements for patients who refuse two consecutive telemental health appointments to be assessed by an on-site clinician for possible referral to IDTT to consider changing the patient's treatment modality to in-person.

6. Use of Telemental Health in Specific Settings or for Specific Purposes

Included among the parties' areas of disagreement was: "Whether there should be restrictions on the use of telemental health for certain clinical tasks, including suicide risk evaluations, provision of care in segregation units (restricted housing units), and evaluations under the Prison Rape Elimination Act (PREA)." ECF No. 7935 at 4. The Special Master's previously offered Recommendations 10 and 12 address this area of disagreement:

> Recommendation 10: That telemental health is not utilized in restricted housing units and not be used to conduct clinician-led groups and should only be utilized to conduct screenings in emergency circumstances in reception centers.
> …
> Recommendation 12: That there are on-site clinicians for required on-site contacts such as crisis assessments/CITs, 5-day follow ups, SRASHEs, RVR MHAs, initial assessments, PREA evaluations, gender affirmation assessments and refusals.

Exhibit F at 12. As noted, defendants' rejected plaintiffs' and the Special Master's proposals to revise the policy to address these concerns.

Upon consideration of the discussions during the meet and confer, the Special Master modifies his prior recommendations as discussed below.

The Special Master withdraws the portion of his prior recommendation (Recommendation 10) that would have prohibited any use of telemental health in RHUs.[19] Instead, the Special Master proposes a requirement that RHUs have at least one FTE on-site primary clinician assigned to the unit and present during regular workdays and hours.

The Special Master maintains his proposal (also addressed in Recommendation 10, *supra*) to prohibit telemental health providers from conducting groups, but withdraws his prior recommendation to prohibit telemental health providers from conducting reception center screenings.

---

[19] On October 5, 2023, CDCR submitted a regulation package to the Office of Administrative Law for RHUs. Exhibit L, Email from D. Maldonado. Under the regulation package RHUs would consist of the following: "1. Administrative Segregation Unit (ASU) and Security Housing Unit (SHU) were merged and renamed to General Population RHU. These units will house incarcerated persons not included in the Mental Health Service Delivery System (MHSDS). 2. Short Term Restricted Housing and Long-Term Restricted Housing were merged and renamed to Correctional Clinical Case Management System (CCCMS) RHU. These units will house incarcerated persons in the MHSDS at the CCCMS level of care. 3. Enhanced Outpatient Program (EOP) ASU and Psychiatric Services Unit were merged and renamed to EOP RHU. These units will house incarcerated persons included in the MHSDS at the EOP level of care." *Id.* The emergency regulation went into effect as of November 1, 2023.

Regarding Recommendation 12, the Special Master withdraws the portion of his prior recommendation that would have prohibited telemental health providers from conducting RVR MHAs, initial assessments, PREA evaluations, gender affirmation assessments, and refusals.

The Special Master's maintains the remainder of his prior Recommendation 12, as discussed below.  The Special Master's proposed policy includes language limiting the use of telemental health "to respond to emergent/urgent mental health referrals or incidents involving danger to self/suicidality/self-harm, except as a last resort in emergency situations when the institution's assigned on-site crisis clinician (i.e. psychologist and/or licensed clinical social worker (LCSW) personnel are not available."  Appendix A at 5-6.[20]

Regarding 5-day follow ups, according to the Program Guide, the purpose of these follow-up appointments is for the primary clinician "who assumes overall responsibilities for the mental health treatment services provided to [a patient]…to monitor the patient in his or her new level of care, document any significant clinical information, and ensure that immediate and appropriate care is provided if the [patient's] condition deteriorates."  *See* ECF. No. 7333-1 at 386. Additionally, the Program Guide indicates that five-day follow-up "contacts shall occur in the inmate-patient's regular housing unit" for patients returning from MHCB placement if the placement was for suicidality.  *See id.* at 100.  Because the assigned clinician must evaluate the patient at their new level of care, observe their condition, and conduct the contact cell-front, 5-day follow-ups should be conducted in person.

---

[20] Notably, CDCR's CIT policy requires that, "The CIT sees each patient in-person, in a confidential setting, together as a team, and as close to the patient's housing unit as possible." *See* July 8, 2021, 12.01.700 Crisis Intervention Teams Policy, Exhibit M at 4.  When appropriate, a SRASHE will be completed by the mental health clinician.  *Id.*

Regarding suicide risk assessments, an onsite clinician should always be available to respond to emergent/urgent referrals and crisis calls involving incidents involving danger to self, suicidality and self-harm during normal business hours; telemental health should only be used as a last resort in emergency situations in which an onsite clinician is not available.

In addition, the Special Master's proposed policy adds that clinicians involved in use of force incidents be on-site. Using telemental health to manage a use of force incident when an onsite clinician is available jeopardizes the safety of patients and staff. The DOM requires that "(t)he cool down period shall include clinical intervention (attempts to verbally counsel and persuade the inmate to voluntarily exit the area) by a licensed mental health practitioner…" 2023 DOM § 51020.12. It further requires:

> (i)f the licensed mental health practitioner is not the treating clinician, they shall review the inmate's health record to determine if the inmate has any previous or current mental health issues. The licensed mental health practitioner shall use that information along with information gained during the clinical intervention to advise the on-site manager of any mental health issues that impact the inmate's ability to understand orders, make it difficult for the inmate to comply with orders, or could lead to a substantial risk of decompensation."

2023 DOM § 51020.12.

There is no evidence that utilizing telehealth technology at cell front or in similar contained areas of a prison is as effective as in-person clinical intervention to de-escalate and avert a controlled use of force. However, the Special Master's experts opine that de-escalation and clinical intervention efforts are most effective when the agitated individual can be seen clearly as psychomotor movement provides significant clinical data regarding the person's state of mind and effectiveness of intervention techniques. This allows the clinician to quickly modify the intervention to avoid an escalation. It is important that the clinician be able to clearly observe the entire area where the person is contained to identify risks and other data that can be incorporated in the intervention (e.g., photos of children on the wall, bible). Technology

limitations, such as problems with clear reception in certain areas of a prison, lack of real-time

alternative when incarcerated person declines telehealth, do not allow for the conclusion that a

telemental health clinical intervention would be equivalent to an in-person intervention and

consultation with custody.

## IV.    __SUMMARY__

The figure below summarizes the major components of the Special Master's proposed

Telemental Health Policy.  Specifically, Figure 1 summarizes the on-site provider requirements

by level of care contained in the Special Master's proposed Telemental Health Policy and

includes comparisons to the court-approved Telepsychiatry Policy and defendants' existing

Telemental Health Policy.

<u>FIGURE 1 – Summary of On-Site Provider Requirements</u>

| Level of Care/Setting | Court-Approved Telepsychiatry Policy (ECF No. 6539 at 5-12) | Defendants' Telemental Health Policy | Special Master's Proposed Telemental Health Policy |
|---|---|---|---|
| **3CMS** | No restrictions | No restrictions | 20 percent of allocated positions be filled by onsite clinicians. |
| **EOP** | One onsite FTE psychiatrist assigned to each EOP program (e.g. EOP General Population or EOP RHU) | No restrictions | 40 percent of allocated positions be filled by onsite clinicians. |
| **MHCB** | Emergency use only | Only when on-site care is not available and to be used for the shortest duration of time as necessary. | Emergency use only |
| **PIP** | Emergency use only | Only when on-site care is not available and to be used for the shortest | Emergency use only |

| | | duration of time as necessary. | |
|---|---|---|---|
| **RHU** | Dependent on level of care | No restrictions | One onsite FTE clinician assigned to each RHU program |

As reflected in this report, the Special Master carefully considered the parties' positions and concerns in developing his proposed Telemental Health Policy. As a result of the discussions during the meet and confer, the Special Master withdrew or partially withdrew several of his prior recommendations, including recommendations that would have prohibited the use of telemental health for RVR MHAs, initial assessments, PREA evaluations, gender affirmation assessments, and refusals. He also withdrew his proposal to prohibit any use of telemental health in RHUs.

**V.    CONCLUSION**

The staffing vacancy crisis among primary clinicians working in CDCR's prisons has "continued virtually unabated" for two consecutive monitoring rounds. ECF No. 8095 at 11. Indeed, this staffing vacancy crisis has had a "reverberating impact…on essentially all aspects of [CDCR's MHSDS]." *Id*. Cognizant of the detrimental effect that these vacancies have on the seriously mentally ill members of the plaintiff class, the Special Master does not now (nor has he ever) seek to limit defendants' ability to use telemental health to supplement their on-site mental health staff to address the immediate crisis.

However, as reported above, the Special Master and his experts are unaware of any large prison system that has replaced on-site provision of mental health services with telemental health to the degree CDCR's current policy would permit. Likewise, the Special Master's literature review revealed a paltry evidence-base demonstrating the efficacy of such an unprecedented shift

to telemental health in a large prison system.  Balancing the "inevitable tensions created by the distinct needs of custody supervision and the distinct need for mental health care," ECF No. 5131 at n. 5, remains imperative.  However, removing such a significant portion of CDCR' on-site clinicians puts defendants at risk of moving backward, diminishing remedial gains that have been made in recent years.  *See supra* pp. 28-30 (discussing Custody and Mental Health Partnership Plan and related case history).

The record in this case demonstrates clearly that with reasonable guardrails telehealth modalities (i.e. telepsychiatry) can be deployed in CDCR to supplement on-site mental health services.  This model, whereby telepsychiatry supplements rather than replaces on-site psychiatry services, has enabled CDCR to significantly reduce staff psychiatry vacancies.  Unfortunately, it appears lost on defendants that the Special Master and Court have endorsed the unlimited use of telepsychiatry for 76 percent of MHSDS patients.  ECF No. 7682 at 5.  Significantly, despite defendants' ongoing opposition to some parts of the court-approved Telepsychiatry policy, CDCR has been able improve psychiatry staffing levels in recent years even with the inclusion of limited, reasonable guardrails governing its use for certain populations.

The Special Master's proposed Telemental Health Policy is largely modeled on principles underlying the court-approved Telepsychiatry policy – that telemental health be deployed to supplement the services provided by on-site psychologists and clinical social workers.  As noted in the report, the Special Master proposes some deviation from the Telepsychiatry Policy to account for the distinct role of the primary clinician in the treatment team.  *See supra* pp. 23-24. The Special Master strongly believes his proposal, inclusive of the reasonable guardrails discussed in this report and reflected in the attached proposed policy, will promote the successful implementation of telemental health.

Accordingly, the Special Master recommends that the Court enter an order directing the following:

1.   That the Special Master's proposed Telemental Health Policy be provisionally approved for a period of 18 months.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Mathew A. Lopes, Jr.
Special Master

March 21, 2024