# EXHIBIT A

**STATE OF CALIFORNIA**
**Budget Change Proposal - Cover Sheet**
DF-46 (REV 10/20)

| Fiscal Year<br>2023-24 | Business Unit<br>5225 | Department<br>California Department of Corrections and Rehabilitation | | Priority No. |
|---|---|---|---|---|

| Budget Request Name<br>5225-320-BCP-2023-MR | Program<br>4660–Mental Health Services - Adult | Subprogram<br>4660014-Mental Health Other-Adult |
|---|---|---|

**Budget Request Description**
Expansion of the Statewide Tele-Mental Health Program

**Budget Request Summary**
The California Department of Corrections and Rehabilitation and California Correctional Health Care Services request 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million General Fund in 2025-26 and ongoing to expand the use of Tele-Mental Health services to include psychology and social work in addition to psychiatry.

| Requires Legislation<br>☐ Yes  ☒ No | Code Section(s) to be Added/Amended/Repealed |
|---|---|

| Does this BCP contain information technology (IT) components? ☒ Yes  ☐ No<br><br>*If yes, departmental Chief Information Officer must sign.* | Department CIO<br>Cheryl Larson | Date<br>5/12/2023 |
|---|---|---|

**For IT requests, specify the project number, the most recent project approval document (FSR, SPR, S1BA, S2AA, S3SD, S4PRA), and the approval date.**

Project No.    Project Approval Document:

Approval Date:

**If proposal affects another department, does other department concur with proposal?** ☐ Yes ☐ No
*Attach comments of affected department, signed and dated by the department director or designee.*

| Prepared By<br>Amar Mehta | Date<br>5/12/2023 | Reviewed By<br>Duane Reeder | Date<br>5/12/2023 |
|---|---|---|---|
| Department Director<br>Diana Toche | Date<br>5/12/2023 | Agency Secretary<br>Jeff Macomber | Date<br>5/12/2023 |

**Department of Finance Use Only**

**Additional Review:** ☐ Capital Outlay ☐ ITCU ☐ FSCU ☐ OSAE ☐ Dept. of Technology

| PPBA<br>Allison Hewitt | Date submitted to the Legislature<br>5/12/2023 |
|---|---|

**A. Budget Request Summary**

The California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS) request 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million General Fund in 2025-26 and ongoing to expand the use of Tele-Mental Health (TMH) services to include psychology and social work in addition to psychiatry.

This request includes funding to establish dedicated TMH management, supervisory oversight, administrative support, tele-presenters, research staff, and information technology (IT) support to help optimize and improve the expanded program, along with purchasing TMH equipment.

**B. Background/History**

*Coleman v. Newsom* is a class action lawsuit filed in 1990, in which the plaintiffs alleged that defendants (CDCR) provided an unconstitutional level of Mental Health Care to inmate-patients. In 1995, following a trial before the magistrate judge, the District Court found CDCR in violation of their Eighth Amendment duty to provide California's mentally ill incarcerated individuals with access to adequate mental health care and appointed a Special Master to monitor CDCR's compliance with court-ordered relief.

On February 28, 2023, the court ordered that CDCR address inadequate mental health staffing levels in California's prisons. The order requires CDCR to comply with staffing ratios in the 2009 Staffing Plan and the maximum ten percent vacancy rate from the court's June 13, 2002, order. CDCR has already implemented a successful tele-psychiatry program that has improved access to mental health care services and reduced staffing shortages. Expanding this program to include tele-psychology and tele-social work will further improve the delivery of mental health care services in the prison system.

Secure videoconferencing improves access to care, enabling patients at institutions to meet with tele-psychiatrists with support from onsite tele-presenters. Tele-psychiatrists are located across the state to allow access to candidate pools that otherwise would not be able to serve the CDCR population. These successes can be built upon by expanding TMH services to include psychologists and social workers.

In addition, the Statewide Mental Health Program (SMHP) is governed by its own court-approved policy with detailed rules and reporting requirements and is responsible for expanding services through a number of court-approved initiatives. While TMH clinicians can assist institutions, they do not significantly decrease the workload of onsite supervisors, who must continue to attend committees, liaise with other disciplines, and perform regular duties. Tele-psychiatry maintains internal control over the clinical and operational support supervision of all tele-psychiatrists, allowing supervisors to respond quickly to obstacles and hurdles and maintain relationships with providers they have recruited. The Statewide Telepsychiatry Program (STP) hired and retained over 90 civil service psychiatrists, crediting the separate supervisory structure as a key component to hiring and retaining a stable group of clinicians to see patients.

Expanding TMH services to include psychologists and social workers will greatly benefit CDCR in improving the delivery of mental health care services to patients while meeting court-ordered requirements. With the proper operational support structure and oversight, CDCR can build upon the success of the STP to further improve the Statewide Mental Health Program and provide an additional opportunity to support recruitment and retention of hard-to-fill clinical positions.

**Resource History**
*(Dollars in thousands)*

| Program Budget | PY – 4 | PY – 3 | PY – 2 | PY-1 | PY | CY |
|---|---|---|---|---|---|---|
| Authorized Expenditures* | $221,886 | $211,507 | $233,436 | $214,800 | $224,524 | $224,712 |
| Actual Expenditures* | $217,173 | $203,939 | $205,887 | $179,654 | $154,414 | $151,957 |
| Authorized Positions* | 1,213.5 | 1,156 | 1,282.5 | 1,178.3 | 1,231 | 1,233 |
| Filled Positions* | 1,164.25 | 1,090.55 | 1,102.85 | 954.85 | 810.2 | 788.78 |
| Vacancies* | 49.25 | 65.45 | 179.65 | 223.45 | 420.8 | 444.22 |

* Mental Health program Psychologist and Social Worker positions only.

## C. State Level Consideration

To comply with federal court orders resulting from *Coleman v. Newsom*, CDCR is mandated to provide a constitutionally adequate level of mental health care to the incarcerated population, with a fill rate of at least 90 percent for specified clinical positions, including psychiatrists, psychologists, and licensed clinical social workers. CDCR has implemented a number of strategic and innovative recruitment and outreach efforts, but achieving a 90 percent fill-rate for these clinical positions has proven challenging for the Department. Additionally, recent trends in the labor market have resulted in a nationwide shortage of mental health clinicians, including psychologists and licensed social workers.

The STP was developed to improve patient care while helping with the recruitment and retention of psychiatrist positions, and its recent growth has significantly improved patients' access to mental health care services. Building on the success of the STP, adding tele-psychology and tele-social work services will enhance the core components of the mental health system and help CDCR fill these hard-to-fill classifications.

## D. Justification

To improve access to mental health services for incarcerated individuals, CDCR and CCHCS are requesting 85.0 positions and $11.0 million General Fund starting in fiscal year 2023-24 and 144.0 positions and $16.8 million ongoing to provide the necessary staffing to operationalize the expansion of the Tele-Mental Health Program to include psychology and social work components. As a part of this proposal, CDCR/CCHCS will redirect 100 existing psychologist and clinical social worker positions to serve in the Tele-Mental Health Program. The resources requested in this BCP will serve as the operational, supervisory, and administrative support for the redirected positions in providing tele-mental health services.

Developing and implementing tele-psychology and tele-social work will require focused effort by the Department as well as the level of additional resources requested. The STP, which was initiated in 2014-15, required significant coordination to develop, implement, and expand to its current staffing level. For instance, expanding CDCR's night shift program from two part-time doctors at 10 institutions to 12 doctors covering all facilities, seven nights a week, took almost two years of planning, hiring, and coordination by a team of senior supervising psychiatrists with support from two chief psychiatrists. CDCR expects developing and implementing tele-psychology and tele-social work to be similarly challenging, necessitating more supervisory resources to develop policies, procedures, coordinate with institutions and IT, hire and train line staff, and address any bumps in the road as CDCR integrates these new services into CDCR's existing infrastructure.

**Tele-Mental Health Leadership, Recruitment, and Integration**

As CDCR and CCHCS expands its STP to include tele-psychology and tele-social work, it will be crucial to hire a team of professionals to support, manage, and supervise the development and implementation of services necessary to facilitate daily operations.

Tele-presenters (medical assistants [MAs]) play an important role in providing technical and onsite support for the tele-psychology and tele-social work services. MAs will be calculated at a 1:1 ratio to psychologists and social workers providing teleservices and will be managed by Supervising Registered Nurse (SRN) IIs, which are calculated at a 1:12 ratio. These MAs will help facilitate TMH services at the institution, ensuring that the technology is working properly and that sessions can proceed smoothly. They will help prepare patients for their appointments, alert the provider to any remarkable patient issues observed, and ensure that the necessary equipment is in place. In addition, MAs will be responsible for confirming the scheduling of TMH sessions, ensuring patients attend their appointments, coordinating care between the TMH providers and onsite mental health staff, and helping to ensure patients receive appropriate follow-up care as needed.

To support TMH, CDCR will need to hire an Assistant Deputy Director (ADD) that will be responsible for overseeing the program's expansion and ensuring that it meets the needs of CDCR's incarcerated population. This position will require extensive knowledge and experience in tele-health, as well as strong leadership and communication skills to coordinate with various stakeholders and agencies.

In addition, two Chief Psychologists, six Senior Psychologist Supervisors, one Supervising Psychiatric Social Worker (SPSW) II, and three SPSW Is will support the ADD and provide supervision for the mental health clinicians within TMH. This team is responsible for enforcing policy, procedures, and training requirements. They will also coordinate with institutions and IT to sort out daily logistics necessary to deliver mental health services. Additionally, they will be responsible for all hiring and training of line staff to ensure the program is implemented smoothly.

Similar to the STP, although the existing line staff fall under existing on-site supervisory positions, the supervisory structure for on-site psychologists and social workers cannot be transferred or shared with off-site counterparts. As TMH expands, proper operational support structure and oversight are needed to ensure its success. A separate supervisory structure is necessary to manage day-to-day operations, oversee quality control, provide clinical supervision, coordinate institutional assignments, and more. The roles of tele-health supervisors and onsite supervisors are largely independent of one another, as TMH has its own duties and functions, with significant coordination costs that onsite supervisors cannot manage.

The Senior Psychologist Supervisor and Supervising Psychiatric Social Worker I positions requested were calculated based on a ratio of 1:12 line staff psychologists and social workers providing tele-services. Chief Psychologist and Supervising Psychiatric Social Worker II positions were calculated based on a ratio of 1:4 supervisory psychologist and social worker positions. Additionally, a Senior Psychologist Supervisor or Supervising Psychiatric Social Worker I position were allocated when the number of line staff full-time equivalents (FTEs) reached half of the ratio, in order to maintain appropriate supervision. For example, 6 FTEs (50 percent of the ratio of 12:1) would result in the first additional Senior or Supervising allocation, and 12 + 6 = 18 FTEs would result in a second Senior or Supervising allocation. Similarly, a Chief position will be allocated when the number of Seniors reaches half of the ratio; for example, 2 FTEs (50 percent of the ratio of 4:1) would result in the first Chief position, and 4 + 2 = 6 FTEs would result in the second Chief position.

Given that CDCR/CCHCS are redirecting 100 line staff psychologists and social workers (66-77 psychologists and 30-41 social workers), utilizing the ratios described above results in a need for 6 Senior Psychologists and 3 Supervising Social Worker Is. Based on the first line supervisory numbers, CDCR/CCHCS are requesting 2 Chief Psychologists and 1 Supervising Psychiatric Social Worker II.

The 1 Research Data (RD) Supervisor I, 1 RD II, 1 RD Specialist I, and 1 RD Analyst II positions requested all play a critical role in maintaining and updating CDCR's OnDemand data reports for compliance, PowerBI reports for operations, and end-user support needed to train and orient new TMH staff. Reporting requirements for a new TMH program will be significant and will require a slightly different set of benchmarks to measure additional axes such as connection strength, dropped calls, bandwidth infrastructure, etc. These experts can ensure that the data is accurately collected and analyzed to generate comprehensive reports to track progress for CDCR and the court and identify areas for improvement. Additionally, they can assist in the development of training materials and user manuals for new TMH staff, ensuring that they are properly oriented and effectively using the technology and systems necessary for their work. The RD Supervisor I & II will provide leadership and oversight for the analytical team, spending the majority of their time in coordination and supervision activities. The RD Specialist I will develop and utilize research methodology and techniques to improve data collection and analysis, while the RD Analyst II will perform a variety of tasks including complex and specific research and data subset analysis needed to support these efforts and include outliers. By working together, these positions can ensure that CDCR's TMH program has the necessary data and systems to support successful implementation and improvements.

## Tele-Mental Health Operational Support

The implementation of a TMH program in a correctional facility is a complex process that involves the integration of many moving parts. The expansion of services requires the addition of many new positions, the modification of existing systems and infrastructure, the development of new policies and procedures, and the coordination of various stakeholders across multiple locations. These changes require careful planning, organization, and management to ensure a successful implementation. To address the growth of the TMH program, CDCR requires positions for administrative support, which will allow the TMH clinicians to focus on critical clinical work. The SMHP needs to ensure operational and administrative support for the new tele-health structure. This provides consistent oversight for support staff and ensures sustainable long-term supervision of line staff.

The TMH program requires support across all program areas to ensure its success. Staff will provide analytical support, develop policies and procedures, and assist with hiring. They will create timelines, provide logistical expertise, and design ongoing maintenance for project sustainability. This team will monitor and audit adherence to TMH services, conduct complex data analysis, and lead targeted improvement projects as a subject matter expert on scheduling and mental health services logistics. Utilizing project management tools, CDCR will enhance and expand TMH services. With continued growth of TMH, the Staff Service Manager (SSM) III will oversee an existing SSM II, and one additional SSM II who will manage two SSM Is, and a Health Program Specialist (HPS) II. One SSM I will oversee the tele-psychology program and the other will oversee the tele-social worker program. One HPS I and three Staff Services Analyst (SSA)/Associate Governmental Program Analysts (AGPAs) will be assigned to each team and provide support to the TMH program, Chief Psychologists, and Supervising Psychiatric Social Worker II positions. (See Workload Analysis for details).

Resource Request for Tele-Mental Health:

- ADD Psychiatrist – 1.0
- Chief Psychologist – 2.0 (1.0 Budget Year [BY], 1.0 BY+1)
- Senior Psychologist Supervisor – 6.0 (3.0 BY, 3.0 BY+1)
- SPSW I – 3.0 (2.0 BY, 1.0 BY+1)
- SPSW II – 1.0
- MA – 100.0 (50.0 BY, 50.0 BY+1)
- SRN II – 8.0 (4.0 BY, 4.0 BY+1)
- RD Supervisor I – 1.0
- RD Supervisor II – 1.0
- RD Analyst II – 1.0

- RD Specialist I – 1.0
- SSM III – 1.0
- SSM II – 1.0
- SSM I – 2.0
- HPS II – 1.0
- HPS I – 2.0
- SSA/AGPA – 6.0

**TMH Information Technology Positions and Equipment**

The CCHCS Information Technology Services Division (ITSD) supports approximately 18,000 employees statewide at all correctional institutions, 14 remote administrative offices, 1 Central Fill Pharmacy, 1 Health Records Center, and headquarters offices. The ITSD services align with the Receiver's Turnaround Plan of Action, Goal 5 – Establish Medical Support Infrastructure, by providing technology support for health care administration in a correctional setting. To support the growth of the Tele-Mental Health Program, CCHCS ITSD requests additional positions be established to provide operations support as follows.

One tele-health support position at the IT Specialist I level is required to support network connectivity and the tele-health video communications systems and solutions. The resource will support tele-health video conferencing systems (Cisco Unified Call Manager), Cisco DX80 monitors and Cisco Webex systems, equipment services, hardware, and software solutions statewide. This position will provide first and second level enterprise-wide IT tele-health support and provision, troubleshoot tele-health communication equipment, and train and assist the customers in the use of tele-health hardware and software across the enterprise.

- Currently the tele-health program is supporting 850 tele-health carts and accounts across the enterprise with 11 positions at a current ratio of 77:1.
- Tele-health expects to add approximately 200 additional carts and accounts bringing the total number to 1,050 carts and accounts. With the additional positions the ratio of support would be 104:1.
- Without the additional ITSD position, the ratio would be 113:1 for these new positions. This would result in longer wait times for service and provisioning requests and longer issue-resolution times, which may impact the ability of the SMHP to deliver patient care using these critical tele-health video conferencing systems.

In addition, an ITSD support position at the IT Associate level is needed in the customer support center to provide first and second level centralized enterprise IT support for the additional positions requested. This position will resolve the first and second tier account issues, installs, and software application maintenance needs. Support and maintenance will also be provided for the IT desktop equipment, such as laptops and associated peripherals and provide enterprise-wide technology solutions in support of the mission of the SMHP.

**ITSD Services Hardware/Software Request**

In addition to the staffing described above, ITSD requires additional hardware and software for the program to operate effectively, as shown below.

| Item | Unit Cost One Time | Unit Cost ongoing | FY 23/24[1] | FY 24/25[2] | FY 25/26[3] | FY 26/27[4] | FY 27/28 and ongoing[5] |
|---|---|---|---|---|---|---|---|
| Cisco DX80 Monitors | $2,500 | $500 | $250,000 | $300,000 | $100,000 | $100,000 | $100,000 |
| Smart Net Total Care | $375 | $375 | $37,500 | $75,000 | $75,000 | $75,000 | $75,000 |
| Call Manager Licensing | $150 | $150 | $15,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Call Manager Software Support | $40 | $40 | $4,000 | $8,000 | $8,000 | $8,000 | $8,000 |
| Webex Meeting License | $250 | $250 | $25,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Webex Meeting Audio License | $180 | $180 | $18,000 | $36,000 | $36,000 | $36,000 | $36,000 |
| EHRS Licensing | $1,500 | $1,500 | $75,000 | $150,000 | $150,000 | $150,000 | $150,000 |
| Microsoft Licensing | Varies | Varies | $30,942 | $63,840 | $69,720 | $76,692 | $84,361 |
| **Total** | | | **$455,442** | **$712,840** | **$518,720** | **$525,692** | **$533,361** |

[1]FY 23/24 includes 100 one-time costs.

[2]FY 24/25 includes 100 one-time cost and 100 ongoing costs (from FY 23/24).

[3]FY 25/26 includes 200 ongoing costs (from FY 23/24 & 24/25).

[4]FY 26/27 includes 200 ongoing costs (from FY 23/24 - 25/26).

[5]FY 27/28 includes 200 ongoing costs (from FY 23/24 - 26/27).

Resource Request:
- IT Associate – 1.0
- IT Specialist I – 1.0

**Human Resources Positions**

CCHCS HR is responsible for headquarters, regional, and institutional recruitment and hiring processes, while delivering innovative HR solutions and services that attract and serve a diverse and highly qualified workforce. HR is also responsible for providing support and guidance to departmental programs and institutions on HR related issues. This HR request is for 4.0 positions that will be established to focus on mental health recruiting and hiring initiatives.

To meet the increased need for the SMHP, HR must expand all mental health clinical recruitment and hiring campaigns to fill current vacancies as well as all mental health positions within this request. HR continues to seek ways to further promote mental health career opportunities and increase candidate awareness with innovative campaigns bridging multiple efforts and reaching multi-generational candidates. However, demands nationwide for mental health providers have greatly impacted the ability for the State to hire what has become an increasingly competitive resource.

In order to compete for candidates in an already strained and competitive workforce, HR has established an end-to-end recruitment and hiring experience to help fill growing vacancies throughout the department. These focused hiring events allow prospective candidates to submit job applications, participate in on-line civil service examinations, and in-person or virtual interviews. If successful, candidates are live-scanned, extended tentative job offers, and given instructions and assistance to begin the credentialling process. HR has expanded this concept and has begun hosting modified hiring events that start at the interview stage. In order to accommodate candidate's schedules, HR posts job advertisements inviting candidates to schedule interviews based on their convenience/availability including virtual or in-person interviews.

Based on the increasing workload, HR is requesting permanent funding for positions to maintain and support mental health program recruitment and hiring initiatives including the new TMH program, while addressing current staffing deficiencies and ensuring the SMHP workload demands are met efficiently, accurately, and timely. HR requests SSA/AGPA and Personnel Technician (PT) II positions to manage the recruitment process to fill vacant positions, post job announcements, analyze

personnel actions, and initiate and complete "Requests for Personnel Actions" in order to establish, recruit, fill, reclassify and redirect positions in accordance with state and departmental laws, rules, processes, procedures, and perform other duties as required. The Personnel Specialist (PS) position will be responsible for the personnel transactions of an assigned roster and is responsible for the processing of attendance and payroll for employees in a variety of bargaining units, as well as excluded employees. The PS is also responsible for interpreting and applying the personnel related laws, rules, regulations, policies, and memoranda of understanding, and performing salary determinations.

Without these positions, HR will experience challenges meeting the recruitment needs and high demands of the SMHP initiatives, in addition to continued implementation of the TMH program. Approval of this request is necessary to ensure HR continues to provide prompt and consistent services, critical to the Department's mission.

Resource Request:

- SSA/AGPA – 2.0
- PT II – 1.0
- PS – 1.0

## E.  Outcomes and Accountability

The expansion of TMH services is critical to meeting the mental health needs of CDCR patients. The requested supervisory and support staff will enable the department to sustain and improve the quality of mental health care services provided remotely. Additionally, the implementation of tele-psychology and tele-social work services will greatly enhance the capacity to deliver comprehensive mental health care to patients, including access to evidence-based treatment modalities. The recruitment and retention efforts will ensure adequate staffing levels to support patient care with the benefit of helping CDCR/CCHCS meet court-mandated fill rates. Furthermore, the research studies conducted with the support of the requested research positions will provide valuable data on the effectiveness of TMH services in an incarcerated setting, enabling the department to continuously improve its services and demonstrate accountability to the court. Ultimately, the requested staff will facilitate the development and implementation of a sustainable and effective TMH program that meets the mental health needs of CDCR patients.

## F.  Analysis of All Feasible Alternatives

### Alternative #1

Approve 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million General Fund in 2025-26 and ongoing expand the use of tele-Mental Health (TMH) services to include psychology and social work in addition to psychiatry. This request includes funding to establish a dedicated TMH program including clinical management and supervisory oversight, tele-presenters, operational oversight and support, HR resources, IT resources and equipment, and establishes ratios by which to adjust supervisory positions and tele-presenters as TMH authority changes.

**Pros:**

- Supports recruitment and retention of clinical positions.
- Tele-psychologists and tele-social workers will be able to focus on providing patient mental health care without the potential need to perform ad-hoc supervisory functions.
- Appropriate supervisory span of control.
- Appropriate clinical and operational support and leadership positions.
- Resources necessary to provide sustainable structure for department to maximize the opportunity to improve recruitment and retention.

**Cons:**

- Requires General Fund support.

**Alternative #2**

Do not approve any positions requested in this proposal.

**Pros:**

- No impact on the General Fund.

**Cons:**

- CDCR will be unable to improve access to mental health services for incarcerated individuals and provide appropriate clinical care to the entire incarcerated population.

- Continues challenges and delays to recruit and retain mental health clinicians.

## G. Implementation Plan

Upon approval of the 2023 Budget Act, CDCR will advertise and recruit for the 35.0 positions that exclude the MAs. The remaining 50.0 MAs will be established, advertised, and recruited upon the hiring of the clinicians.

Starting July 2024, CDCR will advertise and recruit the 9.0 additional positions that exclude the MAs. The remaining 50.0 MAs will be established, advertised, and recruited for upon the hiring of the clinicians.

## H. Supplemental Information

Attachment A – TMH Workload Analysis
Attachment B – IT Workload Analysis
Attachment C – HR Workload Analysis

Court orders available upon request: ECF No.7741, ECF No.7742, and ECF No.7743

## I. Recommendation

Alternative #1 - Approve request for 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144 positions and $16.8 million General Fund in 2025-26 and ongoing to expand the use of TMH services to include psychology and social worker in addition to psychiatry. This request includes funding to establish a dedicated TMH program including management and supervisory oversight, tele-presenters, operational oversight and support, HR resources, IT resources and equipment and establish ratios by which to adjust supervisory positions as TMH authority changes.

# BCP Fiscal Detail Sheet

BCP Title: Expansion of the Statewide Tele-Mental Health Program

BR Name: 5225-320-BCP-2023-MR

Budget Request Summary

## Personal Services

| Personal Services | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| Positions - Permanent | 0.0 | 85.0 | 144.0 | 144.0 | 144.0 | 144.0 |
| **Total Positions** | **0.0** | **85.0** | **144.0** | **144.0** | **144.0** | **144.0** |
| Salaries and Wages Earnings - Permanent | 0 | 6,452 | 10,357 | 10,357 | 10,357 | 10,357 |
| **Total Salaries and Wages** | **$0** | **$6,452** | **$10,357** | **$10,357** | **$10,357** | **$10,357** |
| Total Staff Benefits | 0 | 3,429 | 5,600 | 5,600 | 5,600 | 5,600 |
| **Total Personal Services** | **$0** | **$9,881** | **$15,957** | **$15,957** | **$15,957** | **$15,957** |

## Operating Expenses and Equipment

| Operating Expenses and Equipment | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 5301 - General Expense | 0 | 35 | 54 | 54 | 54 | 54 |
| 5302 - Printing | 0 | 9 | 10 | 10 | 10 | 10 |
| 5304 - Communications | 0 | 14 | 14 | 14 | 14 | 14 |
| 5306 - Postage | 0 | 3 | 3 | 3 | 3 | 3 |
| 5320 - Travel: In-State | 0 | 40 | 56 | 56 | 56 | 56 |
| 5322 - Training | 0 | 12 | 19 | 19 | 19 | 19 |
| 5324 - Facilities Operation | 0 | 34 | 34 | 34 | 34 | 34 |
| 5326 - Utilities | 0 | 1 | 1 | 1 | 1 | 1 |
| 5340 - Consulting and Professional Services - External | 0 | 5 | 5 | 5 | 5 | 5 |
| 5340 - Consulting and Professional Services - Interdepartmental | 0 | 2 | 2 | 2 | 2 | 2 |
| 5346 - Information Technology | 0 | 207 | 415 | 421 | 428 | 436 |
| 5368 - Non-Capital Asset Purchases - Equipment | 0 | 714 | 745 | 250 | 250 | 250 |
| 539X - Other | 0 | 2 | 3 | 3 | 3 | 3 |
| **Total Operating Expenses and Equipment** | **$0** | **$1,078** | **$1,361** | **$872** | **$879** | **$887** |

Total Budget Request

| Total Budget Request | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| **Total Budget Request** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |

# Fund Summary

## Fund Source

| Fund Source | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| State Operations - 0001 - General Fund | 0 | 10,959 | 17,318 | 16,829 | 16,836 | 16,844 |
| **Total State Operations Expenditures** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |
| **Total All Funds** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |

# Program Summary

## Program Funding

| Program Funding | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 4670 - Dental and Mental Health Services Administration-Adult | 0 | 4,300 | 5,316 | 5,306 | 5,306 | 5,306 |
| 4650012 - Medical Administration-Adult | 0 | 1,278 | 1,525 | 1,331 | 1,338 | 1,346 |
| 4650014 - Medical Other-Adult | 0 | 899 | 1,790 | 1,782 | 1,782 | 1,782 |
| 4660014 - Mental Health Other-Adult | 0 | 4,482 | 8,687 | 8,410 | 8,410 | 8,410 |
| **Total All Programs** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |

# Personal Services Details

## Positions

| Positions | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 1303 -  Personnel Spec (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 1401 -  Info Tech Assoc (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 1402 -  Info Tech Spec I (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 4800 -  Staff Svcs Mgr I (Eff. 07-01-2023) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| 4801 -  Staff Svcs Mgr II (Supvry) (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 4802 -  Staff Svcs Mgr III (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5161 -  Pers Techn II (Spec) (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5393 -  Assoc Govtl Program Analyst (Eff. 07-01-2023) | 0.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| 5731 -  Research Data Analyst II (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5734 -  Research Data Supvr I (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5737 -  Research Data Supvr II (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5742 -  Research Data Spec I (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 7374 -  Medical Assistant (Eff. 07-01-2023) | 0.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| 7374 -  Medical Assistant (Eff. 07-01-2024) | 0.0 | 0.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| 8239 -  Receiver's Med Exec (Safety) (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 8336 -  Hlth Program Spec II (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 8338 -  Hlth Program Spec I (Eff. 07-01-2023) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| 9288 -  Sr Psychologist - CF (Supvr) (Eff. 07-01-2023) | 0.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| 9288 -  Sr Psychologist - CF (Supvr) (Eff. 07-01-2024) | 0.0 | 0.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| 9291 -  Supvng Psych Soc Worker I - CF (Eff. 07-01-2023) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| 9291 -  Supvng Psych Soc Worker I - CF (Eff. 07-01-2024) | 0.0 | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 9292 -  Supvng Psych Soc Worker II - CF (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 9318 -  Supvng Registered Nurse II - CF (Eff. 07-01-2023) | 0.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| 9318 -  Supvng Registered Nurse II - CF (Eff. 07-01-2024) | 0.0 | 0.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| 9859 -  Chief Psychologist - CF (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 9859 -  Chief Psychologist - CF (Eff. 07-01-2024) | 0.0 | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Total Positions** | **0.0** | **85.0** | **144.0** | **144.0** | **144.0** | **144.0** |

## Salaries and Wages

| Salaries and Wages | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 1303 -  Personnel Spec (Eff. 07-01-2023) | 0 | 61 | 61 | 61 | 61 | 61 |
| 1401 -  Info Tech Assoc (Eff. 07-01-2023) | 0 | 78 | 78 | 78 | 78 | 78 |
| 1402 -  Info Tech Spec I (Eff. 07-01-2023) | 0 | 97 | 97 | 97 | 97 | 97 |
| 4800 -  Staff Svcs Mgr I (Eff. 07-01-2023) | 0 | 183 | 183 | 183 | 183 | 183 |
| 4801 -  Staff Svcs Mgr II (Supvry) (Eff. 07-01-2023) | 0 | 100 | 100 | 100 | 100 | 100 |
| 4802 -  Staff Svcs Mgr III (Eff. 07-01-2023) | 0 | 115 | 115 | 115 | 115 | 115 |
| 5161 -  Pers Techn II (Spec) (Eff. 07-01-2023) | 0 | 58 | 58 | 58 | 58 | 58 |
| 5393 -  Assoc Govtl Program Analyst (Eff. 07-01-2023) | 0 | 621 | 621 | 621 | 621 | 621 |
| 5731 -  Research Data Analyst II (Eff. 07-01-2023) | 0 | 81 | 81 | 81 | 81 | 81 |
| 5734 -  Research Data Supvr I (Eff. 07-01-2023) | 0 | 91 | 91 | 91 | 91 | 91 |
| 5737 -  Research Data Supvr II (Eff. 07-01-2023) | 0 | 100 | 100 | 100 | 100 | 100 |
| 5742 -  Research Data Spec I (Eff. 07-01-2023) | 0 | 85 | 85 | 85 | 85 | 85 |
| 7374 -  Medical Assistant (Eff. 07-01-2023) | 0 | 2,561 | 2,561 | 2,561 | 2,561 | 2,561 |
| 7374 -  Medical Assistant (Eff. 07-01-2024) | 0 | 0 | 2,561 | 2,561 | 2,561 | 2,561 |
| 8239 -  Receiver's Med Exec (Safety) (Eff. 07-01-2023) | 0 | 384 | 384 | 384 | 384 | 384 |
| 8336 -  Hlth Program Spec II (Eff. 07-01-2023) | 0 | 93 | 93 | 93 | 93 | 93 |
| 8338 -  Hlth Program Spec I (Eff. 07-01-2023) | 0 | 170 | 170 | 170 | 170 | 170 |
| 9288 -  Sr Psychologist - CF (Supvr) (Eff. 07-01-2023) | 0 | 435 | 435 | 435 | 435 | 435 |
| 9288 -  Sr Psychologist - CF (Supvr) (Eff. 07-01-2024) | 0 | 0 | 435 | 435 | 435 | 435 |
| 9291 -  Supvng Psych Soc Worker I - CF (Eff. 07-01-2023) | 0 | 223 | 223 | 223 | 223 | 223 |
| 9291 -  Supvng Psych Soc Worker I - CF (Eff. 07-01-2024) | 0 | 0 | 112 | 112 | 112 | 112 |
| 9292 -  Supvng Psych Soc Worker II - CF (Eff. 07-01-2023) | 0 | 119 | 119 | 119 | 119 | 119 |
| 9318 -  Supvng Registered Nurse II - CF (Eff. 07-01-2023) | 0 | 619 | 619 | 619 | 619 | 619 |
| 9318 -  Supvng Registered Nurse II - CF (Eff. 07-01-2024) | 0 | 0 | 619 | 619 | 619 | 619 |
| 9859 -  Chief Psychologist - CF (Eff. 07-01-2023) | 0 | 178 | 178 | 178 | 178 | 178 |
| 9859 -  Chief Psychologist - CF (Eff. 07-01-2024) | 0 | 0 | 178 | 178 | 178 | 178 |
| **Total Salaries and Wages** | **$0** | **$6,452** | **$10,357** | **$10,357** | **$10,357** | **$10,357** |

## Staff Benefits

| Staff Benefits | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 5150450 - Medicare Taxation | 0 | 94 | 151 | 151 | 151 | 151 |
| 5150500 - OASDI | 0 | 120 | 120 | 120 | 120 | 120 |
| 5150600 - Retirement - General | 0 | 1,434 | 2,323 | 2,323 | 2,323 | 2,323 |
| 5150800 - Workers' Compensation | 0 | 249 | 405 | 405 | 405 | 405 |

| Staff Benefits | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 5150820 - Other Post-Employment Benefits (OPEB) Employer Contributions | 0 | 153 | 249 | 249 | 249 | 249 |
| 5150900 - Staff Benefits - Other | 0 | 1,379 | 2,352 | 2,352 | 2,352 | 2,352 |
| **Total Staff Benefits** | **$0** | **$3,429** | **$5,600** | **$5,600** | **$5,600** | **$5,600** |

## Total Personal Services

| Total Personal Services | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| **Total Personal Services** | **$0** | **$9,881** | **$15,957** | **$15,957** | **$15,957** | **$15,957** |

# Attachment A

**California Department of Corrections and Rehabilitation**
**California Correctional Health Care Services**
**Statewide Telepsychiatry Program**

**Workload Assumptions**

| | |
|---|---|
| Work-hours per person per year* | 1776 |

Daytime Shift

| | |
|---|---|
| Days in Work Year | 260 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

24/7 Services

| | |
|---|---|
| Hours in Work Day | 24 |
| Days in Work Year | 236 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

Assumptions

| | |
|---|---|
| The requested PY resources are to accommodate new workload requirements set forth by court orders as described in the Finance Letter narrative (dates). | |
| This is not an expansion of existing work previously established, but rather new tasks related to the addition of activities to the workload. | |

| | |
|---|---|
| For class specific assumptions, see individual tabs. | |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Assistant Deputy Director RME (Clinical)

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Participates in local process development team efforts to assess and improve processes of care related to medication management, and TMH services; including gender minority, serves as subject matter expert to policy development and/or improvements based on current tele-mental health research. | 1.0 | 420.0 | 420.0 |
| Assists in the achievement of state compliance with Coleman court orders and works to accurately measure and improve the quality and access of TMH services to patients. Develops assessment tools to analyze quality assurance and quality improvement and reports on tele-mental health practice and performance trends. | 3.0 | 52.0 | 156.0 |
| Monitors statewide mental health staffing levels, including line staff Psychiatrist, Psychologist, and Social Worker classifications. Works to improve statewide staffing and more specifically to address staffing shortages via implementation of TMH, as well as compensatory measures, recruitment strategies, and contract and bargaining unit negotiations. | 2.0 | 52.0 | 104.0 |
| Directs administrative operations and clinical oversight of the TMH program, collaborates with all institutions to assess the institutional needs for TMH services and implements new services or additional services when indicated. | 1.0 | 420.0 | 420.0 |
| Acts on behalf of the Deputy Director, Statewide Mental Health Program in meetings, policy development and procedures, project coordination, administrative functions within the Executive Office, CDCR, health care providers, and the public on mental health care issues. | 1.0 | 260.0 | 260.0 |
| Supervises hubs or home-based treatment, recruits highly capable candidates, recruits, trains, and supervises Chief Psychiatrists and other supervisors in the TMH program, conducts probationary and annual performance evaluations on direct reports, and evaluates and provides feedback to employees under their supervision. | 1.0 | 260.0 | 260.0 |
| Serves as a tele-mental health subject matter expert in executive and staff meetings and trainings; and statewide mental health program committees and workgroups to ensure proper protocols and standards are maintained. Serves as a resource/consultant to other mental health care executives and subordinate staff for case reviews and appeals regarding psychiatric care and/or treatment plans. | 8.0 | 52.0 | 416.0 |
| Participates in Continuing Medical Education. | 24.0 | 2.0 | 48.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **2,084.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.2** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

**Classification: Chief Psychologist**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Oversee the Tele-psychology program and Senior Psychologist Supervisors. Provide supervision of the development, delivery, and monitoring of specialized mental health training programs. Ensure supervision of the clinical work of psychologists occurs in areas such as program operation and evaluation, in order to provide direction for specific clinical psychology programs, ensure compliance with professional standards of practice, license maintenance requirements, American Psychological Association (APA) ethical guidelines, and laws and regulations applied to the practice of psychology, using Mental Health Services Delivery System (MHSDS) program guidelines, professional standards of practice, APA ethical guidelines, laws and regulations applied to the practice of psychology, communication skills, organization skills. | 30.0 | 52.0 | 1560.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinate the training, proctorship, orientation, and supervision of new state employees, to ensure that all employees learn the knowledge and skills (e.g., criminal behavior, substance abuse, major mental illnesses) to work within their scope of practice and fully function in their position, understand the safety and security procedures they need to follow, understand the use of the MHSDS program guidelines. | 17.0 | 12.0 | 204.0 |
| Participate in supervisory meetings, Mental Health related committees, medical staff committees to provide mental health expertise in relation to the MHSDS, learn new departmental and institutional policies and procedures, share information between institutional programs, using knowledge of the mental health program's function and procedures, communication skills, understanding of group dynamics, organizational change process, and an understanding of the department's organization, chain of command, and protocol. Coordinate implementation of TMH program, including expansion activities and night shift telepsychology. | 15.0 | 52.0 | 780.0 |
| Consult with mental health subject matter experts, medical, and custody regarding inmates involved with MHSDS, program planning, implementation, and evaluation in order to assess the impact of specialized mental health training to provide information to and solicit information from others about the purpose, implementation, and activities of mental health programs. | 15.0 | 52.0 | 780.0 |
| Responsible for training reports and correspondence with management. Perform program evaluation studies on new and/or existing training programs in order to determine their effectiveness at meeting program guidelines and departmental needs, provide information to court monitors and the chain of command, make changes as part of a quality management program, identify problems and needs, recommend changes and improvements. | 10.0 | 12.0 | 120.0 |
| Participate in Continuing Education and other activities required to maintain licensure to practice. | 16.0 | 2.0 | 32.0 |
| Plan mandated mental health programs training and other special programs in order to improve mental health care delivery, meet specialized needs of particular populations in the institution, and comply with rules, regulations, and court mandates using knowledge of Local Operating Procedures (LOPs), professional standards of practice guidelines, rules, regulations, and court mandates, coordination with different programs (e.g., custody, labor relations, medical), organizational skills, communication skills. | 15.0 | 12.0 | 180.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **3656.0** |
| **TOTAL POSITIONS PROJECTED** | | | **2.1** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

### Classification: Senior Psychologist Supervisor

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Provides administrative program management including oversight of implementation and monitoring of tele-mental Health Program (TMH) requirements, statewide policies and procedures. Works collaboratively with statewide institutions to coordinate delivery of a comprehensive and integrated tele-psychology program. Assists TMH and institutional leadership with the implementation and maintenance of mental health services via tele communication. | 46.0 | 52.0 | 2392.0 |
| Supervises tele-psychologists within the tele-mental health department. Perform program evaluation studies on new and/or existing training programs in order to determine their effectiveness at meeting program guidelines and departmental needs, provide information to court monitors and the chain of command, make changes as part of a quality management program, identify problems and needs, recommend changes and improvements. Coordinate implementation of TMH program, including expansion activities and night shift tele-psychology. | 86.0 | 52.0 | 4472.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinates and organizes training and orientation for TMH employees. Responsible for training reports and correspondence with management. | 23.0 | 12.0 | 276.0 |
| Assist with the coordination of personnel matters to ensure that allocated staff resources are utilized efficiently. Completes probationary and annual performance evaluations. Evaluates staff performance and takes or recommends appropriate action based on audits of staff's casework activities. | 11.0 | 12.0 | 132.0 |
| Participation in statewide and local trainings, and in Continuing Education and other activities required to maintain licensure to practice. Provides direct patient care if necessary. Consults with professional personnel on the technical aspects of research design and analysis of data; maintains familiarity with professional developments and research. | 15.0 | 2.0 | 30.0 |
| Prepares and/or reviews medical records and patient case reports when necessary. Advises staff of appropriate treatment techniques for specific cases. Participates in Interdisciplinary Treatment Team planning sessions and case reviews as needed. Confers with physicians, nurses, and medical assistants regarding patient status and medications. Responds to emergencies and provides emergency tele-psychological evaluation and treatment when necessary. Provides evaluation and treatment to patients when necessary. | 46.0 | 52.0 | 2392.0 |
| Conducts workgroups; participate in/conducts statewide planning meetings and conferences; identify needs related to Specialized TMH Training, Clinical Psychologist training needs and quality improvement efforts. Participate in supervisory meetings, Mental Health related committees, medical staff committees. | 18.0 | 52.0 | 936.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **10,630.00** |
| **TOTAL POSITIONS PROJECTED** | | | **6.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

### Classification: Supervising Psychiatric Social Worker I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Provides administrative program management including oversight of implementation and monitoring of tele-mental Health Program (TMH) requirements, statewide policies and procedures. Works collaboratively with statewide institutions to coordinate delivery of a comprehensive and integrated tele-social work program. Assists TMH and institutional leadership with the implementation and maintenance of mental health services via tele communication, including expansion activities and night shift tele-social work. | 25.0 | 52.0 | 1300.0 |
| Supervises tele social workers within the tele-mental health department. Coordinates with headquarters, statewide and institutional departmental teams on quality management and quality improvement initiatives. | 25.0 | 52.0 | 1300.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinates and organizes training and orientation for TMH employees. Responsible for training reports and correspondence with management. | 4.0 | 12.0 | 48.0 |
| Assist with the coordination of personnel matters to ensure that allocated staff resources are utilized efficiently. Completes probationary and annual performance evaluations. Evaluates staff performance and takes or recommends appropriate action based on audits of staff's casework activities. | 2.0 | 12.0 | 24.0 |
| Regional oversight of Pre-Release program and coordination with local treatment teams and clinical providers to ensure clinical contacts are completed for continuity of care. | 13.0 | 52.0 | 676.0 |
| Schedule and facilitate Coordinated Clinical Assessment Team (CCAT) with community provider for MHSDS patients. | 7.0 | 52.0 | 364.0 |
| Facilitate and schedule tele-mental health appointments between patient and community case managers and/or providers. | 7.0 | 52.0 | 364.0 |
| Monitor factors impacting release and release dates and communicate with case managers as changes occur. | 4.0 | 52.0 | 208.0 |
| Obtain release of information when records are needed by providers outside of normal processes established by county behavioral health departments. | 3.0 | 52.0 | 156.0 |
| Participation in statewide and local trainings, and in Continuing Education and other activities required to maintain licensure to practice. Provides direct patient care if necessary. Consults with professional personnel on the technical aspects of research design and analysis of data; maintains familiarity with professional developments and | 5.0 | 2.0 | 10.0 |
| Conduct workgroups; participate in/conducts statewide planning meetings and conferences; identify needs related to Specialized TMH Training, Clinical Social Work training needs and quality improvement efforts. | 16.0 | 52.0 | 832.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **5282.0** |
| **TOTAL POSITIONS PROJECTED** | | | **3.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

**Classification:  Supervising Psychiatric Social Worker II**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Oversee the Tele-social work program and Supervising Psychiatric Social Worker I. Ensures supervision of the development, delivery, and monitoring of specialized mental health training programs occurs. Provide direction for specific clinical social work programs, ensure compliance with professional standards of practice, license maintenance requirements, and laws and regulations applied to the practice of social work, using MHSDS program guidelines, professional standards of practice. Coordinate implementation of TMH program, including expansion activities and night shift tele-social work. | 12.0 | 52.0 | 624.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinate the training, proctorship, orientation, and supervision of new state employees to ensure that all employees learn the knowledge and skills they need to work within their scope of practice and fully function in their position, understand the safety and security procedures they need to follow, understand the use of the MHSDS program guidelines. | 9.0 | 12.0 | 108.0 |
| Participate in supervisory meetings, TMH related committees, medical staff committees to provide mental health expertise in relation to the MHSDS, learn new departmental and institutional policies and procedures, share information between institutional programs, using knowledge of the mental health program's function and procedures, communication skills, understanding of group dynamics, organizational change process, and an understanding of the department's organization, chain of command, and protocol. | 10.0 | 52.0 | 520.0 |
| Design and develop quality management training tools. Responsible for quality reporting and audits. | 8.0 | 12.0 | 96.0 |
| Perform program evaluation studies on new and/or existing training programs in order to determine their effectiveness at meeting program guidelines and departmental needs, provide information to court monitors and the chain of command, make changes as part of a quality management program, identify problems and needs, recommend changes and improvements. | 2.0 | 12.0 | 24.0 |
| Participate in Continuing Education and other activities required to maintain licensure to practice. | 7.0 | 2.0 | 14.0 |
| Manage SW Pre-Release Program and supervise Regional Supervising Psychiatric Social Worker Is. Oversee coordination with local treatment teams and clinical providers to ensure clinical contacts are completed for continuity of care. | 5.0 | 52.0 | 260.0 |
| Oversee coordination with local treatment teams and clinical providers to ensure clinical contacts are completed for continuity of care. | 1.0 | 52.0 | 52.0 |
| Ensure tele-mental health appointments are scheduled between patient and community case managers and/or providers. | 1.0 | 52.0 | 52.0 |
| Monitor factors impacting release and release dates and communicate with case managers as changes occur. | 1.0 | 52.0 | 52.0 |
| Provides high level reports, administrative documents related to pre-release activities and status updates/recommendations to executive management. | 1.0 | 52.0 | 52.0 |
| Plan mandated mental health programs training and other special programs in order to improve mental health care delivery, meet specialized needs of particular populations in the institution, and comply with rules, regulations, and court mandates using knowledge of Local Operating procedures (LOPs), professional standards of practice guidelines, rules, regulations, and court mandates, coordination with different programs (e.g., custody, labor relations, medical), organizational skills, communication skills. | 6.0 | 12.0 | 72.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1926.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

**California Correctional Health Care Services**
**Program Area: Nursing**
**Issue: Tele-Mental Health Program**

## Classification:  Medical Assistant

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Training (Basic Life Support) | 400.0 | 0.5 | 200.0 |
| Training (Mandatory Annual Training) | 3200.0 | 1.0 | 3200.0 |
| Facilitating tele-mental encounters via videoconferencing (while tele-mental health clinician is doing assessments). | 1000.0 | 52.0 | 52000.0 |
| Conducting initial observations and recording patient's condition; then reporting findings to Tele-psychiatrist. | 500.0 | 52.0 | 26000.0 |
| Observing patient behavior during and after encounter with telepsychiatry and reporting to Tele-psychiatrist. | 500.0 | 52.0 | 26000.0 |
| Documenting clinical observations in chart (including obtaining vital signs, height, weight). | 500.0 | 52.0 | 26000.0 |
| Collaborating with tele-mental health clinicians on facilitating appropriate treatment to patient. | 500.0 | 52.0 | 26000.0 |
| Testing to ensure telepsychiatry equipment is in working condition at beginning of every shift. | 70.0 | 52.0 | 3640.0 |
| Collaborating with local nursing staff to meet clinical needs of the patient (including beginning & end of shift sign-outs). | 70.0 | 52.0 | 3640.0 |
| Assisting patient with physical care, including activities of daily living, ensuring patient safety. | 100.0 | 52.0 | 5200.0 |
| Monitor patient on suicide watch until appropriate relief arrives and documents all activities related to the suicide watch assignments. | 100.0 | 12.0 | 1200.0 |
| Contacting local staff in the event of emergency issues, and transferring appropriate clinical information and documentation. | 100.0 | 52.0 | 5200.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 178280.0 |
| TOTAL POSITIONS PROJECTED | | | 100.4 |

**California Correctional Health Care Services**
**Program Area: Nursing**
**Issue: Tele-Mental Health Program**

## Classification:  Supervising Registered Nurse II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Administratively supervises medical assistants (MAs) facilitating tele-mental encounters via videoconferencing, testing to ensure tele-psychiatry equipment is in working condition at beginning of every shift, observing patient behavior during and after encounter with tele-psychiatry and reporting to the tele-psychiatrist, conducting initial observations and recording patient's condition and reporting findings to Tele-psychiatrist, collaborating with local staff to meet clinical needs of the patient (including beginning & end of shift sign-outs), and documenting clinical observations in chart (including obtaining vital signs, height, weight). | 100.0 | 52.0 | 5200.0 |
| Administratively supervises MAs assisting patients with physical care including activities of daily living, ensuring patient safety, monitoring patients on suicide watch until | 60.0 | 52.0 | 3120.0 |
| Manages personnel functions including timesheets, performance evaluations, probation reports, Equal Employment Opportunity (EEO) and Employee Relations Office (ERO) complaints, etc. | 54.0 | 52.0 | 2808.0 |
| Training new MAs in required duties such as taking vital signs, using the electronic health record system (EHRS), providing updated clinical data to physicians, and other nursing duties. | 60.0 | 52.0 | 3120.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **14248.0** |
| **TOTAL POSITIONS PROJECTED** | | | **8.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Research Data Supervisor I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Apply personnel management, supervision, and training principles to effectively oversee the work activities of employees to ensure the unit operates smoothly and supports the newly created tele-mental health program and efforts to recruit and retain more mental health providers. | 10.0 | 52.0 | 520.0 |
| Work and coordinate with interdisciplinary teams to conduct studies and research projects. | 8.0 | 52.0 | 416.0 |
| Review and edit written reports for accuracy, completeness, and compliance with applicable laws and regulations. | 6.0 | 52.0 | 312.0 |
| Review the work of subordinate staff and provide constructive feedback from the perspective of a supervisor. | 6.0 | 52.0 | 312.0 |
| Plan, organize, and manage a research function in compliance with departmental policies and regulations. | 3.0 | 52.0 | 156.0 |
| Use problem-solving techniques and processes to identify and resolve issues related to the completion of work assignments. | 3.0 | 52.0 | 156.0 |
| Manage workload and assignments of others to meet work unit and project objectives and deadlines. | 2.0 | 52.0 | 104.0 |
| Delegate work to staff to ensure work projects are completed on time and within budget. | 1.0 | 52.0 | 52.0 |
| Apply leadership principles and methods to motivate and maintain the productivity of work unit staff members in accomplishing program objectives. | 1.0 | 52.0 | 52.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 2080.0 |
| TOTAL POSITIONS PROJECTED | | | 1.2 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

### Classification: Research Data Supervisor II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Provides overarching support to the tele-mental health program by identifying new data points that are not yet measured and considering how to capture that data. This includes internal metrics that can assist in targeting efforts to recruit and retain more mental health providers. | 8.0 | 52.0 | 416.0 |
| Supervises staff responsible for carrying out the work of the analytics unit including providing research guidance on research design, advanced statistical analyses and interpretations of results, developing and presenting findings, and identifying additional ways that data can be used to inform and guide the departmental decision making process. | 7.0 | 52.0 | 364.0 |
| Establishes and maintains project priorities and timelines, managing a complex program and developing and effectively using all available resources. | 4.0 | 52.0 | 208.0 |
| Plans and manages a research function, including overseeing the work activities of employees to ensure the unit operates. | 4.0 | 52.0 | 208.0 |
| Provides oversight on projects, ensuring that end products or services are delivered on schedule, within the established budget, and in compliance with applicable laws. Review and edit written reports, using interdisciplinary teams effectively in the conduct of studies. | 3.0 | 52.0 | 156.0 |
| Acts as technical expert to senior management, program supervisors, and departmental employees on data analysis and development of data management and reporting methods. | 3.0 | 52.0 | 156.0 |
| Delegates work to staff to ensure work projects are completed on time and within budget, and review the work of subordinate staff. | 3.0 | 52.0 | 156.0 |
| Objectively identify all facts and implications related to a situation before drawing conclusions and determining courses of action. | 2.0 | 52.0 | 104.0 |
| Utilizes project management techniques to manage the progress of programs and project activities to ensure that project timelines and schedules are appropriately established, modified, and adhered to. | 1.5 | 52.0 | 78.0 |
| Develops standard operating procedures and policies related to the conducting of human resource-related business analytics. | 1.0 | 52.0 | 52.0 |
| Ensures adequate cross training to ensure that all staff have the capabilities they need to be maximally effective in their analytical work. | 1.0 | 52.0 | 52.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 1950.0 |
| TOTAL POSITIONS PROJECTED | | | 1.1 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Research Data Analyst II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Developing and writing programs to track and analyze tele-mental Health Program productivity. | 7.0 | 52.0 | 364.0 |
| Developing program tools to assess with utilization and allocation of tele-mental health program resources. | 6.0 | 52.0 | 312.0 |
| Creating programs that track, analyze, and generate reports submitted to the courts on technical quality of tele-mental health program. | 6.0 | 52.0 | 312.0 |
| Creating programs that track, analyze, and generate reports submitted to the courts on the participation of tele-mental Health Program in Interdisciplinary Treatment Team meetings. | 5.0 | 52.0 | 260.0 |
| Providing statistical analysis and generating reports on clinical equivalence of tele-mental health program versus onsite psychiatry. | 4.0 | 52.0 | 208.0 |
| Developing both qualitative and quantitative measures of tele-mental Health Program versus onsite psychiatry. | 3.0 | 52.0 | 156.0 |
| Coordinating the creation of reports submitted to the court. | 2.0 | 52.0 | 104.0 |
| Designing, planning, and implementing quality improvement projects on data gathering and reporting. | 2.0 | 52.0 | 104.0 |
| Organizing and strategizing for upcoming tele-mental health program needs. | 0.5 | 52.0 | 26.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 1846.0 |
| TOTAL POSITIONS PROJECTED | | | 1.0 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

**Classification: Research Data Specialist I**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Collaborating with IT, CCHCS Quality Management and other discipline related to tele-mental Health Program improvement. | 50.0 | 5.0 | 250.0 |
| Creating and maintaining Power BI reports. | 30.0 | 6.0 | 180.0 |
| Enhancing current Power BI reports. | 30.0 | 6.0 | 180.0 |
| Fulfilling data request from internal and external stakeholders with detailed methodology, validation and verification. | 30.0 | 6.0 | 180.0 |
| Developing scripts, stored procedures, and triggers for development, applying bug fixes and managing SQL database. | 25.0 | 6.0 | 150.0 |
| Maintaining applications, reports and tools ensuring they reach maximum efficiency and function under satisfactory conditions. | 25.0 | 6.0 | 150.0 |
| Reviewing test writing results and documenting findings. | 20.0 | 6.0 | 120.0 |
| Validating and verifying changes to ensure system changes meet requirements and specifications and that it fulfills its intended purpose. | 18.0 | 5.0 | 90.0 |
| Designing, planning, and implementing quality improvement projects on data gathering and reporting. | 15.0 | 5.0 | 75.0 |
| Monitoring, triaging, addressing and resolving ticket from Service Now and statewide communication. | 15.0 | 6.0 | 90.0 |
| Enhancing the Business Rules Methodology Review (BRMR) Share point site. | 8.0 | 6.0 | 48.0 |
| Attending and participating in BRMR related meetings. | 7.0 | 6.0 | 42.0 |
| Coordinating, preparing, tracking and reviewing indicators for BRMR meeting. | 7.0 | 6.0 | 42.0 |
| Enhancing current reports by adding "about this report" to all MH reports. | 7.0 | 6.0 | 42.0 |
| Monitoring, triaging, addressing and resolving ticket from Service Now Incidents. | 7.0 | 6.0 | 42.0 |
| Monitoring, triaging, addressing and resolving ticket from Service Now Task. | 7.0 | 6.0 | 42.0 |
| Participating in internal team meetings. | 7.0 | 6.0 | 42.0 |
| Coordinating, creating, tracking and preparing statewide webinars and training. | 3.0 | 6.0 | 18.0 |
| Professional growth. | 3.0 | 5.0 | 15.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1798.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  HPS II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Tracking, reporting, and monitoring of TMH strategic goals. Reviewing reports, briefing documents, and presenting materials to Mental Health leadership, Office of Legal Affairs and the Coleman court. | 3.0 | 52.0 | 156.0 |
| Leading teams and managing special projects and initiatives, including quality improvement initiatives, and other TMH service projects. | 3.0 | 52.0 | 156.0 |
| Monitoring, auditing, and reporting on adherence to TMH requirements. | 1.0 | 52.0 | 52.0 |
| Utilizing project management tools to lead TMH improvement projects. Reporting on  timelines, updating stakeholders on goals and benchmarks, providing logistical expertise, and designing ongoing maintenance for project sustainability. | 1.0 | 52.0 | 52.0 |
| Conducting complex reviews and detailed data analysis of TMH services performance and outcome measures. Conducting statistical analysis reports, feasibility studies and proposals in support of TMH improvement projects. | 2.0 | 52.0 | 104.0 |
| Leading HPS Is who produce and track measures to determine efficacy of TMH initiatives, policies/procedures, and making recommendations of new initiatives. | 2.0 | 52.0 | 104.0 |
| Lead TMH policy and procedure development efforts. Tracking status, corresponding with internal and external stakeholders. Develop streamlined processes to expedite implementation. Develop labor negotiation tools and assist with inquiries related to TMH and SMHP litigation. | 20.0 | 52.0 | 1040.0 |
| Attend all staff meetings and TMH workgroups. | 1.0 | 52.0 | 52.0 |
| Attending internal and external training courses. | 4.0 | 12.0 | 48.0 |
| Traveling to institutions to assist assessment of current and future TMH services. | 6.0 | 12.0 | 72.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 1836.0 |
| TOTAL POSITIONS PROJECTED | | | 1.0 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  SSM III

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Oversees TMH and SMHP functions and operational support teams and directly supervises SSM IIs, HPS IIs and support staff. Develops implementation plans to effectively respond to emerging priorities. | 13.0 | 52.0 | 676.0 |
| Monitor data validation review related to TMH and SMHP. | 2.0 | 52.0 | 150.0 |
| Participate in strategic planning and process improvement activities relating to TMH and SMHP, including development and evaluation of policies, procedures, and protocols critical to improving the quality of mental health services. | 5.0 | 52.0 | 260.0 |
| Oversight of design, planning, and implementing quality improvement projects specifically relating to TMH and SMHP. | 4.0 | 52.0 | 208.0 |
| Reporting TMH workgroup outcomes across disciplines and to executive Leadership. | 2.0 | 52.0 | 104.0 |
| Leading, organizing, and participating in TMH workgroup activities. | 2.0 | 52.0 | 104.0 |
| Participating in and co-facilitating internal team meetings. | 2.0 | 52.0 | 104.0 |
| Performance evaluations, staff development and team building. | 1.0 | 52.0 | 200.0 |
| Coordinate, track, review materials and participate in statewide webinars and training related to TMH. | 1.0 | 52.0 | 52.0 |
| Provide oversight related to the planning, development, and ongoing maintenance of TMH and SMHP programs to ensure high-quality work is delivered within required timelines. | 1.0 | 52.0 | 52.0 |
| Direct department wide assignments of the most sensitive, complex, and/or confidential nature. Provides recommendations and feedback to CEA, executive leadership, Office of Legal Affairs, and the Coleman Court. | 3.0 | 52.0 | 156.0 |
| Assess program needs and recommend specific actions to facilitate organizational effectiveness and promote workforce excellence. | 2.0 | 52.0 | 104.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **2170.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.2** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  SSM II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Oversee Teams of SSM Is and support staff within the TMH Operational Support Section. Coordinate activities, projects, implementation of TMH program, policies, procedures, and continuous improvement activities, including TMH support related to gender minority related services, policies and procedures, litigation data analytics,  Electronic Health Record System, Quality Management/Utilization Management. | 15.0 | 52.0 | 780.0 |
| Reporting workgroup outcomes across disciplines, TMH clinicians, executive leadership and legal. | 1.0 | 52.0 | 52.0 |
| Coordinating TMH efforts between SSM IIIs, CEAs, Headquarters clinicians, institutions, and HPS II. | 1.0 | 52.0 | 52.0 |
| Directs program development through statistical analyses, research, and program implementation. | 2.0 | 52.0 | 104.0 |
| Provides oversight related to the planning, development, implementation, and on-going maintenance to ensure high quality work is delivered within timelines. | 1.0 | 52.0 | 52.0 |
| Ensures program is consistent and in-line with the policies and procedures of the TMH and the Department. | 2.0 | 52.0 | 104.0 |
| Organizes and directs the most efficient and effective courses of action in the identification of assessed issues, needs, corrective actions, and improvements for TMH. | 2.0 | 52.0 | 104.0 |
| Oversees staff development, implementation, and on-going maintenance of specialized policy, planning, and system assistance related to program operations; determining impacted and affected program activities. | 4.0 | 52.0 | 208.0 |
| Directs program needs and provides oversight and supervision to SSM Is and analytical teams. | 3.0 | 52.0 | 156.0 |
| Leading, organizing, and participating in workgroup activities for TMH and related operational functions. | 2.0 | 52.0 | 104.0 |
| Participating in and co-facilitating internal team meetings. | 2.0 | 52.0 | 104.0 |
| Performance evaluations and team building. | 1.0 | 52.0 | 52.0 |
| Monitoring audits and reviewing reports for Tele MH services including gender minority, Electronic Health Records System, Quality Management/Utilization Management. | 2.0 | 52.0 | 104.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1976.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  SSM I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Overseeing a team of HPSs and AGPAs for the 3 TMH program areas (PSYL, SW). Coordinating activities, managing workload, projects, implementation of TMH program, policies, procedures, and continuous improvement activities. | 40.0 | 52.0 | 2080.0 |
| Reporting workgroup outcomes across disciplines and TMH clinicians. | 2.0 | 52.0 | 104.0 |
| Leading, organizing, and participating in workgroup activities for TMH. | 6.0 | 52.0 | 312.0 |
| Participating in and cofacilitating internal team meetings. | 4.0 | 52.0 | 208.0 |
| Providing supervisory guidance to staff. | 4.0 | 52.0 | 208.0 |
| Designing, planning, and implementing quality improvement projects for TMH. | 4.0 | 52.0 | 208.0 |
| Assisting staff with determining the methodologies and requirements needed to deliver relevant and quality training and for developing and maintaining relationships with key business partners needed to support critical training activities. | 4.0 | 52.0 | 208.0 |
| Performance evaluations, staff development and team building. | 4.0 | 52.0 | 208.0 |
| Monitoring audits and reviewing reports/documents for Tele MH services, including policies and procedures, EHRS, UM/QM, TMH gender minority services. | 4.0 | 52.0 | 208.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **3,744.0** |
| **TOTAL POSITIONS PROJECTED** | | | **2.1** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Health Program Specialist I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Tracking, reporting, and monitoring of TMH strategic goals. | 16.0 | 52.0 | 832.0 |
| Special projects and TMH operational support activities, including, quality improvement initiatives. | 16.0 | 52.0 | 832.0 |
| Monitoring, auditing, and reporting on adherence to TMH requirements. | 4.0 | 52.0 | 208.0 |
| Utilizing project management tools to support improvement projects in order to enhance TMH services. Creating timelines, updating stakeholders on goals and benchmarks, providing logistical expertise, and designing ongoing maintenance for TMH sustainability. | 2.0 | 52.0 | 104.0 |
| Preparing TMH reports, briefing documents, and presenting materials to Mental Health leadership and the Coleman court. | 4.0 | 52.0 | 208.0 |
| Conducting targeted improvement projects as TMH subject matter expert on TMH scheduling, mental health services logistics, and expansion initiatives. | 5.0 | 52.0 | 260.0 |
| Providing detailed statistical analysis reports, feasibility studies and proposals in support of TMH improvement projects. | 5.0 | 52.0 | 260.0 |
| Conducting complex and detailed data analysis of TMH services performance and outcome measures. | 5.0 | 52.0 | 260.0 |
| Producing and tracking measures to determine efficacy of TMH initiatives and making recommendations for future initiatives. | 4.0 | 52.0 | 208.0 |
| Attend staff meetings and TMH workgroups. | 4.0 | 52.0 | 208.0 |
| Attending internal and external training courses. | 3.0 | 52.0 | 156.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 3536.0 |
| TOTAL POSITIONS PROJECTED | | | 2.0 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: AGPA

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Tracking, reporting, and monitoring of TMH strategic goals. | 40.0 | 52.0 | 2080.0 |
| Assist with preparing and editing TMH reports and briefing documents that will be presented to Mental Health leadership and the Coleman court. | 20.0 | 52.0 | 1040.0 |
| Providing detailed analysis reports, in support of improvement projects for TMH services including gender minority, policies, Electronic Health Record System, Quality Management/Utilization Management, and data analytics. | 20.0 | 52.0 | 1040.0 |
| Conducting data analysis of TMH services performance and outcome measures. | 20.0 | 52.0 | 1040.0 |
| Producing and tracking measures to determine efficacy of TMH expansion initiatives and making recommendations for future TMH expansion of new initiatives. | 10.0 | 52.0 | 520.0 |
| Attend staff meetings and TMH workgroups. | 15.0 | 52.0 | 780.0 |
| Support improvement projects in order to enhance TMH services. Tracking timelines, updating stakeholders on goals and benchmarks, providing logistical expertise, and designing ongoing maintenance for project sustainability. | 15.0 | 52.0 | 780.0 |
| Assist with TMH policy development, editing, and review. Assist with inquiries related to various litigation pertaining to TMH and SMHP. | 10.0 | 52.0 | 520.0 |
| Attending internal and external training courses. | 6.0 | 52.0 | 312.0 |
| Provides support to executive leadership. | 60.0 | 52.0 | 3120.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **11232.0** |
| **TOTAL POSITIONS PROJECTED** | | | **6.3** |

# Attachment B

**California Department of Corrections and Rehabilitation**
**California Correctional Health Care Services**
**Statewide Telepsychiatry Program**

**Workload Assumptions**

| | |
|---|---|
| Work-hours per person per year* | 1776 |

Daytime Shift

| | |
|---|---|
| Days in Work Year | 260 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

24/7 Services

| | |
|---|---|
| Hours in Work Day | 24 |
| Days in Work Year | 236 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

Assumptions

| | |
|---|---|
| The requested PY resources are to accommodate new workload requirements set forth | |
| by court orders as described in the Finance Letter narrative (dates). | |
| This is not an expansion of existing work previously established, | |
| but rather new tasks related to the addition of activities to the workload. | |

| | |
|---|---|
| For class specific assumptions, see individual tabs. | |

**California Correctional Health Care Services**
**Program Area: ITSD Customer Support Center**
**Issue: Tele-Mental Health Program**

**Classification: Information Technology Associate (ITSD MH Support) for OPS**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Network connectivity. | 0.8 | 100.0 | 75.0 |
| Account management. | 0.3 | 75.0 | 18.8 |
| Procurement (Major Equipment). | 2.0 | 5.0 | 10.0 |
| Develops work plans, proposals and reporting. | 5.0 | 5.0 | 25.0 |
| Provides special services to customers and other department units. | 3.0 | 4.0 | 12.0 |
| Troubleshoots Equipment/malfunction. | 0.8 | 1185.0 | 888.8 |
| Basic training. | 0.5 | 50.0 | 25.0 |
| Detailed training. | 2.0 | 1.5 | 3.0 |
| Testing network, peripherals. | 0.3 | 280.0 | 70.0 |
| Software management. | 0.3 | 50.0 | 12.5 |
| Hardware management. | 0.5 | 110.0 | 55.0 |
| Deploy Telehealth/psych cart (Region 1) | 5.5 | 6.0 | 33.0 |
| Deploy Telehealth/psych cart (Region 2) | 12.0 | 6.0 | 72.0 |
| Deploy Telehealth/psych cart (Region 3) | 12.0 | 10.0 | 120.0 |
| Deploy Telehealth/psych cart (Region 4) | 22.0 | 7.0 | 154.0 |
| Documentation. | 1.0 | 38.0 | 38.0 |
| Asset management (general duties). | 0.3 | 300.0 | 75.0 |
| Answer incoming calls for enterprise support. | 0.2 | 500.0 | 100.0 |
| Service Now ticket create/move /change. | 0.2 | 1000.0 | 150.0 |
| Provisioning. | 0.3 | 200.0 | 50.0 |
| Product research. | 2.0 | 4.0 | 8.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1995.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

**California Correctional Health Care Services**
**Program Area: ITSD Infrastructure**
**Issue: Tele-Mental Health Program**

**Classification: Information Technology Specialist I for Telehealth**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Connecting network. | 1.0 | 100.0 | 100.0 |
| Managing accounts. | 0.5 | 80.0 | 40.0 |
| Procuring telehealth equipment and peripherals. | 2.0 | 10.0 | 20.0 |
| Developing work plans, proposals and reporting. | 5.0 | 5.0 | 25.0 |
| Providing special services to customers and other department units. | 1.0 | 15.0 | 15.0 |
| Troubleshooting equipment and malfunction. | 0.5 | 750.0 | 375.0 |
| Conducting basic training. | 1.0 | 40.0 | 40.0 |
| Conducting detailed training. | 1.0 | 10.0 | 10.0 |
| Testing network and telehealth peripherals. | 0.5 | 150.0 | 75.0 |
| Managing software. | 0.5 | 60.0 | 30.0 |
| Managing hardware. | 0.5 | 60.0 | 30.0 |
| Deploying telehealth equipment (Region 1). | 12.0 | 13.0 | 156.0 |
| Deploying telehealth equipment (Region 2). | 12.0 | 13.0 | 156.0 |
| Deploying telehealth equipment (Region 3). | 12.0 | 13.0 | 156.0 |
| Deploying telehealth equipment (Region 4). | 12.0 | 13.0 | 156.0 |
| Documenting. | 2.0 | 40.0 | 80.0 |
| Managing assets (general duties). | 0.3 | 300.0 | 75.0 |
| Answering incoming calls. | 0.2 | 500.0 | 100.0 |
| Creating, moving, and updating Solution Center Tickets. | 0.5 | 500.0 | 250.0 |
| Provisioning. | 0.5 | 100.0 | 50.0 |
| Researching products. | 1.0 | 25.0 | 25.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1964.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

# Attachment C

**California Department of Corrections and Rehabilitation**
**California Correctional Health Care Services**
**Statewide Telepsychiatry Program**

**Workload Assumptions**

| Work-hours per person per year * | 1776 |
|---|---|

Daytime Shift

| Days in Work Year | 260 |
|---|---|
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

24/7 Services

| Hours in Work Day | 24 |
|---|---|
| Days in Work Year | 236 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

Assumptions

| The requested PY resources are to accommodate new workload requirements set forth | |
|---|---|
| by court orders as described in the Finance Letter narrative (dates). | |
| This is not an expansion of existing work previously established, | |
| but rather new tasks related to the addition of activities to the workload. | |

| For class specific assumptions, see individual tabs. | |
|---|---|

California Correctional Health Care Services
Human Resources

**Classification:  Associate Governmental Program Analyst**

| ACTIVITY / TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Provides hiring support to headquarters, regional and institutions for Tele-Mental, mental health programs, and institution vacancies to mental health positions by guiding candidates through the recruitment and hiring process as the principal point of contact for all hiring-related activities. This includes communicating to candidate on location(s) of interest, ensuring completion of pre-interview documentation, establishing interview dates, assessing interview questions, screening applications, verifying valid licensure/certification, establishing livescan appointments, ensuring completion of pre-hire documentation, including credentialling and compiling of hiring packet, and follow up. | 18.0 | 100.0 | 1,800.0 |
| Provides hiring support at all hiring events which includes set up at the event, assists candidates with exams, interviews, pre-employment, livescan and tentative offer.  Prepares all hiring paperwork at the event to ensure quick hires and follows up for completion of hires from these events. | 26.0 | 3.5 | 91.0 |
| Ensures hires are progressing appropriately. Coordinates with candidate, hiring programs, credentialing unit, livescan unit, etc. to ensure progress, determining impacts and formulating solutions, and escalates issues to management, as needed. | 15.0 | 100.0 | 1,500.0 |
| Main point of contact for leads which may not result in interview for assigned classification. Communicates with candidates via telephone and email regarding employment inquiries. | 1.0 | 25.0 | 25.0 |
| Coordinates departmental subject matter experts for conferences, interview panel members, local job fairs, and other recruitment events. | 1.0 | 30.0 | 30.0 |
| Produces ad hoc reports for program and executive management regarding mental health and Event hiring data and individual hiring status. | 0.5 | 12.0 | 6.0 |
| Consults and regularly follows up to determine the effectiveness of recruiting plans. Compiles and analyzes the data pertaining to mental health recruitment activities, outreach efforts, and educational partnerships. Makes recommendations to management in regards to establishing recruiting requirements. | 0.5 | 65.0 | 32.5 |
| Works directly with headquarters, regional offices and institutions hiring programs and other Human Resources (HR) programs to address any questions or concerns regarding hiring process. Communicates to programs regarding status of hires and/or candidate pools.  Works towards process improvements and streamlining of hiring timelines through teamwork with programs. | 0.5 | 100.0 | 50.0 |
| Develops social-media recruitment tools, including updating the CCHCS social media pages and accounts in conjunction with Graphic Designers, in addition to other social media strategies to provide referrals to CCHCS recruitment website or other strategies. | 4.0 | 7.5 | 30.0 |
| Requests/posts job ads on the California Department of Human Resources and California Correctional Health Care Services job posting sites and other employment sites as required. Ensures advertisements are posted correctly and free from error. | 0.5 | 15.0 | 7.5 |
| Maintains and develops graphics for social media recruitment platforms such as Facebook, CareerArc, and LinkedIn. Conducts associated research on a monthly basis (image searches, ensures adherence to State of California social media policies, maintains company and career pages, coordination of targeted digital campaigns, and research on best practices). | 5.0 | 12.0 | 60.0 |
| Continues process improvements and streamlining of hiring timelines to expedite hires. | 5.0 | 3.0 | 15.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **3,647.0** |
| **TOTAL POSITIONS PROJECTED** | | | **2.1** |

**Note:** Column C- task assumptions are derived either by:

Number of tasks, per institution, per month, per year (Row 9)

Number of tasks, per training (Row 10)

Number of tasks per month (Rows= 11-14, 16)

Number of classes plus new classes (Row= 15)

Attachment C

**California Correctional Health Care Services**
**Human Resources**

## Classification:  Personnel Technician II (Specialist)

| ACTIVITY /TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Downloads data from California Correctional Health Care Services (CCHCS) exam platform (HODES) to include in clinical/non-clinical  report.  Download State Restriction of Appoint (E2) report and enter E2s into Examination Certification Online System (ECOS).  Audits E2s. | 1.0 | 500.0 | 500.0 |
| Responds to applicant inquiries regarding exam related information.  Prepares notices of exam results and mail to candidates.  Assists analysts with testing online exams in HODES. Updates exam bulletins and organizes electronic exam materials. | 4.0 | 50.0 | 200.0 |
| Prepares ECOS postings for all mental health classifications, initiates and completes the certification process. Provides information to candidates regarding list eligibility and the certification process.  Completes changes to the on-line system as requested by candidates. | 2.0 | 175.0 | 350.0 |
| Analyzes applicants experience and education from the state application or Statement of Qualifications.  Contacts candidates for additional information if needed and verify valid licensure and or certifications.  Utilizes resource materials to ensure applicable state rules are applied to each exam/certification process. | 3.0 | 150.0 | 450.0 |
| Assists with the exam and certification process at all hiring events including candidate prescreening, attending all events and setting up and taking down the event venue. | 30.0 | 3.5 | 105.0 |
| Provides support to Human Resources staff and California Correctional Health Care Services institution Field Liaison Analysts, screen incoming calls and refers analytical questions to the appropriate analyst; sort, file and track incoming mental health applications and mail correspondence.  Reconciles error reports and audit system processes. | 2.0 | 63.0 | 126.0 |
| Americans with Disability Acts compliance functions. | 1.0 | 0.3 | 0.3 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1,731.3** |
| **TOTAL POSITIONS PROJECTED** | | | **1.0** |

**Note:** Column C- task assumptions are derived either by:

Number of tasks, per institution, per month, per year (Row 9)
Number of tasks, per training (Row 10)
Number of tasks per month (Rows= 11-14, 16)
Number of classes plus new classes (Row= 15)

**California Correctional Health Care Services**
**Human Resources**

## Classification:  Personnel Specialist

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Activity* | | | |
| Makes independent decisions on salary determination based on civil service laws and rules - including specific mental health pay differentials that must be reviewed and applied based on eligibility criteria. | 2.00 | 125 | 250.0 |
| Keys appointment transactions on the Personnel Action Request (PAR) and Employee Action Requests via the State Controllers computer system ensuring that all information is accurate and complete. . | 0.75 | 125 | 93.8 |
| Keys separation transactions on the PAR form via the State Controllers computer system.  Prepare and process timely lump sum calculations and payments for separating employees to avoid penalties. | 3.00 | 25 | 75.0 |
| Keys all miscellaneous pay transactions such as overtime, shift pay, On-Call/Callback, Psychiatrist of the Day, Holiday Pay and Out of Class pay.  Keys all miscellaneous employment transactions on the PAR such as locked in pay differentials, range changes, tenure changes, time base changes, and leave of absences. | 0.50 | 600 | 300.0 |
| Processes all benefit documents for employees including health, dental, vision, life insurance, flex-elect and Consolidated Omnibus Budget Reconciliation Act (COBRA).  Processes and monitors Catastrophic Time Banks, Family Medical Leave Act, State Disability Insurance, Non Industrial Disability Insurance, and Temporary Disability. | 2.50 | 250 | 625.0 |
| Maintains attendance records and reconciles monthly payroll with received timesheets to ensure payroll is accurate.  Audits time sheets against employees leave and ensures that time off is reflected in the California Leave Accounting System.  Sets up accounts receivables if employee has insufficient time to cover ableness. | 8.00 | 26 | 208.0 |
| Maintains and files all employee related documents in the Official Personnel File.  Files all payroll documents in accordance with the Department of General Services retention schedule. | 1.00 | 52 | 52.0 |
| Processes garnishments and levies, researches and monitors collections, prepares salary advances and ensures collection, process and monitor accounts receivables to ensure timely collection.  Updates and maintains all Salary Advance and Accounts Receivable information in Business Information System. | 3.00 | 52 | 156.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1,759.8** |
| **TOTAL POSITIONS PROJECTED** | | | **1.0** |

**Note:** Column C- task assumptions are derived either by:
Number of tasks, per institution, per month, per year (Row 9)
Number of tasks, per training (Row 10)
Number of tasks per month (Rows= 11-14, 16)
Number of classes plus new classes (Row= 15)

# EXHIBIT B

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Coleman Team - RBG Only; Coleman Special Master; Steve Fama |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; v_Damon.McClain@doj.ca.gov; v_Namrata.Kotwani@doj.ca.gov; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| **Subject:** | Coleman: Draft Telemental Health Services Policy |
| **Date:** | Friday, July 21, 2023 3:35:59 PM |
| **Attachments:** | Draft Telemental Health Services Policy- 7.21.23.docx |

Good afternoon,

Attached is a draft of CDCR's Telemental Health Services policy. Please provide comments by August 21, 2023. CDCR will consider all comments received and intends to finalize the Telemental Health Services policy shortly thereafter.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 8:** | Revision Date(s): | |
| | Supersedes: | |
| **12.08.100** TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to provide care to CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and social work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly.

Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

## Refusals

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

## Contraindications for Telemental Health

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the telepsychologist and Chief of Telepsychology, or telesocial worker and Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

## Telemental Health and Levels of Care

Telemental health providers will be assigned to CCCMS and EOP levels of care. Whenever possible, CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Services Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**     The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.

- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# EXHIBIT C

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Lopes Matthew; Coleman Team - RBG Only; Coleman Special Master; Steven Fama (sfama@prisonlaw.com) |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; David C. Casarrubias; Laurel E. O"Connor; Neill, Jennifer@CDCR; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| **Subject:** | Coleman: Telemental Health Policy |
| **Date:** | Tuesday, September 19, 2023 7:29:02 PM |
| **Attachments:** | MH HQ Policy - Telemental Health Program.pdf |

Good afternoon,

Attached is the final Telemental Health Policy that was issued to the field today.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | 9/19/2023 |
|---|---|---|
| **CHAPTER 1:** ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| **12.01.901** TELEMENTAL HEALTH PROGRAM | Attachments: | Yes ☐   No ☒ |
| | Director Approval: | *DocuSigned by:* **Amar Mehta** 46AE21AE5D3B4D3... |

| **Purpose** | This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations. |
|---|---|

| **Policy** | Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to care for CDCR patients. |
|---|---|

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified emergency circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

### Equipment

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

counterparts, including the Electronic Health Records System.

- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the telepresenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis, except that telemental health services shall generally only be used in EOP and CCCMS programs, as detailed in the sections below. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned.

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only emergency circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

All elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

### Site Visits

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

### Organizational Structure

All telemental health staff shall report as appropriate within the Telemental Health Program supervisory chain.

### Workflow Interruptions

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

### On-Call or After-Hours Coverage by Telemental Health Providers

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

incidents requiring an in-person presence if needed.

---

**Responsibilities**     The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained telepresenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
- A backup telepresenter when the primary telepresenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor
    15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters,

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**
- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**     If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# EXHIBIT D

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Lopes Matthew; Coleman Team - RBG Only; Coleman Special Master; Steven Fama (sfama@prisonlaw.com) |
| Cc: | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; David C. Casarrubias; Laurel E. O"Connor; Neill, Jennifer@CDCR; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| Subject: | RE: Coleman: Telemental Health Policy |
| Date: | Thursday, September 21, 2023 6:09:43 PM |
| Attachments: | MH HQ Policy - Telemental Health Program.pdf |

All,

Upon review, CDCR determined that a non-final version of the Telemental Health policy was inadvertently released to the field earlier this week. The correct, final version was released to the field today. I have attached the correct version here.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Bentz, Melissa@CDCR
**Sent:** Tuesday, September 19, 2023 4:28 PM
**To:** mlopes@pldolaw.com; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; David C. Casarrubias <DCasarrubias@hansonbridgett.com>; Laurel E. O'Connor <LOConnor@hansonbridgett.com>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Subject:** Coleman: Telemental Health Policy

Good afternoon,

Attached is the final Telemental Health Policy that was issued to the field today.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs

California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | 9/21/2023 |
|---|---|---|
| **CHAPTER 1:** ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| **12.01.901** TELEMENTAL HEALTH PROGRAM | Attachments: | Yes     No ☒ |
| | Director Approval: | DocuSigned by: **Amar Mehta, M.D.** 46AE21AE3D5B4D3... |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Clinical Social Workers (CSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, CSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to care for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

counterparts, including the Electronic Health Records System.

- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the telepresenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services.

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site CSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or CSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or CSW.

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. CDCR seeks to employ psychologists and CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or CSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and CSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

All elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

nursing staff when needed, shall have access to each other to address patient needs.

### Site Visits

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

### Organizational Structure

All telemental health staff shall report as appropriate within the Telemental Health Program supervisory chain.

### Workflow Interruptions

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

### On-Call or After-Hours Coverage by Telemental Health Providers

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**     The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained telepresenter who facilitates the

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor
    15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental

health providers.

- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**          If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# EXHIBIT E

| | |
|---|---|
| **From:** | Thomas Nolan |
| **To:** | Melissa Bentz; Nick Weber; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Elise Thorn; Namrata Kotwani; Paul B. Mello; Damon McClain; Samantha Wolff |
| **Subject:** | Coleman -- Plaintiffs" Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440] |
| **Date:** | Wednesday, February 7, 2024 8:22:24 PM |
| **Attachments:** | TN-MB Re Plaintiffs Positions on Telemental Health Policy Disputes 02-07-2024 489-3.pdf |

<u>Via E-mail Only</u>

February 7, 2024

Dear All —

Enclosed please find my letter setting forth Plaintiffs' positions with respect to the parties' disputes over the telemental health policy.   We look forward to discussing these issues at an upcoming meeting and confer.

Regards,

Tom


Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

February 7, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

Melissa Bentz                    Melissa.Bentz@cdcr.ca.gov
Nicholas Weber                   Nicholas.Weber@cdcr.ca.gov
Sundeep Thind                    Sundeep.Thind@cdcr.ca.gov
Carrie Stafford                  Carrie.Stafford@cdcr.ca.gov
CDCR Office of Legal Affairs

   Re: *Coleman v. Newsom*
     Plaintiffs' Positions Regarding Telemental Health Policy in Preparation for
     Meet and Confer
     <u>Our File No. 0489-3</u>

Dear Office of Legal Affairs:

   We write to set forth our positions in anticipation of the parties' upcoming meet
and confer regarding Defendants' telemental health policy. Our specific positions on
various aspects of the policy were previously summarized in the September 5, 2023 Joint
Report filed by the parties and the exhibits thereto. *See* September 5, 2023 Joint Report,
ECF 7935 and 7935-1 through 7935-3 (including Plaintiffs marked up draft of the policy
as Exhibit C, ECF 7935-3), all attached hereto as **Exhibit 1**.

   As we have explained in the past, despite the promise of telemental health to help
address staffing shortages, appropriate safeguards are essential to ensure that on-site, in-
person mental health care remains the primary method by which psychologists and social
workers provide care to *Coleman* class members. We think the needed safeguards are,
roughly speaking, the same that apply to telepsychiatry. In most respects, these
safeguards are even more important for psychologists and social workers, since they
serve as case managers and in most contexts have more frequent and longer clinical
contacts with patients than psychiatrists. Moreover, particularly in EOP units and
restrictive housing units of all kinds, they play vital roles in creating a safe, therapeutic
environment, and they also are critical collaborators with nursing and custody staff in
creating a therapeutic environment and implementing the requirements of the Custody
Mental Health Partnership Plan (CMHPP).

[4433482.2]

Melissa Bentz, et al.
February 7, 2024
Page 2

We set forth our requests and positions with respect to the telemental health policy below in greater detail, along with some questions about Defendants' experiences to date with the new policy, and a request that the monthly data filed with the Court and provided to Plaintiffs' Counsel and the Special Master be modified to separately break out telemental health staff providing care at each prison, similar to how telepsychiatry positions are broken out in reporting psychiatry staffing data.

## I.     Steps Taken By Defendants in Support of Areas of Agreement Recited in September 5, 2023 Stipulation

What steps, if any, have Defendants taken to ensure that the general principles the parties recited agreement about in the Joint Statement were accomplished during the Defendants implementation of the new policy?  The general principles included that "the goal is to maintain on-site mental healthcare professionals to provide care to *Coleman* patients" (Dkt. No. 7935 at 3) and that "on-site providers should receive incentives for on-site work that are not available to telemental health staff" (*id.*).

1.     What is the status of telemental health and on-site hiring?  Recent data filed with the Court shows that only 60 percent of psychologist positions statewide are filled, and staffing levels for some critical programs are much lower.  *See* 1/31/24 Defendants' Monthly Mental Health Staffing Vacancy Reports, ECF No. 8120, at 6 (showing overall fill rate, and reporting that CHCF has only 33 percent of allocated psychology positions filled and CMF has only 39 percent of psychology positions filled.)

2.     What new incentives have been introduced to help maintain on-site mental health staff and prevent migration to remote work?

3.     How many on-site mental health professionals have migrated to telemental health positions since the new policy was implemented last fall?

4.     How have the annual on-site visits by telemental health staff to their assigned institutions been working?  How long are these visits and what happens during the visits?  Is there a set schedule for the visits?

## II.     Areas of Disagreement in September 5, 2023 Stipulation

The parties also recited the following areas of disagreement with respect to the final draft of the telemental health policy.  (A copy of the final telemental health policy, which Melissa Bentz sent to the other parties on September 21, 2023, is attached hereto as **Exhibit 2**.)  We list each of the areas of disagreement from the Joint Report verbatim below, and below each item from the report we provide more concrete proposals for discussion at the meet and confer:

[4433482.2]

Melissa Bentz, et al.
February 7, 2024
Page 3

1.      Whether restrictions should apply to the provision of telemental health services to
CCCMS and EOP patients, including in the form of limits on the percentage of
primary clinician positions that should be filled through telemental health,
requirements to have a certain number of on-site primary clinicians per program, and
the requirement to provide notice and a plan if the required conditions are not met.

        More specific proposals:

        a.      CDCR should develop separate allocations for on-site and telemental health
                positions.  All parties agree that psychology and social work need some on-
                site presence.  In order to achieve this, CDCR needs specific allocations for
                on-site and remote psychologists and social workers.  We have previously
                suggested setting the allocation for telemental health Case
                Manager/Primary Clinicians to 15-20% in EOP yards, and 30-40% in
                CCCMS yards.  (Dkt. No. 7935-3 at 3, 6.)  No EOP patient should have
                both a telepsychiatrist and a telemental health case manager as part of their
                treatment team.

        b.      If due to a short-term emergency situation these two principles cannot be
                met, then Defendants should be required to have a process in place where
                salaries for on-site psychologists and social workers at the facility will be
                increased by a certain percentage each month until the number of on-site
                providers meets the threshold.

2.      Whether there should be restrictions on the use of telemental health for certain
clinical tasks, including suicide risk evaluations, provision of care in segregation
units (restricted housing units), and evaluations under the Prison Rape Elimination
Act (PREA).  The process for obtaining informed consent for telemental health
services.  The use of telemental health for mental-health-crisis beds and
psychiatric-inpatient programs when on-site care is not available.

        More specific proposals:

        a.      Telemental health shall not be used for the following tasks or locations:

                • Suicide risk evaluations

                • The provision of care in RHU units

                • PREA evaluations

                • MHCB care

Melissa Bentz, et al.
February 7, 2024
Page 4

- PIP care including both Acute and ICF care

b.      The informed consent process for telemental health should allow patients (1) to refuse telemental health care and opt for only in-person care, and (2) to waive the presence of the telepresenter for individual therapy sessions.

3.      Whether telemental health services provided cell front to a patient that refused to attend an appointment should count as a Program Guide-required clinical contact.

        More specific proposal:

a.      Cell-front telemental health care when a patient refuses to attend an appointment should be barred.  When a patient will not come out to see a provider, the on-site clinicians should go see the individual cell-front.  It is important to have a live person go cell front, for example, to be able to tell if the individual is decompensating or not bathing.

4.      The frequency and duration of telemental health visits to assigned institutions.

        More specific proposals:

a.      The first visit by a telemental health provider to each of their assigned institutions should be for an entire week and should include touring the entire institution and all of its programs, meeting with all key mental health managers at the prison, and attendance at an in-person IDTT meeting in each key program (e.g. each CCCMS yard and each EOP yard or area).

- Subsequent visits shall be for no less than 2 consecutive days each year.

**Other Issue for Discussion**:

1.      Standards for Home Office Use (Adequate Confidentiality and Adequate Technology):  While we agree with home office use in theory, we think there need to be minimum standards for the protection of confidentiality, for adequate technology, and for adequate supervision of remote psychologists and social workers.

We look forward to discussing these proposals with Defendants and the Special Master team in more detail at the meet and confer once it is scheduled.

Melissa Bentz, et al.
February 7, 2024
Page 5


**III.    Data Issues**

We request that, going forward, the monthly data and the filed monthly staffing data break out the telemental health positions separately so that all parties know what percentage of positions are staffed remotely.

Please feel free to contact me with any questions about these issues.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

By:   Thomas Nolan
      Of Counsel

Enclosures: Exhibits 1-2
cc:     *Coleman* Special Master Team
        *Coleman* Co-Counsel
        Elise Thorn
        Namrata Kotwani
        Paul Mello
        Damon McClain
        Samantha Wolff

# EXHIBIT 1

ROB A. BONTA, State Bar No. 202668
Attorney General of California
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                        Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                        Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**PARTIES' JOINT REPORT IN RESPONSE TO AUGUST 3, 2023 ORDER ON DEFENDANTS' TELEMENTAL HEALTH SERVICES POLICY (ECF NO. 7901)**<br><br>Judge: The Hon. Kimberly J. Mueller |

## INTRODUCTION

On August 3, 2023, the Court issued an order requiring the parties to meet and confer under the supervision of the Special Master and to file a joint statement regarding defendants' proposed Telemental Health Policy (the "policy"). August 3, 2023 Order, ECF No. 7901 at 2. The parties submit the following joint statement in response.

On July 21, 2023, defendants circulated a copy of a Telemental Health Policy, which would allow psychologists and social workers employed by CDCR to work remotely for CDCR and provide services to Coleman patients using videoconferencing technology, and requested

1    comments from Plaintiffs and the Special Master. A copy of the original circulated policy is

2    attached as Exhibit A.

3         On August 3, 2023, the Court issued its order that the parties meet and confer regarding the

4    policy and Defendants requested that the Special Master and Plaintiffs provide comments before

5    the meet and confer sessions commenced. The Special Master's Office advised Defendants that it

6    would not provide comments in writing. Plaintiffs provided Defendants and the Special Master

7    team with a marked up version of the proposed policy with redlines and comments reflecting their

8    concerns on August 23, 2023. Plaintiffs also asked in the e-mail transmitting the marked up

9    policy that the parties discuss whatever incentives defendants were planning as part of their

10   implementation of the new policy to prevent on site psychologists and social workers from

11   migrating in significant numbers to offsite work as a result of the new policy.

12        The parties met and conferred twice—on August 29 and 31—under the supervision of and

13   with the participation of the Special Master team to discuss plaintiffs concerns about the proposed

14   policy and proposed modifications to the policy. The parties agree about many aspects of the new

15   policy and Defendants made some modifications to the policy based on Plaintiffs' comments, but

16   a number of significant disagreements remain after the meet and confers.

17        The Court's order referenced the fact that the Court had issued an order adopting the

18   Provisionally Approved Telepsychiatry Policy as final, and that Defendants had appealed that

19   order. (*Id.* at 1.) To be clear, the telepsychiatry policy is separate and distinct from Defendants'

20   Telemental Health Policy. Although the two policies are similar in some respects, they concern

21   different classifications. The telepsychiatry policy only concerns care provided by

22   telepsychiatrists. The Telemental Health Policy concerns care provided by telepsychologists and

23   telesocial workers. The Telemental Health Policy in no way modifies the Court ordered

24   telepsychiatry policy.

25   **I.   AGREEMENTS**

26        Plaintiffs and defendants agree about a number of facets of the new policy, including that

27   telemental health is an important component of Defendants' efforts to address psychologist and

28

1    social worker staffing vacancies and that the policy should be implemented without delay.

2    Additionally, the parties agree on the following points:

3        •    Allowing social workers and psychologists who serve as case managers to work

4             remotely has the potential to be an important recruiting tool that helps defendants to

5             address the current staffing vacancies among psychologists and social workers in the

6             CDCR.

7        •    In person mental health services under the policy shall remain the preferred method

8             of care in Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP)

9             programs.

10       •    The goal is to maintain onsite mental healthcare professionals to provide care to

11            Coleman patients.

12       •    Defendants should continue to recruit and hire staff for onsite positions.

13       •    Onsite providers should receive incentives for onsite work that are not available to

14            telemental health staff.

15       •    Clinicians providing telemental health services should be assigned to particular

16            institutions and visit their assigned institutions at least annually.

17       •    Telemental health workers should be permitted to work from home or from hubs.

18       •    Telemental health service providers shall be licensed in California or working

19            towards a California license and shall be license-eligible, and shall work from within

20            the State of California.

21       •    In individual therapy sessions, patients should have the option of requesting to meet

22            one-on-one with the telemental health clinician, without the presence of a third-party

23            telepresenter.  Telepresenters are not required to be in the room with the patient for

24            the entirety of an encounter, though may be requested to stay for part or all of an

25            encounter at the telemental health provider's discretion.

26       •    The telemental health policy should include a process for ensuring continuity of care

27            in the event a patient refuses to be seen by the telehealth clinician.  The parties agree

28            that the procedure on page 3 of Exhibit B addresses this need.

## II. DEFENDANTS MADE MODIFICATIONS TO THEIR POLICY BASED ON PLAINTIFFS' COMMENTS.

Defendants made modifications to their policy based on Plaintiffs comments and suggestions. Attached as Exhibit B is a draft of the policy that shows those changes in redline.

## III. THE PARTIES' DISAGREEMENTS

The parties have a number of disagreements regarding the policy, the details of which can be seen in Exhibit C—Plaintiffs' comments and revisions to the policy. The following list includes the primary disagreements that the parties have regarding the policy:

- Whether restrictions should apply to the provision of telemental health services to CCCMS and EOP patients, including in the form of limits on the percentage of primary clinician positions that should be filled through telemental health, requirements to have a certain number of on-site primary clinicians per program, and the requirement to provide notice and a plan if the required conditions are not met.
- Whether there should be restrictions on the use of telemental health for certain clinical tasks, including suicide risk evaluations, provision of care in segregation units (restricted housing units), and evaluations under the Prison Rape Elimination Act (PREA).
- The process for obtaining informed consent for telemental health services.
- The use of telemental health for mental-health-crisis beds and psychiatric-inpatient programs when on-site care is not available.
- Whether telemental health services provided cell front to a patient that refused to attend an appointment should count as a Program Guide required clinical contact.
- The frequency and duration of telemental health visits to assigned institutions.

## IV. DEFENDANTS' STATEMENT

Defendants' policy does not conflict with any Court order or the Program Guide, it comports with community standards of care, it will improve patient access to care, it will help CDCR to fill vacant positions by—among other things—attracting qualified candidates who would not otherwise consider working for CDCR, and it does not violate the Constitution.

1    Consistent with the regular course of conduct in this case, Defendants proactively solicited

2    comments from Plaintiffs and the Special Master team regarding their new policy before the

3    Court issued the August 3 order, met to discuss those comments, and made revisions to the policy

4    as appropriate.  Because the revised policy does not conflict with the Program Guide, follows

5    community practices, enhances and increases psychologist and social worker treatment of class

6    members, and should enhance Defendants' ability to reduce staffing vacancies, CDCR now

7    intends to implement the revised policy (Exhibit B) as planned, and there is no basis for the Court

8    to delay Defendants' implementation of the policy.  As the policy is implemented and as the

9    program develops, Defendants may modify aspects of the policy, and will provide notice to the

10   Special Master and Plaintiffs regarding any such modifications.

11   **V.    PLAINTIFFS' STATEMENT**

12        Defendants' telemental health policy can help remedy the current staffing problems in the

13   CDCR.  Appropriate safeguards are needed to ensure that on site, in person mental health care

14   continues to be the primary method by which mental health care is provided by psychologists and

15   social workers to Coleman patients in the CDCR.  The Court and the Special Master's experts

16   have recently helped the parties to craft appropriate limitations on the use of telepsychiatry for

17   psychiatrists.  The telepsychiatry policies, however, cannot be imported verbatim for use by

18   psychologists and social workers.  Unlike psychiatrists, psychologists and social workers serving

19   as case managers (also known as primary clinicians) are the primary clinical care providers and

20   managers for *Coleman* class members.  These primary clinicians play a vital role on site in the

21   EOP treatment units to create a therapeutic environment.  They also play vital roles on site to

22   work with custody and nursing staff, and to help in crisis situations.  For the same reasons it is

23   appropriate to limit the use of this technology in higher level of care inpatient programs like

24   MHCBs and PIPs, it is appropriate to limit the use of this modality in high risk encounters like

25   de-escalation to prevent use of force, suicide risk assessments and the clinical work that follows

26   when someone reports having experienced sexual assault.  Plaintiffs have therefore sought

27   specific representations in the policy to ensure that primary clinician work is done primarily by

28   on-site clinicians, supplemented as necessary by remote clinicians.  Telemental health should be

1  used to fill vacancies, and not to replace presently filled onsite positions.  Plaintiffs agree that the

2  policy should be implemented now to fill vacancies.

3

4  Dated:  September 5, 2023                    ROB A. BONTA
                                                ATTORNEY GENERAL OF CALIFORNIA
5                                               DAMON MCCLAIN
                                                SUPERVISING DEPUTY ATTORNEY GENERAL
6
                                                /s/ Damon McClain
7                                               DAMON MCCLAIN
                                                SUPERVISING DEPUTY ATTORNEY GENERAL
8                                               ATTORNEYS FOR DEFENDANTS

9  Dated:  September 5, 2023                    HANSON BRIDGETT LLP

10
                                                /s/ Samantha D. Wolff
11                                              PAUL MELLO
                                                SAMANTHA D. WOLFF
12                                              Attorneys for Defendants

13 Dated:  September 5, 2023                    ROSEN BIEN GALVAN & GRUNFELD LLP

14
                                                /s/ Ernest Galvan
15                                              ERNAST GALVAN
                                                Attorneys for Plaintiffs

16

17 CF1997CS0003
   43863466.docx

18

19

20

21

22

23

24

25

26

27

28

Joint Report Re: Telemental Health Services Policy in Response to 8/3/23 Order  (2:90-cv-00520 KJM-DB (PC))

# CERTIFICATE OF SERVICE

Case Name:   **Coleman v. Newsom, et al.,**          No.   **2:90-cv-00520 KJM-DB (PC)**

I hereby certify that on <u>September 5, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PARTIES' JOINT REPORT IN RESPONSE TO AUGUST 3, 2023 ORDER ON DEFENDANTS' TELEMENTAL HEALTH SERVICES POLICY (ECF NO. 7901) (with Exhibits A-C)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 5, 2023</u>, at San Francisco, California.

|  |  |
|---|---|
| M. Paredes | |
| Declarant | Signature |

CF1997CS0003
43863472.docx

# EXHIBIT A

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8: | Revision Date(s): | |
| | Supersedes: | |
| 12.08.100<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes     No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to provide care to CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and social work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly.

Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

## Refusals

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

## Contraindications for Telemental Health

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the telepsychologist and Chief of Telepsychology, or telesocial worker and Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

## Telemental Health and Levels of Care

Telemental health providers will be assigned to CCCMS and EOP levels of care. Whenever possible, CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Services Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**   The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.

- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

**EXHIBIT B**

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8: | Revision Date(s): | |
| | Supersedes: | |
| 12.08.100<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and ~~Licensed~~ Clinical Social Workers (~~L~~CSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, ~~L~~CSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to ~~provide~~ care ~~to~~ for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and ~~L~~CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

~~psychiatrists~~counterparts, including the Electronic Health Records System.

- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. ~~Whenever possible,~~ CDCR seeks to employ psychologists and ~~L~~CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

### Correctional Clinical Case Management Services and Enhanced Outpatient Program

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

### Mental Health Crisis Bed and Psychiatric Inpatient Program

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

### Clinical Emergency Management

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or ~~L~~CSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

### MHCB and Psychiatric Inpatient Programs

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and ~~L~~CSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new

admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health ~~Services~~ Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**      The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The tele-presenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
  1. Laboratory
  2. Pharmacy
  3. Nursing station(s)
  4. Housing unit(s)
  5. Custody Health Care Access Unit staff
  6. Primary Clinician(s)
  7. Medical Provider(s)
  8. Mental Health Supervisor(s)
  9. Chief of Mental Health
  10. IT Department
  11. Chief and Senior Psychologist
  12. Chief Psychiatrist or Senior Psychiatrist Supervisor
  13. Scheduler
  14. Medical Records Supervisor
  14.15.  Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health

provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

_____

**Questions**     If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

**EXHIBIT C**

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8: | Revision Date(s): | |
| | Supersedes: | |
| 12.08.100 TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

> **Commented [A1]:** The policy should define "telemental health providers." Presumably this refers to psychologists and social workers who remotely act as case managers for MHSDS caseload patients via videoconferencing technology.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to provide care to CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified short-term emergency circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. Telemental health supplements but does not replace on-site psychologists and LCSWs in the CCCMS and EOP programs. CCCMS and EOP patients shall receive care from a mix of on-site and telemental health providers. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and social work supervisors and will be assigned to caseloads at the institution(s) they serve. Telepsychologists and telesocial workers shall be assigned to one institution, rather than splitting their time between several institutions. As appropriate, some telepsychologists and telesocial workers may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

> **Commented [A2]:** CIT should be an on-site function, as discussed below

Telepsychologists and telesocial workers shall be licensed, and their licenses shall be current and valid in the State of California.

**Definitions**

**Telemental Health Providers** refers to psychologists and social workers who provide services remotely through video and audio connections, working primarily from CDCR hubs

12.08.100: Telemental Health Program

and in some cases from home offices that meet CDCR's requirements for confidentiality and connectivity.

**Supplement**

The following term is defined for use in this policy only:

- Supplement means at least 1.0 personnel year (PY) equivalent on-site psychologist or LCSW shall be assigned for each CCCMS program and EOP per yard at each institution. The 1.0 PY equivalent is the minimum required under this policy. Depending on the population of the program, more than 1.0 PY equivalent on-site psychologist or LCSW may be required by the percentage limit on mental health clinicians who can be remote described below, and to ensure that patients have reasonable and prompt access to on-site services.
- Supplemental also means that in the EOP all patients may be assigned either an on-site psychiatrist or an on-site psychologist, but not both.
- Supplement also means that there shall be no all-virtual Interdisciplinary Treatment Team (IDTT) meetings. Each IDTT shall include an on-site psychiatrist or on-site Case Manager/Primary Clinician.
- Supplement also means that most Case Managers/Primary Clinicians shall be on-site. The mix of on-site and remote qualified mental health professionals shall be such that no more than 20% of Case Managers/Primary Clinicians shall be telemental health professionals in Enhanced Outpatient Programs (EOPs) and no more than 40% of Case Managers/Primary Clinicians shall be telemental health professionals in Correctional Clinical Case Management System (CCCMS) programs.

**Equipment**

Telemental health providers shall work in CDCR Hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office.

Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow,

adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen.

At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

As part of the informed consent process, the patient shall specifically be told that (a) they have a right to refuse to receive telemental health services and to obtain in person treatment instead, and (b) that they should be aware that at times, telemental health services requires the presence of third party in the room with the patient, and that this can have a negative impact on the therapeutic alliance between the patient and their treating clinician, and could cause the patient to be less forthcoming about personal matters that they need to work through with their therapist.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate

**Commented [A3]:** Is the plan to require the use of telepresenter for all telemental health clinical encounters or would it be at the option of the telemental health professional? We would like to hear Defendants' thoughts about this issue at the upcoming meeting.

their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's~~ patient shall be treated by an on-site provider to avoid a lapse in treatment.  Patients shall have a right to refuse treatment via telemental health and to receive in—person treatment instead.  After ensuring prompt on-site treatment, the telemental health provider(s) may meet~~also address the refusal by meeting with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors related to the refusal. ~~to determine whether telemental health is an appropriate delivery method for the patient.  The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals.  If t he patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.~~

~~If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.~~

~~If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals.~~

If the patient refuses telemental health services,  the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. ~~If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and Supervising Social Worker II will work with~~ Mental health leadership at the institution to~~will  ensure the patient has continued access to appropriate on-site mental health treatment.

Cell Front
~~Contraindications for~~ Telemental Health

Telemental health may be used cell front when it is necessary for the psychologist or LCSW to speak with the patient and the patient does not attend the scheduled appointment.  However, non-confidential telemental health contacts, including cell-front contacts, shall not be considered a Program Guide required clinical contact under any circumstance.

**Contraindications for Telemental Health**

> **Commented [A4]:** Class members should be given the right to refuse telemental health treatment.  We believe such refusals will be unusual, as they have been with telepsychiatrists.

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis, except that telemental health services shall generally only be used in EOP and CCCMS programs, as detailed in the sections below. If the patient's IDTT, the telepsychologist and Chief of Telepsychology, or telesocial worker and Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. Whenever possible, CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed. Telemental health supplements but does not replace on-site mental health. All CCCMS and EOP facilities shall continue to be served by on-site psychologists and LCSWs in addition to telemental health.

In the EOP all patients shall be assigned either an on-site psychiatrist or an on-site Case Manager/Primary Clinician. In other words, no EOP patient shall have entirely telemental health care.

Most Case Managers/Primary Clinicians shall be on-site. The mix of on-site and remote qualified mental health professionals shall be such that no more than 15% of Case Managers/Primary Clinicians on EOP yards shall be telemental health professionals and no more than 30% of Case Managers/Primary Clinicians on CCCMS yards shall be telemental health professionals.

CDCR shall use all reasonable, good faith efforts to recruit and retain on-site psychologists and LCSWs to provide services at the CCCMS and EOP level of care. If a CCCMS or EOP program does not have the on-site psychologist and LCSW services required by this policy for 30 consecutive calendar days, that would not be consistent with this policy's objectives. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 60 calendar days from the provision of notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how that issue has been resolved.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only emergency circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

12.08.100: Telemental Health Program

CDCR shall use all reasonable, good faith efforts to recruit and retain on-site psychologists and LCSWs to provide in person services at the MHCB and PIP levels of care. If these good faith efforts are unsuccessful, mental health services may be provided via telemental health. If a psychologist or LCSW is required to serve in an MHCB or PIP level of care for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**Clinical Encounters Where On Site Clinicians Must Be Employed**

The use of telemental health services for the following clinical tasks is restricted to only circumstances when on-site care is not available and for the shortest duration of time as necessary.

- CIT team membership and evaluations
- All care provided in RHUs
- Preparation of SRASHEs
- Initial Reception Center mental health assessments
- RVR mental health assessments
- PREA interviews.

CDCR shall use all reasonable, good faith efforts to recruit and retain on-site psychologists and LCSWs to provide the above listed services. If these good faith efforts are unsuccessful, these listed mental health services may be provided via telemental health. If a psychologist or LCSW is required to provide these services via telemental health for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall

participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than ~~annually~~twice a year thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.  The very first visit by a telemental health provider to a new institution shall be for a full work-week and the visit shall include a tour of the facility, interviews with staff, observation of groups, in person IDTT participation in different units and unit types, and any other orientation to the institution and its unique programs and missions that is deemed important by the Chief of Mental Health for the prison.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Services Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

12.08.100: Telemental Health Program

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

**Responsibilities**    The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
  1. Laboratory
  2. Pharmacy
  3. Nursing station(s)
  4. Housing unit(s)
  5. Custody Health Care Access Unit staff

6. Primary Clinician(s)
7. Medical Provider(s)
8. Mental Health Supervisor(s)
9. Chief of Mental Health
10. IT Department
11. Chief and Senior Psychologist
12. Chief Psychiatrist or Senior Psychiatrist Supervisor
13. Scheduler
14. Medical Records Supervisor

- ~~The~~A contact ~~information for~~list of all telemental health providers ~~assigned to~~ with caseloads at the institution, to be made available to ~~relevant~~all onsite staff~~, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.~~.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

| | |
|---|---|
| **Compliance Indicators** | To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services: |

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.

4. Telemental health providers have access to all necessary clinical information via the patient's health record.

5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.

6. Patients are ~~notexcluded~~not excluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.

7. Patients are given a clear informed consent for telemental health services which makes clear that they can choose to be treated only by on-site providers

8. Patients are told that when tele-presenters are employed, that can have some clinical consequences in terms of patient-therapist therapeutic alliance and in terms of the patients willingness to reveal highly personal information.

~~7.~~9. Telemental health providers complete all documentation in the health record by the close of each business day.

~~8.~~10. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.

~~9.~~11. Telemental health providers visit their receiving institutions as directed by this policy.

~~10.~~12. Ongoing mandatory trainings are completed for all telemental health providers.

13. Telemental health providers are licensed, and their licenses are current and valid in the State of California.

~~11.~~14. Telemental health providers are privileged at each licensed or inpatient unit they serve.

15. Telemental health supplements but does not replace on-site mental health at the CCCMS and EOP levels of care.

16. No more than 20% of case managers in EOP units are remote telemental health providers

17. No more than 40% of case managers in CCCMS yards are remote telemental health providers.

18. Telemental health providers do not provide services in RHUs, serve on CIT teams, conduct SRASHEs, conduct RC initial mental health assessments, conduct PREA interviews or assessments, or complete mental health assessments and other tasks related to the RVR process.

**References**
- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# EXHIBIT 2

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | 9/21/2023 |
|---|---|---|
| **CHAPTER 1:**<br>ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| **12.01.901**<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | *DocuSigned by:*<br>Amar Mehta, M.D.<br>46AE21AE3D5B4D3... |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Clinical Social Workers (CSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, CSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to care for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

counterparts, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the telepresenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services.

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site CSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or CSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or CSW.

### Telemental Health and Levels of Care

Telemental health providers will be assigned to CCCMS and EOP levels of care. CDCR seeks to employ psychologists and CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

### Correctional Clinical Case Management Services and Enhanced Outpatient Program

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

### Mental Health Crisis Bed and Psychiatric Inpatient Program

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

### Clinical Emergency Management

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or CSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

### MHCB and Psychiatric Inpatient Programs

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and CSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

All elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

nursing staff when needed, shall have access to each other to address patient needs.

### Site Visits

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

### Organizational Structure

All telemental health staff shall report as appropriate within the Telemental Health Program supervisory chain.

### Workflow Interruptions

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

### On-Call or After-Hours Coverage by Telemental Health Providers

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**    The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained telepresenter who facilitates the

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor
    15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental

health providers.

- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**         If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# EXHIBIT F



PANNONE LORES
DEVEREAUX & O'GARA LLC
counselors at law

Kerry F. Walsh
kwalsh@pldolaw.com

February 27, 2024

<u>VIA ELECTRONIC MAIL</u>
Melissa C. Bentz
Office of Legal Affairs
California Department of Corrections
and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov

<u>VIA ELECTRONIC MAIL</u>
Thomas Nolan
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105
Email: tnolan@rbgg.com

**RE:** **Telemental Health Services Policy Meet and Confer**

Dear Ms. Bentz and Mr. Nolan:

We are writing to frame our discussion on the Telemental Health Services Policy, hereinafter telemental health policy, in anticipation of the court ordered meet and confer, scheduled for February 28, 2024, "to clarify whether, and if so what, outstanding disputes remain over defendants' Telemental Health Services Policy . . ." ECF No. 8087 at 2. As directed by the court, following the meet and confer the Special Master will file a report describing the outcome of the discussions and provide a "proposed Telemental Health Policy for the court's approval." *Id.*

The Special Master and his experts strongly support the use of telemental health to supplement the cadre of on-site primary clinicians necessary to work alongside their custody colleagues, and afford incarcerated people confined in the California Department of Correction and Rehabilitation (CDCR) enrolled in the Mental Health Services Delivery System (MHSDS) the confidentiality, privacy and informed consent process critical to successful mental health treatment. The five primary areas of concern and 12 recommendations outlined below are targeted at promoting the successful implementation of telemental health while creating limited guardrails for its use. They are consistent with professional guidelines on the use of telemental health and generally track the court-approved telepsychiatry policy which has been implemented in the field. They are also consonant with the views expressed by plaintiffs in their February 7, 2024 letter which are shared by the Special Master. *See* Attachment A, Letter from T. Nolan to M. Bentz. As such, the Special Master urges CDCR to consider the recommendations outlined below and the concerns which undergird them. He looks forward to further discussions at the meet and confer.

Below is the history of the telemental health policy, telepsychiatry considerations applicable to telemental health, our five primary areas of concerns, and some general comments.

Northwoods Office Park
1301 Atwood Avenue, Suite 215 N   Johnston, RI  02919
tel 401 824 5100   fax 401 824 5123

pldolaw.com

Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 2

## I.    History of the Telemental Health Policy

On July 21, 2023, CDCR provided the plaintiffs with a draft telemental health policy and requested comments by August 21, 2023. *See* Attachment B, Email from M. Bentz to Plaintiffs and Special Master. After receiving notification from the Special Master of the draft telemental health policy, the Court, on August 3, 2023, ordered the parties to meet within 30 days under the supervision of the Special Master regarding the draft telemental health policy and to file a joint report concerning the outcome of the discussions. ECF No. 7901 at 2. On September 5, 2023, the parties submitted their joint statement outlining their agreements and disagreements. ECF No. 7935.

On September 19, 2023, the defendants notified the Special Master and the plaintiffs that they had issued their telemental health policy to the field that same day. *See* Attachment C, Email from M. Bentz to Plaintiffs and Special Master. Two days later, on September 21, 2023, the defendants provided a different version of the telemental health policy noting that "a non-final version" had been sent to the field and they had provided the field with the correct version that day. *See* Attachment D, Email from M. Bentz to Plaintiffs and Special Master.

During a hearing on November 2, 2023, the Court signaled its general amenability to the use of telemental health stating "given the court's openness to telepsychiatry, telemental health, it's a matter of making certain there is not something festering there that rears up at a later point." ECF No. 8080 at 47.

On December 15, 2023, the Court ordered the parties to meet and confer under the supervision of the Special Master regarding the telemental health policy. ECF No. 8087.

In the Special Master's 30th Round Monitoring Report, filed on December 22, 2023, the Special Master signaled his and his experts' concerns with the telemental health policy, noting that "the final policy tracks the substance of defendants' preferred (though not court-approved) version of the telepsychiatry policy." ECF No. 8095 at 48.

Plaintiffs wrote to set forth their position on the defendants' telemental health policy in anticipation of the court ordered meet and confer on February 7, 2024. *See* Attachment A.

## II.    Telepsychiatry Considerations Applicable to the Telemental Health Policy

Telepsychiatry is separate from but related to telemental health. CDCR indicates that the telepsychiatry program, "has improved access to mental health care services and reduced staffing shortages. Expanding this program to include tele-psychology and tele-social work will further improve the delivery of mental health care service in the prison system." *See* ECF No. 8095, Exhibit D at 2. Still, the court-approved limitations on telepsychiatry are informative on the appropriate use of telemental health, and the cumulative impact of both policies must be considered together. As the parties agree upon some use of telemental health, development and implementation of the policy



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 3

requires consideration of the record which includes findings in the Special Master's monitoring reports.

The Special Master continues to monitor telepsychiatry. His most recent report discusses the interplay between the telepsychiatry policy and the telemental health policy stating:

> The Special Master must reiterate, however, that the telepsychiatry policy is predicated on remote psychiatry only being used in emergencies in mental health crisis beds (MHCBs) and PIPs, and supplementing (not replacing) on-site services in EOPs. ECF No. 6539 at 7. During the monitoring round, the use of telepsychiatry varied across institutions and, consistent with what the Special Master reported in his December 15, 2022 Report and Recommendation on a Final Proposed Telepsychiatry Policy, there remained "variability in CDCR's implementation of the" Telepsychiatry Policy. ECF No. 7682 at 41. Whatever "success" can be attributed to telepsychiatry policy, the Special Master is not persuaded that its implementation to date lends support to CDCR's Tele-Mental Health Policy because the policies are fundamentally different in their treatment of EOPs and higher levels of care.

ECF No. 8095 at 45-46.[1] There, he again stated the limitations of the telepsychiatry policy and how this fundamental difference between the telepsychiatry and telemental health policy makes any perceived success of the telepsychiatry program nontransferable to the telemental health policy.[2]

## III.   Five Areas of Concern

Telemental health is a developing area of mental health services. This expanding role of technology in the provision of mental health services presents many unique opportunities, considerations, and challenges to this practice. In assessing the safe and effective uses of telemental health in CDCR, the Special Master's team considered numerous resources including the American Psychiatry Association Telepsychiatry Toolkit[3] and Position Statement (Position Statement on Telemedicine in Psychiatry), professional ethical standards[4], and the American Psychological

---

[1] On January 12, 2024, the defendants filed their objections to this report. ECF No. 8108. Plaintiffs filed their response on January 23, 2024. ECF No. 8117. To date, the court has not issued an order addressing these objections.

[2] In 2017, the Special Master recommended continued expansion of the telepsychiatry program subject to caveats, which the court adopted with one clarification. *See* ECF Nos. 5564 at 15-17 and 5711 at 23 and 29-30. That clarification, "confirm[ed] that telepsychiatry should serve as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists." ECF No. 5711 at 23.

[3] American Psychiatry Association Telepsychiatry Toolkit, *available at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English*

[4] American Psychiatry Association, Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry, *available at https://www.psychiatry.org/psychiatrists/practice/ethics#section_1*; American Psychology Association Ethical Principals of Psychologists, *available at*



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 4

Association Guidelines for the Practice of Telepsychology to inform our concerns regarding the telemental health policy. *See* Attachment E, American Psychiatry Association Position Statement; Attachment F, American Psychological Association Guidelines for the Practice of Telepsychiatry. These professional standards reflect a patient-centered approach to providing telemental health services in an ethical and professional manner. Our team also relies on the information that has been obtained from over 30 years of monitoring the provision of mental health services within CDCR, pleadings filed by the parties, correspondence from the parties, and information obtained during meet and confers. As reviewed by the Special Master's team of experts, the telemental health policy has five general areas of concern.

### 1. Comparison of Telemental Health with Community Standard: Confidentiality and Informed Consent

Telemental health within CDCR is not equivalent to telemental health in the community for at least two significant reasons: the presence of a telepresenter during therapy sessions, and the inability of the patient to opt out of telemental health in favor of in-person treatment.

CDCR's telemental health policy includes the presence of a telepresenter, which means the clinical interaction is not confidential and private. Telemental health in the community does not include a tele-presenter, which means confidentiality can be maintained. The current policy includes the following provision:

> Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant…. Telemental Health Policy at 5.

Potentially, removing the telepresenter from the psychotherapy session could resolve confidentiality and privacy concerns if the telepresenter would also not be able to hear the content of the interaction between clinician and patient. However, since the telepresenter is needed for potential

---

*https://www.apa.org/ethics/code#:~:text=Psychologists%20strive%20to%20benefit%20those,of%20animal%20subjects%20of%20research.;* National Association of Social Workers Code of Ethics, *available at* *https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English.*



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 5

difficulties that could arise during the treatment session, the policy should include a mechanism to alert them should their presence be required.

In addition, there is no provision for the patient to choose whether or not to have the telepresenter present during the session—it is up to the discretion of the telemental health clinician. This issue of confidentiality during 1:1 sessions is not the same issue of confidentiality present during IDTTs, which is multidisciplinary and includes correctional officers. In the IDTTs, the clinicians do not describe in detail issues covered during their 1:1 sessions due to confidentiality and privacy concerns. Such would not be the case in telemental health sessions if the telepresenter is present.

Next, in the community, telemental health is optional for the client/patient, given that the individual can choose in-person clinical interventions. In contrast, on page three, under "Refusals," the telemental health policy states:

> If a patient refuses treatment via telemental health, the patient's telemental health provider(s) **may** meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. (Emphasis added.)

Based on this language, the patient does not have the ability to choose the nature of the clinical interaction; rather, the onus is on the patient to first refuse to engage in telemental health with the treatment team retaining the ultimate decision-making authority as to how psychotherapy is provided. It appears that the patient must engage in telemental health or risk being denied access to needed treatment. Further, the inability to opt out of telemental health nullifies a patient's ability to provide informed consent. On page two, under "Professional and Patient Identity and Informed Consent," the telemental health policy states:

> At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for **the method** of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services. (Emphasis added.)

This provision does not provide for informed consent because it lacks significant elements of the informed consent process. First, it does not include a discussion regarding the advantages and disadvantages of telemental health versus in-person clinical contacts with a primary clinician. Second, it does not provide incarcerated persons with an option to choose an on-site provider. In other words, it is not a voluntary choice in the context of accessing treatment.

Where a patient has not been afforded a choice as to whether to receive therapy with a remote provider is coupled with the introduction of a third party into the therapy session, the therapeutic alliance and clinical outcome could be negatively impacted. This is distinct from the use of



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 6

telepsychiatry which is primarily focused on the prescription of psychotropic medications rather than on the intimate and highly sensitive personal issues that may arise in individual psychotherapy.

We suggest a modification to the telemental health policy to clarify that incarcerated persons can choose an on-site provider and that the informed consent portion of the telemental health policy include a discussion of the risks and benefits of this modality of treatment.

### 2. Reasonable Limits for Classifications Acting as Telepresenters

In addition to the impact of the presence of telepresenters on the therapeutic process, we are concerned about the lack of reasonable limitations on the permitted classifications of telepresenters. On page five, under "Responsibilities," the telemental health policy states:

> The institution receiving telemental health shall be responsible for providing the following:
>
> …
>
> A dedicated and appropriately **clinically trained** telepresenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. …**When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.** In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
>
> A backup telepresenter when the primary telepresenter is on leave or unavailable. (Emphasis added.)

We recommend that the policy places limitations on backup telepresenters as it is not clear from the policy that they must be clinically trained. Next, the policy should state that nurse practitioners, social workers, psychologists, or physicians acting as telepresenters are required to engage in a clinical encounter in order for the clinical contact to be considered a joint appointment.[5]

### 3. Minimum Number of Clinicians On-site, Titrated by Level of Care

Primary clinicians have an important role in the mental health delivery system at each level of care. Below we discuss each level of care and potential modifications to the telemental health policy.

---

[5] On February 15, 2024, CDCR wrote in response to our letter concerning the memorandum on the "Use of Psychology Practicum Students and Social Work Interns In The Provision of Mental Health Services." *See* Attachment G, Letter from M. Bentz to the Special Master and M. Nunez. The Special Master asked whether CDCR would utilize psychology practicum student to deliver telemental health. *Id*. at 1. CDCR responded, "At this time, interns are not providing services via telemental health, but CDCR reserves the right to change this in the future." *Id*. at 2. If CDCR's position changes, we recommend further discussion on this issue.


pidolaw.com

Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 7

In the enhanced outpatient program (EOP) especially, primary clinicians positively impact the milieu as they work with their custody colleagues and have practical input into policies and procedures based on their understanding of the challenges of day-to-day life in the prison. This collaborative approach based on joint training and joint rounding in the institution is the foundation of the court approved partnership plan. *See* ECF Nos. 5916, 6095, 6278, and 6314. As written, the telemental health policy omits language contained within the telepsychiatry policy, that on-site clinicians should be the preferred method of psychiatric care for EOP patients. Below is a comparison of the two policies:

| Telepsychiatry Policy | Telemental Health Policy |
|---|---|
| The Telepsychiatry Program provides mental health services to the Correctional Clinical Case Management System (CCCMS) level of care and may, under specified circumstances outlined in this policy and procedure, be used for higher levels of mental health care. On-site psychiatrists shall remain the preferred method of psychiatric care for Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Psychiatric Inpatient Program (PIP)1 programs. | Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. |
| ECF No. 7826 at 6 | Telemental Health Policy at 1. |

Similar to the telepsychiatry policy in the context of an EOP unit, we recommend that the telemental health should only be used as a supplement, and not a replacement, for on-site primary clinicians working within the EOP units.

In correctional clinical case management system (3CMS) units, primary clinicians impact custody staff's interactions and perceptions of *Coleman* class members. Further, it is important to have a person on-site to assess and report the patient's response to treatment and functional level beyond just the tele-interview. As with the EOP level of care, we also recommend that telemental health be permitted as a supplement and not a replacement to on-site clinicians in 3CMS.

Plaintiffs have provided draft revisions that address these concerns for EOP and 3CMS patients. Plaintiffs stated:

> Supplement also means that most Case Managers/Primary Clinicians shall be onsite. The mix of on-site and remote qualified mental health professionals shall be such that no more than 20% of Case Managers/Primary Clinicians shall be



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 8

> telemental health professionals in Enhanced Outpatient Programs (EOPs) and no
> more than 40% of Case Managers/Primary Clinicians shall be telemental health
> professionals in Correctional Clinical Case Management System (CCCMS)
> programs.

ECF No. 7935-3 at 3.

Plaintiffs' February 7, 2024 letter provided "more specific proposals" that include setting telemental caseloads on-site at a maximum of 15-20% for EOP yards, and 30-40% for 3CMS yards. *See* Attachment A at 3.

Assuming these proposals are limited to mainline patients and reception center EOP programs, we find either of plaintiffs' options acceptable. However, telemental health should not be utilized for the reception center screening process or in the restricted housing setting. Ultimately, we recommend that there must be a way to ensure a minimum on-site presence of mental health clinicians. Our recommendation for a telemental health policy differs somewhat from the telepsychiatry policy. The recommendation for increased restrictions on the use of telemental health in 3CMS than those that exist for telepsychiatry relates to the different role of primary clinicians in providing therapy and psychiatrists who predominantly focus on medication management, as well as the impact of having too large a proportion of primary clinicians working remotely in the context of the already permissive use of telepsychiatry at that level of care.

In the alternative, we strongly encourage a hybrid model that allows a primary clinician to provide services both on-site and via telemental health in contrast to solely telemental health. During the course of our recent visits to institutions with 3CMS missions, we have observed on-site staff working in this hybrid model even though it is not provided for in the current version of the telemental health or telepsychiatry policies.

We believe that formalizing this model could be attractive to staff seeking some flexibility in the work environment, and at the same time remaining involved in positive impact in the overall milieu and informal interactions with colleagues. This model would also allow primary clinicians to better monitor the patient's ongoing progress and response to treatment by being present on-site regularly and allow the primary clinician to see a patient if a refusal occurs.

Regarding MHCB and PIPs, on page four, under "Mental Health Crisis Bed and Psychiatric Inpatient Program," the telemental health policy states:

> The use of telemental health services in the MHCB and PIP levels of care is
> restricted to only circumstances when on-site care is not available and shall be
> used for the shortest duration of time as necessary.

Plaintiffs proposed the following to the language above, which was modeled after the Telepsychiatry policy:



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 9

| Telepsychiatry Policy | Plaintiffs' Proposed Language |
|---|---|
| Telepsychiatry may not be used at the MHCB level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care.<br><br>If these good faith efforts are unsuccessful, psychiatric services may be provided via telepsychiatry. If a telepsychiatrist is required to serve in an MHCB for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.[6] ECF No. 7826-2 at 5. | The use of telemental health services in the MHCB and PIP levels of care is restricted to only emergency circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.<br><br>If these good faith efforts are unsuccessful, mental health services may be provided via telemental health. If a psychologist or LCSW is required to serve in an MHCB or PIP via telemental health for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved. ECF No. 7935-3 at 7. |

We agree with the proposed addition by plaintiffs. However, we caution the parties regarding the nature of the plans to address the lack of on-site staffing as the staffing plans that have been received thus far have lacked detail and are generally more akin to an update on the staffing situation.

### 4. Patient Teams Comprised Entirely of Remote Clinicians

We are deeply concerned that, under the current version of the telemental health policy it would be plausible that a patient could not have any member of their treatment team on-site; an entirely remote treatment team could negatively impact the treatment provided. Further, our monitoring of CDCR's effort to incorporate telepsychiatrists into huddles and meetings has revealed limited

---

[6] The PIP section of the telepsychiatry policy is slightly different as it substitutes MHCB for PIP and has longer timeframes for notice. *See* ECF No. 7826-2 at 5.



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 10

participation by some remote attendees. For instance, at institutions with 3CMS missions we observed a mental health partnership huddle and interdisciplinary treatment team (IDTT) meeting attended by all remote team members, and this resulted in reduced collaboration between the remote team members that was detrimental to adequate patient care.[7]

We recommend that CDCR modify the telemental health policy to ensure that patients have at least the assigned primary clinician or assigned psychiatrist on-site.

### 5. Frequency and Duration of On-site Visits by Telemental Health Clinicians

On-site visits by clinicians working remotely are important to the success of the telemental health program. We agree with CDCR's requirement that "Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions." Telemental Health Policy at 5. Additionally, these on-site visits aid the clinician in understanding the culture of CDCR institutions.

We recommend more frequent onsite visits to accomplish this goal. We propose that telemental health clinicians visit the institution for at least one full week within 30 days of assignment. Thereafter, they should visit at least twice a year for 3CMS programs and three times per year for EOP programs for at least three consecutive days each visit.

## IV.   General Recommendations, Questions, and Comments

Below are general recommendations and questions for consideration at the meet and confer.

1.  General Recommendations

    i.   We recommend that telemental health not be utilized in restricted housing units and not be used to conduct clinician-led groups and should only be utilized to conduct screenings in emergency circumstances in reception centers.

    ii.  We recommend that CDCR ensure continuity of care for patients who refuse services through telemental health. These patients should not be seen regularly by varied covering clinicians.

    iii. We recommend that there are on-site clinicians for required on-site contacts such as crisis assessments/crisis intervention teams (CITs), 5-day follow ups, suicide risk and self-harm evaluations (SRASHE), rules violations reports (RVR) mental

---

[7] This information will be included in the Special Master's monitoring report on 3CMS institutions.



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 11

<blockquote>
health assessments (MHA), initial assessments, prison rape elimination act (PREA) evaluations, gender affirmation assessments, and refusals.
</blockquote>

2.  Questions and Comments

   i.  Notwithstanding the initial five concerns and recommendations, the need to hire additional clinicians is critical to the success of the telemental health policy. We recommend that CDCR take steps to stem the staffing crisis by addressing on-site working conditions, salary differentials, and permitting hybrid work to reduce and prevent the current perpetual state of crisis. We look forward to hearing the steps CDCR has taken to hire telemental health staff.

   ii.  How does the reporting structure (tele-providers report through the telemental health chain of command rather than through the local managerial structure) impact scheduling, accountability, quality improvement, partnership plan activities, crisis response, and other administrative tasks?

   iii.  Explain how CDCR will ensure that on-site primary clinician staff will not move to telemental health under this plan. What are the incentives to remain on site?

## V.    Conclusion

The Special Master is supportive of the expansion of telemental health so long as adequate guidelines for its use are in place. As discussed above, we suggest that CDCR consider the five areas of concern and 12 recommendations below:

1.  Recommendation 1: Modification to the telemental health policy to clarify that incarcerated persons can choose an on-site provider and that the informed consent portion of the policy include a discussion of the risks and benefits of this modality of treatment.

2.  Recommendation 2: That the telemental health policy place limitations on backup telepresenters as it is not clear from the policy that they must be clinically trained.

3.  Recommendation 3: That nurse practitioners, social workers, psychologists or physicians acting as telepresenters are required to engage in clinical encounters in order for the clinical contact to be considered a joint appointment.

4.  Recommendation 4: Similar to the telepsychiatry policy in the context of an EOP unit, we recommend that telemental health should only be used as a supplement, and not a



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 12

replacement, for on-site primary clinicians working within the EOP units and telemental health only be used in emergency situations in MHCBs and PIPs.

5. Recommendation 5: That said, we also recommend that telemental health is a supplement not a replacement to on-site clinicians in 3CMS programs.

6. Recommendation 6: Assuming plaintiffs' proposals regarding the number and/or percentage of clinicians on-site applies to mainline patients, we find both proposals acceptable, but recommend that there must be a way to ensure a minimum on-site presence of mental health clinicians. In the alternative, we encourage the use of a hybrid model that allows a primary clinician to provide services both on-site and via telemental health in contrast to solely telemental health.

7. Recommendation 7: We agree with the plaintiffs' proposed revision regarding good faith efforts to hire. However, we caution the parties regarding the nature of the plans to address staffing as the plans that have been received thus far have lacked detail and are generally more akin to an update on the staffing situation.

8. Recommendation 8: We recommend the telemental health policy be modified to ensure that patients have at least the assigned primary clinician or psychiatrist on-site.

9. Recommendation 9: That telemental health clinicians visit the institution for at least one full week within 30 days of assignment. Thereafter, they should visit at least twice a year for 3CMS programs and three times per year for EOP programs for at least three consecutive days each visit.

10. Recommendation 10: That telemental health is not utilized in restricted housing units and not be used to conduct clinician-led groups and should only be utilized -to conduct screenings in emergency circumstances in reception centers.

11. Recommendation 11: That CDCR ensure continuity of care for patients who refuse services through telemental health. These patients should not be seen regularly by varied covering clinicians.

12. Recommendation 12: That there are on-site clinicians for required on-site contacts such as crisis assessments/CITs, 5-day follow ups, SRASHEs, RVR MHAs, initial assessments, PREA evaluations, gender affirmation assessments and refusals.



Melissa C. Bentz
Thomas Nolan
February 27, 2024
Page 13


It is our hope that the parties will consider these recommendations prior to the meet and confer. We look forward to meeting with you.

Sincerely,

PANNONE LOPES DEVEREAUX & O'GARA LLC

*/s/ Kerry F. Walsh*

_____

Kerry F. Walsh

KFW/jhg
Enclosures

Attachment A:  February 7, 2024, Letter from T. Nolan to M. Bentz
Attachment B:  July 21, 2023, Email from M. Bentz to Plaintiffs and Special Master
Attachment C:  September 19, 2023, Email from M. Bentz to Plaintiffs and Special Master
Attachment D:  September 21, 2023, Email from M. Bentz to Plaintiffs and Special Master
Attachment E:  December 2021, American Psychiatry Association Position Statement
Attachment F:  December 2013, American Psychological Association Guidelines for the Practice of Telepsychiatry
Attachment G: February 15, 2024, Letter from M. Bentz to the Special Master and M. Nunez


cc:    Matthew A. Lopes
       Ernest Galvan
       Michael Bien
       Lisa Ells
       Elise Thorn
       Nicholas Weber



# ATTACHMENT A

| **From:** | Thomas Nolan |
|---|---|
| **To:** | Melissa Bentz; Nick Weber; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Elise Thorn; Namrata Kotwani; Paul B. Mello; Damon McClain; Samantha Wolff |
| **Subject:** | Coleman -- Plaintiffs" Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440] |
| **Date:** | Wednesday, February 7, 2024 8:22:24 PM |
| **Attachments:** | image001.jpg |
| | TN-MB Re Plaintiffs Positions on Telemental Health Policy Disputes 02-07-2024 489-3.pdf |

Via E-mail Only

‐

February 7, 2024

Dear All –

Enclosed please find my letter setting forth Plaintiffs' positions with respect to the parties' disputes over the telemental health policy.   We look forward to discussing these issues at an upcoming meeting and confer.

Regards,

Tom

Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

February 7, 2024

VIA ELECTRONIC MAIL ONLY

Melissa Bentz                    Melissa.Bentz@cdcr.ca.gov
Nicholas Weber                   Nicholas.Weber@cdcr.ca.gov
Sundeep Thind                    Sundeep.Thind@cdcr.ca.gov
Carrie Stafford                  Carrie.Stafford@cdcr.ca.gov
CDCR Office of Legal Affairs

Re:    *Coleman v. Newsom*
       Plaintiffs' Positions Regarding Telemental Health Policy in Preparation for
       Meet and Confer
       Our File No. 0489-3

Dear Office of Legal Affairs:

We write to set forth our positions in anticipation of the parties' upcoming meet and confer regarding Defendants' telemental health policy. Our specific positions on various aspects of the policy were previously summarized in the September 5, 2023 Joint Report filed by the parties and the exhibits thereto. *See* September 5, 2023 Joint Report, ECF 7935 and 7935-1 through 7935-3 (including Plaintiffs marked up draft of the policy as Exhibit C, ECF 7935-3), all attached hereto as **Exhibit 1**.

As we have explained in the past, despite the promise of telemental health to help address staffing shortages, appropriate safeguards are essential to ensure that on-site, in-person mental health care remains the primary method by which psychologists and social workers provide care to *Coleman* class members. We think the needed safeguards are, roughly speaking, the same that apply to telepsychiatry. In most respects, these safeguards are even more important for psychologists and social workers, since they serve as case managers and in most contexts have more frequent and longer clinical contacts with patients than psychiatrists. Moreover, particularly in EOP units and restrictive housing units of all kinds, they play vital roles in creating a safe, therapeutic environment, and they also are critical collaborators with nursing and custody staff in creating a therapeutic environment and implementing the requirements of the Custody Mental Health Partnership Plan (CMHPP).

[4433482.2]

Melissa Bentz, et al.
February 7, 2024
Page 2

We set forth our requests and positions with respect to the telemental health policy below in greater detail, along with some questions about Defendants' experiences to date with the new policy, and a request that the monthly data filed with the Court and provided to Plaintiffs' Counsel and the Special Master be modified to separately break out telemental health staff providing care at each prison, similar to how telepsychiatry positions are broken out in reporting psychiatry staffing data.

## I.    Steps Taken By Defendants in Support of Areas of Agreement Recited in September 5, 2023 Stipulation

What steps, if any, have Defendants taken to ensure that the general principles the parties recited agreement about in the Joint Statement were accomplished during the Defendants implementation of the new policy?  The general principles included that "the goal is to maintain on-site mental healthcare professionals to provide care to *Coleman* patients" (Dkt. No. 7935 at 3) and that "on-site providers should receive incentives for on-site work that are not available to telemental health staff" (*id.*).

1.    What is the status of telemental health and on-site hiring?  Recent data filed with the Court shows that only 60 percent of psychologist positions statewide are filled, and staffing levels for some critical programs are much lower.  *See* 1/31/24 Defendants' Monthly Mental Health Staffing Vacancy Reports, ECF No. 8120, at 6 (showing overall fill rate, and reporting that CHCF has only 33 percent of allocated psychology positions filled and CMF has only 39 percent of psychology positions filled.)

2.    What new incentives have been introduced to help maintain on-site mental health staff and prevent migration to remote work?

3.    How many on-site mental health professionals have migrated to telemental health positions since the new policy was implemented last fall?

4.    How have the annual on-site visits by telemental health staff to their assigned institutions been working?  How long are these visits and what happens during the visits?  Is there a set schedule for the visits?

## II.    Areas of Disagreement in September 5, 2023 Stipulation

The parties also recited the following areas of disagreement with respect to the final draft of the telemental health policy.  (A copy of the final telemental health policy, which Melissa Bentz sent to the other parties on September 21, 2023, is attached hereto as **Exhibit 2**.)  We list each of the areas of disagreement from the Joint Report verbatim below, and below each item from the report we provide more concrete proposals for discussion at the meet and confer:

[4433482.2]

Melissa Bentz, et al.
February 7, 2024
Page 3

1.     Whether restrictions should apply to the provision of telemental health services to
       CCCMS and EOP patients, including in the form of limits on the percentage of
       primary clinician positions that should be filled through telemental health,
       requirements to have a certain number of on-site primary clinicians per program, and
       the requirement to provide notice and a plan if the required conditions are not met.

       More specific proposals:

       a.     CDCR should develop separate allocations for on-site and telemental health
              positions.  All parties agree that psychology and social work need some on-
              site presence.  In order to achieve this, CDCR needs specific allocations for
              on-site and remote psychologists and social workers.  We have previously
              suggested setting the allocation for telemental health Case
              Manager/Primary Clinicians to 15-20% in EOP yards, and 30-40% in
              CCCMS yards.  (Dkt. No. 7935-3 at 3, 6.)  No EOP patient should have
              both a telepsychiatrist and a telemental health case manager as part of their
              treatment team.

       b.     If due to a short-term emergency situation these two principles cannot be
              met, then Defendants should be required to have a process in place where
              salaries for on-site psychologists and social workers at the facility will be
              increased by a certain percentage each month until the number of on-site
              providers meets the threshold.

2.     Whether there should be restrictions on the use of telemental health for certain
       clinical tasks, including suicide risk evaluations, provision of care in segregation
       units (restricted housing units), and evaluations under the Prison Rape Elimination
       Act (PREA).  The process for obtaining informed consent for telemental health
       services.  The use of telemental health for mental-health-crisis beds and
       psychiatric-inpatient programs when on-site care is not available.

       More specific proposals:

       a.     Telemental health shall not be used for the following tasks or locations:

              • Suicide risk evaluations

              • The provision of care in RHU units

              • PREA evaluations

              • MHCB care

[4433482.2]

Melissa Bentz, et al.
February 7, 2024
Page 4

- PIP care including both Acute and ICF care

b. The informed consent process for telemental health should allow patients (1) to refuse telemental health care and opt for only in-person care, and (2) to waive the presence of the telepresenter for individual therapy sessions.

3. Whether telemental health services provided cell front to a patient that refused to attend an appointment should count as a Program Guide-required clinical contact.

   <u>More specific proposal</u>:

   a. Cell-front telemental health care when a patient refuses to attend an appointment should be barred.  When a patient will not come out to see a provider, the on-site clinicians should go see the individual cell-front.  It is important to have a live person go cell front, for example, to be able to tell if the individual is decompensating or not bathing.

4. The frequency and duration of telemental health visits to assigned institutions.

   <u>More specific proposals</u>:

   a. The first visit by a telemental health provider to each of their assigned institutions should be for an entire week and should include touring the entire institution and all of its programs, meeting with all key mental health managers at the prison, and attendance at an in-person IDTT meeting in each key program (e.g. each CCCMS yard and each EOP yard or area).

      - Subsequent visits shall be for no less than 2 consecutive days each year.

**<u>Other Issue for Discussion</u>**:

1. <u>Standards for Home Office Use (Adequate Confidentiality and Adequate Technology)</u>:  While we agree with home office use in theory, we think there need to be minimum standards for the protection of confidentiality, for adequate technology, and for adequate supervision of remote psychologists and social workers.

We look forward to discussing these proposals with Defendants and the Special Master team in more detail at the meet and confer once it is scheduled.

[4433482.2]

Melissa Bentz, et al.
February 7, 2024
Page 5

### III.    Data Issues

We request that, going forward, the monthly data and the filed monthly staffing data break out the telemental health positions separately so that all parties know what percentage of positions are staffed remotely.

Please feel free to contact me with any questions about these issues.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

By:   Thomas Nolan
Of Counsel

Enclosures: Exhibits 1-2
cc:    *Coleman* Special Master Team
       *Coleman* Co-Counsel
       Elise Thorn
       Namrata Kotwani
       Paul Mello
       Damon McClain
       Samantha Wolff

[4433482.2]

# EXHIBIT 1

ROB A. BONTA, State Bar No. 202668
Attorney General of California
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                                    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>                                    Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**PARTIES' JOINT REPORT IN RESPONSE TO AUGUST 3, 2023 ORDER ON DEFENDANTS' TELEMENTAL HEALTH SERVICES POLICY (ECF NO. 7901)**<br><br>Judge: The Hon. Kimberly J. Mueller |

**INTRODUCTION**

On August 3, 2023, the Court issued an order requiring the parties to meet and confer under the supervision of the Special Master and to file a joint statement regarding defendants' proposed Telemental Health Policy (the "policy"). August 3, 2023 Order, ECF No. 7901 at 2. The parties submit the following joint statement in response.

On July 21, 2023, defendants circulated a copy of a Telemental Health Policy, which would allow psychologists and social workers employed by CDCR to work remotely for CDCR and provide services to Coleman patients using videoconferencing technology, and requested

Joint Report Re: Telemental Health Services Policy in Response to 8/3/23 Order  (2:90-cv-00520 KJM-DB (PC))

1  comments from Plaintiffs and the Special Master.  A copy of the original circulated policy is

2  attached as Exhibit A.

3       On August 3, 2023, the Court issued its order that the parties meet and confer regarding the

4  policy and Defendants requested that the Special Master and Plaintiffs provide comments before

5  the meet and confer sessions commenced.  The Special Master's Office advised Defendants that it

6  would not provide comments in writing.  Plaintiffs provided Defendants and the Special Master

7  team with a marked up version of the proposed policy with redlines and comments reflecting their

8  concerns on August 23, 2023.  Plaintiffs also asked in the e-mail transmitting the marked up

9  policy that the parties discuss whatever incentives defendants were planning as part of their

10  implementation of the new policy to prevent on site psychologists and social workers from

11  migrating in significant numbers to offsite work as a result of the new policy.

12       The parties met and conferred twice—on August 29 and 31—under the supervision of and

13  with the participation of the Special Master team to discuss plaintiffs concerns about the proposed

14  policy and proposed modifications to the policy.  The parties agree about many aspects of the new

15  policy and Defendants made some modifications to the policy based on Plaintiffs' comments, but

16  a number of significant disagreements remain after the meet and confers.

17       The Court's order referenced the fact that the Court had issued an order adopting the

18  Provisionally Approved Telepsychiatry Policy as final, and that Defendants had appealed that

19  order.  (*Id.* at 1.)  To be clear, the telepsychiatry policy is separate and distinct from Defendants'

20  Telemental Health Policy.  Although the two policies are similar in some respects, they concern

21  different classifications.  The telepsychiatry policy only concerns care provided by

22  telepsychiatrists.  The Telemental Health Policy concerns care provided by telepsychologists and

23  telesocial workers.  The Telemental Health Policy in no way modifies the Court ordered

24  telepsychiatry policy.

25  **I.  AGREEMENTS**

26       Plaintiffs and defendants agree about a number of facets of the new policy, including that

27  telemental health is an important component of Defendants' efforts to address psychologist and

28

1  social worker staffing vacancies and that the policy should be implemented without delay.

2  Additionally, the parties agree on the following points:

3  •    Allowing social workers and psychologists who serve as case managers to work

4       remotely has the potential to be an important recruiting tool that helps defendants to

5       address the current staffing vacancies among psychologists and social workers in the

6       CDCR.

7  •    In person mental health services under the policy shall remain the preferred method

8       of care in Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP)

9       programs.

10 •    The goal is to maintain onsite mental healthcare professionals to provide care to

11      Coleman patients.

12 •    Defendants should continue to recruit and hire staff for onsite positions.

13 •    Onsite providers should receive incentives for onsite work that are not available to

14      telemental health staff.

15 •    Clinicians providing telemental health services should be assigned to particular

16      institutions and visit their assigned institutions at least annually.

17 •    Telemental health workers should be permitted to work from home or from hubs.

18 •    Telemental health service providers shall be licensed in California or working

19      towards a California license and shall be license-eligible, and shall work from within

20      the State of California.

21 •    In individual therapy sessions, patients should have the option of requesting to meet

22      one-on-one with the telemental health clinician, without the presence of a third-party

23      telepresenter.  Telepresenters are not required to be in the room with the patient for

24      the entirety of an encounter, though may be requested to stay for part or all of an

25      encounter at the telemental health provider's discretion.

26 •    The telemental health policy should include a process for ensuring continuity of care

27      in the event a patient refuses to be seen by the telehealth clinician.  The parties agree

28      that the procedure on page 3 of Exhibit B addresses this need.

**II. DEFENDANTS MADE MODIFICATIONS TO THEIR POLICY BASED ON PLAINTIFFS' COMMENTS.**

Defendants made modifications to their policy based on Plaintiffs comments and suggestions. Attached as Exhibit B is a draft of the policy that shows those changes in redline.

**III. THE PARTIES' DISAGREEMENTS**

The parties have a number of disagreements regarding the policy, the details of which can be seen in Exhibit C—Plaintiffs' comments and revisions to the policy. The following list includes the primary disagreements that the parties have regarding the policy:

- Whether restrictions should apply to the provision of telemental health services to CCCMS and EOP patients, including in the form of limits on the percentage of primary clinician positions that should be filled through telemental health, requirements to have a certain number of on-site primary clinicians per program, and the requirement to provide notice and a plan if the required conditions are not met.

- Whether there should be restrictions on the use of telemental health for certain clinical tasks, including suicide risk evaluations, provision of care in segregation units (restricted housing units), and evaluations under the Prison Rape Elimination Act (PREA).

- The process for obtaining informed consent for telemental health services.

- The use of telemental health for mental-health-crisis beds and psychiatric-inpatient programs when on-site care is not available.

- Whether telemental health services provided cell front to a patient that refused to attend an appointment should count as a Program Guide required clinical contact.

- The frequency and duration of telemental health visits to assigned institutions.

**IV. DEFENDANTS' STATEMENT**

Defendants' policy does not conflict with any Court order or the Program Guide, it comports with community standards of care, it will improve patient access to care, it will help CDCR to fill vacant positions by—among other things—attracting qualified candidates who would not otherwise consider working for CDCR, and it does not violate the Constitution.

19899275.1 [4352155.1]

4

1   Consistent with the regular course of conduct in this case, Defendants proactively solicited

2   comments from Plaintiffs and the Special Master team regarding their new policy before the

3   Court issued the August 3 order, met to discuss those comments, and made revisions to the policy

4   as appropriate. Because the revised policy does not conflict with the Program Guide, follows

5   community practices, enhances and increases psychologist and social worker treatment of class

6   members, and should enhance Defendants' ability to reduce staffing vacancies, CDCR now

7   intends to implement the revised policy (Exhibit B) as planned, and there is no basis for the Court

8   to delay Defendants' implementation of the policy. As the policy is implemented and as the

9   program develops, Defendants may modify aspects of the policy, and will provide notice to the

10  Special Master and Plaintiffs regarding any such modifications.

11  **V.   PLAINTIFFS' STATEMENT**

12          Defendants' telemental health policy can help remedy the current staffing problems in the

13  CDCR. Appropriate safeguards are needed to ensure that on site, in person mental health care

14  continues to be the primary method by which mental health care is provided by psychologists and

15  social workers to Coleman patients in the CDCR. The Court and the Special Master's experts

16  have recently helped the parties to craft appropriate limitations on the use of telepsychiatry for

17  psychiatrists. The telepsychiatry policies, however, cannot be imported verbatim for use by

18  psychologists and social workers. Unlike psychiatrists, psychologists and social workers serving

19  as case managers (also known as primary clinicians) are the primary clinical care providers and

20  managers for *Coleman* class members. These primary clinicians play a vital role on site in the

21  EOP treatment units to create a therapeutic environment. They also play vital roles on site to

22  work with custody and nursing staff, and to help in crisis situations. For the same reasons it is

23  appropriate to limit the use of this technology in higher level of care inpatient programs like

24  MHCBs and PIPs, it is appropriate to limit the use of this modality in high risk encounters like

25  de-escalation to prevent use of force, suicide risk assessments and the clinical work that follows

26  when someone reports having experienced sexual assault. Plaintiffs have therefore sought

27  specific representations in the policy to ensure that primary clinician work is done primarily by

28  on-site clinicians, supplemented as necessary by remote clinicians. Telemental health should be

1  used to fill vacancies, and not to replace presently filled onsite positions. Plaintiffs agree that the

2  policy should be implemented now to fill vacancies.

3

4  Dated: September 5, 2023

ROB A. BONTA
ATTORNEY GENERAL OF CALIFORNIA

5  DAMON MCCLAIN
SUPERVISING DEPUTY ATTORNEY GENERAL

6

7  */s/ Damon McClain*
DAMON MCCLAIN
SUPERVISING DEPUTY ATTORNEY GENERAL

8  *ATTORNEYS FOR DEFENDANTS*

9  Dated: September 5, 2023

HANSON BRIDGETT LLP

10  */s/ Samantha D. Wolff*
PAUL MELLO

11  SAMANTHA D. WOLFF

12  *Attorneys for Defendants*

13  Dated: September 5, 2023

ROSEN BIEN GALVAN & GRUNFELD LLP

14  */s/ Ernest Galvan*
ERNAST GALVAN

15  *Attorneys for Plaintiffs*

16

17  CF1997CS0003
43863466.docx

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:  **_Coleman v. Newsom, et al.,_**　　　　No.　**2:90-cv-00520 KJM-DB (PC)**

I hereby certify that on September 5, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PARTIES' JOINT REPORT IN RESPONSE TO AUGUST 3, 2023 ORDER ON DEFENDANTS' TELEMENTAL HEALTH SERVICES POLICY (ECF NO. 7901) (with Exhibits A-C)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on September 5, 2023, at San Francisco, California.

　　　　　　M. Paredes　　　　　　　　　　　　　　　　　　
　　　　　　　Declarant　　　　　　　　　　　　　　Signature

CF1997CS0003
43863472.docx

# EXHIBIT A

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8: | Revision Date(s): | |
| | Supersedes: | |
| 12.08.100<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes      No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to provide care to CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and social work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly.

Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

## Refusals

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

## Contraindications for Telemental Health

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the telepsychologist and Chief of Telepsychology, or telesocial worker and Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

## Telemental Health and Levels of Care

Telemental health providers will be assigned to CCCMS and EOP levels of care. Whenever possible, CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Services Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**     The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.

- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

**EXHIBIT B**

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8: | Revision Date(s): | |
| | Supersedes: | |
| 12.08.100<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes      No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and ~~Licensed~~ Clinical Social Workers (~~L~~CSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, ~~L~~CSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to ~~provide~~ care ~~to~~ for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and ~~L~~CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

~~psychiatrists~~counterparts, including the Electronic Health Records System.

- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. ~~Whenever possible,~~ CDCR seeks to employ psychologists and ~~L~~CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

### Correctional Clinical Case Management Services and Enhanced Outpatient Program

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

### Mental Health Crisis Bed and Psychiatric Inpatient Program

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

### Clinical Emergency Management

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or ~~L~~CSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

### MHCB and Psychiatric Inpatient Programs

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and ~~L~~CSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new

admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health ~~Services~~ Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**     The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The tele-presenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
  1. Laboratory
  2. Pharmacy
  3. Nursing station(s)
  4. Housing unit(s)
  5. Custody Health Care Access Unit staff
  6. Primary Clinician(s)
  7. Medical Provider(s)
  8. Mental Health Supervisor(s)
  9. Chief of Mental Health
  10. IT Department
  11. Chief and Senior Psychologist
  12. Chief Psychiatrist or Senior Psychiatrist Supervisor
  13. Scheduler
  14. Medical Records Supervisor
  14. 15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health

provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

_____

**Questions**   If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

**EXHIBIT C**

| VOLUME 12: | | Effective Date: | |
|---|---|---|---|
| MENTAL HEALTH SERVICES | | | |
| CHAPTER 8: | | Revision Date(s): | |
| | | Supersedes: | |
| 12.08.100 | | Attachments: | Yes    No ☒ |
| TELEMENTAL HEALTH PROGRAM | | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

> **Commented [A1]:** The policy should define "telemental health providers." Presumably this refers to psychologists and social workers who remotely act as case managers for MHSDS caseload patients via videoconferencing technology.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to provide care to CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified short-term emergency circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. Telemental health supplements but does not replace on-site psychologists and LCSWs in the CCCMS and EOP programs. CCCMS and EOP patients shall receive care from a mix of on-site and telemental health providers. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and social work supervisors and will be assigned to caseloads at the institution(s) they serve. Telepsychologists and telesocial workers shall be assigned to one institution, rather than splitting their time between several institutions. As appropriate, some telepsychologists and telesocial workers may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

> **Commented [A2]:** CIT should be an on-site function, as discussed below

Telepsychologists and telesocial workers shall be licensed, and their licenses shall be current and valid in the State of California.

**Definitions**

**Telemental Health Providers** refers to psychologists and social workers who provide services remotely through video and audio connections, working primarily from CDCR hubs

and in some cases from home offices that meet CDCR's requirements for confidentiality and connectivity.

**Supplement**
The following term is defined for use in this policy only:
- Supplement means at least 1.0 personnel year (PY) equivalent on-site psychologist or LCSW shall be assigned for each CCCMS program and EOP per yard at each institution. The 1.0 PY equivalent is the minimum required under this policy. Depending on the population of the program, more than 1.0 PY equivalent on-site psychologist or LCSW may be required by the percentage limit on mental health clinicians who can be remote described below, and to ensure that patients have reasonable and prompt access to on-site services.
- Supplemental also means that in the EOP all patients may be assigned either an on-site psychiatrist or an on-site psychologist, but not both.
- Supplement also means that there shall be no all-virtual Interdisciplinary Treatment Team (IDTT) meetings. Each IDTT shall include an on-site psychiatrist or on-site Case Manager/Primary Clinician.
- Supplement also means that most Case Managers/Primary Clinicians shall be on-site. The mix of on-site and remote qualified mental health professionals shall be such that no more than 20% of Case Managers/Primary Clinicians shall be telemental health professionals in Enhanced Outpatient Programs (EOPs) and no more than 40% of Case Managers/Primary Clinicians shall be telemental health professionals in Correctional Clinical Case Management System (CCCMS) programs.

**Equipment**

Telemental health providers shall work in CDCR Hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office.

Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow,

adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen.

At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

As part of the informed consent process, the patient shall specifically be told that (a) they have a right to refuse to receive telemental health services and to obtain in person treatment instead, and (b) that they should be aware that at times, telemental health services requires the presence of third party in the room with the patient, and that this can have a negative impact on the therapeutic alliance between the patient and their treating clinician, and could cause the patient to be less forthcoming about personal matters that they need to work through with their therapist.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate

**Commented [A3]:** Is the plan to require the use of telepresenter for all telemental health clinical encounters or would it be at the option of the telemental health professional? We would like to hear Defendants' thoughts about this issue at the upcoming meeting.

their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the ~~patient's~~patient shall be treated by an on-site provider to avoid a lapse in treatment. Patients shall have a right to refuse treatment via telemental health and to receive in—person treatment instead. After ensuring prompt on-site treatment, the telemental health provider(s) may ~~meet~~also address the refusal by meeting with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors related to the refusal. ~~to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell front telemental health contact, as clinically indicated.~~

~~If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.~~

~~If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals.~~

If the patient refuses telemental health services, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. ~~If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and Supervising Social Worker II will work with~~ Mental health leadership at the institution ~~to~~will ensure the patient has continued access to appropriate on-site mental health treatment.

Cell Front ~~Contraindications for~~ Telemental Health

Telemental health may be used cell front when it is necessary for the psychologist or LCSW to speak with the patient and the patient does not attend the scheduled appointment. However, non-confidential telemental health contacts, including cell-front contacts, shall not be considered a Program Guide required clinical contact under any circumstance.

**Contraindications for Telemental Health**

~~12.08.100: Telemental Health Program~~

> **Commented [A4]:** Class members should be given the right to refuse telemental health treatment. We believe such refusals will be unusual, as they have been with telepsychiatrists.

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis, except that telemental health services shall generally only be used in EOP and CCCMS programs, as detailed in the sections below. If the patient's IDTT, the telepsychologist and Chief of Telepsychology, or telesocial worker and Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. Whenever possible, CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.  Telemental health supplements but does not replace on-site mental health.  All CCCMS and EOP facilities shall continue to be served by on-site psychologists and LCSWs in addition to telemental health.

In the EOP all patients shall be assigned either an on-site psychiatrist or an on-site Case Manager/Primary Clinician.  In other words, no EOP patient shall have entirely telemental health care.

Most Case Managers/Primary Clinicians shall be on-site.  The mix of on-site and remote qualified mental health professionals shall be such that no more than 15% of Case Managers/Primary Clinicians on EOP yards shall be telemental health professionals and no more than 30% of Case Managers/Primary Clinicians on CCCMS yards shall be telemental health professionals.

CDCR shall use all reasonable, good faith efforts to recruit and retain on-site psychologists and LCSWs to provide services at the CCCMS and EOP level of care. If a CCCMS or EOP program does not have the on-site psychologist and LCSW services required by this policy for 30 consecutive calendar days, that would not be consistent with this policy's objectives. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 60 calendar days from the provision of notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how that issue has been resolved.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only emergency circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

12.08.100: Telemental Health Program

CDCR shall use all reasonable, good faith efforts to recruit and retain on-site psychologists and LCSWs to provide in person services at the MHCB and PIP levels of care. If these good faith efforts are unsuccessful, mental health services may be provided via telemental health. If a psychologist or LCSW is required to serve in an MHCB or PIP via telemental health for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**Clinical Encounters Where On Site Clinicians Must Be Employed**

The use of telemental health services for the following clinical tasks is restricted to only circumstances when on-site care is not available and for the shortest duration of time as necessary.

- CIT team membership and evaluations
- All care provided in RHUs
- Preparation of SRASHEs
- Initial Reception Center mental health assessments
- RVR mental health assessments
- PREA interviews.

CDCR shall use all reasonable, good faith efforts to recruit and retain on-site psychologists and LCSWs to provide the above listed services. If these good faith efforts are unsuccessful, these listed mental health services may be provided via telemental health. If a psychologist or LCSW is required to provide these services via telemental health for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall

12.08.100: Telemental Health Program

participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than ~~annually~~twice a year thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.  The very first visit by a telemental health provider to a new institution shall be for a full work-week and the visit shall include a tour of the facility, interviews with staff, observation of groups, in person IDTT participation in different units and unit types, and any other orientation to the institution and its unique programs and missions that is deemed important by the Chief of Mental Health for the prison.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Services Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

| Responsibilities | The institution receiving telemental health shall be responsible for providing the following: |

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited to, the following:
  1. Laboratory
  2. Pharmacy
  3. Nursing station(s)
  4. Housing unit(s)
  5. Custody Health Care Access Unit staff

6. Primary Clinician(s)
7. Medical Provider(s)
8. Mental Health Supervisor(s)
9. Chief of Mental Health
10. IT Department
11. Chief and Senior Psychologist
12. Chief Psychiatrist or Senior Psychiatrist Supervisor
13. Scheduler
14. Medical Records Supervisor

- ~~The~~A contact ~~information for~~list of all telemental health providers ~~assigned to~~ with caseloads at the institution, to be made available to ~~relevant~~all onsite staff, ~~including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.~~
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.

4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are ~~notexcluded~~not excluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Patients are given a clear informed consent for telemental health services which makes clear that they can choose to be treated only by on-site providers
8. Patients are told that when tele-presenters are employed, that can have some clinical consequences in terms of patient-therapist therapeutic alliance and in terms of the patients willingness to reveal highly personal information.
~~7.~~9. Telemental health providers complete all documentation in the health record by the close of each business day.
~~8.~~10. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
~~9.~~11. Telemental health providers visit their receiving institutions as directed by this policy.
~~10.~~12. Ongoing mandatory trainings are completed for all telemental health providers.
13. Telemental health providers are licensed, and their licenses are current and valid in the State of California.
~~11.~~14. Telemental health providers are privileged at each licensed or inpatient unit they serve.

15. Telemental health supplements but does not replace on-site mental health at the CCCMS and EOP levels of care.
16. No more than 20% of case managers in EOP units are remote telemental health providers
17. No more than 40% of case managers in CCCMS yards are remote telemental health providers.
18. Telemental health providers do not provide services in RHUs, serve on CIT teams, conduct SRASHEs, conduct RC initial mental health assessments, conduct PREA interviews or assessments, or complete mental health assessments and other tasks related to the RVR process.

**References**
- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# EXHIBIT 2

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | 9/21/2023 |
|---|---|---|
| **CHAPTER 1:**<br>ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| **12.01.901**<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | DocuSigned by:<br>**Amar Mehta, M.D.**<br>48AE21AE3D3B4D3... |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Clinical Social Workers (CSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, CSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to care for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

counterparts, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

## Physical Environment

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the telepresenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

## Professional and Patient Identity and Informed Consent

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site CSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or CSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or CSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. CDCR seeks to employ psychologists and CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or CSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and CSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

All elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

nursing staff when needed, shall have access to each other to address patient needs.

### Site Visits

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

### Organizational Structure

All telemental health staff shall report as appropriate within the Telemental Health Program supervisory chain.

### Workflow Interruptions

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

### On-Call or After-Hours Coverage by Telemental Health Providers

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**    The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained telepresenter who facilitates the

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor
    15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental

health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Questions**          If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# ATTACHMENT B

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Coleman Team - RBG Only; Coleman Special Master; Steve Fama |
| Cc: | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; v_Damon.McClain@doj.ca.gov; v_Namrata.Kotwani@doj.ca.gov; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| Subject: | Coleman: Draft Telemental Health Services Policy |
| Date: | Friday, July 21, 2023 3:35:59 PM |
| Attachments: | Draft Telemental Health Services Policy- 7.21.23.docx |

Good afternoon,

Attached is a draft of CDCR's Telemental Health Services policy. Please provide comments by August 21, 2023. CDCR will consider all comments received and intends to finalize the Telemental Health Services policy shortly thereafter.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8: | Revision Date(s): | |
| | Supersedes: | |
| 12.08.100<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes      No ☒ |
| | Director Approval: | |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to provide care to CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and social work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly.

Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the tele-presenter and a plan for a response to interruption in services.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

### Refusals

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

### Contraindications for Telemental Health

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the telepsychologist and Chief of Telepsychology, or telesocial worker and Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

### Telemental Health and Levels of Care

Telemental health providers will be assigned to CCCMS and EOP levels of care. Whenever possible, CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse may notify the telepsychologist, who can place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Services Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**    The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained tele-presenter who facilitates the

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Tele-presenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.

- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# ATTACHMENT C

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Lopes Matthew; Coleman Team - RBG Only; Coleman Special Master; Steven Fama (sfama@prisonlaw.com) |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; David C. Casarrubias; Laurel E. O"Connor; Neill, Jennifer@CDCR; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| **Subject:** | Coleman: Telemental Health Policy |
| **Date:** | Tuesday, September 19, 2023 7:29:02 PM |
| **Attachments:** | MH HQ Policy - Telemental Health Program.pdf |

Good afternoon,

Attached is the final Telemental Health Policy that was issued to the field today.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

| **VOLUME 12:** <br> MENTAL HEALTH SERVICES | Effective Date: | 9/19/2023 |
|---|---|---|
| **CHAPTER 1:** <br> ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| **12.01.901** <br> TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | *Amar Mehta* <br> DocuSigned by: <br> 46AE21AE5D3B4D3... |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Licensed Clinical Social Workers (LCSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, LCSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to care for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified emergency circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and LCSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

counterparts, including the Electronic Health Records System.
- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the telepresenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services.

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis, except that telemental health services shall generally only be used in EOP and CCCMS programs, as detailed in the sections below. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site LCSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or LCSW assigned.

Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or LCSW.

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. CDCR seeks to employ psychologists and LCSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only emergency circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or LCSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and LCSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

All elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency

medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

incidents requiring an in-person presence if needed.

_____

**Responsibilities**    The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained telepresenter who facilitates the patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination.  Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.
- A backup telepresenter when the primary telepresenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor
    15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters,

DocuSign Envelope ID: 76A2A48A-5574-4E64-9EF7-457D6901CA60

onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.

11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# ATTACHMENT D

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Lopes Matthew; Coleman Team - RBG Only; Coleman Special Master; Steven Fama (sfama@prisonlaw.com) |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; David C. Casarrubias; Laurel E. O"Connor; Neill, Jennifer@CDCR; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| **Subject:** | RE: Coleman: Telemental Health Policy |
| **Date:** | Thursday, September 21, 2023 6:09:42 PM |
| **Attachments:** | MH HQ Policy - Telemental Health Program.pdf |

All,

Upon review, CDCR determined that a non-final version of the Telemental Health policy was inadvertently released to the field earlier this week. The correct, final version was released to the field today. I have attached the correct version here.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Tuesday, September 19, 2023 4:28 PM
**To:** mlopes@pldolaw.com; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; David C. Casarrubias <DCasarrubias@hansonbridgett.com>; Laurel E. O'Connor <LOConnor@hansonbridgett.com>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Subject:** Coleman: Telemental Health Policy

Good afternoon,

Attached is the final Telemental Health Policy that was issued to the field today.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs

California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

> This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | 9/21/2023 |
|---|---|---|
| **CHAPTER 1:**<br>ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| **12.01.901**<br>TELEMENTAL HEALTH PROGRAM | Attachments: | Yes    No ☒ |
| | Director Approval: | DocuSigned by:<br>**Amar Mehta, M.D.**<br>48AE21AE3D5B4D3... |

**Purpose**

This policy ensures services provided by the Telemental Health Program comply with the California Department of Correction and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guidelines. Telemental health providers shall conduct care consistent with CDCR rules, regulations, policies, and Local Operating Procedures (LOP) of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements) and will be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Policy**

Telemental health enables psychologists and Clinical Social Workers (CSW) to provide real-time evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the psychologist, CSW, patient, and the patient's treatment team. Telemental health is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telemental health is a safe and efficient vehicle to increase access to care for CDCR patients.

Telemental health provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be utilized for higher levels of mental health care. On-site psychologists and CSWs shall remain the preferred method of care for the Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) programs. Telepsychologists and telesocial workers will work from within the State of California, be supervised by civil service telepsychology and telesocial work supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychologists and telesocial workers may be split between half-time allocations or may not be assigned to caseloads and may instead provide focused services such as assisting the Crisis Intervention Team, or short-term coverage during times when the assigned on-site psychologist or telepsychologist or on-site social worker or telesocial worker is unavailable to provide treatment to their assigned caseload.

**Equipment**

Telemental health providers shall work in CDCR hubs or in home offices that meet the following requirements.

The telemental health provider shall be given the following equipment and resources:
- Computer, monitor, speaker, microphone, camera, and state cell phone.
- Computer access to all resources, or equivalent resources utilized by their on-site

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

counterparts, including the Electronic Health Records System.

- Internet access of sufficient speed and stability to allow a videoconference where the patient and telemental health services provider can be seen and heard clearly. Telemental health providers working from home must provide the same standard of internet access.

Telemental health providers working from home must provide a confidential space with their own office furniture. Telemental health providers will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

Telemental health providers must onboard and begin their clinical assignments while working from the CDCR-operated hub. Prior to transitioning to work from home, telemental health providers must demonstrate appropriate use of the technology and workflow, adequate integration with their onsite team(s), and reliability and responsivity while working in the hub. Only once the telemental health supervisors, with input from local on-site supervisors, are fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed.

Work from home is allowed only for civil service telemental health providers. It is not an available assignment for registry telemental health providers.

**Physical Environment**

The patient's interview room and environment shall allow for both the telemental health provider and the patient to be seen and heard clearly by each other. The patient's and telemental health provider's cameras shall be positioned to allow their faces to be clearly visible to each other. The telemental health provider shall also be able to clearly see the patient's body to assess for any signs of movement that may be clinically relevant. When indicated, the telemental health provider can request assistance from the telepresenter, who shall receive appropriate training on how to assess for such physical signs. The telemental health administration and the institution receiving services shall ensure others are not able to enter the telemental health provider's or patient's rooms accidently or overhear conversations from inside or outside the rooms.

Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telemental health provider and the patient shall be appropriately sound-proofed, when possible, or alternative mechanisms shall be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Professional and Patient Identity and Informed Consent**

At the beginning of an initial appointment with a patient, the telemental health provider shall introduce themself and verify the patient's identity verbally and/or by having the patient show their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services.

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telemental health providers must participate in the receiving institution's Interdisciplinary Treatment Teams (IDTT) meetings as required by their assigned clinical duties. To facilitate their participation, IDTT meetings that include a telemental health provider shall be held in a location with videoconference capabilities that allow for the telemental health provider's full participation when their patients are being reviewed.

In addition to IDTT meetings, telemental health providers shall participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to the clinical care of their assigned patients.

**Refusals**

If a patient refuses treatment via telemental health, the patient's telemental health provider(s) may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, or any other relevant factors to determine whether telemental health is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telemental health services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a clinical contact, the telemental health provider may request a consultation from an on-site provider or conduct a cell-front telemental health contact, as clinically indicated.

If the treatment team is unable to resolve the patient's refusal of telemental health visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals. Contingency plans shall also be developed to provide on-site psychological care or social work services to the patient.

If the treatment team concludes telemental health is not an appropriate treatment modality for the patient due to refusals, the team shall report this finding to mental health leadership (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) of the institution receiving telemental health services, as well as the Chief of Telepsychology and Supervising Social Worker II. If it is determined that the patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health Supervising Social Worker II will work with mental health leadership at the institution to ensure the patient has access to appropriate on-site mental health treatment.

**Contraindications for Telemental Health**

Patients shall not be entirely excluded from participation in telemental health services based solely on their level of care or diagnosis. If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial worker and telemental health Supervising Social Worker II, determine that the patient needs to be seen by an on-site psychologist or on-site CSW, they will work with mental health leadership at the institution (Chief and/or Senior Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-site psychologist and/or CSW assigned. Similarly, if the treatment team determines that telemental health services are not appropriate for a patient, the team will work with mental health leadership to assign the patient to an on-site psychologist and/or CSW.

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Telemental Health and Levels of Care**

Telemental health providers will be assigned to CCCMS and EOP levels of care. CDCR seeks to employ psychologists and CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities. CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telemental health services may be utilized to treat patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are followed.

**Mental Health Crisis Bed and Psychiatric Inpatient Program**

The use of telemental health services in the MHCB and PIP levels of care is restricted to only circumstances when on-site care is not available and shall be used for the shortest duration of time as necessary.

**Clinical Emergency Management**

If a clinical emergency arises during a telemental health session (for example, a suicidal, violent, or homicidal patient), the telemental health provider shall immediately notify the appropriate institution staff, as identified by the institution's LOP. The telemental health provider shall coordinate with institutional mental health leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, coordinating arrangements for the patient to be seen by an on-site psychologist or CSW, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders as needed.

**MHCB and Psychiatric Inpatient Programs**

In the event that a telemental health provider is needed in an MHCB or inpatient setting, the telemental health provider, to facilitate familiarity with the program and patients, shall participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telemental health services provider has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychologists and CSWs, telepsychologists and telesocial workers shall be involved in treatment and discharge decisions.

All elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. In the event that a telepsychologist is contacted for seclusion and restraint, a psychiatrist shall also be consulted to assess for the need for emergency medication, as clinically indicated.

To ensure continuity of care, telemental health providers shall provide relevant clinical information during the hand-off to the on-call clinician to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns. Telemental health and clinical staff, including

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telemental health providers are responsible for maintaining relationships with members of their assigned on-site treatment team through regular communication and by visiting institutions. Telemental health providers shall visit their assigned institution within 30 days of assignment and no less than annually thereafter. The telemental health provider will spend at least one day during each site visit at the facility. During this visit, the telemental health provider shall participate in the IDTT, meet with necessary health care staff, attend staff meetings if applicable on that day, and may see patients in person.

**Organizational Structure**

All telemental health staff shall report as appropriate within the Telemental Health Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telemental health providers shall immediately notify their direct supervisor and mental health leadership at the institution (Chief and/or Senior Psychologist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telemental health provider shall also make arrangements with institutional mental health leadership to ensure appropriate patient coverage based on patient need (for example, coverage by an on-site provider or rescheduling of appointments). Telemental health providers may also be redirected to another telemental health assignment when this occurs.

If a telemental health provider has a sustained interruption in technology or significant equipment malfunction, or if there are supervisory concerns that interfere with their ability to see and treat patients, they may be required to report to an office space in the hub.

**On-Call or After-Hours Coverage by Telemental Health Providers**

Telemental health providers shall contribute to on-call or after-hours coverage as assigned, and their provision of services shall be in accordance with applicable California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM) policies, statewide mental health policies, and applicable bargaining unit Memorandums of Understanding.

Telemental health providers are not required to travel to the institution where they are providing on-call or after-hours coverage. Therefore, institutions receiving on-call or after-hours coverage from the Telemental Health Program must provide a backup clinician. This backup clinician shall be within one hour of travel time to the facility in order to attend to incidents requiring an in-person presence if needed.

---

**Responsibilities**    The institution receiving telemental health shall be responsible for providing the following:

- Timely access for patients to the telemental health provider.
- A dedicated and appropriately clinically trained telepresenter who facilitates the

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

patient encounter from the originating site to the telemental health provider and is responsible for providing clinical support and coordination. Telepresenters are not required to be in the room with the patient for the entirety of an encounter, though may be requested to stay for part or all of an encounter at the telemental health provider's discretion. The telepresenter shall be required to introduce themselves when they are in the room and explain that they are subject to the same confidentiality requirements as the telemental health provider and other treatment providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment, facilitating the videoconferencing connection with the telemental health provider, assisting with on-site correspondence and care coordination, and remaining immediately available to the patient during the appointment. Telepresenters shall be assigned from, but not limited to, position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as Dental Assistants or Office Technicians, may be used.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.
- Availability of appropriate clinical staff.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- An institutional contact list of important names and numbers for the telemental health provider. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Custody Health Care Access Unit staff
    6. Primary Clinician(s)
    7. Medical Provider(s)
    8. Mental Health Supervisor(s)
    9. Chief of Mental Health
    10. IT Department
    11. Chief and Senior Psychologist
    12. Chief Psychiatrist or Senior Psychiatrist Supervisor
    13. Scheduler
    14. Medical Records Supervisor
    15. Watch Commander

- The contact information for telemental health providers assigned to the institution made available to relevant onsite staff, including but not limited to telepresenters, onsite leadership, nursing, laboratory, and pharmacy staff.
- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telemental health encounter, including, but not limited to a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telemental health provider.
- Maintenance of teleconferencing connectivity between institutions and telemental

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

health providers.
- Confirmation that telemental health providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance indicators.
- Organized tours for the telemental health providers during their initial visits to the institution.
- On-site clinical contingency plans and patient prioritization strategies to manage absences of telemental health providers.
- An LOP for telemental health services that shall be submitted to the Chief of Telepsychology, or designee, and Supervising Social Worker II for review and approval prior to local distribution or implementation. Any revisions of the LOP for telemental health shall be reviewed and approved by the Chief of Telepsychology, or designee, and Supervising Social Worker II prior to implementation at the institution. The LOP must be reviewed annually.
- Routine system tests to ensure that telemental health equipment is safe, operational, and secure.

---

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telemental Health Program and the institution receiving services:

1. Telemental health providers are provided with the appropriate equipment and resources.
2. Telemental health providers participate in the same manner as on-site providers in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their assigned patients.
3. On-site staff and members of the treatment team communicate with the telemental health providers regarding any important patient issues and concerns related to patient care.
4. Telemental health providers have access to all necessary clinical information via the patient's health record.
5. Telemental health providers communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are notexcluded from participation in the Telemental Health Program based solely on their level of care or diagnosis.
7. Telemental health providers complete all documentation in the health record by the close of each business day.
8. Telemental health provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telemental health providers visit their receiving institutions as directed by this policy.
10. Ongoing mandatory trainings are completed for all telemental health providers.
11. Telemental health providers are privileged at each licensed or inpatient unit they serve.

---

**References**

- CDCR Mental Health Services Delivery System Program Guide, 2021 Revision
- CCHCS Health Care Department Operations Manual
- Bargaining Unit 19 Memorandum of Understanding

---

DocuSign Envelope ID: 71597453-AD7F-4749-8395-E3FAB5B1E6D1

**Questions**          If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# ATTACHMENT E

## APA Official Actions

# Position Statement on Telemedicine in Psychiatry

Approved by the Board of Trustees, December 2021
Approved by the Board of Trustees, July 2018

Approved by the Assembly, November 2021
Approved by the Assembly, May 2018

"Policy documents are approved by the APA Assembly and Board of Trustees. . .  These are . . . position statements that define
APA official policy on specific subjects. . ." – *APA Operations Manual*

**Issue:**

There is a lack of access to psychiatrists in many areas of the country, especially in underserved areas, contributing to the inadequate availability of high-quality psychiatric care.  This is particularly true for under resourced and marginalized communities including rural, low-income, low English proficiency, and LGBTQ+ populations. Telehealth (including audio-only when clinically indicated) increased during the COVID-19 pandemic.  This expanded use revealed opportunities to increase access to and continuity of psychiatric care and exposed several barriers to further or sustained expansion. Telemedicine, including the use of video conferencing and audio-only care, became an essential strategy to improve health equity and increase access to high-quality psychiatric care.

**APA Position:**

**Telemedicine in psychiatry (telepsychiatry) promotes health equity by increasing access to care and is therefore a critical component of the mental health delivery system when its use:**

1. **Includes any synchronous or asynchronous consultation with a patient or other practitioner by regular telephone, text, or videoconferencing;**

2. **Is in the best interest of the patient, protects patient autonomy, confidentiality, and privacy;**

3. **Encourages cultural humility including with efforts to understand the gestures, language, and cultural history of the patient;**

4. **Identifies barriers (e.g. foreign language, or disability) that can affect telepsychiatry participation and provides appropriate workarounds (e.g. interpreters); and,**

5. **Is consistent with APA policies on medical ethics and applicable governing law;**

**Telemedicine in psychiatry should:**

1. **Allow persons with mental health and/or substance use disorders to be seen via audio and/or video in a non-clinical location with no in-person evaluation required, at the discretion of the treating psychiatrist;**

© Copyright, American Psychiatric Association, all rights reserved.

2. **Permit the use of audio-only communications for evaluation and management of patients with mental health and substance use disorders when it is in the patient's best interest and is clinically appropriate at the discretion of the psychiatrist;**

3. **Consider both the psychiatrist and patient locations during a telepsychiatry session and include working with the patient to ensure appropriate privacy and safety;**

4. **Be reimbursed by all payers, public and private, for all covered psychiatric services at parity with in-person delivery, including for audio only visits;**

5. **Permit the prescribing of controlled substances without a prior in-person exam; and,**

6. **Include use for teaching physicians to provide direct supervision of medical residents, medical students, advance practice clinicians, and other trainees regardless of geographic location.**

**Funding and regulation of telemedicine should include:**

1. **Appropriation of funding to achieve universal broadband access to technology regardless of location;**

2. **HIPAA- and 42CFR Part 2 compliant technology standards;**

3. **Payer technology requirements that are no more stringent than HIPAA technology standards;**

4. **Mechanisms to reduce barriers to interstate telepsychiatry practice, such as full medical license reciprocity across the states; and**

5. **Federal funding for research and evaluation to understand the quality, barriers, safety, training needs, and appropriate use of telemedicine, including audio-only, and its impact on health equity across the healthcare delivery landscape.**

**Authors**:

Committee on Telepsychiatry
Council on Healthcare Systems and Financing
Council on Children, Adolescents and Their Families
Council on Geriatric Psychiatry
Council on Quality Care
Council on Minority Mental Health
Council on Addiction Psychiatry
Council on Advocacy and Government Relations
Caucus on College Mental Health
Workgroup on Telehealth and Audio Only Care

© Copyright, American Psychiatric Association, all rights reserved.

# ATTACHMENT F

# Guidelines for the Practice of Telepsychology

Joint Task Force for the Development of Telepsychology Guidelines for Psychologists

These guidelines are designed to address the developing area of psychological service provision commonly known as telepsychology. *Telepsychology* is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies, as expounded in the Definition of Telepsychology section of these guidelines. The expanding role of technology in the provision of psychological services and the continuous development of new technologies that may be useful in the practice of psychology present unique opportunities, considerations, and challenges to practice. With the advancement of technology and the increased number of psychologists using technology in their practices, these guidelines have been prepared to educate and guide them.

These guidelines are informed by relevant American Psychological Association (APA) standards and guidelines, including the "Ethical Principles of Psychologists and Code of Conduct" ("APA Ethics Code"; APA, 2002a, 2010) and the "Record Keeping Guidelines" (APA, 2007). In addition, the assumptions and principles that guide APA's "Guidelines on Multicultural Training, Research, Practice, and Organizational Change for Psychologists" (APA, 2003) are infused throughout the *Rationale* and *Application* subsections describing each of the guidelines. Therefore, these guidelines are informed by professional theories, evidence-based practices, and definitions in an effort to offer the best guidance in the practice of telepsychology.

The use of the term *guidelines* within this document refers to statements that suggest or recommend specific professional behaviors, endeavors, or conduct for psychologists. Guidelines differ from standards in that standards are mandatory and may be accompanied by an enforcement mechanism. Thus, guidelines are aspirational in intent. They are intended to facilitate the continued systematic development of the profession and to help ensure a high level of professional practice by psychologists. "Guidelines are created to educate and to inform the practice of psychologists. They are also intended to stimulate debate and research. Guidelines are not to be promulgated as a means of establishing the identity of a particular group or specialty area of psychology; likewise, they are not to be created with the purpose of excluding any psychologist from practicing in a particular area" (APA, 2002b, p. 1048). "Guidelines are not intended to be mandatory or exhaustive and may not be applicable to every professional or clinical situation. They are not definitive and they are not intended to take precedence over the judgment of psychologists" (APA, 2002b, p. 1050). These guidelines are meant to assist psychologists as they apply current standards of professional practice when utilizing telecommunication technologies as a means of delivering their professional services. They are not intended to change any scope of practice or define the practice of any group of psychologists.

The practice of telepsychology involves consideration of legal requirements, ethical standards, telecommunication technologies, intra- and interagency policies, and other external constraints, as well as the demands of the particular professional context. In some situations, one set of considerations may suggest a different course of action than another, and it is the responsibility of the psychologist to balance them appropriately. These guidelines aim to assist psychologists in making such decisions. In addition, it will be important for psychologists to be cognizant of and compliant with laws and regulations that govern independent practice within jurisdictions and across jurisdictional and international borders. This is particularly true when providing telepsychology services. Where a psychologist is providing services from one jurisdiction to a client/patient located in another jurisdiction, the law and regulations may differ between the two jurisdictions. Also, it is the responsibility of the psychologists who practice telepsychology to maintain and enhance their level of understanding of the concepts related to the delivery of services via telecommunication technologies. Nothing in these guidelines is intended to contravene any limitations set on psychologists' activities based on ethical standards, federal or jurisdictional statutes or regulations, or for those psychologists who work in agencies and public settings. As in all other circumstances, psychologists must be aware of the stan-

The "Guidelines for the Practice of Telepsychology" were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists established by the following three entities: the American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB), and the APA Insurance Trust (APAIT). The "Guidelines for the Practice of Telepsychology" were approved as APA policy by the APA Council of Representatives on July 31, 2013. The co-chairs of the joint task force were Linda Campbell and Fred Millán. Additional members of the task force included the following psychologists: Margo Adams Larsen, Sara Smucker Barnwell, Bruce E. Crow, Terry S. Gock, Eric A. Harris, Jana N. Martin, Thomas W. Miller, and Joseph S. Rallo. APA staff (Ronald S. Palomares, Deborah Baker, Joan Freund, and Jessica Davis) and ASPPB staff (Stephen DeMers, Alex M. Siegel, and Janet Pippin Orwig) provided direct support to the joint task force.

These guidelines are scheduled to expire as APA policy 10 years from July 31, 2013 (the date of their adoption by the APA Council of Representatives). After this date, users are encouraged to contact the APA Practice Directorate to determine whether this document remains in effect.

Correspondence concerning these guidelines should be addressed to the Practice Directorate, American Psychological Association, 750 First Street, NE, Washington, DC 20002-4242.

© 2013 American Psychological Association 0003-066X/13/$12.00
Vol. 68, No. 9, 791–800    DOI: 10.1037/a0035001

dards of practice for the jurisdiction or setting in which they function and are expected to comply with those standards. Recommendations related to the guidelines are consistent with broad ethical principles (APA Ethics Code, APA, 2002a, 2010), and it continues to be the responsibility of the psychologist to apply all current legal and ethical standards of practice when providing telepsychology services.

It should be noted that APA policy generally requires substantial review of the relevant empirical literature as a basis for establishing the need for guidelines and for providing justification for the guidelines' statements themselves (APA, 2002b, p. 1050). The literature supporting the work of the Joint Task Force on the Development of Telepsychology Guidelines for Psychologists (i.e., the Telepsychology Task Force) and the guidelines statements themselves reflect seminal, relevant, and recent publications. The supporting references in the literature review emphasize studies from approximately the past 15 years plus classic studies that provide empirical support and relevant examples for the guidelines. The literature review, however, is not intended to be exhaustive or to serve as a comprehensive systematic review of the literature that is customary when developing professional practice guidelines for psychologists.

## Definition of Telepsychology

*Telepsychology* is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies. Telecommunications is the preparation, transmission, communication, or related processing of information by electrical, electromagnetic, electromechanical, electro-optical, or electronic means (Committee on National Security Systems, 2010). Telecommunication technologies include but are not limited to telephone, mobile devices, interactive videoconferencing, e-mail, chat, text, and Internet (e.g., self-help websites, blogs, and social media). The information that is transmitted may be in writing or include images, sounds, or other data. These communications may be synchronous, with multiple parties communicating in real time (e.g., interactive videoconferencing, telephone), or asynchronous (e.g., e-mail, online bulletin boards, storing and forwarding of information). Technologies may augment traditional in-person services (e.g., psychoeducational materials posted online after an in-person therapy session) or be used as stand-alone services (e.g., therapy or leadership development provided over videoconferencing). Different technologies may be used in various combinations and for different purposes during the provision of telepsychology services. For example, videoconferencing and telephone may also be utilized for direct service, while e-mail and text are used for nondirect services (e.g., scheduling). Regardless of the purpose, psychologists strive to be aware of the potential benefits and limitations in their choices of technologies for particular clients in particular situations.

## Operational Definitions

The Telepsychology Task Force has agreed upon the following operational definitions for terms used in this document. In addition, these and other terms used throughout the document have a basis in definitions developed by the following U.S. agencies: the Committee on National Security Systems (2010), the U.S. Department of Health and Human Services, Health Resources and Services Administration (2010), and the U. S. Department of Commerce, National Institute of Standards and Technology (2008, 2011). Last, the terminology and definitions that describe technologies and their uses are constantly evolving, and therefore psychologists are encouraged to consult glossaries and publications prepared by agencies such as the Committee on National Security Systems and the National Institute of Standards and Technology, which represent definitive sources responsible for developing terminology and definitions related to technology and its uses.

The term *client/patient* refers to the recipient of psychological services, whether psychological services are delivered in the context of health care, corporate, supervision, and/or consulting services. The term *in-person,* which is used in combination with the provision of services, refers to interactions in which the psychologist and the client/patient are in the same physical space and does not include interactions that may occur through the use of technologies. The term *remote,* which is also used in combination with the provision of services utilizing telecommunication technologies, refers to the provision of a service that is received at a different site from where the psychologist is physically located. The term *remote* includes no consideration related to distance and may refer to a site in a location that is in the office next door to the psychologist or thousands of miles from the psychologist. The terms *jurisdictions* and *jurisdictional* are used when referring to the governing bodies at states, territories, and provincial governments.

Finally, there are terms within these guidelines related to confidentiality and security. *Confidentiality* means the principle that data or information is not made available or disclosed to unauthorized persons or processes. The terms *security* and *security measures* are terms that encompass all of the administrative, physical, and technical safeguards in an information system. The term *information system* is an interconnected set of information resources within a system and includes hardware, software, information, data, applications, communications, and people.

## Need for the Guidelines

The expanding role of telecommunication technologies in the provision of services and the continuous development of new technologies that may be useful in the practice of psychology support the need for the development of guidelines for practice in this area. Technology offers the opportunity to increase client/patient access to psychological services. Service recipients limited by geographic location, medical condition, psychiatric diagnosis, financial constraint, or other barriers may gain access to high-quality psychological services through the use of technology.

Technology also facilitates the delivery of psychological services by new methods (e.g., online psychoeducation, therapy delivered over interactive videoconferencing) and augments traditional in-person psychological services. The increased use of technology for the delivery of some types of services by psychologists who are health service providers is suggested by recent survey data collected by the APA Center for Workforce Studies (2008) and by the increasing discussion of telepsychology in the professional literature (Baker & Bufka, 2011). Together with the increasing use and payment for the provision of telehealth services by Medicare and private industry, the development of national guidelines for the practice of telepsychology is timely and needed. Furthermore, state and international psychological associations have developed or are beginning to develop guidelines for the provision of psychological services (Canadian Psychological Association, 2006; New Zealand Psychologists Board, 2011; Ohio Psychological Association, 2010).

## Development of the Guidelines

These guidelines were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists (Telepsychology Task Force) established by the following three entities: the American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB), and the APA Insurance Trust (APAIT). These entities provided input, expertise, and guidance to the Telepsychology Task Force on many aspects of the profession, including those related to its ethical, regulatory, and legal principles and practices. The Telepsychology Task Force members represented a diverse range of interests and expertise that are characteristic of the profession of psychology, including knowledge of the issues relevant to the use of technology, ethical considerations, licensure and mobility, and scope of practice, to name only a few.

The Telepsychology Task Force recognized that telecommunications technologies provide both opportunities and challenges for psychologists. Telepsychology not only enhances a psychologist's ability to provide services to clients/patients but also greatly expands access to psychological services that, without telecommunication technologies, would not be available. Throughout the development of these guidelines, the Telepsychology Task Force devoted numerous hours to reflecting on and discussing the need for guidance for psychologists in this area of practice; the myriad, complex issues related to the practice of telepsychology; and the experiences that they and other practitioners address each day in the use of technology. There was a concerted focus on identifying the unique aspects that telecommunication technologies bring to the provision of psychological services, as distinct from those present during in-person provision of services. Two important components were identified:

(1) the psychologist's knowledge of and competence in the use of the telecommunication technologies being utilized; and

(2) the need to ensure that the client/patient has a full understanding of the increased risks for loss of security and confidentiality when using telecommunication technologies.

Therefore, two of the most salient issues that the Telepsychology Task Force members focused on when creating this document were the psychologist's own knowledge of and competence in the provision of telepsychology and the need to ensure that the client/patient has a full understanding of the potentially increased risks for loss of security and confidentiality when using technologies.

An additional key issue discussed by the task force members was interjurisdictional practice. The guidelines encourage psychologists to be familiar with and comply with all relevant laws and regulations when providing psychological services across jurisdictional and international borders. The guidelines do not promote a specific mechanism to guide the development and regulation of interjurisdictional practice. However, the Telepsychology Task Force noted that while the profession of psychology does not currently have a mechanism to regulate the delivery of psychological services across jurisdictional and international borders, it is anticipated that the profession will develop a mechanism to allow interjurisdictional practice given the rapidity with which technology is evolving and the increasing use of telepsychology by psychologists working in U.S. federal environments such as the U.S. Department of Defense and the Department of Veterans Affairs.

## Competence of the Psychologist

***Guideline 1. Psychologists who provide telepsychology services strive to take reasonable steps to ensure their competence with both the technologies used and the potential impact of the technologies on clients/patients, supervisees, or other professionals.***

***Rationale.*** Psychologists have a primary ethical obligation to provide professional services only within the boundaries of their competence based on their education, training, supervised experience, consultation, study, or professional experience. As with all new and emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists utilizing telepsychology aspire to apply the same standards in developing their competence in this area. Psychologists who use telepsychology in their practices assume the responsibility for assessing and continuously evaluating their competencies, training, consultation, experience, and risk management practices required for competent practice.

***Application.*** Psychologists assume responsibility to continually assess both their professional and technical competence when providing telepsychology services. Psychologists who utilize or intend to utilize telecommunication technologies when delivering services to clients/patients strive to obtain relevant professional training to develop their requisite knowledge and skills. Acquiring

competence may require pursuing additional educational experiences and training, including but not limited to a review of the relevant literature, attendance at existing training programs (e.g., professional and technical), and continuing education specific to the delivery of services utilizing telecommunication technologies. Psychologists are encouraged to seek appropriate skilled consultation from colleagues and other resources.

Psychologists are encouraged to examine the available evidence to determine whether specific telecommunication technologies are suitable for a client/patient, based on the current literature available, current outcomes research, best practice guidance, and client/patient preference. Research may not be available in the use of some specific technologies, and clients/patients should be made aware of those telecommunication technologies that have no evidence of effectiveness. However, this, in and of itself, may not be grounds to deny providing the service to the client/patient. Lack of current available evidence in a new area of practice does not necessarily indicate that a service is ineffective. Additionally, psychologists are encouraged to document their consideration and choices regarding the use of telecommunication technologies used in service delivery.

Psychologists understand the need to consider their competence in utilizing telepsychology as well as their client's/patient's ability to engage in and fully understand the risks and benefits of the proposed intervention utilizing specific technologies. Psychologists make reasonable efforts to understand the manner in which cultural, linguistic, socioeconomic, and other individual characteristics (e.g., medical status, psychiatric stability, physical/cognitive disability, personal preferences), in addition to organizational cultures, may impact effective use of telecommunication technologies in service delivery.

Psychologists who are trained to handle emergency situations in providing traditional in-person clinical services are generally familiar with the resources available in their local community to assist clients/patients with crisis intervention. At the onset of the delivery of telepsychology services, psychologists make reasonable efforts to identify and learn how to access relevant and appropriate emergency resources in the client's/patient's local area, such as emergency response contacts (e.g., emergency telephone numbers, hospital admissions, local referral resources, clinical champion at a partner clinic where services are delivered, a support person in the client's/patient's life when available). Psychologists prepare a plan to address any lack of appropriate resources, particularly those necessary in an emergency, and other relevant factors that may impact the efficacy and safety of said service. Psychologists make reasonable efforts to discuss with and provide all clients/patients with clear written instructions as to what to do in an emergency (e.g., where there is a suicide risk). As part of emergency planning, psychologists are encouraged to acquire knowledge of the laws and rules of the jurisdiction in which the client/patient resides and of the differences of those laws from those in the psychologist's jurisdiction, as well as to document all their emergency planning efforts.

In addition, as applicable, psychologists are mindful of the array of potential discharge plans for clients/patients for whom telepsychology services are no longer necessary and/or desirable. If a client/patient recurrently experiences crises/emergencies, which suggests that in-person services may be appropriate, psychologists take reasonable steps to refer a client/patient to a local mental health resource or begin providing in-person services.

Psychologists using telepsychology to provide supervision or consultation remotely to individuals or organizations are encouraged to consult others who are knowledgeable about the unique issues telecommunication technologies pose for supervision or consultation. Psychologists providing telepsychology services strive to be familiar with professional literature regarding the delivery of services via telecommunication technologies, as well as to be competent with the use of the technological modality itself. In providing supervision or consultation via telepsychology, psychologists make reasonable efforts to be proficient in the professional services being offered, the telecommunication modality via which the services are being offered by the supervisee/consultee, and the technology medium being used to provide the supervision or consultation. In addition, since the development of basic professional competencies for supervisees is often conducted in person, psychologists who use telepsychology for supervision are encouraged to consider and ensure that a sufficient amount of in-person supervision time is included so that the supervisees can attain the required competencies or supervised experiences.

## Standards of Care in the Delivery of Telepsychology Services

*Guideline 2. Psychologists make every effort to ensure that ethical and professional standards of care and practice are met at the outset and throughout the duration of the telepsychology services they provide.*

**Rationale.** Psychologists delivering telepsychology services apply the same ethical and professional standards of care and professional practice that are required when providing in-person psychological services. The use of telecommunication technologies in the delivery of psychological services is a relatively new and rapidly evolving area, and therefore psychologists are encouraged to take particular care to evaluate and assess the appropriateness of utilizing these technologies prior to engaging in, and throughout the duration of, telepsychology practice to determine if the modality of service is appropriate, efficacious, and safe.

Telepsychology encompasses a breadth of different psychological services using a variety of technologies (e.g., interactive videoconferencing, telephone, text, e-mail, Web services, and mobile applications). The burgeoning research in telepsychology suggests that certain types of interactive telepsychological interventions are equal in effectiveness to their in-person counterparts (specific therapies delivered over videoteleconferencing and telephone).

Therefore, before psychologists engage in providing tele-psychology services, they are urged to conduct an initial assessment to determine the appropriateness of the telepsy-chology service to be provided for the client/patient. Such an assessment may include the examination of the potential risks and benefits of providing telepsychology services for the client's/patient's particular needs, the multicultural and ethical issues that may arise, and a review of the most appropriate medium (video teleconference, text, e-mail, etc.) or best options available for the service delivery. It may also include considering whether comparable in-per-son services are available and why services delivered via telepsychology are equivalent or preferable to such ser-vices. In addition, it is incumbent on the psychologist to engage in a continual assessment of the appropriateness of providing telepsychology services throughout the duration of the service delivery.

**Application.** When providing telepsychology services, considering client/patient preferences for such services is important. However, it may not be solely deter-minative in the assessment of their appropriateness. Psy-chologists are encouraged to carefully examine the unique benefits of delivering telepsychology services (e.g., access to care, access to consulting services, client convenience, accommodating client special needs, etc.) relative to the unique risks (e.g., information security, emergency man-agement, etc.) when determining whether or not to offer telepsychology services. Moreover, psychologists are aware of such other factors as geographic location, orga-nizational culture, technological competence (both that of the psychologist and that of the client/patient), and, as appropriate, medical conditions, mental status and stability, psychiatric diagnosis, current or historic use of substances, treatment history, and therapeutic needs that may be rele-vant to assessing the appropriateness of the telepsychology services being offered. Furthermore, psychologists are en-couraged to communicate any risks and benefits of the telepsychology services to be offered to the client/patient and to document such communication. In addition, psy-chologists may consider some initial in-person contact with the client/patient to facilitate an active discussion on these issues and/or to conduct the initial assessment.

As in the provision of traditional services, psycholo-gists endeavor to follow the best practice of service deliv-ery described in the empirical literature and professional standards (including multicultural considerations) that are relevant to the telepsychological service modality being offered. In addition, they consider the client's/patient's familiarity with and competency for using the specific technologies involved in providing the particular telepsy-chology service. Moreover, psychologists are encouraged to reflect on multicultural considerations and how best to manage any emergency that may arise during the provision of telepsychology services.

Psychologists are encouraged to assess carefully the remote environment in which services will be provided to determine what impact, if any, there might be on the efficacy, privacy, and/or safety of the proposed intervention offered via telepsychology. Such an assessment of the remote environment may include a discussion of the cli-ent's/patient's situation within the home or within an or-ganizational context, the availability of emergency or tech-nical personnel or supports, the risk of distractions, the potential for privacy breaches, or any other impediments that may impact the effective delivery of telepsychology services. Along this line, psychologists are encouraged to discuss fully with the clients/patients their role in ensuring that sessions are not interrupted and that the setting is comfortable and conducive to making progress in order to maximize the impact of the service provided, since the psychologist will not be able to control those factors re-motely.

Psychologists are urged to monitor and assess regu-larly the progress of their client/patient when offering te-lepsychology services in order to determine if the provision of telepsychology services is still appropriate and beneficial to the client/patient. If there is a significant change in the client/patient or in the therapeutic interaction that causes concern, psychologists make reasonable efforts to take appropriate steps to adjust and reassess the appropriateness of the services delivered via telepsychology. Where it is believed that continuing to provide remote services is no longer beneficial or presents a risk to a client's/patient's emotional or physical well-being, psychologists are en-couraged to thoroughly discuss these concerns with the client/patient, appropriately terminate their remote services with adequate notice, and refer or offer any needed alter-native services to the client/patient.

## Informed Consent

*Guideline 3. Psychologists strive to obtain and document informed consent that specifically addresses the unique concerns related to the telepsychology services they provide. When doing so, psychologists are cognizant of the applicable laws and regulations, as well as organizational requirements, that govern informed consent in this area.*

**Rationale.** The process of explaining and obtain-ing informed consent, by whatever means, sets the stage for the relationship between the psychologist and the client/patient. Psychologists make reasonable efforts to offer a complete and clear description of the telepsychology ser-vices they provide, and they seek to obtain and document informed consent when providing professional services (APA Ethics Code, Standard 3.10). In addition, they at-tempt to develop and share the policies and procedures that will explain to their clients/patients how they will interact with them using the specific telecommunication technolo-gies involved. It may be more difficult to obtain and doc-ument informed consent in situations where psychologists provide telepsychology services to their clients/patients who are not in the same physical location or with whom they do not have in-person interactions. Moreover, there may be differences with respect to informed consent be-tween the laws and regulations in the jurisdictions where a

psychologist who is providing telepsychology services is located and those in the jurisdiction in which this psychologist's client/patient resides. Furthermore, psychologists may need to be aware of the manner in which cultural, linguistic, and socioeconomic characteristics and organizational considerations may impact a client's/patient's understanding of, and the special considerations required for, obtaining informed consent (such as when securing informed consent remotely from a parent/guardian when providing telepsychology services to a minor).

Telepsychology services may require different considerations for and safeguards against potential risks to confidentiality, information security, and comparability of traditional in-person services. Psychologists are thus encouraged to consider appropriate policies and procedures to address the potential threats to the security of client/patient data and information when using specific telecommunication technologies and to appropriately inform their clients/patients about them. For example, psychologists who provide telepsychology services should consider addressing with their clients/patients what client/patient data and information will be stored, how the data and information will be stored, how it will be accessed, how secure the information communicated using a given technology is, and any technology-related vulnerability to their confidentiality and security that is incurred by creating and storing electronic client/patient data and information.

**Application.** Prior to providing telepsychology services, psychologists are aware of the importance of obtaining and documenting written informed consent from their clients/patients that specifically addresses the unique concerns relevant to those services that will be offered. When developing such informed consent, psychologists make reasonable efforts to use language that is reasonably understandable by their clients/patients, in addition to evaluating the need to address cultural, linguistic, and organizational considerations and other issues that may have an impact on a client's/patient's understanding of the informed consent agreement. When considering for inclusion in informed consent those unique concerns that may be involved in providing telepsychology services, psychologists may include the manner in which they and their clients/patients will use the particular telecommunication technologies, the boundaries they will establish and observe, and the procedures for responding to electronic communications from clients/patients. Moreover, psychologists are cognizant of pertinent laws and regulations with respect to informed consent in both the jurisdiction where they offer their services and the jurisdiction where their clients/patients reside (see Guideline 8 on Interjurisdictional Practice for more detail).

Besides those unique concerns described above, psychologists are encouraged to discuss with their clients/patients those issues surrounding confidentiality and the security conditions when particular modes of telecommunication technologies are utilized. Along this line, psychologists are cognizant of some of the inherent risks a given telecommunication technology may pose in both the equipment (hardware, software, other equipment components)

and the processes used for providing telepsychology services, and they strive to provide their clients/patients with adequate information to give informed consent for proceeding with receiving the professional services offered via telepsychology. Some of these risks may include those associated with technological problems and those service limitations that may arise because the continuity, availability, and appropriateness of specific telepsychology services (e.g., testing, assessment, and therapy) may be hindered as a result of those services being offered remotely. In addition, psychologists may consider developing agreements with their clients/patients to assume some role in protecting the data and information they receive from them (e.g., by not forwarding e-mails from the psychologist to others).

Another unique aspect of providing telepsychology services is that of billing documentation. As part of informed consent, psychologists are mindful of the need to discuss with their clients/patients prior to the onset of service provision what the billing documentation will include. Billing documentation may reflect the type of telecommunication technology used, the type of telepsychology services provided, and the fee structure for each relevant telepsychology service (e.g., video chat, texting fees, telephone services, chat room group fees, emergency scheduling, etc.). It may also include discussion about the charges incurred for any service interruptions or failures encountered, responsibility for overage charges on data plans, fee reductions for technology failures, and any other costs associated with the telepsychology services that will be provided.

# Confidentiality of Data and Information

***Guideline 4. Psychologists who provide telepsychology services make reasonable efforts to protect and maintain the confidentiality of the data and information relating to their clients/patients and inform them of the potentially increased risks of loss of confidentiality inherent in the use of the telecommunication technologies, if any.***

**Rationale.** The use of telecommunications technologies and the rapid advances in technology present unique challenges for psychologists in protecting the confidentiality of clients/patients. Psychologists who provide telepsychology learn about the potential risks to confidentiality before utilizing such technologies. When necessary, psychologists obtain the appropriate consultation with technology experts to augment their knowledge of telecommunication technologies in order to apply security measures in their practices that will protect and maintain the confidentiality of data and information related to their clients/patients.

Some of the potential risks to confidentiality include considerations related to uses of search engines and participation in social networking sites. Other challenges in this area may include protecting confidential data and information from inappropriate and/or inadvertent breaches to es-

tablished security methods the psychologist has in place, as well as boundary issues that may arise as a result of a psychologist's use of search engines and participation on social networking sites. In addition, any Internet participation by psychologists has the potential of being discovered by their clients/patients and others and thereby potentially compromising a professional relationship.

**Application.** Psychologists both understand and inform their clients/patients of the limits to confidentiality and the risks of possible access to or disclosure of confidential data and information that may occur during service delivery, including the risks of others gaining access to electronic communications (e.g., telephone, e-mail) between the psychologist and client/patient. Also, psychologists are cognizant of the ethical and practical implications of proactively researching online personal information about their clients/patients. They carefully consider the advisability of discussing such research activities with their clients/patients and how information gained from such searches would be utilized and recorded, as documenting this information may introduce risks to the boundaries of appropriate conduct for a psychologist. In addition, psychologists are encouraged to weigh the risks and benefits of dual relationships that may develop with their clients/patients, due to the use of telecommunication technologies, before engaging in such relationships (APA Practice Organization, 2012).

Psychologists who use social networking sites for both professional and personal purposes are encouraged to review and educate themselves about the potential risks to privacy and confidentiality and to consider utilizing all available privacy settings to reduce these risks. They are also mindful of the possibility that any electronic communication can have a high risk of public discovery. They therefore mitigate such risks by following the appropriate laws, regulations, and the APA Ethics Code (APA, 2002a, 2010) to avoid disclosing confidential data or information related to clients/patients.

## Security and Transmission of Data and Information

***Guideline 5. Psychologists who provide telepsychology services take reasonable steps to ensure that security measures are in place to protect data and information related to their clients/patients from unintended access or disclosure.***

**Rationale.** The use of telecommunication technologies in the provision of psychological services presents unique potential threats to the security and transmission of client/patient data and information. These potential threats to the integrity of data and information may include computer viruses, hackers, theft of technology devices, damage to hard drives or portable drives, failure of security systems, flawed software, ease of accessibility to unsecured electronic files, and malfunctioning or outdated technology. Other threats may include policies and practices of technology companies and vendors, such as tailored mar-

keting derived from e-mail communications. Psychologists are encouraged to be mindful of these potential threats and to take reasonable steps to ensure that security measures are in place for protecting and controlling access to client/patient data within an information system. In addition, they are cognizant of relevant jurisdictional and federal laws and regulations that govern electronic storage and transmission of client/patient data and information, and they develop appropriate policies and procedures to comply with such directives. When developing policies and procedures to ensure the security of client/patient data and information, psychologists may include considering the unique concerns and impacts posed by both intended and unintended use of public and private technology devices, active and inactive therapeutic relationships, and the different safeguards required for different physical environments, different staffs (e.g., professional vs. administrative staff), and different telecommunication technologies.

**Application.** Psychologists are encouraged to conduct an analysis of the risks to their practice settings, telecommunication technologies, and administrative staff in order to ensure that client/patient data and information are accessible only to appropriate and authorized individuals. Psychologists strive to obtain appropriate training or consultation from relevant experts when additional knowledge is needed to conduct an analysis of the risks.

Psychologists strive to ensure that policies and procedures are in place to secure and control access to client/patient information and data within information systems. Along this line, they may encrypt confidential client/patient data for storage or transmission and utilize such other secure methods as safe hardware and software and robust passwords to protect electronically stored or transmitted data and information. If there is a breach of unencrypted electronically communicated or maintained data, psychologists are urged to notify their clients/patients and other appropriate individuals/organizations as soon as possible. In addition, they are encouraged to make their best efforts to ensure that electronic data and information remain accessible despite problems with hardware, software, and/or storage devices by keeping a secure back-up version of such data.

When documenting the security measures to protect client/patient data and information from unintended access or disclosure, psychologists are encouraged to clearly address what types of telecommunication technologies are used (e.g., e-mail, telephone, video teleconferencing, text), how they are used, and whether the telepsychology services used are the primary method of contact or augment in-person contact. When keeping records of e-mail, online messaging, and other work using telecommunication technologies, psychologists are cognizant that preserving the actual communication may be preferable to summarization in some cases depending on the type of technology used.

# Disposal of Data and Information and Technologies

**Guideline 6. Psychologists who provide telepsychology services make reasonable efforts to dispose of data and information and the technologies used in a manner that facilitates protection from unauthorized access and accounts for safe and appropriate disposal.**

**Rationale.** Consistent with the APA "Record Keeping Guidelines" (APA, 2007), psychologists are encouraged to create policies and procedures for the secure destruction of data and information and the technologies used to create, store, and transmit the data and information. The use of telecommunication technologies in the provision of psychological services poses new challenges for psychologists when they consider the disposal methods to utilize in order to maximally preserve client confidentiality and privacy. Psychologists are therefore urged to consider conducting an analysis of the risks to the information systems within their practices in an effort to ensure full and complete disposal of electronic data and information, plus the technologies that created, stored, and transmitted the data and information.

**Application.** Psychologists are encouraged to develop policies and procedures for the destruction of data and information related to clients/patients. They also strive to securely dispose of software and hardware used in the provision of telepsychology services in a manner that ensures that the confidentiality and security of any patient/client information is not compromised. When doing so, psychologists carefully clean all the data and images in the storage media before reuse or disposal, consistent with federal, state, provincial, territorial, and other organizational regulations and guidelines. Psychologists are aware of and understand the unique storage implications related to telecommunication technologies inherent in available systems.

Psychologists are encouraged to document the methods and procedures used when disposing of the data and information and the technologies used to create, store, or transmit the data and information, as well as any other technology utilized in the disposal of data and hardware. They also strive to be aware of malware, cookies, and so forth and to dispose of them routinely on an ongoing basis when telecommunication technologies are used.

# Testing and Assessment

**Guideline 7. Psychologists are encouraged to consider the unique issues that may arise with test instruments and assessment approaches designed for in-person implementation when providing telepsychology services.**

**Rationale.** Psychological testing and other assessment procedures are an area of professional practice in which psychologists have been trained, and they are uniquely qualified to conduct such tests. While some symptom screening instruments are already frequently being administered online, most psychological test instruments and other assessment procedures currently in use were designed and developed originally for in-person administration. Psychologists are thus encouraged to be knowledgeable about, and account for, the unique impacts of such tests, their suitability for diverse populations, and the limitations on test administration and on test and other data interpretations when these psychological tests and other assessment procedures are considered for and conducted via telepsychology. Psychologists also strive to maintain the integrity of the application of the testing and assessment process and procedures when using telecommunication technologies. In addition, they are cognizant of the accommodations for diverse populations that may be required for test administration via telepsychology. These guidelines are consistent with the standards articulated in the most recent edition of *Standards for Educational and Psychological Testing* (American Educational Research Association, American Psychological Association, and the Council on Measurement in Education, 1999).

**Application.** When a psychological test or other assessment procedure is conducted via telepsychology, psychologists are encouraged to ensure that the integrity of the psychometric properties of the test or assessment procedure (e.g., reliability and validity) and the conditions of administration indicated in the test manual are preserved when adapted for use with such technologies. They are encouraged to consider whether modifications to the testing environment or conditions are necessary to accomplish this preservation. For example, a test taker's access to a cell phone, the Internet, or other persons during an assessment could interfere with the reliability or validity of the instrument or its administration. Further, if the individual being assessed receives coaching or has access to such information as potential test responses or the scoring and interpretation of specific assessment instruments because they are available on the Internet, the test results may be compromised. Psychologists are also encouraged to consider other possible forms of distraction which could affect performance during an assessment and which may not be obvious or visible (e.g., sight, sound, and smell) when utilizing telecommunication technologies.

Psychologists are encouraged to be cognizant of the specific issues that may arise with diverse populations when providing telepsychology and to make appropriate arrangements to address those concerns (e.g., language or cultural issues, cognitive, physical, or sensory skills or impairments, or age may impact assessment). In addition, psychologists may consider the use of a trained assistant (e.g., a proctor) to be on the premises at the remote location in an effort to help verify the identity of the client/patient, provide needed on-site support to administer certain tests or subtests, and protect the security of the psychological testing and/or assessment process.

When administering psychological tests and other assessment procedures when providing telepsychology services, psychologists are encouraged to consider the quality

of those technologies that are being used and the hardware requirements that are needed in order to conduct the specific psychological test or assessment. They also strive to account for and be prepared to explain the potential difference between the results obtained when a particular psychological test is conducted via telepsychology and when it is administered in person. In addition, when documenting findings from evaluation and assessment procedures, psychologists are encouraged to specify that a particular test or assessment procedure has been administered via telepsychology and to describe any accommodations or modifications that have been made.

Psychologists strive to use test norms derived from telecommunication technologies administration if such are available. Psychologists are encouraged to recognize the potential limitations of all assessment processes conducted via telepsychology and to be ready to address the limitations and potential impact of those procedures.

## Interjurisdictional Practice

**Guideline 8. Psychologists are encouraged to be familiar with and comply with all relevant laws and regulations when providing telepsychology services to clients/patients across jurisdictional and international borders.**

**Rationale.** With the rapid advances in telecommunication technologies, the intentional or unintentional provision of psychological services across jurisdictional and international borders is becoming more of a reality for psychologists. Such service provision may range from the psychologists or clients/patients being temporarily out of state (including split residence across states) to psychologists offering their services across jurisdictional borders as a practice modality to take advantage of new telecommunication technologies. Psychological service delivery systems within such institutions as the U.S. Department of Defense and the Department of Veterans Affairs have already established internal policies and procedures for providing services within their systems that cross jurisdictional and international borders. However, the laws and regulations that govern service delivery by psychologists outside of those systems vary by state, province, territory, and country (APA Practice Organization, 2010). Psychologists should make reasonable efforts to be familiar with and, as appropriate, to address the laws and regulations that govern telepsychology service delivery within the jurisdictions in which they are situated and the jurisdictions where their clients/patients are located.

**Application.** It is important for psychologists to be aware of the relevant laws and regulations that specifically address the delivery of professional services by psychologists via telecommunication technologies within and between jurisdictions. Psychologists are encouraged to understand what services the laws and regulations of a jurisdiction consider as telehealth or telepsychology. In addition, psychologists are encouraged to review the relevant jurisdictions' professional licensure requirements, the ser-

vices and telecommunication modalities covered, and the information required to be included in providing informed consent. It is important to note that each jurisdiction may or may not have specific laws that impose special requirements for providing psychological services via telecommunication technologies. The APA Practice Organization (2010) has found that there are variations in whether psychologists are specified as a single type of provider or covered as part of a more diverse group of providers. In addition, there is wide diversity in the types of services and the telecommunication technologies that are covered by these laws.

At the present time, there are a number of jurisdictions without specific laws that govern the provision of psychological services utilizing telecommunication technologies. When providing telepsychology services in these jurisdictions, psychologists are encouraged to be aware of any opinions or declaratory statements issued by the relevant regulatory bodies and/or other practitioner licensing boards that may help inform them of the legal and regulatory requirements involved when delivering telepsychology services within those jurisdictions.

Moreover, because of the rapid growth in the utilization of telecommunication technologies, psychologists strive to keep abreast of developments and changes in the licensure and other interjurisdictional practice requirements that may be pertinent to their delivery of telepsychology services across jurisdictional boundaries. Given the direction of various health professions, and current federal priorities to resolve problems created by requirements of multijurisdictional licensure (e.g., the Federal Communications Commission's 2010 National Broadband Plan, the Canadian government's 1995 Agreement on Internal Trade), the development of a telepsychology credential required by psychology boards for interjurisdictional practice is a probable outcome. For example, nursing has developed a credential that is accepted by many U.S. jurisdictions that allows nurses licensed in any participating jurisdiction to practice in person or remotely in all participating jurisdictions. In addition, an ASPPB task force has drafted a set of recommendations for such a credential.

## Conclusion

It is important to note that it is not the intent of these guidelines to prescribe specific actions, but rather, to offer the best guidance available at present when incorporating telecommunication technologies in the provision of psychological services. Because technology and its applicability to the profession of psychology constitute a dynamic area with many changes likely ahead, these guidelines also are not inclusive of all other considerations and are not intended to take precedence over the judgment of psychologists or applicable laws and regulations that guide the profession and practice of psychology. It is hoped that the framework presented will guide psychologists as the field evolves.

## REFERENCES

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

American Psychological Association. (2002a). Ethical principles of psychologists and code of conduct. *American Psychologist, 57,* 1060–1073. doi:10.1037/0003-066X.57.12.1060

American Psychological Association. (2002b). Criteria for practice guideline development and evaluation. *American Psychologist, 57,* 1048–1051. doi:10.1037/0003-066X.57.12.1048

American Psychological Association. (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. *American Psychologist, 58,* 377–402. doi:10.1037/0003-066X.58.5.377

American Psychological Association. (2007). Record keeping guidelines. *American Psychologist, 62,* 993–1004. doi:10.1037/0003-066X.62.9.993

American Psychological Association. (2010). *Ethical principles of psychologists and code of conduct including 2010 amendments.* Retrieved from http://www.apa.org/ethics/code/index.aspx

American Psychological Association Center for Workforce Studies. (2008). *2008 APA survey of psychology health service providers: Module D: Information on telepsychology, medication, and collaboration.* Retrieved from http://www.apa.org/workforce/publications/08-hsp/telepsychology/index.aspx

American Psychological Association Practice Organization. (2010). Telehealth: Legal basics for psychologists. *Good Practice, 41,* 2–7.

American Psychological Association Practice Organization. (2012, Spring/Summer). Social media: What's your policy? *Good Practice,* pp. 10–18.

Baker, D. C., & Bufka, L. F. (2011). Preparing for the telehealth world: Navigating legal, regulatory, reimbursement, and ethical issues in an electronic age. *Professional Psychology: Research and Practice, 42*(6), 405–411. doi:10.1037/a0025037

Canadian Psychological Association. (2006). *Ethical guidelines for psychologists providing psychological services via electronic media.* Retrieved from http://www.cpa.ca/aboutcpa/committees/ethics/psychserviceselectronically/.

Committee on National Security Systems. (2010). *National information assurance (IA) glossary.* Retrieved from https://www.cnss.gov/Assets/pdf/cnssi_4009.pdf

New Zealand Psychologists Board. (2011). *Draft guidelines: Psychology services delivered via the Internet and other electronic media.* Retrieved from http://psychologistsboard.org.nz/cms_show_download.php?id=141

Ohio Psychological Association. (2010). *Telepsychology guidelines.* Retrieved from http://www.ohpsych.org/psychologists/files/2011/06/OPATelepsychologyGuidelines41710.pdf

U.S. Department of Commerce, National Institute of Standards and Technology. (2008). *An introductory resource guide for implementing the Health Insurance Portability and Accountability Act (HIPAA) Security Rule.* Gaithersburg, MD: Author.

U.S. Department of Commerce, National Institute of Standards and Technology. (2011). *Glossary of key information security terms.* Gaithersburg, MD: Author.

U.S. Department of Health and Human Services, Health Resources and Services Administration. (2010). *Special report to the Senate Appropriations Committee: Telehealth licensure report.* Retrieved from http://www.hrsa.gov/healthit/telehealth/licenserpt10.pdf

# ATTACHMENT G

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Michael Nunez; Coleman Special Master; Coleman Team - RBG Only; Lopes Matthew |
| **Cc:** | Weber, Nicholas@CDCR; Thind, Sundeep@CDCR |
| **Subject:** | RE: Coleman: Notice of Draft Memo "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services" |
| **Date:** | Thursday, February 15, 2024 3:15:22 PM |
| **Attachments:** | MH HQ Memo - Use of Psychology Practicum Students and Social Work Interns in the Provision of MH Services.pdf |

All,

Attached is the final memo titled "Use of Psychology Practicum Students and Social Work Interns in the Provision of MH Services." It was released to the field today.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Bentz, Melissa@CDCR
**Sent:** Wednesday, February 14, 2024 11:41 AM
**To:** Michael Nunez <MNunez@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Subject:** RE: Coleman: Notice of Draft Memo "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services"

All,

Attached is CDCR's response to the letters from Plaintiffs and the Special Master regarding the memo titled "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services." CDCR will finalize and release this memo shortly.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Michael Nunez <MNunez@rbgg.com>
**Sent:** Friday, October 13, 2023 7:32 PM
**To:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; CDCR MHPolicyUnit@CDCR <m_MHPolicyUnit@cdcr.ca.gov>
**Subject:** RE: Coleman: Notice of Draft Memo "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services"

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All,

Please find attached Plaintiffs' comments regarding the draft memorandum titled "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services."

Thank you,

Mike

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Wednesday, September 13, 2023 2:51 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>
**Cc:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; CDCR MHPolicyUnit@CDCR <m_MHPolicyUnit@cdcr.ca.gov>
**Subject:** Coleman: Notice of Draft Memo "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services"

> [EXTERNAL MESSAGE NOTICE]

Hello All,

I write to provide notice to the Special Master and Plaintiffs' counsel of CDCR's attached draft memorandum "Use of Psychology Practicum and Social Work Interns in the Provision of Mental Health Services". Please provide comments by Friday, October 13.

Sincerely,
**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

CONFIDENTIAL NOTICE: THIS COMMUNICATION MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION OR ATTORNEY WORK PRODUCT. DO NOT FORWARD THIS EMAIL WITHOUT PERMISSION. IF YOU RECEIVED THIS COMMUNICATION IN ERROR NOTIFY ME IMMEDIATELY.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

DocuSign Envelope ID: 00887B37-E8E7-44F2-8F65-3C5E78CEA328

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 2/15/2024 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| **From:** | |

*DocuSigned by:*
RAINBOW BROCKENBOROUGH
Regional Health Care Executive
Region I

*DocuSigned by:*
BRITTANY BRIZENDINE
Regional Health Care Executive
Region II

*DocuSigned by:*
CHRISTOPHER PODRATZ
Regional Health Care Executive
Region III

*DocuSigned by:*
SHEREEF AREF
Regional Health Care Executive
Region IV

*DocuSigned by:*
AMAR MEHTA, M.D.
Deputy Director
Statewide Mental Health Program

| **Subject:** | **USE OF PSYCHOLOGY PRACTICUM STUDENTS AND SOCIAL WORK INTERNS IN THE PROVISION OF MENTAL HEALTH SERVICES** |
|---|---|

This memorandum outlines the clinical activities that psychology practicum students and social work interns (unpaid, non-civil service students in training) can provide to the patient population within the California Department of Corrections and Rehabilitation. The Statewide Mental Health Program recognizes the many benefits of offering students in training the opportunity to experience correctional mental health care and aims to potentially retain them as civil service clinicians.

Institutions partnered with educational entities through memoranda of understanding have an obligation to ensure the students perform clinical services that are supplementary and supportive, but not part of the required treatment services under the Mental Health Services Delivery Systems (MHSDS) Program Guide.

Psychology practicum students and social work interns cannot be Mental Health Primary Clinicians (MHPCs). They cannot conduct MHSDS's mandatory MHPC treatment contacts, suicide risk evaluations, 5-day follow-ups, and responding to consult orders.

DocuSign Envelope ID: 00887B37-E8E7-44F2-8F65-3C5E78CEA328

# MEMORANDUM

Psychology practicum students and social work interns can, however, complete supportive treatment such as therapy for concerns that don't rise to the level of necessitating treatment in the MHSDS (i.e., interpersonal skills enhancement) and participation in GP resource centers or drop-in clinics for incarcerated individuals not enrolled in the MHSDS. They can also lead clinical groups that don't require the leader to be an MHPC and for which the topic is within the scope of their experience and education.

The administrative and clinical supervisors shall ensure provisioning for students within the Electronic Health Record System is the MH Practicum Student provision type.  Furthermore, the Chief of Mental Health shall ensure students receive clinical supervision and that all their clinical documentation is co-signed by a licensed provider.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@cdcr.


cc:  Steven Cartwright, Psy.D.
Erick Rizzotto, M.D.
Travis Williams, Psy.D.
Wendy Worrell, Psy.D.
Michael Golding, M.D.
Toni Martello, M.D.
Sophia Le, D.O.
Nicole Morrison, M.D.
Amber Carda, Psy.D.
Daisy Minter, Ph.D.
Lee Lipsker, Ph.D.
Gretchen Huntington, Psy.D.
Laurie Ball
Jennifer Johnson
Tiffany Nguyen
LaToya Garland
Pak Yan Leung
Regional Mental Health Administrators
Regional Psychiatrists

# EXHIBIT G

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | McClendon-Hunt, LaTri-c-ea; Thomas Nolan; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR; MBien@rbgg.com; Ernest Galvan; Lisa Ells |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Elise Thorn; Namrata Kotwani; Paul B. Mello; Damon McClain; Samantha Wolff; Lopes Matthew |
| **Subject:** | RE: Coleman -- Plaintiffs'' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440] |
| **Date:** | Thursday, February 29, 2024 1:28:48 PM |
| **Attachments:** | image003.png |
| | image004.png |
| | image005.jpg |

All,

During yesterday's meet and confer regarding CDCR's Telemental Health policy, the parties and the Special Master's team discussed all but one point in the Plaintiffs' letter. It is our understanding that the letter from the Special Master's team includes recommendations that largely match or exceed what Plaintiffs have requested.

Defendants object to the characterization during the meet and confer that we were refusing to consider Plaintiffs or the Special Masters recommendations. Defendants met in good faith and considered each recommendation. As outlined below, the recommendations made by Plaintiffs' counsel and the Special Master's team were covered by existing policy, were not grounded in evidence or clinical studies, or would substantially interfere with the delivery of care.

As discussed, the Telemental Health policy already includes or allows the following recommendations raised by Plaintiffs' counsel and the Special Master's team: 1. The ability to request that a telepresenter leave for individual therapy; 2. The requirement to have a live person (a telepresenter in addition to the telemental health provider) go cell-front to be able to tell if an individual is decompensating or not bathing; 3. The content of on-site visits; and 4. Restrictions on the use of telesocial work and telepsychology in the MHCBs and PIPs. The Special Master's team also recommended that licensed nurses, clinicians, and physicians acting as telepresenters should be required to engage in the clinical encounter for it be considered a joint appointment. As discussed, the February 7, 2020 Clinical Contacts memo already requires a contact to be clinically significant to be Program Guide compliant. (ECF No. 7333-1 at 636-639.) If a mental health clinician ends an appointment without getting clinically significant information, the memo directs staff to cancel the appointment and place a new scheduling order for an appointment as soon as possible and within compliance timelines when feasible. (*Id*. at 638.)

Plaintiffs and the Special Master's team also raised numerous restrictions on the use of telesocial work and telepsychology in their letters. Defendants have requested, but not received, a reference to national standards or peer-reviewed studies or articles that support those restrictions. As discussed in detail during the meet and confer, CDCR disagrees with artificially limiting the use of telemental health. Any restrictions placed on the use of this modality should be informed by evidence of harm or clinical studies demonstrating that the modality is inappropriate in certain circumstances or interferes with the delivery of care. Neither Plaintiffs, nor the Special Master's team have provided any such evidence.

With 10 minutes left in the meet and confer, the participants had discussed all the issues raised in Plaintiffs' letter, save one. Although we were not allowed to discuss that issue during yesterday's meet and confer, a further meeting seems unnecessary. The last issue in Plaintiffs' letter requests minimum standards for the protection of confidentiality and adequate technology and supervision for telepsychologists and telesocial workers. These standards are already in CDCR's Telemental Health policy, specifically in the sections titled "Equipment" and "Workflow Interruptions," and match what Plaintiffs already agreed to for telepsychiatrists who work from home. (ECF No. 7826.) Plaintiffs have not provided any indication that something is lacking from what is already included

in the policy, nor suggestions for revisions.

It does not appear that the parties have additional issues to discuss. However, if the Special Master feels it is necessary to have a further discussion, CDCR is available on Tuesday, March 5th at 10am. Please let us know what will be discussed prior to any further meeting.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** McClendon-Hunt, LaTri-c-ea <lmcclendonhunt@pldolaw.com>
**Sent:** Wednesday, February 28, 2024 8:23 AM
**To:** Thomas Nolan <TNolan@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; MBien@rbgg.com; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <elise.thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>; Lopes Matthew <mlopes@pldolaw.com>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Counselors:

Attached is the agenda for today's meeting.
**LaTri-c-ea McClendon-Hunt, Senior Counsel**
lmcclendonhunt@pldolaw.com
P 401.824.5113 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

---

**From:** McClendon-Hunt, LaTri-c-ea
**Sent:** Tuesday, February 27, 2024 4:51 PM
**To:** Thomas Nolan <TNolan@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; MBien@rbgg.com; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>; Lopes Matthew <mlopes@pldolaw.com>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

Counselors:

Attached is our letter aid the meet and confer on the telemental health policy. Please disregard the prior letter.

**LaTri-c-ea McClendon-Hunt, Senior Counsel**
lmcclendonhunt@pldolaw.com
P 401.824.5113 • F 401.824.5123
**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

---

**From:** McClendon-Hunt, LaTri-c-ea
**Sent:** Tuesday, February 27, 2024 4:36 PM
**To:** Thomas Nolan <TNolan@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; MBien@rbgg.com; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>; Lopes Matthew <mlopes@pldolaw.com>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-

DMS.FID12440]

Counselors:

Attached is our letter aid the meet and confer on the telemental health policy.

**LaTri-c-ea McClendon-Hunt, Senior Counsel**
lmcclendonhunt@pldolaw.com
P 401.824.5113 • F 401.824.5123
**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

**From:** Thomas Nolan <TNolan@rbgg.com>
**Sent:** Wednesday, February 7, 2024 8:22 PM
**To:** Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>
**Subject:** Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

Via E-mail Only

February 7, 2024

Dear All —

Enclosed please find my letter setting forth Plaintiffs' positions with respect to the parties' disputes over the telemental health policy.   We look forward to discussing these issues at an upcoming meeting and confer.

Regards,

Tom

Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and
protected from disclosure. If you are not the intended recipient, any dissemination, distribution
or copying is strictly prohibited. If you think that you have received this e-mail message in
error, please e-mail the sender at tnolan@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT H

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Coleman Team - RBG Only; Coleman Special Master; Steven Fama (sfama@prisonlaw.com) |
| Cc: | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR |
| Subject: | Coleman: Rescheduling MH Appointments Memo and Clinical Contacts Memo |
| Date: | Tuesday, January 2, 2024 2:18:26 PM |
| Attachments: | MH HQ Memo-Rescheduling Mental Health Appointments.pdf |

Lisa and Marc,

I write in response to your respective emails from December 15th regarding the Rescheduling Mental Health Appointments memo and December 28th regarding the Clinical Contacts and Documentation memo.

The December 15th email requests an update on the Rescheduling Mental Health Appointments memo and asks what effect it will have on indicators in data remediation. In early 2023, CDCR sent Plaintiffs and the Special Master's team a draft of the Rescheduling Mental Health Appointments memo for their review and comment. Around this time, CDCR also sent a draft of the Clinical Contacts memo for review and comment. Plaintiffs' counsel and the Special Master's team provided comments on both memos.

On May 12, 2023, Mr. Hockerson sent CDCR's response to the comments on the Rescheduling Mental Health Appointments memo and the final version was released to the field on May 17, 2023. I have attached a copy of the final memo for your reference. The May 17, 2023 Rescheduling Mental Health Appointments memo does not change how CDCR collects data for any indicators in Data Remediation.

Upon release of the Rescheduling Mental Health Appointments memo to the field, CDCR realized that additional edits were needed. Instead of reopening the May 17th memo, Mental Health decided to combine the content of the Rescheduling Mental Health Appointments memo with the still pending Clinical Contacts memo. CDCR is still completing its final review of the merged memo. Once it has completed internal review, CDCR will send a copy of the newly merged memo to Plaintiffs and the Special Master's team, along with a response to the letters with comments on the prior Clinical Contacts memo. Given this, it will likely be several months before the memo is finalized and ready for release to the field.

Once the memo is finalized and released to the field, CDCR will determine, what (if any) changes are necessary to indicators in data remediation and those changes will be made during the annual update process.

Please let me know if you have any questions.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE

AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT I

| | |
|---|---|
| **From:** | Ernest Galvan |
| **To:** | Melissa Bentz; McClendon-Hunt, LaTri-c-ea; Thomas Nolan; Nick Weber; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR; Michael W. Bien; Lisa Ells |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Elise Thorn; Namrata Kotwani; Paul B. Mello; Damon McClain; Samantha Wolff; Lopes Matthew |
| **Subject:** | RE: Coleman -- Plaintiffs" Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440] |
| **Date:** | Friday, March 1, 2024 5:57:34 PM |
| **Attachments:** | image001.png |
| | image002.png |

Dear Counsel—

I want to thank Ms. McClendon-Hunt for keeping us on track  during the call, and for properly working to set another call as we were running out of time.  I apologize to Ms. McClendon-Hunt for my part in rushing past setting the next meeting.

In light of the information below in Ms. Bentz's email, I do not think we need to reconvene next week.

Responding to the points in Ms. Bentz's email.

1. "Covered by existing policy."  My understanding is that this is the first CDCR policy on telemental health by psychologists and social workers, and that the telepsychiatry policy is separate. If there is an pre-existing policy for telemental health by psychologists and social workers, I have not seen it.
2. "Not grounded in evidence or clinical studies."  What is not grounded in evidence or clinical studies is the idea of shifting a prison mental  health system from mostly in-person to entirely remote care.  We have requested but not received a reference to national standards or peer-reviewed studies or articles that would support a shift to remote care in a correctional system like CDCR's.
3. "Substantially interfere with the delivery of care."  The basic request of Plaintiffs is to make sure that patients who now have at least one member of their care team seeing them face to face, retain access to face to face care by at least one member of the care team, i.e., either the psychiatrist or the primary clinician.  That is not "interfering" with care.  That is asking that you not make a radical  change in care.

Also, confirming a point of agreement, the vacancy report filed yesterday at ECF No. 8142 does break out telemental health allocated and fill positions.  Thank you for making that change.


Ernest Galvan
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 296-2293 (direct)
(415) 694-3606 (mobile)
(415) 433-7104 (fax)
egalvan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com

---

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Thursday, February 29, 2024 10:29 AM
**To:** Latricea McClendon-Hunt <lmcclendonhunt@pldolaw.com>; Thomas Nolan <TNolan@rbgg.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>; Matt Lopes <mlopes@pldolaw.com>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

All,

During yesterday's meet and confer regarding CDCR's Telemental Health policy, the parties and the Special Master's team discussed all but one point in the Plaintiffs' letter. It is our understanding that the letter from the Special Master's team includes recommendations that largely match or exceed what Plaintiffs have requested.

Defendants object to the characterization during the meet and confer that we were refusing to consider Plaintiffs or the Special Masters recommendations. Defendants met in good faith and considered each recommendation. As outlined below, the recommendations made by Plaintiffs' counsel and the Special Master's team were covered by existing policy, were not grounded in evidence or clinical studies, or would substantially interfere with the delivery of care.

As discussed, the Telemental Health policy already includes or allows the following recommendations raised by Plaintiffs' counsel and the Special Master's team: 1. The ability to request that a telepresenter leave for individual therapy; 2. The requirement to have a live person (a telepresenter in addition to the telemental health provider) go cell-front to be able to tell if an individual is decompensating or not bathing; 3. The content of on-site visits; and 4. Restrictions on the use of telesocial work and telepsychology in the MHCBs and PIPs. The Special Master's team also recommended that licensed nurses, clinicians, and physicians acting as telepresenters should be required to engage in the clinical encounter for it be considered a joint appointment. As discussed, the February 7, 2020 Clinical Contacts memo already requires a contact to be clinically significant to be Program Guide compliant. (ECF No. 7333-1 at 636-639.) If a mental health clinician ends an appointment without getting clinically significant information, the memo directs staff to cancel the appointment and place a new scheduling order for an appointment as soon as possible and within compliance timelines when feasible. (*Id*. at 638.)

Plaintiffs and the Special Master's team also raised numerous restrictions on the use of telesocial

work and telepsychology in their letters. Defendants have requested, but not received, a reference to national standards or peer-reviewed studies or articles that support those restrictions. As discussed in detail during the meet and confer, CDCR disagrees with artificially limiting the use of telemental health. Any restrictions placed on the use of this modality should be informed by evidence of harm or clinical studies demonstrating that the modality is inappropriate in certain circumstances or interferes with the delivery of care. Neither Plaintiffs, nor the Special Master's team have provided any such evidence.

With 10 minutes left in the meet and confer, the participants had discussed all the issues raised in Plaintiffs' letter, save one. Although we were not allowed to discuss that issue during yesterday's meet and confer, a further meeting seems unnecessary. The last issue in Plaintiffs' letter requests minimum standards for the protection of confidentiality and adequate technology and supervision for telepsychologists and telesocial workers. These standards are already in CDCR's Telemental Health policy, specifically in the sections titled "Equipment" and "Workflow Interruptions," and match what Plaintiffs already agreed to for telepsychiatrists who work from home. (ECF No. 7826.) Plaintiffs have not provided any indication that something is lacking from what is already included in the policy, nor suggestions for revisions.

It does not appear that the parties have additional issues to discuss. However, if the Special Master feels it is necessary to have a further discussion, CDCR is available on Tuesday, March 5th at 10am. Please let us know what will be discussed prior to any further meeting.

Respectfully,

*Melissa C. Bentz*

Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** McClendon-Hunt, LaTri-c-ea <lmcclendonhunt@pldolaw.com>
**Sent:** Wednesday, February 28, 2024 8:23 AM
**To:** Thomas Nolan <TNolan@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; MBien@rbgg.com; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <elise.thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff

<[SWolff@hansonbridgett.com](mailto:SWolff@hansonbridgett.com)>; Lopes Matthew <[mlopes@pldolaw.com](mailto:mlopes@pldolaw.com)>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Counselors:

Attached is the agenda for today's meeting.
**LaTri-c-ea McClendon-Hunt, Senior Counsel**
[lmcclendonhunt@pldolaw.com](mailto:lmcclendonhunt@pldolaw.com)
P 401.824.5113 • F 401.824.5123
**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
[www.pldolaw.com](http://www.pldolaw.com)  •  Legal Disclaimer

---

**From:** McClendon-Hunt, LaTri-c-ea
**Sent:** Tuesday, February 27, 2024 4:51 PM
**To:** Thomas Nolan <[TNolan@rbgg.com](mailto:TNolan@rbgg.com)>; Melissa Bentz <[Melissa.Bentz@cdcr.ca.gov](mailto:Melissa.Bentz@cdcr.ca.gov)>; Nick Weber <[Nicholas.Weber@cdcr.ca.gov](mailto:Nicholas.Weber@cdcr.ca.gov)>; Thind, Sundeep@CDCR <[Sundeep.Thind@cdcr.ca.gov](mailto:Sundeep.Thind@cdcr.ca.gov)>; Stafford, Carrie@CDCR <[Carrie.Stafford@cdcr.ca.gov](mailto:Carrie.Stafford@cdcr.ca.gov)>; [MBien@rbgg.com](mailto:MBien@rbgg.com); Ernest Galvan <[EGalvan@rbgg.com](mailto:EGalvan@rbgg.com)>; Lisa Ells <[LElls@rbgg.com](mailto:LElls@rbgg.com)>
**Cc:** Coleman Special Master Team <[ColemanSpecialMasterTeam@rbgg.com](mailto:ColemanSpecialMasterTeam@rbgg.com)>; Coleman Team - RBG Only <[ColemanTeam-RBGOnly@rbgg.com](mailto:ColemanTeam-RBGOnly@rbgg.com)>; Steve Fama <[sfama@prisonlaw.com](mailto:sfama@prisonlaw.com)>; Elise Thorn <[Elise.Thorn@doj.ca.gov](mailto:Elise.Thorn@doj.ca.gov)>; Namrata Kotwani <[Namrata.Kotwani@doj.ca.gov](mailto:Namrata.Kotwani@doj.ca.gov)>; Paul B. Mello <[Pmello@hansonbridgett.com](mailto:Pmello@hansonbridgett.com)>; Damon McClain <[Damon.McClain@doj.ca.gov](mailto:Damon.McClain@doj.ca.gov)>; Samantha Wolff <[SWolff@hansonbridgett.com](mailto:SWolff@hansonbridgett.com)>; Lopes Matthew <[mlopes@pldolaw.com](mailto:mlopes@pldolaw.com)>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

Counselors:

Attached is our letter aid the meet and confer on the telemental health policy. Please disregard the prior letter.

**LaTri-c-ea McClendon-Hunt, Senior Counsel**
[lmcclendonhunt@pldolaw.com](mailto:lmcclendonhunt@pldolaw.com)
P 401.824.5113 • F 401.824.5123
**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
[www.pldolaw.com](http://www.pldolaw.com)  •  Legal Disclaimer

**From:** McClendon-Hunt, LaTri-c-ea
**Sent:** Tuesday, February 27, 2024 4:36 PM
**To:** Thomas Nolan <TNolan@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; <MBien@rbgg.com>; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>; Lopes Matthew <mlopes@pldolaw.com>
**Subject:** RE: Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

Counselors:

Attached is our letter aid the meet and confer on the telemental health policy.

**LaTri-c-ea McClendon-Hunt, Senior Counsel**
lmcclendonhunt@pldolaw.com
P 401.824.5113 • F 401.824.5123
**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

**From:** Thomas Nolan <TNolan@rbgg.com>
**Sent:** Wednesday, February 7, 2024 8:22 PM
**To:** Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>
**Subject:** Coleman -- Plaintiffs' Positions on Telemental Health Policy Disputes [IMAN-DMS.FID12440]

Via E-mail Only

February 7, 2024

Dear All —

Enclosed please find my letter setting forth Plaintiffs' positions with respect to the parties' disputes over the telemental health policy.   We look forward to discussing these issues at an upcoming meeting and confer.

Regards,

Tom


Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT J



# CLINICAL SOCIAL WORKER (HEALTH/CORRECTIONAL FACILITY) - SAFETY

## Exam Code: 1RC07

**Department:** State of California
**Exam Type:** Servicewide, Open
**Final Filing Date:** Continuous

## CLASSIFICATION DETAILS

**Clinical Social Worker (Health/Correctional Facility) – Safety (9872) –**

$7,104 - $9,305 per month - This salary shall apply to positions at the Department of Corrections and Rehabilitation within Correctional Health Care Services Division and Adult institutions. (Unlicensed)

$7,643 - $10,011 per month - This salary shall apply to positions at the Department of Corrections and Rehabilitation within Correctional Health Care Services Division and Adult institutions. (Licensed)

$6,765 - $8,892 per month - This salary shall apply to positions within the California Department of State Hospitals. (Unlicensed)

$7,278 - $9,535 per month - This salary shall apply to positions within the California Department of State Hospitals. (Licensed)

View the **Clinical Social Worker (Health/Correctional Facility)- Safety** classification specification.

## APPLICATION INSTRUCTIONS

Final Filing Date: Continuous

**Who Should Apply:**

Applicants who meet the minimum qualifications as stated on this bulletin may apply for and take this examination.

Once you have taken this examination, you may not retake it for **six (6) months**.

**How To Apply:**

The link to connect to the Training and Experience Evaluation is located farther down on this bulletin in the "Taking the Exam" section.

**Special Testing Arrangements:**

If you require special testing arrangements due to a verified disability or medical condition, please contact the department listed in the Contact Information section of this bulletin.

## MINIMUM QUALIFICATIONS

All applicants must meet the education and/or experience requirements as stated on this exam bulletin to be accepted into the examination. Part-time or full-time jobs, regardless of whether paid or volunteer positions, and inside or outside California state service will count toward experience.

**Clinical Social Worker (Health/Correctional Facility) - Safety**

Possession of a valid license as a Licensed Clinical Social Worker issued by the California Board of Behavioral Science. [Individuals who do not qualify for licensure by the California Board of Behavioral Science may be admitted into the examination and may be appointed but must secure a valid license within four years of appointment; however, an individual can be employed only to the extent necessary to be eligible for licensure plus one year. An extension of the waiver may be granted for one additional year based on extenuating circumstances, as provided by Section 1277(e) of the Health and Safety Code. The time duration for unlicensed employment does not apply to active doctoral candidates in social work, social welfare, or social service, until the completion of such training.]

[Unlicensed individuals who are recruited from outside the State of California and who qualify for licensure may take the examination and may be appointed for a maximum of one year at which time licensure shall have been obtained or the employment shall be terminated; an extension of the waiver may be granted for an additional one year based on extenuating circumstances, as provided by Section 1277(e) of the Health and Safety Code. Individuals granted an additional one year based on extenuating circumstances may be appointed for a maximum of two years at which time licensure shall have been obtained or the employment shall be terminated. Additionally, they must take the licensure examination at the earliest possible date after the date of employment.] **And**

**Education:** Completion of a master's degree program from an accredited school of social work, approved by the Council on Social Work Education.

**Special Personal Characteristics:** An objective and empathic understanding of individuals with mental, developmental, or physical disabilities; flexibility to alter hours as needed; tolerance; tact; emotional stability; and respect for persons from diverse backgrounds.

**Special Physical Characteristics:** Persons appointed to this class are reasonably expected to have and maintain sufficient strength, agility, and endurance to perform during physically, mentally, and emotionally stressful situations encountered on the job without compromising their health and well-being or that of their fellow employees, patients, or incarcerated persons.

Assignments may include sole responsibility for the control of patients, clients, or incarcerated persons and the protection of personal and real property.

**Drug Testing Requirement:** Applicants for positions in this class are required to pass a drug-screening test. Testing of current employees who are applicants in an examination or who are transferring is permitted only if the person does not have a current appointment to a class for which drug testing is a requirement.

**Applicants possessing the required license/certificate at the time of application must show the number, title, and expiration date on their Examination Application (Std. Form 678).**

## POSITION DESCRIPTION

### Clinical Social Worker (Health/Correctional Facility) - Safety

A Clinical Social Worker (Health/Correctional Facility) - Safety, under general direction in a health or correctional facility, performs clinical social work with individuals with mental, physical, or developmental disabilities; conducts assessments and summarizes case information for use in diagnosis, treatment (level of care), and dispositional release; diagnoses and/or collaborates in the formulation of a diagnosis; develops, monitors, and modifies treatment plans in collaboration with the interdisciplinary treatment team; identifies and recommends appropriate services based on assessment and, where applicable, civil or penal code commitment; provides individual and group therapy as delineated in the treatment plan; provides suicide and crisis risk assessment and intervention; participates in risk assessment, evaluation, and recommendation for alternate level of care placement, for release to the community, or other case disposition (with consideration for the risk the patient presents to the community); coordinates discharge planning activities and acts as resource on accessing appropriate community support and services to be utilized upon release; responds to requests from clients/patients, family members, courts, and community agencies; provides social work services to family members and community agencies; consults with colleagues and other staff on behavior management treatment issues; prepares verbal and written social work reports and provides court testimony, as required by law and policy, which can be used in all legal jurisdictions; participates in professional meetings, committees,

training, and conferences; participates in research and Quality Assurance and Improvement (QA&I); maintains safety by assisting staff in inspecting facilities, or observing behavior to identify or intervene in security breaches that could lead to injuries or escape; and does other related work.

## EXAMINATION SCOPE

This examination consists of the following components:

**Training and Experience Evaluation –** Weighted 100% of the final score.

The examination will consist solely of a **Training and Experience Evaluation.** To obtain a position on the eligible list, a minimum score of 70% must be received. Applicants will receive their score upon completion of the Training and Experience Evaluation process.

In addition to evaluating applicants' relative knowledge, skills, and ability, as demonstrated by quality and breadth of education and/or experience, emphasis in each exam component will be measuring competitively, relative job demands, each applicant's:

**Knowledge of:**
1. Principles, procedures, techniques, trends, and literature of social work with particular reference to clinical social work;
2. Psycho/social aspects of mental and developmental and physical disabilities;
3. Community organization principles;
4. Scope and activities of public and private health and welfare agencies;
5. Characteristics of mental, developmental, and physical disabilities;
6. Current trends in mental health, public health and public welfare, and federal and State programs in these fields.

**Ability to:**
1. Utilize and effectively apply the required technical knowledge;
2. Establish and maintain the confidence and cooperation of persons contacted in the work;
3. Secure accurate psycho/social data and record such data systematically;
4. Prepare clear, accurate, and concise reports;
5. Work family and community agencies in preparation for discharge;
6. Develop and implement programs;
7. Provide professional consultation;
8. Analyze situations accurately and take effective action;
9. Communicate effectively.

## ELIGIBLE LIST INFORMATION

A servicewide, open eligible list for the Clinical Social Worker (Health/Correctional Facility) - Safety classification will be established for the State of California (all State of California departments, statewide).

The names of successful competitors will be merged onto the eligible list in order of final score regardless of exam date. Eligibility expires **twelve (12) months** after it is established. Applicants must then retake the examination to reestablish eligibility.

Veterans' Preference will be granted for this examination. In accordance with Government Codes 18973.1 and 18973.5, whenever any veteran, or widow or widower of a veteran achieves a passing score on an open examination, he or she shall be ranked in the top rank of the resulting eligible list.

Veterans' status is verified by the California Department of Human Resources (CalHR). Information on this program and the Veterans' Preference Application (Std. Form 1093) is available online**.** Additional information on veteran benefits is available at the Department of Veterans Affairs.

Career Credits are not granted in examinations administered on an open basis.

## EXAMINATION INFORMATION

Preview of the Training and Experience Evaluation

## PREPARING FOR THE EXAMINATION

Here is a list of suggested resources to have available prior to taking the exam.

In an effort to streamline the examination process, please create a CalCareer Account with CalHR.  A CalCareer Account is a one stop shop for taking civil service examinations, applying for state jobs, and provides storage and organization for your documents and communications stemming from job opportunities, all in a paperless format.  To sign up for a CalCareer Account, or log in to your existing account, Click here.

**Employment History:** Employment dates, job titles, organization names and addresses, names of supervisors or persons who can verify your job responsibilities, and phone numbers of persons listed above.

**Education:** School names and addresses, degrees earned, dates attended, courses taken (verifiable on a transcript), persons or office who can verify education, and phone numbers of persons or offices listed above.

**Training:** Class titles, certifications received, names of persons who can verify your training, and phone numbers of persons listed above.

## TAKING THE EXAMINATION

We recommend using Chrome or Edge for optimal performance when accessing the examination.

Take the examination for the **Clinical Social Worker (Health/Correctional Facility)** classification.

## TESTING DEPARTMENTS

State of California (all State of California departments)

## CONTACT INFORMATION

If you have any technical or administrative questions concerning this examination bulletin, including provision of reasonable accommodation for this testing process, please contact:

California Correctional Health Care Services
Attn: Examination Services
8280 Longleaf Drive
Elk Grove, CA 95758

Phone: (916) 691-5894
Email: CPHCSSelectionServices@cdcr.ca.gov
California Relay Service: 7-1-1 (TTY and voice)

TTY is a Telecommunications Device for the Deaf, and is reachable only from phones equipped with a TTY Device.

## EQUAL OPPORTUNITY EMPLOYER

The State of California is an equal opportunity employer to all, regardless of age, ancestry, color, disability (mental and physical), exercising the right of family care and medical leave, gender, gender expression, gender identity, genetic information, marital status, medical condition, military or veteran status, national origin, political affiliation, race, religious creed, sex (includes pregnancy, childbirth, breastfeeding, and related medical conditions), and sexual orientation.

## DRUG-FREE STATEMENT

It is an objective of the State of California to achieve a drug-free State work place. Any applicant for State employment will be expected to behave in accordance with this objective, because the use of illegal drugs is inconsistent with the law of the State, the rules governing civil service, and the special trust placed in public servants.

## GENERAL INFORMATION

Examination and/or Employment Application (Std. Form 678) forms are available at CalHR, local offices of the Employment Development Department, and through your **CalCareer Account.**

If you meet the requirements stated on this examination bulletin, you may take this examination, which is competitive. Possession of the entrance requirements does not assure a place on the eligible list. Your performance in the examination described in this bulletin will be rated against a predetermined job-related rating, and all applicants who pass will be ranked according to their score.

CalHR reserves the right to revise the examination plan to better meet the needs of the service, if the circumstances under which this examination was planned change. Such revision will be in accordance with civil service laws and rules and all applicants will be notified.

**General Qualifications:** Applicants must possess essential personal qualifications including integrity, initiative, dependability, good judgement, the ability to work cooperatively with others, and a state of health consistent with the ability to perform the assigned duties of the class. A medical examination may be required. In open examinations, investigation may be made of employment records and personal history and fingerprinting may be required.

**Eligible Lists:** Eligible lists established by competitive examination, regardless of date, must be used in the following order: 1) sub-divisional promotional, 2) departmental promotional, 3) multi-departmental promotional, 4) servicewide promotional, 5) departmental open, 6) open. When there are two lists of the same kind, the older must be used first. Eligible lists will expire in one to four years unless otherwise stated on the bulletin.

**High School Equivalence:** Equivalence to completion of the 12th grade may be demonstrated in any one of the following ways: 1) passing the General Education Development (GED) Test; 2) completion of 12 semester units of college-level work; 3) certification from the State Department of Education, a local school board, or high school authorities that the competitor is considered to have education equivalent to graduation from high school; or 4) for clerical and accounting classes, substitution of business college work in place of high school on a year-for-year basis.

This bulletin cancels and supersedes all previously issued bulletins.

# EXHIBIT K

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# PSYCHOLOGIST – CLINICAL, CORRECTIONAL FACILITY

## Exam Code:  2RC54

**Department:** California Correctional Health Care Services and California Department of Corrections and Rehabilitation
**Exam Type:** Multi-Departmental, Open
**Final Filing Date:** Continuous

## CLASSIFICATION DETAILS

**Psychologist – Clinical, Correctional Facility (9283) –**

$9,107 - $10,899 per month (Unlicensed)

$10,750 - $13,201 per month (Licensed)

View the **Psychologist - Clinical, Correctional Facility**  classification specification.

## APPLICATION INSTRUCTIONS

Final Filing Date: Continuous

Cutoff Date: Online, 24/7

**Who Should Apply:**

Applicants who meet the minimum qualifications as stated on this bulletin may apply for and take this examination.

Once you have taken this examination, you may not retake it for **six (6) months**.

**How To Apply:**

The link to connect to the Training and Experience Evaluation is located farther down on this bulletin in the "Taking the Examination" section.

**Special Testing Arrangements:**

If you require special testing arrangements due to a verified disability or medical condition, please contact the department listed in the Contact Information section of this bulletin.

## MINIMUM QUALIFICATIONS

All applicants must meet the education and/or experience requirements as stated on this exam bulletin to be accepted into the examination. Part-time or full-time jobs, regardless of whether paid or volunteer positions, and inside or outside California state service will count toward experience.

**Psychologist – Clinical, Correctional Facility**

**License:** Possession of a valid license as a Psychologist issued by the California Board of Psychology and possession of an earned Doctorate Degree in Psychology from an educational institution meeting the criteria of Section 2914 of the Medical Board of California's Business and Professions Code.

Individuals who do not qualify for licensure by the California Board of Psychology or who are in the process of securing this license will be admitted into the examination and may be appointed, but must secure a valid license within three years of an appointment or the employment shall be terminated. For persons employed less than full time, an extension of a waiver of licensure may be granted for additional years proportional to the extent of part-time employment, as long as the person is employed without interruption in service, but in no case shall the waiver exceed five years.

(Unlicensed individuals who are recruited from outside the State of California and who qualify for licensure may take the examination and may be appointed for a maximum of two years, at which time licensure shall have been obtained or the employment shall be terminated. Additionally, they must take the licensure examination at the earliest possible date after the date of employment.)

Applicants who are within six months of receiving their degree will be admitted into the examination, but will not be eligible for appointment until receipt of the degree and completion of the internship.

**Special Personal Characteristics:**  Empathetic understanding of patients of a State correctional facility; willingness to work in a State correctional facility; scientific and professional integrity; emotional stability; patience; alertness; tact; and keenness of observation.

**Special Physical Characteristics:**  Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility, and endurance to perform during stressful (physical, mental, and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of incarcerated patients.

Assignments may include sole responsibility for the supervision of incarcerated patients and/or the protection of personal and real property.

**OUT OF CLASS EXPERIENCE:**  A completion of an "out-of-class (OOC) assignment memorandum", dated within one year of assignment completion, is required to use OOC experience to meet the minimum qualifications for examination purposes.  Employees may obtain this documentation from their Classification and Pay Analyst or institutional Personnel Liaison.  OOC experience without the required documentation cannot be considered for examination purposes.

## POSITION DESCRIPTION

**Psychologist – Clinical, Correctional Facility**

A Psychologist – Clinical, Correctional Facility under general direction, in a State correctional facility or outpatient clinic in the California Department of Corrections and Rehabilitation, carries out difficult assignments in clinical psychology which involve the assessment and treatment of adults, program development and evaluation, clinical research, professional training, and consultation; maintains order and supervises the conduct of incarcerated patients; protects and maintains the safety of persons and property; and does other related work.

Positions exist statewide.

## EXAMINATION SCOPE

This examination consists of the following components:

**Training and Experience Evaluation –** Weighted 100% of the final score.

The examination will consist solely of a **Training and Experience Evaluation.** To obtain a position on the eligible list, a minimum score of 70% must be received. Applicants will receive their score upon completion of the Training and Experience Evaluation process.

In addition to evaluating applicants' relative knowledge, skills, and ability, as demonstrated by quality and breadth of education and/or experience, emphasis in each examination component will be measuring competitively, relative to job demands, each applicant's:

**Knowledge of:**
1. Psychological theories and research;
2. Principles, techniques, and problems in developing and coordinating a clinical psychological treatment program;
3. Principles, techniques, and treads in psychology with particular reference to normal and disordered behavior, human development motivation, personality learning, individual differences, adaptation, and social interaction;
4. Methods for the assessment and modification of human behavior;
5. Characteristics and social aspects of mental disorders and retardation;
6. Research methodology, program evaluation, institutional and social processes, and group dynamics;
7. Functions of psychologists in various mental health services;

8.  Current trends in the field of mental health;
9.  Professional training;
10. Community organization and allied professional services.

**Ability to:**
1.  Plan, organize, and work in a specialized clinical psychological treatment program involving members of other treatment disciplines;
2.  Provide professional consultation and program leadership;
3.  Teach and participate in professional training;
4.  Recognize situations requiring the creative application of technical skills;
5.  Develop and evaluate creative approaches to the assessment, treatment, and rehabilitation of mental disorders, to the conduct of research, and to the development and direction of a psychological program;
6.  Plan, organize, and conduct research, data analysis, and program evaluation;
7.  Conduct assessment and psychological treatment procedures;
8.  Secure the cooperation of professional and lay groups;
9.  Analyze situations accurately and take effective action;
10. Communicate effectively.

## ELIGIBLE LIST INFORMATION

A multi-departmental, open eligible list for the Psychologist – Clinical, Correctional Facility classification will be established for:

**California Correctional Health Care Services**
**California Department of Corrections and Rehabilitation**

The names of **successful** competitors will be merged onto the eligible list in order of final score regardless of examination date. Eligibility expires **twelve (12) months** after it is established. Applicants must then retake the examination to reestablish eligibility.

Veterans' Preference will be granted for this examination. In accordance with Government Codes 18973.1 and 18973.5, whenever any veteran, or widow or widower of a veteran achieves a passing score on an open examination, he or she shall be ranked in the top rank of the resulting eligible list.

Veterans' status is verified by the California Department of Human Resources (CalHR). Information on this program and the Veterans' Preference Application (Std. Form 1093) is available online**.** Additional information on veteran benefits is available at the Department of Veterans Affairs.

Career credits are not granted in examinations administered on an open basis.

## EXAMINATION INFORMATION

Preview the Training and Experience Evaluation

## PREPARING FOR THE EXAMINATION

Here is a list of suggested resources to have available prior to taking the examination.

In an effort to streamline the examination process, please create a CalCareer Account with CalHR. A CalCareer Account is a one stop shop for taking civil service examinations, applying for state jobs, and provides storage and organization for your documents and communications stemming from job opportunities, all in a paperless format. To sign up for a CalCareer Account, or log in to your existing account, Click here.

**Employment History:** Employment dates, job titles, organization names and addresses, names of supervisors or persons who can verify your job responsibilities, and phone numbers of persons listed above.

**Education:** School names and addresses, degrees earned, dates attended, courses taken (verifiable on a transcript), persons or office who can verify education, and phone numbers of persons or offices listed above.

**Training:** Class titles, certifications received, names of persons who can verify your training, and phone numbers of persons listed above.

## TAKING THE EXAMINATION

We recommend using Chrome or Edge for optimal performance when accessing the examination.

Take the examination for the **Psychologist – Clinical, Correctional Facility** classification.

## TESTING DEPARTMENTS

California Correctional Health Care Services
California Department of Corrections and Rehabilitation

## CONTACT INFORMATION

If you have any technical or administrative questions concerning this examination bulletin, including provision of reasonable accommodation for this testing process, please contact:

California Correctional Health Care Services
Attn: Examination Services
8280 Longleaf Drive
Elk Grove, CA 95758

Phone: (916) 691-5894
Email:  CPHCSSelectionServices@cdcr.ca.gov
California Relay Service: 7-1-1 (TTY and voice)

TTY is a Telecommunications Device for the Deaf, and is reachable only from phones equipped with a TTY Device.

## EQUAL OPPORTUNITY EMPLOYER

The State of California is an equal opportunity employer to all, regardless of age, ancestry, color, disability (mental and physical), exercising the right of family care and medical leave, gender, gender expression, gender identity, genetic information, marital status, medical condition, military or veteran status, national origin, political affiliation, race, religious creed, sex (includes pregnancy, childbirth, breastfeeding, and related medical conditions), and sexual orientation.

## DIVERSITY, EQUITY, AND INCLUSION

The California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS) are committed to building and fostering a diverse workplace. We believe cultural diversity, backgrounds, experiences, perspectives, and unique identities should be honored, valued, and supported. We believe all staff should be empowered. CDCR/CCHCS are proud to foster inclusion and representation at all levels of both Departments.

## DRUG-FREE STATEMENT

It is an objective of the State of California to achieve a drug-free State workplace. Any applicant for State employment will be expected to behave in accordance with this objective, because the use of illegal drugs is inconsistent with the law of the State, the rules governing civil service, and the special trust placed in public servants.

## GENERAL INFORMATION

Examination and/or Employment Application (Std. Form 678) forms are available at CalHR, local offices of the Employment Development Department, and through your **CalCareer Account.**

If you meet the requirements stated on this examination bulletin, you may take this examination, which is competitive. Possession of the entrance requirements does not assure a place on the eligible list. Your performance in the examination described in this bulletin will be rated against a predetermined job-related rating, and all applicants who pass will be ranked according to their score.

CCHCS reserves the right to revise the examination plan to better meet the needs of the service, if the circumstances under which this examination was planned change. Such revision will be in accordance with civil service laws and rules and all applicants will be notified.

**General Qualifications:** Applicants must possess essential personal qualifications including integrity, initiative, dependability, good judgement, the ability to work cooperatively with others, and a state of health consistent with the ability to perform the assigned duties of the class. A medical examination may be required. In open

examinations, investigation may be made of employment records and personal history and fingerprinting may be required.

**Eligible Lists:** Eligible lists established by competitive examination, regardless of date, must be used in the following order: 1) sub-divisional promotional, 2) departmental promotional, 3) multi-departmental promotional, 4) servicewide promotional, 5) departmental open, 6) open. When there are two lists of the same kind, the older must be used first. Eligible lists will expire in one to four years unless otherwise stated on the bulletin.

**High School Equivalence:** Equivalence to completion of the 12th grade may be demonstrated in any one of the following ways: 1) passing the General Education Development (GED) Test; 2) completion of 12 semester units of college-level work; 3) certification from the State Department of Education, a local school board, or high school authorities that the competitor is considered to have education equivalent to graduation from high school; or 4) for clerical and accounting classes, substitution of business college work in place of high school on a year-for-year basis.

This bulletin cancels and supersedes all previously issued bulletins.

# EXHIBIT L

| | |
|---|---|
| **From:** | Millham, Sofia A. |
| **To:** | Millham, Sofia A. |
| **Subject:** | FW: CDCR Update: Restricted Housing Units |
| **Date:** | Thursday, March 21, 2024 3:44:08 PM |

Begin forwarded message:

> **From:** "Maldonado, David@CDCR" <David.Maldonado@cdcr.ca.gov>
> **Date:** October 5, 2023 at 2:31:57 PM CDT
> **Subject: CDCR Update: Restricted Housing Units**
>
>
> Good morning,
>
> On September 29, 2022, Governor Newsom vetoed Assembly Bill 2632. This bill would have placed significant restrictions on the use of restricted housing to include the exclusion of certain groups of incarcerated persons. The Governor's veto message directed CDCR to refine and reform the use of restricted housing.
>
> CDCR has submitted to the Office of Administrative Law an emergency regulation package that will limit the use of restricted housing to situations where the individual has engaged in violence or has serious safety concerns. These regulations implement a positive behavioral model to aid in rehabilitation. The changes were made after careful review and consideration, always keeping in mind the safety and security of our staff and incarcerated people.
>
>
> Historically, there have been multiple types of restricted housing in CDCR. These proposed regulations will rename and create specific Restricted Housing Units (RHU) based on the incarcerated person's mental health level of care. CDCR will no longer require transfers between institutions upon assessment of an RHU term.
> RHUs will consist of the following:
>
> 1. Administrative Segregation Unit (ASU) and Security Housing Unit (SHU) were merged and renamed to General Population RHU. These units will house incarcerated persons not included in the Mental Health Service Delivery System (MHSDS).
>
> 2. Short Term Restricted Housing and Long-Term Restricted Housing were merged and renamed to Correctional Clinical Case Management System (CCCMS) RHU. These units will house incarcerated persons in the MHSDS at the CCCMS level of care.

3. Enhanced Outpatient Program (EOP) ASU and Psychiatric Services Unit were merged and renamed to EOP RHU. These units will house incarcerated persons included in the MHSDS at the EOP level of care.

The number of offenses requiring assessment of an RHU term will be reduced from 34 to 19. The RHU term lengths have been shortened by fifty (50) percent from the current expected term, and the use of aggravating and mitigating factors have been excluded from the new calculation of RHU terms. The incarcerated person will serve a set amount of time for each specific offense. Additionally, the proposed regulations eliminate the use of consecutive RHU term(s).

CDCR will be implementing a new positive behavioral model that will allow individuals with an imposed, projected or re-imposed RHU term to earn programming credits, thereby, reducing the length off their RHU term up to 25 percent. The RHU Programming Credit is not an additional credit off the length of the court ordered CDCR sentence. All currently offered rehabilitative and educational services will continue to be provided at their current levels. In addition, new rehabilitative programs will be offered to expand programming in RHUs. Staffing will be reallocated and adjusted to ensure compliance with these programs.

The offered out-of-cell time will be standardized to a minimum of 20 hours a week for all incarcerated persons housed in RHU and Restricted Custody General Population. Furthermore, issuance of allowable property in RHU are standardized based on the individuals privilege group, therefore, property issuance does not change based on the assessment of an RHU Term. This will be a simplified and streamlined process for staff.

I hope this information provides some insight into the changes that are coming to CDCR. Please know that our top priority is ensuring the safety, security, and well-being of all staff and incarcerated people.


For more information about Restricted Housing, click here:
https://www.cdcr.ca.gov/adult-operations/restricted-housing/


**David Maldonado**
Chief (A), Strategic Communications and External Affairs
Office of Public and Employee Communication (OPEC)
CA. Dept. of Corrections & Rehabilitation (CDCR)

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT M

DocuSign Envelope ID: A6C971C2-3BD8-4947-9651-B3F944CF0D4E

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 7/8/2021 |
| **To:** | Associate Directors, Division of Adult Institutions |
| | Wardens |
| | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| | Senior Psychiatrist Supervisors |
| | Chief Nurse Executives |

**From:**

*Amar Mehta*
AMAR MEHTA, M.D.
Deputy Director
Statewide Mental Health Program

CONNIE GIPSON
Director
Division of Adult Institutions

*Barbara Barney-Knox*
BARBARA BARNEY-KNOX
Deputy Director, Nursing
California Correctional Health Care Services

**Subject:    CRISIS INTERVENTION TEAMS POLICY AND PROCEDURE**

This memorandum announces the release of the Crisis Intervention Teams (CIT) policy and procedure (attached). The documents provide guidance to the field regarding responsive crisis intervention strategies directed toward resolving patient crises.

The institutions identified by the Headquarters Mental Health Program Subcommittee to activate CIT are listed on the *Crisis Intervention Teams Designated Facilities* list (attached).

If you have questions or require additional information related to this memorandum, please contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@CDCR.

Attachments

cc: Charles W. Callahan      Michael Golding, M.D.      Lourdes White
    Kimberly Seibel          Toni Martello, M.D.        Marcie Flores
    Joseph Bick, M.D.        Sophia Le, M.D.            Laurie Ball
    Steven Cartwright, Psy.D. Shama Chaiken, Ph.D.      Jennifer Johnson
    Adam Fouch               Amber Carda, Psy.D.        Regional Mental Health Administrators
    Laura Ceballos, Ph.D.    Daisy Minter, Ph.D.        Regional Health Care Executives

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | 7/8/2021 |
|---|---|---|
| CHAPTER 1:<br>ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| 12.01.700<br>CRISIS INTERVENTION TEAMS | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | |

**Policy**

The California Department of Corrections and Rehabilitation (CDCR) shall have Crisis Intervention Teams (CIT) at institutions where a need for such a function has been identified by the Headquarters Mental Health Program Subcommittee.

**Responsibilities**

Statewide

- CDCR and California Correctional Health Care Services departmental leadership, at all levels and within the scope of their authority, shall ensure administrative, custodial, and clinical systems are in place and appropriate tools, training, technical assistance, and levels of resources are available so that health care staff can successfully implement the CIT at designated institutions.
- The Statewide Mental Health Program Subcommittee is responsible for providing oversight of the CIT and identifying and communicating related data and trends.
- The Statewide Mental Health Program Subcommittee is responsible for determining needs based upon emergent referral patterns and rates of Mental Health Crisis Bed (MHCB) rescissions.

Regional

- Regional Mental Health Administrators shall be responsible for implementation of this policy within an assigned region, provide ongoing support and monitoring to ensure implementation of the CIT and use data and trends to identify and take action to mitigate mental health risks within an individual institution or across a region.

Institutional

- The Chief Executive Officer and Warden at designated institutions is responsible for implementation of this policy at the institution level. Institution leadership teams shall ensure that the Institution Mental Health Subcommittee monitors utilization and effectiveness of the CIT, and use data and trends to identify and take action to mitigate patient safety risks related to this process.

**Purpose**

The CIT is an interdisciplinary team, to include a mental health clinician, nursing staff (Supervising Registered Nurse, Unit Supervisor, Senior Psychiatric Technician, or Registered Nurse; a Psychiatric Technician may attend the CIT if there is also a Registered Nurse present), and custody supervisory staff, in consultation with the psychiatrist, that provides responsive crisis intervention strategies directed toward resolving patient crises. Resolving crises by identifying root causes of the patient's concerns serves to improve the care provided to the patient in crisis and allows assessment of the crisis physically closer to the source of the stressor. Prompt attention to potential crisis issues also allows staff to work with the patient to address concerns that could lead to self-harm or suicidal behavior. The interdisciplinary model of the CIT improves the collaboration and partnership of the disciplines to meet the needs of the patients.

This policy and related policies and procedures are intended to reflect best practices in a correctional setting, and should be updated annually, or more often as necessary, to

incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Compliance Indicators**

To be in compliance with this policy, the following expectations shall be met:
1. The CIT sees each patient in-person, in a confidential setting, together as a team, and as close to the patient's housing unit as possible.
2. A Mental Health emergent consult/referral is completed within four hours.
3. Clinical evaluation and outcome are documented in the health record as soon as possible and no later than the end of the work day.
4. CIT members receive headquarters approved, standardized CIT training conducted by local Training for Trainers (T4T) staff.
5. Performance metrics associated with mental health crises are monitored by the institution Mental Health Program Subcommittee monthly and presented to the local Quality Management Committee as appropriate.
6. The Mental Health CIT Powerform is completed.
7. The Nursing CIT Powerform is completed.
8. A Suicide Risk Assessment and Self Harm Evaluation is completed according to policy, when appropriate.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
| --- | --- |
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum and submit it to CDCR MHPolicyUnit@CDCR within 30 days of the effective date valid until the next LOP revision date. |
| does not have a LOP | ensure that one is created to meet the new policy requirements and submitted to CDCR MHPolicyUnit@CDCR within 30 days of the effective date. Ensure the LOP is reviewed annually. |

**References**

Division of Correctional Health Care Services. (2018 Revision). Mental Health Services Delivery System Program Guide. Program Guide Overview, Chapter 1

Health Care Department Operations Manual, Chapter 3, Article 7, Emergency Medical Response

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

DocuSign Envelope ID: A6C971C2-3BD8-4947-9651-B3F944CF0D4E

 CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES


## Crisis Intervention Teams Designated Facilities

Institutions with Crisis Intervention Teams:

| Institution | Activation |
|---|---|
| KVSP | 10/1/2018 |
| CMF | 12/3/2018 |
| COR | 12/3/2018 |
| NKSP | 2/4/2019 |
| LAC | 2/19/2019 |
| CCWF | 3/1/2019 |
| CHCF | 3/6/2019 |
| CMC | 4/15/2019 |
| SVSP | 5/1/2019 |
| CIM | 5/6/2019 |
| WSP | 5/13/2019 |
| MCSP | 5/20/2019 |
| CIW | 6/3/2019 |
| RJD | 6/3/2019 |
| VSP | 6/3/2019 |
| DVI | 6/17/2019 |
| SAC | 10/2/2019 |
| SQ | 9/23/2019 |
| HDSP | 12/3/2019 |
| CRC | 1/13/2020 |
| CCI | 2/3/2020 |

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | 7/8/2021 |
|---|---|---|
| CHAPTER 01:<br>ACCESS TO CARE | Revision Date(s): | |
| | Supersedes: | |
| 12.01.700 (P1)<br>CRISIS INTERVENTION TEAMS | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | |

| | Procedure |
|---|---|
| 1. | When a patient reports an emergent mental health need or staff observes a patient requiring emergent mental health (MH) need, staff shall:<br><br>• If the patient has an urgent or emergent medical condition, staff should refer to the Emergency Medical Response HCDOM (3.7.1).<br>• Immediately move the patient to a triage location and place the patient in a safe place where the patient can be observed continuously until the CIT arrives.<br> ○ The location shall be as close to the patient's current housing as possible to aid in the assessment within the patient's current milieu and the patient shall be interviewed in a confidential setting. A patient does not need to state they are suicidal to deploy the CIT.<br>• Notify a CIT member as indicated by local operating procedures.<br> ○ The CIT shall interview the patient and the emergent MH consult order shall be completed within four hours of the patient expressing the emergent mental health need.<br><br>Upon notification of the mental health emergency, the CIT member shall immediately notify the remaining CIT members. Health care staff shall place an emergent Mental Health Consult order in the health record and select the appropriate referral reason from the "Patient Consult Reason" drop down box.<br><br>The CIT interviews the patient to:<br>• Identify type of crisis present.<br>• Take appropriate action regarding treatment planning and appropriate course of action related to the reason for the CIT contact (e.g., housing, level of care, medical care, MHCB placement, or other issues).<br>• Assess patient's ability to understand what is being said and to effectively communicate their thoughts.<br>• Assess current problem using de-escalation and motivational interviewing techniques.<br>• Assess whether a referral to the psychiatrist or primary care physician is clinically indicated.<br><br>All documentation shall be completed per existing discipline-specific policy and procedures. Mental health clinicians involved in the CIT shall complete the Mental Health CIT Powerform in the health record. If the patient expresses suicidality, a Suicide Risk Assessment and Self Harm Evaluation (SRASHE) shall be completed. Nursing staff involved in the CIT shall complete the Nursing CIT Powerform in the health record. |

| 2. | **Roles** |

Mental Health Clinician
- Reviews health record.
  - o Review any previous CIT contacts and share the information related to these contacts with the rest of the CIT members.
- Performs a Mental Status Exam.
- Provides appropriate mental health treatment recommendation and/or referral.
- Completes SRASHE, as required per policy.
- Completes the Mental Health CIT Powerform in the health record with relevant clinical information pertaining to the CIT intervention.
- Determines the necessity for a referral to MHCB.
  - o If a referral is warranted, the clinician shall initiate the process and complete all required documentation per the 12.05.200.P1. Mental Health Crisis Bed: Referral Procedure and 12.05.601 Documentation Required for Referral to Mental Health Crisis Bed policy.
  - o If a psychiatrist has determined that an MHCB referral is warranted, then the patient shall be referred. If a psychologist on the CIT team disagrees with the psychiatrist's decision, then the more conservative approach shall be honored and the patient shall be referred.
- When clinically indicated, and for every MHCB referral, the CIT shall contact psychiatry (on-duty or on-call, as appropriate) to address clinical considerations related to psychiatric concerns
  - o Examples of when the psychiatrist should be contacted are as follows, but not limited to:
    - a. The patient reports significant side effects of psychotropic medications
    - b. The patient is acutely psychotic or severely agitated
    - c. The patient is engaging in self-injurious behavior and does not require a referral to a higher level of care.
    - d. The patient is threatening to harm him- or herself
  - o The psychiatrist may also be contacted for other issues such as diagnostic clarification concerns, obtaining a second opinion related to the risk for suicidality, or for other clinical considerations.
  - o For patients who engaged in self-injurious behaviors (e.g., head banging, cutting, pulling out sutures or catheters, or re-opening wound), have made a serious suicide attempt, or require a referral to a higher level of care, refer to the Emergency Medical Response System (HCDOM 3.7.1) policy.
- In addition, the CIT shall inquire with the patient if he/she would like to be referred to the psychiatrist for urgent or emergent psychiatric medication issues, such as a PRN.

Psychiatrist
- Acts as a consultant to the CIT.
- When a referral to MHCB is necessary, evaluates whether acute medical treatment or hospitalization is required prior to transfer, and assesses the relative benefits and risks associated with transporting the patient. If needed, the psychiatrist would order medications to assist with patient safety and comfort during travel. They would also order laboratory testing or other assessments as may be medically appropriate.

Nursing Staff (Supervising Registered Nurse, Unit Supervisor, Senior Psychiatric Technician, Registered Nurse, or Psychiatric Technician)
- Reviews the Patient Summary Sheet and health record.
- Evaluates for the presence of physical injuries or medical problems that require immediate attention.

- Evaluates for conditions that mimic mental illness, including substance intoxication and withdrawal.
- Evaluates for medical problems related to psychiatric disorders.
- Communicates relevant historical and current health information to custody and mental health staff.
- Review current medications for appropriate PRN administration, contacting psychiatrist if no medications are available or ordered, if clinically indicated.
- Provides recommendations to the team related to CIT interventions and future medical/nursing treatment planning.
- Liaisons with the patient's Primary Care Physician or the on-call medical provider as clinically indicated
- Liaisons with the patient's psychiatrist or on-call psychiatrist as clinically indicated.

Custody Lieutenant
- CIT requires a Facility Lieutenant (Custody Supervisor). However, a Sergeant may be utilized in the event the Lieutenant is unable to respond to the Housing Unit (e.g., serving as Watch Commander, Incident Commander, etc.). When this occurs, the Facility Sergeant may accompany healthcare staff and respond with the team providing the following criteria is met:
  o The Sergeant must remain in close communication with the Lieutenant and relay information, as appropriate.
  o The Lieutenant maintains responsibility for determining any housing change(s) or custodial responses indicated and participates in the final CIT intervention decision with the team.
- Reviews patient's information in the Strategic Offender Management System.
- Provides custodial information pertinent to treatment planning and determining an appropriate course of action.
- Reviews bed assignment.
- Discusses housing unit conduct with housing officer.
- Evaluates bed card, cell, property and phone use.
- Obtains property card, if needed.
- Provides recommendations to the team related to the CIT interventions and future custodial interventions.

| 3. | **CIT Operating Hours**<br><br>The CIT shall include the following staff during:<br>- Normal business hours and after-hours<br>  o Licensed Psychologist or Licensed Clinical Social Worker<br>  o As clinically indicated, a Psychiatrist<br>  o Lieutenant<br>  o Supervising Registered Nurse, Unit Supervisor, Senior Psychiatric Technician, Registered Nurse, or Psychiatric Technician<br><br>CIT operating hours shall include third watch hours and be based upon local institution utilization rates. The local SPRFIT Committee is responsible for reviewing patterns of emergency referrals to determine the most appropriate hours for the CIT to be utilized for managing emergent referrals. In the event of a mental health emergency in outpatient settings during CIT operating hours, the CIT shall be activated. All three members of the CIT shall respond together as soon as possible, in accordance with Mental Health Services Delivery System Program Guide emergent referral response requirements. |

| | |
|---|---|
| | The CIT process does not replace efforts to respond to life-threatening emergencies. The Health Care Department Operations Manual, Chapter 3, Article 7, Emergency Medical Response, shall be followed in these instances. For emergent consults/referrals outside of normal business hours and/or CIT operating hours, existing local mental health on-call procedures shall be followed. |
| **4.** | **Follow Through**<br><br>When a determination has been made that requires follow-up at a later time, a plan must be established to ensure this occurs (e.g., If the patient requires an urgent psychiatry consult, the team must establish a plan to ensure that the consult is appropriately scheduled and that the psychiatrist assigned to follow-up is informed of the events that resulted in the urgent consult). |
| **5.** | **Difference of Opinion**<br><br>If the CIT members are not unanimous on the appropriate course of action, the decision shall be elevated to institution leadership. The Chief of Mental Health, Chief Psychiatrist, Senior Psychiatrist Supervisor, or designee shall make the final determination. For clinical disagreements, the more conservative approach shall be honored. |