1   ROB BONTA, SBN 202668
    Attorney General of California
2   MONICA N. ANDERSON, SBN 182970
    DAMON MCCLAIN, SBN 209508
3   Supervising Deputy Attorney General
    ELISE OWENS THORN, SBN 145931
4   NAMRATA KOTWANI, SBN 308741
    Deputy Attorneys General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, CA 94244-2550
     Telephone: (916) 210-7318
7    Fax: (916) 324-5205
     E-mail: Elise.Thorn@doj.ca.gov
8   Attorneys for Defendants

    HANSON BRIDGETT LLP
    PAUL B. MELLO, SBN 179755
    SAMANTHA D. WOLFF, SBN 240280
    KAYLEN KADOTANI, SBN 294114
    DAVID C. CASARRUBIAS, SBN 321994
    CARSON R. NIELLO, SBN 329970
     1676 N. CALIFORNIA BLVD., SUITE 620
     WALNUT CREEK, CALIFORNIA 94596
     TELEPHONE: 925-746-8460
     FACSIMILE: 925-746-8490
    Attorneys for Defendants

9

10

11

12

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

13

14

15

16   RALPH COLEMAN, et al.,

17           Plaintiffs,

18        v.

19   GAVIN NEWSOM, et al.

20           Defendants.

21

22

Case No. 2:90-CV-00520- KJM-DB

**DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON HIS EXPERT'S SIXTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND RE-AUDIT OF SUICIDE PREVENTION PRACTICES IN THE PSYCHIATRIC INPATIENT PROGRAMS**

Judge:    Hon. Kimberly J. Mueller

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION...........................................................................................................1

II.   LEGAL STANDARD .................................................................................................3

III.  GENERAL OBJECTIONS .........................................................................................4

   A.    The Filing of the Special Master's Report Without First Providing CDCR
         with a Draft to Demonstrate Compliance is Prejudicial in Light of the Court's
         Contemplated Contempt Proceedings. ...............................................................4

   B.    Defendants Maintain Their General Objection That the Special Master's
         Monitoring of the Court's Suicide Prevention Recommendations Conflates
         Compliance With Implementation. .....................................................................5

   C.    Defendants Also Maintain Their General Objection to Mr. Hayes's Concept
         of Implementation Which Applies Perfect, or Near Perfect, Compliance
         Standards. ............................................................................................................6

   D.    Mr. Hayes's Report Fails to Show a Correlation Between the Implementation
         of His Recommendations and Self-Harm Events, Completed Suicides, or an
         Increase in Suicide Risk. ....................................................................................8

   E.    Mr. Hayes's Findings and Conclusions Are Based on Faulty Methodology
         and Objectively Unverifiable Evidence. .............................................................9

   F.    Mr. Hayes's Recommendations Are Too Vague and Overbroad To Be Useful
         for Correcting Past Staff Behavior and CDCR Processes, and are Therefore
         Problematic.........................................................................................................12

   G.    Mr. Hayes's Findings Are Not Related to the Core Requirements of Several
         Recommendations and His Findings of Noncompliance are Therefore
         Improper. ............................................................................................................16

   H.    Table 3 is Misleading in Mr. Hayes's report and also should be disregarded. ........19

IV.   SPECIFIC OBJECTIONS.........................................................................................20

   A.    Initial Health Screening and Receiving and Release Environment........................20

         1.    California Correctional Institution ................................................23

         2.    Wasco State Prison ........................................................................24

         3.    San Quentin Rehabilitation Center................................................25

         4.    California Institution for Women ..................................................26

         5.    California Health Care Facility .....................................................27

         6.    California Men's Colony................................................................27

         7.    Salinas Valley State Prison ...........................................................28

20681936.1

|   | 8. | California Institution for Men | 29 |
| B. | | Psych Tech Practices | 30 |
| C. | | Suicide Resistant MHCBs | 32 |
| D. | | Use of Suicide Resistant Cells for Newly Admitted Inmates in Restricted Housing Units (Intake Cells) | 32 |
|   | 1. | California Institution for Men | 34 |
|   | 2. | California Men's Colony | 35 |
|   | 3. | California State Prison, Los Angeles County | 36 |
|   | 4. | Kern Valley State Prison | 37 |
|   | 5. | Salinas Valley State Prison | 38 |
|   | 6. | Wasco State Prison | 39 |
| E. | | Practices for Observing MHCB Patients | 39 |
|   | 1. | In 2023, CDCR Conducted over Ten Million Suicide Precaution and Suicide Watch Checks at a Combined Compliance Rate of Over Ninety-Two Percent. | 40 |
|   | 2. | Mr. Hayes's Recommendation to Create a Corrective Action Plan for Kern Valley State Prison and R.J. Donovan Correctional Facility should be Disregarded. | 43 |
| F. | | MHCB Practices for Possessions and Privileges | 44 |
|   | 1. | Wasco State Prison | 45 |
|   | 2. | California State Prison, Sacramento | 46 |
|   | 3. | California Institution for Men | 48 |
|   | 4. | California Institution for Women | 49 |
|   | 5. | California Health Care Facility | 50 |
|   | 6. | California Substance Abuse Treatment Facility | 51 |
|   | 7. | Central California Women's Facility | 52 |
|   | 8. | Objections to Recommendation for Corrective Action Plan | 52 |
|   | 9. | Objection to Recommendation for a Memo Regarding Telephone Calls | 53 |
| G. | | Mental Health Referrals and Suicide Risk Evaluations | 54 |
|   | 1. | Objections to Mr. Hayes's Findings Regarding Recommendation 9 | 54 |

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

a.  Mr. Hayes Did Not Audit Recommendation 9 and his Findings are Therefore Improper. ....................................54

b.  Instead of Auditing Recommendation 9, Mr. Hayes Audited Training Requirements for Which CDCR is Compliant. .................55

2.  Objections to Mr. Hayes's Findings Regarding Recommendation 10.........56

3.  Mr. Hayes's Finding Regarding RJD's Use of the Columbia Screener is Improper. ...................................................58

H.  Safety Planning for Suicidal Inmates .......................................................58

1.  Recommendation 17 is Redundant...............................................................59

2.  Recommendation 18 is Also Objectionable. ...............................................60

a.  Wasco State Prison ..........................................................................61

b.  California State Prison, Sacramento ...............................................61

c.  California Institution for Women ...................................................62

I.  MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks ..........................................63

1.  Wasco State Prison (Recommendation 29) ...................................................66

2.  San Quentin Rehabilitation Center (Recommendation 28) ..........................66

3.  Mule Creek State Prison (Recommendations 28 and 29) .............................67

4.  California State Prison, Corcoran (Recommendations 28 and 29) ..............67

5.  California Substance Abuse Treatment Facility (Recommendations 28 and 29) ......................................................................................68

6.  North Kern State Prison (Recommendation 29)............................................68

7.  Kern Valley State Prison (Recommendations 28 and 29) .............................69

8.  High Desert State Prison (Recommendation 28) ..........................................69

J.  Local SPRFITs ............................................................................................70

1.  Mr. Hayes's Report Makes It Difficult to Determine Which Institutions Were Compliant with Recommendation 31. .............................71

2.  Mr. Hayes's Findings are Improper Because he Does not Audit Whether Local SPRFIT Committees are Adequate. ....................................71

K.  Suicide Prevention Training.......................................................................73

L.  Continuous Quality Improvement ..............................................................75

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

1        1.    Mr. Hayes Found that Defendants have Complied with
2               Recommendation 32...................................................................76

    2.    CDCR's SP CQI Guidebook and Resultant Reports are Robust and
3               Exceed Mr. Hayes's Own Audits. ................................................79

4        3.    Mr. Hayes's Criticisms of the Content of CDCR's SPRFIT Reports
5               are Inaccurate and Improper........................................................81

         a.    Whether Mental Health Compliance Team or Regional Nurse
6                      Consultants Were Involved in the Reports.......................................82

7             b.    Review Frequency of the Reports ......................................83

8             c.    Ability to Audit all Suicide Prevention Practices............................84

9             d.    Length of On-Site Reviews Does not Correlate to Number of
10                     Observations ...................................................................85

11            e.    Reliance on "On Demand Data" ......................................86

         f.    SRASHEs Resulting from Danger-to-Self Referrals ......................87
12            g.    Compliance with CDCR Form 7497 ................................87
13
         h.    Local SPRFIT Reviews of Suicide Risk Management
14                     Program .......................................................................88

15            i.    Local SPRFIT Quorum ...................................................88

16            j.    Max Custody Phone Call Access .....................................89

17            k.    MHCB Observation and Privilege Orders .......................89

18            l.    Adequate Review of Safety Planning...............................90

19            m.    Supervisory Review of Safety Planning...........................90

20            n.    Privacy During Crisis Responses ....................................91

21            o.    Recommendations versus Corrective Action Plans .........91

22       4.    Mr. Hayes's Conclusion That Because SPRFIT Coordinators Have
           "Disparate Findings" From His Own They Are Conducting
23              "Deficient Monitoring" is Incorrect. ..........................................92

24   M.    Reception Center Practices.....................................................................93

25   N.    Baseline Assessment of Suicide Prevention Practices in CDCR's Five
26         Psychiatric Inpatient Programs................................................................95

    1.    Suicide Resistant Beds ...........................................................96
27
         a.    California Medical Facility PIP.......................................96
28

20681936.1       DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

b.   Salinas Valley State Prison PIP.........................................96

2.   Observation of Suicidal Patients ....................................97

a.   Patients in CDCR PIPs are Timely Observed over Ninety Percent of the Time. ..........................................................98

b.   California Institution for Women PIP ..........................98

c.   Salinas Valley State Prison PIP.....................................99

3.   Proper Clothing and Possessions...................................100

4.   Out of Cell Activities .....................................................100

5.   IDTT Meetings ...............................................................101

6.   Safety Planning ..............................................................102

7.   Suicide Prevention Training ...........................................103

8.   SPRFIT ...........................................................................103

a.   Quorum...........................................................................103

(1)   CHCF PIP's SPRIFT Achieves Quorum for its Meetings. ...................................................104

(2)   CIW PIP Achieves Quorum for its Meetings...................104

(3)   SVSP PIP Had No Quorum Issues in Late 2023...............104

b.   Corrective Actions.........................................................104

(1)   CHCF PIP ........................................................105

(2)   CIW PIP ...........................................................105

(3)   CMF PIP ...........................................................105

V.   CONCLUSION ...........................................................................106

VI.   CERTIFICATION.......................................................................106

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Balla v. Idaho State Bd. Of Corr.*,
5
  595 F. Supp. 1558 (D. Idaho 1984) ........................................................................ 5, 6

6
*Language Line Services, Inc. v. Language Services Associates, Inc.*,
  500 Fed.App'x. 678 (9th Cir. 2012) ............................................................................. 3

7
*Estate of Michael Ostby et al. v. Yellowstone County et al*,
8
  Case No. 1:17-cv-00124-SPW (D. Montana 2020) .................................................. 44

9
*Miller v. Harbaugh*,
10
  698 F.3d 956 (7th Cir. 2012) ....................................................................................... 6

11
*Rouser v. White*,
  825 F.3d 1076 (9th Cir. 2016) .................................................................................. 7, 8
12

13
*Taylor v. Barkes*,
  575 U.S. 822 (2015) ................................................................................................. 5, 6

14
*United States v. Silverman*,
15
  861 F.2d 571 (9th Cir. 1988) ....................................................................................... 4

16
**Federal Statutes**

17
18 U.S.C.
  § 3626(a)(1)(A) ........................................................................................................... 7
18

**California Statutes**
19

20
Cal. Code Reg., Title 15
  § 3044(c)(6)(A), (g)(3)(C) ........................................................................................ 89

21
**Other Authorities**

22
Black's Law Dictionary (11th ed. 2019) ........................................................................ 72

23
Fed. R. Civ. P.
24
  53(e)(2) .......................................................................................................................... 3
  53(f) ................................................................................................................................ 3
25
  53(f)(3) ....................................................................................................................... 3, 4
  53(f)(4) ....................................................................................................................... 3, 4
26

27
Hayes, L.M. (2013).  Suicide prevention in correctional facilities: Reflections and
  next steps.  *International Journal of Law and Psychiatry, 36*, 188-194 ..................... 9

28

1
2

U.S. Attorney General, *Review of the Use of Monitors in Civil Settlement
Agreements and Consent Decrees Involving State and Local Governmental
Entities*, U.S. Department of Justice (September 13, 2021) at 4-6 ........................................ 22

3
4

Zhong, S., Senior, M., Yu, R., Perry, A., Hawton, K., Shaw, J., & Fazel, S.  (2021).
Risk factors for suicide in prisons: a systematic review and meta-analysis.
*Lancet Public Health 2020; 6*: e164-74 .................................................................. 12

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

20681936.1

## I.    INTRODUCTION

On March 1, 2024, the Special Master submitted his "Special Master's Report on his Expert's Sixth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (CDCR) and Re-Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs." (ECF No. 8143 [Sixth Re-Audit].) In the report, the Special Master and his expert, Mr. Lindsey Hayes, found that following the Sixth Re-Audit CDCR successfully implemented one of the fifteen remaining suicide prevention recommendations outlined in the Court's December 24, 2020 Order. (*Id.* at 8 [providing that CDCR successfully implemented recommendation 20].) Additionally, Mr. Hayes re-audited CDCR's suicide prevention practices in the Psychiatric Inpatient Programs (PIPs), but concluded that a determination of full and durable implementation of his initial sixteen recommendations would be deferred until the next re-audit. (*Id.* at 16.) The Special Master outlined the recommendations that require further work in the section of his report titled, "Conclusion and Recommendations." (*Id.* at 16-17.)

Since the Special Master's Fifth Re-Audit Report, CDCR has activated its Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator audit program. The program allows CDCR to use real-time data to better understand its compliance with each one of the Court's suicide prevention recommendations outside of Mr. Hayes's annual tour cycle. CDCR has also made significant progress in the remediation of indicators related to suicide prevention through the data remediation process. Mr. Hayes's participation in that process has given CDCR some insight into his monitoring methodology and has allowed CDCR to better assess its system and compare its findings with Mr. Hayes's report—something CDCR has never been able to do before this year. This has allowed CDCR to provide a more fulsome response to the Special Master's suicide reporting to date.

Defendants generally object to the filing of the Special Master's report without first providing CDCR with a draft so that they could demonstrate compliance. Doing so was prejudicial in light of the possibility of upcoming contempt proceedings and the Court's prior order specifically contemplating that Defendants would have an opportunity to demonstrate compliance

after April 1, 2023 but before the filing of the Sixth Re-Audit report. Defendants also maintain their general objection to Mr. Hayes's monitoring of the Court's suicide prevention recommendations conflates compliance with implementation. Similarly, Defendants maintain their general objection to Mr. Hayes's concept of full implementation which applies perfect, or near perfect, compliance standards for establishing full compliance with his recommendations. Defendants also generally object to Mr. Hayes's report because it fails to show a correlation between implementation of his recommendations and self-harm events, completed suicides, or an increase in suicide risk. Additionally, Defendants generally object on the grounds that Mr. Hayes's recommendations are too vague and overbroad to be useful for correcting past staff behaviors. Furthermore, Defendants generally object on the grounds that Mr. Hayes's new findings are not related to the core requirements of several recommendations and his findings of noncompliance are therefore improper. And, Defendants also generally object to the bar graph titled "Table 3" at page 12 of Mr. Hayes's report on the grounds that it is misleading.

Separately, Defendants raise various specific objections to Mr. Hayes's findings that CDCR is noncompliant with several recommendations. For several recommendations where Mr. Hayes found noncompliance, CDCR can demonstrate compliance using the reports generated by CDCR's Regional SPRFIT Coordinators who conduct regular suicide prevention audits at their assigned institutions. These audits are conducted using a standardized audit tool called the Suicide Prevention Continuous Quality Improvement Tool Guidebook ("SP CQI Guidebook"). (Declaration of Travis Williams, PsyD, CCHP-MH ("Williams Decl."), ¶ 9, Ex. A [SP CQI Guidebook].) The SP CQI Guidebook is reviewed and updated on a quarterly basis to ensure alignment with current policy and current audit and data gathering methodology and contains all of Mr. Hayes's nineteen Suicide Prevention Audit Checklist measures. (*Id*.) The relevant audits have been presented to stakeholders through the ongoing data remediation process and most have been remediated by the Special Master's data expert. (*Id*.) Based on the reports generated by the SPRFIT Audits, CDCR specifically objects to various of Mr. Hayes's findings, conclusions, and recommendations as described below.

/ / /

## II.    LEGAL STANDARD

The Order of Reference states that "[p]ursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the special master's findings of fact unless they are clearly erroneous." (ECF No. 640 at 8:18-20 [Order of Reference, Dec. 11, 1995].) However, Rule 53 was "revised extensively" in 2003, and notably, the standard of review was changed for findings of fact made or recommended by a master.  *See* Fed. R. Civ. P. 53(f) advisory committee's note to 2003 amendment. Rule 53(f)(3) now states that "[t]he court must decide de novo all objections and findings of fact made or recommended by a master, unless the parties, with the court's approval," stipulate otherwise. The parties have not done so here.

Back in 2009, the Court ruled that:

> The question of whether the provisions of Fed.R.Civ.P. 53(f)(3) should apply in these proceedings has not been briefed by the parties, and plaintiffs cite no authority mandating its application. Accordingly, the findings cited by defendants will be reviewed under the "clearly erroneous" standard set forth in the December 11, 1995 Order of Reference.

(ECF No. 3731 at 1 n.1.) Thereafter, in 2013, the Court again considered the application of rule 53(f)(3) to this case. It ruled that: "All reports provided by the Special master to the parties in accordance with the Order of Reference filed December 11, 1995 (Doc. No. 640) are reviewed under the standards set forth in that order." (ECF No. 4925 at 1 n.1; *accord* ECF Nos. 7605 at 1 (applying clear error review), 7608 at 1-2 (same), 7609 at 2 (same), 7688 at 1 (same), 7808 at 2 (same).) However, when a report <u>is not</u> provided by the Special Master to the parties in accordance with the Order of Reference, the Court concluded that rule 53(f)(3)'s *de novo* standard of review applies.[1] (*See* ECF No. 4925 at 1 n.1.)

Here, the Special Master did not provide the parties his Sixth Re-Audit Report

---

[1] Defendants to not concede that the Court's 2013 Order is a correct interpretation of the impact rule 53's 2003 amendment had in this case. Indeed, case law shows that a district court errs when it reviews a special master's findings and conclusions for clear error where the parties have not so stipulated. *See Language Line Services, Inc. v. Language Services Associates, Inc.*, 500 Fed.App'x. 678, 682 (9th Cir. 2012) (holding that in a case dealing with a special mastership "the district court erroneously applied a clear error standard of review to the Master's findings of fact and conclusions of law instead of conducting de novo review. Fed.R.Civ.P. 53(f)(3), (4).") Thus, Defendants maintain that the Court must always review the Special Master's findings of fact and conclusion of law de novo unless the parties stipulate to clear error review, regardless of the 1995 Order of Reference.

1   pursuant to the procedure outlined in the Order of Reference. Instead, he filed the report

2   directly with the Court. Thus, pursuant to this Court's own prior order (ECF No. 4925) and

3   Federal Rule of Civil Procedure 53(f)(3), the Court must review the findings of fact made

4   or recommended by the Special Master *de novo*. The Court must also review *de novo* any

5   conclusions of law made or recommended by the Special Master. (Fed. R. Civ. P.

6   53(f)(4).) Under the *de novo* standard of review, the Court does not defer to the Special

7   Master's findings or conclusions, but must freely consider the matter anew, as if no

8   findings or conclusions had been rendered. *See United States v. Silverman*, 861 F.2d 571,

9   576 (9th Cir. 1988).

### III.    GENERAL OBJECTIONS

**A.    The Filing of the Special Master's Report Without First Providing CDCR with a Draft to Demonstrate Compliance is Prejudicial in Light of the Court's Contemplated Contempt Proceedings.**

13   In its February 28, 2023 order, the Court ruled that fines would start accruing at a rate of

14   $1,000 per day per outstanding suicide prevention recommendation per institution beginning on

15   April 1, 2023. (ECF No. 7743 at 4.) The Court further ordered that, in the event CDCR came into

16   compliance after April 1, 2023, it "would consider what fines if any should be imposed." (*Id.*)

17   Because of the time gap between the completion of Mr. Hayes's Sixth Re-Audit and the

18   filing of his report, the Special Master has discretion to allow Defendants to informally

19   demonstrate that they have completed work on outstanding recommendations after the April 1,

20   2023 deadline set by the Court's order, but before the deadline for filing formal objections. (*See*

21   *id.*) However, on February 26, 2024, by minute order, the Court directed the Special Master to file

22   his final report directly with the Court—thereby cutting off Defendants' ability to informally

23   demonstrate compliance. (ECF No. 8137.) This has prejudiced Defendants, particularly in light of

24   the massive fines they may face if they are subsequently found in contempt of the Court's order

25   adopting the Special Master's suicide prevention recommendations. Accordingly, Defendants

26   generally object to having to formally respond to the Special Master's report without first having

27   the opportunity to informally demonstrate compliance.

28   Nonetheless, and as explained in § IV. *infra*, CDCR can demonstrate compliance with

1  many of the suicide prevention recommendations despite Mr. Hayes's finding of noncompliance

2  during his Sixth Re-Audit.

3     **B.      Defendants Maintain Their General Objection That the Special Master's Monitoring of the Court's Suicide Prevention Recommendations Conflates Compliance With Implementation.**

5     As before, Defendants continue to object to the Special Master conflating the concept of

6  compliance with implementation.[2] (*See* ECF No. 7654 at 4-6.) The Eighth Amendment only

7  requires Defendants to establish a "basic program for the identification, treatment, and supervision

8  of inmates with suicidal tendencies." *Balla v. Idaho State Bd. Of Corr.*, 595 F. Supp. 1558, 1577

9  (D. Idaho 1984). In other words, the Constitution only demands that a suicide prevention program

10  be implemented—not that it be perfectly applied. *See Taylor v. Barkes*, 575 U.S. 822, 826 (2015)

11  (*per curiam*) ("No decision of [the United States Supreme] Court establishes a right to the proper

12  implementation of adequate suicide prevention protocols."). Here, it is clear that Mr. Hayes has a

13  different understanding of implementation which means that all staff at all institutions must carry

14  out the letter of each suicide prevention recommendation at 90-100 percent. (*See, e.g.,* ECF No.

15  8143-1 at 1 ["When appropriate, necessary corrective actions are again offered to accelerate the

16  defendants' **full compliance** with the initial court-approved recommendation."]; *and id.* at 9

17  ["Other areas, such as clinical and custody follow-up from discharge and SPRFIT responsibilities

18  (e.g., quorums, local operating procedures, tracking of corrective action plans, etc.) showed

19  improvement, **but were still below the 90 percent threshold for compliance**."].) Both of these

20  examples demonstrate that the Constitutionally required policies have been implemented. Yet, the

21  reported status of the recommendations confuses the concepts of implementation of

22  policies/processes to remedy and address the suicide prevention recommendations with

23  institutional staff's compliance with those policies/processes. Thus, Defendants maintain their

24  general objection to this improper monitoring practice.

25  / / /

26

27  [2] Defendants' acknowledge the Court's prior order (ECF No. 7696), overruling a similar objection to Mr. Hayes's Fifth Re-Audit report. However, Defendants respectfully re-state their objection to avoid waiver/forfeiture concerns as to the Sixth Re-Audit report.

28

**C.    Defendants Also Maintain Their General Objection to Mr. Hayes's Concept of Implementation Which Applies Perfect, or Near Perfect, Compliance Standards.**

Defendants similarly maintain their general objection to Mr. Hayes's concept of implementation, which applies the 90-percent or 100-percent compliance standards for establishing full compliance with his recommendations.[3] (ECF No. 7654 at 5-6.) The Eighth Amendment requires Defendants to establish a "basic program for the identification, treatment, and supervision of inmates with suicidal tendencies" as a "necessary component of any mental health treatment program." *Balla*, 595 F. Supp. at 1577; *see, also,* ECF No. 612 at 23:8-13 (quoting *Balla* with approval for its description of the basic components of a constitutionally adequate system). However, the Eighth Amendment does not mandate that prisons eliminate all suicide risks. *See, e.g.*, *Miller v. Harbaugh*, 698 F.3d 956, 962–65 (7th Cir. 2012).

As explained above, the Special Master's report here demands more than the Constitutional requirement that prisons have in place a "basic program for the identification, treatment, and supervision of inmates with suicidal tendencies." *Balla*, 595 F. Supp. at 1577. The report fails to establish a relationship between CDCR's suicide rate, actual completed suicides, and the State's suicide prevention policies and procedures. Mr. Hayes's findings related to the implementation status of the remaining 15 recommendations and the reassessment of the 21 audited CDCR facilities (ECF No. 8143-1 at 15-69), demonstrates that CDCR has a suicide prevention program in place with at least some level of compliance—if not, substantial compliance—at each institution, a way to identify deficiencies, and a Corrective Action Plan (CAP) process to address deficiencies. Nothing more is required under the Eighth Amendment. *See Taylor*, 575 U.S. at 826.

To reiterate, implementation of the suicide prevention recommendations should focus on the actual development and application of a policy, plan, or audit that makes up CDCR's durable suicide prevention program. Mr. Hayes's requirement of 90-percent and 100-percent compliance

---

[3] As before, Defendants' acknowledge the Court's prior order (ECF No. 7696), overruling a similar objection to Mr. Hayes's Fifth Re-Audit report. However, Defendants respectfully re-state their objection to avoid waiver/forfeiture concerns as to the Sixth Re-Audit report.

1    to establish systemic constitutional compliance is virtually unachievable, is inconsistent with the

2    Prison Litigation Reform Act's needs-narrowness-intrusiveness requirements, and is also at odds

3    with Ninth Circuit jurisprudence. *See* 18 U.S.C. § 3626(a)(1)(A); *Rouser v. White*, 825 F.3d 1076,

4    1082 (9th Cir. 2016) (holding that the term "substantial compliance" in the context of a prison-

5    reform consent decree "doesn't require perfection"). The fixation on near-perfect or perfect

6    numerical compliance measures overlooks the robust self-monitoring mechanisms and policies

7    that have already been implemented by CDCR, and they are divorced from the Constitutional

8    minimums which must govern this case.

9        Separately, the theory that successful implementation and full compliance with all of Mr.

10   Hayes's recommendations is necessary to "demonstrate both [Defendants'] comprehension and

11   ability to execute" (ECF No. 7636 at 31), is unreasonable. Some recommendations simply do not

12   lend themselves to 90-percent or 100-percent compliance. For example, Recommendation No. 20

13   provides that "CDCR should develop a corrective action plan (CAP) to ensure that supervising

14   nursing staff regularly audits psych tech practices during daily rounds of mental health caseload

15   IPs in administrative segregation and during weekly and bi-weekly rounds in the SHUs." (ECF

16   No. 5258 at 7.) Implementation of the recommendation should be judged on whether the CAP was

17   implemented as directed—which it was. (*See* Williams Decl. ¶ 6.) But as is apparent, all

18   recommendations are not created equal. Compliance with some recommendations can be achieved

19   through policy implementation while compliance with others would require line staff's perfect and

20   strict adherence to policies without exception or consideration for the environment in which they

21   work, or acknowledgement of the fact that they are humans and humans make mistakes.

22       Moreover, there are other ways to monitor and improve compliance with critical suicide

23   prevention tasks. (Declaration of Joel T. Andrade, Ph.D., LICSW, CCHP-MH ("Andrade Decl.") ¶

24   21.) For instance, Recommendation 21 reads as follows, "CDCR should enforce its Program

25   Guide requirements authorizing only the two levels of observation which may be provided for

26   suicidal IPs: (1) observation at staggered intervals not exceeding every 15 minutes on Suicide

27   Precaution, and (2) continuous observation for IPs on Suicide Watch." (*Id.*) This recommendation

28   requires 100% compliance, which is highly unlikely due to (1) the fact that there are millions of

such checks required each year and (2) these checks are conducted by individuals, so human error will inevitably result in less than the 100% compliance threshold. (*Id.*) In other words, if one 15-minute check out of millions is missed, then the entire system fails. (*Id.*) That being said, this is an extremely important area for a Suicide Prevention Program that requires constant vigilance and monitoring. (*Id.*) An alternative to the current process would be to establish a review process at each facility that identifies areas that fall below a more reasonable threshold (such as 90%) for such an important task. (*Id.*) Areas that should be analyzed to understand the cause of non-compliance with checks with the goal of improving compliance include, but are not limited to, time of day, day of week (i.e., weekend versus weekday), holidays, and individual staff members. (*Id.*) Monitoring this at the site-level with these or similar criteria to monitor, will allow the CDCR system to more quickly identify the root cause of the specific issues and provide training, corrective action, or in some cases, staff specific counseling, to remedy this important area. (*Id.*)

Mr. Hayes recognizes that CDCR's suicide prevention program is in place and demands perfect or near-perfect implementation. With tens of thousands of services offered, there must be an acceptable percentage of non-compliance. After all, neither the Constitution nor the Eighth Amendment demands perfection. *Rouser*, 825 F.3d at 1082.

### D.    Mr. Hayes's Report Fails to Show a Correlation Between the Implementation of His Recommendations and Self-Harm Events, Completed Suicides, or an Increase in Suicide Risk.

Mr. Hayes fails to provide a correlation between the perfect implementation of his recommendations and self-harm events, completed suicides, or an increase in suicide risk. Indeed, some requirements outlined in the Program Guide and attached memos result in an institution's inability to pass a section of an audit even though clinical care is not negatively affected. (Andrade Decl. ¶ 14.) One example is the requirement that a psychologist (or psychiatrist) complete the SRASHE for individuals within 72 hours of admission and upon discharge from the PIP. (*Id.*) Based on these criteria it was found that only 61% of facilities met this requirement, whereas 98% of SRASHEs were completed in the timeframes outlined in the Program guide, but 39% of these were completed by licensed clinical social workers "who, pursuant to policy, were not authorized to complete the assessments." (*Id.*) On page 313 of the Sixth Re-audit Report it states: "although

20681936.1

98 percent (41 of 42) of discharge SRASHEs were completed in a timely manner, only 61 percent (25 of 41) of the assessments were completed by licensed psychologists (or psychiatrists). In fact, 39 percent (16 of 41) of the discharge SRASHEs were completed by licensed clinical social workers who, pursuant to policy, were not authorized to complete the assessments." (ECF No. 8143-1 at 313.) The fact that licensed clinical social workers can conduct such assessments in the community as well as in correctional settings in other jurisdictions is persuasive and indicates that clinical care can be provided by this classification, including their proper and appropriate completion of a suicide risk assessment. (*Id.*) Nonetheless, the outdated standard utilized under the Program Guide and audited as part of the Sixth Re-Audit review makes it nearly impossible for CDCR to pass such items on an audit. (*Id.*) A discussion of the important role clinical social workers play in conducting suicide risk assessments in correctional mental health settings, is provided in a 2013 journal article[4] by Mr. Lindsay Hayes that states:

> By far the most difficult decision in the area of suicide precaution is the determination that an inmate is no longer suicidal and can be discharged from suicide precautions. That decision must always be made by a qualified mental health professional (QMHP) following a comprehensive suicide risk assessment. Why would we want such critical decisions to be made by anyone other than a licensed, masters-level or above clinician? According to national standards, a QMHP would include a psychiatrist, psychologist, psychiatric social worker, psychiatric nurse, and others by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients (NCCHC, 2008). These decisions must be respected by non-QMHP staff. Decisions by non-QMHPs that result in bad outcomes incur unnecessary liability.

Mr. Hayes's failure to analyze whether technical and perfect implementation of every recommendation would actually result in the prevention of any suicide or related harm is therefore objectionable.

**E.      Mr. Hayes's Findings and Conclusions Are Based on Faulty Methodology and Objectively Unverifiable Evidence.**

Mr. Hayes's analysis is based on faulty methodology and objectively unverifiable evidence. For example, Mr. Hayes reports that staffing shortages "have resulted in struggles to provide even routine clinical contacts to MHSDS IPs which in turn has resulted in increasing

---

[4]   Hayes, L.M. (2013).  Suicide prevention in correctional facilities: Reflections and next steps. *International Journal of Law and Psychiatry, 36*, 188-194.

1  frustration amongst IPs. Not surprisingly, there have been increases in mental health crises and/or

2  discord by IPs throughout CDCR prisons, resulting in incremental increases in emergent/urgent

3  mental health referrals, use of alternative housing and subsequent MHCB rescissions, and

4  discharge custody follow-up assessments. Of note, only MHCB censuses have remained static."

5  (ECF No. 8143-1 at 11-12.) However, Mr. Hayes provides no objective evidence to support this

6  leap in his analysis. He makes no effort to link staffing shortages to actual suicide attempts or self-

7  harm or completed suicides.

8      Mr. Hayes's findings and recommendations are also inconsistent with his own reported

9  data, and ignore relevant facts. To give just one example, Mr. Hayes compares CDCR's suicide

10  rate for 2023 with nationwide rates in 2019. (ECF 8143-1 at 86.) However, he provides no

11  justification for why 2023 and 2019 are comparable years—they are not.

12      Indeed, despite a significant decrease in the rate of deaths by suicide in state prison

13  systems from the 1980's to the early 2010's, over the past 10 years we have seen nearly a doubling

14  of the suicide rate in state prisons in the United States. (Andrade Decl. ¶ 17.) All systems, even the

15  most progressive, struggle with this issue and many have recently realized significant increases in

16  the overall rate of suicide. (*Id.*) Between 2000 and 2013, the suicide rate for incarcerated

17  individuals within state prison systems was fairly consistently found between 14 and 17 per

18  100,000. (*Id.*) Beginning in 2014, a steady increase in this rate began. (*Id.*) The most recent data

19  available from the Department of Justice Bureau of Justice Statistics is from 2019, with a rate of

20  27 suicides per 100,000. (*Id.*) There is no data available from the Bureau of Justice Statistics (BJS)

21  since 2019, so the effects of COVID and significant decreases in the overall incarceration rate in

22  some states, such as California, have not been analyzed. (*Id.*)  Below is a line graph to illustrate:

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

20681936.1

Graph 1:



(*Id.*)

Although there is not available data from BJS on completed suicides within state prison systems since 2019, a recent study of all deaths within the Federal Bureau of Prisons found that: (1) suicide accounted for more than half of all deaths within the study timeframe (from 2014 to 2021), and (2) there was a trend of increased suicide over the course of the study. (*Id.* ¶ 18.) Below is a line graph to illustrate the results:

Graph 2:



(*Id.*)

As more data becomes available through the BJS, it will be important to understand how systems who have realized significant decreases in overall population, will likely have increased

1   rates of suicide per 100,000 incarcerated individuals for two reasons. (*Id.* ¶ 19.) First, statistically,

2   as the overall number of incarcerated individuals in a system decreases, the weight of each death

3   by suicide increases the overall rate. (*Id.*) Second, when examining criminal risk factors for

4   completed suicide in prison systems, the research finds that those who are incarcerated for violent

5   offenses are at increased risk for completed suicide (see meta-analysis 2021[5]). (*Id.*) With

6   decreases in overall incarceration, the population that remains incarcerated are inherently higher

7   risk due to their higher likelihood for being incarcerated for a violent offense. (*Id.*) In fact, the

8   most recent data from BJS from December 2021[6] indicates that California has the highest rate of

9   individuals incarcerated for a violent offense (84.3%) with only one other state (Alaska) having

10  more than 80%, and only three other states above 70% (Maryland, Massachusetts and Rhode

11  Island). (*Id.*) CDCR's robust Suicide Case Review process will allow the Department to

12  understand the unique risk factors and needs within its population and work towards addressing

13  those risks and needs. (*Id.*)

14      Finally, Defendants note that Mr. Hayes recites prior orders that compliment his

15  methodology—but none of that cures his refusals to provide more detailed reports on the specific

16  data he relies on to support his findings. (ECF 8143-1 at 2-4.) Thus, his methodology applied to

17  objectively unverifiable evidence is objectionable.

18  **F.    Mr. Hayes's Recommendations Are Too Vague and Overbroad To Be Useful**
19  **for Correcting Past Staff Behavior and CDCR Processes, and are Therefore**
    **Problematic.**

20      Mr. Hayes's recommendations are both vague and overbroad. To start, Mr. Hayes's

21  methodology of finding the entire CDCR system deficient for a specific recommendation based on

22  dividing the number of non-compliant facilities by the number of compliant facilities is

23  problematic for two reasons. (Andrade Decl. ¶ 12.) First, it does not ensure that every facility

24  achieves compliance (only 90% of facilities), and second, it wastes monitoring resources to

25

26  _____

27  [5]  Zhong, S., Senior, M., Yu, R., Perry, A., Hawton, K., Shaw, J., & Fazel, S.  (2021).  Risk factors for
    suicide in prisons: a systematic review and meta-analysis.  *Lancet Public Health 2020; 6*: e164–74.
28  https://doi.org/10.1016/S2468-2667(20)30233-4

    [6] Carson, E. A. (2021). *Prisoners in 2020–Statistical tables. NCJ*, 302776, 1-50.

20681936.1

continue to monitor sites that have shown compliance. (*Id.*) To illustrate the first point, if 18 of 20 facilities show compliance with one of Mr. Hayes' recommendations (which is 90% of facilities) the monitoring will end; however, at two facilities the issues may still remain. (*Id.*) Alternatively, if 17 of 20 facilities are compliant, which falls below the 90% threshold, all 20 facilities will require further monitoring, which is a waste of monitoring resources by monitoring the 17 facilities that are in compliance. (*Id.*)

A more productive, and clinically focused strategy would be to identify the issues at each specific facility and to conduct individualized corrective action (in the form of CQI) to correct the identified issue at the institutional level. (*Id.*) Facilities that meet (or far exceed) the recommendations in the Sixth Re-Audit Report should come out of the oversight for suicide prevention so that monitoring resources can be redistributed to those non-compliant facilities so that they, too, can come into compliance. (*Id.*) This will ensure that all facilities achieve compliance and resources are used appropriately to monitor areas in need of improvement. (*Id.*) It is typical in correctional systems for some facilities to perform at a much higher level and others at a much lower level. (*Id.*) As such, this individualized approach allows for more expeditious identification of specific needs and resolution of recommended changes. (*Id.*) This approach also allows the system to more quickly (1) focus on facilities that require the most attention, and (2) identify new areas of concern and implement appropriate corrective action. (*Id.*) This improved process would result in more rapidly identifying and addressing problem areas resulting in significantly improved care throughout the entire system. (*Id.*) The current process utilized to review suicide prevention, as outlined in the Sixth Re-Audit report (and previous reports), slows down this potential progression significantly. (*Id.*)

Additionally, due to the size of CDCR, improving this process to more quickly and nimbly address and resolve issues is essential to realizing system-wide improvements in a much more expeditious manner. (*Id.* ¶ 13.) The field of correctional mental health has moved rapidly over the past decade to meet the individual needs of each incarcerated individual. (*Id.*) For example, providing possessions and privileges (such as recreation, visits, phone calls, etc.), as well as out-of-cell interventions (such as group therapy or recreation groups) for individuals on suicide

-13-

1   precautions is becoming more commonplace. (*Id.*) These strategies more appropriately engage

2   patients at the individual level and provide targeted interventions to address individualized needs.

3   (*Id.*) These strategies are similar to those currently implemented in CDCR's MHCB. (*Id.*) While

4   there is a long way to go to ensure such quality care for all incarcerated individuals in the United

5   States, correctional systems must be able to more rapidly and individually (at least at the site level)

6   identify the unique needs specific to that location in order to apply the appropriate resolutions.

7   (*Id.*) As it relates to the Sixth Re-Audit report, it was reported that clinical staff approved

8   possessions and privileges, but in some cases, these were not received by the incarcerated

9   individual. (*Id.*) The reasons for this will vary widely between facilities, and each requires an

10  individualized corrective action plan to remedy the specific cause of non-compliance. (*Id.*) But the

11  current process of review does not allow for the rapid and specific corrective action response

12  necessary to remedy the problem timely. (*Id.*)

13          The Sixth Re-Audit report is also problematic in that it does not clearly identify where

14  each institution falls in terms of compliance and requires the reader to review the appendices and

15  make inferences to determine compliance. (Andrade Decl. ¶ 20.) For instance, Recommendation

16  31 reads as follows, "CDCR under the guidance of the Special Master, should re-examine and

17  revise its local SPRFIT model to make the local SPRFITs a more effective quality

18  assurance/improvement tool."  (*Id.*) On page 52 of the Sixth Re-Audit report it describes

19  measuring compliance with the recommendation as: "The current assessment focused on five areas

20  of Recommendation 31: 1) the degree to which SPRFITs achieved six consecutive months of

21  meeting quorums for all mandatory members or their designees; 2) the degree to which each

22  SPRFIT conducted either semi-annual RCAs or clinical case summaries of serious suicide

23  attempts when appropriate; 3) the degree to which each SPRFIT tracked IPs in the Suicide Risk

24  Management Program (SRMP) and reviewed them during monthly meetings as required by

25  policy; 4) the degree to which facilities had local operating procedures (for SPRFIT, Inmate-

26  Patients Receiving Bad News, SRMP, and CIT); and 5) the degree to which each SPRFIT tracked

27  prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians." (ECF

28  No. 8143-1 at 52.) A review of the Sixth Re-Audit report shows that it is very difficult to

-14-

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

1  understand which facilities were found deficient with each of these five areas used to measure

2  Recommendation 31. (*Id.*) It should not be challenging to identify which institutions have attained

3  compliance and which have not. (*Id.*) A more streamlined process that lists compliance with each

4  item at each facility would enable more expeditious compliance. (*Id.*)

5      Separately, the structure of certain recommendations—which contain numerous subparts—

6  are also overbroad, resulting in a significant impediment to compliance. (Andrade Decl. ¶ 22.) For

7  instance, Recommendation 32 reads as follows, "CDCR, under the guidance of the Special Master,

8  should examine and consider taking reasonable corrective actions to address these additional

9  miscellaneous issues: **Possessions and Privileges for IPs in MHCBs, Continuous Quality**

10  **Improvement, and Reception Centers**. *See* ECF No. 6879 at 24-25 for specific discussion of

11  remaining parts of this recommendation to be implemented." (*Id.*)  Recommendation 32 is difficult

12  to gain compliance with as within each of these miscellaneous areas are numerous additional

13  requirements. (*Id.*) For example, part of the review of Continuous Quality Improvement, requires

14  numerous CQI activities, as well as complying with the reviewer's "Suicide Prevention Audit

15  Checklist" which includes 19 measures.  The measures were: 1) Observation of R&R intake

16  screening by nursing/RC screening by diagnostic clinicians; 2) Confirming R&R/RC screening

17  completeness and privacy and confidentiality; 3) Administrative segregation new intake IPs

18  housed in retrofitted new intake cells for 72 hours; 4) Psych Tech rounds in administrative

19  segregation, SHU, and PSU; 5) Guard One compliance in administrative segregation, SHU, and

20  PSU; 6) SRASHEs required for emergent/urgent mental health referrals for SI/SIB/SA; 7) Use of

21  Alternative Housing; 8) Suicide-resistant MHCBs; 9) SRASHEs required for admission/discharge

22  in MHCB and alternative housing; 10) Observation of MHCB patients; 11)

23  Clothing/property/privileges orders for MHCB patients; 12) Safety planning for suicidal patients

24  in MHCBs; 13) Five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and

25  Psychiatric Inpatient Program (PIP) returns; 14) Clinical and Custody 30-minute Discharge

26  Checks for non-ASU IPs returning from MHCB, Alternative Housing, DSH, and PIP (Form

27  7497); 15) Emergency response equipment in housing units; 16) CPR training for custody and

28  medical staff; 17) Annual suicide prevention training for custody, medical, and mental health staff;

-15-
DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

1    18) SRE Mentoring/7-hour SRE training/Safety Planning training for clinicians; and 19) SPRFIT

2    responsibilities." (*Id.*) Because there are so many requirements embedded within one overarching

3    requirement, compliance is nearly impossible.[7] (*Id.*)

4        Accordingly, Defendants generally object to Mr. Hayes's findings and conclusions on

5    vagueness and overbreadth grounds.

6    **G.    Mr. Hayes's Findings Are Not Related to the Core Requirements of Several
              Recommendations and His Findings of Noncompliance are Therefore**

7    **         Improper.**

8        Many of Mr. Hayes's findings must be rejected because they are unrelated to the plain

9    language of the Court-ordered recommendations at issue. This creates moving targets for CDCR's

10   implementation of his various recommendations which are impossible to achieve. To start, Mr.

11   Hayes's findings that CDCR is noncompliant with a Court ordered recommendation must be, at a

12   minimum, grounded in the plain language of that recommendation—he failed to do so with several

13   of the recommendations.

14       For instance, Mr. Hayes found eight institutions noncompliant with Recommendations 7

15   and 8, "Initial Health Screening and Receiving and Release Unit Environment" not because the

16   "nurse's office [was not] of sufficient size to conduct adequate intake screening,"

17   (Recommendation 7) or because staff were not ensuring that "safety…remain the top priority

18   during intake screenings" (Recommendation 8), but because a nurse omitted or compounded some

19   questions during the screening. (ECF No. 8143-1 at 16; *see, also,* Andrade Decl. ¶ 15 [evaluating

20   how Mr. Hayes's auditing adds additional requirements to Recommendation No. 7].) Furthermore,

21   in three of the institutions at issue, Mr. Hayes even conceded the screening was done in a

22   confidential setting (CHCF, CMC, and SQ), yet still recommended the development of a CAP for

23   the "intake screening process" generally. (*Id*.) That recommendation is overbroad and should

24   therefore not be adopted by the Court.

25       Likewise, Recommendation 9 requires that CDCR "revise its SRE Mentoring Program to:

26   (1) eliminate its 'graduation' component after completion of two adequate assessments; (2)

27   _____

28   [7] Despite the onerous nature of these embedded requirements, and as explained further in § IV. L. 1., *infra*,
     Defendants can demonstrate compliance with Recommendation 32.

1    conduct ongoing mentoring throughout the year; and, (3) audit clinicians' SREs on a regularly

2    scheduled basis." (ECF No. 6879 at 19.) But, instead of auditing the three components of this

3    recommendation, Mr. Hayes audited other things entirely, such as whether certain trainings were

4    attended. (ECF No. 8143-1 at 36-39.) Recommendation 9 makes no mention of training schedules.

5    Yet, based only on compliance with certain training schedules unrelated to the plain language of

6    Recommendation 9, Mr. Hayes finds that CDCR has not complied with the recommendation. (*Id.*

7    at 39.) This too is improper and should therefore not be adopted as the official finding of the

8    Court.

9            Similarly, Recommendation 10 requires that "each facility's SPRFIT … audit the quality

10   of completed SREs on a monthly basis." (ECF No. 6879 at 19; *see, also,* Andrade Decl. ¶ 16

11   [evaluating how Mr. Hayes audits something different than what Recommendation No. 10

12   requires].) But Mr. Hayes does not audit whether the local SPRFITs conduct quality audits of

13   SREs. Instead, he audits how often the department completed its suicide risk assessment when

14   patients present with suicidal ideation or suicidal behavior. (ECF No. 8143-1 at 37.) Mr. Hayes

15   appears to only conduct chart reviews to determine if SRASHEs are being completed 100 percent

16   of the time for patients presenting with suicide risk. (*Id.*) Mr. Hayes's finding that CDCR is not

17   compliant with Recommendation 10 has nothing to do with whether "each facility's

18   SPRFIT….audit[s] the quality of completed SREs." This finding is improper because it is not

19   based on the required elements of the recommendations and it should not be adopted as the official

20   finding of the Court.

21          Recommendation 17 requires that CDCR comply with Recommendations 9 and 10. (ECF

22   No. 6879 at 19, (stating that "CDCR should adopt the recommendations made in connection with

23   SREs set forth above, which will also improve treatment planning contained in the SREs section

24   above").) Yet, instead of monitoring compliance with Recommendations 9 and 10, Mr. Hayes

25   instead monitored whether CDCR revised its policy on safety planning, determining how often

26   safety planning was completed, and determining how often supervisory reviews of safety planning

27   were occurring. (ECF No. 8143-1 at 40 et seq.) On its face, Recommendation 17 is redundant with

28   Recommendations 9 and 10. But, even so, that does not give Mr. Hayes license to rewrite the core

1  requirements of the recommendation. His finding that CDCR does not comply with

2  Recommendation 17 based on an unrelated audit is improper and should not be adopted as the

3  official finding of the Court.

4        Recommendation 20 requires that "CDCR . . . develop a [corrective action plan] to ensure

5  that supervising nursing staff regularly audit PT practices during daily rounds of mental health

6  caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the

7  SHUs." (ECF No. 7636 at 26.) Mr. Hayes does not audit whether CDCR developed that corrective

8  plan or whether supervising nurses regularly audit Psych Tech practices in Restricted Housing

9  Units. Instead, Mr. Hayes conducted his own audit of Psych Tech practices in these housing units.

10  (ECF No. 8143-1 at 16-17.) Mr. Hayes's findings based on this audit do not inform whether

11  CDCR has developed the corrective action plan or whether supervising nurses are conducting

12  audits. This is improper and should therefore not be adopted as the official finding of the Court.

13        Recommendation 31 requires CDCR, "under the guidance of the Special Master, [to] re-

14  examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality

15  assurance/improvement tool." (ECF No. 6879 at 23.) Mr. Hayes did not attend SPRFIT meetings

16  at the institutions where he conducted site visits. Instead, he only reviewed meeting minutes to

17  determine whether they recorded a quorum, tracked suicidal inmates, made corrective actions that

18  he recommended in past reports, and operated under the most up to date local operating

19  procedures. (ECF No. 8143-1 at 92-334.) Yet, without even attending a meeting, on-site or

20  remotely, he determined that for two thirds of CDCR institutions, the SPRFITs are not an

21  "effective quality assurance/improvement tool." (ECF No. 8143-1 at 8.) This defies common

22  sense, is improper and should therefore not be adopted as the official finding of the Court.

23        The Court should not find CDCR out of compliance with any of the above

24  recommendations because Mr. Hayes's audits are out of synch with what is actually required

25  under each recommendation. Accordingly, Mr. Hayes's findings and conclusions must be

26  disregarded.

27  / / /

28  / / /

**H.      Table 3 is Misleading in Mr. Hayes's report and also should be disregarded.**

In an attempt to draw a line between noncompliance and staffing, Mr. Hayes provides a bar graph, titled "Table 3," ostensibly comparing rates of emergent/urgent referrals, alternative housing, crisis bed rescissions, crisis bed census, and discharge custody checks across three points in time. (ECF No. 8143-1 at 12.) He provides this table to show "increases in mental health crises and/or discord by IPs throughout CDCR prisons, resulting in incremental increases in emergent/urgent mental health referrals, use of alternative housing and subsequent MHCB rescissions, and discharge custody follow-up assessments." (*Id.*) There are many errors with this table.

*First*, it uses three unequal points in time (April 2022, April 2023, and November 2023) in an attempt to illustrate a trend line. (*Id.*) Mr. Hayes, without basis, assumes demand remains equal across all points in time or all months in a year.

*Second*, Mr. Hayes's assertion that crises increased "throughout CDCR prisons" is also without basis. (Williams Decl. ¶ 7.) Mr. Hayes's point that the number of emergent/urgent referrals increased from about 2,900 to about 3,700 between April 2022 and November 2023 does not demonstrate that the number of emergent/urgent referrals increased at *all* CDCR institutions over that timeframe. (*Id.*) In fact, the increase is attributable to just five institutions whereas ten institutions had fewer referrals in November 2023 than they did in April 2022. (*Id.*)

*Third*, Mr. Hayes suggests that the table shows a statewide increase in crisis bed rescissions between April 2022 and April 2023. (ECF No. 8143-1 at 12.) But fifty-six percent of the increase came from just one institution, California State Prison, Los Angeles County, during that time period. (Williams Decl. ¶ 8.) Over the same time period, eight institutions saw a decrease in rescissions. (*Id.*)

*Finally*, Mr. Hayes claims the table shows a statewide increase in discharge custody checks (*i.e.* CDCR-7497 forms) between April 2022 and November 2023. Tellingly, he provides no data from April 2023 because this bar was "based on the number of CDCR-7497 packets provided by each audited facility and examined by [Mr. Hayes] during the fifth re-audit and sixth-reaudit assessment." (ECF No. 8143-1 at 12, fn. 5.) In other words, contrary to the bar graph, there were

not about 2,300 CDCR-7497 forms in April 2022 or about 3,400 CDCR-7497 forms in November 2023. Those numbers represent the aggregate number of 7497 forms collected by Mr. Hayes during the entirety of his fifth or sixth re-audit of CDCR. His sixth-reaudit alone took eight months. (ECF No. 8143-1 at 1.) This presentation is grossly misleading and should be disregarded.[8]

Mr. Hayes's conclusion that "[n]ot surprisingly, as seen by Table 3 . . . there have been increases in mental health crisis and/or discord" as a result of staffing challenges cannot be supported by Mr. Hayes's bar graph. (*Id.* at 12.) The graph relies on few data points, and an uneven interval that, by his own admission, aggregates months' worth of data into one point in time. It is improper and must be disregarded.

## IV.    SPECIFIC OBJECTIONS

### A.    Initial Health Screening and Receiving and Release Environment

Defendants object to Mr. Hayes's findings and conclusions regarding Initial Health Screening and Receiving and Release Environment. (ECF No. 8143-1 at 15-16.) Mr. Hayes's findings on Initial Health Screening and Receiving and Release Environment measures compliance with two recommendations:

- Recommendation 7. The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and

- Recommendation 8. Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.

(Special Master's Report on his Expert's Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, Appendix B, ECF No. 6879 at 27, 33-36; *see also*, ECF No. 8143-1 at 15-16.) In his Fifth Re-Audit, the

---

[8] Notably, Mr. Hayes's methodology for collecting 7497 forms is not disclosed in this report.

1    Special Master provided "a list of recommendations that remain to be completely and durably

2    implemented *and the steps defendants must take to do so*." (ECF No. 7636 at 21, emphasis added.)

3    According to that report, compliance with Recommendation 7 requires "defendants to ensure that

4    nurse's office doors are always closed and that nurses consistently ask all 15 mental health/suicide

5    risk questions on the Initial Health Screening form." (*Id.* at 23.) Compliance with

6    Recommendation 8 requires "similar" steps "to include the screening process completed outside

7    the presence of custody personnel." (*Id.* at 23-24.)[9]

8         During the current re-audit, Mr. Hayes concluded that "eight audited facilities were

9    observed to have problematic practices of nurses not asking all of the 15 mental health/suicide risk

10   questions [California Health Care Facility (CHCF), California Men's Colony (CMC), and San

11   Quentin(SQ)], not providing adequate privacy and/or confidentiality during the process [California

12   Correctional Institution (CCI), California Institution for Women (CIW), Salinas Valley State

13   Prison (SVSP), and Wasco State Prison(WSP)], or both [California Institution for Men(CIM)]."

14   (ECF No. 8143-1 at 16.) Defendants object to these findings for various reasons.

15        *First*, Defendants object to Mr. Hayes's finding that CDCR was noncompliant at CHCF,

16   CMF, and SQ for "not asking all of the 15 mental health/suicide risk questions." While the 15

17   questions are an important part of the intake assessment, that is not a requirement of the Court-

18   ordered recommendations. Recommendations 7 and 8, at issue here, pertain to confidentiality and

19   safety of staff and patients. However, absent from those recommendations is a requirement to ask

20   "all of the 15 mental health/suicide risk questions." CDCR objects to Mr. Hayes's findings as

21   improper and asks the court find CHCF, CMF, and SQ compliant with Recommendations 7 and 8.

22        *Second*, Mr. Hayes's findings of noncompliance are based on statistically insignificant

23

24   _____

25   [9] Mr. Hayes stated that "the steps required to achieve compliance" for Recommendation 8 are "identical" to
     those for Recommendation 7 in his Fourth Re-Audit. (ECF No. 6879 at 18.) In his Fifth Re-Audit,

26   however, he noted that the steps required to achieve compliance with Recommendation 8 "are similar" to
     those for Recommendation 7, noting that "[u]pon completion of the steps outlined for Recommendation 7

27   above, to include the screening process completed outside the presence of custody personnel, compliance
     with the implementation of Recommendation 8 will also be achieved." (ECF No. 7636 at 23-24.) Mr.

28   Hayes's reports lack clarity as to whether Recommendations 7 and 8 are "identical" or "similar" in his
     Sixth Re-Audit. If they are no longer identical, the Court should require an explanation.

samples to draw the conclusion that any of the eight institutions are systemically out of compliance. For instance, at CCI, CIM, and SVSP, Mr. Hayes made just one observation. (ECF No. 8143-1 at 116, 125, and 273.) He made two observations at SQ (*Id.* at 128), three at CHCF (*Id.* at 152), and four at CMC. (*Id.* at 254.) At WSP, Mr. Hayes made unspecified "multiple" observations (*Id.* at 101), and similarly did not state how many observations were made at CIW. (*Id.* at 121.) To the extent that the Court intends to levy fines for noncompliance, the record is insufficient to demonstrate sustained or systemic noncompliance at any of these institutions.

Regarding other findings of noncompliance, assuming Mr. Hayes's findings were accurate, CDCR has demonstrated compliance with these recommendations outside of Mr. Hayes's two or three-day visits to these institutions. The Court's February 28, 2023, order made clear that Defendants may "demonstrate to the Special Master and to Mr. Hayes that they have completed work on outstanding recommendations" and that "the final version of his sixth round re-audit report…shall identify with specificity the date on which he finds any affected recommendations were fully implemented." (ECF. No. 7743 at 4.) As discussed below, CDCR demonstrates this compliance by its Regional SPRFIT Coordinator audits and their reports.

CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains an audit for Initial Screening and Receiving and Release Environment. (Williams Decl., Ex. A at 107.)[10] The audit is based off an indicator, Observed Initial Health Screening in a Confidential Setting (SP10), which was remediated by the Special Master's data expert on April 3, 2023. (*Id.*)

_____

[10] There is no copy of Mr. Hayes's audit methodology appended to his Sixth Re-Audit. A review of the record similarly uncovered no copy of his audit methodology appended to any prior final audit report. Mr. Hayes makes passing reference to his "methodology" at the top of his Sixth Re-Audit report, though only by discussing where he visited, meetings he attended, and the topics of his report. (ECF No. 8143-1 at 2-4.) This is not a scientific methodology. By contrast, industry standards such as the National Commission on Correctional Health Care (NCCHC) are more prescriptive in outlining the CQI process so that institutions know exactly what is required. (*See* Andrade Decl. ¶ 23; see also U.S. Attorney General, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State and Local Governmental Entities*, U.S. Department of Justice (September 13, 2021) at 4-6, available at https://www.justice.gov/d9/pages/attachments/2021/09/13/review_of_the_use_of_monitors_in_civil_settlement_agreements_and_consent_decrees_involving_state_and_local_government.pdf (recommending as additional safeguards to special mastership monitoring the public disclosure of monitoring methodologies ).)

1    CDCR's Regional SPRFIT Coordinators conducted several audits at the eight institutions

2    during Mr. Hayes's 6th Re-Audit round. CDCR's specific objections for each institution are

3    below.

4                    **1.    California Correctional Institution**

5        During his April 20-21, 2023 visit to California Correctional Institution (CCI), Mr. Hayes

6    reported that "a nurse in the D-Yard nursing office at CCI emphatically stated that the door to the

7    office always remained open during the intake screening progress [*sic*]." (ECF No. 8143-1 at 16,

8    116.) Accordingly, Mr. Hayes found CCI noncompliant with Recommendation 8 (*see* ECF No.

9    8143-1 at 16) which requires that "[n]urse and officer safety should remain the top priority during

10   the intake screening process" and that "[i]f an inmate's security classification or unknown security

11   classification status creates a safety concern, the screening should be conducted in the least

12   restrictive setting that ensures both staff safety and inmate confidentiality." (ECF No. 7636 at 23.)

13   Mr. Hayes did not observe any screening on D-Yard, yet made his finding based only on a

14   statement by one nurse.

15       Unlike Mr. Hayes, CDCR's SPRFIT Coordinator did observe a D-Yard screening.

16   CDCR's Region 3 SPRFIT Coordinator audited CCI on January 19, 2023 and July 18, 2023.

17   (Declaration of Sean Mintz, Psy.D., ¶¶ 5 & 12, Ex. A & Ex. H.) During the January 19, 2023 visit,

18   the Regional SPRFIT Coordinator noted:

19           There was one screening observed on D yard on the day of this review and the nurse,
             despite not being a regular, did a thorough job. She asked all of the questions, did an
20           efficient mental status exam, and sought elaboration and clarification as indicated.
             While a referral to mental health was not indicated, the nurse ensured that the patient
21           was educated about the proper procedure for requesting services. The door to the
             room was closed to ensure confidentiality and although there was not a custody
22           officer directly outside of the door to observe the process, there was one posted in
             the immediate vicinity and the nurse had a personal alarm device.

23

24   (Mintz Decl. Ex. A, at 9-10.) Based on this information, it is clear that CCI's D-Yard was

25   compliant with Recommendation 8.

26       Mr. Hayes observed only one screening at CCI on B-Yard on April 21, 2023. "The nurse

27   was observed to be asking all required questions pertinent to mental health and suicide risk in that

28   case." (ECF No. 8143-1 at 16.) Mr. Hayes did not report any confidentiality issues with any of the

1   screenings actually observed at CCI. Thus, his findings that CCI was noncompliant with

2   Recommendation 8 should be disregarded.

3          As for C-Yard, during the July 18, 2023 visit, the Regional SPRFIT Coordinator reported

4   observing one screening:

> The screening took place in the minor procedures room with the door closed and a
> custody officer posted immediately outside. The nurse asked all the questions
> appropriately. A mental health referral was not warranted in this case, but the nurse
> took the time to ensure that the patient was educated on the use of inmate request for
> services (7362) forms should the need for services arise.

8   (Mintz Decl. Ex. H, at 8.)

9          In sum, Defendants' objections to Mr. Hayes's CCI findings are threefold. First, Mr. Hayes

10  did not actually view any instances of non-compliance. Second, Mr. Hayes's findings were based

11  solely on the word of one unnamed staff member. And third, CDCR's SPRFIT Coordinators

12  conducted reviews of CCI's practices and observed compliant intake screening. Mr. Hayes's

13  findings are unsupported, inconsistent with more detailed observations and are therefore an

14  insufficient basis for his sweeping conclusion that CCI is not in compliance. Based on the

15  evidence that CCI has come into compliance with Recommendation 8, the Court should find that

16  CCI has fully implemented the recommendation.

17              **2.    Wasco State Prison**

18         During his April 18-19, 2023 visit to Wasco State Prison (WSP), Mr. Hayes reported that

19  WSP lacked confidentiality in its temporary screening area while construction on the new clinic

20  was ongoing. (ECF No. 8143-1 at 16, 101-102.) He reported:

> During the on-site assessment of WSP, the facility was in the final stages of
> completing construction of a new reception center building to house medical intake
> screening and mental health diagnostic testing. As such, and similar to prior
> assessments, the medical intake screening process continued to be housed in the
> existing R&R unit area, with five nursing stations in close proximity of each other
> located in a large corner room. The issue of privacy and confidentiality at WSP will
> presumably be corrected with opening of the new reception center building . . . .

25  (*Id*. at 16.) Since his visit, WSP has opened its new medical clinic. Consistently, during the third

26  and fourth quarter audits in 2023, the CDCR Region 3 SPRFIT Coordinators observed compliant

27  and confidential screens during both visits.

28         Specifically, CDCR's Region 3 SPRFIT Coordinator visited WSP twice after its new

1   screening area opened in mid-2023. (Mintz Decl. Ex. J & Ex. N.) During the August 2023 site

2   visit, the CDCR Region 3 SPRFIT Coordinator observed adequate screening and noted that

3   "confidentiality for R&R screenings is no longer compromised." (*Id.*, Ex. J at 10.)

4          Separately, during the November 2023 site visit, the reviewer observed three additional

5   screenings, each conducted by different nurses. (*Id.*, Ex. N.) In all three cases, the nurse asked all

6   the questions appropriately and made appropriate determinations regarding mental health referrals.

7   The reviewer noted:

8          In two of the three cases, a follow up mental health contact was not indicated but the
           nurse still provided the patient with an educational packet regarding health care
9          services, as well as a healthcare services request form. In addition, the physical
           environment continues to be conducive to the process as screenings are conducted in
10         a confidential setting and suicide prevention posters in both English and Spanish
           were observed to be present in all three offices. This area also demonstrated
11         improvement since the last site review. The institution's local audit of this variable
           reported 100% compliance in the October 2023 SPRFIT committee meeting.
12

13   (*Id.* at 10.)

14          In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

15   reality of WSP's improved (and confidential) space. Moreover, Mr. Hayes's findings are at odds

16   with CDCR's August and November 2023 audits, which were conducted using the agreed upon

17   criteria, and which show that WSP is compliant with Mr. Hayes's recommendation. Mr. Hayes's

18   findings and conclusions are therefore stale and insufficient to support his sweeping conclusion of

19   noncompliance. In accordance with the Court's February 2023 order, because WSP has

20   demonstrated compliance with this recommendation since Mr. Hayes's April 2023 visit, the Court

21   should find that WSP has fully implemented the recommendation.

22              **3.    San Quentin Rehabilitation Center**

23          During his May 23-25, 2023 visit to San Quentin Rehabilitation Center (SQ), Mr. Hayes

24   reported that a nurse was observed not asking all of the questions and when queried about this, the

25   nurse reported that the omitted questions were unnecessary because a referral to mental health was

26   already going to be made. (ECF No. 8143-1 at 15, 128.) In another observation a second nurse

27   failed to ask a "bad news" question. (*Id.*) Due to these observations, Mr. Hayes found that the

28   screenings were inadequate. (*Id.*) Mr. Hayes, however, made no findings that SQ was out of

20681936.1

1  compliance with either Recommendations 7 or 8—regarding the size and confidentiality of the

2  nursing space. (See ECF No. 7636 at 23.) In fact, Mr. Hayes observed that "[t]he door to the

3  nurse's office was closed during both screenings, with a custody officer providing security in the

4  corridor." (ECF No. 8143-1 at 128.) Mr. Hayes thus confirmed SQ's compliance with

5  Recommendations 7 and 8 and his findings that SQ is noncompliant based solely on screening

6  questions are improper and should be disregarded.

7      Indeed, CDCR Region 1 SPRFIT Coordinators visited San Quentin Rehabilitation Center

8  twice in 2023. During the February 2023 visit, the reviewer observed three screenings, each by a

9  different nurse. (Declaration of Joseph H. Obegi, Psy.D., ¶ 5, Ex. A.) All screens were conducted

10  confidentially. (*Id.*) The screenings were conducted appropriately, with the exception of one

11  screening where the nurse asked about current, but not past suicidal ideation. (*Id.*) During the

12  October 2023 site visit, the reviewer observed two screens. (*Id.*, Ex. at 9.) The nurse asked all

13  questions appropriately and the screen was conducted confidentially. (*Id.*) Of note, the nurse was

14  the same one observed by Mr. Hayes during his May 2023 site visit who had been observed not

15  asking questions accurately. Thus, it appears that corrective training was successful. (*Id.*)

16      In sum, although Mr. Hayes observed two nurses omitting some of the required screening

17  questions, his sweeping conclusion that screenings at SQ are inadequate is improper because

18  Recommendations 7 and 8 only pertain to the size and confidentiality of the screening room. (ECF

19  No. 7636 at 23.) His observations about missed screening questions are also inconsistent with the

20  normal practice in place at SQ as demonstrated by subsequent audits. CDCR's October 2023

21  audit, conducted using the agreed upon criteria, shows that SQ is compliant with Mr. Hayes's

22  recommendation. The majority of CDCR's auditor's February findings also show SQ's

23  compliance with this recommendation. Accordingly, the Court should find that SQ is in

24  compliance with these recommendations.

25          **4.    California Institution for Women**

26      During his May 15-17, 2023 visit to California Institution for Women (CIW), Mr. Hayes

27  reported that a max custody patient was screened in a closed room with an officer present "thus

28  compromising both privacy and confidentiality." (ECF No. 8143-1 at 121.) Mr. Hayes's report

1    does not, however, illustrate how the presence of the officer compromised privacy or

2    confidentiality. CDCR officers are bound by HIPAA and are instructed to attend, and are generally

3    present at treatment team meetings. (Williams Decl. ¶ 12.) His finding is inconsistent with his own

4    recommendation which notes that "[n]urse and officer safety should remain the top priority during

5    intake screenings." (ECF No. 8143-1 at 6.) Although use of TTMs are preferred when screening

6    max custody patients, Mr. Hayes's recommendation neither requires the use of TTMs to conduct

7    screenings, nor does it bar the presence of custody staff to ensure "nurse and officer safety" during

8    the screening process. Accordingly, Defendants object to Mr. Hayes's findings that CIW was

9    noncompliant with Recommendation 8.

10              **5.      California Health Care Facility**

11              During his June 8-9, 2023 visit to California Health Care Facility (CHCF), Mr. Hayes

12    observed three screenings. (ECF No. 8143-1 at 152.) In one of the three observations, the nurse

13    did not ask the "bad news" question. (*Id*.) In another observation, the nurse did not ask the date of

14    the inmate's previous suicide attempt although Mr. Hayes reports that the inmate's answer

15    prompted a mental health referral nonetheless. (*Id*. at 152-153.) Mr. Hayes found that the

16    screenings were inadequate. (*Id*.) But similar to his improper findings at SQ detailed above, Mr.

17    Hayes made no findings that CHCF was out of compliance with either Recommendations 7 or 8—

18    regarding the size and confidentiality of the nursing space. (See ECF No. 7636 at 23.) In fact, Mr.

19    Hayes observed that "[t]he door to the nurse's office was closed on each occasion, with officers

20    providing security from the hallway, thus ensuring privacy and confidentiality." (ECF No. 8143-1

21    at 152.) Mr. Hayes thus confirmed CHCF's compliance with Recommendations 7 and 8 and his

22    findings that CHCF is noncompliant based solely on screening questions is improper and should

23    be disregarded.

24              **6.      California Men's Colony**

25              During his October 10-11, 2023 visit to California Men's Colony (CMC), Mr. Hayes

26    observed four intake screenings. (ECF No. 8143-1 at 254.) During three of his observations, the

27    nurse either omitted the bad news questions or failed to ask about current or past suicidal ideation.

28    (*Id*.) Mr. Hayes, however, made no findings that CMC was out of compliance with either

-27-

1  Recommendations 7 or 8—regarding the size and confidentiality of the nursing space. (See ECF

2  No. 7636 at 23.) In fact, Mr. Hayes observed that the space was confidential even for maximum

3  custody patients:

> [A] TTM was located in a vestibule that was adjacent to the nurse's office. Although
> nurses did not have direct line of sight of IPs and needed to walk from the nurse's
> desk to the TTM on several occasions to ask follow-up questions and answer the IP's
> inquiries, the vestibule's outer doors were closed and an officer stationed outside,
> thus ensuring privacy and confidentiality during the process.

7  (ECF No. 8143-1 at 254.) Mr. Hayes thus confirmed CMC's compliance with Recommendations 7

8  and 8 and his conclusion that CMC is noncompliant based solely on screening questions is

9  improper and should be disregarded.

10  **7.   Salinas Valley State Prison**

11  During his October 12-13, 2023 visit to Salinas Valley State Prison, Mr. Hayes observed

12  one new admission intake screening. (ECF No. 8143-1 at 273.) The nurse's office door was open

13  and an officer was in the hallway. (*Id*.) The officer remained in the doorway because "as observed

14  by this reviewer, the IP had engaged in a prolonged conversation with the R&R unit sergeant

15  regarding his property and safety concerns and appeared agitated prior to the screening process."

16  (*Id*.) Because the door was open and an officer was nearby the agitated patient, Mr. Hayes found

17  SVSP noncompliant with Recommendation 8. (*Id*.)

18  Mr. Hayes's report does not illustrate how the presence of the officer compromised privacy

19  or confidentiality. As aforementioned, CDCR officers are bound by HIPAA and are generally

20  present at treatment team meetings. (Williams Decl. ¶ 13.) Mr. Hayes's finding is inconsistent

21  with his own recommendation which notes that "[n]urse and officer safety should remain the top

22  priority during intake screenings." (ECF No. 8143-1 at 6.) Although use of TTMs are preferred

23  when screening max custody patients, his recommendation does not require use of TTMs to

24  conduct screenings nor does it bar the presence of custody staff to ensure "nurse and officer

25  safety" during the screening process. Accordingly, Defendants object to Mr. Hayes's findings that

26  SVSP as noncompliant with Recommendation 8.

27  CDCR's Region 2 SPRFIT Coordinator audited SVSP three times in 2023 though

28  screenings were observed only during the February and December 2023 visits, all of which were

1  confidential. During the February 2023 site visit, the reviewer observed one screening which was

2  conducted in a confidential setting with a closed door. (Declaration of Heather Stahl, Ph.D., ¶ 6,

3  Ex. A at 9.) Likewise, during the December 2023 visit, the reviewer noted that nursing supervisors

4  completed audits and that all intake screenings were completed appropriately, in a confidential

5  setting, with all questions asked. (Stahl Decl. Ex. H at 6.)

6      In sum, Mr. Hayes's conclusion that SVSP is non-compliant with Recommendation 8—

7  based on his observation of one screening—is inconsistent with his own recommendation and

8  improper. CDCR's December 2023 audit, conducted using the agreed upon criteria, shows that

9  SVSP is compliant with Mr. Hayes's recommendation. In accordance with the Court's February

10 2023 order, because SVSP demonstrated compliance with this recommendation as early as

11 February 2023, the Court should find that SVSP has fully implemented the recommendation.

12          **8.    California Institution for Men**

13      During Mr. Hayes's May 18-19, 2023 visit to California Institution for Men (CIM), he

14 observed one intake screening. (ECF No. 8143-1 at 125.) Mr. Hayes reported that the "door to the

15 nurse's office was closed . . . thus ensuring both privacy and confidentiality." (*Id.*) Yet at page 16

16 of his report, Mr. Hayes finds that "issues at . . . CIM . . . could have been easily averted if

17 therapeutic treatment modules (TTMs) had been located in the nursing offices." (*Id.* at 16.) Mr.

18 Hayes reports that he "asked the nurse what the practice would be when a maximum custody IP

19 was screened" and she replied that an officer would be present "for security reasons." (*Id.* at 125.)

20 Mr. Hayes's finding that CIM is noncompliant with Recommendation 8 is improper and not

21 supported by his own finding that the "door . . . was closed" and "ensur[ed] both privacy and

22 confidentiality." (*Id.* at 125.) Mr. Hayes observed no instances where the door was open, and the

23 nurse's response to a question is not evidence of noncompliance. Even if an officer was present,

24 such a practice is not inconsistent with Recommendation 8 which notes that "[n]urse and officer

25 safety should remain the top priority during intake screenings." (ECF No. 8143-1 at 6.)

26 Accordingly, CDCR objects to this finding.

27      Separately, Mr. Hayes also found that the CIM nurse "inappropriately conflated the two

28 'bad news' questions into one question." (*Id.* at 125.) But, asking a compound question is not

1  evidence of noncompliance with Recommendation 8. Moreover, the questions as written are

2  inextricably intertwined with the former embracing the latter. (*Id.* at 15 *Cf.* "Have you recently

3  received any bad news?" *with* "Did the patient receive any bad and/or unexpected news during a

4  recent court hearing".) Thus, Mr. Hayes's conclusion, based on one observation, that CIM was

5  noncompliant should be disregarded as hyper-technical.

6      **B.**    **Psych Tech Practices**

7      Defendants agree with Mr. Hayes's findings that CDCR is in compliance with

8  Recommendation 20. Mr. Hayes found noncompliance at only one institution, Substance Abuse

9  Treatment Facility (SATF). (ECF No. 8143-1 at 16-17.) Defendants object to his findings

10  regarding SATF's compliance with Psych Tech (PT) Practices. Recommendation 20 provides as

11  follows:

12      •   Recommendation 20. CDCR should develop a CAP to ensure that supervising nursing staff

13          regularly audit PT practices during daily rounds of mental health caseload inmates in

14          administrative segregation and during weekly and bi-weekly rounds in the SHUs.

15  (ECF No. 7636 at 26.) In his Fifth Re-Audit, the Special Master provided "a list of

16  recommendations that remain to be completely and durably implemented *and the steps defendants*

17  *must take to do so.*" (*Id.* at 21, emphasis added.) According to that report, compliance with

18  Recommendation 20 "will require defendants to ensure that each audited CDCR facility maintain

19  at least 90 percent compliance with adequate psych tech practices by accurately completing Psych

20  Tech Daily Rounds for all MHSDS inmates in" CDCR Restricted Housing Units (RHU). (*Id.* at

21  26.)

22      Following his June 29-30, 2023 site visit, Mr. Hayes found that SATF was noncompliant

23  with psych tech practices after observing rounds by two psych techs. (ECF No. 8143-1 at 17.) Mr.

24  Hayes found that one psych tech was "appropriately interacting with all IPs." (*Id.*) The second was

25  observed to be engaging with inmates based on their demeanor and would be "indifferent and

26  either asked the questions in a compound fashion . . . in a very rapid fashion and/or entirely

27  omitted suicide risk inquiry for caseload IPs." (*Id.*)

28      Mr. Hayes's sweeping conclusion that SATF is noncompliant is wrong. Whatever issues

20681936.1

1  Mr. Hayes found during his SATF site visit did not occur during an audit before his visit. And an

2  audit after Hayes's visit demonstrates that any such issues were remedied. CDCR Regional

3  SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR

4  institutions. The SP CQI Guidebook contains an audit for Psychiatric Technician Rounds for the

5  restricted housing units. (Williams Decl. Ex. A at 81.) The indicators associated with this audit,

6  Psychiatric Technician Rounds Documentation Audited that Meets all Audit Criteria (RH28) and

7  Observation of PT Rounds where Effective Communication, Interaction, and Referrals Met all

8  Audit Criteria (RH29) were remediated on December 13 and December 11, 2023, respectively.

9  (*Id.* ¶ 15.)

10       CDCR's Region 3 SPRFIT Coordinator conducted audits at SATF in 2023. During the

11  March 23-24, 2023 site visit, one psych tech was observed completing rounds. (Mintz Decl., Ex. D

12  at 2.) The psych tech was observed querying all patients about sleep and appetite and followed up

13  with appropriate qualitative questions. (*Id.*) On three occasions, the psych tech made appropriate

14  referrals to mental health. (*Id.*) The psych tech had a supply of games and puzzles and supplied

15  them to inmates as indicated. (*Id.*) Documentation was made in real-time in the medical record.

16  (*Id.*) She made visual contact with all inmates and asked general mental health questions of

17  inmates who were not in the mental health services delivery system. (*Id.*)

18       Following Mr. Hayes's June 2023 site visit, the Region 3 SPRFIT Coordinator made a visit

19  on September 20-21, 2023. CDCR's reviewer observed two different psych techs completing

20  rounds during that review. (Mintz Decl., Ex. K at 2.) The psych techs completed rounds consistent

21  with prior audits, but one minor deficiency was noted: the psych techs were asking patients if they

22  were "thinking about hurting yourself" instead of more directly asking if they were suicidal. (*Id.*)

23  The reviewer concluded that the deficiencies were "isolated to only one element of rounding."

24  (*Id.*)

25       In a December 2023 site visit, the Region 3 SPRFIT Coordinator found no deficiency in

26  Psych Tech rounds. (Mintz Decl., Ex. Q at 2.) He noted that the psych tech identified non-caseload

27  inmates appropriately, inquired about suicidal and homicidal ideation, as well as sleep and

28  appetite. (*Id.*) The PT supplied patients with games and puzzles and established visual contact

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

1   with each patient. (*Id.*)

2          In sum, Mr. Hayes's conclusion that SATF is non-compliant with Recommendation 20 is

3   improper. Mr. Hayes's one observation is insufficient to conclude that SATF was noncompliant

4   with Recommendation 20, especially in consideration of CDCR's evidence. CDCR's March and

5   December 2023 audit showed full compliance with psych tech rounding procedures and the

6   minimal deficiency noted in the September 2023 audit is not enough to show noncompliance with

7   this recommendation.

8          **C.    Suicide Resistant MHCBs**

9          Mr. Hayes found CDCR in compliance with this component of Recommendation 32,

10  however, he recommended that CDCR develop a corrective action plan to "expedite renovation of

11  the former seclusion room (No. B-68) in the MHCB unit at CCWF into a clinical

12  interview/treatment room." (ECF No. 8143-1 at 87.) Although Defendants are unclear what this

13  recommendation has to do with suicide resistant crisis bed cells, that project was completed the

14  week of February 26, 2024, before Mr. Hayes's Sixth Re-Audit was filed with the Court.

15  (Williams Decl. ¶ 16.) Thus, Mr. Hayes's recommendation is moot and should be disregarded.

16         **D.    Use of Suicide Resistant Cells for Newly Admitted Inmates in Restricted
               Housing Units (Intake Cells)**

17

18         Defendants object to Mr. Hayes's findings and conclusions regarding the Use of Suicide

19  Resistant Cells for Newly Admitted Inmates in Restricted Housing Units (Intake Cells). (ECF No.

20  8143-1 at 19-22.) Mr. Hayes's findings on Use of Suicide Resistant Cells for Newly Admitted

21  Inmates in Restricted Housing Units (i.e. Intake Cells) measures compliance with two

22  recommendations:

23    •   Recommendation 12. CDCR should ensure that there are a sufficient number of suicide-

24        resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72

25        hours of their housing in the unit) and inmates of special concern or heightened risk of

26        suicide (e.g., inmates recently released from suicide observation status).

27    •   Recommendation 13. CDCR should enforce its existing policy of housing only newly

28        admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the

-32-

20681936.1

1    retrofitted cells beyond their first 72 hours.

2    (ECF No. 6879 at 27, 35.) CDCR policy requires that all new RHU inmates must be placed in

3    suicide resistant cells for the first seventy-two hours unless double celled during that timeframe.

4    (ECF No. 7333-1 at 569 [2021 Program Guide].) Mr. Hayes significantly misstates CDCR's

5    policy by finding that "[p]ursuant to CDCR policy, all IPs initially placed in administrative

6    segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-

7    resistant for the first 72 hours." (ECF No. 8143-1 at 19.) This is not CDCR policy.

8        Since 2015, CDCR policy has required that "[a]ny inmate that cannot be double-celled

9    upon initial placement in [RHU] must be housed in an [RHU] intake cell for the first 72 hours of

10   [RHU] placement." (ECF No. 7333-1 at 569.) It is unclear whether Mr. Hayes is measuring

11   compliance with Recommendations 12 and 13 in line with approved CDCR policy, or if he is

12   employing a stricter standard. Mr. Hayes did not provide a copy of his audit tool to confirm

13   whether this is an inadvertent error or a more serious issue with his methodology that calls into

14   question all of his findings regarding Recommendations 12 and 13.

15       Mr. Hayes concluded that "65 percent (13 of 20) of audited facilities were found to have

16   adequate practices, a regression from the previous assessment." (ECF No. 8143-1 at 19.) Mr.

17   Hayes found that seven institutions were noncompliant with use of suicide resistant intake cells,

18   namely California Institution for Men (CIM), California Men's Colony (CMC), California State

19   Prison, Los Angeles County (LAC), Kern Valley State Prison (KVSP), R.J. Donovan Correctional

20   Facility (RJD), Salinas Valley State Prison (SVSP), and Wasco State Prison (WSP). (*Id.*) Mr.

21   Hayes notes various types of deficiencies at each of these institutions to support his findings.

22       Regarding his findings of noncompliance, assuming Mr. Hayes's findings were accurate,

23   CDCR has demonstrated compliance with these recommendations outside of Mr. Hayes's two or

24   three-day visits to these institutions. The Court's February 28, 2023, order made clear that

25   Defendants may "demonstrate to the Special Master and to Mr. Hayes that they have completed

26   work on outstanding recommendations" and that "the final version of his sixth round re-audit

27   report . . . shall identify with specificity the date on which he finds any affected recommendations

28   were fully implemented." (ECF. No. 7743 at 4.) As discussed below, CDCR demonstrates this

1  compliance by its Regional SPRFIT Coordinator audits and their reports.

2      CDCR's Regional SPRFIT Coordinators conducted several audits at the institutions during

3  Mr. Hayes's 6th Re-Audit round. CDCR Regional SPRFIT Coordinators use the SP CQI

4  Guidebook to conduct suicide prevention audits at CDCR institutions. (Williams ¶ 18.) The SP

5  CQI Guidebook contains an audit for ASU Intake Inmates Appropriately Housed, (SP16) which

6  went through data remediation and was remediated by the Special Master's data expert on July 29,

7  2023. (Williams Decl., Ex. A at 81-82.) Although the remediated version of the audit differs

8  slightly from the version used earlier in 2023, none of the changes are relevant to any of Mr.

9  Hayes's criticisms of intake cell policy discussed in detail below. Accordingly, CDCR objects to

10  findings at six institutions as follows.

11              **1.    California Institution for Men**

12      During his May 18-19, 2023 visit to California Institution for Men (CIM), Mr. Hayes

13  reported that only two of fourteen intake cells were occupied with new intake patients and five

14  other new intake patients were in non-intake cells. (ECF No. 8143-1 at 19.) One patient had

15  received an emergent mental health referral two days earlier but was in a non-intake cell. (*Id.*)

16  CDCR objects to Mr. Hayes's findings and conclusions because CDCR's audits demonstrated that

17  CIM was compliant with recommendations 12 and 13.

18      CDCR's Region 4 SPRFIT Coordinator toured CIM four times in 2023—twice before and

19  twice after Mr. Hayes's site visit. During all four visits the reviewer found that new intake inmates

20  were always housed in intake cells. (Declaration of Nina Hudspeth, Psy.D., ¶¶ 6, 7, 10, & 12, Ex.

21  B, Ex. C, Ex. F, & Ex. H.) In visits occurring in February, April, and July 2023, the reviewer

22  found that all new intake inmates were housed in intake cells, however some inmates remained in

23  intake cells beyond seventy-two hours. (*Id.*, Ex. B at 2, Ex. C at 2, & Ex. F at 2.)

24      During the October site visit, however, CIM demonstrated full compliance with

25  recommendations 12 and 13. (Hudspeth Decl, Ex. H at 2.) The reviewer found that all new intake

26  inmates were housed in an intake cell and no inmates were housed in intake cells beyond seventy-

27  two hours. (*Id.*) Like prior visits in 2023, the reviewer noted that all intakes had placards on their

28  cells indicating when they had arrived to the unit. (*Id.*)

1    In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

2  reality of CIM's intake cell usage. Moreover, Mr. Hayes's findings are at odds with CDCR's 2023

3  CIM audits, which were conducted using the agreed upon criteria, and which show that CIM is

4  now compliant with Mr. Hayes's recommendation. In accordance with the February 2023 order,

5  because CIM has demonstrated compliance with recommendations 12 and 13 since Mr. Hayes's

6  May 2023 visit, the Court should find that CIM has fully implemented the recommendations 12

7  and 13.

8    **2.    California Men's Colony**

9    During his October 10-11, 2023 visit to California Men's Colony (CMC), Mr. Hayes

10  reported that all sixteen intake cells were empty but that during an observation of a Psych Tech

11  round, he noticed one "new intake IP housed in a non-new intake cell." (ECF No. 8143-1 at 20.)

12  Mr. Hayes reported that the patient had expressed suicidality during the pre-screening and was

13  returned to housing, but not placed in a new intake cell, despite being a new RHU arrival. (*Id.*)

14    CDCR objects to Mr. Hayes's findings and conclusions because SPRFIT audits confirm

15  CMC's compliance with recommendations 12 and 13. CDCR's Region 2 SPRFIT Coordinator

16  toured CMC twice in 2023. (Stahl Decl. Ex. B & D.) During those visits the reviewer found that

17  new intake inmates were always housed in intake cells. (*Id.*, Ex. B at 2 & Ex. D at 2.) Specifically,

18  CDCR's Region 2 SPRFIT Coordinator visited CMC on March 14, 2023. (*Id.*) At the time, CMC

19  had sixteen intake cells. (*Id.*, Ex. B at 2.) Two intake inmates were housed in those cells and the

20  cells were clearly marked. (*Id.*) During the follow up visit in June 2023, CMC was observed to

21  have three patients on intake status all appropriately housed. The cells were also clearly marked.

22  (Stahl Decl., Ex. D at 2.)

23    Mr. Hayes's finding is based on a single observation and is thus insufficient to demonstrate

24  a pattern of noncompliance at CMC. His findings are also at odds with CDCR's 2023 CMC audits

25  which show that CMC has been compliant with Mr. Hayes's recommendations. In accordance

26  with the February 2023 order, because CMC has demonstrated compliance with this

27  recommendation, the Court should find that CMC has fully implemented the recommendation and

28  has been in substantial compliance since at least March 2023.

20681936.1

### 3.    California State Prison, Los Angeles County

During his August 23-24, 2023 visit to California State Prison, Los Angeles County (LAC), Mr. Hayes reported that "although [he] did not observe any new intake IPs housed in non-intake cells . . . it was difficult to confirm the new intake status of IPs housed in the STRH unit because there were not any 'ASU Door Tags' on many of the unit's new intake cells." (ECF No. 8143-1 at 21.) Mr. Hayes also found that, based on a review of records, there were at least four inmates in non-intake cells in an overflow unit in July and August 2023. (*Id.*) These finding are objectionable for various reasons.

*First*, neither Recommendation 12 or 13 require "ASU Door Tags" on intake cells. Thus, a lack of "ASU Door Tags" is an insufficient finding for Mr. Hayes to conclude that LAC was noncompliant with Recommendation 12 or 13.

*Second*, Mr. Hayes's finding of noncompliance based only on a review of records is similarly improper and does not comport with the methodology agreed upon by the data remediation stakeholders for auditing compliance with Recommendation 12 or 13. (Williams Decl., Ex. A at 81-82.) The remediated audit, ASU Intake Inmates Appropriately Housed, (SP16), does not permit the use of record reviews to determine whether an institution is compliant with intake cell practices. (*Id.*) The audit requires a site visit and visual inspection of the intake cells in an institution's Restricted Housing Unit. (*Id.*) Thus, Mr. Hayes's finding deviates from the agreed upon and remediated methodology and instead relies on untested and undisclosed audit criteria. His finding is improper, unreliable, and should be disregarded by the Court.

*Third*, Mr. Hayes's record review finding is inconsistent with actual on-site observations conducted by CDCR's Region 3 SPRFIT Coordinator. CDCR's Region 3 SPRFIT Coordinator visited LAC four times in 2023 and did observe inmates in intake cells beyond seventy-two hours. (Mintz Decl., Ex. B at 2, Ex. E at 2, Ex. I at 2, & Ex. L at 2.) However, this was a likely result of issues with bed management in LAC's RHUs. (*Id.*) Importantly, the reviewer never observed newly arrived inmates in non-intake cells, meaning that at no time during the four site visits were there new inmates observed unsafely housed in RHUs. (Mintz Decl., Ex. B at 2, Ex. E at 2, Ex. I at 2, and Ex. L at 2.) Thus, the Court should find LAC in compliance with Recommendation 12

20681936.1

1  requiring a sufficient number of intake cells.

2      LAC has demonstrated compliance with the underlying protective purpose of

3  Recommendations 12 and 13—to ensure that new RHU inmates are placed in an intake cell during

4  their first seventy-two hours. In accordance with the February 2023 order, because LAC has

5  demonstrated compliance with this recommendation, the Court should find that LAC has fully

6  implemented the recommendation.

7          **4.      Kern Valley State Prison**

8      During his July 13-14, 2023 visit to Kern Valley State Prison (KVSP), Mr. Hayes reported

9  that he observed two new intake patients housed in non-intake cells. (ECF No. 8143-1 at 21.) One

10  of those inmates had recently been discharged from a crisis bed. (*Id.*) CDCR objects to Mr.

11  Hayes's findings and conclusions because CDCR audits demonstrate KVSP's compliance with

12  Recommendations 12 and 13.

13      CDCR's Region 3 SPRFIT Coordinator toured KVSP three times in 2023—twice before

14  and once after Mr. Hayes's site visit. (Mintz Decl., Ex. C, Ex. F, & Ex. M.) During two of the

15  three visits the reviewer found that new intake inmates were always housed in intake cells. (*Id.*,

16  Ex. C at 2 & Ex. F at 2.) The Region 3 SPRFIT Coordinator's first visit occurred on February 13-

17  14, 2023. (*Id.*, Ex. C.) During the site visit, the reviewer observed four inmates in intake cells and

18  all had been there for less than seventy-two hours. (*Id.* at 2.) There were no inmates

19  inappropriately housed in the CCCMS RHU intake cells during that visit. (*Id.*) On the second site

20  visit, in May 15-16, 2023, the Region 3 SPRFIT Coordinator observed that all but one intake cell

21  was unoccupied. (Mintz Decl., Ex. F at 2.) All intake inmates had been in the cells for less than

22  seventy-two hours. (*Id.*) One inmate on intake status was housed in a non-intake cell. (*Id.*) On the

23  third site visit, on November 8-9, 2023, the Region 3 SPRFIT Coordinator observed compliant

24  intake cell usage. (*Id.*, Ex. M at 2.) All cells were occupied with intake inmates who had been

25  present for less than seventy-two hours. The reviewer did not note any inappropriately housed new

26  arrivals. (*Id.*)

27      In sum, Mr. Hayes's findings and conclusions are stale and fail to reflect the current reality

28  of KVSP's intake cell usage. Moreover, Mr. Hayes's findings are at odds with CDCR's 2023

1    KVSP audits, which were conducted using the agreed upon criteria, and which show that KVSP is

2    now compliant with Mr. Hayes's recommendation. In accordance with the February 2023 order,

3    because KVSP has demonstrated compliance with this recommendation since Mr. Hayes's July

4    2023 visit, the Court should find that KVSP has fully implemented the recommendation and has

5    been in full compliance since November 2023 and in substantial compliance since at least

6    February 2023.

7              **5.      Salinas Valley State Prison**

8         During his October 12-13, 2023 visit to Salinas Valley State Prison, Mr. Hayes noted that

9    on both days of the visit, there were inmates in new intake cells beyond 72 hours in an overflow

10   housing units. (ECF No. 8143-1 at 20.) Additionally, Mr. Hayes found between "6 and 9 IPs

11   housed in new [CCCMS RHU] intake cells were beyond the 72-hour requirement." (*Id.*)

12        CDCR objects to Mr. Hayes's findings and conclusions because CDCR's audits

13   demonstrate that SVSP was compliant with recommendations 12 and 13 as early as February

14   2023. CDCR's Region 2 SPRFIT Coordinator audited SVSP's outpatient program twice in 2023

15   and observed intake patients properly housed in intake cells, with only minor deviations from

16   policy regarding signage during the June 2023 visit. (Specifically, the Region 2 SPRFIT

17   Coordinator visited SVSP first on February 9, 2023 and observed that all new intake inmates were

18   appropriately housed in intake cells. (Stahl Decl., Ex. A at 3-4.) The Region 2 SPRFIT

19   Coordinator visited SVSP again on June 28, 2023. (*Id.*, Ex. E.) During that site visit, SVSP again

20   demonstrated compliance with intake cell policy. (*Id.*, Ex. E at 3-4.) All intake inmates were

21   housed in intake cells. (*Id.*)

22        In sum, Mr. Hayes's findings and conclusions fail to reflect the reality of SVSP's intake

23   cell usage. Moreover, Mr. Hayes's findings are at odds with CDCR's 2023 SVSP audits, which

24   were conducted using the agreed upon criteria, and which show that SVSP is now compliant with

25   Mr. Hayes's recommendation. In accordance with the February 2023 order, because SVSP has

26   demonstrated compliance with this recommendation since Mr. Hayes's site visit, the Court should

27   find that SVSP has fully implemented the recommendation and has been in substantial compliance

28   since at least February 2023.

1

### 6.    Wasco State Prison

2      During his April 18-19, 2023 visit to Wasco State Prison (WSP), Mr. Hayes reported that:

3      During the on-site assessment, one new intake IP was moved from a new intake cell
into a non-new intake cell the previous evening due to a plumbing issue. The review
4      also found that at least two IPs were housed in new intake cells beyond the initial 72-
hour period, and could have been relocated to other cells in order to accommodate
5      the appropriate re-housing of this IP into another new intake cell.

6  (ECF No. 8143-1 at 103.) CDCR objects to Mr. Hayes's findings and conclusions because

7  CDCR's audits demonstrate WSP's compliance with this recommendation.

8      Specifically, CDCR's Region 3 SPRFIT Coordinator visited WSP three times in 2023—all

9  of the visits taking place after Mr. Hayes's site visit. (Mintz Decl., Ex. G, Ex. J, & Ex. N.) On the

10 first visit, in May 2023, the reviewer found that WSP had fourteen retrofitted intake cells. (*Id.*, Ex.

11 G at 2.) Five of those intake cells were occupied by seven inmates and all had been in those cells

12 less than seventy-two hours. (*Id.*) During the August 2023 site visit, the Region 3 SPRFIT

13 Coordinator reported that seven of the fourteen intake cells were occupied and all seven inmates

14 had been in intake cells for less than seventy-two hours. (Mintz Decl., Ex. J at 2.) Finally, during

15 the November 2023 site visit, the Region 3 SPRFIT Coordinator again found compliant intake cell

16 usage, noting four cells were occupied, all for less than seventy-two hours. (*Id.*, Ex. N at 2.)

17     In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

18 reality of WSP's intake cell usage. Moreover, Mr. Hayes's findings are at odds with CDCR's

19 May, August, and November 2023 audits, which were conducted using the agreed upon criteria,

20 and which show that WSP is compliant with Mr. Hayes's recommendations. In accordance with

21 the February 2023 order, because WSP has demonstrated compliance with recommendations 12

22 and 13 since Mr. Hayes's April 2023 visit, the Court should find that WSP has fully implemented

23 the recommendations as of May 2023.

24 ### E.    Practices for Observing MHCB Patients

25     Defendants object to Mr. Hayes's findings and conclusions regarding the Practices for

26 Observing MHCB Patients. (ECF No. 8143-1 at 23-27.) Mr. Hayes's findings on Practices for

27 Observing MHCB Patients measures compliance with one recommendation:

28 - Recommendation 21. CDCR should enforce its Program Guide requirements authorizing

1   only the two levels of observation which may be provided for suicidal inmates: (1)

2   observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide

3   Precaution, and (2) continuous observation for inmates on Suicide Watch.

4   (ECF No. 6879 at 35.) Suicidal patients must be observed either continuously (suicide watch) or

5   on fifteen-minute rounds (suicide precautions) depending on clinical orders.

6          **1.     In 2023, CDCR Conducted over Ten Million Suicide Precaution and
            Suicide Watch Checks at a Combined Compliance Rate of Over
7           Ninety-Two Percent.[11]**

8          Mr. Hayes has recommended, and the court has ordered, that Defendants must achieve

9   perfect compliance with Recommendation 21. (ECF No. 6879 at 22 [finding that "[o]bservation of

10  suicidal patients must be automatic; therefore, 100 percent compliance is required because failure

11  to observe a suicidal patient can result in death by suicide within CDCR facilities]; ECF No.

12  6973.) Mr. Hayes concludes that "none of the 18 audited facilities were at 100 percent compliance

13  with this measure, eight or 56 percent of the facilities were able to obtain 90 percent or more

14  compliance with both Suicide Precaution and Suicide Watch observation." (ECF No. 8143-1 at

15  24.)

16         Mr. Hayes's conclusion that only eight institutions were at least ninety-percent compliant

17  does not align with the data Mr. Hayes provided in the appendices where he found that nine

18  institutions—California State Prison, Sacramento (SAC), Wasco State Prison (WSP), California

19  Institution for Women (CIW), Substance Abuse Treatment Facility (SATF), R.J. Donovan

20  Correctional Facility (RJD), California Medical Facility (CMF), California State Prison, Solano,

21  (SOL), Pelican Bay State Prison (PBSP), and Central California Women's Facility (CCWF)—

22  were over ninety percent compliant with both suicide precaution and suicide watch. (ECF No.

23  8143-1 at 94, 103, 122, 175, 206, 241, 251, 292, and 300.)

24         Mr. Hayes recommends that "CDCR should develop CAPs for the eight facilities (CIM,

25  CMC, CSP/LAC, COR, KVSP, MCSP, NKSP, and SVSP) that fell below 90 percent compliance

26

27  _____

[11] Notably, this statistic does not mean that eight percent of the checks were not conducted because non-
28  compliance can include checks that did not occur within the required timeframe. Thus, a check that
    occurred one minute late would count as a noncompliant check.

20681936.1

1  with both Suicide Precaution and Suicide Watch observation for MHCB patients." (ECF No.

2  8143-1 at 27, emphasis added.) However, Mr. Hayes only reports that two institutions—California

3  State Prison, Corcoran and California State Prison, Los Angeles County—fell below ninety

4  percent for both suicide precautions and suicide watch. (ECF No. 8143-1 at 165, 219.) In fact,

5  according to Mr. Hayes's report, fifteen of the eighteen audited institutions scored over ninety

6  percent for suicide precautions and ten institutions scored over ninety percent for suicide watch.

7  Such information is only available by a detailed review of the appendices.

8         A table developed from Mr. Hayes's appendices is below for reference:

| # | Institution | SP | SW | Month Audited | # of Patients | ECF No. 8143-1 |
|---|---|---|---|---|---|---|
| 1 | SAC | 95% | 91% | March 2023 | 23 | Page 94 |
| 2 | WSP | 95% | 91% | March 2023 | 5 | Page 103 |
| 3 | CIW[12] | 99%/99% | 94%/96% | April 2023 | 18/15 | Page 122 |
| 4 | CIM | 95% | 83% | April 2023 | 68 | Page 126 |
| 5 | MCSP | 94% | 65% | May 2023 | 10 | Page 139 |
| 6 | CHCF | 43% | 97% | May 2023 | 43 | Page 153 |
| 7 | COR | 89% | 72% | May 2023 | 14 | Page 165 |
| 8 | SATF | 98% | 91% | May 2023 | 23 | Page 175 |
| 9 | NKSP | 96% | 88% | June 2023 | 10 | Page 183 |
| 10 | KVSP | 97% | 89% | June 2023 | 10 | Page 193 |
| 11 | RJD | 97% | 95% | July 2023 | 24 | Page 206 |
| 12 | LAC | 83% | 68% | July 2023 | 19 | Page 219 |
| 13 | CMF | 95% | 95% | August 2023 | 63 | Page 241 |
| 14 | SOL | 97% | 93% | August 2023 | 11 | Page 251 |
| 15 | CMC | 98% | 84% | September 2023 | 32 | Page 255 |
| 16 | SVSP | 99% | 80% | September 2023 | 11 | Page 275 |
| 17 | PBSP | 97% | 92% | October 2023 | 16 | Page 292 |
| 18 | CCWF | 95% | 94% | Oct.26-Nov.25, 2023 | 23 | Page 300 |

20         During the current round, CDCR understands that Mr. Hayes "exclusively utilized" the

21  report produced from the Mental Health Observation Reporting Tool. (ECF No. 8143-1 at 24.) Mr.

22  Hayes made one criticism of the tool, namely, that "[i]t does not always account for every patient

23  housed in the MHCB during a specific time period. For example, and as confirmed by CCHCS, if

24  a patient was placed on Suicide Watch and initially housed in Alternative Housing before being

25  transferred to a MHCB unit, that patient might be listed under another 'care team' category instead

---

[12] Mr. Hayes provided compliance statistics separately for CIW's licensed and unlicensed crisis bed unit. (ECF No. 8143-1 at 122.)

1  of the MHCB unit within the Mental Health Observations Reporting Tool." (*Id.*) However, it is,

2  and was during the monitoring period, possible to review the observation documentation for all

3  patients by filtering for "all" instead of just "MHCB" patients when using the tool. (Williams

4  Decl. ¶ 20.) By filtering for "all" the user can see patients whose orders started in alternative

5  housing and remained while in the crisis bed as well as those patients whose orders started in the

6  crisis bed. (*Id.*) Thus, Mr. Hayes's criticism that the tool does not always account for every patient

7  housed in the MHCB during a specific time period is incorrect.

8        Mr. Hayes's findings also fail to take into account the significant number of

9  observations—all made by humans—that occurred during the reporting period. In fact, over *ten*

10  *million* Suicide Precaution and Suicide Watch observations were required in 2023 alone. (*Id*. ¶

11  21.) Combined, CDCR completed these observations at over ninety-two percent compliance. (*Id.*)

12        Statewide data from the Mental Health Observation Reporting Tool is provided in the table

13  below:

| 2023 Timely MHCB SP and SW Observations by Month (Statewide) | | |
|---|---|---|
| **Month (2023)** | Timely Checks | Required Checks | Compliance Rate |
| **January** | 684,022 | 749,840 | 91.22% |
| **February** | 634,776 | 681,654 | 93.12% |
| **March** | 723,670 | 786,761 | 91.98% |
| **April** | 716,795 | 781,016 | 91.78% |
| **May** | 765,701 | 833,976 | 91.81% |
| **June** | 785,126 | 847,008 | 92.69% |
| **July** | 891,824 | 971,408 | 91.81% |
| **August** | 925,981 | 1,000,480 | 92.55% |
| **September** | 828,068 | 887,827 | 93.27% |
| **October** | 837,293 | 908,407 | 92.17% |
| **November** | 792,577 | 843,706 | 93.94% |
| **December** | 770,273 | 819,138 | 94.03% |
| **Totals** | 9,356,106 | 10,111,221 | 92.53% |

23  (Williams Decl., at ¶ 21.)

24        In light of CDCR's high level of compliance with this recommendation and the significant

25  number of observations conducted by CDCR staff in 2023, the Court should reconsider the

26  compliance threshold for Recommendation 21. (See ECF No. 6879 at 22 [finding that "100

27  percent compliance is required"].) Even though checks were not completed 100 percent timely, no

28  patients died by suicide in a crisis bed in 2023. (Williams Decl. ¶ 21.) Given that CDCR staff

1  conducted over ten million observations in one year, it is impossible to achieve perfect compliance

2  with this measure. The Court should modify its order to correlate substantial compliance with a

3  ninety-percent compliance threshold for this recommendation. Alternatively, the Court should

4  reject Mr. Hayes's findings and conclude that CDCR has substantially complied with this

5  recommendation.

6          **2.      Mr. Hayes's Recommendation to Create a Corrective Action Plan for
                    Kern Valley State Prison and R.J. Donovan Correctional Facility
7                    should be Disregarded.**

8          Mr. Hayes reported that during the 5th Re-Audit at Kern Valley State Prison (KVSP)

9  "patients expressed passive suicidal ideation and despite this concerning behavior, remained on Q-

10  30-minute observation with 'full issue' clothing." (ECF No. 8143-1 at 24.) Mr. Hayes reported

11  that, based on a chart review, similar practices were found in "several" crisis bed patients. (*Id*.)

12  Mr. Hayes made similar observations at R.J. Donovan Correctional Facility during his August

13  2023 site visit. (*Id*. at 25.) Accordingly, Mr. Hayes recommended a corrective action plan to

14  remedy the issue because the Program Guide, per Mr. Hayes, requires that:

15          "an inmate with suicidal ideation, threats, or attempt shall be placed in an MHCB on
            Suicide Precaution or Suicide Watch…When an inmate is in a MHCB because of
16          high risk of attempting self-injurious behavior, but is not in immediate danger, he or
            she shall be placed on Suicide Precaution." Program Guide at 12-10-15.
17

18  (Id. at 26-27.)

19          No corrective action plan is necessary because KVSP and RJD are not in violation of the

20  Program Guide. Mr. Hayes misstates the relevant portion of the Program Guide when making his

21  determination. The Program Guide actually states that *"*[w]*hen clinically indicated*, an inmate

22  with active suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide

23  Precaution or Suicide Watch." (ECF No. 7333-1 at 182, emphasis added.) The Program Guide

24  gives clear clinical discretion for when to place a patient on suicide watch or suicide precautions.

25  Mr. Hayes is not a clinician and any finding that the decision to use Q-30-minute checks was

26  clinically contraindicated, as he attempted to state in his report, must be disregarded as improper.[13]

27  _____

28  [13] In other matters for which Mr. Hayes renders expert opinions, he has expressly stated that his opinions

1  Accordingly, his recommendation, based in the appropriateness of clinical decision making must

2  be disregarded as well.

3      **F.**      **MHCB Practices for Possessions and Privileges**

4          Defendants object to Mr. Hayes's findings and conclusions regarding MHCB Practices for

5  Possessions and Privileges. (ECF No. 8143-1 at 27.) Mr. Hayes's findings on MHCB Practices for

6  Possessions and Privileges measures compliance with part of one recommendation:

7      •   Recommendation 32. CDCR, under the guidance of the Special Master, should examine

8          and consider taking reasonable corrective actions to address [this] additional miscellaneous

9          issue[] . . . . Privileges for Inmates in MHCBs . . . .

10  (ECF No. 6879 at 27, 36.) Mr. Hayes explains that these privileges include "recreation, visits, or

11  telephone calls" as well as clothing "for both suicidal and non-suicidal MHCB patients." (*Id.* at

12  99.) The February 14, 2017 policy governing MHCB privileges can be found in the Program

13  Guide. (ECF No. 7333-1 at 379.) The policy allows patients in a crisis bed to access out-of-cell

14  activities such as yard or dayroom consistent with their custody designation unless restricted by

15  their treatment team. (*Id.*) The policy sets no daily or weekly minimum number of hours of out-of-

16  cell time a patient must be offered. The policy also mandates that staff offer patients telephone

17  calls consistent with their privilege group. (*Id.* at 380.) Finally, the policy allows for non-contact

18  visiting for patients in the crisis bed, unless they are on suicide watch or precautions and not

19  cleared by their treatment team. (*Id.*)

20          In his recent report, Mr. Hayes concludes that "33 percent (6 of 18) of audited facilities

21  (with active MHCB units) were found to have adequate practices." (ECF No. 8143-1 at 28.) Mr.

22  Hayes found that twelve institutions were noncompliant with MHCB Privileges. Notably, Mr.

23  Hayes found that three institutions were noncompliant in part because they did not offer a certain

24  amount of yard time. (*See id.* at 95 [findings for California State Prison, Sacramento ], *id.* at 126

25  [findings for California Institution for Men], and, *id.* at 28, 155 [findings for California Health

26

27  "do not include a critique of any clinical judgment utilized by any mental health clinicians." (*See* Request for Judicial Notice, Exhibit A (*Estate of Michael Ostby et al. v. Yellowstone County et al*, Case No. 1:17-

28  cv-00124-SPW (D. Montana 2020) Document No. 156-25 at 13 (June 25, 2020 L. Hayes Assessment of *Otsby v. Yellowstone County et al.*).)

Care Facility].) Mr. Hayes inappropriately attempts to read into this recommendation a minimum-hours requirement for out-of-cell time. His findings of noncompliance are therefore improper. Neither Mr. Hayes's own Court-ordered recommendation nor the CDCR Program Guide policy that he audits sets a minimum out-of-cell-time hours requirement. His findings on this matter should be disregarded.

Regarding other findings of noncompliance, CDCR has demonstrated compliance with these recommendations outside of Mr. Hayes's two or three-day visits to these institutions. The Court's February 28, 2023 order made clear that Defendants may "demonstrate to the Special Master and to Mr. Hayes that they have completed work on outstanding recommendations" and that "the final version of his sixth round re-audit report...shall identify with specificity the date on which he finds any affected recommendations were fully implemented." (ECF. No. 7743 at 4.) Although Mr. Hayes may have found instances of noncompliance at these institutions, CDCR has since remedied many of those issues. CDCR demonstrates this compliance by its Regional SPRFIT Coordinator audits and their reports.

CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains two audits relevant to this recommendation. The first is an audit for Observation and Issue Orders. (Williams Decl., Ex. A at 89-90.) That audit integrates two indicators—observation orders reviewed that are properly documented and MHCB records with rationale for partial issue (SP13 and SP14)—that are not fully remediated as of this writing. (*Id.* ¶ 23.) The second audit is for privileges in crisis bed and inpatient units. (*Id.* Ex. A at 91-92.) That audit contains numerous remediated indicators including those for MHCB out of cell time pertaining to yard, phone calls, visits, showers, and dayroom. (SP15.1, SP15.2, SP15.3, SP15.4, and SP15.5.) Those indicators were remediated on June 26, 2023 by the Special Master's data expert. (*Id.* ¶ 23) Based on more current evidence, CDCR specifically objects to Mr. Hayes's findings below.

### 1. Wasco State Prison

During his April 18-19, 2023 visit to Wasco State Prison (WSP), Mr. Hayes reported that two patients had been in a crisis bed for at least six days and "the review found that one patient

1   had been offered two showers and yard on multiple days, and the second patient was offered only

2   one shower and yard on multiple days. Neither patient was offered a telephone call during the six

3   and seven days of placement." (ECF No. 8143-1 at 104.) Mr. Hayes further reported that there was

4   a misunderstanding that patients in safety smocks could not be allowed out of their cells to attend

5   yard. (*Id*. at 32, 104.) CDCR has since remediated the observed issues and is now in compliance

6   with recommendation 32 at WSP.

7            CDCR's Region 3 SPRFIT Coordinator visited WSP three times in 2023. (Mintz Decl., Ex.

8   G, Ex. J, & Ex. N.) On the first two visits, using paper housing logs, WSP showed inconsistencies

9   with yard and phone call privileges. (*Id.*, Ex. G & Ex. J.) However, during the November 2023 site

10  visit, the reviewer observed that WSP had transitioned to electronic housing logs (114 logs). (*Id.*,

11  Ex. N at 5.) All five patients had been offered yard at the time of the visit. (*Id.*) Four had been

12  offered telephone calls. (*Id.*) The one who had not yet been offered phone calls was a new arrival.

13  (*Id.*)

14           In sum, Mr. Hayes's findings and conclusions are stale and fail to reflect the current reality

15  of WSP's crisis bed privileges. Moreover, Mr. Hayes's findings are at odds with CDCR's

16  November 2023 audit which was conducted using the agreed upon criteria, and which show that

17  WSP is compliant with Mr. Hayes's recommendation. In accordance with the Court's February

18  2023 order, because WSP has demonstrated compliance with this recommendation since Mr.

19  Hayes's April 2023 visit, the Court should find that WSP has fully implemented the

20  recommendation.

21                          **2.      California State Prison, Sacramento**

22           During his April 4-6, 2023 visit to California State Prison, Sacramento (SAC), Mr. Hayes

23  reported that "CC Is were wrongly informing maximum-security/RHU patients during MHCB

24  IDTT meetings that they were prohibited from personal telephone calls except in emergencies."

25  (ECF No. 8143-1 at 30.) In addition, he found that "opportunities for yard were typically offered

26  on average of only once (for an hour) every five days, and telephone calls were offered to only six

27  of 23 patients." (*Id*. at 95.)

28           Mr. Hayes's finding that SAC is out of compliance with CDCR's policy on yard privileges

1    for crisis bed patients is improper. As noted above, the Program Guide policy on out-of-cell time

2    for crisis bed patients has no minimum number of required yard or dayroom time per day or week.

3    (See ECF No. 7333-1 at 379-81.) Thus, Mr. Hayes's finding that SAC was noncompliant for

4    offering yard "on average of only once (for an hour) every five days" is not a finding of a policy

5    violation.

6    Notwithstanding this policy misinterpretation, CDCR has remediated the observed issues

7    and is now in compliance with recommendation 32 at SAC. The CDCR Region 1 SPRFIT

8    Coordinator audited SAC on March 14-17, 2023. (Obegi Decl., Ex. B.) During that site visit, the

9    reviewer observed that all eligible patients in both crisis bed units were offered phone calls. (*Id.*,

10   Ex. B at 7.) No unstructured yard was running but there was yard conducted by recreational

11   therapists. Six of seven patients in CTC-1 were offered yard more than three days. (*Id.*)

12   A second site visit was conducted by the CDCR Region 1 SPRFIT Coordinator on August

13   1-3, 2023. (Obegi Decl., Ex. C.) The reviewer noted substantial improvement. All but one patient

14   in SAC's two crisis bed units had been offered phone calls. (Obegi Decl., Ex. C at 6.) Custody

15   staff had begun offering unstructured yard time in both units and patients were offered yard time

16   on a rotating basis. (*Id.*)

17   Finally, during the most recent site visit which occurred on October 18-19, 2023, the

18   Region 1 SPRFIT Coordinator again observed marked improvement. (Obegi Decl., Ex. F.) Eighty-

19   five percent (18/21) of the eligible patients audited during the site visit were offered phone calls.

20   (Obegi Decl., Ex. F at 6.) Ninety-one percent (22/24) of the patients were offered yard. (*Id.*)

21   In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

22   reality of SAC's crisis bed privileges. Moreover, Mr. Hayes's findings are at odds with CDCR's

23   August and October 2023 audits which was conducted using the agreed upon criteria, and which

24   show that SAC is compliant with Mr. Hayes's recommendation. Mr. Hayes also misinterprets

25   policy, apparently reading into the Program Guide policy minimum out of cell time requirements,

26   and his conclusions in that regard are improper. (ECF No. 7333-1 at 379-81.) In accordance with

27   the February 2023 order, because SAC has demonstrated compliance with this recommendation

28   since Mr. Hayes's April 2023 visit, the Court should find that SAC has fully implemented the

20681936.1

1  recommendation.

2               **3.**      **California Institution for Men**

3       During his May 18-19, 2023 visit to California Institution for Men (CIM), Mr. Hayes

4  reported that "CCI consistently and wrongly told patients on Suicide Watch that they were not

5  eligible for out-of-cell activities until they were cleared from Suicide Watch and approved for full

6  issue clothing." (ECF No. 8143-1 at 30.) Mr. Hayes also found that only ten of the twenty-three

7  patients were offered telephone calls and only eleven of twenty-three patients had been offered

8  yard more than once during their stay. (*Id*. at 126.)

9       CDCR objects to Mr. Hayes's findings and conclusions because CDCR's audits

10  demonstrated that CIM was compliant with this recommendation. Additionally, CDCR's crisis bed

11  privileges policy sets no minimum standard for the number of hours of out-of-cell time a patient

12  must be offered. (ECF No. 7333-1 at 379-81.) His finding that only eleven of twenty-three patients

13  had been offered yard more than once during their stay is meaningless and does not indicate

14  whether CDCR was compliant with its February 14, 2017 policy. (ECF No. 7333-1 at 379.) That

15  finding is therefore improper and should be disregarded.

16       Notwithstanding, CDCR's Region 4 SPRFIT Coordinator toured CIM four times in

17  2023—twice before and twice after Mr. Hayes's site visit. (Hudspeth Decl., Ex. B, Ex. C, Ex. F, &

18  Ex. H.) On each visit by CDCR's Region 4 SPRFIT Coordinator (in February, April, July, and

19  October 2023), the reviewer found that all crisis bed patients had been cleared and were being

20  offered yard, showers, and phone calls. (Hudspeth Decl., Ex. B at 4, Ex. C at 4, Ex. F at 4, & Ex.

21  H at 4.) CIM was also noted to have started using the electronic isolation log starting October 9,

22  2023. (*Id.*, Ex. H at 4.)

23       In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

24  reality of CIM's crisis bed privileges. Mr. Hayes's findings are at odds with CDCR's 2023 CIM

25  audits, which were conducted using the agreed upon criteria, and which show that CIM is now

26  compliant with Mr. Hayes's recommendation. Additionally, Mr. Hayes misinterprets CDCR

27  policy by finding that only eleven patients had been offered more than one yard opportunity

28  during their crisis bed admission, and his conclusions in that regard are improper. In accordance

1  with the Court's February 2023 order, because CIM has demonstrated compliance with this

2  recommendation since Mr. Hayes's May 2023 visit, the Court should find that CIM has fully

3  implemented the recommendation.

4  **4.    California Institution for Women**

5  During his May 15-17, 2023 visit to California Institution for Women (CIW), Mr. Hayes

6  reported that a patient on suicide watch's privileges were impermissibly withheld by her treatment

7  team. (ECF No. 8143-1 at 29.) The patient had been granted telephone calls the day prior and was

8  again granted them a few hours after the treatment team meeting. (*Id.*) Mr. Hayes noted five other

9  cases where patients were not offered out-of-cell activities because of lack of clinical

10 documentation, discrepancy with the 114-A log, or changes in privileges daily despite no changes

11 in patient behavior. (*Id.* at 122-123.) CDCR objects to this finding because CDCR's audits

12 demonstrate compliance both before and after Mr. Hayes's site visit.

13 CDCR's Region 4 SPRIFT Coordinators audited CIW four times in 2023. (Hudspeth

14 Decl., Ex. A, Ex. E, Ex. G, Ex. I.) During the first visit in January 2023, the reviewer observed

15 that crisis bed patients had been cleared for yard and dayroom, though phone calls were not

16 documented. (Hudspeth Decl., Ex. A at 5.) In the unlicensed crisis bed, the reviewer observed that

17 yard, phone calls, dayroom, and other out of cell activities were being offered. (*Id.*, Ex. A at 6.)

18 During the follow up visit in April 2023, the reviewer observed that all patients in the crisis beds

19 were offered yard, day room, and phone calls but yard was not frequently documented. (Hudspeth

20 Decl., Ex. E at 5.) However due to ongoing inclement weather, custody staff were offering patients

21 dayroom options in lieu of yard. (*Id.*) In the unlicensed unit, yard and dayroom was being offered

22 to all crisis bed patients, but phone calls were documented on a separate log. (*Id.*, Ex. E at 5-6.)

23 During the July 2023 visit, the reviewer observed that yard was not being offered for crisis

24 bed patients on suicide watch in both the licensed and unlicensed units. (Hudspeth Decl., Ex. G at

25 4-5.) Otherwise patients in the crisis bed were offered yard, phone calls, and dayroom. (*Id.*) Then,

26 during the November 2023 site visit, the Region 4 SPRFIT Coordinator observed that all patients

27 in both licensed and unlicensed crisis beds were being offered out of cell contacts, including yard,

28 showers, and phone calls. (Hudspeth Decl., Ex. I at 5-6.) Issues identified in the July 2023 visit

1    had been remedied by November 2023. (*Id.*)

2      In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

3    reality of CIW's crisis bed privileges. Mr. Hayes's findings are at odds with CDCR's 2023 CIW

4    audits, which were conducted using the agreed upon criteria, and which show that CIW is now

5    compliant with Mr. Hayes's recommendation. In accordance with the February 2023 order,

6    because CIW has demonstrated compliance with this recommendation since Mr. Hayes's May

7    2023 visit, the Court should find that CIW has fully implemented the recommendation.

8       **5. California Health Care Facility**

9      During his June 8-9, 2023 visit to California Health Care Facility (CHCF), Mr. Hayes

10    misinterpreted CDCR policy and found that "although all of the patients had been approved for

11    out-of-cell activities by providers, almost none were offered yard and/or dayroom *consistent with*

12    *10 hours per week.*" (ECF No. 8143-1 at 28, 155, emphasis added.) As noted above, CDCR's

13    February 14, 2017 crisis bed privileges policy sets no minimum out of cell time requirement for

14    crisis bed patients. (ECF No. 7333-1 at 379-81.) Mr. Hayes's own recommendation similarly does

15    not require a minimum number of out-of-cell time. Mr. Hayes cites to no policy, recommendation,

16    or Court order mandating ten hours of out of cell time per week for patients in a crisis bed.

17    Accordingly, Mr. Hayes's finding of noncompliance is improper.

18      Notwithstanding, in 2023, CDCR's SPRFIT Coordinators made two visits to CHCF and

19    found yard time was consistently offered in accordance with CDCR policy. (Stahl Declaration, Ex.

20    C & Ex. G.) During both the March and November 2023 site visits, the reviewer noted that the

21    114-A log for the MHCB and PIP indicated that patients were offered yard, shower, and phone

22    calls. (Stahl Decl., Ex. C at 3, Ex. G at 3.) Similar findings were noted during a January 16, 2024

23    CHCF site visit. (*Id.*, Ex. I at 3.)

24      In sum, Mr. Hayes's findings and conclusions are improper because they are premised on a

25    misinterpretation of CDCR policy and his own recommendation. Further, CDCR's own audits

26    show that CHCF is compliant with Mr. Hayes's recommendation. In accordance with the February

27    2023 order, because CHCF has demonstrated compliance with this recommendation before and

28    since Mr. Hayes's June 2023 visit, the Court should find that CHCF has fully implemented the

1  recommendation.

2  **6.    California Substance Abuse Treatment Facility**

3  During his June 29-30, 2023 visit to California Substance Abuse Treatment Facility, Mr.

4  Hayes found that a Program Status Report (PSR, i.e. modified program) was used to justify lack of

5  yard offerings, dayroom, and telephone calls. (ECF No. 8143-1 at 30.) The PSR was for an

6  "annual mass institution search of the entire institution." (*Id*.) Crisis bed staff incorrectly

7  interpreted the two-week PSR to mean that out-of-cell time was prohibited for the duration. (*Id*.)

8  Defendants object to Mr. Hayes's findings and conclusion. Although SATF misinterpreted the

9  PSR during two weeks of June 2023, this issue resulted from unusual circumstances, was not

10  systemic, and SATF has shown compliance with privileges since the PSR. (*Id.*)

11  CDCR's Region 3 SPRFIT Coordinator conducted audits at SATF in 2023 on March 23-

12  24, September 20-21, and December 14-15. (Mintz Decl., Ex. D, Ex. K, & Ex. Q.) During the

13  March and September site visits, deficiencies in privileges were noted, though none were noted as

14  relating to a Program Status Report. (*Id.*, Ex. D at 6-7 & Ex. K at 6.) Prior to the December 2023

15  site visit, the institution transitioned to the automated privilege tracking system. (*Id.*, Ex. Q at 6.)

16  During the December 2023 site visit, the Region 3 SPRFIT Coordinator audited ten

17  patients in the crisis bed during the review. (Mintz Decl., Ex. Q at 5-6.) All ten patients had been

18  offered yard during their stay, nine had been offered dayroom, and eight had been offered phone

19  calls. (*Id.*) One of those patients had just arrived at the crisis bed the day prior to the audit which

20  explains why he had not yet been offered phone calls or day room. (Mintz Decl., Ex. Q at 6.)

21  In sum, Mr. Hayes's conclusion that SATF is non-compliant with this recommendation is

22  improper. SATF showed high compliance with crisis bed privileges during the December 2023

23  Region 3 SPRFIT Coordinator site visit. Nor can Mr. Hayes demonstrate that noncompliance due

24  to the PSR was a systemic issue. The issue was isolated to a two-week period in June 2023 and

25  impacted just four patients. In accordance with the February 2023 order, because SATF

26  demonstrated compliance with this recommendation, the Court should find that SATF has fully

27  implemented the corresponding recommendation.

28  / / /

20681936.1

1

### 7.   Central California Women's Facility

2   During his November 14-15, 2023 visit to Central California Women's Facility (CCWF),

3   Mr. Hayes found that custody documentation on the 114 log did not contain any information

4   regarding telephone or dayroom opportunities. (ECF No. 8143-1 at 29, 302.) The CCWF crisis

5   bed had only recently reopened prior to Mr. Hayes's visit. The unit had been closed from

6   November 8, 2021 until October 13, 2023. (Williams Decl. ¶ 24.) Notwithstanding, CDCR's

7   Region 2 SPRFIT Coordinator audited CCWF on February 22, 2024. (Stahl Decl., Ex. J at 4.)

8   Noting Mr. Hayes's findings of noncompliance with phone and dayroom opportunities, the

9   reviewer found that, based on a review of ten crisis bed patients, yard, dayroom, showers, and

10   phone calls were offered to all patients. (*Id.*)

11   In sum, CCWF showed compliance with crisis bed privileges during the February 2024

12   Region 2 SPRFIT Coordinator site visit. In accordance with the February 2023 order, because

13   CCWF demonstrated compliance with this recommendation, the Court should find that CCWF has

14   fully implemented the corresponding recommendation.

15

### 8.   Objections to Recommendation for Corrective Action Plan

16   Mr. Hayes makes several recommendations pertaining to crisis bed privileges. He

17   recommends that CDCR issue corrective action plans at twelve institutions. (ECF No. 8143-1 at

18   34.) That recommendation is unnecessary. First, as noted above, at least seven of those institutions

19   are compliant with Recommendation 32. Second, with very limited exception, Mr. Hayes's

20   findings are stale and he shows no evidence that a corrective action plan is currently necessary—

21   *i.e.* as of the filing of his Sixth Re-Audit report. Since Mr. Hayes's site visits, those institutions

22   have been reaudited for crisis bed privileges by the Regional SPRFIT Coordinators and corrective

23   action plans have been issued where deficiencies were found. Many of Mr. Hayes's findings are

24   nearly a year old as he conducted his visit at SAC and WSP in April 2023 and CIW and CIM in

25   May 2023. The following table compares Mr. Hayes's visits with subsequent CDCR audits:

26   / / /

27   / / /

28   / / /

20681936.1

| Institution | Hayes Visit | Subsequent CDCR Audits |
|---|---|---|
| SAC | April 4-6, 2023 | Aug. 1-3, Oct. 18-19, 2023 |
| WSP | April 18-19, 2023 | May 17-18, Aug. 28-29, Nov. 13-14, 2023 |
| CIW | May 15-17, 2023 | July 11-12, Nov 28, 2023, Feb. 13, 2024 |
| CIM | May 18-19, 2023 | July 5, October 3, 2023 |
| CHCF | June 8-9, 2023 | Nov 2, 2023, Jan 16, 2024 |
| COR | June 27-28, 2023 | Sept. 18-19, Dec 12-13, 2023 |
| SATF | June 29-30, 2023 | Sept. 20-21, Dec 14-15, 2023 |
| KVSP | July 13-14, 2023 | Nov. 8-9, 2023 |
| RJD | August 21-22, 2023 | Nov. 7-8, 2023 |
| CMF | September 25-26, 2023 | March 2024 |
| PBSP | November 2-3, 2023 | December 2023[14] |
| CCWF | November 14-15, 2023 | Feb. 22, 2024 |

In sum, Mr. Hayes's recommendations for corrective action plans to address deficiencies that he discovered months or nearly a year ago are unnecessary as the recommendations are based on outdated findings. CDCR has audited these institutions—often more than once—since Mr. Hayes's site visit and, as demonstrated above, those audits confirmed that the institutions are in compliance with the recommendations.

### 9.  Objection to Recommendation for a Memo Regarding Telephone Calls

Mr. Hayes recommends that CDCR issue a "clarifying memorandum that mandates at least once a week telephone access absent any clinical contraindication and/or disciplinary sanction to remedy continued misinterpretation of CDCR policy regarding telephone privileges afforded to both non-maximum security and maximum security MHCB and PIP patients." (ECF No. 8143-1 at 34.) CDCR objects to issuing a "clarifying memorandum" as CDCR's telephone call policy is sufficiently clear, and Mr. Hayes does not specifically point to any provision in the current policy that is unclear. Furthermore, compliance with that policy is best made through CDCR's regular audit process. CDCR's February 14, 2017, policy clearly articulates the requirement for phone calls: "IPs housed in the MHCB Program shall be entitled to utilize the IP telephone, in accordance with his/her assigned privilege group unless specifically restricted by the MHCB IDTT." (ECF No. 7333-1 at 379-81.) No further policy reiteration is necessary.

/ / /

---

[14] PBSP was reviewed remotely in December 2023.

### G.   Mental Health Referrals and Suicide Risk Evaluations

Defendants object to Mr. Hayes's findings and conclusions regarding Mental Health Referrals and Suicide Risk Evaluations. (ECF No. 8143-1 at 35-40.) Mr. Hayes's findings on Mental Health Referrals and Suicide Risk Evaluations measures compliance with two recommendations:

- Recommendation 9. CDCR should revise its SRE Mentoring Program to (i.) eliminate its "graduation" component after completion of two adequate assessments, (ii.) conduct ongoing mentoring throughout the year, and (iii.) audit clinicians' SREs on a regularly scheduled basis; and,

- Recommendation 10. Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

(ECF No. 6879 at 19, 27, 34, *see also* ECF No. 6973 at 7 [requiring 100 percent compliance with Recommendation 10].) Because these recommendations are distinct, CDCR addresses them one at a time.

#### 1.   Objections to Mr. Hayes's Findings Regarding Recommendation 9

##### a.   Mr. Hayes Did Not Audit Recommendation 9 and his Findings are Therefore Improper.

In his Fifth Re-Audit, Mr. Hayes provided "a list of recommendations that remain to be completely and durably implemented *and the steps defendants must take to do so.*" (ECF No. 7636 at 21, emphasis added.) According to that report, compliance with Recommendation 9, required that "at least 90 percent of mental health clinicians at each audited CDCR facility [must be] compliant with the requirements of both the seven-hour SRE training and SRE mentoring program." (*Id.* at 24.) Notably, although the plain language of Recommendation 9 requires it, Mr. Hayes does not audit whether CDCR has revised its SRE Mentoring Program to eliminate the graduation component, conducted ongoing mentoring throughout the year, or audited clinicians' SREs on a regularly scheduled basis. (*See id*.) Mr. Hayes and the Special Master have substituted a new requirement for Recommendation 9—whether CDCR staff "had completed both the SRE mentoring program and annual or biennial SRE Mentoring Booster training as applicable

1  (Recommendation 9)." (ECF No. 8143-1 at 37.) These training requirements are distinct from the

2  Court-ordered recommendation and, as demonstrated below, CDCR is in compliance with them.

3       Mr. Hayes found that ten institutions were noncompliant with Recommendation 9 because

4  they did not comply with SRE mentoring or biennial SRE training requirements. (ECF No. 8143-1

5  at 37, 39.) Mr. Hayes made no findings whether CDCR: (1) eliminated the graduation component

6  of its SRE Mentoring Program; (2) conducts ongoing mentoring throughout the year; or, (3) audits

7  clinicians' SREs on a regular basis. Thus, his findings of noncompliance for these ten institutions

8  are improper and must be disregarded by the Court. The Court should find, absent evidence to the

9  contrary, that CDCR is fully compliant with Recommendation 9.

10            **b.**      **Instead of Auditing Recommendation 9, Mr. Hayes Audited**

11                   **Training Requirements for Which CDCR is Compliant.**

12       Although Mr. Hayes found CDCR noncompliant at ten institutions[15] with

13  Recommendation 9 because they failed to adhere to SRE training schedules, CDCR can

14  demonstrate compliance with those trainings at California Correctional Institution (CCI). In 2023,

15  CCI had a 94.38% completion rate for the SRE mentoring training and a 98.76% completion rate

16  for the biennial SRE training. (Williams Decl. ¶ 26.)

17       Although the other nine institutions did not score over ninety percent for both initial and

18  biennial SRE training, in 2023, five other institutions scored over ninety percent for the biennial

19  SRE training. Those institutions are Central California Women's Facility (90.29%), California

20  Men's Colony (93.52%), California Medical Facility (92.99%), California State Prison, Los

21  Angeles County (97.25%), and California Health Care Facility (95.43%). (*Id.*) Statewide, in 2023,

22  CDCR scored over ninety-one percent for completion of the biennial training. (*Id.*)

23       Mr. Hayes's findings regarding CDCR's compliance with SRE Mentoring and Biennial

24  Training at CCI are incorrect.

25  / / /

26  

27  [15] California Health Care Facility, California State Prison, Corcoran, Substance Abuse Treatment Facility, California State Prison, Los Angeles County, California Men's Colony, Pelican Bay State Prison,

28  California State Prison, Solano, California Medical Facility, Central California Women's Facility, and California Correctional Institution. (ECF No. 8143-1 at 39.)

### 2. Objections to Mr. Hayes's Findings Regarding Recommendation 10

The Special Master and Mr. Hayes found that in order to achieve compliance with Recommendation 10 "defendants should ensure through the SPRFIT or other process that Suicide Risk Assessment and Self-Harm Evaluations (SRASHEs) are always completed for inmates presenting as possible risk for suicide at each audited CDCR facility." (ECF No. 6879 at 19.) One hundred percent compliance is required. (*Id.*, *see also* ECF 6973.)

Mr. Hayes concludes that "only 71 percent (15 of 21) of audited facilities achieved over 90 percent compliance with the required completion of SRASHEs." (ECF No. 8143-1 at 37.) He noted that six institutions—California Health Care Facility (CHCF), California Men's Colony (CMC), California State Prison, Solano (SOL), Substance Abuse Treatment Facility (SATF), North Kern State Prison (NKSP), and R.J. Donovan Correctional Facility (RJD)—scored under ninety percent. (*Id.*)

CDCR objects to Mr. Hayes's findings of noncompliance because he did not actually audit whether "each facility's SPRFIT . . . audit[s] the quality of completed SREs on a monthly basis." Instead, Mr. Hayes substitutes an entirely different criteria for determining compliance with Recommendation 10 by auditing how often the department completed its suicide risk assessment when patients present with suicidal ideation or suicidal behavior. (ECF No. 8143-1 at 37.) Mr. Hayes's finding that CDCR is not compliant with this recommendation is therefore improper because he failed to make any findings of fact related to the actual recommendation.

The findings in the report demonstrate that Mr. Hayes did not audit the plain language of Recommendation 10. Instead he audited whether the SRASHEs are being adequately completed 100 percent of the time for patients that are presenting as a possible risk for suicide. Mr. Hayes has not recommended, nor has the Court ordered, a compliance threshold for such findings. First, instead of observing whether CHCF's SPRFIT is auditing the quality of completed SREs on a monthly basis, Mr. Hayes instead engages in a review of "a sample of 71 emergent/urgent referrals for SI/behavior" and finds that "clinical staff had completed the required SRASHEs in only 89 percent (63 of 71) of the cases." (ECF No. 8143-1 at 37.) He goes on for over a page to discuss just one case that was problematic but makes no findings regarding whether SPRFITs are

20681936.1

1  conducting quality audits. (*Id.* at 37-38.)

2      Next, Mr. Hayes discusses a concerning case at Kern Valley State Prison—an institution

3  he found completed SRASHEs at "a high 98 percent compliance rate." (*Id.* at 38.) Following that

4  discussion, he criticizes the use the Columbia-Suicide Severity Rating Scale at RJD as a means for

5  documenting suicidal risk. (*Id.* at 38-39.) And finally, Mr. Hayes discusses "noteworthy problems"

6  with some of CDCR's local Crisis Intervention Teams (CIT). (*Id.* at 39.) CITs are not part of

7  Recommendation 10 nor are they subject to any prior recommendation or Court order.

8      Notably, at the six institutions where Mr. Hayes found below ninety percent compliance,

9  Mr. Hayes never reported inadequacy with SRASHE reviews. (ECF No. 8143-1 at 128 [making no

10 findings at CHCF], *id.* at 135 [noting RJD's SPRFIT discussed SRASHEs at SPRFIT meetings],

11 *id.* at 175 [making no findings at SOL], *id.* at 181 [making no findings at NKSP], *id.* at 195

12 [finding that CMC "consistently" discussed SRASHEs in SPRFIT meetings], and, *id.* at 203

13 [again finding that SATF "consistently" discussed SRASHEs].)

14     In sum, Mr. Hayes's findings regarding Recommendation 10 are entirely detached from its

15 requirements—that "[e]ach facility's SPRFIT should audit the quality of completed SREs on a

16 monthly basis." Mr. Hayes did not recommend, nor has the Court ordered, a compliance threshold

17 that SRASHEs be adequately completed 100 percent of the time for patients that are presenting as

18 a possible risk for suicide. His findings to that effect are irrelevant, improper, and should be

19 disregarded. What limited findings he made connecting SPRFITs to SRASHEs do not indicate any

20 level of noncompliance. Thus, the Court should find that CDCR is in compliance with

21 Recommendation 10 given the absence of findings to the contrary.[16]

22 / / /

23 / / /

24 / / /

25

26 [16] Oddly, even though Mr. Hayes had access to the very information underpinning Recommendation 10
   during his re-audit, he failed to report on that data. The Special Master's data expert remediated an
27 indicator called Quality of Selected SRASHE Documentation (SP23) on December 9, 2022—nearly four
   months before the start of Mr. Hayes's most recent audit. (Williams Decl., ¶ 27.) Nothing in his report
28 suggests the indicator was utilized. According to the indicator, in 2023 alone, CDCR conducted 1,445 such
   audits. (*Id.*)

20681936.1

1

### 3. Mr. Hayes's Finding Regarding RJD's Use of the Columbia Screener is Improper.

2

3        Mr. Hayes criticized R.J. Donovan's use of the Columbia-Suicide Severity Rating Scale

4  (C-SSRS) as a "violation of CDCR directives." (ECF No. 8143-1 at 38.) In a footnote, he states

5  that a C-SSRS "might be appropriate as a screening tool for routine screening inquiry when an

6  individual does not present with any known risk for suicide, the SRASHE is required when an

7  individual expresses suicidal ideation or otherwise presents as a danger to self and requires a

8  comprehensive suicide risk assessment." (*Id.* at fn. 10.) Mr. Hayes's finding is improper.

9        Although the Program Guide requires a SRASHE, use of a C-SSRS is also a reasonable

10  tool for documenting suicide risk. (Andrade Decl. ¶ 24 ("CDCR's use of the Columbia-Suicide

11  Severity Rating Scale as a screening tool is clinically appropriate. Indeed, The Joint Commission

12  requires screening for suicidal ideation using a validated tool starting at age 12 and above, and

13  lists the Columbia-Suicide Severity Rating Scale (C-SSRS) Triage version as a validated and

14  evidenced based tool for such screening.").) Because the C-SSRS records a suicide risk

15  assessment, there is no evidence of a failure to conduct a suicide risk assessment or of a gap in

16  CDCR's policy-driven barriers to suicide prevention. The Program Guide states that "[w]hen an

17  inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that

18  no change in suicide risk has occurred since completion of the prior [SRASHE], instead of

19  completing a new [SRASHE]." (ECF No. 7333-1 at 175.) The use of a C-SSRS is within these

20  guidelines and Mr. Hayes makes no findings to the contrary. Mr. Hayes's findings that a C-SSRS

21  is a "violation of CDCR directives" is therefore inaccurate and improper.

22     **H.    Safety Planning for Suicidal Inmates**

23        Defendants object to Mr. Hayes's findings and conclusions regarding Safety Planning for

24  Suicidal Inmates. (ECF No. 8143-1 at 40-47.) Mr. Hayes's findings on Safety Planning for

25  Suicidal Inmates measures compliance with two recommendations:

26  •  Recommendation 17 – CDCR should adopt the recommendations made in connection with

27     SREs set forth above (Referencing Recommendations 9 and 10), which will also improve

28     treatment planning contained in the SREs section above.

- Recommendation 18 – CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment." (ECF No. 6879 at 19, 27, 35, *see also* ECF No. 6973.) Both recommendations are addressed below.

### 1.    Recommendation 17 is Redundant.

By its terms, Recommendation 17 is redundant to Recommendations 9 and 10. "CDCR should adopt the recommendations made in connection with SREs" e.g., those requiring a revision to the SRE mentoring program (Recommendation 9) and requiring each facility's SPRFIT to audit the quality of completed SREs (Recommendation 10). (ECF No. 8143-1 at 7.) Although CDCR objects to his findings, Mr. Hayes found CDCR fifty-two percent compliant with Recommendation 9 and seventy-one percent compliant with Recommendation 10. (*Id.*) Although one would expect that compliance with Recommendation 17 would be aligned accordingly, Mr. Hayes instead finds that CDCR is only ten percent compliant with Recommendation 17. (*Id.*) This begs the question as to what Mr. Hayes is actually monitoring with respect to this Court ordered recommendation.

In his Fourth Re-Audit, Mr. Hayes provided his opinion on the "necessary steps preceding a determination of compliance with" each recommendation's full implementation. (ECF No. 6879 at 16.) Regarding Recommendation 17, Mr. Hayes advised that CDCR institutions "maintain adequate treatment (safety) plans in at least 90 percent of reviewed cases." (*Id.* at 20.) But this is not related to whether CDCR has implemented Recommendations 9 or 10. In his Fifth Re-Audit, Mr. Hayes added yet another prerequisite to finding compliance. (ECF No. 7636 at 21.) According to that report, compliance with Recommendation 17 required defendants "to *implement the new safety planning model and* ensure that each audited CDCR facility maintains adequate treatment (safety) plans in at least 90 percent of reviewed cases." (*Id.* at 25-26, emphasis added.)

Compliance with Recommendation 17 has become a moving target. Instead of monitoring whether CDCR has implemented Recommendations 9 or 10, he now appears to monitor whether CDCR has revised its policy on safety planning, determining how often safety planning was

1   completed, and determining how often supervisory reviews of safety planning were occurring.

2   These findings are not connected to whether CDCR was in compliance with SRE

3   Recommendations 9 and 10.

4          Because the recommendation is redundant and Mr. Hayes now audits entirely different

5   issues from Recommendation 17's requirements, the Court should disregard his findings and strike

6   Recommendation 17 in its entirety. If Mr. Hayes wishes to revise the content of Recommendation

7   17, he should make such a recommendation, subject to judicial review and response from the

8   parties.

9               **2.       Recommendation 18 is Also Objectionable.**

10         Mr. Hayes found safety planning training noncompliance at six institutions. (ECF No.

11  8143-1 at 46.) Although not listed in the body of his report, CDCR believes from the appendices

12  that those six institutions are Wasco State Prison, California State Prison, Sacramento, California

13  Institution for Women, California State Prison, Corcoran, Substance Abuse Treatment Facility,

14  and California State Prison, Los Angeles County. (ECF No. 8143-1 at 99, 107, 124, 168, 178, and

15  224.) CDCR revised its safety planning training in early 2023. (Williams Decl. ¶ 29.) A new

16  training was issued to the field on March 16, 2023 and institutions were given ninety days to

17  complete the training. (*Id.*, Ex. B.) Accordingly, CDCR objects to Mr. Hayes findings of

18  noncompliance made prior to June 16, 2023 as the institutions did not have sufficient time to

19  complete the training.

20         Notwithstanding, Mr. Hayes improperly finds that training of the field should have been

21  completed by March 16, 2023. (ECF No. 8143-1 at 41 [noting that "[t]his reviewer's sixth re-audit

22  commenced in April 2023, subsequent to the defendants' safety plan policy issuance and required

23  completion of training"].) In fact, the "training for trainers," sessions for institutional trainers to

24  learn how to train their staff was completed on March 16, 2023. Training for institutional staff

25  began after that mark and was required to be completed no later than June 16, 2023. (Williams

26  Decl. Ex. B.) Thus, Mr. Hayes's finding that CDCR staff should have fully complied with the

27  training requirements before the start of his round is improper and unreasonable because it fails to

28  account for the applicable deadlines for completing the new training.

Separately, CDCR Regional SPRFIT Coordinators audit safety planning training as part of their regular site visits. Regional SPRFIT Coordinators routinely audit compliance in accordance with instructions in the Suicide Prevention Continuous Quality Improvement Tool Guidebook, last updated January 18, 2024. (Williams Decl., Ex. A at 105.) Their findings are outlined below.

### a.    Wasco State Prison

During his April 18-19, 2023 visit to Wasco State Prison (WSP), Mr. Hayes reported that WSP was only thirty-one percent compliant with safety planning training, noting that the new training had just rolled out. (ECF No. 8143-1 at 107.) Training compliance improved shortly after his site visit and WSP achieved over ninety-percent compliance by August 2023.

CDCR's Region 3 SPRFIT Coordinator visited WSP three times in 2023. (Mintz Decl., Ex. G, Ex. J, & Ex. N.) On the first visit, in May 2023, the reviewer reported that WSP was eighty-nine percent compliant with safety planning training. (Mintz Decl., Ex. G at 9.) During the August 2023 site visit, the CDCR Region 3 SPRFIT Coordinator found that WSP was ninety-six percent compliant with safety planning training. (Mintz Decl., Ex. J at 9.) And during the November 2023 site visit, the reviewer noted that WSP was 100 percent compliant with safety planning training. (Mintz Decl., Ex. N at 9.)

In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current reality of WSP's improved safety planning training compliance. Moreover, Mr. Hayes's findings are at odds with CDCR's August and November 2023 audits which show that WSP is compliant with Mr. Hayes's recommendation. Moreover, because his findings and conclusions are from an audit that occurred before the allowed training period had concluded, they are improper. In accordance with the Court's February 2023 order, because WSP has demonstrated compliance with this recommendation since Mr. Hayes's April 2023 visit, the Court should find that WSP has fully implemented the recommendation.

### b.    California State Prison, Sacramento

During his April 4-6, 2023 visit to California State Prison, Sacramento (SAC), Mr. Hayes reported that SAC was thirty-six percent compliant with the new safety plan training. (ECF No. 8143-1 at 99.) CDCR's Region 1 SPRFIT Coordinator audited SAC three times in 2023. (Obegi

20681936.1

1  Decl., Ex. B, Ex. C, & Ex. F.) By July 2023, SAC was compliant with the newly released safety

2  planning training. (*Id.*, Ex. C at 15 & Ex. F at 13.)

3      A site visit was conducted by the CDCR Region 1 SPRFIT Coordinator on August 1-3,

4  2023. (Obegi Decl., Ex. C.) The reviewer noted that SAC was ninety-five percent compliant with

5  the new safety planning training as of July 2023. (Obegi Decl., Ex. C at 11.) The reviewer noted

6  the same compliance rate during the October 18-19, 2023 site visit. (Obegi Decl., Ex. F at 10.)

7      In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

8  reality of SAC's safety planning training. Moreover, Mr. Hayes's findings are at odds with

9  CDCR's August and October 2023 audits which show that SAC is compliant with Mr. Hayes's

10  recommendation. Moreover, because his findings and conclusions are from an audit that occurred

11  before the allowed training period had concluded, they are improper. In accordance with the

12  February 2023 order, because SAC has demonstrated compliance with this recommendation since

13  Mr. Hayes's April 2023 visit, the Court should find that SAC has fully implemented the

14  recommendation.

15                    **c.    California Institution for Women**

16      During his May 15-17, 2023 visit to California Institution for Women (CIW), Mr. Hayes

17  reported that CIW was only thirty-eight percent compliant with the new safety planning training.

18  (ECF No. 8143-1 at 124.) However, by November 2023, according to CDCR's Region 4 SPRFIT

19  Coordinator, CIW was 100 percent compliant. (Hudspeth Decl., Ex. I at 7.)

20      As with the other institutions noted above, Mr. Hayes's findings and conclusions are

21  outdated and fail to reflect the current reality of CIW's safety planning training. Mr. Hayes's

22  findings are at odds with CDCR's November 2023 CIW audits which show that CIW is now

23  compliant with Mr. Hayes's recommendation. Moreover, because his findings and conclusions are

24  from an audit that occurred before the allowed training period had concluded, they are improper.

25  In accordance with the February 2023 order, because CIW has demonstrated compliance with this

26  recommendation since Mr. Hayes's May 2023 visit, the Special Master and Mr. Hayes should note

27  that CIW has fully implemented the recommendation.

28  / / /

1    **I.    MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks**

2

3    Defendants object to Mr. Hayes's findings and conclusions regarding the MHCB and

4    Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody

5    Welfare Checks. (ECF No. 8143-1 at 47-50.) Mr. Hayes's findings on MHCB and Alternative

6    Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks

7    measure compliance with two recommendations:

8    • Recommendation 28. All inmates discharged from an MHCB or alternative housing, where

9        they had been housed due to suicidal behavior, should be observed at 30-minute intervals

10        by custody staff, regardless of the housing units to which they are transferred.

11    • Recommendation 29. The length of time an inmate is observed at 30-minute intervals

12        following MHCB or alternative housing discharge should be determined on a case-by-case

13        basis by the mental health clinician and clinically justified.

14    (ECF No. 6879 at 27, 36.)

15    Mr. Hayes found that:

16    [O]nly two (CIW and CMC) of 20 audited facilities, or 10 percent, had clinicians and
     custody personnel correctly complete both pages of the 'Discharge Custody Check
17    Sheet' (CDCR MH-7497) forms in 90 percent or more of the cases . . . In addition,
     50 percent (10 of 20) of the audited facilities had neither clinicians nor custody
18    personnel correctly complete both pages of the 'Discharge Custody Check Sheet'
     (CDCR MH-7497) forms in 90 percent or more of the cases.
19

20    (ECF No. 8143-1 at 48.)

21    CDCR developed the two-page CDCR MH-7497 form to document compliance with

22    Recommendations 28 and 29. The first page is for the clinician to determine whether the thirty-

23    minute welfare checks should be continued up to seventy-two hours. (Recommendation 29.) The

24    second page is for custody staff conducting the checks to document their thirty-minute rounds.

25    (Recommendation 28.) (Williams Decl. ¶ 32.)

26    CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook approved by Mr. Hayes

27    to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains an

28    audit for Custody Follow Ups 7497 Forms (SP12) which was remediated on September 15, 2023,

1   by the Special Master's data expert. (Williams Decl., Ex. A at 95.) Despite having been discussed

2   by Plaintiffs and Special Master stakeholders in BRMR for nearly four months between June 29,

3   2022 and October 26, 2022, the Special Master team raised new issues with SP12 in late 2023, and

4   *after* SP12 had already been remediated by the Special Master's data expert. (Williams Decl. ¶

5   33.) Because the indicator was remediated through the agreed upon process, Defendants

6   appropriately rely on compliance data regarding Recommendations 28 and 29.

7          Mr. Hayes's report does not clearly state which institutions are compliant with either

8   Recommendation 28 or 29. Based on Defendants' review of the appendices, Mr. Hayes reported

9   compliance with Recommendation 28 for seven institutions—Wasco State Prison (WSP),

10  California Institution for Women (CIW), California Institution for Men (CIM), North Kern State

11  Prison (NKSP), California Medical Facility (CMF), California Men's Colony (CMC), and Pelican

12  Bay State Prison (PBSP). (ECF No. 8143-1 at 107, 124, 127, 187, 245, 258, and 297.)

13         Mr. Hayes's own findings also show that CDCR is in substantial compliance with

14  Recommendation 28 at another six institutions. San Quentin Rehabilitation Center (SQ), Mule

15  Creek State Prison (MCSP), California State Prison, Corcoran (COR), Substance Abuse Treatment

16  Facility (SATF), Kern Valley State Prison (KVSP), and Central California Women's Facility

17  (CCWF) were all found to be over eighty-five percent compliant with Recommendation 28. (*Id*. at

18  131 finding SQ 88% compliant, 143 finding MCSP at 87% compliance, 167 finding COR at 85%

19  compliance, 177 finding SATF at 87% compliance, 196 finding KVSP at 85% compliance, and

20  304 finding CCWF at 87% compliance.) Based on this data from the Hayes report, the Court

21  should find CDCR in compliance or substantial compliance with Recommendation 28 at thirteen

22  of the twenty audited institutions.

23         Additionally—again based on a review of the appendices—Mr. Hayes reported compliance

24  with Recommendation 29 for five institutions including California Institution for Women (CIW),

25  SQ, California Health Care Facility (CHCF), California Men's Colony (CMC), and High Desert

26  State Prison (HDSP). (*Id.* at 124, 131, 157, 258, and 288.) Again, Mr. Hayes's own findings show

27  that CDCR is in substantial compliance with Recommendation 29 at eight additional institutions.

28  WSP, California Correctional Institution (CCI), CIM, MCSP, COR, PBSP, and CCWF were all

20681936.1

found to be over eighty-five percent compliant with Recommendation 29. (*Id*. at 106 finding WSP at 89% compliance, 118 finding CCI at 85% compliance, 127 finding CIM at 87% compliance, 142 finding MCSP at 89% compliance, 167 finding COR at 88% compliance, 196 finding KVSP at 87% compliance, 297 finding PBSP at 88% compliance, and 304 finding CCWF at 85% compliance.) Based on this data from the Hayes report, the Court should find CDCR in compliance or substantial compliance with Recommendation 29 at thirteen of the twenty audited institutions.

For ease of reference, a compliance table based on the appendices to Mr. Hayes's report is below:

| # | Institution | Page 1 (Rec 29) | Page 2 (Rec 28) | (ECF No. 8143-1) |
|---|---|---|---|---|
| 1 | SAC | 81% | 67% | Page 98 |
| 2 | WSP | 89% | 100% | Pages 106-107 |
| 3 | CCI | 85% | 70% | Page 118 |
| 4 | CIW | 99% | 95% | Page 124 |
| 5 | CIM | 87% | 90% | Page 127 |
| 6 | SQ | 97% | 88% | Page 131 |
| 7 | MCSP | 89% | 87% | Pages 142-143 |
| 8 | CHCF | 93% | 66% | Page 157 |
| 9 | COR | 88% | 85% | Page 167 |
| 10 | SATF | 74% | 87% | Page 177 |
| 11 | NKSP | 81% | 97% | Page 187 |
| 12 | KVSP | 87% | 85% | Page 196 |
| 13 | RJD | 80% | 74% | Page 209 |
| 14 | LAC | 40% | 16% | Page 222 |
| 15 | CMF | 48% | 94% | Page 245 |
| 16 | CMC | 95% | 92% | Page 258 |
| 17 | SVSP | 74% | 62% | Pages 277-278 |
| 18 | HDSP | 100% | 77% | Page 288 |
| 19 | PBSP | 88% | 94% | Page 297 |
| 20 | CCWF | 85% | 87% | Page 304 |

Many of Mr. Hayes's findings for Recommendation 28 or 29 are outdated and improvements have been subsequently made at several institutions as discussed in detail below. In addition to the above objection, CDCR specifically objects to Mr. Hayes's findings at eight institutions below.

/ / /

/ / /

1    **1.    Wasco State Prison (Recommendation 29)**

2        During his April 18-19, 2023 visit to Wasco State Prison (WSP), Mr. Hayes reported that

3    WSP was eighty-nine percent compliant with page one (Recommendation 29) and 100 percent

4    compliant with page 2 (Recommendation 28) in the review period. (ECF No. 8143-1 at 106-107.)

5    However, CDCR's Region 3 SPRFIT Coordinator visited WSP after Mr. Hayes's visit. Using the

6    agreed upon audit criteria, during his November 13-14, 2023 site visit, the reviewer noted that

7    WSP had been over ninety-eight percent compliant with 7497s in July, August, and September

8    2023. (Mintz Decl., Ex. N at 6-7.)

9        In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

10   reality of WSP's compliance with Recommendations 29. Moreover, Mr. Hayes's findings are at

11   odds with CDCR's November 2023 audits, which were conducted using the agreed upon criteria,

12   and which show that WSP is compliant with Mr. Hayes's recommendation. In accordance with the

13   February 2023 order, because WSP has demonstrated compliance with this recommendation since

14   Mr. Hayes's April 2023 visit, the Court should find that WSP has fully implemented the

15   recommendation.

16   **2.    San Quentin Rehabilitation Center (Recommendation 28)**

17       During his May 23-25, 2023 visit to San Quentin Rehabilitation Center (SQ), Mr. Hayes

18   reported that SQ was ninety-seven percent compliant with page one of the 7497 (Recommendation

19   29) but only eighty-eight percent compliant with page 2 (Recommendation 28). (ECF No. 8143-1

20   at 131.) However, CDCR Region 1 SPRFIT Coordinators visited San Quentin Rehabilitation

21   Center twice in 2023. (Obegi Decl., Ex. A & E.) During the second visit in October 2023, the

22   reviewer observed, using the agreed upon audit, reported that SQ had shown compliance with the

23   7497 form, namely that it had scored nearly 100 percent in February 2023, ninety-four percent in

24   March 2023, ninety-seven percent in April 2023, ninety-eight percent in May 2023, ninety-eight

25   percent in June 2023, ninety-nine percent in July 2023 and ninety-nine percent in August 2023.

26   (*Id.*, Ex. E at 5.)

27       In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

28   reality of SQ's compliance with Recommendation 28. Moreover, Mr. Hayes's findings are at odds

1    with CDCR's 2023 audits, which were conducted using the agreed upon criteria, and which show

2    that SQ is compliant with Mr. Hayes's recommendation. In accordance with the February 2023

3    order, because SQ has demonstrated compliance with this recommendation since Mr. Hayes's

4    April 2023 visit, the Court should find that SQ has fully implemented the recommendation as of

5    April 2023.

6                    **3.       Mule Creek State Prison (Recommendations 28 and 29)**

7            During his June 6-7, 2023 visit to Mule Creek State Prison (MCSP), Mr. Hayes found that

8    MCSP was eighty-nine percent compliant with page one (Recommendation 29) and eighty-seven

9    percent compliant with page two (Recommendation 28) of the 7497 form. (ECF No. 8143-1 at

10   142-43.) However, during the CDCR Region 1 SPRFIT Coordinator's December 12, 2023 visit of

11   MCSP, the reviewer audited 7497 form compliance and found that MCSP was ninety-seven

12   percent compliant in September, ninety-five percent compliant in October, and ninety-four percent

13   compliant in November 2023. (Obegi Decl., Ex. G at 5.)

14           In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

15   reality of MCSP's compliance with Recommendations 28 and 29. Moreover, Mr. Hayes's findings

16   are at odds with CDCR's 2023 audits, which were conducted using the agreed upon criteria, and

17   which show that MCSP is compliant with Mr. Hayes's recommendation. In accordance with the

18   February 2023 order, because MCSP has demonstrated compliance with this recommendation

19   since Mr. Hayes's April 2023 visit, the court should find that MCSP has fully implemented the

20   recommendation as of September 2023.

21                   **4.       California State Prison, Corcoran (Recommendations 28 and 29)**

22           During his June 27-28, 2023 visit to California State Prison, Corcoran (COR), Mr. Hayes

23   found that COR was eighty-eight percent compliant with page one (Recommendation 29) and

24   eighty-five percent compliant with page two (Recommendation 28) of the 7497 form. (ECF No.

25   8143-1 at 167.) However, the Region 3 SPRFIT Coordinator visited COR on December 12-13,

26   2023. (Mintz Decl., Ex. P.) The reviewer found that COR's 7497 scores were over ninety percent

27   for July and August 2023 and at eight-seven percent in September 2023. (*Id.*, at 9-10.)

28           In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

20681936.1

1   reality of COR's compliance with Recommendations 28 and 29. Mr. Hayes's findings are at odds

2   with CDCR's 2023 audits, which were conducted using the agreed upon criteria, and which show

3   that COR is compliant with Mr. Hayes's recommendation. In accordance with the February 2023

4   order, because COR has demonstrated compliance with this recommendation since Mr. Hayes's

5   April 2023 visit, the court should find that COR has fully implemented the recommendation.

### 5.    California Substance Abuse Treatment Facility (Recommendations 28 and 29)

6
7          During his June 29-30, 2023 visit to California Substance Abuse Treatment Facility, Mr.

8   Hayes found that SATF was seventy-four percent compliant with page one (Recommendation 29)

9   and eighty-seven percent compliant with page two (Recommendation 28) of the 7497 form. (ECF

10  No. 8143-1 at 177.) However, the Region 3 SPRFIT Coordinator visited SATF on December 14-

11  15, 2023 and, using the agreed upon audit, found SATF compliant for form 7497s in July, August,

12  and September 2023. (Mintz Decl., Ex. Q at 9-10.) In July, SATF scored over ninety-three

13  percent. (*Id.*) In August, SATF scored nearly ninety-seven percent. (*Id.*) And in September, SATF

14  scored ninety-eight percent. (*Id.*)

15         In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

16  reality of SATF's compliance with Recommendations 28 and 29. Moreover, Mr. Hayes's findings

17  are at odds with CDCR's 2023 audits, which were conducted using the agreed upon criteria, and

18  which show that SATF is compliant with Mr. Hayes's recommendation. In accordance with the

19  February 2023 order, because SATF has demonstrated compliance with this recommendation

20  since Mr. Hayes's April 2023 visit, the court should find that SATF has fully implemented the

21  recommendation.

### 6.    North Kern State Prison (Recommendation 29)

22
23         During his July 11-12, 2023 visit to North Kern State Prison (NKSP), Mr. Hayes found

24  that NKSP was eighty-one percent compliant with page one (Recommendation 29) of the 7497

25  form. (ECF No. 8143-1 at 187.) However, CDCR's Region 3 SPRFIT Coordinator visited NKSP

26  on November 15-26, 2023 and found NKSP compliant with 7497 forms in July, August, and

27  September 2023. NKSP scored 100 percent in July and August 2023 and scored ninety percent in

28

1   September 2023. (Mintz Decl., Ex. O at 6-7.)

2       In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

3   reality of NKSP's compliance with Recommendation 29. Moreover, Mr. Hayes's findings are at

4   odds with CDCR's 2023 audits, which were conducted using the agreed upon criteria, and which

5   show that NKSP is compliant with Mr. Hayes's recommendation. In accordance with the February

6   2023 order, because NKSP has demonstrated compliance with this recommendation since Mr.

7   Hayes's April 2023 visit, the court should find that NKSP has fully implemented the

8   recommendation.

9           **7.    Kern Valley State Prison (Recommendations 28 and 29)**

10      During his July 13-14, 2023 visit to Kern Valley State Prison (KVSP), Mr. Hayes reported

11  that KVSP was eighty-seven percent compliant with page one (Recommendation 29) and eighty-

12  five percent compliant with page two (Recommendation 28) of the 7497 form. (ECF No. 8143-1 at

13  196.) However, CDCR's Region 3 SPRFIT Coordinator audited KVSP on November 8-9, 2023.

14  (Mintz Decl., Ex. M.) KVSP was compliant with form 7497 practices during the review. (*Id.*, at

15  8.) The reviewer found that KVSP was ninety-six percent compliant in July 2023, ninety-seven

16  percent compliant in August 2023, and ninety-five percent compliant in September 2023. (*Id.*)

17      In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

18  reality of KVSP's compliance with Recommendations 28 and 29. Moreover, Mr. Hayes's findings

19  are at odds with CDCR's 2023 KVSP audits, which were conducted using the agreed upon

20  criteria, and which show that KVSP is now compliant with Mr. Hayes's recommendation. In

21  accordance with the February 2023 order, because KVSP has demonstrated compliance with this

22  recommendation since Mr. Hayes's July 2023 visit, the Court should find that KVSP has fully

23  implemented the recommendation.

24          **8.    High Desert State Prison (Recommendation 28)**

25      During his October 31 – November 1, 2023 site visit to High Desert State Prison (HDSP),

26  Mr. Hayes found that High Desert State Prison was seventy-seven percent compliant with page 2

27  (Recommendation 28) of the 7497 form. (ECF No. 8143-1 at 288.) However, CDCR's Region 1

28  SPRFIT Coordinator visited HDSP in August 2023. (Obegi Decl., Ex. D at 4.) The reviewer found

1  that overall 7497 compliance with ninety-six percent and that HDSP scored ninety-six percent in

2  April 2023, 100 percent in May 2023, eighty-nine percent in June 2023, and ninety-percent in July

3  2023. (*Id.*)

4      In sum, Mr. Hayes's findings and conclusions are incorrect. Mr. Hayes's findings are at

5  odds with CDCR's 2023 HDSP audits and which show that HDSP is now compliant with Mr.

6  Hayes's recommendation. In accordance with the February 2023 order, because HDSP has

7  demonstrated compliance with this recommendation since Mr. Hayes's July 2023 visit, the court

8  should find that HDSP has fully implemented the recommendation.

9      **J.    Local SPRFITs**

10      Defendants object to Mr. Hayes's findings and conclusions regarding the Local SPRFITs.

11  (ECF No. 8143-1 at 50-53.) Mr. Hayes's findings on Local SPRFITs measures compliance with

12  one recommendation:

13  • Recommendation 31. CDCR, under the guidance of the Special Master, should re-examine

14      and revise its local SPRFIT model to make the local SPRFITs a more effective quality

15      assurance/improvement tool.

16  (ECF No. 6879 at 27, 36. ECF No. 6973.) In his Fifth Re-Audit, Mr. Hayes provided "a list of

17  recommendations that remain to be completely and durably implemented *and the steps defendants*

18  *must take to do so.*" (ECF No. 7636 at 21, emphasis added.) According to that report, compliance

19  with Recommendation 31 required CDCR to "ensure that each audited CDCR facility maintain at

20  least 90 percent compliance with adequate SPRFIT practices that are consistent with the SPRFIT

21  policy." (*Id.* at 28.)

22      In 2018, CDCR issued its revised SPRFIT policy titled "Enhancements to the Suicide

23  Prevention and Response Focused Improvement Teams," that includes nineteen responsibilities

24  and directed the institutions to develop a local operating procedure, maintain a quorum of

25  members at all SPRFIT meetings, and identify inmates who receive "bad news" following a return

26  from court or the Board of Parole Hearings. (See ECF No. 7333-1 at 611.)

27      Mr. Hayes audited five different subitems to measure compliance with Recommendation

28  31. (ECF No. 8143-1 at 52.) In total, he found that "33 percent . . . of facilities had adequate

20681936.1

1   practices in all combined SPRFIT responsibilities." (*Id*.) Fourteen institutions were noncompliant

2   either because of lack of quorum at SPRFIT meetings, lack of local operating procedures aligned

3   with statewide policy, failure to track patients in the Suicide Risk Management Program, or failure

4   to enact corrective action from prior rounds. (*Id*.) These findings and conclusions are

5   objectionable for various reasons.

6           **1.    Mr. Hayes's Report Makes It Difficult to Determine Which Institutions
                    Were Compliant with Recommendation 31.**

7

8       Mr. Hayes notes that ten institutions were noncompliant with achieving a quorum for six

9   consecutive months, four were noncompliant with having local operating procedures consistent

10  with the SPRFIT memorandum, eight were noncompliant with tracking the Suicide Risk

11  Management Program patients, and four were noncompliant with tracking prior corrective actions.

12  (ECF No. 8143-1 at 53.) Although he lists the institutions that he found non-compliant with those

13  four items, his report does not immediately make clear which seven institutions were compliant

14  with Recommendation 31. Mr. Hayes should be ordered to amend his report and clearly articulate

15  which institutions are compliant and for those that are not, why not.

16          **2.    Mr. Hayes's Findings are Improper Because he Does not Audit Whether
                    Local SPRFIT Committees are Adequate.**

17

18      In his initial audit, Mr. Hayes found that local SPRFIT committees lacked quality and

19  needed to be "rebooted." (ECF No. 5259 at 32.) He recommended that CDCR "revise its local

20  SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool."

21  (*Id.* at 32.) CDCR issued its SPRFIT enhancements memo in February 2018. (ECF No. 7333-1 at

22  611.) Since that time, local SPRFIT's have operated under that policy and developed operating

23  procedures and audit tools to measure the myriad requirements during their monthly meetings.

24  (Williams Decl. ¶ 35.) In 2022, committee members attended a four-day training that covered the

25  new expectations and components as well as industry standard quality management tools such as

26  the Design, Measure, Analyze, Improve and Control (DMAIC) process and the Survey Analysis

27

28

20681936.1

1   for Evaluating Risk (SAFER) matrix.[17] (*Id.*) In fact, Mr. Hayes attended these training sessions.

2       Despite Mr. Hayes's involvement, he has not attended a single local SPRFIT meeting

3   either on site or by video or other remote access. (*Id.*) Instead, Mr. Hayes evaluates the quality of

4   the committees based solely on reviews of SPRFIT meeting minutes. But meeting minutes are

5   unlikely to reflect the full work done by these dedicated staff members.

6       One such standard that Mr. Hayes audits is whether the SPRFIT meeting had a quorum.

7   The word "quorum" is a technical term in the law. According to Black's Law Dictionary, quorum

8   is defined as: "The smallest number of people who must be present at a meeting so that official

9   decisions can be made; specif., the minimum number of members (a majority of all the members,

10  unless otherwise specified in the governing documents) who must be present for a deliberative

11  assembly to legally transact business." (Black's Law Dictionary (11th ed. 2019), quorum.) Mr.

12  Hayes defines quorum as *all* team members—not a subset or a majority. (ECF No. 8143-1 at 50.)

13  Thus, as was the case for several institutions, if one member missed a meeting, even if they sent a

14  designee, the meeting was deemed noncompliant with Recommendation 31 because, according to

15  Mr. Hayes, no quorum was established. This is an overly restrictive audit methodology and is

16  inconsistent with common understanding and the authoritative dictionary meaning that a quorum

17  is accepted as less than all members of a group.

18      Several institutions were deemed noncompliant with Hayes's idea of a quorum, including

19  California Correctional Institution because it lacked a psychiatrist (*Id.* at 119), California

20  Institution for Women because it missed quorum for one of six meetings (*Id.* at 124), California

21  State Prison, Corcoran because it lacked a psychiatrist at two meetings (*Id.* at 168), and Salinas

22  Valley State Prison because for one month an "LCSW was incorrectly listed [on meeting minutes]

23  as the designee for the chief psychologist, supervisor or specialist." (*Id.* at 278.) Mr. Hayes makes

24  no findings as to the quality of these local SPRFIT meetings, nor can he, because he only audited

25  and commented on the make-up of the members reflected in the meetings' minutes.

26  _____

27  [17] Notably, the four-day training in 2022 was a joint effort with CCHCS QM which was an approved collaboration across *Plata* and *Coleman*. During the training, a full reboot of the committee structure was

28  completed and new measurement schedules and tools were developed in addition to the education about industry standard QM techniques. (Williams Decl. ¶ 35.)

1        Mr. Hayes also finds that the quality of the local SPRIFT committees are inadequate

2   because they lack up-to-date local operating procedures. (*Id.* at 53.) Yet this finding also has no

3   real connection to—and Hayes does not suggest one—whether a committee is functioning

4   adequately and providing quality oversight of its suicide prevention program.

5        Separately, Mr. Hayes finds fault when local SPRFIT committees fail to immediately

6   address corrective action recommendations he made in prior monitoring rounds. But he fails to

7   consider that his corrective action plans are long since stale. Mr. Hayes's prior report was issued in

8   October 2022 and reflects findings made between mid-2021 and early 2022. (See ECF No. 7636-

9   1.) By comparison, SPRFIT committees prioritize corrective action using community standard

10  tools, including SAFER matrices, to determine which improvement projects are most likely to

11  harm a patient and how widespread the immediate threat to life is. (Williams Decl. ¶ 36.) This

12  process is endorsed by the Joint Commission. (*Id.*) It cannot be doubted that the SPRFIT

13  committees should prioritize improvement projects to address current patient needs above years-

14  old corrective action recommendations. Accordingly, his findings are improper and should be

15  disregarded.

16      **K.      Suicide Prevention Training**

17      Defendants object to Mr. Hayes's findings and conclusions regarding Suicide Prevention

18  Training. (ECF No. 8143-1 at 53.) Mr. Hayes's findings on Suicide Prevention Training measures

19  compliance with one recommendation:

20  •   Recommendation 3. Ensure that all custody and health care staff receive both pre-service

21      and annual suicide prevention training.

22  (ECF No. 6879 at 27, 34.)

23      In his report on the Fourth Re-Audit, The Special Master found that CDCR must "ensure

24  that at least 90 percent of custody, medical, and mental health staff at all audited CDCR facilities

25  receive annual suicide prevention training. Each discipline must have at least 90 percent

26  compliance." (*Id*. at 17.) Mr. Hayes reports that "[o]verall, only 52 percent (11 of 21) of the

27  audited facilities had compliance rates of 90 percent and above for all three disciplines (custody,

28  medical, and mental health)." (ECF No. 8143-1 at 6, 54.) Mr. Hayes lists eight institutions whose

1  compliance for medical staff fell below ninety percent. (*Id.*) As with other recommendations, a

2  review of the appendix is necessary to determine the full scope of his findings. The Court should

3  require Mr. Hayes to amend his report with tables clearly identifying which institutions were

4  noncompliant and why they were noncompliant.

5        Even though not clearly articulated in the report, according to the appendices, Mr. Hayes

6  found suicide prevention training noncompliance for custody personnel at one institution,

7  California State Prison, Los Angeles County (LAC). (*Id.* at 54, 224.) Separately, according to the

8  body of the report, Mr. Hayes found training noncompliance for medical staff at eight

9  institutions—LAC, California Institution for Women (CIW), California Men's Colony (CMC),

10 California Medical Facility (CMF), California State Prison, Sacramento (SAC), Substance Abuse

11 Treatment Facility (SATF), High Desert State Prison (HDSP), and San Quentin Rehabilitation

12 Center (SQ). (*Id.* at 54.) Yet, the appendix revealed that he also found California Health Care

13 Facility (CHCF) "only 87 percent" compliant for medical staff. (*Id.* at 157.) Further, in contrast to

14 findings earlier in the report, Defendants' review of the appendices revealed four institutions that

15 were noncompliant with training for mental health staff—LAC, Mule Creek State Prison (MCSP),

16 California Health Care Facility (CHCF), and Salinas Valley State Prison (SVSP). (*Id.* at 143, 157,

17 224, and 278.)[18]

18        CDCR requires training to be completed once each calendar year. (Williams Decl. at ¶ 38.)

19 CDCR maintains training data and has also developed a data indicator, SP19 Healthcare Staff

20 Current with Suicide Prevention Training, and SP20, Custody Staff with Suicide Prevention

21 Training, to measure compliance. Both were remediated on December 15, 2023 by the Special

22 Master's data expert. These items are audited by CDCR's Regional SPRFIT Coordinators. (*Id.*,

23 Ex. A at 104, 106.)

24        CDCR's suicide prevention training compliance for calendar year 2023 is provided below

25 for those institutions Mr. Hayes found noncompliant with Recommendation 3:

26 / / /

_____

28 [18] Mr. Hayes reports eighteen of twenty-one institutions were compliant with mental health staff annual suicide prevention training at ECF No. 8143-1 at 54.

| 2023 Custody Training Compliance | |
|---|---|
| Institution | Compliance |
| LAC | 91% |

| 2023 MH Training Compliance | |
|---|---|
| Institution | Compliance |
| LAC | 87% |
| CHCF | 82% |
| MCSP | 96% |
| SVSP | 95% |

| 2023 Medical Training Compliance | |
|---|---|
| Institution | Compliance |
| LAC | 87% |
| CIW | 83% |
| CMC | 94% |
| CMF | 92% |
| HDSP | 94% |
| SAC | 88% |
| SATF | 93% |
| SQ | 84% |
| CHCF | 83% |

(Williams Decl. ¶ 38.) As aforementioned, the training compliance is measured in accordance with the two remediated data indicators. Based on this data, the Court should find that MCSP, SVSP, CMC, CMF, HDSP, and SATF were also compliant with Recommendation 3 as all three disciplines at those institutions demonstrated more than ninety-percent compliance with suicide prevention training. In total, seventeen of twenty-one institutions, or eighty-one percent, are compliant with this recommendation.

**L.    Continuous Quality Improvement**

Defendants object to Mr. Hayes's findings and conclusions regarding Continuous Quality Improvement. (ECF No. 8143-1 at 54-63.) Mr. Hayes's findings on Continuous Quality Improvement measures compliance with part of Recommendation 32:

- Recommendation 32 – CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues [including] . . . Continuous Quality Improvement.

1    (ECF No. 6879 at 27, 36.)

2        In his report on the Fourth Re-Audit, the Special Master found that in order to achieve

3    compliance with this part of Recommendation 32, two steps are required. (*Id*. at 24.) First, CDCR

4    "should incorporate all of Mr. Hayes' 19 Suicide Prevention Audit Checklist measures into their

5    CQI guidebook(s). Second, any CQI audit report of a facility's suicide prevention practices should

6    be formatted to contain data on all 19 suicide prevention measures." (*Id*.) A nearly identical

7    recommendation was made in the Fifth Re-Audit. (ECF No. 7636 at 28-29.)

8        Although Mr. Hayes found that CDCR was not compliant with this recommendation, his

9    conclusion is improper and even contradictory to his own findings. In fact, Mr. Hayes concedes in

10   his report that CDCR meets the requirements for Recommendation 32. The Court should not

11   countenance Mr. Hayes's attempt to expand the requirements beyond what was recommended in

12   the Fourth and Fifth Re-Audits.

13        **1.    Mr. Hayes Found that Defendants have Complied with
                   Recommendation 32.**

14

15        Mr. Hayes concedes in his Sixth Re-Audit that CDCR has both incorporated his nineteen

16   items into the SP CQI Guidebook and that the resultant reports include data from all nineteen

17   items:

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|------|----------------------------------------------|---------------------------|
| 1. Observation of R&R intake screening, confirming screening completeness and privacy and confidentiality; | Yes – SP10: Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | Receiving and Release (R&R Screening – Hayes Item 1) |
| 2. Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; | Yes – SP16: ASU Intake Inmates Appropriately Housed | Intake Cells – Hayes Item 2 |
| 3. Clothing allowance for MHCB patients; | Yes – SP14: MHCB Records with Rationale for Limited Issue of Clothing and Bedding | Observation and Issue Orders – Hayes Item 3 |

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|---|---|---|
| 4. Treatment/safety planning for suicidal ideation in MHCBs; | Yes – SP3.1, SP3.4, SP3.7: Safety planning to reduce suicide risk | Quality of Safety Planning – Hayes Item 4 |
| 5. Use of alternative housing; | Yes – SP8: Patients in Alt Housing on continuous observation and provided suicide-resistant bed. | Alternative Housing – Hayes Item 5 |
| 6. Annual suicide prevention training for custody staff; | Yes – SP20: Percentage of Custody Officers with Suicide Prevention Training | Custody Staff Training |
| 7. Five-day clinical and 72 hour custody follow-ups for MHCB returns; | Yes – SP12: Custody Follow Ups for MHCB Discharges/7497 forms | Clinical Discharge Follow-Ups Onsite Paperwork – Custody MHCB/Alternative Housing/Acute/ICF Discharge Follow-Ups |
| 8.  Guard One compliance; | Yes – SP17.1: Percentage of ASU Welfare Checks audited that were not completed on time and staggered (welfare check discrepancies with an explanatory memo) Yes – SP17.4: Percentage of ASU Welfare Checks audited that were not completed on time and staggered (audited welfare checks in segregated housing that include the required visual observation) | Welfare Check Completion (Guard One) – Hayes Item 8 |
| 9. PT rounds in administrative segregation, SHU, and PSU; | Yes – RH28: Percentage of PT round documentation that meets all audit criteria Yes – RH29: PT Rounds where EC and interaction with patient are achieved/attempted and appropriate referrals are made as indicated. Yes – RH3: PT Rounds completed according to PG requirements. | Psychiatric Technician Rounds – Hayes Item 9 |
| 10. Suicide- resistant design of MHCBs; | Yes – SP4: Suicide-resistant MHCBs | Suicide-Resistant Cells – Hayes Item 10 |

20681936.1

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|---|---|---|
| 11. Five-day clinical and custody follow-ups for alternative housing, DSH, and Psychiatric Inpatient Program (PIP) returns; | Yes – SP1: Timely completion of 5/8 day follow ups from MHCB, alt housing, and DSH/PIP. | Clinical Discharge Follow-Ups - Hayes Item 11 |
| 12. SREs required for emergency mental health referrals/TTA Log for suicidal ideation; | Yes – SP2: Emergent/urgent MH referrals that result in SRASHEs. | Urgent and Emergent Referrals for Danger to Self – Hayes Item 12 |
| 13. SREs required for admission/discharge in MHCB and alternative housing; | Yes | Suicide Risk Evaluations – Hayes Item 13 |
| 14. Privileges for MHCB patients; | Yes – SP15.1-SP15.5: MHCB Property and Privileges | Privileges – Hayes Item 14 |
| 15. Emergency response equipment in housing units; | Yes – SP11: Housing Unit/Inmate Living areas with emergency response equipment and inventoried daily. | Emergency Response: Cut-Down Kits – Hayes Item 15 |
| 16. Annual suicide prevention training for medical and mental health staff; | Yes – SP19: Percentage of healthcare staff with suicide prevention training. | Annual IST Suicide Prevention Training Compliance – Hayes Item 16 |
| 17. CPR training for medical staff; | Yes – SP18: Percentage of nursing staff current with CPR training | Training and Mentoring Compliance: Clinical Training Compliance: Nursing CPR Training - Hayes Item 17 |
| 18. SRE Mentoring/Seven-hour SRE training and Safety Planning training for clinicians; | Yes – SP6: SRE Mentor Program | Clinical Training Compliance: Mentoring – Hayes Item 18 Suicide Risk Evaluation Training – Hayes Item 18 Safety Planning Training – Hayes Item 18 |
| 19. SPRFIT responsibilities. | Yes – SP25.1: Satisfactory SPRFIT Meeting (meetings observed that satisfy all audit criteria) Yes – SP25.4: Satisfactory SPRFIT Meeting (meeting minutes reviewed that satisfy all audit criteria) | Institution SPRFIT Committee Observation – Hayes Item 19a |

(Williams Decl. ¶ 9.)

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

20681936.1

1    Mr. Hayes found that, with respect to the first prong, CDCR's current Suicide Prevention

2  On-Site Audit Guidebook "adequately" contains all nineteen of his suicide prevention measures.

3  (ECF No. 8143-1 at 59.) Next, Mr. Hayes concedes that the SPRIFT Coordinator reports are

4  compliant with the second prong of his recommendation because they are "more or less consistent

5  with this reviewer's audit reports." (*Id.*) Because Mr. Hayes has found CDCR compliant the

6  requirements laid out in his Fourth and Fifth Re-Audits, the Court should find that CDCR has

7  complied with Recommendation 32. (ECF Nos. 6879 at 24 and 7636 at 28-29.)

8           **2.    CDCR's SP CQI Guidebook and Resultant Reports are Robust and
                    Exceed Mr. Hayes's Own Audits.**
9

10    The court should find that CDCR is not only in full compliance with Recommendation 32,

11  but exceeds it. CDCR employs four Regional SPRFIT Coordinators who audit their assigned

12  institutions several times per year. (Williams Decl. ¶ 40.) During those audits they use the most

13  current version of the Comprehensive CQI Audits Guidebook which includes a chapter on suicide

14  prevention measures. (*Id.*, Ex. A at 74 et seq.) Suicide prevention measures were first integrated

15  into the Comprehensive CQI Audits Guidebook in March 2023, however, the Regional SPRFIT

16  Coordinators used a standalone version of the suicide prevention measures prior to that merger in

17  2022. (*Id.*)

18    CDCR's Comprehensive CQI Audits Guidebook is updated on a quarterly basis to reflect

19  the most up to date version of the various audits. This is by design. (*Id.*) Since October 2022, the

20  combined guidebook has included "all of Mr. Hayes' 19 Suicide Prevention Audit Checklist

21  measures." (*Id.* ¶ 40.) The Guidebook does more than mimic a Hayes tour. In addition to the

22  nineteen Hayes items the Guidebook includes and the SPRFIT Coordinators report on the

23  following additional suicide prevention measures:

24    • RHU Morning Meetings;

25    • Compliance with ASU Pre-Placement Screens;

26    • Compliance with ASU Screening Questionnaires;

27    • Number of Suicide Risk Evaluations Completed in a Confidential Setting;

28    • Five-day follow up compliance;

1    • Suicide Risk Management Program Reviews;

2    • Suicide Risk Evaluation compliance;

3    • Sustainability of Quality Improvement Plans; and,

4    • Training on suicide screenings, Suicide Risk Management Program, and discontinuing the

5      use of safety contracts in inpatient settings.

6    (*Id.*) After a site visit, CDCR's Regional SPRFIT Coordinators produce a report within weeks to

7    give institutions close to real time feedback and corrective action plans. (*Id.* ¶ 41.) Those reports

8    are "formatted to contain data on all 19 suicide prevention measures." (*See* ECF No. 8143-1 at

9    57.)

10        After issuing their report, the Regional SPRFIT Coordinators conduct return visits with

11   their institutions to again fully assess the institution's compliance with suicide prevention policies

12   and to review the status of any corrective action plans. (Williams Decl. ¶ 41.) Corrective action

13   plans are updated or marked as fulfilled as indicated during the follow up visits. (*Id.*)

14        Some of the SP CQI Guidebook relies on audits and indicators subject to data remediation.

15   At least twenty-five original indicators, as recommended by the Special Master's May 6, 2023

16   Report on CQI, pertain to suicide prevention. (*Id.*, see also ECF No. 7151 at 22.) That number has

17   increased to over thirty and CDCR is in the process of expanding at least sixteen more suicide

18   prevention indicators to the inpatient programs.[19] (Williams Decl. ¶ 41.)

19        Sadly, after spending so many years monitoring the system and approving the SP CQI

20   Guidebook, Mr. Hayes's findings on CQI are inconsistent with the goals of a quality improvement

21   system. He reports that the "measures have not been fully implemented because the Guidebook

22   continues to be periodically revised." (ECF No. 8143-1 at 59.) But he knows that CDCR's

23   Continuous Quality Improvement Tool, of which the Suicide Prevention Guidebook is a part (see

24   *Id.* at 55-56), is designed to be "periodically revised" to ensure alignment with any changes in

25   policy or auditing methodology. (Williams Decl. ¶ 43.) In this sense, Mr. Hayes will never be

26   _____

27   [19] On July 31, 2023, CDCR agreed to extend sixteen of those indicators to the inpatient programs. (ECF
     Nos. 8011 at 6-7, and 8011-1 at 2-3.) The court ordered CDCR to develop those indicators on February 1,
28   2024. (ECF No. 8121 at 5.) Twelve of the sixteen indicators are in the latter stages of data remediation past
     stakeholder review. (Williams Decl. ¶ 42.)

20681936.1

satisfied that the Suicide Prevention On-Site Audit Guidebook is complete because it is designed to always be adapted to comport to revised policies or updates in methodology. Mr. Hayes's finding here is wrong because it is inconsistent with the Court-ordered CQI process, is improper, and should be disregarded.

Although data remediation is an ongoing process, CDCR is compliant with Recommendation 32. (*Id.*) Once the initial phase of data remediation is complete, data indicators will be continuously reviewed and updated. (*Id.*) The next step will be an annual review process and, as needed, updating each indicator or audit to ensure alignment with the governing policy and data measurement tools. (*Id.*) Those changes will require regular updates to the SP CQI Guidebook. (*Id.*)

Because CDCR has developed a CQI Guidebook that includes all nineteen items on Mr. Hayes's checklist and issues regular CQI reports containing data on these nineteen items, the Court should find CDCR in full compliance with Recommendation 32's requirement to develop a suicide prevention continuous quality improvement process.

### 3. Mr. Hayes's Criticisms of the Content of CDCR's SPRFIT Reports are Inaccurate and Improper.

Although Defendants have demonstrated compliance with Recommendation 32's requirement for a suicide prevention continuous quality improvement process, Mr. Hayes for the first time raises new issues to justify his conclusion that CDCR is not in compliance. His attempt to read in new requirements to Recommendation 32 should not be countenanced and his findings should be disregarded.

The first new requirement is that the audits must be conducted quarterly at some institutions. (ECF No. 8143-1 at 59.) Nowhere in the record of Mr. Hayes's decade-long audit has he ever recommended CDCR's audits be conducted on a quarterly basis to comply with Recommendation 32. Nor has the court ordered such a requirement. CDCR has voluntarily suggested "general guidelines" that CDCR conduct quarterly audits of institutions with inpatient units. (Williams Decl. ¶ 44, Ex. A at 78 .) But that plan is not in response to any recommendation or court order. CDCR conducts audits far more frequently than Mr. Hayes, who visits CDCR

20681936.1

1  institutions on an annual basis at best. Mr. Hayes's finding, that CDCR's CQI program is

2  noncompliant for not always having quarterly reports, is therefore without merit. (ECF No. 8143-1

3  at 59.)

4      Mr. Hayes criticizes the reports' comprehensiveness regarding "methodology, particularly

5  in the area of the sample size of medical chart review." (ECF No. 8143-1 at 59.) But sample size is

6  part of the Suicide Prevention On-Site Audit Guidebook and many key performance indicators.

7  The SP CQI Guidebook includes a section on sample sizes which can be cross referenced with the

8  audit reports if certain sample sizes are not clear in the individual reports. (Williams Decl. at ¶ 44.)

9      Mr. Hayes also provides areas of disagreement with the fifty-seven 2023 SPRFIT

10  Coordinator reports he reviewed. (ECF No. 8143-1 at 60-62.) Disagreements with CDCR's own

11  findings are not a basis for finding that CDCR is out of compliance with Recommendation 32 and

12  Mr. Hayes's conclusion is incorrect. Clinical experts bring their own knowledge and experience to

13  their audits, and their audits occur often multiple times per year, and never at the same time that

14  Mr. Hayes conducts his audit. It is not surprising that CDCR's findings do not align perfectly with

15  Hayes's reports. Defendants are further disheartened that Mr. Hayes raised none of these issues

16  with CDCR's suicide prevention team before the filing of this report despite Mr. Hayes having

17  had access to the SPRFIT Coordinators' reports for over a year.

18      Mr. Hayes makes fifteen specific criticisms about the fifty-seven reports he reviewed.

19  (ECF No. 8143-1 at 60-62.) Absent from those criticisms is a finding that the reports failed to

20  comply with Recommendation 32. His criticisms are vague and unhelpful. Some of his criticisms

21  are taken out of context and he does not always provide sufficient information to trace his

22  criticism to the report, region, or author of the report. Those fifteen issues are taken up below.

23        **a.  Whether Mental Health Compliance Team or Regional Nurse**
       **Consultants Were Involved in the Reports**

24

25      Mr. Hayes found that "[m]any regional SPRFIT coordinators did not consistently report

26  whether the regional MHCT lieutenants and/or regional nursing consultants (RNCs) were part of

27  the onsite reviews, consulted during the reviews, or whether MHCT/RNC findings were

28  incorporated into the SPRFIT coordinator reports." (ECF No. 8143-1 at 60.) But he neglects to

1  identify the criticized SPRFIT Coordinator or the institutional reports.

2  Mr. Hayes also neglects to point to any policy or guidebook requirement that the reviewer

3  include in the report whether custody or nursing staff accompanied the reviewer as part of the

4  onsite review. He also neglects to explain how consistently reporting the presence of the custody

5  or nursing teams would change the assessment or outcome of the review. This finding is suspect

6  because, as Mr. Hayes is or should be aware, Regional SPRFIT Coordinators regularly consult and

7  interact with their custody and nursing counterparts as part of their role of providing oversight and

8  consultation to their institutions. (Williams Decl. at ¶ 45.) The SP CQI Guidebook states that

9  "[w]hen the custody and/or nursing representatives are not able to attend the on-site review, they

10  shall provide their evaluation of the compliance measure items by conducting an independent on-

11  site review, and their information will be incorporated into the respective sections of the report."

12  (*Id*. Ex. A at 78.)

13  Notably, Mr. Hayes's Sixth Re-Audit does not identify whether other monitors or experts

14  assisted in the monitoring of CDCR's suicide prevention practices either by assisting in Mr.

15  Hayes's on-site visits or in other ways. However, CDCR is aware that other members of the

16  Special Master team regularly accompany Mr. Hayes during his onsite visits. (Williams Decl. ¶

17  45.)

18  **b.    Review Frequency of the Reports**

19  Mr. Hayes found that "Because not all regional SPRFIT coordinator reports were

20  quarterly, some regional reports were said to have six-month time frames, whereas the review

21  period for other reports was unclear." (ECF No. 8143-1 at 60.) As noted above, CDCR has

22  voluntarily suggested as "general guidelines" that CDCR conduct quarterly audits of institutions

23  with inpatient units. (Williams Decl. ¶ 46, Ex. A at 78.) But CDCR's plan is not in response to any

24  Court order or recommendation by Mr. Hayes. CDCR is working to develop the best suicide

25  prevention audit process possible and CDCR's aggressive frequency guidelines are part of that

26  program.

27  / / /

28  / / /

1

###    c.    Ability to Audit all Suicide Prevention Practices

2         Mr. Hayes found that "[t]he lack of quarterly reports in some regions resulted in the

3   inability to audit all suicide prevention practices." (ECF No. 8143-1 at 60.) But he only provides

4   one example supporting this assertion: "For example, at one facility, the regional SPRFIT

5   coordinator bluntly stated: 'Given that this reviewer did not conduct a site review during Q4 of

6   2022, and that no IDTTs were able to be observed during the Q3 visit, this is the first MHCB

7   IDTT that this reviewer has observed in nearly a year[.]'" (Id.) Although not identified by Mr.

8   Hayes, that quote is from a March 2023 report from Substance Abuse Treatment Facility (SATF).

9         For context, the full quote is as follows:

10        During his most recent site visit, Lindsay Hayes reported concerns related to the
          MHCB IDTT at SATF. Given that this reviewer did not conduct a site review during
11        Q4 of 2022, and that no IDTTs were able to be observed during the Q3 visit, this is
          the first MHCB IDTT that this reviewer has observed in nearly a year. *Therefore,*
12        *despite how good this observed IDTT was, this will remain open for one more audit*
          *period to ensure sustained improvement and if it is observed at that time that IDTTs*
13        *continue to be adequate, this will be closed out.*

14   (Mintz Decl., Ex D at 5, emphasis added.) In the report, the reviewer noted he observed five

15   IDTTs. (Id., at 4.) Another five were observed in September 2023 and yet another five in

16   December 2023. (Id., Ex. K at 4, Ex. Q at 4.) While CDCR's reviewer observed fifteen IDTTs at

17   SATF in 2023, Mr. Hayes observed just three. (ECF No. 8143-1 at 175.) Yet, despite CDCR's

18   reviewer observing five times as many IDTTs as Mr. Hayes, Mr. Hayes finds that the CDCR

19   reviewer's audit cycle "resulted in the inability to audit all suicide prevention practices." Mr.

20   Hayes's findings are simply wrong.

21        Even if Mr. Hayes's criticism had merit, Mr. Hayes's own reports often have gaps in

22   monitoring for all suicide prevention practices. For instance, in the current report, Mr. Hayes

23   visited twenty-one institutions but only audited intake screening at twenty. (Id. at 16.) He audited

24   Psych Tech practices and intake cells at twenty of twenty-one institutions as well. (Id. at 16, 19.)

25   And he observed crisis bed observation practices at eighteen of the twenty crisis bed institutions

26   he audited. (Id. at 24.)

27        CDCR Regional SPRFIT Coordinators always strive to observe all suicide prevention

28   practices when onsite. However, sometimes that is not possible, as is the case with Mr. Hayes's

-84-

20681936.1

own monitoring. His finding that the reports are deficient for this reason is inconsistent with his own monitoring practices, is unpersuasive, and should be disregarded.

### d. Length of On-Site Reviews Does not Correlate to Number of Observations

Mr. Hayes criticized some reports for relying on one-day as opposed to two-day site visits. He states that "[i]n one region, for example, the coordinator observed only one IDTT meeting during the one-day site visit, whereas this reviewer observed 11 IDTT meetings during a two-day site visit at the same facility. This same regional coordinator was unable to observe intake screening by nursing staff during any of the four one-day onsite reviews of two facilities during the entirety of 2023." (ECF No. 8143-1 at 60-61.) Although Mr. Hayes does not identify the institution or report, based upon a review of the appendices it appears Mr. Hayes is referring to California Institution for Men (CIM)—the only institution where he observed eleven IDTTs. (ECF No. 8143-1 at 126.) Mr. Hayes observed more than five IDTTs at only five institutions, making his observation of eleven at CIM an outlier amongst the nineteen institutions he visited where he audited this practice.

Mr. Hayes's statistic obscures the full extent of CDCR's review of CIM in 2023 during which time CDCR conducted more IDTT reviews than Mr. Hayes. CDCR's Region 4 SPRFIT Coordinator audited CIM four times in 2023. (Hudspeth Decl., Ex. B, Ex. C, Ex. F, & Ex. H.) In sum, the reviewer observed sixteen IDTT reviews—five more than Mr. Hayes. (*Id.*) The reviewer observed five IDTTs on February 6, 2023, one IDTT on April 4, 2023, five IDTTs on July 5, 2023, and five IDTTs on October 3, 2023. (Hudspeth Decl., Ex. B at 3, Ex. C at 3, Ex. F at 3, & Ex. H at 3.) Unlike Mr. Hayes, the reviewer was able to assess and track the quality of IDTTs across four data points in 2023.

Mr. Hayes's report is not itself immune from low-sample-size issues. During his two or three-day tours he observed three or less IDTTs at over half of the nineteen crisis beds he visited. In fact, at San Quentin he observed zero crisis bed IDTTs (ECF No. 8143-1 at 130), one each at Mule Creek State Prison, Kern Valley State Prison, and R.J. Donovan Correctional Facility (RJD) (*id.* at 140, 194 and 208), two at Wasco State Prison (*id.* at 104) and three each at California

1   Health Care Facility, Substance Abuse Treatment Facility (SATF), North Kern State Prison,

2   California State Prison, Solano (SOL), Salinas Valley State Prison (SVSP), Pelican Bay State

3   Prison, and Central California Women's Facility (*id.* at 155, 175, 184, 252, 275, 293, and 301).

4           Similarly, his criticism of the intake screening sample is also unpersuasive. As he is aware,

5   on any given day, intake screenings may be a rare occurrence. Mr. Hayes observed none at CCI or

6   HDSP (*id.* at 116 and 286) and one each at CIM, COR, SATF, RJD, SOL, SVSP, and PBSP (*id.* at

7   125, 164, 173, 205, 251, 273, and 291). While CDCR attempts to audit intake screenings during

8   each SPRFIT Coordinator site visit, sometimes scheduling or lack of new intakes preclude the

9   ability to audit intakes.

10          Mr. Hayes's attempt to draw a correlation between the length of site visits and the number

11  of observations is inconsistent with his own monitoring, is improper, and is not supported by the

12  facts. His comparison of the number of treatment team observations at CIM omits a full discussion

13  of the reasons for low sample sizes.  His findings should therefore not be adopted as the findings

14  of the Court.

15                          **e.      Reliance on "On Demand Data"**

16          Mr. Hayes criticizes the reports for "an over-reliance on OnDemand data." (ECF No. 8143-

17  1 at 61.) But the SP CQI Guidebook approves the use of On Demand data and is derived in

18  substantial part from the Court ordered data remediation process. The Special Master

19  recommended that CDCR develop twenty-five suicide prevention data indicators as part of the

20  CQI key indicators. (Special Master's Report on CQIT, ECF No. 7151 at 22-23.) An additional

21  sixteen are being extended to inpatient programs. (ECF No. 8121 at 5.) Mr. Hayes is a participant

22  in data remediation and knows that the indicators integrated into the SP CQI Guidebook and the

23  auditor reports use data agreed upon through data remediation. The SP CQI Guidebook is a

24  product of data remediation—a process designed to create data that all stakeholders can rely on to

25  measure compliance with remedial requirements in this action.

26          To the extent that Mr. Hayes disagrees with how data indicators are being developed or

27  integrated into the SP CQI Guidebook, he should have (and has) raised those issues when the

28  indicators were discussed in data remediation. Where disagreements have occurred, CDCR has

worked with Mr. Hayes and the other stakeholders to revise the indicators as necessary. Because Mr. Hayes's criticism that the SPRFIT reports include OnDemand data is misdirected, the Court should disregard his complaints as irrelevant.

### f.    SRASHEs Resulting from Danger-to-Self Referrals

Mr. Hayes found that "[w]hen auditing emergent/urgent mental health referrals for danger to self (DTS), several regional SPRFIT coordinators relied solely on OnDemand data for completed SRASHEs, and did not conduct medical chart reviews to determine the extent by which referrals for DTS resulted in completed SRASHEs." (ECF No. 8143-1 at 61.) But Mr. Hayes ignores the fact that On Demand data has been approved as the way to accurately identify referrals for danger to self and that these referrals are audited monthly. The audit is reported to the headquarters SPRFIT each month. The sum of these reviews is identified in the Regional SPRFIT Coordinator reports. (Williams Decl. at ¶ 47.)

### g.    Compliance with CDCR Form 7497

Mr. Hayes found that "[n]one of the regional SPRFIT coordinator reports presented separate data for compliance with both Page 1 and Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms; instead, a composite compliance score was presented." (ECF No. 8143-1 at 61.) The scoring of the 7497s is consistent with statewide policy. The October 19, 2021 Revision of Mental Health Crisis Bed Discharge Custody Checks Form and Introduction of Audit Requirements memorandum sets for the grading and scoring procedures for the 7497 audit. (Williams Decl. ¶ 48, Ex. C.) The form will pass the audit if "all items reviewed for the totality of the custody discharge check review receive a 'Yes'." If any item in the review is marked a "No" then the overall review will be marked as a fail. (*Id*., Ex. C at 11.)

Mr. Hayes does not monitor this item per statewide policy. This became evident when the stakeholders fully remediated data indicator SP12 in September 2023—which measures the totality of the 7497 form. (Williams Decl. ¶49) Soon after remediation, Mr. Hayes informed the group that SP12 was not designed to his preference and CDCR has had to start over on the indicator to bifurcate grading of the form. (*Id*.) Nonetheless, the SPRFIT Coordinators used existing statewide policy to monitor 7497s. The shift to bifurcate grading is a recent one that came

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

1    about in the data remediation process.

2            **h.**      **Local SPRFIT Reviews of Suicide Risk Management Program**

3         Mr. Hayes found that "[n]one of the regional SPRFIT coordinator reports addressed the

4    local SPRFIT requirement to review SRMP IPs during monthly SPRFIT meetings." (ECF No.

5    8143-1 at 61.) This is false. SPRFIT Coordinators monitor local SPRFIT compliance with audit

6    criteria. The criteria is laid out in the SP CQI Guidebook, which Mr. Hayes has approved.

7    (Williams Decl. ¶ 50, Ex. A at 94, 96-100.)

8         CDCR's SP CQI Guidebook requires auditors to not just look at SPRFIT meeting minutes

9    but to attend SPRFIT meetings. The committee observation requires the reviewer to check if "the

10   committee discuss[ed] SRMP patients." (*Id.*, Ex. A at 97.) Similarly, the reviewer is required to

11   check meeting minutes to see if "the minutes reflect SRMP patients are tracked and reviewed."

12   (*Id.*, Ex. A at 99.) The SPRFIT reports discuss the review of the committee observations and the

13   review of the minutes. For instance, at California Institution for Men in October 2023, the

14   reviewer observed "qualitative discussion" at the local SPRFIT meeting and observed that the

15   SPRFIT minutes were "audited based upon the Suicide Prevention On-site Audit Guidebook"

16   (Hudspeth Decl., Ex. H at 6.) The reviewer concluded that the minutes "met all audit criteria."

17   (*Id.*) Each SPRFIT Coordinator report includes a discussion of local SPRFIT practices. (Williams

18   Decl. ¶ 50.) Regional SPRFIT Coordinators also audit an institution's SRMP independently of the

19   SPRFIT review. (*Id.*)

20        Thus, the SRMP is reviewed by each SPRFIT coordinator and a result of the review is

21   included in their reports. Mr. Hayes's finding is incorrect and should not be adopted as the finding

22   of the Court.

23           **i.**      **Local SPRFIT Quorum**

24        Mr. Hayes found that "[q]uoroms in SPRFIT meeting minutes for the entire review period

25   were consistently addressed by only two regional SPRFIT coordinators." (ECF No. 8143-1 at 61.)

26   As with the local SPRFIT's review of SRMP, above, this finding is incorrect.

27        The same audit that looks at SPRFIT's review of SRMP requires that the Regional SPRFIT

28   Coordinator audit whether the local SPRFIT established a quorum. (Williams Decl. ¶ 51, Ex. A. at

98.) Regional SPRFIT Coordinators check meeting minutes to see if they "reflect all mandatory members or authorized designees were present." (*Id.*) Each SPRFIT Coordinator report includes a discussion of local SPRFIT practices. (*Id.*) Thus, the SPRFIT quorum is reviewed by each SPRFIT coordinator and a result of the review is included in their reports. Mr. Hayes's finding is incorrect and should not be adopted as the finding of the Court.

### j.     Max Custody Phone Call Access

Mr. Hayes found that "Regional SPRFIT coordinator reports from at least two regions incorrectly suggested that maximum-security MHCB patients were only required to be offered one telephone call per month, with one report stating: 'Because all MAX custody inmates are only allowed one phone call per month, some patients understandably had no phone call privileges recorded.'" (ECF No. 8143-1 at 61.) Mr. Hayes does not identify the regions or reports where he identified this error.

Max custody phone privileges have evolved rapidly over the past few years. Initially, patients in this privilege group received phone calls "on an emergency basis only as determined by institution/facility staff." (Cal. Code Reg., Title 15 § 3044(c)(6)(A), (g)(3)(C).) During COVID, CDCR authorized inmates in this privilege group weekly phone calls. (Williams Decl. ¶ 52.) That policy ended in September 2023 but went back into effect in December 2023. (*Id.*) If one or more Regional SPRFIT Coordinators misstated the max custody crisis bed phone call privilege policy in one or more reports, this is at worst a minor error in reciting an evolving policy decision by CDCR. It is not evidence that the reports are flawed or inadequate.

### k.     MHCB Observation and Privilege Orders

Mr. Hayes found that "[o]ne regional SPRFIT coordinator consistently stated in reports that, although observation and privilege orders were not discussed during IDTT meetings, 'the MHCB team reviews these orders daily during the morning huddle.' Such a response ignored the fact that MHCB patients were not participants in the morning huddle and one of the rationales for discussing the issue in the IDTT meetings is for the patient to be aware of their out-of-cell privileges." (ECF No. 8143-1 at 61-62.) Mr. Hayes fails to identify the reports he references. Regardless, on its face, this does not appear to be a criticism of the SPRFIT Coordinator's reports.

1   According to Mr. Hayes, the SPRFIT Coordinator accurately found that observation and privilege

2   orders were not being discussed during treatment teams. Thus, the SPRFIT Coordinator's

3   reporting was not endorsing or approving the practice related to discussing observation and

4   privilege orders with the patient.

5                    **l.    Adequate Review of Safety Planning**

6        Mr. Hayes found that "[t]here were inconsistencies regarding the adequate review of safety

7   planning. A few of regional SPRFIT coordinators were very thorough in their critique of safety

8   plan quality. Others were not and simply relied upon a facility's CAT self-audit data. At least one

9   regional SPRFIT coordinator did not review safety plans required for IPs released from

10  Alternative Housing." (ECF No. 8143-1 at 62.) Mr. Hayes fails to identify which reports are

11  allegedly deficient. Nor does he explain how using a Chart Audit Tool (CAT) is an inadequate

12  way to conduct monitoring.

13       CDCR SPRFIT Coordinators employ a wide range of tools in their audits, including CATs

14  to gauge the quality of certain documents. One of those CATs is part of a remediated key

15  performance indicator, Quality of Safety Planning to Reduce Suicide Risk (SP3.4). (Williams

16  Decl. ¶ 53.) "CQIT key indicators must be operationalized to properly measure the core

17  requirements of the Program Guide and the Compendium." (ECF No. 7847 at 6, citing ECF Nos.

18  7216 at 4, 6996 at 8, 6846 at 28.) Suggesting that SPRFIT Coordinators were not "thorough" for

19  utilizing an indicator designed to measure requirements of the Program Guide is particularly

20  troubling given the enormous amount of resources devoted to the data remediation process. Mr.

21  Hayes's findings fail to demonstrate that reliance on a CAT is inadequate. As such, they are

22  improper and should not be adopted as the findings of the Court.

23                   **m.    Supervisory Review of Safety Planning**

24       Mr. Hayes found that "[o]ne regional SPRFIT coordinator did not review quality of safety

25  planning because "a new CAT audit specifically for safety planning is currently being developed,"

26  a response that was irrelevant and ignored CDCR's April 5, 2023 memorandum stating the MHCB

27  supervisory review of safety planning was still required and did not absolve review by regional

28  SPRFIT coordinators. In another region, the SPRFIT coordinator simply stated: "The MHCB

1  supervisor provided this reviewer with proof of practice of having conducted reviews of

2  supervisory discharge treatment plans during the month of April," but the report did not identify

3  the results of the supervisor's findings." (ECF No. 8143-1 at 62.)

4      Mr. Hayes's finding regarding the April 5, 2023 memorandum is incorrect because he

5  misinterprets the requirements of this policy. The policy does not require the supervisor to "report

6  the results" of the review. The policy only requires tracking the reviews, specifically, "[f]or each

7  safety plan reviewed, this tracking tool shall include the patient's name and CDCR number, the

8  date of the safety plan, the date of supervisory review of the safety plan, and the reviewing

9  supervisor's name." (Williams Decl. ¶ 55, Ex. D at 1.)

10              **n.    Privacy During Crisis Responses**

11      Mr. Hayes found that "Regional SPRFIT coordinators rarely opined regarding the lack of

12  privacy and confidentiality offered to patients during crisis responses and assessments following

13  Alternative Housing placements." (ECF No. 8143-1 at 62.) This finding is too vague to be of any

14  meaningful value. Mr. Hayes does not identify the SPRFIT coordinators, the institutions, or the

15  reports for which this was an issue. More concerning, Mr. Hayes does not even provide evidence

16  that there was a lack of privacy during the crises responses that were audited by the CDCR

17  SPRFIT Coordinator. Absent that evidence, this appears to be no more than speculation that a

18  discussion of "lack of privacy and confidentiality" was even warranted. His finding is speculative

19  and should not be adopted as the finding of the Court.

20              **o.    Recommendations versus Corrective Action Plans**

21      Mr. Hayes found that "[o]ne regional SPRFIT coordinator reported that 'Temporarily, due

22  to the severe mental health staffing shortage, new CAPs pertaining to mental health deficiencies

23  will be deferred. Instead, all such deficiencies will be listed as recommendations. When mental

24  health staffing improves, some recommendations will be changed to CAPs.' The rationale for a

25  distinction between a recommendation and CAP was unclear." (ECF No. 8143-1 at 62.) Mr. Hayes

26  does not identify the region or report discussed. However, the "distinction between a

27  recommendation and CAP" is not unclear because it is included in the SP CQI Guidebook.

28      The SP CQI Guidebook, which was reviewed by Mr. Hayes, includes a section discussing

1    the "Assignment of Corrective Action Plans (CAPs) and Recommendations." (Williams Decl. ¶

2    57, Ex. A at 109.) In relevant part, the guidebook states the following:

3    •    The auditor should identify specific areas where improvement is warranted. CAPs should

4        be required to resolve the outstanding concerns.

5    •    Recommendations for areas to improve can also be made during the audit. These would be

6        areas that don't rise to the level of needing a formal CAP, but that would help improve the

7        health of the institution's suicide prevention program.

8    (*Id.*) In instances where the local SPRFIT has already identified the issue, the SP CQI Guidebook

9    permits the Regional SPRFIT Coordinator to identify the concern but not issue a formal CAP. (*Id.*)

10   In sum, Mr. Hayes's finding that there is confusion about CAPs and recommendations is wrong.

11   **4.    Mr. Hayes's Conclusion That Because SPRFIT Coordinators Have**
        **"Disparate Findings" From His Own They Are Conducting "Deficient**
12      **Monitoring" is Incorrect.**

13       Finally, Mr. Hayes finds that there were "several clear examples of deficient monitoring, as

14   well as multiple examples of regional SPRFIT coordinators reporting very disparate findings then

15   [*sic*] from this reviewer for comparable review periods." (ECF No. 8143-1 at 62-63.) He gives two

16   examples to justify his finding. First, Mr. Hayes cites to an April 2023 CIM Regional SPRFIT

17   report stating that "[d]uring the February 2023 review, no concerns were identified" with MHCB

18   supervisor review of discharge safety plans. (*Id.*, fn. 20.) But Mr. Hayes did not actually conduct a

19   tour of CIM in a "comparable review period" or under comparable policy requirements as

20   CDCR's SPRFIT Coordinator.

21       Mr. Hayes neglected to note that, as indicated by the same CIM report, these supervisor

22   reviews were suspended by headquarters' policy on February 2, 2023. (Hudspeth Decl., Ex. C at

23   3.) Thus, because supervisor reviews were not being conducted, it is not surprising that CDCR's

24   reviewer identified no concerns during her February 2023 visit. Mr. Hayes reported that when he

25   toured CIM on May 18 and 19, 2023, he found issues of noncompliance. But Mr. Hayes also

26   neglected to report that the supervisor reviews had just been reinstated by statewide policy on

27   April 5, 2023. (*Id.*) Mr. Hayes did not conduct touring during a "comparable review period"

28   because the Regional SPRFIT tour occurred when no reviews were required and Mr. Hayes's tour

1  occurred when supervisory reviews were reinstated. Mr. Hayes's finding is therefore improper.

2      In his second example, in contrast to CDCR's findings, Mr. Hayes notes that he found

3  deficiencies in telephone calls and yard offerings for crisis bed patients at CIM. (ECF No. 8143-1

4  at 63, fn. 20, and 126.) Mr. Hayes's CIM tour occurred on May 18 and 19, 2023 and his sample

5  size consisted of the "23 patients in the MHCBs during the onsite assessment." (*Id.* at 125, 126.)

6  None of the four Regional SPRFIT tours at CIM occurred on May 18 or 19, 2023, nor did any of

7  their samples consist of the "23 patients in the MHCBs during" Mr. Hayes's onsite assessment.

8  Thus, Mr. Hayes's finding that his monitoring was conducted in a "comparable review period" is

9  incorrect.

10     It should not be surprising that Regional SPRFIT Coordinators have different findings than

11  Mr. Hayes. Regional SPRFIT Coordinators conduct visits at different times and often multiple

12  times per year whereas Mr. Hayes visits an institution at most once annually. Regional SPRFIT

13  Coordinators use an agreed upon SP CQI Guidebook to conduct their transparent and standardized

14  reviews. The SP CQI Guidebook sets forth methodology for each audit reported on in the

15  Regional SPRFIT Coordinators' reports. Mr. Hayes has not published his methodology for

16  comparison. None of these differences are evidence that the SPRFIT reports are deficient.

17     CDCR's Regional SPRFIT Coordinator reports are robust products of CDCR's suicide

18  prevention quality assessment and improvement system. In accordance with the SP CQI

19  Guidebook, the Regional SPRFIT Coordinators report on all nineteen Hayes items and many more

20  issues. CDCR is fully compliant with this part of Recommendation 32. Mr. Hayes's list of issues

21  with SPRFIT reports are unpersuasive and are not evidence of noncompliance with this

22  recommendation. The Court should find CDCR fully compliant with this recommendation. No

23  further orders are necessary.

24     **M.    Reception Center Practices**

25     Defendants object to Mr. Hayes's findings and conclusions regarding Reception Center

26  Practices. (ECF No. 8143-1 at 65-69.) Mr. Hayes's findings on Reception Center Practices

27  measure compliance with part of one recommendation:

28     • Recommendation 32 – CDCR, under the guidance of the Special Master, should examine

20681936.1

1    and consider taking reasonable corrective actions to address these additional miscellaneous

2    issues: . . . Reception Centers.

3  (ECF No. 6879 at 27, 36.)

4        In his report on the Fifth Re-Audit, the Special Master provided "a list of recommendations

5  that remain to be completely and durably implemented *and the steps defendants must take to do

6  so.*" (ECF No. 7636 at 21, emphasis added.) According to that report, compliance with the

7  reception center portion of Recommendation 32, the Special Master found that for CDCR to be

8  compliant, CDCR "should provide verification to the Special Master that all reception center

9  facilities are aware of their suicide prevention responsibilities." (*Id.* at 29.)[20] Additionally, the

10  Special Master stated that "proof of practice regarding compliance with CDCR's Reception Center

11  Suicide Prevention Reporting Expectations memorandum should be reflected in monthly SPRFIT

12  meeting minutes for each of the three reception centers." (*Id.* at 17.)

13        CDCR objects to findings made by Mr. Hayes at Wasco State Prison's reception center.

14  During his April 18-19, 2023 visit to Wasco State Prison (WSP), Mr. Hayes reported that despite

15  observations suggesting clinicians in diagnostics are completing their county jail and nurse

16  screening reviews, a recent suicide revealed there were problems with these practices. (ECF No.

17  8143-1 at 69.) He also found that when inmates declined to sign a release of information, nurses

18  used "boilerplate" language such as "declined to sign ROI" or "clinician described the 7385 (ROI)

19  process and the patient declined to authorize a release of information from prior healthcare

20  providers to CDCR/CCHCS." (*Id.*) Mr. Hayes makes no recommendation on how to otherwise

21  document that an inmate declined to sign a release of information.

22        Notwithstanding, CDCR's Regional SPRFIT Coordinators made subsequent visits to WSP

23

24  [20] Those responsibilities include the following: (1) placement of suicide prevention posters in the offices
    utilized for direct patient care by reception center nurses and diagnostic clinicians, as well as reception

25  center housing unit bulletin boards and pill call windows; (2) diagnostic clinicians being required to review
    the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained

26  within the Electronic Health Records System and the Strategic Offender Management System for each
    inmate; (3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that

27  the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form
    during the screening process if a prior history of mental health treatment is reported; and (4) diagnostic

28  clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if
    the screening and/or inmate's behavior suggests a possible current risk for suicide. (ECF No. 7636 at 29.)

1    and did not observe or discover similar issues. During the November 2023 site visit, the reviewer

2    observed two clinicians completing diagnostic screenings. (Mintz Decl., Ex. N at 10.) Between the

3    two clinicians, a total of five screenings were observed. (*Id.*) The county jail records, and the

4    initial health screening were reviewed in all five cases. (*Id.*) There was a total of two patients who

5    reported having received mental health treatment in the community and the clinician appropriately

6    made a request for authorization of a release of information. (*Id.*) Both observed clinicians asked

7    all the questions appropriately and arrived at an appropriate determination regarding referral for an

8    initial clinical assessment. (*Id.*)

9         In sum, Mr. Hayes's findings and conclusions are outdated and fail to reflect the current

10   reality of WSP's diagnostic screening processes. Moreover, Mr. Hayes's findings are at odds with

11   CDCR's November 2023 audits, which were conducted using the agreed upon criteria, and which

12   show that WSP is compliant with Mr. Hayes's recommendation. In accordance with the February

13   2023 order, because WSP has demonstrated compliance with this recommendation since Mr.

14   Hayes's April 2023 visit, the Special Master and Mr. Hayes should note that WSP has fully

15   implemented this recommendation.

16        **N.    Baseline Assessment of Suicide Prevention Practices in CDCR's Five
                   Psychiatric Inpatient Programs**

17

18        CDCR objects to Mr. Hayes's findings regarding CDCR's Psychiatric Inpatient Programs

19   (PIP). Most of Mr. Hayes's site visits were made over a year ago, in January and February 2023.[21]

20   Two site visits occurred before CDCR issued its February 6, 2023 proposed joint schedule to

21   implement corrective action plans in the PIPs (ECF No. 7714) and a third site visit began the next

22   day on February 7, 2023. (ECF No. 8143-1 at 320.) Mr. Hayes's findings and recommendations

23   are outdated and should be given little weight.

24        Mr. Hayes made fifteen recommendations to provide verification regarding numerous

25   work or corrective action plans for the PIPs. In response, CDCR issued corrective action plans or

26

27   [21] Mr. Hayes conducted his site visits on the following dates: CMF PIP January 9-10, 2023; (ECF No.
     8143-1 at 308), CHCF PIP January 11-12, 2023 (*Id.* at 314), SVSP PIP February 7-8, 2023 (*Id.* at 320),
     CIW PIP May 15-17, 2023 (*Id.* at 327), and SQ PIP May 23-25, 2023 (*Id.* at 330).

28

1    remedied many of the issues identified in the Sixth Re-Audit report. Mr. Hayes's request for

2    fifteen additional orders is unnecessary because the issues have already been corrected or CDCR's

3    Regional SPRFIT Coordinators have already established corrective action plans to address the

4    issues. CDCR's Regional SPRFIT Coordinators add all corrective action plans generated from Mr.

5    Hayes's site visits to their own roster and regularly check the status of those plans when they

6    conduct site visits. (Williams Decl. ¶ 58.) They also look to ensure that each institutions' local

7    SPRFIT committee is tracking and completing those same corrective action plans. (*Id.*)

8           **1.    Suicide Resistant Beds**

9                **a.    California Medical Facility PIP**

10          Mr. Hayes found that although the California Medical Facility (CMF) PIP had improved

11   its use of suicide resistant beds for suicidal inmates, "CMF-PIP staff incorrectly stated the

12   following in the cover page to one of the requested documents on designated housing for suicidal

13   patients: 'Dorms and Multi-Person Cells are used only for suicide precaution when there are no

14   limitations on property.' This was clearly wrong. Multi-occupancy cells, including dorms, should

15   never be utilized for suicide observation at the CMF-PIP because they are not suicide-resistant,

16   regardless of property allowance or restriction." (ECF No. 8143-1 at 74.)

17          Mr. Hayes does not explain how use of dorms or multi-person cells for suicide precaution

18   (as opposed to suicide watch) is "clearly wrong." Nor does he point to any standard or CDCR

19   policy banning the use of dorms or multi-person cells for suicide precautions. CDCR uses

20   multiperson cells for protective purposes in other settings. Per Program Guide policy, CDCR

21   double cells new intake patients in Restricted Housing Units where no retrofitted suicide resistant

22   cell is available. (ECF No. 7333-1 at 569.) There could be similar clinical utility in conducting

23   suicide precautions with cell mates present. Mr. Hayes's finding lacks foundation and is not

24   supported by policy. As such, it is improper and should be disregarded.

25               **b.    Salinas Valley State Prison PIP**

26          During his February 7, 2023 site visit to Salinas Valley State Prison PIP, Mr. Hayes found

27   that SVSP PIP lacked sufficient suicide resistant cells. (ECF No. 8143-1 at 74.) Additionally, he

28   found that SVSP PIP had not addressed the "need for fencing or other barriers to prevent patients

1  on suicide observation status from jumping from the second tier of the" C-5 and C-6 housing

2  units. (*Id.*) Accordingly, Mr. Hayes recommended that CDCR "[p]rovide verification that all cells

3  designated to house suicidal patients at SVSP-PIP are now suicide-resistant" and "[p]rovide work

4  plans and CAPs that address the need for fencing or other barriers to prevent patients on suicide

5  observation status from jumping from the second tiers of C-5 and C-6 units at SVSP-PIP." (*Id.* at

6  90.) Defendants object to these recommendations and maintain that no orders are necessary for the

7  following reasons.

8      *First*, regarding the retrofit of cells at SVSP PIP, CDCR completed the retrofits. CDCR

9  began suicide prevention retrofits for cells in SVSP PIP's C-5 and C-6 on September 25, 2023 and

10  completed the project on December 14, 2023. (Williams Decl. ¶ 59.) Retrofits for the cells in TC1

11  and TC2 began on December 18, 2023 and are scheduled to be completed by the end of July 2024.

12  (*Id.*)

13      *Second*, SVSP PIP has procedures in place to prevent suicidal inmates from accessing and

14  jumping from the second tier of SVSP PIP's C-5 and C-6 housing units. CDCR has no plans to

15  install barriers to the second floor of C-5 and C-6, nor has CDCR been ordered to take such

16  extreme measures. There is no finding that C-5 or C-6 are jumping risks or that patients have

17  jumped from C-5 or C-6 in an apparent suicide attempt. Such a recommendation is premature and

18  without basis. Accordingly, CDCR objects to Mr. Hayes's recommendation that CDCR produce

19  "work plans and CAPs" for C-5 and C-6.

20          **2.    Observation of Suicidal Patients**

21      Mr. Hayes found high levels of compliance with observation of suicidal patients during his

22  most recent set of visits to CDCR PIPs. "According to the Mental Health Observations Reporting

23  Tool, all of the PIP units were over 90 percent compliance for both Suicide precaution and Suicide

24  Watch status, but none of the facilities were at 100 percent compliance for either observation

25  status during the current assessment." (ECF No. 8143-1 at 75.)

26      Mr. Hayes also found "significant deficiencies . . . at both SVSP-PIP (in rarely utilizing

27  Suicide Precaution) and CIW-PIP (by utilizing an unauthorized "Behavioral" Suicide Watch

28  level), and required daily assessment of suicidal patients were inconsistently found at CHCF-PIP,

CIW-PIP, CMF-PIP, and SVSP-PIP." (*Id.* at 76.) Mr. Hayes made three recommendations: (1) that CDCR "[p]rovide verification that the previous CAP to ensure that all patients on suicide observation status are always adequately observed at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP has been fully implemented;" (2) that CDCR "[p]rovide verification that "Behavioral Suicide Watch" is no longer utilized at CIW-PIP;" and, (3) that CDCR "[p]rovide verification that suicidal patients are being assessed by a mental health clinician on a daily basis at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP." (*Id.* at 90.) CDCR's responses and objections are below.

### a. Patients in CDCR PIPs are Timely Observed over Ninety Percent of the Time.

Mr. Hayes first recommends that CDCR "[p]rovide verification that the previous CAP to ensure that all patients on suicide observation status are always adequately observed at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP has been fully implemented." (ECF No. 8143-1 at 90.) No further verification or order is necessary because Mr. Hayes's own findings demonstrate that PIP patients are timely observed ninety to ninety-eight percent of the time. Figures from the appendices of Mr. Hayes's report are in the table below.

| CDCR PIP | Suicide Precautions | Suicide Watch | ECF No. 8143-1 at |
|---|---|---|---|
| CMF PIP | 97% | 90% | 308 |
| CHCF PIP | 98% | 97% | 315 |
| SVSP PIP | 98% | 95% | 321 |
| CIW PIP | 98% | 94% | 328 |
| SQ PIP | 96% | 95% | 330 |

As noted above, CDCR conducts millions of observation checks each year on suicidal patients. A 100 percent standard is impossible given the number of checks. Accordingly, further corrective action, given this high level of compliance, is unnecessary and would detract from other corrective action priorities at each PIP.

### b. California Institution for Women PIP

During his May 2023 site visit, Mr. Hayes found that the PIP at California Institution for Women was deficient in observation of suicidal patients because they utilized an "unauthorized 'Behavioral' Suicide Watch level." (ECF No. 8143-1 at 76.) Mr. Hayes recommended that CDCR "[p]rovide verification that 'Behavioral Suicide Watch' is no longer utilized at CIW-PIP." (*Id.* at

1  90.) CIW PIP and CDCR's Region 4 SPRFIT Coordinator created a corrective action plan to

2  address this issue and found that it was corrected and has remained corrected well into 2024.

3  (Hudspeth Decl., Ex. K at 18.)

4     CDCR developed a CAP for use of "behavioral suicide watch" in early 2023. (*Id.*) The

5  CAP was reviewed during the Region 4 SPRFIT Coordinator's site visits in 2023. During the

6  November 2023 visit, the Region 4 SPRFIT Coordinator found that in October 2023, CIW PIP

7  was over ninety-six percent compliant with suicide precaution rounds and over ninety-five percent

8  compliant with suicide watch rounds. (*Id.*, Ex. I at 7.) And in February 2024, CIW PIP again

9  showed high rates of compliance as the reviewer found that they were over ninety-eight percent

10  compliant with suicide precaution rounds and over ninety-seven percent compliant with suicide

11  watch rounds. (*Id.*, Ex. K at 6.)

12     In sum, CIW PIP has eliminated the use of 'Behavioral Suicide Watch' and no order or

13  corrective action plan is necessary.

14        **c.**   **Salinas Valley State Prison PIP**

15     Salinas Valley State Prison PIP conducts required daily assessments of suicidal patients.

16  Mr. Hayes recommended that CDCR "[p]rovide verification that suicidal patients are being

17  assessed by a mental health clinician on a daily basis at CHCF-PIP, CIW-PIP, CMF-PIP, and

18  SVSP-PIP." (ECF No. 8143-1 at 90.)

19     CDCR's Region 2 SPRFIT Coordinator audited SVSP PIP in June 2023. (Stahl Decl., Ex.

20  E & Ex. F.) In auditing observation practices, the reviewer looked to see whether "the patients

21  [was] seen daily by a psychologist or psychiatrist, were observation and issue orders renewed on a

22  daily basis by either the psychologist or psychiatrist and was there clinical justification

23  documented in the progress notes for observation status and issue ordered." (Stahl Decl., Ex. F at

24  2-3.) The reviewer determined that all five cases audited met these criteria. (*Id.*) Similarly, when

25  audited in December 2023, the reviewer determined that nine of ten cases audited met all three

26  components of the review. (*Id.*, Ex. H at 2.)

27     Mr. Hayes's February 2023 findings are outdated as indicated by subsequent reviews

28  conducted by CDCR's SPRFIT Coordinator. His request for verification is improper and

1  unnecessary. SVSP PIP has shown compliance with ensuring patients on suicide watch or

2  precautions are being assessed by a mental health clinician daily at SVSP PIP. No further

3  verification or order is required for SVSP PIP.

4        **3.    Proper Clothing and Possessions**

5        Mr. Hayes recommended that CDCR "[p]rovide verification that the CAPs to ensure that

6  all provider orders regarding clothing and possessions are clinically justified in medical charts, and

7  that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions

8  at both CHCF-PIP and CMF-PIP have been fully implemented." (ECF No. 8143-1 at 90.)

9        Following Mr. Hayes's January 2023 site visit, the Region 4 SPRFIT Coordinator directed

10  California Health Care Facility PIP to add this issue to their Improvement Priorities List and

11  Project Pipeline beginning in April 2023. (*See* Hudspeth Decl. Ex. D at 12 issuing a Corrective

12  Action Plan (CAP) for "Proper Clothing and Possessions.") This remains an active project at

13  CHCF PIP on their project pipeline. (*Id.*) No further verification regarding the CAP is necessary at

14  CHCF PIP. (*Id.*) This is also no longer an active issue at California Medical Facility PIP. During

15  the Region 1 SPRFIT Coordinator's December 2023 visit, he observed only "minor issues" and

16  found that "the orders were up-to-date and generally accurate." (Obegi Decl., Ex. H at 3.)

17  Accordingly, no further orders are necessary regarding CHCF or CMF PIP. Regional SPRFIT

18  Coordinators are regularly auditing this item and noting deficiencies. When those are found,

19  corrective action is taken.

20        **4.    Out of Cell Activities**

21        Following his site visits in early 2023, Mr. Hayes found that several PIPs were not offering

22  yard or dayroom "of ten hours or more" per week. (ECF No. 8143-1 at 79.) Mr. Hayes's findings

23  misstates the out of cell time policy in effect at the time of his audit. CDCR did not file its non-

24  clinical out of cell time plan until March 28, 2023. (ECF No. 7787.) That plan included a

25  requirement for ten hours of out of cell time. In its August 23, 2023 order, the Court rejected

26  CDCR's plan and required instead that CDCR offer twenty hours of structured treatment per week

27  which would not include dayroom or yard. (ECF No. 7924.) CDCR is in the process of developing

28  policies in accordance with the Court's order. Accordingly, Mr. Hayes's finding that policy

1  required ten hours of out of cell time during his tours in early 2023 are improper because no policy

2  was in effect at that time.

3      Mr. Hayes also recommended that CDCR "[p]rovide verification that the CAPs to ensure

4  that suicidal patients have access to out-of-cell activities that are clinically justified, including

5  those on maximum-security status, at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP have been

6  fully implemented." (ECF No. 8143-1 at 90.) But no further verification is necessary because each

7  Regional SPRFIT Coordinator routinely audits the non-clinical activities tracking tool (NCAT) to

8  determine whether patients—all patients—were offered adequate out of cell activities. (Williams

9  Decl. ¶ 60.) The NCAT tracks data for all maximum custody patients including those who are

10  suicidal. (*Id.*) The Regional SPRFIT Coordinators also review clinical justification on orders

11  quarterly. (*Id.*)

### 5.    IDTT Meetings

13      Mr. Hayes found that "at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP…, although

14  treatment team representation was good…, many meetings (involving varying clinical staff) were

15  problematic, with uneven case presentations and higher level of care discussions (during meetings

16  for ICF patients), review of diagnoses, little or no discussion about observation level and

17  possessions for those patients currently on either Suicide Precaution or Suicide Watch, as well as

18  inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence

19  of SI." (ECF No. 8143-1 at 81.) He recommended that CDCR "[p]rovide verification that the

20  CAPs to improve consistency of IDTT meetings for suicidal patients, to include adequate case

21  presentations; higher level of care discussions (during meetings for ICF patients); adequate

22  discussion regarding suicide risk histories; current suicide risk and observation; clothing,

23  possessions, and out-of-cell activities; and safety planning to reduce further recurrence of SI at

24  CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP have been fully implemented." (*Id.* at 90.)

25      CDCR objects to Mr. Hayes's findings as improper because they are outside his area of

26  expertise. Mr. Hayes is not a clinician, yet he assessed the clinical quality of treatment team

27  meetings in CDCR's PIPs. Specifically, he raised issues with "case presentation and higher level

28  of care discussions" and "review of diagnoses" among other items that are inherently clinical in

1   nature. His recommendation is based in large part on his own clinical findings of inadequacy, a

2   subject clearly outside the scope of his expertise and for which he is not qualified to render

3   opinions.

4        CDCR's Regional SPRFIT Coordinators, who are themselves clinicians, audit the

5   treatment team meetings for clinical appropriateness and issue corrective action plans when

6   problems are noted. No further orders are required for this item.

7        **6.      Safety Planning**

8        Mr. Hayes made two recommendations related to PIP safety planning. First, he found that

9   "[a]t CMF-PIP, required safety plans were only completed in 76 percent (32 of 42) of the cases. At

10  CHCF-PIP, required safety plans at CHCF-PIP were only completed in 71 percent (30 of 42) of

11  the cases." (ECF No. 8143-1 at 82.) Mr. Hayes recommended that CDCR "[p]rovide verification

12  that the CAPs to improve the adequacy of safety planning, as well as supervisory review of safety

13  plans, at CHCF-PIP, CMF-PIP, and SVSP-PIP have been fully implemented." (*Id.* at 90.)

14       Adequacy of safety planning is monitored via CDCR's Chart Audit Tool as well as a

15  remediated data indicator, Quality of Safety Planning to Reduce Suicide Risk (SP3.4.). (Williams

16  Decl. ¶ 61.) Supervisory reviews are completed on a statewide SharePoint which requires that

17  supervisors identify if modifications were needed for the safety plan. (*Id.*) CDCR continues to

18  assess the effectiveness of the SharePoint system. (*Id.*) Thus, no further orders are necessary.

19       Next, Mr. Hayes found that "[a]t SVSP-PIP, required safety plans were completed in 86

20  percent (25 of 29) of the cases, with the same percentage completed by either licensed or

21  unlicensed clinical social workers (contrary to policy). (ECF No. 8143-1 at 82) Mr. Hayes

22  recommended that CDCR "[p]rovide verification that SVSP-PIP is no longer utilizing the

23  "Discharge Readiness Tool," "PIP Supervisor Review," and "Discharge Review" EHRS templates

24  in its supervisory review of safety plans. (*Id.* at 90.)

25       CDCR's Region 2 SPRFIT Coordinator regularly audits SVSP PIP. (See Williams Decl. ¶

26  9.) Based on those reviews, one can see that that SVSP PIP no longer uses the "Discharge

27  Readiness Tool," "PIP Supervisor Review," and "Discharge Review" templates for supervisory

28  reviews. Thus, no further order is required.

1

### 7.    Suicide Prevention Training

2    Regarding various suicide prevention trainings, Mr. Hayes recommended that CDCR

3    "[p]rovide verification that the CAPs to ensure that custody, medical, and mental health staff

4    compliance for annual suicide prevention training was above 90 percent, and that mental health

5    clinician compliance rates for SRE mentoring program, seven-hour SRE, and safety plan training

6    was above 90 percent at all PIPs have been fully implemented." (ECF No. 8143-1 at 90.)

7    However, Mr. Hayes already found that custody staff at all five PIPs scored over ninety percent

8    for compliance with suicide prevention training. (*Id.* at 83.) Thus, no order with respect to custody

9    staff is needed.

10    ### 8.    SPRFIT

11    Mr. Hayes found that local SPRFITs were not establishing quorums, except at San Quentin

12    PIP, and that several of the committees were not tracking or addressing prior corrective action

13    recommended by Mr. Hayes or regional teams. (ECF No. 8143-1 at 84-85.) Accordingly, Mr.

14    Hayes made two related recommendations regarding quorum and corrective actions. (*Id.* at 90-91.)

15    ### a.    Quorum[22]

16    Mr. Hayes recommended that CDCR "[p]rovide verification that the CAPs to ensure that

17    CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP CDCR achieved six consecutive months of

18    SPRFIT meeting quorums for all mandatory members or their designees have been fully

19    implemented. (*Id.* at 90.) The recommendation should be modified with respect to CHCF PIP,

20    CIW PIP, and SVSP PIP as Regional SPRFIT Coordinators have recently found that no issues

21    with quorum occurred.

22    In any event, CDCR's Regional SPRFIT Coordinators attend local SPRFIT meetings and

23    audit their meeting minutes. They use the SP CQI Guidebook to audit SPRFIT committees and

24    their minutes. (Williams Decl. ¶ 62, Ex. A at 96-100.) As part of their audit, they look at whether

25    the "all mandatory members, or authorized designees [were] present." (*Id.*, Ex. A at 96, 98.)

26    ///

27

28

---

[22] Defendants re-assert their objection to Mr. Hayes's definition of quorum as asserted is § IV, J. 2., *supra.*

20681936.1

**(1)      CHCF PIP's SPRIFT Achieves Quorum for its Meetings.**

During the recent January 17-18, 2024, Region 4 SPRFIT Coordinator review of CHCF PIP, the reviewer found that the meeting minutes from September through November 2023 reflected that they "met 100% of audit criteria." (Hudspeth Decl., Ex. J at 5.) The reviewer also attended a SPRFIT meeting on October 17, 2023 and noted that "[q]uorum was met and there was a qualitative discussion of the data provided." (*Id.*)

**(2)      CIW PIP Achieves Quorum for its Meetings**.

The Region 4 SPRFIT Coordinator reviewed meeting minutes from October through December 2023 and attended a SPRFIT meeting remotely on November 15, 2023. (Hudspeth Decl., Ex. K at 9-10.) During the November 15, 2023 meeting "[q]uorum was met and there was a qualitative discussion of the data provided." (*Id.*) The minutes "met all audit criteria." (*Id.*)

**(3)      SVSP PIP Had No Quorum Issues in Late 2023.**

Although the reviewer found issues with the quality of the local SPRFIT meetings, no quorum issues were found at SVSP PIP during the late 2023 reviews conducted by the Region 2 SPRFIT Coordinator. (Stahl Decl., Ex. H at 3-4.)

In sum, the recommendation to issue corrective action at four institutions is outdated and stale. Three programs—CHCF, CIW, and SVSP PIPs—have shown compliance with SPRFIT quorum. No recommendation for those three institutions is required.

**b.      Corrective Actions**

Mr. Hayes recommended that CDCR "[p]rovide verification that the CAPs to ensure that SPRFITs at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP tracked prior corrective actions recommended by this reviewer and/or regional SPRFIT clinicians in either monthly SPRFIT minutes or in separate documentation have been fully implemented." (ECF No. 8143-1 at 91.) The recommendation should be modified with respect to CHCF PIP, CIW PIP, and CMF PIP as Regional SPRFIT Coordinators have recently found that the local SPRFIT committees were adequately tracking and reviewing corrective action plans.

CDCR's Regional SPRFIT Coordinators attend local SPRFIT meetings and audit their notes. They utilized the SP CQI Guidebook to audit SPRFIT committees. (Williams Decl. ¶ 63,

Ex. A at 96-100.) As part of their audit, they look at whether the "committee engage[d] in qualitative discussion of system surveillance of the institution's suicide prevention practices, including…[c]orrective action plans for identified deficiencies found by the SPRFIT." (*Id*. at 96.) A similar audit is conducted of meeting minutes. (*Id.* at 98.)

### (1) CHCF PIP

CHCF PIP's SPRFIT committee is tracking prior corrective action recommended by Mr. Hayes or the Regional SPRFIT. During the recent January 17-18, 2024, Region 4 SPRFIT Coordinator review of CHCF PIP, the reviewer found that the meeting minutes from September through November 2023 reflected that they "met 100% of audit criteria." (Hudspeth Decl., Ex. J at 5.)

### (2) CIW PIP

CIW PIP has no open corrective action plans from Mr. Hayes. (Hudspeth Decl., Ex. A, Ex. E, Ex. G, Ex. I, and Ex. K.) CIW PIP is tracking other recommended corrective actions. (*Id.*) The Region 4 SPRFIT Coordinator reviewed meeting minutes from October through December 2023 and attended a SPRFIT meeting remotely on November 15, 2023. (Hudspeth Decl., Ex. K at 9-10.) The discussions were qualitative and the minutes "met all audit criteria." (*Id.*)

### (3) CMF PIP

CMF PIP is tracking both recommendations by Mr. Hayes and the Regional SPRFIT Coordinators at the SPRFIT meetings. (Obegi Decl., Ex. H.) The Region 1 SPRFIT Coordinator reviewed the SPRFIT meeting minutes for January 2024. (*Id.*, at 6 & 16-17.) CMF PIP's SPRFIT committee is tracking corrective action issued by Mr. Hayes and by the Regional Coordinator. (*Id.*)

In sum, the recommendation to issue corrective action at four institutions is outdated and stale. Three programs' SPRFIT committees—CHCF, CIW, and CMF PIPs—have shown compliance with tracking corrective action. No recommendation for those three institutions is required.

/ / /

/ / /

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT

20681936.1

1

## V.     CONCLUSION

2      Defendants have built a robust and durable suicide prevention system, evidenced by the

3 oversight and self-monitoring mechanisms that address noncompliance—which is inevitable in

4 any healthcare system. Defendants will continue their efforts to further implement Mr. Hayes'

5 recommendations. Notwithstanding, Defendants respectfully request that the Court sustain their

6 general and specific objections.

7

## VI.     CERTIFICATION

8      In preparing these objections, the undersigned counsel for the Defendants reviewed the

9 following Court orders relevant to the issues in this filing, ECF Nos. 547, 612, 640, 3731, 3954,

10 4044, 4125, 4361, 4394, 4539, 4693, 4857, 4925, 5271, 5429, 5762, 6212, 6441, 6846, 6973,

11 7004, 7006, 7043, 7150, 7426, 7605, 7608, 7609, 7681, 7688, 7696, 7699, 7731, 7743, 7808,

12 8137.

13   DATED: April 1, 2024                              Respectfully submitted,

14                                                      HANSON BRIDGETT LLP

15

16                                             By:   ___/s/ Paul B. Mello_____
                                                      PAUL B. MELLO
17                                                    SAMANTHA D. WOLFF
                                                      KAYLEN KADOTANI
18                                                    DAVID C. CASARRUBIAS
                                                      CARSON R. NIELLO
19                                                    Attorneys for Defendants

20

21 DATED: April 1, 2024                               ROB BONTA
                                                      Attorney General of California
22                                                    Damon McClain
                                                      Supervising Deputy Attorney General
23

24                                             By:   ___/s/ Elise Owens Thorn_____
                                                      ELISE OWENS THORN
25                                                    Deputy Attorney General
                                                      Attorneys for Defendants
26

27

28

DEFENDANTS' OBJECTIONS TO SIXTH RE-AUDIT REPORT