1  ROB BONTA, SBN 202668
   Attorney General of California
2  MONICA N. ANDERSON, SBN 182970
   DAMON MCCLAIN, SBN 209508
3  Supervising Deputy Attorney General
   ELISE OWENS THORN, SBN 145931
4  NAMRATA KOTWANI, SBN 308741
   Deputy Attorneys General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, CA 94244-2550
     Telephone: (916) 210-7318
7    Fax: (916) 324-5205
     E-mail: Elise.Thorn@doj.ca.gov
8  Attorneys for Defendants

   HANSON BRIDGETT LLP
   PAUL B. MELLO, SBN 179755
   SAMANTHA D. WOLFF, SBN 240280
   KAYLEN KADOTANI, SBN 294114
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
     1676 N. CALIFORNIA BLVD., SUITE 620
     WALNUT CREEK, CALIFORNIA 94596
     TELEPHONE: 925-746-8460
     FACSIMILE:  925-746-8490
   Attorneys for Defendants

9

10

11

12

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

13

**SACRAMENTO DIVISION**

14

15

16   RALPH COLEMAN, et al.,

17              Plaintiffs,

18        v.

19   GAVIN NEWSOM, et al.

20              Defendants.

Case No. 2:90-CV-00520- KJM-DB

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON HIS EXPERT'S SIXTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND RE-AUDIT OF SUICIDE PREVENTION PRACTICES IN THE PSYCHIATRIC INPATIENT PROGRAMS**

21

22

23

24

Judge:    Hon. Kimberly J. Mueller

25

26

27

28

1    Defendants request that the Court, under Federal Rule of Evidence 201, take judicial notice

2 of the document attached hereto as **Exhibit A**.  Judicial notice is appropriate where the fact at

3 issue is "not subject to reasonable dispute" because it "can be accurately and readily determined

4 from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  A court

5 must take judicial notice "if a party requests it and the court is supplied with the necessary

6 information."  Fed. R. Evid. 201(c)(2).  A court may take judicial notice of undisputed matters of

7 public record.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 (9th Cir. 2006)

8 ("We may take judicial notice of court filings and other matters of public record.").

9    Defendants attach a as Exhibit A a true and correct copy of a June 25, 2020 report filed by

10 Mr. Lindsay Hayes in the case of *Estate of Michael Ostby et al. v. Yellowstone County et al*, Case

11 No. 1:17-cv-00124-SPW (D. Montana 2020). The document is docketed as Document No. 156-25

12 and is identified as Mr. Hayes's Assessment of *Otsby v. Yellowstone County et al.* This document

13 is relevant to Defendants' objections to the Special Master's Sixth Re-Audit report because it

14 shows that in other matters for which Mr. Hayes has rendered expert opinions, he has expressly

15 stated that his opinions "do not include a critique of any clinical judgment utilized by any mental

16 health clinicians." (Exhibit A at 13).

17  DATED: April 1, 2024                    Respectfully submitted,

18                                          HANSON BRIDGETT LLP

19

20                              By:  _____/s/ Paul B. Mello_____
                                         PAUL B. MELLO
21                                       SAMANTHA D. WOLFF
                                         KAYLEN KADOTANI
22                                       DAVID C. CASARRUBIAS
                                         CARSON R. NIELLO
23                                       Attorneys for Defendants

24

25

26

27

28

-2-

1  DATED: April 1, 2024

2

3

ROB BONTA
Attorney General of California
Damon McClain
Supervising Deputy Attorney General

4  By:     /s/ Elise Owens Thorn

5

6

ELISE OWENS THORN
Deputy Attorney General
Attorneys for Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20680640.1

# EXHIBIT A

## ASSESSMENT OF *OSTBY v. YELLOWSTONE COUNTY, ET. AL.*

<u>**Introduction**</u>

Detailed below is this writer's assessment of the above captioned case. Such assessment is based upon review of documents supplied to date and identified below. As such, this writer reserves the option of amending and/or enlarging upon this assessment if subsequent documents become available.

By way of background, this writer is a project director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts. A nationally recognized expert in the field of suicide prevention in correctional facilities, this writer has served as project director for the only five national U.S. Justice Department-funded studies conducted of jail, prison, and juvenile suicide. This writer previously served as editor and project director for the *Jail Suicide/Mental Health Update* newsletter, a quarterly publication devoted to research, training and prevention that was funded by the U.S. Justice Department from 1986 through 2009. This writer has authored over 100 publications in the area of suicide prevention in jail, prison, and juvenile facilities. These publications are listed in the curriculum vitae attached as Exhibit 1.

In addition, since 1983, this writer has served as a consultant in providing staff training and program assessment/development services in the area of suicide prevention in correctional facilities to various county and state jurisdictions throughout the country. This writer has also served as the suicide prevention consultant to the Special Litigation Section of the U.S. Justice Department's Civil Rights Division and Office of Civil Rights and Civil

Liberties of the U.S. Department of Homeland Security in their investigations of conditions of confinement in various correctional facilities; as well as serves as a consultant to several state departments of correction and state juvenile correctional agencies in the area of suicide prevention.

Further, this writer has been appointed as a federal court monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. Finally, this writer has served as an expert witness/consultant in over 400 litigation cases involving suicide in correctional facilities, and has been qualified as an expert in both federal and state courts throughout the country. Pursuant to Rule 26 of the Federal Rules of Civil Procedure, this writer's expert witness consultation rates are $300 per hour for case file review, $350 per hour for report writing, and $1,400 for the first four hours of deposition/trial testimony and $350 per hour thereafter. A listing of deposition and trial testimony as an expert witness during the past four years is attached as Exhibit 2.

This writer was a past recipient of the National Commission on Correctional Health Care's Award of Excellence (2001) for outstanding contribution in the field of suicide prevention in correctional facilities. This writer's work has been cited in the suicide prevention sections of various state and national correctional health care standards, and training curricula has been utilized by hundreds of correctional agencies throughout the country.

Finally, as a result of research, technical assistance, and consultant work in the area of suicide prevention in correctional facilities, this writer has reviewed and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 38 years.

### Documents Reviewed

The following documents were reviewed in preparation of this assessment. They include:

- Complaint and Jury Demand;

- Third Party Compliant;

- Yellowstone County's Preliminary Pretrial Statement;

- Affidavit of Probable Cause and Order to Hold Michael Ostby, dated May 8, 2015;

- Various jail records for Mr. Ostby in the Yellowstone County Detention Facility (YCDF) from May 7, 2015 thru July 1, 2015;

- Various medical and mental health records for Mr. Ostby in the YCDF, including medical notes dated May 8 and May 9, 2015, and a mental health note dated June 4, 2015;

- Various Medical Request Forms ("kites") submitted by Mr. Ostby during his YCDF confinement;

- Riverstone Health "Weekly Segregation Assessment" form for Mr. Ostby dated May 28, 2015;

- Coroner's Inquest Transcript of Proceedings regarding Mr. Osby's suicide, dated January 19, 2016;

- Autopsy Report;

- Investigative Report of Mr. Ostby's suicide by Yellowstone County Sheriff's Office Detective Shane Bancroft;

- Various photographs of Mr. Ostby and his Class A Cell No. 1 in the YCDF, as well as suicide notes found in his cell;

- Various incident reports and recorded interviews of YCDF staff regarding Mr. Ostby's suicide;

- Various recorded interviews of YCDF inmates regarding Mr. Ostby suicide;

- Telephonic statement of Christina Quijano, MD, dated March 16, 2017;

- Sworn Statement of Charlene Wright, dated October 4, 2017;

- Plaintiff Counsel Interview of inmate Lester McFerran, dated October 26, 2017; Plaintiff Counsel Interview of inmate Daniel Belmarez, dated October 26, 2017;

- YCDF Officer Activity Log, dated July 1, 2015;

- Mental Health Counseling Agreement between Yellowstone County and the Billings Clinic;

- Health Services Agreement between Yellowstone County and Riverstone Health;

- YCDF Policy and Procedure Manual; and

- Deposition transcript and accompanying exhibits for Shane Bancroft, Sam Bofto, Terry Jessee, Charles Leonard, Brett Toland, and Pam Wong.

Finally, this writer has reviewed several versions of the *Montana Jail Standards*, as well as the following nationally recognized correctional standards: American Correctional Association (ACA)'s *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition (2004); National Commission on Correctional Health Care (NCCHC)'s *Standards for Health Services in Jails*, 9th Edition (2014); and the "Suicide Prevention and Intervention

Standard" from the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* (2011).[1]

## Case Analysis

This writer was asked by plaintiff's counsel to examine all pertinent documents available in this case to date, and give an opinion as to whether, through policy and practice, the actions and/or inactions by Yellowstone County and its Yellowstone County Detention Facility (YCDF) staff and contracted personnel were either contrary to, or inconsistent with, both jail standards and standard correctional practice, and were the proximate causes of Michael Ostby's suicide in the YCDF on July 1, 2015.

The methodology this writer utilizes to review a suicide is to review and analyze documentation, determine the facts upon which to rely and compare the actions of officials and their staff to the applicable state and/or national standards, as well as well-established reasonable practices in the correctional facility setting, in this case, a county jail facility. This writer then bases his professional opinions on this comparison, as well as my education, training and experience, including conducting the only five national studies on inmate suicide for the US Justice Department, developing training curricula on suicide detection and prevention in jail and prison facilities, developing and/or revising suicide prevention policies,

---

[1]The *Montana Jail Standards* closely resemble the national correctional standards from the American Correctional Association. See American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition, Laurel, MD: Author; National Commission on Correctional Health Care (2014), *Standards for Health Services in Jails*, 9th Edition, Chicago, IL: Author; and U.S. Department of Homeland Security (2011), Immigration and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington, DC: Author.

and acting as a federal court monitor in jail, prison, and juvenile facilities throughout the country.

## **Michael Ostby**

According to available records, Michael Osby, 28-years-old, was arrested by Billings Police Department officers during the early afternoon of May 7, 2015 on charges of "criminal mischief" and "assault on a peace or judicial officer." According to the Affidavit of Probable Cause in Order to Hold, the officers were called to the residence of Charlene Wright (Mr. Ostby's girlfriend) after a domestic disturbance. According to the Affidavit, Mr. Ostby was highly agitated and crashed his truck into a parked police vehicle. He then exited the truck carrying a black tire iron and "came toward both officers and demanded they shoot him. The Defendant repeated this several times…..The Defendant continued to yell 'Shoot me!' in an apparent effort to provoke the officers into killing him." Exercising admirable restraint, the officers were able to disarm Mr. Ostby and take them into custody without injury to anyone involved.

Mr. Ostby was subsequently transported to the Yellowstone County Detention facility (YCDF). For reasons that appeared unclear based upon his behavior, he was placed in a holding cell but not initially placed on suicide precautions. Ironically, despite his continuous suicide threats at the scene of arrest, the transporting officer completing Mr. Ostby's "Remanding Report" answered "n/a" to the question "Does/did the prisoner show any signs, or attempts, of suicidal behavior," as well as answering "n/a" to the question "Are there any indications of mental health issues." (In addition, although YCDF policy required that the booking officer completed a "preliminary health screening" form upon

intake into the facility, this document was missing from the reviewed material.) Shortly thereafter, Mr. Ostby attempted to hang himself in the holding cell with a t-shirt. The attempt was interrupted by a detention officer and the inmate was subsequently placed in a restraint chair. Mr. Ostby was allegedly seen that same day (May 7) by a Billings Clinic mental health clinician (Terry Jessee) who apparently cleared him from suicide precautions after he "contracted for safety."[2] Mr. Ostby was escorted from booking to the North 2 Unit.

The following day (May 8), Mr. Ostby was seen by a nurse for intake medical screening. He self-reported several medical problems, including chronic back pain (from Severe Spondylosis, Disc Herniation and Spinal Stenosis). Mr. Ostby had previously been prescribed pain medication for the back pain. The nurse noted his suicide attempt from the previous day, and observed his mood to be "depressed, was tearful a few times during intake." The inmate also self-reported substance abuse issues that included daily intravenous heroin use.

Apparently at some point on May 8, Mr. Ostby attended his preliminary court hearing and, upon his return to the YCDF, became disruptive and expressed suicidal ideation stating "I hope they take me to prison so they can stab me and kill me." He also attempted suicide again by grabbing a t-shirt and tying it around both his neck and the toilet. A detention officer again intervened, an altercation ensued, and Mr. Ostby was again placed on suicide precautions in the booking area. The inmate was allegedly seen again by

---

[2]Mr. Jessee testified during the Coroner's Inquest on January 19, 2016 that he assessed Mr. Ostby on four (4) separate occasions while the inmate was housed in the Yellowstone County Detention Facility, although the clinician only completed one progress note (dated June 4, 2015).

Mr. Jessee, although there was no documentation of any assessment other than a notation in the Inmate Activity Log that Mr. Ostby "contracted for safety." He was again cleared from suicide precautions.

On May 11, Mr. Ostby was placed in segregation (Class A Unit) due to the alleged staff assault on May 8.

During his approximate 55-day confinement in the Yellowstone County Detention Facility, Mr. Ostby submitted several Medical Request Forms (or "kites") for both medical and mental health concerns. The five (5) medical kites included complaints of "getting red bumps and itching all over my back, torso, legs, arms, and feet and belly mostly at night," submitted on May 18; complaints of back problems, i.e., "I feel like I'm being ripped apart. Sharpshooting pains in lower back down through legs. My back problems are getting worse….," as well as complaints of "my toes on my right foot are turning purple more and more every day and I feel like there is a bunch of pressure in them like they're going to explode," both submitted on May 27; further complaints about his back pain, i.e., "hoping to see provider soon about my back and possibly getting some meds and extra mat. My back is getting worse…," submitted on June 9; and finally a few weeks later on June 23 when he complained that "I was told four weeks ago that I would be able to see the doctor for my back and still have not. It is getting worse, it hurts to walk, weigh, sit. I go to sleep at night wishing I'd wake up paralyzed. Do I need my parents to contact the ACLU or their attorney before I get seen or what….I need to see a doctor please."

 In addition to the five (5) submitted medical kites, Mr. Ostby submitted six (6) mental health kites complaining of increased depression and anxiety. For example, on May 19, 2015, Mr. Ostby reported "depression/anxiety." When nursing staff responded to the request and asked him to be more specific on his symptoms, Mr. Ostby wrote a second request for mental health services dated May 21, 2015 that stated:

> "Depression, bipolar, schizo? I cry for hours on end with feelings of worthlessness, hopelessness, anger, sadness, voices in my head talk shit to me, tell me I'm no good. Anxiety, scared, super down. Feel like the world is closing in on me, paranoid, feels like everyone is against me or out to get me and hurt me."

Nursing staff responded to this request by informing Mr. Ostby that he would be scheduled to see the mental health clinician. The following week on May 27, 2015, apparently after not yet being seen by mental health, Mr. Ostby submitted a third request for mental health services that repeated almost verbatim his request from May 21. He was again informed by nursing staff that he would be scheduled to see the mental health clinician. Several days later on May 31, 2015, Mr. Ostby submitted a fourth request for mental health services stating that "I need to see mental health ASAP. The voices in my head or seriously messing with me. I'm seeing stuff that isn't there, shadow people, bugs, ghosts. Can't sleep more than four hours a day. Super paranoid…. (illegible)…." He was again informed by nursing staff that he was scheduled to see the mental health clinician.

On June 2, 2015, Mr. Ostby submitted a fifth mental health kite that stated "I would like to sign the proper DNR ("do not resuscitate") paperwork and no blood transfusions. As I have requested to see mental health for two weeks now, I give up and if anything happens to me it's on this facility. Thank you for your time." Although nursing staff again

responded by informing the inmate that he was scheduled to see the mental health clinician, the kite was also read by Detention Officer Charles Leonard who became concerned because Mr. Ostby was "basically asking for a DNR and no life-saving measures to be taken, and that he was feeling depressed and seeing things and hearing voices" (see Leonard deposition testimony at page 43). Officer Leonard then notified the mental health clinician (Terry Jessee) who did not assess Mr. Ostby, but apparently reviewed all of the mental health kites (and signed them on June 2). According to Officer Leonard, "Per Terry, keep a close on Inmate Ostby. If he exhibits any kind of suicidal behavior, he needs to be placed in a suicide suit in booking." As such, despite the suicidal statement contained in the mental health kite, Mr. Ostby was <u>not</u> placed on suicide precautions nor immediately assessed by Mr. Jessee.

Two days later on June 4, 2015, Mr. Ostby was finally seen by the mental health clinician. Mr. Jessee wrote a progress note that stated Mr. Ostby was having a difficult time adjusting to segregation, and was reporting "'a lot of voices in my head' that are 'making fun of me." The inmate also admitted "that he cries a lot, sometimes from sadness or sense of loss, and sometimes out of frustration." Mr. Ostby was observed by the clinician to be "edgy, pressured, anxious ….Teary-eyed at times during the contact." He denied any current suicidal ideation and "contracts for safety." Mr. Jessee diagnosed the inmate as having "probable major depression, moderate to severe, chronic; anxiety NOS; possible substance-induced psychosis; chronic, long-term polysubstance abuse. Possible personality disorder." Mr. Jessee wrote in his progress note - "continue to monitor. Refer to psychiatry."

However, according to all available records, Mr. Ostby was <u>never</u> referred to the contracted psychiatrist (Christina Quijano, MD) at the YCDF. Dr. Quijano subsequently submitted a statement in which she confirmed that neither Terry Jessee nor any medical or YCDF staff contacted her regarding Mr. Ostby. Based upon the significance of the inmate's mental health complaints, as well as two self-harm/suicide attempts within the YCDF, Dr. Quijano stated that Mr. Ostby clearly should have been referred to her for a psychiatric evaluation.

In Mr. Ostby's final request form, which was undated, he stated a "need to see mental health again ASAP. I got some pretty messed up stuff going on in my head. I'm serious. Thank you." Nursing staff responded to this request on June 12, 2015 and informed Mr. Ostby that he was scheduled to see mental health. There was <u>no</u> documentation to indicate that the inmate was seen again by Mr. Jessee, and as indicated above, he was neither referred to, or seen, by Dr. Quijano.

On June 28, 2015, detention officers initiated a cell inspection in the Class A segregation unit. During the inspection of Mr. Ostby's cell, a plastic spoon which had been sharpened to resemble a knife (and commonly referred to as a "shank") and torn bedsheet were found in his cell. Several YCDF personnel who were deposed in this case admitted that the sharpened spoon and torn bedsheet were potential instruments for self-harm by Mr. Ostby. In fact, Captain Sam Bofto, YCDF Commander, testified that the shank would be considered "a weapon for suicide," (at page 102), whereas Sergeant Pam Wong confirmed

during her deposition that both the shank and torn bedsheet would be considered instruments for suicide, and that "Anytime you find a tool that could be used for self-harm and they have a history of self-harm, that's something we would take under serious consideration" (at pages 65-66). However, despite the discovery of these items, as well as the fact that YCDF personnel were aware that Mr. Ostby had engaged in two recent incidents of self-harm during his YCDF confinement (notwithstanding the fact that he had been arrested for an incident involving "suicide by cop"), none of these personnel initiated a referral to either medical or mental health staff, or placed Mr. Ostby on suicide precautions.

Finally, through transcribed interviews, it was alleged that at least two inmates (Lester McPherran and Daniel Bellmarez) notified several YCDF officers that Mr. Ostby was possibly suicidal prior to his death. In addition, Charlene Wright, Mr. Ostby's girlfriend who was at the scene of the arrest when he threatened "suicide by cop," completed a sworn statement following his death indicating that she called the YCDF several days before Mr. Ostby's suicide and notified an unidentified officer that he was suicidal. There were no available records to indicate that any YCDF personnel ever responded to these notifications.

Sometime during the afternoon of July 1, 2015, an inmate found Mr. Ostby hanging from a clothing hook hinge by a sheet in his Class A cell. He and other inmates began yelling for assistance for an undetermined amount of time. At approximately 4:23pm, an YCDF officer (Levi Anderson) responded to the housing unit and confirmed that Mr. Ostby

was hanging in his cell. An emergency was called, other YCDF officers responded, and cardiopulmonary resuscitation was initiated. Emergency medical services personnel from the community subsequently arrived, attempted to continue life-saving measures, but Michael Ostby was pronounced dead at the scene. A subsequent investigation determined that, contrary to YCDF policy, Mr. Ostby had been left unobserved for approximately 83 minutes (despite a policy requiring observation at 15- minute intervals).

**Opinions**

Based upon review of the case file materials and above summary, this writer offers the following opinions. Such opinions are based upon a reasonable degree of professional certainty. Although these opinions do not include a critique of any clinical judgment utilized by any mental health clinicians in this case, the opinions do include a review of the standard of care by which clinicians are expected provide a written suicide risk assessment, as well as follow-up assessment of inmates discharged from suicide precautions.

*First*, Michael Ostby was suicidal at various times during his confinement within the Yellowstone County Detention Facility, and various jail, medical, and mental health personnel were aware of his suicide risk. Despite his suicide risk, Mr. Ostby was poorly managed and his continuing risk for suicide was ignored, resulting in his subsequent suicide. In addition, if statements from two fellow inmates and Mr. Ostby's girlfriend regarding notice to YCDF staff that he continued to be suicidal are confirmed, the inaction of these personnel would be unconscionable and a proximate cause of his suicide on July 1, 2015. *Second*, the failure of YCDF personnel to observe Mr. Ostby consistent with

required policy was a proximate cause of his suicide on July 1, 2015. *Third*, without opining about any clinical judgment utilized by any mental health clinicians in this case, Billings Clinic clinician Terry Jessee failed to conduct and document a reasonable suicide risk assessment for Mr. Ostby on multiple occasions. Such actions and inactions were very problematic. *Fourth*, Yellowstone County had grossly inadequate policies, procedures, and practices in the area of jail suicide prevention that were contrary to not only state jail standards, but national correctional standards. The basis for these opinions is offered below.

### 1) Michael Ostby Was Suicidal At Various Times During His YCDF Confinement

Michael Ostby was suicidal at various times during his confinement within the Yellowstone County Detention Facility, and various jail, medical, and mental health personnel were aware of his suicide risk. Despite his suicide risk, Mr. Ostby was poorly managed and his continuing risk for suicide was ignored, resulting in his subsequent suicide. If statements from two fellow inmates and Mr. Ostby's girlfriend regarding notice to YCDF staff that he continued to be suicidal are confirmed, the inaction of these personnel would be unconscionable and a proximate cause of his suicide on July 1, 2015. For example:

- As clearly documented within the Affidavit of Probable Cause in Order to Hold, Mr. Ostby "came toward both officers and demanded they shoot him. The Defendant repeated this several times…..The Defendant continued to yell 'Shoot me!' in an apparent effort to provoke the officers into killing him" during an altercation with Billings Police Department officers on May 7, 2015;

- Shortly after arriving at the YCDF on May 7, 2015, Mr. Ostby attempted to hang himself in the holding cell with a t-shirt;

Case 1:17-cv-00124-SPW Document 156-25 Filed 06/25/20 Page 15 of 31
Case 2:90-cv-00520-KJM-SCR Document 8180 Filed 04/01/24 Page 19 of 35

15

- Shortly after returning to the YCDF from a preliminary court hearing on May 8, 2015, Mr. Ostby became disruptive and expressed suicidal ideation, stating "I hope they take me to prison so they can stab me and kill me." He also attempted suicide again by grabbing a t-shirt and tying it around his neck;

- On June 2, 2015, Mr. Ostby submitted another Medical Request Form that stated "I would like to sign the proper DNR ("do not resuscitate") paperwork and no blood transfusions. As I have requested to see mental health for two weeks now, I give up and if anything happens to me it's on this facility." Given the recent suicide history, and heightened level of frustration, it would be reasonable to assume that this was a suicide threat;

- On June 28, 2015, detention officers initiated a cell inspection in the Class A segregation unit and found a sharpened spoon (commonly referred to as a "shank") and torn bedsheet in Mr. Ostby's cell. Several of the YCDF personnel deposed in this case admitted that the sharpened spoon and torn bedsheet were potential instruments for self-harm by Mr. Ostby, i.e., "weapon for suicide;"

- It was alleged by at least two inmates (Lester McPherran and Daniel Bellmarez) that they notified several YCDF officers of Mr. Ostby's possible suicidal behavior in the days leading up to his death; and

- Charlene Wright (Mr. Ostby's girlfriend), who was at the scene of the arrest when he threatened "suicide by cop," completed a sworn statement following his death indicating that she called the YCDF several days before Mr. Ostby's suicide and notified an unidentified officer that he was suicidal.

Although Mr. Ostby was allegedly seen by Terry Jessee, the Billings Clinic mental health clinician, as a result of some of these suicide attempts and threats, Mr. Jessee only documented his assessment on one occasion (June 4), and there was no documentation to suggest that Mr. Jessee was notified by YCDF personnel that at least two inmates and Ms. Wright were concerned that Mr. Ostby was a continued suicide risk, or that a sharpened spoon and torn bedsheet were found in his cell on June 28. In addition, according to Dr. Quijano, the contract psychiatrist, neither Mr. Jessee and/or YCDF personnel ever referred Mr. Ostby to her for a psychiatric evaluation. Based upon the significance of the inmate's

mental health complaints, as well as suicide attempts within the YCDF, Dr. Quijano stated that Mr. Ostby clearly should have been referred to her for a psychiatric evaluation during his approximate 55-day confinement.

**2)  Failure of Yellowstone County Detention Facility Personnel to Adequately Observe Mr. Ostby**

The failure of YCDF personnel to observe Mr. Ostby consistent with required policy was a proximate cause of his suicide on July 1, 2015. Mr. Ostby was housed in Class A, the facility's segregation unit. Pursuant to YCDF Policy 4-04-02.02 (Special Supervision), "Special supervision, such as mentally ill or emotionally disturbed inmates, and those housed in disciplinary and administrative segregation, will be observed more frequently, at least once every fifteen (15) minutes." As such, because he was housed in segregation, Mr. Ostby was required to be observed at 15-minute intervals.

However, according to the investigation of his suicide by the Yellowstone County Sheriff's Office, YCDF officers failed to conduct the required observation of inmates, including Mr. Ostby, in the Class A Unit on July 1, 2015. The investigation determined that a "head count" of all Class A inmates occurred at approximately 3:00pm, and Mr. Ostby was left unobserved for over <u>83</u> minutes until being found hanging at approximately 4:23pm. As such, with observation required at 15-minute intervals and Mr. Ostby left unobserved for over 83 minutes, *YCDF personnel failed to conduct five (5) consecutive cell checks* between 3:00pm and 4:23pm on July 1, 2015.

Case 1:17-cv-00124-SPW Document 156-25 Filed 06/25/20 Page 17 of 31
Case 2:90-cv-00520-KJM-SCR Document 8180 Filed 04/01/24 Page 21 of 35

17

As stated by Detective Shane Bancroft:

"I requested information about 'safety checks.' As the Detention Officers reported they had been conducted roughly every 15 minutes and the decedent appeared to have been down for an extended period of time, I inquired as to what a 'safety check' entailed. Captain Bofto indicated these officers would concentrate on the unit at 15-minute increments. In these cases, the officers did not necessarily enter the pods at all, but would simply listen and observe for signs of trouble, from the doorway to the pod. It appeared at that these checks, Detention Officers *did not look into the individual cells necessarily during the safety checks* (emphasis added).

As I reviewed the Officers' reports, I noted that Detention Officer Toland reported that he had completed a 'head count' at approximately 1500 hrs. and during that time he was sure that Ostby was alive and well. It did not appear that anyone had looked into a cell again until he was located hanging and unresponsive at approximately 1623 hrs."

YCDF Policy 4-04-02.03 unequivocally required that the "Officer will observe inmates' behavior and appearances for unusual or questionable situations, cuts, bruises, expressed hostility, signs of depression, not eating, or nervousness." In addition, *Montana Jail Standards* (No. 08.04 Observation Frequency) required that inmates housed in segregation "are personally observed by a correctional officer."

As stated above, it was noteworthy that Detective Bancroft found that Mr. Ostby "appeared to have been down for an extended period of time," an apparent reference to officers and emergency medical personnel found his body to be in the state of rigor mortis, another obvious indication that YCDF personnel failed to conduct required observation on the inmate.

Finally, despite a written YCDF policy that required observation of segregation at 15-minute intervals, the deposition testimony in this case revealed that YCDF personnel

Case 1:17-cv-00124-SPW   Document 156-25   Filed 06/25/20   Page 18 of 31
Case 2:90-cv-00520-KJM-SCR   Document 8180   Filed 04/01/24   Page 22 of 35

18

had a custom and practice to conduct segregation rounds at 30-minute intervals (see deposition testimony of Charles Leonard at page 28, the deposition testimony of Brett Toland at page 42, and deposition testimony of Pam Wong at page 76). In fact, Detention Officer Toland acknowledged during his deposition that observation checks were not conducted as required on July 1, 2015, stating that "It was a pretty busy day….I wish I could have got in there every 30 minutes" (at page 42).

In sum, although the Yellowstone County Detention Facility was touted as a "direct supervision" facility (i.e., with detention officers stationed *inside* housing units), YCDF Class A Unit was obviously not direct supervision and officers not only violated written policy of not observing segregation inmates at 15-minute intervals, but violated the custom and practice utilized by detention officers of observation at 30-minute intervals. As such, Mr. Ostby was left unobserved for at least 83 minutes which resulted in a proximate cause of his death on July 1, 2015.

### 3)   Grossly Inadequate Suicide Risk Assessment by Mental Health Clinician

Without opining about any clinical judgment utilized by any mental health clinicians in this case, Billings Clinic clinician Terry Jessee failed to conduct and document a reasonable suicide risk assessment for Mr. Ostby on multiple occasions. Such actions and inactions were very problematic. As detailed above, despite the fact that Mr. Osby either threatened and/or engaged in self-harm/suicidal behavior on at least three occasions (e.g., "suicide by cop" by continuing to "yell 'Shoot me!' in an apparent effort to provoke the

officers into killing him" during his arrest on May 7, 2015, an attempted suicide in the

holding cell with a T-shirt shortly after arriving at the YCDF on May 7, and an attempted

suicide the following day (May 8) by again grabbing a t-shirt and tying it around his neck

and toilet after his return from court), Mr. Jessee failed to conduct a suicide risk assessment,

and documented only one interaction with Mr. Ostby almost a month later on June 4, 2015.

The standard of care requires that documentation of a comprehensive assessment

of suicide risk includes sufficient description of the current behavior and justification for

either placement on, or discharge from, suicide precautions. The assessment should include

a brief mental status examination (MSE), listing of chronic and acute risk factors (including

prior history of suicidal behavior), listing of any protective factors, level of suicide risk

(e.g., low, medium, or high), and a treatment plan.[3]   In addition, standards from the

National Commission on Correctional Health Care require that:

> "An evaluation, conducted by a qualified mental health professional,
> designates the individual's level of suicide risk, level of supervision needed,
> and need for transfer to an inpatient mental health facility or program.
> Patients are reassessed regularly to identify any changes in condition
> indicating a need for a change in supervision level or required transfer or
> commitment.  The evaluation includes procedures for periodic follow-up
> assessment after the individual's discharge from suicide precautions."

Finally, the "Mental Health Counseling Agreement" between Yellowstone County

and the Billings Clinic, with an effective date of March 1, 2014, required that the full-time

mental health clinician (Terry Jessee) at the YCDF: "assist in the development and

---

[3]See American Psychiatric Association (2003), "Practice Guideline for the Assessment and Treatment of
Patients with Suicidal Behaviors," *American Journal of Psychiatry*, (160) 11: 1-60 (Supplement); Metzner,
J.L., Hayes, L.M., "Suicide Prevention in Jails and Prisons," in R. Simon and R. Hales (Eds.), *Textbook of
Suicide Assessment and Management*, 2nd Edition, Washington, DC: American Psychiatric Publishing,
Inc., 2012.

implementation of a mental health assessment tool to be utilized in assessing mental health needs of inmates… Shall perform assessments and evaluations of the continuing mental health needs of inmates, as needed, and document such assessments and evaluations." Despite the requirements of this Mental Health Counseling Agreement, Mr. Jessee failed to develop and or implement a "mental health assessment tool" or suicide risk assessment form at the YCDF. In fact, when asked during his deposition whether or not he utilized a specific tool or form to assess suicide risk, Mr. Jessee testified: "To be honest with you, the assessment was in my head. I had been given an early form from the hospital that was an old -- older PAC unit evaluation that they had used before they went digital. And I knew -- I had done that enough times that I knew the form, and I just did it" (at page 79).

Michael Ostby was confined in the Yellowstone County Detention Facility for approximately 55 days. Despite at least three incidents of self-harm/suicidal behavior that he was aware of, Mr. Jessee only documented his interaction with Mr. Ostby on one occasion (June 4). This documentation was in the form of a SOAP-formatted progress note[4] and although containing a brief summary of his mental status, failed to include a listing of chronic and acute risk factors (including prior history of suicidal behavior), listing of any protective factors, and level of suicide risk (e.g., low, medium, or high). Ironically, Mr. Jessee's progress note failed to document whether he specifically asked Mr. Ostby himself whether he was suicidal at the time of the arrest, rather, simply documented that "news reports suggest that he was trying to get the officers to shoot at him." In addition, there was

---

[4]SOAP (subjective, objective, assessment, and plan).

no reference whatsoever in the June 4 progress note regarding Mr. Ostby's two suicide

attempts on May 7 and May 8.


Further, there was evidence in this case that Terry Jessee requested that Mr. Ostby

"contract for safety," i.e., promise not to commit suicide within the facility on at least two

occasions (see deposition testimony at page 117). Of course, the literature and suicide

prevention training curricula are replete regarding the obvious dangers associated with

"contracting for safety."  First, most correctional systems do not have any written policies

and procedures authorizing its use.  In fact, the issue is not even addressed in any national

correctional standards.  Most systems do not utilize "safety contracts" because they have

been found to be ineffective in the management of suicidal individuals.  While there may

be some positive therapeutic aspects to safety contracts, most clinicians agree that once a

patient becomes suicidal, their written or verbal assurances are no longer sufficient to

counter suicidal impulses.


In addition, most experts opine that a safety contract is simply a self-serving sheet

of paper that does not provide an agency or mental health clinician with any legal

protection. As succinctly stated by several clinicians:

> "The contract for safety is an aspect of suicide risk management that has
> been given too much weight over the past several decades. What appears to
> have been created primarily as an assessment tool has become a sort of
> checkbox, detracting from the clinician's own judgment and formulation of
> risk.  It has been taken out of its original context and is now used in virtually
> any setting, with any type of patient population despite the lack of clinical

evidence to prove it is useful and an abundance of literature warning that it is not."[5]

Finally, the Mental Health Counseling Agreement between Yellowstone County and the Billings Clinic required that Mr. Jessee "consult with mental health professionals, such as physicians, as may be needed in assessing and treating inmates' mental health needs." There is <u>no</u> documentation in this case to suggest that Mr. Jessee ever consulted with other mental health professionals, including the YCDF-contracted psychiatrist (Christina Quijano, MD) regarding Mr. Ostby's care. Despite the fact that Mr. Ostby was in the YCDF for approximately 55 days, as well as a June 4 progress note with a notation to "refer to psychiatry," Mr. Jessee admitted during his deposition (at page 128) that he <u>never</u> initiated a referral and/or conferred with Dr. Quijano regarding Mr. Ostby. In her statement, Dr. Quijano confirmed that neither Mr. Jessee nor any medical or YCDF staff contacted her regarding Mr. Ostby. Based upon the significance of the inmate's mental health complaints and suicidal behavior, Dr. Quijano stated that Mr. Ostby clearly should have been referred to her for a psychiatric evaluation. Dr. Quijano was very critical of Mr. Jessee's clinical practices and stated that Michael Ostby:

> "should have been - even the whole suicide by cop, he should have been referred to me. If they had followed those protocols, he should have been referred when he came in. Or if somehow they didn't view that as an actual suicide attempt, then after the first time he attempted suicide while he was actually in the jail, he should have been referred. I was really clear in those protocols and I even had it in red print that any suicide attempt would be an automatic referral to psychiatry, like a high priority, like next appointment referral" (at pages 25-26).

---

[5]Garvey, K, Penn, J, Campbell, A, Esposito, C, and A. Spirito (2009), "Contracting for Safety with Patients: Clinical Practice and Forensic Implication," *Journal of the American Academy of Psychiatry and the Law*, 37: 363-370.

**4)** **Grossly Inadequate Suicide Prevention Policies, Procedures, and Practices**

Yellowstone County had grossly inadequate policies, procedures, and practices in the area of jail suicide prevention that were contrary to not only state jail standards, but national correctional standards. A sound written suicide prevention policy is a prerequisite for running a correctional facility of any size. The importance of written policy in suicide prevention is clearly stated in the American Correctional Association (ACA)'s *Performance-Based Standards for Adult Local Detention Facilities* (4-ADLF-4C-32): "A suicide-prevention program is approved by the health authority and reviewed by the facility or program administrator. It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate and is signed and reviewed annually," and recommends annual training in the "signs of suicide risk" and "suicide precautions."[6] In addition, and as outlined below, the National Commission on Correctional Health Care (NCCHC)'s *Standards for Health Service in Jails* (J-G-05) requires each jail to have a written suicide prevention plan that includes the following components:

> **1) Training.** All staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least biennial training are provided, although annual training is highly recommended.
>
> **2) Identification.** The receiving screening form contains observation and interview items related to the inmate's potential suicide risk. If a staff member identifies someone who is potentially suicidal, the inmate is placed on suicide precautions and is referred immediately to mental health staff.
>
> **3) Referral.** There are procedures for referring potentially suicidal inmates and those who have attempted suicide to mental health care providers or facilities. The procedures specify a time frame for response to the referral.

---

[6] American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities* (4th Edition), Lanham, MD: Author.

**4) Evaluation**. An evaluation, conducted by a qualified mental health professional, designates the individual's level of suicide risk, level of supervision needed, and need for transfer to an inpatient mental health facility or program.  Patients are reassessed regularly to identify any changes in condition indicating a need for a change in supervision level or required transfer or commitment.  The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions.

**5) Housing.**  Unless constant supervision is maintained, a suicidal inmate is not isolated.  Rather, he or she is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff.  All cells or rooms housing suicidal inmates are as suicide-resistant as possible (i.e., without protrusions of any kind that would enable the inmate to hang himself/herself).

**6) Monitoring.**  There are procedures for monitoring an inmate who has been identified as potentially suicidal.  Regular, documented supervision should be maintained, usually every 15 minutes or more frequently if necessary.  While there are several protocols for monitoring suicidal inmates, when an actively suicidal inmate is housed alone in a room, supervision through continuous monitoring by staff should be maintained.  Other supervision aids (e.g., closed circuit television, inmate companions or watchers) can be used as a supplement to, but never as a substitute for, staff monitoring.

**7) Communication.**  Procedures for communication between health care and correctional personnel regarding the status of the inmate are in place to provide clear and current information.  These procedures also include communication between transferring authorities (e.g., county facility, medical/psychiatric facility) and facility correctional personnel.

**8) Intervention.**  There are procedures addressing how to handle a suicide attempt in progress, including appropriate first-aid measures.

**9) Notification.**  Procedures are in place stating when correctional administrators, outside authorities, and family members are notified of potential, attempted, or completed suicides.

**10) Reporting.**  Procedures for documenting the identification and monitoring of potential or attempted suicides are detailed, as are procedures for reporting a completed suicide.

**11) Review.**  There are procedures for medical and administrative review if a suicide or a serious suicide attempt (as defined by the suicide plan)

occurs. See J-A-10 Procedure in the Event of an Inmate Death for details on these processes.

**12) Critical incident debriefing**. The facility administrator specifies the procedures for offering timely critical incident debriefing to all affected personnel and inmates.  Critical incident debriefing is a process whereby individuals are provided an opportunity to express their thoughts and feelings about a critical incident (e.g., suicide attempt, suicide), develop an understanding of critical stress symptoms, and develop ways of dealing with those symptoms.[7]

The U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* requirements for a sound suicide prevention program mirror those of the NCCHC standards.[8]

Finally, the *Montana Jail Standards* (No. 11.13) required that "A suicide-prevention program is approved by the health authority and reviewed by the facility or program administrator. The program must include specific procedures for handling intake, screening, identifying, and continually supervising the suicide-prone inmate. All staff responsible for supervising suicide prone inmates are trained annually on program expectations."

Although correctional standards are generally not legally binding and do not set constitutional requirements, the U.S. Supreme Court has stated that such standards have the ability to serve as guidelines or benchmarks in assessing "duty of care" or "reasonable

---

[7]Ibid. As a nationally-recognized expert in the area of suicide prevention in correctional facilities, NCCHC has regularly requested this writer's assistance in critiquing and revising this provision when the standards are updated every several years, as well as developed a guide for the development of suicide prevention policies which is contained as an appendix to each edition of the NCCHC standards and/or contained on the organization's website.

[8]U.S. Department of Homeland Security (2011), Immigration and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington, DC: Author.

conduct."[9] With that said, numerous jurisdictions throughout the country are required through court-orders and/or settlement agreements to develop and maintain comprehensive suicide prevention programs in their jail, prison, and juvenile systems that include staff training, intake screening/assessment, safe housing, levels of observation, emergency response, and mortality reviews.[10] These program requirements are based upon national correctional standards.

### a) Yellowstone County's Suicide Prevention Policy

Although the Mission Statement within the YCDF *Policy and Procedure Manual* indicated the agency would be "in compliance with state and national constitutional standards," Yellowstone County did <u>not</u> have a written suicide *prevention* policy, rather it had a policy and procedure to respond *after* a suicide attempt or completed suicide. For example, YCDF Policy No. 11-04-00.00 (Attempted Suicide, Suicide or Death of an Inmate) was completely reactive, not proactive to prevention, and simply provided procedures regarding the <u>Discovery</u> of an inmate after an attempted suicide, the <u>Identification and Investigation</u> after the incident, and <u>Follow-up</u> and <u>Reports</u> after the suicide attempt or death. Such a policy was virtually meaningless and unhelpful to the identification and management of suicidal inmates, as well as the prevention of their suicides.

---

[9] See *Rhode v. Chapman*, 452 U.S. 337 (1981), *Bell v. Wolfish*, 441 U.S. 520 (1979).
[10] See the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997a <u>et seq.</u>, and U.S. Justice Department's Civil Rights Division, Special Litigation Section: https://www.justice.gov/crt/special-litigation-section-cases-and-matters0#corrections.  Several of these cases have involved county jails in Mississippi.

Case 1:17-cv-00124-SPW Document 156-25 Filed 06/25/20 Page 27 of 31
Case 2:90-cv-00520-KJM-SCR Document 8180 Filed 04/01/24 Page 31 of 35

27

Yellowstone County failed to have a suicide *prevention* policy that addressed required suicide prevention training, as well as any description of topics to be addressed in any suicide prevention training to its staff; *failed* to address the requirement for intake screening, including inquiry regarding current suicidal ideation, prior history of suicidal behavior, prior mental health history, etc., as well as procedures or guidance on which affirmative responses to the intake screening process warranted referral to medical and/or mental health personnel; *failed* to provide any written procedure or guidance as to the suicide risk assessment process utilized by either medical and/or mental health personnel, as well as the reassessment process utilized by such personnel; *failed* to provide any written procedure or guidance as to whether the suicidal inmate should be placed in a suicide-resistant cell, as well as whether the suicidal inmate would retain their clothing or be issued a safety blanket and safety smock; *failed* to provide any written procedure or guidance regarding the multiple levels of observation utilized for inmates commensurate with their level of suicide risk; *failed* to provide any written procedure or guidance regarding those medical and/or mental health personnel authorized to downgrade and/or discharge an inmate from suicide precautions; *failed* to provide any written procedure or guidance regarding treatment planning for suicidal inmates, as well as follow-up assessments by medical and/or mental health personnel following release from suicide precautions; *failed* to provide any written procedure or guidance regarding the proper emergency response to a suicide attempt (including hanging); and *failed* to provide any written procedure or guidance regarding the mortality review process following an inmate suicide.

Case 1:17-cv-00124-SPW Document 156-25 Filed 06/25/20 Page 28 of 31
Case 2:90-cv-00520-KJM-SCR Document 8180 Filed 04/01/24 Page 32 of 35

28

### b) **Inadequate Housing of Suicidal Inmates**

Although YCDF custom and practices in this case indicated that suicidal inmates, including Mr. Ostby, were housed in holding cells in the booking area, YCDF Policy (No. 3-03-03.03) stated that "inmates who are a danger to themselves" were placed in administrative segregation, and "the means necessary to prevent suicide may amount to a deprivation of rights of an individual. The deprivation when weighed against the need to prevent the inmate from killing or otherwise doing serious harm to himself, or others, is justified." Although the correctional standards and standard of care do not expressly prohibit placement of a suicidal inmate in segregation, the literature is replete with research to indicate a strong relationship between inmate suicide and isolation, finding that placing a suicidal inmate in isolation (such as Mr. Ostby) is detrimental because it escalates a sense of alienation and further removes the individual from proper staff supervision.[11] Further, practices verified by Detective Bancroft of YCDF officers "not necessarily entering the pods at all, but would simply listen and observe for signs of trouble, from the doorway to the pod" in segregation symbolized the antithesis of providing adequate visibility to suicidal inmates.

---

[11]See, for example, Hayes, L.M., "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3), 2012; *National Study of Jail Suicides: 20 Years Later*, Washington, DC: National Institute of Corrections, U.S. Department of Justice, April 2010; *Juvenile Suicide in Confinement: A National Survey*, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, February 2004; *Prison Suicide: An Overview and Guide to Prevention*, Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, 1995; *Training Curriculum on Suicide Detection and Prevention in Jails and Lockups* (Second Edition), with Joseph R. Rowan, Mansfield, Massachusetts: National Center on Institutions and Alternatives, March 1995; *National Study of Jail Suicides: Seven Years Later*, with Joseph R. Rowan. Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988; *Training Curriculum on Suicide Detection and Prevention in Jails and Lockups*, with Joseph R. Rowan, Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988; "And Darkness Closes In...A National Study of Jail Suicides," *Criminal Justice and Behavior*, 10 (4), 1983; *And Darkness Closes In...A National Study of Jail Suicides. Final Report to the National Institute of Corrections.* Washington, D.C.: National Center on Institutions and Alternatives, October 1981.

In addition, photographs of the interior of Mr. Ostby segregation cell indicated that it was not "suicide-resistant" and contained many hazards, including bunk holes, desk/wall brackets, ventilation grates in the sink/toilets, and a clothing hook hinge (utilized in Mr. Ostby's case), that were all conducive to a suicide attempt by hanging. If all of the Class A cells were comparable to Mr. Ostby cell, it was inherently dangerous to house a suicidal inmate within the YDCF segregation unit.

Finally, in an attempt to address the strong relationship between inmate suicide and isolation, correctional standards require that, in addition to providing more frequent observation of segregated inmates by jail personnel, health care staff conduct regular weekly rounds of segregated inmates. Although not written in any YCDF policy, as exemplified by a "Weekly Segregation Assessment" form completed on Mr. Ostby on May 28, 2015, there apparently was a required unwritten policy for medical staff to conduct weekly segregation rounds in the YCDF. *Despite the fact that Mr. Ostby was housed in segregation for the vast majority of his 55-day YCDF confinement, there was only one completed "Weekly Segregation Assessment" form for Mr. Ostby in the available documents.*

## Summary/Conclusion

Michael Ostby was confined in the Yellowstone County Detention Facility for approximately 55 days. He arrived at the facility following an altercation with Billings Police Department officers in which he continued to "yell 'Shoot me!'" in an apparent effort to provoke the officers into killing him." Mr. Ostby subsequently engaged in at least two

incidents of self-harming/suicidal behavior, as well as initiated 11 Medical Request Forms (i.e., "kites") complaining of a variety of medical and mental health problems including excruciating back pain and increased depression and anxiety. There was no documentation that he was seen by a mental health clinician. Finally, on June 2, 2015, his frustration reached the point in which Mr. Ostby submitted a kite that stated "I would like to sign the proper DNR ("do not resuscitate") paperwork and no blood transfusions. As I have requested to see mental health for two weeks now, I give up and if anything happens to me it's on this facility. Thank you for your time." The only documented interaction between Mr. Ostby and the mental health clinician (Terry Jessee) occurred two days later on June 4. Despite finding a sharpened spoon and torn bedsheet in his cell a few days before his suicide which several YCDF personnel conceded could be "weapons for suicide," Mr. Ostby was not placed on suicide precautions nor referred to medical or mental health personnel. Finally, he was never referred to the YCDF-contracted psychiatrist.

Edwin Shneidman, an eminent psychologist and founder of the American Association of Suicidology, put the issue of suicide prevention into proper perspective when he stated:

> "Suicide is not some bizarre and incomprehensible act of self-destruction. Rather, suicidal people use a particular logic, a style of thinking that brings them to the conclusion that death is the only solution to their problems. This style can be readily seen, and there are steps we can take to prevent suicide, if we know where to look."[12]

---

[12] (Shneidman, E. (1987). "At the Point of No Return," *Psychology Today*, March, p. 56.

In conclusion, there was ample evidence in this case that Michael Ostby's risk for suicide was "readily seen" and poorly managed and ignored by jail, medical, and mental health personnel working within the Yellowstone County Detention Facility.


Respectfully Submitted By:


/s/ Lindsay M. Hayes
Lindsay M. Hayes
August 25, 2018