1   ROB BONTA, SBN 202668
    Attorney General of California
2   MONICA N. ANDERSON, SBN 182970
    DAMON MCCLAIN, SBN 209508
3   Supervising Deputy Attorney General
    ELISE OWENS THORN, SBN 145931
4   NAMRATA KOTWANI, SBN 308741
    Deputy Attorneys General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, CA 94244-2550
     Telephone: (916) 210-7318
7    Fax: (916) 324-5205
     E-mail: Elise.Thorn@doj.ca.gov
8   *Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
 1676 N. CALIFORNIA BLVD., SUITE 620
 WALNUT CREEK, CALIFORNIA 94596
 TELEPHONE: 925-746-8460
 FACSIMILE: 925-746-8490
*Attorneys for Defendants*

9

10                    **UNITED STATES DISTRICT COURT**

11                   **EASTERN DISTRICT OF CALIFORNIA**

12                       **SACRAMENTO DIVISION**

13

14

15   RALPH COLEMAN, et al.,

16          Plaintiffs,

17       v.

18   GAVIN NEWSOM, et al.

            Defendants.

19

20

21

Case No. 2:90-CV-00520- KJM-DB

**DECLARATION OF SEAN MINTZ IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON HIS EXPERT'S SIXTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**

Judge:    Hon. Kimberly J. Mueller

22

23      I, Sean Mintz, PsyD., declare as follows:

24      1.      I am a Senior Psychologist Specialist at the California Department of Corrections

and Rehabilitation ("CDCR") and Regional SPRFIT Coordinator for Region 3 of the Statewide

25  Suicide Prevention Unit. I have personal knowledge of the facts set forth herein, except as to those

26  stated on information and belief and, as to those, I am informed and believe them to be true. If

27  called as a witness, I could and would competently testify to the matters stated herein.

28

2.      I am familiar with the Coleman Class Action, the existing Program Guide policies, and CDCR's efforts to develop and maintain a durable suicide prevention program in connection with court-ordered remediation in this matter. The Special Master's expert in suicide prevention practices, Lindsay Hayes, has conducted several audits of the suicide prevention practices in CDCR prisons.

3.      In my role at as the SPRFIT Coordinator for Region 3 at CDCR, I conduct on-site audits of Region 3 institutions to evaluate compliance with statewide suicide prevention and response policies. I have conducted on-site audits of the following institutions: California Correctional Institute (CCI), California State Prison, Los Angeles County (LAC), Kern Valley State Prison (KVSP), Substance Abuse Treatment Facility (SATF), Wasco State Prison (WSP), North Kern State Prison (NKSP), and Corcoran State Prison (COR).

4.      These on-site audits are conducted using a standardized audit tool that contains all of Mr. Hayes's nineteen Suicide Prevention Audit Checklist measures. Following on-site suicide prevention audits at CDCR institutions, I prepare and submit reports to the SPRFIT Committee that include data from all nineteen items on Mr. Hayes's Suicide Prevention Audit Checklist.

5.      On January 19, 2023, I conducted an on-site audit of CCI's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit A** is a true and correct copy of the February 14, 2023 report that summarizes all findings from this on-site audit.

6.      On January 25 and 26, 2023, I conducted an on-site audit of LAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit B** is a true and correct copy of the March 16, 2023 report that summarizes all findings from this on-site audit.

7.      On February 13 and 14, 2023, I conducted an on-site audit of KVSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit C** is a true and correct copy of the March 23, 2023 report that summarizes all findings from this on-site audit.

8.      On March 23 and 24, 2023, I conducted an on-site audit of SATF's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit D** is a true and correct copy of the April 17, 2023 report that summarizes all findings from this on-site audit.

9.      On April 26 and 27, 2023, I conducted an on-site audit of LAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit E** is a true and correct copy of the May 23, 2023 report that summarizes all findings from this on-site audit.

10.     On May 15 and 16, 2023, I conducted an on-site audit of KVSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit F** is a true and correct copy of the June 23, 2023 report that summarizes all findings from this on-site audit.

11.     On May 17 and 18, 2023, I conducted an on-site audit of WSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit G** is a true and correct copy of the June 28, 2023 report that summarizes all findings from this on-site audit.

12.     On July 18, 2023, I conducted an on-site audit of the CCI's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit H** is a true and correct copy of the July 25, 2023 report that summarizes all findings from this on-site audit.

13.     On July 27 and 28, 2023, I conducted an on-site audit of the LAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit I** is a true and correct copy of the September 6, 2023 report that summarizes all findings from this on-site audit.

14.     On August 28 and 29, 2023, I conducted an on-site audit of WSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit J** is a true and correct copy of the September 19, 2023 report that summarizes all findings from this on-site audit.

15.     On September 20 and 21, 2023, I conducted an on-site audit of SATF's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit K** is a true and correct copy of the October 18, 2023 report that summarizes all findings from this on-site audit.

16.     On October 17 and 18, 2023, I conducted an on-site audit of LAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit L** is a true and correct copy of the November 14, 2023 report that summarizes all findings from this on-site audit.

17.     On November 8 and 9, 2023, I conducted an on-site audit of KVSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit M** is a true

1 and correct copy of the November 30, 2023 report that summarizes all findings from this on-site

2 audit.

3        18.      On November 13 and 14, 2023, I conducted an on-site audit of WSP's compliance

4 with statewide suicide prevention and response policies. Attached hereto as **Exhibit N** is a true

5 and correct copy of the December 19, 2023 report that summarizes all findings from this on-site

6 audit.

7        19.      On November 15 and 16, 2023, I conducted an on-site audit of NKSP's compliance

8 with statewide suicide prevention and response policies. Attached hereto as **Exhibit O** is a true

9 and correct copy of the December 11, 2023 report that summarizes all findings from this on-site

10 audit.

11        20.      On December 12 and 13, 2023, I conducted an on-site audit of COR's compliance

12 with statewide suicide prevention and response policies. Attached hereto as **Exhibit P** is a true and

13 correct copy of the January 10, 2024 report that summarizes all findings from this on-site audit.

14        21.      On December 14 and 15, 2023, I conducted an on-site audit of SATF's compliance

15 with statewide suicide prevention and response policies. Attached hereto as **Exhibit Q** is a true

16 and correct copy of the January 10, 2024 report that summarizes all findings from this on-site

17 audit.

18

19        I declare under penalty of perjury under the laws of the United States of America that the

20 foregoing is true and correct.

21        Executed on this 1st day of April , 2024 at Palmdale , California.

22

23

24

25

26 

27 SEAN MINTZ

28

# Exhibit A

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 2/14/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CALIFORNIA CORRECTIONAL INSTITUTE SUICIDE PREVENTION TOUR R1-January 2023 |

On January 19, 2023, the Statewide Suicide Prevention Coordinator conducted a review at California Correctional Institute (CCI). The focus of the review centered on their Administrative Segregation Unit (ASU) and the Receiving and Release (R&R) areas to ensure compliance with statewide suicide prevention and response policies.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up. The summary results of this review are as follows:

Lindsay Hayes Corrective Action Plans (CAPs) that can be closed=1

CAPs generated by this reviewer during prior review that can be closed=2

Lindsay Hayes CAPs that remain open=2

CAPs previously generated by this reviewer that remain open=2

New CAPs generated as a result of this review=3

New recommendations generated as a result of this review=1

**Total CAPs closed=3**

**Total CAPs that remain open=7**

**Total recommendations that remain open=1**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

I.Restricted Housing Units (ASU, ASU CCCMS, STRH, LTRH, ASU EOP-hub, PSU, Condemned)

## Second Watch Morning Meeting

The morning meeting was not observed as part of this review. The reviewer later consulted with the lieutenant who facilitated the meeting and provided this reviewer with the huddle log. The lieutenant indicated that he and a mental health clinician attended and discussed new arrivals and high risk patients. When asked if SRMP patients were discussed, the lieutenant did not specifically recall. This was a noted deficiency during the last review but previously observed morning meetings were generally collaborative and done well.

## Psychiatric Technician (PT) Rounds – Hayes Item 9

There were two PTs present on the unit on the day of this site review and one conducted rounds while the other observed. The PT conducting rounds was utilizing a harness to hold a laptop, which represents improvement over prior site visits in which charting was not being done in real time. CCI's ASU houses both CCCMS and non-MHSDS inmates and consistent with prior visits, the PT had a list of inmates and their relevant levels of care, which she kept on her person during rounds. She conducted guard-one checks as well. While she engaged all patients on the tier, she did not ask any of the non-MHSDS inmates if they had any mental health concerns and she asked only one CCCMS patient about suicidality. She was given feedback by this reviewer in real-time and was receptive. Otherwise, rounds were adequate. The PT had a supply of games and puzzles and offered them to all patients. There were no mental health referrals indicated.

## Intake Cells – Hayes Item 2

Consistent with prior site visits, there are 11 intake cells: A side (101-106) and five on B side (101-105). During this site review, three of those cells (B side 103-105) were occupied and in all three cases, the inmates had been there for less than 72 hours. There were not any inmates who had been in ASU for less than 72 hours who were not appropriately housed. Although this issue was noted by Lindsay Hayes to be problematic during his most recent site review, the increased availability of intake cells seems to have resulted in improvements.

An area of concern that continues to be noted however, is the proper identification of intake cells. It was noted at the last site review (October 2022) that the stenciling above the intake cell doors was not written in permanent writing, but rather using stickers. This is problematic as the stickers can, and were observed to be, falling off. A work-order for permanent stenciling of intake cells has not yet been provided to this reviewer and will continue to be a recommendation for improvement.

**Entertainment Appliances**

This reviewer spoke to a total of six inmates at ASU, including two of the three who were in intake cells, to assess for the presence of an entertainment appliance. All six inmates interviewed reported that they had an electronic appliance and had been provided one promptly upon arrival to the unit.

**Welfare Check Completion (Guard One) – Hayes Item 8**

On the day of this on-site audit, this reviewer observed one custody officer completing welfare checks using Guard One. He took the time to look into each cell and appeared to establish visual contact with a living and breathing inmate each time. Additionally, this reviewer was provided with a guard one tracking report for a randomly determined 24 hour period (0000 to 2359 on January 10, 2023). This report indicates that during that period, there were a total of 2,976 checks conducted, 2,494 (83.8%) of which were completed timely. Given that observation of these welfare checks is typically noted to be qualitatively acceptable and given that this problem was noted on only one randomly determined day, it will not rise to the level of a CAP at this time but will if further deficiencies are noted at later reviews. Meanwhile, this reviewer will request another report from a randomly determined day prior to the next site review.

**ASU Screening (Pre-Placement)**

There were no ASU pre-placement screens observed by this reviewer during this site review as none were indicated.

With regards to overall compliance with ASU screenings, the performance report indicates that the institution was non-compliant with this metric (66%) during the last quarter (Q4 2022):



**ASU Screening (Post Placement Screen Questionnaire)**

There were no ASU post placement screenings observed as none were indicated on the day of this site review.

## II. Inpatient Units (MHCB and/or PIP)

CCI does not have a MHCB. The institution has an Outpatient Housing Unit (OHU) which will be discussed in further detail in the alternative housing section of this report.

### Quality of Safety Planning – Hayes Item 4

For the fourth quarter of 2022, a total of two Safety Planning Interventions (SPIs) were audited by the institution and both were found to be of good quality. In one case, the score was 12/14 and in the other case it was 14/14 for an overall compliance of 100% for the quarter.



### III. Alternative Housing – Hayes Item 5

**SRASHE and SPI compliance**

During the final quarter of 2022 (October through December), there were a total of 12 inmates who were admitted to alternative housing on suicide watch at CCI for Danger to Self and rescinded without being placed into a MHCB. This auditor reviewed all 12 of those charts and while a SRASHE was completed per policy in all 12 cases, there continued to be misunderstanding regarding the requirement to complete SPI in such cases. Specifically, SPI was completed in only 4 of those 12 cases (33%) and in one of those cases, acute risk was assessed as moderate. Additionally, in one other case, the clinician simply noted in the SPI that the patient refused to participate. The clinician did not utilize any collaborative data to develop a safety plan and did not document any efforts to achieve cooperation. This suggests that the clinician was likely aware of the requirement to complete an SPI, but did not do so adequately.

This area was noted as a deficiency during the last review period and it resulted in a CAP. The institution reported that clinicians received training in November 2022 on the requirement to complete SPI in cases in which the patient was discharged from alternative housing after having been admitted for DTS, however the audit results suggest that this training has not translated into performance improvement. Upon meeting with mental health leadership, this reviewer was informed that of the three clinicians who were responsible for this deficiency, one had not yet received the above-referenced training and another has already come to the attention of mental health leadership which has begun the progressive-discipline process. Institutional

leadership will also provide training to the third individual. This CAP will remain open at this time and given the sound plan delineated by the institution, this reviewer will conduct another review of this variable prior to the next scheduled site visit.

## Cell compliance and location

CCI's LOP 12.5.1, *Outpatient Housing Unit Alternative Housing* was last updated in March, 2022 and remains unchanged since the last site visit (October 2022). The LOP states that patients in mental health crisis are to be "assigned to a cell with an affixed safety bed with a safety mattress" and upon inspection, those two cells are cells 14 and 15 in the OHU. This remains unchanged since the last visit. In the even that such cells are unavailable, the policy delineates the following order:

1.) Patient shall be placed in an OHU-AH room and be provided a hospital bed or Safety Stack-A-Bunk bed with a safety mattress.
2.) If all OHU-AH medical beds are full, the Provider on Call is to be contacted to arrange for transfer of a medical patient occupying the OHU-AH Housing medical bed to a CTC, or a contracted med-surge hospital in order to open that bed for the patient in mental health crisis.
3.) If an OHU-AH room (mental health or medical) is not available, the patient in mental health crisis shall be placed in OHU-AH Overflow on Suicide Watch. OHU-AH Overflow is located at the Facility B clinic holding.
4.) The Classification and Parole Representative (C&PR) or Watch Commander (WC) shall be notified within one (1) hour of referral to MHCB.

During this on site review, the OHU overflow cells in Facility B clinic holding were observed. These cells are non-retrofitted wet-cells that are partially covered by a frosted window. Although it is rarely necessary for these cells to be used, and an astute observer can establish constant visual contact with the patient inside the cell despite the partial frosting, it is recommended that the partial frosting be removed nonetheless. Doing so will bring the Alternative Housing policy and practices into alignment with statewide policy and will also allow for more efficient and mistake-proof suicide watch. On the date of this site visit, there were not any inmates on suicide watch.



**Transfer timeline compliance**

According to the performance report, CCI was in full compliance (100%) with timely transfers to a MHCB- during the fourth quarter of 2022.



IV. Suicide Risk Management Program (SRMP)

CCI's LOP 12.10.4 *Suicide Risk Management Program* addresses CCI's SRMP program and was renewed in December 2022. It was determined during a prior review to be in accordance with statewide policy.  On the day of the visit, there were not any patients enrolled in the SRMP none who met objective criteria but were not enrolled.

V.Discharge Custody Checks – Hayes Items 7 and 11

CCI regularly conducts audits of their 7497 post-discharge custody checks. As part of the last site review (October 2022), the prior six months worth of 7497 audits were reported. The data for the final quarter of 2022 is as follows:

| Month | Overall compliance | Total number of packets audited | Primary drivers of non-compliance |
|---|---|---|---|
| October | 76.5% | 4 | Section 3 complete and first entry after arrival to the unit. |
| November | 97.4% | 4 | Checks exceeded 30 minutes at least once for one patient. |
| December | 75.8% | 4 | While most areas were non-compliant, supervisory reviews were completed for only one patient. |

In summary, compliance with custody discharge checks continues to fluctuate at CCI. The most recent available SPRFIT minutes (December 2022) suggest that this item was omitted from the discussion. While a low sample size continues to negatively influence compliance, the institution should nevertheless, demonstrate in meeting minutes that this item is being regularly monitored. This is an area from which a Lindsay Hayes' CAP was generated and while the institution reported progress during the last site visit, the sustainability of this progress has not been demonstrated. This CAP will remain open.

VI.Local SPRFIT Committee – Hayes Item 19

The Regional SPRFIT did not observe any of CCI's monthly SPRFIT meetings since the last site visit. Meeting minutes for each month of the last quarter have been uploaded to the SharePoint site, however the project pipelines have not been. Minutes reflect that all required elements, including quorum, have been met each month. Absent however, is substantive discussion of the CAPs that were generated by this reviewer's site visit or by Lindsay Hayes. Now that CCI is fully accustomed to the SPRFIT reboot process, it is recommended that future minutes include a more detailed discussion of steps taken to alleviate noted deficiencies and also, that the project pipeline be regularly uploaded to the SharePoint site.

**Inmate Family Council**

SPRFIT Committee meeting minutes for the last six months, do not reflect that the SPRFIT coordinator has attended the Inmate Family Council.

**Inmate Advisory Council**

A six month review of minutes, indicates that the SPRFIT Coordinator attended the Inmate Advisory Council meeting in July 2022. This is reflected in the August 2022 SPRFIT committee minutes.

## VII. Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

For the fourth quarter of 2022, overall SRASHE compliance at CCI was 98%. In cases in which an emergent contact was required for Danger to Self (DTS), the SRASHE was completed timely 97% of the time. For the quarter, there were three DTS cases that did not result in an emergent referral (two routine and one urgent). In the one non-compliant emergent SRASHE, the patient was seen and assessed before the order was placed. In all three cases in which there was not an emergent referral, it was because the patient was directly admitted to suicide watch after hours. In summary, although neither variable was 100% compliant, there was no clinical impact in any of the four non-compliant cases.

| | | | |
|---|---|---|---|
| SRE after Em.Consult (except PIP) for Suicidality | 33 | 0.1 | **97%** |
| SRE after Ro.Consult (execpt PIP) for Suicidality | 2 | 0.0 | **100%** |
| SRE after Ur.Consult (except PIP) for Suicidality | 1 | 0.0 | **100%** |

| | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| October | 100% | 86% |
| November | 100% | 99% |
| June | 89% | 100% |
| Q4 Totals | 100% | 92% |

In addition, this reviewer also reviewed a random sample of three routine and seven urgent referrals from the fourth quarter to ensure that there were not any references to suicidality or DTS issues that would have necessitated an emergent referral. Of those 10 total cases, there were only 2 in which the referral made reference to the patient being suicidal or a DTS and in

both of those cases, the patient was directly admitted to suicide watch. The result was that there was no clinical impact in either case.

## VII.Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for December 2022, as well as information obtained while on-site, indicated the following compliance rates:

### Mentoring – Hayes Item 18

As of October 2022, the institution was 100% compliant with SRE mentoring under the former system. Compliance has not since been uploaded to the SharePoint site with regards to the newly adapted SRE mentoring program.

### Annual IST Suicide Prevention Training Compliance – Hayes Item 16

Annual IST Suicide Prevention Training for the 2022 calendar year:
- Custody/Support=1083/1112 (97.39%)
- Healthcare=232/237 (97.89)%
- Mental Health=38/39 (97.44%)
- All staff=1274/1313 (97.1%)

### Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training – Hayes Item 18

Mental Health=25/26 (96.15%)

### Safety Planning Training – Hayes Item 18

Mental Health=25/26 (96.15%)

### Suicide Risk Management Program Training

Mental Health=26/26 (100%)

### Columbia-Suicide Severity Rating Scale Training

Mental Health=26/26 (100%)

The above indicates that training was in compliance with all mental health related Suicide Prevention trainings during 2022, however an update on the progress of SRE mentoring is warranted.

## IX.Receiving and Release (R&R) Screening – Hayes Item 1

Consistent with prior site visits, CCI has four different R&R facilities, one on each activated yard (A, B, C, and D). Despite having been identified as a concern during recent audits, it was noted that suicide prevention posters were absent from the minor procedures rooms in C and D yard, which is where the screenings are conducted. There was one screening observed on D yard on the day of this review and the nurse, despite not being a regular, did a thorough job. She asked all of the questions, did an efficient mental status exam, and sought elaboration and clarification as indicated. While a referral to mental health was not indicated, the nurse ensured that the patient was educated about the proper procedure for requesting services. The door to the room was closed to ensure confidentiality and although there was not a custody officer

directly outside of the door to observe the process, there was one posted in the immediate vicinity and the nurse had a personal alarm device.

## Quality Improvement Plans (QIPs) Generated by Suicide Case

There were four suicides at CCI in the calendar year 2020 which generated a total of seven QIPs in five different clinical domains.  As of the round 1 2023 site visit, the following two QIP follow-ups remain unresolved:

1.) Inadequate clinical justification: Institutional SPRFITs will audit a random sample of 6 crisis calls per month to determine if clinical justification is present when patients are sent back to housing. Report on it in SPRFIT.  This has not been done.  This reviewer will recommend once again that the practice be started.  **Status as of round 1 review:** The institution audited this data for a six month period from September 2021 to March 2022 and monthly compliance was 100%. The institution will now transition to quarterly audits of this data. Current status: SPRFIT minutes indicate that this has been audited quarterly and was 100% compliant at the most recent audit. This can now be closed out.

2.) Clinician did not write justification for why the contact was not-confidential.  ASU program supervisor audit completed cell front contacts (random sample of 10 every month) to ensure that clinical justification is documented.   This data will be reported monthly in the SPRFIT subcommittee meeting. **Status as of round 1 review:** The institution audited this data for a six month period from September 2021 to March 2022 and monthly compliance was 100%. The institution will now transition to quarterly audits of this data. **Current status**: SPRFIT minutes indicate that this has been audited quarterly and was 100% compliant at the most recent audit. This can now be closed out.

There was one suicide in 2022 (J59728) that resulted in a mental health QIP for the institution as follows:

1.) **Problem:** The treatment plan dated April 7, 2021 was nearly identical to the treatment plans dated January 6, 2021 and October 21, 2020. There was an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding Inmate Patterson's functioning or presentation during the review period. More specifically, current information found in other clinical documentation, including but not limited to: coping tools utilized, programming on the unit, psychiatric medication refusals, concentration issues, low energy, reasons for treatment non-compliance, and progress in workbooks issued by the mental health clinician. Additionally, information in the perpetuating and precipitating factors section carried over information about his eligibility for removal from the mental health program from the February 5, 2020 discharge treatment plan. Per MHSDS Program Guide, 2009 Revision (12-7-12) "*The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care*." Quality Improvement Plan: **The CMH and/or designee at CCI** shall;

A) Conduct a review of the three treatment plans named herein (dated 10/21/2020, 01/06/2021, and 04/07/2021 respectively) B) Additionally, audit documentation for five additional inmate-patients for each of the three identified clinicians over a 12-month period (to include progress notes and treatment plans) C) Based on results of this audit, the CMH shall determine the best course of action. At minimum, **all** clinical staff shall be re-trained on the importance of regularly updating treatment plans in correspondence with Program Guide requirements Required supporting documents: Please provide a memorandum detailing the results of this audit (including dates and CDCR numbers of charts reviewed), and all actions taken to address this QIP.  Please include all training materials and 844s. Resolution: The institution has developed and provided a thorough IDTT refresher training that was presented in a staff meeting on May 24, 2022. Plan for follow up: This training will be presented on an ongoing basis to new hires at CCI. **Current status as of R1 2023**: There have been no new hires since the last site visit. This will remain open and on monitoring status.

X.Crisis Intervention Team (CIT)

CCI's LOP 12.10.3 *Crisis Intervention Team* serves as the institution's CIT policy. It specifies that CIT is to be operational Monday through Friday, excluding holidays, between the hours of 1700 and 2200. While consistent with statewide policy memorandum *Updated Crisis Intervention Teams Policy and Procedure* dated 7/6/2022 as it delineates CIT requirements after hours, the LOP that was provided to this reviewer was most recently signed in January 2020 and has expired. During regular business hours, the process at CCI for mental health clinicians to respond individually to any mental health crisis and none occurred during this site visit so as such, an emergent evaluation was not observed. However, past observations at CCI suggest that the process is historically appropriate.

A review of the Crisis Intervention Team report, indicates that there were a total of seven mental health crisis situations that occurred during the hours specified by the institution's local CIT policy during the fourth quarter of 2022. None of those seven had full composition of CIT. Conversely, eleven such events occurred during regular business hours. While this represents a small sample of time and events, minutes from the institution's SPRFIT meeting in December 2022 reflect that the institution itself is aware of this issue as ongoing concern. The lack of CIT activations had previously been on the project pipeline, but minutes from December indicate that it was moved to a PIWP and that the team would take a "just do it" approach to correction. However, the committee had identified the lack of an approved CIT LOP as the boundary to achieving this goal. Given all of these factors, it is recommended that CCI submit an updated CIT policy.

XII.Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

Special Master's Office (OSM) suicide prevention expert Lindsay Hayes, conducted a review of the suicide prevention practices at CCI during the month of July 2021 and since this reviewer's

last site visit in May 2022, Mr. Hayes' preliminary report has been released. What follows is a summary of his findings and the institution's current status.

| Focus of remediation | Specific language about deficiency | Initial CAP | Hayes alone or joint CAP with this reviewer? | Status as of this review. |
|---|---|---|---|---|
| Intake Screenings | This reviewer observed the intake screening processes in the B-Yard Clinic on July 8, 2021. The process was problematic because the nurse did not accurately complete all 15 mental health/suicide risk questions on the Initial Health Screening form, including "Did the patient receive any bad and/or unexpected news during a recent court hearing?," or conduct a mental status examination ("Disoriented to time, place, or person"). Required suicide prevention placards (both English and Spanish versions) were not observed inside the nurse's offices (pg. 111) | A) Place suicide prevention placards in B yard. B) Provide training to nursing staff and track in SPRFIT. CCI is a phase I institution and this was to be placed into the project pipeline in September. | Hayes | A) Placards are present in B yard but absent from other screening areas. B) Nursing staff has been trained. C) This is being discussed in SPRFIT committee and will be added to the project pipeline in February. CCI SPRFIT coordinator has begun observing R&R nursing screenings and will report out on observation results. |
| ASU intake cells | All of the three intake cells were full during the on-site assessment, and a fourth new inmate was scheduled to be placed in the unit on July 9. The inadequate number of retrofitted new intake cells had been a long-standing problem at CCI, | Since the site review, CCI has completed construction and as such, has increased its intake cells to 11. Additionally, the most recent site review by the R3 SPRFIT | Hayes | Resolved |

| | and this reviewer has cited the issue in each of the previous suicide prevention reports. Of note, an inmate (CCI 1) on new intake status and not housed in a new intake cell committed suicide on January 5, 2020 in the B-8 ASU. CDCR had embarked on a "ASU New Intake Cell" construction project that would include the creation of eight additional retrofitted new intake cells at CCI, the projected time for completion was March 2022. In addition, this reviewer was informed by CCI custody leadership on July 9, 2021 that "The New Cell Conversion project that IWL was scheduled to start on 5/31/21 has been put on hold until a door design issue gets resolved." It remained unclear what impact, if any, this delay would have on the creation of new intake cells at CCI on or before March 2022. However, according to defendants' most recent Suicide Prevention Activation Schedules (ECF 7562, filed on May 31, 2022), the project at CCI was completed in January 2022 (pg 111-112). | coordinator indicates that the availability of new intake cells is being consistently discussed in ASU morning meeting. | | |
| Custody Discharge Checks | Thirteen cases were ultimately reviewed, and only 46 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, | The institution will present a plan for corrective action in the May SPRFIT subcommittee meeting. An action item was assigned in July | Joint | Currently in project pipeline and showing fluctuations in progress. There had been misinterpretation of policy during the past 6 month period and the institution has stabilized OHU |

| | | | | |
|---|---|---|---|---|
| | with the majority of the custody checks recommended by clinicians for either 24 or 48 hours. Most of the clinician errors were attributable to incomplete documentation. In addition, only 54 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the custody errors were attributable to gaps in required observation at 30-minute intervals (pg 113). | | | supervisory staff. This will remain open. |
| SRMP | The required LOPs were provided for both "Inmate-Patients Receiving Bad News" and the CIT program, but not available for the "Suicide Risk Management Program." | The institution will develop and finalize the LOP for SRMP. | Hayes only | Resolved. Since the review, LOP 12.10.4 was developed and finalized. |
| Suicide Prevention Training | In addition, approximately 94 percent of custody, 81 percent of medical, and 86 percent of mental health staff completed the annual suicide prevention block training during the previous 12 months. | While the institution cannot retroactively correct 2021 compliance, they are on pace for compliance in 2022. | Hayes only | By the conclusion of calendar year 2022, the institution was in full compliance with suicide prevention IST trainings (see above), which demonstrates an improved process. This can now be closed out. |

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Warden, Associate Warden of Healthcare, Healthcare Captain, and Chief Support Executive (acting for Healthcare CEO). During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

XII. Assignment of Corrective Action Plans and Recommendations

**Corrective Action Plans (CAPs) and Recommendations from prior site visits that remain open as of this review:**

**Open Recommendations not rising to a CAP as of this review:** None

**Open Corrective Action Plans (CAPs) generated by this reviewer and Lindsay Hayes:**

1) **Problem**: The institution was below 90% for 7497 compliance in the month of March and while the spreadsheet indicates explanations, a CAP is required to be submitted and discussed SPRFIT subcommittee. **Corrective Action:** The institution will present a plan for corrective action in the May SPRFIT subcommittee meeting. **Proof of practice:** Documentation within the SPRFIT subcommittee minutes. **Status as of round 2 2022 review**: Meeting minutes suggest that this is being discussed and this audit suggests ongoing improvement. This will remain in monitoring status for one more review period. **Current status**: There has been fluctuation in progress as demonstrated by 7497 audit results. Local SPRFIT backup reported that there was also a period in which policy was misinterpreted by mental health clinicians and this has now been resolved. Continue to monitor.

**Open Corrective Action Plans (CAPs) generated by this reviewer**

2) Secure a rolling cart for ASU PT rounds.  If not already part of the SPRFIT process, the nursing representative in the monthly SPRFIT should begin reporting on PT rounds audits utilizing the new audit tool.  **Status as of round 1 review:** Four drop tables (two on each tier) have been installed at ASU, however they have been installed incorrectly in such a way as to compromise both staff safety and confidentiality. The CNE at the institution reported that she intends to place an order for ergonomically safe braces that can be worn to carry laptops. This will remain open until resolution. **Status as of round 2 2022 review**: Observation suggests that this still has not yet been completed. This will remain open. **Current status**: While a rolling cart has not been secured, a shoulder harness that can be used to hold a laptop, has (see *PT Rounds* section of this report for details). As such, charting in real time is now possible, and sustainable, for the PTs conducting rounds. This can now be closed out.

3) Problem: SPI is not being completed on patients who are rescinded from suicide watch in Alternative Housing if acute risk is estimated as low. **CAP**: Train all MHCB staff that SPI is required regardless of the estimated level of acute risk at the time of discharge. For a training resource, refer to slides 31-32 of the 2019 Statewide *Safety Planning* training. This will be placed into the project pipeline during the November 2022 SPRFIT meeting. **Current status:** Training was provided to staff on this requirement on November 15, 2022. However, this audit suggests that the problem persists despite the training. The institution has provided an explanation for the problem's persistence and anticipate improvements by the next site review. In the interim, a new safety plan has been

# MEMORANDUM

developed and all clinicians statewide will receive training on it prior to the next site review, which may assist in self-correction. This will remain open for one more review period and then closed if improvements are noted.

4) Problem: Lettering on intake cells was falling off because it was taped on and not stenciled. CAP: Stencil the words "Intake Cell" onto the ASU intake cells that do not already have such stenciling. **Status as of R1 2023 visit**: This still has not been completed. There has been a work order submitted and this is on the project pipeline. This will remain open and once the institution submits confirmation that this has been completed, it will be closed out.

**New Corrective Action Plans (CAPs) generated as a result of this review**

5) **Problem**: The cells in the B yard clinic that are used for suicide watch in alternative housing as a third priority, are partially frosted and as such, not fully in compliance with statewide policy. **CAP:** This will be placed on the project pipeline in the February SPRFIT subcommittee meeting. The institution can consider removing the frosting, or finding an alternate location for the alternative housing cells after OHU cells are filled.

6) **Problem**: The institution does not have an up-to-date CIT policy. CAP: Finalize the CIT policy in the February 2023 SPRFIT meeting.

7) **Problem**: The institution has not submitted compliance for SRE mentoring progress since the new process has gone live. CAP: Provide an update on the Coleman training SharePoint site on the status of SRE mentoring by March 31, 2023.

**New Recommendation not rising to the level of a CAP generated as a result of this review**

1) **Problem:** SPRFIT committee meeting minutes are generally vague and lacking in detail with regards to progress towards identified CAPs. Additionally, although provided to this reviewer upon request, the project pipeline has not been uploaded to the SharePoint site. **Recommendation:** Meeting minutes should be more detailed and specific with regards to progress towards CAPs and the project pipeline should be uploaded monthly.

Exhibit B

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 03/16/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D. Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CSP-LAC SUICIDE PREVENTION TOUR January-Quarter 1 2023 |

On January 25-26, 2023, the Statewide Suicide Prevention Coordinator for Region 3, in conjunction with the Regional Nurse Consultant, conducted an on-site review of the Suicide Prevention measures at California State Prison-Los Angeles County (LAC).

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up. The summary results of this review are as follows:

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 1 |
| Lindsay Hayes CAPs that will be deferred | 1 |
| CAPs generated by this reviewer during prior review that can be closed | 2 |
| Lindsay Hayes CAPs that remain open=6 | 6 |
| CAPs previously generated by this reviewer that remain open | 8 |
| New CAPs generated as a result of this review | 4 |
| New recommendations generated as a result of this review | 1 |

**Total CAPs closed=3**
**Total CAPs that remain open=18**
**Total recommendations that remain open=1**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## I.    Restricted Housing Units (ASU, ASU CCCMS, STRH, LTRH, ASU EOP-hub, PSU, Condemned)

LAC has two Administrative Segregation Units; one Short Term Restricted Housing (STRH) unit and one ASU Enhanced Outpatient (EOP) hub. Both were the subject of this review.

### Short Term Restricted Housing (STRH) (reviewed Wednesday January 25)

#### Second Watch Morning Meeting

The second watch morning meeting was observed. The meeting included the sergeant, a psychologist, a Psychiatric Technician, and the institutional SPRFIT coordinator. While the meeting included a discussion of new arrivals, patients on 5-day follow ups, and patients with behavioral and medical concerns, the team required prompting from the local SPRFIT coordinator to discuss the patients in the SRMP. It should be noted that the psychologist who was covering this meeting was not a regularly assigned ASU clinician so it's understandable that she was not fully aware of the required elements of the discussion. Otherwise, it was an adequate morning meeting.

#### Psychiatric Technician (PT) Rounds – Hayes Item 9

This reviewer observed one PT conducting rounds. He was a regularly assigned PT to the unit. He interacted with all the patients and asked all of the required questions of MHSDS patient including queries about suicidal and homicidal ideation, as well as sleep and appetite. When interacting with non-MHSDS patients, he appropriately inquired about mental health concerns. The PT charted in real time on MHSDS patients and established a visual of each cell. He had a supply of papers and games which he offered to some of the inmates but not all of them. When asked about this he stated that as a regular, he believes that he has become familiar enough with the inmates on the unit to know who is likely to want such material and who is not. There was one case in which a routine mental health referral was indicated and the PT appropriately made it in real time. Overall, this was a good rounding.

#### Intake Cells – Hayes Item 2

The STRH at LAC has 11 cells (100-111) designated as intake cells. On the day of this site review, all but one was occupied. Four of the inmates in intake cells had been there for less than 72 hours and the remaining six had been there beyond 72 hours. However, the sergeant produced an updated list with an explanation for each case that had exceeded 72 hours. This report indicated that in three cases, a cellmate could not be found, in two cases a cellmate was refused, and in one other case the inmate had been "on contraband" watch. Although it had been recommended in past reviews that placards specifying the date and time of arrival be placed outside of each door, this practice was not reliably occurring. Some placards were missing altogether, and others were missing critical information including the inmate's name. While intake cell usage continues to be problematic, improvements were noted over the last site visit.

### Entertainment Appliances

This reviewer interviewed a total of 10 patients, including 2 of 4 who had been in STRH for less than 72 hours and 8 other randomly selected inmates. While seven inmates (70%) reported having eventually received an entertainment appliance, all seven indicated that it took over a week to receive it. This was consistent with observation, as neither of the two patients on intake status had received one. The institution, via the healthcare captain, reported that this issue is the result of the institution Post having enough radios or tablets. This will result in a CAP.

### Welfare Check Completion (Guard One) – Hayes Item 8

The sergeant provided this reviewer with a guard one report for a random 48 hour period (January 17, 2023 0000 to January 18, 2359) and in that time, there were a total of 19,104 checks required 13,964 of which were completed timely for an overall compliance of 73.1%. Noteworthy is the fact that during this two calendar day period, the bulk of the non-compliance occurred on January 17 when only 4,413 checks of the required 9,552 were completed timely. There was only one exception on January 18. This suggests that this non-compliance is not systemic, but rather isolated.

In addition to the Guard One report that was provided, this reviewer observed one officer conducting Guard One checks. It appeared that this officer looked into each cell and establish visual contact with each of the inmates within it before proceeding to the next cell. It was observed that there was one cell in which the inmate had covered up the window from within with cardboard and in this case, the officer tapped on the window and received a verbal response before moving on to the next cell.

### ASU Screening (Pre-Placement)

There were no ASU pre-placement screens observed as part of this site review, as none were warranted. A review of the performance report for Q4 of 2022, indicates that LAC was in compliance at 95% with this metric for that time period.



### ASU Screening (Post Placement Screen Questionnaire)

There was one ASU Post Placement Screen Questionnaire observed as part of this site review. The PT, despite being a regular on the unit, did not offer the patient the opportunity to have a confidential interview. The screening was conducted at cell-front within earshot of other inmates. The PT asked all of the questions and based on the responses, a referral was not warranted. However, these interviews are required to be offered in a confidential setting. This

issue was brought to the attention of the Senior Psychiatric Technician in real time and will result in a CAP. A review of the performance report for Q4 of 2022, indicates that LAC was in compliance at 97% for the timely completion of ASU Post Placement screens during that time period.



## ASU EOP Hub (reviewed Thursday January 26)

### Second Watch Morning Meeting
The second watch morning meeting was observed. The meeting included the sergeant, a psychologist, and a Psychiatric Technician. The meeting included a discussion of new arrivals and patients on the SRMP report. It was reported by the sergeant during this meeting, that there were two patients in intake cells who had been in the cell beyond 72 hours and in both cases, the patients had refused cell-mates. The meeting also included, as it did in the last site visit, a discussion of patients on 5-day follow ups, as well as a discussion of those with behavioral and medical concerns. ASU morning meeting at the EOP hub demonstrated some improvement over the last site visit.

### Psychiatric Technician (PT) Rounds – Hayes Item 9
PT rounds were conducted adequately. There was one regular PT completing rounds and he was observed to interact with all inmates and he documented at cell-front in real time. He queried about mental health concerns with all inmates and specifically about sleep and appetite and suicidal and homicidal ideation for inmates in the EOP program. No mental health referrals were indicated and he checked the scheduling function in CERNER to assist a patient who was concerned about when his next psychiatry contact would be. Overall, this was an acceptable PT rounding.

### Intake Cells – Hayes Item 2
The auditing of intake cells this round was cause for some confusion. While the same seven cells (122-128) that were designated as intake cells in prior visits remain unchanged, there was confusion regarding which patients were actually on intake status, due to the apparent lack of an efficient system of monitoring this information on the day of the site review. The sergeant was able to verbally report in the morning meeting that all seven cells were occupied and two had been there for greater than 72 hours because they refused housing. However, he did not produce a written report despite this reviewers request and the placards on the doors were not helpful. Specifically, only one contained the full complement of required information including the patient's name, CDC number, and accurate arrival date. None included the arrival time. It will be recommended once again, that accurate placards be affixed to the cell-doors. Best-practice examples were shared with the institution by this reviewer, repeatedly in the past. There were

no patients on intake status who were not in intake cells or properly housed with a compatible cell-mate and this demonstrated improvement since the last site visit.

## Entertainment Appliances

Similarly to deficiencies that were noted in the STRH, the ASU EOP program was also non-compliant with the issuing of entertainment appliances. Four patients in intake cells were interviewed and none had been issued an entertainment appliance. Given that by this point this reviewer had already received acknowledgement from the institutional leadership that there is a lack of entertainment appliances in the facility, the review of this item did not go any further. The ensuing CAP regarding the issuance of entertainment appliances will apply to both ASU units.

## Welfare Check Completion (Guard One) – Hayes Item 8

The sergeant provided this reviewer with a guard one report for a random 48 hour period (January 11, 2023 0000 to January 12, 2359). During that time period there were a total of 24,000 checks that were required and 23,747 (98.9%) were done timely. During the 1200 hour of January 11, all cells were checked only once but otherwise, there was no pattern detected. The second level of the review of this variable was the observation of Guard One checks being completed and there were deficiencies noted in that case. Specifically, it was observed that there were at least four cells that had the door covered up with an item such as a blanket or a towel resulting in obstructed view and despite this, the officer completing checks simply applied the Guard One baton and proceeded to the next cell. No attempts were made to prompt the inmate to remove the visual obstruction or to even respond verbally. In summary, while a small random time sample demonstrated that the ASU EOP program was overall in compliance with Guard One checks quantitatively, the observation during this site review suggests that the checks were qualitatively poor.

## ASU Screening (Pre-Placement)

No ASU Pre-Placement screens were observed as part of this site review as none occurred. As indicated above (see *STRH* section), the institution was compliant with this variable for the fourth quarter of calendar year 2022.

## ASU Screening (Post Placement Screen Questionnaire)

No ASU Post-Placement screens were observed as part of this site review as none occurred. As indicated above (see *STRH* section), the institution was compliant with this variable for the fourth quarter of calendar year 2022.

## II. Inpatient Units (MHCB and/or PIP)

## Suicide-Resistant Cells – Hayes Item 10

The mental health inpatient cells at LAC had previously been noted as suicide-resistant. This is not a concern for the institution.

## Interdisciplinary Treatment Teams (IDTT)

While concerns with the overall IDTT process continue to be observed, some incremental improvements have been noted. There were a total of four IDTTs held in the MHCB on the date of this site visit and all four were observed. Three of the four IDTTs were for patients who were admitted for Danger to Self (DTS), two of which were discharge IDTTs and two were initial IDTTs. The remaining IDTT was an initial IDTT for a patient who was admitted for Significant Impairment Due to Mental Illness (SIDMI). The MHCB supervisor did not attend the IDTT and there were two different psychologists observed who served as IDTT leader and they stated the purpose of the IDTT in three of the four cases, with one of the initial IDTTs being the exception. There were variations in case presentation between the two. Specifically, although three of the four patients was admitted for DTS, the safety plan was discussed with only one of those patients, as the second observed clinician did not discuss safety planning with the patients. The one case in which the SPI was discussed was a discharge IDTT for a patient who had been admitted for DTS and in that case, the clinician simply read the completed SPI to the patient rather than asking question about it to ensure understanding. Although the IDTT consisted of an interactive discussion among all team members in all four cases, the discussion was minimally collaborative. For example, in one case, the psychologist stated the measurable treatment plan goals and also the diagnosis, while the psychiatrist only discussed the patient's medications and only when prompted. Issue and observation orders were discussed in three of the four cases and a justification note for said orders was present in the chart in two of the four cases. In one of those cases however, the note was qualitatively poor and inconsistent with the rest of the documentation. This was a patient who was admitted for DTS and moved from suicide watch to Q30 observation status within less than 24 hours and before the initial IDTT. This despite the fact that the MHPC initial that was completed on that day indicated that the patient was still suicidal as of that day. While this is problematic, and also consistent with prior concerns noted by both this reviewer and Lindsay Hayes, the institution was more responsive to this concern this time than in the past. The details were provided to the MHCB supervisor who indicated that she would follow up. Additionally, this reviewer provided a training to the MHCB staff about the importance of not rapidly decreasing observation levels. This training occurred after this observed IDTT.

## Quality of Safety Planning – Hayes Item 4

Based on a review of the performance report, there were not any safety plan quality audits completed at CSP-LAC for the fourth quarter of 2022. Effective February 2023, a new safety planning process will be adapted by the statewide mental health program and this will include training for designated staff at CSP-LAC.

## Suicide Watch and Suicide Precaution

On the day of this on-site review (January 26, 2023) there were not any patients on suicide watch or suicide precaution status at the MHCB. There were five patients in the MHCB and all were on Q30 observations. This reviewer conducted a chart review for all five patients to ensure that for the period each was on suicide precautions, nursing checks were completed timely and in a staggered fashion. The review consisted of a 10 hour period (2300-0900) for each patient on a day that they were on suicide precaution status. For the five patients, there was a total of 261 audited checks, 22 of which were completed with a gap of greater than 15 minutes in between

checks for an overall compliance rate of 91.57%. There were a total of 35 checks that were not staggered, as defined by four or more consecutive checks being completed the same number of minutes apart. Also reviewed was the mental health observation reporting tool for the last completed calendar month before this onsite review (December 2022) and it indicates that suicide precaution rounds were completed timely 90.6% of the time and appropriately staggered 91.2% of the time. This demonstrates improvement in this process since the last site visit.

This reviewer also walked the unit and observed that in all five cases, there were signs on the doors indicating what privileges and observations were to be offered and all of these were consistent with orders in the chart. It was also observed, through either observation or by verbal confirmation from the patient, that the property that was ordered had been appropriately issued.

### Observation and Issue Orders – Hayes Item 3

This reviewer audited a random sample of 10 patients who were admitted to the MHCB for DTS during the fourth quarter of 2022 and completed a full MHCB stay. This sample yielded a total of 44 patient days in which the patient was provided with limited issue. Of 88 required orders (1 each for observation and issue), there was only 1 order missing for a compliance rate of 99%. Of 44 required notes justifying the orders, only three were missing for a compliance rate of 93%. However, 11 of the 41 completed notes were deemed qualitatively poor. In one case for example, the note justified partial issue which was inconsistent with the actual order which was for a smock. A note also indicates that a patient on partial issue tore his shirt and although he did not use it for self-harm, he was placed back into a smock yet remained on Q30 observation. It is hoped that these inconsistencies and clinical misunderstandings will be alleviated as the result of the training that was provided by this reviewer to the MHCB staff on February 1, 2023. A new CAP item regarding this concern will be generated if improvement is not noted in the Q2 2023 review.

### Timelines for Suicide Risk Assessments

Overall SRASHE timeliness during the fourth quarter of 2022 was in compliance at 96%. During that review period, there were a total of 356 SRASHEs completed at LAC and only 193 of them (54.2%) were completed in a confidential setting. The most common reason for non-confidential contacts was refusal on the part of the patient (N=73), followed by medical or public health restrictions (N=40). It is appreciated that had the 73 refusals accepted a confidential contact, compliance would have been 74%. However, that is still well below the commonly accepted compliance rate of 90%. Additionally, it was noted during onsite observation that a number of clinical encounters of varying kinds were not offered in a confidential setting. It is recommended that the institution consider use of various confidential areas, including the program office, to conduct clinical contacts.



**Suicide Prevention**

**20.1 Suicide Risk Evaluation**

**96%**
(2,452)

## Privileges – Hayes Item 14

The offering of yard and privileges for patients in the MHCB has been historically problematic at CSP-LAC and very little improvement was noted during this site review. All five patients at the MHCB were approved for yard, dayroom, and phone-calls on the day of this site review and the 114s were reviewed for all five. Only three 114s contained documentation of the patient having been offered yard, only two contained documentation that the patient was offered a phone call, and only one contained documentation that the patient was offered dayroom (the institution's MHCB has a multi-purpose room which doubles as an area for both clinical contacts and a dayroom). One patient was observed by this reviewer to be using the phone on the day of this site review, so it is unclear as to whether there is lack of reliability of privileges being offered, or whether there is inconsistency with the documentation of these privileges being offered. This previously generated CAP will remain open. With regards to clinical approval of privileges; although all five patients were approved for yard, dayroom, and telephone, none of the five patients were approved for visiting and none of the charts contained a clinical justification as to why. The training that this reviewer provided to the MHCB staff on February 1 contained a brief reminder to justify the denial of privileges, however it should be reiterated that this includes the privilege of visiting.

## Clinical Discharge Follow-Ups

For the fourth quarter of 2022, the institution was in compliance (94%) with five-day clinical follow-ups.

**Suicide Prevention**

**20.1 Timely Clinical Discharge follow-ups**

**94%**
(1,487)

## III. Alternative Housing – Hayes Item 5

CSP-LAC's LOP 31, Suicide Prevention, continues to serve as the LOP that incorporates the institution's Alternative Housing process and it has not been revised since the last site review. It specifies that inmates placed in alternative housing awaiting MHCB placement are to be housed as follows:

General Population IPs on Facilities A, B, and C:

Facility D Building 4 (FDB4), any available cell on the bottom tier. No cell adjacent to the showers shall be used.

Enhanced Outpatient (EOP) IPs on Facility D:

- The IPs may remain in their assigned housing unit and shall be rehoused to the bottom tier, in a cell not adjacent to the showers.

Administrative Segregation (ASU) or D5 and/or ASU overflow IPs:

- The IPs will remain in their housing unit and shall be moved to the bottom tier as necessary in a cell not adjacent to the showers.

In the event a cell is unavailable and bed moves cannot be made to accommodate in the locations above, the IPs may be housed in the following locations with the approval of a Manager or Administrative Officer of the Day (AOD):

- Wet holding tanks in the medical clinics on the facilities {old clinics) (non-business hours only).

- If IPs are placed in the facility medical clinics on the facilities (old clinics), it is custody's responsibility to move the IPs out to another alternative housing location prior to 0600 hours.

- When available, the dry holding cells located in the visiting areas should be utilized during business hours. In the event that this location is used in order to provide the IP with access to water and toilets the watcher shall contact the facility Sergeant if this person is unavailable then the facility Lieutenant shall be contacted at the extension listed on Attachment C Facility Sergeant and Lieutenant Extension List.


There are inconsistencies between this LOP and statewide policy. Correctional Treatment Center (CTC) medical beds should be considered as a first priority for placement and CSP-LAC's LOP does not do so. Additionally, although statewide policy allows for the use of holding cells without toilets (AKA "dry cells"), cells with toilets (AKA "wet cells") should be used as a priority. This LOP however, requires that wet cells only be used during non-business hours and the reason for that is unclear. Because of that prioritization within the local LOP, a patient was observed to be on suicide watch in alternative housing during this visit in the C yard visiting area, which does not have access to a toilet. This is also problematic for the reason that this patient was removed from his cell on the bottom tier of D4 and as such, already a housing priority per the local LOP, and placed into the holding cell in the visiting area. This reviewer asked the floor officers in that building why that was and they did not appear to know the answer. This suggests that there was not clear evidence that no other housing was available, which the institution's own LOP requires before placing patients in a dry cell. For the second consecutive audit period, it was noted that the institution was not in compliance with its own LOP. Additionally, this LOP has not been updated to reflect the CAP generated by this reviewer as part of the last site review, meaning that it still allows for the discriminatory practice of withholding clothing from patients for whom there is not yet a suicide watch order. With regards to the direct observation of patients on

suicide watch in alternative housing, one additional problem was noted. There were a total of four patients observed on suicide watch in alternative housing on the day of the site review, including the aforementioned patient in the dry cell in the visiting area, and only three were clearly being watched constantly by the assigned nursing staff member. The one exception was a patient at STRH who was on suicide watch but the nurse was not watching the patient. This reviewer attempted to redirect that nursing staff member with negative results. This was brought to the attention of local nursing leadership in real time and they responded and immediately rectified the problem, however the fact that problems related to the alternative housing practices continue to persist at CSP-LAC, is concerning. All patients did have access to a suicide-resistant mattress and smock.

IV. Suicide Risk Management Program (SRMP)

LAC's LOP #34 *Suicide Risk Management Program* continues to serve as the LOP that addresses the SRMP program. At the time of this review, there were 102 patients in the SRMP program, a 13 patient increase since the last site review. There were only three patients who met objective criteria but were not yet enrolled which is a four patient decrease since last site visit. This suggests that the monitoring and tracking of patients in the SRMP is a strength of LAC's which continues to improve. All three patients who met objective criteria but were not yet enrolled, had been returning patients from PIP and only one had met criteria for less than two weeks by the time of this site review.

For the patients who were enrolled in SRMP on the day of the site review, a random sample of 10 charts were reviewed and for the third consecutive audit period, the institution is showing signs of struggling with appropriate documentation of SRMP treatment plan goals and interventions. This is summarized in the chart below. The institution's LOP reflects the need to update goals and interventions for patients in the SRMP but there is still not full compliance with this. The suicide prevention and response coordinator assigned to region 3 will intervene and provide the necessary training before the next site review for Q2 2023.

|  | Measurable treatment goals documented | Interventions documented |
|---|---|---|
| Initial enrollment IDTT MTP | 7/10 | 7/10 |
| Follow up IDTT MTP | 0/5 | 0/5 |

### V. Discharge Custody Checks – Hayes Items 7 and 11

Local audit results suggests that 7497 compliance continues to be extremely poor at CSP-LAC. Audit results for Q4 2022 are as follows:

| Month | Total compliance | Area most significantly impacting compliance |
|---|---|---|
| October | 61.5% | All except checks DC after at least 24 hours |
| November | 54% | All |
| December | 30.3% | All |

Although the institution has chartered a workgroup to improve 7497 compliance, the continued extremely poor compliance suggests that there exists a lack of local buy-in to the process. For example, only two patients were checked timely in the month of December, and the minutes from the most recent workgroup do not indicate that progressive discipline or training has been provided. This suggests that even the purpose of the 7497 process is not appreciated by the institutional leadership. The workgroup has suggested that patients frequently returning to suicide watch before the 72-hour period has been completed suppresses compliance, however it is unclear what the relationship is between that and the basic elements of the 7497 process, such as custody's ability to check on patients every 30 minutes and mental health staff's ability to document communication of the need to do so. This reviewer has personally attended one of the work-groups and it was stated at the time that a recently failed OMA audit was the reason for the charter, despite the fact that this reviewer has repeatedly produced reports indicating that this was a problematic area. It is suggested that this be elevated at the statewide level and that the progressive discipline be followed. The statewide SPRFIT committee will consider all options available to assist CSP-LAC, including establishment of a task force to intervene at the institutional level.

### VI. Local SPRFIT Committee – Hayes Item 19

This reviewer most recently attended the institution's SPRFIT meeting on January 10, 2023. As a phase II institution, this was the first meeting in which the committee utilized the new SPRFIT reboot process. Not all of the data that is indicated for reporting in January was reported and this can be attributed to the fact that the institutional SRPFIT staff did not complete training until December and consequently, data was not collected during that month. Otherwise, the meeting was adequate. Quorum was met and all required items were discussed, with the exception of a qualitative discussion of CAPs that had previously been generated by this reviewer and by Lindsay Hayes. The committee identified SRMP as a matter that needed a project charter, despite the fact that based on the performance report, this is actually a relatively strong area for LAC. Another noted deficiency was that there was not a discussion about the LOPs that required modification per the CAPs that were generated by this reviewer, nor was there discussion about finalizing the SPRFIT LOP, which has been an outstanding item since the review that Lindsay Hayes conducted. The institution discussed 7497s only briefly and deferred the issue to its workgroup. The discussion was collaborative and all disciplines participated.

One of the concerns that was noted by Lindsay Hayes in his review as it pertains to the SPRFIT, was that quorum was not met for six consecutive months. A six month review of the minutes suggests that quorum has been met every month that a meeting was held from July 2022 to January 2023. One item of note is that there was not a meeting held in December, as the SPRFIT coordinator was out of work for some time. The institution's local practice is to have all Sr. Psychologist Specialists collectively serve as the SPRFIT coordinator's backup, so steps should be taken to ensure that there is sufficient enough training to ensure that one of them can facilitate the meeting if necessary. One final note is that the institution does not have a Correctional Health Services Administrator (CHSA) as a designated position at this time, but quorum has consistently been met otherwise.

### Inmate Family Council and Inmate Advisory Council

Based on a six-month review of the minutes, it does not appear that the SPRFIT coordinator has attended Inmate Family Council or the Inmate Advisory Council. It will be recommended that this be done in the future.

### VII. Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

For the fourth quarter of 2022, SRASHEs were completed timely in 98% cases which there was an emergent referral for DTS. DTS cases were triaged as emergent referrals 426 of 428 times (99%).

|  | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 2437 | 2.9 | 96% |
| SRE after Em.Consult (except PIP) for Suicidality | 426 | 8.5 | 98% |
| SRE after Ur.Consult (except PIP) for Suicidality | 2 | 0.0 | 100% |

|  | Overall SRASHE Compliance | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|---|
| October | 97% | 99% | 99% |
| November | 95% | 100% | 99% |
| December | 96% | 100% | 100% |
| Q4 Total | 96% | 98% | 99% |

Compliance with emergent and urgent SRASHEs remains a strong area for LAC.

### VIII. Suicide Risk Evaluations – Hayes Item 13

During the fourth quarter of 2022, there were 533 patients referred to a MHCB for DTS for whom the referral was rescinded before physical placement into a MHCB. A random sample of 10 of those charts were chosen for review and in all 10 cases, a SRASHE was completed at the time of discharge as was an SPI, regardless of risk level. This demonstrates continued improvement for CSP-LAC in this previously identified area of concern. A random sample of 10

patients who were admitted to the MHCB for DTS and completed a full MHCB stay were selected for audit. Similarly to the alternative housing data, both a SRASHE and an SPI were completed timely. As indicated in the above section, overall SRASHE compliance for quarter 4 was 96%. SRASHE completion at MHCB discharge and MHCB rescission, were both 96%.

| | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 2437 | **2.9** | **96%** |
| SRE at MHCB Clinical Discharge  (admitted for a | 51 | **5.2** | **96%** |
| SREs after rescinded MHCB referral | 1083 | **2.2** | **96%** |

## IX. Emergency Response

### Cut-Down Kits – Hayes Item 15

Cut down kits were not audited as part of this review. Data will be collected from the regional mental health compliance team and provided at the next quarterly audit.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Since the Q4 2022 site visit (October 2022), QIPs were finalized for one additional suicide death that occurred at CSP-LAC in July 2022 (AT2592) and one that occurred in November 2022 (BR0517). These two suicide deaths resulted in a total of eight mental health QIPs.

Patient #1

1.  During a clinical encounter on December 7, 2021 the inmate's clinician wrote that he "mentioned suicide as an option." The clinician's documented an inquiry regarding the inmate's current thoughts, plans and intentions for suicide, i.e. she completed a risk assessment in the moment, but then did not complete a SRASHE as required when an inmate makes suicidal statements. The MHSDS Program Guide, Ch. 10, page 8 requires that when "an inmate expresses current suicidal ideation … a suicide risk assessment shall be made …" and documented by using the filling out a SRASHE in the EHRS. Although the program Guide allows for clinical discretion when no changes in chronic suicide risk have occurred, the documentation did not include a rationale for why a SRASHE was not completed. QIP: **The CSP-LAC CMH or designee** shall review this concern and determine best course of action to address this identified issue. Required supporting documentation: CSP-LAC Chief of Mental Health will outline, in a memorandum, findings of the review and any remedies undertaken.  If remedies included training or instruction, a Form 844 (sign-in sheet) will also be submitted with the memorandum. Actions completed: In November 2022, the institutional SPRFIT coordinator delivered a training to all clinical staff on the MHSDS Program Guide requirements for suicide risk evaluations. This training included an individually focused training for the specifically identified individual. Recommended

follow-up: All future hired psychologists and social workers shall receive this training within 60-days of hire as part of the onboarding process.

2.  A review of eleven suicide risk evaluations from July 2021 through July, 2022 revealed that clinicians appeared to under-appreciate the inmate's level of chronic risk. In only seven of 11 of these evaluations did the clinician rate his Chronic risk for suicide as high despite ample evidence for that level of chronic risk as noted in the Suicide and Self-Harm History section of the review. The underestimation of chronic risk was also in violation of the Safety plan Intervention training, which indicates, if an inmate has a history of two or more suicide attempts, chronic risk should be assessed as high. QIP: **The CSP-LAC CMH or designee** shall review this concern and determine best course of action to address this identified issue. Required supporting documentation: CSP-LAC Chief of Mental Health, will outline, in a memorandum, findings of the review and any remedies undertaken.  As requested remedies include training or instruction, a Form 844 (Sign-In Sheet) will also please be submitted with the memorandum. Actions completed: The institution's SPRFIT coordinator provided the mental health staff with a refresher training on the relevant sections of Safety Planning training in November 2022. Recommended follow-up: The safety planning process has undergone revision at the statewide level and as such, all clinical staff, current as well as future hires, will receive training on the revised process. Therefore, **this QIP can now be closed.**

3.  While housed in the CSP-LAC MHCB unit on July 13, 2022, the inmate's level of observation was changed to once-every-30-minute checks and he was issued partial clothing. On October 29, 2013 the Divisions of Adult Institutions and Health Care Services issued a memorandum requiring (in part) that "Inmate-patients not on suicide precautions or watch" receive full clothing issue ("blues") "unless a  clinical determination is made and documented … that there is a clinical reason these items should not be issued." No such documentation was found in clinical documentation for the inmate. The HQ SPRFIT coordinator for Region III is aware of this issue and has a Correctional Action Plan (CAP) in place as there continues to be concerns with this issue. QIP: **The CSP-LAC CMH or designee** shall review this concern and provide a response regarding the progress of the identified CAP, including any actions or interventions taken. Required supporting documentation: CSP-LAC Chief of Mental Health, will outline, in a memorandum, findings of the review and any remedies undertaken.  If requested remedies include training or instruction, a Form 844 (Sign-In Sheet) will also please be submitted with the memorandum. Actions completed: The Statewide Suicide Prevention and Response Coordinator assigned to region 3, provided the institution with the following HQ memorandums: *Clarification of allowable property for patients on suicide watch, April 24, 2020; Level of observation and property for patients in Mental Health Crisis Beds, March 15, 2016; State-issued clothing and bedding for mental health inmate-patients in the mental health crisis bed and outpatient housing unit, October 29, 2013* and its revision dated *February 14, 2017; Mental Health Crisis Bed Privileges, June 23, 2016.* Also provided

were training materials and examples addressing proper documentation of justification of issue and observation orders. The institution's MHCB supervisor provided this training to a sample of MHCB clinicians on November 9, 2022. However, as is discussed in this report, a recent audit that was conducted by this reviewer suggests that weaknesses in this area persisted. As such, the Statewide Suicide Prevention and response Coordinator assigned to region 3, provided a training again on February 1, 2023. This training included the MHCB supervisor, the institutional SPRFIT coordinator, and the MHCB clinicians, some of whom had not received the training in November. That training material was shared with the institution. Recommended follow-up: In the event of MHCB clinical staffing turnover prior to the next quarterly site review (April 2023), the newly assigned clinicians will receive the training that the institutional leadership deems most effective. Otherwise, this QIP will remain open for one more review period and closed if improvement is noted.

4. **CSP-LAC:** It was documented numerous times in the medical record that the inmate used suicidal language for a variety of purposes. Some of these reasons included:  efforts to speak to MH staff, assert his believed need for a higher level of care, or to act out his frustrations associated with his long sentence.  However, these behaviors were also accompanied by strong denials of his intent to die. This pattern of behavior, although noted over the years by clinicians, did not become part of treatment plans while the inmate was treated at the EOP level of care. This issue associated with inmates using suicidal behaviors or ideation for an intended secondary gain purpose other than an intent to die has been identified as a statewide issue, and a need for enhanced safety planning training.  This identified issue is being addressed in the implementation of the revised safety plan policy, procedure and training in December 2022. QIP: **CSP-LAC CMH or designee** shall ensure that all clinical staff (psychiatrists, psychologists, and social workers) attend the new Safety Plan training and provide training records when completed. Required supporting documentation: **CSP-LAC CMH** shall provide proof of practice training records when the upcoming training is completed. Actions completed: As indicated in QIP #1 above, the safety planning process has undergone revision at the statewide level and as such, all clinical staff, current as well as future hires, will receive training on the revised process. Therefore, **this QIP can now be closed.**

Patient #2

Although this suicide death resulted in six mental health QIPs, two were joint QIPs (one with medical and one with custody) and only one of the remaining four has been completed at the institutional level at the time of this report. The remaining five QIPs will be discussed as part of the next (April 2023) site review.

1. Despite the inmate's significant history of substance abuse, his MAT treatment history, and related polysubstance diagnosis assigned to him by a medical physician on January 14, 2022, treatment teams across two institutions did not appear to recognize the

severity/connection of his substance abuse to his mental illness. Treatment plans dated October 5, 2022, and November 2, 2022 did not include any substance use/abuse related IPOCs. QIP: **The CMH at LAC** shall review this concern and provide training to all mental health staff highlighting the need to include substance abuse concerns in treatment planning/IPOCs whenever substance abuse is identified as a primary or contributory driver of the mental illness. Further, **the CMH at LAC** shall review all clinical documentation in this case and determine why a potential referral to a higher level of care was not considered, and then determine the best course of action. Required supporting documents: Please provide a memorandum detailing the results of the review, and actions taken to address this QIP. Please include all training materials and 844s with memorandum submission.  Actions completed: CSP-LAC has developed a training entitled *Mental Health Patients Return from Higher Level of Care (RHLOC) Training* and made it available on the LMS system. By February 7, 2023, 61 staff had completed this training. Recommended follow-up: This training will be provided to all future hired clinical staff within 60 days of hire, as part of the onboarding process.


## X. Training and Mentoring Compliance

The following was obtained from a review of the Coleman Court Mandated Trainings SharePoint, as well as from data reported by the staff development unit.  Compliance with trainings by the end of December 2022 are as follows:


### Clinical Training Compliance

*Mentoring – Hayes Item 18*

Mentoring for December 2022 was not reported, as the new mentoring process is still in progress. The last time it was reported was in October 2022 and at that time, it was 93.5% under the previous model.

*Annual IST Suicide Prevention Training – Observation*

This training was not observed as part of this site visit.

*Annual IST Suicide Prevention Training Compliance – Hayes Item 16*

For the calendar year 2022, training compliance was as follows:

> Custody=90%
> Medical=63%
> Mental Health=70%

Although below the acceptable compliance rate for medical and mental health, the institution cannot correct 2022 training data at this point. Several trainings were cancelled in 2022 due to COVID-19 restrictions. It is expected that improvement will be noted in 2023. If, by the next site review in April 2023, the institution is not on pace to be in full compliance by the end of the calendar year, a CAP will be generated.

*Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training* =100%

*Safety Planning Training* =92.3%

*Suicide Risk Management Program Training* =93.85%

*Columbia-Suicide Severity Rating Scale Training* =88.46%

Custody Training Compliance – CPR and Suicide Prevention – Hayes Item 6

> Suicide Prevention IST for 2022=90%

### XI.    Receiving and Release (R&R) Screening – Hayes Item 1

There was one R&R screening observed as part of this site review. The nurse asked all questions appropriately and conducted an appropriate mental status exam. The patient was an EOP patient who endorsed suicidal ideation during the screening and the nurse responded appropriately by placing an emergent MHPC consult order and contact mental health. The physical layout of the area continues to be conducive to the process. Suicide prevention posters, in both English and Spanish, were present in the nursing office.

### XII. Reception Center Processing

CSP-LAC does not have a Reception Center.

### XIII. Crisis Intervention Team (CIT)

LAC's LOP #30 *Crisis Intervention Team* expired in December 2022 and the institutional SPRFIT coordinator indicated that he is in the process of reviewing it. It serves as the institution's CIT LOP. It was noted at the last site review (October 2022), that the LOP is mostly in line with statewide policy, with the exception of the specification that if unlicensed, the clinician is required to consult with a supervisor. It was recommended at that time that that modification be included in the revision which, given that the LOP has not yet been revised, has not yet occurred.

### XIV. Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

OSM expert Lindsay Hayes conducted a site review of LAC on April 5-6 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review.

| | Summary of problem identified by Lindsay Hayes in 2021 | progress as of Q1 2023 review | Follow up status |
|---|---|---|---|
| 1 | Intake cells not used according to policy | Minimal | Continue to monitor |
| 2 | Alternative housing SPI not reliably completed | Substatial | Closed |
| 3 | MH observation not being utilized appropriately. | Minimal | Continue to monitor |
| 4 | SRASHEs not reliably completed for referrals. | Substatial | Continue to monitor |
| 5 | Inadequate IDTT meetings. | Minimal | Continue to monitor |
| 6 | Supervisory review od DC SRASHEs | None | Deferred |
| 7 | Inadequate custody DC check completion | None | Continue to monitor |
| 8 | SPRFIT subcommittees | Minimal | Continue to monitor |

### XV.    Assignment of Corrective Action Plans and Recommendations

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, Chief Support Executive, Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

**Corrective Action Plans (CAPs) and Recommendations from prior site visits that remain open as of Q1 2023 review (these CAPs are also summarized in table B):**

**Open Corrective Action Plans (CAPs)**

1.) All CNAs will be trained to utilize the Suicide Prevention Tracker M-Page that is built into Care Compass for consistency and completeness.  Proof of practice: signed 844s submitted to the Regional Nurse Consultant and the Statewide Suicide Prevention and Response Coordinator assigned to Region 3, by December 30, 2021.  This will also be tracked on the CAP SharePoint site. **Status as of Q2 review:** Compliance with the proper completion of rounding continues to be a problem and this still has not been completed. Regional nursing will continue to monitor.  **Status as of Q4 review:** This still has not been completed and will be deferred at this time. **Current status**: Although the requested documentation has not been submitted, this audit suggests that improvements with suicide precaution rounding has improved. **This specific CAP will be closed at this time**.

2) **Problem:** Patients were not consistently being offered yard privileges in the MHCB. **CAP:** Custody Leadership to provide training to all custody officers assigned to the Mental Health Crisis Bed (MHCB) Unit on the February 14, 2021 Memorandum titled: "*MENTAL HEALTH CRISIS BED PRIVILEGES REVISION*".  This training is to ensure inmate patients admitted to the MHCB attend out-of-cell activities consistent with their custody designation (unless specifically restricted by the MHCB IDTT). **Proof of practice:** 844s to be submitted to the Region 3 Statewide Suicide Prevention Coordinator and the Region 3 Mental Health Compliance lieutenants by **April 30, 2022.** This will also be tracked on the CAP SharePoint site. **Current status:** Training was delivered to MHCB custody staff on February 3, 2022 on OP 500, which is consistent with statewide policy. Proof of practice of this training was delivered to the review team on the day of this site visit. Although this training has occurred, there continued to be a noted absence of yard privileges being offered to inmates in the MHCB. This will be revised as follows. **Revised CAP**: Custody representation to present in the monthly SPRFIT sub-committee on the percentage of inmates in the MHCB who were offered yard, in compliance with policy, the previous month. This reviewer will conduct a mid-quarter site review to review this area. **Status as of Q4 review**: This still has not been completed. This will be considered for the project pipeline at the December SPRFIT meeting. **Current status**: This still has not been completed. While there was no SPRFIT meeting in December 2022, meeting minutes from January 2023 suggest that this item has not been discussed or added to the project pipeline. As such it will remain open.

3) **Problem:** Custody Discharge Checks (7497) are consistently below 90% compliance. **CAP:** SPRFIT meeting minutes will reflect the specific corrective action, including the provision

of progressive discipline (sanitized) if necessary, each month for the prior month's audits. **Proof of practice:** SPRFIT minutes will specifically address this item beginning with the April 2022 meeting. **Status as of Q3 review:** This has not been achieved and for the third consecutive audit period, this area remains out of compliance. The institution will submit a memorandum, delineating specific plans to and steps to make improvements, to the statewide suicide prevention unit by October 1, 2022. This may include minutes from the ongoing workgroup. **Current status:** For the fourth consecutive audit period, this has not been achieved. The institution will develop its own CAP. Current status: Institutional 7497 audits suggest that this area is still well below compliance. A 7497 workgroup was chartered since the last review period. This will remain an open CAP until sustainable compliance is achieved.

**Joint CAPs for Lindsay Hayes and this reviewer**

4) **Problem**: During Mr. Hayes' review, a random audit of charts for a sample of inmates who were rescinded from Alternative Housing between February and March 2022, found that SPI was not completed in approximately 52% of cases. Furthermore, results were replicated by this reviewer during this site visit. **Corrective Action:** Retrain all clinical staff who respond to patients on suicide watch in Alternative Housing on the requirement to complete SPI for all patients who were referred to MHCB for DTS, regardless of acute risk level at the time of discharge. For a training resource, refer to slides 31-32 of the 2019 Statewide *Safety Planning* training. **Proof of Practice:** Submit signed 844s to the SPRFIT Coordinator assigned to region 3 or upload it to the CAP SharePoint site by October 15, 2022. **Status as of Q4**: Signed 844s were not submitted. However, this review suggests that improvement has been made in this area. This will continue to be monitored for one more review period. **Current status**: For the second consecutive review period, audits suggest that SPI is now being reliably completed upon rescission from alternative housing. **This will now be closed out.**

5) **Problem**: It was found during Mr. Hayes' review that inmates were not consistently being placed in retrofitted intake cells upon arrival to ASU. Given information collected by this reviewer during this site review and the last (Q2) one, global deficiencies are noted with LAC's adherence to intake cell policy. **Status as of Q4 review**: These global deficiencies continued to be noted at both ASUs during this site review. The institution will develop a CAP. **Current status**: January 2023 SPRFIT minutes suggest that this has been placed on the project pipeline, however it has not been assigned a risk score. While improvements were noted during this site review, problematic use of placards, especially at ASU EOP Hub, make tracking cumbersome. This was discussed as part of the February 2023 SPRFIT meeting. This will remain open.

6) **Problem:** Lack of an appropriate SPRFIT LOP. S**tatus as of Q3 review**: Since the site visit by Mr. Hayes, the institution has developed a separate SPRFIT LOP that encompasses the requirements of the 2018 Enhancement Memorandum, but as of this site review it had

not yet been finalized. Corrective Action: Finalize the SPRFIT policy during MHSC prior to October 2022. **Status as of Q4**: This still has not yet been completed. The October SPRFIT meeting indicated that this LOP is still under review. This is expected to be signed off and completed during the December SPRFIT meeting. **Current status**: As of February 2023, the institution reports that this LOP has still not yet been completed. This will remain open and in the February 2023 SPRFIT meeting, it is suggested that the boundary to completing this LOP, whatever it may be, be discussed and specifically addressed if not signed off.

7) **Problem:** Problematic crisis responding with regards to confidentiality availability. Specifically, inmates in both alternative housing in the housing units and inmates in holding modules awaiting crisis assessment are assessed within view and earshot of other inmates and are not consistently offered confidential contacts. **Current status**: This was noted to still be a problem during the most recent site review. **Corrective Action Plan**: The institution will submit a memorandum, delineating specific plans to and steps to make improvements, to the statewide suicide prevention unit by October 1, 2022. **Status as of Q4 review**: Although no crisis calls were observed as part of this review, it is not believed that any change has been made in this area as no memorandum has been submitted. Additionally, a portion of the institution's Suicide Prevention LOP is not supported by statewide policy (see above) and it is recommended that this be modified (see CAP 9 below). **Current status**: It was specifically observed during this site review, that this problem persists. Requested proofs of practice and steps to improve the availability of confidential space, have not been submitted. This item has been placed on the project pipeline according to February 2023 SPRFIT minutes, but no risk score has been assigned. This will continue to be a CAP until confidential interview space for crisis contacts is secured and reliably utilized.

8) **Problem**: There are two problems concerning LAC's LOP #31, *Suicide Prevention.* A) Although this LOP states that patients placed on suicide watch are not to be placed in cells adjacent to the showers, it was observed during this site review that one patient who was on suicide watch in alternative housing, was housed in a cell adjacent to a shower. B) The policy states "Custody staff shall conduct a complete search of the holding cell and remove contraband prior to placing the IP (patient) in the cell. An unclothed body search will be conducted and the IP (patient) will be issued safety clothes (no tear smock)." This practice is not supported by statewide policy and is in violation of patient rights. Corrective Action Plan: A) Develop a plan to ensure that LAC is following its own policy with regards to the use of alternative housing cells. B) Modify LOP #31 to discontinue the practice of restricting clothing from patients for whom there is not an active suicide watch order. Current status: This LOP has not been modified since the last site visit. While it was not observed that patients were placed in alternative housing in cells adjacent to showers, it was observed that at least one was placed in a dry cell despite the availability of housing unit cells and cells with toilets. Further, the LOP deviates from statewide policy in the

manner in which beds are prioritized. This reviewer will share the statewide Alternative Housing policy with this finalized report.

9) **Problem:** LAC's LOP #34 *Suicide Risk Management Program* is not fully in alignment with statewide policy. Specifically, statewide policy requires that the Mental Health Primary clinician "document treatment progress during routine IDTTs" and "complete the SRMP treatment progress and updates section within the SRMP tab of the Master Treatment Plan" and LOP #34 is missing this element. This has manifested in non-compliance with this requirement as noted above. Corrective Action Plan: Modify LOP #34 to include this element. **Current status:** While the policy now reflects this element, there is not full compliance with it (as described above). The SPRFIT coordinator assigned to region 3 will provide an onsite training before the next (April 2023)

10) **Problem:** LAC's LOP #30 *Crisis Intervention Team* is not fully in alignment with statewide policy. Specifically, statewide policy requires that "If unlicensed, the clinician will immediately consult with an administrative supervisor, or clinical supervisor prior to resolution of the CIT. Documentation shall reflect this consultation." Corrective Action Plan: Modify LOP #30 to include this required element. **Current status**: This LOP has expired since the last site review and has not yet been renewed. This policy will include this element when modified.

| Table B: Summary of open CAPs (joint Lindsay Hayes and Regional SPRFIT tours) | |
| --- | --- |
| **CAP ITEM** | **Status** |
| 1. All CNAs will be trained to utilize the Suicide Prevention Tracker M-Page that is built into Care Compass for consistency and completeness. Proof of practice: signed 844s submitted to the Regional Nurse Consultant and the Statewide Suicide Prevention and Response Coordinator assigned to Region 3, by December 30, 2021. This will also be tracked on the CAP SharePoint site | Closed |
| 2. Patients were not consistently being offered yard privileges in the MHCB. | Remain open |
| 3. Custody Discharge Checks (7497) are consistently below 90% compliance. | Remain open |
| 4. During Mr. Hayes' review, a random audit of charts for a sample of inmates who were rescinded from Alternative Housing between February and March 2022, found that SPI was not completed in approximately 52% of cases. | Closed |
| 5. It was found during Mr. Hayes' review that inmates were not consistently being placed in retrofitted intake cells upon arrival to ASU. Given information collected by this reviewer during this site review and the last (Q2) one, global deficiencies are noted with LAC's adherence to intake cell policy. | Remain open |
| 6. Lack of an appropriate SPRFIT LOP. | Remain open |
| 7. Problematic crisis response with regards to confidentiality availability. Specifically, inmates in both alternative housing in the housing units and inmates in holding modules awaiting crisis assessment are assessed within view and earshot of other inmates and are not consistently offered confidential contacts. | Remain open |

| 8. There are two problems concerning LAC's LOP #31, *Suicide Prevention.* | Remain open |
|---|---|
| 1) LAC's LOP #34 *Suicide Risk Management Program* is not fully in alignment with statewide policy. | Remain open |
| 2) LAC's LOP #30 *Crisis Intervention Team* is not fully in alignment with statewide policy. | Remain open |

**New CAPs generated as the result of this review**

11) **Problem:** Inmates in the ASUs are not reliably be provided with entertainment appliances. **Corrective Action Plan:** This item will be added to the project pipeline during the March 2023 SPRFIT subcommittee meeting.

12) **Problem:** This reviewer observed an ASU post-placement screening in which the patient was not offered a confidential contact. **Corrective Action Plan**: Institutional nursing leadership to determine the extent and scope of this problem and report the findings in the April 2023 SPRFIT committee meeting and if necessary, provide trainings and place this item on the project pipeline.

13) Problem: This reviewer observed that one custody officer at D5 (ASU EOP Hub) was not completing guard-one wellness checks appropriately. Specifically, he did not establish visual contact with the patient to confirm the presence of living, breathing flesh. **Corrective Action Plan:** Institutional custody leadership to determine the extent and scope of this problem and report the findings in the April 2023 SPRFIT committee meeting and if necessary, provide trainings and place this item on the project pipeline.

14) **Problem**: SPRFIT committee minutes do not reflect that the SPRFIT coordinator has attended IAC or IFC every six months. **Corrective Action Plan**: Ensure that minutes begin reflecting this attendance.

**New recommendations not rising to the level of a CAP generated as the result of this review**

1) Provide training to MHCB staff to ensure the understanding that orders for privileges, includes consideration of the privilege of visiting.

Exhibit C

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES


# MEMORANDUM

| | |
|---|---|
| **Date:** | 03/23/23 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D. Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | KERN VALLEY STATE PRISON SUICIDE PREVENTION TOUR-Quarter 1 February 2023 |

On February 13-14, 2023, the Statewide Suicide Prevention Coordinator conducted a review at Kern Valley State Prison (KVSP). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| Lindsay Hayes CAPs that will be deferred | 1 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 2 |
| CAPs previously generated by this reviewer that remain open | 4 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 1 |

Total CAPs that remain open=7
Total recommendations that remain open=1
Total CAPs closed this review=1

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units (ASU, ASU CCCMS, STRH, LTRH, ASU EOP-hub, PSU, Condemned)

KVSP has two restricted housing units and at the time of this visit, one of them (ASU2, which typically houses ASU GP inmates) was closed. Therefore, this review only includes STRH.

<u>STRH</u>

### Second Watch Morning Meeting

For the second consecutive tour, the second watch morning meeting was observed to be strong. All required attendees were present, including a psychologist, the sergeant, floor officers, and a psychiatric technician (PT). All required items were discussed including new arrivals, patients in the Suicide Risk Management Program (SRMP), and patients on 5-day follow-ups. The meeting also included a discussion of intake cell availability.

### Psychiatric Technician (PT) Rounds

On the day of this site review, one PT was observed conducting rounds and she did so adequately. It was observed that she looked inside all of the cells and established a visual contact. She interacted with all inmates and for those in the Mental Health Services Delivery System (MHSDS), inquired appropriately about suicidal ideation, as well as sleep and appetite. For those not in the MHSDS, she inquired about the presence of mental health issues or concerns. She documented in CERNER in real time for all MHSDS patients. This continues to be an area of strength for KVSP.

### Intake Cells

KVSP's ASU I (STRH) has nine intake cells (101-109), which remains unchanged since the last site visit. There were four inmates in housed in these cells and all four had been there for less than 72 hours. There were not any inmates in STRH who were inappropriately housed. Previous site visits had determined that the intake cells were appropriately retrofitted. Placards were present on the doors of all occupied intake cells with accurate dates, which represents improvement from the last site visit. It is recommended that these placards include time of arrival as well. The institution continues to utilize B1 cells 113-116 as overflow ASU cells and on the day of this site visit, there was only one inmate occupying one of those cells. He was not on intake status. Stenciling designating these cells as intake cells is still absent.

### Entertainment Appliances

During this review, a total of eight patients were interviewed and asked if they had received an entertainment appliance promptly upon arrival. The sample included two of the four inmates in intake cells at STRH, the one inmate in B-1, and five other randomly selected inmates. All eight

indicated that they were promptly given an appliance upon arrival. Another area of noted improvement since the last site visit, is that there were not any inmates who were issued appliances with cords while in intake cells.

## Welfare Check Completion (Guard One)

At the request of this reviewer, the sergeant generated a Guard One report for the date of February 8-9, 2023 (06:00-06:00). A review of this report revealed that there were a total of 5,906 Guard One checks completed during this 24 hour period and there were only 103 errors for a compliance rate of 98.25%. The longest violation was 61 minutes (26 minutes beyond the maximum) and this happened twice. This violation aside, this report indicated good overall compliance with Guard One checks. On the day of this site visit, one officer was observed completing Guard One checks and he did so appropriately, making sure to look into each cell to establish visual contact with the inmate, using a flashlight when necessary, before moving on to the next cell. For the second consecutive audit period, the institution has demonstrated good compliance with the Guard One process.

## Inpatient Units (MHCB and/or PIP)

### Interdisciplinary Treatment Teams (IDTT)

Four IDTTs were observed during this site visit. Three of the four patients had been admitted for DTS. The three DTS cases were initial IDTTs and the other was also an initial IDTT. The patient attended the IDTT in person in all four cases. The IDTT leader explained the purpose of the IDTT in only one of the four cases and levels of issue, observation, and privileges were discussed in only three of the four cases. Otherwise, the IDTT was adequate. All members of the treatment team were engaged in the discussion in all four cases, there was an interactive discussion about the treatment plan in all four cases, and safety planning was discussed as indicated. One patient was a mono-lingual Spanish speaker and the IDTT was conducted via an onsite certified translator. This patient was also slightly disorganized in terms of thought process. The treatment team conducted an adequate IDTT despite these challenges. There were three other minor concerns. In one case, the psychologist and the psychiatrist had different diagnostic impressions, yet this was not discussed to resolution. There was one case in which the psychologist had indicated that the patient had been approved for partial issue the previous day, however those orders were not reflected on the patient's door, and he did not have partial issue when in the room. The clinician checked the chart in real-time, and this was rectified. Safety planning was not reviewed by the supervisor prior to the discharge IDTT in any case, however that process is presently on hold in light of the new safety planning training being rolled out.

### Suicide Watch and Suicide Precaution

# MEMORANDUM

On the day of this review, there were a total of 11 patients in the MHCB; four of whom were on Suicide Precautions (Q11-Q15 minute staggered checks) and the remaining seven of whom were on Q30 minute checks. All seven of the patients on Q30 observation status had been at the MHCB for at least five days. A review of the QM SRFIT Power BI report indicates that for a six-month average, KVSP maintained patients on suicide watch and suicide precautions for a shorter period of time than the statewide average (see picture below). For the second consecutive audit period however, KVSP has shown improvement in this area.

|  | SW | RATE | RANK | |
|---|---|---|---|---|
| Average Duration (Days) of MH Observation, Suicide Watch | 1.3 | 0.5 | 16 | ▼ Decrease -18% |
| Average Duration (Days) of MH Observation, Suicide Precaution | 4.4 | 3.1 | 26 | ▲ Increase 116% |

This reviewer observed one nurse conducting rounds on three of the four patients on suicide precautions and in all three cases, she was observed to look inside of the cell and establish visual contact with the patient. She also documented in CERNER in real time. A review of the Mental Health Observation reporting tool indicates that for the month of January 2023, suicide precaution rounds were completed timely 95.9% of the time and were staggered 99.8% of the time. This continues to be an area of strength for KVSP.

### Observation and Issue Orders

**Suicide Precaution Observation:** This reviewer observed one nursing staff member conducting suicide precaution rounding for the four patients who were on suicide precautions on the day of this review. The nurse looked inside each cell and established visual contact with the patient. There were 11 patients in the MHCB on the day of this site review and there were up-to-date orders for observation and issue posted on the door in all but 1 case (discussed in the IDTT section of this report).

**Partial issue:** This reviewer conducted chart reviews for 10 randomly selected patients who completed a full MHCB stay during Q4 2022. The review consisted of each patient day in which less than full issue was ordered, for a total of 39 patient days. Issue orders were present in all but two total patient days (94.8%) and observation orders were present for all but one patient day (97.4%). In one case, an issue order and an observation order were both absent for the same patient on the same day. With regards to the presence of a note justifying limited issue, one was present in all but four cases (89.74%).

With regards to the quality of justification notes, improvement was noted since the last review. Notes were present for 35 of 39 total patient days and a total of 6 (3 consecutive days for two patients) were qualitatively poor. Specifically, they simply indicated "denies SI," yet the patient was given only partial issue each day. Given that this problem was noted with 60% of audited

notes during the last site review, it seems that the institution is making steady improvements in this area.

### Privileges

A review was conducted of the 114-As for 10 of the 11 patients who were in the MHCB on the day of this review. All 10 were approved for phone calls, yard, dayroom, and visiting. This review suggests that there has been a decline in performance since the last site review. The 114s contained documentation that only seven patients (70%) had been offered yard, four (40%) had been offered dayroom, and only 1 (10%) had been offered a phone call. None of the patients had been offered visiting, however it is understood that the opportunity to do so had not yet arisen as visiting is only offered on certain days. Additionally, there was one audited patient who had not yet been offered any privileges and he had only arrived one day earlier. It is suggested that the institution continue to evaluate its patterns and practices of offering privileges in the MHCB to ensure that it aligns with the expectations of statewide policy.

## Alternative Housing

KVSP's LOP 1056 Mental Health Crisis Bed (MHCB) and *Alternative Temporary Housing (ATH): Referral and Referral Rescission Process,* serves as the institution's alternative housing policy and it was last signed off in September 2022. It is consistent with statewide policy and it designates Alternative Housing cells in the following order of priority:

1. MHCB licensed bed
2. CTC licensed medical beds
3. Holding cells with access to water/toilets including, but not limit to, "wet cells" and/or "clinic cells"
4. Holding cells without toilets
5. Other housing where complete and constant visibility can be maintained

In the event that MHCB cells are unavailable, the LOP designates the following Alternative Housing cells:

1. For ASU inmate: STRH cells 196-199.
2. For SNY inmates: C4 cells 114-117 and D8 cells 114-117
3. For General Population inmates: A1 117-118 and B1 cells 117-118

During this review, this auditor conducted a thorough review of the cells in C yard. It was noticed that in all four cases, there was a gap between the top bunk and the wall, which would allow for the anchoring of a noose. Additionally, it was reported by a floor officer, that these cells do not have dimmer switches, but rather only have on and off switches that are controlled from the inside of the cell. As such, a full visual of the inmate therein cannot be established at night. It is recommended therefore, that the institution either discontinue the use of these cells for alternative housing, close the gap between the top bunk and the wall, or install dimmer switches and in the interim, the institution should discontinue the use of these cells at night.

The institution typically admits patients directly to its own MHCB after hours, so the scope of the problem at this time is likely minimal, however this should be evaluated by the SPRFIT.

**Compliance with transfer timelines:** During Q4 of 2022, the institution was 97% compliant with timely admission to the MHCB.



**SRASHE completion for rescinded referrals:** During Q4 of 2022, the institution demonstrated a compliance rate of 99% with the completion of SRASHEs upon rescission of MHCB referrals. This demonstrates the second review period of improvement since the review by Lindsay Hayes. However, a significant decrease in compliance was noted for the completion of SPI upon rescission of referrals for patients who were referred to MHCB but not admitted. A random sample of 10 such charts were audited and SPI was completed in only two cases. In all eight of the non-compliant cases, the patient's acute risk was assessed as low. The errors were noted across six different clinicians. The state is presently rolling out a revised safety planning process with an accompanying revised policy and training on this has begun to be delivered to the field. This training includes the reiteration on the policy expectation that safety planning be completed in these cases and as such, it is expected that improvement will be noted during the next site review.

## Receiving and Release (R&R) Screening

Despite having toured the facility for two days, there were not any new arrivals and as such, no R&R screenings were observed. The physical space was inspected and continues to be conducive to the process. This included the presence of suicide prevention posters in both English and Spanish.

## Emergency Response

This area was not assessed during this tour.

### Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Between 2019 and 2020, suicides resulted in Mental Health Specific QIPs for KVSP within a total of six different clinical domains. By this site visit, two required continued monitoring. Progress is documented below.

1.) SRASHE quality-The responsible clinician was an unlicensed psychologist working under supervision who has since left state service. The CAT audits are completed regularly and compliance reported in MHSC and currently SRASHE mentoring is at 50% and will continue to be reported in SPRFIT. KVSP will develop a plan to bring mentoring into compliance by May 2021. Consider offering group supervision weekly to unlicensed psychologists even after completion of hours. Follow up to be reported at next site visit in May. **Status as of Q1 2021 site visit:** Slight improvement has been demonstrated since the last site visit. SRE mentoring is now in compliance (see below), however the quality of SRASHEs continues to be an area in need of focused attention. The institution reported that the MHCB supervisor and the CMH, frequently review SRASHEs for quality and make appropriate interventions. Additionally, the institution is undergoing staffing changes that may lead to improvement in this area. Monitoring will continue and this will stay open. **Status of Q3 2021 audit**: Mentoring has once again fallen out of compliance and will result in a CAP as indicated below. SHRASHE quality is assessed quarterly via the chart audit tool and was at 50% for Q1. MHSC minutes from March indicate that clinicians who have failed the CAT audit will be re-mentored. This will remain open until sustained quality, as defined by at least four consecutive audit cycles, are within compliance (above 90%). **Status as of Q4 2022:** : The SRE mentoring process has rebooted with a new process and training has been initiated. CAT audits have been suspended at this time to allow clinicians to adapt to the new process. As such this will remain in monitoring status. **Q1 2023 update:** The Suicide Risk Evaluation process is undergoing statewide revision and training will commence in 2023. CAT audit 7 has been suspended until October 2023. Mentoring is 82% compliant overall. This will remain in monitoring status.

2.) Poor quality Treatment Planning-Differential Dx training compliance is at 81% and will be reported on Monthly in MHSC. Future onboarding to include the Transfer discharge treatment planning recommendation training used for the original QIP. **Status as of Q1:** This practice has been implemented. This will remain on hold until differential diagnosis training can be offered again, but in the meantime supervisors will continue to review treatment plans. **Status as of Q2:** This remains unchanged. As of March, compliance with this training remained at 88% and the training still has not been offered. The institution reports that spot-checks are being done on treatment plan quality. The chart audit tool results from Q1, indicate that treatment plan satisfactory scores were only at 75%. This will remain open and in addition, it will be suggested that treatment plans be reviewed at least for all patients in the SRMP program. **Status as of Q4:** Supervisors have been instructed to continue reviewing SRMP patient treatment plans as part of the UNA process as well. This is ongoing. Overall treatment plan quality is improving as well per

the PIP coordinator. Continue monitoring. **Q1 update**: All staff hired since June 1, 2022 have been trained. Supervisors will audit treatment plans regularly and will report out on the results of these audits quarterly to assess progress.

There were two more deaths by suicide at KVSP in the calendar year 2022 and they resulted in a total of seven more mental health QIPs and four more custody QIPs. QIP language and current status of each is as follows.

Patient #1 (Beltran)

1. Within the past year, there was only one SRASHE completed for the inmate. The SRASHE was completed on June 2, 2021, in response to his last quarterly SRASHE after MHCB admission. It estimated both chronic and acute risk to be "low." The risk justification acknowledged his ongoing drug use however appeared to believe the inmate remained sober and had not reported any suicide attempts or suicidal ideation in the previous 90 days. The SRASHE also indicated that he was taking his psychotropic medication as prescribed and reported decreased anxiety and depression. In the months prior to the SRASHE, the inmate reported consistent use of drugs and alcohol and distress over his mother health. He got in a fight, received an RVR, stopped taking his prescribed psychotropic medication and reported depression at a 10. Given the severity of his symptoms in the months prior to this SRASHE, acute risk was underestimated. Additionally, as this was the only SRASHE completed, it likely impacted assessment of risk in other clinical documentation, and may have resulted in the decision not to re-asses suicide risk during future clinical contacts. **Status as of Q4:** The specific clinician is no longer employed at CDCR. **Status as of Q1 2023**: All staff have received relevant training in November 2022. When quarterly CAT audits resume, the efficacy of this training will be assessed ongoingly.

2. There were multiple concerns identified in the MH Master Treatment Plans (MTP): May 4, 2022, February 9, 2022 November 17, 2021, and September 8, 2021. These concerns will be discussed in three parts:
   a. The MTP dated May 4, 2022 did not appear to include updated information on his progress since the last treatment plan. The treatment plan indicated the inmate's increase in anxiety and depression were due to the loss of many family members as well as his mother's diagnosis of Dementia. The treatment plan was not updated to include the inmate's low compliance with mental health treatment, increased isolation, nor continued drug use, all which were identified risk factors.
   b. Three MTPs (May 4, 2022, November 17, 2021 and September 8, 2021) included two Individual Plan of Care (IPOCs) (goals) which included Substance Use/Abuse and Anxiety which had been initiated on March 17, 2021. Only three entries were present since the initiation of these IPOCs in March of 2021. This resulted in limited documentation of the inmate's treatment progress in the treatment plans.

     c.   The MTP dated February 9, 2022 appeared incomplete as it did not identify any IPOCs or PLOs in the current Progress Toward Goal section.

3.  Between February and May 2022, documentation suggests the inmate was experiencing increased symptoms, including worsening depression and anxiety, isolation, ongoing drug use and anger. The documentation during the above specified period did not discuss at what point a higher level of care might be considered since the Plan/Disposition and Estimate Length of Stay sections of the weekly progress notes were not present due to not using the Free Text template rather than the MH PC Note template.  Given his worsening mental health symptoms, it is unclear as to why a higher level of care was not considered during this time.

     a.   1-3 above resulted in one QIP: The **KVSP CEO** shall review the concerns outlined in problems 1-3. Prior clinical concerns were identified with the EOP Primary Clinician who completed the following documentation: SRASHE (June 2, 2021), Master Treatment Plans (May 4, 2022, November 11, 2021, and September 8, 2021), and clinical documentation completed up to May 4, 2022. It is requested that the CEO review these concerns and determine best course of action, which can include disciplinary action or Peer Review. For the Treatment Plan completed on February 9, 2022, and clinical documentation completed from May 12, 2022 until date of death, the CEO shall review the concerns, and determine if these are an isolated incident or part of an ongoing pattern, and decide best course of action, which can include training. Response: In response to the QIP all mental health clinical staff attended training on August 31, 2022 to review barriers related to the utilization of IPOCs, Improving documentation by including details regarding symptoms over time, when completion of a SRASHE and referral to higher level of care should be considered, and why it is beneficial to utilize MHPC Notes instead of Free Text Notes. Staff were provided handouts and examples as well as given the opportunity to ask questions. Plan for Follow up: Higher level of care consideration training will continue to be ongoing with supervisors and the Inpatient Coordinator meeting with staff who are out of compliance. **Status as of Q4:** The specific clinician is no longer employed at CDCR. **Status as of Q1 2023**: All staff have received relevant training in November 2022.  As indicated above, program supervisors will begin auditing treatment plans regularly and presenting the audit results, including interventions that may include training or progressive discipline. The forum and frequency of these audits will be determined by the institution.

4.  **Psychiatry:** As relates to an individual psychiatry appointments/contacts, there were more than several instances when the frequency of psychiatry contacts were inadequate; the time intervals between psychiatry contacts were greater than 30 days (which is longer than that allowed by the program guide).  Response to no-shows and refusal should also

be reviewed and improved to lessen the interval between psychiatry contacts, when the patients do not attend psychiatry appointments.  Additionally, while containing mostly adequate individualized information, psychiatry documentation often contained copied and pasted sections from previous notes, including typos; psychiatry documentation must be individualized to reflect the unique interactions/evaluations occurring during each contact. QIP: **KVSP Chief Psychiatrist** or designee will research these deficiencies to discover specifics and will consider implementation of strategies to prevent reoccurrence. Response: Closed on 10/31 and all 844s have been received. **Follow Up plan:** New psychiatry staff should receive this training. **Q1 update**: No new psychiatrists have been hired since the last tour. It is recommended that the Chief Psychiatrist conduct regular audits of psychiatry documentation and present data quarterly.

Patient #2 (Morales)

1.  There were multiple concerns identified with the MH Master Treatment Plan documentation completed on September 8, 2021, December 1, 2021, February 23, 2022, and April 27, 2022.
    a.  First, the clinical summary section across IDTTs (September 8, 2021, December 1, 2021, and February 23, 2022) was insufficient as the information was primarily pulled forward without change from previous documentation and not updated per policy to reflect progression through the treatment process.
    b.  Second, the information in the transfer/discharge sections (September 8, 2021, and February 23, 2022) was pulled forward from prior documentation and not sufficiently updated to reflect current treatment needs.
    c.  Third, the goal setting with patient section (September 8, 2021, December 1, 2021, February 23, 2022, and April 27, 2022), which specifically requests a discussion of the "Inmate-patient's understanding of his/her treatment needs, perception of his/her strengths and needs, life goals, and progress towards meeting his/her identified goals" was insufficient as the question was not addressed and the content was copied and pasted across IDTTs (December 1, 2021, February 23, 2022, and April 27, 2022) with the exception of one sentence added at the discharge IDTT on April 27, 2022.

QIP: **The CMH or designee at KVSP** shall 1) review the authoring clinician's documentation for 5 inmate-patients over a 12-month period (to include initial assessments, treatment plans, progress notes, and suicide risk assessments) to determine if this issue represents an ongoing pattern; 2) based on the results of this review, the CMH shall determine the best course of action, which may include additional training to address any deficiencies. **Response:** This QIP has been closed out. After review, it was determined that training was indicated and this training has been conducted. **Follow up plan:** New hires at KVSP will receive the relevant training. **Status as of Q1 2023**: Staff have received training on December 7, 2022 and ongoing training will continue during onboarding. Supervisors will report the results of treatment plan audits regularly as discussed above.

2. **Psychiatry:** As relates to an individual psychiatry appointments/contacts, there were several instances when the frequency of psychiatry contacts were inadequate; the time intervals between psychiatry contacts were greater than 30 days (which is longer than that allowed by the program guide). QIP: **KVSP Chief Psychiatrist or designee** will research these deficiencies to discover specifics and will consider implementation of strategies to prevent reoccurrence. Response: This was closed out and not likely a systemic issue. Follow up: None necessary.

### Suicide Risk Management Program (SRMP)

Section XVIII of KVSP's LOP 1031 addresses the SRMP and it is consistent with statewide policy. As of the first day of the institutional onsite review, there were 29 patients enrolled in the SRMP at KVSP and only one who met criteria but was not enrolled and that patient had been at the institution for less than two weeks. A random sample of eleven of the enrolled patients were selected for chart review. Of the 11 charts reviewed, 8 had not yet had a follow-up IDTT since the initial IDTT. Five of the IDTTs had measurable treatment goals in the initial IDTT, but only four contained specific interventions. For the three cases in which there was a follow-up IDTT held, goals and interventions were present in only one case. This indicates that for the second consecutive review period, documenting treatment plan progress for SRMP patients, continues to be a weakness for KVSP. The regional SPRFIT Coordinator will provide an onsite training prior to the next site review (May 2023).

### Discharge Custody Checks

| October | 88.5% |
|---------|-------|
| November | 95.6% |
| December | 92.5% |

For the third consecutive review period, the institution continues to demonstrate overall compliance with 7497 completion. Consistent with previous review periods however, overall compliance was negatively impacted by incomplete custody supervisory reviews. This was noted all three months. In addition, there was notable decline in custody 30-minute check compliance. A review of SPRFIT minutes suggest that improvement has been made in the discussion of 7497 compliance. For example, minutes from November 2022 addressed the specific deficiencies and noted that one clinician's failure to communicate with custody was at the root of the problem. This clinician received training. In light of noted improvement, this will remain open for one more audit period and if all three months of quarter one 2023 (January-March) are noted to be in compliance and improvement is noted with the supervisory review domain, this CAP item will be closed.

### Local SPRFIT Committee

This reviewer last attended the SPRFIT subcommittee meeting on January 17, 2023 and also reviewed the meeting minutes from the fourth quarter of 2022. The observed meeting met quorum and was collaborative, with all disciplines participating relevant to their respective area. Consistent with prior review periods, KVSP still has not uploaded the project pipeline onto the SharePoint site. A review of the minutes suggests some qualitative improvements with the discussion of CAPs. All meetings for which minutes were reviewed met quorum and all required domains were discussed. While the minutes still do not suggest that the SPRFIT coordinator has attended Inmate Advisory Council or Family Council meetings, the CMH attended on the second day of this site review and represented the SPRFIT. Other than the above noted deficiencies, KVSP has effectively adopted the new SPRFIT reboot process.

### Urgent and Emergent Referrals for Danger to Self

This reviewer conducted a three-month audit for Q4 2022 (October to December) to ensure that mental health referrals that were associated with danger to self (DTS) resulted in an emergent mental health referral and that all resulting contact included a SRASHE.  The results are as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| October | 100% | 100% |
| November | 100% | 91.6% |
| December | 100% | 100% |
| Q4 Totals | 100% | 96% |

A qualitative review of the above data indicates that although the institution was not 100% compliant for DTS calls triaged as emergent referrals, both of these non-compliant cases involved patients who had been placed on suicide watch in alternative housing and as such, there was no impact on patient care.

This reviewer also audited a random sample of 10 charts for referrals from Q4 that were not triaged as emergent to ensure that there was not an issue related to suicidality associated with these referrals. Results concluded that 8 of the 10 (80%) were appropriately triaged as routine or urgent, as there was no indication of DTS being of concern at the time. For the other two, there was some indication that the referral may have involved DTS.

### Suicide Risk Evaluations

**Overall Suicide Risk Evaluation (SRASHE) compliance**: During the fourth quarter of 2022, the institution demonstrated overall compliance with SRASHE completion at 96%.

| | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 479 | **4.6** | **96%** |

The monthly breakdown in as follows:

| | |
|---|---|
| October | 97% |
| November | 94% |
| December | 97% |
| 4th quarter total | 96% |

**SRASHE completion following MHCB/PIP discharge**: During the fourth quarter (October to December) of 2022, there were a total of 81 patients who were discharged from the MHCB after having been admitted for DTS and a SRASHE was completed timely in 80 of those cases for a compliance rate of 99%. A random sample of 15 of those charts was selected for audit and in 13 of those 15 cases (86.7%), adequate documentation was present to justify a MHCB discharge. One of the two cases in which the documentation was inadequate was attributable to a clinician who has historical documentation concerns and is no longer employed at KVSP. Additionally, there were five patients who returned from a PIP during the quarter and the required SRASHE was completed timely in all five cases.

| | | | |
|---|---|---|---|
| SRE at MHCB Clinical Discharge (admitted for a | 81 | **0.9** | **99%** |

**Confidentiality of Suicide Risk Assessments:** During the fourth quarter of 2022, a total of 358 Suicide Risk Evaluations were completed at KVSP, 236 (66%) of which were completed in a confidential setting. Of the 122 contacts that were not completed in a confidential setting, 69 were the result of patient refusals and 16 more were the result of some type of modified program, for a total of 85 cases in which the reason for the non-confidential contact was outside of the clinician's control. This represents 67% of the non-confidential contacts which is a decline from the previous site review. If this is noted once again in the next site review, it will result in a CAP.

## Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for December 2022, as well as information obtained while on-site, indicated the following compliance rates:

- Suicide Prevention IST:
  - Custody=757/757 (100%)
  - Mental Health=58/61 (95%)

- o  Nursing=116/122 (95%)
- Suicide Prevention and SRASHE Core Competency Building=82.35%
- Safety Planning Intervention=91.18%
- SRE Mentoring=0%
- SRMP=82.35%

SRE mentoring compliance continues to not be reported on the SharePoint site and SRMP has not made significant progress.

Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary on Appendix A).

| Focus of remediation | Specific language about deficiency | Initial Corrective Action Plan | Status as of Q1 review | Continue monitoring or close out? |
|---|---|---|---|---|
| MHCB Observation Orders | This reviewer observed concerning practices regarding use of "Q-30 minute" observation within the MHCB unit. First, almost all patients admitted to the MHCB for DTS were downgraded from Suicide Precaution status (with observation required at 15-minute intervals) to Q-30-minute observation within the first 24 hours of admittance. The second concerning practice regarding use of "Q-30 minute" observation within the MHCB unit was that some patients assessed as not being suicidal and placed on Q-30-minute observation still remained with "partial issue" clothing without a rationale for withholding "full | Clinicians have been trained to incrementally decrease observation status. Clinicians have also been trained to not restrict issue without justification. Regional SPRFIT has redistributed relevant policy memorandum. | Closed out Q4. | Close out |

| | | | | |
|---|---|---|---|---|
| | issue" clothing (pg 182-183). | | | |
| MH Referrals and SREs | A sample EHRS review of 38 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in only 89 percent (34 of 38) of the cases (pg 184). | A more robust sample (100%) was reviewed by the R3 SPRFIT coordinator and these domains were found to be in compliance. This will continue to be reviewed monthly. | This continues to be in compliance as demonstrated by this audit cycle. | Monitoring will continue as part of the regular SPRFIT review process. |
| Discharge SRASHEs and Safety Plans | The required discharge SRASHEs were completed in all cases, and safety plans were completed in 89 percent (17 of 19) of the cases. This reviewer's examination of the data found problems in untimely supervisory review. For example, although discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, the data indicated that all supervisory reviews occurred well after MHCB discharge, and there was no documentation that discharge SRASHEs completed in October and November received any supervisory review (pg 184). | MHCB supervisory reviews are now being completed daily and meeting minutes reflect that this is 100%. Clinicians have also been retrained on the requirement to complete SPI even when acute risk is low. | MHCB supervisory reviews have been placed on hold while the new Safety Planning process is rolled out. | Deferred until October 2023. |
| Custody Discharge Checks | This reviewer was presented with documentation of 76 cases of inmates discharged from a MHCB or alternative housing placement who remained at KVSP and were not | The institutional custody leadership has completed OJT each time non-compliance is noted. The area of concern (30 minute checks) has improved. Remaining areas of | This concern was placed into the project pipeline in Q4. Improvements noted. | Continue monitoring. Close out if improvement is sustained by next review. |

| | transferred to administrative segregation (where observation at 30-minute intervals was required) from May through October 2021. The review found that only 67 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage almost exclusively related to nursing staff discontinuing the checks on weekends without "face-to-face evaluations" by clinicians. This protocol was established in June 2021 following the statewide distribution of the revised "Discharge Custody Check Sheet" (CDCR MH-7497) form. Almost two-thirds of the custody checks were recommended for 48 hours or more by clinicians. In addition, only 71 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or missing check sheets (pg 185). | non-compliance have been placed in the project pipeline. | | |
|---|---|---|---|---|
| SPRFIT LOP | Review of various LOPs for suicide prevention found that KVSP did not have an LOP consistent with CCHCS's "Enhancements to the | This LOP has been updated and completed. This can now be closed out. | Closed in Q4. | Closed |

| | | | | |
|---|---|---|---|---|
| | Suicide Prevention and Response Focused Improvement Teams" memorandum (pg 185). | | | |
| Suicide Prevention Training | In addition, 91 percent of custody staff, 92 percent of medical staff, and only 88 percent of mental health staff, had completed annual suicide prevention block training during the previous 12 months (pg 185). | While the institution cannot retroactively rectify 2021 compliance, they are on pace for compliance in 2022. | Closed in Q4 | Closed |

## XIII. Crisis Intervention Team (CIT)

KVSP's LOP 1055 *Crisis Intervention Team (CIT)* was revised in September 2022 and serves as the institution's CIT policy. It was noted during the last site review that the policy is mostly aligned with statewide policy, however the requirement for unlicensed clinicians to consult with a supervisor in conjunction with crisis calls, is not reflected in the LOP. This modification to the LOP was not made. This recommendation remains in place. There were no crisis calls observed during this onsite review.

During the fourth quarter of 2022, 21% of the CIT events included the correct composition of the team. The most common reason for CIT calls was DTS and in 52% of the CIT cases, the patient was returned to housing following the contact. A random sample of five SRASHEs associated with these cases, demonstrated that the documentation justifying non-referral to a MHCB was adequate. However, it should be noted that all five were completed by the same unlicensed clinician who is incorrectly identified in the CIT report as being licensed. Additionally, the documentation in the SRASHEs lacked indication that a supervisor was consulted.

### Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Chief Executive Officer, Associate Warden of Healthcare, Warden (A), Healthcare Captain, and Chief Nurse Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Assignment of Corrective Action Plans and Recommendations (see summary on Appendix B).

### Corrective Action Plans (CAPs) and Recommendations from prior site visits that remain open as of Q1 2023 review:

**Open Recommendations that do not rise to the level of a CAP:**

1.) Healthcare Captain or designee to present proof of training to custody supervisors who have failed to complete the supervisory review portion of the 7497 audits by next SPRFIT subcommittee. Additionally, a status update will be provided to this reviewer at the next site visit. **Current status:** SPRFIT minutes indicate that OJT has been provided to the staff who are responsible for supervisory review errors and a status update has been provided to this reviewer. As indicated above, inmates on custody discharge checks are now being clustered in yards in which the staff are familiar with the process. Additionally, overall compliance on 7497s has improved. Nevertheless, the supervisory review portion of the process continues to negatively impact overall compliance and this will remain open until sustained progress, as evidenced by three consecutive months of this domain being above 90% compliance, has been achieved**. Status as of the Q4 review:** While overall, 7497 audits have revealed compliance, this specific item continues to suppress overall compliance despite training. It is now in the project pipeline. **Status as of Q1 review:** Given that this is still an open Lindsay Hayes item that is being monitored and is in the project pipeline, this will be closed out.

**Open Corrective Action Plans (CAPs) generated by this reviewer at prior reviews:**

1.) **Problem:** The institution is non-compliant (under 90%) with two suicide prevention related trainings: SRE mentoring and SRMP. Corrective Action: The institution will develop a plan to bring these trainings into compliance by July 31, 2022. Proof of practice: These trainings will be reflected as above 90% on the Court Ordered Trainings SharePoint site by the date indicated above. Status as of Q4 review: This has not been accomplished and training remains below compliance. Additionally, a chart review has identified qualitative concerns regarding patients in the SRMP (see above). KVSP will place this concern into the project pipeline in the next SPRFIT committee meeting. **Status as of Q1:** The institution did not succeed in achieving compliance with these trainings by the end of 2022. This will remain open.

2.) **Problem:** Treatment plans for patients in the SRMP program are qualitatively poor, in that they do not reliably have measurable treatment plan goals or interventions that were related to the SRMP inclusion criteria. **Corrective Action:** The institution will A) implement CAP 1 to improve SRMP training (see above), B) Provide interim training to all staff about the need to document measurable treatment plan goals and interventions that are relevant to the SRMP inclusion criteria C) Develop a plan for supervisory review of treatment plans for all patients in the SRMP program. **Proof of practice:** A) see CAP 1 above B) Submit 844s to the Statewide Suicide Prevention Coordinator assigned to Region 3 by July 31, 2022 C) Delineate this plan in SPRFIT minutes prior to August 31,

2022. **Status as of Q4 review**: Significant improvement has been noted in the quality of treatment plans for patients in the SRMP. However, treatment plans for patients in the SRMP are not being updated at each follow up IDTT. Additionally, training for SRMP remains below compliance. **Revised CAP**: Develop a plan to ensure that SRMP training is within compliance (above 90%) by the end of calendar year 2022 retrain staff on the specific requirement to update treatment plan progress at follow up IDTTs. **Status as of Q1 review**: Minutes from December 2022 SPRFIT meeting suggest that this has been completed. However, this review suggests that improvements in this area have not been made. The Statewide Suicide Prevention and Response Coordinator assigned to Region 3 will conduct an onsite training for KVSP staff or supervisors, prior to the next site review (May 2023). The target audience for this training will be determined by the institutional mental health leadership.

3.) **Problem:** Treatment plans for patients in the SRMP program are qualitatively poor, in that they do not reliably have measureable treatment plan goals or interventions that were related to the SRMP inclusion criteria. **Corrective Action:** The institution will A) implement CAP 1 to improve SRMP training (see above), B) Provide interim training to all staff about the need to document measurable treatment plan goals and interventions that are relevant to the SRMP inclusion criteria C) Develop a plan for supervisory review of treatment plans for all patients in the SRMP program. **Proof of practice:** A) see CAP 1 above B) Submit 844s to the Statewide Suicide Prevention Coordinator assigned to Region 3 by July 31, 2022 C) Delineate this plan in SPRFIT minutes prior to August 31, 2022. **Status as of Q4 review**: Significant improvement has been noted in the quality of treatment plans for patients in the SRMP. However, treatment plans for patients in the SRMP are not being updated at each follow up IDTT. Additionally, training for SRMP remains below compliance. **Revised CAP**: Develop a plan to ensure that SRMP training is within compliance (above 90%) by the end of calendar year 2022 retrain staff on the specific requirement to update treatment plan progress at follow up IDTTs. **Status as of Q1 review**: Minutes from December 2022 SPRFIT meeting suggest that this has been completed. However, this review suggests that improvements in this area have not been made. The Statewide Suicide Prevention and Response Coordinator assigned to Region 3 will conduct an onsite training for KVSP staff or supervisors, prior to the next site review (May 2023). The target audience for this training will be determined by the institutional mental health leadership.

4.) **Problem:** Inmates are being permitted to use electrical outlets in intake cells. **Corrective Action:** Update LOP to align with state policy that specifies that inmates can be provided with personal appliances after 72 hours. **Status as of Q1**: Inmates in intake cells are no longer being provided with appliances that have cords and the cells are no longer equipped with electrical outlets. This can now be closed.

5.) Problem: KVSP's CIT LOP does not reflect the requirement that unlicensed clinicians consult with a supervisor as part of CIT calls. Specifically, *the Updated Crisis Intervention Team Policy and Procedure* memorandum dated July 2021, states "If unlicensed, the clinician will immediately consult with an administrative supervisor, or clinical supervisor

prior to resolution of the CIT. Documentation shall reflect this consultation." **Corrective Action Plan:** Revise LOP 1055 to reflect this requirement. **Status as of Q1:** This still has not yet been completed and it will remain open.

6.) **Problem:** Qualitative problems are noted with the SPRFIT meetings. Specifically, the project pipeline has not been uploaded to the SharePoint site and was not visually shared with participants on the day of the site review. Additionally, minutes lack evidence of the SPRFIT coordinator attending IAC and IFC regularly and also lack a discussion of specific improvement plans and interventions for ongoing problems. **Corrective Action Plan:** Begin uploading the project pipeline to the SharePoint site monthly and ensure meeting minutes reflect the above elements. **Status as of Q1:** While some qualitative improvements with minutes have been noted, there has not been substantial progress and the project pipelines have not been uploaded to the SharePoint site. This will remain open.

**New Corrective Action Plan (CAP) as of Q1 2023 site review**

7.) **Problem:** Alternative Housing cells in C-yard are problematic. There is a gap between the top bunk and the wall, which could be used as an anchor point, and the cells lack visibility at night. Corrective Action: Consider available options including discontinuing use of these cells for Alternative Housing or closing the gaps and making better visibility possible. Proof of practice: Place this item on the project pipeline in the April SPRFIT subcommittee meeting.

**New Recommendation not rising to the level of a CAP.**

1. Problem: A review of 114s indicates that MHCB patients are not being offered phone calls reliably. The institution should review its pattern of practices to ensure that it aligns with statewide policy, which will be provided to the institution by this reviewer.

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - KVSP - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

**Appendices**

Appendix A: Summary of Lindsay Hayes CAPs and current progress

| | Summary of problem identified by Lindsay Hayes in 2021 | Progress | Follow up status |
|---|---|---|---|
| 1 | MHCB observation orders | Substantial | Closed |
| 2 | SRASHES not being reliably completed for referrals | Substantial | Continue to monitor |
| 3 | Supervisory review of DC SRASHEs | Minimal | Deferred until 10/23 |
| 4 | Inadequate custody DC chaecks completion | Minimal | Continue to monitor |
| 5 | Lack of a SPRFIT LOP | Substantial | Closed |
| 6 | Suicide Prevention IST training | Substantial | Closed |

Appendix B: Summary of CAPs generated by regional SPRFIT tours and progress.

| | Summary of CAP item | Progress as of Q1 2023 | Follow-up plan |
|---|---|---|---|
| 1 | The institution is non-compliant (under 90%) with two suicide prevention related trainings: SRE mentoring and SRMP. | Minimal | Remain open |
| 2 | Qualitatively poor treatment plans for patients in the SRMP. | Minimal | Remain open |
| 3 | Inmates are being permitted to use electrical outlets in intake cells. | Resolved | Close |
| 4 | CIT LOP does not reflect the requirement that unlicensed clinicians consult with a supervisor as part of CIT calls. | None | Remain open |
| 5 | Qualitative problems are noted with the SPRFIT meetings | Minimal | Remain open |
| 6 | Alternative Housing cells in C-yard are problematic. There is a gap between the top bunk and the wall, which could be used as an anchor point, and the cells lack visibility at night. | New CAP | Remain open |

Exhibit D

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 04/17/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | SUBSTANCE ABUSE TREATMENT FACILITY SUICIDE PREVENTION TOUR-Quarter 1 March 2023 |

On March 23rd and 24th, the Statewide Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator conducted a review at Substance Abuse Treatment Facility (SATF). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies.

An exit meeting was conducted with the local SPRFIT, Chief of Mental Health, Warden, Associate Warden of Healthcare, Healthcare CEO, Chief Nurse Executive (CNE), and AW Healthcare. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 1 |
| CAPs generated by this reviewer during prior review that can be closed | 0 |
| Lindsay Hayes CAPs that remain open | 5 |
| CAPs previously generated by this reviewer that remain open | 1 |
| New CAPs generated as a result of this review | 2 |
| New recommendations generated as a result of this review | 1 |

**Total open CAPs=8**
**Total open recommendations=1**
**Total closed CAPs=1**

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Second Watch Morning Meeting

The second watch morning meeting was observed as part of this site review and it was a good meeting. The required attendees; a psychologist and the sergeant, were in attendance, as were the lieutenant, an officer, and two psychiatric technicians (PTs). Overall, it was a good meeting. All required aspects were covered including new arrivals, patients in the SRMP, and patients who met objective criteria for the SRMP and were not enrolled.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was one PT observed completing rounds and although she was not a regular, the rounds were very good. She inquired about suicidal and homicidal ideation with all Mental Health Services Delivery System (MHSDS) patients. She also queried all of them about sleep and appetite and in the cases in which the patient endorsed poor sleep or appetite, she asked qualitative questions, for example "do you have trouble falling asleep or staying asleep?" to get better information about the nature of the complaint. There were three occasions in which a mental health referral was clinically indicated and she placed one in each case. The PT had a supply of games and puzzles, as well as inmate request for services forms, and supplied them to the patients as indicated. She also documented in real time in CERNER and made sure to establish visual contact with the inmate in the cell and observe the condition of the cell. She also asked general mental health questions of the inmates who were not in the MHSDS. PT rounds were identified as an area of concern during Lindsay Hayes' most recent site review and for the third consecutive audit period by this reviewer, improvement has been demonstrated. It is recommended that this CAP be closed out at this time.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

The STRH at SATF is equipped with 10 retrofitted intake cells (100-109) and all were occupied on the day of this review (March 24). Seven of these were occupied by inmates who had been ASU status for less than 72 hours. All of the remaining three had arrived to ASU on March 20, the latest of which was at 1820, and thereby exceeded the 72 hour placement by approximately 10 hours by the time of this review. Additionally, there was one inmate who had arrived to ASU the night before and was not in neither an intake cell, nor housed with a cell-mate. Had the inmates who arrived to STRH on March 20 been rehoused promptly, this individual would have been properly housed. Additionally, there are six appropriately retrofitted overflow intake cells (discussed in further detail below) that were empty on the day of this site review. It is unclear therefore, why the newly arrived inmate had not been placed in an intake cell. The inappropriate use of intake cells was identified as a CAP item during Lindsay Hayes' most recent review and unfortunately, this CAP cannot be confidently resolved at this time.

There are 11 cells at E1 that have been designated as ASU overflow intake cells (110-114; 121-124; 224-225). The latter six (121-124 and 224-225) had been previously inspected by this

reviewer and institutional staff and found to be retrofitted in compliance with statewide policy. During this site review, the other five were reviewed (110-114) and found to not be adequately retrofitted. All five had gaps between both bunks and the wall, large enough to create an anchor-point. All five cells also had a desk with the same gap. It was recommended during this site review, to discontinue use of those cells for ASU intake purposes.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

This reviewer interviewed three of the inmates in intake cells, as well as seven other randomly selected inmates, to ensure that they had been supplied with an entertainment appliance in a timely fashion. All 10 of the interviewed inmates reported that they had a radio and had been issued one promptly upon arrival to the STRH. This had been noted as part of deficiency in Lindsay Hayes' most recent review, as well as during the most recent site visit by this reviewer. This represents one audit in which improvement was noted.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

On the day of the site review, this reviewer requested a Guard One Tracker report for a randomly selected 24-hour period (February 27 at 0630 to February 28 at 0630). This report indicated that a total of 5,974 checks were completed during that 24 hour period and there were only 54 total misses (checks that exceeded 35 minutes) for a total compliance of 99%. The most problematic misses, involved checks that were completed 63 minutes apart, which is 28 minutes beyond the acceptable maximum time period. The pattern suggests that all of these were completed at the same time, on the same day, for the same row of cells. This indicates that this is likely less of a systemic problem and one that resulted from human error at that time.

To evaluate Guard One check completion qualitatively, this reviewer observed one officer completing checks. He took the time to look into each cell and when indicated, utilized a flashlight to, presumably, establish contact with the inmate therein. In summary, the Guard One tracker results, in combination with the sample observed onsite, suggests that Welfare Check (Guard One) completion at SATF is a strong area.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU Pre-placement screens observed as part of this site review, as none occurred. A review of the performance report from Q4 2022, indicates that this has been an area of weakness for SATF, as compliance was only at 79%. A review of the most recent SPRFIT subcommittee meeting minutes, indicates that this particular area of non-compliance has been an action item that was due to be closed out in July 2022, yet there was no indication that this item was discussed. In fact, the meeting minutes indicate simply that they are "still in progress." This item is to be reported on monthly in SPRFIT subcommittee, per the measurement plan of the newly established SPRFIT reboot process. SATF is a phase 2 SPRFIT reboot institution and the last of its staff did not receive training until December, so a learning curve may have been

indicated. The requirement to discuss this item monthly is hereby reiterated and if progress is not noted by the next site review, as evidenced by both documentation of the item being discussed in SPRFIT and performance improvement (above 90%), a CAP will be established.

## 70.2 ASU Pre-Screens



**79%**
(252)

### ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

This reviewer observed one ASU Post-Placement screening. The patient was offered a confidential interview but declined, so the interview was conducted at cell front. The PT asked all of the questions on the form and recorded his answers in CERNER in real-time. The PT appropriately generated a routine mental health referral and a review of the completed document, indicates that it was completed appropriately.

## Inpatient Units (MHCB and/or PIP)

### Suicide-Resistant Cells – Hayes Item 10

MHCB cells at SATF had previously been noted to be suicide resistant.

### Interdisciplinary Treatment Teams (IDTT)

This reviewer observed five IDTTs on the day of this site review. Four of the IDTTs were discharge IDTTs and the other was a routine IDTT. Three of the four initial IDTTs were for patients who had been admitted for Danger to Self (DTS) and the other was Danger to Others (DTO) and Severe Impairment Due to Mental Illness (SIDMI). All of the IDTTs consisted of all of the required team members, in addition to the Chief Psychologist who served as IDTT leader. All required members participated in all five IDTTs and in all five cases, the participation occurred organically and without prompting. All five IDTTs included the discussion of measurable treatment plan goals, the patient's diagnosis, and the patient's issue and observation orders. In applicable cases, the safety plan was discussed with the patient. The discussion included the parameters of the newly initiated safety plan. The psychiatric presentations of the patients varied and the team discussed the treatment plan in ways that ensured the patient could understand the process. In one case, the patient was being retained until the resolution of safety concerns per policy and this process was followed appropriately. Documentation justifying orders was present in all five cases. All five patients had full issue and were on Suicide Precautions, with the documentation suggesting

that that was the highest allowable level of precaution. With the exception of the hesitancy to utilize Q30 checks for patients who are no longer a suicide risk and are prepared to discharge, which was brought to the attention of the MHCB supervisors and the Chief Psychologist, this was a very good IDTT.

During his most recent site visit, Lindsay Hayes reported concerns related to the MHCB IDTT at SATF. Given that this reviewer did not conduct a site review during Q4 of 2022, and that no IDTTs were able to be observed during the Q3 visit, this is the first MHCB IDTT that this reviewer has observed in nearly a year. Therefore, despite how good this observed IDTT was, this will remain open for one more audit period to ensure sustained improvement and if it is observed at that time that IDTTs continue to be adequate, this will be closed out.

## Suicide Watch and Suicide Precaution

On the day of this site review, there were 16 patients in the MHCB; 13 of whom were on Suicide Precautions (Q11-Q15 checks). The remaining three patients were on suicide watch (1:1 direct observation). All 16 cells had issue and observation orders posted on the door. This reviewer observed one nursing staff member conduct Suicide Precaution rounds on six patients and she did so appropriately. In each case, she established visual contact with the patient and documented in real time in CERNER. It was also observed that the three patients on suicide watch were being directly observed.

A review of the Mental Health Observation report for February 2023, indicates that rounds for suicide watch were completed timely at 93.6% and timely for suicide precautions at 98.5%. Additionally, checks were staggered 99% of the time. All available data suggests that SATF continues to reliably complete suicide watch and suicide precaution rounds timely and, in the case of suicide precautions, in a staggered fashion.

## Observation and Issue Orders – Hayes Item 3

The charts were reviewed for six patients who completed a MHCB stay at SATF for DTS during Q4 2022 to ensure that orders for issue and observation were present in the charts, and that a clinical note justifying partial issue was present when indicated. These patients accounted for 14 total patient days and a note justifying partial issue was present in only 1 (7%) of those patient days. Additionally, orders were missing altogether on two patient days. Finally, there was one patient day in which there was an order for full-issue, but the observation order was for Suicide Watch (constant observation). Given that a clinical justification note was absent for that day, this inconsistency was not explained.

Despite these deficiencies, there is some indication that the institution has made improvements in this area since Q4 2022. All four of the charts for the patients who attended IDTT on the day of this site review, were also reviewed and in all four of those cases, issue and observation orders

were present. At the time of this review, the institution was in the beginning phases of a staffing transition that would allow the MHCB supervisor to focus their efforts exclusively on the MHCB rather than performing two different job functions as they previously had. Given this, as well as the noted progress seen in the charts that were viewed for current patients, this will not result in a CAP at this time. This remains problematic for the second consecutive site-review and unfortunately, training was not delivered. The Statewide Suicide Prevention and Response Coordinator assigned to Region 3 will conduct a training, as well as a mid-audit cycle review and if improvements are not noted to be sustained at that time, a CAP will be generated at the next site review.

## Timelines for Suicide Risk Assessments

A review of the performance report for last quarter (October-December 2022), indicates that SATF completed Suicide Risk Evaluations timely 95% of the time overall.

**10.3 Suicide Risk Evaluation**



With regards to the confidentiality of these contacts, 302 of 322 were completed in a confidential setting for an overall compliance rate of 93.7% Of the 20 suicide risk evaluations that were not completed in a confidential setting, it was the result of the patient's refusal 9 times. In three other cases, reasons included lack of available space, modified program, and public health related restrictions (one case each) for a total of 12 (60%) instances in which a confidential contact was not provided, but the reason was outside of the control of the clinician. Given historical patterns at SATF of patients not being offered confidential contacts, a random sample of two of the remaining eight charts were reviewed to determine if justification for a non-confidential contact was documented in the notes and in neither case was it. In light of SATF's significant and ongoing staffing shortage however, the consistently high rate of contacts being offered in a confidential setting is acceptable.

## Privileges – Hayes Item 14

During the most recent site review by Lindsay Hayes, the proper provision of privileges to patients in the MHCB was noted as a concern. Specifically, MHCB patients were denied access to yard because of the absence of a functional yard camera. While the institution has conceded that a new camera has not been installed and that there is no intention to do so, yard privileges are now offered nonetheless. This reviewer audited 114s for 14 of the 16 patients who were in the MHCB on the day of this review. There were three patients who were not clinically approved for yard and none of those three charts contained a note justifying the restriction. For the remaining 10 patients, 114s indicated that yard privileges had been offered to 8 of them (80%). This suggests significant improvement in this area since the most recent Lindsay Hayes review.

In light of the recent procedural changes that have been made, as well as the observed improvements, it is recommended that this CAP be closed out at this time. However, a new recommendation will be generated in light of the absence of notes clinically justifying restrictions.

Despite the significant improvement noted in the offering of yard privileges however, there remain some concerns regarding the provision of privileges to MHCB patients. The aforementioned audit of 114s indicates that of 12 patients who were approved for dayroom, only 4 of them (33%) had been offered dayroom and of the 12 patients who were approved for phone calls, only 6 of them (50%) had been so offered. This list of patients who were not offered these privileges despite clinical approval, has been provided to institutional leadership and it is recommended that they review this list to determine that these patients were offered privileges in accordance with their custodial status.

## Clinical Discharge Follow-Ups

A review of the performance report indicates that clinical discharge follow-ups were completed timely 94% of the time during the fourth quarter of 2022.



**20.1 Timely Clinical Discharge follow-ups**

**94%**
**(750)**

Historical concerns were noted concerning clinical discharge follow-ups. Specifically, during the most recent Lindsay Hayes review, it was noted that the custody portion of these checks were not reliably discontinued by a mental health clinician. Prior audits by this reviewer, have noted that clinical discharge follow-up power forms were not reliably completed in a way in which it could be determined whether the checks were completed by a mental health clinician or a PT. Although it was suggested as part of the Q3 2022 report that issue be reviewed during the October 2022 SPRFIT meeting, minutes from that meeting do not indicate that it was. A random sample of 16 charts were reviewed for patients for whom 5 days of clinical discharge follow-ups were completed. There was no indication that the custody portion of those checks were discontinued by a PT in any case and each patient was seen by a mental health clinician within the first three days, meaning that a system was in place to ensure that the custody portion of the discharge checks were discontinued by the correct discipline. However, in 7 of those 16 cases (43.75%), the documentation did not suggest that the checks were discontinued by a mental health clinician. It is imperative that mental health clinicians at SATF be reminded, once again, to ensure that this documentation occurs consistently and reliably, as it serves as the source of proof that the policy was properly followed.

## Alternative Housing – Hayes Item 5

SATF's LOP 464, Alternative/Temporary Housing outlines SATF's Alternative Housing process and was revised in October 2022. This LOP is in alignment with the statewide policy. It lists the prioritization of housing locations as follows:

1. Correctional Treatment Center (CTC) licensed medical beds
   a. Prior to housing a patient in a CTC licensed medical bed, staff shall ensure the following:
   b. Prior to housing a patient in a CTC licensed medical bed staff must obtain approval from HCPOP.
   c. Prior to admitting a patient to a CTC licensed medical bed staff shall obtain admitting orders from a physician.
   d. CTC licensed medical beds do not have the same design as designated MHCB rooms. CTC licensed medical beds have not been retrofitted for optimal patient safety e.g. reduced anchor points around light fixtures and air vents, non-operational electrical outlets, high visibility.
   e. Use of licensed medical CTC beds for MHCB overflow shall be considered alternative housing; however, because CTC is a licensed setting, all patients placed in CTC pending transfer to a designated MHCB must be provided inpatient level of seNices in accordance with California Code of Regulations, Title 22. Patients shall not be placed in the CTC beds for mental health issues unless a referral to the MHCB has been made. The alternative housing requirements as set forth in this policy shall be followed when patients are placed into these beds.
2. Holding cells with access to water/toilets including, but not limited to, "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.
   a. SATF CTC Specialty Area Holding Cell 114 (water and toilet). **Except for those patients who are on Administrative Segregation Status.**
   b. SATF CTC Specialty Area Holding Cell 115 (water and toilet). **Except for those patients who are on Administrative Segregation Status.**
- If the need for ATH exceeds available space in CTC, reference section IV.E. within this OP.
3. Holding cells without toilets
4. Triage and Treatment Area (TTA) or other clinic exam room
5. Other unit-housing where complete and constant visibility can be maintained

When the necessity for ATH exceeds the available areas designated in the CTC, the following

areas shall be utilized according to the patient's classifications needs:

1. Patients, who are on Administrative Segregation status shall be placed **in** STRH cells 110 and 111.

2. Should overflow be necessary**,** Facility "E-1" shall be utilized for all patients requiring ATH. If vacant cells are available, Facility E Building 1 cells 126, 127, 128, 129, 130, 131, 132 and 133 shall be used and authorized to house patients from all facilities.

3. Facility "C" shall be utilized for all General Populations patients requiring ATH. If vacant cells are available, Facility C, Building 3, A, or C Section, shall be primarily utilized and authorized to house patients from Facilities B and C.

4. The Facility Captain shall be responsible for providing alternative activities for non-ATH inmates who are housed in units that are being utilized for ATH (e.g., dayroom in adjoining section or yard). Movement surrounding ATH areas shall be controlled.

    a.    Facility C - The cells used specifically for ATH are:

- C3 - 124
- C3-125

    b.    Cells 124 and 125 shall be available 7 days a week, 24 hours a day. Permission to use these cells for ATH is granted by a Health Care Manager (Health Care Captain or Health Care Associate Warden) during regular business hours. The Administrative Officer of the Day (AOO) shall grant permission to use these cells during non-business hours.

    a.    Facility D - The cells used specifically for ATH are:

- 03 -114
- 03 - 115
- O3-116
- D3 - 117

Cells 116 and 117 shall be available 7 days a week, 24 hours a day. Permission to use these cells for ATH is granted by a Health Care Manager during regular business hours. The AOD shall grant permission to use these cells during non-business hours.

The LOP is also consistent with statewide policy in that it requires patients to be provided with an "EZ Bed" ("stack-a-bunk") and a mattress in cells that do not already have beds. During this site review however, two patients were observed to be on suicide watch in cells 114 and 115 in the Specialty Holding Area, neither of which has a bunk, and although both had a mattress, neither patient had a stack-a-bunk. This concern has been noted historically and was rectified by ensuring that there were at least two stack-a-bunks in a nearby clean utilities room and that staff had access to a key. Additional bunks were stored in a storage shed outside of the CTC area. During this site review however, only one stack-a-bunk was in the clean utilities closet, despite the fact that neither patient on suicide watch had one. Access to the aforementioned storage shed was difficult to obtain and once it was, it was found that another stack-a-bunk was in the but rather than being easily accessible, it was in the back of the storage shed and hidden behind and below several other items. It is recommended that the institution evaluate this situation to determine the extent of it and reach a resolution. Also reviewed were the alternative housing cells at E-1. Consistent with prior reviews, these cells meet policy requirements and a supply of safety mattresses were readily available.

A sample of 10 charts were selected for audit. These were the charts of patients who were referred to the MHCB for DTS during quarter 4 of 2022, but rescinded before physical placement into a MHCB. After reviewing only four the audit was discontinued, as it was noted that in all four cases, SPI was not completed. This was the case even when acute risk was assessed as moderate. One clinician was responsible for four of those cases. Mental health leadership was notified and a CAP will not be necessary at this time, given that the new safety planning training has been rolled out and it includes reiteration of the policy requirement to complete a safety plan in such situations.

A review of the performance report, indicates that the institution was in compliance with suicide risk evaluations at the time of MHCB referral rescission at 93% for quarter 4 2022.

## Suicide Risk Management Program (SRMP)

SATF's LOP 230 *Suicide Risk Management Program (SRMP),* continues to be the LOP that addresses SRMP. It was most recently revised in September 2022 and is consistent with statewide policy. At the time of this site review, there were 29 patients enrolled in the SRMP program at SATF and 6 who met an objective criteria but were not enrolled. Of the six who were not enrolled, four had been flagged as having met criteria since their last IDTT and were not yet due to attend IDTT. For the remaining two patients, the last IDTT was not done at SATF in one case and in the other the Master Treatment Plan did not reflect justification for non-enrollment. In light of only one violation, SATF seems to have an efficient system for tracking SRMP patients and ensuring timely enrollment.

With regards to the quality of treatment plans for those patients enrolled in the program however, SATF continues to struggle. Of the 29 charts, 7 were chosen randomly for audit. The initial IDTT was not completed at SATF for three of those cases and two others had their initial IDTT as SATF but had not yet had a follow-up IDTT. The results are summarized in the below chart:

|  | Measurable treatment goals documented | Interventions documented |
|---|---|---|
| Initial enrollment IDTT MTP | 0/4 | 1/4 |
| Follow UP IDTT MTP | 0/5 | 0/5 |

A review of the February 2023 SPRFIT meeting minutes reveals that SRMP was discussed. Specifically, the discussion involved the number of patients enrolled and the number who met criteria but were not enrolled and not a qualitative discussion about treatment plan quality. Given this deficiency, a CAP will be generated.

## Discharge Custody Checks – Hayes Items 7 and 11

Discharge Custody Checks (7497s) have traditionally been an area of deficiency for SATF. An action plan was created in the October SPRFIT meeting and carried over into following meetings. The minutes from November and December reflect that training would be forthcoming. In the interim, 7497 compliance in the fourth quarter of 2022 continued to be poor as illustrated below:

| Month | Overall compliance |
|---|---|
| October | 69.6% |
| November | 75% |
| December | 69.4% |
| January | 77.55% |
| February | 93.9% |

A full audit quarter was not yet completed by the time of this site review, however uploaded the first two months of 7497s to the SharePoint site and significant improvement was noted. The institution had finalized OP 307 *Mental Health and Custody Welfare Check Procedures* in January 2023 and the procedures delineated therein, may have resulted in these improvements. Overall compliance had improved to 77.5% in January and 93.9% by February. In February, the domains that had historically suppressed overall compliance (30 minute checks and supervisory reviews), were over 90% compliant. Despite the improved overall compliance, it has not yet demonstrated sustainability and will be monitored for two more

quarters at least. If six months worth of compliance is demonstrated, this will be considered resolved.

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer attended the SPRFIT subcommittee meeting on October 12, 2022, prior to the official roll-out of SPRFIT reboot for phase 2 institutions, of which SATF is one. That meeting did not meet quorum, as the Healthcare AW or designee was not present. The meeting commenced anyway with the approval of minutes tabled. It was otherwise a fair meeting in which interdisciplinary participation. A review of the self-harm report indicates that there were not any events of serious self-injury from September 1 to December 31, so there were no clinical summaries indicated. Suicide prevention practices, including self harm data, five-day follow ups, discharge custody checks, and alternative housing were reflected in the minutes each month. Absent each month, was a discussion of suicide prevention related training compliance.

As a phase 2 institution, it was anticipated that improvement with the quality of SPRFIT subcommittee minutes would be noted after training occurred so therefore, a review of January and February 2023 minutes was also conducted as part of this review. Some slight improvement was noted, as January minutes reflected that suicide prevention IST compliance and safety planning compliance were discussed. This was also noted in February with safety planning training being noted as on hold as the new safety planning process rolls out.

## Inmate Family Council and Inmate Advisory Council

A six-month review of SPRFIT committee minutes (September through February) did not discover documentation of the SPRFIT coordinator having attended Inmate Family Council (IFC) or Inmate Advisory Council (IAC). It is recommended that the SPRFIT coordinator begin attending these meetings every six months.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the fourth quarter of 2022, SATF was in compliance with the completion of emergency suicide risk evaluations in cases of Danger to Self (DTS) at 98%. Additionally, all DTS cases during the quarter were appropriately triaged as emergent referrals.

| | | | |
|---|---|---|---|
| SRE after Em.Consult (except PIP) for Suicidality | 92 | 2.1 | 98% |

The month-by-month breakdown for the quarter is as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| October | 89% | 100% |
| November | 100% | 100% |
| December | 100% | 100% |

There were an unusually low number of emergency DTS cases during the month of October (19), which was nearly 50% lower than in each of the other months of the quarter and therefore, the two non-compliant cases significantly decreased compliance for the month. One of the two non-compliant cases in question was flagged as the result of the incorrect order being used. In the other case, the patient was seen timely and the documentation accompanying SRASHE was completed late. As such, neither non-compliant case was an error that had patient care impact. Finally, a random sample of eight urgent mental health PC orders from the fourth quarter of 2023 were selected and the associated charts were reviewed to ensure that the order was appropriately triaged as urgent instead of emergent for DTS. Only one case contained information that suggested that the order should have been an emergent order for DTS instead of an urgent order and in that case, the patient was still seen within emergent timeframes and a SRASHE was completed.

## Suicide Risk Evaluations – Hayes Item 13

Overall, suicide risk evaluations were in compliance at 95% for the fourth quarter of 2022. Compliance for evaluations completed at the time of admission to a MHCB was 99%, and for rescinded MHCB referrals it was 93%. The institution fell below compliance however (81%), with the completion of suicide risk evaluations at MHCB discharge. There were a total of eight non-compliant cases and after reviewing a random sample of three of those, it was discovered that two were discharged to a PIP, while one was sent to an EOP program. A sample of three other discharge SRASHEs were audited and qualitatively, none of the three adequately justified clinical discharge. A safety plan was completed in all three cases. SATF regularly monitors SRASHE compliance and reports on overall compliance monthly in SPRFIT subcommittee. The fourth quarter compliance was impacted by non-compliance in November and a review of the SPRFIT committee minutes, indicates that only overall compliance was reported. It is recommended that individual domains of compliance be discussed in the event that they are below 90% compliance.

## Emergency Response

### Cut-Down Kits – Hayes Item 15

Cut-down kits were not audited during this site review, but will be so audited during the quarter 2 visit conducted by the regional mental health compliance lieutenants and that data will be incorporated into the quarter 2 report.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

The following five QIPs from the suicide in 2021 remain in a status of ongoing monitoring as of the time of this review.

1) **Problem:** There is a concerning pattern in this case of mental health providers documenting that interventions would be offered to this patient which weren't ultimately provided. As indicated in the body of this report, the patient was seen for an MHPC routine contact on September 8, 2020 and the clinician specifically documented that the patient would be offered bi-weekly sessions after that. The patient was not offered bi-weekly sessions. On September 17, 2021, a different clinician documented that the safety plan would be reviewed and updated during the week and it was not.
   **QIP: The CMH or designee at SATF** shall 1) initiate an inquiry to determine the reasons for lack of appropriate clinical follow-up and interventions which had been documented would occur in both instances; 2) based on the results of the inquiry, the CMH shall determine the best course of action. At minimum, all clinical staff shall be instructed of the necessity to follow through on documented clinical recommendations, or clearly notate why said recommendations did not occur. **Status as of Q2:** In February 2022, SATF delivered a training on the need to provide contacts as clinically indicated. This training included instruction on the logistical and technical aspects of how to place orders that ensure these contacts. SATF is experiencing significant staffing shortages as of the day of this site visit, but it was recommended that this training be provided to all new clinicians upon hire. **Status as of Q1 2023**: This remains unchanged. There has been only one new hire since the last audit period. Staff meetings occur with clinicians monthly. Program supervisors will track the need for this training ongoingly and will provide this training when there are new staff and as an occasional refresher.

2) **Problem:** During an MHPC routine contact on September 8, 2020, the clinician indicated that Inmate Murieta continued to function well and was denying symptoms, including any thoughts of self-harm, but documented that Inmate Murieta would be offered contacts bi-weekly. However, Inmate Murieta was not seen for another PC contact until January 19, 2021, which was outside of Program Guide timeframes. According to the closed appointments report, there were a total of four MHPC contacts that were scheduled but canceled for reasons that are not clear in the mental health documentation, between the dates of September 8, 2020 and January 19, 2021.

**QIP: The CMH or designee at SATF** shall 1) review the identified concern; 2) review six months of compliance reports to determine if this is an isolated incident or part of an ongoing pattern; 3) based on results of the review, the CMH shall determine the best course of action, which may include additional training. **Status as of Q2:** As indicated in QIP above, SATF delivered a training on the need to provide contacts as clinically indicated. This training included instruction on the logistical and technical aspects of how to place orders that ensure these contacts. SATF is experiencing significant staffing shortages as of the day of this site visit, but it was recommended that this training be provided to all new clinicians upon hire. Additionally, no systemic concerns were noted in the review of six months of compliance reports. **Status as of Q3 2022**: Similar to the above, this training has not been delivered to new hires as there have not been any. This will remain in monitoring status. **Status as of Q1 2023:** As indicated above, this remains problematic largely because of staffing issues. Trainings will continue to be delivered in staff meetings to ensure that there is an ongoing understanding of the requirements related to PC contacts. However, compliance with timely PC contacts for the past six months was very poor (38%) and it is unlikely that this can be reasonably rectified given the present staffing concerns. Considered qualitatively, this 38% represents all levels of care housed at SATF and when only the highest risk outpatients housed at the institution (ML EOP and STRH) are considered, compliance with PC contacts is 70%. This indicates that the majority of non-compliance is driven by non-compliant contacts with the lowest risk outpatients housed at SATF (ML CCCMS). In summary, SATF is making a concerted effort to triage and prioritize contacts in terms of clinical need, given that full compliance with program guide mandated timeframes is not a reasonable expectation at this point.

3) **Problem:** There is a note in the chart reflecting a clinical contact for the inmate on the date of his death, November 24, 2021. However, this note raises several concerns. Specifically, the note says "patient seen in housing unit due to staff shortage by supervisor's direct order. No issues of clinical concern noted. Check in and out times are not accurate due to supervisor directive." Additionally, when interviewed, the clinician who wrote the note stated that he did not engage verbally with the patient that day and did not offer him a confidential contact. Although the note is timestamped at 0925, the patient was checked in for his appointment at 1400. Upon interviewing this clinician, he stated that he did not recall seeing the inmate that day and did not actually offer him a clinical contact, as he was under the impression he was directed not to do so.

**QIP:** Before completion of this report, **the CEO and CMH at SATF** proactively addressed this concern. This clinician has been removed from direct patient care, referred for peer review, and a CDCR 989 Request for Investigation was initiated. Additionally, memorandums have been issued by mental health leadership at the institution, clarifying the expectation to offer all patients confidential out-of-cell contacts, and all clinical notes must include a full mental status exam. Following completion of any investigation or direct action, the CEO, CMH or designee shall determine if any additional actions and/or

training shall be required. **Status of Q2:** On December 6, 2021, the supervisor of the STRH provided a written reminder to the staff under his supervision that states as follows: 1. Patients must be offered a confidential setting for their 1:1 MHPC contact; 2. Case notes must be completed on the same day as the clinical encounter – and must include documentation that the patient was offered a confidential setting for their MHPC contact and, if the patient refused to be seen in a confidential setting, that he was seen at cell front; and 3. Patients must be checked in/out for the timeframe that the patient was actually seen and on the same day as the clinical encounter. It is recommended that all future hires, be provided the same information in writing. Additionally, a closed appointments report from May 2022, indicates that there were 354 routine MHPC contacts completed at SATF, across all housing units and levels of care and only 38 of them (11%) were completed cell-front. However, only 12 of those 38 (31%) were seen cell-front because of refusal. While other cell-front contacts were for reasons such as modified program, lack of an escort, or lack of available treatment space, 19 (50%) were closed out as "cell-front standard." All of these patients were at the CCCMS or GP levels of care. Program supervisors should conduct monthly audits in which a small sample (for example five) of the associated progress notes for these cell-front contacts are reviewed to ensure a justified reason for not offering a non-confidential contact. It was recommended that this data be reported at MHSC monthly, but the institution will determine the best forum for this presentation. **Status as of Q3 2022**: Progress on this has not been noted. During the month of August, there were 371 primary clinician contacts at SATF that occurred cell-front. Of these 371 contacts, 65 (17.5%) were closed out as having been completed cell-front due to modified program, and 98 (26.4%) were closed out as being completed cell-front due to inmate refusal. Unfortunately, 205 (55%) of the appointments were closed out as "cell-front standard." Also, the institution has not indicated that they have developed a system for tracking this or a forum for reporting it. When queried, the CMH attributed this ongoing deficiency to a staffing shortage which while accurate (at the time of this report SATF has a 62% combined vacancy rate for psychologists and social workers) would not explain failure to offer contacts confidentially unless the number of contacts per clinician per day is increased. Given that a nexus between failure to offer a patient a confidential contact and a suicide was discovered, the practice of increasing the number of contacts per clinician per day at the sacrifice of providing confidential contacts was previously recommended against. This will remain in monitoring status. **Status of Q1 2023:** Staffing continues to be problematic at SATF. The current expectation is that clinicians will have contact with 8-12 patients per day, thus allowing for more qualitative contact in confidential settings. There were 7,416 MHPC contacts completed in SATF during the fourth quarter of 2022, 5131 (69%) of which were completed in a confidential setting. Of the non-confidential contacts, the modal reasons combined were "standard" and "planned," for 1,136 cases (50% of the non-confidential contacts) while refusals on the part of the patient (666), medical restrictions, and modified program combined accounted for approximately the other 50%. In summary, although most of the MHPC contacts that are offered at SATF are being conducted in a

confidential setting, in approximately half of those cases in which they are not, the patient was not offered an opportunity for a confidential contact. As such, monitoring of this QIP will continue.

4) **Problem:** During the onsite portion of this review, two different clinicians working in the STRH reported they were often directed by a supervisor not to offer out-of-cell contacts, but rather to see inmate-patients at cell front only.

   **QIP: The CMH at SATF** proactively addressed this concern prior to this report. Memorandums have been issued by MH leadership at the institution, clarifying the expectation to offer all inmate-patients confidential out-of-cell contacts, and all clinical notes must include a full mental status exam. The CMH shall further determine if any additional actions and/or training shall be required. **Current status:** As indicated with QIP 4 above, Program supervisors should conduct monthly audits in which a small sample (for example five) of the associated progress notes for these cell-front contacts are reviewed to ensure a justified reason for not offering a non-confidential contact. It was recommended that this data be reported at MHSC monthly, but the institution will determine the best forum for this presentation. **Status as of Q1 2023**: See language for Status as of Q1 2023 for QIP 4 above.

5) **Problem:** Psychiatry-The psychiatric nurse practitioner (PNP) clinical note on September 28, 2021 includes a written plan to see the patient again in four weeks (four weeks from the September 28th appointment). Review of the electronic medical record did not reveal a scheduling order for a four-week appointment with PNP/psychiatrist and did not reveal a PNP or psychiatry clinical contact four weeks following the September 28th appointment, as was planned in the September 28, 2021 note.

   **QIP: CEO and Chief Psychiatrist at SATF** will investigate and identify any individual or procedural elements/failures that contributed to this omission and enact strategies to prevent reoccurrence. Status as of Q3 2022: The Chief Psychiatrist has submitted a memorandum of instruction to all psychiatrists, indicating that STRH contacts are to be done more frequently than program guide mandates, specifically every 30 days. Future hire psychiatrists will be provided with the same training during onboarding. **Status as of Q1 2023:** There have been no new psychiatrists hired at SATF since the last site review so no new training has been delivered.

## QIPs from the July 28, 2022 suicide

Since the last site review, the institution has provided its QIP responses. The results and follow-up recommendations are summarized below.

1) **Problem:** The inmate had a contact with his primary clinician on November 17, 2021 and subsequently was not assessed by a clinician again prior to his death. It is unclear why

Inmate Ramirez was not provided another opportunity for a confidential session, which may have provided additional opportunities for mental health and suicide risk assessments prior to his death. **QIP**: **The SATF-CSP CMH** shall conduct an inquiry into why Inmate Ramirez was not seen for approximately eight months by a CCCMS PC and implement a solution that will prevent reoccurrence of this concern. **Required supporting documents**: SATF-CSP Chief of Mental Health, will outline, in a memorandum, findings of the review and any remedies undertaken.  If remedies included training or instruction, a Form 844 (Sign-In Sheet) will also please be submitted with the memorandum. **Status as of Q1 2023:** After reviewing this issue, mental health leadership at SATF established that the root cause is the lack of staffing. As indicated above, significant staffing shortages make full resolution of this problem unlikely, however the institution is appropriately prioritizing contacts for higher risk patients.

2) **Problem** The treatment plan dated May 25, 2022 had an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding the inmate's functioning and presentation during the review period. More specifically, current information found in other clinical documentation, including but not limited to: frequency/severity of auditory hallucinations, coping tools utilized, programming on the yard, psychiatric medication refusals, sleep disturbance, low energy, and compliance/ participation in the MAT program. Additionally, the transfer/discharge planning section did not have any meaningful clinical information, therefore, there was an absence of justification for the level of care. Per MHSDS Program Guide, 2009 Revision (12-7-12) "*The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care*." **QIP: The SATF-CSP CMH and/or designee** shall audit documentation for five additional inmate-patients for the identified clinician within the past 6 months (to include progress notes and treatment plans). Based on results of this audit, the CMH shall determine the best course of action. At minimum, the clinician shall be re-trained on the importance of regularly updating treatment plans in correspondence with Program Guide requirements. **Required supporting documents**: Please provide a memorandum detailing the results of this audit (including dates and CDCR numbers of charts reviewed), and all actions taken to address this QIP.  Please include all training materials and 844s. **Status as of Q1 2023**: SATF has completed the above-referenced audit and the results indicated that the responsible clinician had demonstrated a pattern of failure to thoroughly document treatment progress and current presentation. As an intervention, the identified clinician received "documentation training" from their supervisor on October 19, 2022. Additionally, the identified clinician was to be scheduled for the 7-hour SRASHE core competency training the next time it was offered at SATF and the identified clinician's documentation would continue to be audited quarterly. As of the date of the site visit, the identified clinician had not yet been re-enrolled in the SRASHE core competency training and the quarterly audits, last completed in October, were overdue. Mental Health leadership was notified

about this on the day of the site review. This will continue to be monitored and will be closed out once the clinician has completed the training and two consecutive audit periods indicate improvement.

3) **Problem:** Psychiatry clinical note authored on February 10, 2022 referenced "Follow up with psychiatry in 90 days …". The psychiatrist entered scheduling order for " MH ML CCCMS Routine MHMD Contact … once every 90 days for one year" on February 10th. Review of the chart reveals no scheduled appointment 90 days after the order was placed on February 10th. **QIP: SATF-CSP CEO and/or CMH** will research this scheduling omission to discover specifics and will consider implementation of strategies to prevent reoccurrence. **Required supporting documents**: CSP-SATF Chief of Mental Health and/or CEO will outline, in a memorandum, findings of the review and any remedies undertaken. If remedies included training or instruction, a Form 844 (Sign-In Sheet) will also please be submitted with the memorandum. **Status as of Q1 2023:** The institutional response has been completed. SATF had proactively addressed this concern by issuing a memorandum to the OSSIIs, reiterating the need to schedule appointments as ordered. SATF should establish a system of monitoring to ensure that appointments are being scheduled as ordered, and delineate this plan at the next quarterly site review.

## Training and Mentoring Compliance

## Clinical Training Compliance

### Mentoring – Hayes Item 18

Mental Health
- Percentage of staff who are mentored as mentees under the old and/or new programs=27/41 (65.85%)
- Percentage of those who are trained as mentors under the new training program=12/12 (100%)

### Annual IST Suicide Prevention Training – Observation

This class was not observed as part of this site review.

### Annual IST Suicide Prevention Training Compliance – For calendar year 2022

Custody=99%
Medical=87%
Mental Health=97%

### Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training –

Mental Health=29/45 (65.9%)

*Safety Planning Training – Hayes Item 18*

Mental Health

- Under SPI=49/51 (96%)

The statewide rollout of the new safety planning training was still in progress as of the time of this review.

*Suicide Risk Management Program Training*

Mental Health=45/47 (95.74%)

*Columbia-Suicide Severity Rating Scale Training*

Mental Health=31/35 (88.57%)

## Receiving and Release (R&R) Screening – Hayes Item 1

There were not any new arrivals received at SATF during this site review. The physical layout of the area was inspected and it remains conducive to the process. Confidentiality is afforded the patient and the patient is placed in a therapeutic module, thereby ensuring the safety of the nurse. Suicide prevention posters, in both English and Spanish, are visible to the patient in the room in which the screening is conducted.

## Crisis Intervention Team (CIT)

SATF's LOP 484 *Crisis Intervention Team* discusses the institution's CIT process. It was modified in November 2022 and now aligns with statewide policy, as the institution has made the revisions that were recommended during the quarter 3 2022 site review. Although the CIT report suggests that only 13% of the CIT calls during the fourth quarter of 2022 had the complete composition of the team, this is likely to be the result of patients who were placed in alternative housing on suicide watch after hours without a face-to-face contact, being inadvertently counted as CIT events. Actual CIT contacts seemed to contain the correct composition of the team 100% of the time. Additionally, nursing documentation was present 100% of the time. During the fourth quarter, 68% of the CIT calls were related to DTS and 44% of the calls, resulted in the patient being returned to housing.

During this onsite review, one CIT call was observed. It was for a patient in the STRH who was endorsing suicidal ideation. The team had offered the patient a confidential contact in an office within the housing unit, however the patient refused that offer. Consequently, the contact was conducted under less-than-ideal conditions in a medical clinic behind the STRH. The patient was also minimally engaged, which further created a challenge for the team. The team consulted before the contact and collaborated during it. The sergeant, psychiatric technician, and psychologist, all interacted with the patient and offered insight. The disposition following the

contact was a MHCB admission. A review of the associated SRASHE was somewhat concerning, as the mental status indicators that were observed by this reviewer during the contact, were not consistent with what was documented in the SRASHE. The specifics of this concern were shared with the mental health leadership.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

The following is a summary of the progress achieved by the institution since the last site review.

| Specific deficiency language | Original CAP | Joint or Hayes CAP only? | Summary of status as of Q1 2023 review |
|---|---|---|---|
| 1. The rounds were inconsistent and the PT, although entering the Psych Tech Daily Rounds information into EHRS for each caseload inmate, was not always inquiring about SI (pg 198). | This problem was not noted during the most recent site review by regional. Institution will monitor and report compliance at MHSC and regional SPRFIT will review again in September. | Hayes only | Close |
| 2. Upon inspection, all of the new intake cells were full on February 7, but all of the inmates housed in these cells were beyond their initial 72-hour new intake status. There was one new intake inmate confined in a wheelchair who was not housed in either a new intake cell or an ADA compliant cell. In addition, this reviewer was informed that new intake inmates who could not be housed in new intake cells within the STRH unit were transferred to the administrative segregation "overflow" cells located in E-Yard, Building 1. This reviewer subsequently inspected the | The daily morning meeting at STRH will include a discussion of whether or not inmates are properly housed in intake cells. This will include a discussion of overflow cells. Prompts will be added to the sergeant's log book. The institution has completed the retrofitting of designated overflow intake cells and SPRFIT minutes, and regional review, suggest improvement since Mr. Hayes' visit. Additionally, new intake cells have been activated since Mr. Hayes' visit when he observed alternative housing cells. | Joint | Continue monitoring |

| | | | |
|---|---|---|---|
| designated overflow cells in E-1 and found that three new intake inmates were housed in the cells and none of the cells were suicide-resistant. Although the cells had retrofitted ventilation grates, each cell had gaps between the wall and the bunks, horizontal brackets that attached the stools to the walls, and gaps between the desktops and the walls. Finally, this reviewer determined that the STRH unit had a capacity for approximately 200 inmates and housed 105 inmates on February 7. There were 56 empty single cells. The very problematic practice of housing new intake inmates in non-new intake cells, which was also found during this reviewer's previous assessment in January 2019, could have been easily corrected if the ten non-72-hour inmates housed in the STRH's new intake cells were properly housed in one of the 56 non-occupied single cells. Of note, several inmates in both the STRH and E-1 units complained that they had not received any entertainment devices (i.e., radios or tablets) (pg 198). | | | |
| 3. Similar to the previous assessment, this reviewer was initially provided data indicating that two TTA examination rooms (No. 166 and No. 167) in the CTC were also utilized for alternative | Inmates are not being housed in TTA cells for ATH. They are housed in safety cells. ATH policy is in the process of being updated as well. | Hayes only | The policy has been updated and it aligns with statewide policy, however deficient practices were noted during this review. Continue monitoring. |

| | | | |
|---|---|---|---|
| housing. These rooms had been identified by this reviewer in the 2016 assessment as extremely problematic because inmates were being shackled to hospital beds in these rooms while on alternative housing status. Upon closer examination, this reviewer was again able to verify that although clinical assessments could occasionally occur in these TTA exam rooms, inmates were actually housed in the CTC holding cells. This reviewer would again strongly recommend to CSATF leadership that these TTA exam rooms not be listed in the "Location and Cell Type" column of alternative housing data reports. In fact, the current CSATF policy on alternative housing (OP-464) entitled "Alternative/ Temporary Housing," dated June 2021, incorrectly states that "Triage and Treatment Area (TTA) or other clinic exam room" could be utilized for housing. Such a policy is flawed and needs to be revised. Although a TTA exam room could be utilized for assessment, it should never be authorized for the housing of inmates on alternative housing status (pg 198-199). | | | |
| 4. A sample EHRS review of 32 emergent/urgent mental health referrals for SI/behavior (in December 2021 and January 2022) found that mental health | This is reviewed monthly in MHSC and due to limited staffing, urgent and emergent consults are prioritized and a more robust sample viewed by | Hayes only | Closed out. |

| | | | |
|---|---|---|---|
| clinicians subsequently completed the required SRASHEs in only 84 percent (27 of 32) of the cases. Most of the deficiencies were noted in urgent referrals (pg 200). | this reviewer found improved compliance. | | |
| 5. The two IDTT meetings involving patients being discharged from the MHCB were particularly problematic. There were uneven case presentations, inadequate discussion regarding suicide risk, and no discussion regarding safety planning. In fact, both patients had the same clinician and the clinician informed each patient during the meeting that "we will talk later about safety planning." (pg 200) | Staff are to be retrained on the requirement to complete safety planning at all DCs. Additionally, the clinician that was observed during the LH audit was not a regular. | Hayes only. | The IDTT observed during this site review was strong. Monitor for one more audit cycle and if improvement is noted to be sustained, it will be recommended that this be closed out. |
| 7. This reviewer's examination of 114-A forms for all 14 patients in the MHCB unit on February 7 found that none of the patients had documentation of forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/quarantine," or simply "quarantine." The current practice of placing MHCB patients on lockdown status and inappropriately using the term "quarantine" as the rationale for prohibiting all out-of-cell activities (except for showers and IDTT attendance) was | Custody leadership indicated that a schedule has been developed for rotation. The LOP that restricted inmates from yard when refusing blood-pressure. | Joint | Closed after Q3, however new problems have arisen. |

| | | | |
|---|---|---|---|
| very problematic and should be immediately remedied (pg 200-201). | | | |
| 8. Although safety plans were required in 49 cases of patients admitted into the MHCB unit for DTS, the review found that safety plans were completed in only 31 percent (15 of 49) of the cases. Safety plans were not completed in 69 percent of the cases because clinicians incorrectly assumed that such plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide. Such a rationale ignores the fact that MHCB patients should be at low acute risk for suicide when they are discharged from an MHCB. This reviewer's examination of the data found problems in untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that several supervisory reviews were occurring well after the IDTT meetings. In addition, the MHCB supervisory review did not identify the very problematic practice identified above in which MHCB clinicians (and perhaps the MHCB supervisor) incorrectly assumed that safety plans were not required because the patients | Train all clinicians to complete SPI at MHCB discharge, regardless of acute risk level.  The institution has developed a different process for supervisory oversite. There has also been a change of MHCB supervision since this review. | Joint | Deferred until the completion of the new safety planning training. |

| | | | |
|---|---|---|---|
| had been discharged from the MHCB unit at low acute risk for suicide (pg 201-202). | | | |
| 9. This reviewer was presented with documentation of 141 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July 2021 through December 2021. The review found that only 77 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form, as well as discharges occurring on the weekends without a face-to-face assessment by a clinician. The majority of custody checks were recommended for 48 hours. In addition, only 78 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals (pg 202). | This review found 3 separate issues A) forms not being completed by clinicians B) checks not being reliably completed by custody C) checks being discontinued without a face to face assessment | Joint | Steady improvement is noted. Continue monitoring until 6 months of sustained compliance is achieved. |
| 10. In addition, 94 percent of custody staff, 85 percent of medical staff, and 90 percent | While the institution can no longer rectify training numbers from 2021, they | Hayes only | SATF finished calendar year 2022 in compliance with 3 of 4 audited |

| of mental health staff received annual suicide prevention block training during the previous 12 months (pg 203). | are currently on pace to be in compliance for 2022. | | staffing categories (custody and mental health). It is recommended that this be closed out. |
|---|---|---|---|

## Assignment of Corrective Action Plans (CAPs) and Recommendations

**Corrective Action Plans (CAPs) and Recommendations from prior site visits that remain open as of Q1 2023 review:**

**Open Corrective Action Plans (CAPs) generated by this reviewer and Lindsay Hayes:**

1) **Problem:** The institution consistently fails to meet full compliance with intake cell policy at STRH. **CAP:** A) The daily morning meeting at STRH, will include a discussion of whether or not all inmates on intake status are properly housed. This discussion will include the inmates who are physically housed at STRH, as well as those inmates in STRH. If full compliance is not present that day, the discussion will include a plan for ensuring proper housing that day and if necessary, any clinical follow-up that may be required. B) The SPRFIT subcommittee, with collaboration from custody representation, will discuss this specific action item and create its own corrective action plan. **Proof of practice:** A) Documentation in the sergeants log book will now include this specific topic of discussion. B) SPRFIT meeting minutes in April will reflect that this action item has been opened and progress will be documented in said minutes, monthly until resolution. This discussion will include, if necessary, the provision of progressive discipline (sanitized). **Current status:** A) A review of the sergeant's log book indicates that this specific prompt was noted. While it was observed in the morning meeting that this area was discussed, it risks being missed if a non-regular clinician is covering the meeting. Therefore, this part of the CAP will remain open. B) While the meeting minutes in April 2022 reflect acknowledgement of this item, they do not reflect that it has been opened as an action plan. However, meeting minutes in May reflect that this has been addressed. Additionally, improvement was noted at this site visit. **Summary of progress:** Approaching goal. Continue to monitor. This will be closed out if it remains in compliance for one more site visit. Current status: While patients are not being inappropriately removed from intake cells prior to 72-hours, inmates are often being held in intake cells for longer than appropriate. The institution has agreed to supply

written documentation that in these cases, all compaction options had been exhausted. **Status as of Q1 2023:** The requested documentation was not supplied and unfortunately, problematic practices were once again noted. The institution has added a prompt to the morning meeting huddle sheet (Attachment E) to prompt discussion of this in morning meeting. This will remain open.

2) **Problem:** Custody Discharge Checks (7497) are consistently below 90% compliance, primarily as the result of supervisory reviews not being completed. **CAP:** SPRFIT meeting minutes will reflect the specific corrective action, including the provision of progressive discipline (sanitized) if necessary, each month for the prior month's audits. **Proof of practice:** SPRFIT minutes will specifically address this item beginning with the April 2022 meeting. **Status as of Q2:** Not approaching goal. The April 2022 minutes indicate that this area has been discussed, however the institution has not yet demonstrated a streamlined process of insuring that these forms are available for audit. As of this site visit in June, March 7497s still have not yet been uploaded to the SharePoint site. This will remain open. **Status as of Q2 2023**: The institution continues to struggle in this area. It has been added as an action item during the October SPRFIT meeting. **Status as of Q1 2023:** Progress has been noted. The institution has finalized an LOP that delineates the process. Improved compliance has been noted for two consecutive months, including one month of compliance above 90%. This will remain open until this compliance is sustained for six consecutive months.

3) **Problem:** The 24-72 hour custody post-discharge check process is not reliably being completed properly. Specifically, it is no longer acceptable for a PT to discontinue checks via verbal consultation with a mental health clinician. As of October 19, 2021, a mental health clinician must conduct a face to face evaluation in order for this process to be discontinued. **CAP:** Train all clinicians and PTs who complete 5-day follow-ups, on the memorandum entitled *Revision of Mental Health Crisis Bed Discharge Custody Checks Form and Introduction of Audit Requirements: 10/19/21* **Proof of Practice:** Submit signed 844s via the CAP SharePoint site by 4/30/2022. S**tatus as of Q2 review:** This was not completed by 4/30/2022. 844s were signed and submitted by mental health staff after the date of the site review and they still have not been submitted for nursing staff. Additionally, this most recent review has not revealed significant progress in this area. **Status as of Q3 2022 review:** 844s have still not been submitted by nursing and there were five cases in which this violation may possibly have happened during Q2. The details were shared with the institution for follow-up and discussion during October SPRFIT subcommittee.  Summary of progress: Not approaching goal. This will remain open. **Status as of Q1 2023**: This audit revealed that less than half of audited cases, included documentation that the custody post-discharge checks were completed by a mental health clinician. This will remain open ad reviewed again next audit cycle.

4) **Problem**: SPI is not being reliably completed on all patients who are discharged from alternative housing. CAP: Train all MHCB staff that SPI is required regardless of the estimated level of acute risk at the time of discharge. **Proof of practice:** 844s to be submitted to the SharePoint site by July 15, 2022.  Current status: 844s have been

completed and notable improvement has been demonstrated. However, SPI is still not reliably being completed for patients rescinded from ATH if acute risk is low. Institution to retrain all clinical staff who respond to patients on suicide watch in Alternative Housing on the requirement to complete SPI for all patients who were referred to MHCB for DTS, regardless of acute risk level at the time of discharge. For a training resource, refer to slides 31-32 of the 2019 Statewide *Safety Planning* training. **Status as of Q1 2023:** Improvement has not been noted. The statewide safety planning policy has been revised and is now addressed as part of the accompanying training. The training includes reiteration of this requirement. Training has begun for SATF's clinical staff and it is expected that this problem will self-correct with the delivery of the training. This will be deferred at this time.

**Open Corrective Action Plans (CAPs) generated by Lindsay Hayes' most recent site visit.**

5) **Problem:** Patients at the MHCB were not reliably being offered yard. This was attributed to the assumption that a functional yard camera was necessary to facilitate yard. **CAP:** SPRFIT meeting minutes in April will reflect that this action item has been opened and progress will be documented in said minutes, monthly until resolution. This discussion will include, if necessary, the provision of progressive discipline (sanitized). **Current status:** SPRFIT meeting minutes did not begin reflecting this until May and progress towards resolution was vague. Additionally, new boundaries to the offering of yard privileges were identified during this review and will result in a new CAP. **Current status:** Significant improvements were noted. Identified boundaries to offering yard privileges to MHCB patients have been removed and during this site review, all audited 114s showed the offering of yard privileges. This will continue to be monitored. **Status as of Q1 2023:** Deficiencies were once again noted despite the removal of previously identified barriers. This version of the CAP will be closed out and a new one developed (see below).

**Corrective Action Plans (CAPs) generated from prior reviews:**

6) **Problem**: SPI is not being reliably completed on all patients who are discharged from the MHCB. **CAP**: Train all MHCB staff that SPI is required regardless of the estimated level of acute risk at the time of discharge. **Proof of practice:** 844s to be submitted to the SharePoint site by July 15, 2022.  **Current status**: 844s have been completed and notable improvement has been demonstrated. However, SPI is still not reliably being completed for patients rescinded from ATH if acute risk is low. Institution to retrain all clinical staff who respond to patients on suicide watch in Alternative Housing on the requirement to complete SPI for all patients who were referred to MHCB for DTS, regardless of acute risk level at the time of discharge. For a training resource, refer to slides 31-32 of the 2019 Statewide *Safety Planning* training. **Status as of Q1 2023**: A small sample of MHCB discharge SRASHEs were reviewed and all included SPI. As

previously indicated, the new statewide safety planning process has begun and the associated training is expected to improve compliance. This will be deferred at this time.

**New Corrective Action Plans (CAPs) generated as a result of this review:**

7) **Problem:** Measurable treatment goals and interventions are absent from the treatment plans for patients enrolled in the SRMP program. Corrective Action: The institution will determine the best course of corrective action, which may include placing this item on the project pipeline, and present it in the May 2023 SPRFIT subcommittee meeting.

8) **Problem**: Patients in the MHCB are not being reliably offered privileges. **Corrective Action:** The Statewide Suicide Prevention and Response Coordinator assigned to region 3 will provide the institution with a copy of the memorandum *Mental Health Crisis Bed Privileges Revision, February 14, 2017* and it is recommended that the monitoring of this be placed on the project pipeline.

**New recommendations not rising to the level of a CAP:**

It is recommended that the SPRFIT coordinator attend IFC and IAC every six months and that a qualitative discussion of the meeting be presented in the SPRFIT minutes the following month.

**Appendices**

Appendix A: Summary of Lindsay Hayes and joint CAPs

| | Summary of problem identified by Lindsay Hayes | Progress | Follow-up status |
|---|---|---|---|
| 1 | Inconsistent PT rounds | Substantial | Close |
| 2 | Improper use of intake cells | Moderate | Continue monitoring |
| 3 | Alternative Housing practice and LOP | Moderate | Continue monitoring |
| 4 | IDTT quality | Substantial | Continue monitoring |
| 5 | Completion of DC safety plans | Minimal | Deferred |
| 6 | Custody DC checks | Substantial | Continue monitoring |
| 7 | Training compliance | Moderate | Continue monitoring |

Appendix B: Summary of CAPs generated by this reviewer

| | Summary of problem | Progress | Follow-up status |
|---|---|---|---|
| 1 | Completion of DC safety pkans | Minimal | Deferred |
| 2 | SRMP treatment plan goals | New | Begin monitoring |
| 3 | MHCB privileges not being offered | New | Begin monitoring |

Appendix C: SATF's status regarding compliance with outstanding Recommendations in Lindsay Hayes' October 2022 Report

| Aspect of Recommendation that Remains Outstanding | SATF'S status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% |
| No. 10: Auditing SRE quality | Non-compliant | Audits are not being done quarterly |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Non-compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Partially compliant | Safety plans are being competed, supervisory reviews are not. |
| No. 18: Safety planning training | Partially compliant | Training is underway |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Non-compliant | Below 90% |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Non-compliant | Below 90% |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are still not being reliably offered, CQIT is a statewide issue, and SATF does not have a Reception Center |

# MEMORANDUM

Exhibit E

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 05/23/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D. Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CSP-LAC SUICIDE PREVENTION TOUR April-Quarter 2 2023 |

On April 26 and 27, 2023, the Statewide Suicide Prevention Coordinator for Region 3, in conjunction with the Regional Nurse Consultant, conducted an on-site review of the Suicide Prevention measures at California State Prison-Los Angeles County (LAC).

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up. The summary results of this review are as follows:

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 2 |
| Lindsay Hayes CAPs that will be deferred | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 0 |
| Lindsay Hayes CAPs that remain open | 5 |
| CAPs previously generated by this reviewer that remain open | 11 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 2 |

**Total CAPs closed=2**
**Total CAPs that remain open=17**
**Total recommendations that remain open=2**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## I.    Restricted Housing Units (ASU, ASU CCCMS, STRH, LTRH, ASU EOP-hub, PSU, Condemned)

LAC has two Administrative Segregation Units; one Short Term Restricted Housing (STRH) unit and one ASU Enhanced Outpatient (EOP) hub. Both were the subject of this review.

### Short Term Restricted Housing (STRH)

### Second Watch Morning Meeting

The second watch morning meeting was observed. The meeting included the sergeant, a psychologist, a Psychiatric Technician, and the institutional SPRFIT coordinator. The discussion did involve new arrivals, patients on 5-day follow ups, patients on suicide watch, and a discussion of patients who would be released from ASU that day but did not discuss SRMP. This is despite being a regularly assigned clinician to the program. This was relayed to the STRH supervisor during the exit interview who stated this would be addressed.

### Psychiatric Technician (PT) Rounds

Unfortunately, PT rounds at STRH were not observed during this site review because of a miscommunication. There were however, 14 inmates in housing unit A4 who were designated as ASU overflow and the PT was observed conducting rounds there. He did not have a laptop with him and instead, took notes and indicated that he would complete the relevant documentation later. Without the benefit of access to a laptop, the PT did not know which inmates were in the mental health services delivery system and which were not so he asked all of them about suicidal and homicidal thoughts as well as appetite and sleep. The need for more access to laptops was communicated to the Sr. Psychiatric Technician who indicated that he would train the PTs to chit out laptops prior to conducting rounds in ASU overflow.

### Intake Cells

The STRH at LAC has 12 cells (100-111) designated as intake cells. On the day of this site review, all were occupied and all but four had been in the cell for less than 72 hours. Placards on the wall in the sergeant's office indicated that two of those four had refused cell mates, although there was not any other source of information confirming this. The patient who had been in an intake cell the longest had arrived at ASU on April 11 (16 days as of the day of this review). Placards remain problematic at STRH, as some were missing altogether, and others were inaccurate. Steady and continual improvement is noted to continue but an excess of ASU inmates and a shortage of space continues to serve as a barrier to full compliance with this item.

### Entertainment Appliances

Seven patients at STRH were interviewed as part of this review and all seven confirmed that they had been provided with an entertainment appliance, typically a tablet, promptly upon arrival. However, two patients who had been provided with a tablet had reported problems with them. One indicated that he did not have earbuds and another reported that he did not have a charger. This was brought to the attention of custody staff who stated that the patients had to write to

the company that provides the appliance to receive new ear buds or chargers. While both inmates in this particular case have since been provided with their own television, this barrier still presents a problem in situations in which the inmate is on intake status. Given that this process creates a barrier for access to entertainment appliances, especially for inmates who lack the capacity for such self-advocacy, it is recommended that the institution provide inmates with a radio in the meantime when such situations occur.

## Welfare Check Completion (Guard One)

The sergeant provided this reviewer with a guard one report for a random 24-hour period (April 17, 2023 0600 to April 18, 0600) and in that time, there were a total of 5,267 checks required and 5,184 of them were completed timely for an overall compliance of 98%. This demonstrates significant improvement since the last site review. Guard-one checks were not observed as part of this site review but had previously been noted to be unremarkable.

## ASU Screening (Pre-Placement)

There were no ASU pre-placement screens observed as part of this site review, as none were warranted. A review of the performance report for Q1 of 2023, indicates that LAC fell out of compliance at with only 85% completed timely during that period.



**70.3 ASU Pre-Screens**

85%
(306)

Given that this is the first quarter of non-compliance, it need not rise to the level of a CAP at this time. However, LAC should report on this variable regularly in SPRFIT subcommittee according to the requirements of the SPRFIT measurement plan and address barriers accordingly.

## ASU Screening (Post Placement Screen Questionnaire)

There were not any ASU post-placement screens observed as part of this review as none were indicated. A review of the performance report for Q1 of 2023, indicates that compliance for that time period was 86%. Although this represents a decrease in compliance from the prior review period, it remains above the 85% compliance goal. This should be regularly monitored in the SPRFIT subcommittee via the measurement plan to ensure sustained compliance.

### 70.4 ASU GP Screens



## ASU EOP Hub

### Second Watch Morning Meeting

On the day of this site review, the sergeant was having computer problems and as such, the second watch morning meeting occurred in an unusual fashion in that it was held in two separate parts. The first part was observed, and it was attended by the psychologist, the sergeant, and the PT. During it, the clinician had a list of all the patients in the SRMP. New arrivals and 5-day follow ups were discussed but because the sergeant did not have access to a computer, arrival dates and current census were deferred until the second part of the morning meeting. This reviewer interviewed the clinician after that, and she reported that the rest of the required elements were discussed during that time and she explained that she provided the sergeant with the list of patients presently in SRMP and that he reviewed it.

### Psychiatric Technician (PT) Rounds

PT rounds were observed and once again, deemed to be adequate. The regularly assigned PT completed rounds and he seemed to have a rapport with all the patients he saw. He interacted with all of them at cell-front and documented in real-time in CERNER. He appropriately asked about mental health issues, including suicidal and homicidal ideation, as well as sleep and appetite. He had in his possession a supply of blank paper and he provided it to patients upon request. He also took the time to address concerns that patients discussed. One had concerns about his medications and the PT reviewed them in real time and agreed to make a psychiatry referral. Another patient complained of having medical concerns which were immediately addressed by the PT. One other mental health primary clinician routine referral was indicated and the PT placed the order in real time.

### Intake Cells

The ASU EOP housing unit has seven intake cells (122-128) and this remains unchanged from the last site review and overall, improvement was noted in their use. Each cell was occupied, one of which was occupied by a patient on suicide watch. All but one of these intake cells were occupied by an inmate who had arrived to ASU more than 72 hours ago. Additionally, there were not any inmates on intake status who were not housed in intake cells. Another area of improvement since the last review, was that placards were affixed to all the doors. The only exceptions were for the three inmates who had arrived into an intake cell the night before and the custody staff had created the signs and affixed them to the doors within an hour of this reviewer bringing this to the attention of the sergeant. Although the signs included the end date of the 21-day orientation

period rather than the end date of the 72-hour intake period, the fact that they were present and accurate is significant improvement since the last site review.

## Entertainment Appliances

Significant improvement was also noted in entertainment appliance issuance. This reviewer conducted tier walks and interviewed 2 of the patients in intake cells, as well as 9 other randomly selected inmates including 1 who was on 21-day orientation status, for a total of 10. All but two of them (80%) indicated that they had received a radio or tablet timely, including the two inmates who had just arrived the previous night. It is noted that two of those eight complained that the device did not work properly, and both of those inmates had since been issued their own personal televisions. Nevertheless, this still demonstrates significant improvement since the last site review.

## Welfare Check Completion (Guard One)

Upon request, the sergeant provided this reviewer with a guard one report for a random 24-hour period (April 2, 2023, 0600 to April 3, 0600). During that time period there were a total of 1,525 checks that were required and 1,265 were done timely (as defined by no more than 35 minutes elapsing between checks) for an overall compliance rate of 83%. The noted deficiencies are accounted for entirely by one period in which almost all inmates in the housing unit were checked 59 minutes apart and another period in which almost every inmate was checked between 81 and 84 minutes apart. While these misses are significantly outside of the required timeline and numerous in occurrences, the pattern suggests that the failure occurred during one 3-hour period out of the 24 rather than in a scattered fashion that would be suggestive of a systemic problem. Further, prior reviews have suggested that this is a typical strong area for LAC. Given that, this reviewer requested another randomly determined 24-hour period during the quarter (April 17, 2023, 0600 to April 18, 2023 0600) and 100% compliance was demonstrated. It can be concluded that the low compliance on the first review was an isolated incident, so a CAP will not be generated at this time but will be if future deficiencies are noted.

One officer was observed conducting checks and she did so appropriately. She looked into each cell and presumably established visual contact with the inmate in the cell before moving on. This demonstrates improvement since the last site review, however given the small sample of time observed, this will continue to be audited and monitored regularly.

## ASU Screening (Pre-Placement)

No ASU Pre-Placement screens were observed as part of this site review as none occurred. As indicated above (see *STRH* section), the institution had fallen out of compliance with this variable during the first quarter of 2023.

## ASU Screening (Post Placement Screen Questionnaire)

No ASU Post-Placement screens were observed as part of this site review as none occurred. As indicated above (see *STRH* section), the institution was compliant with this variable for the first quarter of calendar year 2023.

## II. Inpatient Units (MHCB and/or PIP)

### Suicide-Resistant Cells

The mental health inpatient cells at LAC had previously been noted as suicide resistant. This is not a concern for the institution.

### Interdisciplinary Treatment Teams (IDTT)

Five IDTTs were observed on the day of this site review, two of which were for patients who were admitted for DTS and one of those was a discharge IDTT. Consistent with previous observations, the IDTT was primarily driven by the psychologist who served as the primary clinician. Other disciplines participated in the process but in most cases, it was with specific prompting. Treatment plan goals and interventions, as well as the patient's diagnosis, were all discussed but the discussion primarily was between the psychologist and the psychiatrist. In one case, the nurse's contribution was helpful, but not relevant to the patient's mental health treatment plan. In the one discharge IDTT, there was not a robust discussion of the patient's treatment plan. Issue and observation was discussed in all five IDTTs and notes were present in the chart in all cases. In the case of the discharge IDTT, there was no indication that the discharge safety plan was reviewed by the supervisor or designee prior to the discharge. It is noted that the MHCB supervisor was on leave during the week of this onsite review, however the institution should develop a system to ensure that the safety plans are being audited regularly regardless.

### Quality of Safety Planning

Based on a review of the performance report, the institution completed 31 safety plan quality audits in the first quarter of 2023. Although none (0%) were determined to meet audit criteria, the fact that the institution is now completing these is demonstrating improvement.

### Suicide Watch and Suicide Precaution

On the day of this on-site review there was one patient on suicide watch and one on suicide precaution status at the MHCB. The patient on suicide watch was observed to be under continuous observation and it was observed that the nursing staff member checked on the patient on suicide precaution status appropriately. It should be noted that while the visual check was done according to the timeframe prescribed in a suicide precaution order (Q11-15 minutes), charting was not done in real time. Rather, the nurse returned to a workstation to complete charting and when queried about this, he stated that the computer he was using must remain constantly plugged in so as not to die. LAC historically has struggled with adequate access to computers for nursing staff and this may be a product of that.

This reviewer interviewed at cell-front, four of the nine patients who were on Q30 observations and all had been given the items that were approved for them according to the orders. With regards to orders posted on the doors, LAC utilizes a local system in which different colored chips are used to indicate watch (red for suicide watch, yellow for suicide precautions, and green for Q30) and a summary page in which the issue and privileges are checked off. During this site review, none of the doors had a colored chip and when prompted nurse produced them. It is

recommended that LAC utilize the system most commonly used statewide in which issue and observation orders are simply printed daily.

A review of the Mental Health Observation reporting tool for March 2023 found that during that month, 91.2% of suicide precaution rounds were completed timely and 72.6% were completed timely for patients on suicide watch in the MHCB. Additionally, the report indicates that 92.4% of the checks were appropriately staggered.

## Observation and Issue Orders

This reviewer audited a random sample of 10 patients who were admitted to the MHCB for DTS during the first quarter of 2023 and completed a full MHCB stay. Orders were missing for only one patient day. There were a total of 20 patient days in which the patient was provided with less than full issue. A note justifying the partial or safety issue was present in 12 (60%) of those days. The note that was present was clinically adequate in only nine cases. There were five patient days in which the orders themselves were inconsistent, in that the patient was provided with safety issue despite being on suicide precautions, and the note did not adequately justify this discrepancy. Fortunately, there were no noted instances of patients being placed in a safety smock while on Q30 minute checks. This represents a qualitative improvement since the last review period. A review of the SPRFIT POWER BI report, indicates that the average number of days in which a patient at LAC's MHCB remains on suicide watch (0.7) and suicide precautions (1.8), remain below state average for the past six months (1.3 and 4.3 respectively). However, both are trending upwards. This suggests that there are steady improvements, although progress still is needed. Open CAPs pertaining to these issues will remain open at this time.

| | | | | |
|---|---|---|---|---|
| Average Duration (Days) of MH Observation, Suicide Watch | 1.3 | 0.7 | 21 | ▲ Increase 1% |
| Average Duration (Days) of MH Observation, Suicide Precaution | 4.3 | 1.8 | 20 | ▲ Increase 25% |

## Timelines for Suicide Risk Assessments

Overall SRASHE timeliness during the first quarter of 2023 was in compliance at 95%. During that review period, there were a total of 352 SRASHEs completed at LAC and 187 of them (53%) were completed in a confidential setting. Unlike the pattern that had been discovered in the most recent review, the patient's refusal of a confidential contact was not the most frequently occurring reason for the non-confidential contacts during the first quarter. While there were 57 such cases (accounting for 34.5% of the total non-confidential contacts), there were 72 cases (43.6% of the total non-confidential contacts) in which no reason code was given at all and 19 others that suggest that were closed out either as "standard" or "as planned," suggesting that it was the clinician's intent to not offer a confidential contact. In total, of the 165 suicide risk assessments that were not completed in a confidential setting, there was no indication that no

confidential contact was even offered for 91 (55%) of them. It is recognized that at the time of this review, LAC was experiencing a protracted clinical staffing shortage, as well as an extremely high number of emergent consults and alternative housing contacts and it is possible that these factors are making it difficult to offer confidential contacts consistently. The institutions should evaluate the factors that are creating barriers to the consistent offering of confidential contacts and develop a plan to remove those barriers that are within the institution's control (for example, interdisciplinary conflict over available space).

### 20.3 Suicide Risk Evaluation



**Privileges**

The offering of yard and other privileges for patients in the MHCB continued to be problematic on the day of this site review. Of the 10 patients who were in the MHCB on the day of this review, 10 were clinically approved for phone, yard, and dayroom privileges so all 10 of those patient's 114s were reviewed. The 114s indicated that only six (60%) had been offered a phone call at one point during their stay, only three (30%) had been offered yard, and only two (20%) had been offered dayroom privileges. Consistent with the findings of last review, none had been clinically approved for visits. The institution should monitor the appropriate offering of privileges regularly in SPRFIT subcommittee and per the SPRFIT measurement plan, this data is next required to be reported in July. The previously generated CAP will remain open.

**Clinical Discharge Follow-Ups**

For the first quarter of 2023, the institution was in compliance (96%) with five-day clinical follow-ups.

### 20.1 Timely Clinical Discharge follow-ups



Charts were reviewed for a sample of 10 patients who completed at least 3 days of clinical discharge follow-ups during the first quarter of 2023. Only three of those charts (30%) contained documentation that the custody portion of the follow-up was completed on or before the third day. In all seven non-compliant cases, the patient had been seen by a mental health clinician, rather than nursing staff, in each of the first three days. Additionally, the documentation suggests that a higher level of care was not clinically warranted on the third day in any of these cases. This

suggests that custody discharge checks are not being discontinued by nursing staff and that custody discharge checks are not being extended beyond 72 hours in lieu of a referral to a MHCB. In combination with the ongoing low compliance with the 7497audit domain that speaks to checks being discontinued after no more than 72 hours, it is most likely the case that clerical oversites persist in the documentation. Given that this item is not one of the outstanding statewide Lindsay Hayes items, nor does it have direct patient care impact, it will not rise to a CAP at this time. However, it is recommended that clinicians be reminded to include the discontinuation of custody checks appropriately and consistently within the 5-day follow up power form for the sake of documentation transparency.

### III. Alternative Housing

CSP-LAC's LOP 31, Suicide Prevention, continues to serve as the LOP that incorporates the institution's Alternative Housing process and it has not been revised since the last site review. Therefore, it continues to specify that inmates placed in alternative housing awaiting MHCB placement are to be housed as follows:

General Population IPs on Facilities A, B, and C:
Facility D Building 4 (FDB4), any available cell on the bottom tier. No cell adjacent to the showers shall be used.
Enhanced Outpatient (EOP) IPs on Facility D:
- The IPs may remain in their assigned housing unit and shall be rehoused to the bottom tier, in a cell not adjacent to the showers.
Administrative Segregation (ASU) or D5 and/or ASU overflow IPs:
- The IPs will remain in their housing unit and shall be moved to the bottom tier as necessary in a cell not adjacent to the showers.
In the event a cell is unavailable and bed moves cannot be made to accommodate in the locations above, the IPs may be housed in the following locations with the approval of a Manager or Administrative Officer of the Day (AOD):
- Wet holding tanks in the medical clinics on the facilities {old clinics) (non-business hours only).
- If IPs are placed in the facility medical clinics on the facilities (old clinics), it is custody's responsibility to move the IPs out to another alternative housing location prior to 0600 hours.
- When available, the dry holding cells located in the visiting areas should be utilized during business hours. In the event that this location is used in order to provide the IP with access to water and toilets the watcher shall contact the facility Sergeant if this person is unavailable then the facility Lieutenant shall be contacted at the extension listed on Attachment C Facility Sergeant and Lieutenant Extension List.

The inconsistencies between this LOP and statewide policy were discussed in the last report and given that it has not been updated, these inconsistencies persist and will not be reiterated here.

On the first day of this site review, there were 10 patients on suicide watch in alternative housing, three of which were observed by this reviewer. All three were under constant visual observation by a nursing staff member. In one case in the ASU EOP housing unit, the nurse was utilizing a 7365 instead of CERNER and when asked about this, she stated that she was told that the institution does not have enough laptops. All patients had access to a smock and a safety mattress.

## IV. Suicide Risk Management Program (SRMP)

LAC's LOP #34 *Suicide Risk Management Program* continues to serve as the LOP that addresses the SRMP program, however it was last signed in July 2021. At the time of this review, there were 117 patients in the SRMP program, a 15 patient increase since the last site review. According to the performance report, there were four patients who met objective criteria but were not yet enrolled which is a one patient decrease since last site visit. However, all four charts were reviewed, and it was noted that in two cases, the clinician had made a clerical error (checked off "high acute" when the narrative suggests the acute risk level was low) and in one other case, there seems to have been a performance report error as the patient was not assessed as high risk. The one remaining case was a true miss, in that that patient had returned from PIP for DTS, was assessed as high acute risk, and had since been to IDTT and was not enrolled.

For the patients who were enrolled in SRMP on the day of the site review, a random sample of five charts were reviewed and for the fourth consecutive audit period, the institution is showing signs of struggling with appropriate documentation of SRMP treatment plan goals and interventions. This is summarized in the chart below. The institution's LOP reflects the need to update goals and interventions for patients in the SRMP but there is still not full compliance with this. The suicide prevention and response coordinator assigned to region 3 did not offer the required training before this next site review so this will be done before the next site review for Q3 2023.

|  | Measurable treatment goals documented | Interventions documented |
|---|---|---|
| Initial enrollment IDTT MTP | 5/5 | 5/5 |
| Follow up IDTT MTP | 0/3 | 0/3 |

## V. Discharge Custody Checks

Local audit results suggests that 7497 compliance continues to be extremely poor at CSP-LAC. Audit results for Q1 2023 are as follows:

# MEMORANDUM

| Month | Total compliance | Area most significantly impacting compliance |
|---|---|---|
| January | 39.5% | All |
| February | 52.8% | All |
| March | 49.1% | All |

The institution has not demonstrated any improvement on 7497 performance since the last review. During this site review, this reviewer was informed by the CMH that all mental health staff have been retrained on the requirements of mental health portion of 7497s and that progressive discipline would be issued in the future. Unfortunately, custody has not offered that same assurance. March 2023 SPRFIT minutes simply indicate that "monitoring will continue" and that the workgroup continues to meet, however there was not a discussion of interventions. This will continue to be pursued at the statewide level.

## VI. Local SPRFIT Committee

This reviewer most recently attended the institution's SPRFIT meeting on January 10, 2023. As a phase II institution, this was the first meeting in which the committee utilized the new SPRFIT reboot process. Not all the data that is indicated for reporting in January was reported and this can be attributed to the fact that the institutional SRPFIT staff did not complete training until December and consequently, data was not collected during that month. Otherwise, the meeting was adequate. Quorum was met and all required items were discussed, except for a qualitative discussion of CAPs that had previously been generated by this reviewer and by Lindsay Hayes. The committee identified SRMP as a matter that needed a project charter, even though based on the performance report, this is actually a relatively strong area for LAC. Another noted deficiency was that there was not a discussion about the LOPs that required modification per the CAPs that were generated by this reviewer, nor was there discussion about finalizing the SPRFIT LOP, which has been an outstanding item since the review that Lindsay Hayes conducted. The institution discussed 7497s only briefly and deferred the issue to its workgroup. The discussion was collaborative, and all disciplines participated.

One of the concerns that was noted by Lindsay Hayes in his review as it pertains to the SPRFIT, was that quorum was not met for six consecutive months. A six-month review of the minutes suggests that quorum has been met every month that a meeting was held from July 2022 to January 2023. One item of note is that there was not a meeting held in December, as the SPRFIT coordinator was out of work for some time. The institution's local practice is to have all Sr. Psychologist Specialists collectively serve as the SPRFIT coordinator's backup, so steps should be taken to ensure that there is sufficient training to ensure that one of them can facilitate the meeting if necessary. One final note is that the institution does not have a Correctional Health Services Administrator (CHSA) as a designated position at this time, but quorum has consistently been met otherwise.

Inmate Family Council and Inmate Advisory Council

Based on a six-month review of the minutes, it does not appear that the SPRFIT coordinator has attended Inmate Family Council or the Inmate Advisory Council. It will be recommended that this be done in the future.

## VII. Urgent and Emergent Referrals for Danger to Self

For the fourth quarter of 2022, SRASHEs were completed timely in 98% cases which there was an emergent referral for DTS. DTS cases were triaged as emergent referrals 426 of 428 times (99%).

| | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 2437 | 2.9 | 96% |
| SRE after Em.Consult (except PIP) for Suicidality | 426 | 8.5 | 98% |
| SRE after Ur.Consult (except PIP) for Suicidality | 2 | 0.0 | 100% |

| | Overall SRASHE Compliance | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|---|
| January | 97% | 99% | 99% |
| February | 95% | 100% | 99% |
| March | 96% | 100% | 100% |
| Q1 Total | 96% | 98% | 99% |

Compliance with emergent and urgent SRASHEs remains a strong area for LAC.

## VIII. Suicide Risk Evaluations

LAC continues to experience a large number of MHCB referrals who are placed in alternative housing and rescinded prior to MHCB placement. According to data provided by the institution on the day of this site review, there were 703 such cases during the first quarter of 2023. A random sample of 10 were selected for review and in all 10 cases, a SRASHE was completed prior to the rescission and a safety plan was completed in all but one case. All but two of the audited SRASHEs contained justification that adequately justified the rescission. A random sample of 10 patients who were admitted to the MHCB for DTS and completed a full MHCB stay during Q1 of 2023 were selected for audit. Both a SRASHE and an SPI were completed timely in all ten cases. The SRASHE justified the discharge decision in all but one case, however this justification was not documented on the appropriate portion of the SRASHE (the "rationale" section). Given that justification was present in 90% of cases however, this does not warrant a CAP. As indicated in the above section, overall SRASHE compliance for quarter 1 was 95%. SRASHE completion at MHCB discharge and MHCB rescission, were both 96%.

| | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 2437 | 2.9 | 96% |
| SRE at MHCB Clinical Discharge (admitted for a | 51 | 5.2 | 96% |
| SREs after rescinded MHCB referral | 1083 | 2.2 | 96% |

## IX. Emergency Response

### Cut-Down Kits

Cut down kits were not audited as part of this review. Data will be collected from the regional mental health compliance team and provided when next available.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Below are the QIPs from suicides between 2019 and 2013 that remain open for CSP-LAC.

Patient #1

1.  During a clinical encounter on December 7, 2021, the inmate's clinician wrote that he "mentioned suicide as an option." The clinician's documented an inquiry regarding the inmate's current thoughts, plans and intentions for suicide, i.e., she completed a risk assessment in the moment, but then did not complete a SRASHE as required when an inmate makes suicidal statements. The MHSDS Program Guide, Ch. 10, page 8 requires that when "an inmate expresses current suicidal ideation … a suicide risk assessment shall be made …" and documented by using the filling out a SRASHE in the EHRS. Although the program Guide allows for clinical discretion when no changes in chronic suicide risk have occurred, the documentation did not include a rationale for why a SRASHE was not completed. QIP: **The CSP-LAC CMH or designee** shall review this concern and determine best course of action to address this identified issue. Required supporting documentation: CSP-LAC Chief of Mental Health will outline, in a memorandum, findings of the review and any remedies undertaken. If remedies included training or instruction, a Form 844 (sign-in sheet) will also be submitted with the memorandum. Actions completed: In November 2022, the institutional SPRFIT coordinator delivered a training to all clinical staff on the MHSDS Program Guide requirements for suicide risk evaluations. This training included an individually focused training for the specifically identified individual. Recommended follow-up: All future hired psychologists and social workers shall receive this training within 60-days of hire as part of the onboarding process. Status as of Q2: There have three new clinicians onboarded since February 2023 and all have been enrolled in this LMS training. The SPRFIT coordinator will ensure that all have been trained within 60-days of their hire date. This will remain open until the 7-hour SRASHE Core Competency training is in compliance (above 90%) for two consecutive site reviews.

2. While housed in the CSP-LAC MHCB unit on July 13, 2022, the inmate's level of observation was changed to once-every-30-minute checks, and he was issued partial clothing. On October 29, 2013 the Divisions of Adult Institutions and Health Care Services issued a memorandum requiring (in part) that "Inmate-patients not on suicide precautions or watch" receive full clothing issue ("blues") "unless a clinical determination is made and documented … that there is a clinical reason these items should not be issued." No such documentation was found in clinical documentation for the inmate. The HQ SPRFIT coordinator for Region III is aware of this issue and has a Correctional Action Plan (CAP) in place as there continues to be concerns with this issue. QIP: **The CSP-LAC CMH or designee** shall review this concern and provide a response regarding the progress of the identified CAP, including any actions or interventions taken. Required supporting documentation: CSP-LAC Chief of Mental Health, will outline, in a memorandum, findings of the review and any remedies undertaken.  If requested remedies include training or instruction, a Form 844 (Sign-In Sheet) will also please be submitted with the memorandum. Actions completed: The Statewide Suicide Prevention and Response Coordinator assigned to region 3, provided the institution with the following HQ memorandums: *Clarification of allowable property for patients on suicide watch, April 24, 2020; Level of observation and property for patients in Mental Health Crisis Beds, March 15, 2016; State-issued clothing and bedding for mental health inmate-patients in the mental health crisis bed and outpatient housing unit, October 29, 2013* and its revision dated *February 14, 2017; Mental Health Crisis Bed Privileges, June 23, 2016.* Also provided were training materials and examples addressing proper documentation of justification of issue and observation orders. The institution's MHCB supervisor provided this training to a sample of MHCB clinicians on November 9, 2022. However, as is discussed in this report, a recent audit that was conducted by this reviewer suggests that weaknesses in this area persisted. As such, the Statewide Suicide Prevention and response Coordinator assigned to region 3, provided a training again on February 1, 2023. This training included the MHCB supervisor, the institutional SPRFIT coordinator, and the MHCB clinicians, some of whom had not received the training in November. That training material was shared with the institution. Recommended follow-up: In the event of MHCB clinical staffing turnover prior to the next quarterly site review (April 2023), the newly assigned clinicians will receive the training that the institutional leadership deems most effective. Otherwise, this QIP will remain open for one more review period and closed if improvement is noted. Status as of Q2 2023: Incremental improvement is noted. This will continue to be monitored for one more audit period.

Patient #2

1. Despite the inmate's significant history of substance abuse, his MAT treatment history, and related polysubstance diagnosis assigned to him by a medical physician on January 14, 2022, treatment teams across two institutions did not appear to recognize the

severity/connection of his substance abuse to his mental illness. Treatment plans dated October 5, 2022, and November 2, 2022, did not include any substance use/abuse related IPOCs. QIP: **The CMH at LAC** shall review this concern and provide training to all mental health staff highlighting the need to include substance abuse concerns in treatment planning/IPOCs whenever substance abuse is identified as a primary or contributory driver of the mental illness. Further, **the CMH at LAC** shall review all clinical documentation in this case and determine why a potential referral to a higher level of care was not considered, and then determine the best course of action. Required supporting documents: Please provide a memorandum detailing the results of the review, and actions taken to address this QIP. Please include all training materials and 844s with memorandum submission. Actions completed: CSP-LAC has developed a training entitled *Mental Health Patients Return from Higher Level of Care (RHLOC) Training* and made it available on the LMS system. By February 7, 2023, 61 staff had completed this training. Recommended follow-up: This training will be provided to all future hired clinical staff within 60 days of hire, as part of the onboarding process. Status as of Q2: There have been three newly hired clinicians since February 2023 and the SPRFIT coordinator will ensure that all have been trained within 60 days of their hire date.

2. No Self-Harm Power Form was completed as per policy, in reference to the November 7, 2022, incident whereby Inmate Mahoney's PC noted a large cut on his forearm. While the timing of the injury remained unknown, this information was critical as it was the first-time staff observed evidence of serious self-harm on the inmate. Per HQ Memorandum dated October 28, 2019, Clarification of Documenting and Reporting Suicide Attempts and Self-Harm Incidents, when self-harm occurs: *"The designated mental health clinician shall document the determination and self-harm data within the Self-harm Power Form in the EHRS as soon as possible…"* QIP: **The CMH or designee at LAC** shall review this concern and Audit the charts of ten inmates who have engaged in self-injurious behavior within the past six months to determine if a Self-Harm Power Form was submitted. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on self-harm reporting requirements/follow-up with the local Suicide Prevention Coordinator to ensure self-harm incidents are being correctly entered into EHRS. Required supporting documents: Please provide a memorandum detailing the results of the review, (including the Self-Harm Power Form audit, with CDCR numbers), and actions taken to address this QIP. Please include all training materials with memorandum submission. Actions completed: An audit of patients referred to PIP for self-harm during a six-month period revealed that 9 out of 10 (90%) had self-harm Powerform entries. The one exception involved a case that occurred in the MHCB and there was not adequate communication with mental health. The SPRFIT coordinator and the Chief Psychologist attended the Title 22 Licensing Committee meeting to solidify a better, more sustainable process of communication. This was likely an isolated incident. No further follow-up is indicated, and this can now be closed out.

3. There were risk justification issues in the September 30, 2022, October 8, 2022, and November 7, 2022 SRASHEs completed at LAC. Several risk factors were incorrectly marked in the SRASHEs including current/recent substance abuse, history of violence as

well as recent violence, recent psychotic symptoms, and safety concerns which may have contributed to an underestimation of risk. In the November 7, 2022 SRASHE, while the clinician's narrative justifying low acute risk was quite detailed and comprehensive on the surface, the current discovery of recent self-injurious behavior (of unknown date), a diagnosis involving psychosis with odd behavior noted the same day by his PC, agitation, recent RVR for an assault where he fractured the nose of another inmate with resulting ASU placement (increased isolation), and continued withdrawal/substance abuse concerns secondary to not being re-started on Suboxone, would all suggest his acute risk for suicide was likely higher than estimated. QIP: **The CMH or designee at LAC** shall initiate an inquiry to determine the reason for inaccuracies in risk justification on the identified SRASHEs and propose an identified course of action to mitigate reoccurrence. The CMH shall determine if the course of action shall pertain to the identified clinicians or all mental health staff. Required supporting documents: Please provide a memorandum detailing the results of the inquiry and the identified course of action to address this QIP. If training is provided, please submit all training materials and 844s. Actions taken: Audits were completed by a Sr. Psychologist Supervisor and it was determined that, for the most part, the clinician in question makes adequate clinical determinations. However, other systemic issues were noted, and the institution's intended follow-up is ongoing SRASHE 7-hour core competency training and training on the revised SRE mentoring program. This QIP will remain open until both trainings are in compliance (above 90%) for two consecutive site reviews (a minimum of six months) beginning with Q3 2023 (July).

4. An active MHMD scheduling order was visible to schedulers, but an individual psychiatry appointment was not scheduled and attempted prior to the IDTT on October 5, 2022. QIP: **The Chief Psychiatrist or designee at LAC** will investigate the cause of this deficiency and effect a remedy. Required supporting documents: **The Chief Psychiatrist or designee** will provide a memorandum to documented discussion had with schedulers or schedulers' supervisor. Please ensure 844s are submitted. Actions taken: Training was provided to all mental health schedulers. Recommended Follow-up: It is recommended that all future-hired mental health schedulers receive the same training.

5. Between August 5, 2022, and November 6, 2022 (after return from county jail), the inmate submitted nine 7362s requesting to be placed back on Suboxone. There was no documentation this inmate's case was discussed in any established forum, such as the Primary Care Team huddle. There was no collaborative plan of care or intervention developed to address his overlapping medical and mental health needs. It is unclear why Inmate Mahoney's case was not discussed in medical/mental health huddles or other health care appointments to initiate a plan of action for resuming his Suboxone. QIP: **CMH** shall review this concern and determine best course of action to mitigate its reoccurrence. At minimum, this should include a plan to improve collaboration between the medical and mental health staff during treatment of inmate-patients with co-morbid mental health and substance abuse issues. Required supporting documents:  Please provide a memorandum detailing the review of the factors contributing to this concern and any identified course of action. If training is provided, please submit training curricula and all

844s. Actions taken: On February 8, 2023, the CMH issued a memorandum directing all clinicians to ensure that all patients who have a mental health or medical condition that impacts their ability to participate in substance abuse treatment, shall have their case discussed in Primary Care Team Huddle. Recommended follow-up: Given the lack of an automated or reliable non-automated way of measuring ongoing compliance with this variable, it is recommended that all new staff simply be trained on this requirement during onboarding.

6. On November 7, 2022, at approximately 1300 hours, the inmate's PC observed a cut to his left arm. The PC notified custody and medical staff he would first need to be medically cleared, and then assessed for self-harm by mental health. Inmate Mahoney was placed on the crisis line. Per LAC's Local Operating Policy (LOP) for the Crisis Intervention Team (CIT LOP #30), LOP 31 (Suicide Prevention), and Program Guide, Chapter 10 (Suicide Prevention and Response), it appears there were multiple deviations from these policies during the initiation of CIT response during the November 7, 2022, incident. QIP: The **Warden, CEO, and CMH at LAC** shall initiate an inquiry into the events which occurred on November 7, 2022, to develop a plan of action to prevent reoccurrence. At minimum, <u>all</u> staff involved in CIT shall be re-trained on LAC's Crisis Intervention Team Policy (LOP #30) Any additional action required shall be determined by institutional managers. Required supporting documents: Please provide a memorandum detailing the review of the factors contributing to this concern, and any identified course of action. Please submit all training curricula and all 844s. Actions taken: CIT clinicians were provided with training; however this will remain open until the CIT LOP is revised (as discussed above).

There was another death by suicide at CSP-LAC in February 2023 and it resulted in one mental health QIP which, as of the day of this site review, had not yet been submitted.

## X.    Training and Mentoring Compliance

The following was obtained from a review of the Coleman Court Mandated Trainings SharePoint, as well as from data reported by the staff development unit.  Compliance with trainings by the end of December 2022 are as follows:

### Clinical Training Compliance
*Mentoring – Hayes Item 18*
Mentoring compliance through March 2023 according to the Coleman training SharePoint site through the end of March 2023 is as follows:
    Mental Health mentored under old program= 86.67% (52/60)
    Mental Health mentored under new program= 4% (2/49)
*Annual IST Suicide Prevention Training – Observation*
This training was not observed as part of this site visit.
*Annual IST Suicide Prevention Training Compliance – Hayes Item 16*
Through March 2023, training compliance was as follows:
    Custody=30%
    Non-custody=16%

The institution provided only custody and non-custody compliance. Non-custody compliance through March was below the expected point by the end of the first quarter and therefore, the institution should develop a plan to improve compliance with the IST training among non-custody staff.

Compliance with the below mental health specific trainings was obtained from the Coleman training SharePoint site through the end of March 2023.

    Suicide Prevention and SRASHE Core Competency Building Training=100% (60/60)
    Safety Planning Training=0% under new system. 88.3% under old system.
    Suicide Risk Management Program Training =100% (60/60)
    Columbia-Suicide Severity Rating Scale Training =91.49% (43/47)

Custody Training Compliance – CPR and Suicide Prevention – Hayes Item 6
    Suicide Prevention IST=30%
    Custody CPR=27%
    Nursing CPR=100%

## XI.    Receiving and Release (R&R) Screening – Hayes Item 1

The nursing R&R screening process continues to be strong at LAC. There was one R&R screening observed as part of this site review and the nurse completed it in an exceptional fashion. She asked all questions appropriately and conducted an appropriate mental status exam. The patient was a non-MHSDS patient who screened negative, yet the nurse provided him with education about how to reach out to mental health in the future should he decide he wants to do so. Once again, the physical layout of the area continues to be conducive to the process. Suicide prevention posters, in both English and Spanish, were present in the nursing office.

## XII. Reception Center Processing

CSP-LAC does not have a Reception Center.

## XIII. Crisis Intervention Team (CIT)

LAC's LOP #30 *Crisis Intervention Team* expired in December 2022 and has not yet been revised. The institution is operating at this time under LOP #28 *Crisis Referral Procedure* which covers the process for clinical response to mental health crises, but not the CIT process. During the onsite portion of this review, one emergent mental health contact was observed by this reviewer. It was for a patient who reported suicidal ideation. He was placed under constant visual observation in an otherwise empty gymnasium on the yard. This is where the clinical interview took place. The clinician engaged the patient well and obtained collateral data by consulting with custody. The patient verbalized concerns about his psychiatric medications and the clinician ordered a follow-up urgent psychiatric consult. The patient was returned to housing and the associated SRASHE justified this decision.

## XIV. Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

# MEMORANDUM

OSM expert Lindsay Hayes conducted a site review of LAC on April 5-6, 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

## XV.    Assignment of Corrective Action Plans and Recommendations

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, Chief Support Executive, Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

**Corrective Action Plans (CAPs) and Recommendations from prior site visits that remain open as of Q2 2023 review (these CAPs are also summarized in Appendix B):**

**Open Corrective Action Plans (CAPs)**

1) **Problem:** Patients were not consistently being offered yard privileges in the MHCB. **CAP:** Custody Leadership to provide training to all custody officers assigned to the Mental Health Crisis Bed (MHCB) Unit on the February 14, 2021, Memorandum titled: "*MENTAL HEALTH CRISIS BED PRIVILEGES REVISION*". This training is to ensure inmate patients admitted to the MHCB attend out-of-cell activities consistent with their custody designation (unless specifically restricted by the MHCB IDTT). **Proof of practice:** 844s to be submitted to the Region 3 Statewide Suicide Prevention Coordinator and the Region 3 Mental Health Compliance lieutenants by **April 30, 2022.** This will also be tracked on the CAP SharePoint site. **Current status:** Training was delivered to MHCB custody staff on February 3, 2022, on OP 500, which is consistent with statewide policy. Proof of practice of this training was delivered to the review team on the day of this site visit. Although this training has occurred, there continued to be a noted absence of yard privileges being offered to inmates in the MHCB. This will be revised as follows. **Revised CAP**: Custody representation to present in the monthly SPRFIT sub-committee on the percentage of inmates in the MHCB who were offered yard, in compliance with policy, the previous month. This reviewer will conduct a mid-quarter site review to review this area. **Status as of Q4 review**: This still has not been completed. This will be considered for the project pipeline at the December SPRFIT meeting. **Status as of Q1**: This still has not been completed. While there was no SPRFIT meeting in December 2022, meeting minutes from January 2023 suggest that this item has not been discussed or added to the project pipeline. As such it will remain open. **Status as of Q2:** Remain open. This remains problematic and SPRFIT minutes acknowledge that it is a required element of the SPRFIT measurement plan. It will be reported by the SPRFIT subcommittee in July.

2) **Problem:** Custody Discharge Checks (7497) are consistently below 90% compliance. **CAP:** SPRFIT meeting minutes will reflect the specific corrective action, including the provision of progressive discipline (sanitized) if necessary, each month for the prior month's audits. **Proof of practice:** SPRFIT minutes will specifically address this item beginning with the

# MEMORANDUM

April 2022 meeting. **Status as of Q3 review:** This has not been achieved and for the third consecutive audit period, this area remains out of compliance. The institution will submit a memorandum, delineating specific plans to and steps to make improvements, to the statewide suicide prevention unit by October 1, 2022. This may include minutes from the ongoing workgroup. **Status as of Q4:** For the fourth consecutive audit period, this has not been achieved. The institution will develop its own CAP. **Status as of Q1**: Institutional 7497 audits suggest that this area is still well below compliance. A 7497 workgroup was chartered since the last review period. This will remain an open CAP until sustainable compliance is achieved. **Status as of Q2:** This remains out of compliance and is not improving. Remain open.

3) **Problem:** This reviewer observed an ASU post-placement screening in which the patient was not offered a confidential contact. **Corrective Action Plan**: Institutional nursing leadership to determine the extent and scope of this problem and report the findings in the April 2023 SPRFIT committee meeting and if necessary, provide trainings and place this item on the project pipeline. **Status as of Q2**: Not completed. This CAP will be modified as follows: Problem: Several sources indicate that there are many mental health contacts, whether completed by nursing or mental health staff, that are not completed in a confidential setting. **Revised CAP:** This will be placed into the project pipeline in the June 2023 SPRFIT committee meeting.

4) Problem: This reviewer observed that one custody officer at D5 (ASU EOP Hub) was not completing guard-one wellness checks appropriately. Specifically, he did not establish visual contact with the patient to confirm the presence of living, breathing flesh. **Corrective Action Plan:** Institutional custody leadership to determine the extent and scope of this problem and report the findings in the April 2023 SPRFIT committee meeting and if necessary, provide trainings and place this item on the project pipeline. **Status as of Q2:** Not yet completed. Remain open.

5) **Problem**: SPRFIT committee minutes do not reflect that the SPRFIT coordinator has attended IAC or IFC every six months. **Corrective Action Plan**: Ensure that minutes begin reflecting this attendance. **Status as of Q2**: Not yet completed. Remain open.

## Joint CAPs for Lindsay Hayes and this reviewer

6) **Problem**: It was found during Mr. Hayes' review that inmates were not consistently being placed in retrofitted intake cells upon arrival to ASU. Given information collected by this reviewer during this site review and the last (Q2) one, global deficiencies are noted with LAC's adherence to intake cell policy. **Status as of Q4 review**: These global deficiencies continued to be noted at both ASUs during this site review. The institution will develop a

CAP. **Status as of Q1**: January 2023 SPRFIT minutes suggest that this has been placed on the project pipeline, however it has not been assigned a risk score. While improvements were noted during this site review, problematic use of placards, especially at ASU EOP Hub, make tracking cumbersome. This was discussed as part of the February 2023 SPRFIT meeting. This will remain open. **Status as of Q2:** Compliance was noted during this review. Remain open for one more monitoring period.

7) **Problem:** Lack of an appropriate SPRFIT LOP. S**tatus as of Q3 review**: Since the site visit by Mr. Hayes, the institution has developed a separate SPRFIT LOP that encompasses the requirements of the 2018 Enhancement Memorandum, but as of this site review it had not yet been finalized. Corrective Action: Finalize the SPRFIT policy during MHSC prior to October 2022. **Status as of Q4**: This still has not yet been completed. The October SPRFIT meeting indicated that this LOP is still under review. This is expected to be signed off and completed during the December SPRFIT meeting. **Current status**: As of February 2023, the institution reports that this LOP has still not yet been completed. This will remain open and, in the February 2023, SPRFIT meeting, it is suggested that the boundary to completing this LOP, whatever it may be, be discussed and specifically addressed if not signed off. **Status as of Q2:** Finalized and completed. Close out.

8) **Problem:** Problematic crisis responding with regards to confidentiality availability. Specifically, inmates in both alternative housing in the housing units and inmates in holding modules awaiting crisis assessment are assessed within view and earshot of other inmates and are not consistently offered confidential contacts. **Current status**: This was noted to still be a problem during the most recent site review. **Corrective Action Plan:** The institution will submit a memorandum, delineating specific plans to and steps to make improvements, to the statewide suicide prevention unit by October 1, 2022.  **Status as of Q4 review**: Although no crisis calls were observed as part of this review, it is not believed that any change has been made in this area as no memorandum has been submitted. Additionally, a portion of the institution's Suicide Prevention LOP is not supported by statewide policy (see above) and it is recommended that this be modified (see CAP 9 below).  **Status as of Q1 2023**: It was specifically observed during this site review, that this problem persists. Requested proofs of practice and steps to improve the availability of confidential space, have not been submitted. This item has been placed on the project pipeline according to February 2023 SPRFIT minutes, but no risk score has been assigned. This will continue to be a CAP until confidential interview space for crisis contacts is secured and reliably utilized. **Status as of Q2 review**: Partially resolved. The confidentiality portion of this concern can be addressed in CAP #3. Remain open otherwise.

9) **Problem**: There are two problems concerning LAC's LOP #31, *Suicide Prevention.* A) Although this LOP states that patients placed on suicide watch are not to be placed in cells

adjacent to the showers, it was observed during this site review that one patient who was on suicide watch in alternative housing, was housed in a cell adjacent to a shower. B) The policy states "Custody staff shall conduct a complete search of the holding cell and remove contraband prior to placing the IP (patient) in the cell. An unclothed body search will be conducted and the IP (patient) will be issued safety clothes (no tear smock)." This practice is not supported by statewide policy and is in violation of patient rights. Corrective Action Plan: A) Develop a plan to ensure that LAC is following its own policy with regards to the use of alternative housing cells. B) Modify LOP #31 to discontinue the practice of restricting clothing from patients for whom there is not an active suicide watch order. Status as of Q1 2023: This LOP has not been modified since the last site visit. While it was not observed that patients were placed in alternative housing in cells adjacent to showers, it was observed that at least one was placed in a dry cell despite the availability of housing unit cells and cells with toilets. Further, the LOP deviates from statewide policy in the manner in which beds are prioritized. This reviewer will share the statewide Alternative Housing policy with this finalized report. **Status as of Q2:** Not resolved. Remain open.

10) **Problem:** LAC's LOP #34 *Suicide Risk Management Program* is not fully in alignment with statewide policy. Specifically, statewide policy requires that the Mental Health Primary clinician "document treatment progress during routine IDTTs" and "complete the SRMP treatment progress and updates section within the SRMP tab of the Master Treatment Plan" and LOP #34 is missing this element. This has manifested in non-compliance with this requirement as noted above. Corrective Action Plan: Modify LOP #34 to include this element. **Status as of Q1:** While the policy now reflects this element, there is not full compliance with it (as described above). The SPRFIT coordinator assigned to region 3 will provide an onsite training before the next (April 2023). **Status as of Q2:** This remains unchanged since Q1. Regional SPRFIT has not delivered training yet so this will remain open.

11) **Problem:** LAC's LOP #30 *Crisis Intervention Team* is not fully in alignment with statewide policy. Specifically, statewide policy requires that "If unlicensed, the clinician will immediately consult with an administrative supervisor, or clinical supervisor prior to resolution of the CIT. Documentation shall reflect this consultation." Corrective Action Plan: Modify LOP #30 to include this required element. **Status as of Q1**: This LOP has expired since the last site review and has not yet been renewed. This policy will include this element when modified. **Status as of Q2:** Not resolved. Remain open.

**New CAPs generated as the result of this review**

# MEMORANDUM

12) Problem: The institution is not on pace to be 90% compliant with suicide prevention IST training by the conclusion of calendar year 2023. **Corrective action plan:** The institution will evaluate barriers to this and determine the best course of action. This will be reported in the SPRFIT subcommittee meeting prior to the Q3 (July) site review.

**Recommendations not rising to the level of a CAP generated as the result of prior reviews**

1) Provide training to MHCB staff to ensure the understanding that orders for privileges, includes consideration of the privilege of visiting. **Status as of Q2**: Not resolved. Remain open.

**New recommendations not rising to the level of a CAP generated as the result of this review**

2) Implement the statewide practice of printing out MHCB orders daily and placing them on the doors for MHCB patients.

Appendix A

| | | Summary of problem identified by Lindsay Hayes in 2021 | progress as of Q2 2023 review | Follow up status |
|---|---|---|---|---|
| | 1 | Intake cells not used according to policy | Substatial | Continue to monitor |
| | 2 | Alternative housing SPI not reliably completed | Substatial | Closed Q1 |
| | 3 | MH observation not being utilized appropriately. | Substatial | Continue to monitor |
| | 4 | SRASHEs not reliably completed for referrals. | Substatial | Close |
| | 5 | Inadequate IDTT meetings. | Minimal | Continue to monitor |
| | 6 | Supervisory review od DC SRASHes | None | Return to monitor |
| | 7 | Inadequate custody DC check completion | None | Continue to monitor |
| | 8 | SPRFIT subcommittees | Substatial | Close |

Appendix B

| | Summary of Corrective Action Plan identified by regional SPRFIT-Coordinator | Status as of Q2 2023 |
|---|---|---|
| 1 | Patients were not consistently being offered privileges in the MHCB | Remain open |
| 2 | Custody Discharge Checks (7497) are consistently below 90% compliance | Remain open |
| 3 | Non-confidential mental health contacts | Revised/open |
| 4 | Inaccurately conducted Guard-one checks | Remain open |
| 5 | SPRFIT coordinator attendance at IAC/IFC | Remain open |
| 6 | Use of retrofitted intake cells | Remain open |
| 7 | Lack of SPRFIT LOP | Closed |
| 8 | Problematic crisis responding | Revised/open |
| 9 | Suicide Prevention LOP | Remain open |
| 10 | SRMP treatment plans and policy | Remain open |
| 11 | CIT policy | Remain open |
| 12 | IST training | New |

# MEMORANDUM

Appendix C: LAC's status on Lindsay Hayes statewide outstanding items.

| Aspect of Recommendation that Remains Outstanding | LAC's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% but in process. |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly, however problems with the performance report is impacting accuracy. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Partially compliant | Safety plans are being completed, supervisory reviews are not. |
| No. 18: Safety planning training | Partially compliant | Training is underway |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Non-compliant | Below 90% |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Non-compliant | Below 90% |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Partially-compliant | SPRFIT LOP finalized, quorum regularly met aside from CHSA, which institution does not have. |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are still not being reliably offered, CQIT is a statewide issue, and COR does not have a Reception Center |

Exhibit F

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 06/23/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D. <br> Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | KVSP SUICIDE PREVENTION TOUR May-Quarter 2 2023 |

On May 15-16, 2023, the Statewide Suicide Prevention Coordinator conducted a review at Kern Valley State Prison (KVSP). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 2 |
| CAPs generated by this reviewer during prior review that can be closed | 3 |
| Lindsay Hayes CAPs that remain open | 1 |
| CAPs previously generated by this reviewer that remain open | 2 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 0 |
| Previously generated recommendations that remain open | 1 |

Total CAPs that remain open=4
Total recommendations that remain open=1
Total CAPs closed this review=5

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

# MEMORANDUM

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

KVSP has two restricted housing units and at the time of this visit, ASU2, which typically houses non MHSDS inmates, was still closed. Therefore, this review only includes STRH.

## Second Watch Morning Meeting

For the third consecutive tour, the second watch morning meeting was observed to be strong. All required attendees were present, including a social worker, the sergeant, a floor officer, and a psychiatric technician (PT). All required items were discussed including new arrivals, patients in the Suicide Risk Management Program (SRMP), and patients on 5-day follow-ups. The meeting also included a discussion of intake cell availability.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

On the day of this site review, one PT was observed conducting rounds at STRH. All required elements were covered. She asked all patient about suicidal and homicidal ideation, as well as sleep and appetite. She documented in real time in CERNER and offered all patients handouts. This is an ongoing strength of KVSP's.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

KVSP's STRH has eight intake cells (101-108) and on the day of this site review, all but one was occupied and the unoccupied one was temporarily not being used because of a plumbing problem. All inmates who were in intake cells had been there for less than 72 hours. One patient who had been on intake status for less than 72 hours was placed with a compatible cellmate. Placards were present on the doors of all occupied intake cells with accurate dates and arrival times, which demonstrates improvement since the last site visit in which arrival times were absent. The institution continues to utilize B1 as an ASU overflow with cells 114-116 designated as intake cells. All three intake cells had stenciling present. All three intake cells were occupied; one of which was occupied by a non-ASU inmate who was on suicide watch and the other two were occupied by ASU inmates who had been ASU status for significantly longer than 72 hours, with arrival dates of January 18 and April 24, 2023. Another patient who had just arrived on first watch, was inappropriately housed in a non-intake cell. This was brought to the attention of the sergeant in real time who indicated that it would be corrected.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

During this review, a total of eight patients were interviewed and asked if they had received an entertainment appliance promptly upon arrival and all eight indicated that they had. Four of the patients in intake cells were interviewed, as were three other inmates in STRH and one other inmate in B-1. This represents the second consecutive audit period in which improvement has been noted in this area.

# MEMORANDUM

**ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]**
There were not any ASU pre-placement screenings that occurred during this site review. A review of the performance report indicates that these screenings were in compliance at 91% during the first quarter of 2023.

## 70.1 ASU Pre-Screens



**ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]**
There was one ASU Post-placement screening observed during the visit. The PT who completed the rounds, failed to offer the patient a confidential contact. She also did not document the screening in real-time. This concern was brought to the attention of the supervising PT in real-time and it was addressed. Given that, this will not rise to the level of a CAP at this time. KVSP was in compliance with these screenings for Q1 2023 at 98%.

## 70.2 ASU GP Screens



**Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]**
One officer was observed completing Guard One checks and he seemed to do so adequately. He looked inside of each cell and when the light was off, he used the flashlight to establish visual contact of the inmate before moving on to the next cell.

At the request of this reviewer, the sergeant generated a Guard One report for the date of April 3-April 4, 2023 (06:00-06:00). A review of this report revealed that there were a total of 5,941 Guard One checks completed during this 24 hour period and there were 103 errors (checks that exceeded 35 minutes) for a compliance rate of 98%. This indicates that KVSP continues to demonstrate strength in this area.

# MEMORANDUM

## Inpatient Units (MHCB and/or PIP)

### Interdisciplinary Treatment Teams (IDTT)

Only one IDTT occurred during this site review, and it was observed. This IDTT was for a patient who was admitted to the MHCB for Significant Impairment Due to Mental Illness (SIDMI) and was being referred to a Psychiatric Inpatient Program (PIP) and as such, there were not any IDTTs observed for patients who were admitted for DTS.  In general, the IDTT was strong. All members of the team participated, at least when prompted, and measurable treatment plan goals were discussed. The patient was provided with full-issue and this was documented in the chart, however it was not discussed during the IDTT. The MHCB supervisor provided this reviewer with proof of practice of having conducted reviews of supervisory discharge treatment plans during the month of April.

### Quality of Safety Planning – Hayes Item 4

Based on the performance report, 17 safety plans were reviewed during Q1 of 2023 and all were deemed to have failed as indicated by a score of 0 out of 14. This is likely related to inconsistencies with the performance report. This audit is in the process of revision at the statewide level and will likely improve following this revision.

### Suicide Watch and Suicide Precaution

On the day of this review, there were a total of eight patients in the MHCB; one of whom was on Suicide Watch. The remaining seven were on Q30 minute checks. For the second consecutive audit cycle, all seven of the patients on Q30 observation status had been at the MHCB for at least five days. A review of the QM SRFIT Power BI report indicates that for a six-month average, KVSP maintained patients on suicide watch for an average of 0.6 days and suicide precautions for 3.3 days, both of which are slightly longer than they were last review. While KVSP still ranks 26th statewide in the duration of time in which patients are kept on suicide precautions, thy dropped three spots and now rank 19th in the length of time in which a patient in maintained on suicide watch. Nevertheless, they continue to trend upward slightly in this area.

| MEASURE | SW | RATE | SW RANK | TREND |
|---|---|---|---|---|
| Average Duration (Days) of MH Observation, Suicide Precaution | 4.1 | 3.3 | 26 | ▲ Increase 79% |
| Average Duration (Days) of MH Observation, Suicide Watch | 1.3 | 0.6 | 19 | ▲ Increase 13% |

There was one nurse observed watching the patient on suicide watch and constant, unobstructed visual observation was noted. Given that there were not any patients on suicide precautions, those rounds were not observed but prior reviews, these rounds were observed to be done correctly. This reviewer observed one nurse conducting rounds on three of the four patients on suicide precautions and in all three cases, she was observed to look inside of the cell and establish visual contact with the patient. She also documented in CERNER in real time. A review of the Mental Health Observation reporting tool indicates that for the month of April 2023, suicide precaution rounds were completed 97.2% of the time and suicide precaution rounds were completed timely in 84.5% of cases. The low compliance with suicide watch compliance was explained in the SPRFIT subcommittee meeting on the day of this site review. In the month of April, there was a shortage of laptop computers available for nursing staff so paper documentation was done in those cases. The report also indicates that checks in April were staggered 99.8% of the time.  and in the time and were staggered 99.8% of the time. This continues to be an area of strength for KVSP.

## Observation and Issue Orders – Hayes Item 3

 This reviewer conducted chart reviews for 10 randomly selected patients who completed a full MHCB stay during Q1 2023. The review consisted of each patient day in which less than full issue was ordered, for a total of 27 patient days. Issue and observation orders were both present in all but one patient day (96%) as issue order and an observation order were both absent for the same patient on the same day. With regards to the presence of a note justifying limited issue, one was present in all but one patient day (96%).

With regards to the quality of justification notes, improvement continues to be sustained for the second consecutive quarterly review. Only 5 of the 27 justification notes were deemed to be qualitatively poor. For example, language remained the same from one day to the next in two cases and in two more cases, the justification simply read "admitted for danger to self," although issue and observation were both different in each case and neither was the patient's first MHCB day.

## Privileges – Hayes Item 14

A review was conducted of the 114-As for all eight patients who were in the MHCB on the day of this review. All eight were approved for phone calls, yard, and dayroom. Documentation suggests that two had been offered dayroom (20%), four had been offered phone calls (50%), and seven had been offered yard (87.5%). Although compliance is still low, improvement was noted since the last site review. One concern was noted however, in that the 114 for the one patient who had not been offered yard indicated "no yard-suicide watch" on two different days. This was brought to the attention of the ASU sergeant and reiterated that being on suicide watch does not preclude a patient from attending yard. Per the SPRFIT measurement plan, the institution is required to report on this item in July 2023 and it is recommended that prior to then, its local policy be reviewed to ensure alignment with statewide policy.

## Clinical Discharge Follow-Ups

This reviewer conducted an audit of a random sample of 7 charts for patients who were rescinded from Alternative Housing (ATH) during the first quarter of 2023 and 8 for patients who were discharged from the MHCB for a total of 15 charts. Safety plans were present each day in 12 cases and only 8 contained documented verification, either on the 5-day follow-up powerform or via the presence of page 1 of the 7497, that the custody portion of the checks were discontinued by a mental health clinician. It is noted that during last quarter, KVSP had not yet completed the revised safety planning training. Given that the requirements of reviewing safety plans is reiterated in that training, improvement in this area is expected. With regards to the documentation of the custody checks being discontinued by a mental health clinician; the institutional SPRFIT regularly audits 7497 compliance, and the acceptable compliance rate suggests that checks are regularly being discontinued timely and by a mental health clinician.

## Alternative Housing – Hayes Item 5

KVSP's LOP 1056 Mental Health Crisis Bed (MHCB) and *Alternative Temporary Housing (ATH): Referral and Referral Rescission Process,* serves as the institution's alternative housing policy and it was last signed off in September 2022. This remains unchanged since last site review. It designates Alternative Housing cells in the following order of priority:

1. MHCB licensed bed
2. CTC licensed medical beds.
3. Holding cells with access to water/toilets including, but not limit to, "wet cells" and/or "clinic cells."
4. Holding cells without toilets
5. Other housing where complete and constant visibility can be maintained.

In the event that MHCB cells are unavailable, the LOP designates the following Alternative Housing cells:

1. For ASU inmate: STRH cells 196-199.
2. For SNY inmates: C4 cells 114-117 and D8 cells 114-117
3. For General Population inmates: A1 117-118 and B1 cells 117-118

During this review, this auditor conducted a thorough review of the cells in D yard and the same concerns were noted as with C yard during the last review. The cells contained gaps between the top bunk and the wall, which would allow for the anchoring of a noose. All cells had dimmer switches to allow for visual observation of the patient at night while allowing for sleep, however the switches are controlled from the inside. These cells are used infrequently; however it is recommended that the SPRFIT committee continue to monitor this.

**Compliance with transfer timelines:** During Q1 of 2023, the institution was 99% compliant with timely admission to the MHCB.

## 15.3 Timely admission to MHCB



**99%**
**(106)**

**SRASHE completion for rescinded referrals:** During Q1 of 2023, the institution demonstrated a compliance rate of 94% with the completion of SRASHEs upon rescission of MHCB referrals, which demonstrates sustained improvement in this area. Once again however, clinicians continue to fail to complete safety plans for patients who have been referred to an MHCB and rescinded. A random sample of 10 such patient charts from quarter 1 2023 were reviewed and a safety plan was completed on only 1 (10%). The safety planning training was still not complete as of the time of this site review, however given the ongoing problems with compliance, this will result in a CAP.

## Cut-Down Kits – Hayes Item 15

This area was not assessed during this tour.

## Suicide Risk Management Program (SRMP)

Section XVIII of KVSP's LOP 1031 addresses the SRMP and it is consistent with statewide policy. As of the second day of the institutional onsite review, there were 54 patients enrolled in the SRMP at KVSP, which was a 25 patient increase from last review. There were four patients who met an objective criterion but were not enrolled and this was a three patient increase from last review. A random sample of 10 charts for patients who were in the SRMP were reviewed to ensure that treatment plan goals and interventions related to the patient's reason for being placed in the SRMP were present. For one of these patients, the initial IDTT was completed at a different institution and treatment plan goals and interventions were present for eight of the remaining nine charts. There was a follow-up IDTT present for three of the cases and there was documented progress in one of those cases. The regional SPRFIT coordinator did not offer training on this item prior to this site review and as this continues to be a weakness, this will be done prior to next site visit.

## Discharge Custody Checks – Hayes Items 7 and 11

The institution submitted the results of custody discharge checks (7497) audits for quarter one and the monthly breakdown is as follows:

| January | 95.6% |
|---------|-------|
| February | 93.5% |
| March | 91.8% |

For the fourth consecutive review period, the institution continues to demonstrate overall compliance with 7497 completion. Consistent with previous review periods however, overall compliance was negatively impacted by incomplete custody supervisory reviews. However, that specific domain is now on the institutional SPRFIT subcommittee's project pipeline.

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer attended the SPRFIT subcommittee meeting during this tour on May 16, 2023, and also reviewed the minutes from the first quarter of 2023. During the meeting on May 16, all required members were in attendance, however custody representation called in and was not able to verbally participate, thereby negatively impacting that discipline's level of contribution. Otherwise, the meeting was strong and collaborative. Not all previously identified corrective action plans were on the project pipeline. The minutes from all three months of the first quarter of 2023 were reviewed. They consistently reflect that quorum was met and that items are being monitored according to the SPRFIT measurement plan. Minutes also suggest that no Root Cause Analyses (RCAs) were indicated as there were no serious self-harm incidents. This reviewer reminded the committee during the May 16, 2023, SPRFIT subcommittee meeting that RCAs are no longer required, but rather a comprehensive clinical review is.

## Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

The minutes from the SPRFIT subcommittee meeting in February, indicate that the CMH attended IFC on January 20, 2023, and IAC on February 14, 2023, on behalf of the SPRFIT subcommittee. The minutes also reflect a summary of these meetings for purposes of SPRFIT.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

This reviewer conducted a three-month audit for Q1 2023 to ensure that mental health referrals that were associated with danger to self (DTS) resulted in an emergent mental health referral and that all resulting contact included a SRASHE. The results are as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| January | 92% | 100% |
| February | 100% | 99% |
| March | 90% | 95% |
| Q4 Totals | 94% | 97% |

The institution continues to appropriately triage referrals in which suicidality or DTS are related to the referral reason, and they continue to appropriately complete suicide risk evaluations in such cases.

An additional random sample of 10 charts were reviewed for patients who whom there was an urgent mental health referral generated during Q1 2023 and in all cases but one (90%

compliance), the order was appropriately placed as emergent and there was not any indication that suicidality or DTS was an issue.

Suicide Risk Evaluations – Hayes Item 13

**Overall Suicide Risk Evaluation (SRASHE) compliance**: During the first quarter of 2023, the institution demonstrated overall compliance with SRASHE completion at 94%.

## 10.1 Suicide Risk Evaluation



| | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 518 | **5.0** | **94%** |

The monthly breakdown in as follows:

| | |
|---|---|
| January | 95% |
| February | 97% |
| March | 90% |
| 1st quarter total | 94% |

**SRASHE completion following MHCB/PIP discharge**: During the first quarter (January to March) of 2023, there were a total of 85 patients who were discharged from the MHCB after having been admitted for DTS and a SRASHE was completed timely in 80 of those cases for a compliance rate of 91%. This is an 8% decrease from the last review but is still in compliance (above 90%). A random sample of 10 of those charts was selected for audit and all those cases contained adequate documentation was present to justify a MHCB discharge. This is the first audit cycle in which that was noted for KVSP.

| | | | |
|---|---|---|---|
| SRE at MHCB Clinical Discharge (admitted for a | 85 | **4.8** | **91%** |

**Confidentiality of Suicide Risk Assessments:** During the first quarter of 2022, a total of 517 Suicide Risk Evaluations were completed at KVSP, however only 417 were reflected on the closed appointments report. Of those 417, 285 (68%) of which were completed in a confidential setting. Of the 132 contacts that were not completed in a confidential setting, 44 were the result of patient refusals and 15 more were the result of some type of modified program and 2 were the result of not having escort officers available. In total, there were 61 cases in which the reason for the non-confidential contact was outside of the clinician's control. This represents 46% of the non-confidential contacts which is a decline from the previous site review. Additionally, there were 52 cases in which no reason code was used at all. Given the discrepancy however between the two sources of data (the performance report and the closed appointments report), it cannot reliably be concluded that KVSP is not adequately offering confidential contacts. This will be deferred as a CAP at this time until this discrepancy is resolved.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Between 2019 and 2020, suicides resulted in Mental Health Specific QIPs for KVSP within a total of six different clinical domains.  By the time of this site visit, two from a suicide that occurred in 2020 required continued monitoring. Progress is documented below.

| Issue Identified | QIP | Status as of Q2 2023 |
|---|---|---|
| Multiple concerns were found with the SRASHE completed on January 15, 2020. | **The KVSP CMH or designee** shall review this concern and A) complete an audit of five SRASHEs (consistent with chart audit criteria) by this clinician within the past 6 months to assess whether this is an isolated incident or an ongoing concern, and decide on best course of action, and B) ensure training is provided to this clinician regarding when SPI is required.  C) The CMH shall also ensure that all mental health staff attend the updated SPI training webinars in April 2020. | KVSP indicated that CAT audits have been completed and tracked. Over the course of the past two quarters, all clinicians have been audited and 22 of 28 (78%) have passed and all the clinicians who have failed have been mentored. It is recommended that this be closed out once KVSP has a six-month pass rate of 85%. Additionally, weekly group supervision is being offered for unlicensed clinicians. |
| There were multiple concerns identified with the IDTT completed on February 5, 2020. | **The KVSP CMH or designee shall** review the concerns identified in this QIP. At minimum, training shall be provided to the treatment team about the identified concerns and the necessary components required for IDTT documentation and EHRS orders. A special focus of this training should involve discussion of the importance of making appropriate diagnoses, initiating IPOCs, and placing level of care orders at the time of the IDTT. | One new clinician has been hired and onboarded since Q1 and has received the transfer discharge treatment planning recommendation training. Effectiveness is to be demonstrated by improved quality of treatment plans as demonstrated by supervisor audits. The institution has not yet determined a means by which supervisors are to audit treatment plans and present on the results. Therefore, this will remain open. |

There were two more deaths by suicide at KVSP in the calendar year 2022 and one more in 2023 that resulted in Mental Health QIPs that were still outstanding as of this site review.

| Issue Identified | CAP | Status |
| --- | --- | --- |
| Patient #1 | | |
| Within the past year, there was only one SRASHE completed for the inmate. The SRASHE was completed on June 2, 2021, in response to his last quarterly SRASHE after MHCB admission. It estimated both chronic and acute risk to be "low."  The risk justification acknowledged his ongoing drug use however appeared to believe the inmate remained sober and had not reported any suicide attempts or suicidal ideation in the previous 90 days.  The SRASHE also indicated that he was taking his psychotropic medication as prescribed and reported decreased anxiety and depression.  In the months prior to the SRASHE, the inmate reported consistent use of drugs and alcohol and distress over his mother health.  He got in a fight, received an RVR, stopped taking his prescribed psychotropic medication and reported depression at a 10. Given the severity of his symptoms in the months prior to this SRASHE, acute risk was underestimated. Additionally, as this was the only SRASHE completed, it likely impacted assessment of risk in other clinical documentation and may have resulted in the decision not to re-asses suicide risk during future clinical contacts. | The **KVSP CEO** shall review the concerns outlined in problems 1-3. Prior clinical concerns were identified with the EOP Primary Clinician who completed the following documentation: SRASHE (June 2, 2021), Master Treatment Plans (May 4, 2022, November 11, 2021, and September 8, 2021), and clinical documentation completed up to May 4, 2022. It is requested that the CEO review these concerns and determine best course of action, which can include disciplinary action or Peer Review. For the Treatment Plan completed on February 9, 2022, and clinical documentation completed from May 12, 2022, until date of death, the CEO shall review the concerns, and determine if these are an isolated incident or part of an ongoing pattern, and decide best course of action, which can include training. | The specific clinician who was responsible for this error is no longer employed at CDCR and all staff have since received relevant training which seems to have been effective. KVSP indicated that CAT audits have been completed and tracked. Over the course of the past two quarters, all clinicians have been audited and 22 of 28 (78%) have passed and all the clinicians who have failed have been mentored. It is recommended that this be closed out once KVSP has a six-month pass rate of 85%. |
| There were multiple concerns identified in the MH Master Treatment Plans (MTP): May 4, 2022, February 9, 2022, November 17, 2021, and September 8, 2021. These concerns will be discussed in three parts:<br><br>a. The MTP dated May 4, 2022, did not appear to include updated information on his progress since the last treatment plan.  The treatment plan indicated the inmate's increase in anxiety and depression were due to the loss of many family members as well as his mother's diagnosis of Dementia.  The treatment plan was not updated to include the inmate's low compliance with mental health treatment, | . | The institution has not yet determined a forum for the presentation of treatment plan audit results. This will remain open. |

| | | |
|---|---|---|
| increased isolation, nor continued drug use, all which were identified risk factors.<br><br>b. Three MTPs (May 4, 2022, November 17, 2021, and September 8, 2021) included two Individual Plan of Care (IPOCs) (goals) which included Substance Use/Abuse and Anxiety which had been initiated on March 17, 2021.  Only three entries were present since the initiation of these IPOCs in March of 2021.  This resulted in limited documentation of the inmate's treatment progress in the treatment plans.<br><br>c. The MTP dated February 9, 2022, appeared incomplete as it did not identify any IPOCs or PLOs in the current Progress Toward Goal section. | | |
| Between February and May 2022, documentation suggests the inmate was experiencing increased symptoms, including worsening depression and anxiety, isolation, ongoing drug use and anger. The documentation during the above specified period did not discuss at what point a higher level of care might be considered since the Plan/Disposition and Estimate Length of Stay sections of the weekly progress notes were not present due to not using the Free Text template rather than the MH PC Note template.  Given his worsening mental health symptoms, it is unclear as to why a higher level of care was not considered during this time. | | The institution has not yet determined a forum for the presentation of treatment plan audit results. This will remain open. |
| **Psychiatry:** As relates to an individual psychiatry appointments/contacts, there were more than several instances when the frequency of psychiatry contacts were inadequate; the time intervals between psychiatry contacts were greater than 30 days (which is longer than that allowed by the program guide).  Response to no-shows and refusal should also be reviewed and improved to lessen the interval between psychiatry contacts, when the patients do not attend psychiatry appointments.  Additionally, while containing mostly adequate individualized information, psychiatry documentation often contained copied | **KVSP Chief Psychiatrist** or designee will research these deficiencies to discover specifics and will consider implementation of strategies to prevent reoccurrence. | No new psychiatrists have been hired since last quarter and the institution has not determined a means by which to audit psychiatry documentation. This will remain open. |

| | | |
|---|---|---|
| and pasted sections from previous notes, including typos; psychiatry documentation must be individualized to reflect the unique interactions/evaluations occurring during each contact. | | |
| **Patient #2** | | |
| There were multiple concerns identified with the MH Master Treatment Plan documentation completed on September 8, 2021, December 1, 2021, February 23, 2022, and April 27, 2022.

a. First, the clinical summary section across IDTTs (September 8, 2021, December 1, 2021, and February 23, 2022) was insufficient as the information was primarily pulled forward without change from previous documentation and not updated per policy to reflect progression through the treatment process.

b. Second, the information in the transfer/discharge sections (September 8, 2021, and February 23, 2022) was pulled forward from prior documentation and not sufficiently updated to reflect current treatment needs.

c. Third, the goal setting with patient section (September 8, 2021, December 1, 2021, February 23, 2022, and April 27, 2022), which specifically requests a discussion of the "Inmate-patient's understanding of his/her treatment needs, perception of his/her strengths and needs, life goals, and progress towards meeting his/her identified goals" was insufficient as the question was not addressed and the content was copied and pasted across IDTTs (December 1, 2021, February 23, 2022, and April 27, 2022) with the exception of one sentence added at the discharge IDTT on April 27, 2022. | **The CMH or designee at KVSP** shall 1) review the authoring clinician's documentation for 5 inmate-patients over a 12-month period (to include initial assessments, treatment plans, progress notes, and suicide risk assessments) to determine if this issue represents an ongoing pattern; 2) based on the results of this review, the CMH shall determine the best course of action, which may include additional training to address any deficiencies. **Response:** This QIP has been closed out. After review, it was determined that training was indicated, and this training has been conducted. | **Follow up plan:** New hires at KVSP will receive the relevant training.

**Status as of Q2 2023:** One new clinician has been hired and onboarded since Q1 and has received training. Effectiveness is to be demonstrated by improved quality of treatment plans as demonstrated by supervisor audits. As indicated above however, the institution has not yet determined a means by which to present this data. This will remain open. |
| **Patient #3** | | |
| The patient was discharged from KVSP MHCB on January 18, 2023. However, the MHPC discharge summary was not completed in EHRS until January 31, 2023. | **The CMH or designee at KVSP** shall review at random 10 patients housed at KVSP MHCB within the last six months to determine if there is a pattern of MHPC Discharge Summaries being submitted late. | The CMH conducted an audit of ten random charts and a systemic pattern was not detected. Additionally, all MHCB staff were retrained on March 22, 2023, on the need to complete discharge summaries timely. No further |

| | | |
|---|---|---|
| | | follow-up is warranted, and it is recommended that this be closed out. |
| The MHCB discharge SRASHE was completed on January 18, 2023, and listed warning sign of feeling trapped. It was further noted that "his impulsive behaviors to engage in self-harm to get needs met when feeling trapped may increase his potential risk." The MHPC at the KVSP MHCB documented the patient was at low acute risk for suicide due to denial of suicidal ideation. The SRASHE failed to integrate the patient's warning sign into an accurate assessment of risk. | **The CMH or designee at KVSP** shall audit SRASHEs for five additional inmate-patients for the identified clinician within the past six months. Based on results of this audit, the CMH shall determine the best course of action. At minimum, the clinician shall be re-trained on the consideration of risk factors, warning signs, and protective factors in coming to a determination of a patient's acute risk for suicide. | The CMH conducted an audit of five SRASHEs completed by the responsible clinician and determined that this was an isolated incident. Nevertheless, that clinician received retraining on April 25, 2023. Additionally, supervisory review of MHCB discharge SRASHEs and safety plans are being conducted regularly once again at KVSP. No further follow-up is warranted, and it is recommended that this be closed out. |
| The patient repeatedly reported safety concerns at CSP-LAC D-Yard. He was admitted to the KVSP MHCB on January 10 following self-inflicted laceration on his left upper inner arm reportedly secondary to safety concerns (i.e., threats from other inmates). The patient informed the MHPC at the MHCB that if discharged back to CSP-LAC EOP he would continue to engage in self-injurious behavior. When the MHPC at the MHCB received information that the patient was concerned about his physical safety at his endorsed institution, this should have been reported to the MHCB Sergeant. The IDTT should have then documented the results of the investigation of safety concerns in the patient's Master Treatment Plan with specific verbiage as listed in the *Revised Mental Health and Custody Staff Reporting and Documentation of Patient Safety Concerns* Memorandum. Additionally, the Correctional Counselor was not present in the MHCB IDTT on January 11, 2023, and it does not appear that the communication occurred between Mental Health and Custody regarding the proper steps to address the patient's safety concerns. | **The Warden at KVSP or designee** shall initiate an inquiry to determine the reason for the Correctional Counselor's absence at the IDTT on January 11, 2023, and determine best course of action. | **Actions taken**: All MHCB clinicians were retrained on Mental Health and Custody Staff Reporting and Documentation of Patient Safety Concerns on April 5, 2023.

**Follow up:** All clinicians who are newly assigned to the MHCB will receive this training. Finally, a prompt to follow this policy is incorporated into the new safety plan and clinicians at KVSP are currently being trained on this. May 30, 2023, was the originally anticipated date for completion of this training. After that is completed, the MHCB supervisor will continue to conduct regular audits. The institution will determine the best course for presentation of this data and if no deviations from this policy are noted in safety plans for six months, it will be recommended that this QIP be closed. |

## Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for April 2023, as well as information obtained while on-site, indicated the following compliance rates:

### Clinical Training Compliance

# MEMORANDUM

### Mentoring – Hayes Item 18

- Clinicians mentored under the old and the new mentoring program=29/39 (74%)
- Clinicians mentored under the new mentoring program=25/39 (64%)
- Mentors fully trained under the new mentoring program =10/10

*Suicide Prevention and SRASHE Core Competency Building Training* = 34/39 (87%)

*Columbia-Suicide Severity Rating Scale Training (CSSRS)* = 29/39 (74%)

*Suicide Risk Management Program Training (SRMP)*= 34/39 (87%)

*Safety Planning Training =* 5/39 (12.8%)

*Discontinue the use of safety contracts =*26/39 (67%)

*Annual IST Suicide Prevention Training Compliance – Hayes Item 16* The institution indicated that 100% of the staff who have been scheduled thus far, have attended. In total, 33% have been trained. It is requested that this be broken down by discipline in future site visits.

### CPR Training

- Nursing=99%
- Custody=100%

Significant progress is noted with SRMP training compliance. Although not yet at 90%, the rapid improvement demonstrates that a process is in place to ensure that training is delivered. This CAP can now be closed out.

### Receiving and Release (R&R) Screening – Hayes Item 1

One R&R nursing screening was observed. The patient was an EOP patient who endorsed a history of mental health symptoms and treatment and denied current suicidal ideation. The nurse asked all questions appropriately and documented in real-time. She also ensured that the patient understood the 7362 process. The physical layout is conducive to the process.

### Crisis Intervention Team (CIT)

KVSP's LOP 1055 *Crisis Intervention Team (CIT)* was revised in May 2022 and serves as the institution's CIT policy. The requirement for unlicensed clinicians to consult with a supervisor in conjunction with crisis calls, is reflected in the LOP. There were not any CIT events observed during this site review.

During the first quarter of 2023, 24% of the CIT events included the correct composition of the team and in all cases of non-compliance, the patient was a direct admission to the MHCB. The nursing documentation was present in 97% of cases. The most common reason for CIT calls was once again DTS and the patient was returned to housing following the contact in 59% of cases. Once again, a random sample of five SRASHEs associated with these cases, demonstrated that the documentation justifying non-referral to a MHCB was adequate.

# MEMORANDUM

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary on Appendix A)

| Title | Definition of the Problem | May 2023 Update | Status |
|---|---|---|---|
| MHCB Observation Orders | Concerning practices regarding use of "Q-30 minute" observation within the MHCB unit were observed. First, almost all patients admitted to the MHCB for DTS were downgraded from Suicide Precaution status (with observation required at 15-minute intervals) to Q-30-minute observation within the first 24 hours of admittance. The second concerning practice regarding use of "Q-30 minute" observation within the MHCB unit was that some patients assessed as not being suicidal and placed on Q-30-minute observation still remained with "partial issue" clothing without a rationale for withholding "full issue" clothing (pg 182-183). | Clinicians have been trained to incrementally decrease observation status. Clinicians have also been trained to not restrict issue without justification. Regional SPRFIT has redistributed relevant policy memorandum. | **Close.** |
| Urgent/emergent referrals and SRASHEs | The required discharge SRASHEs were completed in all cases, and safety plans were completed in 89 percent (17 of 19) of the cases. This reviewer's examination of the data found problems in untimely supervisory review. For example, although discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, the data indicated that all supervisory reviews occurred well after MHCB discharge, and there was no documentation that discharge SRASHEs completed in October and November received any supervisory review (pg 184). | This continues to be in compliance as demonstrated by this audit cycle. | **Close.** |
| Discharge SRASHEs and Safety Plans | The reviewer was presented with documentation of 76 cases of inmates discharged from a MHCB or alternative housing placement who remained at KVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May through October 2021. The review found that only 67 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms | MHCB supervisory reviews are now being completed and proof of practice was provided. | **Open. This will continue to be monitored.** |

# MEMORANDUM

| | completed correctly by mental health clinicians, with the low completion percentage almost exclusively related to nursing staff discontinuing the checks on weekends without "face-to-face evaluations" by clinicians. This protocol was established in June 2021 following the statewide distribution of the revised "Discharge Custody Check Sheet" (CDCR MH-7497) form. Almost two-thirds of the custody checks were recommended for 48 hours or more by clinicians. In addition, only 71 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or missing check sheets (pg 185). | | |
|---|---|---|---|
| Custody Discharge Checks | Low compliance with the custody portion of the discharge custody checks forms and the early discontinuation of checks by nursing staff. | This concern was placed into the project pipeline and improvements were noted. | **Close.** |
| SPRFIT LOP | Lack of a SPRFIT LOP. | This LOP has been completed. | **Close.** |
| Suicide Prevention Training | Low training compliance for the previous calendar year. | While the institution cannot retroactively rectify 2021 compliance, they were in compliance in 2022. | **Close.** |

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).

Below are the three corrective action plans (CAPs) assigned during prior reviews, as well as an update and status.

| CAP | May 2023 Update | Status |
|---|---|---|
| The institution is non-compliant (under 90%) with two suicide prevention related trainings: SRE mentoring and SRMP. | Compliance achieved. | **Close.** |
| Treatment plans for patients in the SRMP program are qualitatively poor, in that they do not reliably have measurable treatment plan goals or | This continues to be a weakness. | **Open. This will continue to be monitored.** |

| | | |
|---|---|---|
| interventions that were related to the SRMP inclusion criteria. | | |
| KVSP's CIT LOP does not reflect the requirement that unlicensed clinicians consult with a supervisor as part of CIT calls. Specifically, *the Updated Crisis Intervention Team Policy and Procedure* memorandum dated July 2021, states "If unlicensed, the clinician will immediately consult with an administrative supervisor, or clinical supervisor prior to resolution of the CIT. Documentation shall reflect this consultation." | This requirement is reflected in the LOP. | **Close.** |
| Qualitative problems are noted with the SPRFIT meetings. Specifically, the project pipeline has not been uploaded to the SharePoint site and was not visually shared with participants on the day of the site review. Additionally, minutes lack evidence of the SPRFIT coordinator attending IAC and IFC regularly and also lack a discussion of specific improvement plans and interventions for ongoing problems. | This has been corrected. | **Close.** |
| Alternative Housing cells in C-yard are problematic. There is a gap between the top bunk and the wall, which could be used as an anchor point, and the cells lack visibility at night. | Not achieved. Remain open and expand this CAP to the ATH cells on D-yard. | **Open. This will expand to D-yard and continue to be monitored.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | May 2023 Update | Status |
|---|---|---|
| A review of 114s indicates that MHCB patients are not being offered phone calls reliably. The institution should review its pattern of practices to ensure that it aligns with statewide policy, which will be provided to the institution by this reviewer. | This has not been resolved. | **Open. This will continue to be monitored.** |

Below is the three new Corrective Action Plan (CAP) that have been generated as a result of this review.

| Concern | Corrective Action Plan |
|---|---|
| Safety plans are not being reliably completed for patients upon rescission from Alternative Housing | The institution will place this concern into the project pipeline during the SPRFIT committee meeting prior to the next site review in August 2023. |

# MEMORANDUM

**Conclusions/Comments**

An exit meeting was conducted with the local SPRFIT, Chief Executive Officer, Associate Warden of Healthcare, Healthcare Captain, and Chief Nurse Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - KVSP - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

# MEMORANDUM

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | MHCB observation orders. | Substantial | **Closed.** |
| 2 | Urgent/emergent referrals | Substantial | **Closed.** |
| 3 | Supervisory review of DC safety plans | Minimal | **Open. This will continue to be monitored.** |
| 4 | Discharge Custody Checks | Moderate | **Closed as of this review.** |
| 5 | SPRFIT LOP | Substantial | **Closed.** |
| 6 | Suicide prevention IST. | Substantial | **Closed.** |

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Suicide prevention trainings. | Substantial | **Closed as of this review.** |
| 2 | Qualitatively poor treatment plans for SRMP patients. | Minimal | **Open. This will continue to be monitored.** |
| 3 | Inadequate CIT LOP | Substantial | **Closed as of this review.** |
| 4 | Qualitative problems with SPRFIT meetings. | Substantial | **Closed as of this review.** |
| 5 | Alternative Housing Cells. | None | **Open. This will continue to be monitored.** |
| 6 | Safety plans not being completed. | None | **New CAP** |

**APPENDIX C**- KVSP's status on Lindsay Hayes statewide outstanding items.

| Aspect of Recommendation that Remains Outstanding | KVSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% but in process. |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly, however problems with the performance report are impacting accuracy. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASplacement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Compliant | Safety plans and supervisory reviews are being completed |
| No. 18: Safety planning training | Partially compliant | Training is underway |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Partially compliant | One domain out of compliance and it is in the project pipeline. |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Complaint | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are mostly being reliably offered, CQIT is a statewide issue, and KVSP does not have a Reception Center |

Exhibit G

 CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 06/28/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | WASCO STATE PRISON SUICIDE PREVENTION TOUR-Q2 May 2023 |

On May 17-18, 2023, the Region III Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator conducted a review at Wasco State Prison (WSP). The focus of the review centered on their Administrative Segregation Unit (ASU), Mental Health Crisis Bed (MHCB), and Reception Center (RC) to ensure compliance with statewide suicide prevention and response policies.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 3 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 1 |
| Anticipated new Lindsay Hayes CAP | 1 |
| CAPs previously generated by this reviewer that remain open | 2 |
| New CAPs generated as a result of this review | 0 |
| New recommendations generated as a result of this review | 0 |
| Previously generated recommendations that remain open | 2 |

Total CAPs that remain open=4
Total recommendations that remain open=2
Total CAPs closed this review=4

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

# MEMORANDUM

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Second Watch Morning Meeting

The second watch morning meeting was observed, and it was an efficient and effective meeting. It was attended by the sergeant, a psychologist, and a psychiatric technician (PT). All required elements were discussed, including new arrivals, intake cell usage, and patients in the Suicide Risk Management (SRMP) program. The latter of which, represents improvement since the last site review (August 2022).

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was a regularly assigned Psychiatric Technician (PT) who was observed completing rounds and she did so effectively. She had a list of all the patients in the unit and was able to reference it, as well as EHRS, to determine which were members of the Mental Health Services Delivery System (MHSDS) and which were not. Regardless, she exceeded policy expectations by charting on all inmates. She asked all MHSDS patients about suicidal and homicidal ideation, as well as sleep and appetite. She had with her a small supply of formerly used handouts, as she still does not have internet access.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with the last three site visits, WSP has 14 intake cells (117-130), two of which are designated for ADA inmates. All of these cells, including the ADA designated ones (117-118), are retrofitted in compliance with statewide policy. On the day of this review, five of those cells were occupied and all seven had been in an intake cell for less than 72 hours. All new intakes (inmates who arrived at ASU less than 72 hours ago) were appropriately housed, as there were five in intake cells and two others who were housed together as compatible cellmates.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Four inmates, including two of the five who were in intake cells, were interviewed and all indicated that they had been provided with an entertainment appliance upon arrival to the housing unit.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

This reviewer requested a Guard One tracker report for a randomly determined 24-hour time period (April 5 at 0600 to April 6 at 0600) and it was provided. Results indicated that that in that time period, 4,321 checks were completed and remarkably, 4,320 (99%) were completed timely (less than 35 minutes apart). This observer also watched one custody officer completing checks and he seemed to do so appropriately, establishing a visual with the inmate in the cell before moving on to the next one.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU pre-placement screens observed as part of this review. According to the performance report, there were 168 such screenings completed during the first quarter of 2023 and the institution was in compliance at 97%.

### 70.1 ASU Pre-Screens



## ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU post-placement screenings observed as part of this review. According to the performance report, there were 82 such screenings conducted at the institution in the first quarter of 2023 and 100% were completed timely.

### 70.2 ASU GP Screens



## Inpatient Units (MHCB and/or PIP)
## Suicide-Resistant Cells – Hayes Item 10

WSP-RC has six Mental Health Crisis Beds (MHCBs) and all have been previously determined to be suicide resistant.

## Interdisciplinary Treatment Teams (IDTT)

Two IDTTs were conducted at the MHCB on the day of this site review, and both were observed. Both were discharge IDTTs for patients who had been admitted for Danger to Self (DTS). In both cases, the primary clinician (PC) served as the IDTT leader who effectively discussed the purpose of the IDTT and facilitated a team discussion. The IDTT included an interactive discussion by all members, towards the patient's treatment plan goals. Issue and observation was discussed in both cases. While the safety plan was discussed collaboratively with the patient in one case, the clinician in the other case articulated afterwards, that she did not believe that it was clinically indicted to do so with her patient, as it had been discussed with him the day prior and she believed that the patient would be oppositional in response to this, given that he was already resistant to being discharged. One other concern that arose during the IDTT, is that one of the two patients had safety concerns which the treatment team acknowledged, however they were

not resolved appropriately according to statewide policy. This concern was elevated to both the CMH and the AW of Healthcare who appropriately intervened.

The institution provided evidence that supervisory reviews of discharge safety plans are being regularly conducted, however the two patients who were discharged on the day of this review were not included in the data set. It is unclear therefore, whether or not the safety plans were actually reviewed prior to the discharge. As indicated above, one of the two patients endorsed safety concerns and this was acknowledged by the treatment team, however the documented safety plan did not contain any acknowledgement of this.

### Quality of Safety Planning – Hayes Item 4

Based on a review of the performance report, quality of safety plan audits were conducted during the first quarter for 32 safety plans. According to this report however, all 32 failed with a score of 0 out of 14, which is unlikely to be accurate. Modifications are presently being made to the audit tool and this will likely improve performance report accuracy. A random sample of 10 safety plans completed during the first quarter of 2023 were audited by this reviewer and all were deemed to be adequate. During his most recent review however, Lindsay Hayes identified several safety plans that he deemed problematic.

### Suicide Watch and Suicide Precaution

On the day of this review, all six patients in the MHCB were on suicide precautions. Issue and observation orders were on the doors in all six cases. Nursing staff was observed conducting the rounding and the rounds were done appropriately with visual contact being established in each case and documentation occurring in real time. In one case, a patient on suicide precautions placed paper over his windows and refused to verbally respond to the nurse. She attempted to obtain cooperation and when the patient did not respond, the nurse activated her personal alarm. Additionally, this reviewer was able to briefly speak to two MHCB patients and both indicated that they have been provided with the items that were ordered for them. For April 2023, 95.4% of suicide precaution rounds were completed timely and checks were staggered 95.4% of the time.

### Observation and Issue Orders – Hayes Item 3

The charts for a randomly selected sample of 10 patients who completed a full MHCB stay during the first quarter of 2023, were audited. Each day in which the patient was ordered less than full issue, was reviewed to ensure that orders, as well as notes justifying them, were present. This sample yielded 69 total patient days and while orders were present in all 69 cases, a note justifying issue and observation was present in only 45 (65%). On seven patient days, the note was qualitatively questionable. In two cases, the note was exactly the same as the prior day, it was inconsistent with the order in three cases, and not patient specific in two cases. Despite the many strengths of the institution's suicide prevention efforts, this is an issue that has persisted at WSP-RC for quite some time. It is recommended that the institution once again consider viable options for remediation.

## Timelines for Suicide Risk Assessments

In the first quarter of 2023, WSP-RC was compliant with timely suicide risk assessments at 99%.



With regards to confidentiality, the closed appointments report indicates that WSP-RC completed 385 Suicide Risk Evaluations, 292 (76%) were completed in a confidential setting. Among those appointments that were not completed in a confidential setting, the patient's refusal and modified program were the modal reasons. This indicates that WSP-RC reliably offers confidential contacts to patients for the completion of suicide risk evaluations.

## Privileges – Hayes Item 14

The 114s for all six MHCB patients were reviewed to ensure that all of those who were approved for privileges were appropriately offered those privileges. While five of the six indicated that the patient had been offered yard, none indicated that they had been offered telephone calls. This was brought to the attention of custody leadership and need not result in a CAP at this time. However, if deficiencies are noted locally when this item is presented in SPRFIT subcommittee per the measurement plan in July, the institution will develop a CAP.

## Clinical Discharge Follow-Ups

A review of the performance report from the first quarter of 2023 indicates that the institution was in compliance with timely clinical discharge follow-ups at 100%. A random sample of 15 patients who were either discharged from a MHCB, or rescinded from Alternative Housing during the first quarter of 2023, were selected for chart review. In all 15 cases, the follow-ups were completed for at least five days and the safety plan was present for each applicable day. Only nine contained documentation, either in the Powerform or the presence of the first page of the 7497 being scanned into the chart, that indicates that the custody portion of the follow-ups were discontinued by a mental health clinician. Given the local 7497 audit results, it is likely that these checks are regularly discontinued by a mental health clinician and not nursing staff, however this is not being properly documented. The MHCB supervisor has indicated that staff will be trained to document accordingly, so this need not rise to the level of a CAP at this time.

## Alternative Housing – Hayes Item 5

WSPs LOP 018, ATH Placement, MHCB referral, rescission, and discharge policy addresses alternative housing and was most recently revised in March 2023. The prioritization of designated cells are CTC cells first, then cells 146 and below in building B2 for SNY patients, and a ground-floor holding cell for ASU inmates.  All other patients are simply maintained in a bottom-tier cell. The cells at B-2 were observed as part of this site review. The officer is able to control the lights

from the outside on all of these cells. The lights however, do not dim. While this may be disruptive to the patient's sleep during overnight alternative housing stays, it is not a violation of statewide policy. There were no patients on suicide watch in alternative housing during this site review. During the first quarter of 2023, Alternative Housing timeframes were in compliance at 100%.

## Suicide Risk Management Program (SRMP)

WSP-RC's OP 119 *Suicide Risk Management Program* addresses the SRMP at the institution and it was most recently signed in September 2022. It is consistent with statewide policy. On the day of this site review there were two patients in the SRMP and none who met objective criteria but were not enrolled. Both patients in the SRMP were originally placed into the program at a different institution and one had not yet had an IDTT at WSP-RC. In the other case, the patient had one IDTT at WSP-RC, however the clinician had incorrectly noted that the patient was not in the program and as such, progress towards his treatment plan goals was not documented. Given the relatively small sample size, as well as WSP-RC's regular monitoring of this in SPRFIT subcommittee, it will not rise to the level of a CAP at this point but will if it persists in future reviews.

## Discharge Custody Checks – Hayes Items 7 and 11

The institution conducts audits of custody discharge checks and submits them monthly. A review of all three months of the checks for the first quarter of 2023 indicates that all were in compliance (above 90%) and in two months, there was only one domain (name of clinician completing the form and follow up status on day one) that was below 80% compliance. SPRFIT meeting minutes for March and April 2023, both indicate that the clinicians who were responsible for these errors in the months of February and March, received training. Compliance with discharge custody checks remains a strength of WSP-RC.

| January | 98% |
|---------|-----|
| February | 96.6% |
| March | 94.1% |

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer attended the SPRFIT subcommittee meeting on January 17, 2023 and it was noted to be collaborative with all of the required elements having been covered. It is noted that WSP-RC was a phase 2 institution for SPRFIT reboot rollout and while all required SPRFIT subcommittee members were trained by January, all necessary data had not yet been collected during the month of December as training was still ongoing at that time. Minutes for all three months of quarter 1 were reviewed and with the exception of February having not met quorum, all required elements were covered. The February SPRFIT committee approved January's minutes via electronic vote.

All required elements of the reception center specific audits were presented accordingly, including an overview of the results of the poster audit, the Release of Information (ROI) requests, and the reviews of SOMS and the initial health screening.

# MEMORANDUM

## Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

Minutes from the March 2023 SPRFIT meeting indicate that the IAC was attended by the SPRFIT coordinator on February 28, 2023 and the minutes from that meeting were included within the SPRFIT minutes.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the first quarter of 2023, WSP-RC was in compliance with the completion of suicide risk evaluations in conjunction with MHPC emergent consults for DTS at 99% and all DTS cases were appropriately triaged as emergent referrals, indicating that this continues to be a significant area of strength for WSP-RC and demonstrates improvement since the last site review (August 2022). Furthermore, the one case in which the performance report reflects that a suicide risk evaluation was not completed timely, was the result of a data-entry error in which the patient actually was seen timely. The monthly breakdown is as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| January | 98% | 100% |
| February | 100% | 100% |
| March | 100% | 100% |
| Q1 totals | 99% | 100% |

Additionally, a random sample of five urgent orders from the first quarter of 2023 were reviewed to ensure that none contained references to suicidality or self-harm and none did. They are all deemed to have been appropriately triaged as urgent referrals.

## Suicide Risk Evaluations – Hayes Item 13

As indicated above, WSP-RC was in compliance with suicide risk evaluations at 99% during quarter 1 of 2023. This included 100% compliance with evaluations competed at the time of MHCB discharge and 98% with MHCB referral rescissions. A random sample of 10 MHCB referral rescissions were reviewed and all 10 contained a SRASHE and a safety plan regardless of estimated acute risk.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

As of the last quarterly review, all prior suicide case review QIPs had been closed out. As of the time of this (Q2 2023) review, there had been three more suicides at WSP-RC, two of which resulted in mental health QIPs. Responses for one however, were not yet due. The two that emerged in the other case are as follows:

| Issue Identified | QIP | Status as of Q2 2023 |
|---|---|---|
| The patient's MH Screening did not appear to include a thorough review of his EHRS record, per policy. Specifically, the Initial Intake Screening and county jail records were not incorporated into his MH Screening yet had relevant information about his suicide history. Per HQ Memorandum, dated August 22, 2019, entitled, Clarification of Mental Health Documentation Review Requirements: "This memorandum clarifies documentation requirements during the reception center mental health assessment process per the Mental Health Services Delivery System Program Guide (2009 Revision), Chapter 2, Reception Center Mental Health Assessment, pages 12-2-5 and 12-2-7. | **The CMH and/or designee at WSP** shall review this concern and: a. Audit ten charts of the MHPC who conducted the MH Screening Interview to determine if this is an ongoing issue. b. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on mental health documentation review policy, as required during the completion of a MH Screening Interview. | An audit was conducted of 10 screenings that were completed by the identified clinician and two contained deficiencies. That clinician will be provided with a refresher training, as will all clinicians who complete diagnostic screenings and will include a review of the August 22, 2019 Clarification of Mental Health Documentation Review Requirements memorandum. 844s will be submitted upon completion. After that, the SPRFIT coordinator, supervisor, or a designee, will audit diagnostic screenings twice monthly by observing the screening process and will report findings of observed compliance in SPRFIT subcommittee according to the SPRFIT reboot reporting schedule. This will be discontinued once 90% compliance is observed for one audit cycle. |
| The patient's 8-page county jail Intake Packet, noted, 'Suicide History'. During Initial Health Screening, the patient endorsed a suicide attempt, "[two] months ago in county". WSP failed to appropriately review these records and complete a SRASHE, as per CDCR Policy. The Program Guide states in 12-10-9, "*At minimum, a written suicide risk assessment using a SRASHE shall be completed… (8th bullet point) Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats or attempts.*" | **The CMH and/or designee at WSP** shall review this concern and: a. Audit ten charts of MHPC who failed to conduct the SRASHE, specifically concentrating on whether appropriate risk assessments were made with SRASHEs completed based upon Initial Health Screening and county jail records, to determine if this is an ongoing issue. b. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on when Program Guide requires administration of a SRASHE upon screening of a new arrival to an institution. | 10 screenings were audited and none contained deficiencies. Only one patient would have required a SRASHE per program guide requirements and he had already been seen by CIT for the same issue. Training will be provided to all clinicians who conduct screenings and 844s will be submitted upon completion. Additionally, the supervisor will audit two of said clinicians screenings monthly for three months and will provide intervention as necessary. |

## Training and Mentoring Compliance
### Clinical Training Compliance (mental health clinicians only)
*-Mentoring* =0%

*-Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building)* =45/45 (100%)

*-Safety Planning Training – Hayes Item 18* =40/45 (89%)

*-Suicide Risk Management Program Training* =45/45 (100%)

*-Columbia-Suicide Severity Rating Scale Training* =34/45 (76%)

*-Discontinue the use of safety contracts=*Institution unable to provide data.

## Custody Staff Training

*Annual IST Suicide Prevention Training – Observation*

This training was not observed during this site review.

*Annual IST Suicide Prevention Training Compliance  (Through April 2023)*

- Custody=396/794 (49.8%)
- Mental Health=17/39 (43.58%)
- Healthcare=88/263 (33.46%)

*CPR Training*

- Nursing=100%
- Custody=100%

## Receiving and Release (R&R) Screening – Hayes Item 1

The R&R process at WSP-RC remains problematic. Construction on a new medical clinic has been ongoing for quite some time and as of the day of this site review, it still was not yet complete and a tentative completion date of June 5, 2023, was offered. However, the institution has taken measures to improve confidentiality over time. One nurse was observed completing an interview and rather than separating out the two bad news questions, they were combined into one question. This reviewer provided that feedback in real time and the nurse was receptive. The screening was otherwise adequate.

## Reception Center Processing

### Diagnostics Process

One clinician was observed completing diagnostic screenings. Five were observed and in all five cases, the interview was conducted confidentially, and all questions were asked appropriately. The clinician was observed to review the relevant records and asked all five patients, including one who did not have any history of mental health treatment in the community, if they wished to sign an ROI for records. However, the manner in which this question was asked had some flaws. For example, one patient reported having been hospitalized in the community on an involuntary basis and the clinician did not query further about specifics (which hospital, when, etc.), and did not specifically ask the patient to sign an ROI. The clinician was offered training and coaching in real-time by this observer and this was also brought to the attention of mental health leadership. During his most recent site review of WSP-RC, it was recommended by OSM expert Lindsay Hayes that the SPRFIT coordinator regularly conduct in-person audits of the diagnostic screening process and that recommendation is seconded by this reviewer, as real-time training and monitoring can be offered in situations where the ROI request, or records review request,

was observed to be inadequate. Otherwise, the diagnostic screening process at WSP-RC is efficient.

### Suicide Prevention Poster Audit

A review was conducted of all RC housing units, as well as all medical clinics, mental health treatment space, and R&R. English and Spanish versions of the suicide prevention posters were present in all areas with the exception of one side of one housing unit (C2 B-side) in which only an English poster was present. However, this was corrected in real time. The posters are audited monthly by the local SPRFIT and minutes suggest that posters are consistently present in nearly all required areas.

## Crisis Intervention Team (CIT)

WSP-250 Crisis Intervention Team serves as the institution's CIT policy. CIT operates seven days per week at the institution and the hours of operation are as follows:

Sunday: 0800-2100

Monday-Tuesday: 0700-2100

Wednesday-Friday: 0700-1800

Saturday: 0800-1800

There were not any CIT calls observed as part of this site review. A review of the CIT quality management report indicates that 97% of the CIT events in the first quarter of the year contained nursing documentation and 23% had the complete composition of the team. 70% of the calls were for DTS and 45% of all CIT calls resulted in a MHCB admission. It appears that all but one of the calls that did not have full composition of the team was the result of a direct admission to the MHCB or alternative housing.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary in Appendix A).

Special Master's Office expert Lindsay Hayes conducted a review of the suicide prevention practices at WSP-RC on July 6-7, 2021 and more recently on April 18-19 2023. The following is a summary of the findings and current status of recommendations from the 2021 visit, as the written report from the most recent site review has not yet been received, however one recommendation is anticipated.

| Title | Definition of the Problem | May 2023 Update | Status |
|-------|---------------------------|-----------------|--------|
| Problematic R&R nursing screenings. | Not all questions were asked appropriately and privacy was compromised. | Minor deficiencies were noted with questioning. Confidentiality remains compromised until HCFIP completion (see above). | **Open. This will continue to be monitored.** |
| Urgent/emergent referrals and SRASHEs | It was noted in a sample of charts that not all emergent referrals for DTS had an associated SRASHE completed and not all DTS cases were triaged as emergent. | A review of 100% of the available cases shows ongoing compliance with both variables of above 90%. | **Close.** |
| Discharge custody checks. | Low compliance with the mental health portion of the discharge custody checks forms. | Compliance has been noted (see above). | **Close.** |
| Local policies | Three policies were not complete. | These policies have since been completed. | **Close.** |
| **Anticipated problem from 2023 review** | **Definition of the Problem** | **Corrective Action Plan** | |
| Poor quality safety plans | A review of a sample of safety plans were determined to be qualitatively poor. | This item to be placed on the project pipeline. | |

# MEMORANDUM

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary in Appendix B)

Below are the four corrective action plans (CAPs) assigned during prior reviews, as well as an update and status.

| CAP | May 2023 Update | Status |
|---|---|---|
| Justifications for observation and limited issue are clinically insufficient. | Not resolved. The SPRFIT subcommittee will place this into the project pipeline and consider options for remediation. | **Open. This will continue to be monitored.** |
| An audit of nursing rounding for patients on suicide precautions, reveals that checks are not being consistently done in a staggered fashion. | Checks were reliably staggered (above 90%) in April 2023 and above 85% for the two months preceding that. This can now be closed out. | **Close.** |
| It was observed during a prior site review that at least three inmates were not being constantly observed after being placed in a therapeutic module to await an evaluation by a mental health clinician. | A workgroup has convened and this issue no longer persists. | **Close.** |
| Safety plans are not being reliably completed for patients who are rescinded from suicide watch in alternative housing when they are assessed as low acute risk. | A review of 10 charts for patients who were rescinded from alternative housing in the first quarter of 2023 found that this is now being completed. | **Close.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | April 2023 Update | Status |
|---|---|---|
| Create a prompt in the sergeant's log book at ASU to remind clinicians to discuss patients in the SRMP program during the morning meeting. | While the creation of the prompt has not been completed, SRMP is being reliably discussed in the morning meetings. | Close. |
| Allow for PTs at ASU to have internet access in order to obtain handouts for ASU inmates. | Not completed. | Remain open. The institution should explore alternative ways to ensure PTs have access to handouts for patients daily. |

There are no new Corrective Action Plans (CAPs) or recommendations that have been generated as a result of this review.

# MEMORANDUM

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, the CMH, the Warden, AW of Healthcare, Captain of Healthcare, and Chief Nursing Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 and via exit call in 2023. | Progress | Follow-up status |
|---|---|---|---|
| 1 | Non-confidential R&R screens | Moderate | **Open. This will continue to be monitored.** |
| 2 | Urgent/emergent referrals | Substantial | **Close.** |
| 3 | Discharge Custody Checks | Substantial | **Close.** |
| 4 | Local policies | Substantial | **Close.** |
| 5 | Safety Plan quality. | None | **New.** |

**APPENDIX B-** Summary of CAPs generated by regional SPRFIT tours and progress.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Justification for issue and observation in MHCB. | Minimal. | **Open. This will continue to be monitored** |
| 2 | Non-staggered suicide precaution checks. | Substantial | **Close.** |
| 3 | Patients not being reliably observed while awaiting evaluation. | Substantial | **Close.** |
| 4 | Safety plans not being reliably completed for ATH discharges. | Substantial | **Close.** |

# MEMORANDUM

**APPENDIX C-** WSP's status on Lindsay Hayes statewide outstanding items

| Aspect of Recommendation that Remains Outstanding | WSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Non-compliant | HCFIP project not yet complete |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% but in process. |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly, however problems with the performance report is impacting accuracy. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS) | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Compliant | |
| No. 18: Safety planning training | Compliant | Above 90% |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | Below 90% |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Non-compliant | Below 90% |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Non-compliant | Quorum not regularly met. |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are still not being reliably offered, CQIT is a statewide issue, and the institution has not yet solidified a plan for consistent in person diagnostic screening audits although monthly chart audits are in compliance. |

Exhibit H

 

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 07/25/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CALIFORNIA CORRECTIONAL INSTITUTE SUICIDE PREVENTION TOUR R2-July 2023 |

On July 18, 2023, the Statewide Suicide Prevention Coordinator conducted a review at California Correctional Institute (CCI). The focus of the review centered on their Administrative Segregation Unit (ASU) and the Receiving and Release (R&R) areas to ensure compliance with statewide suicide prevention and response policies.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 3 |
| Lindsay Hayes CAPs that remain open | 2 |
| New preliminary Lindsay Hayes CAPS | 2 |
| CAPs previously generated by this reviewer that remain open | 2 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 1 |
| Previously generated recommendations that remain open | 1 |

**Total CAPs closed=3**
**Total CAPs that remain open=7**
**Total recommendations that remain open=2**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Second Watch Morning Meeting

The morning meeting was not observed as part of this review.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was one PT observed completing rounds. This PT had completed most of her rounds before the arrival of this reviewer and as such, only two contacts could be observed. She asked all required questions, including querying about suicidal and homicidal ideation, with both patients. She also asked both patients about medication concerns and offered to return with psychoeducational materials on their medications. She made one mental health referral as indicated. She had with her a laptop but was not using the shoulder strap that had previously been provided to PTs and she indicated that she did not personally find it comfortable. Charting was completed in real time, nonetheless.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

There continues to be 11 intake cells: six on A side (101-106) and five on B side (101-105). During this site review, two of those cells (A side 104 and 105) were occupied and in both cases, the inmates had been there for less than 72 hours. There were not any inmates who had been in ASU for less than 72 hours who were not appropriately housed. This is the third consecutive audit period of sustained improvement. Another area of noted improvement was that permanent stenciling is now present on all intake cells.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

This reviewer either spoke to or observed a total of seven inmates at ASU, including both inmates who were in intake cells, to assess for the presence of an entertainment appliance. All seven inmates were either observed to have one or reported having gotten one, however there was one who indicated that the radios get poor reception.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

On the day of this on-site audit, this reviewer observed one custody officer completing welfare checks using Guard One. He took the time to look into each cell and appeared to establish visual contact with a living and breathing inmate each time. Additionally, this reviewer was provided with a Guard One tracking report for a randomly determined 36-hour period (0600 on July 16 to 1800 on July 17). This report indicates that during that period, there were a total of 1,635 checks conducted, 1,588 (97%) of which were completed timely.

### ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were no ASU pre-placement screens observed by this reviewer during this site review as none were indicated.

# MEMORANDUM

With regards to overall compliance with ASU screenings, the performance report indicates that the institution was in compliance with this metric (87%) during the last two quarters (January through June 2023):



### 70.3 ASU Pre-Screens

ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There was one ASU post-placement screening observed. Although the PT asked all the required questions, completed the form appropriately, and arrived at the correct clinical disposition considering the patient's responses, she did not offer the patient a confidential contact. This reviewer provided her with this feedback, and she indicated that she is not a regular during second watch on ASU.

A review of the performance report indicates that during the first two quarters of 2023 (January to June), CCI was below compliance with the timely completion of these screens at 84%. Upon consultation with the regional Nurse Consultant, this will rise to the level of a CAP as delineated below.



### 70.4 ASU GP Screens

### Inpatient Units (MHCB and/or PIP)

CCI does not have a MHCB. The institution has an Outpatient Housing Unit (OHU) which will be discussed in further detail in the alternative housing section of this report.

### Quality of Safety Planning – Hayes Item 4

The performance report indicates that for the first two quarters of 2023, only one safety plan was reviewed locally, and it was not deemed to have passed. This reviewer audited the safety plans of all five patients who were rescinded from alternative housing during the second quarter of 2023, as well as for a randomly determined four others who were rescinded during the first quarter of 2023 and all nine were deemed to be inadequate. It should be noted that during this period, the statewide training on the new safety plan had rolled out and CCI demonstrated poor performance on use of both the old (Safety Plan Intervention) and the new (Safety Plan) tools. This deficiency was also noted by Lindsay Hayes during his most recent site review.

Alternative Housing – Hayes Item 5

**SRASHE and SPI compliance**

During the first quarter of 2023 there were a total of 12 inmates who were admitted to alternative housing on suicide watch at CCI for Danger to Self and rescinded without being placed into a MHCB and there were 5 more such cases during the second quarter for a total of 10. This auditor reviewed 10 of those charts and previously identified concerns continued to be noted. A SRASHE was completed per policy in all 10 cases, however there were 2 cases in which a safety plan was not completed. Notably, none of these deficiencies occurred during the second quarter of the review period, suggesting that perhaps improvement had been made in the interim. Justification for decreasing the level of care was present in all 10 cases, however problems with safety planning quality was noted (as discussed above). The CAP related to this issue will remain open at this time.

**Cell compliance and location**

CCI's LOP 12.5.1, *Outpatient Housing Unit Alternative Housing* was last updated in March 2022 and despite repeated reminders from this reviewer, it still has not been updated. The LOP states that patients in mental health crisis are to be "assigned to a cell with an affixed safety bed with a safety mattress" and upon inspection, those two cells are cells 14 and 15 in the OHU. This remains unchanged since the last visit. In the even that such cells are unavailable, the policy delineates the following order:

1.) Patient shall be placed in an OHU-AH room and be provided a hospital bed or Safety Stack-A-Bunk bed with a safety mattress.
2.) If all OHU-AH medical beds are full, the Provider on Call is to be contacted to arrange for transfer of a medical patient occupying the OHU-AH Housing medical bed to a CTC, or a contracted med-surge hospital in order to open that bed for the patient in mental health crisis.
3.) If an OHU-AH room (mental health or medical) is not available, the patient in mental health crisis shall be placed in OHU-AH Overflow on Suicide Watch. OHU-AH Overflow is located at the Facility B clinic holding.

4.) The Classification and Parole Representative (C&PR) or Watch Commander (WC) shall be notified within one (1) hour of referral to MHCB.

While technically in compliance with statewide policy, it was noted during the last review (January 2023) that these cells had at least partially frosted windows, making full observation difficult. It is once again recommended that the institution consider whether it is necessary to include these cells in the LOP, as there had only been 17 patients in alternative housing for the entire first half of 2023. This issue was placed in the project pipeline during the February SPRFIT meeting but as of May, still not appropriately assigned a risk score. As such, the SPRFIT committee has not been able to properly assess the scope of the problem.

**Transfer timeline compliance**

According to the performance report, CCI was in compliance (98%) with timely transfers to a MHCB- during the first half of 2023.



Suicide Risk Management Program (SRMP)

CCI's LOP 12.10.4 *Suicide Risk Management Program* addresses CCI's SRMP program and was renewed in December 2022. It was determined during a prior review to be in accordance with statewide policy.  On the day of the visit, there were not any patients enrolled in the SRMP and none who met objective criteria but were not enrolled.

Discharge Custody Checks – Hayes Items 7 and 11

CCI regularly conducts audits of their 7497 post-discharge custody checks. The data for the first half of 2023 is as follows:

| Month | Overall compliance | Total number of packets audited | Primary drivers of non-compliance |
|-------|---------|---------|---------|
| January | 93.3% | 3 | 30-minute checks |
| February | 100% | 2 | None |
| March | 90.6% | 8 | 30-minute checks |
| April | 76.9% | 3 | Mental health portion |
| May | 82.9% | 4 | Mental health portion and 30-minute checks |

| June | NA | 0 | NA |
|------|----|----|----|

In summary, compliance with custody discharge checks was very strong during the first quarter of 2023 and then compliance decreased. As described above, meeting minutes continues to lack a substantive discussion of the root cause of the issue or of recommended corrections.   This CAP will remain open.

## Institution SPRFIT Committee Observation – Hayes Item 19a

The Regional SPRFIT did not observe any of CCI's monthly SPRFIT meetings since the last site visit. Meeting minutes for each month of the last 2 quarters have been uploaded to the SharePoint site, as have the project pipelines from January through April 2023. Minutes from January through April inclusive, demonstrate that quorum had been met despite the absence of a senior or chief psychiatrist. The institution was of the understanding that this was not required given the absence of allotment for a position, however during the Lindsay Hayes review in April, this was deemed inadequate. As such, minutes from May reflect a designated psychiatrist presence. While all required elements are discussed and audits reported per the measurement plan, the minutes lack a substantive discussion of how to solve compliance problems. For example, the PT rounds were noted as being below the acceptable compliance rate of 90% for three consecutive months with the matter simply attributed to a staffing shortage. Additionally, although non-compliance was noted with 7497s during the month of April, May's minutes only acknowledge this and do not discuss a reason for non-compliance or a plan to correct it.

## Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

SPRFIT Committee meeting minutes for the last six months reflect that the SPRFIT coordinator attended the Inmate Family Council on February 10, 2023. A summary of the SPRFIT coordinator's role in the meeting was documented. However, the minutes do not reflect that the SPRFIT coordinator has attended the Inmate Advisory Council meeting.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the first half of 2023, overall SRASHE compliance at CCI was 98%. In cases in which an emergent contact was required for Danger to Self (DTS), the SRASHE was completed timely 100% of the time. For the quarter, there was only one DTS case that did not result in an emergent referral.

| SRE after Em.Consult (except PIP) for Suicidality | 54 | 0.0 | 100% |
|---|---|---|---|
| SRE after Ro.Consult (execpt PIP) for Suicidality | 1 | 0.0 | 100% |

| Month | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| January | 100% | 100% |
| February | 100% | 100% |
| March | 100% | 99% |
| April | 100% | 100% |
| May | 100% | 100% |
| June | 100% | 100% |
| First half totals | 100% | 99% |

The institution continues to demonstrate ongoing compliance in this area.

## Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for June 2023, as well as information obtained while on-site, indicated the following compliance rates for mental health specific suicide prevention trainings:

| Training | Clinicians trained/total clinicians | Compliance percentage |
|---|---|---|
| SRE Mentoring | 17/22 | 77% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 22/22 | 100% |
| Safety Planning Training | 22/22 | 100% |
| Suicide risk management program training | 22/22 | 100% |
| Columbia-Suicide Severity Rating Scale Training | 22/22 | 100% |

On the day of this site review, the institution provided this reviewer with training compliance with suicide prevention IST training through June 30, 2023, and that is summarized below.

| Department | Total staff/trained | Compliance percentage |
|---|---|---|
| Custody | 499/514 | 97% |
| Medical/nursing | 116/119 | 97.47% |
| Mental Health | 14/37 | 37.83% |
| Total Staff | 639/656 | 97.4% |

With the exception of the mental health staff, all departments at CCI are on pace to be in full compliance with the suicide prevention IST training by the end of the calendar year 2023. Given that the institution fell below overall compliance during the calendar year 2022, this will result in a recommendation not rising to the level of a CAP as delineated below.

# MEMORANDUM

## Receiving and Release (R&R) Screening – Hayes Item

Consistent with prior site visits, CCI has four different R&R facilities, one on each activated yard (A, B, C, and D). During this site review, there was one screening observed on C yard. The screening took place in the minor procedures room with the door closed and a custody officer posted immediately outside. The nurse asked all the questions appropriately. A mental health referral was not warranted in this case, but the nurse took the time to ensure that the patient was educated on the use of inmate request for services (7362) forms should the need for services arise. Suicide prevention posters were present in the room as well.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

As of this review, there is one QIP from a death by suicide that occurred in 2022, that remains in monitoring status.

| Issue Identified | QIP | Status as of Q2 2023 |
|---|---|---|
| The treatment plan dated April 7, 2021 was nearly identical to the treatment plans dated January 6, 2021 and October 21, 2020. There was an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding the inmate's functioning or presentation during the review period. More specifically, current information found in other clinical documentation, including but not limited to: coping tools utilized, programming on the unit, psychiatric medication refusals, concentration issues, low energy, reasons for treatment non-compliance, and progress in workbooks issued by the mental health clinician. Additionally, information in the perpetuating and precipitating factors section carried over information about his eligibility for removal from the mental health program from the February 5, 2020 discharge treatment plan. Per MHSDS Program Guide, 2009 Revision (12-7-12) "*The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care.*" | **The CMH and/or designee at CCI** shall; A) Conduct a review of the three treatment plans named herein (dated 10/21/2020, 01/06/2021, and 04/07/2021 respectively) B) Additionally, audit documentation for five additional inmate-patients for each of the three identified clinicians over a 12-month period (to include progress notes and treatment plans) C) Based on results of this audit, the CMH shall determine the best course of action. At minimum, **all** clinical staff shall be re-trained on the importance of regularly updating treatment plans in correspondence with Program Guide requirements Required supporting documents: Please provide a memorandum detailing the results of this audit (including dates and CDCR numbers of charts reviewed), and all actions taken to address this QIP. Please include all training materials and 844s. | CCI has developed a treatment planning training that has been delivered to all staff except for the two most recent hires. It is recommended that those clinicians be provided with that training prior to August 31, 2023, and that the CCI SPRFIT coordinator or designee conduct a one-time audit of treatment plans using CAT #6 and if the passing rate is over 90%, this can be closed out. |

# MEMORANDUM

## Crisis Intervention Team (CIT)

CCI's LOP 12.10.3 *Crisis Intervention Team* serves as the institution's CIT policy, and it was approved in February 2023. This demonstrates improvement, as there was not an updated LOP at the time of the last site review. The LOP specifies that CIT is to be operational Monday through Friday, excluding holidays, between the hours of 0800 and 1700. No CIT calls occurred during this review and as such, none were observed.

A review of the Crisis Intervention Team report indicates that there was only one outpatient CIT event for the first half of the year, while the report picked up on direct admits for the remaining 43 cases so as such, this report is of questionable validity at this time. However, the one outpatient CIT event did have the full composition of the team and had nursing documentation present.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary on Appendix A)

The Office of the Special Master's (OSM) suicide prevention expert Lindsay Hayes conducted a review of the suicide prevention practices at CCI during the month of July 2021 and since this reviewer's last site visit in January 2023, Mr. Hayes' has conducted another visit (April 2023) and shared his preliminary findings. What follows is a summary of his findings and the institution's current status.

Summary of findings from the fifth re-audit (July 2021) and current status.

| Title | Definition of the Problem | July 2023 Update | Status |
|---|---|---|---|
| Intake Screenings. | This reviewer observed the intake screening processes in the B-Yard Clinic on July 8, 2021. The process was problematic because the nurse did not accurately complete all 15 mental health/suicide risk questions on the Initial Health Screening form, including "Did the patient receive any bad and/or unexpected news during a recent court hearing?," or conduct a mental status examination ("Disoriented to time, place, or person"). Required suicide prevention placards (both English and Spanish versions) were not observed inside the nurse's offices (pg 111) | Improvements have been noted. Screening was done in a confidential setting and all questions were asked. During his most recent review however (April 2023) Mr. Hayes was provided with a problematic response from one nurse on D yard regarding confidentiality. | **Remain open until confidentiality in D yard is observed to be 100% compliant as reflected in SPRFIT minutes.** |

# MEMORANDUM

| Custody Discharge Checks | Thirteen cases were ultimately reviewed, and only 46 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority of the custody checks recommended by clinicians for either 24 or 48 hours. Most of the clinician errors were attributable to incomplete documentation. In addition, only 54 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the custody errors were attributable to gaps in required observation at 30-minute intervals (pg 113). | Compliance with this, particularly the second page of the form, continues to fluctuate. | **Open. This will continue to be monitored.** |
|---|---|---|---|

The following are the anticipated Corrective Action Plans (CAPs) based on Lindsay Hayes' preliminary review of his most recent onsite audit (April 20 and 21 2023).

| Title | Preliminary definition of the problem | CAP |
|---|---|---|
| Inadequate safety plans | Safety plans were deemed qualitatively poor. | Place this issue into the project pipeline in the August 2023 site review. |
| SPRFIT minutes | Minutes do not meet quorum because there is no psychiatrist present. | CMH to request exemption from HQ Suicide Prevention unit to utilize line psychiatrist for SPRFIT subcommittee meetings. |

**Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).**

Below are the open Corrective Action Plans (CAPs) generated by this reviewer during previous site reviews, as well as current status.

| CAP | July 2023 Update | Status |
|---|---|---|
| Safety plans not being reliably completed when patients are rescinded from alternative housing. | Compliance is improving but not yet 100%. | **Remain open for one more audit cycle.** |
| Lettering on intake cells was falling off because it was taped on and not stenciled. | Substantial improvement. | **Close.** |
| The cells in the B yard clinic that are used for suicide watch in alternative housing as a third priority, are partially frosted and as such, not fully in compliance with statewide policy. | This has been placed on the project pipeline but not assigned a risk score. | **Remain open until assigned a risk score.** |

# MEMORANDUM

| | | |
|---|---|---|
| The institution does not have an up-to-date CIT policy. | This has been corrected. Policy has been finalized. | **Close.** |
| The institution has not submitted compliance for SRE mentoring progress since the new process has gone live. | This has been corrected. | **Close.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status.

| Concern | July 2023 Update | Status |
|---|---|---|
| SPRFIT committee meeting minutes are generally vague and lacking in detail with regards to progress towards identified CAPs. Additionally, although provided to this reviewer upon request, the project pipeline has not been uploaded to the SharePoint site. | Partially resolved. | **Open. This will continue to be monitored.** |

Below is the new recommendation not rising to the level of a CAP from this review.

| Concern | Recommendation |
|---|---|
| Mental health clinicians are behind pace to be in full compliance with suicide prevention IST training by the end of calendar year 2023. | The SPRFIT committee will assess the reason for this and report in the subcommittee by September 2023 and if necessary, establish a plan for training. |

Below is the new Corrective Action Plan (CAP) that have been generated as a result of this review.

| Concern | Corrective Action Plan |
|---|---|
| The institution is below 90% compliant with ASU post-placement screens completed timely and in the one observed case, the patient was not offered a confidential contact. | The institution will place this concern into the project pipeline during the SPRFIT committee meeting in August 2023. |

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Chief of Mental Health, Associate Warden of Healthcare, Healthcare Captain, and Chief Nursing Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - Improvement Priority List and

# MEMORANDUM

Project Pipeline - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

# MEMORANDUM

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Intake Screenings. | Substantial | **Remain open.** |
| 2 | Custody Discharge Checks | Moderate | **Remain open.** |

# MEMORANDUM

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Completion of safety plans | Moderate. | **Open. This will continue to be monitored.** |
| 2 | Intake cell stenciling. | Substantial. | **Closed as of this review.** |
| 3 | Overflow suicide watch cells. | Moderate. | **Open. This will continue to be monitored.** |
| 4 | CIT policy | Substantial | **Closed as of this review.** |
| 5 | SRE mentoring training compliance. | Substantial | **Closed as of this review.** |
| 6 | ASU post-placement screens | None | **New CAP** |

# MEMORANDUM

**APPENDIX C** - CCI's status on Lindsay Hayes statewide outstanding items.

| Aspect of Recommendation that Remains Outstanding | KVSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Partially Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% but in process. |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly, however problems with the performance report are impacting accuracy. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | NA | CCI does not have a MHCB. |
| No. 18: Safety planning training | Compliant | |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Partially compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Partially compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Partially complaint | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | NA | CCI does not have a MHCB or a Reception Center |

Exhibit I

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 09/06/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CSP-LAC SUICIDE PREVENTION TOUR April-Quarter 3 2023 |

On July 27-28, 2023, the Statewide Suicide Prevention Coordinator for Region 3, conducted an on-site review of the Suicide Prevention measures at California State Prison-Los Angeles County (LAC). Although this visit preceded the most recent site visit by OSM representative Lindsay Hayes on August 23 and 24, this report was finalized afterwards and as such, will incorporate preliminary findings from that review.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up. The summary results of this review are as follows:

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 1 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 4 |
| CAPs previously generated by this reviewer that remain open | 7 |
| New CAPs generated as a result of this review | 1 |
| CAPs generated by this reviewer that can be deferred | 1 |
| New recommendations generated as a result of this review | 0 |
| Previously generated recommendations that remain open | 0 |

**Total CAPs closed=2**
**Total CAPs that remain open=12**
**Total recommendations that remain open=0**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

LAC has two Administrative Segregation Units; one Short Term Restricted Housing (STRH) unit and one ASU Enhanced Outpatient (EOP) hub. Both were the subject of this review.

## Short Term Restricted Housing

## Second Watch Morning Meeting

The second watch morning meeting was observed. The meeting included the sergeant, a psychologist, and the institutional SPRFIT coordinator. The discussion did involve new arrivals, patients on 5-day follow ups, patients on suicide watch, and patients demonstrating recent behavioral problems. However, for the second consecutive review period, the team did not discuss SRMP. When prompted by this reviewer, the clinician stated that she believed that there were not any patients in the SRMP on that day, however this was not accurate. Given the significant number of CAPs that LAC already has and the need to prioritize them, this will be deferred for one more review period.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

PT rounds were conducted by a regular on the unit and were observed. The PT completed documentation in CERNER in real time, offered all patients writing materials, and looked into each cell. It was noted however, that when patients were resistant and not fully cooperative, he elected not to ask them about suicidal ideation. He was given real time feedback about this by this reviewer and seemed to self-correct.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with the last site review, the STRH at LAC has 12 cells (100-111) designated as intake cells. On the day of this site review, all were occupied. One of the cells was occupied by a patient who was on suicide watch and another was occupied by two patients. Of the 12 patients on intake status, seven had been celled in intake cells beyond 72 hours. The sergeant reported that all compactions had been exhausted and despite several open beds on the unit, many inmates were either unable or unwilling to be double-celled. Additionally, placards continue to be problematic. While present on all but one cell and containing accurate patient information in all cases, date and time of arrival continued to be absent. Best practice examples have been shared previously with the institution multiple times.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Six patients at STRH were interviewed as part of this review and four indicated that they had been provided with appliances.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

Although a Guard One tracker report was unable to be obtained specifically for STRH as part of this site review due to technical difficulties at the institution, the statewide monitoring report indicates that overall compliance at LAC was 93.31% for the month of July 2023. One officer was observed completing Guard One checks and while he seemed to do so appropriately in most cases, there was one cell in which the window was largely covered save for some small points of visibility and the light was off inside the cell. The officer did not seem to achieve visual contact in that case.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH

There were no ASU pre-placement screens observed as part of this site review, as none were warranted. A review of the performance report for Q2 of 2023, indicates that LAC was at 91% compliance with this variable, which demonstrated improvement since the last quarterly review.

**70.3 ASU Pre-Screens**



91%
(359)

## ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU post-placement screens observed as part of this review as none were indicated. A review of the performance report for Q2 of 2023, indicates that compliance for that time period was 96%. This is another area of improvement since the last quarterly review.

**70.4 ASU GP Screens**



96%
(55)

## ASU EOP Hub

## Second Watch Morning Meeting

The second watch morning meeting was not observed as part of this site review.

# MEMORANDUM

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

One regularly assigned PT was observed completing rounds and they were once again adequate. He interacted with all patients and for those in the MHSDS, he inquired about suicidal and homicidal ideation. He asked about sleep and appetite and charted in real time in CERNER. One mental health referral was indicated, and he appropriately placed it.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

The ASU EOP housing unit has seven intake cells (122-128) and this remains unchanged from the last site review. On the day of this review, six were occupied and three of those six had been in intake cells for less than 72 hours. Like the observation at STRH, placards remain problematic as they did not consistently include arrival dates and times. The relevant policy memorandum, "Administrative Segregation Unit Intake Cell Procedure" dated September 29, 2010, was once again shared with the healthcare captain following the exit call.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Unfortunately, decline was once again noted in compliance with the offering of entertainment appliances. Four patients were interviewed and none had an appliance. This was brought to the attention of the sergeant who simply stated that there were no more.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

This reviewer was provided with a guard one report for a random 24-hour period (July 20, 2023, 0600 to July 21, 2023 0600). During that time there were a total of 4,869 checks that were required, 4,719 of which were done timely as defined by no more than 35 minutes elapsing between checks, for an overall compliance rate of 97%. The noted deficiencies are almost entirely accounted for by one hour in which almost all inmates in the housing unit were checked between 37 and 38 minutes apart, which is only slightly beyond the maximum allowable period. This continues to be a strength for LAC. With regards to welfare-check quality, one officer was observed conducting checks and she did so appropriately. She looked into each cell and presumably established visual contact with the inmate in the cell before moving on. This demonstrates improvement since the last site review, however given the small sample of time observed, this will continue to be audited and monitored regularly.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

No ASU Pre-Placement screens or Post-Placement screens were observed as part of this site review as none occurred. As indicated above (see *STRH* section), the institution has demonstrated improved compliance with this variable since the last quarterly review.

## Inpatient Units (MHCB and/or PIP)

# MEMORANDUM

## Interdisciplinary Treatment Teams (IDTT)

Two IDTTs were observed as part of this site review; one of which was a routine IDTT for a patient who had been admitted for Significant Impairment Due to Mental Illness (SIDMI) and the other was a discharge IDTT for a patient who had been admitted for DTS. In general, the IDTT process was observed to be significantly improved over past observations. In both cases, the team was engaged and collaborative. The only exception to this was the CCI, who's participation was limited to answering questions when prompted. This CCI was not a regular. The supervisor attended the IDTT and attempted to facilitate a team discussion. Issue and observation were discussed in all cases and appropriately documented. In the one applicable case, the clinician reviewed the safety plan with the patient and the supervisor was observed to review it in real-time. She was also observed to give the clinician the appropriate feedback.

## Quality of Safety Planning – Hayes Item 4

Based on a review of the performance report, the institution completed 25 safety plan quality audits in the second quarter of 2023. Similar to the last audit period, none (0%) were determined to meet audit criteria. Additionally, this reviewer audited 10 randomly selected safety plans for patients who were discharged from the MHCB after having been admitted for DTS, and only 2 (20%) were deemed to be of adequate quality. Problems that were noted with the remaining eight included repetition (copying sections), information that was not clinically related to safety planning, and failure to incorporate interventions. The details were shared with mental health leadership. The MHCB supervisor provided this reviewer with the tracking sheet that has been used to review discharge safety plans.

## Suicide Watch and Suicide Precaution

On the day of this on-site review there was one patient on suicide watch and eight on suicide precaution status at the MHCB. The patient on suicide watch was observed to be under continuous observation and it was observed that the nursing staff member checked on the patient on suicide precaution status appropriately. The mental health observations reporting tool, indicates that LAC was 81.7% compliant with suicide precaution rounding during the month of June and that checks were staggered 96.5% of the time. It should be noted however, that this report indicates that there were only 12 total patients under observation in the month of June so as such, its accuracy is questionable. An area of deficiency that was noted was that there were not any signs on the doors indicating observation levels. Nursing leadership was informed about this. A review of the SPRFIT POWER BI report, indicates that the average number of days in which a patient at LAC's MHCB remains on suicide watch during the past six months is 0.7 and the number of days in which patients are maintained on suicide precautions had increased to 2.9. The latter represents an improvement since the last quarterly review and both are reflected as improvements in the POWER BI report. As such, open CAPs pertaining to this issue can now be closed.

| | | | | |
|---|---|---|---|---|
| Average Duration (Days) of MH Observation, Suicide Precaution | 3.9 | 2.9 | 26 | ▲ Increase 85% |
| Average Duration (Days) of MH Observation, Suicide Watch | 1.2 | 0.7 | 20 | ▲ Increase 2% |

## Observation and Issue Orders – Hayes Item 3

This reviewer audited a random sample of 10 patients who were admitted to the MHCB for DTS during the second quarter of 2023 and completed a full MHCB stay. The sample yielded a total of 61 patient days. Issue orders were absent a total of only two days and observation orders were present for each patient day. A note justifying the issue and observation was quantitatively present for 40 patient days. A note justifying both was missing for eight patient days, including one in which the patient had been ordered a smock despite being on Q30 minute checks. A note justifying issue orders only was absent in seven patient days. Qualitatively, there were four notes that poorly justified the issue and/or observation orders.

## Timelines for Suicide Risk Assessments

Overall SRASHE timeliness during the second quarter of 2023 was compliant at 96%. During that review period, there were a total of 2,795 SRASHEs completed at LAC. A sample of 362 were selected from the closed appointments report and 219 were completed in a confidential setting.

## 10.1 Suicide Risk Evaluation



## Privileges – Hayes Item 14

The offering of yard and other privileges for patients in the MHCB continued to be problematic on the day of this site review. The 114s were reviewed for all nine patients who were in the MHCB on the day of this review, as all nine were clinically approved for phone, yard, and dayroom privileges. The 114s reflected that only two were offered yard, only three were offered dayroom, and six were offered phone calls. As of the day of this site review, minutes from July's SPRFIT meeting were not yet available, so it is unknown whether this was discussed. The previously generated CAP will remain open.

# MEMORANDUM

## Clinical Discharge Follow-Ups

For the second quarter of 2023, the institution was compliant (95%) with post discharge (five-day) clinical follow-ups.



**10.4 Timely Clinical Discharge follow-ups**

95%
(1,788)

## Alternative Housing – Hayes Item 5

At the time of this site review, CSP-LAC's LOP 31, Suicide Prevention, underwent revision in April 2023 and continues to serve as the LOP that incorporates the institution's Alternative Housing process. The housing priorities had remained unchanged and continued to be specified as follows:

General Population IPs on Facilities A, B, and C:
Facility D Building 4 (FDB4), any available cell on the bottom tier. No cell adjacent to the showers shall be used.
Enhanced Outpatient (EOP) IPs on Facility D:
- The IPs may remain in their assigned housing unit and shall be rehoused to the bottom tier, in a cell not adjacent to the showers.

Administrative Segregation (ASU) or D5 and/or ASU overflow IPs:
- The IPs will remain in their housing unit and shall be moved to the bottom tier as necessary in a cell not adjacent to the showers.

In the event a cell is unavailable and bed moves cannot be made to accommodate in the locations above, the IPs may be housed in the following locations with the approval of a Manager or Administrative Officer of the Day (AOD):
- Wet holding tanks in the medical clinics on the facilities {old clinics) (non-business hours only).
- If IPs are placed in the facility medical clinics on the facilities (old clinics), it is custody's responsibility to move the IPs out to another alternative housing location prior to 0600 hours.
- When available, the dry holding cells located in the visiting areas should be utilized during business hours. In the event that this location is used in order to provide the IP with access to water and toilets the watcher shall contact the facility Sergeant if this person is unavailable then the facility Lieutenant shall be contacted at the extension listed on Attachment C Facility Sergeant and Lieutenant Extension List.

Prior to the finalization of this report however, CSP-LAC amended this LOP to reflect that patients from all housing units except for the ASUs, would be placed in cells 142-150 on C5. The policy has also been changed to indicate that "an unclothed body search will be conducted. Continual direct visual observation will be maintained at all times until mental health assessment is completed…." The policy no longer states that in the meantime, the patient "will be issued safety clothes (no tear smock)." Therefore, the institution's local policy no longer requires patients to be denied their clothing while awaiting a crisis evaluation, which is an improvement since the last site review. Unfortunately however, this change was not observed to have been put into practice during this onsite review (see CIT section for details).

Over the course of this two-day onsite review, there were 15 patients on suicide watch in alternative housing, 4 of whom were rescinded on the first day (July 27) and placed back on suicide watch by the following day (July 28). It is recognized that this reflects a common pattern for LAC, of patients endorsing suicidal ideation after alternative housing rescission. This reviewer was able to observe a total of eight patients and all were being constantly observed. All observers were appropriately documenting in real time and all patients had access to a smock. On the second day however, the institution was noted to have been out of compliance with its own, and statewide policy for alternative housing, as there were five patients who were observed to be in therapeutic modules in the D yard gym, rather than in alternative housing cells. The details were shared with the CMH and the SPRFIT coordinator who indicated that they would explore the source of the problem. Meanwhile, it is recommended that the institution consider clustering all alternative housing beds into one housing unit and amend the LOP accordingly.

## Suicide Risk Management Program (SRMP)

LAC's LOP for the *Suicide Risk Management Program* was awaiting executive committee finalization at the time of this site review and could not be provided to this reviewer. At the time of this review, there were 113 patients in the SRMP program, a 4 patient decrease since the last site review. There were not any patients who met objective criteria and were not yet enrolled. A random sample of 10 patients in the SRMP were selected for chart reviews and it was found that goals and interventions were present in only 2 (20%) of cases. This reflects an ongoing pattern at LAC in which ensuring that patients are enrolled in SRMP is a strength of LAC's, however ensuring that treatment plans are adequately documented remains a weakness. Given LAC's staffing struggles and other areas of deficiency that require prioritization, the open CAP regarding this issue will be deferred at this time.

## Discharge Custody Checks – Hayes Items 7 and 11

Local audit results suggests that 7497 compliance continues to be extremely poor at CSP-LAC. results for Q2 2023 are as follows:

| Month | Total compliance | Area most significantly impacting compliance |
|-------|------------------|-----------------------------------------------|
| April | 59.1% | All |
| May | 33.7% | All |

| June | 57.7% | All except checks discontinued timely |
|------|-------|---------------------------------------|

The institution has however, demonstrated improvement on 7497 performance since the last review, particularly with regards to the mental health portion of the form. During this site review, this reviewer met with the warden and the CMH and recommended that, given that most of the 7497s are precipitated by rescissions from alternative housing, that all alternative housing patients be housed on the same unit and clustered. That was completed prior to the finalization of this report, as an addendum to the suicide prevention LOP was signed on August 4, 2023. It is anticipated that this will result in improvements.

## Institution SPRFIT Committee Observation – Hayes Item 19a

The SPRFIT minutes from April and May 2023 were reviewed. Quorum was not met in either month. The chief psychiatrist was not present in either meeting and in the month of May, the institution counted a Sr. Psychologist specialist as a designee, which should not be the case. Additionally, the minutes seem to reflect that there are more than the eight members who are, per policy, voting members. Despite not meeting quorum either month, minutes were approved. The minutes seemed to reflect a more substantive discussion of corrective action items. There still has not been a project pipeline uploaded to the SharePoint site and neither month's minutes reflect that the SPRFIT coordinator has attended Inmate Family Council (IFC) or Inmate Advisory Council (IAC). All other elements are addressed.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

For the second quarter of 2023, SRASHEs were completed timely in 98% cases which there was an emergent referral for DTS. DTS cases were triaged as emergent referrals 100% of the time.

| Suicide Risk Evaluation | 2806 | 3.5 | 96% |
|-------------------------|------|-----|-----|
| SRE after Em.Consult (except PIP) for Suicidality | 490 | 12.2 | 98% |

| | Overall SRASHE Compliance | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|---|
| April | 96% | 98% | 100% |
| May | 96% | 98% | 100% |
| June | 95% | 96% | 100% |
| Q2 Total | 98% | 96% | 100% |

Compliance with emergent and urgent SRASHEs remains a strong area for LAC.

### Suicide Risk Evaluations – Hayes Item 13

According to the on-demand report, there were 2,806 SRASHEs completed at LAC during the second quarter of 2023.

A random sample of 10 patients who were admitted to alternative housing on suicide watch during the second quarter of 2023, were selected for review and in all 10 cases, a SRASHE was completed prior to the rescission and a safety plan was completed in all but one case. All but one of the audited SRASHEs contained justification that adequately justified the rescission.  While a safety plan was completed in all but one case, five of the six that were audited for quality, were qualitatively poor.

### Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Below are the QIPs from suicides between 2019 and 2023 that remain open for CSP-LAC.

| Issue Identified | QIP | Status |
|---|---|---|
| **Patient #1** | | |
| During a clinical encounter on December 7, 2021, the inmate's clinician wrote that he "mentioned suicide as an option." The clinician's documented an inquiry regarding the inmate's current thoughts, plans and intentions for suicide, i.e., she completed a risk assessment in the moment, but then did not complete a SRASHE as required when an inmate makes suicidal statements. The MHSDS Program Guide, Ch. 10, page 8 requires that when "an inmate expresses current suicidal ideation … a suicide risk assessment shall be made …" and documented by using the filling out a SRASHE in the EHRS. Although the program Guide allows for clinical discretion when no changes in chronic suicide risk have occurred, the documentation did not include a rationale for why a SRASHE was not completed. | **The CSP-LAC CMH or designee** shall review this concern and determine best course of action to address this identified issue. Required supporting documentation: CSP-LAC Chief of Mental Health will outline, in a memorandum, findings of the review and any remedies undertaken.  If remedies included training or instruction, a Form 844 (sign-in sheet) will also be submitted with the memorandum. | The institution has now been in compliance (above 90%) with the SRASHE core competency training, five of the past six months and over 85% all six months (January-June). This can now be closed out. |
| While housed in the CSP-LAC MHCB unit on July 13, 2022, the inmate's level of observation was changed to once-every-30-minute checks, and he was issued partial clothing. On October 29, 2013 the Divisions of Adult Institutions and Health Care Services issued a memorandum requiring (in part) that "Inmate-patients not on suicide precautions or watch" receive full clothing issue ("blues") "unless a | **The CSP-LAC CMH or designee** shall review this concern and determine best course of action to address this identified issue. Required supporting documentation: CSP-LAC Chief of Mental Health will outline, in a memorandum, findings of the review and any remedies undertaken.  If remedies included training or instruction, a Form 844 (sign-in sheet) | On August 2, 2023, the institution launched an LMS training entitled *Mental Health Privileges, precautions, and suicide watch orders.* Newly hired staff will also be enrolled in the future. Additionally, improvements to documentation were noted during this on site review. The institution has a sustainable process in place and this can now be closed out. |

| | | |
|---|---|---|
| clinical determination is made and documented … that there is a clinical reason these items should not be issued." No such documentation was found in clinical documentation for the inmate. The HQ SPRFIT coordinator for Region III is aware of this issue and has a Correctional Action Plan (CAP) in place as there continues to be concerns with this issue. | will also be submitted with the memorandum. | |
| Patient #2 | | |
| Despite the inmate's significant history of substance abuse, his MAT treatment history, and related polysubstance diagnosis assigned to him by a medical physician on January 14, 2022, treatment teams across two institutions did not appear to recognize the severity/connection of his substance abuse to his mental illness. Treatment plans dated October 5, 2022, and November 2, 2022, did not include any substance use/abuse related IPOCs. | **The CMH at LAC** shall review this concern and provide training to all mental health staff highlighting the need to include substance abuse concerns in treatment planning/IPOCs whenever substance abuse is identified as a primary or contributory driver of the mental illness. Further, **the CMH at LAC** shall review all clinical documentation in this case and determine why a potential referral to a higher level of care was not considered, and then determine the best course of action. Required supporting documents: Please provide a memorandum detailing the results of the review, and actions taken to address this QIP. Please include all training materials and 844s with memorandum submission. | LAC has developed a training titled *Mental Health Patients Return from Higher Level of Care (RHLOC) Training* and made it available on the LMS system. 62/70 (89%) of clinicians have completed it. This will remain open until 90% of staff have received it. |
| There were risk justification issues in the September 30, 2022, October 8, 2022, and November 7, 2022 SRASHEs completed at LAC. Several risk factors were incorrectly marked in the SRASHEs including current/recent substance abuse, history of violence as well as recent violence, recent psychotic symptoms, and safety concerns which may have contributed to an underestimation of risk. In the November 7, 2022 SRASHE, while the clinician's narrative justifying low acute risk was quite detailed and comprehensive on the surface, the current discovery of recent self-injurious behavior (of unknown date), a diagnosis involving psychosis with odd behavior noted the same day by his PC, agitation, recent RVR for an assault where he fractured the nose of another inmate with resulting ASU placement (increased isolation), and continued withdrawal/substance abuse concerns secondary to not being re-started on Suboxone, would all suggest | **The CMH or designee at LAC** shall initiate an inquiry to determine the reason for inaccuracies in risk justification on the identified SRASHEs and propose an identified course of action to mitigate reoccurrence. The CMH shall determine if the course of action shall pertain to the identified clinicians or all mental health staff**.** | This QIP will remain open until both the SRASHE core competency training and the SRE mentoring trainings are in compliance (above 90%) for two consecutive site reviews (a minimum of six months) beginning with Q3 2023. This has not yet been accomplished for SRE mentoring and as such, this QIP will remain open. |

# MEMORANDUM

| | | |
|---|---|---|
| his acute risk for suicide was likely higher than estimated. | | |
| An active MHMD scheduling order was visible to schedulers, but an individual psychiatry appointment was not scheduled and attempted prior to the IDTT on October 5, 2022. | **The Chief Psychiatrist or designee** will provide a memorandum to documented discussion had with schedulers or schedulers' supervisor. | Training has been delivered to schedulers and there is no evidence to suggest that this is an ongoing systemic issue. This QIP can now be closed. |
| Between August 5, 2022, and November 6, 2022 (after return from county jail), the inmate submitted nine 7362s requesting to be placed back on Suboxone. There was no documentation this inmate's case was discussed in any established forum, such as the Primary Care Team huddle. There was no collaborative plan of care or intervention developed to address his overlapping medical and mental health needs. It is unclear why Inmate Mahoney's case was not discussed in medical/mental health huddles or other health care appointments to initiate a plan of action for resuming his Suboxone. | **CMH** shall review this concern and determine best course of action to mitigate its reoccurrence. At minimum, this should include a plan to improve collaboration between the medical and mental health staff during treatment of inmate-patients with co-morbid mental health and substance abuse issues. | This QIP will be closed once the institution is in compliance (above 90%) with the training titled *Assessing Complex Cases: Understanding the Effects of Psychosis and Substance Use on Suicide Risk* which is scheduled to be rolled out to the field in October 2023. |
| On November 7, 2022, at approximately 1300 hours, the inmate's PC observed a cut to his left arm. The PC notified custody and medical staff he would first need to be medically cleared, and then assessed for self-harm by mental health. Inmate Mahoney was placed on the crisis line. Per LAC's Local Operating Policy (LOP) for the Crisis Intervention Team (CIT LOP #30), LOP 31 (Suicide Prevention), and Program Guide, Chapter 10 (Suicide Prevention and Response), it appears there were multiple deviations from these policies during the initiation of CIT response during the November 7, 2022, incident. | The **Warden, CEO, and CMH at LAC** shall initiate an inquiry into the events which occurred on November 7, 2022, to develop a plan of action to prevent reoccurrence. At minimum, all staff involved in CIT shall be re-trained on LAC's Crisis Intervention Team Policy (LOP #30) Any additional action required shall be determined by institutional managers. | CIT clinicians were provided with training and the CIT policy has been finalized. This can now be closed out. |
| | Patient #3 | |
| On December 17, 2022, the patient submitted a 7362 requesting to speak with his MHPC because his family informed him his middle brother died by suicide. This was triaged as a routine consult despite qualifying as bad news that should have been addressed either as an urgent or emergent consult. | **The CMH or designee at CSP-LAC** shall review at random 10 7362s submitted at LAC within the last six months to determine if requests for mental health services are being triaged appropriately. | The local audit conducted in response to this QIP found that 10 of 10 audited cases (100%) were found to be appropriately triaged, making it likely that this was an isolated incident. This can now be closed. |

### Training and Mentoring Compliance

The following was obtained from a review of the Coleman Court Mandated Trainings SharePoint site for the end of June 2023, as well as from data reported by the institution. Compliance with trainings are as follows:

## Clinical Training Compliance

| Training | Clinicians trained/total clinicians | Compliance percentage | Compliance reported by institution on day of review |
|---|---|---|---|
| SRE Mentoring | 15/37 | 40.54% | 66% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 53/56 | 94.64% | 95% |
| Safety Planning Training | 38/58 | 65.52% | 66% |
| Suicide risk management program training | 60/63 | 95.24% | 95% |
| Columbia-Suicide Severity Rating Scale Training | 42/50 | 84% | 84% |
| Discontinue use of safety contracts | NA | NA | 90% |

On the day of this site review, the institution had not yet provided this reviewer with training compliance with suicide prevention IST training through June 30, 2023.

## Receiving and Release (R&R) Screening – Hayes Item 1

There were not any nursing screens observed as part of this review. Prior reviews suggest that this has typically been strong at LAC. The physical space continues to be conducive to the process. Suicide prevention posters in English and Spanish were posted.

## Crisis Intervention Team (CIT)

LAC's LOP #30 *Crisis Intervention Team* was signed off in July 2023 and is now in alignment with statewide policy. It indicates that CIT occurs during non-business hours, staffing permitting, and as such a call was not observed during the week of this review. During the onsite portion of this review, one emergent mental health contact was observed by this reviewer. It was for a patient who reported suicidal ideation. He was placed under constant visual observation in the gymnasium on the yard, in which there were multiple other inmates and staff within earshot. Consistent with prior reviews, the clinical interview took place there instead of in a confidential setting. Additionally, despite the amendments made to the Suicide Prevention LOP as discussed above, this patient was provided with a smock instead of clothes. The clinical interview itself was adequate. The responding clinician was the patient's primary clinician and she was familiar with his case, yet consulted with custody prior to the intervention. She also completed a SRASHE.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary on Appendix A)

OSM expert Lindsay Hayes conducted a site review of LAC on April 5-6, 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

| Title | Definition of the Problem | July 2023 Update | Status |
|-------|---------------------------|------------------|--------|
| ASU Intake cells | During inspection of both units, this reviewer observed that two new intake inmates housed in the EOP ASU were not in new intake cells as required. The supervisor in the unit informed this reviewer that new intake inmates were placed in unsafe, non-new intake cells on almost a weekly basis. CSP/LAC had not been scheduled for construction of any new intake cells (pg 260). | This continues to be an area of deficiency. | **Remain open.** |
| MH observation | This reviewer's examination of various medical charts for MHCB patients indicated that most patients were often on Suicide Precaution status for an average of only 24 hours before being moved to 30-minute observation. In addition, the chart review found that several patients remained on 30-minute observation despite still reporting current SI (pg 261). | Substantial progress is noted. | **Close as of quarter 3 review.** |
| Discharge SRASHEs and safety plans | Required discharged SRASHEs were completed in all cases, but safety plans were completed in only 70 percent (14 of 20) of the cases. In addition, only 70 percent of the clinical five-day follow-ups were timely. This reviewer's examination of the data found problems in untimely supervisory review specifically, the reviews were typically done consistent with the CAT audit schedule and not prior to or during the anticipated discharge IDTT meeting for each patient. In fact, supervisory review of discharge SRASHEs and safety plans had not been completed since January 2022 (pg 263-266). | Improvements are being made, as the institution was able to provide proof of practice of these audits being completed. | **Remain open. Continue to monitor for one more review period.** |

| IDTT meetings | Overall, although there was good treatment team representation, the IDTT meetings included uneven case presentations, inadequate summaries of suicide risk history and inquiry regarding current SI, uneven explanations of privileges within the MHCB unit, and little, if any, discussion regarding safety planning to reduce further recurrence of SI. The meetings would have been more problematic if not for the participation of the MHCB supervisor (pg 263). | IDTT quality is improving. | **Remain open. Continue to monitor for one more review period.** |
| --- | --- | --- | --- |
| Discharge custody checks | This reviewer was presented with documentation of 337 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSP/LAC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from October 2021 through March 2022. The review found that only 88 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form. When completed correctly, the majority of custody checks were recommended for 72 hours by clinicians. In addition, only 40 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation and/or entire observation checks omitted (pg 266). | This continues to be problematic, but the institution has implemented a pilot program in which all patients on discharge custody checks will be clustered into the same housing unit. Progress is therefore expected by next audit period. | **Remain open.** |

**Preliminary findings from the most recent Lindsay Hayes site review:**

As indicated above, Mr. Hayes once again conducted a review at LAC on August 23-24 2023 and below is a summary of the preliminary findings that were also confirmed by this reviewer.

| Concern | Status |
|---|---|
| Poor quality safety plans. | This will likely rise to the level of a CAP. |
| Lack of privacy and confidentiality with regards to crisis responding. | This is already an active CAP that was developed by this reviewer. |
| Safety plans not being revised timely after supervisory review. | The new statewide SharePoint site has been developed. This will likely improve compliance with this variable. |
| Poor quality 7497s. | This is already an active CAP that was developed by this reviewer. |
| Lack of placards at STRH. | This will likely result in a CAP that can be alleviated through a "just-do-it" project. |

Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, Chief Executive Officer, Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

| CAP | July 2023 Update | Status |
|---|---|---|
| Patients were not consistently being offered yard privileges in the MHCB. | This continues to be problematic. It will be discussed in the SPRFIT subcommittee per the measurement plan. | **Remain open.** |
| Custody Discharge Checks (7497) are consistently below 90% compliance. | This continues to be problematic, however the institution has initiated a pilot program intended to improve this. | **Remain open.** |
| This reviewer observed an ASU post-placement screening in which the patient was not offered a confidential contact. | The June 2023 project pipeline was not available for review. | **Remain open.** |
| This reviewer observed that one custody officer at D5 (ASU EOP Hub) was not completing guard-one wellness checks appropriately. Specifically, he did not establish visual contact with the patient to confirm the presence of living, breathing flesh. | This is still not an action item. However, improvement was noted for one site visit. | **Remain open.** |
| SPRFIT committee minutes do not reflect that the SPRFIT coordinator has attended IAC or IFC every six months. | Not completed. | **Remain open.** |
| Problematic crisis responding with regards to confidentiality availability. Specifically, inmates in both alternative housing in the housing units and | This remains problematic. | **Remain open.** |

| | | |
|---|---|---|
| inmates in holding modules awaiting crisis assessment are assessed within view and earshot of other inmates and are not consistently offered confidential contacts. | | |
| Problematic Suicide Prevention Policy. | This has been resolved. LOP is now compliant. | **Close.** |
| Treatment plan goals and interventions are not being reliably documented for SRMP patients. | This remains problematic, however this will be deferred given the staffing problems and the need to attend to more urgent CAPs. | **Deferred for one more audit cycle.** |
| The institution is not on pace to be 90% compliant with suicide prevention IST training by the conclusion of calendar year 2023. | Despite repeated requests for this data, it was not provided to this reviewer. | **Remain open.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | July 2023 Update | Status |
|---|---|---|
| Provide training to MHCB staff to ensure the understanding that orders for privileges, includes consideration of the privilege of visiting. | Not resolved, but will be deferred in light of staffing shortages. | **Deferred.** |
| Implement the statewide practice of printing out MHCB orders daily and placing them on the doors for MHCB patients. | This has been completed. | **Close.** |

Below is the three new Corrective Action Plan (CAP) that have been generated as a result of this review.

| Concern | Corrective Action Plan |
|---|---|
| Lack of entertainment appliances in the ASU units. | The institution will place this concern into the project pipeline during the SPRFIT committee meeting prior to the next site review in October 2023. |

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, Chief Support Executive, Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - LAC - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Intake cells not used according to policy | Minimal | **Remain open.** |
| 2 | Mental Health observation not being utilized appropriately. | Substantial | **Closed as of this review.** |
| 3 | Discharge SRASHEs and safety plans | Substantial | **Remain open** |
| 4 | IDTT meetings | Substantial | **Remain open** |
| 5 | Discharge custody checks | Minimal | **Remain open** |

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Privileges in the MHCB | Minimal | **Remain open.** |
| 2 | Discharge custody checks | Minimal | **Remain open.** |
| 3 | Non-confidential ASU post-placement screening | Minimal | **Remain open.** |
| 4 | Inadequate completion of welfare checks. | Minimal | **Remain open.** |
| 5 | SPRFIT coordinator attendance at IFC and IAC | None | **Remain open.** |
| 6 | Non-confidential crisis-response contacts | Minimal | **Remain open.** |
| 7 | Problematic Suicide Prevention Policy. | Substantial | **Closed as of this review.** |
| 8 | Treatment plans for SRMP patients | Minimal | **Deferred.** |
| 9 | Suicide prevention IST compliance | Minimal | **Remain open.** |

**APPENDIX C** - LAC's status on Lindsay Hayes statewide outstanding items.

| Aspect of Recommendation that Remains Outstanding | LAC's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Below 90% |
| No. 10: Auditing SRE quality | Non-compliant | Audits are not being done quarterly. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Partially-compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Compliant | Safety plans and supervisory reviews are being completed |
| No. 18: Safety planning training | Non-compliant | Below 90% |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Non-compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Non-compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Non-complaint | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Non-compliant | Privileges are not being reliably offered, CQIT is a statewide issue, and LAC does not have a Reception Center |

Exhibit J

CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



# MEMORANDUM

| | |
|---|---|
| **Date:** | 09/19/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D. <br> Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | WASCO STATE PRISON SUICIDE PREVENTION TOUR-Q3 August 2023 |

On August 28-29, 2023, the Region III Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator conducted a review at Wasco State Prison (WSP). The focus of the review centered on their Administrative Segregation Unit (ASU), Mental Health Crisis Bed (MHCB), and Reception Center (RC) to ensure compliance with statewide suicide prevention and response policies.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 1 |
| CAPs generated by this reviewer during prior review that can be closed | 0 |
| 2021 Lindsay Hayes CAPs that remain open | 0 |
| Preliminary new Lindsay Hayes CAP that remain open | 1 |
| CAPs previously generated by this reviewer that remain open | 1 |
| New CAPs generated as a result of this review | 0 |
| New recommendations generated as a result of this review | 0 |
| Previously generated recommendations that remain open | 0 |

**Total CAPs that remain open=2**
**Total recommendations that remain open=0**
**Total CAPs closed this review=1**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Second Watch Morning Meeting

The second watch morning meeting was observed. All required attendees were present. The psychologist was not a regularly assigned clinician to ASU and as such, required prompting from the SPRFIT coordinator to discuss patients in the Suicide Risk Management (SRMP) program. Otherwise, the meeting was thorough. Intake cells were discussed, as were new arrivals and patients on five-day follow-ups. Two psychiatric technicians attended the meeting and contributed appropriately.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was one Psychiatric Technician (PT) who was observed completing rounds. She was a regular and the rounds were effective. A list from SOMS of all inmates in the housing unit was used to identify the relevant levels of care. She also utilized EHRS for this purpose. She had with her a supply of handouts and puzzles, demonstrating improvement since prior visits. She charted in CERNER in real time before moving to another cell. One mental health referral was clinically indicated and she appropriately placed it.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with the last three site visits, WSP has 14 intake cells (117-130), two of which are designated for ADA inmates. On the day of this review, seven of those cells were occupied and all seven had been in an intake cell for less than 72 hours. All new intakes (inmates who arrived at ASU less than 72 hours ago) were appropriately housed. Only one of the seven cells had a placard on the door that included the arrival time and this was brought to the attention of the sergeant in real time.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Three of the seven inmates who were in intake cells, in addition to six others who were on 21-day status, were interviewed. Only three indicated that they had been provided with an entertainment appliance upon arrival to the housing unit. This was also brought to the attention of custody and mental health leadership in real time and more radios were reportedly secured. This is a SPRFIT audit item that was reported during the July 2023 SPRFIT subcommittee meeting per the measurement plan and this local audit indicated compliance of 100%. As such, this need not result in a CAP at this time.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

During the month of July 2023, there were 115,728 total checks expected at WSP-RC and 109,594 were completed timely for a compliance rate of 94.7%. While onsite, there was one officer observed completing Guard One checks and he seemed to do so appropriately. He established visual contact with each patient before using the pipe and moving on to the next cell.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU pre-placement screens observed as part of this review. According to the performance report, there were 195 such screenings completed during the second quarter of 2023 and the institution was in compliance at 99%.



## ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU post-placement screenings observed as part of this review. The institution demonstrated a significant decline in compliance with this variable during the second quarter of 2023. According to the performance report, there were 89 such screenings conducted at the institution during that time in the second quarter of 2023 and only 75% were completed timely. Given that this was the first quarter of poor compliance with this variable, it will not rise to the level of a CAP at this time.



## Inpatient Units (MHCB and/or PIP)

### Suicide-Resistant Cells – Hayes Item 10

WSP-RC has six Mental Health Crisis Beds (MHCBs) and all have been previously determined to be suicide resistant.

### Interdisciplinary Treatment Teams (IDTT)

Four IDTTs were conducted at the MHCB during this site review and all four were observed. Two were discharge IDTTs for patients who had been admitted for Significant Impairment Due to Mental Illness (SIDMI), one was a discharge IDTT for a patient who had been admitted for DTS, and one other was an initial IDTT for a patient who had been admitted for DTS, but was demonstrating significant disorganization. There were two different psychologists who were present and while all four patients were experiencing psychiatric symptoms that impacted effective communication, both psychologists effectively reviewed treatment planning in a way that the patient could understand. All required attendees were present, as was a Recreational Therapist (RT) and all members of the team had access to a laptop except for the nurse.

Participation by all parties was adequate but in three cases, due to staffing needs, the psychiatrist in attendance was a telepsychiatrist and this impacted the organic nature of the process and in at least one case, seemed to create additional resistance on the part of the patient. Otherwise, the IDTTs were all adequate. In the case of the discharge of the patient who had been admitted for DTS, the patient's safety plan was completed in advance and thoroughly reviewed with the patient during the IDTT.

The institution provided evidence that supervisory reviews of discharge safety plans are being regularly conducted, however the one patient who was discharged during this review was not included in the data set. This is the second consecutive review in which this was found to be the case. Mental health leadership indicate that the MHCB supervisor had been out for some time and had just returned to work that day. Therefore, it is recommended that the institution establish a system for coverage of the task of supervisory review of MHCB discharge safety plans.

## Quality of Safety Planning – Hayes Item 4

Based on a review of the performance report, quality of safety plan audits were conducted during the second quarter for five safety plans. A random sample of 20 safety plans completed during the second quarter of 2023 were audited by this reviewer and all but two were deemed to be adequate. One of the inadequate safety plans involved a patient who refused to engage in safety planning. This may be suggestive of improvements since the most recent review that was conducted by Lindsay Hayes.

## Suicide Watch and Suicide Precaution

On the day of this review, there were six patients in the MHCB and all were on suicide precautions. Issue and observation orders were on the doors in all six cases. For July 2023, 95.5% of suicide precaution rounds were completed timely and checks were staggered 94% of the time, however the report also indicates that there were only 56 total patients under observation during that time so the accuracy of this is unclear.

## Observation and Issue Orders – Hayes Item 3

Chosen for audit, were the charts for a randomly selected sample of 10 patients who were admitted for DTS during the second quarter of 2023 and completed a full MHCB stay. Each day in which the patient was ordered less than full issue, was reviewed to ensure that orders, as well as notes justifying them, were present. This sample yielded 70 total patient days. Orders for issue and observation were present in all 70 cases. A note justifying limited issue was present for 46 patient days (65.7%) and a note justifying observation was present for 51 patient days (73%). This rate is similar to prior reviews. Although there were a total of 5 different clinicians who were responsible for the omission of a note providing clinical justification, the same individual was responsible for 18 of the omissions. This provider was referred to local mental health leadership. While this continues to be an area of deficiency for WSP-RC, the pattern suggests that the training need is likely isolated to one provider. An area in which the institution has demonstrated improvement since the last review, is with regards to the quality of

justification notes. Only three notes were deemed to be clinically inadequate, one of which was because it was inconsistent with the order.

## Timelines for Suicide Risk Assessments

In the first quarter of 2023, WSP-RC was compliant with timely suicide risk assessments at 98%.



With regards to confidentiality, the closed appointments report listed a sample of 460 Suicide Risk Evaluations that were completed during the second quarter of 2023. Of those 460, 380 (83%) were completed in a confidential setting. This represents a slight improvement since the last review. Additionally, of those 80 that were not completed in a confidential setting, all but 2 were for reasons outside of the clinician's control (for example refusals, modified program, etc). This demonstrates that the offering of confidential contacts was a strength among the institution's mental health staff during the second quarter.

## Privileges – Hayes Item 14

The 114s for all six MHCB patients were reviewed to ensure that all of those who were approved for privileges were appropriately offered those privileges. Only three of the six indicated that the patient had been offered yard and phone calls. In one case, there was documentation of only phone calls having been offered and in two cases, there was not any documentation of any privileges having been offered, however one of those two patients had just arrived the previous night. The minutes from the July 2023 SPRFIT subcommittee, indicate that this was audited locally and found to be compliant at 100% so therefore, this will only raise to the level of a CAP if still non-compliant after one more audit cycle.

## Clinical Discharge Follow-Ups

A review of the performance report from the second quarter of 2023 indicates that the institution was compliant with timely clinical discharge follow-ups at 100%. This is the second consecutive quarter in which that was the case. A random sample of five patients who were either discharged from a MHCB, or rescinded from Alternative Housing during the second quarter of 2023, were selected for chart review. In all 15 cases, the follow-ups were completed for at least five days and the safety plan was present for each applicable day. In all five cases, either in the Powerform or the presence of the first page of the 7497 being scanned into the chart, that indicates that the custody portion of the follow-ups were either discontinued by a mental health clinician or that the patient was referred for a crisis assessment prior to the completion of the custody portion of the discharge checks.

## Alternative Housing – Hayes Item 5

WSPs LOP 018, *Alternative Housing Placement, MHCB referral, rescission, and discharge policy*, continues to address alternative housing and was most recently revised in March 2023. The prioritization of designated cells is as follows: Housing unit B2, cells 146 and below for SNY patients; Housing unit B6 for general population patients, including those from the mainline program; and a ground-floor holding cell for ASU inmates.

## Suicide Risk Management Program (SRMP)

WSP-RC's OP 119 *Suicide Risk Management Program* addresses the SRMP at the institution. It was most recently revised in July of 2023 and was still in draft form at the time of this site review. It is consistent with statewide policy. On the first day of this site review there were not any patients in the SRMP and only one who met objective criteria but were not enrolled. The one patient who met criteria but was not yet enrolled, had been flagged only two weeks prior for having three or more admissions in the past four months and that patient was at a MHCB at another institution on the day of this review.

## Discharge Custody Checks – Hayes Items 7 and 11

The institution conducts audits of custody discharge checks and submits them monthly. A review of all three months of the checks for the second quarter of 2023 indicates that all were compliant (above 90%). This item remains a strength of WSP-RC.

| April | 100% |
|-------|------|
| May   | 99.3% |
| June  | 100% |

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer did not attend the SPRFIT subcommittee meeting during the second quarter of 2023. Minutes were reviewed for all three months of the quarter and they were generally strong. All three months' meetings met quorum and all items were discussed according to the measurement plan, with the exception that in April, nursing was not prepared to present one of their required items (patients in alternative housing with staff actively watching). All required elements of the reception center specific audits were presented accordingly, including an overview of the results of the poster audit, the Release of Information (ROI) requests, and the reviews of SOMS and the initial health screening.

## Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

As indicated in the last (quarter two) report, minutes from the March 2023 SPRFIT meeting indicate that the IAC was attended by the SPRFIT coordinator on February 28, 2023 and the minutes from that meeting were included within the SPRFIT minutes.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the second quarter of 2023, WSP-RC was once again in compliance with the completion of suicide risk evaluations in conjunction with MHPC emergent consults for DTS at 98%. 98% of

DTS cases were appropriately triaged as emergent referrals. The monthly breakdown is as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| April | 98% | 98% |
| May | 100% | 100% |
| June | 100% | 97% |
| Q2 totals | 98% | 98% |

Additionally, a random sample of five urgent orders from the second quarter of 2023 were reviewed to ensure that none contained references to suicidality or self-harm and none did. For the second consecutive review period, they were all deemed to have been appropriately triaged as urgent referrals.

## Suicide Risk Evaluations – Hayes Item 13

As indicated above, WSP-RC was in compliance with suicide risk evaluations at 98% during the second quarter of 2023. This included 100% compliance with evaluations competed at the time of MHCB discharge and 96% with MHCB referral rescissions. A random sample of 10 MHCB referral rescissions were reviewed and for the second consecutive review period, all 10 contained a SRASHE and a safety plan regardless of estimated acute risk.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

As of the time of this (Q3 2023) review, there were six QIPs from two previous suicides that remained in monitoring status. Below is the status as of this review.

| Issue Identified | QIP | Status as of Q3 2023 |
|---|---|---|
| Patient #1 | | |
| The patient's MH Screening did not appear to include a thorough review of his EHRS record, per policy. Specifically, the Initial Intake Screening and county jail records were not incorporated into his MH Screening yet had relevant information about his suicide history. Per HQ Memorandum, dated August 22, 2019, entitled, Clarification of Mental Health Documentation Review Requirements: "This memorandum clarifies documentation requirements during the reception center mental health assessment process per the Mental Health Services Delivery System Program Guide (2009 Revision), Chapter 2, Reception Center Mental Health Assessment, pages 12-2-5 and 12-2-7. | The CMH and/or designee at WSP shall review this concern and: a. Audit ten charts of the MHPC who conducted the MH Screening Interview to determine if this is an ongoing issue. b. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on mental health documentation review policy, as required during the completion of a MH Screening Interview. | Since the last site review, the Senior Psychologist Supervisor of the Reception Center observed one clinician conduct a MH screening and that clinician was the subject of the original QIP. Given however, that a sample size of only one was reviewed and this was not presented in a formal forum, this will remain open. |

| The patient's 8-page county jail Intake Packet, noted, 'Suicide History'. During Initial Health Screening, the patient endorsed a suicide attempt, "[two] months ago in county". WSP failed to appropriately review these records and complete a SRASHE, as per CDCR Policy. The Program Guide states in 12-10-9, "*At minimum, a written suicide risk assessment using a SRASHE shall be completed... (8th bullet point): Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats or attempts.*" | **The CMH and/or designee at WSP** shall review this concern and: a. Audit ten charts of the MHPC who conducted the MH Screening Interview to determine if this is an ongoing issue. b. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on mental health documentation review policy, as required during the completion of a MH Screening Interview. | Since the last site review, the Senior Psychologist Supervisor of the Reception Center observed one clinician conduct a MH screening and that clinician was the subject of the original QIP. Given however, that a sample size of only one was reviewed and this was not presented in a formal forum, this will remain open. |
|---|---|---|
| | **Patient #2** | |
| While the ICC documentation was completed according to policy, there was a discussion regarding comments the patient made regarding danger to others that resulted in remaining in a single cell that were not documented. In addition, contradictory information was documented in the ICC progress note and ICC Chrono, which made it difficult to determine Mr. McCafferty's risk level. It does not appear that the patient was assessed for possible need for MHCB placement for danger to others. | The WSP Chief of Mental Health (CMH) or designee shall review this concern and determine the appropriate course of action. | All ASU clinical staff received training on June 13, 2023. The focus of the training was documentation expectations for ICC chronos and the expectation that a referral be made when patients in ICC make verbalizations consistent with Danger to Others. With regards to follow-up, ICC notes completed by the responsible clinicians will be audited for three months and the results of this audit will be submitted on September 30, 2023. If improvement is noted, this will be closed out at the next (Q4) site review. |
| There were multiple concerns with the completion of the MH Initial Assessments on February 28, 2023, and March 7, 2023. | The WSP Chief of Mental Health (CMH) or designee shall review this concern and A) review the involved clinician(s) MH Initial Assessment documentation for five patients over a six-month period. This review shall be consistent with chart audit criteria. B) Based on the results of this review, the CMH shall determine the best course of action. | Five mental health assessments completed by both of the responsible clinicians were audited and deficiencies were found. Both clinicians received training on May 23, 2023. With regards to follow-up, assessments completed by the responsible clinicians will be audited for three months and the results of this audit will be submitted on September 30, 2023. If improvement is noted, this will be closed out at the next (Q4) site review. |
| There were multiple concerns with the completion of the MH Master Treatment Plan on March 16, 2023. First, the EHRS diagnoses were not updated. Second, the clinical summary and case formulation contained no new information since the Initial Assessment was completed. In particular, the case formulation question still contained an entry that had not been edited since June 29, 2020. | The CMH or designee at WSP shall review this concern and A) review the involved clinician(s) MH Master Treatment Plan documentation for five patients over a six-month period. This review shall be consistent with chart audit criteria. B) based on the results of this review, the CMH shall determine the best course of action. | There were five mental health treatment plans audited and several contained deficiencies. Similar to the above QIPs, training was provided on May 23, 2023 and the responsible clinicians will have their Master Treatment Plans audited for three months. The results of this audit will be submitted on September 30, 2023. If improvement is noted, this will be closed out at the next (Q4) site review. |

| Multiple concerns were found with SRASHEs completed on February 28, 2023, and March 7, 2023. Please see *Conclusions* section for further details. | The CMH or designee at WSP shall review this concern, and<br>A) using the new CAT audit criteria for SRASHEs, audit five SRASHEs completed by the identified clinician to assess if this was an isolated incident or ongoing concern, and<br>B) based on results of the audit, the CMH shall determine the best course of action which could include re-mentoring. | The responsible clinicians were trained on June 15, 2023. The 7-Hour SRASHE core competency training was offered again prior to the end of June and as indicated above, all staff are now in compliance with that training. This can now be closed out. |

## Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for July 2023, as well as information obtained while on-site, indicated the following compliance rates:

### Clinical Training Compliance

| Training | Total Clinicians/Clinicians trained | Compliance percentage |
|---|---|---|
| SRE Mentoring | 2/46 | 4% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 46/46 | 100% |
| Safety Planning Training | 44/46 | 96% |
| Suicide risk management program training | 46/46 | 100% |
| Columbia-Suicide Severity Rating Scale Training | 35/46 | 76% |
| Discontinue to use of safety contracts | 44/46 | 96% |

### *Annual IST Suicide Prevention Training Compliance*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 799 | 441 | 55.2% |
| Mental Health | 47 | 29 | 61.7% |
| Healthcare | 210 | 73 | 34.8% |

### *CPR Training*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 797 | 436 | 55% |
| Nursing | 194 | 194 | 100% |

## Receiving and Release (R&R) Screening – Hayes Item 1

Since the last site review, the new medical clinic at WSP-RC has opened and confidentiality for R&R screenings is no longer compromised. In addition to the physical environment now offering confidentiality, it was noted that all the screening rooms had the appropriate suicide prevention posters in both English and Spanish. A total of two screenings were observed and they were mostly positive except for the following two concerns. In one case, the nurse did not properly assess for the presence of auditory hallucinations and did not ask the second bad news question. The SPRFIT meeting minutes from the month of July suggests that these screenings were completed appropriately 100% of the time and during the most recent review by Lindsay Hayes, the nursing screens were observed to be appropriate. Given these factors, the open CAP regarding this item can be closed, however it is recommended that that the nurse who completed the screening in question be included among the audit sample the next time data is collected for this measure.

## Reception Center Processing

### Diagnostics Process

Two clinicians were observed completing diagnostic screenings. The first clinician was observed completing two screenings and the second was observed completing three for a total of five screenings observed. The county jail records and the initial health screening were reviewed in all five cases. The first observed clinician had one patient who had a history of mental health treatment in the community, thereby making a request for authorization of a release of information (ROI) applicable and she appropriately requested that the patient sign an ROI. This clinician also asked all patients all questions and queried further when indicated. The second clinician however, conducted screening processes that were more problematic. In all three cases, the clinician did not appropriately frame the request of the patient to sign the ROI. In one case, the patient had received treatment in San Diego County jail and the clinician requested he sign a ROI. However, a ROI is not required for county jail records. Additionally, she did not query about community treatment with this patient. Finally, this clinician did not ask all the questions as listed on the screening tool and in all three cases, modified at least one question in such a manner that the clinical intent of the question was lost. It is recognized that this clinician is an unlicensed psychologist working under supervision and as such, the details were shared with the CMH who indicated that local interventions with that clinician would be implemented. While this will not rise to the level of a CAP at this time, it is recommended that this particular clinician's administrative or clinical supervisor, or another designee, observe her complete at least one screening and provide training in real time. At minimum, training should be provided based on the reported observations of this reviewer.

### Suicide Prevention Poster Audit

A review was conducted of the RC housing units, all medical clinics, and mental health treatment space on all but one yard (D-yard). The review also included R&R. English and Spanish versions of the suicide prevention posters were present in all areas. The posters are audited monthly by the local SPRFIT and minutes suggest that posters are consistently present in nearly all required areas.

# MEMORANDUM

## Crisis Intervention Team (CIT)

WSP-250 Crisis Intervention Team was most recently updated in July 2023 and continues to serve as the institution's CIT policy. The CIT hours of operation remain unchanged since the last revision of the policy and are as follows:

Sunday: 0800-2100

Monday-Tuesday: 0700-2100

Wednesday-Friday: 0700-1800

Saturday: 0800-1800

There was one CIT call observed as part of this review. It was collaborative and all members of the CIT (sergeant, psychologist, and nurse), participated and engaged the patient appropriately. A SRASHE was completed in conjunction with the assessment, as was a CIT Powerform. A review of the CIT quality management report indicates that 86% of the CIT events in the second quarter of the year contained nursing documentation and 35% had the complete composition of the team. 68% of the calls were for DTS and 29% of all CIT calls resulted in a MHCB admission.

# MEMORANDUM

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary in Appendix A).

Special Master's Office expert Lindsay Hayes conducted a review of the suicide prevention practices at WSP-RC on July 6-7, 2021 and more recently on April 18-19 2023. This is the second site visit since the preliminary findings from the April 2023 review. The following is a summary of the findings and status of recommendations from the 2021 visit, as well as the preliminary findings from the April 2023 review.

| Title | Definition of the Problem | August 2023 Update | Status |
|-------|---------------------------|--------------------|--------|
| Problematic R&R nursing screenings. | Not all questions were asked appropriately and privacy was compromised. | While minor deficiencies were noted with questioning, confidentiality is noted to have improved substantially. | **Close.** |

Preliminary findings from the April 2023 review:

| Title | Definition of the Problem | August 2023 Update | Status |
|-------|---------------------------|--------------------|--------|
| Poor quality safety plans | A review of a sample of safety plans were determined to be qualitatively poor. | This item still has not been placed into the project pipeline. | **Remain open.** |



# MEMORANDUM

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary in Appendix B)

Below is the one corrective action plans (CAP) assigned during prior reviews, as well as an update and status.

| CAP | August 2023 Update | Status |
|---|---|---|
| Justifications for observation and limited issue are clinically insufficient. | Improvement has been noted during this review, as all but three audited notes were insufficient. There is one clinician who is responsible for the majority of absent notes so as such, this will remain open for one more audit cycle. | **Remain open.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | August 2023 Update | Status |
|---|---|---|
| Allow for PTs at ASU to have internet access in order to obtain handouts for ASU inmates. | Although not completed, PTs were observed to now have access to handout materials. | **Close.** |

There are no new Corrective Action Plans (CAPs) or recommendations that have been generated as a result of this review.

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, the CMH, the CEO, the Warden, AW of Healthcare, Captain of Healthcare, and Chief Nursing Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - Improvement Priority List and Project Pipeline - All Documents (sharepoint.com) monthly following SPRFIT subcommittee meeting.

## Appendices

**APPENDIX A** – Status of deficiencies as noted in the <u>Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs</u> written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 and via exit call in 2023. | Progress | Follow-up status |
|---|---|---|---|
| 1 | Non-confidential R&R screens | Moderate | **Open. This will continue to be monitored.** |
| 2 | Urgent/emergent referrals | Substantial | **Close.** |
| 3 | Discharge Custody Checks | Substantial | **Close.** |
| 4 | Local policies | Substantial | **Close.** |
| 5 | Safety Plan quality. | None | **New.** |

**APPENDIX B-** Summary of CAPs generated by regional SPRFIT tours and progress.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Justification for issue and observation in MHCB. | Minimal. | **Open. This will continue to be monitored** |
| 2 | Non-staggered suicide precaution checks. | Substantial | **Close.** |
| 3 | Patients not being reliably observed while awaiting evaluation. | Substantial | **Close.** |
| 4 | Safety plans not being reliably completed for ATH discharges. | Substantial | **Close.** |

# MEMORANDUM

**APPENDIX C-** WSP's status on Lindsay Hayes statewide outstanding items

| Aspect of Recommendation that Remains Outstanding | WSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | HCFIP project complete |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% but in process. |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly, most recently in April 2023. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS) | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Compliant | |
| No. 18: Safety planning training | Compliant | Above 90% |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | Above 90% |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | Above 90% |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | Quorum regularly met during Q3. |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are improving, CQIT is a statewide issue, and the institution has not yet solidified a plan for consistent in person diagnostic screening audits although monthly chart audits are in compliance. |

Exhibit K

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | October 18, 2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | SUBSTANCE ABUSE TREATMENT FACILITY SUICIDE PREVENTION TOUR-Quarter 3 September 2023 |

On September 20th and 21st, the Statewide Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator conducted a review at Substance Abuse Treatment Facility (SATF). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies. Also incorporated are the preliminary findings of Office of Special Master (OSM) expert Lindsay Hayes from his most recent review on June 29-30, 2023.

An exit meeting was conducted with the backup SPRFIT coordinator, Chief of Mental Health, the Warden, the Chief Deputy Warden, the Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 1 |
| CAPs generated by this reviewer during prior review that can be closed | 4 |
| Lindsay Hayes CAPs that remain open | 4 |
| CAPs previously generated by this reviewer that remain open | 3 |
| New CAPs generated as a result of this review | 3 |
| New recommendations generated as a result of this review | 0 |

**Total open CAPs=10**
**Total open recommendations=0**
**Total closed CAPs=5**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Short Term Restricted Housing

### Second Watch Morning Meeting

The second watch morning meeting was observed as part of this site review and once again, it was a strong meeting. All required attendees were present including a psychologist, the sergeant, officers, and two psychiatric technicians (PTs). The team discussed new arrivals, patients in the SRMP program, and intake cell usage. The only matter of concern was that the sergeant reported that there were three inmates in intake cells beyond 72 hours and one inmate who was not housed in an intake cell who should have been, and he indicated that the reason was lack of bed availability. As discussed below however (Intake cell section) this was not consistent with the findings of this observer on that day. Systemically however, the morning meeting remains strong with regards to the discussion of content.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

In light of deficiencies that were noted during the most recent site review by Lindsay Hayes, this reviewer observed two differed PTS completing rounds during this review. Both were regulars on the unit. While both PTs provided the patients with handouts, took the time to observe the condition of each patient's cell, and made mental health referrals as indicated, both PTs were observed to query about suicidal ideation in a non-direct fashion. Specifically, both asked the patients "are you thinking about hurting yourself" rather than asking specifically about suicidal ideation. The first PT was given this feedback in real time yet did not adjust. SPRFIT minutes from the month of June 2023, indicate that the local audit for psychiatric technician rounds documentation was compliant at 97% and deficient PT rounds resulted in a CAP previously, but noted improvements resulted in the recommendation, by this reviewer, to close out that CAP during the last site review (March 2023). Additionally, the deficient performance that was noted by Lindsay Hayes was isolated to one PT and the deficiency noted by this reviewer was isolated to only one element of rounding. Therefore, these recent deficiencies will not result in the re-activation of a CAP at this time but will if deficiencies are noted again in the next site review.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with the last site review, the STRH at SATF is equipped with 10 retrofitted intake cells (100-109). There were nine intake cells occupied on the morning of this site review and the one available cell had been vacated only a few hours prior. Of the nine patients in intake cells, two were housed beyond 72 hours and more concerningly, there were three who had arrived within less than 72 hours who were not housed in intake cells. Additionally, SATF has activate housing unit C4 for ASU overflow and on the day of this review, there were three patients housed there and all had arrived within less than 72 hours. In total therefore, there were six patients who required retrofitted intake cells but were not properly housed within one. Since the last site

review, SATF has appropriately de-activated the five non-retrofitted cells at E1 (110-114) that they had previously designated as intake cells. However, there were still six retrofitted cells (121-124; 224-225) available at E1 which were all empty on the day of this review. As indicated above, the reason for intake cell non-compliance that was provided by the sergeant during the STRH morning meeting was a lack of available bedspace, however it is unclear how this explanation is viable in light of the fact that there were two patients housed in STRH in intake cells beyond 72 hours, as well as six available intake cells available at E1. Although the institution's SPRFIT subcommittee has reported that the local audits of this variable have been in compliance for at least six months, the deficiencies noted by this reviewer remain concerning. The CAP related to ASU intake cells cannot be reliably closed out at this time.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

This reviewer interviewed six of the inmates in intake cells, as well as two others who had recently arrived to the unit, to ensure that they had been supplied with an entertainment appliance in a timely fashion. Five of the eight had indicated that they had, but one of the those five indicated that his device was not working properly. The local SPRFIT minutes from the month of July indicates that local audits have found 100% compliance in this area.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

On the day of this site review, one officer was observed completing checks. He took the time to look into each cell and when indicated, utilized a flashlight to, presumably, establish contact with the inmate therein. The monitoring report indicates that for the month of August 2023, there were a total of 129,411 checks expected at the STRH and 125,696 were completed timely (not exceeding 35 minutes apart) for a compliance rate of 97.13%. This continues to be an area of ongoing compliance at SATF.

### ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU Pre-placement screens observed as part of this site review, as none occurred. A review of the performance report from Q2 2023, indicates that this has been an area of improvement for SATF since the last site review, as compliance has increased to 86%. This item is supposed to be discussed monthly in the SPRFIT subcommittee meeting but for the second consecutive review period, it has not been.



### ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU post-placement screens observed as part of this review as none were indicated. A review of the performance report for Q2 of 2023, indicates that compliance for that time period was 95%.



## Inpatient Units (MHCB and/or PIP)

### Suicide-Resistant Cells – Hayes Item 10

MHCB cells at SATF had previously been noted to be suicide resistant.

### Interdisciplinary Treatment Teams (IDTT)

This reviewer observed five IDTTs during this site review; three of which were initial IDTTs and two of which were discharge IDTTs. Four of the IDTTs were for patients who were admitted for Danger to Self (DTS) and the other was a discharge IDTT for a patient who was admitted for Severe Impairment Due to Mental Illness (SIDMI). All of the IDTTs consisted of all of the required team members, in addition to the MHCB supervisor who served as IDTT leader. All required members participated in all five IDTTs. There was one patient who endorsed safety concerns related to a drug debt and the CCI obtained information and documented it, indicating it would be passed on to the sergeant. Treatment plan goals were discussed in all five IDTTs. Issue and observation were discussed in all five cases; however, the psychiatrist was the only treatment team member who discussed this in all five cases and seemed to be the loan decision maker regarding this. Despite this, clinical notes justifying the issue and observation orders are consistently written by a psychologist. Safety planning was discussed with the patient in only one case and there was not evidence that it was reviewed by the supervisor before the conclusion of the IDTT, as the safety plans were not present in the chart at the time during any of these IDTTs. The statewide suicide prevention unit is prepared to initiate a new system on the SharePoint site for completing supervisory review of discharge safety plans and it is anticipated that this will simplify the process and improve compliance in this area. It should also be noted that during his most recent review of SATF, Lindsay Hayes reported concerns about the overall organicity of the IDTTs. Specifically, he verbalized concerns that they were "staged" because the SPRFIT coordinator and the Chief Psychologist were present and typically are not. There have been shifts in institutional leadership since then and the MHCB supervisor, who used to also

serve as the SPRFIT coordinator, is now solely responsible for the supervision of the MHCB and can attend more regularly.

## Suicide Watch and Suicide Precaution

On the day of this site review, there were 18 patients in the MHCB; 13 of whom were on Suicide Precautions (Q11-Q15 checks) and the remaining five patients were on suicide watch (1:1 direct observation). For the second consecutive audit period, there were not any patients on Q30 checks. All 18 cells were noted to have issue and observation orders posted on the door. This reviewer observed one nursing staff member conduct Suicide Precaution rounds on six patients and she did so appropriately. In each case, she established visual contact with the patient and documented in real time in CERNER. It was also observed that the three patients on suicide watch were being directly observed.

A review of the Mental Health Observation report for August 2023, indicates that rounds for suicide watch were completed timely at 84.5% and timely for suicide precautions at 98.2%. Additionally, checks were staggered 98.8% of the time. This remains an area of strength for SATF.

## Observation and Issue Orders – Hayes Item 3

The charts were reviewed for 10 patients who completed a MHCB stay at SATF for DTS during Q2 2023 to ensure that orders for issue and observation were present in the charts, and that a clinical note justifying partial issue was present when indicated. These patients accounted for 28 total patient days. While observation orders were present for all 28 patient days, issue orders were absent for 9 patient days, yielding a compliance rate of 67.8%. In three cases in which an order was present, the issue order spoke only to bedding and property, but not clothing. Additionally, a note justifying the issue and observation orders was present for only seven patient days and the notes were deemed by this reviewer to be of inadequate quality in two of those seven instances, with one note mentioning order but lacking justification and another note having justification that was inconsistent with the order. Minutes from the SPRFIT subcommittee from July 2023, indicate that the local audit of this variable was below compliance at 85%, however there was not a substantive discussion of the root cause of this low compliance rate or a proposed solution to it. As indicated above (IDTT section), this may result from a disconnect between which provider is responsible, by practice at the institution, for writing the notes versus which provider is responsible by practice for making the clinical determination. This will result in a CAP.

## Timelines for Suicide Risk Assessments

A review of the performance report for the second quarter of 2023 (April-June), indicates that SATF completed Suicide Risk Evaluations timely 91% of the time overall.



Of the 919 SRASHEs that were completed at SATF during that time, the closed appointments report identified 313 of them. Of those 313, 274 (87.54%) were completed in a confidential setting. Of the 39 contacts that were not completed in a confidential setting, 21 were due to the patient's refusal and 2 others were due to a lack of confidential space. In total, 59% of the non-confidential contacts were for reasons that were outside of the clinician's control. This is consistent with the last review period's findings and, in light of SATF's significant staffing shortage, demonstrates an acceptable effort to offer confidential contacts consistently.

## Privileges – Hayes Item 14

This reviewer conducted an audit of the 114s for 10 of the patients who were at the MHCB during this onsite review. The 114s reflected that 6 of the 10 had been offered yard at some point during their stay but only 4 had been offered phone calls and only 2 had been offered dayroom. This continues to be an area of deficiency for SATF, and institutional leadership has regularly indicated that the deficiency is related more to documentation than to the actual offering of privileges. It is understood that SATF will soon be activating the electronic 114s and as such, reliable documentation is expected to improve. Additionally, SATF is experiencing a staffing shortage and several other pressing priorities so as such, the present CAP related to this item will remain open and a new one will not be reactivated at this time.

## Clinical Discharge Follow-Ups

A review of the performance report indicates that clinical discharge follow-ups were completed timely 91% of the time during the second quarter of 2023.



This reviewer selected for audit, a random sample of 10 charts for patients who completed 5 full days of clinical discharge checks during quarter 2 of 2023. Documentation reflects that the safety plan was completed and reviewed in four cases and that the custody portion of the discharge checks were discontinued by a mental health clinician in seven cases. Although both metrics are below 90% compliance, the former is better than expected given that the institution has not provided any of the clinicians with safety planning training and the latter demonstrates

improvements from prior review periods. Low compliance with safety planning training will be reflected in its own separate CAP.


## Alternative Housing – Hayes Item 5

SATF's LOP 464, Alternative/Temporary Housing outlines SATF's Alternative Housing process and was revised in October 2022. Thie remains unchanged since the last site review and is in alignment with the statewide policy. It lists the prioritization of housing locations as follows:

1. Correctional Treatment Center (CTC) licensed medical beds
   a. Prior to housing a patient in a CTC licensed medical bed, staff shall ensure the following:
   b. Prior to housing a patient in a CTC licensed medical bed staff must obtain approval from HCPOP.
   c. Prior to admitting a patient to a CTC licensed medical bed staff shall obtain admitting orders from a physician.
   d. CTC licensed medical beds do not have the same design as designated MHCB rooms. CTC licensed medical beds have not been retrofitted for optimal patient safety e.g. reduced anchor points around light fixtures and air vents, non-operational electrical outlets, high visibility.
   e. Use of licensed medical CTC beds for MHCB overflow shall be considered alternative housing; however, because CTC is a licensed setting, all patients placed in CTC pending transfer to a designated MHCB must be provided inpatient level of services in accordance with California Code of Regulations, Title 22. Patients shall not be placed in the CTC beds for mental health issues unless a referral to the MHCB has been made. The alternative housing requirements as set forth in this policy shall be followed when patients are placed into these beds.
2. Holding cells with access to water/toilets including, but not limited to, "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.
   a. SATF CTC Specialty Area Holding Cell 114 (water and toilet). **Except for those patients who are on Administrative Segregation Status.**
   b. SATF CTC Specialty Area Holding Cell 115 (water and toilet). **Except for those patients who are on Administrative Segregation Status.**
- If the need for ATH exceeds available space in CTC, reference section IV.E. within this OP.
3. Holding cells without toilets
4. Triage and Treatment Area (TTA) or other clinic exam room
5. Other unit-housing where complete and constant visibility can be maintained.

When the necessity for ATH exceeds the available areas designated in the CTC, the following areas shall be utilized according to the patient's classifications needs:

1. Patients, who are on Administrative Segregation status shall be placed **in** STRH cells 110 and 111.

2. Should overflow be necessary**,** Facility "E-1" shall be utilized for all patients requiring ATH. If vacant cells are available, Facility E Building 1 cells 126, 127, 128, 129, 130, 131, 132 and 133 shall be used and authorized to house patients from all facilities.

3. Facility "C" shall be utilized for all General Populations patients requiring ATH. If vacant cells are available, Facility C, Building 3, A, or C Section, shall be primarily utilized and authorized to house patients from Facilities B and C.

4. The Facility Captain shall be responsible for providing alternative activities for non-ATH inmates who are housed in units that are being utilized for ATH (e.g., dayroom in adjoining section or yard). Movement surrounding ATH areas shall be controlled.

   a.     Facility C - The cells used specifically for ATH are:

   - C3 - 124
   - C3-125

   b.     Cells 124 and 125 shall be available 7 days a week, 24 hours a day. Permission to use these cells for ATH is granted by a Health Care Manager (Health Care Captain or Health Care Associate Warden) during regular business hours. The Administrative Officer of the Day (AOO) shall grant permission to use these cells during non-business hours.

   a.     Facility D - The cells used specifically for ATH are:

   - 03 -114
   - 03 - 115
   - O3-116
   - D3 - 117

   Cells 116 and 117 shall be available 7 days a week, 24 hours a day. Permission to use these cells for ATH is granted by a Health Care Manager during regular business hours. The AOD shall grant permission to use these cells during non-business hours.

Since the last site review, the institution has improved the accessibility of "EZ Bed" ("stack-a-bunk") and a mattress.

A sample of 10 charts were selected for audit. These were the charts of patients who were referred to the MHCB for DTS during quarter 2 of 2023 but rescinded before physical placement into a MHCB. A safety plan was completed prior to discharge in all but one case. It should be noted that only four of those completed safety plans were deemed to be qualitatively adequate, and safety plan quality was a concern that was also noted by Lindsay Hayes during his most recent site review. This, however, can be attributable at this point, to the fact that the institution still has not begun safety planning training, which will result in its own CAP.

A review of the performance report indicates that the institution was in compliance with suicide risk evaluations at the time of MHCB referral rescission at 99% for quarter 2 2023. Additionally, alternative housing stays were compliant at 99%.



## Suicide Risk Management Program (SRMP)

SATF's LOP 230 *Suicide Risk Management Program (SRMP),* continues to be the LOP that addresses SRMP. It was most recently revised in September 2022 and is consistent with statewide policy. At the time of this site review, there were 33 patients enrolled in the SRMP program at SATF and 15 who met an objective criterion but were not enrolled. The list of patients who met criteria but were not yet enrolled was discussed as part of the SPRFIT subcommittee meeting that occurred during this review and program supervisors have been notified about the patients who require enrollment. It is likely that the significant staffing shortage at SATF is contributing to the delay in enrollment and furthermore, four of the 13 had been flagged as meeting criteria for less than 2 weeks. As such, this will not result in a CAP at this time. A random sample of 10 patients who were enrolled in the SRMP as of the day of this review, were selected for audit and in 6 of those cases, treatment plan goals and interventions related to the patient's reason for placement in the SRMP, were documented in the most recent Master Treatment Plan. This represents improvement since the last site review.

## Discharge Custody Checks – Hayes Items 7 and 11

Discharge Custody Checks (7497s) has demonstrated significant improvement since the SATF created an action plan and delivered training towards the end of 2022. For the second quarter of 2023, 7497 compliance is as follows:

| Month | Overall compliance |
|-------|--------------------|
| April | 100% |
| May | 96.5% |
| June | 98.8% |

# MEMORANDUM

During the last site review, it was determined the open CAP related to this item would be closed if compliance could be demonstrated for six consecutive months. Therefore, audit results from February, March, and July were also reviewed and compliance for those months were 93.9%, 93.6%, and 93.4% respectively. However, during his most recent audit, Lindsay Hayes discovered ongoing deficiencies with page one. Therefore, the CAP related to this will remain open for one more audit cycle to ensure sustained compliance.

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer attended the SPRFIT subcommittee meeting on July 19, 2023, and again during this site review on September 20, 2023. At the time of the July meeting, it was observed that the committee continued to discuss all CAPs but had not placed them on the project pipeline. That occurred with prompting from this reviewer and all CAPs were assigned a priority score. However, there was very little participation from the committee beyond that of the SPRFIT coordinator and the chief psychologist. The institution had utilized the regional psychiatrist to establish quorum. In the September meeting, it was observed that CAPs were placed onto the project pipeline, but a qualitative discussion of progress was still absent. Additionally, custody representation was missing from the September meeting. A review of minutes from the second quarter of 2023 (April-June), revealed some concerns. April's minutes lacked a discussion of training compliance and there was not a substantive discussion, in any month, of the institution's progress towards outstanding CAP items. While the minutes have been submitted, the project pipelines have not and despite several open CAPs and improvement projects, the project pipeline that was included with the July 2023 minutes contained only one item. The minutes do reflect that the committee reliably collects data and reports out according to the measurement plan.

## Inmate Family Council and Inmate Advisory Council

A six-month review of SPRFIT committee minutes (February through July) did not discover documentation of the SPRFIT coordinator having attended Inmate Family Council (IFC) or Inmate Advisory Council (IAC). This is the second consecutive review period in which this deficiency has been noted. Given SATF's present staffing shortages and open improvement projects taking priority at this time, a CAP on this item will be deferred for one more review period.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the second quarter of 2023, SATF was in compliance with the completion of emergency suicide risk evaluations in cases of Danger to Self (DTS) at 95%. Additionally, 99% of all DTS cases during the quarter were appropriately triaged as emergent referrals.

| | | | |
|---|---|---|---|
| SRE after Em.Consult (except PIP) for Suicidality | 109 | **6.9** | **95%** |
| SRE after Ur.Consult (except PIP) for Suicidality | 1 | **0.0** | **100%** |

The month-by-month breakdown for the quarter is as follows:

| | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| April | 94% | 100% |
| May | 93% | 99% |
| June | 97% | 100% |
| Q2 2023 | 95% | 99% |

## Suicide Risk Evaluations – Hayes Item 13

Overall, suicide risk evaluations were compliant at 91% for the second quarter of 2023. Compliance for evaluations completed at the time of referral to a MHCB was 99%, and for rescinded MHCB referrals it was 89%. For the second consecutive review period however, the institution remained below compliance, with the completion of suicide risk evaluations at MHCB discharge (82%). It was recommended during the last review, that the SPRFIT subcommittee discuss specifics of low compliance and that has not occurred. A random sample of 10 charts for patients who were rescinded from alternative housing during quarter 2, and 10 who were discharged from the MHCB in quarter 2, found that a SRASHE was present in the chart in all 20 cases and that there was documented justification for clinical discharge in 14 of the 20 cases. This variable has improved since the last site review.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

The following QIPs from a suicide in 2021 and another in 2022, remain in a status of ongoing monitoring as of the time of this review.

| Issue Identified | QIP | Status |
|---|---|---|
| Patient #1 | | |
| There is a concerning pattern in this case of mental health providers documenting that interventions would be offered to this patient which weren't ultimately provided. As indicated in the body of this report, the patient was seen for an MHPC routine contact on September 8, 2020 and the clinician specifically documented that the patient would be offered bi-weekly | **The CMH or designee at SATF** shall 1) initiate an inquiry to determine the reasons for lack of appropriate clinical follow-up and interventions which had been documented would occur in both instances; 2) based on the results of the inquiry, the CMH shall determine the best course of action. At minimum, all clinical staff shall be instructed of the necessity to follow through on documented clinical recommendations, | While the institution was unable to report on the specifics of the need for continued training ongoingly, spot-checks on the part of institutional leadership have revealed that this is not a systemic problem any longer at SATF. It is recommended that this QIP be closed out. |

| | | |
|---|---|---|
| sessions after that. The patient was not offered bi-weekly sessions. On September 17, 2021, a different clinician documented that the safety plan would be reviewed and updated during the week and it was not. | or clearly notate why said recommendations did not occur. | |
| During an MHPC routine contact on September 8, 2020, the clinician indicated that Inmate Murieta continued to function well and was denying symptoms, including any thoughts of self-harm, but documented that Inmate Murieta would be offered contacts bi-weekly. However, Inmate Murieta was not seen for another PC contact until January 19, 2021, which was outside of Program Guide timeframes. According to the closed appointments report, there were a total of four MHPC contacts that were scheduled but canceled for reasons that are not clear in the mental health documentation, between the dates of September 8, 2020 and January 19, 2021. | **The CMH or designee at SATF** shall 1) review the identified concern; 2) review six months of compliance reports to determine if this is an isolated incident or part of an ongoing pattern; 3) based on results of the review, the CMH shall determine the best course of action, which may include additional training. | In light of their significant staffing shortage, SATF has developed a triage plan that allows them to prioritize clinical contacts for those patients who are at highest need. As indicated in the last site review report, full-compliance is not something that can be reasonably expected at this time given the institution's significant staffing shortage and it is recommended that this QIP be closed out. |
| There is a note in the chart reflecting a clinical contact for the inmate on the date of his death, November 24, 2021. However, this note raises several concerns. Specifically, the note says "patient seen in housing unit due to staff shortage by supervisor's direct order. No issues of clinical concern noted. Check in and out times are not accurate due to supervisor directive." Additionally, when interviewed, the clinician who wrote the note stated that he did not engage verbally with the patient that day and did not offer him a confidential contact. Although the note is timestamped at 0925, the patient was checked in for his appointment at 1400. Upon interviewing this clinician, he stated that he did not recall seeing the inmate that day and did not actually offer him a clinical contact, as he was under the impression he was directed not to do so. | Before completion of this report, **the CEO and CMH at SATF** proactively addressed this concern. This clinician has been removed from direct patient care, referred for peer review, and a CDCR 989 Request for Investigation was initiated. Additionally, memorandums have been issued by mental health leadership at the institution, clarifying the expectation to offer all patients confidential out-of-cell contacts, and all clinical notes must include a full mental status exam. Following completion of any investigation or direct action, the CEO, CMH or designee shall determine if any additional actions and/or training shall be required. | In light of their significant staffing shortage, SATF has developed a triage plan that allows them to prioritize clinical contacts for those patients who are at highest need. Problematic documentation has not been noted ongoingly. While the offering of confidential contacts continues to improve, full-compliance is not something that can be reasonably expected at this time given the institution's significant staffing shortage and it is recommended that this QIP be closed out. |
| During the onsite portion of this review, two different clinicians working in the STRH reported they were often directed by a supervisor to not offer out-of-cell contacts, but rather to see inmate-patients at cell front only. | **The CMH at SATF** proactively addressed this concern prior to this report. Memorandums have been issued by MH leadership at the institution, clarifying the expectation to offer all inmate-patients confidential | See language above. There is no evidence to suggest that any such directive remains in place. This QIP can be closed out. |

| | out-of-cell contacts, and all clinical notes must include a full mental status exam. The CMH shall further determine if any additional actions and/or training shall be required. | |
|---|---|---|
| Psychiatry-The psychiatric nurse practitioner (PNP) clinical note on September 28, 2021 includes a written plan to see the patient again in four weeks (four weeks from the September 28th appointment). Review of the electronic medical record did not reveal a scheduling order for a four-week appointment with PNP/psychiatrist and did not reveal a PNP or psychiatry clinical contact four weeks following the September 28th appointment, as was planned in the September 28, 2021 note. | **CEO and Chief Psychiatrist at SATF** will investigate and identify any individual or procedural elements/failures that contributed to this omission and enact strategies to prevent reoccurrence. | SATF has only one state psychiatrist and does not have a chief psychiatrist at this time. The institution has not developed an alternative manner for which to track this. It is recommended that it be deferred until a chief psychiatrist is hired. |
| | Patient #2 | |
| The inmate had a contact with his primary clinician on November 17, 2021 and subsequently was not assessed by a clinician again prior to his death. It is unclear why Inmate Ramirez was not provided another opportunity for a confidential session, which may have provided additional opportunities for mental health and suicide risk assessments prior to his death. | **The SATF-CSP CMH** shall conduct an inquiry into why Inmate Ramirez was not seen for approximately eight months by a CCCMS PC and implement a solution that will prevent reoccurrence of this concern. | The institutional triage plan is allowing for the prioritization of higher-risk patients, as the root cause of this problem was determined to be staffing. It is recommended that this QIP be closed out. |
| The treatment plan dated May 25, 2022 had an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding the inmate's functioning and presentation during the review period. More specifically, current information found in other clinical documentation, including but not limited to: frequency/severity of auditory hallucinations, coping tools utilized, programming on the yard, psychiatric medication refusals, sleep disturbance, low energy, and compliance/ participation in the MAT program. Additionally, the transfer/discharge planning section did not have any meaningful clinical information, therefore, there was an absence of justification for the level of care. Per MHSDS Program Guide, 2009 Revision (12-7-12) "*The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent* | **The SATF-CSP CMH and/or designee** shall audit documentation for five additional inmate-patients for the identified clinician within the past 6 months (to include progress notes and treatment plans). Based on results of this audit, the CMH shall determine the best course of action. At minimum, the clinician shall be re-trained on the importance of regularly updating treatment plans in correspondence with Program Guide requirements. | The identified clinician attended the SRASHE Core Competency training on June 12, 2023. This QIP will remain open until the results of supervisory audits are provided. |

| | | |
|---|---|---|
| *clinical information that may indicate the need for a different level of care."* | | |
| Psychiatry clinical note authored on February 10, 2022 referenced "Follow up with psychiatry in 90 days …". The psychiatrist entered scheduling order for " MH ML CCCMS MHMD Contact … once every 90 days for one year" on February 10th. Review of the chart reveals no scheduled appointment 90 days after the order was placed on February 10th. | **SATF-CSP CEO and/or CMH** will research this scheduling omission to discover specifics and will consider implementation of strategies to prevent reoccurrence. | SATF has only one state psychiatrist and does not have a chief psychiatrist at this time. The institution has not developed an alternative manner for which to track this. It is recommended that it be deferred until a chief psychiatrist is hired. |

## Training and Mentoring Compliance

### Clinical Training Compliance

| Training | Clinicians trained/total clinicians | Compliance percentage |
|---|---|---|
| SRE Mentoring | 17/41 | 41.46% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 23/43 | 53.49% |
| Safety Planning Training | 0/49 | 0% |
| Suicide risk management program training | 37/44 | 84.1% |
| Columbia-Suicide Severity Rating Scale Training | 24/34 | 70.59% |
| Discontinue the use of safety contracts | 52/69 | 75% |

Institutional mental health leadership reported that a meeting was being planned for September 21, 2023, to develop a plan to begin training for the safety planning.

*Annual IST Suicide Prevention Training – Observation*

This class was observed as part of this site review. It was conducted by a certified instructor. Unfortunately, the class started 30 minutes later than its scheduled time for reasons outside of the control of the instructor and as such, the class did not last for the entire 120 minutes. Otherwise, the training was adequate. It is recommended that institutional IST ensure that adequate timing is afforded for the delivery of this training.

*Annual IST Suicide Prevention Training Compliance – Thus far for calendar year 2023*

Custody=67%
Medical=67%

Mental Health=60%

*CPR Training*

Custody=72%

Nursing=100%

## Receiving and Release (R&R) Screening – Hayes Item 1

There was one R&R screening conducted during this site review. The nurse was observed to ask all the questions appropriately and made a mental health referral as indicated. The physical layout of the area remains conducive to the process. Confidentiality was afforded the patient and the patient was placed in a therapeutic module, thereby ensuring the safety of the nurse. Suicide prevention posters, in both English and Spanish, were visible to the patient in the room in which the screening is conducted. SPRFIT meeting minutes from the second quarter of 2023, as well as the first month of the second quarter (April-July) were available for review and they indicate that local audits had found that R&R screenings were conducted appropriately 100% of the time each month.

## Crisis Intervention Team (CIT)

SATF's LOP 484 *Crisis Intervention Team* discusses the institution's CIT process and was modified in November 2022. It aligns with statewide policy. Given SATF's significant staffing shortage, the provision of services via CIT are inconsistent and the CIT process was not operational as of the day of this site review. Previous assessment of the CIT practices at SATF have determined them to be adequate.

During this onsite review, CIT was not operational due to the assigned clinician being in training all week and as such, crisis calls were assigned to yard clinicians. None were observed as there were not any that occurred.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

OSM expert Lindsay Hayes conducted a site review of SATF on February 7-8, 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

| Title | Definition of the Problem | September 2023 Update | Status |
|-------|---------------------------|------------------------|--------|
| Intake cells | Upon inspection, all of the new intake cells were full on February 7, but all of the inmates housed in these cells were beyond their initial 72-hour new intake status. There was one new intake inmate confined in a wheelchair who was not housed in either a new intake cell or an ADA compliant cell.<br>In addition, this reviewer was informed that new intake inmates who could not be housed in new intake cells within the STRH unit were transferred to the administrative segregation "overflow" cells located in E-Yard, Building 1. This reviewer subsequently inspected the designated overflow cells in E-1 and found that three new intake inmates were housed in the cells and none of the cells were suicide-resistant. Although the cells had retrofitted ventilation grates, each cell had gaps between the wall and the bunks, horizontal brackets that attached the stools to the walls, and gaps between the desktops and the walls.<br>Finally, this reviewer determined that the STRH unit had a capacity for approximately 200 inmates and housed 105 inmates on February 7. There were 56 empty single cells. The very problematic practice of housing new intake inmates in non-new intake cells, which was also found during this reviewer's previous assessment in January 2019, could have been easily corrected if the ten non-72-hour inmates housed in the STRH's new intake cells were properly housed in one of the 56 non-occupied single cells. Of note, several inmates in both the STRH and E-1 units complained that they had not received any entertainment devices (i.e., radios or tablets) (pg 198). | As indicated above, this remains problematic. | **Remain open.** |
| Alternative Housing | Similar to the previous assessment, this reviewer was initially provided data indicating that two TTA examination rooms (No. 166 and No. 167) in the CTC were also utilized for alternative housing. These rooms had been identified by this reviewer in | Improvement is noted during the most recent Lindsay Hayes review. | **Close** |

| | | | |
|---|---|---|---|
| | the 2016 assessment as extremely problematic because inmates were being shackled to hospital beds in these rooms while on alternative housing status. Upon closer examination, this reviewer was again able to verify that although clinical assessments could occasionally occur in these TTA exam rooms, inmates were actually housed in the CTC holding cells. This reviewer would again strongly recommend to CSATF leadership that these TTA exam rooms not be listed in the "Location and Cell Type" column of alternative housing data reports. In fact, the current CSATF policy on alternative housing (OP-464) entitled "Alternative/ Temporary Housing," dated June 2021, incorrectly states that "Triage and Treatment Area (TTA) or other clinic exam room" could be utilized for housing. Such a policy is flawed and needs to be revised. Although a TTA exam room could be utilized for assessment, it should never be authorized for the housing of inmates on alternative housing status (pg 198-199). | | |
| MHCB privileges | This reviewer's examination of 114-A forms for all 14 patients in the MHCB unit on February 7 found that none of the patients had documentation of forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/quarantined," or simply "quarantine." The current practice of placing MHCB patients on lockdown status and inappropriately using the term "quarantine" as the rationale for prohibiting all out-of-cell activities (except for showers and IDTT attendance) was very problematic and should be immediately remedied (pg 200-201). | During his most recent review, Lindsay Hayes found that this was still problematic and this was verified during this review. | **Remain open.** |
| Safety plans | Although safety plans were required in 49 cases of patients admitted into the MHCB unit for DTS, the review found that safety plans were completed in only 31 percent (15 of 49) of the cases. Safety plans were not completed in 69 percent of the | While the completion of safety plans for patients rescinded from alternative housing is no longer problematic, safety plan quality and the reliable review of safety plans remains of concern. | **Remain open.** |

| | | | |
|---|---|---|---|
| | cases because clinicians incorrectly assumed that such plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide. Such a rationale ignores the fact that MHCB patients should be at low acute risk for suicide when they are discharged from an MHCB. This reviewer's examination of the data found problems in untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that several supervisory reviews were occurring well after the IDTT meetings. In addition, the MHCB supervisory review did not identify the very problematic practice identified above in which MHCB clinicians (and perhaps the MHCB supervisor) incorrectly assumed that safety plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide (pg 201-202). | | |
| Custody discharge checks | This reviewer was presented with documentation of 141 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July 2021 through December 2021. The review found that only 77 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form, as well as discharges occurring on the weekends without a face-to-face assessment by a clinician. The majority of custody checks were recommended for 48 hours. In addition, only 78 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for | Significant improvement has been noted, however Lindsay Hayes continued to note deficiencies with page one. Close if compliance is noted for one more audit cycle. | Remain open. |


| | correctional officers consistently conducting checks at 30-minute intervals (pg 202). | | |
|---|---|---|---|

**Preliminary findings from the most recent Lindsay Hayes site review:**

As indicated above, Mr. Hayes once again conducted a review at SATF on June 29 and 30 2023 and that visit supplemented the quarter 2 review by this reviewer. Below is a summary of the preliminary findings that were also confirmed by this reviewer.

| Concern | Status |
|---|---|
| Poor quality safety plans and safety plans that were not complete. | This will likely rise to the level of a CAP. |
| Poor PT rounds | One deficient PT rounding was observed during the review. CAP will be reactivated if noted next site review. |
| Safety plans not being reviewed by the MHCB supervisor. | This is already an active CAP. |
| MHCB IDTTs in which mental health leadership who does not normally attend, attended. | This will likely rise to the level of a CAP, however it was not observed during this review. |
| Inappropriate placement of patients into alternative housing upon their return from PIP or MHCB. | This practice has reportedly been discontinued. |
| Patients not being seen regularly in the MHCB. | This is likely the result of staffing shortages but will likely rise to the level of a CAP. |
| RNs not attending CIT. | CIT LOP reflects this requirement. CIT was not active during this review. This will not likely be a CAP. |
| Privileges not being reliably offered in the MHCB. | This is already an active CAP that will remain open. |
| Non-compliance with training. | This was verified during this review and will result in a CAP. |

Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).

An exit meeting was conducted with the backup SPRFIT coordinator, Chief of Mental Health, the Warden, the Chief Deputy Warden, the Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes. The following is a summary of CAPs that remain open from prior reviews and their current status.

| CAP | September 2023 Update | Status |
|-----|----------------------|--------|
| The institution consistently fails to meet full compliance with intake cell policy at STRH. | This continues to be problematic. It is on the project pipeline and may require a process redesign. | **Remain open.** |
| Custody Discharge Checks (7497) are consistently below 90% compliance, primarily as the result of supervisory reviews not being completed. | As indicated above, improvement has been noted. Lindsay Hayes has noted a different deficiency so that CAP will remain open. | **Close as of this review.** |
| The 24-72 hour custody post-discharge check process is not reliably being completed properly. Specifically, it is no longer acceptable for a PT to discontinue checks via verbal consultation with a mental health clinician. As of October 19, 2021, a mental health clinician must conduct a face to face evaluation in order for this process to be discontinued. | As indicated above, improvement has been noted. | **Close as of this review.** |
| Safety planning is not being reliably completed on all patients who are discharged from alternative housing. | While safety planning in general remains problematic, this specific concern has been resolved. | **Close as of this review.** |
| Safety planning is not being reliably completed on all patients who are discharged from the MHCB. | While safety planning in general remains problematic, this specific concern has been resolved. | **Close as of this review.** |
| Measurable treatment goals and interventions are absent from the treatment plans for patients enrolled in the SRMP program. | As indicated above, improvement is noted. | **Remain open.** |
| Patients in the MHCB are not being reliably offered privileges. | Improvement has not been noted but is expected when the institution transitions to electronic 114 documentation. | **Remain open.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | September 2023 Update | Status |
|---------|----------------------|--------|
| It is recommended that the SPRFIT coordinator attend IFC and IAC every six months and that a qualitative discussion of the meeting be presented in the SPRFIT minutes the following month. | Not resolved, but will be deferred in light of staffing shortages. | **Deferred.** |

Below is the three new Corrective Action Plan (CAP) that have been generated as a result of this review.

| Concern | Corrective Action Plan |
|---|---|
| ASU pre-placement screenings not being discussed in SPRFIT subcommittee per the measurement plan. | Ensure that a discussion of this item is included in SPRFIT minutes per the measurement plan. |
| Inadequate presence, and quality, of notes justifying observation and limited issue in the MHCB. | The institution will place this item on the project pipeline for prioritization. |
| Poor compliance with trainings (safety planning, SRE mentoring, and 7-hour SRASHE core competency. | SATF's Mental Health leadership will create a CAP, including plans for resolution, by November 30, 2023. |

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - SATF - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Intake cells not used according to policy | Minimal | **Remain open.** |
| 2 | Alternative Housing. | Substantial | **Closed as of this review.** |
| 3 | MHCB privileges | Minimal | **Remain open** |
| 4 | Safety plans | Minimal | **Remain open** |
| 5 | Discharge custody checks | Substantial | **Remain open** |

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Intake cell compliance | Minimal | **Remain open.** |
| 2 | Discharge custody checks-Supervisory review. | Substantial | **Close as of this review.** |
| 3 | 24-72 hour discontinuation of custody checks. | Substantial | **Close as of this review.** |
| 4 | Safety plans not completed for alternative housing discharges | Substantial | **Close as of this review.** |
| 5 | Safety plans not completed for MHCB discharges | Substantial | **Close as of this review.** |
| 6 | SRMP treatment plans | Moderate | **Remain open.** |
| 7 | MHCB privileges | Minimal | **Remain open.** |

Appendix C: SATF's status regarding compliance with outstanding Recommendations in Lindsay Hayes' October 2022 Report

| Aspect of Recommendation that Remains Outstanding | SATF'S status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% |
| No. 10: Auditing SRE quality | Non-compliant | Audits are not being done quarterly |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Non-compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Partially compliant | Safety plans are being competed, supervisory reviews are not. |
| No. 18: Safety planning training | Non-compliant | Training has not been delivered |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are still not being reliably offered, CQIT is a statewide issue, and SATF does not have a Reception Center |

Exhibit L

 

**CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 11/14/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D. <br> Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CSP-LAC SUICIDE PREVENTION TOUR October-Quarter 4 2023 |

On October 17-18, the Statewide Suicide Prevention Coordinator for Region 3, conducted an on-site review of the Suicide Prevention measures at California State Prison-Los Angeles County (LAC). This report will incorporate status on preliminary findings from the preliminary findings from the most recent site visit by OSM representative Lindsay Hayes on August 23 and 24.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up. The summary results of this review are as follows:

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 4 |
| CAPs previously generated by this reviewer that remain open | 7 |
| New CAPs generated as a result of this review | 1 |
| CAPs generated by this reviewer that can be deferred | 0 |
| New recommendations generated as a result of this review | 1 |
| Previously generated recommendations that remain open | 1 |

**Total CAPs closed=1**
**Total CAPs that remain open=12**
**Total recommendations that remain open=1**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

# MEMORANDUM

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

LAC has two Administrative Segregation Units; one Short Term Restricted Housing (STRH) unit and one ASU Enhanced Outpatient (EOP) hub. Both were the subject of this review.

## Short Term Restricted Housing

## Second Watch Morning Meeting

The second watch morning meeting was observed. The meeting included the sergeant, a psychologist, and a psychiatric technician. It was a strong meeting. They discussed new arrivals, including whether they were properly housed. For the four patients who were housed in intake cells beyond 72 hours, the sergeant offered reasoning (see intake cell section). The psychologist in attendance also queried about appliances and discussed the patients in the SRMP which demonstrates improvement since the last site review. Patients demonstrating recent behavioral problems were discussed, as were those on suicide watch.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

PT rounds were conducted by a regular on the unit and the rounds were observed to be strong. The PT queried about suicidal ideation, as well as sleep and appetite, with all patients. The PT completed documentation in CERNER in real time. She spent adequate time with all patients and seemed to have a rapport with them. There were two instances in which it was clinically indicated to check CERNER for upcoming appointments and she did so. There was one in which a mental health referral was indicated and she placed it. She had a supply of writing materials and offered them to the patients upon request. A review of the SPRFIT subcommittee minutes from July and August indicates that the local audit found this to be 97% compliant in June and 94% compliant in July. This continues to be an area of strength for LAC.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with prior site reviews, the STRH at LAC has 12 cells (100-111) designated as intake cells. On the day of this site review, all the intake cells were occupied. Two were occupied by patients on suicide watch and of the remaining 10, 2 were occupied by 2 patients. Of the 14 patients in intake cells, 3 had been in an intake cell for greater than 72 hours. Although the sergeant produced an explanation in the morning meeting, it was inconsistent with observation. Specifically, he cited a lack of available bed space even though there were 85 available beds on that day. Once again, the presence of placards on the doors was problematic. Six of the cells lacked placards entirely and the remaining six did not have complete information as they were missing arrival dates. Minutes from the July SPRFIT subcommittee meeting indicates that this variable was 100% compliant in June and July.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Six patients at STRH were interviewed as part of this review and all indicated that they had not been offered a radio. This is contrary to the sergeant's report in the morning meeting, which was that all patients had been provided with an appliance. This may stem from confusion regarding

policy for the provision of radios versus the provision of tablets. Minutes from the August 2023 SPRFIT subcommittee meeting indicates that the local audit at LAC found this variable to be compliant at 100%.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

For the month of September 2023, there were a total of 125,022 checks expected at STRH and 118,012 were completed timely for a compliance percentage of 94.39%. Minutes from the August 2023 SPRFIT subcommittee meeting indicates that the local audit at LAC found this variable to be in compliance at 100%. Two different officers were observed completing Guard One checks and both seemed to do so appropriately, establishing visual contact with the inmate before moving on to the next cell.

### ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH

There were no ASU pre-placement screens observed as part of this site review, as none were warranted. A review of the performance report for Q3 of 2023, indicates that LAC was at 88% compliance with this variable. Although this demonstrates a slight decrease in compliance since the last quarterly review, it is noted that there were 1,078 more such screenings conducted during quarter 3 and the variable remains in compliance.

#### 70.1 ASU Pre-Screens



### ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU post-placement screens observed as part of this review as none were indicated. A review of the performance report for Q3 of 2023, indicates that compliance for that time period was 93%.

#### 70.2 ASU GP Screens



### ASU EOP Hub

# MEMORANDUM

## Second Watch Morning Meeting

The second watch morning meeting was not observed as part of this site review.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

PT rounding continues to be a strength at LAC. One regularly assigned PT was observed and he interacted with all patients and inquired about suicidal and homicidal ideation. He asked about sleep and appetite and charted in real time in CERNER. He also inquired with each patient about their participation in mental health treatment. One patient reported being concerned about his mental health groups and the PT indicated that he would follow up with the patient's primary clinician (PC). He demonstrated rapport with the patients as well.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

The ASU EOP housing unit has seven intake cells (122-128) and this remains unchanged from the last site review. On the day of this review, six were occupied and three of those six had been in intake cells for greater than 72 hours and the reason provided was lack of available bed space. For the second consecutive audit cycle, placards remain problematic as they did not consistently include arrival dates and times.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

For the third consecutive audit period, non-compliance was noted with the issuing of entertainment appliances. This area was audited by the regional mental health compliance lieutenants on October 18, 2023 and they indicated that none of the patients had received entertainment appliances. A separated CAP will be generated as a result of that audit so it will not be duplicated here.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

For the month of September 2023, there were 122,015 checks expected at the ASU EOP Hub and 114,146 were completed timely for a compliance rate of 93.55%. With regards to welfare-check quality, one officer was observed conducting checks and did so appropriately. He looked into each cell and presumably established visual contact with the inmate in the cell before moving on. This demonstrates the second consecutive site review in which compliance was noted and will continue to be audited and monitored regularly.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

No ASU Pre-Placement screens or Post-Placement screens were observed as part of this site review as none occurred. As indicated above (see *STRH* section), the institution has demonstrated compliance with this variable during quarter 3.

## Inpatient Units (MHCB and/or PIP)

## Interdisciplinary Treatment Teams (IDTT)

Three IDTTs were observed as part of this site review, all of which were discharge IDTTs for patients who had been admitted for Danger to Self. Each IDTT involved a different psychologist and in all three cases, that individual served as IDTT leader as the MHCB supervisor was not present. IDTT quality fluctuated and seemed to be largely dependent upon the clinician. The mental status of all three patients suggested that they were able to understand and engage in the process, yet safety planning was only thoroughly reviewed in one case and was mentioned, but not thoroughly reviewed, in one other. In one case it was not reviewed at all and this was additionally concerning because the patient seemed to be minimizing the event that resulted in his initial MHCB placement. All three patients were on full-issue at the time of the IDTT and this was mentioned, however observation level was not, nor were other out of cell privileges. The safety plan in all three cases was completed prior to the IDTT, yet they were not reviewed by the supervisor. According to the SPRFIT measurement plan, this item is required to be audited in the month of June and results reported in July. However, a review of the minutes indicates that it was not, as incomplete data was presented in the month of July (see SPRFIT committee section below).

## Quality of Safety Planning – Hayes Item 4

This reviewer audited 20 randomly selected safety plans; 10 for patients who were discharged from the MHCB during quarter 3 2023, and 10 for patients who were rescinded from alternative housing. Of those 20, 8 (40%) were deemed to be of adequate quality, which is an improvement since the last site review. Similar to the last review, problems that were noted with those that were deemed inadequate included repetition (copying sections), information that was not clinically related to safety planning, and failure to incorporate interventions. In September 2023, CSP-LAC developed and finalized LOP #37 Mental Health Safety Planning, which delineates the requirements for safety planning. This policy aligns with statewide policy and the associated statewide training.

## Suicide Watch and Suicide Precaution

On the day of this on-site review there were eight patients at the MHCB and they were all on suicide precaution (Q11-15) status. One nurse was observed completing rounds with six of them and she did so appropriately, by documenting in real time in CERNER and establishing a visual of the patient. While all of the cells had papers outside the door summarizing issue and privilege status, as well as a colored chit to denote observation, the orders themselves were not present. The practice of printing the orders and placing them on the doors was recommended during a prior audit period and this practice had been implemented at the time of Lindsay Hayes' most recent review. It is recommended that this practice be re-implemented. The mental health observations reporting tool, indicates that LAC was 84.2% compliant with suicide precaution rounding during the month of September and that checks were staggered 97.3% of the time. Additionally, the tool indicates that suicide watch rounding was completed timely only 54.3% of the time. As this has already been opened as a regional nursing CAP, it will not be duplicated here. A review of the SPRFIT POWER BI report, indicates that the average number of days in which

a patient at LAC's MHCB remains on suicide watch during the past six months is 3.9 and the number of days in which patients are maintained on suicide precautions 1.2, both of which are decreases since the last quarterly review. The CAP related to this item was closed during the last review and need not be reopened at this time, but will if the trend shows a decline during the next review period.

| MEASURE | SW | RATE | SW RANK | TREND |
|---|---|---|---|---|
| Average Duration (Days) of MH Observation, Suicide Precaution | 3.9 | 5.7 | 34 | ▼ Decrease -7% |
| Average Duration (Days) of MH Observation, Suicide Watch | 1.2 | 1.0 | 25 | ▼ Decrease -25% |

## Observation and Issue Orders – Hayes Item 3

This reviewer audited a random sample of 10 patients who were admitted to the MHCB for DTS during the third quarter of 2023 and completed a full MHCB stay. None of these patients were on less than full issue for more than one day so as such, each day with less than full issue was reviewed, as was the first day on full issue in each case. The result was 15 patient days and there was an order present for all days and a note missing for only one day. All notes adequately justified the decision, which demonstrates ongoing improvement in this area.

## Timelines for Suicide Risk Assessments

Overall SRASHE timeliness during the third quarter of 2023 was compliant at 95%. During that review period, there were a total of 5,150 SRASHEs completed at LAC. A sample of 371 were selected from the closed appointments report and 231 (62%) were completed in a confidential setting. Of the 140 nonconfidential contacts, 107 (76%) were for reasons outside of the control of the clinician. This suggests that LAC has begun making a more concerted effort to offer contacts in a confidential setting.

## 10.2 Suicide Risk Evaluation



**95%**
(5,150)

↔

## Privileges – Hayes Item 14

LAC began using the electronic 114 process at the MHCB on October 16, 2023. On October 17, those entries were reviewed for all eight patients who were in the MHCB that day and there was indication that all eight had been offered yard and telephone privileges. While the offering of dayroom had not been documented, this is likely the result of dayroom having not been offered yet that week. This demonstrates improvement from prior site reviews and minutes from the August 2023 SPRFIT subcommittee indicates that this was 100% compliant. The CAP related to this will be closed out if compliance is noted for one more review period.

## Clinical Discharge Follow-Ups

For the third quarter of 2023, the institution was compliant (95%) with post discharge (five-day) clinical follow-ups.



## Alternative Housing – Hayes Item 5

LAC's Alternative Housing process is incorporated into CSP-LAC's LOP 31, Suicide Prevention and the addendum dated September 12, 2023 delineates the housing priorities as follows:

- o  Facilities A, B, C, D and MSF:
  - ·  Facility C Building 5 (FCBS) cells 134-150, other cells on the lower tier in FCBS can be authorized with AOD approval.
- o  Administrative Segregation (ASU) or DS and/or ASU overflow IPs:
  - ·  The IPs will remain in their housing unit and shall be moved to the bottom tier as necessary in a cell not adjacent to the showers.
  - ·  During ad-seg overflow period custody may use FCBS for alt housing.

On the first day of this site review there were three patients on suicide watch at alternative housing in STRH and on the second day, there were three in C5. In five of these six cases, the nursing staff conducting observation was maintaining direct and continuous observation and in the other case, the reason was because of the environmental set up. The patient was placed in a "wet" holding tank in STRH and the cell windows are not conducive to full observation (see photograph below). This cell is equipped with a metal bunk and a suicide resistant mattress. It is unclear why this cell was used in-lieu of the patient's own cell. While use of this cell does not technically violate LAC's own LOP, the necessity of its use should be re-evaluated by local leadership.



A sample of 10 patients who were referred to the MHCB for DTS during quarter 3 2023 but rescinded before being admitted, were selected for chart review. A SRASHE was present in all 10 cases, as was a safety plan. Documentation adequately justified the rescission in all 10 cases.

## Suicide Risk Management Program (SRMP)

LAC's LOP 34 *Suicide Risk Management Program (SRMP)* was signed off in August 2023 and aligns with statewide policy. At the time of this review, there were 112 patients in the SRMP program, a 1 patient decrease since the last site review. There were six patients who met objective criteria and were not yet enrolled. A random sample of 10 patients in the SRMP were selected for chart reviews and it was found that goals and interventions were present in 6 cases. This demonstrates slight improvement since the last site review. Given this fact, along with the ongoing staffing

shortages at LAC and other areas of deficiency that require prioritization, the open CAP regarding this issue will remain in deferred status at this time.

## Discharge Custody Checks – Hayes Items 7 and 11

Local audit results suggests that 7497 compliance continues to be extremely poor at CSP-LAC. results for Q3 2023 are as follows:

| Month | Total compliance | Area most significantly impacting compliance |
|---|---|---|
| July | 50% | All |
| August | 63.7% | All except checks discontinued timely. |
| September | 56.4% | All |

The statewide suicide prevention and response coordinator assigned to region 3, provided institutional leadership with a best-practice example to improve the tracking of, and compliance with, 7497s. The institution continues to struggle despite this. While 7497 compliance is an item that is already on the institution's project pipeline, it is recommended that its priority score be reconsidered so that the SPRFIT committee can focus improvement efforts onto it. Minutes from the SPRFIT subcommittee meeting in July 2023, indicated that the ongoing workgroup has determined that "Custody is responsible for determining a better process" yet this was not delineated as a process redesign with a project lead.

## Institution SPRFIT Committee Observation – Hayes Item 19a

The SPRFIT committee meeting was attended by this reviewer during the onsite portion of this review. It was noted to be problematic. The committee was not prepared to report out on all items per the measurement plan. Additionally, while items were listed on the project pipeline, the committee did not demonstrate an awareness of the specifics of any of these problems. Additionally, the SPRFIT coordinator was not present and although the backup served to fulfil quorum, the committee seemed to be under the misunderstanding that the absence of the SPRRFIT coordinator meant that the items on the project pipeline could not be reassessed risk scores. As such, the committee did not assign risk scores to items that had been previously identified as CAPs. Finally, rather than the 8 members required by policy for quorum, the committee had identified approximately 12 individuals as voting members. This all persisted despite in-vivo coaching from this reviewer. Minutes from July and August were reviewed. While minutes from July indicate that quorum was not met, this was only because it was miscalculated in light of what was discussed above regarding the institution having more voting members than necessary. While the minutes reflect that some CAP items should be closed, for example inaccurate guard one checks, the minutes lack a substantive discussion as to why and what was done about the problem. Additionally, while the minutes reflect that the Inmate Family Council (IFC) and Inmate Advisory Council (IAC) meetings have been attended by the CMH, the minutes do not indicate when. Finally, there are two examples above in which the SPRFIT subcommittee reported compliance being at 100% (intake cell compliance and entertainment appliances)

despite these being consistently in contrast to observation. Given the ongoing struggles with SPRFIT subcommittee meetings and minutes, it is recommended that priority be given to revisiting risk scores on the project pipeline in the first SPRFIT committee meeting after receipt of this report.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

For the third quarter of 2023, SRASHEs were completed timely in 98% cases which there was an emergent referral for DTS. DTS cases were triaged as emergent referrals 100% of the time.

|  | Measurements | Time Overdue | Compliance |
|---|---|---|---|
| Suicide Risk Evaluation | 3189 | 3.3 | 95% |
| SRE after Em.Consult (except PIP) for Suicidality | 518 | 7.3 | 98% |

|  | Overall SRASHE Compliance | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|---|
| July | 95% | 99% | 100% |
| August | 94% | 97% | 100% |
| September | 96% | 97% | 100% |
| Q3 Total | 95% | 98% | 100% |

A random sample of 16 referrals from the third quarter of 2023, 8 emergent referrals and 8 urgent referrals, were audited to ensure that the urgent referrals did not contain reference to danger to self and that, when indicated, a SRASHE was completed. Results indicated that all eight of the urgent referrals were appropriately classified as urgent and that none required a SRASHE. Additionally, a SRASHE was deemed to be clinically indicated in seven of the eight emergent referrals and one was completed timely in all seven cases. Compliance with emergent and urgent SRASHEs remains a strong area for LAC.

## Suicide Risk Evaluations – Hayes Item 13

According to the on-demand report, there were 3,189 SRASHEs completed at LAC during the third quarter of 2023.

A sample of 10 patients who were referred to the MHCB for DTS during quarter 3 2023 but rescinded before being admitted, were selected for chart review. A SRASHE was present in all 10 cases, as was a safety plan. Documentation adequately justified the rescission in all 10 cases.

# MEMORANDUM

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Below are the QIPs from suicides between 2019 and 2023 that remain open for CSP-LAC. All of the below pertain to one patient.

| Issue Identified | QIP | Status |
|---|---|---|
| Despite the inmate's significant history of substance abuse, his MAT treatment history, and related polysubstance diagnosis assigned to him by a medical physician on January 14, 2022, treatment teams across two institutions did not appear to recognize the severity/connection of his substance abuse to his mental illness. Treatment plans dated October 5, 2022, and November 2, 2022, did not include any substance use/abuse related IPOCs. | **The CMH at LAC** shall review this concern and provide training to all mental health staff highlighting the need to include substance abuse concerns in treatment planning/IPOCs whenever substance abuse is identified as a primary or contributory driver of the mental illness. Further, **the CMH at LAC** shall review all clinical documentation in this case and determine why a potential referral to a higher level of care was not considered, and then determine the best course of action. Required supporting documents: Please provide a memorandum detailing the results of the review, and actions taken to address this QIP. Please include all training materials and 844s with memorandum submission. | LAC has developed a training titled *Mental Health Patients Return from Higher Level of Care (RHLOC) Training* and made it available on the LMS system. A review of the SPRFIT subcommittee minutes from August 2023 indicates that 62/64 (97%) of clinicians have completed it. This can now be closed out. |
| There were risk justification issues in the September 30, 2022, October 8, 2022, and November 7, 2022 SRASHEs completed at LAC. Several risk factors were incorrectly marked in the SRASHEs including current/recent substance abuse, history of violence as well as recent violence, recent psychotic symptoms, and safety concerns which may have contributed to an underestimation of risk. In the November 7, 2022 SRASHE, while the clinician's narrative justifying low acute risk was quite detailed and comprehensive on the surface, the current discovery of recent self-injurious behavior (of unknown date), a diagnosis involving psychosis with odd behavior noted the same day by his PC, agitation, recent RVR for an assault where he fractured the nose of another inmate with resulting ASU placement (increased isolation), and continued withdrawal/substance abuse concerns secondary to not being re-started on Suboxone, would all suggest his acute risk for suicide was likely higher than estimated. | **The CMH or designee at LAC** shall initiate an inquiry to determine the reason for inaccuracies in risk justification on the identified SRASHEs and propose an identified course of action to mitigate reoccurrence. The CMH shall determine if the course of action shall pertain to the identified clinicians or all mental health staff. | Although SRASHE core competency training is above compliance, SRE mentoring is not. This QIP will remain open until such time that it is in compliance (above 90%) for a minimum of two consecutive site reviews. |

| Between August 5, 2022, and November 6, 2022 (after return from county jail), the inmate submitted nine 7362s requesting to be placed back on Suboxone. There was no documentation this inmate's case was discussed in any established forum, such as the Primary Care Team huddle. There was no collaborative plan of care or intervention developed to address his overlapping medical and mental health needs. It is unclear why Inmate Mahoney's case was not discussed in medical/mental health huddles or other health care appointments to initiate a plan of action for resuming his Suboxone. | **CMH** shall review this concern and determine best course of action to mitigate its reoccurrence. At minimum, this should include a plan to improve collaboration between the medical and mental health staff during treatment of inmate-patients with co-morbid mental health and substance abuse issues. | Minutes from the August 2023 SPRFIT subcommittee meeting indicates that the institution is in compliance with the locally developed Co-Morbid Substance Abuse Treatment memorandum with 51/52 (98%) of clinicians having been trained. This QIP will be closed when compliance is achieved with the training titled Suicide Risk Considerations: *Assessing the Potential Impact of Co-occurring Substance use and Psychotic Disorders*. which is scheduled to be rolled out to the field in October 2023. |

## Training and Mentoring Compliance

The following was obtained from a review of the Coleman Court Mandated Trainings SharePoint site for the end of September 2023, as well as from data reported by the institution. Compliance with trainings are as follows:

## Clinical Training Compliance

| Training | Clinicians trained/total clinicians | Compliance percentage | Compliance reported by institution on day of review |
|---|---|---|---|
| SRE Mentoring | 22/39 | 56.41% | NA |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 54/55 | 98.2% | NA |
| Safety Planning Training | 49/57 | 85.96% | NA |
| Suicide risk management program training | 44/49 | 89.8% | NA |
| Columbia-Suicide Severity Rating Scale Training | 47/49 | 89.79% | NA |
| Discontinue use of safety contracts | NA | NA | 93% |

### Annual IST Suicide Prevention Training Compliance – Hayes Item 16

| Discipline | Compliance reported so far in 2023 |
|---|---|
| Custody | 81% |
| Healthcare | 74% |
| Mental Health | 73% |

### Receiving and Release (R&R) Screening – Hayes Item 1

There was one nursing screen observed as part of this review. Consistent with prior reviews, the physical space continues to be conducive to the process. Suicide prevention posters in English and Spanish were posted. The observed nurse omitted asking the patient about a lifetime history of suicide attempts and instead, asked the patient only if he had had attempted suicide within the last 12 months, to which he replied he had not. This issue was brought to the attention of nursing leadership who indicated that individualized training would be provided so it need not result in a CAP at this time.

### Crisis Intervention Team (CIT)

LAC's LOP #30 *Crisis Intervention Team* was signed off in July 2023 and continues to serve as the institution's CIT policy. It indicates that CIT occurs during non-business hours, staffing permitting. One crisis call was observed during the course of this onsite review. It was for a patient who was referred for suicidal ideation and the responding psychologist was the patient's primary clinician. The overall quality of the assessment, including the disposition, were adequate given the boundaries which remain the same as what had been noted in prior site reviews. Specifically, the patient was in a therapeutic module in the gym while a recreation therapy group was being held and there were other inmates within earshot. As such, confidentiality was compromised, as was the clinician and patient's ability to effectively communicate. Additionally, the patient was observed to be wearing boxer shorts and was not given his clothes, despite the fact that practice aligns with neither statewide, nor local policy. The CAP related to this will remain open.

### Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary on Appendix A)

OSM expert Lindsay Hayes conducted a site review of LAC on April 5-6, 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

| Title | Definition of the Problem | October 2023 Update | Status |
|-------|---------------------------|---------------------|--------|
| ASU Intake cells | During inspection of both units, this reviewer observed that two new intake inmates housed in the EOP ASU were not in new intake cells as required. The supervisor in the unit informed this reviewer that new intake inmates were placed in unsafe, non-new intake cells on almost a weekly basis. CSP/LAC had not been scheduled for construction of any new intake cells (pg 260). | This continues to be an area of deficiency. | **Remain open.** |
| Discharge SRASHEs and safety plans | Required discharged SRASHEs were completed in all cases, but safety plans were completed in only 70 percent (14 of 20) of the cases. In addition, only 70 percent of the clinical five-day follow-ups were timely. This reviewer's examination of the data found problems in untimely supervisory review specifically, the reviews were typically done consistent with the CAT audit schedule and not prior to or during the anticipated discharge IDTT meeting for each patient. In fact, supervisory review of discharge SRASHEs and safety plans had not been completed since January 2022 (pg 263-266). | Improvements noted in the supervisory review of discharge safety plans during the Q3 review were not noted to be sustained during this review. Although proof of practice was submitted, the submitted proof of practice had not been updated since the previous month. | **Remain open. Continue to monitor until the statewide SharePoint site is rolled out.** |
| IDTT meetings | Overall, although there was good treatment team representation, the IDTT meetings included uneven case presentations, inadequate summaries of suicide risk history and inquiry regarding current SI, uneven explanations of privileges within the MHCB unit, and little, if any, discussion regarding safety planning to reduce further recurrence of SI. The meetings would have been more problematic if not for the participation of the MHCB supervisor (pg 263). | IDTT quality did not sustain the improvement noted in the last review. | **Remain open. Continue to monitor for one more review period.** |
| Discharge custody checks | This reviewer was presented with documentation of 337 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSP/LAC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from October 2021 through March | This continues to be problematic. A best-practice was provided to the institution. | **Remain open.** |

| | | |
|---|---|---|
| | 2022. The review found that only 88 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form. When completed correctly, the majority of custody checks were recommended for 72 hours by clinicians. In addition, only 40 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation and/or entire observation checks omitted (pg 266). | | |

**Preliminary findings from the most recent Lindsay Hayes site review:**

Below is a summary of the status from the preliminary findings from Mr. Hayes' review at LAC on August 23-24 2023.

| Concern | Status |
|---|---|
| Poor quality safety plans. | Improvement noted but still need for improvement. |
| Lack of privacy and confidentiality with regards to crisis responding. | No progress noted. |
| Safety plans not being revised timely after supervisory review. | The new statewide SharePoint site has been developed. This will likely improve compliance with this variable. |
| Poor quality 7497s. | This is already an active CAP that was developed by this reviewer. |
| Lack of placards at STRH. | The institution has not yet developed a CAP. |

Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, Chief Executive Officer, Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

| CAP | October 2023 Update | Status |
|---|---|---|
| Patients were not consistently being offered yard privileges in the MHCB. | Improvement is noted and reported as 100% compliant when most recently noted in the SPRFIT subcommittee per the measurement plan. | **Remain open for one more review period.** |

| | | |
|---|---|---|
| Custody Discharge Checks (7497) are consistently below 90% compliance. | This continues to be problematic, however the institution has been provided with a best practice. | **Remain open.** |
| This reviewer observed an ASU post-placement screening in which the patient was not offered a confidential contact. | This has not been placed on the project pipeline and there is no indication that training has occurred. | **Remain open.** |
| This reviewer observed that one custody officer at D5 (ASU EOP Hub) was not completing guard-one wellness checks appropriately. Specifically, he did not establish visual contact with the patient to confirm the presence of living, breathing flesh. | Improvement has been noted for the second consecutive review period. | **Close as of Q4 review.** |
| SPRFIT committee minutes do not reflect that the SPRFIT coordinator has attended IAC or IFC every six months. | Minutes reflect that the CMH has attended, however dates and discussion of content is absent. | **Remain open.** |
| Problematic crisis responding with regards to confidentiality availability. Specifically, inmates in both alternative housing in the housing units and inmates in holding modules awaiting crisis assessment are assessed within view and earshot of other inmates and are not consistently offered confidential contacts. | This remains problematic. There has been no progress made on this and it was not reconsidered for prioritization on the project pipeline. | **Remain open.** |
| Treatment plan goals and interventions are not being reliably documented for SRMP patients. | This remains problematic, however this will be deferred given the staffing problems and the need to attend to more urgent CAPs. | **Deferred for one more audit cycle.** |
| The institution is not on pace to be 90% compliant with suicide prevention IST training by the conclusion of calendar year 2023. | As of October 2023, overall compliance was on pace to be over 90%, but warrants monitoring. | **Remain open.** |
| Lack of entertainment appliances in the ASU units. | This has been placed on the project pipeline but not adequately prioritized. It will also result in a new CAP by the regional healthcare compliance lieutenants. | **Remain open.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | July 2023 Update | Status |
|---|---|---|
| Provide training to MHCB staff to ensure the understanding that orders for privileges, includes consideration of the privilege of visiting. | Not resolved, but will be deferred in light of staffing shortages. | **Remain Deferred.** |

Below are the recommendations from this review that does not rise to the level of a CAP.

# MEMORANDUM

| Concern | Recommendation |
|---|---|
| Holding tank 137 in STRH is not conducive to suicide watch | Discontinue use of this cell for suicide watch. |

Below is the new Corrective Action Plan (CAP) that have been generated as a result of this review.

| Concern | Corrective Action Plan |
|---|---|
| Inadequate SPRFIT subcommittee meetings. | SPRFIT subcommittee to reconsider the risk scores od assigned items at the next SPRFIT subcommittee meeting following receipt of this report. |

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, Chief Support Executive, Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - LAC - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

# MEMORANDUM

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Intake cells not used according to policy | Minimal | **Remain open.** |
| 2 | Discharge SRASHEs and safety plans | Moderate | **Remain open** |
| 4 | IDTT meetings | Moderate | **Remain open** |
| 5 | Discharge custody checks | Minimal | **Remain open** |

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Privileges in the MHCB | Minimal | **Remain open.** |
| 2 | Discharge custody checks | Minimal | **Remain open.** |
| 3 | Non-confidential ASU post-placement screening | Minimal | **Remain open.** |
| 4 | Inadequate completion of welfare checks. | Substantial | **Closed as of this review.** |
| 5 | SPRFIT coordinator attendance at IFC and IAC | Moderate | **Remain open.** |
| 6 | Non-confidential crisis-response contacts | Minimal | **Remain open.** |
| 7 | Treatment plans for SRMP patients | Moderate | **Deferred.** |
| 8 | Suicide prevention IST compliance | Minimal | **Remain open.** |

**APPENDIX C**- LAC's status on Lindsay Hayes statewide outstanding items.

| Aspect of Recommendation that Remains Outstanding | LAC's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Below 90% |
| No. 10: Auditing SRE quality | Non-compliant | Audits are not being done quarterly. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Partially-compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Partially-compliant | Safety plans and supervisory reviews are being completed but not with all patients. |
| No. 18: Safety planning training | Non-compliant | Below 90% |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Non-compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Non-compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compiant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Compliant | Privileges are being reliably offered, CQIT is a statewide issue, and LAC does not have a Reception Center |

# MEMORANDUM

Exhibit M

 CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 11/30/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | KVSP SUICIDE PREVENTION TOUR November-Quarter 4 2023 |

On November 8-9, 2023, the Statewide Suicide Prevention Coordinator conducted a review at Kern Valley State Prison (KVSP). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies. This report also incorporates updates on the progress of the preliminary findings from the most recent site visit by OSM representative Lindsay Hayes on July 13-14, 2023.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 0 |
| CAPs previously generated by this reviewer that remain open | 1 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 0 |
| Previously generated recommendations that remain open | 0 |

**Total CAPs that remain open=2**
**Total recommendations that remain open=0**
**Total CAPs closed this review=1**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

KVSP had two restricted housing units at the time of this visit; a Short-Term Restricted Housing Unit (STRH) and a Restricted Housing Unit (RHU) that typically houses non-MHSDS inmates. Both were the subject of this review.

## Short Term Restricted Housing

## Second Watch Morning Meeting

For the fifth consecutive site review, the second watch morning meeting was observed to be strong. All required attendees were present, including a social worker, the sergeant, a floor officer, and a psychiatric technician (PT). All required items were discussed including new arrivals, patients with behavioral problems, patients in the Suicide Risk Management Program (SRMP), and patients on 5-day follow-ups. It was also observed that the issuance of entertainment appliances was discussed.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

On the day of this site review, one PT was observed conducting rounds at STRH and all required elements were covered. This PT asked all patient about suicidal and homicidal ideation, as well as sleep and appetite and medication compliance. She also offered puzzles and horoscopes to all patients and provided them as requested. She documented in real time in CERNER and offered all patients handouts. This continues to be an area of compliance at KVSP.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with prior reviews, KVSP's STRH has eight intake cells (101-108) and on the day of this site review, all were occupied. All inmates who were in intake cells had been there for less than 72 hours and there were no patients on intake status who were not in an intake cell. Only three of these eight cells contained placards on the doors. In two of the five cases in which the intake cells lacked placards, the patient had arrived earlier that same morning and in the other three cases, the patient had arrived to the unit the previous night.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

During this review, five inmates were interviewed, including one of the two on intake status, and all five had been offered radios. One of the two had indicated that he did not want one and in the other case, the patient was provided one once it was discussed in morning meeting.

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU pre-placement screenings that occurred during this site review. A review of the performance report indicates that these screenings were compliant at 90% during the third quarter of 2023.

## 70.1 ASU Pre-Screens



### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

One officer was observed completing Guard One checks and he seemed to do so adequately. He established visual contact with each inmate before moving on to the next cell.

The statewide monitoring report indicates that during the month of October 2023, there were 117,586 total checks completed out of 124,753 expected checks for an overall compliance rate of 94.26%.

### ASU 2 (RHU 2)

This unit typically houses only non-MHSDS inmates, however there were MHSDS patients housed at this unit on the day of this review.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

On the day of this site review, one non-regular PT was observed conducting rounds. Despite not being a regular on the unit, she conducted very good PT rounds. She used a list, as well as the CERNER banner bar, to distinguish MHSDS from non-MHSDS individuals. She interacted with all inmates and for those who were in the CCCMS program, she asked them all the required questions, including queries about suicidal ideation and sleep and appetite. She documented in real time in CERNER in those cases.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

One officer was observed completing Guard One checks and he seemed to do so adequately. He looked inside of each cell to establish visual contact of the inmate before moving on to the next cell.

The statewide monitoring report indicates that during the month of October 2023, there were 125,227 total checks completed out of 133,190 expected checks for an overall compliance rate of 94.02%.

### ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There was not an ASU Post-placement screening observed during this visit as none were indicated. KVSP was compliant with these screenings for the third quarter of 2023 at 99%.

**70.2 ASU GP Screens**



### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

The RHU 2 has five intake cells (101-105). During this review, two of the five intake cells were occupied, and both of those inmates had been placed into RHU less than 72 hours prior. There were two other inmates on intake status who were not in intake cells but were appropriately housed together. In summary, there were not any inappropriately housed individuals.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

During this review, six inmates were interviewed, including three of the four on intake status, and all had been issued radios.

### Inpatient Units (MHCB and/or PIP)

### Interdisciplinary Treatment Teams (IDTT)

Four IDTTs were observed during this review, three of which were initial IDTTs for patients who were admitted for Danger-to-Self (DTS) and one that was a discharge IDTT for a patient who had been admitted for DTS.. One of the IDTTs was held in absentia because the patient refused to attend. All observed IDTTs were adequately completed. The treatment team had an interactive discussion about the patient's initial treatment plan goals, a strong case-formulation was presented in each case, and all members participated. Initial safety planning was adequately discussed in each case and in the case of the discharge, the discharge safety plan was discussed. In the case of the patient who did not attend, the team reviewed the most recently completed safety plan. Issue and observation and relevant rationale were all discussed and adequately documented as well. The MHCB supervisor provided this reviewer with proof of practice of supervisory review of discharge safety plans, however the one patient who was discharged during this review was not on that log. It is noted however, that KVSP has recently had turnover in that position and an acting MHCB supervisor had been appointed shortly before this review and as such, that person was still in the process of learning and was provided with onsite training by this reviewer. Given prior compliance with this requirement, a CAP is not indicated.

### Quality of Safety Planning – Hayes Item 4

A random sample of 21 safety plans were chosen for review and only six were deemed to be of adequate quality. This continues to be an area of concern for KVSP. Given that training for staff at KVSP has now been provided and the CAP related to the absence of safety plan has been resolved, this will be opened as a new CAP.

### Suicide Watch and Suicide Precaution

On the day of this review, there were a total of 10 patients in the MHCB, 7 of whom were on suicide precaution and the remaining 2 were on Q 30 checks and for the fourth consecutive audit cycle, all patients on Q 30 checks had been at the MHCB for more than 7 days. A review of the QM SRFIT Power BI report indicates that for a six-month average, KVSP maintained patients on suicide watch for an average of 1.2 days and suicide precautions for 3.4 days, both of which represent the third consecutive review period of sustained improvement.

| MEASURE | SW | RATE | SW RANK | TREND |
|---------|----|------|---------|-------|
| Average Duration (Days) of MH Observation, Suicide Precaution | 3.9 | 3.4 | 26 | ▲ Increase 1% |
| Average Duration (Days) of MH Observation, Suicide Watch | 1.2 | 0.8 | 22 | ▲ Increase 28% |

A review of the Mental Health Observation reporting tool indicates that for the month of October 2023, suicide precaution rounds were completed timely 97% of the time and suicide precaution rounds were staggered in 99.9% of cases.

On the first day of this onsite review, there was one nurse who was observed conducting suicide precautions rounding. She was observed to look into each cell and establish visual contact with each patient. However, she did not chart in real time but rather waited until all patients were seen and charted on all of them afterwards. On the second day, a different nurse was observed and improvement was noted, as she charted in real time on all patients. As such, a CAP is not indicated.

### Observation and Issue Orders – Hayes Item 3

This reviewer conducted chart reviews for 10 randomly selected patients who completed a full MHCB stay during the third quarter of 2023. The review consisted of each patient day in which less than full issue was ordered, for a total of 41 patient days. Issue and observation orders were both present for each patient day. A note justifying limited issue was present in all but seven cases and a note justifying observation was present in all but six cases. In six of the seven non-compliant charts, the omissions are attributed to two psychiatrists. In one other case, the patient

was not seen at all because of inappropriate behavior on his part. In summary, while substantial improvement is not noted, a decline has not been noted either. KVSP has a reliable system for ensuring the documentation of issue and observation orders.

## Privileges – Hayes Item 14

Since the last site review, KVSP has activated automated 114-As. A review was conducted for all seven patients who were in the MHCB on the day of this review and had been for at least two days. All were approved for phone calls, yard, and dayroom and the automated 114s indicated that three had been offered yard, four had been offered phone, and one had been offered dayroom. The CAP related to this item will remain open.

## Clinical Discharge Follow-Ups

For the third quarter of 2023, clinical discharge follow-ups were compliant at 96%. This remains a strength for KVSP.



## Alternative Housing – Hayes Item 5

KVSP's LOP 1056 Mental Health Crisis Bed (MHCB) and *Alternative Temporary Housing (ATH): Referral and Referral Rescission Process,* continues to serve as the institution's alternative housing policy. It remains unchanged since the last site review as it was last signed off in June 2023. It still designates Alternative Housing cells in the following order of priority:

1. MHCB licensed bed
2. CTC licensed medical beds.
3. Holding cells with access to water/toilets including, but not limit to, "wet cells" and/or "clinic cells."
4. Holding cells without toilets
5. Other housing where complete and constant visibility can be maintained.

In the event that MHCB cells are unavailable, the LOP designates the following Alternative Housing cells:
1. For ASU inmate: STRH cells 196-199.
2. For SNY inmates: C4 cells 114-117 and D8 cells 114-117
3. For General Population inmates: A1 117-118 and B1 cells 117-118

During prior reviews it was noted that the cells in C yard and D yard contained gaps between the top bunk and the wall, which would allow for the anchoring of a noose, and all had dimmer switches that were controlled on the inside of the cell, thereby obstructing observation for the observer of a patient on suicide watch at night. This was once again observed to be the case during this review. However, the cells in one section of B1 are all retrofitted. It was recommended in prior reviews that this housing unit be used for alternative housing and that was reiterated during this onsite review.

**Compliance with transfer timelines:** During the third quarter of 2023, the institution was 93% compliant with ensuring that patients do not exceed 24 hours in alternative housing.



**SRASHE completion for rescinded referrals:** During the third quarter of 2023, the institution demonstrated a compliance rate of 94% with the completion of SRASHEs upon rescission of MHCB referrals. A random sample of 10 patients who were rescinded from alternative housing in the third quarter, were chosen for review and a safety plan was completed in all 10 cases. While these safety plans were qualitatively substandard (see *Quality of Safety* Plans section), the safety plans now being reliably completed demonstrates sustained improvement and is the first review period in which compliance was noted in all 10 reviewed cases. As such, the CAP related to this item can now be closed out.

## Suicide Risk Management Program (SRMP)

Section XVIII of KVSP's LOP 1031 addresses the SRMP and it is consistent with statewide policy. As of the second day of the institutional onsite review, there were 79 patients enrolled in the SRMP at KVSP, which was a 15 patient increase from last review. The "SRMP Meet criteria but not enrolled" report was not operational during this onsite review so that report was run later and it indicated that, as of the dates of the onsite review, two patients had met criteria but were not enrolled.  A random sample of 10 charts for patients who were in the SRMP were reviewed to ensure that treatment plan goals and interventions related to the patient's reason for being placed in the SRMP were present. Goals were present in seven charts and interventions were present for eight. A CAP related to the quality of SRMP treatment plans was closed out during the last (quarter 3) site review as improvement had been noted at that time.

## Discharge Custody Checks – Hayes Items 7 and 11

The institution submitted the results of custody discharge checks (7497) audits for quarter three and the monthly breakdown is as follows:

| July | 96.5% |
|------|-------|
| August | 97% |
| September | 95.7% |

For the sixth consecutive review period, the institution continues to demonstrate overall compliance with 7497 completion.

## Institution SPRFIT Committee Observation – Hayes Item 19a

The minutes from the SPRFIT subcommittee meetings during the third quarter of 2023 were reviewed. quorum was met all three months, improvement projects and corrective action plans were discussed in all three months, and audits were discussed per the measurement plan. Self-harm incidents were also discussed. RCA's were not held as there were not any serious self-harm incidents during the quarter.

## Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

The SPRFIT subcommittee minutes from the August 2023 meeting, indicate that the PIP coordinator, who serves as a backup to the SPRFIT coordinator, attended IFC on July 14 and discussed topics related to suicide prevention. These minutes also reflect that IAC is being attended monthly.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

This reviewer conducted a three-month audit for the third quarter of 2023 to ensure that mental health referrals that were associated with danger to self (DTS) resulted in an emergent mental health referral and that all resulting contacts included a SRASHE. The results are as follows:

| Month | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|-------|-----------------------------------|------------------------------------------------|
| July | 94% | 100% |
| August | 98% | 100% |
| September | 95% | 100% |
| Q3 Totals | 96% | 100% |

An additional random sample of 16 charts were selected for review. Eight of these were for patients for whom there was an emergent referral placed for DTS during quarter 3, and eight for patients for whom there was a non-emergent order placed (two routine, six urgent) for reasons not related to DTS. In the case of all eight DTS referrals, a SRASHE was completed timely and a safety plan was completed in three of the four instances in which one was indicated. Mental health leadership at KVSP was notified about the non-compliant case. In the case of urgent

referrals, a review of all eight referrals indicated that all were properly triaged as non-emergent, given that there were not any DTS issues of concern present. In one case, despite not being an emergent issue, a SRASHE was clinically indicated and it was completed. The institution continues to appropriately triage referrals in which suicidality or DTS are related to the referral reason, and they continue to appropriately complete suicide risk evaluations in such cases.

Suicide Risk Evaluations – Hayes Item 13

**Overall Suicide Risk Evaluation (SRASHE) compliance**: During the third quarter of 2023, the institution demonstrated overall compliance with SRASHE completion at 95%.

### 10.2 Suicide Risk Evaluation



The monthly breakdown in as follows:

| July | 93% |
|------|-----|
| August | 96% |
| September | 96% |
| 3rd quarter total | 95% |

**SRASHE completion at MHCB/PIP discharge**: KVSP's compliance with this variable improved during the third quarter (July to September) of 2023 and was at 91%.

| SRE at MHCB Clinical Discharge  (admitted for a | 86 | 3.6 | 91% |
|---|---|---|---|

Additionally, a random sample of 10 charts of patients who completed a full MHCB stay during the second quarter, was selected for audit. A SRASHE was completed in all but one case and in all but one of the nine cases in which one was completed, the SRASHE contained adequate documentation to justify a MHCB discharge.

Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

Between 2019 and 2020, suicides resulted in Mental Health Specific QIPs for KVSP within a total of six different clinical domains.  By the time of this site visit, two from a suicide that occurred in 2020 required continued monitoring. Progress is documented below.

| Issue Identified | QIP | Status as of Q4 2023 review |
|---|---|---|
| Multiple concerns were found with the SRASHE completed on January 15, 2020. | **The KVSP CMH or designee** shall review this concern and A) complete an audit of five SRASHEs (consistent with chart audit criteria) by this clinician within the past 6 months to assess whether this is an isolated incident or an ongoing concern, and decide on best course of action, and B) ensure training is provided to this clinician regarding when SPI is required.  C) The CMH shall also ensure that all mental health staff attend the updated SPI training webinars in April 2020. | CAT audits have been completed and tracked and local results indicate that the pass rate was 81.25%. This will remain open until the pass rate is 85%. |
| There were multiple concerns identified with the IDTT completed on February 5, 2020. | **The KVSP CMH or designee shall** review the concerns identified in this QIP. At minimum, training shall be provided to the treatment team about the identified concerns and the necessary components required for IDTT documentation and EHRS orders. A special focus of this training should involve discussion of the importance of making appropriate diagnoses, initiating IPOCs, and placing level of care orders at the time of the IDTT. | Minutes from the August 2023 SPRFIT committee meeting indicate that the supervisors of two programs presented audit results, but pass/fail rates were not presented. Supervisors will continue to audit master treatment plans and this QIP will remain in monitoring status. |

There were two more deaths by suicide at KVSP in the calendar year 2022 and two more in 2023 that resulted in Mental Health QIPs. Progress on those QIPs that are still outstanding is discussed below. One of the deaths by suicide that occurred in 2023, occurred since the last site review (patient #3 below) and the institution's QIP responses were not yet due at the time of this report.

| Issue Identified | CAP | Status as of Q4 2023 review |
|---|---|---|
| Patient #1 | | |
| Within the past year, there was only one SRASHE completed for the inmate. The SRASHE was completed on June 2, 2021, in response to his last quarterly SRASHE after MHCB admission. It estimated both chronic and acute risk to be "low."  The risk justification acknowledged his ongoing drug use however appeared to believe the inmate remained sober and had not reported any suicide attempts or suicidal ideation in the previous 90 days.  The SRASHE also indicated that he was taking his psychotropic medication as prescribed and reported decreased anxiety and depression.  In the months prior to the SRASHE, the | The **KVSP CEO** shall review the concerns outlined in problems 1-3. Prior clinical concerns were identified with the EOP Primary Clinician who completed the following documentation: SRASHE (June 2, 2021), Master Treatment Plans (May 4, 2022, November 11, 2021, and September 8, 2021), and clinical documentation completed up to May 4, 2022. It is requested that the CEO review these concerns and determine best course of action, which can include disciplinary action or Peer Review. For the Treatment Plan completed on February 9, 2022, and clinical documentation completed from May 12, 2022, until | As indicated above, minutes from the August 2023 SPRFIT committee meeting indicate that the supervisors of two programs presented audit results, but pass/fail rates were not presented. Supervisors will continue to audit master treatment plans and this QIP will remain in monitoring status and closed out once KVSP reports a six-month pass rate of 85%. |

| | | |
|---|---|---|
| inmate reported consistent use of drugs and alcohol and distress over his mother health. He got in a fight, received an RVR, stopped taking his prescribed psychotropic medication and reported depression at a 10. Given the severity of his symptoms in the months prior to this SRASHE, acute risk was underestimated. Additionally, as this was the only SRASHE completed, it likely impacted assessment of risk in other clinical documentation and may have resulted in the decision not to re-asses suicide risk during future clinical contacts. | date of death, the CEO shall review the concerns, and determine if these are an isolated incident or part of an ongoing pattern, and decide best course of action, which can include training. | |
| There were multiple concerns identified in the MH Master Treatment Plans (MTP): May 4, 2022, February 9, 2022, November 17, 2021, and September 8, 2021. These concerns will be discussed in three parts:<br><br>a. The MTP dated May 4, 2022, did not appear to include updated information on his progress since the last treatment plan. The treatment plan indicated the inmate's increase in anxiety and depression were due to the loss of many family members as well as his mother's diagnosis of Dementia. The treatment plan was not updated to include the inmate's low compliance with mental health treatment, increased isolation, nor continued drug use, all which were identified risk factors.<br><br>b. Three MTPs (May 4, 2022, November 17, 2021, and September 8, 2021) included two Individual Plan of Care (IPOCs) (goals) which included Substance Use/Abuse and Anxiety which had been initiated on March 17, 2021. Only three entries were present since the initiation of these IPOCs in March of 2021. This resulted in limited documentation of the inmate's treatment progress in the treatment plans.<br><br>c. The MTP dated February 9, 2022, appeared incomplete as it did not identify any IPOCs or PLOs in the current Progress Toward Goal section. | Same as above | As indicated above, minutes from the August 2023 SPRFIT committee meeting indicate that the supervisors of two programs presented audit results, but pass/fail rates were not presented. Supervisors will continue to audit master treatment plans and this QIP will remain in monitoring status and closed out once KVSP reports a six-month pass rate of 85%. |
| Between February and May 2022, documentation suggests the inmate was experiencing increased symptoms, | Same as above | As indicated above, minutes from the August 2023 SPRFIT committee meeting indicate that the supervisors |

| | | |
|---|---|---|
| including worsening depression and anxiety, isolation, ongoing drug use and anger. The documentation during the above specified period did not discuss at what point a higher level of care might be considered since the Plan/Disposition and Estimate Length of Stay sections of the weekly progress notes were not present due to not using the Free Text template rather than the MH PC Note template.  Given his worsening mental health symptoms, it is unclear as to why a higher level of care was not considered during this time. | | of two programs presented audit results, but pass/fail rates were not presented. Supervisors will continue to audit master treatment plans and this QIP will remain in monitoring status and closed out once KVSP reports a six-month pass rate of 85%. |
| **Psychiatry:** As relates to an individual psychiatry appointments/contacts, there were more than several instances when the frequency of psychiatry contacts were inadequate; the time intervals between psychiatry contacts were greater than 30 days (which is longer than that allowed by the program guide).  Response to no-shows and refusal should also be reviewed and improved to lessen the interval between psychiatry contacts, when the patients do not attend psychiatry appointments.  Additionally, while containing mostly adequate individualized information, psychiatry documentation often contained copied and pasted sections from previous notes, including typos; psychiatry documentation must be individualized to reflect the unique interactions/evaluations occurring during each contact. | **KVSP Chief Psychiatrist** or designee will research these deficiencies to discover specifics and will consider implementation of strategies to prevent reoccurrence. | There has been one new psychiatrist hired and training was delivered on October 17, 2023. This can now be closed. |
| | Patient #2 | |
| There were multiple concerns identified with the MH Master Treatment Plan documentation completed on September 8, 2021, December 1, 2021, February 23, 2022, and April 27, 2022.<br><br>a. First, the clinical summary section across IDTTs (September 8, 2021, December 1, 2021, and February 23, 2022) was insufficient as the information was primarily pulled forward without change from previous documentation and not updated per policy to reflect progression through the treatment process. | **The CMH or designee at KVSP** shall 1) review the authoring clinician's documentation for 5 inmate-patients over a 12-month period (to include initial assessments, treatment plans, progress notes, and suicide risk assessments) to determine if this issue represents an ongoing pattern; 2) based on the results of this review, the CMH shall determine the best course of action, which may include additional training to address any deficiencies. **Response:** This QIP has been closed out. After review, it was determined that training was indicated, and this training has been conducted. | As indicated above, minutes from the August 2023 SPRFIT committee meeting indicate that the supervisors of two programs presented audit results, but pass/fail rates were not presented. Supervisors will continue to audit master treatment plans and this QIP will remain in monitoring status and closed out once KVSP reports a six-month pass rate of 85%. |

| | | |
|---|---|---|
| b. Second, the information in the transfer/discharge sections (September 8, 2021, and February 23, 2022) was pulled forward from prior documentation and not sufficiently updated to reflect current treatment needs.<br><br>c. Third, the goal setting with patient section (September 8, 2021, December 1, 2021, February 23, 2022, and April 27, 2022), which specifically requests a discussion of the "Inmate-patient's understanding of his/her treatment needs, perception of his/her strengths and needs, life goals, and progress towards meeting his/her identified goals" was insufficient as the question was not addressed and the content was copied and pasted across IDTTs (December 1, 2021, February 23, 2022, and April 27, 2022) with the exception of one sentence added at the discharge IDTT on April 27, 2022. | | |
| Patient #3 | | |
| The patient received a cell front contact for a staff referral (MHPC Progress Note; dated: 08/30/2023). This contact did not appear to adequately address the referral concern associated with him presenting as "anxious, fearful, [with] loss of interest." Furthermore, the patient did not receive the opportunity to be seen in a private and confidential environment, per policy. Per Memorandum, Evaluations in Private and Confidential Settings (dated: 10/07/2015), "*The purpose of this memorandum is to remind institutions all health screenings and evaluations, including emergency mental health evaluations, shall be conducted in a private and confidential setting that affords confidentiality of sight and sound from other inmates and staff members. When evaluations are conducted in an area where other inmates and staff can hear the evaluation, inmate-patients (IPs) are less likely to disclose pertinent information that may impact treatment decisions. Private settings encourage full disclosure and open candid responses from IPs.*" | **The KVSP CMH or designee** shall:<br>1. Review this concern and complete an audit of 10 inmates (per confidential contact policy guidelines) as assigned to this provider over the past 12 months to assess whether this was an isolated incident or remains an ongoing concern. Based on the results of that review, the CMH shall decide best course of action.<br>2. Provide training to all mental health providers regarding Policy Directive, Evaluations in Private and Confidential Settings, to ensure all inmates are provided the opportunity for out-of-cell contacts when having been referred to Mental Health and/or submitted a CDCR 7362 for services. | QIP responses were not yet due as of the time of this review. Progress will be reported during the next (quarter 1 2024) site review. |

# MEMORANDUM

## Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for October 2023, as well as information obtained while on-site, indicated the following compliance rates:

### Clinical Training Compliance

| Training | Total Clinicians/Clinicians trained | Compliance percentage |
|---|---|---|
| SRE Mentoring | 24/22 | 91.6% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 37/34 | 91.89% |
| Safety Planning Training | 37/35 | 94.59% |
| Suicide risk management program training | 37/36 | 97.3% |
| Columbia-Suicide Severity Rating Scale Training | 34/27 | 79.41% |
| Discontinue use of safety contracts | 47/46 | 98% |

### Annual IST Suicide Prevention Training – Observation

This class was observed as part of this site review and it was well done. It was conducted by a certified instructor. The class lasted the entire 120 minutes. The instructor demonstrated fidelity to the curriculum, covered all slides, answered questions, and effectively appropriately engaged the participants.

### Annual IST Suicide Prevention Training Compliance

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 619 | 619 | 100% |
| Mental Health | 25 | 25 | 100% |
| Nursing | 130 | 130 | 100% |

## Receiving and Release (R&R) Screening – Hayes Item 1

There were not any R&R nursing screenings observed as part of this review as none occurred. The physical environment remains conducive to both safety and confidentiality and prior audits have reliably suggested that this is an area of strength for KVSP. The institutional SPRFIT subcommittee meeting minutes indicate that this data was collected by the institution in July and reported in August to be 100% compliant.

## Crisis Intervention Team (CIT)

KVSP's LOP 1055 *Crisis Intervention Team (CIT)* was last revised in May 2023 and serves as the institution's CIT policy and it specifies that CIT operates during normal business hours. Although operational during this review, there were not CIT calls that occurred. According to the CIT reporting tool, 16% of the CIT calls during the month of October contained the full composition of the team and 84% contained proper nursing documentation. All but one of the calls that did not have full composition of the team occurred outside of normal business hours. This suggests improvement since the last site review in which a call was observed and the full composition of the CIT was not present.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary on Appendix A)

The final outstanding CAP that was noted in Mr. Hayes' 2022 site review was closed during the last (quarter 3, 2023) site review.

**Preliminary findings from the most recent Lindsay Hayes site review:**

Below is a summary of the progress on the preliminary findings from Mr. Hayes' most recent review on July 13-14 2023 that were also confirmed by this reviewer.

| Concern | Status |
|---|---|
| Inadequate safety plans | Safety plans were continue to be qualitatively poor. |
| Inadequate use of intake cells | This was once again, not noted to be a problem during this review. |
| Safety plans not being completed after rescission from Alternative Housing. | This is already a CAP that was generated by this reviewer previously and can be closed as of this review. |
| Privileges not being reliably offered in the MHCB. | This has been placed on the project pipeline but improvement has not been noted. |

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).

Below are the three corrective action plans (CAPs) assigned during prior reviews, as well as an update and status.

| CAP | November 2023 Update | Status |
|---|---|---|
| Alternative Housing cells in C and D yard are problematic. There is a gap between the top bunk and the wall, which could be used as an anchor point, and the cells lack visibility at night. | Not achieved. The recommendation to utilize B-1 is reiterated. | **Remain open.** |
| Safety plans are not being reliably completed for patients upon rescission from Alternative Housing | Improvement noted. | **Close as of this review.** |

# MEMORANDUM

| | | |
|---|---|---|
| A review of 114s indicates that MHCB patients are not being offered phone calls reliably. The institution should review its pattern of practices to ensure that it aligns with statewide policy, which will be provided to the institution by this reviewer. | The institution has placed this item on the project pipeline but improvement was not noted during this review. | **Remain open.** |

There are no concerns that did not rise to the level of a CAP from prior reviews that remain in monitoring status.

Below is the new Corrective Action Plan (CAP) that has been generated as a result of this review.

| Concern | Corrective Action Plan |
|---|---|
| Poor quality safety plans. | The institution will develop a plan for monitoring and auditing safety plan quality by December 31, 2023. |

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Chief Executive Officer, Associate Warden of Healthcare, Healthcare Captain, and Chief Nurse Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - KVSP - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

# MEMORANDUM

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the <u>Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs</u> written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | MHCB observation orders. | Substantial | **Closed.** |
| 2 | Urgent/emergent referrals | Substantial | **Closed.** |
| 3 | Supervisory review of DC safety plans | Minimal | **Closed.** |
| 4 | Discharge Custody Checks | Moderate | **Closed.** |
| 5 | SPRFIT LOP | Substantial | **Closed.** |
| 6 | Suicide prevention IST. | Substantial | **Closed.** |

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Alternative Housing Cells. | None | **Open. This will continue to be monitored.** |
| 2 | Safety plans not being completed. | None | **Close as of this review.** |

# MEMORANDUM

**APPENDIX C** - KVSP's status on Lindsay Hayes statewide outstanding items.

| Aspect of Recommendation that Remains Outstanding | KVSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Compliant | Above 90% |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Compliant | Safety plans and supervisory reviews are being completed |
| No. 18: Safety planning training | Compliant | Above 90% |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Complaint | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are not fully being offered, CQIT is a statewide issue, and KVSP does not have a Reception Center |

Exhibit N

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 12/19/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | WASCO STATE PRISON SUICIDE PREVENTION TOUR-Q4 November 2023 |

On November 13-14, 2023, the Region III Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator conducted a review at Wasco State Prison (WSP). The focus of the review centered on their Restricted Housing Unit (RHU), Mental Health Crisis Bed (MHCB), and Reception Center (RC) to ensure compliance with statewide suicide prevention and response policies. This report also incorporates updates on the progress of the preliminary findings from the most recent site visit by OSM representative Lindsay Hayes on April 18-19, 2023.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 0 |
| Preliminary new Lindsay Hayes CAPs that remain open | 1 |
| CAPs previously generated by this reviewer that remain open | 1 |
| New CAPs generated as a result of this review | 2 |
| New recommendations generated as a result of this review | 1 |
| Previously generated recommendations that remain open | 0 |

**Total CAPs that remain open=4**
**Total recommendations that remain open=1**
**Total CAPs closed this review=1**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

# MEMORANDUM

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Second Watch Morning Meeting

The second watch morning meeting was observed and consistent with recent reviews, it was strong. All required attendees were present, including a regularly assigned psychologist, the sergeant, and two psychiatric technicians (PTs). All required elements were discussed including new arrivals, patients on five-day follow ups, and patients in the SRMP program. All attendees participated in the meeting appropriately.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was one Psychiatric Technician (PT) who was observed completing rounds. This PT was a regular on the unit and the rounding was strong. Given that WSP has only one RHU and it houses all mental health levels of care, this PT utilized a SOMS generated list, as well as the EHRS banner-bar, to identify the relevant levels of care. She asked all required questions of mental health service delivery system (MHSDS) patients including querying about suicidal and homicidal ideation, as well as sleep and appetite. She had with her a supply of handouts and puzzles and charted in CERNER in real time before moving to another cell. She also checked pending appointments in CERNER for the patients who inquired. There was one case in which a mental health referral was indicated, and the PT appropriately placed it.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with the last three site visits, WSP has 14 intake cells (117-130), two of which are designated for ADA inmates. On the day of this review, four of those cells were occupied and all four had been in an intake cell for less than 72 hours. All new intakes (inmates who arrived at ASU less than 72 hours ago) were appropriately housed in intake cells. Improvement was noted with the presence of placards on the doors indicating arrival time.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Two of the four inmates who were in intake cells, in addition to five others, were interviewed. Five of the seven indicated they had been offered a radio and the two exceptions were the inmates on intake status, both of whom had just arrived the previous day. One of the five inmates who did have a radio, reported that it was not working, and this was relayed to the sergeant. Improvement with the process for ensuring the issuance of entertainment appliances was noted, as all observed cells had a chrono on the door indicating that the inmate had been offered a radio and when. The institution will be due to report compliance with this variable in January 2024.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

During the month of November 2023, there were 83,845 total checks expected at WSP-RC and 79,889 were completed timely for a compliance rate of 95.28%. While onsite, there was one officer observed completing Guard One checks and he seemed to do so appropriately. He established visual contact with each patient before using the pipe and moving on to the next cell. The institution most recently reported on their own compliance with this item in July 2023 and local audits found 100% compliance. The next reporting period for this item will be January 2024.

# MEMORANDUM

## RHU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any RHU pre-placement screens observed as part of this review. According to the performance report, there were 157 such screenings completed during the third quarter of 2023 and the institution was in compliance at 99%.



**70.1 ASU Pre-Screens**

99%
(157)

## ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

There were two ASU post-placement screenings observed as part of this review and both were done adequately. Each was completed by a different PT. One of the two inmates initially refused the confidential contact but with additional encouragement, he accepted the confidential contact. All questions were asked, and documentation occurred in real time. A referral was not indicated in either case, but the PT offered the patient education on how to request mental health services should that become necessary. According to the performance report, there were 87 such screenings conducted at the institution during that time in the third quarter of 2023 and the institution was 98% compliance with the timely completion of them, which represents significant improvement in compliance since the last site review.



**70.2 ASU GP Screens**

98%
(87)

## Inpatient Units (MHCB and/or PIP)
## Suicide-Resistant Cells – Hayes Item 10

WSP-RC has six Mental Health Crisis Beds (MHCBs) and all have been previously determined to be suicide resistant.

## Interdisciplinary Treatment Teams (IDTT)

Three IDTTs were observed during this site review. The same psychologist served as the primary clinician for all three. One of the IDTTs was a discharge IDTT for a patient who was admitted for Danger to Self (DTS), one was a discharge IDTT for a patient who was admitted for Danger to Others (DTO), and one was an initial IDTT for a patient who was admitted for DTS. The

psychologist in attendance served as the IDTT leader and stated the purpose of the IDTT and ensured a team discussion about the treatment plan. In the case of the discharge IDTTs, the team adequately discussed the patient's discharge treatment plan. Although the safety plan was completed prior to the IDTT in the case of both discharges, it was adequately discussed in only the case of the patient who had been admitted for DTO. Additionally, although progress notes justifying issue and observation orders were present in the chart in all three cases, issue and observation were not discussed. All required attendees were present, as was a Recreational Therapist (RT) and all members of the team had access to a laptop except for the nurse.

The institution provided evidence that supervisory reviews of discharge safety plans are being regularly conducted, however the process currently involves the supervisor conducting reviews after the discharge in the case in which discharges occur on her day off. As such, these reviews are not regularly being conducted in a timely fashion or per policy. This was once again discussed with the CMH. The need to establish a system for coverage of the task of supervisory review of MHCB discharge safety plans is already an action item on WSP's project pipeline.

## Quality of Safety Planning – Hayes Item 4

Based on a review of the performance report, quality of safety plan audits were conducted during the third quarter for seven safety plans and 86% were deemed to be of quality. A random sample of 20 safety plans completed during the second quarter of 2023 were audited by this reviewer and only 8 were deemed to be adequate. The most common inadequacy was a lack of specific clinical interventions. This represents a decrease in compliance since the last site review so this will continue to be monitored.

## Suicide Watch and Suicide Precaution

On the day of this review, there were five patients in the MHCB. Three of those five were on suicide precautions (Q11-15 minute checks) and the remaining two were on Q30 minutes checks. One nurse was observed conducting rounds with the patients on suicide precautions. He appeared to do so appropriately as he looked into each cell and charted in real time. For October 2023, 94.4% of suicide precaution rounds were completed timely and checks were staggered 92.8% of the time.

## Observation and Issue Orders – Hayes Item 3

Chosen for audit, were the charts for a randomly selected sample of 10 patients who were admitted for DTS during the third quarter of 2023 and completed a full MHCB stay. Each day in which the patient was ordered less than full issue was reviewed to ensure that orders, as well as notes justifying them, were present. This sample yielded 57 total patient days. Orders for issue and observation were present in all 57 cases and a note justifying both limited issue and observation was present for 41 patient days (72%). This demonstrates quantitative improvement since the last review, however 12 of the 16 omissions are attributed to one psychiatrist and that individual was so identified during the last review as well, suggesting that training either has not occurred or has not been effective in mitigating this. While all the notes qualitatively justified the order, many used generic language across both patients and patient

days. This represents a decline since last review and as such, the CAP related to this will remain open.

## Timelines for Suicide Risk Assessments

In the third quarter of 2023, WSP-RC was compliant with the timely completion of suicide risk evaluations at 99%.



With regards to confidentiality, the closed appointments report listed a sample of 465 Suicide Risk Evaluations that were completed during the third quarter of 2023. Of those 465, 359 (77%) were completed in a confidential setting. This represents a slight decline since the last review; however, it was noted that 102 of the 106 non-confidential contacts were because of reasons outside of the control of the clinician. Of those 102, 68 were the result of the patient refusing the confidential contact. This demonstrates that the offering of confidential contacts continues to be a strength for the institution.

## Privileges – Hayes Item 14

Since the last site review, WSP has transitioned to utilizing electronic 114s. These were reviewed for all five patients who were in the MHCB on the first day of this review. All five had been offered yard and four of the five had been offered phone calls, with the one exception being a patient who had only arrived two days prior. This demonstrates a significant area of improvement since the last site review. This item is next due to be locally audited for report out in the January 2024 SPRFIT subcommittee meeting.

## Clinical Discharge Follow-Ups

A review of the performance report from the third quarter of 2023 indicates that the institution was compliant with timely clinical discharge follow-ups at 99%.



A sample of five patients were selected for chart audits. All five were either rescinded from Alternative Housing, discharged from the MHCB, or returned from a PIP during the third quarter of 2023. The follow-ups were completed for at least five days in all cases and the safety plan was present for each applicable day. The safety plan was reviewed in all but one of the 17 days in which the contact was completed by a mental health clinician.

## Alternative Housing – Hayes Item 5

WSPs LOP 018, *Alternative Housing Placement, MHCB referral, rescission, and discharge policy*, continues to address alternative housing and was most recently revised in March 2023. The prioritization of designated cells is as follows: Housing unit B2, cells 146 and below for SNY patients; Housing unit B6 for general population patients, including those from the mainline program; and a ground-floor holding cell for ASU inmates. There were not any patients on suicide watch in alternative housing during this site review. During the third quarter of 2023, the institution was compliant with ensuring the timely transfer or rescission of patients from alternative housing at 94%.



110.1 Alternative Housing Stays
**94%** (177) ↔

A sample of 12 charts were reviewed for patients who were placed into alternative housing on suicide watch for DTS and rescinded prior to placement into a MHCB during the third quarter of 2023. All 12 contained a suicide risk evaluation with adequate justification for rescission and all but two contained a safety plan.

## Suicide Risk Management Program (SRMP)

WSP-RC's OP 119 *Suicide Risk Management Program* addresses the SRMP at the institution. It was most recently revised in August of 2023 and was approved during the October 2023 SPRFIT subcommittee meeting. It is consistent with statewide policy. On the first day of this site review there were two patients in the SRMP and none who met objective criteria but were not enrolled. The most recent treatment plans were reviewed for both enrolled patients to ensure that appropriate treatment plan goals and interventions were present and in one case they were and in the other case, they were absent.

## Discharge Custody Checks – Hayes Items 7 and 11

The institution conducts audits of custody discharge checks and submits them monthly. A review of all three months of the checks for the third quarter of 2023 indicates that once again, all three months were compliant (above 90%). This item remains a strength of WSP-RC.

| July | 98% |
|---|---|
| August | 98.6% |

| September | 98.6% |
|-----------|-------|

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer did not attend the SPRFIT subcommittee meeting during the third quarter of 2023. Minutes were reviewed for all three months of the quarter, and they were generally strong. All three months' meetings met quorum and most items were discussed according to the measurement plan. In July however, the ASU pre-screens were not discussed, nor were patients in alternative housing with staff actively watching. In the case of the latter, this is the second consecutive review period in which that was noted to not have been reported. This will result in a CAP. All required elements of the reception center specific audits were presented accordingly, including an overview of the results of the poster audit, the Release of Information (ROI) requests, and the reviews of SOMS and the initial health screening.

## Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

Minutes from the September 2023 SPRFIT subcommittee meeting, indicate that the SPRFIT coordinator attended the IAC on August 2, 2023. The minutes include a substantive summary of the meeting topics.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the third quarter of 2023, WSP-RC was once again in compliance with the completion of suicide risk evaluations in conjunction with MHPC emergent consults for DTS at 98%. All but one DTS case were appropriately triaged as emergent referrals. The monthly breakdown is as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|--|-----------------------------------|-----------------------------------------------|
| July | 97% | 100% |
| August | 97% | 100% |
| September | 98% | 99% |
| Q3 totals | 98% | 99% |

Additionally, a random sample of fifteen emergent and sixteen urgent orders from the third quarter of 2023 were reviewed. All cases in which there was concern about DTS were triaged as emergent and in all clinically indicated cases, a SRASHE was completed. Compliance in this area is continually sustained at WSP.

## Suicide Risk Evaluations – Hayes Item 13

As indicated above, WSP-RC was in compliance with suicide risk evaluations at 99% during the third quarter of 2023. This included 100% compliance with evaluations competed at the time of MHCB discharge and 100% with MHCB referral rescissions. A random sample of 12 MHCB referral rescissions were reviewed. All 12 contained a suicide risk evaluation and 10 of the 12 contained a safety plan regardless of estimated acute risk.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

As of the time of this (Q3 2023) review, there were six QIPs from two previous suicides that remained in monitoring status. Below is the status as of this review.

| Issue Identified | QIP | Status as of Q4 2023 |
|---|---|---|
| **Patient #1** | | |
| The patient's MH Screening did not appear to include a thorough review of his EHRS record, per policy. Specifically, the Initial Intake Screening and county jail records were not incorporated into his MH Screening yet had relevant information about his suicide history. Per HQ Memorandum, dated August 22, 2019, entitled, Clarification of Mental Health Documentation Review Requirements: "This memorandum clarifies documentation requirements during the reception center mental health assessment process per the Mental Health Services Delivery System Program Guide (2009 Revision), Chapter 2, Reception Center Mental Health Assessment, pages 12-2-5 and 12-2-7. | **The CMH and/or designee at WSP** shall review this concern and: a. Audit ten charts of the MHPC who conducted the MH Screening Interview to determine if this is an ongoing issue. b. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on mental health documentation review policy, as required during the completion of a MH Screening Interview. | This clinician has been out on medical leave since the last site review so as such, additional observations have not been completed. When two more are completed, this can be closed out. |
| The patient's 8-page county jail Intake Packet, noted, 'Suicide History'. During Initial Health Screening, the patient endorsed a suicide attempt, "[two] months ago in county". WSP failed to appropriately review these records and complete a SRASHE, as per CDCR Policy. The Program Guide states in 12-10-9, "*At minimum, a written suicide risk assessment using a SRASHE shall be completed... (8th bullet point): Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats or attempts.*" | **The CMH and/or designee at WSP** shall review this concern and: a. Audit ten charts of the MHPC who conducted the MH Screening Interview to determine if this is an ongoing issue. b. Based on the results of the audit, the CMH shall determine the best course of action. At minimum, all mental health staff shall be retrained on mental health documentation review policy, as required during the completion of a MH Screening Interview. | The clinician who was the original subject of the QIP has been out on medical leave since the last site review so as such, additional observations have not been completed. When two more are completed and the results are presented in a formal forum, this can be closed out. |
| **Patient #2** | | |
| While the ICC documentation was completed according to policy, there was a discussion regarding comments the patient made regarding danger to others that resulted in remaining in a single cell that were not documented. In addition, contradictory information was documented in the ICC progress note and ICC Chrono, which made it difficult to determine Mr. McCafferty's risk level. It does not appear that the patient was assessed for possible need | The WSP Chief of Mental Health (CMH) or designee shall review this concern and determine the appropriate course of action. | The ASU supervisor completed an audit of 15 ICC notes completed by the responsible clinicians over the course of three months and all were found to meet audit compliance. This can now be closed out. |

| | | |
|---|---|---|
| for MHCB placement for danger to others. | | |
| There were multiple concerns with the completion of the MH Initial Assessments on February 28, 2023, and March 7, 2023. | The WSP Chief of Mental Health (CMH) or designee shall review this concern and<br>A) review the involved clinician(s) MH Initial Assessment documentation for five patients over a six-month period. This review shall be consistent with chart audit criteria.<br>B) Based on the results of this review, the CMH shall determine the best course of action. | The ASU supervisor audited 15 assessments completed by each of the responsible clinicians for three months and the results of this audit indicate that neither clinician demonstrated improvement. The institution indicated that a follow up training will be held during the week of November 21, 2023, and the audit will continue for another three months. Results will be provided by December 29, 2023, and will be closed out during the next site review if compliance is noted. |
| There were multiple concerns with the completion of the MH Master Treatment Plan on March 16, 2023. First, the EHRS diagnoses were not updated. Second, the clinical summary and case formulation contained no new information since the Initial Assessment was completed. In particular, the case formulation question still contained an entry that had not been edited since June 29, 2020. | The CMH or designee at WSP shall review this concern and<br>A) review the involved clinician(s) MH Master Treatment Plan documentation for five patients over a six-month period. This review shall be consistent with chart audit criteria.<br>B) based on the results of this review, the CMH shall determine the best course of action. | The ASU supervisor audited 15 assessments completed by each of the responsible clinicians for three months and the results of this audit indicate that neither clinician demonstrated improvement. The institution indicated that a follow up training will be held during the week of November 21, 2023, and the audit will continue for another three months. Results will be provided by December 29, 2023, and will be closed out during the next site review if compliance is noted. |

## Training and Mentoring Compliance

Review of the Coleman Court Mandated Trainings SharePoint for October 2023, as well as information obtained while on-site, indicated the following compliance rates:

### Clinical Training Compliance

| Training | Total Clinicians/Clinicians trained | Compliance percentage |
|---|---|---|
| SRE Mentoring | 2/47 | 4.25% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 47/47 | 100% |
| Safety Planning Training | 47/47 | 100% |
| Suicide risk management program training | 46/46 | 100% |
| Columbia-Suicide Severity Rating Scale Training | 36/31 | 86.11% |
| Discontinue to use of safety contracts | 47/47 | 100% |

### Annual IST Suicide Prevention Training Compliance

# MEMORANDUM

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 866 | 713 | 82% |
| Mental Health | 72 | 57 | 79% |
| Healthcare | 209 | 129 | 62% |

*CPR Training*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 865 | 718 | 83% |
| Nursing | 189 | 1891 | 100% |

Apart from SRE mentoring, WSP is in, or approaching, compliance with all required trainings. The low compliance with SRE mentoring is already an item on the institution's project pipeline so it need not rise to the level of a CAP at this time, however it is designated as a "just-do-it" project and very little progress is being achieved. It is recommended that the committee reconsider the type of improvement project that will be assigned to address this deficiency and document the results of that consideration in the next SPRFIT subcommittee meeting after receipt of this report.

## Receiving and Release (R&R) Screening – Hayes Item 1

Three screenings, each conducted by a different nurse, were observed as part of this site review. In all three cases, the nurse asked all the questions appropriately and made an appropriate determination regarding mental health referrals. In two of the three cases, a follow up mental health contact was not indicated but the nurse still provided the patient with an educational packet regarding health care services, as well as a healthcare services request form. In addition, the physical environment continues to be conducive to the process as screenings are conducted in a confidential setting and suicide prevention posters in both English and Spanish were observed to be present in all three offices. This area also demonstrated improvement since the last site review. The institution's local audit of this variable reported 100% compliance in the October 2023 SPRFIT committee meeting.

## Reception Center Processing

### Diagnostics Process

Two clinicians were observed completing diagnostic screenings. The first clinician was observed completing three screenings and the second was observed completing two for a total of five screenings observed. The county jail records, and the initial health screening were reviewed in all five cases. There was a total of two patients who reported having received mental health treatment in the community and the clinician appropriately made a request for authorization of a release of information (ROI). Both observed clinicians asked all the questions appropriately and arrived at an appropriate determination regarding referral for an MHPC initial assessment. This area is observed to have improved since the last site review.

# MEMORANDUM

## Suicide Prevention Poster Audit

A review was conducted of the RC housing units, all medical clinics, and mental health treatment space on D yard and one housing unit on B yard. The review also included R&R. English and Spanish versions of the suicide prevention posters were present in all areas except for one nursing clinic in D yard in which only a Spanish version of the poster was present. The posters are audited monthly by the local SPRFIT, and minutes continue to suggest that posters are consistently present in nearly all required areas.

## Crisis Intervention Team (CIT)

WSP-250 Crisis Intervention Team was most recently updated in July 2023 and as such, remains unchanged since the last site review (August 2023). It continues to serve as the institution's CIT policy. The CIT hours of operation remain unchanged since the last revision of the policy and are as follows:

Sunday: 0800-2100

Monday-Tuesday: 0700-2100

Wednesday-Friday: 0700-1800

Saturday: 0800-1800

There were not any CIT calls observed as part of this review. A review of the CIT quality management report indicates that 78% of the CIT events in the third quarter of the year contained nursing documentation and 28% had the complete composition of the team. This represents a slight decline since the last review period. During the third quarter, 57% of the calls were for DTS and 43% of all CIT calls resulted in a MHCB admission.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary in Appendix A).

Special Master's Office expert Lindsay Hayes conducted a review of the suicide prevention practices at WSP-RC on July 6-7, 2021, and more recently on April 18-19, 2023. The last pending CAP from the 2021 review was closed during the last site review (August 2023). This is the third visit since the preliminary findings from the April 2023 review. The following is a summary of the findings and status from the April 2023 review.

| Title | Definition of the Problem | August 2023 Update | Status |
|-------|---------------------------|--------------------|--------|
| Poor quality safety plans | A review of a sample of safety plans were determined to be qualitatively poor. | This item still has not been placed into the project pipeline. | **Remain open.** |

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary in Appendix B)

Below is the one corrective action plans (CAP) assigned during prior reviews, as well as an update and status.

| CAP | November 2023 Update | Status |
|-----|---------------------|--------|
| Justifications for observation and limited issue are clinically insufficient. | A decline in performance was noted since the last site review. | **Remain open.** |

There are no outstanding concerns that did not rise to the level of a CAP from prior reviews.

Below is the concern not rising to the level of a CAP as the result of this review.

| Concern | Recommendation |
|---------|----------------|
| SRE mentoring remains out of compliance with little progress, despite being on the project pipeline as a "just do it." | The SPRFIT committee should reconsider the type of project assigned to this problem and document a result of that consideration in the next SPRFIT subcommittee minutes. |

Below are the two new Corrective Action Plans (CAPs) that have been generated as a result of this review.

| Concern | Recommendation |
|---------|----------------|
| For the second consecutive review period, patients in alternative housing with staff actively watching was not reported in the SPRFIT subcommittee minutes per the measurement plan. | The SPRFIT committee will ensure that this audit item is discussed, and reflected in the SPRFIT subcommittee minutes, in January 2024. |
| The institution does not have an effective system for ensuring the completion of supervisory review of discharge safety plans during the absence of the MHCB supervisor. | The institutional mental health leadership will develop a plan for the review of discharge safety plans and document this plan in the SPRFIT subcommittee meeting minutes by February 28, 2024. |

**Conclusions/Comments**

# MEMORANDUM

An exit meeting was conducted with the local SPRFIT, the CMH, the CEO, the Warden, AW of Healthcare, Captain of Healthcare, and Chief Nursing Executive. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Please ensure CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - Improvement Priority List and Project Pipeline - All Documents (sharepoint.com) monthly following SPRFIT subcommittee meeting.

# MEMORANDUM

## Appendices

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 and via exit call in 2023. | Progress | Follow-up status |
|---|---|---|---|
| 1 | Non-confidential R&R screens | Substantial | **Close.** |
| 5 | Safety Plan quality. | Minimal | **Open. This will continue to be monitored.** |

# MEMORANDUM

**APPENDIX B-** Summary of CAPs generated by regional SPRFIT tours and progress.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Justification for issue and observation in MHCB. | Minimal. | **Open. This will continue to be monitored** |
| 2 | Incomplete reporting of nursing items in the SPRFIT subcommittee | None. | **New. Remain open.** |

# MEMORANDUM

**APPENDIX C-** WSP's status on Lindsay Hayes statewide outstanding items

| Aspect of Recommendation that Remains Outstanding | WSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | HCFIP project complete |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | This is a new CAP as of the Q4 review. |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly, most recently in September 2023. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS) | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Compliant | |
| No. 18: Safety planning training | Compliant | Above 90% |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | Above 90% |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | Above 90% |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | Quorum regularly met during Q3. |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are improving, CQIT is a statewide issue, and the institution has not yet solidified a plan for consistent in person diagnostic screening audits although monthly chart audits are in compliance. |

Exhibit O

 

## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 12/11/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | NORTH KERN STATE PRISON SUICIDE PREVENTION TOUR-Q4 November 2023 |

On November 15-16, 2023, the Statewide Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator covering region III, conducted a review at North Kern State Prison (NKSP). The focus of the review centered on their Restricted Housing Unit (RSU) and Mental Health Crisis Bed (MHCB), and Reception Center (RC) to ensure compliance with statewide suicide prevention and response policies. This report also incorporates updates on the progress of the preliminary findings from the most recent site visit by OSM representative Lindsay Hayes on July 11-12, 2023.

Attached is the report based upon the Suicide Prevention On-site Audit Guidebook that will be provided to the Statewide SPRFIT committee for review and follow-up.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 3 |
| CAPs previously generated by this reviewer that remain open | 1 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 0 |
| Previously generated recommendations that remain open | 0 |

**Total CAPs open=5**
**Total CAPs closed=1**

Should you have any questions or require further clarification, please contact me at (916) 385- 4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]
### Second Watch Morning Meeting

The ASU morning meeting was not observed during this review. This has historically been an area of strength for NKSP.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

PT rounds were completed by one PT who is a one day per week regular. She asked the required questions of Mental Health Services Delivery System (MHSDS) patients, including Suicidal and Homicidal ideation and sleep and appetite. Consistent with prior site reviews, she relied on both a SOMS generated list, and the EHRS banner-bar, to differentiate MHSDS patients from non-MHSDS patients. She had a supply of sudoku puzzles and other handouts. There was one mental health referral indicated and she appropriately placed it, and she used CERNER to check pending appointments in the one case in which that was indicated. The minutes from October 2023 indicate that the local audit determined compliance to be 100%.

## Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with prior reviews, NKSP's RHU has 10 intake cells (109-113 and 134-138) and on the day of this review, only 3 were occupied. All three had been in an intake cell for less than 72 hours. There were two other inmates who had arrived to the unit less than 72 hours earlier and although not in intake cells, they were appropriately housed together. All intake cells included placards with the date and time of the inmate's arrival to ASU. Minutes from the October 2023 SPRFIT subcommittee, indicate that the local audit of this variable was reported to be compliant at 100%.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

This reviewer interviewed seven inmates in the RHU, including all five of the inmates who were on intake status, and all indicated that they had received a radio. Consistent with prior reviews, the cells displayed placards on the doors that indicated that the inmate had received a radio. Minutes from the July 2023 SPRFIT subcommittee, indicate that the local audit of this variable was reported to be 100% and this is due to be reported again in January. This continues to be a strength for NKSP.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

During the month of October 2023, there were 119,686 total checks expected at NKSP and 115,172 were completed timely for a compliance rate of 96.23%. Minutes from the July 2023 SPRFIT subcommittee, indicate that the local audit of this variable was reported to be 100% and this is due to be reported again in January. One officer was observed completing Guard One checks and seemed to do so appropriately. He looked into each cell and established visual contact prior to moving on to the next cell.

# MEMORANDUM

**ASU Pre-Placement Screening ("ASU Pre-Placement Form")** [ASU, ASU EOP HUB, STRH RC, STRH]

There were not any ASU prescreens observed as part of this tour. A review of the performance report indicates that for the third quarter of 2023, this variable was in compliance at 92%.

### 70.1 ASU Pre-Screens



**ASU Post-Placement Screening ("ASU Screening Questionnaire")** [ASU, ASU EOP HUB, STRH RC, STRH]

There were no ASU post placement screenings that occurred during this site visit. A review of the performance report indicates that this variable was compliant during the third quarter of 2023 at 93%.

### 70.2 ASU GP Screens



## Inpatient Units (MHCB and/or PIP)
## Suicide-Resistant Cells – Hayes Item 10

NKSP has 10 Mental Health Crisis Beds (MHCBs) and all have been previously deemed to be suicide resistant.

## Interdisciplinary Treatment Teams (IDTT)

One IDTT was held during the time of this site review, and it was observed. All required attendees were present in all cases, as was a Recreation Therapist (RT). The psychologist served as the IDTT leader in the absence of the MHCB supervisor. The patient was experiencing severe psychiatric symptoms that impaired his ability to effectively communicate, yet the psychologist asked questions that were clinically inappropriate for that context, such as asking the patient to scale (1-10) his anxiety. Additionally, he invited other team members to participate by asking the patient if he had any questions for them, rather than prompting relevant contribution. The patient did not ask relevant questions of either the CCI, or the RT, possibly due to his symptomology, so neither party participated consequently. The psychiatrist did attempt to adjust communication accordingly. The patient was being referred to the Acute Psychiatric Program level of care, yet the IDTT did not include a discussion as to the relevant admission reason (danger to self, danger to others, or Significant Impairment Due to Mental Illness). The patient was observed to be on partial issue and requested to have his clothes and the psychologist indicated

# MEMORANDUM

that the patient would be provided with full issue when he is "doing well" but did not articulate what that meant in terms of treatment plan progress. Finally, despite this reviewer's request for individuals who are not usually in attendance at IDTT to not attend, this request was not honored per the directive of the medical hiring authority. This may have impacted not only the organic nature of the process, but also possibly increased the patient's already high level of paranoia. Finally, due to a lack of adequate staffing resources, the institution continues to not consistently conduct supervisory reviews of discharge safety plans.

## Quality of Safety Planning – Hayes Item 4

During the third quarter of 2023, NKSP conducted three Quality of Safety Planning audits and all three were determined to pass. As part of this review, a sample of 20 safety plans (10 who were discharged from MHCB and 10 who were rescinded from alternative housing) were selected for audit and all contained deficiencies. The most common of these included not including interventions, and repeating information throughout sections. Additionally, there was one clinician who documented the same safety plan for multiple patients, and this was referred to local leadership. The institution continues to struggle in this area and the open CAP will remain in monitoring status.

## Observation and Issue Orders – Hayes Item 3

This reviewer audited a sample of 10 charts for patients who were admitted to the MHCB at NKSP for Danger to Self (DTS) during the third quarter of 2023 and completed a full MHCB stay. Each day in which the patient received less than full issue was subject to the review, yielding a total of 61 patient days. Orders were present in the chart for each day. A note justifying issue and observation, was quantitatively present in the chart in 53 of the 61 cases (86.9%). This demonstrates an approximate 14% improvement since the last site review. Improvement in the quality of the justification notes continues to be noted, as there were only two that were deemed qualitatively poor and, in both cases, the justification note was inconsistent with the order.

## Suicide Watch and Suicide Precaution

NKSP has 10 MHCBs, 9 of which were occupied on the first day of this site review. All nine patients were on suicide precautions (Q11-15 minute checks). There were two different nurses observed completing suicide precaution rounds and both did so adequately. They both ensured that they looked into both cells and charted in real time in CERNER before moving on to another cell. Both nurses utilized a timer to ensure that rounds were completed in both a timely, and staggered fashion.

A review of the mental health observation reporting tool for April 2023, indicates that NKSP was in compliance with the timely completion of suicide precaution rounds at 98.6%. Additionally, checks were staggered 97.2% of the time.

## Timelines for Suicide Risk Assessments

NKSP was in compliance with suicide risk evaluations at 97% for the second quarter of 2023.

## Privileges – Hayes Item 14

Since the last site review, NKSP has transitioned to the use of automated 114s. This reviewer audited the 114s for all 10 patients who were at the MHCB level of care on the first day of this site review. The 114s indicated that all patients had been offered both yard and telephone calls during their MHCB stay. This demonstrates an ongoing pattern of improvement. The institution is due to collect this data again in December and report it in the SPRFIT subcommittee meeting in January.

## Clinical Discharge Follow-Ups

For the third quarter of 2023, NKSP was compliant with clinical discharge follow-ups at 96%. Charts were reviewed for a sample of 10 patients who completed 5 days of their post-discharge clinical follow ups at NKSP during the third quarter for a total of 50 patient days. Documentation suggests that the safety plan was reviewed in all but 10 days for a compliance rate of 80%. This has not historically been a matter of concern for NKSP, so it will be reviewed again as part of the quarter 1, 2024 site review and will become a CAP if a low compliance rate persists.

## Alternative Housing – Hayes Item 5

NKSPs LOP 268, *Alternative Housing* was most recently revised in March 2023 and designates building A4, cells 101-105 as the first priority for patients in alternative housing with the exception of ASU inmates. Also consistent with the last site review, Stack-a-Bunk beds were present in each cell, as were safety mattresses. There was one patient on suicide watch in alternative housing and the nursing staff members were maintaining constant visual observation and documenting in real time in CERNER in all three cases. The remaining cells were all clean. During the third quarter of 2023, alternative housing stays were compliant (less than 24 hours in duration) 100% of the time at NKSP. The use of alternative housing continues to be a strength of NKSPs.



## Suicide Risk Management Program (SRMP)

The procedure for SRMP at NKSP is contained within the institution's LOP 181 *Suicide Prevention* which was most recently updated in March 2023. It is consistent with statewide policy. On the first day of this onsite review, there were three patients in the SRMP at NKSP. All three charts were reviewed, and measurable treatment plan goals and interventions related to the reason for placement in SRMP, were present in all three charts. There was one who met objective criteria for SRMP but was not enrolled, however that patient was inaccurately flagged for meeting criteria, as his recent PIP placement was for competency restoration and not for DTS.

## Discharge Custody Checks – Hayes Items 7 and 11

A review of the discharge custody checks (7497s) audits completed by the institution during the

third quarter of 2023 indicates that for the third consecutive review period, improvements have been sustained. Compliance monthly was as follows:

| July | 100% |
|------|------|
| August | 100% |
| September | 99.5% |

Minutes suggest that this continues to be closely monitored monthly by the SPRFIT subcommittee.

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer attended the SPRFIT subcommittee meeting on November 21, 2023. That meeting met quorum, was collaborative, and followed the measurement plan. Minutes from the prior quarter (July through September 2023) were reviewed. A discussion of the presence of posters was absent in July, minutes from August contained no indication that five-day follow-ups were discussed, and minutes from September lacked an indication that minutes were approved. While all three months contained evidence that 35 randomly selected diagnostic screenings were audited to ensure that the clinician documented having reviewed county jail records and when applicable requested a Release of Information (ROI), the minutes lacked a discussion of having audited these charts for evidence that the nursing screening was reviewed. The SPRFIT coordinator provided raw data that indicates that this is being audited and it was recommended that this be reflected in the minutes. It was also recommended that results of all of three of these RC specific audits be discussed within the body of the minutes. Real time training was provided to the SPRFIT coordinator. Although some progress is noted, the CAP related to SPRFIT minutes will remain open.

### Inmate Family Council (IFC) and Inmate Advisory Council (IAC)

The SPRFIT subcommittee minutes were reviewed from September indicate that the SPRFIT coordinator attended the IAC on August 18, 2023.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the third quarter of 2023, NKSP was in compliance with the requirement to complete suicide risk evaluations with emergent referrals at 98%. DTS referrals were triaged as emergent MHPC contacts 91.72% of the time. The monthly breakdown is as follows:

| Month | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|-------|-----------------------------------|-----------------------------------------------|
| July | 100% | 95% |
| August | 93% | 93.3% |
| September | 100% | 97% |
| Q3 Totals | 98% | 91.72% |

Since the last review, the practice of placing urgent MHPC orders when patients are directly admitted to suicide watch in alternative housing overnight and using DTS as the reason code, has decreased, resulting in the first review period in which DTS calls were appropriately triaged as emergent over 90% of the time each month.

Additionally, a random sample of 15 emergent and 15 non-emergent referrals from the third quarter of 2023 were selected for audit. All but one non-emergent referral was appropriately triaged, as there was a DTS component, yet it was placed as urgent. All other cases in which there were concerns about DTS, the order was placed as emergent, and a suicide risk evaluation was completed in all cases in which one was clinically indicated.

## Suicide Risk Evaluations – Hayes Item 13

This reviewer conducted an audit of a sample of 10 charts for patients who were discharged from the MHCB at NKSP during quarter 3, 2023 and 10 who were rescinded from alternative housing after being admitted for DTS during the quarter. Suicide Risk Evaluations were completed in all 20 cases and all 20 evaluations contained an adequate justification for discharge or rescission. For the second consecutive site review, a safety plan was also completed in all 20 cases. While the institution continues to struggle with the quality of these safety plans (discussed above), the CAP related to their not being completed can be closed out.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

As of this review, one QIP from a prior suicide remained in follow up status and the current status of that one (patient #1) is below. Additionally, there was an unknown inmate death at NKSP on August 1, 2022, and since the last (August 2023) site review, that death had been deemed a suicide. As such, a suicide case review was completed, and it resulted in one mental health QIP (patient #2 below). Responses were not yet due as of the time of this report.

| Issue Identified | CAP | Status |
|---|---|---|
| Patient #1 | | |
| MHPC initial not completed timely | It is recommended that the institution develop a Corrective Action Plan to address late MHPC. initials. | **Status as of Q4 2023:** This variable continues to remain poor at only 58% compliance due to low staffing. This will remain deferred. |
| Patient #2 | | |
| Most of the weekly mental health progress notes completed from June 12, 2022, onwards did not contain some standard components, specifically, the patient's subjective report and the interventions applied. In addition, some content appeared to be carried from note to note, and although the content of the notes suggested contacts were completed at cell-front, notes did not state whether the patient refused a confidential meeting. In addition, most of the weekly mental health progress notes from June 12, 2022 forward were not completed on the day of clinical contact. Per the EHRS end-user training for mental health (training module 4: Documentation): "Documentation must be completed at the point of care." Lastly, although the patient had weekly mental health | **The Chief Mental Health at NKSP** shall conduct a review to determine what actions or training is required. | QIP responses were not yet due as of the time of this review. Progress will be reported during the next (quarter 1 2024) site review. |

# MEMORANDUM

| contacts per the MHSDS Program Guide, weekly appointments were not scheduled. Scheduling appointments is required by the EHRS workflow for Administrative Segregation (specifically, 1100-20 Mental Health Administrative Segregation Unit). All of the aforementioned issues involved the same mental health clinician. | | |
|---|---|---|

## Training and Mentoring Compliance

A review of the Coleman Court Mandated Trainings SharePoint for October 2023, as well as information obtained while on-site, indicated the following compliance rates:

### *Clinical Training Compliance*

| Training | Total Clinicians/Clinicians trained | Compliance percentage |
|---|---|---|
| SRE Mentoring | 28/27 | 96.43% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 28/27 | 96.43% |
| Safety Planning Training | 28/27 | 96.43% |
| Suicide risk management program training | 28/27 | 96.43% |
| Columbia-Suicide Severity Rating Scale Training | 28/27 | 96.43% |
| Discontinue to use of safety contracts | 29/29 | 100% |

### *Annual IST Suicide Prevention Training Compliance*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 836 | 829 | 99.2% |
| Mental Health | 28 | 26 | 92.9% |
| Nursing | 136 | 131 | 96.3% |

### *CPR Training*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 794 | 792 | 99% |
| Nursing | 172 | 172 | 100% |

## Receiving and Release (R&R) Screening – Hayes Item 1

Three different nurses were observed completing screenings. Two were observed to be thorough

and efficient, as they asked all the relevant questions and made the appropriate decision regarding referral so as such, each was observed completing one screen. The third nurse was observed to complete two screenings and in both cases, she did not ask the second bad news question. Local audits, including from September 2023, consistently indicate that this variable is assessed to be 100% compliant, yet this is the second consecutive site review in which this deficiency was noted. It is recommended that the identified nurse be observed by an institutional nursing supervisor and that training be provided as indicated. This will rise to the level of a CAP if deficiencies are noted during the next site review.

## Reception Center Processing

### Diagnostics Process

This reviewer observed two different clinicians conduct diagnostic screenings. Three screenings were observed with the first clinician and two were observed with the second clinician for a total of five screenings observed. While both clinicians asked all the required questions and made an appropriate decision regarding referral, only one of the two adequately reviewed county jail records. This issue was referred to the CMH, who also observed these screenings. An ROI was indicated in one of the five cases and the clinician appropriately obtained it.

### Poster audit

This reviewer conducted an audit of all medical clinics, pill windows, and RC housing units on all yards, as well as R&R. It was noted that an English and Spanish version of the suicide prevention posters were present in all required locations.

## Crisis Intervention Team (CIT)

OP 200 Crisis Intervention Team addresses NKSP's CIT procedures. The policy was most recently revised in March 2023 and as such, remains unchanged since the last site review. It is in alignment with statewide policy, and it indicates that CIT operates during normal business hours, and after hours based on utilization rates. Two CIT calls were observed during this onsite review, both were for patients who had been referred for DTS. In the first case, the clinician proceeded with the CIT contact without the presence of nursing staff and when nursing staff did arrive, their participation was minimal and of little additive value. The following day, the second CIT call was observed and this one was done appropriately. The same clinician completed both calls. A SRASHE justifying disposition was completed in both cases. It was noted that during both CIT calls, the patient was denied clothing while awaiting contact with the CIT. This reviewer informed custody leadership of the problematic nature of this practice and as a result, it was rectified via memorandum from the warden. As such, this need not rise to the level of a CAP or recommendation.

According to the CIT reporting tool, 60% of the CIT calls that occurred during quarter 3 (July to September 2023) contained the appropriate composition of the team and 84% contained nursing documentation. Most of these calls (74%) were related to DTS and just over half of all calls (56%) resulted in the patient being returned to housing.

# MEMORANDUM

**Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes (See summary in Appendix A).**

OSM expert Lindsay Hayes conducted a site review of NKSP on November 15-16, 2021. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

| Title | Definition of the Problem | November 2023 Update | Status |
|-------|---------------------------|----------------------|--------|
| Insufficient diagnostic screenings | It was identified that clinicians were not reliably reviewing records (such as health screenings and county jail records) during diagnostic screenings. | It was noted that one of two clinicians reliably reviewed county jail records and SPRFIT meeting minutes do not suggest that a review of nursing screenings is being done consistently. | **Remain open.** |
| Supervisory review of discharge safety plans. | It was noted that MHCB discharge safety plans were not being reliably reviewed. | NKSP has continues to not reliably complete this process. | **Remain open. This will continue to be monitored.** |
| Insufficient SPRFIT minutes | It was noted that proof of practice of compliance with RC reporting expectations, was not always present in SPRFIT meeting minutes, | This review suggests compliance has not slightly improved, but concerns remain. | **Remain open. This will continue to be monitored.** |

**Preliminary findings from the most recent Lindsay Hayes site review:**

Below is a summary of the progress on the preliminary findings from Mr. Hayes' most recent review on July 11-12, 2023, that were also confirmed by this reviewer.

| Concern | Status |
|---------|--------|
| Poor quality safety plans. | Improvement has not been noted. This will become a CAP. |
| Insufficient reference to reviewing county jail records in diagnostics. | This is already incorporated into the open CAP from 2021 and will remain open. |

# MEMORANDUM

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary in Appendix B)

Below are the corrective action plans (CAPs) assigned during prior reviews, as well as an update and status.

| CAP | November 2023 Update | Status |
|---|---|---|
| SPI is not being reliably completed for patients who are rescinded from suicide watch in alternative housing. | A review of 10 cases from the second quarter, indicates that these are now being completed, however deficiencies were noted during Lindsay Hayes's review. | **Close as of Q4 review.** |
| Insufficient discussion of safety plans for patients discharging from the MHCB. | Improvement was not noted during this site review as no applicable IDTTs were observed. | **Open. This will continue to be monitored.** |

Below is the one new Corrective Action Plans (CAP) that has been generated as a result of this review.

| Concern | Status |
|---|---|
| Poor quality safety plans. | NKSP will develop a CAP to address this deficiency and reflect it in the minutes of the next SPRFIT site review following receipt of this report. |

## Conclusions/Comments

An exit meeting was conducted with the local SPRFIT, Chief of Mental Health, HC captain, Warden, Associate Warden of Healthcare, SRN II, CSE, and Warden. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Insufficient diagnostic screenings | Moderate | **Open. Continue monitoring for one more audit cycle.** |
| 2 | Supervisory review of DC safety plans | None | **Open. This will continue to be monitored.** |
| 3 | Insufficient SPRFIT minutes | Minimal | **Open. This will continue to be monitored.** |

**APPENDIX B-** Summary of previous CAPs assigned by this reviewer or joint with Lindsay Hayes

|   | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Safety planning for ATH discharges | Substantial | **Close as of Q4 review.** |
| 2 | Insufficient discussion of safety plans in MHCB | None | **Remain open.** |
| 3 | Diagnostic clinician seeking ROI | Moderate | **Close as of Q4 review.** |

**APPENDIX C-** NKSP's progress on statewide Lindsay Hayes items

| Aspect of Recommendation that Remains Outstanding | KVSP's status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Compliant | |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS) | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Non-compliant | |
| No. 18: Safety planning training | Compliant | |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are being reliably offered, CQIT is a statewide issue, and the institution is improving the auditing and reporting of monthly chart audits. |

Exhibit P

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 01/10/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | CORCORAN STATE PRISON SUICIDE PREVENTION TOUR-QUARTER 4 December 2023 |

On December 12th and 13th, the Statewide Suicide Prevention and Response Coordinator conducted a review at Corcoran State Prison (COR). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies. Also incorporated are the preliminary findings of Office of Special Master (OSM) expert Lindsay Hayes from his most recent review on June 27-28, 2023.

An exit meeting was conducted with the local SPRFIT, Chief Psychologist, CMH, Warden, Associate Warden of Healthcare, Chief Deputy Warden, Healthcare CEO. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 0 |
| CAPs generated by this reviewer during prior review that can be closed | 1 |
| Lindsay Hayes CAPs that remain open | 2 |
| CAPs previously generated by this reviewer that remain open | 4 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 2 |

**Total open CAPs=7**
**Total open recommendations=2**
**Total closed CAPs=1**

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Short Term Restricted Housing

### Second Watch Morning Meeting

The second watch morning meeting was observed as part of this audit. A psychologist, a psychiatric technicians (PT), a tele psychiatrist, and the sergeant were all present for most of the meeting. However, the psychologist arrived a few minutes late. Other than the lack of a substantive discussion of patients in the Suicide Risk Management Program (SRMP), the meeting was strong. All other elements of the meeting were covered including new arrivals, patients with medical or medication concerns, and patients on five-day follow-ups.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was one PT who was observed, and she was a regular. She conducted rounds efficiently in that she asked all required questions of all patients including suicidal and homicidal ideation. She also inquired about sleep and appetite in all cases. She had with her a supply of puzzles and handouts which she offered to all patients. She made mental health referrals and placed consult orders as appropriate, and she charted in real time on all patients in CERNER.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with prior site reviews, the STRH at COR has five intake cells (101-105) and they are all retrofitted in compliance with statewide policy. On the date of observation, three were occupied and all three had been at an RHU for less than 72 hours. There were no inmates on intake status who were not housed in intake cells.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

A total of eight inmates, including all three of those in intake cells, were selected for the auditing of the issuance of entertainment appliances. Five of those inmates were directly interviewed and indicated that they had been offered a radio upon arrival to the unit and three others had placards on the door denoting that a radio had been offered.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

The monitoring report indicates that for the month of November 2023, there were a total of 109,851 checks expected at the STRH and 106,038 were completed timely (not exceeding 35 minutes apart) for a compliance rate of 96.53%. One officer was observed completing welfare checks and consistent with last review, he seemed to do so appropriately as he established visual contact with all inmates inside the cell prior to proceeding.

### ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH

There was one ASU Pre-Placement screening observed as part of this site review and it was done well. All questions were asked appropriately, and it was completed in a confidential setting. For the third quarter of 2023, the institution was compliant with ASU pre-screens at 87%, which was only a slight decrease from the previous quarter. During the September 2023 SPRFIT subcommittee meeting, the committee discussed August's low compliance with this variable and found that of 23 non-compliant cases, 11 were incorrectly flagged as such because they were SHU to ASU transfers. By outcounting those cases, compliance for the month improved to 92%.

### 70.1 ASU Pre-Screens



## ASU EOP Hub
### Second Watch Morning Meeting

The second watch morning meeting was observed as part of this review, and it was serviceable. The sergeant attended, as did a mental health clinician and a PT. The team discussed new arrivals, as well as patients who were on five-day follow ups and those who had behavioral concerns. Omitted however, was a discussion of patients in the SRMP. It is understood that this clinician was new and unfamiliar with the process for facilitating this meeting. This is not likely a systemic concern.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

One regularly assigned PT was observed completing rounds and did so appropriately. She inquired about sleep and appetite, as well as about suicidal and homicidal ideation, with all patients and documented in real-time in CERNER. She placed one mental health referral as appropriate and checked appointments as indicated. She had a supply of puzzles and other handouts to provide to the patients. This continues to be an area of strength. The institution conducted its local audit of PT rounds at this unit in August 2023 and the minutes from the following month's (September 2023) SPRFIT subcommittee meeting indicate that compliance was 100%.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with prior reviews, the RHU EOP hub at COR has five intake cells (124-128) and they are all retrofitted in compliance with statewide policy. On the date of observation, only two were occupied. Both inmates had been in intake cells for greater than 72 hours, however one had reached the 72-hour point during first watch the previous night and was also awaiting a lower-lower bed. In the other case, the patient had arrived from another RHU so that individual should

not have been placed in an intake cell at all. There were two other patients on the unit at that time who had arrived the previous day from another RHU and were not housed in intake cells, so it is unlikely that this occurrence was the result of misunderstanding of the policy. The September 2023 SPRFIT subcommittee minutes reported the institution's local compliance for August to be 100% for all RHUs.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

Seven patients, including the two in intake cells, were interviewed and all indicated that they had been offered a radio. One patient reported that his was not working and this was relayed to the sergeant. In general, the process for assuring timely provision of radios at this unit continues to be a strength.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

One officer was observed completing welfare checks and consistent with prior reviews, he seemed to do so appropriately. He looked into each cell and established visual contact with the patient therein. During the month of November 2023, there were a total of 98,874 checks expected at this unit and 95,159 were completed timely for a compliance rate of 96.24%.

# Long Term Restricted Housing (LTRH)

## Second Watch Morning Meeting

The second watch morning meeting was not observed as part of this site review, as strengths had previously been demonstrated.

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

There was one regularly assigned PT observed completing rounds and, consistent with prior reviews, the rounding was done well. The PT queried about suicidal ideation, as well as sleep and appetite, in all cases and documented in real time in CERNER. She had a supply of puzzles and handouts and offered them to all patients. This will next be audited during the quarter 2 review of 2024.

## Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

The monitoring report indicates that for the month of November 2023, there were a total of 259,619 checks expected at the LTRH and 259,369 were completed timely (not exceeding 35 minutes apart) for a compliance rate of 96.38%. There were not any officers observed completing welfare checks during this review.

## Restricted Housing Unit (RHU)

The institution uses housing unit 4A4R and 4A4L as ASU housing for non-MHSDS inmates. Each of those wings contains four intake cells: 4A4R 48-51; and 4A4L 48-51. On the day of this site review, two were occupied, both by inmates who had been there for less than 72 hours. One of those inmates had a C-PAP machine and as such, there was an extension cord in the cell.

## RHU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]

No ASU post-placement (GP) screenings were observed as part of this review. For the third quarter of 2023, overall compliance was 100%.



## Inpatient Units (MHCB and/or PIP)

## Suicide-Resistant Cells – Hayes Item 10

Prior reviews have indicated that all of the cells in the MHCB at COR are suicide resistant with the exception of one and that cell is only used for constant visual observation.

## Interdisciplinary Treatment Teams (IDTT)

Four IDTTs were observed as part of this site visit and improvements were noted over the last review. All four patients were admitted for Danger to Self (DTS). Three of the four were discharge IDTTs and one patient was being referred to an ICF. All team members were present for all IDTTs and there were three different psychologists present, but the rest of the treatment team remained the same. The MHCB supervisor served as IDTT leader and facilitated a team discussion towards the patient's treatment plan. Issue and observation was discussed in three of the four cases and justification for such orders were present in all four charts. The safety plan was completed and discussed with the patient in all three discharge IDTTs. There was one patient who is in the Developmental Disability Program (DDP) and the team effectively modified their approach to establish the patient's acceptance of his discharge safety plan. Not all team members had access to laptops during the process, however the limited space within the IDTT room is a common barrier to this. Since the last site review, institutional leadership has made adjustments to the regularly assigned MHCB clinicians, including psychologists and psychiatry. In combination with the presence of the MHCB supervisory during the process, this seems to have resulted in improvements. The MHCB supervisor provided proof of practice of having reviewed two of the three safety plans for patients who were discharged on that day. The CAP

related to deficiencies in the IDTT process will remain open for one more site review and if the process is noted next site review to have been sustainably improved, it will be closed out at that time.

### Quality of Safety Planning – Hayes Item 4

According to the performance report, COR conducted only one safety plan audit during the third quarter of 2023 locally. This reviewer conducted an audit of 20 safety plans that were completed during that same quarter (10 for patients who were discharged from the MHCB and 10 for patients who were rescinded from alternative housing) and only 4 (20%) were determined to be adequate. This represents a decline since last review period and the same common errors were noted. Those include a lack of documented interventions, a lack of documented clinical impressions, and information being copy and pasted across sections. There is already an open concern related to this that stems from the most recent review by Lindsay Hayes, however specific CAP language is missing and this will result in a separate CAP.

### Suicide Watch and Suicide Precaution

On the day of this review, there were a total of 19 patients in the MHCB, 17 of whom were on Suicide Precautions (Q11-Q15 minute checks) and 2 of whom were on Suicide Watch (constant one to one observation). Both patients on suicide watch were noted to be constantly observed by a nursing staff member who was charting in real time in CERNER. This reviewer observed three nursing staff members completing Suicide Precaution rounding for a sample of seven patients and in all seven cases, the nurse looked into the room to observe the patient and documented in real time in CERNER.

A review of the Mental Health Observation Reporting Tool from October 2023, indicates that suicide watch rounding was completed timely 59.4% of the time, suicide precaution rounding was completed timely 91.9% of the time, and the checks were staggered 99% of the time.

### Observation and Issue Orders – Hayes Item 3

This reviewer conducted a chart audit for 10 randomly selected patients who completed a full MHCB stay at COR during the third quarter of 2023, as well as the prior day's notes of the 4 patients for whom IDTT was observed during this site review. Each day in which a patient was ordered less than full issue was audited for a total of 84 patient days. Orders for issue were present in the chart on 83 patient days and for observation on 81 patient days. Only 64 of these orders had an accompanying note justifying it. Furthermore, the justifications were largely deficient. The notes were inconsistent with the order for at least 16 patient days and 4 of the 10 patients were on partial issue and suicide precautions on the day of their discharge without any adequate justification as to why. None of the patients were ever placed on Q30 minute observation. This represents a significant decline in performance since the las site review. The MHCB supervisor pre-emptively provided a refresher training to the MHCB clinicians on December 8, 2023 so this may result in improvements. The open CAP related to this item was

closed out during the last (quarter 3 2023) site review and, if the significant decline is noted to be sustained in the next site review (quarter 1 2024), it will be reopened.

The same sample of 10 patients was utilized to ensure that a discharge suicide risk evaluation and a discharge safety plan were completed. Both were completed in all 10 cases, however discharge was adequately justified in only 8 cases (see *Quality of Safety Planning* section above for a discussion of the quality of the safety plans). This represents a decline in performance since the last site review.

## Timelines for Suicide Risk Assessments

During the third quarter of 2023, Suicide Risk Assessments were completed timely at COR 93% of the time.



A review of the closed appointments report also indicates that out of 329 completed SRASHEs for the third quarter of 2023, 201 (61%) were completed in a confidential setting. This data is nearly identical to the second quarter, with only one fewer total SRASHEs completed in the third quarter. During this review period the modal reason for non-confidential contacts was, once again, "as planned," with the remainder of the reasons being modified program, lack of available escorts, and refusal on the part of the patient. This suggests that most often, contacts are being conducted in a non-confidential setting because the patient is not being offered the opportunity for a confidential contact and this will result in a recommendation not rising to the level of a CAP.

## Privileges – Hayes Item 14

Since the last site review, COR has transitioned to the use of electronic 114s. A sample of 10 such 114s for patients who were in the MHCB on the day of this visit, were audited to ensure that privileges were being regularly documented as being offered. Yard privileges were offered in all 10 cases. However only 4 of the 10 had been offered telephone privileges and only 2 of the 10 had been offered dayroom. Although improvement has been noted since prior reviews, this is the third consecutive audit cycle in which the documentation of offering of telephone privileges was problematic and the CAP related to telephone privileges will remain open.

## Clinical Discharge Follow-Ups

During the third quarter of 2023, clinical discharge follow-ups (5-day follow-ups) were completed timely 98% of the time. A sample of 15 of those cases were reviewed and a significant decrease in compliance with safety plans and the review of them, was noted. There were three cases in which the safety plan was absent on one day and four cases in which it was absent every day, leaving only eight (53.3%) of cases in which there was a safety plan present each day. In two of those eight cases, the safety plan was not reviewed each day. There were two cases in which the final day was not completed by a mental health clinician, but rather by a PT. Considering all 3 variables across all 15 cases, compliance was only 77.78% for the third quarter. Given that this is the institution's first quarter of inadequate performance on 5-day follow-ups, this was brought to the attention of mental health leadership while onsite and will not result in a CAP.

**20.2 Timely Clinical Discharge follow-ups**



## Alternative Housing – Hayes Item 5

COR's LOP 1017, Mental Health Crisis Bed Referral, Referral Rescission and Discharge, outlines COR's Alternative Housing process and attachment A specifies the designated Alternative Housing locations. This was updated in July 2022 and as such, is overdue for revision. Designated housing unit cells are the ASU HUB (3A03) cells 142-150 and 4A1L cells 41-52. In October 2023, local audits focused on housing unit 4A3. There were 21 patients on alternative housing that were observed and all 21 had staff actively observing. During this site review, there were not any patients on alternative housing. This reviewer was informed that the LOP was in the process of changing. The plan is to house all patients on suicide watch in alternative housing in a wing of the STRH. This is regardless of previous housing or mental health LOC designation. A copy of that LOP will be forwarded to this reviewer upon its finalization.

During the third quarter of 2023, COR was compliant with alternative housing stays at 96%.

**110.1 Alternative Housing Stays**



CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**                                             P.O. Box 588500
                                                                     Elk Grove, CA 95758

A random sample of 16 charts were reviewed for patients who were referred to a MHCB for DTS at COR during the third quarter of 2023 and not admitted. Upon rescission, a suicide risk evaluation using a SRASHE was completed in only 14 cases, which represents a decline in previous performance. Of those 16 cases, a safety plan was present in only 10. The six contacts in which a safety plan was not completed, were conducted by six different clinicians and four of those six had received the safety plan training prior to the time of the non-compliant contact. This suggests that the problem continues to be systemic and that it remains despite training. While performance has improvement since the last site review, this continues to be below goal. As such, the CAP related to this will remain open. See above in the *Quality of Safety Planning* section for a discussion of the quality of the 10 completed safety plans.

## Suicide Risk Management Program (SRMP)

COR's LOP 1018 *Suicide Prevention and Response*, addresses the Suicide Risk Management Program (SRMP) and this remains unchanged since the last site review. As of the first day of this site review, there were 39 patients enrolled in the SRMP at COR and only 3 who met criteria but were not yet enrolled. All three of the patients who were not yet enrolled had met criteria for less than two weeks and had not yet been to IDTT.

A random sample of 10 charts for patients who were enrolled in the SRMP program, were reviewed to ensure that measurable treatment plan goals and interventions were documented in the most recent master treatment plan that was completed at COR and they were in 5 of 10 cases. There has been no improvement in this area since the last site review. The institution continues to monitor this CAP via training and as of the end of November 2023, SRMP training was in compliance at 91.3%. As such, this CAP item will remain open.

## Discharge Custody Checks – Hayes Items 7 and 11

The institution has uploaded its internal review of discharge custody checks (7497s) form the third quarter of 2023 to the SharePoint site for review. Overall compliance was above 90% for two of the three months, however overall compliance continues to be negatively impacted by compliance with 30-minute checks.  This is the third consecutive review period in which this domain is noted to have negatively impacted overall compliance. This is now on the institution's project pipeline and has been given the highest risk score of all items on the pipeline. It will remain in monitoring status.

| Month | Overall Compliance | Deficient domains |
|-------|--------------------|--------------------|
| July | 93.2% | Checks discontinued after no more than 72 hours, 30-minute checks and supervisory reviews. |
| August | 92.9% | 30-minute checks. |

| September | 87.5% | Checks DC after no more than 72 hours; 30-minute checks; supervisory review. |
|---|---|---|

## Institution SPRFIT Committee Observation – Hayes Item 19a

Although the minutes from August indicate that the meeting met quorum, they also indicate that the inpatient coordinator (IPC) was not present, nor was a designee. Minutes from the prior month were approved without modifications despite this. Quorum was met the other two months, and all audit items were discussed according to the measurement plan, however a discussion of the issuance of entertainment appliances was missing in July. Minutes from the September meeting suggest that the items on the project pipeline have been assigned risk scores and project types. Progress towards open CAPs developed by this reviewer, as well as open improvement projects were also discussed. However, the committee minutes to not reflect that specific CAPs have yet been developed for the deficiencies noted by Lindsay Hayes during his July 2023 site review. Minutes from July reflect that there had been two serious self-harm attempts the previous month and a clinical case review was conducted for each case.

## Inmate Advisory Council and Inmate Family Council

The minutes still do not reflect that the SPRFIT coordinator or designee had attended these meetings within the last six months. As noted during the last (September) site review however, a plan for ensuring future attendance was not discussed until September. As such, this deficiency will not result in a CAP unless it is noted again as part of the next (quarter 1, 2024) site review.

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

COR continues to demonstrate efficiency with the completion of suicide risk evaluations in cases in which DTS is present and triaging those cases as emergent. During the third quarter of 2023, a suicide risk evaluation was completed in 98% of the cases in which DTS was present and DTS cases were triaged as emergent referrals 98.9% of the time. This continues to be an area of strength for the institution.

The monthly breakdown is as follows:

| Month | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| July | 97% | 97% |
| August | 99% | 100% |
| September | 99% | 100% |
| Q3 Totals | 98% | 98.9% |

Also selected for audit was a random sample of 15 emergent referrals and 15 urgent referrals from quarter 3, 2023. There were only two urgent orders that had a DTS component and as such, should have been emergent and a SRASHE was completed timely nonetheless in one of those

cases. A SRASHE was clinically indicated in 11 of the 15 emergent referrals and one was completed in each case.

## Suicide Risk Evaluations – Hayes Item 13

For the third quarter of 2023, COR demonstrated an overall compliance with suicide risk evaluations of 93%.

### 10.2 Suicide Risk Evaluation



93%
(1,478)

A review of the performance report for the second quarter of 2023, indicates that COR experienced a decrease in compliance with suicide risk evaluations were completed at the time of MHCB discharge, continued to decline and was only 75% compliant. This reviewer audited a sample of 10 charts for patients who were discharged during the third quarter of 2023, and all had the required SRASHE. Consistent with the last site review, the POWER BI report indicates that suicide risk evaluations were completed timely 94% of the time over the course of six months. The July 2023 SPRFIT minutes reflect that this was also out of compliance in June, and it was discussed. After drill-down, the committee indicated that 11 of 65 SRASHEs were completed on the day of the discharge and only one was late. However, all three months in the third quarter were also out of compliance and there is no indication that this was discussed in any SPRFIT committee meeting. Although this is the second consecutive review period in which low compliance with SRASHEs completed at the time of discharge was noted, the institution has demonstrated that they are monitoring it through the SPRFIT subcommittee. As such, rather than rising to the level of a CAP at this time, it will result in a recommendation, as discussions should also involve consideration of how to solve the problem systemically. SRASHEs were completed at the time of rescinded MHCB referral, 94% of the time.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

COR continues to demonstrate a sustainable process related to ensuring continued progress on closed QIPs from suicides that occurred between 2019 and 2020. As of this site review, there were QIPs still in monitoring status from a suicide in 2022 (patient #1) and another from a suicide in 2023 (patient #2).

| Issue Identified | QIP | Status |
|---|---|---|
| Patient #1 | | |

# MEMORANDUM

| | | |
|---|---|---|
| There were several concerns related to issue and observation orders while Inmate Hinds was in the MHCB:<br><br>The treatment team maintained the Inmate on staggered 15-minute checks (Suicide Precaution) from September 10 through October 3, 2021 and then 30-minute checks for the remaining 11 days of her MHCB hospitalization. The language used to justify these levels of observation were essentially the same throughout Inmate Hinds' hospitalization. When reducing an individual's level of suicide observation, it is important to provide a clinical justification. The MHSDS Program Guide states that "[w]hen an inmate is in an MHCB because of high risk of attempting self-injurious behavior, but is not in immediate danger, her or she shall be placed on Suicide Precaution." The team's charting did not appear to provide such as justification.<br><br>Second, several orders for 30-minute observation contained the notation "Self Harm Behavior and Suicidal Behavior." This language is reserved exclusively for Suicide Precaution or Suicide Watch orders. | **The CMH or designee at COR shall** review these concerns and determine the best course of action to prevent reoccurrence. | It was recommended during Q3 that this QIP be closed out if improvements are sustained for one more audit cycle. A significant decline in performance in this area was noted during this review. This will remain open for one more site review and closed if compliance is regained. |
| Patient #2 | | |
| Several treatment requirements included in the MHSDS Program Guide (2021) were not met during the patient's recent care. Specifically, a MHPC Initial Assessment was not held within 10 days of arrival and an Initial IDTT was not held within 14 days of arrival, nor was a MHPC Initial Assessment or Initial IDTT held upon his return to COR from CMF's MHCB on April 15, 2023. Additionally, during two series of 5-Day Follow-Up contact encounters, one day was missed in each series of contacts, April 19, 2023, and May 15, 2023. | **The CMH or designee at COR shall** review these concerns and determine the best course of action to prevent reoccurrence. | During the third quarter of 2023, IDTTs for all levels of care except for ML CCCMS were timely at 94%. However, timely PC contacts was below compliance at only 74%. As such, it is recommended that the IDTT portion of this QIP be closed out as sustainable compliance has been achieved, but compliance with timely PC contacts will continue to be monitored until another quarter of 90% compliance is achieved. |
| The Acute Risk Factor section of the SRASHE completed on May 14, 2023, was not completed. Additionally, chronic risk was underestimated as low which is inconsistent with statewide | **The CMH or designee at COR** shall review this concern and determine the best course of action. | The training titled *Assessing Complex Cases: Understanding the Effects of Psychosis and Substance Use on Suicide Risk* has not yet been |

| | | released to LMS and will be closed out once 90% compliance is achieved. |
|---|---|---|
| guidelines for patients with previous suicide attempts. | | |

## Training and Mentoring Compliance

The court ordered training SharePoint site through November 2023 and data reported by the institution were used to determine training compliance.

## Clinical Training Compliance

For reasons that are unclear, there were some inconsistencies between what was on the SharePoint site and what was reported by the institution. This is the second consecutive review period in which this is the case and as such, a recommendation will be generated.

| Training | Clinicians trained/total clinicians per SharePoint site | Compliance percentage | Compliance reported by institution on day of review |
|---|---|---|---|
| SRE Mentoring | 0/0 | 0 | 31% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 40/46 | 87% | 89% |
| Safety Planning Training | 34/49 | 69.38% | 70% |
| Suicide risk management program training | 46/42 | 91.3% | 70% |
| Columbia-Suicide Severity Rating Scale Training | 35/33 | 94.28% | NA |
| Discontinue use of safety contracts | NA | NA | 95% |

### *Annual IST Suicide Prevention Training – Observation*

This class was observed as part of this site review, and it was well done. It was conducted by a certified instructor. The class lasted the entire 120 minutes. The instructor covered all slides, expanded on them using examples, answered questions, and effectively appropriately engaged the participants. The instructor was well versed in the specific suicide prevention practices at COR and used this as a teaching point at multiple times throughout the class. The instructor demonstrated fidelity to the model for the most part, with the one exception being that the group exercise was skipped because of time limitations. Overall proficiency was such that a CAP is not warranted.

*Annual IST Suicide Prevention Training Compliance*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 1019 | 919 | 90.2% |
| Mental Health | 31 | 21 | 97.7% |
| Nursing | 259 | 229 | 88.4% |

*CPR Training*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 1354 | 947 | 70% |
| Nursing | 259 | 259 | 100% |

## Receiving and Release (R&R) Screening – Hayes Item 1

This reviewer observed two R&R screenings during this site review. Consistent with prior reviews, the space was conducive to the process. In both cases, the nurse did not ask the last question on the questionnaire ("did the patient receive any bad or unexpected news during a recent court hearing"). This was attributed to a misunderstanding about the requirement to ask that question, so this reviewer provided training in real time. This is unlikely to be a systemic problem in light of COR's usual strong performance in this area and a CAP is not warranted. The September 2023 SPRFIT subcommittee minutes reported the institution's local compliance for August to be 100%.

## Crisis Intervention Team (CIT)

COR's CIT process is outlined in LOP 1031 *Crisis Intervention Team*/ Mental Health Emergent Referral and this policy was revised in January 2023. This policy specifies that the operating hours for CIT are 0700-1700. This policy specifies that a mental health clinician will make the initial contact with the patient and CIT will only be activated if the clinician determines that "a custody or medical issue" is present.

According to the CIT report, only 1% of the CIT calls in the third quarter of 2023 contained the full composition of the team and only 50% contained nursing documentation. The open CAP related to the CIT process and policy can be closed at this time.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

OSM expert Lindsay Hayes conducted a site review of COR on February 9-10, 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

| Title | Definition of the Problem | September 2023 Update | Status |
|---|---|---|---|
| Supervisory review of discharge safety plans. | Pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from August 2021 through January 2022. This reviewer's examination of the data found problems in untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that several supervisory reviews were occurring well after the IDTT meetings. In addition, there was no data provided to indicate that MHCB supervisory review of safety plans occurred during January 2022. | The Spreadsheet was updated to meet requirements during the Hayes tour. Reviews are being completed ongoing, but are often not completed before the discharge IDTT due to critical staffing and workload issues in MHCB. | **Remain open.** |
| Custody post-discharge checks. | This reviewer was presented with documentation of 85 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from August 2021 through January 2022. The review found that only 84 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form, as well as discharges occurring on the weekends without a face-to-face assessment by a clinician. The majority of custody checks were recommended for 48 hours. In addition, only 70 percent of the "custody check" forms (Page 2) were completed correctly by correctional | The custody portion of the 7497 audits, specifically the 30 minute check portion, negatively impacted overall compliance during the third quarter. | **Remain open.** |

| | staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals, as well as missing custody check forms (pg 211). | | |
|---|---|---|---|

**Preliminary findings from the most recent Lindsay Hayes site review:**

Below is a summary of the progress on the preliminary findings from Mr. Hayes' most recent review on June 27 and 28, 2023.

| Concern | Status |
|---|---|
| Poor quality safety plans and safety plans that were not complete. | Safety plans continue to be qualitatively poor. |
| Safety plans not completed for ATH discharges. | Improvement has not been noted. |
| Safety plans not being reviewed by the MHCB supervisor. | Improvement is noted but deficiencies with the process remain. This will be resolved if improvement is noted during the first review after the statewide SharePoint site is implemented. |
| Low quality MHCB IDTTs. | Improvement was noted but not systemically enough to discontinue this CAP. Continue to monitor. |
| Privileges not being reliably offered in the MHCB. | Improvement is noted with yard privileges only. Continue to monitor. |
| Non-compliance with training. | This continues to be of concern. |
| Custody post-discharge checks. | Compliance was below 90% for both pages, but compliance has been continually noted by this reviewer. The open CAP will remain open until the Q1 2024 review if improvement is sustained. |

**Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).**

An exit meeting was conducted with the SPRFIT coordinator, Chief of Mental Health, the Chief Deputy Warden, the Chief Nursing Executive, the Chief Support Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes. The following is a summary of CAPs that remain open from prior reviews and their current status.

| CAP | December 2023 Update | Status |
|---|---|---|
| Treatment progress for patients in the SRMP is not consistently being documented in the Master Treatment Plans of follow-up IDTTs. | No improvement was noted. | **Remain open.** |
| Several deficiencies were noted in the IDTT process | Improvement noted. | **Remain open for one more audit cycle.** |
| Low compliance with Suicide Prevention related trainings. | Safety planning training and SRE mentoring training compliance remains poor and the discontinuation of safety contracts training data was not provided. | **Remain open.** |
| Deficiencies were noted related to CIT, both in terms of the systemic process and the observation on site the day of the review. | The revised policy was provided and observation suggests improvement. | **Close as of Q4 review.** |
| Safety plans are not reliably being completed with alternative housing discharges. | Improvement is noted but deficiencies remain. | **Remain open.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | December 2023 Update | Status |
|---|---|---|
| It is recommended that the SPRFIT coordinator attend IFC and IAC every six months and that a qualitative discussion of the meeting be presented in the SPRFIT minutes the following month. | This was deferred during the last review period and will be reactivated. Minutes will demonstrate attendance by June 2024. | **Reopen.** |

Below are concerns that did not rise to the level of a CAP from this review.

| Concern | Recommendation |
|---|---|
| Low compliance with suicide risk evaluations for MHCB discharges are discussed by the SPRFIT, but plans for remediation are not identified. | Identify remediation strategies to improve performance report compliance the next time this variable is below 90% for the prior month. |
| Patients not being reliably offered confidential contacts for the completion of suicide risk evaluations. | Identify the source of low compliance and possible remediation strategies. |
| There is a lack of consistency between training data on the court ordered training data SharePoint site and what is reported by the institution. | Identify the source of this discrepancy and ensure consistency. |

Below is the new Corrective Action Plan (CAP) that has been generated as a result of this review.

# MEMORANDUM

| Concern | Corrective Action Plan |
|---|---|
| Outstanding concerns from Lindsay Hayes' last review lack specific CAP language | The institution will develop language for all outstanding CAPs and reflect this in the next SPRFIT subcommittee after receipt of this report. |

# MEMORANDUM

**APPENDICES**

**APPENDIX A** – Status of deficiencies as noted in the <u>Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs</u> written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2022 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Supervisory review of discharge safety plans. | Moderate | **Remain open.** |
| 2 | Custody post-discharge checks. | Substantial | **Remain open.** |

# MEMORANDUM

**APPENDIX B-** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Treatment plans for SRMP patients. | Moderate | **Remain open.** |
| 2 | MHCB IDTT quality. | Minimal | **Remain open.** |
| 3 | Suicide prevention trainings | Minimal | **Remain open.** |
| 4 | CIT process and LOP | Substantial | **Close as of Q4 2023 review.** |
| 5 | ATH rescission safety plans | Minimal | **Remain open.** |

**Appendix C:** COR's status regarding compliance with outstanding Recommendations in Lindsay Hayes' October 2022 Report

| Aspect of Recommendation that Remains Outstanding | COR'S status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% |
| No. 10: Auditing SRE quality | Compliant | Audits are being done quarterly |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | compliant | |
| No. 17: Completing safety plans, supervisory audit of safety plans | Partially compliant | Supervisory reviews are being completed but not 100% reliably. |
| No. 18: Safety planning training | Non-compliant | Training is underway |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | Lindsay Hayes most recent review found less than 90% compliance. |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | Lindsay Hayes most recent review found less than 90% compliance. |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are still not being reliably offered, CQIT is a statewide issue, and COR does not have a Reception Center |

# MEMORANDUM

Exhibit Q

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 1/10/2024 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Sean Mintz, Psy.D.<br>Sr. Psychologist Specialist-Suicide Prevention Unit-R3 |
| **Subject:** | SUBSTANCE ABUSE TREATMENT FACILITY SUICIDE PREVENTION TOUR-Quarter4 December 2023 |

On December 14th and 15th, the Statewide Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator conducted a review at Substance Abuse Treatment Facility (SATF). The focus of the review centered on their Administrative Segregation Unit (ASU) and Mental Health Crisis Bed (MHCB) to ensure compliance with statewide suicide prevention and response policies. Also incorporated are the preliminary findings of Office of Special Master (OSM) expert Lindsay Hayes from his most recent review on June 29-30, 2023.

An exit meeting was conducted with the backup SPRFIT coordinator, Chief of Mental Health, the Warden, the HC AW, the Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes.

| | |
|---|---|
| Lindsay Hayes Corrective Action Plans (CAPs) that can be closed | 3 |
| CAPs generated by this reviewer during prior review that can be closed | 2 |
| Lindsay Hayes CAPs that remain open | 1 |
| CAPs previously generated by this reviewer that remain open | 1 |
| New CAPs generated as a result of this review | 1 |
| New recommendations generated as a result of this review | 0 |

**Total open CAPs=3**
**Total open recommendations=0**
**Total closed CAPs=5**

Should you have any questions or require further clarification, please contact me at (916) 385-4177 or sean.mintz@cdcr.ca.gov

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

### Short Term Restricted Housing

### Second Watch Morning Meeting

The second watch morning meeting was observed as part of this site review and it was a strong meeting. All required attendees were present including a mental health clinician, the sergeant, and two psychiatric technicians (PTs). The team discussed new arrivals, patients in the SRMP program, patients with behavioral concerns, patients on five-day follow-ups, and intake cell usage.

### Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

One regular PT was observed completing rounds and improvement was noted since the last site review. The PT was deliberate in using CERNER to distinguish MHSDS patients from non-MHSDS inmates and with MHSDS patients, she inquired about suicidal and homicidal ideation, as well as sleep and appetite, in all cases. She had a supply of games and puzzles and offered some to all patients with whom she interacted, regardless of their level of care. She looked into each cell to establish a visual of the condition of the cell. She also charted in CERNER in real time.

### Intake Cells – Hayes Item 2 [ASU, ASU EOP HUB, STRH RC, STRH]

Consistent with the last site review, the STRH at SATF is equipped with 10 retrofitted intake cells (100-109), all of which were occupied on the first day of this site review. Of the 10 patients in intake cells, 3 had been there for over 72 hours. The sergeant indicated that all compactions had been exhausted and that there was no more space available. There were not any inmates on intake status who were not properly housed in an intake cell. While the lack of sufficient RHU space remains concerning, this is outside of the institution's control and the staff at SATF demonstrated improvement in ensuring proper housing. This is on the institution's project pipeline and the CAP related to it can be closed.

### Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

This reviewer interviewed 10 patients, including 7 of the 9 who were in intake cells, to ensure that they had been supplied with an entertainment appliance in a timely fashion. All 10 indicated that they had been. This indicates improvement in this area since the last site review. The SPRFIT subcommittee is due to report on this variable again in January 2024.

### Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, STRH RC, STRH, STRH Female, LTRH, Condemned]

On the day of this site review, one officer was observed completing checks and he seemed to do so appropriately. He took the time to look into each cell and when indicated, utilized a flashlight to do so. He seemed to reliably establish visual contact with each inmate before moving on to the next cell. The monitoring report indicates that for the month of November

2023, there were a total of 128,460 checks expected at the STRH and 125,341 were completed timely (not exceeding 35 minutes apart) for a compliance rate of 97.57%. This continues to be an area of ongoing compliance at SATF.

RHU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH
There were not any RHU pre-placement screenings observed as none occurred. A review of the performance report from the third quarter of 2023, indicates that this has been an area of improvement for SATF since the last site review, as compliance has increased to 89%. This represents a slight (3%) improvement since the last review period. This item is supposed to be discussed monthly in the SPRFIT subcommittee meeting but for the second consecutive review period, it has not been. The explanation provided to this reviewer while on site, was that there were not any that occurred during regular business hours when they could be observed by nursing leadership.

### 70.1 ASU Pre-Screens



RHU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH]
There was one RHU Post-placement screen observed as part of this site review. The interview was conducted at cell front because the inmate declined a confidential contact. The PT asked all of the required questions and documented in real time. A review of the performance report for the third quarter of 2023, indicates that compliance for that time period was 97%.

### 70.2 ASU GP Screens



## Inpatient Units (MHCB and/or PIP)

### Suicide-Resistant Cells – Hayes Item 10
MHCB cells at SATF had previously been noted to be suicide resistant.

## Interdisciplinary Treatment Teams (IDTT)

This reviewer observed five IDTTs during this site review; three of which were discharge IDTTs and two of which were initial IDTTs. In the case of the three discharge IDTTs, two were initially admitted for DTS and one was initially admitted for Danger to Others (DTO). One of the initial IDTTs was for a patient who was admitted for DTS and the other was admitted for DTO and Severe Impairment Due to Mental Illness (SIDMI). All of the IDTTs consisted of all of the required team members, in addition to the MHCB supervisor who served as IDTT leader. All required members participated in all five IDTTs and the IDTT leader facilitated a team discussion in all five cases. The safety plan was reviewed with both patients who were discharging after having been admitted for DTS. Nevertheless, significant deficiencies were identified in the IDTT process. There was one patient who was scheduled to be discharged, and requested to be, however the psychiatrist had indicated in the IDTT that he no longer agreed with the decision to discharge the patient. An adequate clinical rationale was not offered despite the patient requesting a reason. The associated psychiatric progress note, also does not support the decision to not discharge the patient and the diagnostic impression does not align with the psychiatrist's concern that the patient was "psychotic." These concerns were elevated to the CMH who had already implemented a plan to address them.

Another concern with the IDTT process included the discussion of issue and observation. Although issue and observation were discussed in all IDTTs, orders for them were justified in only one of the three cases. It was also unclear why restrictions were implemented in some cases. In the case of the above-referenced patient for example, he was admitted for DTO and was not considered a risk of self-harm, yet when he requested a pen-filler to write a letter to his family, this request was denied without adequate justification. Program Guide 12-10-16, specifies that patients on suicide precautions are to be provided with reading and writing material unless adequate justification is documented. Finally, the IDTTs all lacked a comprehensive discussion of the events and symptoms that precipitated the crisis and also lacked a comprehensive discussion of the patient's treatment plan goals and progress towards them. Mental health leadership at SATF is considering staffing changes within the MHCB that, if implemented, are likely to improve the overall process. Also, given the historically adequate IDTT process at SATF, the deficiencies noted during this review need not rise to the level of a CAP.

## Suicide Watch and Suicide Precaution

On the first day of this site review, there were 17 patients in the MHCB; 13 of whom were on Suicide Precautions (Q11-Q15 checks) and the remaining four patients were on suicide watch (1:1 direct observation). For the third consecutive audit period, there were not any patients on Q30 checks. This even though discharge was planned that day for three patients, including one who was not admitted for DTS. All four patients on suicide watch were being constantly observed. This reviewer observed one nursing staff member conduct Suicide Precaution rounds on 11 patients and she did so appropriately. In each case, she established visual contact with

the patient and documented in real time in CERNER. On the first day of this review, there were up to date issue and observation orders on the door for all 17 patients. On the second day of the review, one of the patients on suicide precautions did not have up to date orders on the door, however that patient had just been removed from suicide watch not long before this observation. While the rationale for the orders in not consistently clear, the nursing rounding was observed to be strong.

A review of the Mental Health Observation report for November 2023, indicates that rounds for suicide precautions were completed timely at 98.3% and they were staggered 99.2% of the time. This remains an area of strength for SATF.

## Observation and Issue Orders – Hayes Item 3

The charts were reviewed for 10 patients who completed a MHCB stay at SATF for DTS during Q3 2023 to ensure that orders for issue and observation were present in the charts, and that a clinical note justifying partial issue was present when indicated. The sample yielded a total of 40 patient days and deficiencies continue to be noted. An order for observation was missing entirely for 12 patient days and on two days, observation orders were for "one to one" despite the patient not being assessed as currently suicidal. With regards to the justification notes, they were found to be generally confusing. A note justifying issue was absent on 26 of the 40 days and a note justifying observation was absent 23 days. Notes that were present were internally inconsistent on three patient days.

It was noted during the last review period, that the practice at SATF creates an inherent disconnect. Specifically, the regularly assigned psychiatrist makes the final decision regarding issue and observation orders and often does so independent of, or inconsistent with, the judgment of the rest of the team. Therefore, the justification behind the order may not make sense to the clinician who is responsible for writing the note. These concerns have been elevated to local leadership, as well as regional leadership, and it is anticipated that staffing changes in the MHCB that involve psychiatry, will soon be made. Improvement in this area is expected to occur as a consequence of these changes but in the meantime, the CAP related to this will remain open.

## Timelines for Suicide Risk Assessments

A review of the performance report for the third quarter of 2023 (July-September), indicates that SATF completed Suicide Risk Evaluations timely 87% of the time overall. There were also 250 more evaluations that were completed this review period.

## 10.2 Suicide Risk Evaluation



Of the 1,169 SRASHEs that were completed at SATF during that time, the closed appointments report identified 274 of them. Of those 274, 214 (78%) were completed in a confidential setting. Of the 60 contacts that were not completed in a confidential setting, 10 were due to the patient's refusal and 39 others were due to other matters outside of the control of the clinician, such as a lack of confidential space and a lack of available escorts. In total, 85% of the non-confidential contacts were for reasons that were outside of the clinician's control. Although the overall percentage of suicide risk evaluations that were completed in a confidential setting has decreased since the last review period, the percentage in which a confidential contact was not offered despite the clinician being able to do so, has decreased. This represents the third consecutive review period in which SATF has demonstrated an acceptable effort to complete suicide risk evaluations in a confidential setting.

### Privileges – Hayes Item 14

Since the last site review, SATF has activated the automated 114 process. This reviewer conducted an audit of the 114s for 10 of the patients who were at the MHCB during this onsite review and improvements were noted from past reviews. The 114s reflected that all 10 patients had been offered yard at some point during their stay, 9 had been offered dayroom, and 8 had been offered phone calls. There was one patient who had been offered neither phone calls nor dayroom, but he had just arrived to the MHCB the day prior. This represents the second consecutive review period of sustained improvement and the CAP related to this can be closed.

### Clinical Discharge Follow-Ups

A review of the performance report indicates that clinical discharge follow-ups were completed timely 94% of the time during the third quarter of 2023.

## 10.4 Timely Clinical Discharge follow-ups



This reviewer selected for audit, a random sample of 15 charts for patients who completed 5 full days of clinical discharge checks during quarter 3 of 2023. Documentation reflects that the safety plan was completed and included each day in 14 (93%) of the cases, which demonstrates improvement. However, the final day was completed by a mental health clinician in only 10 (67%)

cases. Institutional mental health and nursing leadership will be provided with a reminder of this requirement and it will not rise to the level of a CAP at this time, but will if compliance is noted as low again during the next review period.

## Alternative Housing – Hayes Item 5

SATF's LOP 464, Alternative/Temporary Housing outlines SATF's Alternative Housing process and remains unchanged since the last site review. It aligns with statewide policy, however it was revised in October 2022 and as such, is overdue for renewal. It lists the prioritization of housing locations as follows:

1. Correctional Treatment Center (CTC) licensed medical beds
   a. Prior to housing a patient in a CTC licensed medical bed, staff shall ensure the following:
   b. Prior to housing a patient in a CTC licensed medical bed staff must obtain approval from HCPOP.
   c. Prior to admitting a patient to a CTC licensed medical bed staff shall obtain admitting orders  from a physician.
   d. CTC licensed medical beds do not have the same design as designated MHCB rooms. CTC licensed medical beds have not been retrofitted for optimal patient safety e.g. reduced anchor points around light fixtures and air vents, non-operational electrical outlets, high visibility.
   e. Use of licensed medical CTC beds for MHCB overflow shall be considered alternative housing; however, because CTC is a licensed setting, all patients placed in CTC pending transfer to a designated MHCB must be provided inpatient level of services in accordance with California Code of Regulations, Title 22. Patients shall not be placed in the CTC beds for mental health issues unless a referral to the MHCB has been made. The alternative housing requirements  as set forth in this policy shall be followed when patients  are placed into these beds.
2. Holding cells with access to water/toilets including, but not limited to, "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.
   a. SATF CTC Specialty Area Holding Cell 114 (water and toilet). **Except for those patients who are on Administrative Segregation Status.**
   b. SATF CTC Specialty Area Holding Cell 115 (water and toilet). **Except for those patients who are on Administrative Segregation Status.**
- If the need for ATH exceeds available space in CTC, reference section IV.E. within this OP.
3. Holding cells without toilets
4. Triage and Treatment Area (TTA) or other clinic exam room
5. Other unit-housing where complete and constant visibility can be maintained.

When the necessity for ATH exceeds the available areas designated in the CTC, the following

areas shall be utilized according to the patient's classifications needs:

1. Patients, who are on Administrative Segregation status shall be placed **in** STRH cells 110 and 111.

2. Should overflow be necessary**,** Facility "E-1" shall be utilized for all patients requiring ATH. If vacant cells are available, Facility E Building 1 cells 126, 127, 128, 129, 130, 131, 132 and 133 shall be used and authorized to house patients from all facilities.

3. Facility "C" shall be utilized for all General Populations patients requiring ATH. If vacant cells are available, Facility C, Building 3, A, or C Section, shall be primarily utilized and authorized to house patients from Facilities B and C.

4. The Facility Captain shall be responsible for providing alternative activities for non-ATH inmates who are housed in units that are being utilized for ATH (e.g., dayroom in adjoining section or yard). Movement surrounding ATH areas shall be controlled.

    a.    Facility C - The cells used specifically for ATH are:

- C3 - 124
- C3-125

    b.    Cells 124 and 125 shall be available 7 days a week, 24 hours a day. Permission to use these cells for ATH is granted by a Health Care Manager (Health Care Captain or Health Care Associate Warden) during regular business hours. The Administrative Officer of the Day (AOO) shall grant permission to use these cells during non-business hours.

    a.    Facility D - The cells used specifically for ATH are:

- 03 -114
- 03 - 115
- O3–116
- D3 - 117

Cells 116 and 117 shall be available 7 days a week, 24 hours a day. Permission to use these cells for ATH is granted by a Health Care Manager during regular business hours. The AOD shall grant permission to use these cells during non-business hours.

SATF has a system of ensuring that "EZ Bed" ("stack-a-bunk") and a mattress are accessible for all patients on suicide watch in alternative housing.

During the third quarter, SATF had fallen out of compliance with the completion of suicide risk evaluations completed after MHCB rescission, with a compliance of only 88%. A sample of 10 charts were selected for audit. These were the charts of patients who were referred to the MHCB for DTS during quarter 3 of 2023 but rescinded before physical placement into a MHCB, and a SRASHE was present in all 10 of those cases. A safety plan was completed prior to discharge in all but three cases and those were all attributable to the same clinician and mental health leadership was notified about the need for retraining for this individual.

A review of the performance report indicates that the institution was in compliance with alternative housing stays at 99%.



**110.1 Alternative Housing Stays**
**99%**
**(290)**

## Suicide Risk Management Program (SRMP)

SATF's LOP 230 *Suicide Risk Management Program (SRMP),* continues to be the LOP that addresses SRMP. It was most recently revised in September 2023 and is consistent with statewide policy. At the time of this site review, there were 39 patients enrolled in the SRMP program at SATF and 9 who met an objective criterion but were not enrolled. Of those nine, three had been to IDTT at SATF since criteria were met and four others have not been and were overdue. A sample of 10 charts of patients who were enrolled were reviewed. Only four contained measurable in treatment plan goals in the most recent master treatment plan and only five contained interventions. This remains stagnant since the last review and it is recognized that the lack of a consistent SPRFIT coordinator has contributed to this deficit. The LOP delineates a local process for tracking and monitoring the patients in the SRMP but not for those who need to be enrolled. It is recommended that individual program supervisors be trained to track the SRMP data weekly.

## Discharge Custody Checks – Hayes Items 7 and 11

For the third quarter of 2023, Discharge Custody Checks (7497s) compliance is as follows:

| Month | Overall compliance |
|---|---|
| July | 93.4% |
| August | 96.9% |
| September | 98.1% |

This demonstrates eight straight months of sustained compliance with the completion of 7497s by both custody staff, and mental health. Therefore, the CAP related to this item can be closed out.

## Institution SPRFIT Committee Observation – Hayes Item 19a

This reviewer attended the SPRFIT subcommittee meeting on November 21, 2023. The meeting was able to meet quorum with the CSE covering for the CHSA, however the SPRFIT coordinator was not present and as such, not all information was collected appropriately. A review of the minutes from all three months of quarter 3 (July-September) indicates that quorum was met each month. The institution continues to have low staffing so the regional psychiatrist serves as the chief psychiatrist and often the SPRFIT coordinator role is filled by a back-up. Root cause analyses (RCAs) were not discussed semi-annually. Minutes from the September meeting indicate that there was a serious self-harm episode in August and as such, an RCA or case review should have been presented. Each month the committee discussed the number of patients enrolled in the SRMP and the number of patients who met criteria but were not enrolled. However, the discussion did not address the plan for the patients who were not enrolled. The minutes continue to have deficiencies, however it is acknowledged that the lack of a reliably present SPRFIT coordinator may have influenced this. Members of the SPRFIT committee were provided with training in real time during this site review.

## Inmate Family Council and Inmate Advisory Council

Consistent with last review cycle, the institution has not reliably established SPRFIT representation at the Inmate Advisory Council (IAC) and Inmate Family Council (IFC) committees. The CAP related to this was deferred last site review and will be discontinued at this time in favor of a revised CAP concerning SPRFIT meetings and minutes in general (see concerns above).

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

During the third quarter of 2023, SATF was in compliance with the completion of emergency suicide risk evaluations in cases of Danger to Self (DTS) at 93%. Additionally, 98% of all DTS cases during the quarter were appropriately triaged as emergent referrals.

| | | | |
|---|---|---|---|
| SRE after Em.Consult (except PIP) for Suicidality | 137 | **10.6** | **93%** |
| SRE after Ur.Consult (except PIP) for Suicidality | 2 | **59.5** | **50%** |

The month-by-month breakdown for the quarter is as follows:

|  | DTS CALLS WITH A COMPLETED SRASHE | DTS CALLS APPROPRIATELY CLASSIFIED AS EMERGENT |
|---|---|---|
| July | 90% | 95% |
| August | 94% | 98% |
| September | 95% | 100% |
| Q3 2023 | 93% | 99% |

Also selected for review was a sample of 15 emergent referrals and 15 urgent referrals from quarter 3 2023. None of the urgent referrals had a DTS component and therefore, they were all triaged appropriately as urgent. A SRASHE was completed timely in all 10 of the cases in which an emergent referral involved a DTS component. Ensuring the accurate urgency of mental health referrals and the timely completion of SRASHEs when indicated, continues to be a strength for SATF.

## Suicide Risk Evaluations – Hayes Item 13

Overall, suicide risk evaluations were compliant at 87% for the third quarter of 2023. Compliance for evaluations completed at the time of referral to a MHCB was 99%, and for rescinded MHCB referrals it was 88%. For the third consecutive review period, the institution remained below compliance with the completion of suicide risk evaluations at MHCB discharge (79%) and the SPRFIT committee minutes continue to lack a substantive discussion as to why. A random sample of 10 charts for patients who were rescinded from alternative housing during quarter 3, and 10 who were discharged from the MHCB in quarter 3, found that a SRASHE was present in the chart in all 20 cases and that there was adequate justification for clinical discharge in 14 of the 20 cases, which remains the same as it was the last site review.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

The following QIPs from a suicide in 2021 and another in 2022, remain in a status of ongoing monitoring as of the time of this review.

| Issue Identified | QIP | Status |
|---|---|---|
| Patient #1 | | |
| Psychiatry-The psychiatric nurse practitioner (PNP) clinical note on September 28, 2021 includes a written plan to see the patient again in four weeks (four weeks from the September 28th appointment). Review of the electronic medical record did not reveal a scheduling order for a four-week appointment with PNP/psychiatrist and did not reveal a PNP or psychiatry clinical contact four weeks following the September 28th | **CEO and Chief Psychiatrist at SATF** will investigate and identify any individual or procedural elements/failures that contributed to this omission and enact strategies to prevent reoccurrence. | SATF still does not have a chief psychiatrist and has not developed an alternative manner for which to track this. However, SATF is in the process of hiring a chief psychiatrist. This QIP will continue to be deferred in the meantime and will be closed out once this process is established. |

| | | |
|---|---|---|
| appointment, as was planned in the September 28, 2021 note. | | |
| Patient #2 | | |
| The treatment plan dated May 25, 2022 had an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding the inmate's functioning and presentation during the review period. More specifically, current information found in other clinical documentation, including but not limited to: frequency/severity of auditory hallucinations, coping tools utilized, programming on the yard, psychiatric medication refusals, sleep disturbance, low energy, and compliance/ participation in the MAT program. Additionally, the transfer/discharge planning section did not have any meaningful clinical information, therefore, there was an absence of justification for the level of care. Per MHSDS Program Guide, 2009 Revision (12-7-12) *"The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care."* | **The SATF-CSP CMH and/or designee** shall audit documentation for five additional inmate-patients for the identified clinician within the past 6 months (to include progress notes and treatment plans). Based on results of this audit, the CMH shall determine the best course of action. At minimum, the clinician shall be re-trained on the importance of regularly updating treatment plans in correspondence with Program Guide requirements. | The identified clinician attended the SRASHE Core Competency training on June 12, 2023. The results of local supervisory audits have not been provided and this QIP will remain open until they are. |
| Psychiatry clinical note authored on February 10, 2022 referenced "Follow up with psychiatry in 90 days …".  The psychiatrist entered scheduling order for " MH ML CCCMS Routine MHMD Contact … once every 90 days for one year" on February 10th.  Review of the chart reveals no scheduled appointment 90 days after the order was placed on February 10th. | **SATF-CSP CEO and/or CMH** will research this scheduling omission to discover specifics and will consider implementation of strategies to prevent reoccurrence. | SATF still does not have a chief psychiatrist and has not developed an alternative manner for which to track this. However, SATF is in the process of hiring a chief psychiatrist. This QIP will continue to be deferred in the meantime and will be closed out once this process is established. |

## Training and Mentoring Compliance

### Clinical Training Compliance

| Training | Clinicians trained/total clinicians | Compliance percentage |
|---|---|---|
| SRE Mentoring | 16/42 | 38.09% |
| Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training | 25/45 | 55.55% |

| Safety Planning Training | 10/40 | 25% |
|---|---|---|
| Suicide risk management program training | 36/39 | 92.31% |
| Columbia-Suicide Severity Rating Scale Training | 23/37 | 62.16% |
| Discontinue the use of safety contracts | Not provided | 97% |

Training compliance has improved since the last site review, however it remains poor.

*Annual IST Suicide Prevention Training Compliance – Thus far for calendar year 2023*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 1132 | 1004 | 88.7% |
| Mental Health | 113 | 89 | 78.8% |
| Healthcare | 371 | 291 | 78.4% |

*CPR Training*

| Discipline | Total staff | Total in compliance | Compliance percentage |
|---|---|---|---|
| Custody | 1111 | 980 | 88.2% |
| Nursing | 261 | 261 | 100% |

## Receiving and Release (R&R) Screening – Hayes Item 1

There were not any R&R screenings observed during this site review. However, the physical environment continues to be conducive to the process. SPRFIT meeting minutes from the third quarter of 2023, as well as the first month of the third quarter (July-September) were available for review and they indicate that local audits had found that R&R screenings were conducted appropriately 100% of the time each month. This is the second consecutive review period of sustained compliance according to local audits.

## Crisis Intervention Team (CIT)

Consistent with the last site review, SATF's LOP 484 *Crisis Intervention Team* discusses the institution's CIT process. It aligns with statewide policy, but is overdue for revision as it was last modified in November 2022 and signed off in December 2022.

During this onsite review, there were not any CIT calls observed. The utilization of CIT services at SATF continues to be inconsistent because of their significant staffing shortages. According to the CIT reporting tool, there were only four full CIT events during the entire third quarter of 2023. The rest of the mental health emergencies during the quarter, seem to have occurred

after hours or at other points in which CIT was not active. Previous assessment of the CIT practices at SATF have determined them to be adequate.

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

OSM expert Lindsay Hayes conducted a site review of SATF on February 7-8, 2022. Table A below describes the CAPs from that visit based on his preliminary report, as well as status as of this site review. Appendix B contains a summary of site-specific progress towards Lindsay Hayes' statewide recommendations.

| Title | Definition of the Problem | December 2023 Update | Status |
|---|---|---|---|
| Intake cells | Upon inspection, all of the new intake cells were full on February 7, but all of the inmates housed in these cells were beyond their initial 72-hour new intake status. There was one new intake inmate confined in a wheelchair who was not housed in either a new intake cell or an ADA compliant cell. In addition, this reviewer was informed that new intake inmates who could not be housed in new intake cells within the STRH unit were transferred to the administrative segregation "overflow" cells located in E-Yard, Building 1. This reviewer subsequently inspected the designated overflow cells in E-1 and found that three new intake inmates were housed in the cells and none of the cells were suicide-resistant. Although the cells had retrofitted ventilation grates, each cell had gaps between the wall and the bunks, horizontal brackets that attached the stools to the walls, and gaps between the desktops and the walls. Finally, this reviewer determined that the STRH unit had a capacity for approximately 200 inmates and housed 105 inmates on February 7. There were 56 empty single cells. The very problematic practice of housing new intake inmates in non-new intake cells, which was also found during this reviewer's previous assessment in January 2019, could have been easily corrected if the ten non-72-hour inmates housed in the STRH's new intake cells were properly | As indicated above, this remains problematic. | **Close as of Q4 review.** |

|  |  |  |  |
|---|---|---|---|
|  | housed in one of the 56 non-occupied single cells. Of note, several inmates in both the STRH and E-1 units complained that they had not received any entertainment devices (i.e., radios or tablets) (pg 198). |  |  |
| MHCB privileges | This reviewer's examination of 114-A forms for all 14 patients in the MHCB unit on February 7 found that none of the patients had documentation of forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/quarantined," or simply "quarantine." The current practice of placing MHCB patients on lockdown status and inappropriately using the term "quarantine" as the rationale for prohibiting all out-of-cell activities (except for showers and IDTT attendance) was very problematic and should be immediately remedied (pg 200-201). | Improvement has been noted. | **Close as of Q4 review.** |
| Safety plans | Although safety plans were required in 49 cases of patients admitted into the MHCB unit for DTS, the review found that safety plans were completed in only 31 percent (15 of 49) of the cases. Safety plans were not completed in 69 percent of the cases because clinicians incorrectly assumed that such plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide. Such a rationale ignores the fact that MHCB patients should be at low acute risk for suicide when they are discharged from an MHCB. This reviewer's examination of the data found problems in untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that several supervisory reviews were occurring well after the IDTT meetings. In addition, the MHCB supervisory review did not identify the very problematic practice identified above in which MHCB clinicians (and perhaps the MHCB | Safety plan quality and the reliable review of safety plans remains of concern. | **Remain open.** |

| | | | |
|---|---|---|---|
| | supervisor) incorrectly assumed that safety plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide (pg 201-202). | | |
| Custody discharge checks | This reviewer was presented with documentation of 141 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July 2021 through December 2021. The review found that only 77 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form, as well as discharges occurring on the weekends without a face-to-face assessment by a clinician. The majority of custody checks were recommended for 48 hours. In addition, only 78 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals (pg 202). | For eight consecutive months, and for the second consecutive audit cycle, compliance has been sustained. | **Close as of Q4 review.** |

**Preliminary findings from the most recent Lindsay Hayes site review:**

Below is a summary of the progress on the preliminary findings from Mr. Hayes' most recent review on June 29th and 30th, 2023.

| Concern | Status |
|---|---|
| Poor quality safety plans and safety plans that were not complete. | This is already an active CAP that will remain open. |
| Poor PT rounds | Deficiencies were not noted. |
| Safety plans not being reviewed by the MHCB supervisor. | This is already an active CAP. Improvement has not been made. |
| MHCB IDTTs in which mental health leadership who does not normally attend, attended. | This will likely rise to the level of a CAP, however the institution has stabilized staffing so that this is no longer problematic. |

| | |
|---|---|
| Inappropriate placement of patients into alternative housing upon their return from PIP or MHCB. | This practice has reportedly been discontinued. |
| Patients not being seen regularly in the MHCB. | This is likely the result of staffing shortages but will likely rise to the level of a CAP. |
| RNs not attending CIT. | CIT LOP reflects this requirement but is expired and this will result in its own CAP. CIT was not active during this review. |
| Privileges not being reliably offered in the MHCB. | This is already an active CAP that will be closed as of this review. |
| Non-compliance with training. | This was remain open |

## Assignment of Corrective Action Plans (CAPs) and Recommendations (See summary on Appendix B).

An exit meeting was conducted with the backup SPRFIT coordinator, Chief of Mental Health, the Warden, the Chief Deputy Warden, the Chief Nursing Executive, and Healthcare Captain. During the exit, staff were informed this memorandum will be submitted to the Statewide SPRFIT committee for oversight purposes. The following is a summary of CAPs that remain open from prior reviews and their current status.

| CAP | December 2023 Update | Status |
|---|---|---|
| The institution consistently fails to meet full compliance with intake cell policy at STRH. | Improvement was noted during this site review. | **Close as of Q4 review.** |
| Measurable treatment goals and interventions are absent from the treatment plans for patients enrolled in the SRMP program. | Improvement is not noted since the last site review. | **Remain open.** |
| Patients in the MHCB are not being reliably offered privileges. | Improvement has been noted. | **Close as of Q4 review.** |
| ASU pre-placement screenings not being discussed in SPRFIT subcommittee per the measurement plan. | Improvement has not been made. | **Remain open.** |
| Inadequate presence, and quality, of notes justifying observation and limited issue in the MHCB. | This remains problematic. It is anticipated that forthcoming staffing changes in the MHCB will lead to improvement. | **Remain open.** |
| Poor compliance with trainings (safety planning, SRE mentoring, and 7-hour SRASHE core competency. | A CAP was created but compliance remains poor. | **Remain open.** |

Below are concerns that did not rise to the level of a CAP from prior reviews, as well as updates and status:

| Concern | December 2023 Update | Status |
|---------|---------------------|--------|
| It is recommended that the SPRFIT coordinator attend IFC and IAC every six months and that a qualitative discussion of the meeting be presented in the SPRFIT minutes the following month. | Not resolved, but will be remain in deferred status for one more review period in light of staffing shortages and greater priorities. | **Deferred.** |

Below is the new Corrective Action Plan (CAP) that has been generated as a result of this review.

| Concern | Corrective Action Plan |
|---------|------------------------|
| Update expired LOPs (for example CIT and alternative housing). | Discuss these LOPs, and modify them if possible, at the first SPRFIT subcommittee meeting following receipt of this report. |

Please ensure the CAPs are updated on the project pipeline and that the project pipeline is uploaded to the SharePoint site Suicide Prevention and Response - SATF - All Documents (sharepoint.com) monthly following the SPRFIT subcommittee meeting.

**Appendices**

**APPENDIX A** – Status of deficiencies as noted in the Fifth Re-Audit and Update of Suicide Prevention Practices in the prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs written by Lindsay M. Hayes dated October 24, 2022

| | Summary of problem identified by Lindsey Hayes in 2021 | Progress | Follow-up status |
|---|---|---|---|
| 1 | Intake cells not used according to policy | Moderate | **Close as of this review.** |
| 2 | MHCB privileges | Substantial | **Close as of this review.** |
| 3 | Safety plans | Minimal | **Remain open** |
| 4 | Discharge custody checks | Substantial | **Close as of this review.** |

# MEMORANDUM

**APPENDIX B–** Summary of previous CAPs assigned in prior SPRFIT site reviews.

| | Summary of concern | Progress | Follow up status |
|---|---|---|---|
| 1 | Intake cell compliance | Minimal | **Close as of this review.** |
| 2 | SRMP treatment plans | Moderate | **Remain open.** |
| 3 | MHCB privileges | Minimal | **Close as of this review.** |

Appendix C: SATF's status regarding compliance with outstanding Recommendations in Lindsay Hayes' October 2022 Report

| Aspect of Recommendation that Remains Outstanding | SATF'S status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No.8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% |
| No. 10: Auditing SRE quality | Non-compliant | Audits are not being done quarterly. |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Partially compliant. | Non-compliance is typically the result of exhausted compactions. |
| No. 17: Completing safety plans, supervisory audit of safety plans | Partially compliant | Safety plans are being competed, supervisory reviews are not. |
| No. 18: Safety planning training | Non-compliant | Training has begun but remains out of compliance. |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge custody check sheet" | Compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge custody check sheet." | Compliant | |
| No. 31: Achieving quorum for SPFRIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening. | Partially compliant | Privileges are now being reliably offered, CQIT is a |

| | | statewide issue, and SATF does not have a Reception Center |
|---|---|---|