1   ROB BONTA, SBN 202668
Attorney General of California
2   MONICA N. ANDERSON, SBN 182970
DAMON MCCLAIN, SBN 209508
3   Supervising Deputy Attorney General
ELISE OWENS THORN, SBN 145931
4   NAMRATA KOTWANI, SBN 308741
Deputy Attorneys General
5   1300 I Street, Suite 125
P.O. Box 944255
6   Sacramento, CA 94244-2550
Telephone: (916) 210-7318
7   Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
8   Attorneys for Defendants

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
  1676 N. CALIFORNIA BLVD., SUITE 620
  WALNUT CREEK, CALIFORNIA 94596
  TELEPHONE: 925-746-8460
  FACSIMILE: 925-746-8490
Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br>      Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al. <br><br>      Defendants. | Case No. 2:90-CV-00520- KJM-DB <br><br> **DECLARATION OF JOSEPH H. OBEGI IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON HIS EXPERT'S SIXTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION** <br><br> Judge:    Hon. Kimberly J. Mueller |

I, Joseph H. Obegi, PsyD., declare as follows:

1.     I am a Senior Psychologist Specialist at the California Department of Corrections and Rehabilitation ("CDCR") and Regional SPRFIT Coordinator for Region 1 of the Statewide Suicide Prevention Unit. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2.      I am familiar with the Coleman Class Action, the existing Program Guide policies, and CDCR's efforts to develop and maintain a durable suicide prevention program in connection with court-ordered remediation in this matter. The Special Master's expert in suicide prevention practices, Lindsay Hayes, has conducted several audits of the suicide prevention practices in CDCR prisons.

3.      In my role as the SPRFIT Coordinator for Region 1 at CDCR, I conduct on-site audits of Region 1 institutions to evaluate compliance with statewide suicide prevention and response policies. I have conducted on-site audits of the following institutions: High Desert State Prison (HDSP), California State Prison, Sacramento (SAC), San Quentin State Prison (SQSP), Mule Creek State Prison (MCSP), Pelican Bay State Prison (PBSP), California State Prison, Solano (SOL), Folsom State Prison (FSP), and California Medical Facility (CMF).

4.      These on-site audits are conducted using a standardized audit tool that contains all of Mr. Hayes's nineteen Suicide Prevention Audit Checklist measures. Following on-site suicide prevention audits at CDCR institutions, I prepare and submit reports to the SPRFIT Committee that include data from all nineteen items on Mr. Hayes's Suicide Prevention Audit Checklist.

5.      On February 27 and 28, 2023, I conducted an on-site audit of SQSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit A** is a true and correct copy of the March 15, 2023 report that summarizes all findings from this on-site audit.

6.      From March 14 through 17, 2023, I conducted an on-site audit of SAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit B** is a true and correct copy of the March 29, 2023 report that summarizes all findings from this on-site audit.

7.      From August 1 through 3, 2023, I conducted an on-site audit of SAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit C** is a true and correct copy of the September 1, 2023 report that summarizes all findings from this on-site audit.

DECLARATION OF JOSEPH H. OBEGI ISO DEFENDANTS' OBJECTIONS TO REPORT ON SIXTH RE-AUDIT

8.   On August 9, 2023, I conducted an on-site audit of HDSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit D** is a true and correct copy of the August 22, 2023 report that summarizes all findings from this on-site audit.

9.   On October 11 and 12, 2023, I conducted an on-site audit of SQSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit E** is a true and correct copy of the December 4, 2023 report that summarizes all findings from this on-site audit.

10.   On October 18 and 19, 2023, I conducted an on-site audit of SAC's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit F** is a true and correct copy of the November 28, 2023 report that summarizes all findings from this on-site audit.

11.   On December 12, 2023, I conducted an on-site audit of MCSP's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit G** is a true and correct copy of the December 22, 2023 report that summarizes all findings from this on-site audit.

12.   From December 19 through 21, 2023, I conducted an on-site audit of CMF-PIP and CMF's compliance with statewide suicide prevention and response policies. Attached hereto as **Exhibit H** is a true and correct copy of the January 22, 2024 report that summarizes all findings from this on-site audit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of March, 2024 at Davis, California.



_____
JOSEPH H. OBEGI

DECLARATION OF JOSEPH H. OBEGI ISO DEFENDANTS' OBJECTIONS TO REPORT ON SIXTH RE-AUDIT

# Exhibit A

 

**CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 03/15/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD<br>Sr. Psychologist Specialist<br>Suicide Prevention Unit, Region 1 |
| **Subject:** | SAN QUENTIN STATE PRISON (SQSP) SUICIDE PREVENTION TOUR-ROUND 5, February 2023 |

On February 27th and 28th of 2023, I conducted an on-site review of SQSP's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, this audit covered the period October 2022 through January 2023.

**Institutional Updates**

**Decentralization of the Condemned Population**
SQSP has been notified that the remainder of the condemned population will be decentralized next year. When decentralization first began, SQSP formed the Condemned Inmate Transfer Taskforce, which meets biweekly. Its purpose is to develop plans to mitigate suicide risk and support residents. In anticipation of further decentralization, SQSP has taken these steps:

- With the approval Inpatient Referral Unit (IRU), SQSP will reserve four PIP beds in anticipation of an increase in referrals
- Stratified suicide risk for each condemned resident
- At CDCR's 2022 Suicide Summit, presented on the unique needs of condemned inmates to educate executives and managers statewide

Anytime the department releases new information about decentralization, SQSP takes these steps:

- Conducts sweeps of all condemned residents

- Screens residents for adjustment problems at all mental health and medical appointments
- Provides staff-wide education about the newly released information
- Conducts outreach with the East Block Advisory Committee (an inmate-led committee that represents condemned residents)
- As indicated, provides additional treatment contacts and refers to a higher level of care

Finally, in anticipation of the transfer, SQP recently began advocating to have all condemned inmates screened for the Developmental Disability Program.

**Restricted Housing**

*Second Watch Morning Meeting*
Staff held the meeting on unit, and a sergeant and social worker were present. The meeting covered topics such as new arrivals, patients in the Suicide Risk Management Program (SRMP), and patients of concern. Meeting attendance was recorded in the unit log and on the Mental Health Huddle Report.

*Intake Cells*
The cells in Carson (SQSP's ASU) are single-occupancy, 30 of which are retrofitted intake cells (cells 108-122 and 201-215). SQSP reported that there was not an instance in which they approached full occupancy of their retrofitted intake cells. I previously inspected all intake cells. All were retrofitted in compliance with the statewide policy, and all were marked by a green sign stating "INTAKE CELL."

Six retrofitted intake cells were being inappropriately used as storage rooms because, the ASU sergeant reported, the unit did not have sufficient space to store inmates' property. I reported this use to the Regional Lieutenants of Mental Health Compliance Team.

There were two inmates in intake cells during the site visit and both were within the 72-hour period. In my last visit, an ASU officer stated there was no system for ensuring inmates were promptly moved at



*Figure 1: Clipboard for Tracking When to Move Inmates Out of Retrofitted Intake Cells*

the 72-hour mark. After the visit, SQSP implemented a clipboard system in which officers logged the inmate's name and CDCR number, the cell number, and the date and time the 72-hour period would conclude. The clipboard was available to all officers by the podium (Figure 1). This is a commendable and innovative solution.

Sixteen inmates were in the 21-day period. All had 21-day placards. (An additional 10 appeared to need placards. However, all were ASU-to-ASU transfers that were outside the 21-day period.)

*Psychiatric Technician (PT) Rounds*
During his November 2021 visit, Lindsay Hayes observed that the PT merely greeted general population (GP) inmates rather than engaging them in conversation. In my visit, and contrary to his finding, I observed the PT, who was not a regular, use appropriate discretion in making conversation. (The case was similar during my previous two visits.) For MHSDS patients, the PT asked all required questions and recorded his observations in real-time using a laptop. For GP inmates, the PT inquired about mental health concerns and sometimes asked about suicidal and homicidal ideation (neither question is required). When inmates were asleep or out of cell, he made a note to return later in his shift. Finally, the Senior PT conducts a monthly audit to verify the quality of rounding. According to monthly SPRFIT minutes, compliance is consistently 100% on this audit.

*Access to Entertainment Appliances*
Twenty-three of the 26 inmates in the 21-day intake period had an entertainment appliance (i.e., a radio or TV; SQSP does not yet have tablets). I relayed the omissions to the ASU sergeant. He explained that these likely occurred because the inmates were ASU-to-ASU transfers, and SQSP does not verify that transfers have an entertainment appliance. The ASU sergeant agreed to train his staff to address this gap moving forward. SQSP does have a laudable practice of recording on the 114-A that a radio was issued.

*Welfare Check Completion (Guard 1)*
I observed one officer complete Guard One checks. The officer deliberately stopped at each cell and looked inside. However, many cells were completely dark and others had cell-fronts that were fully or partially covered. The officer did not use a flashlight or ask for coverings to be removed. I relayed my observations to the ASU sergeant who conducted training the same day. (The sergeant reported the officer was covering and not trained in conducting Guard 1 checks.) I reviewed Guard 1 checks for a 24-hour period on 1-29-2023. Compliance was 100%.

*ASU Pre-Screening (Pre-Placement)*
Per the SPRFIT report, compliance with ASU pre-placement screens during the audit period was variable (75-87%, Ns=30-55). However, SQSP drills down on flagged inmates each month and typically finds that the misses are attributable to report errors (e.g., triggered by internal movement, MHCB returns, or premature SOMS entry). Actual compliance was 100% in December and 97% in November. Revised percentages for October and January were not available. SQSP reported working with staff to mitigate a common source or report errors: SOMS data entry which preceded the time of the screening.

*ASU GP Screens (Post Placement)*
During the audit period, compliance with ASU screens showed an upward trend: 84% in October, 88% in November, 92% in December, and 100% in January (Ns=12-29).

I was unable to observe an ASU GP screening. However, I reviewed the documentation of six GP inmates placed in ASU during January 2023 and confirmed that confidential interviews are sometimes conducted (presumably when the inmate agreed to one).

**Inpatient Units**
All MHCB and PIP cells are located on the 4th floor of the Central Health Services Building (CHSB). There are 40 beds. At the time of the visit, the MHCB census was zero, and the PIP census was 31 (Acute = 11, ICF=20).

*Suicide-Resistant Cells*
I previously surveyed all MHCB and PIP cells in April 2021. All met CDCR's specifications for suicide-resistant cells. There have been no modifications since my last visit.

*Interdisciplinary Treatment Team (IDTT)*
I observed four IDTTs. All required team members were present and active participants. The CCI was present via speakerphone. In two IDTTs, the admitting reason was DTS. In these meetings, the team reviewed the safety plan and reviewed orders for observation and issue. In one case (AP7714), the patient was experiencing an increase in the frequency of suicidal ideation but was not experiencing urges to die and denied intent or making plans. After discussion, the team, appropriately in my view, elected to increase the observation frequency from q60 to q30 with no change in issue or privileges. The treatment plan adequately documented this decision.

*Quality of Safety Planning*
I reviewed the safety plans of ten discharged MHCB and PIP patients admitted for suicidality. All patients had safety plans completed before discharge. At least some content was individualized, and all content was appropriate.

I also verified whether the supervisory review of safety plans was occurring (CAT audit: MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans). In Quarter 4 2022, only five cases were audited according to CQIT data. However, SQSP maintains an internal record of auditing and reported auditing 12 cases. Moreover, the local SPRFIT committee routinely reports on the number of audits completed. Due to pending revisions in the audit, headquarters recently suspended the audit until October of 2023.

*Suicide Watch and Suicide Precaution*
No patients were on constant observation at the time of my visit. One patient was on suicide precaution, and the remainder were on q60.

Improving the overall timeliness of suicide precaution has been a longstanding focus at SQSP. Rounding was only fair in the past six months: 96% in October, 91% in November, 89% in December, and 91% in January. However, SQSP has a nursing work group dedicated to improving compliance, and their efforts are bearing fruit: February compliance, which is outside the monitoring period, was 97% and just above the statewide average of 96%. According to lead of this workgroup, improvement was the result of several factors: improvement in the report's accuracy, training staff to use the handoff option following the transition from alternative housing to an outside MHCB, ensuring that q30 orders are not labeled "precaution" (which the report perceives as actual suicide precaution), and real time auditing and feedback by the Sr. Psychiatric Technician.

The measure for staggering was released just before the site visit. Compliance was generally good: 91% in October, 96% in November, 94% in December, and 96% in January. Examining some months in more depth, I identified multiple staff who did not stagger rounds for several hours and reported these to the local CNE. I did not ask for SQSP to complete corrective training because the rule is new, and I expect that a statewide announcement is forthcoming.

During my visit, I did not have an opportunity to verify that the rounder walked the unit with a laptop and rolling cart and documented in real-time.

*Observation and Issue Orders*
CHSB staff posted printed issue orders on each patient's door. Because the PIP houses patients long-term, patients are routinely not on suicide watch or precaution for extended periods. In my visit, all but one PIP patient had a standing order for q60. (The PIP uses communication orders to document q60, which are reprinted and reposted monthly.) Similarly, most PIP patients are ordered full issue for much of their stay. In these cases, the PIP reprints and reports issue orders monthly.

The single PIP patient on suicide precaution had daily orders for observation and issue as required by the memorandum on suicide prevention in the PIP (1-6-2021). All patients possessed all ordered items.

I reviewed the charts of four patients who had orders for suicide watch or precaution at some point in their stay to verify whether progress notes justified those orders. In three cases, progress notes did not justify the orders for suicide watch or precaution nor did they justify discontinuing such orders. In the fourth case, justifications were absent in some notes while other notes had clear, concise, and well-reasoned justifications.

I also reviewed the four cases for terms that could cause confusion when used to described suicide watch or precaution (e.g., "stags," "enhanced observation"). I found only one instance in which a provider referred to suicide precaution as "routine checks." Thus, the use of such terms did not appear to be a systemic problem.

*Privileges*
SQSP uses NCAT for both MHCB and PIP patients. At SQSP, the phone is located in the dayroom. Thus, patients may use the phone while exercising their dayroom privilege.

I reviewed NCAT entries for five PIP patients during a two-week period (1-9 to 1-22). Showers, yard, dayroom, and phone privileges were regularly recorded (offered and refused) each week for each patient, which is an improvement over my last visit. In some cases, yard, dayroom, and phone privileges were offered almost daily. In other cases, these privileges were offered at least multiple times per week. In one case, a patient attended two visits.

*Clinical Discharge Follow Ups*
Compliance in this area was strong: 98% in Quarter 4 (N=188 days) and 100% in January (N=62 days). I audited six patients on follow-ups in January. In all cases, the last day was completed by a mental health clinician. Except in one case, safety plans were not included on any day of the follow-up. I shared this finding with the local CMH who subsequently ensured that the involved clinicians were retrained.

*MHCB Rescissions*
During the audit period, staff rescinded MHCB referrals in 14 cases and completed the required SRASHE in each case.

*Other Inpatient Issues*
In my last visit, I found that nursing staff occasionally documented the use of contracts for safety. To ascertain whether contracts were still in use, I searched the charts of ten patients for

instances of "contract" using the global search feature in EHRS. I found only one instance, in October, in which a nurse used a verbal contract for safety. Since October, CDCR nursing released a memorandum (dated 1-23-2023) prohibiting the use of contracts for safety. I could not verify whether SQSP completed the CAP of revising the local nursing curriculum to prohibit use of safety contracts. However, the need for the CAP is obviated by the new nursing memorandum.

**Alternative Housing**
No patients were in alternative housing at the time of my site visit. Staff referred 78 patients to the MHCB in the past three months. All patients were admitted within 24 hours (average 9.3 hours).

The local policy on alternative housing specifies a prioritized list of locations: CTC licensed medical beds (Rooms 29-34), large holding cells within the CHSB, and TTA. In practice, the large holding cells are dedicated to alternative housing and used exclusively. Patients are supplied with a stack-a-bunk. Staff confirmed that a supply of stack-a-bunks and their fitted mattresses were available (six in a nearby storage closet and one in an alternative housing cell).

**Suicide Risk Management Program (SRMP)**
At the time of the site review, 23 patients were enrolled in SRMP, and seven patients were eligible for SRMP but not yet enrolled. All patients not yet enrolled are in the process of being scheduled for IDTT. SQSP reported a new process for monitoring patients who newly qualify for SRMP and for scheduling their IDTTs. The responsibility for monitoring has been assigned to a supervisor who monitors the SRMP reports and, via email, sends lists to clinicians of patients who are eligible but not yet enrolled.

In my last visit, I found that in five cases clinicians erroneously marked "Not applicable" on the SRMP tab of the Master Treatment Plan when, in fact, the patient met the criteria for SRMP. This pattern continues to be evident. I reviewed the SRMP section of the Master Treatment Plan for ten patients. Five were listed as "Not applicable," but there was no indication that the clinician had intended to remove the patient from SRMP. Four cases had goals and interventions. The last case was of patient currently in an inpatient setting (so the SRMP policy did not apply).

**Custody Inpatient Discharge Follow-ups**
During the audit period, compliance was good: 96% in October, 97% in November, 91% in December, and 90% in January. That said, 5 packets were either lost or missing page 2. Local staff had identified this issue prior to my visit. They reported that turnover among custody

managers likely led to the problem. Nevertheless, the new healthcare captain has been assigned the task of examining the chain of custody for 7497 forms.

**Institutional SPRFIT Committee**
SQSP holds one joint SPRFIT meeting that includes the PIP.

I virtually attended a local SPRFIT subcommittee meeting in September 2022 and reviewed the recording of the February 2023 meeting. The conversation in each meeting was robust. System surveillance was conducted—using automated, nonautomated measures, and the SPRFIT report—and areas of weakness were identified. The committee reviewed quality audits of SRASHEs, reported the number of supervisory reviews of safety plans, and reviewed the status of CAPs generated by regional and Lindsay Hayes visits.

I reviewed the minutes for the meetings in September through December. A quorum was achieved all meetings.[1] The quality of the minutes varied with respect to recording the committee's discussion. For example, December minutes omitted discussion sections. SPRFIT minutes were consistently uploaded to the SPRFIT website. As of the February meeting, there were no improvement projects. However, there was an ongoing workgroup dedicated to improvement compliance with suicide watch and suicide precaution rounds. A project pipeline was maintained.

*Policies*
In Lindsay Hayes' October 2022 report, he reported that (1) SQSP's suicide prevention policy did not include components from the memorandum "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" dated 2-2-2018 and (2) SQSP did not have a policy consistent with the memorandum on bad news

| Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| *Statewide Memorandum (Date)* | *In Local Policy?* |
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (Vol. 24, Ch. 26) |
| Bad News (4-28-2021) | Yes (Vol. 24, Ch. 11) |
| Discharge custody checks (revised 10-10-2021) | Yes (Vol. 24, Ch. 29) |
| MHCB Patient Identifier (12-03-2022) | No |
| SRMP (7-12-2021) | Yes (Vol. 24, Ch. 54) |
| SRE Mentoring (revised 7-12-2022) | Yes (Vol. 19, Ch. 4) |
| Cut-Down Kit (revised 8-10-2022) | Yes (OP 0-1136) |
| Safety Concerns (revised 9-21-2022) | Yes (Vol. 19, Ch. 4) |
| Security Welfare Checks (revised 10-7-2022) | Yes (OP 0-1100) |
| Safety Planning (2-13-2023) | In process |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | In process |
| Note: "In process" indicates that the memorandums are sufficiently new that it is premature to expect compliance. | |

---

[1] I also verified that quorum was achieved for six consecutive months (July through December) as required by the CAP listed in Appendix A.

dated 4-28-2021. Since then, SQSP has addressed these omissions. In addition, I also reviewed local policies to verify that all recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1.

*Severe Self-Harm*
Per the SPRFIT report, the 6-month rate for self-harm incidents at SQSP was .5 per 1000, which was far below the statewide average of 4.5. For the PIP, the rate was 54.7 (N=11), which is higher than the statewide average but the lowest of all PIPs. (In larger PIPs, rate varied from 139 to 171 per 1000.) There were no serious suicide attempts during the audit period.

*Inmate Family Council*
The local SPRFIT coordinator last attended IFC on 9-16-2022 and 1-20-2023. The date of attendance was not recorded in the minutes of the SPRFIT meeting.

*Inmate Advisory Council*
The local SPRFIT coordinator last attended IAC 2-2-2023. The date of attendance was not recorded in the minutes of the SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Per the Performance Report for Quarter 4, overall compliance with the timelines for completing SRASHEs was fair overall (92%, N=224) but variable: 89% in October, 97% in November, and 90% in December. (January was 90%, N=88). Compliance during the quarter with specific SRASHE timelines for the mainline and the MHCB is as follows:

- Emergent consults for DTS: 100% (N=45)
- Urgent consults for DTS: n/a
- At MHCB clinical discharge: 100% (N=8)
- Upon MHCB referral: 98% (N=52)
- Upon arrival from a PIP: 80% (N=5)
- 90-day assessments after rescinded MHCB referral: 86% (N=29)
- 90-day assessments post-MHCB discharge: 87% (N=84)

Because compliance with the 90-day assessments was low, I examined the missed cases. In about two-thirds of the cases, clinicians saw patients after the due date. In the remaining third, clinicians signed the SRASHE days to weeks after the clinical contact. Because the latter was not consistent usual document requirements, I communicated my findings to the CMH.

For the same period in the PIP, compliance with SRASHE timelines appeared low:

- Upon admission to PIP: 93% (N=15)
- Prior to clinical discharge from PIP: 50% (N=12)

However, SQSP staff reported, and I confirmed, that the low percentage for discharge was due to report errors. (The report often misidentified the discharge date.) Recalculating compliance, I found that all SRASHEs were completed the day of or the day before clinical discharge.

*Urgent and Emergent Consults for Danger to Self (DTS)*
In Quarter 4, timely contact for urgent and emergent DTS consults occurred 100% (N=11) of the time. SQSP classified all DTS referrals as emergent.

**Emergency Response**

*Cut-Down Kits*
The Mental Health Compliance Team reported 100% compliance as of January 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
There were no suicides at SQSP in 2022 or thus far in 2023. However, SQSP was assigned four QIPs following the suicide of a former patient (BK4376) at CMF-PIP. The QIPs were:

1. The frequency of contacts did not follow the treatment plan
2. Nursing documentation of suicide watch was often not entered timely.
3. Nursing documentation of suicide precaution often not entered timely.
4. Nursing documentation on the patient when he was out-to-court.

All QIPs were subsequently completed by SQSP and then approved by the Suicide Prevention Unit on 1-27-2023. I attempted to verify whether SQSP's QIPs appeared durably implemented. For first QIP, I reviewed two charts of current PIP patients (F83930, P84696). In February, both had planned treatment that included weekly contact with a psychiatrist, psychologist, social work, and a recreational therapist. In the first case, I found no gross discrepancies between treatment planned and treatment delivered. In the second case, no social work contact occurred for three weeks, and no psychologist contacts for two.

To assess the second and third QIP, I relied on the SPRFIT report. In February, suicide watch compliance was 99% and suicide precaution compliance was 97%.

I am unable to assess the fourth QIP. I know of no method to identify PIP patients who have left temporarily for court.

**Training and Mentoring Compliance**

Compliance with Annual IST Suicide Prevention Training for 2022 was fair. Overall compliance was 91%. Compliance for custody was 91%, nursing staff was 90%, and mental health staff was 92%. In response to this borderline level of compliance, SQSP has moved to "hard" scheduling (assigning staff, in advance, to particular weeks).

Compliance with long-standing training requirements is good, except for SRE mentoring. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for SQSP as of January 2022:

- Suicide Prevention and SRASHE Core Competency Building: 93%
- SRE Mentoring: 62%
- Safety Planning Intervention: 100%
- Suicide Risk Management Program (SRMP): 93%
- C-SSRS: 84%
- Nursing CPR: 99%
- Custody CPR: 100%

Similarly, compliance was generally good for staff in the PIP apart from SRE mentoring:

- Suicide Prevention and SRASHE Core Competency Building: 100%
- SRE Mentoring: 80%
- Safety Planning Intervention: 100%
- Suicide Risk Management Program (SRMP): 100%
- C-SSRS: 88%

SQSP reported that SRE mentoring was low in both programs for several reasons: the staffing shortage in EOP makes staff less available for mentoring, the training coordinator recently departed state service, and the time necessary to mentor three separate suicide risk assessments is challenging.

**Receiving and Release (R&R) Screening**

I observed three R&R screenings, each by a different nurse. All screenings were conducted confidentially (with the door closed). In two screenings, the nurses asked all questions accurately. In the third, the nurse asked about current suicidal ideation but not past. (Of note, local auditing indicates 100% compliance, which may indicate a misunderstanding of the audit items.) In my last visit, I noted that printed version of the suicide prevention posters were posted rather than the full-size laminated versions. This has since been corrected.

**Reception Center Processing**
SQSP is not a reception center.

**Crisis Intervention Team (CIT)**
As I noted in my last report, CIT is not active at SQSP because it has been difficult to recruit for this position. (SQSP has a high-risk team that responds to calls during the week and business hours.)

**Active Corrective Action Plans (CAPS)**
CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial," except for suicide precaution rounds, indicate that the CAP has been preliminarily met, with sustainability to be assessed at the next site visit.

Appendix A summarizes SQSP's status with respect to the PIP-specific CAPs that Lindsay Hayes listed in his October 2022 report. Appendix B summarizes SQSP's status with respect to each outstanding

| Table 2. Status of Open CAPs | | |
|---|---|---|
| *Source/Date* | *Problem* | *Progress* |
| Hayes Nov 2019 | 1) Timeliness of suicide precaution rounds | Substantial |
| Hayes Oct 2022 | 2) PT ignored GP inmates in ASU | Completed |
| Hayes Oct 2022 | 3) No SPRFIT LOP consistent with statewide policy | Completed |
| Hayes Oct 2022 | 4) Quorum at SPRFIT not consistently achieved. | Completed |
| Hayes Oct 2022 | 5) No LOP address bad news | Completed |
| Regional Jul 2021 | 6) Yard and phone use were not consistently entered into NCAT for yard and phone use, including refusals for both activities | Substantial |
| Regional Oct 2022 | 7) Revise the local nursing curriculum so that it prohibits the use of contracting for safety | Closed (due to new statewide memorandum) |
| Regional Oct 2022 | 8) For patients who meet SRMP criteria, regularly audit Master Treatment Plans to ensure that these patients are, in fact, included in SRMP (unless there is a clear and documented contraindication) | None |

statewide recommendation that Lindsay Hayes listed in Table 1 of his report. Taken together, the CAPs listed in the Appendices are ones that have already been assigned (Table 2) or do not apply to SQSP. Some were assigned soon after Lindsay Hayes' exit in November 2021, and others were identified in previous regional visits. Finally, all applicable CAPs in the Appendices are in compliance as of this visit, save one: Compliance with the Annual Suicide Prevention training. To address this item, SQSP independently moved to hard scheduling earlier this year.

---

### CONCLUSION

---

I held an exit meeting was held with the Warden, Chief of Mental Health, Chief Psychiatrist, CEO, the Chief Nursing Executive, the SPRFIT coordinator, and other key executives and managers. I presented preliminary findings.

As a result of this review, and in consultation with regional representatives from custody and nursing as appropriate, the following CAPs are assigned:

1)  In ASU, distribute loaner radios to ASU-ASU transfers who have no other entertainment appliances
2)  Create a plan to ensure the chain of custody for 7497 forms
3)  Create a plan to achieve 100% compliance with SRE Mentoring
4)  Create plan to ensure that an order for suicide watch or precaution is accompanied by a progress note that clearly justifies the need for the order or for discontinuing the order

As a result of this review, the following actions are recommended to SQSP:

1)  Train staff to omit terms from progress notes and orders for suicide watch or precaution that could cause confusion (e.g., "routine checks", "stags", "mental health observation", "Q-11", "behavioral suicide watch", and "enhanced observation")
2)  Continue the nursing workgroup tasked with improving compliance with suicide precaution rounds
3)  Record attendance to IAC and IFC meetings in SRFIT minutes
4)  In SPRFIT minutes, include a brief summary of the discussions held on each agenda item
5)  Update local policy to incorporate statewide memorandums (see Table 1 for details)
6)  Revise the local procedure for scheduling 90-day SRASHEs to include a larger buffer
7)  Continue implementing the plan to hard schedule staff for Annual Suicide Prevention training in IST
8)  Retrain all R&R nurses to ask all screening questions accurately
9)  Review the local R&R audit with auditors to ensure they understand the item content

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B

**Appendix A: SQSP's Status Regarding PIP-Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | SQSP's Status | Comment |
|---|---|---|
| Develop a CAP to ensure uniformity during the nursing intake screening process to include adequate mental health and suicide risk questions. | N/A | A statewide solution is necessary |
| Develop a CAP to ensure that SRASHEs are always completed consistent with the requirements of the PIP suicide prevention policy | Compliant | Part of standardized local monitoring |
| Develop CAPs at both CMF-PIP and SVSP-PIP to ensure that all cells designated to house suicidal patients are suicide-resistant. | N/A | |
| Develop a CAP to ensure that only Suicide Precaution and Suicide Watch statuses are permitted for the observation for suicidal patients, and that terms such "stags," "mental health observation," "Q-11," "behavioral suicide watch," and "enhanced observation" are prohibited to be used in provider orders and progress notes. | Compliant | No evidence of systematic problems |
| Develop a CAP to ensure that regular nursing rounds conducted at 15-minute intervals (meant for non-suicidal patients) should never be utilized as a substitute for Suicide Precaution status. | N/A | SQSP does not use "call light" or "safety rounds" |
| Develop CAPs at both SVSP-PIP and CIW-PIP to ensure patients on suicide observation status are always assessed on a daily basis, and that orders for discharge from Suicide Watch and Suicide Precaution at SVSP-PIP are only completed following an assessment by a provider. | N/A | |
| Develop CAPs at CMF-PIP, CHCF-PIP, SVSP-PIP, and SQ-PIP to ensure that all patients on suicide observation status are always adequately observed. | Compliant | Part of standardized local monitoring |
| Develop CAPs at CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP to ensure that all provider orders regarding clothing and possessions are clinically justified in medical charts, and that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions. | Compliant | |
| Develop a CAP for all PIPs to ensure that suicidal patients have access to out-of-cell activities that are clinically justified, including those on maximum-security status. | Compliant | |
| Develop a CAP to improve the reliability of data generated from the Mental Health NCAT (Non-Clinical Activity Tracking) database regarding out-of-cell activities. | Compliant | |
| Develop a CAP in improve the consistency of IDTT meetings for suicidal patients | Compliant | |

(continued on next page)

(continued)

| | | |
|---|---|---|
| Develop a CAP to improve the adequacy of safety planning and enforce the requirement for supervisory review of a safety plan prior to, or during the IDTT in which the discharging SRASHE is completed. In addition, both CAPs should include clear guidance that a patient's current low acute risk at discharge and/or refusal or lack of cooperation for safety plan development should never be considered reasons for exemption to both safety plan development and supervisory review. | Compliant | |
| Develop a CAP to ensure that "contracting for safety" is not utilized. | Compliant | |
| Develop CAPs to increase custody, medical, and mental health staff compliance for annual suicide prevention training at CMF-PIP and CHCF-PIP. | Non-compliant | SQSP has moved to "hard scheduling" |
| Develop CAPs to increase mental health clinician compliance rates for both SRE mentoring program and seven-hour SRE training at CMF-PIP, CHCF-PIP, and SVSP-PIP. | N/A | |
| Develop a CAP to ensure that SPRFITs at each PIP meet required monthly meetings quorums, and that deficient suicide prevention practices, including those cited in this reviewer's report, are remedied. | Compliant | |

**Appendix B: SQSP's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| Aspect of Recommendation that Remains Outstanding | SQSP's Status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS) | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audits of safety plans | Compliant | Compliant with safety plan completion; compliant with safety plan audits |
| No. 18: Safety planning training | Partially compliant | Training is underway |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Non-compliant | 90% or better for overall packet but missing packets |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Non-compliant | 90% or better for overall packet but missing packets |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | Compliant | Continuous Quality Improvement Audit is statewide item; SQSP is not a reception center |

Exhibit B

 

**CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 3/29/2024 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD<br>Sr. Psychologist Specialist<br>Suicide Prevention Unit, Region 1 |
| **Subject:** | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) SUICIDE PREVENTION TOUR-ROUND 4, MARCH 2023 |

From March 14th through March 17th of 2023, I conducted an on-site review of SAC's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, this audit covered the period December 2022 through February 2023.

**Institutional Updates**
There are several changes to SAC's mission. The first remains in process: The level IV GP population of B yard—about 270 inmates—was transferred to other institutions last quarter. The new mission of the yard has not been finalized. Second, SAC's minimum facility was closed last quarter.

Finally, mental health staffing is a growing concern. The adjusted vacancy rate is for psychiatrists is 0%, 8% for social workers, and 34% for psychologists. One program medication in place as a result: contacts by primary clinicians in EOP have been reduced to every other week.

Body cams for officers were introduced at SAC in January. Since then, the rate of consults for suicidality has increased dramatically, swelling form 77 per 1,000 inmates in November 2022 to 248 per 1,000 inmates in February 2023 or about 13 consults per day. (Complaints of chest pain have also risen to about 5 per day.) Staff report that many consults appear to be attempts by residents to "catch" officers being unresponsive to suicidal concerns. To gauge whether this trend reflects increasing suicide risk at SAC, I looked at other emerging indicators of risk. Although admissions to inpatient units increased—an expected result given that consults for suicidality are increasing, no other worrisome trends appeared.

**Restricted Housing**
SAC has three segregated units: ASU EOP, STRH, and PSU.

*Second Watch Morning Meeting*
SAC holds morning meetings in ASU EOP and STRH. Staff use the huddle report to record attendance. I attended meetings in both units. All required members were present, and members discussed all required topics (e.g., new arrivals, patients of concern).

Because I noted problems with sergeant attendance at ASU EOP's morning meeting during my last visit, I reviewed one week of attendance records. The sergeant attended all days. I also reviewed sergeant attendance at the STRH morning meeting over a one-week period. The sergeant attended all but one day. (In addition, the clinician did not sign on two days, but she was the designated notetaker. So, the omissions of a clinician's signature appear to be an oversight.)

*Intake Cells*
SAC has 15 retrofitted cells in its ASU EOP unit (building A5, B section; cells 105-109, 114-121, 217-218) and eight retrofitted cells in its STRH unit ("stand-alone" building; cells 100-107). In his last visit, Lindsay Hayes noted that all cells were suicide-resistant.

In the ASU EOP unit, all 15 intake cells had "INTAKE CELL" stenciled above their doors. In addition, all inmates had a placard noting their 72-hour start and end dates as well the 21-day end date (Figure 1). The placards included the date of arrival, the 72-hour date, and the 21-day date. Two of the five inmates housed in intake cells were past the 72-hour mark. The ASU sergeant reported that the absence of available cells prevented timely rehousing. There were a number of inmates in the 21-day intake period. Their cells were labeled with a



*Figure 1: Example of a Placard in ASU EOP*

magnetic placard stating "21-DAY INTAKE" (Figure 2).  However, these placards were often not affixed accurately (i.e., placed on cells when the inmate was beyond the 21-day period). (As a result of this finding, SAC temporarily removed all magnetic placards until a reliable system is designed. Notably, STRH relies solely on printed placards.)

In STRH, all eight intake cells also had "INTAKE CELL" stenciled above their doors. No inmates were housed in intake cells.



*Figure 2: Inaccurately Applied Magnetic Placards*

During my last visit, STRH had nearly completed the transition to the superior printed placards used in ASU EOP. All STRH cells now have this placard.

*Psychiatric Technician (PT) Rounds*
I observed three different PTs, one in each segregation unit. In ASU EOP, the PT asked about mental health concerns, inquired about suicidal ideation, and documented in real-time. No mental health referrals were indicated. When the PT encountered a covered window, he immediately notified custody. Custody officers responded promptly and, after a great deal of effort, were able to visually confirm the inmate's safety. Similarly, the PT encountered an inmate who hung a curtain around his bunk but did converse with the PT. After completing rounding in the section, the PT reported the covering to the unit officers.

The PT in STRH asked GP inmates about mental health concerns and, for MHSDS patients, inquired about SI. He completed documentation in real time. No mental health referrals were warranted.

Similarly, in PSU, the PT asked about mental health concerns, inquired about SI, and charted in real-time. No mental health referrals were warranted.

Finally, the Senior PT conducts a monthly audit to monitor documentation during rounding. According to monthly SPRFIT minutes, compliance was good: 90% in December, 83% in January, and 100% in February.

*Access to Entertainment Appliances*
In the last week of October 2022, SAC received and distributed its first shipment of tablets. Distribution was completed in November.

In ASU EOP, none of 5 inmates in retrofitted intake cells had radios (or tablets) and only two inmates on 21-day intake status had no entertainment appliance. During my visit, these omissions were corrected. Initially, officers reported that their supply of radios was exhausted.



However, upon further investigation, the institution did have a supply of 50 radios. This signals a breakdown in the system for resupplying ASU EOP with radios.

The problem was slightly different in STRH. Four inmates on 21-day intake status did not have an entertainment appliance. I brought this to the attention of the ASU sergeant. In the ensuing conversation, we realized that all of the inmates were ASU-to ASU transfers, and radios were not issued to them upon arrival. In the sergeant's assessment, this was a gap in procedure that she intended to correct.

*Welfare Check Completion (Guard 1)*
In ASU EOP, I observed an officer complete Guard 1 checks. In the case of a completely covered cell window, he convinced the inmate to temporarily remove the covering and obtained a visual. However, in another case, a curtain obscured the view of an inmate, but the officer took no action. Several cells were also pitch dark, but the officer did not use a flashlight. I reported these anomalies to the ASU sergeant who will decide on the appropriate training.

In PSU, I observed Guard high-quality Guard 1 checks. In STRH, the officer completing Guard 1 checks was especially prepared. She walked with a Guard 1 wand in one hand and a lit flashlight in other the other. She used the flashlight frequently.

Overall compliance with Guard 1 checks in February was 90%.

*ASU Pre-Screening (Pre-Placement)*
Per the SPRFIT report, compliance with ASU pre-placement screens during the audit period was fair: 83% in December, 87% in January, and 86% in February (Ns=72-108). These are about the same levels of performance present I noted in my last visit and similar to the statewide average. SAC does not investigate the reasons for late screenings. That said, in February, SAC initiated a performance improvement project on ASU pre-screenings.

I was not able to observe a screening.

*ASU GP Screens (Post Placement)*
During the audit period, compliance with ASU screens was strong: 91% in December and 100% in January and February (Ns=11-17).

I was unable to observe an ASU GP screening. However, confidential spaces were available in ASU-EOP (rooms in the dining hall adjacent to the building.) (ASU GP screens do not occur in STRH or the PSU.)

**Inpatient Units**

SAC has two licensed MHCBs: CTC-1 (13 beds) and CTC-2 (11 beds). At the time of the visit, the MHCB census was 24.

*Suicide-Resistant Cells*

During Lindsay Hayes' last site visit in November 2018, he reported that all cells in CTC-1 and CTC-2 met CDCR's specifications for suicide-resistance. I observed no new changes to the physical plant.

*Interdisciplinary Treatment Team (IDTT)*

I observed four IDTTs. All required team members were present and active participants. In three of the IDTTs, the admitting reason was DTS. In these meetings, the team reviewed the safety plan and reviewed orders for observation and issue. In one IDTT in CTC-2, the team elected to use and discuss safety planning based on the clinical circumstances even though the admitting reason was not danger to self. In another IDTT, a patient (G08783), who was on q30 and full issue, reported an increase in SI. The team spontaneously reviewed the need to change the observation level and issue. They concluded, appropriately in my view, that no change was clinically indicated. A progress note filed later in the day (3-15-2023) contained an adequate justification for the decision.

*Quality of Safety Planning*

I reviewed the safety plans of ten discharged MHCB patients admitted for suicidality. All patients but one had safety plans completed before discharge (90%). In all of the plans, at least some content was individualized, and content was appropriate.

I also verified whether the supervisory review of safety plans was occurring (CAT audit: MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans). In the past six months, SAC audited 83 cases according to CQIT data. On average, 3.7 days passed between the date of the SRASHE and the date audit results were submitted (range: .5-14.6; 49% were entered in 2 days or less). Due to pending revisions in the audit, headquarters recently suspended the audit until October of 2023.

*Suicide Watch and Suicide Precaution*

No patients were on constant observation at the time of my visit.

In my last report, I noted durable improvement in the timeliness of suicide precaution rounds. In the last six months, performance was similarly good: 95% overall (range = 94-97%). The statewide average over the same period was also 96%. SAC stated that the report contained errors that underestimated performance, which I confirmed was likely the case, and has submitted tickets.

HQ Nursing released a new measure for staggering in late February. SAC's compliance was excellent: 99.4% in November, 99.1% in December, 99.7% in January, and 99.3% in February.

During my visit, I verified that rounders in CTC-1 walked the unit with a laptop and rolling cart and documented in real-time.

*Observation and Issue Orders*

MHCB staff posted printed issue orders on each patient's door. Observation and issue were reordered daily as required by the memorandum on state-issued clothing and bedding in the MHCB (10-29-2013 and 3-15-2016). Each patient had an up-to-date observation and issue order posted on their door (Figure 3) per the memorandum on patient identifiers (dated 12-12-2022). This is sustained improvement: During one of my previous visits, staff did not post observation orders.



*Figure 3: Plastic Sleeves in CTC 1 and 2*

Patients in CTC-1 and CTC-2 generally possessed all ordered items and only those items. When I found minor omissions (e.g., missing a pen filler or toothpowder), staff immediately corrected them.

In CTC-2, five patients had an unusual combination of observation and issue orders (AU5369, BK2654, BF2040, G41520, AD3072): They were on suicide precaution but (a) were ordered full issue and (b) sheets were not included in the orders. In addition, documented justifications were not present. The orders for multiple patients in CTC-1 exhibited the same pattern. These variations contradict statewide policy, which states that full issue is reserved for patients no longer on suicide precaution and that full issue includes sheets. Regarding the pattern of not ordering sheets, the local MHCB supervisor explored this finding during my site visit by interviewing her staff. She reported the omission of sheets was an oversight in the ordering process rather than a volitional practice of withholding sheets.

To verify whether progress notes contained justifications for orders, I reviewed the charts of some patients who had orders for suicide watch or precaution at some point in their stay. In two cases (AS3068, BF7926), suicide watch was discontinued but the notes stated: "There is NO marked change in the patient's symptoms or suicide risk that warrants a change in observation status." In another case, suicide watch was discontinued but the note stated, "Continue

observation in MHCB LOC with suicide precautions," and no justification for keeping the patient in a suicide smock was included. Sometimes suicide precaution was discontinued but the corresponding note stated, "continue as Q30 minute checks" (AU5369). On the other hand, some cases did include a justification for discontinuation of suicide watch (AD3072) and suicide precaution (AS3068).

Throughout my review of documentation, I looked for terms that could cause confusion when used to described suicide watch or precaution (e.g., "stags," "enhanced observation"). I found no instances of such terms.

*Privileges*
Clinicians granted all privileges upon admission to the MHCB. SAC has two recreational therapists dedicated to covering CTC-1 and CTC-2. However, as of late, they are sometimes pulled to cover groups due SAC's shortage of psychologists.

Recording phone and yard privileges was an area of weakness in past visits. During this visit, phone privileges (offered and refused) were recorded for all eligible patients in both CTCs. (Nearly all the patients in both CTCs were MAX custody. Because all MAX custody inmates are only allowed one phone call per month, some patients understandably had no phone call privileges recorded.) Both CTCs offered phone privileges Wednesdays and Sundays on 3rd watch. Supervisory signatures on the 114-As were present in CTC-1 but not in CTC-2. This is an improvement. Supervisory signatures were absent in both CTC during my last visit.

Custody does not run unstructured yard in either CTC. Thus, yard is offered exclusively by recreational therapists. Of the seven patients in CTC-1 with more than three a three-day stay, six had been offered yard. Yard in CTC-2 was much less frequent.

*Clinical Discharge Follow Ups*
Compliance in this area was strong: 97% in December 2022, 93% in January, and 96% in December. I audited five patients on follow-ups in January. In all cases, the last day was completed by a mental health clinician and safety plans were included on all days of the follow-up.

*MHCB Rescissions*
During the audit period, staff regularly rescinded MHCB referrals: 10 in December, 28 in January, and 29 in February). This appears an attributable and expectable result of the surge in DTS consults over the audit period. I examined a sample of five rescissions. A SRASHE was completed in all cases.

*Other Inpatient Issues*

I observed no patients wearing a safety smock in addition to other clothing. I did find one patient who possessed a smock but was not ordered one. I requested that an officer remove it.

In prior visits, I noted intermittent difficulties maintaining an adequate supply of laundry in both CTC-1 and CTC-2, as well as distributing laundry on the unit. I found no such problem this visit in either CTC.

During IDTT, I observed that staff did not place MAX custody patients in the therapeutic treatment module. Instead, the patient remained cuffed, sat sideways on a chair, and was flanked by two officers. Staff reported that this was the usual practice. However, while the practice preserves safety, it does not maximize confidentiality.

Finally, beside each cell door there was informational placard posted by custody (Figure 4, above). In my previous visit, the placard included outdated information about the mental health level of care and the level of observation. SAC corrected the problem: The placard no longer includes information about suicide watch or suicide precaution.

**Alternative Housing**

Two patients were in alternative housing at the time of my site visit. Both were assigned observers, and both observers were engaged in direct, constant observation. Staff referred 175 patients to the MHCB in the past three months. Patients were admitted within 24 hours more than 98% of the time.

The local policy on alternative housing specifies a prioritized list of locations. The first locations are CTC beds followed by cells in B-7 (locally referred to as ASHM or "Alternative Housing/ Alternative Safe Housing Management" cells. Currently, cells in B-7 are the most frequently used location.

**Suicide Risk Management Program (SRMP)**

The number of patients enrolled SRMP continues to grow. In November 2021, there were 74 patients enrolled, 112 in May 2022, 166 in November 2022. During this visit, 189 are enrolled. SAC has the largest SRMP population in the state, and it accounts for 21% of the statewide SRMP population.

Four patients met the criteria for SRMP but were not yet enrolled. The staff reported that all are in the process of being scheduled for IDTT.

I reviewed the SRMP section of the Master Treatment Plan for ten patients. Two of ten did not have goals and interventions listed. I forwarded this information to the CMH and requested training.

**Custody Inpatient Discharge Follow-ups**

SAC typically has a high volume of 7497s: 13-24 per month during the audit period. (In the past, the volume has reached 40 in a month.) In my last visit, I noted that improvement 7497 documentation was durable and performance strong. However, there has been an abrupt decline. Overall compliance was 89% in December 2022, 83% in January, and 87% in February. Nearly all weaknesses were on page 2. Even more concerning: About half of the forms (25 of 53) forms were lost. SAC reported that the decline followed turnover within the management of the healthcare access team. (SAC initiated an improvement project. See the next section for details.)

**Institutional SPRFIT Committee**

Because SAC moved to in-person meetings, I was not able to virtually attend a local SPRFIT meeting. During the audit period, minutes were detailed and showed that system surveillance was conducted—using automated, nonautomated measures, and the SPRFIT report. Areas of weakness were identified.

SAC achieved A quorum at all meetings. The committee reviewed self-harm incidents in detail, and it also reviewed SRMP and the quality audits of SRASHEs. Minutes did not include a review of CAPs generated by regional and Lindsay Hayes visits. SPRFIT minutes were consistently uploaded to the SPRFIT website.

As of the February meeting, the committee had three improvement projects: ASU pre-screens completed timely, custody compliance with 7497

| Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| **Statewide Memorandum (Date)** | **In Local Policy?** |
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (OP 025) |
| Bad News (4-28-2021) | Yes (OP 115) |
| Discharge custody checks (revised 10-10-2021) | Yes (OP 115) |
| MHCB Patient Identifier (12-03-2022) | Yes (OP 115) |
| SRMP (7-12-2021) | Yes (OP 115) |
| SRE Mentoring (revised 7-12-2022) | Yes (OP 115) |
| Cut-Down Kit (revised 8-10-2022) | Yes (OP 115) |
| Safety Concerns (revised 9-21-2022) | Yes (OP 321) |
| Security Welfare Checks (revised 10-7-2022) | Yes (Addendum to OP 129) |
| Safety Planning (2-13-2023) | Yes (Addendum to OP 115) |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | In process |
| Note: "In process" indicates that the memorandums are sufficiently new that it is premature to expect compliance. | |

documentation, and visiting eligibility for patients in MHCB. Minutes included a status update on each project.

*Policies*
I completed a detailed review of all policies at SAC related to suicide prevention and forwarded my findings via email on 8-22-2022. SAC reported that all findings were incorporated into the appropriate policies. In addition, I reviewed local policies to verify that all recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1.

*Severe Self-Harm*
Per the SPRFIT report, the 6-month rate for self-harm incidents at SAC was 13.1 per 1,000, which 45% lower than a year ago but three times higher than the statewide average of 4.2. Incidents most often occur among EOP patients (115 of 152), be they on the mainline, ASU or PSU. There were no serious suicide attempts during the audit period. That said, one comprehensive review will be needed as a result of a serious suicide attempt that occurred during the visit (AW1423).

*Inmate Family Council*
The local SPRFIT coordinator last attended IFC on 10-28-2022. The date of attendance was recorded in the minutes of the SPRFIT meeting.

*Inmate Advisory Council*
The local SPRFIT coordinator last attended IAC 10-28-2022. The date of attendance was recorded in the minutes of the SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Due to the surge in DTS consults, SAC has completed more SRASHEs, over and above its usual high volume. For example, SAC completed 787 SRASHEs compared to its typical volume of 400-500 per month. This makes the current high compliance with SRASHE timelines remarkable (96% in the past six months.) Compliance so far this quarter with specific SRASHE timelines for the mainline and the MHCB is as follows:

- Emergent consults for DTS: 97% (N=713)
- Urgent consults for DTS: 50% (N=2)
- At MHCB clinical discharge: 94% (N=103)
- Upon MHCB referral: 99% (N=129)
- Upon arrival from a PIP: 24% (N=92)
- 90-day assessments after rescinded MHCB referral: 99% (N=369)
- 90-day assessments post-MHCB discharge: 95% (N=546)

*Urgent and Emergent Consults for Danger to Self (DTS)*

According to the SPRFIT report, timely contact for urgent and emergent DTS consults appears to be low: 79% over the past six months. However, staff relayed that the report contains errors that underestimated compliance (i.e., the report includes voided and cancelled consult orders). Staff did submit a ticket to have this corrected. (I confirmed that errors in the report are very likely.) SAC classified nearly all DTS referrals as emergent (713 of 715).

**Emergency Response**

*Cut-Down Kits*

The Mental Health Compliance Team reported 100% compliance as of March 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**

The last suicide at SAC occurred in June of 2022 (AS6846). For a review of the resulting QIPs, please refer to my November 2022 report.

**Training and Mentoring Compliance**

Compliance with Annual IST Suicide Prevention Training for 2022 was fair. Overall compliance was 91%. Compliance for custody was 91%, nursing staff was 85%, and mental health staff was 91%. SAC appears to be on track with 2023 training: Twenty-one percent of all staff have been trained so far this year.

Compliance with long-standing training requirements is very good, except for SRE mentoring. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for SAC as of February 2023, unless otherwise noted:

- Suicide Prevention and SRASHE Core Competency Building: 97%
- SRE Mentoring: 92%
- Safety Planning Intervention: 97%
- Suicide Risk Management Program (SRMP): 98%
- C-SSRS: 97%
- Prohibition of safety contracts: 84%
- Nursing CPR: 100%
- Custody CPR: 97% (as of March 2023)

**Receiving and Release (R&R) Screening**

I observed one R&R screening. The screening was conducted confidentially (with the door closed), and the officer was posted outside the door. However, the nurse only asked about 4-5

of the required questions. (Of note, local auditing shows 100% compliance, which may indicate a misunderstanding of the audit items.)

The suicide prevention posters posted on the wall were printed versions rather than the full-size laminated versions. In addition, two posters were placed on the outside of the therapeutic module. From the patient's perspective, only blank side of the posters was visible. (Posters on the wall are sufficient.) No staff spontaneously expressed concern about safety in R&R screenings.

**Reception Center Processing**
SAC is not a reception center.

**Crisis Intervention Team (CIT)**
SAC still operates a CIT seven days a week from 3 PM to 9 PM. The team takes many calls (82 during the audit period) and most pertain to suicidality (96%). Ten calls (12%) resulted in a referral to an MHCB.

I observed one CIT activation. All required members were present. No MHCB admission was indicated. A SRASHE as completed.

**Active Corrective Action Plans (CAPS)**
CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial," except for suicide precaution rounds, indicate that the CAP has been preliminarily met, with sustainability to be assessed at the next site visit.

Appendix A summarizes SAC's status regarding the CAPs that

| Table 2. Status of Open CAPs | | |
|---|---|---|
| *Source/Date* | *Problem* | *Progress* |
| Regional Jun 2022 | 1) Create a plan to ensure daily attendance by the program sergeant at the morning meeting in ASU EOP | Completed |
| Regional Jun 2022 | 2) Create a plan to ensure custody's attendance to Annual Suicide Prevention Training is 90% or greater, and submit the plan to the Region 1 Mental Health Compliance Team | Completed |
| Regional Jun 2022 | 3) Retrain CTC officers to record the offering and refusal of phone privileges to MHCB patients and periodically audit compliance | Completed |
| Regional Jun 2022 | 4) Revise the local policy on suicide prevention to correct inaccuracies and omissions | Completed |
| Regional Oct 2022 | 5) Investigate the reasons for low compliance with ASU pre-screens and ASU GP screens and take the indicated action | In progress |
| | | |

Lindsay Hayes recommended in his October 2022 report. Appendix B summarizes SAC's status regarding each outstanding statewide recommendation that Lindsay Hayes listed in Table 1 of his report. Taken together, the CAPs listed in the Appendices are ones that have already been assigned (Table 2) or do not apply to SAC. Some were assigned soon after Lindsay Hayes' exit in November 2021, and others were identified in previous regional visits. Finally, all applicable CAPs in the Appendices are compliant as of this visit, save one: asking all questions during R&R visits. Although SAC successfully addressed this item in the past, it reappeared during my visit. As a result, I added it as a CAP.

---

**CONCLUSION**

I held an exit meeting was held with Associate Wardens, the Chief of Mental Health, Chief Psychiatrist, CEO, the Chief Nursing Executive, SPRFIT coordinator, and other key executives and managers. I presented preliminary findings.

As a result of this review, and in consultation with regional representatives from custody and nursing as appropriate, the following CAPs are assigned:

1) Create a plan to ensure the chain of custody regarding 7497 forms and improve compliance on page 2 of the form
2) Create a plan to provide unstructured yard to MHCB patients CTC-1 and CTC-2
3) In the MHCB, improve the quality of documented justifications for suicide watch and suicide precaution as well as the documented justifications when such orders are discontinued

As a result of this review, the following actions are recommended:

1) Examine the communication process ASU officers use to communicate the need for more radios
2) In ASU, (a) provide radio or tablet to inmates who are ASU-to-ASU transfers and do not possess an entertainment appliance and (b) ensure an ASU policy covers this procedure
3) For MHCB patients who are MAX custody, use the TTM during IDTT
4) In the MHCB, ensure the sheets are always included in the order for full issue

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B

---

**Appendix A: SAC's Status Regarding Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | SAC's Status | Comment |
|---|---|---|
| Develop a CAP to ensure that nurses nursing accurately asked all intake screening questions | Noncompliant | Deficiencies present this visit |
| Develop a CAP to create an LOP addressing "Inmate-Patients Receiving Bad News" | Compliant | |
| Develop a CAP to create an LOP for SRMP and to track SRMP during local SPRFIT meetings | Compliant | |

**Appendix B: SAC's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| Aspect of Recommendation that Remains Outstanding | SAC's Status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Compliant | 93% as of January 2023 |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Sufficient number of retrofitted intake cells | Compliant | Ample vacancies observed |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audits of safety plans | Compliant | 83 audits completed during audit period |
| No. 18: Safety planning training | Compliant | 96% as of January 2023 |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Noncompliant | Deficiencies present this visit |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | N/A | Continuous Quality Improvement Audit is statewide item; SAC is not a reception center |

Exhibit C

 

**CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 9/1/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD<br>Sr. Psychologist Specialist<br>Suicide Prevention Unit, Region 1 |
| **Subject:** | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) SUICIDE PREVENTION TOUR-ROUND 5, AUGUST 2023 |

From August 1st through August 3rd, 2023, I conducted an on-site review of SAC's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, this audit covered the period March 2023 through June 2023.

**Institutional Updates**
For months, SAC has been operating an ASU overflow, which has strained resources and affected compliance with some suicide prevention practices in their segregated units. Only in the past week was SAC able to transfer 60 or so ASU inmates. In addition, B yard has a growing level II population of CCCMS and GP inmates. In the past several months, two homicides and one staff assault occurred.

Mental health staffing is a growing concern. The adjusted vacancy rate is for psychiatrists is 0%, 6% for social workers, and 42% for psychologists. As a result of low staffing, multiple program modifications are in place for the CCCMS and EOP programs. CIT has also been suspended.

In a previous report, I noted the rate of consults for suicidality had increased by 50% following the introduction of body-worn cameras for officers in February. The increase has become a stable trend. SAC's 6-month rate of consults remains elevated over last year's typical levels: 238 per 1,000, which is 13 times higher than the statewide average and almost 2.5 times higher than RJD, the institution with the second highest rate in the state (85.7 per 1,000). Inpatient admissions also increased following the introduction of body-worn cameras and remain high relative to SAC's previous baseline. Admissions to inpatient units remain elevated—an expected result given that

consults for suicidality are increasing. The rate of self-harm is trending upward, but the trend in the rate of suicide attempts is unchanged and the rate of foreign body ingestions has trended downward. In the context of the current program modifications, the overall picture is concerning.

**Restricted Housing**
SAC has three segregated units: ASU EOP, STRH, and PSU.

*Second Watch Morning Meeting*
SAC holds morning meetings in ASU EOP and STRH. Staff use the huddle report to record attendance. I was able to only attend the morning meeting in STRH. All required members were present, and members discussed all required topics (e.g., new arrivals, patients of concern).

*Intake Cells*
SAC has 15 retrofitted cells in its ASU EOP unit (building A5, B section; cells 105-109, 114-121, 217-218) and eight retrofitted cells in its STRH unit ("stand-alone" building; cells 100-107). In his last visit, Lindsay Hayes noted that all cells were suicide-resistant.

In the ASU EOP unit, all 15 retrofitted intake cells had "INTAKE CELL" stenciled above their doors. Eleven intake cells were occupied. Of these, five had no placard and the remainder had a placard that did not include the 72-hour start and end dates or the 21-day end date. (See Figure 1 for an example of the placard typically used). As a result, I could not readily discern whether any of the inmates were past the 72-hour mark. In addition, many cells in the unit had placards with no dates, so I could not readily determine whether any inmates were in the 21-day intake period and, if so, how many. Magnetic placards, as noted in my last report, are no longer used. The AW of the yard reported that the placement of placards was affected by the drain on custody resources secondary to the size of the ASU overflow population.



*Figure 1: Example of a Placard in ASU EOP and STRH*

The situation in STRH was markedly different. Like ASU EOP, all retrofitted intake cells had "INTAKE CELL" stenciled above their doors. Seven retrofitted intake cells were occupied. None were past the 72-hour mark. All cells had a placard with appropriate dates noted.

*Psychiatric Technician (PT) Rounds*

I observed three different PTs, one in each segregation unit. All asked the required questions of mental health inmates. However, the PT in STRH, who was not a regular, believed that he was not required to ask GP inmates any questions. I reviewed the policy requirement with him. The Sr. PT was present for this conversation. All of the PTs documented in real time. There were no mental health concerns requiring a referral.

Finally, the Senior PT conducts a monthly audit to monitor documentation during rounding. According to monthly SPRFIT minutes, compliance was good: 98% in March, 100% in April, and 99% in May. (More recent data are not yet available.)

*Access to Entertainment Appliances*
In the last week of October 2022, SAC received and distributed its first shipment of tablets. Distribution was completed in November.

In ASU EOP, three of the inmates in retrofitted intake cells had no radios (or tablets). Because so many cells had placards without dates, I could not determine whether any inmates on 21-day intake status had an entertainment appliance. The sergeant reported that their supply of radios was exhausted. However, upon further investigation, the institution did have a supply of 340 radios. This signals a breakdown in the system for resupplying ASU EOP with radios. I noticed the same issue during my last visit.

In STRH, all inmates on 21-day intake status had an entertainment appliance (N=15).

*Welfare Check Completion (Guard 1)*
In ASU EOP, I observed an officer complete Guard 1 checks. In the case of a completely covered cell window, he could not elicit the inmate's cooperation and moved on to the next cell.  I reported my observation to the ASU sergeant who will decide on the appropriate training.

I observed high-quality Guard 1 checks in PSU and STRH. When assessing a dark cell, the officer in PSU paused, pulled his flashlight, and illuminated the cell for several moments before moving on to the next cell. The officer in STRH walked with a Guard 1 wand in one hand and a lit flashlight in other the other. He used the flashlight frequently.

Overall compliance with Guard 1 checks in June was 90%.

*ASU Pre-Screening (Pre-Placement)*
Per the SPRFIT report, overall compliance with ASU pre-placement screens during the audit period was fair: 84% (N=375). This is about the same level of performance I observed in my last two visits and close to the statewide average (88%). In February, SAC initiated a performance improvement project on ASU pre-screenings. In addition, following my last visit, SAC began

investigating the reasons for late screenings. The main reasons are movement between segregated units and movement from a segregated unit to alternative housing and then back to ASU. However, ASU pre-screens were not designed for either type of movement. Therefore, while performance appears only fair, there does not appear to be a gap in suicide prevention. That said, SAC created a related improvement project and is dedicating substantial staff resources to complete pre-screens in all cases.

I was not able to observe an ASU pre-screening.

*ASU GP Screens (Post Placement)*
During the audit period, overall compliance with ASU GP screens was 86% (N= 43), which is somewhat lower than on my last visit.

I was unable to observe an ASU GP screening. However, confidential spaces were available in ASU-EOP (rooms in the dining hall adjacent to the building). (ASU GP screens are not required in STRH or the PSU because all residents are enrolled in the MHSDS.)

**Inpatient Units**
SAC has two licensed MHCBs: CTC-1 (13 beds) and CTC-2 (11 beds). At the time of the visit, the MHCB census was 24.

*Suicide-Resistant Cells*
During Lindsay Hayes' last site visit in November 2018, he reported that all cells in CTC-1 and CTC-2 met CDCR's specifications for suicide-resistance. I observed no new changes to the physical plant.

*Interdisciplinary Treatment Team (IDTT)*
I observed six IDTTs across CTCs 1 and 2. All required team members were present and active. In all cases, the admitting reason was DTS or included DTS. Appropriately, the team reviewed aspects of the safety plan. When discharge was the disposition, the clinician informed the patient they would collaborate on a safety plan before physical discharge. While this is clinically reasonable, the statewide policy requires staff to complete the safety plan by the IDTT meeting. (See the memorandum "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans dated 3-10-2020.) The team reviewed orders for observation and issue in all cases.

*Quality of Safety Planning*
I reviewed the safety plans of seven discharged MHCB patients admitted for suicidality and not referred to a PIP. All patients had safety plans completed before discharge. In all plans, the content was individualized and appropriate.

I also verified whether the supervisory review of safety plans was occurring (CAT audit: MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans). Since May, SAC audited 64 cases according to the local log. (Due to pending revisions in the audit, headquarters recently suspended the audit until October of 2023.) Plans tended to be completed on the date of clinical discharge.

*Suicide Watch and Suicide Precaution*
One patient was on constant observation at the time of my visit. The staff person was engaged in direct and continuous observation and was not engaged in other activities.

The timeliness of suicide precautions rounds continues to be good: 96% overall (range = 95-95%), which is the same as the current statewide average.

HQ Nursing released a new measure for staggering in late February. SAC's compliance continues to be excellent: 99.4% in November, 99.2% in April, 98.9% in May, and 99.2% in June.

I verified that rounders in CTC-1 and CTC-2 walked the unit with a laptop and rolling cart and documented in real time.

*Observation and Issue Orders*
MHCB staff posted printed issue orders on each patient's door. Observation and issue were reordered daily as required by the memorandum on state-issued clothing and bedding in the MHCB (10-29-2013 and 3-15-2016). Each patient had an up-to-date observation and issue order posted on their door (Figure 2) per the memorandum on patient identifiers (dated 12-12-2022).



*Figure 2: Plastic Sleeves in CTC 1 and 2*

Patients in CTC-1 and CTC-2 possessed all ordered items and only those items. When I found minor omissions (e.g., missing sheets), the staff immediately corrected them.

In CTC-2, two patients had an unusual combination of observation and issue orders (BF7685, AA9191): They were on suicide precaution but (a) were ordered full issue and (b) sheets were not included in the orders. However, documented justifications were present on at least some days of this combination.

To verify whether progress notes contained justifications for orders, I reviewed five charts of current patients who had orders for suicide watch or precaution at some point in their stay. I reviewed notes on days that suicide watch or suicide precaution was discontinued. All had justifications present, which is an improvement over my last stay. (Of note, SAC now audits progress notes for adequate justifications.)

Throughout my review of documentation, I looked for terms that could cause confusion when used to describe suicide watch or precaution (e.g., "stags," "enhanced observation"). I found no instances of such terms.

*Privileges*
Clinicians generally granted all privileges upon admission to the MHCB.

Recording phone and yard privileges was an area of weakness in past visits. Substantial improvement was evident during my last visit and has been maintained. Phone privileges (offered and refused) were recorded for all but one of the eligible patients in both CTCs. Both CTCs offered phone privileges on Wednesdays and Sundays on 3rd watch.

Sometime after my last visit, custody began running unstructured yard for both CTCs on the weekend. This is a significant improvement. Because the yard space is limited, patients are offered unstructured yard on a rotating basis. The rotation is recorded in a binder maintained by custody.

*Clinical Discharge Follow-ups*
Compliance in this area was strong: 95% overall (N=1,163). I audited 12 patients on follow-ups during the audit period. In all cases, the last day was completed by a mental health clinician. (SAC does use PTs to complete contacts needed on the weekends.) However, safety plans were completed in only 65% of cases. In some cases, the plan was not completed at the time the MHCB referral was rescinded. (In one case, it appears no plan was completed because the patient plainly "recanted" SI. This is a clinically sound decision and a reasonable exception to statewide policy).

*MHCB Rescissions*
During the audit period, staff regularly rescinded MHCB referrals, about one-third of the total number of MHCB referrals (N=323). This appears to be an expected result of the surge in DTS consults over the audit period. I examined a sample of six rescissions. A SRASHE was completed in all cases. However, safety plans were not completed in four cases.

*Other Inpatient Issues*
As in my last visit, I observed no patients wearing a safety smock in addition to other clothing.

In addition, staff do not place MAX custody patients in the therapeutic treatment module. Instead, the patient remained cuffed, sat sideways on a chair, and was flanked by two officers. Staff reported that this was the usual practice. However, while the practice preserves safety and is not prohibited by policy, it does not maximize confidentiality.

**Alternative Housing**
One patient was in alternative housing at the time of my site visit. The observer was engaged in direct, constant observation. Staff referred 323 patients to the MHCB during the audit period. Patients were admitted within 24 hours more than 99% of the time.

The local policy on alternative housing specifies a prioritized list of locations. The first locations are CTC beds followed by cells in B-7 (locally referred to as ASHM or "Alternative Housing/ Alternative Safe Housing Management" cells. Currently, cells in B-7 are the most frequently used.

**Suicide Risk Management Program (SRMP)**
The number of patients enrolled in SRMP continues to grow steadily. In November 2021, there were 74 patients enrolled. During this visit, 207 are enrolled. SAC has the largest SRMP population in the state, almost twice the size of the next largest SRMP population. SAC accounts for 21% of the statewide SRMP population.

Only one patient met the criteria for SRMP but was not yet enrolled. (The patient just met the criteria on 7-21-2023).

I reviewed the SRMP section of the Master Treatment Plan for eight patients. Three were erroneously described as not being in the program. I forwarded this information to the local SPRFIT. The plan is to correct the treatment plan at the next treatment meeting. The remainder had goals and interventions listed.

**Custody Inpatient Discharge Follow-ups**
SAC typically has a high volume of 7497s: 19-40 per month during the audit period. In my last report, I noted an abrupt decline in performance. Although SAC initiated an improvement project early this year, performance has not improved. Of completed forms, overall compliance was 80% in March, 83% in April, 82% in May, and 74% in June. All weaknesses were on page 2. As before, forms continue to be lost: 7 in March, 17 in April, 1 in May, and 16 in June.

I met with AW of Healthcare to understand the current problems and SAC's solutions. In brief, numerous problems regarding custody's responsibilities were found. To address the problems, custody completed institution-wide retraining of sergeants, initiated disciplinary action, and centralized training of disciplinary action. In addition, they made changes to the chain of custody for the form and send out a daily list of inmates who have active custody checks. Because these promising changes are relatively new, performance may not clearly improve for several months.

**Institutional SPRFIT Committee**
Because SAC holds in-person meetings, I could not virtually attend a local SPRFIT meeting. During the audit period, minutes were detailed and showed that system surveillance was conducted (e.g., using automated and nonautomated measures, the SPRFIT report). Areas of weakness were identified.

SAC achieved a quorum at all meetings. The committee reviewed self-harm incidents in detail, and it also reviewed SRMP and the quality audits of SRASHEs. The minutes did not include a review of CAPs generated by regional and Lindsay Hayes visits. SPRFIT minutes were consistently uploaded to the SPRFIT website.

As of the June meeting, the committee had several improvement projects: ASU pre-screens completed timely, custody compliance with 7497 documentation, visiting eligibility for patients in MHCB, and volume of emergent/urgent consults. Minutes included a status update on each project.

*Policies*
I completed a detailed review of all policies at SAC related to suicide prevention and forwarded my findings via email on 8-22-2022. SAC reported that all findings were incorporated into the appropriate policies. In addition, I reviewed local policies to verify that all recent statewide

| Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| *Statewide Memorandum (Date)* | *In Local Policy?* |
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (OP 025) |
| Bad News (4-28-2021) | Yes (OP 115) |
| Discharge custody checks (revised 10-10-2021) | Yes (OP 115) |
| MHCB Patient Identifier (12-03-2022) | Yes (OP 115) |
| SRMP (7-12-2021) | Yes (OP 115) |
| SRE Mentoring (revised 7-12-2022) | Yes (OP 115) |
| Cut-Down Kit (revised 8-10-2022) | Yes (OP 115) |
| Safety Concerns (revised 9-21-2022) | Yes (OP 321) |
| Security Welfare Checks (revised 10-7-2022) | Yes (Addendum to OP 129) |
| Safety Planning (2-13-2023) | Yes (Addendum to OP 115) |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | In process (OP 115) |
| Update to SRE Mentoring Program (6-7-2023) | In process |
| Clinical reviews for serious suicide attempts (6-14-2023) | In process |
| Note: "In process" indicates that the memorandums are sufficiently new that it is premature to expect compliance. | |

memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1.

*Severe Self-Harm*
Historically, SAC tends to have the highest rate of self-injury of all non-PIP institutions. Per the SPRFIT report, the 6-month rate for self-harm incidents at SAC was 17.9 per 1,000, which is more than four times higher than the statewide average of 4.2. Incidents continue to occur most often among EOP patients (115 of 152), be they on the mainline, in ASU, or in PSU. Two serious suicide attempts occurred during the audit period. A clinical review was completed for each case (AW1423 and AR3404). The reports identified areas of improvement and documented action plans. A third serious suicide attempt occurred this month but was outside the audit period (AA9191).

*Inmate Family Council*
The local SPRFIT coordinator last attended IFC on 5-18-2023. The date of attendance was recorded in the minutes of the SPRFIT meeting.

*Inmate Advisory Council*
The local SPRFIT coordinator last attended IAC 2-3-2023. The date of attendance was recorded in the minutes of the SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Due to the ongoing surge in DTS consults, SAC continues to complete SRASHEs over and above its usual high volume. This makes the current high compliance with SRASHE timelines remarkable (97% during the audit period.) Compliance so far this quarter with specific SRASHE timelines for the mainline and the MHCB is as follows:

- Emergent consults for DTS: 97% (N=1951)
- Urgent consults for DTS: 0% (N=2)
- Routine consults for DTS: 100% (N=2)
- At MHCB clinical discharge: 95% (N=254)
- Upon MHCB referral: 99% (N=320)
- Upon arrival from a PIP: 82% (N=51)
- 90-day assessments after rescinded MHCB referral: 98% (N=1053)
- 90-day assessments post-MHCB discharge: 96% (N=1213)

The timeliness of SREs upon arrival from PIP has improved compared to my last visit (

*Urgent and Emergent Consults for Danger to Self (DTS)*
As noted at the outset of this report, consults for DTS surged following the introduction of body cams in January. July saw an even larger increase: In previous months, the number of monthly DTS consults was roughly 400. In July it was 608. The reasons for this increase are unclear. SAC opened an improvement project to address the volume.

According to the SPRFIT report, timely contact for urgent and emergent DTS consults appears to be low: 76% over the past six months. Although similar to performance at the time of my last visit, staff continued to observe errors in the report, and those errors resulted in underestimated compliance (i.e., the report includes voided and canceled consult orders). For example, June compliance was 85% but corrected compliance was 90%. Staff did submit a ticket to have the errors corrected. (I confirmed that errors in the report are very likely.) SAC classified nearly all DTS referrals as emergent (1950 of 1954).

**Emergency Response**

*Cut-Down Kits*
The Mental Health Compliance Team reported 100% compliance as of March 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
The last suicide at SAC occurred in June of 2022 (AS6846). (For a review of the resulting QIPs, please refer to my November 2022 report.) Nine QIPs were assigned for a suicide that occurred at SVSP (V30437). (The decedent had transferred from SAC to SVSP and died 3 months later.). The QIPs were completed on 6-8-2023. The QIPs were:

1. Not all of the patient's self-harm occurrences were captured.
2. The patient's treatment plan did not include self-injury as a focus of treatment.
3. The response to mental health consults did not always occur within timelines.
4. Safety planning was not completed following the recission of and referral to an MHCB.
5. Treatment plans did not address an array of ongoing problem behaviors.
6. Quality concerns regarding suicide risk assessments.
7. Quality concerns regarding safety plans.
8. A suicide risk assessment was not conducted following in an incident of superficial lacerations.
9. Nurses did not refer the patient after observing superficial lacerations.

I could not assess QIPs 1, 5, and 9 because there is no ready way to do so. I did assess the remaining QIPs and found durable compliance in July 2023, except for QIP 4, as follows.

To assess QIP 2, I reviewed the IPOCs of three patients at SAC who had three or more incidents of self-harm in July 2023 and had recently updated treatment plans (AX5503, BA8753, BK4673). For two of the patients, self-harm was an identified treatment goal. The third patient had a goal related to impulsive behavior, which is a reasonably related goal.

To assess QIP 3, I reviewed the Timely Referrals KPI and the SRE KPI for July 2023. Overall compliance was 87% for timely referrals and 97% for emergent consults for suicidality. These indicate reasonable compliance with the QIP.

Regarding QIP 4, I reported on the completion of safety plans following MHCB recission on p. 6 of this report. Four of six recissions did not have the required safety plan.

To assess QIP 6, I reviewed five SRASHEs completed in July 2023 (AS1566, BR3490, AC3519, BF2040, BL2359) and focused on the quality of risk justifications. I found that all justifications were adequate or better.

Regarding QIP 7, I reported the quality of safety plans on p. 4 of this report. All plans had individualized and appropriate content.

To assess QIP 8, I reviewed five incidents of self-harm incidents, involving lacerations and rated as minor in July 2023, to verify whether a SRASHE was completed (BM1615, BR3490, BB5536, AZ4821, AX7408). I found that all incidents were accompanied by a SRASHE.

**Training and Mentoring Compliance**

Compliance with the Annual IST Suicide Prevention Training for 2022 was fair. Overall compliance was 91%. Compliance for custody was 91%, nursing staff was 85%, and mental health staff was 91%. As of June, SAC is ahead of schedule for its 2023 training: Sixty-six percent of all staff have been trained so far this year.

Compliance with long-standing training requirements is very good, except for the C-SSRS training. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for SAC as of July 2023, unless otherwise noted:

- Suicide Prevention and SRASHE Core Competency Building: 100%
- SRE Mentoring: 98% (any training), 64% new training
- Safety Planning: 95%
- Suicide Risk Management Program (SRMP): 98%
- C-SSRS: 85%
- Prohibition of safety contracts: 95% for mental health, 80% for nursing

- Nursing CPR: 100%
- Custody CPR: 97% (as of March 2023)

## Receiving and Release (R&R) Screening

I observed one R&R screening. The screening was conducted confidentially (with the door closed), and an officer was posted outside the door. The patient was placed in a therapeutic module and cuffs were removed. However, as in my last visit, the nurse asked only 4-5 of the required questions. (In our discussion after the screening, the nurse seemed to believe the questions were repetitive and may have been concerned with further irritating a mildly irritable patient.) I relayed my observations to local nursing managers. Local auditing shows 100% compliance (March through May), which indicates the problems I observed today were not systemic.

No staff spontaneously expressed concern about safety in R&R screenings.

## Reception Center Processing

SAC is not a reception center.

## Crisis Intervention Team (CIT)

SAC no longer operates a CIT due to its staffing shortage. It still uses a clinician after hours to take calls.

## Active Corrective Action Plans (CAPS)

CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, all CAPs will remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial," except for suicide precaution rounds, indicate marked progress or that the CAP has been preliminarily met, with

**Table 2. Status of Open CAPs**

| Source/Date | Problem | Progress |
|---|---|---|
| Regional Oct 2022 | 1) Investigate the reasons for low compliance with ASU pre-screens and ASU GP screens and take the indicated action | Substantial |
| Regional Mar 2023 | 2) Create a plan to ensure the chain of custody regarding 7497 forms and improve compliance on page 2 of the form | Some |
| Regional Mar 2023 | 3) Create a plan to provide unstructured yard to MHCB patients CTC-1 and CTC-2 | Completed |
| Regional Mar 2023 | 4) In the MHCB, improve the quality of documented justifications for suicide watch and suicide precaution | Substantial |

sustainability to be assessed at the next site visit.

Appendix A summarizes SAC's status regarding the CAPs that Lindsay Hayes recommended in his October 2022 report. Appendix B summarizes SAC's status regarding each outstanding statewide recommendation that Lindsay Hayes listed in Table 1 of his report. As of this visit, two CAPs are noncompliant.

---

**CONCLUSION**

---

I held an exit meeting with the Warden, CEO, Sr. Psychiatrist, Chief Nursing Executive, SPRFIT coordinator, and other key executives and managers. I presented preliminary findings.

As a result of this review, one new CAPs are assigned:

1) Ensure MHCB clinicians complete safety plans prior to the discharge IDTT, per policy.

As a result of this review, the following actions are recommended:

1) Monitor the use placards in ASU EOP unit
2) Investigate why ASU EOP is periodically unable to tap into existing supplies of radios
3) Closely monitor the effectiveness of the new plan for addressing deficiencies in the 7497 process
4) Retrain clinicians to complete a safety plan whenever they rescind an MHCB referral for DTS
5) Consider reviewing whether SRMP is clinically indicated for patients enrolled in it for an extended period of time

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B

# MEMORANDUM

**Appendix A: SAC's Status Regarding Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | SAC's Status | Comment |
|---|---|---|
| Develop a CAP to ensure that nurses nursing accurately asked all intake screening questions | Compliant | Deficiencies present this visit but local audits show a pattern of strong compliance |
| Develop a CAP to create an LOP addressing "Inmate-Patients Receiving Bad News" | Compliant | |
| Develop a CAP to create an LOP for SRMP and to track SRMP during local SPRFIT meetings | Compliant | |

**Appendix B: SAC's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| Aspect of Recommendation that Remains Outstanding | SAC's Status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Compliant | 98% as of July 2023 |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Sufficient number of retrofitted intake cells | Compliant | Ample vacancies observed |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Unable to assess | Unable to assess in ASU EOP; STRH was compliant |
| No. 17: Completing safety plans, supervisory audits of safety plans | Partially compliant | Some required safety not completed; 64 audits completed during the audit period |
| No. 18: Safety planning training | Compliant | 95% as of July 2023 |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Noncompliant | Deficiencies present this visit |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | N/A | Continuous Quality Improvement Audit is a statewide item; SAC is not a reception center |

Exhibit D

 

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

# MEMORANDUM

| | |
|---|---|
| **Date:** | 8/22/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD<br>Sr. Psychologist Specialist<br>Suicide Prevention Unit, Region 1 |
| **Subject:** | HIGH DESERT STATE PRISON (HDSP) SUICIDE PREVENTION TOUR - ROUND 6, AUGUST 2023 |

On August 9th, I conducted an on-site review of HDSP's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, the audit period was April through July of 2023.

**Institutional Changes**
B Yard, which closed in December 2021, reopened in October 2022 following the closure of CCC. In February 2023, B yard became a Level III yard for non-designated inmates, some of whom are CCCMS. HDSP also re-opened its minimum support facility and began receiving patients in May 2023. Finally, HDSP's CTC closed on March 30th for floor resurfacing and will likely remain closed for the remainder of the year. As a result, I did not review all aspects of MHCB performance.

As with most institutions in Region 1, HDSP is experiencing difficulty staffing psychologists. Only 4 of 11 positions are filled.

**Restricted Housing**

*Second Watch Morning Meeting*
At HDSP, the morning meeting was held on the unit and was combined with the partnership huddle. All required members were present. The meeting was very comprehensive. It covered, among other things, topics such as new arrivals, high-risk patients, and relevant medical and mental health issues.

*Psychiatric Technician (PT) Rounds*
I observed one psychiatric technician (PT), who was not an ASU regular, complete rounds. For MHSDS patients, she inquired about mental health concerns, medication side effects, suicidal ideation, and several aspects of functioning (e.g., sleep). I was not able to observe rounds on non-MHSDS inmates. No referrals were indicated. The PT completed charting on MHSDS patients in real-time using a laptop on a rolling cart. She also completed a Guard One check for each patient. She asked questions clearly and was plainly supportive and encouraging.

*Intake Cells*
HDSP has 18 retrofitted cells (100-111, 196-199), some of which were added in September 2021. (See my December 2021 report for details.) All cells had "Intake Cell" stenciled on the door. Staff reported that the facility has had to occasionally resort to double-celling inmates in retrofitted cells.

During a previous last visit, I surveyed all cells and found that all met CDCR's requirements for suicide-resistance.

HDSP's ASU recently implemented a revised and improved placard. The placard now includes the date of placement and a date 21 days later. All inmates on 21-day intake had a placard.

Thirteen inmates were housed in retrofitted intake cells. Because HDSP's ASU has been at capacity, six were past the 72-hour mark, some by a week or more.

*Access to Entertainment Appliances*
All 13 inmates in retrofitted cells had a radio. There were an additional 15 inmates in the 21-day intake period, and all had an entertainment appliance. (HDSP's tablet program began in July 2022.)

*Welfare Check Completion (Guard 1)*
On a previous visit, I observed problems with the quality of Guard 1 checks. During my previous visit and this visit, quality was markedly improved. The officer completed Guard One checks with a lit flashlight and clearly paused when cells were dark. In response to a CAP on the quality of checks, HDSP instituted an audit and accountability process: ASU Lieutenants now informally verify the quality of checks during every watch and report that this task was completed on each watch's Daily Activity Report (DAR).

Overall compliance with Guard 1 checks in July was 99%.

*ASU Pre-Screening (Pre-Placement)*
No ASU intake screenings occurred during the visit. As noted in previous reports, HSDP has a good practice of completing the screening immediately upon arrival to the unit but before the inmate has been housed. Rooms for confidential screenings were available, and each contained a holding cell. I also inquired about the process of screening for inmates placed after hours. The PT on duty reported that inmates are still offered a confidential setting for screening.

During my last visit compliance with ASU pre-screening was poor, but I did not assign a CAP because HDSP had a related improvement project underway. The project appears to be making headway. Although overall performance during the audit period was poor (81%, N=193), there was a clear upward trend: 80% in April, 67% in May, 89% in June, and 100% in July. Staff reported that the key improvement underlying this trend was (a) training custody staff to delay data entry of SOMS movement until after the pre-screening had been completed and (b) modifying their local Inmate Movement (IMF) to cement knowledge provided in the training.

*ASU GP Screens (Post Placement)*
Compliance with ASU screens was excellent: 98% during the audit period (N=133). I was unable to observe a screening.

**Inpatient Units**
HDSP has one licensed MHCB consisting of 10 beds. Because the MHCB was closed for floor resurfacing, I did not review most related performance indicators.

*Clinical Discharge Follow-Ups*
Compliance with clinical discharge follow-ups was very good: 98% (N=83 days). For eight patients, I verified that the safety plan was included on each day of the follow-up and that the final day of the follow-up was completed by a clinician. HDSP does not use PTs for any part of the follow-up procedure.

*MHCB Rescissions*
During the audit period, six MHCB referrals were rescinded out of 39. (The Timely MHCB Referral indicators identified eight, but two were identified in error.) All referrals had SRASHEs completed, all SRASHEs included a clinically reasonable justification.

**Alternative Housing**
No patients were in alternative housing during the site visit. Thirty-nine patients were referred to the MHCB during the audit period, and 90% were admitted within 24 hours.

OP 809 specifies a prioritized list of locations for alternative housing. Only the first-priority cells (medical beds in the CTC) met most of the criteria for suicide resistance (e.g., non-suicide resistant ADA bars were present). When patients are placed in rooms with no permanent bed, they are supplied with an EZ bunk and a mattress. A supply of stack-a-bunks and mattresses is ordinarily kept in the CTC. The remainder of the cells were holding cells in the CTC, cells in R&R, exam rooms in the TTA and CTC, and cells in a housing unit (Delta 8).

During the auditing period, HSDP is temporarily using its MHCB cells as the first-priority for alternative housing. (Although the entire CTC is offline due to the reflooring project, the MHCB cells have been refloored and are useable). I visually inspected these cells, and all were clean.

**Suicide Risk Management Program (SRMP)**
No patients were enrolled in SRMP, and no patients were eligible for SRMP. Thus, I could not review the quality of goals and interventions associated with SRMP.

**Custody Inpatient Discharge Follow-Ups**
I reviewed local audits of the 7497 form. Overall compliance was 96% in April (N=3), 100% in May (N=3), and 89% in June (N=4), and 90% in July (N=3). Errors most often occurred on page 2. There is an open improvement project for 7497s. The first phase of the project has focused on the supervisory signatures. The second phase will focus on the timeliness of 30-minute checks.

**Institutional SPRFIT Committee**
I was not able to virtually attend a meeting since my last visit. I did review the available minutes. These continue to show good system surveillance. Two improvement projects remain open: 7497s custody supervisory review (a Lean 6 Sigma project) and ASU Pre-Screens. A quorum was achieved at all meetings.[1] Minutes were detailed and met all audit criteria.

*Policies*
HDSP does have a local suicide prevention policy (OP 810). I also reviewed local policies to verify that recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1 (next page). In December 2022, I conducted a detailed review of HDSP's suicide prevention policies and shared my findings (via email) with the CMH and the local SPRFIT. However, the requested changes have not yet been made.

---

[1] Due to HDSP's staffing package, HDSP has no AW of Healthcare (a required member of SPRFIT). In consultation with the Chief of Statewide Suicide Prevention at headquarters in December 2021, HDSP was granted the following exception: The required custody member for HDSP's SPRFIT shall be the healthcare captain. The healthcare captain's designee shall be the healthcare lieutenant.

**Severe Self-Harm**

Per the SPRFIT Reboot report, the 6-month average for self-harm incidents was .6 per 1000, which is well below the statewide average of 4.1. The local SPRFIT does monitor self-harm trends. In addition, twice per year, the institution reviews all self-harm for medically serious incidents, and the results are memorialized in a local memorandum. Detailed reviews are completed for medically serious incidents. There have been no qualifying incidents since my last visit.

**Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention**

| Statewide Memorandum (Date) | In Local Policy? |
|---|---|
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (OP 809) |
| Bad News (4-28-2021) | Yes (OP 847) |
| Discharge custody checks (revised 10-10-2021) | Yes (OP 764) |
| MHCB Patient Identifier (12-03-2022) | Yes (OP 798) |
| SRMP (7-12-2021) | Yes (OP 810) |
| CIT (7-8-2021) | Yes (OP 838) |
| SRE Mentoring (revised 7-12-2022) | Yes (OP 850) |
| Cut-Down Kit (revised 8-10-2022) | No[a] (OP 505) |
| Safety Concerns (revised 9-21-2022) | Yes (OP 810) |
| Security Welfare Checks (revised 10-7-2022) | Yes (OP 525) |
| Safety Planning (2-13-2023) | In process |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | In process |
| Update to SRE Mentoring Program (6-7-2023) | In process |
| Clinical reviews for serious suicide attempts (6-14-2023) | In process |

Note: [a] denotes policies with relevant content but not yet updated to reflect the recently released memorandum.

*Inmate Family Council*

The SPRFIT coordinator attended IFC on 4-14-2023, and this was recorded in the minutes of the SPRFIT meeting.

*Inmate Advisory Council*

The local SPRFIT coordinator attended IAC on 5-30-2023, and this was recorded in the minutes of the SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*

Per the On Demand report, overall compliance with SRASHE timelines was excellent (98%, N=152). HDSP completed about 38 SRASHEs per month during audit period compared to 20 during my last visit.

- Emergent consults for DTS: 98% (N=51)
- At MHCB clinical discharge: N/A (due to MHCB closure
- Upon MHCB referral: 100% (N=30)
- After rescinded MHCB referral: 97% (N=38)
- 90-day assessments post-MHCB discharge: 100% (N=30)

*Urgent and Emergent Consults for Danger to Self*
I reviewed all referrals generated during the audit period for which the referral reason was Danger to Self (DTS). HDSP appropriately and consistently classified all such referrals as emergent.

**Emergency Response**

*Cut-Down Kits*
The Mental Health Compliance Team reported 100% as of July 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
No suicides occurred in 2022 or thus far in 2023. There are no open QIPs.

**Training and Mentoring Compliance**
Compliance with Annual IST Suicide Prevention Training in 2023 was good, with the exception of mental health: 99%, 84%, and 100% for custody, medical, and mental health respectively. This year, training appears to be on track. Fifty-three percent of HDSP staff have completed the training so far.

Compliance with long-standing training requirements is excellent. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for HDSP through July 2023:

- SRE Mentoring: 100% (33% for the new mentoring program)
- Suicide Prevention and SRASHE Core Competency Building: 100%
- Safety Planning: 94%
- Suicide Risk Management Program (SRMP): 100%
- C-SSRS: 100%
- Prohibition of safety contracts (Mental Health): 100%
- Prohibition of safety contracts (Nursing): 98%
- Nursing CPR: 100%
- Custody CPR: 98% as of July 2023

**Receiving and Release (R&R) Screening**
No R&R screenings occurred during my site visit. HDSP does have a private office for screenings. The office has a chair for GP patients and a therapeutic treatment module for MAX custody patients. HDSP does audit initial health screenings. Audits conducted in April and May show 100%.

**Reception Center Processing**
HDSP is not a reception center.

**Crisis Intervention Team (CIT)**
HDSP shortened its CIT hours in Fall 2022 due to the limited availability of mental health clinicians. CIT still operates only during the day, from 0700 to 1630, seven days a week. After hours, HDSP relies on telepsychiatry as well as on-call psychologists and social workers. CIT was activated 31

| Table 2. Status of CAPs | | |
|---|---|---|
| *Source/Date* | *Problem* | *Progress* |
| Hayes Nov 2017 | 1. Compliance with Annual Suicide Prevention training for nursing and mental health staff not at benchmark | Some |
| Regional Dec 2022 | 2. In ASU, create a plan to (a) ensure there is a system for distributing entertainment appliances to new ASU placements and (b) periodically verify that inmates received those appliances timely | Substantial |
| Regional Dec 2022 | 3. In ASU, create a plan to periodically audit the quality of Guard 1 checks | Substantial |
| | | |

times during the audit period. All CIT events had the required members, and the CIT form was always completed. All but one event was for suicidal ideation. I reviewed six CIT events where the referring reason was suicidal ideation, The required SRASHE was completed in all cases. No CIT activations occurred during my visit.

**Corrective Action Plans (CAPS) Generated by a Site Review Conducted by Lindsay Hayes**
CAPs are in various stages of completion (Table 2). Unless otherwise noted in Table 2, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports.

Appendix A summarizes the institution's status regarding the CAPs that Lindsay Hayes recommended in his October 2022 report. There were no CAPs specific to HDSP. Two CAPs applied to institutions with an MHCB. Because HDSP's MHCB is temporarily closed, I listed the status of these CAPs as not appliable.

Appendix B summarizes institution's status regarding each outstanding statewide recommendation that Lindsay Hayes listed in Table 1 of his report. All recommendations are compliant as of this visit.

| | CONCLUSION | |
|---|---|---|

An exit meeting was held with the Warden, CEO, Chief of Mental Health, Chief of Nursing, the SPRFIT coordinator, and other key executives and managers. Preliminary findings were presented.

As a result of this review, no CAPs are assigned to HDSP:

As a result of this review, the following actions are recommended to HDSP:

1) Revise policies to incorporate recent memorandums
2) Revise the suicide prevention policy to incorporate requested changes forwarded on 12-5-2022
3) Complete the improvement project on ASU Pre-Screening
4) Ensure that mental health exceeds 90% compliance with Annual Suicide Prevention before the end of the calendar year

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B



**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

**Appendix A: HDSP's Status Regarding Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | Status | Comment |
|---|---|---|
| Ensure that all CDCR facilities are auditing safety plans prior to MHCB discharge | N/A | HDSP's MHCB is temporarily closed |
| Ensure that all facilities below 90% regarding page 1 or page 2 of the 7497 form exceed 90% | N/A | HDSP's MHCB is temporarily closed |

Note: There were no CAPs specific to HDSP.

**Appendix B: HDSP's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| Aspect of Recommendation that Remains Outstanding | Status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | Compliant based on local auditing |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | No local concerns reported |
| No. 9: SRE mentoring program | Compliant | 100% as of Mach 2023 |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Sufficient number of retrofitted intake cells | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | Compliance constrained by population of ASU unit |
| No. 17: Completing safety plans, supervisory audits of safety plans | N/A | HDSP's MHCB is temporarily closed |
| No. 18: Safety planning training | Compliant | 94% trained |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | N/A | HDSP's MHCB is temporarily closed |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Compliant | Overall compliance was 89% or greater for all months |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Compliant | Overall compliance was 89% or greater for all months |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | N/A | Continuous Quality Improvement Audit is a statewide item; HDSP is not a reception center |

Exhibit E

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 12/4/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD |
| | Sr. Psychologist Specialist |
| | Suicide Prevention Unit, Region 1 |
| **Subject:** | SAN QUENTIN STATE PRISON (SQSP) SUICIDE PREVENTION TOUR-ROUND 6, OCTOBER 2023 |

On October 11th and 12th 2023, I conducted an on-site review of SQSP's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, this audit covered the period February 2022 through September 2023.

**Institutional Updates**
As I noted in my last report, SQSP has been notified that the remainder of the condemned population will be decentralized next year and SQSP has taken many steps to mitigate suicide and support residents. Several weeks prior to my visit, SQSP began holding interdisciplinary "pre-committee meetings" with condemned individuals to identify their respective needs. Transfers have not yet begun.

In addition, the local SPRFIT coordinator leads a Lighter Keepers program, a group for inmate peer responders that has a suicide prevention component. There are 18 participants.

**Restricted Housing**

*Second Watch Morning Meeting*
Staff held the meeting on the unit, and a sergeant and social worker were present. The meeting covered topics such as new arrivals, patients in the Suicide Risk Management Program (SRMP), and patients of concern. Meeting attendance was recorded in the unit log and on the Mental Health Huddle Report.

# MEMORANDUM

*Intake Cells*

The cells in Carson (SQSP's ASU) are single-occupancy, 30 of which are retrofitted intake cells (cells 108-122 and 201-215). ASU officers reported that there was not an instance in which they approached full occupancy of their retrofitted intake cells. I previously inspected all intake cells. All were retrofitted in compliance with the statewide policy, and all were marked by a green sign stating "INTAKE CELL."

In my last visit, six retrofitted intake cells were being inappropriately used as storage rooms because, the ASU sergeant reported, the unit did not have sufficient space to store inmates' property. This has been corrected.

There were five inmates in intake cells during the site visit. All were within the 72-hour period. (SQSP tracks the 72-hour timeline on a clipboard available to all custody staff.)

An additional three inmates were in the 21-day period. All but one had a 21-day placard. This omission was corrected while I was onsite. (Additional inmates appeared to need placards, but all were ASU-to-ASU transfers and outside the 21-day period.)

*Psychiatric Technician (PT) Rounds*

I observed one regularly assigned PT complete rounds. For MHSDS patients, the PT asked all required questions and recorded her observations in real-time using a tablet. For GP inmates, the PT inquired about mental health concerns and suicidal and homicidal ideation (neither question is required). The PT explained that when inmates are asleep or out of the cell, she recorded checks not completed on the unit's Isolation Log so that the PT on the next shift could round on those inmates. Finally, the Senior PT conducts a monthly audit to verify the quality of rounding. According to monthly SPRFIT minutes, compliance was consistently 100% on this audit in the past three months.

*Access to Entertainment Appliances*

All inmates in the 21-day intake period had an entertainment appliance (i.e., a radio, TV, or tablet). SQSP does have a laudable practice of recording on the 114-A that a radio was issued.

*Welfare Check Completion (Guard 1)*

I observed one officer complete Guard One checks. The officer deliberately stopped at each cell and looked inside. The officer was equipped with and regularly used a flashlight to visualize inmates in dark cells. She also directed inmates to lower cell door coverings. I reviewed Guard 1 checks for September 2023. Compliance was 99%.

*ASU Pre-Screening (Pre-Placement)*

Per the Performance Report, compliance with ASU pre-placement screens during the audit period was 78% overall and highly variable (66-93%). However, SQSP drills down on flagged inmates each month and typically finds that the misses are attributable to report errors (e.g., triggered by internal movement, MHCB returns, or premature SOMS entry). For example, actual compliance was 97% in July and 93% in June. To support SQSP in improving performance I met with the healthcare captain and local SPRFIT and shared remedies employed by other institutions to ensure that pre-screens are completed before bed moves. Since the report errors affect all institutions, I submitted an IT ticket.

*ASU GP Screens (Post Placement)*

During the audit period, compliance with ASU GP screens 80% (N=195) and variable (58-100%). I learned that this KPI is not tracked by the local SPRFIT committee and is not part of the current measurement plan for suicide prevention. I elevated this to the Statewide Chief of Suicide Prevention.

**Inpatient Units**

All MHCB and PIP cells are located on the 4th floor of the Central Health Services Building (CHSB). There are 40 beds. At the time of the visit, the MHCB census was zero, and the PIP census was 26 (Acute = 6, ICF = 20).

*Suicide-Resistant Cells*

I previously surveyed all MHCB and PIP cells in April 2021. All met CDCR's specifications for suicide-resistant cells. There have been no modifications since my last visit.

*Interdisciplinary Treatment Team (IDTT)*

I observed three IDTTs. All required team members were present and active participants. The CCI was present via speakerphone. In two IDTTs, the admitting reason was DTS. In these meetings, the team reviewed orders for observation and issue, but safety planning was not discussed. Clinical summaries were robust.

*Quality of Safety Planning*

I reviewed the safety plans of 11 discharged MHCB and PIP patients admitted for suicidality. All patients had safety plans completed before discharge. Content commonly contained clinical impressions and interventions.

I also verified whether the supervisory review of safety plans was occurring (CAT audit: MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans). SQSP maintains an internal

record of auditing. From June 2023 through mid-November, staff audited 27 MHCB cases and 19 PIP cases (a mixture of DTS, DTO, and SMI cases).

*Suicide Watch and Suicide Precaution*
One patient was briefly on constant observation at the time of my visit.

Improving the overall timeliness of suicide precaution has been a longstanding focus at SQSP. Substantial improvement was discernable as of my last visit and durably strong compliance now exists. From May 2023 forward, monthly compliance equaled or exceeded 94%. Compliance with staggering was good as well: 97% in May, 94% in June, 95% in July, 97% in August, and 98% in September.

During my visit, no inmates were on suicide precaution, so I did not have an opportunity to verify that the rounder walked the unit with a laptop and rolling cart and documented in real time.

*Observation and Issue Orders*
CHSB staff posted printed issue orders on each patient's door. Because the PIP houses patients long-term, patients are routinely not on suicide watch or precaution for extended periods. In my visit, all but one PIP patient had a standing order for q60. (The PIP uses communication orders to document q60, which are reprinted and reposted monthly.) Similarly, most PIP patients are ordered full issue for much of their stay. In these cases, the PIP reorders issue orders monthly.

I reviewed the charts of five patients who had orders for suicide watch or precaution at some point in their stay to verify whether progress notes justified those orders. Justifications were present in all cases. I also reviewed the same cases for terms that could cause confusion when used to describe suicide watch or precaution (e.g., "stags," "enhanced observation"). I found no confusing terms.

*Privileges*
SQSP uses NCAT for both MHCB and PIP patients. At SQSP, the phone is located in the dayroom. Thus, patients may use the phone while exercising their dayroom privilege.

I reviewed NCAT entries for five PIP patients during a one-week period (9-11 to 9-17). Showers, yard, dayroom, and phone privileges were regularly recorded (offered and refused) each week for each patient. There was variability in the amount of documented privilege offerings. For example, of the three condemned patients, one was offered privileges on 19 occasions, another on 14 occasions, and another on 32 occasions. As another example, phone privileges are scheduled to be offered daily, but one non-MAX patient had no phone offerings recorded.

*Clinical Discharge Follow-ups*
Compliance in this area was excellent: 100% (N=723 days). I audited seven patients on follow-ups in January. In all cases, the last day was completed by a mental health clinician, and safety plans were always present.

*MHCB Rescissions*
During the audit period, staff rescinded MHCB referrals in 19 cases, 13 of which were for danger to self. Of these, all had the required SRASHE, but two did not have the required safety plan.

*Other Inpatient Issues*
To ascertain whether contracts were in use, I searched the charts of eight patients for instances of "contract" using the global search feature in EHRS. I found none.

**Alternative Housing**
No patients were in alternative housing at the time of my site visit. Staff referred 362 patients to the MHCB during the audit period. Patients were admitted within 24 hours 98% of the time.

The local policy on alternative housing specifies a prioritized list of locations: CTC licensed medical beds (Rooms 29-34), large holding cells within the CHSB, and TTA. In practice, the large holding cells are dedicated to alternative housing and used exclusively. Patients are supplied with a stack-a-bunk. Staff confirmed that a supply of stack-a-bunks and their fitted mattresses were available.

**Suicide Risk Management Program (SRMP)**
At the time of the site review, 27 patients were enrolled in SRMP. Two patients were eligible for SRMP but not yet enrolled. One has been at the institution for one month. The other has been out to court since July 2021.

SQSP has an existing CAP, initiated in October 2022, to address clinicians erroneously marking "Not applicable" on the SRMP tab of the Master Treatment Plan when, in fact, patients meet the criteria for SRMP. This problem was still evident in my last visit and remains so. I audited the charts of 10 enrolled patients. Half were incorrectly identified as "not applicable." The remainder were accurate and goals and interventions were listed.

**Custody Inpatient Discharge Follow-ups**
During the audit period, compliance was good: 99.7% in February, 94% in March, 97% in April, 98% in May, 98% in June, 99% in July, and 99% in August. This is a dramatic improvement over my last visit. In addition, no packets were lost.

**Institutional SPRFIT Committee**
SQSP holds one joint SPRFIT meeting that includes the PIP.

I reviewed the recording of the local SPRFIT subcommittee meeting held in October. The conversation was robust. System surveillance was conducted—using automated, nonautomated measures, and the SPRFIT report—and areas of weakness were identified. The committee reviewed quality audits of SRASHEs and reviewed the status of CAPs generated by regional and Lindsay Hayes visits.

I reviewed the minutes for the meetings in February through September. A quorum was achieved all meetings. Minutes were detailed. SPRFIT minutes were consistently uploaded to the SPRFIT website. As of the September meeting, there were no improvement projects. However, there is still an ongoing workgroup dedicated to improvement compliance with suicide watch and suicide precaution rounds. A project pipeline was maintained.

*Policies*
SQSP does have a local suicide prevention policy (Vol. 19, Ch. 4) 59). I also reviewed local policies to verify that all recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1.

*Severe Self-Harm*
Per the SPRFIT report, the 6-month rate for self-harm incidents at SQSP was 1.4 per 1000, which was far below the statewide average of 4.2. I could not assess self-harm for the PIP only because of the way beds were recently reclassified (i.e., as flex beds). There was one serious suicide attempt by laceration in late June. A comprehensive review will be completed during the next 6-month cycle.

| Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| *Statewide Memorandum (Date)* | *In Local Policy?* |
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (Vol. 24, Ch. 26) |
| Bad News (4-28-2021) | Yes (Vol. 24, Ch. 11) |
| Discharge custody checks (revised 10-10-2021) | Yes (Vol. 24, Ch. 29) |
| MHCB Patient Identifier (12-03-2022) | Yes (Vol. 19, Ch. 4) |
| SRMP (7-12-2021) | Yes (Vol. 24, Ch. 54) |
| SRE Mentoring (revised 7-12-2022) | Yes (Vol. 19, Ch. 4) |
| Cut-Down Kit (revised 8-10-2022) | Yes (OP 0-1136) |
| Safety Concerns (revised 9-21-2022) | Yes (Vol. 19, Ch. 4) |
| Security Welfare Checks (revised 10-7-2022) | Yes (OP 0-1100) |
| Safety Planning (2-13-2023) | Yes (Vol. 24, Ch. 57) |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | Yes (Vol. 19, Ch. 4) |
| SRE Mentoring 2nd revision (6-7-2023) | In process |
| Semi-annual reviews/RCAs of self-harm (6-14-2023) | In process |
| Note: "In process" indicates that the memorandums are sufficiently new that it is premature to expect compliance. | |

*Inmate Family Council*
A designee for the local SPRFIT coordinator attended IFC on 10-23-2023. The date of attendance was not yet recorded in the minutes of the SPRFIT meeting.

*Inmate Advisory Council*
The local SPRFIT coordinator last attended IAC on 7-8-2023 and 9-27-2023. The former date was recorded in the minutes of the SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Per the Performance Report for Quarter 4, overall compliance with the timelines for completing SRASHEs was good overall (93%, N=699). No month was below 90%. Compliance during the quarter with specific SRASHE timelines for the mainline and the MHCB is as follows:

- Emergent consults for DTS: 100% (N=130)
- Urgent consults for DTS: n/a
- At MHCB clinical discharge: 67% (N=36)
- Upon MHCB referral: 99% (N=157)
- Upon arrival from a PIP: 69% (N=13)
- 90-day assessments after rescinded MHCB referral: 89% (N=85)
- 90-day assessments post-MHCB discharge: 93% (N=275)

Because compliance for MHCB clinical discharges was low, I examined all late cases. I found only two missed cases. The remainder were report errors (e.g., cases that MHCB transfers from another institution, documentation signed on time but marked as late).

Compliance with 90-day assessments post-MHCB discharge was depressed due to a change in the coding of MHCB beds (changed to flex beds).

For the same period in the PIP, compliance with SRASHE timelines appeared low:

- Upon admission to PIP: 82% (N=22)
- Prior to clinical discharge from PIP: 62% (N=29)

Low compliance upon admission was caused by missed SRASHEs when patients were discharged from the SQSP's MHCB and admitted to SQSP's PIP. Low compliance prior to clinical discharge was caused by (a) report errors (falsely identified discharges) but mostly by (b) SRASHEs that were late by 1 to 5 hours.

**Urgent and Emergent Consults for Danger to Self (DTS)**

I reviewed referrals for which the referral reason was Danger to Self (DTS). SQSP appropriately and consistently classified all such referrals as emergent (N= 699).

**Emergency Response**

*Cut-Down Kits*
The Mental Health Compliance Team reported 100% compliance as of September 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
Two suicides occurred since my last visit, both of which occurred in September: BD6438 and BR9371. The suicide case reviews were completed in early October. QIPs are not yet due, so a review of the durability of QIPs will be completed at the next site visit.

**Training and Mentoring Compliance**
Compliance with the Annual IST Suicide Prevention Training for 2022 was fair. Overall compliance was 91%. Compliance for custody was 91%, nursing staff was 90%, and mental health staff was 92%. As I noted in a previous report, SQSP moved to "hard" scheduling (assigning staff, in advance, to particular weeks). Year-to-date compliance is on track: 83% for custody, 63% for mental health, and 88% for nursing.

Compliance with long-standing training requirements is good, except for SRE mentoring. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for SQSP as of October 2023:

- Suicide Prevention and SRASHE Core Competency Building: 88%
- SRE Mentoring: 72% (any mentor training), 53% (new mentor training)
- Safety Planning Intervention: 94%
- Suicide Risk Management Program (SRMP): 94%
- C-SSRS: 93%
- Prohibition of safety contracts: Mental health: 92%, Nursing: 90%
- Nursing CPR: 100%
- Custody CPR: 99% as of September 2023

Similarly, compliance was generally good for staff in the PIP apart from SRE mentoring:

- Suicide Prevention and SRASHE Core Competency Building: 100%
- SRE Mentoring: 78%
- Safety Planning Intervention: 100%
- Suicide Risk Management Program (SRMP): 93%

- C-SSRS: 100%

SQSP reported that SRE mentoring was low in both programs for several reasons: the staffing shortage in EOP makes staff less available for mentoring, the training coordinator has not yet been replaced, and the time necessary to mentor three separate suicide risk assessments is challenging.

**Receiving and Release (R&R) Screening**
I observed two R&R screenings, both by the same nurse. All screenings were conducted confidentially (with the door closed). The nurse asked all mental health screening questions accurately. (Of note, the nurse was the same one Lindsay Hayes noted as not asking questions accurately. Thus, subsequent training appears durable.) In addition, per recent SPRFIT minutes, local nursing supervisor audits frequently indicate 100% compliance.

**Reception Center Processing**
SQSP is not a reception center.

**Crisis Intervention Team (CIT)**
Since my last report, SQSP has partially filled its CIT positions. CIT now operates Tuesday through Friday from 12 p.m. to 10 p.m. I did observe one activation of SQSP's high-risk team, which operates during business hours. A patient was referred for grief following a family loss. The responding clinician screened for suicidality. Even though no safety plan was indicated, the clinician did review with the patient his last plan.

**Active Corrective Action Plans (CAPS)**
CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial," except for suicide precaution rounds, indicate that the CAP has been preliminarily met, with sustainability to be assessed at the next site visit.

Appendix A summarizes SQSP's status with respect to the PIP-specific CAPs that Lindsay Hayes listed in his October 2022 report. Of these, one remains noncompliant, and one is partially compliant. Appendix B summarizes SQSP's status with respect to each outstanding statewide recommendation that Lindsay Hayes listed in Table 1 of his report. SQSP is compliance with all recommendations save Compliance with the Annual Suicide Prevention training, which will be reassessed at the beginning of 2024.

## CONCLUSION

I held an exit meeting with the Warden, Chief of Mental Health, Chief Psychiatrist, CEO, the Chief Nursing Executive, the SPRFIT coordinator, and other key executives and managers. I presented preliminary findings.

As a result of this review, and in consultation with regional representatives from custody and nursing as appropriate, the following CAPs are assigned:

1) Include ASU GP screens as part of the SPRFIT Committee's system surveillance

As a result of this review, the following actions are recommended to SQSP:

| Table 2. Status of Open CAPs | | |
|---|---|---|
| *Source/Date* | *Problem* | *Progress* |
| Hayes Nov 2019 | 1) Timeliness of suicide precaution rounds | Substantial |
| Regional Jul 2021 | 2) Yard and phone use were not consistently entered into NCAT for yard and phone use, including refusals for both activities | Substantial |
| Regional Oct 2022 | 3) For patients who meet SRMP criteria, regularly audit Master Treatment Plans to ensure that these patients are, in fact, included in SRMP (unless there is a clear and documented contraindication) | None |
| Regional Feb 2023 | 4) In ASU, distribute loaner radios to ASU-ASU transfers who have no other entertainment appliances | Completed |
| Regional Feb 2023 | 5) Create a plan to ensure the chain of custody for 7497 forms | Completed |
| Regional Feb 2023 | 6) Create a plan to achieve 100% compliance with SRE Mentoring | Some |
| Regional Feb 2023 | 7) Create a plan to ensure that an order for suicide watch or precaution is accompanied by a progress note that clearly justifies the need for the order or for discontinuing the order | Completed |
| | | |

1) Devise process to ensure ASU pre-screens are signed before requests for bed moves to ASU are made in SOMS
2) In the policy section of the SPRFIT minutes, record the progress of policy revisions
3) Update local policy to reflect the contents of the newest memorandum on semi-annual reviews or self-harm (dated 6-14-2023)
4) Update the policy on SRE mentoring to reflect the contents of the newest memorandum on SRE mentoring (dated 6-7-2023)
5) For patients admitted for DTS, ensure that some aspect of safety planning is reviewed during IDTTs

6) Ensure the SRASHEs are completed when patients are discharged from the SQSP's MHCB and admitted to SQSP's PIP

7) In the PIP, ensure the SRASHEs are completed before discharge orders are submitted

8) Complete the clinical review for the medically serious attempts

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B

**Appendix A: SQSP's Status Regarding PIP-Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | SQSP's Status | Comment |
|---|---|---|
| Develop a CAP to ensure uniformity during the nursing intake screening process to include adequate mental health and suicide risk questions. | N/A | A statewide solution is necessary |
| Develop a CAP to ensure that SRASHEs are always completed consistent with the requirements of the PIP suicide prevention policy | Compliant | Part of standardized local monitoring |
| Develop CAPs at both CMF-PIP and SVSP-PIP to ensure that all cells designated to house suicidal patients are suicide-resistant. | N/A | |
| Develop a CAP to ensure that only Suicide Precaution and Suicide Watch statuses are permitted for the observation for suicidal patients, and that terms such "stags," "mental health observation," "Q-11," "behavioral suicide watch," and "enhanced observation" are prohibited to be used in provider orders and progress notes. | Compliant | No evidence of systematic problems |
| Develop a CAP to ensure that regular nursing rounds conducted at 15-minute intervals (meant for non-suicidal patients) should never be utilized as a substitute for Suicide Precaution status. | N/A | SQSP does not use "call light" or "safety rounds" |
| Develop CAPs at both SVSP-PIP and CIW-PIP to ensure patients on suicide observation status are always assessed on a daily basis, and that orders for discharge from Suicide Watch and Suicide Precaution at SVSP-PIP are only completed following an assessment by a provider. | N/A | |
| Develop CAPs at CMF-PIP, CHCF-PIP, SVSP-PIP, and SQ-PIP to ensure that all patients on suicide observation status are always adequately observed. | Compliant | Part of standardized local monitoring |
| Develop CAPs at CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP to ensure that all provider orders regarding clothing and possessions are clinically justified in medical charts, and that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions. | Compliant | |
| Develop a CAP for all PIPs to ensure that suicidal patients have access to out-of-cell activities that are clinically justified, including those on maximum-security status. | Compliant | |
| Develop a CAP to improve the reliability of data generated from the Mental Health NCAT (Non-Clinical Activity Tracking) database regarding out-of-cell activities. | Partially compliant | Substantial progress |
| Develop a CAP in improve the consistency of IDTT meetings for suicidal patients | Compliant | |

(continued on next page)

(continued)

| | | |
|---|---|---|
| Develop a CAP to improve the adequacy of safety planning and enforce the requirement for supervisory review of a safety plan prior to, or during the IDTT in which the discharging SRASHE is completed. In addition, both CAPs should include clear guidance that a patient's current low acute risk at discharge and/or refusal or lack of cooperation for safety plan development should never be considered reasons for exemption to both safety plan development and supervisory review. | Compliant | |
| Develop a CAP to ensure that "contracting for safety" is not utilized. | Compliant | |
| Develop CAPs to increase custody, medical, and mental health staff compliance for annual suicide prevention training at CMF-PIP and CHCF-PIP. | Non-compliant | SQSP moved to "hard scheduling"; to be reassessed in early 2024 |
| Develop CAPs to increase mental health clinician compliance rates for both SRE mentoring program and seven-hour SRE training at CMF-PIP, CHCF-PIP, and SVSP-PIP. | N/A | |
| Develop a CAP to ensure that SPRFITs at each PIP meet required monthly meeting quorums and that deficient suicide prevention practices, including those cited in this reviewer's report, are remedied. | Compliant | |

**Appendix B: SQSP's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| *Aspect of Recommendation that Remains Outstanding* | *SQSP's Status* | *Comment* |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Non-compliant | Less than 100% |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Completing SREs (for urgent/emergent referrals for DTS) | Compliant | |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audits of safety plans | Compliant | Compliant with safety plan completion; compliant with safety plan audits |
| No. 18: Safety planning training | Compliant | 100% of staff have been trained |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | Compliant | Continuous Quality Improvement Audit is a statewide item; SQSP is not a reception center |

Exhibit F

 

# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 11/28/2023 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD<br>Sr. Psychologist Specialist<br>Suicide Prevention Unit, Region 1 |
| **Subject:** | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) SUICIDE PREVENTION TOUR-ROUND 6, OCTOBER 2023 |

On October 18th and 19th of 2023, I conducted an on-site review of SAC's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, this audit covered the period July 2023 through September 2023.

**Institutional Updates**

SAC is implementing the new standardized restricted housing policy, which involves increasing out-of-cell time to 20 hours, adding a night yard, using the same property matrix, shortening SHU terms, and removing some offenses from the SHU matrix.

Mental health staffing continues to be a concern. The adjusted vacancy rate is 41% for social workers and 39% for psychologists. As a result of low staffing, multiple program modifications are in place for the CCCMS and EOP programs. CIT has also been suspended.

In each of my last two reports, I noted the rate of consults for suicidality had increased by 50% following the introduction of body-worn cameras for officers in February. The increase has become a stable trend. SAC's 6-month rate of consults remains elevated over last year's typical levels: 267 per 1,000, which is 13 times higher than the statewide average. Inpatient admissions also increased following the introduction of body-worn cameras and remained high relative to SAC's previous baseline. Admissions to inpatient units remain elevated—an expected result given that consults for suicidality are increasing.  The rate of self-harm declined during the past three months.

**Restricted Housing**
SAC has three segregated units: ASU EOP, STRH, and PSU.

*Second Watch Morning Meeting*
SAC holds morning meetings in ASU EOP and STRH. Staff use the huddle report to record attendance. I was unable to attend the morning meeting at PSU, but asked the local SPRFIT to attend and report her observations. All required members were present, and members discussed all required topics (e.g., new arrivals, and patients of concern).

*Intake Cells*
SAC has 15 retrofitted cells in its ASU EOP unit (building A5, B section; cells 105-109, 114-121, 217-218) and eight retrofitted cells in its STRH unit ("stand-alone" building; cells 100-107). In his last visit, Lindsay Hayes noted that all cells were suicide-resistant.

In the ASU EOP unit, all 15 retrofitted intake cells had "INTAKE CELL" stenciled above their doors. Five intake cells were occupied. All were in the cells for less than 72 hours. In addition, all had a placard that included the 72-hour start and end dates and the 21-day end date. These are marked improvements over my last visit. (See Figure 1 for an example placard).



Figure 1: Example of a Placard in ASU EOP and STRH

Like ASU EOP, all retrofitted intake cells had "INTAKE CELL" stenciled above their doors. Four retrofitted intake cells were occupied. None were past the 72-hour mark. All cells had a placard with appropriate dates noted.

*Psychiatric Technician (PT) Rounds*
I observed PT rounding in ASU EOP. The PT asked the required questions of mental health inmates and documented in real-time. There were no mental health concerns requiring a referral.

Finally, the Senior PT conducts a monthly audit to monitor documentation during rounding. According to monthly SPRFIT minutes, compliance was good: 100% in July, 99% in August, and 99% in September.

*Access to Entertainment Appliances*
In ASU EOP, all inmates on 21-day intake status had an entertainment appliance. This is a marked improvement. In addition, the unit had a supply of radios on hand, which is another improvement over my last visit.

In STRH, all inmates on 21-day intake status had an entertainment appliance (N=26).

*Welfare Check Completion (Guard 1)*
In ASU EOP, I observed an officer complete Guard 1 checks. The officer deliberately paused at each cell and used a flashlight when cells were dark.  I also observed high-quality Guard 1 checks in ASU EOP and STRH. The officer I observed in each unit made deliberate stops at each cell, used a flashlight on dark cells, and, when window coverings were present, stayed at the cell until the inmate cooperated with the visual check. I was not able to see checks in PSU.

Overall compliance with Guard 1 checks in September was 87%. I consulted with the Region 1 Lieutenants from the MHCT who reported that low compliance was due to ongoing custody vacancies.

*ASU Pre-Screening (Pre-Placement)*
Per the SPRFIT report, overall compliance with ASU pre-placement screens during the audit period was fair: 77% (N=385). This is about the same level of performance I observed in my last two visits and close to the statewide average (88%). The main reasons are movement between segregated units and movement from a segregated unit to alternative housing and then back to ASU. However, ASU pre-screens were not designed for either type of movement. Therefore, while performance appears only fair, there does not appear to be a gap in suicide prevention. There is a related improvement project, but no progress has been made since my last visit. (I consulted with the local SPRFIT and recommended several changes for the project lead to consider.)

I was not able to observe an ASU pre-screening.

*ASU GP Screens (Post Placement)*
During the audit period, overall compliance with ASU GP screens was 89% (N= 46), which is roughly similar to performance at my last visit. (Notably, September was 64%.) The reasons for performance consistently below 90% are unclear. SAC assigned investigation of the problem to the improvement project on ASU Pre-Screens.

I was unable to observe an ASU GP screening. However, confidential spaces were available in ASU-EOP (rooms in the dining hall adjacent to the building). (ASU GP screens are not done in STRH or the PSU because all residents are enrolled in the MHSDS.)

**Inpatient Units**
SAC has two licensed MHCBs: CTC-1 (13 beds) and CTC-2 (11 beds). At the time of the visit, the MHCB census was 24.

*Suicide-Resistant Cells*
During Lindsay Hayes' last site visit in November 2018, he reported that all cells in CTC-1 and CTC-2 met CDCR's specifications for suicide resistance. I observed no new changes to the physical plant.

*Interdisciplinary Treatment Team (IDTT)*
I observed four IDTTs across CTCs 1 and 2. All required team members were present and active. In CTC 2, both were discharge IDTTs and the reason for admission was DTS. Appropriately, the team reviewed aspects of the safety plan. The team reviewed orders for observation and issue although as a discharge IDTT, this was not necessary. In CTC-1, the IDTTs were routine and concerned admissions for serious mental impairment, so discussion of safety planning was not indicated. The meetings were held in absentia because the patients were too symptomatic to meaningfully participate. Observation and issue orders were reviewed.

*Quality of Safety Planning*
I reviewed the safety plans of six discharged MHCB patients admitted for suicidality and not referred to a PIP. All patients had safety plans completed before discharge. In all but two of the plans, the content was individualized and appropriate. One plan had good content in the first section, but the remainder of the sections said, "See below." Most plans were completed after IDTT (i.e., the appointments for SREs were scheduled after the IDTT appointment).

I also verified whether the supervisory review of safety plans was occurring (CAT audit: MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans). Since May, SAC audited 86 cases according to the local log. (Due to pending revisions in the audit, headquarters recently suspended the audit until October of 2023.) Audits were generally completed on the day of clinical discharge.

*Suicide Watch and Suicide Precaution*
One patient was on constant observation at the time of my visit (CTC-1). The staff person was engaged in direct and continuous observation and was not engaged in other activities.

The timeliness of suicide precautions rounds continues to be good: 96% in July, 96% in August, and 97% in September. This performance is in line with the current statewide average of 96%. HQ Nursing released a new measure for staggering in late February. SAC's compliance continues to be very good: 98% in July, 99% in August, and 99% in September.

I verified that rounders in CTC-1 and CTC-2 walked the unit with a laptop and rolling cart and documented in real-time.

*Observation and Issue Orders*

MHCB staff posted printed issue orders on each patient's door. Observation and issue were reordered daily as required by the memorandum on state-issued clothing and bedding in the MHCB (10-29-2013 and 3-15-2016). Each patient had an up-to-date observation and issue order posted on their door (Figure 2) per the memorandum on patient identifiers (dated 12-12-2022). Recently, SAC elected to simplify issue orders. Rather than itemizing in the issue order, they simply noted "full issue." All CTC staff have been trained to understand what full issue entails.



Patients in CTC-1 and CTC-2 possessed all ordered items and only those items. No patients had unusual combinations of orders.

*Figure 2: Plastic Sleeves in CTC 1 and 2*

To verify whether progress notes contained justifications for orders, I reviewed five charts of current patients admitted for danger to self and who had orders for suicide watch or precaution at some point in their stay. I reviewed notes on days that suicide watch or suicide precaution was discontinued. With rare exceptions, notes had justifications present. This reflects sustained improvement over two visits. (Of note, SAC audits progress notes for adequate justifications.)

Throughout my review of documentation, I looked for terms that could cause confusion when used to describe suicide watch or precaution (e.g., "stags," "enhanced observation") but found none. I also looked for instances in which providers used contracts for safety and also found none.

*Privileges*
Clinicians generally granted all privileges upon admission to the MHCB.

Recording phone and yard privileges was an area of weakness in past visits. Substantial improvement was evident in my last two visits and again in this visit, albeit with minor exceptions. To verify current compliance, I reviewed the Restricted Housing Unit Report for the week of 9-11-2023 for patients who were present the entire week or nearly so. For phone privileges, I only reviewed non-MAX patients. For yard privileges, I reviewed all patients. Of the 10 patients eligible for phone privileges in CTC-1, two patients had no phone privileges recorded (offered or refused). Of the 13 patients eligible for yard privileges, two patients had no yard privileges recorded (offered or refused). Of the eleven patients in CTC-2 eligible for phone privileges, only one patient had no privileges recorded (offered or refused). Yard privileges were recorded for all patients. (Both CTCs offered phone privileges on Wednesdays and Sundays on 3rd watch. Unstructured yard is only offered on the weekends. Because the yard space is limited, patients are offered unstructured yard on a rotating basis. The rotation is recorded in a binder maintained by custody.)

*Clinical Discharge Follow-ups*
Compliance in this area was strong: 96% overall (N=1,044). I audited seven patients on follow-ups during the audit period. In all cases, the last day was completed by a mental health clinician. (SAC does use PTs to complete contacts needed on the weekends.) In addition, safety plans were completed in all but one of the cases, which is an improvement over my last visit.

*MHCB Rescissions*
During the audit period, staff regularly rescinded MHCB referrals, about half of the total number of MHCB referrals (N=293). This appears to be an expected result of the surge in DTS consults discussed earlier. I examined a sample of six rescissions. A SRASHE was completed in all cases. Safety plans were also completed in all cases, which is a marked improvement.

**Alternative Housing**
One patient was in alternative housing at the time of my site visit. The observer was engaged in direct, constant observation. Staff referred 323 patients to the MHCB during the audit period. Patients were admitted within 24 hours 88% of the time. Although this is a decrease of 11% decrease since my last visit, it was attributable to a single month of low performance (July 80%). Staff reported that the low performance was due to the lack of available MHCB beds statewide. August and September were both 96%.

The local policy on alternative housing specifies a prioritized list of locations. The first locations are CTC beds followed by cells in B-7 (locally referred to as ASHM or "Alternative Housing/ Alternative Safe Housing Management" cells. Currently, cells in B-7 are the most frequently used.

**Suicide Risk Management Program (SRMP)**
During this visit, 200 are enrolled. This is the first time enrollment has not increased since SRMP's introduction. SAC has the largest SRMP population in the state, almost twice the size of the next largest SRMP population. SAC accounts for 20% of the statewide SRMP population.

Twelve patients met the criteria for SRMP but were not yet enrolled. However, staff reported that 10 were scheduled for IDTT, and two cases were false positives.

I reviewed the SRMP section of the Master Treatment Plan for eight patients. Two were erroneously described as not being in the program. I forwarded this information to the local SPRFIT. Of the remainder, all but one had goals and interventions listed. (The single miss had interventions but not goals.)

**Custody Inpatient Discharge Follow-ups**
SAC typically has a high volume of 7497s: 26-45 per month during the audit period. In my last report, I noted SAC initiated an improvement project early this year. However, performance has not yet improved on page 2. Overall compliance was 75% in July, 73% in August, and 77% in September, which is a decrease of 5-8% since my last visit. (Staff report that performance is improving in October, mainly with respect to supervisor reviews.) A main obstacle to improvement is custody vacancies, which sometimes leave a single officer to manage an entire unit. Finally, 7497s continue to be lost, about 4 to 12 a month.

**Institutional SPRFIT Committee**
Because SAC holds in-person meetings, I could not virtually attend a local SPRFIT meeting. During the audit period, minutes were detailed and showed that system surveillance was conducted (e.g., using automated and nonautomated measures, the SPRFIT report). Areas of weakness were identified, and improvement projects were reviewed.

SAC achieved a quorum at all meetings. The committee reviewed self-harm incidents in detail, and it also reviewed SRMP and the quality audits of SRASHEs. The minutes included a review of CAPs generated by regional and Lindsay Hayes visits. SPRFIT minutes were consistently uploaded to the SPRFIT website.

As of the September meeting, the committee had several improvement projects: ASU pre-screens completed timely, custody compliance with 7497 documentation, and volume of emergent/urgent consults. Minutes included a status update on each project.

*Policies*

I completed a detailed review of all policies at SAC related to suicide prevention and all findings were subsequently incorporated into the appropriate policies. In addition, I reviewed local policies to verify that all recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1.

*Severe Self-Harm*

Historically, SAC tends to have the highest rate of self-injury of all non-PIP institutions. Per the SPRFIT report, the 6-month rate for self-harm incidents at SAC was 19.5 per 1,000, which is more than four times higher than the statewide average of 4.2, and it is a modest increase from my last visit. Incidents continue to occur most often among EOP patients (128 of 201), be they on the mainline, in ASU, or in PSU. Two serious suicide attempts occurred during the audit period (AN0195 and F55161). Clinical reviews have not yet been completed.

| Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
| --- | --- |
| **Statewide Memorandum (Date)** | **In Local Policy?** |
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (OP 025) |
| Bad News (4-28-2021) | Yes (OP 115) |
| Discharge custody checks (revised 10-10-2021) | Yes (OP 115) |
| MHCB Patient Identifier (12-03-2021) | Yes (OP 115) |
| SRMP (7-12-2021) | Yes (OP 115) |
| SRE Mentoring (revised 7-12-2022) | Yes (OP 115) |
| Cut-Down Kit (revised 8-10-2022) | Yes (OP 115) |
| Safety Concerns (revised 9-21-2022) | Yes (OP 321) |
| Security Welfare Checks (revised 10-7-2022) | Yes (Addendum to OP 129) |
| Safety Planning (2-13-2023) | Yes (Addendum to OP 115) |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | Yes (draft of OP115) |
| Update to SRE Mentoring Program (6-7-2023) | Yes (Addendum to OP 115) |
| Clinical reviews for serious suicide attempts (6-14-2023) | Yes (draft of OP115) |

*Inmate Family Council*

The local SPRFIT coordinator last attended IFC on 5-18-2023. The date of attendance was recorded in the minutes of the SPRFIT meeting. (June, July, and August were canceled by families.)

*Inmate Advisory Council*

The local SPRFIT coordinator last attended IAC on 7-7-2023. The date of attendance was recorded in the minutes of the SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Due to a sustained increase in DTS consults (450-600 per month), SAC continues to complete SRASHEs over and above its usual high volume. This makes the current high compliance with SRASHE timelines remarkable (96% during the audit period.) Compliance so far this quarter with specific SRASHE timelines for the mainline and the MHCB is as follows:

- Emergent consults for DTS: 98% (N=1343)
- Urgent consults for DTS: 0% (N=2)
- Routine consults for DTS: 100% (N=1)
- At MHCB clinical discharge: 96% (N=161)
- Upon MHCB referral: 99% (N=217)
- Upon arrival from a PIP: 100% (N=22)
- 90-day assessments after rescinded MHCB referral: 95% (N=799)
- 90-day assessments post-MHCB discharge: 94% (N=757)

The timeliness of SREs upon arrival from PIP has improved markedly compared to my last visit (82%).

*Urgent and Emergent Consults for Danger to Self (DTS)*
According to the SPRFIT report, timely contact for urgent and emergent DTS consults appears to be low: 82% over the past six months. Although performance was somewhat higher at the time of my last visit (76%), staff continued to observe errors in the report, and those errors resulted in underestimated compliance (i.e., the report includes voided and canceled consult orders). SAC classified nearly all DTS referrals as emergent (1343 of 1346).

**Emergency Response**

*Cut-Down Kits*
The Mental Health Compliance Team reported 100% compliance as of March 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
The last suicide at SAC occurred in June of 2022 (AS6846). However, nine QIPs were assigned for a suicide that occurred at SVSP (V30437). For a review of those QIPs, see my July report.

**Training and Mentoring Compliance**
Compliance with the Annual IST Suicide Prevention Training for 2022 was fair. Overall compliance was 91%. Compliance for custody was 91%, nursing staff was 85%, and mental health staff was

91%. As of October, SAC is on schedule for its 2023 training: 71% of custody staff, 87% of medical staff, and 91% of mental health staff have completed annual training.

Compliance with long-standing training requirements is very good, except for SRE mentoring. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for SAC as of September 2023, unless otherwise noted:

- Suicide Prevention and SRASHE Core Competency Building: 99%
- SRE Mentoring: 98% (any training), 67% new training
- Safety Planning: 98%
- Suicide Risk Management Program (SRMP): 99%
- C-SSRS: 92%
- Prohibition of safety contracts: 97% for mental health, 84% for nursing
- Nursing CPR: 100%
- Custody CPR: 97% (as of March 2023)

**Receiving and Release (R&R) Screening**
I observed two R&R screenings. In the first, the RN missed the second bad news question. I provided feedback and the nurse subsequently asked all questions during the second screening. Staff report the regular R&R retired, and now the position is covered by floats. The screening was conducted confidentially (with the door closed), and an officer was posted outside the door. The patient was placed in a therapeutic module and cuffs were removed. Over my last visits, R&R screens have been a consistent weakness.  That said, local auditing shows 100% compliance (July through September), which indicates the problems I observed today were not systemic.

No staff spontaneously expressed concern about safety in R&R screenings. SAC's R&R does have a therapeutic module, which is used for all interviews.

**Reception Center Processing**
SAC is not a reception center.

**Crisis Intervention Team (CIT)**
SAC no longer operates a CIT due to its staffing shortage. It

| Table 2. Status of Open CAPs | | |
|---|---|---|
| *Source/Date* | *Problem* | *Progress* |
| Regional Oct 2022 | 1) Investigate the reasons for low compliance with ASU pre-screens and ASU GP screens and take the indicated action | Substantial |
| Regional Mar 2023 | 2) Create a plan to ensure the chain of custody regarding 7497 forms and improve compliance on page 2 of the form | Some |
| Regional Mar 2023 | 3) In the MHCB, improve the quality of documented justifications for suicide watch and suicide precaution | Completed |
| **Regional Jun 2023** | 4) Ensure MHCB clinicians complete safety plans prior to the discharge IDTT, per policy | None |

still uses a clinician after hours to take calls.

**Active Corrective Action Plans (CAPS)**
CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, all CAPs will remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial," except for suicide precaution rounds, indicate marked progress or that the CAP has been preliminarily met, with sustainability to be assessed at the next site visit.

Appendix A summarizes SAC's status regarding the CAPs that Lindsay Hayes recommended in his October 2022 report. All CAPs are compliant as of this visit. Appendix B summarizes SAC's status regarding each outstanding statewide recommendation that Lindsay Hayes listed in Table 1 of his report. As of this visit, SAC is not compliant with one recommendation.

## CONCLUSION

I held an exit meeting with the Warden, CEO, Sr. Psychiatrist, Chief Nursing Executive, SPRFIT coordinator, and other key executives and managers. I presented preliminary findings.

As a result of this review, one new CAP is assigned:

1) Add ASU GP screens to the Pipeline and address it as a separate improvement project

As a result of this review, the following actions are recommended:

1) When custody vacancies are resolved, improve compliance with Guard 1 checks
2) Monitor the Restricted Housing Unit Report to ensure the phone and yard privileges are recorded for all eligible patients
3) Complete the clinical reviews for the suicide attempts that occurred during the review period
4) Improve nursing's compliance with the review of the memorandum regarding the prohibition of safety contracts

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B

**MEMORANDUM**

**Appendix A: SAC's Status Regarding Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | SAC's Status | Comment |
|---|---|---|
| Develop a CAP to ensure that nurses nursing accurately asked all intake screening questions | Compliant | Deficiencies present this visit but local audits show a pattern of strong compliance |
| Develop a CAP to create an LOP addressing "Inmate-Patients Receiving Bad News" | Compliant | |
| Develop a CAP to create an LOP for SRMP and to track SRMP during local SPRFIT meetings | Compliant | |

**Appendix B: SAC's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| Aspect of Recommendation that Remains Outstanding | SAC's Status | Comment |
|---|---|---|
| No. 7: Confidentiality of nursing screens in R&R | Compliant | |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | |
| No. 9: SRE mentoring program | Compliant | 98% as of July 2023 |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Sufficient number of retrofitted intake cells | Compliant | Ample vacancies observed |
| No. 13: Use of retrofitted cells in first 72 hours of ASU placement | Compliant | |
| No. 17: Completing safety plans, supervisory audits of safety plans | Compliant | |
| No. 18: Safety planning training | Compliant | 95% as of July 2023 |
| No. 20: Audit psych tech practices in ASU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Noncompliant | Deficiencies present this visit |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | N/A | Continuous Quality Improvement Audit is a statewide item; SAC is not a reception center |

Exhibit G

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**



# MEMORANDUM

| | |
|---|---|
| **Date:** | 12/22/2023 |

| | |
|---|---|
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD |
| | Sr. Psychologist Specialist |
| | Suicide Prevention Unit, Region 1 |
| **Subject:** | MULE CREEK STATE PRISON (MCSP) SUICIDE PREVENTION TOUR - ROUND 7, DECEMBER 2023 |

On December 12th and 12th 2023, I conducted an on-site review of MCSP's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, the audit period was September through November of 2023.

**Institutional Updates**

This report's findings should be understood in the context of MCSP's ongoing mental health staffing shortage. MCSP reports a 62% functional vacancy rate for psychology and social work, which is 3% higher than at my last visit. More vacancies are expected in the near future. Program guide modifications to the EOP and CCCMS programs, which began in March 2022, are still in place.

**Restricted Housing**

*Second Watch Morning Meeting*
At MCSP, the morning meeting is held on the unit in the sergeant's office and is combined with the partnership huddle. A clinician and sergeant were present, in addition to a PT. The meeting continues to be robust, with good multidisciplinary input and coverage of the required topics. In addition, staff reviewed the status of each patient in SRMP, which is a laudable practice.

*Psychiatric Technician (PT) Rounds*
I observed two psychiatric technicians (PT) complete rounds. For MHSDS patients, both asked all MHSDS patients about suicidal ideation and completed charting in real-time using a laptop on a

**MEMORANDUM**

rolling cart. One PT asked GP inmates "How's your day?" rather than the required question, "Do you have any mental concerns?" I shared my observation with the local CNE.

*Intake Cells*
MCSP has 13 retrofitted cells (126-133, 229-233) in Building 12. (Cells 226-28 were decommissioned as intake cells in approximately August 2021.) I previously inspected all intake cells, and all generally complied with CDCR's specification for suicide resistance. When all intake cells are occupied, staff place patients in cells reserved for alternative housing (cells 147-150). These cells are also retrofitted.

Intake cells were clearly labeled with an "intake" stencil. In addition, MCSP has a system of placards for identifying the intake status of inmates: green placards for the first 72-hour period, blue for the first 21 days, and yellow for inmates past the 21 days. The placards are placed in plastic sleeves, which are posted on the cell doors. All placards were up-to-date.

Two intake cells were in use, and both patients were within the 72-hour period.

*Access to Entertainment Appliances*
All but two inmates in the 21-day intake period (N=27) had an entertainment appliance, either a radio, TV, or tablet. I brought the issue of missing radios to the RHU sergeant, and radios were issued the same day.

*Welfare Check Completion (Guard 1)*
I observed two officers complete Guard 1 checks. The checks were of good quality: The officers stopped at each door and deliberately looked inside each cell. (That said, the suicide case review that is underway for a recent suicide at MHCSP revealed poor quality checks on 3rd watch. A related QIP is expected.) I also reviewed the statewide Security/Welfare Check Monitoring Report for May. Compliance was 94.5% in November.

*RHU Pre-Screening (Pre-Placement)*
I was unable to see an RHU pre-screening during the visit. Compliance with RHU pre-screens was fair overall during the audit period and unchanged from my last visit: (87%, N=218, range 86-89%). Staff attributes this level of compliance to the methodology of the current report, which does not take into account RHU-to-RHU transfers. (MCSP is an RHU hub and has many such transfers.) I found eight cases of RHU transfers to an MHCB and back to MCSP's RHU. I elevated the issue to the statewide chief of suicide prevention in November 2023. That said, the major source of depressed performance was cases in which pre-screens were late by 5 to 60 minutes. I found 19 such instances. This is likely due to SOMS movement being entered before pre-

screenings were signed. Thus, although there is no systematic gap in screening, performance could be improved by signing pre-screenings before SOMS movement.

*RHU GP Screens (Post Placement)*
I observed one RHU GP screening. All required questions were asked. (The PT used a preprinted list of the questions to ensure accuracy). However, the screening was conducted on the dayroom floor rather than in a confidential office. In previous visits, staff reported to me that inmates are normally escorted to Building 12.5 and interviewed in a confidential office when those rooms are available. I confirmed that rooms were available at the time of the screening. I shared my observation with the local CNE.

Compliance with RHU GP screens was excellent overall (100%, N=27).

**Inpatient Units**
MCSP has one licensed MHCB consisting of 8 beds. On the second day of my visit, the census was 6.

*Suicide-Resistant Cells*
During Lindsay Hayes' last site visit in June 2019, he reported that all cells were suicide resistant.

*Interdisciplinary Treatment Team (IDTT)*
I observed four IDTTs: one routine and three discharges. All required team members were present and active. The MHCB supervisor was present and coordinated the meeting. All patients were admitted for danger to self. In one case, observation and issue orders were not discussed. However, as I have previously reported, the MHCB team reviews these orders daily during the morning huddle. Safety planning was not discussed in any of the cases. In one case, this was permissible because the IDTT had to be cut short due to a patient's increasing irritability.

*Quality of Safety Planning*
I reviewed the safety plans of ten MHCB patients admitted for suicidality and not transferred to a PIP. All but one had the required safety plan. Plans contained clinical impressions and interventions, which is an improvement over my last visit.

I also verified whether the supervisory review of safety plans was occurring. I reviewed the local log of reviews and found that 34 charts were reviewed during the audit period.

*Suicide Watch and Precaution*
No patients were on constant observation at the time of the visit.

Over the audit period, the timeliness of suicide precaution rounding was very good: 96-98%. Compliance with staggering suicide precaution rounds was consistently high (95-99%). The rounder directly observed patients and documented in real-time using a rolling cart equipped with a laptop.

*Observation and Issue Orders*
On each patient's door is a plastic sleeve containing the most recent observation and issue orders. All orders were up-to-date. Patients possessed ordered items.

I reviewed orders for current patients. Clinicians re-ordered observation and issue daily as required by statewide memorandums (10-29-2013, 11-16-2021). I reviewed the charts of seven patients and looked for justifications for the level of observation and issue. In four charts, clinicians did not document a clinical rationale for discontinuing suicide watch or suicide precaution.

*Privileges*
I reviewed privileges for current patients. Clinicians granted all privileges to patients upon admission. MCSP has one full-time recreational therapist dedicated to the CTC.

Recently, custody implemented a plan to deliver one hour of unstructured yard per week to each patient. Patients in half the cells are offered yard on Saturday and the other half on Sunday. This is a nominal amount of yard time. Using the Automated Restricted Housing Record (ARHR), I reviewed privilege documentation for the week of 11-27-2023 for four patients who were present the entire week. Phone privileges were offered daily, and showers were offered regularly. During the week I audited, no patient had more than 1.25 hours of yard hours documented. (I checked other weeks and generally found the same pattern.)

All patients had a timely mechanical restraint review (MMR).

*Clinical Discharge Follow-Ups*
Per the Performance Report, MCSP completed all five days of clinical discharge follow-ups 99% of the time during the audit period (N=835 days). MCSP does use PTs on holidays and weekends.

*MHCB Rescissions*
During the audit period, 96 of 191 MHCB referrals were rescinded. I audited seven cases in which the reason for referral was DTS and verified that all had the required SRASHE and safety plan.

*Other MHCB Issues*

Just prior to my last visit, MCSP developed and implemented a system for providing patients access to tablets during their stay. Tablet access is still occurring and is a laudable practice.

**Alternative Housing**

No patients were in alternative housing at the time of the visit. Patients were routinely referred to the MHCB during the audit period and transferred within 24 hours 95% of the time (N=191). Although MCSP's local policy does specify a prioritized list of locations, in practice, four cells in RHU are used (147-150), all of which are retrofitted.

**Suicide Risk Management Program (SRMP)**

The SRMP population is steadily growing at MCSP. At the time of the site review, 121 patients were enrolled in SRMP versus 105 and 88 at my last two visits. No patients were eligible for SRMP but not yet enrolled. I also audited the treatment plans of 13 patients enrolled in SRMP. Eleven had goals and interventions listed. One was incorrectly described as not applicable, which is fewer than in my last audit. The improvement is attributable to a new audit process at MCSP. One of the SPR-FIT coordinators regularly audits random patients from SRMP each week to ensure that their SRMP status is accurately reflected in the master treatment plan. In addition, the coordinator alerts clinicians to patients who have been in the program for more than a year and appear to have met their SRMP goals. These are both laudable practices.

**Custody Inpatient Discharge Follow-Ups**

Although compliance with the 7497 form has been a historical weakness at MCSP, durable compliance was evident on my last visit, and the pattern continues: 97% in September (N=20), 95% in October (N=20), and 94% in November (N=20).

**Institutional SPRFIT Committee**

I did not virtually attend a local SPRFIT subcommittee meeting this quarter. I reviewed the available minutes during the audit period. A quorum was achieved at all meetings. The minutes were detailed and met all audit criteria. As noted in my last report, MCSP has one active improvement project pertaining to suicide watch documentation. November was the first month of substantial improvement in compliance: 88% vs 55-71% in the three months prior.

*Policies*

MCSP does have a local suicide prevention policy (MC 59). I also reviewed local policies to verify that recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 1. Local policy does not yet include a reference to

patient identifiers in MHCB or the requirement for supervisory review of discharge plans on or before clinical discharge.

**Severe Self-Harm**

Per the SPRFIT Reboot report, the six-month average for self-harm incidents is 3.6 per 1000, which was below the statewide average of 4.2. The local SPRFIT does monitor self-harm trends. November SPRFIT minutes noted increase in overdoses on yards B and C. So far this year, one medically serious suicide attempts has occurred at MCSP. A review was completed.

| Table 1. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| **Statewide Memorandum (Date)** | **In Local Policy?** |
| Alternative Housing (12-12-2012, 5-16-2012) | Yes (MC 38) |
| Bad News (4-28-2021) | Yes (MC 59) |
| Discharge custody checks (revised 10-19-2021) | Yes (MC 115) |
| MHCB Patient Identifier (12-03-2022) | No*(MC 038) |
| SRMP (7-12-2021) | Yes (MC 59) |
| CIT (7-8-2021) | Yes (MC 024) |
| SRE Mentoring (revised 7-12-2022) | Yes (MHLOP 014) |
| Cut-Down Kit (revised 8-10-2022) | Yes (MC 127) |
| Safety Concerns (revised 9-21-2022) | Yes (MC 038) |
| Security Welfare Checks (revised 10-7-2022) | Yes (MC 42) |
| Safety Planning (2-13-2023) | No** (MC 059 or MC 038) |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | Yes (addendum to MC 059) |
| SRE Mentoring 2nd revision (6-7-2023) | Yes |
| Semi-annual reviews/RCAs of self-harm (6-14-2023) | Yes (addendum to MC 059) |
| Note: * Indicates that a policy exists but has not yet been updated to reflect the memorandum. Policy updates occur annually. ** Policies do not yet include the requirement for supervisory review of discharge plans on or before clinical discharge | |

**Inmate Family Council**

The local SPRFIT coordinator attends IFC every six months. The last date of attendance was 1-19-2023. The last meeting in September 2023, was cancelled, and this was noted in minutes of the October SPRFIT meeting.

**Inmate Advisory Council**

The local SPRFIT coordinator last attended IAC on 5-4-3023. The last meeting in September 2023 was canceled, and this was also noted in the minutes of the October SPRFIT meeting.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*

Per the On Demand report, overall compliance with SRASHE timelines during the audit period was high (98%, N=1,193). MCSP completed a substantial number of SRASHEs during the audit period: about 400 per month. Monthly compliance with specific SRASHE timelines for the mainline and MHCB was very good, except for upon arrival from PIP.

- Emergent consults for DTS: 98% (N=230)
- Urgent consults for DTS: 100% (N=1)

- At MHCB clinical discharge: 96% (N=77)
- Upon MHCB referral: 100% (N=140)
- Upon arrival from PIP: 69% (N=16)
- After rescinded MHCB referral: 98% (N=356)
- 90-day assessments post-MHCB discharge: 98% (n=371)

I examined the five late SRASHEs for PIP returns. I found that three were late by hours and two were completed the day after the due date. Thus, although compliance was low, it did not amount to a concerning gap in suicide prevention.

*Urgent and Emergent Consults for Danger to Self*
I reviewed referrals for which the referral reason was Danger to Self (DTS). MCSP appropriately and consistently classified nearly all such referrals as emergent (99%, 229 out of 230).

**Emergency Response**

*Cut-Down Kits*
The Mental Health Compliance Team reported 100% as of November 2023.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
Three suicides have occurred thus far in 2023: BD4059 in late May, K77832 in early June, and AL7441 in November. The first two happened on consecutive days. There are no open QIPs. The suicide case review for the third death is in process.

For BD4059, there were five QIPs:

1. One master treatment plan did not contain substantive IPOCs
2. An initial assessment contained outdated information
3. Routine contacts were not timely or were missed
4. Two nursing forms (primary and secondary assessments) were not completed following the emergent medical response
5. DOT medication was not administered for four days while the patient was in a family housing unit

Because the causes of QIPs 1 through 3 were attributed to critical staffing at MCSP, I did not reassess them. QIPs 4 and 5 pertain to nursing functions, which are outside of my scope, so I did not assess them.

For K77832, there was one QIP:

1. Two nursing forms (primary and secondary assessments) were not completed following the emergent medical response

This QIP concerned nursing functions, which are outside of my scope, so I did not assess it.

**Training and Mentoring Compliance**

In 2022, compliance with Annual IST Suicide Prevention Training was: Custody 95%, medical/nursing 92%, and mental health 83%. Year-to-date compliance is on track except for mental health: custody 97%, nursing 94%, and mental health 75%. Staff report that compliance is already higher because additional IST trainings have been held.

Compliance with long-standing training requirements is very good except for SRE mentoring and nursing's compliance with the LMS on safety contracts. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for MCSP as of November 2023:

- Suicide Prevention and SRASHE Core Competency Building:95%
- SRE Mentoring: 82% (any version), 40% (new version)
- Safety Planning Intervention: 95%
- Suicide Risk Management Program (SRMP): 100%
- C-SSRS: 98%
- Discontinuing the use of safety contracts: 100% for mental health, 95% for nursing
- Nursing CPR: 100%
- Custody CPR: 94% (as of November 2023)

Progress with SRE mentoring has been slowed by critical staffing at MCSP. Half of the mentors are line staff, and line staff that require mentoring have difficulty being available due to their workloads. Finally, there has been turnover at MCSP, which creates new mentoring needs.

**Receiving and Release (R&R) Screening**

I was unable to observe R&R screenings because there were no new arrivals. MCSP does have a confidential room for screenings.

**Reception Center Processing**

MCSP is not a reception center.

**Crisis Intervention Team (CIT)**

MCSP has maintained shortened CIT hours due to the local staffing shortage. CIT operates only on Friday, Saturday, and Sunday from 1400-2200 (3rd watch hours). CIT was not scheduled to be active on the days of my visit.

The team is active and responded to about 17 calls during the audit period. All CIT events had the required members. All events were for suicidal ideation, and all but one of the patients were returned to housing. Finally, I reviewed six cases and found that all had the

| Table 2. Status of CAPs | | |
|---|---|---|
| **Source/Date** | **Problem** | **Progress** |
| Hayes Jun 2019 | 1. Timeliness of suicide precaution rounds | Substantial |
| Regional Sep. 2023 | 2. Devise a plan in which custody officers offer unstructured yard time to MHCB patients on a regularly scheduled basis | Completed |
| | | |

required SRASHE and CIT PowerForm. In multiple cases of referrals for suicidal ideation, the clinician determined that ideation was feigned and, thus, safety planning was not indicated. This is a clinically reasonable departure from policy, which requires a safety plan whenever the referring reason is suicidal ideation.

**Active Corrective Action Plans (CAPs)**

CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports.

Appendix A summarizes the institution's status regarding the CAPs that Lindsay Hayes recommended in his October 2022 report. Appendix B summarizes institutions's status regarding each outstanding statewide recommendation that Lindsay Hayes listed in Table 1 of his report. All applicable CAPs in the Appendices are compliant as of this visit, save one: compliance with SRE mentoring.

---

## CONCLUSION

An exit meeting was held with the Chief Deputy Warden, CEO, Chief of Mental Health, Chief Psychologist, CNE, SPRFIT coordinators, and other key executives and managers. Preliminary findings were presented.

Temporarily, due to the severe mental health staffing shortage, new CAPs pertaining to mental health deficiencies will be deferred. Instead, all such deficiencies will be listed as

recommendations. When mental health staffing improves, some recommendations will be changed to CAPs. The following CAPs pertain to nursing only:

1) Train PTs to always ask GP inmates in RHU, "Do you have any mental health concerns?" to be consistent with the corresponding nursing training
2) Train PTs to use confidential space in building 12.5 (as available) when GP inmates in RHU agree to a confidential screening rather than rely on modules located on the dayroom floor of RHU
3) Improve compliance with RHU pre-screens to 90% or above

As a result of this review, the following actions are recommended to MCSP:

1) Train MHCB clinicians to document justifications for discontinuing suicide watch and suicide precaution
2) Consider developing an audit to monitor justifications for discontinuing suicide watch and suicide precaution are present in the charts of MHCB patients
3) Update the policies pertaining to safety planning so they reference the supervisory review of discharge safety plans
4) Regarding the plan to provide unstructured yard in the MHCB:
    a. Review the plan to determine whether more than one hour a week can be provided
    b. Ensure that all unstructured yard is provided by officers and use the "yard" code in the ARHR only when yard is provided by officers
    c. Create a Post Order Addendum that describes the provision of unstructured yard in the MHCB

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).

Addendum: Appendices A and B

 

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**

**Appendix A: MCSP's Status Regarding Specific CAPs Listed Lindsay Hayes' October 2022 Report**

| CAP | Status | Comment |
|---|---|---|
| Ensure that compliance for SRASHE's following emergent and urgent referrals for DTS exceeds 90% | Compliant | |
| Ensure the compliance with safety plans at MHCB discharge exceeds 90% | Compliant | |
| Ensure that all CDCR facilities are auditing safety plans prior to MHCB discharge | Compliant | |
| Ensure that all facilities below 90% regarding page 1 or page 2 of the 7497 form exceed 90% | Compliant | |

**Appendix B: MCSP's Status Regarding Compliance with Outstanding Recommendations in Lindsay Hayes' October 2022 Report**

| Aspect of Recommendation that Remains Outstanding | Status | Comment |
| --- | --- | --- |
| No. 7: Confidentiality of nursing screens in R&R | Compliant | Unable to assess this visit |
| No. 8: Nurse and officer safety during R&R screenings | Compliant | No local concerns reported |
| No. 9: SRE mentoring program | Noncompliant | 82% (any version), 40% (new version) |
| No. 10: Auditing SRE quality | Compliant | Quality audits are completed quarterly |
| No. 12: Sufficient number of retrofitted intake cells | Compliant | From Apr-November 2023, intake cell capacity was not exceeded per staff report |
| No. 13: Use of retrofitted cells in first 72 hours of RHU placement | Compliant | Compliance is sometimes constrained by the size of the RHU population |
| No. 17: Completing safety plans, supervisory audits of safety plans | Compliant | |
| No. 18: Safety planning training | Compliant | 95% |
| No. 20: Audit psych tech practices in RHU | Compliant | |
| No. 21: Using only suicide precaution and suicide watch for suicidal patients | Compliant | |
| No. 28: Accurate completion of page 2 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 29: Accurate completion of page 1 of the "Discharge Custody Check Sheet" | Compliant | |
| No. 31: Achieving quorum for SPRFIT meetings, incomplete local policies | Compliant | |
| No. 32: Privileges for MHCB inmates, Continuous Quality Improvement Audit, Reception Center screening | N/A | Continuous Quality Improvement Audit is a statewide item; MCSP is not a reception center |

Exhibit H



**CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES**

# MEMORANDUM

| | |
|---|---|
| **Date:** | 1/22/2024 |
| **To:** | Statewide Suicide Prevention and Response – Focused Improvement Team Committee |
| **From:** | Joseph H. Obegi, PsyD<br>Sr. Psychologist Specialist<br>Suicide Prevention Unit, Region 1 |
| **Subject:** | CALIFORNIA MEDICAL FACILITY, SUICIDE PREVENTION TOUR - ROUND 7, DECEMBER 2023 |

On December 19th, 20th, and 21st of 2023, I conducted an on-site review of CMF-PIP and CMF's compliance with statewide suicide prevention and response policies. This report summarizes all findings and concludes with corrective action plans and recommendations. Unless otherwise noted, the audit covered the period September 2023 through November 2023.

**Institutional Updates**
This report's findings should be understood in the context of a critical and worsening mental health staffing shortage at CMF. (Staffing first became impacted in November 2021.) This has affected line staff and supervisory positions. Program modifications have been in place since early 2022. In addition, the ability of the SPRFIT committee to monitor and respond to deficiencies is severely impeded. The severity has also impacted CMF's ability to meet the requirement for contacts by a psychologist or social worker in the MHCB and PIP.

---

### CMF-PIP

**Restricted Housing**
Because the PIP is a psychiatric hospital and not a mainline program, a review of suicide prevention practices in mainline restricted housing units (a review of morning meetings, PT rounds, intake cells, etc.) was not applicable.

**Inpatient Units**

CMF-PIP consists of 12 units totaling 396 beds. The PIP has a combination of Acute and ICF units, but each program's total number of beds changes depending on statewide need. The PIP has one Acute MAX unit (Q3) and two ICF dormitories. Outside of the dormitories, all beds are single-occupant cells.

*Suicide-Resistant Cells*

Since my last visit, I observed no changes in the physical plant that changed the suicide resistance of cells.

*Interdisciplinary Treatment Team (IDTT)*

I observed five IDTTs, two of which were admitted for DTS. All required team members were present and active participants. In some cases, CCIs attended remotely. Brief summaries were presented, and treatment planning was discussed. Safety planning was not reviewed in the meeting for one of the two patients admitted for DTS. Because patients were not on an enhanced level of observation or on limited issue, discussions of observation and issue were appropriately omitted from discussion.

*Quality of Safety Planning*

I reviewed the safety plans of 7 discharged PIP patients across Acute and ICF admitted for suicidality. All but one had a safety plan, which is a significant improvement over my last visit.

Due to critical staffing, CMF suspended the CAT audit pertaining to MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans in early 2023.

*Suicide Watch and Suicide Precaution*

I was able to observe constant observation being conducted on one patient. The observer was constantly monitoring and not engaged in other activities.

The overall timeliness of suicide precaution rounding was good in the past six months: 96% (range = 94-98%). Compliance with staggering was also good: 96% in September, 96% in October, and 97% in November.

I observed nursing staff complete suicide precaution rounds. In S2, the nurse observed the sole patient on suicide precaution but did not have a laptop with her, so she did not document in real time. In contrast, in S2 and Q1, the nurses used a rolling cart equipped with a laptop to document in real time. Because the former appeared to be an isolated issue, I relayed the finding to the local CNE, and the staff member was subsequently trained.

*Observation and Issue Orders*
Four patients were on suicide watch or precaution on the last day of my visit.

Orders were placed in a plastic sleeve beside each patient's door. The orders were up-to-date and generally accurate. I observed minor anomalies. In one case, a communication order was posted rather than the more detailed requisition order. (I asked staff to correct these issues while I was on site.) In two other cases, issue orders contained contradictory information: The order noted "partial," but the itemized list suggested full issue (and the patient possessed full issue). I asked the staff to correct these issues while I was onsite.

I reviewed the orders for six patients on suicide watch or precaution in the last seven days (N=13), and all contained justifications when those orders were discontinued. I also reviewed the same cases for terms that could cause confusion when used to describe suicide watch or precaution (e.g., "stags," "enhanced observation"). I found no confusing terms. Finally, I found no evidence that staff were relying on safety rounds (i.e., call-light rounds) rather than utilizing suicide precaution orders.

The Acute program continues not to issue bed linens to patients when they are no longer on enhanced observation and ordered full issue. This contradicts Title 15, Section 3030, State-Issued Inmate Clothing and Linen. It also differs from the general practice of limiting stated-issued clothing and linens in inpatient units only when a clinical indication exists.

*Privileges*
Clinicians granted all privileges to patients upon admission to the PIP.

I reviewed the NCAT entries for 12 patients for the week of November 12th through the 19th, one from each unit. All privileges were generally provided. Dayroom was almost always documented daily. Two units recorded two showers, and the remainder was recorded three. Yard was regularly offered, most often daily. There was a pattern of not recording phone privileges, with only three units recording them. CMF does have an improvement project dedicated to NCATs.

*MHCB Rescissions*
Not applicable.

*Other PIP Issues*
To verify compliance with the memorandums prohibiting the use of safety contracts (dated 1-23-2023 and 2-17-2023), I conducted an EHRS search using the search term "contract" in the charts of five patients admitted for DTS to CMF's PIP. I found no instances of "contract."

**Alternative Housing**
Not applicable. The PIP does not operate alternative housing.

**Suicide Risk Management Program (SRMP)**
Not applicable. SRMP is an outpatient program.

**Custody Inpatient Discharge Follow-ups**
Not applicable. Follow-ups are an outpatient function.

**Institutional SPRFIT Committee**
As of August 2023, CMF now operates a single SPRFIT meeting that covers business in both the PIP and the non-PIP. For details of the committee's functioning, please refer to the Institutional SPRFIT Committee section under the CMF heading below.

| Table 1. Alignment of Local Policies with Recent PIP-Specific Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| *Statewide Memorandum (Date)* | *In Local Policy* |
| PIP Suicide Prevention (01-06-2021) | No |
| Non-Clinical Out of Cell Time Tracking (03-08-2021) | Yes (OP 63) |
| PIP Allowable Items Contraband Policy (9-29-2021) | No[a] (Vol. XVI, Ch. 11, Section 2.02) |
| Completion of Suicide Risk Assessments and Self-Harm Evaluations in PIP Settings (10-22-2021) | Yes (Ch. 11, Sections 1.07 and 1.08) |
| Update to Suicide Precaution and Suicide Watch Orders (11-16-2021) | No |
| MHCB Patient Identifier (12-03-2022) | No[a] |
| Safety Concerns (revised 9-21-2022) | No |
| Safety planning (2-13-2023) | No |
| Note: [a] denotes policies with relevant content but not yet updated to reflect the most recent memorandum. | |

*Policies*
The PIP operates under CMF's local suicide prevention policy (Ch. 4, Section 3). I reviewed local policies to verify that recent statewide memorandums specific to suicide prevention in PIPs have been incorporated into local policy. The results are presented in Table 1. On my last visit, staff were confused about the location of the policies, so I could not confirm whether all local policies were present and up-to-date. Just prior to my current visit, the CMH had assigned the responsibility of reviewing all local MHSDS policies to a program director. Although policy gaps still exist, I expect many to be corrected at my next visit as a result of this assignment. (Updating local policies is a current corrective action plan (CAP).

*Severe Self-Harm*
The 6-month average for self-harm incidents is 65.7 per 1000, which is substantially lower than the rate as of my previous visit. The rate is higher than the statewide average (4.2) but lower than a similarly sized PIP (161; CHCF). A large dip in the self-harm rate occurred in June, and this coincided with the rollout of tablets in the PIP. The number of incidents per month ranged from 5 to 26. There have been no serious suicide attempts so far this year.

*Inmate Family Council*
For details, please refer to the separate section for CMF.

*Inmate Advisory Council*
For details, please refer to the separate section for CMF.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Per the Performance Report, overall compliance with the timelines for completing SRASHEs was, at first glance, low during the audit period:

- SRE upon admission: 81% (N=153)
- SRE prior to clinical discharge: 58% (N=136)

However, PIP staff reported that compliance with admission and discharge SRASHES is underestimated due to errors in the On Demand report. For example, in the October minutes of the SPRFIT meeting, corrected compliance in October was 100% and 79%, respectively, and 100% and 93% in November. Psychiatry continues to assume responsibility for the admission SRASHEs.

*Urgent and Emergent Consults for Danger to Self (DTS)*
Because the PIP is a hospital, staff rarely utilize urgent and emergent referrals for DTS. Thus, this area was not reviewed.

**Emergency Response**

*Cut-Down Kits*
As of September 2023, the Mental Health Compliance Team found 100% institution-wide.

**Training and Mentoring Compliance**
Compliance with the Annual IST Suicide Prevention Training for the entire institution is presented in the CMF section of this report.

**Receiving and Release (R&R) Screening**
Although the PIP does not operate the R&R, it does complete an evaluation of new PIP admissions. In his last visit, Lindsay Hayes observed a screening that was not held in a confidential office. I observed two admission assessments. One was held in the dayroom of P2. The door was closed, and an officer was stationed outside. The nursing staff did inquire about SI. (The assessment occurred following a separate assessment completed by the unit psychiatrist.) In contrast, the second nursing admission assessment was not confidential. It was held in the exam room of S1. The door was kept open, and staff positioned a privacy screen in front of the door.

(Staff reported that the patient had behaved unpredictably during transport, hence the precaution of keeping the door open.)

**Reception Center Processing**
Not applicable. The PIP is not a reception center.

**Crisis Intervention Team (CIT)**
Not applicable. CITs are only active in outpatient settings.

**Active Corrective Action Plans (CAPS)**

CAPs are in various stages of completion (Table 2). Unless otherwise noted in the tables, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial" indicate that the CAP has been preliminarily met, with sustainability to be assessed at the next site visit.

For new CAPs and recommendations, please refer to the Conclusion section of this report.

| Table 2. Status of CAPs Pertaining to the PIP | | |
|---|---|---|
| *Source/Date* | *Problem* | *Progress* |
| Hayes Oct 2022 | Ensure orders observation and issue are clinically justified | Completed |
| Hayes Oct 2022 | Improve training compliance for SRE mentoring and the 7-hour SRE training | Some (94% for SRE training, 0% for SRE mentoring) |
| Regional Apr 2021 | Create a plan to address the discrepancies between items ordered for patients, items actually issued to those patients | Substantial |
| Regional Nov 2021 | Create an action plan to ensure the IDTT meetings include a review of issue and privileges | Unable to assess* |
| Regional Feb 2022 | Retrain PIP clinicians to complete SRASHEs before the discharge IDTT | Some |
| Regional Jul 2023 | Update local policies so that they incorporate recent statewide memorandums | Some |
| Regional Jul 2023 | Create a plan to ensure officers record phone privileges (offered and refused) in NCAT | None |

Note: *I could not assess this because, in the IDTTs I observed, it was not necessary to review observation and issue. Patients were not on an enhanced level of observation and had been ordered full issue.

---

<strong>CMF</strong>

---

**Restricted Housing**

CMF has multiple RHU units that are activated and deactivated depending on local needs. At the time of my visit, M3 and I3 were activated. W1 ("Willis") was deactivated.

*Second Watch Morning Meeting*

Staff held the meeting via conference software and led by an office technician. (In-person meetings will resume in mid-January.) A clinician, several psychiatric technicians, and a nurse were present, but a sergeant was not. The meeting covered required topics (new arrivals, behaviors of concern) and other relevant topics. Because ensuring sergeant attendance is a current CAP, I reviewed 844s from the last two weeks of meetings during 2nd watch. Of the ten days available, a sergeant was present only 70% of the time compared to 35% of the time at my last visit.

*Psychiatric Technician (PT) Rounds*

I observed one psychiatric technician (PT) complete rounds in RHU-EOP (M3). For MHSDS patients, he inquired about suicidal ideation and other areas (e.g., medication side effects, sleep). The PT completed charting on MHSDS patients in real time using a laptop on a rolling cart. For non-MHSDS inmates, however, the PT asked, "Are you good?" or "Everything okay?" rather than the prescribed phrasing, "Do you have any mental health concerns?" No mental health issues requiring referral were apparent during the rounds. I asked the CNE to review training needs.



*Figure 1: Example placard in M3*

*Intake Cells*

CMF has ten intake cells: three on W1 (101, 102, and 103), two on I3 (306 and 307), and five on M3 (302-306). [1] In M3, cells 304-306 were added in 2022. All are suicide resistant. All intake cells had "INTAKE" stenciled above the cell doors. All cells in CMF'S RHU units are single cells. During my visit,

---

[1] During a visit in April 2021, I inspected the two intake cells in I3. In both cells, neither the sink nor the toilet had a stainless steel skirt that extended to the floor. Neither cell had touch bolts nor light switches. In his February 2019 visit, Lindsay Hayes reported that the intake cells in M3 and W1 were suicide resistant.

three intake cells in M3 were occupied.

Intake cells are used regularly at CMF. Only three intake cells were occupied, all in M3. Two inmates were one or more days past the 72-hour period.

The institution used a placard to identify inmates on 21-day intake status (Figure 1). The placard noted the date of arrival and a date 21 days later. Seven inmates in M3 and four in I3 were in their first 21 days. All had the above-noted placard posted beside their cell door.

*Access to Entertainment Appliances*
Twelve of thirteen inmates on 21-day intake status had a radio or tablet. I relayed the omission to the RHU sergeant, and he corrected this within the hour. In both M3 and I3, complaints about the reliability of Wi-Fi connectivity were common.

*Welfare Check Completion (Guard 1)*
I observed two officers complete Guard One checks, one in M3 and one in I3. Both officers looked inside each cell before moving to the next. In addition, I reviewed the statewide Security/Welfare Check Monitoring Report covering November 2023. Compliance was 99%.

*RHU Pre-Screening (Pre-Placement)*
Per the SPRFIT report, compliance with RHU pre-placement screens declined precipitously over the audit period: 98% in September, 66% in October, and 70% in November. However, staff reported the cause of low compliance was inmates laying over at CMF en route to another institution. Thus, low compliance does not indicate a systematic deficiency in this suicide prevention procedure.

*RHU GP Screens (Post Placement)*
I was not able to observe an RHU GP screening. During the audit period, compliance with RHU screens declined precipitously over the audit period: 100% in September, 86% in October, and 57% in November. The cause was the same as for RHU pre-screening: a bolus of layovers passing through CMF.



**Inpatient Units**
CMF has one licensed MHCB consisting of two wings (A and B) totaling 50 beds. The census was 30 on the second day of my visit.

*Figure 2: Spherical Mirror*

*Suicide-Resistant Cells*
During previous visits, Lindsay Hayes found all cells to be suicide resistant. No modifications to MHCB cells have been made since. All cells have call buttons and, unique to CMF, have a spherical mirror mounted to each cell's ceiling to facilitate observation (Figure 2). This permits observers to see patients lying immediately in front of the cell door or immediately below the front windows.

*Interdisciplinary Treatment Team (IDTT)*
I observed a discharge IDTT and a routine IDTT. The latter was for a patient presenting with vague suicidality and referred to ICF. All required team members were present and active participants. Clinical summaries were presented, treatment planning was discussed, and observation and issue orders were reviewed as appropriate. In the applicable case, safety planning was not reviewed.

*Quality of Safety Planning*
I reviewed the safety plans of seven discharged MHCB patients admitted for suicidality. All had safety plans, a marked improvement over my last visit.

Due to critical staffing, CMF continues to suspend the CAT audit pertaining to MHCB/PIP: Supervisory Review of MHCB/PIP Discharge Safety Plans.

*Suicide Watch and Suicide Precaution*
There were no patients on constant observation on the days I visited the MHCB. Most patients were on suicide precaution.

The overall timeliness of suicide precaution rounding was good in the past six months: 96% (range = 95-98%). Compliance with staggering was very good: 98% in September, 99% in October, and 99% in November.

During my visit, I observed multiple rounders walking the unit with laptops and rolling carts and documenting observations in real time.

*Observation and Issue Orders*
A document holder had flags corresponding to different levels of observation: yellow for q30 (pictured in Figure 1), blue for suicide precaution, and red for suicide watch). The holder also contained the current issue order. Together, these fulfill the memorandum on MHCB patient identifiers (dated 12-3-2022).



*Figure 3: Example of a Placard in CMF's MHCB*

In general, patients possessed ordered items. The exception was ordered hygiene. Many patients on A and B sides reported not having soap, toothpowder, or a toothbrush. I reported this to the unit sergeant and requested the omissions be corrected.

Clinicians reordered observation and issue daily as required by the memorandum on state-issued clothing and bedding in the MHCB (10-29-2013 and 3-15-2016). As I noted in previous reports, it is a common but not unreasonable practice at CMF to maintain suicide precaution but grant full issue (jumpsuit, t-shirt, etc.). The reason for this departure from statewide guidelines was included in notes about half of the time. Staff generally ordered minimum full issue for patients and graduated patients to q30 well before discharge (5 of 7 cases).

*Privileges*
Clinicians granted all privileges to patients upon admission to the MHCB.

In the last Lindsay Hayes visit and my past site visits, the documentation of privilege use in 114-As was a weakness. Specifically, officers did not consistently record phone and yard use. Substantial progress was evident during my last visit, although confusing notations were sometimes present. Since then, CMF has transitioned to the new Automated Restricted Housing Record (ARHR). I used ARHR to review how often privileges were offered to seven current patients. All patients were offered showers, phone use, and yard regularly during their stays. In general, showers were offered three times per week, while phone use and yard time were offered about every other day.

*MHCB Rescissions*
During the audit period, staff regularly rescinded MHCB referrals during the audit period (N=13). I examined a sample of seven rescissions for patients initially referred for DTS. A SRASHE was completed in all cases. A safety plan was not completed in most cases (6 of 7). However, in each case, the clinician judged the patient not to be experiencing suicidality, so omitting a safety plan was, in my view, clinically reasonable.

*Other MHCB Issues*
To verify compliance with the memorandums that prohibit the use of safety contracts (dated 1-23-2023 and 2-17-2023), I conducted an EHRS search using the search term "contract" in the charts of six patients admitted for DTS to CMF's MHCB. I found no instances of "contract."

The MHCB does not maintain a stock of bed sheets (nor do Acute units in the PIP) despite the requirements of Title 22, § 79829 (a). Thus, clinicians cannot order bed sheets and cannot comply with the statewide memorandum on state-issued clothing for MHCB patients (10-29-

2013). I elevated the matter to my supervisor because the issue has not been rectified since my last visit.

**Alternative Housing**

Clinicians routinely referred patients to an MHCB during the audit period (N=106). Patients were transferred to the MHCB within timelines in 94% of cases.

As I noted in previous reports, CMF has no stand-alone local policy on alternative housing. Relevant aspects are covered across several different policies. However, none specify the cells CMF uses for alternative housing (A-19, A-20, B-19, and B-20, which are observation cells in the MHCB).

**Suicide Risk Management Program (SRMP)**

At the time of the review, 47 patients at CMF were enrolled in SRMP. Five patients at CMF met SRMP criteria but were not included. (The report incorrectly included two additional patients.) I also audited the treatment plans of nine patients enrolled in SRMP. Only one had goals and interventions listed. In the remainder of the plans, clinicians either checked SRMP as not applicable or had not yet completed a master treatment plan thus far in 2023. The problems likely reflect the impact of critical staffing and the resulting program modifications.

**Custody Inpatient Discharge Follow-ups**

Overall compliance gradually held steady over the audit period but was still below 90%: 88% in September, 85% in October, and 87% in November. That said, there was substantial improvement in the custody portion of the form. Improvement appears due to regularly training officers identified as deficiently completing the form.

**Institutional SPRFIT Committee**

As of August 2023, CMF now operates a single SPRFIT meeting that covers business in both the PIP and the non-PIP. CMF has one remaining SPRFIT coordinator to monitor both the PIP and non-PIP. (CMF is allocated 2.5 full-time SPRFIT coordinator positions.) However, CMF added a second coordinator (acting) as of December 25th.

I attended the local SPRFIT subcommittee during my visit. All required members were present,[2] and the meeting generally conformed to the criteria in the SPRFIT Meeting Observation Tool.

---

[2] Given the changes in staffing allocations, current policy has not yet accommodated quorum requirements based on the newest staff changes (e.g., a single institution-wide CMH, removal of the executive director and clinical director positions) or describe quorum for a combined SPRFIT meeting. Thus, on a temporary basis, I assessed quorum as met when the following positions were present: CMH, chief psychiatrist of PIP, chief psychiatrist of outpatient, Sr. PT, SRN III for PIP, SRN III for outpatient, Associate Warde of Healthcare, a business administrator for PIP, and a business administrator for the non-PIP.

CAPs were reviewed, action items were used, and there was good system surveillance. There are two performance improvement projects: Ensuring the issue orders match what is in patients' cells and improving NCAT compliance. Although CMF has identified the need for more improvement projects, critical staffing prevents additional projects from being initiated. Similarly, critical staffing has limited CMF's ability to address and resolve CAPs. I reviewed the available minutes during the audit period. All were detailed and met audit criteria. A quorum was not achieved in the September and October meetings. (The CMH, a psychologist, was incorrectly used as a designee for a chief psychiatrist.)

| Table 3. Alignment of Local Policies with Recent Statewide Policies Pertaining to Suicide Prevention | |
|---|---|
| *Statewide Memorandum (Date)* | *In Local Policy* |
| Alternative Housing (12-12-2012, 5-16-2012) | No |
| Bad News (4-28-2021) | Yes (OP 161) |
| Discharge custody checks (revised 10-10-2021) | No* (Ch. 4, section 1) |
| MHCB Patient Identifier (12-03-2022) | No[a] (Ch. 10, section 11) |
| SRMP (7-12-2021) | Yes (Ch. 3, Section 6) |
| SRE Mentoring (revised 7-12-2022) | No[a] (Ch. 3, Section 2) |
| Cut-Down Kit (revised 8-10-2022) | No[a] (OP 8) |
| Safety Concerns (revised 9-21-2022) | No |
| Security Welfare Checks (revised 10-7-2022) | Yes (OP 74) |
| Safety planning (2-13-2023) | In process |
| Discontinue Safety Contracts (1-23-2023, 2-17-2023) | In process |
| SRE Mentoring 2nd revision (6-7-2023) | No |
| Semi-annual reviews/RCAs of self-harm (6-14-2023) | No |
| Note: [a] denotes policies with relevant content but not yet updated to reflect the most recent memorandum. | |

## Policies

CMF has a local suicide prevention policy (Ch. 4, Section 3) consistent with the "enhancements" memorandum dated 2-2-2018. I also reviewed local policies to verify that recent statewide memorandums related to suicide prevention have been incorporated into local policy. The results are presented in Table 3 and have not appreciably changed since my last review. As mentioned earlier in this report, the CMH recently assigned the responsibility of reviewing all local MHSDS policies to a program director. (Updating local policies is a current corrective action plan, CAP).

## Severe Self-Harm

Per the SPRFIT Reboot report, the 6-month average for self-harm incidents is 5.2 per 1000, which was higher than the statewide average of 4.2. For reasons that are not known, there was a temporary increase in the rate (See Figure 4). There were no serious suicide attempts.

.



*Figure 4: Rate of Self-Harm at CMF (non-PIP)*

*Inmate Family Council*
Due to critical staffing, CMF suspended the requirement that the local SPRFIT coordinator attend the meeting of the Inmate Family Council.

*Inmate Advisory Council*
Due to critical staffing, CMF suspended the requirement that the local SPRFIT coordinator attend the meeting of the Inmate Advisory Council.

**Suicide Risk Evaluations**

*Timelines for Suicide Risk Assessment*
Per the Performance Report, overall compliance with the timelines for completing SRASHEs was good during the audit period (96%). Compliance with specific SRASHE timelines for the mainline and MHCB is as follows:

- Emergent consults for DTS: 99% (N=92)
- Urgent consults for DTS: n/a (N=0)
- Routine consults for DTS: 100% (N=1)
- At MHCB clinical discharge: 100% (N=214)
- Upon MHCB referral: 94% (N=62)
- Upon arrival from a PIP: 92% (N=13)
- After rescinded MHCB referral: 87% (N=63)
- 90-day assessments post-MHCB discharge: 94% (N=128)

*Urgent and Emergent Consults for Danger to Self (DTS)*
During the audit period, compliance with timelines for urgent and emergent consults for DTS was 99%. CMF classified nearly all DTS referrals as emergent (92 of 93).

**Emergency Response**

*Cut-Down Kits*
As of September 2023, the Mental Health Compliance Team found 100% institution-wide.

**Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews**
There has been one suicide at CMF thus far in 2023 (V36539), which occurred in EOP. Two former CMF residents also died by suicide after transferring (BD6438 and BU0981). There are no open QIPs.

Regarding V36539, seven QIPs were assigned to CMF:

1. CMF PIP: Master treatment plans were not updated in a clinically meaningful way.
2. CMF PIP: Routine IDTTs did not occur timely
3. CMF: No clinician-to-clinician contact occurred post-MHCB discharge.
4. CMF: In one treatment plan, IPOCs were not included
5. CMF: Level of care changes (from modified to unmodified) occurred without a treatment team meeting when ASU patients were transferred to the mainline.
6. CMF: An initial PC assessment has significant portions missing.
7. CMF: Although the patient refused a mental health appointment, there was no documentation that a cell-front contact occurred.
8. CMF: Some psychiatry appointments did not occur before initial treatment meetings.

I did not assess the durability of QIPs 1 and 2 because these are attributable to the effects of critical staffing. I did not assess the durability of QIPs 4, 6, or 8 because, according to CMF's QIP response, the QIPs pertained to individual performance, program guide modifications due to critical staffing, or, in the case of QIP 8, refusals of care by the patient. CMF's response to QIP 3 indicated the problem was widespread. As such, I reviewed the charts of five patients and verified whether a note for clinician-to-clinician contact was completed. In no case was a note completed. CMF's response to QIP 5 indicated the problem was a common practice. However, I could not verify current compliance because there are no statewide tools to identify patients with a past placement in ASU.

Regarding BD6438, six QIPs were assigned to CMF:

1. Daily clinical contacts did not occur in the MHCB
2. Confidential meetings in the MHCB were not always provided
3. A suicide risk evaluation did not contain an adequate risk justification
4. Some safety plans were of low quality
5. A translator was not always during clinical contacts
6. Documentation for suicide watch was not always timely

I assessed QIP 1 by reviewing the related KPI in the On Demand Report, "MHCB Daily Provider Contacts. In December, the compliance was 81%. However, CMF remains at critical staffing levels, including in the MHCB. Thus, CMF does not have the number of psychologists necessary to achieve adequate compliance. I did not evaluate QIPs 2, 3, 4, and 5 because each was specific to one staff member. I could not evaluate QIP 5 because I could not find an automated means of identifying MHCB patients requiring a translator. I used the SRPFIT report to assess compliance with QIP 6. The report indicated that CMF's 6-month average for timely documentation of suicide watch was 94%.

Regarding BU0981, XX QIP were assigned to CMF:

1. A discharge SRASHE did not have an accompanying safety plan.
2. Suicide precaution rounds were not always timely.

To assess QIP, I used findings from this report, which indicated that safety plans are regularly completed. (See section "Quality of Safety Plans" for details.) I used the SRPFIT report to assess compliance with QIP 6. The report indicated that CMF's 6-month average for timely documentation of suicide precaution was 96%.

**Training and Mentoring Compliance**

Institution-wide compliance with the Annual IST Suicide Prevention Training for 2022 was good: 93%. Compliance for custody was 93%, nursing staff was 90%, and mental health staff was 95%. Year-to-date compliance figures institution-wide are 90% for custody, 84% for mental health, and 84% for nursing as of December 1st. CMF plans to review the negative list and offer additional training in late December.

Compliance with long-standing training requirements is uneven and a consequence of critical staffing levels. The SharePoint site for training mandated by the Coleman court lists the following compliance percentages for CMF-PIP as of November 2023:

- Suicide Prevention and SRASHE Core Competency Building: 94%
- SRE Mentoring: 0% (suspended due to critical staffing)
- Safety Planning Intervention: 98%
- Suicide Risk Management Program (SRMP): 100%
- C-SSRS: 62%
- Discontinuing the use of safety contracts: 95% for mental health, 93% for nursing*
- Nursing CPR: 94%* (According to CMF nursing, the remaining 6% are undergoing training, or their BLS cards have not been processed)
- Custody CPR: 91%* (as of September 2023)

*Refers to compliance institution-wide.

| Table 4. Status of CAPs for CMF (Non-PIP) | | |
|---|---|---|
| **Source/Date** | **Problem** | **Progress** |
| Hayes/Feb 2019, May 2021 | 1) Poor compliance with completing Custody Discharge Checks | Some |
| Hayes/Feb 2019 | 2) Compliance with suicide prevention trainings | None |
| Hayes/May 2021 | 3) MHCB patients are not consistently offered showers, yard time, and telephone access | Substantial |
| Hayes/Feb 2019, May 2021 | 4) Poor discussion of safety planning during MHCB IDTTs | None |
| Hayes/May 2021 | 5) No review of serious suicide attempts | Unable to assess (no qualifying events) |
| Regional/April 2021 | 6) Address the discrepancies between items ordered for MHCB patients and items actually issued to those patients. | Some |
| Regional/April 2021 | 7) Create an action plan to ensure that all suicide precaution rounds are completed timely | Substantial |
| Regional/April 2021 | 8) Create and implement an action plan to ensure that all patients admitted to the MHCB for DTS have a safety plan upon discharge and audit the effectiveness of the plan | Substantial |
| Regional/April 2021 | 9) Create and implement a plan to ensure that bed sheets are distributed to all patients not on suicide watch or precaution (unless there is a documented clinical justification) and audit the effectiveness of the plan | None |
| Regional/April 2021 | 10) By May 4, 2022, draft an addendum to the local policy on alternative housing that lists the prioritized locations for alternative housing and submit the draft to the Region 1 SPRFIT | None |
| Regional/July 2021 | 11) Ensure RHU sergeants attend morning meetings and audit attendance periodically | Some |
| Regional/July 2021 | 12) Ensure all 114-As for MHCB patients are submitted for scanning into ERMS | Closed due to ARHR implementation |
| Regional/Feb 2023 | 13) Build a stock of state-issued clothing and bedding-to include sheets, safety blankets, and wool blankets-in the MHCB that is sufficient to meet locally defined PAR levels | None |
| Regional/Feb 2023 | 14) Draft an addendum to the local policy on suicide watch and precaution that specifies which items are permitted to q30, including sheets, and that is consistent with the memorandum on state-issued clothing to MHCB patients (10-29-2013) | None |
| | | |

**Receiving and Release (R&R) Screening**
I observed one screening by an R&R nurse. The door was closed, and the patient was interviewed in a module. The nurse asked all the required questions.

**Reception Center Processing**
CMF is not a reception center.

**Crisis Intervention Team (CIT)**
CMF is required to operate a CIT, but due to critical staffing, CIT now operates on an on-call basis (not full CIT activations). The on-call operates Monday through Friday, 8 AM to 10 pm.

**Active Corrective Action Plans (CAPS)**
CAPs are in various stages of completion (Table 4, previous page). Unless otherwise noted in the tables, I recommend all CAPs remain open until the next site visit. CAPs marked as "completed" are considered closed and will not be carried forward into future reports. CAPs marked as "substantial" indicate that the CAP has been preliminarily met, with sustainability to be assessed at the next site visit.

---

## CONCLUSION

An exit meeting was held with the Associate Warden, the Chief of Mental Health, the Director of Nursing, the SPRFIT coordinator, and other key executives and managers. Preliminary findings were presented.

Temporarily, due to the severe mental health staffing shortage, new CAPs pertaining to mental health deficiencies will be deferred. Instead, all such deficiencies will be listed as recommendations. When mental health staffing improves, some recommendations will be changed to CAPs.

As a result of this review, and in collaboration with my custody and nursing partners, no new CAPs are assigned.

As a result of this review, the following actions are recommended:

1) Retrain PIP and MHCB clinicians to review safety planning at IDTTs when the admission reason is danger to self
2) Audit sergeant attendance monthly and report compliance during the SPRFIT meeting

3)  Direct members of the performance improvement project on NCATs to adopt the non-automated audit tool for auditing privilege use in the PIP

4)  Ensure that MHCB patients possess ordered hygiene items

5)  Periodically verify that patients on the SRMP list have associated goals and interventions listed on the master treatment plan

6)  When verifying quorum, only use designees permitted by statewide policy

7)  When staffing permits, resume the supervisory review of discharge safety plans

8)  When staffing permits, resume SRE mentoring

9)  When staffing permits, resume attending the meetings of the Inmate Family Council and the Inmate Advisory Council

10) Ensure the mainline clinicians complete a note documenting clinician-to-clinician contact post-MHCB discharge

Should you have any questions or require further clarification, please feel free to contact me (279-333-6819; joseph.obegi@cdcr.ca.gov).