1 | ROB BONTA, SBN 202668
Attorney General of California
2 | MONICA N. ANDERSON, SBN 182970
DAMON MCCLAIN, SBN 209508
3 | Supervising Deputy Attorney General
ELISE OWENS THORN, SBN 145931
4 | NAMRATA KOTWANI, SBN 308741
Deputy Attorneys General
5 | 1300 I Street, Suite 125
P.O. Box 944255
6 | Sacramento, CA 94244-2550
Telephone: (916) 210-7318
7 | Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
8 | *Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
 1676 N. CALIFORNIA BLVD., SUITE 620
 WALNUT CREEK, CALIFORNIA 94596
 TELEPHONE: 925-746-8460
 FACSIMILE: 925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.

Defendants.

Case No. 2:90-CV-00520- KJM-DB

**DECLARATION OF TRAVIS WILLIAMS IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON HIS EXPERT'S SIXTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND RE-AUDIT OF SUICIDE PREVENTION PRACTICES IN THE PSYCHIATRIC INPATIENT PROGRAMS**

Judge:    Hon. Kimberly J. Mueller

I, Travis Williams, PsyD., declare as follows:

1.     I am a Mental Health Administrator at the California Department of Corrections and Rehabilitation ("CDCR"). I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

DECLARATION OF TRAVIS WILLIAMS ISO DEFENDANTS' OBJECTIONS TO REPORT ON SIXTH RE-AUDIT

2.    In my role at as a Mental Health Administrator for CDCR, I regularly work on the Coleman Class Action as part of CDCR's Mental Health leadership team. I am familiar with existing Program Guide policies and I regularly attend the small workgroup meetings held with experts on the Special Master's team.

3.    I am also actively involved in CDCR's efforts to develop and maintain a durable suicide prevention program in connection with court-ordered remediation in this matter. Lindsay Hayes, the Special Master's expert in suicide prevention practices, has conducted several audits of the suicide prevention practices in CDCR prisons.

4.    I have been involved in extensive measures taken by CDCR to improve its suicide prevention practices to save inmate lives and comply with Mr. Hayes recommendations. To this end, CDCR has completed construction projects, issued memoranda and policy, hired additional leadership staff, and developed mechanisms that continually self-monitor and self-correct when noncompliance by staff occurs.

5.    On March 1, 2024, the Special Master submitted his "Special Master's Report on his Expert's Sixth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (CDCR) and Re-Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs." (ECF No. 8143 [Sixth Re-Audit].) In the report, the Special Master and his expert, Mr. Lindsey Hayes, found that following the Sixth Re-Audit CDCR successfully implemented one of the fifteen remaining suicide prevention recommendations outlined in the Court's December 24, 2020 Order. (*Id.* at 8 [providing that CDCR successfully implemented recommendation 20].) Additionally, Mr. Hayes re-audited CDCR's suicide prevention practices in the PIPs, but concluded that a determination of full and durable implementation of his initial sixteen recommendations would be deferred until the next re-audit. (*Id.* at 16.) The Special Master outlined the recommendations that require further work in the section of his report titled, "Conclusion and Recommendations." (*Id.* at 16-17.)

6.    Mr. Hayes found CDCR was noncompliant with several recommendations in his most recent audit report. For several recommendations where Mr. Hayes found noncompliance, CDCR can demonstrate compliance. For example, Recommendation No. 20 provides that "CDCR

1  should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly

2  audits psych tech practices during daily rounds of mental health caseload IPs in administrative

3  segregation and during weekly and bi-weekly rounds in the SHUs." (ECF No. 5258 at 7.) A

4  corresponding CAP has already been developed.

5    7.    Mr. Hayes's assertion that crises increased "throughout CDCR prisons" is also

6  without basis. (ECF No. 8143-1 at 12.) Mr. Hayes's point that the number of emergent/urgent

7  referrals increased from about 2,900 to about 3,700 between April 2022 and November 2023 does

8  not demonstrate that the number of emergent/urgent referrals increased at *all* CDCR institutions

9  over that timeframe. In fact, the increase is attributable to just five institutions whereas ten

10  institutions had fewer referrals in November 2023 than they did in April 2022.

11    8.    Mr. Hayes also suggests that the table he created on page 12 of his report shows a

12  statewide increase in crisis bed rescissions between April 2022 and April 2023. (ECF No. 8143-1

13  at 12.) But fifty-six percent of the increase came from just one institution, California State Prison,

14  Los Angeles County, during that time period. Over the same time period, eight institutions saw a

15  decrease in rescissions.

16    9.    CDCR's Regional SPRFIT Coordinators conduct regular suicide prevention audits

17  at their assigned institutions. These audits are conducted using a standardized audit tool called the

18  Suicide Prevention Continuous Quality Improvement Tool Guidebook ("SP CQI Guidebook").

19  The SP CQI Guidebook is reviewed and updated on a quarterly basis to ensure alignment with

20  current policy and current audit and data gathering methodology. The SP CQI Guidebook contains

21  all of Mr. Hayes's nineteen Suicide Prevention Audit Checklist measures:

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|---|---|---|
| 1. Observation of R&R intake screening, confirming screening completeness and privacy and confidentiality; | Yes – SP10: Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | Receiving and Release (R&R Screening – Hayes Item 1) |

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|---|---|---|
| 2. Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; | Yes – SP16: ASU Intake Inmates Appropriately Housed | Intake Cells – Hayes Item 2 |
| 3. Clothing allowance for MHCB patients; | Yes – SP14: MHCB Records with Rationale for Limited Issue of Clothing and Bedding | Observation and Issue Orders – Hayes Item 3 |
| 4. Treatment/safety planning for suicidal ideation in MHCBs; | Yes – SP3.1, SP3.4, SP3.7: Safety planning to reduce suicide risk | Quality of Safety Planning – Hayes Item 4 |
| 5. Use of alternative housing; | Yes – SP8: Patients in Alt Housing on continuous observation and provided suicide-resistant bed. | Alternative Housing – Hayes Item 5 |
| 6. Annual suicide prevention training for custody staff; | Yes – SP20: Percentage of Custody Officers with Suicide Prevention Training | Custody Staff Training |
| 7. Five-day clinical and 72 hour custody follow-ups for MHCB returns; | Yes – SP12: Custody Follow Ups for MHCB Discharges/7497 forms | Clinical Discharge Follow-Ups / Onsite Paperwork – Custody MHCB/Alternative Housing/Acute/ICF Discharge Follow-Ups |
| 8. Guard One compliance; | Yes – SP17.1: Percentage of ASU Welfare Checks audited that were not completed on time and staggered (welfare check discrepancies with an explanatory memo) / Yes – SP17.4: Percentage of ASU Welfare Checks audited that were not completed on time and staggered (audited welfare checks in segregated housing that include the required visual observation) | Welfare Check Completion (Guard One) – Hayes Item 8 |
| 9. PT rounds in administrative segregation, SHU, and PSU; | Yes – RH28: Percentage of PT round documentation that meets all audit criteria / Yes – RH29: PT Rounds where EC and interaction with patient are achieved/attempted and appropriate referrals are made as indicated. | Psychiatric Technician Rounds – Hayes Item 9 |

20674337.5

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|---|---|---|
| | Yes – RH3: PT Rounds completed according to PG requirements. | |
| 10. Suicide- resistant design of MHCBs; | Yes – SP4: Suicide-resistant MHCBs | Suicide-Resistant Cells – Hayes Item 10 |
| 11. Five-day clinical and custody follow-ups for alternative housing, DSH, and Psychiatric Inpatient Program (PIP) returns; | Yes – SP1: Timely completion of 5/8 day follow ups from MHCB, alt housing, and DSH/PIP. | Clinical Discharge Follow-Ups - Hayes Item 11 |
| 12. SREs required for emergency mental health referrals/TTA Log for suicidal ideation; | Yes – SP2: Emergent/urgent MH referrals that result in SRASHEs. | Urgent and Emergent Referrals for Danger to Self – Hayes Item 12 |
| 13. SREs required for admission/discharge in MHCB and alternative housing; | Yes. | Suicide Risk Evaluations – Hayes Item 13 |
| 14. Privileges for MHCB patients; | Yes – SP15.1-SP15.5: MHCB Property and Privileges | Privileges – Hayes Item 14 |
| 15. Emergency response equipment in housing units; | Yes – SP11: Housing Unit/Inmate Living areas with emergency response equipment and inventoried daily. | Emergency Response: Cut-Down Kits – Hayes Item 15 |
| 16. Annual suicide prevention training for medical and mental health staff; | Yes – SP19: Percentage of healthcare staff with suicide prevention training. | Annual IST Suicide Prevention Training Compliance – Hayes Item 16 |
| 17. CPR training for medical staff; | Yes – SP18: Percentage of nursing staff current with CPR training | Training and Mentoring Compliance: Clinical Training Compliance: Nursing CPR Training - Hayes Item 17 |
| 18. SRE Mentoring/Seven-hour SRE training and Safety Planning training for clinicians; | Yes – SP6: SRE Mentor Program | Clinical Training Compliance: Mentoring – Hayes Item 18 Suicide Risk Evaluation Training – Hayes Item 18 Safety Planning Training – Hayes Item 18 |

| Item | Present in CQI Guidebook and Which Indicator | Location in CQI Guidebook |
|---|---|---|
| 19. SPRFIT responsibilities. | Yes – SP25.1: Satisfactory SPRFIT Meeting (meetings observed that satisfy all audit criteria) Yes – SP25.4: Satisfactory SPRFIT Meeting (meeting minutes reviewed that satisfy all audit criteria) | Institution SPRFIT Committee Observation – Hayes Item 19a |

The relevant audits have been presented to stakeholders through the ongoing data remediation process and most have been remediated by the Special Master's data expert. A true and correct copy of the most recent SP CQI Guidebook, dated January 18, 2024, is attached hereto as **Exhibit A**.

10.    Mr. Hayes's findings on Initial Health Screening and Receiving and Release Environment measures compliance with Recommendations 7 and 8. Recommendation 7 provides that the nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process. (Special Master's Report on his Expert's Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, Appendix B, ECF No. 6879 at 27, 33-36; *see also*, ECF No. 8143-1 at 15-16.) Recommendation 8 provides that Nurse and officer safety should remain the top priority during the intake screening process and, therefore, if an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality. (*Id.*)

11.    CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains an audit for Initial Screening and Receiving and Release Environment. The audit is based off an indicator, Observed Initial Health Screening in a Confidential Setting (SP10), which was remediated by the Special Master's data expert on April 3, 2023.

12.    During his May 15-17, 2023 visit to California Institution for Women (CIW), Mr. Hayes reported that a max custody patient was screened in a closed room with an officer present

"thus compromising both privacy and confidentiality." (ECF No. 8143-1 at 121.) Mr. Hayes's report does not, however, illustrate how the presence of the officer compromised privacy or confidentiality. CDCR officers are bound by HIPAA and are generally present at treatment team meetings.

13.     During his October 12-13, 2023 visit to Salinas Valley State Prison, Mr. Hayes observed one new admission intake screening and concluded that because the door was open and an officer was nearby the apparently agitated patient, Mr. Hayes found SVSP noncompliant with Recommendation 8. (ECF No. 8143-1 at 273.) Mr. Hayes's report does not illustrate how the presence of the officer compromised privacy or confidentiality. As aforementioned, CDCR officers are bound by HIPAA and are specifically instructed to attend, and generally are always present at, treatment team meetings.

14.     Mr. Hayes found that CDCR is in compliance with Recommendation 20, except with respect to one institution, Substance Abuse Treatment Facility (SATF).  (ECF No. 8143-1 at 16-17.) Recommendation 20 provides that CDCR should develop a CAP to ensure that supervising nursing staff regularly audit PT practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs. (ECF No. 7636 at 26.)

15.     Following his June 29-30, 2023 site visit, Mr. Hayes found that SATF was noncompliant with psych tech practices after observing rounds by two psych techs, once of which he observed to be engaging with inmates based on their demeanor and would be "indifferent and either asked the questions in a compound fashion . . . in a very rapid fashion and/or entirely omitted suicide risk inquiry for caseload IPs." (ECF No. 8143-1 at 17.) The issues Mr. Hayes found during his SATF site visit were remedied prior to and since his site visit. CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains an audit for Psychiatric Technician Rounds for the restricted housing units. (Ex. A at 81.) The indicators associated with this audit, Psychiatric Technician Rounds Documentation Audited that Meets all Audit Criteria (RH28) and Observation

1  of PT Rounds where Effective Communication, Interaction, and Referrals Met all Audit Criteria

2  (RH29) were remediated on December 13 and December 11, 2023, respectively.

3      16.     Mr. Hayes found CDCR in compliance with this component of Recommendation

4  32, however, he recommended that CDCR develop a corrective action plan to "expedite

5  renovation of the former seclusion room (No. B-68) in the MHCB unit at CCWF into a clinical

6  interview/treatment room." (ECF No. 8143-1 at 87.) But Defendants completed its project

7  implementing suicide resistant crisis bed cells the week of February 26, 2024, before Mr. Hayes's

8  Sixth Re-Audit was filed with the Court.

9      17.     Mr. Hayes's findings and conclusions regarding the Use of Suicide Resistant Cells

10  for Newly Admitted Inmates in Restricted Housing Units (Intake Cells) measures compliance with

11  two recommendations (Recommendations 12 and 13). (ECF No. 8143-1 at 19-22.)

12  Recommendation 12 provides that CDCR should ensure that there are a sufficient number of

13  suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72

14  hours of their housing in the unit) and inmates of special concern or heightened risk of suicide

15  (e.g., inmates recently released from suicide observation status). (ECF No. 6879 at 27, 35.)

16  Recommendation 13 provides that CDCR should enforce its existing policy of housing only newly

17  admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted

18  cells beyond their first 72 hours. (*Id.* at 27, 35.) Mr. Hayes concluded that "65 percent (13 of 20)

19  of audited facilities were found to have adequate practices, a regression from the previous

20  assessment." (ECF No. 8143-1 at 19.) Mr. Hayes found that seven institutions were noncompliant

21  with use of suicide resistant intake cells, namely California Institution for Men (CIM), California

22  Men's Colony (CMC), California State Prison, Los Angeles County (LAC), Kern Valley State

23  Prison (KVSP), R.J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP),

24  and Wasco State Prison (WSP). (*Id.*) Mr. Hayes notes various types of deficiencies at each of

25  these institutions to support his findings.

26      18.     Even assuming Mr. Hayes's findings were accurate, CDCR has demonstrated

27  compliance with these recommendations outside of Mr. Hayes's two or three-day visits to these

28  institutions. CDCR's Regional SPRFIT Coordinators conducted several audits at the institutions

during Mr. Hayes's 6th Re-Audit round. CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains an audit for ASU Intake Inmates Appropriately Housed, (SP16) which went through data remediation and was remediated by the Special Master's data expert on July 29, 2023. (Ex. A at 81-82.) Although the remediated version of the audit differs slightly from the version used earlier in 2023, none of the changes are relevant to any of Mr. Hayes's criticisms of intake cell policy.

19.     Mr. Hayes's findings on Practices for Observing MHCB Patients measures compliance with Recommendation 21. (ECF No. 8143-1 at 23-27.) Recommendation 21 provides that CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch. (ECF No. 6879 at 35.) Mr. Hayes concludes that "none of the 18 audited facilities were at 100 percent compliance with this measure, eight or 56 percent of the facilities were able to obtain 90 percent or more compliance with both Suicide Precaution and Suicide Watch observation."[1] (ECF No. 8143-1 at 24.)

20.     During the current round, CDCR understands that Mr. Hayes "exclusively utilized" the report produced from the Mental Health Observation Reporting Tool. (ECF No. 8143-1 at 24.) Mr. Hayes made one criticism of the tool, namely, that "[i]t does not always account for every patient housed in the MHCB during a specific time period. For example, and as confirmed by CCHCS, if a patient was placed on Suicide Watch and initially housed in Alternative Housing before being transferred to a MHCB unit, that patient might be listed under another 'care team' category instead of the MHCB unit within the Mental Health Observations Reporting Tool." However, it is, and was during the monitoring period, possible to review the observation documentation for all patients by filtering for "all" instead of just "MHCB" patients when using

---

[1] Notably, suicide watch check compliance should not be conflated with the requirement for continuous observation. Suicide watch check compliance relates to the need for the nursing staff to document, at regular intervals, the activities of the patient under observation. It does note measure whether a patient is being continually observed.

the tool. By filtering for "all" the user can see patients whose orders started in alternative housing and remained while in the crisis bed as well as those patients whose orders started in the crisis bed.

21.    Mr. Hayes's findings also fail to take into account the significant number of observations—all made by humans—that occurred during the reporting period. In fact, over *ten million* Suicide Precaution or Suicide Watch observations were required in 2023 alone. Combined, CDCR completed these observations at over ninety-two percent compliance. A true and correct copy of Statewide data from the Mental Health Observation Reporting Tool is provided in the table below:

| 2023 Timely MHCB SP and SW Observations by Month (Statewide) | | | |
|---|---|---|---|
| **Month (2023)** | Timely Checks | Required Checks | Compliance Rate |
| **January** | 684,022 | 749,840 | 91.22% |
| **February** | 634,776 | 681,654 | 93.12% |
| **March** | 723,670 | 786,761 | 91.98% |
| **April** | 716,795 | 781,016 | 91.78% |
| **May** | 765,701 | 833,976 | 91.81% |
| **June** | 785,126 | 847,008 | 92.69% |
| **July** | 891,824 | 971,408 | 91.81% |
| **August** | 925,981 | 1,000,480 | 92.55% |
| **September** | 828,068 | 887,827 | 93.27% |
| **October** | 837,293 | 908,407 | 92.17% |
| **November** | 792,577 | 843,706 | 93.94% |
| **December** | 770,273 | 819,138 | 94.03% |
| **Totals** | 9,356,106 | 10,111,221 | 92.53% |

Critically, even though checks were not completed 100 percent timely, no patients died by suicide in a crisis bed in 2023.

22.    Hayes's findings on MHCB Practices for Possessions and Privileges measures compliance with one part of Recommendation 32. (ECF No. 8143-1 at 27.) That part of Recommendation 32 provides that "CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address [this] additional miscellaneous issue[] . . . . Privileges for Inmates in MHCBs . . . ." ((ECF No. 6879 at 27, 36.) In his recent report, Mr. Hayes concludes that "33 percent (6 of 18) of audited facilities (with active MHCB units) were found to have adequate practices." (ECF No. 8143-1 at 28.) Mr. Hayes found that twelve institutions were noncompliant with MHCB Privileges. Notably, Mr. Hayes found that three institutions were noncompliant in part because they did not offer a certain amount of yard

1   time. (See ECF No. 8143-1 at 95 [findings for California State Prison, Sacramento ], *id.* at 126

2   [findings for California Institution for Men], and, *id.* at 28, 155 [findings for California Healthcare

3   Facility].) Regarding several of Mr. Hayes findings of noncompliance, CDCR has demonstrated

4   compliance with these recommendations outside of Mr. Hayes's two or three-day visits to these

5   institutions. Although Mr. Hayes may have found instances of noncompliance at these institutions,

6   CDCR has since remedied many of those issues. CDCR demonstrates this compliance by its

7   Regional SPRFIT Coordinator audits and their reports.

8        23.     As previously mentioned, CDCR Regional SPRFIT Coordinators use the SP CQI

9   Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook

10   contains two audits relevant to this recommendation. The first is an audit for Observation and

11   Issue Orders. (Ex. A at 89-90.) That audit integrates two indicators—observation orders reviewed

12   that are properly documented and MHCB records with rationale for partial issue (SP13 and

13   SP14)—that are not fully remediated as of this writing. The second audit is for privileges in crisis

14   bed and inpatient units. (*Id*. at Ex. A at 91-92.) That audit contains numerous remediated

15   indicators including those for MHCB out of cell time pertaining to yard, phone calls, visits,

16   showers, and dayroom. (SP15.1, SP15.2, SP15.3, SP15.4, and SP15.5.) Those indicators were

17   remediated on June 26, 2023 by the Special Master's data expert.

18        24.     Separately, during his November 14-15, 2023 visit to Central California Women's

19   Facility (CCWF), Mr. Hayes found that custody documentation on the 114 log did not contain any

20   information regarding telephone or dayroom opportunities. (ECF No. 8143-1 at 29, 302.) The

21   CCWF crisis bed had only recently reopened prior to Mr. Hayes's visit. The unit had been closed

22   from November 8, 2021 until October 13, 2023.

23        25.     Mr. Hayes's findings on Mental Health Referrals and Suicide Risk Evaluations

24   measures compliance with two recommendations, Recommendations 9 and 10. (ECF No. 6879 at

25   19, 27, 34, *see also* ECF No. 6973 at 7 [requiring 100 percent compliance with Recommendation

26   10].) Recommendation 9 requires that CDCR should revise its SRE Mentoring Program to i.

27   eliminate its "graduation" component after completion of two adequate assessments, ii. Conduct

28   ongoing mentoring throughout the year, and iii. Audit clinicians' SREs on a regularly scheduled

1   basis. (*Ibid.*) Recommendation 10 requires that each facility's SPRFIT should audit the quality of

2   completed SREs on a monthly basis. (*Ibid.*)

3        26.    Although Mr. Hayes found CDCR noncompliant at ten institutions[2] with

4   Recommendation 9 because they failed to adhere to SRE training schedules, CDCR can

5   demonstrate compliance with those trainings at California Correctional Institution (CCI). In 2023,

6   CCI had a 94.38% completion rate for the SRE mentoring training and a 98.76% completion rate

7   for the biennial SRE training. Although the other nine institutions did not score over ninety

8   percent for both initial and biennial SRE training, in 2023, five other institutions scored over

9   ninety percent for the biennial SRE training. Those institutions are Central California Women's

10  Facility (90.29%), California Men's Colony (93.52%), California Medical Facility (92.99%),

11  California State Prison, Los Angeles County (97.25%), and California Healthcare Facility

12  (95.43%). Statewide, in 2023, CDCR scored over ninety-one percent for completion of the

13  biennial training.

14       27.    With respect to Recommendation 10, The Special Master and Mr. Hayes found that

15  in order to achieve compliance "defendants should ensure through the SPRFIT or other process

16  that Suicide Risk Assessment and Self-Harm Evaluations (SRASHEs) are always completed for

17  inmates presenting as possible risk for suicide at each audited CDCR facility." (ECF No. 6879

18  at19.) Mr. Hayes concludes that "only 71 percent (15 of 21) of audited facilities achieved over 90

19  percent compliance with the required completion of SRASHEs." (ECF No. 8143-1 at 37.) He

20  noted that six institutions—California Healthcare Facility (CHCF), California Men's Colony

21  (CMC), California State Prison, Solano (SOL), Substance Abuse Treatment Facility (SATF),

22  North Kern State Prison (NKSP), and R.J. Donovan Correctional Facility (RJD)—scored under

23  ninety percent. (*Id.*) Notably, at the six institutions where Mr. Hayes found below ninety percent

24  compliance, Mr. Hayes never reported inadequacy with reviewing SRASHEs. (ECF No. 8143-1 at

25

26

27  [2] California Healthcare Facility, California State Prison, Corcoran, Substance Abuse Treatment
    Facility, California State Prison, Los Angeles County, California Men's Colony, Pelican Bay State
28  Prison, California State Prison, Solano, California Medical Facility, Central California Women's
    Facility, and California Correctional Institution. (ECF No. 8143-1 at 39.)

20674337.5

1    128 [making no findings at CHCF], *id.* at 135 [noting RJD's SPRFIT discussed SRASHEs at

2    SPRFIT meetings], *id.* at 175 [making no findings at SOL], *id.* at 181 [making no findings at

3    NKSP], *id.* at 195 [finding that CMC "consistently" discussed SRASHEs in SPRFIT meetings],

4    and, *id.* at 203 [again finding that SATF "consistently" discussed SRASHEs].) This is even though

5    Mr. Hayes had access to the very information underpinning Recommendation 10 all along. The

6    Special Master's data expert remediated an indicator called Quality of Selected SRASHE

7    Documentation (SP23) on December 9, 2022—nearly four months before the start of Mr. Hayes's

8    most recent audit. Nothing in his report suggests the indicator was utilized. According to the

9    indicator, in 2023 alone, CDCR conducted 1,445 such audits.

10        28.    Mr. Hayes's findings and conclusions regarding Safety Planning for Suicidal

11    Inmates measure compliance with Recommendations 17 and 18. (ECF No. 8143-1 at 40-47.)

12    Recommendation 18 provides that CDCR should develop a specific timetable for the training of

13    all of its mental health clinicians on treatment planning for the suicidal inmate, using its

14    PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment." (ECF No.

15    6879 at 19, 27, 35, *see also* ECF No. 6973.)

16        29.    With respect to Recommendation 18, Mr. Hayes found safety planning training

17    noncompliance at six institutions. (ECF No. 8143-1 at 46.) CDCR revised its safety planning

18    training in early 2023 and a new training was issued to the field on March 16, 2023 and

19    institutions were given ninety days to complete the training. Moreover, the "training for trainers,"

20    sessions for institutional trainers to learn how to train their staff was completed on March 16,

21    2023. Training for institutional staff began after that mark and was required to be completed no

22    later than June 14, 2023. A true and correct copy CCHCS's Training Announcement for Safety

23    Planning Training (T4T) corroborating these facts is attached hereto as **Exhibit B**.

24        30.    Separately, CDCR Regional SPRFIT Coordinators audit safety planning training as

25    part of their regular site visits. Regional SPRFIT Coordinators routinely audit compliance in

26    accordance with instructions in the Suicide Prevention Continuous Quality Improvement Tool

27    Guidebook, last updated January 18, 2024. (Ex. A at 105.)

28

31.     Mr. Hayes's findings and conclusions regarding  MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks (ECF No. 8143-1 at 47-50) measure compliance with Recommendations 28 and 29 (ECF No. 6879 at 27, 36). Recommendation 28 provides that all inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. (*Id.*) Recommendation 29 provides that the length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified. (*Id.*) CDCR developed the two-page CDCR MH-7497 form to document compliance with Recommendations 28 and 29. A true and correct copy of an October 19, 2021 Memorandum regarding the Revision of Mental Health Crisis Bed Discharge Custody Checks Form and Introduction of Audit Requirement that includes a blank CDCR MH-7497 form is attached hereto as **Exhibit C**. The form appears at 4-7.

32.     In his recent report, Mr. Hayes concludes that "33 percent (6 of 18) of audited facilities (with active MHCB units) were found to have adequate practices." (ECF No. 8143-1 at 28.) Mr. Hayes found that twelve institutions were noncompliant with MHCB Privileges. Notably, Mr. Hayes found that three institutions were noncompliant in part because they did not offer a certain amount of yard time. (See ECF No. 8143-1 at 95 [findings for California State Prison, Sacramento ], *id.* at 126 [findings for California Institution for Men], and, *id.* at 28, 155 [findings for California Healthcare Facility].) The first page is for the clinician to determine whether the thirty-minute welfare checks should be continued up to seventy-two hours. (Ex. C at 4 [Recommendation 29].) The second page is for custody staff conducting the checks to document their thirty-minute rounds. (*Id.* at 5 [Recommendation 28].)

33.     Again, CDCR Regional SPRFIT Coordinators use the SP CQI Guidebook to conduct suicide prevention audits at CDCR institutions. The SP CQI Guidebook contains an audit for Custody Follow Ups 7497 Forms (SP12) which was remediated on September 15, 2023 by the Special Master's data expert. (Ex. A at 95.) Despite having been discussed by Plaintiffs and Special Master stakeholders in BRMR for nearly four months between June 29, 2022 and October

26, 2022, the Special Master team raised new issues with SP12 in late 2023, and *after* SP12 had already been remediated by the Special Master's data expert. Because the indicator was remediated through the agreed upon process, Defendants rely on compliance data regarding Recommendations 28 and 29.

34.    Mr. Hayes's findings and conclusions regarding Local SPRFITs measure compliance with Recommendation 31. (ECF No. 8143-1 at 50-53.) Recommendation 31 provides that CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool. (ECF No. 6879 at 27, 36. ECF No. 6973.)

35.    In his initial audit, Mr. Hayes found that local SPRFIT committees lacked quality and needed to be "rebooted." (ECF No. 5259 at 32.) He recommended that CDCR "revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool." (*Id.* at 32.) CDCR issued its SPRFIT enhancements memo in February 2018. (ECF No. 7333-1 at 611.) Since that time, local SPRFIT's have operated under that policy and developed operating procedures and audit tools to measure the myriad requirements during their monthly meetings. In 2022, Committee members attended a four-day training that covered the new expectations and components as well as industry standard quality management tools such as the Design, Measure, Analyze, Improve and Control (DMAIC) process and the Survey Analysis for Evaluating Risk (SAFER) matrix. Notably, the four-day training in 2022 was a joint effort with CCHCS QM which was an approved collaboration across *Plata* and *Coleman*. During the training, a full reboot of the committee structure was completed and new measurement schedules and tools were developed in addition to the education about industry standard QM techniques. In fact, Mr. Hayes attended these training sessions. Despite Mr. Hayes's involvement, he has not attended a single local SPRFIT meeting either on site of by using virtual means such as Microsoft Teams®.

36.    Separately, Mr. Hayes finds fault when local SPRFIT committees fail to immediately address corrective action recommendations he made in prior monitoring rounds, but Mr. Hayes's prior report was issued in October 2022 and reflects findings made between mid-2021 and early 2022. (See ECF No. 7636-1.) By comparison, SPRFIT committees prioritize

1  corrective action using community standard tools, including SAFER matrices, to determine which

2  improvement projects are most likely to harm a patient and how widespread the immediate threat

3  to life is. This process is endorsed by the Joint Commission.

4       37.     Mr. Hayes's findings on Suicide Prevention Training measure compliance with

5  Recommendation 3. (ECF No. 8143-1 at 53.) Recommendation 3 requires that Defendants ensure

6  that all custody and health care staff receive both pre-service and annual suicide prevention

7  training. (ECF No. 6879 at 27, 34.)

8       38.     CDCR requires training to be completed once each calendar year. CDCR maintains

9  training data and has also developed a data indicator, SP19 Healthcare Staff Current with Suicide

10 Prevention Training, and SP20, Custody Staff with Suicide Prevention Training, to measure

11 compliance. Both were remediated on December 15, 2023 by the Special Master's data expert.

12 These items are audited by CDCR's Regional SPRFIT Coordinators. (Ex. A at 104, 106.) As

13 aforementioned, the training compliance is measured in accordance with the two remediated data

14 indicators. Compliance measures are included in the table below:

| 2023 Custody Training Compliance | |
|---|---|
| Institution | Compliance |
| LAC | 91% |

| 2023 MH Training Compliance | |
|---|---|
| Institution | Compliance |
| LAC | 87% |
| CHCF | 82% |
| MCSP | 96% |
| SVSP | 95% |

| 2023 Medical Training Compliance | |
|---|---|
| Institution | Compliance |
| LAC | 87% |
| CIW | 83% |
| CMC | 94% |
| CMF | 92% |
| HDSP | 94% |
| SAC | 88% |
| SATF | 93% |
| SQ | 84% |
| CHCF | 83% |

DECLARATION OF TRAVIS WILLIAMS ISO DEFENDANTS' OBJECTIONS TO REPORT ON SIXTH RE-AUDIT

20674337.5

39.     Mr. Hayes' findings on Continuous Quality Improvement measure compliance with part of Recommendation 32. (ECF No. 8143-1 at 53.) That part of Recommendation 32 says CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues [including] . . . Continuous Quality Improvement. (ECF No. 6879 at 27, 36.)

40.     CDCR employs four Regional SPRFIT Coordinators who audit their assigned institutions several times per year. During those audits they use the most current version of the Comprehensive CQI Audits Guidebook which includes a chapter on suicide prevention measures. (Ex. A at 74 et seq.) Suicide prevention measures were first integrated into the Comprehensive CQI Audits Guidebook in March 2023, however, the Regional SPRFIT Coordinators used a standalone version of the suicide prevention measures prior to that merger in 2022. CDCR's Comprehensive CQI Audits Guidebook is updated on a quarterly basis to reflect the most up to date version of the various audits. This is by design. Since October 2022, the combined guidebook has included "all of Mr. Hayes' 19 Suicide Prevention Audit Checklist measures." The Guidebook does more than mimic a Hayes tour. In addition to the nineteen Hayes items the Guidebook includes, and the SPRFIT Coordinators report on, the following additional suicide prevention measures:

- RHU Morning Meetings
- Compliance with ASU Pre-Placement Screens
- Compliance with ASU Screening Questionnaires
- Number of Suicide Risk Evaluations Completed in a Confidential Setting
- Five-day follow up compliance
- Suicide Risk Management Program Reviews
- Suicide Risk Evaluation compliance
- Sustainability of Quality Improvement Plans
- Training on suicide screenings, Suicide Risk Management Program, and discontinuing the use of safety contracts in inpatient settings

41.     After a site visit, CDCR's Regional SPRFIT Coordinators produce a report within weeks to give institutions close to real time feedback and corrective action plans. Those reports are formatted to contain data on all 19 suicide prevention measures. After issuing their report, the Regional SPRFIT Coordinators conduct return visits with their institutions to again fully assess the institution's compliance with suicide prevention policies and to review the status of any corrective action plans. Corrective action plans are updated or marked as fulfilled as indicated during the follow up visits. Some of the SP CQI Guidebook relies on audits and indicators subject to data remediation. At least twenty-five original indicators, as recommended by the Special Master's May 6, 2023 Report on CQI, pertain to suicide prevention. (*See* ECF No. 7151 at 22.) That number has increased to over thirty and CDCR is in the process of expanding at least sixteen more suicide prevention indicators to the inpatient programs.

42.     On July 31, 2023, CDCR agreed to extend sixteen of those indicators to the inpatient programs. (ECF Nos. 8011 at 6-7, and 8011-1 at 2-3.) The court ordered CDCR to develop those indicators on February 1, 2024. (ECF No. 8121 at 5.) Twelve of the sixteen indicators are in the latter stages of data remediation past stakeholder review.

43.     In his report, Mr. Hayes finds that the "measures have not been fully implemented because the Guidebook continues to be periodically revised." (ECF No. 8143-1 at 59.) CDCR's Continuous Quality Improvement Tool, of which the Suicide Prevention Guidebook is a part (see *Id*. at 55-56), is designed to be "periodically revised" to ensure alignment with any changes in policy or auditing methodology. Although data remediation is an ongoing process, CDCR is compliant with Recommendation 32. Once the initial phase of data remediation is complete, data indicators will be a continuously reviewed and updated. The next step will be an annual review process and, as needed, updating each indicator or audit to ensure alignment with the governing policy and data measurement tools. Those changes will require regular updates to the SP CQI Guidebook.

44.     Mr. Hayes further finds that the audits must be conducted quarterly at some institutions. (ECF No. 8143-1 at 59.) But nowhere in the record of Mr. Hayes's decade-long audit has he ever recommended CDCR's audits be conducted on a quarterly basis to comply with

1    Recommendation 32. Nor has the Court ordered such a requirement. CDCR has voluntarily

2    decided to suggest as "general guidelines" that CDCR conduct quarterly audits of institutions with

3    inpatient units. (Ex. A at 78.) Mr. Hayes criticizes the reports' comprehensiveness regarding

4    "methodology, particularly in the area of the sample size of medical chart review." (ECF No.

5    8143-1 at 59.) But sample size is part of the Suicide Prevention On-Site Audit Guidebook and

6    many key performance indicators. The reader of a report can reference that guidebook to

7    determine the sample size if it is not disclosed in the audit report.

8        45.    Mr. Hayes found that "[m]any regional SPRFIT coordinators did not consistently

9    report whether the regional MHCT lieutenants and/or regional nursing consultants (RNCs) were

10    part of the onsite reviews, consulted during the reviews, or whether MHCT/RNC findings were

11    incorporated into the SPRFIT coordinator reports." (ECF No. 8143-1 at 60.) Mr. Hayes also

12    neglects to explain how consistently reporting if the custody or nursing teams were part of the

13    onsite review process would change the assessment or outcome of the review. Nor does he point to

14    any policy or guidebook requiring that the reviewer document whether he or she was accompanied

15    by custody or nursing staff as part of their onsite review. Regardless, Regional SPRFIT

16    Coordinators regularly consult and interact with their custody and nursing counterparts as part of

17    their role of providing oversight and consultation to their institutions. Moreover, the SP CQI

18    Guidebook states that "[w]hen the custody and/or nursing representatives are not able to attend the

19    on-site review, they shall provide their evaluation of the compliance measure items by conducting

20    an independent on-site review, and their information will be incorporated into the respective

21    sections of the report." (Ex. A at 78.) Although Mr. Hayes's Sixth Re-Audit does not identify

22    whether other monitors or experts assisted in the monitoring of CDCR's suicide prevention

23    practices either by assisting in Mr. Hayes's on-site visits or in other ways, CDCR is aware that

24    other members of the Special Master team regularly accompany Mr. Hayes during his onsite

25    visits.

26        46.    Mr. Hayes found that "Because not all regional SPRFIT coordinator reports were

27    quarterly, some regional reports were said to have six-month time frames, whereas the review

28    period for other reports was unclear." (ECF No. 8143-1 at 60.) As noted above, CDCR has

20674337.5

1   voluntarily decided to suggest as "general guidelines" that CDCR conduct quarterly audits of

2   institutions with inpatient units. (Ex. A at 78.)

3       47.    Mr. Hayes found that "[w]hen auditing emergent/urgent mental health referrals for

4   danger to self (DTS), several regional SPRFIT coordinators relied solely on OnDemand data for

5   completed SRASHEs, and did not conduct medical chart reviews to determine the extent by which

6   referrals for DTS resulted in completed SRASHEs." (ECF No. 8143-1 at 61.) But, On Demand

7   accurately identifies referrals for danger to self and these referrals are audited monthly. The audit

8   is reported to the headquarters SPRFIT each month and the sum of these reviews is then identified

9   in the Regional SPRFIT Coordinator reports.

10      48.    Mr. Hayes found that "[n]one of the regional SPRFIT coordinator reports presented

11   separate data for compliance with both Page 1 and Page 2 of the "Discharge Custody Check

12   Sheet" (CDCR MH-7497) forms; instead, a composite compliance score was presented." (ECF

13   No. 8143-1 at 61.) But, the scoring of the 7497s is consistent with statewide policy. The October

14   19, 2021 Revision of Mental Health Crisis Bed Discharge Custody Checks Form and Introduction

15   of Audit Requirements memorandum sets for the grading and scoring procedures for the 7497

16   audit. (Ex. C.)

17      49.    As stated in the memo, the 7497 form will pass the audit if "all items reviewed for

18   the totality of the custody discharge check review receive a 'Yes'." (Ex. C at 11.) If any item in

19   the review is marked a "no" then the overall review will be marked as a fail. (*Id*.) Mr. Hayes does

20   not monitor this item per statewide policy. This became evident when the stakeholders fully

21   remediated data indicator SP12 in September 2023—which measures the totality of the 7497 form.

22   Soon after remediation, Mr. Hayes informed the group that SP12 was not designed to his

23   preference and CDCR has had to start over on the indicator to bifurcate it. Nonetheless, the

24   SPRFIT Coordinators used existing statewide policy to monitor 7497s. The shift to bifurcate

25   grading is a recent one that came about in the data remediation process.

26      50.    Mr. Hayes found that "[n]one of the regional SPRFIT coordinator reports addressed

27   the local SPRFIT requirement to review SRMP IPs during monthly SPRFIT meetings." (ECF No.

28   8143-1 at 61.) This is incorrect as SPRFIT Coordinators monitor local SPRFIT compliance with

1  audit criteria. The criteria is laid out in the SP CQI Guidebook, which Mr. Hayes has reviewed.

2  (Ex. A at 94, 96-100.) And each SPRFIT Coordinator report includes a discussion of local

3  SPRFIT practices and Regional SPRFIT Coordinators also audit an institution's SRMP

4  independently of the SPRFIT review.

5        51.    Mr. Hayes found that "[q]uoroms in SPRFIT meeting minutes for the entire review

6  period were consistently addressed by only two regional SPRFIT coordinators." (ECF No. 8143-1

7  at 61.) The same audit that looks at SPRFIT's review of SRMP requires that the Regional SPRFIT

8  Coordinator audit whether the local SPRFIT established a quorum. (Ex. A at 98.) Regional

9  SPRFIT Coordinators check meeting minutes to see if they "reflect all mandatory members or

10  authorized designees were present." (*Id.*) Each SPRFIT Coordinator report includes a discussion

11  of local SPRFIT practices.

12        52.    Mr. Hayes found that "Regional SPRFIT coordinator reports from at least two

13  regions incorrectly suggested that maximum-security MHCB patients were only required to be

14  offered one telephone call per month, with one report stating: 'Because all MAX custody inmates

15  are only allowed one phone call per month, some patients understandably had no phone call

16  privileges recorded.'" (ECF No. 8143-1 at 61.) During COVID, CDCR authorized inmates in this

17  privilege group weekly phone calls. That policy ended in September 2023, but went back into

18  effect in December 2023.

19        53.    Mr. Hayes found that "[t]here were inconsistencies regarding the adequate review

20  of safety planning. A few of regional SPRFIT coordinators were very thorough in their critique of

21  safety plan quality. Others were not and simply relied upon a facility's CAT self-audit data. At

22  least one regional SPRFIT coordinator did not review safety plans required for IPs released from

23  Alternative Housing." (ECF No. 8143-1 at 62.) CDCR SPRFIT Coordinators employ a wide range

24  of tools in their audits, including CATs to gauge the quality of certain documents. One of those

25  CATs is part of a remediated key performance indicator, Quality of Safety Planning to Reduce

26  Suicide Risk (SP3.4).

27        54.    Mr. Hayes found that "[o]ne regional SPRFIT coordinator did not review quality of

28  safety planning because "a new CAT audit specifically for safety planning is currently being

-21-

1   developed," a response that was irrelevant and ignored CDCR's April 5, 2023 memorandum

2   stating the MHCB supervisory review of safety planning was still required and did not absolve

3   review by regional SPRFIT coordinators. In another region, the SPRFIT coordinator simply

4   stated: "The MHCB supervisor provided this reviewer with proof of practice of having conducted

5   reviews of supervisory discharge treatment plans during the month of April," but the report did not

6   identify the results of the supervisor's findings." (ECF No. 8143-1 at 62.)

7          55.     Mr. Hayes's finding regarding the April 5, 2023 memorandum, a true and correct

8   copy of which is attached hereto as **Exhibit D**, is incorrect because he misinterprets the

9   requirements of this policy. The policy does not require the supervisor to "report the results" of the

10  review. The policy only requires tracking the reviews, specifically, "[f]or each safety plan

11  reviewed, this tracking tool shall include the patient's name and CDCR number, the date of the

12  safety plan, the date of supervisory review of the safety plan, and the reviewing supervisor's

13  name." (Ex. D at 1.)

14         56.     Mr. Hayes found that "[o]ne regional SPRFIT coordinator reported that

15  'Temporarily, due to the severe mental health staffing shortage, new CAPs pertaining to mental

16  health deficiencies will be deferred. Instead, all such deficiencies will be listed as

17  recommendations. When mental health staffing improves, some recommendations will be changed

18  to CAPs.' The rationale for a distinction between a recommendation and CAP was unclear." (ECF

19  No. 8143-1 at 62.) Mr. Hayes does not identify the region or report. However, the "distinction

20  between a recommendation and CAP" is not unclear because it is included in the SP CQI

21  Guidebook.

22         57.     Moreover, the SP CQI Guidebook, which was reviewed by Mr. Hayes, includes a

23  section discussing the "Assignment of Corrective Action Plans (CAPs) and Recommendations."

24  (Ex. A at 109.) In relevant part, the guidebook states the following:

25    •   The auditor should identify specific areas where improvement is warranted. CAPs should

26        be required to resolve the outstanding concerns.

27    •   Recommendations for areas to improve can also be made during the audit. These would be

28        areas that don't rise to the level of needing a formal CAP, but that would help improve the

1    health of the institution's suicide prevention program.

2    (*Id.*) In instances where the local SPRFIT has already identified the issue, the SP CQI Guidebook

3    permits the Regional SPRFIT Coordinator to identify the concern but not issue a formal CAP.

4    58.    Mr. Hayes findings' regarding CDCR's Psychiatric Inpatient Programs include a

5    request for fifteen additional orders is unnecessary because the issues have already been corrected

6    or CDCR's Regional SPRFIT Coordinators have already established corrective action plans to

7    address the issues. CDCR's Regional SPRFIT Coordinators add all corrective action plans

8    generated from Mr. Hayes's site visits to their own roster and regularly check the status of those

9    plans when they conduct site visits. They also look to ensure that each institutions' local SPRFIT

10   committee is tracking and completing those same corrective action plans.

11   59.    During his February 7, 2023 site visit to Salinas Valley State Prison PIP, Mr. Hayes

12   found that SVSP PIP lacked sufficient suicide resistant cells and also that it had not addressed the

13   "need for fencing or other barriers to prevent patients on suicide observation status from jumping

14   from the second tier of the" C-5 and C-6 housing units. (ECF No. 8143-1 at 74.) Accordingly, Mr.

15   Hayes recommended that CDCR "[p]rovide verification that all cells designated to house suicidal

16   patients at SVSP-PIP are now suicide-resistant" and "[p]rovide work plans and CAPs that address

17   the need for fencing or other barriers to prevent patients on suicide observation status from

18   jumping from the second tiers of C-5 and C-6 units at SVSP-PIP." (*Id*. at 90.) In regards to the

19   retrofit of cells at SVSP PIP, CDCR completed the retrofits. CDCR began suicide prevention

20   retrofits for cells in SVSP PIP's C-5 and C-6 on September 25, 2023 and completed the project on

21   December 14, 2023. Retrofits for the cells in TC1 and TC2 began on December 18, 2023 and are

22   scheduled to be completed by the end of July 2024.

23   60.    Following his site visits in early 2023, Mr. Hayes recommended that CDCR

24   "[p]rovide verification that the CAPs to ensure that suicidal patients have access to out-of-cell

25   activities that are clinically justified, including those on maximum-security status, at CHCF-PIP,

26   CIW-PIP, CMF-PIP, and SVSP-PIP have been fully implemented." (ECF No. 8143-1 at 90.) But

27   no further verification is necessary because each Regional SPRFIT Coordinator routinely audits

28   the non-clinical activities tracking tool (NCAT) to determine whether patients—all patients—were

1   offered adequate out of cell activities. The NCAT tracks data for all maximum custody patients

2   including those who are suicidal. The Regional SPRFIT Coordinators also review clinical

3   justification on orders quarterly.

4       61.     Mr. Hayes made two recommendations related to PIP safety planning. First, he

5   found that "[a]t CMF-PIP, required safety plans were only completed in 76 percent (32 of 42) of

6   the cases. At CHCF-PIP, required safety plans at CHCF-PIP were only completed in 71 percent

7   (30 of 42) of the cases." (ECF No. 8143-1 at 82.) Mr. Hayes recommended that CDCR "[p]rovide

8   verification that the CAPs to improve the adequacy of safety planning, as well as supervisory

9   review of safety plans, at CHCF-PIP, CMF-PIP, and SVSP-PIP have been fully implemented."

10  (*Id.* at 90.) Adequacy of safety planning is monitored via CDCR's Chart Audit Tool as well as a

11  remediated data indicator, Quality of Safety Planning to Reduce Suicide Risk (SP3.4.) Supervisory

12  reviews are completed on a statewide SharePoint which requires supervisors identify if

13  modifications were needed for the safety plan. CDCR continues to assess the effectiveness of the

14  SharePoint system.

15      62.     Mr. Hayes found that local SPRFITs were not establishing quorums, except at San

16  Quentin PIP, and that several of the committees were not tracking or addressing prior corrective

17  action recommended by Mr. Hayes or regional teams. (ECF No. 8143-1 at 84-85.) Accordingly,

18  Mr. Hayes made two related recommendations regarding quorum and corrective actions. (*Id.* at

19  90-91.) As to quorum, Mr. Hayes recommended that CDCR "[p]rovide verification that the CAPs

20  to ensure that CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP CDCR achieved six consecutive

21  months of SPRFIT meeting quorums for all mandatory members or their designees have been

22  fully implemented." (*Id.* at 90.) CDCR's Regional SPRFIT Coordinators attend local SPRFIT

23  meetings and audit their meeting minutes. They utilized the SP CQI Guidebook to audit SPRFIT

24  committees and their minutes. (Ex. A at 96-100.) As part of their audit, they look at whether the

25  "all mandatory members, or authorized designees [were] present." (Ex. A at 96, 98.)

26      63.     As to corrective action, Mr. Hayes recommended that CDCR "[p]rovide

27  verification that the CAPs to ensure that SPRFITs at CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-

28  PIP tracked prior corrective actions recommended by this reviewer and/or regional SPRFIT

-24-

20674337.5

1  clinicians in either monthly SPRFIT minutes or in separate documentation have been fully

2  implemented." (ECF No. 8143-1 at 91.) But, CDCR's Regional SPRFIT Coordinators attend local

3  SPRFIT meetings and audit their notes. They utilized the SP CQI Guidebook to audit SPRFIT

4  committees. (Ex. A at 96-100.) As part of their audit, they look at whether the "committee

5  engage[d] in qualitative discussion of system surveillance of the institution's suicide prevention

6  practices, including…[c]orrective action plans for identified deficiencies found by the SPRFIT."

7  (Ex. A at 96.) A similar audit is conducted of meeting minutes. (Ex. A at 98.)

8          I declare under penalty of perjury under the laws of the United States of America that the

9  foregoing is true and correct.

10         Executed on this first day of April, 2024 at Carmichael, California.

11

12                                          s/ Travis Williams
                                            _____
13                                          TRAVIS WILLIAMS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

# Comprehensive Continuous Quality Improvement Audits

## Guidebook

**1/18/2024**

I.      Chapter One - Continuous Quality Improvement Audits
        a.  Pages 3-49
        b.  Attachments A-L (pages 50-73)

II.     Chapter Two - Suicide Prevention On-Site Audits
        a.  Pages 74-109
        b.  Attachments A-B (pages 110-112)

III.     Chapter Three - Division of Adult Institutions Audits
        a.  Pages 113-115

IV.     Chapter Four – Custody and Mental Health Partnership
        Program Audits
        a.  Pages 116-117

# I.     Chapter One - Continuous Quality Improvement Audit
## Table of Contents

Scheduling Your Visit..................................................................................................................6

    Coordinating Your Visit......................................................................................................6

    Creating the Schedule .......................................................................................................6

Preparing for Your Visit............................................................................................................9

    Data Review........................................................................................................................9

    Tool Updating....................................................................................................................10

    Pre-Visit Call.....................................................................................................................10

What to Do Upon Arrival ........................................................................................................10

    Check-In Meeting ..............................................................................................................10

    Document Binders ............................................................................................................11

Mental Health Audit Instructions ..........................................................................................11

    Preface...............................................................................................................................11

    CQIT Audit Terminology ..................................................................................................11

    Treatment Space ..............................................................................................................12

    IDTT Observation [RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned, MHCB] ..............................................................................14

    Patient Interviews [RC, RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned] .............................................................................18

    Group Treatment Observation [RC EOP, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned] ..........................................................................................25

    Group Wait List [ML CCCMS]...........................................................................................26

    ICC Observation [ASU, ASU EOP HUB, PSU, STRH, STRH RC, LTRH, Condemned]................26

    High Refusers [ASU EOP HUB, PSU].................................................................................28

    Cell Cleanliness [Alternative Housing, MHCB]..................................................................28

    Clinical Restraint [MHCB] ................................................................................................29

    Seclusion and Restraints [MHCB, PIP Acute, PIP ICF] .........................................................30

    Staff Interview [Institution Wide]....................................................................................31

    Five Day Follow-Up Assessment [On-Site Paperwork] ....................................................31

    Medication Management ..................................................................................................32

    Heat Incident Log MH [On-Site Paperwork] ....................................................................33

Overall Area Rating [R&R Intake, RC, RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned, Alternative Housing, MHCB] ........................................................ 33

Custody Audit Instructions ........................................................................................................... 34

Therapeutic Treatment Module/Security Desk Standards [RC EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned] ........................................................................ 34

Mechanical Restraint Documentation [MHCB] ............................................................... 35

Therapeutic Treatment Module Use Observation [MHCB] ............................................... 35

ICC Timelines [ASU, ASU EOP HUB, PSU, STRH, LTRH, SHU] ......................................... 36

Entertainment Appliances [ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned] ............... 36

Unclothed Body Search [ASU EOP HUB, PSU] ................................................................ 37

Out of Cell Time and Showers [ASU, ASU EOP HUB, PSU, SHU, Condemned] ................... 38

Out of Cell Time and Showers [STRH RC, STRH Female, LTRH] ....................................... 39

Out of Cell Time and Showers [STRH] ........................................................................... 40

Custody Housing Review [All Housing Units] ................................................................. 41

RVRs [On-Site Paperwork] ........................................................................................... 43

Custody Staff Training (CQI Custody) [On-Site Paperwork] ............................................ 44

Issuance of Property Tracking & Transfer Timelines for NDS [ASU, ASU EOP HUB, STRH RC, STRH, LTRH, PSU, SHU] ............................................................................. 45

Phone Calls Offered for NDS [ASU, ASU EOP Hub, STRH RC, STRH, LTRH, PSU, SHU] ......... 46

Use of Force [On-Site Paperwork] ................................................................................ 47

Post Visit Instructions ................................................................................................................. 47

Check-Out Meeting .................................................................................................... 47

Completing Your Report .............................................................................................. 48

Checking Your Data .................................................................................................... 49

Attachments ............................................................................................................................... 50

Attachment A – CQI Site Visit Preparation Checklist .................................................................... 50

Attachment B – Pre-Scheduled Audit Areas .................................................................................. 53

Attachment C – Custody Escort Officer Script .............................................................................. 55

Attachment D – Restraint Checklist(s) ......................................................................................... 56

Attachment E – Regional Technical Instructions ........................................................................... 59

Attachment F – Report Writing Outline ........................................................................................ 60

Attachment G – How to Run the Non-Disciplinary Segregation Report (NDS) ................................ 61

Attachment H – CQI Entrance Talking Points ........................................................................ 64

Attachment I – Case Selection Review Guidelines ................................................................ 65

    Case Review Selection Guidelines ..................................................................................... 65

    Case Review Writing Guidelines ........................................................................................ 65

Attachment J – Exit Interview Talking Points ...................................................................... 66

    Mental Health Exit ............................................................................................................ 66

    Custody Exit – To be presented by the MHCT Regional Lieutenants ................................ 67

Attachment K – Security Desks ........................................................................................... 69

Attachment L – Treatment Modules and Security Booths .................................................... 71

# Scheduling Your Visit

## Coordinating Your Visit

a) Prior to the audit, the mental health regional team will work together to schedule a range of audit dates.
   - Audit dates are not finalized until the mental health regional team coordinates the dates with the institution staff.
b) A mental health regional team member contacts the chief of mental health (CMH), chief executive officer (CEO), and chief psychiatrist (CP) of the scheduled facility to determine final audit dates.
   - Final dates are determined based upon Interdisciplinary Treatment Team (IDTT), Institutional Classification Committee (ICC), and group schedules. Ensure that these meetings, in the locations in which you need to observe them, are occurring on the days you are at the institution.
c) The regional team members will notify all the parties of the final dates.
   - Custody regional team members will notify the institution's warden of the visit dates along with expectations for the audit.
      o Expectations are noted in the CQI Site Visit Preparation Checklist (Attachment A).
      o Other expectations include:
         ▪ The warden's participation in the check-in and check-out meeting.
         ▪ Custody staff available to escort audit team members upon request.
   - The mental health regional administrator or designee will notify the CEO, CMH and CP of the final visit dates and provide expectations for the audit.
      o Expectations are noted in the CQI Site Visit Preparation Checklist (Attachment A).
      o Other expectations include:
         ▪ Staff conduct business as usual (do not change group leaders or IDTTs membership for the audit).
         ▪ CEO, CMH, CP and chief nurse executive (CNE) participation in the check-in and check-out meeting.
         ▪ Adherence to schedules (ICC, IDTT, groups, patient survey).
         ▪ Staff available to escort audit team members.

## Creating the Schedule

a) At least two weeks prior to the scheduled visit, the mental health regional analyst will request the name of a local contact who has access to facility scheduling information.
   - Ongoing communication with this liaison is critical to ensure the visit is well organized and the institution staff knows what is expected.
   - Verbal communication is critical to finalizing a schedule that will help ensure the visit goes smoothly.
b) Coordination with institution designee.

- This is done by the regional analyst.
  - o Provide the CQI Site Visit Preparation Checklist (Attachment A) for the dates you will be visiting the institution, to request:
    - IDTT (IDTT for all MHSDS patients-ASU, ML EOP, ML CCCMS, MHCB, LTRH, STRH, PSU) schedules;
    - ICC schedules; and
    - Group therapy schedules for the following: RC EOP, ML EOP, ASU, ASU EOP Hub, PSU, STRH RC, STRH, LTRH and Condemned.
  - o Coordinate the schedule with the institution designee using the IDTT, ICC, and group schedules, and the Pre-Scheduled Audit Areas (Attachment B). Ensure all required pre-scheduled meetings/interviews are included in the schedule.
    - Custody team members do not have any pre-scheduled events so the defined schedule is primarily for the clinical team.
    - To avoid excessive walking from one end of the institution to another, ensure the pre-scheduled items are coordinated logistically with the lay-out of the institution.
    - Build in estimated time for non-scheduled audit items (e.g., reserve about two hours in the schedule before or after the MHCB IDTT to complete all non-scheduled MHCB items).
    - Include in the schedule all areas where there are no pre-scheduled events. This will help ensure the team remembers visit all required areas during the visit (e.g., alternative housing, OHU).
    - Teams can be divided to accommodate scheduling (e.g., one clinical team member can go to a CCCMS IDTT, while another goes to an EOP IDTT on another yard, and a custody team member is in the ASU).
- c) The regional analyst or designee provides the Randomized Patient List to the institution's designee to schedule the patient survey.
  - Two weeks before the visit:
    - o Go to Lifeline Internet site, click "Quality Management" (under "Health Care Operations"), click "Quality Management Portal" (under "External Links"), click "All Reports & Operational Tools," click "Mental Health Performance Reports," click "Randomized Patient List," enter parameters (see below for example).
      - *Example:* Mainline EOP (ML EOP) list
        Institution: CIM
        Program: ML
        Provider: Null
        Number to select: (auto populates)
        MHI: EOP, EOPMod
        SubProgram: Any, but uncheck ASU, LTRH, PSU, STRH
        Cellbed: Null
        Flags: (auto populates)

Click "View Report"

- *Example:* ASU
  Institution: CIM
  Program: ASU
  Provider: Nulll
  Number to select: (auto populates)
  MHI: CCCMS, EOP, EOPMod
  SubProgram: Select All
  Cellbed: Null
  Flags: (auto populates)
  Click "View Report"

  o Export each list to Excel and save.
  o Run the report for ML CCCMS, ML EOP, RC, ASU, LTRH, STRH, and PSU programs.
  o Ensure you only run the list for programs offered at the institution.

d) Email the saved Excel spreadsheet of the Randomized Patient List(s) to the designee at the institution responsible for coordinating the visit with the instructions for them to schedule:

- One group of 10 patients in each yard per program (ML CCCMS, ML EOP, RC, ASU, ASU EOP HUB, LTRH, STRH, and PSU) as applicable to their institution.
- One group of 10 patients in the MHSDS program at desert institutions, or, if there are fewer than 10 patients at the desert institution, ducat and interview all MHSDS patients at that institution.  The goal is to have groups of 10. Please account for refusals, ducat more than 10 as many will refuse.  Remind custody staff that only 10 patients are needed. Do not cancel the patient's treatment for them to participate in the patient survey.

e) Email the Custody Escort Officer Script (Attachment C) along with the Excel spreadsheet of the Randomized Patient List(s) to the institution designee.

- Ask the designee to provide the Custody Escort Officer Script and request that they use it.
- Contact a custody audit team member and request that the Custody Escort Officer Script be provided to the warden.  Also, request that the warden provide the Custody Escort Officer Script to the officers and use it to explain the purpose of the patient survey to the patients.

f) Remind the institution designee to email electronic copies of the Acute/ICF returns list (to both the MH regional contact and the regional lieutenant), Suicide Risk Evaluation (SRE) mentor program training list, and staffing numbers for clinical staff.

- Call the institution designee one day before your visit to remind them about the Custody Escort Officer Script. Verify that patients are scheduled for the patient survey and ensure you know about any last-minute schedule changes.
- The institution designee will provide the percentage of all PC and psychiatrist appointments seen in a confidential setting.
  o Two weeks prior to the visit:

- ▪ Run the Appointments report in On Demand. Enter the following parameters as an example for all PC Contacts:
  - Institution: SQ
  - Program: Select All
  - MHI: CCCMS; EOP; EOP Mod; MHCB; Acute; ICF
  - Starting: 7/1/2021
  - Ending: 12/31/2021
  - Tx Category: PC Contact
  - Outcome Type: Completed
  - Modality: Select All
- ▪ Pivot Table:
  - Export the results to Excel and save
  - Select cell A1 in the Appointments sheet
  - Select the Insert tab at the top of the ribbon
  - Select Pivot Table
  - When the Create Pivot Table window pops up, select "Ok"
  - In the Pivot Table Fields pane, drag the following fields to the specific areas:
    - CDCR (Values)
    - Confidential (Rows)
- ▪ In the Values area, select the dropdown arrow and select "Value Field Settings." When the "Value Field Settings" window pops up, select the "Show Values As" tab. In the "Show Values As" dropdown, select "% of Grand Total." Please note that on the Pivot Table:
  0 = % of Patients NOT seen in a confidential setting
  1 = % of Patients SEEN in a confidential setting
- ▪ Repeat these steps for PSY Contacts
- • The regional analyst or designee ensures all attendees and their equipment have been cleared for entrance.
- • The regional analyst or designee ensures a call-in line and provides exit meeting invitations to the: warden, CMH, CP, CEO, regional CEO, CNE, plaintiff's counsel, Coleman attendees, OLA and AG's office.

## Preparing for Your Visit

### Data Review

a) Within one week before your visit:
  - • Review all data on the Performance Report from On Demand.  This will help inform your visit and prompt you to ask further questions and/or undertake additional investigations.

## Tool Updating

a) The CQI tool (CQIT) is a web-based application that does not need to be manually updated by users.

## Pre-Visit Call

a) Mental health and custody audit team designees should coordinate a pre-visit call with the CEO, warden, health care AW, CMH, CP and CNE the week prior to the visit.

b) All visit expectations will be expressed including:
- Patient Survey Script (see Patient Interviews audit for script)
- Patient survey ducating and escorts (timely)
- Binder preparation (see Attachment A)
- Confidentiality of patient survey
- Institution mental health staff not to attend patient survey
- CMH not to attend any observation meeting unless they typically attend

# What to Do Upon Arrival

## Check-In Meeting

a) The first thing that will occur at the start of each visit is a brief "check-in" meeting with, at a minimum, the CEO, CMH, CP, CNE, warden, custody audit team, and mental health audit team. It is also recommended that facility captains attend (see CQI Entrance Talking Points [Attachment H]).

b) Warden and CEO/CMH presentations
- Custody audit team members may ask wardens to provide any relevant updates regarding their program, mission, etc.
- Mental health audit team members may ask CEOs and CMHs to provide any relevant updates regarding their mental health census, populations, and program changes.

c) Custody and mental health presentations
- Both audit teams should provide institution leadership with an overview of the areas in which they will be visiting.
- At the inception of the visit, the audit teams should inform institutional leadership that the visit is a means to collect data to provide supportive tools for leadership and their staff.
  - Emphasize that the reports generated from the visit will allow them to use and make decisions about their quality improvement priority areas.
  - Emphasize that the reports generated from the visit will allow them to facilitate change through their own quality management system.
- Data discussion – a designated mental health audit team member will provide an overview of the data from the Performance Report that was prepared in the Data Review section of "Preparing for Your Visit."

d) A designated custody staff member will review all relevant custody data from the mental health Performance Report and the CDCR Office of Research site (for welfare check data).

### Document Binders

a) Before you leave the check-in meeting, ask institutional staff for the document binders (one for mental health and one for custody) outlined in the CQI Site Visit Preparation Checklist (Attachment A) provided by the team members ahead of the visit.
- The details related to the items that go into these binders are in the CQI Site Visit Preparation Checklist (Attachment A).

# Mental Health Audit Instructions

## Preface

This guidebook is designed to provide specific audit instructions for every audit included in the CQIT to improve inter-rater reliability and validity of our audits. Although CQIT covers a great deal of items that shall be reviewed on site, it is also critical that each auditor pay special attention to qualitative items that may not be explicitly in CQIT. It is critical that all information available (CQIT audit items, other Performance Report items) are utilized to paint a complete picture on institution performance using your written report.

For example, the Performance Report reflects a high percentage of appointment cancellations (uses EHRS data), patients report they do not get to their appointments on time (CQIT patient survey item), and while on site you notice the MH staff is unorganized and there is a lack of escort officers (not in any formal audit but important to note and include in your report).

Also note the patient and staff interview questions are predominantly conveyed through report writing. Although patient survey questions are measurable, questions related to unclothed body searches, custody response, timeliness of groups, and yard time offered in restricted units are not reported on the Performance Report from a patient report perspective; these items are intended to further inform your impression and other data regarding institution performance in these areas.

## CQIT Audit Terminology

a) <u>Review Period</u>: date range for document selection related to the audit. The review period will always be the last completed 6 months prior to the audit date. For example, if the audit date is in July 2022, the Review Period will be January 1, 2022 – June 30, 2022.
b) <u>Area</u>: Housing area (e.g., alternative housing, ASU, ASU EOP Hub, Condemned, Institution Wide, LTRH, MHBC, ML CCCMS, ML EOP, PSU, R&R, RC, RC EOP, SHU, STRH).
c) <u>Data Entry</u>: enter audit data on the same date the audit was conducted

d) <u>Data Submission</u>: submit all audit data by the end of the next business day of when CQI tour concludes. For example, if your tour concludes on Friday, submit all data by end of day Monday.

e) <u>CQIT Audit Fields</u>
Note: not all audits will contain all these fields.
**Start Date**: the date the audit was performed on
**End Date**: the date the audit was completed
**Sub Area**: a smaller housing area that is part of a larger housing area. For example, MHCB is the area. MHCB, Side A is the sub area. ASU is the area. S Wing is the sub area.
**Time**: the time the audit was conducted. Note: the time defaults to the current time.
**Percentage**: an amount that is a proportion of a larger sum. Note: you do not have to calculate percentage; there will be specific instructions on where to obtain percentages.
**Provider Login ID**: username used to sign into computers
**CDCR #**: the incarcerated person's or patient's CDCR number

## Treatment Space

a) General Instructions:
  - Respond one time for each treatment room observed.
    - Review all spaces where mental health treatment is offered.
  - In auditing treatment space, it is not necessary to observe a room in use. Instead, staff may be asked about the space observed.
  - If possible, complete the IDTT and group treatment space audits while observing IDTT and group.
  - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - Start Date
    - Sub Area

b) Group Treatment Space [RC, RC EOP, STRH RC, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH, LTRH, Condemned, PIP Acute, PIP ICF]:
  1. Is the group treatment space confidential?
    - Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.
  2. Is the space large enough to accommodate chairs for each participant?
    - If you do not respond to this question while observing a group, you may need to ask staff if they usually (more than half of the time) have enough chairs for everyone.
  3. Does the space have adequate ventilation and temperature control (not too hot or cold)?
    - Noting that everyone prefers a different room temperature, respond if the room is judged by the auditor to be too "stuffy" or if participants report it is too hot or cold.

c) Individual Treatment Space [RC, RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH, STRH RC, LTRH, Condemned, MHCB, PIP Acute, PIP ICF]:
  1. Is the treatment space observed confidential?

- Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.
2. Is there enough space for two chairs?
   - If you do not respond to this question while observing an individual session, you will need to determine if the space has enough room for two chairs to fit in comfortably.
3. Is the space configured so the space is safe?
   - Examples of unsafe space include:
     - The space is set up so the patient sits by the door, blocking the door from custody being able to get in if there were an emergency (check for possible lay out change since last audit).
     - The space is used for storage of items (e.g., broom closet, storage for beds or other items).
     - The space is in a remote area with no custody supervision or proximity to respond in case of an emergency.
     - The space is in an area where an alarm will not work.
4. Is the space well ventilated and temperature controlled (not too hot or cold)?
   - This is more difficult to assess in an individual room while not in use. To assess you may:
     - Interview staff and ask about ventilation.
     - Noting that everyone prefers a different room temperature, respond if the room is judged to be too "stuffy".

d) IDTT Treatment Space [RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, MCHB, Condemned, PIP Acute, PIP ICF]:
   - Complete this audit while observing the quality of the IDTT.
1. Is there enough space for each participant to have a chair?
   - Do not count the audit team. Only determine this by judging if there is enough space for regular institution IDTT members.
2. Is there a chair for each participant?
   - Do not count the audit team. Only determine this by judging if there is a chair for regular institution IDTT members.
   - This includes the patient having a chair, but the custody escort does not require a chair.
3. Is there a conference table?
   - Some rooms have a small side table in the middle of the room used as a conference table. This is not adequate and does not count as a "yes."
4. Is the space confidential?
   - Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.
5. Is the space free from unnecessary and distracting noise?
   - Some examples of unnecessary and distracting noise are:
     - Loud fans that make it difficult to hear.

- A crowd of people and activity right outside the room that make it difficult to hear.

6. Is the space free from unnecessary interruptions (e.g., people walking through)?
   o Some examples of unnecessary interruptions include:
     - Space in which people have to walk through the meeting to get to other locations in the facility.
     - Space in a large area (e.g., the dining room) where many people are regularly entering and exiting the area during the meeting.

7. Is the space well ventilated and temperature controlled (not too hot or cold)?
   o Noting that everyone prefers a different room temperature, respond if the room is judged by the auditor to be too "stuffy" or if participants report it is too hot or cold.

## IDTT Observation [RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned, MHCB]

a) General Instructions:
   - You are required to observe five patient IDTTs in one building of each program (e.g., if the prison has three separate EOP buildings, you only need to sit in on one of the EOP building's IDTTs for five patients) but you must rotate buildings each visit to ensure over time all programs are sampled.
   - If there are less than five to observe in any given program, observe all.
   - Before the first patient is brought in, introduce yourself to the team and tell them:
     o You must introduce yourself to each patient.
     o Other than your initial introduction, the treatment team should proceed with the IDTT as they typically would.  The treatment team should not be presenting the case to you.
     o To the extent that any of the attendees are present at the IDTT due solely to the audit, politely request that they not attend so that the audit fairly represents the quality of the treating team members.
     o Ask for a list of patients scheduled to be seen by the IDTT. This will help you with entering the patient CDCR numbers as they are being brought to the IDTT.
   - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
     o CDCR #
     o Start Date
     o Sub Area

b) IDTT Observations:
   1. Did the first IDTT start within 15 minutes of the scheduled time?
      o Judge this using the schedule you received in planning your visit.  If the meeting is more than 15 minutes late starting, note this as a "no" unless there was a legitimate reason (e.g., one of the team members attending to an emergency), that does not appear to be the norm.

2. Did the IDTT leader state the purpose of the IDTT?
   - o This will be apparent. The IDTT leader is expected to tell the patient the reason(s) they are having the meeting.
3. Did the primary clinician (PC) complete or update the PC intake evaluation prior to the initial IDTT meeting?
   - o The requirement for a new or updated intake evaluation will depend on the patient's program. If it is required, the PC must complete a new intake evaluation or update the current intake evaluation on a progress note.
   - o You may need to check in EHRS; other times it may be obvious as they will be looking at it in the IDTT.
4. Is there a psychiatrist (or PNP as allowed per policy) at the IDTT?
5. Did the psychiatrist complete the intake evaluation prior to the initial IDTT meeting?
   - o The psychiatrist must complete an initial evaluation prior to the IDTT.
   - o You may need to check in EHRS; other times it may be obvious as they will be looking at it in the IDTT.
6. If it appears that the patient's mental health status had an impact on his/her understanding of the proceedings, did IDTT members ensure effective communication?
   - o This applies only to patients who you, as a clinician, observe to have difficulty paying attention or understanding what the IDTT members are saying.
     - ▪ *Training discussion – what are some of the things you might observe with a patient who is having difficulty understanding?*
   - o Note "N/A" if you judge the patient as being able to understand.
   - o Note this as a "yes" if any member in the IDTT checked with the patient for understanding by asking him/her to restate what was said.
7. Did the PC provide succinct case formulation (Predisposing, Perpetuating, Precipitating, and Protective factors) to inform relevant treatment information including, but not limited to:
   - o Functional impairments
   - o Diagnosis
   - o Areas of distress
   - o Strengths
   - o Weaknesses
   - o History of mental illness, hospitalizations, suicide attempts
8. Did the psychiatrist provide relevant information regarding diagnosis, medications to address the diagnosis, and discuss side effects?
   - o The psychiatrist should explain what medication was prescribed and the rationale of why medication was or was not prescribed.

- o If medication is prescribed, the psychiatrist should discuss side effects (risks and benefits) of the medication *with the patient*.
- o Select "Not in attendance" if the psychiatrist (or PNP) is not present

9. Was the patient invited to participate in the IDTT and asked open-ended questions that enhances the patient's understanding of the treatment plan?
    - o Please provide detailed comments on why the patient was not invited.
    - o Select "N/A" if the patient declined to attend or there is good clinical rationale for not inviting the patient.
    - o If the patient attends, one can assume the patient was invited to attend.
    - o Asking only whether the patient "has any questions" is insufficient.
    - o Some examples of questions you might look for to qualify as a "yes" response:
        - ▪ What did we talk about working on together when we met last (week, two days ago, etc.)?
        - ▪ Tell me what we said is your diagnosis? What does that mean?
        - ▪ Tell me what this meeting is about?

10. Was the correctional counselor engaged in the discussion, knowledgeable, and provided relevant information to the case?
    - o The correctional counselor does not have to give an entire case presentation but is expected to provide relevant custody information and engage in the team's discussion.
    - o Select "Not in attendance" if the CCI is not present

11. Did the IDTT leader facilitate a team discussion by attempting to engage all participants (including staff and the patient)?
    - o If the IDTT leader asked other team members questions to prompt their input, this response is "yes" even if the team leader was unsuccessful in his/her attempt.

12. Did the overall IDTT include interactive discussion of all staff participants toward the treatment plan?
    - o This is about the interaction of all team members; if team members present information in isolation, and then disengage, the response to this item is "no."
    - o If one staff participant on the patient's treatment team does not interact, the response is "no."
    - o You may exclude staff attendees who are NOT on the patient's treatment team but are in attendance (this should be clear from introductions at the beginning of the meeting).

13. Was the patient given an opportunity to provide meaningful input regarding their treatment plan, goals, and all determinations made at IDTT?
    - o This will be evident. It is the expectation IDTT staff members discuss treatment options with the patient, rather than present their case to

other team members or discuss treatment options with other team members and not engage the patient.

- o Select "Not in attendance" if the patient is not present

14. Were measurable treatment goals discussed?

- o All treatment goals must be measurable.
  - ▪ For example, "Your short-term goal is to be free of auditory hallucinations for two weeks.  Your long-term goal is to come out of your cell for yard time at least two times per week for the next two months."

15. Were all considerations on the HLOC form and appropriateness of level of care discussed with contributions from all members of the IDTT, including the patient?

- o If the patient meets any criteria on HLOC form, and was not referred to HLOC, the team must verbally discuss treatment modifications and clinical justification for non-referral.
- o Statements such as "does not meet any indicators on HLOC form" are not acceptable – this will not be meaningful to the patient.
- o Look for statements such as, "You are doing well at the EOP level of care so I am recommending we keep you at this level of care, you have not had any MHCB admissions, you are going to most of your treatment appointments, and we are making progress on your treatment goals."

16. For IDTT updates ONLY: Did the team leader discuss progress towards the treatment goals?

- o The PC is expected to discuss with the IDTT what progress, if any, has been made toward measurable treatment goals.
  - ▪ For example, "Mr. Y has reported that he accomplished his goal of being free from auditory hallucinations for two weeks.  He is working towards his long-term goal of coming out for yard at least three times per week for two months and has done this for one week so far."

17. Can the primary clinician access the health record and are they using it as needed?

- o If the primary clinician is not there, then select "not in attendance."

18. Can the primary psychiatrist access the health record and are they using it as needed?

- o If the primary psychiatrist is not there, then select "not in attendance."

19. Can the correctional counselor access SOMS/ERMS and are they accessing it as needed?

20. (For non-ASU ML EOP audits ONLY): For Initial EOP IDTTs and IDTTs in which a patient does not have a work/education assignment, was eligibility (clinical appropriateness) for work/education assignment discussed?

21. (For non-ASU ML EOP audits ONLY): Did the treatment team discuss what, if any, reasonable accommodations may be needed for work/education assignment?

22. Is management of the patient's resistance to treatment addressed through individualized treatment intervention(s) and goals with custody input?
23. Did the treatment team discuss if there were any RVR write-ups?
24. If the treatment team discussed RVR write-ups, were the mental health recommendations from any RVRs since the last IDTT also discussed?
25. If appropriate to address in treatment plan, was the behavior that led to the RVR accounted for in the treatment plan?
26. MHCB ONLY: For patients who were admitted for danger-to-self or engaged in self-injurious-behavior while admitted, is the safety plan discussed?
27. MHCB ONLY: Are levels of observation discussed?
28. MHCB ONLY: Is level of observation justified?
29. MHCB ONLY: Is the discharge plan discussed?
30. Did the outcome from the IDTT meeting appear predetermined, and not impacted by the patient's or other team members' input?

## Patient Interviews [RC, RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned]

a) First Steps: Logistics
   1. The regional administrator designates a staff member to generate a Randomized Patient List from On Demand at least two weeks prior to the visit and send the list to the institution's CMH and to the contact at the institution. The list MUST be generated two weeks prior to the visit to ensure that patients who are interviewed have been in the program for several weeks (not applicable to desert institutions).
   2. Prior to, and again upon arrival at the institution, confirm that the institution received the list and remind institution leadership when you plan on conducting the patient surveys.
   3. Ensure that the institution staff followed the pre-visit checklist. The goal is to have groups of 10 patients. Please account for refusals, therefore have them ducat more than 10 patients to a group room as many will refuse. However, remind custody staff that only 10 patients are needed. Advise the institution staff to skip patient names on the list for those who are no longer in the program (this is going to occur since we run a list two weeks prior).
   4. Remind the institution contact responsible for coordinating the audit schedule that the custody officers must use the Custody Escort Officer Script to explain to patients the reason for the ducat.
   5. You do not have to ask the positive/negative questions with hand raising if there is a small number of patients.
b) Data Entry
   1. All responses should be entered as an integer.
      o For any items that are N/A, enter 0 for all questions that are not applicable. When a 0 is entered for positive and negative selections for each topic, the programming will score them as N/A.

c) Conducting the Interviews
  1. Introduction - Before you begin asking the standardized questions:
     - Introduce yourself
     - Explain that you are there to conduct a patient survey to see how they rate the treatment being provided to them.
     - Explain that the survey is anonymous and add a statement about the limits of confidentiality. For example, explain that if you believe a patient is suicidal, homicidal, or in a mental health crisis, you will have to break confidentiality.
     - Patient Survey Script: "This is anonymous. Although you were ducated for this, we do not know who you are and we are not keeping the ducats nor are we putting any names or CDCR numbers into our computer. We want you to feel comfortable to be honest." Explain that you are not writing their name and CDCR number down.
     - Not applicable to smaller groups: Explain that you have to ask each question in a positive and negative format because some people do not respond and we need both to calculate the response. Remind patients to respond only once.
     - Explain what is meant by usually or mostly.
       - "When I say usually or mostly, I mean more than half of the time."
     - Remind patients to only answer about the program and institution in which you are conducting the survey.
       - "Answer about your experiences here at _____ only."
     - Explain to patients that you need to count responses, so you need them to raise their hand high in the air and hold it up while you count when they respond.
     - Explain to patients that you also want to hear more about their experiences but to please hold off until the end, because many of the things they want to tell you will likely be asked in the survey.
  2. Asking the standardized questions:
     - Although it is critical that all assessors utilize the standardized questions as their template, to create an improved communication flow and ensure we obtain as many accurate responses as possible, questions may be amended as needed.
       - For example, instead of asking "What keeps you from going to your MH appointments?" you might ask, "There are times when you may not be able to get to your MH appointments, when that happens, what are some of the reasons you are not able to go?"
     - The most important thing here is to use your clinical skills to read the patients.
     - Another example is when you have a smaller group of patients you may not need to ask the positive and negative questions each time.
       - For example, if you are interviewing five patients and you ask, "Raise your hand if you feel that you are seen as often as you

19

need to be?" Rather than asking the next question, "Raise your hand if you feel that you are NOT seen as often as you need to be?" you may just be able to turn to the patients that did not raise their hand on the first question and ask, "You did not raise your hand, does that mean you do not think you are seen as often as you need to be?"

3.  Getting qualitative details using the radio buttons:
    o   Once you have ascertained how many patients are satisfied and/or dissatisfied, you need to get information about where improvements can be made.
    o   Ask each patient who reported satisfaction to raise their hand then, one by one, ask what they like about the treatment. Use the radio buttons to record their responses, and when radio button is appropriate for the response, select "other" and type it in.
    o   Now ask each patient who reported dissatisfaction to raise their hand, one by one, and ask how we can make improvements. Again, use the radio buttons to record responses, and when no radio button is appropriate for the responses, mark "other" and type it in.
    o   If you frequently get a response that is not in the radio buttons, notify the QM team so a radio button for this response can be added.
    o   It is important to explore areas where there is a conflict between patients' reports and data from performance reports or staff reports.

4.  Managing group leaders:
    o   A limitation of conducting interviews in a group setting is that a strong group leader can take over the group and influence other's responses.
        ▪   Use your clinical skills to minimize this.
        ▪   Let every person in the group know their responses are kept among the group.
        ▪   If anyone is uncomfortable responding within the group, they can see you after.
        ▪   If any patient expresses disinterest in participating and wants to leave, let the patient leave.

5.  Managing non-responders:
    o   You may encounter a situation where a patient does not respond to your questions, or does so but not according to what you asked (e.g., shrugs shoulders when you ask who likes/dislikes their group therapy).
        ▪   Do not immediately make assumptions about their responses. Again, use your clinical skills to engage the patient. Ask for clarification if needed.
        ▪   If it appears the patient is not stable and/or the responses are not likely to be meaningful, do not count this patient in your sample as they meet our exclusionary criteria.
        ▪   If they are stable but simply withdrawn, offer to get responses afterwards or do what you can to draw them out.

d)  CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
- Start Date
- Sub Area
- Time

e) Standardized Questions:
1.  How many patients were interviewed?
2.  Raise your hand if you go to most of your MH appointments?
3.  Raise your hand if you do NOT go to most of your MH appointments?
4.  What keeps you from going to your MH appointments?
    o  Did not get ducat
    o  Escort problems
    o  Modified program
    o  Discouraged by others
    o  Weather (too cold, too hot)
    o  Schedule conflicts (other appointments, work, visiting, canteen)
    o  Treatment is not helpful
    o  I don't like my clinician
    o  Symptoms of mental illness (e.g., "too depressed")
    o  Other
    o  N/A
5.  Raise your hand if you are usually able to get to your MH appointments on time?
6.   Raise your hand if you are NOT usually able to get to your MH appointments on time?
7.  When you do not get there on time, what types of things keep you from getting to your appointments on time?
    o  Did not get ducat
    o  Escort problems
    o  Modified program
    o  Discouraged by others
    o  Weather (too cold, too hot)
    o  Schedule conflicts (other appointments, work, visiting, canteen)
    o  Other: Describe
    o  N/A
8.  Raise your hand if you feel that you are seen as often as you need to be?
9.  Raise your hand if you feel that you are NOT seen as often as you need to be?
10. Raise your hand if you are usually seen within four hours if it is an emergency, within 24 hours if your situation is urgent and within 5 business days for non-emergencies when you request to be seen.
11. Raise your hand if you are NOT usually seen quickly when you need to be?
12. Raise your hand if you know your MH treatment plan?
    Item Tip: Describe treatment team and treatment plan to patients, "This is the plan that is developed when your psychiatrist, PC, CCI, and you all meet and discuss your treatment."  "It is what you are working on for your mental health

treatment."  "The issues that you and your clinicians have identified and that you want help within your treatment sessions."

13. Raise your hand if you do NOT know your MH treatment plan?
14. Raise your hand if you agree with your MH treatment plan?
15. Raise your hand if you do NOT agree with your MH treatment plan?
16. Raise your hand if you are mostly satisfied with your MH treatment team meetings?
17. What do you like about your MH treatment team meetings (IDTT)?
    o The clinicians listen to me
    o They help me get the treatment I need
    o The IDTT asks what I think
    o The IDTT is helpful
    o I get to discuss treatment with all of my providers at once
    o Other:  Specify
    o N/A
18. Raise your hand if you are NOT mostly satisfied with your MH treatment team meetings (IDTT)?
19. How can your mental health treatment team meetings be improved?
    o Listen to my opinion more
    o Less people in the room
    o They ask what I think
    o Spend more time with me
    o Other: Specify
    o N/A
20. Raise your hand if you know how to make an appointment with your PC or psychiatrist?
21. Raise your hand if you do NOT know how to make an appointment with your PC or psychiatrist?
22. Raise your hand if you are satisfied with the treatment from your PC?
23. What do you like about the treatment you receive from your PC?
    o He/she listens to me
    o He/she cares about me (or understands me)
    o He/she provides methods to help cope
    o Other: Specify
    o N/A
24. Raise your hand if you are NOT satisfied with the treatment from you PC?
25. How can the treatment you receive from your PC be improved?
    o Be seen more often
    o Spend more time with me
    o More individualized treatment
    o Focus on treatment progress rather than a quick check-in
    o Other: Specify
26. Raise your hand if you are satisfied with the treatment from your psychiatrist?
27. What do you like about the treatment you receive from your psychiatrist?

- o He/she listens to me
- o He/she explains the medications to me
- o He/she provides methods to cope
- o Other: Specify
- o N/A

28. Raise your hand if you are NOT satisfied with the treatment from your psychiatrist?

29. How can the treatment you receive from your psychiatrist be improved?
    - o Be seen more often
    - o Spend more time with me
    - o Better explain medications
    - o Other: Specify
    - o N/A

30. Raise your hand if you are mostly satisfied with your group treatment?

31. What do you like about your group treatment?
    - o The group leader encourages discussion
    - o The group leader helps me with my MH issues
    - o The clinician pays attention to my treatment needs
    - o The clinician asks us all to contribute.
    - o I learn new skills/techniques
    - o I get support from others
    - o I get out of cell
    - o I get to interact with others
    - o Other: Specify
    - o N/A

32. Raise your hand if you are NOT mostly satisfied with your group treatment?

33. How can your group treatment be improved?
    - o More groups offered
    - o Groups more directed to my treatment issues
    - o Other: Specify
    - o N/A

34. Raise your hand if you are usually seen by MH clinicians in a confidential setting? Item Tip: Explain confidential, "A private setting where other patients cannot hear or see the interaction and other staff cannot hear the interaction."

35. Raise your hand if you are NOT usually seen by your MH clinician in a confidential setting?
    - o If you are not usually seen in a confidential setting, where are you typically seen?
    - o If you are not usually seen in a confidential setting, do you know why? Please explain.

36. For those of you who take psychiatric medication, raise your hand if you usually do NOT have to wait more than 24 hours to start getting a new medication that was prescribed to you?

37. Raise your hand if you usually have to wait more than 24 hours to start getting a new medication that was prescribed to you?

38. Raise your hand if you usually get your regular medications on time (e.g., AM meds are received between 0630-0800, afternoon meds between 1130-1300, PM meds between 1630-1830, and HS meds after 2000).

39. Raise your hand if you usually do NOT get your regular medications on time?

40. Raise your hand if your medications continue without disruption when you transfer to a new institution.

41. Raise your hand if your medications do NOT continue or administration is disrupted when you transfer to a new institution.

42. ML EOP ONLY: How many of you are offered at least 10 hours of treatment per week (for ML) or 5 hours per week (RC)?

43. ML EOP ONLY: How many of you are NOT offered at least 10 hours (or 5 for RC) of treatment per week?

44. ASU ONLY: Raise your hand if you received the ASU Inmate Orientation Mental Health Guide within a day of your arrival?

45. ASU ONLY: Raise your hand if you have NOT received the ASU Inmate Orientation Mental Health Guide within a day of your arrival?

46. For those of you on heat medications, how many of you are offered alternatives for yard when you have to return from the yard when there is a heat alert? (Note: this is for your report only – will not be calculated).

47. If you are offered alternatives to yard during heat alerts, what alternatives are you offered?

**The following items are not measured on the Performance Report. Keep measurable data but also ensure sufficient comments are noted.**

48. Raise your hand if group treatment hours offered usually conflict with other activities (e.g., showers, yard, and law library).

49. Raise your hand if your treatment groups usually start on time and last for the full allotted time.

50. Raise your hand if your treatment groups usually do NOT start on time and last for the full allotted time.

51. Raise your hand if the C/Os respond to urgent MH requests.

52. Raise your hand if the C/Os do NOT respond to urgent MH requests.

53. ASU ONLY: Raise your hand if you are offered 10 hours of yard each week.

54. ASU ONLY: Raise your hand if you are NOT offered 10 hours of yard each week.

55. STRH Male ONLY: Raise your hand if you are offered 18.5 hours of out of cell time each week.

56. STRH Male ONLY: Raise your hand if you are NOT offered 18.5 hours of out of cell time each week.

57. STRH RC, STRH female, LTRH ONLY: Raise your hand if you are offered 13.5 hours of out of cell time each week.

58. STRH RC, STRH female, LTRH ONLY: Raise your hand if you are NOT offered 13.5 hours of out of cell time each week.
59. Segregated units ONLY: Raise your hand if you have a crank radio, television, or other entertainment device.
60. ASU EOP ONLY: Raise your hand if you are strip searched upon return to cell after remaining within a secure housing unit under the supervision of staff.
61. ASU EOP ONLY: Raise your hand if unclothed body searches are conducted in a private area.
62. ASU EOP ONLY: Raise your hand if unclothed body searches are NOT conducted in a private area.
63. ASU EOP ONLY: Raise your hand if unclothed body searches are conducted by an officer of the same or preferred gender.
64. ASU EOP ONLY: Raise your hand if unclothed body searches are NOT conducted by an officer of the same or preferred gender.
65. Is there anything else regarding the mental health program you would like to share?

## Group Treatment Observation [RC EOP, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned]

a) General Instructions:
- Obtain a list of planned groups for the week(s) of the audit and randomly select at least two groups (per program) with different facilitators to audit.
    - Random selection means without definite aim, direction, rule or method.
- Only observe "talking" groups; not art or exercise groups.
- Before the first patient is brought in, introduce yourself to the group leader and tell him or her:
    - You will introduce yourself to the group
    - Other than your initial introduction, proceed with the group as he/she typically would.  He/she should NOT present the group content to you.
- If the CMH or chief psychiatrist is in attendance, ask him/her if he/she usually attends group; if he/she does not, tell him/her you want to see business as usual and politely ask him/her not to attend.
- If the group leader was changed as a result of your visit, you must audit another group.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - Start Date
    - Sub Area

b) Group Observations:
1. Did the group leader start the group on time?
    - If the group starts more than 5 minutes after the scheduled time, mark "no" unless there is a legitimate reason (such as the leader attending to a patient emergency) that does not appear to be the norm.
2. Did the group leader attempt to engage each participant?

- o If the group leader asked each group participant a question in an attempt to engage them, this response is "yes" regardless if all the patients actually engaged.
3. If media or music is used, is it only used for short periods of time to illustrate the group topic?
    - o If a movie or music is used consistently throughout the group, without any pause to apply the contents to treatment, the response to this item is "no."
4. Does the leader facilitate interaction between all group members on the clinical topic?
    - o This is about the group leader attempting to get each participant to engage with others about the clinical topic.
5. For clinician-led groups, is clinical process addressed during the group?
    - o Clinician-led groups are those led by a social worker, psychologist, or psychiatrist.
    - o For example, if the clinician is using cognitive behavioral techniques to address treatment issues in a stress reduction group, he/she may help group members to dispel stressors that are not real and to focus on steps to address real stressors.

## Group Wait List [ML CCCMS]

a) General Instructions:
- Use the CQI Site Visit Preparation Checklist (Attachment A) item # 9 to assist in answering the following questions.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - o Start Date
    - o Sub Area
b) Standardized Questions:
1. Is more than one type of group (different topics or focus) currently offered?
2. Have any patients on the list been waiting longer than 90 days?
3. If there is no wait list, why?

## ICC Observation [ASU, ASU EOP HUB, PSU, STRH, STRH RC, LTRH, Condemned]

a) General Instructions:
- Ask for a list of patients scheduled to attend the ICC before the meeting begins. This is often referred to as the "call sheet."
- You may have to look up the patient in the EHRS to determine who is in the mental health program.
- To save yourself time, and at the institution's discretion, you may request that staff bring in all mental health patients first.
- Respond to questions for each MH patient's ICC.
- Before the first patient is brought in, introduce yourself to the ICC members and then:

- o You want to introduce yourself to each patient.
- o Other than your initial introduction, proceed with the ICC as they typically would. You want to see business as usual.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o Start Date
  - o Sub Area

b) Standardized Questions:
  1. (Not ASU EOP HUB): Is the MH clinician who is in attendance, the assigned clinician?
     - o If this is not apparent, after the patient leaves ask if a clinician was present.
     - o A psychologist, social worker, or psychiatrist may act as a designee for the assigned clinician. The designee must consult mental health treatment records, confer whenever possible with the patient's assigned clinician, and be up to date on required training relating to removing patients from MAX custody.
  2. ASU EOP HUB ONLY: Is the clinician the CMH or acting as their designee?
  3. Did the MH clinician provide useful information regarding each patient's current mental health condition (e.g., need for medication, tendency for behavioral difficulties, suggested interventions, LOC, need for staff assistant)?
     - o Some examples from the MHSDS Program Guide (pg. 12-7-2) are:
       - ▪ Patient's current participation in treatment
       - ▪ Medication compliance
       - ▪ Suitability of single or double celling
       - ▪ Risk assessment of self-injurious or assaultive behavior
       - ▪ Status of ADLs
       - ▪ Ability to understand Due Process proceedings
       - ▪ Likelihood of decompensation if retained in ASU
       - ▪ Recommendations for alternative placement
       - ▪ Any other custodial and clinical issues that have an impact on the patient's mental health treatment.
     - o Not all of the items above must be included to qualify for a "yes" response on this question, but relevant information regarding a patient's current mental health condition is expected.
  4. Did the ICC chair consider both the clinical and custody needs of the patient for program review? For example, clinical contra-indications to transfer; significant limitations on MH treatment if the patient's MAX custody status is maintained.
     - o It is expected that this consideration will occur after the mental health clinician provides input but may also surface in terms of a discussion regarding the patient's level of care and/or questions the committee chair asks the MH clinician.
  5. If it appears that the patient's mental health status had an impact on his/her understanding of the ICC, did staff members ensure effective communication?

- o This applies only to the patient who you, as a clinician, observe having difficulty paying attention or understanding what ICC members are saying.
- o Note N/A if you judge the patient as being able to understand.
- o Note this as a "yes" if any member in the ICC checked with the patient for understanding by asking the patient to restate what was said.

6. Did the ICC start on time?
   - o Judge this using the schedule you received in planning your visit. If the meeting is more than 15 minutes late starting, note this as a "no" unless there was a legitimate reason (such as one of the team members attending to an emergency), that does not appear to be the norm.

## High Refusers [ASU EOP HUB, PSU]

a) General Instructions:
- • Use the ASU/PSU High Refuser Report to identify all high refusers with an initial date of refusal in the column titled, "First date/time as high refuser" that is within the reporting period.
- • Ask for the 128B Chronos for high refusers (may be in hard copy or in SOMS/ERMS).
- • Check for documentation in EHRS on the PowerForm titled, Review for all High Percentage Treatment Refusals.
- • For any patient for whom documentation of a discussion was not found, list their CDCR number in the provided comment box.
- • CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
   - o Start Date

b) Standardized Questions:
1. How many high refusers were identified (by the ASU/PSU High Refuser Report)?
2. Among the high refusers identified, how many 128Bs that address the most recent high refusal event were available in the unit or in SOMS/ERMS for review?
3. Of the high refusers identified, how many had the "Review of all High Percentage Treatment Refusals" PowerForm in EHRS indicating a discussion occurred between mental health and custody staff to address reason for high refusal within 7 calendar days of being last identified?
4. How many individual identified barriers related to security policies as the rationale for their refusal?
5. Of those individual for whom refusals were due to barriers related to security policies, how many 128Bs include a plan of action to address reasons for high refusal?

## Cell Cleanliness [Alternative Housing, MHCB]

a) General Instructions:

- For all units throughout the prison, observe all of the MHCB and alternative housing cells used for mental health patients.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) Standardized Questions:
1. How many cells were observed?
   - In each unit, enter the total number of cells observed for cell cleanliness.
2. Of those, how many are clean (free of debris, old food, feces and urine, etc.)?
   - Enter the total number of cells in each unit observed that you classify as "clean."
   - Clean cells may include but are not limited to:
     - Free of debris on the floor (use judgment, the patient's lunch tray from that day, for example, may not be enough to consider the cell unclean).
     - Clean floor (no grime on the floor, floor has clearly been mopped within past few days).
     - No grime on walls, vents, and ceiling.
   - Another strategy you may use to determine cell cleanliness is to ask the patients.
3. MHCB ONLY: Is there a documented cleaning schedule or log?
4. MHCB ONLY: If so, is it followed?

## Clinical Restraint [MHCB]

a) General Instructions:
- Ask the MHCB RN for their restraint log and the Restraint Checklist(s) (Attachment D).
- Use the restraint log and Restrain Checklist(s) to respond to the audit questions.
- Ensure any deficiencies are noted in the exit meeting and qualitative summary of your CQI Report, as this is a high-risk area.
- In the CQIT Start Date field, the date should reflect the date the audit was completed (NOT the date the data was entered in the tool).
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) Standardized Questions:
1. How many restraint occurrences were in the restraint log during the quarter?
   - Use the restraint log to count the number of restraint occurrences that occurred during the COMPLETE QUARTER prior to your visit (e.g., if you are visiting in Oct., use July-Sept data to count the number of occurrences).
   - If a restraint log is not available, select "N/A", note this in the Comments box and address this during the exit meeting and in your CQI Report.

- o If no checklist(s) or log is available, note this in your comments and address it in your write-up and exit.
2. How many Restraint Checklists were completed during the quarter?
    - o Count the number of Restraint Checklists that were completed during the COMPLETE QUARTER prior to your visit.
    - o If Restraint Checklists are not available, enter 0, note this in the Comments box and address this during the exit meeting and in your CQI Report.
    - o If there is a discrepancy between the number of restrain occurrences in the restraint log and Restraint Checklists(s), note the discrepancy in the Comment box and address it during the exit meeting and in your CQI Report.
3. Of those, how many restraint incidents met all audit criteria?
    - o If there is one box on the Restraint Checklist(s) marked with a "no," or a question with none of the boxes selected, you can respond "no" to this question (this is an 'all or nothing' audit).
4. For deficiencies, which items on the Restraint Checklist(s) were not met?
    - o Note the date and CDCR numbers of the Restraint Checklist(s) that had deficiencies. Also, specify Restraint Checklist(s) items that were not met for each Checklist that failed.
5. Did the institution staff address all deficiencies? If yes, how?
    - o You many ask staff if deficiencies were addressed and, if so, where to find the documentation.
    - o Use the Comment box to note how staff addressed deficiencies.

## Seclusion and Restraints [MHCB, PIP Acute, PIP ICF]

a) General Instructions:
- Use the Restraint/Seclusion Logs maintained on the unit to answer audit questions.
- Complete one audit per patient per restraint/seclusion incident.
    - ▪ For example, if a patient is placed in seclusion, released for a brief time, and then placed back into seclusion, this is two separate audits.
- For time, must use military time (0000-2359).
- For any outliers or unusual trends, please research the incident or trend and report your findings. Findings to report include, staff involved, reason for incident, leadership oversight of incident, patient mental health history and any other relevant findings that may give a full picture why this incident or trend is unusual.
- Examples of outliers or unusual trends are but are not limited to:
    - ▪ Patient being placed in restraints for more than 4 hours, placed in seclusion more than 8 hours.
    - ▪ Any patients who appear to be placed in seclusion/restraints more often than other patients in the MHCB, Acute and/or ICF unit.

- An increase in the use of seclusion/restraint in the MHCB, Acute and/or ICF unit over the review period.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Sub Area
  - Date
  - CDCR Number

b) Standardized Questions:

1. Is the incident Seclusion or Restraint?
2. What date did the incident start?
3. What time did the incident start? (Please use military time)
4. What date did the incident end?
5. What time did the incident end? (Please use military time)
6. If the incident was extended beyond (8 hours for seclusion, 4 hours for restraint), please provide a summary of the incident.

## Staff Interview [Institution Wide]

a) General Instructions:

- Invite all staff to attend.
- Conduct an informal interaction with staff and enter information in comments section of CQIT (or take your own notes as this data will only be used for your report).
- Bring up patient survey items to verify, gain more information.
- CQIT Audit Fields:
  - Start Date

b) Suggested Questions (this portion is not scripted, these are suggested questions):

1. How many of you have seen the Performance Report?
2. Are there any custodial concerns as it relates to access to care?
3. Are there things that prevent you from being able to do your job?
4. Do you have sufficient tools to access the electronic health record?
5. What would you like us to know?
6. Are there any barriers to program efficiency and completion of work?
7. If barriers to program efficiency exist, what are they?
8. Do you have access to confidential individual treatment space when needed? (Note which level of care and yard where staff report any treatment area concerns).
   - Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.
   - Enter comments to assist your summary of this in your report.
9. Do you find staff works collaboratively to effectively accomplish required work?

## Five Day Follow-Up Assessment [On-Site Paperwork]

a) General Instructions:

- Using the document provided in your binder, randomly select 15 patients on five-day follow-ups who were never admitted to MHCB to interview.
    - Random selection means without definite aim, direction, rule or method.
- Interview each patient to determine if MHCB referral is indicated.
- Assess if they were appropriately NOT admitted, or if they should have been admitted.
- If they should have been admitted, have them seen emergently by local MH staff for a SRE and MHCB referral review.
- Assessments should include an out of cell interview and be thorough enough for the reviewer to determine if the patient was appropriately NOT admitted to MHCB.
- An SRE is not required, but a progress note and referral to local staff should be completed if the patient requires a referral to MHCB.
- This item will not show on the Performance Report – this is a report only item.
- If there were no patients to interview, randomly select at least 10 patients who were previously on five-day follow-up using the Appointments report from On Demand to interview, ideally from different buildings. Select N/A for questions 1 and 2 below, and respond to question 3 regarding confidentiality.
- This item is a qualitative report only item – no On Demand percentages associated.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - Start Date
    - End Date

b) Standardized Questions:
    1. How many patients on 5-day follow ups were interviewed?
    2. How many patients were on 5-day follow ups, but not clinically indicated for MHCB placement?
    3. Did all patients interviewed indicate if they are usually seen confidentially for their 5-day follow ups? If not, why?
        - Note if this is due to refusal.
        - If refusal, what does clinician do? Do they encourage patient to vacate cell?
        - If not due to refusal, why are they seen cell front? Compare to data in appointments report.

## Medication Management

a) General Instructions:
    - There are no standardized medication management audit questions in CQIT except in the patient survey; however, ensure you pay attention to medication management issues such as:
        - Patient reports of delays in receiving medications.
        - Staff reports of patient safety issues related to medication prescribing or access to medication.

- o Review Medication Management items on the Healthcare Services Dashboard in advance of your visit and note any areas where you either validate or find discrepancies between your observations and the data.
- o Ensure you have the psychiatrist on the visit with you while addressing/questioning medication issues, where possible.

## Heat Incident Log MH [On-Site Paperwork]

a) General Instructions:
- Contact the HQ Liaison for a copy of all CDCR MH7111-1 Heat Plan Monthly Summary Report between May 1 and October 31 of the current year.
- Review all MHSDS patients on the Heat Incident Log and report the number of heat-related illness incidents experienced by patients prescribed a heat risk medication on the current *Heat Alert Medications List* (Attachment A of the April 29, 2022 Heat Plan Memo) during the review period.
- Assess whether the required cooling and/or hydration measures were taken (for Stage II and Stage III Alert), and whether the required medical rounds were performed (for Stage III Alert only)?
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o Start Date
  - o End Date

b) Standardized Questions:
1. How many heat-related illness incidents were reported for MHSDS patient(s) prescribed heat alert medications during the reporting period?
   - o Count "incident" from the CDCR MH 7711-2. Report the total count of incidents not the total count of patients.
2. For each Stage II or Stage III heat related illness incident, use the Comment box to describe whether the corresponding Monthly Summary Report (MH-7711-1) reflects that the required precautionary measures were taken (e.g., cooling, hydration, and medical rounds). In the Comment box, note each incident with the patient's name, CDCR number, date of incident, and whether precautionary measures were taken.

## Overall Area Rating [R&R Intake, RC, RC EOP, ML CCCMS, ML EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned, Alternative Housing, MHCB]

a) General Instructions:
- Take into consideration all factors including, but not being limited to applicable controls, policies and procedures.
- If there are measures in place to address deficiencies and risk management, note this.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o Start Date
  - o End Date

b) Standardized Questions:

1. Select one appropriate rating from the list (considerations are defined for each response):
    o Not Applicable - An overall rating does not apply in this area
    o Proficient - Controls are adequate and effective in addressing key risks to patient mental healthcare, documentation meets or exceeds standards, staff are effectively using tools available to them, local policies and procedures are current, etc.
    o Improvement is Needed – Controls are lacking in addressing key risks to patient mental healthcare and are sporadic, risks are not being effectively managed, documentation does not meet qualitative standards, staff are not aware of the most recent applicable requirements for the area, etc.
    o Significant Improvement Needed - Most findings were rated as critical and/or high and urgent corrective actions are required, documentation was nonexistent or incomplete in communicating intent or patient treatment, elevated actions must be taken, etc.

## Custody Audit Instructions

### Therapeutic Treatment Module/Security Desk Standards [RC EOP, ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned]

a) General Instructions:
- View therapeutic treatment modules (TTMs)/security desks in the housing units to respond to each question.
- For institutions and programs in which ADA TTMs are required, note in comments if an ADA TTM is not available and address in comments and provide to regional for reporting.
- Respond once per room observed.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    o Start Date
    o Sub Area

b) Standardized Questions:
1. For groups, are the TTMs/security desks in a semi-circle?
2. Are the TTMs/security desks in an area where other patients and/or staff cannot hear the interaction?
    o Locate all TTMs/security desks used for clinical interaction with patients and confirm that they are located in an area where other patients and staff cannot hear the interaction.
3. Do the TTMs/security desks meet PIA approval standards?
    o For PIA standards, see Security Desks (Attachment K) and Treatment Modules and Security Booths (Attachment L).
4. Do staff report sufficient number of TTMs/security desks for providing treatment?
    o Ask several MH clinicians if they usually have a sufficient number of TTMs/security desks available to provide treatment.

5. Are the TTMs/security desks clean? (e.g., free of debris, spider webs, clean walls, floor)
   - Look for garbage on the floors, grime on the walls and floor, spider webs. If any are present, mark "no."

## Mechanical Restraint Documentation [MHCB]

a) General Instructions:
   - The Auditor will review the 114A's that are kept in the officer' station.
   - Each 1114A should have a 128 Mechanical Restraints Review (MRR) with it that indicates their "cuff" status.
   - CDCR 128B MRR's are required for all non-MAX custody patients housed in the MHCB that identify whether or not the individual requires the use of restraints.
   - The auditor will Review 20 non-Max custody patients, per housing unit program (if less than 20, audit all is multiple units, select 20 per unit).
   - Auditor will Confirm a hard copy of the CDCR 128B MRR is readily available on the unit for each non-MAX patient.
   - If the CDCR 128-B MRR is not with the 114-A check the patient's cell door for a copy.
   - If there is no MRR, enter the CDCR number of the patient in the comment box and note that there was no MRR available to review
   - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
     - Start Date
     - Sub Area
b) Standardized Questions:
   1. Upon review of the 114A, how many non-max custody patients are in the MHCB? (20 per housing unit pulling from all wings, if less than 20, all)
      - Please enter the CDC R numbers of these patients audited in the Comment Box.
   2. Of those, how many required Mechanical Restraints, and had a completed 128-B (MRR) documenting the requirement or rationale?
      - Please enter the CDCR numbers of any patients who did not have the above documentation, or whose rationale for restraints is inconsistent with policy.
   3. During the site visit, using the comment box below, if the auditor happens upon any non-max patients observed in restraints without appropriate documentation, include further details gathered from the staff.

## Therapeutic Treatment Module Use Observation [MHCB]

a) General Instructions:
   - While in the MHCB conducting other audits, observe patients being seen by mental health staff in the MHCB.
   - Conduct audit one time for each patient observed in a TTM.

- Check to see if each patient you observe has documentation justifying use of custody restraints per California Code Regulations (CCR) Title 15 3268.2 a treatment module shall be utilized for the duration of encounters with patients who are a safety and security risk.
- If none are observed, ask MHCB custody staff where the patients who do not require restraints are seen for mental health treatment. DO NOT ASK LEADING QUESTIONS such as, "You don't put the patients who do not have to be in restraints in a treatment module for mental health appointments, do you?" Do not respond to audit questions if the staff interview occurs and instead document results in audit comments for incorporation into report.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    o CDCR #
    o Start Date
    o Sub Area

b) Standardized Questions:
    1. Only for patients currently in a TTM: Is the patient currently max custody or has a 128B justification for placement in a TTM?

## ICC Timelines [ASU, ASU EOP HUB, PSU, STRH, LTRH, SHU]

a) General Instructions:
- Pull housing roster to locate MHSDS patients in segregation units.
- Review 20 114-As that meet the following eligibility criteria (if less than 20, audit all) per housing unit program.
- Only review the 114-As of MHSDS patients who have been in the housing unit for *at least 11 calendar days* at the time of the on-site audit.
- Determine the date the patient arrived to the segregated unit. Review the 114-As, starting from the arrival date, and check to see if the initial ICC was completed within 10 calendar days of arrival date (date of arrival is considered as Day 0). If the 114-As are not available on the unit, refer to SOMS for the ICC date. Note: 114-As are archived monthly and may not be available on the unit.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    o Start Date
    o CDCR #

b) Standardized Questions:
    1. Was the patient's initial ICC held within 10 calendar days of segregation arrival?

## Entertainment Appliances [ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH, Condemned]

a) General Instructions:
- Enter the number of patients audited.
- Review the institution's DOM or LOP regarding property.
- Randomly select at least 10 patients in each housing unit and ask about the presence of working entertainment appliances (e.g., television, radio, or tablet).
    o Select 10 patients who are in their cell.

- o   Random selection means without definite aim, direction, rule or method.
- Please make sure you also include *all alternate units/cells* throughout the institution currently being used to house ASU, ASU EOP HUB, PSU, STRH RC, STRH, LTRH or Condemned patients. If there are 10 or less patients in these alternate units/cells, ask all patients.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o   Start Date
  - o   End Date
  - o   Sub Area

b)  Standardized Questions:
1. How many patients were audited?
2. Enter the CDCR numbers you audited.
3. Of those, how many patients reported the entertainment appliance is in proper working order?
   - o   Audit occupied cells only and ask the patient(s) if their entertainment appliance(s) is in working condition. If you audit a double occupied cell, ask both patients.
   - o   Approved appliances are a television, radio or tablet upon initial placement.
   - o   For any patient with a documented and approved reason to not have an entertainment appliance, please add reason in the Comment box.

## Unclothed Body Search [ASU EOP HUB, PSU]

a)  General Instructions:
- Respond once for each custody staff person interviewed.
- Attempt to interview all custody staff in the unit individually.
- Please make sure you also include custody staff in *alternate units/cells* throughout the institution currently being used to house ASU EOP HUB, and PSU patients.
- Have each custody staff person show you all areas in the housing unit where unclothed body searches are conducted.
- Ask the following question, then respond to the question in CQIT.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o   Start Date
  - o   Audit Time
  - o   Sub Area

b)  Standardized Question:
1. When you conduct an unclothed body search, where do you usually do it?
   - o   A private area is an area that allows the patient to preserve some measure of dignity and self-respect.
   - o   Assess if the area(s) you are shown is private and respond to the question with Yes – Private Area; No – Not Private Area; or Sometimes.

- o If you are shown more than one area and all areas are confidential, select "Yes - Private Area."
- o If you are shown more than one area and all areas are not confidential, select "No - Not Private Area" and add in the Comment box which area(s) was not confidential.
- o If you are shown more than one area and if one area was confidential but any other area(s) was not confidential, select "Sometimes" and add in the Comment box which area(s) was not confidential.

## Out of Cell Time and Showers [ASU, ASU EOP HUB, PSU, SHU, Condemned]

a) General Instructions:

- Audit all patients with designated housing of ASU, ASU EOP HUB, PSU, and Condemned units.
- Please make sure you also *include all patients* who may be located throughout the institution in *alternate units/cells* currently being used to house ASU, ASU EOP HUB, PSU, SHU or Condemned patients.
- In condemned units, this audit only applies to MHSDS patients.
- Count "R" refused times as offered when the amount of time refused is recorded in the 114-A. Refused time ("R") is only counted if the in and out time is documented on the 114-A. If the in and out time is not documented, count as "0."
- Review 20 114-As that meet the following eligibility criteria (if less than 20, audit all) per housing unit program to ensure all patients have been offered the minimally required yard and showers, noting any exceptions and deficiencies.
- Only review the 114-As of patients who have been in the housing unit for a full seven-day week period. Audit the prior 4 weeks. For each week, identify how many were there for the entire week (Monday 12:00 AM – Sunday 11:59 PM).
- Enter results for each patient's 114-A reviewed.
- Source documentation for safety or security issues: utilize the PSR (Program Status Report) to determine whether there were safety or security issues that would have prevented the institution staff from offering out of cell/yard time (e.g., heat alert, fog recall, etc.). If any PSRs were documented in the audited time period, please include that information with applicable dates in the Comments box. Note: there is no safety or security reasons for not offering showers.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o CDCR #
  - o Start Date
  - o Sub Area

c) Standardized Questions:

1. Is the patient in MHSDS?
2. Was the requirement for 10 hours or more of out of cell time over at least three different days met (if the patient was in the housing unit for a full seven-day

week period and there was no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time)?
  - o Use N/A if PSR out of cell/yard time is not available for safety and security reasons.
3. Was the patient offered showers on at least three different days within the same week audited?

## Out of Cell Time and Showers [STRH RC, STRH Female, LTRH]

a) General Instructions:
  - Audit all patients with designated housing STRH RC, STRH Female, and LTRH.
  - Please make sure you also *include all patients* who may be located throughout the institution in *alternate units/cells* currently being used to house STRH RC, STRH Female or LTRH patients.
  - Count "R" refused times as offered when the amount of time refused is recorded in the 114-A. Refused time ("R") is only counted if the in and out time is documented on the 114-A. If the in and out time is not documented, count as "0."
  - Review 20 114-As that meet the following eligibility criteria (if less than 20, audit all) per housing unit program to ensure all patients have been offered the minimally required yard and showers, noting any exceptions or deficiencies.
  - Only review the 114-As of patients who have been in the housing unit for a full seven-day week period. Audit the prior 4 weeks. For each week, identify how many were there for the entire week (Monday 12:00 AM – Sunday 11:59 PM).
  - Enter results for each patient's 114-A reviewed
  - Source documentation for safety or security issues: utilize the PSR (Program Status Report) to determine whether there were safety or security issues that would have prevented the institution staff from offering out of cell/yard time (e.g., heat alert, fog recall, etc.). If any PSRs were documented in the audited time period, please include that information with applicable dates in the Comments box. Note: there is no safety or security reasons for not offering showers.
  - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - o CDCR #
    - o Start Date
    - o Sub Area
b) Standardized Questions:
1. Was the requirement for 13.5 hours or more of out of cell time over at least three different days met (if the patient was in the housing unit for a full seven-day week period and there was no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time)?
  - o Ensure each patient was in the housing unit for a full seven-day week period, there was no documented safety or security issues that would have prevented institution staff from offering out of cell/yard time, and

was offered at least 10 hours of yard and 3.5 hours of additional out of cell activities. Patients under heat alert may be offered additional out of cell activities to fulfill the 13.5.

2. Was the patient offered showers on at least three different days within the same week audited?

## Out of Cell Time and Showers [STRH]

a) General Instructions:

- Audit all patients with designated housing STRH male.
- Please make sure you also *include all patients* who may be located throughout the institution in *alternate units/cells* currently being used to house STRH patients.
- Count "R" refused times as offered when the amount of time refused is recorded in the 114-A. Refused time ("R") is only counted if the in and out time is documented on the 114-A. If the in and out time is not documented, count as "0."
- Review 20 114-As that meet the following eligibility criteria (if less than 20, audit all) per housing unit program to ensure all patients have been offered the minimally required yard and showers, noting any exceptions or deficiencies.
- Only review the 114-As of patients who have been in the housing unit for a full seven-day week period.  Audit the prior 4 weeks. For each week, identify how many were there for the entire week (Monday 12:00 AM – Sunday 11:59 PM).
- Enter results for each 114-A reviewed
- Source documentation for safety or security issues: utilize the PSR (Program Status Report) to determine whether there were safety or security issues that would have prevented the institution staff from offering out of cell/yard time (e.g., heat alert, fog recall, etc.). If any PSRs were documented in the audited time period, please include that information with applicable dates in the Comments box. Note: there is no safety or security reasons for not offering showers.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - CDCR #
  - Start Date
  - Sub Area

b) Standardized Questions:

1. Was the requirement for 18.5 hours or more of out of cell time over at least seven days met (if the patient was in the housing unit for a full-seven-day week period and there was no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time)?

2. Was the patient offered showers on at least three different days within the same week audited?

## Custody Housing Review [All Housing Units]

a) General Instructions:
- Audit every housing unit.
- Interview available custody housing unit staff in every housing unit.
- Complete the following fields and respond to the questions one time for each housing unit audited.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    o Start Date
    o Sub Area

b) <u>Custody MH Referral Process</u>
Standardized Questions:
1. How many custody housing unit staff were interviewed regarding their responsibility to complete a 128-MH5 Mental Health Referral Chrono when incarcerated people exhibit signs of mental illness?
2. Document the open-ended, non-leading question(s) you use when interviewing custody staff:
    o Which question(s) did you ask staff to determine knowledge of the MH referral process? (select all if applicable)
    o Ask question (i) and follow-up with (ii) and/or (iii) if needed
        i. What would you do if a person was exhibiting signs/symptoms of a mental health illness?
        ii. In what scenarios would you consider submitting an emergency referral to mental health?
        iii. What documentation would you use if a person was exhibiting signs/symptoms of a mental health illness?
3. Based upon your assessment, of those interviewed, how many staff had acceptable knowledge of when and how to refer to mental health?
    o Were the staff interviewed aware of their responsibility for (i), (ii), and/or (iii)?
4. Are CDCR Forms 128-MH5 (revised 7/22) Mental Health Referral Chronos accessible and available to staff (both paper and electronic forms are acceptable)?
    o Physically check each housing unit for availability of 128-MH5.
    o Respond once for each housing unit observed.
    o Physically check and ask staff where to find MH-5 or "show me the form or show me how to obtain it online."

c) <u>Peace Officer CPR Mouth Shield</u>
General Instructions:
- Go to all housing units on site and ask to see each officer's Cardiopulmonary Resuscitation (CPR) mouth shield.
- The mouth shield MUST be carried by the staff member to qualify as a "yes" response.

Standardized Questions:

5. How many peace officers were observed?
   o Enter the total number of peace officers queried about their mouth shield in each unit.
6. Of those, how many peace officers were observed to carry a personal Cardiopulmonary Resuscitation (CPR) mouth shield on their person?
   o Total the number of officers you queried who were carrying their mouth shield and enter that number.

d) <u>Heat Risk Thermometer Checks</u>

General Instructions:

- Only required between May – October.
- Physically check the thermometer in every housing unit in which MHSDS patients are housed.
- Enter the building number (e.g., D-1) in the Sub Area field of CQIT.
- Respond to audit questions for each thermometer and log checked. If the unit is air conditioned and the air conditioner functional, mark N/A for questions about the logs.

Standardized Questions:

7. Is a working thermometer present in the housing unit?
8. Is the thermometer mounted in a high location that gives an accurate reading of the temperature (e.g., temperature must be taken at the highest non-air-conditioned location where heat risk patients are housed)?
9. Is there a heat log that is current? (logged within the past three hours).
10. Is the staff documenting the highest reading (not averaging temperatures)?
11. Is there a daily printed list of patients on heat alert medications in the housing unit?
12. How many heat alert days (i.e., days where the outside temperature reached 90 degrees or higher) were included in the audit for the quarter being reviewed?
    o Include the dates for each heat day in this question's comment section; use the format YYYY-MM-DD.
    o If there are fewer than 10 heat alert days, audit all dates, otherwise select 10 random days.
    o Random selection means without definite aim, direction, rule or method.
13. Of those heat alert days audited, how many Daily Activity Reports (DAR) reflect alternative out of cell activities were offered during periods in which outside temperatures reached 90 degrees or more?
    o For this question:
      ▪ In the comment box, report once for all days reviewed to assess overall if alternatives were offered.
      ▪ If the DAR for an audited day is not available, count that day as NOT having offered alternative out-of-cell activities.
      ▪ The information in this comment should be reflected in your write up. No percentage will be calculated using this information, you

must write in your report if the institution is or is not providing reasonable alternatives during heat recall.

- The following are some examples of alternative out-of-cell activities institutions could provide to heat-risk patients as possible forms of reasonable accommodations:
  - Modified yard times (scheduled during cooler periods of the day)
  - Night yard or morning yard
  - Additional dayroom/inner-wing program opportunities such that equivalent out-of-cell time is maintained.
  - Recreation gymnasium programs during summer/warmer months.
  - Cooling and hydrating measures should be provided in addition to these appropriate out-of-cell activities

Staff knowledge of heat plan requirements – *this is a report only item and will not appear on the Performance Report.*

14. How many staff were interviewed regarding knowledge of heat plan procedures?
15. Of those, how many were knowledgeable of the heat plan procedures (including provisions of alternative activities during heat recall, how to use heat list to recall patients from the yard, etc.)?

## RVRs [On-Site Paperwork]

a) General Instructions:

- Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.
- The selection period for RVRs to review will be consistent with the rest of document review for this audit, which is the last complete prior quarter (e.g., Quarter 1: January 1, 2022 – March 31, 2022).
- Institutions completing a self-audit should reach out to regional lieutenants and request copies of all reports utilized for RVRs prior to completing any reviews.
- Identify the number of RVRs by running the CQIT RVR Analytics report in SOMS Reporting (Oracle Reports > Team folder MHCT > CQIT > RVR analytics) for the audit period (Q1 Jan-March, Q2 April-June, Q3 July-Sept, Q4 Oct-Dec). For example, for an audit in April, audit Jan-March RVRs
- For questions 1-7, include all RVR levels (Administrative, Counseling Only, Serious)
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date

b) Standardized Questions:

1. During the prior quarter, how many RVRs were issued?
2. Of those, how many were issued to non-MHSDS participants?
3. How many were issued to patients at the CCCMS level of care?
4. How many were issued to patients at the EOP level of care?

5. How many were issued to patients at the MHCB level of care?
6. How many were issued to patients at the ICF level of care?
7. How many were issued to patients at the acute level of care?
8. How many Final/Concluded RVRs were reviewed?
    o Audit a randomly selected sample of 20 or all if the total number is less than the required sample size. Completed RVR's are defined as "Final/Concluded."
        ▪ Random selection means without definite aim, direction, rule or method.
9. Of the RVRs reviewed, how many met the criteria for MH assessment?
    o This will be the total number of RVRs listed on the CQIT RVR Report.
10. Of those, how many were referred for MH assessment?
11. Of the RVRs reviewed that met criteria for MH assessment, how many were recommended for the behavior to be documented in an alternate manner (in SOMS, RVR Mental Health Assessment question 2)?
    o Using the CQIT MH RVRs Documented in an Alternative Manner Report, located in the CQIT Reports folder in SOMS Reporting, count the number of RVRs listed for the quarter.
12. Of those, how many did the Captain disagree with the clinician's recommendation and document their rationale in the Captain's Review?
13. Of the RVRs that met criteria for MH assessment, how many did the Captain agree with (reduced to a 128A, 128B or void)?
14. Of the assessed RVRs reviewed, how many did the MH clinician recommend mitigation (in SOMS, RVR Mental Health Assessment question 4)?
15. Of the RVRs reviewed in which mitigation was recommended, how many did the Senior Hearing Officer (SHO) document consideration of mitigation based on the MH clinician's recommendation and document in the disposition section of RVR?
16. Of the RVRs reviewed in which mitigation was recommended, how many did the SHO mitigate?
    o Count how many RVRs were actually mitigated by the SHO by reviewing documentation in disposition section of RVR disposition.
17. How many adjudicated RVRs requiring a CDCR 115 MH-A that could result in a SHU term were reviewed?
18. Of those, how many did the ICC consider and document their consideration of the MHA input/recommendation?
    o Randomly select 20 RVRs per institution and use the CQIT RVR Report to identify the RVRs that are SHU-able from the complete prior quarter. Use SOMS to locate finalized ICC Chrono assessing the RVR.
        ▪ Random selection means without definite aim, direction, rule or method.

## Custody Staff Training (CQI Custody) [On-Site Paperwork]

a) General Instructions:

- Use Staffing information provided by the institution prior to the visit (on the CQI Site Visit Preparation Checklist) to determine overall custody staffing numbers for each custody job classification.
- Use the BIS program to determine who has attended the Use of Force annual training by job classification. The BIS system is a statewide system. Staff who transferred from one institution to another will have their training history transferred as well.
- New employees are already included in the BIS system.
- You can also review the training completion status from the time of the audit for the current calendar year only; this will not be entered into the tool but can be used to inform local leadership regarding training completion progress for the current year.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o Start Date
  - o End Date

b) Standardized Questions (need to be repeated for each job classification category):

1. How many currently employed custody staff (excluding staff currently on long-term leave) were employed during the previous calendar year?
2. Of those, how many custody staff were current with annual Use of Force (UOF) policy training in the previous calendar year?

## Issuance of Property Tracking & Transfer Timelines for NDS [ASU, ASU EOP HUB, STRH RC, STRH, LTRH, PSU, SHU]

a) General Instructions:

- Run the MAX Custody Inmate Extract report from the Reporting system in SOMS 3 days prior to visit. Review the How to Run the Non-Disciplinary Segregation (NDS) (Attachment G) for instructions.
- For eligible NDS patients who are not housed in segregated housing units, use "institution-wide" and note the housing program assignment in the Sub Area field.
- Audit only MHSDS patients.
- Talk to all available housing unit custody staff in all housing units where NDS patients are housed to see if they can identify patients designated NDS.
- For transfer timelines, use the NDS report previously ran to determine if the patient (designated NDS 200) was transferred within 72 hours of NDS designation. (Note: NDS: 102 cases are eligible for property and privileges only, not accelerated transfer. NDS: 204 cases meet criteria for accelerated transfer, but cannot transfer due to medical hold). Count the total number of MHSDS NDS patients reviewed and the total number transferred within 72 hours.
- For property issuance, determine the date each patient's property was issued for all MHSDS NDS patients reviewed. This information can be found on the 114 forms, in the unit logbook, or by speaking with the officer responsible for personal property. Compare the date each NDS patient received their property

with eh date they arrived in segregation using the reports identified above. For patients who have not received property, notify unit staff and document the length of time since NDS designation in the Comment box at the bottom of the audit.

- CQIT Audit Fields:
  - ○ Start Date
  - ○ Sub Area

b) Standardized Questions:

1. How many custody staff were asked about identification of patients on NDS status?
2. Of those, how many custody staff could identify all NDS patients?
3. Of those identified NDS patients, how many have been issued personal property?
4. Of those identified NDS patients, how many have not been issued personal property?
5. Is the property officer aware of all the NDS patients who do not have their property?
6. How many NDS patients were reviewed and required transfer within 72 hours?
7. Of the NDS patients identified as requiring transfer within 72 hours, how many were transferred within that timeframe?

## Phone Calls Offered for NDS [ASU, ASU EOP Hub, STRH RC, STRH, LTRH, PSU, SHU]

a) General Instructions:

- Run the MAX Custody Inmate Extract report from the Reporting system in SOMS 3 days prior to visit. Review the How to Run the Non-Disciplinary Disciplinary Segregation (NDS) (Attachment G) for instructions.
- For eligible NDS patients who are not housed in segregated housing unit, use "institution-wide" and note the housing program assignment in Sub Area.
- Audit only MHSDS patients.
- Identify the date the patient was designated NDS. Identify how many qualifying weeks the patient was designated NDS (qualifying week = full seven-day period, Monday 12:00 AM — Sunday 11:59 PM). Add up the total qualifying weeks for the NDS patient housed in the unit. Review the 114-A/other documentation contained in the housing unit to determine if phone calls were offered within the qualifying week.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - ○ Start Date
  - ○ Sub Area
  - ○ CDCR #

b) Standardized Questions:

1. From the time the patient was designated NDS, how many qualifying weeks has the patient been housed in segregation?

2. Of those qualifying weeks, how many weeks was the patient offered at least one phone call per week?

## Use of Force [On-Site Paperwork]

a) General Instructions:
- Contact the institution two weeks prior to the visit and request a copy of the Use of Force incidents for the complete prior quarter.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - End Date

b) Standardized Questions:

1. What is the total number of <u>controlled</u> use of force incidents?

2. What is the total number of <u>controlled</u> use of force incidents involving MH patients?

3. What is the total number of <u>immediate</u> use of force incidents?

4. What is the total number of <u>immediate</u> use of force incidents involving MH patients?

5. Of the total number of controlled use of force incidents, how many were required to administer PC2602 medication?

# Post Visit Instructions

## Check-Out Meeting

a) Before you leave the institution, you will have a check-out meeting. The regional administrator and custody audit team lead will attempt to ensure the warden, CEO, CMH, chief psychiatrist and CNE are in attendance.  The custody and mental health audit teams will attend the check-out meeting together (see Exit Interview Talking Points [Attachment J]).

b) Mental health audit team members will discuss their impressions during the visit.
- The institution leadership staff has been notified that specific information related to opportunities for improvement within their programs may be discussed at these meetings.
- Provide specific information that will enable the institution leadership staff to take action on any high priority areas.

c) Remind institutional leadership staff that data will be updated on the Performance Report within several days.

d) Custody audit team members will also discuss their impressions during the custody specific audits.

e) Address any immediate health and safety issues with the institution leadership staff and ensure they have a course of action before leaving the institution.

## Completing Your Report

a) Once you are certain all audit entries are complete and correct, press the "Submit Audit" icon on the Conduct Audit page of CQIT (submit all audit data by the end of the next business day of when your CQI tour concludes).

b) Within three working days of your visit, the custody team will complete the qualitative report for each audit category (access to care, quality of care, special populations, utilization and resource management, and safety) and submit to the mental health regional administrator and DAI mental health compliance team captain.

c) Within two days of receipt of custody reports, the DAI mental health compliance team captain will provide edits, if applicable, and submit to the MH regional administrator and the regional custody auditor.

d) Within 10 working days of receipt of custody's report, the MH regional team will complete the written report following the process and template below.

e) Writing Process:

- Once the regional administrator receives the custody portion of the report, start writing the report at the beginning of the data on the report previously exported to Word. Note that if formatting changes occur with the data a page break may need to be entered before the text.
- Once the finished draft report is ready, including custody's portion of the report, submit a copy to the custody team for final review.
- The custody team will conduct an executive review and will submit the final report back to the regional administrator or designee within one week. Any edits will be in track changes.
- Once the final report is received, the regional administrator or designee will save the report and email to Headquarters Mental Health Quality Management staff within 15 working days of the visit.

f) General Writing Guidelines:

- Use Calibri (Body) 12-point font.
- Proof read. The regional administrator is accountable for report quality.
- If there were any immediate health or safety issues that were included in your report, you must include that the issue was addressed and what the institution staff have done to resolve the issue.
- Provide a brief introduction that includes demographic/census information.
- Provide brief sentences that state when the institution is performing well on items.
- Provide specific examples.
- Compare all sources of data available - note discrepancies and similarities between data and observations.
  - *Example:* "Regional staff attended the IDTT in CTC I. There was a full complement of staff for the IDTT that began twenty minutes late. This is consistent with staff attendance data on the Performance Report, which reflects 96% of all IDTTs measured included all required staff."

- The quarter you are writing your report for will be the quarter during the time of your visit (Q1: Jan 1-March 31; Q2: April 1-June 30; Q3: July 1-Sept. 30; and Q4: Oct. 1-Dec. 31).
- Avoid opinions. State facts.
  - *Example:* Instead of, "The lengths of stay in the MHCB are too long," write, "Lengths of stay in MHCB exceeded policy requirements. Data reveal that 95% of all MHCB admits within the past 6 months had lengths of stay beyond 10 days. Ten out of the 55 admits over the past 6 months had lengths of stay beyond 18 days."
- Use the Report Writing Outline (Attachment F) to write your report.

## Checking Your Data

a) As of 2/1/22, coding of indicators using the new CQIT is not complete. Therefore, not all data will show as expected.
b) At the conclusion of each visit, the regional analyst should open the Performance Report for the institution toured and check to ensure all data from the visit are showing.  The "heat grid," which is accessed by clicking on the colored performance bar, is a user-friendly way to easily check for missing data.
c) If data on any indicators are missing, then the analyst can open the CQIT Audit Report to check to see if the data were uploaded.
- If data were NOT uploaded, work with your team and/or the custody team to ensure all data are entered and uploaded.
- One reason for missing data may be missing responses. The computer will not calculate if responses are missing.
- If data WERE uploaded and all responses complete, email Headquarters Mental Health Quality Management staff immediately.
d) Check percentages for CQIT indicators:
- If a percentage is over 100%, check the raw data for data entry errors.
- If a percentage is lower than expected given the impressions from the visit, check the raw data for data entry errors.

# Attachments

## Attachment A – CQI Site Visit Preparation Checklist

| | Reporting Period: |
|---|---|
| *Facility:* | |
| *Site Visit Dates:* | |
| *Contact:* | |
| *Admin:* | |

*Instructions:   Please ensure that you complete each item on the list before your CQI Site Visit starts. Upon the audit team's arrival at your institution for the CQI Site Visit, provide the audit team (one for the mental health and one for the custody team) copies of those items requested on paper.  The copies should be organized and presented in a tabbed binder. The mental health contact at each institution shall coordinate with custody staff to ensure that all custody items are ready for the audit team upon arrival.*

| *Audit Preparation and Document Request:* | *Completed?* |
|---|---|
| 1. **Three weeks prior** the planned audit week, email an IDTT Schedule to the HQ or Regional staff person who emails you this checklist. The IDTT schedule should include the times and locations for all the IDTTs scheduled for the entire planned audit week. | |
| 2.  **Three weeks prior** to the planned audit week, email a group schedule for all CCCMS, EOP, ASU, PSU, LTRH, STRH, STRH RC programs to the HQ or Regional staff person who emails this checklist. The group schedule should include the times, programs (CCCMS, EOP, ASU, PSU, LTRH, STRH, STRH RC, RC EOP) and locations for all the groups scheduled for the planned audit week. | |
| 3. **Three weeks prior** to the planned audit week, email an ICC Schedule to the HQ or Regional staff person who emailed you this checklist. The ICC schedule should include the times and locations of all ICCs scheduled for the entire planned audit week. | |
| 4. **Three weeks prior** to the planned audit week, email a list of DSH and Acute/ICF returns for the reporting period to your regional contact and to DAI Mental Health Compliance Team Captain. | |
| 5.  **Three weeks prior** to the planned audit week, email copies of vacancy reports for all Mental Health staff. Note the staff on long-term leave. | |
| 6. **Three weeks prior** to the planned audit week provide one copy of the past six months of Mental Health Subcommittee Minutes. | |
| 7. **Three weeks prior** to planned audit week (for ASU EOP HUB and PSU ONLY): Provide a list of patients who refused more than 50% of offered treatment in a two-month period during the review period. | |
| 8. **Three weeks prior** to planned audit week provide a copy of the waitlist for all groups in all programs. | |
| 9. **Three weeks prior** to planned audit week, provide the percentage of all appointments seen in a confidential setting, by program, for the review period. (Primary Care & Psychiatry contacts) | |
| 10. **Three weeks prior** to planned audit week provide copy of MHCB Operational Procedure and MHCB custody restraint policy. (Disregard if no MHCB at facility). | |
| 11. **Three weeks prior** to planned audit week provide the total number of custody staff employed at the institution. Note the number of staff on long-term leave. | |

| | |
|---|---|
| 12. **Three weeks prior** to planned audit week provide the number of controlled and immediate use of force incidents, and the number for each type on ICF, ACUTE, MHCB, EOP, and CCCMS patients. | |
| 13. **Three weeks prior** to planned audit week provide the number of heat related illnesses reported at your facility during the audit period. | |
| 14. **72 hours prior to visit:** Using each "Random Patient List" you received from the regional administrator or analyst prior to the visit, either ducat or coordinate with custody staff to ensure groups of 10 patients are scheduled to be seen for a patient group satisfaction survey on a day during the tour. Use the appointment type "MH CQIT Group Survey" in EHRS.<br>• The goal is to have groups of 10. Please account for refusals, ducat more than 10 as many will refuse. Remind custody staff that only **ten** patients are needed.<br>• <u>One group per each yard for each program</u> (ML CCCMS, ML EOP, MHSDS in Reception Centers, STRH in Reception Centers, ASU, LTRH, and STRH, RC EOP) must be ducated. Ex. Yards A, B, C ML CCCMS. **No other programs will require this group interview.**<br>• All MHSDS patients must be ducated at Desert Institutions.<br>• Ensure adequate, confidential treatment space is available for the group surveys. If treatment modules MUST be used, ensure they are in a well-lit area and are the modules that have seats in them.<br>• Do NOT cancel treatment appointments for patients to participate in this interview: Skip those with scheduling conflicts and move onto the next name on the list.<br>• Provide custody staff with the script, "Custody Escort Officer Script," which should be used to inform patients why they are being asked to participate in the survey. Follow up with custody to ensure the script is used.<br>• Ensure translators, sign language interpreters, staff assistants, and any other adaptive support providers are also scheduled for any patients with effective communication needs. | |
| 15. Notify nursing staff that auditors will need access to the "Restraint Log Checklist" for the reporting period, as stated above, prior to the audit. This is a new checklist that is kept in the MHCB nursing schedule. | |
| 16. Provide **current** list of all MHCB patients who have had an IDTT by using the Appointments report from On Demand. | |
| 17. Provide a **current** list of all patients currently on a five-day follow-up who were never admitted to MHCB. This report is run and provided on the day of the site visit. | |
| 18. Notify the Warden, Associate Warden of Healthcare, Health Care Access Capt., and CEO or designees of tour and schedule a pre-visit check-in and post-visit check-out meeting with the Warden, CEO, Associate Warden of Healthcare, Chief of Mental Health, and CNE. Facility captains are also encouraged to attend these meetings. | |
| 19. Notify the ASU Capt. and other custody staff in the affected areas of the tour. | |
| 20. Secure room/space for team to interview selected patients. | |
| 21. Arrange access to C-Files or ERMS. Auditors will need to be able to pull C-files or access ERMS on site. Ensure records staff are prepared to accommodate these requests. | |
| 22. Secure space for the assessment team to leave their personal belongings and work throughout the day. | |
| 23. Notify custody staff in ASU that the assessment teams will need access to isolation logs and custody welfare check logs. | |

| | |
|---|---|
| *24. Ensure CQI audit teams are provided access to the MHCB Unit Health Records for all patients in the MHCB during the time of the assessment.* | |
| *25. The regional team shall interview staff during visit. Schedule a one-hour meeting for those who wish to attend. Coordinate with facility on date/time/place.* | |
| *26. Provide a current roster of all MHCB patients. (Disregard if no MHCB at facility).* | |
| *27. On day of visit, provide a list of all ASU incarcerated people currently on 21-day intake status.* | |
| *28. On day of visit, provide list of all ASU incarcerated people currently on 72-hour intake status including date of ASU placement.* | |
| *29. Ensure that the past 5 weeks of 114-As are available in ASU for review and the auditors have a **designated area to review them.*** | |
| *30. On day of visit, provide SOMS visiting history for patients currently housed in MHCB.* | |

***Other requirements to ensure a successful visit:***

| | |
|---|---|
| *The CMH shall have a meeting with all staff and notify them of the following:* <br> • *Do not make changes to group or IDTT leaders or normal processes for the audit.* <br> • *Institution staff shall not attend patient surveys.* <br> • *Introduce the auditors (or ask them to introduce themselves) when an IDTT or group is observed, and then proceed as normal. DO NOT present to the audit team members.* <br> • *Notify staff of the staff interview date and time.* | |

***MH Regional Team Data Collection Items (to be requested by the regional teams):***

| | |
|---|---|
| *Percentage of staff peer reviewed (HQ QM has) -* Headquarters *Mental Health Quality Management staff* | |
| *MHPS committee performance (HQ QM has) -* Headquarters *Mental Health Quality Management staff* | |
| *Number of heat related illnesses (HQ has) -* Headquarters *Mental Health Quality Management staff (compare with what institution provides)* | |

## Attachment B – Pre-Scheduled Audit Areas

ALL
- Staff Interview

MHCB
- IDTT

ASU
- IDTT
- Group Survey (1 per yard for each program)
- Group therapy observation (2 different clinicians and groups)
- ICC

EOP
- IDTT
- Group Survey (1 per yard for each program)
- Group therapy observation (2 different clinicians and groups)

CCCMS
- IDTT
- Group Survey (1 per yard for each program)

LTRH/STRH
- IDTT
- Group Survey (1 per yard for each program)
- Group therapy observation (2 different clinicians and groups)
- ICC

PSU
- IDTT
- ICC
- Group Survey (1 per yard for each program)
- Group Therapy Observation (2 different clinicians and groups)

RC
- Group Survey (1 per yard for each program)

RC EOP
- Group Observation
- IDTT observation
- Group Survey (1 per yard for each program)

Condemned
- IDTT
- ICC
- Group Survey (1 per yard for each program)
- Group Therapy Observation

Desert Institution
- Group Survey (1 per yard for each program)

## Attachment C – Custody Escort Officer Script

**"Script" for Custody Escort Officers Regarding the Reason for the Group Appointment**

Custody officers: Please give each patient the reason they are being escorted to the patient group interview appointment. Use the following script to explain the reason for the interview.

"A small group of mental health clinicians and administrators from CDCR's headquarters in Sacramento would like to interview you regarding your level of satisfaction with the treatment you are receiving here at _____.

This interview will be in a small group with other patients and is completely voluntary. The staff will not write down anyone's names and the results will be kept anonymous. The results will be used to help the mental health program improve the treatment provided. Your participation should be approximately 1 hour."

# Attachment D – Restraint Checklist(s)

Use this worksheet to detail the actions of staff (Nursing, Medical, Mental Health and Custody) for all restraint occurrences and within 24 hours of order termination. Intended goals are 1) determining if all policies, procedures, regulations were followed within timelines; 2) were each of the items met for each restraint episode; 3) if not, what areas were deficient and; 4) what is the corrective action plan to address those areas. Upon completion, file this worksheet in a notebook that is kept in the MHCB nursing station.

CDC #_____

I-P Name (Last)_____

Employee_____

Date_____

| | | Yes | No | NA | Comments |
|---|---|---|---|---|---|
| 1. | If the patient is medically compromised, was a physician contacted prior to or immediately after the placement in restraints? | ☐ | ☐ | ☐ | |
| 2. | If the patient is medically compromised or disabled, were all necessary steps to safeguard his/her safety taken? This includes, at a minimum: <br>• contact to a physician prior to or immediately after placement into restraints notifying him or her of a medically compromised patient's placement into restraints <br>• immediately upon notification, physician order of discontinuation from restraints or order of special measures/treatments to be taken to safeguard the patient's medical condition | ☐ | ☐ | ☐ | |
| 3. | Were at least three (3) custody staff present, with CTC staff, for the application of restraints? | ☐ | ☐ | | |
| 4. | Did the RN perform a mental status and physical assessment of the patient immediately upon placement in restraints? | ☐ | ☐ | | |
| 5. | Did the RN document (respond "yes" only if all criteria are met): <br>• The need for initiation of restraints <br>• A description of the patient's behavior and other relevant factors upon which the patient was determined to be a danger to self or others. <br>• Staff action taken to utilize all alternatives. <br>• Information about reasons for restraints. <br>• Conditions for release. <br>• The patient's response to restraints. <br>• If applicable, injuries to the patient? | ☐ | ☐ | | |

| | | | |
|---|---|---|---|
| 6. Was a soft cloth or bandage applied to the extremity before applying the restraints? | ☐ | ☐ | |
| 7. Was the Watch Commander and Chief Psychiatrist or designee notified upon the order for placement in restraints? | ☐ | ☐ | |
| 8. Did an authorized clinician give verbal or written order within one hour of notification of placement in restraints? | ☐ | ☐ | |
| 9. Was the initial order issued four hours or less? | ☐ | ☐ | |
| 10. Was a face-to-face evaluation conducted by an authorized clinician or a qualified RN prior to the expiration of the initial order (within 4 hours)? | ☐ | ☐ | |
| 11. If the clinician conducting the initial face to face evaluation was not a physician/psychiatrist, was a physician/psychiatrist consulted within four hours of the initial order to review current medications and any contraindications? | ☐ | ☐ | |
| 12. Was each extremity checked every fifteen minutes? | ☐ | ☐ | |
| 13. Were fluids, nourishment and bathroom breaks provided every 15 minutes as needed and practicable? | ☐ | ☐ | |
| 14. Was range of motion performed for two minutes on each limb every one hour unless the patient was too agitated or assaultive to safely remove restraints? a. Was range of motion (or inability to perform range of motion) documented on a restraint/seclusion record? | ☐ | ☐ | |
| 15. Were hourly assessments conducted by the RN? | ☐ | ☐ | |
| 16. Did the RN document the need for continuation and provide justification regarding the elements of the emergency necessitating restraints on a progress note? | ☐ | ☐ | |

| | | | |
|---|---|---|---|
| 17. Did the RN contact an authorized clinician every 4 hours to provide a description of current behavior? | ☐ | ☐ | ☐ |
| 18. Did the authorized clinician or RN conduct a face-to-face evaluation every 8 hours? | ☐ | ☐ | ☐ |
| 19. If the initial order was given via telephone did the authorized clinician sign the order within 24 hours? | ☐ | ☐ | ☐ |
| 20. Did the authorized clinician write an order every 24 hours with a treatment plan that specifies rationale for restraints and behavioral goals for removal of restraints? | ☐ | ☐ | ☐ |
| 21. Did psychiatrist conduct a face-to-face evaluation every 24 hours? | ☐ | ☐ | ☐ |
| 22. Were restraints terminated when conditions of release were met, when the patient identified behavior or danger to self or others were no longer present, or when it would be harmful for the patient to remain in restraints due to medical contraindications? | ☐ | ☐ | ☐ |
| 23. Was the restraint log kept and updated? | ☐ | ☐ | ☐ |
| 24. If a staff or patient injury occurred, was an adverse sentinel event reporting form completed and submitted? | ☐ | ☐ | ☐ |

## Attachment E – Regional Technical Instructions

1. Log in to tablet, laptop, or desktop
2. Log in to BIG-IP Edge Client
3. Open Microsoft Edge browser
4. Copy and paste the web address below in the address bar
   - https://cqit.cphcs.ca.gov/
   - If you do not have access to the tool, please submit a Service Now ticket
5. For instructions on navigating the tool:
   - Click Dashboard > Dashboard
   - Under Resources, select "CQIT Demo PowerPoint"

## Attachment F – Report Writing Outline

Please see separate attachment entitled Report Writing Outline.

# Attachment G – How to Run the Non-Disciplinary Segregation Report (NDS)

1.    Open SOMS and select Reports
2.    Select the "Classification" tab
3.    Select "Max Custody Inmate Extract"
4.    Input institution only (this allows the report to publish institution-wide), then select the Excel icon on the top right of the page to export.
5.    Once the report is published, filter ASU Placement Code to those identified as NDS


*A list of all incarcerated people assigned to the selected institution on NDS status will appear.*


<u>Step 1</u>

**Welcome to SOMS Portal**

Access to SOMS and all activities conducted within the system are recorded. The content of the system is private and privileged information. Use of the system and the information contained within it are to be used strictly for the fulfillment of job responsibilities and shall not be discussed or shared with other persons except as is necessary for professional reasons.

Below are the applications you have entitlements to:







Step 2



Step 3



Step 4



Step 5

| ASU Placement Reason | ASU Placement Code | ASU Placement Date | ASU Placement Date Type | ASU Extension Reason | ASU Extension Days Req/ Approved | ASU Extension Expiratio | Last ASU ICC Date | Next ASU ICC Date |
|---|---|---|---|---|---|---|---|---|
| NDS status for privileges and property | NDS:102 | 12/17/2021 | ASU Placement Date | | | | 06/16/2022 | 06/01/2022 |
| NDS status for privileges and property | NDS:102 | 11/12/2021 | ASU Placement Date | | 0/180 | 10/30/2022 | 07/14/2022 | 05/01/2022 |
| NDS status for privileges and property | NDS:102 | 08/29/2021 | ASU Placement Date | | | | 07/14/2022 | 12/30/2020 |
| NDS status for privileges and property | NDS:102 | 02/12/2022 | ASU Placement Date | | | | 07/14/2022 | 06/30/2022 |
| NDS status for privileges and property | NDS:102 | 06/20/2022 | ASU Placement Date | Retain Pending Parole | 42/42 | 08/11/2022 | 06/30/2022 | 07/08/2021 |
| NDS status for privileges and property | NDS:102 | 06/01/2022 | ASU Placement Date | | 0/180 | 01/09/2023 | 06/29/2022 | 07/06/2022 |
| NDS Status for Accelerated Transfer | NDS:200 | 07/09/2022 | ASU Placement Date | | 0/180 | 01/10/2023 | 07/14/2022 | |
| NDS Status for Accelerated Transfer | NDS:200 | 07/04/2022 | ASU Placement Date | | 0/180 | 01/14/2023 | 07/14/2022 | |
| NDS Status for Accelerated Transfer | NDS:200 | 06/15/2022 | ASU Placement Date | | 0/180 | 01/14/2023 | 07/14/2022 | 08/17/2022 |
| NDS status for privileges and property | NDS:102 | 05/20/2022 | ASU Placement Date | | 0/30 | 07/23/2022 | 06/23/2022 | 06/22/2022 |
| NDS status for privileges and property | NDS:102 | 11/01/2021 | ASU Placement Date | | | | 07/14/2022 | 12/06/2021 |

## Attachment H – CQI Entrance Talking Points

- Introduce every member of the team.
- State the purpose of the visit: to provide information to you (the institution leadership and staff) for use as part of their own self-monitoring and improvement system.
- Provide an overview of the schedule.
- Indicate when and where data will be available (MH Performance Report within a week of the visit).
- Indicate when they can expect a written report.
- Are there any changes over the past year that have impacted your program that we may not be aware of?
  - New units
  - Mission changes
- Are there any other anticipated changes?
- Review performance data and ask any clarification questions.
  - Include all performance data such as MAPIP and chart reviews (all are on the Performance Report).
- Discuss staffing: provide fill rate for mental health clinical positions. Are there any barriers that have impacted ability to fill vacancies?
- Ask if there is any particular area they would like for you to pay attention to on the visit.
- Ask if there are any other questions or comments.
- Request the document request binders (one for custody and one for MH regional teams).

## Attachment I – Case Selection Review Guidelines

### Case Review Selection Guidelines

- Obtain a random targeted sample (e.g., a random sample of all EOP patients if we are looking at something specific to EOP).
  - Random selection means without definite aim, direction, rule or method.
- May include patients who are seen on a visit, when approached on a visit, or if there are complaints on a patient interview.
- Reviews may be done as a result of a specific issue/question.
- Consider reviews if something comes up regarding RVRs, Use of Force, or other custody issues.
- Complete case reviews at desert institutions.
- For efficiency, when you review a chart based upon an observation on site, complete the chart review the same day.
- Ask custody lieutenants to provide cases for you to review.
  - For example, MHSDS patient with multiple RVRs, use of force or controlled use of force incidents – particularly ICF, ACUTE, MHCB LOC, or when there are cases where content of SOMS says the patient was not seen despite asking multiple times, etc. Lieutenants refer to MH reviewer for case review).

### Case Review Writing Guidelines

- Include identifying information
- Explicitly state why the case was reviewed (ask yourself, "Why did I review the case?").
- Provide a concise history for context.
  - For example, Patient X has been at MCSP EOP for xxx, dx, brief chronology, course of "what has happened to this person." If there is years of information, you can say, what time period you reviewed and acknowledge you did not review years of information.
- Associate the case with the big picture (staff and patient interviews, observation, chart audit and timelines data).
- Most important: provide an overall assessment, findings, and recommendations. Were there any problems or not? Give conclusion and outcome.
- Reference the cases in text, give sequential numbers so you can footnote/reference them.
- All documents, reports and case reviews should be a standalone document.
- Look at all case reviews and identify themes – this will be evident after review from the cases.

# Attachment J – Exit Interview Talking Points

## Mental Health Exit

Program Overview:
- Indicate if the institution passed on mental health items
- Vacancy rates
- Program changes, census
- Status of any housing considerations
    - Transfer timelines: percent transferred within required timelines

Access to Care:
- Timely PC Contacts: percentage and note patient survey responses and observations
- Timely Psy Contacts: percentage and note patient survey responses and observations
- Timely IDTTs: percentage and note patient survey responses and observations
- Medication continuity/access: note MAPIP results and patient survey responses and observations
- Refusals: Note Performance Report Tx Hours Attended percentage and augment with patient survey results, staff survey results, and observations. If patients are refusing a lot, why? If patients mostly attend treatment, what does the institution do to accomplish this?
    - For refusals in ASU EOP, were the discussions between the PC and custody held to address issues?
- If any other access issues are identified, note what these were. If exceptional practices are in place to improve access, note this.

Quality of Care:
- Discuss by Yard/Program
- Quality of IDTTs: overall good or not. Note areas for improvement. Note if something was done exceptionally well.
- Quality of Groups: overall good or not. Note areas for improvement. Note if something was done exceptionally well.
- Treatment space assessment (Confidential? Is there enough?)
- Are groups offered in CCCMS? If so, is there a waitlist?

MHCB:
- Cleanliness of cells
    - Was there a log?
- Were patients given full issue unless they were on suicide watch or precaution (which was clearly noted in the chart)?
- For those on 1:1 watch, was the person actively watching (not reading, etc.)?
- Were nursing 15 minutes check sheets on the door and staggered on time?

Alternative Housing:
- From the Performance Report: percent of MHCB referrals transferred within 24 hours "timely transfers to MHCB."
- How many were in alternative housing?
- Were cells in use consistent with location order of policy?
- Were cells clean?
- Was everyone on 1:1 watch?
- Did every alternative housing cell have a bed and toilet?

Segregation:
- Discuss by Yard/Program:
- Clinician input at ICC and custody consideration

R&R:
- Was the correct form used and were all questions asked for the nurse intake screen?
- Was the screen conducted in a confidential setting? If not, why?

## Custody Exit – To be presented by the MHCT Regional Lieutenants

Overall:
- Indicate if the institution passed on custody items and provide the percent score when applicable
- Percent of custody staff who completed CPR training
- Percent of custody staff who completed suicide prevention training
- RVRs:
  - Percent issued to CCCMS:
  - Percent issued to EOP:
  - Percent issued to MHCB:
  - Percent of RVRs with recommended mitigation, and percent mitigation considered. Percent mitigated.

By Program/Yard:
- Heat Plan:
  - Did staff correctly and consistently complete the log according to policy?
  - Were alternative activities provided (when applicable, if not applicable because temps never rose above 90 indicate this).
- CPR mouth shields: percent of staff on each yard with these on person.
- MH referrals (128-MH5): percent of staff on each yard with knowledge of how to refer. If referral forms were not on a yard, state where they need them.
- Did all buildings have complete suicide cut-down kits accessible and with proper inventory?
- MHCB custody discharge checks: percent completed on time (once every 30 min.) per policy.
- Coleman Posters – are they present?  Are they the correct version?

Segregation (ASU, ASU EOP HUB, STRH, LTRH, PSU, Condemned):

- TTMs/security desks placement and cleanliness.
- Guard One percentage. If there is an overflow housing unit, were the manual checks documented correctly and percent.
- Percent for out-of-cell time.
- Percent for showers.
- ICC - percent of incarcerated people and/or patients seen within 10 days of ASU or STRH placement.
- Intake Cells:
  - Did they have placards?
  - Are they placing incarcerated people and/or patients in intake cells as required?
  - Were incarcerated people and/or patients identified that required intake cells and were not in one?
- Entertainment Appliances/Hand Cranked Radios – incarcerated people and/or patients' access to entertainment appliances.
- Unclothed Body Searches (ASU EOP and PSU) – conducted in a private setting?
- Non-Disciplinary Segregation (NDS) – is there an appropriate tracking of NDS incarcerated people and/or patients and their privileges (phone calls, property)?

MHCB:

- Were patients not on max custody status escorted without mechanical restraints? For those who were, was there a 128B with appropriate justification for use of restraints?
- Does the institution use TTMs/security desks for group and/or individual therapy for those patients NOT on mechanical restraint status?  If so, is there appropriate justification?

# Attachment K – Security Desks

CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS > Security Desk > BACK <




**CORRECTIONS & DETENTION**
## SECURITY BOOTHS AND DESKS
SECURITY DESK Item# 797100

Lexan screen not included. Please refer to item # 797200 when ordering the lexan add-on.

All metal security desk chair made with heavy duty replacement vinyl seat and back cushions. Desk surface adjustable for easy accessibility. Includes security fasteners- floor anchoring hardware not included. Dimensions: 34-1/8''H x 47- 3/4''D x 30-3/4''W. Security desk is delivered assembled.

**PRODUCT NO.  797100.1000       $1,995.00 Each**

| COLOR | QUANTITY |
|-------|----------|

CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS >
Lexan Insert Only for Security Desk > BACK <




**CORRECTIONS & DETENTION**
## SECURITY BOOTHS AND DESKS
LEXAN INSERT ONLY FOR SECURITY DESK Item# 797201

Cut-to-size, predrilled for easy attachment.

**PRODUCT NO.  797201.1000       $89.00 Each**

| OPTION | QUANTITY |
|--------|----------|
| Clear Lexan | 1 ± |

**ADD TO CART**
ENTER

 PRINT

CORRECTIONS & DETENTION
## SECURITY BOOTHS AND DESKS

SECURITY DESK WITH REMOVABLE CHAIR - WHEELCHAIR ACCESSIBLE Item# 797101

Lexan screen not included. Please refer to item # 797200 when ordering the lexan add-on.



All metal security desk chair made with heavy duty replacement vinyl seat and back cushions. Desk surface adjustable for easy accessibility. Pin lock release and pull bar on chair back allows easy chair removal for wheelchair access. Includes security fasteners- floor anchoring hardware not included. Dimensions: 34-1/8"H x 52"D x 22"W. Security desk is delivered assembled.

PRODUCT NO.  797101.1000        $2,095.00 Each

# Attachment L – Treatment Modules and Security Booths

**CATALOG** > **METAL PRODUCTS** > **CORRECTIONS & DETENTION** > **SECURITY BOOTHS AND DESKS** > **Treatment Module** > **BACK** <

🖨 PRINT



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**

TREATMENT MODULE Item# 795100

Built in Desk with Floor Mounted Stool. Heavy Steel and steel mesh construction. Door slam prevention. Lexan on front and two sides.

Dimensions: 77.5"H x 37.5"D x 35"W

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

**View Metal Finish Options**
**Recycled Content Certificate**




| FINISH | HINGE SIDE | QUANTITY |
|--------|-----------|----------|

**CATALOG** > **METAL PRODUCTS** > **CORRECTIONS & DETENTION** > **SECURITY BOOTHS AND DESKS** > **Treatment Module - Wheelchair** > **BACK** <

🖨 PRINT



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**

TREATMENT MODULE - WHEELCHAIR Item# 795101

Built in Desk with Stool. Desk and stool are spring loaded and flip up for wheelchair access. Heavy Steel and steel mesh construction. Door slam prevention. Lexan on front and two sides.

This unit is delivered in two parts and requires final assembly and tac welding on site after delivery.

Wheelchair accessible. 78.06"H x 54.09"D x 42.50"W

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

**Recycled Content Certificate**

CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS > Security Booth > **BACK** <     PRINT



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**
SECURITY BOOTH **Item# 794100**

Heavy steel and steel mesh construction. Multipoint locking door. Cuffing slot. Door slam prevention. 30"W x 25"D x 78"H. Weight 295 lbs.

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

**View Metal Finish Options**

| FINISH | HINGE SIDE | QUANTITY |
|--------|-----------|----------|
| Autumn Haze | | 1 + |
| Lite Gray | | ADD TO CART |

---

CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS >
Security Holding Module - Wheelchair Accessible > **BACK** <     PRINT



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**
SECURITY HOLDING MODULE - WHEELCHAIR ACCESSIBLE **Item# 795200**

Our largest Treatment Module will comfortably accommodate full wheelchair motion including 360 degree turning. We have also incorporated a built in flip up stool in the corner to allow for standard usage.   Heavy steel and steel mesh construction. Door slam prevention. Dimensions:   64''W x 67.79''D x 78.2''H.

This unit is delivered in 4 parts and requires final assembly and tack welding on site after delivery.

Available lite gray color and left hinge - right handle configuration only.

| PRODUCT NO. 795200.1000 | | $4,915.00 Each |
|-------------------------|-----------|----------------|
| FINISH | HINGE SIDE | QUANTITY |

CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS >
Security Booth - Stool > BACK <

 PRINT



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**

SECURITY BOOTH - STOOL Item# 794101

Heavy steel and steel mesh construction. Multipoint locking door. Cuffing slot. Door slam prevention. 30''W x 36''D x 78''H. Weight 295 lbs.

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

| FINISH | HINGE SIDE | QUANTITY |
|---|---|---|
| Autumn Haze | | 1 + |
| Lite Gray | | ADD TO CART |



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**

SECURITY LIBRARY BOOTH Item# 794300

Built in steel desk and book slot. Floor mounted stainless steel seat. Heavy steel and steel mesh construction. Multipoint locking door. Cuffing slot. Door slam prevention. 30"W x 49.5"D x 78"H. Weight: 470 lbs.

This item is not the Mental Health Programming Module.  Please refer to Item #795100.

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

**View Metal Finish Options**

73

# SUICIDE PREVENTION ON-SITE AUDIT GUIDEBOOK

## SUICIDE PREVENTION AND RESPONSE UNIT

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

## II.    Chapter Two - Suicide Prevention Audit

## Table of Contents

Suicide Prevention On-Site Audit Instructions ...................................................................... 77

    Preface ................................................................................................................................. 77

    Notifying the Institution ...................................................................................................... 77

    Creating the Schedule ......................................................................................................... 78

    Data Review ......................................................................................................................... 79

What to Do Upon Arrival .......................................................................................................... 79

    Check-In Meeting (optional) ................................................................................................ 79

Audit Instructions ..................................................................................................................... 79

    CQIT Audit Terminology ...................................................................................................... 79

    Restricted Housing Units [ASU, STRH, ASU EOP HUB] ....................................................... 80

        Second Watch Morning Meeting ................................................................................... 80

        Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH] ........ 81

        Intake Cells – Hayes Item 2 ........................................................................................... 81

        Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH] .................................. 82

        Security/Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, SHU, STRH, LTRH, Condemned] ..................................................................................... 83

        ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH ................................................................................................................................. 84

        ASU Post-Placement Screening ("ASU Screening Questionnaire") [ASU, ASU EOP HUB, STRH RC, STRH] ................................................................................................................. 85

    Inpatient Units (MHCB) ....................................................................................................... 85

        Suicide-Resistant Cells – Hayes Item 10 ........................................................................ 85

        Interdisciplinary Treatment Teams (IDTT) ..................................................................... 86

        Quality of Safety Planning – Hayes Item 4 ..................................................................... 87

        Suicide Watch and Suicide Precaution .......................................................................... 88

        Observation and Issue Orders – Hayes Item 3 ............................................................... 89

        Timelines for Suicide Risk Assessments ......................................................................... 91

        Privileges – Hayes Item 14 [MHCB, Acute, ICF] ............................................................. 91

        Clinical Discharge Follow-Ups ....................................................................................... 92

    Alternative Housing – Hayes Item 5 ................................................................................... 93

    Suicide Risk Management Program (SRMP) ........................................................................ 94

On-Site Paperwork – Custody MHCB/Alternative Housing/Acute/ICF Discharge Follow-Ups [ML, ML EOP, ML CCCMS] ........................................................................................................................................95

Institution SPRFIT Committee Observation – Hayes Item 19a .............................................................. 96

Institution SPRFIT Committee Minutes – Hayes Item 19b ..................................................................... 97

Institution LOP – Hayes Item 19c ......................................................................................................... 100

Urgent and Emergent Referrals for Danger to Self – Hayes Item 12 .................................................... 101

Suicide Risk Evaluations – Hayes Item 13............................................................................................. 101

Emergency Response................................................................................................................................ 102

Cut-Down Kits – Hayes Item 15 ....................................................................................................... 102

Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews ........................................... 103

Training and Mentoring Compliance ..................................................................................................... 103

Clinical Training Compliance ............................................................................................................. 103

Custody Staff Training (Suicide Prevention) [On-Site Paperwork].................................................. 106

Receiving and Release (R&R) Screening – Hayes Item 1 ...................................................................... 107

Reception Center Processing.................................................................................................................... 107

Diagnostics Process ............................................................................................................................ 107

Crisis Intervention Team (CIT) ............................................................................................................... 108

Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes ........... 10909

Assignment of Corrective Action Plans (CAPs) and Recommendations............................................. 109

Attachment A – Site Visit Entrance Talking Points................................................................................ 110

Attachment B – Exit Interview Talking Points ....................................................................................... 111

# Suicide Prevention On-Site Audit Instructions

## Preface

Oversight with attention toward continuous quality improvement is paramount to ensuring the strength of any suicide prevention program. As such, the statewide suicide prevention and response unit has developed a robust on-site audit that will result in a standardized assessment of each institution's suicide prevention program. Additionally, the on-site audit will provide support and oversight in identifying areas that may require improvement. The suicide prevention on-site audit involves reliance on observations, clinical judgment, discussions with local staff, audit tools, and review of various performance report metrics. Some portions of the review will involve clinical chart reviews either during or after the on-site visit. The on-site audit will be conducted by the suicide prevention and response unit's suicide prevention coordinator assigned to each region. These audits typically take one to two days to complete.

The on-site review requires the reviewer to, at times, pay particular attention to qualitative items that may not be explicitly addressed in automated measures or common audit tools. It may require that the reviewer consider multiple pieces of information that don't appear to be explicitly connected to establish potential trends in areas of an institution's performance. For example, a review of the SPRFIT Committee's minutes may suggest the committee is appropriately addressing all required items. However, when observing the committee, the auditor may notice that the committee is not discussing qualitative issues, or not taking appropriate action on the deficiencies found in reviewing data.

Upon the completion of the on-site review, the reviewer will integrate the findings into a written report. The report is provided to the institutional multidisciplinary leadership team within 14 days of the on-site review. The report includes a comprehensive overview of the findings, identifies attained or sustained compliance, and identifies areas of non-compliance or a need for improvement. Areas of identified non-compliance will be addressed through detailed corrective action plans. Any action plans to address deficiencies shall be tracked until a sustainable solution is in place and observed during subsequent on-site visits. An abridged version of the report, including any corrective action plans assigned to the institution, shall be discussed at the monthly Statewide Suicide Prevention Committee.

## Notifying the Institution

Prior to the visit, a notification is sent to the multidisciplinary institutional leadership team indicating the intention of conducting an on-site review of the institution's suicide prevention program. This notification will include the proposed dates of the visit and the reviewers who will be on site to conduct the review. Additionally, the requested documents and support needed to complete a comprehensive review of the suicide prevention program will be included in the formal notification. This notice is sent approximately 3-4 weeks ahead of the visit.

## Creating the Schedule

When possible, it is preferred that on-site reviews are conducted as a multidisciplinary team, consisting of the Suicide Prevention Coordinator, Mental Health Compliance Team (MHCT) Lieutenant, and a nursing representative from the respective region. As a part of the review, the nursing and custody counterparts conduct observations and information gathering in their respective areas of the compliance measures. When the custody and/or nursing representatives are not able to attend the on-site review, they shall provide their evaluation of the compliance measure items by conducting an independent on-site review, and their information will be incorporated into the respective sections of the report.

Below is a general guideline for the frequency in which an institution shall receive on-site audits:

| Mental Health Program Type | Frequency of Audit |
|---|---|
| With an inpatient program (mental health crisis bed [MHCB] or psychiatric inpatient program [PIP]) | Quarterly |
| Without an inpatient program | Every six months |

Additionally, there may be other indications for increased frequency of on-site reviews at an institution more frequently than listed above:

- At the request of the institution.
- At the request of the regional Mental Health Compliance Team (MHCT) or other internal stakeholders.
- As a result of a Lindsay Hayes audit with identified deficiencies.
- As a result of a previous on-site audit with identified deficiencies; the frequency of on-site audits can increase to address these deficiencies.
- As a result of findings that indicate a potential unique trend, necessitating additional review and/or support.

Insofar as possible, the auditor shall strive to conduct the on-site audit on the day in which the institution is holding their SPRFIT Committee so an observation of the committee can be completed. If this is not feasible, the auditor shall attempt to attend the SPRFIT Committee remotely, so feedback can be provided in the formal report.

If the institution is conducting the annual IST suicide prevention trainings for institutional staff, the auditor shall observe a portion of the training to determine the adequacy of the instructor's delivery of the material. If training is not occurring at the time of the on-site review, the reviewer shall request a schedule for suicide prevention trainings and when possible, the reviewer may observe the trainings remotely.

## Data Review

Within one week prior to the audit:

   a) Review pertinent data related to suicide prevention from the On Demand Performance Report (e.g., alternative housing transfer timelines, daily contacts in MHCB, MHCB readmissions,). This will help inform the review and prompt the auditor to ask further questions and/or undertake additional investigations.

   b) Review other sources of data, such as the Mental Health Observation Tool, the Crisis Intervention Team Reporting Tool, Acute/ICF performance reports, and NCAT report.

   c) Review any data related to other audits conducted on a regular basis, as they relate to suicide prevention, such as the institution's manual 7497 audits or the Suicide Prevention Coordinator's regional review of urgent and emergent referrals and SRASHE completion.

# What to Do Upon Arrival

## Check-In Meeting (optional)

*It should be noted that activities such as morning meetings, PT rounds, R&R arrivals, or IDTTs that must be attended by the auditor are a priority for the on-site audit and the check-in meeting should be omitted to accommodate.*

   a) The first thing that will occur at the start of each visit is a brief "check-in" meeting with, at a minimum, the CEO, CMH, CNE, Warden, custody auditor, and mental health auditor. It is also recommended that the facility Captains attend.

   b) Warden and CEO/CMH Presentations:
   - Custody auditor may ask Warden to provide any relevant updates regarding their program, mission, etc.
   - Mental health auditor may ask CEO and CMH to provide any relevant updates regarding their suicide prevention programs.

   c) Custody and Mental Health Presentations (nursing presentation, if a regional NCPR is in attendance):
   - Both auditors should provide institutional leadership with an overview of the areas in which they will be visiting.
   - At the inception of the visit, the audit team should inform institutional leadership that the visit is a means to collect data to provide supportive tools for leadership and their staff.
      o Emphasize that the reports generated from the visit will allow them to use and make decisions about their quality improvement priority areas.
      o Emphasize that the reports generated from the visit will allow them to facilitate change through their own quality management system.

# Audit Instructions

## CQIT Audit Terminology

   a) <u>Review Period</u>: date range for document selection related to the audit. The review period will always be the last completed 6 months prior to the audit date. For example,

if the audit date is in July 2022, the Review Period will be January 1, 2022 – June 30, 2022.

b) <u>Area</u>: Housing area (e.g., alternative housing, ASU, ASU EOP Hub, Condemned, Institution Wide, LTRH, MHBC, ML CCCMS, ML EOP, PSU, R&R, RC, RC EOP, SHU, STRH).

c) <u>Data Entry</u>: enter audit data on the same date the audit was conducted.

d) <u>Data Submission</u>: submit all audit data by the end of the next business day of when CQI tour concludes. For example, if your tour concludes on Friday, submit all data by end of day Monday.

e) <u>CQIT Audit Fields</u>
Note: not all audits will contain all these fields.
**Start Date**: the date the audit was performed on
**End Date:** the date the audit was completed
**Sub Area**: a smaller housing area that is part of a larger housing area. For example, MHCB is the area. MHCB, Side A is the sub area. ASU is the area. S Wing is the sub area.
**Time**: the time the audit was conducted. Note: the time defaults to the current time.
**Percentage**: an amount that is a proportion of a larger sum. Note: you do not have to calculate percentage; there will be specific instructions on where to obtain percentages.
**Provider Login ID**: username used to sign into computers
**CDCR #**: the incarcerated person's or patient's CDCR number

## Restricted Housing Units [ASU, STRH, ASU EOP HUB]

## Second Watch Morning Meeting

a) General Instructions:
- The morning meeting observation is only required in one ASU unit but you should ensure that for each visit, you rotate the units observed.
- If the auditor cannot observe the morning meeting, the auditor should obtain the huddle sheets and review.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) Standardized Questions:
1. Did MH staff identify patients at high risk for suicide?
   - Mental health staff should explicitly state which patients are identified as high risk. On the rare occasion there are none identified, they should also state this or the response on this item is "no."
2. Were the ASU sergeant and MH clinician in attendance?
   - If either or both the ASU sergeant or designee and a MH clinician were not in attendance, the response on this item is "no."
3. Were new arrivals discussed?

## Psychiatric Technician (PT) Rounds – Hayes Item 9 [ASU, ASU EOP HUB, PSU, STRH, LTRH]

a) General Instructions:
- Auditors will observe the PT while they conduct the rounds in the segregated housing units.
- Auditors will make note of the questions that are being asked of each patient whose rounding was observed.
- Auditors shall document the number of individuals that were observed.
- Auditors will obtain the Restricted Housing Unit Rounds Audit Forms for each day of the review period from the institution SRN on each unit visited.
- CQIT Audit Fields (see CQIT GB Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) Standardized Questions:
1. How many PT Rounds Quarterly Fidelity audits were reviewed?
2. Of those, how many audits are answered with all "Yes" or appropriate "N/A" to all the audit questions in the "Observation of Rounds" section (Questions 4-7)?
3. How many audits are answered with all "Yes" or appropriate "N/A" to all the audit questions in the "Documentation Review" section (Questions 8-12)?
4. How many days are there in the review period?
5. Of those days, how many had RHU PT Rounds Audit Form entries where the answer was "yes" to the question "PT's initials on Isolation Log for every inmate in the RHU?"

## Intake Cells – Hayes Item 2

a) General Instructions:
- Utilize the CQIT ASU Intake Report located in the CQIT Reports folder in SOMS Reporting. Use the report to determine current 21-day incarcerated persons roster.
- Make note of the number of cells designated as ASU Intake Cells.
- All ASU designated intake cells will be reviewed at least every four quarters.
- Identify incarcerated persons housed in ASU for the first 72 hours of confinement.
- Auditors will ask custody staff to show them the designated intake cells.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) Standardized Questions:
1. How many incarcerated persons are on intake status within the first 72 hours of placement?
2. How many incarcerated persons housed in ASU for the first 72 hours are either double celled with an appropriate cell partner or are celled alone in a retrofitted intake cell?

3. How many incarcerated persons were housed in intake cells beyond 72 hours during the review period?
4. How many designated intake cells were audited?
   o Include the cell number of each cell audited
5. Of those, how many met the criteria to be suicide resistant?
   o Include the cell number of each failed cell

c) Suicide Resistant:
   • Visually observe the intake cells and make note of whether there are obvious ligature points anywhere in the cell. Consider:
     o Beds should be concrete slab or have metal plates to cover openings/gaps
     o Toilet/sink combo units
     o Hemispherical bubblers on the sinks
     o Flush controllers
     o Light switches with touch bolts
     o No gaps around bed frames
     o For ADA cells, if there is a grab bar, it requires a metal plate under the bar
     o Vent grate holes should be no larger than 3/16th of an inch
     o Sprinkler heads should not be exposed (some have protective cones, others are flush with the ceiling and drop down when set off, some are breakaway type)
     o No-pick caulking on all fixtures, including lights, light switches, electrical outlets and other gaps between fixtures and walls/ceilings
   • Any deficiencies found with a cell shall be documented with photographic evidence.
   • If the institution has submitted work orders, copies of those work orders are to be obtained and saved with the report.
     o Progress reports for these work orders should be addressed at subsequent on-site visits to ensure timely resolution of deficiencies.

d) Identification:
   • All intake cells should be labeled with a stencil marking stating, "INTAKE CELL" and they should have an accurate placard notating the designation. Visual observation should confirm the presence of the stenciling and placards.

e) Window Frosting or Other Visual Obstructions:
   • The physical observation of the intake cells should verify whether there are any frosted windows in the intake cells, when applicable. Additionally, any serious visual obstructions from outside the cell should be notated.

## Entertainment Appliances [ASU, ASU EOP HUB, STRH RC, STRH]

a) General Instructions:
   • Identify the occupied intake cells and check presence of entertainment appliances (e.g., radio or tablet).

- o Approved appliances are a television, radio, or tablet upon initial placement.
- Audit occupied cells only and ask the patient(s) if their entertainment appliance(s) is in working condition. If you audit a double occupied cell, ask both patients.
- For any patient with a documented and approved reason to not have an entertainment appliance, please add reason in the comment box.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - o Start Date
  - o End Date
  - o Sub Area

b) Standardized Questions:
   1. How many patients were audited?
      - o Enter the CDCR numbers you audited
   2. Of those patients audited, how many reported the entertainment appliance is in proper working order?

## Security/Welfare Check Completion (Guard One) – Hayes Item 8 [ASU, ASU EOP HUB, PSU, SHU, STRH, LTRH, Condemned]

a) General Instructions:
   - Enter responses for each segregated housing unit audited (e.g., if there are two ASU units, enter two different audits). Anytime Guard One is unavailable or the system is down, paper forms will be used.
   - Enter one audit per security/welfare check round.
   - Observe correctional staff conduct security/welfare checks (rounds) at least once during your tour of the unit.
   - Request a printout of the Round Tracker report utilizing the "time between checks" view for a random 24-hour period during the audit period to calculate compliance.
   - For PBSP only: During 1st Watch at PBSP, Guard One checks are required at 60-minute intervals in segregated housing units in Facility C and D.
   - A discrepancy is defined as any measurement that is either late, missing, or non-staggered.
   - Visually inspect the Round Tracker report for any discrepancies.
   - Review the Isolation Log and/or SOMS for any inconsistencies where routine checks were previously conducted but suddenly ceased, in order to ascertain whether an incarcerated person is no longer assigned to that cell.
   - For any legitimate discrepancies, a signed memo dated the same day as the Rounds Tracker report must be provided.
   - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
     - o Sub Area

b)  Standardized Questions:
1. How many cells have an incarcerated person assigned at the time of the security/welfare check?
2. For the security/welfare check round observed, how many of the assigned cells did the correctional staff conduct a visual/physical observation of a living, breathing incarcerated person free from obvious injury, ensuring there is a clear and unobstructed view into the cell looking for damage to the cell and/or any misconduct or self-injurious behavior?
3. How many reports have identified discrepancies?
4. Of the reports identified with discrepancies, how many have memos signed and dated the same date of the report?

## ASU Pre-Placement Screening ("ASU Pre-Placement Form") [ASU, ASU EOP HUB, STRH RC, STRH]

a)  General Instructions:
- Observe the ASU screening process, if possible, to see if it is conducted confidentially.  If they are not conducted confidentially, note the reason.
- Obtain a list of the individuals who arrived on the day of the audit of the ASU unit.
- If an observation cannot be completed, conduct a record review of the pre-placement screening in EHRS to determine if the screening was completed timely.

b)  Quality of Screenings:
- Document the quality of the observed screenings. Specifically observe whether or not all questions were asked. This should be verified by reviewing the documentation in EHRS after the conclusion of the screening.
- If no screenings are observed, review the records of the ASU admissions on the day of the audit and verify that the documentation in EHRS is appropriate.

c)  Performance Report Metrics:
- The auditor will conduct a review of at least 3 months' worth of Performance Report compliance for pre-placement screenings. Deficiencies should be noted.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  o Start Date
  o Sub Area

d)  Standardized Questions:
1. How many screenings were observed?
2. Of those, how many were completed in a confidential setting?
3. Of those observed, were all questions from the form asked?
4. Was documentation verified in EHRS?

**ASU Post-Placement Screening ("ASU Screening Questionnaire")** [ASU, ASU EOP HUB, STRH RC, STRH]

    a) General Instructions:
- Observe ASU Screening Questionnaire (Post-Placement) and GP screening process to see if they are conducted confidentially. If not, note reasons for this.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

    b) Standardized Questions:
1. How many screenings were observed?
2. Of those, how many were completed in a confidential setting?

## Inpatient Units (MHCB)

### Suicide-Resistant Cells – Hayes Item 10

    a) General Instructions:
- Any cell in the CTC that is being used as a Mental Health Crisis Bed should be retrofitted to be suicide-resistant, consistent with *Intake Cells-Hayes Item 2* section above.

    b) Compliance with Suicide Resistant Standards:
- Any deficiencies found with a cell shall be documented with photographic evidence.
- If the institution has submitted work orders, copies of those work orders are to be obtained and saved with the report.
  - Progress reports for these work orders should be addressed at subsequent on-site visits to ensure timely resolution of deficiencies.
- All MHCB cells and CTC used as MHCB cells will be reviewed at least every four quarters.

    c) CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
- Start Date
- Sub Area

    d) Standardized Questions:
- How many cells are in the MHCB and CTC used as MHCB?
  - Exclude red line cell. Add appropriate comments about red line cell in the comment box.
  - Only count the CTC beds being used as MHCB
  - Include the cell number of each cell audited
- Of those, how many met the criteria to be suicide-resistant?
  - See *Intake Cells-Hayes Item 2 audit re: criteria of suicide resistant*
  - Include the cell number of each failed cell

## Interdisciplinary Treatment Teams (IDTT)

a) General Instructions:
- You are required to observe five patient IDTTs in one unit of each program (ICF/Acute), but you must rotate units each visit to ensure over time all units are sampled.
- If there are less than five to observe in any given unit, observe all.
- Before the first patient is brought in, introduce yourself to the team and then:
  - You must introduce yourself to each patient.
  - Other than your initial introduction, the team should proceed with the IDTT as they typically would. The team should not be presenting the case to you.
  - To the extent that any of the attendees are present at the IDTT due solely to the audit, politely request that they not attend so that the audit fairly represents the quality of the treating team members.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) IDTT Observations:
1. Did the IDTT leader state the purpose of the IDTT?
   - This will be apparent. The IDTT leader is expected to tell the patient the reason(s) they are having the meeting.
2. Was the Correctional Counselor engaged in the discussion, knowledgeable, and provided relevant information to the case?
   - The Correctional Counselor does not have to give an entire case presentation but is expected to provide relevant custody information and engage in the team's discussion.
3. Did the IDTT leader facilitate a team discussion by attempting to engage all participants (including staff and the patient)?
   - If the IDTT leader asked other team members questions to prompt their input, this response is "yes" even if the team leader was unsuccessful in their attempt.
4. Did the overall IDTT include interactive discussion of all staff participants toward the treatment plan?
   - This is about the interaction of all team members; if team members present information in isolation, and then disengage, the response to this item is "no."
   - If one staff participant on the patient's treatment team does not interact, the response is "no."
   - You may exclude staff attendees who are NOT on the patient's treatment team but are in attendance (this should be clear from introductions at the beginning of the meeting).

c) Observation, Issue, and Privileges Review:
5. Are levels of observation, issue, and privileges discussed?

- o Verify that all IDTTs for patients admitted for DTS, or expressed/engaged in suicidal behavior during placement, adequately discussed current suicide risk and prior history of suicidal behavior during the case presentations prior to determining current level of observation.
6. Are orders for such justified in EHRS?
   - o Were all orders for observation, issue, and privileges for patients admitted to the MHCB for danger to self, clinically appropriate and accompanied by a progress note that included a clinical rationale?
7. Were safety smocks only utilized for patients on Suicide Watch or Suicide Precaution?
8. Were safety smocks inappropriately utilized (offered with 'partial issue' clothing, offered because patient complained of being cold, etc.)?
9. Were all patients not on Suicide Watch or Suicide Precaution in full issue clothing commensurate with the patient's preferred gender?

d) Safety Planning (Suicidal Patients ONLY):

10. Is the safety plan discussed?
    - o Regardless of the reason for the IDTT, if the patient was admitted to the MHCB for danger to self, or expresses any suicidal ideation during the MHCB stay, safety planning must be discussed during the initial IDTT (if the patient is stable enough to discuss). Document whether this topic was discussed.
    - o If this is a discharge IDTT, the treatment team and the patient should all be familiar with the patient's safety plan. This should be discussed comprehensively during the IDTT.
      - ▪ The auditor should document the qualitative results of this discussion and notate if safety planning is a focus of the discharge IDTT.
      - ▪ The auditor shall conduct a review of the records after the IDTT is conducted to ensure the documentation related to safety planning was included and clinically appropriate.
11. Had the final safety plan been completed prior to IDTT?
12. Was the safety plan reviewed by the MHCB supervisor either prior to, or during, the IDTT meeting?
    - o This should be verified through the MHCB Supervisor Review of Safety Plan report.
13. If the supervisor determined the safety plan to be inadequate, was it revised?

## Quality of Safety Planning – Hayes Item 4

a) General Instructions:

- • Quality of safety plans is a Chart Audit Tool. The results of those audits for the audit period shall be included in the report, as shown in the performance report.
- • The sample shall be generated by selecting five cases with a safety plan from those patients who were discharged from inpatient settings.

- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

b) Standardized Questions:
  1. Was the safety plan completed, as required by policy?
  2. Was the safety plan individualized to the patient to address ways to mitigate the patient's suicide risk?
  3. Did any safety plan include inappropriate narrative regarding why the plan was not completed (e.g., patient refused to participate, etc.)?

## Suicide Watch and Suicide Precaution

a) General Instructions:
  - Walk through the unit and see if the Adaptive Support Form (CDCR 128 C-2), documenting rounding requirements (Q15, etc.), is posted on the doors.
  - Review for every patient on suicide watch and for randomly selected five patients on suicide precautions.
  - Respond for each patient/rounds observed.
  - Utilize the Mental Health Observations Reporting Tool in the CCHCS Quality Management portal for a random selection for patients on suicide precautions.
  - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - CDCR #
    - Start Date
    - End Date
    - Sub Area

b) Standardized Questions:
  1. Is the Adaptive Support Form (CDCR 128 C-2), with the observation level, on the door?
  2. Was the Adaptive Support Form (CDCR 128 C-2) completed within one calendar day of the site visit, as required by policy?
  3. Is the correct form (in EHRS) used for documentation of checks?
  4. Are checks being conducted and documented at the cell front while observing the patient?

c) Suicide Precaution Rounds:
  5. Based upon the Mental Health Observation Tool, what were the total violations notated and the longest time between rounds?
  6. Were the rounds staggered or did they follow a strict "every 11 minutes" timeline?
  7. If there are patients on suicide precaution while the audit is being conducted, observe the nursing staff during the required rounds. Is the nurse(s) attentive during the observation? Is the nurse(s) actively engaged in the duty of observing each patient?

d) Suicide Watch Observation:
  8. If there are patients on suicide watch while the audit is being conducted, observe the nursing staff assigned to complete the continuous observation. Is

the nurse attentive during the observation by continuously watching the patient, and not attending to other assignments or tasks?

## Observation and Issue Orders – Hayes Item 3

a) General Instructions:
- Do not change the default "audit start date" as it needs to reflect that the audit was completed on-site during the current quarter.
- Use MH patient issue orders in EHRS and progress notes to supplement this review.
- Partial issue is anything less than:
  - Socks (1 pair)
  - Clothing
    - Male patients: 1 pair blue denim jeans and 1 blue chambray shirt, or one jumpsuit, or one Reception Center shirt and pants.
    - Female patients: 1 blouse or T-shirt, 1 pair slacks, or 1 dress, muumuu, robe, or duster, 1 nightgown.
  - Underclothes
    - Male patients: 1 pair white undershorts (to be exchanged as needed), 1 undershirt.
    - Female patients: 1 bra, 1 pair panties (to be exchanged as needed).
    - Transgender patients, upon request: 1 brassiere or 1 pair white boxer shorts.
  - Reading materials (1 book or psychoeducational articles)
  - Hygiene items (1 toothbrush, tooth powder, soap)
  - One blanket
  - A bed (cement bed with safety mattress on top acceptable)
  - Prescribed healthcare appliance (pay special attention to this as it may not be apparent the patient has an appliance. Ask the patient and ask staff, do not make assumptions they do not have/need a healthcare appliance if they do not have one). If the patient and staff members provide inconsistent answers regarding the patient's health care appliance, follow up to resolve the inconsistency.
    - *Examples:* glasses, CPAP machine, cane, and walker
- Randomly select 10 patients who are on partial issue and use their health record to respond to the following questions. If there are less than 10, review all.
  - While reviewing orders, check for terms like "psych observation," "crisis evaluation," or other non-specific orders that are inconsistent with policy.
  - Check to see if there is a documented justification for the decision to limit the patient's issue.

- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - CDCR #
  - Start Date
  - Sub Area

b) Standardized Questions:

1. Does patient clothing issue on the Adaptive Support Form (CDCR 128 C-2) or other authorized form on the cell door for each patient match what each patient has been issued?

2. For every day the patient was on partial issue, NOT including today, is there a progress note justifying partial issue?
   - Vague statements such as "suicide prevention" should not be considered adequate justification.
   - The justification should be written by the provider who writes and updates the physician's order every calendar day.

3. For every day the patient was on partial issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify partial issue in the observation order and in the progress note?
   - The justification in the progress note should detail the patient's unique risk factors and clinical need.

4. For every day the patient was on partial issue, NOT including today, did the order and/or progress note authorize non-suicide observation (e.g., 30-minute nursing checks)?

5. For every day the patient was on partial issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note?

6. Are specific orders for suicide precaution documented?

7. Based on observation and chart review, were safety smocks only utilized for patients on Suicide Watch or Suicide Precaution?

8. Based on observation and chart review, were safety smocks appropriately ordered (not offered with 'partial issue' clothing or because patient complained of being cold, etc.)?

9. Were all patients not on Suicide Watch for Suicide Precaution in full issue clothing (to include pants or jumpsuit)?

10. Was there a daily provider order that justified clothing, property, and out-of-cell activities for patients on either Suicide Watch or Suicide Precaution?

11. Are orders for observation reordered daily until the patient is clinically removed from suicide precautions?

12. Are there any patients who were maintained on suicide precautions for the duration of stay, regardless of the clinical presentation of the patient?
    - If yes, enter their CDCR number in the comment box.

13. Do patients possess all ordered items and only those items?

## Timelines for Suicide Risk Assessments

a) General Instructions:
- This item is an automated indicator located in the On Demand Performance Report.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date

b) Standardized Questions:
  1. Are the suicide risk assessments being conducted in confidential settings?
     - Include local observations over and above the data, if observed.
     - To determine if suicide risk assessments are being conducted in confidential settings, utilize the Appointments report in the On Demand site, and use the audit period to extract the number of suicide risk evaluations conducted and calculate compliance with confidentiality.

## Privileges – Hayes Item 14 [MHCB, Acute, ICF]

a) General Instructions:
- This item is completed by custody auditors.
- While on-site, review the 114-As for the patients currently housed in the MHCB and the NCAT for the patients currently housed in Acute/ICF.
- From the list, randomly select a total of 10 MHCB patients, 10 Acute non-enhanced observation patients, and 10 ICF non-enhanced observation patients, for a total of 30 patients, and review their 114-As or NCATs. If the list is less than 30, then all patients on the list shall be audited.
  - In cases where the MHCB or Acute/ICF has more than one sub area, conduct one audit per sub area.
- Next audit the 114-As or the NCATs for all patients on enhanced observation institution wide.
- Exclude patient days where they have been out to court or out to medical during their inpatient stay for an entire 8-hour shift of second watch.
- Use the issue orders, which are posted on the cell door to determine clinical restrictions.
- Ensure that despite a facility and/or housing unit being on 'modified program' or the patient on 'quarantine status,' MHCB and Acute/ICF patients are still permitted all out-of-cell-activities.
- If a patient was clinically cleared but not offered dayroom and/or yard due to physical plant design, the auditor will indicate the deficiency in the comments section of the audit.
- Identify other potential barriers to patients not receiving authorized privileges, e.g., yard and other out-of-cell activities not offered in absence of RT.
- Verify that patients on maximum security status have access to out-of-cell time, including yard and phone calls, unless restricted due to a documented clinical/custodial reason, i.e., the MHCB yard has a small management yard (SMY).

- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - End Date
  - Sub Area

b) Standardized Questions:

1. How many patients who have had an initial IDTT are NOT restricted from yard time (due to clinical reason) by the clinical team?
2. Of those, how many patients have documentation in the 114-A or NCAT identifying yard was offered?
   - Note the CDCR number and the reason (e.g., documented custody factors such as RVR sanction) why the patient was not offered yard in the comment box.
3. How many patients who have had an initial IDTT are NOT restricted from phone calls (due to clinical reason) by the clinical team?
4. Of those, how many patients have documentation in the 114-A or NCAT identifying a phone call was offered at least once per week?
   - Note the CDCR number and the reason (e.g., documented custody factors such as RVR sanction) why the patient was not offered phone call in the comment box.
5. How many patients who have had an initial IDTT are NOT restricted from visits (due to clinical reason) by the clinical team AND had a visit/visitor arrive at the institution during their time at the MHCB or Acute/ICF?
6. Of those, how many patients were offered a visit?
   - Instructions: pull SOMS visiting history for all patients currently housed in the MHCB and Acute/ICF to verify whether a visitor arrived for a visit.
7. For those patients who had a visitor arrive at the institution for a visit, were any visits denied?
   - Note any denied visits in comments section and address this in your report.
   - If a visit was denied, identify the reason(s) in the notes and the report if appropriate/not appropriate.
8. How many MHCB or Acute/ICF patients were reviewed?
9. Of those, how many patients were offered a shower at least three (3) times per week?
10. How many patients who have had an initial IDTT are NOT restricted from dayroom (due to clinical reason) by the clinical team?
11. Of those, how many patients have documentation in the 114-A or NCAT identifying dayroom was offered?

## Clinical Discharge Follow-Ups

a) General Instructions:

- Obtain a list of patients discharged from MHCB, PIP, and Alternative Housing during the audit period.

- Randomly select 15 patients and review the EHRS documentation.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date

b) Standardized Questions:

1. Were the five-day clinical follow-ups completed consistently each day for a minimum of five days following discharge from the MHCB, PIP, and alternative housing?
2. For patients who required a safety plan, was the safety plan included in each day of the five-day follow-ups? (Note: *adequacy* of safety plan is covered in another section).
   - Verify that the final day of the five-day follow-up was completed by a mental health clinician.

## Alternative Housing – Hayes Item 5

a) General Instructions:

- Survey all alternative housing cells.
- Respond once for EACH alternative housing area.
- Report compliance with transfer timelines, as tracked by official reports.
  - Utilize the Performance Report Indicator "Timely Admission to MHCB" for compliance.
- Report compliance with SRASHEs completed for all rescinded referrals.
  - Utilize the Performance Report Indicator "Suicide Risk Evaluation" for compliance.
- Report compliance with holding cell usage.
  - Utilize the institutional Holding Cell Logs to verify patients are in holding cells no longer than 4 hours.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date

b) Policy Requirement for Prioritized Cell Locations:

- Correctional Treatment Center Licensed medical beds
- Outpatient Housing Unit (OHU)
- OHU overflow cells
- Holding cells with access to water/toilets including, but not limited to, "wet cell," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic Area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.
- Holding cells without toilets
- Triage and Treatment Area or other clinic exam room
- Other unit-housing where complete and constant visibility can be maintained.

c) Standardized Questions:

1. Does the institution have a local operating procedure that outlines the requirements for alternative housing and does it align with statewide policy guidelines?
2. How many cells are in an area consistent with policy?
3. How many cells are used in the correct order of priority per policy?
4. How many alternative housing cells were reviewed?
5. How many patients in alternative housing were reviewed?
6. How many patients were offered out of cell clinical contact?
7. What are the cell numbers of the cells you reviewed?
8. What are the CDCR numbers of the patients you reviewed?
9. Of those, how many were observed with watch staff actively watching the patient (not reading, talking with other staff, etc.) with an unobstructed view, and on 1:1 only?
   o For the purposes of this audit, 2:1 observations are excluded. If a 2:1 observation was audited, please do not include these patients in your answer for question #8. Instead, include a summary of these 2:1 instances and their circumstances in the comment box (or CQIR).  See Memo: March 27, 2006 Temporary Moratorium on the User of Video Monitoring as the Sole Observation Method for Suicide Watch.
10. How many patients have a suicide-resistant bed?
11. How many patients were provided a safety mattress and safety blanket?
12. How many patients were held in authorized holding cells (that are only "designed for the patient to sit or stand") for longer than 4 hours?
13. Of the alternative housing cell reviewed, how many have suicide resistant beds that are readily accessible?

## Suicide Risk Management Program (SRMP)

a) General Instructions:

- Verify that the facility has an LOP for the SRMP that is consistent with the most recent SRMP policy and procedure.
- The auditor should review the "SRMP" and "SRMP – Meet criteria but not included" On Demand reports to determine the number of patients enrolled in the SRMP and those who have met criteria but are not included in the SRMP.
- A random sample of five patients from those reports shall be selected to be audited. If there are less than five patients in the reports, all patients shall be audited.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  o Start Date

b) Standardized Questions:

1. For patients who are listed in the "SRMP – Meet criteria but are not included" report, is there clinical justification for why the patient was not placed in the SRMP?

2. Of those patients included in the SRMP report, how many have interventions and goals listed in the SRMP tab of the Master Treatment Plan to address their suicide risk?

## On-Site Paperwork – Custody MHCB/Alternative Housing/Acute/ICF Discharge Follow-Ups [ML, ML EOP, ML CCCMS]

a) General Instructions:
   - Do not change the default "audit start date" as it needs to reflect the audit was completed on-site during the current quarter.
   - Ask for all Discharge Custody Check Sheets (CDCR MH-7497) completed during the review period. Review 15 randomly selected CDCR MH-7497s (or audit all if the total number of discharges were less than 15). The auditor is to select these NOT unit staff. This audit only looks at CDCR MH-7497s in ML, ML EOP, and ML CCCMS.
   - The CDCR-MH-7497s are usually kept with the Litigation Coordinators or Associate Warden of Health Care.
   - Restricted housing units utilizing Guard One are no longer required to complete MHCB/Acute/ICF discharge custody checks.
   - Verify if custody staff completed checks every 30 minutes for the first 24 hours following discharge from a MHCB/Acute/ICF for each patient (total responses will be 15, or the total number of discharges if there were less than 15).
   - Respond to questions one time per each individual check sheet audited.
   - N/A = if the checks were terminated before this day (e.g., terminated on day 2, day 3)
   - First check starts at "1", "arrival to unit" on the observation legend on the Discharge Custody Check Sheet, and 30 minutes thereafter.
   - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
     - Start Date
     - Sub Area
     - CDCR number

b) Standardized Questions:
   1. On day one, is the name of the clinician/PT who completed the form, the date and time of evaluation, and status (continue, discontinue, refer to MHCB) all documented on the form?
   2. On day two, is the name of the clinician who completed the form, the date and time of evaluation, and status (continue, discontinue, refer to MHCB) all documented on the form?
   3. On day three, is the name of the clinician who completed the form, the date and time of the evaluation and status (discontinue or refer to MHCB) all documented on the form?
   4. Were the checks continued for a minimum of 24 hours after the patient entered the housing unit?

  o Use N/A if the patient left the housing unit (e.g., referred to MHCB, transferred to segregated housing, parole, etc.) before 24 hours.

5. At day three, were the checks either discontinued prior to 72 hours or was the patient referred to the MHCB?
6. Does the custody staff's documented arrival time on page 2, section IV, match the date and time of arrival in section III and is the code "1-arrival to unit" entered?
7. Were all the checks completed timely with no more than 30 minutes occurring between each check?
8. Did each check have all details noted?
9. Was there documentation of a custodial supervisor reviewing the form on each shift for the entirety of the time the custody discharge checks were conducted?
10. Did review of Page 1 of the form indicate any irregularities by clinical staff (e.g., authorization for discontinuation of checks for in time/date certain in the future, pre-printed notations for the following day without the patient being seen, etc.)?
11. Did review of Page 2 of the form indicate any irregularities by custody staff (e.g., pre-printed time intervals, checks not initialed, etc.)?
12. Was the final day of the discharge checks form completed by a mental health clinician following face-to-face interaction with the patient?

## Institution SPRFIT Committee Observation – Hayes Item 19a

a) General Instructions:
- The auditor should attempt to schedule the site visit on a day when the local SPRFIT Committee is scheduled to meet to facilitate observation of the committee's meeting.
  - o If the site visit is not completed on a day the local SPRFIT Committee is scheduled to meet, the auditor can attend the committee virtually.

b) CQIT Audit Fields (see CQIT Audit Fields section for field definitions)
- Start Date: the date of the observed SPRFIT Committee meeting

c) SPRFIT Committee Observation:
1. Are all mandatory members, or authorized designees present?
2. Does the committee engage in a qualitative discussion of system surveillance of the institution's suicide prevention practices, including, but not limited to:
   - o Suicide prevention training;
   - o Self-harm data;
   - o Quality of SRASHEs;
   - o Five-day clinical follow-ups, and safety planning;
   - o Discharge custody checks;
   - o Alternative housing;
   - o Review of serious suicide attempts (i.e., Self-Harm Power Form with injury severity rating of "3"); and
   - o Corrective action plans for identified deficiencies found by the SPRFIT?

3. Does the committee discuss identified needs for improvement?
4. Is there multidisciplinary participation during the committee?
5. Does the committee discuss SRMP patients?

d) For <u>Reception Centers Only</u>:

6. Does the committee report on the placement of suicide prevention posters in required facilities' areas on a monthly basis?
   - o Answer N/A if the institution audited is not a RC institution.
7. Does the committee report on the completed audit of 100 diagnostic mental health screenings on a quarterly basis, to assess whether the clinician reviewed the patient's intake screening, county records, and SOMS, whether the clinician obtained an ROI from the patient, and whether the clinician completed a SRASHE if the patient presented a possible risk of suicide?
   - o Answer N/A if the institution audited is not a RC institution.

## Institution SPRFIT Committee Minutes – Hayes Item 19b

a) General Instructions:

- Sample
  - o The auditor will access the On Demand Self-Harm report to determine how many self-harm incidents occurred during the review period (i.e., last three or six months).
  - o The auditor will ask the institution for the most recent SPRFIT minutes.
    - For institutions assigned quarterly on-site visits, ask for and audit all three minutes from last quarter.
    - For institutions assigned less frequent on-site visits, ask for and audit the six most recent minutes.
    - This set of minutes may fall outside of the sample size of three or six months of audited minutes. If so, do not include these minutes in the numerator or denominator; they are only used to establish expected timeframes for conducting aggregate root cause analyses (RCAs) or clinical summaries.
    - If the On Demand Self-Harm report shows five or more self-harm incidents during the review period, the auditor will make sure the institution selected the five most serious incidents, defined by degree of injury from 0-no apparent injury to 4-death, developed a semi-annual aggregate RCA or clinical summaries based on these five incidents, and presented the aggregate RCA or clinical summaries at a SPRFIT meeting within the review period.
      - i. For institutions assigned quarterly on-site visits, if no aggregate RCA or clinical summaries are located in the three most recent minutes, make sure one was done within the last six minutes and audited last visit.
      - ii. If the On Demand Self-Harm report shows fewer than five self-harm incidents, the auditor will make sure the

aggregate RCA or clinical summaries included all incidents from that time self period (e.g., if there were three self-harm incidents on the On Demand report, all three must have been presented at a SPRFIT meeting).

  a.  Submit one audit per set of minutes reviewed.

iii.  If no minutes were found for the month, submit an audit with all "no" and note in the audit comment that minutes were not found.

iv.  CQIT Audit Fields (see CQIT Audit Fields section for field definitions)

  a.  Start Date: the date of the SPRFIT Committee Minutes

- o  The institutional SPRFIT Coordinator is expected to attend the local Inmate Family Council meetings at least once every six months.
  - ▪  Documentation of attendance and discussion should be included in the SPRFIT Committee minutes.
- o  The institutional SPRFIT Coordinator is expected to attend the local Inmate Advisory Council meetings once every six months.
  - ▪  Documentation of attendance and discussion should be included in the SPRFIT Committee minutes.

b)  Review of SPRFIT Committee Minutes

1.  Do the minutes reflect all mandatory members, or authorized designees were present?

2.  Do the minutes reflect the committee's engagement in qualitative discussion of system surveillance of the institution's suicide prevention practices, including, but not limited to:
  - o  Suicide prevention training
  - o  Self-harm data;
  - o  Quality of SRASHEs;
  - o  Five-day clinical follow-ups, and safety planning;
  - o  Discharge custody checks;
  - o  Alternative housing;
  - o  Review of serious suicide attempts (i.e., Self-harm Power Form with injury severity rating of "3"); and
  - o  Corrective action plans for identified deficiencies found by the SPRFIT.

3.  Do the minutes demonstrate that the committee conducted either a semi-annual aggregate RCA or, in the alternative, clinical summaries of the most serious self-harm incidents (i.e., defined by degree of injury from 0-no apparent injury to 4-death)?

4.  Review the minutes to determine when the last time the SPRFIT committee conducted an aggregate RCA or clinical summaries. Place that date in the comment box.
  - o  Mark Yes if there is documentation in the sampled minutes that the SPRFIT Committee conducted an aggregate RCA or clinical summaries of

the five most serious self-harm incidents, or all of the self-harm incidents if fewer than five.

- o Mark N/A if the minutes do not have documentation of the RCA AND the minutes are within six months of the last time the SPRFIT committee conducted an aggregate RCA or clinical summaries of the five most serious self-harm incidents.
- o Mark No if the minutes do not have documentation AND the minutes are more than six months after the last time the SPRFIT committee conducted an aggregate RCA or clinical summaries of the five most serious self-harm incidents.

5. Do the minutes reflect the committee's discussion of specific problems with the institution's suicide prevention program that have been identified for improvement?

6. Do the minutes reflect that SRMP patients are tracked and reviewed?

7. Is there documentation in the SPRFIT Committee minutes that the Coordinator attended the Inmate Family Council meeting?
   - o Mark Yes if there is documentation of a time the Coordinator attended the Inmate Family Council meeting.
   - o If there is no documentation of a time the Coordinator attended the Inmate Family Council meeting, request the most recent six months of minutes.
   - o Review the most recent six months of minutes to determine the last time the Coordinator attended the Inmate Council meeting.
   - o Mark Yes if the minutes do have documentation AND the minutes are within six months of the last time the Coordinator attended the Inmate Family Council meeting.
   - o In the comment box, add the date of the minutes identified during the six-month audit review period that have documentation that the Coordinator attended the Inmate Family Council meeting.
   - o Mark N/A if the minutes do not have documentation AND the minutes are within six months of the last time the Coordinator attended the Inmate Family Council meeting.
   - o Mark No if the minutes do not have documentation AND the minutes are more than six months after the last time the Coordinator attended the Inmate Family Council meeting.

8. Does the documentation in the SPRFIT Committee minutes reflect the discussion that occurred during the Inmate Family Council meeting?
   - o Mark N/A if the above question is N/A.

9. Is there documentation in the SPRFIT Committee minutes that the Coordinator attended the Inmate Advisory Council meeting?
   - o Mark Yes if there is documentation of a time the Coordinator attended the Inmate Advisory Council meeting.

- o If there is no documentation of a time the Coordinator attended the Inmate Advisory Council meeting, request the most recent six months of minutes.
- o Review the most recent six months of minutes to determine the last time the Coordinator attended the Inmate Advisory Council meeting.
- o Mark Yes, if the minutes do have documentation AND the minutes are within six months of the last time the Coordinator attended the Inmate Advisory Council meeting.
- o In the comment box, add the date of the minutes identified during the six-month audit review period that have documentation that the Coordinator attended the Inmate Advisory Council meeting.
- o Mark N/A if the minutes do not have documentation AND the minutes are within six months of the last time the Coordinator attended the Inmate Advisory Council meeting.
- o Mark No if the minutes do not have documentation AND the minutes are more than six months after the last time the Coordinator attended the Inmate Advisory Council meeting.

10. Does the documentation in the SPRFIT Committee minutes reflect the discussion that occurred during the Inmate Advisory Council meeting?
- o Mark N/A if the above question is N/A.

c) For RC institutions only:

11. Do the minutes reflect that the SPRFIT Coordinator:
- o Reported out on the placement of suicide prevention posters in required facility areas on a monthly basis?
- o Answer N/A if the institution audited is not a RC institution.

12. Do the minutes reflect that the SPRFIT Coordinator:
- o Audited 100 diagnostic mental health screenings on a quarterly basis, to assess whether the clinician reviewed the patient's intake screening, county records, and SOMS, whether the clinician obtained an ROI from the patient, and whether the clinician completed a SRASHE if the patient presented a possible risk of suicide?
- o Answer N/A if the institution audited is not a RC institution.

## Institution LOP – Hayes Item 19c

a) General Instructions:
- The auditor shall request a copy of the institution's LOP related to the SPRFIT Program to ensure it is consistent with current statewide policy.
- The auditor shall request a copy of the institution's LOP related to Inmate-Patients Receiving Bad News to ensure it is consistent with current statewide policy.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions)
  - o Start Date: the date of the SPRFIT Committee Minutes

b) Review of LOP
   1. Is the institution's LOP related to the SPRFIT Program consistent with current statewide policy?
   2. Is the institution's LOP related to Inmate-Patients Receiving Bad News consistent with current statewide policy?

## Urgent and Emergent Referrals for Danger to Self – Hayes Item 12

a) General Instructions:
   - Timely completion of Urgent and Emergent Referrals is included in the On Demand Performance Report and should be utilized for determining overall compliance with this metric.
     - Review all referrals from the previous three full months prior to the site visit.
   - Any referral that includes references to the patient being a danger to him/herself or expressing suicidality should be classified as an emergent referral. If it is classified as urgent or routine, justification must be provided.
   - Use the Suicide Risk Evaluation indicator on the On Demand Performance Report and utilize line items for SREs completed for routine, urgent, and emergent consult orders for suicidality.
   - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
     - Start Date
b) Standardized Questions:
   1. For Urgent consults only: did any of the referrals include references to the patient being a danger to self or express suicidality?
   2. For consults indicating danger to self or suicidality: was there a SRASHE completed as a result of the consult order?

## Suicide Risk Evaluations – Hayes Item 13

a) General Instructions:
   - Utilize the Suicide Risk Evaluation indicator on the Performance Report to access information related to the compliance with completion of suicide risk evaluations for admission to, and discharge from, a mental health crisis bed or psychiatric inpatient program. Additionally, utilize it to determine the completion of a suicide risk evaluation for a rescinded MHCB referral based upon Alternative Housing placement. Report out separately on rescinded MHCB referrals resulting in SRASHEs.
   - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
     - Start Date
b) Standardized Questions:
   1. How many referrals for placement in an MHCB were completed during the review period?
   2. How many of those referrals had a Suicide Risk Evaluation completed?

3. How many clinical discharges from an MHCB or PIP were completed during the review period?
4. How many of those clinical discharges had a Suicide Risk Evaluation completed?
5. How many MHCB rescissions were completed during the review period?
6. How many of those rescissions had a Suicide Risk Evaluation completed?
   o Report percentage of completed SRASHEs that provided adequate clinical justification for MHCB rescissions.
      ▪ The auditor should randomly select 15 MHCB rescissions during the auditing period and review the clinical justification for those cases. If there are fewer than 15 MHCB rescissions during the audit period, all cases shall be reviewed.

## Emergency Response

### Cut-Down Kits – Hayes Item 15

CCR Title 15, Section 3365. Suicide Prevention and Response

a) General Instructions:
   • Go to all housing units on site, inspect the cut-down kit/tool inventory log.
      o During all subsequent visits during the calendar year in which the first site visit occurred, the auditor shall go to 5 different randomly selected housing units to inspect the cut-down kit/tool inventory log.
   • Staff must physically inspect the ambu bag to ensure there are no cracks and that it is functional.
   • Verify that the cut-down tool is contained within the cut-down kit and <u>not</u> stored separately.
      o Compliance requires all equipment, including the cut-down tool, to be in the same cut-down kit.
   • CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
      o Start Date
      o Sub Area
b) Standardized Questions:
   1. Does the housing unit have an approved cut-down kit?
      o Respond once per housing unit based upon if there is a cut-down kit present that includes all of the following:
         ▪ Durable Response Bag
         ▪ ResQHook
         ▪ ResQHook Sheath
         ▪ Ambu Bag
         ▪ CO2
   2. Is the ambu bag functional?
      o Staff must physically inspect the ambu bag
   3. Is the cut-down kit inventoried each shift on the standardized "Cut-Down Kit Inventory Sheet"?

- o Select five random dates within the past 30 days that is prior to the audit and check the log in each applicable unit/area for compliance for that day.
- o Institutions shall receive credit for inventorying cut-down kits only if it is on the standardized inventory sheet or not. It must be noted each time an improper inventory sheet is discovered, followed-up with providing the institution with the proper inventory sheet to remedy the discrepancy.

## Quality Improvement Plans (QIPs) Generated by Suicide Case Reviews

a) General Instructions:
- The auditor shall document any suicides that have occurred since the last on-site suicide prevention tour.
- The auditor shall document any current QIPs that were generated as a result of any suicides.
   - o Additionally, the auditor should indicate the status of the open QIPs and notate if there are any stalled efforts to improve the performance surrounding the identified QIP.

## Training and Mentoring Compliance

### Clinical Training Compliance

#### Mentoring – Hayes Item 18

a) General Instructions:
- Gather the percentage of staff who are current, as of the date of site review, with SRE mentoring.
- Discuss the percentage in your report. Percentage is available here: http://teamsite/team/Programs/MHI/bh/c.o.training/SitePages/Home.aspx
- Find the average of the compliance for the initial SRE Mentoring Training and the Biennial training by adding the two compliance rates together and dividing by two. This is the overall compliance for SRE Mentoring.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
   - o Start Date
b) Standardized Questions:
   1. Enter the number of staff who were required to complete SRE Mentoring.
   2. Enter the number of staff who completed SRE Mentoring.
   3. Enter the percentage of staff who completed SRE Mentoring from the team site.

#### Annual IST Suicide Prevention Training – Observation

a) General Instructions:
- Observe training in session. If scheduling does not permit you to observe a training on-site, the auditor should attempt to observe a training by

videoconferencing (if a virtual training option is available at the institution for the review period).
- Watch trainer and trainee interaction to respond to the following questions.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date

b) Standardized Questions:
  1. Was the Suicide Prevention training provided by a mental health clinician?
  2. Had the mental health clinician received Training-for-Trainers (T4T) prior to giving the Suicide Prevention training?
  3. Were all the main objectives of the training covered? (Answer Yes only if all components below are covered).
     - Warning signs of suicide
     - Suicide risk assessment
     - Suicide methods awareness
     - Interventions for suicidal ideation, threats, gestures, and attempts, including treatment for suicidal individuals
     - Suicide reporting and reviews
     - Mental health evaluations for rules violation reports
     - The mental health referral process
  4. Was the duration of the class the full 120 minutes?
  5. Did the instructor attempt to stimulate discussion?
  6. Did the instructor use examples that illustrated his/her main points?
  7. Was the correct version of the training used?
  8. Was the training provided live, either in person or through videoconferencing?
  9. If the live training was provided virtually, are cameras on for both the classroom and instructor?

*Annual IST Suicide Prevention Training Compliance – Hayes Item 16*

a) General Instructions:
- Utilize data provided by the institution's In-Service Training (IST) office to answer the questions below.
  - Ask for the IST report for health care staff trained as of the audit date and dating back 365 days.
  - Request nursing, mental health, and medical staff to be provided in a separate calculation.
  - Compliance should be reported per discipline rather than as one.
  - New hires in the previous calendar year must be trained before starting work and will be therefore current with the annual training requirement.
- This is an annual audit and will be conducted the first time the auditor is on-site at the institution in the subsequent year.
  - For example, for 2022 data, the auditor will conduct this audit during the first on-site audit in 2023 at the institution.

- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
b) Standardized Questions:
  1. How many currently employed nursing staff (excluding staff currently on long-term leave) were employed during the last calendar year?
  2. Of those, how many nursing staff were trained in suicide prevention in the last calendar year?
  3. How many currently employed mental health staff (excluding staff currently on long-term leave) were employed during the last calendar year?
  4. Of those, how many mental health staff were trained in suicide prevention in the last calendar year?
  5. How many currently employed medical staff (excluding staff currently on long-term leave) were employed during the last calendar year?
  6. Of those, how many medical staff were trained in suicide prevention in the last calendar year?

*Suicide Risk Evaluation (Suicide Prevention and SRASHE Core Competency Building) Training – Hayes Item 18*

a) General Instructions:
  - Obtain current training completion status for mental health clinical staff from the Chief of Mental Health

*Safety Planning Training – Hayes Item 18*

a) General Instructions:
  - Obtain current training completion status from the "Coleman Court Mandated Trainings" SharePoint site.

*Suicide Risk Management Program Training*

a) General Instructions:
  - Obtain current training completion status from the "Coleman Court Mandated Trainings" SharePoint site.

*Columbia-Suicide Severity Rating Scale Training*

a) General Instructions:
  - Obtain current training completion status from the "Coleman Court Mandated Trainings" SharePoint site.

*Nursing CPR Training*

a) General Instructions:
  - Obtain the number of nursing staff—Registered Nurses, Licensed Vocational Nurses, Licensed Psychiatric Technicians, and Certified Nursing Assistants—employed at the institution at the time of the on-site audit. Include registry

nursing staff but exclude nursing staff on long-term leave. Obtain this number from the CNE.
- Obtain the number of nursing staff who completed a health care provider-level course in Basic Life Support (BLS) consistent with the American Heart Association (AHA) guidelines for Cardiopulmonary Resuscitation (CPR) and Emergency Cardiovascular Care within the previous two years (measured as in the last 730 days). Include registry nursing staff but exclude nursing staff on long-term leave. Obtain training completion statuses from the CNE
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date

b) Standardized Questions:
1.  How many nursing staff were employed at the time of the on-site audit?
2. Of those nursing staff, how many completed CPR training within the last 730 days?

## Custody Staff Training (Suicide Prevention) [On-Site Paperwork]

a) General Instructions:
- Use staffing information provided by the institution prior to the visit (on the CQI Site Visit Preparation Checklist) to determine overall custody staffing numbers.
- Use the BIS program to determine who has received training. The BIS system is a statewide system. Staff who are transferred from one institution to another will have their training history transferred as well.
- New employees are already included in the BIS system.
- For suicide prevention training, ask for the percentage of custody staff trained in the last calendar year.
- You can also review the training completion status from the time of the audit for the current calendar year only; this will not be entered into the tool, but can be used to inform local leadership regarding training completion progress for the current year.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - End Date

b) Standardized Questions:
1. How many custody staff are currently employed (less long-term leave)?
2. How many custody staff (less long-term leave) were employed at the time of the on-site audit?
3. Of those custody staff, how many completed CPR training within the last 730 days?
4. Of those, how many custody staff were trained in suicide prevention in the last calendar year?

## Receiving and Release (R&R) Screening – Hayes Item 1

a) General Instructions:
- Observe R&R process to see if they are conducted confidentially.
- Check to see if all of the questions are being asked.
- Respond for each R&R Screen observed (e.g., if five are observed, complete the audit five times).
- If multiple nursing staff assigned to the R&R during the on-site assessment, audit each nurse
- Sample size: Five incarcerated persons per nurse assigned to perform screens during the observation of the R&R screening process. If there are less than five incarcerated persons per nurse, observe all.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    o Start Date
    o Sub Area

b) Standardized Questions:
1. Was the screen conducted in a confidential setting?
2. Did the nurse(s) complete the intake medical screening by asking all 16 required questions, including both questions (#3, #16) pertaining to bad news?
3. Were all questions asked?
4. Did the nurse(s) enter all responses immediately into EHRS?
5. Were English and Spanish suicide prevention posters displayed inside the nurse's office in close proximity to the incarcerated person?

## Reception Center Processing

### Diagnostics Process

a) General Instructions:
- Observe RC screenings
- Respond for each RC Screen observed (e.g., if five are observed, complete the audit five times).
- Confidentiality means not within sight and sound of other incarcerated persons and patients and sound of staff members.
- If multiple diagnostic clinicians are assigned to the RC Screening process during the on-site assessment, audit each diagnostic clinician.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    o Start Date
    o Sub Area

b) Standardized Questions
1. Was the screen conducted in a confidential setting?
2. Did RC clinician review the initial health screening conducted by nursing staff, SOMS, county jail records and/or any other records? (Note: can only be answered by auditor reviewing the medical chart of each observed screening).

3.  If the patient reported a history of mental health treatment, did the clinician attempt to have the patient sign a CDCR 7385 Release of Information?
4.  Did RC clinician enter all responses immediately into EHRS?
5.  If the incarcerated person expressed/displayed suicidal ideation/behavior, was a SRASHE completed?

## Crisis Intervention Team (CIT)

a) General Instructions:

- Identify if the institution has an operational CIT. As of July 8, 2021 the following institutions have a formal CIT:
    - Kern Valley State Prison
    - California Medical Facility
    - California State Prison-Corcoran (COR)
    - North Kern State Prison
    - California State Prison-Los Angeles County (LAC)
    - Central California Women's Facility
    - California Healthcare Facility
    - California Men's Colony
    - Salinas Valley State Prison
    - California Institution for Men
    - Wasco State Prison
    - Mule Creek State Prison
    - California Institution for Women
    - R.J. Donovan State Prison
    - Valley State Prison
    - California State Prison-Sacramento (SAC)
    - San Quentin State Prison
    - High Desert State Prison
    - California Rehabilitation Center
    - California Correctional Institution
- All attempts shall be made to observe a CIT event occur during the on-site visit. However, at no time should a CIT be delayed to accommodate the auditor's schedule.
- Verify that each facility with a CIT has an LOP for the CIT that is consistent with the most recent policy and procedure.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - Start Date

b) Standardized Questions

1.  During the observed CIT event, were all members of the CIT present, as required by policy?
2.  If the crisis response involved any type of DTS (suicidal ideation, self-injurious behavior, suicide attempt, etc.), was a SRASHE completed?

- o   If unlicensed clinician responded, verify appropriate contact with licensed supervisor.
3. Was the incarcerated person under continuous observation upon arrival of CIT?
4. Did the CIT meet with the incarcerated person in a confidential setting?
5. Was all documentation completed, as required by policy?

## Corrective Action Plans (CAPs) Generated by a Site Review Conducted by Lindsay Hayes

a)  General Instructions:
- The auditor should list all open CAPs that have been issued by external audits, including Lindsay Hayes.
- Progress toward resolving these CAPs should also be listed.
- Any CAPs that are not completed should include a discussion of the progress being made to resolve the outstanding concerns and anticipated completion dates.
- Identify the responsible party, e.g., local SPRFIT.

## Assignment of Corrective Action Plans (CAPs) and Recommendations

a)  General Instructions:
- The auditor should identify specific areas where improvement is warranted. CAPs should be required to resolve the outstanding concerns.
- Recommendations for areas to improve can also be made during the audit. These would be areas that don't rise to the level of needing a formal CAP, but that would help improve the health of the institution's suicide prevention program.
- Institutional SPRFIT Committees may have identified concerns and deficiencies listed in their SPRFIT Committee Project Pipeline. In these cases, the auditor may identify the concern but notate that it is being addressed through the proper local quality management mechanisms and not assign it as a formal CAP.

## Attachment A – Site Visit Entrance Talking Points

**A visit entrance meeting should be offered, but it is not a required part of the site visit.**

- Introduce every member of the team
- State the purpose of the visit: to provide information to you (the institution leadership and staff) for use as part of their own self-monitoring and improvement system.
- Provide an overview of the schedule.
- Indicate when they can expect a written report.
- Inquire if there are any mission changes over the past quarter that have impacted the program that the team may not be aware of?
- Inquire if there are any other anticipated changes?
- Review performance data and ask any clarification questions.
- Ask if there is any particular area they would like for you to pay attention to on the visit.
- Ask if there are any other questions or comments.
- Request the document request binders or electronic files.

## Attachment B – Exit Interview Talking Points

Training Overview:
- Compliance with the clinical training requirements
  - Annual IST Suicide Prevention Training
  - Suicide Risk Evaluation and SRASHE Core Competency Training
  - Safety Planning Training
  - SRE Mentoring Training
- Compliance with custody training requirements
  - Annual IST Suicide Prevention Training
  - CPR Certification
- Compliance with medical training requirements
  - Annual IST suicide prevention training
  - CPR certification

Mental Health Crisis Bed and/or PIP:
- Suicide resistance of the cells
- Were patients given full issue unless they were on suicide watch or precaution (which was clearly noted in the chart)?
- For those on 1:1 watch, was the person actively watching (not reading, etc.)?
- Were nursing Suicide Precaution checks completed timely and staggered?
- Did the IDTTs discuss safety planning?
- Safety plan completion and quality
- For discharges, were the supervisory reviews of the safety plans conducted appropriately and timely?
- Observation and issue orders
- Admission and Discharge SRASHEs
- Privilege use

Alternative Housing:
- From the Performance Report: percent of MHCB referrals transferred within 24 hours "timely transfers to MHCB."
- How many individuals were in alternative housing?
- Were cells in use consistent with location order of the policy?
- Were the cells clean?
- Was everyone on 1:1 watch?
- Did every alternative housing cell have a bed and toilet?

Segregation:
- Discuss by Yard/Program
  - Intake cell usage
  - Daily huddle completion
  - Access to entertainment appliances

- o Guard One Compliance
- o Quality of PT rounds

Custody Discharge Checks (CDCR MH-7497):
- Compliance with correctly completing forms
  - o Indicate where deficiencies were notated
- Did the institution establish local CAPs to address deficiencies noted in their internal auditing process?

R&R:
- Were all questions asked for the nurse intake screening?
- Was the screening conducted in a confidential setting? If not, why?

CIT Observation, if applicable:
- Discuss team composition
- Quality of intervention
- SRASHE completed when indicated

Corrective Action Plans (CAPs):
- Discuss progress on current CAPs
- Any new CAPs and recommendations that are likely to be developed as a result of the site visit

# Chapter Three – Division of Adult Institutions Audits

## Table of Contents

Desert Instituions (CQI Custody) Transfer ........................................................................................................... 114

## Desert Institution (CQI Custody) [CDCR]

a) General Instructions:

- By the first working day of the month, the MHCT's CCII shall enter the following:
    - o For the "Inmates at Desert Institutions Historical Upon Arrival" report, the CCII will answer the audit questions:

        5. What is the total number of required 72-hour patient transfers on the "MHSDS Inmates at Desert Institutions Historical MH Upon Arrival" report? Enter the sum of the two numbers calculated in step 13 to respond to this question, i.e., (the number of required 72-hour patient transfers that occurred within 72 hours) plus (the number of required 72-hour patient transfers that were performed late, or overdue for transfer at the end of the month).

        6. Of those, how many patient transfers were sent to a MHSDS designated institution within 72 hours? Use the first number identified above to respond to this question, i.e., (the number of required 72-hour patient transfers that occurred within 72-hours).

    - o For the "MHSDS Inmates at Desert Institutions Historical MH Change" report, the MHCT's CCII will answer the following audit questions:

        3. What is the total number of patient transfers from the "MHSDS Inmates at Desert Institution Historical MH change" report whose LOC changed to CCCMS or EOP while housed at the desert institutions? This is the number identified in step 9(a).

        4. Of those patient transfers, how many were transferred to a MHSDS designated institution within 14 calendar days? This is the number identified above in step 9(d).

- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
    - o Start Date: The MHCT CCII will enter the date all data was reviewed in the "Start Date" field on the CQIT application, not the date of the audit submission.

b) Standardized Questions:

1. What is the reporting month?
    - o Add the first day of the reporting period.
2. What is the report type?
    - o Drop down:
        - MHSDS Inmates at Desert Institutions Historical MH Change Report
        - MHSDS Inmates at Desert Institutions Historical MH Upon Arrival
3. What is the total number of patient transfers from the "MHSDS Inmates at Desert Institutions Historical MH Change" report whose LOC changed to CCCMS to EOP while housed at the desert institutions?
    - o Use the number identified above in step (9)(a) to respond to this question.
4. Of those patients transfers, how many were transferred to a MHSDS designated institutions within 14 calendar days?

- o Use the number identified above in step (9)(d)(i) to respond to this question.
5. What is the total number of required 72-hours patient transfers on the "MHSDS Inmates at Desert Institutions Historical MH Upon Arrival" report?
6. Of those, how many inadvertent patient transfers were sent to a MHSDS designated institution within 72 hours?

# Chapter Four – Custody and Mental Health Partnership Plan (CMHPP)Audits

## Table of Contents

CMHPP - Annual Training ............................................................................................................................................................. 117

## CMHPP - Annual Training [On-Site Paperwork]

a) General Instructions:
- 
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - End Date

b) Standardized Questions:

1. How many currently employed Custody staff (excluding staff currently on long term leave) were employed during the previous calendar year?

2. Of those, how many custody staff were trained in CMHPP annual training in the previous calendar year?

Exhibit B

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

*\*\*TRAINING ANNOUNCEMENT\*\**

Safety Planning Training (T4T)

*\*Please note: This is a live training only. There are no webinar options being offered\**

| Session # | Title | Date(s) | Time(s) | Location |
|---|---|---|---|---|
| Session 1 | Safety Planning Training (T4T) | Wednesday, February 15, 2023 – Thursday, February 16, 2023 | 9:00 am – 5:00 pm | Region 1-Elk Grove |
| Session 2 | Safety Planning Training (T4T) | Tuesday, February 21, 2023 – Wednesday, February 22, 2023 | 9:00 am – 5:00 pm | Region 1-Elk Grove |
| Session 3 | Safety Planning Training (T4T) | Wednesday, March 1, 2023 – Thursday, March 2, 2023 | 9:00 am – 5:00 pm | Region 1-Elk Grove |
| Session 4 | Safety Planning Training (T4T) | Tuesday, March 7, 2023 – Wednesday, March 8, 2023 | 9:00 am – 5:00 pm | Region 1-Elk Grove |
| Session 5 | Safety Planning Training (T4T) | Wednesday, March 15, 2023 – Thursday, March 16, 2023 | 9:00 am – 5:00 pm | Region 1-Elk Grove |

Course Description

The California Department of Corrections and Rehabilitation aims to identify and treat patients with an identified risk for suicide or self-harm and prevent patient deaths due to suicide. Patients who are identified with an elevated risk of suicide or self-harm require an individualized safety plan that addresses signs, symptoms, and circumstances in which the patient's risk for suicide is likely to increase, how the reoccurrence of suicidal thoughts can be reduced or eliminated, and the specific actions the patient and staff will take if suicidal ideation and/or thoughts/impulses to engage in self-harm reoccur. This is a Training for Trainers course. This course teaches attendees how to conduct the training on the revamped approach to safety planning that also aligns with the release of the upcoming Safety Plan Policy and Procedure.  The upcoming safety plan training will replace the current approach to safety plans.

Participant Requirements:  The following attendees are required to attend the Safety Planning T4T course (the T4T is a 2-day training):

1. SPR-FIT Coordinator and/or Training Coordinator
2. MHCB and PIP Program Supervisors (who are tasked with auditing the discharge safety plans)- for institutions with a MHCB and/or PIP
3. For back-up purposes—one licensed psychologist, licensed social worker or psychiatrist selected by the Chief of Mental Health.

For the Institutional Training (this will be an 8-hour training):

Upon completion of the T4T, trainers will have 90 days from training completion date to schedule and conduct training to the following institutional staff:

Required attendees include:

- All psychiatry, psychology, and social work classifications for all Mental Health Programs

*Training Coordinators: Please forward this training announcement as appropriate.*

Continuing Education
There are 7.0 APA CEs being offered for this training.

Registration Information for the T4T Training
To register, please submit your information using the following registration link by **COB, Friday, January 27, 2023**. There will be a limit of 45 participants per session. Reservations will be taken in the order they are received and consideration will be given based on institutional needs. The calendar invite with training details will be provided to attendees after the cutoff date.

Important Contacts
Instructors............................................................................................................. Rita Dhesi, Psy.D.
Support Staff……………………………………………………………………………………kitdy.rakthay@cdcr.ca.gov
Training Related Questions………………………………………………………………MHTU General Mailbox

*Training Coordinators: Please forward this training announcement as appropriate.*

Exhibit C

State of California                                                  Department of Corrections and Rehabilitation

# Memorandum

Date:     10/19/2021

To:       SEE DISTRIBUTION LIST

Subject:  **REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY CHECKS FORM AND INTRODUCTION OF AUDIT REQUIREMENT**

This memorandum announces the revision to the California Department of Corrections and Rehabilitation (CDCR) Form MH-7497, *Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet*. Effective immediately, staff shall utilize the newly titled CDCR Form MH-7497 (06/21) *Inpatient and Alternative Housing Discharge Custody Check Sheet* (attached).

To improve the continuity of clinical care for inmate-patients (IP) discharged from an inpatient or alternative housing setting, revisions to the form have been implemented. The following are staff responsibilities regarding IPs who have been discharged from an inpatient or alternative housing to a general population housing or restricted housing unit:

### Clinical and Custody Responsibilities - Discharge to General Population Housing Units
Upon the discharge of an IP admitted to inpatient or alternative housing for suicidality, the discharging clinician shall initiate the CDCR Form MH-7497, *Inpatient and Alternative Housing Discharge Custody Check Sheet* before physical discharge. The discharging clinician shall ensure the form is provided to transporting/escorting custody staff, who shall deliver the form to the receiving institution's Central Control staff. Central Control staff at the receiving institution shall document the IP's new housing information on the form and ensure the form is delivered to the appropriate housing unit.

Once the IP has physically arrived at the receiving housing unit, custody staff shall conduct a personal observation within the housing unit on the IP every 30 minutes during the initial 24 hours of placement. Housing unit staff shall document all custody checks using the observations legend listed on the CDCR Form MH-7497. For example, when an IP is released out to the yard, staff shall utilize the Observation Code number eight to reflect the IP being out to the yard until their return to the housing unit. Housing unit staff are not required to have the IP return to the housing unit to conduct the discharge custody checks. When an IP returns to the housing unit from program activities, housing unit staff shall note the arrival time on the CDCR MH-7497 and continue the discharge custody checks as directed above.

### Weekend and Holiday Procedures
When discharge custody checks occur on a weekend or holiday, a designated mental health clinician shall conduct the evaluation, as available. If a mental health clinician is unavailable, the contact may be conducted by a psychiatric technician. If the custody discharge checks end on a weekend or holiday, the psychiatric technician shall see the IP and contact the on-call mental health clinician for a decision regarding the continuation of checks. The the on-call clinician shall conduct a face-to-face evaluation and determine if the discharge custody checks may be discontinued and are responsible for documenting the basis of the decision on a progress note and notifying custody staff of the determination.

Associate Directors, Division of Adult Institution
Wardens
Chief Executive Officers
Chiefs of Mental Health
Chief Nurse Executives
Executive Directors, Psychiatric Inpatient Programs
Page 2

**Audit Requirements**

To ensure a durable and sustainable oversight mechanism for this process, the Statewide Mental Health Program, in collaboration with the Division of Adult Institutions, has developed an audit tool to measure compliance with each component of the discharge check process. Each institution's Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator shall conduct these audits as documented in the attached audit guidebook with the support and coordination of the institutional Healthcare Access management team. Results of these audits, and any relevant corrective action plans, shall be presented in the monthly SPRFIT Committee and forwarded to the Statewide SPRFIT Coordinators by the eighth (8th) calendar day of each month.

Wardens and CEOs shall ensure all impacted Post Orders and local operating procedures (LOP) are updated within 60 days to reflect these changes. The revision may be a supplement to be included in the next scheduled revision of the LOP. Additionally, each institution shall provide verification of completion by submitting a proof of practice memorandum to their respective Mission Associate Director within 60 days.

To ensure consistency, Wardens, Chief Executive Officers, and Chief Nurse Executives, or designees, shall provide On-the-Job (OJT) training to all custody managers, lieutenants, sergeants, correctional officers, psychiatric technicians, and clinical mental health staff. The BET code 11062534 shall be utilized to document the OJT. Each institution shall provide proof of practice to their respective Mission Associate Director and Regional Health Care Executive within 60 days of the date of this memorandum.

If you have any questions, please contact Lourdes White, Captain, Mental Health Compliance Team, at DAI-MHCompliance@cdcr.ca.gov, or you may contact the mental health policy unit by email: MHPolicyUnit@cdcr.ca.gov.


CHARLES W. CALLAHAN
Deputy Director
Division of Adult Institutions

AMAR MEHTA
Deputy Director
Statewide Mental Health Program


BARBARA BARNEY-KNOX
Deputy Director
Nursing Services


Attachments

Associate Directors, Division of Adult Institution
Wardens
Chief Executive Officers
Chiefs of Mental Health
Chief Nurse Executives
Executive Directors, Psychiatric Inpatient Programs
Page 3


DISTRIBUTION LIST:

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Chief/Senior Psychiatrists
Chief Nurse Executives
Executive Directors, Psychiatric Inpatient Programs

cc: Connie Gipson
    Kimberly Seibel
    Sircoya Williams
    Laura Eldridge
    Steven Cartwright
    Travis Williams
    Laura Ceballos
    Michael Golding
    Toni Martelllo
    Sophia Le
    Shama Chaiken
    Amber Carda
    Daisy Minter
    Marcie Flores
    Lourdes White
    Laurie Ball
    Jennifer Johnson
    Regional Health Care Executives
    Regional Mental Health Administrators
    Regional SPRFIT Coordinators

**Inpatient and Alternative Housing Discharge Custody Check Sheet**

CDCR MH-7497 (Rev. 06/21)

**Form:** Page 1 of 2
**Instructions:** Page 3 and 4

| I. Discharging Information: To be completed by clinician |
|---|

Inmate-Patient Name:                    CDCR #:                    Date of Discharge from Inpatient Unit:

Discharging Level of Care:                    Inpatient Unit Discharging Institution:

Inpatient Unit Discharging Clinician:

| II. Clinical Evaluation |
|---|

**Day 1: To be completed NO EARLIER THAN 24 HOURS after arrival to the housing unit:**

Mental Health Clinician:                    Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician:                    Date/Time of Evaluation:

Consulting MH Clinician:                    Date/Time of Consult:

☐ Discontinue Custody Checks        Date: _____        Time: _____

☐ Continue Custody Checks          Date: _____        Time: _____

☐ Refer to MHCB          Date and Time of Referral:

**Day 2**

Mental Health Clinician:                    Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician:                    Date/Time of Evaluation:

Consulting MH Clinician:                    Date/Time of Consult:

☐ Discontinue Custody Checks        Date: _____        Time: _____

☐ Continue Custody Checks          Date: _____        Time: _____

☐ Refer to MHCB          Date and Time of Referral:

**Day 3**

Mental Health Clinician:                    Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician:                    Date/Time of Evaluation:

Consulting MH Clinician:                    Date/Time of Consult:

☐ Discontinue Custody Checks        Date: _____        Time: _____

☐ Refer to MHCB          Date and Time of Referral:

**DISTRIBUTION** - Copies: Health Records, Health Care Access Unit Captain
**SCANNING LOCATION** - DOCUMENT TYPE - MHCB Discharge Custody Check Sheet, GROUPER - Mental Health Documentation, SUB GROUPER - MHCB
*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state law.*

**Inpatient and Alternative Housing Discharge Custody Check Sheet**

CDCR MH-7497 (Rev. 06/21)

**Form:** Page 2 of 2

**Instructions:** Page 3 and 4

| III. Receiving Institution Information |
|---|

Receiving Institution:                      Assigned Housing Unit:

Date/Time of Arrival to Housing Unit:

Segregated Housing: ☐ YES   ☐ NO    * If yes: Utilize "Guard 1 Tracking System"

| IV. Custody Checks- **initiate 30 minutes welfare check upon arrival to the unit** |
|---|

Inmate-Patient Name:             CDCR #:            Assigned Housing Unit:

**Observation Legend**

1 - Arrival to Unit
2 - In Cell Sleeping/Laying Down
3 - In Cell Eating
4 - In Cell Watching TV/Reading
5 - In Cell Talking to Cell Mate
6 - In Cell Misc.

7 - Day Room Activities
8 - Out to Yard
9 - Return from Yard
10 - Showering
11 - Out to Program
12 - Return from Program

13 - Custody Supervisor Review (once per shift)
14 - Emergency (i.e., institution/housing unit emergency, etc.)
15 - In-Person Clinician Review of Custody Discharge Checks
16 - I/P Medical Emergency (i.e., medical code)
17 - I/P Referred Back to MHCB
18 - I/P Referred to MH (complete MH-5)
19 - Custody Checks Discontinued

| Date | Time | Observation | Print Name | Comments |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**DISTRIBUTION** - Copies: Health Records, Health Care Access Unit Captain
**SCANNING LOCATION** - DOCUMENT TYPE - MHCB Discharge Custody Check Sheet, GROUPER - Mental Health Documentation, SUB GROUPER - MHCB

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state law.*

STATE OF CALIFORNIA                                                                DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Inpatient and Alternative Housing**  Case 2:90-cv-00520-KJM-SCR    Document 8180-6    Filed 04/01/24    Page 153 of 161
**Discharge Custody Check Sheet**
CDCR MH-7497 (Rev. 06/21)

Form: Page 1 and 2
Instructions: Page 3 of 4

**Instructions**

**Purpose of Form:** The **CDCR MH-7497 (06/21),** Inpatient and Alternative Housing Discharge Custody Check Sheet is used for patients who were admitted to a MHCB, alternative housing or inpatient setting for suicidality and have subsequently been discharged.  It is used to document the following:

1. All custody checks are being conducted at least every 30 minutes, ensuring the patient is not engaging in any self-injurious behavior.
2. Clinical evaluations to determine if the patient requires continued 30 minute checks or if custody checks can be discontinued. If it is determined the patient cannot be safely removed from custody checks 72 hours after arriving in the housing unit, they will be referred back to MHCB.

**I.   Discharging Information**
  This section is to be completed by a mental health clinician.
  1. Enter the patient's name.
  2. Enter the patient's CDCR number.
  3. Enter the date of discharge from Inpatient Unit, alternative housing or inpatient setting.
  4. Enter the patient's discharging level of care using the drop-down box.
  5. Enter the institution from which the patient is being discharged.
  6. Enter the name of the discharging clinician.

**II.   Clinical Evaluation**
  This section is to be completed by mental health clinician or Psychiatric Technician.
  1. On each day, check the relevant box that establishes if checks shall be discontinued, continued, or if the patient shall be referred to the MHCB.
  2. Date, time, and sign in the section for each day.
  3. Document clinical information regarding the patient encounter on the CDCR MH-7230-B, Interdisciplinary Progress Note - Five Day Follow-Up form. Supplemental information may be documented on a mental health progress note.
  4. On day 3, if the clinician believes ongoing custody checks are required, the "refer to MHCB" box shall be checked and the patient referred to MHCB.
  5. Only a mental health clinician can discontinue the custody discharge checks. If Day 3 is completed by a Psychiatric Technician, a mental health clinician shall be contacted to a complete a face-to-face evaluation of the patient to discontinue the custody checks.

**III.   Receiving Institution Information**
  1. Receiving Institution Section: The discharging clinician shall enter the receiving institution to which the patient is being discharged.
  2. Once the receiving institution section is completed and the name of the receiving institution is entered, MHCB staff shall print the CDCR MH-7497, Inpatient and Alternative Housing Discharge Custody Check Sheet and provide to the transporting/escorting custody staff. The CDCR MH-7497 Inpatient and Alternative Housing Discharge Custody Check Sheet shall accompany the patient to the receiving institution and housing unit.
  3. Transporting/escorting staff shall provide the form to Central Control at the receiving institution wherein the assigned housing unit portion shall be completed by the Central Control staff.
  4. Assigned Housing Unit: Central Control staff at the receiving institution shall write the patient's housing unit and cell number.
  5. Upon the patient's arrival into the housing unit, the housing unit staff will write in the date and time.
  6. Segregated Housing: check box Yes or No. If checked yes, utilize the Guard 1 Tracking System.

**Inpatient and Alternative Housing**
**Discharge Custody Check Sheet**
CDCR MH-7497 (Rev. 06/21)

**Form:** Page 1 and 2
**Instructions:** Page 4 of 4

## IV. Custody Checks

To be completed by custody staff conducting checks. One entry per check is required.

1. Enter the patient's name.
2. Enter the patient's CDCR #.
3. Enter the patient's assigned housing unit.
4. Date: Write the date of each check conducted.
5. Time: Write the time the check was conducted and do not write times in advance.
6. Observation: Write the number(s) from the observation legend best describing the behavior or activity that was observed during the check.
7. Print Name: Once the information is written in, the staff member conducting the custody check shall print their name legibly.
8. Comments: Complete this section to provide any additional information that needs to be communicated to the mental health clinician or psychiatric technician. If based on what staff observes during the custody check, they believe the patient is a danger to self or others or is exhibiting unusual and/or bizarre behavior, custody staff shall immediately contact Mental Health Services and submit a CDCR 128-MH5 Mental Health Referral Chrono. This section shall be utilized to document the date and time the patient was referred to Mental Health Services. In the event an emergency occurs within or outside of the housing unit requiring custody staff to respond that prevents them from conducting the custody check, the date, time, and nature of the emergency shall be documented in the comment section.   In the event this occurs, custody staff shall resume the custody checks as soon as possible.

## V. Additional Information

1. When custody supervisors are conducting reviews of the form during tours of the unit, the custody supervisor shall fill in the date and time, and note the appropriate observation code. Once the information is filled in, the custody supervisor reviewing the form shall print and sign their name legibly.
2. If at any time custody staff discovers the patient has not been evaluated by Mental Health Services within established time frames, staff shall notify their custody supervisor, who will contact Mental Health Services.
3. If the patient's housing unit assignment changes, print the new housing unit information on page two of the form.
4. When all the custody check information on page two has been filled in, initiate an additional page two of the form, print the patient's current information, and continue documenting the custody checks. All additional pages printed to document the custody checks shall be kept together with page one of the form.

# Custody Inpatient Discharge Checks Audit Guide

## Methodology

### Frequency of Audits

A review of 7497s shall be completed on a weekly basis. These reviews shall be completed by the SPRFIT Coordinator, or designee, for mental health and the Associate Warden of Healthcare, or designee.

### Sample Size

Each weekly review of 7497s should contain a review of at least five 7497s.  If there are less than five 7497s completed in a given week, all completed 7497s shall be reviewed.  The total number of reviews shall be 20 for a month with four weeks and 25 for months with five weeks. The auditors shall utilize the local tracking logs of all MHCB and inpatient discharges to draw the sample for auditing each week.

### Reporting

The results of these weekly reviews shall be compiled monthly and reported to the institutional SPRFIT Committee and forwarded to the statewide suicide prevention and response unit at headquarters.

### Corrective Action Plans

If the monthly review of 7497s results in less than 90% overall compliance, as indicated in the executive summary tab of the excel spreadsheet's "Overall Pass/Fail" column, a corrective action plan shall be established.  The resulting Corrective Action Plan shall contain the specific deficiencies noted in the review as well as a measurable plan for correction with a specified date in which the corrective action will be completed with an anticipated date for reaching compliance.

## Using the Excel Spreadsheet

The audits of the 7497s reviewed on a weekly basis shall be documented on the official "Custody Inpatient Discharge Checks Audit" spreadsheet.  The first tab of this spreadsheet is where the data will be entered for each review.  The responses on this tab will automatically populate on the second, "Executive Summary" tab.  The results of this executive summary shall be provided to the institutional SPRFIT Committee and forwarded to the statewide suicide prevention and response unit.

### Name

Document the name of the patient who received the custody discharge checks.

### CDCR Number

Document the CDCR number of the patient who received the custody discharge checks.

### Date and Time Patient Arrived to the Housing Unit

The date and time should be documented based upon what was listed on the 7497 form. This time shall be used to calculate whether the custody checks were discontinued before or after the first 24 hours in which the patient was in the housing unit.

### Housing Unit

Document the housing unit in which the patient was housed when the custody discharge checks occurred. For patients who are subsequently moved to restricted housing units, where Guard One checks are required, a comment shall be made in the Comments column. The time in which the patient is moved to restricted housing should also be documented in the comments section.

### Section I – Discharging Information

Section 1 shall be reviewed and if all fields are completed on the form, this can be listed as "Yes".  If there are any missing fields in this section, it must be listed as "No".  For this section, the name of the inmate, CDCR number, date of discharge from the MHCB, the discharging level of care, MHCB discharging institution and MHCB discharging clinician shall all be accurately documented by the mental health clinician for this section to pass.

### Section II: Clinical Evaluation

#### Day 1

A review of the entirety of Day 1 shall be completed. Any omissions of any fields will render a "No" on this item.  Full, complete, and accurate documentation of the mental health clinician, or other staff, completing the section must be identified as well as the date and time of the evaluation. Documentation must also support whether the clinician determined the custody checks should be continued or discontinued for a full "Yes" to be given. Specifically, the auditors shall consider the following when determining pass or fail for this item: Is the name of the clinician who completed the documentation, the date and time of evaluation, and status (continue, discontinue, or refer to MHCB) all documented on Day 1?

#### Day 2

A review of the entirety of Day 2 shall be completed. Any omissions of any fields will render a "No" on this item.  Full, complete, and accurate documentation of the mental health clinician, or other staff, completing the section must be identified as well as the date and time of the evaluation. Documentation must also support whether the clinician determined the custody checks should be continued or discontinued for a full "Yes" to be given. Specifically, the auditors shall consider the following when determining pass or fail for this item: Is the name of the clinician who completed the documentation, the date and time of evaluation, and status (continue, discontinue, or refer to MHCB) all documented on Day 2?

#### Day 3

A review of the entirety of Day 3 shall be completed. Any omissions of any fields will render a "No" on this item.  Full, complete, and accurate documentation of the mental health clinician, or other staff, completing the section must be identified as well as the date and time of the evaluation. Documentation must also support whether the clinician determined the custody checks should be continued or discontinued for a full "Yes" to be given. Specifically, the auditors shall consider the following when determining pass or fail for this item: Is the name of the clinician who completed the documentation, the date and time of evaluation, and status (discontinue or refer to MHCB) all documented on Day 3?

#### Discontinued After at Least 24 Hours

A "Yes" on this item can only be given if the custody checks were continued for a *minimum* of 24 hours after the patient entered the housing unit.  Confirmation of the amount of time that elapsed is based upon the date documented on the 7497 form. If the patient's custody discharge checks were discontinued prior to the patient being in the housing unit for 24 hours, a "No" shall be documented. Specifically, the auditors shall apply the following question for this item: Were the checks continued for a minimum of 24 hours after the patient entered the housing unit?

*Checks Discontinued Prior to 72 Hours*

A "Yes" on this item can only be given if the custody discharge checks were discontinued *prior* to 72 hours after the patient entered the housing unit. Confirmation of the amount of time that elapsed is based upon the date documented on the 7497 form.  If the patient's custody discharge checks continued beyond 72 hours after the patient arrived in the housing unit, a "Yes" shall be documented. Specifically, the auditors shall apply the following question for this item: At day three were the checks either discontinued prior to 72 hours or was the patient referred to the MHCB?

*Section II Pass/Fail*

If all items reviewed for Section II received a "Yes", this item shall also be marked as "Yes".  If there are any items that are marked as "No", this item shall also be marked as "No".

Section IV: Custody Checks

*1st Entry Upon Arrival to Unit*

The first entry in the custody checks (section III) shall be marked as "1 – Arrival to Unit" with the exact date and time of arrival, which shall match the documented time of arrival from Section I of the 7497 form. The custody officer's name shall be legibly written in this line. If any aspects of this line are missing, then it shall be documented as "No", otherwise this item shall be documented as "Yes". Specifically, the auditors shall consider the following when determining pass or fail for this item: Does the custody staff's documented arrival time on page two, section IV, match the date and time of arrival in section III and is code "1-arrival to unit" entered?

*Checks Occurred Every 30 Minutes*

Each line of Section III shall be document a custody check with no more than 30 minutes lapsing between checks.  Each check must have a date and time listed. Additionally, the specific observation from the observation legend shall be documented.  The officer conducting the check shall legibly print his or her name. Specifically, the auditors shall consider the following when determining pass or fail for this item: For each 7497 reviewed, did all of the checks occur with no more than 30 minutes lapsing between checks with specific observation details noted?

*Supervisor Review*

A custodial supervisor shall document in Section III a review of the form was conducted on each shift for the entirety of the time the custody discharge checks are conducted. If a custodial supervisor does not document a review for any shift, this item shall be marked as "No." Specifically, the auditors shall consider the following when determining pass or fail for this item: Did a custody supervisor document a

review of the form during each shift for the entirety of the time the custody discharge checks are conducted?

*Section IV Pass/Fail*

If all items reviewed for Section IV receive a "Yes", this item shall also be marked as "Yes".  If there are any items marked as "No", this item shall also be marked as "No".

Overall Pass/Fail

If all items reviewed for the totality of the custody discharge check review receive a "Yes", then this item shall also be marked as "Yes". If there are any items in the custody discharge check review that are marked as "No", this item shall also be marked as "No".

Exhibit D

DocuSign Envelope ID: D726378C-4156-4069-A634-C08E43BFA16A

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 4/5/2023 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| | Psychiatric Inpatient Program Executive Directors |
| **From:** | *DocuSigned by:* |
| | **Amar Mehta** |
| | AMAR MEHTA M.D. |
| | Deputy Director |
| | Statewide Mental Health Program |
| **Subject:** | **UPDATE TO THE SUSPENSION OF CHART AUDIT TOOL 13** |

This memorandum provides an update to the suspension of the Chart Audit Tool (CAT) 13 (Mental Health Crisis Bed [MHCB]/Psychiatric Inpatient Program [PIP]: Supervisory Review of MHCB/PIP Discharge Safety Plans) as indicated in the email sent on February 2, 2023- RE: *UPDATE: Momentary Pause for Data Entry for CAT Audits*. To ensure patients are discharged from an inpatient setting with a clinically appropriate safety plan, despite the pause of the CAT 13, all MHCB/PIP supervisors shall conduct the reviews of safety plans prior to the patient's discharge. The clinical review of safety plans is based on supervisory, clinical experience, and attendance to departmental suicide prevention trainings.

MHCB/PIP supervisors shall develop a procedure to track patient discharges and the review of the safety plans. For each safety plan reviewed, this tracking tool shall include the patient's name and CDCR number, the date of the safety plan, the date of supervisory review of the safety plan, and the reviewing supervisor's name. As a reminder, safety plans at discharge should include management of the unique risks for self-harm, including specific strategies patients can employ to remain safe.

Every effort should be made to review the safety plan prior to discharge. However, discharges shall not be delayed pending supervisory review of the safety plan. In cases in which a patient has been discharged, yet the safety plan requires revision, the safety plan shall be modified, and the receiving institution shall be informed that an update has been submitted.

MHCB/PIP supervisors shall complete the review of safety plans on SRASHEs for discharging patients based on the following criteria:

1. Institutions with 10 discharges per week, or lower, shall review 100% of SRASHEs.
2. Institutions with more than 10 discharges per week shall review at least one SRASHE by each clinician weekly.

# MEMORANDUM

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@CDCR.

cc:  Steven Cartwright, Psy.D.
    Erick Rizzotto, M.D.
    Laurie Ball
    Travis Williams, Psy.D.
    Wendy Worrell, Psy.D.
    Michael Golding, M.D.
    Sophia Le, D.O.
    Amber Carda, Psy.D.
    Daisy Minter, Ph.D.
    Lee Lipsker, Ph.D.
    Gretchen Huntington, Psy.D.
    Jennifer Johnson
    LaToya Garland
    Pak Yan Leung
    Regional Mental Health Administrators
    Regional Psychiatrists
    Regional Health Care Executives