1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF CALIFORNIA
2
   RALPH COLEMAN, et al.,      ) Case No. 2:90-CV-00520-KJM-DB
3                              )
              v.               ) Sacramento, California
4                              ) March 28, 2024, 3:38 p.m.
   GAVIN NEWSOM, et al.,       )
5                              ) Re: Status Conference
                 Defendants.   )
6
              TRANSCRIPT OF PROCEEDINGS
7       BEFORE THE HONORABLE KIMBERLY J. MUELLER
           CHIEF UNITED STATES DISTRICT JUDGE
8
   APPEARANCES:
9  For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD, LLP by
                            MS. LISA ELLS
10                          MS. JENNY SNAY YELIN
                            MS. LUMA KHABBAZ
11                          101 Mission Street, Sixth Floor
                            San Francisco, California  94105
12
   For the Defendants:      HANSON BRIDGETT, LLP by
13                          MR. PAUL B. MELLO
                            1676 N. California Boulevard, Suite 620
14                          Sacramento, California  95814

15                          HANSON BRIDGETT, by
                            MS. SAMANTHA D. WOLFF
16                          425 Market Street, 26th Floor
                            San Francisco, California  94105
17
                            OFFICE OF THE ATTORNEY GENERAL
18                          DEPARTMENT OF JUSTICE by
                            MS. ELISE OWENS THORN
19                          1300 I Street, Suite 125
                            Sacramento, California  95814
20
              MARYANN VALENOTI, RMR, CRR
21               Official Court Reporter
              501 I Street, Suite 4-200
22               Sacramento, CA 95814
              mvalenotiRMRCRR@gmail.com
23                (916)930-4275

24  Proceedings reported via mechanical steno - transcript produced
    via computer-aided transcription
25

1    APPEARANCES CONTINUED:

2    For the Defendants:    OFFICE OF THE ATTORNEY GENERAL
                            DEPARTMENT OF JUSTICE by
3                           MR. DAMON GRANT MC CLAIN
                            455 Golden Gate Avenue, Suite 11000
4                           San Francisco, California  94102

5    Also Present:          Jennifer Neill, Esq. (CDCR)
                            Dr. Steven Cartwright
6                           Dr. David Leidner (Via teleconference)
                            Melissa Bentz, Esq.
7                           Pak Yan Leung
                            Dr. Wendy Worrell
8

9            SACRAMENTO, CALIFORNIA, THURSDAY, MARCH 28, 2024

10          (In open court.)

11          THE CLERK:  All rise, Court is now in session.  Chief

12   Judge Kimberly J. Mueller now presiding.

13          Thank you.  You may be seated.

14          Calling civil case 90-520, Coleman, et al. versus

15   Newsom, et al.  This is on calendar for a status conference.

16          THE COURT:  All right.  I'm going to call roll, and I

17   granted permission for one person to appear by video

18   conference.

19          So, first, for plaintiffs, Ms. Ells?

20          MS. ELLS:  Yes, Your Honor.

21          THE COURT:  Are you leading for the purposes of this

22   hearing?

23          MS. ELLS:  Yes, Your Honor.

24          THE COURT:  All right.  And, Ms. Yelin.

25          MS. YELIN:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.  And is it "Khabbaz"?

2          MS. KHABBAZ:  Yes, Your Honor.  Good afternoon.

3          THE COURT:  Good afternoon.

4          And then for the defense, Mr. Mello?

5          MR. MELLO:  Good afternoon, Your Honor.

6          THE COURT:  Mr. McClain.

7          MR. MC CLAIN:  Good afternoon, Your Honor.

8          THE COURT:  Ms. Thorn.

9          MS. THORN:  Good afternoon, Your Honor.

10          THE COURT:  Ms. Wolff.

11          MS. WOLFF:  Good afternoon, Your Honor.

12          THE COURT:  Are there other members of the defense

13    that you want to identify for the record, Mr. Mello?

14          MR. MELLO:  Also present is Dr. Cartwright, Ms. Neill,

15    Ms. Bentz, Ms. Leung and Dr. Worrell, and then on screen is Dr.

16    Leidner.

17          THE COURT:  All right.  I do see Dr. Leidner.  Dr.

18    Leidner, are you able to see and hear the Court?

19          DR. LEIDNER:  I am.  Thank you, Your Honor.  Good

20    afternoon.

21          THE COURT:  Good afternoon.  The Court excused

22    Secretary Macomber and Mr. Weber.

23          And the Court's Special Master is present, Mr. Lopes.

24          SPECIAL MASTER LOPES:  Yes, Your Honor.

25          THE COURT:  I set this status to talk through data

1    remediation to keep this on track.  There's four remediations

2    overdue at this point, and I want to talk about -- at least the

3    Court considers it overdue -- how we keep this on track to be

4    completed soon because this is such an important task.  I mean,

5    I don't need to remind anyone here that the need for

6    remediation based on the Court's findings that CDCR, the

7    defendants, were not presenting fully accurate information to

8    the Court, and it's essential, moreover, for the remedy to be

9    completely effective for the data to be accurate and for CQIT

10   to come together, finally.

11            I have a number of areas I want to cover.  I'll go

12   through each, and then ask if anyone has anything they wish to

13   say to further enlighten me or to correct what you think may be

14   a misimpression by the Court.

15            First of all, in terms of the number of indicators, I

16   believe at this point stakeholders agree that there are 170

17   indicators derived from an original list of 148.  I believe

18   more may be coming.

19            I just want to make clear, I'm fundamentally agnostic

20   on the number as long as it achieves the goal of full and

21   accurate reporting and the process is not being exploited or

22   highjacked for other purposes.  I mean, my eyebrows go up

23   sometimes when I see the numbers, but fundamentally, I'm

24   agnostic.  The key is to have this work.

25            So, am I right that you agree that 170 indicators is

1    the current number, or that's at least the ballpark, Ms. Ells?

2    MS. ELLS:  Your Honor, I think you're talking about

3    the numbers that are currently operative, right, currently

4    remediated; is that accurate?

5    THE COURT:  There were 148 provisionally approved

6    initially; you agree with that number?

7    MS. ELLS:  It sounds right, but I don't have that

8    number off the top of my head.

9    THE COURT:  And then here's my breakdown:  This is key

10   indicators:  I have 100 validated, verified, and marked as

11   remediated; 15 in final review after programming and initial

12   testing; 26 validated; 25 in active BRMR discussion; 4 with

13   defendants creating documentation for indicators.  Are we

14   talking apples and oranges here?

15   MS. ELLS:  I don't think so, Your Honor.  I will say

16   that defendants are in charge of tracking.  So, I believe what

17   you are saying is accurate, but they are probably the people to

18   direct this to in the first instance, but I believe that what

19   you are saying is accurate.

20   THE COURT:  All right.  Mr. Mello, or whoever you

21   would delegate it to, you agree?

22   MR. MELLO:  We do not believe that that is the number.

23   We believe the number is 265 key indicators.  But --

24   THE COURT:  Does that include extended and new?

25   MR. MELLO:  -- I'm going to turn it over to

1  Dr. Cartwright on the numbers.

2          DR. CARTWRIGHT:  Good afternoon, Your Honor.  Yes,

3  that does include the extended and new indicators, but to your

4  point, the workload is ultimately the workload, and we worked

5  closely with plaintiffs and Special Master's team to try and

6  arrive at a number that makes sense and everyone could agree

7  on, but what's not in dispute, as far as I know, is the amount

8  of work that needs to happen and before us.

9          THE COURT:  All right.  Well, I was just reading off

10  key indicators, not extended and new.

11          In any event, the real focus is to talk about the

12  process and how do we bring this home as soon as possible.  I'm

13  showing that there are 41 extended indicators that have been

14  verified simply waiting validation, verification, confirmation

15  as remediated by the Special Master; you agree with that, Dr.

16  Cartwright?

17          DR. CARTWRIGHT:  Yes, Your Honor, that sounds about

18  right.

19          THE COURT:  And could the technical work be done on

20  those, for example, by April 26?

21          DR. CARTWRIGHT:  For the 41 extended indicators?

22          THE COURT:  Yes.

23          DR. CARTWRIGHT:  Those are what we commonly refer to

24  as in the "final phase."  They're beyond validation and

25  verification.  Oftentimes Dr. Potter, the data expert, will

1  work with the parties to make sure that there's a final check

2  and that everyone agrees, so to speak, and then he can label it

3  as "remediated."  Because of unknown kind of back and forth, I

4  couldn't say for sure, but the anticipation is that those would

5  be done soon because we've already spent substantial time going

6  through them on multiple occasions.

7          THE COURT:  Thirty-one were completed by the defense

8  last week.

9          DR. CARTWRIGHT:  The extended indicators still, Your

10  Honor.

11          THE COURT:  Of those 41, 31 were completed last week;

12  does that sound right?

13          DR. CARTWRIGHT:  I would have to double check, I don't

14  want to give you misinformation.

15          THE COURT:  All right.  But agreed, the 41 of those

16  extended indicators are in final phase?

17          DR. CARTWRIGHT:  Yes, Your Honor.

18          THE COURT:  All right.  So I want to turn to --

19  there's one dispute now pending court resolution, I did issue

20  an order this morning on the TTMs, and there's one dispute

21  still before me, and that is concerning the medical hold

22  exception to program guide timelines, for transfer to CCCMS and

23  EOP levels of care, and an order on that is forthcoming.  I

24  think that's the only dispute currently pending before me;

25  agreed, Ms. Ells?

1          MS. ELLS:  Yes, Your Honor.

2          THE COURT:  Mr. Mello?

3          MR. MELLO:  Yes, Your Honor.

4          THE COURT:  And then turning to the issues that need

5     to be addressed to make certain any obstacles of data

6     remediation are overcome.  I'm looking particularly at the

7     issue of patient-wise measurements, which I addressed in an

8     order filed December 5 of 2023, and I believe there are 38 of

9     those because the defense continues to raise technical

10    objections or objections based on not fully understanding what

11    the Special Master is looking for.  Does that sound right,

12    Mr. Mello or Dr. Cartwright?

13         MR. MELLO:  I think we still have confusion with

14    respect to patient-wise.

15         DR. CARTWRIGHT:  Yes, Your Honor.  There's a bit of a

16    learning curve.  Dr. Potter has worked with us to explain how

17    it should work; how it should be -- how kind of the

18    specification should be designed.  We even had kind of a

19    special workshop session with many people in attendance today

20    to just go through the documentation and ask Dr. Potter, What

21    should go here, how should this look?  We completed that.  It

22    then went through the formal process, and on second review

23    Dr. Potter had additional notes and thought about how it should

24    change.  So we met as a group again in our BRMR meeting and

25    tried to go through those.  We've gotten some additional notes

1   from that meeting as well.

2          So like I said, there is a bit of a learning curve.

3   We're not saying we don't want to do anything that Dr. Potter

4   has presented.  We recognize this as the Special Master's

5   preferred methodology.  We just want to understand how to write

6   it up in the specifications so that it could move through the

7   process.

8          THE COURT:  Is it fair to say that as of today of the

9   38 indicators effected by this patient-wise issue, CDCR has

10  only released documentation for one, for a formal stakeholder

11  review?

12         DR. CARTWRIGHT:  Yes, Your Honor, that's the one I was

13  referring to that we worked together with Dr. Potter on, and as

14  a kind of trial run, we put that through to see if we got it

15  right and if it would make sense.  The idea being that that

16  template would serve us to work more efficiently on the

17  subsequent indicators.

18         THE COURT:  So if you had to guess, provide an

19  informed guess as to when the 37 would move out of the initial

20  phase, when would that happen?

21         DR. CARTWRIGHT:  It's difficult to say because we

22  don't understand the four corners of the patient-wise

23  methodology.  We want to understand it, and we look to

24  Dr. Potter to help guide that conversation, but it seems to be

25  an iterative process where we continue to see from his

1  perspective additional areas that need to be documented a

2  certain way or designed a certain way.

3          THE COURT:  Anything to say so far on this, Ms. Ells?

4          MS. ELLS:  Your Honor, we're not in all of those

5  meetings, but, you know, I think from our perspective, the

6  parameters are relatively straightforward translating those

7  into documentation.  I understand it can be complicated, and

8  the stakeholders are working toward that goal.

9          The one thing that I would say is that Dr. Potter has

10  recommended a way to streamline the documentation so that it

11  doesn't have to be 38 separate sets of documentation that must

12  be created and maintained, you know, in perpetuity, and has

13  suggested ways to streamline that into much fewer sets of

14  documentation, and defendants have opted not to proceed that

15  direction.  So that's the only thing I would say is an

16  additional bit of context there.

17          THE COURT:  Any response to that, Dr. Cartwright?

18          DR. CARTWRIGHT:  Yes, Your Honor.  I wouldn't say that

19  we've elected not to take that recommendation.  As we've

20  mentioned many times at our joint meeting, we understand that

21  Dr. Potter believes that a combined documentation approach will

22  ultimately be the best way forward.  But a problem we've

23  encountered often in this process is the cost of a learning

24  curve.  And combining documentation while also learning a new

25  process, a new methodology, presents a compounding learning

1    curve.

2         So, I told him many times, and I believe Ms. Ells was

3    there, that we are not foreclosing the opportunity on combining

4    the documentation at a later date.  It may make sense, but at

5    this stage while we are learning, we would prefer to keep the

6    documentation separate so that we could fully understand it,

7    and then see the opportunities that a combined documentation

8    would offer, and for his part, Dr. Potter seems to be accepting

9    of that.

10        THE COURT:  So the Court's interest is in making

11   certain the process here is moving forward as efficiently and

12   as effectively as possible, again, to get to the end goal.  So

13   my question really at this point is why should I not order one

14   or more members of defendant's data remediation team to work

15   directly with the Special Master to create documentation and

16   write code for all the indicators?

17        I told the Special Master, he's the person I can

18   direct.  If he chooses to delegate, he could do that, but I

19   need to make my direction to the Special Master perfectly

20   clear.  So why should I not do that?

21        Moreover, why should I not, given what the Court

22   learned during the evidentiary hearings and the Court's

23   understanding of Dr. Leidner's particular skills in technical

24   writing, why should I not direct that he be at the table and a

25   key player?

1          MR. MELLO:  If I may go first.  If Your Honor's

2    contemplating further orders with respect to data remediation,

3    defendants would appreciate the opportunity to actually brief

4    those issues as to having orders issued from the bench without

5    full understanding of the process.

6          With respect to the technical issues, the way that the

7    process works, I would defer to Dr. Cartwright of course, but

8    if the Court is contemplating further orders, defendants would

9    like the due process right to receive what the Court is

10   contemplating so that they could brief the issues and explain

11   to the Court the complex nature of this issue.  It's not as

12   simple as just saying, "Do it."  I think Dr. Cartwright can

13   explain to the Court how much has been done; how many

14   indicators have gone through the process after two years, and

15   how many are remaining.  So, I think it's not quite that

16   linear, but I'll defer to Dr. Cartwright on the more technical

17   issues.

18         THE COURT:  I'm asking why not?  I'm not issuing a

19   bench order, I'm asking why not; should I direct a process that

20   avoids bogging down?

21         DR. CARTWRIGHT:  I apologize, Your Honor, just to

22   understand, were you suggesting a scenario in which perhaps Dr.

23   Leidner and Dr. Potter work exclusively on this and --

24         THE COURT:  I'm not directing Dr. Potter, I'm

25   directing the Special Master.

1          DR. CARTWRIGHT:  Understood.

2          THE COURT:  My specific question was why should I not

3    order one or more members of the date remediation team,

4    including Dr. Leidner, to work directly with the Special Master

5    to create documentation and write code for all of the

6    indicators, the 38?

7          DR. CARTWRIGHT:  Understood, Your Honor.  What we've

8    learned through this process is that data remediation is

9    incredibly complex and far more challenging than we initially

10   anticipated in 2021.  My concern with that approach is that we

11   really need everyone that's involved currently in order to

12   ensure that we have the end product that we have achieved so

13   far.  Right now we have I think over 150 indicators that have

14   passed the validation and verification milestone, which is in

15   line with our initial 24-month timeline.  There's still a lot

16   to do.  It's a project that's grown and continues to grow.  And

17   my concern with maybe having a more streamlined approach is

18   that they will miss -- key members will miss important context.

19         THE COURT:  It's not so much streamlining, it's having

20   the right people at the table who is -- does not Dr. Leidner

21   possess specific skills that are essential to completing this

22   task in a timely, but also fully competent and skilled way?

23         MS. ELLS:  Your Honor, may I interrupt for a

24   clarification?  Are you referring to just the 37 TCM?

25         THE COURT:  Are you talking to me?

1          MS. ELLS:  Yes, may I interrupt with just a

2     clarification?

3          THE COURT:  I'm talking about patient-wise right now.

4          MS. ELLS:  So not all indicators.

5          THE COURT:  I'm talking about the 37 --

6          MS. ELLS:  Thirty-eight.

7          THE COURT:  I think the 38 because only one has been

8     recently released.  I'm talking about patient-wise.

9          DR. CARTWRIGHT:  Understood, Your Honor.  I apologize,

10    I didn't realize that.

11         THE COURT:  That's the category we're in now.

12         DR. CARTWRIGHT:  In that case, similar concerns.  Dr.

13    Leidner has a great deal of skill, and I have a lot of respect

14    for him, but his part in this process is localized to the

15    verification stage.  He has a bit of a keyhole view into the

16    overall process.

17         The knowledge to kind of get the documentation

18    correctly specified and moved through the process in a way that

19    both our technical programmers will understand and lay people,

20    to the extent possible, will understand is something that we've

21    crafted over time and have been increasingly successful at.  So

22    we'd want to make sure that part is included.

23         Also, the project initially kind of focused on quality

24    improvement, but increasingly it seems like it is measuring or

25    intending to measure the remedy, and I worry without the right

1    stakeholders there, that part of the process might not be

2    considered, even in this narrow part of the patient-wise

3    flexible approach.

4         THE COURT:  Well, if you stay on the current path, is

5    it feasible to complete work on the patient-wise indicators by

6    the end of May?

7         DR. CARTWRIGHT:  Again, Your Honor, I would have to

8    understand from Dr. Potter kind of the four corners of what

9    patient-wise is in order to give a more complete answer.

10        THE COURT:  Do you have a current internal estimate as

11   to when patient-wise would be done if the Court takes no step

12   whatsoever?

13        DR. CARTWRIGHT:  Apologies, Your Honor.  We don't tend

14   to think about the grouping of the indicators in terms of when

15   will this group move forward or when will another group move

16   forward.  There is a process of flow occurring whereas one

17   indicator might get slowed down because of an unexpected delay,

18   another one could take its place so that we're constantly

19   making progress.

20        My best guess on the current track, you know, I

21   believe 150 indicators through verification, and that took

22   about 24 months.  We see roughly a similar amount of workload

23   ahead of us, and without any change, we would anticipate a

24   similar amount of time to complete the current known workload.

25        THE COURT:  So 24 months.

1          DR. CARTWRIGHT:  It hurts me to say that, Your Honor.

2    Although on the bright side, a bit of a happy note, once

3    something is remediated, it seems to be a quality product.

4    We're not having any debates about the remediated items.  It

5    seems to live up to the promise of data remediation.  It's

6    reliable, it's sustainable, and it's transparent.

7          So the true cost of this project might be time, but I

8    understand that due dates can focus the mind, and Your Honor

9    has certainly reminded us of that.

10          THE COURT:  Anything significant about that time

11    frame, Ms. Ells?

12          MS. ELLS:  May I respond to the larger question?

13          THE COURT:  You may, yes.

14          MS. ELLS:  As well as the time.

15          Your Honor, we agree with the proposed approach that

16    you are -- that you are contemplating.  I think this Court has

17    trust in Dr. Leidner, we do as well as plaintiffs, and he has a

18    long history in this case, including with the Special Master

19    team for a long time.  He has deep, deep knowledge, plus the

20    technical skills.  So we think that is a good suggestion, and

21    in this context while normally we might be concerned about not

22    having stakeholder review of all that documentation.  This is

23    very technical, methodological information, and, frankly, it's

24    not my skill set.  So, Dr. Leidner, and the other technical

25    people who understand data better than we do, have really lead

1    this charge.  So, we think it would streamline particularly

2    this set of indicators.

3          I guess the other thing I would say is part of our

4    concern about this process at this point is there are some

5    things that we think could be more sufficient.  For instance,

6    we had some focused discussions about the one patient-wise

7    documentation and that it has not returned to BRMR now for

8    quite a while, I can't remember exactly how long, but I would

9    estimate at least a month, and we don't have any insider

10   control into the agenda of how things proceed through this

11   process on defendants' side.

12         So, certainly people are working very hard.  I don't

13   dispute that, but it creates inefficiencies when the parties

14   spend a lot of time discussing some documentation, have some

15   additional feedback, and then it takes a long time for it to

16   come back and people simply just don't remember where they

17   were.

18         So, I think, you know, at this point it would be more

19   efficient to take it out of that process.  It's purely a data,

20   methodological implementation issue from our perspective.  It

21   has nothing to do with the scope of the remedy.

22         THE COURT:  "Take it"?

23         MS. ELLS:  The 38 patient-wise indicators.

24         THE COURT:  Yes.

25         MS. ELLS:  I'll be honest, I'm alarmed to hear that it

1   could be an additional 24 months that we are in this process,

2   and I don't think it can take that long or should given the

3   importance of this issue to this case.  Defendants have

4   represented to this Court that they have sufficient staff

5   devoted to this project, and it's hard for me to square that

6   with a 24-month timeline.

7           THE COURT:  All right.  Understood.

8           Let me move on to potential obstacles to complete data

9   remediation.  I just want to make certain I understand what's

10  going on with restricted housing policies.  I understand this

11  is referenced in a report before me from the Special Master,

12  but in connection with this hearing, I did want to ask, am I

13  correct in understanding, and I'm asking because I think this

14  relates to data remediation overall.  I think it could be a

15  reason for delay, but I've been informed that the parties may

16  be preparing to file a stipulation for my approval setting out

17  their agreement to modify three chapters of the program guide

18  with regard to these regulations, and that also may address the

19  parties' differing views on what it means for program guide

20  updates generally; am I right about this?  Ms. Ells, you look

21  confused.

22          MS. YELIN:  Your Honor, you may be referencing an

23  e-mail exchange that we have had with defendants regarding our

24  perspective that when defendants modify policies or implement

25  policies that modify the current remedy in the case, the

1  parties should be informing the Court about that.  And we have

2  left it right now with inviting defendants to send us a

3  proposed stipulation that would seek clarification of at least

4  one of the Court's orders, but we have not committed to filing

5  such a stipulation.

6  THE COURT:  I understood there were two things

7  possibly coming my way:  One is a stipulation regarding the

8  three chapters of the program guide affected by RHU regs, but

9  also plaintiffs filing a motion for clarification of my

10  February 2022 order to clarify what it means.  Even if the

11  Court would suspend regular updates, it did not mean I should

12  know about major changes to the program guide, but I'm prepared

13  to think through whatever issues the parties want to bring to

14  me.

15  You're addressing that, the motion seeking

16  clarification of the February 7 order, right?

17  MS. YELIN:  That's what I was just referencing, but

18  yes, we have been in discussions with defendants about all of

19  these issues, which we do see as closely intertwined given our

20  perspective that the new RHU policy does modify chapters of the

21  existing program guide.

22  THE COURT:  Just on the motion for clarification of

23  the February 7, 2022 order, why shouldn't I direct you to file

24  that motion as promptly as possible to get that ball rolling?

25  MS. YELIN:  Sure.  The parties have been discussing

1     potentially filing a joint motion for clarification where we

2     would each set forth our separate perspectives about the issue

3     in a single document.

4             THE COURT:  That's fine.

5             MS. YELIN:  Okay.

6             THE COURT:  I can clarify, exhausting meet and confer

7     to the extent you agree, to the extent you have different

8     positions, within 14 days?

9             MS. YELIN:  Sure.

10            THE COURT:  All right.  Mr. Mello?

11            MR. MELLO:  Your Honor, first, I'm curious how the

12     Court knows about defendants' discussions with plaintiffs'

13     counsel, Number 1.

14            Number 2, there are various deadlines coming up of

15     which requests have been filed with the Court regarding

16     additional time to respond to the telemental health policy that

17     hadn't been acted on, and just additional mediations that are

18     occurring, a status conference on the 26th, a request to extend

19     the deadline to time the joint statement on the 26th.  To add a

20     new deadline, I don't know that it's possible, and I do not

21     know that the parties' discussions on this issue were ready for

22     presentation to the Court in a motion to clarify at this time.

23            So, there are many deadlines.  There are many requests

24     for additional time to do things, and we're glad to talk more

25     and get more clarity from plaintiffs' counsel on the issue

1   before, I guess, committing to file a motion to clarify in two

2   weeks.

3           MS. YELIN:  Your Honor, to be clear --

4           THE COURT:  I'm just addressing -- so I have -- just

5   so it's clear, I have a letter that was copied to the Special

6   Master's team.  Special Masters are known to the Court.  You

7   don't expect me to see those letters possibly if they have

8   relevance to what I'm thinking about at any given time?

9           MR. MELLO:  No, I didn't expect that communications or

10  agreements between the parties would become a subject of this,

11  but my apologies, Your Honor.

12          THE COURT:  Well, what I understand is this issue

13  potentially is impeding data remediation, completion of data

14  remediation, and so the purpose of this status is to focus on

15  whatever it will take to get data remediation moving and what

16  the Court can do.

17          So, when are you suggesting it would be appropriate

18  for me to set a date by which the joint motion would be filed,

19  Mr. Mello?

20          MR. MELLO:  I guess it would depend on what happens

21  with our request for additional time to respond to the

22  telemental health policy and the parties' joint request for

23  additional time to file the joint statement due before the

24  April 26 deadline.

25          THE COURT:  I'll look at the balance of the schedule

1   with respect to other matters, and I'll give you a date by

2   which to file the joint motion for clarification of the

3   February 2022 order.

4         Also, with respect to the Special Master being in the

5   loop, arm of the court, being part of these discussions, am I

6   incorrect in understanding that there's substantive agreement

7   among the parties with the Special Master's concurrence on the

8   major contours of the RHU regulations, and that it makes sense

9   to clarify for the Court that I should agree to modification of

10  three chapters of the program guide; do I have that right, Ms.

11  Ells?  And if so, why not just clarify that now?

12        MR. MELLO:  With respect to RHU, yes, Your Honor.

13        MS. YELIN:  Yes.

14        THE COURT:  All right.  So, on that, can you present a

15  stipulation promptly just to get that cleared away?

16        Is the agreement -- have you reached substantive

17  agreement, Ms. Neill?  Is this a drafting issue?

18        MS. NIELL:  I don't believe so, Your Honor.  I think

19  we have RHU regulations that are in temporary effect.  I think

20  the parties and the Special Master's team agreed with them;

21  that it's a great step towards modifying our RHU policies.  I

22  think the hesitation is I guess with the stipulation that

23  you're looking for, is it just to say that the parties agree in

24  principle with what CDCR has drafted?

25        THE COURT:  Setting up their agreement to modify the

1   three chapters of the program guide consistent with the regs

2   without addressing this issue of updates, which I'll deal with

3   when I see your joint motion on clarification of the

4   February 2022 order, because this relates to data remediation

5   as I understand it.

6           So why not -- what's -- what possible reason can there

7   be if there is agreement to not, say, file that within 14 days?

8           MS. NIELL:  So, I believe, and I'm not an expert on

9   data remediation, I think it's unclear that this is slowing

10  down data remediation.  It's some computer changes we have

11  unrelated to data remediation that might be slowing down the

12  process, Your Honor.

13          THE COURT:  Well, I understand the Special Master

14  believes that part of data remediation needs to await final

15  adoption of RHU policies, and so clarifying the landscape with

16  regard to RHUs, it will clarify and eliminate any uncertainty

17  there.  Who is the person to tell me about that?

18          MS. NIELL:  Dr. Cartwright can answer.

19          DR. CARTWRIGHT:  Yes, Your Honor.  I didn't realize

20  exactly where you were coming from, but I think I understand

21  now.

22          The way the data remediation proceeds in these types

23  of situations where we are out of policy.  Certainly one as

24  foundational as this is, contemplating being changed, we go off

25  of the current policies, and we remediate as much as possible

1   with the current policies.  With the understanding that

2   policies often change, that we need to build into the process a

3   way for us to remediate future changes due to policies.

4          So, in the grand scheme of things, yes, if we're

5   moving towards a place where RHU is going to be adopted as a

6   part of the overall program guide and expectations, data

7   remediation will need to reflect that, but in the short-term

8   we're proceeding with the current policies, and with the

9   understanding that if we're really close to adopting RHU, you

10  might hold back a little bit because it's only days or weeks

11  away from being agreed upon, but I don't know if that's true at

12  this point.  I don't understand kind of the machinations

13  between the parties and what's being stipulated to.

14         THE COURT:  Good word, "machinations."  It sounds to

15  me that there's fundamental agreement.  Again, I'll look at the

16  total schedule.  I'll give you a date by which I'm going to ask

17  you to present me a stipulation.  You could put it in your own

18  words setting forth your agreement to modify three chapters of

19  the program guide.

20         I understand there's also a dispute over the

21  August 23, 2023, order regarding minimum treatment standards

22  for PIPs.  My thought there is to direct the parties to also

23  file a joint motion for clarification to tee up that dispute

24  because it sounds like I just need to resolve it.  Agreed, Ms.

25  Ells?

1          MS. ELLS:  Yes, Your Honor.

2          THE COURT:  Mr. Mello?

3          MR. MELLO:  I don't disagree.

4          THE COURT:  Fourteen days work for that one, Ms. Ells?

5          MS. ELLS:  Your Honor, I'm on vacation for eight of

6     those 14 days, so I would prefer a 21-day time line, perhaps.

7          THE COURT:  Mr. Mello, 21 days?

8          MR. MELLO:  The same statement above, Your Honor.

9     We've got three mediations, status conferences, current filings

10    that are due next week and the following week.  I don't know if

11    21 days is sufficient to do all of those things that need to

12    happen in that time.

13         THE COURT:  All right.  I'll look at the overall

14    schedule.

15         So, then, in terms of documentation, and recognizing

16    the proliferation of indicators and, therefore, documentation,

17    I have questions here about possible steps I could take, and I

18    would like your reaction to the possibility that I provide this

19    further direction.  So, it's really two questions that I

20    would -- well, why should I not delegate final authority for

21    providing direction on the technical aspects of documentation

22    to the Special Master and making certain it's only the

23    technical?  Ms. Ells, any reaction to that possibility?

24         MS. ELLS:  Your Honor, I think I would like to think

25    through exactly how that would work, but in concept that makes

1   sense to us.

2          THE COURT:  All right.  Mr. Mello, any initial

3   reaction or Dr. Cartwright?

4          MR. MELLO:  I think our question is what does the

5   Court contemplate by the word "technical" and then I think

6   probably Dr. Cartwright can respond, but it depends on what the

7   Court means by "technical" for purposes of this.

8          THE COURT:  It's focusing on the data systems

9   themselves and thinking that the Special Master who is the

10  person I deal with on this issue is the person with the

11  necessary technical expertise at his disposal to guide and make

12  technical decisions for documentation and business rules that

13  are acceptable under industry standards; that's the notion.

14  It's focusing on the technical needs.  Does that make sense to

15  you, Dr. Cartwright?

16         I'm not a technician.  I'm doing my best as a

17  generalist lay judge, which most of us are, to get my arms

18  around this, and so that's my understanding of it.  Do you

19  understand what I'm focusing on, trying to focus on?

20         DR. CARTWRIGHT:  I believe so, Your Honor.  When I

21  think about the arc of data remediation and the process it has

22  to go through to reach its end point, as you move farther and

23  farther along, there are increasingly complex technical

24  specifications, and Dr. Leidner surely and Dr. Potter help us

25  tremendously understand those kind of parts of it.

1          Earlier in the process, though, is where documentation

2    gets crafted, and it can't be solely for the programming or the

3    coder to understand.  It has to be for the lay people to

4    understand.  Dr. Leidner is not part of that process typically,

5    so he would have a learning curve, I believe, to kind of get to

6    that point.  And Dr. Potter -- I think what you are mentioning

7    here is something we've already tried a trial process with,

8    working with them, saying what should we put in the Overview

9    section, what should we put in the numerator and the

10   denominator, what should we put in kind of exceptions or the

11   scope of this, and that has had its own learning curve as well

12   that I mentioned earlier.

13          So, to answer your question, I am not convinced that

14   it would immediately give you the type of rapid acceleration in

15   the process that you're looking for.

16          THE COURT:  Apart from you, how many of the people at

17   the table are trained in data systems as opposed to mental

18   health?

19          DR. CARTWRIGHT:  At this table, Your Honor?

20          THE COURT:  No, at the table for data remediation, I'm

21   sorry.  Thank you for providing me an opportunity to clarify

22   what I mean by -- I mean the table -- it's a metaphorical

23   table.  I don't know if you are doing this virtually or not,

24   but what's the group of people that is working on this project?

25          DR. CARTWRIGHT:  Currently we have 22 people that are

1  full-time dedicated to this project, and then an untold number

2  of subject matter experts come into the process at various

3  points to help us understand not just the technical components

4  of it, but how does this really work in practice; what was the

5  program guide's intent here, how could we make this work in the

6  system for the end users, for the clinician, the doctors, that

7  need to understand it, but also how can we tie that all

8  together into a project management kind of focus and make sure

9  it all gets along?

10  THE COURT:  So, there are 22 software engineers or

11  developers?

12  DR. CARTWRIGHT:  Not quite, Your Honor.  Many are, but

13  there are some that don't have as much skill, they're more of

14  the testers, and they're kind of in the process of their career

15  of moving up to that potential step, and then of course there

16  are the dedicated, kind of supervisory structure at the

17  first-line supervisor level that helps us manage that process.

18  THE COURT:  Then in formulation of the reports, data

19  reports, why should I not delegate final decision making in the

20  technical lane and the substantive lane to the Special Master

21  giving the parties expedited access to dispute resolution given

22  the disputes over formulation of data reports; any reason not

23  to make clear that kind of delegation, Ms. Ells?

24  MS. ELLS:  I see no reason not to do that.

25  THE COURT:  Mr. Mello?

1          MR. MELLO:  First, can you explain what you mean by

2     "data reports" for Dr. Cartwright, and then I have one

3     question.  You said both the technical and the substantive

4     piece, because the Court has defined this process as measuring

5     the remedy, is that what you mean by the prospective

6     substantive piece leaving to the Special Master deciding what

7     the scope of the remedy is?

8          THE COURT:  So when I say "data reports," what are the

9     possibilities in your mind what that could mean?

10         DR. CARTWRIGHT:  Your Honor, in the ecosystem of data

11    remediation, we have KPIs, key performance indicators, but we

12    also have reports, data reports, and they're slightly

13    different.  I wasn't quite sure if that's what you were

14    referring to.

15         THE COURT:  Well, I think I'm referring to data

16    reports.  Does that make sense to you given what I'm asking, or

17    is that confusing?

18         DR. CARTWRIGHT:  It's a bit confusing to the extent

19    that you're referring to another component in data remediation,

20    meaning the reports, as opposed to a key performance indicator.

21    If that's what you are referring to, it would have a similar

22    process and learning curve as a key performance indicator

23    would, so my reservations would be the same.

24         THE COURT:  All right.  Let me ask the Special Master,

25    does "data report" cover both of those, data report and KPIs?

1          SPECIAL MASTER LOPES:  The "data report," as I

2     understand it, Your Honor, would cover both.

3          THE COURT:  All right.

4          MS. ELLS:  Your Honor, I think I had understood you to

5     be speaking about sort of there are reporting on the metrics of

6     where in the process all of these data pieces are.  It's more

7     of a tracking type of report.  So I'm not totally clear on what

8     exactly we're contemplating here and what our position is in

9     response to that.

10          THE COURT:  All right.  I think this is going beyond

11     just the tracking, but let me just ask the Special Master:  Can

12     you clarify where, from your point of view, the issue is with

13     respect to data reports getting bogged down?

14          SPECIAL MASTER LOPES:  Your Honor, if you would

15     indulge me, I believe that Dr. Potter would give you a clearer

16     answer, and if he's able to come forward, that would be

17     beneficial to the Court.

18          THE COURT:  All right.  Dr. Potter, you have to speak

19     in a language the rest of us can understand, the generalists in

20     the room at least.  So if you could give a concise

21     clarification, I'll accept that.

22          If you could just come into the middle and speak into

23     the microphone.  It's facing me.  You could turn it around.  I

24     don't know why it's facing that direction.

25          DR. POTTER:  Thank you, Judge.  I believe the concept

1    here is there's a reporting interface that goes along with the

2    indicators and reports in the system.  So, currently what's

3    called an "indicator" in this process can either be a KPI,

4    which is at present a single statistic that has to underlying

5    data associated with it, or it could be a report that might

6    have multiple statistics in it, with also underlying data in

7    it, and these reports essentially have columns of data that you

8    could look at so you could see underneath what's happening, and

9    they also have statistics that are calculated based on the rows

10    in the report using the columns in the report.

11          THE COURT:  All right.  So when I was asking about

12    data reports, you heard me reference both data reports and

13    KPIs?

14          DR. POTTER:  Yes.

15          THE COURT:  And this is all pointing towards the

16    annual certification process, laying the foundation for annual

17    certification?

18          DR. POTTER:  I would express that a little

19    differently.  The annual certification process is this concept

20    that Dr. Cartwright mentioned earlier where these indicators

21    are getting remediated initially, and it's through stakeholder

22    review of the way they operate, they validate that they're

23    going to actually measure, for example, program guide

24    compliance requirements, but then if the policy changes or work

25    flow changes or something in the data system changes, sometimes

1    those indicators will need to be rewritten and the parties need

2    to look and say, Hey, does it still work correctly?

3            THE COURT:  All right.  Understood.

4            DR. POTTER:  Thank you.

5            THE COURT:  I think that's enough for now.  I need to

6    better understand what might help there.  I have no other

7    questions.  I would just say to the extent there really is a

8    risk that this process takes another 24 months, that does give

9    the Court great pause, and it reinforces my desire to think

10   about what I might do without wading into an area that I

11   understand only as a generalist, but performing my role as the

12   judge presiding over this case.  The questions are what might I

13   do to make certain things are moving forward as quickly as

14   possible without sacrificing any quality.

15           Inevitably I have to ask the question:  Should I just

16   contract this out in order to get this done according to some

17   clear performance measures in a set timeline?  So, I just want

18   to put that out there.  It's an obvious, common sense reaction

19   to what I'm hearing.

20           With that, that's what I wanted to cover.  I will give

21   you some deadlines based on the joint motions.  I'll think

22   about your initial reactions to what I'm proposing, and if I

23   did want to impose specific changes and make specific

24   delegations, I'll consider defenses' request to issue those in

25   the form of an order to show cause.

1          Anything else you want me to know, Ms. Ells?

2          MS. ELLS:  No, Your Honor.

3          THE COURT:  Mr. Mello?

4          MR. MELLO:  The only thing we would add is that in the

5     past defendants filed activation schedules so that there was

6     complete transparency with respect to status and the process.

7     And defendants would very much like to file regular status

8     reports so that the Court has in a usable place on the docket

9     the status of data remediation in a public transparent way.  I

10    believe those were done quarterly in the past and defendants

11    would be happy to do that again, Your Honor.

12         THE COURT:  The Court has used that approach in the

13    past, but it would show a 24-month timeline, right, that's what

14    you are telling me.

15         MR. MELLO:  Yeah, but it would show in a transparent

16    way, which we know is very important, the status of the process

17    and where it stands.

18         MS. ELLS:  May I briefly respond, Your Honor?

19         THE COURT:  You may.

20         MS. ELLS:  The status reports, the activation

21    schedules that opposing counsel is referring to, in the past

22    has lead to fairly extensive litigation.  We've had to file,

23    you know, response briefs disputing various aspects.  I think

24    the better path would be to direct the Special Master to file

25    neutral reports on a quarterly basis to avoid the prospect of

1 litigation over activation reports which I think is completely

2 unnecessary given how far behind we are in this process

3 already.

4      THE COURT:  The issue of quarterly reports suggests

5 more patience than this Court has at this point.  I have to

6 think deeply about what I've heard here today.

7      I think I have what I need.  Thank you very much.

8      THE CLERK:  Court is in recess.

9     (Proceedings adjourned at 4:32 p.m.)

10

11           C E R T I F I C A T E

12

13      I certify that the foregoing is a true and correct

14 transcript of the proceedings in the above-entitled matter.

15

16 _____     April 2, 2024

    MARYANN VALENOTI, RMR, CRR        DATE

17 Official Court Reporter

    CA CSR #11266

18

19

20

21

22

23

24

25