DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
ADRIENNE SPIEGEL – 330482
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO COURT'S APRIL 2, 2024 ORDER TO SHOW CAUSE REGARDING DATA REMEDIATION**

Judge: Hon. Kimberly J. Mueller

The Court issued an Order to Show Cause on April 2, 2024 after a March 28, 2024 hearing regarding the status of data remediation. ECF No. 8181. The Court ordered the parties to show cause "why the court should not (1) delegate to the Special Master responsibility to ensure the 38 patient-wise indicators move through all five steps of the data remediation process so he can mark them as remediated by May 31, 2024 and (2) direct defendants to make Dr. Leidner available to work directly with the Special Master as needed to meet this deadline and to make equally available such CDCR mental health staff as Dr. Leidner may identify to complete necessary tasks." *Id.* at 5. Plaintiffs know of no reasons why the Court should not make both of the contemplated orders, and urge the Court to do so forthwith.

More than four months ago, the Court adopted the Special Master's recommendation that Defendants should incorporate his expert's preferred "patient-wise" timely compliance methodology ("TCM") alongside Defendants' preferred "events-wise" methodology in the then-twenty-five "TCM" indicators. *See* Dec. 5, 2023 Order, ECF No. 8078 at 15. In objecting to his recommendation, Defendants noted they did not have any "workload issue" that would prevent them from incorporating the recommended methodology, and they acknowledged they collected the raw data necessary for the patient-wise measures and the expert's recommended degree of impact statistics. *Id.* at 13 (citing ECF No. 7954-1 at 2 n.2). This was consistent with former CDCR Secretary Kathleen Allison's May 2022 statement that Defendants' "staff assigned to work on data remediation including its technical writers are sufficient in number and qualifications." ECF No. 7556 ¶ 6.

Yet in the ensuing four months since that order, CDCR has failed to finalize the documentation for even one of the now 38 "TCM" indicators. ECF No. 8181 at 3-4. That one indicator, "SC8.1: Timely Submission of MH RVR MH Assessment Results Patient-Wise Flexible," is still stuck in the BRMR process. Declaration of Maya E. Campbell ("Campbell Decl.") ¶¶ 7-9. It has been discussed in two meetings, and CDCR—which has nearly unilateral control over the agenda-setting for the meetings—has not brought it

back for discussion since March 6, 2024, over one month ago. *Id.* ¶¶ 9-10. And the stakeholders' discussion of SC8.1 came after extensive time in a workgroup process, during which the Special Master's data expert worked closely with CDCR's technical writing staff to provide specific guidance about how to design the documentation for patient-wise measures. *Id.* ¶ 8.

Defendants' claim that they do not understand how to design indicators in accordance with the methodology and are on a "learning curve," *see* ECF No. 8181 at 4, is therefore perplexing. The Special Master's expert's methodology was clearly set forth in his original recommendation, *see* ECF No. 7954, which itself followed countless hours in which the Special Master's data expert provided detailed demonstrations, walked Defendants through specific examples, and patiently answered questions about the methodology. *See* ECF No. 8064 at 4.

Since the Court's order, the Special Master's expert has provided significant additional guidance to CDCR, including about how to incorporate his methodology efficiently into their existing documentation so they can avoid creating 38 new indicators from whole-cloth, which would then need to be separately verified, validated, and maintained after remediation. Mar. 28, 2024 Tr. at 10:9-16. CDCR has declined to adopt that approach, stating only that proceeding that way would steepen their existing learning curve and potentially delay remediation. *Id.* at 10:18-11:9. Whether CDCR is intentionally delaying the progress on the patient-wise indicator documentation or truly does not have the capacity to move the process forward more quickly due to a lack of appropriate expertise or sufficient staff, it is clear that the current system is not working and will not result in compliance with the Court's December 2023 order on any reasonable timeframe. The Court's suggestion that the Special Master take direct responsibility for completing the patient-wise documentation—in concert with Dr. Leidner and other CDCR staff as necessary—is appropriate.

Plaintiffs also fully support the Court's contemplation of an order requiring that Dr. Leidner be made available to work directly with the Special Master to complete all

steps of the remediation process for the 38 patient-wise indicators. Dr. Leidner has extensive experience that uniquely qualifies him to assist the Special Master's expert in this role. Dr. Leidner has worked for CDCR for decades, both as a mental health clinician treating patients and as a headquarters specialist. In that role, Dr. Leidner "helped develop CDCR's Health Care Data Warehouse and the Statewide Mental Health Program's quality management reporting system," and has worked to "maintain and enhance these systems, analyze data, and provide statistics as needed for the Statewide Mental Health Program." ECF No. 6012-3 at ¶ 2. He has "extensive background in statistics and research design, including graduate-level training in both fields," and has worked as a data analyst, statistics consultant, and taught statistics at the college level. *Id.* at ¶ 3. He also has extensive technical skills and decades of experience with database and statistical programming. *Id.* at ¶ 4. To Plaintiffs' knowledge, no other member of CDCR's data team comes close to matching his expertise vis-à-vis the data remediation work.

Surprisingly, given the clear match between Dr. Leidner's skills, expertise, and knowledge of Defendants technical and mental health systems, he has to date played a very limited role in the portions of the data remediation process to which Plaintiffs are privy. He is rarely an active participant in BRMR meetings, and CDCR appears to have tasked him mainly on the programming and verification steps, which, while critical, take place after the important work of drafting the documentation of the indicator. Campbell Decl. ¶ 5; ECF No. 8181 at 2. Given his specific experience with data and statistics, Dr. Leidner is very well positioned to understand and implement the TCM methodology that other members of the data team continue to claim is confusing after many, many months of focused discussion. Indeed, it would create significant efficiencies for Dr. Leidner to be directly involved much earlier in the process, and for him to work closely with Dr. Potter to develop the documentation in a way that is more likely to streamline the later steps of the remediation process.

Dr. Leidner is also well-positioned to identify which other members of CDCR's data remediation team are best suited to assist in expediting remediation of the patient-wise

indicators, and at what stages, because his expertise with technical writing and programming make him most familiar with the steps necessary to complete the project. His direct involvement, along with that of whichever "CDCR mental health staff … [he] may identify to complete necessary tasks," ECF No. 8181 at 5, will ensure that CDCR retains control over the implementation of the Court's order and should dispel any concerns that the Special Master will be supplanting CDCR in designing the documentation for their indicators.

There is no dispute or confusion about what these patient-wise indicators must measure, and how; the Court definitively settled any such questions in December. ECF No. 8078. It is simply a matter of ensuring that the right people, with the right expertise and support, are focused on this important component of the data remediation project. Plaintiffs are dismayed at Defendants' suggestion that the remainder of the project—which has already been pending for years—will take twenty-four months, and support any appropriate measures that will accelerate the pace of this long-overdue work. The Court's two contemplated narrow actions would greatly aid the completion of an important component of the project. Plaintiffs strongly urge the Court to issue an order confirming both.

DATED: April 9, 2024

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Jenny S. Yelin*
Jenny S. Yelin

Attorneys for Plaintiffs

/ / /

/ / /

/ / /

/ / /

**CERTIFICATION**

Plaintiffs' counsel certifies that she reviewed the following orders in preparing this filing: ECF Nos. 8181, 8078.

DATED: April 9, 2024

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Jenny S. Yelin*
Jenny S. Yelin

Attorneys for Plaintiffs