Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Lawrence M. Cirelli, SBN 114710
Paul B. Mello, SBN 179755
Samantha D. Wolff, SBN 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone: 925-746-8460
Facsimile: 925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE [ECF No. 8181]**<br><br>Judge: Hon. Kimberly J. Mueller |

## I. INTRODUCTION

On April 2, 2024, the Court entered an order directing the parties to show cause in writing why the Court should not: (1) delegate to the Special Master responsibility to ensure the 38 patient-wise indicators move through all five steps of the data remediation process so he can mark them as remediated by May 31, 2024; and, (2) direct Defendants to make Dr. Leidner available to work directly with the Special Master as needed to meet this deadline and to make equally available such CDCR mental health staff as Dr. Leidner may identify to complete necessary tasks, among other possible orders. ECF No. 8181 at 7:7-14. Defendants oppose the contemplated order as it relates to the 38 patient-wise indicators for several reasons.

20702806.6

DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE

1    First, the Court's proposed approach would not expedite the process for completing the remaining patient-wise indicators that still require substantive discussion given that the delay lies with the validation step of the process—a step that requires input and consideration by both parties as to what is specifically required by each indicator and its corresponding remedial requirement so that it is accurately measured. This aspect of the process is not something the Special Master can assume on his own; rather, the parties must be permitted to provide their positions on the scope and requirements of the remedy. Additionally, this process has been further extended by the requirement to apply the patient-wise-flexible and degree-of-impact methodologies to the 38 timely-compliance indicators, all of which had already begun the remediation process under CDCR's opportunity-based methodology and which now require that additional documentation be created using the new, additional methodologies. Second, the Court's contemplated order delegating responsibility for the remediation of the 38 patient-wise indicators to the Special Master is inconsistent with its longstanding view that Defendants are responsible for choosing and implementing the mechanisms for meeting their Constitutional obligations in the remedial phase of this case. And third, the order would exceed the Special Master's jurisdiction as proscribed by the Order of Reference. Accordingly, Defendants oppose the order as contemplated.

## II.   ARGUMENT

**A.   The Court's contemplated order overlooks complexities surrounding the data remediation process for the 38 timely compliance key performance indicators.**

By way of background, Defendants and the Special Master previously agreed on a six-step data remediation process. ECF No. 8181 1:23-3:11 (describing steps and agreement). The following diagram reflects those steps:

| Step 1 Documentation | Step 2 Validation | Step 3 Approvals | Step 4 Programming | Step 5 Verification | Step 6 Remediation |

Prior to the Court's ruling on the patient-wise methodology, CDCR had already completed documentation for all 38 timely compliance key performance indicators (Step 1) using its own

opportunity-based methodology.[1] Declaration of Dr. Steven Cartwright ("Cartwright Decl."), ¶ 7. Twenty-three of those indicators are currently in the validation step of the process where both the Special Master and Plaintiffs' counsel provide their feedback and input on Defendants' documentation (Step 2).[2] *Id.* As part of validation, the Special Master and Plaintiffs' counsel provide feedback not only on Defendants' opportunity-based methodology, but also on the substance of the business rules underlying the indicators, such as the population measured by the indicator, what types of contacts count as compliant, and the timelines required by the Program Guide. *Id.* at ¶ 5. Many of these discussions include interpretation of the Program Guide or substantive, non-technical, requirements. *Id.* While most of the TCM indicators remain in validation, two have been approved by the Change Advisory and Prioritization Committee (CAPC – Step 3), and fifteen are in various phases of programming and verification (Steps 4 & 5). *Id.* at ¶ 8.

As explained below, the Court's anticipated order delegating authority over the process to the Special Master will not have the intended effect of expediting data remediation because the validation step, which necessarily requires input from the parties to interpret how to appropriately measure the remedy, would still remain a time-consuming but necessary step in the process. Additionally, each of the 38 TCM indicators will require new documentation explaining the patient-wise flexible approach and degree-of-impact statistics before they can complete all steps of data remediation.

1.   *Delegation of the Validation Step to the Special Master's Team is Inappropriate As the Parties Must Confirm the Remedy will be Adequately Measured at this Step.*

Not surprisingly, a majority of the timely compliance key performance indicators are in the validation step (Step 2). The validation step is the most time-consuming of all data remediation steps because it requires rounds of detailed feedback, analysis, and consideration from

---

[1] Defendants' opportunity-based methodology focuses on the service requirement (e.g., a Program Guide requirement that a treatment service be offered to inmate-patients on a certain schedule) that is the subject of the particular indicator. ECF No. 8078 at 3:15-16 & fn. 4.

[2] Defendants believe the 20 "MM" indicators listed in Step 2 are ready to move forward to Step 3 but are awaiting confirmation from the Special Master's team and Plaintiffs' counsel.

20702806.6

3

DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE

stakeholders. Cartwright Decl. ¶ 5. Validation can take months to complete, depending on the nature of the indicator and whether there are any disputes requiring formal resolution.[3] *Id.* ¶ 5. The belief that "significant efficiencies" can be achieved by delegating to the Special Master responsibility for ensuring these indicators complete all five steps of the process no later than May 31, 2024, overlooks this important context. Delegation to the Special Master will not expedite the validation step, which is the true source of data remediation delays, because the parties must agree upon the various terms underpinning each key performance indicator before they can proceed through the steps. Indeed, the technical staff do not control the process until Step 4, when all parties involved have agreed and approved of the underlying documentation that will be used to program the key performance indicator. Nor would it be appropriate for the Special Master to unilaterally decide the contours of the remedy in this case without Defendants' input. *See* Order of Reference, ECF No. 640 at 3:16-21.

The path through validation for the patient-wise flexible version of the TCM indicators that have already achieved validation under the opportunity-based methodology may be more

---

[3] The AC2.1 "Timely PC Contacts" indicator (listed above as key performance indicator No. 1) is illustrative here of the lengthy delays at the validation step. Historically, *i.e.* before the data remediation process began, CDCR used the word "weekly" to mean a calendar week spanning Monday through Sunday. Cartwright Decl. ¶ 6. However, when this indicator entered validation (Step 2), Plaintiffs' counsel and the Special Master took issue with how the word "weekly" would be operationalized and interpreted it to mean seven calendar days. *Id.* As a result, it took five months to resolve the definition of "weekly" during the validation step, including time utilizing the dispute resolution process. *Id.* The following timeline illustrates the validation process for this indicator:

| July 18, 2023→ | Aug. 3, 2024→ | Aug. 25, 2023→ | Nov. 15, 2023→ | Dec. 2023 |
|---|---|---|---|---|
| Issue Identified During BRMR Meeting | Level 1 Dispute Resolution | Level 2 Dispute Resolution | Level 3 Dispute Resolution | Issue Finally Resolved |

In short, the delay was due to a substantive dispute as to the meaning of the word "weekly" and not any technical issue with CDCR's technical staff. *Id.* Similar interpretation disagreements continue to arise for AC2.1 and other timely compliance indicators, including whether contacts must be completed by the "assigned" clinician to be compliant. *Id.* Substantive decisions, including how to calculate the duration of offered treatment when a patient refuses and what types of appointments are appropriate structured treatment or primary clinician interactions are also discussed in BRMR meetings. *Id.* By and large, the stakeholders are able to reach an agreement regarding these substantive items, but it takes time. *Id.*

expeditious as most (if not all) of the substantive decisions, including interpretation of the remedy, have occurred. However, it is necessary for the documentation of the patient-wise version of each TCM indicator to move through the validation process so that any new substantive issue can be discussed and so that both parties and the Special Master's team have a common understanding of the methodology and how the data for each indicator is being used to determine the corresponding summary statistic. This step should not be delegated to the Special Master.

2. *Recently-Ordered Application of the Special Master's Methodologies Requires a Second Set of Documentation to Move Through the Data Remediation Process for the 38 Patient-Wise-Flexible Key Performance Indicators.*

Previously, the Court ordered the development of 38 timely compliance key performance indicators in accordance with the Special Master's proposed patient-wise-flexible and degree-of-impact methodologies[4]—*i.e.* methodologies different than Defendants' opportunity-based methodology. *See, generally*, ECF No. 8078. Utilizing the Special Master's patient-wise-flexible and degree-of-impact methodologies to document, program, and verifying all 38 timely compliance key performance indicators will necessarily further extend the data remediation process. Cartwright Decl. ¶ 9. An additional documentation requirement was effectively added for all 38 timely compliance key performance indicators.[5] It also requires Defendants to understand the Special Master's vision for how these indicators will work in order to have CDCR's staff program them to the Special Master's data expert's satisfaction.[6]

---

[4] The patient-wise-flexible methodology is the Special Master's recommended methodology to be used *in addition to* Defendants' preferred opportunity-based methodology. *See* ECF No. 8078 at 4:3-5, 23-26. The patient-wise-flexible methodology focuses on how many individual inmate-patients subject to a specific service requirement timely receive the service and allows cases featuring some deviation from the minimum standard to be scored as compliant. *Id.* at 4:9-16. The patient-wise-flexible methodology is also supplemented with degree-of-impact statistics which provide additional information on the extent of the delay when timelines are not met. *Id.* at 4:17-23. This additional degree-of-impact information requires its own methodological documentation.

[5] The parties and the Special Master have agreed that it would ideal if the opportunity-based and patient-wise flexible versions of the indicators shared a business rule, thus limiting the new documentation required. While Defendants hope this is possible, it is unclear whether using the same business rule will be possible without a clear understanding of what (if any) changes the Special Master's Data Expert would recommend to each business rule. *See* Cartwright Decl., fn. 1.

[6] Defendants' preferred approach is not to have "all CDCR staff assigned to this project

As noted above, the documentation for the patient-wise version of indicators that have already completed validation under the opportunity-based methodology may be simpler to move through the data remediation process, but only if the documentation is clear. To create clear documentation and limit the time spent in Step 2 of the process, CDCR needs to fully understand the Special Master's methodologies to ensure that it can provide the necessary documentation to operationalize the indicators. While there is no uncertainty about *which* methodologies to utilize, there is uncertainty about *what* is exactly required to ensure proper documentation.[7] Clear documentation is necessary for indicators to achieve programming and verification.

CDCR has attempted to provide the documentation for one key performance indicator using the Special Master's patient-wise-flexible and degree-of-impact methodologies (Step 1). ECF No. 8181 at 4:13-21. Throughout January 2024, the parties and the Special Master agreed to devote time in BRMR to working on the documentation. Cartwright Decl. ¶ 11. Usually, CDCR would draft the initial documentation independently and then provide the draft for review by the Special Master and Plaintiffs' counsel. However, given the complexity of the patient-wise methodology and degree-of-impact statistics—and the fact that the methodology is the Special Master's—all stakeholders agreed joint drafting would be appropriate, at least for the first indicator. *Id.* After several meetings, during which the parties and the Special Master's data expert walked through the documentation template and filled in each section with the detailed information necessary to achieve data remediation, CDCR was tasked with sending the

---

learn the necessary technical steps as the work progresses." ECF No. 8181 at 5 fn.4. Nor do defendants ask that the Special Master "train[] CDCR's quality assurance team." *Id*. Defendants simply need to understand the Special Master's preferred methodologies so they can efficiently move these 38 indicators through each step of the process.

[7] To put this into perspective, each indicator is made up of three pieces of documentation: (1) the key performance indicator; (2) the business rule; and (3) the data element. Cartwright Decl. ¶ 4. The key performance indicator includes the numerator and denominator information, links to the business rules, reporting location, explanation of pop ups, and the underlying rationale for the indicator. *Id.* The business rule includes information regarding the underlying data and each indicator can have multiple business rules (e.g., for transfer timelines there are different rules depending on the transferee's ultimate level of care). *Id.* The data element includes a screenshot to explain where the data originates, including an explanation of the data sources when an indicator is run. *Id.*

documentation for a patient-wise indicator through the normal validation process. *Id.* When CDCR initially presented its documentation to Plaintiffs' counsel and the Special Master team, CDCR assumed the comments would be minimal, as all stakeholders had worked through the documentation template together. *Id.* at ¶ 12. Instead, the Special Master's Data Expert provided significant general comments that were difficult to understand and to square with the documentation for the indicator at hand. *Id.* Despite conversations regarding the patient-wise documentation and requests for more specific comments for the one indicator that has moved into validation (SC8.1), Defendants still do not have clear guidance as to what the Special Master's methodologies require. *Id.* at ¶ 13; *see also id.* at Ex. A.

Defendants believe that the data remediation process can be expedited if they obtain clarification regarding the Special Master's methodologies and corresponding documentation detailing the requirements in the documentation templates previously agreed upon and used to achieve data remediation for years. Cartwright Decl., ¶ 14. Defendants need detailed specifics, including information regarding what should be included in each section of current documentation template. *Id.* Thus far, general, inconsistent, or incomplete guidance has been provided, but not the specificity needed to create documentation of the patient-wise methodology clear enough to complete validation, programming, and verification. *Id.* With clarity, Defendants could produce complimentary documentation to get all 38 key performance indicators through the six-step process. *Id.* Critically, CDCR's technical staff[8] would similarly have the necessary guidance to program the software to create these indicators at Step 4—without the need for any additional programmers or contractors. *Id.*; *see* ECF No. 8181 at 6:23-24 (referring to potentially retaining an outside contractor to perform technical programming).

Because the Court's contemplated order does not address these concerns, Defendants do not believe the Court's proposed approach will expedite the data remediation process. Accordingly, Defendants oppose the order.

/ / /

---

[8] The Court's order appears to refer to CDCR's programmers as "technical staff." *See* ECF No. 8181 at 4:21.

B.  **The Court's contemplated order is inconsistent with the Court's longstanding view that Defendants are responsible for choosing and implementing the mechanisms for meeting their Constitutional obligations in the remedial phase of this case.**

Defendants separately oppose the Court's contemplated order because it is inconsistent with the longstanding view that Defendants are responsible for choosing and implementing the mechanisms for meeting their Constitutional obligations in the remedial phase of this case. "The court emphasizes again that the court and the Special Master have been guided throughout the remedial phase of this action by the view that it is the court's obligation to identify constitutional deficiencies and defendants' obligation to remedy them." ECF No. 4539 at 65:25-66:3; *see, also,* ECF No. 612 ("Moreover, in cases challenging conditions of prison confinement, courts must strike a careful balance between identification of constitutional deficiencies and deference to the exercise of the wide discretion enjoyed by prison administrators in the discharge of their duties."). Here, the portion of the order that would delegate the entire data remediation process to the Special Master for the 38 timely compliance key performance indicators would frustrate CDCR's duty to choose and implement the mechanisms for meeting their Constitutional obligations. Indeed, if the Special Master would provide Defendants with his patient-wise-flexible and degree-of-impact methodologies, Defendants could streamline the documentation piece of the six-step process and get data remediation for these indicators back on track.

Alternatively, to the extent the Court will delegate any aspect of this process to the Special Master, it should be limited to Step 1: documentation. If the Special Master provided the initial draft of documentation using his patient-wise-flexible and degree-of-impact methodologies for the timely compliance key performance indicators that have already completed validation using Defendants' opportunity-based methodology, the parties could move directly to validation (Step 2) to resolve any disputes with the Special Master's documentation. Those disputes should be limited as the substantive policy interpretation and non-technical decisions for these indicators were already completed when the opportunity-based versions of the indicators went through validation. Then those indicators would be approved and could be promptly sent to CDCR's technical staff for programming and verification. Such an order would strike a careful balance of moving data remediation forward while still giving Defendants the necessary responsibility to choose and

implement the Special Master's documentation into verifiable key performance indicators.

**C.    The Court's contemplated order directing CDCR to cede control over an employee, Dr. David Leidner, to the Special Master would exceed the Special Master's jurisdiction as proscribed by the Order of Reference.**

The Court's proposal—directing Defendants to make Dr. Leidner available at the Special Master's direction—would frustrate key limitations in the Order of Reference. The Order of Reference provides as follows: "The special master shall not be empowered to direct defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. The sole power to direct compliance and punish compliance remains with the court. Neither the special master nor anyone in his employ shall intervene in the administrative management of the CDC or any of the institutions that are part of the class in the instant action." ECF No. 640 at 7-8 (¶ 11). The contemplated order would directly contradict this important provision in the Order of Reference and frustrate its purpose. The Court's order would essentially allow the Special Master to direct one of Defendants' subordinates to take specific actions related to data remediation. Because the Special Master lacks that power under the Order of Reference, Defendants oppose the Court's order.

Separately, Dr. Leidner's expertise is limited to Step 5 (verification) of the data remediation process. The expansion of his role to include other steps in the process is unlikely to further expedite the data remediation process because he has limited involvement in the other steps of data remediation—including the critical documentation and validation steps.[9] Dr. Leidner has no decision-making authority regarding CDCR's Mental Health Services Delivery System (MHSDS) and therefore cannot bind CDCR—or any other Defendant for that matter—in any decision related to this case. Declaration of Diana Toche ("Toche Decl") ¶ 3.

To be clear, Dr. Leidner has been retained by CDCR's Undersecretary of Health Care Services, Dr. Diana Toche, to work under her direction in the limited role of providing the Special

---

[9] This is by design. The verification staff develops their tests based solely on the documentation and not any pre-conceived notions regarding the documentation. Expanding Dr. Leidner's role to other steps may inadvertently limit his objectivity and consequently skew the verification step.

---

Case 2:90-cv-00520-KJM-SCR — Document 8195 — Filed 04/09/24 — Page 10 of 10

Master with information, options, and recommendations regarding management of CDCR's strategic mental health data. *Id.* ¶ 3. Because of his limited and clearly delineated role within CDCR, Defendants oppose the Court's contemplated order expanding his role in the data remediation process beyond his current duties.

### III. CONCLUSION

For the foregoing reasons, Defendants oppose the order as contemplated.

### IV. CERTIFICATION

Defendants' counsel certify that they reviewed the following orders in preparing this filing: ECF Nos. 623, 640, 4539, 6230, 8078, 8181.

DATED: April 9, 2024

ROB BONTA
Attorney General of California

By: */s/ Elise Owens Thorn*
DAMON MCCLAIN
Supervising Deputy Attorney General
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

DATED: April 9, 2024

HANSON BRIDGETT LLP

By: */s/ David C. Casarrubias*
LAWRENCE M. CIRELLI
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
*Attorneys for Defendants*

20702806.6

10

DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE