1  Rob Bonta, State Bar No. 202668
   Attorney General of California
2  Monica N. Anderson, State Bar No. 182970
   Senior Assistant Attorney General
3  Damon McClain, State Bar No. 209508
   Supervising Deputy Attorney General
4  Elise Owens Thorn, State Bar No. 145931
   Namrata Kotwani, State Bar No. 308741
5  Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone: (916) 210-7318
    Fax: (916) 324-5205
8   E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:   925-746-8460
Facsimile:   925-746-8490
*Attorneys for Defendants*

9

10              **UNITED STATES DISTRICT COURT**

11             **EASTERN DISTRICT OF CALIFORNIA**

12                 **SACRAMENTO DIVISION**

13

14  RALPH COLEMAN, et al.,

15         Plaintiffs,

16     v.

17  GAVIN NEWSOM, et al.

18         Defendants.

Case No. 2:90-CV-00520- KJM-DB

**DECLARATION OF STEVEN CARTWRIGHT IN SUPPORT OF DEFENDANTS RESPONSE TO ORDER TO SHOW CAUSE**

Judge:    Hon. Kimberly J. Mueller

19

20         I, Steven Cartwright, declare as follows:

21         1.     I am currently employed as the Assistant Deputy Director of the California Department

22  of Corrections and Rehabilitation's (CDCR) Statewide Mental Health Services Delivery System

23  (MHSDS). I have held this position since July 17, 2020. I have been employed by CDCR since

24  January 1, 2016. I submit this declaration in support of Defendants' response to the Court's Order

25  to Show Cause.

26         2.     I have personal knowledge of the facts set forth herein, except as to those stated on

27  information and belief and, as to those, I am informed and believe them to be true.  If called as a

28  witness, I could and would competently testify to the matters stated herein.

3.      In my capacity as Assistant Deputy Director, I oversee Defendants' data remediation efforts.  I participate in all stages of validation and verification, including data analysis, planning, change management, reporting, and monitoring.  I work closely and regularly with Dan Potter, the Special Master's data expert.  Additionally, I attend meetings related to data remediation to ensure that CDCR's efforts align with the requirements of Court orders on data remediation and the objectives of the data remediation project—documentation, validation, and verification of the mental health reporting system.  By actively participating in the various stages of data remediation, I ensure that we identify the root cause of data quality issues and determine the most effective remediation approach.  I work with the team to develop a comprehensive plan that outlines the scope, timelines, and resources required for data remediation.  I also oversee the implementation of workflows and procedures to ensure that remediated data is accurate, complete, and produces data sufficient to measure compliance with the business requirements.  Attending meetings related to data remediation allows me to stay informed and enables me to collaborate with stakeholders and communicate the progress of our data remediation efforts effectively.  Through ongoing reporting and monitoring, I track the progress of data remediation efforts and identify areas for further improvement.

4.      The data remediation process involves a six-step process: (1) documentation; (2) validation; (3) approvals; (4) programming; (5) verification; and (6) remediation.  As is relevant here, the documentation stage requires CDCR to produce three pieces of documentation for each indicator: (a) the Key Performance Indicator (including what information goes into the numerator and denominator, a summary of the indicator, links to the business rules, the reporting location, an explanation of the pop ups, and a rationale for the indicator); (b) the business rule (meaning, what data is being pulled for each business rule, and one indicator could have multiple business rules); and (c) the data element (a screenshot to explain where the data originates, including an explanation of the data sources when an indicator is run).  In short, Defendants draft the initial documents at Step 1 and provide this information to Plaintiffs and the Special Master during Step 2 – validation.

5.      During Step 2, there are various cycles of input from the Special Master's team and

Plaintiffs' counsel, lengthy BRMR meetings, and dispute resolution proceedings, when necessary. As part of validation, the Special Master and Plaintiffs' counsel provide feedback not only on Defendants' opportunity-based methodology, but also on the substance of the business rules underlying the indicators, such as the population measured by the indicator, what types of contacts count as compliant, and the timelines required by the Program Guide.  Many of these discussions include interpretation of the remedy or substantive, non-technical decisions.  At times, as a result of the meet and confers in Step 2, Defendants may need to go back to Step 1 to modify or entirely overhaul the documentation that is provided for a specific indicator.  The validation step is the most time-consuming of all data remediation steps because of these rounds of detailed feedback, analysis, and consideration from stakeholders, which can take months to complete, depending on the nature of the indicator. Indeed, weekly BRMR meetings are scheduled for five or more hours each week.

6.      The AC2.1 "Timely PC Contacts" indicator (listed below as key performance indicator No. 1) is illustrative here of the lengthy delays that can occur at the validation step. Historically, *i.e.* before the data remediation process began, CDCR used the word "weekly" to mean a calendar week spanning Monday through Sunday.  However, when this indicator entered validation (Step 2), Plaintiffs' counsel and the Special Master took issue with how the word "weekly" would be operationalized and interpreted it to mean seven calendar days.  As a result, it took five months to resolve the definition of "weekly" during the validation step, including time utilizing the dispute resolution process (the issue was identified on July 18, 2023 during a BRMR meeting and was not resolved until around December 2023).  The following timeline illustrates the validation process for this indicator:

| July 18, 2023→ | Aug. 3, 2024→ | Aug. 25, 2023→ | Nov. 15, 2023→ | Dec. 2023 |
|---|---|---|---|---|
| Issue Identified During BRMR Meeting | Level 1 Dispute Resolution | Level 2 Dispute Resolution | Level 3 Dispute Resolution | Issue Finally Resolved |

In short, the delay was due to a substantive dispute as to the meaning of the word "weekly" and not any technical issue with CDCR's technical staff nor the size of the team working on data

3

remediation. Similar interpretation disagreements continue to arise for AC2.1 and other timely compliance indicators, including whether contacts must be completed by the "assigned" clinician to be compliant.  Substantive decisions, including how to calculate the duration of offered treatment when a patient refuses and what types of appointments are appropriate structured treatment or primary clinician interactions are also discussed in BRMR meetings.  By and large, the stakeholders are able to reach an agreement regarding these substantive items, but it takes time.

7.      Specifically, as this process relates to the 38 timely compliance methodology (TCM) key performance indicators, CDCR had completed the documentation step for all 38 of these indicators using CDCR's opportunity-based methodology.  Defendants' opportunity-based methodology focuses on the service requirement that is the subject of the particular indicator. Given the time-consuming nature of Step 2, described above, it is not surprising that twenty-three of those 38 indicators are currently in the validation step (Step 2) of the process.

8.      While most of the TCM indicators remain in validation, two have been approved by the Change Advisory and Prioritization Committee (CAPC – Step 3), and thirteen are in various phases of programming and verification (Steps 4 & 5).  The following table illustrates CDCR's progress to date under its opportunity-based methodology:

| | Indicator Number | Provisionally Approved Indicator Names | Current Indicator Name | Current Phase of the Process |
|---|---|---|---|---|
| 1 | AC2.1 | Timely PC Contacts | Timely PC Contacts | Step 2 - Validation |
| 2 | AC2.4 | Timely PC Contacts | Daily PC Interactions - ASU EOP Hub High Refusers | Step 2 - Validation |
| 3 | AC5 | Treatment Offered | Treatment Offered | Step 2 - Validation |
| 4 | MM5.1 | Continuity of Meds Upon Inter-Institutional Transfer at R&R | Transfer Medications Received Timely - Inter-System (Between Institutions) - GP | Step 2 - Validation |
| 5 | MM5.2 | Continuity of Meds Upon Inter-Institutional Transfer at R&R | Transfer Medications Received Timely - Inter-System (Between Institutions) - RHU | Step 2 - Validation |
| 6 | MM5.3 | Continuity of Meds Upon Inter-Institutional Transfer at R&R | Transfer Medications Received Timely - Inter-System (Between Institutions) - MH Inpatient | Step 2 - Validation |

| | Indicator Number | Provisionally Approved Indicator Names | Current Indicator Name | Current Phase of the Process |
|---|---|---|---|---|
| 7 | MM5.4 | Continuity of Meds Upon Inter-Institutional Transfer at R&R | Transfer Medications Received Timely - Inter-System (Between Institutions) - Specialized Medical | Step 2 - Validation |
| 8 | MM6.1 | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | Transfer Medications Received Timely - Intra-System (Within Institutions) - GP | Step 2 - Validation |
| 9 | MM6.2 | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | Transfer Medications Received Timely - Intra-System (Within Institutions) - RHU | Step 2 - Validation |
| 10 | MM6.3 | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | Transfer Medications Received Timely - Intra-System (Within Institutions) - MH Inpatient | Step 2 - Validation |
| 11 | MM6.4 | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | Transfer Medications Received Timely - Intra-System (Within Institutions) - Specialized Medical | Step 2 - Validation |
| 12 | MM7 | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | Transfer Medications Received Timely - Stable Housing | Step 2 - Validation |
| 13 | MM8.1 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Transfer Medications Received Timely - New Arrival to CDCR (RC) - GP | Step 2 - Validation |
| 14 | MM8.2 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Transfer Medications Received Timely - New Arrival to CDCR (RC) - RHU | Step 2 - Validation |
| 15 | MM8.3 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Transfer Medications Received Timely - New Arrival to CDCR (RC) - MHCB | Step 2 - Validation |

DECLARATION OF STEVEN CARTWRIGHT IN SUPPORT OF DEFENDANTS RESPONSE TO ORDER TO SHOW CAUSE

| Indicator Number | Provisionally Approved Indicator Names | Current Indicator Name | Current Phase of the Process |
|---|---|---|---|
| 16 | MM8.4 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Transfer Medications Received Timely - New Arrival to CDCR (RC) - CTC | Step 2 - Validation |
| 17 | MM9 | Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH | Transfer Medications Received Timely - Leaving CDCR | Step 2 - Validation |
| 18 | MM23.1 N | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Medication Management: Transfer Medications Received Timely - GP | Step 2 - Validation |
| 19 | MM23.2 N | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Medication Management: Transfer Medications Received Timely - RHU | Step 2 - Validation |
| 20 | MM23.3 N | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Medication Management: Transfer Medications Received Timely - MH Inpatient | Step 2 - Validation |
| 21 | MM23.4 N | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Medication Management: Transfer Medications Received Timely - Specialized Medical | Step 2 - Validation |
| 22 | AC3 | Timely Psychiatry Contacts | Timely MHMD Contacts | Step 3 – Approvals (Approved) |
| 23 | AC4 | Timely IDTTs | Timely IDTTs | Step 3 – Approvals (Approved) |
| 24 | MM3 | Diagnostic Monitoring-Antipsychotics | Diagnostic Monitoring-Antipsychotics | Step –4 & 5 - Programming/Verification |
| 25 | MM4 | Diagnostic Monitoring-Clozapine | Diagnostic Monitoring-Clozapine | Step 4 & 5 – Programming/Verification |
| 26 | AC1 | Timely MH Referrals | Timely MH Referrals | Steps 4 & 5 – Programming/ Verification |
| 27 | MM10 | Diagnostic Monitoring-QT Prolongation EKG 12 Months | Diagnostic Monitoring - QT Prolongation EKG 12 Months | Steps 4 & 5 – Programming/ Verification |
| 28 | MM11.1 | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Carbamazepine | Steps 4 & 5 – Programming/ Verification |

| | Indicator Number | Provisionally Approved Indicator Names | Current Indicator Name | Current Phase of the Process |
|---|---|---|---|---|
| 29 | MM11.2 | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Lamotrigine | Steps 4 & 5 – Programming/ Verification |
| 30 | MM11.3 | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Lithium | Steps 4 & 5 – Programming/ Verification |
| 31 | MM11.4 | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Oxcarbazepine | Steps 4 & 5 – Programming/ Verification |
| 32 | MM11.5 | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Valproic Acid | Steps 4 & 5 – Programming/ Verification |
| 33 | MM14 | Diagnostic Monitoring-Antidepressants | Diagnostic Monitoring-Antidepressants | Steps 4 & 5 – Programming/ Verification |
| 34 | NM1 | Timely response to Critical Med non-adherence notification | Timely response to Critical Med non-adherence notification | Steps 4 & 5 – Programming/ Verification |
| 35 | NM2 | Timely response to Non-critical Med non-adherence notification | Timely Response to Non Critical Med Non Adherence Notification | Steps 4 & 5 – Programming/ Verification |
| 36 | SC8.1 | Timely MH RVR Assessments | Timely Submission of MH RVR MH Assessment Results | Steps 4 & 5 – Programming/ Verification |
| 37 | URM3 | Timely Transfers to the MHCB | Timely Transfers to the MHCB | Steps 4 & 5 – Programming/ Verification |
| 38 | SP9 | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | Mental Health Observations Reporting Tool | Steps 4 & 5 – Programming/ Verification |

9.    As a result of this Court's December 2023 ruling to develop the 38 timely compliance key performance indicators in accordance with the Special Master's patient-wise flexible and degree of impact statistics methodologies, each of these 38 indicators (regardless of where they are currently in the data remediation process under CDCR's opportunity-based methodology) will require new documentation explaining the patient-wise flexible approach and

1   degree of impact statistics.  They will also need to complete all additional steps of data

2   remediation under these new methodologies, though it is possible that the path through validation

3   for the patient-wise flexible version of the TCM indicators that have already achieved validation

4   under the opportunity-based methodology may be more expeditious as most (if not all) of the

5   substantive decisions, including interpretation of the remedy, should have already been

6   addressed[1].  It also requires Defendants to learn how to complete the data remediation steps under

7   these new methodologies.

8       10.     Nonetheless, it is necessary for documentation of the patient-wise version of each

9   TCM indicator to move through the validation process so that any new substantive issue can be

10  discussed and so that both parties and the Special Master's team have a common understanding of

11  the methodology and how the data for each indicator is being used to determine the summary

12  statistic.  To ensure that this process moves as efficiently and expeditiously as possible, it is

13  essential that clear documentation is provided in Step 1, so as to limit the time spent in Step 2.  To

14  do so, CDCR needs consistent specifications of the Special Master's methodologies to ensure that

15  it can provide the necessary documentation to operationalize the indicators. While there is no

16  uncertainty about *which* methodologies to utilize, there is uncertainty about *what* is exactly

17  required to ensure proper documentation.  Clear documentation is necessary for indicators to

18  achieve programming and verification, but so far CDCR has received inconsistent or incomplete

19  information needed to fully document the Special Master's new methodologies.

20      11.     Thus far, only one patient-wise key performance indicator has completed the

21  documentation step (Step 1).  Throughout January 2024, the parties and the Special Master agreed

22  to devote time in BRMR to working on the documentation for the first patient-wise flexible and

23  associated degree-of-impact indicators.  Usually, CDCR would draft the initial documentation

24  independently and then provide the draft for review by the Special Master and Plaintiffs' counsel.

25  However, given the complexity of the patient-wise methodology and degree of impact statistics

26

27  _____

[1] This is because opportunity-based and patient-wise flexible versions of TCM indicators can

28  share the same underlying business rules.

1  and the fact that the methodology is the Special Master's, all stakeholder agreed joint drafting

2  would be appropriate, at least for the first indicator.  After several meetings, during which the

3  parties and the Special Master's data expert walked through the documentation template and filled

4  in each section with the detailed information necessary to achieve data remediation, CDCR was

5  tasked with sending it through the normal validation process.

6          12.     When CDCR initially presented its documentation to Plaintiffs' counsel and the

7  Special Master team for the SC8.1 indicator, CDCR assumed the comments would be minimal, as

8  all stakeholders had worked through the documentation template together.  Instead, the Special

9  Master's Data Expert provided extensive general comments that were difficult to apply to the

10  documentation for the indicator at hand.  This pivot away from detailed specifics to broader

11  commentary has introduced ambiguity, complicating our efforts to finalize the SC8.1

12  documentation and laying down a clear path for the documentation of other indicators.

13          13.     Despite conversations regarding the patient-wise documentation and requests for

14  more specific comments for SC8.1, the one indicator that has moved to validation, Defendants still

15  do not have clear guidance as to what the Special Master's methodologies requires.  Attached as

16  **Exhibit A** is a true and correct copy of an email dated March 7, 2024, from CDCR Office of Legal

17  Affairs attorney Melissa Bentz to Deputy Special Master Kerry Walsh (in which I was copied)

18  requesting additional clarification and feedback regarding the documentation requirement of the

19  SC8.1 patient-wise flexibility and degree of impact indicator specifically, and all patient-wise

20  flexibility and degree of impact indicators generally.  I am informed and believe it to be true that

21  as of the date of this filing, no response has been received.

22          14.     It is likely that the data remediation process could be expedited if CDCR could

23  obtain a stabilized or definitive version of the Special Master's methodologies and corresponding

24  documentation requirements.  We need the documented specifications that are essential for the

25  patient-wise flexibility indicators to be validated, programmed, and verified.  This detailed

26  documentation will serve as a foundational guide, ensuring procedural clarity and consistency

27  across the board for the remaining TCM indicators.  Thus far, general guidance has been provided,

28  but not the specificity needed to create documentation of the patient-wise methodology clear

enough to complete validation, programming, and verification, and certainly not in an expeditious manner.  With clarity, Defendants could produce complimentary documentation to get all 38 key performance indicators through the six-step process.  Critically, CDCR's technical staff would similarly have the necessary guidance to program the software to create these indicators at Step 4—without the need for any additional programmers or contractors.

15.    Alternatively, if the Special Master's team provided the initial draft of documentation using his patient-wise-flexible and degree-of-impact methodologies for the timely compliance key performance indicators that have already completed validation using Defendants' opportunity-based methodology, the parties could move directly to validation (Step 2) to resolve any disputes with the Special Master's documentation. Those disputes should be limited as the substantive policy interpretation and non-technical decisions for these indicators were already completed when the opportunity-based versions of the indicators went through validation. Then those indicators would be approved and could be promptly sent to CDCR's technical staff for programming and verification.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of April, 2024, at Elk Grove, California.


  _/s/ Steven Cartwright_
Steven Cartwright

# Exhibit A

| From: | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
|---|---|
| Sent: | Thursday, March 7, 2024 1:52 PM |
| To: | Coleman Special Master; Coleman Team - RBG Only |
| Cc: | v_Nicholas.Weber@cdcr.ca.gov; Thind, Sundeep@CDCR; v_Steven.Cartwright@cdcr.ca.gov; Worrell, Wendy; Leung, Pak Yan@CDCR; Garland, Latoya@CDCR; Kirby, Melissa@CDCR |
| Subject: | Coleman: Request for Special Master Team's Comments on SC8.1 |

Kerry,

As discussed in BRMR yesterday, it would be incredibly helpful if Dr. Potter could provide any specific comments or revisions he has on SC8.1 patient-wise flexible (PWF) and degree of impact (DOI) to all stakeholder as soon as possible. During our conversations over the last two days, it became clear that during the prior stakeholder review period Dr. Potter provided general comments regarding PWF and DOI statistics and how he believed we could make documentation of these types of indicators more efficient. However, those comments did not include specific revisions to SC8.1 PWF and DOI despite having concerns about some of the language. While we appreciate the time spent discussing the PWF and DOI items this week, it was incredibly confusing for a lot of CDCR staff as we were unclear that the original comments were meant to be broad comments and did not see any SC8.1 specific comments until yesterday's BRMR meeting. I understand that Dr. Potter sent specific comments on SC8.1 DOI to Ms. Kirby at 11:30am just as BRMR was starting. But those comments were not widely disseminated to Plaintiffs or Defendants. Our goal is to receive Dr. Potter's comments and follow the normal process of conducting our internal review, making appropriate changes, and then bringing the items to BRMR for discussion as needed. This is necessary not only to move the SC8.1 items forward, but also to allow CDCR to fully understand the PWF and DOI methodologies so we can start creating documentation for other timely compliance methodology indicators.

Please let us know when we may expect all of Dr. Potter's comments on SC8.1 PWF and DOI.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.