ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

HANSON BRIDGETT LLP
PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                                    Plaintiffs,<br><br>           v.<br><br>GAVIN NEWSOM, et al.,<br><br>                                    Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**PARTIES' JOINT REPORT IN RESPONSE TO NOVEMBER 15, 2023 ORDER SETTING APRIL 26, 2024 STATUS CONFERENCE (ECF NO. 8066)**<br><br>Judge: The Hon. Kimberly J. Mueller |

## INTRODUCTION

On November 15, 2023, the Court scheduled a status conference for April 26, 2024, to address issues related to the steps Defendants have taken to enhance class members' access to the Department of State Hospitals (DSH), the development of programs for class members with personality disorders, and Defendants' compliance with required staffing levels in the California Department of Corrections and Rehabilitation's (CDCR) Psychiatric Inpatient Programs (PIPs). (ECF Nos. 8066.) On March 8, 2024, the Court added Defendants' compliance with court-ordered suicide prevention measures to the agenda. (ECF No. 8147 at 8.)

[4473778.2]

1

1    On April 15, 2024, the parties proposed that the Court defer two topics on the April 26,

2    2024 status conference agenda to a later date.  Those topics—Defendants' Least Restrictive

3    Housing policy and other steps to enhance class members' access to DSH, as well as Defendants'

4    compliance with staffing requirements in CDCR's PIPs—are the subject of ongoing court-ordered

5    mediation.  On April 18, 2024, the Court ordered that the April 26 status conference will cover

6    the development of programs for class members with personality disorders and Defendants'

7    compliance with court-ordered suicide prevention measures, and deferred the discussion of PIP

8    staffing as well as the Least Restrictive Housing policy and other steps to enhance class members'

9    access to DSH until thirty days after the end of the court-ordered mediation period.  (ECF

10   No. 8205.)

11    As directed in the November 15, 2023 order, the parties met and conferred under the

12   supervision of the Special Master regarding revisions to Defendants' Least Restrictive Housing

13   policy and other steps to enhance class members' access to DSH, as well as the development of

14   programs for class members with personality disorders.  (ECF No. 8066 at 5.)  The Court further

15   ordered the parties to file a joint report about the aforementioned inpatient program topics and

16   Defendants' compliance with PIP staffing requirements.  (*Id*.)  The parties' joint report must be

17   filed by April 19.  (ECF No. 8184.)  Based on the amended agenda for the April 26 status

18   conference, the parties submit below their respective positions concerning the development of

19   programs for class members with personality disorders.[1]

20   / /

21   / /

22

23

24

25    [1]  As this report shows, the parties disagree about the scope of the treatment that must be
      provided to *Coleman* class members and whether providing treatment for personality disorders is
26    required under the Eighth Amendment.  However, this joint report responds to the Court's
      11/15/23 order for reporting on the parties' discussions of more prompt development of programs
27    for class members with personality disorders including a possible pilot program as discussed in
      this order. (ECF No. 8066 at 5.)  It is not meant to provide full briefing on the scope of the Eighth
28    Amendment remedy as it relates to the provision of treatment of personality disorders

I.   **DEFENDANTS' POSITION ON THE DEVELOPMENT OF PROGRAMS FOR CLASS MEMBERS WITH PERSONALITY DISORDERS**

A.   **Defendants Identified Class Members with Personality Disorders Who may Benefit from Treatment.**

On September 23, 2021, the Court ordered CDCR to conduct an Unmet Needs Assessment to identify the "subset of class members with severe personality disorders associated with significant functional impairments who have special treatment needs not yet available in an inpatient setting." (ECF No. 7305 at 15.)  The order was based on the lone statement that the "Special Master has informed the court that there is a subset of class members with severe personality disorders associated with significant function impairments who have special treatment needs not yet available in an inpatient setting."  (*Id.*)  The order did not include findings that the patients with personality disorder diagnoses were at risk of harm, that a lack of treatment options for patients with personality disorder diagnoses somehow violated their Eighth Amendment rights, or that the treatment of personality disorders was a required part of the 1995 remedy in this case.  In fact, there have been no orders entered to date that establish Defendants' obligation under the Eighth Amendment to provide class members with treatment for their personality disorders.  The Program Guide distinguishes the treatment of personality disorders from the treatment services provided by the CDCR's mental health treatment programs, placing them in the same class as sexual and substance abuse disorders.[2]  (ECF No. 7333-1 at 23.)  Simply put, the treatment of personality disorders is not part of the Eighth Amendment remedy in this case.  Even though not a required part of the remedy, Defendants have consistently acknowledged that there is a subset of Coleman patients with personality disorders who may benefit from treatment and has worked with the Special Master and Plaintiffs to develop a methodology to assess that need as part of the UNA.  That assessment resulted in a recommendation that "CDCR should

---

[2] Plaintiffs' attempt to recast Program Guide requirements through arguments regarding medical necessity or newer availability of treatment of personality disorders does not hold.  The Program Guide requires Defendants to provide treatment to class members if they require inclusion in the Mental Health Services Delivery System due to medical necessity, but nowhere in the Program Guide are Defendants required to provide specialized treatment for patients with personality disorders. Instead, as mentioned above, treatment of personality disorders is specifically excluded from the Program Guide. *See Program Guide at 12-1-6,* 12-2-1, 12-2-2, 12-8-2, and 12-9-3.

1   implement the 12-month plan outlined in this report, aiming to validate the findings from the

2   2022/2023 UNA and evaluate the treatment needs of the 470 patients with personality disorders

3   identified during the 2022/2023 UNA." (ECF No. 7865-3 at 11.) CDCR's 12-month plan was

4   "guided by a thoughtful and rigorous evaluation of patient needs, not by legal categorizations. It

5   doesn't automatically equate a diagnosis of personality disorder with inclusion in the Coleman

6   class, nor does it suggest that a Coleman remedy is necessarily inclusive of a treatment program

7   for these disorders. As mental health practitioners dedicating our career to improving the lives of

8   our patients, our focus remains on understanding and addressing their individual treatment

9   needs." (*Id.*)

10       **B.**    **Defendants Proposed a Plan to Develop a Treatment Program for**

11              **Personality Disorders.**

12       As previously reported, the UNA Report identified 470 class members who may benefit

13   from treatment for their personality disorders. (ECF No. 7865-2 at 2.) The November 15, 2023

14   order directed the parties to meet and confer under the supervision of the Special Master "to

15   discuss more prompt development of a pilot program for this subgroup of class members, with the

16   specific goal of developing a plan for the pilot program within three months and implementing

17   the pilot program within six months thereafter." (ECF No. 8066 at 4:15-24.)

18       Consistent with the November 15, 2023 order, CDCR developed a plan to treat personality

19   disorders for the subgroup of class members identified in the UNA. On February 20, 2024,

20   CDCR circulated its proposed *Plan to Provide Treatment for MHSDS Patients with Personality*

21   *Disorders* (CDCR's Plan) to Plaintiffs and the Special Master. A copy of CDCR's Plan is

22   attached as Exhibit A.

23       CDCR's Plan recognizes that "there is not currently an unambiguous correctional standard

24   for specialized treatment for some or all personality disorders" and that "there is no clear single

25   standard treatment guaranteed to be effective, even for the percentage of patients that agree to

26   engage with treatment." In summary, CDCR's Plan presents treatment options that will "provide

27   the best care possible to the greatest number of patients." This will consist of a menu of

28   specialized treatment options at all Enhanced Outpatient Program (EOP) institutions to include

1    evidence-based, manualized treatments that can be offered where the patients are currently

2    located, thus, avoiding destabilizing and stressful transfers to a new location.

3        CDCR's Plan includes details on the following four treatment options that may be included

4    in the proposed menu of specialized treatment options: (1) Systems Training for Emotional

5    Predictability and Problem Solving for Borderline Personality Disorder (STEPPS), a program that

6    offers a manualized group treatment format that is designed for outpatient treatment use for

7    patients diagnosed with borderline personality disorder; (2) Dialectical Behavior Therapy (DBT)

8    Skills Groups, a program that offers groups focus on four main topics: mindfulness, interpersonal

9    effectiveness, emotion regulation and distress tolerance; (3) START-NOW, a manual-guided

10   skills training originally developed for correctional settings and also adapted for forensic

11   psychiatric units; and (4) Thinking for a Change (T4C), a program developed with cooperation by

12   the National Institute of Corrections (NIC) by a panel of experts in cognitive behavioral therapies.

13       These treatment options will vary per institution based on institution and patient need.

14   Further, CDCR will continue to review other treatment options available for patients with

15   personality disorders and may remove or replace some of the above treatment options as

16   appropriate. Staff will be provided with the resources, training, and certifications necessary to

17   facilitate the various treatment options, and that class members will also be provided with

18   information regarding the requirements of participating in the various treatment options and the

19   evidence behind the treatment so they are aware of the potential benefits.

20       **C.    The Special Master and Plaintiffs Are Receptive to the Plan.**

21       Plaintiffs provided input and detailed comments to CDCR's plan on March 12, 2024.

22   Plaintiffs' response is attached as Exhibit B.  On March 21 the Special Master contacted the

23   parties to schedule the first meeting to discuss CDCR's Plan and the first meeting was set for

24   April 5.  Although the Special Master has not provided Defendants with any written comments on

25   the plan, his team provided verbal input on the plan at the meetings held on April 5 and April 15.[3]

26   _____

27       [3] Defendants note that the Special Master seems to have disregarded their repeated
     requests to reduce the number of staff who attend meetings and court appearances by having
28   sixteen members of his team in attendance at the April 5 discussion, including ten mental health
     experts, three attorneys, two paralegals, and a custody monitor.  The parties met for a second time

1    In general, the Special Master's experts and Plaintiffs' counsel were receptive to CDCR's Plan.

2         At the April 15 meeting, CDCR indicated that it will first implement the treatment plan at a

3    few institutions.  Plaintiffs expressed their concern that the initial roll-out should include

4    institutions with higher custody levels as many class members with personality disorders tend to

5    reside in those institutions.[4]  CDCR explained that once they have had an opportunity to assess

6    the programs at the initial institutions they will be better-positioned to expand the treatment

7    groups to more complex institutions.  CDCR Mental Health will issue a statewide notice to all

8    staff concerning the implementation of the treatment programs so that all staff are aware of the

9    new programs.

10        Plaintiffs also expressed a concern regarding a lack of specific target dates for the roll out.

11   Defendants agreed to provide an estimated roll-out schedule and description of the steps that are

12   involved in the implementation of CDCR's Plan.

13        **D.    Status of Development of CDCR's Plan.**

14        As explained during the April 5 and April 15 meetings, CDCR is not currently able to

15   provide a specific start and completion time or an activation schedule with start and end dates

16   because there are too many variables, including identifying staff who are interested and invested

17   in this type of treatment at each institution to facilitate the treatment, training that staff, which

18   may require training with the entity that owns the treatment program materials, and identifying

19   patients at each institution to form appropriate groups. Notwithstanding, CDCR has developed the

20   tentative process identified below to roll-out CDCR's Plan at the first two institutions. CDCR is

21   considering San Quentin State Prison and Valley State Prison for the first phase of the roll-out,

22   but that is subject to change.  CDCR plans to roll-out the treatment modalities at other institutions

23

24   ————————————
     on April 15, with seven mental health experts and monitors, six lawyers and one paralegal in
     attendance from the Special Master's team.  It remains unclear to Defendants why this many
25   attendees (at great cost to the State) are necessary.

26        [4] Plaintiffs reference a discontinued DBT program at CMF without attempting to explain
     the reason that program was unsuccessful.  *See infra* at 12:25-26.  *CMF* is a level II facility and
     many patients referred to the DBT program were unable to transfer to CMF due to custody
27   factors.  In developing the current treatment for patients identified in UNA, CDCR's Plan will
     provide access to the treatment modalities in all EOP programs to avoid complications related to
28   transfers, restrictions based on custody factors.

                              Joint Report in Response to Nov. 15, 2023 Order (ECF 8066)  (2:90-cv-00520 KJM-DB (PC))
                                                                                                          20745750.1

1     taking into account lessons learned from the implementation of the plan at the first two trial

2     institutions.

3          There are many steps to implementing new treatment groups in a consistent manner across

4     institutions, especially when the treatment is a manualized therapy that requires training, staff and

5     patient investment, and consistency to be most effective. Within the next 60 days, CDCR will

6     finalize the location for the initial roll-out of this treatment and transmit a memo to the

7     institutions regarding the new treatment groups, including one-page summaries of each treatment,

8     the criteria for potential placement in the groups, exclusion criteria, and absence allowance for

9     participants. Voluntary patient participation is key to not only the patient's success in these

10    treatments, but also to the other patients in the group.

11         Once the memo is sent to the institutions, they will be given two weeks to identify one to

12    two group facilitators per institutions. The facilitators will then be given a deadline to complete

13    the required training. CDCR is going to roll out the START-NOW group first. This treatment

14    modality can be implemented quickly relative to the other modalities. Training materials are

15    available online, at no charge for materials or training. The online training is self-paced and can

16    be completed in approximately four hours.  All training materials can be printed/downloaded by

17    group facilitators.

18         Other treatments will be added as CDCR determines the logistics for training and

19    implementation, as well as institutional need. CDCR is still researching an appropriate DBT

20    program structure to emulate. Once a program structure is chosen, DBT Skills Groups can likely

21    be implemented quickly as the DBT training and group materials are available online. Unlike

22    START-NOW and DBT, training for T4C and STEPPS must be completed by official trainers for

23    each program. T4C training consists of 73 hours over 5 weeks of interactive online training

24    culminating with three and a half days onsite at NIC in Colorado and is provided on an annual

25    basis.  CDCR will be unable to send participants from the Headquarters Training Unit to the 2024

26

27

28

1    training and will aim to attend the 2025 sessions.[5] CDCR is still waiting to hear from STEPPS

2    regarding their training requirements and timelines.

3        Most of the treatment groups are provided in cycles of four to eight months, assuming one

4    to two groups per week. Institutions may run multiple cycles of the same treatment group or one

5    cycle of multiple treatment groups simultaneously, based on facilitator availability and patient

6    need. Upon completion of two full cycles, either simultaneous or overlapping cycles of the same

7    treatment group or two cycles of different treatment groups, CDCR will provide an update to

8    Plaintiffs' counsel and the Special Master regarding the implementation and success of the

9    treatment groups.

10       Plaintiffs' request for a court order is unnecessary and inappropriate. Defendants have

11   provided information regarding the initial steps of implementation and proposed a timeline for

12   providing updates to Plaintiffs and the Special Master.  More importantly, the plan proposed by

13   Defendants goes above and beyond what is required by the Program Guide and community

14   standards.  Even Plaintiffs tacitly acknowledge this stating that "effective treatments for BPD are

15   relatively new even in the community."  Relatively new treatments do not reflect the minimum

16   standard of care and, regardless of when the referenced treatment was developed, Plaintiffs have

17   provided no evidence that specialized treatment for Borderline Personality Disorder, or any other

18   personality disorder, is the standard of care in either the community or in a correctional setting.

19   Defendants should be allowed to implement CDCR's Plan to provide this progressive treatment,

20   which is for a class of disorders that were specifically and intentionally excluded from the

21   Program Guide, without court order.  An order requiring the filing of implementation schedules

22   and quarterly updates with no set end date is unnecessary and will lard the docket.

23   / / /

24

25       [5] Plaintiffs criticize CDCR for not planning to have clinician trainers attend the training
     for the Thinking for Change program of the National Institute of Corrections until 2025.
26   Although Plaintiffs did not ask, the training unit does not have staff available to attend all of the
     required sessions of the 73-hour training.  CDCR' Plan is to focus immediately on delivering the
27   programs and materials that can be rolled-out in the near future and then include the Thinking for
     a Change modality when institutions are able to plan for staff ability to take on the required
28   training.

1  **II.    PLAINTIFFS' POSITION ON THE DEVELOPMENT OF PROGRAMS FOR CLASS
       MEMBERS WITH PERSONALITY DISORDERS**

2

3          Plaintiffs disagree with Defendants' assertion above that treatment for personality disorders

4  "is not a required part of the remedy" in this case.  *See supra* at 3:17.  In fact, the Program Guide

5  clearly requires – and has always required – treatment for individuals with personality disorders

6  who are already in the Mental Health Services Delivery System ("MHSDS") for other reasons, as

7  well as mandating treatment for those with personality disorders alone who require treatment for

8  their conditions on "medical necessity" grounds.  *See* ECF No. 7333-1 at 23.  Defendants' UNA

9  study reviewed patients who were part of the MHSDS, and the Court's order requiring

10  development of a program to treat patients with personality disorders described the patients as a

11  "subgroup of class members."  ECF No. 8066 at 4.  The patients for whom these programs will be

12  targeted are *Coleman* class members, their treatment is clearly required by the Program Guide and

13  part of the Eighth Amendment remedy in this case.

14          At the same time, Plaintiffs are generally supportive of Defendants' current plan to adopt

15  and implement four relatively new but well-established treatment modalities designed to treat

16  personality disorders within EOP programs, all four of which have either been designed for use in

17  correctional environments or validated for such use.  While Plaintiffs consider Defendants' plans

18  promising, Plaintiffs are concerned that Defendants will not commit to firm timelines for

19  implementation, especially since the Court originally ordered Defendants to implement their plan

20  within nine months.  ECF No. 8066 at 4.  The Court should require Defendants to file a final

21  implementation plan in 60 days, with a detailed activation schedule, followed by quarterly reports

22  on their progress in implementing these new programs, including data on the number of clinicians

23  trained in each type of program, the locations where each of these new treatment programs have

24  been implemented, and the number of patients enrolled in them, in order to ensure that

25  Defendants make steady progress in implementing these important new programs.  Plaintiffs also

26  request that the Court direct the Special Master to evaluate these programs in his future

27  monitoring rounds, and make any recommendations necessary to ensure these programs are fully

28  and effectively implemented.

1

**A.    The Program Guide Requires Treatment As Medically Necessary for Individuals with Personality Disorders.**

2

3      While individuals with personality disorders are not automatically part of the EOP or

4  CCCMS treatment programs in the MHSDS, the Program Guide makes clear that they shall be

5  provided with treatment when medically necessary, and when their personality disorder is

6  accompanied by an Axis I major mental disorder.  2021 Program Guide, ECF 7333-1 at 23.[6]  That

7  is the case for all of the 470 class members identified as needing treatment for a personality

8  disorder as part of the UNA study – all of them were class members at the CCCMS, EOP or

9  MHCB level of care, and therefore each of their mental health treatment teams had previously

10  determined that they met the specific treatment criteria for the MHSDS.  *See* UNA Study Report,

11  ECF No. 7865-3 at 80 (UNA operationalization criteria stating that review limited to "CCCMS,

12  EOP and MHCB patients at the institutions with EOP or MHCB will be reviewed") and at 48-51

13  (discussing findings with respect to the 470 patients identified).

14      The medical necessity treatment criteria within the EOP and CCCMS Chapters of the

15  Program Guide affirmatively state that treatment "*shall* be provided" when "[m]ental health

16  intervention is necessary to protect life and/or treat significant disability/dysfunction in an

17  individual diagnosed with or suspected of having a mental disorder."  *See id.* at 37-38 (CCCMS)

18  and 53 (EOP).  The UNA criteria for inclusion of class members with personality disorders in the

19  study were each indicators of precisely this kind of "significant disability/dysfunction" where the

20  Program Guide requires treatment.  The UNA criteria required the "Category 3" patient to "have

21  a personality disorder associated with significant disruptive behavioral disturbances, which may

22  include self-harming behaviors" and specifically listed as examples of functional impairment

23  including self-harming behaviors, disruption of the programming of others, and frequent peer

24  conflict.  *See* 6/30/23 UNA Study Report, ECF 7865-3, at Appendix 2, Operationalization of

25

26      ──────────────────────

[6]The Program Guide also excluded from the Security Housing Unit at PBSP anyone with "a diagnosis of a severe personality disorder that is manifested by frequent episodes of psychosis or depression and results in significant functional impairment," *id.* at 142, which is a good description of at least some of the individuals identified with unmet needs for personality disorder treatment in the UNA study.

27

28

Subject Criteria, at 79.  Patients with these symptoms and behaviors due to a personality disorder would all meet the Program Guide medical necessity standard.  Defendants' argument in this regard is a red herring.

Notably, the most recent 2021 Program Guide also includes a 2017 Dialectical Behavioral Therapy (DBT) program that was designed by CDCR clinicians and leadership at the time to treat this very population.  *See* 2021 Program Guide, ECF 7333-1, at 354-364 (description of 2017 DBT EOP program and admission criteria and procedures for same).  Defendants' 2017 DBT EOP program, which Defendants subsequently abandoned without notice to Plaintiffs or the Court, also reflects the fact that newer, validated treatments for personality disorders have been developed in the last two decades that did not exist at the time of the original Program Guide.

**B.    Validated New Treatments Are Available for Personality Disorders, Including Those Chosen By Defendants**

The specific treatments for personality disorders that Defendants have identified have been studied in correctional contexts with favorable results, or are designed specifically with a correctional patient population in mind.  To the extent Defendants' unsubstantiated assertion in their Plan that treatments for BPD are not yet widespread in correctional settings is true, it may simply reflect the fact that the effective treatments for BPD are relatively new even in the community.[7]  *See* Lois Choi-Kain, Ellen Finch, et al., *What Works in the Treatment of Borderline Personality Disorder*, Curr Behav Neurosci Report 2017; 4(1): 21-30 (noting that BPD was "once thought to be an untreatable condition" but that in recent years multiple established evidenced-based treatment protocols have been identified, including the STEPPS program chosen by

---

[7]  Defendants selectively cite this sentence earlier in this statement, removing the limiting phrase "[t]o the extent Defendants' unsubstantiated assertion in their Plan that treatments for BPD are not yet widespread in correctional settings is true…"  *See* supra at 8:12-13.  Defendants assert that these new treatments are too new to be part of the standard of care, but the quoted article is from 2017 and speaks of new treatments that were in fact developed as much as a decade prior to that time.  These treatments are now well-established in the community and are part of the standard of care.  The fact that prisons might be lagging behind the community, if true, would not excuse any refusal to provide treatments that are the standard of care in the community and deemed effective.

1    Defendants).  That is also likely the reason for the somewhat limiting exclusionary language

2    regarding personality disorders in the Program Guide.

3        Two of the new programs chosen by Defendants – the Systems Training for Emotional

4    Predictability and Problem Solving ("STEPPS") program, and the START NOW program – are

5    specifically designed for prison settings, according to the materials from the organizations

6    promoting these approaches that Defendants linked to in their February 20, 2024 Plan to Provide

7    Treatment for MHSDS Patients with Personality Disorders ("Defendants' February 20, 2024

8    Plan").  *See* Exhibit A at 2-3.  And Defendants' February 20, 2024 Plan also acknowledges that

9    the third program – the Thinking for Change (T4C) program – "was developed with cooperation

10   by the National Institute of Corrections by a panel of experts in cognitive behavioral therapies."

11   *See* Exhibit A hereto, Defendants' Plan, at 3.  The fourth modality, Dialectical Behavioral

12   Therapy (DBT), has been studied and found effective in correctional contexts, and as noted has

13   been employed previously by CDCR.

14       **C.    The Court should Order an Activation Schedule and Regular Updates on
              Implementation of These Programs To Ensure Full Implementation**
15

16       Defendants indicate above that "CDCR is not currently able to provide a specific start and

17   completion time or an activation schedule with start and end dates because there are too many

18   variables."  *See supra* at 6:14-15.  Plaintiffs appreciate that Defendants want to be careful in

19   selecting clinicians to run these new treatment programs, and that outside organizations must be

20   enlisted to provide training for several of the programs, and would support a modest extension of

21   the existing court-ordered deadline for implementation.  *See* ECF No. 8066, at 4.  But Defendants

22   should still be required to commit to a schedule for implementing these programs, and to move

23   expeditiously.  It is unacceptable, for example, that Defendants do not plan to have clinician

24   trainers attend the training for the Thinking for Change program of the National Institute of

25   Corrections until 2025.  The relevant deadline for applying for the NIC training program for 2024

26   is still approximately six weeks away on June 7, 2024.  *See* National Institute of Corrections

27   Website at  https://nicic.gov/resources/nic-library/all-faqs/when-and-where-will-nic-offer-

28   thinking-change-facilitator-training.

Plaintiffs request that the Court order Defendants to file a final implementation plan in 60 days, with a detailed activation schedule.  In addition, the Court should order Defendants to provide regular updates to the Court and the other parties every 90 days thereafter, to ensure that implementation proceeds smoothly and that Defendants do not abandon these programs in the same way that the 2017 DBT EOP program was abandoned.  These updates should include an updated activation schedule, data on the number of clinicians trained in each type of program, the locations where each of these new treatment programs have been implemented or are planned, and the number of patients enrolled in them.

Plaintiffs also ask to the Court to direct that the Special Master review the expeditious implementation of these new programs as well as their performance in future monitoring round reports, and make any recommendations as appropriate to ensure that they are successfully implemented.

/ / /

/ / /

/ / /

1

## III.  PARTIES' CERTIFICATION OF ORDERS

2        The Parties have reviewed the following orders that are relevant to this filing:  ECF No.

3   7305, 8066, 8184, and 8205.

4    Dated: April 19, 2024                            ROB BONTA
                                                      Attorney General of California
5                                                     DAMON MCCLAIN
                                                      Supervising Deputy Attorney General
6
                                                      */s/ Elise Owens Thorn*
7
                                                      ELISE OWENS THORN
                                                      Deputy Attorney General
8                                                     *Attorneys for Defendants*

9                                                     HANSON BRIDGETT LLP

10                                                    */s/ Paul Mello*

11                                                    PAUL MELLO
                                                      SAMANTHA D. WOLFF
12                                                    *Attorneys for Defendants*

13   Dated: April 19, 2024                            ROSEN BIEN GALVAN & GRUNFELD LLP

14                                                    THOMAS NOLAN
                                                        *Attorneys for Plaintiffs*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

[4473778.2]

14

# Exhibit A

**CDCR's Plan to Provide Treatment for MHSDS Patients with Personality Disorders**
**February 20, 2024**

During the 2022/23 UNA, CDCR identified 470 patients who did not qualify for inpatient care but may benefit from some form of a special treatment program for patients with personality disorders. (ECF No. 7865-3 at 48.) This group of patients is referred to as "Category 3" patients. (*Id*.) As noted in CDCR's UNA Report, there was a wide divergence of symptoms and maladaptive behaviors presented by the Category 3 patients, highlighting a variation in treatment needs. (*Id*.) Many of the identified patients had one or more personality disorder diagnoses requiring distinct treatment approaches, and a significant percentage had no personality disorder diagnosis at all at the time of the review. Accordingly, CDCR's plan to provide treatment to personality disorder patients will offer a suite of treatment options to clinicians to use at their discretion within the EOP setting, rather than creating a single program or housing unit for such a diverse population.

## I.       Breakdown of Category 3 Patients

Out of the 470 patients identified as Category 3, 379 (81%) had an active personality disorder. Many of those 379 patients had more than one personality disorder diagnosis.  Amongst those 379 patients, there were 527 personality disorder diagnoses. Below is a breakdown of the personality disorder diagnoses (not patients) identified in Category 3.

- o  Antisocial personality disorder (including diagnoses of Dissocial personality disorder) – **306** diagnoses
- o  Borderline personality disorder (including diagnoses of Emotionally Unstable personality disorder) – **166** diagnoses
- o  Narcissistic personality disorder – **32** diagnoses
- o  Unspecified personality disorder (including Personality disorder unspecified) – **8** diagnoses
- o  Histrionic personality disorder – **6** diagnoses
- o  Other specified personality disorder (including Other specific personality disorder) – **4** diagnoses
- o  Paranoid personality disorder – **2** diagnoses
- o  Schizotypal personality disorder – **1** diagnosis
- o  Dependent personality disorder – **1** diagnosis
- o  Obsessive-compulsive personality disorder – **1** diagnosis

**Total of 527 Diagnoses, among 379 patients (91 patients did not have a PD diagnosis).**

Because these 379 patients may have several personality disorder diagnoses, it is important to keep in mind that breaking patients out by any single personality disorder does not create a homogenous group. Patients' co-morbid psychiatric disorders and other personality disorder diagnoses must be considered when determining what, if any, evidence-based treatment is appropriate.

It is also important to note that the third largest group within this population, 91 of the identified Category 3 patients, did not have any active personality disorder diagnosis at all at the time of review.

### a.   Co-Morbid Diagnoses and Treatment Options

Per the above, the most prevalent personality disorder diagnosis in the Category 3 patients was Antisocial Personality Disorder (ASPD). There is currently no single clear, widespread community standard, inside or outside of a correctional setting, for patients with primary ASPD. Patients with ASPD may often be socially exploitative, initially evaluating others primarily as a means to an end. Patients who are willing to change are most likely to see measurable benefits from treatment. Care must be taken to protect other

1

patients and clinicians from those who do not wish to change but may be seeking a secondary gain. If this possibility is not taken seriously, some patients with ASPD may approach a clinician or other patients in a group setting in a way that directly or indirectly undermines treatment for the entire group of participants, rather than engages with it.

Similar to ASPD, Narcissistic Personality Disorder (NPD) is exceptionally difficult to treat. NPD can be conceptualized as a pathological, defensive stance against vulnerability that commonly depends upon a distortion of reality to be sustainable. Patients with NPD also typically lack insight into their condition and are unable to consider another person's perspective. Successful mental health treatment depends on a patient's ability to be at least somewhat vulnerable, to have or to develop some insight into their condition, and to form a therapeutic relationship with another person.

The second most prevalent personality diagnosis in the Category 3 patients was Borderline Personality Disorder (BPD). Although there are some evidence-based treatments for patients with BPD, it has been recognized that implementation of a true treatment program for BPD patients in a correctional setting is nearly impossible. Such treatment is not a community standard across correctional systems. To complicate matters, the data shows that many of the Category 3 patients with BPD also have a diagnosis of ASPD. Once ASPD is added on top of other diagnoses, potentially significant problems of non-engagement rise to the fore, amid other complications.

Of the 470 patients identified in Category 3, a total of 71 individuals (about 15%) have been diagnosed exclusively with BPD or Emotionally Unstable Personality Disorder. Similarly, among the 470 patients identified in Category 3, more than 50% of them, equating to 253 patients, have been diagnosed exclusively with ASPD, or Dissocial Personality Disorder.

## II.    CDCR's Plan to Treatment of MHSDS Patients with Personality Disorders

Specialized treatment is not necessary for all patients diagnosed with a personality disorder. There is not currently an unambiguous correctional standard for specialized treatment for some or all personality disorders. For Category 3 patients that may benefit from specialized treatment, there is no clear single standard treatment guaranteed to be effective, even for the percentage of patients that agree to engage with treatment.

However, there are MHSDS patients with primary personality disorders throughout CDCR that could benefit from specific treatment options in outpatient settings. In fact, 93 percent of the patients identified as Category 3 were in outpatient levels of care. Seventy-seven percent of the Category 3 patients were at the EOP level of care. Therefore, in order to provide the best care possible to the greatest number of patients, CDCR plans to implement a menu of specialized treatment options at all EOP institutions. These specialized treatment options will include evidence-based, manualized treatments that can be offered where the patients are currently located, thus, avoiding destabilizing and stressful transfers to a new location.

The specific group treatments should focus on managing the most challenging aspects of the patient's behaviors that are driven by the personality disorder characteristics. The treatment offerings may include some of the following:

- <u>Systems Training for Emotional Predictability and Problem Solving for Borderline Personality Disorder (STEPPS)</u>: The STEPPS program offers a manualized group treatment format that is designed for outpatient treatment use for patients diagnosed with borderline personality disorder. The groups are taught/led by two facilitators who meet with participants for two-hour group sessions weekly for approximately 20 weeks. The facilitator manual and participant materials are

all included so participants at different locations would all receive the same program. STEPPS is comprised of three parts: Awareness of Emotional Intensity Difficulties, Emotional Management Skills Training, and Behavior Management Skills training. STEPPS is used in a variety of settings including correctional populations. [link]

- Dialectical Behavior Therapy (DBT) Skills Groups: DBT Skills Groups offer the benefit of introducing DBT to a wider selection of patients in a variety of both inpatient and outpatient settings when a full DBT program is not feasible. The groups focus on four main topics: mindfulness, interpersonal effectiveness, emotion regulation and distress tolerance. The skills taught are appropriate for patients who have varying levels of functioning. While DBT was developed to treat patients with a primary diagnosis of borderline personality disorder, the skills in DBT have also been found to assist patients with a variety of mental health disorders. DBT is widely known to assist in reducing the incidence and severity of self-harm, greater compliance with treatment and reduced need or duration in an inpatient program.

- START-NOW: START NOW is a manual-guided skills training originally developed for correctional settings and also adapted for forensic psychiatric units. The program targets individuals struggling with mood dysregulation, impulsivity, aggression addictions, and/or interpersonal discord. The skills taught are appropriate for patients with varying cognitive and academic limitations. The main principles include reinforcing personal responsibility for behavior, identify strengths and build on them, appreciate and respect individual differences, capabilities and limitations and looking for multiple opportunities to teach the connections between thoughts, feelings and behavior. [link]

- Thinking for a Change (T4C): Thinking for a Change was developed with cooperation by the National Institute of Corrections by a panel of experts in cognitive behavioral therapies. The program focuses on problem solving through cognitive restructuring and social skills interventions. The skills are taught through 25 lessons over 30 weeks with participants meeting for one or two sessions with homework assigned between meetings. Participants learn how to challenge their cognitive distortions and can then begin to respond to situations more pro-socially. [link]

The final menu of treatment options will be carefully crafted to ensure the treatment options are evidence-based and focused on the relevant scope of patients that will most benefit. Staff will be provided with the resources, training, and certifications necessary to facilitate the various treatment options.

Patients will also be provided with information regarding the requirements of participating in the various treatment options and the evidence behind the treatment so they are aware of the potential benefits. However, participation in the treatment programs cannot be mandated; voluntary engagement is required for most, or all, of these programs to be beneficial, as members must practice new skills outside of the groups and there is often homework between sessions. Patients will be assessed for their willingness and ability to engage with a multi-week treatment course in an outpatient setting, and treatment teams will provide an agreement that can be signed by both the patient and the treatment team to memorialize that willingness and commitment to treatment.

Along with voluntary participation in the groups, the integrity of the groups is integral to success. Thus, the treatment groups will be maintained on closed cycles, meaning that new members will not be added during the duration of the program. Keeping the groups on closed cycles helps with group cohesion, avoiding the interruption of adding new members mid-cycle. Although not all members of the group may complete the full cycle, they may have the opportunity to rejoin future cycles.

Once the menu of options is in place, clinicians will select the options most suited to the Category 3 patients at their institutions at any given time. The Personality Disorder UNA criteria will be used by institution treatment teams to identify new patients who may benefit from the treatment programs.

### a. Benefits to Patients

First, providing these outpatient treatment options in all EOP institutions will benefit more patients without removing them from their current housing and will assist in creating consistency across EOP programs. This plan also ensures that access to personality disorder treatment programs is available to all eligible patients and not just those that would fit into a particular custody level with similar classification case factors, as was the requirement at the former CMF program.

Second, easier access to the treatment options, by allowing patients to remain in place, will also help improve patient engagement with the treatment modalities. It is also widely understood that, although treatment teams may offer these groups, there are considerable challenges inherent with patients not only agreeing to participate but actually completing the full series of group sessions offered. Most studies indicate that participation and completion of treatment groups is variable. However, for patients that do complete the groups, symptom reduction or improvement in functioning is often seen. CDCR anticipates that by providing the treatment options more broadly, participation will increase and patients will be more likely to complete the programs.

Finally, CDCR's plan will help ensure continuity of care for this difficult to treat population and allow patients to socialize with less severely ill peers who can provide support and normalize healthy behaviors. It will also avoid destabilizing a patient by forcing a transfer to a new program. Transferring patients would involve disrupting the lives of our patients and their families, loss of continuity of care with treatment teams, and interrupting (and sometimes discontinuing) job and education assignments. Patients who transfer not only leave the life they know, but are also required to adjust to a new institution with all that entails, including new classes if in school, new job and jobs waitlist if working, new cellmate if double-celled, new mental health and medical treatment teams, new social environments and peers, new custody officers, new physical plant environments and routines, new visiting arrangements for family and friends, awaiting property transfers, and unpacking into a new cell, and various other disruptions. Such upheaval is unnecessary when the treatment can and should be offered everywhere.

### b. Benefits to Staff

Keeping patients in familiar locations will also help optimize care provided by the Mental Health, Nursing, and Custody teams as they are not overwhelmed by a unit housing only the most complex and historically treatment-resistant patients. Dispersing such patients will allow treatment teams to maintain generally less complicated caseloads, leading to having more time to spend with each patient and experiencing less burnout. Custodial staff and patients will also remain familiar to each other, requiring fewer periods of adjustment with the unpredictability that may accompany it.

# Exhibit B



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

March 12, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>
Melissa Bentz
Nick Weber
CDCR Office of Legal Affairs
Melissa.Bentz@cdcr.ca.gov
Nicholas.Weber@cdcr.ca.gov

Re:    *Coleman v. Newsom:* Plaintiffs' Responses and Questions About
       Defendants' February 20, 2024 Plan for Personality Disorder Treatment
       <u>Our File No. 0489-3</u>

Dear Melissa and Nick:

We write to ask questions and provide feedback regarding Defendants' February 20, 2024 Plan to Provide Treatment for MHSDS Patients with Personality Disorders, which includes a proposed set of four treatment programs for EOP programs to adopt in order to address the unmet treatment needs of the 470 individuals identified in the UNA study as needing some treatment for a personality disorder beyond what is currently available in CDCR's MHSDS.  *See* Defendants' February 20, 2024 Plan to Provide Treatment for MHSDS Patients with Personality Disorders ("Defendant Plan for PD Treatment" or "Defendants' Plan").

Defendants' Plan is required by the several Court orders, including the Court's November 15, 2023 Order, ECF No. 8066, which explains that:

The court expressly required the scope of the UNA to be sufficient to "identify with specificity the size of" the "subset of class members with severe personality disorders associated with significant functional impairments who have special treatment needs not yet available in an inpatient setting."  ECF No. 7305 at 15.  The UNA Report identifies 470 class members in this subset. *See*, *e.g.*, ECF No. 7865-2 at 2.  Given the court's discussion with the parties at the hearing, the court will order them to meet and confer under the supervision of the Special Master to discuss more prompt development of a pilot program for this subgroup of class members, with the specific goal of developing a plan for the

[4453185.2]

Melissa Bentz
March 12, 2024
Page 2

pilot program within three months and implementing the pilot program within six months thereafter.

11/15/23 Order, ECF 8066, at 4:15-24.

Defendants' February 20, 2024 Plan, which is responsive to this Order, includes two sections. The first section includes a breakdown of the "Category 3" patients identified in the UNA study as needing such treatment, along with an analysis discussing the difficulty of treating personality disorders within a prison setting. The second section is a plan to provide a menu of treatment options in EOP programs to MHSDS patients with personality disorders, with the main focus on treatments for patients with Borderline Personality Disorder. While we do not agree with the analysis in the first section, we think the menu of treatment options identified in the second section is promising and positive (although we have some questions and concerns about aspects of that proposal as well).

We also have a number of overall questions about training, timing, and scope for the implementation of the planned treatment programs.

A.    **Defendants' Analysis of the Population Identified in UNA As Needing Personality Disorder Treatment, and of the Potential for Successful Treatment for Personality Disorders, is Overly Pessimistic**

In the first section of Defendants' Plan, Defendants present their analysis of the need for treatment for the group(s) of individuals identified in the UNA study with Personality Disorder-related treatment needs, as well as their analysis of the availability of effective treatment for this group. This section of the plan is overly negative about the possibility of effective treatment programs for these individuals. Indeed, in this respect, the analysis in the first section of the Defendants' Plan conflicts with the second section of the Plan, which details Defendants' actual menu of planned potential treatment programs for this group. That second section identifies and includes four different effective treatments for personality disorders, each of which Defendants acknowledge has been employed in -- or even in several cases, specifically designed for -- correctional settings. For several of these program types, Defendants have shared studies validating their use in correctional settings.

As an example of the overly pessimistic approach to the issue, the proposal states the following about treatments for the 166 individuals identified in the UNA study as having treatment needs related to their Borderline Personality Disorder diagnosis:

Melissa Bentz
March 12, 2024
Page 3

> Although there are some evidence-based treatments for patients with BPD, it has been recognized that implementation of a true treatment program for BPD patients in a correctional setting **is nearly impossible**. Such treatment is **not a community standard** across correctional systems. To complicate matters, the data shows that many of the Category 3 patients with BPD also have a diagnosis of ASPD. Once ASPD is added on top of other diagnoses, potentially significant problems of non-engagement rise to the fore, amid other complications.

Defendants' Plan at 2 (emphasis supplied).

Please provide us with the evidence, if any, on which Defendants base their conclusion that "implementation of a true treatment program for BPD patients in a correctional setting is nearly impossible." Plan at 2. The literature and analysis provided by Defendants, as bolstered by the evidence from the Special Master team, belies Defendants' claim. The specific treatments Defendants themselves have identified were, as discussed below, studied in correctional contexts or are designed specifically with a correctional patient population in mind. To the extent Defendants' unsubstantiated assertion is true that treatments for BPD are not yet widespread in correctional settings, it may simply reflect the fact that the effective treatments for BPD are relatively new even in the community. *See* Lois Choi-Kain, Ellen Finch, et al., *What Works in the Treatment of Borderline Personality Disorder*, Curr Behav Neurosci Report 2017; 4(1): 21-30 (noting that BPD was "once thought to be an untreatable condition" but that in recent years multiple established evidenced-based treatment protocols have been identified).

Moreover, it is apparent from Defendants' proposal and related materials that at least three of the four treatment programs Defendants are considering have been used in and are tailored to correctional populations – indeed, two appear to have been designed specifically with correctional populations in mind.[1]

---

[1] The Systems Training for Emotional Predictability and Problem Solving (STEPPS) protocol website linked to by Defendants notes that "*STEPPS has been implemented in correctional settings (both prisons and community corrections), residential treatment, and inpatient units. Specific suggestions are included for these settings.*" *See* STEPPS Website, About the Manual Section at https://www.steppsforbpd.com/about-stepps/ (accessed on 3/6/24) (emphasis added).

The START NOW website linked to by Defendants explains that the program "was originally designed for use specifically in correctional facilities to treat offenders with behavioral disorders and associated behavioral problems. It was developed to meet

Melissa Bentz
March 12, 2024
Page 4

The fourth modality (DBT) has been studied and found effective in correctional contexts,[2] and in fact has been employed previously by CDCR.  Articles shared by Defendants in February include positive findings about implementing DBT in prisons.  For example, the article by Claire Nee and Sarah Farman analyzing pilot programs implementing DBT in women's prisons in the UK reports that the "overall findings from the pilots have been very promising in terms of the viability of DBT as an offending behaviour programme and improving the manageability of prisoners on the wing."  *See* Claire Nee and Sarah Farman, *Dialectical Behaviour Therapy as a treatment for Borderline Personality Disorder in prisons: three illustrative case studies,* in Journal of Forensic Psychiatry and Psychology (2007) 18, at PDF p. 2; *see also id.* at PDF 3 ("The overall findings showed clear potential for the effective delivery of DBT in prison settings.")

Another study from 2009 found after 16 weeks of DBT skills treatment in a correctional setting that there was "significant reduction in targeted behavior from baseline."  *See* D. Shelton *et al*., *Treatment of Impulsive Aggression In Correctional Settings,* Behav. Sci Law 27: 787-800 (2009).  Moreover, Defendants acknowledge in the Plan that "DBT is widely known to assist in reducing the incidence and severity of self-harm, greater compliance with treatment and reduced need or duration in an inpatient program."  Defendants' February 20, 2024 Plan at 3.

Beyond our disagreement with Defendants' characterization of the efficacy of the treatment options, we have some questions specific to this first section of the Defendants' Plan:

---

the needs for a situationally and cognitively appropriate broad-ranged, manual-guided treatment for behaviorally disordered offenders."  *See* START NOW Website, Setting: Corrections Section, at https://www.carilionclinic.org/start_now#setting-correctional (accessed on 3/6/24).  And Defendants' Plan itself acknowledges that the Thinking for Change (T4C) program "was developed with cooperation by the National Institute of Corrections by a panel of experts in cognitive behavioral therapies."  *See* Defendants' Plan at 3.

[2] Notwithstanding its application in the correctional context, the evidence base for DBT in the community is very strong.  *See, e.g.,* L. Choi-Kain, E. Finch, et al., *What Works. in the Treatment of Borderline Personality Disorder*, Curr Behav Neurosci Rep, Published Online, February 3, 2017, at 2 (summarizing studies of different manualized treatments for BPD and explaining that "DBT again showed higher reductions in suicidal behavior and self-injury, inpatient hospitalization, and treatment drop out than treatment by other experts in the community").

Melissa Bentz
March 12, 2024
Page 5

1.      On the first page, the Plan notes that "it is also important to note that the third largest group within this population, 91 of the [UNA Study] identified Category 3 patients, did not have any active personality disorder at all at the time of review." We do not agree. Despite the lack of Personality Disorder diagnosis, the panels of CDCR clinical staff who sat on the UNA panels clearly thought these 91 individuals had personality disorders. We think the UNA reviews, which involved some of CDCR and DSH's most experienced clinicians, along with members of the Special Master's expert clinical team, were thorough and careful enough to accurately detect the presence of personality disorders at the time the reviews were conducted

      a.      Did CDCR follow up and ask the treatment teams to assess these individuals for a personality disorder diagnosis following the UNA reviews?

      b.      If not, why not? Has CDCR gone back to see if treatments teams added personality disorder diagnoses for these individuals following the findings by the UNA teams? If not, we request that CDCR do so now.

**B.      Defendants' Plan for Specific Treatment Programs for Personality Disorders in EOP Programs**

Plaintiffs generally support Defendants' plan to employ the four treatment approaches outlined in their plan within EOP units, in order to treat class members with Borderline Personality Disorders and other personality disorders. However, we have questions and concerns about a number of aspects of the plan, as outlined below.

    **a.      <u>Request that Defendants Commit to All Four Specific Treatment Programs</u>:** Although the plan lists four promising treatment modalities, we note that the plan does not seem to commit to any or all of the four listed treatment offerings. Rather, the plans states that "the treatment offerings may include some of the following." Plan at 2. We think all four potential programs are promising and that Defendants should commit to all four.

Relatedly, if Defendants have not decided whether to offer all four of the listed programs, when will they make a decision about this issue? We think that the Court Orders on this issue at least implicitly require Defendants to commit to which approaches they are going to initially try. *See* 11/15/23 Order at ¶ 2.b. (requiring meet and confer "to discuss more prompt development of programs for class members with personality disorders including a possible pilot program as discussed in this order.").

[4453185.2]

Melissa Bentz
March 12, 2024
Page 6

       **b.**      **Location of the Treatment Programs and Population Served:**  We agree with the approach to add these programs in existing EOP programs, so that individuals can receive treatment without disruptive transfers, and also to prevent the creation of clusters of difficult-to-treat patients that can lead to burn out among treating staff at a particular prison.  However, in our experience, many of the individuals with the most serious personality-disorder related mental health concerns end up in the acute and ICF treatment programs at CMF, CHCF and CIW.

       1.      Have Defendants considered also training staff members in the PIP program at CMF, CHCF and CIW on the four proposed treatment strategies?  At a minimum, we suggest CDCR at least give clinicians in the inpatient programs information about these new EOP programs so that they can recommend appropriate programming in their discharge treatment plans.

       2      Are Defendants concerned that some EOP programs may not have a sufficient number of patients with the targeted personality disorders to make having treatment groups targeting Borderline Personality Disorder and other Personality Disorders feasible and productive?

       We note that according to the UNA report, some EOP programs had far more patients with unmet needs for personality disorder related treatment than others.  For example, the following are the numbers of Category 3 patients identified at some of the largest EOP programs:

| EOP Program | Number of Category 3 Patients Identified[3] |
|---|---|
| CMC | 12 (a low number of cases despite large size of EOP program) |
| SAC | 102 |
| LAC | 70 |
| RJD | 66 |
| CMF | 10 (like CMC, a relatively low number given the large EOP program there) |

---

[3] *See* UNA Report, ECF 7865-3 at 32, PDF 39, cases mostly but not all from EOP programs.

[4453185.2]

Melissa Bentz
March 12, 2024
Page 7

      3.      Given this distribution of Category 3 cases, would it make sense to use a hub approach with 6 or 7 of the EOPs specializing in these treatment programs?

      4.      Do Defendants believe these treatment modalities will benefit and should be available to people with personality disorders not in the group of 470 individuals identified in UNA? We assume this group is fluid and will change over time. How will Defendants account for that?

      5.      Will mixing individuals with different personality disorders work in creating groups for these individuals in EOP programs?

      6.      Have Defendants considered whether there should be an option to cluster individuals with similar diagnoses at a single EOP program, or a smaller number of programs, to facilitation implementation of the four selected treatment approaches?

      **c.**      <u>**Selection of the Four Specific Treatment Programs**</u>: While the four treatment approaches under consideration are promising, we were also interested in knowing why Defendants selected those approaches over other approaches. In the 2017 article summarizing recent advances in treatments for personality disorders, there were five main evidence-based treatments outlines, only two of which Defendants are considering. *See* L. Choi-Kain, E. Finch, et al., *What Works. in the Treatment of Borderline Personality Disorder*, Curr Behav Neurosci Rep, Published Online, February 3, 2017. The five "major treatments" that the authors explain have been "established as evidence based treatments for BPD" are as follows:

      1.      Dialectical behavioral therapy (DBT)

      2.      Mentalization-based treatment (MBT)

      3.      Schema-focused therapy (SFT)

      4.      Transference-focused psychotherapy (TFP), and

      5.      Systems training for emotional predictability and problem solving (STEPPS)

*Id*. at 1. We appreciate that Defendants are considering the first and fifth treatment modality, but request more information on why they decided not to pursue MBT, SFT and TFP. Additionally, why did Defendants decide not to pursue Moral Reconation Therapy (MRT) which they shared a number of articles about?

Melissa Bentz
March 12, 2024
Page 8

     d.   <u>Timing, Staffing, and Resource Issues</u>:  These promising treatments will undoubtedly require a significant allocation of resources.  Many of the programs require team facilitation by two clinicians.  We noted and appreciate Defendants' commitment in the Plan that "Staff will be provided with the resources, training and certifications necessary to facilitate the various treatment plans."  *See* Defendants Plan at 3.  We also generally agree with Defendants' efforts to disperse the treatment to keep any one institution from being overwhelmed with these cases and to maximize access to these treatments for patients, subject to our questions above.  We have the following remaining questions.

     1.    Do Defendants anticipate conducting any training of custody staff in in the EOP units providing this treatment?

     2.    Do Defendants plan to train all EOP clinicians to conduct the identified therapies?  Are Defendants considering any plan to support the therapists who commit to working with and treating this challenging population?  Given the importance of staff consistency in these programs, it would be great if there are incentives that can be given to the clinicians doing this challenging work in order to improve the likelihood of retention.

     3.    We understand that closed groups are important for consistency and stability.  What if someone doing well in a group has to be transferred to a different EOP program for custody reasons?  Can there be some exceptions to the general cohorting approach for these groups?

     We appreciate the effort that was taken in developing this promising Plan, and look forward to discussing Defendants' further thoughts including, at the appropriate time, implementation details after the Plan's contours solidify.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP


*/s/ Thomas Nolan*

By:  Thomas Nolan
      Of Counsel

[4453185.2]

Melissa Bentz
March 12, 2024
Page 9


TN:TN

cc:    *Coleman* Special Master Team
        *Coleman* Co-counsel
        Sundeep Thind
        Paul Mello
        Samantha Wolff
        Elise Thorn
        Damon McClain
        Namrata Kotwani
        Amar Mehta
        Erick Rizzotto
        Steven Cartwright
        Diana Toche
        Joseph Bick

[4453185.2]