UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ralph Coleman, et al., | No. 2:90-cv-0520 KJM DB |
| Plaintiffs, | ORDER |
| v. | |
| Gavin Newsom, et al., | |
| Defendants. | |

On February 15, 2024, the Special Master filed a request for the appointment of additional staff and for an increase in the hourly rates he and his team are paid for work and for travel time. ECF No. 8130. On the same day, defendants requested ten days to "closely review and consider the Special Master's request, and to file a response setting forth their position." ECF No. 8131 at 1. The court granted defendants' request the same day, Feb. 15 Min. Order, ECF No. 8133, and defendants filed their response on February 26, 2024, ECF No. 8138.[1] With leave of court, Feb. 29 Min. Order, ECF No. 8141, on March 13, 2024 plaintiffs filed a response to defendants' response, ECF No. 8156.

---

[1] On February 27, 2024, defendants filed a Notice of Errata and a corrected version of their response that includes the required certification of orders reviewed. ECF Nos. 8139, 8139-1.

1

I.  **REQUEST FOR APPOINTMENT OF ADDITIONAL STAFF**

    A.  **Special Master's Request and Responses of the Parties**

        1.  **Special Master's Request**

The Special Master requests appointment of three experts, two court monitors, and a paralegal. *See generally* ECF No. 8130. He seeks these appointments to:

- replace one expert and one monitor who have retired[2]; and
- augment his ability to "efficiently and expeditiously" fulfill his numerous responsibilities.

*Id*. at 3.[3] Currently, the Special Master's responsibilities include: regular monitoring of California Department of Corrections and Rehabilitation's (CDCR) mental health headquarters, all prison institutions with mental health care programs, and inpatient programs in the California Department of State Hospitals (DSH) designated for *Coleman* class members; regular monitoring of CDCR's suicide prevention efforts and writing reports on the results of that monitoring; coordination with the Court Expert in *Armstrong v. Newsom*, Case No. 4:94-cv-2307-CW (N.D. Cal.), and the Receiver in *Plata v. Newsom*, Case No. 4:01-cv-1351 JST (N.D. Cal.); overseeing the ongoing data remediation project in this case precipitated by defendants' "knowing presentation of misleading information" to the court and the Special Master, *see generally* Dec. 17, 2019 Order, ECF No. 6427; as required by the court, supervising meet and confers between the parties in aid of full implementation of the *Coleman* remedy and preparing additional reports as needed, ECF No. 8130 at 4-5. Ongoing litigation in this action also requires the Special Master to expend time and resources. *Id*. at 7.[4]

---

[2] In his request, the Special Master notes that in addition to two staff retirements, two of his court monitors "have taken extended leaves of absence due to medical issues . . . further compound[ing] the strain on the Special Master's resources and the need to hire additional staff members." *Id*. at 3 n.1. The Special Master has informed the court that since the request was filed, one monitor has returned to work, one monitor remains on medical leave indefinitely with plans to return, and one paralegal has left employment.

[3] In this order citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to the page numbers assigned by ECF and located in the upper right hand corner of the pages.

[4] The Special Master includes defendants' proposed expert prison tours in his justification for the request. ECF No. 8130 at 7. The court issued an order after the Special Master filed his

2

**2.     Defendants' Response**

Defendants oppose the Special Master's request for additional staff, contending it "appears unnecessary and inconsistent with the shared goal of ending judicial oversight." ECF No. 8138 at 6. Defendants "do not dispute the Special Master's characterization of his team's workload" but contend the need to perform "more work does not mean additional staff are required." *Id*. at 8. They argue the Special Master "does not state deadlines are being missed or that members of his team are leaving because of the demands of the monitorship" and that while increased efficiency "should always be sought" the Special Master has not explored other ways of increasing efficiency. *Id*. at 8-9. They suggest "there is a reasonable question about how efficiently the current staff are utilized" and, in light of those questions, whether additional staff is needed. *Id*. at 9-10. They contend the data remediation project cannot support the request because the court's deadline for completing the project is March 31, 2024.[5] *Id*. at 10. Defendants direct the court's attention to guidance issued by the United States Department of Justice (DOJ) in September 2021, entitled *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State and Local Government Entities*; defendants urge the court to consider DOJ recommendations contained in that document. *Id*. at 11-12 and Ex. I to Weber Decl., ECF No. 8138-1 at 394-403.[6]

---

request denying defendants' request to lift the court's stay of those tours, Mar. 6, 2024 Order, ECF No. 8144, and the court has assumed the proposed tours do not take place in making this order.

[5] Notwithstanding this contention, as discussed below, defendants more recently stated in open court that the data remediation project would, in their view, take an additional two years to complete. *See* Apr. 2, 2024 Order at 6, ECF No. 8181.

[6] Defendants argue in part that the DOJ recommends scrutiny of requests for extra staff to constrain monitoring costs and "minimize[ ] any actual conflict of interest between a monitor's duty to the jurisdiction and her bottom line. Monitorships should be designed to avoid even the appearance that a monitor is primarily motivated by profit." ECF No. 8138 at 12 (quoting Ex. I to Weber Decl.). Defendants are cautioned to refrain from unsupported personal attacks on the integrity of the court's Special Master. *See* Feb. 13, 2023 Order, ECF No. 4335. There is no evidence or suggestion in the record before this court that the Special Master is now, or ever has been, "primarily motivated by profit." This is particularly true where, as here, the Special Master has not sought increases in the rates of compensation for nineteen years for some positions and for almost a decade for others. *See infra*, p. 9. The parties have not opposed the few prior rate increases the Special Master has requested, *see, e.g.,* Mar. 4, 2005 Order, at 1, ECF No. 1653, nor has any party interposed objections to any of the Special Master's monthly bills, which have been

3

### 3. Plaintiffs' Response

Plaintiffs contend the Special Master has adequately justified his request to add additional members to his team. Plaintiffs observe the total number on the Special Master's team will increase by a net of two, and say the increase is warranted. They point out it is undisputed that the Special Master has shown "a clear and marked increase in both [his] writing responsibilities and his overall monitoring workload" in the last three years, that it is "certainly reasonable for him to assert" that a net increase of "two individuals to his team will help enhance his team's ability to continue to fulfill its obligations." ECF No. 8156 at 5. Plaintiffs take substantial issue with defendants' assertion that their progress toward a durable remedy in this action warrants denial of the Special Master's request. They point, among other things, to the court's recent tentative ruling finding defendants in contempt of court for ongoing mental health understaffing and the impact of that ongoing understaffing on progress toward a durable remedy as well as to the Special Master's recently filed report on suicide prevention practices, which suggests defendants' ongoing non-compliance with specific court orders to adopt those practices. *Id*. at 5-6.

Plaintiffs argue defendants' reliance on the total amount of fees they have paid the Special Master is "irrelevant, without the context of *why* that money has been paid." *Id*. at 6 (emphasis in original). They point to additional work required by the onset of the COVID-19 pandemic, increased monitoring responsibilities "in recent years due to Defendants' continued non-compliance with court orders," *id*., and the data remediation project as examples of the increased workload imposed on the Special Master and his team. Plaintiffs also argue that defendants' own increase in legal staff for this action corresponds to the overall workload increase in this action and "bel[ies] Defendants' claims of inefficiency." *Id*. at 8, quoting ECF No. 8130 at 5 n.7 and *State of California Budget Change Proposal 5225-081-BCP-2022-GB*, at 7 (Jan. 10, 2022)

---

served on all parties for almost thirty years prior to the court's issuance of orders directing payment of those bills.

(hereafter 2022 BCP)[7] ("'CDCR recently received authorization to add six new attorney positions and eight administrative support positions to bolster the Office of Legal Affairs (OLA's class action division,' . . . a CDCR budget request justified in part by the fact that the '*Coleman* case has . . . seen a marked uptick in litigation over the past four years.'")).

Plaintiffs also note "the Order of Reference gives substantial deference to the Special Master's judgment about what staff he requires to perform his duties," *id*. (citing Dec. 11, 1995 Order ¶ B.7, ECF No. 640), and that defendants have failed to show the Special Master's request is unreasonable.

**B.     Discussion**

Section B.7. of the Order of Reference empowers the Special Master "[t]o retain or employ independent experts, specialists, assistants, administrative support staff or any other such person whose advice or assistance the special master deems necessary to the effective fulfillment of his duties. . ." ECF No. 640 at 7.  The Order of Reference further provides that "[a]ll such persons, as well as the nature of their compensation, shall be approved by the court in advance of their retention or employment." *Id*.

The Special Master has made a substantial showing of need for the additional staff he requests.  Before he filed the request, the Special Master and his team totaled thirty people, including the Special Master, two Deputy Special Masters, thirteen experts, eleven court monitors, and three paralegals.  At the time the Special Master filed the request the team totaled twenty-six active members: one expert and one court monitor had retired, and two members of the team were on medical leave.  *See* note 2 *supra*.  Thus, today the Special Master and his team total twenty-six  people, plus one additional individual on indefinite medical leave who is expected to return.  Appointment of the six individuals requested by the Special Master will, at present, increase the total number of people on the Special Master's team by only two – four individuals will replace team members who have retired, left, or are on medical leave.

---

[7] *Available at* https://esd.dof.ca.gov/Documents/bcp/2223/FY2223_ORG5225_BCP5062.pdf (last visited Apr. 23, 2024).

5

Collectively, the Special Master's team is responsible for regularly monitoring defendants' implementation of their remedial plans designed to provide constitutionally adequate mental health care to over 30,000 seriously mentally ill class members, who are housed at one of four levels of mental health care in most prison institutions across the state as well as three state hospitals, and writing reports to the court on the results of that monitoring.[8]  Separately, the Special Master is monitoring defendants' implementation of court-ordered suicide prevention measures; his expert recently completed a sixth re-audit of defendants' progress and the expert's report is pending before the court.  The Special Master is also supervising ongoing mental health data remediation, a project that has taken three years so far and is not yet completed.  In addition the urgent need to finally remedy ongoing constitutionally deficient levels of mental health staff has led to additional work for the Special Master and his team in connection with, among other matters, defendants' proposed expansion of the use of telemental health.

None of defendants' arguments in opposition to the Special Master's requests has merit. In addition to their robust legal team, defendants themselves have retained a consulting firm that "hired 'approximately 30' experts" to conduct a study of CDCR's delivery of mental health care to class members, including one round of proposed prison tours.[9]  ECF No. 8144 at 2.  At a minimum, this belies defendants' suggestion that the number of staff the Special Master deems necessary to fulfill his ongoing monitoring responsibilities, particularly in combination with his other responsibilities, is unreasonable.

Additionally, defendants' opposition to the Special Master's request contains at least one serious inconsistency with a position they are taking elsewhere in this litigation:  in their response

---

[8] As the court recently stated, "[s]ince April 1998, the Special Master has completed twenty-nine rounds of monitoring and reporting on defendants' implementation of and compliance with Program Guide requirements and, most recently, has completed a thirtieth comprehensive monitoring round and filed8 three parts of a four part report of his findings from that round." ECF No. 8144 at 8.  Between 1997 and November 2023, the population of seriously mentally ill inmates in CDCR increased from 14,493, *see* ECF No. 1749 at 3, to 33,763, *see* 11/27/2023 MHSDS Mgmt. Info. Summ. (MIS) Report (provided by *Coleman* Special Master from CDCR Secure Website for Monthly Reports).

[9] As noted above, the court has declined to lift its stay of those proposed tours.  ECF No. 8144.

to the Special Master's request, filed February 26, 2024, defendants rely on the court's March 31, 2024 deadline to complete data remediation to argue "it is unclear how or why [the Special Master requires] additional personnel . . . with data remediation reaching a close," ECF No. 8138 at 10, whereas on March 28, 2024, defendants represented in open court that data remediation would, in their view, take an additional two years to complete, ECF No. 8181 at 6.

While the court expects that defendants share the goal of ending judicial oversight, to date defendants' strategy for ending this oversight appears focused primarily on litigation rather than expedited compliance with the longstanding remedies in this action. *See, e.g.,* 2022 BCP at 7 (adding six new attorneys and eight administrative support positions to CDCR's Office of Legal Affairs (OLA)'s class action division due in part to "a marked uptick in litigation" in *Coleman* "over the past four years."). Detours into litigation have inevitably delayed progress toward the end of judicial oversight and, in turn, have expanded and extended the Special Master's responsibilities.[10] Defendants have not provided any grounds that reasonably call into question the Special Master's assessment of the number of staff he requires to fulfill his ongoing responsibilities under the Order of Reference. *See* ECF No. 640 ¶ B.7. Nor do the recent increases in the size of defendants' litigation team correlate with an assumption of defense responsibility for monitoring and other duties currently borne by the Special Master; to date, those increases have corresponded primarily with an increase in litigation activity and a corresponding increase in work required of the Special Master.

Significantly, defendants do not object to the qualifications of any of the persons the Special Master seeks to appoint. For the reasons set forth above, the court will grant the Special Master's request to appoint these six persons.

/////

/////

---

[10] Most recently, in 106 pages of objections to the Special Master's Report on his Expert's Sixth Re-Audit and Update of Suicide Prevention Practices, defendants contend, among other things, they should have been given an opportunity to demonstrate to the Special Master they are in fact in compliance with required suicide prevention measures. This opportunity would have required additional expenditure of time and effort by the Special Master and members of his team.

7

## II. REQUEST FOR INCREASED COMPENSATION

### A. Background

In 1995, the court found defendants in violation of the Eighth Amendment due to their failure to provide seriously mentally ill state prisoners with access to adequate mental health care. *See generally Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995). On December 11, 1995, the court appointed J. Michael Keating, Jr. to serve as Special Master to work with defendants on development of plans to remediate the constitutional violations, to monitor defendants' "implementation of and compliance with" remedial plans ordered by the court, and to report to the court periodically on the status of defendants' compliance with those plans. *See generally* Dec. 11, 1995 Orders, ECF Nos. 639, 640. In 1995, the Special Master's compensation was set at one hundred fifty dollars ($150.00) per hour for work performed under the order of reference and seventy-five dollars ($75.00) per hour for travel time, and included reimbursement of "all reasonable expenses incurred by the special master in performing his duties," ECF No. 640 at 8–9. Defendants bear the cost of the Special Master's fees and expenses "as part of the costs of this action." *Id*. at 9. The court also authorized the Special Master to "act by himself or through employees of, or assistants to, the special master approved by the court." *Id*. at 7.

Since early 1996, the court has approved appointment of deputy special masters, experts, assistants/monitors, and paralegals to the Special Master's staff. The court approved appointment of current Special Master, Matthew A. Lopes, Jr., as Deputy Special Master on February 15, 1996, with his compensation set at one hundred forty dollars ($140.00) per hour for work performed and seventy-five dollars ($75.00) per hour for travel time. Feb. 15, 1996 Order at 1–2, Dkt. No. 664. Between 1996 and 2000, the court granted requests by the Special Master to appoint experts to his team, with compensation ranging between one hundred seventy-five dollars ($175.00) and two hundred dollars ($200.00) per hour for work performed, and travel time compensated for one expert at one hundred dollars ($100.00) per hour and for others at seventy-five dollars ($75.00) per hour. *See generally* Dkt. No. 664; Mar. 14, 1996 Order, Dkt. No. 670; Mar. 25, 1998 Order, Dkt. No. 924; Jul. 23, 1998 Order, Dkt. No. 960; Sept.10, 1999 Order, ECF No. 1065; May 10,

2000 Order, ECF No. 1162. During the same period, the court also authorized the Special Master to appoint assistant special masters to be compensated at the rate of one hundred thirty ($130.00) per hour for work and seventy-five dollars ($75.00) per hour for travel time. *See generally* Dkt. No. 924; Apr. 6, 1998 Order, Dkt. No. 931; Aug. 7, 1998 Order, Dkt. No. 963; Nov. 5, 1998 Order, Dkt. No. 985; ECF No. 1162.

In 2004, the court granted the Special Master's request to appoint a deputy Special Master to be compensated at the rate of two hundred dollars ($200.00) per hour for work performed, and seventy-five dollars ($75.00) per hour for travel time. Jan. 30, 2004 Order, ECF No. 1564.

On March 4, 2005, the court approved the Special Master's request to increase his compensation to two hundred sixty dollars ($260.00) per hour, the compensation for deputy Special Masters and experts to two hundred fifty dollars ($250.00) per hour, the compensation for monitors to two hundred dollars ($200.00) per hour, and travel time for all to ninety dollars ($90.00) per hour. ECF No. 1653.

On October 29, 2007, the court granted the Special Master's request to approve appointment of Kerry Walsh, Esq., as a monitor, to be compensated at an hourly rate of two hundred twenty-five dollars ($225.00) for work performed. Oct. 29, 2007 Order at 1, ECF No. 2490. On November 1, 2007, Matthew A. Lopes, Jr., assumed the role of Special Master at the rate of compensation established in 2005. Oct. 9, 2007 Order, ECF No. 2453. The court also appointed two deputy special masters at the hourly rate established in 2005. *Id*.

In June 2010, the court approved the Special Master's request to appoint two new monitors to be compensated at the rate of two hundred thirty-five dollars ($235.00) per hour. June 17, 2010 Order, ECF No. 3858. In 2014, the court granted the Special Master's request to raise the hourly rate for three monitors on his team to the two hundred thirty-five dollar ($235.00) rate that had been established for other monitors. Aug. 7, 2014 Order, ECF No. 5193. Since then, this has remained the established hourly rate for the Special Master's monitors.

In 2019, the Special Master asked the court to approve appointment of two paralegals. ECF No. 6307. On October 8, 2019, the court granted the request and authorized the appointment of the paralegals at an hourly rate of one hundred ninety dollars ($190.00) for work performed.

1  Oct. 8, 2019 Order, ECF No. 6313.  In March 2020, the court approved the Special Master's
2  request to hire a third paralegal at the same rate.  Mar. 3, 2020 Order, ECF No. 6496.  That
3  remains the established hourly rate for the Special Master's paralegals.

### B. Increases Requested

The Special Master requests the following increases in compensation rates for himself and his staff:

- Special Master: $390.00/hour
- Deputy Special Master: $380.00/hour
- Expert: $380.00/hour
- Monitor: $330.00/hour
- Paralegal: $225.00/hour
- Travel (for all staff): $140.00/hour

ECF No. 8130 at 2.

### C. Positions of the Parties

Defendants oppose the Special Master's request for increases in the hourly rates paid to him and his staff.  They point to the increased cost of monitoring over the past several years, and express concern about the request for increases particularly where, they argue, several "safeguards" recommended in the DOJ memo cited above are absent here.  ECF No. 8138 at 12. Specifically, those safeguards include "an annual cap on monitors' fees, structuring monitorships to encourage the use of pro bono time and possible partnership with academic institutions or non-profit organizations, exploring alternative or flat-fee arrangements" as well as "additional safeguards unrelated to billing arrangements, including term limits for monitors that can be renewed through judicial evaluation and reappointment, a public monitoring plan that sets forth short-term and long-term timelines for compliance, and public disclosure of the monitor's bills and monitoring methodologies, among others."  *Id*. (citing Ex. I to Decl. of Weber at 398-400, ECF No. 8138-1).  They contend that such safeguards are needed "to ensure responsible expenditure of the public fisc."  *Id*. at 13.  Defendants also contend the Special Master's

comparison to rates paid in *Armstrong* for monitors and experts is not helpful because the *Armstrong* team is much smaller and has cost the State substantially less money over time; they also say his comparison to fees and expenses defendants pay to their own "subject matter experts" is also not helpful because those experts have discrete tasks.[11]

Plaintiffs support the Special Master's request for an increase in compensation, pointing to the absence of any increased compensation for the Special Master or most members of his team in well over a decade. They urge the court to reject defendants' comparison to the *Armstrong* case, contending "the *Armstrong* experts' monitoring duties are very limited compared to the extensive duties of the Special Master in *Coleman*." ECF No. 8156 at 9 (citing *Armstrong v. Newsom*, No. 4:94-cv-2307 (N.D. Cal.), ECF No. 1121 at 2 (June 11, 2007)). Plaintiffs also contend, without detailed explanation, defendants' request for application of safeguards in the DOJ memorandum "is exactly the kind of 'suggestion for court action presented under the guise of status reports and other documents' that the Court has disapproved of and prohibited." *Id*. at 10 (quoting Dec. 24, 2020 Order at 1, ECF No. 7003).

### D. Legal Standard

The Special Master was appointed under Federal Rule of Civil Procedure 53, *see Coleman v. Wilson*, 912 F. Supp. at 1324, and his compensation in this action is governed by subsection (g) of that rule. *Cf. Coleman v. Wilson*, 933 F. Supp. 954 (E. D. Cal. 1996) (Special Master's compensation is not subject to the limitations contained in the Prison Litigation Reform Act of 1995 because Special Master was appointed before enactment of those limitations). Federal Rule of Civil Procedure 53(g)(1) requires the court to set the basis and terms for compensation of a special master "in the appointing order" and authorizes the court to "set a new basis and terms after notice and an opportunity to be heard." Fed. R. Civ. P. 53(g)(1).

---

[11] Defendants also contend "rules of court that protect against excessive fees or improper use of expert witnesses" do not apply to members of the Special Master's team. ECF No. 8138 at 14 (citing Fed. R. Civ. P. 26(b)(4)(E) and Fed. R. Evid. 702, which require the court to "consider the fairness of imposing the likely expenses on the parties and . . . protect against unreasonable expense or delay" in contrast with Fed. R. Civ. P. 53(g), which does not include a similar requirement). The court looks with great disfavor on unsupported assertions, as here, of improper conduct by the Special Master in the handling of his responsibilities.

More than a century ago, the United States Supreme Court set out general guidelines that apply to setting compensation for a special master:

> The value of a capable master's services cannot be determined with mathematical accuracy, and estimates will vary, of course, according to the standard adopted. He occupies a position of honor, responsibility, and trust; the court looks to him to execute its decrees thoroughly, accurately, impartially, and in full response to the confidence extended; he should be adequately remunerated for actual work done, time employed, and the responsibility assumed. His compensation should be liberal, but not exorbitant. The rights of those who ultimately pay must be carefully protected; and while salaries prescribed by law for judicial officers performing similar duties are valuable guides, a higher rate of compensation is generally necessary in order to secure ability and experience in an exacting and temporary employment which often seriously interferes with other undertakings. See *Finance Committee of Pennsylvania v. Warren*, 82 Fed. 525, 527, 27 C.C.A. 475; *Middleton v. Bankers' & Merchants' Tel. Co.* (C.C.) 32 Fed. 524, 525.

*Newton v. Consolidated Gas Co. of New York*, 259 U.S. 101, 104-05 (1922). In general, courts look to "the prevailing market rate for similar work" to set compensation for a special master. *Trout v. Ball*, 705 F. Supp. 705, 708 (D. D. C. 1989); *see, e.g.*, *Catholic Social Services, Inc. v. Johnson*, 2014 WL 4298212, slip op. at 1 (E. D. Cal. 2014); *see also Depuy Synthes Sales, Inc. v. Stryker Corporation,* 2023 WL 6793214, slip op. at 3 (C. D. Cal. 2023) (citing cases). The concept of "prevailing market rate" is drawn from case law governing calculation of reasonable attorneys' fees under 42 U.S.C. § 1988. As used in the cases, "market rate" refers to hourly rate of compensation, and "prevailing market rate" is generally understood as "rates in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *See, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 892-894 & n.11 (1984); *see also Gates v. Deukmejian*, 987 F.2d 1392, 1404-05 (9th Cir. 1992). "The general rule is that the rates . . . in the forum district . . . are used" but the court may look to "rates, other than those of the forum, . . . if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Gates*, 987 F.2d at 1405.

/////

Following these general principles, as discussed above, most courts look to the prevailing market rate among special masters in the forum district to find "the prevailing market rates in the relevant community." *Catholic Social Services, Inc.*, slip op. at 1 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)); *see also Depuy Synthes Sales, Inc.*, slip op. at 3 (looking to "fees and costs charged by special masters" in Los Angeles). Looking to the market rate among special masters, rather than attorneys more generally, is consistent with the Ninth Circuit's recognition of "the unique nature of the master's role. A special master is a 'surrogate of the court' and in that sense the service performed is an important public duty of high order in much the same way as is serving in the Judiciary.'" *Cordoza v. Pacific States Steel Corp.*, 320 F.3d 989, 995 (9th Cir. 2003).[12]

### E. Analysis

#### 1. DOJ Memo

At the outset, the court finds the standards in the DOJ memorandum cited by defendants are not applicable here. By its terms the DOJ memo, which is addressed to "Heads of Civil Litigation Components United States Attorneys," ECF No. 8138-1 at 394, "provides internal [United States] Department [of Justice] guidance only. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter or proceeding." *Id*. at 398. Moreover, the memo recognizes that "because existing consent decrees and monitorships are the product of extensive negotiation between the parties, with approval by a federal court, the specific recommendations outlined below should apply only to consent decrees and monitorships used in future cases." *Id*. at 397.

/////

---

[12] Alternatively, courts have looked to market rates for private attorneys and then reduced those rates by a defined percentage to reflect the fact that special masters serve a public function and, accordingly, that "the highest range of fees in private litigation is not a proper basis for compensation of masters." *Reed v. Cleveland Bd. Of Ed.*, 607 F.2d 737, 745-46 (6th Cir. 1979) (setting compensation for special master at an hourly rate "one-half the highest Cleveland rate found by the district court and approximately two-thirds the average rate of experienced Cleveland trial attorneys."). Here, neither party argues for, or provides any evidence to aid in, this alternative analysis.

1    As noted above, the Special Master was appointed under Federal Rule of Civil Procedure 53 after the court found defendants in violation of the Eighth Amendment and determined extensive remedial efforts were needed to address the identified violations. *Coleman v. Wilson*, 912 F. Supp. at 1324. Rule 53(g)(1) sets out the terms for changing a special master's compensation, requiring "notice and an opportunity to be heard." Fed. R. Civ. P. 53(g)(1). The provisions of Rule 53 neither suggest nor require the court consider or impose any of the safeguards the United States Attorney General has apparently instructed members of the DOJ to consider, as of September 2021, in entering into consent decrees or settlement agreements that involve appointment of a monitor. Rather, the Special Master's request is controlled by applicable case law as set forth above.

### 2.  Determination of Hourly Rate

In support of his request for increased compensation, the Special Master points in relevant part[13] to the hourly rates paid to the court's expert team in *Armstrong v. Newsom*, Case No. 94-2307 (N. D. Cal.), which range from $300.00 to $900.00 per hour, the average hourly rates for monitoring services provided by members of plaintiffs' team in *Armstrong,* which ranged in 2022 and 2023 from $396.29 to $491.44 per hour, and the hourly rates paid to some of the Special Master's experts for comparable work in other cases, ranging from $315.00 to $600.00. ECF No. 8130 at 14-15..

Without citation to any legal authority and relying solely on the DOJ memo they cite, defendants' opposition to the Special Master's request for increased compensation focuses on the cumulative cost of the mastership, and not on the hourly rates the Special Master requests. *See* ECF No. 8138 at 11-14. Defendants do not address the reasonableness of the hourly rates requested by the Special Master under the applicable legal standards. Plaintiffs contend that in view of defendants' failure to demonstrate that the Special Master's requested rates are unreasonable, the court should accept the request. ECF No. 8156 at 10.

---

[13] The Special Master has also provided rates paid to litigation experts hired by the parties and the general hourly rates for plaintiffs' counsel in *Armstrong*. These positions are not comparable to those of the Special Master and members of his team who are performing services for the court.

14

Applying the legal standards set out above, the court looks first to the hourly rate paid to Special Masters in this district. While this court does not have a large community of Special Masters, most recently in 2015 it appointed a Special Master in a case brought under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et. seq., Section 504 of the Rehabilitation Act of 1973, "and related federal and state laws," *Morgan Hill Concerned Parents Assoc. v. California Department of Education*, Case No. 2:11-cv-03471 KJM AC, at an hourly rate of $350.00. *See* Case No. 2:11-cv-03471, ECF No. 6, ECF No. 116, at 2, ECF No. 116-1 at 2. The Special Master in that case served this court for three years. *See id.*, ECF No. 373. The current hourly rate for the Special Master is $90.00 below that rate and has been the same for the past nineteen years. The hourly rate for the Special Master's deputies and experts is $100.00 below that hourly rate and has also been the same for the past nineteen years. The hourly rate for his monitors is $115.00 below that rate and has remained the same for almost fourteen years for some monitors and almost a decade for others. And the hourly rate for paralegals has been the same since the Special Master first added paralegals to his staff five years ago. Viewed through this lens and compared to the hourly rate the court approved for the *Morgan Hill* Special Master almost a decade ago in a less complex case, the rates requested by the Special Master are entirely reasonable.

The same finding is compelled by comparison of the rates the Special Master requests to those paid to individuals providing comparable services to a sister court in *Armstrong v. Newsom*. *Armstrong* is another class action lawsuit brought against California's Governor and the CDCR for violations of the Americans with Disabilities Act and the Rehabilitation also in the remedial phase of litigation. *See, e.g.*, *Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023). The services provided to the *Armstrong* court by the Court Expert and his team as well as the monitoring services provided by plaintiffs' counsel more closely approximate the work provided by the Special Master and his team in this case than do the services provided by the special master in *Morgan Hill*. Thus, while *Armstrong* is in the Northern District of California, the absence of comparable mastership teams in this district permits the court to consider the rates paid in *Armstrong* as part of its assessment of whether the Special Master's request is reasonable. *Cf.*

15

1  *Gates*, 987 F.2d at 1405 (court may look outside forum where comparable services unavailable
2  within forum).  With the exception of two consultants retained in 2023, the rates requested by the
3  Special Master here are far below those currently paid to the *Armstrong* Court Expert, members
4  of his team, and monitors.  *See* ECF No. 8130 at 15 n.12 & n.13.  This comparison also compels
5  the conclusion that the Special Master's requested rates are reasonable.  The Special Master's
6  outdated rates of compensation are out of step with prevailing relevant market rates and the
7  adjustments the Special Master requests are entirely warranted.  Citing no legal authority and
8  relying on the inapplicable DOJ memo to which they point, defendants oppose the Special
9  Master's request based solely on the cumulative cost of the mastership and not on the hourly rates
10 the Special Master requests.  *See* ECF No. 8138 at 11-14.  Defendants' focus is misplaced.  As
11 discussed above, the cumulative costs of the mastership in this case are driven by several factors,
12 most of which are almost exclusively within defendants' control:  the size of the mentally ill
13 inmate population in CDCR and the expansive number of prisons in which mental health units are
14 located,[14] substantial and as yet unremediated mental health understaffing throughout the prison
15 system, and defendants' ongoing failure to come into compliance with the Eighth Amendment as
16 well as their litigation strategies to defend this failure and to delay remediation rather than
17 expeditiously correct it.  Generally speaking, concerns regarding the public fisc are reasonable
18 and laudable but it is defendants who have it within their power to ensure that every public dime
19 and dollar is expended with laser precision on expeditious remediation, which will hasten the day
20 when expenditures on the Special Mastership can taper off and ultimately terminate.

21 **III.   CONCLUSION**

22       The hourly rates requested by the Special Master are entirely reasonable in the relevant
23 market and the court therefore will grant his request for increased compensation.
24 /////

---

[14] CDCR acknowledged this aspect of the case in the 2022 BCP, noting that "[c]lass action cases persist for . . . lengthy durations due to the complexity of institutional reform, the size and geographic diversity of CDCR, and the size of the various plaintiff classes in each of the cases; these factors make it difficult to fully implement the remedial measures and demonstrate that compliance is sustainable."  2022 BCP at 2.

16

In accordance with the above, IT IS HEREBY ORDERED that:

1. The Special Master's Request for the Appointment of Additional Staff and for Increase in Compensation, ECF No. 8130, is GRANTED;

2. The Special Master is authorized to appoint J. David Dawdy, M.A.; Kerry Eudy, J.D., Ph.D; John S. Wilson, Ph.D, CCHP-MH, CPHQ; Mr. Darrin Bell; Ms. Lynn Bissonnette; and Ms. Cristina Izarry to the Special Master's staff to perform the duties set forth in the Special Master's Request and the accompanying memorandum, filed February 15, 2024, and to be compensated at the rates set forth in this order; and

3. Beginning with the date this order is filed and continuing thereafter, the Special Master and his staff shall be compensated at the following rates:

| | |
|---|---|
| Special Master: | $390.00/hour |
| Deputy Special Master: | $380.00/hour |
| Expert: | $380.00/hour |
| Monitor: | $330.00/hour |
| Paralegal: | $225.00/hour |
| Travel (for all staff): | $140.00/hour. |

DATED: April 23, 2024.

_____
CHIEF UNITED STATES DISTRICT JUDGE