Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**PARTIES' JOINT REPORT IN RESPONSE TO APRIL 2, 2024 ORDER (ECF NO. 8206)**<br><br>Judge: The Hon. Kimberly J. Mueller |

## INTRODUCTION

The parties submit this joint report in response to the Court's April 18, 2024 order concerning the resolution of a data remediation dispute over whether medical holds qualify as a suspending event of the Program Guide timelines for transfer to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care. (ECF No. 8206 at 4.) As ordered, this joint report includes (1) the parties' final positions on the dispute as presented in the meet and confer process under the November 16, 2023 order (ECF No. 8069); (2) the last proposal for transfer timeline exceptions discussed prior to the parties' determination

1   they could not reach agreement; and (3) a brief statement of the parties' respective positions as to

2   whether the court should require Defendants to adopt that proposal as an addendum to the

3   Program Guide.  (ECF No. 8206 at 4-5.)  As reflected below, the remaining issues concern (1) the

4   responsibilities of the joint team to weigh medical and mental health needs and specifically to

5   make a determination that the medical need is both more urgent and cannot be treated at any

6   institution to which the patient is eligible to be transferred that has the appropriate level of MH

7   care; and (2) whether Plaintiffs' proposal for an oversight mechanism is necessary.

8                    **FACTUAL AND PROCEDURAL BACKGROUND OF THE DISPUTE**

9           On October 18, 2023, the Special Master provided the parties with a proposed resolution for

10  a pending data remediation dispute concerning the remediation of the provisionally approved

11  indicators AC7.1 (Timely Transfer to EOP) and AC7.4 (Timely Transfer to CCCMS).  (ECF No.

12  8069 at 14.)  The Special Master proposed that medical holds should not be considered as a

13  suspending event of the Program Guide timelines for transfer to the CCCMS and EOP levels of

14  care and that Defendants should modify the key performance indicators to include drill down

15  information regarding any reasons for such delayed transfers.  (*Id.*)  Defendants objected to the

16  Special Master's proposal and Plaintiffs filed a response to Defendants' objections.  *See* ECF

17  Nos. 8040 and 8052.

18          On November 16, 2023, this Court considered the parties' responses to the Special Master's

19  proposal.  (ECF No. 8069 at 14-18.)  The Court deferred a decision on this dispute to reconcile a

20  purported conflict between CDCR's Health Care Department Operations Manual (HCDOM) and

21  the Program Guide transfer timelines, and ordered the parties to "take all steps necessary to meet

22  and confer under the supervision of the Special Master to develop proposed exceptions to the

23  Program Guide timelines for transfer to CCCMS and EOP levels of care that comport with other

24  court-approved exceptions to Program Guide transfer timelines and avoid unnecessary conflict

25  with relevant provisions of the HCDOM."  (*Id.*)

26          CDCR presented Plaintiffs and the Special Master with proposed medical hold exception

27  language on December 5, 2023.  (Exhibit A.)  The parties then met to discuss the proposed

28  language on December 6, followed by the Special Master and Plaintiffs providing written

comments to the proposed language on December 8, 2023. (Exhibits B and C.) Plaintiffs'

comments included red-lined revisions to CDCR's proposed policy language. (Exhibit C.)

CDCR responded to Plaintiffs' and the Special Master's concerns on December 11, 2023, and

proposed revised language to attempt to address some of Plaintiffs' concerns regarding the

timeline required to resume transfers after a patient's medical issue has resolved. (Exhibit D.) On

December 13, 2023, Plaintiffs provided further written input on CDCR's proposed language, and

proposed alternative language for the resumption of the transfer timeframe issue. (Exhibit E.)

Later that day, the parties then met and conferred for a second time with the Special Master and

his team. *Id.* On December 14, CDCR responded to Plaintiffs' December 13 e-mail as to all

issues except for the resumption of the transfer timeframe issue and provided a new draft of the

proposed exception language. (Exhibit F.) On December 15, CDCR rejected Plaintiffs' proposed

language regarding the resumption of transfer timelines, and reiterated the proposal Defendants

set forth in their December 11 email. (Exhibit G.) On December 15, Plaintiffs advised CDCR

that they continued to disagree on three issues: the criteria, process, and appropriate decision-

makers for determining whether a medical hold justifies a delay; Plaintiffs' request to incorporate

some oversight mechanism of the joint medical-mental health teams' review of the justification

for delays; and appropriate language for how the transfer timeline would resume after a medical

hold is lifted. (Exhibit H.) On April 25, 2024, CDCR clarified that the timeline resumption

language presented to Plaintiffs on December 11 only applies to patients whose original transfer

timeline has less than thirty days remaining when the medical hold is lifted. (Exhibit I.) The

transfer timeline clock keeps running during the medical hold and the resumption timeline (thirty

days) applies only if the medical hold is resolved when there are less than 30 days left on the

clock or if the timeline has already expired. (*Id.*) Plaintiffs informed Defendants on April 25 that

they agree with this language, and the parties no longer have a dispute about this issue. (*Id.*) If

the Court adopts medical hold language, the parties jointly request that it include the resumption

language they agreed to on April 25, 2024: "if, upon resolution of the medical issue, there are

fewer than 30 days remaining on the original transfer timeline or if the transfer timeline has

already expired, the patient shall be placed on the expedited transfer list and transferred within 30 days."

The last complete proposal discussed prior to the parties' determination they could not reach agreement is attached to Mr. Weber's December 14 e-mail (Exhibit F). Plaintiffs' last complete proposal is attached to Ms. Yelin's December 8 email (Exhibit C). The parties' e-mail communications in the time between December 8 and December 14 provide further clarification of their respective positions, including some alternative proposals each party put forward during the meet and confer process. *See* Exhibits A-H. On December 15, 2023, the parties reached an impasse on their work to develop a medical hold exception. Because the parties have now reached an agreement on timeline resumption language, the current impasse is the result of two remaining disputes: (1) the scope of the review by the joint medical and mental health team concerning the reasonableness of the medical hold when weighing it against the need to transfer the patient to a mental health program; and (2) whether there is a need for an oversight mechanism of the joint medical and mental health teams' reviews.

The parties' respective positions required by the April 18 order are set forth below.

## DEFENDANTS' POSITION

### I. THE APRIL 18 ORDER RECOGNIZES THAT THERE MUST BE A MEDICAL HOLD EXCEPTION TO THE TRANSFER TIMELINES

The April 18 order adopts the Special Master's data remediation recommendation for the indicators AC7.1 (Timely Transfer to EOP) and AC7.4 (Timely Transfer to CCCMS), which proposed removing the medical hold language from the suspending events sections of both indicators. The Special Master also recommended that transfers to CCCMS and EOP settings that exceed required timeframes should be scored as not satisfying the relevant Program Guide requirement. In addition, the Special Master recommended that Defendants modify the indicators to include drill down information regarding any reasons for delayed transfers to EOP and CCCMS settings, including medical holds. (ECF Nos 8206 and 8040 at 11.) The order further overrules Defendants' objections to that recommendation.[1]  (*Id.* at 4, and ECF No. 8040.)

---

[1] In light of the Court's order that the parties "take all steps necessary to meet and confer

But the April 18 order seems to present inconsistent objectives.  On the one hand, the order adopts the Special Master's October 18 recommendation that the medical hold language be removed from the suspending events sections of the documentation for AC7.1 and AC7.4 and the transfers that exceed required timeframes should be scored as noncompliant.  On the other hand, the April 18 order appears to confirm the process required under the November 16 order that the parties take all steps to develop a medical hold exception policy to the CCCMS and EOP transfer timelines.  (ECF No. 8206 at 4.)  In other words, the Court ordered that medical holds will not be considered exceptions to the transfer timelines, but then ordered the parties to develop a policy governing medical hold exceptions to those same timelines.

The need for a medical exception policy was born out of the data remediation project.  Thus, to the extent that the court adopts a medical exception policy, the court should also permit Defendants to integrate it into the appropriate data indicators, including AC7.1 and AC7.4. The language in the order supports this reading:  "[r]ather than further slowing the already delayed data remediation process *pending this necessary reconciliation*, the court will adopt the Special Master's reasonable proposed resolution but order the parties to make a further filing" that looks to reconcile medical and mental health policies.  (ECF No. 8206 at 3:19-4:2, emphasis added.)  In other words, the April 18 order recognizes that there must be an exception policy to the transfer timelines based on a patient's need for medical treatment and that this policy must be in place in order to satisfy the Eighth Amendment.  (*Id.*)  Without this objective, there would be no need to craft a policy setting forth the requirements for a medical hold exception to the transfer timelines at issue.

As required by the November 16, 2023 order, Defendants urge this Court to approve the exception language CDCR proposed during the meeting and confer process.  CDCR's proposed policy reflects the common sense application of exceptions to stringent timelines when a class

---

under the supervision of the Special Master to develop proposed exceptions to the Program Guide timelines for transfer to CCCMS and EOP levels of care that comport with other court-approved exceptions to Program Guide transfer timelines and avoid unnecessary conflict with relevant provisions of the HCDOM," Defendants restate facts and argument that support those efforts but which were also presented to the Court in response to the Special Master's recommendation.

member has medical needs that delay compliance with the transfer timeline.  This is consistent

with the prior orders of this Court.  *See* December 15, 2017 Order, ECF No. 5750 (approving

addendum to PIP transfer timeline, ECF No. 5744 at Exhibit 1); September 27, 2019 Order, ECF

No. 6295 (approving addendum to MHCB transfer timeline); and September 27, 2019 Order,

ECF No. 6296 (approving desert institutions transfer policy addendum).

## II.   CDCR's PROPOSED POLICY EXCEPTION COMPORTS WITH THE COURT-APPROVED EXCEPTIONS TO PROGRAM GUIDE TRANSFER TIMELINES

On December 15, 2023, the parties reached an impasse on their work to develop a medical

hold exception.  The impasse is the result of Plaintiffs' insistence that the policy must include

more onerous conditions than have been applied to prior court-approved transfer timeline

exception policies with respect to two issues: (1) the scope of the review by the joint medical and

mental health team concerning the reasonableness of the medical hold when weighing it against

the need to transfer the patient to a mental health program; and (2) the need for headquarters

oversight over every aspect of the ability to place a patient on a medical hold at other institutions.

Plaintiffs' proposed expansions to the medical hold policy exception add a headquarters

oversight process and impose on institutions an obligation to second-guess medical staff

decisions.  They are prime examples of unnecessary overreach.  Defendants urge the Court to

reject Plaintiffs' proposals because they would expand the remedy in this case, contradict the

Court's previous rulings on transfers, and are inappropriate and unnecessary.  Defendants will

address each of Plaintiff's proposals below.

### A.   CDCR's Proposed Exception is Consistent with Prior Court-Ordered Exceptions and Avoids Unnecessary Conflict with Relevant Provisions of the HCDOM.

CDCR modeled the joint medical and mental health team review element of the proposed

exception on the three court-approved transfer policies.  (ECF No. 5744 at 5-6; ECF Nos. 6261,

6261-1; and 6279 at 6.)  CDCR's proposed policy exception, reflected in Exhibits F and G, is

consistent with the current court-approved exceptions.  In fact, Defendants' proposed policy

captures every single element of all three court-approved exceptions policies, often verbatim.

1    As Defendants conveyed to Plaintiffs, "the three settled medical exception policies have

2    similar core components – a direction to local medical and mental health staff to work together to

3    weigh the relative urgency between the medical issue and the need to transfer to a different

4    mental health program and to document those discussions in the medical record."  (Exhibit D.)

5    CDCR's proposed policy is also consistent with established medical policy.  HCDOM section

6    3.1.9(c)(3)(G)(3), regarding Health Care Transfers, already requires medical and mental health

7    staff to collaborate about patients on medical holds to "determine the patient's most appropriate

8    location" to facilitate transfer.

9    **B.    Plaintiffs Add an Unnecessary and Burdensome Standard to the Balancing Test that Weighs the Priority Given to a Patient's Medical Condition.**

10    Plaintiffs, instead of maintaining fidelity to the court-approved medical hold exceptions,

11    insist that the reviewing joint team is responsible to weigh medical and mental health needs and

12    then specifically make a determination that the medical need is BOTH more urgent and cannot be

13    treated at any institution to which the patient is eligible to be transferred that also has the

14    appropriate level of mental health care:  "[a] medical hold should only be deemed appropriate if

15    the medical need is more urgent and there **is a reasonable justification for needing to treat it at**

16    **the institution where the patient is currently housed.**  We think the teams should be

17    considering not just whether the patient's medical need could be treated at the endorsed

18    institution, but also whether there is another institution somewhere in the system that could

19    appropriately treat the person's medical and mental health needs simultaneously."  (Exhibit H

20    (emphasis added).)

21    Plaintiffs' suggestion that a patient can go to any institution that offers the patient's mental

22    health level of care is an oversimplification of the system.  While providers will make every effort

23    to resolve the medical hold, including by finding ways to offer the care at the receiving

24    institution, that is not always possible.  But unlike Plaintiffs' suggestion, there are not necessarily

25    a multitude of other placement options because other medical and custodial case factors are a

26    constraint on where patients can be housed.[2]  For instance, inmates with disabilities,

27

28    _____

[2] Notably, Plaintiffs' proposed language was not included in the MHCB exceptions

1    developmental disabilities, and medical needs, must be housed consistent with orders

2    promulgated under *Armstrong v. Newsom*, *Clark v. California*, and *Plata v. Newsom*,

3    respectively.  Restrictions to address valley fever exposure, enemy concerns, staff reductions or

4    absences, and custody levels further limit where inmates may be housed.  As a result, not all

5    inmates in a level of care can go to every other institution that houses and treats that same level of

6    care.

7         Plaintiffs acknowledge that there are hundreds of patient transfers that would require their

8    proposed reasonableness assessment.  ((Exhibit H.)  But nowhere do they define what would be

9    required under their proposed reasonableness assessment or explain what that process would

10   entail.  Plaintiffs have not provided any legal or factual basis for the requested assessment and it

11   is not part of any prior policy exceptions or court order.  In addition, the Special Master has not

12   indicated that the joint teams need to establish a reasonable justification when deciding that a

13   patient needs to remain at his current institution for medical treatment.  Nor could he without

14   running afoul of the medical policies identified in the April 18 order that have been in place for

15   years.  (ECF No. 8206 at 4:19-5:7.)  Finally, the Special Master did not endorse this proposal

16   during the meet and confer sessions or in any other communication to Defendants.

17        Defendants' proposed medical exception already includes an appropriate balancing test –

18   the same found in all the three court approved medical exception policies – and also ensures that

19   the joint team of medical and mental health providers are continually assessing whether the

20   patients' medical needs are more urgent than the patient's need to transfer to a new institution.

21   Specifically, Defendants' proposal only authorizes a medical hold "[i]f a patient has a medical

22   condition that cannot be treated at the endorsed institution and the medical condition is deemed

23   more urgent than the mental health treatment need at or after the time of endorsement, as

24   determined by a joint team of medical and mental health clinicians."  (Exhibit F.)  That a patient's

25   medical need is more urgent than his need to transfer is implicitly evidence that there exists a

26   "reasonable justification" for treating the patient in place instead of transferring him to another

27   _____

28   policy. CDCR operates twenty-one crisis bed units and endorsements to crisis beds have far less
     case factor restraints than the general population.

1   institution.  Plaintiffs' requested addition is unnecessary in light of Defendants' proposed

2   language and the near identical language found in prior court approved exceptions policies.   The

3   court should not adopt it.

4       **C.    Headquarters Oversight of the Joint Medical and Mental Health Teams is
              Improper and Inconsistent with Existing Precedent.**

5

6       Plaintiffs also seek to expand the current court-ordered exception policies to add a

7   requirement for some oversight or monitoring mechanism to "ensure[] that the joint team

8   discussions/documentation are happening as expected, and that the teams' weighing of priorities

9   are appropriate."  (Exhibit H.)  Again, this type of monitoring is not present in prior court

10  approved medical exception policies.  The November 16 Order was specific in directing the

11  parties "to develop proposed exceptions to the Program Guide timelines for transfer to CCCMS

12  and EOP levels of care that comport with other court-approve exceptions." (ECF No. 8069 at 17.)

13  Plaintiffs' requested vague oversight requirement exceeds what is required under the existing

14  policies that recognize exceptions due to medical holds and should be rejected as inconsistent

15  with CDCR's latest proposed draft language that is modeled on the prior policies.

16      CDCR will not integrate into the policy a concept of real-time headquarters oversight of the

17  local processes.  No such provision exists in the desert or MHCB medical exceptions policies.

18  The PIP medical exception policy only requires CDCR's headquarters Inpatient Referral Unit –

19  which is tasked with oversight of CDCR's PIP beds – to "track[] each exception to ensure transfer

20  as soon as the exception is resolved."  (ECF No. 5744 at 6.)  Creating a unit specifically tasked

21  with oversight of medical holds for CCCMS and EOP patients is not necessary.  Nor is it

22  appropriate to create a joint team of mental health and medical staff to continually review and

23  second guess local healthcare teams' decision making processes.  CDCR and CCHCS clinicians

24  most familiar with the patient must be trusted to adequately weigh competing healthcare issues

25  and determine, jointly, the best course of action for the patient's needs.

26      The prior policies provide ample tracking and oversight consistent with program objectives.

27  The PIP policy requires that CDCR's Inpatient Referral Unit (IRU) "track[] each exception to

28  ensure transfer as soon as the exception is resolved."  The PIP version does not require oversight

of documentation or whether the teams are appropriately weighing priorities. Similarly, although the desert transfer exception policy references the need to involve the Regional Deputy Medical Executive and the Regional Mental Health Administrator, there is no requirement in the desert transfer policy for the Regionals to provide oversight of documentation or to ensure that weighing is being done appropriately. (ECF No. 6279 at 6.) Plaintiffs rely on language that references work done by the two Regionals to support their requests for Headquarters oversight, but the Regionals are referenced in the desert transfer policy to assist with transfer decisions that require dispute resolution or elevation to managers when the local teams need help to rehouse the patient. (Exhibit F.)

And finally, it would not be appropriate for CDCR to create an audit or a performance indicator to monitor this process. The exception requires a joint team of mental health and medical providers to collaborate on patient care and weigh the relative needs of the patient. Any oversight of that process, including whether documentation is being done appropriately and whether the teams are weighing relative need, would require buy in from both mental health and medical. It is not mental health's place to second guess the joint decisions by those local teams.

### III. DEFENDANTS' POSITION ON INCLUDING THE PROPOSAL AS AN ADDENDUM TO THE PROGRAM GUIDE

There should be no further updates or addenda to the Program Guide to ensure consistency in the jurisprudence of this case. On February 7, 2022, this Court discontinued the parties' obligation to file updates to the Program Guide and Compendium. (ECF No. 7456 at 4.) The court's order stated that a "final list of [Continuous Quality Improvement Tool (CQIT)] indicators will replace the need for annual updates." (*Id.*) The parties have been engaged in data remediation since 2021 working towards the goal of establishing that same "final list of CQIT indicators." Although the parties were previously obligated to update the Program Guide and Compendium on an annual basis (ECF No. 6806 at 17), that changed in 2022 when the court disposed of the annual update requirement and referred the then-pending dispute to the Special Master. (ECF No. 7456 at 3.) The court anticipated that the remedy would be adequately distilled

1  in the final list of CQIT key indicators and ordered that further updates to the Program Guide and

2  Compendium were no longer necessary.  (*Id*. at 2.)

3      The issue before the Court arose out of the data remediation process.  As stated above, the

4  MHSDS has operated for decades without the need to develop a medical holds exception to the

5  Program Guide transfer timelines for EOP and CCCMS programs.  At this point, if the Court's

6  April 18 order remains in place as amended by CDCR's proposed policy exception, Defendants

7  should be permitted to integrate the medical hold exception into the indicators' business rules and

8  there would be no reason to further encumber the long list of Program Guide updates.

9  **IV.   DEFENDANTS' CERTIFICATION OF ORDERS.**

10      Defendants' counsel has reviewed the following orders that are relevant to this filing:

11  ECF Nos. 5750, 6296, 6806, 7456, 8010, 8069, and 8206.

12                          **PLAINTIFFS' POSITION**

13      Defendants' "final" proposal, conveyed on December 14, *see* Exhibit F, is inadequate for

14  two reasons: (1) it does not build in sufficient protections into the process for placing and/or

15  maintaining a medical hold to ensure that a patient's mental health care needs are weighed

16  appropriately against their medical needs; and (2) it does not provide for any oversight over the

17  determinations of the joint medical-mental health teams to ensure that their decisions and

18  decision-making processes are appropriate.  Plaintiffs urge the Court to order Defendants to adopt

19  their proposed language as an addendum to the Program Guide, as modified to address these two

20  concerns using Plaintiffs' December 8 language as a model.  *See* Exhibit C.

21  **I.   INCLUSION OF CRITERIA FOR DETERMINING WHETHER A MEDICAL HOLD**
22  **JUSTIFIES A DELAY**

23      It is Plaintiffs' position that medical holds should not delay patient's mental health

24  transfers past Program Guide timelines unless the patient's medical issue cannot be treated at the

25  institution where they would otherwise be transferred, or at any other institution to which the

26  patient is eligible to be endorsed that offers the appropriate level of mental health care.  For

27  example, if a patient housed at Avenal State Prison with a simultaneous medical need is referred

28  to the EOP level of care, CDCR staff should be required to make a determination before placing

[4473778.2]                          11

1   or maintaining a medical hold that will delay Program Guide-required transfers both that the

2   patient's medical issue is more urgent than the patient's need for EOP treatment, as Defendants'

3   final proposal reflects, and to specifically conclude that there is no other EOP institution

4   statewide where the patient could be properly transferred and have their medical needs

5   appropriately addressed.

6          CDCR's original proposal failed to adequately address this concern.  Instead, it allowed for

7   a medical hold to be placed with no requirement that CDCR consider whether the patient would

8   be able to receive adequate medical care at the planned institution offering the appropriate level

9   of mental health care, or at any other institution offering that level of care.  *See* Exhibit A. After

10  Plaintiffs explained their concerns, *see* Exhibits C and E, CDCR agreed to incorporate additional

11  language restricting medical holds to circumstances where the joint team concludes that the

12  patient's medical condition that cannot be treated at the patient's "endorsed" institution.  Exhibit

13  F.  This, however, is insufficient.

14         CDCR's final proposal omits any requirement that staff consider whether the medical

15  need—even if more urgent—can be appropriately addressed at *any* institution that has an EOP or

16  CCCMS program so that both needs can be met simultaneously.  Instituting such a requirement

17  would dramatically decrease the number of patients who are forced to remain at institutions that

18  cannot adequately treat their mental health care for longer than the Program Guide transfer

19  timeline, and would instead result in patients being timely transferred to institutions that can

20  simultaneously meet their medical and mental health needs.  It should be a rare occurrence that a

21  patient would have an urgent medical need that cannot be treated appropriately at an institution

22  that also provides the appropriate level of mental health care.  Nearly every institution in the

23  system can treat CCCMS patients, and CDCR currently has 19 EOP programs statewide, in

24  various geographical areas and serving various security levels.  Plaintiffs' therefore maintain the

25  position that a medical hold should only be deemed appropriate if the medical need is more

26  urgent and there is a reasonable justification for needing to treat it at the institution where the

27  patient is currently housed, despite the Program Guide transfer timeline requirements.  Staff

28  should be required to consider not just whether the patient's medical need could be treated at the

1    endorsed institution, but also whether there is another institution somewhere in the system that
2    could appropriately treat the person's medical and mental health needs simultaneously, and they
3    should consistently revisit that determination during the pendency of the medical hold.  There is
4    precedent for this arrangement:  Both the PIP and desert transfers medical hold exception
5    language incorporates a similar provision.  *See*, *e.g.*, ECF No. 5744 at 4 ("If a patient has a
6    medical condition that **cannot be treated at a PIP** and that is deemed more urgent than the
7    mental health treatment need at or after the time of the referral, as determined by a joint team of
8    medical and mental health clinicians, a medical hold shall be ordered" (emphasis added)); ECF
9    No. 6279 at 5 (defining medical hold as requiring a determination that "it is medically prudent to
10   provide these services at the institutions where the patient is currently housed"); *see id.* at 6 ("The
11   goal is to have the patient be expeditiously housed at an institution that can meet both the medical
12   needs as well as the mental health needs of the patient.").

13        *Coleman* class members ought not to be forced to sacrifice their right to timely mental
14   health treatment unless their medical need is both more urgent and cannot be adequately treated at
15   an institution that can also meet their mental health needs.  Plaintiffs therefore request that the
16   Court modify Defendants' final proposal to include Plaintiffs' December 8, 2023 proposed
17   language:  "If the medical condition is deemed more urgent than the mental health treatment
18   need, and the joint team determines that the medical condition cannot be appropriately treated at a
19   CCCMS or EOP institution where the patient would otherwise be transferred, a medical hold shall
20   be ordered in accordance with current policy if one is not already in place, or an existing medical
21   hold may be maintained.  If the medical condition is deemed more urgent than the mental health
22   treatment need, but the joint team determines that the condition may be treated appropriately at a
23   CCCMS or EOP institution, the medical hold shall be lifted."
24   / / /
25   / / /
26
27
28

1    **II.    INCORPORATION OF AN OVERSIGHT MECHANISM FOR THE JOINT MEDICAL-MENTAL HEALTH TEAMS' REVIEW OF THE JUSTIFICATION FOR DELAYS**

2

3        Defendants' draft policy currently requires that mental health staff "document

4    discussion[s]" about a patient's level of required mental health care and medical needs

5        including the names and positions of those who participated in the discussion, the
     date and time the discussion occurred, the determination reached, and the specific
6        rationale for the determination . . . and the reasons the patient must remain at the
     sending institution in order to receive the appropriate medical treatment.
7

8    Exhibit C.

9        Plaintiffs request that the Court require the policy to incorporate an oversight mechanism to

10    ensure that the joint teams' balancing discussions are occurring as required and that their

11    decision-making processes are appropriately documented.  Plaintiffs originally proposed that

12    CDCR incorporate a provision for oversight by Headquarters or Regional staff.  *See* Exhibit C.

13    Plaintiffs later clarified, in response to Defendants' concerns, that "we are not asking you to

14    create a new HQ unit, nor are we asking you to conduct "real-time" oversight," and that they were

15    open to discussing several possibilities for oversight, including "incorporat[ing] it into

16    CQIT, …requir[ing] that the Regional MH teams periodically look at the documentation, or …

17    requir[ing] institutional MH leadership to review a reasonable sample of the notes at some

18    defined frequency."  Exhibit E.  Notably, the same desert transfer policy that CDCR has

19    identified as a model for the medical hold delay procedure includes provisions for the

20    involvement of Regional MH and medical administrators in the process.  *See* ECF No. 6279 at 6.

21    The Special Master team's December 8, 2023 comments echoed Plaintiffs' request that the policy

22    be implemented in a manner that would allow for oversight:  "We recommend defendants

23    consider documenting [the medical hold information and joint-team discussions] in a manner

24    susceptible to feeding relevant data into the related transfer timeframe indicators, such as through

25    use of a power form to facilitate automated tracking."  Nonetheless, Defendants rejected the

26    possibility of allowing for oversight of any sort.

27        Defendants' policy already specifically requires mental health staff to document in the

28    patient's medical record "the names and positions of those who participated in the [joint-team]

1    discussion, the date and time the discussion occurred, the determination reached, and the specific

2    rationale for the determination" that the medical hold is appropriate.  Exhibit A.  It further

3    requires staff to take specific action to facilitate the patient's transfer as soon as the medical hold

4    is lifted.  *Id.*  Without any form of auditing or oversight to ensure these important steps are

5    actually occurring, Defendants' proposed policy risks becoming a dead letter – meaning patients

6    needing mental health care may be denied that treatment for extended periods of time (and well

7    beyond the Program Guide transfer timelines Defendants themselves developed) for no legitimate

8    reason whatsoever.  That is an unacceptable risk under the Eighth Amendment.   This Court

9    should order Defendants to develop a method to track compliance with their medical hold policy,

10   either through a CQIT audit or, as the Special Master recommended, through an automated

11   mechanism that can feed into the relevant transfer timeline indicators.

12   **III.    CONCLUSION**

13         If the Court is inclined to adopt a medical hold exception for transfers to EOP and CCCMS,

14   Plaintiffs urge the Court to modify Defendant's proposed language as described

15   above.  Defendants take the absurd position that the Court should adopt their preferred medical

16   hold exceptions language to allow for exceptions to the EOP and CCCMS transfer timelines, but

17   that the Court need not require them to adopt it as an addendum to the Program

18   Guide.  Defendants' suggestion runs contrary to how the Court has handled the parties' similar

19   negotiated exceptions in the context of transfers to inpatient beds, *see* ECF No. 5744 at 5, to crisis

20   beds, *see* ECF No. 6261-1 at 2, and out of desert institutions, *see* ECF No. 6279 at 4.  Like those

21   exceptions, any medical hold exception in this context would necessarily modify the current

22   Program Guide transfer requirements.  *See* ECF No. 7333-1 at 12-1-16.  It makes little sense to

23   have a policy operating that directly conflicts with the timeframes that are clearly laid out in the

24   Program Guide, and such a policy could create great confusion.  The Court should order that any

25   medical hold language it adopts be an explicit amendment to the Program Guide's transfer

26   requirements.

27

28

[4473778.2]

1    **IV.    PLAINTIFFS' CERTIFICATION OF ORDERS**

2          Plaintiffs' counsel has reviewed the following orders that are relevant to this filing:  ECF

3    Nos. 5750, 6296, 6806, 8010, 8069, and 8206.

4    Dated: April 25, 2024                              ROB BONTA
                                                        Attorney General of California
5                                                       DAMON MCCLAIN
                                                        Supervising Deputy Attorney General

6                                                       *Elise Owens Thorn*
                                                        ELISE OWENS THORN
7                                                       Deputy Attorney General
                                                        *Attorneys for Defendants*
8

9                                                       HANSON BRIDGETT LLP

10                                                      *Samantha D. Wolff*
                                                        PAUL MELLO
11                                                      SAMANTHA D. WOLFF
                                                        *Attorneys for Defendants*

12

13   Dated: April 25, 2024                              ROSEN BIEN GALVAN & GRUNFELD LLP

14                                                      *Maya Campbell*
                                                        MAYA CAMPBELL
15                                                      *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28