1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone:  (916) 210-7318
    Fax:  (916) 324-5205
8   E-mail:  Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

   HANSON BRIDGETT LLP
   LAWRENCE M. CIRELLI, SBN 114710
   PAUL B. MELLO, SBN 179755
   SAMANTHA D. WOLFF, SBN 240280
   KAYLEN KADOTANI, SBN 294114
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
   1676 N. CALIFORNIA BLVD., SUITE 620
   WALNUT CREEK, CALIFORNIA 94596
   TELEPHONE:    925-746-8460
   FACSIMILE:    925-746-8490
   *Attorneys for Defendants*

9

10              **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF CALIFORNIA**

12                  **SACRAMENTO DIVISION**

13

14  RALPH COLEMAN, et al.,                 Case No. 2:90-CV-00520- KJM-DB

15          Plaintiffs,                     **JOINT RESPONSE TO APRIL 2, 2024
                                            ORDER; MOTION FOR**
16      v.                                  **CLARIFICATION OF FEBRUARY 7, 2022
                                            ORDER DISCONTINUING UPDATING**
17  GAVIN NEWSOM, et al.                    **PROCESS RE: PROGRAM GUIDE AND
                                            COMPENDIUM; STIPULATION**
18          Defendants.                     **SETTING FORTH THE PARTIES'
                                            POSITIONS REGARDING THE**
19                                          **PENDING RESTRICTED HOUSING
                                            UNIT REGULATIONS**
20

21                                          Judge:    Hon. Kimberly J. Mueller

22

23

24

25

26

27

28

[4477085.2]20770856.1

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

I.      INTRODUCTION ............................................................................................................3

II.     THE PARTIES' STIPULATION SETTING FORTH THEIR RESPECTIVE
        POSITIONS REGARDING THE RHU REGULATIONS AND POLICY ..........................3

III.    THE PARTIES' JOINT REPRESENTATION OF THEIR UNDERSTANDING
        OF THE SPECIAL MASTER'S POSITION REGARDING THE RHU
        REGULATIONS ..............................................................................................................5

IV.     THE PARTIES' JOINT MOTION FOR CLARIFICATION ...........................................6

        A.    Background Regarding The Updating Process and the February 7, 2022
              Order.......................................................................................................................7

              1.    *Developments and Efforts by the Court, the Special Master, and the
                    Parties That Led to the February 7, 2022 Order.* .........................................7

        B.    The Parties Position Regarding the February 7, 2022 Court Order's Effect,
              if Any, on Defendants' Duty to Inform the Court to the Extent its RHU
              Regulations and Policy Update the Program Guide .................................................9

              *Plaintiffs' Position:* ...............................................................................................9

              1.    The Court should clarify that the February 7, 2022 Order does not
                    relieve Defendants of their obligation to inform the Court that they
                    intend their RHU Regulations and Policy to supersede existing
                    chapters and additional policies of the Program Guide...............................9

              2.    The New RHU Policies Should Be Modified to Clearly Require that
                    the "Assigned" Correctional Counselor and "Assigned" Primary
                    Clinicians Must Attend IDTTs in RHU Units, As Required By
                    Current Program Guide Policies ................................................................12

              3.    Defendants Should be Precluded From Including Medical Hold and
                    Refusal to Transfer Exceptions in the New Mental Health RHU
                    Regulations................................................................................................14

              *Defendants' Position:* ...........................................................................................15

              4.    The February 7, 2022 Order does not Require Defendants to inform
                    the Court of modifications to CDCR's RHU regulations or the RHU
                    policy.........................................................................................................16

              5.    The proposed RHU policy and regulations do not affect the
                    provisions of the remedy afforded to class members. ................................17

              6.    Remaining Areas of Dispute Regarding the RHU Regulations and
                    Policy.........................................................................................................18

                    (1)    Whether the RHU policy should include language
                           mandating that the "assigned" primary clinician and
                           "assigned" correctional counselor attend IDTT or

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

conduct certain clinical encounters. ....................................18

    (2)    The validity of the proposed exceptions to the 30-day mandated timeline for transfers to specialized RHU units for medical holds and for a patient's refusal to transfer. ...................................................................18

    b.    *Conclusion*...................................................................20

CERTIFICATION...................................................................20

CERTIFICATION...................................................................20

JOINT MOTION FOR CLARIFICATION OF FEBRUARY 7, 2022 ORDER

# I.    INTRODUCTION

On April 2, 2024, the Court entered an order directing the parties to file a joint motion for clarification of the Court's February 7, 2022 Order, which, in relevant part, approved the 2021 Program Guide and Compendium updates, and "DISCONTINUED" "the parties' obligation to file further updates to the Program Guide and the Compendium unless or until further order of the court." ECF No. 7456 at 3-4 (emphasis in original). Specifically, in light of CDCR's proposed regulations and policy changes governing Restricted Housing Units (RHUs), the Court ordered the parties to: (1) state their position on the effect, if any, of the Court's February 7, 2022 Order on Defendants' obligation to inform the Court to the extent they intend the proposed RHU policy and regulations to replace certain chapters of the Program Guide; (2) file a stipulation of counsel setting forth the parties' agreements with respect to the substantive provisions of the RHU regulations; and (3) include in the stipulation a joint representation of what they understand to be the position of the Special Master with respect to the RHU regulations. ECF No. 8181 at 6. Accordingly, the parties' joint motion for clarification is set forth below.[1]

The parties also set forth their respective positions, including their areas of agreement and disagreement with respect to the substantive provisions of the pending RHU regulations, as well as their understanding of the Special Master's position regarding the same. Notably, the parties are in general agreement with the overwhelming majority of substantive provisions of the RHU regulations and policies. *See id.* at 6:1-2.

## II.    THE PARTIES' STIPULATION SETTING FORTH THEIR RESPECTIVE POSITIONS REGARDING THE RHU REGULATIONS AND POLICY

The purpose of the RHU regulations and policy is to decrease the likelihood of

---

[1] The parties agree that the present briefing is limited to the subject of whether Defendants must inform the Court of the changes being made to the Program Guide by implementing their new RHU initiative. The parties further agree that they do not interpret the April 2, 2024 Order (ECF No. 8181) as a request for briefing on the larger issue of the Program Guide updating process generally. However, to the extent the Court intended for the parties to provide more fulsome briefing on the updating process, the parties would respectfully request the opportunity to be heard on this topic.

incarcerated persons (including those in the MHSDS) being placed in RHU, and to shorten the time of stay for those persons placed in the RHU. *See* App'x 1 (June 29, 2023 Letter from Defendants to Plaintiffs and Special Master Re RHU Regulations). It is Defendants' position that they undertook the RHU regulations and policy changes independent of the *Coleman* process or Court order, in response to the Governor's veto of AB2632, which directed CDCR to develop regulations revising the use of restricted housing.[2] Defendants assert that neither of those provisions are a remedial requirement in this case. Plaintiffs disagree and believe that these policy changes were made in the context of *Coleman* violations and remedial planning. Plaintiffs assert that decreasing the likelihood of class members being placed in RHU and shortening their lengths of stay are remedial requirements in *Coleman*.

The content and impact of the RHU regulations and the RHU mental health policy on the Program Guide and Compendium has been the focus of several meet and confers, including discussions, emails, and letters between the parties and the Special Master's team. *See* App'x 1-15. In June 2023, Defendants notified Plaintiffs and the Special Master of the RHU project. App'x 1. Importantly, the parties are in agreement with the vast majority of the issues relating to the RHU regulations and the RHU mental health policy. App'x 15 (April 23, 2024 email from Plaintiffs to Defendants Re RHU mental health policy and regulations). The Court also recognized the parties' "general agreement with the contours of the proposed RHU regulations . . ." at the March 28, 2024 Status Conference. ECF No. 8181 at 6. And, as Plaintiffs noted in their January 31, 2024 letter regarding comments and requested changes to the RHU mental health care policy, Defendants have accepted numerous proposed changes from Plaintiffs and the Special Master, which were reflected in the draft RHU mental health policy that was sent to Plaintiffs and the Special Master on January 24, 2024. App'x 10 (Jan. 31, 2024 letter from Plaintiffs to Defendants Re RHU policy). On April 9, 2024, Defendants again provided Plaintiffs with a revised draft RHU policy in response to Plaintiffs' January 31, 2024 letter requesting additional changes to the RHU policy.

---

[2] *See* Office of the Governor, September 29, 2022 Letter to Members of the California State Assembly, https://gov.ca.gov/wp-content/uploads/2022/09/AB-2632-VETO.pdf?emrc=ccbc61; *see also* App'x 1 (June 29, 2023 letter from CDCR to Special Master).

App'x 14 (April 8, 2024 Ltr. from Defendants to Plaintiffs with attachments). The current drafts of the RHU Policy and the RHU Regulations are attached as Appendices 16-17.

Currently, only three disputes remain between the parties concerning the RHU regulations and policy changes: (1) Defendants' duty to inform the Court of the changes being made to the Program Guide remedy by implementing their new RHU Policies and Regulations; (2) the absence of requirements in the new RHU mental health policy (which Defendants have said will replace key sections of the Program Guide relating to segregation), for certain IDTTs to be attended by the patient's "assigned" primary clinician, and "assigned" correctional counselor; and (3) the validity of the proposed exceptions to the 30-day mandated timeline for transfers to specialized RHU units for medical holds and for a patient's refusal to transfer. App'x 15.

### III.  THE PARTIES' JOINT REPRESENTATION OF THEIR UNDERSTANDING OF THE SPECIAL MASTER'S POSITION REGARDING THE RHU REGULATIONS

The parties' understanding of the Special Master's position as to the RHU changes is as follows. The Special Master has sent several communications to CDCR regarding the RHU initiative since it was announced. *See* App'x 13 (Feb. 2, 2024 email from Special Master to CDCR Assistant Secretary Neill); App'x 12 (Feb. 2, 2024 Ltr. from Deputy Special Master Re Proposed RHU Regs); App'x 6 (Sept. 21, 2023 Ltr. from Deputy Special Master Re Draft CCCMS and EOP RHU Healthcare Policies). The Special Master is generally supportive of CDCR replacing its segregation units (ASU, SHU, STRH, LTRH, EOP ASU Hub, PSU) with restricted housing units (GP-RHU, CCCMS-RHU, EOP-RHU) because the RHU changes increase patients' access to tablets and other privileges, increase the ability of patients to reduce assessed RHU terms via programming, reduce the number of offenses that require placement into an RHU, reduce the length of time for all RHU offenses, and increase out of cell time for some incarcerated persons in RHU to 20 hours. *See* App'x 13 at 1; *see also* App'x 12 at 1.

The Special Master shares Plaintiffs' concerns discussed in Plaintiffs' January 31, 2024 comments on the RHU policies. *See* App'x 13 at 1 ("On January 31, 2024, the plaintiffs sent comments on the RHU healthcare policies. I have attached plaintiffs' letter for your reference. I share all of the concerns outlined in their letter.")  Those shared concerns include the substantive

1  disputes briefed below regarding transfer timeframe exceptions, and regarding "assigned"

2  clinicians and "assigned" correctional counselors.  *See* App'x 10 at 3-4, 6 (Jan. 31, 2024 Ltr. from

3  Plaintiffs to Defendants Re RHU Policy).

4          The Special Master has also shared with the parties that he disagrees with Defendants'

5  position that CDCR can unilaterally supersede three full chapters and a number of policies of the

6  2021 Coleman Program Guide and Compendium through its regulatory and policymaking

7  procedures to implement the RHU initiative without seeking approval of or filing any notice with

8  the Court. *See* App'x 13 at 1; App'x 12 at 1-3. The Special Master urged CDCR to notify and seek

9  leave of the Court regarding the RHU changes. *See* App'x 13 at 1 App'x 12 at 3. The Special

10 Master also noted in his comments on the RHU regulations that the regulations included an

11 exception for medical holds when transferring class members to CCCMS RHU or EOP RHU

12 units.  The Special Master explained that the *Coleman* Court ordered this medical hold exception

13 to the 30-day timeframe removed from data remediation indicators.  *See* App'x 12 at 3.

14         In addition to the three concerns that are being briefed by the parties in this pleading, the

15 Special Master had an additional concern in his January 31, 2024 Letter to the CDCR Regulation

16 and Policy Management Branch that the regulations and the new mental health RHU policy did

17 not adequately cover the "requirement to conduct case by case reviews and/or long term

18 segregated case conferences of Coleman patients," two policies mandated by the Court's April 10,

19 2014 Order, ECF 5196.  *See* App'x 12 (Deputy Special Master's February 2, 2024 Letter to CDCR

20 Regulation and Policy Management Branch) at 3.  Defendants have taken the position that these

21 policies remain in the Program Guide, and are codified at ECF No.7333-1 at 535. Plaintiffs

22 dropped their earlier objections to the omission of these policies based on the representation from

23 Defendants that they remain in effect and part of the remedy because they are not being replaced

24 by the new policies. *See* App'x (April 8, 2024 Letter from Nick Weber to Tom Nolan) at 4.

25              **IV.    THE PARTIES' JOINT MOTION FOR CLARIFICATION**

26         The parties submit their joint motion for clarification pertaining to the February 7, 2022

27 order and its implications with respect to the current dispute pertaining to the RHU policy

28 changes.

**A.      Background Regarding The Updating Process and the February 7, 2022 Order**

In its February 7, 2022 Order, the Court approved the 2021 Program Guide and Compendium, discontinued the parties' obligation to file further annual updates to the Program Guide and Compendium, and referred outstanding disputes to the Special Master for consideration as to whether the substantive provisions of five policies omitted from the 2021 Program Guide Update are, or should be, reflected in the list of Continuous Quality Improvement Tool (CQIT) indicators. ECF No. 7456 at 3-4. The Court noted that it "anticipate[d] that final approval of a list of CQIT indicators will replace the need for annual updates to the Program Guide and the Compendium," *id.* at 4, and anticipated that it would give final approval to the list of CQIT key indicators around Fall 2022. *Id.* at 3:8-10.

1.      *Developments and Efforts by the Court, the Special Master, and the Parties That Led to the February 7, 2022 Order.*

The Court's February 7, 2022 Order was the result of a nearly five-year process in which the Court, the Special Master, and the parties engaged in numerous attempts to design a durable Program Guide update process.

In 2017, the Court identified a need to "incorporate modifications to the Program Guide . . . when conflicts arose regarding the interpretation of provisions governing transfer timelines to mental health crisis beds." June 29, 2018 Special Master Report on 2018 Program Guide, ECF No. 5844 at 1. Following extensive meet and confers involving the parties and the Special Master in 2018, the Special Master filed the 2018 Program Guide as well as recommendations to, among other things, create a new Program Guide modification process. *Id.* at 10. In its July 9, 2019 Order, the Court directed the parties to "develop an improved method for regular administrative updating of the 2018 Program Guide" and compendium.[3] ECF No. 6214 at 19. In its February 10, 2020 Order, the Court directed the parties to file an updated Program Guide and Compendium annually,

---

[3] This Order also required the development of the Compendium of Remedial Measures Related to Custodial Issues not Included in the 2018 Program Guide. ECF No. 6219 at 19.

1  consistent with the updating process proposed by the Special Master. ECF No. 6460 at 2. On

2  February 14, 2020, the Special Master proposed a Program Guide and Compendium update

3  process, which set forth timelines for policy discussions. ECF No. 6466 at 14-17.

4          On August 3, 2020, the Court ordered the parties to file a joint updated Program Guide and

5  Compendium of Custody Related Remedial Measures (Compendium) on an annual basis. ECF

6  No. 6806 at 15-17. The Court also provisionally approved an update process and ordered the

7  parties to follow it for one year. *Id*. This Court-ordered process required the Special Master to

8  determine whether each policy constituted a "material modification" of the Program Guide. *Id.* at

9  16. In the event that the Special Master determined that a policy was a "material modification" to

10  the Program Guide, the order required the parties and the Special Master to engage in discussions

11  and reach agreement on a finalized policy. *Id.* at 16-17.

12          The Court found that "'material modifications of the court approved remedy' are not

13  susceptible to comprehensive definition" and that a "working definition of the phrase as

14  understood and shared by all stakeholders" would need to be developed. ECF No. 6806 at 12, fn.

15  8. Because the parties did not reach agreement as to a definition of "material modification,"

16  Defendants moved for reconsideration of a "material modification" determination and requested

17  that the Court "adopt a definition of material modification that is both practicable and also focused

18  on furthering the goal of the Program Guide—providing constitutionally adequate mental health

19  care." ECF No. 7290 at 1-2.

20          On September 21, 2021, the Court denied Defendants' motion for reconsideration, but

21  deferred defining "material modification" to "thoughtful discussion among all stakeholders and, if

22  necessary, consideration by this court after full briefing." ECF No. 7323 at 8.

23          On September 29, 2021, the parties filed a Joint Report regarding the Efficacy of the

24  Updating Process and Proposed Amendments. ECF No. 7332. The parties proposed a notice and

25  comment period for material modifications and an annual Program Guide updating process. ECF

26  No. 7332-1. The parties also agreed that their proposal could not be implemented until the

27  "dispute as to the definition of 'material modification' is resolved." ECF No. 7332 at 3.

28          Also on September 29, 2021, the parties filed the 2021 Program Guide and Compendium,

1  which detailed a dispute over whether five policies were considered "material modifications" to

2  the Program Guide. ECF No. 7333 at 2.

3        At an October 7, 2021 Status Conference, the Court stated that the Program Guide and

4  Compendium updating process "was intended to provide transparency – administrative

5  transparency, just making clear what the remedy was," and that the August 3, 2020 annual

6  Program Guide and Compendium update process was unworkable and had expired. Tr. 10/7/21,

7  ECF No. 7345 at 13:10-21. Following this Status Conference, the Court, on October 12, 2021,

8  issued a Minute Order confirming that the August 3, 2020 Program Guide update process order

9  had expired by its terms on August 3, 2021, and took "the question of what updating process it

10 will order going forward under submission." ECF No. 7342. Notably, data remediation occurred in

11 parallel to the 2020-2021 Program Guide update litigation discussed above.[4]

12       Since the February 7, 2022 Order, the Court has "approved the joinder of two remedial

13 efforts – the data remediation process and finalization of a list of 'key indicators' for [CQIT]."

14 ECF No. 8121 (citing January 4, 2023 Order, ECF No. 7695).

15 **B.**    **The Parties Position Regarding the February 7, 2022 Court Order's Effect, if Any, on
        Defendants' Duty to Inform the Court to the Extent its RHU Regulations and Policy**

16         **Update the Program Guide**

17

18       *Plaintiffs' Position:*

19     1.    **The Court should clarify that the February 7, 2022 Order does not relieve
        Defendants of their obligation to inform the Court that they intend their RHU**

20         **Regulations and Policy to supersede existing chapters and additional policies
        of the Program Guide.**

21       Defendants' RHU initiative makes policy and regulatory changes that Defendants contend

22 will supersede three full chapters and several additional policies of the 2021 Program Guide and

23 Compendium update ("the Program Guide").  *See, e.g.*, App'x 13 at 1-2 (January 30, 2024 Email

24 from Assistant Secretary to Special Master Re RHU and Program Guide).  The new RHUs and the

25

26 _____

[4] On September 3, 2020, the Court issued an order on benchmarks and the Continuous Quality

27 Improvement Tool (CQIT). The Court found that CQIT includes "key indicators" that are "the
functional equivalent of 'benchmarks' that, as used in this order, signify the material provisions of

28 the Program Guide and Compendium that must be durably implemented." (ECF No. 6846 at 28.)

1   rules governing them are modeled from the former segregation units and the provisions in the

2   Program Guide and Compendium that govern them.  The Parties engaged in extensive

3   negotiations from the summer of 2023 to present to ensure that the new RHU regulations and

4   policy retain the core requirements of the Program Guide.  The Parties have reached agreement in

5   almost all respects, save for the two remaining issues briefed in this filing, and Plaintiffs' several

6   additional concerns and objections that are outside the agreed scope of this briefing.[5]  *See* App'x

7   15 (April 23, 2024 email from Plaintiffs to Defendants Re RHU Policy and Regulations).

8          Yet as Plaintiffs and the Special Master repeatedly stated throughout the negotiations,

9   regardless of the parties' general agreement about the substantive components of the initiative,

10  Defendants still must inform the Court of their intent to change the existing Program Guide.  *See,*

11  *e.g.*, App'x 10 at 1-2 (January 31, 2024 Letter from Plaintiffs to Defendants Re RHU Policy.);

12  App'x 12 at 1-3 (February 2, 2024 Comments from Deputy Special Master Re RHU Regulations).

13  Nor do Plaintiffs waive their right to identify and restore important remedial changes that might

14  have been missed or are not apparent in Defendants' drafting and implementation of the RHU

15  initiative.  *See* App'x 10 at 1-2 (January 31, 2024 Letter from Plaintiffs to Defendants Re RHU

16  Policy).

17         The Court has long made clear that Defendants "are not free to unilaterally make material

18  modifications to the longstanding remedy in this action."  Sept. 20, 2018 Order, ECF No. 5928 at

19  11; *see also* ECF No. 6806 at 10 ("court-ordered and/or approved remedies in this action… cannot

20  be modified with respect to members of the plaintiff class without approval of this court.").

21  Defendants contend that the Court's February 7, 2022 Order absolves them of the responsibility of

22  informing the Court about their intended RHU changes because they will incorporate them into

23  CQIT indicators.  *See* App'x 7 at 6 (12/19/23 letter from Defendants re RHU Policy).  The

24  February 2022 Order does no such thing.  That order, in which the Court discontinued the parties'

25  ────────────────────

26  [5] First, changes Plaintiffs requested that Defendants refused to make on the basis that they are not
    mandated by the existing Program Guide or Compendium.  Second, requests to incorporate

27  additional policies from the Program Guide or Compendium into the RHU initiative, which
    Defendants refused to do while assuring Plaintiffs that the existing policies will remain binding

28  and are not superseded or modified by the RHU initiative.

1  obligation to "file further annual updates," noted only that the Court "anticipate[d] that final

2  approval of a list of CQIT indicators will replace the need for annual updates," based on an

3  assumption that the Court would be able to give final approval to the list of CQIT key indicators

4  after the completion of the Twenty-Ninth Round Monitoring Report.  ECF No. 7456 at 3-4.  Since

5  that time, the data remediation process has become significantly more complex, and it may well be

6  months—or years, according to Defendants—before the Court will be able to give final approval

7  to the key indicator list.  ECF No. 8181 at 1, 3.  Even if the Court ultimately approves of its

8  anticipated plan to have the CQIT indicators "replace" the existing core remedial documents,

9  during this interim period before that happens, the Court must know about the current contours of

10  Defendants' obligations to the *Coleman* class.  The Court's discontinuation of the annual updating

11  process did not give Defendants leave to use regulatory and policymaking processes to make the

12  RHU changes, which supersede policies implemented pursuant to and approved by Court orders,

13  without so much as filing a notice with the Court.

14       The Program Guide and Compendium were developed to remedy the Eight Amendment

15  violations in this case, including the Court's findings in the 1995 trial, and following the 2013

16  enforcement proceedings regarding segregation units.  *See* April 10, 2014 Order, ECF No. 5131 at

17  37-74 (finding continuing violations regarding segregation units and ordering development of

18  remedial plans including to decrease the likelihood of class members being placed in such housing

19  and shortening their lengths of stay); *see also* August 29, 2014 Order, ECF No. 5212 (approving

20  and ordering implementation of remedial plans).  Notably, a key part of the remedial plans the

21  Court ordered be implemented on August 29, 2014 was creation of the CCCMS restricted housing

22  units, which is currently in the Program Guide, ECF No. 7333-1 at 443, 446, 448, 455, 469, and

23  which CDCR asserts it is superseding through its RHU initiative.  The Court should clarify that its

24  February 2022 Order does not allow Defendants to implement this sweeping change to the

25  existing Program Guide and Compendium without informing the Court and, if Plaintiffs object,

26  obtaining the Court's approval of the modification.

27  ///

28  ///

2.    **The New RHU Policies Should Be Modified to Clearly Require that the "Assigned" Correctional Counselor and "Assigned" Primary Clinicians Must Attend IDTTs in RHU Units, As Required By Current Program Guide Policies**

During the parties' meet and confers and correspondence regarding the new RHU policies, Plaintiffs' Counsel has repeatedly asked Defendants to modify the new policies to explicitly require that the "assigned" primary clinician and "assigned" correctional counselor attend IDTTs. *See* App'x 10 at 6 (1/31/24 Letter from Plaintiffs Re RHU Policies), at 6.  Although Defendants made some changes in the language with respect to this issue, the latest draft of their RHU mental health policy does not match the language in the existing Program Guide sections.  The Court should order that Defendants modify the policies to require "assigned" clinicians and correctional counselors as detailed below.

First, for CCCMS RHU units, the most recent draft of Defendants' mental health RHU policies *does require* that IDTTs be attended by the "assigned PC," which is sufficient to capture the existing requirement for assigned primary clinician attendance at CCCMS RHU IDTTs.  *See* App'x 16, Mental Health RHU Policies, at CCCMS Policy § (a)(2)(F)(1).  However, the same section of the policy fails to clearly require attendance by the "assigned" Correctional Counselor, and Defendants have refused to edit that section to require the policy to more clearly and unambiguously include this requirement.  See *id*. at CCCMS Policy at § (a)(2)(F)(2); *See also* App'x 14 at 3 (4/8/24 Letter from Defendants re RHU Policy).  The current Program Guide section regarding CCCMS SHU IDTTs clearly requires attendance by the "assigned" correctional counselor.  *See* Program Guide, ECF No. 7333-1 at 148, 12-8-8, (CCCMS SHU program IDTT must include "assigned Correctional Counselor").  Defendants, in refusing to add "assigned" to this section on IDTT composition, point out that a later section of the policy, Section (a)(2)(G), requires that the IDTT "shall include the patient's correctional counselor."  *See* App'x 14 at 3 (4/8/24 Letter from Defendants re RHU Policy); *see also* App'x 16, Mental Health RHU Policies, at CCCMS Policy § (a)(2)(G).  The policy would be clearer and less subject to confusion if both sections on IDTT participation clearly specified that the CCCMS RHU IDTT should be attended by the patient's "assigned Correctional Counselor," as in practice this is often not the case.  This is particularly important given that Defendants have repeatedly taken the position during the data

remediation process that if a Program Guide provision does not include the word "assigned," even if that meaning is clear from the context, then Defendants are not required to measure whether the staff member was the assigned one in the compliance statistic for the indicator.  *See* Declaration of Jenny S. Yelin, filed herewith, at  ¶ 2.

Second, while the current Program Guide clearly requires EOP IDTTs to include the patient's "assigned" primary clinician and the patient's "assigned" correctional counselor in attendance "at a minimum," these requirements are not captured in the new EOP RHU mental health policy.  For example, in Chapter 7, the Program Guide requires that ASU IDTTs for EOP patients "are composed of, at a minimum:  [t]he assigned PC . . . [and] [t]he assigned Correctional Counselor."  *See* 2021 Program Guide, ECF 7333-1 at 137-38, 12-7-12 to 12-7-13.  Similarly, Program Guide Chapter 9, which Defendants are also seeking to replace with the RHU initiative, clearly requires that the "assigned PC" will attend the IDTT in the PSU.  *See id.* at 158, 12-9-5, (the IDTT in PSU "is composed of, at minimum" various people including the "Assigned Primary Clinician.").

Defendants new EOP RHU mental health policy provides that the IDTT may be attended by the "Assigned PC *or designee*."  App'x 16, EOP RHU Policy, at § (a)(2)(B)(1)(d) (emphasis supplied).  The "or designee" language is not included in the current Program Guide and its presence in the mental health RHU policy undermines the clear Program Guide mandate for attendance by the assigned PC.  Similarly, the new EOP RHU mental health policy permits IDTT attendance by any "Correctional Counselor I or Correctional Counselor II."  App'x 16, EOP RHU Mental Health Policy at § (a)(2)(B)(1)(c).  This language must be changed to require attendance by the "assigned Correctional Counselor" as mandated by the Program Guide sections discussed above.

Notably, in data remediation negotiations, Defendants have agreed that an IDTT will only be counted as compliant for QC1 – IDTT staffing if  the "assigned" primary clinician and the "assigned" Correctional Counselor are present for patients in ASU and SHU settings and if the "assigned" primary clinician is present for IDTTs for patients in the PSU. Defendants should not be permitted to change these existing requirements unilaterally.  *See* Yelin Decl. ¶ 3.

1    **3.    Defendants Should be Precluded From Including Medical Hold and Refusal to Transfer Exceptions in the New Mental Health RHU Regulations**

2

3    The proposed RHU regulations correctly specify—as required by the Program Guide—that

4    the required transfer timeline for *Coleman* class members to the CCCMS and EOP RHUs is

5    30 calendar days. *See* App'x 17, Regulations, at §§ 3335.2 and 3335.3. However, the regulations

6    also include the following four exceptions to the 30-calendar-day mandate for these transfers –

7    exceptions which are not contained in the *Coleman* remedy and are not authorized by the *Coleman*

8    remedy, one of which the Court has also expressly rejected in the data remediation process. "(1)

9    An exception to the 30-day requirement is allowed, and time constraints suspended, in the

10   following circumstances: (A) Healthcare staff determines, based on medical necessity, that a

11   transfer cannot occur, and places a hold; (B) During a delay resulting from the inmate's refusal to

12   transfer; (C) The inmate is out-to-court; (D) The inmate is placed in a Mental Health Crisis Bed or

13   higher level of care." *See* App'x 17, Regulations, §§ 3335.2 (d)(1)(A) (EOP); 3335.3 (d)(1)(A)

14   (CCCMS). The exceptions diverge from the Program Guide, which requires that transfers take

15   place within 30 days of arrival in restricted housing or from identification as having mental health

16   needs, with no exceptions. *See* Program Guide, ECF No. 7333-1 at 19, 12-1-16 (EOP ASU hub);

17   451, 453, 456 (CCCMS STRH and LTRH). The Defendants should not be permitted to grant

18   themselves new exceptions to these court-ordered timelines.

19   Moreover, the Court has already explicitly rejected the medical hold exception for

20   measuring CDCR's compliance with the 30-day deadline for transfers to CCCMS RHU settings in

21   the data remediation process. In its October 11, 2023 Order, the Court noted that these specialized

22   mental health restrictive housing units "were created to avoid the risk of serious additional harm to

23   class members through placement in administrative segregation units," and found that there was

24   no justification for the proposed vague medical hold exception contained in CDCR's proposed

25   data element, which the Court noted failed to include "a specific definition of medical hold" or

26   explain "how it would be operationalized." *See* 10/11/23 Order, ECF No. 8010 at 9:5-6 and 7:22-

27   23. The equivalent indicator for transfers to EOP RHU settings is still winding its way through

28   the data remediation process, and Plaintiffs have objected in that context to CDCR's attempt to

insert a medical hold exception.  *See* Yelin Decl. ¶ 4.  Plaintiffs object to Defendants' attempt to radically change the existing transfer timeline requirements without obtaining Court approval to do so and in contravention of the Court's October 2023 order.  Because none of the enumerated exceptions in Defendants' regulations are present in the existing Program Guide, Defendants should not be permitted to include any of them.  The 30-day deadline  includes adequate time for resolving all of the issues the exceptions are intended to address prior to transfer.

> ***Defendants' Position:***

The February 7, 2022 Order does not obligate Defendants to inform the Court of modifications to CDCR's RHU regulations or the RHU policy for several reasons.

First, the Court's February 7, 2022 Order unambiguously discontinued the parties' obligation to file updates to the Program Guide and Compendium and, instead, directed the parties to devote their efforts and resources to the data remediation process and developing the final list of CQIT indicators, which they have done. ECF No. 7456 at 4. Indeed, there is no Court-approved process to update the Program Guide or Compendium. Thus, the notion that Defendants are required to file updates to the Program Guide and Compendium is inconsistent with the Court's February 7, 2022 Order.

In addition, Defendants have not unilaterally and materially modified the *Coleman* remedy. Rather, CDCR developed the RHU policy to provide clear guidance to its mental health care providers regarding current custody designations for the RHUs. *See generally* App'x 1, 7, 14. The proposed RHU policy and regulations reflect largely custodial changes and do not affect the provisions of the remedy afforded to class members who are housed in the RHU. *Id.*

Because no updating process currently exists, the remedy is not affected by the RHU policy changes, and Plaintiffs and the Special Master have been closely involved in the development of the RHU policy changes, Defendants should not be required to formally update the court regarding these modifications.

///

///

///

4.    **The February 7, 2022 Order does not Require Defendants to inform the Court of modifications to CDCR's RHU regulations or the RHU policy.**

The Court previously found that the Program Guide and Compendium are the "primary court approved remedial documents in this action," and noted that "development and implementation of an improved quality improvement process is fundamental to ending federal court oversight." ECF No. 7456 at 2 (internal quotations omitted). The Court recognized that the "quality improvement process is comprehensive, distilling elements of the Program Guide, Compendium and other remedial measures." *Id*. Further noting that "remedial planning in this action was complete" and that "CQIT 'key indicators' [are] the functional equivalent of 'benchmarks' that . . . signify the material provisions of the Program Guide and Compendium," the Court discontinued the parties' obligation to file further annual updates to the Program Guide and Compendium. *Id*. at 2, 4.

The Court ordered that the "final list of CQIT indicators will replace the need for annual Updates," and anticipated that the final list would be approved by the Court in the Fall of 2022. *Id*. While the list remains to be finalized and approved, the order remains intact – that the updating process is discontinued. *Id.* at 4. Plaintiffs' request that Defendants update the Court as to the RHU regulations and policy would disregard the Court's direction regarding updates to the Program Guide and Compendium set forth in its February 7, 2022 Order, and create obligations where none presently exist.

In addition, although Defendants need not *formally* inform the Court of Program Guide modifications brought about by the RHU regulations and policy (*see* ECF 7456 at 4), as a practical matter, the Court remains informed of modifications to the Program Guide through its Special Master. Indeed, as the Court recently noted at the March 28, 2024 Status Conference, the Special Master is "in the loop" and "part of these discussions." March 28, 2024 Tr. at 21:6, 22:4-5. Here, as it relates specifically to the RHU policy changes, the Special Master (and Plaintiffs' counsel) have been involved in discussions related to anticipated changes regarding the RHU since at least June 2023. And, as the Court noted, the Special Master has provided the Court with informal updates as to the contours of these changes, all of which prevents unnecessary crowding of the

1    docket. *Id.*

2        5.    **The proposed RHU policy and regulations do not affect the provisions of the**
            **remedy afforded to class members.**

3

4        While the proposed RHU regulations and policy touch on aspects of the MHSDS, the

5    changes are largely custodial in nature and do not materially change the remedy for class members

6    housed in RHUs. A significant component of the RHU regulations is the merger of the short and

7    long term segregation programs for each level of care. *See* App'x 1, 17. The CCCMS Short Term

8    Restricted Housing (STRH) and Long Term Restricted Housing (LTRH) programs have been

9    merged into the CCCMS RHU. *See* App'x 16, 17. Likewise, the shorter term EOP Administrative

10   Segregation Unit and longer term Psychiatric Services Unit programs have merged into the EOP

11   RHU. *Id.* Although the names of the housing programs have changed, the provision of care,

12   including the amount and frequency, provided to patients housed in those new programs remains

13   the same. *See* App'x 16, 17.

14       The proposed RHU policy, attached as Appendix 16, replaces only Chapters 7-9 of the

15   Program Guide as well as Program Guide memoranda on the STRH and LTRH. And critically, the

16   purpose of replacing portions of the Program Guide is to tailor the policy for the new RHUs, not to

17   change the *Coleman* remedy. For example, Chapters 7-9 of the Program Guide concern the now

18   defunct Administrative Segregation Units (ASU), Security Housing Units (SHU), Psychiatric

19   Services Units (PSY), and memoranda on the STRH and LTRH. *See* ECF No. 7333-1 at 443, 446,

20   448, 455, and 469. Because these housing units have been combined with and replaced by the

21   Correctional Clinical Case Management System (CCCMS), General Population (GP), and

22   Enhanced Outpatient Program (EOP) RHUs, CDCR developed the RHU policy to provide clear

23   guidance to its mental health care providers regarding current custody designations for the RHUs.

24       Despite these changes to the naming convention, the same treatment requirements found in

25   the ASU, SHU, PSU, STRH, and LTRH provisions of the Program Guide are applied to the

26   RHUs. Defendants are not changing the provisions of the *Coleman* remedy by merely updating

27   policies to align with the current custody designation for RHUs. Rather, the purpose of the RHU

28   regulations is to decrease the likelihood of inmates (including those in the MHSDS) being placed

in RHU, and for those placed in RHU, to shorten their terms there. *See* App'x 1, 7, 14. And neither of those provisions are a part of the *Coleman* remedy. Accordingly, no formal update to the Court is required.[6]

6.     **Remaining Areas of Dispute Regarding the RHU Regulations and Policy**

Plaintiffs have expressed support of Defendants' extensive modifications to shorten the lengths of stay in RHUs, and the parties are in general agreement as to the majority of the RHU regulations and policy changes. App'x 15. However, in addition to the effect, if any, of the Court's February 7, 2022 Order on Defendants' duty to inform the Court of the changes to the Program Guide, two disputes remain between the parties.

(1)     Whether the RHU policy should include language mandating that the "assigned" primary clinician and "assigned" correctional counselor attend IDTT or conduct certain clinical encounters.

Plaintiffs request that the word "assigned" be added in association with correctional counselors who attend both CCCMS and EOP IDTTs. *See id.*, §§ CCCMS (a)(2)(G) and EOP (a)(2)(B)(1)(c). Regarding CCCMS IDTTs, the word "assigned" is unnecessary because section (a)(2)(G) already reads "[t]he IDTT shall include the patient's Correctional Counselor . . . ." The assigned correctional counselor is not required at EOP RHU IDTTs. *See* Program Guide at 12-9-5, concerning the PSU (EOP long term segregation unit replaced by EOP RHU) listing the "Correctional Counselor II" as an IDTT attendee, ECF No. 7333-1 at 158.[7]

(2)     The validity of the proposed exceptions to the 30-day mandated timeline for transfers to specialized RHU units for medical holds and for a patient's refusal to transfer.

Plaintiffs have acknowledged Defendants' changes to the RHU policy, which specify the timeline for transfers to specialized RHUs for class members, is 30 calendar days. App'x 10. The

---

[6] As is relevant here, Defendants believe that a finalized list of key CQI indicators would provide the parties with clarity as to which policies must be integrated into CQI through data remediation.

[7] Plaintiffs informed Defendants at 3:59 p.m. the day of filing that, as it relates to the parties' disputes, the policy for EOP patients allows for an assigned primary clinician *or designee*, where the Program Guide allows for the assigned primary clinician. This is the first time Plaintiffs raised the issue of the primary clinician designee, and accordingly, Defendants are unable to brief that issue at this time.

18

1  parties, however, have yet to reach agreement regarding at least two of the exceptions to the

2  transfer timelines set forth in the RHU regulations. An exception to the 30-day requirement to

3  transfer a patient to a CCCMS or EOP RHU is permitted under the regulations[8] in the following

4  circumstances: (1) healthcare staff determines, based on medical necessity, that a transfer cannot

5  occur, and places a hold; (2) during a delay resulting from the inmate's refusal to transfer; (3) the

6  inmate is out-to-court; and (4) the inmate is placed in a Mental Health Crisis Bed or higher level

7  of care. *See* Cal. Code of Regs. tit. 15, §§ 3335.2 (d)(1)(A) (EOP timeline exceptions) and 3335.3

8  (d)(1)(A) (CCCMS timeline exceptions). Plaintiffs oppose the first and second exceptions,

9  regarding medical holds and a patient's refusal to transfer.

10      Defendants maintain that the exceptions to the 30-day timeline for transfers to specialized

11  RHUs, including for medical holds and refusals, are common sense reasons to not complete a

12  transfer on time. In support of their position, Plaintiffs rely on the Court's October 11, 2023 Order

13  that required Defendants to remove the medical hold exception from the indicator's business rule

14  for the STRH and LTRH data indicator—which Defendants did. ECF No. 8010 at 11. But this

15  Order applies to a data indicator, not CDCR's RHU regulations. *Id.* Nor does it bar Defendants

16  from maintaining a policy that permits custody staff to decide when it is safe and appropriate to

17  move a patient in the event of a medical hold. Although CDCR will update its Restricted Housing

18  indicators, including the STRH and LTRH transfer indicator, to align with the new CCCMS RHU

19  regulations and policy, in accordance with the court's October 11, 2023 order, CDCR will not

20  reinsert a medical hold exception to the indicator.

21      Plaintiffs have not adequately explained their opposition to an exception for when a patient

22  refuses to transfer. This court has approved two transfer refusal exceptions. *See* ECF No. 5750,

23  ORDER approving parties' PIP transfer timeframe exceptions, ECF No. 5744 at 5, and ECF No.

24  6295, ORDER approving parties' MHCB transfer timeframe exceptions, ECF No. 6261-1 at 2. In

25  both cases, the parties have agreed that a refusal to transfer suspends the transfer timeframe.

26

27  _____

    [8] *See* Public Comment Version of Regulations, NCR 23-15 Restricted Housing Units (ca.gov), at

28  41-43.

1   Plaintiffs have not explained why the same should not be true for RHU transfers. Like those two

2   approved exceptions, CDCR's RHU regulations also suspend timeframes when a patient refuses to

3   transfer. The court should not interfere with the RHU regulations in this instance.

4              b.      *Conclusion*

5          Because the updating process was unambiguously suspended by this Court's February 7,

6   2022, and because the updated RHU policy reflects largely custodial changes and therefore does

7   not impact the *Coleman* remedy, Defendants should not be required to update the Court as to these

8   changes. Moreover, although no formal update to the Court is required, the Court nonetheless

9   remains abreast of any policy modifications that may impact the Program Guide or Compendium

10  through her Special Master, who was extensively and intimately involved in the creation and

11  implementation of the RHU policy and regulations.

12

13                          **<u>CERTIFICATION</u>**

14         Plaintiffs' counsel certifies that he reviewed the following orders in preparing this filing:

15  ECF Nos. 5131, 5212, 5928, 6806, 7212, 7456, 7695, 8010, 8121, 8181, 8196.

16

17                          **<u>CERTIFICATION</u>**

18         Defendants' counsel certifies that he reviewed the following orders in preparing this filing:

19  ECF Nos. 5196, 5750, 6214, 6295, 6460, 6806, 7323, 7342, 7456, 7695, 8010, 8121, and 8181.

20

21  DATED:  April 25, 2024              Respectfully submitted,

22                                      ROSEN BIEN GALVAN & GRUNFELD LLP

23                                      By:      */s/ Marc J. Shinn-Krantz*

24                                               Marc J. Shinn-Krantz

25                                      Attorneys for Plaintiffs

26

27

28

JOINT MOTION FOR CLARIFICATION OF FEBRUARY 7, 2022 ORDER

1    DATED:  April 25, 2024       ROB BONTA, Attorney General of California

2            DAMON MCCLAIN
           Supervising Deputy Attorney General

3            By:       */s/ Elise Thorn*

4               Damon McClain
              Elise Owens Thorn

5               Deputy Attorney General

6               Attorneys for Defendants

7

8    DATED:  April 25, 2024       HANSON BRIDGETT LLP

9            By:       */s/ Carson R. Niello*

10           Lawrence Cirelli
              Paul B. Mello

11               Samantha D. Wolff
              Carson R. Niello

12

13            Attorneys for Defendants

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT MOTION FOR CLARIFICATION OF FEBRUARY 7, 2022 ORDER