APPENDIX 2



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830  ▪  F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email:  CTrapani@rbgg.com

July 31, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Nicholas Weber
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov

> Re:    *Coleman v. Newsom*:  Plaintiffs' Comments on Proposed Changes to
> Segregation in CDCR's Restricted Housing Unit (RHU) Project
> <u>Our File No. 0489-03</u>

Dear Nick:

    We write in response to your letter of June 29, 2023 requesting comments on CDCR's draft regulations and other shared information about Defendants' Restricted Housing Unit (RHU) project.  Thank you for sharing those materials.  We also appreciate having the opportunity to discuss the proposed project and the new regulations with CDCR on July 14, 2023, and we look forward to meeting again on August 1, 2023 about these proposals.

    The draft regulations are encouraging as they appear to be designed to further reduce the number of people in segregation and their lengths of stay.  This is very positive.  For example, the significant cuts in the length of RHU terms, and the elimination of RHU terms across the board for a number of offenses will help reduce segregation populations and shorten lengths of stay for everyone, including our clients in the MHSDS.  We also agree it makes sense to simplify the system of different types of segregation units, so that there are three different types of units rather than six, and to reduce the concentration of high need EOP patients in the CSP-Sacramento PSU.

    Unfortunately, the project does not include targeted measures to address the continuing significant discrepancy in the rates that people with mental health disabilities are assigned to segregation, or in the longer lengths of stay in segregation for MHSDS participants, as compared to the rest of the CDCR population.  As explained in Mike Bien's email to you on July 18, 2023, and as shown in the charts attached thereto, the monthly data produced by CDCR shows that as of April 24, 2023, the EOP population in segregation was back up to over 10% of all EOPs, at 10.69%, and the CCCMS population

[4331633.1]

Nicholas Weber
July 31, 2023
Page 2

in segregation was at 4.7%. *See Coleman* Monthly Reports for April 2023 (HCPOP Report, DMH Licensure Data, MIS Report). By way of comparison, according to Dillon Hockerson's June 6, 2023 email to Plaintiffs, as of June 1, 2023, only 2.69% of people not in the MHSDS were in segregation. That means that EOP individuals are being assigned to segregation units at a rate almost exactly **four times** the rate of people without a mental health disability.[1]

We are also concerned by recent data showing the number of EOP individuals in segregation increasing  steadily since January of 2022, when pandemic restrictions on movement started to be unwound. The total population of EOP individuals in EOP ASU hub institutions along with those waiting in non-hub institutions has risen in a steady fashion since January 2022, through January 2023, and then even more sharply through April 2023, rising from 522 in January 2022 to 546 in January 2023 and then to 610 in April 2023. *See* EOP ASU Trends Report, Exhibit 5 to December 2022 Monthly Statistical Report, and Exhibit 5 to April 2023 Monthly Statistical Report.

Plaintiffs' below comments are meant to highlight opportunities for CDCR to better target the *Coleman* population through revisions to the draft regulatory packages.

## I.    C-Status and Privilege Group C

The proposed changes will increase the use of Privilege Group C (and thereby, use of C-Status) in lieu of segregation terms. This is positive in that fewer people will be housed in segregated units. However, we are concerned that the changes will result in some *Coleman* patients being placed on perpetual Privilege Group C restrictions, or worse, on perpetual C-Status. As DAI explained to us at the July 18 meeting, C-Status—also known as "C over C" or "program failure"—is the term used for individuals assigned to both Work Group C and Privilege Group C. Please let us know whether this understanding is correct.

The RHU regulations currently have no limit on how long someone can be on either one of these statuses, although for each RVR there is a limit of 180-days on C-Status terms as punishment in the new regulations. Sections 3044 (b)(4)(A), (b)(4)(B) and (b)(6)(C),

---

[1] If PSU patients are included, the disparity is even more stark. As of April 24, 2023, out of a total EOP population of 6,886 individuals statewide, 787 EOP patients—a staggering 11.42%—were housed in segregation units. *See* April 2023 Monthly Statistical Report (produced on June 15, 2023), Exhibit 6a (HCPOP Information Report).

Nicholas Weber
July 31, 2023
Page 3

Because of the restrictive privileges and limited out-of-cell time for people on C-Status, there are harms to long term placement on this status that are similar to the harms of segregation placements.[2]

The parties have historically collaborated to reduce isolation and encourage therapeutic socialization among members of the *Coleman* class, particularly those at the EOP and higher levels of care. For these individuals, it is well established that the kinds of isolation and lack of stimulation experienced in segregation, and to a lesser extent on C-Status, can lead to psychological decompensation, and psychological crises. *See, e.g.*, Reiter, Keramet, at al., *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States*, 2017-2018. Am J Public Health. 2020, at 1 ("Many studies document psychological harms of segregation, including associations between solitary confinement and self-harm, anxiety, depression, paranoia, and aggression, among other symptoms.").

Our shared goal of reducing the isolation of MHSDS patients would be furthered by time limits on C-Status and Privilege Group C placements, especially for people at the EOP level of care. Specifically current regulations allow assignment to C-Status with no credit earning as punishment for an RVR for up to 180 days or for the number of days equal to the disciplinary credits forfeited, whichever is less. Cal. Code Regs. tit. 15 § 3044 (b)(4)(A)-(B). We are not aware of any rule prohibiting back to back terms on C-Status. Can staff impose multiple consecutive 180-day C-Status terms for multiple RVRs? If the limit is 180 days, is there any time period that must pass before another 180-day term is imposed? We recommend a ban on consecutive C-Status term and requirement for a fixed time off period before C-Status can be re-imposed.

We request that Defendants impose a maximum term of 90 days on C-Status for EOP patients, in order to reduce the risk of decompensation from being isolated in their cells. Please also take this opportunity to revise the C-Status regulations to include a minimum number of days between each C-Status term for EOP patients. Defendants should also develop a policy to direct staff to use C-Status for shorter periods of time with patients in the MHSDS—even a few days at a time, especially at first—whenever

---

[2] We recognize and appreciate that some of the proposed changes make C-status less restrictive. For example, under the old regulations anyone on C-status was only allowed one self-help group per week. Under the new regulations that restriction is lifted and individuals can be in multiple self-help groups. Cal. Code of Regs. tit. 15 § 3044 (f)(1)(H) (new language). Individuals on C-Status will also be able make one call a week (it used to be only on an emergency basis). *Id*. at § 3044 (f)(1)(C). Tablet possession will be permitted, but all calling capabilities and paid services will be shut off. *Id* at § 3044(f)(1)(L).

Nicholas Weber
July 31, 2023
Page 4

possible and it should be unusual to impose longer C-Status terms on MHSDS patients and especially on EOP patients.

Defendants should also revise the threshold for determining eligibility for placement on C-Status, also termed "program failure," for MHSDS patients. The current definition of "program failure" in Title 15, which controls when an ICC can consider placing an MHSDS patient on C-Status, is set forth below:

> Program failure means any inmate who generates a significant disciplinary history within the last 180 days from the current date. A guilty finding for two serious Rules Violation Reports or one serious and two administrative Rules Violation Reports within that 180 day time period is reasonable evidence of a significant disciplinary history and may be considered a program failure.

Cal. Code Regs. tit. 15, § 3000. For *Coleman* class members, and particularly for EOPs, Defendants should revise this definition to require MHSDS patients to commit four (rather than two) serious RVRs in a 180 day period before becoming eligible for C-Status. Another way to raise the threshold for our clients we recommend is to shorten the time frame for the two predicate RVRs to within a 90 day (rather than 180 day) period for MHSDS patients.

Additionally, because administrative RVRs are less serious, and often concerns minor offenses like being out of bounds or missing work, which are offenses that EOP individuals are more prone to commit due to their mental health symptoms, administrative RVRs should be eliminated as a basis for "program failure" status altogether for MHSDS patients, or at least for EOPs.[3]

---

[3] Regarding the topic of administrative RVRs, CDCR should take this opportunity to implement rules that allows for these minor offenses to be reversed and stricken from *Coleman* class members' custody files. The Board of Parole Hearings ("BPH") often uses this kind of disciplinary information against EOP life prisoners in the parole consideration process, even when punishments are mitigated down to counseling chronos or administrative RVRs. Data produced by the BPH to Plaintiffs' counsel in *Armstrong* regarding hearing outcomes for EOPs in the parole consideration process shows that EOPs are far less likely to be granted parole than non-MHSDS life prisoners. For example, in the calendar year 2022, EOP individuals were granted parole at their scheduled BPH hearings just **2.8%** of the time, while non-MHSDS individuals were granted parole **17.5%** of the time. In other words, EOPs were more than **six times** less likely to be granted parole.

Nicholas Weber
July 31, 2023
Page 5

It should be harder to place MHSDS patients on "program failure" status. Plaintiffs would like to know more about the consequences of a "program failure" determination. Is this status indefinite? Is it reviewed annually in ICC? How do individuals get off program failure status? We believe this status may be inappropriate for EOP individuals, given the likely consequences for their mental health functioning.

Additionally, Defendants should draft regulations that permit IDTTs to require additional privileges for EOP patients on privilege group C and C-Status when clinically indicated, similar to the process in the regulations for recommending additional privileges for EOP patients in RHUs.

Once the regulations go into effect, we request as part of the *Coleman* monthly report that CDCR provide monthly data on the total number of individuals (both MHSDS patients and non-MHSDS individuals) who are assigned Privilege Group C and C-Status and their levels of care (if any). Additionally, mental health clinicians who perform Mental Health Assessments (MHAs) should be provided clear guidance on which offenses have been removed from the RHU matrix and converted to instead result in a penalty of Privilege Group C placement.

## II.    CSP-Sacramento Psychiatric Services Unit (PSU)

We are encouraged that CDCR's RHU project will create unified mental health restrictive housing units and reduce the concentration of class members in the CSP-Sacramento Psychiatric Services Unit (PSU). As we have consistently stated, the PSU is a very problematic and anti-therapeutic unit for our clients, and the staff who work there. We will advocate separately for specialized treatment for individuals with borderline personality disorders in our objections to the UNA report, but such treatment programs would also help address the needs of the difficult-to-treat population housed in the PSU currently, and in the future hopefully dispersed to mental health treatment units around the state. Defendants should keep in mind that if new treatment programs for personality disorders are implemented to help treat this population, such programs will need to be concentrated in a few key locations that can readily hire clinical staff.

During our meeting on July 14, Nick Weber indicated that the SAC PSU population would be dispersed throughout system once the new RHU system is in place. We would like to know more about the timetable for this change, and what CDCR's plan is to ensure that adequate treatment resources exist in the EOP ASU Hubs/EOP RHUs that would receive individuals from this demanding population to treat. Will CDCR proactively transfer people out of the PSU to other EOP RHU units to expedite this process, or rather wait for the dispersal of this population to occur naturally over time?

[4331633,1]

Nicholas Weber
July 31, 2023
Page 6


### III.    Program Guide and Compendium Rules for LTRH/STRH and EOP/PSU

Prior to merger of the different types of mental health ASU units (STRH/LTRH and PSU/EOP ASU Hubs), we will need to see CDCR's plans for how to combine the current remedial requirements that apply to the different units.  During the July 14, 2022 meeting, Defendants indicated that when the two programs have different requirements (e.g., staffing ratios), CDCR will use the requirement that provides the highest level of privileges, treatment, or staffing.  For example CDCR will use the staffing ratio that requires the highest number of staff, and the greater mandate for number of hours of out-of-cell time as between the two units being combined.  CDCR representatives at the meeting also indicated that they would deploy the Behavior Incentive Program (BIP) now in place in the SAC PSU to all EOP RHU units.  We agree with the approach conceptually, but we would like to see detailed proposals and have the opportunity to weigh in.  We also request more information about the timetable for these changes and efforts to ensure sufficient treatment resources in receiving institutions.

Defendants would also likely have to update a number of Program Guide policies and procedures in connection with the new proposals and even just to address the re-naming of the programs.  Please let us know if there is plan to address this issue and any draft revisions to Program Guide policies.

Plaintiffs also ask that Defendants plan proactively for how these changes will impact class members, and expand programs that assist class members in moving more successfully out of segregated environments.  For example, the new EOP RHU programs should incorporate a process similar to the PSU step-down program and the Maximum Custody review programs in the PIPs to allow for treatment outside of treatment modules and other steps as a means of easing the transition to general population settings.

Please also provide information on where the new CCCMS and EOP RHUs will be, and in which buildings they will be located (unless the plan is simply to rename all the existing mental health segregation units either CCCMS RHU or EOP RHU).

We anticipate that there will be shrinking in the overall footprint of segregation units as this project is rolled out.  If that is correct, we would like to know more about where units will be closed or made smaller.  Which institutions will have EOP ASU or other mental health segregation units closed or reduced in size?  Please also share population projections on how these changes will affect *Coleman* class members and programs.  How much will these changes reduce the current overall populations in EOP ASU units?  In the PSU?  In STRH units?

[4331633,1]

Nicholas Weber
July 31, 2023
Page 7

     Also please confirm that the plan will be for the new EOP RHUs to use the EOP ASU certification process.  Please also confirm that there will be no combination units including EOPs, CCCMS, and/or mainline class members permitted under the new regulations.

     Please also confirm that the intake cells in Administrative Segregation Units will continue to be employed, and confirm whether Defendants have measured whether their intake cells currently will be sufficient under the new program alignment.

     Also, will any of the current changes in sentences be retroactive and shorten existing SHU terms?

## IV.    Out-of-Cell Time

     One of the best elements of the new RHU plan is Defendants' proposal to expand out-of-cell time and recreation time for people in segregated units.  Under the new regulations, the minimum out-of-cell time for people in segregation will increase to 20 hours a week, at least 10 of which must be exercise.  *See* Proposed Cal. Code of Regs. tit. 15 § 3343(i).  We applaud this expansion and the commitment of resources that will be needed to accomplish this.

     However, there is no comparable increase in the out-of-cell times for MHSDS patients in specialized RHUs for CCCMS and EOP patients.  Currently, EOP ASU Hub and PSU patients must be offered 20 hours of out-of-cell time, including 10 hours of exercise and 10 hours of therapeutic activities.  *See* 2021 Program Guide, ECF No. 7333-1 at 135, 160; Cal. Code Regs., tit. 15 § 3343.  Male CCCMS patients in STRH units must be offered 20 hours of out-of-cell activities per week.  2021 Program Guide, ECF 7333 at 452 (January 15, 2015 memo stating "the CCCMS-STRH will offer 20 hours of out-of-cell activities per week" including 18.5 hours of exercise and 90 minutes of structured therapeutic activity).

     Due to "physical plant limitations," female CCCMS patients in the STRH are offered only 13.5 hours per week.  *Id.* ("The [CCCMS-STRH Female] programs will offer 10 hours per week of exercise outside of the cell and 3.5 additional hours of recreational activity in a secure treatment module [on the dayroom floor or other designated area].").  Male and female patients in the LTRH must be offered 18.5 hours of out-of-cell activities per week.  *Id.* at 453 (requirement that LTRH individuals be provided with 15 hours of out of cell activities per week).

     We request that Defendants consider whether, as part of the enhancements of out-of-cell time generally to reduce the negative impacts of segregation and isolation, to also increase out-of-cell time and privileges for patients in EOP and CCCMS RHUs.  At the

[4331633.1]

Nicholas Weber
July 31, 2023
Page 8

very least, CCCMS patients, and especially female CCCMS patients, should be offered
the same number of hours of out-of-cell time as EOP patients in administrative
segregation (i.e., a minimum of 20 total out-of-cell hours, including treatment, for all
MHSDS RHUs) and people in non-mental health RHUs.

Do Defendants have a plan to increase the out of cell for women and CCCMS
patients to 20 hours of out of cell time per week?

Also, we are concerned about the staffing needed to increase out of cell time in
segregation units to 20 hours. Do Defendants have a plan to augment staffing in
segregation units to facilitate these expansions? How are current efforts to reduce
custody staffing shortages going?

## V.    EOP and CCCMS RHU Transfer Timeframe Exceptions

The new regulations include the requirement from the Program Guide for transfer
to an EOP hub within 30 days of placement in the EOP level of care. *See* ECF 7333-1,
2021 Program Guide at 12-1-16 and 12-7-8. However, the new regulations propose new
exceptions to the transfer timeframe requirements that are not in the Program Guide. *See*
Proposed Cal. Code of Regs. tit. 15 § 3335.2. These "suspending events" are the subject
of an ongoing and unresolved dispute in the data remediation process that will likely
require the Court's input to fully resolve. It is not appropriate to finalize these
regulations until that time.

In particular, we object to the medical hold exception proposed in the draft
regulations. In its May 24, 2023 Order, the Court noted that "it previously has approved
exceptions to inpatient and MHCB transfer timeline requirements, *see* December 15,
2017 Order, ECF No. 5750, and those exceptions may provide a prototype for use in the
context of transfers to LTRH and STRH units. For this reason, this issue will be referred
back to the Special Master for further consideration." Plaintiffs have consistently asked
Defendants to negotiate a transfer timeframe exceptions policy for the LTRH, STRH,
EOP ASU Hub and PSU to resolve these disputes in the data remediation process.
Defendants have refused. The issue is now pending before the Special Master at Level 2
of the dispute resolution process. It is not appropriate to move forward with the draft
regulations until this data dispute is resolved.

The draft regulations also contain a proposed exception due to a "delay resulting
from the inmate's refusal to transfer." *See* Proposed Cal. Code of Regs. tit. 15
§ 3335.2(d)(1)(B). We strongly object to this language. The timeframe for transfer is
already generous enough to address delays caused for this reason. Allowing this

[4331633.1]

Nicholas Weber
July 31, 2023
Page 9

exception will create a perverse incentive not to proactively address patients' concerns which may cause them to refuse to transfer.

The regulations contain the same transfer timeline exceptions in the CCCMS RHU section, which is § 3335.3. Our objections apply equally to those provisions.

## VI.    Objections to Proposed Language In Section 3335

There are two problematic new provisions in section 3335 (Restricted Housing Unit Placement). First, 3335(E) allows temporary retention in segregation as "NDRH" (non-disciplinary restricted housing) for people who are "Post Restricted Housing Unit Maximum Release Date (RHU MRD) pending transfer to GP." These patients should be transferred out of the RHU within 72 hours if they are part of the *Coleman* class, consistent with the Court's April 10, 2014 Order regarding harms to patients placed in segregation for non-disciplinary purposes. Please revise the draft regulations accordingly.

Second, Section 3335(F) allows retention in RHU as NDRH due to "Lack of appropriate bed space." This language violates *Armstrong* Court Orders that require moving a patient who lacks bed space due to a disability to a different location within 24 hours, and requires onerous efforts to move the person right away. These requirements should be included here as part of the regulations in order to correct this inconsistency between the current regulations and the *Armstrong* requirements.

## VII.   R.J. Donovan EOP ASU Hub Maximum Capacity Order

In your June 29, 2023 letter, you ask that we stipulate to ending the court-ordered cap of RJD EOP ASU Hub bed space (*see* July 27, 2004 Order, ECF No. 1598 at 2) on the grounds that the cap will end up "thwarting the goal of reducing unnecessary transfers and increasing continuity of care." *See* Defs.' June 29, 2023 Ltr. at 5. The most recent EOP ASU Hub certification for RJD for April 2023, which we received on June 27, 2023, **did not certify** RJD on the grounds that RJD "did not meet expectations due to Timely Mental Health Referrals (89%) and Out of Cell Time (53%)."

Because of our concerns about the adequacy of care at RJD, as well as the recent problems with staff misconduct there against people with disabilities, including EOP patients, we are not willing to consider a stipulation at this time. We are open to revisiting the issue after the RHUs are rolled out and sufficient time has passed to begin evaluating their success.

[4331633.1]

Nicholas Weber
July 31, 2023
Page 10

     In the meantime, if Defendants have done any analysis of the adequacy of the treatment space at RJD for a larger EOP RHU population, we would appreciate Defendants sharing that analysis.

     Thank you for considering these comments.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:  Cara E. Trapani

*/s/ Thomas Nolan*

Thomas Nolan
Of Counsel

CET:cg
cc:    *Coleman* Co-Counsel
      *Coleman* Special Master team
      Elise Thorn
      Damon McClain
      Namrata Kotwani
      Samantha Wolff
      Paul Mello
      Melissa Bentz
      Dillon Hockerson

[4331633.1]