1                    UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3   RALPH COLEMAN, et al.,   ) Case No. 2:90-CV-00520-KJM-DB
                          )
4        v.            ) Sacramento, California
                          ) April 26, 2024, 9:06 a.m.
5   GAVIN NEWSOM, et al.,    )
                          ) Re: Status Conference
6            Defendants.   )

7               TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE KIMBERLY J. MUELLER
8         CHIEF UNITED STATES DISTRICT JUDGE

9   APPEARANCES:
   For the Plaintiffs:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
10                        MS. LISA ELLS
                        MS. JENNY SNAY YELIN
11                        MR. MICHAEL BIEN
                        MR. MICHAEL NUNEZ
12                        101 Mission Street, Sixth Floor
                        San Francisco, California  94105
13

14   For the Defendants:    HANSON BRIDGETT, LLP by
                        MR. PAUL B. MELLO
15                        1676 N. California Boulevard, Suite 620
                        Sacramento, California  95814

16                        HANSON BRIDGETT, by
                        MS. SAMANTHA D. WOLFF
17                        425 Market Street, 26th Floor
                        San Francisco, California  94105
18

19                        OFFICE OF THE ATTORNEY GENERAL
                        DEPARTMENT OF JUSTICE by
20                        MS. ELISE OWENS THORN
                        1300 I Street, Suite 125
                        Sacramento, California  95814
21

22              MARYANN VALENOTI, RMR, CRR
                 Official Court Reporter
23              501 I Street, Suite 4-200
                 Sacramento, CA 95814
24            mvalenotiRMRCRR@gmail.com
                  (916)930-4275
25   Proceedings reported via mechanical steno - transcript produced
   via computer-aided transcription

1    APPEARANCES CONTINUED:

2    For the Defendants:      OFFICE OF THE ATTORNEY GENERAL
                              DEPARTMENT OF JUSTICE by
3                             MR. DAMON GRANT MC CLAIN
                              455 Golden Gate Avenue, Suite 11000
4                             San Francisco, California  94102

5    Also Present:            Matthew Lopes, Special Master
                              Dr. Steven Cartwright
6                             Jeff MacComber
                              Diana Toche
7                             Lindsay Hayes
                              Amar Mehta
8

9                                 --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA, FRIDAY, APRIL 26, 2024

2                              --o0o--

3          (In open court.)

4          THE CLERK:  All rise.  Court is now in session.  Chief

5    United States District Judge Kimberly J. Mueller now presiding.

6          Please be seated.

7          Calling civil case number 90-0520, Coleman, et al.

8    versus Newsom, et al.

9          This is on for further hearing regarding transfer

10   timelines and suicide prevention measures.

11         THE COURT:  All right.  Appearances, please, for the

12   plaintiffs.

13         MS. ELLS:  Good morning, Your Honor.  Lisa Ells, Jenny

14   Yelin, Michael Bien and Michael Nunez for the plaintiffs today.

15         THE COURT:  All right, good morning to you all.  And

16   for the defendants.

17         MR. MELLO:  Hello, Your Honor.  Paul Mello, lead

18   counsel for defendants.  I'm joined by Samantha Wolff, Elise

19   Thorn and Damon McClain.

20         THE COURT:  Who else is present for the defendants?

21         MR. MELLO:  Also present are doctor or director --

22   Deputy Director Amar Mehta, Assistant Director Steven

23   Cartwright, Secretary Jeff MacComber, Undersecretary Dr. Diana

24   Toche, legal affairs secretary for the Governor, David Sapp,

25   and am I missing anyone?  I believe -- I mean, there's other

1    folks, but those persons are present, Your Honor.

2            THE COURT:  All right.  Thank you.

3            There's three things the Court is prepared to discuss

4    today:  One is programs regarding personality disorders, a data

5    remediation, and suicide prevention, in that order.

6            I am going to hear a report from the Special Master

7    regarding the data remediation.  He's prepared to give a report

8    for the record, and I am going to explain why I directed

9    Mr. Sapp to be here; I promised to do that and I will.

10            So, on the personality disorders program, I looked

11    back at my order, I've looked at the parties' joint statement.

12    My understanding is that CDCR has developed a plan to provide

13    treatment for MHSDS patients with personality disorders, and

14    that plan is generally acceptable to plaintiffs, right, Ms.

15    Ells?

16            MS. ELLS:  That's correct, Your Honor.

17            THE COURT:  All right.  The Special Master has seen

18    the plan and advises the Court it's generally acceptable.

19    Who's speaking for the defendants on this?  I know in the past

20    I've had discussions with Mr. McClain on the record, but who's

21    speaking today about that?

22            MR. MELLO:  It would be either myself, Mr. Mello or

23    Dr. Mehta.

24            THE COURT:  All right.  So the Court had contemplated

25    that a pilot would be implemented no later than August, and

1   what I understand is that the defendants, CDCR tentatively has

2   identified two institutions, San Quentin and Valley State

3   Prison for an initial pilot.

4           MR. MELLO:  Right.

5           THE COURT:  The plaintiffs agree that a

6   two-institution pilot makes sense.  Who's speaking for the

7   plaintiffs on this?

8           MS. ELLS:  I am, Your Honor.

9           THE COURT:  All right.

10          MS. ELLS:  We are amenable to rolling it out at two

11  institutions initially.  I do think we have concerns about the

12  lack of sort of firm timelines in the rollout plan generally,

13  including as to whether or not August is actually a milestone

14  that is within reach of defendants under their current schedule

15  that they're proposing.

16          THE COURT:  Well, the Court is contemplating making

17  the schedule more clear in an order, and so that's really my

18  question.  Plaintiffs ask for a more aggressive schedule, I

19  think.  The Court is inclined to make clear August

20  implementation of the pilot is a firm date, but for two

21  institutions, and of how many institutions; is it all

22  institutions where this needs to be rolled out ultimately?

23          MS. ELLS:  Defendants could speak to their plan, but

24  my understanding is that the plan is to roll it out at every

25  EOP institution.

1           THE COURT:  All right.  Agreed?

2           DR. MEHTA:  Yes, that's correct, Your Honor.

3           THE COURT:  So, remind me how many is that?

4           DR. MEHTA:  I'm sorry, off the top of my head I

5    believe it's about 15, but I could confirm that.

6           MS. ELLS:  It's 19, Your Honor.

7           DR. MEHTA:  Nineteen.

8           THE COURT:  All right, 19.  Thank you.

9           Just to clarify the Court's thinking and the reasons

10   for its plan to issue an order with some firm deadlines, not

11   just aspirational deadlines, while taking account of what the

12   plaintiffs are suggesting, the Court's position is that the

13   defendants' opportunity to challenge the Eighth Amendment basis

14   for requiring development of a program such as this has long

15   since past.  I included it in a September 2021 order.  There is

16   a general statement in the defendant's UNA report, but there's

17   no position stated in the UNA report that the Court can

18   construe as any serious disagreement with the need for the

19   program.

20          And then looking at the program guide itself and its

21   language about personality disorders, I just think the time has

22   past for any serious objection to moving forward with this

23   program with due haste.

24          So, Mr. Mello, is there more you want to say about

25   that?

1          MR. MELLO:  I would say that defendants have made

2     clear that they are going forward with this program, and Dr.

3     Mehta could speak to why defendants do not concede that it is

4     required by the Eighth Amendment or by the remedy in this case.

5          They do not concede the requisite PLRA findings have

6     been made, but to be clear, defendants are going to, on their

7     own volition, develop this program, and so we do not concede

8     that it's part of the remedy in this case; however, defendants

9     are developing the program as articulated in the document.

10          THE COURT:  But the defendants haven't submitted and

11     apparently don't plan to submit any requests for relief from

12     prior court orders as provided by the December 24, 2020 order;

13     do I have that right?

14          MR. MELLO:  To be clear, defendants have never

15     understood that this Court's orders have found that a

16     personality disorder program is part of the remedy in this case

17     and do not believe that there are requisite PLRA findings.  As

18     to whether or not we will seek relief from this becoming an

19     additional growth of the remedy in Coleman at this late stage,

20     I would have to confer with my clients about that, but we are

21     developing a program.

22          THE COURT:  So, how much of the defendants' position

23     about the schedule is related to staffing shortages, and is

24     this a topic being discussed in the settlement discussions

25     without disclosing anything going on in those discussions?

1          MR. MELLO:  I don't believe the personality disorder

2     program is part of the mediation discussions.  I believe that

3     the reason that defendants are slowly rolling out this new

4     program voluntarily is because they -- as they said in the UNA

5     report, they wanted to study and evaluate and train.  I don't

6     think it is just staffing related, it could be, but I think the

7     idea was to develop a program that is consistent with community

8     standards even though there aren't really in corrections for

9     such programs and to do it in a thoughtful and meaningful way.

10    I think it has more to do about wanting to do it right than it

11    has to do with anything else, Your Honor.

12          THE COURT:  All right.  And the plaintiff understands

13    that that position, that staffing really is not an issue here?

14          MS. ELLS:  I think it's always an issue with every

15    aspect of this case right now, to be frank.  However, I do

16    credit that defendants -- there is an element of this

17    complicated population where the right staff need to be brought

18    on and trained, and there needs to be a rollout in which

19    patients have an educational opportunity to want to participate

20    in this kind of program for this population.

21          We do, however, you know, definitely dispute that

22    these methods that defendants are discussing implementing, we

23    do think most of them are developed for correctional

24    population.  Some of them have been sort of well established

25    treatment modalities for these types of patients for a long

1   time.  So we don't believe that they are new or inappropriate

2   for this population.  We think they were thoughtfully selected,

3   and we support their implementation.

4          THE COURT:  So help me understand the defendants'

5   position:  If the two institutions -- if the Court says confirm

6   what the two institutions are and do that soon, I'll set some

7   kind of deadline, and then begin implementation by August, how

8   long does the pilot need to run to get information on how it's

9   working, first step, Dr. Mehta?

10         DR. MEHTA:  Yes, Your Honor.  The program that we're

11  planning on starting with has a 32-week course for one module.

12  So, for a patient to begin and complete the course would take

13  about 32 weeks depending on whether we do it once or twice a

14  week.  So that would be one cycle.  With a little bit of lead

15  time to select, as Ms. Ells was saying, the right staff and the

16  right patients to be in that group, which is something we've

17  also discussed with the Special Master, that you want to pick

18  the perfect people at the beginning to set a culture of success

19  for this kind of group, and with the complications involved

20  with that, after that's complete, I think 32 weeks is our

21  target.

22         THE COURT:  So, if a pilot proceeds with two

23  institutions, I'll play that out, by what point would this

24  program be able to be deployed at all 19 institutions?

25         DR. MEHTA:  After the first cycle, Your Honor, of 32

1    weeks, we would want to make sure that we have chosen the right

2    options.  In the plan we identify four different group

3    treatment modalities that we could use.  We are really not sure

4    how this population is going to respond.  We're not sure how

5    many patients are going to sign up.  Typically, in studies of

6    these treatment programs, less than half are -- less than half

7    of the patients are often willing to participate.

8         This is a very voluntary program.  They get homework

9    in between sessions.  They need to engage.  So, we need to

10   figure out who's going to take up our offer.  What are the best

11   programs to offer specifically?  There's 470 patients, and over

12   90 of them don't even have a personality disorder diagnosis.

13   So, there is a wide range of people that we are talking about

14   that are not going to all respond to the same treatments.

15        We think we've chosen four very good options, but

16   after the pilot, we could have to completely change.  It may be

17   that one of those is best for everybody or none of those are

18   appropriate for our population, but I think all of those things

19   are things we could manage once the pilot has started and

20   everything.  It's just we do need a little bit of time along

21   the way.

22        THE COURT:  Only two institutions makes sense for an

23   initial pilot?

24        DR. MEHTA:  Yes, Your Honor.  We've identified these

25   two institutions, we're looking at other options as well.

1          I don't think we want to hold back what we're doing,

2  but we also don't want to implement something with flawed

3  foundation before we've been able to test it.

4          THE COURT:  And are those the two institutions that,

5  in fact, would be in the pilot?

6          DR. MEHTA:  I believe so, Your Honor, San Quentin and

7  VSP seem to be the best suited at this time.

8          THE COURT:  What's the population of those two

9  institutions, of the 470?

10         DR. MEHTA:  So those 470 patients were identified

11  about two years ago, and during the UNA screening and selection

12  process, so many of those patients have moved around and some

13  have been discharged or released from the prison entirely or

14  entered or exited the mental health program.  I think we're

15  basically assuming that when we go to these institutions, we're

16  going to have to identify the patients that were of the

17  original 470, as well as other patients that may be suitable

18  for this program.

19         THE COURT:  Do you have an estimate off the top of

20  your head -- I'm not going to hold you to it -- how many at

21  those two institutions?  If those are the two for the pilot, is

22  it a good enough number to get a good read on how this could

23  work?

24         DR. MEHTA:  Yes, Your Honor, I believe so.  They're

25  relatively low security institutions.  San Quentin has a dorm

1   of EOP.  It's the only dorm of EOP that we have in the state,

2   and they're Level II.  So, relatively low security.

3           I think out of that the population in the dorms there,

4   we will absolutely be able to find enough to run at least one

5   group cycle here.

6           As I said, if there are more, then we'll consider our

7   further options, and we want to do as much as we can.

8           THE COURT:  Given the planning that's been done, the

9   treatment module identified, the institutions, could the pilot

10  begin sooner than August?  It appears you are poised to begin

11  it sooner.

12          DR. MEHTA:  Yeah.

13          THE COURT:  What's a realistic start date in your

14  mind?

15          DR. MEHTA:  I'm hesitant to pick an exact date, but I

16  think with the training required for the people who will be

17  leading the group, and the identification of the patients and

18  that sort of screening process, it's, you know, late April

19  right now.  August I think is what we've been anticipating, but

20  we could certainly take that back and discuss and see if there

21  is an alternate date we could provide, but I think August is

22  what we've been targeting.

23          THE COURT:  All right.  So holding that thought, from

24  the start of implementation of a pilot, 32 weeks, how much time

25  to evaluate once the 32 weeks runs?  You've described the

1    evaluation needed, but how quickly responsibly can that happen?

2          DR. MEHTA: I'm guessing, Your Honor, please don't

3    hold me to it, but I would guess 30 to 60 days we could figure

4    out. If the answer is that the treatment we tried is a good

5    option, that will be a little bit quicker, and if the answer is

6    that it's not a good option and we need to go back and pick a

7    different option, that will take a little bit longer. So I

8    would think that, you know, 60 days to be on the safe side.

9          THE COURT: But then possible, let's just assume one

10    scenario, best case it all runs as one would hope, then the

11    program could be deployed at all 17 other institutions after an

12    evaluation period.

13          DR. MEHTA: Yeah, I believe so. We're going to be

14    starting with one of the identified modalities, which is the

15    most simple and efficient to train the group leaders for. Some

16    of those modalities have much, much longer training times and,

17    like, spending a week in Colorado, that kind of thing, but the

18    ones that we could start soon, the ones that we will be able to

19    train internally, we could roll those out if successful.

20          THE COURT: The plaintiffs expressed concern, right,

21    about not attending training this year; do I have that right?

22          MS. ELLS: Yes, Your Honor. I think --

23          THE COURT: So, anything to say about what you've

24    heard so far?

25          MS. ELLS: Only that we have some concern about the

1   low security setting of the two EOP programs that have been

2   selected.  My understanding is that a lot of the patients that

3   fall in this category are in higher security settings, and we

4   worry about sort of the validity of a pilot that does not

5   include those kind of patients in terms of its transferability

6   to all 19 institutions.  So we do have some concerns around

7   that, although we understand the perspective of defendants.

8           THE COURT:  So on that, Dr. Mehta, possible to

9   identify at least one high security institution to ensure the

10  pilot takes account of a range of factors.

11          MR. MELLO:  If I may jump in real fast, to the extent

12  this is going to be deemed "defendants' personality disorder

13  program," and it changes to something that is not defendants'

14  reasoned, measured thinking, it should not be referred to as

15  "defendants' personality disorder program" because it no longer

16  is, it's something else.  It's negotiated.  It's imposed upon

17  defendants.

18          With that caveat, I think Dr. Mehta has described for

19  the Court the reasoning and the reason why they selected these

20  two institutions, but with that sort of caveat, Your Honor,

21  I'll turn it over to Dr. Mehta.

22          THE COURT:  Dr. Mehta.

23          DR. MEHTA:  Thank you.  Yeah, I definitely understand

24  the plaintiffs' and Ms. Ells' concern here.  I don't think

25  that's unreasonable.  We're selecting the options that we have

1   so that we could get a positive culture established for a

2   culture of success for these kind of programs.

3          It's a big investment for both the patients and the

4   staff to be able to engage in this sort of long-term program.

5   I don't, in any sense, disagree with what Ms. Ells is saying.

6   I think that will be part of the plan, adapting it to high

7   security missions and making sure that that works just as well.

8   But I think for the original ones, we've identified San Quentin

9   and VSP as a good place to start, but I agree it will be a lift

10  to move to high security.

11         THE COURT:  What about the training; why is it not

12  possible to send people this year?

13         DR. MEHTA:  Out of the four options, Your Honor, the

14  one that I think we're speaking of is it's called Thinking for

15  a Change (T4C), the training is hosted by the National

16  Institute of Corrections in Colorado.  It's offered at specific

17  times during the year.

18         The people who would do those trainings, we have a

19  team, a headquarters, and then we have some people at the

20  institutions who would probably go themselves; just arranging

21  for everybody to go, and then they will become trainers

22  themselves.  So, they will have to come back and train other

23  people in the institution.

24         The lead time for that is long enough that we think it

25  makes sense to start the program with the more direct and

1   simple programs that we could offer.  The DBT skills group or

2   the more general Start Now.  The Start Now program is probably

3   the simplest one to go with, and we think that that may prove

4   to be an excellent option, and we will sort of evaluate the

5   need for more complicated options after that.

6           THE COURT:  And the training is offered only once a

7   year?  No ability of the State of California to request special

8   training at times that fit with the State's needs?

9           DR. MEHTA:  That I honestly don't know, Your Honor,

10  but I do think that it would be something we would want to do

11  later rather than earlier so that we could test out the simpler

12  options.  Always better to be able to give people an option

13  that they could put in place right away.

14          THE COURT:  All right.  So I understand plaintiffs'

15  position.  Anything to say -- I've read what the parties have

16  presented to the Court, but anything more to say about that

17  issue, Ms. Ells?

18          MS. ELLS:  I guess only that you know this is a

19  population that everyone in this room has been aware of since

20  the beginning of this case, and it's a population that is very

21  high need, very complicated, very costly to the state, and it's

22  an issue that I'm glad to see that we're moving forward with in

23  a reasoned way.  I think it should be implemented as quickly as

24  possible, particularly at the higher security levels where I

25  think the need is greatest, and it may make sense to have a

1    phase, to the extent the defendants want to institute a culture

2    of success in these lower custody settings, it may make sense

3    to have a phased rollout to ensure that it rolls out

4    successfully to the higher custody units and programs in

5    reasoned fashion.

6         We remain concerned that certain modalities may not

7    translate quite as well or that they may need adjustment in

8    order to do that, but we do think that oversight of this

9    rollout is important and should occur as quickly as possible

10   given the very high need of this population of class members.

11        THE COURT:  All right.  I'm going to think about what

12   you've said here this morning on this issue.  I will issue

13   something shortly clarifying the Court's order.

14        I do want to ask, though, about one footnote in the

15   joint statement.  I'm not remembering the number, but it

16   includes a defendants' note about the Special Master

17   purportedly disregarding repeated requests to reduce the number

18   of staff attending meetings.  Who wrote that footnote?

19        MR. MELLO:  It was defendants' position that was

20   written and put in a briefing.  Without divulging

21   attorney-client or work product, counsel writes a brief, it's

22   evaluated and signed off on by clients and then it is

23   submitted.

24        THE COURT:  So the footnote is in the Joint Statement;

25   you're not confused by what I'm asking?

1          MR. MELLO:  No, we are not.

2          THE COURT:  The Joint Statement is signed by Mr. Mello

3     and Ms. Thorn.  I'm striking that footnote.  If there are

4     legitimate concerns, there are ways to raise those concerns.

5     This is not the way to raise a concern about an arm of the

6     Court, a person who's been given authority to determine the

7     kind of resources needed to address issues.  This footnote is

8     but one facet of an approach that is corrosive, unprofessional

9     and disappointing.  So I just -- I'm striking that footnote.

10          It's not the first time the defendants have been told

11     that they need to respect the Special Master as an arm of the

12     Court, and there are proper ways -- if there really is

13     something the defendants believe is unethical, out of line,

14     inconsistent with any court order, there are proper ways to

15     bring that to the Court's attention.  It's not by dropping the

16     footnote.

17          MR. MELLO:  May I be heard?

18          THE COURT:  You may.

19          MR. MELLO:  I appreciate that.  I think, Your Honor,

20     that defendants did articulate in response to a recent request

21     their concerns about efficiency and spending.  And for my

22     clients, I would like to know, now that the Court has ruled on

23     those things, what is the appropriate mechanism for defendants

24     to voice to the Court concerns about inefficiencies in the face

25     of requests, informal requests?  What is the appropriate place

1  for defendants to make such concerns?

2  THE COURT:  This Court is not in the business of

3  giving legal advice.  If counsel cannot figure that out -- you

4  can't tell me it's above your paygrade to not figure that out.

5  So, I will leave it there.

6  I want to turn to data remediation, and as I

7  indicated, the Special Master is prepared to provide an oral

8  report the Court had indicated it was looking for.

9  I know that there are filings in response to an order

10 regarding the possible use of Dr. Leidner to help complete data

11 remediation; I'm considering responses to that, and considering

12 how the Court might provide some directive to make the process

13 more efficient, but I am going to ask Special Master Lopes, who

14 has been present since the beginning of this hearing, I didn't

15 acknowledge your presence, Special Master Lopes, but could you

16 provide your report now in the status of the 41 indicators that

17 previously were close to completion of remediation, and then

18 I'll have some follow-up questions for you, I think.

19 SPECIAL MASTER LOPES:  Thank you, Your Honor.  Your

20 Honor, the Court's order that was filed on April 2, 2024,

21 directed me to take all steps necessary, but not later than

22 April 25, which was they asked me to remediate or mark as

23 remediated 41 indicators.

24 As of yesterday, that number was down to 40.  The

25 parties and my data expert and the data team excluded one of

the indicators by consent, so-called SP24E.  So that number was down to 40.

It's my understanding that there were exchanges that were made late last night, and the total number of indicators that was remediated as of yesterday was 32, leaving eight additional indicators that need to be remediated.

There were exchanges between the parties and my data expert, Dr. Potter, and the data team.  We believe that several of those indicators that remain, so the eight indicators can be remediated.

Dr. Potter is going to make recommendations to the defendants, which hopefully will solve the problems that we see, and I would hope that within the next two weeks we can get all eight remaining indicators remediated.

The Court's order also speaks to the 38 so-called patient-wise indicators; we have not had any movement on those. We haven't had meetings on those indicators, Your Honor.

THE COURT:  All right.  So could I expect a report from you in two weeks on the status of the eight that you mentioned?

SPECIAL MASTER LOPES:  Yes, Your Honor.

THE COURT:  All right.  I'll make a note of that. I'll expect that report.  I'll ask that it be in a form I could put on the docket.

SPECIAL MASTER LOPES:  Yes, Your Honor.

1          THE COURT:  And then in terms of the 38 patient-wise

2     indicators, based on what you currently know, Special Master

3     Lopes, what do you think is a reasonable period of time to

4     complete this project which is now past due?

5          SPECIAL MASTER LOPES:  Your Honor, that project may be

6     more complicated.  We would like to try to work on two, maybe

7     three indicators to try to work out some of the kinks, if there

8     are any, and then roll them out for the remainder, but there

9     will be a need to have probably fewer BRMR meetings, and there

10    will be an intent focus on documentation putting together the

11    process for two or three indicators that we would -- that

12    Dr. Potter will recommend to the parties that we start to

13    evaluate.

14         THE COURT:  I believe I had heard previously from Dr.

15    Cartwright, I think he's here, that he expected this could take

16    another two years, that was the last I heard, right, Dr.

17    Cartwright?

18         DR. CARTWRIGHT:  That's correct, Your Honor.  The last

19    time we met, I said that if looking forward at the remaining

20    work ahead of us, it would take a similar amount of time that

21    had passed so far, which is about 24 months, and so without

22    anything changing and continuing with the same process, given

23    the amount of work that's been added since 2021, we saw another

24    24 months required.

25         THE COURT:  And the Court doesn't find that

1    acceptable.  Just so it's clear, I'm thinking about what I can

2    do about it.  I heard work that was added, but I'm not going to

3    address that right now.

4         So, Special Master Lopes, assuming the Court expects

5    data remediation foundational to this case resolving, expects

6    it to be done sooner than two years out, do you believe that is

7    possible, and what's the earliest I could ask for a further

8    update from you on what remains after the eight indicators are

9    remediated within two weeks, hopefully?

10        SPECIAL MASTER LOPES:  My data remediation team felt

11   that two years was much too long, and we were of the mind that

12   this could be done more quickly within that timeline, possibly

13   within the next 20 to 40 weeks, but two years was too long.

14        Your Honor, if I may, the project is very challenging

15   and the topic is very dense.  There are any number of

16   indicators where we have already had back and forth, BRMR, and

17   it may be that some of these indicators need to have more

18   intense focus of the nature that we've -- as we have been doing

19   in the past month.  It may be that the Court should consider

20   having monthly statuses to hold everyone's feet to the fire, if

21   you will, and keep minds focused.

22        The data remediation process can be difficult, but

23   there are a lot of take-backs.  There are a lot of

24   reexamination of indicators, and it is also very difficult to

25   get to yes.  So, to the extent that the Court would consider

1    either having a status every month or maybe two months, it may

2    be beneficial.  This past -- the working relationship I think

3    in the past 24 days has been very productive and minds have

4    been focused.

5            THE COURT:  So a status in Court?

6            SPECIAL MASTER LOPES:  Yes, Your Honor.

7            THE COURT:  I'm prepared to entertain that because I'm

8    prepared to do whatever it will take to get this done.  I'm not

9    trying to put pressure that cuts any corners, that leads to the

10   cutting of any corners, but this project has to -- has to move

11   forward and reach a conclusion.

12           So, do the parties have anything they want me to know

13   about this aspect of the case?  Who's speaking for the

14   plaintiffs, Ms. Ells?

15           MS. ELLS:  I will, Your Honor.  I agree with that, and

16   I also agree that it has been a productive month.  I think from

17   our perspective, one of the things that has helped is a

18   specific list of indicators that needed to get done in the

19   given amount of time, because one of the concerns I think that

20   we have had is that indicators will be in the second stage of

21   validation where the parties discuss the underlying business

22   rules and how they're implemented and come to agreement.  Those

23   are very substantive discussions, but they sometimes last

24   eight, 12 months, and there are vast periods of time when they

25   are not being discussed by the parties in the interim, and I

1   think that leads to everybody sort of forgetting the thread of

2   the conversation.  So, having a focus for a given period of

3   time to really focus on a few indicators, complete all

4   discussions around them, and then move on to other indicators,

5   I think may make sense as well, and I think you could sort of

6   direct defendants and the Special Master and the parties to

7   come up with a schedule for those, but really focusing on

8   certain indicators and getting them absolutely completely

9   through validation stage before moving on to other indicators,

10  I think would make this process more efficient.  I think people

11  are literally just forgetting where we were in conversations

12  that occurred six months ago the last time an indicator was

13  discussed.

14          THE COURT:  All right.  For the defense, who's

15  speaking on this?

16          MR. MELLO:  I will, Your Honor.  Real quickly, when

17  Dr. Cartwright was referring to additional items, he was

18  just -- when he was describing a potential two-year horizon, it

19  was based upon the fact that 101 indicators had been remediated

20  out of the original 148, which has now grown to at least 267.

21  So that was the additional work he was referencing and that was

22  the basis based upon history that led him to believe that it

23  would take two years.  Number 1.

24          Number 2 --

25          THE COURT:  The defendants have made a decision to

1    split some indicators, right?  I mean, the growth in the number

2    is not something the Court ordered.

3           MR. MELLO:  Your Honor, this is, again, an example

4    where negotiations and pressuring results in something later

5    being described as "defendants' decision" when it's a joint

6    decision.  It's an evolving decision.  It's part of the

7    remediation process.  So, I think that does a disservice to the

8    actual events.

9           On that point I think it's important to note that even

10   with respect to these eight indicators that the Special Master

11   referenced, this is an example where indicators -- remember,

12   Your Honor's recent court order said there are six steps in the

13   data remediation process, and there are indicators that make it

14   all the way through step 6, and then they go back to step 1 or

15   step 2.  That is the cause of many of these delays.  But of

16   course defendants will work with the Special Master's expert

17   and would like to finish data remediation quickly, but I don't

18   think it should be lost that defendants are not the ones that

19   are sending items back from step 6 to step 1 and step 2.  So

20   that just needs to be recognized, but they will continue to

21   work tirelessly on this project because they would very much

22   like data remediation to be completed as well.

23          THE COURT:  Do you agree that more regular statuses in

24   Court would keep minds focused?

25          MR. MELLO:  I think we suggested that -- obviously, we

1    take a ton of people away from their regular jobs, I guess our

2    regular jobs, counsel, but we take a ton of people away from

3    their regular jobs to come in and do status conferences, and we

4    fly people around the country for these.  I think it might be

5    more efficient, like I suggested before, maybe monthly, I

6    guess, joint updates to the Court on data remediation as

7    opposed to maybe -- of course we will do what Your Honor

8    suggests, but I think there might be a more efficient way where

9    people can continue to do their jobs, and we could report

10   regularly to the Court, maybe through a joint statement because

11   I know Ms. Ells had concerns about our statement in the past.

12   That might be a more efficient way, and I'm probably over my

13   skis here.  I have not consulted with my clients, but I'm just

14   thinking of efficiency, Your Honor.

15          THE COURT:  All right.  The Court is as well, and here

16   is -- in thinking through your responses to the order to show

17   cause and what I've heard this morning, I'll issue an order

18   shortly.

19          The Court's observation is that when I -- when I ask

20   for statements outside the Court's presence, things could run

21   amuck and we just don't have time for that.

22          Anything else on data remediation, Special Master

23   Lopes?

24          SPECIAL MASTER LOPES:  Your Honor, I believe that Mr.

25   Mello's view is a narrow one.  The splitting is something that

1     we're deeply concerned about.  It is something that we try to

2     avoid.  It is not something that everyone feels that they want

3     to -- that we want to expand the universe.

4          I think we would love to see that number stay at 267.

5     I don't believe that anyone initially thought it would balloon

6     to that level, but there is even concerns that with the 38

7     indicators that are patient-wise, that there's some suggestion

8     that has been made that those need to be split.  If that kind

9     of thing occurs, we could be here forever splitting and

10    splitting and splitting.

11         It's just something to be -- that I'm concerned about,

12    I think the parties are concerned about, but it has started to

13    get away from us.  I would like to see that number stay at 267

14    so we could claw back and make progress.

15         I believe that we made steady progress this month.  I

16    don't look at the eight indicators and the fact that we didn't

17    get through them to be a sign of a problem, but there are

18    ongoing negotiations, and we discover things as we go.  Some of

19    those indicators may be remediated this week.

20         It's definitely a challenging process.  The topic is

21    dense, and, again, there are layers and layers and layers to

22    this, and there are lots of take-backs, and there's splitting.

23    We need to narrow the number of take-backs, and we need to

24    collectively work on holding the line and not splitting anymore

25    indicators unless absolutely necessary.

1       THE COURT:  All right.  There's no dispute on

2   splitting for me, but I am aware of that issue, so I'm not

3   going to make any decision about that.  I just have heard about

4   it and the possible concerns associated with it, the Special

5   Master's concerns as he's just articulated.

6       All right.  So, let's turn to suicide prevention.  I'm

7   ending with this because it is -- this is the only other thing

8   to discuss today, right, Ms. Ells?

9       MS. ELLS:  So far as we are aware, yes.

10      THE COURT:  Mr. Mello, agreed?

11      MR. MELLO:  Yes.

12      THE COURT:  All right.  I'm ending with this because

13  of its seriousness and the need, too, for this part of the

14  remedy to be fully satisfied.

15      So, the Special Master's most recent report to the

16  Court indicates that the defendants are out of compliance with

17  14 out of 15 outstanding recommendations.  The defendants have

18  filed voluminous objections.  The Court is prepared to rule

19  shortly on the objections in Section 3, which the Court

20  construes as general objections, but it is going to treat the

21  objections in Section 4 separately.  I believe they are of a

22  different nature, and I need to think through carefully what

23  those objections mean regardless, I believe, based on my

24  initial evaluation, that even if I were to sustain the

25  defendants' objections, the defendants would still be out of

1  compliance with respect to seven, seven indicators.

2      Who's speaking on this?

3      MR. MELLO:  Me, Your Honor.

4      THE COURT:  All right.  Do you agree with that, Mr.

5  Mello?

6      MR. MELLO:  I don't agree.  I think we had general

7  objections, and, again, it's difficult to discern from the

8  objections, and to be clear, Dr. Williams is the suicide

9  prevention person, and he's on a preplanned vacation, but I

10 think it's difficult to discern whether a failing on those

11 remaining eight items or seven items is at the system level or

12 at the institutional level.  It's difficult to discern what

13 "compliance" means or not.  So, I don't think I could agree

14 that it is even if you sustain all of our objections, it's

15 seven, but because there's some difficulty in discerning

16 whether or not we are out of compliance if one institution is

17 out of compliance.  That's my pause, Your Honor, but if Your

18 Honor reads it that way, I'm not going to disagree with you,

19 but that's my pause.

20     THE COURT:  Through the objections, are defendants

21 trying to effectively change well-established monitoring

22 standard?

23     MR. MELLO:  Absolutely not, Your Honor.  Defendants'

24 objections are different this time for several reasons.  One,

25 it's a new report based upon new findings, and as we indicate

1  in other parts of the objections, expanded or growing, or I

2  think as plaintiff said, morphing recommendations.  It's the

3  first time that they've had the opportunity to present

4  remediated data through the SPRFIT audit program to challenge

5  or rebut findings.  It's the first time they've been afforded

6  the opportunity or have offered expert testimony in support of

7  their position.

8         It's the first time that defendants have responded to

9  a reaudit report under the threat of contempt proceedings.

10 It's the first time because of the way that the ordinary

11 process is, there's a draft report, informal responses, a final

12 report and objections.  It's the first time that this Court

13 will be reviewing de novo defendants' objections because it was

14 filed directly with respect to a reaudit.

15        With respect to defendants' standing objections,

16 defendants made those objections transparent and respectfully

17 to preserve arguments on appeal.  Again, this is a new report,

18 and they preserved those objections.

19        THE COURT:  You're talking about the new reaudit

20 report?

21        MR. MELLO:  The new reaudit report, yes, Your Honor.

22 They did that to preserve arguments on appeal, and they did it

23 quite transparently in the footnotes, and they did it to ensure

24 that their due process rights were considered.  Again, if this

25 informal process would have occurred, it's possible that those

1    objections wouldn't have ended up in our formal objections

2    because they would have been preserved in the Informal

3    Objections attached to the Special Master's report.

4        I think it's also important to know that we didn't

5    seek affirmative relief.  Again, if this informal process would

6    have been available, it's possible that the Special Master's

7    expert Mr. Hayes could have made changes as a result of some of

8    those general objections and specific objections.

9        So, defendants, again, respectfully, and because

10   independent reports, and out of concerns for waiver, and

11   forfeiting of defenses for potential appellate review, and to

12   preserve their due process rights, made those robust

13   objections.  I mean, what's significant about this report is

14   that we now have this SPRFIT program.  We have real live data,

15   including remediated data, to compare the Special Master's

16   findings to our findings and to present that to the Court.

17        THE COURT:  Was there no opportunity to present any of

18   the information now before the Court to Mr. Hayes before he

19   finalized the last reaudit report?

20        MR. MELLO:  The last reaudit -- we're here today

21   talking about the sixth; are you talking about the sixth

22   reaudit?

23        THE COURT:  Yes.

24        MR. MELLO:  So the way it was presented is this Court

25   entered a minute order.  The Court said, I understand

1   defendants are not going to be in compliance, and ordered that

2   the Special Master forego the ordinary process.

3           THE COURT:  No, I'm talking about before Mr. Hayes

4   finished his report, was there no possibility for presenting to

5   Mr. Hayes or the Special Master any of the voluminous

6   information now before the Court?  I understand the due process

7   issue, put that aside.  I'm talking about what was -- was the

8   Special Master's expert fully informed real time in a way that

9   would have allowed him to include everything that you now say

10  mattered in the sixth reaudit?

11          MR. MELLO:  Respectfully, Your Honor, that's

12  chronologically impossible.  How could we have known what was

13  going to be in the sixth reaudit report without seeing his

14  sixth reaudit report?

15          THE COURT:  I'm talking about the process of the

16  defendants providing information, being present during his

17  reaudit report.

18          MR. MELLO:  They are present.  There are exit

19  interviews, et cetera, but I don't know how they could

20  meaningfully and appropriately respond to their suppositions as

21  opposed to seeing in writing the Special Master's report and

22  then responding appropriately.

23          THE COURT:  What is the earliest the defendants had

24  information that it now says is relevant to the sixth reaudit

25  report?

1        MR. MELLO:  "Relevant to the sixth reaudit report" is

2  really difficult.  I don't understand the question.  Defendants

3  didn't have an opportunity to respond to the words in the sixth

4  reaudit report until they saw the sixth reaudit report.

5        THE COURT:  So, thinking about the time frame of

6  April 1, 2023, and March 1 of this year, did the defendants

7  have information it could have provided to the Special Master,

8  or is it saying that it did provide additional information that

9  should have been taken account of?

10       MR. MELLO:  I don't know the answer to that question.

11  I know that they regularly meet, and I wish Dr. Williams were

12  here.  I know that they are in constant contact, but again,

13  it's impossible for defendants to respond.  They shouldn't

14  suppose.  It's impossible to know.  However, I do know that the

15  Special Master's expert does have access to those SPRFIT audit

16  reports as part of the process, so he had information that led

17  to specific objections in the report in real time.

18       THE COURT:  How did he have access to that

19  information?

20       MR. MELLO:  He has access to the SPRFIT audit reports

21  is my understanding.

22       THE COURT:  Just so I understand, is it the

23  defendants' position if there was information in a database

24  someplace, that it was up to the Special Master's expert to go

25  find that, even if defendants didn't raise it before completion

1    of his sixth reaudit?

2            MR. MELLO:  So, Your Honor, again, because I'm not

3    there and the Special Master's expert is not here to answer the

4    question, and Dr. Travis is not here, I am not taking the

5    position that he has to go on an archeological dig to figure

6    out what is in those reports.  He has access to those reports.

7    He regularly interacts with leadership, but again, defendants

8    can't divine what he's going to say in his actual report and

9    then respond to the actual work in realtime.

10           THE COURT:  Actually, the Special Master's expert is

11   available if needed.  I understand Dr. Williams is not, but I

12   didn't direct that he be here.

13           MR. MELLO:  If I may, Your Honor, I think the Special

14   Master's report indicates that he has access to those audit

15   reports, the report that was filed with the Court.  So, I guess

16   I don't have anything more.

17           THE COURT:  All right.  Ms. Ells, anything to say

18   based on what you've heard before I talk about possible next

19   steps the Court is considering?

20           MS. ELLS:  Ms. Yelin will address this.

21           THE COURT:  All right.  Ms. Yelin.

22           MS. YELIN:  So we can't comment on whether the Special

23   Master should have been able to guess what these specific

24   objections would say, but we now are in a situation where there

25   are two sets of competing facts about defendants' compliance

1   with these recommendations.  So, we are also focused on what

2   can be done about that given the Court's intention to move to

3   enforcement and contempt proceedings, and given the kind of

4   complicated evidentiary landscape that this presents, we do

5   have some ideas that we've been thinking about.

6           THE COURT:  Well, that does identify the problem here,

7   what are your ideas?  I mean, you suggest some form of

8   discovery; should I send the Special Master's expert back out

9   into the field, that would be time consuming --

10          MS. YELIN:  So, I think --

11          THE COURT:  -- counterproductive, I think, although

12  that's who I would rely on to tell me what's really going on

13  here.

14          MS. YELIN:  Of course, my apologies, Your Honor, for

15  interrupting you.

16          I think any path that we pursue here is going to be

17  somewhat time consuming, and we do understand defendants'

18  position that the change in the process here has resulted in

19  them being, you know, using the objections as their opportunity

20  to present their evidence of compliance, which originally would

21  have happened through a different procedure.

22          I think that there's a possible path forward with a

23  tie into the data remediation process, actually, because as has

24  been alluded to today, there has been this recent change in

25  that there's now some of the suicide prevention indicators that

1    are intended to measure what Mr. Hayes is monitoring are now

2    remediated.

3         I think many of them are -- there is the new

4    initiative of the regional SPRFIT auditors, and defendants are

5    relying heavily on their findings to contest, you know,

6    Mr. Hayes' findings is not in compliance, and we're dealing now

7    with different facts and different time periods that are

8    covered by what Mr. Hayes found and what they found.

9         So, one possible path forward is to have, as Ms. Ells

10   was alluding to, we do think in the data remediation process,

11   it makes a lot of sense to focus on certain indicators and

12   finishing them.  One possible initial focus for those could be

13   remediating the remaining suicide prevention indicators and all

14   of the indicators that are related to the Hayes

15   recommendations, and then having a process where defendants'

16   regional SPRFIT coordinators are using their audit, their

17   guidebook that they've developed.

18        But Mr. Hayes is touring with them, and plaintiffs are

19   present, and Mr. Hayes is observing, and then the results of

20   those audits are what form the factual basis of any eventual

21   contempt proceedings.

22        THE COURT:  So, they'd tie in with data remediation,

23   but that doesn't really address your suggestion that some kind

24   of discovery is needed, right?

25        MS. YELIN:  I think that that would be a form of

1  discovery.

2          THE COURT:  A way to obtain the information.

3          MS. YELIN:  Yes.

4          THE COURT:  On what schedule?

5          MS. YELIN:  We haven't done a complete analysis of how

6  many of the indicators that relate to Mr. Hayes'

7  recommendations are still outstanding, but I think it's a

8  relatively small number, and our hope would be that if we could

9  complete those soon as sort of the first next tranche of

10 priority for the data remediation process, that this type of

11 schedule could start very soon, and it would be obviously a big

12 time commitment for everybody involved, but we think it would

13 create the cleanest factual record so that everybody is

14 analyzing the same set of facts based on the same time period,

15 and it's also an opportunity for defendants to demonstrate

16 their ability to self monitor in this important area which is

17 itself one of Mr. Hayes' recommendations that remains

18 outstanding.

19         THE COURT:  On the data remediation tie in, what do

20 the defendants have to say?

21         MR. MELLO:  So, if I understand the timing, if I

22 understand the request is with the tranche -- that's a good

23 word, I like that -- one of the first tranches that we could

24 focus on in data remediation would be the remaining suicide

25 prevention indicators; I think that our clients would be

1     supportive of that, too.  That's why they had the opportunity

2     to provide factual and remediated data in response to this

3     report because of that process.  So, I think defendants would

4     be supportive of starting with that, and it's now stuck in my

5     head, "tranche" of indicators.

6             THE COURT:  Special Master Lopes, do you have any

7     initial response to that suggestion?  I recognize you may be

8     hearing this for the first time.

9             SPECIAL MASTER LOPES:  Yes, Your Honor.  For the

10    record, I love the word "tranche" and use it regularly.

11            THE COURT:  Good.  We agree on something.

12            SPECIAL MASTER LOPES:  Your Honor, that's one part of

13    this.  The other part is you can't sit and look at indicators

14    from your office and understand whether they're suicide

15    prevention concerns.  Those require tours, and I just want to

16    state for the record, that we -- the expert, Lindsay Hayes,

17    makes those tours regularly, and he's accompanied by the

18    defendants.  He gives an exit in his -- they have a clear sense

19    of what his findings may be because he has shadowed everywhere

20    he goes.  He has weekly meetings with the defendants which give

21    them an opportunity to discuss things that are moving towards

22    compliance or improvements that are noted, and so it is a bit

23    challenging to think that he hasn't been clear about his

24    concerns.

25            That said, I have no reason to disbelieve

1   representations made by defendants' counsel that there may be a

2   document somewhere that he needed to read.  I don't recall

3   having received a comprehensive list.

4          These areas of concern have been known for years now,

5   the 14 points that he looks -- that he was going to look at

6   have been known for some time -- excuse me, let me change that,

7   they're known for some time.

8          I don't recall receiving a comprehensive report from

9   the defendants stating that they were making headway towards

10  achieving compliance with any of them.  The first I believe I

11  saw of it was in the defendants' response.

12         That said, I'm happy to look at the tranche of

13  indicators regarding suicide prevention issues, but I do

14  believe that the touring is a substantial part of Mr. Hayes'

15  conclusions, and you just can't do that from your office and

16  note all of compliance.

17         THE COURT:  Understood.  Mr. Mello, just going back,

18  the defendants' objections were filed 30 days after the sixth

19  reaudit report, voluminous objections.

20         MR. MELLO:  Correct.

21         THE COURT:  Thirty days after.

22         MR. MELLO:  Correct.  That was the deadline by the

23  Court.

24         THE COURT:  The defendants had a lot of information in

25  hand by the time they filed those objections.

1          MR. MELLO:  Your Honor, they have a SPRFIT coordinator

2     auditor program that regularly tours the facilities.  They do

3     it pursuant to a guidebook that has been reviewed by

4     plaintiffs' counsel and the Special Master's team.  Those audit

5     reports are known and available to the Special Master's expert.

6     He indicates it; he indicated as such in his reports.  I don't

7     understand the concern with defendants filing voluminous

8     objections in 30 days.  It was hard to do.  I don't understand

9     the connection to the issues before the Court, but it was a

10    very significant -- again, we were in a different position, and

11    it was the first time we had data and remediated data.

12         And to the Special Master's point, it is based upon

13    indicators, as well as a guidebook that has been reviewed and

14    approved by the Special Master, as well as audits.  They go out

15    in the field.  These are audits that are done in the field, as

16    the Court probably notes from the voluminous objections in the

17    part after Part 3 of the report where it's specific to

18    institutions.

19         Again, we think, you know, we are encouraged by using

20    that group of indicators, making those important or starting

21    with them in data remediation.

22         Thank you, Your Honor.

23         MS. YELIN:  Your Honor, may I clarify something about

24    our proposal?

25         THE COURT:  You may.  I mean, ultimately the Court has

1   been prepared to set an evidentiary hearing.  I understand the

2   two sets of facts, but how do I -- without, you know,

3   accommodating more time, how do I get this part moved forward

4   in a way -- the defendants agreed to implement suicide

5   prevention recommendations nine years ago.  They've missed two

6   deadlines.  This Court has said before, this Court is not as

7   patient as it may look at times.  This is time that's passed

8   up.

9               MS. YELIN:  We share that concern, and we do note that

10  defendants' objections, especially general objections to

11  Mr. Hayes' report, are kind of ignoring the larger context

12  here, which is that these recommendations have been in place,

13  like you said, for close to a decade, and they've repeatedly

14  been found not to be in compliance.

15              People are continuing to die at very high rates.

16  There have been seven suicides so far in 2024 in CDCR prisons.

17  So we do share the Court's frustration, and just to address

18  what do we do from here, I think our concern is that without a

19  common set of facts regarding defendants' compliance or

20  noncompliance at each institution with each recommendation,

21  which is how the Court intends to have the fines calculated, we

22  will be having a long trial over whether there is compliance or

23  noncompliance before we get to the question of whether

24  defendants should be held in contempt for their noncompliance,

25  if that's the way that the Court prefers to perceive that,

1  that's fine, we're just trying to think of creative solutions

2  for how to have a common basis for everybody to work from and

3  to address defendants' concerns which, you know, we don't think

4  they're entirely valid, but we do understand their concern

5  about the fact that they were not given a formal opportunity to

6  present these -- this evidence that they contend shows

7  compliance with some of the recommendations before the report

8  was finalized.

9          THE COURT:  Understood.

10          MS. YELIN:  Just to clarify one thing that I mentioned

11  earlier, we do -- our suggestion, which again is just a

12  suggestion, would include on-site monitoring, but everybody

13  would be involved, and it would be an opportunity for Mr. Hayes

14  to observe and provide feedback to the SPRFIT regional

15  coordinators, which is part of the purpose of the

16  recommendation he has regarding quality improvement.

17          So, it would not just be looking at the data that

18  comes from the indicators, but it would involve on-site

19  touring, and, yes, it would be somewhat time consuming, but we

20  do think that it would be the best path forward.

21          We have thought of other possible ways to proceed, but

22  that would be our preferred approach.  We're happy to describe

23  the other ones if that would be helpful.

24          THE COURT:  What are the other ones?

25          There has to be -- there has to be a field report,

1    that's the only way to get to the bottom of this, but the Court

2    is not prepared to just say, Go away for another year and come

3    back and tell me what's going on; that does not work at this

4    point.

5          So, that's part of the -- there is a way to have full

6    and fair proceedings and not let this, you know, aspect of the

7    case -- I'm sorry for the metaphor -- twist in the wind.  So

8    what are the other ideas, Ms. Yelin?

9          MS. YELIN:  Sure.  I think one of them is sort of a

10   modified version of the first one we described and would

11   address the concern, Your Honor, is raising right now about not

12   just waiting another year before we get anywhere with this, and

13   that would be having Mr. Hayes conduct further on-site audits

14   of each of the institutions, but rather than waiting and

15   producing a seventh reaudit report at the end of the round, you

16   produce, you know, informal or formal reports after each tour

17   within a short period of time after the tour and conduct

18   evidentiary proceedings.

19         THE COURT:  That was occurring to the Court with a

20   prioritization, perhaps, if certain institution's desire --

21   require careful focus immediately.  All right.  So that's one.

22         MS. YELIN:  Then our final thought is something that I

23   believe we have raised in our papers, which is directing the

24   Special Master to respond to defendants' specific objections,

25   and sort of treating those specific objections as informal

1  objections with the intent that if there are things that

2  Mr. Hayes determines need to be modified or any of defendants'

3  specific objections cause him to reconsider any of his

4  findings, those could be addressed in a final, final report

5  that would be filed after that.

6       No matter what, Your Honor, we do still reserve our

7  request to do a full response to all of defendants' objections.

8  We understand your intent to rule on the general objections

9  soon.  We do think that those, almost all of those, can be

10  overruled based on the law of the case.  And as we said in our

11  papers, we would still like the opportunity to respond in full

12  to all of defendants' objections no matter which path the Court

13  selects.

14       THE COURT:  You are referencing Section 3 in

15  particular?

16       MS. YELIN:  Yes.

17       THE COURT:  Understood.  Anything to say based on

18  those other options, Mr. Mello?

19       MR. MELLO:  Your Honor, defendants are proud of their

20  suicide prevention program.  They have other jurisdictions that

21  come and review it and say it's the most fulsome one in the

22  country, so I don't want that to be lost.

23       Defendants are being threatened with contempt, and so

24  I just -- I question whether contempt proceedings are the most

25  efficient way to move the case forward.  However, I must

1    respond to the opportunity for the Special Master to

2    essentially write a rebuttal report, that would be a new report

3    if that option were selected.  Defendants would request, as you

4    indicated 30 days was not really enough time, but 45 days to

5    respond to any rebuttal report by the Special Master.

6              THE COURT:  I don't think I said anything about 30

7    days not being enough time.

8              MR. MELLO:  I don't want to put --

9              THE COURT:  I don't know how you heard that.

10             MR. MELLO:  -- words in your mouth.  The Court was

11   surprised we were able to respond in such a fulsome manner in

12   30 days.

13             THE COURT:  I just said you did respond in 30 days,

14   that's what I pointed out.

15             MR. MELLO:  My apologies.  I don't want to put words

16   in your mouth.

17             So, defendants would request the opportunity, if the

18   Court allows such a rebuttal report to be filed, it's a new

19   report, and defendants would have the opportunity to respond to

20   said report.

21             And, again, I understand the Court is going to rule on

22   the Section 3 objections, and to be clear, the Court can rule

23   and overrule objections.  It is quite another thing to strike

24   responses when they're in response to new documents with new

25   evidence which gets us outside the law of the case and to

1    preserve arguments on potential appeal.  We don't understand

2    why that would be an option when the Court can simply overrule

3    objections.  Again, if we're going to go down the path of

4    contempt proceedings, I think we need more clarity as to what

5    that might look like, what evidence is presented.

6         Then, sort of lastly, the idea that Mr. Hayes would go

7    out with the SPRFIT coordinators and do audits at the same

8    time, if I heard that right, again, we lose control of our own

9    program, our own auditing program, and it then is shoehorned

10   into this process.  We're very proud of our SPRFIT coordinator

11   auditing program.  It's fulsome.  It's based upon a guidebook.

12   They go out on average quarterly per year at institutions, and

13   it's resulted in what everybody believes is appropriate;

14   identifying and self-correcting, that is the definition of

15   "durable", is identifying and self-correcting.

16        With that, I don't have anything more, Your Honor.

17        THE COURT:  All right.  This Court doesn't need to say

18   it again, but the whole structure of this case has respected

19   that it's ultimately defendants that do need to have their

20   durable program, but defendants aren't free to operate all of

21   the programs required by the remedial orders in this case

22   unless or until the Court relieves them of Court oversight.

23        I'm going to take a short recess.

24        The Special Master's expert is here.  I'm not going to

25   ask him to come forward now, but I'm going to ask him during

1     the recess if he wants to put anything on the record given what
2     he's heard.  So that's the purpose of this recess.  It's a
3     10-minute recess.
4              (Recess taken 10:31 a.m. to 10:41 a.m.)
5              THE CLERK:  Please remain seated and come to order.
6     Court is again in session.
7              THE COURT:  All right.  We're back on the record, and
8     as I indicated, I did ask the Special Master and his expert
9     Mr. Hayes if there's anything they wanted to put on the record
10    regarding suicide prevention, and I understand that Mr. Hayes
11    is prepared to make a few remarks.
12             Mr. Hayes, I think, so it's clear for the record, you
13    could use the podium.  You could use the middle podium, how
14    about that, to reflect your neutral status.
15             MR. HAYES:  Thank you, Your Honor.  Good morning.
16             Yes, I was offered the opportunity in chambers, and I
17    feel it necessary to correct the record from some of the
18    misinformation I heard from Mr. Mello regarding my report and
19    steps going forward.
20             I think it's very disingenuous for the defendants to
21    suggest that the report that they found or they received on
22    March 1 was a surprise.  I have not only been doing this for
23    nine years on this case, but every exit, a half hour in length
24    at each facility, produces almost zero questions or comments in
25    each facility during this past mining period from April through

1    November of 2023.

2          In addition to that, I have normally monthly scheduled

3    meetings with Dr. Williams, mental health administrator, and

4    representation from DAI and nursing leadership that were

5    prearranged by the Special Master who allowed them an

6    opportunity to provide monthly updates on the progress.  Those

7    are normally scheduled monthly, but at times have been canceled

8    by the defendants for purposes of, quote, We have nothing to

9    report this month.

10          When we are in session during those monthly meetings,

11   they're relatively short, about a half hour.

12          I also observe the weekly Suicide Prevention Response

13   Unit staff meetings where there is an additional opportunity

14   for the team, who are -- part of the team would be the four

15   SPRFIT coordinators to report any progress regarding my

16   monitoring or the remaining 14 or 15 recommendations.

17          The second point I wanted to raise is regarding the

18   SPRFIT reports.  They started that process I believe the middle

19   of 2022.  I only started to critique those reports, which are

20   in my report, during the 2023 cycle of monitoring.  They began

21   in January, and they ended at the end of the year.  Contrary to

22   what the defense counsel has said, they were not made available

23   to me until beginning in September of last year, and only upon

24   my request they were put on to a SharePoint -- the Coleman

25   SharePoint drive, that was in the middle of September, and

1    they -- I believe the last December 2023 report was put on the

2    SharePoint in the middle of February of this year, two weeks

3    before filing the March report.

4         I've reviewed every single one.  I think there were 59

5    of them.  I waited until I received all of them to give them an

6    opportunity so could I look at all reports for each facility in

7    total before making decisions or critiquing the individual

8    facilities without getting all of the available reports.

9         They're not always filed quarterly despite the

10   representations, even today and in previous filings to this

11   Court.  There are times in which I think only one or two

12   facilities were monitored quarterly in 2023 by the defendants.

13        There were several facilities that were monitored by

14   the SPRFIT coordinators once or twice, and some of those

15   monitoring sites were one day, not two days.  I am there for

16   two days per site, except for one facility in which I am there

17   three days.

18        So, to suggest that I had full access to these reports

19   prior to issuing my report, that is true, but they weren't

20   exactly timely.

21        Third, without getting into the weeds, there were

22   numerous examples of misinformation regarding my monitoring in

23   the defendants' filing, and I have many concerns, but the most

24   significant concern going forward has to do with the CQIT

25   guidebook process.  It remains in draft form.

1          The Suicide Prevention section of the guidebook was

2    developed by Dr. Williams, with input from me.  As stated in my

3    report, the 19 areas that I monitor are covered within the

4    draft Suicide Prevention section of the guidebook, but I have

5    concerns after reading the filing from the defendants of the --

6    I don't know the correct word -- the different interpretation

7    of the monitoring going forward.

8          For example, having to do with intake screening, they

9    were criticizing the fact that I was looking now at whether the

10   nurses are asking all 15 questions on the intake screening

11   form, despite knowing full well if they looked at my first

12   audit report in 2014, I always looked at that and continue to

13   look at that on a regular basis.  They're suggesting in their

14   filing that I not look at that, that's not part of the

15   recommendations for that indicator and that I should only look

16   at privacy and confidentiality.

17         My concern with that response is that will that revise

18   their CQIT guidebook; are they only going to look at

19   confidentiality and privacy?

20         They also have a new argument in the filing about

21   there's nothing wrong with an officer being in the same nursing

22   screening room because they are -- it would not be a violation

23   of HIPAA.  This is a new argument.

24         Part of the reason they were in compliance with the

25   majority or the facilities were in compliance with the majority

1  of the areas of confidentiality is because they installed

2  TTA -- excuse me, TTM modulars in the nurse's screening to

3  avoid having the officer in that room, and for them to now

4  raise that suggests that they might revise their guidebook to

5  allow the officer to be in there.

6          Finally, touching on all three of my points, I have

7  been imploring Dr. Williams and his team to expedite the

8  correction of safety planning within the department, which has

9  been a failure for nine or 10 years.  We have worked with the

10 Special Master's team, have worked with the defendants, and

11 it's a very challenging recommendation.

12         We have asked him and his team to have special summits

13 on safety planning, and the response in that filing of April 1

14 is they don't want me to even monitor safety planning.  They

15 want you to strike that as one of the indicators that I'm

16 monitoring.  My concern, again, is how would that effect their

17 CQIT guidebook going forward?

18         THE COURT:  Thank you.  Special Master Lopes, just any

19 follow up?

20         SPECIAL MASTER LOPES:  No, Your Honor.

21         THE COURT:  All right.  Thank you very much, you may

22 be seated.  The Court is hearing this, and so I wanted it to be

23 made of record.  I'm not making any findings at this point.

24         MR. MELLO:  Your Honor, may I respond?

25         THE COURT:  Not now.  I understand that you may wish

1    to, and I'll provide you an opportunity at the right time.

2           I'm submitting the matters we discussed this morning.

3           I do want to make certain that Mr. Sapp understands

4    why I've directed him to be here today, and I may direct him to

5    appear at future proceedings as well.  He's sitting in the

6    audience.  He's not at counsel table.  It's fine with the Court

7    if he remains in the audience, and I'm doing this in open court

8    because in Coleman, as I'm certain you know, we don't have a

9    culture of ex parte communications unlike some other cases, and

10   I don't see that changing.

11          There is the settlement process going on, of course,

12   which the Court has approved, but I just wanted to make it

13   clear that short of ordering the governor here himself, the

14   Court does need the governor's right hand person on this

15   important case to hear and understand what's going on in this

16   courtroom, at least at critical junctures, and I think today

17   has been one of those, especially if the Court is heading

18   toward further proceedings which could lead to additional

19   findings of contempt.

20          I can't tell you exactly how I'm going to proceed.

21   I'm going to digest what I heard today.  I don't relish that

22   possibility.  I have no choice but to contemplate it, with

23   respect to suicide prevention at least, something I've heard

24   over and over again, is a very high priority.  It was Secretary

25   Ellison's highest priority.

1          As I said a little bit ago, time has past on so many

2     fronts, and I know there's much on the Governor's stovetop, on

3     this Governor's stovetop.  This case can't be put on the back

4     burner or set on low heat to be kept warm while a cadre of sous

5     chefs slice and dice whatever else is going to be thrown into

6     the Coleman pot.  Any number of metaphors could be used here,

7     but that's the one that occurs to me today.

8          I'm not going to dwell on this, but it speaks volumes,

9     I think, that it's appellate lawyers who do the main speaking

10    to the Court.

11         There is an absolute right to appeal anything this

12    Court does, but I also note there are many public servants who

13    understood the importance of this case.  They've been working

14    on it for years.  They're doing the right thing day to day.

15    They stand ready to do more of the right thing necessary to

16    bring this case home.  It's not going to happen tomorrow, the

17    Court accepts that, but it has to happen sooner rather than

18    later, and if the person ultimately in charge, the person with

19    whom the buck stops, were to make clear that that's what he

20    wants, the Court has to believe those dedicated public servants

21    could deliver in a direct fashion.  Some of them are here in

22    this courtroom and they're doing that.

23         This is such an important case, and it's not for the

24    Court to think about policy, but from the point of view of

25    someone who's been on the bench now for more than 20 years,

1    who's had this Court for a long time, this case crystallizes

2    issues of great import, of constitutional import for California

3    without a well-developed alternative infrastructure for those

4    politically powerless persons with serious mental health

5    issues.  It appears -- maybe not just appears -- California

6    State Prisons have become the primary solution, if you could

7    call it the "solution," for housing and containing those

8    persons once they commit crimes that warrant incarceration.

9           The custodial nature of the prison settings poses

10   multiple challenges to the State's fulfilling of its

11   responsibilities to the incarcerated mentally ill, even if it

12   holds them accountable, I understand that.  I'm not saying --

13   the Court's not saying there hasn't been progress; there has

14   been progress since this case was first filed, since the remedy

15   was first put in effect, but the work is not done, and as much

16   as this Court respects that it's the State that must design and

17   implement and prove that it can durably implement the remedy

18   here.  The passage of time does not lessen the dire need for

19   the work to be completed and completed as soon as possible.

20          I'm saying this out loud, and I'm saying it directly

21   to you, Mr. Sapp, because I do believe you understand the

22   importance of this kind of case, and of this case in

23   particular, and I do believe that you respect the role of the

24   courts, of a federal court in this case in particular.

25          You are here as a person who speaks to the governor

1    about this case.  So, I will respect your time and respect that

2    you have many other things to do, but also you could expect

3    that I will continue to direct that you be present when there

4    is business before this Court that I think you need to be aware

5    of personally given your role.

6            I don't need to tell you this, of course, but anytime

7    you wish to address the Court directly, you, of course, may do

8    that.  I will welcome hearing from you directly whenever you

9    believe I should.

10           I help that explains why I did not grant your request

11   to be excused today.  Again, I will respect your time in the

12   future, but your time may be required here, so thank you very

13   much.

14           We are adjourned.

15           MR. MELLO:  Your Honor, real quick.

16           THE COURT:  We are adjourned.

17           MR. MELLO:  I think he may want to speak, Mr. Sapp.

18           THE COURT:  Mr. Sapp, you want to address me now?

19           MR. SAPP:  Yes, Your Honor.

20           THE COURT:  You are behind the bar, so I understood

21   you would be acting in the capacity as a listener, not an

22   attorney, member of the bar, but I'm happy to hear from you as

23   I just said.

24           MR. SAPP:  Thank you, Your Honor.  I wasn't exactly

25   sure what the answer would be from the order, so I appreciate

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    the opportunity and appreciate the message that you just said.

2         I did want to share I guess two points with Your

3    Honor.  The first is that within the governor's administration

4    there are 18 cabinet-level agencies that include dozens of

5    departments and boards underneath them.  My role and

6    responsibility includes oversight of all of them, and I want to

7    assure the Court that there is no single matter that is

8    currently active that I spend more time on than this one.

9         THE COURT:  Good to hear.

10        MR. SAPP:  So, I just want to be clear and on the

11   record, but to the extent you have a perception or view that

12   the Governor and the Governor's office is not directly engaged

13   in this matter, I want to be clear that we are very engaged in

14   tracking the matter.  There's a member of my team who's

15   assigned full time to corrections matters, as well as the time

16   that I spend on the case, so I just want to let the Court know

17   that that is true.

18        The other thing that I wanted to note, I agree with

19   the Court's observation that the given policy choices, some of

20   them going back to the 1960s, that had been made about mental

21   health polices, housing, deinstitutionalization that occurred

22   under then Governor Reagan, that the correction system has

23   become a place where it's the primary vehicle for providing

24   mental healthcare, and that's why Governor Newsom championed

25   Proposition 1, which is going to lead to a significant

1   expansion of mental health services and housing support in the

2   community, including to address many of the issues and

3   challenges that you noted.

4          So, I appreciate -- we want to let you know that we

5   recognize the urgency here, but also this is a multi-faceted,

6   decades-in-the-making challenge, and it is a major priority for

7   the Governor's administration to continue to address.

8          THE COURT:  Thank you for saying that for the record.

9          I checked the population stats.  I am aware of what

10  else is going on, of course that's beyond my purview, but I

11  appreciate there are many pieces to the puzzle here.

12         As of February, the mentally ill incarcerated

13  population I believe is almost 34,000, the SHDS capacity is

14  34,777.  I think the male EOP population is overcapacity by 75

15  inmates.

16         I'm certain you are aware of those numbers, but that

17  is ultimately the question is will these other efforts pull

18  people out of the carceral setting, but I appreciate what

19  you've said, and anytime you want to provide me with updates

20  that you believe are relevant to what this Court is doing here,

21  you are welcome.

22         MR. SAPP:  Thank you, Your Honor.

23         THE COURT:  Thank you.  We are now adjourned.

24      (Proceedings adjourned at 10:49 p.m.)

25

1      C E R T I F I C A T E

2

3   I certify that the foregoing is a true and correct

4 transcript of the proceedings in the above-entitled matter.

5

6

7 MARYANN VALENOTI, RMR, CRR    May 3, 2024
                 DATE
 Official Court Reporter

8 CA CSR #11266

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25