1    DONALD SPECTER – 083925           MICHAEL W. BIEN – 096891
     STEVEN FAMA – 099641              ERNEST GALVAN – 196065
2    MARGOT MENDELSON – 268583         LISA ELLS – 243657
     PRISON LAW OFFICE                 JENNY S. YELIN – 273601
3    1917 Fifth Street                 THOMAS NOLAN – 169692
     Berkeley, California  94710-1916  JARED MILLER – 353641
4    Telephone:   (510) 280-2621       ROSEN BIEN
                                       GALVAN & GRUNFELD LLP
5    CLAUDIA CENTER – 158255           101 Mission Street, Sixth Floor
     DISABILITY RIGHTS EDUCATION       San Francisco, California  94105-1738
6    AND DEFENSE FUND, INC.            Telephone:   (415) 433-6830
     Ed Roberts Campus
7    3075 Adeline Street, Suite 210
     Berkeley, California  94703-2578
8    Telephone:   (510) 644-2555

9    Attorneys for Plaintiffs

10

11                      UNITED STATES DISTRICT COURT

12                      EASTERN DISTRICT OF CALIFORNIA

13

14   RALPH COLEMAN, et al.,            Case No. 2:90-CV-00520-KJM-DB

15            Plaintiffs,              **PLAINTIFFS' OBJECTIONS TO THE
                                       SPECIAL MASTER'S PROPOSED
16       v.                            TELEMENTAL HEALTH POLICY**

17   GAVIN NEWSOM, et al.,             Judge:  Hon. Kimberly J. Mueller

18            Defendants.

19

20

21

22

23

24

25

26

27

28

[4502996.2]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

I.    PROCEDURAL HISTORY ................................................................................... 1

II.   STANDARD OF REVIEW .................................................................................... 3

III.  THE SPECIAL MASTER'S PROPOSED POLICY HAS TOO FEW
      SAFEGUARDS FOR THE USE OF TELEMENTAL HEALTH ............................ 4

      A.    The Court Should Adopt Plaintiffs' Prudent Proposed Restrictions on
            the Percentage of Case Managers Who Can Work Remotely........................ 4

            1.    CDCR's Long History of Staff Misconduct Against Class
                  Members Continues to This Day............................................................. 5

            2.    The Custody-Mental Health Partnership Plan, Designed to
                  Remedy Misconduct and Train Staff, Is Still Not Fully
                  Implemented, And Requires On-Site Staff to be Present For It
                  to Work .................................................................................................... 9

      B.    The Court Should Ban the Use of Telemental Health in RHUs Given
            the Demonstrated Need for Live Human Interaction in Segregated
            Settings ............................................................................................................. 12

      C.    Permitting All-Virtual Treatment Teams at the EOP Level of Care Is
            Unwise Considering the Needs of Those Patients........................................... 15

      D.    The Court Should Require On-Site Attendance of One Clinical Team
            Member at All IDTTs....................................................................................... 18

      E.    Defendants Should Be Required To Have In-Person Clinicians
            Evaluate Individuals Making Sexual Assault and Sexual Harassment
            Complaints Under PREA .................................................................................. 19

CONCLUSION................................................................................................................. 21

CERTIFICATION ........................................................................................................... 22

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*Armstrong v. Newsom*,
    No. 94-CV-02307 CW, 2021 WL 933106 (N.D. Cal. Mar. 11, 2021), *aff'd*
    *in part, vacated in part,* 58 F.4th 1283 (9th Cir. 2023) .............................................. 7

*Coleman v. Wilson*,
    912 F.Supp. 1282 (E.D. Cal. 1995) ........................................................................... 6

*In re U.S.A. Motel Corp.*,
    450 F.2d 499 (9th Cir. 1971) ..................................................................................... 4

*Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B.*,
    547 F.2d 575 (D.C. Cir. 1976) .................................................................................. 4

5

6

7

8

9

10

11

12

### OTHER AUTHORITIES

13

Am. Psychiatric Ass'n,
    *Resource Document on Telepsychiatry for Adults in Jails and Prisons* (Feb.
    2023) ............................................................................................................ 11, 14, 20

Strong, Justin D. et al,
    *The body in isolation: The physical health impacts of incarceration in
    solitary confinement*, Plos One (October 9, 2020) .................................................. 13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

In the context of the Special Master's most recent monitoring report, which "paint[ed] a bleak picture of defendants' progress toward a durable remedy," *see* Special Master's 30th Round Monitoring Report: Part C, ECF No. 8095 at 11[1], and a suicide prevention practices report that once again revealed Defendants' "deeply concerning" failure to implement fourteen outstanding suicide prevention recommendations, *see* Suicide Prevention Report, ECF No. 8143 at 16-17, Defendants put forth a telemental health policy that would radically change the way that mental health care is provided within CDCR. The Special Master's proposed revisions to that policy go part of the way to reduce the harms that CDCR's full proposal would cause, including important safeguards regarding informed consent and restrictions on the use of telehealth in MHCBs and PIPs. Those revisions, however, do not go far enough to ensure that telehealth is used appropriately, and to ensure a sufficient on-site presence of primary clinicians (PCs)—the lifeblood of any functioning mental health system. The Special Master rejected Plaintiffs' reasonable proposals without sufficient justification, including higher percentages of on-site clinicians at both CCCMS and EOP levels of care; a ban on the use of tele-PCs in Restricted Housing Units; a ban on all-virtual treatment teams in EOP and all-virtual IDTTs; and a restriction on the use of telehealth for Prison Rape Elimination Act ("PREA") evaluations. Plaintiffs request that the Court find that Plaintiffs' proposals discussed here are necessary to ensure adequate mental health care, and order Defendants to include them in the telemental health policy.

## I.    PROCEDURAL HISTORY

The Special Master's Report describes the background and extensive history relative to the development of the telemental health policy and its precedent, the Telepsychiatry Policy. *See* Special Master's Report and Proposed Telemental Health Policy (hereinafter "Telemental Health Report"), ECF No. 8165 at 4-19. The

---

[1] Page citations to documents in the dockets are based on ECF pagination.

1  Telepsychiatry Policy, which was finalized in 2023 but had been provisionally approved

2  since 2020, permits the wholesale replacement of on-site psychiatrists at the CCCMS level

3  of care, allows telepsychiatrists to "supplement" but not replace on-site psychiatrists at the

4  EOP level of care, and permits telepsychiatry within Restricted Housing Units (RHUs) to

5  the extent allowed by those other policies.  *See* Provisional Telepsychiatry Policy, ECF

6  No. 6539 at 5-12 (Ex. A); Apr. 12, 2023 Order, ECF No. 7807 at 11 (adopting that policy

7  as final).

8        After Defendants received authorization for funding to establish a telemental health

9  program that would permit telework for CDCR's psychologists and social workers (who

10  act as the PCs in the Mental Health Services Delivery System (MHSDS)), Defendants

11  provided a draft Telemental Health Policy to govern the use of tele-PCs going forward.

12  Telemental Health Report at 11-12.  The Court ordered the parties to meet and confer

13  regarding the draft policy, *see* Aug. 3, 2023 Order, ECF No. 7901 at 2, and the parties

14  submitted a Joint Report regarding their positions on the draft policy.  Parties' Joint Report

15  in Response to Aug. 3, 2023 Order, ECF No. 7935.  In that report, Plaintiffs submitted

16  comments and revisions to the policy.  ECF No. 7395-3 (Ex. C to ECF No. 7935).  Those

17  comments and revisions included: restrictions on the provision of telemental health

18  services to CCCMS and EOP patients in the form of percentage limits on positions that can

19  be filled through telehealth, *id.* at 3, 6, 11; restrictions on the use of telemental health for

20  certain clinical tasks, including but not limited to the provision of care in RHUs and PREA

21  interviews, *id.* at 7, 11; restrictions on the use of telemental health for cell-front contacts,

22  *id.* at 5; restrictions on the use of telemental health for mental-health crisis beds (MHCBs)

23  and psychiatric-inpatient programs (PIPs), *id.* at 6-7; restrictions on EOP patients having

24  both a telepsychiatrist and tele-PC, *id.* at 6; restrictions on the use of all-virtual

25  Interdisciplinary Treatment Team (IDTT) meetings; requirements for informed consent, *id.*

26  at 4; and requirements for regular visitation to institutions by telehealth providers, *id.* at 8,

27  among other proposed revisions.

28        Without accepting any of these proposals, Defendants issued their draft policy to

the field in September 2023.  Telemental Health Report at 12-13.  In December 2023, the Court ordered the parties to meet and confer again regarding the outstanding disputes over the draft policy.  Dec. 15, 2023 Order, ECF No. 8087 at 2.  In advance of the parties' meet-and-confer process, the Special Master wrote a February 27, 2024 letter outlining 12 recommendations for the appropriate use of telemental health within CDCR.  Telemental Health Report at 15-17.  The parties met regarding the disagreements over the policy, under the supervision of the Special Master, but Defendants indicated that they did not agree to any of the Plaintiffs' proposals or to any of the Special Master's recommendations.  *Id.* at 17.  On March 21, 2024, the Special Master issued his recommendation for a proposed Telemental Health Policy that accepted some of Plaintiffs' proposals but rejected many others, and also withdrew several of the Special Master's recommendations put forth in the February 2024 letter.  *Id.* at 19-38; Appendix A to Telemental Health Report, ECF No. 8165-1 at 1-10.

## II.    STANDARD OF REVIEW

The Special Master's Telemental Health Report includes telepsychiatry-related and telemental health-related findings to support his recommendation to adopt the proposed Telemental Health Policy and is therefore a compliance report within the meaning of the Order of Reference.  *See* Dec. 15, 2023 Order, ECF No. 8087 at 2 ("1. Within ninety days form the date of this order, the parties shall meet and confer under the supervision of the Special Master to clarify whether, and if so what, outstanding disputes remain over defendants' Telemental Health Services Policy and the Special Master shall file a short report on the outcome of those discussions; 2. The Special Master shall include with his report required by this order a proposed Telemental Health Services Policy for the court's approval."); Dec. 11, 1995 Order, ECF No. 640 at 4 (listing Special Master's duties, including to "make interim reports to the court on the progress of the remedial plan" and to "prepare and file with the court periodic reports assessing defendants' compliance with such remedial plan as the court may order.").  The Order of Reference provides that the Court shall adopt the findings of fact in the Special Master's reports "unless they are

1    clearly erroneous." *Id.* at 8.

2        A finding is "clearly erroneous" when "on review of the entire evidence, the

3    reviewing court arrives at the firm conviction that the finding is mistaken." *In re U.S.A.*

4    *Motel Corp.*, 450 F.2d 499, 503 (9th Cir. 1971).  The party objecting to the Special Master's

5    findings has the burden of proving that they are clearly erroneous." *Oil, Chem. & Atomic*

6    *Workers Int'l Union, AFL-CIO v. N.L.R.B.*, 547 F.2d 575, 580 (D.C. Cir. 1976).

7    **III.    THE SPECIAL MASTER'S PROPOSED POLICY HAS TOO FEW**
     **SAFEGUARDS FOR THE USE OF TELEMENTAL HEALTH**
8
9        As recently as December 2023, the Special Master wrote the following regarding

10   the issue of telehealth within CDCR:

11       The history of this case and the Special Master's and his experts' collective
         experience working in and monitoring correctional mental health
12       departments demonstrate the positive impact on-site mental health clinicians
         have on their patients' environment of care.  Without the advocacy of mental
13       health clinicians—on-site, fully immersed in the carceral environment their
         patients reside in, and empathic to the impact of that environment—the daily
14       lives of many *Coleman* class members may likely be very different than it is
         today. Whether tele-PCs (many of whom will more than likely have never
15       stepped foot in a CDCR prison) can positively impact the milieu in the same
         manner as their on-site counterpart remains an open question."

16   ECF No. 8095 at 49.  Defendants' Telemental Health Policy risks disrupting and possibly

17   reversing this positive impact that on-site mental health clinicians have made over the last

18   two-plus decades, and the Special Master's proposed revisions to that policy do not go far

19   enough to prevent this foreseeable harm.  Permitting the majority of tele-clinicians to work

20   remotely, permitting the use of telehealth in segregated settings where human contact is at

21   a premium, permitting all-virtual treatment teams for people with serious mental health

22   needs at the EOP level of care, and permitting telehealth appointments to discuss sensitive

23   issues like sexual assault are all decisions that do not work towards creating a functioning

24   and constitutional mental health system.  Those practices should all be rejected.

25       **A.    The Court Should Adopt Plaintiffs' Prudent Proposed Restrictions on**
             **the Percentage of Case Managers Who Can Work Remotely**
26
27       A rapid migration to remote work by CDCR's psychologists and social workers—

28   the direct case managers in the MHSDS—will undermine the already tenuous therapeutic

culture of CDCR's mental health units. During the meet-and-confer process, Defendants indicated that they do not believe that *any limitation* on the percentage of primary mental health clinicians who can work remotely is appropriate in EOP or CCCMS units. *See* ECF No. 8165-2 at 247 (Ex. G) (February 29, 2024 e-mail from Defendants explaining that "CDCR disagrees with artificially limiting the use of telemental health."). But even though the Special Master acknowledged a risk that unlimited use of telemental health services "could leave California's prisons with only a nominal onsite clinical presence, altering the balance between the twin imperatives of custody and treatment," *see* Telemental Health Report at 3, the Special Master's proposed policy nonetheless only requires a nominal presence of 20 percent of allocated PCs on site in CCCMS programs and only 40 percent of allocated PCs on site in the treatment-intensive, residential EOP programs. Appendix A to Telemental Health Report, ECF No. 8165-1 at 6.

These minimums are too low to ensure that a sufficiently robust clinical presence can affect the prison culture positively in mental health units. The Custody Mental Health Partnership Plan (CMHPP), which is designed to address the CDCR's problems with staff misconduct, has not been fully implemented. *See generally* ECF No. 8095 at 112-13. Those staff misconduct issues have plagued CDCR for years and have shown little sign of improving; moving the vast majority of clinicians to remote work will only serve to further stall any progress made in improving the treatment milieu within CDCR.

The Court should adopt Plaintiffs' more restrictive targets, which would require the minimum percentage of cases managers on-site in EOP units to be 80 percent, and the minimum percentage of case managers on-site in CCCMS units to be 60 percent. *See* ECF No. 8165-2 at 79 (Ex. E).

## 1. CDCR's Long History of Staff Misconduct Against Class Members Continues to This Day

Since the very start of this case, CDCR has struggled to create mental health units that are safe and therapeutic for class members—struggles that have been well-documented. *See Coleman v. Wilson*, 912 F.Supp. 1282, 1319-20 (E.D. Cal. 1995)

1  (adopting Magistrate's finding that "mentally ill inmates who act out are typically treated

2  with punitive measures without regard to their mental status" and discussing poor training

3  of custody staff as the cause of this problem)  Problems with staff misconduct against class

4  members continue to this day, despite the Court and the Special Master's ongoing,

5  intensive efforts to foster collaboration and increase training for custody and clinical staff

6  alike.  The Court summarized some of the earlier concerning findings of the Special

7  Master in this area in its August 9, 2016 Order on these issues, after noting "the inevitable

8  tensions created by the distinct needs of custody supervision and the distinct needs for

9  mental health care":

10      It appears there may be some prison institutions in California that simply are
        unable to achieve the necessary collaboration.  For example, the Special
11      Master reports that in spite of focused efforts that began at Salinas Valley
        State Prison (SVSP) in 2009, the concerns were "so concerning" to the
12      Special Master's monitor in February 2015 "as to necessitate a second visit."
        ECF No. 5439 at 61, 65-66.  Intervening monitoring reports had shown
13      ongoing serious problems in the treatment of mentally ill inmates by custody
        staff at SVSP in spite of training efforts.  *Id.* at 62.  Collaboration training
14      was conducted at seven institutions following submission of an amended
        plan in October 2009.  Despite this training, the Special Master's 26th Report
15      identifies ongoing culture clashes at five of the seven institutions, including
        SVSP.  *Id.* at 61, 63, 65.  That seven years have been expended on
16      unsuccessful efforts to train custody staff in the proper treatment of mentally
        ill inmates cannot be countenanced and should be of concern to every
17      defendant in this action.  The Court also notes the report from the Office of
        the Inspector General (OIG) concerning High Desert State Prison, *id.* at
18      63 & n.21, which raises grave questions about the viability of mental health
        programming at that institution.
19
    Aug. 9, 2016 Order, ECF No. 5477 at 7.
20
        Recent monitoring by the Special Master confirms that these problems with staff
21
    abuse of prisoners in the MHSDS remain widespread in CDCR's mental health programs.
22
    For example, in the recent 30th round monitoring report on institutions with EOP
23
    programs, the Special Master found:
24
25      All 15 institutions [with EOP programs] reported numerous staff misconduct
        complaints against custody and mental health staff.  For custody, there were
26      32 such complaints at CHCF, 357 at CMC, 710 at CSP/Corcoran, 665 at
        CSP/Sac, 208 at CCWF, 203 at KVSP, 337 at SVSP, and 136 at VSP.
        CSATF reported no custody staff misconduct complaints and MCSP was
27      unable to produce this data.  For mental health staff, there were 26
        complaints at CMC, one at CSATF, 30 at CCWF, 15 at KVSP, 44 at MCSP,
28      and four at VSP.  CSP/Corcoran and SVSP reported 18 and 45, respectively,

against health care staff, and CSP/Sac reported 25 against mental health and medical staff. Six institutions did not differentiate between types of staff and reported all staff misconduct complaints together; there were 193 such complaints at CIW, 562 at CSP/LAC, 708 at RJD, 268 at SQ and 310 at CMF.

ECF No. 8095 at 99. Despite these widespread reports of misconduct, the Special Master found that "only one custody staff member was reassigned as a result." *Id.* at 102.

In 2021, in the related case of *Armstrong v. Newsom*, Judge Wilken similarly found that significant staff misconduct at six CDCR prisons was directed primarily at disabled class members in *Armstrong* and *Coleman*:

> The data produced by Defendants also support the notion that a staff culture exists in which staff target disabled inmates for abuse. The data show that, despite the dozens of allegations of abuse by inmates, only a relatively small number of the incidents have resulted in discipline, and that out of the incidents that have resulted in discipline, disabled inmates are overrepresented. For example, from 2017 to 2020, despite the dozens of allegations of abuse at LAC, there were six staff misconduct incidents at LAC involving incarcerated people that resulted in discipline, and three of the six incidents (or fifty percent) involved misconduct directed at an Armstrong or Coleman class member. Grunfeld Decl. ¶ 14, Docket No. 3169-4. At COR, from 2017 to 2020, there were eighteen staff misconduct incidents involving incarcerated people that resulted in discipline, and all of them (one hundred percent) involved misconduct directed at an Armstrong or Coleman class member. *Id.* ¶ 15. At KVSP, from 2017 to 2020, there were twenty-four staff misconduct incidents involving incarcerated people that resulted in discipline, and sixteen of them (or sixty-six percent) involved misconduct directed at an Armstrong or Coleman class member. *Id.* ¶ 17.

*Armstrong v. Newsom*, No. 94-CV-02307 CW, 2021 WL 933106, at *17 (N.D. Cal. Mar. 11, 2021), *aff'd in part, vacated in part,* 58 F.4th 1283 (9th Cir. 2023). Earlier in the same decision, Judge Wilken highlighted the undisputed evidence of abuse against EOP patients at CSP/LAC and CSP/Corcoran by describing some of the individual incidents of abuse against EOP patients, who were among the 170 declarations from incarcerated people with disabilities gathered by plaintiffs' counsel for the two 2020 staff misconduct motions. *Id.* at *4-5, 10. The incidents followed a pattern in which *Coleman* class members asked for access to mental health treatment and, instead of getting it, were attacked by custody staff. *Id.*

Ongoing staff misconduct consistent with these reports have been detailed by the

Special Master in his recent monitoring rounds at CSP/LAC, CSP/Corcoran and other individual institutions. *See, e.g.,* ECF No. 8095 at 120 (discussing problems with controlled uses of force at CSP/Corcoran and CSP/LAC); *id.* at 711-712 (regarding CSP/LAC: "Some patients reported custody concerns, including instances of custody staff mocking their symptoms and mental health status. […] Concerningly, patients indicated that custody staff retaliated against them if they submitted complaints by not allowing them to leave their cells for mental health appointments and medication passes."); *id.* at 543-44 (problems with controlled uses of force at KVSP), Special Master's EOP 29th Round Monitoring Report—Part C, ECF No. 7715 at 272 (CMC EOP patients reported problems with custody "including retaliation against patient who reported abuses, attempting to influence patients' level of care, interference with group access, and physical and mental patient abuse" and patients reported fearing retaliation for speaking to Special Master team); *id.* at 318 (84 staff misconduct complaints at CIW during the review period that "included allegations of sexual misconduct, use of force, discrimination, substandard care, staff misconduct and improper use of restraint"); *id.* at 446-49 (EOP ASU patients at CSP/LAC expressed concerns about staff misconduct, among other issues); *id.* at 463 (patient reports of "unprofessional behavior, harassment and intimidation" at CSP/LAC); *id.* at 466 (EOP patients "attributed group treatment refusals to custodial barriers including not receiving a ducat and/or custody staff not opening the door to release them for group" and "[s]taff confirmed this had been an issue"). A use-of-force incident at VSP discussed in the 30th Round Report is of particular concern, as the Special Master found it was "unreasonable." ECF No. 8095 at 122. Although the patient in the incident was handcuffed and in a holding cell, after the patient kicked his leg back (with no indication of contact to any officer), an officer pulled him out of the cell and tackled him to the ground, causing the patient "injuries to his front teeth, mouth and trachea." *Id.*

Mental health clinicians who never come to the facility will not be in a position to advocate for their patients, form working relationships with custody, and deescalate conflicts. Remote therapy has a valuable role to play. On-site collaboration remains

necessary, now more than ever.

**2.    The Custody-Mental Health Partnership Plan, Designed to Remedy Misconduct and Train Staff, Is Still Not Fully Implemented, And Requires On-Site Staff to be Present For It to Work**

In response to consistent findings of this kind of staff misconduct over the last sixteen years in the Special Master's monitoring reports, along with documentation of an abusive cultures at many prisons, the Court has ordered a variety of measures to improve the culture of CDCR.  Central to these efforts has been the 2016 creation of the Custody Mental Health Partnership Project (CMHPP).  *See* ECF No. 5477 at 9 (requiring Defendants to work with the Special Master to "discuss, consider, and develop strategies and initiatives to improve collaboration between custody and mental health at all institutions where mentally ill inmates are housed").  The importance of the CMHPP was affirmed by the Court three years later when it ordered the program expanded to include CCCMS programs and explained that the CMHPP "requirement extends to all levels of mental health care in the prison system, **and the remedy must be available to all staff who interact with mentally ill inmates at least until the cultural conflicts that plague full remediation are resolved."** Feb. 20, 2019 Order, ECF No. 6095 at 4 (emphasis added).

The CMHPP includes a variety of collaborative, **in-person** activities, designed to foster a therapeutic culture in CDCR mental health units, including huddles and joint rounding of mental health units.  *See* Defendants' Report on Status of Implementation of the CMHPP, ECF No. 5916 at 13-15.  Other measures implemented by the Court to limit abusive misconduct also rely on in-person therapeutic contacts, including de-escalation efforts by mental health staff whenever planned uses of force are contemplated.  *See, e.g.,* Apr. 10, 2014 Order, ECF 5131 at 30.  One central collaborative component of the CMHPP is quarterly custody-mental health partnership roundtable trainings.  ECF No. 5916 at 14-18.  However, due to the current staffing problems, the Special Master recently reported that none of the 14 EOP institutions where he monitored the CMHPP in

the 30th monitoring round demonstrated compliance with this key element, explaining that "[t]raining attendance was not properly tracked at 11 institutions—CHCF, CIW, CSP/Corcoran, CSP/LAC, CSP/SAC, CSATF, CCWF, KVSP, MCSP, RJD, and SVSP— and, thus, compliance could not be assessed." ECF No. 8095 at 100-101. In addition, "CMF reported significant non-compliance for both custody and mental health staff, while SQ reported noncompliance for custody staff; compliance could not be assessed for SQ mental health staff. CMC did not provide the round table training. MCSP further reported that round table training would be discontinued due to significant mental health staffing vacancies." *Id*. at 101. In the 29th EOP Monitoring Report, the Special Master similarly explained that, at SVSP, "due to custody and mental health staffing shortages, quarterly partnership round table training was not held during the third and fourth quarters of 2021." ECF No. 7715 at 647; *see also id*. ("When the training was provided, leadership reported that it was inconsistently co-taught by custody and mental health."). At other prisons, like CHCF, the institution "did not provide data that reported mental health and custody staff attendance at the quarterly partnership round table training." *Id*. at 243. CHCF also failed to "conduct required second and third watch huddles during the review period."

These CMHPP efforts, already faltering, would be severely undermined by any large migration of mental health staff to remote work. The collaboration called for by the CMHPP relies on in-person and informal contacts between custody and mental health, and this remedy is already incomplete and long-overdue. For example, the 2017 instructor manual for the CMHPP Lesson Plan 1 notes the objectives of the training include "strengthen[ing] open and direct communication between disciplines" and "increas[ing] pro-active problem solving." *See* Declaration of Jared Miller ("Miller Decl.") Ex. A at 1. There will be fewer opportunities for this kind of collaboration when clinical staff members are working remotely.

In reviewing the effect of the implementation of telepsychiatry on care in EOP units, the Special Master's 30th Round Report noted that, at SVSP:

Most staff members, including senior leadership, supervisors, and line staff,

1
2
3

> reported that while telepsychiatry was essential to seeing patients at SVSP, they preferred on-site psychiatrists.  They believed that telepsychiatrists generally did not fully grasp safety and security issues, as well as staff and patients' experiences. Mental health leadership reported that many telepsychiatrists viewed the facility as "out of sight, out of mind."

4  ECF No. 8095 at 230.  Similarly, in his 2022 report on telepsychiatry, the Special Master

5  also noted that "no interviewed telepsychiatrists were familiar with the requirements of the

6  Custody and Mental Health Partnership Plan (CMHPP), which was a concern due to

7  psychiatrists required participation in several activities."  Special Master's Report and

8  Recommendations on Final Proposed Telepsychiatry Policy, ECF No. 7682 at 41.  The

9  Special Master also noted that "[o]ther interviewed telepsychiatrists were unfamiliar with

10  the Program Guide and several could not name any correctional officer at the institution."

11  *Id*.  On-site staff are much better positioned to communicate and build relationships with

12  custody staff.  As the American Psychiatric Association's (APA) 2023 Resource

13  Document on Telepsychiatry for Adults in Jails and Prisons explained:

14
15
16
17

> A challenge to remote working arrangements is the diminished opportunity to build important relationships with coworkers.  Telepsychiatrists who are off-site are not part of the conventional flow of information throughout the day, which often includes informal conversations with staff and other patients as well as patient observations outside of appointments (Kaftarian, 2019).  Especially in jails and prisons, where patients have limited ability to manage their own health care, communication between relevant staff regarding treatment plans is critical to ensure that patient needs are met.

18
19  Am. Psychiatric Ass'n, *Resource Document on Telepsychiatry for Adults in Jails and*

20  *Prisons* (Feb. 2023) at 6, available at https://www.psychiatry.org/getattachment/00e3f401-

21  0792-4b78-90ba-5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-

22  Prisons.pdf.  The CMHPP relies on this same kind of co-worker engagement on the

23  workplace grounds, and it will be impeded if most case managers are permitted to migrate

24  to off-site work.

25      If and when the CMHPP is fully implemented and appears to be successful, the

26  Court could gradually allow higher levels of remote work while having the Special Master

27  monitor the process and make sure the CMHPP and the provision of care to patients are

28  not negatively affected.  Without such a gradual approach, there is a strong likelihood that

1  remote work will undermine the efficacy of the CMHPP and prevent it from achieving its

2  important remedial goals, which remain unmet at this time.  Given the current status of the

3  CMHPP, the Court should remain cautious and institute Plaintiffs' proposed required

4  minimum percentages for on-site clinicians: 80 percent for EOP and 60 percent for

5  CCCMS.

6  **B.      The Court Should Ban the Use of Telemental Health in RHUs Given the
        Demonstrated Need for Live Human Interaction in Segregated Settings**

7

8          In his proposed Telemental Health Policy, the Special Master declined to ban the

   use of telemental health in Restricted Housing Units (RHUs), no matter the level of care.
9
   Telemental Health Report at 31-32; Appendix A to Telemental Health Report, ECF
10
   No. 8165-1 at 5-6.  The proposed final policy is an about-face for the Special Master, who
11
   stated in a February 27, 2024 letter to the parties, in advance of the parties' meet-and-
12
   confer process, that he was recommending, without qualification, that "telemental health is
13
   not utilized in restricted housing units."  ECF No. 8165-2 (Ex. F) at 140.  The Special
14
   Master offers no reason for this change except to say that it was made "[u]pon
15
   consideration of the discussions during the meet and confer."  Telemental Health Report at
16
   32.  As far as Plaintiffs are aware, Defendants did not share any literature during the meet-
17
   and-confer process that supports the use of telehealth by PCs in a segregated setting.  It is
18
   therefore unclear what justification the Special Master has for not continuing to require on-
19
   site clinicians in RHUs.
20
          This Court and the Special Master have long recognized that "the overwhelming
21
   weight of evidence in the record is that placement of seriously mentally ill inmates in
22
   California's segregated housing units can and does cause serious psychological harm,
23
   including decompensation, exacerbation of mental illness, inducement of psychosis, and
24
   increased risk of suicide."  Apr. 10, 2014 Order, ECF No. 5131 at 45-46.  In particular,
25
   "interaction with others" is needed to "ameliorate the anti-therapeutic effects of isolation
26
   on the mentally ill patient."  *Id.* at 62 (quoting Special Master's Twenty-Fifth Monitoring
27
   Report, ECF No. 4298 at 37).  While the MHSDS's segregation practices may have
28

1   improved in the last decade, decades of research have shown that limiting an incarcerated

2   person's contact with other human beings has deleterious effects on their mental health.

3   *See, e.g.,* Strong, Justin D. et al, *The body in isolation: The physical health impacts of*

4   *incarceration in solitary confinement*, Plos One (October 9, 2020) at 2 (noting extensive

5   research on negative impacts of solitary confinement on mental health, including the effect

6   of social deprivation).  This fact is also borne out by evidence that over 23 percent of the

7   completed suicides in CDCR came in RHUs between 2019 and 2023—a figure much

8   higher than the share of CDCR's population housed in RHUs.  *See* Lindsay Hayes's Sixth

9   Re-Audit on CDCR's Suicide Prevention Practices, ECF No. 8143-1 at 86; CDCR Office

10  of Research, *Restricted Housing Profile Chart* (Apr. 30, 2024) at 1, available at

11  https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2024/05/STA429-050524-

12  M.pdf (showing that three percent of CDCR's population is in restrictive housing as of

13  April 30, 2024).

14      The Program Guide's requirements for increased frequency of clinical contacts with

15  incarcerated persons in restrictive housing reflect the serious harm that a segregated setting

16  can cause to people with mental illness.  Primary clinicians must have individual contacts

17  with patients at the CCCMS and EOP levels weekly in restrictive housing, as opposed to

18  every 90 days and every other week, respectively, when such individuals are not in

19  restrictive housing.  *See* 2021 Revision of Program Guide, ECF No. 7333-1 at 48, 65, 132,

20  135.  If these weekly contacts now solely take place via video, important opportunities to

21  have live human contact will be lost.  Because there is also no bar on the use of

22  telepsychiatry in restrictive housing in the Telepsychiatry Policy, *see generally* ECF

23  No. 6539 at 5-12, the need to assure that people in segregation receive that human contact

24  becomes even more paramount.

25      The APA's 2023 *Resource Document on Telepsychiatry for Adults in Jails and*

26  *Prisons*—relied upon by the Special Master to help justify the proposed policy in his

27  Telemental Health Report, *see id.* at 21-22—supports the view that telehealth should be

28  limited in segregated settings.  That document reiterates how telehealth "may especially

1   exacerbate feelings of isolation in patients who experience limited human contact through

2   disciplinary or administrative segregation practices."  Am. Psychiatric Ass'n, *Resource*

3   *Document on Telepsychiatry for Adults in Jails and Prisons* (Feb. 2023) at 4-5.  The

4   Special Master is correct that "[r]esearch into the benefits of telemental health … is

5   characterized by the lack of replication of results and minimal research regarding

6   telemental health in correctional settings and/or how it compares to the community."

7   Telemental Health Report at 22.  Given the warnings of the APA and the voluminous

8   research base regarding the negative effects of isolation on mental health, it does not make

9   sense to move forward with this policy without more restrictions on the use of telehealth in

10  segregated settings.

11          The Special Master's decision, as part of the policy, to require that "at least one

12  FTE [full-time equivalent] on-site clinician must be assigned to the RHU" does not remedy

13  the problems described above.  Appendix A to Telemental Health Report, ECF No. 8165-1

14  at 5.  According to the policy, the on-site clinician "is responsible for conducting cell-front

15  contacts with patients who refused more than 50% of their offered programming," *id.* at 6,

16  but the on-site clinician would otherwise not be tasked with having contact with

17  incarcerated individuals who are not refusing appointments.  Furthermore, the proposed

18  policy is dangerously vague in that it merely states that "the total number of such FTE

19  clinicians assigned to the RHU should be based on the number of RHU beds in a particular

20  institution." *Id.*  Without a concrete ratio of required FTE clinicians to RHU beds in an

21  institution, this policy is meaningless; an institution with 400 RHU beds could have as few

22  as one clinician on-site.  Reading the policy to require one FTE on-site clinician *per unit*

23  does not help matters, as the number of beds in each unit varies widely across institutions

24  and within institutions; for example, San Quentin State Prison (SQ) has one RHU unit with

25  102 beds and a second unit with 185 beds, whereas CSP/LAC has two RHU units with 200

26  beds apiece, and Valley State Prison (VSP) has only one RHU unit with 88 beds.  *See*

27  Miller Decl. Ex. B at 24, 38, 40.  CDCR's RHU population data also shows that the

28  population of various RHUs varies greatly from month to month, further complicating the

1    ability of the policy to ensure that sufficient staff are on-site at a given time.  *See* CDCR

2    Office of Research, *Restricted Housing Profile Chart* (Apr. 30, 2024) at 5-6, available at

3    https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2024/05/STA429-050524-

4    M.pdf (showing, e.g., that CSP-Corcoran had 225 people in its RHUs in April 2024 but

5    averaged 357.6 people per month over the preceding 13 months).  If this portion of the

6    policy is to be enforceable, it must establish a concrete ratio for the number of FTE on-site

7    clinicians required per number of RHU beds and/or per each RHU's population.

8         Ultimately, however, that fix is not sufficient. With such widespread research

9    available supporting the idea that the isolation and lack of consistent human contact in

10    segregation units has serious, negative effects on mental health for the people living in

11    them, it does not make sense to adopt a policy that limits human contact even further—

12    particularly with individuals (primary clinicians) with whom patients are designed to form

13    strong bonds in the course of their treatment.  The Court should reject the Special Master's

14    decision to change course and should ban the use of telemental health in RHUs.

15         **C.    Permitting All-Virtual Treatment Teams at the EOP Level of Care Is
             Unwise Considering the Needs of Those Patients**

16

17         Similar to the issue of telehealth in RHUs, the Special Master also backtracked on

      having a bar on incarcerated individuals at the EOP level having *both* a telepsychiatrist and
18
      a tele-PC, without offering sufficient justification for that decision.  *Compare* Feb. 27,
19
      2024 Letter, ECF No. 8165-2 (Ex. F) at 137-38 ("We are deeply concerned that, under the
20
      current version of the telemental health policy it would be plausible that a patient could not
21
      have any member of their treatment team on-site" and therefore "recommend[ing] that
22
      CDCR modify the telemental health policy to ensure that patients have at least the assigned
23
      primary clinician or assigned psychiatrist on-site.") with Appendix A to Telemental Health
24
      Report, ECF No. 8165-1 at 2-10 (Special Master's proposed policy containing no such
25
      provision).  The Special Master's Report indicated that his withdrawal of this
26
      recommendation came because of "the changes made to address informed consent and
27
      privacy," Telemental Health Report at 29 n.17, but the requirement of informed consent
28

1  does not change the fact that having an all-virtual treatment team will have negative effects

2  on the provision of mental health care—particularly at the EOP level of care.

3      The Special Master and the Court have both already recognized that EOP care

4  requires some on-site clinical presence. *See, e.g.,* July 3, 2018 Order, ECF No. 5850 at 5

5  ("Telepsychiatry may supplement on-site psychiatry at the Enhanced Outpatient (EOP)

6  level of care but it should not replace on-site psychiatry"); Special Master's 2017 Report

7  on Status of Mental Health Staffing, ECF No. 5564 at 16-17 (use of telepsychiatry at EOP

8  level of care should be limited); ECF No. 7682 at 54-55 ("Given the level of acuity of

9  *Coleman* class members at the EOP level of care, on-site psychiatry should remain the

10 preferred modality."). In December 2023, the Special Master again emphasized that "[t]he

11 prospect of defendants' mental health programs operating with little-to-no on-site

12 psychiatrists or primary clinicians … is deeply concerning. Even in the EOP program,

13 where the telepsychiatry policy requires a minimum onsite presence for psychiatry, the

14 care of individual patients could be planned and provided by a **treatment team having**

15 **neither the patient's psychiatrist nor primary clinician present in the facility where**

16 **the patient resides**." ECF No. 8095 at 49 (emphasis added).

17     There is no justification for switching the EOP to all-virtual treatment teams. EOP

18 programs treat patients with serious mental disorders, such as schizophrenia,

19 schizoaffective disorder, bipolar disorder, and other psychotic disorders, and who are often

20 at risk for decompensation. As the Court has noted, "[a]lthough EOP is labeled an

21 'outpatient' program, outpatient is contextual and … the Revised Program Guide makes

22 clear EOP is a residential program, synonymous with an inpatient setting." July 3, 2018

23 Order, ECF No. 5850 at 5-6. Treating patients at an inpatient level of care requires at least

24 *some* in-person interaction—particularly for patients who may not have the capacity to

25 fully express the nature of their symptoms. Past monitoring reports show that

26 telepsychiatrists sometimes miss key information because they were viewing their patients

27 through a screen. *See, e.g.,* ECF No. 8095 at 188 (telepsychiatrist evaluating for

28 movement side effects of antipsychotic medication failed to notice that the patient was

1    bouncing his leg continuously during the session, and the telepresenter failed to report that

2    information to the psychiatrist); *id.* at 272 (EOP patient indicating telepsychiatrist could

3    not see that he was profusely sweating during an appointment and questioning whether the

4    telepsychiatrist could treat him appropriately); *id.* at 665 (four CCCMS patients reporting

5    that telepsychiatrists had trouble understanding their non-verbal expressions); ECF

6    No. 7682 at 37-38 (telepsychiatrist at SATF could not see signs of akathisia due to not

7    having a full view on video); *id.* at 39 (staff at SATF reporting that telepsychiatrist "only

8    got a 'small snapshot' of the patient") *see also* ECF No. 5564 at 17 ("[O]n-site

9    psychiatrists are better able to discern nonverbal behavior demonstrated by inmates which

10   often has an important impact on diagnoses and treatment planning.").  If CDCR allows

11   *both* primary members of the treatment team to work remotely, they risk missing this

12   crucial information completely—a fact that patients may not fully grasp when giving

13   "informed" consent.

14          An all-virtual treatment team lacks the necessary presence of a clinician who is in a

15   position to understand the prison environment and advocate with custody staff for the

16   patient and their unique mental health needs.  In the December 2023 monitoring report, the

17   Special Master noted that several CDCR staff members and patients have expressed

18   concern that tele-clinicians will not be able to positively affect the treatment milieu in the

19   same way that on-site clinicians have.  *See, e.g.,* ECF No. 8095 at 230 ("Most staff

20   members, including senior leadership, supervisors, and line staff … believed that

21   telepsychiatrists generally did not fully grasp safety and security issues, as well as staff and

22   patients' experiences"); *id.* at 272 (patient reporting that telepsychiatrists "did not

23   understand prison"); *id.* at 475 (staff expressed "concerns about [telehealth's] use, further

24   opining that patients benefited from clinicians' on-site presence, which positively impacted

25   patients' general advocacy"); *id.* at 701 ("Leadership [at CSP-LAC] further opined that

26   headquarters' plan to hire telehealth primary clinicians was inappropriate for the MHCB

27   and EOP patient population."); *id.* at 728 ("Most staff were not supportive of the plan to

28   use telehealth, expressing both logistical and treatment efficacy concerns."); *see also* ECF

1    No. 7682 at 41 (example of telepsychiatrist not knowing any correctional officers "was

2    concerning, as the close coordination and integration of the treatment team, with collateral

3    information from custody officers and knowledge of the milieu and environment of care

4    are **essential, especially for treatment of complex patients at the EOP level of care or**

5    **higher")** (emphasis added).  All of these recent examples should give the Court pause

6    before permitting EOP patients to have all-virtual treatment teams.

7         **D.      The Court Should Require On-Site Attendance of One Clinical Team**
             **Member at All IDTTs**

8         The IDTT is the touchstone of CDCR's mental health system, responsible for

9    developing and revising treatment plans, evaluating treatment needs, and deciding on the

10   appropriate level of care for each incarcerated patient.  Despite the importance of a

11   functioning IDTT to the MHSDS, the Special Master opted not to adopt Plaintiffs'

12   proposal that IDTTs at all levels of care be required to include at least one of the patient's

13   assigned psychiatrist or PC on-site.  Instead, at the EOP level of care, the Special Master

14   allows for both primary members of a treatment team to be remote as long as the EOP

15   supervising psychologist is in attendance on-site; at the CCCMS level of care, there is no

16   requirement at all for on-site participation in the IDTT.  Appendix A to Telemental Health

17   Report, ECF No. 8165-1 at 4.

18        The Special Master erred in permitting all treatment team members to be virtual at

19   IDTTs in his proposed policy.  At the EOP level, requiring the EOP supervising

20   psychologist to appear in person does nothing to change the fact that patients with serious

21   mental illness will be having their treatment team making vital decisions about their care

22   without being able to examine the patient in person.  Patients often decide that an IDTT is

23   not worth attending when their primary clinician is not present.  *See, e.g.,* ECF No. 8095 at

24   291 (reporting that, at SATF, "the majority of observed IDTTs were conducted in absentia,

25   as most patients requested to leave when they observed the absence of their assigned PCs.")

26   At the CCCMS level of care, the IDTTs happen so infrequently—only once per year, unless

27   otherwise clinically indicated, *see* ECF No. 7333-1 at 44—that requiring the in-person

28

1   attendance of at least one team member will not be a burden to CDCR's clinical staff.

2       Considering these dynamics, the Court should adopt Plaintiffs' proposal and require

3   that at least one of the psychiatrist or PC appear at each IDTT in person at all levels of care.

4       **E.    Defendants Should Be Required To Have In-Person Clinicians Evaluate Individuals Making Sexual Assault and Sexual Harassment Complaints Under PREA**

5

6       There are certain clinical situations where telemental health services by a remote

7   clinician may be equal to or even superior to on-site, face-to-face services.  However,

8   assessing a traumatized victim of sexual assault shortly after they report the assault is not

9   one of those situations, and Defendants' Telemental Health policy should be amended to

10  include a restriction requiring that emergency PREA evaluations by psychologists must be

11  completed on-site, in face-to-face in person meetings.  The CDCR Department Operations

12  Manual, or DOM, in Section 54040.7, provides for an emergency mental health referral

13  following any forensic medical examination that takes place after a report of sexual

14  assault:

15          Inmates reporting sexual assault and who were referred to a contracted
            SANE [Sexual Assault Nurse Examiner] forensic medical evaluation, even if
16          the inmate refused the evaluation, shall be referred for an emergency mental
            health evaluation. . . .  If this Referral is made after hours the on-call
17          clinician shall be contacted to respond to the institution.  The emergent
            referral must be completed by mental health within **four (4)** hours of the
18          inmate victims [sic] return to the facility following the SANE forensic
            medical examination or their refusal to participate in the SANE examination.

19
    DOM § 54040.7 (emphasis in original), available at
20
    https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2024/03/2024-
21
    DOM.pdf.  This same section of the DOM also cautions staff to keep in mind that
22
    individuals reporting sexual assault "may be seriously traumatized physically and/or
23
    mentally."  *Id*.  (This section of the DOM also appears to already require an in-person
24
    evaluation even after regular working hours, as it requires the on-call physician to
25
    "respond to the institution," which presumably requires responding in person.  *Id.*)
26
        The emergency evaluation of a traumatized prisoner who has just reported sexual
27
    violence and who may have just been given a forensic medical examination—which can be
28

1   re-traumatizing for many people—must be done in person.  The reason for the emergency

2   psychological referral in these circumstances is to help individuals process *recent* trauma.

3   The resulting clinical interaction is one that should fall into the same category as de-

4   escalation by a clinician during a use-of-force cool down period, an area where the Special

5   Master recommends in-person contact only, because "the Special Master's experts opine

6   that de-escalation and clinical intervention efforts are most effective when the agitated

7   individual can be seen clearly as psychomotor movement provides significant clinical data

8   regarding the person's state of mind and effectiveness of intervention techniques."

9   Telemental Health Report at 34.  The same can be said of an incarcerated person

10  traumatized by a recent sexual assault.  Treating such an individual in person is required to

11  provide the most therapeutic form of direct human contact, and to allow the clinician to be

12  most attuned how the patient is functioning and whether their therapeutic strategies are

13  working.

14          Just as with other provisions, the Special Master team changed its position on this

15  issue, after initially recommending in its letter to the parties that "there are on-site

16  clinicians for required on-site contacts such as […] PREA evaluations."  ECF No 8165-2

17  (Ex. F) at 140.  The reversal of their position on this important component of the proposed

18  Telemental Health Policy between the meet-and-confer period and his final report may

19  reflect a statement in the APA position paper on telepsychiatry noting that "studies suggest

20  imprisoned patients may be more comfortable discussing **sexual abuse history** over

21  telepsychiatry than in face-to-face encounters (Tucker et al., 2006)."  Am. Psychiatric

22  Ass'n, *Resource Document on Telepsychiatry for Adults in Jails and Prisons* (Feb. 2023)

23  at 5 (emphasis added).  However, someone's comfort level in disclosing sexual abuse

24  *history* in therapy is very different from their needs when being given emergency mental

25  health treatment after a recent sexual assault and a forensic rape examination in which the

26  patient has already disclosed the incident.  For the person with very recent trauma, in-

27  person clinical consultation is critical.  That is at least in part because, with telemental

28  health, "patient interviews may be less empathetic than direct face-to-face interviews,

1  resulting in a detrimental impact on the development of therapeutic rapport." *Id*. at 4.

2  (citing 2008 literature review by Khalifa et al. finding that this is a commonly cited

3  reservation about telepsychiatry).

4        For all of those reasons, this critical emergency interview with an incarcerated

5  individual who may have recently been raped should be mandated to be in person.

6  **CONCLUSION**

7        For all of the above reasons, the Special Master erred.  His proposal should be

8  amended to (1) require a minimum of 80 percent of EOP PCs to be on-site and 60 percent

9  of CCCMS PCs to be on-site; (2) ban the use of telehealth by PCs in RHUs; (3) ban the

10  use of all-virtual treatment teams (i.e., both the psychiatrist and PC are virtual) for EOP

11  patients; (4) ban the use of all-virtual IDTTs at all levels of care; and (5) ban the use of

12  telehealth for PREA evaluations.

13

14  DATED:  May 28, 2024        Respectfully submitted,

15                        ROSEN BIEN GALVAN & GRUNFELD LLP

16

17                    By:  */s/ Jared Miller*

18                         Jared Miller

19                    Attorneys for Plaintiffs

20

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

**CERTIFICATION**

2

Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

3

filing: ECF Nos. 640, 5131, 5477, 5850, 6095, 6230, 6539, 7807, 7901, 8087.

4

5

DATED:  May 28, 2024                    Respectfully submitted,

6

ROSEN BIEN GALVAN & GRUNFELD LLP

7

8

By:  */s/ Jared Miller*

9

Jared Miller

10

Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28