ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7318
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Paul B. Mello, SBN 179755
Samantha D. Wolff, SSBN 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:   925-746-8460
Facsimile:    925-746-8490
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY (ECF NO. 8165)** |

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................ 1

Background ............................................................................................................................. 2

General Objections ................................................................................................................ 4

    I.    The Court's December 15, 2023 Order and the Special Master's Proposed Telemental Health Policy Improperly Intrude Into CDCR's Administrative Management of Its Mental Health Program. ............................................................ 4

        A.    The Order of Reference does not permit the Special Master to write CDCR's Policies. ....................................................................................... 4

        B.    Absent a showing that CDCR's telemental health policy violates the Eighth Amendment, the Court lacks authority to enjoin CDCR from implementing it. ........................................................................................ 5

        C.    Defendants object to all of the Special Master's recommendations and proposed revisions because there is no evidence that CDCR's telemental health policy violates the Constitution. ..................................... 6

    II.    The Overwhelming Evidence Supports CDCR's Telemental Health Policy. .......... 9

    III.    The Special Master's Proposed Revisions Are Not Supported by Experts Well-Versed in Providing Mental Health Treatment Through Telemedicine. ..................................................................................................... 10

Specific Responses and Objections ..................................................................................... 13

    I.    The Special Master's Literature Review Does Not Support His Proposed Restrictions on Telemental Health. ........................................................................ 13

    II.    Defendants Object to—and the Court Should Reject—the Special Master's Proposed Restrictions on the Use of Telemental Health at Higher Levels of Care. ..................................................................................................................... 18

    III.    Defendants Object to—and the Court Should Reject—the Special Master's Proposed Revisions Concerning Informed Consent. ........................................... 19

        A.    The Special Master's recommendations and revisions concerning informed consent are not warranted or necessary. ..................................... 19

        B.    The Special Master's assertion that Plaintiffs must have a right to choose in-person treatment is baseless. ..................................................... 21

    IV.    Deendants Object to—and the Court Should Reject—the Special Master's Proposed Revisions Concerning Telepresenters. ................................................. 24

    V.    Defendants Object to—and the Court Should Reject—the Special Master's Proposed Requirement for a Minimum Number of On-Site Providers............... 26

    VI.    Defendants Object to—and the Court Should Reject—the Special Master's Revisions Concerning Frequency and Duration of On-Site Visits. ...................... 29

    VII.    Defendants Object to—and the Court Should Reject—the Special Master's Recommendations and Revisions Concerning Cell-Front Telemental Health. ..................................................................................................... 31

i

**TABLE OF CONTENTS**
**(continued)**

Page

VIII.   Defendants Object to—and the Court Should Reject—the Special Master's Recommendations and Revisions Concerning the Use of Telemental Health for Particular Purposes or in Specific Settings....................................................... 32

    A.    Emergent/Urgent Referrals and Suicide Risk Assessments...................... 32

    B.    Group Treatment ................................................................................ 33

    C.    Five-Day Follow-Up Visits................................................................. 34

    D.    Use-of-Force Incidents....................................................................... 34

    E.    Mental Health Crisis Bed Discharges ................................................ 34

IX.   The Special Master's "Figure 1" Chart is Incomplete. ......................................... 35

X.   The Special Master Omitted Discussion of Several of the Proposed Restrictions in the Report.................................................................................... 36

Conclusion ......................................................................................................................... 37

Certification....................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page**

**CASES**

Balla v. Idaho
    29 F.4th 1019 (9th Cir. 2022) ........................................................................ 16

Beard v. Banks
    548 U.S. 521 (2006) ......................................................................................... 6

Bell v. Wolfish
    441 U.S. 520 (1979) ......................................................................................... 8

Cooter & Gell v. Hartmax Corp.
    496 U.S. 384 (1990) ....................................................................................... 38

Edmo v. Corizon
    935 F.3d 757 (9th Cir. 2019) ........................................................................ 16

Estelle v. Gamble
    429 U.S. 97 (1976) ..................................................................................... 5, 23

Gilmore v. California
    220 F.3d 987 (9th Cir. 2000) .......................................................................... 6

Graves v. Arpaio
    623 F.3d 1043 (9th Cir. 2010) ..................................................................... 7, 8

Hoptowit v. Ray
    682 F.2d 1237 (9th Cir. 1982) ........................................................................ 8

Inmates of Suffolk Cnty. Jail v. Rouse
    129 F.3d 649 (1st Cir. 1997) ........................................................................... 6

Jackson v. McIntosh
    90 F.3d 330 (9th Cir. 1996) .......................................................................... 24

Miller v. French
    530 U.S. 327 (2000) ......................................................................................... 6

Operating Engineers Pension Trust v. A-C Co.
    859 F.2d 1336 (9th Cir. 1988) ...................................................................... 38

Ruiz v. Estelle
    679 F.2d 1115 (5th Cir.) .................................................................................. 6

Sanchez v. Vild
    891 F.2d 240 (9th Cir. 1989) ........................................................................ 23

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. State of Mich.*
  940 F.2d 143 (6th Cir. 1991)................................................................. 7, 8

*Westefer v. Neal*
  682 F.3d 679 (7th Cir. 2012)................................................................. 6, 7

**STATUTES**

18 U.S.C.
  § 3626(f)........................................................................................... 4

Americans with Disabilities Act ............................................................. 37

California Business & Professions Code
  § 2290.5(b) ....................................................................................... 20

California Code of Regulations, Title 15
  § 3999.202........................................................................................ 20

California Welfare and Institutions Code
  § 14132.725(d) .................................................................................. 22
  § 14132.725(d)(3) ............................................................................. 22

Prison Litigation Reform Act, 18 U.S.C.
  § 3626............................................................................................ *passim*

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ............................................................................ *passim*

**COURT RULES**

Federal Rule of Appellate Procedure
  8(a)(1)(A)'s ...................................................................................... 38

Federal Rules of Civil Procedure
  11(b)(1) ............................................................................................ 38
  53(c) ................................................................................................ 4
  62(c) ................................................................................................ 38

**INTRODUCTION**

There is a nationwide shortage of mental health professionals, and the shortage acutely affects prison systems like the California Department of Corrections and Rehabilitation (CDCR) because of the additional challenges of recruiting professionals to treat patients in remote areas and under difficult conditions.  (Decl. Penn, Ex. D (Secretariat Expert Report) at 4-26.)  Other healthcare organizations, private or otherwise, have also had issues recruiting and retaining mental health providers.  (*Id.* at 26-29.)  Based on CDCR's successful telepsychiatry policy, which reduced vacancy rates without any findings of harm to patients identified in the Special Master's monitoring, CDCR developed a telemental health policy.  This policy 1) comports with the requirements of the remedy in this case; 2) provides safeguards through reasonable restrictions on the use of telemental health even though the overwhelming evidence shows that telemental health is a nationally accepted method of delivering mental health treatment and is well within the standard of care  (Decl. Mehta ¶¶ 14-15, 18, 21-22; Decl. Penn ¶¶ 42, 47-50); improves access to care for mental health patients and 4) expands the pool of mental health clinicians who will work for CDCR, ensuring that care can be provided in remote locations, and improving retention of clinicians who already work for CDCR.

The Special Master's report fails to demonstrate that any aspect of CDCR's telemental health policy constitutes cruel and unusual punishment under the Eighth Amendment.  Thus, an order enjoining the implementation of CDCR's policy and mandating that CDCR implement the Special Master's policy would not comport with the requirements of the Prison Litigation Reform Act.  Not one of the Special Master's proposed revisions is necessary for a constitutionally adequate policy, and Defendants object to all of his proposed revisions to CDCR's telemental health policy on that basis.

Telemental health is a widely accepted alternative to on-site treatment.  The evidence of its successful use is uncontroverted.  CDCR's policy should be implemented without the unnecessary limitations the Special Master and Plaintiffs propose.

If the Court has concerns about CDCR's telemental health policy, it can require that the Special Master monitor its implementation and operation and promptly report to the Court if

1

1   monitoring reveals that the use of telemental health is somehow intererfering with patients' access

2   to constitutionaly adequate mental health treatment.  Plaintiffs' counsel are similarly free to report

3   any issues they identify.  If Plaintiffs or the Special Master are able to demonstrate that some part

4   of the policy—as implemented—does not pass constitutional muster, then it may be appropriate

5   for the Court to issue a narrowly tailored order to correct that aspect of the policy.  But any

6   proposed limitations on the policy are impermissible absent such a showing.

7       At a time when CDCR is faced with extremely difficult staffing challenges and Court-

8   imposed fines in excess of $100,000,000 for its inability to comply with staffing requirements, the

9   Court should not countenance unnecessary restrictions on the use of telemental health that will

10  only hurt CDCR's ability to improve patients' access to care and staffing levels.

11                                   **BACKGROUND**

12      CDCR's telemental health policy created a program whereby telepsychologists and

13  telesocial workers provide mental health services to CDCR's patients remotely using video-

14  conferencing technology and with the assistance of on-site telepresenter staff.  (Decl. Mehta ¶ 4.)

15  CDCR released its telemental health policy on September 21, 2023, and, with Plaintiffs' support[1],

16  immediately began to implement it and the process to hire telepsychologists and telesocial

17  workers.  (*Id.*)  The hiring process is ongoing.  (*Id.*.)  Based on CDCR's experience with the

18  expansion of telepsychiatry, CDCR's hiring strategy was to first hire leadership and supervisor

19  positions for the telemental health program, and to then turn its focus to hiring line staff.  (*Id.*)  As

20  of May 23, 2024, CDCR had hired 30 telemental health staff: one telemental health assistant

21  deputy director, two chief telepsychologists, one level II supervising telesocial worker, three level

22  I supervising telesocial workers, one senior telepsychologist supervisor, four telepsychologists,

23  and eighteen telesocial workers.  (*Id.*.)

24      Telemental health facilitates the delivery of mental health treatment; it is not a separate

25  form of medicine.  (*Id.* at ¶ 17.)  It is used to deliver the exact same care that is provided by on-

26  site clinicians.  (*Id.* at ¶ 5.)  Under CDCR's telemental health policy, telepsychologists and

27  telesocial workers follow the same professional and ethical standards and carry out the same

28  _____
    [1] ECF No. 7935 at 3 (the parties joint report on telemental health).

                                         2

1   duties and functions as on-site staff.  (*Id.*)  There is no difference in the licensing, credentialing,

2   or training of telemental health clinicians as compared to on-site psychologists and social

3   workers, although telemental health providers do receive additional training in the technology and

4   standards of telemedicine.  (*Id.*)  And, importantly, the policy is consistent with the 2021 Mental

5   Health Services Delivery System Program Guide (Program Guide).  (Decl. Mehta ¶ 6; ECF No.

6   7333-1.)

7        In CDCR's Mental Health Services Delivery System, psychologists and social workers

8   fulfill the role of primary clinicians.  (Decl. Mehta ¶ 6.)  Primary clinicians who provide services

9   through telemental health are referred to as telemental health providers or telemental health

10   clinicians.  (*Id.*)  The Program Guide sets forth the expected duties of primary clinicians when

11   treating *Coleman* class members at each level of care.  For both the CCCMS and the EOP levels

12   of care, primary clinicians are required members of the interdisciplinary treatment teams (ECF

13   No. 7333-1, Program Guide at 12-3-9 and 12-4-6.)  CDCR's telemental health policy is not only

14   consistent with Program Guide requirements, but is intended to ensure compliance with them.

15   (ECF No. 8165-2, Ex. D at 67)[2]

16        CDCR's telemental health policy respects and ensures that telemental health clinicians are

17   part of the treatment team, thereby preserving the treatment milieu.  (Decl. Mehta ¶ 7.)  Under the

18   policy, telemental health clinicians are required to engage with their on-site team members as part

19   of the interdisciplinary treatment teams for their patients and to regularly consult with other team

20   members in meetings and in huddles to discuss their patients and other matters relevant to the

21   provision of care.  (ECF No. 8165-2, Ex. D at 69.)  CDCR telemental health clinicians are

22   expected to regularly speak with other staff members such as escort officers, gather crucial

23   information about their patients and the environment from the telepresenters, and can be taken

24   cell front through telepresence where they can observe the common areas and the cells of their

25   patients.  (Decl. Mehta ¶ 7.)  Telepresenters also collect and provide valuable information for the

26   telemental health clinicians, and relay important information back to other on-site staff.  (*Id.*)

27

28         [2] All citations to ECF documents use the ECF designated page number at the top of the document.

CDCR's telemental health policy is not intended to replace on-site primary clinicians. (Decl. Mehta ¶ 9.)  To date, the policy has worked as intended—it has attracted candidates who do not currently work on site at prisons and who likely would not consider employment with CDCR if they were required to work on site.  (*Id.*)  These new hires have virtually worked alongside on-site staff at the prisons where they have been assigned.  (*Id.*)  CDCR does not intend to reduce its efforts to recruit and retain on-site clinicians, and those efforts are ongoing.  (*Id.* at ¶ 10.)

CDCR's successful use of telepsychiatry demonstrates that CDCR's patients are open to telehealth as a mode of delivering mental healthcare, and patients themselves have requested more access to telemental health services, as reflected in a letter from the Inmate Advisory Council at the Substance Abuse Treatment Facility.  (Decl. Mehta ¶ 11, Ex. A.]

## GENERAL OBJECTIONS

**I. THE COURT'S DECEMBER 15, 2023 ORDER AND THE SPECIAL MASTER'S PROPOSED TELEMENTAL HEALTH POLICY IMPROPERLY INTRUDE INTO CDCR'S ADMINISTRATIVE MANAGEMENT OF ITS MENTAL HEALTH PROGRAM.**

### A. The Order of Reference does not permit the Special Master to write CDCR's Policies.

The Special Master's primary role under the Order of Reference was to develop a remedial plan to address the constitutional violations the Court found in 1995 and to monitor implementation and compliance once a remedial plan is developed.  (ECF No. 640 at 2:10-21.)  The remedial plan was set and first approved in 2006.  (ECF No. 1773.)  The telemental health policy conforms to that plan.  It is, in fact, a mechanism to carry-out the plan, not an amendment to the plan.

The rules governing special masterships do not permit the Court to grant the Special Master authority to unilaterally override Defendants' lawful policy decisions and replace them with the Special Master's preferred policies.  *See* Fed. R. Civ. P. 53(c); 18 U.S.C. § 3626(f).  Nor does the Order of Reference permit the Special Master to draft Defendants' operational policies or otherwise interfere with their executive function of running their prisons.  (ECF No. 640.)  In fact, the Order specifically prohibits the Special Master and his staff from "interven[ing] in the

4

1  administrative management" of Defendants' institutions, and states that the Special Master "shall

2  not be empowered to direct defendants . . . to take or to refrain from taking any specific action to

3  achieve compliance." (ECF No. 640 at 7:24-8:4.)

**B.      Absent a showing that CDCR's telemental health policy violates the Eighth
          Amendment, the Court lacks authority to enjoin CDCR from
          implementing it.**

6       Under the Prison Litigation Reform Act (PLRA), the Court cannot issue orders imposing

7  injunctions that exceed minimum constitutional requirements.  When imposing an injunction

8  concerning a state's prison operations, a district court must undertake a detailed analysis under

9  the Prison Litigation Reform Act, 18 U.S.C. § 3626 (PLRA).  The court may only take remedial

10  action if it finds a violation of a federal right.  *Id.*  Here, a ruling that CDCR's telemental health

11  policy violates the Eighth Amendment would require a finding that the policy is incompatible

12  with the evolving standards of decency that mark the progress of a maturing society or that it

13  constitutes the unnecessary and wanton infliction of pain—findings that are not remotely

14  supported by the record.  *Estelle v. Gamble*, 429 U.S. 97, 102-103 (1976).  But if such a finding

15  were made, the court would then need to evaluate what relief would hew most closely to address

16  the violation to ensure that any ordered relief would be narrowly tailored and the least intrusive

17  means necessary to correct that violation.  18 U.S.C. § 3626.  In this way, Congress ensured that

18  prisoners' constitutional rights would be appropriately safeguarded, while also limiting courts'

19  involvement in day-to-day prison management.

20       As one of dozens of staffing-improvement initiatives Defendants have proposed over the

21  past decade, CDCR developed and implemented a telemental health policy that it determined

22  captures best practices for using telemental health in its mental health program, including

23  reasonable limitations on its use.  The telemental health policy is a direct response to a mental

24  health staffing shortage and this Court's mandate that CDCR must staff all allocated positions at

25  ninety percent or better.

26       The Court lacks authority to enjoin CDCR from implementing its telemental health policy

27  under the PLRA because the Court must avoid improperly intruding into the daily operations of

28  CDCR unless it is necessary to correct an established constitutional violation.  The United States

5

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1    Supreme Court has consistently counseled that courts must give deference to states and their

2    agencies on issues of prison management.  *See Beard v. Banks*, 548 U.S. 521, 528 (2006); *Miller*

3    *v. French*, 530 U.S. 327, 328 (2000) (explaining that "curbing the equitable discretion of district

4    courts was one of the PLRA's principal objectives").

5         If the Court were to issue an injunction requiring CDCR to implement the Special Master's

6    proposed revised policy in lieu of CDCR's policy—without any evidence that CDCR's policy

7    violates patients' constitutional rights or any findings that the Special Master's plan complies

8    with the PLRA—such a ruling would exceed the Court's authority and improperly substitute the

9    Special Master's judgment for CDCR's.  *See Gilmore v. California*, 220 F.3d 987, 991 (9th Cir.

10   2000) ("[i]t is clear that Congress intended the PLRA to revive the hands-off doctrine," the

11   former "rule of judicial quiescence" that the federal judiciary not be involved with the problems

12   of state-run prisons); *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997)

13   ("Congress passed the PLRA in an effort, in part, to oust the federal judiciary from day-to-day

14   prison management."); *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir.), *amended in part and*

15   *vacated in part*, 688 F.2d 266 (5th Cir. 1982) (stating that "the powers of the court's appointed

16   agents should not intrude to an unnecessary extent on prison administration").  In fact, the PLRA

17   even precludes courts from ordering prison officials to implement their own prison policies if

18   those policies exceed the constitutional minimum.  *Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir.

19   2012) (finding that court order adopting the Illinois Department of Corrections' detailed due

20   process policy went beyond the constitutional minimum and violated the PLRA's prohibition

21   against judicial intervention in the day-to-day operations of prison systems).  Where, as here, no

22   finding of a constitutional deficiency related to the use of telemental health has been shown, the

23   Court may not impose an injunction requiring CDCR to replace its telemental health policy with

24   the Special Master's proposed policy.

25        **C.    Defendants object to all of the Special Master's recommendations and
               proposed revisions because there is no evidence that CDCR's telemental
26             health policy violates the Constitution.**

27        The Special Master's proposed policy revisions are improper because there is no evidence

28   that any aspect of CDCR's telemental health policy violates the Constitution, and even more so

6

1   because they are unnecessary limitations on CDCR's ability to staff its mental health program.  In

2   short, the Special Master's proposed telemental health policy is precisely the sort of interference

3   into CDCR's ability to run a correctional system that courts are directed to avoid.  *See, e.g.,*

4   *Westefer*, 682 F.3d at 685 ("To repeat, the PLRA requires that an injunction use the 'least

5   intrusive means necessary to correct the violation of the [f]ederal right.'  Locking in specific

6   deadlines—even with hedging 'whenever possible' language—deprives prison administrators of

7   the operational flexibility to adjust procedures as future needs dictate and cannot be considered

8   the least intrusive means of correcting the due-process violation.").  Without some evidence that

9   the Special Master's proposed restrictions are necessary to correct a constitutional violation, his

10  proposed revisions to CDCR's policy should be rejected.

11       The Special Master's proposed revisions would impose limitations on telemental health that

12  severely restrict CDCR's policy, making it exceedingly difficult to implement the telemental

13  health program.  The revisions would burden on-site clinicians with many of the basic duties of

14  primary clinicians that can be satisfactorily completed by telemental health clinicians, negatively

15  impacting retention of on-site providers.  (Decl. Mehta ¶ 13.)  The December 15, 2023 order

16  requiring the Special Master's submission of a proposed policy for the Court's approval indicates

17  that the Court contemplates issuing an order that CDCR implement the Special Master's proposed

18  policy.  (ECF No. 8087 at 2:14-15.)  Such an order would represent new affirmative prospective

19  injunctive relief in this action.  To order such relief under the PLRA, the Court must make

20  specific findings based on the factual record to show that the restrictions imposed by the Special

21  Master's proposed policy are necessary to correct a current and ongoing constitutional violation

22  and the least intrusive means by which to do so.  *Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th

23  Cir. 2010); *see also United States v. State of Mich.*, 940 F.2d 143, 159–60 (6th Cir. 1991) (district

24  court lacked authority to impose additional requirements on remedial plan proposed by prison

25  officials; state was entitled to develop and implement its own procedures "until it appears from

26  affirmative proof that the plan and procedures result in a constitutional infringement").  The

27  record before the Court does not support such a finding.

28

7

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1      Many of the Special Master's concerns about CDCR's telemental health policy are purely

2   speculative—as they must be—because Defendants have not yet had a chance to fully implement

3   their policy.  And because there are no factual findings that CDCR's use of telemental health has

4   ever violated patients' Eighth Amendment rights, nor evidence that the Special Master's proposed

5   restrictions on the use of telemental health are necessary to correct a current and ongoing

6   constitutional violation, judicial imposition of restrictions on the use of telemental health would

7   violate the PLRA.  *See Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th Cir. 2010); *see also*

8   *United States v. State of Mich.*, 940 F.2d 143, 159–60 (6th Cir. 1991) (district court lacked

9   authority to impose additional requirements on remedial plan proposed by prison officials; state

10   was entitled to develop and implement its own procedures "until it appears from affirmative proof

11   that the plan and procedures result in a constitutional infringement.").

12      At most, the Special Master's report expresses a preference to include additional

13   restrictions and prohibitions on the use of telemental health.  But the Constitution does not require

14   that CDCR institute forms of treatment that others might prefer, only that it provides patients with

15   minimally adequate access to mental health care.  *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.

16   1982) (finding that the Eighth Amendment does not require that prison officials provide the most

17   desirable medical and mental health care; nor should judges simply "constitutionalize" the

18   standards set forth by professional associations such as the American Medical Association or the

19   American Public Health Association); *see also Bell v. Wolfish*, 441 U.S. 520, 543–544 n.27

20   (1979) (draft recommendations of the Department of Justice are not determinative of

21   constitutional requirements).

22      The applicable literature and the experiences of numerous healthcare systems that use

23   telemental health in correctional and non-correctional settings show that telemental health has

24   been successfully used to deliver services to individuals with a wide range of mental health

25   diagnoses.  (Decl. Mehta ¶¶ 14-22; Decl. Penn ¶¶ 49-50, 68.)  Further, there are no national

26   guidelines from any major mental health organizations that prohibit the use of telemental health at

27   any levels of care.  (Decl. Penn ¶¶ 47-49, 56, 63, 69, 74, 79-81, 85.)  No evidence, therefore,

28   supports the proposition that telemental health is any less effective than in-person treatment,

8

1    much less that CDCR's telemental health policy is an unconstitutional means of delivering mental

2    health care to CDCR's patients.

3         Because there is no evidence that CDCR's telemental health policy violates the Constitution

4    or that any of the Special Master's proposed revisions are necessary, narrowly tailored, and the

5    least intrusive method to cure a constitutional violation, Defendants object to all of the Special

6    Master's recommendations and proposed revisions to the policy.

7    **II.    THE OVERWHELMING EVIDENCE SUPPORTS CDCR'S TELEMENTAL HEALTH
          POLICY.**

8

9         CDCR's telemental health policy will increase the number of available psychologists and

10   social workers in CDCR's mental health programs and expand access to care during the ongoing

11   critical nationwide shortage of mental health professionals.  (Decl. Mehta ⁋⁋ 8-10; Decl. Penn ⁋

12   45.)  Again, CDCR does not intend to reduce its efforts to recruit and retain on-site clinicians.

13   (Decl. Mehta ⁋ 10.)  Instead, given the current staffing climate, CDCR seeks to utilize telemental

14   health to augment these efforts.  (*Id.*)  An abundance of evidence demonstrates that telemental

15   health is an effective and widely-accepted treatment modality used by numerous oganizations

16   across the country.  (Decl. Mehta ⁋⁋ 14-22; Decl. Penn ⁋⁋ 42, 49-50.)  In short, the evidence

17   demonstrates that telemental health is safe, effective, and improves access to care.  (Decl. Mehta

18   ⁋⁋ 14-22; Decl. Penn ⁋⁋ 48, 51.)

19        CDCR's telemental health policy permits psychologists and social workers to screen,

20   assess, and treat *Coleman* class members from remote locations to supplement existing staffing

21   levels and mitigate the continuing national shortage of these classifications.  (Decl. Mehta ⁋ 4, 6.)

22   The Special Master proposes unreasonable restrictions on CDCR's ability to fully benefit from

23   the use of telemental health, not because it is a modality that does not work well, but because of

24   speculative concerns (e.g., it might negatively impact the treatment milieu).  (Decl. Mehta ⁋ 34,

25   37.)  His speculative fears are unfounded and do not provide a sufficient basis for the proposed

26   restrictions.  CDCR's telemental health policy is supported by CDCR's decades of experience

27   delivering care to patients through telepsychiatry, a modality the Special Master himself touts as a

28   success.  (ECF No. 8165 at 2; Decl. Mehta ⁋ 11, 23-24.)  It is also supported by expert testimony

9

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1  and literature from the relevant mental health community, and—absent a showing that it will not

2  provide a constitutional level of mental healthcare—should be allowed to take hold.  (Decl.

3  Mehta ¶¶ 8, 11, 14-62; Decl. Penn ¶¶ 47-51.)

4      The evidence in support of CDCR's telemental health policy overwhelmingly supports its

5  use uninhibited by the Special Master's proposed restrictions.

6  **III.  THE SPECIAL MASTER'S PROPOSED REVISIONS ARE NOT SUPPORTED BY EXPERTS
7         WELL-VERSED IN PROVIDING MENTAL HEALTH TREATMENT THROUGH
       TELEMEDICINE.**

8      In support of CDCR's telemental health policy, Defendants submit declarations from

9  Deputy Director of Mental Health Dr. Mehta and Dr. Joseph Penn, who manages a mental health

10 program for the Texas Department of Corrections.  Both of these individuals have extensive and

11 direct experience providing mental health treatment to incarcerated patients, managing very large

12 and complex correctional mental health systems, providing mental health treatment via

13 telemedicine, and managing programs that deliver care through telemedicine.  (Decl. Mehta ¶¶ 1-

14 2; Decl. Penn ¶¶ 1-15.)

15     Both Dr. Mehta and Dr. Penn fully support CDCR's telemental health policy, as written,

16 which they conclude is adequate and either meets or exceeds the standard of care.  (Decl. Mehta

17 ¶¶ 8; Decl. Penn ¶ 45.)  And they both dispute the validity of the concerns and arguments raised

18 by the Special Master's report in support of his proposed revisions to CDCR's telemental the

19 policy.  (Decl. Mehta ¶ 13; Decl. Penn ¶ 46, 56-91.)

20     Dr. Mehta is the Deputy Director of the Statewide Mental Health Program for the

21 California Department of Corrections and Rehabilitation.  (Decl. Mehta ¶ 1.)  Prior to this

22 position, he was the Statewide Chief of Telepsychiatry.  (*Id.*)  He has worked in CDCR since July

23 2013, during which time he also served as a staff telepsychiatrist directly delivering care via

24 telepsychiatry at multiple levels of care for roughly six years, site director for residency training,

25 institutional clinical lead, and acting statewide Chief of Psychiatry.  (*Id.* at ¶¶ 1-2)  Serving as

26 the statewide Chief of Psychiatry, Telepsychiatry Services, for nearly a year, he oversaw a

27 significant expansion of the staff of the telepsychiatry program.  (*Id.*)  He was directly involved

28 with the use of telemental health throughout the period of the COVID-19 pandemic, at nearly all

10

1   institutions, in one form or another.  (*Id.*)  And he remains closely involved with the telemental

2   health unit during its current expansion and implementation.

3       Dr. Penn is imminently qualified to provide opinions on telepsychiatry and telemental

4   health.  Dr. Penn oversees mental healthcare delivered to approximately 80 percent of the nation's

5   largest state correctional system as the Director of Mental Health Services of the University of

6   Texas Medical Branch-Correctional Managed Care.  (Decl. Penn ¶¶ 1-2)  Texas Tech University

7   Health Sciences Center-Correctional Managed Care provides services to the other 20 percent.

8   (Decl. Penn ¶ 6.)  He also presents nationally and internationally on correctional and non-

9   correctional mental health care delivery and standards of care, is actively involved at a national

10  level in a leadership role within several psychiatric organizations, and regularly authors and is

11  invited to present on a range of mental health care topics.  (Decl. Penn ¶¶ 16-33.)  Importantly,

12  Dr. Penn has many years of direct experience providing mental health treatment to incarcerated

13  patients through telepsychiatry and has overseen successful telepsychiatry and telemental health

14  programs in the Texas system.  (Decl. Penn ¶¶ 2-9.)  Dr. Penn's UTMB CMC sector currently

15  provides treatment to about 25,125 mental health patients.  (*Id.* ¶ 2.)  Of those patients about

16  24,000 are at an outpatient level of care—comparable to CDCR's Clinical Case

17  Management System (CCCMS) and Enhanced Outpatient (EOP) levels of care—and

18  about 1,125 are at an inpatient level of care.  (*Id.*)  When Dr. Penn began working for the

19  University of Texas Medical Branch in 2008, it already had robust telemedicine and

20  telepsychiatry programs in place.  (*Id.*)   The University of Texas Medical Branch provides

21  nearly all outpatient psychiatric care to patients—comparable to CDCR's EOP and CCCMS

22  levels of care—via telepsychiatry, and there have been no issues attributed to the modality.

23  (Decl. Penn ¶¶ 68, 74.)

24      Deputy Director Mehta has attests that—in his professional opinion and based on his

25  extensive work and experience as a telepsychiatrist, managing CDCR's telepsychiatry program,

26  and overseeing the delivery of services through telemental health—telemental health is an

27  appropriate and effective modality for delivering mental-health treatment to CDCR's patients.

28  (Decl. Mehta ¶ 8.)  He further avers that the Special Master's proposed limitations on the use of

11

1  telemental health could undermine the proper functioning of CDCR's telemental health unit and

2  the purposes of the policy, which are to improve mental health staffing, improve access to care

3  for CDCR's mental health patients, and improve the provision of all Program Guide-required

4  care.  (*Id.* at ¶ 13.)

5      Similarly, Dr. Penn attests that CDCR's telemental health policy is well drafted to

6  implement a telemental health program that will meet or exceed the standard of care,

7  help CDCR meet its staffing needs, and improve access to care for CDCR's patients.

8  (Decl. Penn ¶ 45.)  He further avers that the Special Master's proposed revisions to

9  CDCR's telemental health policy are either unnecessary or in some cases problematic

10  because they potentially put patients at greater risk of harm or are disruptive to

11  continuity of care.  (Decl. Penn ¶ 46.)  And Dr. Penn attests that the Special Master's

12  revisions are not supported by medical evidence or standards of care.  (Decl. Penn ¶¶ 46-49,

13  56, 63, 69, 74, 79-81, 85.)

14      By contrast, the Special Master has not presented evidence in support of his proposed

15  policy revisions.  While this Court observed in its July 3, 2018 order that the Special Master's

16  opinions are informed and guided by a team of nationally recognized experts in correctional

17  mental health (ECF No. 5850 at 6-7), none of these experts' credentials indicate *any* level of

18  experience or expertise specific to telemental health, much less telemental health expertise on par

19  with Drs. Mehta and Penn.  (*See* ECF No. 669 at 2-3 and attached curriculum vitae (CV); ECF

20  No. 920 at 1-2 and attached CV; ECF No. 2161-1 at 3 and attached CV; ECF No. 2162-1; ECF

21  No. 2211-1 at 3-4; ECF No. 5192 at 21-28; ECF No. 6308 at 17-20; ECF No. 6461 at 22-32; ECF

22  No. 7391 at 14-21; ECF No. 7440 at 8-12 (CVs of the Special Master's psychiatry and

23  psychology experts, none of which indicate any experience or expertise in the areas of

24  telepsychiatry, telemental health, or managing large and complex statewide correctional mental

25  health systems).)

26

27

28

1    **SPECIFIC RESPONSES AND OBJECTIONS**

2    I.     **THE SPECIAL MASTER'S LITERATURE REVIEW DOES NOT SUPPORT HIS PROPOSED
        RESTRICTIONS ON TELEMENTAL HEALTH.**

3

4          The Special Master reports that his experts' review of literature and professional standards

5    "informed" his proposed restrictions on the use of telemental health, and lists 41 articles reviewed

6    by his team.  (ECF No. 8165 at 19.)  But it is impossible to square the Special Master's proposed

7    restrictions with the articles he cites.  The overwhelming majority of the articles support the use

8    of the tele-modality for mental healthcare and conclude that its effectiveness is on par with in-

9    person treatment.  (Decl. Mehta ⁋⁋ 14-15.)  Consequently, they do not support the Special

10   Master's proposed restrictions and prohibitions on CDCR's use of telemental health.  Some of the

11   articles suggest that special consideration should be given to the use of telemental health at higher

12   levels of care, but did not cite evidence supporting that assertion and did not claim that the use of

13   telemental health at higher levels of care is inadequate.  (Decl. Mehta ⁋ 20.)  Regardless, CDCR's

14   policy already places appropriate restrictions on the use of telemental health at higher levels of

15   care.  (ECF No. 8165-2, Ex. D at 70.)

16         The Special Master's report provides a detailed discussion of one article in the literature-

17   review section of his report—the American Psychiatric Association's (APA) February 2023

18   *Resource Document on Telepsychiatry for Adults in Jails and Prisons* ("Resource Document").

19   That article concerned telepsychiatry, not telemental health, and the Special Master's heavy

20   reliance on it is problematic, as discussed below.

21         The Special Master's report implies that the Resource Document constitutes a "standard"

22   issued by the APA.  (ECF No. 8165 at 21.)  In fact, the Resource Document does not represent

23   the opinion, guidance, or a standard of the APA.  The Resource Document itself cautions that

24   "'[t]he findings, opinions, and conclusions of this report do not necessarily represent the views of

25   the officers, trustees, or all members of the American Psychiatric Association.  Views expressed

26   are those of the authors.'" (Resource Document[3] at 1.)  The APA's Operations Manual clearly

27         [3] American Psychiatric Association Resource Document on Telepsychiatry for Adults in
     Jail and Prisons at 4 (https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-

28

13

1  states that resource documents do not represent APA policy.  (Decl. Mehta ₽ 19.)  Thus, the

2  Special Master's assertion that the document represents an APA standard is wrong.

3      Additionally, it is noteworthy that the section of the Resource Document pertaining to

4  treatment at higher levels of care contains no citations to studies or evidence, and indicates that

5  the recommendations are based on opinion and not on published evidence.  (Decl. Mehta ₽ 20;

6  Decl. Kafterian, ECF No. 7772-1 ₽₽ 36-38.)  Moreover, it is not clear from the Resource

7  Document that any of the authors have direct and extensive experience practicing in telemental

8  health that would provide a foundation for their opinions.  (Decl. Mehta ₽ 20.)

9      Significantly, one of the Resource Document's authors is the Special Master's expert, Dr.

10  Metzner, and the document was written during a period when proposed restrictions on

11  telepsychiatry were being litigated in this case.  It is troubling that out of the extensive literature

12  and studies that demonstrate the effectiveness of telemental health and telepsychiatry, the Special

13  Master and his expert choose to pin their focus on a single contrary source, which was drafted by

14  the Special Master's expert while these issues were being litigated.

15      The Special Master's literature-review section also references the APA Telepsychiatry

16  Toolkit (ECF No. 8165 at 19, n. 13), which is actually enthusiastic about the tele-modality as the

17  following quotes demonstrate:

18      •    "Telepsychiatry using videoconferencing is a validated and effective practice of

19           medicine. Telepsychiatry videoconferencing is equivalent to in-person encounters in

20           diagnostic accuracy, treatment effectiveness, patient satisfaction, and is often more

21           cost efficient than in-person encounters."  (https://www.psychiatry.org/psychiatrists

22           /practice/telepsychiatry/toolkit, last referenced on May 20, 2024.)

23      •    "Telepsychiatry's evidence base is substantial and satisfaction is extremely high

24           among patients, psychiatrists and other professionals."  (*Id.*)

25

26

27

28  5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf), last accessed on
    May 15, 2024.

14

- "The evidence base [for telepsychiatry] is formidable for children, adolescents and adults regarding assessment (diagnostic, cognitive, other) and treatment (medication, therapy)." (*Id.*)

- "The experience other mental health clinicians using telemedicine (i.e., *telemental health*), is consistent with, and further substantiates the diagnostic, therapeutic and outcome evidence base." (*Id.* (emphasis added).)

- "Telepsychiatry has a robust evidence base and leads to high patient and provider satisfaction ratings, and outcomes equivalent to in-person care." (*Id.*)

- "Telepsychiatry is especially effective with respect to the treatment of PTSD, depression, and ADHD, in team based environments, and with some patient groups may be more effective than in-person care." (*Id.*)

- "Care models that have good evidence include direct care, consultation to primary care and collaborative care. [Telepsychiatry] is being studied specifically, now, as a way to leverage psychiatric expertise in stepped and integrated care models, too." (*Id.*)

- "There are a few populations in which [telepsychiatry] may be preferable to in-person care (e.g., autism spectrum, severe anxiety disorders, geriatric patients with physical limitations, those with significant geographical obstacles)." (*Id.*)

- "Telepsychiatry potentially harmonizes the geographical distribution of psychiatrists and psychiatric patients in both inpatient and outpatient settings." (*Id.*)

Clearly, the APA Toolkit does not support the Special Master's proposed restrictions on the use of telemental health.

The Special Master's report cites the American Psychological Association Guidelines for the Practice of Telepsychology, but without discussion of those guidelines or how they support the proposed revisions. (ECF No. 8165 at 19, n. 13.) In fact, the American Psychological Association clearly supports the use of telemental health, consistent with CDCR's policy:

- "Teletherapy has been shown to be an efficacious treatment modality for a variety of mental health concerns, including anxiety, depression, PTSD, and adjustment

15

disorder, among others." (https://www.apa.org/practice/telehealth-telepsychology, last referenced on May 20, 2024.)

- "Teletherapy, including services delivered via telephone or videoconferencing, has been shown to have similar outcomes to traditional, in-person therapy." (*Id.*)

- "An overwhelming number of psychologists (96%) said they believed the use of telehealth during the pandemic has proven its worth as a therapeutic tool." (*Id.*)

- "Patients generally report high degrees of satisfaction with telehealth visits for their medical care. Patients also generally report high degrees of satisfaction with their virtual mental health care and report interest in continued access to virtual care postpandemic." (*Id.*)

The Special Master's report suggests that a lack of prison-specific studies on the use of telemental health in prison settings justifies the numerous proposed restrictions on its use. (ECF No. 8165 at 22.) But that has it backwards. As discussed, unless *evidence* shows CDCR's policy violates the Eighth Amendment, the Court may not reject the policy and it certainly cannot impose the Special Master's policy on CDCR based on the absence of more prison-specific studies. That is especially true where, as here, Defendants have presented competent evidence that speaks directly to the issue. The Special Master's position is also inconsistent with Ninth Circuit decisions finding that the community standard of care is highly relevant in determining what care is medically acceptable within prisons. *Balla v. Idaho*, 29 F.4th 1019, 1026 (9th Cir. 2022); *Edmo v. Corizon*, 935 F.3d 757, 786 (9th Cir. 2019). Here, expert testimony and abundant literature confirm that telemental health is widely accepted and used in the community, and that CDCR's policy is within the standard of care. (Decl. Mehta ¶¶ 14-22; Decl. Penn ¶¶ 42, 49-50.)

Moreover, inferences can reasonably be drawn regarding the effectiveness of telemental health in prisons from studies of the modality in the community. (Decl. Mehta ¶ 18; Decl. Penn ¶ 51.) All of medicine functions by drawing reasonable inferences regarding the safety and effectiveness of healthcare interventions in a multitude of settings, and such inferences are drawn in the medical field regularly because studies cannot be conducted in every possible environment or under every possible set of circumstances. (*Id.*) Here, taken together, the numerous articles

16

1    and studies concerning telepsychiatry and telemental health represent multiple and independent

2    lines of evidence that converge on a single conclusion: that telemental health is effective and

3    equivalent to in-person treatment.  (Decl. Mehta ℙ 18.)  The evidence for this is overwhelming

4    and many uncontested clinical practices rest on far less universal evidence.  (*Id.*)

5         The Special Master cites no evidence in support of his conclusory assertion that community

6    studies are not transferrable to carceral settings.  Instead, he cites to one of his own previous

7    reports, but that report also did not contain evidence supporting the assertion.  (ECF No. 8165 at

8    22 (citing ECF No. 7682 at 7-8.))  The Special Master's argument seems to be based on the

9    assumption that psychological problems experienced by incarcerated patients are somehow

10   fundamentally different from those experienced by people in the community or that there is no

11   reason to believe that modalities proven to be safe and effective in the community would be so in

12   a prison setting.  (Decl. Mehta ℙ 18.)  That is not evidence; it is speculation.  And if it were true,

13   there would be no basis for applying the many decades of community-based research and clinical

14   experience in treating mental health conditions of incarcerated patients.  (*Id.*)  But, of course, the

15   field of correctional mental health routinely and effectively applies community-based research

16   and experience to correctional settings.  (Decl. Mehta ℙ 18; Decl. Penn ℙℙ 51.)

17        The Special Master also incorrectly asserts that Defendants only considered the same 56

18   articles that they submitted in support of their telepsychiatry policy.  (ECF No. 8165 at 20-21.)  In

19   fact, Defendants conducted an extensive literature review as they drafted the telemental health

20   policy that included those 56 articles *plus an additional 37 articles*, most of which specifically

21   concerned telemental health, not telepsychiatry.  (Decl. Mehta ℙ 16, Ex. B.)

22        Reasonable inferences can also be drawn from CDCR's telepsychiatry program, which—

23   despite the Court-imposed restrictions on its use—has been successful at providing psychiatric

24   treatment to numerous class members for many years.  (Decl. Mehta ℙ 3, 11-12, 23-24.)  In fact,

25   after many years of use, the Special Master has never made findings that the modality of

26   telepsychiatry has ever caused harm to CDCR's patients.  (Decl. Mehta ℙ 3.)  And the expansion

27   of the telepsychiatry program has significantly improved psychiatrist staffing levels  (*Id.*)

28

17

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1   The Special Master suggests that inferences cannot be drawn from telepsychiatry because

2   the two classifications are too different.  (ECF No. 8165 at 23-24.)  In particular, he notes that

3   psychiatrists only discuss medication management with their patients and not highly sensitive and

4   private matters like those handled by primary clinicians.  (*Id.*)  In addition to unfairly minimizing

5   the work that psychiatrists perform, this claim is wrong.  Psychiatrists frequently discuss highly

6   sensitive and private matters with their patients, including, among other things,feelings of fear,

7   anxiety and stress; causes of situational depression; impulse control; past trauma; problematic

8   interpersonal relationships, and sexual side effects of medications.  (Decl. Mehta ⁋ 23; Decl. Penn

9   ⁋⁋ 54.)  And CDCR's psychiatrists and telepsychiatrists provide many forms of therapy to their

10  patients.  (Decl. Mehta ⁋ 23.)

11  The Special Master's literature-review section goes on to identify other distinctions

12  between psychiatry and psychology in CDCR's system—such as staffing ratios and the frequency

13  of patient contacts—but fails to explain why these distinctions require his proposed restrictions on

14  telemental health.  (ECF No. 8165 at 23-24.)  Regardless of any differences between them,

15  telepsychiatry and telemental health are both proven and widely accepted modalities for the

16  provision of mental health services and the Special Master has not demonstrated a sufficient basis

17  for placing unnecessary restrictions on their use.  (Decl. Mehta ⁋ 24; Decl. Penn ⁋ 55.)

18  Given the abundance of literature supporting the use of telemental health, it is impossible to

19  reconcile the Special Master's insistance that Defendants wait to take full advantage of telemental

20  health until after more prison-specific studies have been conducted—something that could take

21  years or decades—with his conclusion that there is a staffing emergency in the prisons.

22  **II.    DEFENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL**
23  **MASTER'S PROPOSED RESTRICTIONS ON THE USE OF TELEMENTAL HEALTH AT**
    **HIGHER LEVELS OF CARE.**

24  CDCR's telemental health policy already places appropriate limitations on the use of

25  telemental health at higher levels of care (i.e., mental health crisis beds and inpatient beds):

26   CDCR seeks to employ psychologists and CSWs who can deliver in-person, on-site
    treatment and care to patients in all inpatient facilities.  CDCR will not use telemental
27   health in lieu of on-site mental health providers at the inpatient levels of care for any
    reason other than a lack of availability of on-site mental health providers.
28

18

1   (ECF No. 8165-2, Ex. D at 70.)  This is a reasonable restriction on the use of telemental health at

2   higher levels of care and makes clear the intention and preference for on-site providers at these

3   levels of care.  (Decl. Mehta ⁋ 25; Decl. Penn ⁋⁋ 58-59.)

4   CDCR's policy language is clearer and easier to understand than the Special Master's

5   proposed revision, which would require that providers at higher levels of care wait until a

6   patient's situation becomes an "emergency situation" before permitting a telemental health

7   provider to intervene and provide treatment.  (Decl. Penn ⁋⁋ 58-59.)  In a situation where there

8   are no available on-site providers, there is no legal or factual basis to require that care be withheld

9   from patients in need of care unless and until their situation worsens and becomes an emergency

10  (a term that is undefined in the proposed restriction).  (*Id.*)  Defendants object to these proposed

11  revisions to the policy.

12  **III.   DEFENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL MASTER'S PROPOSED REVISIONS CONCERNING INFORMED CONSENT.**

13

14  **A.   The Special Master's recommendations and revisions concerning informed consent are not warranted or necessary.**

15  CDCR's telemental health policy already requires informed consent: "At the beginning of

16  the patient's first telemental health contact, the telemental health provider shall obtain informed

17  consent for the method of treatment by, at a minimum, explaining the treatment modality,

18  including a description of the role of the telepresenter and a plan for a response to interruption in

19  services."  This provision adequately addresses the informed consent requirement.  (Decl. Penn ⁋

20  61.)

21  Informed consent is a term of art.  In the medical field it means: "the process in which a

22  health care provider educates a patient about the risks, benefits, and alternatives of a given

23  procedure or intervention."[4]  Like virtually all medical professionals, CDCR's psychologists and

24  social workers are well versed in the meaning of this term and that it requires a discussion of risks

25  and benefits of any form of treatment.  (Decl. Mehta ⁋ 26; Decl. Penn ⁋ 62.)  Moreover,

26

27

28  ───────────────────
    [4] National Institutes of Health, National Library of Medicine at
    https://www.ncbi.nlm.nih.gov/books/NBK430827/, last accessed on May 15, 204.

19

California Code of Regulations, Title 15, which governs the provision of medical care in CDCR's

prisons, also defines informed consent:

> Informed Consent means a patient who has the capacity to make informed decisions
> is made aware of risks, benefits, and alternatives to proposed treatment for a disease
> or condition from which the patient suffers, and the patient is able to agree and clearly
> agrees to the recommended treatment without duress or coercion.

Cal. Code Regs., tit. 15, § 3999.202.

CDCR also has a longstanding practice of obtaining informed consent from all patients who

participate in treatment upon entry to the Mental Health Services Delivery System.  (Decl. Mehta

¶¶ 26-27.)  The Special Master's revisions concerning informed consent are unnecessary and go

well beyond what he previously deemed acceptable for the recent telepsychiatry policy.  (Decl.

Mehta ¶ 28; Decl. Penn ¶¶ 62-70.)  The proposed revisions also contain a lengthy recitation of

CDCR's policy for Clinical Emergency Management.  (Decl. Mehta ¶ 29.)  CDCR's telemental

health policy already incorporates this language where it belongs—in the section titled Clinical

Emergency Magagement.  (ECF No. 8165-2, Ex. D at 70.)  Accordingly, the proposed additional

text is redundant and unnecessary.  Moreover, CDCR's policy on Clinical Emergency

Management is not a modality-specific policy—it applies equally to on-site and remote clinicians.

(Decl. Mehta ¶ 29.)

The proposed revisions also require that each patient give both oral and written informed

consent before they are provided with telemental health services.  (ECF No. 8165-1, App. B at

14.)   The Special Master cites no legal, medical-ethics requirement or mental health standard to

support this revision, and obtaining multiple forms of informed consent is not a required practice

in the community.  *See* Cal. Bus. Prof. Code § 2290.5(b) (allowing informed consent for

telehealth to be provided either orally or in writing).  Nor are both forms of consent required by

the Texas Dartment of Criminal Justice, which only requires the completion of standardized

informed-consent forms.  (Decl. Penn ¶ 69.)  There is no basis to require informed-consent in a

manner that is different from the informed consent required in the community.  Defendants object

to the Special Master's proposed revision requiring both written and oral informed consent.

1     Given that informed consent is already defined in CDCR's policies and is well understood

2  by clinicians, it is enough that CDCR's telemental health policy requires that informed consent be

3  obtained.  Every nuance of obtaining informed consent need not be delineated in a policy that is

4  designed to broadly establish a telemental health program.  CDCR's providers must be afforded

5  autonomy and trust to complete their jobs in accordance with their medical training.  Micro-

6  management of these tasks is exactly the type of unnecessary burden on providers that can affect

7  retention and that violates the PLRA.  (ECF No. 8019 at 8, fn. 2.)  Because the informed-consent

8  provision in CDCR's telemental health policy is adequate and does not violate the Eighth

9  Amendment, Defendants object to the Special Master's informed-consent revisions to the policy.

10        **B.    The Special Master's assertion that Plaintiffs must have a right to choose
               in-person treatment is baseless.**
11

12     CDCR's telemental health policy already includes a process for addressing situations where

13  a patient refuses telemental health treatment:

14        If a patient refuses treatment via telemental health, the patient's telemental health
          provider(s) may meet with the other members of the patient's treatment team to
15        consider mental health reasons, behavioral issues, custodial issues, or any other
          relevant factors to determine whether telemental health is an appropriate delivery
16        method for the patient. The treatment team shall work toward resolving any issues
          contributing to the patient's refusal of telemental health services.
17

18  (ECF No. 8165-2, Ex. D at 69.)  The policy goes on to state that "[i]f it is determined that the

19  patient is not appropriate for telemental health, the Chief of Telepsychology and telemental health

20  Supervising Social Worker II will work with mental health leadership at the institution to ensure

21  the patient has access to appropriate on-site mental health treatment."  (*Id.*)

22     CDCR's policy also ensures that patients for whom telemental health services are

23  contraindicated will receive on-site treatment:

24        If the patient's IDTT, telepsychologist and Chief of Telepsychology, or telesocial
          worker and telemental health Supervising Social Worker II, determine that the patient
25        needs to be seen by an on-site psychologist or on-site CSW, they will work with
          mental health leadership at the institution (Chief and/or Senior Psychologist
26        Supervisor and Chief of Mental Health) to ensure the patient has an appropriate on-
          site psychologist and/or CSW assigned. Similarly, if the treatment team determines
27        that telemental health services are not appropriate for a patient, the team will work
          with mental health leadership to assign the patient to an on-site psychologist and/or
28        CSW.

21

1    (*Id.*)  Thus, the policy already ensures that telemental health will not be a patient's only option if

2    there are medical or mental health reasons for which it is contraindicated.

3         But the Special Master's concern is not that patients for whom telemental health is

4    inappropriate will be forced to use that modality.  Rather, he asserts that all patients must be

5    provided with in-person treatment if that is their preference.  (ECF No. 8165 at 24.)  He relies on

6    three primary arguments to support this assertion.

7         First, the Special Master's report asserts that "generally speaking" the use of telemental

8    health in the community is voluntary on the part of the patient.  (ECF No. 8165 at 25.)  This is a

9    red herring.  Of course, a patient's acceptance of mental health treatment—regardless of the

10   modality—is always voluntary.  (Decl. Penn ‖ 64.)  Furthermore, to the extent the Special Master

11   claims that all patients in the community who prefer in-person treatment get it, he offers no

12   evidence that this is the case because he cannot.  To the contrary, the availability of in-person

13   treatment is highly variable among different patients based on location, community resources,

14   ability to pay, and insurance coverage or lack thereof, among other factors.  (*Id.*)  Due to such

15   factors, many patients' best—and sometimes only—option for obtaining timely

16   treatment is through telemental health.  (*Id.*)  One of the many benefits of telemental

17   health is that it makes high quality psychological services available to patients limited by

18   geographic location, medical condition, psychiatric diagnosis, financial constraint or

19   other barriers.  (*Id.*)

20        Second, he cites to model telehealth-patient-consent language issued by the California

21   Department of Health Care Servies (CDHCS), which references the right of Medi-Cal recipients

22   to "in-person services."  Importantly, that model language and the "right to in-person services"

23   for Medi-Cal patients is based on California Welfare and Institutions Code § 14132.725(d), which

24   expressly excludes "inmates in state prisons, county jails, or youth correctional facilities."  *Id.* §

25   14132.725(d)(3).  Thus, this policy is clearly and specifically not intended for carceral settings

26   and does not give CDCR patients a right to in-person services.  There is no basis for substituting

27   the Special Master's preference for the considered judgment of California's elected officials.

28

Third, the Special Master's report cited ethical standards for social workers issued by the National Association of Social Workers (NASW), which state that social workers should assess their clients' "suitability and capacity for electronic and remote services" and help their clients identify alternate methods of service if they don't wish to use telehealth.[5]  The standard does not require that social workers provide—or that patients receive—in-person services simply because that is their preference.  Nor does it state that the provision of telesocial work in such situations does not meet the standard of care.  Nor does it create a legal requirement for providing in-person social-worker services to CDCR's patients.  Moreover, as discussed above, CDCR's policy already has provisions to ensure that patients who need in-person services receive them.

The Special Master's report did not discuss guidelines from the American Psychological Association (APA), which provide more detailed guidance on this issue and recommend only that patient preference should be considered—not dictate—whether telepsychology is used:

> [C]onsidering client/patient preferences for such services is important. However, it may not be solely determinative in the assessment of their appropriateness. Psychologists are encouraged to carefully examine the unique benefits of delivering telepsychology services (e.g., access to care, access to consulting services, client convenience, accommodating client special needs, etc.) relative to the unique risks (e.g., information security, emergency management, etc.) when determining whether or not to offer telepsychology services. Moreover, psychologists are aware of such other factors as geographic location, organizational culture, technological competence (both psychologist and client/patient), and, as appropriate, medical conditions, mental status and stability, psychiatric diagnosis, current or historic use of substances, treatment history, and therapeutic needs that may be relevant to assessing the appropriateness of the telepsychology services being offered.[6]

Further, it beggars belief that the Eighth Amendment *requires* inmates be given the option between in-person treatment and equally effective telemental health treatment.  The Eighth Amendment does not require that incarcerated patients receive their *preferred* course of treatment.  *Estelle*, 429 U.S. at 107 (no Eighth Amendment violation when the course of treatment offered was not what a plaintiff preferred); *Sanchez v. Vild*, 891 F.2d 240, 241-242 (9th Cir. 1989) (no Eighth Amendment violation where patient wanted surgery but received alternative

---

[5] NASW Code of Conduct at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Codeof-Ethics-English/Social-Workers-Ethical-Responsibilities-to-Clients, last accessed on May 15, 2024.

[6] APA Telepsychology Practice Guidelines at https://www.apa.org/practice/guidelines/telepsychology, last accessed on May 15, 2024.

23

1    treatments for his condition); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (to establish

2    an Eighth Amendment violation, a plaintiff must prove that the offered course of treatment was

3    medically unacceptable).  CDCR's constitutional obligation is to offer a medically adequate form

4    of treatment to class members and its telemental health policy satisfies that obligation.

5          Lastly, the Special Master's recommendation ignores the problematic nature of the rule he

6    proposes, which is that it enables and encourages clinician-shopping and manipulation by

7    patients.  (Decl. Penn ¶ 63.)  This is a concern specific to carceral settings.  (*Id.*)  Given that

8    psychologists and social workers are currently a limited resource, allowing 30,000 or so patients

9    to dictate who their provider is and their modality of treatment based on a purported preference

10   for either in-person or telemental health would create an unworkable system.

11         For these reasons, Defendants object to the Special Master's revisions to the telemental

12   health policy requiring that patients get to choose between on-site or telemental health services.

13   **IV.   DEENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL**
     **MASTER'S PROPOSED REVISIONS CONCERNING TELEPRESENTERS.**

14

15         CDCR's telemental health policy already requires clinicians to discuss the role of the

16   telepresenter when obtaining informed consent from patients.  (ECF No. 8165-2, Ex. D at 68.)

17   And as the Special Master's report noted, the parties previously agreed that: "Telepresenters are

18   not required to be in the room with the patient for the entirety of an encounter, though may be

19   requested to stay for part or all of an encounter at the telemental health provider's discretion."

20   (ECF No. 7935 at 3 (Parties' Joint Report on Telemental Health).)  CDCR's telemental health

21   policy adopted that exact language.  (ECF No. 8165-2, Ex. D at 72.)

22         As discussed by the parties during a meeting on CDCR's policy, the purpose of this

23   language is to allow either the patient or the clinician to request that the telepresenter leave the

24   room—something CDCR fully agrees with.  (Decl. Mehta ¶ 31.)  It is important, however, that

25   the telemental health provider have the final say regarding the presence of the telepresenter in

26   certain situations for patient safety, which is the reason for the policy's language.  (*Id.*)  There

27   may be clinical circumstances that require the presence of a telepresenter based on the clinician's

28   judgment, such as a patient who is in crisis and in need of observation until they can be safely

1   relocated, a patient who is acting bizarrely, or a patient with physical symptoms like tremors.

2   (*Id.*)  In light of the fact that the parties already agreed to this language in principal, the Special

3   Master's proposed revision to the policy is unnecessary and usurps the clinical judgement of

4   telemental health providers.

5        The Special Master proposed a revision that would require the provider to explain to

6   patients at the beginning of *every* telemental health appointment that they may request the

7   telepresenter to leave the room and then document that admonition *at every appointment*.  (ECF

8   No. 8165-1, App. B at 14.)  This requirement is unnecessary and would be onerous for the

9   clinician, frustrating to most patients, and would waste valuable appointment time.  (Decl. Mehta

10  ‖ 32.)  It is exactly the type of onerous documentation requirement that Dr. David testified hurts

11  CDCR's ability to retain staff.  (ECF No. 8019 at 8, fn. 2.)

12       The Special Master's report also asserted that the presence of a telepresenter compromises

13  confidentiality.  (ECF No. 8165 at 25.)  This is simply not true.  (Decl. Penn ‖ 72.)  Though

14  CDCR has never disagreed that the telepresenter can leave the room, subject to the provider's

15  clinical judgment, it is notable that many doctors in the community have clinical assistants

16  (similar to CDCR's medical assistants and telepresenters), nurses, or scribes in the room during

17  clinical encounters, and this is not considered a violation of confidentiality.  (Decl. Mehta ‖ 33.)

18  Like those medical staff, telepresenters are part of the treatment team, are bound by HIPAA

19  requirements, and must maintain confidentiality.  (*Id.*)

20       The Special Master's report notes that in the community, telemental health does not involve

21  the presence of telepresenters, as though this is a mark against CDCR's policy.  (ECF No. 8165 at

22  25.)  The opposite is true.  Telepresenters have real-time access to the patients' electronic health

23  records and are able to provide information about the patient that would not be available to

24  community telemental health providers, which provides CDCR telemental health providers with a

25  clinical advantage over community providers in assessing and treating their patients.  (Decl. Penn

26  ‖ 71.)

27       The Special Master's report raised a concern that backup telepresenters must be trained to

28  perform telepresenting duties, and added language to CDCR's policy purportedly to ensure that

25

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1   they are.  (ECF No. 8165 at 27.)  CDCR agrees that telepresenters must be trained, and that is

2   why its telemental health policy already states that institutions receiving telemental health

3   services are required to provide a "dedicated and appropriately clinically trained telepresenter

4   who facilitates the patient encounter from the originating site to the telemental health provider

5   and is responsible for providing clinical support and coordination." (ECF No. 8165-2, Ex. D at

6   71.)  CDCR's policy makes no exception to this training requirement for backup telepresenters,

7   nor does it allow for untrained staff to serve as telepresenters.  Defendants therefore object to the

8   proposed revisions, which are unnecessary.

9        The Special Master's proposed revision to the policy concerning when a psychologist's or

10   social worker's participation in a telemental health appointment as a backup telepresenter will

11   count as a joint appointment is also unnecessary.  (ECF No. 8165-1, App. B at 20.)  As the

12   Special Master's report notes, joint-appointment requirements are already set forth in the

13   February 7, 2020 Clinical Contacts and Documentation memorandum.  (ECF No. 8165 at 27.)  It

14   is therefore unnecessary and redundant to restate those requirements in CDCR's telemental health

15   policy.

16        For these reasons, Defendants object to all of the Special Master's proposed policy

17   revisions related to telepresenters.

18   **V.    DEFENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL MASTER'S PROPOSED REQUIREMENT FOR A MINIMUM NUMBER OF ON-SITE PROVIDERS.**

19

20        The impact a clinician has on the treatment milieu is not generally a modality-specific

21   issue.  (Decl. Mehta ¶ 34.)  An engaged clinician will frequently interact with the other staff and

22   positively contribute to the milieu whether they are using telepresence or not.  (*Id.*)  A clinician

23   with little engagement who does not frequently interact with the other staff will have less impact

24   on the milieu whether they are on site or not.  (*Id.*)  Moreover, it is a part of the telemental health

25   provider's job to hear about the environment for many hours each day, and they become highly

26   aware and acculturated to the physical environment.  (*Id.*)  Telemental health clinicians are also

27   able to promote best practices and bring fresh perspectives to the institution, as well as potential

28   experience from other institutions and healthcare organizations.  (*Id.*)

1      In support of his proposed restrictions on the use of telemental health—including his

2  proposed minimum number of on-site positions—the Special Master raises a number of

3  speculative concerns about things that *might* come to pass when CDCR's policy is fully

4  implemented.  For example, he speculates that "telemental health providers' relative

5  disconnection from their patients' uniquely challenging environment of care will impede the

6  clinicians' ability to positively impact the treatment milieu."  (ECF No. 8165 at 29.)  This concern

7  appears to be based, in part, on the faulty premise that telemental health providers will be

8  comprised of people who have "never stepped foot in a prison."  (*Id.*)  This notion ignores the

9  fact that CDCR's telemental health policy requires providers to visit the prisons to which they are

10  assigned.  (ECF No. 8165-2, Ex. D at 71.)  Moreover, CDCR's many years of experience with

11  telepsychiatry demonstrates that telemental health providers can appropriately impact the

12  treatment milieu through their relationships and interactions with custody staff, their frequent and

13  required attendance at all IDTTs, meetings, and huddles, and their day-to-day involvement in the

14  provision of mental health treatment at their assigned institutions.  (Decl. Mehta ¶ 36.)

15      The Special Master speculates that if mental health staff were not "fully immersed in the

16  carceral environment their patients reside in . . . the daily lives of many *Coleman* class members

17  *may likely* be very different than it is today."  (ECF No. 8165 at 28 (*emphasis added*).)  This

18  speculative concern is based on the faulty premise that under CDCR's policy there will be no on-

19  site mental health staff at the prisons.

20      The Special Master also assumes—without evidence—that only on-site mental health staff

21  can help "balance" the custody-related and mental health-related needs and enable collaboration

22  between custody and mental health staff.  (ECF No. 8165 at 29.)  This is a false assumption and

23  lacks any evidentiary support.  CDCR's experience with the telepsychiatry program demonstrates

24  that remote providers develop and maintain professional relationships and meaningfully engage

25  with custody staff on important issues related to mental health.  (Decl. Mehta ¶ 35.)  And as the

26  Special Master's report notes, CDCR has a Custody and Mental Health Partnership Plan to ensure

27  ongoing collaboration.  (ECF No. 8165 at 29.)  The Special Master's speculation therefore fails to

28  demonstrate that there would be any impact on the balance between custody and mental health

1  needs from CDCR's telemental health policy, much less an impact so severe that it would result

2  in constitutionaly inadequate care.

3     Delaying the adoption of proven treatment modalities based on speculation and false

4  assumptions causes real harm to patients.  (Decl. Mehta ⁋ 37.)  It does not protect patients, but

5  rather prevents them from receiving care.  (*Id.*)  The Special Master's baseless assumptions and

6  speculation do not support imposing unnecessary requirements for on-site staffing minimums,

7  particularly during a time of significant staffing shortages where imposing such restrictions would

8  result in fewer clinicians to provide patients with Program Guide required treatment.  The Special

9  Master's dire descriptions of psychologist and social worker staffing[7] cannot be reconciled with

10  his insistence on hobbling a policy designed to significantly improve staffing levels and patients'

11  access to care.

12     Furthermore, the Special Master provides no evidentiary or clinical basis for the arbitrary

13  20% minimum requirement for CCCMS or the 40% minimum requirement for EOP programs.

14  These minimums are made up out of whole cloth.  There are no state or national standards that

15  require these on-site minimums, nor did the Special Master's report reference any provider of

16  mental health services that requires them.  (Decl. Mehta ⁋ 38; Decl. Penn ⁋ 74.)  In Texas,

17  virtually all outpatient psychiatric care is provided via telepsychiatry and there is no minimum

18  on-site requirement.  (Decl. Penn ⁋ 74.)

19     Moreover, these proposed revisions to CDCR's policy are unworkable because CDCR does

20  not measure or track assignments to levels of care in this way.  (Decl. Mehta ⁋ 38.)  Clinicians in

21  all environments commonly cover caseloads for other clinicians wherever that is needed.  (*Id.*)

22  The Special Master's minimum requirements would limit the institutions' flexibility to assign

23  clinicians as necessary based on patient needs.  (*Id.*)  And although CDCR has long provided

24  staff allocations to the institutions based on court-mandated ratios, the institutions have always

25

26  ―――――――――――――
[7] For example, this statement from his Twenty-Eighth Round Monitorning Report: "Far and away the most disturbing development since the filing of the Twenty-Eighth Round Monitoring Report has been the vacancy rate explosion among primary clinicians (psychologists and social workers).  With the vacancy rates observed at some institutions, it was virtually impossible to provide anything close to Program Guide-compliant mental health care."  (Special Master's Report, ECF No. 7715 at 30.)

27

28

1 had the flexibility to assign those clinicians to the levels of care where they are needed, with the

2 results measured by compliance with Program Guide requirements.  (*Id.*)  Consequently, the

3 system is not designed to report how many clinicians are working with patients at specific levels

4 of care because that number can vary day to day.  (*Id.*)

5      Rather than imposing these arbitrary minimums, which would violate the PLRA, the Court

6 should permit CDCR to implement its policy subject to the Special Master's monitoring that

7 would surely report on any negative impacts on patient care, and if constitutionally required,

8 result in a remedial order.  For these reasons, Defendants object to the Special Master's revisions

9 requiring a minimum number of on-site staff.

10      The Special Master's proposed revisions to the policy also inserted a reference to hybrid

11 clinicians who would work part time on site and part time off site through telemental health.

12 (ECF No. 8165-1, App. B at 12.)  CDCR's telemental health policy does not encompass hybrid

13 work.  (Decl. Mehta ⁋ 39.)  If CDCR decides to implement a policy allowing for hybrid mental

14 health staff, it will do so in a separate policy.  (*Id.*)  The proposed reference to hybrid staff in the

15 telemental health policy is confusing and misplaced, and Defendants object to it.

16      The Special Master's proposed revisions to the policy also include a requirement that at

17 "least one of an EOP patient's assigned psychiatrist or assigned primary mental health clinician

18 must attend the IDTT in person unless the EOP supervising psychologist is in attendance on-site."

19 (ECF No. 8165-1, App. B at 14.)  There is no clinical basis for this requirement, nor is there a

20 standard of care that requires it.  (Decl. Mehta ⁋ 40.)  Furthermore, it does not comport with the

21 Program Guide, which only requires attendance by the assigned primary clinician, assigned

22 psychiatrist, correctional counselor, and patient.  (ECF No. 7333-1, Program Guide at 12-4-6.)

23 Accordingly, Defendants object to the revision.

24 **VI.    DEFENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL
        MASTER'S REVISIONS CONCERNING FREQUENCY AND DURATION OF ON-SITE**
25 **VISITS.**

26      There is no constitutional basis for a requirement that telemental health providers visit their

27 assigned prisons.  Nonetheless, CDCR's telemental health policy already requires that telemental

28 health providers visit their assigned prison within 30 days of assignment and visit on an annual

29

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1   basis thereafter.  (ECF No. 8165-2, Ex. D at 71.)  Each visit must be for at least one day.  (*Id.*)

2   During these visits, the provider will "participate in the IDTT, meet with necessary healthcare

3   staff, attend staff meetings if applicable on that day, and may see patients in person."  (*Id.*)

4       The Special Master asserts that prison visits by telemental health providers must be more

5   frequent and longer in duration because doing so would be more consistent with the Court-

6   imposed telepsychiatry policy.[8]  (ECF No. 8165 at 30.)  The Special Master presented no

7   evidence that this revision is required by the standard of care, is part of any guidelines concerning

8   the provision of telemental health, or is required by any community or correctional mental

9   healthcare providers.  Nor is it a requirement in Texas, where virtually all outpatient psychiatric

10  care is provided via telepsychiatry and there are no mandatory prison visits.  (Decl. Penn ¶ 80.)

11      There is no clinical basis for requiring mental healthcare providers to meet their patients

12  where they live or to spend time immersed in their environments.  (Decl. Mehta ¶ 41; *see also*

13  ECF No. 7702 at 23 (Defendant's response to recommendation for telepsychiatrist site visits.)  In

14  the community, the standard of care does not require this.  (Decl. Mehta ¶ 41; Decl. Penn ¶¶ 79-

15  80.)  Whether an appointment is at a community clinician's office or virtual, the clinician does

16  not typically experience or become physically immersed in their patient's environment.  (Decl.

17  Mehta ¶ 41.)

18      CDCR's telemental health clinicians can actually gain deeper insights about their patients

19  than community providers because they can easily talk to on-site prison staff who see the patients

20  in various settings outside of appointments and can confirm the veracity of reported issues—

21  something most community providers cannot do.  (Decl. Mehta ¶ 43.)  Moreover, under CDCR's

22  policy, telemental health providers are required to fully participate in all meetings that on-site

23  providers attend, including IDTT meetings, staff meetings, and huddles relevant to the clinical

24  care of their assigned patients.  (ECF No. 8165-2, Ex. D at 69; Decl. Mehta ¶ 7.)  Thus, CDCR's

25  policy ensures the telemental health providers are part of the treatment team, thereby preserving

26  the treatment milieu.

27          [8] The Court's order mandating the provisional telepsychiatry policy is currently on appeal
    before the Ninth Circuit and that order did not make specific findings concerning the merits of
28  Defendants' position concerning site visits by telepsychiatrists.  (ECF No. 7807.)

30

1    The Special Master has made no showing that the on-site-visitation aspect of CDCR's

2    telemental health policy somehow amounts to cruel and unusual punishment, or would otherwise

3    cause the care provided by telemental health workers to be constitutionally inadequate.  The

4    Special Master's report does not reference another telemental health system with on-site

5    requirements similar to those he proposes.  Nor are his proposed revisions required by the

6    standard of care or necessary to achieve adequate care.  (Decl. Mehta ¶ 41; Decl. Penn ¶¶ 79-80.)

7    A preference for more frequent visits is not sufficient grounds for the proposed revisions to the

8    policy, which would only serve to defeat the purpose of the policy by making employment at

9    CDCR less appealing to candidates who are interested in working as telemental health providers.

10    Defendants therefore object to the Special Master's proposed revision concerning the frequency

11    and duration of on-site visits.

12    **VII.   DEFENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL
         MASTER'S RECOMMENDATIONS AND REVISIONS CONCERNING CELL-FRONT
13       TELEMENTAL HEALTH.**

14    CDCR's policies allow for clinicians to conduct cell-front visits with their patients

15    who did not attend their appointment.  (Decl. Mehta ¶ 46.)  CDCR's telemental health

16    policy permits telemental health providers to conduct these cell-front visits and count

17    them towards Program Guide requirements in the same way cell-front visits by on-site

18    clinicians are counted.  (*Id.*)

19    The Special Master's proposed revisions state that if a patient does not refuse an

20    appointment in person, the telemental health clinician must "go to the patient to encourage the

21    patient to participate in a confidential contact, confirm the refusal, discuss the risks associated

22    with refusing treatment, and discuss the reasons for refusal."  (ECF No. 8165 at 31.)  Under the

23    Special Master's revisions, these cell-front visits only count towards Program Guide requirements

24    for on-site clinicians, not for telemental health clinicians.  (*Id.*)

25    The Special Master provides no rationale for this arbitrary rule aside from consistency with

26    the telepsychiatry policy.  Nor did the Special Master present any evidence supporting these

27    revisions to the policy and there is no standard of care that requires them.  (Decl. Mehta ¶

28    47; Decl. Penn ¶¶ 81-83.)  There is no clinical basis for only counting towards compliance

31

1    completion of these required cell-front visits by on-site clinicians.  (*Id.*)  During COVID-19, on-

2    site clinicians who were teleworking were permitted to conduct these cell-front visits and they

3    were counted towards Program Guide requirements.  (Decl. Mehta ¶ 47.)  The Special Master's

4    revision is arbitrary and internally inconsistent with goals of continuity of care.  (*Id.*)  CDCR has

5    the technological capacity to allow telemental health providers to conduct high quality cell-front

6    visits, and those visits should count towards compliance, as they do for on-site clinicians.  (*Id.*)

7        The Special Master's revisions would also prohibit cell-front contacts by telemental health

8    providers in Restrictive Housing Units (RHU).  (ECF No. 8165 at 30-31.)  The Special Master

9    provides no rational basis for this ban and there is no clinical evidence to support such a ban,

10   which would prevent telemental health clinicians from performing vital wellness checks on their

11   patients and observing the condition of their patients and the state of their cells.  (Decl. Mehta ¶

12   48.)

13       Clinicians can build rapport over time with their patients through wellness checks, and as

14   the Special Master's report notes in its recommendations for refusals, clinicians can encourage

15   their patients to come out to a confidential setting for more in depth conversation and educate

16   them about the risks of refusing their appointments. (*Id.*)  Regardless of whether it counts

17   towards program guide requirements, the Special Master's prohibition would hamper a clinician's

18   ability to perform duties essential to their role, and would cause unnecessary disruptions to

19   continuity of care.  (*Id.*)

20       The Special Master's cell-front-related revisions are unnecessary, not factually or legally

21   justified, and they undermine efforts to achieve continuity of care.  Defendants object to the

22   proposed revisions.

23   **VIII. DEFENDANTS OBJECT TO—AND THE COURT SHOULD REJECT—THE SPECIAL**
     **MASTER'S RECOMMENDATIONS AND REVISIONS CONCERNING THE USE OF**
24   **TELEMENTAL HEALTH FOR PARTICULAR PURPOSES OR IN SPECIFIC SETTINGS.**

25       **A.    Emergent/Urgent Referrals and Suicide Risk Assessments**

26       The Special Master's revisions prohibit telemental health providers from responding

27   to emergent/urgent mental health referrals or incidents involving danger to

28   self/suicidality/self-harm, and from performing suicide risk assessments, except as a last

                                              32

1  resort in emergency situations when the institution's assigned on-site personnel are not
2  available.  (ECF No. 8165 at 33.)

3       The prohibition is not evidence-based and is not consistent with community standards.
4  (Decl. Mehta ¶¶ 49-51; Decl. Penn ¶¶ 85-88.)  Emergency rooms and other acute care settings
5  commonly rely on telemental health to conduct crisis evaluations, including suicide risk
6  assessments.  (Decl. Mehta ¶ 50; Decl. Penn ¶ 85.)  In Texas, telemental health clinicians have
7  safely and effectively provided treatment and conducted evaluations of patients at extremely high
8  risk for self-harm and suicide for the past eight years.  (Decl. Penn ¶ 86.)

9       The best clinician for handling these types of urgent or emergent situations is the assigned
10 primary clinician, regardless of whether they work remotely or onsite.  (Decl. Mehta ¶ 50; Decl.
11 Penn ¶ 87.)  The Special Master's proposed prohibition disregards the clinical utility of
12 therapeutic rapport and familiarity with one's patients, would disrupt continuity of care, and
13 would unduly burden on-site clinical staff with responsibility for handling patient crises that
14 should be handled by the assigned primary clinician whenever possible.  (*Id.*)

15      Under the Special Master's revisions, a telemental health clinician who is engaged in
16 therapy with a patient who makes a statement indicating suicidality would be forced to end the
17 session and call an on-site clinician—who may know nothing about the patient—to intervene and
18 perform a suicide risk evaluation.  (Decl. Mehta ¶ 51.)

19      Defendants object to these policy revisions because they are unnecessary, potentially
20 harmful to the patients and to the therapeutic relationship, disrupt continuity of care, and there is
21 absolutely no clinical or evidence-based reason supporting them.

22      **B.    Group Treatment**
23      The Special Master's revisions also prohibit telemental health clinicians from
24 providing group treatment.  (ECF No. 8165 at 32.)  The Special Master cites no evidence or
25 standard of care that supports this prohibition, and provides no rationale for such a ban.  The
26 proposed restriction is unnecessary and unsupported by evidence.  (Decl. Mehta ¶¶ 52-53;
27 Decl. Penn ¶ 84.)

28

                                             33

Virtual group therapy has become a mainstay in community mental health treatment. (Decl. Mehta ‖ 53.)  There is no clinical evidence to support this prohibition, and it would infringe on telemental health clinicians' ability to perform core duties of their role, which would also unnecessarily place additional burdens on on-site clinical staff.  Defendants object to these revisions.  (Decl. Mehta ‖ 52; Decl. Penn ‖ 84.)

### C.   Five-Day Follow-Up Visits

CDCR requires clinicians to conduct five-day follow-up visits with patients who have transferred to a different level of care for the purpose of monitoring the patients in their new levels of care and documenting significant clinical information.  (Decl. Mehta ‖ 54.)  The Special Master proposed a revision that would prohibit telemental health providers from conducting these visits.  (ECF No. 8165 at 33.)

Though there is no requirement that five-day follow-ups be done cell front, the proposed prohibition on telemental health clinicians performing five-day follow-ups seems to be related to Special Master's proposed prohibition on telemental health cell-front visits.  (Decl. Mehta ‖ 55.) There is no clinical rationale supporting the prohibition, and it is internally inconsistent with other stated goals, such as continuity of care.  (Decl. Mehta ‖ 55; Decl. Penn ‖ 89.)  Defendants therefore object to the Special Master's proposed revisions concerning five-day follow-up visits.

### D.   Use-of-Force Incidents

The Special Master's revisions would also prohibit telemental health clinicians from intervening in use-of-force incidents.  (ECF No. 8165 at 34-35.)  Barring telemental health clinicians from speaking with their patients—who they know and with whom they have established a rapport—is not supported by evidence and could result in increased uses of force if assigned telemental health providers are not permitted to assist efforts to deescalate the situation. (Decl. Penn ‖ 91.)  Defendants objection to this revision.

### E.   Mental Health Crisis Bed Discharges

The Special Master's revisions also prohibit telemental health providers from performing mental health-crisis-bed (MHCB) discharges.  (ECF No. 8165-1, App. B at 17.)  This revision is unnecessary and it is not clear why the Special Master proposed it.  (Decl. Mehta ‖ 56.)  First,

34

1   CDCR's policy already places limitations on the use of telemental health in MHCBs.  (*Id.*)

2   Second, discharge from a MHCB is an IDTT determination, not a unilateral decision on the part

3   of one clinician.  (*Id.*)  Defendants object to these revisions.

4   **IX.   THE SPECIAL MASTER'S "FIGURE 1" CHART IS INCOMPLETE.**

5           The Special Master's "Figure 1" chart seems designed to give the impression that the

6   Special Master has only proposed a few minor changes to CDCR's telemental health policy.

7   (ECF No. 8165 at 35.)  This is not the case.  In fact, the Special Master's revisions make

8   numerous substantive changes to the policy, as can easily be seen in the red-lined draft of the

9   policy attached as Appendix B to the Special Master's report.  (Decl. Mehta ¶ 57; ECF No. 8165-

10  1, App. B.)  Many of his revisions are not included in the chart at Figure 1.  (Decl. Mehta ¶ 57.)

11  Taken together, the numerous substantive revisions, restrictions, and prohibitions completely

12  undermine the policy's intended purpose, which is to improve staffing and access to care.  (*Id.*)

13          The Special Master's "Figure 1" chart did not include many substantive and problematic

14  restrictions in the  revised policy, including the following:

15          •   Restrictions on telemental health clinicians' ability to respond to clinical emergencies,

16              including urgent/emergent referrals and incidents involving self-harm or suicidality,

17              and to perform suicide risk assessments;

18          •   Restrictions on performing five-day follow-ups;

19          •   Restrictions on providing group treatment;

20          •   Requiring written consent for the use of telemental health in RHU, and a ban on cell-

21              front contacts RHUs;

22          •   Prohibition on telemental health providers performing MHCB discharges;

23          •   Increased frequency and duration of site visits;

24          •   Changes to informed consent; and

25          •   Changes to the process for handling refusals.

26  (*Id.*)

27

28

35

1  **X.     THE SPECIAL MASTER OMITTED DISCUSSION OF SEVERAL OF THE PROPOSED RESTRICTIONS IN THE REPORT.**

The Special Master's proposed restrictions to CDCR's use of telemental health are not limited to those discussed in his report.  (Decl. Mehta ¶ 59.)  Some of those additional problematic restrictions are discussed below.

First, the Special Master requires that telemental health providers be fully licensed.  (ECF No. 8165-1, App. B.)  It is not CDCR's current intention to hire unlicensed telemental health clinicians because its initial focus is on hiring and deploying experienced telemental health clinicians as quickly as possible.  (Decl. Mehta ¶ 60.)  However, state regulations and community practices allow for unlicensed staff to see patients—both in person and via telehealth—under the supervision of a licensed clinician, and to receive such supervision remotely.  (*Id.*)  Moreover, the Program Guide allows the use of unlicensed psychologists and social workers and CDCR currently employees unlicensed psychologists and social workers on-site.  (Decl. Mehta ¶ __; ECF No. 7333-1, Program Guide at 12-1-10.)  The Special Master's basis for his revisions, which would treat telemental health providers differently, is not clear and would arbitrarily limit CDCR's ability meet staffing needs in the future.  (Decl. Mehta ¶ 60.)  This restriction lacks any reasonable justification, and Defendants therefore object to it.

In the "Purpose" section of CDCR's telemental health policy, the Special Master removes language describing CDCR's intention for the policy to reflect best practices in correctional settings and to update the policy periodically to maintain consistency with evolving best practices and advancements in care recommendations, and replaced that language with vague references to "relevant *Coleman* court orders" and "federal and state statutes."  (ECF No. 8165-1, App. B at 12.)  His report provides no rationale or discussion regarding these changes.  Technology is constantly advancing, and, as the COVID pandemic demonstrated, telehealth practices can evolve rapidly on a large scale.  (Decl. Mehta ¶ 61.)  A program committed to adhering to the highest standards in care must continually update itself in order to keep pace with the latest evidence and technological development.  (*Id.*)  There is no legitimate basis for the revisions, and the Court should reject them.

36

1   The Special Master's revisions also add language regarding the Americans with Disabilities

2   Act and the *Armstrong v. Newsom* class action.  (ECF No. 8165-1, App. B at 16.)  These revisions

3   are unnecessary because ADA- and *Armstrong*-related requirements are spelled out in separate

4   policies that apply to all clinicians in CDCR's system.  (Decl. Mehta ¶ 62.)  The Special Master's

5   report provided no rationale or discussion regarding these revisions, they are unnecessary, and

6   Defendants object to them.

7        The Special Master also made unnecessary revisions to the sections of CDCR's telemental

8   health policy that discuss equipment, physical environment, and telepresenters.  (ECF No. 8165-

9   1, App. B at 13.)  His report provides no rationale or discussion regarding these revisions, which

10  are generally redundant with other provisions in CDCR's telemental health policy or redundant

11  with other existing policies.  (Decl. Mehta ¶ 63.)  These revisions add no value to CDCR's

12  telemental health policy, they are unnecessary, and Defendants object to them.  (*Id.*)

13                                    **CONCLUSION**

14       CDCR's telemental health policy is supported by current standards of care, national

15  psychiatric and psychological organizations, the opinions of qualified experts who have extensive

16  experience providing mental healthcare through the tele-modality in carceral settings, and

17  CDCR's years of successfully using telepsychiatry to deliver mental health treatment and to

18  expand access to care for patients.  CDCR's policy was designed to ensure that mental health

19  Program Guide services extend to all who need them within CDCR's mental health program,

20  notwithstanding staffing, geographical, or other challenges.

21       The Special Master and Plaintiffs have not offered persuasive reasons supported by

22  empirical evidence to reject CDCR's policy in favor of the Special Master's revised policy, which

23  would unnecessarily place restrictions on the use of telemental health, undermine its potential to

24  impact current staffing shortages, and cause telemental health practitioners to avoid employment

25  with CDCR.

26       The record does not demonstrate that CDCR's telemental health policy will result in

27  constitutionally inadequate mental health treatment to class members.  Consequently, any order

28

1  enjoining CDCR from implementing its policy would violate the PLRA.  Defendants object to all

2  of the Special Master's recommendations and proposed revisions on this basis.

3       If the Court shares the Special Master's concerns about certain aspects of CDCR's

4  telemental health policy, it can order the Special Master to monitor the use of telemental health to

5  ensure that it provides constitutionally adequate treatment to patients.

6       Defendants respectfully request that the Court sustain Defendants' objections and reject the

7  Special Master's recommendations and proposed revisions to CDCR's telemental health policy.

8                          **CERTIFICATION**

9       In preparing this filing, Defendants' counsel certify that they have reviewed the following

10  relevant orders: ECF Nos. 640, 1773, 5711, 5850, 6230, 6539, 7807, 7830, 7901, 8087, and 8239.

11  This response sets forth arguments that have not been resolved by prior court orders as they are

12  specifically tailored to address the merits of Defendants' response to the Special Master's March

13  21, 2024 report on telemental health.  Counsel acknowledges this Court's prior orders concerning

14  telepsychiatry (ECF Nos. 5711, 5850, 6539, 7807, and 7830), but those orders do not foreclose

15  this response.  Counsel make this filing under their obligation to represent their clients zealously

16  under their right to relief under Fed. R. Civ. P. 62(c), *Operating Engineers Pension Trust v. A-C*

17  *Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988), and to satisfy Federal Rule of Appellate Procedure

18  8(a)(1)(A)'s requirement.  Counsel certify that they have conducted a reasonable inquiry and have

19  determined that this filing is well grounded in fact, legally tenable, and not presented for an

20  improper purpose, to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

21  Fed. R. Civ. P. 11(b)(1); and *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 393 (1990) (internal

22  quotation marks omitted).  Each factual contention made in this filing is supported by a reference

23  to evidence in the record and the legal contentions are warranted by existing law or by a

24  nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new

25  law.  Fed. R. Civ. P. 11(b)(2).

26

27

28

1  Dated:  May 28, 2024                          Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California
3                                                DAMON MCCLAIN
                                                 Supervising Deputy Attorney General
4

5                                                /s/ *Damon McClain*
                                                 Damon McClain
6                                                Supervising Deputy Attorney General
                                                 *Attorneys for Defendants*
7

8                                                 *HANSON BRIDGETT LLP*

9                                                */s/ Samantha D. Wolff*
                                                 *PAUL B. MELLO*
10                                               *SAMANTHA D. WOLFF*
                                                 *DAVID C. CASARRUBIAS*
11                                               *Attorneys for Defendants*

12  CF1997CS0003

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Resp.to Report and Proposed Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

# CERTIFICATE OF SERVICE

Case Name:   **Coleman v. Newsom, et al.,**          No.   **2:90-cv-00520 KJM-DB (PC)**

I hereby certify that on <u>May 28, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY (ECF NO. 8165)**

- **DECLARATION OF AMAR MEHTA, M.D. IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY**

- **DECLARATION OF JOSEPH PENN, MD, IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>May 28, 2024</u>, at San Francisco, California.

| G. Guardado | */s/ G. Guardado* |
|:---:|:---:|
| Declarant | Signature |

CF1997CS0003
44181502.docx