ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, State Bar No. 294114
DAVID C. CASARRUBIAS, State Bar No. 321994
CARSON R. NIELLO, State Bar No. 329970
HANSON BRIDGETT LLP
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF JOSEPH PENN, MD, IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY**<br><br>Judge:    The Honorable Kimberly J. Mueller |

I, Joseph V. Penn, MD, CCHP-MH, LFAPA, declare:

1.    I am a psychiatric physician based in Conroe, Texas. I attended medical school at the University of Texas Medical Branch (UTMB), Galveston, Texas, graduating in 1992. I completed seven years of specialty/subspecialty residency training—four years of general psychiatry in 1996 at Brown University, Providence, Rhode Island, two years of child and

1

1  adolescent psychiatry in 1998 at Brown University, Providence, Rhode Island, and one year of

2  forensic psychiatry, at Yale University, New Haven, Connecticut, in 1999.  My training and

3  qualifications are further detailed in my curriculum vitae (CV) and below.  (See Exhibit A.)  I

4  specialize in correctional medicine, specifically, correctional psychiatry.  I have dedicated my

5  thirty-two-year career to the psychiatric and mental health care of incarcerated individuals across

6  correctional settings.  I submit this declaration in support of Defendants' response to the

7  Special Master's Report and Proposed Telemental Health Policy.

8  **I.      EXPERIENCE IN TEXAS CORRECTIONAL HEALTH CARE**

9        2.      I am the Director of Mental Health Services of the University of Texas

10  Medical Branch (UTMB) Correctional Managed Care (CMC), a university-based

11  correctional health care system that provides correctional health care statewide in Texas.  I

12  have held this position since February 2008.  In my role as the UTMB CMC Director of

13  Mental Health Services, I oversee the provision of mental health services, including on-

14  site and telemental health services provided by psychiatrists, psychologists, social

15  workers, and other qualified mental health professionals to approximately 80% of the

16  entire Texas state jail and state adult prison population housed within the Texas

17  Department of Criminal Justice (TDCJ) facilities statewide, which currently exceeds

18  120,000 adult inmates).  The UTMB CMC sector currently has about 25,125 mental health

19  patients.  Of those patients about 24,000 are at an outpatient level of care—comparable to

20  CDCR's Clinical Case Management System (CCCMS) and Enhanced Outpatient (EOP)

21  levels of care—and about 1,125 are at an inpatient level of care.  Texas has maintained the

22  largest state prison population nationally for many years.  When I began working at

23  UTMB CMC in 2008, it already had robust telemedicine and telepsychiatry programs in

24  place.

25        3.      I also manage the psychiatric services to approximately 700 youths housed

26  statewide within secure state school residential facilities in the Texas Juvenile Justice

27  Department (TJJD), the State of Texas's state juvenile correctional system.

28  Approximately seventy percent of these youth offenders are on psychotropic medications

and the state successfully delivers all psychiatric treatment to this population of patients via telepsychiatry. I also oversee the delivery of supplemental telepsychiatry services to county jail inmates detained in the Bexar County Jail, San Antonio, Texas. I previously oversaw telepsychiatry service delivery to county jails in Angleton, Galveston, and Victoria, Texas. I also had clinical and administrative oversight of on-site psychiatric services that UTMB-CMC previously provided at four Federal Bureau of Prison units in Beaumont, Texas.

4.      I have continued to provide direct patient care and "on-call" after hours coverage to incarcerated adults and youths in Texas since 2008. Throughout my 16 years of experience as the UTMB-CMC mental health services director, I have overseen approximately 320 mental health staff including psychiatrists, psychologists, social workers, mental health managers and clinicians, case managers, psychiatric nurse practitioners, psychiatric physician assistants, and other qualified mental health professionals and student trainees across the state. I provide both clinical and administrative support, peer review, oversight, quality assurance, supervision, and leadership. I review and co-sign at least ten percent of the charts of psychiatric nurse practitioners and physician assistants that I directly supervise. I also routinely conduct peer reviews of psychiatrists, psychiatric nurse practitioners, and psychiatric physician assistants. I also routinely conduct chart reviews and respond to inquiries regarding quality of care, administrative reviews, quality reviews, and mental health morbidity and mortality reviews.

5.      I have overseen the implementation and expansion of weekend telemental health and telepsychiatry services to TDCJ state jail and state prison patients across the UTMB sector statewide. This program, referred to as the Weekend CDO (Constant and Direct Observation) Program, was implemented in December 2016 and has been successfully used to provide telemental health and telepsychiatry services to inmate patients who have engaged in self-harm and/or suicide attempts, demonstrated clinical acuity, and have medical orders for a transfer to crisis management unit and inpatient psychiatric prison unit admission. They have been placed on suicide watch precautions, with one assigned TDCJ correctional officer monitoring them twenty-four hours per day via constant and direct observation watch status. The weekend

1   program has been used safely and effectively across the state of Texas for approximately eight

2   years.

3         6.      I have direct experience and familiarity regarding the regular work week (e.g.,

4   Mondays through Fridays) use of telemental health and telepsychology in the TDCJ system to

5   improve access and continuity of mental health and psychiatric care across the State of Texas.

6   TDCJ has 100 state jails and state prisons across the entire state of Texas.  Texas Tech University

7   Health Sciences Center Correctional Managed Care provides services to 20 male only facilities on

8   the west side of Texas.  UTMB-CMC provides mental health services and specialized treatment

9   programs at 80 TDCJ facilities which include both males and females, and other special

10  populations, for example, intellectually impaired inmates [e.g., at the Developmentally Disabled

11  Program (DDP), separate male and female DDP programs, youthful offender program (juvenile

12  inmates), Death Row male and female inmates, BAMBI (Baby and Mother Bonding Initiative

13  Program) for postpartum female inmates and their infants or toddlers, and other specialized

14  mental health treatment programs such as the TARPP (Treatment and Relapse Prevention

15  Program), Mental Health Therapeutic Diversion Program (MHTDP) for high custody level males

16  and females in restrictive housing settings (formerly known as administrative segregation) with

17  mental disorders.  UTMB-CMC has utilized telemental health and telepsychology to improve

18  access to care and continuity of care to non-mental health caseload units, which are units that do

19  not house inmates on the mental-health caseload.  Should an inmate present with any mental

20  health request, concern, or risk of self-harm or suicide or homicide, or demonstrate any

21  impairments in their functioning and activities of daily living while housed in a non-mental health

22  caseload TDCJ prison unit, UTMB CMC nursing or medical staff, can and do refer the inmate

23  patient, typically the same or next day to be seen via telemental health using remote

24  videoconferencing by an off-site qualified mental health professional.  A mental health

25  assessment or full mental health evaluation is readily completed in a timely manner via telemental

26  health services.  The mental health professional has the ability at all times to speak directly with

27  unit based nursing staff, medical staff, custody staff, and other staff if needed.  The telemental

28  health clinician has the option of recommending an immediate referral to crisis management,

4

1  transfer to a designated state prison inpatient behavioral health facility (there are three in Texas),

2  placement on suicide watch/CDO precautions, the provision of supportive psychotherapy (e.g.,

3  individual counseling), an immediate referral to a psychiatrist or other psychiatric provider for

4  further diagnostic evaluation and consideration of psychotropic medication(s), that the patient be

5  transferred to a mental-health-caseload unit for further mental health evaluation and treatment, or

6  re-assessment/re-evaluation by the same or a different mental health clinician or a telepsychiatric

7  provider that same day or the next day via telemental health or telepsychiatry.

8      7.    I have also been directly involved in the review and acceptance or deferral of female

9  TDCJ inmates who are currently pregnant and have co-occurring medical or mental health and

10  substance use disorders into the TDCJ BAMBI (Baby and Mother Bonding Initiative Program). I

11  also oversee the telepsychiatry and telemental health services that are readily provided or made

12  available to these patients.

13      8.    Although I do not oversee psychology services or the use of telepsychology for

14  youths within the TJJD, I have familiarity with both.  I am particularly aware that during the

15  COVID-19 pandemic, in an effort to ensure access to care and continuity of care, TJJD

16  psychology staff utilized telepsychology statewide to evaluate, diagnose, treat, and provide

17  psychological services (e.g., such as individual psychotherapy) to high risk youths, youths

18  engaging in self-harm or suicide attempts, youths with psychotic symptoms, youths with impulse

19  control and severe behavioral issues including aggression and assaultive and destructive

20  behaviors, and that these mental health services were safely delivered via telepsychology.

21  Furthermore, there were no adverse criticisms by patients, families, guardians, or external

22  stakeholders, and no patient-safety issues or adverse outcomes.

23      9.    Frequently, I provide clinical support, prescribe, order, reorder or adjust inmate

24  patients' psychotropic medications and provide other consultation and behavioral treatment

25  recommendations to mental health, nursing, and medical treatment staff and to custody leadership

26  in the TDCJ and TJJD and infrequently to Bexar County Jail.  Periodically, I evaluate TDCJ and

27  TJJD patients in person or via telepsychiatry at a variety of locations.  I also participate in system-

28  wide psychiatric on-call duties for both TDCJ and TJJD.

10.     In addition to my Director of Mental Health Services role, during separate periods due to clinical director vacancies, I served as the acting clinical director (lead psychiatrist) and oversaw the care of more than 500 inmate patients admitted as inpatients to crisis management, diagnostic and evaluation and other specialized treatment tracks admitted to two dedicated TDCJ state prison behavioral health facility psychiatric prison units.  These inmates were housed at two of three TDCJ dedicated psychiatric inpatient/behavioral health facility units located in Texas.  I am also routinely involved in the referral, acceptance, and admission and transfers or discharges of inmate patients within the state's three dedicated TDCJ inpatient psychiatric prison units from the community, local emergency departments, hospitals, county jails, psychiatric state hospitals, or other TDCJ outpatient units.

11.     When needed, I also consult and oversee the evaluation and management of particularly complicated state prison inmate patients across TDCJ outpatient units, TDCJ inpatient/behavioral health facility prison units, stepdown [chronic mentally ill programs], and medical/psychiatric inpatients housed in TDCJ medical infirmary prison units or within our specialty medical surgical hospital, a maximum security prison unit, Hospital Galveston, on the grounds of the UTMB academic medical center, and other UTMB complex hospitals in Galveston, Texas.

12.     Some examples of additional special populations and programs that I directly oversee include the provision of telepsychiatry services to youths sentenced to TDCJ and housed in the Youthful Offender Programs.  I also oversaw the development and implementation of several Mental Health Therapeutic Diversion Treatment Programs for male and female inmates on the mental health caseload who were previously housed in restrictive housing settings.

13.     I have additional recent experience in the provision of telepsychiatry and short-term mental health and psychiatric treatment and management for undocumented migrant confinees with pending state charges at several state jail units in South Texas as part of the Operation Lone Star Program.  I have been directly involved in the evaluation, clinical management, and psychopharmacological treatment of several migrant confinees and in clinical decision-making and management of many of these confinees.

6

14.    With regard to my direct clinical and administrative experience within jail settings, I supervise telepsychiatry services that UTMB-CMC provides to jail inmates at the Bexar County Jail, San Antonio, Texas through a contract with University Health Services—a contracted medical and mental health care services provider.  I am credentialed as a University Health Services psychiatrist and remain available to provide telepsychiatry services and psychiatric consultation to Bexar County Jail inmates.  I periodically tour the Bexar County Jail and meet with other mental health, psychiatric, medical, nursing, and pharmacy staff and the University Health Services clinical and administrative leadership.  I also had previous direct clinical involvement and administrative oversight of mental health and psychiatric services that UTMB-CMC provided to three county jails, specifically the Victoria County Jail, Victoria, Texas, Galveston County Jail, Galveston, Texas and Brazoria County Jail in Angleton, Texas.

15.    I am also particularly knowledgeable—and maintain daily direct clinical and administrative involvement—in establishing access to mental health and psychiatric care and continuity of care in the Texas state prison system regardless of the medical or mental health need and acuity, current medical comorbid issues (e.g., cardiac, liver, end stage kidney disease, dialysis dependent, delirium, neurocognitive disorders, and other medical comorbidities) or infectious diseases (e.g., COVID-19, tuberculosis, Candida auris, Hepatitis B and C, HIV) across a variety of custody levels.  This includes restrictive housing settings, suicide prevention, psychiatric and mental health evaluations and follow-up in person or via telepsychiatry or telemental health, and other treatment practices and modalities within state prison correctional settings.

**II.    ADDITIONAL TRAINING AND BACKGROUND**

16.    I am triple board-certified in forensic psychiatry, general psychiatry, and child and adolescent psychiatry.  All these boards are under the American Board of Psychiatry and Neurology (ABPN); this is a member board of the American Board of Medical Specialties that grants board certification for psychiatrists and neurologists in the United States.  I am fully licensed as a health care professional, specifically as a medical doctor, to practice medicine in Texas.

17. I provided direct patient care and forensic psychiatry consultation in Rhode Island for approximately fifteen years, nine of these working primarily within juvenile correctional settings, and in Connecticut for one year.

18. Since 1999 I have focused my clinical, administrative, and forensic work within correctional settings including adult and juvenile detention facilities, jails, and prisons, and non-correctional civil detention such as Immigration and Customs Enforcement (ICE) facilities.

19. Additionally, I have achieved and maintained specialized certification as a Certified Correctional Health Professional-Mental Health (CCHP-MH) since 2004 by the National Commission on Correctional Health Care (NCCHC)—a national organization that provides health care accreditation of jails and short-term detention facilities, prisons, juvenile facilities, mental health treatment programs, and opioid treatment programs in correctional facilities. This requires passing of a written national examination, demonstration of proficiency in national correctional health standards, annual attestation of continuing medical education credits, full medical licensure without restrictions, and annual re-certification.

20. I attend state, national, and international medical and health care meetings and have completed continuing medical education and maintenance of certification requirements to achieve and maintain my status as a triple board-certified psychiatrist. I previously served as a board examiner for the ABPN in the areas of general adult psychiatry and child and adolescent psychiatry, on the general psychiatry recertification committee, and on the forensic psychiatry committee. I currently serve on the ABPN's Forensic Psychiatry Maintenance of Certification (MOC) Committee.

21. I remain current in the evaluation, diagnosis, and treatment of individuals within both correctional, forensic, and non-correctional non-forensic settings, as demonstrated by my national board re-certification and maintenance of certification within general, child and adolescent, and forensic psychiatry. I remain knowledgeable in clinical and administrative psychiatry through my leadership work at the national and state level within the American Academy of Psychiatry and the Law, American Psychiatric Association (APA), American Academy of Child and Adolescent

8

1   Psychiatry, Texas Society of Psychiatric Physicians—the state district branch of the APA, the

2   American College of Psychiatrists—and through other medical and psychiatric organizations.

3       22.    I have extensive experience in examining and consulting to various systems regarding

4   improving access to care and continuity of care within correctional settings.  I am familiar with

5   mental health and psychiatric best practices, including suicide prevention policies and practices

6   within juvenile and adult correctional settings nationally.  I have also published and presented in

7   the areas of correctional mental health care and suicide prevention at state, national, and

8   international meetings.

9       23.    I have served on several national task forces and committees and have published on

10  the use of psychotropic medications within correctional settings.

11
12  **III.    PUBLICATIONS, PRESENTATIONS, ACADEMICS, AND PROFESSIONAL ORGANIZATIONS**

13      24.    With regard to my academic work and clinical teaching roles, I am a Clinical

14  Professor, Department of Psychiatry and Behavioral Sciences, UTMB, Galveston, Texas.  I was

15  previously Clinical Associate Professor in the Department of Psychiatry and Human Behavior, at

16  Brown University and the Warren Alpert Medical School, Providence, Rhode Island.  I provide

17  clinical supervision to several psychiatrists, psychiatric nurse practitioners, physician assistants,

18  and student trainees.  I provide grand rounds, lectures, and trainings on a variety of forensic

19  psychiatry and correctional psychiatry topics at several medical schools and residency/fellowship

20  training programs, to clinical faculty, psychiatry residents, medical students, physician assistant

21  students and other trainees, treatment program staff, and other professional organizations.  I am

22  frequently invited to lecture in-state, nationally, and internationally.

23      25.    I have published extensively in scientific journals and other peer reviewed

24  publications in the areas of correctional-health patient care, mental health needs of youths, adults,

25  and geriatric inmates, correctional mental health, continuity of care of incarcerated individuals

26  with mental illness and substance abuse issues, and suicide prevention topics.  I have been

27  appointed to councils, committees, work groups, task forces, and made numerous national and

28

1  international contributions to mental-health organizations, including the APA, the American

2  Academy of Child and Adolescent Psychiatry, the American Academy of Psychiatry and the Law,

3  the International Association for Correctional and Forensic Psychology, and the American

4  College of Correctional Physicians.  Although I am no longer a member of the APA Council on

5  Psychiatry and Law, I was invited to consult as a reviewer on a draft APA position statement on

6  the use of telepsychiatry within correctional settings.

7       26.  I have provided guidance and consultation to other jail and prison systems in the

8  United States and the United Kingdom.  I have published and presented on numerous topics

9  regarding incarcerated individuals with mental health and substance abuse, special populations,

10  and suicide prevention.  Some of my more recent publications include *Psychiatric Services in*

11  *Correctional Facilities: A Work Group Report of the American Psychiatric Association*, the

12  chapter, "Standards and Accreditation for Jails, Prisons, and Juvenile Facilities," in the Oxford

13  Textbook of Correctional Psychiatry, and the chapter, "Correctional Psychiatry" in a recent

14  edition of the Kaplan and Sadock's *Comprehensive Textbook on Psychiatry*.  I was a lead author

15  in two recent versions of the American Academy of Psychiatry and the Law's "Resource

16  Document for Prescribing in Corrections," and a separate "Resource Document for Prescribing in

17  Juvenile Justice/Correctional Settings."

18       27.  I have presented and consulted nationally on correctional and non-correctional mental

19  health care delivery and standards of care.  Some recent examples include: the Office of the

20  California Attorney General regarding the California Department of Corrections and

21  Rehabilitations; Office of the Nevada Attorney General regarding the Nevada Department of

22  Corrections; Office of the Colorado Attorney General regarding the Colorado Department of

23  Corrections; Office of the Rhode Island Attorney General regarding the Rhode Island Department

24  of Corrections; Office of the North Carolina Attorney General regarding the North Carolina

25  Department of Corrections; Sacramento County Jail, Rio Cosumnes Correctional Center and Yolo

26  County Jail, and other surrounding county jails; the Wake County Jail, Raleigh, North Carolina,

27  and recently, the San Diego County Jail, San Diego, California.  I have also served as a Technical

28  Assistance Project Consultant, U.S. Department of Justice in several states regarding jails,

prisons, ICE facilities, and tribal nation correctional facilities, National Institute of Corrections; Technical Assistance to New York County Jails, Valhalla, New York; Consultant to the State of Vermont Department of Corrections; and Consultant, National Institute of Mental Health regarding ICE detainees; and Consultant to the US Marshals Service regarding suicide prevention efforts (other examples are listed in my CV).

28.    I have undergone specialized initial and ongoing training and served as a physician surveyor for the NCCHC.  I have surveyed several major metropolitan county jails, and short term detention facilities.  I am a past chair of the NCCHC accreditation and standards committee and continue to serve as a committee member.  I have served on several NCCHC standards revision task-force groups to revise the NCCHC health care standards: NCCHC Standards for Health Services in Jails and Prisons, NCCHC Standards for Mental Health Services in Correctional Facilities, and the NCCHC Juvenile Health Standards.

29.    I am actively involved at a national level in a leadership role within several psychiatric organizations.  I recently served on the Council of the American Academy of Psychiatry and the Law (AAPL) and am also the AAPL representative to the NCCHC Board of Directors.  I am the co-chair of the American Academy of Psychiatry and the Law Correctional Forensic Psychiatry Committee.  I am also a past chair of the AAPL's Suicidology committee, a committee focused on suicide phenomenology and suicide assessment and prevention, and remain an active committee member.  I also serve on the AAPL Government Action Committee and its Media and Public Relations and Rappeport Fellowship Committees.  I also serve on the American Academy of Child and Adolescent Psychiatry's Children and the Law committee.  I was previously the American Academy of Child and Adolescent Psychiatry's representative to the NCCHC Board of Directors and am now the AAPL representative.  I am a past chair of the NCCHC Board of Directors.  I have served as the NCCHC Board Chair for two different terms over three-year cycles.

30.    I have guided the development of correctional psychiatry resource documents, publications, policy, best practices, and position statements within the APA, the AAPL, the American Academy of Child and Adolescent Psychiatry, and the Texas Society of Psychiatric

1    Physicians.  I am a past president of the Texas Society of Psychiatric Physicians, the Texas

2    statewide branch of the APA.  I am also involved at a state level and have testified at the Texas

3    State Capital on a variety of psychiatric, correctional, and forensic psychiatry and mental health

4    issues.

5         31.    In addition to these leadership roles, I previously served on the behavioral health

6    committee and the health care committee of the American Correctional Association, which also

7    provides accreditation of correctional facilities nationally.  I am also a past board member of the

8    American College of Correctional Physicians.

9         32.    I maintain ongoing communication with other correctional professionals who provide

10   direct clinical, administrative, and/or consultative work within correctional settings across the

11   United States and several other countries.  I frequently attend and present at correctional health

12   and other correctional related conferences and serve on several committees, as described earlier,

13   including those conferences organized by the NCCHC, and the American Correctional

14   Association.  I am currently on the NCCHC Mental Health Standards Revision task force.  I

15   previously served on the two most recent NCCHC task forces/work groups that were responsible

16   for revising the separate NCCHC standards for jails and prisons in 2014 and 2018.  I was recently

17   appointed to the most current NCCHC jails and prisons standards revision task force.  I have

18   participated in various APA, AAPL, and American Academy of Child and Adolescent Psychiatry

19   committees and task force/work groups with relevance to adult and juvenile correctional health,

20   suicide prevention policies and best practices, and the development of correctional standards and

21   position statements.  I am frequently contacted and consulted regarding policies, procedures, best

22   practices, and how to provide access to care, continuity of care, and implement efficient

23   psychiatric and mental health care to jails, prisons, juvenile, and other correctional settings.

24        33.    Through these various experiences and my ongoing continuing medical education, I

25   remain current in best practices for correctional psychiatry and mental health care services.

26   Further, I continually review emerging correctional health research and evidence-based practices

27   and quality improvement initiatives.

28

## IV.    EXPERT CONSULTATION

34.    I have been qualified as an Expert Witness in various State and Federal Courts in the field of forensic, child and adolescent, and correctional psychiatry (1998-present), and have given expert opinion in several areas, for example, standards of care in jails, prisons, juvenile correctional facilities and other settings.  I have also provided expert opinion regarding the use of telepsychiatry, psychotropic medications, psychic harm, PTSD, suicide, suicide prevention, suicide risk assessment, seclusion and restraint, restrictive housing in correctional settings, transgender inmates with or without gender dysphoria, and other issues related to correctional psychiatry and mental healthcare.

35.    From 2013-2014, I was a correctional psychiatric consultant to the Special Master, *Coleman v. Brown*, et al., United States District Court for the Eastern District of California.  From 2017-2019 I served as a consultant to the State of California's Office of the Attorney General regarding psychiatrists, psychologists, and other mental health staffing, and the use of telepsychiatry.  I have previously toured several CDCR prison facilities, interviewed CDCR psychiatrists, psychologists, social workers, and other health care staff, including unit-based, regional, and senior leadership staff.  My onsite evaluations and tours were focused on access and continuity of care for restrictive housing units and specialty programs for different classifications of CDCR inmates with various medical and mental health needs.

36.    Since 1998, I have conducted numerous evaluations and site tours of various state prisons in Rhode Island, Vermont, Texas, California, Arizona, several county jails across the United States, juvenile detention facilities in Florida, Colorado, and Puerto Rico, and ICE facilities across various jurisdictions.  I have toured numerous high security restrictive housing settings.  Based upon my experience, I am familiar with different custody and housing levels, inmate movement for various activities and other operational issues.  I have a fundamental understanding and appreciation of the impact and interplay between correctional custody and mental health delivery in custodial situations.

37.    Regarding my work as a correctional and forensic psychiatrist, I am not solely a plaintiff or defense expert, nor a monitor or a member of a monitor team.  When possible, I

13

1    attempt to balance my consulting work as a court appointed expert, plaintiff expert, and defense

2    expert.  A list of my depositions and trial testimony is attached.  (See Exhibit B).  My fee

3    schedule is also attached.  (See Exhibit C).

4                **OPINIONS REGARDING CDCR'S TELEMENTAL HEALTH POLICY**

5        38.    Due to my direct work experience and career focus on correctional psychiatry

6    and mental health, and my work within organized psychiatry, correctional and forensic

7    psychiatry at a state and national level, I believe that I am uniquely qualified to render

8    opinions regarding the provision of telemental health and CDCR's Telemental Health

9    Policy.

10       39.    In preparing this declaration, I have reviewed:

11            a.    CDCR's Telemental Health Policy;

12            b.    ECF No. 8087, Court Order (regarding Telemental Health);

13            c.    ECF No. 7901, Court Order (regarding Telemental Health);

14            d.    ECF No. 8095, Special Master's Thirtieth Round Monitoring Report—

15                 Part C;

16            e.    ECF No. 7935, The Parties' Joint Report to the Court on the Telemental

17                 Health Policy;

18            f.    ECF No. 8165, The Special Master's Report and Proposed Telemental

19                 Health Policy;

20            g.    Expert Economic Report of Erica Greulich, Ph.D., and Jessica Dutra,

21                 Ph.D.: Impact of Labor Market Conditions and CDCR's Initiatives on

22                 the Employment of Mental Health Professionals (Attached as Exhibit

23                 D);

24            h.    ECF No. 7702-1, Declaration of Joseph Penn, M.D., in Support of

25                 Defendants' Position on the Use of Telepsychiatry;

26            i.    ECF No. 5873-2, Expert Report of Joseph Penn, MD, CCHP, FAPA:

27                 Telepsychiatry in Correctional Healthcare; and

28

j.   ECF No. 7682-1, Declaration of Joseph Penn, M.D., in Support of

Defendants' Position on the Use of Telepsychiatry;

40.   I also conducted a literature review of published articles and studies related to telemental health.  I attach a list of the reviewed articles and studies.  (See Exhibit E.)  I also reviewed online resources from the American Psychiatric Association and the American Psychology Association, as discussed below.

41.   All opinions stated in this document are based upon my years of training, my 16 years of experience overseeing a large correctional mental health program in the largest state prison system in the United States, my experiences working in and visiting mental health programs in various jurisdictions, my experience with the provision of telepsychiatry and telemental health services, my review of the records, my extensive knowledge and understanding of professional standards and ethics, and a reasonable degree of medical certainty.

42.   It is my opinion that the use of telemental health, and in particular telepsychology and telesocial work, comport with or exceed the correctional and community standard of care and can be integral and instrumental in ensuring the timely provision of quality mental health care and continuity of care.

**V.     CDCR's Telemental Health Policy**

43.    I have carefully reviewed CDCR's telemental health policy.  I understand that CDCR refers to psychologists and social workers as primary clinicians, that there is large overlap between the scope of their duties, and that both classifications provide mental health treatment to CDCR state prison inmate-patients.  I further understand that CDCR's telemental health policy permits psychologists and social workers to provide mental-health services to patients via telemedicine, and that the **policy's purpose is to supplement—not replace—CDCR's on-site primary mental health clinicians**.

44.   I further understand that CDCR refers to telepsychologists and telesocial workers collectively as "telemental health clinicians" or "telemental health providers."  I have adopted these terms for the purposes of this declaration.

45.     It is my opinion that CDCR's telemental health policy is well drafted to implement a telemental health program that will meet or exceed the standard of care, help CDCR meet its staffing needs, and improve access to care for CDCR's patients.

46.     As discussed in more detail below, it is my opinion that the Special Master's proposed revisions to CDCR's telemental health policy are either unnecessary or in some cases problematic because they potentially put patients at greater risk of harm or are disruptive to continuity of care.  And as discussed below, many of the Special Master's revisions are not supported by medical evidence or standards of care.

## VI.    LITERATURE REVIEW

47.     I have conducted a review of all current and recent scientific publications regarding the use of telemental health in community, forensic, and correctional settings. The literature supporting telemental health is not currently as robust as that supporting telepsychiatry, but the most recent studies are overwhelmingly positive regarding the safety and effectiveness of telemental health.  I found no published literature that describes harm or risks of harm through the use of telemental health as clinically indicated.  And I found no published studies that conclude that telemental health is generally contraindicated for any cohort or classification of patients.  This is consistent with my own extensive experience in practicing in and overseeing telepsychiatry programs and overseeing telemental health programs.

48.     My opinions regarding the telemental health modality comport with the following statement from the American Psychological Association:

> Technology offers the opportunity to increase client/patient access to psychological services. Service recipients limited by geographic location, medical condition, psychiatric diagnosis, financial constraint or other barriers may gain access to high quality psychological services through the use of technology. Technology also facilitates the delivery of psychological services by new methods (e.g., online psychoeducation, therapy delivered over interactive videoconferencing), and augments traditional in-person psychological services.[1]

---

[1] https://www.apa.org/practice/guidelines/telepsychology, last accessed May 24, 2024.

49.    Moreover, the fact that the American Psychological Association has promulgated guidelines for the practice of telepsychology demonstrates that this modality is **widely accepted, widely utilized, and expanding in use for the provision of mental healthcare.**  The American Psychological Association, the leading scientific and professional organization representing psychology in the United States, with more than 157,000 researchers, educators, clinicians, consultants, and students as its members agrees with this assessment regarding the use of telepsychology:

> The increased use of technology for the delivery of some types of services by psychologists who are health service providers is suggested by recent survey data collected by the APA Center for Workforce Studies (APA Center for Workforce Studies, 2008), and in the increasing discussion of telepsychology in the professional literature (Baker & Bufka, 2011). **Together with the increasing use and payment for the provision of telehealth services by Medicare and private industry,** the development of national guidelines for the practice of telepsychology is timely and needed. Furthermore, state and international psychological associations have developed or are beginning to develop guidelines for the provision of psychological services (Ohio Psychological Association, 2010; Canadian Psychological Association, 2006; New Zealand Psychological Association, 2011).[2]

50.    Given the trend of recent studies demonstrating the effectiveness of telemental health, the fact that professional organizations are embracing the modality and developing guidelines for its use, and that fact that Medicare and private industry will pay for telemental health services, the lack of an even more robust literature on telemental health does not support the Special Master's proposed restrictions on CDCR's use of the modality.  Such restrictions can cause real harm to patients who would have better access to mental health care and better continuity of mental health care under CDCR's telemental health policy, especially if it is effective at substantially increasing CDCR's staffing levels.

51.    In medicine, there are rarely definitive scientific studies demonstrating that a particular treatment is safe and effective for all conceivable groups of patients under all conceivable clinical circumstances.  It is therefore medically acceptable to draw

---

[2] *Id.* (emphasis added)

1  reasonable inferences from studies that do not precisely match the specific clinical

2  circumstances at issue.  Physicians and other health care professionals rely on existing

3  empirical literature to guide their clinical approach to patients.  Here, it is perfectly

4  reasonable to consider community-based studies and literature as strong evidence that

5  telemental health will work equally well in a state prison context.  **The community-based**

6  **studies—and moreover some prison-based studies—indicate that telemental health is**

7  **generally a safe and effective modality for providing mental-health services**, which

8  obviates the need for the Special Master's proposed restrictions on its use.

9      52.    In my direct clinical and administrative work in the largest state prison system in the

10  United States, I have direct experience with the many uses and benefits of telepsychiatry and

11  telemental health in improving access to care and continuity of care.  Based on my experience, it

12  is my professional opinion that CDCR's telemental health policy will bring the same

13  improvements to CDCR's provision of mental healthcare to its patients.

14  **VII.    ROLES OF PSYCHIATRISTS AND PRIMARY CLINICIANS**

15      53.    Given the fact that existing studies indicate that telemental health is a safe and

16  effective treatment modality, the import of distinctions between the roles of psychiatrists

17  and primary clinicians drawn by the Special Master's report is unclear.  But one of the

18  Special Master's findings—specifically that primary clinicians typically discuss private,

19  sensitive and confidential matters with their patients while psychiatrists only discuss

20  medication management—is incorrect.

21      54.    Based on my experience, psychiatrists frequently discuss highly sensitive and

22  private issues with their patients, such as adverse childhood experiences, gender, sexuality,

23  sexual activity, sexual and other physical side effects of psychotropic medications, past

24  suicide attempts, self-harm, and past or recent emotional, physical, and/or sexual traumas

25  or traumatic events, past or recent substance use, legal histories, past and current conflicts

26  with family members, cell-mates, custody staff, pending legal issues such as parole status

27  or pending appeals, medication non-compliance, being bullied or extorted for their

28  psychotropic medications, the very real stigma related to having a mental illness,

18

Decl. Dr. Penn Supporting Defs.' Resp. & Objections to Special Master's Report and Proposed
Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1    particularly within a carceral setting (which has a myriad of other social hierarchy and

2    physical safety issues), the stigma associated with taking psychotropic medication(s), and

3    other highly sensitive issues.  Psychiatrists discuss these sensitive and private topics with

4    patients because there is a critical need to explore and understand each patient from a bio-

5    psycho-social perspective and to explore current stressors and traumas before prescribing

6    or renewing any psychotropic medication, making medication adjustments, prescribing

7    additional psychotropic medications, checking laboratory studies, or deciding to

8    discontinue or not to prescribe psychotropic medications.

9         55.    Regardless, any differences in the roles of psychiatrists and primary clinicians

10   do not lend support to the Special Master's proposed restrictions on the use of telemental

11   health.

12   **VIII.  TELEMENTAL HEALTH AT HIGHER LEVELS OF CARE**

13        56.    I am aware of no studies or literature endorsing a blanket restriction on the use

14   of telemental health at the inpatient level of care, nor am I aware of other correctional

15   systems that prohibit its use at inpatient levels of care.  I am also aware that across several

16   Texas state psychiatric hospitals, telepsychiatrists routinely provide mental health services

17   at the inpatient level of care.  The use of telemental health is also within the standard of

18   care for emergency departments, inpatient psychiatric hospitals, other community health

19   settings, and state psychiatric hospitals, and community hospitals, all of which frequently

20   provide telepsychiatry and telemental health services for their patients.  Due to a national

21   shortage of psychiatrists, and a lack of qualified mental health professionals in many areas

22   in the United States, particularly in rural and underserved areas, telemental health is, in

23   fact, used across the United States and internationally in "free world" community,

24   emergency room, outpatient settings and medical and psychiatric hospitals afterhours and

25   on weekends and holidays.

26        57.    Given my direct experience since December 2016 with greater than 9,000 high-

27   risk incarcerated TDCJ state prison inmates with recent self-harm or suicide attempts who

28   received a telemental health or telepsychiatry evaluation while being monitored on one to

19

1   one continuous and observation (CDO) status, telemental health has, and continues to

2   effectively and safely provide vital and timely mental health evaluation and treatment

3   services to seriously mentally ill (SMI) and non-SMI inmate patients alike presenting with

4   imminent risk of harm to self or others.

5          58.    Regarding the use of telemental health at higher levels of care, CDCR's

6   telemental health policy already provides the following:  "CDCR seeks to employ

7   psychologists and clinical social workers who can deliver in-person, on-site treatment and care to

8   patients in all inpatient facilities.  CDCR will not use telemental health in lieu of on-site mental

9   health providers at the inpatient levels of care for any reason other than a lack of availability of

10  on-site mental health providers."  This self-imposed restriction on the use of telemental health at

11  CDCR's higher levels of care, while not required by the standard of care, is reasonable given

12  CDCR's preference to employ on-site clinicians in its inpatient units.

13         59.    In my opinion, CDCR's restriction on the use of telemental health in inpatient

14  units is reasonable because it ensures that in a situation where on-site clinicians are

15  unavailable, patients can still be provided mental healthcare through telemental health,

16  which is a perfectly adequate form of mental-health treatment.

17         60.    The Special Master's proposed revisions to this part of CDCR's policy,

18  however, are unreasonable and could unnecessarily put patients at risk of harm.  The

19  Special Master's revisions preclude telemental health clinicians from providing care to

20  patients in inpatient units "except as a last resort in emergency situations when the

21  assigned on-site psychologist and/or licensed clinical social worker is not available."  It is

22  unreasonable and potentially harmful to patients to prohibit telemental health providers

23  from providing needed mental health evaluation and treatment unless and until a patient's

24  situation becomes an emergency.  This is particularly true in situations where an earlier

25  intervention by a telemental health provider could have prevented the emergency from

26  developing.

27

28

## IX.    INFORMED CONSENT

61.    CDCR's telemental health policy already requires informed consent: "At the beginning of the patient's first telemental health contact, the telemental health provider shall obtain informed consent for the method of treatment by, at a minimum, explaining the treatment modality, including a description of the role of the telepresenter and a plan for a response to interruption in services." This informed-consent provision meets the standard of care and is adequate.

62.    Informed consent is an important principle in health care and is widely understood by mental-health professionals. Psychiatrists, psychologists, social workers and other qualified mental health professionals have certain profession defined ethical duties regarding obtaining informed consent outside of an emergency situation. CDCR's informed-consent provision satisfies the standard of care by simply requiring informed consent and providing general guidance on what should be discussed with the patients. A more detailed informed-consent provision, such as the one the Special Master proposed is not necessary or required.

63.    The Special Master's informed-consent section asserts that CDCR's policy must be revised to allow CDCR state inmate patients the option of choosing to have either telemental health services or in-person treatment based on their preference. There are no national correctional healthcare standards, position statements, or practice guidelines that mandate this proposed revision. There are myriad reasons—unrelated to any clinical justification—why a patient—regardless of the treatment setting, inpatient, outpatient, community, correctional, residential, or other setting—may express a preference for one mental health clinician over another, or moreover having a mental health professional in person as opposed to via telemedicine. In my professional opinion, as a practicing correctional and forensic psychiatrist, the Special Master's proposed revision is highly problematic because it would enable and possibly encourage CDCR inmate patients to attempt to control or inappropriately manipulate who their treating clinician will be—

1    based on sex, gender or some other preference unrelated to any clinical justification—by

2    simply expressing a preference for either on-site or telemental health treatment.

3         64.    The Special Master's report asserts that CDCR's patients must have a right to

4    in-person treatment because in the community a patient's decision to accept telemental

5    health is voluntary.  In fact, acceptance of any form of mental health treatment is always

6    voluntary regardless of the modality and regardless of the setting.  To the extent the

7    Special Master claims community patients always have an option to receive in-person

8    treatment, he is wrong.  The availability of in-person treatment is highly variable among

9    different patients based on location, community resources, mental health professional availability

10   and practice type (some may practice exclusively only via remote telemental health) ability to

11   pay, and insurance coverage or lack thereof, among other factors.  As the above quote from the

12   American Psychological Association explains, one of the many benefits of telemental

13   health is that it makes "high quality psychological services" available to patients "limited

14   by geographic location, medical condition, psychiatric diagnosis, financial constraint or

15   other barriers."  Due to factors such as geographic location and long wait times for in-

16   person appointments, many patients' best—and sometimes only—option for obtaining

17   timely treatment is through telemental health.  But this fact is not concerning because

18   studies demonstrate high levels of patient satisfaction with telemental health.

19        65.    Additionally, the American Psychological Association has provided guidance

20   on the issue of patient preference, and **states that a patient's preference is one issue that**

21   **should be considered, but not that it should dictate what treatment modality is**

22   **offered:** "[C]onsidering client/patient preferences for such services is important.  However, it

23   may not be solely determinative in the assessment of their appropriateness."[3]

24        66.    To the extent there are concerns about patients who refuse to participate in

25   telemental health treatment, CDCR's telemental health policy adequately addresses them:

26   "If a patient refuses treatment via telemental health, the patient's telemental health

27   provider(s) may meet with the other members of the patient's treatment team to consider

28   _____

[3] https://www.apa.org/practice/guidelines/telepsychology, last accessed May 24, 2024.

Decl. Dr. Penn Supporting Defs.' Resp. & Objections to Special Master's Report and Proposed
Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

1    mental health reasons, behavioral issues, custodial issues, or any other relevant factors to

2    determine whether telemental health is an appropriate delivery method for the patient.

3    The treatment team shall work toward resolving any issues contributing to the patient's

4    refusal of telemental health services."

5        67.    Likewise, CDCR's policy already addresses concerns about patients for whom

6    telemental health is contraindicated:  "If the patient's IDTT, telepsychologist and Chief of

7    Telepsychology, or telesocial worker and telemental health Supervising Social Worker II,

8    determine that the patient needs to be seen by an on-site psychologist or on-site CSW, they

9    will work with mental health leadership at the institution (Chief and/or Senior

10   Psychologist Supervisor and Chief of Mental Health) to ensure the patient has an

11   appropriate on-site psychologist and/or CSW assigned.  Similarly, if the treatment team

12   determines that telemental health services are not appropriate for a patient, the team will

13   work with mental health leadership to assign the patient to an on-site psychologist and/or

14   CSW."

15       68.    In my 16 years of direct clinical and administrative experience in correctional

16   psychiatric and mental healthcare delivery within the largest state prison setting in the

17   United States, however, it is an extraordinarily rare occurrence that a patient presents with

18   symptoms that might preclude telemental health as a safe and effective treatment modality.

19   A majority of patients who have serious mental illnesses (SMI) —such as schizophrenia,

20   schizoaffective disorder, bipolar disorder, or other chronic psychotic disorders, and non-SMI such

21   as mood/depressive disorders, anxiety disorders, PTSD,—or other mental disorders and who are

22   clinically stable (i.e., do not require an acute inpatient level of psychiatric care) do very well with

23   telepsychiatry and telemental health.  In the UTMB CMC sector of TDCJ, nearly all of outpatient

24   psychiatric care to patients comparable to CDCR's EOP and CCCMS levels of care is delivered

25   exclusively via telepsychiatry and there have been no issues.  Obviously should a patient

26   deteriorate, their mental health treatment needs are re-evaluated, and they may require a higher

27   level of care, to include transfer to an inpatient behavioral health facility with onsite psychiatric

28   and mental health staff.  Regardless, CDCR's telemental health policy adequately addresses these

23

1  various types of situations should they arise and provides a continuum of clinically appropriate

2  safeguards.

3      69.    The Special Master proposed revisions that would require consent to be

4  obtained both orally and in writing.  There is no standard of care, practice guideline,

5  position statement, or clinical basis for this requirement.  There is no current requirement

6  within the TDCJ state prison system for correctional health care staff to obtain both

7  written and oral consent for telemental health, telepsychiatry, or telemedicine services.

8  Both of TDCJ's contracted health care systems (UTMB CMC and Texas Tech University

9  Health Sciences Correctional Managed Care) use standardized written informed-consent

10  forms for the purpose of obtaining informed consent for all types of healthcare.  CDCR's

11  policy, which already requires that informed consent be obtained, is adequate as written.

12      70.    The Special Master's revisions would also require the telemental health

13  clinicians to inform patients before each and every session that they can request that the

14  telepresenter leave the room and then document that practice every time.  This would be

15  an unnecessary and burdensome requirement, and a poor use of appointment time and

16  precious staff resources.  There are additional custody safety risks that need to be carefully

17  considered.  CDCR's telemental health policy already requires clinicians to explain the

18  presence and purpose of telepresenters during the informed-consent process, which is

19  sufficient.

20  **X.    TELEPRESENTERS**

21      71.    The Special Master notes that in the community there is no telepresenter with

22  the patient during treatment, as though the presence of a telepresenter is problematic.  In

23  fact, telepresenters are a genuine clinical best practice feature of CDCR's telemental

24  health policy, as opposed to a deterrent or detractor.  The participation of telepresenters

25  represents an advantage that CDCR's telemental health program has over community

26  telemental health because telepresenters can provide additional timely clinically relevant input

27  and observations to the telemental health clinician.  For example, telepresenters can provide

28  descriptions of the patient's behavior and interactions with others outside the treatment room,

1    they can describe their interactions with the patient during the escort into the treatment area, they

2    can relay real-time information regarding grooming, hygiene, being malodorous or not, weight

3    gain or loss, abnormal movements or motor activity, nonverbal expressions, observed interactions

4    with others (e.g., health care, custody staff, and other inmates) outside the clinic room before,

5    during, and after the telemental health session, and other subtle findings, communication or

6    conduct that may provide insight into the patients state of mind, and would not be readily

7    available without the telepresenter.  This additional information substantially improves the

8    clinician's ability to effectively evaluate, diagnose, and treat the patient.  Most community

9    telemental health providers do not have the benefit of this type of information when they treat

10   patients.

11        72.    The Special Master asserts that the presence of telepresenters compromises

12   confidentiality.  This is also inaccurate.  Under CDCR's policy, telepresenters are trained

13   members of the treatment team and are bound by all of the same confidentiality and

14   CDCR mental health and health care policy and procedural requirements as the clinicians.

15   Should they not abide by confidentiality requirements, there are clearly delineated

16   disciplinary consequences (e.g. to include disciplinary action, additional supervision,

17   and/or termination) and other human resources implications.

18        73.    The Special Master's revisions require that a patient can direct the

19   telepresenters to leave the treatment room if that is the patient's preference, regardless of

20   the clinicians judgement.  This is highly problematic and potentially dangerous for the

21   inmate patient, as well as clinical and custody staff, and other inmate patients in the clinic

22   area or waiting area.  It is important that clinicians have discretion to keep a telepresenter

23   in the room in situations where a patient may be psychotic, delusional (demonstrated fixed

24   false beliefs), decompensating, agitated, threatening, suicidal, or otherwise a danger to self

25   or others.  CDCR's policy already allows for the telepresenter to leave, but gives the

26   clinician the discretion to keep the telepresenter present, which is an appropriate policy

27   that recognizes the importance of clinical judgement, and moreover the vital need at all

28   times for patient and staff safety within any correctional setting.

## XI.    MINIMUM ON-SITE STAFF REQUIREMENTS

74.    The Special Master proposed revisions to CDCR's telemental health policy that would require a minimum level of on-site staff (20% for CCCMS and 40% for EOP) at the prisons.  These levels are arbitrary—they are not based on any published objective data or studies.  The TDCJ does not require a minimum number of on-site psychiatrists for outpatient state prisoners, and almost all outpatient psychiatric care systemwide is provided by telepsychiatrists and other telepsychiatric providers.  Moreover, there are no national guidelines or correctional-health standards that require a minimum level of on-site health care staff.  NCCHC, in particular, does not mandate any set number of psychiatric or mental health care staff or staffing ratios.  And I am aware of no other state or federal correctional system that utilizes telemental health and also mandates similar on-site psychiatric or mental health staffing levels.

75.    The Special Master's rationale for his proposed on-site requirements appear to be based on an assumption that only on-site staff can have a positive impact on the treatment milieu, that only on-site providers who are fully immersed in the carceral environment can be empathetic to the impact the environment has on the patients, and that only on-site providers can advocate effectively for their patients.  Based on my extensive direct clinical and administrative experience with both correctional telepsychiatry and telemental health for greater than sixteen years, these assumptions are incorrect.

76.    In my experience, telepsychiatrists and telemental health providers understand the impact of prison environments of their patients, empathize with their patients, and advocate for their patients.  They also have a positive impact on the treatment milieu through their frequent communications with on-site staff and treatment teams.

77.    I also strongly disagree with the Special Master's claim that only on-site providers can collaborate with custody staff and bring balance between mental-health-treatment needs and custody needs, and note that he provides no evidence in support of the assertion.  Based on my experience overseeing telepsychiatry and telemental health programs, these mental health professionals frequently communicate with custody staff and other on-site health care staff and

26

1    help maintain an appropriate balance between custody and mental-health and other health care

2    needs.

3        78.    CDCR's telemental health policy ensures that their telemental health clinicians

4    will understand the prison environment by requiring that they periodically visit their

5    assigned prisons.  Likewise, the policy ensures that they will impact the treatment milieu

6    by requiring that they attend all treatment team meetings, huddles, and IDTTs.

7    **XII.    FREQUENCY AND DURATION OF ON-SITE VISITS**

8        79.    CDCR's telemental health policy already requires telemental health clinicians

9    to conduct one-day visits to their assigned institutions within 30 days of their hire date and

10   annually thereafter.  This requirement is more than adequate and exceeds the community

11   and correctional standard of care.  In fact, there is no standard of care that requires

12   telemental health clinicians to physically tour and hold in person clinics at the locations

13   where their patients live and work.

14       80.    I understand that the Special Master's revisions to CDCR's telemental health

15   policy seek to significantly expand the frequency and duration of on-site visits by

16   telemental health clinicians.  There is no basis for the Special Master's proposed

17   expansion.  There is no community or correction standard that requires such an expansion,

18   nor is there evidence that the frequency and duration of visits proposed by the Special

19   Master are necessary to provide adequate mental healthcare.  I am aware of no other state

20   or federal correctional system providing telemental health services that mandates

21   frequency and duration-of-visit requirements similar to those proposed by the Special

22   Master.   In my role as the director of mental health services for UTMB CMC (which

23   provides psychiatric and mental health services for approximately 80% of the entire TDCJ

24   state system), we encourage our outpatient telepsychiatrists and telepsychiatric providers

25   to periodically visit state prison units, but we do not require these staff to do so, and we do

26   not mandate frequency or duration of visit requirements as those proposed by the Special

27   Master.

28

Decl. Dr. Penn Supporting Defs.' Resp. & Objections to Special Master's Report and Proposed
Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

## XIII.  CELL-FRONT TELEMENTAL HEALTH

81.    I understand that the Special Master's proposed revisions would not count as compliant any cell-front visits conducted by telemental health providers even though on-site clinicians' cell-front visits are counted towards compliance.  So long as CDCR has the technological capability to allow telemental health providers to conduct high-quality cell-front visits, there is no clinical basis for not counting their cell-front visits toward compliance.  I am not aware of any other state or federal correctional system that does not count a cell-front visit as a mental health treatment encounter if it is conducted by a telemental health provider.

82.    I am aware that CDCR has the technological capability to allow telemental health providers to effectively conduct cell-front visits.  With this in mind, there is no reason not to permit a qualified mental health clinician who is assigned to and familiar with a patient to conduct a telemental health cell-front visit and to count that visit toward compliance.  Based on my literature review and my own experience managing the provision of telemental and telepsychiatric health across Texas state prisons and other correctional facilities to date, there is no reason to assume that a telemental health cell-front visit will be any less effective than a visit by on-site staff.

83.    I further understand that the Special Master's revisions would require that patients who refuse two consecutive telemental health appointments must be assessed by an on-site clinician for possible referral to IDTT to consider changing the patient's treatment modality to in-person.  The Special Master's proposed revision is unnecessary because CDCR's telemental health policy already adequately addresses such a situation in the "Refusals" section.  CDCR's provision is more than adequate and exceeds the standard of care.

## XIV.  TELEMENTAL HEALTH FOR PARTICULAR TYPES OF SERVICES

84.    I understand that the Special Master's revisions would prohibit telemental health clinicians from providing group therapy treatment.  The Special Master cites no evidence or standard of care that supports this revision.  I am aware of no studies

1    indicating that a telemental health provider cannot effectively conduct group treatment and

2    the Special Master's recommendation is inconsistent with numerous studies that

3    demonstrate that the effectiveness of telemental health is equivalent to in-person treatment.

4    Nor am I aware of any other state or federal correctional system that prohibits telemental

5    health providers from providing group mental health treatment.  Accordingly, the

6    proposed restriction is unnecessary and unsupported.

7        85.    I understand that the Special Master's revisions would restrict the use of

8    telemental health to respond to emergent/urgent mental health referrals or incidents

9    involving danger to self/suicidality/self-harm, except as a last resort in emergency

10   situations when the institution's assigned on-site mental health personnel are not available.

11   And his revisions would also prohibit telemental health providers from conducting suicide

12   risk assessments.  I strongly disagree with these proposed prohibitions.  The Special

13   Master provides no evidentiary basis for them, and no standard of care requires them.  I

14   am not aware of any correctional system that has similar prohibitions.  In fact, community

15   hospitals and emergency rooms routinely utilize telemental health and telepsychiatry for

16   these types of urgent situations and for suicide risk assessments.

17       86.    The proposed restriction is also not supported by my own experience of

18   managing the provision of telemental health to extremely high-risk inmate patients with

19   recent self-harm or suicide attempts who require suicide precautions, specifically constant

20   and direct observation (CDO) status, twenty-four hours a day by a correctional officer.

21   This weekend CDO program has resulted in the safe and effective provision of telemental

22   health evaluation and treatment and suicide risk assessment services to greater than 9,000

23   high-risk inmate patients for the past eight years.

24       87.    The proposed restriction would also disrupt continuity of care if the patient's

25   assigned telemental health provider was available to treat the patient but prohibited from

26   doing so.  The assigned provider would be in the best position to evaluate and treat the

27   patient in such an emergency situation.  Likewise, a patient's assigned telemental health

28   clinician is in the best position to conduct a suicide risk assessment.

88.    Of course, there may be some emergency situations where on-site treatment is needed, and CDCR's telemental health policy already contains a provision—titled Clinical Emergency Management—that adequately addresses such circumstances.  The Special Master's proposed revisions are therefore unnecessary.

89.    CDCR requires mental health clinicians to conduct five-day follow-up visits with patients who have transferred to a different level of care for the purpose of monitoring the patients in their new levels of care and documenting significant clinical information.  The Special Master proposed a revision that would prohibit a telemental health provider from conducting these visits.  Again, the Special Master has not provided any evidence or other support for this restriction, which is problematic because it would disrupt access to care and continuity of care.  I am also unaware of any other correctional system that has a similar prohibition.  If the patient has an assigned telemental health provider, that provider would be in the best position to evaluate a patient during a five-day follow-up visit.

90.    The Special Master's revisions also prohibit telemental health providers from handling emergency/urgent mental health referrals and suicide risk assessments.  He cites no evidence in support of this prohibition, there is no standard of care that requires it, and I am not aware of any other correctional system with a similar prohibition.  In fact, community hospitals and emergency rooms often use telemental health and telepsychiatry for these types of urgent clinical situations and for time sensitive suicide risk assessments.  Additionally, in a situation where a patient's primary clinician is a telemental health provider, the Special Master's prohibition would prevent that clinician—who is in the best position to evaluate the patient—from intervening and providing care.

91.    The Special Master also proposes a prohibition on telemental health providers intervening for the purposes of de-escalating a potential or emerging use-of-force incident.  Again, if a patient's primary clinician is a telemental health provider and is available and able to intervene, there is no clinical basis or standard of care that would preclude the intervention.  Nor am I aware of any other correctional system with a similar prohibition.

30

1    Use of force incidents pose significant risks of injury to the inmate patient, custody and

2    health care staff, other inmates, and have associated risks of morbidity and mortality.

3    Therefore, any therapeutic intervention to attempt to diffuse or de-escalate and thereby

4    avert the need for a potential use-of-force is advantageous to everyone.  In fact, the

5    assigned mental health clinician is the best positioned and most appropriate health care

6    professional to intervene in a timely manner, and make an attempt to help de-escalate the

7    acute situation.  This is particularly more likely if a current therapeutic alliance, working

8    clinical treatment relationship, and rapport has been established between the telemental

9    health clinician and the patient.

10           I declare under penalty of perjury under the laws of the United States of America that the

11   foregoing is true and correct.

12           Executed on this 28th day of May, 2024, in Houston, Texas.

13

14                                                */s/ Joseph V. Penn*
                                          _____
15                                          Joseph V. Penn, M.D., CCHP-MH, LFAPA

16

17
     CF1997CS0003
18

19

20

21

22

23

24

25

26

27

28

Decl. Dr. Penn Supporting Defs.' Resp. & Objections to Special Master's Report and Proposed
Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

Exhibit A

March 28, 2024

CURRICULUM VITAE

NAME:                        Joseph V. Penn MD CCHP-MH LFAPA

Present Position:            Director, Mental Health Services
Business Address:            University of Texas Medical Branch (UTMB)
                             Correctional Managed Care (CMC)
                             200 River Pointe Drive, Suite 200
                             Conroe, Texas 77304
Business Telephone:          (936) 494-4183
Business Fax:                (936) 242-0254
E-mail:                      jopenn@utmb.edu

EDUCATION:

Undergraduate     1987 B.S. in Biology
                  University of the Incarnate Word (formerly Incarnate Word College), San
                  Antonio, Texas
                  Honors: Alpha Chi, Academic All-American, Who's Who in American
                  Universities & Colleges, Graduated Summa Cum Laude

Medical School    1992 M.D.
                  University of Texas Medical Branch, Galveston, Texas
                  Honors: Who's Who in American Colleges/Universities, Junior Marshal

TRAINING (GME) GRADUATE MEDICAL EDUCATION:

Residency         1992-1996    General Psychiatry
                  1995-1996    Chief Resident
                  Department of Psychiatry and Human Behavior,
                  Brown University, Providence, Rhode Island

Residency         1996-1998    Child and Adolescent Psychiatry
                  Department of Psychiatry and Human Behavior,
                  Brown University, Providence, Rhode Island

Fellowship        1998-1999    Forensic Psychiatry
                  Department of Psychiatry
                  Yale University, New Haven, Connecticut

ADDITIONAL POSTGRADUATE EDUCATION:

                  2014 Management Certificate
                  Physician Leadership Academy
                  University of Houston Clear Lake, Clear Lake, Texas and the
                  University of Texas Medical Branch, Galveston, Texas

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

MILITARY SERVICE:        None

LICENSURE INFORMATION:

1993        Rhode Island Medical License # 8849
1998        Connecticut Medical License # 36678
1999        Texas Medical License # K7081
1999        Massachusetts Medical License # 161086

BOARD CERTIFICATION AMD OTHER CERTIFICATIONS:
1997        Diplomate, American Board of Psychiatry & Neurology # 43847
1998        Additional Certification, Child and Adolescent Psychiatry # 4583
2003        Additional Certification, Forensic Psychiatry # 1438
2004        Certified Correctional Health Care Professional, Mental Health (CCHP-MH), National Commission on Correctional Health Care
2007        Re-Certification, American Board of Psychiatry & Neurology # 43847
2013        Re-Certification, Forensic Psychiatry, American Board of Psychiatry & Neurology #1438
2017        Re-Certification, General Psychiatry, American Board of Psychiatry & Neurology #43847
2017        Re-Certification, Child and Adolescent Psychiatry, American Board of Psychiatry & Neurology #4583
2022-2024   Certified compliance with the standards for continuing education in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry, American Board of Psychiatry & Neurology

PROFESSIONAL WORK HISTORY:
7/1999 – 2/2008        Director of Child and Adolescent Forensic Psychiatry, Rhode Island Hospital, Lifespan Health System, Providence, Rhode Island

2/2008 – current       Director of Mental Health Services, UTMB Correctional Managed Care, Conroe, Texas

University Teaching Roles

Brown University, Residency in Psychiatry, 1995: "Effective Documentation and Medical Record Strategies for Psychiatrists," New Residents' Seminar Series (single seminar).

Brown University, Residency in Psychiatry, 1995: "Antipsychotics: An Introduction and Rational Clinical Approach," New Residents' Seminar Series (single seminar).

Brown University, Residency in Psychiatry, 1995: "Cultural Psychiatry," PG-3 Seminar Series, Seminar Leader (weekly seminars).

Brown Medical School, 1997: "Biomed 278: Introduction to Clinical Psychiatry," Small Group Leader, (weekly meetings).

Brown University, Residency in Psychiatry, 1997: " PG-2 Seminar: Mood Disorders in Children and Adolescents" (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1998: "Children's Testimony in Court: Roles of the Expert Witness and Videotaped Interviews," Child and Adolescent Forensic Psychiatry Seminar Series, (single seminar).

2

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

Yale University Law School, Disabilities Clinic, 1999: "Introduction to Child and Adolescent Psychopharmacology," (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: "Risk Assessment of Youth Violence," Child Psychiatry Boot Camp Seminar Series, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: "Rhode Island Mental Health Law," Child Psychiatry Boot Camp Seminar Series, (single seminar).

Brown University Residency in Psychiatry, 1999: "Introduction to Child and Adolescent Forensic Psychiatry," PG-3 Resident Seminar, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999: Community Mental Health Center Rotation, Family Health Center at SSTAR, Fall River, Massachusetts, Clinical Supervisor, (weekly clinic and supervision).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: Clinical Supervisor, Brown University Child Psychiatry Forensic Psychiatry Elective, (weekly supervision).

Brown University Residency in Psychiatry, 2000-2001: "Disruptive Disorders, Antisocial Behaviors, and Legal Issues," PG-2 Resident Seminar, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 2000-2008: "Child and Adolescent Forensic Psychiatry" Seminar Leader, (four seminars).

Brown University, Residency in Child and Adolescent Psychiatry, 2001-2002: Clinical Supervisor, Community Mental Health Center Rotation, Kent County Mental Health Center, Warwick, Rhode Island, (weekly clinic and supervision).

Brown University, Residency in Child and Adolescent Psychiatry, 2001-2008: Clinical Supervisor, Forensic/Juvenile Justice Rotation, Rhode Island Training School, Cranston, Rhode Island, (daily and weekly clinics and supervision).

Brown Medical School, 2002-2008: Clinical Supervisor for 3rd and 4th year medical students, Longitudinal elective, 4th year elective, and psychiatry rotation, Rhode Island Training School, Cranston, Rhode Island, (daily and weekly clinics and supervision).

Brown University Residency in Psychiatry, 2002-2003: Tutor-Advisor to Nada Milosavljevic, M.D., J.D., PG-2 Psychiatry Resident.

Brown University Residency in Psychiatry, 2003: "Bullying, Beatings, and Beyond: Assessment and Treatment of Youth Violence," Noon Seminar, (single seminar).

Brown University Post-Doctoral Juvenile Forensic Psychology Training Program, 2003-2008: Core Supervisor and Seminar Leader.

Brown University Psychology Intern and Post-Doctoral Fellowship Training Program, Child Track Seminar Series Presenter, 2004-2008: "The Law and Psychiatry/Psychology" (single seminar).

Brown University Residency in Psychiatry, 2004-2008: "Risk Assessment of Potentially Violent Juveniles," PG-3 Resident Seminar, (single seminar).

Brown University Residency in Psychiatry, 2004-2008: "Divorce, Custody and Visitation Issues: The Psychiatrist Facing Court Systems," PG-2 Resident Seminar, (single seminar).

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

Brown University Residency in Child and Adolescent Psychiatry, 2005-2008: "Evaluation and Treatment of Conduct Disorder," Child and Adolescent Psychiatry Developmental Psychopathology Seminar Series, (single seminar).

UTMB Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, 2008-present: "Opportunities and Challenges within Correctional and Forensic Psychiatry," (single seminar).

UT Health Science Center at Houston, Department of Psychiatry and Behavioral Sciences, Residency in Child Psychiatry, 2008-present: "Juvenile Correctional Mental Health Services in Texas," (single seminar).

UTMB Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, 2010-present: "Suicide Prevention and Litigation: Timely Risk Management Approaches," Forensic Psychiatry Seminar Series, (single seminar).

Baylor College of Medicine, Department of Psychiatry and Behavioral Sciences, Residency in Child and Adolescent Psychiatry, Forensic Psychiatry for Child Psychiatry Didactic Series, 2016-present: "Child and Adolescent Forensic and Correctional Psychiatry," (two seminars).

Baylor College of Medicine, Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, PGY3 Forensic Psychiatry Didactic Series, 2016-present: "Correctional Psychiatry," (single seminar).

Hospital Teaching Roles

Butler Hospital, 1993-1996: Seminar Leader, Various Psychiatry Topics, Brown University Medical Students' Psychiatry Clerkship, (multiple seminars).

Rhode Island Hospital, 1995: Psychiatry Preceptor and Consultant to Internal Medicine House staff Clinic, (twice weekly clinic).

E. P. Bradley Hospital, 1997: Adolescent Program Training, "The Use of Antipsychotics in Adolescents," (one seminar).

RESEARCH ACTIVITIES:

Grant support

1. Penn (PI)                                             01/01/2002-01/01/2003
   "Incidence of Suicide Attempts and Self-Injurious Behavior in a Juvenile Correctional Facility." Source: American Academy of Child and Adolescent Psychiatry, Eli Lilly and Company. $ 9,000.
   Role: Principal Investigator

2. Penn (PI)                                             01/01/2003-05/31/2004
   "Correlates of Suicidal Behavior in Incarcerated Juveniles." Source: Lifespan Developmental Grant, Lifespan. $ 29,451.
   Role: Principal Investigator

4

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

3. Penn (PI)                                          06/30/2004-12/31/2005
   "Liability Prevention for Hasbro Hospital Staff: Practical Strategies for Youths with
   Mental Health and Substance Abuse Issues."  Source: Lifespan Risk Management,
   Lifespan. $12,200.
   Role: Principal Investigator

4. 5K23DA021532 (PI: Tolou-Shams, PhD.)              02/01/2008-01/13/2013
   "HIV Prevention in the Family Drug Court."  Source: National Institute of Drug Abuse
   (NIDA)
   Role: Consultant


COMMITTEE RESPONSIBILITIES:

<u>National Committees</u>

Academy of Correctional Health Care Professionals (ACHCP)
2003-2004     Education Committee
2005-2008     Membership Committee
2006-2008     Board of Directors
2007-2008     Education Committee

American Academy of Child and Adolescent Psychiatry (AACAP)
1997-2000     Television and the Media Committee
1999-        Rights and Legal Matters Committee
1999-2002     Task Force on Juvenile Justice Reform
2002-2006     Committee on Juvenile Justice Reform
2007-2016     AACAP Representative to the National Commission on Correctional Health Care
2016-        Children and the Law Committee


American Board of Psychiatry and Neurology (ABPN)
1998-2001     Psychiatry Re-Certification Committee
2001-2004     Re-appointed, Psychiatry Re-Certification Committee
2006         Examiner, Part II General Psychiatry Examination Committee
2001-2006     Examiner, Child and Adolescent Psychiatry Examination Committee
2007-2014     Forensic Psychiatry Examination Committee
2020-        Forensic Psychiatry Article-Based Continuing Certification Committee

American Academy of Psychiatry and the Law (AAPL)
1998-        Rappeport Fellowship Committee
2006-        Suicidology Committee
2010--2012    Institutional and Correctional Psychiatry
2011-2016     (Chair) Suicidology Committee
2016-        AAPL Representative to the National Commission on Correctional Health Care
2017-2026     Media and Public Relations Committee
2018-2021     Councilor, AAPL Council
2020-2026     Awards Committee
2020-2026     Education Committee
2021-        (Co-Chair) Correctional Forensic Psychiatry Committee
2022-        Awards Committee

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

2022-          Education Committee

American College of Psychiatrists (ACOP)
2014-2017      Committee on the Education Award
2020-2024      Laughlin Fellowship, Selection Committee

American Correctional Association (ACA)
2013-2021      Health Care Committee
2013-2021      Mental Health Committee


American Psychiatric Association (APA)
2012-2014      Workgroup on Persons with Mental Illness in the Criminal Justice System
2014-          Workgroup on Mental Illness and Criminal Justice
2013-2015      Council on Children, Adolescents and Their Families, American Psychiatric Association, Arlington, Virginia
2015-2017      Chair, Council on Children, Adolescents and Their Families, American Psychiatric Association, Arlington, Virginia
2023-2025      Public Psychiatry Fellowship Selection Committee

Association for Academic Psychiatry
2003-2004      Program Committee

Coalition for Juvenile Justice
2001-2002      Membership Committee

National Commission on Correctional Health Care
2003-          Juvenile Health Committee
2003-2004      Standards Revision Task Force, Standards for Health Services in Juvenile Detention and Confinement Facilities
2005           Program Committee
2005           (Chair) Clinical Guidelines Monitoring Subcommittee
2006-2007      (Vice-Chair) Clinical Guidelines Monitoring Subcommittee
2006-2010      Executive Committee, Member At-Large
2007-2008      (Chair) Juvenile Health Committee
2007-2008      Clinical Guidelines Monitoring Subcommittee
2008-2010      Finance Committee
2011-2014      (Chair) Juvenile Health Committee
2011-          Executive Committee
2010-          Accreditation Committee
2012-2014      (Vice Chair) Accreditation Committee
2013           Standards Revision Task Force, Standards for Health Services in Jails and Prisons
2014-2016      (Chair) Accreditation Committee
2014-          Certified Correctional Health Professional-Mental Health (CCHP-MH) Committee
2014-          Mental Health Standards Revision Task Force, Standards for Mental Health Services in Correctional Facilities
2016           Standards Revision Task Force, Standards for Health Services in Jails and Prisons
2018-2022      (Chair) Standards Revision Task Force, Standards for Health Services in Juvenile 2022
2021           Chair, NCCHC Governance Board
2022-          Accreditation and Standards Committee

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

| | |
|---|---|
| 2022-2024 | (Chair) CCHP-MH Committee |
| 2023- | Mental Health Standards Revision Task Force, Standards for Mental Health Services in Correctional Facilities |
| 2024- | NCCHC Resources Inc. (NRI) Board of Directors (Chair) |
| 2024- | Treasurer and Chair, Finance Committee |

Other

Hospital Committees

| | |
|---|---|
| 1994-96 | Pharmacy and Therapeutics Committee, Butler Hospital, Providence, RI |
| 1995-96 | Outpatient Specialty Program Directors Group, Butler Hospital, Providence, RI |

University Committees

Brown University Department of Psychiatry and Human Behavior

| | |
|---|---|
| 1992-96 | Policy Committee, Residency Training Program |
| 1992-96 | Selection Committee, Residency Training Program |
| 1994 | Residency Recruitment Coordination Committee |
| 1994-96 | SDDS/Primary Care Psychiatry Research Committee |
| 1994 | Search Committee, Director of General Psychiatry Residency Training Program |
| 1998 | Selection Committee, Child and Adolescent Psychiatry Residency Program |

Brown University School of Medicine

| | |
|---|---|
| 2000-2002 | Search Committee, Department of Pediatrics |
| 2003-2007 | Search Committee, Post-Doctoral Training Program in Juvenile Forensic Psychology |

University of Texas Medical Branch Correctional Managed Care

| | |
|---|---|
| 2008- | Continuing Medical Education (CME) Committee |
| 2008-2010 | County Jail Pharmacy and Therapeutics Committee |
| 2008- | Mental Health Services Policy Committee |
| 2008- | Quality Council |
| 2008- | Mental Health Inpatient Leadership Group (Chair) |
| 2009-2011 | Medical Executive Committee (Chair) |
| 2009- | Executive Council |

State/Regional Committees

Rhode Island Psychiatric Society

| | |
|---|---|
| 1995-1996 | Executive Committee |
| 2006-2008 | (Chair) Public Affairs Committee |

Rhode Island Training School

| | |
|---|---|
| 2000-2001 | Health, Mental Health, and Suicide Prevention Work Group |
| 2002 | Resocialization Steering Committee |
| 2003-2008 | Pharmacy and Therapeutics Committee |
| 2004-2008 | Risk Management Committee |
| 2004-2008 | Suicide Prevention Work Group |

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

Rhode Island Department of Children, Youth, and Families

| | |
|---|---|
| 2003 | Article 23 Committee and Subcommittee |
| 2004 | Psychotropic Medications and Chemical Restraints |

Rhode Island Department of Health

| | |
|---|---|
| 2006-2008 | Suicide Prevention Subcommittee |

Texas Department of Criminal Justice

| | |
|---|---|
| 2008- | Correctional Managed Care Health Care (CMHCC) Joint Pharmacy and Therapeutics (P & T) Committee |
| 2008- | CMHCC P & T Psychiatric Subcommittee |
| 2008-2009 | CMHCC P & T Drug Withdrawal/Benzodiazepine Discontinuation Subcommittee |
| 2008- | CMHCC Joint Suicide Morbidity and Mortality Committee |
| 2008- | CMHCC Joint Suicide Prevention Working Group |
| 2008- | CMHCC System Leadership Council |
| 2008- | CMHCC Joint Mental Health Work Group |
| 2009-2011 | CMHCC Joint Mental Health Work Group (Chair) |
| 2012-2017 | CMHCC Joint Gender Identity Disorder Work Group |
| 2012-2015 | CMHCC Integrated Mental Health Procedure Committee |
| 2014-2016 | CMHCC Joint Mental Health Work Group (Chair) |
| 2017- | CMHCC Joint Gender Dysphoria Working Group (Co-Chair) |
| 2017-2018 | CMHCC Correctional Managed Care Joint P & T Committee (Chair) |
| 2022- | CMHCC Joint Mental Health Work Group (Chair) |
| 2024-2025 | CMHCC Joint Mental Health Work Group (Chair) |

Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI)

| | |
|---|---|
| 2024- | (Gubernatorial Appointment) Advisory Committee to the Texas Board of Criminal Justice on Offenders with Medical or Mental Impairments |

Texas Juvenile Justice Department (formerly known as the Texas Youth Commission)

| | |
|---|---|
| 2008- | Youth Health Services Leadership Council |
| 2008- | Youth Services Pharmacy and Therapeutics Committee |
| 2008- | Mental Health Subcommittee |
| 2008- | Psychiatry Subcommittee |
| 2016-2018 | (Chair) Youth Services Pharmacy and Therapeutics Committee |

Texas Society of Psychiatric Physicians

| | |
|---|---|
| 2009- | Government Affairs Committee |
| 2009-2012 | Public Mental Health Services Committee |
| 2009-2010 | Strategic Planning and Coordinating Committee |
| 2012-2013 | (Vice-Chair) Forensic Psychiatry Committee |
| 2013-2015 | Continuing Medical Education Committee |
| 2013- | (Chair) Forensic Psychiatry Committee |
| 2013- | Executive Council |
| 2018-2019 | President |
| 2020- | Texas Federation of Psychiatry Executive Committee |

MEMBERSHIP IN SCIENTIFIC SOCIETIES/PROFESSIONAL ORGANIZATIONS:

| | |
|---|---|
| 1987-99 | American Medical Association |

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

2002-2003   American Medical Association
2022-2024   American Medical Association
1992-      Theta Kappa Psi Medical Fraternity Alumni
1992-      American Psychiatric Association
1993-2008   Rhode Island Psychiatric Society
1995-      American Academy of Child and Adolescent Psychiatry
1996-2004   Association for Academic Psychiatry
1996-98    Rhode Island Medical Society
1997-98    American Association of General Hospital Psychiatrists
1997-98    Brown University House staff Association
1999-2008   Rhode Island Council of Child and Adolescent Psychiatry
1997-      American Academy of Psychiatry and the Law
1998-99    Connecticut Psychiatric Society
2002-      Academy of Correctional Health Professionals
2008-      Texas Society of Psychiatric Physicians
2008-      Texas Society of Child and Adolescent Psychiatry
2009-      American College of Psychiatrists
2011-2015   American College of Physician Executives
2018-      Titus Harris Society
2020-2022   (President) Titus Harris Society

HONORS:

1994   ACNP Program for Minority Research Training in Psychiatry
1994   Center for Mental Health Services Scholarship
1995   Mead Johnson Fellow, Association for Academic Psychiatry
1995   Laughlin Fellow, American College of Psychiatrists
1996   Outstanding Young Men of America
1996   Chester M. Pierce, M.D., Sc.D. Resident Research Award
1997   Lebensohn Award, American Association of General Hospital Psychiatrists
1997   Rappeport Fellow, American Academy of Psychiatry & the Law
1999   Presidential Scholar, American Academy of Child & Adolescent Psychiatry
2000   Pilot Research Award, American Academy of Child & Adolescent Psychiatry
2001   America's Registry of Outstanding Professionals
2002   Who's Who in Medicine and Healthcare
2003   Who's Who in America
2003   Who's Who in Science and Engineering
2003   Junior Faculty Development Award, Association for Academic Psychiatry
2004   Brown Medical School Teaching Recognition Award
2004   Distinguished Alumnus, University of the Incarnate Word
2004   Strathmore's Professional Honor Society
2005-   Best Doctors in America
2006   Madison Who's Who
2006   Fellow, American Psychiatric Association (Life Fellow Status in 2022)
2007   Who's Who Among Executives and Professionals
2007   Fellow, The Lloyd Society
2008   Member, American College of Psychiatrists
2011   Cambridge Who's Who Registry among Executives and Professionals in the Field of
       Research, Medicine, and Healthcare

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

ADDITIONAL INFORMATION:

Academic Appointments

| | |
|---|---|
| 1995-1996 | Assistant Instructor in Psychiatry |
| 1998-2007 | Clinical Assistant Professor of Psychiatry, Department of Psychiatry and Human Behavior, Brown University School of Medicine, Providence, Rhode Island |
| 2007-2012 | Clinical Associate Professor of Psychiatry, Department of Psychiatry and Human Behavior, Warren Alpert Medical School of Brown University, Providence, Rhode Island |
| 2009-2013 | Clinical Associate Professor of Psychiatry, Department of Psychiatry and Behavioral Sciences, UTMB Medical School, Galveston, Texas |
| 2014- | Clinical Professor of Psychiatry, Department of Psychiatry and Behavioral Sciences, UTMB Medical School, Galveston, Texas |
| 2017- | Clinical Professor, Physician Assistant Studies, UTMB Medical School, Galveston, Texas |

Hospital and Other Correctional Behavioral Health Facility Appointments

| | |
|---|---|
| 1994-1997 | Psychiatric House Officer, Landmark Medical Center, Woonsocket, Rhode Island |
| 1994-1998 | Psychiatric House Officer, St. Joseph Center for Psychiatric Services, Providence, Rhode Island |
| 1999-2008 | Medical Staff, Rhode Island Hospital, Providence, Rhode Island |
| 1999-2008 | Medical Staff, Emma Pendleton Bradley Hospital, East Providence, Rhode Island |
| 2013-2014 | Acting Clinical Director, Texas Department of Criminal Justice (TDCJ), TDCJ Skyview/Hodge Units, Rusk, Texas |
| 2017- | Staff Psychiatrist, University Medicine Associates, Bexar County Hospital District d/b/a University Health, in conjunction with Detention Health Care Services ("University Health"), Bexar County Jail, San Antonio, Texas |
| 2018-2020 | Consulting Psychiatrist, River Oaks Hospital and Clinics, Houston, Texas |
| 2019-2020 | Acting Clinical Director, TDCJ, Jester IV Unit, Richmond, Texas |
| 2023 | Acting Clinical Director, TDCJ, Jester IV Unit, Richmond, Texas |

Other Appointments

| | |
|---|---|
| 1995- | Reviewer, Hospital Physician |
| 1996 | Reviewer, Academic Psychiatry |
| 1996 | Reviewer, Journal of Nervous and Mental Disease |
| 1997 | Reviewer, Journal of Clinical Psychiatry |
| 1997 | Staff Psychiatrist, Kent County Mental Health Center, Warwick, RI |
| 1998-2001 | Consultant, New Haven State's Attorney Office, New Haven, CT |
| 1998-2000 | Consultant, Capital Defense and Trial Services Unit, Office of the Chief Public Defender, Hartford, CT |
| 1998-2001 | Consultant, Office of the Public Defender, Bridgeport, CT |
| 1998-1999 | Psychiatrist, New Haven Court Clinic, New Haven, CT |

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

| | |
|---|---|
| 1998-1999 | Consultant, Disabilities Clinic, Yale Law School, New Haven, CT |
| 1998-1999 | Psychiatric Expert Witness, Trial Practice Course, Yale Law School, New Haven, CT |
| 1998-1999 | Consultant, Special Populations Unit, CT Department of Mental Health and Addictions Services, Hartford, CT |
| 1998-1999 | Genesis Group Co-leader and Individual Therapist, Whiting Forensic Institute, Middletown, CT |
| 1998-1999 | Child Custody and Placement Clinic, Yale Child Study Center, New Haven, CT |
| 1998-2001 | Consultant, Superior Court, Juvenile Matters, Stamford, CT |
| 1999 | Consultant, Psychiatric Security Review Board, Middletown, CT |
| 1999 | Consultant, United States Department of State, Washington, DC |
| 1999-2001 | Staff Child Psychiatrist, The Family Health Center at SSTAR Program, Fall River, MA |
| 1999-2008 | Director of Psychiatric Services, Rhode Island Training School, Cranston, RI |
| 1999-2008 | Consultant, Rhode Island Family Court |
| 1999-2008 | Consultant, Rhode Island Department of Children, Youth, and Families |
| 1999-2008 | Consultant, RI Department of Disability Determination Services, Providence, RI |
| 1999-2000 | Consultant, Providence Police Department, Kid's INC. Program, Providence, RI |
| 1999-2001 | Consultant, Office of the Attorney General, Providence, RI |
| 2000-2001 | Consultant, Superior Court, Juvenile Matters, Hartford, CT |
| 2000-2001 | Consultant, United States Attorney, District of Rhode Island, Providence, RI |
| 2001 | Consultant, Butler Hospital, Providence, RI |
| 2001 | Consultant, Northwest Special Education Region, Scituate, RI |
| 2001 | Consultant, Qualidigm, Middletown, CT |
| 2001-2003 | Consultant, Town of Narragansett, Narragansett, RI |
| 2001-2002 | Consultant, Office of the Public Defender, Enfield, CT |
| 2001-2002 | Consultant, Medical Consultants Network, Seattle, WA |
| 2001-2002 | Advisory Board, HELP Mental Health and Wellness Initiative, Providence, RI |
| 2002 | Consultant, Yarmouth Police Department, Yarmouth, MA |
| 2002-2003 | Consultant, Office of the Mental Health Advocate, Cranston, RI |
| 2002 | Consultant, Commonwealth of Massachusetts, Committee for Public Council, Boston, MA |
| 2002- | Editorial Board, Hospital Physician |
| 2002- | Reviewer, Journal of Correctional Health Care |
| 2003- | Consultant, Bradley Hospital, East Providence, RI |
| 2003- | Representative, American Academy of Child & Adolescent Psychiatry to the National Commission on Correctional Health Care, Chicago, Illinois |
| 2003- | Board of Directors, National Commission on Correctional Health Care, Chicago, Illinois |
| 2003 | Advisory Panel, ADHD in Correctional Institutions, National Commission on Correctional Health Care, Chicago, Illinois |
| 2004 | Consultant, Town of West Warwick, RI, Pension Board |
| 2004 | Consultant, Rhode Island Department of Corrections |
| 2004 | Reviewer, Journal of the American Medical Women's Association |
| 2004- | Editorial Board, Psychiatry |
| 2005 | Consultant, Florida Department of Juvenile Justice |
| 2005-2008 | Consultant, Office of the Public Defender, Providence, RI |
| 2005 | Consultant, Bradley School, Portsmouth, RI |

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

| | |
|---|---|
| 2005-2006 | Consultant, Office of the Attorney General, Hartford, CT |
| 2006-2007 | Consultant, Phoenix House, New York, NY |
| 2006- | Editorial Board, Correctional Health Report |
| 2006-2008 | Consultant, Physicians and Lawyers for National Drug Policy |
| 2006-2008 | Board of Directors, Academy of Correctional Health Care Professionals |
| 2007-2009 | Consultant, Town of East Providence, RI, Police Department |
| 2007-2009 | Technical Assistance Project Consultant, National Commission on Correctional Health Care, Various Correctional Facilities, Valhalla, New York |
| 2007-2010 | Chair (Chair-Elect, Chair, Immediate Past), Board of Directors, National Commission on Correctional Health Care, Chicago, Illinois |
| 2007-2011 | Contributor and Consultant to the American Academy of Child and Adolescent Psychiatry (AACAP) Work Group on Quality Issues. Practice Parameter for Child and Adolescent Forensic Evaluations. J Am Acad Child Adolesc Psychiatry 2011; 50:1299-1312 |
| 2008 | Consultant, National Institute of Mental Health (NIMH), Bethesda, MD |
| 2009 | Consultant, Kansas Department of Juvenile Corrections |
| 2009 | Consultant, Philadelphia Department of Behavioral Health and Mental Retardation Services |
| 2009 | Reviewer, Ambulatory Pediatrics |
| 2009- | Board of Directors, Society of Correctional Physicians (SCP) |
| 2011- | Editorial Board, Journal of Correctional Health Care |
| 2011 | Technical Assistance Project Consultant, U.S. Department of Justice, National Institute of Corrections (NIC) |
| 2011 | Consultant, Rhode Island Department of Corrections |
| 2011- | Consultant, Agency for Health Research and Quality's (AHRQ) Effective Health Care (EHC) Program |
| 2011 | Consultant, Office of the Attorney General, Providence, Rhode Island |
| 2011 | Consultant, Vermont Department of Corrections (John Allen and Associates) |
| 2012 | Technical Assistance Project Consultant, National Commission on Correctional Health Care, Idaho Department of Corrections |
| 2012 | Consultant, National Commission on Correctional Health Care, US Immigration and Customs Enforcement (ICE) San Diego Contract Detention Facility, San Diego, California |
| 2012 | Surveyor, National Commission on Correctional Health Care, Orleans Parish Criminal Sheriff's Office, New Orleans, Louisiana |
| 2012 | Surveyor, National Commission on Correctional Health Care, Hudson County Correctional Center, Kearny, New Jersey |
| 2012 | Reviewer, Academic Pediatrics |
| 2012-2013 | Consultant, Office of the Attorney General, Providence, Rhode Island |
| 2013- | Consultant, Polk County Juvenile Detention Center/Polk County Jail, Bartow, Florida |
| 2013-2016 | Member, Council on Psychiatry and Law, American Psychiatric Association, Arlington, Virginia |
| 2013 | Surveyor, National Commission on Correctional Health Care, Harris County Jail, Houston, Texas |
| 2013 | Surveyor, National Commission on Correctional Health Care, Rio Grande Detention Center, Laredo, Texas |
| 2013-2014 | Consultant, Juvenile Justice Commission (JJC) State of New Jersey, and the |

12

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

|  | University of Medicine and Dentistry of New Jersey (UMDNJ)-University Behavioral HealthCare/University Correctional HealthCare, Trenton, New Jersey |
|--|--|
| 2013- | Reviewer, Suicide and Life-Threatening Behavior |
| 2013- | Consultant, Division of Health Services, Arizona Department of Corrections, Phoenix, Arizona |
| 2013 | Surveyor, National Commission on Correctional Health Care, El Paso Service Processing Center, El Paso, Texas |
| 2013-2014 | Consultant to Special Master, *Coleman v. Brown*, *Governor of California, et al.,* United States Court of Appeals, Ninth Circuit, Pasadena, California |
| 2021-2023 | Presenter and Discussant re: Telepsychiatry and Telepsychology Service Implementation in Correctional and Criminal Court Settings, National Health Service (NHS) Health and Justice, NHS England and NHS Improvement, series of virtual meetings |
| 2019-2020 | Consultant, Sacramento County Commissioners and Sacramento County Jails and Other Surrounding County Jails (John Allen and Associates) |
| 2021- | State of Texas "The 5 Agencies Project," Cross-Agency Coordination on Healthcare Strategies and Measures: Self-Harm Subgroup. The 5 agencies include Health and Human Services Commission (HHSC), Department of State Health Services (DSHS), Employees Retirement System of Texas (ERS), Texas Department of Criminal Justice (TDCJ), and Teacher Retirement System (TRS), and the University of Texas Health Science Center at Houston Center for Health Care Data (UTHealth Data Center) |
| 2022 | Presenter and Discussant, Suicide Roundtable Meeting, United States Marshals Service Office of Detention Standard and Compliance, Washington, DC |
| 2022 | Consultant, Wake County Detention Center, Raleigh, North Carolina (John Allen and Associates) |
| 2022-2023 | Consultant, NRI, Colorado Department of Human Services, Division of Youth Services, Secure Youth Centers, State of Colorado |
| 2022-2023 | Consultant, The Moss Group, Washington, District of Columbia |
| 2023 | Consultant, NRI, Ponce and Villalba Juvenile Correctional Detention Centers, Ponce, Puerto Rico, and Villalba, Puerto Rico |
| 2023-2024 | Consultant, Kentucky Department of Juvenile Justice, Detention Centers, State of Kentucky (John Allen and Associates) |
| 2024- | Consultant, San Diego County Jail, San Diego, California (John Allen and Associates) |

PUBLISHED:

A. Peer Reviewed Publications

1. Chang K, Neeper R, Jenkins M, **Penn JV**, Bollivar L, Israeli L, Malloy P, Salloway SP. Clinical Profile of Patients Referred for Evaluation of Adult Attention-Deficit Hyperactivity Disorder (Abstract) Journal of Neuropsychiatry and Clinical Neurosciences 1995;7:400-1.

2. **Penn JV**, Salloway SP. Development of Multiple Sclerosis in a Patient with Attention-Deficit Hyperactivity Disorder (Abstract) Journal of Neuropsychiatry and Clinical Neurosciences 1995;7:406-7.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

3. Jenkins M, Malloy P, Cohen R, Salloway S, Neeper R, **Penn JV**, Chang K. Attentional and Learning Dysfunction Among Adults with History of Childhood ADHD <u>Journal of the International Neuropsychological Society</u> 1996;2:209.

4. **Penn JV**, Boland RJ, McCartney JR, Kohn R, Mulvey T. Recognition and Treatment of Depressive Disorders by Internal Medicine Residents and Attendings <u>General Hospital Psychiatry</u> 1997;19:179-184.

5. Jenkins M, Cohen R, Malloy P, Salloway S, Gillard E, **Penn JV**, Marcotte A. Neuropsychological Measures Which Discriminate Among Adults with Residual Attention Deficit Disorder and Other Attentional Complaints <u>Clin Neuropsychologist</u> 1998;12:74-83.

6. **Penn JV**, Esposito CL, Schaeffer LE, Fritz GK, Spirito A. Suicide Attempts and Self-Mutilative Behavior in a Juvenile Correctional Facility <u>J Am Acad Child Adolesc Psychiatry</u> 2003; 7:762-769.

7. **Penn JV**, Child and Adolescent Forensic Psychiatry, <u>Medicine and Health Rhode Island</u> 2005;9:310-317.

8. Zonfrillo MR, **Penn JV**, Leonard HL. Pediatric Psychotropic Polypharmacy. <u>Psychiatry 2005</u> 2005; 8:14-19.

9. Stein, LAR, Lebeau-Craven, R, Martin R, Colby SM, Barnett, NP, Golembeske, C, **Penn, JV**. Use of the Adolescent SASSI in a Juvenile Correctional Setting. <u>Assessment</u> 2005, 12:384-394.

10. **Penn JV**, Thomas CR. AACAP Work Group on Quality Issues. Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities. <u>J Am Acad Child Adolesc Psychiatry</u> 2005; 10:1085-1098.

11. **Penn JV**, Esposito CL, Stein LAR, Lacher-Katz M, Spirito A. Juvenile Correctional Workers' Perceptions of Suicide Risk Factors and Mental Health Issues of Incarcerated Juveniles. <u>J Correctional Health Care</u> 2006; Volume 11, Issue 4: 333-346.

12. Cascade EF, Kalali AH, **Penn JV**, Feifel D. Recent Changes in Prescriptions for Antipsychotics in Children and Adolescents. <u>Psychiatry</u> (Edgmont). 2006 Volume 3, Issue 9:18-20.

13. Esposito-Smithers CL, **Penn JV**, Stein LAR, Lacher-Katz M, Spirito A. A Test of Problem Behavior and Self-Medication Theories in Incarcerated Adolescent Males. <u>J Child Adol Substance Abuse</u> 2008; Volume 17, Issue 4: 41-56.

14. Baillargeon J**,** Binswanger IA, **Penn JV**, Williams BA, Murray OJ. Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door. <u>The American Journal of Psychiatry</u> 2009; Volume 166, Issue 1:103-109.

15. Baillargeon J**, Penn JV**, Thomas CR, Temple JR, Baillargeon G, Murray OJ. Suicide in America's Largest Prison System. <u>Journal of the American Academy of Psychiatry and the Law</u> 2009; Volume 37, Number 2: 188-193.

16. Garvey KA, **Penn JV,** Campbell AL, Esposito-Smithers CL, Spirito A. Contracting for Safety with Patients: Clinical Practice and Forensic Implications. <u>Journal of the American Academy of Psychiatry and the Law</u> 2009; Volume 37, Number 3: 363-370.

17. Ochoa KC, Pleasants GL, **Penn JV**, Stone DC. Disparities in Justice and Care: Persons with Severe Mental Illnesses in the U.S. Immigration Detention System. Journal of the American Academy of Psychiatry and the Law 2010; Volume 38, Number 3: 392-399.

18. Baillargeon J**,** Hoge SK, **Penn JV**. Addressing the Challenge of Community Reentry among Released Inmates with Serious Mental Illness. American Journal of Community Psychology 2010; Volume 46, Number 3-4: 361-375.

19. Baillargeon J, **Penn JV**, Knight K, Harzke AJ, Baillargeon G, Becker EA. Risk of Reincarceration among Prisoners with Co-occurring Severe Mental Illness and Substance Use Disorders. Adm Policy Ment Health 2010; Volume 37, Number 4:367-74.

20. Harzke AJ, Baillargeon J, Baillargeon G, Olvera R, Torrealday O, **Penn JV**, Parikh R. Co-occurrence of Substance Use Disorders with Other Psychiatric Disorders in the Texas Juvenile Correctional system. International Journal of Prisoner Health 2011; 7, 4-16.

21. Harzke, AJ, Baillargeon J, Baillargeon G, Henry J, Olvera R, Torrealday O., **Penn, JV**, Parikh, R. Prevalence of Psychiatric Disorders in the Texas Juvenile Correctional System. Journal of Correctional Health Care 2012; Volume 18, Number 2: 143-157.

22. Hilliard WT, Barloon L, Farley P, **Penn JV,** Koranek A. Bupropion Diversion and Misuse in the Correctional Facility. Journal of Correctional Health Care 2013; Volume 19, Number 3: 211-217.

23. McKee J, **Penn JV**, Koranek A. Psychoactive Medication Use and Misadventuring Issues in Correctional Healthcare – What all Clinicians Should Know. Journal of Correctional Health Care 2014; 20(3):249-260.

24. Trestman, RL (Chair), **Penn JV**, et al. Psychiatric Services in Correctional Facilities: Third Edition A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing 2015.

25. Baillargeon J, Pulvino JS, Leonardson JE, Linthicum LC, Williams B, **Penn J** Williams RS, Baillargeon G, Murray OJ. The Changing Epidemiology of HIV in the Criminal Justice System. International Journal of STD & AIDS. 2017;28(13):1335-1340.

26. Tamburello A, Metzner J, Ferguson E, Champion M, Ford E, Glancy G, Appelbaum K, **Penn J,** Burns K, Ourada J. The American Academy of Psychiatry and the Law Practice Resource for Prescribing in Corrections. Journal of the American Academy of Psychiatry and Law 46:242-43, 2018. DOI:10.29158/JAAPL.003762-18

27. Tamburello A, **Penn J,** Ford E, Champion M, Glancy G, Metzner J, Ferguson E, Tomita T, Ourada J. The American Academy of Psychiatry and the Law Practice Resource for Prescribing in Corrections. Journal of the American Academy of Psychiatry and Law 50:S1–S62, 2022. DOI:10.29158/JAAPL.220082-22

28. Tamburello A, **Penn JV,** Negron-Muñoz R, Kaliebe K. Prescribing Psychotropic Medications for Justice-Involved Juveniles. Journal of Correctional Health Care J Correct Health Care. 2023 Apr;29(2):94-108. DOI: 10.1089/jchc.21.09.0086. Epub 2023 Jan 13.

29. Baillargeon J, Linthicum LC, Murray OJ, Raji MA, Kuo YF, Pulvino JS, Milani SA, Williams B, Baillargeon GR, Blair PA, Kristen Peek M, **Penn JV**. The Prevalence of Cognitive Impairment and Dementia in Incarcerated Older Adults. The Journals of Gerontology, Series B: Psychological Sciences and Social Sciences. 2023 Dec 06; 78(12):2141-2146. PMID: 37793395.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

PUBLISHED

B.  Non-Peer Reviewed Publications

1.  **Penn JV**, Martini J, Radka D. Weight Gain Associated with Risperidone (Letter to Editor) Journal of Clinical Psychopharmacology 1996;16:259-260.

2.  **Penn JV**, Leonard HL, March J: OCD in Children and Adolescents.  In M.T. Pato, G Steketee (eds.), OCD Across the Life Cycle, Annual Review of Psychiatry, Volume 16. Washington, DC: American Psychiatric Press, 1997, pp 7-53.

3.  **Penn JV**, Hagino 0: Child and Adolescent Psychiatry.  In R.J. Goldberg, Practical Guide to the Care of the Psychiatric Patient, 2nd Edition. St. Louis: Mosby, 1998, pp 340-374.

4.  **Penn, JV**, Casoli-Reardon M. Antisocial and Violent Youth (Book Review) Shamsie Lugus et al., Journal of the American Academy of Child and Adolescent Psychiatry 2001;12:1483-1484.

5.  **Penn, JV**, Casoli-Reardon M. Antisocial and Violent Youth (Book Review) Shamsie Lugus et al., Journal of Developmental and Behavioral Pediatrics 2001; 22: 258-259.

6.  **Penn JV**. Attention-Deficit/Hyperactivity Disorder: Review Questions. Hospital Physician 2001; 6:27-28.

7.  **Penn JV**. Quick to Cry? Parenting 2001; 4:185.

8.  **Penn JV**, Leonard HL: Diagnosis and Treatment of Obsessive-Compulsive Disorder in Children and Adolescents.  In M.T. Pato, J. Zohar (eds.), Current Treatments of Obsessive-Compulsive Disorder, 2nd Edition. Washington, DC: American Psychiatric Press, 2001, pp. 109-132.

9.  **Penn JV**. Justice for Youth? A History of the Juvenile and Family Court. The Brown University Child and Adolescent Behavior Letter 2001; 9:1-4.

10.  **Penn JV**. Child and Adolescent Depression: Review Questions. Hospital Physician 2002; 1:39-40.

11.  Thomas CR, **Penn JV**: Juvenile Justice Mental Health Services, In Child and Adolescent Psychiatric Clinics of North America. Edited by Haller L. Philadelphia: WB Saunders, 2002, pp 731-748.

12.  **Penn JV**: Use of Psychotropic Medications with Incarcerated Youth. Standards for Health Services in Juvenile Detention and Confinement Facilities National Commission on Correctional Health Care, 2004, 263-265.

13.  Carlsen AB, **Penn JV** Kids Who Commit Adult Crimes: Serious Criminality by Juvenile Offenders (Book Review) Flowers RB, Journal of Developmental & Behavioral Pediatrics 2005; 26:390-391.

14.  Kraus LJ, **Penn JV**: Standards for Juvenile Detention and Confinement Facilities. In Recommendations for Juvenile Justice Reform. (Monograph) 2nd Edition. American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform, 2005, p.40-47.

15.  Masters KJ, **Penn JV**: Seclusion and Restraint: Juvenile Justice Plus Restrictive Interventions Equals Fragmentation. AACAP News, 2005, p. 164, 172.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

16. **Penn JV**: Safe Use of Psychotropic Medications with Confined Youth. <u>Correct Care</u>, 2005, Volume 19, Issue 2, p. 12.

17. Murakami S, Rappaport N, **Penn JV**: An Overview of Juveniles and School Violence. In <u>Psychiatric Clinics of North America</u>. Edited by Scott C. Philadelphia: Elsevier, 2006, pp. 725-741.

18. **Penn JV**: Expert Commentary: Antipsychotic Use Among Children and Adolescents. <u>Psychiatry 2006</u>. 2006; 9:19.

19. **Penn JV**: Child and Adolescent Psychiatry. In R.J. Goldberg, <u>Practical Guide to the Care of the Psychiatric Patient</u>, 3rd Edition. Elsevier: Philadelphia, PA, 2007, pp 389-441.

20. Romero L, **Penn JV**. Ethical Issues of Youthful Offenders: Confidentiality, Right to and Right to Refuse Treatment, Seclusion and Restraint. In C. Kessler and L. Kraus, <u>The Mental Health Needs of Young Offenders,</u> Cambridge University Press, Cambridge, UK, 2007, pp. 401-422.

21. **Penn JV**, Thomas CR. Mental Health Care in Juvenile Detention Facilities: A Review (Letter to Editor) <u>Journal of the American Academy of Psychiatry and the Law.</u> 2006; 34:570-571.

22. Faille L, Clair M, **Penn JV**. Special Risk Management Issues in Child and Adolescent Psychiatry. <u>Psychiatric Times</u>. 2007; 7:64-67.

23. **Penn JV**. Invited Editorial: "Psychotropic Medications in Incarcerated Juveniles: Over versus Under-Prescribed?" <u>Arch Pediatr Adolesc Med</u>. 2008 Mar;162(3):281-3.

24. Baillargeon J**,** Paar DP, **Penn JV** Psychiatric Disorders and HIV/Hepatitis Coinfection <u>CorrDocs</u>. Volume 11, Issue 3:12.2008

25. Baillargeon J**, Penn JV**, (Letter to Editor) <u>The American Journal of Psychiatry</u> 2009; 166:490.

26. **Penn JV**. Suicide Prevention Strategies for Juveniles in Correctional Settings. In <u>Condotte Suicidarie: Un'analisi Nel Sistema Degli Istituti Penali Minorili (Suicide Behavior: An Analysis of the Juvenile Justice/Correctional System).</u> Numeri Pensati: Gangemi Editore, Rome, Italy, 2010, pp 66-76.

27. Clair M, Faille L, **Penn JV.** Prevention and Treatment of Violent Offending/Offenders. In Ferguson CJ, <u>Violent Crime: Clinical and Social Implications</u>, Sage Publications, Thousand Oaks, CA, 2010, 351-372.

28. **Penn JV**. Standards and Accreditation for Jails, Prisons, and Juvenile Facilities, In <u>Oxford Textbook of Correctional Psychiatry</u>. Edited by Trestman R, Appelbaum K, and Metzner J. Oxford University Press, New York, NY, 2015, pp 359-365.

29. McGlasson T, Champion MK, **Penn JV**. (2018) Geriatric Offenders: Evaluation and Treatment within Correctional Settings, In J. C. Holzer, R. Kohn, J. M. Ellison, & P. R. Recupero (Eds*.),* Geriatric Forensic Psychiatry: Principles and Practice (pp. 227–236). Oxford University Press, Oxford, UK.

30. **Penn JV**, Weinstein HC. (2017) Correctional Psychiatry, In Kaplan & Sadock's Comprehensive Textbook of Psychiatry 10th edition. Edited by Sadock BJ, Sadock VA and Ruiz P, (pp.4449-4477). Lippincott Williams & Wilkins, Philadelphia, Pennsylvania.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

C. ABSTRACTS:

1. Penn JV, Phillips KA. (1995). Body Dysmorphic Disorder and Social Phobia, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting, Miami, Florida.

2. Penn JV, Boland RJ, McCartney JR. (1995). Recognition and Treatment of Depressive Disorders Among Internists, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting. Miami, Florida.

3. Penn JV, Salloway SP. (1995). Development of Multiple Sclerosis in a Patient with Attention-Deficit Hyperactivity Disorder, Poster Session, American Neuropsychiatric Association Annual Meeting. Pittsburgh, Pennsylvania.

4. Chang K, Neeper R, Jenkins M, Penn JV, Bollivar L, Israeli L, Malloy P, Salloway SP. (1995). Clinical Profile of Patients Referred for Evaluation of Adult Attention-Deficit Hyperactivity Disorder, Poster Session, American Neuropsychiatric Association Annual Meeting. Pittsburgh, Pennsylvania.

5. Penn JV, Zimmerman M, Mattia J. (1996). Screening for Psychiatric Disorders in Medical Outpatients: A Patient Acceptance Study, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting. New York, New York.

6. Jenkins M, Malloy P, Cohen R, Salloway SP, Neeper R, Penn JV, Chang K. (1996). Attentional and Learning Dysfunction among Adults with History of Childhood ADHD, Poster Session, International Neuropsychological Society Annual Mid-Year Meeting. Veldhoven, The Netherlands.

7. Penn JV, Boland RJ, McCartney JR. (1996). Recognition and Treatment of Depressive Disorders by Internal Medicine Attendings and House staff, Annual Chester M. Pierce, M.D., Sc.D., Resident and Medical Student Research Symposium, National Medical Association 101st Scientific Assembly, Chicago, Illinois.

8. Penn JV, Boland RJ, McCartney JR. (1996). Recognition and Treatment of Depressive Disorders by Internal Medicine Attendings and House staff, Poster Session, Annual Lifespan Hospitals Research Celebration, Providence, Rhode Island.

9. Penn JV, Holden P, Hendren RL. (1997). Can You Teach Child and Adolescent Psychopharmacology from Somebody Else's Lecture Notes? Workshop Presentation and Poster Session, Annual Meeting Association for Academic Psychiatry, Albuquerque, New Mexico.

10. Leonard HL, Penn JV, March J. (1997). OCD in Children and Adolescents, Review of Psychiatry, Obsessive-Compulsive Disorder Across the Life Cycle, American Psychiatric Association Annual Meeting. San Diego, California.

11. Penn JV, Esposito C, Spirito A. (2001). Incidence of Suicide Attempts and Self-Injurious Behavior in a Juvenile Correctional Facility, Poster Session, American Academy of Child and Adolescent Psychiatry Annual Meeting. Honolulu, Hawaii.

12. Penn JV, Esposito CL, Stein LAR, Lacher-Katz M, Spirito A. (2003) Juvenile Correctional Workers' Perceptions of Suicide Risk Factors and Mental Health Issues of Incarcerated

18

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

Juveniles, Poster Session, American Academy of Psychiatry and the Law Annual Meeting, San Antonio, Texas.

13. Penn JV. (2005) AACAP Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities, Symposium, Emerging Frontier of Psychiatry: Juvenile Justice, American Psychiatric Association Annual Meeting, Atlanta, Georgia.

14. Penn JV. (2005) Surviving the Challenges of Juvenile Corrections: Suicide Prevention Strategies, Symposium, Juvenile Justice and Mental Health, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Paris, France.

15. Merideth P, Janofsky J, Penn JV. Phillips RTM, Recupero P. (2005) Difficult Case? Consult Your Colleagues, Workshop, American Academy of Psychiatry and the Law Annual Meeting, Montreal, Canada.

16. Chen JT, Hunt J, Penn JV, Spirito A. (2006) Psychiatric Differences Among Adolescents in a Psychiatric Hospital Versus a Juvenile Correctional Facility, Poster Session, American Psychiatric Association, Institute on Psychiatric Services, New York, New York.

17. Penn JV. (2006) Suicide Attempts and Self-Mutilative Behavior in a Juvenile Correctional Facility, Symposium, Recent Developments in the Research of Juvenile Offenders, American Academy of Child and Adolescent Psychiatry Annual Meeting. San Diego, California.

18. Penn JV. (2007) Acting Out: How to Manage Difficult Adolescents in Correctional Settings, Symposium (Chair), Novel Approaches to the Evaluation and Treatment of Juvenile Offenders, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Padua, Italy.

19. Garvey KA, Penn JV. (2007) Contracting for Safety with Adolescents: Is This an Empirically Based Practice? Poster Session, American Academy of Psychiatry and the Law Annual Meeting, Miami, Florida.

20. Ryan E, Penn JV. (2007) Juvenile Sexual Offenders: Update on Clinical and Forensic Evaluation Strategies, Workshop Presentation, American Academy of Child and Adolescent Psychiatry Annual Meeting. Boston, Massachusetts.

21. Baillargeon J, Penn JV. (2008) The Prevalence and Treatment of Psychiatric Disorders in a State Prison System, Academic and Health Policy Conference on Correctional Health, Quincy, Massachusetts.

22. Garvey KA, Penn JV, Campbell AL, Esposito-Smythers CL, Spirito A. (2008) Contracting for Safety: Clinical Practice and Forensic Implications, Paper Session, American Academy of Psychiatry and the Law Annual Meeting, Seattle, Washington.

23. Baillargeon J, Penn JV, (2009) Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door, Symposium, International Academy of Law and Mental Health, International Congress on Law and Mental Health, New York, New York.

24. Baillargeon J, Penn JV, (2009) Psychiatric Disorder and Parole Revocation Among Texas Prison Inmates, Academic and Health Policy Conference on Correctional Health, Fort Lauderdale, Florida.

25. Dingle AD, Zito JM, Sharma S, Zima BT, Varley CK, Carlson GA, Penn JV. (2010) Psychotropic Medication Use in Vulnerable Child and Adolescent Populations,

19

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

Symposium, American Academy of Child and Adolescent Psychiatry Annual Meeting, New York, New York.

26. Penn JV, (2011) Framework of Correctional Managed Care Models: Formulary Development and Implementation, Symposium, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Berlin, Germany.

27. Ochoa K, Penn JV, Venters H, Hustings E, Mehta S, Belous L. (2011) Seriously Mentally Ill Persons in U.S. Immigration Detention, Panel, American Academy of Psychiatry and the Law Annual Meeting, Boston, Massachusetts.

28. Penn JV, Harzke AJ, Baillargeon J, (2012) Risk of Reincarceration among Prisoners with Co-Occurring Serious Mental Illness and Substance Use Disorders, Academic and Health Policy Conference on Correctional Health, Atlanta, Georgia.

29. Penn JV, (2012) Practicing Behind Bars: Challenges and Opportunities Within Correctional Psychiatry, Symposium, Forensic Psychiatry: Informing Clinical Practice, American Psychiatric Association Annual Meeting, Philadelphia, Pennsylvania.

30. Torrealday O, Penn JV, (2013) Juveniles Behind Bars: Meeting Treatment Needs Through a Statewide Academic and Correctional Managed Care Partnership, Academic and Health Policy Conference on Correctional Health, Chicago, Illinois.

31. Penn JV, (2013) Psychiatric Services in Jails and Prisons: An Update on the APA Guidelines, American Psychiatric Association Annual Meeting, San Francisco, California.

32. Penn JV, (2013) Psychiatric Comorbidity in Secure Juvenile Settings: How Complex an Issue is It Really? International Academy of Law and Mental Health, International Congress on Law and Mental Health, Amsterdam, The Netherlands.

33. Torrealday O. Penn JV, Parikh R, (2014) Meeting Complex Mental Health Needs of Youthful Offenders, Academic and Health Policy Conference on Correctional Health, Houston, Texas.

34. Parikh R, Torrealday O, Penn JV, (2014) Save Money and Get Better Care? Cost Effective Health Care Delivery in Juvenile Corrections, Academic and Health Policy Conference on Correctional Health, Chicago, Illinois.

35. Torrealday O, Penn JV, (2015) Grievances: Strategies to Reduce Grief and Grievances While Improving Patient Care, Academic and Health Policy Conference on Correctional Health, Boston, Massachusetts.

36. Appelbaum K, Ford E, Metzner J, Penn JV, Trestman R, (2015) The New APA Guidelines on Correctional Psychiatry, Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, Fort Lauderdale, Florida.

37. Penn JV, "Diagnosis and Treatment of Individuals with Gender Dysphoria (GD) Within Correctional Settings," Developments in Correctional Psychiatry Course, American Academy of Psychiatry and the Law (AAPL), Virtual CME Program, December 2021.

38. Tamburello, A, Fisher K, Champion M, Penn JV, (2022) Lessons Learned: Forensic Facilities in the Pandemic Era, Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, New Orleans, Louisiana.

39. Sonnier L, Mayer T, Purkayastha S, Penn JV, (2022) The Antidote to Polypharmacy: Deprescribing in Juvenile Justice, Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, New Orleans, Louisiana.

40. Hatters-Friedman, Sorrentino R, Landess J, Penn JV, Westmoreland P, (2023) Forensic Reproductive Psychiatry: Practice Guidelines Review, Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, Chicago, Illinois.

41. VanDercar AH, Jain A, Virano S, Penn JV, (2023) Drugs in "Controlled Correctional Settings," Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, Chicago, Illinois.

42. Kushner DB, Rosenbaum K, Champion MK, Thompson C, Penn JV, (2023) Forensic Mental Health Legislation: Balancing Our Obligation, Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, Chicago, Illinois.

PAPERS AND CONTINUING EDUCATION PROGRAMS PRESENTED:

1. "Cognitive Behavioral Treatment of Panic Disorder," Rhode Island Hospital, Department of Psychiatry, General Hospital Psychiatry Continuing Education Series, Providence, Rhode Island, 1993.

2. "Social Phobia: An Overview of Treatment Strategies," Rhode Island Hospital, Department of Psychiatry, General Hospital Psychiatry Continuing Education Series, Providence, Rhode Island, 1994.

3. "Paraphilias and Sexual Deviations," Butler Hospital, Outpatient Department Case Conference, Providence, Rhode Island, 1995.

4. "Cultural Competence in the Delivery of Mental Health Services," Rhode Island Psychological Association 1995 Annual Convention, Providence, Rhode Island, 1995.

5. "Can You Teach Child and Adolescent Psychopharmacology from Somebody Else's Lecture Notes?" Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1997.

6. "Consulting to the Community: A Challenge for the Child and Adolescent Psychiatrist," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1997.

7. "A School-Based Approach to Selective Mutism," Elmhurst Elementary School, Portsmouth, Rhode Island, 1977.

8. "Moodiness and Depression in Children and Adolescents," WLNE ABC Channel 6, Providence, Rhode Island, 1997.

9. "Moodiness and Depression in Adolescents," Mount Hope High School, Bristol, Rhode Island, 1997.

10. "Moodiness and Depression in Children and Adolescents," Lifespan Health Connection, Speaking of Kids, Parenting Education Series, Bradley Hospital, East Providence, Rhode Island, 1997.

11. "Career Opportunities in Child and Family Psychiatry," Junior Explorers, Miriam Hospital, Providence, Rhode Island, 1998.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

12. "The Crisis of School Violence: How Do We Help Our Children," Testimony before the Congressional Children's Caucus, Washington, District of Columbia, 1999.

13. "Assessment of Violent Behavior in Adolescents," Department of Pediatrics, Division of Adolescent Medicine, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 1999.

14. "Overview of Child Psychiatric Consultation at the Rhode Island Training School to the Rhode Island Family Court," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 1999.

15. "The New Law and Psychiatry Service at Brown," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1999.

16. "Violent Threats Made by Adolescents: An Approach to Assessment and Treatment," The Family Health Center at SSTAR Program, Fall River, Massachusetts, 1999.

17. "Introduction to Child and Adolescent Psychopharmacology," Miriam Hospital, Rhode Island Nursing Association, Clinical Nurse Specialists Continuing Education Seminar, Providence, Rhode Island, 2000.

18. "What We Don't Want to Happen to Our Youth," Adolescent Mental Health and School Success Conference, Rhode Island Department of Health, Providence, Rhode Island, 2000.

19. "Psychiatric and Abuse Issues Affecting Incarcerated Youth," Justice for All Youth Conference, Rhode Island Office of the Child Advocate, Warwick, Rhode Island, 2000.

20. "Juvenile Violence," Grand Rounds, Newport Hospital, Newport, Rhode Island, 2000.

21. "Demystifying the Courts and the Legal Process for Juveniles," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 2000.

22. "Warning Signs in Adolescents: A Practical Guide for Families and Educators," Lifespan Health Connection, Parenting Matters, Parenting Education Series, Tollgate High School, Warwick, Rhode Island, 2000.

23. "Mood Dysregulation and Mood Disorders in Incarcerated Youth," Grand Rounds, Judge Baker Children's Center, Boston, Massachusetts, 2001.

24. "The Crisis of School Violence: How Do We Help Our Children," Grand Rounds, Department of Psychiatry, State University of New York, Buffalo, New York, 2001.

25. "Mental Health Evaluation and Treatment of Incarcerated Youth," Child Psychiatry Fellowship Seminar Series, New England Medical Center, Boston, Massachusetts, 2001.

26. "Mood, Substance Abuse, and Other Mental Disorders in Violent Youth," St. Anne's Hospital, Fall River, Massachusetts, 2001.

27. "Teen Violence: Risk Management and Malpractice Issues" Annual Conference, National Organization of Forensic Social Workers, Philadelphia, Pennsylvania, 2001.

28. "Mental Health Needs of Incarcerated Youth" Annual Conference, National Organization of Forensic Social Workers, Philadelphia, Pennsylvania, 2001.

29. "Children's Mental Health Issues in Rhode Island: Problems and Solutions" Testimony before Congressional Committee Hearing, Rhode Island State House, Providence, Rhode Island, 2001.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

30. "Mental Health Evaluation and Treatment of Incarcerated Youth," Sixth New England Correctional Health Conference, Sturbridge, Massachusetts, 2001.

31. "When Psychotherapies Are Not Enough: Medical Management of Aggression," Pediatric Psychopharmacology: An Update for Primary Care Practitioners, Providence, Rhode Island, 2001.

32. "Mental Health Evaluation and Treatment of Incarcerated Juveniles," The Providence Center, Providence, Rhode Island, 2001.

33. "School Shootings and Youth Violence," Truman Taylor Show, WLNE ABC, Channel 6, Providence, Rhode Island, 2001.

34. "Juveniles Presenting with Violent or Threatening Behaviors" Greater Fall River Child Protection Council and St. Anne's Hospital Lecture Series, Fall River, Massachusetts, 2001.

35. "School Shootings and Youth Violence," Healthwatch, NBC, WJAR Channel 10, Providence, Rhode Island, 2001.

36. "Youth Violence," Bradley/Hasbro Hospitals: Parenting Matters 2001, Toll Gate High School, Warwick, Rhode Island, 2001.

37. "School Violence: Strategies for Schools and Families," N.A. Ferry Middle School, Johnston, Rhode Island, 2001.

38. "School Violence: Strategies for Schools and Families" CBS, WPRI, Channel 12, Providence, Rhode Island, 2001.

39. "Re-Defining the Use of Psychotropic Medications in Children and Adolescents," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 2001.

40. "Bullying, Beatings & Beyond: Assessment and Treatment of Youth Violence," Rhode Island Psychological Society, Pawtucket, Rhode Island, 2001.

41. "Psychiatric Services for Incarcerated Juveniles," Annual Meeting, National Commission on Correctional Health Care (NCCHC), Albuquerque, New Mexico, 2001.

42. "Assessment and Treatment of Juvenile Sexual Offenders," (Discussant) Grand Rounds, Rhode Island Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, Providence, Rhode Island, 2001.

43. "Re-Defining the Use of Psychotropic Medications in Children and Adolescents," Rhode Island Training School, Clinical Staff In-Service, Cranston, Rhode Island, 2002.

44. "Youth Violence: Evaluation and Treatment Approaches," University of Texas Medical Branch, Department of Psychiatry, Psychiatry Resident's Journal Club, Galveston, Texas, 2002.

45. "Youth Violence: Practical Strategies for Clinicians," St. Luke's Hospital, Department of Psychiatry, Grand Rounds, New Bedford, Massachusetts, 2002.

46. "Redefining the Use of Psychotropic Medications in Juvenile Justice Populations," 7th Northeast Correctional Health Care Conference, Sturbridge, Massachusetts, 2002.

47. "Profile of a Columbine Type Perpetrator: What to Look for and What to do About it," Annual Juvenile Probation and Justice Management Conference (Juvenile Probation

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

Track): National Council of Juvenile and Family Court Judges Conference, Tucson, Arizona, 2002.

48. "Conduct Disorder: Evaluation and Treatment Approaches," Plymouth, Massachusetts, 2002.

49. "Conduct Disorder: Evaluation and Treatment Approaches," Child and Adolescent Psychiatry Grand Rounds, Taunton State Hospital, Taunton, Massachusetts, 2002.

50. "Redefining the Use of Psychotropic Medications in Children and Adolescents," Kent County Mental Health Center, Warwick, Rhode Island, 2002.

51. "The Project Hope Experience: Evaluation and Treatment of Mental Health Issues in Incarcerated Juveniles," Children's Mental Health - A System of Care Approach, American Academy of Child and Adolescent Psychiatry, Boston, Massachusetts, 2002.

52. "Clinical Challenges in Child and Adolescent Psychiatry," Beaumont, Texas, 2002.

53. "Recognizing Other Psychiatric Disorders" American Academy of Pediatrics: DB:PREP An Intensive Review Course of Developmental and Behavioral Pediatrics, Providence, Rhode Island, 2002.

54. "Youth Violence: Practical Strategies for Clinicians," Family Service Association of Greater Fall River, Inc., Fall River, Massachusetts, 2002.

55. "Bullying, Beatings, and Beyond: Assessment and Treatment of Youth Violence," Grand Rounds, Department of Pediatrics, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 2002.

56. "Psychotropic Medications:  What They Do, What They Don't Do," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 2002.

57. "Recognition and Management Strategies of Youth Violence for Mental Health Professionals," Child and Adolescent Psychiatry Grand Rounds, Taunton State Hospital, Taunton, Massachusetts, 2002.

58. "Suicide Prevention in Juvenile Correctional Facilities," Staff Training Program, Rhode Island Training School, Cranston, Rhode Island, 2002.

59. "The Elephant in the Room: How the Legal System Can Impact Therapy," (Discussant) Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 2003.

60. "Youth Violence," Bradley/Hasbro Hospitals: Parenting Matters 2003, Toll Gate High School, Warwick, Rhode Island, 2003.

61. "Identification and Treatment of Mental Health Issues in Incarcerated Youth," 8th Northeast Correctional Health Care Conference, Sturbridge, Massachusetts, 2003.

62. "Missed Opportunities and Challenges: Identifying Mental Health and Substance Abuse Issues in Today's Youth," Physician Leadership on National Drug Policy Conference: Adolescent Substance Abuse and Mental Health: A Public Health Priority, Providence, Rhode Island, 2003.

63. "Evaluation and Treatment of Incarcerated Juveniles with Mental Health Issues: Challenges, Frustrations, and Solutions," Butler Hospital, Child and Adolescent Services Program Lecture Series, Providence, Rhode Island, 2003.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

64. "Surviving the Challenges of Juvenile Corrections: Suicide Prevention Strategies," National Conference on Correctional Health Care, Austin, Texas, 2003.

65. "Redefining the Use of Psychotropic Medications in Children," Annual Meeting of the RI Chapter of the American Academy of Pediatrics, Providence, Rhode Island, 2003.

66. "How Young People Become Criminals: Their Developmental Trajectories Before and After," Brown University, Behavioral Misadventures Symposium, Providence, Rhode Island, 2003.

67. "Understanding and Defusing Explosive Kids," Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004.

68. "Mixing Legal and Street Drugs: A Cocktail for Disaster," Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004.

69. "Promising Programs: Suicide Prevention/Good Practices," 23rd Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004.

70. "Challenging Youths, Families & Systems: Implementing Psychiatric Strategies and Risk Management Principles," Problems in Pediatrics Conference, Colby College, Waterville, Maine, 2004.

71. "Acting Out Youths: Practical Evaluation & Treatment Strategies," Problems in Pediatrics Conference, Colby College, Waterville, Maine, 2004.

72. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics PREP Course: Costa Mesa, California, 2004.

73. "Risky Behavior: How to Keep Youth Safe in Inpatient and Community Settings," Grand Rounds, Department of Pediatrics, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 2004.

74. "ADHD Co-Morbidity: Practical Evaluation and Treatment Approaches," 2004 Fall CME Conference, New York State Society of Physician Assistants, Albany, New York, 2004.

75. "Behavioral Health Issues for Juvenile Offenders," 3rd Annual Behavioral Health in Corrections Conference, University of Rhode Island, Kingston, Rhode Island, 2004.

76. "Redefining the Use of Psychotropic Medications for Incarcerated Juveniles," National Conference on Correctional Health Care, New Orleans, Louisiana, 2004.

77. "Surviving Juvenile Corrections: Timely Suicide Prevention Strategies," National Conference on Correctional Health Care, New Orleans, Louisiana, 2004.

78. "How Young People Become Criminals: Their Developmental Trajectories Before and After," Contemporary Social Work Practice, Bradley Hospital Educational Series, Bradley Hospital, East Providence, Rhode Island, 2004.

79. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: PREP Course: Miami, Florida, 2005.

80. "Forensic Mental Health Evaluations," Continuing Legal Education Program, Office of the Public Defender, Providence, Rhode Island, 2005.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

81. "Juvenile Suicide Risk in Congregate Care Settings, "Suicide Prevention Promises and Practices – Focus on Youth Conference, Rocky Hill, Connecticut, 2005.

82. "Profile of a Columbine-Type Juvenile: What to Look for and What to Do About It," Juvenile Courts Association of Georgia 2005 Annual Seminar, Pine Isle Resort at Lake Lanier, Georgia, 2005.

83. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: PREP Course: Portland, Oregon, 2005.

84. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: Practical Pediatrics Course: Beaver Creek, Colorado, 2005.

85. "Strategies for Resident Advocacy at the State Legislature," 2nd Northeast Pediatric Resident Advocacy Conference, Hasbro Children's Hospital, Brown Medical School, Providence, Rhode Island, 2005.

86. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2005.

87. "Suicide Prevention/Intervention Training," Staff Training Seminar Series, Rhode Island Training School, Cranston, Rhode Island, 2006.

88. "ADHD and Juvenile Delinquency," Annual Meeting, American Society for Adolescent Psychiatry, Miami, Florida, 2006.

89. "Forensic Mental Health Evaluations," Continuing Legal Education Program, Criminal Division, Office of the Attorney General, Providence, Rhode Island, 2006.

90. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," National Conference on Correctional Health Care, San Diego, California, 2006.

91. "Berber v. Mellott, MD: Lessons from a Medical Malpractice Mock Trial," Continuing Medical Education Program, Professional Risk Management Services, Inc., Providence, Rhode Island, 2006.

92. "How to Respond to Mentally Ill and Substance-Abusing Youth in the Juvenile Justice System," 25th Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Providence, Rhode Island, 2006.

93. "Acting Out: How to Manage Difficult Adolescents," National Conference on Correctional Health Care, Atlanta, Georgia, 2006.

94. "You Be the Judge: A Mock Trial Involving an Inmate's Claim," National Conference on Correctional Health Care, Atlanta, Georgia, 2006.

95. "Assessment and Treatment of Court-Involved Youth in Juvenile Corrections and Other Settings: Challenges, Frustrations, and Solutions," Contemporary Social Work Practice, Bradley Hospital Educational Series, Bradley Hospital, East Providence, Rhode Island, 2006.

96. "Mental Health Services for Juvenile Offenders," Grand Rounds, Department of Psychiatry, Maine Medical Center, Portland, Maine, 2007.

97. "Strategies to Avoid the Courtroom – The Case for Thorough Medical Documentation," UNAP/Rhode Island Health Care Education Trust Seminar Series, Rhode Island Hospital, Providence, Rhode Island, 2007.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

98. "Suicide Prevention Strategies for Juveniles in Correctional Settings," Congress: Prevention of Suicidal Conduct in Incarcerated Minors, Campidoglio, Sala Della Protomoteca, Rome, Italy, 2007.

99. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," National Conference on Correctional Health Care, Las Vegas, Nevada, 2007.

100. "Civil Commitment of Adolescents," Rhode Island/Hasbro Hospitals Department of Pediatric Emergency Medicine, Case Conference, Providence, Rhode Island, 2007.

101. "Emerging Issues in Forensic Psychiatry," St. Luke's Hospital, Department of Psychiatry, Grand Rounds, New Bedford, Massachusetts, 2007.

102. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2007.

103. "Redefining the Use of Psychotropic Medications for Incarcerated Juveniles," National Conference on Correctional Health Care, Nashville, Tennessee, 2007.

104. "Lessons Learned from Inside the Fence: Juvenile Offenders, the RI Training School and Family Court Systems," Rhode Island Psychiatric Society, Providence, Rhode Island, 2007.

105. "Use of Psychotropic Medications for Incarcerated Youth," Updates in Correctional Health Care, National Conference on Correctional Health Care, San Antonio, Texas, 2008.

106. "Mentally Ill Juveniles," American Correctional Association, New Orleans, Louisiana, 2008.

107. "Identification and Management of Juvenile Mental Disorders," National Conference on Correctional Health Care, Chicago, Illinois, 2008.

108. "Identification and Management of Juvenile and Adult Mental Disorders," Texas Corrections Association, Austin, Texas, 2008.

109. "Use of Psychotropic Medications Within Correctional Settings," Mental Health Managers Conference, UTMB CMC Mental Health Services, Huntsville, Texas, 2008.

110. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2008.

111. "Mental Health Services within the Texas Correctional System," National Institute of Mental Health (NIMH) and UTMB: Mental Illness, Incarceration and Community Re-Entry: Telepsychiatry and Continuity of Mental Health Care, Austin, Texas, 2008.

112. "Essentials of Correctional Juvenile Health Care," Updates in Correctional Health Care: Transforming Principles to Practice, Las Vegas, NV.

113. "Preventing Suicide in Corrections: Timely Collaboration Between Administration, Custody, and Clinical Staff," UTMB CMC Annual Conference, Galveston, Texas, 2009.

114. "Psychotropic Medication Education for Non-Psychiatrists," UTMB CMC Mental Health Services Conference, Huntsville, Texas, 2009.

115. "Malingering: Practical Evaluation and Management Approaches," UTMB CMC Mental Health Services Conference, Huntsville, Texas, 2009.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

116. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," Academy of Correctional Health Professionals Regional Seminar, Austin, Texas, 2009.

117. "Rational Approach to Psychotropic Medications in Correctional Settings," Academy of Correctional Health Professionals Regional Seminar, Austin, Texas, 2009.

118. "Behind the Bars and Razor Wire: Mental Health Disorders Within Correctional Settings," Texas Department of Criminal Justice (TDCJ) Community Justice Assistance Division (CJAD) Skills Conference, Austin, Texas, 2009.

119. "Essentials of Correctional Juvenile Health Care," National Conference on Correctional Health Care, Orlando, Florida, 2009.

120. "Evaluation and Treatment of Personality Disorders," Mental Health Managers Conference, UTMB CMC Mental Health Services, Huntsville, Texas, 2009.

121. "Mental Health Issues of the Female Offender," Texas Corrections Association Annual Conference, Galveston, Texas, 2010.

122. "Identification and Management of Adult and Juvenile Mental Health Disorders in Correctional Settings, National Conference on Correctional Health Care, Boston, Massachusetts, 2010.

123. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Las Vegas, Nevada, 2010.

124. "Essentials of Correctional Juvenile Health Care," National Conference on Correctional Health Care, Las Vegas, Nevada, 2010.

125. "Mental Health Formulary and Disease Management Guidelines Development and Utilization with the Texas Department of Criminal Justice," Mental Health Conference, United States Bureau of Prisons-Health Services Division, Oklahoma City, Oklahoma, 2010.

126. "Competency to Assist in Immigration/Deportation Hearings: Application of Existing Competency Evaluation Models to Immigration Context (Non-Citizens with Mental Disabilities)," United States Immigration and Customs Enforcement (ICE)/Office for Civil Rights and Civil Liberties (CRCL) Mental Health Roundtable, Washington, D.C., 2010.

127. "Mental Health Systems of Care, Formulary and Disease Management Guidelines Development and Utilization within the Texas Department of Criminal Justice," Forensic Best Practices Conference, Houston, Texas, 2010.

128. "Juvenile Waiver and Transfer to Criminal Court," Conference Update on Juvenile Forensic Evaluations, Capacity for Justice, Austin, Texas, 2010.

129. "Practicing Behind Bars: Challenges and Opportunities Within Correctional Psychiatry" Grand Rounds, UTMB Department of Psychiatry and Behavioral Sciences, Galveston, Texas, 2010.

130. "Behind the Bars and Razor Wire: Mental Health Disorders within Correctional Settings" University of Texas Arlington, Annual Psychiatric Nursing Symposium, Arlington, Texas, 2011.

131. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Phoenix, Arizona, 2011.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

132. "Medical Conditions That Can Present as 'Psychiatric' in Nature," National Conference on Correctional Health Care, Baltimore, Maryland, 2011.

133. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Baltimore, Maryland, 2011.

134. "Containing Your Psychotropic Medication Expenses: Strategies for Formulary Development and Implementation," American Correctional Association, Phoenix, Arizona, 2012.

135. "Child and Adolescent Forensic Psychiatry," International Conference on Forensic Psychiatry, Santiago, Chile, 2012.

136. "An In-Depth Look at NCCHC's 2008 Standards for Health Services in Prisons and Jails, National Conference on Correctional Health Care, San Antonio, Texas, 2012.

137. "Acting Out" Offenders: Implementing Mental Health/Psychiatric Strategies and Risk Management Principles, National Conference on Correctional Health Care, San Antonio, Texas, 2012.

138. "Save Pharmacy Dollars: Contain Your Psychotropic Medication Use and Expenses" American Correctional Association, Denver, Colorado, 2012.

139. "Practicing Behind Bars: Challenges and Opportunities within Correctional Psychiatry" Grand Rounds, Keck School of Medicine of the University of Southern California, Department of Psychiatry, Los Angeles, California, 2012.

140. "Review of NCCHC's Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012.

141. "Medical Conditions That Present as 'Psychiatric' in Nature," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012.

142. "Mad Versus Bad Offenders: Implementing Mental Health Strategies and Risk Management Principles," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012.

143. "Contain Your Psychotropic Medication Use and Expenses," American Correctional Association, Houston, Texas, 2013.

144. "Evaluation and Management of Juvenile Offenders," American Correctional Association, Houston, Texas, 2013.

145. "Integrating Mental Health and Medical Issues in the Complex Environment of Corrections," Society of Correctional Physicians, Denver, Colorado, 2013.

146. "Update on NCCHC Standards," National Institute on Corrections (NIC), U.S. Department of Justice, State Directors of Mental Health Network meeting, National Advocacy Center, Columbia, South Carolina, 2013.

147. "Identification and Prevention of Suicide and Self Injurious Behaviors in Correctional Settings," American Association of Suicidology, Austin, Texas 2013.

148. "'Acting Out' Adolescents: Pearls for Effective Evaluation and Management," American Correctional Association, National Harbor, Maryland, 2013.

149. "Preventing Suicide Behind Bars: Real World Approaches," American Correctional Association, National Harbor, Maryland, 2013.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

150. "DSM-5: An Overview and Its Impact on Correctional Mental Health," UTMB CMC Annual Conference, Galveston, Texas, 2013.

151. "Overview of UTMB CMC Mental Health Services," Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) Advisory Committee, Austin, Texas, 2013.

152. "An In-Depth Look at NCCHC's 2014 Standards for Health Services in Prisons," National Conference on Correctional Health Care, Nashville, Tennessee, 2013.

153. "Institutional Self-Injury: Managing the Self-Destructive Juvenile," National Conference on Correctional Health Care, Nashville, Tennessee, 2013.

154. "Medical Conditions That Present as Psychiatric in Nature," National Conference on Correctional Health Care, Atlanta, Georgia, 2014.

155. "Guidelines for Treatment of Adolescents with ADHD," National Conference on Correctional Health Care, Atlanta, Georgia, 2014.

156. "Correctional Psychiatry: The Final Frontier of Psychiatry," Psychiatry Grand Rounds, John Peter Smith (JPS) Health Network, Fort Worth, Texas, 2014.

157. "DSM 5: What Pediatricians Need to Know," "Psychopharmacology in Primary Care: Practical Strategies," "Adolescent Substance Abuse," and "Adolescent Suicide and Self-Injurious Behaviors," American Academy of Pediatrics: Practical Pediatrics CME Course, Hilton Head, South Carolina, 2014.

158. "Mental Health Issues of Female Offenders," and "Update on NCCHC Standards," National Institute on Corrections (NIC), U.S. Department of Justice, State Directors of Mental Health Network meeting, National Corrections Academy, Aurora, Colorado, 2014.

159. "Correctional Psychiatry: The Final Frontier of Psychiatry?" Grand Rounds, UTMB Department of Psychiatry and Behavioral Sciences, Galveston, Texas, 2014.

160. "Mental Health Issues of the Female Offender," American Correctional Association, Salt Lake City, 2014.

161. "Strategies to Improve Patient Safety and Professional Satisfaction," National Conference on Correctional Health Care, Las Vegas, Nevada, 2014.

162. "Risk Management: How is Your Jail Liable?" National Conference on Correctional Health Care, Las Vegas, Nevada, 2014.

163. Various Topics in Child and Adolescent Psychiatry, 25th Annual Pediatric Symposium, Joe DiMaggio Children's Hospital at Memorial, Fort Lauderdale, Florida, 2014.

164. "Breaking Bad: Timely Strategies for Offenders with Mental Illness," Mid-Winter Workshop, Texas Corrections Association, Austin, Texas, 2014.

165. "Assessment & Prevention of Suicide and Self-Injurious Behaviors: Correctional Best Practices," American Correctional Association, Long Beach, California, 2015.

166. "Diagnosing Mental Illness Using DSM-5," American Correctional Association, Indianapolis, Indiana, 2015.

167. "An In-Depth Look at NCCHC's 2015 Standards for Health Services in Juvenile Detention and Confinement Facilities," National Conference on Correctional Health Care, Dallas, Texas, 2015.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

168. "Medical Conditions That Present as Psychiatric in Nature." National Conference on Correctional Health Care, Dallas, Texas, 2015.

169. "Demystifying Mental Illness: It's Not All in Your Head." Texas Department of Criminal Justice (TDCJ) Health Services Division Annual Conference, Huntsville, Texas, 2015.

170. "PTSD in Corrections, Diagnostic and Treatment Issues." American Correctional Association, New Orleans, Louisiana, 2016.

171. "The Development of a University-Based Specialty Program for State Prisoners with Gender Dysphoria." American Correctional Association, New Orleans, Louisiana, 2016.

172. "Acting Out Youths: Timely Forensic and Correctional Approaches." Presidential Symposia, "Issues for Child and Adolescent Psychiatry in the 21st Century." American Psychiatric Association, Atlanta, Georgia, 2016.

173. "Use of Telepsychiatry Within Correctional Settings." American Correctional Association, Boston, Massachusetts, 2016.

174. "LGBT Offenders: Critical Issues in Gender Dysphoria." Coalition of Correctional Health Authorities, All Health Authority Training, National Institute of Corrections, Washington, D.C., 2016.

175. "Guidelines for Treating ADHD in Adolescents," NCCHC, Las Vegas, Nevada, October 2018.

176. "Epidemiology of Suicide." Texas Society of Psychiatric Physicians Conference, Austin, Texas. 2018.

177. "The Assessment and Management of Suicide Risk, Tex Med Conference, San Antonio, Texas May 2018.

178. "The Assessment and Management of Violence Risk, Tex Med Conference, San Antonio, Texas May 2018.

179. "Guidelines for Treating ADHD in Adolescents," NCCHC, Las Vegas, Nevada, October 2018.

180. "Practicing Correctional Psychiatry Behind the Bars and Razor Wire: Challenges and Opportunities," McMaster University, Hamilton, Ontario, Canada: International Forensic Psychiatry Lecture Series. Virtual CME Program, December 2020.

181. "Mental Health: Finding a Way Past Trauma and Violence," UTMB Health Virtual Winter Series, Galveston, Texas, March 2021.

182. "Seclusion and Restraint in Correctional Settings," Texas Society of Child and Adolescent Psychiatry: Child Psychiatry at the Crossroads: Focus on At Risk Populations and Social Change. Virtual CME Program, July 2021

183. "I Refuse to Take My Meds! Psychotropic Medication Treatment Over Objection," NCCHC, Denver, Colorado, April 2022.

184. "Gender Minority Care in the Correctional Setting," International Association for Correctional and Forensic Psychology (IACFP), Virtual Presentation, April 2022.

Joseph V. Penn, MD CCHP-MH LFAPA Curriculum Vitae

185. "Special Populations Behind Bars and Razor Wire: Correctional Psychiatry Challenges and Opportunities," Rutgers University Integrated Special Populations and New Jersey ACTS Special Populations Core Series Seminar, Virtual Presentation, May 2022.

186. Pre-Conference Seminar, "Standards for Health Services in Juvenile Detention and Confinement Facilities," NCCHC, Las Vegas, Nevada, October 2022.

187. "Youth Behind Bars and Razor Wire: Timely Forensic Versus Clinical Psychiatric Strategies," Baystate Medical Center, Department of Pediatric Grand Rounds, Springfield, Massachusetts, November 2022"Serving the Underserved Behind Bars and Razor Wire: Mental Health Needs and Timely Strategies," Healthcare in the Justice System: Bridges to Access 2023, The University of Oklahoma Health Sciences Center, Oklahoma City, Oklahoma, February 2023

188. "Challenges and Opportunities: Working in Different Correctional Settings," American Psychiatric Association Forensic Psychiatry Course, "Challenges and Opportunities: Forensics and Corrections: What You Need to Know," APA Annual Meeting, San Francisco, California, May 2023"Practicing Behind Bars and Razor Wire: Challenges and Opportunities for Psychiatrists" VTC Psychiatry Adult Case Conference, Grand Rounds Carilion Clinic, Roanoke, Virginia, August 2023

189. "Upholding the Constitutional Standard: Correctional Mental Health Monitoring and Expert Work Across Correctional Facilities," American Academy of Forensic Science, Denver, Colorado, Virtual Presentation, February 2024

# Exhibit B

**Joseph V. Penn, MD CCHP FAPA**
**Testimony**

Revised 1/3/2024

## 2023

State of Texas v. Josiah Perez, 296th District Court of Collin County, McKinney, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

Kanautica Zayre-Brown v. The North Carolina Department of Public Safety, et al., United States District Court for the Western District of North Carolina, Access to Sexual Reassignment Surgery (A/K/A gender affirming genital surgery)

Bobbie Lee Haverkamp A/K/A David Allen Haverkamp v. Lannette Linthicum, MD, et al. United States District Court for the Southern District of Texas, Corpus Christi Division, Access to Sexual Reassignment Surgery (A/K/A gender affirming genital surgery), 30(b)6 witness

State of Texas v. James Antwone Acy, Criminal District Court 4 of Dallas County, Dallas, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

Carrie Roth-Walker, individually, and on behalf of the Statutory Beneficiaries of Branden Roth, deceased v. Christopher Nanos, Sheriff of Pima County; Pima County, Wellpath, et al; Jail Inmate on Jail Inmate Assault Resulting in Death

## 2022

John Rapp, in his Personal Capacity and as Personal Representative of the Estate of Nicholas Rapp v. NaphCare, Inc., Kitsap County, et al.; Jail Suicide

Mariah M. Walters, as Personal Representative of the Estate of Elizabeth Najar v. Board of County Commissioners of Chaves County, New Mexico and CorrHealth, LLC d/b/a CorrHealth LLC, Jail Suicide

G.H., et al., v. Eric S. Hall, Florida Department of Juvenile Justice and Secretary of the Department of Juvenile Justice, et al., United States District Court, Northern District of Florida, Risk of Mental Harm to Detained Juveniles Housed in Behavioral Confinement While in State of Florida Juvenile Detention Centers

G.H., et al., v. Eric S. Hall, Florida Department of Juvenile Justice and Secretary of the Department of Juvenile Justice, et al., United States District Court, Northern District of Florida, Risk of Mental Harm to Detained Juveniles Housed in Behavioral Confinement While in State of Florida Juvenile Detention Centers

Wilhen Hill Barrientos, et al. v. CoreCivic, Inc. United States District Court, Middle District of Georgia, Mental Risk of Harm to U.S. Immigration and Customs Enforcement (ICE) Detainees Confined, with a Focus on ICE Detainees' Participation, Housing Assignments, and Privileges (or Loss Thereof) While Housed at the Stewart Detention Center, Lumpkin, Georgia

## 2021

Victor Parsons; et al., on behalf of themselves and all others similarly situated, and Arizona Center for Disability Law v. David Shinn, Director, Arizona Department of Corrections Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract, Monitoring Bureau, Arizona Department of Corrections Rehabilitation and Reentry, in their official capacities: U.S. District Court, District of Arizona, Phoenix, Arizona. Arizona Department of Corrections State Prisoners: Unconstitutional Conditions of Confinement, Access to and Provision of Clinically Appropriate and Individually Determined Mental Health Evaluation and Treatment Services, Mental Health Intake Health Screening and Procedures, Mental Health and Psychiatric Evaluation and Treatment Services, Other Mental Health Policies and Procedures, Mental Health and Psychiatric Staffing, Suicide Prevention Policy and Procedures, Audits and Compliance Reports, Access to Mental Health and Psychiatric Care

Stephen Knox v. Rob Jeffreys, Dr. Kelly Renzi, Dr. Andrew Tilden and Wexford Health Sources, Inc., et al, United States District Court, Central District of Illinois, Mental Health Conditions and Treatments of Mr. Stephen Knox While Housed in Restrictive Housing

Bryan P. Bonham v. State of Nevada, Nevada Department of Corrections, et al, United States District Court, District of Nevada, Is Restriction of a State Prison Inmate's Out of Cell Activities Due to COVID Precautions Reasonable or Does This Pose Risk Of Mental Harm or Mental Disorder(s)

## 2020

William A. Ruda, MD and Sandra L. Ruda v. State of New Jersey Department of Human Services; Ann Klein Forensic Center; State of New Jersey Department of Corrections; Moises Polanco; Carrier Clinic, Inc. et al. Superior Court of New Jersey, Somerset County, Forensic Patient on Physician Assault Resulting in Injuries

Debra P. Vought and Eric Vought as the Permanent Guardians Acting on Behalf of Jared R. West v. San Juan County Regional Medical Center, Inc., Presbyterian Medical Services, Inc., et al; Aztec District Court, Aztec, New Mexico, Jail Mental Health Services

Medical Malpractice Screening Panel Testimony (confidential by state statute) – I am unable to reference the name, issue, city, or state as it would identify the case

**2019**

State of Texas v. Pontrey Jones, Judicial District Court 403rd District Court, Travis County, Austin, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

Luis Alberto Mendez v. County of Sacramento; The Regents of the University of California; Gregory Sokolov, MD; Danielle Dass, LCSW; Charlene Williams, NP; Andrea Javist; Deputy Sheriff Tineley Sietz; Deputy Sheriff Alexander Egenberger; Deputy Sheriff Jordan Lee, United States District Court for the Eastern District of California Sacramento Division, Sacramento California, Jail Self Harm

Connie McMillin, as Independent Executrix of the Estate of Lee B. Albin, Deceased, and Heather Albin and Claire McMillin-Albin v. Oceans Behavioral Hospital Lufkin; Oceans Behavioral Hospital of Lufkin, LLC; Oceans Healthcare, LLC; Vernon Johnson, MD; and Vernon Charles Johnson, MD, PA, Angelina County, Texas, Medical Malpractice

**2018**

State of Texas v. Anthony Paz Torres, Judicial District Court 203rd, Dallas County, Dallas, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

State of Florida v. Anthony Carter, Third Judicial Circuit of Florida, Columbia County, Lake City, Florida, Deposition to Perpetuate Testimony, Death Penalty

Ferreira, et al. v. Penzone, et al., United States District Court, District of Arizona, Phoenix, Arizona, Jail Inmate on Jail Inmate Assault Resulting in Death

**2017**

Jacqueline Smith (Estate of Danarian Hawkins) v. Harris County, Houston, Texas, Jail Suicide and Suicide Prevention

US v. Graff, Court Martial/Sentencing Hearing, United States Army Base, Fort Hood, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

State of Texas v Randall Mays, Henderson County, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Death Row Inmates, 30(b)6 witness

Civil Action No. BC494030; Dianne Jordan v. Los Angeles County Sheriffs' Department, Los Angeles Police Department (LAPD), Superior Court of California, County of Los Angeles, Central District, et al., Jail Suicide and Suicide Prevention

Civil Action No. 2:15-cv-01845-JAT; Ferreira, et al. v Arpaio, et al., Maricopa County Jail, Phoenix, Arizona United States District Court, District of Arizona, Mental Health Services and a Jail Inmate on Inmate Assault Resulting in Death

Civil Action No. 4:14-cv-03326; Ashley Adams, et al v. Brad Livingston, et al; In the United States District Court for the Southern District of Texas, Houston Division, Houston, Texas, Extreme Heat and Inmates with Mental Disorders, 30(b)6 witness

Civil Action No. 4:14-cv-03302; Edna Webb, et al v. Brad Livingston, et al; In the United States District Court for the Southern District of Texas, Houston Division, Houston, Texas, Developmental Disabilities Program (DDP) Evaluation and Treatment Services and Mental Health Services, 30(b)6 witness

# Exhibit C

RE:                                                              Client Name/Case
_____

I. Fee schedule for providing expert services to your firm with reference to the
   above name matter:

(A)  Review of depositions, records, report, or other data..........600.00 pr/hr
(B)  Conference with attorney or others as required.................600.00 pr/hr
(C)  Psychiatric consultation with written report.....................600.00 pr/hr
(D)  Research...................................................................600.00 pr/hr
(E)  Deposition – testimony..............................................750.00 pr/hr
(F)  Testimony in court...................................................750.00 pr/hr

II.  Billing for out-of-town cases will be $3,000.00 for a minimum of 4 hours and
     $6,000.00 for 8 hours per day, and will include any/all travel time.  Any
     additional time will be billed at $750.00 per hour.  Travel expenses, meals and
     accommodations will be computed at actual rate.

III.  It is hereby specifically agreed that payment of all fees and expenses as outlined
      herein are the full responsibility of the undersigned attorney and firm of which
      he/she may be a member, and payment is not contingent on any verdict or
      settlement of the above captioned matter.

IV. It is also specifically agreed that the undersigned attorney and firm will be
    responsible for securing funds in advance for depositions (and not subsequent to
    the deposition).

V.  A retainer amount of $5,000.00 payable to "*Joseph Penn MD and Forensic
    Associates, LLC*" is due before starting any work in this matter.  Dr. Penn will
    submit invoices periodically and will notify the undersigned attorney/firm if an
    additional retainer amount is necessary.

VI. Please sign one copy of this agreement and return to this office.  The original is
    for your records.

                                   Joseph Penn MD and Forensic Associates, LLC
                                   206 A S. Loop 336 W. #158
                                   Conroe, Texas 77304


Agreed & Accepted by


_____        _____
Attorney for firm                                   Name of law firm

Date_____

# Exhibit D

DEFENDANTS'
EXHIBIT
5
Case No. 2:90-CV-00520-KJM-DB

1  ROB A. BONTA, State Bar No. 202668
   Attorney General of California
2  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
3  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
4  Deputy Attorneys General
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-7318
     Fax: (916) 324-5205
7    E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

   PAUL B. MELLO, State Bar No. 179755
   SAMANTHA D. WOLFF, State Bar No. 240280
   KAYLEN KADOTANI, SBN 294114
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
   HANSON BRIDGETT LLP
     1676 N. California Boulevard, Suite 620
     Walnut Creek, CA 94596
     Telephone: (925) 746-8460
     Fax: (925) 746-8490
     E-mail: PMello@hansonbridgett.com
   *Attorneys for Defendants*

8
9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                          SACRAMENTO DIVISION

12

13   **RALPH COLEMAN, et al.,**              Case No. 2:90-cv-00520 KJM-DB (PC)

14                          Plaintiffs,      **DEFENDANTS' RULE 26(a)(2)(B)
                                             DISCLOSURE OF ERICA GREULICH,**
15        v.                                 **PH.D.**

16                                           Judge: The Hon. Kimberly J. Mueller
     **GAVIN NEWSOM, et al.,**
17
                            Defendants.
18

19
20
21
22
23
24
25
26
27
28

19828822.1 [4339211.1]                        1
          Defs.' R. 26(a)(2)(B) Disclosure of Erica Greulich, Ph.D.  (2:90-cv-00520 KJM-DB (PC))

DEFS-005.001

# Coleman, et al. v. Newsom, et al.

**United States District Court**
**Eastern District of California**
**Case No.: 2:90-cv-00520 KJM-DB (PC)**

**Expert Report of Erica Greulich, Ph.D., and Jéssica Dutra, Ph.D.**

**August 31, 2023**

DEFS-005.002

# Economic Report:

# Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Mental Health Professionals

*Secretariat Economists*

**Table of Contents**

I.      Introduction and Assignment ...................................................................... 0

II.     Qualifications ............................................................................................. 1

III.    Summary of Opinions ................................................................................. 2

IV.     Market Conditions Indicate that Mental Health Professionals Shortages and Other Factors will Continue to Impair CDCR Hiring .......................................................... 4

        A.   Nationwide Shortages of Mental Health Professionals Create Universal Hiring Challenges ........................................................................................... 4

             1.   Supply of Psychiatrists ........................................................... 6

             2.   Supply of Other Mental Health Professionals ......................... 8

             3.   Evidence of Nationwide Shortages .......................................... 10

        B.   Shortages are Prevalent in California ................................................ 20

             1.   Current Demand and Supply .................................................... 20

             2.   Current and Projected Shortages of Mental Health Practitioners .... 22

             3.   Recruiting and Retention Difficulties at California Health Systems ..... 26

        C.   The Impact of the COVID-19 Pandemic on Mental Health Provider Shortages ......... 29

             1.   Impact on the Demand for Mental Health Services ................... 29

             2.   Impact on the Supply of Mental Health Providers .................... 29

             3.   Impact on Hiring and Retention in the Correctional Labor Market ..... 31

             4.   Impact on the Use of Telehealth for Mental Health Care ........... 32

        D.   CDCR Shortages ............................................................................... 34

             1.   CDCR Vacancy and Fill Rates ................................................. 34

             2.   Relative Access to Mental Health Professionals ...................... 42

             3.   The Impact of the COVID-19 Pandemic on Mental Health Provision at CDCR ..... 45

        E.   CDCR Hiring Initiatives and Their Potential to Alleviate Shortages ............. 47

             1.   Competitive Salary ................................................................. 47

             2.   Salary Enhancements and Other Monetary Benefits Offered by CDCR ........ 59

             3.   Other CDCR Benefits .............................................................. 65

             4.   Other Hiring Initiatives ........................................................... 66

             5.   Factors that compound CDCR's Hiring Challenges .................. 67

V.      Potential of Increased Pay to Alleviate Shortages ..................................... 68

        A.   Salary Premiums and Civil Service Fill Rates ................................... 69

        B.   Hiring Gains and Losses ................................................................... 74

        C.   Evidence from Registry Hires ........................................................... 77

DEFS-005.004

VI. Proposed Policy Solutions Aimed at Alleviating Mental Health Provider Shortages .......... 78

   A. Increased Telehealth Opportunities ................................................................ 78

   B. Increased Pay and Benefits ........................................................................... 79

   C. Utilization of Other Types of Mental Health Professionals............................. 79

   D. Policy Solutions Beyond CDCR's Control..................................................... 80

VII. Conclusion ..................................................................................................... 81

## List of Figures

Figure 1 - Adult Psychiatry Workforce Projection Percent Adequacy, 2020-2035 ..................... 12
Figure 2 - Adult Psychiatry Workforce Projection Shortage (FTE Workers), 2020-2035 ........... 13
Figure 3 - Psychiatrist salary comparison ................................................................ 16
Figure 4 - Mental Health Provider Shortage Areas and Number of CDCR Facilities Per County 23
Figure 5 - Psychiatrist Vacancy Rate ...................................................................... 35
Figure 6 - CDCR Statewide Psychiatrist Positions and Vacancy Counts.................................... 36
Figure 7 - Clinical Social Worker Vacancy Rate ........................................................... 37
Figure 8 - CDCR Statewide Clinical Social Worker Positions and Vacancy Counts ................. 37
Figure 9 - Recreation Therapist Vacancy Rate ............................................................. 38
Figure 10 - CDCR Statewide Recreation Therapist Positions and Vacancy Counts.................... 39
Figure 11 - Psychologist Vacancy Rate ..................................................................... 40
Figure 12 - CDCR Statewide Psychologist Positions and Vacancy Counts............................... 40
Figure 13 - Medical Assistant Vacancy Rate ................................................................ 41
Figure 14 - CDCR Statewide Medical Assistant Positions and Vacancy Counts........................ 42
Figure 15 - CDCR Average Psychiatrist Salary Comparison with Statewide and National
Averages ................................................................................................... 49
Figure 16 - CDCR Average Psychologist Salary Comparison with Statewide and National
Averages ................................................................................................... 51
Figure 17 - CDCR Average Clinical Social Worker Salary Comparison with Statewide and
National Averages........................................................................................... 53
Figure 18 - CDCR Average Recreation Therapist Salary Comparison with Statewide and
National Averages........................................................................................... 54
Figure 19 - CDCR Average Medical Assistant Salary Comparison with Statewide and National
Averages ................................................................................................... 56
Figure 20 – Filled Positions Regression Analysis – CDCR Salary Coefficients and Confidence
Intervals.................................................................................................... 71
Figure 21 - Filled Positions Regression Analysis Coefficients of Interest and Confidence
Intervals.................................................................................................... 73
Figure 22 - CDCR Statewide Hiring Gains and Losses.................................................... 75
Figure 23 - CDCR Statewide Hiring Gains and Losses:.................................................... 76

DEFS-005.005

**List of Tables**

Table 1 - Shortages of Behavioral Health Providers in CA............................................................. 25
Table 2 - CDCR Inmates' Access to Mental Health Providers Relative to California Adult
Population ........................................................................................................................................ 44

DEFS-005.006

## I.   Introduction and Assignment

1. This report was prepared by Dr. Erica Greulich and Dr. Jéssica Dutra, who are economists and Directors with Secretariat Economists ("SE"), an economics consulting firm in the fields of microeconomics, law and economics, public policy, and business strategy.

2. The purpose of this report is to assess whether, in light of prevailing labor market conditions and compensation levels, the California Department of Corrections and Rehabilitation ("CDCR") has taken reasonable measures to meet mandated staffing levels and maximum vacancy rates among certain classifications of mental health providers. We base the report on a comprehensive review of documents and data from CDCR, data and information from publicly available sources, academic research, policy studies and independent statistical analyses. We assess prevailing and projected supply of and demand for mental health services; CDCR salaries, other monetary compensation and non-monetary benefits, particularly as they compare to other employers of mental health providers; and trends in markets for the provision of mental health services that are likely to impact CDCR's ability to hire and retain staff sufficient to meet its vacancy goals.

3. This report supplements previous research and analysis that Dr. Greulich and a co-author conducted for the *Coleman* litigation in 2018.[1] Therein we concluded that salary adjustments or other forms of additional monetary compensation would not enable CDCR to permanently and significantly increase the size of the pool of psychiatrists that it employs. Here we update that research and analysis to 2023, and expand it to psychologists, clinical social workers, recreational therapists, and medical assistants. We further assess other measures that may enhance CDCR's ability to hire and retain a larger mental health care provider workforce.

4. SE is being compensated for our work in this case at an hourly billing rate of $675. This hourly rate applies to our work preparing this report and to any testimony that we are asked to provide at deposition or a hearing. Other research staff at SE have assisted us on this matter, and SE is being compensated for their time at their standard hourly rates which range from $385 to $425. To date the SE team has accrued $457,815 in fees exclusive of

---

[1] Greulich, Erica and Fowdur, Lona. "Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists." 2018. ("Fowdur and Greulich 2018").

reimbursable expenses. Neither our compensation nor SE's compensation for work on this matter depends in any way on the litigation outcome.

## II.     Qualifications

5.  Dr. Greulich has a bachelor's degree in mathematics from Princeton University and a Ph.D. in economics from the University of California at Berkeley. Labor economics was one of her fields of specialization in graduate school, and a substantial portion of her work as an economist has been the application of quantitative methods to measure employment outcomes. Since obtaining her Ph.D. in 2005, Dr. Greulich has been employed by SE's predecessor, Economists Incorporated ("EI"), and SE. Throughout her career she has addressed economic questions on a broad range of matters and industries. In particular, she has consulted on employment-related matters such as wage and hour class action lawsuits, racial and gender discrimination matters, proactive pay equity audits and lost earnings matters. Dr. Greulich has conducted economic analyses for both plaintiffs and defendants and on behalf of businesses, individuals, governments and non-profits. She has testified about economic issues by declaration and at deposition.

6.  Dr. Dutra has a bachelor's degree in economics from Ibmec in Brazil, a bachelor's degree in European management from the Université de Strasbourg in France, and a Ph.D. in economics from the University of Kansas. Industrial organization (the field of economics devoted to the study of how markets work) and applied microeconometrics were her primary fields of specialization in graduate school. Dr. Dutra has taught advanced undergraduate courses in the economics of antitrust, industrial organization, and microeconomics at the University of Kansas. In the course of her consulting work, Dr. Dutra has worked on antitrust and competition matters in a wide range of industries. She has particular healthcare expertise, having worked on hospital mergers, physicians' lost privileges matters, payment rate arbitration cases between insurance companies and hospital groups, and class actions involving hospital networks.  She is continuously engaged in both the academic and practitioner environments, serving on the American Bar Association, delivering presentations at economics conferences, publishing and peer reviewing papers in academic journals.

DEFS-005.008

7. Our *curricula vitae* are attached as Appendix 4 to this report.  Therein, we describe our background, experience, and qualifications in more detail.

III.    **Summary of Opinions**

8. Based on the materials and data we have considered as well as our statistical analyses, we do not find that the evidence supports a finding that CDCR will be able to significantly enhance the number of mental health providers it employs through salary adjustments or other monetary compensation. CDCR's initiatives to boost employment through monetary adjustments have had limited impact on the number of mental health provider professionals it has been able to hire and retain over the past 5 years, and there is no evidence to suggest that this will change in the future.

9. There is a well-documented collective nationwide shortage of mental health professionals, as well as a shortage of psychiatrists in particular that is projected to worsen. The available evidence further indicates large unmet need for mental health care in California, and pervasive shortages of mental health providers throughout the state despite regional variation. Documented difficulties in the hiring and retention of mental health providers at California public sector employers and Kaiser Permanente, plus numerous reports of long wait times for mental health providers in other correctional systems and among the general public in California and nationwide, indicate that such difficulties are not limited to CDCR.

10. The onset of the COVID-19 pandemic has been linked to increased demand for mental health services, increased burnout among mental health providers, and increased numbers of mental health care providers retiring or otherwise exiting their professions. The pandemic has reportedly caused pre-existing recruitment and retention problems to worsen among licensed professions that provide mental health care. It has exacerbated correctional staffing shortages, including among mental health care providers working in correctional institutions. However, since the onset of COVID-19 there has been a sharp uptake in the use and acceptance of telehealth, particularly among psychiatrists and psychologists, which has attenuated the difficulty in access in many locations and situations.

11. CDCR data on filled and vacant positions across the 5 classifications considered in this report indicate that CDCR has enjoyed success in achieving lower vacancy rates among psychiatrists between 2018 and 2022. In particular, CDCR's expanded use of

DEFS-005.009

telepsychiatry during the COVID-19 pandemic coincides with a reduction in the psychiatrist vacancy rate at CDCR. Recreation therapist vacancy rates have also generally remained at 10% or lower throughout this period. However, the CDCR data suggest greater difficulties in filling authorized positions for the other classifications at issue. In particular, the number of filled psychologist and clinical social worker positions have generally declined throughout the 2018 to 2022 period.

12. Despite documented vacancies, CDCR employs a disproportionate number of mental health care providers in California. An analysis of the CDCR inmate population's access to psychiatrists, psychologists and clinical social workers indicates that CDCR provides access to these providers that is many times larger than access among the general adult population of California, even accounting for rough estimates of differences in demand.

13. Vacancies among mental health providers at CDCR persist despite substantial premiums in base pay relative to average pay among other employers of mental health professionals in California and nationwide. Conservative estimates of CDCR average base pay for psychiatrists, psychologists, clinical social workers ("CSWs") and recreation therapists have universally exceeded statewide and nationwide averages between 2018 and 2022. The maximum pay available to CDCR medical assistants has similarly exceeded California and U.S. benchmarks throughout this period, and the minimum pay available to CDCR medical assistants has been generally consistent with the national benchmark.

14. Other than the expanded use of telepsychiatry, many of the monetary and other hiring incentives and initiatives offered by CDCR have not noticeably impacted its ability to attract and retain additional mental health care professionals. Enhanced registry rates have had little to no impact on the number of registry-filled positions. Differential pay at Psychiatric Inpatient Patient ("PIP") facilities does not appear to have had a meaningful impact on the number of positions filled at these facilities. CDCR's fringe benefits (retirement contributions, estimated medical, dental and vision benefits, and Other Post-Employment Benefits) plus its programs offering dual appointments, cash-for-call, salary increases and bonuses potentially boost CDCR employees' compensation substantially above national and statewide averages, yet these benefits and programs have been ineffective at permanently increasing employment levels.

DEFS-005.010

15. A statistical analysis of CDCR's hiring outcomes and relative salaries fails to yield evidence showing that CDCR may be able to meaningfully increase its employment of the classifications at issue by increasing its salaries relative to market averages.

16. CDCR has already implemented many proposed policy solutions that are frequently mentioned as potential means to alleviate current and projected shortages of mental health professionals. Remaining proposed solutions are largely outside of CDCR's control. The available evidence suggests that telehealth is one avenue that enhances CDCR's ability to achieve its vacancy goals. Increased reliance on Psychiatric Nurse Practitioners ("PNPs") and psychiatric pharmacists may also enhance CDCR's ability to achieve and maintain low psychiatrist vacancy rates but not its ability to fill additional psychologist, clinical social worker, recreation therapist or medical assistant positions.

## IV. Market Conditions Indicate that Mental Health Professionals Shortages and Other Factors will Continue to Impair CDCR Hiring

17. In 2018 we reported on the nationwide shortage of psychiatrists that was mirrored within California and impacted CDCR's ability to hire and retain additional psychiatrists.[2] Research indicates that since 2018 nationwide and statewide shortages of psychiatrists have persisted and are projected to continue. Furthermore, shortages exist among mental health professionals more broadly and are perceived as worsening since the onset of COVID-19.

### A. Nationwide Shortages of Mental Health Professionals Create Universal Hiring Challenges

18. Mental illness has become the costliest medical condition in the United States, costing $201 billion annually.[3] The demand for mental health services has historically exceeded the supply, and the COVID-19 pandemic has only worsened this disparity.[4] Furthermore,

---

[2] Ibid.
[3] Satiani, Anand et al. "Projected Workforce of Psychiatrists in the United States: A Population Analysis." *Psychiatric services (Washington, D.C.)* vol. 69,6 (2018) doi:10.1176/appi.ps.201700344. ("Satiani et al."). p. 710.
[4] *See, e.g.,* National Alliance on Mental Illness. "NAMI State Legislation Report: Trends in State Mental Health Policy, 2020-2021 Legislative Review ("NAMI 2020")." p.4. Available at https://www.nami.org/NAMI/media/NAMI-Media/PDFs/NAMI_2020-21_State_Legislation_Report.pdf.

DEFS-005.011

mental health services are frequently reimbursed at lower rates than medical services, which compounds mental health workforce shortages.[5]

19. Taken collectively there are an estimated 1.2 million providers in the behavioral health workforce as of 2020.[6] The number of mental health providers per capita steadily increased from 2017 to 2022, reaching 305 providers per 100,000 population as of September 2022.[7] However, access to mental health care varies widely by geography and population throughout the U.S. Providers are unevenly distributed across the country, with rural areas, low-income communities and communities with higher percentages of Black or Hispanic and Latino individuals in particular experiencing a more drastic lack of providers.[8] Among practicing mental professionals, many work in cash-only practices that do not accept insurance.[9] Recent evidence indicates that even in urban areas where psychiatrists are more concentrated, 40% of psychiatrists go into private, cash-only practices which tend to serve patients with higher socioeconomic status.[10]

20. On the demand side, one in every five adults in the United States suffers from some form of mental illness and one in twenty suffers from severe mental illness.[11] The COVID-19

---

[5] *Id.*, p. 33.

[6] United States Government Accountability Office. "Behavioral Health: Available Workforce Information and Federal Actions to Help Recruit and Retain Providers." 2022, p.8. Available at https://www.gao.gov/assets/gao-23-105250.pdf. ("GAO 2022"). This 1.2 million figure includes providers such as primary care physicians who are not behavioral health providers *per se* but prescribe a certain amount of related medications.

[7] United Health Foundation. "America's Health Rankings: Mental Health Providers in United States." 2023 ("UHF 2023"). Available at https://www.americashealthrankings.org/explore/measures/MHP.This figure includes psychiatrists, psychologists, licensed clinical social workers, counselors, marriage and family therapists and advanced practice nurses specializing in mental health care.

[8] Ku, Benson S et al. "Associations between mental health shortage areas and county-level suicide rates among adults aged 25 and older in the USA, 2010 to 2018." *General hospital psychiatry* vol. 70 (2021): 44-50. doi:10.1016/j.genhosppsych.2021.02.001 ("Benson et al."). p. 44. *See also* Agapie, Elena et al. "Understanding Mental Health Apps for Youth: Focus Group Study With Latinx Youth." *JMIR formative research* vol. 6,10 (2022). doi:10.2196/40726.

[9] Coffman, Janet and Margaret, Fix. "Building the Future Behavioral Health Workforce: Needs Assessment." *Healthforce Center at UCSF*, 2023. ("Coffman and Fix 2023"). p. 24. Available at https://static1.squarespace.com/static/5b1065c375f9ee699734d898/t/63e695d3ce73ca3e44824cf8/1676056025905/CBHDA_Needs_Assessment_FINAL_Report_2-23.pdf; Bai, Nina. "These Psychiatrists Bring Mental Health Care to Those Who Need It Most." *University of California San Francisco*, 14 May 2019, citing National Council Medical Director Institute for the 2003-2013 statistic. Available at https://www.ucsf.edu/news/2019/05/414401/public-psychiatry-health-equity-and-inclusiveness.

[10] Gardner, Jordan S et al. "Remote Telepsychiatry Workforce: a Solution to Psychiatry's Workforce Issues." *Current psychiatry reports* vol. 22,2 8. 27 (2020). doi:10.1007/s11920-020-1128-7. ("Gardner et al. 2020"). p. 2.

[11] *See, e.g.,* Merritt Hawkins. "The Silent Shortage, A White Paper Examining Supply, Demand and Recruitment Trends in Psychiatry." *Merritt Hawkins White Paper Series*, 2018, p. 4. Available at

DEFS-005.012

pandemic has led to a documented increase in anxiety and depression among U.S. adults, exacerbating short-term mental health care provider shortages and potentially increasing longer-term demand due to increased stress-related conditions and substance abuse.[12] Demand for mental health care continues to grow due to increased recognition of mental health needs, which is in turn driven by an aging population, the opioid epidemic, and legislative goals intended to improve care and reduce healthcare costs.[13]

21. Increases in demand for mental health services coupled with insufficient and unevenly distributed provision of mental health services has led to shortages of mental health care throughout the U.S. Less than half of those with a mental illness (46.2%) received mental health services in 2020.[14] 77% of counties across the nation have severe shortages of mental health providers.[15] Nationwide, 6.2% of adults reported unmet need for mental health treatment in 2018-2019. The figure was slightly lower in California (5.7%), and ranged from 3.5% in Hawaii to 11.2% in the District of Columbia.[16] We discuss nationwide shortages in further detail below.

## 1. Supply of Psychiatrists

22. Psychiatrists are licensed physicians and surgeons who are certified by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and

---

https://www.merritthawkins.com/news-and-insights/thought-leadership/white-paper/examining-supply-demand-and-recruitment-trends-in-psychiatry; NAMI. "Mental Health by the Numbers." Last updated April 2023 and accessed August 28, 2023. Available at https://www.nami.org/Learn-More/Mental-Health-By-the-Numbers; Harrar, Sari. "Inside America's Psychiatrist Shortage." *Psycom*, 1 October, 2019. ("Harrar 2019"). Available at https://www.psycom.net/inside-americas-psychiatrist-shortage.

[12] *See, e.g.,* NAMI 2020, *supra* note 4, p. 4 and IHS Markit. "The Complexities of Physician Supply and Demand: Projections From 2019 to 2034," prepared for the Association of American Medical Colleges. June 2021. ("IHS Markit 2021"). p. 22. Available at https://www.aamc.org/media/54681/download.

[13] Gardner et al. 2020, *supra* note 10, p.1.

[14] NAMI 2020, *supra* note 4, p. 32.

[15] Nenn, Kerry. "We're Facing a Shortage of Mental Health Professionals." *American Addiction Centers*, recovery.org, 16 July, 2023 ("Nenn 2023"), citing a statistic reported by the National Council for Behavioral Health.

[16] Kaiser Family Foundation ("KFF") analysis of Substance Abuse and Mental Health Services Administration (SAMHSA)'s restricted online data analysis system (RDAS), National Survey on Drug Use and Health (NSDUH), 2018 and 2019, Substance Abuse and Mental Health Data Archive.

DEFS-005.013

Psychiatry, or who have completed a residency program in psychiatry approved by the American Medical Association or the American Osteopathic Association.[17] In many states, only licensed physicians are permitted to prescribe and monitor medication for mental health conditions.[18]

23. As of 2021 there were 38,411 active psychiatrists in the U.S., of which 23,645 (61.6%) were age 55 or older. More than a quarter were over age 65.[19] Thus the already-limited supply of psychiatrists is likely to become more constrained over the next few years as older psychiatrists reduce their hours or retire.

24. In recent years a slightly larger proportion of medical residents entered psychiatry, and the number of new psychiatry residents grew 5.3% from 2010 to 2015.[20] From 2016 to 2021, the growth in first-year psychiatry residents and fellows was even greater, 26.3%. However, the number of actively practicing psychiatrists increased only 0.2% from 2016 to 2021, from 38,345 to 38,424 nationwide.[21] The additional supply of recently trained psychiatrists has barely kept up with retirements and those leaving the psychiatrist workforce for other reasons over this period.

25. The supply of nurse practitioners and advanced practice registered nurses has grown rapidly over the past twenty years and is projected to continue doing so.[22]

---

[17] 22 CCR § 79567.

[18] Some states including California permit psychiatric nurse practitioners ("PNPs") to prescribe and monitor medications, with some degree of supervision by a licensed psychiatrist. *See, e.g.,* https://www.nami.org/About-Mental-Illness/Treatments/Types-of-Mental-Health-Professionals.

[19] Association of American Medical Colleges. "2022 Physician Specialty Data Report" ("AAMC 2022'). Executive Summary and Table 1.4. Available at https://www.aamc.org/data-reports/workforce/report/physician-specialty-data-report. Merritt Hawkins. "2022 Review of Physician and Advanced Practitioner Recruiting Incentives." 2022, p. 21. ("MH 2022"). Available at https://www.merritthawkins.com/trends-and-insights/article/reports/2022-review-of-physician-advanced-practitioner-recruiting-incentives/. For comparison purposes, only 46.7% of all active physicians were age 55 or older in 2021; AAMC 2022, Table 1.4.

[20] Gardner et al. 2020, *supra* note 10, p. 1.; Weiner, Stacy. "Addressing the escalating psychiatrist shortage." *AAMCNews*, 12 February 2018. ("Weiner 2018"). Available at https://www.aamc.org/news/addressing-escalating-psychiatrist-shortage.

[21] AAMC 2022, Executive Summary and Tables 1.9 and 2.6. This is substantially less than the 7.0 percent growth among all active physicians between 2016 and 2021.

[22] *See, e.g.,* IHS Markit 2021, *supra* note 12, pp. 1, 35, 37; and Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Nurse Anesthetists, Nurse Midwives, and Nurse Practitioners." 8 September 2022. Available at https://www.bls.gov/ooh/healthcare/nurse-anesthetists-nurse-midwives-and-nurse-practitioners.htm.

DEFS-005.014

## 2. Supply of Other Mental Health Professionals

26. In addition to psychiatrists, this Report assesses labor market conditions relevant to CDCR's employment of psychologists, clinical social workers, recreational therapists and medical assistants. Psychologists possess a doctorate degree in psychology and are either licensed or license-eligible and in the process of obtaining their license from the Board of Psychology.[23] Licensed clinical social workers ("LCSWs") are licensed as LCSWs by the Board of Behavioral Sciences.[24] Recreational therapists specialize in therapeutic recreation and are registered or eligible for registration as such by the Board of Park and Recreation Personnel or the National Therapeutic Recreation Society.[25] CDCR's mental health medical assistants primarily act as telepresenters for CDCR's telepsychiatrists, telepresenting patient encounters and providing clerical duties and other direct support to telepsychiatrists.[26]

### a. Psychologists

27. Recent estimates of the number of clinical psychologists nationwide range widely. 2021 estimates from the Bureau of Labor Statistics ("BLS") indicate 129,101 psychologists nationwide, 58,100 of which are clinical and counseling psychologists.[27] BLS employment projections estimate 118,800 clinical, counseling and school psychologists in the workforce as of 2020.[28] Another study estimates that there are 102,000 psychologists nationwide who specialize in behavioral health.[29]

28. Studies have found that the nationwide supply of psychologists either declined or increased modestly in the earlier years of this century. One study found that per capita supply

---

[23] 22 CCR § 79509.
[24] 22 CCR § 79539.
[25] 22 CCR § 79569.
[26] See, e.g., Joint Statement Re: Maximum Vacancy Rates for Recreation Therapists and Medical Assistant Positions, 14 March 2023, pp. 8-9.
[27] GAO 2022, supra note 6, p. 29; BLS Occupational Employment and Wage Statistics ("OEWS") May 2022 estimates suggest a modest increase to 62,880 clinical and counseling psychologists nationwide. See https://www.bls.gov/oes/current/oes193033.htm.
[28] GAO 2022, supra note 6, pp.27-28. This estimate is projected to increase to 131,100 by 2030.
[29] Id. p. 9.

DEFS-005.015

decreased 4% between 2003 and 2013.[30] Another study found that the supply of active psychologists nationwide was stable from 2005 to 2013, increasing slightly by 3.2%. There were considerable increases in retired and semi-retired psychologists but new psychologists entering the field compensated for those who retired.[31] We present more recent estimates of the number of psychologists and psychologists per capita in California below.

29. The BLS projects that 11,300 new psychologist jobs will be created nationwide between 2021 and 2031, representing 6% growth. There were 181,600 such jobs in 2021.[32]

### b. Social Workers

30. As of 2020 there were an estimated 221,791 behavioral health LCSWs nationwide.[33] Recent estimates from 2020 and 2021 indicate fewer LCSWs who specialize in mental health and substance abuse, 113,810 to 124,000.[34]

31. The BLS projects that the number of mental health and substance abuse social workers in the workforce will increase to 142,500 by 2030,[35] and that the number of social worker jobs (not limited to mental health and substance abuse) will grow by 9% between 2021 and 2031.[36]

### c. Recreation Therapists

[30] Benson et al., *supra* note 8, p. 2.

[31] Lin, Luona, et al. "Demographics of the U.S. Psychology Workforce: Findings from the American Community Survey." *American Psychological Association Center for Workforce Studies*. 2015. ("Lin et al."). pp. 1, 4.

[32] Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Psychologists." 8 September 2022. Available at https://www.bls.gov/ooh/life-physical-and-social-science/psychologists.htm. The BLS's definition of psychologists for the Occupational Outlook Handbook includes positions that require only a master's degree and not a doctoral degree, differentiating it from some of the workforce estimates reported above.

[33] GAO 2022, *supra* note 6, p. 8. Behavioral health encompasses physical as well as mental health. BLS OEWS 2022 estimates indicate 290,360 clinical social workers nationwide, not limited to those specializing in mental health and substance abuse. *See* Bureau of Labor Statistics OEWS National Salary Data, 2022.

[34] GAO 2022, *supra* note 6, pp. 28-29.

[35] *Ibid*.

[36] Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Social Workers." 8 September 2022. Available at https://www.bls.gov/ooh/community-and-social-service/social-workers.htm.

DEFS-005.016

32. Little research appears to have been done specific to the supply of recreation therapists in the U.S. BLS OEWS estimates indicate that there are 15,920 recreation therapists nationwide as of 2022, down from 20,080 only two years earlier.[37]

### d. Medical Assistants

33. There similarly appears to be little research specific to the supply of medical assistants in the U.S.[38] BLS OEWS estimates indicate that there are 752,460 medical assistants nationwide as of 2022, up from 646,320 in 2017.[39] The BLS further projects that the number of medical assistant jobs will grow by 16% between 2021 and 2031.[40]

### 3. Evidence of Nationwide Shortages

### a. Current and Projected Psychiatrist Shortages

34. Nationwide shortages of psychiatrists have been well-documented. For example, a 2018 American Association of Medical Colleges ("AAMC") article cites the statistic that there were no psychiatrists in more than half of US counties.[41]

35. While certain urban or metropolitan areas have an overabundance of psychiatrists, rural and non-metropolitan counties tend to have greater unmet need for psychiatrists and other mental health providers. Impoverished areas with greater mental health needs tend to experience limited access to mental health resources, exacerbating the shortage.[42] One

---

[37] Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wages, May 2022, 29-1125 Recreational Therapists." 25 April 2023. Available at https://www.bls.gov/oes/current/oes291125.htm. *See* Bureau of Labor Statistics OEWS National Salary Data, 2017 and 2022.]

[38] Medical assistants differ from physician assistants, about whom more data tend to be available. Unlike medical assistants, physician assistants are licensed healthcare providers.

[39] Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wages, May 2022, 31-9092 Medical Assistants." 25 April 2023. Available at https://www.bls.gov/oes/current/oes319092.htm. *See also* Bureau of Labor Statistics OEWS National Salary Data, 2020 and 2022.

[40] Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Medical Assistants." 25 October 2022. Available at https://www.bls.gov/ooh/healthcare/medical-assistants.htm.

[41] As reported in Weiner 2018, *supra* note 20.

[42] Butryn, Tracy, et al. "The shortage of psychiatrists and other mental health providers: Causes, current state, and potential solutions." *International Journal of Academic Medicine*, vol. 3, no. 1, Jan.-Apr. 2017, p. 6. Available at *Gale AcademicOneFile*, link.gale.com/apps/doc/A537799483/AONE?u=anon~71beeae1&sid=googleScholar&xid=9b4fc9ea.

DEFS-005.017

study found that 27% of metropolitan counties and 65% of non-metropolitan counties in the U.S. lack a psychiatrist, and 42% of metropolitan counties and 81% of non-metropolitan counties lack a PNP.[43]

36. One method used to document shortages of mental health professionals is called *Mental Health Professional Shortage Areas* ("MHPSAs").[44] MHPSAs are determined by the ratio of the population to psychiatrists within the area. If it is greater than 30,000 to 1 – or greater than 20,000 to 1 where high needs are indicated – the area is designated a MHPSA.[45] There are 6,464 MHPSAs nationwide, with 156.8 million people, 46.9% of the U.S. population, living in a MHPSA.[46] 7,871 additional psychiatrists are needed to remove MHPSA designations nationwide.[47] This is an increase from the estimate of 6,100 additional psychiatrists needed to remove all such designations in 2019.[48]

37. The National Center for Health Workforce Analysis ("NCHWA") collects, assesses, and presents data on the U.S. health care workforce, including adult psychiatry.  Their current workforce projections of future supply and demand cover the period from 2020-2035 and were generated using some data from the pandemic period. It is possible to observe supply and demand measured in full time equivalent ("FTE") worker trends, as well as percent adequacy in each period,[49] and distinctions across metropolitan ("Metro") versus non-

---

[43] Andrilla, C Holly A et al. "Geographic Variation in the Supply of Selected Behavioral Health Providers." *American Journal of Preventive Medicine* vol. 54,6 Suppl 3 (2018): S199-S207. doi:10.1016/j.amepre.2018.01.004. ("Andrilla et al. 2018"). In the Pacific region, which includes California, 9 percent of metropolitan counties and 56 percent of non-metropolitan counties lacked a psychiatrist, and 22 percent of metropolitan counties and 72 percent of non-metropolitan counties lacked a PNP.

[44] HPSAs can be geographic areas, populations, or facilities. A geographic HPSA occurs when there is a shortage of providers for an entire group of people within a defined geographic area. A population HPSA occurs when there is a shortage of providers for a specific group of people within a defined geographic area. A facility HPSA occurs when there is a shortage of providers at a public or non-profit private medical facility, correctional facility, state or county mental hospital or certain types of facilities that are automatically designated as HPSAs based on statute or through regulation. Facilities automatically designated based on statute are excluded from calculations of unmet need and additional practitioners needed to remove a designation. See https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation.

[45] KFF. "Mental Health Care Health Professional Shortage Areas." 30 September 2022. Available at https://www.kff.org/other/state-indicator/mental-health-care-health-professional-shortage-areas-hpsas.

[46] *Ibid.*; and United States Census Bureau. "U.S. and World Population Clock" (2023) as of 30 September 2022. Available at https://www.census.gov/popclock/.

[47] KFF. "Mental Health Care Health Professional Shortage Areas." 30 September 2022. Available at https://www.kff.org/other/state-indicator/mental-health-care-health-professional-shortage-areas-hpsas.

[48] IHS Markit 2021, *supra* note 12, p. 3.

[49] Percent adequacy is defined as supply/demand.

DEFS-005.018

metropolitan ("NonMetro") counties.[50] As shown in Figure 1, NCHWA predicts that the national shortage of adult psychiatrists will reach a deficit of 31% by 2035, ranging from an average of 25% in Metro areas to an astounding 71% deficit in their NonMetro counterparts. The effective supply shortage as measured by FTE (adult) psychiatrists can be seen projected in Figure 2 below, where 3,800 FTEs would be necessary to fill the gap in NonMetro areas in 2035, and an additional 10,400 FTEs would be needed in Metro areas in the same year for a total of 14,300 FTE professionals needed nationwide.

**Figure 1 - Adult Psychiatry Workforce Projection Percent Adequacy, 2020-2035**



Source: HRSA Workforce Projections

---

[50] Data is available at https://data.hrsa.gov/data/download?data=WorkforceProjections and documentation is available at https://data.hrsa.gov/data/download?data=WorkforceProjections. Accessed 22 June 2023.

DEFS-005.019

**Figure 2 - Adult Psychiatry Workforce Projection Shortage (FTE Workers), 2020-2035**



Source: HRSA Workforce Projections

FTE Gap is constructed and Demand - Supply.

38. The U.S. Department of Health and Human Services' Health Resources and Services Administration ("HRSA") projects whether the future behavioral health workforce will be sufficient to meet the needs of a baseline level of care. Its projections for 2017-2030, reflecting "status quo" modeling to determine whether the behavioral health workforce will be sufficient to provide a level of care at least as good as 2017 levels and not addressing maldistribution or inadequacies related to 2017 care levels, project that the supply of psychiatrists nationwide as of 2030 will be adequate to meet only 68% of demand nationwide.[51] These projections do not include the potential impacts of COVID-19 on the behavioral health workforce.

39. The HRSA developed alternative Behavioral Workforce Projections for the 2020-2035 period intended to capture increased need and demand for behavioral health services due to COVID-19 and the continuing opioid crisis, and to more accurately reflect recent demand for and supply of behavioral health care. The alternative scenarios account for unmet need for behavioral health services, reduced barriers to access among populations

---

[51] GAO 2022, *supra* note 6, p. 12. This implies that if 2017 levels of care from these providers were inadequate to meet demand, the 2030 projections would be similarly inadequate to meet demand.

DEFS-005.020

that have historically had lower access to behavioral health care, a reduced pipeline entering the behavioral health workforce, and combinations of these effects. Projections to 2035 under these scenarios suggest an even more inadequate supply of psychiatrists, sufficient to meet only 41% to 57% of demand nationwide.[52]

40. Another study projected demand for psychiatrists and resulting shortages based on data from the AAMC and American Board of Psychiatry and Neurology in conjunction with U.S. population data. The authors projected that the number of psychiatrists in the U.S. would contract through 2024, due largely to workforce retirements, before slowly beginning to expand in 2025. Estimates of psychiatrist shortages ranged from approximately 14,000 to 31,000 in 2024, depending on the psychiatrist-to-population ratio used, to a shortage of approximately 18,000 to a surplus of approximately 3,500 in 2050.[53]

    b. *Current and Projected Shortages of Other Mental Health Providers*

41. Less data are available regarding shortages of non-psychiatrist mental health providers. Much of the data that is available aggregates information for multiple types of providers, some of which are not among the classifications considered here.

42. The National Alliance on Mental Illness estimates that as of 2020, 37% of the U.S. population lived in an area with a shortage of psychologists, counselors and social workers.[54] 18% of U.S. counties report an unmet need for non-prescribing mental health providers, which include psychologists, social workers, advanced practitioners, therapists and counselors.[55] Furthermore, the American Psychological Association reports a sharp increase in psychologists reporting an inability to meet patients' demand for treatment, from 30% in 2020 to 46% in 2022.[56]

---

[52] U.S. Department of Health and Human Services, Health Resources and Services Administration. "Behavioral Health Workforce Projections, 2020-2035." 2022. ("HRSA 2022"). Available at https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/Behavioral-Health-Workforce-Projections-Factsheet.pdf.
[53] Satiani et al., *supra* note 3, p. 710.
[54] NAMI 2020, *supra* note 4, p .50.
[55] Butryn et al., *supra* note 42, p. 5.
[56] American Psychological Association. "Psychologists struggle to meet demand amid mental health crisis: 2022 COVID-19 Practitioner Impact Survey" 2022. Available at https://www.apa.org/pubs/reports/practitioner/2022-covid-psychologist-workload.

DEFS-005.021

43. Similar to psychiatry, there is substantial variation in the provision of psychology services across the U.S. Nationwide, 19% of metropolitan counties and 47% of non-metropolitan counties lack a psychologist.[57]

44. The HRSA's 2017-2030 baseline projections reflect "status quo" modeling to determine whether the behavioral health workforce will be sufficient to provide a level of care at least as good as 2017 levels and do not address maldistribution or inadequacies related to 2017 care levels. They project that the supply of psychologists, social workers, PNPs and psychiatric physician assistants is adequate to meet projected demand at a level of care at 2017 levels.[58]

45. However, the HRSA's alternative Behavioral Workforce Projections for the 2020-2035 period capture increased need and demand for behavioral health services due to COVID-19 and the continuing opioid crisis, and more accurately reflect recent demand for and supply of the behavioral health workforce. They project an inadequate supply of psychologists but an adequate supply of social workers, PNPs and psychiatric physician assistants nationwide as of 2035.[59]

*c. Salary Trends*

46. The progression of psychiatrists' salaries relative to other physicians' salaries also provides evidence of psychiatrist shortages. The Occupational Employment and Wage Statistics ("OEWS") program operates under the umbrella of the U.S. Bureau of Labor Statistics ("BLS") and provides annual estimates of employment and wages for over 800 occupations, including some mental health specialties.[60] For each occupation, OEWS provides average wages for the United States as a whole as well as for individual states, metropolitan areas, and nonmetropolitan areas. The averages are based on employee

---

[57] Andrilla, et al. 2018. In the Pacific region, which includes California, 5 percent of metropolitan counties and 37 percent of non-metropolitan counties lack a psychologist.

[58] GAO 2022, *supra* note 6, p. 12. This implies that if 2017 levels of care from these providers were inadequate to meet demand, the 2030 projections would similarly be inadequate to meet demand. These projections do not include the potential impacts of COVID-19 on the behavioral health workforce.

[59] HRSA 2022, *supra* note 52.

[60] A description of the program is at https://www.bls.gov/oes/.

DEFS-005.022

salaries and other forms of compensation such as incentive pay and production bonuses excluding overtime.[61]  Self-employed individuals are excluded.

47. A comparison of nationwide average salaries between 2017 and 2022 indicates that psychiatrist salaries have grown by 14.5% in the past five years, to $247,350, while average salaries for family medicine physicians and general practitioners have grown 7.6% to $224,460 and average salaries for pediatricians have grown 8.4% to $203,240.  Salaries for psychiatrists in California grew at a higher rate – 20.2% – between 2017 and 2022, reaching $311,950 as of 2022.[62] See Figure 3 below.

**Figure 3 - Psychiatrist salary comparison**



Source: BLS National and State Occupational Employment and Wage Estimates.

48. Similar analyses show that between 2017 and 2022 nationwide average salaries for clinical, counseling and school psychologists, clinical social workers, recreation therapists and medical assistants grew by 17.2%, 16.1%, 13.4% and 21.2% respectively.[63]

---

[61] Inclusions and exclusions from OEWS wage data are described at
https://www.bls.gov/oes/oes_ques.htm#overview.
[62] SE analysis of annual OEWS data, 2017-2022 (Mean Salaries and Growth Rates by Occupation_CKD.xlsx).
[63] *Ibid*.

DEFS-005.023

49. Several studies have documented generalized physician shortages across primary care and specialty physician categories.[64]  A higher increase in psychiatrist salaries relative to other physician specialties comports with worse shortages for psychiatrists relative to primary care physicians and pediatricians. Comparative salary increases for the other CDCR classifications currently at issue in this litigation show mixed results and are less clearly interpreted due to comparison occupations' differing educational and licensing requirements.[65]

50. The OEWS-reported psychiatrist salary trends align with those reported by Merritt Hawkins, a national medical-professional search and consulting firm. Merritt Hawkins ranked psychiatrists fourth on their list of most-requested recruiting assignments in 2021-2022 and tied this to a "longstanding dearth of behavioral health providers, a shortage that has been exacerbated due to COVID-19."[66] Average starting base salaries for the psychiatrist positions that Merritt Hawkins brokered increased from $263,000 in 2016-2017 to $299,000 in 2021-2022, a 14% increase over five years.[67]

*d.   Long Wait Times and Reduced Access Comport with Shortages*

51. Long patient wait times for mental health professionals also provide evidence of hiring challenges and the extent of national shortages. For example, a 2023 survey reports that 58% of mental health and substance use disorder industry employees who provide client

---

[64] *See, e.g.,* Association of American Medical Colleges. "AAMC Report Reinforces Mounting Physician Shortage." 11 June 2021. Available at https://www.aamc.org/news/press-releases/aamc-report-reinforces-mounting-physician-shortage.

[65] SE analysis of annual OEWS data, 2017-2022 (Mean Salaries and Growth Rates by Occupation_CKD.xlsx). For example, clinical, counseling and school psychologists' salaries (17.2%) increased more than those of postsecondary psychology teachers (4.0%) but roughly the same as sociologists (17.6%) between 2017 and 2022. Clinical social workers' salaries increased 16.1%, less than those of rehabilitation counselors (18.2%) or community health workers (17.9%). Recreation therapists' average salary increases (13.4%) were greater than those of occupational therapists (9.6%) or physical therapists (11.2%). Average salaries increased more for medical assistants (21.2%) than for physician assistants (19.6%) or dental assistants (15.6%). Many of these comparison occupations have different educational and/or licensing requirements than the CDCR classifications to which they are compared. As such, the labor pools available to prospective employers in each occupation differ, as do the salary levels paid to employees in each occupation.

[66] MH 2022, *supra* note 19, pp. 3, 6.

[67] MH 2022, *supra* note 19, pp. 10, 37. Base salaries exclude bonuses which are common in many physician employment contracts. Merritt Hawkins' annual starting salary figures may fluctuate if compensation was atypically high or low for a given specialty in a given year, recruiting practices changed for that specialty, or changes in Medicare or other payer reimbursement influenced compensation.

care say their waitlist is longer than ever.[68] The American Psychological Association's 2022 COVID-19 Practitioner Impact Survey found that 60% of psychologists were reporting no openings for new patients, 38% had a waitlist, and among those with a waitlist more than 40% had waiting lists of 10 or more patients. Among those with no waitlist, nearly 60% indicated that this was due to either not having the capacity to manage one, or too many people requesting services.[69]

52. Multiple "mystery shopper" studies in different states where researchers called psychiatrists seeking care found that only 12% to 15% were accepting new patients. Average waiting times in one study in the Los Angeles area were more than 5 weeks.[70] A Harvard University study found that only 17% of calls requesting an appointment with a mental health counselor were successful.[71] A field experiment reported in the American Economic Association Papers and Proceedings requested 1,000 appointments from a nationally representative sample of mental health providers and concluded that although their results were imprecise, COVID-19 likely reduced access to care.[72]

53. Excessive wait times prevail in numerous correctional systems across the country. Mental health advocates in more than a dozen states have sued over wait times in correctional systems.[73] The *New York Times* recently reported on delays in psychological services in a Wisconsin state prison experiencing an extended lockdown that observers attribute to prolonged staffing shortages. Inmates reported that prisoners at Waupun prison were

---

[68] The Harris Poll. "National Council for Mental Wellbeing Industry Workforce Shortages Research." *National Council for Mental Wellbeing*. 2023, p.9. ("NCMW"). Available at https://www.thenationalcouncil.org/wp-content/uploads/2023/04/Workforce-Shortage-Survey-Results-1.pdf?gfaction=event_send&category&action&label&entryid=0&nonce=5e8ee3c1a5.

[69] American Psychological Association. "Psychologists struggle to meet demand amid mental health crisis: 2022 COVID-19 Practitioner Impact Survey." 2022. ("APA 2022 Survey"). Available at https://www.apa.org/pubs/reports/practitioner/2022-covid-psychologist-workload. Also see Stringer, Heather. "Providers predict longer wait times for mental health services. Here's who it impacts most," *Monitor on Psychology* 54(3). 1 April 2023 ("Stringer"). Available at https://www.apa.org/monitor/2023/04/mental-health-services-wait-times.

[70] Harrar 2019, *supra* note 11. In some studies, the percentage accepting new patients was specific to individuals with a particular insurance carrier or plan.

[71] Nenn 2023, *supra* note 15.

[72] Harrell, Benjamin, et al. "The Impact of COVID-19 on Access to Mental Health Care Services," *AEA Papers and Proceedings 2023*, 113:420-422 ("Harell et al. 2023").

[73] Ervin, Dana Miller, "Fractured: The Wait Inmates With Mental Illness Endure Because They're Too Sick For Trial," *PBS Frontline*, April 18, 2023 ("Ervin 2023"). Available at https://www.pbs.org/wgbh/frontline/article/north-carolina-inmates-mental-illness-trial/.

DEFS-005.025

threatening or engaging in self-harm to get medical attention.[74] A separate investigation found that half of North Carolina inmates found incapable to stand trial wait more than 313 days to get a hospital bed, sometimes with minimal in-jail mental health treatment.[75]

54. As discussed more fully in section IV.B.3 below, in California Kaiser Permanente has had issues with understaffing and long wait times for mental health care for more than 10 years.

*e. Cash-Only Practices Are Consistent with Shortages*

55. For psychiatrists in particular, institutional employment of additional providers appears to be impaired by the high proportion who work in cash-only private practice and not with insured individuals. In a 2014 nationwide study 45% of psychiatrists did not accept private health insurance or Medicaid, considerably less than eight years earlier.[76] Even in urban areas where there tend to be higher concentrations of psychiatrists, 40% of psychiatrists go into private, cash-only practices which tend to serve patients with higher socioeconomic status.[77] As a consequence of psychiatrists choosing to practice in cash-only practices, the labor pool available to organizations seeking to employ more psychiatrists is smaller. The high proportion of psychiatrists who can maintain financially viable cash-only practices comports with generalized psychiatrist shortages.[78] In particular, because the supply of psychiatrists is constrained, demand for services from patients who can pay out-of-pocket is sufficient to sustain 40% to 45% of psychiatrists in cash-only practices.

---

[74] Koran, Mario, "Inside a 'Nightmare' Lockdown at a Wisconsin Prison," *The New York Times*, August 19, 2023 ("Koran 2023"). Available at https://www.nytimes.com/2023/08/19/us/wisconsin-prison-lockdown.html.
[75] Ervin 2023, *supra* note 73.
[76] Harrar 2019, *supra* note 11.
[77] Gardner et al. 2020, *supra* note 10, p. 2.
[78] As noted in Fowdur and Greulich 2018, studies have documented that inadequate reimbursement rates from Medicare and Medicaid as well as commercial insurance plans have contributed to psychiatrists choosing cash-only practices. *See* Fowdur and Greulich 2018, *supra* note 1, p. 11.

DEFS-005.026

### B. Shortages are Prevalent in California

#### 1. Current Demand and Supply

56. Recent estimates suggest that 14% to 17% of adults in California need mental health care.[79] Based on the current population estimate of 30,521,000 persons 18 years and older living in California, there are between 4 and 5.5 million adults in the state who have need of mental health services.[80] Nearly two-thirds (63.2%) of those who experienced mental illness between 2017 and 2019 failed to receive mental health services.[81] Data from the Substance Abuse and Mental Health Services Administration ("SAMHSA") corroborates that a significant proportion of mental health needs are unmet in California. This agency's findings show that only 37% of adults with mental illnesses in California sought and received treatment between 2017 and 2019 and that the incidence of conditions leading to greater demand for services such as suicidal thoughts and substance use disorders either increased or remained unabated between 2015 and 2019.[82] More recently, it has been well-documented that rates of anxiety, depression and substance use have increased since the COVID-19 pandemic began in 2020, as has unmet need for behavioral health services.[83]

57. Although estimates vary, California has approximately 100,000 licensed behavioral health professionals to serve its demand for mental health services.[84] One recent study estimates that there were 6,015 psychiatrists, 17,452 psychologists, 26,055 LCSWs, 8,951 psychiatric technicians and 1,321 nurse practitioners specializing in behavioral health as

---

[79] California Health Care Foundation. "Mental Health in California: Waiting for Care." 2022, pp. 2-4. ("CHCF 2022"). Available at https://www.chcf.org/wp-content/uploads/2022/07/MentalHealthAlmanac2022.pdf. California Future Health Workforce Commission. "Meeting the Demand of Health: Final Report of the California Future Health Workforce Commission." February 2019, p. 16. ("CFHWC 2019"). Available at https://futurehealthworkforce.org/our-work/finalreport/.

[80] U.S. Census population estimates available at https://www.census.gov/quickfacts/fact/table/CA/PST045222. The estimated population is 39,029,342, of which 21.8 percent are under 18 years of age.

[81] CHCF 2022, *supra* note 79, pp. 2 and 20.

[82] Substance Abuse and Mental Health Services Administration. "Behavioral Health Barometer: California, Volume 6: Indicators as measured through the 2019 National Survey on Drug Use and Health and the National Survey of Substance Abuse Treatment Services." 2020, pp. 23-26, 31, 33. ("SAMHSA 2020"). Available at https://www.samhsa.gov/data/sites/default/files/reports/rpt32815/National-BH-Barometer_Volume6.pdf.

[83] *See, e.g.,* Coffman and Fix 2023, *supra* note 9, p. 13.

[84] Coffman and Fix estimate 111,000 professionals (Coffman and Fix 2023, *supra* note 9, p. 5). The California Health Care Foundation estimates 99,000 professionals (CHCF 2022, *supra* note 79, p. 46).

DEFS-005.027

of 2019-2020.[85] The CHCF estimates fewer psychiatrists (4,066) in California, but Kaiser Family Foundation, a health policy research and polling organization, estimates that as of May 2023 there are 7,491 psychiatrists in California.[86]

58. Among psychiatrists, California ranks 12th among all U.S. states and Washington D.C. in providers per capita, with 19 psychiatrists per 100,000 residents. California's psychiatrists represent 13% of all practicing psychiatrists nationwide and the largest statewide pool of psychiatrists in the United States.[87] Similarly, California had the most psychology licenses issued and maintained among all states in 2022. Its 24,344 licenses represented 14% of all licenses issued and maintained in the U.S. and Canada.[88]

59. The supply of licensed behavioral health providers in California increased 20% between 2016 and 2020. However, this increase has not alleviated shortages due to the state's unprecedented increases in demand during the same period.[89] Furthermore, recent trends in the number of graduates from behavioral health programs in California show that growth from this particular source of supply has not been equal across provider types. Growth rates were highest among providers that represent a small portion of all behavioral health professionals in California – masters' level psychiatric mental health nurse practitioners, first-year psychiatry residents, and doctoral-level clinical and counseling psychologists.[90] Conversely, graduates of master's degree programs in clinical and counseling psychology

---

[85] Coffman and Fix 2023, *supra* note 9, Table 4, p. 21. Totals may overestimate the workforce in each occupation as some licensed professionals do not provide direct services to clients or work outside of behavioral health settings (e.g., LCSWs who practice in child welfare and hospice settings). Not all nurse practitioners who specialize in behavioral health are specific to psychiatry. Reliable data on physician assistants and other licensed professionals who work in behavioral health is not available.

[86] CHCF 2022, *supra* note 79, p. 46. KFF. "Professionally Active Specialist Physicians by Field." May 2023. Available at https://www.kff.org/other/state-indicator/physicians-by-specialty-area/.

[87] Robertson, Marcus. "All 50 states ranked by psychiatrists per capita." *Becker's Behavioral Health*, 2 June 2023. Available at https://www.beckersbehavioralhealth.com/behavioral-health-news/all-50-states-ranked-by-psychiatrists-per-capita.html#:~:text=The%20U.S.%20may%20face%20a,there%20are%2056%2C536%20practicing%20psychiatrists.

[88] The Centre for Data and Analysis on Psychology Licensure. "Number of Licenses." 2022. Available at https://asppbcentre.org/spotlight/number-of-licenses/.

[89] Wiener, Jocelyn. "Why California Faces A Shortage Of Mental Health Workers." *CalMatters*, September 8, 2022. ("Wiener September 2022"). Available at https://calmatters.org/health/2022/09/california-shortage-mental-health-workers/.

[90] Coffman and Fix 2023, *supra* note 9, pp. 7, 36-39.

DEFS-005.028

increased but at a low rate insufficient to replace professionals at or near retirement age.[91] Graduates of master's degree programs in social work decreased over the period studied.[92]

### 2. Current and Projected Shortages of Mental Health Practitioners

60. Despite California's large number of mental health providers relative to other states, shortages in California are pervasive. For example, the HPSA survey for the quarter ending June 2023 indicates that 458 facilities in California qualify for the Mental Health Professional Shortage Area ("MHPSA") designation.[93] For residents of these MHPSAs, less than one-fourth of mental health needs were met. A total of 675 additional practitioners would be needed to remove all MHPSA designations in the state in June 2023.[94]

61. Figure 4 shows the number of MHPSAs and the number of CDCR facilities in each county in California. Approximately half of CDCR facilities (18) are located in counties with more than ten MHPSAs. An additional 10 facilities are located in counties with more than 5 MHPSAs.

---

[91] *Id.*, pp. 7, 10.
[92] *Id.*, pp. 7, 37.
[93] Bureau of Health Workforce, Health Resources and Services Administration. "Designated Health Professional Shortage Areas Statistics, Designated HPSA Quarterly Summary." 2023. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiuoZaR0OGAAxW2MlkF HRS6DNkQFnoECB8QAQ&url=https%3A%2F%2Fdata.hrsa.gov%2FDefault%2FGenerateHPSAQuarterlyReport &usg=AOvVaw1LT8qWBehcYcTuxRIrUkEe&opi=89978449; Health Resources and Services Administration. "U.S. Department of Health & Human Services Report, Table 5." Available at https://data.hrsa.gov.
[94] *Ibid.* The percentage of need met is based on the ratio of population to psychiatrists only, and excludes services provided by other mental health providers.  See Table 5 note (9) for more detail.

DEFS-005.029

**Figure 4 - Mental Health Provider Shortage Areas and Number of CDCR Facilities Per County**



Source: 1. HRSA Health Provider Shortage Areas (Mental Health)

Downloaded 06/22/2023

2. CDCR-Adult-Institutions Addresses and Psychiatrists Salaries.xlsx

This analysis does not include PIP facilities.

62. As in the rest of the country, the supply of mental health practitioners in California has not kept pace with demand, nor has the supply of new practitioners been sufficient to replace a diminishing workforce. A 2018 academic study by researchers at the University of California, San Francisco found that 45% of psychiatrists, 37% of psychologists and 13% of social workers in California are over age 60 and likely to retire or reduce their hours in

DEFS-005.030

the near future.[95]  As a consequence of these retirements, and assuming the number of new entrants remains the same, the study projected that the overall number of psychiatrists will decline by 34%, the number of psychologists will decline by 47% and the number of LCSWs will decline by 23% between 2016 and 2028.[96]

63. The same study calculated that current utilization rates in California indicated a shortage of 336 psychiatrists in 2016, but adjusted for unmet need, the shortage was closer to 1,400.[97] It considered demand for psychologists, marriage and family therapists, licensed professional clinical counselors and LCSWs collectively and assumed that demand in 2016 equaled the collective supply of these professionals.[98] Thus by construction there was no shortage in 2016 based on current utilization rates, but after accounting for unmet need the shortage exceeded 14,000 providers.[99]

64. The study considered changes in the supply of behavioral health providers based on a stock-and-flow model.[100] The modelling exercise considered the number of licensed professionals practicing in the state, inflows of new graduates and out-of-state or foreign psychiatrists, and outflows such as retirements and deaths.  On the demand side, the study relied in part on the HRSA analysis to assess existing shortages and considered both current utilization and unmet need in its projections.[101]  The results indicated that California's behavioral health provider shortage will get significantly worse, as shown in the table below. For psychiatrists, the shortage is projected to expand to almost 2,700 by 2028 under current utilization rates and to almost 3,900 to relieve unmet need.[102] For psychologists, MFTs, LPCCs and LCSWs the collective shortage is projected to grow to more than 6,000

---

[95] Coffman, Janet, et al. "California's Current and Future Behavioral Health Workforce." *HealthForce Center at UCSF*, 2018 ("Coffman et al. 2018"). Table 3.9, p. 29.  Available at https://healthforce.ucsf.edu/publications/california-s-current-and-future-behavioral-health-workforce. As this study was completed in 2018 it does not capture the effects of the COVID-19 pandemic on demand for mental health services, supply of mental health practitioners, likely retirements, etc.
[96] *Id.*, pp. 79-80, 82.
[97] *Id.*, p. 51.
[98] This follows HRSA's forecasting model which assumes that demand for all health providers other than primary care providers and psychiatrists equals supply in the baseline year.
[99] Coffman et al. 2018, *supra* note 95, p. 51.
[100] *Id.*, p. 44.
[101] *Id.*, p. 49.
[102] *Id.*, Figure 5.2.

DEFS-005.031

providers under current utilization rates and more than 21,000 providers accounting for unmet need.[103]

**Table 1 - Shortages of Behavioral Health Providers in CA**

| | 2016 | | 2028 Projection | |
|---|---|---|---|---|
| | At 2016 Utilization Rates | Including Unmet Need | At 2016 Utilization Rates | Including Unmet Need |
| Psychiatrists | 336 | 1,429 | 2,682 | 3,866 |
| Psychologists, LMFTs, LPCCs and LCSWs | 0 | 14,254 | 6,442 | 21,584 |

Source: Coffman et al., 2018, Figures 5.2 and 5.3.

Note: Demand for psychologists, LMFTs, LPCCs and LCSWs is assumed equal to supply in 2016.

65. Putting these shortfalls in percentage terms, there is a projected shortfall of 41% of needed psychiatrists and 11% of needed psychologists, LMFTs, LPCCs and LCSWs by 2028 assuming 2016 utilization rates. Accounting for unmet need, there is a projected shortfall of 50% of needed psychiatrists and 28% of needed psychologists, LMFTs, LPCCs and LCSWs.[104]

66. Numerous sources point to significant regional differences in the shortages of behavioral health professionals across California.  For instance, while the numbers of psychiatrists and psychologists per capita are highest in the Greater Bay Area and San Diego regions and above average in the Los Angeles and Central Coast regions, they are below average in the Northern and Sierra, Sacramento and Orange County regions and half the statewide

---

[103] *Id.*, Figure 5.3.

[104] *Id.*, Figures 5.2, 5.3 and 5.4. As is evident from Table 1, HRSA projections assume that all professions in the table except psychiatrists are in equilibrium, *i.e.* current supply of these professionals is equal to current demand and there is no existing shortfall for psychologists, LMFTs, LPCCs and LCSWs. To the extent that there is a current shortfall among these other provider types, as other sources suggest, HRSA's shortfall projections are likely understated.

DEFS-005.032

average or less in the San Joaquin Valley and Inland Empire regions. In these latter regions, recruitment and retention of behavioral health professionals is perceived as especially difficult due to competition for few licensed professionals per capita.[105] Conversely, the highest numbers of psychiatric technicians per capita are found in the San Joaquin Valley, Inland Empire and Central Coast regions, and the lowest in the San Diego, Sacramento and Los Angeles regions.[106] However, despite geographical differences, timely access to mental health care is a challenge across all regions statewide. In 2017, only two of California's 56 county mental health plans met time- and network-access requirements.[107]

67. A more recent 2023 study continues to find that a large portion of the behavioral health workforce in California is at or near retirement age, and that likely retirements and reductions in work hours over the next decade among older psychiatrists and psychologists will lead to more intense competition for newly licensed professionals in these fields.[108] Similarly, San Diego County estimates that it currently has 17,000 behavioral health workers and needs an additional 8,100 to meet current demand, but that it will need another 10,000 in the next five years due in part to numerous impending retirements.[109]

### 3. Recruiting and Retention Difficulties at California Health Systems

68. For public sector employers such as county departments of health, state hospitals and prison systems, hiring challenges are compounded because many employed psychiatrists have a preference for larger private systems such as Kaiser Permanente and Sutter.[110] As a

---

[105] Coffman and Fix 2023, *supra* note 9, p. 32.

[106] *Id.*, Figure 3.3 and Table 3.4. *Also see* CHCF 2022, pp. 46-47, available at https://www.chcf.org/wp-content/uploads/2022/07/MentalHealthAlmanac2022.pdf; and Coffman and Fix 2023, *supra* note 9, p. 6, and Table 6, p. 24. Another source estimates 19 licensed psychiatrists per 100,000 people in the Bay Area versus 6 per 100,000 people in the San Joaquin Valley, more than 3 times as many per capita. The disparity is even greater for licensed psychologists per capita: 73 per 100,000 in the Bay Area versus 16 per 100,000 in the San Joaquin Valley, 4.5 times as many (Wiener September 2022, *supra* note 89).

[107] CFHWC 2019, *supra* note 79, p. 17.

[108] Coffman and Fix 2023, *supra* note 9, pp. 26-27 and 33. 31% of psychiatrists in California are age 65 or older, and another 23% are 55-64 years old. 27% of clinical and counseling psychologists are age 65 or older, and another 21% are 55-64 years old. The proportion near retirement is considerably smaller for social workers – 4% are 65 or older, and another 18% are 55-64 years old.

[109] Wiener September 2022, *supra* note 89.

[110] See, e.g., Waters, Rob. "In Telehealth: A Window to Our Future Workforce." *California Health Care Foundation Blog*. 26 March 2018. Available at https://www.chcf.org/blog/telehealth-window-to-our-future-workforce. Employed psychiatrists refer specifically to those hired by institutions such as hospitals and the government. It excludes self-employed psychiatrists in private or small group practice.

DEFS-005.033

result, public institutions face hiring challenges even when they are located outside of rural areas.

69. A 2021 survey of California's county behavioral health agencies – public sector employers, as is CDCR – found that more than 70% had difficulty recruiting LCSWs, LPCCs, psychiatrists and others who provide mental health services. Even more – 82% – had difficulty recruiting personnel who specialize in treating specific populations, including individuals involved in the criminal justice system. Major barriers to recruiting included competition from other employers, inability to offer competitive pay and a lengthy hiring process. Among rural counties location was perceived as a major barrier to recruitment while among urban counties a high cost of living and lack of affordable workplace housing were cited as major barriers.[111] Furthermore, California's county behavioral health agencies reported that many of the same factors affected retention as well as recruitment of behavioral health professionals. More than 65% reported difficulty retaining LCSWs and psychiatrists, among others. Major barriers to retention included competition from other employers, inability to offer competitive pay, extensive documentation requirements and burnout.[112]

70. Hiring challenges are not limited to public-sector employers. Even institutions such as Kaiser Permanente have been unable to recruit a full complement of mental health professionals for at least the last ten years. In 2013 the California Department of Managed Health Care fined Kaiser $4 million for failing to provide adequate mental health treatment. Kaiser responded by hiring more than 1,000 new psychiatrists and therapists and contracting with outside providers. However, two years later a state survey found that Kaiser still failed to provide its enrollees timely access to mental health treatment.[113] In its responses to regulator surveys, the Kaiser Permanente Health Plan highlighted a daunting behavioral health shortage, an aging psychiatrist workforce, low proportions of medical school residents specializing in psychiatry and other factors that contributed to its hiring

---

[111] Coffman and Fix 2023, *supra* note 9, p. 8.

[112] *Id.*, p. 9.

[113] Gold, Jenny. "After $4 million fine in 2013, Kaiser Permanente cited again for mental health access problems." *Health Care Finance*, 5 July 2017. Available at https://www.healthcarefinancenews.com/news/after-4-million-fine-2013-kaiser-cited-again-mental-health-access-problems#:~:text=In%202013%2C%20Kaiser%20agreed%20to,a%20psychiatrist%20or%20a%20therapist.

DEFS-005.034

challenges.[114] In 2019, Kaiser employees noted that "chronic understaffing" at Kaiser's behavioral health services led to long wait times for psychotherapy appointments.[115]

71. Kaiser has recently experienced difficulty retaining mental health clinicians. 668 mental health clinicians left Kaiser between June 2021 and May 2022, nearly double the number that left in the 12 preceding months. In a union survey of departing clinicians 85% stated that they left because of unsustainable workloads or insufficient time to complete work.[116] Kaiser Permanente mental health clinicians in northern California went on strike for 10 weeks in 2022. At issue were the manageability of clinicians' workloads and long wait times for patients seeking care.[117] A shortage of mental health staff is consistent with Kaiser clinicians' perceptions of unsustainable or unmanageable workloads, insufficient time to complete work and long wait times. Press coverage contemporaneous with the strike noted that counties, school districts and non-profit organizations statewide had also complained of mental health practitioner shortages.[118]

72. Some practitioners leaving Kaiser had been recruited by telehealth start-ups offering work-from-home options, while others entered private practice.[119] Mental health telehealth startups have also been credited with drawing providers away from public sector jobs. Telehealth and private sector jobs are perceived as offering better work-life balance, greater flexibility and more frequent interactions with patients.[120]

73. Thus, the same factors that have increased demand and led to nationwide shortages of mental health professionals have also created hiring challenges for employers of mental

---

[114] See Office of Plan Monitoring, Division of Plan Surveys. "Routine Survey of Kaiser Foundation Health Plan, Inc." *Department of Managed Health Care*, 2017. pp. 14-15. Available at https://www.dmhc.ca.gov/desktopmodules/dmhc/medsurveys/surveys/055_r_full%20service-behavioral%20health_061217.pdf.

[115] See American Psychological Association and California Psychological Association letter to California Department of Managed Health Care re: Kaiser Access to Mental Health Care. 27 January, 2020, p. 2. Available at https://www.apaservices.org/practice/legal/managed/apa-cpa-letter-january-27-2020.pdf.

[116] Wiener, Jocelyn. "Kaiser mental health workers signal open-ended strike in Northern California." *CalMatters*, 2 August, 2022. ("Wiener August 2022"). Available at https://calmatters.org/health/2022/08/kaiser-mental-health-worker-strike/. Also see Mensik, Hailey. "10-week Kaiser strike ends with deal aimed at improving mental health access". *Healthcare Drive*, 25 October 2022. Available at https://www.healthcaredive.com/news/kaiser-strike-mental-health-california-hawaii-deal/634917/.

[117] Wiener August 2022, *supra* note 116.

[118] *Ibid.*

[119] *Ibid.*

[120] Wiener September 2022, *supra* note 89.

DEFS-005.035

health professionals within California. Competition for mental health professionals in California mirrors the vigorous competition for such providers nationwide.

### C. The Impact of the COVID-19 Pandemic on Mental Health Provider Shortages

#### 1. Impact on the Demand for Mental Health Services

74. The COVID-19 pandemic has been linked to increased rates of mental illness and increased demand for mental health services.[121] Household surveys administered by the Centers for Disease Control and Prevention found that the percentage of adults experiencing anxiety or depressive symptoms increased from 11% in 2019 to 38% in 2020. Twice as many people with undiagnosed anxiety or depression had an unmet need for counseling in 2020 compared to recent years.[122] Academic research has similarly suggested that symptoms of anxiety and depression increased during the first year of the pandemic, though the extent of the increase is unclear and varies across population subgroups.[123]

75. A 2022 poll by the American Psychological Association found that demand for anxiety and depression treatment remained high more than two years after the pandemic began, and demand for treatment of trauma- and stress-related disorders and substance use disorders had grown. Psychologists' workloads and patient loads rose due to increased demand. 46% reported being unable to meet their patients' demand for treatment in 2022, an increase from 30% only two years earlier.[124]

#### 2. Impact on the Supply of Mental Health Providers

76. Anecdotal reports indicate since the onset of COVID-19 psychiatrists have retired and exited psychiatric practice for reasons not predicted prior to the pandemic, and that they

---

[121] *See, e.g.*, Harrell et al. 2023, *supra* note 72.
[122] Barna, Mark. "Mental health workforce taxed during COVID-19 pandemic: Worker shortage hinders access." *The Nation's Health*, 51(10), January 2022, pp. 1-14. ("Barna 2022"). Available at https://www.thenationshealth.org/content/51/10/1.3.
[123] As reported in Panchal, Nirmita, et al. "The Implications of COVID-19 for Mental Health and Substance Use." *Kaiser Family Foundation*, updated 20 March, 2023 ("Panchal et al. 2023"). Available at https://www.kff.org/mental-health/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/.
[124] APA 2022 Survey, *supra* note 69.

DEFS-005.036

are likely to continue to do so in the future, worsening existing psychiatrist shortages.[125] This mirrors surveys indicating intentions among physicians and health care workers more broadly to leave their current practice or reduce their hours in the near future.[126]

77. Burnout, whether related to the pandemic or excessive workloads more generally, appears to be a major contributor to mental health providers leaving their jobs. The American Journal of Psychiatry reported that 78% of psychiatrists surveyed in 2020 reported burnout.[127] Burnout rates among physicians are reported to be twice as high as other professional groups.[128] A National Council for Mental Wellbeing survey found that 93% of all mental health workers have experienced burnout, and almost half considered changing jobs in the past year because of workforce shortages that they were responsible for covering.[129]

78. According to the executive director of the National Association of State Mental Health Program Directors, the pre-existing recruitment and retention problem among psychiatrists spread during the pandemic to the other licensed professions in behavioral health.[130] Some providers retired and have not been replaced, while others have looked for employment outside of health care.[131] Also relevant to CDCR are medical assistants, whom according to an American Medical Association study experienced some of the highest degrees of COVID-related stress. Health care organizations across the country have consequently had a difficult task filling medical assistant positions.[132]

[125] Yellowlees, Peter. "Impact of COVID-19 on Mental Health Care Practitioners." *The Psychiatric clinics of North America* vol. 45,1 (2022): 109-121. doi:10.1016/j.psc.2021.11.007. ("Yellowlees 2022").
[126] *See, e.g.,* Robeznieks, Andis. "How an aging nation, COVID-19 stretch the doctor workforce thin." *American Medical Association*, 6 April, 2022. Available at https://www.ama-assn.org/practice-management/sustainability/how-aging-nation-covid-19-stretch-doctor-workforce-thin#; Sinsky, Christine A et al. "COVID-Related Stress and Work Intentions in a Sample of US Health Care Workers." *Mayo Clinic proceedings. Innovations, quality & outcomes* vol. 5,6 (2021): 1165-1173. doi:10.1016/j.mayocpiqo.2021.08.007.
[127] As reported in Sullivan, Ann. "How the COVID-19 Pandemic Affects the Future of Behavioral Health Care." *Behavioral Health News,* 2022. Available at https://behavioralhealthnews.org/bhn-summer-2022-issue/.
[128] Yellowlees 2022, *supra* note 125.
[129] Merelli, Annalisa. "Half of US mental health workers are considering getting out." *Business News*, May 2, 2023. Available at https://qz.com/half-of-us-mental-health-workers-are-considering-gettin-1850391460#.
[130] Barna 2022, *supra* note 122.
[131] *Ibid.*
[132] Henry, Tanya Albert. "Medicine's great resignation? 1 in 5 doctors plan exit in 2 years." *American Medical Association*, January 18, 2022. Available at https://www.ama-assn.org/practice-management/physician-health/medicine-s-great-resignation-1-5-doctors-plan-exit-2-years.

DEFS-005.037

### 3.    Impact on Hiring and Retention in the Correctional Labor Market

79. The COVID-19 pandemic has exacerbated shortages of prison staff, a phenomenon that has been well documented for correctional officers. For example, Georgia prisons reported up to 70% vacancy rates among correctional officers. Florida temporarily closed three prisons due to understaffing, and staff vacancy rates doubled early in the pandemic.[133] Nebraska declared staffing emergencies at numerous facilities. Texas prisons have more than 5,000 correctional officer vacancies.[134] Staff vacancy rates are as high as 53% in Wisconsin's "chronically understaffed" state prison system. Other state prisons have denied inmates timely medical care, showers and exercise and kept inmates on lockdown due to staffing shortages.[135] Nearly one-third of federal correctional officer jobs were vacant as of mid-2021, and officials have asked nurses, teachers and cooks to guard inmates.[136]

80. Shortages have also been noted specifically in relation to the provision of correctional mental health care. For example, Wisconsin state prisons currently face a 27% shortage of staff for psychological services.[137] Mental health staff departures across the U.S. have led to disruptions to basic clinical services such as getting to appointments. One-on-one therapy was canceled in Illinois, another state whose corrections department is being sued over inadequate provision of mental health care.[138]

81. Departures of correctional officers and correctional mental health staff during COVID-19 has not been attributed to any single cause, though the risk of illness and new job opportunities that became available after the initial wave of COVID-19 subsided have been linked to the staffing shortages.[139] For example, North Carolina officials attribute delays in

---

[133] Blakinger, Keri, et al. "US prisons face staff shortages as officers quit amid COVID." *The Associated Press*, November 1, 2021 ("Blakinger et al. 2021"). Available at https://apnews.com/article/coronavirus-united-states-prisons-staff-shortages-health-dba13f1c6368392be2bc5e7375170a78.

[134] Park, Katie, et al. "As COVID recedes in prisons, will any lessons learned stick?" *The Associated Press*, 30 June, 2021. Available at https://apnews.com/article/coronavirus-pandemic-prisons-health-government-and-politics-5747e5cbae1084380aeaaae49bf0c8ce.

[135] Koran 2023, *supra* note 74.

[136] *Ibid.*; *see also* Sisak, Michael R and Balsamo, Michael. "Cooks, nurses guard inmates with US prisons down 6K officers." *The Associated Press*, 21 May, 2021. Available at https://apnews.com/article/business-health-coronavirus-pandemic-prisons-government-and-politics-88fff925b1901a36a10581c28d826916.

[137] Koran 2023, *supra* note 74.

[138] Blakinger et al. 2021, *supra* note 133.

[139] Blakinger et al. 2021, *supra* note 133.

DEFS-005.038

mental health care in North Carolina's system to underfunding and the national crisis in mental health, exacerbated by staffing shortages worsened due to COVID-19. North Carolina officials cited pandemic-related staffing shortages as the reason that nearly 1 in 3 psychiatric beds are not operating throughout the state. Not only did North Carolina state hospitals lose one-fourth of their workforce during the pandemic, but staff shortages in outpatient and community settings made it harder to discharge state hospital patients, worsening the wait for inmates who needed inpatient care.[140]

### 4. Impact on the Use of Telehealth for Mental Health Care

82. Another effect of the COVID-19 pandemic was a sharp increase in the use of telehealth for the provision of mental health services. Telemedicine[141] in general, and telepsychiatry in particular, are increasingly viewed as widening accessibility and potentially increasing the quality of service in health care delivery. Results from several studies show that even prior to the COVID-19 pandemic patients nationwide had increasingly grown accustomed to telemedicine services and a non-trivial proportion of the population was comfortable with the format, highlighting the growing importance of this method of health care delivery.[142]

83. The use of telehealth ballooned during the pandemic, particularly for provision of mental health care. Patients' reluctance to visit traditional health care settings during the pandemic accelerated providers' investment in telehealth infrastructure and patients' willingness to engage providers through telemedicine.[143] Mental health and substance use comprised 11% of telehealth visits from March to August 2019 but 39% of telehealth visits two years

---

[140] Ervin 2023, *supra* note 73.
[141] There are many definitions to telehealth, but the American Telemedicine Association ("ATA") defines it as "a mode of delivering healthcare services through the use of telecommunications technologies, including, but not limited to, asynchronous and synchronous technology, and remote patient monitoring technology, delivered by a healthcare practitioner to a patient or to another practitioner at a different physical location than the healthcare practitioner." *See* ATA's Standardized Telehealth Terminology and Policy Language for States on Medical Practice, "American Telemedicine Association. ATA", 5 September, 2022. ("ATA 2022"). Available at https://www.americantelemed.org/wp-content/uploads/2020/10/ATA-_Medical-Practice-10-5-20.pdf.
[142] *See, for example*, Welch, Brandon M et al. "Patient preferences for direct-to-consumer telemedicine services: a nationwide survey." *BMC health services research* vol. 17,1 784. 28 Nov. 2017, doi:10.1186/s12913-017-2744-8.
[143] IHS Markit 2021, *supra* note 12, p. 23.

DEFS-005.039

later.[144] By 2021, nearly 40% of mental health and substance use disorder outpatient visits occurred via telehealth.[145]

84. Rural areas have relied more heavily on telehealth during the pandemic.[146] From March to August 2021, 55% of mental health and substance use visits in rural areas occurred via telehealth, compared to 35% in urban areas.[147]

85. Many state Medicaid programs expanded coverage of telehealth for behavioral health services during the pandemic. Observers have pointed to telehealth's role in continuing to improve access to behavioral health services, particularly in rural areas where mental health provider shortages are more prevalent, and health advocates have urged that the federal and state regulations that allowed this expansion of telehealth be made permanent.[148]

86. Studies have pointed to the adoption of telehealth by psychiatry in particular early in the pandemic, its improvements in clinical quality and continuity of care, and changing perceptions that view digital care in psychiatry as a need and not merely an aid.[149] Furthermore, the shift to hybrid and virtual care during the COVID-19 pandemic is projected to lead to increased scheduling and geographic flexibility from home among psychiatrists, in turn leading to fewer workforce shortages and less burnout.[150]

87. Among psychologists, as of 2022 58% of those responding to the APA poll had transitioned to a hybrid model of treating some patients remotely and others in person. Slightly less than one-third, 31%, saw all patients remotely, implying that only 11% of psychologists responding to the poll practiced in-person care exclusively.[151] An overwhelming 96% indicated that they believed the use of telehealth during the pandemic proved its worth as a therapeutic tool.[152]

---

[144] NAMI 2020, p. 56. Available at https://www.nami.org/NAMI/media/NAMI-Media/PDFs/NAMI_2020-21_State_Legislation_Report.pdf.
[145] Panchal et al. 2023, *supra* note 123.
[146] *Ibid.*
[147] NAMI 2020, p. 56.
[148] Panchal et al. 2023, *supra* note 123; Barna 2022, *supra* note 122. Expanded Medicaid coverage of behavioral health telehealth services included expanding the range of services offered through telehealth as well as the range of provider types eligible for reimbursement for providing telehealth services. Some private payers also eliminated telehealth coverage restrictions for mental health services during the pandemic (Panchal et al. 2023).
[149] Yellowlees 2022, *supra* note 125.
[150] *Ibid.*
[151] APA 2022 Survey, *supra* note 69.
[152] *Ibid.*

DEFS-005.040

88. Recruiting and search firm Merritt Hawkins noted in 2021 that some physicians specifically requested telehealth opportunities in their job searches.[153] COVID-19 appears to have affected providers' preferences regarding telehealth and possibly their expectations of whether they can secure employment that matches preferences for telehealth opportunities. Such preferences and expectations make it more difficult for employers to hire individuals for on-site positions if those individuals desire and are able to find opportunities to work via telehealth, possibly from home, for other employers.

## D. CDCR Shortages

### 1. CDCR Vacancy and Fill Rates

89. Figure 5 shows the monthly fluctuations in CDCR's statewide psychiatry vacancy rate between January 2018 and December 2022. The discrepancy between CDCR's required, or authorized positions, and the total number of psychiatrist positions it has filled through civil service (including telepsychiatry and PNPs) and hours contracted through a registry program fluctuated between 18% and 23% in 2018 and 2019. It climbed to 26% in May 2020 before dropping to 1.5% in August 2021. Since then, the vacancy rate has fluctuated but generally remained at or below 10%. It stood at 9.6% as of November 2022 and 10.6% as of December 2022.

90. Changes in CDCR's demand for psychiatrists and the number of filled positions over time, shown in Figure 6 below, illustrate the trends underlying changes in the vacancy rate. The red line tracks authorized psychiatrist positions, which generally decreased throughout the period. The green line shows the total psychiatrist positions filled and the yellow line shows vacancies, which are the difference between authorized positions and total filled positions. Vacancies decreased starting in April 2020 before leveling out and then increasing slightly in 2022. This was due largely to the decrease in authorized positions between 2018 and 2022. CDCR has filled between 260 and 301 positions in this period.

91. The decreased psychiatrist vacancy rate from mid-2020 forward is due in part to telepsychiatry, for which CDCR appears to have had success in hiring and/or retaining

---

[153] Beattie, Linda. "Physician Shortages in Medical Specialties in 2021: An Inside Look." *Merritt Hawkins Physician Staffing Blog,* 16 March, 2021. Available at https://www.merritthawkins.com/news-and-insights/blog/healthcare-news-and-trends/physician-shortages-in-medical-specialties-in-2021-an-inside-look.

DEFS-005.041

employees. Telepsychiatry-filled positions have steadily increased from 47 in early 2020 to 86 at the end of 2022. Conversely, CDCR's on-site civil service filled positions declined from 154 to 123 over the same period.[154]

**Figure 5 - Psychiatrist Vacancy Rate**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

---

[154] However, CDCR's increase in filled telepsychiatry positions does not appear to have occurred at the expense of filled on-site civil service positions. CDCR data on appointments and separations over the 5-year period from 2018 through 2022 indicates that there were 79 telepsychiatry appointments, only 9 of which were transfers from other CDCR institutions. Limiting the period of consideration to February 2020 through December 2022, consistent with the increase in telepsychiatry positions and decrease in civil service positions discussed herein, only 5 of 59 telepsychiatry appointments were transfers from other CDCR institutions. *See* "Staff Psychiatrist.xlsx."

DEFS-005.042

**Figure 6 - CDCR Statewide Psychiatrist Positions and Vacancy Counts**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

92. CDCR vacancy rates and authorized, filled and vacant positions for psychologists, social workers, recreation therapists and medical assistants are presented in the eight charts below. These charts suggest that CDCR has had mixed results in its efforts to recruit and retain additional mental health providers in these classifications.

93. Figure 7 and Figure 8 show that CDCR was able to maintain a vacancy rate below 10% among social worker positions until February 2022. Since then, authorized positions have remained constant and then increased, while civil service filled positions continued on a downward trajectory and registry filled positions remained roughly the same. This has led to a decrease in total filled positions and increased vacancies.

DEFS-005.043

**Figure 7 - Clinical Social Worker Vacancy Rate**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

**Figure 8 - CDCR Statewide Clinical Social Worker Positions and Vacancy Counts**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

DEFS-005.044

94. Figure 9 and Figure 10 show that CDCR has generally been able to maintain a vacancy rate below 10% among recreation therapist positions since January 2019. The number of authorized positions decreased through June 2021 and then increased slightly. The number of filled positions including registry has fluctuated from 243 to 278 between 2018 and 2022, with 250 of 278 authorized positions filled as of December 2022, leading to a 10.0% vacancy rate.

**Figure 9 - Recreation Therapist Vacancy Rate**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

DEFS-005.045

**Figure 10 - CDCR Statewide Recreation Therapist Positions and Vacancy Counts**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

95. CDCR was generally able to maintain a psychologist vacancy rate at or below 10% through October 2019. See Figure 11 below. However, the number of filled psychologist positions, shown in Figure 12, has continued to decrease gradually throughout the 2018-2022 time period. The psychologist vacancy rate increased between February 2021 and October 2022 due both to increases in the number of authorized positions and decreases in the number of filled positions. The vacancy rate flattened in the last two months of 2022. As of December 2022, the psychologist vacancy rate was 31.4%.

DEFS-005.046

**Figure 11 - Psychologist Vacancy Rate**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

**Figure 12 - CDCR Statewide Psychologist Positions and Vacancy Counts**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

DEFS-005.047

96. Figure 13 and Figure 14 respectively show the vacancy rate and authorized, filled and vacant positions for medical assistants.[155] CDCR employed as many as 109 medical assistants in May 2018. This gradually declined to 75 as of October 2019 before declining more severely through May 2020, after which the number of filled positions gradually increased through May 2022.[156] As of December 2022 the medical assistant vacancy rate stood at 28.6%.

**Figure 13 - Medical Assistant Vacancy Rate**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

---

[155] A vacancy rate for medical assistants is only available since July 2020 since medical assistants were captured by CDCR blanket authority and not assigned to specific institutions in prior months. As such, authorized medical assistant positions are not reflected in the data.
[156] CDCR attributes the pre-COVID decrease in filled mental health medical assistant positions in part to an increase of medical assistants switching from mental health to medical positions. *See* Coleman CDCR Experts questions-HR Response (005).docx. *See also* Carter, Andrea. "RE: Coleman: Questions from Labor Economists." August 20, 2023.

DEFS-005.048

**Figure 14 - CDCR Statewide Medical Assistant Positions and Vacancy Counts**



Note: PIP facilities excluded from analysis.
Source: Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022

## 2. Relative Access to Mental Health Professionals

97. In the face of national and statewide shortages of mental health providers, CDCR has been unable to hire a full complement of providers sufficient to meet the requirements of the 2009 Staffing Plan and its subsequent modifications. However, recent population and employment statistics indicate that CDCR already employs a disproportionately large proportion of psychiatrists, psychologists and social workers in the state relative to the share of the state's population corresponding to CDCR inmates.[157]

98. In recent months, CDCR employed approximately 340 of the state's roughly 5,930 psychiatrists, or more than one in every 18 psychiatrists. Similarly, CDCR employed approximately 740 of the state's roughly 17,250 psychologists, more than 1 in 24, and approximately 318 social workers among roughly 25,720 LCSWs in California, more than

---

[157] Estimates are not available for recreation therapists or medical assistants.

DEFS-005.049

1 in 81.[158] CDCR's inmate population of about 95,700 adults comprises just 0.25% of the state's population and 0.31% of the state's adults, however.[159] Thus, CDCR inmates have more than 18 times as much access to psychiatrists, nearly 14 times as much access to psychologists and nearly 4 times as much access to social workers than members of the public.[160]

99.    As shown in Table 2 below, CDCR's population has consistently had relatively greater access to psychiatrists, psychologists and social workers in recent years. CDCR inmates' access to psychiatrists has increased relative to that of the adult population in California since 2018, from 11.3 times the access in 2018 to 18.3 times the access in 2022. CDCR inmates' access to psychologists and social workers relative to the adult population in California in 2022 is approximately the same as it was in 2018. In 2022 CDCR inmates had roughly 13.7 times more access to psychologists, compared to 13.5 times as much in 2018. CDCR inmates had 3.9 times more access to social workers in 2022, compared to 4.0 times more access in 2018.

---

[158] Coleman Request Filled Vacancy Report, January 2018 - December 2022; Coffman and Fix 2023, Table 6, p. 24; https://www.census.gov/quickfacts/fact/table/CA/PST045222. As of 2020 there were 15.2 psychiatrists, 44.2 psychologists and 65.9 LCSWs actively licensed per 100,000 population in California. California's estimated population is 39,029,342, 21.8 percent of which are under 18 years of age.
[159] CDCR Population Trends January 2018-December 2022v2.xlsx.
[160] The CDCR psychiatrist to inmate ratio is 1:281, and the general psychiatrist to adult population ratio in the state is 1:5,145. The corresponding numbers are 1:129 at CDCR and 1:1,769 statewide for psychologists, and 1:301 at CDCR and 1:1,187 statewide for social workers.

DEFS-005.050

**Table 2 - CDCR Inmates' Access to Mental Health Providers Relative to California Adult Population**

| Year | Provider Type | Number of CDCR Providers | CDCR Inmate Population | Number of Providers in CA | CA Population | CA Adult Population | Population Per Provider: CDCR | Population Per Provider: CA Adult | CDCR Access Relative to CA |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D1 | D2 | E = B / A | F = D2 / C | G = F / E |
| 2018 | Psychiatrist | 283 | 127,652 | 6,013 | 39,557,045 | 30,567,090 | 450.40 | 5083.78 | 11.29 |
| | Psychologist | 985 | 127,652 | 17,484 | 39,557,045 | 30,567,090 | 129.60 | 1748.27 | 13.49 |
| | Social Worker | 436 | 127,652 | 26,068 | 39,557,045 | 30,567,090 | 292.52 | 1172.59 | 4.01 |
| 2019 | Psychiatrist | 272 | 124,190 | 6,006 | 39,512,223 | 30,617,582 | 456.01 | 5097.95 | 11.18 |
| | Psychologist | 921 | 124,190 | 17,464 | 39,512,223 | 30,617,582 | 134.92 | 1753.14 | 12.99 |
| | Social Worker | 402 | 124,190 | 26,039 | 39,512,223 | 30,617,582 | 308.77 | 1175.86 | 3.81 |
| 2020 | Psychiatrist | 283 | 95,456 | 5,984 | 39,368,078 | 30,576,844 | 337.09 | 5109.81 | 15.16 |
| | Psychologist | 857 | 95,456 | 17,401 | 39,368,078 | 30,576,844 | 111.37 | 1757.22 | 15.78 |
| | Social Worker | 394 | 95,456 | 25,944 | 39,368,078 | 30,576,844 | 242.22 | 1178.59 | 4.87 |
| 2021 | Psychiatrist | 352 | 99,790 | 5,964 | 39,237,836 | 30,465,205 | 283.50 | 5108.05 | 18.02 |
| | Psychologist | 799 | 99,790 | 17,343 | 39,237,836 | 30,465,205 | 124.96 | 1756.62 | 14.06 |
| | Social Worker | 367 | 99,790 | 25,858 | 39,237,836 | 30,465,205 | 271.81 | 1178.19 | 4.33 |
| 2022 | Psychiatrist | 340 | 95,706 | 5,932 | 39,029,342 | 30,523,315 | 281.25 | 5145.14 | 18.29 |
| | Psychologist | 741 | 95,706 | 17,251 | 39,029,342 | 30,523,315 | 129.12 | 1769.37 | 13.70 |
| | Social Worker | 318 | 95,706 | 25,720 | 39,029,342 | 30,523,315 | 300.87 | 1186.74 | 3.94 |

**Notes:**

1. CDCR provider numbers and inmate populations are as of December of each calendar year.

2. CA provider numbers are available in 2020 only and are assumed to be the same from 2018 to 2022.

3. CA Provider numbers are in Professionals per 100,000 population. It was normalized by CA population for the purpose of this calculation.

**Sources:**

1. Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022 - Values Only.xlsx

2. CDCR Population Trends January 2018-December 2022v2.xlsx

3. Coffman, J. and M. Fix, "Building the Future Behavioral Health Workforce: Needs Assessment," HealthForce Center at UCSF, February 2023, T

4. SCPRC-EST2018-18+POP-RES.xlsx

5. SCPRC-EST2019-18+POP-RES.xlsx

6. sc-est2020-18+pop-res.xlsx

7. SCPRC-EST2021-18+POP.xlsx

8. SCPRC-EST2022-18+POP.xlsx

100.    CDCR inmates have greater access to mental health care relative to the adult population in California even accounting for potentially greater demand among the incarcerated. In recent years CDCR's mental health census has included approximately one-third of its population.[161] Further, as noted above, recent estimates indicate that 14% to 17% of adults in California need mental health care, suggesting that demand for mental

---

[161] *Coleman* monthly report 6 b MHSDS MIS to Special Master, January 2019, December 2020, December 2021 and December 2022.

DEFS-005.051

health care among CDCR's population is 2 to 2.5 times greater than that among the general population.[162] Rough estimates are that among those who need mental health care, access to psychiatrists at CDCR in 2022 is 7 to 9 times that of the general population, access to psychologists at CDCR is 5 to 7 times that of the general population, and access to social workers is 1.5 to 2 times that of the general population.

### 3. The Impact of the COVID-19 Pandemic on Mental Health Provision at CDCR

101.    In contrast to the increased rates of mental illness and increased demand for mental health services documented nationwide during the COVID-19 pandemic, CDCR experienced a decline in its mental health population and a lower level of patient referrals to higher levels of care during the pandemic.[163] The average mental health population across all levels of care at CDCR decreased from 36,217 in 2019 to 32,821 in 2020 and has subsequently remained between approximately 32,000 and 33,000.[164] CDCR did not find evidence of an increased number of cases that should have been referred to a higher level of care but were not.[165]

102.    CDCR has had mixed success in hiring and retaining mental health providers and reducing vacancy rates among psychiatrists, psychologists, clinical social workers, recreation therapists and medical assistants since the onset of COVID-19.[166] It has been able to fill more telepsychiatrist positions (and slightly more psychiatrist positions overall) and experienced a large decline in its psychiatrist vacancy rate. Although the number of filled recreational therapist positions declined slightly since the onset of COVID-19, the recreational therapist vacancy rate has generally remained at or below 10%. The opposite, however, is true of clinical social workers and psychologists, for whom CDCR has been less successful in filling positions and reducing vacancy rates since early 2020. CDCR was

---

[162] CHCF 2022, *supra* note 79, pp. 2-4; CFHWC 2019, *supra* note 79,  p. 16.
[163] "Mental Health Population Trends Jan2013-June2023.xlsx" and CDCR, "Lessons Learned During the COVID-19 Pandemic," June 2021 ("CDCR Lessons Learned"), p. 9. CDCR notes that its lower-than-expected inpatient referrals are consistent with other research studies that observed a decrease in mental health visits during the pandemic, but also that patient visits may not directly correlate with reduced mental health distress (CDCR Lessons Learned, p. 33).
[164] "Mental Health Population Trends Jan2013-June2023.xlsx."
[165] CDCR Lessons Learned, *supra* note 163, p. 33.
[166] *See* Figure 6, Figure 8, Figure 10, Figure 12, and Figure 14 above.

DEFS-005.052

successful in achieving a less than 10% vacancy rate among clinical social workers through January 2022 but not more recently. The vacancy rate among medical assistants dropped, and filled medical assistant positions correspondingly increased, in the first year of the pandemic. Both have subsequently fluctuated.

103.     One large impact of the pandemic at CDCR has been the expanded use of telehealth. On-site mental health staffing at CDCR was impacted during the pandemic due to staff infections, mandated public health measures and an inability of high-risk providers to enter institutions safely.[167] Although the parties to this litigation had reached a court-approved agreement on a provisional telepsychiatry policy before the pandemic began, COVID resulted in an expanded use of telepsychiatry. For example, institutions were permitted to transition high-risk on-site providers to telework from home, some facilities instituted intra-institutional telehealth programs, and CDCR telepsychiatrists meeting certain criteria were permitted to work from home. As the pandemic progressed telehealth was also temporarily expanded to include limited telepsychology and telesocial-work.[168]

104.     CDCR perceived that its flexibility and willingness to accommodate the ability to work from home ultimately resulted in a retention of onsite providers while effectively recruiting more civil telepsychiatrists during the COVID-19 pandemic.[169] This is reinforced by the data charted in Figure 6 above, which shows that telepsychiatry-filled positions at CDCR steadily increased from 47 in early 2020 to 86 by the end of 2022. This corresponds to the reduction in overall psychiatrist vacancies and attainment of a 90% psychiatrist staffing rate in many months during this period.[170]

105.     CDCR reports that its telepsychiatry program saw an increase in applicant interest during the COVID-19 pandemic. Many applicants reported that they sought a telepsychiatry position due to concerns about their personal health and that of their family

---

[167] CDCR Lessons Learned, *supra* note 163, p. 11.
[168] *Ibid.* Emergency and then statewide approval for telepsychology and telesocial-work was authorized in 2020. Psychologists and social workers from other institutions successfully provided telehealth services to desert institutions, where recruitment and retention of clinical psychologist and social worker staff was challenging even prior to the pandemic, and which had significant staffing shortages and increased patient need due to restrictions on patient transfers during the pandemic. *Id.*, pp. 16-17 and 19.
[169] *Id.*, p. 20.
[170] *Id.*, p. 21 and Figure 5 and Figure 6 above. Also, as noted above, CDCR's appointment and separation data indicate that an overwhelming majority of individuals appointed to CDCR telepsychiatrist positions during this period did not transfer from other CDCR institutions.

DEFS-005.053

during the pandemic. CDCR also perceives that its efforts to implement on-site teleworking enabled it to retain several psychiatrists who may otherwise have left their employment at CDCR.[171]

### E. CDCR Hiring Initiatives and Their Potential to Alleviate Shortages

106.    An individual's decision to accept or remain in a job is influenced by a multitude of considerations. In addition to compensation and benefits, individuals' decisions may be affected by job location, non-monetary benefits, work environment, flexibility and the ability to work from home, among others. Here we discuss many of the monetary and non-monetary initiatives CDCR has pursued to enhance its attractiveness as an employer of mental health providers. Many additional considerations and policy solutions that have been proposed to alleviate shortages of mental health care providers are not available to CDCR.

107.    That individuals' decisions are influenced by more than short-term cash compensation (*i.e.*, excluding retirement and other cash benefits) is evidenced by many CDCR providers' decisions to enter civil service employment as opposed to providing registry services to CDCR. At current CDCR registry rates, providers electing to work 2,000 hours in a year would earn annual pay of $400,000 to $650,000 for psychiatrists, $212,000 for PNPs, $204,000 to $324,000 for psychologists, $130,000 to $180,000 for LCSWs and $134,000 for recreation therapists.[172] These annual equivalents are considerably more than average civil service employees' salaries for these classifications in 2022, as shown in Figure 15 through Figure 19 below.

#### 1. Competitive Salary

108.    Figure 15 through Figure 19 compare CDCR civil service salaries to average salaries paid to psychiatrists, psychologists, clinical social workers, recreation therapists and medical assistants in California and nationwide.[173] The red line in each chart tracks

---

[171] CDCR Lessons Learned, *supra* note 163, pp. 20-21.
[172] Current hourly registry rates range from $200 to $325 for psychiatrists, $106 for PNPs, $102 to $162 for psychologists, $65 to $90 for LCSWs and $67 for recreation therapists. *See* 21-00147-02 Exhibit B-2A eff 4-5-23.pdf.
[173] CDCR registry hires are excluded from these analyses.

average CDCR salary in each month from January 2018 through December 2022. CDCR salaries are understated in these comparisons because they exclude compensation for overtime, call coverage, and certain other forms of pay such as fringe benefits (including retirement and health insurance benefits), award payments and other miscellaneous reimbursements.[174] Further, they rely on the assumption that CDCR mental health care providers in each classification who do not receive the maximum base pay instead receive the minimum base pay among pay ranges for that classification.[175] This assumption is conservative because at least some CDCR mental health care providers who do not receive the maximum pay for their classification earn salaries that are higher than the minimum.[176]

### i. Staff Psychiatrists

109.     CDCR average psychiatrist pay in Figure 15 is limited to staff psychiatrists and excludes chief and senior psychiatrists. Pay scales for chief and senior psychiatrists are higher than those for staff psychiatrists, so CDCR average pay would likely be greater if chief and senior psychiatrists were included in the analysis. The data indicate that CDCR staff psychiatrists on average earned about $301,500 in base pay in 2018 and 11.8% more or about $337,000 in 2022. Psychiatrists who are not hired at the maximum salary scale are eligible to receive annual salary raises (generally 5%) based on merit until they reach their respective caps.[177] For 2022, the most recent year for which a comparison is possible, CDCR provided base salaries that were 12.7% higher than the average base salary of $299,000 offered in placements brokered by recruiting firm Merritt Hawkins.[178]

---

[174] CDCR statewide average base pay excludes certain forms of compensation included in the OEWS data, such as awards, mileage pay and production bonuses. Both CDCR base pay and the OEWS salaries to which CDCR salaries are compared exclude overtime and other bonuses.

[175] Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; MH Salary Ranges and History 2012-2023.xlsx.

[176] CDCR offers salaries above the minimum salary rate for the classification to candidates with extraordinary qualifications and for classifications with a documented history of recruitment difficulties. *See* "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx." Furthermore, CDCR offers merit pay increases to employees on an annual basis until they reach the maximum salary of their classification and pay range.

[177] Carter, Andrea. "RE: Coleman: Questions from Labor Economists." August 20, 2023. The annual merit pay raise applies to all classifications discussed in this report.

[178] MH 2022, *supra* note 19, p. 10.

DEFS-005.055



**Figure 15 - CDCR Average Psychiatrist Salary Comparison with Statewide and National Averages**



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Salary Ranges and History.xlsx; Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf

110.     Figure 15 also shows average statewide and national salaries for psychiatrists based
on annual data available from OEWS.  These salaries are for employed psychiatrists only
(*i.e.*, they exclude self-employed individuals) and tend to include other forms of
compensation such as incentive pay and some production bonuses.  Thus, OEWS salaries
likely overestimate base salaries for employed psychiatrists.[179] The OEWS average
compensation for psychiatrists has increased by 12.2% nationwide, from $220,380 in 2018
to $247,350 in 2022.[180]

111.     California experienced a greater increase, rising by 22.0% from $255,790 in 2018
to $311,950 in 2022.   Average psychiatrist compensation statewide declined from
$255,790 in 2018 to $236,930 in 2019 before increasing to $245,000 in 2020 and jumping
to $305,090 in 2021. It is unclear how much of these changes is attributable to the COVID-

---

[179] OEWS wages do not include call coverage and overtime payments.  *See*
https://www.bls.gov/oes/current/oes_tec.htm.
[180] The salaries and wages for psychiatrists in OEWS data were identified with SOCs 29-1223 and 29-1066. Even
though was a code change from the 2010 SOC System to the 2018 SOC System for psychiatrists, the group of
professionals included in the definition remained the same. For more details, *see* https://www.bls.gov/SOC/.

DEFS-005.056

19 pandemic and its effects on the supply of and demand for psychiatrists in California and nationwide, as precise data on COVID-19 and its effects on the supply of mental health providers are not yet available.

112.    Figure 15 shows that CDCR base salaries have remained consistently above both the statewide and national benchmarks over the past five years despite greater increases in statewide and national salaries that narrowed the pay gap with CDCR.  CDCR staff psychiatrists have on average received base salaries that were at least 7% and as much as 31% higher than compensation averages statewide.  National averages have consistently been below the California statewide average and CDCR salaries exceeded nationwide averages by at least 31% and as much as 44% over this period.

### ii.    Clinical Psychologists

113.    CDCR average psychologist pay in Figure 16 is limited to Clinical Psychologists and excludes Chief and Senior Psychologists. Pay scales for Chief and Senior Psychologists are generally higher than those for Clinical Psychologists, so CDCR average pay would likely be greater if Chief and Senior Psychologists were included in the analysis.

114.    The data indicate that CDCR clinical psychologists on average earned about $117,400 in base pay in 2018 and 11.0% more or about $130,400 in 2022. Psychologists who are not hired at the maximum salary scale are eligible to receive annual salary raises (generally 5%) based on merit until they reach their respective caps.

**Figure 16 - CDCR Average Psychologist Salary Comparison with Statewide and National Averages**



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Salary Ranges and History.xlsx; Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf

115.    Figure 16 also shows average statewide and national salaries for clinical, counseling and school psychologists based on annual OEWS data. The OEWS average compensation for these psychologists has increased by 11.7% nationwide, from $85,340 in 2018 to $95,307 in 2022.[181]

116.    California experienced a smaller percentage increase over this period, though its salary levels have been consistently higher than nationwide averages. Average psychologist salaries in California increased by 6.1% from $108,350 in 2018 to $114,924 in 2022.  Average clinical, counseling and school psychologist compensation declined slightly in California between 2020 and 2021, though nationwide salaries continued to increase slightly. Again, it is unclear how much of these changes is attributable to the COVID-19 pandemic and its effects on the supply of and demand for psychologists in California and nationwide, as precise data are not yet available.

---

[181] Mean wages for Psychologists were taken from SOC (19-3031) for years 2017-2020, and calculated as the weighted averages of Clinical and Counseling Psychologists (SOC 19-3033) and School Psychologists (SOC 19-3034) in 2021 and 2022 due to the split occurred in the code from SOC 2010 System to SOC 2018 System. For more details, *see* https://www.bls.gov/SOC/.

DEFS-005.058

117.     Figure 16 shows that CDCR base salaries for clinical psychologists have remained consistently above both the statewide and national benchmarks over the past five years and have increased more than statewide and national salaries during this period. CDCR clinical psychologists have on average received base salaries that were at least 4% and up to 15% higher than compensation averages statewide. National averages have consistently been below the California statewide average and CDCR salaries exceeded nationwide averages by 35% to 39% over this period.

### iii.     Clinical Social Workers

118.     CDCR average clinical social worker pay in Figure 17 is limited to Clinical Social Workers and excludes Supervising Psychiatric Social Workers. Pay scales for Supervising Psychiatric Social Workers are higher than those for Clinical Social Workers, so CDCR average pay would likely be greater if Supervising Psychiatric Social Workers were included in the analysis.

119.     The data indicate that CDCR clinical social workers on average earned about $86,300 in base pay in 2018 and 18.8% more or about $102,500 in 2022. Clinical social workers who are not hired at the maximum salary scale are eligible to receive annual salary raises (generally 5%) based on merit until they reach their respective caps.

DEFS-005.059

**Figure 17 - CDCR Average Clinical Social Worker Salary Comparison with Statewide and National Averages**



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023; Salary Ranges and History.xlsx; Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf

120.     Figure 17 also shows average statewide and national salaries for clinical social workers based on annual OEWS data. The OEWS average compensation for clinical social workers has increased by 12.6% nationwide, from $54,848 in 2018 to $61,782 in 2022.[182] California clinical social workers enjoyed a larger percentage increase over this period on average, even though their salary levels were consistently higher than nationwide averages. Average clinical social worker salaries in California increased by 21.5% from $69,878 in 2018 to $84,901 in 2022.

121.     CDCR base salaries for clinical social workers have remained consistently above both the statewide and national benchmarks over the past five years. CDCR clinical social workers have on average received base salaries that were at least 15% and as much as 24% higher than compensation averages statewide. National averages have consistently been

_____

[182] Mean wages for Clinical Social Workers were calculated as the weighted averages of Healthcare Social Workers (SOC 21-1022) and Mental Health and Substance Abuse Social Workers (SOC 21-1023) with weights being employment. There were no changes in the SOC classification for these workers, but these two codes fulfill the description of clinical social worker.

DEFS-005.060

below the California statewide average and CDCR salaries exceeded nationwide averages by at least 54% and as much as 66% over this period.

<em>iv.    Recreation Therapists</em>

122.    Figure 18 presents CDCR average pay for recreation therapists from 2018 to 2022. CDCR recreation therapists earned about $82,900 on average in base pay in 2018 and 15.4% more or about $95,700 in 2022. Recreation therapists who are not hired at the maximum salary scale are eligible to receive annual salary raises (generally 5%) based on merit until they reach their respective caps.

**Figure 18 - CDCR Average Recreation Therapist Salary Comparison with Statewide and National Averages**



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Salary Ranges and History.xlsx; Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf

123.    Figure 18 also shows average statewide and national salaries for recreation therapists based on annual OEWS data. The OEWS average compensation for recreation

DEFS-005.061

therapists has increased by 11.2% nationwide, from $50,640 in 2018 to $56,310 in 2022.[183] California recreation therapists experienced a smaller percentage increase over this period, even though their salary levels were considerably and consistently higher than nationwide averages. Average recreation therapist salaries in California increased by 3.1% from $75,810 in 2018 to $78,190 in 2022. Average California recreation therapist compensation fluctuated during this period, most notably declining from $77,960 in 2020 to $71,380 in 2021 before increasing to $78,190 in 2022. Nationwide salaries continued to increase slightly throughout this period. Due to a lack of precise data it is unclear how much of these fluctuations is attributable to the COVID-19 pandemic and its effects on the supply of and demand for recreation therapists in California and nationwide.

124.    Figure 18 shows that CDCR base salaries for recreation therapists have remained consistently above both the statewide and national benchmarks over the past five years and that the premium paid by CDCR relative to the statewide average, and premium paid by CDCR relative to the nationwide average, have increased. CDCR recreation therapists have on average received base salaries that were at least 9% and up to 29% higher than compensation averages statewide. National averages have consistently been below the California statewide average and CDCR salaries exceeded nationwide averages by 64% to 71% over this period.

<em>v.    Medical Assistants</em>

125.    Figure 19 presents CDCR minimum pay for medical assistants from 2018 to 2022. CDCR medical assistants earned a minimum of approximately $33,700 in base pay in 2018 and a minimum of 23.4% more or about $41,500 in 2022. Similar to other classifications, medical assistants who are not hired at the maximum salary scale are eligible to receive annual salary raises (generally 5%) based on merit until they reach their respective caps.

126.    As of June 2023 no medical assistants earned the maximum base pay in their pay range, and consistent with the other classifications presented above we assume that any provider who does not earn the maximum receives the minimum base pay among pay

---

[183] Recreation therapists' mean wages were obtained using SOC (29-1125).

ranges offered to that classification.[184] However, for comparison purposes in Figure 19 we also present the maximum base pay that CDCR medical assistants could earn in each year. This increased 23.4% from approximately $44,300 in 2018 to approximately $54,600 in 2022.[185] As of July 2023, 23.1% of CDCR medical assistants earned the minimum available base pay, and 76.9% earned more than the minimum but less than the maximum available pay.[186] Thus the true average CDCR medical assistant pay is greater than the minimum CDCR pay but less than the maximum CDCR pay shown in Figure 19.

**Figure 19 - CDCR Average Medical Assistant Salary Comparison with Statewide and National Averages**



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023; Salary Ranges and History.xlsx; Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf

---

[184] Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; MH Salary Ranges and History 2012-2023.xlsx. As of August 2023 there are mental health medical assistants reaching the maximum base pay in their pay range. *See* Carter, Andrea. "RE: Coleman: Questions from Labor Economists." August 20, 2023. This occurred subsequent to the data used in our analyses.
[185] MH Salary Ranges and History 2012-2023.xlsx.
[186] Employees at MIN and MAX Salary Ranges - July 2023.pdf.

DEFS-005.063

127.    Figure 19 also shows average statewide and national salaries for medical assistants based on annual OEWS data. The OEWS average compensation for medical assistants has increased by 17.8% nationwide, from $34,540 in 2018 to $40,700 in 2022.[187] California medical assistants enjoyed a larger percentage increase over this period on average, 25.1%, from $38,250 in 2018 to $47,850 in 2022.

128.    Figure 19 shows that the minimum CDCR base salary for medical assistants has been competitive with a national benchmark, though consistently below the state benchmark, over the past five years. The maximum salary that medical assistants could earn at CDCR has exceeded both statewide and national averages throughout this five-year period.

### vi.    *Regional Analysis*

129.    CDCR average salaries are also competitive regionally within California. Within the 14 metropolitan and micropolitan statistical areas where CDCR has facilities and for which region-specific OEWS data are available, CDCR average base salaries have generally been at least as high as the regional OEWS average salaries and often substantially higher. For medical assistants we again compare the minimum and maximum CDCR salary to regional averages.

130.    Regional comparisons are presented in Appendix 1. Appendix Figure A 1 shows that CDCR average base salaries for psychiatrists have generally been at least as high as the regional OEWS average salaries and often substantially higher. The only exception is the San Francisco-Oakland-Hayward area, where regional average salaries have exceeded CDCR average psychiatrist salaries in recent years.

131.    Appendix Figure A 2 shows that CDCR average base salaries for psychologists have generally been at or above regional OEWS average salaries, particularly in recent years. Similarly, as shown in Appendix Figure A 3, CDCR clinical social worker salaries have generally matched or exceeded regional OEWS salaries between 2018 and 2022. CDCR recreation therapist salaries, shown in Appendix Figure A 4, have generally matched or exceeded regional OEWS salaries, though there have been fluctuations in the

---

[187] Medical Assistants' mean wages were obtained using SOC (31-9092).

DEFS-005.064

Fresno and Vallejo-Fairfield regions' average salaries such that they exceeded CDCR average salaries for periods between 2018 and 2022.

132.     Appendix Figure A 5 shows that even the minimum CDCR salary available to medical assistants is at or above regional averages in six out of fourteen regions in which the comparison can be made. The maximum CDCR salary available to medical assistants is at or above the average in all regions except San Francisco-Oakland-Hayward and Vallejo-Fairfield. True average CDCR medical assistant salaries for each region presented in Appendix Figure A 5 are greater than the minimum but less than the maximum presented in each chart.

133.     Furthermore, CDCR average salaries are typically higher and often substantially higher than the those paid to Federal Bureau of Prisons ("BOP") psychiatrists, psychologists and social workers in California.[188] BOP psychiatrists are paid at Federal General Schedule grade 13 and 15 rates and staff psychologists are paid at grade 11 and 12 rates. Two current BOP social worker job openings are also paid at the grade 11 rate. Since federal employees' salaries are statutorily limited, the base pay of BOP psychiatrists at or near the top of the GS-15 pay grade does not change in response to changes in the supply of or demand for psychiatrists.[189]

134.     Between 2018 and 2022, CDCR psychiatrists' statewide average base pay was 79% to 98% above the maximum salary earned by BOP psychiatrists in California, depending on the BOP psychiatrists' location. CDCR psychiatrists' statewide average base pay was 175% to 257% above the minimum salary earned by BOP psychiatrists in California.[190]

135.     During this period, CDCR psychologists' statewide average base pay was at or up to 26% above the maximum salary earned by BOP psychologists in California in all

---

[188] BOP salary data are publicly available via Bureau of Prisons and Office of Personnel Management websites. Federal Bureau of Prisons. "Psychiatrist Job Series Number: 0602." Available at https://www.bop.gov/jobs/positions/index.jsp?p=Psychiatrist; Federal Bureau of Prisons. "Psychologist Job Series Number: 0180." Available at https://www.bop.gov/jobs/positions/index.jsp?p=psychologist; USAJOBS. "Justice, Bureau of Prisons/Federal Prison System. 0185-Social Worker" Available at https://www.usajobs.gov/Search?j=0185&a=DJ03; U.S. Office of Personnel Management. "Salaries & Wages." Available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/. Pay scales are currently unavailable for recreation therapists due to a lack of job openings.
[189] Statutory limits apply in the four metropolitan areas in California where BOP psychiatrists earn higher locality pay. Rates are limited to the rate for level IV of the Executive Schedule (5 U.S.C. 5304 (g)(1)). See https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/.
[190] Comparison of CDCR statewide average salary to GS-13 step 1 and GS-15 step 10 salary data.

locations and periods except the San Jose-San Francisco-Oakland locality in 2020, when BOP psychologist pay exceeded CDCR pay by 1% to 2%. CDCR psychologists' statewide average base pay was 53% to 97% above the minimum salary earned by BOP psychologists in California.[191]

136.    Finally, CDCR clinical social workers' statewide average base pay was at or up to 19% above the maximum salary earned by BOP social workers throughout California except for the Los Angeles-Long Beach, Sacramento-Roseville, San Diego-Carlsbad and San Jose-San Francisco-Oakland localities through 2020 and San Jose-San Francisco-Oakland more recently. CDCR clinical social workers' statewide average base pay was 14% to 55% above the minimum salary earned by BOP social workers' in California.[192]

## 2.  Salary Enhancements and Other Monetary Benefits Offered by CDCR

### a.  Annual Merit-Based Salary Adjustment

137.    For CDCR employees who are not hired at the maximum salary within their salary range, CDCR offers annual salary raises of based on merit. These increases are typically granted annually until the employee reaches the maximum of their salary range.[193] CDCR data shows that as of July 2023, 92% of CDCR staff psychiatrists, 70.4% of clinical psychologists, 59.7% of clinical social workers and 70.2% of recreation therapists earn the maximum salary within their respective salary ranges.[194]

### b.  Enhanced Registry Contract Rates

138.    CDCR entered into a contract with registry-services provider Management Solution, LLC in May 2017 which stipulated rates for registry psychiatrists, PNPs, psychologists, LCSWs and recreation therapists. Hourly staff rates were $200-$220 for

---

[191] Comparison of CDCR statewide average salary to GS-11 step 1 and GS-12 step 10 salary data.
[192] Comparison of CDCR statewide average salary to GS-11 step 1 and step 10 salary data.
[193] Coleman CDCR Experts questions-HR Response (005).docx.
[194] Max Salary Coleman Request 2018 – 2023.pdf. No CDCR medical assistants earned the maximum salary within their pay range. Among more senior employees, as of June 2023 86.4% of Chief Psychiatrists, 100% of Senior Psychiatrist (Supervisor) employees, 71.7% of Chief Psychologists, 81.6% of Senior Psychologist (Specialist) employees, 76.1% of Senior Psychologist (Supervisor) employees and 82.8% of Supervising Psychiatric Social Worker I employees earned the maximum salary within their respective salary ranges.

DEFS-005.066

registry psychiatrists, depending on facility, $106/hour for PNPs, $75-$105 for psychologists, $46-$55 for LCSWs and $45 for recreation therapists.[195] Through a series of amendments issued between June 2017 and March 2022, rates were increased for classifications at selected facilities.[196]

139.       CDCR entered into a new contract with Management Solution, LLC in May 2022 which increased rates for registry psychiatrists at certain facilities, psychologists, LCSWs and recreation therapists. An April 2023 amendment further increased rates for selected classifications and facilities. Hourly registry rates now range from $200 to $325 for psychiatrists, $106 for PNPs, $102 to $162 for psychologists, $65 to $90 for LCSWs and $67 for recreation therapists.[197] If a registry provider were to work a 2,000-hour work year, these hourly rates equate to annual pay of $400,000 to $650,000 for psychiatrists, $212,000 for PNPs, $204,000 to $324,000 for psychologists, $130,000 to $180,000 for LCSWs and $134,000 for recreation therapists. These annual equivalents are considerably more than – as much as double or more – average annual wages for these classifications in California and nationwide, as reported by the BLS.[198]

140.       California Correctional Health Care Services ("CCHCS") has hired 64 registry psychiatrists, 63 registry psychologists, 54 registry LCSWs and 44 registry recreational therapists since the May 2022 contract and April 2023 amendment went into effect. However, as shown in Figure 6, Figure 8, Figure 10, Figure 12 and Figure 14, there has been only a minimal increase in the number of positions in these classifications that CDCR

---

[195] 16-00467 Exhibit B-2 and B-2A Original Contract eff 5-1-17.pdf.
[196] CDCR facilities with higher registry rates for a given classification, and those where registry rates increased for a given classification, are hard-to-recruit institutions and "sister" institutions. CDCR aims to ensure that staff do not leave one institution for another institution at which registry rates increased. *See* Ponciano, Angela. "RE: Coleman: Questions from Labor Economists." August 30, 2023.
[197] 21-00147 Exhibit B-2 and B-2A Original Contract eff 5-1-22.pdf; 21-00147-02 Exhibit B-2A eff 4-5-23.pdf; and Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, May 5, 2023, p. 5. *See also* Declaration of Angela Ponciano in Support of Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, May 5, 2023, p. 2, and Declaration of Lisa Ellis in Support of Plaintiffs' Reply in Support of Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, May 16, 2023, Exhibit C. *See also* "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx."
[198] See Figure 15 through Figure 19 above.

has been able to fill through its registry program through the end of 2022.[199] CDCR's registry pay increases do not appear to have had a meaningful effect on filled positions.

### c. Differential Pay Rates

141.     CDCR implemented a 15% PIP pay differential for psychiatrists and psychologists in May 2022, although it was unable to advertise the increased rates for recruitment purposes until July 2022 (psychiatrists) or September 2022 (psychologists).[200]

142.     The CDCR fill and vacancy data presented in Figure 6, Figure 8, Figure 10, Figure 12 and Figure 14 suggest that differential pay rates did not increase overall civil service fill rates among psychiatrists or psychologists through the end of 2022.  The overall number of civil service-filled staff psychiatrist positions including telepsychiatrists decreased 4.2% between August 2022 and December 2022, and the overall number of filled clinical psychologist positions increased 0.6% between October 2022 and December 2022. At PIP facilities, the number of filled staff psychiatrist positions increased 3.7% – from 27 to 28 filled positions – between August 2022 and December 2022, and the overall number of filled clinical psychologist positions did not change between October 2022 and December 2022.[201] Thus a 15% pay differential does not appear to have had a meaningful impact on filled staff psychiatrist and clinical psychologist positions in the 3 to 5 months after the differential was advertised.

143.     Civil service filled positions at PIP facilities did, however, increase between May and December 2022, by 33.3% for staff psychiatrists and 15.8% for clinical psychologists, while the number of civil service filled staff psychiatrist and clinical psychologist positions overall at CDCR decreased by 3.7% and 6.4% respectively in this period.[202] Although CDCR psychiatrists and psychologists were not formally notified of the increased pay rates, impacted staff may have been informed informally through their union. It is our

---

[199] We do not have 2023 fill and vacancy data similar to those analyzed for 2018 through 2022 to assess changes after December 2022.

[200] Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, May 5, 2023, pp. 4-5. *See also* Declaration of Andrea Carter in Support of Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, May 5, 2023, p. 2. *See also* "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx." As mentioned above, through its registry program CDCR currently offers enhanced hourly rates at numerous facilities for psychiatrists, psychologists and LCSWs.

[201] Calculations based on data in "Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022.xlsx."

[202] Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022.xlsx.

DEFS-005.068

understanding that union members are typically kept updated of changes through the negotiation process. If this occurred, the filled position data are weakly consistent with CDCR psychiatrists and psychologists from non-PIP facilities switching to PIP facilities upon learning of the pay differential. CDCR appointment and separation data indicate that 4 of 6 staff psychiatrist appointments (67%), and 2 of 5 clinical psychologist appointments (40%) at PIP facilities between May and December 2022 were transfers from other institutions, compared to 42% of staff psychiatrist appointments and 30% of clinical psychologist appointments for the entire period for which we have data.[203]

### d. Dual-Appointment Program

144.      CDCR provides on-site dual appointment opportunities for psychiatrists, clinical social workers and psychologists at their primary institutions, and has implemented an internal marketing campaign to solicit interested employees. Through the dual appointment program, CDCR mental health professionals can work up to an additional 10 hours per week. Thus, CDCR mental health professionals could earn an increment of up to 25% of their base salary by participating in the dual appointment program. This equates to $84,239 for staff psychiatrists, $32,595 for clinical psychologists and $25,635 for clinical social workers at their 2022 average base salary levels.[204]

145.      To date, 32 psychiatrists, 22 psychologists and 10 clinical social workers have been hired through the dual appointment program. An additional 3 psychologist applicants and 2 clinical social worker applicants are in the process of being hired.[205] This equates to 8 FTE psychiatrists, 6.25 FTE psychologists and 3 FTE clinical social workers once the pending hires are included, if all dual appointees work the maximum 10 hours permitted.

146.      These dual appointment hires indicate that the majority of the existing pool of CDCR psychiatrist, psychologist and clinical social worker employees prefer not to work additional hours for CDCR despite the opportunity to increase their base salaries by as much as 25%. Similarly, the dual appointment program has the potential to increase CDCR

---

[203] "Staff Psychiatrist.xlsx" and "Psychologist.xlsx."
[204] 25% of $336,957 for staff psychiatrists, $130,381 for clinical psychologists and $102,539 for clinical social workers.
[205] Coleman CDCR Experts questions-HR Response (005).docx. Psychologist dual appointment hire information is only available since 2022.

DEFS-005.069

base pay by 25% for psychiatrists, psychologists and clinical social workers considering competing offers from other employers. However, it has not led to discernable improvements in CDCR's vacancy rates.

### e. Cash-for-Call Program

147.    CDCR implemented a program to provide cash compensation for call coverage, instead of leave credits.[206] CDCR psychiatrists, psychologists (including Senior Psychologists) and clinical social workers are eligible to participate in the cash-for-call program. Among psychiatrists, to date only 39 have done so.[207]

### f. Relocation, Retention and Other Bonuses

148.    CDCR amended its provision of recruitment and retention bonuses for on-site civil service psychiatrists and expanded the provision to include civil service psychologists, all institutions and additional timeframes. Eligible employees can receive $5,000 upon completion of consecutive qualifying pay periods. These changes were effective in May 2022 although CDCR was unable to advertise the expanded bonus provision for recruitment purposes until July 2022 (psychiatrists) or September 2022 (psychologists).[208]

149.    CDCR also provides relocation reimbursement assistance through the State of California as a recruitment incentive for new-to-State hires in hard to recruit positions. However, many other employers considered by potential CDCR hires may offer similar relocation allowances to attract new hires. For example, 78% of recruiting search engagements in which the recruiting search firm Merritt Hawkins was involved in 2021-2022 offered a relocation allowance.[209]

---

[206] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.
[207] Coleman CDCR Experts questions-HR Response (005).docx.
[208] Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 5 May 2023, pp. 4-5. *See also* Declaration of Lisa Ellis in Support of Plaintiffs' Reply in Support of Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 16 May 2023, Exhibit A. *See also* "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx."
[209] MH 2022, *supra* note 19, p. 17.

DEFS-005.070

### g. Pension and Fringe Benefits

150.    CDCR's mental health providers are eligible for pension benefits administered by CalPERS.[210] Pensions are calculated using a defined benefit formula based on years of service, age at retirement, and final compensation based on the highest salary over a one- or three-year period, subject to a compensation cap.[211]

151.    CDCR estimates of the value of benefits associated with the maximum salary for the five classifications of mental health employees considered in this report range from $34,123 for medical assistants (59.1% of the maximum medical assistant salary of $57,756) to $131,792 for chief psychiatrists (33.9% of the maximum chief psychiatrist salary of $389,328). CDCR retirement contributions, estimated medical, dental and vision benefits, and Other Post-Employment Benefits are included in these estimates.[212] Nationwide, employer costs for insurance, retirement and legally required benefits among health care and social assistance workers nationwide were 27% of wages and salaries as of March 2023.[213]

### h. Other Monetary Compensation

152.    CDCR offers additional forms of monetary compensation to its employees, including paid leave, compensation for travel and overtime.[214] Although these additional monetary incentives contribute to CDCR's competitiveness relative to other employers,

---

[210] For a description of the plan, see https://www.calpers.ca.gov/page/employers/benefit-programs/retirement-benefits.

[211] California Correctional Health Care Services Retirement Benefits Summary, p. 6 of "Coleman Response.pdf"; BU 19 & 20 Retirement Info (2023).xlsx; Retirement Info 2023.xlsx Bu 19 20.xlsx; Coleman CDCR Experts questions-HR Response (005).docx.

[212] Defendants' Supplemental Response to Plaintiffs' First Set of Interrogatories to Defendant Jeff Macomber, August 24, 2023. Other Post-Employment Benefits are prefunded health benefits that current active employees will receive as state retirees. The benefits are jointly prefunded by the State of California and the employee. *See* https://www.calhr.ca.gov/employees/Pages/opeb-faq.aspx.

[213] BLS, Employer Costs for Employee Compensation, March 2023, Table 2. Available at https://www.bls.gov/news.release/pdf/ecec.pdf. BLS estimates include life and disability insurance as well as health insurance, and BLS includes Social Security, Medicare, Federal and state unemployment insurance and workers' compensation among its legally required benefits. It does not explicitly include prefunded retirement health benefits.

[214] Coleman CDCR Experts questions-HR Response (005).docx. Only recreation therapists and medical assistants are eligible for overtime compensation.

DEFS-005.071

they have not been effective at bridging the deficit between CDCR's mental health professional needs and its filled positions.

### 3.  Other CDCR Benefits

#### a.  Loan Forgiveness and Visa Support

153.    CCHCS provides clinical employees with visa support for both non-citizen and non-permanent resident status. As a work sponsor, it provides representation to these employees throughout the process to maintain employment in the United States or to achieve permanent residency. CCHCS has also promoted student loan forgiveness programs administered by the Human Resources Services Agency.[215] Although additional hires attributable to these efforts may not be observed contemporaneously, other employers considered by CDCR employees and potential hires may offer these same benefits and their provision has value to certain applicants and employees. Removing these benefits may cause mental health professionals to leave CDCR or not join CDCR in the first place, instead choosing employment at institutions that offer Sixteen percent of engagements in which the recruiting search firm Merritt Hawkins was involved in 2021-2022 offered educational forgiveness. In 2019-2020, 24% of Merritt Hawkins' engagements offered educational forgiveness.[216]

#### b.  Ability of Telepsychiatrists to Work from Home

154.    As noted above, during the COVID-19 pandemic CDCR permitted telepsychiatrists meeting certain criteria to work from home. A May 9, 2023 Court order permits them to continue to work from home.[217] CDCR perceived that its flexibility and willingness to accommodate the ability to work from home ultimately resulted in a retention of onsite providers while effectively recruiting more civil telepsychiatrists during the COVID-19 pandemic.[218] CDCR's data show a reduction in overall psychiatrist vacancies and

---

[215] Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 5 May, 2023, p. 5; "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx."
[216] MH 2022, *supra* note 19, p. 20.
[217] Stipulation and Order Approving the Parties' Modifications to CDCR's Telepsychiatry Policy, May 9, 2023, ECF 7830.
[218] CDCR Lessons Learned, *supra* note 163, p. 20.

DEFS-005.072

attainment of a 90% psychiatrist staffing rate in many months from early 2020 to the end of 2022.[219]

### 4. Other Hiring Initiatives

155.        CDCR has engaged in numerous other hiring initiatives, some of which are described below. However, these initiatives do not appear to have contributed to CDCR's ability to achieve its staffing goals in the 2018-2022 period.

#### a.  Internships

156.        The Statewide Mental Health Program supports a Psychologist Internship program at 7 CDCR facilities.[220] 179 interns have completed CDCR's programs and 73 have remained within CDCR, a 41% retention rate.[221]

#### b.  On-site Hiring Events

157.        CDCR has engaged in numerous outreach and recruiting efforts to enhance hiring of mental health professionals in recent years. These include numerous on-site events conducted by CCHCS in 2022 and 2023 which focused on hiring mental health staff, in particular for PIP facilities. Plaintiffs acknowledge that at least 18 of the PIP staff hired at these events fill mental health positions.[222] Although these events emphasized hiring staff for PIP facilities, CCHCS has also been able to hire mental health professionals for non-PIP sites through these events.[223] CCHCS is planning additional on-site hiring events.[224]

---

[219] *Id.*, p. 21 and Figure 5 and Figure 6 above.
[220] Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 5 May, 2023, p. 3.
[221] Based on information received from CDCR Human Resources.
[222] Plaintiffs' Reply in Support of Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff as Non-Compliant with Court's Orders, 16 May, 2023, p. 4. *See also* "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx."
[223] *See* Declaration of Lisa Ellis in Support of Plaintiffs' Reply in Support of Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 16 May 2023, Exhibit E, p. 2.
[224] *Id.*, pp. 2-3. *See also* Declaration of Jasinda Muhammad in Support of Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 5 May 2023, p. 2, and "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx."

*c.  Additional Professional Outreach Efforts*

158.      CCHCS and CDCR conduct numerous other outreach and recruiting efforts, including:

- o   educational outreach to niche associations and professional associations for each classification;

- o   partnership with educational entities to promote correctional health care career opportunities to alumni and graduating students, including a "Meet the expert" virtual seminar series connecting students to CDCR mental health clinicians;

- o   attending conferences where human resources and mental health clinicians speak to prospective candidates;

- o   geo-targeted direct mail and email campaigns for psychiatrists, psychologists and clinical social workers;

- o   mental health-targeted hiring events at locations in communities near CDCR institutions, aimed at expanding awareness of career pathways within the institutions, increasing the candidate pipeline, and facilitating hiring.[225]

## 5.  Factors that compound CDCR's Hiring Challenges

159.      The increasing acceptance of telehealth makes it more possible for mental health providers to locate in preferred locations, making it harder for CDCR to attract on-site mental health providers to facilities in locations that those providers may perceive as less desirable. This may facilitate hiring of telehealth providers by CDCR and other employers, as telehealth providers may be able to locate in a place of their choosing and work partially or entirely remotely from that location. This may, for example, apply to CDCR telepsychiatrists who work from home or in CDCR telepsychiatry hubs convenient to where the providers prefer to locate.

160.      However, greater acceptance and use of telehealth may make it more difficult for employers to hire mental health providers who are required to work on-site, particularly if those providers have the opportunity to work remotely via telehealth for other employers. If CDCR on-site psychiatrists, psychologists, clinical social workers, recreation therapists

---

[225] "Statements concerning CCHCS and CDCR recruiting and retention efforts.docx."

and medical assistants would be required to work on-site for any potential employer, CDCR's on-site requirements are comparable to other employers. But if there are remote telehealth work opportunities available to the pools of professionals who would potentially consider providing on-site mental health services at CDCR, they may prefer such telehealth jobs, putting CDCR at a competitive disadvantage and making it harder for CDCR to hire providers to work on-site.

161.    Several states have relaxed education, licensing or other rules in order to allow out-of-state providers to serve their residents.[226] Should California permit such relaxation of its requirements for mental health providers, this may serve to increase competition for practitioners located in California who would consider employment at CDCR, but who may instead opt to work for an out-of-state employer. Conversely, it could augment the pool of providers available to CDCR by permitting it to recruit out-of-state providers. To our knowledge there are no publicly available data with which to assess the efficacy of relaxed licensing or education requirements.[227]

## V.    Potential of Increased Pay to Alleviate Shortages

162.    Figure 5 to Figure 14 above indicate that CDCR has faced hiring challenges between 2018 and 2022, particularly among psychologists, clinical social workers and to a lesser extent medical assistants. However, as shown in Figure 15 to Figure 19, CDCR has consistently paid base salary premiums to its employees in these classifications, as well as to its staff psychiatrists and recreational therapists, relative to employees in these occupations statewide and nationwide. We assess the extent to which CDCR's salaries relative to those paid by employers in California and the U.S. enable CDCR to meet its vacancy goals.

---

[226] NAMI 2020, *supra* note 4, p. 50, citing legislation in Iowa, Mississippi and New Jersey.
[227] States including Minnesota, New Jersey, Tennessee and Virginia were authorized to enter an agreement that allows psychologists to practice across state lines either through telehealth or in-person services, and practice in multiple states (NAMI 2020, *supra* note 4, p. 60). Should California enter into such an agreement, it could similarly increase competition for psychologists currently practicing in California and/or augment the psychologist labor pool from which CDCR would be able to recruit.

DEFS-005.075

## A. Salary Premiums and Civil Service Fill Rates

163.     Regression analysis is a statistical method frequently used by economists that allows one to examine the relationship between two or more variables of interest. While there are many types of regression analysis, at their core they all examine the association or the influence of one or more independent variables on a dependent variable.[228] Perhaps most importantly, regression analysis allows one with some degree of statistical confidence to determine which factors are associated with changes in the dependent variable, which factors can be ignored, and whether the associations are positive or negative.

164.     Here we use multivariate linear regression techniques to estimate the relationship between changes in CDCR's filled civil service positions for the mental health professionals discussed in this report and changes in their respective salaries. A separate set of regressions using net hires as a dependent variable is discussed below. A detailed description of regression specifications, results, and interpretation of those results is provided in Appendix 2. We summarize the methodology and results here.

165.     We estimate the relationship between CDCR's filled civil service positions for staff psychiatrists (including telepsychiatrists and PNPs), clinical psychologists, clinical social workers, recreation therapists, and medical assistants and salary levels at CDCR and among all employers for the mental health classification in question.[229] Each observation is for a particular classification in a particular time period. For completeness, we alternatively consider national and state-level average salaries in our regressions. All regressions control for the number of authorized CDCR positions for the classification (a measure of demand for mental health professionals at California's correctional facilities), a time trend and the COVID-19 pandemic. They further allow for individually estimated fixed effects for each professional classification, which capture unobservable time invariant characteristics specific to the classification.

166.     Outcomes of interest from the filled position regressions are summarized in Figure 20 and Figure 21 for easy interpretation. The vertical axis lists the explanatory variables of

---

[228] A dependent variable is the main factor a researcher is trying to understand or predict. Independent variables are the factors that a researcher hypothesizes have an impact on the dependent variables.
[229] CDCR compensation for Chief and Senior Psychiatrists, Chief and Senior Psychologists, and Supervising Psychiatric Social Workers, and PNPs are excluded from these analyses.

DEFS-005.076

interest in the regressions while the horizontal axis indicates values of point estimates and confidence intervals of the estimated coefficients.[230]  Estimated coefficients from different models are grouped by explanatory variable.

167.        The vertical line at zero serves as a reference point to a variable's statistical significance.[231] If a confidence interval intersects the vertical line at zero, that estimate is statistically indistinguishable from zero itself and the independent variable has no statistically meaningful association with our dependent variable in this context. If the confidence interval is entirely less than (to the left of) zero, the variables are negatively associated – *i.e.*, an increase in the explanatory variable is associated with a decrease in civil service-filled positions at CDCR. If the confidence interval is entirely greater than (to the right of) zero, the variables are positively associated (*i.e.*, an increase in the explanatory variable is associated with an increase in civil service-filled positions at CDCR.

---

[230] A point estimate measures the value of interest, but with error that depends on the extent of variation in the data. A confidence interval incorporates that error and describes a range of values that include the population value of interest, for a given confidence level. For example, a 95% confidence level is frequently used by economists. One can be 95% confident that the true value of interest lies within the interval that is constructed based on a 95% confidence level.

[231] An estimated coefficient is statistically significantly different from zero when zero lies outside the confidence interval.

DEFS-005.077



**Figure 20 – Filled Positions Regression Analysis – CDCR Salary Coefficients and Confidence Intervals**



168.    The bottom set of coefficients in Figure 20 corresponds to models (1) and (2) in Appendix Table A 1, while the classification-specific estimates in the top 5 panels of Figure 20 correspond to models (9) and (10) in Appendix Table A 3. Each model estimates the association between percentage changes in CDCR salary and percentage change in filled civil service positions across all classifications of mental health professionals considered. The estimates in the bottom row of Figure 20 suggest a positive but insignificant association between CDCR salaries and filled positions. Although the point estimate is positive, we do not find a statistically significant relationship between CDCR salaries and filled positions – that is, we cannot conclude that there is a nonzero relationship between the two.

169.    We estimated alternative specifications in which we allowed changes in CDCR salaries to impact changes in filled positions flexibly, by estimating separate coefficients for each classification. These specifications allow different classifications to relate differently to changes in compensation. As shown in the top 5 rows of Figure 20, the estimated effects are not uniform across professions. Coefficients for most specifications were not statistically significant, and point estimates were both positive and negative across

DEFS-005.078

classifications.[232] This lack of uniformity reinforces our skepticism that CDCR could increase civil service filled positions by raising salaries.

170.     We also ran a series of regressions estimating the association between filled positions and lagged CDCR and lagged California or U.S. salaries. If (potential) employees do not respond immediately to changes in relative salaries, the lagged specification may better capture employment decisions in response to salary changes. Results of the lagged specifications are qualitatively similar to those shown in Figure 20 and are presented in Appendix Table A 2.

171.     In a separate set of regressions, we analyzed the ratio of CDCR salary vis-à-vis market salary (*i.e.*, the premium offered by CDCR over California or U.S. average salaries). We would expect to see a positive relationship between CDCR salary premiums and filled civil service positions. In many ways this is a more interesting measure, because it doesn't simply measure the relationship between higher CDCR salaries and filled positions, all else held constant, but assesses the potential for CDCR to increase filled positions by increasing its salary premium over California or U.S. averages.

---

[232] The exception is Medical Assistants, for which both point estimates are both positive and statistically significant at a significance level of 5%, suggesting that increased CDCR pay is associated with more filled Medical Assistant positions.

DEFS-005.079

**Figure 21 - Filled Positions Regression Analysis Coefficients of Interest and Confidence Intervals**



172.    The four models summarized in Figure 21 assess the relationship between changes in the premium paid by CDCR over national or statewide average salaries and civil service-filled positions for mental health professionals.[233] They estimate the association between percentage changes in the ratio between CDCR and average U.S. salaries (bottom row), or percentage changes in the ratio between CDCR and average California salaries (middle row), and percentage changes in filled civil service positions across all classifications of mental health professionals considered. Most estimates in these four "CDCR premium" models are statistically insignificant. The exception is a negative and statistically significant relationship between CDCR salary premiums relative to California average salaries and filled psychiatrist positions in the 2018-2022 period. On the whole we do not

---

[233] The "CDCR/CA Salary" and "CDCR/US Salary" rows in Figure 21 correspond to models (3) and (4) in Appendix Table A 1, while the classification-specific estimates in Figure 21 correspond to models (11) and (12) in Appendix Table A 3.

DEFS-005.080

find evidence to support a conclusion that increasing CDCR's premium over California or U.S. average salaries is associated with an increase filled positions in any meaningful way.

173.        In sum, we do not find evidence supporting that CDCR may be able to meaningfully increase filled positions by trying to outbid the market, as shown by the generally insignificant and in some cases negative estimated coefficients on CDCR salaries and salary premiums. CDCR's mental health employees and potential hires may respond to other incentives that are not captured by base salary alone, and are beyond the scope of this regression analysis.

## B.  Hiring Gains and Losses

174.        The above analyses of filled positions estimate the relationship between CDCR salaries and civil service employment at CDCR. While total employment in each month reflects the cumulative effects of hires and separations over time, the number of employees hired or separating in a given period is arguably more responsive to salary changes.

175.        Figure 22 below shows the monthly hires and separations among clinical social workers, staff psychiatrists and clinical psychologists at CDCR from January 2018 to December 2022.[234]   Both measures fluctuate throughout the period for all three classifications.

---

[234] Appointment Style = "Promotion" and Appointment Style = "Transfer from another Institution" were excluded from all three data sets for this analysis as we wanted to focus on staff additions to and departures from the CDCR system. "Other" and "N/A" appointments and separations are included in Figure 22 even though they are aggregations that include hires and separations such as non-voluntary demotions in addition to voluntary demotions, external hires from other departments, terminations or separations without fault, and employees absent without leave (Coleman CDCR Experts questions-HR Response (005).docx). Class Title = "NURSE PRACTITIONER, CF" was excluded from Staff Psychiatrist data for this analysis.

DEFS-005.081

**Figure 22 - CDCR Statewide Hiring Gains and Losses**



Source: 1. Clinical Social Worker.xlsx
2. Psychologist.xlsx
3. Staff Psychiatrist.xlsx

176.     We ran a series of eight pooled regressions estimating the relationship between CDCR salaries and net hires of staff psychiatrists, clinical psychologists and clinical social workers.[235] All regressions include profession fixed effects,[236] the number of authorized CDCR positions, a time trend, and the COVID-19 period indicator. One regression controls for current CDCR and statewide average salary levels separately, one controls for current CDCR and nationwide average salary levels separately, and two control for current CDCR premiums over statewide or nationwide salaries expressed as ratios. The additional four specifications control for the lagged version of these control variables.[237]

---

[235] Net hires are defined as appointments minus separations in each period, excluding the same types of appointments and separations as described above.

[236] Professions fixed effects capture unobservable time invariant characteristics specific to the classification.

[237] As discussed above, if (potential) employees do not respond immediately to changes in relative salaries, the lagged specification may better capture employment decisions associated with salary changes. Lagged net hire regression results are presented in Appendix Table A 5. Results are qualitatively similar to those presented here, and none of the coefficients of interest are statistically significant.

DEFS-005.082

177.    The outcomes of interest from the net hire regressions with current (not lagged) CDCR and market salaries are presented in Figure 23, and detailed results are in Appendix Table A 4. Among these four regressions none finds a relationship between CDCR salaries or salary premiums and filled positions that is statistically significant at the 5% level.[238] Thus we find a lack of support that CDCR can meaningfully influence its net hires by increasing its compensation in relation to market salaries for employed mental health professionals.

**Figure 23 - CDCR Statewide Hiring Gains and Losses:**

**Coefficients of Interest and Confidence Intervals**



Coefficient estimates and 95% confidence intervals

---

[238] The model that includes CDCR salary premiums over California average salaries as an explanatory variable finds a relationship that is statistically significant at the 10% level. A significance level of 5% or less is most frequently used as a rule of thumb to reject the null hypothesis of no relationship between an independent and a dependent variable, though statistical results significant at the 10% and 1% levels are commonly reported too. If we assume here that statistical significance is predicated on a significance level of 5% or less, as is typical, none of the net hire regressions yield evidence of a statistically significant relationship between CDCR relative pay and net hires. Furthermore, the one regression that yields a result that is statistically significant at the 10% level finds a *negative* relationship between CDCR salary premiums and net hires. That is, CDCR net hires were *lower* in periods when CDCR salary premiums were greater relative to average salaries in California.

DEFS-005.083

178.    We conclude that hiring and separation data from the past five years do not provide a statistical basis to conclude that higher CDCR pay is associated with increased net hires across the three classifications for which such an analysis is possible.

## C. Evidence from Registry Hires

179.    A comparison of registry rates and civil service pay for CDCR psychiatrists, PNPs, psychologists, CSWs and recreation therapists also provides an opportunity to gauge the sensitivity of CDCR mental health providers' employment decisions to compensation increases. Current maximum base salaries for staff psychiatrists, PNPs, clinical psychologists, CSWs and recreation therapists are $343,596, $154,212, $139,812, $113,244 and $99,660 respectively.[239] Civil service mental health professionals may choose to provide their services to CDCR through the registry program instead of opting for civil service employment at CDCR. Assuming full-time employment of 2,000 hours per year, at current registry rates psychiatrists could earn annual pay of $400,000 to $650,000, or 16% to 89% more than their current maximum annual base pay.[240] PNPs could earn $212,000 through the registry program, 37% more than their current maximum base pay. Clinical psychologists could earn $204,000 to $324,000, 46% to 132% more than their current maximum base pay, while clinical social workers could earn $130,000 to $180,000, 15% to 59% more than their current maximum base pay. Finally, recreation therapists could earn $134,000 through the registry program, 34% more than their current maximum base pay.

180.    Despite the potential to earn 15% to 132% more than civil service base pay through CDCR's registry program, CDCR has been unable to hire additional registry program participants sufficient to meet its hiring goals.[241]

---

[239] MH Salary Ranges and History 2012-2023.xlsx.
[240] See 21-00147-02 Exhibit B-2A eff 4-5-23.pdf for current registry rates. Also see the "Enhanced Registry Contract Rates" section above.
[241] The potential additional pay may be greater than the percentages stated above for CDCR employees who are not earning the current maximum civil service base pay for their classification.

DEFS-005.084

## VI.    Proposed Policy Solutions Aimed at Alleviating Mental Health Provider Shortages

181.    Numerous policy studies, analyses and press reports have documented the increasing demand for mental health services and current and projected provider shortages in California and nationwide. Many of these studies have proposed policy changes and other initiatives to alleviate these shortages. CDCR has already implemented many such initiatives, while others remain largely beyond its control.

### A.  Increased Telehealth Opportunities

182.    As documented above, telehealth had gained increasing acceptance even before COVID-19, but saw its acceptance and use blossom during the pandemic. Many mental health providers have signaled their intention to continue to pursue telehealth either on its own or as a hybrid with in-person care in the foreseeable future. There have been numerous calls for its continued use as a strategy to cope with provider shortages and to increase the number of mental health professionals.[242]

183.    Despite challenges inherent in implementing telehealth to provide mental health care in prison settings, it is perceived as an important service to scale up care in prison settings where access to care has become more difficult.[243] Telepsychiatry has also been an important resource for prisons and jails in rural areas, with minimal or no psychiatric services available on site, and where the cost of transport and security concerns of moving inmates for off-site psychiatric services are a concern.[244] Both telehealth providers and incarcerated patients have indicated satisfaction with telehealth provision. [245]

---

[242] *See, e.g.,* GAO 2022 *supra* note 6; Nenn, Kerry. "We're Facing a Shortage of Mental Health Professionals." *American Addiction Centers*, recovery.org, 16 July, 2023 ("Nenn 2023"), citing a statistic reported by the National Council for Behavioral Health; and United Health Foundation, "America's Health Rankings: Mental Health Providers in United States" 2023 ("UHF 2023"). Available at https://www.americashealthrankings.org/explore/measures/MHP.

[243] *See, e.g.*, Glaser, Michelle, et al., "Provider satisfaction and patient outcomes associated with a statewide prison telemedicine program in Louisiana." *Telemedicine and e-Health* 16.4 (2010): 472-479 ("Glaser et al. 2010") and Botrugno, Carlo, "An Ethical Perspective for Telemedicine in Prison." *The Prison Journal* (2023): 00328855231188432 ("Botrugno 2023"). The authors analyze perceptions of the use of telehealth in prisons following hurricanes (Glaser et al. 2010) and COVID-19 (Botrugno 2023).

[244] *See, e.g.,* Botrugno 2023 and Zaylor, Charles, Pamela Whitten, and Charles Kingsley. "Telemedicine services to a county jail." *Journal of Telemedicine and Telecare* 6.1_suppl (2000): 93-95.

[245] *See, e.g.,* Glaser et al. 2010; Myers, Kathleen, et al. "Telepsychiatry with incarcerated youth." Journal of Adolescent Health 38.6 (2006): 643-648.

DEFS-005.085

184.     CDCR's expanded use of telepsychiatry after the onset of COVID-19 coincided with a reduction in overall psychiatrist vacancies and attainment of a 90% psychiatrist staffing rate in many months.[246] CDCR saw increased applicant interest in its telepsychiatry program during the pandemic, including from applicants specifically seeking a telehealth position, and perceived that its ability to implement on-site telework enabled it to retain psychiatrists who may otherwise have left employment at CDCR.[247] The available evidence indicates that telehealth is one avenue that enhances CDCR's ability to achieve its vacancy goals.

185.     Due to the widespread and increasing use and acceptance of tele-mental health among non-psychiatrist mental health professionals, CDCR may be at a competitive disadvantage in recruiting and retaining providers who prefer to offer their services via telehealth and seek employers who can accommodate their preference.

## B. Increased Pay and Benefits

186.     Policy studies also point to increased pay and monetary benefits such as student loan repayment or forgiveness as a means to encourage medical students to consider specializing in psychiatry, thereby reducing the extent of current shortages.[248] As discussed above, CDCR offered compensation greater than or competitive with regional, state and national averages over the past five years, and its higher pay is not associated with an increased ability to fill more mental health care provider positions or augment hiring and retention of mental health provider employees. In addition, CDCR already promotes loan forgiveness opportunities.

## C. Utilization of Other Types of Mental Health Professionals

187.     Specifically addressing national and statewide shortages of psychiatrists, numerous studies recommend expanding the ability to prescribe medication for mental health issues to health care providers beyond psychiatrists, most frequently to PNPs and psychologists.[249]

---

[246] *See* Figure 5 and Figure 6.
[247] CDCR Lessons Learned, *supra* note 163, pp. 20-21.
[248] *See, e.g.*, Nenn 2023, *supra* note 15; Butryn, *supra* note 42, p. 6.
[249] *See, e.g.,* Harrar 2019, *supra* note 11.

DEFS-005.086

Psychiatric pharmacists at some hospitals and university medical centers are also trained to evaluate, recommend and monitor medications.[250] Additional studies recommending reliance on complementary mental health care providers are discussed in Fowdur and Greulich (2018).[251]

188. CDCR currently permits PNPs to carry patient case loads and perform direct care under the supervision of a psychiatrist, and includes them in its tabulations of filled and vacant psychiatrist positions.[252] California is not among the states that permit psychologists to prescribe medications for mental health conditions.[253] California does permit psychiatric pharmacists to initiate, change, or discontinue medications under a physician-directed protocol.[254]

189. Initiatives that expand the ability of PNPs, psychologists and psychiatric pharmacists to prescribe medication or otherwise address mental health needs could enhance CDCR's ability to achieve its psychiatrist vacancy goals, though the small number of PNPs and psychiatric pharmacists in the U.S. – and the fact that CDCR already employs PNPs and includes them in its tabulations of filled psychiatrist positions – suggest that the ability of these providers to alleviate shortages at CDCR will be limited in the foreseeable future. Additionally, expanded prescribing abilities will not alleviate shortages of non-psychiatrist mental health care providers at CDCR, in California or nationwide.

## D. Policy Solutions Beyond CDCR's Control

190. Other proposed policy solutions aimed at alleviating national and statewide shortages of mental health providers are beyond CDCR's control. Some of these measures include:

---

[250] Ibid.
[251] Fowdur and Greulich 2018, *supra* note 1, pp. 40-41.
[252] Defendants' Response to the Court's 25 September, 2020 Order, 2 October, 2020, p. 2.
[253] *Ibid.* Idaho, Illinois, Iowa, Louisiana and New Mexico are among the states that permit psychologists to prescribe some medications for mental health conditions.
[254] *See, e.g.,* Wang, I. et al., Wang, Indriani et al. "Role of a psychiatric pharmacist in a Los Angeles "Skid-Row" safety-net clinic." *Journal of Urban Health : Bulletin of the New York Academy of Medicine* vol. 88,4 (2011): 718-23. doi:10.1007/s11524-011-9573-6. Psychiatric pharmacists undergo specialized training in patient assessment and psychopharmacology. Most complete residencies in psychiatry, and many are board certified by the Board of Pharmaceutical Specialties

DEFS-005.087

- Expanding the number of psychiatry resident positions and enhancing the capacity of PNP programs;[255]

- Early outreach and mentorship to encourage students earlier in the education pipeline to consider behavioral health careers;[256]

- Strengthening behavioral health training for primary care physicians, as they are frequently the first providers to observe, diagnose and treat individuals with mental illness.[257]

## VII.    Conclusion

191.    In sum, based on materials and data considered as well as our independent statistical analyses, we do not find evidence to support that salary adjustments or attempts to outbid other employers of mental health professionals will enable CDCR to meaningfully increase filled positions for the classifications at issue. Monetary incentives offered in the past 5 years have not meaningfully impacted the number of filled positions and there is no reason to expect that this would change in the future. Telepsychiatry is one avenue has yielded a notable increase in filled positions, especially since the onset of COVID-19, and is associated with a lower vacancy rate among psychiatrists.

192.    CDCR has already implemented many proposed policy solutions that are frequently mentioned as potential means to alleviate current and projected shortages of mental health professionals. Remaining proposed solutions are largely outside of CDCR's control.

---

[255] UHF 2023, *supra* note 242, and AAMC 2022, *supra* note 19, Table 1.8. According to the AAMC, a large percentage of psychiatrists – 55.5% – practiced in 2021 in the state where they completed graduate medical education.
[256] GAO 2022, *supra* note 6, p. 18.
[257] UHF 2023, *supra* note 242.

DEFS-005.088

We declare that the foregoing report is true and correct.

Executed on August 31, 2023.

_____
                                                                 Jéssica Dutra, Ph. D.


_____
                                                                 Erica Greulich, Ph. D.

DEFS-005.089

# Appendix

**Table of Figures**

Appendix Figure A 1 – Psychiatrists ............................................................................. ii
Appendix Figure A 2 - Psychologists ......................................................................... iii
Appendix Figure A 3 - Clinical Social Workers......................................................... iv
Appendix Figure A 4 - Recreation Therapist............................................................. v
Appendix Figure A 5 - Medical Assistants ................................................................ vi

**Table of Tables**

Appendix Table A 1 – Filled Positions Regressions ................................................. xi
Appendix Table A 2 - Filled Positions Regressions with Lagged Salaries ................ xii
Appendix Table A 3 - Filled Positions Regressions with Iterative Term ................... xiii
Appendix Table A 4 - Net Hire Regressions ............................................................ xv
Appendix Table A 5 - Net Hire Regressions Lagged ............................................... xvi

DEFS-005.090

# Appendix 1

## CDCR Average Salaries Compared to MSA Averages

### Appendix Figure A 1 – Psychiatrists



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; Salary Ranges and History.xlsx;
Note: San Luis Obispo includes Paso Robles and Arroyo Grande

## Appendix Figure A 2 - Psychologists



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; Salary Ranges and History.xlsx;
Note: San Luis Obispo includes Paso Robles and Arroyo Grande

## Appendix Figure A 3 - Clinical Social Workers



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; Salary Ranges and History.xlsx;
Note: San Luis Obispo includes Paso Robles and Arroyo Grande

## Appendix Figure A 4 - Recreation Therapist



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; Salary Ranges and History.xlsx;
Note: San Luis Obispo includes Paso Robles and Arroyo Grande

DEFS-005.094

## Appendix Figure A 5 - Medical Assistants



Source: Bureau of Labor Statistics; Max Salary Coleman Request 2018-2023;
Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf; Salary Ranges and History.xlsx;
Note: San Luis Obispo includes Paso Robles and Arroyo Grande

DEFS-005.095

## Appendix 2

### Regressions Relating CDCR Measures of Employment, Salaries and Salary Premiums

Economists often use regression analysis to evaluate and model relationships in the context of academic research, policy evaluations, and litigation. We use multivariate linear regression techniques to estimate the relationship between CDCR's employment of mental health professionals and potential variables that may explain variation in CDCR employment levels. Linear regression, the most widely used type of regression analysis, finds the line that most closely fits the data. This line allows us to estimate the value of the dependent variable when the independent variables take on a given set of values. One way to estimate the line that "best fits" the data is to calculate the squared difference each actual value and the value predicted by the line.

Each observation in our data is indexed by the pair "$i, t$", which indicates classification "$i$" at time "$t$." $t$ is defined semi-annually. We have four base formulations for the models used throughout this report, and their structures are as follows:

$$\log(Employment_{i,t}) = \alpha_i + \alpha_1 \log(CDCR\ salary_{i,t}) + \alpha_2 \log(Market\ salary_{i,t}) + \alpha_3 \log(authorized_{i,t}) + \alpha_4 t + \alpha_5 COVID_t + \epsilon_{i,t} \tag{A.1}$$

$$\log(Employment_{i,t}) = \beta_i + \beta_1 \log\left(\frac{CDCR\ salary_{i,t}}{Market\ salary_{i,t}}\right) + \beta_2 \log(authorized_{i,t}) + \beta_3 t + \beta_4 COVID_t + \epsilon_{i,t} \tag{B.1}$$

$$Net\ Hires_{i,t} = \gamma_i + \gamma_1 \log(CDCR\ salary_{i,t}) + \gamma_2 \log(Market\ salary_{i,t}) + \gamma_3 \log(authorized_{i,t}) + \gamma_4 t + \gamma_5 COVID_t + \epsilon_{i,t} \tag{C.1}$$

$$Net\ Hires_{i,t} = \delta_i + \delta_1 \log\left(\frac{CDCR\ salary_{i,t}}{Market\ salary_{i,t}}\right) + \delta_2 \log(authorized_{i,t}) + \delta_3 t + \delta_4 COVID_t + \epsilon_{i,t} \tag{D.1}$$

DEFS-005.096

where $Employment_{i,t}$ is measured as the number of filled civil service positions, that captures the "stock" of CDCR employed professionals in a classification at a point in time;[258] $Market\ salary_{i,t}$ is either the California statewide or the nationwide average annual salary, reflecting the average compensation available to each classification at a point in time in the market; $Net\ Hires_{i,t}$ is a measure of hires minus separations from CDCR; $t$ is a linear time trend measuring the number of semesters since January 2018; and $COVID_t$ is an indicator function that assumes the value 1 between the first half of 2020 and the first half of 2022, which captures any changes in the level of employment that occurred during the pandemic.[259] Profession-specific fixed effects $\{\alpha_i, \beta_i, \gamma_i, \delta_i\}$ measure unobservable time-invariant characteristics of each profession that affect the level of employment measured in models (A.1) and (B.1), or the net hires measured in models (C.1) and (D.1). The time trend proxies for unobserved changes in the supply of or demand for these professionals that have been trending over time. Each indexed coefficient listed above measures the association between an independent variable and the dependent variable.

The regressions utilize semi-annual data from January 2018 through December 2022, with the caveat that for Medical Assistants, there is no data on authorized positions until July 2020.[260] The source of filled and authorized positions is CDCR monthly fill and vacancy data.[261] CDCR salaries are imputed from CDCR salary data based on pay scales and do not include benefits.[262] CDCR hires and separations were obtained for clinical social workers, psychiatrists, and psychologists.[263] California and U.S. average salaries for mental health professionals are published in 2018-2022

---

[258] For psychiatrists, *Filled Civil Service* was calculated to include positions that were filled by telepsychiatry and PNPs.

[259] While it is a point of debate when exactly one could consider COVID-19 as being "done", we have chosen as a cut-off the date that the CDC relaxed recommendation for masks indoors: February 25, 2022 (https://abc7news.com/cdc-covid-coronavirus/11599042/). We tested specifications with alternative cutoff dates, such as the "open the border" date (November 8, 2021) and the date that the federal COVID-19 public health emergency declaration ended (May 11, 2023), as robustness checks. They did not meaningfully change results.

[260] See *infra* note 261.

[261] *See,* "Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022 - Values Only.xlsx".

[262] *See,* Psychiatrist Salary.xlsx; MH Salary Ranges and History 2012-2023.xlsx; Max Salary Coleman Request 2018 - 2023.pdf; and Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf. The average imputed salary is calculated by weighting minimum and maximum salaries for staff psychiatrists by the statewide proportion of psychiatrists earning the maximum salary. The proportion of psychiatrists not earning the maximum salary are assumed to earn the minimum salary.

[263] See *supra* notes 234, 235, and Figure 22.

Occupational Employment and Wage Statistics data, downloaded from the Bureau of Labor Statistics.[264] CDCR PIP facilities are not included in the regression analyses.

For regressions based on equations (A.1) and (B.1), *filled positions*, *authorized positions* and *relative salaries* are measured in logarithmic terms. Estimated coefficients on these variables are interpreted as percentage changes in filled positions associated with a one-percent increase in the independent variable in question. Coefficients on the unit variables of time and COVID are interpreted as percentage changes in filled positions associated with an incremental increase in the independent variable (*e.g.,* an additional time period, or the existence of the COVID-19 pandemic).

For regressions based on equations (C.1) and (D.1), net hires are measured as semi-annual changes, which may be positive, zero or negative, and thus cannot be measured in logarithmic terms. The estimated coefficients in hiring regressions are thus interpreted the number of additional net hires given a one percent increase in the explanatory variable (*e.g.*, CDCR salary). Coefficients on the unit variables of time and COVID are interpreted as the number of additional net hires associated with an incremental increase in the independent variable (*e.g.,* an additional time period, or the existence of the COVID-19 pandemic).

We have adjusted the collected data underlying the regressions so that the variables are all measured at the same frequency.[265] The dependent variable changed on a monthly basis while most of the explanatory variables changed on an annual, near-annual or semi-annual basis. Point estimates are unlikely to change substantially regardless of the specification frequency, and the resulting confidence intervals would likely be similar given the need to adjust residuals.[266] We estimated regressions on a semi-annual basis, as it results in the fewest assumptions regarding interpolation of data.

---

[264] *See* https://www.bls.gov/oes/tables.htm, *see also supra* note 179. OEWS wage estimates represent wages and salaries only, excluding overtime pay, and do not include nonproduction bonuses or employer costs of nonwage benefits, such as health insurance or employer contributions to retirement plans.
[265] Such adjustments may come at a cost, as documented in academic literature in economics and statistics. Interpolation of variables that are observed at less frequent intervals can be addressed by adjusting the error terms when determining whether variables are significant. *See, for example*, Chow, Gregory C. & An-Ioh Lin, Best Linear Unbiased Interpolation, Distribution, and Extrapolation of Time Series by Related Series, 53 THE REVIEW OF ECONOMICS AND STATISTICS 4, 372 (1971). Interpolation is a process of determining the unknown values that lie in between the known data points.
[266] Ibid.

DEFS-005.098

The regressions are estimated with heteroskedasticity-consistent covariance matrix estimation with estimation-type "HC3", which addresses likely non-normality in the distribution of residuals and grants robustness to our inferences of statistical significance.[267]

If the expectation that higher CDCR salaries are associated with greater employment of mental health professionals is correct and can be shown empirically, we expect estimates of $\{\alpha_1, \beta_1, \gamma_1, \delta_1\}$ to be positive and statistically significant. Similarly, we expect the relationship between employment and authorized positions $\{\alpha_3, \beta_2, \gamma_3, \delta_2\}$ to be positive. The effect of changes in market salary are theoretically ambiguous: on one hand, higher overall market salaries indicate higher average base pay that can be earned from employers other than CDCR, which could divert employment from CDCR to other employers and result in a reduction in CDCR filled positions. On the other hand, since we are measuring average market salaries for employed professionals, an increase could also indicate greater compensation to be earned as an alternative to private practice (*i.e.*, self-employment) and thus increase the overall pool of candidates available to employers of mental health professionals. A larger labor pool could in turn increase the number of CDCR filled positions. The net effect measured by $\{\alpha_2, \gamma_2\}$ is then an empirical question, and ultimately depends on which of these forces prevail in a given time period and economic environment.

All regression tables below omit the estimated coefficients for classification-specific fixed effects $\{\alpha_i, \beta_i, \gamma_i, \delta_i\}$ for exposition, as is common practice. These values are available upon request.

**Filled Position Regressions**

We ran a series of twelve pooled regressions estimating the relationship between CDCR salaries and civil service-filled positions for staff psychiatrists, clinical psychologists, clinical social

---

[267] In the presence of heteroskedasticity, OLS estimates are unbiased, but the usual tests of significance will generally yield inappropriate results and may lead researchers to make incorrect inferences regarding statistical significance. By adjusting tests with a heteroscedasticity-consistent covariance matrix ("HCCM"), a researcher is able to make valid inferences even in the presence of heteroscedasticity of unknown form. While there are multiple formulations of HCCMs, the well-known version "HC3" we have implemented throughout this report has been shown to perform well in the academic literature with samples as small as 25. *See, for example*, Long, J. Scott, and Laurie H. Ervin. "Using heteroscedasticity consistent standard errors in the linear regression model." *The American Statistician* 54.3 (2000): 217-224.

DEFS-005.099

workers, recreation therapists, and medical assistants.[268] The results are shown below in Appendix Table A 1 through Appendix Table A 3.

**Appendix Table A 1 – Filled Positions Regressions**

| | Regression with Filled Positions | | | |
| | Log Salaries | | Log Premiums | |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| CDCR Salary | 3.106 | 3.225 | | |
| US Salary | 1.478 | | | |
| CA Salary | | 0.967+ | | |
| CDCR/US Salary | | | 0.448 | |
| CDCR/CA Salary | | | | -0.741 |
| Authorized | 1.706 | 1.854 | 1.989 | 2.312 |
| COVID-19 | 0.133 | 0.136 | 0.101 | 0.113 |
| Time Trend | -0.069 | -0.062 | 0.011 | 0.018 |
| Professions FE[I] | Yes | Yes | Yes | Yes |
| Num.Obs. | 45 | 45 | 45 | 45 |

[I]Professions FE allows for different intercepts for each of the classifications.
+ $p < 0.1$, * $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

Appendix Table A 1 presents regression results for four models estimating the association between filled positions and CDCR and California or U.S. salaries. Regressions (1) and (2) follow the model specified in equation (A.1) and regressions (3) and (4) follow the model specified in equation (B.1). A p-value of 5% or less is frequently used as a rule of thumb to reject the null hypothesis that there is no relationship between the independent variable and the dependent variable.[269] This corresponds to a five percent or less chance that the observed result is due to chance. Each of the estimated coefficient's respective significance according to its p-value is indicated with the number of stars according to the legend in the bottom of the regression output table.

---

[268] The measure of staff psychiatrist filled positions includes telepsychiatrists and PNPs.
[269] *See, e.g.,* Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in National Research Council, *Reference Manual on Scientific Evidence: Third Edition*, Washington DC: The National Academies Press, 2011, p. 320.

DEFS-005.100

**Appendix Table A 2 - Filled Positions Regressions with Lagged Salaries**

| | Regression with Filled Positions | | | |
| | Log Salaries | | Log Premiums | |
| | (5) | (6) | (7) | (8) |
|---|---|---|---|---|
| CDCR Salary [Lagged] | 0.400 | -0.519 | | |
| US Salary [Lagged] | 1.309 | | | |
| CA Salary [Lagged] | | 1.299 | | |
| CDCR/US Salary [Lagged] | | | -0.986 | |
| CDCR/CA Salary [Lagged] | | | | -1.343 |
| Authorized | 2.106 | 2.662 | 2.494 | 2.914 |
| COVID-19 | 0.143 | 0.164 | 0.132 | 0.164 |
| Time Trend | -0.016 | 0.008 | 0.020 | 0.025 |
| Professions FE[I] | Yes | Yes | Yes | Yes |
| Num.Obs. | 41 | 41 | 41 | 41 |

[I]Professions FE allows for different intercepts for each of the classifications.

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

Appendix Table A 2 presents regression results for four models estimating the association between filled positions and lagged CDCR and California or U.S. salaries. Regressions (5) and (6) are modeled as equation (A.2) and regressions (7) and (8) are modeled as equation (B.2), both shown below.

$$\log(Employment_{i,t}) = \alpha_i + \alpha_1 \log(CDCR\ salary_{i,t-1}) + \alpha_2 \log(Market\ salary_{i,t-1}) + \\ \alpha_3 \log(authorized_{i,t}) + \alpha_4 t + \alpha_5 COVID_t + \epsilon_{i,t} \quad \text{(A.2)}$$

$$\log(Employment_{i,t}) = \beta_i + \beta_1 \log\left(\frac{CDCR\ salary_{i,t-1}}{Market\ salary_{i,t-1}}\right) + \\ \beta_2 \log(authorized_{i,t}) + \beta_3 t + \beta_4 COVID_t + \epsilon_{i,t} \quad \text{(B.2)}$$

DEFS-005.101

**Appendix Table A 3 - Filled Positions Regressions with Iterative Term**

| | Regression with Filled Positions | | | |
| --- | --- | --- | --- | --- |
| | Log Salaries | | Log Premiums | |
| | (9) | (10) | (11) | (12) |
| CDCR Salary - Psychiatrist | 1.664 | 2.006 | | |
| CDCR Salary - Psychologist | -2.999 | -2.493* | | |
| CDCR Salary - Clinical Social Worker | -1.708 | -1.491+ | | |
| CDCR Salary - Recreation Therapist | 0.237 | 0.687 | | |
| CDCR Salary - Medical Assistant | 6.800* | 6.913* | | |
| CDCR/US Salary - Psychiatrist | | | -3.588+ | |
| CDCR/US Salary - Psychologist | | | 2.249 | |
| CDCR/US Salary - Clinical Social Worker | | | -3.580 | |
| CDCR/US Salary - Recreation Therapist | | | 2.620 | |
| CDCR/US Salary - Medical Assistant | | | 6.847 | |
| CDCR/CA Salary - Psychiatrist | | | | -1.892* |
| CDCR/CA Salary - Psychologist | | | | -1.213 |
| CDCR/CA Salary - Clinical Social Worker | | | | -0.602 |
| CDCR/CA Salary - Recreation Therapist | | | | 0.578 |
| CDCR/CA Salary - Medical Assistant | | | | 6.535 |
| US Salary | 0.457 | | | |
| CA Salary | | 0.174 | | |
| Authorized | 0.421 | 0.442 | 1.459 | 1.788 |
| COVID-19 | 0.051 | 0.052 | 0.050 | 0.078 |
| Time Trend | -0.018 | -0.019 | 0.002 | -0.001 |
| Professions FE[I] | Yes | Yes | Yes | Yes |
| Num.Obs. | 45 | 45 | 45 | 45 |

[I]Professions FE allows for different intercepts for each of the classifications.

+ $p < 0.1$, * $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

Appendix Table A 3 presents regression results for four models estimating the association between filled positions and CDCR and California or U.S. salaries, where regressions (9) and (10) are modeled as equation (A.3) and regressions (11) and (12) are modeled as equation (B.3), both shown below. In these regressions the coefficient on CDCR salary or CDCR salary premium is permitted to vary across the 5 classifications, *i.e.*, we estimate separate relationships between CDCR pay and filled positions for each classification.

DEFS-005.102

$$\log(Employment_{i,t}) = \alpha_i + \alpha_{i,1}\log(CDCR\ salary_{i,t}) + \alpha_2\log(Market\ salary_{i,t}) + \\ \alpha_3\log(authorized_{i,t}) + \alpha_4 t + \alpha_5 COVID_t + \epsilon_{i,t}$$

(A.3)

$$\log(Employment_{i,t}) = \beta_i + \beta_{i,1}\log\left(\frac{CDCR\ salary_{i,t}}{Market\ salary_{i,t}}\right) + \\ \beta_2\log(authorized_{i,t}) + \beta_3 t + \beta_4 COVID_t + \epsilon_{i,t}$$

(B.3)

The results of regressions based on models (A.1), (A.2), and (A.3) generally indicate an insignificant association between CDCR salaries and filled positions. Estimated effects are not uniform across classifications. At a standard 95% confidence level, eleven out of fourteen estimated coefficients are statistically insignificant, two are positive and statistically significant and one is negative and statistically significant.[270] Because of the general lack of statistical significance and lack of uniformity across classifications, we do not find empirical evidence suggesting that CDCR could influence the number of civil service filled positions by raising salaries.

Regressions based on models (B.1), (B.2), and (B.3) also generally suggest an insignificant relationship between ratios of CDCR salary vis-à-vis market salary (*i.e.*, the premium offered by CDCR over California or U.S. average salaries) and filled positions. Thirteen out of the fourteen estimated coefficients are statistically insignificant at the 95% confidence level while one (the relationship between CDCR/US salary premiums and filled positions for psychiatrists) is counter-intuitively negative and statistically significant. The overwhelming lack of statistical significance and one counter-intuitive result do not support a finding that CDCR is likely to increase the number of filled positions by trying to outbid market salaries.

Taken collectively, the results of these regressions do not provide evidence showing that CDCR may be able to meaningfully increase filled positions through salary adjustment or trying to outbid market salaries. The classifications of mental health professionals included in the analyses may respond to incentives that are not captured by base salary alone, such as those discussed in section VI of this report, and are thus beyond the scope of this regression analysis.

---

[270] The two positive and statistically significant results are both for medical assistants, in the specifications where we permit the estimated relationship between CDCR salary and filled positions to vary across classifications.

DEFS-005.103

**Net Hire Regressions**

We also ran a series of eight pooled regressions estimating the effects of CDCR salaries on net hires of staff psychiatrists, clinical psychologists and clinical social workers.[271]

### Appendix Table A 4 - Net Hire Regressions

|  | Regression with Net Hires | | | |
|---|---|---|---|---|
|  | Log Salaries | | Log Premiums | |
|  | (13) | (14) | (15) | (16) |
| CDCR Salary | -177.877 | -182.173 |  |  |
| US Salary | 114.593 |  |  |  |
| CA Salary |  | 86.581+ |  |  |
| CDCR/US Salary |  |  | -127.417 |  |
| CDCR/CA Salary |  |  |  | -88.190+ |
| Authorized | 74.311 | 111.765 | 82.525 | 121.500 |
| COVID-19 | -0.977 | -0.247 | -0.090 | 1.132 |
| Time Trend | 1.426 | 2.367 | 0.587 | 1.011 |
| Professions FE[I] | Yes | Yes | Yes | Yes |
| Num.Obs. | 30 | 30 | 30 | 30 |

[I]Professions FE allows for different intercepts for each of the classifications.

$+ p < 0.1$, $* p < 0.05$, $** p < 0.01$, $*** p < 0.001$

Appendix Table A 4 presents regression results for four models estimating the association between net hires and CDCR or California or U.S. salaries. Regressions (13) and (14) follow the model specified in equation (C.1) and regressions (15) and (16) follow the model specified in equation (D.1).

---

[271] *See*, *supra* note 235.

DEFS-005.104

**Appendix Table A 5 - Net Hire Regressions Lagged**

| | Regression with Net Hires | | | |
| --- | --- | --- | --- | --- |
| | Log Salaries | | Log Premiums | |
| | (17) | (18) | (19) | (20) |
| CDCR Salary [Lagged] | -57.593 | -1.604 | | |
| US Salary [Lagged] | 6.225 | | | |
| CA Salary [Lagged] | | 0.432 | | |
| CDCR/US Salary [Lagged] | | | -0.569 | |
| CDCR/CA Salary [Lagged] | | | | -0.344 |
| Authorized | 62.950 | -1.430+ | -1.772* | -1.619* |
| COVID-19 | -0.186 | -0.032 | -0.031 | -0.024 |
| Time Trend | 1.086 | -0.056** | -0.080*** | -0.078*** |
| Professions FE[1] | Yes | Yes | Yes | Yes |
| Num.Obs. | 27 | 27 | 27 | 27 |

[1]Professions FE allows for different intercepts for each of the classifications.

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

Appendix Table A 5 presents regression results for four models estimating the association between net hires and lagged CDCR and California or U.S. salaries. Regressions (17) and (18) are modeled as equation (C.2) and regressions (19) and (20) are modeled as equation (D.2), both shown below. As discussed above, if (potential) employees do not respond immediately to changes in relative salaries, the lagged specification may better capture employment decisions associated with salary changes.

$$Net\ Hires_{i,t} = \ \gamma_i + \gamma_1 \log(CDCR\ salary_{i,t-1}) + \gamma_2 \log(Market\ salary_{i,t-1}) + \\ \gamma_3 \log(authorized_{i,t}) + \gamma_4 t + \gamma_5 COVID_t + \epsilon_{i,t} \tag{C.2}$$

$$Net\ Hires_{i,t} = \ \delta_i + \delta_1 \log\left(\frac{CDCR\ salary_{i,t-1}}{Market\ salary_{i,t-1}}\right) + \delta_2 \log(authorized_{i,t}) + \delta_3 t + \\ \delta_4 COVID_t + \epsilon_{i,t} \tag{D.2}$$

DEFS-005.105

Among the net hire regressions none finds a statistically significant estimated coefficient for CDCR salary measures at the 95% confidence level. Thus we again find a lack of support that CDCR is likely to be able to meaningfully influence its net hires by increasing its compensation, or by attempting to outbid market salaries for employed mental health professionals. We do not run an interactive model similar to the one presented in Appendix Table A 3 with net hires as a dependent variable. Due to the limited number of observations and larger number of coefficients needed to be estimated for those regressions, we would end up with very few degrees of freedom.[272]

---

[272] Degrees of freedom is the number of independent values that can vary in an analysis. If a model has too few degrees of freedom it may be unsolvable. Even if a model is solvable, too few degrees of freedom leads to unreliable regression results.

DEFS-005.106

## Appendix 3

## Materials Relied Upon

### Academic Papers

1.  Agapie, Elena et al. "Understanding Mental Health Apps for Youth: Focus Group Study With Latinx Youth." *JMIR Formative Research*, vol. 6, no. 10, 2022. doi:10.2196/40726.

2.  Andrilla, C. Holly A., et al. "Geographic Variation in the Supply of Selected Behavioral Health Providers." *American Journal of Preventive Medicine,* vol. 54, no. 6, suppl. 3, 2018: S199-S207. doi:10.1016/j.amepre.2018.01.004.

3.  Barna, Mark. "Mental health workforce taxed during COVID-19 pandemic: Worker shortage hinders access." *The Nation's Health*, vol. 51, no. 10, January 2022. Available at https://www.thenationshealth.org/content/51/10/1.3.

4.  Chow, Gregory C. & An-Ioh Lin. "Best Linear Unbiased Interpolation, Distribution, and Extrapolation of Time Series by Related Series." 53 *The Review of Economics and Statistics,* vol. 53, no. 4, 1971.

5.  Gardner, Jordan S, et al. "Remote Telepsychiatry Workforce: A Solution to Psychiatry's Workforce Issues." *Current Psychiatry Reports*, vol. 22, no. 8, 27 January 2020. doi:10.1007/s11920-020-1128-7.

6.  Harrell, Benjamin, et al. "The Impact of COVID-19 on Access to Mental Health Care Services," *AEA Papers and Proceedings*, 2023, 113:420-422.

7.  Ku, Benson S., et al. "Associations between mental health shortage areas and county-level suicide rates among adults aged 25 and older in the USA, 2010 to 2018." *General Hospital Psychiatry*, vol. 70, 2021: 44-50. doi:10.1016/j.genhosppsych.2021.02.001.

8.  Satiani, Anand, et al. "Projected Workforce of Psychiatrists in the United States: A Population Analysis." *Psychiatric Services*, vol. 69, no. 6, 2018. doi:10.1176/appi.ps.201700344.

9.  Sinsky, Christine A., et al. "COVID-Related Stress and Work Intentions in a Sample of US Health Care Workers." *Mayo Clinic Proceedings: Innovations, Quality & Outcomes*, vol. 5, no. 6, 2021: 1165-1173. doi:10.1016/j.mayocpiqo.2021.08.007.

DEFS-005.107

10. Welch, Brandon M., et al. "Patient preferences for direct-to-consumer telemedicine services: a nationwide survey." *BMC Health Services Research*, vol. 17, no. 1: 784, November 2017. doi:10.1186/s12913-017-2744-8.

11. Yellowlees, Peter. "Impact of COVID-19 on Mental Health Care Practitioners." *The Psychiatric Clinics of North America*, vol. 45, no. 1, 2022: 109-121. doi:10.1016/j.psc.2021.11.007.

12. Long, J. Scott, and Laurie H. Ervin. "Using Heteroscedasticity Consistent Standard Errors in the Linear Regression Model." *The American Statistician*, vol. 54, no. 3, 2000, pp. 217–24. *JSTOR*, doi:10.2307/2685594. Accessed 30 August 2023.

**Data and Documents From Attorneys**

13. 16-00467 Exhibit B-2.pdf.

14. 21-00147-02 Exhibit B-2A eff 4-5-23.

15. 21-00147 Exhibit B-2.pdf.

16. 16-00467 Exhibit B-2 and B-2A Original Contract eff 5-1-17.pdf.

17. 21-00147 Exhibit B-2 and B-2A Original Contract eff 5-1-22.pdf.

18. B-2A Original Contract eff 5-1-17.pdf.

19. B-2A Original Contract eff 5-1-22.pdf.

20. BU 19 & 20 Retirement Info (2023).xlsx.

21. CDCR-Adult-Institution-Addresses.pdf.

22. CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.

23. CDCR, "Lessons Learned During the COVID-19 Pandemic," June 2021.

24. CDCR Population Trends January 2018-December 2022v2.xlsx.

25. Clinical Social Worker.xlsx.

26. Coleman CDCR Experts questions-HR Response (005).docx.

27. Coleman Monthly Report 6b MHSDS MIS to Special Master.

28. Coleman Request Filled Vacancy Report Jan 2018 - Dec 2022 - Values Only.xlsx.

29. Coleman Response.pdf.

30. Employees at MIN and MAX Salary Ranges - July 2023 v2.pdf.

31. Max Salary Coleman Request 2018 – 2023.pdf

DEFS-005.108

32. Mental Health Population Trends Jan2013-June2023.xlsx.

33. MH Salary Ranges and History 2012-2023.xlsx.

34. Nov 2015 CDCR Status Update Regarding Staffing_LF_Other steps taken.pdf.

35. Psychiatrist Salary.xlsx.

36. Psychologist.xlsx.

37. Retirement Info 2023.xlsx Bu 19 20.xlsx.

38. Salary Ranges and History.xlsx.

39. Institution Acronym List.doc.

40. STAFF PSYCH – MAX.pdf.

41. Staff Psychiatrist.xlsx.

42. Statements concerning CCHCS and CDCR recruiting and retention efforts.docx.


**Data From External Sources**

43. Bureau of Labor Statistics. "Employer Costs for Employee Compensation." March 2023. Available at https://www.bls.gov/news.release/pdf/ecec.pdf.

44. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wage Statistics, Tables Created by BLS, Metropolitan and nonmetropolitan area." May 2017-2022. Available at https://www.bls.gov/oes/tables.htm.

45. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wage Statistics, Tables Created by BLS, National." May 2017-2022. Available at https://www.bls.gov/oes/tables.htm.

46. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wage Statistics, Tables Created by BLS, State." May 2017-2022. Available at https://www.bls.gov/oes/tables.htm.

47. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Psychologists." 8 September 2022. Available at https://www.bls.gov/ooh/life-physical-and-social-science/psychologists.htm.

48. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wages, May 2022, 19-3033 Clinical and Counseling Psychologists." 25 April 2023. Available at https://www.bls.gov/oes/current/oes193033.htm.

DEFS-005.109

49. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wages, May 2022, 29-1125 Recreational Therapists." 25 April 2023. Available at https://www.bls.gov/oes/current/oes291125.htm.

50. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Employment and Wages, May 2022, 31-9092 Medical Assistants." 25 April 2023. Available at https://www.bls.gov/oes/current/oes319092.htm.

51. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Medical Assistants." 25 October 2022. Available at https://www.bls.gov/ooh/healthcare/medical-assistants.htm.

52. Bureau of Labor Statistics, U.S. Department of Labor. "Occupational Outlook Handbook, Nurse Anesthetists, Nurse Midwives, and Nurse Practitioners." 8 September 2022. Available at https://www.bls.gov/ooh/healthcare/nurse-anesthetists-nurse-midwives-and-nurse-practitioners.htm.

53. Federal Information Processing System (FIPS) Codes for States and Counties. Available at transition.fcc.gov/oet/info/maps/census/fips/fips.txt.

54. Health Resources and Services Administration. "U.S. Department of Health & Human Services Report, Table 5." Available at https://data.hrsa.gov.

55. https://data.hrsa.gov/data/download?data=WorkforceProjections.

56. https://www.bls.gov/oes/tables.htm

57. https://www.census.gov/quickfacts/fact/table/CA/PST045222.

58. Kaiser Family Foundation. Mental Health Care Health Professional Shortage Areas. 30 September 2022. Available at https://www.kff.org/other/state-indicator/mental-health-care-health-professional-shortage-areas-hpsas.

59. Kaiser Family Foundation. "Professionally Active Specialist Physicians by Field." May 2023. Available at https://www.kff.org/other/state-indicator/physicians-by-specialty-area/.

60. Robertson, Marcus. "All 50 states ranked by psychiatrists per capita." *Becker's Behavioral Health*, 2 June 2023. Available at https://www.beckersbehavioralhealth.com/behavioral-health-news/all-50-states-ranked-by-psychiatrists-per-capita.html#:~:text=The%20U.S.%20may%20face%20a,there%20are%2056%2C536%20practicing%20psychiatrists.

61. SALARY TABLE 2018-LA.pdf – SALARY TABLE 2022-LA.pdf.

DEFS-005.110

62. SALARY TABLE 2018-RUS.pdf – SALARY TABLE 2022-RUS.pdf.

63. SALARY TABLE 2018-SAC.pdf – SALRARY TABLE 2022-SAC.pdf.

64. SALARY TABLE 2018-SD.pdf – SALARY TABLE 2022-SD.pdf.

65. SALRY TABLE 2018-SF.pdf – SALARY TABLE 2022-SF.pdf.

66. sc-est2020-18+pop-res.xlsx. Available at https://www2.census.gov/programs-surveys/popest/datasets/

67. SCPRC-EST2018-18+POP-RES.xlsx. Available at https://www2.census.gov/programs-surveys/popest/datasets/

68. SCPRC-EST2019-18+POP-RES.xlsx. Available at https://www2.census.gov/programs-surveys/popest/datasets/

69. SCPRC-EST2021-18+POP-RES.xlsx. Available at https://www2.census.gov/programs-surveys/popest/datasets/

70. SCPRC-EST2022-18+POP-RES.xlsx. Available at https://www2.census.gov/programs-surveys/popest/datasets/

71. U.S. Census population estimates available at https://www.census.gov/quickfacts/fact/table/CA/PST045222.

72. United States Census Bureau. "U.S. and World Population Clock," 30 September 2022. Available at https://www.census.gov/popclock/.


## Court Filings, Orders and Discovery Materials

73. Declaration of Angela Ponciano in Support of Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 5 May 2023.

74. Declaration of Lisa Ellis in Support of Plaintiffs' Reply in Support of Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 16 May 2023.

75. Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff, 5 May 2023.

76. Defendants' Response to the Court's September 25, 2020 Order, 2 October 2020.

77. Defendants' Supplemental Response to Plaintiffs' First Set of Interrogatories to Defendant Jeff Macomber, 24 August 2023.

DEFS-005.111

78. CDCR November 2015 Update to Report on the June 19, 2014, Staffing Review Order.

79. Case 2:90-cv-00520- KJM-DAD Document 5269, filed 02/02/2015.

80. Joint Statement Re: Maximum Vacancy Rates for Recreation Therapists and Medical Assistant Positions, 14 March 2023.

81. Plaintiffs' Reply in Support of Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff as Non-Compliant with Court's Orders, 16 May 2023.

82. Stipulation and Order Approving the Parties' Modifications to CDCR's Telepsychiatry Policy, May 9, 2023, ECF 7830.

## Articles and Online Sources

83. American Psychological Association. "Psychologists struggle to meet demand amid mental health crisis: 2022 COVID-19 Practitioner Impact Survey." 2022. Available at https://www.apa.org/pubs/reports/practitioner/2022-covid-psychologist-workload.

84. Association of American Medical Colleges. "AAMC Report Reinforces Mounting Physician Shortage." 11 June 2021. Available at https://www.aamc.org/news/press-releases/aamc-report-reinforces-mounting-physician-shortage.

85. Association of American Medical Colleges. *2022 Physician Specialty Data Report.* Executive Summary and Table 1.4. Available at https://www.aamc.org/data-reports/workforce/report/physician-specialty-data-report.

86. Bai, Nina. "These Psychiatrists Bring Mental Health Care to Those Who Need It Most." University of California, San Francisco, 14 May 2019. Available at https://www.ucsf.edu/news/2019/05/414401/public-psychiatry-health-equity-and-inclusiveness.

87. Beattie, Linda. "Physician Shortages in Medical Specialties in 2021: An Inside Look." *Merritt Hawkins Physician Staffing Blog,* 16 March 2021. Available at https://www.merritthawkins.com/news-and-insights/blog/healthcare-news-and-trends/physician-shortages-in-medical-specialties-in-2021-an-inside-look.

88. Blakinger, Keri, et al. "US prisons face staff shortages as officers quit amid COVID." *The Associated Press*, 1 November 2021. Available at https://apnews.com/article/coronavirus-united-states-prisons-staff-shortages-health-dba13f1c6368392be2bc5e7375170a78.

DEFS-005.112

89. Botrugno, Carlo. "An Ethical Perspective for Telemedicine in Prison." *The Prison Journal*, 2023: 00328855231188432.

90. Bureau of Health Workforce, Health Resources and Services Administration. "Designated Health Professional Shortage Areas Statistics, Designated HPSA Quarterly Summary." 2023. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiuoZaR0OGAAxW2MlkFHRS6DNkQFnoECB8QAQ&url=https%3A%2F%2Fdata.hrsa.gov%2FDefault%2FGenerateHPSAQuarterlyReport&usg=AOvVaw1LT8qWBehcYcTuxRIrUkEe&opi=89978449.

91. Butryn, T. et al. "The shortage of psychiatrists and other mental health providers: Causes, current state, and potential solutions," *International Journal of Academic Medicine*, vol. 3, no.1, January-June 2017. Available at Gale AcademicOneFile, link.gale.com/apps/doc/A537799483/AONE?u=anon~71beeae1&sid=googleScholar&xid=9b4fc9ea.

92. Ervin, Dana M. "Fractured: The Wait Inmates With Mental Illness Endure Because They're Too Sick For Trial," *PBS Frontline*, 18 April 2023. Available at https://www.pbs.org/wgbh/frontline/article/north-carolina-inmates-mental-illness-trial/.

93. Federal Bureau of Prisons. "Psychiatrist Job Series Number: 0602." Available at https://www.bop.gov/jobs/positions/index.jsp?p=Psychiatrist.

94. Federal Bureau of Prisons. "Psychologist Job Series Number: 0180." Available at https://www.bop.gov/jobs/positions/index.jsp?p=psychologist.

95. Glaser, Michelle, et al. "Provider satisfaction and patient outcomes associated with a statewide prison telemedicine program in Louisiana." *Telemedicine Journal and E-Health: The Official Journal of the American Telemedicine Association*, vol. 16, no. 4, 2010. doi:10.1089/tmj.2009.0169.

96. Gold, Jenny. "After $4 million fine in 2013, Kaiser Permanente cited again for mental health access problems." *Health Care Finance*, 5 July 2017. Available at https://www.healthcarefinancenews.com/news/after-4-million-fine-2013-kaiser-cited-again-mental-health-access-problems#:~:text=In%202013%2C%20Kaiser%20agreed%20to,a%20psychiatrist%20or%20a%20therapist.

DEFS-005.113

97. Harrar, Sari. "Inside America's Psychiatrist Shortage." Psycom, 1 October 2019. Available at https://www.psycom.net/inside-americas-psychiatrist-shortage.

98. Henry, Tanya Albert. "Medicine's great resignation? 1 in 5 doctors plan exit in 2 years." *American Medical Association*, 18 January 2022. Available at https://www.ama-assn.org/practice-management/physician-health/medicine-s-great-resignation-1-5-doctors-plan-exit-2-years.

99. https://abc7news.com/cdc-covid-coronavirus-us/11599042/

100. https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation.

101. https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-Definitions.pdf.

102. https://www.bls.gov/oes/.

103. https://www.bls.gov/oes/current/oes_tec.htm.

104. https://www.bls.gov/oes/oes_ques.htm#overview.

105. https://www.bls.gov/SOC/

106. https://www.calpers.ca.gov/page/employers/benefit-programs/retirement-benefits.

107. https://www.calhr.ca.gov/employees/Pages/opeb-faq.aspx.

108. https://www.nami.org/About-Mental-Illness/Treatments/Types-of-Mental-Health-Professionals.

109. https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/.

110. Koran, Mario, "Inside a 'Nightmare' Lockdown at a Wisconsin Prison," *The New York Times*, 19 August 2023. Available at https://www.nytimes.com/2023/08/19/us/wisconsin-prison-lockdown.html.

111. Lin, Luona, et al. "Demographics of the U.S. Psychology Workforce: Findings from the American Community Survey." *American Psychological Association Center for Workforce Studies*, 2015.

112. Mensik, Hailey. "10-week Kaiser strike ends with deal aimed at improving mental health access". *Healthcare Drive*, 25 October 2022. Available at https://www.healthcaredive.com/news/kaiser-strike-mental-health-california-hawaii-deal/634917/.

113. Merelli, Annalisa. "Half of US mental health workers are considering getting out." *Business News*, 2 May 2023. Available at https://qz.com/half-of-us-mental-health-workers-are-considering-gettin-1850391460#.

DEFS-005.114

114.    Merritt Hawkins, "2022 Review of Physician and Advanced Practitioner Recruiting Incentives." Available at https://www.merritthawkins.com/trends-and-insights/article/reports/2022-review-of-physician-advanced-practitioner-recruiting-incentives/.

115.    Myers, Kathleen, et al. "Telepsychiatry with incarcerated youth." *Journal of Adolescent Health*, vol. 38, no. 6, 2006.

116.    National Alliance on Mental Illness. "Mental Health by the Numbers." Last updated April 2023. Accessed 28 August 2023. Available at https://www.nami.org/Learn-More/Mental-Health-By-the-Numbers.

117.    Nenn, Kerry. *We're Facing a Shortage of Mental Health Professionals.* American Addiction Centers, 16 July 2023. Available at recovery.org.

118.    Panchal, Nirmita, et al. "The Implications of COVID-19 for Mental Health and Substance Use." *Kaiser Family Foundation*, updated 20 March 2023. Available at https://www.kff.org/mental-health/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/.

119.    Park, Katie, et al. "As COVID recedes in prisons, will any lessons learned stick?" *The Associated Press*, 30 June 2021. Available at https://apnews.com/article/coronavirus-pandemic-prisons-health-government-and-politics-5747e5cbae1084380aeaaae49bf0c8ce.

120.    Robeznieks, Andis. "How an aging nation, COVID-19 stretch the doctor workforce thin." *American Medical Association*, 6 April 2022. Available at https://www.ama-assn.org/practice-management/sustainability/how-aging-nation-covid-19-stretch-doctor-workforce-thin#.

121.    Sisak, Michael R and Balsamo, Michael. "Cooks, nurses guard inmates with US prisons down 6K officers." *The Associated Press*, 21 May 2021. Available at https://apnews.com/article/business-health-coronavirus-pandemic-prisons-government-and-politics-88fff925b1901a36a10581c28d826916.

122.    Stringer, Heather. "Providers predict longer wait times for mental health services. Here's who it impacts most," *Monitor on Psychology*, vol. 54, no. 3. 1 April 2023. Available at https://www.apa.org/monitor/2023/04/mental-health-services-wait-times.

DEFS-005.115

123. Sullivan, Ann. "How the COVID-19 Pandemic Affects the Future of Behavioral Health Care." *Behavioral Health News,* 2022. Available at https://behavioralhealthnews.org/bhn-summer-2022-issue/.

124. The Centre for Data and Analysis on Psychology Licensure. "Number of Licenses". 2022. Available at https://asppbcentre.org/spotlight/number-of-licenses/.

125. U.S. Office of Personnel Management. "Salaries & Wages." Available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/

126. United Health Foundation. "America's Health Rankings: Mental Health Providers in United States." 2023. Available at https://www.americashealthrankings.org/explore/measures/MHP.

127. USAJOBS. "Justice, Bureau of Prisons/Federal Prison System. 0185-Social Worker." Available at https://www.usajobs.gov/Search?j=0185&a=DJ03

128. Wang, I. et al., "Role of a Psychiatric Pharmacist in a Los Angeles "Skid-Row" safety-net clinic," J Urban Health, August 2011. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3157501/.

129. Waters, Rob. "In Telehealth: A Window to Our Future Workforce." *California Health Care Foundation Blog*. 26 March 2018. Available at https://www.chcf.org/blog/telehealth-window-to-our-future-workforce.

130. Weiner, Stacy. Addressing the escalating psychiatrist shortage. *AAMCNews*, 12 February 2018. Available at https://www.aamc.org/news/addressing-escalating-psychiatrist-shortage.

131. Wiener, Jocelyn. "Kaiser mental health workers signal open-ended strike in Northern California." *CalMatters*, 2 August 2022. Available at https://calmatters.org/health/2022/08/kaiser-mental-health-worker-strike/.

132. Wiener, Jocelyn. "Why California Faces A Shortage Of Mental Health Workers." *CalMatters*, 8 September 2022. Available at https://calmatters.org/health/2022/09/california-shortage-mental-health-workers/.

133. Zaylor, Charles, Pamela Whitten, and Charles Kingsley. "Telemedicine services to a county jail." *Journal of Telemedicine and Telecare,* vol. 6, supp. 1, 2000.

**Reports**

DEFS-005.116

134.       Association of American Medical Colleges. *2022 Physician Specialty Data Report*. Executive Summary and Table 1.4. Available at https://www.aamc.org/data-reports/workforce/report/physician-specialty-data-report.

135.       California Future Health Workforce Commission. *Meeting the Demand of Health: Final Report of the California Future Health Workforce Commission*. February 2019. Available at https://futurehealthworkforce.org/our-work/finalreport/.

136.       California Health Care Foundation. "California Health Care Almanac. Mental Health in California: Waiting for Care." July 2022. Available at https://www.chcf.org/wp-content/uploads/2022/07/MentalHealthAlmanac2022.pdf.

137.       Coffman, Janet, et al. "California's Current and Future Behavioral Health Workforce." HealthForce Center at UCSF, 2018. Available at https://healthforce.ucsf.edu/publications/california-s-current-and-future-behavioral-health-workforce.

138.       Coffman, Janet and Margaret Fix. "Building the Future Behavioral Health Workforce: Needs Assessment." Healthforce Center at UCSF, 2023. Available at https://static1.squarespace.com/static/5b1065c375f9ee699734d898/t/63e695d3ce73ca3e4 4824cf8/1676056025905/CBHDA_Needs_Assessment_FINAL_Report_2-23.pdf.

139.       Greulich, Erica and Fowdur, Lona. "Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists." 2018.

140.       Harris Poll. "National Council for Mental Wellbeing Industry Workforce Shortages Research." *National Council for Mental Wellbeing*, 2023. Available at https://www.thenationalcouncil.org/wp-content/uploads/2023/04/Workforce-Shortage-Survey-Results-1.pdf?gfaction=event_send&category&action&label&entryid=0&nonce=5e8ee3c1a5.

141.       IHS Markit. "The Complexities of Physician Supply and Demand: Projections From 2019 to 2034," Association of American Medical Colleges, June 2021. Available at https://www.aamc.org/media/54681/download.

142.       Merritt Hawkins. "The Silent Shortage, A White Paper Examining Supply, Demand and Recruitment Trends in Psychiatry." Merritt Hawkins White Paper Series, 2018.

DEFS-005.117

Available at https://www.merritthawkins.com/news-and-insights/thought-leadership/white-paper/examining-supply-demand-and-recruitment-trends-in-psychiatry.

143.     National Alliance on Mental Illness. "NAMI State Legislation Report: Trends in State Mental Health Policy, 2020-2021 Legislative Review." Available at https://www.nami.org/NAMI/media/NAMI-Media/PDFs/NAMI_2020-21_State_Legislation_Report.pdf.

144.     Office of Plan Monitoring, Division of Plan Surveys. "Routine Survey of Kaiser Foundation Health Plan, Inc." *Department of Managed Health Care*, 2017. Available at https://www.dmhc.ca.gov/desktopmodules/dmhc/medsurveys/surveys/055_r_full%20service-behavioral%20health_061217.pdf.

145.     Substance Abuse and Mental Health Services Administration. "Behavioral Health Barometer: California, Volume 6: Indicators as measured through the 2019 National Survey on Drug Use and Health and the National Survey of Substance Abuse Treatment Services." 2020. Available at https://www.samhsa.gov/data/sites/default/files/reports/rpt32815/National-BH-Barometer_Volume6.pdf.

146.     U.S. Department of Health and Human Services, Health Resources and Services Administration. "Behavioral Health Workforce Projections, 2020-2035." 2022. Available at https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/Behavioral-Health-Workforce-Projections-Factsheet.pdf.

147.     United States Government Accountability Office. "Behavioral Health: Available Workforce Information and Federal Actions to Help Recruit and Retain Providers." 2022. Available at https://www.gao.gov/assets/gao-23-105250.pdf.

**Other Sources**

148.     22 CCR § 79509.

149.     22 CCR § 79539.

150.     22 CCR § 79567.

151.     22 CCR § 79569.

152.     American Psychological Association and California Psychological Association letter to California Department of Managed Health Care re: Kaiser Access to Mental

DEFS-005.118

Health Care. 27 January 2020. Available at
https://www.apaservices.org/practice/legal/managed/apa-cpa-letter-january-27-2020.pdf.

153.     ATA's Standardized Telehealth Terminology and Policy Language for States on
Medical Practice, American Telemedicine Association. 5 September 2022. Available at
https://www.americantelemed.org/wp-content/uploads/2020/10/ATA-_Medical-Practice-
10-5-20.pdf.

154.     Carter, Andrea. "RE: Coleman: Questions from Labor Economists." August 20,
2023.

155.     Ponciano, Angela. "RE: Coleman: Questions from Labor Economists." August 30,
2023.

156.     Rubinfeld, Daniel L. "Reference Guide on Multiple Regression." National
Research Council, Reference Manual on Scientific Evidence: Third Edition. *The National
Academies Press*, 2011.

DEFS-005.119

# Appendix 4

DEFS-005.120



**Contact Details**

Direct:    +1 202.833.5240
Cell:       +1 785.393.7083
Email:      jdutra@secretariat-intl.com

**Professional History**

- Secretariat Economists
- Economists Incorporated
- University of Kansas-Economics Department
- Ultragaz (*Brazil*)

**Education**

- Ph.D., Economics (*Honors*), University of Kansas
- M.A., Economics, University of Kansas
- B.Sc., Economics (*Honors*) Ibmec, Brazil
- B.A., European Management (*Honors*), Université de Strasbourg, France

**Affiliations**

- American Economic Association
- American Bar Association, Antitrust Section

**Languages**

- Portuguese (*Native*)
- English (*Fluent*)
- French (*Advanced*)
- Spanish (*Advanced*)

# JÉSSICA DUTRA, Ph.D.
Director

**Current Position**

Dr. Dutra is a Director with Secretariat Economists.

**Professional Experience**

Dr. Dutra works with antitrust and competition over a wide range of industries, including healthcare, natural gas, copyright, and music. She specializes in the application of economic principles and state of the art quantitative methods in the context of litigation and damage calculation.

Dr. Dutra has taught advanced undergraduate courses in the economics of antitrust, industrial organization, and microeconomics at the University of Kansas. She is continuously engaged in both the academic and practitioner environments, serving on the American Bar Association, delivering presentations at economics conferences, publishing and peer reviewing papers on academic journals.

Dr. Dutra is certainly a world citizen. Having lived in five continents, she received her Ph.D. in Economics and M.A. in Economics from the University of Kansas, a B.A. in European Management from the Université de Strasbourg in France, and a B.S. in Economics from Ibmec in Brazil. She is native in Portuguese and fluent in English, having also advanced communication skills in French and Spanish.

**Secretariat**
Economists

DEFS-005.121

**Representative Engagements**

- Powers et al. v.  Health First, Inc. No.: 6:23-cv-00375-PGB-RMN

- IsoNova Technologies, LLC v. David Rettig and OvaInnovations, LLC (2023)

- CPS Energy v. Houston Pipe Line Company, LP and Oasis Pipeline, LP, Cause No. 2021-CI-05138, District Court of Bexar County, Texas, 407th Judicial District (2023).

- Retained by State Attorney General to investigate conduct on a technology platform. (2022)

- Colucci et al v. Health First, Inc. No 6:2021cv00681 (2022)

- State of Washington v. Johnson & Johnson/Janssen Pharmaceuticals, et al. (No. 20-2-00184-8 SEA, State of Washington, King County Superior Court), May 2022.

- Wrigley v. Providence of Alaska re. economic and antitrust damages in a lost privileges matter, January 2022.

- HCA Hospitals v. Kaiser Foundation Health Plan: (2021) out of network reimbursement rates.

- Prime Healthcare v. Blue Shield of California (JAMS Ref. 12200646), 2020.

- NRG Energy, Inc., FERC Docket No. EC20-96-000 (2020)

- Energy Texas, Inc., FERC Docket No. EC20-85-000 (2020).

**Publications and Working Papers**

- "An overview of market definition in the draft merger guidelines" (with Jason Albert, Richard Manning, Steven Schwartz, Anushree Subramaniam, Wei Tan, Pablo Varas, and Keith Waehrer), 2023.

- "The US FTC and DOJ release a draft version of their new Merger Guidelines significantly impacting market definition assessments" (with Jason Albert, Richard Manning, Steven Schwartz, Anushree Subramaniam, Wei Tan, Pablo Varas, and Keith Waehrer), 2023  *e-Competition Bulletin*

- "Alternative measures of "representative market prices" for FERC delivered price tests" (with John Morris and Tristan Snow Cobb), 2021 *Energy Law Journal* 42(1).

- "Antitrust analysis with upward pricing pressure and cost efficiencies." (with Tarun Sabarwal), 2020 *PLoS ONE 15(1): e0227418.*

- "Paradigm Shifts on Merger Efficiencies in Antitrust Analysis", 2020 *Kansas Law Review 68*.

- "Should Market Power Still Be a Concern in the U.S. Electric Power Industry?" (with John Morris and Tristan Snow Cobb), 2020 *The Electricity Journal 33(4).*



DEES-005.122

JESSICA DUTRA, Ph.D.

- "The European Commission's New Initiatives for Digital Platforms" Winter 2021 *Economists Ink.*

- "Merger Efficiencies and Market Concentration" Summer 2020 *Economists Ink.*

- "Antitrust Analysis with Upward Pricing Pressure and Cost Efficiencies" Winter 2020 *Economists Ink.*

- "An Economic Analysis of the Impact of Digital Music Streaming" April 2023 (with Robert Stoner)

- "Copyright Industries in the U.S. Economy: The 2022 Report" (with Robert Stoner)

- "BioPharma Economic Impact on the US Economy" (with Robert Stoner)

- "The U.S Music Industries – Jobs & Benefits: The 2020 Report" (with Robert Stoner).

- "Copyright Industries in the U.S. Economy: The 2020 Report" (with Robert Stoner).

- "The U.S Music Industries – Jobs & Benefits: The 2022 Report" (with Robert Stoner). *Forthcoming*

- "Economic Impact Analysis of the U.S. Publishing Industry" (with Robert Stoner). *Forthcoming*

- "Legal Access to Medical and Recreational Marijuana and Motor Vehicle Fatalities in the U.S., 1990--2019" (with Gregory Leung). *Working Paper*

- "Recent Developments in Difference-in-Differences and Implications for Antitrust". *Working Paper*

- "Anticompetitive effects of common ownership on hospital prices" (with David Slusky and José Azar). *Working Paper*

- "The Impact of Distinct Cannabis Vertical Market Structures in the United States" (with Gregory Leung). *Working Paper*

**Presentation and Professional Activities**

- "BioPharma Economic Impact on the US Economy"
  - Pfizer, 2023
- "Machine Learning in Antitrust" (with Thibault Schrepel and Ai Deng)
  - ABA, Antitrust Law Section Webinar, Spring 2022
- "The Impact of Distinct Cannabis Vertical Market Structures in the United States"
  - Southern Economic Association Conference, SEA, 2021
- "Legal Access to Medical and Recreational Marijuana and Motor Vehicle Fatalities in the U.S., 1990—2019" (with Gregory Leung)
  - Southern Economic Association Conference, SEA, 2021
- "Finding 'representative market prices' for calculating concentration in electric power markets" (with John Morris and Tristan SnowCobb)

3



- o FERC, 2020.
- "Antitrust analysis with upward pricing pressure and cost efficiencies"
  - o Southern Economic Association Conference, SEA, 2019
  - o Facebook, 2019
  - o Brattle Group, 2018
  - o Kansas State University Economics Department Seminar, 2018
  - o Southern Economic Association Conference, SEA, 2018
  - o Women in Statistics and Data Sciences, American Statistical Association, 2018
  - o Midwest Economic Association Conference, MEA, 2018
- "Paradigm Shifts on Merger Efficiencies in Antitrust Analysis"
  - o Kansas Law Review Symposium – Antitrust Law and Policy in the 21st Century. 2019.
- "Investigating the Effects of Common Ownership on Hospital Prices."
  - o Association for Public Policy Analysis and Management Annual Conference. 2019
- "Unilateral Effects of Multimarket Oligopolies."
  - o Women in Statistics and Data Sciences, American Statistical Association, 2018
  - o Missouri Valley Economic Association Conference, MVEA, 2017
  - o KU Graduate Research Competition, The University of Kansas, 2017

## Awards and Honors

- American Bar Association - Antitrust Law Section

  - Economics Committee Young Economist Representative 2021-2022, 2023-2025
  - M&A Committee Young Economist Representative 2022-2023
- The University of Kansas

  - Summer Research Fellowship 2018
  - Graduate Teaching Assistant Scholarship 2014-2019
  - Comprehensive Doctoral Exam with Honors 2017
  - Summer Fellowship 2015
  - Graduate Assessment Consultant 2015, 2017, 2018
  - Graduate Research Consultant 2017
- American Statistical Association

  - Women in Statistics and Data Sciences Travel Award 2017, 2018
  - Hackathon for Social Service Finalist 2017
- Golden Key International Honour Society

## Select Teaching Experience

- Industrial Organization and Antitrust Policy, University of Kansas, 2016-2019

- Principles of Microeconomics, University of Kansas, 2017



DEES-005.124

JESSICA DUTRA, Ph.D.

**Referee/Peer Review Experience**

- Review of Industrial Organization
- PLoS ONE



DEES-005.125



# Erica E. Greulich, Ph.D.
Director

### Current Position

Dr. Greulich is a Director with Secretariat Economists.

### Professional Experience

Dr. Greulich specializes in empirical microeconomics and quantitative analysis, including estimation of damages and lost profits. Her consulting engagements most frequently concern employment, discrimination, breach of contract and antitrust matters. She has consulted on numerous class action engagements and testified regarding lost earnings.

Prior to joining Secretariat Economists, Dr. Greulich's research and experience focused on the nexus between regulation, housing markets, and wage and employment outcomes. Her research has been published in the *Brookings-Wharton Papers on Urban Affairs* and *Regional Science and Urban Economics*.

While at the University of California, Berkeley, Dr. Greulich taught courses in microeconomics and game theory. She collaborated on research projects estimating the impact of immigration on rent burdens and the effects of tax subsidies on housing consumption.

**Contact Details**

Direct:     +1 415.975.3227
Email:      egreulich@secretariat-intl.com

**Professional History**

- Secretariat Economists
- Economists Incorporated
- Department of Economics, University of California Berkeley

**Education**

- Ph.D., Economics, University of California, Berkeley
- A.B., Mathematics, Princeton University

**Accreditations**

- American Bar Association (Labor and Employment Section, Antitrust Section)
- American Economic Association

### Expert Testimony

- *Nicole Tokarski v. Med-Data, Inc.* – Declaration on behalf of defendant regarding sample size and selection of a sample of putative class members. Non-expert consulting analysis of proposed methodology to calculate classwide damages stemming from exposure of personal information.

- *Keddrick Brown v. Progressive Mountain Insurance Company and Mitchell International, Inc.* – Declaration on behalf of defendant regarding analysis of a sample of insurance claim files.



Secretariat Economists was formed in July 2021 with Secretariat's acquisition of Economists Incorporated.

DEFS-005.126

Erica E. Greulich, Ph.D.

- *Deon Jones v. City of Los Angeles, et al.* – Expert report and deposition testimony on behalf of plaintiff regarding lost earnings.

- *Ralph Coleman, et al. v. Gavin Newsom, et al.* – Expert report and rebuttal report analyzing labor market conditions and initiatives to boost employment, on behalf of defendants.

- *David R. Dautrich; Diane M. Dautrich v. Nationstar Mortgage, LLC, et al.* – Rebuttal report on behalf of defendant assessing loss and damages allegedly relating to failed loan modification.

- *Mitch Spencer v. FedEx Ground Package System, Inc.* – Declaration on behalf of defendant in wage and hour matter regarding the use of statistical extrapolation for purposes of class certification and estimation of damages.

**Selected Consulting Matters**

*Confidential employment consulting matters:*

- Proactive pay equity audit for an information services company.

- Proactive audit of racial disparities in earnings for a mental health services provider. Authored memo submitted to EEOC.

- Analyzed liability of alleged failure to hire in racial and gender discrimination matter on behalf of defendant meat processing facility.

- Analyzed improper wage deduction and overtime claims on behalf of plaintiff class of mortgage officers.

- Analyzed minimum wage violation claims on behalf of plaintiff class of truck drivers.

- Analyzed racial, gender and age impact of planned reduction in force at a science and technology company.

- Analyses in response to OFCCP Predetermination Notices on behalf of a janitorial services company and a medical devices manufacturer.

- Uncompensated time audit for retail greeting card company.

- *Elliot Ambrosio and Sierra Trenholm v. Progressive Preferred Insurance Company and Progressive Advanced Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Michael Curran v. Progressive Preferred Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Sreedhar Gopalakrishnan and Sumathy Krishnamurthy v. Nationstar Mortgage LLC* – On behalf of defendant, analysis of economic damages in relation to mortgage payment dispute.

2



DEFS-005.127

Erica E. Greulich, Ph.D.

- *Lillian Bartee and Lisa Bledsoe v. Progressive Advanced Insurance Company and Progressive Casualty Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Eric Jones and Herbert Bowens v. Progressive Universal Insurance Company and Artisan and Truckers Casualty Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Mon Cheri Davenport, Candice Watts and Kathi Cassi v. Progressive Direct Insurance Company, Progressive Specialty Insurance Company, and Progressive Preferred Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Taylor Costello v. Mountain Laurel Assurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Keddrick Brown v. Progressive Mountain Insurance Co. and Michelle Bost v. Progressive Premier Insurance Co. of Illinois* - Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Christopher Cuomo v. Turner Services, Inc. and CNN America, Inc.* - Analyzed harm due to alleged wrongful termination and reputational harm, on behalf of defendant.

- *Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company and Yankee Atomic Electric Company v. United States of America* – On behalf of the United States, analyzed economic incentives to minimize costs in light of expected litigation recovery.

- *Leon Drummond, et al. v. Progressive Specialty Insurance Company and Progressive Advanced Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Lynn Freeman v. Progressive Direct Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Robert Kronenberg, et al. v. Allstate Insurance Company and Allstate Fire and Casualty Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Shahid Khan, et al. v. BDO Seidman LLP, et al.* – On behalf of plaintiffs, assessment of financial benefits from alleged violations.

- *In Re Fifth Third Early Access Cash Advance Litigation* – Assessment of contract damages on behalf of plaintiffs and class members.

3



DEFS-005.128

Erica E. Greulich, Ph.D.

- *Southern California Edison Company v. United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *Ludovic Michaud, et al. v. United States of America* – Analysis of lost income on behalf of defendant in wrongful death matter.

- *Domenick Volino, et al. v. Progressive Casualty Insurance Company, et al.* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Roslyn La Liberte v. Joy Reid* – Analysis of injury and economic damages on behalf of defendant relating to alleged defamation.

- *Glenn Durgin, et al. v. Allstate Property and Casualty Insurance Company* – Assessment of economic issues on behalf of defendant relating to certification of putative class of insured individuals.

- *Arthur Sampson, Jr. and Connie Nichols v. United Services Automobile Association, et al.* – Assessment of economic issues on behalf of defendants relating to certification of putative class of insured individuals.

- *Eugenio and Rosa Contreras et al. v. Nationstar Mortgage LLC et al.* – Assessed proposed damages methodology in class certification matter relating to allegedly improper fees charged to borrowers, on defendant's behalf.

- *Elizabeth V. Fortson v. Garrison Property and Casualty Insurance Company* – Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Charles McNamee et al. v. Nationstar Mortgage LLC* – On defendant's behalf, assessed reliability of survey instrument in Fair Debt Collection Practices Act matter.

- *Duke Energy Progress and Duke Energy Florida LLC. vs. The United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *Jeff Olberg, et al. v. Allstate Insurance Co. et al.* - Economic analysis on defendant's behalf relating to certification of putative class of insured individuals.

- *Ameenjohn Stanikzy v. Progressive Direct Insurance Co.* – Assessment of economic issues on behalf of defendant relating to certification of putative class of insured individuals.

- *Agency Audit* – Sampling design and data analysis for internal audit at a governmental institute. Non-litigation.

4



Erica E. Greulich, Ph.D.

- *NorthStar Vermont Yankee LLC v. The United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *Dominion Energy Kewaunee v. The United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *James Ellis v. University of Southern California* – Damages assessment on behalf of respondent relating to alleged breach of contract, defamation and false light claims.

- *Audrey Heredia et al. v. Sunrise Senior Living, LLC and Sunrise Senior Living Management, Inc.* – Analysis of economic issues relating to class certification on defendants' behalf.

- *EEOC v. Birmingham Beverage Co., Inc. d/b/a/ AlaBev* – On behalf of defendant, analyzed alleged race-based disparate treatment in promotions.

- *Cameron Lundquist et al. v. First National Insurance Company of America, et al.* – Assessment of economic issues on behalf of defendant insurers relating to certification of putative class of insureds whose vehicles were deemed a total loss.

- *Exelon Generation Company LLC, et al. v. The United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *NextEra v. The United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *Omaha Public Power District v. The United States of America* – On behalf of U.S. Department of Energy, analyzed predictions regarding a market for exchanges of spent nuclear fuel acceptance rights.

- *Lynnett Myers, Carol Butler and Arva Lowther v. Marietta Health Care Inc., Marietta Memorial Hospital and Selby General Hospital* – Analyzed proposed statistical sampling and analysis on defendant's behalf; analyzed class damages.

- *North American Soccer League, LLC v. United States Soccer Federation, Inc. and Major League Soccer, LLC* – Analysis of antitrust liability on behalf of defendant.

- *Erin Kis et al. v. Covelli Enterprises, Inc.* – Assessment of liability on behalf of defendant in alleged misclassification matter, including statistical analysis of a random sample of payroll records.

- *State of California v. Wilbur L. Ross, Jr., et al.; City of San Jose and Black Alliance for Just Immigration v. Wilbur L. Ross, Jr., et al.* – For defendant, critical assessment of quantitative analyses.

5



Erica E. Greulich, Ph.D.

- *Robyn Kravitz, et al. v. U.S. Department of Commerce, et al.; La Unión Del Pueblo Entero, et al. v. Wilbur L. Ross, Jr., et al.* – For defendant, critical assessment of quantitative analyses.

- *Loreley Financing (Jersey) NO. 28, Limited vs. Merrill Lynch, Pierce, Fenner & Smith Incorporated et al.* – Critical assessment of econometric analyses on behalf of plaintiff.

- *Independent Sports & Entertainment, LLC v. Daniel Fegan* – On behalf of plaintiff, assessment of financial harm caused by defendant.

- *In Re: Aaron Slator* – Assessment of contract damages on behalf of respondents.

- *Sherri Johnson v. E & B Natural Resources Management Corporation, et al.* – Provided analysis to defendant as the designated damages rebuttal expert in employee misclassification matter.

- *All-South Subcontractors, Inc. v. Sunbelt Rentals, Inc.* – Analysis of class certification claims on behalf of defendant.

- *Grogans Backpay* – Analyzed back pay and benefits payable to wrongfully terminated client.

- *Surf City Steel, Inc., et al., v. International Longshore and Warehouse Union, et al.* – Evaluated antitrust injury on behalf of defendant.

- *Brandon Felczer, et al. v. Apple Inc., et al.* – Analyzed wage and hour claims on behalf of defendant in class action matter.

- *Timothy Watkins v. Continental Tire The Americas, LLC d/b/a General Tire and Rubber Company, et al.* – Estimated financial loss on behalf of defendant.

- *Charles Ridgeway, et al., v. Wal-Mart Stores Inc.* – Analyzed injury and damages relating to wage and hour claims on behalf of defendant in class action matter.

- *2B Trading, Inc. (USA) v. GoPro Hong Kong, Ltd. (Hong Kong S.A.R.) v. United World Brands (Colombia)* – Assessment of analyses of economic harm and profits on behalf of counterclaimant due to alleged breach of contract.

- *In Re Taco Bell Wage and Hour Actions* – Economic analysis of wage and hour claims and estimation of damages on behalf of defendant in class action matter.

- *Peter Sripramot v. NorCal Freight Mgmt., Inc., et al.* – Estimated financial loss on behalf of defendant.

- *Louis Cimaglia, et al. v. Royal Pontiac Buick GMC Inc., et al.* – Estimated financial loss on behalf of defendant.



DEFS-005.131

Erica E. Greulich, Ph.D.

- *Ameira Watters, et al. v. General Motors LLC, et al.* – Estimated financial loss on behalf of defendant.

- *In Re Text Messaging Antitrust Litigation* – Economic analysis of liability and damages related to alleged pay-per-use SMS collusion among U.S. wireless providers on behalf of plaintiffs at class action certification stage.

- *Ramah Navajo School Board, Inc. v. Kathleen Sebelius et. al.* – Assessment of analyses of economic harm and damages on behalf of defendant.

- *BDO Seidman, LLP, v. Morgan, Lewis & Bockius, LLP* – Assessment of damages on behalf of defendant related to alleged breach of professional obligations.

- *Securities and Exchange Commission v. Ralph R. Cioffi and Matthew M. Tannin* – Consulting and analysis regarding hedge fund operations on behalf of defendant Cioffi.

- *Ultra Internet Media, S.A., et al. v. Caesars License Company, LLC et al.* – For defendant, assessment of damages related to purported breach of contract.

- *Lauren Knowles v. Kelly Buick, Inc., et al.* – Analysis of economic loss on behalf of defendant.

- *The Apple iPod iTunes Anti-Trust Litigation* – Econometric analysis on behalf of plaintiffs at class certification and merits stages of antitrust matter.

- *Warner Chilcott Laboratories Ireland Limited; Warner Chilcott Company, Inc.; Warner Chilcott (US), LLC; and Mayne Pharma International PTY, Ltd v. Mylan Pharmaceuticals Inc. and Mylan Inc.* – Analysis of economic issues related to market for doxycycline hyclate on behalf of defendant.

- *The Research Foundation of State University of New York; New York University; Galderma Laboratories Inc.; and Galderma Laboratories, L.P. v. Mylan Pharmaceuticals Inc.* – Evaluation of commercial success of Oracea (doxycycline) on behalf of defendant.

- *Novartis Pharmaceuticals Corporation v. Mylan Pharmaceuticals Inc. and Mylan Inc.* – On behalf of defendant, economic analysis of competitive effects of foreclosure of generic fluvastatin.

- *Northern States Power Company v. United States* – Analysis of damages on behalf of defendant in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the U.S. Department of Energy.

- *Alabama Power Company, Georgia Power Company, and Southern Nuclear Operating Company, Inc. v. United States* – Analysis of damages on behalf of defendant in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the U.S. Department of Energy.

7



DEFS-005.132

Erica E. Greulich, Ph.D.

- *Detroit Edison Company v. United States* – Analysis of damages on behalf of defendant in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the U.S. Department of Energy.

- *United States of America v. Ralph Cioffi and Matthew Tannin* – Economic analysis of hedge fund operations on behalf of defendants.

- *National Union Fire Insurance Co. of Pittsburgh, PA v. Puget Plastics Corporation et al.* – For plaintiff, economic analysis of lost profits and diminution in business value.

- *Reginald G. Moore, et al., v. Janet Napolitano, Secretary, U.S. Department of Homeland Security* – Assisted in analysis on behalf of defendant of the use of statistical methodologies in assessing employment discrimination issues.

- *Consumers Energy Company v. United States* – Analysis of damages on behalf of defendant in connection with partial breach of the contract for disposal of spent nuclear fuel between plaintiff and the U.S. Department of Energy.

- *Global Dining-CA v. Taisei Construction Corporation* – For plaintiff, estimation of lost profits due to delayed restaurant opening.

- *Deutscher Tennis Bund, et al., v. ATP Tour Inc.* – Antitrust liability analysis on behalf of defendant.

- *Saint John's Hospital and Health Center v. McDermott, Will & Emery LLP* – Consulting on behalf of defendant in legal malpractice case.

- *In Re: The National Benevolent Association of the Christian Church (Disciples of Christ), et al.* – Damage estimation on behalf of plaintiff in malpractice case.

- *Ralph Franklin & Son Logging v. United States* – For defendant, analysis of conditions in California electricity market and timber industry.

- *Patrick J. Cunningham and Anton N. Zanki v. International Business Machines Corporation* – Consulting and estimation on behalf of defendant in class action case involving alleged breach of contract of contract of employee retirement benefits.


**Publications**

- "Department of Justice Gets First Guilty Plea in Criminal No-Poach Antitrust Case," *Economists Ink*, Fourth Quarter 2022.

- "Disparate Impact and Employment Actions During COVID-19," *Economists Ink*, Fall 2020.

8



<span style="color:#8B1A1A">Erica E. Greulich, Ph.D.</span>

- "Franchise No-Poach Agreements – the Debate of Standard of Review," *Economists Ink*, Summer 2019.

- "Proposed OFCCP Changes Unlikely to Have Imminent Effect on Contactors," *Economists Ink*, Winter 2018.

- "FTC Issues Report on Sharing Economy," *Economists Ink*, Spring 2017.

- "Zinc Antitrust Claims Dismissed," *Economists Ink*, Spring 2016.

- "Discounting Lost Future Earnings," with Jonathan L. Walker, *Economists Ink*, Summer 2015.

- "Appendix and Glossary" in *Econometrics: Legal, Practical and Technical Issues (Second Edition)*, ABA Antitrust Section, 2014.

- "Keyword Advertising and Trademark Infringement," with Clarissa A. Yeap, *Economists Ink*, Fall 2011.

- "DTB and the Use of Regression Analysis to Assess Market Definition and Competitive Effects," with Jonathan Walker, *Economics Committee Newsletter*, Antitrust Law Section of the American Bar Association, Spring 2011.

- "The Single Entity Issue in American Needle and DTB," with Jonathan Walker, *Westlaw Journal Antitrust*, Volume 18, Issue 1, April 2010.

- "Housing subsidies and tax expenditures: The case of mortgage credit certificates," with John M. Quigley, *Regional Science and Urban Economics*, 39(2009): 647-657.

- "DOT and DOJ Provide Differing Views on Application by Continental Airlines for Antitrust Immunity," with Gloria J. Hurdle, *Economists Ink*, Fall 2009.

- "Retail Markets: Gasoline Station Markets," in *Market Definition*, ABA Antitrust Section.

- "DOJ Decides Not to Challenge the XM-Sirius Merger," *Economists Ink*, Spring 2008.

- "Department of Justice and Federal Trade Commission Approaches to Market Definition," with Henry McFarland, *2007 Annual Review of Antitrust Law Developments*, ABA Antitrust Section, March 2008.

- "The Economics of Entry in Merger Analysis," economic commentary to accompany ABA Antitrust Section, *Mergers and Acquisitions*, 3rd ed., Chapter 5, March 2008.

- "Economic Analysis In Urban Real Estate Markets," with Manny A. Macatangay, *Economists Ink*, Summer 2006.

9



DEFS-005.134

Erica E. Greulich, Ph.D.

- "What Can We Learn From the FTC's Recent Merger Study?," with Robert A. Kneuper, *Economists Ink*, Winter 2006.

- "The Anatomy of Rent Burdens:  Immigration, Growth, and Rental Housing," with John M. Quigley and Steven Raphael, *Brookings-Wharton Papers on Urban Affairs*, (5)1, 2004:  149-187.

## Working Papers

- "Quality of Life Estimates for U.S. Metropolitan Areas: Evidence from the 1980- 2000 PUMS", August 2005.

- "Explaining Housing Premiums: Does the Evidence of Amenities and Population Characteristics Support "Equilibrium" Theories of Housing and Labor Markets?", August 2005.

- "Construction of 1980-1990-2000 Individual-Level Dataset and Extension of Constant-Geography Metropolitan Area Definitions to 2000", August 2005.

## Fellowships and Awards

- Graduate Fellowship, U.C. Berkeley Fisher Center for Real Estate and Urban Economics (2004-2005)

- Continuing Student Fellowship, Burch Center for Tax Policy and Public Finance (2004)

- Continuing Student Fellowship, U.C. Berkeley Department of Economics (2003)



DEES-005.135

## <u>DECLARATION OF SERVICE BY E-MAIL</u>

Case Name:    Ralph Coleman, et al. v. Gavin Newsom, et al.
Case No.:      2:90-cv-00520 KJM-DB (PC)

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  My business address is 300 S. Spring Street, Suite 1702, Los Angeles, CA 90013. I am 18 years of age or older and not a party to this matter.

On <u>August 31, 2023</u>, I served the attached **DEFENDANTS' RULE 26(a)(2)(B) DISCLOSURE OF ERICA GREULICH, PH.D.** by transmitting a true copy via electronic mail addressed as follows:


Steve Fama
- Email:  sfama@prisonlaw.com
Lisa Ells
- Email:  lells@rbgg.com
Ernest Galvan
- Email:  egalvan@rbgg.com
Michael Bien
- Email:  mbien@rbgg.com
Jenny Yelin
- Email:  jyelin@rbgg.com
Coleman Team
- Email:  colemanTeam-RBGOnly@rbgg.com


I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 31, 2023</u>, at Los Angeles, California.


|  |  |
|---|---|
| V. Thompson | /s/ V. Thompson |
| Declarant | Signature |

CF1997CS0003

DEFS-005.136

# Exhibit E

**Telemental Health Literature Review**
**Joseph V Penn MD CCHP-MH LFAPA**
**Dated 5-22-2024**

1. Jessica Abram et al., Practical Issues in Delivery of Clinician-to-Patient Telemental Health in an Academic Medical Center, Harvard Review of Psychiatry, 135-145 (2017).

2. American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Telepsychiatry and AACAP Committee on Quality Issues, Clinical Update: Telepsychiatry with Children and Adolescents, 56 Journal of the American Academy of Child and Adolescent Psychiatry 10, 875-893 (2017).

3. American Psychiatry Association Telepsychiatry Toolkit and Position Statement (Position Statement on Telemedicine in Psychiatry), https://www.psychiatry.org/getattachment/a9405e26-3a69-4e9d-95b6-5df9568fb443/Position-Telemedicine-in-Psychiatry.pdf

4. American Psychiatric Association's February 2023 *Resource Document on Telepsychiatry for Adults in Jails and Prisons*, Approved by the Joint Reference Committee, February 2023  https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf

5. American Psychological Association Guidelines for the Practice of Telepsychology (2013) https://www.apa.org/pubs/journals/features/amp-a0035001.pdf

6. American Psychiatry Association Position Statement Position Statement on Telemedicine in Psychiatry https://www.psychiatry.org/getattachment/a9405e26-3a69-4e9d-95b6-5df9568fb443/Position-Telemedicine-in-Psychiatry.pdf

7. American Psychology Association Ethical Principals of Psychologists, available at https://www.apa.org/ethics/code#:~:text=Psychologists%20strive%20to%20benefit%20those,of%20animal%20subjects%20of%20research.;

8. Diana J. Antonacci, M.D. et al., Empirical Evidence on the Use and Effectiveness of Telepsychiatry via Videoconferencing: Implications for Forensic and Correctional Psychiatry, Behav. Sci. Law 26, 253-269 (2008).

9. Phoebe Barnett et al., Implementation of Telemental Health Services Before COVID-19: Rapid Umbrella Review of Systematic Reviews, 23 Journal of Medical Internet Research (2021).

10. Barrera-Valencia et al, Cost-effectiveness of synchronous vs. asynchronous telepsychiatry in prison inmates with depression, Asociaci ´on Colombiana de Psiquiatr´ıa 46, 65-73 (2017).

11. Ashley B. Batastini and Robert D. Morgan, Connecting the Disconnected: Preliminary

Results and Lessons Learned from a Telepsychology Initiative with Special Management Inmates, 13 Psychological Services 3, 283-291 (2016).

12. Batastini, A. B., King, C. M., Morgan, R. D. & McDaniel, B. (2016). Telepsychological services with criminal justice and substance abuse clients: A systematic review and meta-analysis. Psychological Services, 13, 20-30. doi: 10.1037/ser0000042

13. Benjamin B. Brodey et al, Satisfaction of Forensic Psychiatric Patients with Remote Telepsychiatric Evaluation, 51 Psychiatry Services 10, 1305-1307 (2000).

14. Subho Chakrabarti, Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-based Approaches, 5 World Journal of Psychiatry 3, 286-304 (2015).

15. Stacie Anne Deslich et al., Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations, The Permanente Journal 3, 80-86 (2013).

16. Jeffrey DeVido et al., Telepsychiatry for Inpatient Consultations at a Separate Campus of an Academic Medical Center, Telemedicine and e-Health, 572-576 (2015).

17. Amy Donahue et al., Telemental Health and the Management of Psychosis, Psychiatry in the Digital Age (2021).

18. David Farabee et al., An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees, Psychiatry Services 67:5, 562-565 (2016).

19. Francisca García-Lizana and Ingrid Muñoz-Mayorga, What About Telepsychiatry? A Systematic Review, Primary Care Companion to the Journal of Clinical Psychiatry (2010).

20. Michelle Glaser et al., Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana, Telemedicine and e-Health, 472-479 (2010).

21. David Goldbloom and David Gratzer, Telepsychiatry 2.0, The Canadian Journal of Psychiatry (2017).

22. Mohammad Haidous et al., A Review of Evaluation Approaches for Telemental Health Programs, International Journal of Psychiatry in Clinical Practice (2020).

23. Donald M. Hilty et al., An Update on Telepsychiatry and How It Can Leverage Collaborative, Stepped, and Integrated Services to Primary Care, Academy of Consultation-Liaison Psychiatry, 227-250 (2018).

24. Donald M. Hilty et al., The Effectiveness of Telemental Health: A 2013 Review, Telemedicine and e-Health, 444-454 (2013).

25. Natalia Krzyzaniak et al., The Effectiveness of Telehealth Versus Face-to-Face Interventions for Anxiety Disorders: A Systematic Review and Meta-Analysis, International Society for Telemedicine and eHealth (2021).

26. Brittanie LaBelle et al., Characterizing the Use of Telepsychiatry for Patients with Opioid Use Disorder and Cooccurring Mental Health Disorders in Ontario, Canada, Hindawi International Journal of Telemedicine and Applications (2018).

27. Mostafa Langarizadeh et al., Telemental Health Care, An Effective Alternative to Conventional Mental Care: a Systematic Review, ACTA Inform Med., 240-246 (2017).

28. Deborah Larsen et al., Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers, Telemedicine and e-Health (2004).

29. S. Leonard et al., The Development and Evaluation of a Telepsychiatry Service for Prisoners, Journal of Psychiatric and Mental Health Nursing, 461-468 (2004).

30. Philip R. Magaletta et al., Telehealth in the Federal Bureau of Prisons: Inmates' Perceptions, Professional Psychology: Research and Practice, 497-502 (2000).

31. Luisa Manfredi et al., Rural Jail Telepsychiatry: A Pilot Feasibility Study, Telemedicine and e-Health, 574-577 (2005).

32. Robert D. Morgan et al, Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities, Journal of Consulting and Clinical Psychology, 158-162 (2008).

33. Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use of telemental health alter the treatment experience?: Inmates' perceptions of telemental health vs. face-to-face treatment modalities. Journal of Consulting and Clinical Psychology, 76, 158-162. doi:10.1037/0022-006X.76.1.158

34. National Association of Social Workers Code of Ethics, available at https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics- English.

35. Eve-Lynn Nelson et al., A Comparison of Psychiatrist Evaluation and Patient Symptom Report in a Jail Telepsychiatry Clinic, Telemedicine Journal and e-Health, 2004.

36. Richard O'Reilly et al., Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results From a Randomized Controlled Equivalence Trial, Psychiatry Services, 836-843 (2007).

37. Nasreen Roberts et al., Child and Adolescent Emergency and Urgent Mental Health Delivery Through Telepsychiatry: 12-Month Prospective Study, Telemedicine and e-

Health 10, 842-846 (2017).

38. Sy Atezaz Saeed et al., Training Residents in the Use of Telepsychiatry: Review of the Literature and a Proposed Elective, Psychiatry, 271-283 (2017).

39. Alberto Salmoiragi et al., A Systematic Review of the Use of Telepsychiatry in Acute Settings, Journal of Psychiatric Practice, 389-393 (2015).

40. Substance Abuse and Mental Health Services Administration (SAMHSA). *Telehealth for the Treatment of Serious Mental Illness and Substance Use Disorders.* SAMHSA Publication No. PEP21-06-02-001 Rockville, MD: National Mental Health and Substance Use Policy Laboratory. Substance Abuse and Mental Health Services Administration, 2021.

41. Merle Schlief, Synthesis of the Evidence on What Works for Whom in Telemental Health: Rapid Realist Review, Interactive Journal of Medical Research (2022).

42. Ian Sharp et al., The Use of Videoconferencing with Patients with Psychosis: A Review of the Literature, Annals of General Psychiatry (2011).

43. Jay Shore et al., Diagnostic Reliability of Telepsychiatry in American Indian Veterans, American Journal of Psychiatry (2007).

44. Jay Shore et al., Best Practices in Videoconferencing-Based Telemental Health, American Psychiatry Association (2018).

45. Surendra P. Singh et al., Accuracy of Telepsychiatric Assessment of New Routine Outpatient Referrals, BMC Psychiatry, 2007.

46. Dawn E. Sugarman and Alisa B. Busch, Telemental Health for Clinical Assessment and Treatment, BMJ (2023).

47. John F. Thomas, The Use of Telepsychiatry to Provide Cost-Efficient Care During Pediatric Mental Health Emergencies, Psychiatric Services 69:2, 161-168 (2018).

48. Charles Zaylor et al., Clinical Outcomes in a Prison Telepsychiatry Clinic, Journal of Telemedicine and Telecare, 47-49 (2001).

49. Charles Zaylor et al., Telemedicine Services to a County Jail, Journal of Telemedicine and Telecare, 93-95 (2000).

50. Wanhong Zheng et al., Treatment Outcome Comparison between Telepsychiatry and Face-to-Face Buprenorphine Medication-Assisted Treatment (MAT) for Opioid Use Disorder: A 2-Year Retrospective Data Analysis, J Addict Med (2018).

# CERTIFICATE OF SERVICE

Case Name: __Coleman v. Newsom, et al.,__          No.    __2:90-cv-00520 KJM-DB (PC)__

I hereby certify that on <u>May 28, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY (ECF NO. 8165)**
- **DECLARATION OF AMAR MEHTA, M.D. IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY**
- **DECLARATION OF JOSEPH PENN, MD, IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>May 28, 2024</u>, at San Francisco, California.

|  |  |
|---|---|
| G. Guardado | */s/ G. Guardado* |
| Declarant | Signature |

CF1997CS0003
44181502.docx