1    ROB BONTA, State Bar No. 202668
     Attorney General of California
2    MONICA N. ANDERSON, State Bar No. 182970
     Senior Assistant Attorney General
3    DAMON MCCLAIN, State Bar No. 209508
     Supervising Deputy Attorney General
4    ELISE OWENS THORN, State Bar No. 145931
     NAMRATA KOTWANI, State Bar No. 308741
5    Deputy Attorneys General
       455 Golden Gate Avenue, Suite 11000
6      San Francisco, CA  94102-7004
       Telephone:  (415) 510-4431
7      Fax:  (415) 703-5843
       E-mail:  Namrata.Kotwani@doj.ca.gov
8    Attorneys for Defendants

     HANSON BRIDGETT LLP
     PAUL B. MELLO, State Bar No. 179755
     SAMANTHA D. WOLFF, State Bar No. 240280
     KAYLEN KADOTANI, SBN 294114
     DAVID C. CASARRUBIAS, SBN 321994
     CARSON R. NIELLO, SBN 329970
       1676 N. California Boulevard, Suite 620
       Walnut Creek, CA 94596
       Telephone:  (925) 746-8460
       Fax:  (925) 746-8490
       E-mail:  PMello@hansonbridgett.com
     Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF AMAR MEHTA, M.D. IN SUPPORT OF DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT AND PROPOSED TELEMENTAL HEALTH POLICY** |

1

Decl. Mehta ISO Defs.' Object. to Report on Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

**DECLARATION OF AMAR MEHTA, M.D.**

I, Amar Mehta, M.D., declare:

1.      I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR).  Prior to this position, I was the Statewide Chief of Telepsychiatry.  I have worked in CDCR since July 2013, during which time I have also served as a staff telepsychiatrist directly delivering care via telepsychiatry at multiple levels of care for roughly 6 years, site director for residency training, institutional clinical lead, and acting statewide Chief of Psychiatry.  After medical school and internship, I attended residency in adult Psychiatry, and completed fellowships in both Child & Adolescent Psychiatry and Forensic Psychiatry.  I am Board-certified in the four specialties of Adult, Child & Adolescent, and Forensic Psychiatry, and Addiction Medicine.  I submit this declaration in support of Defendants' Objections to the Special Master's March 21, 2024 Report and Proposed Telemental Health Policy.  I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2.      Serving as the statewide Chief of Psychiatry, Telepsychiatry Services, for nearly a year, I oversaw a significant expansion in the program's staff.  I was directly involved with the use of telemental health throughout the period of the COVID-19 pandemic, at nearly all institutions in one form or another.  I remain closely connected with the telemental health unit during its current expansion and implementation.

**Background**

3.      CDCR already has a fully implemented telepsychiatry program in place.  CDCR has used telepsychiatry for more than 10 years and significantly increased its team of telepsychiatrists beginning in 2019.  The program has been very successful in improving access to care and psychiatrist staffing levels.  I am aware of no findings by the Special Master that any CDCR patient has ever suffered harm due to a problem with the modality of telepsychiatry.

4.      CDCR's telemental health policy created a program whereby telepsychologists and telesocial workers provide mental health services to CDCR's patients remotely using video-conferencing technology and with the assistance of on-site telepresenter staff as needed.  CDCR

2

1   released its telemental health policy on September 21, 2024, with immediate implementation and

2   the ongoing hiring of telepsychologists and telesocial workers.  Based on CDCR's experience

3   with the growth of telepsychiatry, CDCR's hiring strategy was to first hire leadership and

4   supervisor positions for the telemental health program, and to then turn its focus to hiring line

5   staff.  As of May 23, 2024, CDCR had hired 30 telemental health staff: one Assistant Deputy

6   Director, one Supervising Psychiatric Social Worker II, three Supervising Psychiatric Social

7   Worker I, two Chief Psychologists, one Senior Psychologist Supervisor, four staff psychologists,

8   and eighteen staff social workers.

9          5.      Under CDCR's telemental health policy, telepsychologists and telesocial workers

10  follow the same professional and ethical standards and carry out the same clinical duties as on-

11  site staff.  There is no difference in the licensing or credentialing of telemental health clinicians as

12  compared to on-site psychologists and social workers.  The clinical education and training is also

13  identical, though telemental health providers receive additional training in the technology and

14  standards of telemedicine.

15         6.      In CDCR's Mental Health Services Delivery System, psychologists and social

16  workers are generally referred to collectively as mental health primary clinicians.  Primary

17  clinicians who provide services through telemental health are referred to as telepsychologists and

18  telesocial workers and collectively as telemental health providers or telemental health clinicians.

19  The Program Guide sets forth the expected duties of primary clinicians when treating mental

20  health patients at each level of care.  CDCR's telemental health policy clearly requires that

21  telemental health clinicians adhere to all Program Guide requirements when treating patients in

22  any setting.

23         7.      CDCR's telemental health policy respects and ensures that telemental health

24  clinicians are part of the treatment team, thereby preserving the equivalent milieu wherever

25  patients are seen.  Under the policy, telemental health clinicians are required to engage with their

26  on-site team members as part of the interdisciplinary treatment teams for their patients and they

27  regularly consult with other team members outside of interdisciplinary treatment team meetings,

28  including other formal and informal meetings, and in huddles to discuss their patients and other

1  matters relevant to the provision of care on their shared yard.  Telepresenters such as medical

2  assistants also collect and provide valuable information for the telemental health clinicians, and

3  relay important information back to other on-site staff.  CDCR telemental health clinicians are

4  expected to regularly communicate with other staff members such as escort officers, gather

5  crucial information about their patients and the environment from the telepresenters, and can be

6  taken cell-front through telepresence where they can observe the common areas and the cells of

7  their patients.

8         8.     In my professional opinion and as the Deputy Director of the Statewide Mental

9  Health Program, CDCR's telemental health program constitutes an appropriate and safe modality

10  to deliver mental health treatment to incarcerated patients, and can improve access to care,

11  improve CDCR's ability to provide high quality care (as required by the Program Guide), and

12  improve recruitment and retention to the benefit of all patients and clinicians.

13         9.     CDCR's telemental health policy has never been intended to replace all on-site

14  staff.  To date, the policy has worked as intended—it has attracted many candidates who do not

15  currently work on-site at prisons and who likely would not consider employment with CDCR if

16  they were required to work on-site.  These new hires have worked virtually alongside on-site staff

17  at the prisons where they have been assigned.

18        10.    CDCR does not intend to reduce its important efforts to recruit and retain on-site

19  clinicians, and those efforts are ongoing.

20        11.    CDCR's successful use of telepsychiatry demonstrates that CDCR's patients are

21  open to telehealth as a mode of delivering mental health care, and patients themselves have

22  requested more access to telemental health services, as reflected in a letter from the Inmate

23  Advisory Council at the Substance Abuse Treatment Facility.  A copy of that letter is attached as

24  Exhibit A.

25        12.    CDCR's extensive experience in providing telepsychiatry has taught us that the

26  modality of telemedicine brings a layer of efficiency to the delivery of mental health services in

27  the prisons and that it can greatly improve morale and recruitment and retention.

28

Decl. Mehta ISO Defs.' Object. to Report on Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

13.     I have carefully reviewed the Special Master's report on CDCR's telemental health policy and his proposed revisions to the policy.  Based on my years of training and personal clinical experience working as a telepsychiatrist in more than one correctional setting, as well as my experience overseeing CDCR's telepsychiatry program and now the expansion of telemental health, it is my professional opinion that the Special Master's proposed revisions to the telemental health policy could undermine the proper functioning of this unit and the purposes of the policy, which include improving access to care for CDCR's mental health patients, improving the provision of high quality care consistent with the Program Guide, and improving mental health recruitment and retention.  The Special Master's proposed revisions would impose limitations on telemental health that would severely restrict CDCR's policy, making it exceedingly difficult to implement the telemental health program.  This would burden on-site clinicians with many of the basic duties of primary clinicians that can be satisfactorily completed by telemental health clinicians, , negatively impacting retention of on-site providers.

**Literature Review**

14.     My staff and I have conducted a thorough literature review concerning telemental health, and update our review regularly.  We have also reviewed the 41 articles cited in the Special Master's report, which the Special Master says "informed" his recommendations and proposed revisions to CDCR's telemental health policy.  Based on a review of the 41 articles, it is difficult to understand how they support any of the Special Master's specific proposed revisions. The articles, though mostly focused on telepsychiatry, were overall overwhelmingly positive about the modality, included positive findings about the effectiveness of telepsychiatry and telemental health, and concluded that outcomes were equivalent to in-person care, and in fact, in some situations they indicated that telehealth may be preferred.

15.     Our review of the medical literature overwhelmingly showed that telemental health is considered an effective and efficient means of providing mental health care.  The review included both the 56 articles we referenced in support of CDCR's telepsychiatry policy plus an additional 37 articles, attached here as Exhibit B.  Through our review we determined that there can be special considerations for specific patient populations, but there is no evidence of absolute

Decl. Mehta ISO Defs.' Object. to Report on Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

contraindications for the use of telemental health. The articles we reviewed also demonstrate that telemental health has been increasing as a means of overcoming geographic limitations to clinician availability and increasing access to treatment for remote and underserved populations across the state, country, and globe. The review confirmed that telemental health is a nationally accepted method for delivering mental health treatment and is well within the standard of care. The literature on telemental health further confirms that it has allowed many organizations in the country to provide quality mental health care to patients who need it most. By implementing its new telemental health policy, CDCR is catching up to a proven and widely accepted modality for providing mental health care. Telemental health is not an experimental form of therapy that is only provided to patients with no alternative. On the contrary, it is a major form of treatment in the community, including training programs and hospital emergency departments even in major cities, where the density of in-person clinicians is relatively high.

16.    I am aware that the Special Master's report asserts that Defendants rely on the same 56 articles that they submitted in support of CDCR's proposed telepsychiatry policy to support their telemental health policy. This is incorrect. Defendants relied on those 56 articles plus 37 additional articles and studies in support of the telemental health policy.

17.    The California Medical Board recognizes that: (1) telehealth is "a tool in medical practice, not a separate form of medicine"; (2) there "are no legal prohibitions to using technology in the practice of medicine, as long as the practice is done by a California licensed physician and complies with state and federal privacy laws"; and (3) the standard of care is the same whether the patient is seen in-person, through telehealth or other methods of electronically enabled health care."[1] The Special Master does not seem to recognize these points. Instead, he seems to view telemental health as a novel and untested form of medicine. But telehealth is in fact only a tool for providing the same mental health services that CDCR has been providing for many years.

---

[1]  https://www.mbc.ca.gov/Resources/Medical-Resources/telehealth.aspx, last accessed on May 15, 2024.

19900160.1

18.    The Special Master's report suggests that a lack of prison-specific studies on the use of telemental health justifies his numerous proposed restrictions on its use.  We have identified some studies that do specifically concern telemental health in correctional settings.  But all of medicine functions by drawing reasonable inferences regarding the safety and effectiveness of healthcare interventions in a multitude of different settings.  Such inferences are commonly drawn in the medical field because studies cannot be conducted in every possible environment or under every possible set of circumstances.  Importantly, nearly all of the telemental health studies converge on a single conclusion: that telemental health is effective and equivalent to on-site treatment.  The Special Master's argument that restrictions and prohibitions on CDCR's use of telemental health are necessary because there are not additional prison-specific telemental health studies misses this fundamental point; there can always be more studies.  The evidence supporting telemental health as an effective modality is overwhelming and many common and uncontested clinical practices rest on far less universal evidence.  The Special Master's arguments seem to be based on the false assumption that psychological problems experienced by incarcerated patients are fundamentally different from those experienced by people in the community.  If that were true, there would be no basis for applying the many decades of other community-based research and clinical experience in treating mental health conditions to incarcerated patients—something that is routinely and effectively done throughout the field of correctional mental health care.

19.    I am aware that the Special Master's report on telemental health cites the American Psychiatric Association's (APA) February 2023 *Resource Document on Telepsychiatry for Adults in Jails and Prisons*.  I was surprised that the report implies that this document represents an APA standard.  The APA's Operations Manual clearly states that resource documents do not represent APA policy, and the article itself cautions that "[t]he findings, opinions, and conclusions of this report do not necessarily represent the views of the officers, trustees, or all members of the American Psychiatric Association.  Views expressed are those of

7

19900160.1

1    the authors." (*Resource Document*[2] at 1.)  The *Resource Document* does not represent an APA

2    standard.

3          20.    The Special Master's report paid particular attention to the *Resource Document's*

4    assertion that "telepsychiatry in higher levels of care be used as a last resort or in very specific

5    situations, for example when in-person recruitment is not successful."  It is noteworthy that the

6    section of the *Resource Document* pertaining to treatment at higher levels of care contains no

7    citations to studies or evidence, and indicates that the recommendations are based on opinion and

8    not on published evidence.  Moreover, it is not clear from the *Resource Document* that any of the

9    authors have direct experience practicing in telepsychiatry or the extent of their direct experience

10   providing mental health treatment to incarcerated populations, and none of the authors disclosed

11   any potential conflicts of interest.  Consequently, the basis for their opinion regarding higher

12   levels of care is unclear.  Regardless, as discussed below, CDCR's telemental health policy

13   already contains reasonable limitations on the use of telemental health at the inpatient level of

14   care.

15         21.    The actual American Psychiatric Association (APA) position on telepsychiatry is

16   reflected in the APA toolkit, which the Special Master referenced in his report.[3]  The APA toolkit

17   provides a wealth of information, and states (with references linked on the website):

18         • "Telepsychiatry using videoconferencing is a validated and effective practice of

19           medicine.  Telepsychiatry videoconferencing is equivalent to in-person encounters in

20           diagnostic accuracy, treatment effectiveness, patient satisfaction, and is often more

21           cost efficient than in-person encounters."

22         • "Telepsychiatry's evidence base is substantial and satisfaction is extremely high

23           among patients, psychiatrists and other professionals."

24

25

26   [2] American Psychiatric Association Resource Document on Telepsychiatry for Adults in
     Jail and Prisons at 4 (https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-
27   5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf), last accessed on
     May 15, 2024.
28   [3] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit, last accessed on
     May 20, 2024.

- "The evidence base [for telepsychiatry] is formidable for children, adolescents and adults regarding assessment (diagnostic, cognitive, other) and treatment (medication, therapy)."

- "The experience [of] other mental health clinicians using telemedicine (i.e., telemental health), is consistent with, and further substantiates the diagnostic, therapeutic and outcome evidence base."

- "Telepsychiatry has a robust evidence base and leads to high patient and provider satisfaction ratings, and outcomes equivalent to in-person care."

- "Telepsychiatry is especially effective with respect to the treatment of PTSD, depression, and ADHD, in team based environments, and with some patient groups may be more effective than in-person care."

- "Care models that have good evidence include direct care, consultation to primary care and collaborative care. [Telepsychiatry] is being studied specifically, now, as a way to leverage psychiatric expertise in stepped and integrated care models, too."

- "There are a few populations in which [telepsychiatry] may be preferable to in-person care (e.g., autism spectrum, severe anxiety disorders, geriatric patients with physical limitations, those with significant geographical obstacles)."

- "Telepsychiatry potentially harmonizes the geographical distribution of psychiatrists and psychiatric patients in both inpatient and outpatient settings."

22.      The American Psychological Association has promulgated guidelines on the use of telepsychology, which is a further indication of the widespread and growing use of the modality. The following statements from the American Psychological Association, which are based on its own extensive literature review, also comport with my team's findings (with references linked on the website)[4]:

- "Teletherapy has been shown to be an efficacious treatment modality for a variety of mental health concerns, including anxiety, depression, PTSD, and adjustment disorder, among others."

---

[4] https://www.apa.org/practice/telehealth-telepsychology, last accessed on May 20, 2024.

- "Teletherapy, including services delivered via telephone or videoconferencing, has been shown to have similar outcomes to traditional, in-person therapy."
- "An overwhelming number of psychologists (96%) said they believed the use of telehealth during the pandemic has proven its worth as a therapeutic tool."
- "Patients generally report high degrees of satisfaction with telehealth visits for their medical care.  Patients also generally report high degrees of satisfaction with their virtual mental health care and report interest in continued access to virtual care postpandemic."

**Roles of Psychiatrists and Primary Clinicians**

23.    CDCR's telepsychiatry program has been successful at providing psychiatric treatment to numerous class members for many years, including prior to 2020 when sweeping changes were made to the policy despite the lack of a supporting evidentiary basis.  The Special Master suggests that inferences cannot be drawn from the successful use of telepsychiatry because the two classifications are too different.  In particular he notes that psychiatrists only discuss medication management with their patients and not highly sensitive and private matters like those handled by primary clinicians.  In addition to unfairly disparaging the important services that psychiatrists provide, that claim is false.  Psychiatrists are frequently required to discuss highly sensitive and private matters with their patients.  The most common side effects of the most common medications are the sexual side effects of anti-depressants, and selecting the right medication and gauging its progress requires deep discussions of symptoms of fear, anxiety, stress, impulse control, past trauma, and problematic interpersonal relationships—all sensitive and private subjects.  In addition, our psychiatrists and telepsychiatrists provide many forms of therapy to our patients.  The Special Master's mischaracterization of our psychiatrists' interactions with their patients wrongly discounts their significant contribution to the provision of care and the importance of their relationship with the patients.

24.    Regardless of any differences between the roles of psychiatrists and primary clinicians, telepsychiatry and telemental health are both proven and widely accepted modalities for providing mental health care, and both unambiguously meet the standard of care.

10

Decl. Mehta ISO Defs.' Object. to Report on Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

**Telemental Health at Higher Levels of Care**

25.     CDCR's telemental health policy already placed appropriate limitations on the use of telemental health at higher levels of care (i.e., mental health crisis beds and inpatient beds): "CDCR seeks to employ psychologists and CSWs who can deliver in-person, on-site treatment and care to patients in all inpatient facilities.  CDCR will not use telemental health in lieu of on-site mental health providers at the inpatient levels of care for any reason other than a lack of availability of on-site mental health providers."  This is a reasonable restriction on the use of telemental health at higher levels of care and makes clear the intention and preference for on-site providers in these settings.  This policy language was intended to add definition to the more ambiguous "emergency situation" language from the revised 2020 Telepsychiatry Policy, and to be more consistent with the uncontested policy language from the Department of State Hospitals.

**Informed Consent**

26.     Informed consent is a term of art.  In the medical field it means: "the process in which a health care provider educates a patient about the risks, benefits, and alternatives of a given procedure or intervention."[5]  Like virtually all healthcare professionals, CDCR's psychologists and social workers are well versed in the meaning of this term and the fact that it requires a discussion of risks and benefits for any form of treatment.

27.     California Code of Regulations, Title 15, which governs the provision of medical care in CDCR's prisons, also defines informed consent: "Informed Consent means a patient who has the capacity to make informed decisions is made aware of risks, benefits, and alternatives to proposed treatment for a disease or condition from which the patient suffers, and the patient is able to agree and clearly agrees to the recommended treatment without duress or coercion."  Cal. Code Regs., tit. 15, § 3999.202.

28.     The Special Master's revisions concerning informed consent go well beyond what was acceptable to the Special Master for the recent telepsychiatry policy.  Informed consent is already well defined for trained clinicians, and all patients have long given informed consent to

_____

[5] National Institutes of Health, National Library of Medicine at https://www.ncbi.nlm.nih.gov/books/NBK430827/, last accessed on May 15, 2024.

19900160.1

1    participate in treatment upon entry to the Mental Health Services Delivery System. The Special

2    Master's extensive revisions add length to the policy without providing any benefit. It also repeats

3    consent requirements in other sections, such as the Restricted Housing Unit section.

4         29.    The Special Master's revisions also contain a recitation of CDCR's policy for

5    Clinical Emergency Management.  CDCR's telemental health policy already incorporates this

6    language in the section titled Clinical Emergency Management, where it is repeated in the Special

7    Master's draft policy.  It is redundant and unnecessary to include this language in the section on

8    informed consent.  Moreover, this is not a modality-specific intervention.  The policy on Clinical

9    Emergency Management applies equally to on-site and remote clinicians, and there is no

10    difference in its application.

11         30.    CDCR's telemental Health policy already includes a process for addressing

12    situations where a patient refuses telemental health treatment, which involves a discussion with

13    the treatment team that knows the patient best to determine the clinical factors at play in the

14    specific case, and ensures that patients for which telemental health services may be

15    contraindicated will receive on-site treatment.  Thus, CDCR's policy already ensures that

16    telemental health will not be a patient's only option if there are medical or mental health reasons

17    for which it is not indicated.  This approach was satisfactory to the Special Master in the recent

18    telepsychiatry policy and there is no reason that it is not sufficient for CDCR's telemental health

19    policy.

20    **Telepresenters**

21         31.    During our meet and confer sessions with Plaintiffs regarding the telemental health

22    policy, Plaintiffs expressed concerns that there may be times that a patient would be more

23    comfortable speaking to a primary clinician without the presence of a telepresenter.  The parties

24    agreed without conflict that telepresenters need not always be in the room.  The parties further

25    agreed that there may be circumstances in which it would be appropriate for the telemental health

26    provider to maintain discretion to request that the telepresenter stay in the room.  Accordingly,

27    CDCR's policy states: "Telepresenters are not required to be in the room with the patient for the

28    entirety of an encounter, though may be requested to stay for part or all of an encounter at the

1    telemental health provider's discretion." Despite this agreement, which is reflected in the parties

2    joint statement regarding telemental health (ECF No. 7935 at 3), the Special Master's revisions to

3    the policy make the telepresenter's presence based solely and completely on the patient's

4    preference. This is problematic and potentially dangerous. There may be clinical circumstances

5    that require the presence of a telepresenter based on the clinician's judgment, such as a patient

6    who is in crisis and in need of observation until other staff arrives to safely relocate them, a

7    patient who is acting bizarrely, or a patient with physical symptoms such as tremors with a

8    significant fall risk. In these types of situations, the clinician must be permitted to exercise their

9    clinical discretion regarding the presence of a telepresenter for patient safety.

10          32.     The Special Master also revised the policy to require that telemental health

11   providers explain to patients at the beginning of every single telemental health appointment that

12   they may request the telepresenter to leave the room, and then document that admonition at every

13   single appointment. This requirement is unnecessary and would be onerous for the clinician,

14   frustrating to most patients, and waste valuable appointment time.

15          33.     The Special Master's report also asserts that the presence of a telepresenter

16   compromises confidentiality. This is not true. Though CDCR has never disagreed that the

17   telepresenter can leave the room, subject to the provider's clinical judgment, it is notable that

18   many doctors in the community have clinical assistants (similar to CDCR's medical

19   assistants/telepresenters), nurses, or scribes in the room during clinical encounters, and this is not

20   a violation of confidentiality or otherwise problematic. Medical assistants and other

21   telepresenters are part of the clinical treatment team, are bound by HIPAA requirements, and

22   must maintain confidentiality as any other member of the clinical treatment team.

23          **Minimum On-Site Staff Requirement**

24          34.     The Special Master's report speculates that telemental health providers' relative

25   disconnection from their patients' uniquely challenging environment of care will impede the

26   clinicians' ability to positively impact the treatment milieu. Speaking from years of personal

27   experience as well as supervising hundreds of clinicians, the impact a clinician has on the

28   treatment milieu is not generally a modality-specific issue. An engaged clinician will frequently

13

Decl. Mehta ISO Defs.' Object. to Report on Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

1   interact with the other staff and positively contribute to the milieu whether they are using

2   telepresence or not.  A clinician with little engagement who does not frequently interact with the

3   other staff will have less impact on the milieu whether they are on-site or not.  Moreover, it is a

4   part of the telemental health provider's job to listen to and consider information about the

5   environment for many hours each day, and they become highly aware and acculturated to the

6   physical environment.  CDCR's telemental health policy already requires providers to visit the

7   prisons to which they are assigned within the first 30 days of assignment and annually thereafter,

8   though this is not a standard practice in the community and is not an evidence-based practice.

9   Additionally, CDCR's telemental health clinicians are able to positively impact the milieu by

10   promoting best practices and bringing fresh perspectives to the institutions, as well as potential

11   experience from other institutions and healthcare organizations.

12      35.    The Special Master assumes—without evidence—that only on-site mental health

13   staff can help "balance" the custody-related and mental health-related needs and enable

14   collaboration between custody and mental health staff.  CDCR's experience with telepsychiatry

15   demonstrates that this is not true.  CDCR's telepsychiatry program demonstrates that remote

16   providers also can develop and maintain comparable professional relationships with custody staff

17   and meaningfully engage with custody staff on important issues related to mental health.

18      36.    Moreover, CDCR's decades of experience with telepsychiatry demonstrates that

19   telemental health providers can appropriately impact the treatment milieu through their

20   relationships and interactions with custody staff, their frequent and required attendance at

21   meetings, huddles, and IDTTs, and their day-to-day involvement in the provision of mental health

22   treatment at their assigned institutions.

23      37.    Delaying the adoption of proven treatment modalities based on unfounded,

24   speculative concerns causes real harm to patients.  It does not protect patients, but rather prevents

25   them from receiving care.  This sort of speculation should not be the basis for imposing

26   unnecessary requirements for on-site staffing minimums, particularly during a time of significant

27   staffing shortages where imposing such restrictions could result in patients not receiving Program

28   Guide required treatment.

19900160.1

38.     The Special Master's proposed minimum on-site requirements—20% for CCCMS and 40% for EOP—were acknowledged as arbitrary during our meet and confer sessions.  There is no clinical basis for these requirements and they are not required by any standard of care.  Moreover, these proposed revisions to CDCR's policy are unworkable because CDCR does not measure or track assignments to levels of care in this way.  Clinicians in all environments commonly cover caseloads for other clinicians wherever that is needed.  The Special Master's minimum requirements would also limit the institutions' flexibility to assign clinicians as necessary based on patient needs.  And although CDCR has long provided staff allocations to the institutions based on court-mandated ratios, the institution has long assigned those clinicians however they wish, with the results measured by compliance with Program Guide requirements.  Consequently, there is no system to determine exactly how many clinicians are working with patients at exactly what specific levels of care as it varies day to day.

39.     The Special Master's proposed revisions to the policy also inserted a reference to "hybrid" clinicians who would work part time on-site and part time off-site, and unnecessarily deleted language that would allow assignments split between half-time allocations at two different institutions.  CDCR's telemental health policy does not encompass hybrid work.  If CDCR decides to implement a policy allowing for hybrid mental health staff, it will do so in a separate policy.  The proposed reference to hybrid staff in the telemental health policy is inappropriate and disconnected from actual practice.  The initial reference to split assignments in CDCR's policy was solely to provide for actual half-time positions to meet requirements in the California civil service system, which was not disputed but has been removed from the policy by the Special Master's revision.

40.     The Special Master's proposed revisions to the policy also include a requirement that at least one of an EOP patient's assigned psychiatrist or assigned primary mental health clinician must attend the IDTT in-person unless the EOP supervising psychologist is in attendance on-site.  There is no clinical basis for this requirement, nor is there a standard of care that requires it.  Furthermore, it does not comport with the Program Guide, which only requires

19900160.1

1    attendance by the assigned primary clinician, assigned psychiatrist, correctional counselor, and

2    patient.  Furthermore, a supervisor would be less familiar with the patient.

3        **Frequency and Duration of On-Site Visits**

4        41.    There is no clinical basis for requiring mental health care providers to visit their

5    patient's living space or the physical environments where they spend a portion of their time.  In

6    the community, the standard of care does not require this, even in situations where the patient's

7    environment would be less familiar to the clinician and potentially more relevant than living in

8    prison (e.g., patients who live in shelters, patients who live in rural versus suburban areas, etc.).

9    Whether an appointment is at a community clinician's office or virtual, the clinician is not

10   required to experience the environment where the patient lives.

11       42.    Regardless, CDCR's telemental health policy already requires that telemental

12   health providers visit their assigned prison within 30 days of assignment and visit on an annual

13   basis thereafter.  Each visit must be for at least one day.  During these visits, the provider will

14   participate in the IDTT, meet with necessary healthcare staff, attend staff meetings, and may see

15   individual patients in-person.  This requirement is more than adequate to assure that telemental

16   health clinicians appreciate the correctional setting where their patients live.

17       43.    Furthermore, CDCR's telemental health staff can gain deeper insight into their

18   patients' lives than community providers because primary clinicians can easily talk to on-site

19   prison staff who see the patients in settings outside of appointments, and can confirm the veracity

20   of reported issues—something most community providers cannot do.  Our patients are also seen

21   much more frequently by medically trained professionals such as nurses in medication lines and

22   physicians or other clinicians in clinics, and the patients have access to health care 24 hours a day,

23   7 days a week, 365 days a year.

24       44.    Under CDCR's policy, telemental health providers are required to fully participate

25   in meetings that on-site providers attend, including staff meetings, training, clinical reviews, and

26   others relevant to the clinical care of their assigned patients.  This ensures that telemental health

27   providers are part of the treatment team and will have an appropriate and equivalent impact on the

28   milieu.

45.     The Special Master's report does not reference a single article in support of his site visit requirements or any other mental health system with a frequency and duration-of-visit standard similar to those he recommends based on any form of evidence.  Nor are his proposed revisions concerning frequency and duration of visits required by the standard of care.  These unnecessarily extreme requirements would hurt CDCR's telemental health recruitment efforts.  CDCR is competing with many other employers who correctly see no benefit to imposing such onerous requirements on their telemental health staff.  The Special Master's proposed revisions would disrupt the personal and family lives of telemental health staff who may be seeking telemental health employment precisely to avoid such disruptions, and would otherwise not work in the prison system at all.  Ultimately, the proposed revisions will make telemental health employment with CDCR less attractive and hinder efforts to fill vacant positions.

**Cell-Front and Other Visits**

46.     CDCR's policies allow for on-site clinicians to conduct cell-front visits with their patients who did not attend their appointment.  CDCR's telemental health policy also permits telemental health providers to conduct cell-front visits with their patients who did not attend their appointments, and counts them towards Program Guide requirements in the same circumstances in which they count for on-site clinicians.  Under the Special Master's revisions, if a patient does not refuse an appointment in-person, telemental health clinicians are required to "go to the patient to encourage the patient to participate in a confidential contact, confirm the refusal, discuss the risks associated with refusing treatment, and discuss the reasons for refusal."  This is an appropriate response.  If the telemental health clinician is unable to do this, the revisions require an on-site clinician to go see the patient and address these issues.  Under the Special Master's proposed revisions, these cell-front visits would be required, but would only count towards Program Guide requirements for the on-site clinicians, though the view from outside the door is the same.

47.     There is no clinical basis for treating cell-front visits differently for on-site clinicians looking through bars or a window and telemental health clinicians looking through bars or a window. The only rationale for the revision provided by the Special Master is that it is

17

19900160.1

1   consistent with the telepsychiatry policy.  In fact, during COVID-19, on-site clinicians who were

2   teleworking were permitted to conduct these cell-front visits and they were counted towards

3   Program Guide requirements.  The revision is arbitrary and internally inconsistent with goals of

4   continuity of care.

5       48.     The Special Master's revisions also prohibit cell-front contacts by telemental

6   health providers in Restrictive Housing Units (RHU).  The Special Master's rationale for this ban

7   is not explained.  There is no clinical evidence to support these revisions, and they would prevent

8   telemental health clinicians from performing vital wellness checks on their patients and observing

9   the condition of their patients and the state of their cells.  Clinicians can build rapport over time

10  with their patients through wellness checks, and as the Special Master's report notes in its

11  recommendations for refusals, clinicians can encourage their patients to come out to a

12  confidential setting for more in depth conversation from the cell-front and educate them about the

13  risks of refusing their appointments.  Regardless of whether it counts towards Program Guide

14  requirements, the Special Master's prohibition would hamper a clinician's ability to perform

15  duties essential to their role, and cause unnecessary disruptions to continuity of care.

16      **Telemental Health for Particular Purposes or in Particular Settings**

17      49.     The Special Master's revisions would prohibit telemental health providers

18  from responding to their own patients for emergent/urgent mental health referrals or

19  incidents involving danger to self/suicidality/self-harm, and from performing suicide risk

20  assessments in these situations, except as a last resort in emergency situations when the

21  institution's assigned on-site personnel are not available.  This proposed restriction is not

22  based on evidence, not consistent with the use of telemental health in other settings, and

23  damaging to the patient-clinician relationship.

24      50.     Emergency rooms and other acute care settings commonly rely on telemental

25  health to conduct crisis evaluations, including suicide risk assessments.  In fact, the best clinician

26  for handling these types of situations is the assigned primary clinician, regardless of whether they

27  work remotely or on-site.  Additionally, the prohibition disregards the clinical utility of

28  therapeutic rapport and familiarity with one's own patients, disrupts continuity of care, and

18

Decl. Mehta ISO Defs.' Object. to Report on Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

1   unduly burdens on-site clinical staff with responsibility for handling patient crises for unfamiliar

2   patients that should be handled by the assigned primary clinician whenever possible.

3       51.     The Special Master's policy would also have the unusual result of forcing a

4   telemental health clinician who is engaged in therapy with a patient to respond to a statement

5   indicating suicidality by ending the session and then calling an on-site clinician who is less

6   familiar with the patient to perform a suicide risk evaluation.  I oppose this unnecessary

7   requirement because it is potentially harmful to the patient and to the therapeutic relationship,

8   disrupts the continuity of care, and there is absolutely no clinical or evidence-based reason

9   supporting it.

10      52.     The Special Master's revisions would also prohibit telemental health

11  clinicians from providing group treatment.  The Special Master cites no evidence or

12  standard of care that supports this revision, and provides no rationale for the ban.  The

13  proposed restriction is unnecessary and unsupported by evidence.  This would forbid

14  CDCR from augmenting an on-site group provider with a telemental health clinician that

15  may be an expert or supervisor in the modality at any time.  If CDCR were to propose a

16  form of tele-group therapy in the future, it could develop an appropriate policy and should

17  not need to then also modify this policy.

18      53.     Virtual group therapy has become a mainstay in community mental health

19  treatment.  There is no clinical evidence to support this prohibition, and it would infringe on

20  telemental health clinicians' ability to perform core duties of their role, which would also

21  unnecessarily place additional burdens on on-site clinical staff.

22      54.     CDCR requires clinicians to conduct five-day follow-up visits with some

23  patients who have transferred to a different level of care for the purpose of monitoring the

24  patients in their new levels of care and documenting significant clinical information.  The

25  Special Master proposed a revision that would prohibit telemental health providers from

26  conducting these visits.

27      55.     Though five-day follow-ups are not required to be done cell-front, the proposed

28  prohibition on telemental health clinicians performing five-day follow-ups seems to be related to

19

1    Special Master's proposed restrictions on telemental health cell-front visits counting towards

2    Program Guide requirements. There is no clinical rationale to support the prohibition, and it is

3    internally inconsistent with other stated goals, such as continuity of care.  It would also prevent a

4    telemental health clinician from performing a five-day follow-up in a confidential office space,

5    while allowing on-site clinicians to continue performing them cell-front.

6          56.    The Special Master's policy also prohibits telemental health providers from

7    performing mental health crisis bed (MHCB) discharges specifically, except in emergency

8    situations.  This oddly specific revision is unnecessarily duplicative of the prior 2 sentences in the

9    policy.  First, CDCR's policy already places limitations on the use of any telemental health in

10   MHCBs, including discharges.  Second, discharge from a MHCB is an IDTT decision, not a

11   unilateral decision on the part of one clinician.  This recommendation is also not based in clinical

12   evidence and goes against community standards, where telemental health is often used in

13   emergency room settings to assess, admit, and discharge patients.

14          **The Special Master's "Figure 1" Chart**

15          57.    The Special Master's "Figure 1" chart seems designed to give the impression that

16   the Special Master has only proposed a few minor changes to CDCR's telemental health policy.

17   This is highly misleading.  In fact, the Special Master's revisions make numerous substantive

18   changes to the policy, many of which are not included in the chart, as can easily be seen in the

19   red-lined draft of the policy attached as Appendix B to the Special Master's report.  Taken

20   together, the numerous substantive revisions completely undermine the policy's intended

21   purpose, which is to improve access to high quality care, improve Program Guide compliance,

22   and improve recruitment and retention.

23          58.    The Special Master's "Figure 1" chart did not include many major and problematic

24   revisions that he proposed which are inconsistent with CDCR's court-approved telepsychiatry

25   policy, including the following:

26      •   Restrictions on telemental health clinicians' ability to respond to clinical emergencies,

27          including urgent/emergent referrals and incidents involving self-harm or suicidality,

28          and to perform suicide risk assessments;

1      • Restrictions on performing 5-day follow-ups;

2      • Restrictions on providing group treatment;

3      • Not allowing cell-front contacts at all in RHU;

4      • Increased frequency and duration of site visits;

5      • Changes to informed consent; and

6      • Changes to the process for handling refusals.

7      **Special Master's Additional Proposed Revisions**

8      59.    The Special Master's revisions to CDCR's telemental health policy were not

9      limited to those he discussed in his report.  He made additional problematic revisions, a number

10     of which I discuss below.

11     60.    The Special Master revised the policy to require that telemental health providers

12     be fully licensed.  We have been clear that we are not currently hiring unlicensed telemental

13     health clinicians because our initial focus is on hiring and deploying experienced telemental

14     health clinicians as quickly as possible.  However, state regulations and community practices

15     allow for unlicensed staff to see patients—both in-person and via telehealth—under the

16     supervision of a licensed clinician, and to receive such supervision remotely. This is even done

17     routinely in training programs.  Moreover, the Program Guide allows the use of unlicensed

18     psychologists and social workers and CDCR currently employees unlicensed psychologists and

19     social workers on-site.  The Special Master's basis for his revisions that would treat telemental

20     health providers differently in this regard is not clear and would arbitrarily limit the scope of

21     practice for certain clinicians, reducing recruitment and retention efforts in the future.

22     61.    In the "Purpose" section of CDCR's telemental health policy, the Special Master

23     removed language describing CDCR's intention for the policy to reflect best practices in

24     correctional settings and to update the policy periodically to maintain consistency with evolving

25     best practices and advancements in care recommendations, and replaced that language with vague

26     references to "relevant *Coleman* court orders" and "federal and state statutes."  His report

27     provides no rationale or discussion regarding these changes. These revisions are misguided and

28     short-sighted.  Technology is constantly advancing, and, as the COVID pandemic demonstrated,

21

1    telehealth practices can evolve rapidly on a large scale.  A program committed to adhering to the

2    highest standards in care must continually update itself in order to keep pace with the latest

3    evidence and technological development.  A policy should describe the practice, not refer to other

4    documents that may change after the policy is written, or a specific court case that will eventually

5    end while CDCR's mental health care continues.

6         62.     Similarly, the Special Master's revisions also added language regarding the

7    Americans with Disabilities Act and the *Armstrong* case.  These revisions are unnecessary

8    because those requirements are spelled out in separate policies which apply to all clinicians in our

9    system and are enforced by another court.  The Special Master's report provided no rationale or

10    discussion regarding these revisions, and other mental health policies do not generally contain

11    this language, which has been noted to be bad practice for policy writing.

12         63.     The Special Master also made unnecessary revisions to the sections of CDCR's

13    telemental health policy that discuss equipment, physical environment, and telepresenters.  His

14    report provided no rationale or discussion regarding these revisions, which are generally

15    redundant with other provisions in CDCR's telemental health policy or redundant with other

16    existing policies.  They also add length but no value to CDCR's telemental health policy.

17         I declare under penalty of perjury under the laws of the United States of America that the

18    foregoing is true and correct.

19         Executed on this 28th day of May, 2024, at San Francisco, California.

20

21                                      ***/s/ Amar Mehta***

                                      _____

22                                             Amar Mehta

23

24

25

26

27

28

19900160.1

# Exhibit A

Date:  August 21, 2023

To:  A. Banerjee, C.E.O. Health Care Services, CSATF/SP at Corcoran

From:  D. Viens (AP0497) A.D.A. Coordinator, Facility 'G', I.A.C.

SUBJECT:  Proposal Implementing Telehealth For CCCMS Pilot Program

PROPOSAL

I offer this on behalf of the Facility 'G' I.A.C. and Population to respectfully request your consideration of implementing the tele-health services for CCCMS care within our facility. The Correctional Clinical Case Management System has essentially disappeared since the early days of Covid-19. We understand the significance of this water-shed moment and its lingering effects of various health care challenges. Particularly for those in a constrained enviroment like a correctional facility in the outskirts of Central valley. We are currently without any CCCMS clinicians working on our facility. Many of our constituent's have not had a meaningful direct patient care session since December of 2020.

We have raised this issue numerous times without an adequate response. Telehealth has emerged as an innovative solution to address the health care challenges we are facing. By offering virtual CCCMS consultations, inmates would have access they need befor it becomes a more serious psychological problem. Streamlining CCCMS care via tele-health will ameliorate the time-consuming and logistical problems of face to face care every 90 days.

Moreover, we understand the requirements mandated by 'Coleman v. Newsom'. We are proposing the Administration and Population collaborate to convince the court receiver/PLO, that screen therapy is better than no therapy. The population has grown accustomed to telehealth/Webex, using it for PCP appointments, surgical consultation, psychiatry, even for court proceedings and parole hearings. It is only sensical to move forward to significantly improve the quality of CCCMS health care.

<u>1</u> of 2

Inmate Advisory Council (IAC)
State of California                                                              Facility "G" CSATF-SP
                                                          Department of Corrections & Rehabilitation

**Date:**     August 21, 2023

**To:**       A. Banerjee, C.E.O. Health Care Services, CSATF/SP at Corcoran

**From:**     D. Viens (AP0497) A.D.A. Coordinator, Facility 'G', I.A.C.

**SUBJECT:**  Proposal Implementing Telehealth For CCCMS Pilot Program


        Thank you for your time and consideration. I appreciate your
dedication to the well-being of all the inmates under your care.
If there is an opportunity, I would be grateful to discuss this
further for the betterment of our community.


                                              APPROVED / DISAPPROVED


_____                    _____
A. Will (F-10395)
I.A.C. Chairman, Facility 'G'               E. Smith, Captain
                                            Facility 'G', CSATF/SP

# Exhibit B

## 2008 APA Survey of Health Service Providers: Insurance

Daniel Michalski, MPA and Jessica Kohout, PhD
APA Center for Workforce Studies

August 2009

**Acknowledgments:**

The *2008 APA Survey of Health Service Providers* is a product of the Center for Workforce Studies, a unit within the Science Directorate of the American Psychological Association. The authors are grateful for the continued support of Dr. Steven Breckler, Executive Director for the Science Directorate, and Dr. Norman Anderson, Chief Executive Officer and Executive Vice President of the APA. We would also like to recognize the cross-directorate collaboration made possible by Dr. Lynn Bufka, Assistant Executive Director for Practice Research and Policy. We also thank Tanya Jacobsen, MAPP for her work developing the paper and online instruments and Victoria Pagano for assistance with data tables. Special thanks to Marlene Wicherski for assistance on all aspects of this study but especially, methodology and sampling.

**Introduction:**

The objective of the *2008 APA Survey of Health Service Providers* was to gain a broad understanding of those psychologists providing health services in the United States. Prior research in this area has focused primarily on APA members, which presents problems for generalizability of the data to nonmember providers. This study attempted to address these limitations by including non-APA member participants. Indeed, this was the first major effort undertaken by the APA Center for Workforce Studies (CWS) to include those outside of the association's membership.

Specifically, this brief report or module focuses on insurance and the ways in which the current health service providers (HSPs) are remunerated for their work. While the vast majority of responses to this particular section of the survey came from APA member psychologists, the data gathered from this effort will be valuable to the association's planning for the entire psychology workforce. As a whole, it is hoped that by researching financial payments to practitioners and sources of professional revenue, valuable glimpses of issues impacting practitioner income and remuneration may become apparent. Furthermore, these data may indicate future trends of access to psychological services. Unlike previous efforts focusing solely on new doctorates or early career psychologists, the data in this report are drawn from the current population of HSPs across all stages of the psychology career.

**Methodology:**

Thirty-four thousand two hundred and eighty-nine members of APA identified as working as and/or trained as "health service providers" and holding a doctoral degree in psychology were included in the sample. In other words, the membership sample included members engaged in professional practice or potentially eligible to do so by merit of training or educational background sufficient for licensure in most jurisdictions.

Additionally, a roster of licensed, doctoral-level psychologists in the United States was purchased by CWS in April 2008, from a vendor able to compile a listing of individuals with state-issued professional licenses in psychology. The vendor culled duplicate entries across states and forwarded this list of 99,350 names and mailing addresses on to CWS. This list was then compared against the member sample of HSPs to remove duplicate records.

For the first wave in September 2008, an email invitation was sent to 23,818 members identified as licensed by one or more state licensing agencies/boards and having a valid email address on file with APA. Three follow-up reminders were sent to non-respondents one week apart.

The second email distribution was sent in October to 10,471 members with unconfirmed licensure status (names not appearing on the purchased list) and valid email addresses on file with APA. Non-respondents from this distribution received three follow-up reminders also spaced one week apart.

Third,10,000 randomly selected licensed psychologists (members and non-members) were mailed a paper version of the survey along with a URL address to access the online version from an internet accessible personal computer. The paper instrument did not include questions pertaining to insurance and methods of client payments. However, 83 of the 5,486 online responses received for this effort were identified as originating from the general survey URL provided to those included in the paper distribution. As such, this small group of respondents consisted of APA members and non-members.

Only fully completed and submitted online surveys were included in analysis; data from partial or saved surveys were excluded. Four modules were randomly assigned to the 5,486 members of the sample. One thousand three hundred and eighteen participants completed this Insurance module. This brief focuses on the results from those chosen to participate in this section of the survey. Measures of central tendency for values less than 10 in demographic categories were suppressed to protect confidentiality.

Given the exploratory nature of this study, only proportions and frequencies were reported; no distinction between members and non-members is implied beyond descriptive convenience.

## Results:

Participants answered several questions regarding their participation with various insurance programs and how they were paid for their services. The vast majority of respondents (94%) identified that they were licensed for professional practice in psychology by one or more state licensure boards/agencies. Those not licensed to practice may have been working in settings or performing activities that did not require a license.

**Table 1** summarizes general demographic characteristics of those responding to questions in the insurance module. Missing values were excluded prior to analysis. The majority of respondents (94%) were licensed for professional practice by at least one state licensing board or agency. The remaining respondents may not be licensed due to a work setting (i.e. consulting) or a position (i.e. faculty or administration) not requiring licensure. Consistent with other CWS studies, more than three fourths (78%) of respondents held a PhD degree while one fifth (20%) indicated that they held a PsyD degree. Just over 2% reported an EdD degree. Women were in the majority (60%) and 4 percent of participants identified as Latino/Hispanic. The other race/ethnicity categories for this module are consistent with the full population of those surveyed in this full effort, as well as the other sub-groups analyzed in the other modules. Less than 5% reported a disability. Among those that chose to respond to the sexual orientation item, 7 percent identified as gay, lesbian, bisexual, or other orientation. On average respondents have been licensed for 17 years (SD=10.48) with 20 the most frequent number of years licensed. The longest duration of licensure was 46 years. The median age for participants responding to this insurance module was 54.

**Table 1**

**Characteristics of Insurance Module Respondents**

| | | | n | % |
|---|---|---|---|---|
| **Licensure Status** | | | | |
| | Yes | | 1,242 | 94.2 |
| | No | | 76 | 5.8 |
| | Total | | 1,318 | 100.0 |
| | | | | |
| **Latino/Hispanic Origin** | | | | |
| | Valid N | 1,242 | | |
| | Latino | | 44 | 3.5 |
| **Race/Ethnicity** | | | | |
| | Valid N | 1,282 | | |
| | Native American | | 7 | 0.5 |
| | Asian | | 27 | 2.1 |
| | Black/African American | | 39 | 3.0 |
| | Hawaiian/Pacific Islander | | 1 | 0.1 |
| | White | | 1,189 | 92.7 |
| | Multiracial | | 12 | 0.9 |
| | Other | | 13 | 1.0 |
| **Gender** | | | | |
| | Male | | 534 | 41.0 |
| | Female | | 769 | 59.0 |
| | Transgender | | 1 | 0.1 |
| | Total | | 1,304 | 100.0 |
| | | | | |
| **Degree** | | | | |
| | PhD | | 1,015 | 77.9 |
| | PsyD | | 258 | 19.8 |
| | EdD | | 30 | 2.3 |
| | Total | | 1,303 | 100.0 |
| | | | | |
| **Sexual Orientation** | | | | |
| | Heterosexual | | 1,157 | 90.7 |
| | Gay | | 20 | 1.6 |
| | Lesbian | | 35 | 2.7 |
| | Bisexual | | 26 | 2.0 |
| | Other | | 9 | 0.7 |
| | Prefer not to answer | | 29 | 2.3 |
| | Total | | 1,276 | 100.0 |
| | | | | |
| **Disabilities** | | | | |
| | Yes | | 58 | 4.5 |
| | No | | 1,237 | 95.5 |
| | Total | | 1,295 | 100.0 |

Notes: N=1,318. Totals sum greater than 100 percent for the Race/Ethnicity category as respondents could select multiple options. Missing values were excluded prior to analysis.

Source: 2008 Psychology Health Service Provider Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 2** shows levels of participation in federal programs where services are provided on a contractual basis. Respondents could select multiple options between Tricare, VA, or other governmental program. More than half of those responding to this item (56%) selected Tricare, while just under half (49%) participated in an "Other" government program under contract. VA participation was least prevalent at only 12%.

**Table 2**
**Level of Participation in Federal Programs on a Contractual Basis**

| Program | n | % |
|---|---|---|
| Tricare | 243 | 56.5 |
| VA | 52 | 12.1 |
| Other government program(s) | 210 | 48.8 |

Notes: N=430. Totals sum greater than 100 percent as respondents could select multiple options. Missing values were excluded prior to analysis.

Source: 2008 Psychology HSP Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 3** reports the extent to which HSPs contracted with behavioral health carve-out plans and frequencies are reported in aggregate and by demographic characteristics. With the exception of EdDs, slight majorities or greater of HSPs reported that they do not participate in carve-out plans across nearly every listed characteristic. The small cohort of EdDs in this study was insufficient as a basis for analysis and presentation of data. Also, EdDs may work in professional settings where contracting with carve-out plans is uncommon. Blacks/African Americans reported the highest percentage of non-participation in carve-out plans (88%) except for Native Americans (100%). Yet, the small population of Native American participants does not allow for inferences to the general population of these psychologists.

5

**Table 3**
**Contracts with Behavioral Health Carve-out Plans by Demographic Characteristics**

|  | Yes | | No | |
|---|---|---|---|---|
|  | n | % | n | % |
| All | 400 | 34.5 | 761 | 65.5 |
| PhD | 293 | 32.8 | 599 | 67.2 |
| PsyD | 86 | 37.6 | 143 | 62.4 |
| EdD | 14 | 53.8 | 12 | 46.2 |
| Male | 168 | 34.9 | 313 | 65.1 |
| Female | 231 | 34.2 | 445 | 65.8 |
| Latino | 8 | 20.0 | 32 | 80.0 |
| Black/African American | 4 | 11.8 | 30 | 88.2 |
| Asian | 6 | 27.3 | 16 | 72.7 |
| Native American | 0 | 0.0 | 5 | 100.0 |
| White/Caucasian | 378 | 35.5 | 687 | 64.5 |
| Gay | 8 | 40.0 | 12 | 60.0 |
| Lesbian | 11 | 36.7 | 19 | 63.3 |
| Bisexual | 5 | 21.7 | 18 | 78.3 |
| Disabilities | 16 | 32.0 | 34 | 68.0 |

Notes: Valid N=1,161. Only valid percents are reported. Missing values were excluded prior to analysis.

Source: 2008 Psychology HSP Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 4** breaks out the proportion of payments that clients that pay directly or for whom HSPs bill insurance companies. In aggregate, respondents informed us that 33% of their payments were paid directly, while the remaining two thirds (67%) of payments were obtained by billing insurance plans.

**Table 4**
**Proportion of Clients by Payment Method**

| Method | Mean % | SD |
|---|---|---|
| Clients that pay directly | 33.1 | 38.35 |
| Clients for whom I bill insurance on their behalf | 66.9 | 38.35 |

Note: Valid N=891. Missing values were excluded prior to analysis.
Source: 2008 Psychology Health Service Provider Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 5** analyzes Medicare participation by demographic characteristics. One hundred and thirty-six respondents reported that they had previously participated in Medicare but do so no longer. EdDs reported the highest proportion of participation in Medicare (82%) with nearly half of PhDs and PsyDs participating (49% and 48% respectively). As previously mentioned the small cohort of EdDs (N=27 for this item), does not allow for meaningful analysis. Nearly half of women (47%) and 52% of men participated. Ethnic minority psychologists reported the lowest proportion of Medicare participation, ranging from 16% for Latinos to 35% for Asians. White/Caucasians held the greatest level of participation at 51% as did those identifying a disability (50%). For those not currently participating in Medicare, the majority had never participated.

**Table 5**
**Medicare Participation by Demographic Characteristics**

|  | Yes | | No, Never participate | | No, No longer participate | |
|---|---|---|---|---|---|---|
|  | n | % | n | % | n | % |
| All | 612 | 49.3 | 493 | 39.7 | 136 | 11.0 |
| PhD | 465 | 48.6 | 380 | 39.7 | 111 | 11.6 |
| PsyD | 117 | 48.1 | 104 | 42.8 | 22 | 9.1 |
| EdD | 22 | 81.5 | 3 | 11.1 | 2 | 7.4 |
| Male | 269 | 52.1 | 177 | 34.3 | 70 | 13.6 |
| Female | 340 | 47.2 | 316 | 43.8 | 65 | 9.0 |
| Latino | 7 | 16.3 | 32 | 74.4 | 4 | 9.3 |
| Black/African American | 7 | 18.4 | 28 | 73.7 | 3 | 7.9 |
| Asian | 8 | 34.8 | 15 | 65.2 | 0 | 0.0 |
| Native American | 2 | 33.3 | 3 | 50.0 | 1 | 16.7 |
| White/Caucasian | 578 | 51.0 | 427 | 37.7 | 129 | 11.4 |
| Gay | 11 | 57.9 | 7 | 36.8 | 1 | 5.3 |
| Lesbian | 16 | 51.6 | 15 | 48.4 | 0 | 0.0 |
| Bisexual | 8 | 30.8 | 15 | 57.7 | 3 | 11.5 |
| Disabilities | 26 | 49.1 | 19 | 35.8 | 8 | 15.1 |

Notes: Valid N=1,241. Only valid percents are reported. Missing values were excluded prior to analysis.

Source: 2008 Psychology HSP Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 5a** highlights the reasons that respondents were not participating in Medicare. Just under one third (31%) stated an "Other" reason for non-participation in Medicare. Many respondents do not participate in Medicare by virtue of their client case-mix (30%). Yet nearly one quarter (23%) chose to not participate or discontinue participation due to reimbursement rates.

**Table 5a**

**Reasons for Not Participating in Medicare**

| Reason | n | % |
|---|---|---|
| Client case-mix is primarily non-Medicare eligible | 187 | 29.7 |
| I stopped participating in all/do not participate in any insurance plans | 120 | 19.1 |
| Reimbursement rates became/are too low | 143 | 22.7 |
| Delays in getting paid | 75 | 11.9 |
| Other | 195 | 31.0 |

Note: Valid N=629. Totals sum greater than 100 as respondents could select multiple options.
Source: 2008 Psychology Health Service Provider Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 5b** explores the other reasons that respondents do not or no longer participate in Medicare beyond the options provided in Table 5a. While more than one quarter (27%) of responses did not fit a discernable category, nearly one fifth (19%) stated that inconvenient or burdensome paperwork and administration as contributing to their non-participation. Work setting also determined Medicare participation, as those working in organized health care settings (such as prisons, VA, and schools) or other work settings not eligible for Medicare (including retirees) accounted for 41%. Also, new doctorates providing services under supervision provided non-licensure as a reason for not participating in Medicare (6%). A small proportion of respondents received funding through grants or offered their services pro bono (5%).

**Table 5b**
**Other Reasons for Not Participating in Medicare**

| Reason | n | % |
|---|---|---|
| Paperwork/Inconvenience/Billing discrepancies/Burdensome | 37 | 19.0 |
| Public or other organized work setting (other than VA/military/corrections) | 34 | 17.4 |
| Work in a VA or military facility; or clients VA eligible | 23 | 11.8 |
| Work setting isn't applicable;retired | 19 | 9.7 |
| Not yet licensed; not licensed | 11 | 5.6 |
| Other funding source (i.e. grants) or pro bono | 9 | 4.6 |
| Removed due to lack of claims | 5 | 2.6 |
| Work in a correctional institution (federal or state) | 4 | 2.1 |
| Miscellaneous | 53 | 27.2 |
| **Total** | **195** | **100.0** |

Note: Valid N=195.
Source:  2008 Psychology Health Service Provider Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 6** analyzes Medicaid participation by demographic characteristics. When compared to the level of participation in Medicare, a smaller proportion of psychologists reported participation in Medicaid, 32% versus 49%. By characteristic, smaller proportions were reported for each category; at or less than 33%.  As was evident in Table 5, for those not participating, the majority never participated.

**Table 6**

**Medicaid Participation by Demographic Characteristics**

| | Yes | | No, Never participated | | No, No longer participate | |
|---|---|---|---|---|---|---|
| | n | % | n | % | n | % |
| All | 389 | 31.5 | 683 | 55.4 | 161 | 13.1 |
| PhD | 293 | 30.8 | 529 | 55.7 | 128 | 13.5 |
| PsyD | 83 | 34.4 | 133 | 55.2 | 25 | 10.4 |
| EdD | 9 | 33.3 | 14 | 51.9 | 4 | 14.8 |
| Male | 175 | 34.2 | 250 | 48.8 | 87 | 17.0 |
| Female | 211 | 29.4 | 432 | 60.3 | 74 | 10.3 |
| Latino | 5 | 12.2 | 34 | 82.9 | 2 | 4.9 |
| Black/African American | 9 | 23.7 | 25 | 65.8 | 4 | 10.5 |
| Asian | 5 | 21.7 | 16 | 69.6 | 2 | 8.7 |
| Native American | 0 | 0.0 | 4 | 66.7 | 2 | 33.3 |
| White/Caucasian | 363 | 32.2 | 613 | 54.3 | 152 | 13.5 |
| Gay | 3 | 15.8 | 14 | 73.7 | 2 | 10.5 |
| Lesbian | 10 | 33.3 | 19 | 63.3 | 1 | 3.3 |
| Bisexual | 3 | 11.5 | 21 | 80.8 | 2 | 7.7 |
| Disabilities | 18 | 34.6 | 27 | 51.9 | 7 | 13.5 |

Notes: Valid N=1,233. Missing values were excluded prior to analysis.
Source:  2008 Psychology HSP Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 6a** highlights the reasons why respondents were not participating in Medicaid. Slightly more than one third of psychologists selected an "Other" reason for not participating. As was discovered in Table 5a for Medicare, respondents felt that issues concerning reimbursement rates contributed to their non-participation, but at a higher proportion (32% compared to 23% for Medicare).

**Table 6a**

**Reasons for Not Participating in Medicaid**

| Reason | n | % |
|---|---|---|
| Client case-mix is primarily non-Medicaid eligible | 200 | 23.7 |
| I stopped participating in all/do not participate in any insurance plans | 154 | 18.2 |
| Reimbursement rates became/are too low | 266 | 31.5 |
| Delays in getting paid | 115 | 13.6 |
| Other | 235 | 27.8 |

Note: Valid N=844. Totals sum greater than 100 as respondents could select multiple options.
Source:  2008 Psychology Health Service Provider Survey, American Psychological Association,
Center for Workforce Studies, August 2009.

**Table 6b** examines more specific "Other" reasons that respondents no longer participated or do not participate in Medicaid. Many of the reasons for not participating in Medicaid are similar to those offered by respondents in Table 5b (Other Reasons for Not Participating in Medicare).   Similarly, paperwork burdens were a primary reason for nearly one fifth of respondents (19%).  Yet, the most common reason was that psychology is not included in some states' Medicaid programs (20%).  Work setting also determined participation in Medicaid, with 37% stating that their current employment (including retirement) doesn't necessitate Medicaid participation. A small proportion of respondents received funding through grants or provided services *pro bono* (3%). As found in Table 5b, 5% of respondents are not yet licensed and as such unable to participate in Medicaid.

**Table 6b**
**Other Reasons for Not Participating in Medicaid**

| Reason | n | % |
|---|---|---|
| Psychology inelligible for participation in state of practice | 46 | 19.6 |
| Paperwork/Inconvenience/Billing discrepancies/Burdensome | 44 | 18.7 |
| Work setting isn't applicable;retired | 38 | 16.2 |
| Work in a VA or military facility; or clients VA eligible | 28 | 11.9 |
| Public or other organized work setting (other than VA/military/corrections) | 21 | 8.9 |
| Not yet licensed; not licensed | 11 | 4.7 |
| Other funding source (i.e. grants) or pro bono | 8 | 3.4 |
| Work in a correctional institution (federal or state) | 3 | 1.3 |
| Miscellaneous | 36 | 15.3 |
| **Total** | **235** | **100.0** |

Note: Valid N=235.
Source:  2008 Psychology Health Service Provider Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Table 7** breaks out the methods by which patient services were covered financially across various private, public, and personal sources. Across all respondents, 43% of revenue from clients came from private insurance payments.  Self-pay by clients accounted for 21% of financial remuneration to psychologists for health care services. At 2%, Tricare accounted for the smallest proportion of revenue.

13

**Table 7**
**Client Coverage**

| Coverage | Mean % | SD |
|---|---|---|
| Private Insurance | 42.9 | 35.76 |
| Medicare | 11.5 | 20.58 |
| Medicaid | 10.1 | 22.56 |
| VA | 4.2 | 19.45 |
| Tricare | 1.8 | 8.48 |
| Other government program | 8.3 | 24.55 |
| Self-pay | 21.2 | 31.50 |
| Total | 100.0 | ** |

Note: Valid N=1,062. Missing values were excluded prior to analysis.
Source: 2008 Psychology Health Service Provider Survey, American Psychological Association, Center for Workforce Studies, August 2009.

**Conclusion:**

The reasons respondents were not participating or discontinued participation in federal programs such as Medicare and Medicaid suggest that the complexities and administrative procedures of these programs encourage many HSPs in independent settings to opt out of participation. Those working in organized settings such as schools, VA facilities, or hospitals do not encounter these issues but may be providing services to focused subgroups of the broader population. Although the majority of respondents reported that their clients pay by private insurance and/or through a government program, a significant number of these psychologists rely on clients able to pay directly. In short, does a client's method of payment or type of insurance determine access to psychological care? As increasing numbers of health service provider psychologists enter the workforce each year, policymakers should be aware of challenges faced by those currently in the workforce and how their participation in public and private insurance programs affects access to mental health services.

**Appendix:** Partial Instrument—Insurance Module

14

**Appendix: Partial Instrument—Insurance Module**

- Through which federal programs do you provide services on a contractual basis? (mark all that apply)

    - Tricare
    - VA
    - Other government program(s) (please specify) [                    ]

- Do you contract with any behavioral health carve-out plans (e.g. Magellan, PacificCare)?

    - No
    - Yes

- What is the proportion of clients

    - That pay you directly
    - for whom you bill insurance on their behalf

- Are you currently a participating Medicare provider?

    - Yes
    - No, I was never a participating provider
    - No, I am no longer a participating provider

- If you previously participated in Medicare but no longer do so, when (month/year) did you leave the Medicare program?

    - Month
    - Year

- Indicate the reason(s) you no longer or do not participate in Medicare. (mark all that apply)

    - Client case-mix is primarily non-Medicare eligible
    - I stopped participating in all/do not participate in any insurance plans
    - Reimbursement rates became/are too low
    - Delays in getting paid
    - Other (please specify)

- Are you currently a participating Medicaid provider?

    o Yes
    o No, I was never a participating provider
    o No, I am no longer a participating provider

- If you previously participated in Medicaid but no longer do so, when (month/year) did you leave the Medicaid program?

    o Month
    o Year

- Indicate the reason(s) you no longer or do not participate in Medicaid. (mark all that apply)

    o Client case-mix is primarily non-Medicaid eligible
    o I stopped participating in all/do not participate in any insurance plans
    o Reimbursement rates became/are too low
    o Delays in getting paid
    o Other (please specify)

- Of your total client caseload, in the last typical week, what proportion of your clients are covered by (categories should add up to 100%):

    o Private insurance

    o Medicare

    o Medicaid

    o VA

    o Tricare

    o Other government program

    o Self-pay



NIH Public Access
Author Manuscript
*J Dual Diagn*. Author manuscript; available in PMC 2013 November 08.

Published in final edited form as:
*J Dual Diagn*. 2012 ; 8(4): 283–293. doi:10.1080/15504263.2012.723317.

**NIH-PA Author Manuscript** (left margin, repeated)

# A Web-Based Behavior Therapy Program Influences the Association Between Cognitive Functioning and Retention and Abstinence in Clients Receiving Methadone Maintenance Treatment

**Michelle C. Acosta, PhD**[*], **Lisa A. Marsch, PhD**[+], **Haiyi Xie, PhD**[+], **Honoria Guarino, PhD**[*], and **Yesenia Aponte-Melendez, MA**[*]

[*]Center for Technology and Health, National Development and Research Institutes, Inc., New York, New York, USA

[+]Center for Technology and Behavioral Health, Dartmouth Psychiatric Research Center, Department of Psychiatry, The Geisel School of Medicine at Dartmouth, Hanover, New Hampshire, USA

## Abstract

**Objective**—Deficits in cognitive functioning have been well-documented in persons with substance use disorders. In addition, some evidence suggests that poorer cognitive functioning predicts poorer engagement in substance abuse treatment and worse treatment outcomes.

**TRIAL DESIGN**—Non-blind, randomized clinical trial with parallel design.

**Methods**—Clients were recruited from a local methadone maintenance clinic within the first 30 days of treatment. All participants completed a comprehensive, computerized neuropsychological assessment (MicroCog) at the time they entered the clinical trial. Participants were randomized to receive 12 months of either standard methadone maintenance treatment, or methadone maintenance treatment with an integrated web-based intervention as part of treatment. The aims of the current study were to (1) characterize the cognitive functioning of clients entering methadone maintenance treatment; (2) evaluate the impact of cognitive functioning on the primary outcomes of treatment retention and opioid abstinence; and (3) determine whether cognitive functioning had a differential impact on these outcomes across treatment conditions. Randomization was non-blind and participants were stratified on past month cocaine use, prior history of methadone, LAAM or buprenorphine treatment, and counselor.

**Results**—Eighty participants were randomized to each condition (total $n$=160). Mean scores on MicroCog scales fell in the average and low average ranges and there were no differences in scores between treatment groups. Lower scores on General Cognitive Proficiency predicted longer study retention ($\chi^2$=5.03, $p < .05$), though this effect was quite small. Generalized linear modeling showed that scores on all MicroCog scales except for Spatial Processing significantly predicted opioid abstinence (defined as percent of total weeks and percent of tested weeks with continuous abstinence), with lower scores predicting smaller percentages of continuous weeks of abstinence.

Corresponding author: Michelle Acosta, PhD, Center for Technology and Health, National Development and Research Institutes, Inc., 71 W. 23rd St., 8th floor, New York, NY 10010, USA. acosta@ndri.org.

DISCLOSURES In addition to her academic affiliation, Dr. Marsch is affiliated with HealthSim, LLC, the health-promotion software development organization that developed the web-based Therapeutic Education System referenced in this manuscript. Dr. Marsch has worked extensively with her institutions to manage any potential conflict of interest.

No other authors have any financial disclosures to make.

This pattern was not evident in regression analyses in which abstinence was defined as number of total weeks of abstinence. An interaction effect was observed, whereby lower cognitive scores predicted lower levels of abstinence for participants in standard methadone maintenance treatment, but not for those who received the web-based intervention as part of methadone maintenance treatment.

**Conclusions**—Technology-based interventions may hold promise for minimizing the impact of poorer cognitive functioning on treatment outcomes.

### Keywords

cognitive; methadone maintenance treatment; technology; web-based intervention

Cognitive functioning may be comprised of multiple domains including executive functioning (impulsivity/cognitive control, abstract thinking, judgement, planning, problem solving, cognitive flexibility), verbal and nonverbal learning and memory, and processing speed (Powell, 1993; Lyvers, 2000). There is a preponderance of evidence documenting cognitive deficits in substance abusing populations (e.g., Erche et al., 2006; Rogers & Robbins 2001; Volkow, Fowler & Wang 2003). Deficits have been documented in a wide range of cognitive domains including executive functioning, memory, impulsivity, decision making, spatial and verbal abilities, and processing speed (e.g., Aharonovich 2003, 2006, 2008; Bates, LeBouvie, & Voebel, 2002; Bates et al., 2004, 2006; Carroll 2011; Ersche et al., 2006). Many of these deficits are thought to be associated with dysfunction in the prefrontal cortex, though there may be subtle, differential impact on particular neural pathways depending upon the drug of abuse (Volkow, Fowler, & Wang, 2003).

For example, the impact of chronic alcohol use on cognitive functioning has been widely studied, and indicates chronic drinkers demonstrate impaired memory and abstract reasoning (e.g., Allen, Goldstein, & Seaton, 1997; Bates & Convit, 1999; Bates, Labouvie, & Voelbel, 2002; Goldstein et al., 2004). Chronic stimulant abuse has been shown to cause impairments in visuo-motor performance, attention, and verbal memory (e.g., Roselli & Ardilla, 1993) with persistence of these deficits documented over time (O-Malley, Adamse, Heaton, & Gawin, 1992), possibly due to changes in the frontostriatal circuitry (Volkow et al., 1993). Opioid users have been much less studied than alcohol or stimulant users, though there is evidence that chronic opioid use may contribute to problems with decision making (Madden, Petry, Badger & Bickel, 1997). In studies of chronic drug users, amphetamine users demonstrated more difficulties with attention and spatial planning, whereas opioid users demonstrated more difficulties applying a learned strategy to new learning and with spatial memory (Ersche et al., 2006; Ornstein et al., 2000). It is still not known whether these cognitive deficits are caused by chronic drug use or are indicative of a pre-existing vulnerability that contributes to drug taking.

Complicating the picture, there is evidence that opioid pharmacological treatments, such as methadone maintenance, may serve to impair cognitive ability (Darke et al., 2000; Foreman et al., 2004; Mintzer & Stitzer 2002; Mintzer, Copersino, & Stitzer 2005; Zacny 1995). Methadone treatment has been shown to be safe and effective, especially when provided via long-term methadone maintenance treatment (Ball & Ross, 1991; Marsch, 1998; Strain et al., 1993). Unfortunately, cognitive impairments in attention, working memory, cognitive flexibility, problem solving and abstract reasoning have been demonstrated in persons maintained on methadone, compared to non-opioid using controls and abstinent opioid abusers (Darke, Sims, McDonald & Wickes, 2000; Mintzer & Stitzer, 2002; Pirastu et al., 2006; Rapeli et al., 2007; Verdejo et al., 2005). However, most of this prior work did not examine the length of time participants had been taking methadone. Newer research indicates that persons maintained on methadone for at least six months showed improved

visuospatial functioning compared to those in their first 30 days of treatment (Soyka, Zingg, Koller, & Hennig-Fast, 2010), indicating that there may be some attenuation of possible methadone effects on cognitive functioning over time.

Non-pharmacological (i.e., behavioral) treatments have been shown to have strong efficacy in treating a variety of substance use disorders, particularly cognitive-behavioral approaches (Carroll, 1998; Dutra et al., 2008). In addition, numerous clinical trials have demonstrated that clients in methadone maintenance treatment who are provided with evidence-based psychosocial interventions are significantly more likely to remain in treatment and to experience markedly greater reductions in drug use than those receiving standard drug counseling in methadone maintenance treatment (e.g., Condelli & Dunteman, 1993; McLellan et al., 1993; O'Brien et al., 1995). For example, the Community Reinforcement Approach, a cognitive-behavioral therapy intervention, has been shown to decrease opioid and other drug use and improve psychosocial functioning (please see Abbott, 2009 for review). While cognitive-based treatments have shown good efficacy in the treatment of substance use disorders, some argue that cognitive deficits may interfere with problem solving, learning and applying new information/skills, and planning behavioral alternatives to substance use (Lyvers, 2000). This may make it difficult for treatment seekers to engage in or benefit from treatments that focus heavily on skills-building, coping, or other cognitive tasks.

The relationship between cognitive functioning and substance abuse treatment outcomes is complex. Lower levels of cognitive functioning appear to predict poorer treatment retention, but evidence of a direct relationship with substance abuse treatment outcomes is mixed (Aharonovich et al., 2003, 2006, 2008; Bates et al., 2006; Carroll et al. 2011; Passetti et al., 2008). One study found that impaired decision-making predicted lower levels of abstinence in a sample of opioid dependent persons receiving opioid substitution and behavioral therapy (Passetti et al., 2008). Other studies have shown that while cognitive functioning predicts treatment retention, it is indirectly associated with outcomes such as abstinence (Aharonovich et al., 2008; Bates et al., 2006). The impact of cognitive functioning is clinically meaningful, as retention in substance abuse treatment predicts improved outcomes (Grella et al., 1999; Smith & McCrady, 1991). Two studies of chronic alcohol users found that cognitive functioning predicted a variety of other factors (e.g., self-efficacy, treatment affiliation), which in turn were associated with abstinence, suggesting that mechanisms of change may differ in those with cognitive impairment (Bates et al. 2006; Morgenstern & Bates, 1999). For example, both studies showed a strong link between self-efficacy and abstinence in people without cognitive impairment, but a weak or non-significant impact in those with cognitive impairments.

Cognitive impairments may influence outcomes for certain types of substance abuse treatment, but not others. For example, patients with alcohol dependence who had lower levels of verbal learning, had poorer drinking outcomes in relapse prevention therapy but not supportive therapy. Conversely, higher levels of verbal learning were associated with better outcomes for relapse prevention therapy but not for supportive therapy (Jaffe et al., 1996). In addition, in a sample of patients with alcohol dependence, cognitive impairments led to poorer outcomes in cognitive-behavioral therapy, but not supportive therapy (Cooney, Kadden, Litt, & Getter, 1991). It may be that treatments that require more cognitive processing present specific challenges to those with cognitive impairments.

Some researchers are now starting to examine the impact of substance abuse treatment on cognitive deficits (Bates et al., 2004; Bates et al., 2005) and to explore treatments to improve cognitive functioning in substance abusing populations (e.g., Turner et al., 2009). One study examined a cognitive remediation approach consisting of exercises focused on increasing

memory and attention through repetition. Patients in residential substance abuse treatment were examined and it was found that patients who received this intervention had significantly better retention and treatment outcomes than those who did not (Grohman & Fals-Stewart, 2003).

Technology-based interventions may present a unique opportunity to intervene with patients who present with a range of cognitive functioning, as they may be able to present material in multiple formats, tailor content and presentation to an individual's needs, demonstrate and reinforce new skills at the individual's own pace, etc. However, very little research exists on how technology-based interventions may impact treatment retention and outcomes in populations where cognitive functioning is associated with outcomes. A preliminary study examined the impact of cognitive functioning on retention and outcome for patients randomized to either standard counseling for alcohol or drug dependence or standard counseling plus a 6-session computer-delivered intervention based on cognitive-behavioral therapy (Carroll, et al. 2011). Results indicated that lower levels of overall cognitive functioning, executive functioning, visual memory and processing speed were not associated with retention or outcomes in either 8-week condition. Inattention (measured by the Continuous Performance Task II; Conners, 2004) and impulsivity (measured by the Balloon Analogue Risk Task; Lejuez et al., 2002) were negatively associated with treatment retention, homework completion and treatment outcomes in the patients receiving the computer-delivered treatment, but not with those receiving standard counseling. The authors suggest that substance users who are more impulsive may be less likely to learn or implement new skills or less likely to actively engage in treatment (e.g., completing homework assignments).

The aims of the current study are to comprehensively characterize multiple dimensions of cognitive functioning in methadone maintenance clients enrolled in a study designed to evaluate a web-based intervention; examine the impact of baseline cognitive functioning on retention and treatment outcome (i.e., abstinence from opioids) in the intervention study; and determine whether cognitive functioning had a differential impact on these outcomes across treatment conditions. We predict that: (1) participants will fall in the low average to average ranges of cognitive functioning, similar to drug abusing populations in other studies; and (2) participants with lower cognitive functioning at baseline will have poorer retention and lower levels of abstinence during the intervention study. We also will explore whether an interactive web-based intervention, which allows clients to control the pace of skills training and aims to train clients to become fluent in key skills and information despite their baseline knowledge / skills levels, may influence treatment outcomes among clients with varying levels of cognitive functioning.

## METHODS

### Participants

Participants were new adult clients ($n$=160; age > 18 years) within the first 30 days of initiating methadone maintenance treatment. All clients entering methadone maintenance treatment met DSM-IV criteria for opioid dependence and the criteria in the Federal Register outlining regulations regarding the use of opioid drugs in the treatment of opiate addiction.

### Project Setting

The study was conducted in a large methadone maintenance treatment center (census of approximately 500) in an urban area of the northeastern US. As per the policy at the methadone maintenance treatment program, participants' methadone doses generally were stabilized within the first two weeks of treatment, and they were provided with stable

Acosta et al.                                                                                                     Page 5

therapeutic maintenance doses of methadone thereafter (average of 80-120 mg daily), depending on treatment response.

## Study Procedures

Clients were informed of the opportunity to participate in a research study at the time they entered methadone maintenance treatment. Interested clients were then able to speak with a research associate who had a complete discussion of the study, and subsequently conducted screening and written informed consent procedures with eligible and interested patients. The study was conducted in accordance with the Declaration of Helsinki and the National Development and Research Institutes, Inc. Institutional Review Board approved and monitored the study.

**Random Assignment**—Immediately following the baseline assessment, participants were randomly assigned to one of the two study conditions in an intent-to-treat design: (1) standard treatment or (2) reduced standard treatment plus a web-based behavior therapy program called the Therapeutic Education System. Participants were stratified on past month cocaine use and prior history of methadone, LAAM or buprenorphine treatment using permuted block randomization. Randomization was non-blind.

**Treatment Conditions**—Each study condition lasted for a period of 12 months. Participants who were randomly assigned to the standard treatment condition received the standard drug counseling offered at the methadone maintenance treatment program; participants had counseling once weekly for the first four weeks, then twice per month for an anticipated total of 26 hours over the 12 month study. Unfortunately, we were unable to collect specific data on what comprised standard counseling sessions at the clinic, as counselors were reluctant to participate if that information was collected. However, the program mandate, similar to many other methadone maintenance programs, focuses largely on compliance with program rules.

Participants who were randomly assigned to the reduced standard treatment condition plus the web-based intervention received the same standard drug counseling as those in the first condition, except that half of each scheduled counseling session was held with the therapist and the other half was replaced with the web-based intervention. In order to parallel the standard counseling schedule, participants were asked to complete one web-based intervention session per week during their first four weeks, then twice per month after that.

**Web-based intervention**—The content of the web-based intervention was based on the Community Reinforcement Approach (Budney & Higgins, 1998; Higgins et al., 1991). The Community Reinforcement Approach is a flexible, skills-based approach in which people are taught to identify patterns of drug or alcohol use, and to use specific strategies to avoid or cope with triggers for substance use. It also encompasses skills training areas such as problem solving, communication, relaxation or other skills that may be helpful in achieving and maintaining abstinence (Budney & Higgins, 1998; Higgins et al., 1991). The web-based intervention is comprised of 65 sections that address drug use and related issues (e.g., identifying and managing triggers for use, information about HIV and Hepatitis C), as well as more general skills such as financial management, communication skills, management of negative moods and depression, time management, etc. All text presented in the program is accompanied by audio to accommodate individuals with reading difficulties. The web-based intervention (Therapeutic Education System) employs a fluency-based Computer Assisted Instruction (e.g., Binder, 1993) approach, which requires the learner to develop a pre-determined level of accuracy and speed in responding during an active learning process (© copyright 1997, HealthSim, Inc.). It also includes interactive, video-based simulations

(Issenberg et al., 2001) and a number of interactive exercises to enhance learning and personalize content for participants. The Therapeutic Education System has been used in a variety of drug abusing populations and has been shown to be effective in increasing retention and abstinence in these populations and to increase HIV prevention knowledge and intentions to reduce HIV risk behavior (Bickel et al., 2008; Marsch et al., 2011).

In the current study, participants accessed the Therapeutic Education System intervention using one of 4 computers set up in a room designated for this activity at the methadone maintenance treatment program. Participants used a unique password to log into the program and were provided with headphones to wear while using the intervention.

**Urine Drug Testing—**Participants provided weekly urine samples to research staff, approximately 25% of which were randomly observed by a research associate or clinic staff member of the same sex. Each sample was tested for the presence of: THC, cocaine, barbituates, benzodiazepines, methamphetamine, opiates, methadone, propoxyphene, and oxycontin using point-of-care qualitative urine test cups (Drug Check Drug Test Cup, Drug Test Systems, Dover, NH).

**MicroCog Assessment of Cognitive Functioning (Powell, 1993)—**As part of a larger baseline assessment, participants were administered the Short Form of the MicroCog Assessment of Cognitive Functioning. MicroCog was standardized in a US adults population sample ($n$=810, 50% male) stratified by age, gender, race/ethnicity, geographic region, and education. The test has demonstrated sound reliability, stability, and discriminant (i.e., can differentiate dementia versus depression) and convergent validity on a variety of assessments (Powell et al., 1993). This computerized battery is self-administered and normative scores are provided at three levels. Level 1 Index scores assess functioning in the domains of attention/mental control, memory (verbal and visual), spatial processing, abstract reasoning, and reaction time/processing speed (as measured by subscales contained within each domain). The Attention/Mental Control Index assesses attention span, vigilance, concentration, perseverance, and resistance to interference (Powell, 1993). The Memory Index assesses both short-term (immediate) and longer-term (delayed) memory abilities. The Reasoning/Calculation Index captures the ability to reason and perform abstract thinking tasks. Spatial Processing refers to visuospatial information processing and assesses a combination of visuospatial perception, visual recognition, and visual memory. Reaction Time measures the amount of time between the presentation of a stimulus and a designated response (e.g., key press; Powell, 1993).

Level 2 scores represent overall Information Processing Speed and Information Processing Accuracy. Information Processing Speed reflects average response time across MicroCog subscales, regardless of the correctness of the response. Processing speed has been shown to be sensitive to cognitive impairment, including brain injury. Information Processing Accuracy reflects average correct responses across MicroCog subscales, regardless of the speed of response. Finally, Level 3 scores (General Cognitive Functioning and General Cognitive Proficiency) are broadest and represent more global cognitive functioning. In the General Cognitive Functioning score, response accuracy and speed are weighed equally, while in the General Cognitive Proficiency score, accuracy is weighed more heavily than speed. The population mean for Index scores is 100 with a standard deviation of 15. For individual subtests, the mean score is 10 with a standard deviation of 1.5 (Powell, 1993).

**Compensation—**Participants received $50 for completing a baseline assessment consisting of several self-report measures and clinical interviews, and $10 for each urine sample provided.

NIH-PA Author Manuscript    NIH-PA Author Manuscript    NIH-PA Author Manuscript

## Data Analyses

Descriptive statistics were run to characterize the sample. A survival analysis using Cox's proportional hazards model was conducted to examine the impact of MicroCog scores on weeks retained in the intervention study (out of a possible 52 week window). Retention was calculated as the number of days each participant actively participated in the study (date of last contact subtracted from baseline). Opioid abstinence was based on urine analysis results for opiates, propoxyphene, and oxycodone. A missed test prior to study dropout was treated as positive for opioid use when summarizing abstinence. Opioid abstinence was calculated in three ways: percentage of total study weeks with continuous opioid abstinence, percentage of tested study weeks with continuous opioid abstinence, and total number of weeks of opioid abstinence. We chose to examine opioid abstinence in this manner as these are commonly used outcomes in substance abuse treatment research and may allow our findings to be more easily compared to other studies. Additionally, these varying ways of defining abstinence allow us to examine overall as well as continuous/maintenance patterns of abstinence. Ordinary least squares regressions were used to estimate the effect of MicroCog index scores on number of weeks of opioid abstinence (main effect model), and possible differential effects of MicroCog index scores across intervention groups (Micro-Cog index by intervention interaction model). Generalized linear modeling with binomial distribution was used to assess the effect of MicroCog index scores on percentage of total study weeks and percentage of tested study weeks with continuous opioid abstinence, and their possible differential effects across intervention groups.

# RESULTS

## Participants

Participants ($n$=160) ranged in age from 20 to 64 ($M$=40.66, $SD$=9.83) and most participants were male (75.0%). Participants reported their race to be White (44.3%), Black or African American (31.7%), or Other (24.1%), and 27.39% endorsed Hispanic ethnicity. Participants had an average of 12.2 years of education ($SD$=2.4), and there were no significant differences in years of education between treatment groups. The vast majority of participants reported that their primary opioid was heroin (96.3%). Approximately a third (33.8%) reported having Hepatitis C and 10.0% reported being positive for HIV.

## Overall Cognitive Functioning

MicroCog Index scores fell in the average and low average ranges for our sample (See Table 1). No differences on any of the baseline MicroCog domains were observed between the standard group and the group who received reduced standard treatment group plus the web-based intervention.

## Impact of Cognitive Functioning on Retention

Results from the survival analysis indicated that only General Cognitive Proficiency was a significant predictor of weeks retained in the intervention study; those with higher General Cognitive Proficiency were retained in the study for a briefer time than those with lower General Cognitive Proficiency scores ($\chi^2$=5.03, $p < .05$), though the magnitude of this effect was quite small (having higher General Cognitive Proficiency scores increased the chance of drop out by approximately 2%; Hazard ratio=1.016). There was no differential impact of any MicroCog Index on retention in the standard versus web-based treatment groups (all $p$s > .05).

NIH-PA Author Manuscript     NIH-PA Author Manuscript     NIH-PA Author Manuscript

**Impact of Cognitive Functioning on Opioid Abstinence**

**Percentage of total weeks with continuous opioid abstinence**—Regarding abstinence, all of the MicroCog indices were significant predictors of opioid abstinence expect for Spatial Processing (see Table 2). Higher cognitive scores predicted larger percentages of study weeks with continuous abstinence. In addition, the MicroCog Indices of Attention/Mental Control, Memory, Information Processing Accuracy and General Cognitive Functioning had significant differential effects (i.e., interaction effects) across treatment groups (see Table 3). Specifically, these MicroCog Indices were positively associated with abstinence for participants in standard treatment, but there was no relationship between these cognitive scores and abstinence for participants who received the Therapeutic Education System. Higher scores on Attention/Mental Control, Memory, Information Processing Accuracy and General Cognitive Functioning predicted larger percentages of study weeks with continuous abstinence, but only for participants in standard treatment.

**Percent of tested weeks with continuous abstinence**—When abstinence was examined as percentage of tested weeks with continuous opioid abstinence, all MicroCog Indices again were significant predictors of abstinence except for Spatial Processing, which was marginally significant (see Table 2). Higher cognitive scores predicted higher percentages of tested weeks with continuous abstinence. Regarding differential effects across treatment groups, the MicroCog Indices of Attention/Mental Control, Memory, Information Processing Accuracy and General Cognitive Functioning had significant differential effects across treatment groups (see Table 3). Specifically, these MicroCog Indices were positively associated with abstinence for participants in standard treatment, but there was no relationship between these cognitive scores and abstinence for participants who received the Therapeutic Education System. Higher scores on Attention/Mental Control, Memory, Information Processing Accuracy and General Cognitive Functioning predicted higher percentages of study weeks with continuous abstinence, but only for participants in standard treatment.

**Total number of weeks abstinent**—Unlike findings for percent of total and tested weeks with continuous abstinence, none of the MicroCog Index scores were significant predictors of total number of weeks of opioid abstinence. In addition, there was no impact of study group (standard versus Therapeutic Education System) on the relationship between MicroCog scores and number of weeks of opioid abstinence.

## DISCUSSION

The current study examined cognitive functioning and the impact of cognitive functioning on retention and treatment outcomes in a sample of 160 clients with opioid dependence entering methadone maintenance treatment. Mean levels of cognitive functioning fell in the average and low average ranges for our sample, which is consistent with other studies of substance abusing populations (e.g., Carroll et al., 2011; Aharanovich et al., 2006). Regarding the impact of cognitive functioning on retention and outcomes, our findings were mixed. In the current study, lower general cognitive functioning predicted longer study retention, which is in contrast to other research in similar populations (Aharonovich et al., 2003, 2006, 2008; Carroll et al., 2011). It is possible that the difference in treatment length in the current study compared with other studies that have examined this relationship may account in part for this discrepancy in the impact of cognitive functioning on retention. Specifically, the current study examined retention over a 52-week intervention period, whereas prior studies have examined retention over intervention periods of 8-12 weeks. Perhaps cognitive functioning has a differential impact on retention early in the treatment

Acosta et al.                                                                                                    Page 9

process versus later in the treatment process. For the current sample of clients in methadone maintenance treatment, the use of a longer intervention period may be more generalizable, as the mean length of methadone maintenance treatment ranges between 1.5 - 4.5 years (e.g., D'Aunno & Vaughn, 1992; Keen et al., 2000; Magura, Nwakeze, & Demsky, 1998). It is important to note that the impact of cognitive functioning on retention in our study was quite small, suggesting that we use caution when extrapolating from this finding.

Regarding the impact of cognitive functioning on opioid abstinence, we found that multiple domains of cognitive functioning significantly predicted abstinence. Significant cognitive predictors included executive functioning (i.e., attention/mental control), memory, reasoning, reaction time, information processing speed, information processing accuracy, and general cognitive functioning. The only cognitive domain that did not emerge as a predictor for abstinence was spatial processing. These findings contribute to the overall body of literature indicating that lower levels of cognitive functioning negatively impact substance abuse treatment outcomes (Cooney, Kadden, Litt, & Getter, 1991; Jaffe et al., 1996). Interestingly, the findings from the current study are the reverse of what has been observed in similar populations. Specifically, the current study demonstrated that lower levels of cognitive functioning did not lead to poorer retention, but did predict poorer treatment outcomes. Prior research in drug abusing populations has generally found that lower levels of cognitive functioning led to poorer treatment engagement/retention, though evidence for a direct impact on outcome is mixed (Aharonovich, Nunes, & Hasin, 2003; Aharonovich et al., 2006, 2008; Bates et al., 2006; Carroll et al., 2011; Passeti et al., 2008). Again, it is possible that the longer treatment period of our study compared to other studies (52 weeks versus 8-12 weeks) allowed the impact of cognitive functioning to emerge or strengthen over time.

Of particular importance, an interaction effect was seen in the current study, whereby lower cognitive scores predicted lower levels of abstinence for participants in standard methadone maintenance treatment, but not for those who received the web-based intervention as part of methadone maintenance treatment. This finding may indicate that technology-based interventions may be useful in minimizing the impact of poor cognitive functioning on treatment outcomes in populations with documented cognitive deficits. This finding is in contrast to prior reports in which lower cognitive functioning negatively impacted treatment outcomes for participants receiving cognitively-based interventions, and compared to more supportive or less cognitively-based approaches (Carroll et al., 2011; Cooney, Kadden, Litt, & Getter, 1991; Jaffe et al., 1996). Surprisingly, the current web-based intervention (i.e., Therapeutic Education System) also is based on a cognitive, skills-based approach. However, participants with lower levels of cognitive functioning who received the web-based intervention did not have worse outcomes than those involved in only standard care. In fact, participants with lower levels of cognitive functioning who received only standard methadone maintenance treatment had poorer treatment outcomes, suggesting a protective effect of the web-based intervention for those with lower levels of cognitive functioning. Perhaps the use of the web-based intervention served to "level the playing field" for these participants. It is possible that the self-paced nature of the intervention allowed participants to incorporate information at their own pace. Or perhaps the fluency learning approach of the web-based intervention (which required individuals to over-learn information presented in the intervention) is a good fit for a population with cognitive impairments. It also is possible that the amount of repeated exposure to the intervention may have allowed persons with lower levels of cognitive functioning to benefit. While it seems likely that exposure to our web-based intervention was able to attenuate the impact of cognitive functioning on treatment outcomes, additional research is needed to identify the potential mechanisms of action.

There are several limitations that should be noted. First, the current study examined a treatment length of 52 weeks, in contrast to the 8-12 weeks reported in most other published literature, which makes comparisons difficult. Therefore, our conclusions should be interpreted with caution. Second, because the only treatment outcome examined in the current study was opioid abstinence, it is difficult to know what the impact of cognitive functioning may have been on a broader array of substance-related, psychosocial, and psychiatric outcomes. Third, the use of a single, computer-administered cognitive assessment may limit the generalizability of our findings. We did not explore other cognitive domains, such as decision making, which have been shown to impact treatment retention and outcomes in substance-abusing populations. Fourth, the impact of withdrawal from illicit opioids and initiation of methadone treatment was not controlled for in the current trial. This may be problematic, as both withdrawal and initiation of methadone treatment may negatively impact cognitive functioning (Darke et al., 2000; Foreman et al., 2004; Mintzer & Stitzer 2002; Mintzer, Copersino, & Stitzer 2005; Zacny 1995). Participants were administered MicroCog early in their treatment episode before they may have been fully stabilized on methadone. One possibility is that cognitive functioning may have improved for participants after they were maintained on methadone for six months, as suggested by emerging research (i.e., Soyka, Zingg, Koller, & Hennig-Fast, 2010), which may have influenced retention and outcomes in the second half of our treatment window. However, preliminary findings from our parent trial do not support evidence of a delayed onset of effects. Finally, we were did not examine or control for psychiatric diagnoses that may have influenced cognitive functioning, such as schizophrenia and depression. Current evidence suggests a complex relationship between substance use and cognitive ability on functioning in persons with dual diagnoses (Potvin, Stavro, & Pelletier, 2012), indicating a need for more careful scrutiny of this issue.

Additional research is needed to clarify what appears to be a complex relationship between cognitive functioning and treatment retention and outcomes in substance-abusing populations; a replication study is needed in order to more fully understand these effects. However, the current study provides promising support that a web-based intervention that is cognitively/skills-based may be beneficial for individuals with varying levels of cognitive proficiency. Thus, it may be beneficial for web-based interventions to be made widely available for substance abusing and other populations.

## Acknowledgments

The research study reported in this manuscript was supported by National Institute on Drug Abuse (NIH) R01 DA021818 (PI: L. Marsch). The preparation of this manuscript was partially supported by National Institute on Drug Abuse (NIH) P30DA029926 (PI: L. Marsch). Portions of this paper were presented at the Annual Meeting for the College on Problems of Drug Dependence in Palm Springs, CA in June 2012.

## Appendix

## APPENDIX:

Description of Subscales Administered in MicroCog Short Form Assessment

## Numbers Forward

The participant is shown a sequence of single digits on the computer screen. The participant must enter the digits in correct order using the computer number pad. The number of digits to be recalled varies from 2 to 9.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

**Wordlist 1**

The participant is presented with a list of 16 words, containing five groups of category-related items, which is presented four times. Participants are asked to respond to words that are members of one of four categories and not to respond to words in the fifth category.

**Wordlist 2**

A list of 36 words (including the 16 from Wordlist 1) is presented and participants must identify which words were previously presented.

**Math**

Participants are presented with eight mathematical problems including addition, subtraction, multiplication, and division and are asked to type their answer using the keyboard.

**Story**

The participant is shown a brief story on the screen. After reading the story, the participant is asked 6 multiple choice questions about the story.

**Address**

The participant is presented with a name and address and asked to memorize this information for later recall.

**Clocks**

The participant is presented with a series of seven analog clocks and asked to choose which of five digital clocks is the correct match.

**Analogies**

The participant is shown 11 pairs of verbal analogies and asked to select the best answer from a multiple choice list for each pair.

**Timers**

The participant is asked to press the Enter key as quickly as possible in response to five auditory, five visual, and five combined auditory/visual signals.

## REFERENCES

Abbott PJ. A review of the community reinforcement approach in the treatment of opioid dependence. Journal of Psychoactive Drugs. 2009; 41(4):379–385. [PubMed: 20235445]

Aharonovich E, Nunes E, Hasin D. Cognitive impairment, retention and abstinence among cocaine abusers in cognitive-behavioral treatment. Drug and Alcohol Dependence. 2003; 71(2):207–211. doi:10.1016/S0376-8716(03)00092-9. [PubMed: 12927659]

Aharonovich E, Hasin DS, Brooks AC, Liu X, Bisaga A, Nunes EV. Cognitive deficits predict low treatment retention in cocaine dependent patients. Drug and Alcohol Dependence. 2006; 81(3):313–322. doi:10.1016/j.drugalcdep.2005.08.003. [PubMed: 16171953]

Aharonovich E, Amrhein PC, Bisaga A, Nunes EV, Hasin DS. Cognition, commitment language, and behavioral change among cocaine-dependent patients. Psychology of Addictive Behaviors. 2008; 22(4):557–562. doi:10.1037/a0012971. [PubMed: 19071981]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Allen DN, Goldstein G, Seaton BE. Cognitive rehabilitation of chronic alcohol abusers. Neuropsychology Review. 1997; 7:21–39. doi:10.1007/BF02876971. [PubMed: 9243529]

Ball, JC.; Ross, A. The effectiveness of methadone maintenance treatment: Patients, programs, services and outcomes. Springer-Verlag; New York, NY: 1991.

Bates, M.; Convit, A. Neuropsychology and neuroimaging of alcohol and illicit drug abuse. In: Calev, A., editor. The assessment of neuropsychological functions in psychiatric disorders. American Psychiatric Press; Washington, DC: 1999. p. 373-445.

Bates ME, Labouvie EW, Voelbel G. Individual differences in latent neuropsychological abilities at addictions treatment entry. Psychology of Addictive Behaviors. 2002; 16:35–46. doi: 10.1037/0893-164X.16.1.35. [PubMed: 11934085]

Bates ME, Barry D, Labouvie EW, Buckman JF, Fals-Stewart W, Voelbel G. Risk factors and neuropsychological recovery in alcohol use disordered clients exposed to different treatments. Journal of Consulting and Clinical Psychology. 2004; 72:1073–1080. doi:10.1037/0022-006X. 72.6.1073. [PubMed: 15612853]

Bates ME, Voelbel GT, Buckman JF, Labouvie EW, Barry D. Short term neuropsychological recovery clients with substance use disorders. Alcoholism: Clinical and Experimental Research. 2005; 29:367–377. doi: 10.1097/01.ALC.0000156131.88125.2A.

Bates ME, Pawlak AP, Tonigan JS, Buckman JF. Cognitive impairment influences drinking outcome by altering therapeutic mechanisms of change. Psychology of Addictive Behaviors. 2006; 20:241–253. doi:10.1037/0893-164X.20.3.241. [PubMed: 16938062]

Bickel WK, Marsch LA, Buchhalter A, Badger G. Computerized behavior therapy for opioid dependent outpatients: A randomized, controlled trial. Experimental and Clinical Psychopharmacology. 2008; 16:132–143. doi:10.1037/1064-1297.16.2.132. [PubMed: 18489017]

Binder C. Behavioral fluency: A new paradigm. Educational Technology. Oct.1993 8:14.

Budney, AJ.; Higgins, ST. Therapy manuals for drug addiction, a community reinforcement plus vouchers approach: Treating cocaine addiction. National Institute on Drug Abuse; Rockville, MD: 1998.

Carroll KM, Kiluk BD, Nich C, Babuscio TA, Brewer JA, Potenza MN, Lejuez CW. Cognitive function and treatment response in a randomized clinical trial of computer-based training for cognitive behavioral therapy (CBT4CBT). Substance Use and Misuse. 2011; 46:23–34. doi: 10.3109/10826084.2011.521069. [PubMed: 21190403]

Carroll, KM. Therapy Manuals for Drug Addiction. National Institute of Drug Abuse; Rockville, MD: 1998. A cognitive-behavioral approach: Treating cocaine addiction.

Cooney NL, Kadden RM, Litt MD, Getter H. Matching alcoholics to coping skills or interactional therapies: Two-year follow-up results. Journal of Consulting and Clinical Psychology. 1991; 59:598–601. doi:10.1037//0022-006X.59.4.598. [PubMed: 1655847]

Condelli WS, Dunteman GH. Exposure to methadone programs and heroin use. American Journal of Drug and Alcohol Abuse. 1993; 19(1):65–78. doi:10.3109/00952999309002666. [PubMed: 8438832]

D'Aunno T, Vaughn TE. Variations in methadone treatment practices. Results from a national study. JAMA: The Journal of the American Medical Association. 1992; 267(2):253–258.

Darke S, Sims J, McDonald S, Wickes W. Cognitive impairment among methadone maintenance patients. Addiction. 2000; 95:687–695. doi:10.1046/j.1360-0443.2000.9556874.x. [PubMed: 10885043]

Dutra L, Stathopoulou G, Basden S, Leyro TM, Powers MB, Otto MW. A meta-analytic review of psychosocial interventions for substance use disorders. American Journal of Psychiatry. 2008; 165:179–187. doi:10.1176/appi.ajp.2007.06111851. [PubMed: 18198270]

Ersche KD, Clark L, London M, Robbins TW, Sahakian BJ. Profile of executive and memory function associated with amphetamine and opiate dependence. Neuropsychopharmacology. 2006; 31:1036–1047. doi:10.1038/sj.npp.1300889. [PubMed: 16160707]

Forman SD, Dougherty GG, Casey BJ, Siegle GJ, Braver TS, Barch DM, Lorensen E. Opiate addicts lack error-dependent activation of rostral anterior cingulate. Biological Psychiatry. 2004; 55:531–537. doi:10.1016/j.biopsych.2003.09.011. [PubMed: 15023582]

Goldstein RZ, Leskovjan AC, Hoff AL, Hitzemann R, Bashan F, Khalsa SS, Volkow ND. Severity of neuropsychological impairment in drug addiction: Association with metabolism in the brain reward circuit. Neuropsychologia. 2004; 42:1447–1458. doi:10.1016/j.neuropsychologia. 2004.04.002. [PubMed: 15246283]

Grella CE, Hser Y-I, Joshi V, Anglin MD. Patient histories, retention and outcome modules for younger and older adults in DATOS. Drug and Alcohol Dependence. 1999; 57:151–166. doi: 10.1016/S0376-8716(99)00082-4. [PubMed: 10617099]

Grohman K, Fals-Stewart W. Computer-assisted cognitive rehabilitation with substance-abusing patients: Effects on treatment response. The Journal of Cognitive Rehabilitation. 2003; 21:2–9.

Higgins ST, Delaney DD, Budney AJ, Bickel WK, Hughes JR, Foerg F, Fenwick JW. A behavioral approach to achieving initial cocaine abstinence. American Journal of Psychiatry. 1991; 148:1218–1224. [PubMed: 1883001]

Issenberg SB, Gordon MS, Gordon DL, Safford RE, Hart IR. Simulation and new learning technologies. Medical Teacher. 2001; 23(1):16–23. [PubMed: 11260734]

Jaffe AJ, Rounsaville B, Chang G, Schottenfeld RS, Meyer RE, O'Malley SS. Naltrexone, relapse prevention, and supportive therapy with alcoholics: An analysis of patient treatment matching. Journal of Consulting and Clinical Psychology. 1996; 64(5):1044–1053. doi:10.1037/0022-006X. 64.5.1044. [PubMed: 8916634]

Keen J, Rowe G, Mathers N, Campbell M, Seivewright N. Can methadone maintenance for heroin-dependent patients retained in general practice reduce criminal conviction rates and time spent in prison? British Journal of General Practice. 2000; 50:48–49. [PubMed: 10695069]

Lyvers M. "Loss of control" in alcoholism and drug addiction: A neuroscientific interpretation. Experimental and Clinical Psychopharmacology. 2000; 8:225–249. doi: 10.1037//1064-1297.8.2.225. [PubMed: 10843306]

Madden GJ, Petry NM, Badger GJ, Bickel WK. Impulsive and self-control choices in opioid-dependent patients and non-drug-using control participants: Drug and monetary rewards. Experimental and Clinical Psychopharmacology. 1997; 5:256–262. doi: 10.1037//1064-1297.5.3.256. [PubMed: 9260073]

Magura S, Nwakeze PC, Demsky S. Pre- and in-treatment predictors of retention in methadone treatment using survival analysis. Addiction. 1998; 93(1):51–60. doi:10.1046/j. 1360-0443.1998.931516.x. [PubMed: 9624711]

Marsch LA. The efficacy of methadone maintenance interventions in reducing illicit opiate use, HIV risk behavior and criminality: A meta-analysis. Addiction. 1998; 93(4):515–532. doi:10.1046/j. 1360-0443.1998.9345157.x. [PubMed: 9684390]

Marsch, LA.; Grabinski, MJ.; Bickel, WK.; Desrosiers, A.; Guarino, H.; Muehlbach, B.; Acosta, M. Computer-assisted HIV prevention for youth with substance use disorders. In: Marsch, LA., editor. Special Issue on Technology and Substance Use Disorders. Substance Use and Misuse. Vol. 46. 2011. p. 46-56.doi:10.3109/10826084.2011.521088

McLellan AT, Arndt IO, Metzger DS, Woody GE, O'Brien CP. The effects of psychosocial services in substance abuse treatment. JAMA: The Journal of the American Medical Association. 1993; 269(15):1953–1959. doi:10.1001/jama.1993.03500150065028. [PubMed: 8385230]

Mintzer MZ, Copersino ML, Stitzer ML. Opioid abuse and cognitive performance. Drug and Alcohol Dependence. 2005; 78:225–230. doi:10.1016/j.drugalcdep.2004.10.008. [PubMed: 15845327]

Mintzer MZ, Stitzer ML. Cognitive impairment in methadone maintenance patients. Drug and Alcohol Dependence. 2002; 67:41–51. doi:10.1016/S0376-8716(02)00013-3. [PubMed: 12062778]

Morgenstern J, Bates ME. Effects of executive function impairment on change processes and substance use outcomes in 12-step treatment. Journal of Studies on Alcohol and Drugs. 1999; 60(6):846–855.

O'Brien CP, Woody GE, McLellan AT. Enhancing the effectiveness of methadone using psychotherapeutic interventions. NIDA Research Monograph. 1995; 150:5–18. [PubMed: 8742769]

O'Malley S, Adamse M, Heaton RK, Garwin FH. Neuropsychological impairment in chronic cocaine abusers. American Journal of Drug and Alcohol Abuse. 1992; 18(2):131–44. doi: 10.3109/00952999208992826. [PubMed: 1562011]

Acosta et al.                                                                                                                    Page 14

Ornstein TJ, Iddon JL, Baldacchino AM, Sahakian BJ, London M, Everitt BJ, Robbins TW. Profiles of cognitive dysfunction in chronic amphetamine and heroin abusers. Neuropsychopharmacology. 2000; 23:113–126. doi:10.1016/S0893-133X(00)00097-X. [PubMed: 10882838]

Passetti F, Clark L, Mehta MA, King JM. Neuropsychological predictors of clinical outcome in opiate addiction. Drug and Alcohol Dependence. 2008; 94:82–91. doi:10.1016/j.drugalcdep.2007.10.008. [PubMed: 18063322]

Pirastu R, False R, Messina M, Binio V, Spiga S, Falconieri D, Diana M. Impaired decision-making in opiate-dependent subjects: Effect of pharmacological therapies. Drug and Alcohol Dependence. 2006; 83:163–168. doi:10.1016/j.drugalcdep.2005.11.008. [PubMed: 16343811]

Powell, DH.; Kaplan, EF.; Whitla, D.; Caitlin, R.; Funkenstein, HH. MicroCog: Assessment of cognitive functioning. The Psychological Corporation; San Antonio, TX: 1993.

Rapeli P, Fabritius C, Alho H, Salaspuro M, Wahlbeck K, Kalska H. Methadone vs. buprenorphine/naloxone during early opioid substitution treatment: A naturalistic comparison of cognitive performance relative to healthy controls. BMC Clinical Pharmacology. 2007; 7(5) doi:10.1186/1472-6904-7-5.

Rogers RD, Robbins TW. Investigating the neurocognitive deficits associated with chronic drug misuse. Current Opinion in Neurobiology. 2001; 11:250–257. doi:10.1016/S0959-4388(00)00204-X. [PubMed: 11301247]

Roselli M, Ardilla A. Cognitive effects of cocaine and polydrug abuse. Journal of Clinical and Experimental Neuropsychology. 1993; 18:122–135. doi:10.1080/01688639608408268.

Smith DE, McCrady BS. Cognitive impairment among alcoholics: Impact of drink refusal skill acquisition and treatment outcome. Addictive Behaviors. 1991; 16:265–274. doi:10.1016/0306-4603(91)90019-E. [PubMed: 1663696]

Soyka M, Zingg C, Koller G, Hennig-Fast K. Cognitive function in short- and long-term substitution treatment: Are there differences? The World Journal of Biological Psychiatry. 2010; 11(2):400–408. doi:10.3109/15622970902995604. [PubMed: 19536703]

Strain EC, Stitzer ML, Liebson IA, Bigelow GE. Dose-response effects of methadone in the treatment of opioid dependence. Annals of Internal Medicine. 1993; 119(1):23–27. [PubMed: 8498759]

Turner TH, LaRowe S, Horner MD, Herron J, Malcolm R. Measures of cognitive functioning as predictors of treatment outcome for cocaine dependence. Journal of Substance Abuse Treatment. 2009; 37:328–334. doi:10.1016/j.jsat.2009.03.009. [PubMed: 19394790]

Verdejo A, Toribio I, Orozco C, Puente KL, Perez-Garcia M. Neuropsychological functioning in methadone maintenance patients versus abstinent heroin abusers. Drug and Alcohol Dependence. 2005; 78:283–288. doi:10.1016/j.drugalcdep.2004.11.006. [PubMed: 15893159]

Volkow ND, Fowler JS, Wang GJ. The addicted human brain: Insights from imaging studies. The Journal of Clinical Investigation. 2003; 111(10):1444–1451. doi:10.1172/JCI18533. [PubMed: 12750391]

Zacny JP. A review of the effects of opioids on psychomotor and cognitive functioning in humans. Experimental and Clinical Psychopharmacology. 1995; 3:432–466. doi:10.1037//1064-1297.3.4.432.

NIH-PA Author Manuscript    NIH-PA Author Manuscript    NIH-PA Author Manuscript

Acosta et al.
Page 15



**FIGURE 1.**
CONSORT Diagram: Flow of participants through the study protocol

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Acosta et al.    Page 16

**TABLE 1**

Mean scores on MicroCog Indices

| Index | Standard Score[*] M(SD) | Range | Range of Scores | % Participants Below Average Range—[**] |
|---|---|---|---|---|
| General Cognitive Functioning | 78.5(16.6) | Low Average | 50-115 | 33.1% |
| General Cognitive Proficiency | 77.7(13.9) | Low Average | 50-114 | 33.1% |
| Information Processing Speed | 85.0(19.5) | Average | 50-123 | 21.9% |
| Information Processing Accuracy | 80.8(16.2) | Low Average | 50-117 | 23.8% |
| Attention/Mental Control | 83.5(17.8) | Low Average | 50-116 | 23.8% |
| Memory | 82.8(17.5) | Low Average | 50-114 | 25.6% |
| Spatial Processing | 96.6(14.7) | Average | 50-130 | 5.6% |
| Reasoning/Calculation | 81.7(17.5) | Low Average | 50-119 | 24.4% |
| Reaction Time | 95.5(17.3) | Average | 50-120 | 10.0% |

[*] normative mean = 100, $SD$ = 15

[**] Below Average range include scores of 69 or below and correspond to approximately 2.2% of the general population

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Acosta et al.
Page 17

**TABLE 2**

MicroCog Indices predict Percentage of Study Weeks and Tested Study Weeks with Continuous Opioid Abstinence

| MicroCog Index | Percentage of Study Weeks with Continuous Opioid Abstinence | | | Percentage of Tested Study Weeks with Continuous Opioid Abstinence | | |
|---|---|---|---|---|---|---|
| | Estimate | SE | t | Estimate | SE | t |
| Attention/Mental Control | 0.008 | 0.002 | 4.13 **** | 0.009 | 0.002 | 4.60 **** |
| Reasoning | 0.007 | 0.002 | 3.72 *** | 0.008 | 0.002 | 4.11 **** |
| Memory | 0.006 | 0.002 | 2.86 ** | 0.006 | 0.002 | 3.05 ** |
| Spatial Processing | 0.004 | 0.002 | 1.76 | 0.005 | 0.002 | 1.91 |
| Reaction Time | 0.015 | 0.002 | 6.76 **** | 0.016 | 0.002 | 6.92 **** |
| Information Processing Speed | 0.006 | 0.002 | 3.62 *** | 0.007 | 0.002 | 3.90 *** |
| Information Processing Accuracy | 0.005 | 0.002 | 2.33 * | 0.006 | 0.002 | 2.72 * |
| General Cognitive Functioning | 0.008 | 0.002 | 3.89 **** | 0.009 | 0.002 | 4.34 **** |
| General Cognitive Processing | 0.008 | 0.003 | 3.02 ** | 0.010 | 0.003 | 4.00 *** |

****
$p < .0001$,

***
$p < 0.001$,

**
$p < .01$,

*
$p < .05$

*J Dual Diagn.* Author manuscript; available in PMC 2013 November 08.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Acosta et al.

Page 18

**TABLE 3**

Interaction of MicroCog Score by Treatment Condition on Percentage of Study Weeks and Percentage of Tested Study Weeks with Continuous Opioid Abstinence

| MicroCog Index | Percentage of Study Weeks with Continuous Opioid Abstinence | | | Percentage of Tested Study Weeks with Continuous Opioid Abstinence | | |
|---|---|---|---|---|---|---|
| | Estimate | SE | t | Estimate | SE | t |
| Attention/Mental Control | 0.023 | 0.003 | 7.05 **** | 0.0217 | 0.003 | 6.66 **** |
| Attention/Mental Control by Treatment Group | −0.025 | 0.004 | −6.01 **** | −0.021 | 0.004 | −4.95 **** |
| Reasoning | 0.011 | 0.003 | 3.60 *** | 0.009 | 0.003 | 3.09 *** |
| Reasoning by Treatment Group | −0.005 | 0.004 | −1.29 | 0.000 | 0.004 | 0.06 |
| Memory | 0.011 | 0.003 | 3.53 *** | −0.010 | 0.003 | 3.26 ** |
| Memory by Treatment Group | −0.011 | 0.004 | −2.73 ** | −0.010 | 0.004 | −2.28 * |
| Spatial Processing | −0.002 | 0.003 | −0.46 | −0.000 | 0.003 | −0.09 |
| Spatial Processing by Treatment Group | 0.008 | 0.005 | 1.64 | 0.005 | 0.005 | 1.16 |
| Reaction Time | 0.014 | 0.003 | 4.34 **** | 0.014 | 0.003 | 4.33 **** |
| Reaction Time by Treatment Group | 0.000 | 0.004 | 0.01 | 0.001 | 0.004 | 0.25 |
| Information Processing Speed | 0.005 | 0.003 | 2.02 * | 0.005 | 0.003 | 1.86 |
| Information Processing Speed by Treatment Group | 0.001 | 0.003 | 0.41 | 0.003 | 0.003 | 0.95 |
| Information Processing Accuracy | 0.027 | 0.004 | 6.80 **** | 0.026 | 0.004 | 6.49 **** |
| Information Processing Accuracy by Treatment Group | −0.032 | 0.005 | −6.88 **** | −0.030 | 0.005 | −6.23 **** |
| General Cognitive Functioning | 0.016 | 0.003 | 5.10 **** | 0.016 | 0.003 | 4.75 **** |
| General Cognitive Functioning by Treatment Group | −0.016 | 0.004 | −3.71 *** | −0.012 | 0.004 | −2.77 *** |
| General Cognitive Processing | 0.012 | 0.004 | 2.96 ** | 0.0124 | 0.004 | 2.95 ** |
| General Cognitive Processing by Treatment Group | −0.008 | 0.005 | −1.62 | −0.004 | 0.005 | −0.78 |

****
$p < .0001$,

***
$p < 0.001$,

**
$p < .01$,

*
$p < .05$

**U.S. Department of Veterans Affairs**

Public Access Author manuscript

*Clin Psychol (New York).* Author manuscript; available in PMC 2022 August 11.

Published in final edited form as:
*Clin Psychol (New York)*. 2020 January 06; 27(2): . doi:10.1111/cpsp.12311.

# A systematic review of providers' attitudes toward telemental health via videoconferencing

**Samantha L. Connolly**[1,2], **Christopher J. Miller**[1,2], **Jan A. Lindsay**[3,4,5], **Mark S. Bauer**[1,2]

[1]Center for Healthcare Organization & Implementation Research, VA Boston Healthcare System, Boston, Massachusetts

[2]Department of Psychiatry, Harvard Medical School, Boston, Massachusetts

[3]HSR&D Center for Innovations in Quality, Effectiveness and Safety, Michael E. DeBakey VA Medical Center, Houston, Texas

[4]Baylor College of Medicine, Houston, Texas

[5]South Central Mental Illness Research, Education and Clinical Center, Houston, Texas

## Abstract

Telemental health conducted via videoconferencing (TMH-V) has the potential to improve access to care, and providers' attitudes toward this innovation play a crucial role in its uptake. This systematic review examined providers' attitudes toward TMH-V through the lens of the unified theory of acceptance and use of technology (UTAUT). Findings suggest that providers have positive overall attitudes toward TMH-V despite describing multiple drawbacks. Therefore, the relative advantages of TMH-V, such as its ability to increase access to care, may outweigh its disadvantages, including technological problems, increased hassle, and perceptions of impersonality. Providers' attitudes may also be related to their degree of prior TMH-V experience, and acceptance may increase with use. Limitations and implications of findings for implementation efforts are discussed.

### Keywords

attitudes; clinical video teleconferencing; implementation; providers; technology; telehealth; telemental health; telepsychiatry; videoconferencing

## 1 | INTRODUCTION

Telemental health, in which mental health care is provided from a distance, encompasses a broad range of practices, including the use of videoconferencing, e-mail, remote monitoring devices, and smartphone applications (Grady et al., 2011; Hailey, Roine, & Ohinmaa, 2008). Telemental health conducted via videoconferencing, referred to hereafter as TMH-V, provides real-time mental health care directly to patients and is rapidly expanding

This article is a U.S. Government work and is in the public domain in the USA.

**Correspondence:** Samantha L. Connolly, VA Boston Healthcare System, 150 S. Huntington Avenue, Building 9, Room 208C, Boston, MA 02130, USA. samantha.connolly@va.gov.

across private and publicly funded health-care systems worldwide (Australian Government Department of Health, 2018; Godleski, Darkins, & Peters, 2012; Lacktman & Rosen, 2017; O'Gorman, Hogenbirk, & Warry, 2015). Psychotherapy, medication management, and assessment services can be delivered via TMH-V to patients located at remote clinics or directly to patients' homes, improving access to care by reducing travel time and costs and providing specialty services to underserved locations (Fletcher et al., 2018; Hubley, Lynch, Schneck, Thomas, & Shore, 2016). TMH-V has shown robust clinical effectiveness in multiple trials, and outcomes were demonstrated as noninferior to in-person care in several studies (Bashshur, Shannon, Bashshur, & Yellowlees, 2016; Hilty et al., 2013; Hubley et al., 2016). Patients have reported high satisfaction with TMH-V overall, describing it as effective and efficient (Kruse et al., 2017).

The effectiveness and patient-level acceptance of TMH-V have been well-documented, and there is a growing body of literature examining characteristics of mental health providers using this technology in practice (Glueckauf et al., 2018). However, there has yet to be a systematic review of providers' attitudes toward TMH-V. This represents a critical gap in the literature, given that providers are often the gatekeepers of health-care innovations (Brooks, Turvey, & Augusterfer, 2013; Whitten & Mackert, 2005). If providers do not support the use of TMH-V, uptake may stagnate at the clinic level and patients may be unable to access TMH-V care. TMH-V has the potential to both benefit and inconvenience providers, and these factors may differentially impact providers' attitudes. For example, while TMH-V may make care more efficient and accessible and can increase providers' flexibility, it may also present new challenges with regard to navigating new technologies, coordinating care, scheduling appointments, and developing rapport with patients (Brooks et al., 2013).

It is therefore important to examine factors contributing to providers' attitudes toward TMH-V. The unified theory of acceptance and use of technology (UTAUT; Venkatesh, Morris, Davis, & Davis, 2003) is a comprehensive framework that identifies four primary constructs underlying individuals' acceptance of a technological innovation: performance expectancy, effort expectancy, social influence, and facilitating conditions. Performance expectancy is the extent to which an individual believes that an innovation will be useful and will have a relative advantage over other systems. According to the UTAUT, performance expectancy is the strongest predictor of intention to use a technology. Effort expectancy is defined as the perceived ease of using a given innovation. Social influence refers to perceptions that important people, such as organizational leadership, want the individual to use a new technology, and would view the individual positively for doing so. Facilitating conditions are defined as the perceived level of organizational and technical infrastructure in place to support use of the technology. The UTAUT posits that these four constructs can be moderated to varying extents by user age, gender, and experience using the technology, as well as the degree of voluntariness of adopting the innovation.

The current systematic review had three primary aims. The first was to assess the extent to which providers' overall attitudes toward TMH-V were positive or negative. The second aim was to situate these findings within the key constructs outlined in the UTAUT, namely the extent to which TMH-V was found to be useful, easy to use, encouraged by organizational leaders, and supported by necessary infrastructure. The third aim was to examine potential

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

influences of provider age, gender, experience with TMH-V, and voluntariness of use on attitudes toward this innovation.

## 2 | METHODS

We conducted a comprehensive review of the Englishlanguage, peer-reviewed literature on providers' attitudes to ward TMH-V, published between January 2000 and June 2019 within three databases: PubMed, CINAHL, and Embase. Each subsequent database search filtered out results from the previous databases to prevent duplicates. Our initial search strategy required articles to contain a term pertaining to TMH-V as well as a term referring to providers or attitudes/experiences within their titles and/or abstracts. The complete list of searched terms is as follows (with asterisks indicating that any words beginning with that string of letters were included):

- TMH-V terms: telemental health, tele-mental health, telepsychiatry, telepsychotherapy, telepsychology, teletherapy, e-therapy, online therapy, online counseling, OR [(telehealth, telemedicine, telecare, video*, communication tech*) AND (psych*, mental*)]

- Provider terms: provider*, clinician*, psychiatrist*, psychologist*, stakeholder*, nurse*, professional*, physician*, social work*, personnel*

- Attitude terms: attitude*, perception*, experience*, interest*, opinion*, view*, utilization, satisfaction

The first author screened the titles and abstracts of the articles resulting from this search and identified those appropriate for full-text review. To meet criteria for inclusion with this review, articles were required to include the following:

- Information regarding providers' attitudes toward or experiences using TMH-V to provide direct, real-time clinical care to patients. Consulting with another provider by videoconference, or the use of alternative technologies such as secure messaging, store and forward communications, or web-based treatment protocols did not qualify.

- Information from the perspective of the provider who conducted/would be conducting the TMH-V session with the patient versus from a primary care or emergency room doctor requesting a TMH-V consult.

- Qualitative and/or quantitative data collected using an explicitly identified measure, such as a survey or semi-structured interview. Articles that did not indicate and describe the measure used to collect their data were excluded.

- At least four providers meeting the above criteria were sampled. Providers could be of varying disciplines. This number was chosen in an attempt to achieve balance between including as many high-quality studies as possible, while also helping ensure that the interpretations of findings were reasonably generalizable to the broader population of mental health providers.

Connolly et al.                                                                                                         Page 4

### 2.1 | Reliability

The first author identified a subset of 10 articles from within the 86 identified for full-text review, some of which the first author had determined to meet inclusion criteria, others of which were ultimately excluded. These articles were independently scored as eligible or ineligible by co-authors CJM and MSB. Fleiss's kappa for the three raters within this subset of manuscripts was .829, indicating excellent interrater reliability. SLC, CJM, and MSB then met for a consensus meeting in which the inclusion/exclusion of all 86 articles was discussed, guided by a document compiled by SLC including detailed summaries of the articles' study designs, participants, and findings. The group reached consensus on the 38 articles included in the final sample.

### 2.2 | Analytic approach

The following information was reported for each included study: the number, discipline, and extent of TMH-V experience of providers sampled, the type of services provided through TMH-V, characteristics of the patient population, the location at which patients received TMH-V care, the measures used to assess providers' attitudes, and a brief summary of main findings. TMH-V experience was defined as whether or not providers had ever conducted a TMH-V session with a patient. Risk for selection bias, performance bias, detection bias, attrition bias, and selective reporting bias was assessed for all studies according to Cochrane Collaboration guidelines (Higgins & Green, 2011).

At the broadest level, it was determined whether providers' overall attitudes toward TMH-V were reported as primarily positive or negative within each study, when that information was available. Each article was then coded for the presence of the four primary UTAUT constructs within provider attitude data: Performance expectancy, effort expectancy, social influence, facilitating conditions, and subconstructs were identified. The frequency with which subconstructs were endorsed, and the percentage of all articles that included each subconstruct were then calculated, and findings were summarized across articles. Next, based on the UTAUT model, the potential moderating role of gender, age, experience, and voluntariness of use was considered within provider attitude data. Articles were coded as to whether they presented findings involving any of these moderators. Experience was the only moderator discussed across multiple articles; these results were summarized across articles. Additional distinctions in providers' attitudes not encompassed in the above sections were then coded and summarized.

## 3 | RESULTS

The initial search strategy resulted in 739 articles. Eightysix articles were identified as appropriate for full-text review after title and abstract screening (see modified PRISMA diagram, Figure 1). Of these 86 articles, 38 ultimately met criteria for inclusion with this review (Table 1). Twenty-eight studies (74%) assessed providers' attitudes toward specific modes of TMH-V treatment, for which the patient population and the location of patients' care were identified; the remaining ten studies (26%) were surveys of providers' attitudes toward TMH-V more generally. Seventeen studies exclusively sampled providers with TMH-V experience (45%), 19 studies included providers both with and without experience

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

(50%), and two studies exclusively sampled providers with no experience (5%). TMH-V was described as having various uses, including providing psychotherapy (22/38, 58%), short-term consultation and assessment (17/38, 45%), and medication management (12/35, 34%). Twenty-eight studies specified the locations at which patients received TMH-V care, including hospitals and clinics (21/28, 75%), within their homes (5/28, 18%), or in other locations, including schools, youth centers, crisis homes, or community centers (4/28, 14%). Fifteen studies involved the treatment of child and adolescent patients (39%), ten included military personnel/veterans (26%), and three included indigenous populations (8%). Eighteen studies (47%) were conducted outside of the United States, including Canada (7/38, 18%), Australia (5/38, 13%), and the United Kingdom (3/38, 8%). One study was conducted in each of the following countries: China, Finland, Italy, and Norway.

## 3.1 | Overall attitudes toward TMH-V

### 3.1.1 | Positive attitudes—Overall attitudes toward TMH-V were largely positive (Adler, Pritchett, Kauth, & Nadorff, 2014; Baird, Whitney, & Caedo, 2018; Brooks, Manson, Bair, Dailey, & Shore, 2012; Cunningham, Connors, Lever, & Stephan, 2013; Levy & Strachan, 2013; Mitchell, MacLaren, Morton, & Carachi, 2009; Moreau et al., 2018; Whitten & Kuwahara, 2004; Wynn, Bergvik, Pettersen, & Fossum, 2012), such that providers were satisfied with TMH-V (Interian, King, St. Hill, Robinson, & Damschroder, 2017; Lindsay et al., 2017; Mayworm et al., 2019; Ruskin et al., 2004) and favorable toward its use (Cipolletta & Mocellin, 2018; Moreau et al., 2018), describing it as important (Glover, Williams, Hazlett, & Campbell, 2013; Volpe, Boydell, & Pignatiello, 2013) and an acceptable mode of treatment delivery (Elford et al., 2001, 2000; Thomas et al., 2017). These positive opinions were observed across types of services provided, location of TMH-V care, and patient populations.

Providers' positive attitudes most frequently included reference to the UTAUT construct of performance expectancy, with multiple articles describing the innovation as being effective (Jameson, Farmer, Head, Fortney, & Teal, 2011; Perle, Burt, & Higgins, 2014; Starling & Foley, 2006) and useful (Gelber, 2001; Gibson, O'Donnell, Coulson, & Kakepetum-Scghultz, 2011; Glueckauf et al., 2018; Kopel, Nunn, & Dossetor, 2001; Simms, Gibson, & O'Donnell, 2011). One statistical analysis found that providers' perception of usefulness was the most important factor in determining intention to use TMH-V based on questionnaire data (Monthuy-Blanc, Bouchard, Maïano, & Seguin, 2013), consistent with UTAUT hypotheses (Venkatesh et al., 2003). Six subconstructs of performance expectancy were identified (Table 2). The most commonly endorsed subconstruct was increasing access to care, such as for patients in remote locations, with disabilities or illnesses that made travel difficult, or with child or elder care responsibilities, as well as allowing for care during inclement weather (16/38, 42%; see Table 2 for included studies). The second most frequently endorsed benefit was saving time and money and increasing efficiency of services (12/38, 32%). Multiple articles also shared provider sentiments that TMH-V could have advantages over in-person care in some circumstances, such as by increasing patient comfort and decreasing inhibition when discussing sensitive subjects including trauma (8/38, 21%). Several of these advantages over in-person care were specific to providing TMH-V directly to patients' homes versus to another clinic (Gordon, Wang, & Tune, 2015; Lindsay et

Connolly et al.    Page 6

al., 2017). These included allowing care to be received discreetly and privately at home, offering a window into a patient's living environment, and serving as a stepping stone into care for avoidant patients. Receiving feedback that patients liked TMH-V was also noted as a positive aspect (6/38, 16%). TMH-V was described as providing increased flexibility, such as by allowing providers to work from different locations or check in more easily with high-risk patients (4/38, 11%). TMH-V was also mentioned as providing new job opportunities for providers, expanding the reach of their work, and facilitating increased collaboration with other clinicians (3/38, 8%).

Regarding effort expectancy, multiple articles reported that providers found TMH-V to be easy to use (7/38, 18%). The remaining two constructs were discussed less frequently. In terms of social influence, several articles described the positive impact of supportive leadership on providers' attitudes toward TMH-V (3/38, 8%). Facilitating conditions, such as having strong technical support services, were also mentioned in several articles (4/38, 11%).

### 3.1.2 | Negative attitudes—Although overall attitudes toward TMH-V were largely positive, there were several exceptions. A minority of psychiatrists (4 of 11) reported being satisfied providing medication management through TMH-V in one study (Wagnild, Leenknecht, & Zauher, 2006). They described technological and scheduling barriers, perceptions of TMH-V as impersonal, and reinforcement of patients' social isolation as drawbacks. Two studies reported difficulty recruiting clinicians to provide TMH-V care (Adler et al., 2014; Shulman, John, & Kane, 2017). Reasons for providers opting to not participate included lack of interest (Adler et al., 2014) and concerns about technological issues (Shulman et al., 2017); both studies noted that perceptions of extra effort and hassle associated with TMH-V were deterrents.

Multiple drawbacks to TMH-V use were noted regarding performance expectancy, including articles that reported positive attitudes toward TMH-V overall. Six subconstructs were identified, and the frequency with which they were endorsed is reported in Table 3. Concerns were often raised regarding TMH-V being impersonal or interfering with the therapeutic relationship. Difficulties detecting nonverbal cues such as fidgeting or crying, poor hygiene, or signs of intoxication were noted, along with trouble maintaining eye contact and disruptions to conversation flow (19/38, 50%; see Table 3 for included studies). Safety and legal concerns were common, including the inability to be physically present to assess for risk and coordinate patient transfer to a hospital; some providers questioned their liability in the case of a crisis and the limitations of their licenses, such as whether they could legally see a patient via TMH-V across state lines (13/38, 34%). Some providers felt that patients would not like using the TMH-V modality as compared to in-person visits (8/38, 21%). A lack of provider knowledge regarding TMH-V security and confidentiality was noted in several articles (7/38, 18%). Providers also raised the possibility that certain patients, such as those with hearing or visual impairments, or those who are socially isolated or high risk, would not be appropriate for TMH-V care (5/38, 13%). Finally, some noted an inability to conduct a thorough assessment, including a physical examination, using TMH-V (6/38, 16%).

VA Author Manuscript

The most frequently endorsed concern fell within the construct of effort expectancy and involved technological problems, including suboptimal audio and video quality, insufficient bandwidth to support videoconferencing, and malfunctions during treatment sessions (23/38, 61%). TMH-V was also often associated with increased workload and hassle due to factors such as equipment setup and additional scheduling processes (16/38, 42%). With respect to social influence, two studies (5%) mentioned the negative impact of having poor communication or support from leadership regarding TMH-V. In terms of facilitating conditions, several articles described a need for technical support and training (9/38, 24%), as well as having limited access to TMH-V equipment, clinic space, and funding (6/38, 16%).

### 3.2 | Attitude variability related to extent of TMH-V experience

#### 3.2.1 | Users versus nonusers—Several studies drew comparisons between users and nonusers of TMH-V within their samples. Compared to those with no experience, users had more positive attitudes toward TMH-V (Adler et al., 2014; Gilmore & Ward-Ciesielski, 2019) and expressed more confidence regarding their ability to provide care through TMH-V (Adler et al., 2014; Austen & McGrath, 2006). Providers with TMH-V experience were less likely to cite drawbacks to use such as staffing and credentialing concerns (Adler et al., 2014) or difficulties operating the technology, managing high-risk patients, or developing a therapeutic alliance (Interian et al., 2017). Predictors of increased use of TMH-V included finding the technology easy to use and having a history of training (Gibson et al., 2011; Glover et al., 2013; Simms et al., 2011) as well as having more years in practice (Gilmore & Ward-Ciesielski, 2019; Simms et al., 2011). A study of psychiatry residents found that those in rural as opposed to urban settings were more likely to plan on using TMH-V after residency (Glover et al., 2013). One study noted that younger age was related to TMH-V use (Gilmore & Ward-Ciesielski, 2019); however, more years in practice was also reported as predictive of TMH-V use, making this finding difficult to interpret given that these variables would likely be negatively correlated.

#### 3.2.2 | Preuse versus postuse—Although relatively few studies assessed providers' attitudes before and after TMH-V use, the majority revealed an increase in positive sentiments with experience. Studies reported increases in positive opinions (Brooks et al., 2012; Whitten & Kuwahara, 2004), interest (Glover et al., 2013), comfort level (Gelber, 2001), and ease of use of the technology (Gibson et al., 2011), as well as decreases in providers' skepticism (Elford et al., 2000) and apprehension (Brooks et al., 2012) following use. Several studies reported that providers were pleasantly surprised after trying TMH-V, noting that it was "much better than I thought it would be" (Elford et al., 2000), and caused less disruption to clinical care (Adler et al., 2014) and rapport development (Lindsay et al., 2017) than anticipated. Multiple studies noted that providers were surprised by their patients' generally positive attitudes toward TMH-V (Adler et al., 2014; Brooks et al., 2012; Kopel et al., 2001; Newman, Bidargaddi, & Schrader, 2016), their willingness to participate, and the speed at which they adapted to this new mode of treatment delivery (Whitten & Kuwahara, 2004). In contrast, one qualitative study noted that two providers characterized TMH-V consultations as "twice as hard" to conduct as in-person sessions because of poor audio and video quality; they described being unable to detect nonverbal cues and needing

Connolly et al.                                                                                           Page 8

to use shorter sentences and exaggerated gestures (Starling & Foley, 2006). However, it is worth noting that this study was published in 2006 and that the technology being evaluated is likely not representative of the current quality of TMH-V platforms.

Some providers with TMH-V experience noted that the benefits of TMH-V outweighed its various drawbacks and described the development of strategies and workarounds to address barriers encountered during use (Gibson et al., 2011; Lindsay et al., 2017; Simms et al., 2011). These included developing relationships with local law enforcement and hospitals to implement safety protocols in the case of a patient emergency, panning the camera around the provider's treatment room to reassure wary patients that no one else was overhearing their confidential session, or completing the remainder of a session by phone if the video connection unexpectedly failed.

### 3.3 | Additional distinctions in providers' attitudes

#### 3.3.1 | Provider satisfaction with TMH-V versus in-person care—Most studies comparing providers' opinions toward TMH-V and in-person care found the latter to be more desirable. Providers reported preferring in-person care when completing child assessments and interventions (Elford et al., 2000; Levy & Strachan, 2013), and psychodynamic therapists described TMH-V as being slightly less effective than in-person sessions (Gordon et al., 2015). A minority of psychiatry residents with TMH-V experience felt that TMH-V was equal to face-to-face encounters (34%; 40% noted that it was not equal, and 26% were neutral; Glover et al., 2013). Providers conducted both TMH-V and in-person sessions in four intervention studies included in this review: a randomized controlled trial (RCT) of psychologists completing a cognitive behavioral therapy protocol for bulimia (Ertelt et al., 2011), an RCT of psychiatrists providing medication management and supportive counseling (Ruskin et al., 2004), a non-RCT in which psychologists conducted clinical intake interviews (Schopp, Johnstone, & Merrell, 2000), and a non-RCT in which psychiatrists provided school-based medication management and assessment to children (Mayworm et al., 2019). In-person sessions were rated significantly higher in terms of provider satisfaction (Mayworm et al., 2019; Ruskin et al., 2004; Schopp et al., 2000), as well as providers' perception of goal formation, task completion, and development of a therapeutic bond (Ertelt et al., 2011). Three of these four studies shared that, despite being significantly lower than in-person scores, TMH-V ratings remained high (Ertelt et al., 2011; Mayworm et al., 2019; Ruskin et al., 2004). Several studies reported that providers found TMH-V to be adequate (Kopel et al., 2001), equivalent (Elford et al., 2001), or an acceptable alternative (Elford et al., 2000; Thomas et al., 2017) to in-person sessions, noting that there was "little to no difference" in care (Volpe et al., 2013). It is notable that these studies examined short-term consultation or assessment services delivered via TMH-V versus longer term psychotherapy or medication management.

#### 3.3.2 | TMH-V provider satisfaction as compared to patients and referring providers—Studies that compared provider and patient attitudes toward TMH-V found patients to be more satisfied than providers on average (Cruz, Krupinski, Lopez, & Weinstein, 2005; Shulman et al., 2017; Thomas et al., 2017). Providers rated working alliance measures as lower for TMH-V versus in-person sessions of a cognitive behavioral

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

therapy protocol, while there were no significant differences in patient-rated scores between modalities (Ertelt et al., 2011). Another study reported that providers found technical difficulties to be more problematic and burdensome than patients; the authors posited that patients were more accustomed to experiencing delays when receiving health care as compared to providers (Schopp et al., 2000). In a study of emergency room providers who requested TMH-V consultation from a psychiatrist or social worker at a remote hospital, the providers requesting the patient consultation were more satisfied with the service than the providers conducting the TMH-V session (Thomas et al., 2017). It was hypothesized that the workflow of those providing TMH-V consultation was impacted more than the workflow of the requesting providers.

### 3.4 | Risk of bias

There is the risk of publication bias within the current review, such that negative or contradictory findings regarding providers' attitudes toward TMH-V may have been omitted from results sections or may have precluded publication of completed research altogether. A risk of selection bias was identified within all included studies. Specifically, it is possible that the providers who opted to complete TMH-V surveys or participate in TMH-V intervention protocols may be categorically different from providers who opted out. Only one study (Shulman et al., 2017) reported the number of providers who elected to participate relative to the total number approached. Performance bias can occur within unblinded studies and refers to the provision of increased attention to the experimental group (i.e., those receiving TMH-V) as compared to the control group, beyond the scope of the actual intervention. Four studies assigned patients to TMH-V or in-person care (Ertelt et al., 2011; Mayworm et al., 2019; Ruskin et al., 2004; Schopp et al., 2000); providers in these studies may have given additional attention to patients in the TMH-V condition given the novelty of this modality, which could have impacted their subsequent perceptions of TMH-V effectiveness. Performance bias was also possible in the multiple other intervention studies without an in-person control condition, as providers may have put more effort into TMH-V sessions conducted within the context of a research study. Detection bias is also inevitable in this context, given that the main outcomes of this review are providers' attitudes toward using TMH-V, preventing any sort of blinding regarding treatment condition when considering outcomes. Attrition bias is a significant concern among the included intervention studies. Only one study (Adler et al., 2014) reported on the observed attrition rate of therapists, with attrition here referring to inability to ultimately provide TMH-V care due to clinic and organization-level barriers. The remaining studies only included providers who participated in the full intervention within their samples, inviting the possibility that providers who ultimately dropped out of the intervention or were unable to provide TMH-V were not accounted for in analyses. Selective reporting bias is also likely given that many included studies did not clearly specify outcomes of interest within their analytic plans.

## 4 | DISCUSSION

The current systematic review revealed a diverse and growing literature examining providers' attitudes toward TMH-V, and findings were positive overall. TMH-V was described as improving access to care for patients, increasing efficiency of services, saving

Connolly et al.                                                                                            Page 10

time and money, and being more effective than in-person care in some circumstances. Additional benefits included TMH-V being easy to use, well-received by patients, supported by organizational leadership, and facilitated by strong training and technical support systems. While few articles reported negative overall attitudes toward TMH-V, many drawbacks to use were mentioned across studies. Technological difficulties were the most common concern and were reported in the majority of articles. Increased hassle and workload were also frequently mentioned. Most studies noted that TMH-V could feel impersonal, interfere with the therapeutic relationship, or impede the detection of nonverbal cues. Some providers reported beliefs that patients would not like TMH-V or that certain patients would not be appropriate to receive care remotely. Safety, security, liability, and confidentiality concerns were noted, as was the difficulty of conducting a thorough assessment via TMH-V. Lack of facilitating conditions, including training and technical support, was also endorsed. Poor support from leadership was a less frequently mentioned contributor to negative attitudes.

This finding that overall attitudes toward TMH-V were positive despite the presence of many drawbacks suggests that the relative weights of its benefits and disadvantages are not equal. Specifically, the perceived benefits of increasing efficiency, flexibility, and access to care for patients may offset the relative impersonality of TMH-V as well as its technological difficulties and increased provider burden. This finding aligns with the UTAUT, which posits that the performance expectancy of an innovation is the most significant predictor of its acceptance (Venkatesh et al., 2003).

Current findings also suggest a relationship between experience using TMH-V and providers' attitudes. Specifically, providers with experience using TMH-V reported more acceptance of the modality than nonusers. A trend emerged in which providers experienced increases in positive sentiments upon using TMH-V, including being, "pleasantly surprised" by its functionality and ease of use (Adler et al., 2014; Elford et al., 2000; Lindsay et al., 2017). These findings, while tentative, align with UTAUT predictions, such that the perceived effort required to use an innovation declines following experience interacting with and adjusting to the technology (Venkatesh et al., 2003). In keeping with this theory, workflow modifications would become practiced over time and require less hassle on the part of the provider. Furthermore, experienced providers described developing strategies and workarounds to address barriers to use. This suggests that with experience, providers can mitigate some of the negative aspects of TMH-V, contributing to more positive overall attitudes toward the innovation.

However, while providers' attitudes toward TMH-V tended to improve with experience, they still generally displayed a preference for conducting appointments in person versus via TMH-V. The exception to this finding involved short-term consultation and assessment procedures, in which TMH-V was deemed largely equivalent to in-person sessions. Therefore, TMH-V satisfaction may vary based on the nature of services being provided. For example, difficulties establishing a therapeutic alliance from behind a screen may have a larger impact within longer term care, in which the alliance develops over time and is an important predictor of therapy success (Martin, Garske, & Davis, 2000), as compared to brief patient interactions that do not involve follow-up. These difficulties may particularly

impact psychologists, who may be more likely to have frequent and longer sessions with patients (e.g., weekly evidence-based treatment protocols) as opposed to providers primarily offering brief consultations or periodic medication management appointments. Findings emphasize the importance of optimizing audio and video quality to improve the ability to connect with patients via TMH-V, by increasing detection of subtle nonverbal cues and minimizing audio and video lags that can disrupt conversation flow. Through training, providers can also be made aware of these drawbacks and develop new strategies, for instance adjusting camera placement to ensure proper angles and lighting to best see and be seen by the patient, or maintaining a low threshold to inquire about recent substance use, given the greater difficulty of detecting intoxication remotely (Shore, 2013). That being said, there may be instances in which an in-person appointment is deemed necessary to conduct a thorough assessment (e.g., to measure vital signs if the patient does not have a home monitoring device such as a personal blood pressure cuff). This will likely be a greater barrier to prescribing clinicians or behavioral medicine specialists as opposed to those who do not conduct physical examinations as part of their treatment protocols.

Although TMH-V satisfaction levels were high overall, providers reported lower satisfaction than their patients. It is possible that the perceived drawbacks of establishing a therapeutic relationship via TMH-V may be more salient to providers than to patients, as noted in one study in which providers reported lower working alliance scores for TMH-V versus in-person sessions, while patient scores did not differ across modalities (Ertelt et al., 2011). The degree of effort required to use TMH-V also likely contributes to observed discrepancies in satisfaction. TMH-V represents a shift in the care model, such that providers are expected to reach out to their patients, versus their patients being expected to come to their office, a dynamic that redistributes effort expenditures and may in turn affect satisfaction. Indeed, TMH-V is more likely to impose burdens on providers—in terms of undergoing training and integrating new technologies and processes into their preexisting workflows—as compared to patients, for whom TMH-V is intended to decrease the more burdensome aspects of care. Furthermore, patients may be more accustomed to encountering delays and adapting to unfamiliar systems when receiving care as compared to their providers (Schopp et al., 2000).

Several aspects of the UTAUT were notably underrepresented within the reviewed articles. Although many articles discussed the moderating role of experience, there was little to no information shared regarding the role of gender, age, and voluntariness of use on providers' acceptance of TMH-V. Future research should aim to examine these factors as they may influence attitudes toward TMH-V adoption. Indeed, findings of demographic differences within the broader mental health technology literature are complex and not consistent across studies (Glueckauf et al., 2018; McMinn, Bearse, Heyne, Smithberger, & Erb, 2011). There was also relatively little information provided regarding social influence from leadership or contextual factors. The role of organizational support can significantly influence providers' attitudes, as discussed within established implementation frameworks (e.g., CFIR; Damschroder et al., 2009). Indeed, one study in the current review emphasized the importance of developing an organization-level "telehealth culture" involving information sharing across providers, policy development, training, and system-wide changes in administrative systems and staffing to ensure successful and sustained uptake of TMH-V (Newman et al., 2016).

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

Connolly et al.                                                                                                          Page 12

Developing a TMH-V implementation plan, including formalized education, training, and supervision, as well as the involvement of experienced facilitators, can help to increase provider buy-in, enthusiasm, and confidence navigating this new technology (Fletcher et al., 2018). These strategies will be especially important to consider when moving beyond small-scale trials and toward the widespread integration of TMH-V into general practice. Ideally, successive generations of providers will receive TMH-V education and training as part of their graduate programs, which will increase the ubiquity of these services. However, postgraduate training is necessary to ensure that current providers gain comfort and experience navigating this technology and that these skills are maintained over time as technologies continue to evolve. It is notable that few of the reviewed studies described the nature and extent of TMH-V education and training received by providers. Future studies should prioritize examination of these factors and their influence on providers' attitudes toward TMH-V.

Limitations to the current conclusions must be noted, particularly regarding the observed relationship between attitudes toward TMH-V and experience. Importantly, there is no way to determine the causality of provider sentiments; for instance, providers with more positive a priori opinions toward TMH-V or who experienced fewer barriers to use may have been more likely to ultimately use TMH-V. Alternatively, use of TMH-V may have subsequently increased providers' positive opinions. Similarly, selection bias may exist in study designs; for instance, providers with more positive attitudes toward TMH-V may have been more likely to participate in the included studies, while providers who were unable to integrate TMH-V into their practice, who discontinued TMH-V use, or who had negative attitudes overall may not be adequately represented. In addition, many articles did not distinguish between providers with or without TMH-V experience when describing attitudes toward use. This represents a significant limitation as the potential moderating role of experience could not be examined, such as whether there was variation in the number or type of drawbacks endorsed by these groups. Furthermore, measures of providers' attitudes and satisfaction with TMH-V were highly variable across studies as there is no "gold standard" measurement of these constructs, which prevents direct comparison of findings and limits overall interpretations. Additional limitations include the omission of non-English-language publications and the small sample sizes of some of the included studies. Indeed, the experience of implementing and using TMH-V within a small trial may be very different from attempts to integrate TMH-V into larger and more complex settings. Although a consensus approach was used to determine article inclusion, the systematic review analyses were conducted by the first author and did not involve additional formal consensus procedures, which could be considered a limitation. However, all co-authors provided critical feedback regarding the analytic plan and presentation of current findings. Finally, 12 of the included studies were published over 10 years ago, and given the time taken to conduct and publish research, many of the more recent studies are likely also referring to technologies that are now somewhat outdated. Given the fast-moving pace of innovation, it is possible that some of the drawbacks discussed in this review may be specific to older TMH-V equipment and processes that have since been refined. This in turn limits the potential generalizability of these findings to current conditions and emphasizes the need for ongoing review of the literature as TMH-V technology continues to evolve and improve.

VA Author Manuscript

Connolly et al.                                                                                                    Page 13

Although the current review focused on TMH-V, it is important to note that additional technologies may fall within the domain of telemental health, including e-mail, smartphone apps, message boards, or web-based therapy protocols. Two of the studies included in the current review surveyed providers' attitudes toward telemental health technologies more broadly, with only TMH-V results reported here (Cipolletta & Mocellin, 2018; Glueckauf et al., 2018). Future work should aim to synthesize findings from papers that evaluate multiple forms of telemental health concurrently, in order to examine variation in provider attitudes based on mental health technology type. Future studies should also examine whether there may be discipline-level variability in providers' attitudes toward TMH-V that may relate to differences in typical encounter characteristics; for instance, whether prescribing clinicians with less frequent and shorter appointments with their patients may have more positive views toward TMH-V than psychologists with longer and more frequent sessions.

The finding that providers' positivity toward TMH-V may have outweighed various barriers to use could have important implications when attempting to implement this technology in practice. If providers believe that using TMH-V will improve overall access to care and ultimately increase efficiency and flexibility, they may be more willing to accept initial increases in hassle and disruptions in workflow, as well as an altered quality of connection with patients. This distinction is important to consider when introducing TMH-V to providers, specifically preparing providers for the inevitable growing pains of adopting this new technology, but emphasizing the net benefits that TMH-V may provide to their patients and themselves with sustained use.

The balance between perceived benefits and drawbacks of TMH-V among providers is also likely to continually shift in response to rapid advances occurring in the field. Improvements in the quality of communication via TMH-V, due to strengthened broadband connectivity and increasingly sophisticated video and audio technologies, may help to lessen the relative disadvantages of connecting with a patient from behind a screen (Brooks et al., 2013). With continued use and troubleshooting, TMH-V will ideally become more seamlessly integrated into electronic health record, scheduling, and billing platforms, which would relieve a substantial amount of staff burden. In addition, the introduction of legislation allowing for the wider provision of telehealth, such as a recently enacted bill allowing TMH-V to occur across state lines within the Veterans Health Administration, as well as similar legislation within the Department of Defense, will decrease logistical barriers to care (Brooks et al., 2013; U.S. Department of Veterans Affairs, 2018; Zur, 2019). State laws requiring insurers to reimburse TMH-V appointments to the same extent as in-person care (i.e., parity laws) will also be critical in increasing uptake, as will the relaxation of mandates in some states requiring out-of-state providers to obtain special licenses to provide telehealth services (Adler-Milstein, Kvedar, & Bates, 2014). In fact, a Psychology Interjurisdictional Compact (PSYPACT), which would provide a streamlined certification process for psychologists to conduct TMH-V across state lines, is currently in development (Wicklund, 2019b); similar compacts have already taken effect for physicians and nurses across multiple states (Wicklund, 2019a). The development and dissemination of established clinical competencies and guidelines for care will also likely help to standardize TMH-V practices and increase provider confidence (Hilty, Maheu, Drude, & Hertlein, 2018; Shore et al., 2018). Furthermore, providers' comfort interacting with patients via

TMH-V may continue to increase as videoconferencing becomes ubiquitous across multiple domains, from coordinating remote work meetings to connecting with family members using smartphone video chat features.

It is also worth noting that many of the most unique strengths of TMH-V involve providing services directly to patients' homes versus to remote clinics—for instance allowing immobile and severely ill patients to receive care, providing a window into a patients' living environment, and serving as a stepping stone into services for avoidant or highly anxious patients (Fletcher et al., 2018; Gordon et al., 2015; Lindsay et al., 2017). Advancements in technology, including improved wireless connectivity and facilitated access to smartphones and tablets, will allow more TMH-V to take place within patients' homes, which may further increase the relative advantages of this modality. Only five of the included studies in this review delivered TMH-V to patients' homes, and four of those studies were published in the past three years, highlighting the relative novelty of this modality and the need for additional research to understand possible effects of TMH-V delivery location (e.g., clinic or home) on provider and patient perceptions as well as clinical outcomes.

Yet importantly, current findings reveal that providers prefer in-person contact when given the choice. It therefore remains likely that regardless of future advancements in technology, in-person contact will continue to be preferred by many providers and patients when it is easily accessible. As such, TMH-V can be viewed as one of many effective treatment modalities whose relative advantage will vary depending on the unique circumstances of each clinical contact. For some patients with significant barriers to receiving in-person care, TMH-V technology may represent the first and only way in which they are able to undergo therapy. Even if a provider may generally prefer in-person appointments when given the choice, the benefit of providing therapy via TMH-V to a patient who otherwise would receive none is clear. A hybrid model of care may be ideal in other cases, such that patients receive a combination of in-person and TMH-V sessions based on changing needs over the course of therapy (Yellowlees & Nafiz, 2010). These hybrid care structures will likely become more common as TMH-V uptake increases, and their use and effectiveness should be studied.

In sum, the current review revealed that providers' attitudes toward TMH-V are positive overall, despite the acknowledgment of multiple drawbacks to its use. This finding suggests that the relative advantages of TMH-V in certain circumstances, such as increasing access to care where services are limited, may outweigh its various disadvantages from the provider perspective. Gaining experience conducting TMH-V sessions with patients may lessen perceived drawbacks of use and foster the development of strategies and workarounds to improve care delivery. As health-care systems increasingly prioritize TMH-V, it will be crucial to consider providers' attitudes and perspectives when working to facilitate uptake, as they will play a key role in the successful implementation of this innovation.

## ACKNOWLEDGMENTS

We are grateful to Terri Fletcher, Ph.D., Julianna Hogan, Ph.D., and Sonora Hudson, M.A. for their careful reads of the manuscript. The research reported here was supported in part by the Department of Veterans Affairs, Veterans Health Administration, VISN 1 Career Development Award to Samantha L. Connolly. SLC's contribution to this

work was also supported in part by the Department of Veterans Affairs Office of Academic Affiliations Advanced Fellowship Program in Health Services Research, the Center for Healthcare Organization and Implementation Research (CHOIR), VA Boston Healthcare System. CJM and MSB's contribution to this work was supported by the Behavioral Health Quality Enhancement Research Initiative (QUERI QUE 15-289). JAL's contribution was partly supported by use of facilities and resources of the Michael E. DeBakey VA Medical Center, HSR&D Center for Innovations in Quality, Effectiveness and Safety (CIN13-413) and by the South Central Mental Illness Research, Education and Clinical Center. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health, the U.S. Department of Veterans Affairs, the U.S. Government, Harvard Medical School, or Baylor College of Medicine.

**Funding information**

Behavioral Health Quality Enhancement Research Initiative, Grant/Award Number: QUERI QUE 15-289; Michael E. DeBakey VA Medical Center; Department of Veterans Affairs, Veterans Health Administration, VISN 1 Career Development Award; Department of Veterans Affairs Office of Academic Affiliations Advanced Fellowship Program in Health Services Research, the Center for Healthcare Organization and Implementation Research (CHOIR), VA Boston Healthcare System; HSR&D Center for Innovations in Quality, Effectiveness and Safety, Grant/Award Number: CIN13-413; South Central Mental Illness Research, Education and Clinical Center

# REFERENCES

Adler G, Pritchett LR, Kauth MR, & Nadorff D (2014). A pilot project to improve access to telepsychotherapy at rural clinics. Telemedicine and e-Health, 20(1), 83–85. 10.1089/tmj.2013.0085 [PubMed: 24168721]

Adler-Milstein J, Kvedar J, & Bates DW (2014). Telehealth among US hospitals: Several factors, including state reimbursement and licensure policies, influence adoption. Health Affairs, 33(2), 207–215. 10.1377/hlthaff.2013.1054 [PubMed: 24493762]

Austen S, & McGrath M (2006). Telemental health technology in deaf and general mental-health services: Access and use. American Annals of the Deaf, 151(3), 311–317. 10.1353/aad.2006.0033 [PubMed: 17087441]

Australian Government Department of Health. (2018, August 31). Better access telehealth services for people in rural and remote areas. Retrieved from http://www.health.gov.au/internet/main/publishing.nsf/Content/mental-ba-telehealth

Baird MB, Whitney L, & Caedo CE (2018). Experiences and attitudes among psychiatric mental health advanced practice nurses in the use of telemental health: Results of an online survey. Journal of the American Psychiatric Nurses Association, 24(3), 235–240. 10.1177/1078390317717330 [PubMed: 28748728]

Bashshur RL, Shannon GW, Bashshur N, & Yellowlees PM (2016). The empirical evidence for telemedicine interventions in mental disorders. Telemedicine and e-Health, 22(2), 87–113. 10.1089/tmj.2015.0206 [PubMed: 26624248]

Brooks E, Manson SM, Bair B, Dailey N, & Shore JH (2012). The diffusion of telehealth in rural American Indian communities: A retrospective survey of key stakeholders. Telemedicine and e-Health, 18(1), 60–66. 10.1089/tmj.2011.0076 [PubMed: 22082106]

Brooks E, Turvey C, & Augusterfer EF (2013). Provider barriers to telemental health: Obstacles overcome, obstacles remaining. Telemedicine and e-Health, 19(6), 433–437. 10.1089/tmj.2013.0068 [PubMed: 23590176]

Cipolletta S, & Mocellin D (2018). Online counseling: An exploratory survey of Italian psychologists' attitudes towards new ways of interaction. Psychotherapy Research, 28(6), 909–924. 10.1080/10503307.2016.1259533 [PubMed: 28068875]

Cruz M, Krupinski EA, Lopez AM, & Weinstein RS (2005). A review of the first five years of the University of Arizona telepsychiatry programme. Journal of Telemedicine and Telecare, 11(5), 234–239. 10.1258/1357633054471821 [PubMed: 16035965]

Cunningham DL, Connors EH, Lever N, & Stephan SH (2013). Providers' perspectives: Utilizing telepsychiatry in schools. Telemedicine and e-Health, 19(10), 794–799. 10.1089/tmj.2012.0314 [PubMed: 23980938]

Damschroder LJ, Aron DC, Keith RE, Kirsh SR, Alexander JA, & Lowery JC (2009). Fostering implementation of health services research findings into practice: A consolidated framework for

advancing implementation science. Implementation Science, 4(1), 50. 10.1186/1748-5908-4-50 [PubMed: 19664226]

Elford DR, White H, St John K, Maddigan B, Ghandi M, & Bowering R (2001). A prospective satisfaction study and cost analysis of a pilot child telepsychiatry service in Newfoundland. Journal of Telemedicine and Telecare, 7(2), 73–81. 10.1258/1357633011936192

Elford R, White H, Bowering R, Ghandi A, Maddiggan B, & John KS (2000). A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. Journal of Telemedicine and Telecare, 6(2), 73–82. 10.1258/1357633001935086 [PubMed: 10824374]

Ertelt TW, Crosby RD, Marino JM, Mitchell JE, Lancaster K, & Crow SJ (2011). Therapeutic factors affecting the cognitive behavioral treatment of bulimia nervosa via telemedicine versus face-to-face delivery. International Journal of Eating Disorders, 44(8), 687–691. 10.1002/eat.20874 [PubMed: 22072405]

Fletcher TL, Hogan JB, Keegan F, Davis ML, Wassef M, Day S, & Lindsay JA (2018). Recent advances in delivering mental health treatment via video to home. Current Psychiatry Reports, 20(8), 1–9. 10.1007/s11920-018-0922-y [PubMed: 29368239]

Gelber H (2001). The experience in Victoria with telepsychiatry for the child and adolescent mental health service. Journal of Telemedicine and Telecare, 7(2), 32–34. 10.1258/1357633011937065

Gibson K, O'Donnell S, Coulson H, & Kakepetum-Scghultz T (2011). Mental health professionals' perspectives of telemental health with remote and rural First Nations communities. Journal of Telemedicine and Telecare, 17(5), 263–267. 10.1258/jtt.2011.101011 [PubMed: 21824967]

Gilmore AK, & Ward-Ciesielski EF (2019). Perceived risks and use of psychotherapy via telemedicine for patients at risk for suicide. Journal of Telemedicine and Telecare, 25(1), 59–63. 10.1177/1357633X17735559 [PubMed: 28990454]

Glover JA, Williams E, Hazlett LJ, & Campbell N (2013). Connecting to the future: Telepsychiatry in postgraduate medical education. Telemedicine and e-Health, 19(6), 474–479. 10.1089/tmj.2012.0182 [PubMed: 23570291]

Glueckauf RL, Maheu MM, Drude KP, Wells BA, Wang Y, Gustafson DJ, & Nelson EL (2018). Survey of psychologists' telebehavioral health practices: Technology use, ethical issues, and training needs. Professional Psychology: Research and Practice, 49(3), 205. 10.1037/pro0000188

Godleski L, Darkins A, & Peters J (2012). Outcomes of 98,609 US Department of Veterans Affairs patients enrolled in telemental health services, 2006–2010. Psychiatric Services, 63(4), 383–385. 10.1176/appi.ps.201100206 [PubMed: 22476305]

Gordon RM, Wang X, & Tune J (2015). Comparing psychodynamic teaching, supervision, and psychotherapy over videoconferencing technology with Chinese students. Psychodynamic Psychiatry, 43(4), 585–599. 10.1521/pdps.2015.43.4.585 [PubMed: 26583442]

Grady B, Myers KM, Nelson E-L, Belz N, Bennett L, Carnahan L, … Voyles D (2011). Evidence-based practice for telemental health. Telemedicine and e-Health, 17(2), 131–148. 10.1089/tmj.2010.0158 [PubMed: 21385026]

Hailey D, Roine R, & Ohinmaa A (2008). The effectiveness of telemental health applications: A review. The Canadian Journal of Psychiatry, 53(11), 769–778. 10.1177/070674370805301109 [PubMed: 19087471]

Higgins JP, & Green S (2011). Cochrane handbook for systematic reviews of interventions 5.1.0. The Cochrane Collaboration, 33–49.

Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, & Yellowlees PM (2013). The effectiveness of telemental health: A 2013 review. Telemedicine and e-Health, 19(6), 444–454. 10.1089/tmj.2013.0075 [PubMed: 23697504]

Hilty DM, Maheu MM, Drude KP, & Hertlein KM (2018). The need to implement and evaluate telehealth competency frameworks to ensure quality care across behavioral health professions. Academic Psychiatry, 42(6), 818–824. 10.1007/s40596-018-0992-5 [PubMed: 30426453]

Hubley S, Lynch SB, Schneck C, Thomas M, & Shore J (2016). Review of key telepsychiatry outcomes. World Journal of Psychiatry, 6(2), 269–282. 10.5498/wjp.v6.i2.269 [PubMed: 27354970]

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

Connolly et al.

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

Page 17

Interian A, King AR, St. Hill LM, Robinson CH, & Damschroder LJ (2017). Evaluating the implementation of home-based videoconferencing for providing mental health services. Psychiatric Services, 69(1), 69–75. 10.1176/appi.ps.201700004 [PubMed: 28859586]

Jameson JP, Farmer MS, Head KJ, Fortney J, & Teal CR (2011). VA community mental health service providers' utilization of and attitudes toward telemental health care: The gatekeeper's perspective. Journal of Rural Health, 27(4), 425–432. 10.1111/j.1748-0361.2011.00364.x

Kopel H, Nunn K, & Dossetor D (2001). Evaluating satisfaction with a child and adolescent psychological telemedicine outreach service. Journal of Telemedicine and Telecare, 7(2), 35–40. 10.1258/1357633011937074 [PubMed: 11747654]

Kruse CS, Krowski N, Rodriguez B, Tran L, Vela J, & Brooks M (2017). Telehealth and patient satisfaction: A systematic review and narrative analysis. British Medical Journal Open, 7(8), e016242. 10.1136/bmjopen-2017-016242

Lacktman NM, & Rosen DL (2017). 2017 Telemedicine and digital health survey. Retrieved from https://www.foley.com/files/uploads/2017-Telemedicine-Survey-Report-11-8-17.pdf

Levy S, & Strachan N (2013). Child and adolescent mental health service providers' perceptions of using telehealth. Mental Health Practice, 17(1), 28–32. 10.7748/mhp2013.09.17.1.28.e810

Lindsay JA, Hudson S, Martin L, Hogan JB, Nessim M, Graves L, … White D (2017). Implementing video to home to increase access to evidence-based psychotherapy for rural veterans. Journal of Technology in Behavioral Science, 2(3–4), 140–148. 10.1007/s41347-017-0032-4 [PubMed: 32346604]

Martin DJ, Garske JP, & Davis MK (2000). Relation of the therapeutic alliance with outcome and other variables: A meta-analytic review. Journal of Consulting and Clinical Psychology, 68(3), 438–450. 10.1037/0022-006X.68.3.438 [PubMed: 10883561]

Mayworm AM, Lever N, Gloff N, Cox J, Willis K, & Hoover SA (2019). School-based telepsychiatry in an urban setting: Efficiency and satisfaction with care. Telemedicine and e-Health, 1–9, 10.1089/tmj.2019.0038 [PubMed: 30633720]

McMinn MR, Bearse J, Heyne LK, Smithberger A, & Erb AL (2011). Technology and independent practice: Survey findings and implications. Professional Psychology: Research and Practice, 42(2), 176. 10.1037/a0022719

Mitchell SA, MacLaren AT, Morton M, & Carachi R (2009). Professional opinions of the use of telemedicine in child & adolescent psychiatry. Scottish Medical Journal, 54(3), 13–16. 10.1258/rsmsmj.54.3.13

Monthuy-Blanc J, Bouchard S, Maïano C, & Seguin M (2013). Factors influencing mental health providers' intention to use telepsychotherapy in First Nations communities. Transcultural Psychiatry, 50(2), 323–343. 10.1177/1363461513487665 [PubMed: 23666941]

Moreau JL, Cordasco KM, Young AS, Oishi SM, Rose DE, Canelo I, … Hamilton AB (2018). The use of telemental health to meet the mental health needs of women using Department of Veterans Affairs services. Women's Health Issues, 28(2), 181–187. 10.1016/j.whi.2017.12.005 [PubMed: 29339013]

Newman L, Bidargaddi N, & Schrader G (2016). Service providers' experiences of using a telehealth network 12 months after digitisation of a large Australian rural mental health service. International Journal of Medical Informatics, 94, 8–20. 10.1016/j.ijmedinf.2016.05.006 [PubMed: 27573307]

O'Gorman LD, Hogenbirk JC, & Warry W (2015). Clinical telemedicine utilization in Ontario over the Ontario Telemedicine Network. Telemedicine and e-Health, 22(6), 473–479. 10.1089/tmj.2015.0166 [PubMed: 26544163]

Perle JG, Burt J, & Higgins WJ (2014). Psychologist and physician interest in telehealth training and referral for mental health services: An exploratory study. Journal of Technology in Human Services, 32(3), 158–185. 10.1080/15228835.2014.894488

Pesämaa L, Ebeling H, Kuusimäki M-L, Winblad I, Isohanni M, & Moilanen I (2007). Videoconferencing in child and adolescent psychiatry in Finland–an inadequately exploited resource. Journal of Telemedicine and Telecare, 13(3), 125–129. 10.1258/135763307780677631 [PubMed: 17519053]

Ruskin PE, Silver-Aylaian M, Kling MA, Reed SA, Bradham DD, Hebel JR, … Hauser P (2004). Treatment outcomes in depression: Comparison of remote treatment through

Connolly et al.                                                                                                      Page 18

telepsychiatry to in-person treatment. American Journal of Psychiatry, 161(8), 1471–1476. 10.1176/appi.ajp.161.8.1471 [PubMed: 15285975]

Schopp L, Johnstone B, & Merrell D (2000). Telehealth and neuropsychological assessment: New opportunities for psychologists. Professional Psychology: Research and Practice, 31(2), 179. 10.1037/0735-7028.31.2.179

Shore JH (2013). Telepsychiatry: Videoconferencing in the delivery of psychiatric care. American Journal of Psychiatry, 170(3), 256–262. 10.1176/appi.ajp.2012.12081064 [PubMed: 23450286]

Shore JH, Yellowlees P, Caudill R, Johnston B, Turvey C, Mishkind M, … Hilty D (2018). Best practices in videoconferencing-based telemental health, April 2018. Telemedicine and e-Health, 24(11), 827–832. 10.1089/tmj.2018.0237 [PubMed: 30358514]

Shulman M, John M, & Kane JM (2017). Home-based outpatient telepsychiatry to improve adherence with treatment appointments: A pilot study. Psychiatric Services, 68(7), 743–746. 10.1176/appi.ps.201600244 [PubMed: 28245700]

Simms DC, Gibson K, & O'Donnell S (2011). To use or not to use: Clinicians' perceptions of telemental health. Canadian Psychology, 52(1), 41. 10.1037/a0022275

Starling J, & Foley S (2006). From pilot to permanent service: Ten years of paediatric telepsychiatry. Journal of Telemedicine and Telecare, 12(3), 80–82. 10.1258/135763306779380147

Thomas JF, Novins DK, Hosokawa PW, Olson CA, Hunter D, Brent AS, … Libby AM (2017). The use of telepsychiatry to provide cost-efficient care during pediatric mental health emergencies. Psychiatric Services, 69(2), 161–168. 10.1176/appi.ps.201700140 [PubMed: 29032703]

U.S. Department of Veterans Affairs (2018). VA expands telehealth by allowing health care providers to treat patients across state lines [Press release]. Retrieved from https://www.va.gov/opa/pressrel/pressrelease.cfm?xml:id=4054

Venkatesh V, Morris MG, Davis GB, & Davis FD (2003). User acceptance of information technology: Toward a unified view. MIS Quarterly, 27(3), 425–478. Retrieved from https://www.jstor.org/stable/30036540?seq=1#metadata_info_tab_contents

Volpe T, Boydell KM, & Pignatiello A (2013). Attracting child psychiatrists to a televideo consultation service: The TeleLink experience. International Journal of Telemedicine and Applications, 4, 1–8. 10.1155/2013/146858

Wagnild G, Leenknecht C, & Zauher J (2006). Psychiatrists' satisfaction with telepsychiatry. Telemedicine & e-Health, 12(5), 546–551. 10.1089/tmj.2006.12.546 [PubMed: 17042708]

Whitten P, & Kuwahara E (2004). A multi-phase telepsychiatry programme in Michigan: Organizational factors affecting utilization and user perceptions. Journal of Telemedicine and Telecare, 10(5), 254–261. 10.1258/1357633042026378 [PubMed: 15494082]

Whitten PS, & Mackert MS (2005). Addressing telehealth's foremost barrier: Provider as initial gatekeeper. International Journal of Technology Assessment in Health Care, 21(4), 517–521. 10.1017/S0266462305050725 [PubMed: 16262977]

Wicklund E (2019a). Telemedicine licensure compact is now live in half the country. mHealth Intelligence. Retrieved from https://mhealthintelligence.com/news/telemedicine-licensure-compact-is-now-live-in-half-the-country

Wicklund E (2019b). Telehealth licensure compact for psychologists is ready to go live. mHealth Intelligence. Retrieved from https://mhealthintelligence.com/news/telehealth-licensure-compact-for-psychologists-is-ready-to-go-live

Wynn R, Bergvik S, Pettersen G, & Fossum S (2012). Clinicians' experiences with videoconferencing in psychiatry. Studies in Health Technology and Informatics, 180, 1218–1220. Retrieved from https://www.ncbi.nlm.nih.gov/pubmed/22874406 [PubMed: 22874406]

Yellowlees P, & Nafiz NJ (2010). The psychiatrist-patient relationship of the future: Anytime, anywhere? Harvard Review of Psychiatry, 18(2), 96–102. 10.3109/10673221003683952 [PubMed: 20235774]

Zur O (2019). TeleMental health services across state lines. Zur Institute. Retrieved from https://www.zurinstitute.com/telehealth-across-state-lines/

VA Author Manuscript

VA Author Manuscript

VA Author Manuscript

Connolly et al. Page 19

**Public Health Significance**

Mental health providers can conduct appointments remotely via videoconferencing, a form of telemental health (TMH-V) which can increase access to care for patients who live far from specialty providers or have difficulty leaving their homes. It is important to understand providers' attitudes toward this technology, as they play a crucial role in whether this service will be widely adopted by health-care systems and will therefore be offered to patients. The current review found that providers feel positive toward TMH-V despite reporting multiple drawbacks; this suggests that the relative advantages of TMH-V, such as its ability to increase access to care, may outweigh its disadvantages, including technological problems, increased hassle, and perceptions of feeling impersonal.

Connolly et al. Page 20



**FIGURE 1.**
Modified PRISMA diagram

VA Author Manuscript    VA Author Manuscript    VA Author Manuscript

Connolly et al.                                                                                          Page 21

**TABLE 1**

Summary of articles included in systematic review ($N = 38$)

| References | N | Providers sampled and TMH-V experience | TMH-V services provided | Patients served | Location of patients' TMH-V care | Study design and/or provider measures (Additional collected data not analyzed in current review included in italics) | Main findings |
|---|---|---|---|---|---|---|---|
| 1. Adler et al. (2014) | 12 | Psychologists, social workers, and counselors; 2 of the 12 clinicians ultimately provided TMH-V | Psychotherapy | Veterans in South Central United States | VA community-based outpatient clinics | Pre–post surveys of providers who both did and did not engage in TMH-V intervention | Adopters had more positive views of TMH-V at preassessment and nonadopters endorsed more barriers. Adopters noted increases in knowledge, confidence, and motivation at postassessment. Intervention was less disruptive than initially imagined |
| 2. Austen and McGrath (2006) | 134 | Nurses, psychologists, and psychiatrists, 12% had TMH-V experience | Psychotherapy and/or medication management | Deaf and nondeaf patients in the UK | Unknown or not applicable | Questionnaire | Those with experience using TMH-V felt more confident regarding their abilities to use the technology. Providers report relatively low access to TMH-V technologies |
| 3. Baird et al. (2018) | 83 | Psychiatric advanced practice nurses; 63% had TMH-V experience | Telenursing | Children and adults in the United States | Unknown or not applicable | Online survey | Attitudes toward TMH-V were positive overall, and providers would like more training |
| 4. Brooks et al. (2012) | 39 | Unspecified clinicians involved in developing 3 TMH-V clinics | Psychotherapy and/or medication management | Native American Veterans in the Northern Plains | VA community-based outpatient clinics | Semi-structured phone interviews *Implementation process and timeline data also collected* | Positive impressions of TMH-V increased over time from 67% to 82%, due to providers gaining experience and receiving positive feedback from patients and staff |
| 5. Cipolletta and Mocellin (2018) | 289 | Psychologists; 8.3% had TMH-V experience | Psychotherapy | Patients in Italy | Unknown or not applicable | Anonymous survey *E-mail, text, and online forum data also collected* | 62.6% were favorable toward TMH-V |
| 6. Cruz et al. (2005) | 4 | Psychiatrists, psychologist; all provided TMH-V care | Psychotherapy, medication management, and/or consultation | Children, adolescents, and adults in Arizona | Referring rural hospitals with no mental health providers | Satisfaction form completed after each patient contact *Patient data (satisfaction, diagnoses, demographics, # of visits) also collected* | Providers noted that TMH-V improved clinical efficiency for 61% of appointments, but were generally less satisfied with TMH-V and endorsed more barriers than their patients |
| 7. Cunningham et al. (2013) | 10 | Psychiatrist, social workers, and counselors; all provided TMH-V care | Consultation | Schoolchildren in urban Maryland | 8 schools | Anonymous online survey | Providers reported positive experiences with TMH-V, rated comfort using technology as 9.75 out of 10 and described process as efficient |
| 8. Elford et al. (2000) | 5 | Psychiatrists; all provided TMH-V care | Diagnostic assessments | Children and adolescents in Newfoundland | Child psychiatry center within a hospital | Pre–post surveys of TMH-V intervention, satisfaction questionnaires after each assessment *Also measured agreement between TMH-V and in-person diagnoses and patient/parent satisfaction* | 21 of 23 sessions rated as going moderately well or very well. All psychiatrists endorsed TMH-V as acceptable alternative to in-person sessions, but they prefer in-person and feel it allows for better communication. Noted fewer barriers and less skepticism toward TMH-V at follow-up compared to baseline |

VA Author Manuscript        VA Author Manuscript        VA Author Manuscript

Connolly et al.                                                                                                     Page 22

| References | N | Providers sampled and TMH-V experience | TMH-V services provided | Patients served | Location of patients' TMH-V care | Study design and/or provider measures (*Additional collected data not analyzed in current review included in italics*) | Main findings |
|---|---|---|---|---|---|---|---|
| 9. Elford et al. (2001) | 5 | Psychiatrists; all provided TMH-V care | Diagnostic assessments | Children and adolescents in Newfoundland | Child psychiatry center within a hospital | Satisfaction questionnaires after each assessment; *Patient/parent satisfaction and cost data also collected* | All 25 assessments rated as satisfactory or very satisfactory; 21 were rated as equivalent to in-person, 3 as not as good but "good enough," and 1 as superior to in-person due to ability to zoom camera on facial tic for diagnostic purposes |
| 10. Ertelt et al. (2011) | 6 | Psychologists; all provided both TMH-V and in-person care | Cognitive behavioral therapy for bulimia | Adults with bulimia diagnoses in North Dakota and Minnesota | Distal therapy sites | RCT comparing TMH-V to in-person treatment. Providers completed Working Alliance Inventory (WAI) questionnaire; *Patient WAI data also collected* | Providers rated adherence to therapeutic tasks, goals, and therapeutic bond significantly higher for in-person versus TMH-V sessions; TMH-V means were 1–2 points lower than in-person. No significant differences in patient ratings of in-person and TMH-V sessions |
| 11. Gelber (2001) | 25 | Unspecified clinicians; all delivered TMH-V care | Consultation and other clinical work | Children and adolescents in rural Australia | CAMHS clinics | Telephone survey. *Length and frequency of use data also collected* | 50% valued TMH-V use and 45% valued highly. 96% reported an increased comfort level over time, described adapting to the technology |
| 12. Gibson et al. (2011) | 68 | Psychologists, psychiatrists, social workers, and nurses; 49% had TMH-V experience | Consultation | Patients in remote and rural First Nations communities in Canada | Community centers | Online survey of all providers and qualitative interviews of those with TMH-V experience. *Frequency of use data also collected* | 50% of survey respondents rate TMH-V as useful, 9% rate as not useful at all. Those who rated TMH-V as easier and more useful and who underwent training were more likely to use TMH-V more often. TMH-V is described as becoming easier to use with more experience |
| 13. Gilmore and Ward-Ciesielski (2019) | 52 | Masters and PhD level psychotherapists; 50% had TMH-V experience | Psychotherapy | Patients with acute suicide risk in the United States | Unknown or not applicable | Online survey | Providers who had more positive attitudes toward TMH-V and had more years in practice were more likely to use TMH-V with patients at a high risk for suicide |
| 14. Glover et al. (2013) | 283 | Psychiatry residents; 18% had TMH-V experience | Medication management | Children, adolescents, and adults in the United States | Unknown or not applicable | Online survey. *Frequency of use data also collected* | 72% were interested/very interested in TMH-V. 72% of those with prior experience said that their interest in TMH-V increased with use. 40% said TMH-V is not equal to in-person care, while 34% felt it is equal |
| 15. Glueckauf et al. (2018) | 164 | Psychologists; 26% had TMH-V experience | Psychotherapy | Children, adolescents, and adults in the United States | Unknown or not applicable | Anonymous online survey. *Telephone, text, e-mail, and frequency of use data also collected* | 73% describe TMH-V as useful |
| 16. Gordon et al. (2015) | 176 | Psychologists, psychiatrists, and social workers; 79% had used TMH-V for >3 years | Psychodynamic psychotherapy | Students in China | Patient's home | Online survey. *Attitudes toward teaching and supervision via telehealth also measured* | TMH-V rated as "slightly less effective" than in-person care on factors such as symptom reduction, privacy, exploring transference and countertransference, and relational problems |
| 17. Interian et al. (2017) | 33 | Psychologists, psychiatrists, social workers, and nurses; 61% had TMH-V experience | Psychotherapy | Urban, suburban, and rural US veterans | Patient's home | Semi-structured interviews. *Implementation process and rate of uptake data also collected* | Those with no TMH-V experience more consistently questioned the effectiveness of TMH-V as compared to current users. Current users noted satisfaction with TMH-V but also encountered significant logistical barriers |

VA Author Manuscript    VA Author Manuscript    VA Author Manuscript

Connolly et al.

Page 23

| References | N | Providers sampled and TMH-V experience | TMH-V services provided | Patients served | Location of patients' TMH-V care | Study design and/or provider measures (*Additional collected data not analyzed in current review included in italics*) | Main findings |
|---|---|---|---|---|---|---|---|
| 18. Jameson et al. (2011) | 86 | Psychologists, psychiatrists, social workers, and therapists; 58% had TMH-V experience | Medication management and psychotherapy | Urban and rural veterans in southern United States | VA community-based outpatie | Semi-structured interviews and phone surveys *Utilization data also collected* | Effectiveness scores for diagnostic interviews and psychotherapy were positive. Providers wanted to see research comparing TMH-V to in-person effectiveness, noted loss of in-person contact and technical issues as barriers |
| 19. Kopel et al. (2001) | 8 | Psychiatrists; all providers delivered TMH-V care | Assessment and consultation | Children and adolescents in rural New South Wales | Mental health clinics | Technology evaluation questionnaire completed after each assessment *Patient and parent satisfaction data also collected* | 79% of sessions rated as adequate compared to in-person, 15% almost as good, 4% poor, and 1% rated as good as in-person. Ease of use rated as fair at 47% of sessions and good or excellent at 49% of sessions. Providers surprised how positively families responded to TMH-V |
| 20. Levy and Strachan (2013) | 61 | Medical, nursing, and psychology staff; 62% had TMH-V experience | Assessment and intervention | Children and adolescents in rural Scotland | CAMHS clinics | Online and paper surveys | Majority think TMH-V would improve local access and are willing to introduce it into their service, but most would prefer in-person care |
| 21. Lindsay et al. (2017) | 5 | Psychologists, social workers, counselors, and psychology interns; all delivered TMH-V care during intervention | Psychotherapy | Veterans in rural Mississippi | Patient's home | Qualitative phone interviews *Implementation process and uptake data also collected; qualitative interviews also conducted with patients* | Overall satisfaction with TMH-V modality. Providers noted multiple barriers to use but described being flexible and adapting following unforeseen technological issues |
| 22. Mayworm et al. (2019) | 7 | Psychiatrists; all conducted TMH-V and in-person sessions | Medication management and assessment | Schoolchildren in Baltimore | 25 schools | Anonymous satisfaction surveys, focus groups *Patient, caregiver, and referring clinician satisfaction data also collected; efficiency analyses also conducted* | Providers rated satisfaction with TMH-V 4 out of 5. Note increased access to care and flexibility. Ease of use rated lower. Providers preferred in-person sessions but satisfaction rates were similar between modalities |
| 23. Mitchell et al. (2009) | 19 | Psychologists, psychiatrists, social worker, and nurse; all with TMH-V experience | Direct clinical care | Children and adolescents in Scotland | CAMHS clinics and hospitals | Questionnaires | 79% prefer TMH-V over telephone communication. More benefits of TMH-V were noted as compared to drawbacks |
| 24. Monthuy-Blanc et al. (2013) | 205 | Psychologists, social workers, nurses, natural helpers; none had TMH-V experience | Psychotherapy | First Nations communities in Canada | Unknown or not applicable | Technology Acceptance Questionnaire | The only significant predictor of providers' intention to use TMH-V was its perceived usefulness |
| 25. Moreau et al. (2018) | 40 | Psychologists, social workers, primary care providers; some had TMH-V experience | Psychotherapy | Female veterans in urban and rural Midwest and southern United States | VA facilities | Semi-structured qualitative interviews | Providers enthusiastic about using TMH-V to improve access to care for female veterans. Noted multiple barriers including technology challenges and need for safety protocols |
| 26. Newman et al. (2016) | >40 | Psychiatrists, nurse practitioners; some had TMH-V experience | Psychotherapy and assessment | Patients in rural Australia | Hospitals and clinics | Phone interviews and focus groups *Utilization data also collected* | TMH-V accepted for varying extents across providers, with many citing its ability to increase access. Multiple drawbacks noted as well as a |

*Clin Psychol (New York)*. Author manuscript; available in PMC 2022 August 11.

VA Author Manuscript    VA Author Manuscript    VA Author Manuscript

Connolly et al.

VA Author Manuscript    VA Author Manuscript    VA Author Manuscript

| References | N | Providers sampled and TMH-V experience | TMH-V services provided | Patients served | Location of patients' TMH-V care | Study design and/or provider measures (Additional collected data not analyzed in current review included in italics) | Main findings |
|---|---|---|---|---|---|---|---|
| 27, Perle et al. (2014) | 782 | Psychologists and trainees; 19.4% had TMH-V experience | Psychotherapy | Patients in the United States and Canada | Unknown or not applicable | Online surveys | 79.5% agreed that TMH-V can be effective treatment; fewer (58.3%) felt TMH-V to patient's home would be effective. 42% unsure whether TMH-V is as effective as in-person care; need for further training and development of "telehealth culture" |
| 28, Pesämaa et al. (2007) | 26 | Psychiatrists; all had TMH-V experience | Consultation | Children and adolescents in Finland | Hospitals | Questionnaire. *Utilization data also collected* | All providers agreed that TMH-V saves time, costs, and work; 35% agreed that it improves the quality of services. Multiple technological barriers to use noted |
| 29, Ruskin et al. (2004) | 8 | Psychiatrists; all provided both TMH-V and in-person care | 8 sessions of medication management and supportive counseling over 6 months | Veterans in Maryland | VA facility | RCT comparing TMH-V to in-person treatment. Satisfaction questionnaire completed at week 26. *Patient satisfaction, adherence, treatment outcome, and cost data also collected* | Psychiatrist satisfaction was significantly greater for in-person sessions versus TMH-V. However, satisfaction ratings were high in both conditions, suggesting positive perception of TMH-V |
| 30, Schopp et al. (2000) | 9 | Psychologists and trainees; all conducted TMH-V and in-person sessions | Clinical interviews | Adults in rural midwestern United States | Hospitals and clinics | Satisfaction questionnaire after each in-person or TMH-V session, and qualitative interviews. *Patient satisfaction and cost data also collected* | Provider satisfaction was significantly higher for in-person versus TMH-V sessions. Providers described greater frustration with technological delays as compared to patients |
| 31, Shulman et al. (2017) | 31 | Psychiatrists; 6 of whom ultimately provided both TMH-V and in-person care | Medication management and psychotherapy | Patients at a New York hospital outpatient psychiatry clinic | Patient's home | RCT comparing in-person to TMH-V psychiatric care; providers completed online survey. *Patient satisfaction and adherence data also collected* | Authors reported difficulty recruiting providers; those who agreed only selected a fraction of their patients as appropriate for TMH-V care and reported concerns about technical problems and extra hassle. Patients had more positive opinions of TMH-V experience than providers |
| 32, Simms et al. (2011) | 185 | Psychologists, psychiatrists, social workers, and nurses; 40% had TMH-V experience | Psychotherapy | Patients, including Veterans, in Canada | Unknown or not applicable | Online survey and qualitative interviews | Majority rated TMH-V as very useful or somewhat useful, but more rated TMH-V as difficult to use as compared to easy. Those using TMH-V more frequently had more years in practice, more training, and perceived technology as useful and easy. Discussed barriers such as safety concerns and noted developing solutions |
| 33, Starling and Foley (2006) | 27 | Psychologists, psychiatrists, and social workers; all participated in TMH-V intervention | Consultation | Children and adolescents in rural New South Wales | Clinics | Questionnaire | 53% reported TMH-V is effective. Two providers reported it was "twice as hard" to conduct TMH-V sessions versus in-person due to difficulties engaging families, having to use shorter sentences and less nonverbal communication |

Connolly et al. Page 25

| References | N | Providers sampled and TMH-V experience | TMH-V services provided | Patients served | Location of patients' TMH-V care | Study design and/or provider measures (*Additional collected data not analyzed in current review included in italics*) | Main findings |
|---|---|---|---|---|---|---|---|
| 34. Thomas et al. (2017) | 148 | Psychiatrists and social workers; all providers delivered TMH-V care | Psychiatric emergency consultation | Children and adolescents in Colorado | Emergency departments | Telehealth satisfaction instrument completed after each consultation *Utilization and caregiver/ referring provider satisfaction data also collected* | Providers rated TMH-V as acceptable and rated ease of use and quality of care positively. Provider satisfaction scores were lower than those of referring providers and caregivers, likely due to increased workload, concerns regarding developing therapeutic alliance, and making accurate diagnoses |
| 35. Volpe et al. (2013) | 36 | Psychiatrists, 83% had TMH-V experience | Consultation and short-term follow-up | Children and adolescents in rural Ontario, Australia, and the United States | Mental health clinics and ho | Online survey of 26 providers, focus groups, and qualitative interviews with 10 providers with TMH-V experience | 68% of survey respondents described TMH-V as an important innovation providing increased access to care. 40% of survey respondents and majority of interviewees endorsed little to no differences between TMH-V and in-person consultations |
| 36. Wagnild et al. (2006) | 11 | Psychiatrists; all had TMH-V experience | Medication management | Children, adolescents, and adults in rural Montana | Hospitals and clinics | Semi-structured interviews | Four of 11 providers reported satisfaction with TMH-V. Agreed that TMH-V improves access but cited many barriers including technology issues, difficulty establishing rapport, and trouble reading nonverbal cues |
| 37. Whitten and Kuwahara (2004) | 36 | Psychiatrists; all participated in TMH-V intervention | Consultation | Children, adolescents, and adults in rural and urban Michigan | Clinic, youth center, crisis homes | Pre-post focus groups and interviews during project implementation *Utilization and patient satisfaction data also collected* | Majority of providers either started project with positive attitude toward TMH-V or developed positive attitude during providing; increased reported negative attitude toward TMH-V before and during implementation. Majority were reluctant to initiate TMH-V but were pleasantly surprised by level of TMH-V acceptance by their patients |
| 38. Wynn et al. (2012) | 11 | Psychologists and psychiatrists; none had TMH-V experience | Consultation | Patients in Norway | Not applicable | Qualitative interview | Providers were in general positive toward TMH-V given that they could first meet in-person. Had multiple concerns regarding potential effectiveness, technological difficulties, lack of training, and trouble developing rapport |

Abbreviations: CAMHS, Child and Adolescent Mental Health Services; RCT, randomized controlled trial; TMH-V, telemental health via videoconferencing.

VA Author Manuscript    VA Author Manuscript    VA Author Manuscript

VA Author Manuscript    VA Author Manuscript    VA Author Manuscript

Connolly et al.    Page 26

**TABLE 2**

Positive aspects of TMH-V generated by providers

| UTAUT constructs and author-derived subconstructs[a] | Article frequency (percentage)[b] | Included articles[c] |
|---|---|---|
| **Performance expectancy** | | |
| Increased access to care | 16 (42) | 5, 7, 12, 16, 17, 20, 21, 22, 23, 25, 26, 32, 34, 35, 36, 37 |
| Saves time and money, efficient | 12 (32) | 5, 6, 7, 11, 20, 21, 22, 23, 26, 28, 32, 35 |
| Can be more effective than in-person care | 8 (21) | 5, 7, 12, 16, 20, 21, 26, 37 |
| Patients like TMH | 6 (16) | 1, 4, 7, 16, 19, 37 |
| Increased flexibility | 4 (11) | 7, 21, 22, 35 |
| New opportunities for provider | 3 (8) | 3, 7, 35 |
| **Effort expectancy** | | |
| Easy to use | 7 (18) | 1, 8, 12, 19, 28, 34, 35 |
| **Social influence** | | |
| Organization supportive of TMH | 3 (8) | 4, 26, 35 |
| **Facilitating conditions** | | |
| Availability of good technical support | 4 (11) | 4, 12, 17, 35 |

Abbreviations: TMH-V, telemental health via videoconferencing; UTAUT, unified theory of acceptance and use of technology.

[a] UTAUT constructs are bolded, and author-derived constructs are unbolded.

[b] Frequency and percentage of articles that included the given subconstruct, total N=38.

[c] Numbers correspond to article numbers assigned in Table 1.

Connolly et al. Page 27

VA Author Manuscript        VA Author Manuscript        VA Author Manuscript

**TABLE 3**

Negative aspects of TMH-V generated by providers

| UTAUT constructs and author-derived subconstructs[a] | Article frequency (percentage)[b] | Included articles[c] |
|---|---|---|
| **Performance expectancy** | | |
| Impersonal/interferes with therapeutic relationship | 19 (54) | 3, 5, 6, 8, 9, 10, 11, 12, 13, 18, 20, 21, 28, 31, 32, 33, 34, 36, 38 |
| Safety and legal concerns | 13 (37) | 3, 4, 5, 8, 12, 13, 16, 21, 25, 27, 31, 32, 35 |
| Patients will not like TMH | 8 (23) | 1, 4, 17, 26, 31, 32, 36, 38 |
| Security and confidentiality concerns | 7 (20) | 3, 5, 20, 27, 35, 36, 38 |
| Not appropriate for certain patients | 5 (14) | 12, 21, 26, 32, 36 |
| Unable to conduct thorough assessment | 6 (16) | 8, 13, 22, 34, 36, 38 |
| **Effort expectancy** | | |
| Technological problems | 23 (66) | 4, 5, 6, 7, 8, 9, 11, 12, 17, 18, 19, 20, 21, 25, 26, 28, 30, 31, 32, 35, 36, 37, 38 |
| Increased work and hassle | 16 (46) | 1, 3, 4, 8, 17, 20, 21, 23, 26, 27, 31, 32, 33, 36, 37, 38 |
| **Social influence** | | |
| Poor communication or support from leadership | 2 (6) | 1, 17 |
| **Facilitating conditions** | | |
| Need for technical support and training | 9 (26) | 1, 3, 11, 20, 25, 28, 35, 36, 38 |
| Limited space, equipment, and funding | 6 (17) | 1, 11, 12, 23, 25, 28 |

Abbreviations: TMH-V, telemental health via videoconferencing; UTAUT, unified theory of acceptance and use of technology.

[a] UTAUT constructs are bolded, and author-derived constructs are unbolded.

[b] Frequency and percentage of articles that included the given subconstruct, total $N = 38$.

[c] Numbers correspond to article numbers assigned in Table 1.

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 88 of 329

JMIR Mental Health
Internet interventions, technologies and digital innovations for mental health and behaviour change

JMIR Publications

About     Search     Archive     Current Issue     Submit     Editorial Board

ISSN 2368-7959

JMIR Ment Health. 2021 Oct; 8(10): e22199.

Published online 2021 Oct 15. doi: 10.2196/22199: 10.2196/22199

PMCID: PMC8556637

PMID: 34652276

# Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages and Barriers

Monitoring Editor: Rita Kukafka and Gunther Eysenbach

Reviewed by Christel Salewski and Raquel De Boni

Beatriz Sora, PhD,⊠1 Rubén Nieto, PhD,2 Adrian Montesano del Campo, PhD,2 and Manuel Armayones, PhD3

1 Department of Psychology, Rovira i Virgili University, Tarragona, Spain

2 Department of Psychology, eHealth Center, Open University of Catalonia, Barcelona, Spain

3 eHealth Center, Open University of Catalonia, Barcelona, Spain

Beatriz Sora, Department of Psychology, Rovira i Virgili University, Campus Sescelades. Carretera Valls, s/n, Tarragona, 43007, Spain, Phone: 34 977558097 ext 8097, Email: beatriz.sora@urv.cat.

⊠Corresponding author.

Corresponding Author: Beatriz Sora beatriz.sora@urv.cat

Received 2020 Jul 6; Revisions requested 2020 Aug 24; Revised 2020 Oct 19; Accepted 2021 Aug 2.

Copyright ©Beatriz Sora, Rubén Nieto, Adrian Montesano del Campo, Manuel Armayones. Originally published in JMIR Mental Health (https://mental.jmir.org), 15.10.2021.

This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Mental Health, is properly cited. The complete bibliographic information, a link to the original publication on https://mental.jmir.org/, as well as this copyright and license information must be included.

## Abstract

### Background

Telepsychology is increasingly being incorporated in clinical practice, being offered in many psychotherapy centers, especially after the impact of the pandemic. However, there seems to be a remarkable discrepancy between the offer, or interest in, and real-world uptake of e-mental health interventions among the population. A critical precondition is clients' willingness to accept and use telepsychology, although this issue has thus far been overlooked in research.

9/18/23, 2:33 PM          Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages a…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 89 of 329

Objective

The aim of this study was to examine people's acceptance and use of telepsychology by adopting an extended model of the unified theory of acceptance and use of technology (UTAUT) that integrates perceived telepsychology advantages and barriers, usefulness perceptions, behavioral intention, and telepsychology use.

Methods

An online survey was conducted with a convenience sample of 514 participants. Structural equation models were computed to test a mediation model.

Results

Results supported the UTAUT model to explain participants' acceptance and use of telepsychology. They showed a causal chain in which perceived telepsychology advantages and barriers were related to telepsychology use through the perceived usefulness of and intention to use telepsychology.

Conclusions

Telepsychology use may be explained according to the UTAUT model when coupled with participants' perceptions of telepsychology advantages and barriers. Mental health stakeholders could consider these factors in order to increase the acceptance and use of telepsychology.

**Keywords:** telepsychology, telepsychology advantages, telepsychology barriers, telepsychology use, telepsychology usefulness, intention to use telepsychology

## Introduction

### Background

Every year, a high percentage of the population requires mental health services [1]. However, not all people have adequate access to the specialized mental health care they need. Figures illustrating this vary widely between studies and depend on the definition given to mental health care. For example, a representative European sample evidenced that while 6.5% of people had a need for mental health care, more than 3% of them did not receive the appropriate treatment [2]. The negative consequences of failing to treat these problems are well documented in the literature and include poor health outcomes, suicide, divorce, substance abuse, child neglect and abuse, and youth delinquency [3-5]. Thus, finding solutions that spread access to mental health care throughout the population is critical.

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 90 of 329

Information and communication technologies (ICT) have great potential to facilitate access to interventions. In this regard, telepsychology, which the American Psychological Association (APA) defines as "the provision of psychological services using telecommunication technologies," has appeared in recent years as an alternative to traditional face-to-face interventions, at least for a significant proportion of the population. Telepsychology involves the use of different electronic tools to deliver health care, which may range from telephones and fiber optics to interactive satellite video [6]. This work focuses on videoconferencing technology, which synchronously overcomes geographical barriers, thereby enabling people to see and talk to each other as if they were in the same room despite being apart.

Literature on telepsychology use (especially on the use of videoconferencing technology) has increased exponentially in recent years [7]. In this line, institutions such as the APA have created guidelines for the use of telepsychology [8]. Systematic reviews showing the positive effects of telepsychology have also appeared. For example, Varker et al [9] reviewed published research about the use of synchronous telepsychology to treat anxiety, post-traumatic stress disorder, and adjustment disorder. They found strong evidence pointing to the high-quality nature of this option, as well as to the equivalence between telephone- or videoconference-delivered interventions and face-to-face interventions. Although more research is needed, in general terms, available results suggest that telepsychology could produce equal results when compared to traditional interventions and that therapeutic alliance can be as successfully established in videoconference psychotherapy as in face-to-face interventions [10-12]. In addition, telepsychology is also gaining representativeness in routine clinical practice, especially after the pandemic. For instance, Pierce et al [13] surveyed a national sample of 2619 licensed psychologists in the United States and found that those practicing in outpatient facilities reported a 26-fold increase in telepsychology in response to the pandemic. Moreover, participants stated that 34.96% of their clinical work would be conducted via telepsychology after the pandemic ceases, reflecting an important shift in attitudes toward the use of telepsychology.

For really potentiating the use of telepsychology, a fundamental precondition, as with the implementation of any other new technology or application [14,15], is to study users' willingness to accept and use it. In general, there seems to be a remarkable discrepancy between the interest in and real-world uptake of e-mental health interventions among the population [16,17]. Studies have shed light on the fact that willingness to participate in e-mental health interventions is limited, either because of a low uptake rate among patients or low acceptance by the population in general [18-21].

Unfortunately, research has overlooked this issue. Only 3% of studies on eHealth, in general, focus on people's acceptance, making this an understudied domain [22,23]. Consequently, there is limited knowledge about people's genuine attitudes towards e-mental health and the reasons behind their intention to use it [14]. A comprehensive understanding of determinant factors for acceptance and use of e-mental health, in general, and telepsychology, in particular, represents an essential first step towards creating successful telepsychology services. This is a pressing issue in the current context of social distancing and the telepsychology revolution [13].

9/18/23, 2:33 PM          Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages a…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 91 of 329

## Acceptance and Use of Telepsychology: Unified Theory of Acceptance and Use of Technology (UTAUT) Model

Technology acceptance is a relatively mature area of research, and there is a significant amount of literature on the matter [24]. It presents several models, based mainly on social psychology, to explain people's acceptance and use of new technologies. Some more widely accepted theories on the use behavior of new technologies are the technology acceptance model (TAM) [25], theory of planned behavior (TPB) [26], theory of reasoned action (TRA) [27], motivational model (MM) [28], combined TAM and TPB (C-TAM-TPB) [29], model of personal computer use, theory of innovation diffusion (TID) [30], and social cognitive theory (SCT) [31]. These theories and models have since been fused to create a more complex framework: the unified theory of acceptance and use of technology (UTAUT) [24]. This model was proposed in order to combine the contributions of the mature yet fragmented literature on technology acceptance and to establish a unified theory to explain individuals' use and acceptance of technology. The UTAUT contemplates 4 core determinants of use and intention: (1) performance expectancy, (2) effort expectancy, (3) social influence, and (4) facilitating conditions. In this respect, Koivumäki et al [22] summarized their definitions as follows. Performance expectancy reflects the degree to which using a technology will facilitate the achievement of some goal (ie, technology will enhance quality of life performance). It involves determinants such as perceived usefulness, extrinsic motivation, job fit, relative advantages, and outcome expectations from technology acceptance studies. Effort expectancy represents the degree of ease associated with the use of a technology, such as ease of use and its determinants and complexity. Social influence is defined as the extent to which it is perceived that significant others (eg, family or friends) believe that they should use a technology. It reflects the determinants of social factors, subjective norms, and image from the technology acceptance literature. Facilitating conditions represent perceptions of the external resources and infrastructure that support the use of an information and technology system (eg, perceived behavioral control and compatibility). Finally, behavioral intention was defined as a measure of the strength of one's intention to perform a specific behavior [26]. It reflects the acceptance to use eHealth tools. More specifically, the UTAUT model [24] proposes that performance expectancy, effort expectancy, and social influence are direct predictors of the intention to use an innovative technology and that facilitating conditions and behavioral intention are direct determinants of actual use.

This model has been applied and tested in multiple contexts to provide insight into the forces that motivate individuals to adopt technology. In the case of eHealth, most empirical research singles out performance expectancy (eg, perceived usefulness) as the strongest predictor of technology acceptance [32-37]. Perceived usefulness is defined as the extent to which a person believes that using a system will help him or her to achieve their objectives [25]. It essentially captures people's cognitive expectations about the performance of the system, which determines the intention of technology use. In other words, if people believe that the new technology, in our case telepsychology, can help them, they will present higher intention to use it compared to those who do not perceive any benefit. In this line, several meta-analyses in the eHealth field show that perceived usefulness has the largest effects on behavioral intention (eg, [38,39]). Likewise, behavioral intention is the main predictor of use behavior (eg, [32,40]). Unfortunately, as mentioned previously, we are

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 92 of 329

not aware of any study that has specifically examined telepsychology; accordingly, people's acceptance and use of psychotherapy through videoconferencing — that is, telepsychology — are still unknown.

## Additional Determinants of Telepsychology Acceptance and Use: Advantages and Barriers

The UTAUT model [24] underpins the determinants of technology acceptance and use, making it the most complete model for predicting technology acceptance and use. However, given the complex nature of eHealth acceptance and its determinants, it necessary to extend this model and adapt it to different contexts [14].

A relevant line of research has expanded the UTAUT model by including success factors (eg, advantages) and resistance factors (eg, barriers) that drive people to adopt and use a certain technology (eg, [14,36,41,42]). At the initial stage of adoption of a new ICT, people have limited knowledge and thus struggle to decide whether to use it. There are likely opportunity factors that motivate them to use the new technology, as well as barrier or risk factors (understood as perceptions and not only as actual obstacles) that cause them to hesitate using it. Hence, perceived advantages and barriers represent reasons for or against the use of a technology [43].

Literature on eHealth suggests that the inclusion of ICT in mental health care services may pose several advantages and barriers for patients that conventional face-to-face interventions do not. Ebert et al [41] summarized them as follows. Advantages include the fact that (1) e-mental health interventions are more easily accessible at any time and place, (2) e-mental health interventions facilitate the integration of acquired skills in daily life because of the patients' active roles, (3) participants can work at their own pace and go through materials as often as they want, (4) travel time and costs are removed, and (5) e-mental health interventions may attract people who do not make use of traditional mental health services. The following barriers have been pointed out: (1) low expectancies regarding its effectiveness, (2) reservations regarding data security, (3) low comfort using such programs, (4) influence by important social contacts (eg, family and health professionals), (5) negative attitudes towards seeking psychological help in general, (6) low internet experience, and (7) high internet anxiety. Further studies added low internet orientation in health problems and insufficient knowledge of eHealth interventions [21] as well as worries about impersonal interaction [44].

In sum, research has paid special attention to advantages and barriers that may determine e-mental health care services. However, authors such as Henneman et al [14] call for further research, as knowledge about eHealth adoption barriers and advantages remains limited. For example, only a handful of empirical studies have simultaneously examined advantages and barriers [42], indicating that, to facilitate the use of eHealth applications, they need to integrate ease of use and usefulness with a certain level of reliability. Finally, in terms of telepsychology, we are not aware of any study that has specifically focused on psychotherapy through videoconferencing technology. Thus, the advantages of and barriers to adopting telepsychology remain to be studied.

## Research Purpose and Hypotheses

Case 2:90-cv-00520-KJM-SCR       Document 8253-2       Filed 05/28/24       Page 93 of 329

This study aimed to obtain a deeper understanding of people's acceptance and use of telepsychology by examining the determinant factors according to an extended UTAUT model that includes perceived telepsychology advantages and barriers. It represents a first step in the study of telepsychology acceptance and use. Thus, our goal was to examine the strongest predictors of technology use in the UTAUT model following eHealth literature (ie, usefulness perceptions and behavioral intention). Our conceptual model is displayed in Figure 1 and integrates telepsychology advantages and barriers as antecedents of usefulness perceptions and behavioral intention. It also considers usefulness perceptions and behavioral intention as key mediating mechanisms for telepsychology use. So, first, this model proposed that perceived telepsychology advantages and barriers may determine telepsychology usefulness. The more advantages and fewer barriers that are perceived, the more useful telepsychology will be perceived. Second, telepsychology usefulness is related to telepsychology use because, when people believe that telepsychology can help them, that is, it is useful, then they will have a higher intention to use it. Third, intention to use is related to use. Intention to use is a natural predictor of technology use. Finally, note that in the UTAUT model, sex and age play a moderator role in the relationship between usefulness and behavioral intention. They have significant effects in the model, so we included them as control variables to take into account their effects on telepsychology acceptance and use. Accordingly, we had the following hypotheses:

- Hypothesis 1 stated that perceived telepsychology barriers are negatively related with telepsychology usefulness.
- Hypothesis 2 stated that perceived telepsychology advantages are positively related with telepsychology usefulness.
- Hypothesis 3 stated that telepsychology usefulness is positively related with the intention to use telepsychology.
- Hypothesis 4 stated that the intention to use telepsychology is positively related to telepsychology use.
- Hypothesis 5 stated that telepsychology usefulness mediates the relationship between perceived telepsychology barriers (H5a) and advantages (H5b) and the intention to use telepsychology.
- Hypothesis 6 stated that the intention to use telepsychology mediates the relationship between telepsychology usefulness and telepsychology use.

## Methods

### Procedure and Sample

As we wanted to study the general population perspective, we recruited a convenience sample through an online advertisement published on our university's website. The ad explained the research project, explained its main objective, and asked for volunteers who might be willing to participate in our research by taking an open online survey. The ad also provided the link to the survey, which was implemented using the Qualtrics platform. In order to increase response rates, the researchers sent this link along with a brief summary of the research project to their contacts via email.

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 94 of 329

All of the surveys implemented in the host institution for research purposes are implemented using the Qualtrics platform, since it guarantees data protection. Qualtrics allows downloading responses in different formats. Once the survey closed, we downloaded data in Excel format and moved it to SPSS.

The survey was responsive to different devices, but we recommended that potential participants complete it using a computer since it was perceived by the research team and users who tested it in advance to be easier. The survey assessed the dimensions (presented in the order used for the survey) that are presented in the following sections. Questions had to be completed to progress in the survey and move to the next screen (if a question was not answered, the system provided an error message). There was a maximum of 10 screens (some of them did not appear if they were not applicable for the specific participant by taking into account his or her previous responses). There was not a specific number of items per screen since it depended on the type of item, but we always tried to avoid excessive scrolling.

The user's IP was not registered to guarantee anonymity; however, the Qualtrics system maintains an opened survey and saves a participant's progress for a week. So, during this period, if participants stopped and restarted the survey, they were directed to the exact place they were when they left the survey (if they used the same computer and browser). At the bottom of the screen, there was a progress bar.

The only inclusion criterion for participation was being older than 18 years. In the data collection process, anonymity and confidentiality were guaranteed, and participants provided their consent to participate by accessing the survey and accepting the conditions (ie, all responses were anonymous, no personal data were gathered, and participants could stop participating at any time). No incentive was offered to participants. The protocol was previously approved by the university's ethics committee. The final sample was composed of 514 participants. A total of 568 persons entered the system; of these, 54 did not complete the survey and were excluded.

## Measures

The current literature did not offer measures for the specific variables in this study. Accordingly, a specific online survey was created following similar studies and taking into account the available literature. The survey was created and reviewed in an iterative manner by the authors. In addition, before making the survey available to participants, it was tested by 4 volunteers who suggested changes that were implemented. They could judge both the format and functionality of the online survey and the content of the items. Regarding the content of items, they could assess if they were appropriate for the targeted construct and easily understandable. The measures of this study were perceived telepsychology advantages, perceived telepsychology barriers, telepsychology usefulness, intention to use telepsychology, and telepsychology use.

**Perceived Telepsychology Advantages**  The perceived telepsychology advantages were assessed by computing the participants' answers to the statement: "Please indicate the different advantages that might motivate you to use telepsychology." According to the literature (eg, [41]), the possible answer options were: (1) lower economic cost, (2) the possibility of receiving treatment from

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 95 of 329

home, (3) access to specialized treatment, (4) greater anonymity, (5) as a complement to face-to-face psychotherapy, and (6) none of the above. All "yes" responses were given a value of 1, except for the last option (none of the above), which was given a value of 0. The sum of the marked ("yes") options was the index that represented perceived telepsychology advantages.

**Perceived Telepsychology Barriers**   The perceived telepsychology barriers were measured by means of a self-developed scale. It included a general statement: "Please indicate to what extent the following elements would present a barrier to doing online psychotherapy," with 9 items that reflected the main barriers identified in the literature (eg, [19,41,43]). These items were: (1) it would prevent me from having close or warm contact with my therapist, (2) it would prevent me from expressing my emotions or feelings, (3) I would not be able to pick up on the therapist's nonverbal language well, (4) the therapist would not understand my nonverbal language well, (5) there would be online confidentiality risks, (6) I would not have enough connection speed or the connection would cut out, (7) there is scarce scientific evidence for the efficacy of telepsychology, (8) there is scarce legal regulation, and (9) I lack the knowledge or resources required to video-conference. The response options varied from 1 (not at all) to 5 (very much so). The mean of the items was the index that represented perceived telepsychology barriers.

**Telepsychology Usefulness**   Telepsychology usefulness was also measured using a self-developed, 5-point Likert scale. It included the general statement: "Please indicate to what extent you think telepsychology can be effective for the following issues," with 8 items reflecting the most common presenting problems in psychotherapy. More specifically, the items were: (1) improvement of mood disorders (eg, depression, anxiety), (2) improvement of relational problems (eg, couple or family problems), (3) improvement of work-related stress problems, (4) health problems (eg, chronic pain, diet, fibromyalgia), (5) personal growth issues, (6) mild psychological problems (interfering little with daily life), (7) moderate psychological problems (interfering moderately with daily life), and (8) severe psychological problems (interfering seriously with daily life). The response options ranged from 1 (not at all) to 5 (very much so).

**Intention to Use Telepsychology**   Intention to use telepsychology was assessed with a mono-item scale asking: "If you had a problem today, how likely would you be to use telepsychology?" The response options ranged from 1 (very unlikely) to 5 (very likely).

**Telepsychology Use**   Telepsychology use was measured as a dummy variable with the following question: "Have you ever attended any kind of online psychological therapy?" Two answer options were provided: (1) no and (2) yes.

## Analysis

The following preliminary analyses were computed: mean, SD, and correlation. In addition, given that the measures of telepsychology barriers and usefulness were self-developed, we examined their validity and reliability through confirmatory factor analysis (CFA) and Cronbach alpha. Later, structural equation models (SEM) were performed to test our hypotheses on mediation effects. Two models were computed: (1) a full model that included the direct and indirect relationships among all our variables and (2) a hypothesized UTAUT model. Mplus software [43] was used.

Maximum likelihood was employed to estimate the parameters of the model. Model adjustment was assessed through chi-squared statistics and fit indices, such as the Tucker-Lewis index (TLI), root mean square error of approximation (RMSEA), and weighted root mean square residual (WRMR). A good fit was defined as values higher than .90 for TLI, values lower than .08 for RMSEA, and values lower than 1 for WRMR [45,46].

## Results

### Sample Characteristics

Of the 514 participants, 79.8% (410/514) were women, and 20.2% (104/514) were men. The mean age was 36.27 (SD 10.35) years. Only 0.4% (2/514) of the participants had not completed any level of education, while 2.7% (14/514) had studied at elementary school, 27.0% (139/514) had studied at secondary school, 43.2% (222/514) had studied at college, and 26.7% (137/514) had studied a postgraduate course. Up to 61.9% (318/514) of participants reported having undergone face-to-face psychotherapy, and 6.4% (33/514) had experienced telepsychology formats. Finally, 17.1% (88/514) had a monthly salary lower than €600 (US $708.54), 16.7% (86/514) had a salary between €600 and €999 (US $1179.71), 26.7% (137/514) earned between €1000 (US $1180.86) and €1499 (US $1770.14), 20.6% (106/514) earned between €1500 (US $1771.32) and €1,999 (US $2360.58), 10.7% (55/514) had an annual income between €2000 (US $2361.72) and €3000 (US $3542.63), 3.5% (18/514) earned more than €3000, and finally 24 participants did not disclose their salary range.

### Preliminary Analysis

Table 1 shows our descriptive results. Most of the variables were significantly correlated with the others. Noteworthy is the high correlation between telepsychology usefulness and intention to use telepsychology ($r$=0.50). Table 2 presents our confirmatory factor analysis. Goodness-adjustment indexes pointed out an appropriate adjustment of data to model for telepsychology barriers and usefulness measures (see [46-48]). Cronbach alphas were .83 for telepsychology barriers and .92 for telepsychology usefulness. Thus, it is possible to conclude that the validity and reliability of these scales were appropriate.

### Hypothesis Testing

Table 2 presents the SEM results. Both the full and UTAUT models indicated an acceptable fit because the adjustment indexes were very similar. However, taking into account the theoretical framework and the fact that the UTAUT model presented a slightly better adjustment compared to the full model, we adopted the UTAUT model results.

Figure 1 displays the model results and supports all hypotheses. Hypothesis 1 was supported, as there was a significant negative relationship between perceived telepsychology barriers and telepsychology usefulness. In other words, the higher the perceived barriers to telepsychology were, the less useful participants perceived it to be. Hypothesis 2 was also supported: Perceived

Case 2:90-cv-00520-KJM-SCR    Document 8253-2     Filed 05/28/24     Page 97 of 329

telepsychology advantages were positively related with telepsychology usefulness. This means that the greater the perceived advantages of telepsychology, the more useful participants perceived it to be and the higher their intention of use was. Note that the effect of perceived telepsychology barriers on telepsychology usefulness was stronger than the association between perceived telepsychology advantages and telepsychology usefulness.

Hypothesis 3, which suggested a positive relationship between telepsychology usefulness and the intention to use telepsychology, was supported as well, with results showing a significant positive relationship. In other words, participants that perceived telepsychology as useful tended to show a greater intention to use it.

Hypothesis 4 was supported, as there was a significant positive relationship between the intention to use telepsychology and actual telepsychology use, indicating that participants with higher levels of intention to use telepsychology presented higher telepsychology use than those with low intention.

Finally, all the hypotheses about mediation effects were also supported. Regarding the mediator role of telepsychology usefulness (H5), the results showed that it mediated the relationship between perceived telepsychology advantages (B=.23, $P$=.00) and perceived telepsychology barriers (B=−.47, $P$=.00) and the intention to use telepsychology.

The results presented a significant indirect effect of telepsychology usefulness on telepsychology use through the intention to use telepsychology (H6), showing that the intention to use telepsychology mediates the relationship between telepsychology usefulness and telepsychology use (B=.27, $P$=.00). In sum, perceived advantages and barriers affected participants telepsychology use through their perception of telepsychology usefulness and their intention to use telepsychology.

## Discussion

### Principal Findings

This study is one of few to examine the acceptance and use of telepsychology from participants' perspectives. It draws from the UTAUT model to explain how people accept and use telepsychology, taking into account not only UTAUT factors (usefulness) but also additional determinants such as perceived telepsychology advantages and barriers.

Our results supported the viability of the UTAUT model in assessing telepsychology acceptance and use. It showed that telepsychology use is predicted by telepsychology usefulness and the intention to use telepsychology. These results are congruent with the extensive literature on the acceptance and use of new technology and on eHealth acceptance and use in particular [22,35,36,38-40].

Perceived advantages and barriers also played a relevant role in explaining telepsychology acceptance and use. These factors determined participants' perceptions of telepsychology usefulness, which affected their intention to use it and, in turn, their actual use of it. A positive perception in

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 98 of 329

the balance between telepsychology advantages and barriers seems to be critical in determining whether people will accept and use this treatment option, with barriers having the strongest effect. These results are also congruent with previous literature on perceived eHealth advantages and barriers [14,36,41,42]. In this respect, it is worthy to mention that this literature has pointed out a discrepancy between low performance expectancy and actual efficacy of eHealth interventions [14,49]. This discrepancy is at least partially supported by our study, as it illustrates the critical role of perceived barriers in explaining telepsychology usefulness. Therefore, the need for further and transparent information and education to clarify misconceptions, especially those related to telepsychology barriers, was clear.

Overcoming barriers and fostering a positive perception of telepsychology has become a central issue since the outbreak of the COVID-19 pandemic. In this new context of social distancing, online psychotherapy has become more a necessity than an option. Many European and American mental health providers and policies relied on using technology to mitigate COVID-19 risks and to respond to elevated mental health demands. Our results can help stakeholders to strategically design ways of facilitating access and readiness to this treatment modality by focusing on the tested UTAUT model. Furthermore, as suggested by Pierce et al [13], telepsychology has come to stay, beyond the response to the pandemic crisis, and, therefore, the maturity of the field needs accelerated development to equal its expected widespread dissemination in routine practice.

Finally, the focus of this study was on the perception of synchronous videoconferencing, which is the most similar form of internet-delivered treatment to face-to-face psychotherapy. Other forms of telepsychology, such as internet-based treatment or self-guided, internet-based psychological interventions, could share some critical aspects with the model presented in our study. However, further research should be carried out to understand specific barriers and perceived usefulness when the intervention involves minimal or nonexistent contact with professionals.

## Limitations

Despite the interesting insight provided by this study, some limitations must be taken into consideration. First, all the measures were self-reported by participants, making common method variance possible. Future research should consider using additional measures from other sources. Second, the research design of this study was cross-sectional. Thus, it was not possible to infer causal relationships. Further research with longitudinal designs will be necessary to appropriately examine the possible causal effects as well as the stability of the UTAUT model over time.

Third, a convenience sampling method was used to collect data, which may limit the extrapolation of our results, especially to clinical settings. However, as it happens in other studies [50], it is unlikely to jeopardize the validity of our results, and it seems more probable that our results would be similar in other samples. In addition, since more than 60% of participants had used psychotherapy services in the course of their life, restrictions to the generalizability of the results to actual patients are lessened. In any case, further replication studies are needed. Fourth, 79.8% of the sample were women. This composition could have influenced our results, and it can make ex-

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 99 of 329

trapolating them to a male sample difficult. Nevertheless, psychotherapy services are also more commonly used by women than men. Further research is needed to replicate and validate our results.

## Future Research

This study represents a first step towards applying the UTAUT model to telepsychology. However, we focused on the most important factors to explain participants' acceptance and use of telepsychology, thereby overlooking other factors that are also relevant. In fact, it is congruent with the recent work by Ammenwerth [51], who concluded that the acceptance of a technology depends on multiple additional factors that has been overlooked, such as socio-organizational, workflow, cultural, or emotional aspects as well as differences in user groups (physicians, nurses, patients). For example, a critical personal determinant in telepsychology acceptance and use could be a previous mental health diagnosis or treatment. Thus, future research is needed to examine these additional factors to gain a deeper understanding of telepsychology acceptance and use. Such factors could be ease of use, facilitators, or moderator variables. Telepsychology is a new field of study that requires further research, especially from the users' perspectives. A promising line of patient-focused research consists of involving users in the development of tools and platforms used to deliver interventions in order to meet their needs and minimize perceived barriers. Optimizing the engagement of participants in interventions is a key aspect for achieving successful treatment outcomes. Finally, it is probable that consumers' and professionals' perceptions about online psychotherapy had shifted as they have been impelled to experience the setting due to the pandemic crisis. Data collection was carried out before the outbreak, and, therefore, we could not take into account the social context when developing the UTAUT model for telepsychology. It is probable that society's perception about telepsychology has changed. Hence, additional research is necessary to better understand telepsychology acceptance by society.

## Practical Implications

This study describes the main factors that must be taken into account to promote acceptance and use of telepsychology among potential clients. Our results provide evidence of the need to foster a positive perception of telepsychology, with a focus on its advantages, and to come up with ways to overcome perceived barriers that do not otherwise hinder conventional face-to-face psychotherapy. In this respect, mental health care stakeholders have a critical role, as van Voorhees et al demonstrated [52], showing that uptake of an e-mental health intervention increased when clinicians adopted a focus on client-centered information aimed at intrinsic motivation.

9/18/23, 2:33 PM    Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages a…

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 100 of 329

## Abbreviations

| | |
|---|---|
| APA | American Psychological Association |
| C-TAM-TPB | combined technology acceptance model and theory of planned behavior |
| CFA | confirmatory factor analysis |
| ICT | information and communication technology |
| RMSEA | root mean square error of approximation |
| SCT | social cognitive theory |
| SEM | structural equation models |
| TAM | technology acceptance model |
| TID | theory of innovation diffusion |
| TLI | Tucker-Lewis index |
| TPB | theory of planned behavior |
| TRA | theory of reasoned action |
| UTAUT | unified theory of acceptance and use of technology |
| WRMR | weighted root mean square residual |

## Footnotes

Conflicts of Interest: None declared.

## References

1. World Health Organization *The World Health Report.* 2001. [2020-05-22]. https://www.who.int/whr/2001/en/

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 101 of 329

2. Alonso J, Codony M, Kovess V, Angermeyer MC, Katz SJ, Haro JM, De Girolamo G, De Graaf R, Demyttenaere K, Vilagut G, Almansa J, Lépine JP, Brugha TS. Population level of unmet need for mental healthcare in Europe. *Br J Psychiatry.* 2007 Apr 02;190(4):299–306. doi: 10.1192/bjp.bp.106.022004.S0007125000171776 [PubMed: 17401035] [CrossRef: 10.1192/bjp.bp.106.022004]

3. Blumenthal SJ, Kagen J. The Effects of Socioeconomic Status on Health in Rural and Urban America. *JAMA.* 2002 Jan 02;287(1):109. doi: 10.1001/jama.287.1.109-jms0102-3-1. [PubMed: 11754719] [CrossRef: 10.1001/jama.287.1.109-jms0102-3-1]

4. Johnson DR, Booth A. Rural Economic Decline and Marital Quality: A Panel Study of Farm Marriages. *Family Relations.* 1990 Apr;39(2):159. doi: 10.2307/585718. [CrossRef: 10.2307/585718]

5. Kim KJ, Conger RD, Lorenz FO, Elder GH. Parent–adolescent reciprocity in negative affect and its relation to early adult social development. *Developmental Psychology.* 2001;37(6):775–790. doi: 10.1037/0012-1649.37.6.775. [PubMed: 11699752] [CrossRef: 10.1037/0012-1649.37.6.775]

6. Rees CS, Haythornthwaite S. Telepsychology and videoconferencing: Issues, opportunities and guidelines for psychologists. *Australian Psychologist.* 2007 Feb 02;39(3):212–219. doi: 10.1080/00050060412331295108. [CrossRef: 10.1080/00050060412331295108]

7. Simpson S. Psychotherapy via videoconferencing: a review. *British Journal of Guidance & Counselling.* 2009 Aug;37(3):271–286. doi: 10.1080/03069880902957007. [CrossRef: 10.1080/03069880902957007]

8. Guidelines for the Practice of Telepsychology. *American Psychological Association.* [2021-09-14]. https://www.apa.org/practice/guidelines/telepsychology .

9. Varker T, Brand RM, Ward J, Terhaag S, Phelps A. Efficacy of synchronous telepsychology interventions for people with anxiety, depression, posttraumatic stress disorder, and adjustment disorder: A rapid evidence assessment. *Psychol Serv.* 2019 Nov;16(4):621–635. doi: 10.1037/ser0000239.2018-24930-001 [PubMed: 29809025] [CrossRef: 10.1037/ser0000239]

10. Sucala M, Schnur JB, Constantino MJ, Miller SJ, Brackman EH, Montgomery GH. The therapeutic relationship in e-therapy for mental health: a systematic review. *J Med Internet Res.* 2012 Aug 02;14(4):e110. doi: 10.2196/jmir.2084. https://www.jmir.org/2012/4/e110/ v14i4e110 [PMCID: PMC3411180] [PubMed: 22858538] [CrossRef: 10.2196/jmir.2084]

11. Flückiger C, Del Re AC, Wampold BE, Horvath AO. The alliance in adult psychotherapy: A meta-analytic synthesis. *Psychotherapy (Chic)* 2018 Dec;55(4):316–340. doi: 10.1037/pst0000172.2018-23951-001 [PubMed: 29792475] [CrossRef: 10.1037/pst0000172]

12. Simpson SG, Reid CL. Therapeutic alliance in videoconferencing psychotherapy: a review. *Aust J Rural Health.* 2014 Dec 10;22(6):280–99. doi: 10.1111/ajr.12149. [PubMed: 25495622] [CrossRef: 10.1111/ajr.12149]

13. Pierce BS, Perrin PB, Tyler CM, McKee GB, Watson JD. The COVID-19 telepsychology revolution: A national study of pandemic-based changes in U.S. mental health care delivery. *Am Psychol.* 2021 Jan;76(1):14–25. doi: 10.1037/amp0000722.2020-61592-001 [PubMed: 32816503] [CrossRef: 10.1037/amp0000722]

14. Hennemann S, Beutel ME, Zwerenz R. Drivers and Barriers to Acceptance of Web-Based Aftercare of Patients in Inpatient Routine Care: A Cross-Sectional Survey. *J Med Internet Res.* 2016 Dec 23;18(12):e337. doi: 10.2196/jmir.6003. https://www.jmir.org/2016/12/e337/ v18i12e337 [PMCID: PMC5219589] [PubMed: 28011445] [CrossRef: 10.2196/jmir.6003]

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 102 of 329

15. Chismar W, Wiley-Patton S. Does the extended technology acceptance model apply to physicians. 36th Annual Hawaii International Conference on System Sciences; January 6-9, 2003; Big Island, HI. 2003. https://ieeexplore.ieee.org/document/1174354 . [CrossRef: 10.1109/hicss.2003.1174354]

16. Kern A, Hong V, Song J, Lipson SK, Eisenberg D. Mental health apps in a college setting: openness, usage, and attitudes. *Mhealth.* 2018 Jun;4:20–20. doi: 10.21037/mhealth.2018.06.01. doi: 10.21037/mhealth.2018.06.01.mh-04-2018.06.01 [PMCID: PMC6043844] [PubMed: 30050916] [CrossRef: 10.21037/mhealth.2018.06.01] [CrossRef: 10.21037/mhealth.2018.06.01]

17. Torous J, Nicholas J, Larsen ME, Firth J, Christensen H. Clinical review of user engagement with mental health smartphone apps: evidence, theory and improvements. *Evid Based Ment Health.* 2018 Aug 05;21(3):116–119. doi: 10.1136/eb-2018-102891.eb-2018-102891 [PMCID: PMC10270395] [PubMed: 29871870] [CrossRef: 10.1136/eb-2018-102891]

18. Kaltenthaler E, Sutcliffe P, Parry G, Beverley C, Rees A, Ferriter M. The acceptability to patients of computerized cognitive behaviour therapy for depression: a systematic review. *Psychol Med.* 2008 Nov;38(11):1521–30. doi: 10.1017/S0033291707002607.S0033291707002607 [PubMed: 18205964] [CrossRef: 10.1017/S0033291707002607]

19. Waller R, Gilbody S. Barriers to the uptake of computerized cognitive behavioural therapy: a systematic review of the quantitative and qualitative evidence. *Psychol Med.* 2009 May;39(5):705–12. doi: 10.1017/S0033291708004224.S0033291708004224 [PubMed: 18812006] [CrossRef: 10.1017/S0033291708004224]

20. Gun SY, Titov N, Andrews G. Acceptability of Internet treatment of anxiety and depression. *Australas Psychiatry.* 2011 Jun;19(3):259–64. doi: 10.3109/10398562.2011.562295. [PubMed: 21682626] [CrossRef: 10.3109/10398562.2011.562295]

21. Eichenberg C, Wolters C, Brähler E. The internet as a mental health advisor in Germany--results of a national survey. *PLoS One.* 2013;8(11):e79206. doi: 10.1371/journal.pone.0079206. https://dx.plos.org/10.1371/journal.pone.0079206 .PONE-D-13-09176 [PMCID: PMC3836792] [PubMed: 24278121] [CrossRef: 10.1371/journal.pone.0079206]

22. Koivumäki T, Pekkarinen S, Lappi M, Väisänen J, Juntunen J, Pikkarainen M. Consumer Adoption of Future MyData-Based Preventive eHealth Services: An Acceptance Model and Survey Study. *J Med Internet Res.* 2017 Dec 22;19(12):e429. doi: 10.2196/jmir.7821. https://www.jmir.org/2017/12/e429/ v19i12e429 [PMCID: PMC5756317] [PubMed: 29273574] [CrossRef: 10.2196/jmir.7821]

23. Jiang LC, Wang Z, Peng T, Zhu JJ. The divided communities of shared concerns: mapping the intellectual structure of e-Health research in social science journals. *Int J Med Inform.* 2015 Jan;84(1):24–35. doi: 10.1016/j.ijmedinf.2014.09.003.S1386-5056(14)00176-2 [PubMed: 25277295] [CrossRef: 10.1016/j.ijmedinf.2014.09.003]

24. Venkatesh V, Morris M, Davis G, Davis F. User Acceptance of Information Technology: Toward a Unified View. *MIS Quarterly.* 2003;27(3):425. doi: 10.2307/30036540. [CrossRef: 10.2307/30036540]

25. Davis FD. Perceived Usefulness, Perceived Ease of Use, and User Acceptance of Information Technology. *MIS Quarterly.* 1989 Sep;13(3):319. doi: 10.2307/249008. [CrossRef: 10.2307/249008]

26. Fishbein M, Ajzen I. *Belief, Attitude, Intention and Behavior: An Introduction to Theory and Research.* Reading, MA: Addison-Wesley; 1975.

27. Fishbein M. *Readings in Attitude Theory and Measurement.* New York, NY: John Wiley & Sons; 1967.

9/18/23, 2:33 PM          Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages a…

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 103 of 329

28. Davis FD, Bagozzi RP, Warshaw PR. Extrinsic and Intrinsic Motivation to Use Computers in the Workplace1. *J Appl Social Pyschol.* 1992 Jul;22(14):1111–1132. doi: 10.1111/j.1559-1816.1992.tb00945.x. [CrossRef: 10.1111/j.1559-1816.1992.tb00945.x]

29. Taylor S, Todd PA. Understanding Information Technology Usage: A Test of Competing Models. *Information Systems Research.* 1995 Jun;6(2):144–176. doi: 10.1287/isre.6.2.144. [CrossRef: 10.1287/isre.6.2.144]

30. Rogers EM. *Diffusion of Innovations, 5th ed.* New York, NY: Free Press; 2003.

31. Bandura A. *Social foundations of thought and action: A social cognitive theory.* Englewood Cliffs, NJ: Prentice-Hall; 1986.

32. Hoque R, Sorwar G. Understanding factors influencing the adoption of mHealth by the elderly: An extension of the UTAUT model. *Int J Med Inform.* 2017 May;101:75–84. doi: 10.1016/j.ijmedinf.2017.02.002.S1386-5056(17)30033-3 [PubMed: 28347450] [CrossRef: 10.1016/j.ijmedinf.2017.02.002]

33. Taiwo A, Downe A. The theory of user acceptance and use of technology (UTAUT): a meta-analytic review of empirical findings. *Journal of Theoretical and Applied Information Technology.* 2013;49(1):48–58. doi: 10.12691/ajis-3-2-3. [CrossRef: 10.12691/ajis-3-2-3]

34. Liu L, Miguel Cruz A, Rios Rincon A, Buttar V, Ranson Q, Goertzen D. What factors determine therapists' acceptance of new technologies for rehabilitation – a study using the Unified Theory of Acceptance and Use of Technology (UTAUT) *Disabil Rehabil.* 2015;37(5):447–55. doi: 10.3109/09638288.2014.923529. [PubMed: 24901351] [CrossRef: 10.3109/09638288.2014.923529]

35. Hennemann S, Beutel ME, Zwerenz R. Ready for eHealth? Health Professionals' Acceptance and Adoption of eHealth Interventions in Inpatient Routine Care. *J Health Commun.* 2017 Mar;22(3):274–284. doi: 10.1080/10810730.2017.1284286. [PubMed: 28248626] [CrossRef: 10.1080/10810730.2017.1284286]

36. Hennemann S, Witthöft M, Bethge M, Spanier K, Beutel ME, Zwerenz R. Acceptance and barriers to access of occupational e-mental health: cross-sectional findings from a health-risk population of employees. *Int Arch Occup Environ Health.* 2018 Apr;91(3):305–316. doi: 10.1007/s00420-017-1280-5.10.1007/s00420-017-1280-5 [PubMed: 29189895] [CrossRef: 10.1007/s00420-017-1280-5]

37. Dünnebeil S, Sunyaev A, Blohm I, Leimeister JM, Krcmar H. Determinants of physicians' technology acceptance for e-health in ambulatory care. *Int J Med Inform.* 2012 Nov;81(11):746–60. doi: 10.1016/j.ijmedinf.2012.02.002.S1386-5056(12)00034-2 [PubMed: 22397989] [CrossRef: 10.1016/j.ijmedinf.2012.02.002]

38. Dohan MS, Tan J. Perceived usefulness and behavioral intention to use consumer-oriented web-based health tools: A meta-analysis. Nineteenth Americas Conference on Information Systems; August 15-17, 2013; Chicago, IL. 2013.

39. Zhao Y, Ni Q, Zhou R. What factors influence the mobile health service adoption? A meta-analysis and the moderating role of age. *International Journal of Information Management.* 2018 Dec;43:342–350. doi: 10.1016/j.ijinfomgt.2017.08.006. [CrossRef: 10.1016/j.ijinfomgt.2017.08.006]

40. Dwivedi YK, Rana NP, Chen H, Williams MD. A Meta-analysis of the Unified Theory of Acceptance and Use of Technology (UTAUT) In: Nüttgens M, Gadatsch A, Kautz K, Schirmer I, Blinn N, editors. *Governance and Sustainability in Information Systems. Managing the Transfer and Diffusion of IT. TDIT 2011. IFIP Advances in Information and Communication Technology, vol 366.* Berlin, Heidelberg: Springer; 2011. pp. 155–170. [CrossRef: 10.1007/978-3-642-24148-2_10]

41. Ebert DD, Berking M, Cuijpers P, Lehr D, Pörtner M, Baumeister H. Increasing the acceptance of internet-based mental health interventions in primary care patients with depressive symptoms. A randomized controlled trial. *J Affect Disord.* 2015 May 01;176:9–17. doi: 10.1016/j.jad.2015.01.056.S0165-0327(15)00069-5 [PubMed: 25682378] [CrossRef:

Case 2:90-cv-00520-KJM-SCR      Document 8253-2      Filed 05/28/24      Page 104 of 329

42. Schnall R, Higgins T, Brown W, Carballo-Dieguez A, Bakken S. Trust, Perceived Risk, Perceived Ease of Use and Perceived Usefulness as Factors Related to mHealth Technology Use. *Stud Health Technol Inform.* 2015;216:467–71. http://europepmc.org/abstract/MED/26262094 . [PMCID: PMC5588863] [PubMed: 26262094]

43. Cocosila M, Archer N, Yuan Y. Early Investigation of New Information Technology Acceptance: A Perceived Risk - Motivation Model. *CAIS.* 2009;25:30. doi: 10.17705/1cais.02530. [CrossRef: 10.17705/1cais.02530]

44. Young KS. An empirical examination of client attitudes towards online counseling. *Cyberpsychol Behav.* 2005 Apr;8(2):172–7. doi: 10.1089/cpb.2005.8.172. [PubMed: 15938657] [CrossRef: 10.1089/cpb.2005.8.172]

45. Paramio Pérez G, Almagro BJ, Hernando Gómez A, Aguaded Gómez JI. Validación de la escala eHealth Literacy (eHEALS) en población universitaria española. *Rev. Esp. Salud Publica.* 2015 Jun;89(3):329–338. doi: 10.4321/s1135-57272015000300010. [PubMed: 26388346] [CrossRef: 10.4321/s1135-57272015000300010]

46. Muthén LK, Muthén BO. *Mplus User's Guide. Seventh Edition.* Los Angeles, CA: Muthen & Muthen; 2012.

47. Bentler PM. Comparative fit indexes in structural models. *Psychol Bull.* 1990 Mar;107(2):238–46. doi: 10.1037/0033-2909.107.2.238. [PubMed: 2320703] [CrossRef: 10.1037/0033-2909.107.2.238]

48. Browne M, Cudeck R. Alternative Ways of Assessing Model Fit. *Sociological Methods & Research.* 2016 Jun 29;21(2):230–258. doi: 10.1177/0049124192021002005. [CrossRef: 10.1177/0049124192021002005]

49. Barak A, Hen L, Boniel-Nissim M, Shapira N. A Comprehensive Review and a Meta-Analysis of the Effectiveness of Internet-Based Psychotherapeutic Interventions. *Journal of Technology in Human Services.* 2008 Jul 03;26(2-4):109–160. doi: 10.1080/15228830802094429. [CrossRef: 10.1080/15228830802094429]

50. Bakker AB, Sanz-Vergel AI, Rodríguez-Muñoz A, Antino M. Ripple Effects of Surface Acting: A Diary Study among Dual-Earner Couples. *Span J Psychol.* 2019 Mar 01;22:E7. doi: 10.1017/sjp.2019.6.S1138741619000064 [PubMed: 30819266] [CrossRef: 10.1017/sjp.2019.6]

51. Ammenwerth E. Technology Acceptance Models in Health Informatics: TAM and UTAUT. *Stud Health Technol Inform.* 2019 Jul 30;263:64–71. doi: 10.3233/SHTI190111.SHTI190111 [PubMed: 31411153] [CrossRef: 10.3233/SHTI190111]

52. Van Voorhees BW, Hsiung RC, Marko-Holguin M, Houston TK, Fogel J, Lee R, Ford DE. Internal versus external motivation in referral of primary care patients with depression to an internet support group: randomized controlled trial. *J Med Internet Res.* 2013 Mar 12;15(3):e42. doi: 10.2196/jmir.2197. https://www.jmir.org/2013/3/e42/ v15i3e42 [PMCID: PMC3636270] [PubMed: 23482332] [CrossRef: 10.2196/jmir.2197]

9/18/23, 2:33 PM          Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages a…

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 105 of 329

## Figures and Tables

## Figure 1



Results of the structured equation model (SEM) for the hypothesized unified theory of acceptance and use of technology (UTAUT) model applied to telepsychology. All parameters are standardized; results are controlled for sex and age; telepsychology use is a dummy variable: (1) no and (2) yes. *$P$<.05, **$P$<.01.

9/18/23, 2:33 PM    Acceptance and Use of Telepsychology From the Clients' Perspective: Questionnaire Study to Document Perceived Advantages a…

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 106 of 329

Table 1

Descriptive analysis and correlations.

| Variable | | Sex | Age[a] | Perceived telepsychology advantages[b] | Perceived telepsychology barriers[c] | Telepsycho usefulness[c] |
|---|---|---|---|---|---|---|
| **Sex** | | | | | | |
| | r | 1 | –0.03 | 0.03 | 0.09 | 0.01 |
| | P value | —[g] | .55 | .54 | .06 | .76 |
| **Age** | | | | | | |
| | r | –0.03 | 1 | –0.10 | –0.02 | –0.22 |
| | P value | .55 | — | .02 | .71 | <.001 |
| **Perceived telepsychology advantages** | | | | | | |
| | r | 0.03 | –0.10 | 1 | –0.08 | 0.37 |
| | P value | .54 | .02 | — | .09 | <.001 |
| **Perceived telepsychology barriers** | | | | | | |
| | r | 0.09 | –0.02 | –0.08 | 1 | –0.38 |
| | P value | .06 | .71 | .09 | — | <.001 |
| **Telepsychology usefulness** | | | | | | |
| | r | 0.01 | –0.22 | 0.37 | –0.38 | 1 |
| | P value | .76 | .00 | <.001 | <.001 | — |
| **Intention to use telepsychology** | | | | | | |
| | r | 0.05 | –0.03 | 0.32 | –0.25 | 0.50 |
| | P value | .26 | .48 | <.001 | <.001 | <.001 |
| **Telepsychology use** | | | | | | |
| | r | –0.03 | 0.01 | –0.04 | 0.11 | –0.11 |
| | P value | .45 | .87 | .36 | .01 | .01 |

[a]Mean (SD): 36.27 (10.35) years.

[b]Mean (SD): 2.61 (1.28).

[c]Mean (SD): 3.04 (1.23).

[d]Mean (SD): 3.14 (1.14).

[e]Mean (SD): 2.69 (1.28).

[f]Dummy variable: (1) yes and (2) no.

[g]Not applicable.

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 107 of 329

**Table 2**

Fit indices for the structural equation model.

| Variables | $\chi^2$ | $df$ | $P$ value | $\chi^2/df$ |
|---|---|---|---|---|
| CFA[d]: perceived telepsychology barriers | 75.16 | 18 | <.001 | 4.17 |
| CFA: telepsychology usefulness | 72.20 | 16 | <.001 | 4.51 |
| Full model: direct and indirect effects | 291.95 | 10 | <.001 | 29.19 |
| UTAUT[f] model | 291.95 | 10 | <.001 | 29.19 |

[a]TLI: Tucker-Lewis index.

[b]RMSEA: root mean square error of approximation.

[c]WRMR: weighted root mean square residual.

[d]CFA: confirmatory factor analysis.

[e]N/A: not applicable.

[f]UTAUT: unified theory of acceptance and use of technology.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| ALABAMA | NO | NO | NO | NO | *Code of Ala. § 34-26-41*<br><br>(f) f) An individual who possesses a valid license to practice psychology independently at the doctoral level, by any jurisdiction recognized by the Association of State and Provincial Psychology Boards, may practice psychology in Alabama for no more than 30 days each calendar year without applying for a license to practice psychology in Alabama, unless otherwise exempted pursuant to this chapter. This authority to practice does not apply to a psychologist who has been denied licensure in Alabama, is a legal resident of Alabama, or intends to practice full-time or a major portion of his or her time in Alabama. | *Code of Ala. §34-26-42*<br><br>Class B Misdemeanor: $500-5000 fine per occurrence plus court costs |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| ALASKA | NO | NO | NO | NO | *12 Alaska Admin. Code 60.035 - Courtesy license*<br><br>(a) A courtesy license authorizes the licensee to practice psychology for no more than 30 days in a 12-month period. An applicant will only be issued one courtesy license in that person's lifetime. A courtesy licensee shall submit a report to the board each month during the period of courtesy licensure indicating the number of days practiced under the courtesy license during the month. A courtesy license does not authorize the licensee to conduct a general psychology practice or to perform services outside the scope of practice of psychology that is specified on the | *Alaska Stat. § 08.86.210*<br><br>Class B Misdemeanor: possible fine up to $2000 AND/OR possible imprisonment up to 90 days |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | courtesy license.<br><br>(b) The board or its designee will issue a one-time courtesy license to an applicant who meets the requirements of this section. | |
| **ARIZONA** | *ARS § 36-3601 et seq.*<br><br>Psychologists are included under the definition of "health care providers" who may practice telemedicine in the state.<br><br>Telemedicine is the practice of health care delivery, diagnosis, consultation and treatment and the transfer of medical data through interactive audio, video or data communications that | NO | NO | SB 1353 enacted 4/8/13 codified as *ARS §20-841.09, §20-1057.13, §20-1376.05 & §20-1406.05*<br><br>For policies issued on or after Jan 1, 2015, private payers are required to provide coverage for live video consultations when treating specific conditions (mental health disorders & neurological diseases included) & originating site is in a rural area (area in a county < 900,000 population or area in county with > | *A.R.S. § 32-2075(4)*<br><br>Licensed out-of-state psychologist may provide services within his/her customary area of practice within the state up to 20 days per year.<br><br>The psychologist must inform the client or public of the limited nature of these activities and services & that the psychologist is not licensed in this state. | *A.R.S. § 32-2084*<br><br>Class 2 Misdemeanor: possible fine up to $750 AND/OR possible imprisonment up to 4 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | occur in the physical presence of the patient | | | 900,000 but proximity to nearest city of 500,00 is > 30 miles) | | |
| ARKANSAS | NO | NO | NO | NO | NO | *A.C.A. § 17-97-301*<br><br>Misdemeanor: fine of $500-$1,000 |
| CALIFORNIA | *Cal. Bus. & Prof. Code §§ 2904.5, 2290.1*<br><br>CA licensure is required to provide telehealth services to CA residents; telehealth includes live interactive and store & forward technologies; patient's verbal consent must be obtained prior to delivery of telehealth services & documented in patient's record.<br><br>Failure to obtain patient consent in advance constitutes | *Cal. Bus & Prof. Code § 2904.5 – Applicability of Telemedicine Provisions of Section 2290.5* | See CA Board of Psychology's "Notice to California Consumers Regarding the Practice of Psychology on the Internet" available online at http://www.psychboard.ca.gov/consumers/internet-thrpy.shtml | *Cal. Health & Safety Code § 1374.13; Cal. Ins. Code § 10123.85; Cal. Welfare & Institutions Code §§ 14132.72, 14132.725*<br><br>Private payers cannot require in-person contact between a health care provider and patient or limit the type of setting where services are provided before payment is made for covered telehealth services, subject to coverage terms and conditions | *Cal. Bus & Prof Code §2912 – Out of State Psychologists - Exemption*<br><br>Nothing in this chapter shall be construed to restrict or prevent a person who is licensed as a psychologist at the doctoral level in another state or territory of the United States or in Canada from offering psychological services in this state for a period not to exceed 30 days in any calendar year. | *Cal. Bus & Prof Code §2970*<br><br>Misdemeanor: fine not exceeding $2,000 AND/OR imprisonment in county jail not exceeding 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | unprofessional conduct. | | | | | |
| **COLORADO** | NO | NO but see *C.R.S. § 12-36-106 (1) (g)* authorizing delivery of telemedicine by licensed providers within their scope of practice | *State Board of Psychologist Examiners Policies § 30-1*<br><br>Policy recommends initial in-person visit prior to using telehealth & outlines issues that must be addressed by the psychologist & patient at the outset as well as the challenges posed by services provided remotely or electronically.<br><br>http://cdn.colorado.gov/cs/Satellite/DORA-Reg/CBON/DORA/1251632089838 | YES but limited to rural areas – see *C.R.S. § 10-16-123*<br><br>Face-to-face contact between the provider and patient is not required if the patient lives in a county with 150,000 or fewer residents<br><br>References definition of telemedicine as found in C.R.S. 12-36-106(1)(g), meaning the use of advanced technology, including, but not limited to, interactive audio, interactive video, or interactive data communication. | *C.R.S. § 12-43-215(9)*<br><br>Out-of-state psychologists licensed in another state may perform certain activities or services without CO license if:<br>(a) Performed within the scope of the person's license or certification;<br>(b) Do not exceed 20 days per year in this state;<br>(c) Are not otherwise in violation of this article; and<br>(d) Disclosed to the public that the person is not licensed or certified in this state. | *C.R.S. § 12-43-226*<br><br>Class 2 Misdemeanor (1st offense): Fine of $250-1,000 &/OR imprisonment of 3-12 months<br><br>Class 6 Felony (subsequent offense): Fine of $1,000-100,000 &/OR imprisonment of 12-18 months |
| **CONNECTICUT** | NO | NO | NO | NO | NO | *Conn. Gen. Stat. § 20-193* (amended by 2013 Ct. SB 983, Section 82) |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | | Class D Felony: Fine not to exceed $5,000 &/OR possible imprisonment for a term not less than 1 year nor more than 5 years |
| DELAWARE | CDR 24-3500 -- Section 18.0 Telepsychology "Telepsychology" includes telephone, email, Internet-based communications, & videoconferencing. Must be licensed to provide telepsychology services to DE residents. Obtain patient consent; use secure communications where feasible; document risk-benefit analysis; develop written emergency contingency plan | NO | NO | NO | 24 Del. C. §3510 Out-of-state psychologists licensed in another jurisdiction may provide services without a DE license if they do not exceed an "aggregate of 6 days of professional services as a psychologist, per calendar year." | 24 Del. C. § 3520 Misdemeanor: For 1st offense, fine of $500-1,000 for each offense &/OR possible imprisonment up to 1 year 2nd or subsequent offense: fine of $1,000-2,000 for each offense &/OR possible imprisonment up to 1 year. |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | NO | NO | See DC Board of Psychology newsletter (Spring 2013) available online at http://doh.dc.gov/sites/default/files/dc/sites/doh/release_content/attachments/Psych%20newsletter%20Spring%202013%20email%20post.pdf | | *D.C. Code § 3-1205.02*<br><br>Health professionals authorized to practice in any state adjoining DC may treat patients in DC if:  the health professional does not have an office or other regularly appointed place in DC to meet patients; Registers with the appropriate board and pays the registration fee prior to practicing DC; and The state in which the individual is licensed allows DC licensed health professionals to practice in that state under the conditions set forth in this section.<br><br>Health professionals practicing in the District pursuant to subsection (a)(4) of this section shall not see patients or clients in the office or | *D.C. Code § 3-1205.14*<br><br>Civil penalty:  fine up to $5,000 for each violation<br><br>Issuance of cease & desist order pursuant to D.C. Code § 3-1205.16 |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | other place of practice of a DC licensee, or otherwise circumvent the provisions of this chapter. | |
| **FLORIDA** | NO | *Fla. Stat. § 490.003(4)(a)*<br><br>Psychological services may be rendered to individuals, couples, families, groups, and the public <u>without regard to place of service</u>.<br><br>(Cited by board in declaratory statement) | See Board's opinion dated 06/05/06 stating that teletherapy constitutes practice of psychology requiring Florida licensure -- http://www.doh.state.fl.us/mqa/psychology/Petitions/DOH_06-0976.pdf<br><br>See Board's declaratory statement dated 02/16/12 stating that FL licensed psychologist in MI may provide telepsychology to FL patients -- http://doh.state.fl.us/mqa/declaratory/psychology/DOH-12- | NO | *Fla. Stat. § 490.014(2)(e)*<br><br>Licensed out-of-state psychologist may practice no more than 5 days in any month and no more than 15 days in any calendar year<br><br>Licensure requirements in the psychologist's home state must be equivalent to or exceed FL's licensing requirements | *Fla. Stat. § 490.012(4)*<br><br>1st Degree Misdemeanor: Possible fine up to $1,000 &/OR possible imprisonment not to exceed 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | 0324-DS-MQA.pdf | | | |
| **GEORGIA** | *O.C.G.A. § 33-24-56.4 -- Georgia Telemedicine Act*<br><br>Telemedicine is defined as the use of audio, video, or data communications for health care delivery, diagnosis, consultation, treatment, or transfer of medical data used or obtained during a medical visit with a patient<br><br>Standard telephone, facsimile transmissions, unsecured e-mail, or a combination thereof are excluded | *Ga. Comp. R. & Regs. r. 510-5-.07(2) -- Representation of Services.*<br><br>Practicing via Electronic Transmission. The provision of psychological services by electronic transmission (e.g. internet, telephone, computer...) must meet the same legal and ethical standards as psychological services provided in person. This rule applies to both psychologists who are licensed in Georgia and to other psychologists residing elsewhere who are providing psychological services to clients/patients in Georgia who must meet the requirements of section 510-9-.03. The Georgia Board will | NO | *O.C.G.A. § 33-24-56.4 - Payment for telemedicine services*<br><br>Private payers cannot refuse to cover services provided via telehealth so long as provider followed generally accepted health care practices and standards prevailing in the applicable professional community at the time the services were provided | *O.C.G.A. § 43-39-7; Ga. Comp. R. & Regs. r. 510-9-.03*<br><br>(8) An individual licensed to practice psychology in another jurisdiction may practice psychology in Georgia without applying for a license, so long as the requirements for a license in the other jurisdiction are equal to or exceed the requirements for licensure in Georgia, and the psychologist limits that person's practice in Georgia to no more than 30 days per year, as defined in the rules and regulations of the board.<br><br>Board rules require advance permission for limited practice – | *O.C.G.A. § 43-39-19*<br><br>Misdemeanor:  Possible fine of $100-$1000 &/or imprisonment up to 12 months |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | report out of state psychologists to their respective licensing boards for practicing psychology via these means in the state of Georgia without a Georgia license. | | | submit at least 5 days before the intended practice  either IPC attestation form issued by ASPPB, or verification form from the state licensing board indicating no history of disciplinary action | |
| **HAWAII** | NO | NO | NO | *HRS § 431:10A-116.3 – Coverage for telehealth*<br><br>"Telehealth" is defined as including but not limited to real-time video conferencing-based communication, secure interactive and non-interactive web-based communication, & secure asynchronous information exchange<br><br>Standard telephone contacts, facsimile transmissions, or email text are excluded<br><br>Private payers cannot require face-to-face | *HRS § 465-9*<br><br>Licensed out-of-state psychologist may practice for a period not to exceed 90 days in any calendar year<br><br>Must petition the board for a temporary permit in advance<br><br>Licensure requirements in the psychologist's home state must be equivalent to or exceed HI's licensing requirements | *HRS § 465-15 (b)*<br><br>Misdemeanor:  Possible fine of $1,000 for each violation &/OR imprisonment not more than 1 year |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | contact as a prerequisite for payment for telehealth services subject to coverage terms & conditions<br><br>No reimbursement for a telehealth consultation between health care providers unless a provider-patient relationship exists between the patient and one of the health care providers involved in the telehealth interaction | | |
| **IDAHO** | YES – *Idaho Code § 54-2305 (11)*<br><br>Authorizes the psychology licensing board to develop standards & requirements addressing the use of communication technology in the practice of | NO | NO | NO | *IDAPA 24.12.01.300*<br><br>Psychologists licensed in another state may practice in ID for a period not to exceed 30 days within a calendar year if they hold an interjurisdictional practice certificate (IPC) issued by ASPPB. | *Idaho Code § 54-2310*<br><br>Misdemeanor:  Possible fine up to $1,000 &/or imprisonment up to 6 months |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | psychology, including supervision. | | | | Those psychologists are required to notify the Board of their intent to practice and provide documentation of their status. | |
| ILLINOIS | NO | NO | NO | NO | *225 ILCS 15/11.5*<br><br>Licensed out-of-state psychologists may obtain a temporary permit authorizing the rendering of clinical psychological services in IL for up to 10 calendar days per year, consecutively or in aggregate | *225 ILCS 15/16.5*<br><br>Civil penalty up to $10,000 for each offense as determined by the Department of Financial and Professional Regulation |
| INDIANA | NO<br><br>But there seems to be a collaborative effort between IPA & the state psychology board to develop telepsychology policies<br><br>http://www.in.gov/pl | NO | NO | NO | *Burns Ind. Code Ann. § 25-33-1-4.5*<br><br>Licensed out-of-state psychologists may obtain a temporary psychology permit limited by terms and conditions considered appropriate by the board. | *Burns Ind. Code Ann. §25-33-1-15; 35-50-3-2*<br><br>Class A misdemeanor: Possible fine up to $5,000 &/or imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | a/files/Psychology_N ewsletter_- _March_2012.pdf  http://www.indianap sychology.org/pdf/ne wsletters/newsletter _sept_12.pdf | | | | A psychologist may practice under a limited scope psychology permit not more than 30 days every 2years. | |
| IOWA | NO | NO | NO | NO  But Iowa has developed a state-based telecommunications network that may be used for telemedicine purposes *See Iowa Code § 8D.1 et seq.; 751 IAC 7.1 ; 751 IAC 7.11* | *Iowa Code § 154B.3(5) 645 IAC 240.8*  Licensed out-of-state psychologists may practice for a period not to exceed 10 consecutive business days or 15 business days in any 90 day period  Must file a summary of intention to practice in IA & licensure verification in advance with the board  Licensure requirements in the psychologist's home state must be equivalent to or exceed IA's licensing | *Iowa Code § 147.83 -- Permanent Injunction; Iowa Code § 147.86; Iowa Code § 903.1 (1)(b)*  Serious Misdemeanor: Possible fine of $315- $1,875 &/or imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | requirements | |
| KANSAS | NO | *KAR 102-1-19 – Services rendered to individuals located in this state*<br><br>Each person, regardless of the person's location, who engages in either of the following activities shall be deemed to be engaged in the practice of psychology in this state and shall be required to have a license, issued by the board, to practice psychology as a licensed psychologist:<br>• If he/she engages in the practice of psychology, providing services to one or more individuals located in this state; or<br>• Represents oneself to be a psychologist available to provide psychological | NO | NO | *K.S.A. § 74-5316a*<br><br>Licensed out-of-state psychologists must obtain a temporary permit from the licensing board in order to practice for no more than 15 days per year Must demonstrate good cause to Board for request to extend temporary permit for additional 15 days<br><br>Any psychology services rendered within any 24-hour period shall count as one entire day of psychology services. | *K.S.A. § 74-5316a*<br><br>The licensing board may issue a cease and desist order &/OR assess a fine of up to $ 1,000 per day, for failure to obtain a temporary permit to practice psychology in KS<br><br>*K.S.A. § 74-5341; K.S.A. § 21-6602; K.S.A. § 21-6611*<br><br>Class A Misdemeanor : Possible fine up to $2,500 &/OR imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | services to one or more individuals located in this state. | | | | |
| KENTUCKY | *Kentucky Rev. Stat. § 319.140; 201 KAR 26:310*<br><br>"Telehealth" is defined as the use of audio, video, or other electronic means to deliver health care<br><br>Must obtain patient's informed consent & maintain confidentiality of patient information, including electronic data | *201 KAR 26:310(3)*<br><br>"Telepsychology" is defined as the practice of psychology between a psychologist & patient using electronic communication technology; or two-way, interactive, simultaneous audio and video | NO | *KRS § 304.17A-138*<br><br>A telehealth consultation shall not be reimbursable under this section if it is provided through the use of an audio-only telephone, facsimile machine, or electronic mail.<br><br>*806 KAR 17:270 -- Telehealth claim forms & records* | *KRS § 319.015(8)*<br><br>Licensed out-of-state psychologists may practice for no more than 30 days every 2 years<br><br>Must register with the board prior to engaging in temporary practice or must hold a current, valid Interjurisdictional Practice Certificate issued by ASPPB<br><br>*201 KAR 26:215(6) – Nonresident status*<br><br>A licensed out-of-state psychologist may engage in temporary practice of telepsychology if he/she receives prior board approval and complies with the above | *KRS § 319.990*<br><br>Misdemeanor:  Possible fine up to $500 &/OR possible imprisonment up to 6 months for each violation<br><br>Licensing board may also recover investigative expenses including reasonable attorney fees relating to the prosecution of those found guilty of violating of practicing psychology without a license |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | requirements for temporary practice | |
| LOUISIANA | NO | NO – not specified in statute or regulation but see licensing board opinion | YES<br><br>See Louisiana State Board of Examiners of Psychologists Opinion #013-Telepsychology Issued: March 29, 2012, available online at http://www.lsbep.org/pdfs/News_vol25.pdf | *La. R.S. 22:1821(E)*<br><br>Appears to be limited to physicians only; reimbursement must be at least 75% of the "the reasonable and customary amount of payment, benefit, or reimbursement which that licensed physician receives for an intermediate office visit"<br><br>*La. R.S. 37:1262*<br><br>"Telemedicine" is defined as the practice of health care delivery, diagnosis, consultation, treatment, and transfer of medical data using interactive telecommunication technology that enables a health care practitioner and a | *La. R.S. 37:2365(D); LAC 46:LXIII.1001*<br><br>Licensed out-of-state psychologists may practice psychology in LA for a period not to exceed 30 days in any calendar year<br><br>However, he/she must be associated with a psychologist who is licensed in & a resident of Louisiana<br><br>The out-of-state psychologist's state also must have a similar license exception privilege in place | *La. R.S. 37:2360*<br><br>Misdemeanor – Possible fine of $100-$500 &/OR possible imprisonment up to 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | patient at two locations separated by distance to interact via two-way video and audio transmissions simultaneously." Phone calls or emails between a provider & patient are excluded as are consultations between providers. | | |
| **MAINE** | NO | NO | NO | *24-A M.R.S. § 4316 – Coverage for telemedicine services* "Telemedicine" is defined as the delivery of health care services, means the use of interactive audio, video or other electronic media for the purpose of diagnosis, consultation or treatment. " Audio-only telephone, facsimile machine or e-mail excluded | *32 M.R.S. § 3812* The "use of occasional services of qualified consultant psychologists from another state or jurisdiction or the use of the services of organizations from another state or jurisdiction employing qualified psychologists does not constitute the unlawful practice of psychology." *CMR 02-415-001 (13)* | *32 M.R.S. § 3814; 10 M.R.S. § 8003-C; 17-A M.R.S. § 1301; 17-A M.R.S. § 4-A* Criminal penalty (Class E crime):  Fine up to $1,000 &/OR imprisonment up to 1 year Civil penalty: Fine of not less than $1,000 but not more than $5,000, each violation Permanent injunction (including costs of investigation & attorneys' |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | Private payers must cover telehealth services, subject to coverage terms & conditions | "Occasional services" means consultation within Maine by a psychologist licensed in another state or jurisdiction but not licensed by the board, subject to the provisions of Chapter 9 of the board's rules. "Occasional services" does not include psychotherapy. *CMR 02-415-009(3)* A psychologist not licensed by the board who provides "occasional services" as defined above shall notify the board in writing each time the psychologist consults in Maine on a form provided by the board. Such consultation may not occur more than 10 days in a calendar year. Consultation in Maine | fees) |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | beyond this 10-day period will only be permitted in exigent circumstances. | |
| MARYLAND | NO | NO | NO<br><br>But see Spring 2011 newsletter of the Maryland Board of Examiners of Psychologists for status of board's work in this area<br><br>http://dhmh.maryland.gov/psych/pdf/MarchNewsletterSpring2011.pdf | *Md. INSURANCE Code Ann. § 15-139*<br><br>"Telemedicine" is defined as the delivery of health care services, the use of interactive audio, video, or other telecommunications or electronic technology by a licensed health care provider to the patient who is a different site.<br><br>Phone calls, faxes & email messages between the provider & patient are excluded.<br><br>Private payers must provide coverage for telehealth services subject to coverage terms & conditions | *Md. HEALTH OCCUPATIONS Code Ann. § 18-301(d); COMAR 10.36.01.07(4)*<br><br>Board may authorize a non-resident to practice without a license if the Board finds that circumstances warrant & subject to any limitations the Board imposes<br><br>In authorizing an exception, the Board: (a) Shall determine whether the circumstances warrant an exception to licensure, taking into account the: (i) Qualifications of the nonresident psychologist, (ii) Psychological services to be provided, | *Md. HEALTH OCCUPATIONS Code Ann. § 18-401, § 18-404, § 18-317.1.*<br><br>Criminal penalty (misdemeanor):  possible fine up to $10,000 &/OR imprisonment up to 1 year for each violation.<br><br>Civil penalty: possible fine up to $50,000 to be assessed by the Board |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | and (iii) Duration of the exception to licensure; and (b) May impose any limitations on the psychologist's practice of psychology that the Board considers to be appropriate. See FAQs on licensing board website: http://dhmh.maryland.gov/psych/SitePages/FAQ.aspx | |
| MASSACHUSETTS | NO | NO | See March 2006 policy of MA Board of Registration of Psychologists available online: http://www.mass.gov/?pageID=ocaterminal&L=6&L0=Home&L1=Licensee&L2=Division+of+Professional+Licensure+Boards&L3=Board+of+Registration+of+Psychologists&L4=Statut | *ALM GL ch. 175, § 47BB -- Telemedicine.* "Telemedicine" is defined as the delivery of health care services, using interactive audio, video or other electronic media for the purpose of diagnosis, consultation or treatment. Audio-only phones, | *ALM GL ch. 112, § 123 (a) -- Activities Excluded From Penalty Provisions* The penalties in § 122 shall not apply to: (a) persons eligible for licensure under §119 who provide consultative services for a fee no more than 1 day/month | *ALM GL ch. 112, § 122* Possible fine up to $500 &/OR imprisonment up to 3 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

## Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | es+and+Regulations &L5=Board+Policies +and+Guidelines&si d=Eoca&b=terminal content&f=dpl_boar ds_py_policy_electr onic_services&csid= Eoca | faxes or emails are excluded<br><br>Coverage of telemedicine services may be limited to those health care providers in a telemedicine network approved by the insurer. | *ALM GL ch. 112, § 124*<br><br>A nonresident psychologist may obtain a temporary license to practice in MA up to 1 year if  he/she registers with the board & practices in consultation with, or under the supervision of, a licensed psychologist or possesses qualifications acceptable to the board. | |
| **MICHIGAN** | NO | NO | NO | *MCLS § 500.3476; MCLS § 550.1401k*<br><br>"Telemedicine" means the use a real-time, interactive audio or video, or both, telecommunications system for the health care professional to examine and interact with the patient at the time the services are provided.<br><br>Private payers cannot | Generally, NO but there is an exception for those who live in adjacent states<br><br>*MCLS § 333.16171(h) License for practice of health profession; exemptions.*<br><br>An individual residing adjacent to the land border between this state and an adjoining state who is authorized under the laws of that | *MCLS § 333.16294*<br><br>Practice without a license constitutes a felony<br><br>*MCLS § 750.503*<br><br>If a person is convicted of a felony for which no punishment is specially prescribed, felony punishable by imprisonment up to 4 years &/or a fine up to $5,000 |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | require face-to-face contact between a health care professional & patient for services appropriately provided through telemedicine.  Telehealth services must be covered, subject to contract terms & conditions. | state to practice a health profession and whose practice may extend into this state, but who does not maintain an office or designate a place to meet patients or receive calls in this state. | |
| MINNESOTA | NO | NO | NO | Only for Medicaid – Minn. Stat. *§ 256B.0625* | *Minn. Stat. § 148.916(1)*  Licensed out-of-state psychologists may practice in the state for no more than 7 calendar days  But if more than 7 days, the psychologist must obtain approval from the Board for guest licensure.  Practice under guest licensure may not exceed 9 consecutive months per calendar year | *Minn. Stat. § 146.18; Minn. Stat. § 609.02; Minn. Stat. § 609.125; Minn. Stat. § 609.033*  Misdemeanor:  Possible fine up to $1,000 &/OR imprisonment up to 90 days |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Approval for guest licensure must be received at least 30 days prior to anticipated practice in MN | |
| **MISSISSIPPI** | NO | *Miss. Code Ann. § 73-31-3(d)(iii), § 73-31-14(3)*<br><br>The practice of psychology shall be construed within the meaning of this definition without regard to whether payment is received for services rendered and without regard to the means of service provision (e.g., face-to-face, telephone, Internet, or telehealth).<br><br>Applicants awaiting licensure in Mississippi are prohibited from the practice of psychology without a temporary license issued by the | NO | *Miss. Code Ann. § 83-9-351*<br><br>"Telemedicine" is defined as the delivery of health care services such as diagnosis, consultation, or treatment through the use of interactive audio, video, or other electronic media.<br><br>Must be "real-time" consultation<br><br>Use of audio-only telephone, fax or e-mail excluded<br><br>Private payers must provide coverage for telehealth services to same extent as in- | *Miss. Code Ann. §73-31-14(2); CMSR 50-021-3201 – Rule 4.7(B)*<br><br>Out-of-state licensed psychologists may apply to the board for a temporary practice certificate to engage in practice on temporary basis in MS.<br><br>That practice must be limited in scope and duration, not exceeding 30 days during a consecutive 12-month period.<br><br>May be subject to a jurisprudence exam at the board's discretion | *Miss. Code Ann. §73-31-23; Miss. Code Ann. §73-31-25*<br><br>Misdemeanor:  Possible fine up to $300 &/OR possible imprisonment up to 60 days for each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | board. For the purposes of this subsection, the practice of psychology shall be construed without regard to the means of service provision (e.g., face-to-face, telephone, Internet, telehealth). | | person services but may limit coverage to providers in a telemedicine network approved by the payer. | | |
| MISSOURI | NO | NO | NO | 2013 HB 986 to be codified as *§376.1900.1 R.S.Mo*, effective Jan 1, 2014<br><br>"Telehealth" has the same meaning as defined under *§208.670 R.S. Mo*. -- the "use of medical information exchanged from one site to another via electronic communications to improve the health status of a patient."<br><br>Private payers must provide coverage for telehealth services to same extent as in- | *§ 337.045(5) R.S.Mo*<br><br>Licensed out-of-state psychologist may practice for no more than 10 consecutive business days in any 90 day period, or in aggregate may not exceed 15 business days in any 9-month period | *§ 337.065(1) R.S.Mo; § 560.011 R.S.Mo; § 560.016 R.S.Mo*<br><br>Class A Misdemeanor: possible fine up to $1,000 &/OR possible imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | person services but may limit coverage to providers in a telemedicine network approved by the payer | | |
| **MONTANA** | NO | *MONT. ADMIN. R. 24.189.301*<br><br>(1) "Defined professional relationship" means a relationship in which a licensee or license applicant provides diagnostic, assessment and/or therapeutic services to a client. A defined professional relationship shall be initially established in a context where services are provided:<br>(a) in person and face-to-face; or<br>(b) transmitted via electronic or related methods. If provided under this subsection, the context must also | NO | SB 270 (2013).to be codified under Title 33, Chapter 22, Part 1, effective 1/1/2014<br><br>"Telehealth" is defined the use of interactive audio, video, or other telecommunications technology to deliver health care services.<br><br>Includes real-time and store-&-forward technology; but excludes audio-only phone, fax or email<br><br>Must be delivered through secure communications compliant with HIPAA<br><br>Private payers must provide coverage for | *Mont. Code Anno. § 37-17-104 (1)(d); MONT. ADMIN. R. 24.189.414*<br><br>Licensed out-of-state psychologists may render consulting psychological services not to exceed in the aggregate60 days during a calendar year.<br><br>If services exceed 10 days in a calendar year, the psychologist must submit a notarized form to the Dept. of Labor & Industry in advance as to the nature, extent & duration of the services to be provided in the state.<br><br>Notification shall be provided to the board | *Mont. Code Anno. §37-17-312*<br><br>Misdemeanor: Possible fine up to $500 &/OR imprisonment in county jail up to 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | be:<br>(i) two-way;<br>(ii) interactive;<br>(iii) real-time;<br>(iv) simultaneous;<br>(v) continuous; and<br>(vi) providing for both audio and visual interaction.<br><br>*MONT. ADMIN. R. 24.189.607(4)(d)(ii)(A)* also allows for teleconferencing (two-way, interactive, real time, simultaneous, continuous, and provides audio &visual interaction) as substitute for face-to-face postdoctoral supervision | | telehealth services to same extent as in-person services | each year nonresident psychological services are rendered.<br><br>A letter verifying termination of said services shall be filed with the board at the time of termination. | |
| **NEBRASKA** | NO | NO | NO | NO for private insurance but yes for NE Medicaid (*see R.R.S. Neb. §71-8501 et seq.*) | *R.R.S. Neb. § 38-3119; 172 NAC 155-004.03*<br><br>Licensed, out-of-state psychologists may provide services in NE so long as they do not provide more than an | *R.R.S. Neb. § 38-3130(2); 172 NAC 155-004.03; 172 NAC 155-012*<br><br>Class II misdemeanor: possible fine up to $1,000 &/OR possible imprisonment up to 6 |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | aggregate of 30 days of professional services during the 12 month period beginning with the first date of issuance may be issued a letter to practice.<br><br>Requirements for a license in the other jurisdiction are equal to or exceed NE"s licensure requirements<br><br>Must notify DHHS - Regulation & Licensure of the nature and location of their practice and provide evidence of their licensure in another jurisdiction to obtain a letter permitting temporary practice | months<br><br>An individual who practices prior to issuance of a credential for temporary practice is subject to assessment of an Administrative Penalty, or such other action as provided in the statutes and regulations governing the credential.<br><br>Administrative penalty may be $10 per day, not to exceed a total of $ 1,000 for practice without a credential. |
| **NEVADA** | NO | NO | See FAQs on State of Nevada Board of Psychological Examiners website: http://psyexam.nv.g | NO | *Nev. Rev. Stat. Ann. §641.410; NAC 641.180*<br><br>Licensed, out-of-state psychologists may practice in NV without a | *Nev. Rev. Stat. Ann. §641.440; §193.140*<br><br>Gross misdemeanor: possible fine up to $2,000 &/OR imprisonment in |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | ov/FAQs/<br><br>In Nevada, psychologists licensed in another state cannot provide services to residents without a license. This includes teletherapy of any type. | | license so long as he/she does not practice more than 30 days in a calendar year **&** if the psychologist is invited as a consultant by a NV-licensed psychologist.<br><br>Licensure requirements for other jurisdiction must meet licensure requirements for NV.<br><br>The application for approval to practice as a consultant in NV must be submitted at least 30 days before the psychologist intends to begin practice in this State.<br><br>The application must be approved before practicing as a consultant in NV. | county jail up to 364 days |
| **NEW HAMPSHIRE** | *RSA 329-B:16*<br><br>Persons licensed by | *RSA 329-B:2(7)(h)*<br><br>Provision of any of | See Feb. 17, 2012 statement of interpretation by | *RSA 415-J: 1 et seq.— New Hampshire Telemedicine Act* | *RSA 329-B:20(I)*<br><br>Licensed, out-of-state | *RSA 329-B:17*<br><br>Class A Misdemeanor (for |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | the board who practice electronically shall be subject to standards of care for the practice of telemedicine and telehealth for psychology established by the board pursuant to rules adopted under RSA 541-A. | these services or activities by any means, including electronic or telephonic constitutes the practice of psychology | the NH Board of Mental Health Practice, which regulated psychologists prior to July 1, 2013  http://www.nh.gov/ mhpb/documents/o ut-of- statepractice.htm | "Telemedicine" is defined as the use of audio, video, or other electronic media for the purpose of diagnosis, consultation, or treatment.  Audio-only telephone or fax excluded.  Private payers must provide coverage for telehealth services to same extent as in-person services. | psychologists may temporarily practice in NH if no more than 30 days per year.  Licensure requirements in the psychologist's home state must be equal to or exceed NH's requirements for licensure.  The out-of-state psychologist must hold one of the following credential: ASPPB's CPQ or IPC; ABPP; NR's HSP certification; or other equivalent qualifications determined by the board. | a natural person): possible fine up to $2,000 &/OR possible imprisonment up to 1 year, each violation  Felony if committed by any other person (§330-A:23) |
| NEW JERSEY | NO | NO | NO | NO | *N.J. Stat. § 45:14B-6(d)*  Licensed out-of-state psychologists may practice in NJ without a license for not more than 10 consecutive business days or 15 | *N.J. Stat. § 45:1-11; N.J. Stat. § 45:1-18.2*  Possible civil penalty up to $10,000 for the first violation & up to $20,000 for the second and each subsequent violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | business days in any 90-day period subject to following conditions: Resides outside of NJ; major practice is outside of NJ: provides Board with summary of qualifications & minimum of 10 days' advance written notice of intention to practice; & home state's licensing requirements must be equivalent to NJ's licensing requirements | |
| NEW MEXICO | NO | NO | NO | 2013 N.M. Laws, Chap. 105 (SB 69) to be codified as *N.M. Stat. Ann. § 13-7-14, § 59A-22-49.3, § 59A-23-7.12, § 59A-46-50.3, § 59A-47-45.3?* "Telemedicine" is defined as the use of interactive simultaneous audio & video or store & forward technology | *N.M. Stat. Ann. § 61-9-10.1(A); NMAC 16.22.5.13* Licensed out-of-state psychologists may obtain a temporary license to practice for up to 6 months in NM Temporary license temporary license may be extended at the discretion of the board | *N.M. Stat. Ann. § 61-9-14* Misdemeanor: Possible fine up to $1,000 &/or imprisonment up to 3 months for each violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | using information and telecommunications technologies by a health care provider to deliver health care services at a site other than the site where the patient is located<br><br>Telemedicine used to provide clinical services shall be encrypted and shall conform to state and federal privacy laws.<br><br>Private payers must provide coverage for telehealth services to same extent as in-person services. | with a written request 30 days prior to the expiration, stating the reason for extension. | |
| **NEW YORK** | NO<br><br>But there is a provision governing hospital credentialing/ privileging of health care practitioners providing | NO | Telepractice Guideline issued by the NYS Office of the Professions available online: http://www.op.nysed.gov/prof/psych/psychtelepracticeguide.htm | NO | *NY CLS Educ § 7605 (8); 8 NYCRR § 72.5*<br><br>Licensed out-of-state practitioner may practice may engage in temporary period up to 10 consecutive business days in any period of 90 | *NY CLS Educ § 6512; NY CLS Penal § 70.00; CLS Penal § 80.00*<br><br>Class E felony: possible fine up to $5,000 &/or imprisonment up to 4 years |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | telemedicine services – *see* NY CLS Pub Health § 2805-u  "Telemedicine" is defined as the delivery of clinical health care services through real-time two-way electronic audio-visual communications. The health care practitioner providing telemedicine must be licensed to practice in NY State. | | | | consecutive days or in the aggregate no more than 15 business days in any such 90-day period.  They must file with the department before practicing  This is a one-time practice exemption. | |
| **NORTH CAROLINA** | NO | NO | See March 2005 opinion of NC Psychology Board available online: http://ncpsychology board.org/office/Ele ctronicServices.htm | NO | *N.C. Gen. Stat. § 90-270.4(f); 21 N.C.A.C. 54.1610*  Licensed out-of-state psychologists may practice for up to 5 days in any calendar year.  Nonresident psychologists shall submit to the Board a | *N.C. Gen. Stat. §90-270.17; N.C. Gen. Stat. § 14-3; N.C. Gen. Stat. § 15A-1340.23*  Class 2 misdemeanor: possible fine up to $1,000 &/OR imprisonment of more than 30 days up to 6 months, each violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

## Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | written statement from their home state verifying licensure in good standing with a written description of their intended practice at least 5 working days prior to engaging in temporary practice in NC | |
| NORTH DAKOTA | NO | *N.D. Cent. Code § 43-51-02 -Location of practice of an occupation or profession*<br><br>The provision of services to an individual in this state which fall within the standard of practice of a profession or occupation regulated by a board, regardless of the means by which the services are provided or the physical location of the person providing those services, constitutes the practice of that | NO | NO | *N.D. Cent. Code, §43-32-30(2); N.D. Cent. Code, § 43-51-05; N.D. Admin. Code 66-02-01-16*<br><br>Licensed out-of-state psychologists may practice temporarily in ND for up to 30 days in any calendar year<br><br>The 1-year period commences on the date the written application is approved by the board.<br><br>The application must include verified documentation that the | *N.D. Cent. Code, §43-32-31*<br><br>Class B Misdemeanor: possible fine up to $1000 dollars &/OR imprisonment up to 30 days<br><br>Civil injunction remedy also available |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | occupation or profession in this state and is subject to regulation by the appropriate board in this state. | | | nonresident psychologist is licensed in good standing; the nature of the services to be provided; & explanation of when the services are to be provided. | |
| OHIO | OAC Ann. 4732-3-01(S); OAC Ann. 4732-13-03, 4732-13-04 (supervision); & OAC Ann. 4732-17-01

"Telepsychology" is defined as the practice of psychology by distance communication technology such as but not necessarily limited to telephone, email, Internet-based communications, and videoconferencing.

In order to practice telepsychology in the state of Ohio one | See OAC Ann 4732-3-01 | NO | NO | ORC Ann. 4732.22(B); OAC Ann. 4732-5-02(B)(2)

Licensed out-of-state psychologists may practice temporarily in OH for not more than 30 days a year

Must submit an application prior to practicing in Ohio indicating that home state's licensure requirements are equal to or exceed OH's licensing requirements

Holding an active inter-jurisdictional practice certificate (IPC) issued | ORC Ann. 4732.99

Possible fine of $100-500 &/OR imprisonment of 6 months up to 1 year, each violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

## Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | must hold a current, valid license issued by the state board of psychology or shall be a registered supervisee of a licensee being delegated telepsychology practices. | | | | by ASSPB shall be deemed to qualify for permission to practice | |
| OKLAHOMA | 36 Okl. St. § 6801 et seq  -- Oklahoma Telemedicine Act

"Telemedicine" is defined as the practice of health care delivery, diagnosis, consultation, treatment, including but not limited to, the treatment and prevention of strokes, transfer of medical data, or exchange of medical education information by means of audio, | NO but psychologists are included in the list of providers authorized to provide services under the Telemedicine Act | See Kennedy v. Freeman, 919 F.2d 126 (1990) (out-of-state doctor had sufficient contacts with OK for OK court to assert personal jurisdiction in medical malpractice action)

http://www.leagle.com/decision/19901045919F2d126_11003

See OK AG Opinion 00-041 addressing the ability of dental board to regulate | 36 Okl. St. § 6803

Health care service plans, disability insurer programs, workers' compensation programs, or state Medicaid managed care program contracts shall provide coverage of telehealth services, subject to contract terms & conditions. | 59 Okl. St. § 1353(9 )

Licensed out-of-state psychologists may practice temporarily for no more than an aggregate 5 days during any year.

He/she must inform the Board prior to initiation of services. | 59 Okl. St. § 1374

Misdemeanor:  possible fine up to $500 &/OR imprisonment up to 6 months, each violation |

Disclaimer:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | video, or data communications.<br><br>Consultation by phone or fax is excluded<br><br>Provider must obtain written patient consent prior to engaging in telehealth.  See *36 Okl. St. § 6804* for what must be specifically included in the informed consent | | dental services provided via internet in OK<br><br>http://www.oklegal. onenet.net/oklegal- cgi/ifetch?okag+125 6050667529+F | | | |
| **OREGON** | NO | NO | NO | *ORS § 743A.058*<br><br>"Telemedical" means delivered through a two-way video communication that allows a health professional to interact with a patient who is at an originating site as defined in the statute.<br><br>Private payers must | *ORS § 675.063; Or. Admin. R. 858-010-0055*<br><br>Licensed, out-of-state psychologists must obtain a limited (visitor's) permit to engage in temporary practice in OR.<br><br>A visitor's permit shall be effective for no more than 30 days in a 12 | *ORS § 675.990; ORS § 161.615;  ORS § 161.635*<br><br>Class C Misdemeanor: possible fine up to $6,250 &/OR imprisonment up to 1 year<br><br>*ORS § 675.150 --* Injunction remedy |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | provide coverage for telehealth services, subject to contract terms & conditions. | month period. The licensure requirements for the psychologist's home state must be essentially equivalent to those required in OR. | |
| **PENNSYLVANIA** | NO | NO | See *Guideline Regarding Requirements for Provision of Psychological Services Regardless of Delivery Method*, available on the State Board of Psychology's website: http://www.portal.state.pa.us/portal/server.pt/community/state_board_of_psychology/12521/licensure_information/572083 | NO | *63 P.S. § 1203(7); 49 Pa. Code § 41.52(c)* Licensed, out-of-state psychologists must obtain advance permission from the Board to practice on temporary assignment in PA. Temporary practice is limited to up to 6 months. Only 1 additional 6-month extension may be granted.  Requests for extension must be submitted in writing to the Board. | *63 P.S. § 1211* Misdemeanor:  Possible fine up to $ 1,000 &/or imprisonment up to 6 months For additional violations, possible fine not less than $2,000 &/or imprisonment not less than 6 months up to 1 year |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Licensed, out-of-state psychologists on temporary assignment in PA for an aggregate of no more than 14 days are exempted from the notification requirement. | |
| **RHODE ISLAND** | NO | NO | Email communication from RI Board Administrator dated 4/20/10 indicates that the RI psychology board views provision of telemental health services as requiring licensure in RI. It may also be possible to provide services under temporary licensure provision. It should be noted that the board equates 1 teletherapy session to 1 calendar day of the 10 calendar day limit. | NO | *R.I. Gen. Laws § 5-44-23(h); CRIR 14-140-036(2.9)*<br><br>Licensed out-of-state psychologists may practice temporarily up to 10 calendar days per calendar year with no more than 5 days of this activity occurring consecutively | *R.I. Gen. Laws § 5-44-21*<br><br>Misdemeanor: Possible fine up to $500, each offense |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | | |
| **SOUTH CAROLINA** | NO | *S.C. Code Ann. § 40-55-50*<br><br>(C) A person is deemed to be practicing as a psychologist within the meaning of this chapter if the person engages in any of the activities enumerated in subsection (A) electronically within this State including, but not limited to, by means of the internet, phone lines, and personal computer modems. | NO | NO | *S.C. Code Ann §40-55-110*<br><br>Licensed, out-of-state psychologists must obtain a temporary permit from the Board to practice temporarily for a period not to exceed 60 days within a calendar year<br><br>Must demonstrate that the home state's licensing requirements are equivalent to SC's requirements. | *S.C. Code Ann §40-55-170*<br><br>Felony:  possible fine up to $50,000 &/or imprisonment up to 1 year |
| **SOUTH DAKOTA** | NO | NO | NO | NO | *S.D. Codified Laws § 36-27A-2 (4)*<br><br>Licensed out-of-state psychologists engage in temporary practice up to no more than an aggregate of 20 days during any 1 year.<br><br>If exceed 10 consecutive | *S.D. Codified Laws §36-2-2; S.D. Codified Laws § 22-6-2*<br><br>Class 2 misdemeanor: possible fine of $500 &/OR 30 days imprisonment in a county jail, each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | days of practice in any year, then must report to the board in writing the nature and extent of practice in SD. | |
| **TENNESSEE** | NO | NO | NO | NO | *Tenn. Code Ann. § 63-11-211(b)(5)*<br><br>Licensed, out-of-state psychologists may practice up to 12 days per year for such purposes as special training or consultation, speciation evaluation or intervention, or serving as an expert witness | *Tenn. Code Ann. § 63-11-206(a); Tenn. Code Ann. § 40-35-111(e)(2)*<br><br>Class B misdemeanor: possible fine up to $500 &/OR imprisonment up to 6 months |
| **TEXAS** | *Tex. Ins. Code §1455.001 et seq.* (health care coverage)<br><br>*Tex. Occ. Code §111.001 et seq.* (informed consent, patient confidentiality)<br><br>*Tex. Occ. Code* | NO | See December 1999 telepractice policy statement of Texas State Board of Examiners of Psychologists available online: http://tsbep.texas.gov/files/newsletters/1999Fall.pdf | *Tex. Ins. Code §1455.004*<br><br>Private payers must provide coverage for telehealth services, subject to contract terms & conditions. | *Tex. Occ. Code § 501.263; 22 TAC § 463.27*<br><br>Licensed, out-of-state psychologists must obtain a temporary permit to practice in TX.<br><br>The home state's licensing requirements must be substantially | *Tex. Occ. Code § 501.502; Tex. Occ. Code § 501.503; Tex. Penal Code § 12.21; 22 TAC § 470.22*<br><br>Civil penalty of $1,000 for each day of violation<br><br>Class A Misdemeanor: possible fine up to $4,000 &/OR imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | §106.001<br><br>The fact that an activity occurs through the use of the Internet does not affect a licensing authority's power to regulate an activity or person that would otherwise be regulated under this title.<br><br>*Tex. Gov't Code §531.001(7)*<br><br>Telehealth service" means a health service, delivered by a licensed or certified health professional acting within the scope of their license or certification and that requires the use of advanced telecommunications technology, other than phone or fax, including: | | | | equal to the licensing requirements in TX.<br><br>The temporary permit is valid only for a period up to 30 days as specified by the board and for the limited purpose approved by the board.<br><br>A person holding a temporary license issued under this chapter shall display a sign indicating that the license is temporary. The sign must be approved by the board and displayed in every room in which the person provides psychological services.<br><br>Yes (Tex. Occ. Code §501.263; 22 TAC §463.27) | Each day a violation continues or occurs is a separate violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | (A) compressed digital interactive video, audio, or data transmission; (B) clinical data transmission using computer imaging by way of still-image capture and store and forward; and (C) other technology that facilitates access to health care services or medical specialty expertise. | | | | | |
| **UTAH** | NO | Utah Code Ann. § 58-61-102(10)  "Remotely" is defined as communicating via Internet, telephone, or other electronic means that facilitate real-time audio or visual interaction between individuals when they are not physically present in the same room at the same time. | NO | NO | Utah Code Ann. § 58-61-307(2)(k)  An individual who is licensed, in good standing, to practice mental health therapy elsewhere in the US outside of Utah may provide short term transitional mental health therapy remotely to a client in Utah only if: (i) the individual is | Utah Code Ann. § 58-61-501; § 58-61-503; Utah Code Ann. § 76-3-203; § 76-3-301  3rd degree felony: possible fine up to $5,000 &/or imprisonment up to 5 years |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | *Utah Code Ann. § 58-61-307(2)(k)*<br><br>Short-term telemental health services may be provided in UT from another state if the nonresident psychologist meets certain specified conditions (further described in column #5) | | | present in the state or territory where the individual is licensed to practice mental health therapy;<br>(ii) the client relocates to Utah;<br>(iii) the client is a client of the individual immediately before the client relocates to Utah;<br>(iv) the individual provides the short term transitional mental health therapy to the client only during the 45 day period beginning on the day on which the client relocates to Utah;<br>(v) within 10 days after the day on which the client relocates to Utah, the individual provides written notice to the division of the individual's intent to provide short term transitional mental health therapy remotely to the client; and<br>(vi) the individual does | |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | not engage in unlawful conduct or unprofessional conduct. | |
| **VERMONT** | *26 V.S.A. § 3018 – Telepractice*<br><br>Licensees who provide services regulated under this chapter by means of the internet or any other electronic means are deemed to provide such services in this state, and are subject to the jurisdiction of the board. The board may take disciplinary or other action against such licensees. Action taken by the board does not preclude any other jurisdiction from also taking disciplinary or other action against such licensees. | *CVR 04-030-270(6.8) – Telepractice*<br><br>(a) Telepractice is governed 26 V.S.A. § 3018. Professionals who provide service via the Internet or other electronic means should provide as much information as possible to individuals who access their services.<br><br>(b) Psychologists from other jurisdictions providing telepractice services to persons in Vermont are deemed to be practicing in Vermont. They must be licensed by the Board and must comply with the disclosure requirements of Rule 6.8. | See board website for disclosures required for telepractice:<br>http://vtprofessionals.org/opr1/psychologists/telepractice.asp | *8 V.S.A. § 4100k - Coverage for telemedicine services*<br><br>"Telemedicine" means the delivery of health care services such as diagnosis, consultation, or treatment through the use of live interactive audio & video over a secure connection that complies with HIPAA.<br><br>Audio-only telephone, e-mail, or fax excluded.<br><br>Coverage for telehealth services is required, subject to contract terms & conditions.<br><br>A health insurance plan may limit coverage to providers in the plan's network and may | *CVR 04-030-270(1.8)*<br><br>Licensed, out-of-state psychologists must obtain a temporary license to practice in VT.<br><br>Temporary practice is limited up to 10 days, or 80 hours in a 12-month period.<br><br>No applicant may be issued more than two temporary licenses. | *26 V.S.A. § 3002;  26 V.S.A. § 3003; 3 V.S.A. § 127*<br><br>Injunction & civil penalty up to $1,000<br><br>Criminal penalty:  possible fine up to $5,000 &/or imprisonment up to 1 year |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | (c) Vermont licensed psychologists who provide telepractice services to clients outside of Vermont remain under the jurisdiction of the Board. They shall comply with the disclosure requirements of Rule 6.8 and shall specifically disclose: (1) Name, location, and telephone number of the psychologist; (2) What the psychologist is licensed and trained to do; and (3) The limits and limitations of Internet practice and service delivery. | | require originating site health care providers to document the reason the services are being provided by telemedicine rather than in-person. | | |
| VIRGINIA | NO | NO | Based on a communication with staff of the Virginia Board of Psychology, see 115: 1.4 available online -- | *Va. Code Ann. § 38.2-3418.16*<br><br>"Telemedicine" is defined as the delivery of health care services, means the use of | *Va. Code Ann. § 54.1-3601(6), (7)*<br><br>Licensed, out-of-state psychologists may practice temporarily if consulting with VA | *Va. Code Ann. § 54.1-2401*<br><br>Civil penalty up to $5,000, each violation<br><br>*Va. Code Ann. § 54.1-111;*<br>*Va. Code Ann. § 18.2-10;* |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | http://www.dhp.virginia.gov/counseling/counseling_guidelines.htm | interactive audio, video, or other electronic media used for the purpose of diagnosis, consultation, or treatment.<br><br>Audio-only telephone, electronic mail message, or facsimile transmission is excluded<br><br>Coverage for telehealth services is required, subject to contract terms & conditions. | licensed psychologists, or when issued a temporary license by the Board to participate in continuing education programs or rendering psychological services without compensation to any patient at clinics for indigent/uninsured | *Va. Code Ann. § 18.2-11*<br><br>Class 1 misdemeanor: possible fine up to $2,500 &/or imprisonment up to 12 months<br><br>Subsequent offense within 36-month period constitutes class 6 felony Possible fine up to $2,500 &/or imprisonment of 1-5 years or in court's discretion up to 12 months |
| **WASHINGTON** | NO | NO | NO | NO | *Rev. Code Wash §18.83.082; WAC § 246-924-480; WAC § 246-924-483*<br><br>Licensed, out-of-state psychologists may petition the Board for a temporary permit to practice within the state for a period not to exceed 90 days in a calendar year. | *Rev. Code Wash. (ARCW) § 18.83.180; ARCW §9.92.020*<br><br>Gross Misdemeanor: Possible fine up to $5,000 &/or imprisonment up to 364 days |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Licensure requirements in the psychologist's home state must meet or exceed those requirements for licensure in WA.<br><br>A national background check may be required; however, the temporary practice permit may be issued while the check is completed if the psychologist meets certain conditions specified in WAC § 246-924-483. | |
| **WEST VIRGINIA** | NO | NO | See Board policy statement on Telepsychology – Skype, available online:<br><br>http://www.wvpsychbd.org/policy_statements.htm | NO | *W. Va. Code* §30-21-3<br><br>Licensed, out-of-state psychologists may practice for a period not to exceed 10 days in any calendar year<br><br>Must not establish a regular place of practice in the state | *W. Va. Code* § 30-21-13<br><br>Misdemeanor:  Possible fine up to $500 &/OR imprisonment up to 6 months |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Licensure requirements in the psychologist's home state must meet or exceed the licensing requirements in WV  Must petition the board in advance | |
| WISCONSIN | NO | *Wis. Adm. Code Psy 2.14(2)*  A psychologist provides psychological services in this state whenever the patient or client is located in this state, regardless of whether the psychologist is temporarily located in this state or is providing services by electronic or telephonic means from the state where the psychologist is licensed. | NO | NO | *Wis. Stat. § 455.03; Wis. Adm. Code Psy 2.14(1)*  Licensed, out-of-state psychologists may engage in temporary practice so long as he/she does not more than 60 working days in any one year without holding a license.  The psychologist's home state requirements for psychology licensure must be equivalent to or higher than the requirements for licensure in WI.  If temporary practice exceeds 20 working | *Wis. Stat. § 455.11*  Possible fine up to $200 &/OR imprisonment up to 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | days within a year, the psychologist must report to the Board the nature & extent of practice. | |
| **WYOMING** | NO | NO | See reference to "telepsychology" in June 11, 2012 Board newsletter available online at: http://plboards.stat e.wy.us/psychology/ pdf/Newsletters/1st EditionNewsletterJu ne2011.pdf | NO | *Wyo. Stat. § 33-27-117 (e); WCWR 024-068-003(1)(c)* <br><br> Licensed, out-of-state psychologists must obtain a temporary license, which allows practice up to 30 working days in 1 year. <br><br> Temporary license is available if the licensing requirements in the psychologist's home state meets or exceeds WY's licensing requirements. <br><br> If temporary practice exceeds 20 working days in 1 year, the psychologist must report the nature and extent of his/her | *Wyo. Stat. § 33-27-119* <br><br> Misdemeanor: possible fine up to $750 &/OR imprisonment up to 6 months, each violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | practice in  WY to the board | |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.



👤 Log in  |  Register        🛒 Cart

🔍

**Journal of Technology in Human Services** ›
Volume 26, 2008 - Issue 2-4

5,696 | 98 | 41
Views | CrossRef citations to date | Altmetric

Original Articles

# Best Practices in Online Therapy

Jo-Anne M. Abbott, **Britt Klein** ✉ & Lisa Ciechomski

Pages 360-375 | Received 30 Apr 2007, Accepted 04 Oct 2007, Published online: 08 Sep 2008

❝ Cite this article    🔗 https://doi.org/10.1080/15228830802097257



 |  |  | ❝ Citations | 

 Reprints & Permissions        Read this article

## ABSTRACT

This article discusses important issues in delivery of best practice Internet-based therapy (etherapy). Etherapy is first defined as the interaction between a consumer and a therapist via the Internet (commonly via e-mail) in association with the use of a structured web-based clinical treatment program. A summary of the professional and ethical issues is provided, along with illustrated examples of best-practice principles experienced in clinical and research work by members of the Swinburne University of Technology Etherapy Unit (formerly the Etherapy Research, Education, and Training Unit in the Department of General Practice at Monash University). Etherapy has been found to be effective in treating a range of psychological disorders. Future research

investigating methods of enhancing consumers' ability to engage in etherapy should further increase the effectiveness of this type of therapy.

🔍 **KEYWORDS:**  Best practice   internet therapy   mental health   online therapy   professional ethics

## ACKNOWLEDGEMENT

The authors would like to thank the following organizations for making our research trials of our programs possible: Australian Rotary Health Research Fund, NH & MRC and beyondblue, BP Australia, the Australian Institute of Sport, the University of Ballarat, and Monash University. We thank all of the participants and general practitioners who have been involved in the programs.

We would also like to acknowledge the contributions of those who have been involved with Panic Online over the past 10 years: the late Jeff Richards (the primary chief investigator on the Panic Online trials), Alan Penhall, Dr. Marlies Alvarenga, Tony Archbold, Gwenda Cannard, Dr. David Austin, Joe Bolza, Dr. Marcia Pope, Dr. Felicity Smith, Dr. Craig Stapleton, Dr. Ciaran Pier, Peter Schattner, Dr. David Pearce, Dr. Tori Wade, Dr. Litza Kiropoulos, Jo Mitchell, Dr. Kathryn Gilson, Kerrie Shandley, Katy Symons, Mal Boyle, and Leon Piterman.

# Additional information

## Notes on contributors

### Jo-Anne M. Abbott

Dr. Jo-Anne Abbott is Research Fellow and Psychologist, Faculty of Life and Social Sciences, SwinPsyCHE etherapy Unit, Swinburne University of Technology, Hawthorn, Australia.

**Britt Klein**
Dr. Britt Klein is Co-Director Etherapy Unit, Senior Lecturer and Clinical
Psychologist, Etherapy Unit, SwinPsyCHE, Faculty of Life and Social Sciences,
Swinburne University of Technology, Melbourne, Australia.

**Lisa Ciechomski**
Dr. Lisa Ciechomski is Research Fellow and Psychologist, School of Nursing
and Midwifery, Faculty of Medicine, Nursing and Health Sciences, Monash
University, Frankston, Australia.

❮ **Previous** article               **View** issue table of contents               **Next** article ❯

Log in via your institution

❯  **Access through your institution**

Log in to Taylor & Francis Online

❯   **Log in**

Restore content access

❯   **Restore content access for purchases made as guest**

## Purchase options *                                    Save for later

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 161 of 329

**PDF download + Online access**

- 48 hours access to article PDF & online version
- Article PDF can be downloaded
- Article PDF can be printed

**USD 50.00**

🛒 Add to cart

**Issue Purchase**

- 30 days online access to complete issue
- Article PDFs can be downloaded
- Article PDFs can be printed

**USD 385.00**

🛒 Add to cart

*\* Local tax will be added as applicable*

## Related Research ⓘ

**People also read**          Recommended articles          Cited by 98

A Comprehensive Review and a Meta-Analysis of the Effectiveness of Internet-Based Psychotherapeutic Interventions ❯

Azy Barak et al.

Journal of Technology in Human Services

Published online: 8 Sep 2008

Online counselling: a descriptive analysis of therapy services on the Internet ❯

Andrea Chester et al.

British Journal of Guidance & Counselling

Published online: 18 Jan 2007

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 162 of 329

Online counseling: The good, the bad, and the possibilities  ⟩

Kurt D. Baker et al.

Counselling Psychology Quarterly

Published online: 2 Dec 2011

View more

## Information for

Authors

R&D professionals

Editors

Librarians

Societies

## Opportunities

Reprints and e-prints

Advertising solutions

Accelerated publication

Corporate access solutions

## Open access

Overview

Open journals

Open Select

Dove Medical Press

F1000Research

## Help and information

Help and contact

Newsroom

All journals

Books

## Keep up to date

Register to receive personalised research and resources by email

 Sign me up

  

 

Copyright © 2023 Informa UK Limited    Privacy policy    Cookies    Terms & conditions

Accessibility

Registered in England & Wales No. 3099067
5 Howick Place | London | SW1P 1WG

tmj, 2018, 24. Downloaded from https://www.liebertpub.com. By Mary Ann Liebert - on September 18, 2023. Re-use and distribution is strictly not permitted, except for Open Access articles

# Policy

## Best Practices in Videoconferencing-Based Telemental Health April 2018

Jay H. Shore, MD, MPH,[1,2] Peter Yellowlees MD, MBBS,[3]
Robert Caudill, MD,[4] Barbara Johnston, MSN,[5]
Carolyn Turvey, PhD,[6] Matthew Mishkind, PhD,[1]
Elizabeth Krupinski, PhD,[7] Kathleen Myers, MD, MPH,[8]
Peter Shore, PsyD,[9] Edward Kaftarian, MD,[10] and Donald Hilty, MD[11]

[1]Helen and Arthur E. Johnson Depression Center, the University
 of Colorado Anschutz Medical Campus, Aurora, Colorado.
[2]Department of Psychiatry, the University of Colorado
 Anschutz Medical Campus, Aurora, Colorado.
[3]Department of Psychiatry, University of California, Davis,
 Sacramento, California.
[4]Department of Psychiatry, The University of Louisville
 School of Medicine, Louisville, Kentucky.
[5]HealthLinkNow, Sacramento, California.
[6]Department of Psychiatry, Carver College of Medicine,
 The University of Iowa, Iowa City, Iowa.
[7]Department of Radiology and Imaging Sciences, Emory
 University School of Medicine, Atlanta, Georgia.
[8]Center for Child Health, Behavior, and Development,
 Seattle Children's Hospital, Seattle, Washington.
[9]Portland Veterans Affairs Health Care System, Portland, Oregon.
[10]Orbit Health Telepsychiatry, Encino, California.
[11]Northern California Veterans Affairs Health Care System,
 Sacramento, California.

## Abstract

*Telemental health, in the form of interactive videoconferencing, has become a critical tool in the delivery of mental health care. It has demonstrated the ability to increase access to and quality of care, and in some settings to do so more effectively than treatment delivered in-person. This article updates and consolidates previous guidance developed by The American Telemedicine Association (ATA) and The American Psychiatric Association (APA) on the development, implementation, administration, and provision of telemental health services. The guidance included in this article is intended to assist in the development and delivery of effective and safe telemental health services founded on expert consensus, research evidence, available resources, and patient needs. It is recommended that the material reviewed be contemplated in conjunction with APA and ATA resources, as well as the pertinent literature, for additional details on the topics covered.*

*Keywords: telemedicine, telehealth, telemental health, policy*

## Introduction

This document represents a collaboration between the American Psychiatric Association (APA) and the American Telemedicine Association (ATA) to create a consolidated update of the previous APA and ATA official documents and resources in telemental health to provide a single guide on best practices in clinical videoconferencing in mental health. The APA is the main professional organization of psychiatrists and trainee psychiatrists in the United States, and the largest psychiatric organization in the world. The ATA, with members from throughout the United States and the world, is the principal organization bringing together telemedicine practitioners, health care institutions, government agencies, vendors, and others involved in providing remote health care using telecommunications.

Telemental health in the form of interactive videoconferencing has become a critical tool in the delivery of mental health care. It has demonstrated its ability to increase access and quality of care, and in some settings to do so more effectively than treatment delivered in-person.

The APA and the ATA have recognized the importance of telemental health with each individual association undertaking efforts to educate and provide guidance to their members in the development, implementation, administration, and provision of telemental health services. It is recommended that this guide be read in conjunction with the other APA and ATA resources that provide more detail.[1–7]

| OFFICIAL APA AND ATA GUIDELINES, RESOURCES, AND TELEMENTAL HEALTH TRAININGS | |
|---|---|
| **APA** | **ATA** |
| (1) APA Web-based Telepsychiatry Toolkit (2016)[1] | (4) Practice Guidelines for Telemental Health with Children and Adolescents (2017)[4] |
| (2) Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry, Council on Law and Psychiatry (2014)[8] | (5) Telemental Health Resource Toolbox (2017)[9] |
| | (6) Delivering Online Video Based Mental Health Services (2014)[5] |
| (3) American Psychiatric Association. Telepsychiatry via Videoconferencing. (1998)[3] | (7) A Lexicon of Assessment and Outcome Measures for Telemental Health (2013)[10] |
| | (8) Practice Guidelines for Video-Based Online Mental Health Service (2013)[6] |
| | (9) Practice Guidelines for Videoconferencing-Based Telemental Health (2009)[7] |
| | (10) Evidence-Based Practice for Telemental Health (2009)[11] |

DOI: 10.1089/tmj.2018.0237    © MARY ANN LIEBERT, INC. • VOL. 24    NO. 11 • NOVEMBER 2018    **TELEMEDICINE and e-HEALTH** 827

SHORE ET AL.

tmj, 2018, 24, Downloaded from https://www.liebertpub.com. By Mary Ann Liebert - on September 18, 2023. Re-use and distribution is strictly not permitted, except for Open Access articles

These guidelines focus on interactive videoconferencing-based mental health services (a.k.a., telemental health). The use of other technologies such as virtual reality, electronic mail, electronic health records, telephony, remote monitoring devices, chat rooms, or social networks is not a focus of this document except where these technologies interface with videoconferencing services.

The document was created by a joint writing committee drawn from the APA Committee on Telepsychiatry and the ATA Telemental Health Special Interest Group (TMH SIG). This document draws directly from ATA's three previous guidelines, selecting from key statements/guidelines, consolidating them across documents, and then updating them where indicated. Following internal review processes within the APA and the ATA, the Board of Directors of the ATA and the Joint Reference Committee (JRC) of the APA have given approval to its publication.

The reference list includes several detailed reviews providing justification and documentation of the scientific evidence supporting telemental health.[12–16] Following ATA guideline writing convention, this document contains requirements, recommendations, or actions that are identified by text containing the keywords "shall," "should," or "may." "Shall" indicates that it is required whenever feasible and practical under local conditions. "Should" indicates an optimal recommended action that is particularly suitable, without mentioning or excluding others. "May" indicates additional points that may be considered to further optimize the telemental health care process.

It should be recognized that compliance with these recommendations will not guarantee accurate diagnoses or successful outcomes. The purpose of this guide is to assist providers in providing effective and safe medical care founded on expert consensus, research evidence, available resources, and patient needs.

This document is not meant to establish a legal standard-of-care.

## Administrative Considerations

### PROGRAM DEVELOPMENT

Providers or organizations delivering mental health services should conduct a telehealth needs assessment before initiating services. This needs assessment should include, at a minimum, the following components: program overview statement, services to be delivered, proposed patient population, provider resources, technology needs, staffing needs, quality and safety protocols, business and regulatory processes, space requirements, training needs, evaluation plan, and sustainability.

## LEGAL AND REGULATORY ISSUES

*Licensure and malpractice.* Health care services have been defined as delivered in the state where the patient is located. Providers of telemental health services shall comply with state licensure laws, which typically entail holding an active professional license issued by the state in which the patient is physically located during a telemental health session, and shall have appropriate malpractice coverage. Providers shall conduct their own due diligence to determine the type of licensure required, and ensure they are in compliance with state licensing board regulations. If providing care within a federal health care system (e.g., Department of Veterans Affairs, Department of Defense, and Indian Health Service), providers shall follow the specific organization guidelines around licensure, which may allow for a single state licensure across multiple jurisdictions. Providers may utilize the interstate licensure compact or special telemedicine licensures offered by certain states provided they comply with all individual state licensure and program requirements.

*Scope of practice.* Providers or organizations offering telemental health services shall ensure that the standard-of-care delivered through telemedicine is equivalent to in-person care. Persons engaged in telemental health services shall be aware of their professional organization's positions on telemental health and incorporate the professional association standards and clinical practice guidelines whenever possible. Providers in practice and trainees should stay current with evolving technologies, telemental health research findings, and policies.

*Prescribing.* Providers shall be aware of both federal and state guidelines around the prescription of controlled substances, including the Ryan Haight Online Pharmacy Consumer Protection Act of 2008. Providers shall comply with federal and state regulations around the prescription of controlled substances based on the setting, model of care, scope of practice, and locations in which they are practicing and where the patient is located at the time of treatment.

*Informed consent.* Local, state, and national laws regarding verbal or written consent shall be followed. If written consent is required, then electronic signatures, assuming these are allowed in the relevant jurisdiction, may be used. The provider shall document the provision of consent in the medical record.

*Billing and reimbursement.* The patient shall be made aware of any and all financial charges that may arise from the services to be provided before the commencement of initial services. Appropriate documentation and coding should be undertaken specifying when services are rendered through telemental health.

© MARY ANN LIEBERT, INC.

tmj, 2018, 24, Downloaded from https://www.liebertpub.com, By Mary Ann Liebert - on September 18, 2023. Re-use and distribution is strictly not permitted, except for Open Access articles

STANDARD OPERATING PROCEDURES/PROTOCOLS

Before initiating telemental health services, any organization or provider shall have in place a set of Standard Operating Procedures or Protocols that should include (but are not limited to) the following administrative, clinical, and technical specifications:

- Roles, responsibilities (i.e., daytime and after-hours coverage), communication, and procedures around emergency issues.
- Agreements to assure licensing, credentialing, training, and authentication of practitioners as well as identity authentication of patients according to local, state, and national requirements.
- A systematic quality improvement and performance management process that complies with any organizational, regulatory, or accrediting requirements for outcomes management.

*Patient–provider identification.* All persons at both sites of the videoconference shall be identified to all participants at the beginning of a telemental health session. Permission from the patient should not be required if safety concerns mandate the presence of another individual or if the patient is being legally detained.

At the beginning of a video-based mental health treatment with a patient, the following information shall be verified and documented:

- The name and credentials of the provider and the name of the patient.
- The location(s) of the patient during the session.
- Immediate contact information for both provider and patient (phone, text message, or e-mail), and contact information for other relevant support people, both professional and family.
- Expectations about contact between sessions shall be discussed and verified with the patient, including a discussion of emergency management between sessions.

*Emergencies*

GENERAL CONSIDERATIONS. Professionals shall maintain both technical and clinical competence in the management of mental health emergencies. Provisions for management of mental health emergencies shall be included in any telemental health procedure or protocol. Clinicians shall be familiar with local civil commitment regulations and should have arrangements to work with local staff to initiate/assist with civil commitments or other emergencies.

CLINICALLY SUPERVISED SETTINGS. Clinically supervised settings are patient locations where other medical or support staff are available in real time to support the telemental health sessions. Emergency protocols shall be created with clear explanation of roles and responsibilities in emergency situations. These include determination of outside clinic hours emergency coverage and guidelines for determining when other staff and resources should be brought in to help manage emergency situations. Clinicians shall be aware of safety issues with patients displaying strong affective or behavioral states upon conclusion of a session and how patients may then interact with remote site staff.

CLINICALLY UNSUPERVISED SETTINGS. In instances wherein the mental health provider is providing services to patients in settings without clinical staff immediately available:

- Providers should discuss the importance of having consistency in where the patient is located for sessions and knowing a patient's location at the time of care, as it impacts emergency management and local available resources.
- As patients change locations, providers shall be aware of the impact of location on emergency management protocols. These include emergency regulations, resources (e.g., police, emergency rooms, and crisis teams), and contacts. These should be documented and available to providers.
- For treatment occurring in a setting where the patient is seen without access to clinical staff, the provider should consider the use of a "Patient Support Person" (PSP) as clinically indicated. A PSP is a family, friend, or community member selected by the patient who could be called upon for support in the case of an emergency. The provider may contact the PSP to request assistance in evaluating the nature of emergency and/or initiating 9-1-1 from the patient's home.
- If a patient and/or a PSP will not cooperate in his or her own emergency management, providers shall be prepared to work with local emergency personnel in case the patient needs emergency services and/or involuntary hospitalization.

*Care coordination.* With consent from the patient and in accordance with privacy guidelines, telemental health providers should arrange for appropriate and regular communication with other professionals and organizations involved in the care of the patient.

## Technical Considerations
VIDEOCONFERENCING PLATFORM REQUIREMENTS

Providers and organizations should select videoconferencing applications that have the appropriate verification, confidentiality, and security parameters necessary to be

**SHORE ET AL.**

tmj, 2018, 24, Downloaded from https://www.liebertpub.com. By Mary Ann Liebert - on September 18, 2023. Re-use and distribution is strictly not permitted, except for Open Access articles

properly utilized for this purpose. In the event of a technology breakdown, causing a disruption of the session, the professional shall have a backup plan in place (e.g., telephone access). Telemental health shall provide services at a bandwidth and with sufficient resolutions to ensure that the quality of the image and/or audio received is appropriate to the services being delivered.

### INTEGRATION OF VIDEOCONFERENCING INTO OTHER TECHNOLOGY AND SYSTEMS

Organizations shall ensure the technical readiness of the telehealth equipment and the clinical environment. They shall have policies and procedures in place to ensure the physical security of telehealth equipment and the electronic security of data. Organizations shall ensure compliance with all relevant safety laws, regulations, and codes for technology and technical safety.

*Privacy, security, and Health Insurance Portability and Accountability Act.* For telemental health services provided within the United States, the U.S. Health Insurance Portability and Accountability Act (HIPAA) of 1996, and state privacy requirements, shall be followed at all times to protect patient privacy. Privacy requirements in other countries shall be followed for telemental health services provided in those countries.

Patients receiving mental health and substance use disorder services are afforded a higher degree of patients' rights as well as organizational responsibilities (e.g., need for specific consent from patients to release information around substance use). Telemental health organizations shall be aware of these additional responsibilities and ensure that they are achieved. Telemental health organizations and providers shall determine processes for documentation, storage, and retrieval of telemental health records.

### PHYSICAL LOCATION/ROOM REQUIREMENTS

During a telemental health session, both locations shall be considered a patient examination room regardless of a room's intended use. Providers shall ensure privacy so clinical discussion cannot be overheard by others outside of the room where the service is provided. To the extent possible, the patient and provider cameras should be placed at the same elevation as the eyes with the face clearly visible to the other person. The features of the physical environment for both shall be adjusted so the physical space, to the degree possible, maximizes lighting, comfort, and ambiance.

When asynchronous telemental health consultations are occurring, the interviewer should be appropriately trained, and the digital recording of the interview shall be shared and stored in accordance with HIPAA regulations.

## Clinical Considerations

### PATIENT AND SETTING SELECTION

There are no absolute contraindications to patients being assessed or treated using telemental health. The use of telemental health with any individual patient is at the discretion of the provider. For clinically unsupervised settings (e.g., home and office) where support staff are not immediately available, providers shall consider appropriateness of fit for an individual patient. Provision of telemental health services in professionally unsupervised settings requires that the patient take a more active and cooperative role in the treatment process than would be the case for in-person locales. Patients need to be able to set up the videoconferencing system, maintain the appropriate computer/device settings, establish a private space, and cooperate for effective safety management. Factors to consider include:

- Providers should consider such things as patient's cognitive capacity, history regarding cooperativeness with treatment professionals, current and past difficulties with substance abuse, and history of violence or self-injurious behavior.
- Providers shall consider geographic distance to the nearest emergency medical facility, efficacy of patient's support system, and current medical status.
- The consent process shall include discussion of circumstances around session management so that if a patient can no longer be safely managed through distance technology, the patient is aware that services may be discontinued.
- Providers should consider whether there are any medical aspects of care that would require in-person examination including physical examinations. If the provider cannot manage the medical aspects for the patient without being able to conduct initial or recurrent physical examinations, this shall be documented in the record, and arrangements shall be made to perform physical examinations onsite as clinically indicated.

### MANAGEMENT OF HYBRID PATIENT–PROVIDER RELATIONSHIPS

Telemental health interviews can be conducted as part of a wider in-person and online clinical relationship using multiple technologies by providers working individually or in teams. The telemental health interview can be an adjunct to periodic face-to-face in-person contact or can be the only contact. It is typically supported by additional communication technologies such as faxed or e-mailed consultation information, patient portals, telephone, mobile devices, and electronic health records. Providers should have clear policies pertaining to communications with patients. These should

  © MARY ANN LIEBERT, INC.

tmj, 2018, 24, Downloaded from https://www.liebertpub.com. By Mary Ann Liebert - on September 18, 2023. Re-use and distribution is strictly not permitted, except for Open Access articles

describe the boundaries around ways in which patients can communicate with a provider, the content of which is appropriate to share over different technology platforms, anticipated response times, and how and when to contact a provider. Providers should identify clearly which platforms are acceptable for communication of an emergency and expected response times. Providers should be attentive of the impact of different technology platforms on patient rapport and communication. All modes of communication of personal health history shall be HIPAA compliant.

## ETHICAL CONSIDERATIONS

Health professionals shall be responsible for maintaining the same level of professional and ethical discipline and clinical practice principles and guidelines as in person care in the delivery of care in telemental health, as well as additional telemental health-related concerns such as consent processes, patient autonomy, and privacy.

## CULTURAL ISSUES

Telemental health providers should be culturally competent to deliver services to the populations that they serve. Providers should familiarize themselves with the cultures and environment where they are working and may use site visits and cultural facilitators to enhance their local knowledge when appropriate and practical. Providers should assess a patient's previous exposure, experience, and comfort with technology/videoconferencing. They shall be aware of how this might impact initial telemental health interactions. Providers should conduct ongoing assessment of the patient's level of comfort with technology over the course of treatment.

## SPECIFIC POPULATIONS AND SETTINGS

*Child/adolescent populations.* Telemental health procedures for the evaluation and treatment of youth shall follow the same guidelines presented for adults with modifications to consider the developmental status of youth such as motor functioning, speech and language capabilities, relatedness, and relevant regulatory issues. When working with younger children, the environment should facilitate the assessment by providing an adequate room size, furniture arrangement, toys, and activities that allow the youth to engage with the accompanying parent, presenter, and provider, and demonstrate age-appropriate skills.

Extended participation of family members or other relevant adults is typical of mental health treatment of children and adolescents. Providers should adhere to usual in-person practices for including relevant adults with appropriate modifications for delivering service through videoconfer-

encing in the context of resources at the patient site. Extended participation may include a "presenter" who may facilitate sessions (e.g., vital signs, assistance with rating scales, managing active children, and assisting with any urgent interventions). Providers should consider how the presenter's involvement can affect service delivery (e.g., social familiarity with the family, perceived confidentiality, and sharing information with other team members).

When telemental services are delivered outside of traditional clinic settings (e.g., schools), providers should work with staff to ensure safety, privacy, appropriate setting, and accommodations. This is particularly true if multiple staff participate in sessions. Appropriateness for telemental care shall consider safety of the youth, the availability of supportive adults, the mental health status of those adults, and ability of the site to respond to any urgent or emergent situations.

*Forensic and correctional.* Providers shall be aware of system issues in working in forensic and correctional settings and follow applicable standard consent around both treatment and evaluation in terms of patient's legal status and rights. Providers shall have clear site-specific protocols about working with patients and staff in forensic and correctional settings.

*Geriatric.* The geriatric patient often has multiple medical problems and the inclusion of family members should be undertaken as clinically appropriate and with the permission of the patient. Interviewing techniques shall be adapted for patients who may be cognitively impaired, find it difficult to adapt to the technology, or have visual or auditory impairment. Cognitive testing may be provided through videoconferencing but might need to be modified for use through video. Organizations administrating cognitive testing through videoconferencing shall be aware of the properties of the individual test instrument, how it may be impacted by videoconferencing, and any potentially needed modifications.

*Military, veteran, and other federal populations.* Providers shall be familiar with the federal and specific organizational structures and guidelines for patients related to the location of care. Providers should familiarize themselves with the culture of the patients (e.g., military cultural competency) and the organizational systems in which they practice.

*Substance use disorder treatment.* Providers shall be aware of and comply with federal, state, and local regulations around prescription of controlled substances involved in substance use disorder treatment. Providers shall coordinate with onsite staff to provide appropriate standard of care, including care

**SHORE ET AL.**

tmj, 2018, 24, Downloaded from https://www.liebertpub.com. By Mary Ann Liebert - on September 18, 2023. Re-use and distribution is strictly not permitted, except for Open Access articles

coordination and monitoring of physiological parameters for monitoring of ongoing treatment as clinically indicated.

*Inpatient and residential settings.* Providers should work to integrate themselves into inpatient and residential care settings where they practice through virtual participation in administration and organizational meetings, including clinical case staffing on a routine/regular basis. Remote providers should optimize use of patient site staff for help with telemental health consultations and case coordination as clinically indicated. Inpatient units should provide the telemental health provider with adequate access to patients, members of the interdisciplinary treatment team, and primary medical providers and nursing support when appropriate.

*Primary care settings.* Providers should be aware of best practice in leveraging telepsychiatry to support integrated care across a continuum of models, including direct patient assessment, consultative models, (e.g., asynchronous), and team-based models of care. Providers practicing integrated care telepsychiatry should attend to the impact of virtual interactions on team processes, dynamics, and patient outcomes in the delivery of integrated care.

*Rural.* Providers should be familiar with the impact of rural environments on treatment including firearm ownership, kinship in small communities, local geographic barriers to care, and general availability of health care resources.

## Acknowledgments

The authors thank the staff of the ATA and the APA (Sabrina L. Smith, Dr. HA [ATA], Harry Mellon [ATA], Nathan Tatro, MA [APA], and Michelle Dirst, MA [APA]) for their support in preparing this document. The authors also recognize the work of the following reviewers: TMH SIG (ATA), APA Committee on Telepsychiatry (APA), ATA Standards and Guidelines Committee Member (SG), ATA staff (ATAS), and APA staff (APAS). These best practices for videoconferencing-based telemental health have been prepared in collaboration and endorsement by the APA and the ATA. As such, they are copyrighted by the APA.

## Disclosure Statement

No competing financial interests exist.

## REFERENCES

1. APA Telepsychiatry Toolkit. **2016**. Available at www.psychiatry.org/psychiatrists/practice/telepsychiatry (last accessed September 12, 2018).

2. Recupero P, Fisher JCE. APA resource document on telepsychiatry and related technologies in clinical psychiatry. **2014**. Available at www.psychiatry.org/File%20Library/Psychiatrists/Directories/Library-and-Archive/resource_documents/Resource-2014-Telepsychiatry-Clinical-Psychiatry.pdf (last accessed September 12, 2018).

3. American Psychiatric Association. *Telemental health via videoconferencing.* 1998.

4. Myers K, Nelson EL, Rabinowitz T, Hilty D, Baker D, Barnwell SS, Comer JS. American Telemedicine Association practice guidelines for telemental health with children and adolescents. *Telemed J E Health* 2017;23:779–804.

5. Turvey C, Yellowlees P, Shore JH, Shore P. Delivering online video based mental health services. American Telemedicine Association Learning Center, **2014**. Available at http://learn.americantelemed.org/diweb/catalog/item/id/241193/q/o=n%26c=96%26t=3359 (last accessed September 12, 2018).

6. Turvey C, Coleman M, Dennison O, Drude K, Goldenson M, Hirsch P, Jueneman R, Kramer GM, Luxton DD, Maheu MM, Malik TS, Mishkind MC, Rabinowitz T, Roberts LJ, Sheeran T, Shore JH, Shore P, van Heeswyk F, Wregglesworth B, Yellowlees P, Zucker ML, Krupinski EA, Bernard J. ATA practice guidelines for video-based online mental health services. *Telemed J E Health* 2013;19:722–730.

7. Yellowlees P, Shore J, Roberts L. Practice guidelines for videoconferencing-based telemental health—October 2009. *Telemed J E Health* 2010;16:1074–1089.

8. American Psychiatric Association, Resource document on telepsychiatry and related technologies in clinical psychiatry, **2014**. Available at https://www.psychiatry.org/File%20Library/Psychiatrists/Directories/Library-and-Archive/resource_documents/Resource-2014-Telepsychiatry-Clinical-Psychiatry.pdf (last accessed October 17, 2018).

9. ATA Telehealth Resource Toolbox. **2017**. Available at www.americantelemed.org/main/policy-page/state-policy-resource-center/additional-state-resources (last accessed October 16, 2018).

10. Shore JH, Mishkind MC, Bernard J, Doarn CR, Bell Jr. I, Bhatia R, Brooks E, Caudill R, Cohn ER, Delphin BJ, Eppolito A, Fortney J, Friedl K, Hirsch P, Jordan PJ, Kim TJ, Luxton DD, Lynch MD, Maheu MM, McVeigh FL, Nelson E, Officer C, O'Neil PT, Roberts LJ, Rye C, Turvey C, Vo A. A lexicon of assessment and outcome measures for telemental health. *Telemed J E Health* 2014;20:282–292.

11. The American Telemedicine Association. Evidence-based practice for telemental health, **2009**. Available at https://higherlogicdownload.s3.amazonaws.com/AMERICANTELEMED/618da447-dee1-4ee1-b941-c5bf3db5669a/UploadedImages/New%20Guideline%20Cover%20May%2017 /NEW ATA%20Evidence%2 0Based%20Practice.pdf (last accessed October 16, 2018).

12. Grady B, Myers KM, Nelson EL, Belz N, Bennett L, Carnahan L, Rowe, N. Evidence-based practice for telemental health. *Telemed J E Health* 2011;17:131–148.

13. Hubley S, Lynch SB, Schneck C, Thomas M, Shore J. Review of key telemental health outcomes. *World J Psychiatry* 2016;6:269–282.

14. Bashshur RL, Shannon GW, Bashshur N, Yellowlees PM. The empirical evidence for telemedicine interventions in mental disorders. *Telemed J E Health* 2016;22:87–113.

15. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health. *Telemed J E Health* 2013;19:444–454.

16. Shore JH. Telepsychiatry: Videoconferencing in the delivery of psychiatric care. *Am J Psychiatry* 2013;170:256–262.

Address correspondence to:
*Jay H. Shore, MD, MPH*
*Department of Psychiatry*
*The University of Colorado Anschutz Medical Campus*
*Aurora, CO 80045*

*E-mail:* jay.shore@uchsc.edu

*Received:* September 13, 2018
*Accepted:* September 20, 2018
*Online Publication Date:* October 24, 2018

© MARY ANN LIEBERT, INC.

**ARTICLE**

# Clinician Experiences With Telepsychiatry Collaborative Care for Posttraumatic Stress Disorder and Bipolar Disorder

Theresa J. Hoeft, Ph.D., Jennifer D. Hall, M.P.H., Leif I. Solberg, M.D., Linda H. Takamine, Ph.D., M.A., Maria N. Danna, M.A., John C. Fortney, Ph.D., Stephanie Shushan, M.H.A., Deborah J. Cohen, Ph.D.

**Objective:** Posttraumatic stress disorder (PTSD) and bipolar disorder are common in primary care. Evidence supports collaborative care in primary care settings to treat depression and anxiety, and recent studies have evaluated its effectiveness in treating complex conditions such as PTSD and bipolar disorder. This study aimed to examine how primary care clinicians experience collaborative care for patients with these more complex psychiatric disorders.

**Methods:** The authors conducted semistructured interviews with 22 primary care clinicians participating in a pragmatic trial that included telepsychiatry collaborative care (TCC) to treat patients with PTSD or bipolar disorder in rural or underserved areas. Analysis utilized a constant comparative method to identify recurring themes.

**Results:** Clinicians reported that TCC improved their confidence in managing medications for patients with PTSD or

bipolar disorder and supported their ongoing learning and skill development. Clinicians also reported improvements in patient engagement in care. Care managers were crucial to realizing these benefits by fostering communication within the clinical team while engaging patients through regular outreach. Clinicians valued TCC because it included and supported them in improving the care of patients' mental health conditions, which opened opportunities for clinicians to enhance care and address co-occurring general medical conditions. Overall, benefits of the TCC model outweighed its minimal burdens.

**Conclusions:** Clinicians found that TCC supported their care of patients with PTSD or bipolar disorder. This approach has the potential to extend the reach of specialty mental health care and to support primary care clinicians treating patients with these more complex psychiatric disorders.

*Psychiatric Services 2023; 74:596–603; doi: 10.1176/appi.ps.202100595*

Posttraumatic stress disorder (PTSD) and bipolar disorder are prevalent within primary care but are often undetected or undertreated. Within primary care clinics, 9%–23% of patients screen positive for PTSD (1–6). However, without systematic screening, only 11%–18% of primary care patients with PTSD are given a diagnosis (7, 8). Up to 10% of primary care patients screen positive for bipolar disorder (9). Undiagnosed bipolar disorder can result in prescription of antidepressants without a mood stabilizer, contrary to clinical guidelines (10). PTSD and bipolar disorder often co-occur with general medical conditions that are treated in primary care (11, 12) but may be difficult to treat when mental health symptoms are poorly managed.

Psychiatric disorders are more prevalent among Medicaid enrollees and those in poverty (13), and access to mental health services for these populations may be more limited. Federally Qualified Health Centers (FQHCs) provide services to Medicaid enrollees and underserved populations yet may not provide sufficient access to psychiatrists or licensed clinical

psychologists (14) and struggle with providing patients access to community-based specialty mental health services (15–17).

Virtual psychiatric consultation can mitigate access challenges and support clinical teams and their patients with

<div style="border:1px solid;padding:8px;">

**HIGHLIGHTS**

- Using telepsychiatry collaborative care (TCC), clinicians gained confidence in identifying posttraumatic stress disorder (PTSD) and bipolar disorder and in prescribing medications with support from a telepsychiatrist consultant.

- Care managers were another critical component of support for clinicians using TCC, assisting, for example, with medication management, care coordination, and patient engagement.

- The findings of this study can support future implementations of TCC to treat patients with PTSD or bipolar disorder.

</div>

PTSD and with bipolar disorder. We studied telepsychiatry collaborative care (TCC), delivered as one arm of a pragmatic clinical trial to patients with PTSD or bipolar disorder (18). Collaborative care addresses patients' mental health needs in primary care with support from a care manager (CM) and psychiatric consultant (19). Collaborative care has been extensively studied, has been found to be effective for treating depression and anxiety in primary care (20–23), and has had varied success in treating PTSD through primary care, with greater success when models included brief CM-delivered psychotherapy (24, 25). Collaborative care models for bipolar disorder have been tested in specialty care settings in randomized controlled trials (RCTs) (26–28). However, although observational studies of collaborative care for bipolar disorder have occurred in primary care settings (17, 29–31), no previous RCTs have been conducted. In our RCT, TCC included care coordination and brief psychotherapy performed by the CM and a diagnostic and treatment planning visit with the consulting telepsychiatrist. TCC is effective for managing PTSD and bipolar disorder in primary care, increases access to high-quality mental health care that patients and their primary care clinicians appreciate, and could be a beneficial alternative to specialty care referrals (18, 31). Further study is needed on how primary care clinicians experience TCC to better inform future implementations of the model and to assist clinic leaders and primary care clinicians with integrating general medical and mental health care for patients with serious mental illness. Findings could also identify important adaptations to TCC to make it more appealing to primary care providers.

## METHODS

### Setting
The Study to Promote Innovation in Rural Integrated Telepsychiatry (SPIRIT) trial was conducted in 24 community health centers (CHCs) associated with 12 FQHCs in underserved areas of Arkansas, Michigan, and Washington between 2016 and 2020 (32–34) (Table 1). FQHCs were recruited if they did not have psychiatrists or licensed clinical psychologists onsite. Patients were recruited if they screened positive for bipolar disorder or PTSD, excluding patients to whom psychiatric clinicians had already prescribed psychotropic medications. Patients were randomly assigned to receive TCC (N=508) or referral for direct treatment by a telepsychiatrist or telepsychologist (N=496) for up to 12 months. Our analysis in this article focused on clinicians' experiences with the TCC arm only.

### Model
Patients in TCC saw a CHC-based CM, usually a licensed clinical social worker or registered nurse, who coordinated care with the patient, primary care clinician, and consulting telepsychiatrist. The consulting telepsychiatrist conducted an initial videoconferencing visit with patients to establish a diagnosis and treatment plan, because these steps were considered more nuanced for this patient population than for patients with less serious psychiatric disorders (e.g., depression or anxiety). The consulting telepsychiatrist communicated the diagnosis and treatment plan, typically through the electronic health record (EHR) or CM, to the primary care clinicians, who maintained patient oversight, including prescribing medications. The CM met with patients regularly in person and by telephone to monitor treatment response, promote treatment adherence, and deliver brief behavioral activation psychotherapy (35). Behavioral activation has been used in collaborative care since its inception (23) and has been studied in primary care for PTSD (25) but not for bipolar disorder. The clinician and telepsychiatrist consultant could communicate via telephone, EHR, or the CM. The CM and telepsychiatrist consultant regularly reviewed a Web-based care registry during their virtual case consultations to discuss patient progress. TCC differed from the telereferral study arm, in which the telepsychiatrist prescribed medications and the telepsychologist delivered psychotherapy—cognitive-behavioral therapy (CBT) (36, 37) or cognitive processing therapy (CPT) (38).

### Sample
In total, 127 primary care clinicians participated in the SPIRIT trial. Clinicians designated as clinician champions and those with more than nine participating patients were included in our sample (N=37) to ensure that participating clinicians were familiar with the intervention. Champions acted as advocates for both TCC and the telereferral arm at their CHC. We selected clinicians to ensure heterogeneity of state, CHC, and academic degree by using an iterative sampling approach. We selected a small number of clinicians for interviews, analyzed the data, and used insights to inform subsequent sampling decisions. This process continued until we reached saturation, which occurred after 22 interviews. Seven of the 29 clinicians contacted either did not respond or declined to participate.

### Data Collection
We conducted semistructured interviews during the last year of the intervention (October 2019–June 2020) to ensure clinicians had adequate experience with TCC to reflect on. We used an interview guide to conduct interviews and asked clinicians to describe their role in TCC, experiences communicating and working with the TCC team, and the extent to which TCC changed how they managed patients' mental health care. Interviews lasted 30–60 minutes. Interviews were conducted by using videoconferencing software or a telephone and were audio-recorded with permission, professionally transcribed, deidentified, reviewed for accuracy, and entered into Atlas.ti, version 8, a qualitative software package. All procedures were approved by the University of Washington, University of Arkansas for Medical Sciences, and University of Michigan institutional review boards.

**TABLE 1. Characteristics of patients served by Federally Qualified Health Centers (FQHCs)**

| Characteristic | % of patients | | | | | | | | | | | | U.S. average (N=19,792)[a,b] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FQHC 1 (N=17,104 patients) | FQHC 2 (N=28,262) | FQHC 3 (N=210,894) | FQHC 4 (N=22,784) | FQHC 5 (N=16,078) | FQHC 6 (N=2,700) | FQHC 7 (N=15,767) | FQHC 8 (N=18,086) | FQHC 9 (N=24,130) | FQHC 10 (N=51,367) | FQHC 11 (N=44,065) | FQHC 12 (N=68,221) | |
| Adult[b] | 53.2 | 58.0 | 64.3 | 60.9 | 72.5 | 69.0 | 57.9 | 75.7 | 57.1 | 66.1 | 61.7 | 50.1 | 73.4 |
| Non-Hispanic White[b] | 71.9 | 89.4 | 51.0 | 27.8 | 32.5 | 16.2 | 95.1 | 90.0 | 95.9 | 59.3 | 47.5 | 37.0 | 43.7 |
| Hispanic/Latino[b] | 42.4 | 57.1 | 35.8 | 67.9 | 3.0 | 1.8 | 6.0 | 4.8 | 1.0 | 11.1 | 35.0 | 33.9 | 27.5 |
| Black/African American[b] | .9 | 1.6 | 5.7 | 1.6 | 64.5 | 82.5 | .3 | 3.9 | .8 | 28.6 | 39.6 | 26.1 | 22.9 |
| American Indian/Alaska Native[b] | 5.6 | .8 | 1.2 | 1.4 | .1 | .0 | .5 | 1.0 | .7 | .4 | .5 | .4 | 2.8 |
| Best served in a language other than English[b] | 23.0 | 20.8 | 30.6 | 29.7 | 1.0 | 1.6 | 3.4 | 6.1 | 1.2 | 3.3 | 20.8 | 22.7 | 19.2 |
| At or below 200% poverty level[b] | 84.7 | 90.9 | 95.5 | 93.7 | 97.5 | 94.8 | 75.7 | 94.3 | 75.4 | 93.7 | 94.8 | 95.7 | 90.0 |
| Uninsured[b] | 19.7 | 18.5 | 16.8 | 15.8 | 24.6 | 18.0 | 8.6 | 8.6 | 3.7 | 25.9 | 27.1 | 21.4 | 25.2 |
| Medicaid[b] | 51.8 | 52.8 | 63.1 | 65.1 | 40.5 | 23.9 | 40.8 | 54.1 | 24.5 | 46.9 | 50.2 | 57.8 | 44.3 |
| Medicare[b] | 12.1 | 7.9 | 6.3 | 9.8 | 18.7 | 19.6 | 20.3 | 13.7 | 23.5 | 12.5 | 10.2 | 6.6 | 10.7 |
| Receiving mental health services[b] | 2.5 | 4.2 | 6.2 | 6.8 | 3.1 | .0 | .0 | 10.2 | 2.4 | 10.7 | 12.7 | 8.4 | 8.5 |
| Receiving substance use services[b] | .0 | .0 | 1.5 | .0 | .0 | .0 | .0 | .0 | .0 | 3.0 | .0 | 2.8 | 1.2 |
| Screened for depression and care plan[b] | 61.7 | 92.1 | 96.0 | 89.7 | 88.3 | 73.5 | 94.8 | 75.7 | 57.0 | 65.9 | 64.5 | 85.6 | 64.4 |
| | N | N | N | N | N | N | N | N | N | N | N | N | N[c] |
| Clinics[d] | 5 | 3 | 34 | 3 | 7 | 4 | 11 | 5 | 9 | 23 | 7 | 8 | 10,400 |
| Clinics in trial | 2 | 1 | 2 | 1 | 2 | 1 | 2 | 3 | 4 | 2 | 2 | 2 | NA |

[a] Average percentage across all 1,373 FQHCs.
[b] Source: 2017 Uniform Data System (33).
[c] Source: America's Health Centers (34).
[d] Source: website of each participating FQHC.

## Analysis

A diverse team of researchers with qualitative expertise and backgrounds in primary care, integrated care, and health services research (T.J.H., J.D.H., L.I.S., L.H.T., M.N.D., D.J.C.) analyzed the interview data, initially as a group. Team members then independently analyzed an interview to discuss at group meetings. Key passages were described and labeled, leading to an initial set of codes. This process continued until the group developed a code list with clear definitions that members applied consistently. As the code list was updated, we ensured that changes were applied to all transcripts. The team transitioned to analyzing the remaining data, with at least two people analyzing the remaining transcripts, and discussing discrepancies with each other and the larger group. Preliminary findings were discussed and shared with the larger study team and the study's community advisory board, comprising mental health advocates and individuals with lived experience with PTSD, bipolar disorder, or both.

## RESULTS

Clinicians who participated in the study (race-ethnicity data were not available) had one of four different medical degrees and came from 12 CHCs across the three study states (Table 2). Both clinician champions (N=6) and other clinicians (N=16) were interviewed.

Findings were focused on four key areas. First, clinicians—especially early-career clinicians—appreciated support from the telepsychiatrist consultant both in medication management and in promotion of ongoing learning and skill development. Second, clinicians identified the CM role as critical to team communication and communication with the patient. Third, clinicians valued TCC because it included and supported them in improving treatment of patients' mental health conditions, opening opportunities for clinicians to also focus on co-occurring general medical conditions. Fourth, clinicians did not find the model burdensome in large part because of the CM role, which reduced clinicians' administrative burden while increasing patient engagement. In addition, TCC team members treated patients with previously unmanaged bipolar disorder, which also contributed to a reduction in burden for providers.

### Support With Medication Management

Primary care clinicians were responsible for medication management and found that the medication selection and dosage support from the telepsychiatrist consultant expanded their medication management confidence, comfort, and skills. Clinicians leveraged guidance from the telepsychiatrist consultant when prescribing recommended medications, managing laboratory work, and sharing possible side effects with patients. Clinicians reported feeling comfortable following recommendations, which were detailed and well laid out.

> I would be doing the medication monitoring and initiated the medication on the recommendation of the psychiatrist. They did really lay out the recommendations beautifully, though. . . . It was, "We'll start there here. We'll move up to here. They have these side effects. We can decrease here. Check these labs." (clinician 3, Michigan)

Clinicians appreciated the telepsychiatrist consultant's availability to them and their patients, although such consultations were rare. For patients with complex cases, some clinicians would have preferred a referral option so that the telepsychiatrist could prescribe medications directly to those patients.

### Opportunities for Continued Learning

Working with the telepsychiatrist consultant (e.g., reviewing the telepsychiatrist consultant's notes) improved clinicians' ability to recognize, diagnose, and treat PTSD and bipolar disorder and to monitor patients' engagement in treatment. "I learned how underdiagnosed bipolar disorder is. And I'm starting to now see that in several more patients where I probably would've never even thought to look for it" (clinician 11, Michigan).

Early-career clinicians in particular appreciated the learning opportunity this partnership offered. Continued learning areas were also highlighted as opportunities for improvement for future implementations; these areas included making introductions with the telepsychiatrist consultant earlier to improve comfort with reaching out for support and offering clinic-level education opportunities.

### Essential Role of the CM

Clinicians reported that CMs were critical to supporting communication within the team, coordinating care, monitoring patient progress, and communicating regularly with patients, which improved clinical care. Although clinicians reviewed the telepsychiatrist consultant's notes in the EHR, they had minimal direct synchronous interaction with the telepsychiatrist consultant and largely relied on CMs for this communication. CMs ensured that information on diagnosis, medication management, and side effects was clearly communicated to the clinician and patient while also relaying treatment progress to the telepsychiatrist consultant.

> [The CM] probably had the bigger role in this because she would have follow-up with the patients and then report back to the psychiatrist. . . . They seemed to have more of a collaborative role even than I. I was sort of getting, "Here are the recommendations," . . . and then I would just kind of act on that. (clinician 22, Washington)

Clinician communication with CMs varied in intensity, frequency, and mode, including in-person check-ins, EHR communication, and brief huddles. Closer physical proximity between the CM and clinicians led to greater ease of communication.

CMs communicated regularly with patients through telephone and CHC visits. They helped coordinate visits, offered behavioral activation, and mitigated social and economic barriers to care.

TABLE 2. Characteristics of participating clinicians (N=22), by state

| Characteristic | N | | | |
| | Total | Arkansas | Michigan | Washington |
| --- | --- | --- | --- | --- |
| Community health centers represented | 12 | 4 | 4 | 4 |
| Primary care clinicians | 22 | 5 | 6 | 11 |
| M.D. or D.O. degree | 14 | 4 | 3 | 7 |
| N.P. or P.A. degree | 8 | 1 | 3 | 4 |
| Clinician champion | 6 | 3 | 0 | 3 |
| Other clinician (i.e., nonchampion) | 16 | 2 | 6 | 8 |

If she [the CM] wasn't there, I don't know how successful this would have been, just because she was reminding patients of their appointments. If they needed to fill a gas card or a bus ticket, she'd make sure they [had] one. She'd also ask them how the medication is going because many times, patients, if they don't like how they feel initially, they'll just stop and they won't contact you. (clinician 3, Michigan)

**Patient Engagement and Oversight**
Primary care clinicians valued being involved in patients' mental health care and receiving the additional support TCC afforded. Increased patient engagement and improved management of mental health conditions opened opportunities for clinicians to address patients' medical concerns. For example, bringing patients in for regular psychiatric medication refills could improve engagement in medical care and open opportunities for clinicians to address chronic medical concerns longitudinally and continuously: "I thought [TCC] helped [patients'] overall care because, quite often, they had other chronic issues that we were dealing with. Trying to bring everything together and get the full picture, I got a lot more information and could try to help them" (clinician 15, Washington).

Clinicians perceived that with TCC, patients could avoid long waits for an initial psychiatrist visit and experience shorter wait times for medication dose changes compared with what patients typically experienced when working with community psychiatrists. With TCC, the CM could engage patients on the day a need was identified and schedule with the telepsychiatrist consultant soon after.

I think just being able to get patients in front of services at the time that they need [them] has really made more people utilize and access [them], because a lot of people, if you maybe schedule them an appointment [in] a week or 2 weeks, maybe won't come back. Life will get busy or they'll decide, "Hey, maybe I'm doing fine." (clinician 6, Washington)

**Low Perceived Burden**
The TCC model was not perceived as burdensome, in part because of the small caseload of patients with PTSD or bipolar disorder among most clinicians and because of the supportive and coordinating role of the CM. By assuming responsibility for managing communication and tasks related to care coordination, the CM was pivotal in ensuring

that the additional work of managing psychiatric needs was not burdensome to the clinician. Clinicians commented about their burden being relieved because of collaboration with the CM. If the CM could not manage the administrative work for medication management, on the other hand, clinicians were burdened by these administrative tasks. In addition, TCC reduced patient care burden because clinicians were working and visiting with patients whose bipolar disorder was better managed: "If you've got a patient [who] has unmanaged bipolar [disorder], they can take up a lot of your time. And I saw that a lot of these patients did really well and were able to have really productive medical visits" (clinician 14, Arkansas).

## DISCUSSION

Primary care clinicians in underserved areas valued TCC and offered positive feedback about their experiences treating patients with PTSD or bipolar disorder. Clinicians gained confidence in their roles of identifying these conditions and prescribing medications with support from the telepsychiatrist consultant's detailed prescribing recommendations and other communications. Such support offered the opportunity for continued learning among the clinicians. CMs supported clinicians in medication management and patient engagement while also offering behavioral activation to patients. Clinicians valued the oversight TCC offered them in managing patients' general medical and mental health conditions simultaneously, with psychiatric support from the telepsychiatrist consultant. Clinicians also generally did not perceive the model to be burdensome, in large part because of CM support. These findings suggest that there are multiple facilitators of widespread implementation.

Our findings align well with the literature, although studies of collaborative care differ in how much burden clinicians experience. The views of primary care clinicians differ on how much work is involved in collaborative care; some reported added burden, whereas others did not or said it reduced their workload (39). Several studies found that colocation of the CM and clinicians was a facilitator of successful implementation of collaborative care because it increased the regularity of contact between the providers (39). Close proximity was also highlighted by clinicians in the SPIRIT trial. Collaborative care has not been studied extensively in the care for patients with PTSD or bipolar disorder, so our findings add to a growing body of literature (17, 26–31). Primary care patients who have depression, anxiety, insomnia, or other problems may also have PTSD (24) or bipolar disorder (17, 29–31). Models of collaborative care for PTSD in primary care are evolving, with some offering psychotherapy within the model and some facilitating outside referral to psychotherapy (25). TCC included

HOEFT ET AL.

CM-delivered behavioral activation, which may add to the effectiveness of the model, thereby contributing to a lower perceived burden among clinicians. Importantly, clinicians in the SPIRIT trial were willing to manage patients with these complex mental health needs, likely because of the support from a broader care team (40, 42). Finally, one other recent study has highlighted the benefit of the collaborative care model in providing continuing education for rural providers (41).

TCC increased the accessibility of evidence-based care, was as effective as more resource-intensive telereferral to specialty mental health services (18), and was well received by patients and clinicians (31). CMs' outreach helped engage patients in care more quickly than specialty mental health care in the community, which often has long wait times. In a study that used a "mystery-shopper" method in an urban area, whereby research assistants called the offices of 150 randomly selected local psychiatrists and asked for the earliest appointment date for a family member, only 7% (N=11) of psychiatrists were able to make an appointment within 2 weeks, and only 77% (N=115) could be reached at all (43). Primary care providers are therefore forced to treat patients with bipolar disorder because of limited access to specialty care as well as stigma about seeking mental health treatment (44).

There were limitations to using TCC, however. Some clinicians felt more comfortable having a psychiatrist manage medications directly for some of their patients with complex cases. Primary care nurse practitioners in Arkansas were not legally able to prescribe psychotropic medications, which may pose a TCC implementation barrier in some clinics. Also, some patients might benefit more from intensive psychotherapies, such as CBT or CPT (31, 36–38, 45). Therefore, referral to local specialty mental health providers or telereferral (e.g., with academic medical centers) may be an important complement to TCC in order to address these patients' needs and thereby improve implementation of TCC in primary care. Offering TCC in primary care can be better for those with social anxiety or pressing social needs (31) and may be preferred when stigma, urgent comorbid conditions, and poor access to specialty mental health care are barriers to care (25, 43). Clinics may adapt TCC by offering a stepped care approach (46, 47) that refers to specialists those patients whom the clinicians are not comfortable managing or who do not respond well to TCC. Clinician involvement when implementing TCC can ensure that patient and clinician needs are the foci when developing workflows and resources to support clinicians.

This study had several limitations. We waited until the final year of the study to conduct clinician interviews to ensure that clinicians had adequate experience with TCC. This delay may have contributed to recall bias for a few providers, weakening potential reflections on how TCC was experienced. The delay in recruiting resulted in turnover of some clinicians in these rural clinics. We sampled clinicians with more experience with the program to better understand their experiences with care and thus were unable to examine experiences of clinicians with fewer patients. However, we expect that these clinician experiences are representative of experiences of those with fewer patients in the study because all patients were recruited on the basis of positive screens. Patients were not recruited via clinician referral. We also were unable to examine experiences of those who refused an interview or did not respond to outreach (N=7 of 29 contacted), who may have had different experiences that may be important to explore.

## CONCLUSIONS

Clinicians who were willing to be interviewed expressed many positive statements about TCC, highlighting improvements in engagement in mental health treatment and in care more broadly for patients with PTSD or bipolar disorder. The model supported clinicians in their care of these patients, including by offering continued education. Although TCC was effective and acceptable to clinicians, uptake of the model outside of this trial setting will require support from clinic administrators and clinicians interested in implementing this model, organizations such as academic health centers to provide specialty mental health care via telehealth to these practices (48), and payment models that will support implementation of TCC (49). Clinics implementing TCC will likely still rely on referrals to local specialty mental health providers and may consider offering telepsychiatry and telepsychology visits with specialty mental health providers at nearby academic medical centers to help meet the needs of all patients and providers. At the same time, these types of referral models may not offer the training support, patient engagement, and care coordination that TCC can offer.

**AUTHOR AND ARTICLE INFORMATION**

Department of Psychiatry and Behavioral Sciences, University of Washington, Seattle (Hoeft, Fortney); Department of Family Medicine, Oregon Health & Science University, Portland (Hall, Danna, Cohen); HealthPartners Institute, Bloomington, Minnesota (Solberg); Center for Clinical Management Research, U.S. Department of Veterans Affairs (VA) Ann Arbor Healthcare System, Ann Arbor (Takamine); Center of Innovation for Veteran-Centered and Value-Driven Care, Health Services Research & Development, VA Puget Sound Health Care System, Seattle (Fortney); Community Health Plan of Washington, Seattle (Shushan). Send correspondence to Dr. Hoeft (thoeft@uw.edu).

This work was supported by a grant from the Patient-Centered Outcomes Research Institute (PCORI; PCS-1406-19295) to Dr. Fortney and Jurgen Unützer.

The authors thank the clinicians from participating Federally Qualified Health Centers as well as the Study to Promote Innovation in Rural Integrated Telepsychiatry's consumer advisory board and policy advisory board members for their guidance and Dr. Karen Drummond and Ms. Roopradha Datta for their contributions to data collection and analysis.

The statements in this article are solely the responsibility of the authors and do not necessarily represent the views of the U.S. government or of PCORI, its board of governors, or its methodology committee.

The authors report no financial relationships with commercial interests.

Received October 6, 2021; revisions received May 18 and July 17, 2022; accepted August 26, 2022; published online November 29, 2022.

## REFERENCES

1. Weisberg RB, Bruce SE, Machan JT, et al: Nonpsychiatric illness among primary care patients with trauma histories and posttraumatic stress disorder. Psychiatr Serv 2002; 53:848–854

2. Gillock KL, Zayfert C, Hegel MT, et al: Posttraumatic stress disorder in primary care: prevalence and relationships with physical symptoms and medical utilization. Gen Hosp Psychiatry 2005; 27:392–399

3. Meredith LS, Eisenman DP, Green BL, et al: Design of the Violence and Stress Assessment (ViStA) study: a randomized controlled trial of care management for PTSD among predominantly Latino patients in safety net health centers. Contemp Clin Trials 2014; 38:163–172

4. Stein MB, McQuaid JR, Pedrelli P, et al: Posttraumatic stress disorder in the primary care medical setting. Gen Hosp Psychiatry 2000; 22:261–269

5. Magruder KM, Frueh BC, Knapp RG, et al: Prevalence of posttraumatic stress disorder in Veterans Affairs primary care clinics. Gen Hosp Psychiatry 2005; 27:169–179

6. Davis RG, Ressler KJ, Schwartz AC, et al: Treatment barriers for low-income, urban African Americans with undiagnosed posttraumatic stress disorder. J Trauma Stress 2008; 21:218–222

7. Magruder KM, Frueh BC, Knapp RG, et al: PTSD symptoms, demographic characteristics, and functional status among veterans treated in VA primary care. J Trauma Stress 2004; 17:293–301

8. Liebschutz J, Saitz R, Brower V, et al: PTSD in urban primary care: high prevalence and low physician recognition. J Gen Intern Med 2007; 22:719–726

9. Cerimele JM, Chwastiak LA, Dodson S, et al: The prevalence of bipolar disorder in general primary care samples: a systematic review. Gen Hosp Psychiatry 2014; 36:19–25

10. Ghaemi SN, Hsu DJ, Thase ME, et al: Pharmacological treatment patterns at study entry for the first 500 STEP-BD participants. Psychiatr Serv 2006; 57:660–665

11. Pietrzak RH, Goldstein RB, Southwick SM, et al: Medical comorbidity of full and partial posttraumatic stress disorder in US adults: results from wave 2 of the National Epidemiologic Survey on Alcohol and Related Conditions. Psychosom Med 2011; 73:697–707

12. Smith DJ, Martin D, McLean G, et al: Multimorbidity in bipolar disorder and undertreatment of cardiovascular disease: a cross-sectional study. BMC Med 2013; 11:263

13. Burke BT, Miller BF, Proser M, et al: A needs-based method for estimating the behavioral health staff needs of community health centers. BMC Health Serv Res 2013; 13:245

14. Community Health Center Chartbook. Bethesda, National Association of Community Health Centers, 2018. http://www.nachc.org/wp-content/uploads/2018/06/Chartbook_FINAL_6.20.18.pdf.

15. Cook NL, Hicks LS, O'Malley AJ, et al: Access to specialty care and medical services in community health centers. Health Aff 2007; 26:1459–1468

16. Rust G, Daniels E, Satcher D, et al: Ability of community health centers to obtain mental health services for uninsured patients. JAMA 2005; 293:554–556

17. Fortney JC, Pyne JM, Ward-Jones S, et al: Implementation of evidence-based practices for complex mood disorders in primary care safety net clinics. Fam Syst Health 2018; 36:267–280

18. Fortney JC, Bauer AM, Cerimele JM, et al: A pragmatic randomized comparative effectiveness trial of teleintegrated care and telereferral care for treating complex psychiatric disorders in primary care. JAMA Psychiatry 2021; 78:1189–1199

19. Kroenke K, Unützer J: Closing the false divide: sustainable approaches to integrating mental health services into primary care. J Gen Intern Med 2017; 32:404–410

20. Unützer J, Katon W, Callahan CM, et al: Collaborative care management of late-life depression in the primary care setting: a randomized controlled trial. JAMA 2002; 288:2836–2845

21. Katon W, Robinson P, Von Korff M, et al: A multifaceted intervention to improve treatment of depression in primary care. Arch Gen Psychiatry 1996; 53:924–932

22. Katon W, Von Korff M, Lin E, et al: Stepped collaborative care for primary care patients with persistent symptoms of depression: a randomized trial. Arch Gen Psychiatry 1999; 56:1109–1115

23. Archer J, Bower P, Gilbody S, et al: Collaborative care for depression and anxiety problems. Cochrane Database Syst Rev 2012; 10:CD006525

24. Schnurr PP: Extending collaborative care for posttraumatic mental health. JAMA Intern Med 2016; 176:956–957

25. Hoeft TJ, Stephens KA, Vannoy SD, et al: Interventions to treat posttraumatic stress disorder in partnership with primary care: a review of feasibility and large randomized controlled studies. Gen Hosp Psychiatry 2019; 60:65–75

26. Simon GE, Ludman EJ, Bauer MS, et al: Long-term effectiveness and cost of a systematic care program for bipolar disorder. Arch Gen Psychiatry 2006; 63:500–508

27. Bauer MS, McBride L, Williford WO, et al: Collaborative care for bipolar disorder: part I. Intervention and implementation in a randomized effectiveness trial. Psychiatr Serv 2006; 57:927–936

28. Kilbourne AM, Goodrich DE, Lai Z, et al: Life Goals Collaborative Care for patients with bipolar disorder and cardiovascular disease risk. Psychiatr Serv 2012; 63:1234–1238

29. Cerimele JM, Chan YF, Chwastiak LA, et al: Bipolar disorder in primary care: clinical characteristics of 740 primary care patients with bipolar disorder. Psychiatr Serv 2014; 65:1041–1046

30. Cerimele JM, Kern JS: Bipolar disorder in primary care: integrated care experiences. Focus 2017; 15:244–248

31. Hall JD, Danna MN, Hoeft TJ, et al: Patient and clinician perspectives on two telemedicine approaches for treating patients with mental health disorders in underserved areas. J Am Board Fam Med 2022; 35:465–474

32. Fortney JC, Heagerty PJ, Bauer AM, et al: Study to promote innovation in rural integrated telepsychiatry (SPIRIT): rationale and design of a randomized comparative effectiveness trial of managing complex psychiatric disorders in rural primary care clinics. Contemp Clin Trials 2020; 90:105873

33. Health Center Program Uniform Data System (UDS) Data. Rockville, MD, Health Resources and Services Administration, n.d. https://data.hrsa.gov/tools/data-reporting. Accessed Dec 31, 2019

34. America's Health Centers. Bethesda, National Association of Community Health Centers, 2017. http://www.nachc.org/wp-content/uploads/2017/11/Americas_Health_Centers_Nov_2017.pdf

35. Jakupcak M, Wagner A, Paulson A, et al: Behavioral activation as a primary care–based treatment for PTSD and depression among returning veterans. J Trauma Stress 2010; 23:491–495

36. Otto MW, Reilly-Harrington NA, Kogan JN, et al: Managing Bipolar Disorder: A Cognitive-Behavioral Approach: Therapist Guide. New York, Oxford University Press, 2009.

37. Mueser KT, Rosenberg SD, Xie H, et al: A randomized controlled trial of cognitive-behavioral treatment for posttraumatic stress disorder in severe mental illness. J Consult Clin Psychol 2008; 76:259–271

38. Monson CM, Schnurr PP, Resick PA, et al: Cognitive processing therapy for veterans with military-related posttraumatic stress disorder. J Consult Clin Psychol 2006; 74:898–907

39. Overbeck G, Kousgaard MB, Davidsen AS: The work and challenges of care managers in the implementation of collaborative care: a qualitative study. J Psychiatr Ment Health Nurs 2018; 25:167–175

40. Cerimele JM, Fortney JC, Pyne JM, et al: Bipolar disorder in primary care: a qualitative study of clinician and patient experiences with diagnosis and treatment. Fam Pract 2019; 36:32–37

41. Al Achkar M, Bennett IM, Chwastiak L, et al: Telepsychiatry consultation as a training and workforce development strategy for rural primary care. Ann Fam Med 2020; 18:435–448

42. Meredith LS, Eisenman DP, Green BL, et al: System factors affect the recognition and management of posttraumatic stress disorder by primary care clinicians. Med Care 2009; 47:686–694

43. Blech B, West JC, Yang Z, et al: Availability of network psychiatrists among the largest health insurance carriers in Washington, DC. Psychiatr Serv 2017; 68:962–965

44. Kilbourne AM, Goodrich DE, O'Donnell AN, et al: Integrating bipolar disorder management in primary care. Curr Psychiatry Rep 2012; 14:687–695

45. Morland L, Wells S, Rosen C: PTSD and Telemental Health. Washington, DC, US Department of Veterans Affairs, 2021. https://www.ptsd.va.gov/professional/treat/txessentials/telemental_health.asp. Accessed Sept 20, 2021

46. Fortney JC, Pyne JM, Turner EE, et al: Telepsychiatry integration of mental health services into rural primary care settings. Int Rev Psychiatry 2015; 27:525–539

47. Engel CC, Jaycox LH, Freed MC, et al: Centrally assisted collaborative telecare for posttraumatic stress disorder and depression among military personnel attending primary care: a randomized clinical trial. JAMA Intern Med 2016; 176:948–956

48. Fortney JC, Veith RC, Bauer AM, et al: Developing telemental health partnerships between state medical schools and Federally Qualified Health Centers navigating the regulatory landscape and policy recommendations. J Rural Health 2019; 35: 287–297

49. Carlo AD, Unützer J, Ratzliff ADH, et al: Financing for collaborative care—a narrative review. Curr Treat Options Psychiatry 2018; 5:334–344

# Call for Policy Article Submissions

## Topic: Behavioral Health Workforce Shortages

*Psychiatric Services* is pleased to call for policy article submissions. Twice per year, the *Psychiatric Services* Policy Advisory Group will select a high-priority policy topic. Submissions should provide a critical analysis of the topic and present a balanced overview of potential policy strategies at the federal, state, tribal, or local levels. Authors should take care to avoid making overtly political or partisan claims. Please see below for additional information about how to submit a manuscript for consideration.

The first high-priority policy topic will be behavioral health workforce shortages. Specific issues to address may include team-based care, telehealth, collaborative and integrated care models, peer roles, insurance acceptance, and scope of practice.

### Additional information

- Articles may be submitted as either a Policy Review (4,000–6,000 words) or an Open Forum (1,600 words).
- Authors should follow the format requirements for the article type being submitted as outlined in the journal's author guidelines (ps.psychiatryonline.org/ps_ifora)
- When submitting a manuscript for consideration, authors should mention the solicitation and policy topic in a cover letter as part of the submission.
- All submissions will undergo the journal's standard peer review process.
- Submission deadline: June 30
- Authors are invited to send questions about this call for policy article submissions to psjournal@psych.org.

# Computer Therapy for the Anxiety and Depressive Disorders Is Effective, Acceptable and Practical Health Care: A Meta-Analysis

**Gavin Andrews[1]\*, Pim Cuijpers[2], Michelle G. Craske[3], Peter McEvoy[4], Nickolai Titov[5]**

**1** School of Psychiatry, University of New South Wales, Sydney, New South Wales, Australia, **2** Department of Clinical Psychology, Vrije Universiteit Amsterdam, Amsterdam, The Netherlands, **3** Department of Psychology, University of California Los Angeles, Los Angeles, California, United States of America, **4** Centre for Clinical Interventions, Perth, Western Australia, Australia, **5** School of Psychiatry, University of New South Wales, Sydney, New South Wales, Australia

## Abstract

*Background:* Depression and anxiety disorders are common and treatable with cognitive behavior therapy (CBT), but access to this therapy is limited.

*Objective:* Review evidence that computerized CBT for the anxiety and depressive disorders is acceptable to patients and effective in the short and longer term.

*Method:* Systematic reviews and data bases were searched for randomized controlled trials of computerized cognitive behavior therapy versus a treatment or control condition in people who met diagnostic criteria for major depression, panic disorder, social phobia or generalized anxiety disorder. Number randomized, superiority of treatment versus control (Hedges g) on primary outcome measure, risk of bias, length of follow up, patient adherence and satisfaction were extracted.

*Principal Findings:* 22 studies of comparisons with a control group were identified. The mean effect size superiority was 0.88 (NNT 2.13), and the benefit was evident across all four disorders. Improvement from computerized CBT was maintained for a median of 26 weeks follow-up. Acceptability, as indicated by adherence and satisfaction, was good. Research probity was good and bias risk low. Effect sizes were non-significantly higher in comparisons with waitlist than with active treatment control conditions. Five studies comparing computerized CBT with traditional face-to-face CBT were identified, and both modes of treatment appeared equally beneficial.

*Conclusions:* Computerized CBT for anxiety and depressive disorders, especially via the internet, has the capacity to provide effective acceptable and practical health care for those who might otherwise remain untreated.

*Trial Registration:* Australian New Zealand Clinical Trials Registry ACTRN12610000030077

**Citation:** Andrews G, Cuijpers P, Craske MG, McEvoy P, Titov N (2010) Computer Therapy for the Anxiety and Depressive Disorders Is Effective, Acceptable and Practical Health Care: A Meta-Analysis. PLoS ONE 5(10): e13196. doi:10.1371/journal.pone.0013196

**Editor:** Bernhard T. Baune, James Cook University, Australia

**Received** June 18, 2010; **Accepted** September 7, 2010; **Published** October 13, 2010

**Copyright:** © 2010 Andrews et al. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Funding:** GA, NT, PM, MC hold a grant for research on Internet Treatment from the Australian National Health and Medical Research Council registration #630560. The funders had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript.

**Competing Interests:** The authors have declared that no competing interests exist.

\* E-mail: gavina@unsw.edu.au

## Introduction

Anxiety disorders and major depressive disorders are common, costly and debilitating [1,2]. Remarkably, less than half the people with these disorders see a physician and only a quarter receive appropriate treatment [3]. Effective treatments for these disorders exist (i.e., selective serotonin reuptake inhibitors (SSRIs) and cognitive behavior therapy (CBT) [4,5]. However, the public health impact of these remedies is limited for a number of reasons. Specifically, these disorders often are unrecognized [3,6], the efficacy of SSRIs may be limited to very severe cases [7], CBT is not widely available, in part because of insufficient numbers of adequately trained clinicians [8], and patients do not or cannot adhere to the costs and demands of face-to-face CBT treatment. Almost one third of individuals attending an anxiety disorders clinic did not start treatment [9], and attrition from randomized controlled trials for anxiety and depression can reach 50% [10].

Internet and computer-based delivery formats could improve access to CBT. There have been two recent meta-analyses of internet-based and other computerized psychological treatments for depression and anxiety states [11,12]. They included studies of participants at risk, with sub-threshold symptoms, or with DSM disorders. In anxiety states, the effect size superiority over control conditions was large (23 studies, Cohen's d = 1.1), and in depressive states the effect size was moderate (12 studies, d = 0.41). Two transdiagnostic programs included in these meta-analyses, one aimed at panic and phobias – Fearfighter [13] – and the other aimed at depression and anxiety states - Beating the Blues [14] – were sufficiently powerful to be recommended for routine use in the UK National Health Service [15].

Recent research on computerized CBT delivered over the internet (iCBT) or by computer in the clinic (cCBT) has emphasized programs in which a predetermined syllabus presents the principles and methods of CBT in a series of lessons, usually with homework assignments and supplementary information. The majority of newer programs are designed for individual anxiety or depressive disorders. Computerized CBT can be self-guided, supported by reminders from a non-clinical technician or practice nurse, or guided by a clinician who makes telephone calls, sends emails or posts comments on a private forum. The major advantages of iCBT are accessibility and convenience for both patients and clinicians, but equally important is that treatment fidelity in both iCBT and cCBT is guaranteed by the computerized delivery. If these treatments are to become part of health care we need to know if such programs benefit patients who meet criteria for anxiety or depressive disorders in the short- and long-term, and if they are acceptable to such patients.

## Rationale

We restricted the present review to studies *designed* as randomized controlled trials of computerized CBT for *participants* who met diagnostic criteria for either major depressive disorder, social phobia, panic disorder with or without agoraphobia, or generalized anxiety disorder (GAD). Computerized CBT was required to be the major *intervention* that was *compared* to treatment as usual, or to control conditions such as placebo or waitlist. We confined the analysis of *outcome* to self report measures of the principal characteristic of each disorder; to the magnitude and stability of the outcome; and to the acceptability of computer therapy as estimated from the level of adherence to the course and the satisfaction upon completion.

## Method

This review was registered (www.ANZCTR.org.au/ACTRN 12610000030077.aspx). All English language randomized controlled trials of iCBT or cCBT that used participants who met DSM criteria (established by structured diagnostic interview) for either major depression, social phobia, panic disorder or GAD, and that compared iCBT or cCBT with treatment as usual, placebo or waitlist control groups, were included. All papers analysed were either published or in press and the investigators had copies of all final manuscripts.

## Information sources

The search strategy followed that of the previous meta-analyses [11,12] that used a database of studies on psychological treatment [16] (www.psychotherapyrcts.org) and other general data bases to include RCTs of computer-aided psychotherapy that were published after the cut off dates for previous meta-analyses (from March 2008 for anxiety disorders and January 2009 for depression). The search was conducted on the 31st of December 2009. A total of 2670 abstracts were examined from the following databases: PubMed (N = 308), Cochrane Database of Systematic Reviews and Register of Controlled Trials (N = 719), Cinahl (N = 88), PsychINFO (N = 78), Medline (N = 171), Social Sciences Citation Index (N = 1155), and Embase (N = 155). We identified abstracts by combining terms indicative of psychological treatment and depression, anxiety, and anxiety disorders (both MeSH terms and text words). In addition, these terms were paired with the terms 'internet or computer or online' to identify papers relating to internet or computer treatment in particular. Reference lists for all identified reviews and meta-analyses of computer-aided psychotherapy, as well as those of included studies, for the time period of

interest were also examined. Finally, we wrote to researchers to identify any unpublished studies meeting the inclusion criteria.

## Study selection

All studies of adults with the relevant diagnoses that randomized subjects to computerized CBT versus treatment as usual or control condition were included. We additionally examined studies in which computerised CBT was compared with face to face CBT. Items extracted in each study were as follows: Number of subjects randomized; basic results (details of treatment condition, details of control group, significant differences in outcome, Hedges g and number needed to treat (NNT), adequacy of bias minimization scored 0 = complete minimization, 5 = no minimization (adequacy of sequence generation, allocation concealment, adequate blinding, missing data addressed, no selective reporting [17]); follow-up duration and stability, acceptability to participants (percent adherent to the full course, percent satisfied). These acceptability and bias ratings were independently conducted by two researchers, with differences resolved following discussion.

## Meta-analysis

We followed a described method [12, p197–198]. In brief, we calculated the effect size (Hedges' g) indicating the difference between the two conditions at post-test, as the difference between the mean of the treatment condition and the mean of the control condition, divided by the pooled standard deviation and adjusted for small sample bias [18]. We only used instruments that related to the principal measure of the disorder to generate a mean effect size. Because the effect size is not easy to interpret from a clinical point of view, we also calculated the NNT by transforming the effect sizes based on Z scores using the formulae provided by Kraemer and Kupfer [19]. The NNT is defined as the number of patients one would expect to treat to have one more successful outcome.

The effect sizes for each study were pooled according to the random effects model, and differences between subgroups of studies tested using the mixed effects model. As indicators of heterogeneity of pooled effect sizes, we calculated $I^2$, which indicates the heterogeneity in percentages, and we tested whether the level of heterogeneity was significant using the Q statistic. Small study bias was tested by inspecting the funnel plot on the primary outcome measures (effects on depression or anxiety at post-test) and by a trim-and-fill procedure [20], which yields an estimate of the pooled ES after taking bias into account. All analyses were conducted using the computer program Comprehensive Meta-Analysis (version 2.2.021) [21].

## Results

The previous meta-analyses [11,12] were taken as having been comprehensive for the period covered by their search strategy. Nine studies included in those meta-analyses met the new inclusion criteria, (focus on one of the four specified diagnoses, iCBT or cCBT the principal treatment). Thirteen additional studies were identified making 22 studies in all. Minimization of research bias was assessed [17]. All studies reported data using the *intention to treat* method and all used *self report measures* of the *main outcome* thereby obviating the need for blinding. Three studies only met these basic criteria, 13 studies also met the *method of sequence generation* or *allocation concealment* criteria and six studies satisfied all 5 criteria.

Results of the meta-analysis of the 22 studies [22–43] are displayed in Table 1: grouped by diagnosis, listing author and date of publication, N randomized, effect size of intervention compared

**Table 1.** Selected characteristics and results of randomized controlled studies examining the effects computerized and internet-based cognitive behaviour therapy for adult depression and anxiety disorders.

| Study | Conditions | N | g | NNT | Bias Risk | F-U | Adhere/Satisf |
|---|---|---|---|---|---|---|---|
| **MAJOR DEPRESSION** | | | | | | | |
| Andersson, 2005[22] | iCBT + therapist support > waitlist + discussion group | 75 | 0.87 | 2.16 | 0 | 26w | 63/- |
| Kessler, 2009[23] | iCBT + therapist support > TAU by GP | 297 | 0.61 | 2.99 | 0 | 16w | 73/- |
| Perini, 2009[24] | iCBT + therapist support > waitlist | 48 | 0.56 | 3.25 | 1 | - | 74/82 |
| Selmi 1990[25] | cCBT > waitlist | 36 | 1.26 | 1.59 | 2 | 9w | 100/- |
| Titov 2010[26] | iCBT + therapist support > waitlist | 141 | 0.99 | 1.94 | 1 | - | 70/87 |
| Wright 2005[27] | cCBT + therapist support > waitlist | 45 | 1.10 | 1.77 | 1 | 26w | 87/- |
| **PANIC DISORDER** | | | | | | | |
| Carlbring, 2001[28] | iCBT > waitlist | 41 | 0.99 | 1.94 | 1 | - | 80/85 |
| Carlbring, 2006[29] | iCBT > waitlist | 60 | 1.13 | 1.74 | 0 | 39w | 80/97 |
| Klein, 2001[30] | iCBT > Self-monitoring control | 23 | 0.39 | 4.59 | 2 | - | 90/- |
| Klein, 2006[31] | iCBT > Information control | 55 | 1.49 | 1.41 | 1 | 13w | 90/- |
| Richards, 2006[32] | iCBT > Information control | 32 | 0.74 | 2.50 | 0 | 13w | 82/- |
| Wims 2010[33] | iCBT + therapist support > waitlist | 59 | 0.28 | 6.41 | 1 | 4w | 79/- |
| **SOCIAL PHOBIA** | | | | | | | |
| Andersson, 2006[34] | iCBT > waitlist | 64 | 0.76 | 2.44 | 0 | 52w | 56/- |
| Berger et al. 2009[35] | iCBT > waitlist | 52 | 0.64 | 2.86 | 1 | - | 90/85 |
| Botella et al. 2009[36] | iCBT > waitlist | 52 | 1.07 | 1.82 | 2 | 52w | 48/- |
| Carlbring, 2007[37] | iCBT > waitlist | 57 | 1.07 | 1.82 | 1 | 52w | 93/- |
| Furmark et al 2009[38] | iCBT + therapist support > waitlist | 120 | 0.67 | 2.75 | 0 | 52w | 97/70 |
| Titov, 2008 I[39] | iCBT + therapist support > waitlist | 105 | 0.94 | 2.02 | 1 | 26w | 78/100 |
| Titov, 2008 II[40] | iCBT + therapist support > waitlist | 88 | 1.18 | 1.68 | 1 | 26w | 81/100 |
| Titov, 2008 III[41] | iCBT + therapist support > waitlist | 98 | 1.02 | 1.89 | 1 | - | 77/- |
| **GAD** | | | | | | | |
| Titov 2009[42] | iCBT + therapist support > waitlist | 48 | 1.08 | 1.81 | 1 | - | 75/85 |
| Robinson 2010[43] | iCBT + therapist support > waitlist | 150 | 1.13 | 1.74 | 1 | - | 74/87 |

N, number randomized; g, Hedges g; NNT number needed to treat; Bias risk (0 = no risk, 5 = high risk) inadequacy of sequence generation, no allocation concealment, inadequate blinding, missing data not addressed, selective reporting; F-U, follow-up in weeks; Adhere/satisfaction, percent adhering to whole course/percent satisfied with course; iCBT, CBT over the internet; cCBT, CBT over computer in clinic; GAD, Generalized Anxiety Disorder.
doi:10.1371/journal.pone.0013196.t001

to control condition (Hedges g), NNT, risk of bias; length of follow-up; and adherence and patient satisfaction as a proxy for acceptability. Summary data are in Table 2 and a funnel plot of studies ranked by disorder shows the confidence limits around the effect sizes for each study (Figure 1).The overall effect size superiority of computerized CBT over control group across all four disorders was 0.88 and the confidence limits did not include zero (p<0.001). Similar results were obtained for major depression (g = 0.78, 95% CI 0.59–0.96), social phobia (g = 0.92, 95% CI 0.74–1.09), panic disorder (g = 0.83, 95% CI 0.45–1.21) and GAD (g = 1.12, 95%CI 0.76–1.47). Heterogeneity was non-significant for each disorder and for all studies together. There was a small, non-significant indication for small sample bias (adjusted effect size g = 0.80). Although the effect size for studies using a waitlist control group (g = 0.94; 95% CI: 0.81–1.07) was somewhat higher than for treatment as usual and other control groups (g = 0.75; 95% CI: 0.51–0.98), this difference was not significant (p>0.1).

Fourteen of the 22 studies reported follow-up data that range from 4 to 52 weeks post-treatment (median 26 weeks), and in none was there evidence of relapse. Adherence and satisfaction are indicators of acceptability of computerised CBT to patients. All studies measured one or both. Adherence was good, and a median

of 80% of people who began these programs completed all lessons (range 48%–100%). Ten of the 23 studies provided data on patient satisfaction and a median of 86% (range 70%–100%) of patients reported that they were satisfied or very satisfied.

There were two studies [25,27], in which computerized CBT was also compared to face-to-face CBT for depression and three

**Table 2.** Summary results of meta-analyses examining the effects of internet- and computerized CBT for depression and anxiety disorders.

| Disorder | N | g | 95% CI | Z | I² | NNT |
|---|---|---|---|---|---|---|
| MDD | 6 | 0.78 | 0.59–0.96 | 8.20 *** | 0 | 2.39 |
| Social phobia | 8 | 0.92 | 0.74–1.09 | 10.28 *** | 0 | 2.07 |
| Panic | 6 | 0.83 | 0.45–1.21 | 4.27 *** | 49.77 | 2.26 |
| GAD | 2 | 1.12 | 0.76–1.47 | 6.19 *** | 0 | 1.75 |
| All disorders | 22 | 0.88 | 0.76–0.99 | 15.04 *** | 7.84 | 2.15 |

doi:10.1371/journal.pone.0013196.t002



Computerised CBG for Depression



**Figure 1. Effect sizes of Computerised CBT versus control conditions at post-test.**
doi:10.1371/journal.pone.0013196.g001

comparison trials, not included in the main meta-analysis as there was no control group, in which the comparison between computerised CBT and face to face CBT was in patients with depression or panic disorder [44–46] (total number of patients in the five studies was 567; 300 in the computerized and 267 in the face-to-face conditions). The effect size indicating the difference between computerized-treatments and face-to-face treatments was non-significant $g = 0.09$ in favour of computerized treatments (95% CI: $-0.34 \sim 17$), with zero heterogeneity. In the computerion condition therapist time was reduced compared to face-to-face therapy for depression by 50% [27] and 79% [44], and in panic disorder by 35% [46] and 70% [45]. Treatment satisfaction was reported as good in both computerised and face-to-face treatment groups [27,45,46].

## Discussion

Twenty two RCTs of computerised CBT for major depression, social phobia, panic disorder or generalized anxiety disorder showed superiority in outcome over control groups. The effect sizes are substantial, and the results indicate both short term and long term benefits. Furthermore, patients adhered to and were satisfied with computerised CBT, despite the significantly reduced amount of contact with the clinician. Thus, computerised CBT is an efficacious and acceptable treatment, and by increasing convenience and reducing clinician time that would otherwise be required by face-to-face treatment, it offers increased access to treatment for those suffering from anxiety and depression.

The results come from 9 different groups working independently in 7 different countries. Similar results were obtained for

each disorder and heterogeneity was non-significant for each disorder and for all studies together. It is as though there is a core set of CBT skills that is of benefit in the internalising disorders included in this analysis.

Most patients had been recruited as volunteers, largely after media publicity, but a minority were referred by their clinician. This raises the question, 'are these patients comparable to patients who seek face-to-face treatment?' In a large study ($n = 774$), internet patients with one of these four disorders were as severe when assessed by symptom, distress and disability measures as those attending a face-to-face clinic, and both groups were significantly more severe than cases identified in an epidemiological survey [47]. Another index of severity is treatment history. Three studies reported this. In one study of iCBT for depression in a primary care setting, three quarters of patients had a history of previous episodes [23]. The chronicity was similar in two iCBT studies for depression in community volunteers. In the first [24] 70% had sought prior help and 51% were currently taking medication for their depression. In the second study [26] help seeking and medication rates were comparable and 72% said their onset of depression was before the age of 21, 78% said they had had more than 5 episodes and 78% said that they had had no remission in the last 2 years. Thus, it appears that participants in these trials resemble people who attend regular clinics. There were few data on treatment history in the studies of anxiety disorders.

The mean effect size, indicating the superiority of the computerized intervention over the control group, was 0.88, NNT 2.15. The most common control group was waitlist, with treatment for them delayed until the intervention group had completed treatment. Placebo or active treatment control groups are preferable, but are

difficult to arrange when there is no face to face contact with the participants. Interventions compared to waitlist controls have shown increased effect sizes compared to interventions compared to the treatment as usual studies [12] and the null finding in the present meta-analysis may be due to insufficient power. There were no studies comparing computerised CBT and medication. Five studies compared internet therapy directly with face-to-face CBT for depression or panic disorder, and while all found strong pre-post treatment effects, none found differences between the two modes of delivery. We conclude that computerized CBT, with clinician or technician assistance which can be as brief as one hour per patient, can work as well as face-to-face CBT.

Adherence to computerized CBT was good; in the median study, 80% of individuals who began these programs completed all stages. This rate of completion suggests that computerized CBT was well accepted by participants. The programs contained between five and nine 'lessons'. Conceivably, some participants who do not complete all the lessons may have gained all they need from the program. More research is needed regarding the tailoring of computerized programs to the needs of individuals. Ten of the 22 studies provided data on patient satisfaction; in the median study 86% of patients were satisfied or very satisfied with the computerized CBT program. Participants noted the advantages of computerized therapy, including convenience (such as completion of the program in the evening when there are no competing demands), ability to proceed at one's own pace to master the material, low cost and privacy. We conclude that computerised CBT is acceptable to patients.

There is a need for more extensive follow-up assessment as only 14 of the 22 studies provided follow-up data, at a median 26 weeks (range 4–52). As with face-to-face CBT [5], the benefits lasted and no significant relapse was reported.

The majority of studies identified measures of distress, disability, quality of life, or work force participation as secondary outcome measures. While changes in these secondary outcome measures were not as large as in the primary outcome measures, they were significant and demonstrate that internet treatment has the capacity to change health status not merely reduce specific symptoms. One study pooled data from three RCTs of social phobia and showed significant improvements in comorbid symptoms of depression and generalized anxiety even though the treatment was focused solely on the social phobia [48].

The benefits described are substantial yet the content of the programs is relatively simple and the therapist or technician contact brief. For example in the Andersson [22] study (g = 0.87), the treatment group had access to five weekly text 'lessons' about recovering from depression – behavioural activation, cognitive restructuring, sleep and physical health, and relapse prevention and future goals. This raises an issue of whether we presently conceptualise the nature of these four disorders correctly, either as related to temperament [2] or to neurotransmitter abnormalities [49] neither of which could be expected to yield to relatively brief sessions of skills based teaching about controlling worrying thoughts and confronting feared situations. The mechanism by which these programs produce benefit needs to be explored.

In sum, the 22 identified computerized CBT programs generated a large effect size superiority over control groups with maintenance of gains at follow-up and good patient adherence and satisfaction. As the programs become more sophisticated, the clinician or technician time required seems to be decreasing to the order of 10 minutes per week per patient [26,43,50].

Is it possible to integrate these internet services with existing mental health services so that people who do not recover with internet therapy can, in a stepped care design, receive face to face care? We now, it seems, are beginning to know enough about the efficacy, applicability and potential cost savings from the internet programs for people with anxiety and depressive disorders to begin to integrate these internet services with existing mental health services.

## Author Contributions

Conceived and designed the experiments: GA PC MGC PM NT. Performed the experiments: PC PM. Analyzed the data: GA PC MGC PM NT. Contributed reagents/materials/analysis tools: NT. Wrote the paper: GA PC MGC PM NT.

## References

1. Kessler RC, Berglund P, Demler O, Walters EE (2005) Prevalence, severity, and comorbidity of 12-month DSM-IV disorders in the National Comorbidity Survey replication. Arch Gen Psychiatry 62(6): 617–621.
2. Goldberg DP, Krueger RF, Andrews G, Hobbs MJ (2009) Emotional disorders: Cluster 4 of the proposed meta-structure for DSM-V and ICD-11. Psychol Med 39: 2043–2059.
3. Andrews G, Issakidis C, Sanderson K, Corry J, Lapsley H (2004) Utilising survey data to inform public policy: comparison of the cost-effectiveness of treatment of ten mental disorders. Br J Psychiatry 184: 526–533.
4. Roy-Byrne PP, Cowley DS (2007) Pharmacological treatments for panic disorder, generalized anxiety disorder, specific phobia and social anxiety disorder. In: Nathan PE, Gordon JM, eds. A guide to treatments that work. 3rd ed. New York: Oxford University Press. pp 395–427.
5. Butler AC, Chapman JE, Forman EM, Beck AT (2006) The empirical status of cognitive-behavioral therapy: A review of meta-analyses. Clin Psychol Rev 26: 17–31.
6. Weisberg RB, Dyck I, Culpepper L, Keller MB (2007) Psychiatric treatment in primary care patients with Anxiety Disorders: A comparison of care received from primary care providers and psychiatrists. Am J Psychiatry 164: 276–282.
7. Fournier JC, DeRubeis RJ, Hollon SD, Dimidjian S, Amsterdam JD, et al. (2010) Antidepressant drug effects and depression severity: A patient-level meta-analysis. JAMA 303(1): 47–53.
8. Weissman MM, Verdeli H, Gameroff MJ, Bledsoe SE, Betts K, et al. (2006) National Survey of Psychotherapy training in psychiatry, psychology, and social work. Arch Gen Psychiatry 63(8): 925–934.
9. Issakidis C, Andrews G (2004) Pretreatment attrition and dropout in an outpatient clinic for anxiety disorders. Acta Psychiat Scand 109(6): 426–433.
10. Haby MM, Donnelly M, Corry J, Vos T (2006) Cognitive behavioural therapy for depression, panic disorder and generalized anxiety disorder: a meta-regression of factors that may predict outcome. Aust N Z J Psychiatry 40(1): 9–19.
11. Cuijpers P, Marks IM, Van Straten A, Cavanagh K, Gega L, et al. (2009) Computer-aided psychotherapy for Anxiety Disorders: A meta-analytic review. Cogn Behav Ther 38(2): 66–82.
12. Andersson G, Cuijpers P (2009) Internet-based and other computerized psychological treatments for adult depression: A meta-analysis. Cogn Behav Ther 38(2): 196–205.
13. Marks IM, Kenwright M, McDonough M, Whittaker M, Mataix-Cols D (2004) Saving clinician' time by delegating routine aspects of therapy to a computer: A randomized controlled trial in phobia/panic disorder. Psychol Med 34: 9–18.
14. Proudfoot J, Ryden C, Everitt B, Shapiro DA, Goldberg D, et al. (2004) Clinical efficacy of computerised cognitive-behavioural therapy for anxiety and depression in primary care: randomized controlled trial. Br J Psychiatry 185: 46–54.
15. National Institute for Clinical Excellence: Computerised cognitive behaviour therapy for depression and anxiety: Technology Appraisal 97. http://www.nice.org.uk/nicemedia/pdf/TA097guidance.pdf. Accessed 2009 November 24.
16. Cuijpers P, Van Straten A, Warmerdam L, Andersson G (2008) Psychological treatment of depression: a meta-analytic database of randomized studies. BMC Psychiatry 8: 36.
17. Higgins JPT, Green S, eds (2009) Cochrane Handbook for Systematic Reviews of Interventions Version 5.0.2 [updated September 2009]. The Cochrane Collaboration, Available: www.cochrane-handbook.org..
18. Hedges LV, Vevea JL (1996) Estimating effect size under publication bias: small sample properties and robustness of a random effects selection model. J Educ Behav Stat 21(4): 299–332.
19. Kraemer HC, Kupfer DJ (2006) Size of treatment effects and their importance to clinical research and practice. Biol Psychiatry 59: 990–996.
20. Duval S, Tweedie R (2009) A nonparametric "trim and fill" method of accounting for publication bias in meta-analysis. J Am Stat Assoc 1(104): 1338–1350.

Internet Treatment for Depression

21. Borenstein M, Hedges L, Higgins J, Rothstein H (2007) Comprehensive Meta Analysis Version 2. Englewood, NJ: Biostat.

22. Andersson G, Bergström J, Holländare J, Carlbring P, Kaldo V, et al. (2005) Internet-based self-help for depression: randomized controlled trial. Br J Psychiatry 187: 456:451.

23. Kessler D, Lewis G, Kaur S, Wiles N, King M, et al. (2009) Therapist-delivered internet psychotherapy for depression in primary care: a randomized controlled trial. Lancet 374: 628–634.

24. Perini S, Titov N, Andrews G (2009) Clinician-assisted internet-based treatment is effective for depression: randomized controlled trial. Aust N Z J Psychiatry 43: 571–578.

25. Selmi PM, Klein M H, Greist JH, Sorrell SP, Erdman HP (1990) Computer-administered cognitive-behavioral therapy for depression. Am J Psychiatry 147(1): 51–56.

26. Titov N, Andrews G, Davies M, McIntyre K, Robinson E, et al. (2010) Internet treatment for depression: a randomized controlled trial comparing clinician versus technician assistance. PLoS ONE 5(6): e10939. doi:10.1371/journal.pone.0010939.

27. Wright JH, Wright AS, Albano A, Basco MR, Goldsmith LJ, et al. (2005) Computer-assisted cognitive therapy for depression: maintaining efficacy while reducing therapist time. Am J Psychiatry 162(6): 1158–1164.

28. Carlbring P, Westling BE, Ljunstrand P, Ekselius L, Andersson G (2001) Treatment of panic disorder via the internet: a randomized trial of a self-help program. Behav Ther 35: 751–764.

29. Carlbring P, Bohman S, Brunt S, Buhrman M, Westling BE, et al. (2006) Remote treatment of panic disorder: a randomized trial of internet-based cognitive behavior therapy supplemented with telephone calls. Am J Psychiatry 163: 2119–2125.

30. Klein B, Richards JC (2001) A brief internet-based treatment for panic disorder. Behav Cogn Psychother 29: 113–117.

31. Klein B, Richards JC, Austin DW (2006) Efficacy of internet therapy for panic disorder. J Behav Ther Exp Psychiatry 37: 213–238.

32. Richards JC, Klein B, Austin DW (2006) Internet cognitive behavioural therapy for panic disorder: does the inclusion of stress management information improve end-state functioning? Clin Psychol 10(1): 2–15.

33. Wims E, Titov N, Andrews G, Choi I (2010) Clinician-assisted internet-based treatment is effective for panic: a randomized controlled trial. Aust N Z J Psychiatry. in press.

34. Andersson G, Carlbring P, Holmström A, Sparthan E, Furmark T, et al. (2006) Internet-based self-help with therapist feedback and in vivo group exposure for social phobia: a randomized controlled trial. J Consult Clin Psychol 74(4): 677–686.

35. Berger T, Hohl E, Caspar F (2009) Internet-based treatment of social phobia: a randomized controlled trial. J Clin Psychol 65(10): 1021–1035.

36. Botella C, Gallego MJ, Garcia-Palacios A, Baños RM, Quero S, et al. (2009) The acceptability of an internet-based self-help treatment for fear of public speaking. Br J Guid Counc 37(3): 297–311.

37. Carlbring P, Gunnarsdóttir M, Hedensjö L, Andersson G, Ekselius L, et al. (2007) Treatment of social phobia: randomized trial of internet-delivered cognitive-behavioural therapy with telephone support. Br J Psychiatry 190: 123–128.

38. Furmark T, Carlbring P, Hedman E, Sonnenstein A, Clevberger P, et al. (2009) Guided and unguided self-help for social anxiety disorder: randomized controlled trial. Br J Psychiatry 195: 440–447.

39. Titov N, Andrews G, Schwencke G, Drobny J, Einstein D (2008) Shyness 1: distance treatment of social phobia over the internet. Aust N Z J Psychiatry 42: 585–594.

40. Titov N, Andrews G, Schwencke G (2008) Shyness 2: treating social phobia online: replication and extension. Aust N Z J Psychiatry 42: 595–605.

41. Titov N, Andrews G, Choi I, Schwencke G, Mahoney A (2008) Shyness 3: randomized controlled trial of guided versus unguided internet-based CBT for social phobia. Aust N Z J Psychiatry 42(12): 1030–1040.

42. Titov N, Andrews G, Robinson E, Schwencke G, Johnston L, et al. Clinician-assisted internet based treatment is effective for generalized anxiety disorder: randomized controlled trial. Aust N Z J Psychiatry 43: 905–912.

43. Robinson E, Titov N, Andrews G, McIntyre K, Schwencke G, et al. (2010) Internet treatment for generalized anxiety disorder: a randomized controlled trial comparing clinician versus technician assistance. PLoS ONE 5(6): e10942. doi:10.1371/journal.pone.0010942.

44. Kay-Lambkin FJ, Baker AL, Lewin TJ, Carr VJ (2009) Computer-based psychological treatment for comorbid depression and problematic alcohol and/or cannabis use: a randomized controlled trial of clinical efficacy. Addiction 104: 378–388.

45. Carlbring P, Nilsson-Ihrfelt E, Waara J, Kollenstam C, Buhrman M, et al. (2005) Treatment of panic disorder: live therapy vs. self-help via the internet. Behav Res Ther 43: 1321–1333.

46. Kiropoulos LA, Klein B, Austin DW, Gilson K, Pier C, et al. (2008) Is internet-based CBT for panic disorder and agoraphobia as effective as face-to-face CBT? J Anxiety Disord 22: 1273–1284.

47. Titov N, Andrews G, Kemp A Robinson E (2010) Characteristics of adults with anxiety or depression treated at an internet clinic: comparison with a national survey and an outpatient clinic. PLoS ONE 5(5): e10885. doi:10.1371/journal.pone.0010885.

48. Titov N, Gibson M, Andrews G, McEvoy P (2009) Internet treatment for social phobia reduces comorbidity. Aust N Z J Psychiatry 43(8): 754–759.

49. Licinio J, Wong M-L (2010) Pharmacogenomics of antidepressants: what is next? Mol Psy 15: 445. doi:10.1038/mp.2010.58.

50. Titov, N, Andrews G, Schwencke G, Solley K, Johnston L, et al. (2009) An RCT comparing effect of two types of support on severity of symptoms for people completing internet-based cognitive behaviour therapy for social phobia. Aust N Z J Psychiatry 43(10): 920–926.

Psychological Services
2016, Vol. 13, No. 3, 283–291

© 2016 American Psychological Association
1541-1559/16/$12.00    http://dx.doi.org/10.1037/ser0000078

# Connecting the Disconnected: Preliminary Results and Lessons Learned From a Telepsychology Initiative With Special Management Inmates

Ashley B. Batastini and Robert D. Morgan
Texas Tech University

The use of telepsychology, such as videoconferencing (VC) systems, has been rapidly increasing as a tool for the provision of mental health services to underserved clients in difficult to access settings. Inmates detained in restrictive housing appear to be at an increased risk of experiencing emotional and behavioral disturbances compared to their general population counterparts, yet they are less likely to receive appropriate treatment due to security constraints. The primary purpose of this article is to describe the process of implementing a novel telepsychology intervention specifically designed to offer group therapy to high-security, administratively segregated inmates. In addition, preliminary results on treatment and therapeutic process outcomes in a sample of 49 participants are reported. Although some evidence indicated that telepsychology was less preferred than in-person sessions, group differences on measures of psychological functioning and criminal thinking were not found across 3 conditions (telepsychology, in-person, and a no-treatment control). Furthermore, a number of limitations associated with program implementation and study design suggest that results be interpreted with caution and should not be used to discount the use of telepsychology as a viable treatment delivery option. Recommendations for future development and evaluation of telepsychological programs are discussed within the context of correctional settings and beyond.

Keywords: telepsychology, videoconferencing, group therapy, administrative segregation, solitary confinement

The use of special management, or administrative segregation housing, is an increasingly popular correctional practice intended to prevent inmates from inflicting harm on themselves or others, or conversely from being the target of harm by others (Fine & Wingrove, 2014; King, 1999; O'Keefe, 2008). Currently, over 80,000 inmates across the United States are being detained in these units (Stephan, 2008), where they spend approximately 23 to 24 hr a day in their cells. Although there has been some debate over the long-term psychological effects of using special management units to contain behavior (see Morgan et al., 2015 for a review), some negative outcomes have been documented. For example, in their recent meta-analysis, Morgan et al. (2015) found that segregated housing was associated with moderate increases in criminal recidivism and overall mental health impairment. Similarly, despite the intention to reduce incidents of self-harm, segregated inmates have been found to engage in these behaviors (including suicide) at higher rates than those detained in the general population (Kaba et al., 2014; Sánchez, 2013).

Persons with mental illness often have particular difficulty coping with the stressors encountered behind prison walls and may be more likely to spend time in administrative segregation when alternative therapeutic options are absent (Metzner & Fellner, 2010). Unfortunately, mental health services in segregation are especially limited due to security restrictions, and typically consist of psychotropic medications, brief check-ins at the inmate's cell front, and occasional meetings in private with a clinician (Beaven, 2005; Metzner & Fellner, 2010). Group therapy is sometimes offered to segregated inmates by securing them in individual metal holding cells (known as therapeutic modules) that are placed in a semicircle around the provider. Each module is approximately the size of a telephone booth and can cost upward of about $18,000 (Metzner & Dvoskin, 2006). This set-up not only has the potential to obstruct communication (verbal and nonverbal) between the provider and other treatment participants, but feelings of embarrassment or dehumanization associated with these modules may also distract inmates from fully participating in the therapeutic process. The demand for better quality treatment of inmates in special management is further evident in a number of recent lawsuits (e.g., Ashker v. Governor of California, 2014; Silverstein v. Federal Bureau of Prisons, 2014). So, as the discussion continues over whether or not restrictive housing is really "that bad" for the health and well-being of those detained there, best practices would suggest that prisons nonetheless strive to prevent possible iatrogenic effects and treat existing problems, especially for those who are high-risk and high-needs (Andrews & Bonta, 2010).

Ashley B. Batastini and Robert D. Morgan, Department of Psychological Sciences, Texas Tech University.

We thank the Kansas Department of Corrections for their support in this project. The views and opinions expressed herein represent those of the authors and do not necessarily reflect the views and opinions of Texas Tech University or KDOC. Ashley B. Batastini was located at Texas Tech University at the time this project was completed; she is currently affiliated with the Department of Psychology at the University of Southern Mississippi.

Correspondence concerning this article should be addressed to Ashley B. Batastini who is now at Department of Psychology, University of Southern Mississippi, 118 College Drive, #5025 Hattiesburg, MS 39406-5025. E-mail: ashley.batastini@usm.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Telepsychology, which refers to "the provision of psychological services using telecommunication technologies" (APA, 2013, p. 1), has been on the rise in criminal justice contexts and elsewhere (Ax et al., 2007; Batastini, McDonald, & Morgan, 2013). In fact, it has been projected that the integration of technology into mental health sectors will be largest expanding initiative over the next decade (Norcross, Pfund, & Prochaska, 2013). Currently, these services are most typically rendered using real-time audiovisual monitors (i.e., videoconferencing programs) that connect agencies requiring services to agencies that can provide such services (Ax et al., 2007; Miller, Clark, Veltkamp, Burton, & Swope, 2008).

Within criminal justice settings, telepsychology has not only demonstrated better cost-effectiveness compared with traditional in-person services (National Institute of Justice, 2002), but it is also associated with high satisfaction among correctional clients and providers (Brodey et al., 2000; Magaletta, Fagan, & Peyrot, 2000; Morgan, Patrick, & Magaletta, 2008), good to excellent interrater reliability across both forensic (Manguno-Mire et al., 2007) and clinical assessment outcomes (Lexcen, Hawk, Herrick, & Blank, 2006; Nelson, Zaylor, Cook, 2004), as well as improvements in mental health functioning over time (Zaylor et al., 2001). Furthermore, while no studies have yet examined the effectiveness of group therapy for inmates via telepsychology, there is evidence of positive clinical and process-related outcomes among noncorrectional samples (Frueh, Henderson, & Myrick, 2005; Greene et al., 2010; Morland et al., 2011). Group psychotherapy in general has also been associated with symptom reduction among incarcerated populations (e.g., Wolff et al., 2015) and court-mandated clients (e.g., Rosenbaum, Gearan, & Ondovic, 2002).

In an effort to improve access to quality mental health care for high-risk individuals detained in an otherwise restricted and largely isolated environment, the Kansas Department of Corrections (KDOC) implemented a pilot telepsychology initiative. To our knowledge, there are no other video-based programs that specifically target the needs of this unique and difficult-to-reach population. Therefore, the purpose of this article is to describe the implementation of the KDOC pilot program, present preliminary outcome data on clinical and process variables across telepsychology and traditional in-person delivery methods, and offer practical recommendations for agencies (correctional and beyond) looking to develop similar therapeutic initiatives. Given the literature to date, we expected that the video-based modality would be at least comparable with treatment-as-usual delivered in-person, and that both groups would evidence improvements at the end of treatment. Telepsychological approaches, particularly those involving videoconferencing, have the potential to foster safer, more intensive, and arguably more humane interactions with treatment providers than what is typically afforded to administratively segregated inmates.

## Method

### Psychotherapy Intervention

Coping skills group (CSG; Gingerich & Mueser, 2005) is an evidence-based, group-formatted intervention that aims to improve the lives of individuals with significant problems related to their mental health functioning. CSG employs cognitive–behavioral strategies to teach participants more adaptive ways of dealing with everyday issues. To conduct CSG sessions in-person, segregated

inmates are escorted to a multipurpose room on the cellblock where they meet with a Master's-level mental health provider (MHP). However, security restrictions and spacing capacity only allow for a maximum of two inmates per group when this method of service delivery is used.

To deliver CSG through videoconferencing (VC), up to six inmates can be seen on the video monitor simultaneously. While we recognize that the difference in group size across modalities could be seen as a confound, we would argue that the ability to accommodate more inmates in the group is an inherent benefit to using telepsychology in this setting. Not only is it more efficient to treat a larger number of inmates at one time, but the VC modality also offers participants greater opportunities to practice interpersonal skills and relate to others with similar experiences. In this way, the VC condition is more similar to conventional group psychotherapy approaches than the two-inmate, in-person condition. Further, it should be noted that none of the VC groups exceeded four participants, even though the maximum occupancy was six.

For security purposes, inmates receiving VC treatment are individually escorted to separate multipurpose rooms where they were restricted from physical contact with other group members and the MHP. A Polycom camera and monitor system (protected by transparent Plexiglas) is placed in these rooms to allow group members to view and communicate with each other, as well as the MHP facilitator. The MHP tunes into each group session via a Polycom video-monitoring system located within the on-site mental health department.

On average, participants in both conditions received weekly 1-hr group sessions over the course of 6 weeks. It should also be noted that, although the implementation procedures for CSG initially intended for MHPs to conduct groups through both modalities during the same timeframe so as to reduce potential confounds related to provider characteristics, this was not possible because of staffing limitations. For example, at the time of the telepsychology initiative, other programmatic changes to KDOC policies were taking place, which meant that some providers were assigned to facilitate other types of mental health interventions within the prison. The reallocation of staff also limited the number of segregated inmates who could participate in CSG.

### Program Participants

Inmates recruited for treatment were held in individual cells (with no cellmates) located within one of the three administrative segregation units at the KDOC facility. All evaluation procedures were approved by the Institutional Review Board (IRB) for the Protection of Human Subjects at Texas Tech University (TTU), as well as the research department affiliated with KDOC. Although inmates were initially preselected for treatment by KDOC mental health department staff, the voluntary nature of their participation was explained prior to obtaining informed consent. It was further emphasized that no compensation or external incentives would be provided to program volunteers and that, conversely, no sanctions would be implemented should they refuse participation upfront or choose to withdraw during the course of treatment. Inmates were excluded from the study if they: (a) were sentenced to death, (b) were unable to understand the English language, (c) declined to provide written informed consent, (d) lacked the capacity to pro-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

vide voluntarily consent, or (e) declined to participate in at least one session of the intervention.

In addition to the two treatment conditions, data was also collected on a no-treatment control group. Program data was collected on a total of 49 all-male inmate participants (VC = 24; in-person = 12; no-treatment control = 13). The majority of inmates identified as White (44.9%), had a mean age of 29.8 ($SD$ = 8.2) years with 11.4 ($SD$ = 1.4) years of formal education, were diagnosed with a primary substance-use (38.8%) or mood-related disorder (26.5%), and had spent an average of 5.2 ($SD$ = 1.8) years in prison on their current conviction(s). Time spent in special management housing ranged from less than 1 year to 11.4 years, with an average of 1.3 ($SD$ = 1.8) years.

True random assignment to the three study conditions was not feasible due to unexpected logistical and security constraints. For example, the KDOC facility experienced technical difficulties after installing the Polycom videoconferencing system that rendered it unavailable for use. To avoid delays in treatment provision and data collection, a majority of inmates in the first cohort either received treatment in-person or were not assigned to a group. To create more equal sample sizes across the conditions, a larger proportion of participants in the second cohort were assigned to the video modality than the in-person modality. In other instances, pairs of inmates with a documented history of serious interpersonal conflict were not placed in the same treatment group, as this was seen as a potential barrier to the group's productivity and safety.

Despite nonrandom assignment, no statistically significant differences (using $p < .05$) were found across a number of demographic variables including: age, education level, ethnicity, offense type (i.e., violent vs. nonviolent), primary psychiatric diagnosis, active use of psychotropic medications, prior criminal justice involvement, current sentence length, time served in most recent special management placement, number of disciplinary infractions within the past year, number of sick calls (i.e., written requests for mental health services) placed within the past year, pretreatment assessment scores (including measures of mental health symptomology and criminal thinking styles; see below), and number of treatment sessions completed.

## Data Collection Procedures

Inmate data was collected from the KDOC electronic records database, as well as inmates' self-report. In addition to demographic information, data on the frequency of inmate disciplinary infractions and mental health-related sick call requests was obtained from the KDOC database. The following self-report measures were selected to assess outcomes related to the CSG program and were administered at pre- and posttreatment: (a) the Symptom Checklist 90-Revised (SCL90-R; Derogatis, 1994); (b) the Psychological Screening Inventory of Criminal Thinking Styles (PICTS; Walters, 2013); and (c) the Measure of Criminogenic Thinking Styles (MOCTS; Mandracchia & Morgan, 2011). To examine process-related outcomes, inmates were asked to complete the following measures at the conclusion of their treatment experience: (a) the Client Satisfaction Questionnaire (CSQ-8; Larsen, Attkisson, Hargreaves, & Nguyen, 1979); (b) the Working Alliance Inventory (WAI; Horvath & Greenberg, 1989); and (c) the Intervention Group Environment Scale (I-GES; Wilson et al., 2008). Group process variables were not assessed at pretreatment

because participants were not yet exposed to the CSG program; any pretreatment ratings would likely have reflected some other interpersonal experience that was not of interest in the present study. Treatment completion status (i.e., whether or not the inmate was classified as a "completer" and, if not, the reason for his premature termination) was also included as a measure of group adherence.

**Symptom Checklist-90-Revised.** The SCL90-R is a 90-item self-report inventory that measures psychological symptoms and related distress along nine primary symptom dimensions (i.e., somatization, obsessive-compulsive, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, and psychoticism). Additionally, the SCL90-R contains three summary, or global, scores (i.e., global severity index [GSI], positive symptom distress index [PSDI], and positive symptom total [PST]). The GSI represents a respondent's average score across the 90 items and is an indicator of overall level of functioning. The PSDI is a measure of intensity that is calculated by averaging all responses above zero. The PST is the total number of symptoms endorsed by the respondent. The SCL90-R has been used extensively in forensic and correctional settings to assess general psychological functioning (e.g., Davison & Taylor, 2001; Nelson, Zaylor, & Cook, 2004). For the present study, only the three summary latent scores were included in the analyses. Cronbach's alpha ($\alpha$) was calculated to determine the full-scale internal consistency of the SCL90-R, as all 90 items are used to compute the three indices of interest. Consistency for the pre- and posttreatment SCL90-R was excellent ($\alpha$ = .98 at both assessment time points).

**Psychological Inventory of Criminal Thinking Styles.** The PICTS is an 80-item self-report questionnaire that measures eight thinking patterns (i.e., mollification, cutoff, entitlement, power orientation, sentimentality, superoptimism, cognitive indolence, and discontinuity) that are believed to be instrumental in maintaining a criminal lifestyle (Walters, 1995). In addition to calculating eight scales representing the thinking types proposed by Walters, the PICTS also generates a global measure of the presence or absence of criminal thinking (general criminal thinking), four content scales (proactive, reactive, current, and historical criminal thinking), and five factor and special scales (problem avoidance, interpersonal hostility, self-assertion, denial of harm, and the fear of change). Proactive criminal thinking is a measure of goal-directed, deliberate, and organized forms of aggression or criminal behavior, whereas reactive criminal thinking is a measure of spontaneous, impulsive, and reactionary forms of aggression or criminal behavior. Similar to the SCL90-R, the present study only examined changes across aggregate measures of criminal thinking (i.e., general, proactive, reactive, current, and historical). All five subscales of the PICTS used in this study evidenced good to excellent internal consistency at pre- and posttreatment ($\alpha$ ranging between .80 and .95).

**The Measure of Criminogenic Thinking Styles.** The MOCTS is a 70-item self-report inventory that was developed based on common theories of criminal (i.e., Yochelson and Samenow's thinking errors, Walter's thinking patterns) and noncriminal (i.e., Ellis's irrational beliefs, Beck's automatic thoughts) cognitive styles. It is designed to assess a broader range of dysfunctional thought processes prevalent in offender populations that may be associated with antisocial attitudes and behaviors. The MOCTS measures three cognitive factors: (a) control; (b) cognitive immaturity (i.e.,

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

overreliance on underdeveloped cognitive shortcuts such as self-pity and judging); and (c) egocentrism. In the present study, internal consistency of the three MOCTS subscales at each time point ranged from good to excellent (α between .80 and .95).

**The Client Satisfaction Questionnaire.**  The CSQ-8 is an eight-item measure that assesses overall client satisfaction with mental health services—in this case, the CSG intervention. The developing authors reported high internal consistency (Larsen et al., 1979), and factor analyses have consistently yielded only one factor (e.g., Nguyen, Attkisson, & Stegner, 1983). This measure has also been administered in previous treatment outcome studies examining VC modalities (Bishop, O'Reilly, Maddox, & Hutchinson, 2002), including those with correctional populations (Morgan et al., 2008). Internal consistency of the CSQ-8 in the present evaluation was excellent (Cronbach's alpha = .95).

**The Working Alliance Inventory.**  The WAI is a 36-item questionnaire that contains three subscales targeting different aspects of the therapeutic alliance: (a) client and therapist agreement on the goals of therapy (Goal); (b) agreement on how to reach those goals (Task); and (c) the degree of confidence and acceptance between client and therapist (Bond). The developing authors reported good internal consistency for the global score (Total), as well as the three subscales (Horvath & Greenberg, 1989). The instrument was also reliably correlated with other measures of therapist and client outcomes (Horvath & Greenberg, 1989). Only the client version was used in the present study. Internal consistency for the three WAI subscales was excellent (α ranged from .91 to .96).

**The Group Environment Scale—Intervention Version.**  The I-GES is 25-item measure designed to assess features of the treatment group that may impact its effectiveness. The I-GES is a clinically driven modification of the Group Environment Scale created by Moos (1986). Subscales of the I-GES include: (a) cohesiveness, (b) implementation and preparedness, and (c) counterproductive activity. The original validation study showed statistically robust evidence of internal consistency (α ranging from .80 to .92) and construct validity (examined by comparing I-GES scores to other pertinent group process variables; Wilson et al., 2008). For the current study, internal consistency among the three I-GES subscales was good to excellent (α ranged from .77 to .91).

## Testing for (Non) Significance

Because this study attempted, in part, to "accept" several null hypotheses, modifications to standard significance testing were warranted. There are theoretical problems that arise when attempting to prove a null hypothesis (Kluger & Tikochinsky, 2001). That is, researchers can only fail to reject a null hypothesis because the absence of evidence cannot be assumed to be evidence of absence (Jaykaran, Saxena, Yadav, & Kantharia, 2011). Consequently, research designs that seek to accept null hypotheses are often viewed as controversial. Some have argued, however, that this view is inconsistent with current practice (Cortina & Folger, 1998; Frick, 1995). Frick (1995) suggests that the null hypothesis can be accepted if: (a) the null is plausible, (b) results are consistent with the null, and (c) a "good [methodological] effort" is made to find an effect (p. 137). Frick specified that one way to achieve good effort is to use a more liberal criterion for rejecting the null hypothesis. The use of a less-restrictive critical p value is appro-

priate for study designs such as this because it reduces the likelihood of a Type II error (Stevens, 1996).

Accordingly, a more rigorous, twofold criterion for accepting the null hypothesis was adopted for this study. Specifically, this criteria involved a critical $p > .20$ with effect sizes below the conventional small threshold (e.g., $d < .20$,[1] $\eta_p^2 < .01$; Cohen, 1992). Conversely, in concluding that the alternative hypothesis was instead supported, the traditional alpha level of $p < .05$ with medium to large effect sizes (e.g., $d \geq .50$; Cohen, 1992) was applied. This approach takes null hypothesis testing to a more confirmatory level than what was previously relied on in other similar studies comparing VC and in-person treatment delivery (e.g., Frueh et al., 2007; Greene et al., 2010; Morgan et al., 2008).

## Results

### Treatment Outcome Variables

After adjusting for deviations in normality and variance, a series of $2 \times 3$ mixed factorial multivariate analyses of variance (MANOVA) was performed to examine differences on the SCL90-R, PICTS, and MOCTS across conditions (telepsychology, in-person, no-treatment control). The respective subscales of each measure served as the combined dependent variable for each analysis. Pillai's Trace criterion was used as the test statistic because it is a more robust measure of group equivalence. Pillai's Trace is recommended when there are deviations in the assumption of homogeneity of covariances and/or study conditions contain unequal sample sizes (Tabachnick & Fidell, 2007), as was the case in the current analyses. All three MANOVAs failed to reveal statistically significant multivariate interactions of time and condition for the combined dependent variables (SCL90-R: Pillai's Trace = .02, $F(2, 44)$ = .38, $p$ = .69, $\eta_p^2$ = .02; PICTS: Pillai's Trace = .00, $F(2, 38)$ = .00, $p$ = .99, $\eta_p^2$ = .00; MOCTS: Pillai's Trace = .01, $F(2, 45)$ = .02, $p$ = .97, $\eta_p^2$ = .00). Post hoc group comparisons were likewise nonsignificant ($p$ values ranged from .10 to >.99) with low associated effect size estimates. Thus, while the VC and in-person groups appear to be relatively comparable, inmates who participated in CSG regardless of modality did not show improvements when compared with non-CSG inmates. These findings suggest that the intervention of choice was not particularly effective in targeting mental health functioning or criminal thinking for segregated inmates. Means and standard deviations for the SCL90-R, PICTS, and MOCTS are reported in Table 1. Similarly, Kruskal-Wallis tests (a nonparametric equivalent to a univariate analysis of variance [ANOVA]) examining the frequency of disciplinary infractions and mental health-related sick call requests placed since the preassessment failed to reveal statistically significant differences across the three groups ($p$ = .69 and .64, respectively), with all inmates showing low occurrences of each outcome.

---

[1] Because the sample sizes across video and in-person modalities were unequal, Hedges' g was used as the effect size estimate instead of Cohen's d. Hedges' g is a similar calculation, but adjusts the pooled standard deviation with appropriate weights for the sample sizes. The magnitude of this effect is interpreted in the same manner as Cohen's d.

Table 1
*Means and Standard Deviations of SCL90-R, PICTS, and MOCTS Subscales by Measurement Time Point*

| Measure | Condition | | |
|---|---|---|---|
| | Telepsych $M$ ($SD$) | In-Person $M$ ($SD$) | Control $M$ ($SD$) |
| Pre-SCL90-R | — | — | — |
| Global Severity Index | 1.23 (.56) | 1.18 (.83) | 1.26 (.94) |
| Positive Symptom Distress Index | 2.10 (.55) | 2.01 (.53) | 2.00 (.66) |
| Positive Symptom Total | 51.25 (19.35) | 48.70 (29.19) | 51.85 (25.44) |
| Post-SCL90-R | — | — | — |
| Global Severity Index | 1.24 (.69) | 1.01 (.80) | 1.11 (.85) |
| Positive Symptom Distress Index | 2.07 (.62) | 1.88 (.62) | 2.09 (.66) |
| Positive Symptom Total | 49.92 (21.70) | 44.80 (29.46) | 45.08 (26.69) |
| Pre-PICTS | — | — | — |
| Current | 30.47 (8.19) | 29.03 (6.67) | 30.18 (11.93) |
| Historical | 27.99 (5.50) | 24.15 (7.66) | 26.25 (10.32) |
| Proactive | 66.67 (10.66) | 55.14 (11.76) | 65.61 (20.50) |
| Reactive | 56.20 (10.05) | 54.91 (12.57) | 57.91 (19.62) |
| General[a] | 123.37 (21.80) | 109.55 (18.67) | 119.89 (38.16) |
| General (log) | 2.09 (.08) | 2.04 (.076) | 2.06 (.14) |
| Post-PICTS | — | — | — |
| Current | 29.29 (8.86) | 23.11 (8.78) | 26.30 (10.15) |
| Historical | 24.95 (6.34) | 24.00 (7.79) | 25.00 (9.43) |
| Proactive | 58.89 (12.52) | 56.33 (21.79) | 61.45 (17.99) |
| Reactive | 54.19 (13.91) | 44.46 (13.37) | 44.56 (13.37) |
| General[a] | 113.85 (23.67) | 97.91 (29.81) | 114.44 (32.29) |
| General (log) | 2.05 (.09) | 1.98 (.12) | 2.05 (.12) |
| Pre-MOCTS | — | — | — |
| Control | 190.02 (28.77) | 168.92 (39.90) | 186.75 (28.36) |
| Control | 65.46 (11.53) | 56.67 (15.46) | 61.58 (13.15) |
| Cognitive immaturity | 82.84 (19.09) | 71.17 (25.11) | 87.00 (27.28) |
| Ego | 42.32 (6.41) | 41.08 (6.36) | 41.75 (7.61) |
| Post-MOCTS | — | — | — |
| Control | 179.60 (23.08) | 156.65 (27.64) | 179.08 (34.63) |
| Control | 61.56 (12.65) | 54.15 (13.32) | 60.08 (11.83) |
| Cognitive immaturity | 77.29 (17.04) | 61.25 (19.67) | 77.75 (27.12) |
| Ego | 40.76 (5.68) | 41.25 (7.81) | 41.25 (8.64) |

*Note.* SCL90-R = Symptom Checklist 90-Revised; PICTS = Psychological Inventory of Criminal Thinking Styles; MOCTS = Measure of Criminogenic Thinking Styles.
[a] Values reported are based on nontransformed data.

## Group Process Variables

Because inmates in the no-treatment control condition were not exposed to CSG, only the VC and in-person treatment conditions ($N = 34$) were compared on group process outcomes. There were no statistically significant differences between VC and in-person conditions with regard to treatment completion status (i.e., successfully completed = 82.6% vs. 72.7%, respectively; kicked out for disciplinary reasons = 4.3% vs. 9.1%, respectively; voluntarily withdrew = 13.0% vs. 18.2%, respectively), $\chi^2(2) = 0.51$, $p = .77$, $\phi = .12$.

Results of a one-way univariate ANOVA procedure showed no statistically significant differences at the 0.05 level across treatment conditions on service satisfaction as measured by the CSQ-8, $F(1, 34) = 3.13$, $p = .09$. However, the alpha level can be said to be approaching significance. Further, the magnitude of this effect was in the medium to large range (Hedge's $g = 0.65$; 95% CI [−0.04, 1.34]). An examination of means indicated that participants who received treatment via telepsychology were generally less satisfied overall ($M = 21.43$, $SD = 5.23$) than participants who received treatment in-person ($M = 25.09$; $SD = 6.46$).

Separate one-way MANOVA procedures were conducted on the WAI and I-GES, again using their respective subscales serving as

the combined dependent variables. Results for the WAI failed to reveal a statistically significant multivariate effect of condition, Pillai's Trace = .16, $F(3, 30) = 1.9$, $p = .15$. The between-subjects effect of condition was also nonsignificant for the bond and goal subscales though these findings trended toward significance with medium to large accompanying effect sizes, bond: $F(1, 32) = 4.08$, $p = .05$, $g = 0.75$ (95% CI [0.05, 1.45]); goal: $F(1, 32) = 3.50$, $p = .07$, $g = 0.66$ (95% CI [−0.03, 1.36]). The task subscale, however, did reach statistical significance and the associated effect size estimate was large, $F(1, 32) = 5.57$, $p = .03$, $g = 0.84$ (95% CI [0.13, 1.54]). An examination of means showed that participants who received treatment via telepsychology were less trusting and accepting of their MHP facilitator, and agreed less on the tasks and goals related to the CSG intervention than participants who received treatment in-person. Means and standard deviations for the WAI subscales are presented in Table 2.

Results for the I-GES also revealed no statistically significant multivariate effect of condition on the combined dependent variable, Pillai's Trace = .10, $F(3, 30) = 1.11$, $p = .36$. The between-subjects effect of condition on each of the three subscales was also not statistically significant; however, all effect size estimates were in the medium range, Co: $F(1, 32) = 2.16$, $p = .15$, $g = 0.52$ (95%

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

BATASTINI AND MORGAN

Table 2
*Means and Standard Deviations of CSQ-8, WAI, and I-GES Total and Subscales*

| | Condition | |
|---|---|---|
| Measure | Telepsych $M$ (SD) | In-Person $M$ (SD) |
| WAI total score | 178.91 (38.84) | 212.10 (36.46) |
| Task[a] | 63.16 (14.45) | 76.17 (8.73) |
| Task ($\sqrt{}$) | 2.75 (2.19) | 4.53 (1.74) |
| Bond | 55.23 (12.40) | 65.84 (17.86) |
| Goal | 60.52 (14.68) | 70.09 (12.22) |
| I-GES total score | 18.78 (5.34) | 22.18 (4.50) |
| Cohesiveness | 5.43 (2.76) | 6.82 (2.09) |
| Implementation and preparedness | 8.78 (2.32) | 9.91 (1.81) |
| Counterproductive activity | 4.57 (1.67) | 5.45 (1.51) |

*Note.* WAI = Working Alliance Inventory; I-GES = Group Environment Scale, Intervention Version.
[a] Values reported are based on nontransformed data.

CI [−0.17, 1.21]); IP: $F(1, 32) = 2.00$, $p = .17$, $g = 0.50$ (95% CI [−0.19, 1.19]); CA: $F(1, 32) = 2.23$, $p = .15$, $g = 0.53$ (95% CI [−0.16, 1.22]). re An examination of means suggested that participants who received treatment via telepsychology felt less cohesiveness within the group, perceived the intervention as less organized and the facilitator as less prepared, and experienced more counterproductive activity in the group than those who received treatment in-person. Means and standard deviations by I-GES subscale are also reported in Table 2.

## Discussion

The current evaluation sought to describe a novel telepsychology initiative specifically for segregated inmates—a high-risk, high-needs subgroup of inmates who are often restricted from adequate treatments due to security and confidentiality concerns (Metzner & Fellner, 2010). In addition, preliminarily data on treatment outcome and process related variables were reported. This evaluation represents the first attempt to compare VC and in-person modalities in the delivery of group treatment for an inmate population. Overall, the CSG intervention was not associated with meaningful improvements in psychological functioning or reductions in criminal thinking. However, there were some noteworthy group differences across measures of therapeutic process. Although the designated treatment modality did not appear to impact whether or not inmates successfully completed the CSG program, most other comparisons at least trended toward statistical significance. Furthermore, and arguably more revealing, were the associated magnitudes of the effect size estimates. For measures of treatment satisfaction, working alliance, and group-specific processes, all effect size estimates fell within the medium to large range as described by Cohen (1992). From these findings, it appears that participants who received in-person sessions had a more favorable treatment experience than those who received VC sessions, even though this did not impact their willingness or ability to complete treatment.

The results of this pilot program are consistent with previous research suggesting that telehealth-based interventions are often perceived as somewhat less favorable than traditional in-person

interventions (e.g., Greene et al., 2010). However, it is worth noting that overall attitudes reported by participants in this study were higher than what was found in previous research with inmate populations (i.e., Morgan et al., 2008). Further, the extent to which this discrepancy is clinically meaningful remains questionable because the intervention itself did not produce measurable changes regardless of modality. Even though prior research (Frueh et al., 2007; Greene et al., 2010) has suggested that telepsychological approaches can yield positive therapeutic outcomes even when client ratings of some process elements (e.g., working alliance) are lower than ratings for in-person, it remains relevant to consider how this relationship might apply to an inmate population. For example, special management inmates may be especially resistant to services not provided in the traditional in-person format because of their already limited social contact; that is, they may be less motivated to engage in treatment when the expectation of in-person treatment is denied. Accordingly, additional time at the beginning of treatment to explain the process (e.g., how the technology works, why it is being used) and methods of interacting/communicating that will increase interpersonal effectiveness (e.g., where to look into the camera so as to maintain eye contact) may help ease any frustrations or misunderstanding.

## Limitations of Current Program Evaluation

Observed findings of both the treatment outcome and therapeutic process comparisons were likely impacted by several limitations. The most concerning was the achieved sample size. Despite statistical efforts to account for both small and unequal sample sizes across conditions, the precision of results reported here, as well as the stability of any conclusions drawn from them, are nonetheless reduced. A second problem was the lack of random assignment. Therefore, causal effects (or lack thereof) could have been confounded by other extraneous variables that were not measured in this evaluation. For example, differences in inmates' perceptions of the treatment may have been influenced by preexisting characteristics (e.g., general attitudes toward treatment or the specific facilitator, readiness for change, insight into current problems) that were unrelated to the modality itself. Additionally, even though group equivalency was tested across several potentially confounding demographic variables, the achieved sample size may again have limited the ability to detect true differences. Related to the issue of nonequivalence, the larger number of inmates permitted in the video format (despite being a possible advantage compared with the two-inmate, in-person format) could have further muddied the results.

Similar to the issue of nonrandom participant assignment was the manner in which group facilitators were assigned to each treatment condition. Due to limited staff availability, MHP's could not facilitate both an in-person and a videoconferencing group. Thus, any group differences that existed could be attributed to therapist characteristics (e.g., fatigue/burnout, attitudes toward participants or the program, treatment adherence, other personality factors) rather than the treatment modality. Furthermore, technological complications (e.g., delays in setting up the VC equipment that prolonged the start of treatment) may have caused negative reactions among inmates that influenced their perceptions of the overall treatment experience. Therefore, lower ratings of satisfaction, alliance, and group cohesion among telepsychology partici-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

pants may be better explained by frustration and disorganization associated with its implementation rather than the virtual nature of service delivery.

With regard to the selected intervention, CSG was not specifically designed to target criminal thinking errors or severe psychopathology in a population of high-risk segregated male inmates. Although coping skills interventions (i.e., those that teach patients techniques for managing stress and/or dealing with persistent mental illness) are generally found to be effective in reducing symptom severity (Mueser et al., 2002), it is likely that segregated inmates with mental health problems present with unique issues that need to be incorporated into the treatment design. Thus, it appears that the first step is to develop a program tailored not only to their complex psychological and behavioral needs, but also to their unique prison environment. For example, inmates detained in segregation units are largely isolated from other peers and have limited access to activities. It could be beneficial for a treatment program to teach coping skills geared toward alleviating these concerns (e.g., techniques to reduce sensory deprivation, encouraged use of all offered recreation time and creative outlets). Segregated inmates also have higher rates of suicidal and self-injurious behavior (Kaba et al., 2014; Sánchez, 2013), passive-aggressive response styles, and personality diagnoses (e.g., borderline; O'Keefe, 2008) than those in the general prison population. As such, it is important for treatment to focus on reducing the risk of self-injury, as well as improving interpersonal skills and distress tolerance. Lastly, the effectiveness of interventions with any offender population is enhanced when known predictors of antisocial behavior (e.g., criminal thinking) are explicitly targeted (Andrews & Bonta, 2010; Gendreau & Goggin, 2013; Morgan, Kroner, Mills, & Batastini, 2013). Establishing a program that works with this subpopulation in a traditional in-person format will lend itself to a more clinically meaningful comparison with a nontraditional telepsychology format. Largely as a result of the KDOC initiative, one such program (Escaping the Cage; Batastini, Morgan, Kroner, & Mills, 2014) was recently developed and is currently undergoing pilot investigation. Escaping the Cage is intended to address issues specific to segregated inmates as outlined above and to accommodate the high-security institutional restrictions of this setting.

## Lessons Learned: Recommendations for Policy, Practice, and Research

Although the expected benefits of telepsychology, such as lower costs, easier access to services, and increased institutional safety are of substantial interest to correctional systems (Ax et al., 2007), it is possible that these benefits may not outweigh potential costs, such as loss of therapeutic connectedness and possibly poorer treatment outcomes as a result. However, in the context of its limitations and evidence from other available research (see Batastini, King, Morgan, & McDaniel, 2015), we do not conclude that this evaluation should be used to support the discontinued application of telepsychology as a treatment modality in correctional practice, especially when in-person treatments are less available, or are more difficult to implement (e.g., group therapy for high-risk segregated inmates).

Given the lack of clarity regarding the implementation of telepsychology, we offer a number of recommendations for any agency or organization, including correctional facilities, planning to initiate such a program. It should be noted that these recommendations are subject to change as new evidence on the effectiveness of telepsychology emerges. First, consideration should be given to the risks and benefits within the context of the agency's needs (e.g., safety, rehabilitation goals, allocation of staff) and logistical constraints. Doing so will likely prevent resources from being wasted on programs that cannot be systematically or effectively conducted. For example, prisons with more financial freedom may be better off making other institutional changes (e.g., hiring more staff, designating structured therapeutic housing blocks for severely mentally ill inmates) to facilitate greater access to in-person treatment rather than attempting to install video-monitoring equipment that may or may not be as effective. Second, mental health providers are advised to consider other factors that could impact the usefulness of a VC intervention. That is, will the intended intervention translate successfully from in-person to video? If not, can adaptations be made without compromising the integrity of the intervention?

As indicated above, there were some technological problems in the current study that, if prevented, may have led to more positive experiences in treatment. Thus, we recommend that agencies electing to implement a telepsychology program first establish systematic guidelines for its use, and then adequately train all staff on policies and strategies for troubleshooting technical difficulties as well as dealing with client-related emergencies. As previously suggested, providing clients with a thorough explanation of the equipment and/or a tailored informed consent form may reduce anxiety about the process. In addition, clients should be screened for their appropriateness to participate in a telepsychology intervention. For example, clients who express extreme discomfort with technology or who have acutely psychotic thoughts involving technology may not be suitable for this type of programming.

Lastly, it is important for agencies, research consultants, and mainline staff to spend time establishing a working partnership (Apa et al., 2012). Achieving buy-in from all key personnel and stakeholders will likely create a sense of excitement about and commitment to the program that may improve compliance with implementation and evaluation. In turn, it is expected that provider adherence to established protocols will foster a more positive and productive therapeutic experience. Telepsychology programs, like any other intervention or policy, should be continually monitored using the highest level of scientific rigor possible. This would include, but is not limited to, recruiting an adequate sample size, using a randomized control design, eliminating confounds related to provider characteristics, conducting integrity checks for quality assurance, and assessing maintenance of treatment gains over longer follow-up periods. Additionally, future process evaluations should consider measuring other potentially relevant variables such as provider satisfaction, frequency of and response to in-session technological difficulties (e.g., loss of connection), clinician experience with videoconferencing programs, and attitudes specific to the service delivery modality (e.g., perceptions about ease of use, audio/visual quality, comfort level with equipment). Cost-benefit analyses may also be of interest to agencies and their stakeholders. The failure to achieve desired psychological, behav-

ioral, or financial markers would suggest the need for programmatic adjustments.

## Conclusion

Although this process evaluation provided some evidence that telepsychology is less preferable than in-person services, the degree to which this preference impacts treatment progress is unknown. In addition, given the noted limitations, it is more likely that these differences were related to problems in treatment delivery rather than the delivery method itself. The rapid expansion of telepsychology (Norcross et al., 2013) within the mental health profession suggests that this modality is unlikely to fall out of demand in the foreseeable future. Therefore, to improve its effectiveness and better justify its use, policymakers, researchers, and clinicians should collaboratively strive to understand the nuances of technology-based interventions across clinical populations and settings—perhaps with the greatest urgency toward those most likely to be at the forefront of this expansion.

## References

American Psychological Association. (2013). *Guidelines for the practice of telepsychology.* Retrieved from http://www.apapracticecentral.org/ce/guidelines/telepsychology-guidelines.pdf

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct* (5th ed.). New Providence, NJ: Matthew Bender & Company Inc.

Apa, Z. L., Bai, R., Mukherejee, D. V., Herzig, C. T. A., Koenigsmann, C., Lowy, F. D., & Larson, E. L. (2012). Challenges and strategies for research in prisons. *Public Health Nursing, 29,* 467–472. http://dx.doi.org/10.1111/j.1525-1446.2012.01027.x

Ashker v. Governor of California, No. C 09–5796 (N. D. Cal. June 2, 2014).

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment. *Criminal Justice and Behavior, 34,* 893–905. http://dx.doi.org/10.1177/0093854807301555

Batastini, A. B., King, C. M., Morgan, R. D., & McDaniel, B. (2016). Telepsychological services with criminal justice and substance abusing clients: A systematic review and meta-analysis. *Psychological Services, 13,* 20–30.

Batastini, A. B., McDonald, B., & Morgan, R. D. (2013). Videoteleconferencing in forensic and correctional practice. In K. Myers & C. Turvey (Eds.), *Telemental health: Clinical, technological, and administrative foundations of evidence-based practice* (pp. 251–271). Waltham, MA: Elsevier. http://dx.doi.org/10.1016/B978-0-12-416048-4.00013-0

Batastini, A. B., Morgan, R. D., Kroner, D. G., & Mills, J. F. (2014). *Escaping the cage: A mental health treatment program for inmates detained in restrictive housing.* Unpublished manual.

Beaven, G. (2005). Offenders with mental illnesses in maximum and supermaximum security settings. In S. L. Charles & J. B. Gerbasi (Eds.), *Handbook of correctional mental health* (pp. 209–228). Arlington, VA: American Psychiatric Publishing, Inc.

Bishop, J. E., O'Reilly, R. L., Maddox, K., & Hutchinson, L. J. (2002). Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *Journal of Telemedicine and Telecare, 8,* 217–221. http://dx.doi.org/10.1258/135763302320272185

Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatric Services, 51,* 1305–1307. http://dx.doi.org/10.1176/appi.ps.51.10.1305

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112,* 155–159. http://dx.doi.org/10.1037/0033-2909.112.1.155

Cortina, J. M., & Folger, R. G. (1998). When is it acceptable to accept a null hypothesis: No way, Jose? *Organizational Research Methods, 1,* 334–350. http://dx.doi.org/10.1177/109442819813004

Davison, S., & Taylor, P. J. (2001). Psychological distress and severity of personality disorder symptomology in prisoners convicted of violent and sexual offences. *Psychology, Crime & Law, 7,* 263–273. http://dx.doi.org/10.1080/10683160108401797

Derogatis, L. R. (1994). *Symptom checklist-90-R (SCL90-R): Administration, scoring, and procedures manual* (3rd ed.). Minneapolis, MN: National Computer Systems.

Fine, S., & Wingrove, J. (2014, December 16). Retired Supreme Court justice Arbour slams practice of solitary confinement. *The Globe and Mail.* Retrieved from http://www.theglobeandmail.com

Frick, R. W. (1995). Accepting the null hypothesis. *Memory & Cognition, 23,* 132–138. http://dx.doi.org/10.3758/BF03210562

Frueh, B. C., Henderson, S., & Myrick, H. (2005). Telehealth service delivery for persons with alcoholism. *Journal of Telemedicine and Telecare, 11,* 372–375.

Frueh, B. C., Monnier, J., Yim, E., Grubaugh, A. L., Hamner, M. B., & Knapp, R. G. (2007). A randomized trial of telepsychiatry for posttraumatic stress disorder. *Journal of Telemedicine and Telecare, 13,* 142–147. http://dx.doi.org/10.1258/135763307780677604

Gendreau, P., & Goggin, C. (2013). Practicing psychology in correctional settings. In I. B. Weiner & R. K. Otto (Eds.), *Handbook of forensic psychology* (4th ed., pp. 759–794). Hoboken, NJ: John Wiley & Sons, Inc.

Gingerich, S., & Mueser, K. (2005). *Coping skills group: A session-by-session guide* (1st ed.). Plainview, NY: Wellness Reproductions and Publishing, Inc.

Greene, C. J., Morland, L. A., Macdonald, A., Frueh, B. C., Grubbs, K. M., & Rosen, C. S. (2010). How does tele-mental health affect group therapy process? Secondary analysis of a noninferiority trial. *Journal of Consulting and Clinical Psychology, 78,* 746–750. http://dx.doi.org/10.1037/a0020158

Horvath, A. O., & Greenberg, L. S. (1989). Development and validation of the Working Alliance Inventory. *Journal of Counseling Psychology, 36,* 223–233. http://dx.doi.org/10.1037/0022-0167.36.2.223

Jaykaran, Saxena, D., Yadav, P., & Kantharia, N. D. (2011). Nonsignificant P values cannot prove null hypothesis: Absence of evidence is not evidence of absence. *Journal of Pharmacy and Bioallied Sciences, 3,* 465–466. http://dx.doi.org/10.4103/0975-7406.84470

Kaba, F., Lewis, A., Glowa-Kollisch, S., Hadler, J., Lee, D., Alper, H., . . . Venters, H. (2014). Solitary confinement and risk of self-harm among jail inmates. *American Journal of Public Health, 104,* 442–447. http://dx.doi.org/10.2105/AJPH.2013.301742

King, R. D. (1999). The rise and rise of supermax. *Punishment and Society, 1,* 163–186. http://dx.doi.org/10.1177/14624749922227766

Kluger, A. N., & Tikochinsky, J. (2001). The error of accepting the "theoretical" null hypothesis: The rise, fall, and resurrection of commonsense hypotheses in psychology. *Psychological Bulletin, 127,* 408–423.

Larsen, D. L., Attkisson, C. C., Hargreaves, W. A., & Nguyen, T. D. (1979). Assessment of client/patient satisfaction: Development of a general scale. *Evaluation and Program Planning, 2,* 197–207. http://dx.doi.org/10.1016/0149-7189(79)90094-6

Lexcen, F. J., Hawk, G. L., Herrick, S., & Blank, M. B. (2006). Use of video conferencing for psychiatric and forensic evaluations. *Psychiatric Services, 57,* 713–715. http://dx.doi.org/10.1176/ps.2006.57.5.713

Magaletta, P. R., Fagan, T. J., & Peyrot, M. F. (2000). Telehealth in the federal bureau of prisons: Inmates' perceptions. *Professional Psychology: Research and Practice, 31,* 497–502. http://dx.doi.org/10.1037/0735-7028.31.5.497

Mandracchia, J. T., & Morgan, R. D. (2011). Understanding criminals' thinking: Further examination of the measure of offender thinking

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

styles-revised. *Assessment, 18*, 442–452. http://dx.doi.org/10.1177/
1073191110377595

Manguno-Mire, G. M., Thompson, J. W., Jr., Shore, J. H., Croy, C. D.,
Artecona, J. F., & Pickering, J. W. (2007). The use of telemedicine to
evaluate competency to stand trial: A preliminary randomized controlled
study. *The Journal of the American Academy of Psychiatry and the Law,
35*, 481–489.

Metzner, J., & Dvoskin, J. (2006). An overview of correctional psychiatry.
*Psychiatric Clinics of North America, 29*, 761–772. http://dx.doi.org/10
.1016/j.psc.2006.04.012

Metzner, J. L., & Fellner, J. (2010). Solitary confinement and mental
illness in U.S. prisons: A challenge for medical ethics. *The Journal of the
American Academy of Psychiatry and the Law, 38*, 104–108.

Miller, T. W., Clark, J., Veltkamp, L. J., Burton, D. C., & Swope, M.
(2008). Teleconferencing model for forensic consultation, court testi-
mony, and continuing education. *Behavioral Sciences & the Law, 26*,
301–313. http://dx.doi.org/10.1002/bsl.809

Moos, R. (1986). *Group environment scale manual* (2nd ed.). Palo Alto,
CA: Consulting Psychologists Press.

Morgan, R. D., Gendreau, P., Smith, P., Gray, A., Labrecque, R. M.,
MacLean, N., . . . Mills, J. F. (2015). Quantitative syntheses on the
effects of administrative segregation on prisoners' well-being. *Psychol-
ogy, Public Policy, and Law*. Manuscript under review.

Morgan, R. D., Kroner, D. G., Mills, J. F., & Batastini, A. B. (2013).
Treating criminal offenders. In I. B. Weiner & R. K. Otto (Eds.),
*Handbook of forensic psychology*. (4th ed., pp. 795–838). Hoboken, NJ:
John Wiley & Sons, Inc.

Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use
of telemental health alter the treatment experience? Inmates' percep-
tions of telemental health versus face-to-face treatment modalities.
*Journal of Consulting and Clinical Psychology, 76*, 158–162. http://
dx.doi.org/10.1037/0022-006X.76.1.158

Morland, L. A., Hynes, A. K., Mackintosh, M. A., Resick, P. A., & Chard,
K. M. (2011). Group cognitive processing therapy delivered to veterans
via telehealth: A pilot cohort. *Journal of Traumatic Stress, 24*, 465–469.
http://dx.doi.org/10.1002/jts.20661

Mueser, K. T., Corrigan, P. W., Hilton, D. W., Tanzman, B., Schaub, A.,
Gingerich, S., . . . Herz, M. I. (2002). Illness management and recovery:
A review of the research. *Psychiatric Services, 53*, 1272–1284. http://
dx.doi.org/10.1176/appi.ps.53.10.1272

National Institute of Justice. (2002, May). *Implementing telemedicine in
correctional facilities*. Retrieved February 2, 2011 from www.ncjrs.gov/
pdffiles1/nij/190310.pdf

Nelson, E. L., Zaylor, C., & Cook, D. (2004). A comparison of psychiatrist
evaluation and patient symptom report in a jail telepsychiatry clinic.
*Telemedicine and e-Health, 10*, S-54–S-59. http://dx.doi.org/10
.1089/tmj.2004.10.S-54

Nguyen, T. D., Attkisson, C. C., & Stegner, B. L. (1983). Assessment of
patient satisfaction: Development and refinement of a service evaluation

questionnaire. *Evaluation and Program Planning, 6*, 299–313. http://dx
.doi.org/10.1016/0149-7189(83)90010-1

Norcross, J. C., Pfund, R. A., & Prochaska, J. O. (2013). Psychotherapy in
2022: A Delphi poll on its future. *Professional Psychology: Research
and Practice, 44*, 363–370. http://dx.doi.org/10.1037/a0034633

O'Keefe, M. (2008). Administrative segregation from within: A correc-
tions perspective. *The Prison Journal, 88*, 123–143. http://dx.doi.org/10
.1177/0032885507310999

Rosenbaum, A., Gearan, P. J., & Ondovic, C. (2002). Completion and
recidivism among court- and self-referred batterers in a psychoeduca-
tional group treatment program: Implications for intervention and public
policy. *Journal of Aggression, Maltreatment, & Trauma, 5*, 199–220.
http://dx.doi.org/10.1300/J146v05n02_12

Sánchez, H. G. (2013). Suicide prevention in administrative segregation
units: What is missing? *Journal of Correctional Health Care, 19*, 93–
100. http://dx.doi.org/10.1177/1078345812474638

Silverstein v. Federal Bureau of Prisons, No. 12–1450 (10th Cir. March 22,
2014).

Stephan, J. J. (2008). *Census of state and federal correctional facilities,
2005* (NCJ 222182). Retrieved from http://www.bjs.gov/content/pub/
pdf/csfcf05.pdf

Stevens, J. (1996). *Applied multivariate statistics for the social sciences*
(3rd ed.). Mahwah, NJ: Erlbaum, Inc.

Tabachnick, B. G., & Fidell, L. S. (2007). *Using multivariate statistics* (5th
ed.). Boston, MA: Pearson Education, Inc.

Walters, G. D. (1995). The psychological inventory of criminal thinking
styles (PICTS), Part I: Reliability and preliminary validity. *Criminal
Justice and Behavior, 22*, 307–325. http://dx.doi.org/10.1177/
0093854895022003008

Walters, G. D. (2013). *The psychological inventory of criminal thinking
styles (PICTS), user's manual*. Allentown, PA: Center for Lifestyle
Studies.

Wilson, P. A., Hansen, N. B., Tarakeshwar, N., Neufeld, S., Kochman, A.,
& Sikkema, K. J. (2008). Scale development of a measure to assess
community-based and clinical intervention group environments. *Journal
of Community Psychology, 36*, 271–288. http://dx.doi.org/10.1002/jcop
.20193

Wolff, N., Huening, J., Shi, J., Frueh, C. B., Hoover, D. R., & McHugo, G.
(2015). Implementation and effectiveness of integrated trauma and ad-
diction treatment for incarcerated men. *Journal of Anxiety Disorders, 30*,
66–80. http://dx.doi.org/10.1016/j.janxdis.2014.10.009

Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a
prison telepsychiatry clinic. *Journal of Telemedicine and Telecare, 7*,
47–49. http://dx.doi.org/10.1177/1357633X010070S119

Received September 18, 2015
Revision received January 14, 2016
Accepted January 20, 2016 ■

*Article*



*International Social Work*
2023, Vol. 66(2) 298–312
© The Author(s) 2021



Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/0020872820980833
journals.sagepub.com/home/isw



# Considerations for integrating technology into social work practice: A content analysis of nine professional social work associations' Codes of Ethics

## Katheryn Margaret Pascoe [iD]
Ulster University, UK

## Abstract

This article provides an overview of key ethical considerations for the adoption of technology in social work practice. A content analysis was conducted across nine professional social work associations' Codes of Ethics. Although considered key reference documents to guide safe practice, this research found limited and varied coverage of technology and focused predominantly on social media use. In an increasingly Internet-based and technology-driven world, social workers must resist reactionary responses to rapid technological developments. Consulting multiple sources is vital to assess the advantages and limitations of technology use, and to mitigate risks to service users, their families, fellow practitioners and the profession.

## Keywords

Codes of Ethics, Internet, professional competence, social media, social work, technology

## Introduction

In the last decade, there has been a significant growth of digital technologies, with an increased reliance on the Internet and mobile devices for communication, entertainment, information and practical tasks. Technology has also crept into social work, often without conscious decision or critical reflection (Mishna et al., 2012, 2014). In response to demand for clear policies, procedures and training for technology use, this article provides an overview of key ethical considerations when integrating technology into social work practice by combining the key messages in recent literature and a content analysis of nine professional social work Codes of Ethics. Previous studies have focused on individual countries, predominantly the United States; however, this study provides an international insight by assessing the level of guidance offered across multiple Codes, extending the framework of ethical considerations. With significant variability and limited direction offered in individual Codes, actively consulting multiple resources for guidance on the

**Corresponding author:**

Katheryn Margaret Pascoe, School of Applied Social and Policy Sciences, Ulster University, Shore Road, Newtownabby BT37 0QB, UK.
Email: Pascoe-km@ulster.ac.uk

integration of technology is vital. Decisions to adopt technology should be deliberate, well-informed and conscious acts, and the social work profession must remain critical and reflective to ensure safe and ethical practice.

## Background

There are many benefits offered with the use of technology in social work practice. Extending options for service delivery, online platforms, video conferences and telephone calls are just a few tools that enable professionals to engage with harder-to-reach or less mobile populations and provide supports to under-serviced regions (see Brownlee et al., 2010; Bryant et al., 2018; Harris and Birnbaum, 2015; Richardson et al., 2009; Rummell and Joyce, 2010; Simpson et al., 2005). Online services, video conferences or telephone calls can encourage a sense of safety for clients, giving them more control over their environment and how they wish to engage, while a sense of protection or anonymity may influence service users to be more open and relaxed (Callahan and Inckle, 2012; Rummell and Joyce, 2010; Simpson et al., 2005). In a literature review of videoconference tele-mental-health services, consistently high levels of user satisfaction were reported, with equivalent efficiency when compared with face-to-face services (Richardson et al., 2009). In addition, asynchronous communication, such as using emails alongside face-to-face service provision, can enable an environment of self-expression and reflection, helping clients to clarify their thoughts and meanings in preparation for their sessions (Mattison, 2012). Email can also support the development of a therapeutic relationship by contributing to positive perceptions of support (Mattison, 2012). However, despite the emerging opportunities and benefits that information and communication technology (ICT) present, social workers have called for clearer direction and policies to keep practitioners and service users safe, while managing the ethical concerns, risks and challenges that arise with its use (Coner et al., 2020; Kirwan and McGuckin, 2014; Mattison, 2012; Mishna et al., 2014, 2012; Reamer, 2013).

In the field of social work, literature has been published on the ethical considerations raised with the use of ICT, focused predominantly on the provision of online services such as e-counselling (see Groshong and Phillips, 2015; Harris and Birnbaum, 2015; Reamer, 2013; Rummell and Joyce, 2010). A summary of key ethical considerations and practical steps advised in the literature follows.

### Confidentiality and privacy

Social workers cannot guarantee confidentiality when communicating with clients online, but practical steps can be taken to improve cyber security, including software and Internet site encryption, password-protected computers and accounts, and installing firewall software (Harris and Birnbaum, 2015; Mattison, 2012; Reamer, 2013, 2017; Rummell and Joyce, 2010). Upon highlighting the risks to confidentiality and privacy, Groshong and Phillips (2015: 146) compare sending emails over open severs to 'sending a postcard in regular mail', highlighting how information can be easily compromised. This article advocates for encryption of emails and educating clients about risks to privacy and confidentiality when harnessing ICT. The ethical responsibility is placed on the social worker to mitigate such risks and to discuss limitations with clients, including protection of their own privacy and confidentiality online (Mattison, 2012; Reamer, 2013). Decisions to communicate electronically or mediated by technology should be discussed with service users and mutually agreed upon.

### Informed consent

Informed consent is required before engaging in services and is applicable whether delivered online, face to face, or enhanced by technological adjuncts. This can become an ethical dilemma

for online services, as the identity and capabilities of the service user is not always accurately represented, can be difficult to confirm, and the question of parental consent for minors must be considered (Reamer, 2013, 2017). In addition, clients may access services while under the influence of alcohol or other drugs, making them temporarily unable to provide informed consent (Reamer, 2017). Informed consent should include a discussion of the benefits of and limitations to services provided online or mediated with technology, parameters of confidentiality, potential technology issues, what to do in the event of an emergency, expected response times, and what is appropriate to discuss via email and text messages outside of scheduled appointments (Mishna et al., 2012; Reamer, 2013, 2017; Rummell and Joyce, 2010).

### Professional boundaries and dual relationships

Communication technology can also impact professional boundaries. Communication through email, social media sites and text messaging can be perceived by the client as informal and personal rather than professional, blurring practice boundaries and influencing dual relationships (Boddy and Dominelli, 2017; Mattison, 2012; Reamer, 2017). Managing boundaries and expectations should be discussed in the process of informed consent. However, if appropriate boundaries cannot be maintained with clients, is it more responsible to avoid engaging with technology to safeguard the professional helping relationship (Groshong and Phillips, 2015)?

### Social media and electronic searching

The rise of social media and the Internet has created an intersection of the private and public life, with information published online available to past, present and future service users, providing personal details that may not ordinarily be disclosed within the helping relationship (Boddy and Dominelli, 2017; Groshong and Phillips, 2015; Mishna et al., 2012; Reamer, 2017). Because online information can be publicly available, social workers should remain critical about how their online presence could impact engagement with clients, and take steps to protect their own privacy. This is reinforced by Byrnes et al. (2019), wherein focus groups with newly qualified social workers and teachers discussed how clients can harness the Internet and social media to seek out personal details about their social workers/teachers. Similarly, social workers conducting online searches and social media surveillance of clients to inform decisions on intervention and service provision have been observed (Coner et al., 2020). This practice raises ethical concerns, questioning a client's right to privacy and querying the accuracy of information sourced (Coner et al., 2020). Finally, the use of social media can distort professional boundaries if connected to personal accounts (Boddy and Dominelli, 2017), and the refusal of social-networking requests can be interpreted as personal rejection by service users (Reamer, 2017). Although there may be demand from clients, management or funders to engage online, these concerns must be managed to mitigate any risks to clients and practitioners.

### Professional competency

Continued professional development (CPD) is essential in order to achieve high practice standards (Irish Association of Social Workers [IASW], 2007) and is pertinent to the introduction of all forms of intervention, including the integration of technological adjuncts. Literature recommends practitioners only integrate technology if they have appropriate training and remain familiar with rapidly changing practices and online contexts to ensure competency and safety (Reamer, 2013, 2017; Rummell and Joyce, 2010). Mattison (2012) suggests that, as a condition of licence renewal,

regulators should require practitioners to evidence CPD that has addressed the risks, benefits and safeguards of using digital communications in practice. This suggestion could be expanded to include updated training on technology use to ensure continued skill development.

### Licensing regulations and practice jurisdictions

With online service provision, practising within the parameters of social work regulations and licensing is questioned. Clients could reside anywhere, including states and countries that differ from the practitioner's region of registration. With the increased ability to misrepresent oneself online or withhold information, a true location may not be disclosed. Licensing restrictions, laws, regulations and liability coverage vary across professional bodies, regions and countries, and a detailed coverage is beyond the scope of this article; however, it is important to be familiar with those relevant to your locale (see Groshong and Phillips, 2015; Harris and Birnbaum, 2015; Reamer, 2013; Rummell and Joyce, 2010). Focused predominantly on the United States and Canada, there remains a dearth of research investigating the implications at a global level or across regions with political and/or economic unions.

### Safety and anonymity

Within the context of online, text or phone-based social services, the professional duty of care must be considered. For example, if personal online connections are made with past clients, what is the professional duty of care when observing changes in online behaviour outside of the formal helping relationship (Boddy and Dominelli, 2017)? There is an ethical obligation to report people who present as a danger to themselves or others, such as disclosing child abuse, suicidal ideation or homicidal intent, but this is not easily managed when anonymity is offered or where personal data are not verified for service access (Callahan and Inckle, 2012; Rummell and Joyce, 2010). Reamer (2013) questions how a service or social worker can navigate safety concerns when someone 'disappears' online and stops engaging, while Harris and Birnbaum (2015) critique anonymity as a barrier to making appropriate referrals and ensuring the best care is received. Furthermore, when communication is mediated by technology, a reduction in verbal and non-verbal cues can impact the accuracy of assessments and intervention (Harris and Birnbaum, 2015). These risks to client safety require careful consideration when harnessing technology in practice; does the professional duty of care change when services are not delivered face to face?

### Digital divide

Despite the growing role of technology in society, not everyone has the same level of skill and knowledge, and technology cannot be utilised equally with all service users (Bryant et al., 2018; Garrett, 2005; Harris and Birnbaum, 2015). Digital skills can be considered life skills, yet socio-economic factors, language, gender, age and education all impact access to technology and skill development (Bryant et al., 2018). A narrative of digital natives has arisen which assumes that all young people are inherently capable with innate digital skills due to their experiences growing up in an era dominated by technical and digital developments (Wilson and Grant, 2017). This narrative, however, is not reflective of reality. Having access to digital tools and technology does not guarantee adequate knowledge for safe and effective use, and many young people still require additional support to improve their technical and digital skills (Wilson and Grant, 2017). The decision to adopt any form of technological enhancements in service delivery should be negotiated between the social worker and client, and reasonable options must be provided (Harris and

Birnbaum, 2015). Assuming capabilities, access to necessary tools and adequate knowledge can act to exclude and marginalise people seeking support rather than empower them.

## Data management

Maintaining records is a core element of social service provision, including assessments, intervention plans and follow-up reports. When integrating technological adjuncts to practice, consideration must be given to how interactions such as phone calls, text messages or social media engagements will be accurately recorded and who has access, while adhering to data protection laws (Reamer, 2017). Such ethical concerns are also relevant to the use of large information systems which enable greater sharing of data across services, with the potential to impinge on individual rights to privacy (Garrett, 2005).

In the United Kingdom, ethical standards have been introduced with the Data Protection Act 2018 (United Kingdom Government, 2018) which established clear rules for managing personal data. The following six principles are enforceable under the law:

Personal data must be

used for specified, explicit purposes
used fairly, lawfully and transparently
used in a way that is adequate, relevant and limited to only what is necessary
accurate and, where necessary, kept up to date
kept for no longer than is necessary
handled in a way that ensures appropriate security, including protection against unlawful or unauthorised processing, access, loss, destruction or damage.

However, not all countries have similar laws or enforceable standards. Social workers should continue to question the purpose of data collection, storage and use. Informed by experience and relationships with clients, social workers are well placed to make suggestions regarding best practice in data management.

## Predictive algorithms

Although addressed in literature as a stand-alone topic, the adoption of algorithms for decision making in social services has raised several ethical concerns. Applied in order to model risk in child protection and determine eligibility for resources including social welfare and housing, algorithmic decision making has been harnessed to standardise practice and reduce the role of discretion (Eubanks, 2018). While computerised decision making is perceived to be objective in applying rules equally to all applicants, the power and biases built into the systems are overlooked (Eubanks, 2018; Keddell, 2019).

The use of predictive algorithms in social work practices threatens a client's right to be treated as an individual. Calculations are informed by group characteristics and general trends, not specific circumstances. These trends lack accuracy, failing to draw upon a representative sample of society, often harnessing incomplete data sets which over-sample the poor (Eubanks, 2018; Keddell, 2019). In addition, the right to actively participate in decision making is undermined, as algorithmic calculations are often complex and not understood by the service user or social worker (Eubanks, 2018; Keddell, 2019). Finally, linking personal data from multiple sources can jeopardise the right to informed consent if service users are not made aware of the use of their data or are unable to remove their data from the system (Keddell, 2019). Despite assumed objectivity, predictive algorithms are not value free and an automation of decisions in child protection and resource eligibility can reinforce

inequalities and threaten service users' rights. As the implementation of predictive algorithms increases, social workers must advocate for client rights to informed consent over the use of personal data, participation in decision making and the ability to be treated fairly as individuals.

## Methodology: Content analysis of professional Codes of Ethics

Focus groups and interviews with practising social workers have demonstrated a demand for clear and consistent policies and further training to inform the use of technology in a safe and ethical manner (Coner et al., 2020; Kirwan and McGuckin, 2014; Mishna et al., 2012; Social Care Institute for Excellence, 2019). However, professional social work associations have varied in their response to the growing presence of technology in practice. Previous studies have focused on individual countries and have not drawn comparisons across contexts. This work seeks to address such a gap by providing an international comparison, extending the framework of ethical considerations when adopting technology in social work practice.

Social work ethics have evolved significantly since professionalisation in the late 19th century, with formal codes emerging in the 1960s in western countries, including the United Kingdom, Australia and Canada (Reamer, 2017). While the enforceability differs depending on regulatory standards and membership, a Code of Ethics outlines the values, responsibilities and principles of a profession, and acts as a point of reference to guide ethical decision making in practice (Australian Association of Social Workers [AASW], 2010; IASW, 2007). Code compliance is typically required to gain membership to professional social work associations (Reamer, 2017) and is used for holding social workers to account, often consulted during investigations into conduct (AASW, 2010). To assess the level of guidance and consistency offered by professional bodies, a process of content analysis was conducted across nine social work associations' Codes of Ethics during November 2019–January 2020 (see Table 1). This was prior to the peak of a global pandemic in 2020, and early research has evidenced increasing ethical challenges in response to the growing need for technology in remote service delivery (Banks et al., 2020). While it is expected that Codes, practice guidelines and training will be revised in light of Covid-19, the content analysis presented below provides an overview of ethical considerations on the use of technology prior to any reviews.

Content analysis is a widely accepted research method for analysing text-based data through a systematic process of coding to identify themes or patterns (Hsieh and Shannon, 2005; Silverman, 2020). Codes can represent explicit or inferred messages and are clearly defined before connections between codes are assessed. Following deductive principles, an initial coding scheme was informed by the ethical considerations stated in literature, previously outlined in this article (Flick, 2018; Hsieh and Shannon, 2005). Operational definitions for each code were developed from the literature. Bias in the initial coding was mitigated by identifying all text with a direct link to the search terms (see Table 2). Extracts that did not align with the initial codes were analysed to determine whether they constituted a new code or sub-code. The initial codes were then revised and redefined in response to the data analysis. Codes were ranked in order of frequency to determine dominant themes. This process was combined with a quantitative approach to assess manifest content and explore term frequency (Hsieh and Shannon, 2005).

As summarised in Table 1, the content analysis included Codes from the Aotearoa New Zealand Association of Social Workers (ANZASW), Australian Association of Social Workers (AASW), American National Association of Social Workers (NASW), British Association of Social Workers (BASW), Canadian Association of Social Workers (CASW), Irish Association of Social Workers (IASW), National Association for Professional Social Workers of India (NAPSWI) and the Singapore Association of Social Workers (SASW). These associations were chosen to represent a range of contexts within the limitations of text produced in English and with free online access.

**Table 1.** Summary of documents consulted, and the inclusion of ethical principles for the use of technology in practice.

| Association | Acronym | Document consulted and date of publication | Explicit inclusion of ethical principles for the use of technology in practice | Approximate word count excluding title page, content page, acknowledgements, reference list and appendices |
|---|---|---|---|---|
| Aotearoa New Zealand Association of Social Workers | ANZASW | *Code of Ethics/Ko te Tauaki Tikanga* (2019) | Yes | 2400 |
| Australian Association of Social Workers | AASW | *Code of Ethics* (2010) | Yes | 11,600 |
| British Association of Social Workers | BASW | *Code of Ethics* (2014) | No | 3600 |
| Canadian Association of Social Workers | CASW | *Code of Ethics* (2005) | No | 3500 |
| Irish Association of Social Workers | IASW | *Code of Ethics* (2007). | No | 1100 |
| International Federation of Social Workers | IFSW | *Global social work statement of ethical principles* (2018) | Yes | 1400 |
| National Association for Professional Social Workers of India | NAPSWI | *Code of ethics for professional social workers in India* (2015). | Yes | 10,700 |
| National Association of Social Workers (United States) | NASW | *Code of Ethics* (2017). | Yes | 9200 |
| Singapore Association of Social Workers | SASW | *Code of Professional Ethics (3rd Revision)* (2017). | Yes | 3100 |

*Pascoe*

**Table 2.** Frequency of terms searched across all nine documents.

| Term searched | ANZASW | AASW | BASW | CASW | IASW | IFSW | NASW | NAPSWI | SASW | Total term frequency |
|---|---|---|---|---|---|---|---|---|---|---|
| Digital | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 5 |
| Online | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 6 |
| Social media | 3 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 2 | 10 |
| Technology | 1 | 0 | 0 | 0 | 0 | 4 | 20 | 0 | 3 | 28 |
| ICT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Internet | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 3 | 1 | 6 |
| Email or e-mail | 0 | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 5 |
| Computer | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 |
| Social network(ing site) | 0 | 3 | 0 | 0 | 0 | 0 | 4 | 0 | 2 | 9 |

The United Kingdom, Canada and the United States cover large areas that present diversity in culture and population across territories, regions and states. The BASW has branches for England, Northern Ireland, Scotland and Wales. Similarly, the CASW acts as a confederation with nine provincial and territorial partner organisations, and the NASW has 55 chapters across the United States. It should be acknowledged, however, that the Codes of Ethics included in this study are not a representative sample of professional associations and overwhelmingly represent societies with a western or colonial influence and history. Further comparative studies should be conducted to include a greater range of associations, recognise indigenous social work practice and address diverse cultural contexts.

A ninth document, the 'Global Social Work Statement of Ethical Principles' by the International Federation of Social Workers (IFSW, 2018) was included. As the global body for social work professionals, all eight associations are members, and the IFSW also represents professional social work associations from across Africa, the Caribbean, Latin America, Asia, the Pacific and Europe. The IFSW does not have a specific Code of Ethics, but the statement of ethical principles holds a similar role in informing practice decisions.

## Findings

An initial text search was conducted to detect any explicit mention of technology in social work. Terms included *digital*, *online*, *social media*, *technology*, *ICT*, *Internet*, *email* and *computer*, and are summarised in Table 2. The term *social network(ing) site* was later included as a synonym for social media, as it was used interchangeably. When combined, *social media* and *social network(ing) site* was the second most frequent term. This was notable in the content analysis wherein social media was a dominant theme. *Technology* was the most frequent term, favoured by the IFSW, SASW and NASW. Interestingly, as a common acronym for information and communication technology, *ICT* was not used in the documents, but the full term was captured under the *technology* word search.

As seen in Table 1, three documents (BASW, CASW, IASW) retrieved no hits. This was confirmed with a full reading of the Codes, which found no evidence of direct or indirect referencing to technology in social work practice. Although the BASW (2014) and CASW (2005) Codes of Ethics have no mention of technology, a separate policy focused on social media use was identified for both associations (BASW, 2018; CASW, 2014).

The NASW (2017) offered the most comprehensive coverage of technology in their Code of Ethics, providing specific steps to reduce associated risks and navigate ethical dilemmas. However, others mentioned technology only briefly. The ANZASW notes that the use of digital technology and social media 'may pose threats to a range of our ethical obligations' (2019: 11), but fails to indicate relevant ethical obligations, what risks might present or how to minimise them. The AASW (2010) aligns the use of technology, including online platforms, telephones and computers, with remote and rural service delivery, a reflection of the geographical make-up of the country. This classification, however, risks undermining the applicability of such considerations to technology use in urban or suburban contexts. Engaging with information management software, emails, telephone calls or Internet-based resources is not restricted to rural or remote practice and is used alongside face-to-face practice or adopted in response to client preferences; therefore, applicability across contexts should not be overlooked (Mattison, 2012; Mishna et al., 2012).

In the NAPSWI (2015) Code of Ethics, technology was only recognised in the context of social work education, stating an obligation to ensure adequate infrastructure and equipment for distance, mixed-mode or Internet-based social work education to facilitate programme objectives. The principle of CPD and responsibility to contribute to the training and education of students and colleagues are present across the nine documents, yet the NAPSWI was the only Code to make a

direct link between the use of technology and the delivery of social work education. With the development of mobile applications for expanding social work knowledge and training (see Campbell and McColgan, 2016; Turner et al., 2020) and the evolution of web-based content revolutionising opportunities for gaining formal social work qualifications by distance (Shorkey and Uebel, 2014), the author expects a growing recognition in ethical standards for online education. While it is noted that some associations have additional practice standards that include social work education, these are not referred to in the Codes of Ethics, even in instances where sections were dedicated to education and training.

In total, seven themes were identified in the content analysis, each of which is presented in turn.

## Social media

Social media use was the most common theme evident across the Codes of Ethics. Five of the nine documents recognised risks to social workers, clients, the community and/or the professional body when using social media and social networking sites. Threats to confidentiality, professional boundaries and reputation were highlighted, with recommendations to establish separate online accounts for communicating with service users. The intersection of the private and public life through social media is recognised, with Codes stating social workers should be aware of both professional engagements online and personal social media use and how this may affect their reputation and ability to work effectively with clients (NASW, 2017; SASW, 2017):

Social workers, not their clients or former clients, are responsible for setting and maintaining clear and appropriate professional boundaries in all forms of communication, including face to face contact, written communication, telephone and online communications (including social networking, email, blogging and instant messaging). (AASW, 2010: 22)

Social workers shall take reasonable steps to prevent clients' access to their personal social networking sites to avoid boundary confusion and inappropriate dual relationships. Steps may include the setting up of a separate social media site or website to communicate with clients. (SASW, 2017: 5)

Digital technology and social media may pose threats to the practice of many ethical standards. (IFSW, 2018)

We commit to representing the profession of social work, our colleagues, our Association and our employers fairly, accurately and respectfully in all public and social media. (ANZASW, 2019: 13)

## Electronic searching

Although discussed in conjunction with the use of social media in previous studies (Byrnes et al., 2019; Coner et al., 2020), using the Internet to seek information on clients has gained significantly less attention in the Codes consulted. Social media use addressed the representation of social workers and keeping personal data safe, but failed to question or offer guidance on the use of Internet search engines or social media surveillance to gain information on service users. Addressed only by the NASW, Internet searching standards require social workers to be transparent and only use the Internet to source information in essential situations:

(p) Social workers should develop and inform clients about their policies, consistent with prevailing social work ethical standards, on the use of electronic technology, including Internet-based search engines, to gather information about clients.

(q) Social workers should avoid searching or gathering client information electronically unless there are compelling professional reasons, and when appropriate, with the client's informed consent. (NASW, 2017)

The NASW (2017), however, does not address the practice of monitoring client social media accounts. When compared with literature (Byrnes et al., 2019; Coner et al., 2020), this inconsistency raises the following question: How do perceptions of Internet searching for personal information on service users differ from the surveillance of social media in social work practice? Even in instances where social workers were resistant to the use of social media to gain information on their clients, they were faced with dilemmas of being 'drawn in' to consulting Facebook by third parties, including managers (Coner et al., 2020). This is an emerging area of research and practice; however, an exclusion from Codes raises ethical dilemmas. As social media increases in our day-to-day lives, infringement of clients' rights to informed consent and privacy is predicted to grow.

### Professional boundaries and dual relationships

The risk of electronic communication being perceived as informal and blurring the professional/personal boundaries is recognised in three Codes. As quoted above, the AASW (2010) places responsibility on the social worker to maintain clear boundaries across all forms of engagement and communication, including telephones, email and Skype. Both the AASW (2010) and NASW (2017) add to existing literature by specifically prohibiting sexualised conduct with clients, client's relatives and their close connections, through any form of electronic expressions including social media, email or text messaging. Professional boundaries were closely linked to the use of social media, with two documents recommending social workers decline personal social media requests due to the risks of boundary confusion, inappropriate dual relationships, and potential harm to clients (NASW, 2017; SASW, 2017). The SASW (2017), however, suggests social media can be used in practice, recommending separate personal and work-related social media accounts in order to maintain boundaries.

### Cyber security and confidentiality

The importance of cyber security and the added risks to confidentiality were addressed in four Codes (AASW, IFSW, NASW, SASW). Practical steps to mitigate risks were detailed, including passwords, encryption, anti-virus software and firewalls to safeguard against unauthorised access. The SASW (2017: 5) states it is the social worker's role to 'inform clients on the potential risks and adverse consequences associated with the disclosure of confidential information on the internet, and on social media, text messaging, and video conferencing sites and applications'. These Codes reiterate concerns raised in literature around confidentiality and data management, inquiring as to who has access to personal data and what the level of security is over stored files and online communications (Garrett, 2005; Groshong and Phillips, 2015; Mattison, 2012; Reamer, 2013; Rummell and Joyce, 2010). Unlike the storage of paper files in locked cabinets, the behaviours and choices of service users have a direct impact on the security of information communicated through technology, and steps must be taken to educate them on cyber security. Combined with the growth in cloud-based storage and development of mobile applications to support intervention (e.g. Schlosser et al., 2018), the considerations for data protection are increasingly complex.

### Professional competency

Although competency and CPD are noted in each Code, competence with technology was only evidenced in the more recently updated documents. Reflecting the messages in literature (Reamer, 2013, 2017; Rummell and Joyce, 2010), three Codes highlight the importance of developing adequate knowledge and skills before adopting technology in practice, with ongoing training in technological advancements necessary in order to maintain professional and safe services:

We commit to obtaining the necessary knowledge and skills for the proper and respectful use of digital technology and social media. (ANZASW, 2019: 11)

. . . must obtain the necessary knowledge and skills to guard against unethical practice when using technology. (IFSW, 2018)

1.04 (d) Social workers who use technology in the provision of social work services should ensure that they have the necessary knowledge and skills to provide such services in a competent manner. This includes an understanding of the special communication challenges when using technology and the ability to implement strategies to address these challenges. (NASW, 2017)

### Digital divide

Although a digital divide is discussed in literature (Bryant et al., 2018; Wilson and Grant, 2017), only one Code recognises the need to consider a client's technological skills. The NASW (2017) endorses critical reflection for social workers to be aware of the intellectual, emotional and physical capabilities of clients to both use technology and understand the associated benefits, risks and limitations. This standard highlights the importance of assessing the client's willingness or ability to engage with technology and to discuss alternative methods for service delivery rather than adopting a standardised approach.

### Licensing regulations and practice jurisdictions

The NASW is the only Code that addresses the potential for laws to differ across jurisdictions. The Code states practitioners must be aware of, and comply with, the regulations that govern practice in both the social worker's and client's location. However, other professional bodies, including the AASW, BASW and CASW, operate in a context where legislation can differ depending on states, territories or devolved government structures. Although overlooked in the Codes and in literature outside of the United States and Canada, social workers have a professional and ethical responsibility to practice in accordance with relevant laws and must be aware of different regulations when services mediated by technology absolve the restrictions of physical location.

## Discussion

Of the Codes consulted, none addressed the use of predictive algorithms in decision making. As a developing area of research and tools being introduced to social services, greater attention is needed to ensure that the rights of service users are protected. With social workers' engagement with clients and first-hand knowledge of service delivery and systems, they should be active stakeholders and can harness a collective professional identity to influence reviews and evaluations of existing and developing algorithmic tools. As research in the area of predictive algorithms develops, the voices of social workers and service users must be heard.

As seen in Table 1, the Codes range in length from approximately 1140 words (IASW, 2007) to more than 10,000 (AASW, 2010; NAPSWI, 2015); however, document length is not a definitive indicator for comprehensive inclusion of technological considerations. In approximately 1400 words, the IFSW (2018) addressed the use of technology and social media, recognised cyber security and stated the importance of CPD for competent use of technology. Despite being of comparable length, the IASW (2007) fails to incorporate any mention of technology. Furthermore, the CASW (2005) offers no explicit guidance on technology in 3500 words, yet the SASW (2017) offers guidance for risks to confidentiality and managing professional boundaries with the use of social media within a shorter document. These contradictions evidenced an inability to predict the inclusion of technology based on word length.

The processes for updating national and international professional documents can be time-consuming, restricting the ability to respond in a timely manner to dynamic work environments and societal changes. Yet the dates of publication indicate a developing trend. The three Codes with no reference to technological developments were published between 2005 and 2014, whereas the most comprehensive guidance with specific technology sections were offered by more recently updated publications (IFSW, 2018; NASW, 2017). This difference suggests the timing of reviews has relevance to the inclusion of technology, with content reflecting social and contextual factors relevant to the time. Informed by front-line practice, social workers are well placed to make suggestions regarding best practice in technology adoption and data management, and the development of policies and review of Codes should actively seek their insights. Further research, however, is required in order to better understand the variance across Codes and the factors shaping professional associations' responses to technology in social work.

Ethical dilemmas and standards are constantly evolving in response to professional, individual and societal changes, developing practice theories and shifting models of service delivery; therefore, Codes of Ethics must remain living documents. Codes will continue to have limitations and cannot account for every possible outcome in practice as social work is not prescriptive. Responsiveness to diversity is necessary and guidelines must offer this flexibility. While clear policies support competence and ethical decision making, the values, responsibilities and principles underlining a Code of Ethics are transferable across practice contexts; therefore, even when technology use is not explicitly stated, principles such as informed consent, empowerment, safety, confidentiality and professional boundaries remain applicable. It was only the IFSW (2018) that highlighted the relevance of principles regardless of the mode of services delivery, yet this notion should be considered across all of the Codes consulted. Because a Code of Ethics is a key document to guide practice, in order to counteract limitations future reviews should incorporate references to other practice standards and resources such as the AASW (2010), which provides an appendix for relevant national legislation, declarations and treaties.

## Conclusion

With significant variation across Codes and, with the exception of the NASW (2017), limited guidance offered in each, this overview concludes that social workers cannot rely on their professional association's Code of Ethics alone. Social workers should actively seek guidance through multiple sources, including published studies, additional association guidelines such as social media policies, national legislation, sister associations, and professional supervision. These resources are vital to support reflexive practice that continues to question day-to-day actions and whether risks have been sufficiently considered, managed or mitigated to ensure safe and ethical practice when adopting technology.

### Declaration of conflicting interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship and/or publication of this article.

### Funding

The author(s) disclosed receipt of the following financial support for the research, authorship and/or publication of this article: This work was supported by the University of Ulster and the Doctoral Training Alliance as a recipient of the Marie Sklodowska-Curie PhD Fellowship Programme. This project has received funding from the European Union's Horizon 2020 research and innovation programme under grant agreement No. 801604.

### ORCID iD

Katheryn Margaret Pascoe  https://orcid.org/0000-0001-7135-5552

## References

Aotearoa New Zealand Association of Social Workers (ANZASW) (2019) 'Code of Ethics/Ko Te Tauaki Tikanga'. Available online at: https://anzasw.nz/wp-content/uploads/Code-of-Ethics-Adopted-30-Aug-2019.pdf

Australian Association of Social Workers (AASW) (2010) 'Code of Ethics'. Available online at: https://www.aasw.asn.au/document/item/1201 (accessed 19 October 2020).

Banks, S., R. Cai, E. Jonge, J. Shears, M. Shum, A. Sobocan, K. Strom, R. Truell, J. Uriz and M. Weinberg (2020) 'Ethical Challenges for Social Workers during Covid-19: A Global Perspective', Rheinfelden, Switzerland: International Federation of Social Workers'. Available online at: https://www.ifsw.org/wp-content/uploads/2020/07/2020-06-30-Ethical-Challenges-Covid19-FINAL.pdf (accessed 19 October 2020).

Boddy, J. and L. Dominelli (2017) 'Social Media and Social Work: The Challenges of a New Ethical Space', *Australian Social Work* 70(2): 172–84.

British Association of Social Workers (BASW) (2014) 'Code of Ethics: The Code of Ethics for Social Work'.Available online at: https://www.basw.co.uk/about-basw/code-ethics

British Association of Social Workers (BASW) (2018) 'BASW's Social Media Policy'. Available online at: https://www.basw.co.uk/resources/basws-social-media-policy

Brownlee, K., J. Graham, E. Doucette, N. Hotson and G. Halverson (2010) 'Have Communication Technologies Influenced Rural Social Work Practice?', *British Journal of Social Work Practice* 10(2): 622–37.

Bryant, L., B. Graham, D. Tedmason and S. Diamandi (2018) 'Tele-Social Work and Mental Health in Rural and Remote Communities in Australia', *International Social Work* 61(1): 143–55.

Byrnes, J., G. Kirwan and C. McGuckin (2019) 'Social Media Surveillance in Social Work: Practice Realities and Ethical Implications', *Journal of Technology in Human Services* 37(2–3): 142–58.

Callahan, C. and K. Inckle (2012) 'Cyber Therapy or Psychobabble? A Mixed Methods Study of Online Emotional Support', *British Journal of Guidance and Counselling* 40(3): 261–78.

Campbell, A. and M. McColgan (2016) 'Making Social Work Education App'ier: The Process of Developing Information-Based Apps for Social Work Education and Practice', *Social Work Education* 35(3): 297–309.

Canadian Association of Social Workers (CASW) (2005) 'Code of Ethics 2005'. Available online at: https://www.casw-acts.ca/en/what-social-work/casw-code-ethics/code-ethics (accessed 19 October 2020).

Canadian Association of Social Workers (CASW) (2014) 'Social Media Use and Social Work Practice'. Available online at: https://www.casw-acts.ca/sites/casw-acts.ca/files/documents/social_media_use_and_social_work_practice.pdf (accessed 19 October 2020).

Coner, T., L. Beddoe, H. Ferguson and E. Joy (2020) 'The Use of Facebook in Social Work Practice with Children and Families: Exploring Complexity in an Emerging Practice', *Journal of Technology in Human Services* 38(2): 137–58.

Eubanks, V. (2018) *Automating Inequality: How High-Tech Tools Profile, Police and Punish the Poor*. Manhattan, NY: St. Martin's Press.

Flick, U. (2018) *An Introduction to Qualitative Research*, 6th edn. London: SAGE.

Garrett, P. (2005) 'Social Work's "Electronic Turn": Notes on the Development of Information and Communication Technologies in Social Work with Children and Families', *Critical Social Policy* 25(4): 529–53.

Groshong, L. and D. Phillips (2015) 'The Impact of Electronic Communication on Confidentiality in Clinical Social Work Practice', *Clinical Social Work Journal* 43: 142–50.

Harris, B. and R. Birnbaum (2015) 'Ethical and Legal Implications on the Use of Technology in Counselling', *Clinical Social Work Journal* 43: 133–41.

Hsieh, H. and S. Shannon (2005) 'Three Approaches to Qualitative Content Analysis', *Qualitative Health Research* 15(9): 1277–88.

International Federation of Social Workers (IFSW) (2018) 'Global Social Work Statement of Ethical Principles'. Available online at: https://www.ifsw.org/global-social-work-statement-of-ethical-principles/ (accessed 19 October 2020).

Irish Association of Social Workers (IASW) (2007) 'Irish Association of Social Workers' Code of Ethics'. Available online at: https://www.iasw.ie/download/6/8b37e75a-26f6-4d94-9313-f61a86785414.PDF (accessed 19 October 2020).

Keddell, E. (2019) 'Algorithmic Justice in Child Protection: Statistical Fairness, Social Justice and the Implications for Practice', *Social Sciences* 8(10): 1–22.

Kirwan, G. and C. McGuckin (2014) 'Digital Natives or Digitally Naive? E-Professionalism and Ethical Dilemmas among Newly Graduated Teachers and Social Workers in Ireland', *Journal of Technology in Human Services* 31(1–2): 119–32.

Mattison, M. (2012) 'Therapeutic Email as a Direct Practice Methodology', *Social Work* 57(3): 249–58.

Mishna, F., M. Bogo, J. Root and S. Fantus (2014) 'Here to Stay: Cyber Communication as a Complement to Social Work Practice', *Families in Society: The Journal of Contemporary Social Services* 95(3): 179–86.

Mishna, F., M. Bogo, J. Root, J. Sawyer and M. Khoury-Kassabri (2012) 'It Just Crept In: The Digital Age and Implications for Social Work Practice', *Clinical Social Work Journal* 43: 277–86.

National Association for Professional Social Workers of India (NAPSWI) (2015) 'Code of Ethics for Professional Social Workers in India'. Available online at: https://www.napswi.org/pdf/NAPSWI_Code_of_Ethics).pdf (accessed 19 October 2020).

National Association of Social Workers (NASW) (2017) 'Read the Code of Ethics'. Available online at: https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English (accessed 19 October 2020).

Reamer, F. (2013) 'Social Work in a Digital Age: Ethical and Risk Management Challenges', *Social Work* 58(2): 163–72.

Reamer, F. (2017) 'Evolving Ethical Standards in the Digital Age', *Australian Social Work* 70(2): 148–59.

Richardson, L., C. Frueh, A. Grubaugh, R. Johnson, L. Egede and J. Elhai (2009) 'Current Directions in Videoconferencing Tele-Mental Health Research', *Clinical Psychology: Science and Practice* 16(3): 323–38.

Rummell, C. and N. Joyce (2010) 'So Wat Do U Want to Wrk on 2day? The Ethical Implications of Online Counselling', *Ethics and Behaviour* 20(6): 482–96.

Schlosser, D., T. Campellone, B. Truong, K. Etter, S. Vergani, K. Komaiko and S. Vinogradov (2018) 'Efficacy of PRIME, a Mobile App Intervention Designed to Improve Motivation in Young People with Schizophrenia', *Schizophrenia Bulletin* 44(5): 1010–20.

Shorkey, C. and M. Uebel (2014) 'History and Development of Instructional Technology and Media in Social Work Education', *Journal of Social Work Education* 50: 247–61.

Silverman, D. (2020) *Interpreting Qualitative Data*, 6th edn. London: SAGE.

Simpson, S., L. Bell, J. Know and D. Mitchell (2005) 'Therapy via Video Conferencing: A Route to Client Empowerment?', *Clinical Psychology and Psychotherapy* 12: 156–65.

Singapore Association of Social Workers (SASW) (2017) 'Singapore Association of Social Workers Code of Professional Ethics (3rd Rev.)'. Available online at: https://www.sasw.org.sg/docs/SASW%20Code%20of%20Professional%20Ethics%20-%203rd%20Revision%20(online).pdf (accessed 19 October 2020).

Social Care Institute for Excellence (2019) 'Digital Capabilities for Social Workers: Stakeholders' Report'. Available online at: https://www.scie.org.uk/social-work/digital-capabilities/stakeholders (accessed 19 October 2020).

Turner, D., M. Landmann and D. Kirkland (2020) 'Making Ideas "app"-En: The Creation and Evolution of a Digital Mobile Resource to Teach Social Work Interviewing Skills', *Social Work Education* 39(2): 188–99.

United Kingdom Government (2018) 'Data Protection'. Available online at: https://www.gov.uk/data-protection (accessed 19 October 2020).

Wilson, G. and A. Grant (2017) '#NotWithoutMe: A Digital World for All? Findings from a Programme of Digital Inclusion for Vulnerable Young People across the UK', *Carnegie UK Trust*. Available online at: https://www.carnegieuktrust.org.uk/publications/digitalworld/ (accessed 19 October 2020).

## Author biography

Katheryn Margaret Pascoe is a current PhD researcher at the University of Ulster, having worked and studied in New Zealand and the United Kingdom.

**NIH Public Access**
**Author Manuscript**
*Clin Psychol (New York)*. Author manuscript; available in PMC 2010 September 1.

Published in final edited form as:
*Clin Psychol (New York)*. 2009 September 1; 16(3): 323–338. doi:10.1111/j.1468-2850.2009.01170.x.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# Current Directions in Videoconferencing Tele-Mental Health Research

**Lisa K. Richardson, M.App.Psy.**[1], **B. Christopher Frueh, Ph.D.**[2], **Anouk L. Grubaugh, Ph.D.**[3,4], **Leonard Egede M.D., M.S.**[3,4], and **Jon D. Elhai, Ph.D.**[5]

[1] Murdoch University, Perth, WA., Australia

[2] The Menninger Clinic and Baylor College of Medicine, Houston TX

[3] Ralph H. Johnson Veterans Affairs Medical Center, Charleston, SC, USA

[4] Medical University of South Carolina, Charleston, SC, USA

[5] University of South Dakota, Vermillion, SD, USA

## Abstract

The provision of mental health services via videoconferencing tele-mental health has become an increasingly routine component of mental health service delivery throughout the world. Emphasizing the research literature since 2003, we examine: 1) the extent to which the field of tele-mental health has advanced the research agenda previously suggested; and 2) implications for tele-mental health care delivery for special clinical populations. Previous findings have demonstrated that tele-mental health services are satisfactory to patients, improve outcomes, and are probably cost effective. In the very small number of randomized controlled studies that have been conducted to date, tele-mental health has demonstrated equivalent efficacy compared to face-to-face care in a variety of clinical settings and with specific patient populations. However, methodologically flawed or limited research studies are the norm, and thus the research agenda for tele-mental health has not been fully maximized. Implications for future research and practice are discussed.

## Keywords

telepsychiatry; telepsychology; tele-mental health; videoconferencing; mental health care; service delivery; rural; access-to-care

As a service delivery medium, tele-mental health using videoconferencing technology holds promise as a viable means of delivering high quality mental health services to settings with significant access-to-care barriers (Frueh, Deitsch, Santos et al., 2000; Frueh, Monnier, Elhai, Grubaugh, & Knapp, 2004; McGinty, Saeed, Simmons, & Yildirim, 2006; Monnier, Knapp, & Frueh, 2003; Schopp, Demiris, & Glueckauf, 2006). Tele-mental health can be delivered via a range of technologies including telephone, internet and email, virtual reality simulators, and videoconferencing. However, the multi-sensory output and real-time quality of videoconferencing make it an attractive alternative to other technologies which access a narrower range of sensory modalities when assessing or intervening in mental health settings.

As suggested by the many novel program demonstrations reported in the tele-health literature generally, and the significant investment in tele-mental health infrastructure by large

Correspondence: B. Christopher Frueh, Ph.D., Professor of Psychology, University of Hawaiʻi at Hilo, 200 West Kawili Street, Hilo, Hawaiʻi, 96720, USA. frueh@hawaii.edu.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

government agencies such as the Veterans Affairs (VA) administration in the US (Godleski, Nieves, Darkins, & Lehmann, 2008), it appears that the use of tele-mental health via videoconferencing has been widely embraced as a cost-efficient and effective service—particularly for those facing access-to-care barriers (Antonacci, Bloch, Saeed et al., 2008; McGinty et al., 2006; Norman, 2006; Shore & Manson, 2005). Research on videoconference tele-mental health has grown to reflect the attractiveness of this mode of service delivery, which takes a variety of forms including direct patient intervention and psychotherapy, assessment and evaluation, medication management, case management, supportive counseling, psycho-education, and professional supervision and training, as well as administrative and managerial tasks (see Glueckauf & Ketterson, 2004; Godleski et al., 2008).

From an initial review of 68 peer reviewed journal articles in the period 1970–2000 (Frueh et al., 2000), there were 63 new published reports three years later (Monnier et al., 2003), and 148 new publications from April 2003 to July 2008. This review is focused on the application of tele-mental health via videoconferencing to deliver patient interventions (as opposed to training or administrative activities via this modality), and the measurement of various outcomes from those interventions. Additionally, we briefly review recent findings regarding the application of tele-mental health to special populations for whom this medium may offer particular benefits. As we have completed two reviews of the tele-mental health literature previously (i.e., Frueh et al., 2000; Monnier et al., 2003) this paper will predominantly draw on peer reviewed literature from April 2003 to July 2008. Because technology advances have occurred rapidly in the past five years, studies conducted since 2003 are using much more sophisticated, faster, and cheaper technology than prior studies.

We examined MEDLINE, PsycINFO, and Telemedicine Information Exchange (TIE) databases for literature on telepsychiatry. The search encompassed the period April 2003 (the end date of our previous reviews) to July 2008. The following terms were used independently in this search: telepsychiatry, telepsychology, tele-mental health, videoconferencing, and video conferencing. Articles resulting from the search of "video conferencing" and "videoconferencing" that were unrelated to mental health practice were not reviewed. Non-reviewed articles from these searches focused on telemedicine that incorporated non-psychological or psychiatric disciplines (e.g., radiography, neurology). Both positive and negative outcome reports were identified in the literature, thereby limiting the likely influence of publication bias. Only articles published in peer-reviewed scientific journals were included. The lack of consistency in the terminology used in the tele-mental health literature remains an unresolved challenge (see Antonacci et al., 2008), and arguably, no single term adequately captures the nuances of the various related service delivery formats. For ease of comprehension, the term "tele-mental health" will be used in this review to describe only videoconferencing in mental health, which is typically referred to as telepsychiatry, telepsychology, and behavioral telehealth elsewhere. This review is not intended to be exhaustive of all information technology service delivery mediums and does not include telephone, email, or web-based mental health services.

## What we already knew about videoconferencing tele-mental health

The research base for tele-mental health-related interventions is a slightly more than 50 years old and a number of prior reviews are available (e.g., Frueh et al., 2000; Hilty, Liu, Marks, & Callahan, 2003; Hilty, Marks, Urness, Yellowlees, & Nesbitt, 2004; Hyler & Gangure, 2003; Monnier et al., 2003; Norman, 2006) though they predate a major proportion of the total research conducted on this topic, including most clinical trials. Prior to 2003, the tele-mental health literature largely consisted of novel applications and case studies, and based on the above reviews provide the following:

1.  Strong evidence for high patient and moderately-high provider satisfaction for a range of tele-mental health services;

2.  Strong evidence for the reliability of clinical assessments (neuropsychological testing, clinical interviews, mental status exams) relative to face-to-face assessments;

3.  Minimal evidence supporting the effectiveness of tele-mental health to treat specific mental health diagnoses such as depression and anxiety disorders using well established treatments;

4.  Minimal evidence and anecdotal reports suggesting that unique qualities of tele-mental health may enhance treatment outcomes for certain populations;

5.  Minimal evidence and anecdotal reports suggesting comparable effectiveness of tele-mental health for specific populations, including incarcerated patients, children and adolescents, rural populations, and older adults, particularly as a compensatory approach to service gaps in real world practice settings.

The weaknesses previously identified in the research literature include a paucity of methodologically rigorous efficacy, effectiveness, and cost studies, and lack of research into the legal, ethical and regulatory issues inherent in this application of technology to clinical practice (Antonacci et al., 2008; Frueh et al., 2000; Glueckauf & Ketterson, 2004; Hilty et al., 2003; Hyler, Gangure, & Batchelder, 2005; Kuulasmaa, Wahlberg, & Kuusimäki, 2004; Monnier et al., 2003; Norman, 2006; Pesämaa, Ebeling, Kuusimäki et al., 2004; Urness, Hailey, Delday, Callanan, & Orlick, 2004; Wootton, 2006). Very few tele-mental health studies include randomized, controlled designs. Further, the field has under-utilized standardized clinical outcome measures, instead emphasizing satisfaction as a primary outcome domain (Antonacci et al., 2008; Myers, Valentine, & Melzer, 2008), even when psychometric properties of satisfaction measures were unknown or questionable (see Mair & Whitten, 2000, for review). If tele-mental health was still considered within a framework of developmental research, such methodological shortcomings would be expected; however sufficient evidence now exists to advance the field to randomized, controlled studies of outcome, process, and cost variables.

## Clinical Research: 2003–2008

### Clinical Outcomes

**Novel Applications & Program Descriptions—**The bulk of published reports on tele-mental health since 2003 fall into the category of novel clinical demonstrations and program descriptions. Tele-mental health service or program descriptions have been published from around the world, although such reports from under-developed nations are rare. These service or program descriptions include reports in the areas of: child and adolescent mental health service delivery (Browne, Reilly, & Bradley, 2006; Nelson, Barnard & Cain, 2003, 2006; Ryan, Stathis, Smith, Best, & Wootton, 2005; Savin, Garry, Zuccaro, & Novins, 2006; Staller, 2006); family therapy (Bischoff, Hollist, Smith, & Flack, 2004; Hill, Brown, Diebold et al., 2004; Keilman, 2005; Kuulasmaa et al., 2004); mental health services for the deaf (Austen & McGrath, 2006b; Lopez, Cruz, Lazarus et al., 2004); substance use (Frueh, Henderson, & Myrick, 2005); cognitive-behavior therapy (CBT) for mood and anxiety disorders (Griffiths, Blignault, & Yellowlees, 2006; Himle, Fischer, Muroff et al., 2006); cancer patients with adjustment disorder (Cluver, Schuyler, Frueh, Brescia, & Arana, 2005; Shepherd, Goldstein, Whitford et al., 2006); mental health practitioner training and supervision (Ekblad, Manicavasagar, Silove et al., 2004; Fahey, Day, & Gelber, 2003; Heckner & Giard, 2005; Hilty, Alverson, Alpert et al., 2006; Meyer, Hamel-Lambert, Tice et al., 2005; Walter, Rosenquist, & Bawtinhimer, 2004); psychiatric consultation-liaison services (Hilty, Yellowlees, Cobb et al., 2006; Hockey, Yellowlees, & Murphy, 2004); deployed military personnel (Grady & Melcer, 2005; Hill et al., 2004; Neufeld, Yellowlees, Hilty, Cobb, &

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Bourgeois, 2007); and diagnosis/assessment (Hildebrand, Chow, Williams, Nelson, & Wass, 2004; Kobak, 2004; Shore, Hilty, & Yellowlees, 2007).

Recent reports build on earlier research that focused on the application of tele-mental health to determine the reliability of psychiatric interviews and assessments (e.g., Baer, Cukor, Jenike et al., 1995; Ruskin, Reed, Kumar et al., 1998; Zarate, Weinstock, Cukor et al., 1997), its utility as a consultation, educational, and professional supervision tool (e.g., Clark, 1997; Hilty, Servis, Nesbitt, & Hales, 1999) and other case studies (e.g., Cowain, 2001; Glueckauf, Fritz, Ecklund-Johnson et al., 2002; Mitchell, Myers, Swan-Kremeier, & Wonderlich, 2003). Outcome findings common to recent program descriptions include: high patient satisfaction; moderate to high clinician satisfaction; and positive clinical outcomes, albeit typically in the form of qualitative anecdotal evidence (Bischoff et al., 2004; Griffiths et al., 2006; Kuulasmaa et al., 2004). A recent study also demonstrated that both rural and urban primary care patients were generally receptive to using medical and tele-mental health interventions via videoconferencing if offered; and they did not believe that videoconferencing technology would be overly sophisticated or complicated (Grubaugh, Cain, Elhai, Patrick, & Frueh, 2008). This same study found that rural patients in particular expressed a willingness to use telepsychiatry if it improved their access to services they would not otherwise receive.

The diversity of the novel applications described above highlights the increasingly ubiquitous and creative use of videoconferencing in mental health, but also demonstrates its greatest weakness. That is, most of these reports are non-randomized and statistically underpowered with regard to sample size. Interestingly, there are several tele-mental health services that have now been operating for close to ten years or more (e.g., Appal-Link, South Australia's Rural & Remote Mental Health Service, University of Arizona, University of California-Davis, University of Michigan, University of Nebraska-Lincoln), so more robust quantitative indicators of the success or failure of large scale programs may soon be available.

**Clinical Trials**—In general, outcomes across clinical trials have been positive. However, only a handful of randomized, controlled studies of tele-mental health clinical outcomes have been published (De Las Cuevas, Arredondo, Cabrera, Sulzenbacher, & Meise, 2006; Frueh, Monnier, Yim et al., 2007; Fortney, Pyne, Edlund et al., 2007; O'Reilly, Bishop, Maddox et al., 2007; Poon, Hui, Dai, Kwok, & Woo, 2005; Ruskin, Silver-Aylaian, Kling et al., 2004). These studies have all randomized participants to receive either tele-mental health or face-to-face services, but differ significantly in terms of sample size, intervention approach, and outcome measures. The methodological shortcomings of these studies include: inadequate power due to small sample size (Frueh, Monnier, Yim et al., 2007; Poon et al., 2005), mixed diagnostic subject pools (De Las Cuevas et al., 2006; Fortney et al., 2007; O'Reilly et al., 2007), mixed or non-standardized interventions that are difficult to replicate (O'Reilly et al., 2007; Ruskin et al., 2004), relatively small clinical within-group change between delivery conditions (O'Reilly et al., 2007), and as noted by others (Antonacci et al., 2008; Greene, Morland, Durkalski, & Frueh, in press) flawed conceptual and methodological approaches.

Some of the clinical studies described above have randomly assigned participants to receive "treatment as usual" (TAU) via videoconferencing or face-to-face. These TAU packages have included components of supportive counseling, psychoeducation, and medication delivered to depressed veterans ($\underline{n}$ = 119; Ruskin et al., 2004) or a combination of CBT with medication delivered to adult psychiatric outpatients ($\underline{n}$ = 140; De Las Cuevas et al., 2006). In each of these studies, both intervention conditions yielded comparable outcomes, with few between-groups differences in symptom severity, treatment adherence, retention, or satisfaction. Participants in the videoconferencing conditions of these studies also reported high satisfaction with the medium and a rapid and strong development of therapeutic alliance (Ruskin et al., 2004). Although these larger tele-mental health efficacy studies controlled for provider and evaluator

effects and used standardized assessments, the interventions delivered were generally brief in duration (20–30 minutes), non-manualized, and difficult to replicate given their focus on site-specific patients and their needs.

The largest ($\underline{n}$ = 495) randomized controlled study thus far compared tele-mental health to face-to-face TAU clinical psychiatric services delivered to distant communities in Canada (O'Reilly et al., 2007). TAU consisted of a clinical assessment by a psychiatrist and up to 4 monthly follow-up sessions, including some combination of medication management, psycho-education, supportive counseling, and/or triage services. The two forms of service delivery were compared on self-report clinical outcomes, satisfaction, and post-intake psychiatric admissions over 12-months. On all measures of clinical outcome, tele-mental health was comparable to face-to-face service delivery, with both groups reporting clinically and socially relevant levels of reduced symptomatic distress and improved mental health (i.e., a reduction from diagnostic caseness and reduced number of psychiatric hospitalizations). Participants also reported moderate levels of satisfaction with the medium. In the cost analysis, the average cost of tele-mental health was 10% less per patient, and 16% less per visit, than the cost of face-to-face treatment when travel and reimbursement expenses for psychiatrists were taken into account. Overall, this study concluded that a brief tele-mental health intervention provided a more cost-effective clinical service with no loss of efficacy compared to traditional face-to-face care. However, the authors noted that while the brief tele-mental health intervention was as successful as TAU, they would not draw similar conclusions about equivalency with regard to more complex psychotherapies that they viewed as "more dependent on the therapist-patient relationship" (p. 842).

Smaller controlled trials of tele-mental health have used CBT to treat a variety of conditions, including adults with panic disorder and agoraphobia (Bouchard, Paquin, Payeur et al., 2004), combat veterans with posttraumatic stress disorder (Frueh, Monnier, Yim et al., 2007), and children with depression (Nelson et al., 2003; Nelson et al., 2006). CBT may be particularly well suited to tele-mental health in that it is focused on learning principles, is often time limited, and may not be as dependent on the therapeutic relationship than other insight oriented or experiential therapies, thereby reducing the potential impact of technological interference with therapeutic alliance (Bouchard et al., 2004). Results suggest that CBT delivered via videoconferencing is at least as effective as CBT delivered face-to face, although each of the above studies had small sample sizes (e.g., $\underline{n}$ = < 40) and therefore may have been unable to detect statistically significant differences between groups. Furthermore, as argued elsewhere (e.g., Greene et al., in press; O'Reilly et al., 2007), failure to detect a statistically significant difference in outcome does not necessarily indicate equivalence of outcome.

Results so far demonstrate that treatment delivered by videoconferencing results in no worse clinical outcomes than the same treatment delivered face-to-face. However, due to the lack of randomized clinical trials (especially for specific treatments and for specific patient populations) and the many methodological limitations in extant published studies, the evidence base to support the clinical efficacy of tele-mental health interventions remains under-developed.

## Process Outcomes & Issues

Most tele-mental health research includes indices of clinical processes such as satisfaction, therapeutic alliance, therapeutic environment, clinical context, and clinician skills (e.g., Bischoff et al., 2004; Foster & Whitworth, 2005; Frueh, Monnier, Grubaugh et al., 2007; Miller, 2003; Modai, Jabarin, Kurs et al., 2006; Rees & Stone, 2005; Shores, Ryan-Dykes, Williams et al., 2004; Singh, Arya, & Peters, 2007). The most consistently reported outcomes for tele-mental health research are satisfaction and acceptance, which are virtually always high (Browne et al., 2006; Cluver et al., 2005; De Las Cuevas, Artiles, De La Fuente, & Serrano,

NIH-PA Author Manuscript

2003; Dobscha, Corson, & Solodky, & Gerrity, 2005; Ekblad et al., 2004; Frueh et al., 2005; Greenberg, Boydell, & Volpe, 2006; Greenwood, Chamberlain, & Parker, 2004; Keilman, 2005; Krupinski, Barker, Lopez, & Weinstein, 2004; Meyer et al., 2005; Modai et al., 2006; Morgan, Patrick, & Magaletta, 2008; Morland, Frueh, Pierce, & Miyahara, 2003; Urness, Wass, Gordon, Tian, & Bulger, 2006). Patients participating in tele-mental health have specifically cited the benefits of reduced travel time, decreased lost work time, shorter wait times for services, and a greater sense of personal control over sessions (Hilty, Nesbitt, Kuenneth, Cruz, & Hales, 2007; Simpson, Bell, Knox, & Britton, 2005).

Compared to symptom reduction and cost effectiveness, satisfaction is a simple variable to measure, and it is perceived to be a necessary first step for the development of good therapist-client relationships (Rees & Haythornthwaite, 2004). However a common weakness of tele-mental health research, particularly in small studies and novel demonstrations, has been to overemphasize patient satisfaction as being the same as clinical effectiveness. Furthermore, the majority of studies examining satisfaction with tele-mental health have typically used study-specific measures of this outcome, and the psychometric properties of these instruments are largely unknown. Finally, we do not know whether patient satisfaction with tele-mental health would remain as high in the presence of alternative mental health services, or if ratings of high satisfaction are a by-product of simply being pleased to receive any service at all.

With low quality videoconferencing, the potential exists for the therapeutic alliance to be ruptured or underdeveloped in tele-mental health (Rees & Haythornthwaite, 2004; Rees & Stone, 2005; Schopp et al., 2006; Starling & Foley, 2006). However, several studies suggest that patients rate the strength and quality of the therapeutic alliance similarly in face-to-face versus videoconference service delivery regardless of intervention (Cluver et al., 2005; Morgan et al., 2008; Simpson, et al., 2005; Simpson, Knox, Mitchell et al., 2003). To date, research has yet to empirically delineate optimal technical and environmental conditions for tele-mental health consultations, although experiential-based recommendations have been proposed (Cruz, Cruz, Krupinski et al, 2004; Jones, Leonard, & Birmingham, 2006; Major, 2005; Miller, 2003; Rees & Haythornthwaite, 2004; Urness, 2003). Additionally, extant studies demonstrate that if transmissions do suffer from an "artificiality" as a consequence of bandwidth, camera resolution, color/picture, or sound distortion, this artificiality does not significantly disrupt patient satisfaction, accuracy of assessments, reliability of evaluations, or clinical outcomes for patients in a number of settings (Cruz et al., 2004; Hyler et al., 2005; Jones et al., 2006; Kennedy & Yellowlees, 2003; Sorvaniemi, Ojanen, Santamaki, 2005; Urness, 2003).

Technological illiteracy (lack of knowledge, limited exposure to technology or education about the equipment) and lack of confidence to manage problems involving technology are the main impediments patients describe in using tele-mental health (Alverson, Shannon, Sullivan et al., 2004; Shore, Savin, Novins, & Manson, 2006; Starling & Foley, 2006). However, these issues can typically be overcome with education, exposure, and early stage on-site support (Bischoff et al., 2004; Greenwood et al., 2004; Shore et al., 2006; Shore, Hilty, & Yellowlees, 2007). Generally speaking, successful tele-mental health services depend on how practitioners and patients adapt to the technology and how they incorporate it into routine use, rather than on technical issues (Kerr & Norris, 2004; Morgan et al., 2008; Sulzbacher, Vallin, & Waetzig, 2006).

In contrast to typically positive patient ratings of satisfaction associated with the use of tele-mental health services, clinicians have often reported lower expectations regarding the value of tele-mental health (Austen & McGrath, 2006a; Cruz, Krupinski, Lopez, & Weinstein, 2005; Elford, White, Bowering et al., 2000; May, Gask, Atkinson et al., 2001; Schopp, Johnstone, & Merrell, 2000; Werner, 2004; Whitten & Kuwahara, 2004). One study demonstrated that clinical psychologists report lower therapeutic alliance indices in tele-mental

health conditions when randomly assigned to evaluate face-to-face or videoconference therapy sessions (Rees & Stone, 2005). Despite initial concerns, clinicians generally report being satisfied with videoconferencing technology after using it (Austen & McGrath, 2006a; Foster & Whitworth, 2005; Grealish, Hunter, Glaze, & Potter, 2005; Ruskin et al., 2004; Starling & Foley, 2006; Whitten & Mackert, 2005; Wagnild, Leenknecht, & Zauher, 2006). Fortunately, evidence suggests that tele-mental health usually requires little to no additional clinician preparation time than a traditional consultation (Aas, 2003), and typically does not require significant modifications to adult protocols (Singh et al., 2007). Additionally, based on an examination of therapist fidelity ratings, it appears that manualized interventions can be delivered via tele-mental health in a competent and adherent manner (Frueh, Monnier, Grubaugh et al., 2007).

## Cost Outcomes

Cost data suggest that tele-mental health services demonstrate adequate cost-effectiveness, even when the assessment of success is extended beyond direct costs to include administrative, clinical, and social outcomes (Hailey, Bulger, Stayburg, & Urness, 2003; Hilty, Bourgeois, Nesbitt, & Hales, 2004; Hyler & Gangure, 2003, 2004; Kennedy, 2005). One study reported decreased costs associated with performing telepsychiatric consultations on a 384 kilobits per second (kbs) integrated services digital network (ISDN) from 2003 to 2005 (Shore, Brooks, Savin, Manson, & Libby, 2007). Psychiatrists administered the Structured Clinical Interview for DSM (SCID) to 53 non-VA affiliated American-Indian veterans and concluded that tele-mental health interviews cost $8,000 less per clinic in 2005 than in-person interviews conducted the same year. In established clinics, the cost for tele-mental health in 2003 was $1,700 more per clinic than in-person clinical interviews conducted the same year, but $12,000 less in 2005. While costs associated with personnel, travel, and equipment remained relatively stable over the study period, a nearly 2 ½ times reduction in transmission costs and three times greater frequency of use of tele-mental health technology were responsible for the greater economic efficiency of videoconferencing in the same time frame.

In a study conducted in Canada, individual patient costs for tele-mental health were lower compared to face-to-face consultations when a comparable number of patients were seen in both conditions (Persaud, Jreige, Skedgel et al., 2005). Another study compared the cost of videoconferencing with the cost of sending a patient from a remote community for suicide risk assessment (Jong, 2004). The author of this study concluded that tele-mental health assessments saved nearly $141,000 for 71 patients during 2003, while proving satisfactory to clinicians and patients alike. A report in the U.S. found that the cost of lost consultations via videoconferencing varied according to the type of consultation, number of appointments scheduled, and the baseline service level of the clinical setting (Krupinski et al., 2004). However, the cost of videoconferencing equipment and transmission since the time period of Krupinski's report (i.e., 1997–2003) has dropped considerably. This report also identified factors associated with unsuccessful consultations, such as changes in tele-health sub-specialties, personnel turnover at tele-health sites and missed or cancelled appointments by patients. More recently, data suggest that the cost-effectiveness of providing traditional face-to-face psychiatric consultations in rural areas is four times greater than the cost of tele-mental health consultations (Harley, 2006).

The use of in-home portable videophones as opposed to desk-mounted videoconference systems is yet to be fully demonstrated despite their potential to offer even greater convenience and access to consumers (Cluver et al., 2005). The average cost of plug and play videophones is likely to be prohibitive for most consumers at this time, however, as technology improves and prices for videoconferencing equipment decrease, the capacity for larger clinical services to purchase and "loan out" this technology to clients is likely to become more feasible. The

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

potential of Voice over Internet Protocol (VOIP) technology to replace closed transmission networks offers significant cost savings through the use of Internet Protocol to Internet Protocol (IP-to-IP) transmission. However, the quality of this transmission may vary and the critical issue of security and data encryption has yet to be effectively addressed in the tele-mental health literature (Miller, Burton, Hill et al., 2005).

## Ethical, Regulatory, & Legal Issues

Published reports on the ethical, legal, and regulatory issues involved in the use of tele-mental health are largely anecdotal and generally describe recommendations to address regulatory or financial barriers to service implementation. These issues include integrating technology and evidence into practice, collaboration with law enforcement, cross-state licensure or collaboration with certified personnel, standard-of-care issues (including emergency protocols, determination of roles and responsibilities of involved staff, liability for risks of abandonment or negligence in the face of equipment failure), managing reimbursement regulations and disincentives, practice behavior and treatment approaches, clinical risk management, privacy and security, and infrastructure management (Hyler & Gangure 2004; McGinty et al., 2006; Miller et al., 2005; Schopp et al., 2006; Shore, Hilty, & Yellowlees, 2007). Some patients have expressed concerns that videoconferencing technology may use insecure networks, and reduce patient privacy if equipment is situated outside of traditional clinical areas; thereby increasing the risk that tele-mental health interactions may be overheard by others. (Myers, Valentine, Morganthaler, & Melzer, 2006). The use of secure networks, encryption (Miller et al., 2005), and appropriate set-up and demonstration of the technology should allay such fears (Frueh et al., 2000; Jones et al., 2006).

Concerns regarding tele-health practitioner experience and credentialing remain, and do not yet have any legal precedent set (Hyler & Gangure, 2004; Jones et al., 2006). However, the implementation of videoconferencing appears to be confined primarily to larger mental health service organizations/networks as adjuncts to traditional services; and these organizations are typically governed by pre-existing standards of professional and ethical practice, including professional codes of conduct. So far many ethical and regulatory issues surrounding tele-mental health service delivery via videoconferencing remain unaddressed (Hyler & Gangure, 2004; Koocher, 2007), and this lack of clarity extends to other electronic means of mental health service delivery as well (see Mallen, Vogel, & Rochlen, 2005, for review of ethical considerations of online counseling). However, practice guidelines to address these shortfalls are gradually emerging (e.g., Shore, Hilty, & Yellowlees, 2007; Shore & Manson, 2004; Shore & Manson, 2005).

# Research with Special Populations: 2003–2008

## Rural and Remote Populations

Significant differences in socioeconomic status, lifestyle behaviors, and access-to-care have resulted in health disparities between rural and urban communities (Institute of Medicine, 2004). Rural populations have unique characteristics that affect conditions of tele-mental health service provision, including provider cultural awareness and "local knowledge" that influence referral and support responses, firearm ownership that affects risk assessment and emergency management, and dual relationships or boundary issues in small communities (Alverson et al., 2004; Bischoff et al., 2004; Schopp et al., 2006; Shore, Hilty, & Yellowlees, 2007). In addition, rural service providers face a number of unique challenges, including limited access to specialized training and consultation and limited options for assessment and treatment referral sources (Griffiths et al., 2006; Hilty et al., 2007; Hilty, Yellowlees, & Nesbitt, 2006). Despite these issues, research on rural populations supports the potential for tele-mental health to address the mental health disparities of isolated communities, particularly with regard to the

Richardson et al.                                                                                                      Page 9

provision of services where none are otherwise available (Bischoff et al., 2004; Greenwood et al., 2004; Myers et al., 2008; Thomas, Miller, Hartshorn, Speck, & Walker, 2005).

Active military personnel represent a unique population of remote patients who generally seek health care from military providers because they are perceived to better understand illness in the context of military life relative to civilian providers (Morland et al., 2003). However, travel to receive mental health care services from military personnel may be timely and cost prohibitive (Morland, Pierce, & Wong, 2004). A retrospective analysis of tele-mental health compared to face-to-face services for military personnel found no significant differences across conditions in prescription rates, service recommendations, tests ordered, or indices of therapeutic alliance (Grady & Melcer, 2005). Even more promising, the tele-mental health treatment condition in this study was associated with significantly better global assessment of functioning scores, compliance with medication plans, and attendance at follow-up appointments. These data offer hope that tele-mental health can address the access to care issues faced by patients and providers in rural or remote areas.

## Ethnoracial Minorities

Although the literature on tele-mental health with ethnoracial minority groups is limited, a systematic framework (based on the *DSM-IV* outline for understanding cultural issues in psychiatric treatment) has been proposed to address cultural aspects of telemental health care (Shore et al., 2006). Since 2003 only a handful of tele-mental health studies have reported on ethnoracial minorities (Krupinski et al., 2004; Nieves & Stack 2007; Vega, Pollitt, & Mays, 2007). One recent empirical study has indicated preliminary support for the diagnostic reliability of psychometric assessment tools administered via tele-mental health in an ethnically diverse sample of veterans (Shore, Savin, Orton, Beals, & Manson, 2007), while another small study conducted with Native American children and their families ($\underline{n}$ = 21) found preliminary support for the reliability of clinical assessments using tele-mental health, in addition to adequate acceptability and high satisfaction for tele-mental health services (Savin et al., 2006). Despite these promising findings, more methodologically rigorous research with various ethnic and minority groups is needed.

## Children & Adolescents

The data on tele-mental health with children and adolescents are promising, though controlled trials with this population are lacking (Alessi, 2003; Browne et al., 2006; Savin et al., 2006; Starling & Foley, 2006). A review of 27 tele-mental health studies from 1966 to 2003 found that most studies on children and tele-mental health focused on satisfaction with clinical care, which was typically rated as high, or described novel programs or care (Pesämaa et al., 2004). Only two randomized, controlled studies of tele-mental health with children and/or adolescents have been published during our period of review (Elford et al., 2000; Nelson et al., 2003; Nelson et al., 2006). Reporting twice on various outcomes of the same study, Nelson and colleagues (2003, 2006) reported positive and equivalent treatment outcomes between videoconferencing and face-to-face conditions. In their research children ($\underline{n}$ = 28) with depression were randomized to receive 8 sessions of CBT either via tele-mental health or face-to-face. They found an 82% depression remission rate which did not differ between service delivery conditions and concluded that tele-mental health studies could feasibly be designed as randomized, controlled studies, and that CBT for depression delivered to children via tele-mental health was as effective as that delivered face-to-face (Nelson et al., 2006),

In the only other randomized controlled study of tele-mental health with children, Elford et al. (2000) reported good concordance between psychiatric diagnoses and treatment recommendations delivered via tele-mental health versus face-to-face settings and high

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

satisfaction with tele-mental health from parents and child participants; however a preference for face-to-face assessments was maintained by psychiatrists.

More recent studies of children and adolescents (Greenberg et al., 2006; Myers, Sulzbacher, & Melzer, 2004; Myers et al., 2008; Myers et al., 2006; Pesämaa et al., 2004; Savin et al., 2006; Sulzbacher et al., 2006) have replicated earlier efforts to establish the acceptability or feasibility of tele-mental health for this population, yet concerns remain that this research is primarily descriptive rather than empirical (Greenberg et al., 2006). One report described a successful Australian program that has been in service for 10 years, and has provided more than 600 telepsychiatry sessions annually in clinical intervention, professional supervision, and training (Starling & Foley, 2006). Clinicians in these studies reported the need for modified tele-mental health protocols for children under the age of five, those with developmental delays, and those who are extremely impaired. These studies also suggest that it may be helpful for a local provider to be present with the parent(s) and child for the initial assessment (e.g., Savin et al., 2006).

## Older Adults

Older adults may have less experience with both interactive technology and mental healthcare use, possibly limiting their ability to benefit from tele-mental health technology. However, older adults may also be a group for whom tele-mental health can have particular advantages (i.e., by addressing transportation and mobility issues). Since 2003, studies with older adults have yielded equivalent diagnostic accuracy of dementia and cognitive functioning between face-to face and tele-mental health modes of service delivery (Cullum, Weiner, Gehrmann, & Hynan, 2006; Hildebrand et al., 2004; Poon et al., 2005; Shores et al., 2004). It has also been suggested that videoconferencing can facilitate communication with dementia patients by limiting distracting gestures or behaviors from view (Savenstedt, Zingmark, Hyden, & Brulin, 2005). Although the data on tele-mental health in older adults are growing, extant studies have been small in size (i.e., $\underline{n} < 30$) and have generally consisted of uncontrolled study designs. The study by Poon et al. (2005) was the first randomized, controlled study to compare the effectiveness of a cognitive intervention delivered via tele-mental health versus face-to-face among elderly, mildly demented, community dwelling-residents in Hong Kong ($\underline{n} = 22$). Results from this study were promising and demonstrated the suitability of using tele-mental health with cognitively impaired elderly; however the small sample size, small delay between treatment end and follow-up, and the lack of information regarding the content of the cognitive intervention limit the conclusions that can be drawn.

## Incarcerated patients

Descriptions of tele-mental health programs with incarcerated patients suggest this medium may provide increased clinician safety, cost savings, privacy, and an expanded range of services, including neuropsychological and competency assessments, diagnosis, and treatment (Brett & Blumberg, 2006; Khalifa, Saleem, & Stankard, 2007; Leonard, 2004; Lexcen, Hawk, Herrick, & Blank, 2006; Manfredi, Shupe, & Batki, 2005; Myers et al., 2006; Miller et al., 2005; Nelson, Zaylor, & Cook, 2004; Price & Sapci, 2007; Stankard & Saleem, 2007). Data also support the reliability of tele-mental health assessments in this population (Lexcen et al., 2006; Nelson et al., 2004). Once again, research with this particular special population of tele-mental health users is fraught with methodological limitations, including limited outcome evaluations, small sample sizes, and lack of controlled trials.

# Discussion and Conclusions

Since our last review (Monnier et al., 2003), high levels of satisfaction and acceptance with tele-mental health have been consistently demonstrated among patients across a variety of

clinical populations and for a broad range of services. Moreover, mental health services delivered via teleconferencing technology generally appear to be clinically superior to reduced or no mental health services at all. Nevertheless, low tele-mental health session uptake rates and service surveys suggest that many clinicians who have not used tele-mental health remain skeptical about the feasibility of this medium of care (Austen & McGrath, 2006a; Rees & Stone, 2005). Similar to concerns noted more than ten years ago (Baer, Cukor, & Coyle, 1997), inexperienced clinicians continue to believe that the artificiality of the transmission experience has the potential to negatively affect the therapist-client relationship. These beliefs remain despite the fact that process studies consistently indicate that tele-mental health sessions require minimal technical modifications on the part of the therapist, and the communication medium of videoconferencing appears to have little negative influence on clinical outcomes or satisfaction.

The clinical effectiveness of tele-mental health interventions in children, non-elderly adults, and elderly adults has been demonstrated via case studies, program evaluations, and some controlled trials. To date, however, there are few controlled efficacy and effectiveness studies and research explicitly conducted with racial minorities or people living in rural areas is minimal. Of the studies that evaluate clinical efficacy, few ensure that both the face-to-face and tele-mental health conditions are assessed in a standardized or consistent manner. Additionally, with few exceptions (e.g. Krupinski et al., 2004; Shore & Manson, 2004), these studies typically fail to address the issue of missed appointments or missing data. It has also been argued that all tele-mental health efficacy studies should assess direct and indirect costs associated with this medium of care, and include longitudinal formal cost-effectiveness, cost–benefit, cost-offset, and opportunity-cost assessments (Glueckauf & Ketterson, 2004; Hilty, Bourgeois et al., 2004). Such data are still lacking in the majority of published reports.

Although some studies have demonstrated an advantage for specific patient groups to benefit from tele-mental healthcare relative to face-to-face interventions (i.e., dementia patients, incarcerated patients, patients with eating disorders), the conditions under which the unique qualities of tele-mental health offer more to the patient than "treatment as usual" remain elusive. In general, efficacy studies have focused on general psychiatric services (Rees & Haythornthwaite, 2004) rather than the delivery of psychotherapy, and most of the psychotherapy studies reviewed have failed to use manualized or replicable interventions. Large trials targeting specific populations with specific psychiatric disorders and using uniform approaches across conditions are needed to advance the tele-mental health evidence base. Thus, the same recommendations for the field remain four years after our last review of tele-mental healthcare: There is a need for randomized trials using established efficacious treatments and participants with similar symptom and demographic profiles.

One last methodological issue concerns the conceptual framework of study designs. Mental health outcomes research usually incorporates a traditional significance testing, between-groups study design that is based on the hypothesis that one group is statistically superior to another. However, this may be conceptually inappropriate for studies of tele-mental health service delivery where the hypothesis is that the experimental intervention (tele-mental health) does not differ from the control intervention (face-to-face care) in either direction by more than a pre-specified unimportant or insignificant amount (i.e., *equivalence*); or does not differ by less than a certain amount in a one-sided test (i.e., *non-inferiority*) (Greene et al., in press). In other words, because the goal of much tele-mental health research is to demonstrate that the novel mode of service delivery is "about as good" as traditional modes of service delivery, different study designs and statistical concepts are required. Such study designs and statistical concepts are poorly understood and rarely or inadequately applied (see Greene et al., in press, for a review of concepts, issues, and practical applications).

Richardson et al. Page 12

In the past, tele-mental health research may have been inherently biased toward those providers and patients who already embraced the technology and service delivery medium (Whitten & Mackert, 2005). Studies which systematically assess users and non-users of tele-mental health could ameliorate such biases and help identify barriers to implementation. The extant literature suggests that the use of tele-mental health in routine clinical practice settings is increasing, costs associated with videoconferencing are decreasing, quality is improving, and patients appear receptive to trying tele-health interventions to address their mental health care needs. Given the growth and apparent success of tele-mental health service delivery over the past five years, it is reasonable to expect that tele-mental health will eventually demonstrate clinical outcomes for specific populations and mental health problems that are comparable to face-to-face care in randomized trials. In fact, there are currently a number of large-scale, federally-funded clinical trials under way (see http://clinicaltrials.gov). Findings from these and future studies will be all the more significant in light of the growing data to suggest that tele-mental health interventions represent a feasible and cost-effective way to improve access-to-care for underserved clinical populations, such as ethnoracial minorities and people living in rural areas.

## Acknowledgments

This work was partially supported by Australian-American Fulbright Commission Post-graduate Award to Ms. Richardson and grant MH074468 from the National Institute of Mental Health to Dr. Frueh.

## References

Aas I. Organizing for remote consultations in health care--the production process. Behaviour & Information Technology 2003;22:91–100.

Alessi NE. Quantitative documentation of the therapeutic efficacy of adolescent telepsychiatry. Telemedicine Journal and e-Health 2003;9:283–289. [PubMed: 14611696]

Alverson DC, Shannon S, Sullivan E, Prill A, Effertz G, Helitzer D, et al. Telehealth in the trenches: reporting back from the frontlines in rural America. Telemedicine Journal and e-Health 2004;10:S95–S109.

Antonacci DJ, Bloch RM, Saeed SA, Yildiram Y, Talley J. Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: Implications for forensic and correctional psychiatry. Behavioral Sciences and the Law 2008;26:253–269. [PubMed: 18548519]

Austen S, McGrath M. Attitudes to the use of videoconferencing in general and specialist psychiatric services. Journal of Telemedicine and Telecare 2006a;12:146–150. [PubMed: 16638236]

Austen S, McGrath M. Tele-mental health technology in deaf and general mental-health services: Access and use. American Annals of the Deaf 2006b;151:311–317. [PubMed: 17087441]

Baer, L.; Cukor, P.; Coyle, JT. Telepsychiatry: Application of telemedicine to psychiatry. In: Bashshur, R.; Sanders, JH.; Shannon, GW., editors. Telemedicine: Theory and Practice. Springfield, IL: Charles C Thomas; 1997. p. 265-288.

Baer L, Cukor P, Jenike MA, Leahy L, O'Laughlin J, Coyle JT. Pilot studies of telemedicine in psychiatric patients with obsessive compulsive disorder. American Journal of Psychiatry 1995;152:1383–1385. [PubMed: 7653700]

Bischoff RJ, Hollist CS, Smith CW, Flack P. Addressing the mental health needs of the rural underserved: Findings from a multiple case study of a behavioral telehealth project. Contemporary Family Therapy: An International Journal 2004;26:179–198.

Bouchard S, Paquin B, Payeur R, Allard M, Rivard V, Fournier T, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. Telemedicine Journal and e-Health 2004;10:13–25. [PubMed: 15104911]

Brett A, Blumberg L. Video-linked court liaison services: Forging new frontiers in psychiatry in Western Australia. Australasian Psychiatry 2006;14:53–56. [PubMed: 16630199]

Browne D, Reilly M, Bradley O. Telepsychiatry in a child and adolescent psychiatric service. Irish Journal of Psychological Medicine 2006;23:21–23.

Richardson et al.                                                                                                    Page 13

Clark PH. A referrer and patient evaluation of a telepsychiatry consultation-liaison service in South Australia. Journal of Telemedicine and Telecare 1997;3:12–14. [PubMed: 9218368]

Cluver JS, Schuyler D, Frueh BC, Brescia F, Arana GW. Remote psychotherapy for terminally ill cancer patients. Journal of Telemedicine and Telecare 2005;11:157–159. [PubMed: 15901444]

Cowain T. Cognitive-behavioural therapy via videoconferencing to a rural area. The Australian and New Zealand Journal of Psychiatry 2001;35:62–64. [PubMed: 11270458]

Cruz M, Cruz R, Krupinski E, Lopez A, McNeely R, Weinstein RS. Effect of camera resolution and bandwidth on facial affect recognition. Telemedicine Journal and e-Health 2004;10:392–402. [PubMed: 15650536]

Cruz M, Krupinski EA, Lopez AM, Weinstein RS. A review of the first five years of the University of Arizona telepsychiatry programme. Journal of Telemedicine and Telecare 2005;11:234–239. [PubMed: 16035965]

Cullum CM, Weiner MF, Gehrmann HR, Hynan LS. Feasibility of telecognitive assessment in dementia. Assessment 2006;13:385–390. [PubMed: 17050908]

De Las Cuevas C, Arredondo M, Cabrera M, Sulzenbacher H, Meise U. Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemedicine and e-Health 2006;12:341–350. [PubMed: 16796502]

De Las Cuevas C, Artiles J, De La Fuente J, Serrano P. Telepsychiatry in the Canary Islands: User acceptance and satisfaction. Journal of Telemedicine and Telecare 2003;9:221–224. [PubMed: 12952693]

Dobscha SK, Corson K, Solodky J, Gerrity MS. Use of videoconferencing for depression research: Enrollment, retention, and patient satisfaction. Telemedicine Journal and E-Health 2005;11:84–89. [PubMed: 15785225]

Ekblad S, Manicavasagar V, Silove D, Baarnhielm S, Reczycki M, Mollica R, et al. The use of international videoconferencing as a strategy for teaching medical students about transcultural psychiatry. Transcultural Psychiatry 2004;41:120–129. [PubMed: 15171210]

Elford R, White H, Bowering R, Ghandi A, Maddiggan B, St John K, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. Journal of Telemedicine and Telecare 2000;6:73–82. [PubMed: 10824374]

Fahey A, Day N, Gelber H. Tele-education in child mental health for rural allied health workers. Journal of Telemedicine and Telecare 2003;9:84–88. [PubMed: 12699577]

Fortney J, Pyne J, Edlund M, Williams D, Robinson D, Mittal D, et al. A randomized trial of telemedicine-based collaborative care for depression. Journal of General Internal Medicine 2007;22:1086–1093. [PubMed: 17492326]

Foster P, Whitworth J. The role of nurses in telemedicine and child abuse. Computers, Informatics, Nursing 2005;23:127–131.

Frueh BC, Deitsch SE, Santos AB, Gold PB, Johnson MR, Meisler N, et al. Procedural and methodological issues in telepsychiatry research and program development. Psychiatric Services 2000;51:1522–1527. [PubMed: 11097648]

Frueh BC, Henderson S, Myrick H. Telehealth service delivery for persons with alcoholism. Journal of Telemedicine and Telecare 2005;11:372–375. [PubMed: 16238840]

Frueh BC, Monnier J, Elhai JD, Grubaugh AL, Knapp RG. Telepsychiatry treatment outcome research methodology: Efficacy versus effectiveness. Telemedicine Journal and e-Health 2004;10:455–458. [PubMed: 15689650]

Frueh BC, Monnier J, Grubaugh AL, Elhai JD, Yim E, Knapp RG. Therapist adherence and competence with manualized cognitive-behavioral therapy for PTSD delivered via videoconferencing technology. Behavior Modification 2007;31:856–866. [PubMed: 17932240]

Frueh BC, Monnier J, Yim E, Grubaugh AL, Hamner MB, Knapp RG. A randomized trial of telepsychiatry for post-traumatic stress disorder. Journal of Telemedicine and Telecare 2007;13:142–147. [PubMed: 17519056]

Glueckauf RL, Fritz SP, Ecklund-Johnson EP, Liss HJ, Dages P, Carney P. Videoconferencing-based family counseling for rural teenagers with epilepsy: Phase 1 findings. Rehabilitation Psychology 2002;47:49–72.

Glueckauf RL, Ketterson TU. Telehealth interventions for individuals with chronic illness: Research review and implications for practice. Professional Psychology: Research and Practice 2004;35:615–627.

Godleski L, Nieves JE, Darkins A, Lehmann L. VA Telemental health: Suicide assessment. Behavioral Sciences and the Law 2008;26:271–286. [PubMed: 18548515]

Grady BJ, Melcer T. A retrospective evaluation of tele-mental healthcare services for remote military populations. Telemedicine and e-Health 2005;11:551–558. [PubMed: 16250818]

Grealish A, Hunter A, Glaze R, Potter L. Telemedicine in a child and adolescent mental health service: Participants' acceptance and utilization. Journal of Telemedicine and Telecare 2005;11:S53–55. [PubMed: 16375797]

Greenberg N, Boydell KM, Volpe T. Pediatric telepsychiatry in Ontario: Caregiver and service provider perspectives. Journal of Behavioral Health Services and Research 2006;33:105–111. [PubMed: 16636911]

Greene CJ, Morland LA, Durkalski V, Frueh BC. Noninferiority and equivalence trials: Design issues and implications for mental health research. Journal of Traumatic Stress. (in press).

Greenwood J, Chamberlain C, Parker G. Evaluation of a rural telepsychiatry service. Australasian Psychiatry 2004;12:268–272. [PubMed: 15715789]

Griffiths L, Blignault I, Yellowlees P. Telemedicine as a means of delivering cognitive behavior therapy to rural and remote mental health clients. Journal of Telemedicine and Telecare 2006;12:136–140. [PubMed: 16638234]

Grubaugh A, Cain GD, Elhai JD, Patrick SL, Frueh BC. Attitudes toward medical and mental health care delivered via telehealth applications among rural and urban primary care patients. Journal of Nervous and Mental Disease 2008;196:166–170. [PubMed: 18277227]

Hailey D, Bulger T, Stayberg S, Urness D. The reality of applying an assessment guideline to a telemedicine mental health programme. Journal of Telemedicine and Telecare 2003;9:344–349. [PubMed: 14680519]

Harley J. Economic evaluation of a tertiary telepsychiatry service to an island. Journal of Telemedicine and Telecare 2006;12:354–357. [PubMed: 17059652]

Heckner C, Giard A. A comparison of on-site and telepsychiatry supervision. Journal of the American Psychiatric Nurses Association 2005;11:35–38.

Hildebrand R, Chow H, Williams C, Nelson M, Wass P. Feasibility of neuropsychological testing of older adults via videoconferencing: Implications for assessing the capacity for independent living. Journal of Telemedicine and Telecare 2004;10:130–134. [PubMed: 15165437]

Hill JV, Brown MC, Diebold CJ, Borders MA, Staudenmeier J, Detwiler HF, et al. Behavioral health care of isolated military personnel by videoconference. Telemedicine Journal and e-Health 2004;10:369–373. [PubMed: 15650531]

Hilty DM, Alverson DC, Alpert JE, Tong L, Sagduyu K, Boland RJ, et al. Virtual reality, telemedicine, web and data processing innovations in medical and psychiatric education and clinical care. Academic Psychiatry 2006;30:528–533. [PubMed: 17139025]

Hilty DM, Bourgeois JA, Nesbitt TS, Hales RE. Cost issues with telepsychiatry in the United States. Psychiatric Bulletin 2004;28:6–8.

Hilty DM, Liu W, Marks S, Callahan EJ. The effectiveness of telepsychiatry: A review. Canadian Psychiatric AssociationBulletin 2003;35:10–17.

Hilty DM, Marks SL, Urness D, Yellowlees PM, Nesbitt TS. Clinical and educational telepsychiatry applications: A review. The Canadian Journal of Psychiatry 2004;49:12–23.

Hilty DM, Nesbitt TS, Kuenneth CA, Cruz GM, Hales RE. Rural versus suburban primary care needs, utilization, and satisfaction with telepsychiatric consultation. Journal of Rural Health 2007;23:163–165. [PubMed: 17397373]

Hilty DM, Servis ME, Nesbitt TS, Hales R. The use of telemedicine to provide consultation-liaison service to the primary care setting. Psychiatric Annals 1999;29:421–427.

Hilty DM, Yellowlees PM, Cobb HC, Bourgeois JA, Neufeld JD, Nesbitt TS, et al. Models of telepsychiatric consultation--liaison service to rural primary care. Psychosomatics 2006;47:152–157. [PubMed: 16508028]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Hilty DM, Yellowlees PM, Nesbitt TS. Evolution of telepsychiatry to rural sites: Changes over time in types of referral and in primary care providers' knowledge, skills and satisfaction. General Hospital Psychiatry 2006;28:367–373. [PubMed: 16950370]

Himle JA, Fischer DJ, Muroff JR, Van Etten ML, Lokers LM, Abelson JL, et al. Videoconferencing-based cognitive-behavioral therapy for obsessive-compulsive disorder. Behavior Research and Therapy 2006;44:1821–1829.

Hockey AD, Yellowlees PM, Murphy S. Evaluation of a pilot second-opinion child telepsychiatry service. Journal of Telemedicine and Telecare 2004;10:S48–S50.

Hyler SE, Gangure DP. A review of the costs of telepsychiatry. Psychiatric Services 2003;54:976–980. [PubMed: 12851433]

Hyler SE, Gangure DP. Legal and ethical challenges in telepsychiatry. Journal of Psychiatric Practice 2004;10:272–276. [PubMed: 15552552]

Hyler SE, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. CNS Spectrums 2005;10:403–413. [PubMed: 15858458]

Institute of Medicine. Committee on the Future of Rural Health Care. Washington, DC: National Acadamies Press; 2004. Quality through collaboration: The future of rural mental health.

Jones RM, Leonard S, Birmingham L. Setting up a telepsychiatry service. Psychiatric Bulletin 2006;30:464–467.

Jong M. Managing suicides via videoconferencing in a remote northern community in Canada. International Journal of Circumpolar Health 2004;63:422–428. [PubMed: 15709317]

Keilman P. Telepsychiatry with child welfare families referred to a family service agency. Telemedicine and e-Health 2005;11:98–101. [PubMed: 15785227]

Kennedy C, Yellowlees P. The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory. Journal of Telemedicine and Telecare 2003;9:12–16. [PubMed: 12641887]

Kennedy CA. The challenges of economic evaluations of remote technical health interventions. Clinical and Investigative Medicine 2005;28:71–74. [PubMed: 15909483]

Kerr K, Norris T. Telehealth in New Zealand: current practice and future prospects. Journal of Telemedicine and Telecare 2004;10:S60–S63.

Khalifa N, Saleem Y, Stankard P. The use of telepsychiatry within forensic practice: A literature review on the use of videolink. Journal of Forensic Psychiatry and Psychology 2007;19:2–13.

Kobak KA. A comparison of face-to-face and videoconference administration of the Hamilton Depression Rating Scale. Journal of Telemedicine and Telecare 2004;10:231–235. [PubMed: 15273034]

Koocher GP. Twenty-first century ethical challenges for psychology. American Psychologist 2007;62:375–384. [PubMed: 17638436]

Krupinski EA, Barker G, Lopez AM, Weinstein RS. An analysis of unsuccessful teleconsultations. Journal of Telemedicine and Telecare 2004;10:6–10. [PubMed: 15006208]

Kuulasmaa A, Wahlberg K, Kuusimäki M. Videoconferencing in family therapy: A review. Journal of Telemedicine and Telecare 2004;10:125–129. [PubMed: 15165436]

Leonard S. The development and evaluation of a telepsychiatry service for prisoners. Journal of Psychiatric and Mental Health Nursing 2004;11:461–468. [PubMed: 15255921]

Lexcen FJ, Hawk GL, Herrick S, Blank MB. Use of video conferencing for psychiatric and forensic evaluations. Psychiatric Services 2006;57:713–715. [PubMed: 16675769]

Lopez AM, Cruz M, Lazarus S, Webster P, Jones EG, Weinstein RS. Use of American Sign Language in telepsychiatry consultation. Telemedicine Journal and e-Health 2004;10:389–391. [PubMed: 15650535]

Mair F, Whitten P. Systematic review of studies of patient satisfaction with telemedicine. British Medical Journal 2000;320:1517–1520. [PubMed: 10834899]

Major J. Telemedicine room design. Journal of Telemedicine and Telecare 2005;11:10–14. [PubMed: 15829037]

Mallen MJ, Vogel DL, Rochlen AB. The practical aspects of online counseling: Ethics, training, technology, and competency. The Counseling Psychologist 2005;33:776–818.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Manfredi L, Shupe J, Batki SL. Rural jail telepsychiatry: A pilot feasibility study. Telemedicine and e-Health 2005;11:574–577. [PubMed: 16250821]

May C, Gask L, Atkinson T, Ellis N, Mair F, Esmail A. Resisting and promoting new technologies in clinical practice: The case of telepsychiatry. Social Science and Medicine 2001;52:1889–1901. [PubMed: 11352414]

McGinty KL, Saeed SA, Simmons SC, Yildirim Y. Telepsychiatry and e-mental health services: Potential for improving access to mental health care. Psychiatric Quarterly 2006;77:335–342. [PubMed: 16927161]

Meyer D, Hamel-Lambert J, Tice C, Safran S, Bolon D, Rose-Grippa K. Recruiting and retaining mental health professionals to rural communities: An interdisciplinary course in Appalachia. Journal of Rural Health 2005;21:86–91. [PubMed: 15667015]

Miller EA. The technical and interpersonal aspects of telemedicine: Effects on doctor-patient communication. Journal of Telemedicine and Telecare 2003;9:1–7. [PubMed: 12641885]

Miller TW, Burton DC, Hill K, Luftman G, Veltkemp LJ, Swope M. Telepsychiatry: Critical dimensions for forensic services. Journal of the American Academy of Psychiatry and the Law 2005;33:539–546. [PubMed: 16394233]

Mitchell JE, Myers T, Swan-Kremeier L, Wonderlich S. Psychotherapy for Bulimia Nervosa delivered via telemedicine. European Eating Disorders Review 2003;11:222–230.

Modai I, Jabarin M, Kurs R, Barak P, Hanan I, Kitain L. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. Telemedicine and e-Health 2006;12:515–520. [PubMed: 17042703]

Monnier J, Knapp RG, Frueh BC. Recent advances in telepsychiatry: An updated review. Psychiatric Services 2003;54:1604–1609. [PubMed: 14645799]

Morgan RD, Patrick AR, Magaletta PR. Does the use of tele-mental health alter the treatment experience? Inmates' perceptions of tele-mental health versus face-to-face treatment modalities. Journal of Consulting and Clinical Psychology 2008;76:158–162. [PubMed: 18229993]

Morland LA, Frueh BC, Pierce K, Miyahara S. PTSD and tele-mental health: Updates and future directions. National Center for PTSD Clinical Quarterly 2003;12:1–5.

Morland LA, Pierce K, Wong MY. Telemedicine and coping skills groups for Pacific Island veterans with post-traumatic stress disorder: A pilot study. Journal of Telemedicine and Telecare 2004;10:286–289. [PubMed: 15494087]

Myers KM, Sulzbacher S, Melzer SM. Telepsychiatry with children and adolescents: Are patients comparable to those evaluated in usual outpatient care? Telemedicine Journal and e-Health 2004;10:278–285. [PubMed: 15650522]

Myers KM, Valentine J, Melzer SM. Child and adolescent telepsychiatry: Utilization and satisfaction. Telemedicine and e-Health 2008;14:131–137. [PubMed: 18361702]

Myers KM, Valentine J, Morganthaler R, Melzer SM. Telepsychiatry with incarcerated youth. Journal of Adolescent Health 2006;38:643–648. [PubMed: 16730590]

Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. Telemedicine Journal and e-Health 2003;9:49–55. [PubMed: 12699607]

Nelson EL, Barnard M, Cain S. Feasibility of telemedicine intervention for childhood depression. Counselling and Psychotherapy Research 2006;6:191–195.

Nelson EL, Zaylor C, Cook D. A comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. Telemedicine Journal and e-Health 2004;10:S54–S59.

Neufeld JD, Yellowlees PM, Hilty DM, Cobb H, Bourgeois JA. The e-mental health consultation service: Providing enhanced primary-care mental health services through telemedicine. Psychosomatics 2007;48:135–141. [PubMed: 17329607]

Nieves J, Stack KM. Hispanics and telepsychiatry. Psychiatric Services 2007;58:877–878. [PubMed: 17535953]

Norman S. The use of telemedicine in psychiatry. Journal of Psychiatric and Mental Health Nursing 2006;13:771–777. [PubMed: 17087682]

O'Reilly R, Bishop J, Maddox K, Hutchinson L, Fisman M, Takhar J. Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. Psychiatric Services 2007;58:836–843. [PubMed: 17535945]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Persaud DD, Jreige S, Skedgel C, Finley J, Sargeant J, Hanlon N. An incremental cost analysis of telehealth in Nova Scotia from a societal perspective. Journal of Telemedicine and Telecare 2005;11:77–84. [PubMed: 15829051]

Pesämaa L, Ebeling H, Kuusimäki ML, Winblad I, lsohanni M, Moilanen I. Videoconferencing in child and adolescent telepsychiatry: A systematic review of the literature. Journal of Telemedicine and Telecare 2004;10:187–192. [PubMed: 15273027]

Poon P, Hui E, Dai D, Kwok T, Woo J. Cognitive intervention for community-dwelling older persons with memory problems: Telemedicine versus face-to-face treatment. International Journal of Geriatric Psychiatry 2005;20:285–286. [PubMed: 15717335]

Price J, Sapci H. Law & psychiatry: Telecourt: The use of videoconferencing for involuntary commitment hearings in academic health centers. Psychiatric Services 2007;58:17–18. [PubMed: 17215408]

Rees CS, Haythornthwaite S. Telepsychology and videoconferencing: Issues, opportunities and guidelines for psychologists. Australian Psychologist 2004;39:212–219.

Rees CS, Stone S. Therapeutic alliance in face-to-face versus videoconferenced psychotherapy. Professional Psychology: Research and Practice 2005;6:649–653.

Ruskin P, Silver-Aylaian M, Kling M, Reed S, Bradham D, Hebel J, et al. Treatment outcomes in depression: Comparison of remote treatment through telepsychiatry to in-person treatment. American Journal of Psychiatry 2004;161:1471–1476. [PubMed: 15285975]

Ruskin P, Reed S, Kumar R, Kling M, Seigel E, Rosen M, Hauser P. Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. Psychiatric Services 1998;49:1086–1088. [PubMed: 9712219]

Ryan V, Stathis S, Smith A, Best D, Wootton R. Telemedicine for rural and remote child and youth mental health services. Journal of Telemedicine and Telecare 2005;11:76–78. [PubMed: 16036003]

Savenstedt S, Zingmark K, Hyden L, Brulin C. Establishing joint attention in remote talks with the elderly about health: A study in nurses' conversations with elderly persons in teleconsultations. Scandinavian Journal of Caring Sciences 2005;19:317–324. [PubMed: 16324054]

Savin D, Garry M, Zuccaro P, Novins D. Telepsychiatry for treating rural American Indian youth. Journal of the American Academy of Child and Adolescent Psychiatry 2006;45:484–488. [PubMed: 16601654]

Schopp L, Demiris G, Glueckauf R. Rural backwaters or front-runners? Rural telehealth in the vanguard of psychology practice. Professional Psychology: Research and Practice 2006;37:165–173.

Schopp, L.; Johnstone, B.; Merrell, D. Professional Psychology: Research and Practice. Vol. 31. 2000. Telehealth and neuropsychological assessment: New opportunities for psychologists; p. 179-183.

Shepherd L, Goldstein D, Whitford H, Thewes B, Brummell V, Hicks M. The utility of videoconferencing to provide innovative delivery of psychological treatment for rural cancer patients: Results of a pilot study. Journal of Pain and Symptom Management 2006;32:453–461. [PubMed: 17085271]

Shore JH, Brooks E, Savin DM, Manson SM, Libby AM. An economic evaluation of telehealth data collection with rural populations. Psychiatric Services 2007;58:830–835. [PubMed: 17535944]

Shore JH, Hilty DM, Yellowlees PM. Emergency management guidelines for telepsychiatry. General Hospital Psychiatry 2007;29:199–206. [PubMed: 17484936]

Shore JH, Manson SM. Telepsychiatric care of American Indian veterans with post-traumatic stress disorder: Bridging gaps in geography, organizations, and culture. Telemedicine Journal and e-Health 2004;10:S64–S69.

Shore JH, Manson SM. A developmental model for rural telepsychiatry. Psychiatric Services 2005;56:976–980. [PubMed: 16088015]

Shore JH, Savin D, Novins D, Manson SM. Cultural aspects of telepsychiatry. Journal of Telemedicine and Telecare 2006;12:116–121. [PubMed: 16638232]

Shore JH, Savin D, Orton H, Beals J, Manson SM. Diagnostic reliability of telepsychiatry in American Indian veterans. American Journal of Psychiatry 2007;164:115–118. [PubMed: 17202552]

Shores MM, Ryan-Dykes P, Williams RM, Mamerto B, Sadak T, Pascualy M, et al. Identifying undiagnosed dementia in residential care veterans: Comparing telemedicine to in-person clinical examination. International Journal of Geriatric Psychiatry 2004;19:101–108. [PubMed: 14758575]

Simpson S, Bell L, Knox J, Britton P. Therapy via videoconferencing: A route to client empowerment? Clinical Psychology and Psychotherapy 2005;12:156–165.

Simpson S, Knox J, Mitchell D, Ferguson J, Brebner J, Brebner E. A multidisciplinary approach to the treatment of eating disorders via videoconferencing in north-east Scotland. Journal of Telemedicine and Telecare 2003;9:S37–S38. [PubMed: 12952717]

Singh SP, Arya D, Peters T. Accuracy of telepsychiatric assessment of new routine outpatient referrals. BMC Psychiatry 2007;7:55–68. [PubMed: 17919329]

Sorvaniemi M, Ojanen E, Santamaki O. Telepsychiatry in emergency consultations: A follow-up study of sixty patients. Telemedicine and e-Health 2005;11:439–441. [PubMed: 16149889]

Staller JA. Psychiatric nurse practitioners in rural pediatric telepsychiatry. Psychiatric Services 2006;57:138. [PubMed: 16399978]

Stankard P, Saleem Y. Forensic telepsychiatry. Psychiatric Bulletin 2007;31:155.

Starling J, Foley S. From pilot to permanent service: Ten years of pediatric telepsychiatry. Journal of Telemedicine and Telecare 2006;12:S80–S82.

Sulzbacher S, Vallin T, Waetzig EZ. Telepsychiatry improves paediatric behavioural health care in rural communities. Journal of Telemedicine and Telecare 2006;12:285–288. [PubMed: 17022835]

Thomas CR, Miller G, Hartshorn JC, Speck NC, Walker G. Telepsychiatry program for rural victims of domestic violence. Telemedicine and e-Health 2005;11:567–573. [PubMed: 16250820]

Urness D. Telepsychiatry and doctor–patient communication: A tale of two interviews. Canadian Psychiatry Society Bulletin 2003;35:21–25.

Urness D, Hailey D, Delday L, Callanan T, Orlik H. The status of telepsychiatry services in Canada: A national survey. Journal of Telemedicine and Telecare 2004;10:160–164. [PubMed: 15165442]

Urness D, Wass M, Gordon A, Tian E, Bulger T. Client acceptability and quality of life--Telepsychiatry compared to in-person consultation. Journal of Telemedicine and Telecare 2006;12:251–254. [PubMed: 16848938]

Vega WA, Pollitt A, Mays RA Jr. Reply to Hispanics and telepsychiatry. Psychiatric Services 2007;58:878. [PubMed: 17535954]

Wagnild G, Leenknecht C, Zauher J. Psychiatrists' satisfaction with telepsychiatry. Telemedicine Journal and E-Health 2006;12:546–551. [PubMed: 17042708]

Walter DA, Rosenquist PB, Bawtinhimer G. Distance learning technologies in the training of psychiatry residents: A critical assessment. Academic Psychiatry 2004;28:60–65. [PubMed: 15140810]

Werner P. Willingness to use telemedicine for psychiatric care. Telemedicine Journal and e-Health 2004;10:286–293. [PubMed: 15650523]

Whitten PS, Kuwahara E. A multi-phase telepsychiatry programme in Michigan: Organizational factors affecting utilization and user perceptions. Journal of Telemedicine and Telecare 2004;10:254–261. [PubMed: 15494082]

Whitten PS, Mackert MS. Addressing telehealth's foremost barrier: Provider as initial gatekeeper. International Journal of Technology Assessment in Health Care 2005;21:517–521. [PubMed: 16262977]

Wootton R. Realtime telemedicine. Journal of Telemedicine and Telecare 2006;12:328–336. [PubMed: 17059648]

Zarate CA, Weinstock L, Cukor P, Morabito C, Leahy L, Burns C, et al. Applicability of telemedicine for assessing patients with schizophrenia: Acceptance and reliability. Journal of Clinical Psychiatry 1997;58:22–25. [PubMed: 9055833]

NIH-PA Author Manuscript

Journal of Rural Mental Health

© 2022 American Psychological Association
ISSN: 1935-942X

2022, Vol. 46, No. 4, 271–276
https://doi.org/10.1037/rmh0000214

BRIEF REPORT

# Disparities in Mental Health Access Before and After Transitioning to Telehealth

Ryan P. Egan, Daniel B. Hurley, Mark C. Goetz, Claire S. Smith,
Brian A. Palmer, and Catherine A. St. Hill
Allina Health, Minneapolis, Minnesota, United States

Telehealth implementation has potential to reduce disparities in access to mental health care. We examined the number of mental health visits accessed and the visit format used (office, phone, or virtual) by patient demographics before and after a large health system's shift to telehealth during the COVID-19 pandemic. Patients ages 6–17 accessed relatively fewer and female patients accessed relatively more mental health visits after the telehealth transition. Demographic variables were associated with visit format used, with rural residents, older adults, females, and White and Black/African American patients using a higher proportion of phone visits. Implications are discussed for the future implementation of telehealth.

---

**Public Health Significance Statement**
This study found changes in the gender and age of patients accessing mental health services before and after a large health system began providing services remotely in response to the COVID-19 pandemic. It also found that phone calls were relatively preferred by certain demographic groups. These groups may be adversely affected by limitations on reimbursement for mental health services provided by phone.

---

*Keywords:* telehealth, telemental health, health disparities, COVID-19, rural

Systematic differences in health and health disparities have disproportionately impacted underrepresented groups based on factors such as race, ethnicity, gender identity, sexual orientation, socioeconomic status, age, disability status, geographic location, and primary language, among other factors (National Academies of Sciences, Engineering, and Medicine, 2017). Similar to physical health disparities, mental health disparities also present a set of challenges. In the United States, over 120 million people live in areas

where access to mental health care is limited (Health Resources & Services Administration, 2020). Evidence shows unmet mental health needs to be relatively higher for rural adults, children, women, nonmarried people, low-income populations, those without health insurance, those in fair or poor health, and those whose physical activity is limited (Roll et al., 2013; Ziller et al., 2010).

Possible manifestations of mental health care disparities include differences in access, use, and quality of care. In the United States, rural residents experience limited access to mental health services, as they often need to travel prohibitively far to attend in-person services due to low population density and local shortages of mental health care providers (Benavides-Vaello et al., 2013). Related to use of mental health treatment, rural residents were found to have a lower average number of mental health office visits compared to

This article was published Online First August 29, 2022.
Ryan P. Egan ⓘ https://orcid.org/0000-0001-7692-0290
The authors received no external funding for this research. The authors have no conflicts of interest to declare.
Correspondence concerning this article should be addressed to Ryan P. Egan, Allina Health, 480 Osborne Road NE, Suite 260, Minneapolis, MN 55432, United States. Email: Ryan.Egan@allina.com

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

urban residents, and middle aged to older adults may attend fewer mental health-related office visits (Ziller et al., 2010). Disparities in mental health service utilization also depend on age, gender, race, ethnicity, income, and insurance status (Roll et al., 2013). Last, disparities in quality of care have appeared by age and rurality. Regarding age, people at either extreme, older or younger, were found to receive lower quality care, such as fewer counseling visits and less often being prescribed guideline-concordant psychotropic medications (Young et al., 2001). Reducing the aforementioned disparities in access, use, and quality of health care remains one of the most pressing challenges in U.S. public health today.

In 2020, COVID-19 spread rapidly across the United States and presented unique challenges for health care systems to provide standard evidence-based care. The COVID-19 pandemic has not affected all demographics equally. In particular, older adults experienced higher risk and mortality, both due to advanced age and higher prevalence of health conditions that increase risk for COVID-19 mortality (Shahid et al., 2020). Telehealth is one solution that was implemented much more broadly to help mitigate the spread of COVID-19.

Telehealth may reduce or eliminate health disparities by improving access, use, and quality of health and mental health care for underrepresented populations (Bashshur et al., 2016). Implementing telehealth has been shown to improve at-risk patients' access to care, especially for psychiatrists, by enabling visits with providers from a remote location (Bashshur et al., 2016). Telehealth may also increase the quality of care available to rural and limited-mobility patients by enabling electronic storage and communication of records, in-home monitoring, and assistance from distant technical experts (Benavides-Vaello et al., 2013; Marcin et al., 2016). The studies cited above have shown encouraging results for the ability of telehealth to reduce health disparities across multiple demographics.

Despite its promise, some have raised concerns about telehealth potentially worsening existing health disparities or introducing new disparities. Hames et al. (2020) warned that telehealth may be unsuitable for older adults, who may be more likely to have difficulty adapting to changing technology and may have vision and memory deficits that introduce novel challenges when using telehealth. Furthermore, in the United States, approximately 20–40 million people, including a disproportionate number of rural residents, lack of access to broadband internet, which creates a significant barrier that may lead to exacerbating health disparities if telehealth is introduced broadly (Summers-Gabr, 2020). If telehealth is to be implemented with the goal of reducing health and mental health disparities, these and other complicating factors should be addressed.

COVID-19 and the related rapid shift to implement telehealth initiatives across health care systems presents an opportunity to better understand the effects of telehealth on mental health care disparities. The present study examines a large, multicenter health care system in the Midwestern United States shifting from in-person care to telehealth over the course of several weeks in March 2020. This relatively brief transition period provided a unique opportunity to explore if this shift to telehealth mitigated or exacerbated mental health care disparities. The primary aim of this study was to examine disparities in access to and use of mental health care before and after the transition to telehealth. We focused on disparities in reference to four demographic variables: rurality, age, gender, and race.

## Method

We conducted a retrospective, observational, cohort-based study using data collected from 72,070 mental health visits by 31,215 patients at a large health system in the state of Minnesota. Because the health system is concentrated in the Minneapolis–St. Paul metropolitan area, with clinics and hospitals spread into outlying rural areas, the majority of the sample was concentrated in urban and suburban areas (79.3%), as defined by residence in the seven-county metropolitan area that includes Ramsey, Hennepin, Washington, Dakota, Anoka, Scott, and Carver counties. Patients were categorized into five age groups: 0–5 years (0.2%), 6–17 years (15.9%), 18–25 years (13.6%), 26–64 years (56.5%), and 65 years and older (13.8%). The sample was predominantly female (63.3%). Patients were majority White (91.8%), 5.1% Black, and 3.1% another race. Ethnically, 4.1% of patients identified as Hispanic.

The health system converted nearly all mental health visits from an in-person format to a virtual

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

(i.e., video and audio) or phone (i.e., audio only) format between March 1 and March 31, 2020. For analysis, data were grouped into two 3-month time periods: pretelehealth transition (December 1, 2019 to February 29, 2020) and posttelehealth transition (April 1, 2020 to June 30, 2020). Prior to the onset of the COVID-19 pandemic in March 2020, virtual and phone visits were exceedingly rare in our sample, with only one out of 35,573 visits in the pretelehealth transition period being a virtual visit and 0 being phone visits. During the posttelehealth transition period, the vast majority of visits were virtual (62.5%) or phone (36.0%) visits, with only 1.5% of visits being conducted in-person.

We removed all patients listed as non-Minnesota residents and all visits with nonmental health procedures, no-shows, and late cancels. Three sets of analyses were conducted. The first examined differences in patient demographics before and after the transition to telehealth using Pearson's chi-squared tests. Post hoc chi-squared tests were conducted using a Bonferroni correction for Type I error. The second set of analyses compared visit format (office, phone, or virtual) in the posttransition period across demographic groups using chi-squared tests. Third, due to age- and rurality-related barriers to mental health access, we conducted multivariable multinomial regression with visit format as the outcome and age, rurality, and the interaction between these two variables as independent variables. For multinomial regression analyses, patients with visits in both time periods are considered independent events.

## Results

There was no significant difference in the rurality of patients accessing mental health care before and after the transition to telehealth, although there was a marginal trend toward a decline in rural patients from pre- to posttransition, $\chi^2(1, N = 30,880) = 3.12, p = .08$. There was a significant difference in access between age groups before and after the transition to telehealth, $\chi^2(4, N = 31,215) = 35.59, p < .001$. We conducted 10 Bonferroni-corrected post hoc tests, in which each pair of age groups was compared separately, to discern any changes in specific age groups across time periods. Three of these tests returned $p$ values lower than the Bonferroni-corrected threshold of $\alpha = .005$. Representation of the 6–17 age group significantly declined from pre- to post-telehealth

transition when compared with the 18–25 age group, $\chi^2(1, N = 9,198) = 8.75, p = .003$; 26–64 age group, $\chi^2(1, N = 22,588) = 32.56, p < .001$; and 65+ age group, $\chi^2(1, N = 9,262) = 13.54, p < .001$. A significantly greater proportion of females accessed mental health care after the transition to telehealth (64.3% of the patient population) than before the transition (62.4%), $\chi^2(1, N = 31,214) = 11.51, p < .001$. There was no significant difference in the race of patients accessing mental health care before versus after the telehealth transition, $\chi^2(2, N = 30,216) = 0.56, p = .76$.

Visit format varied significantly by rurality, $\chi^2(2, N = 36,136) = 231.44, p < .001$; age group, $\chi^2(8, N = 36,136) = 1529.60, p < .001$; gender, $\chi^2(2, N = 36,496) = 46.95, p < .001$; and race, $\chi^2(4, N = 35,404) = 13.25, p = .01$, during the posttelehealth transition period. Visit format varied only slightly by gender and race, with usage rates for each group being within a few percentage points of other groups (see Table 1). Female patients and patients who identified as White or Black/African American used the highest proportion of phone visits. Using virtual visits as a reference group, age was significantly associated with higher use of phone versus virtual visit format, $OR = 1.20$, 95% CI [1.17, 1.23], $p < .001$, but not office versus virtual visit format, $OR = 1.00$, 95% CI [0.90, 1.10], $p = .93$. Adults ages 65 and older had the highest rate of phone visit usage, whereas children ages 0–5 had the highest rate of virtual visit usage. Compared to urban or suburban residents, rural residents were significantly more likely to receive a phone visit instead of a virtual visit, $OR = 0.70$, 95% CI [0.67, 0.74], $p < .001$, and more likely to receive an office visit instead of a virtual visit, $OR = 0.46$, 95% CI [0.38, 0.55], $p < .001$ (see Table 1). The interaction between age and rurality was not significant when comparing virtual visits to office visits, $OR = 0.96$, 95% CI [0.79, 1.17], $p = .70$, or phone visits, $OR = 1.00$, 95% CI [0.94, 1.06], $p = .90$.

## Discussion

When the COVID-19 pandemic began in the United States in March 2020, our health system transitioned nearly all mental health appointments from in-person office visits to virtual or phone visits. This provided an opportunity to examine disparities in access to and use of mental health care across rurality, age group, gender, and race before and after telehealth implementation.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

**Table 1**

*Number of Visits by Visit Format and Demographics in Posttelehealth Transition Period*

| Characteristic | Office visits | Phone visits | Virtual visits |
| --- | --- | --- | --- |
| Residence | | | |
| Rural | 186 (2.4%) | 3,273 (42.1%) | 4,311 (55.5%) |
| Urban/suburban | 360 (1.3%) | 9,739 (34.3%) | 18,267 (64.4%) |
| Age | | | |
| 0–5 | 2 (2.6%) | 8 (10.4%) | 67 (87.0%) |
| 6–17 | 91 (1.8%) | 2,020 (39.8%) | 2,970 (58.5%) |
| 18–25 | 63 (1.4%) | 1,327 (28.7%) | 3,234 (69.9%) |
| 26–64 | 323 (1.5%) | 6,814 (31.5%) | 14,461 (67.0%) |
| 65+ | 67 (1.4%) | 2,843 (59.8%) | 1,846 (38.8%) |
| Gender | | | |
| Female | 304 (1.2%) | 15,594 (63.2%) | 8,789 (35.6%) |
| Male | 246 (2.1%) | 7,218 (61.1%) | 4,345 (36.8%) |
| Race | | | |
| White | 475 (1.5%) | 11,824 (36.2%) | 20,364 (62.3%) |
| Black/African American | 38 (2.2%) | 624 (36.3%) | 1,059 (61.5%) |
| Other | 19 (1.9%) | 330 (32.4%) | 671 (65.8%) |

In summary, findings revealed subtle shifts in the demographics of the population who was accessing care before versus after the transition to telehealth. The 6–17 age group accessed fewer mental health appointments after the transition to telehealth, whereas females accessed relatively more. A marginal trend was also found showing rural residents accessed fewer mental health appointments after the transition to telehealth. Rural residents, adults ages 65 and older, and females were the groups most likely to use phone visits following the transition to telehealth. People of color who did not identify as Black/African American were found to use the highest proportion of virtual visits. No interaction was detected between age and rurality on visit format.

These results carry implications for the state of mental health disparities and the effects of telehealth implementation on such disparities. First, children ages 6–17 accessed relatively fewer mental health services after the transition to telehealth. This may be due to a number of factors. Because these are school-aged children, referrals to community-based mental health services from schools may have been stopped or significantly reduced during the initial response to COVID-19 due to schools convening virtually. Another possibility may relate to families' inability to engage in telehealth, perhaps due to the technological challenges with setting up accounts for child patients or hesitancy to try a new visit format with their children. There may be realistic limitations also on the quality of mental health care that

can be provided to children remotely, given differences in methods used by providers to engage children versus adults.

Our findings showed that residents of rural areas and older adults tended to access phone visits at higher rates than other groups. These populations are traditionally more difficult to reach and geographically restricted, raising concerns about disparities in access to telehealth (Benavides-Vaello et al., 2013). These populations' preference for phone visits may be due to limited broadband access or technological literacy (Hoogland et al., 2020; Summers-Gabr, 2020). In our analyses, we did not find an association between rural residency or older age and receipt of proportionally fewer mental health services following the transition to telehealth, although there was a marginal trend toward rural residents accessing fewer visits. Nonetheless, because these populations relied on phone visits to a greater extent, they may be adversely affected by limits on reimbursement for telephone-based services. Reimbursement weighs heavily on decisions about clinical service delivery and will continue to be a significant factor that clinicians consider moving forward. As of January 1, 2022, the Center for Medicare and Medicaid Services will continue to accept audio-only interactions for the most common mental health services (Centers for Medicare & Medicaid Services, 2021). Ongoing reimbursement for telephone services will help prevent disparities that might otherwise emerge preventing rural residents and older adults from accessing mental health care.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Another important consideration not addressed by this study relates to the quality of care received across patient populations. Specifically, phone visits may result in lower quality care due to lack of face-to-face interaction and inability to use visual materials such as graphics, handouts, and worksheets, which are a key component of many evidence-based psychotherapies such as cognitive behavioral therapy (Beck, 2021). One review of telehealth in rural communities found that pediatric patients in emergency departments received higher quality of care by several metrics when services were provided using videoconferencing than when the same services were provided using telephone (Marcin et al., 2016). Therefore, even though rural and older adults used mental health services at similar rates as the rest of the population before and after the transition to telehealth, these groups may have received lower quality services, characterized by a lack of visually driven, evidence-based components and nonverbal communication in the therapeutic relationship. Improvements in access to videoconferencing technology may reduce mental health disparities for these groups by providing higher quality, video-enabled care.

The primary limitation of the present study was its observational nature, which prevented precise conclusions about the causes of the observed disparities. Any changes from pre- to post-telehealth transition may be due not only to the transition to telehealth, but also to the COVID-19 pandemic itself, which created its own set of disparities, or to the public and governmental response to the pandemic (Kim et al., 2020). For example, gender-related findings may be better explained by the activation of traditional parental gender roles in response to a rapid shift to at-home schooling. Nonetheless, the large sample size afforded by our observational approach complements studies that are better able to isolate the effects of telehealth implementation on mental health disparities.

## References

Bashshur, R. L., Shannon, G. W., Bashshur, N., & Yellowlees, P. M. (2016). The empirical evidence for telemedicine interventions in mental disorders. *Telemedicine Journal and e-Health*, 22(2), 87–113. https://doi.org/10.1089/tmj.2015.0206

Beck, J. S. (2021). *Cognitive behavior therapy: Basics and beyond* (3rd ed.). Guilford Press.

Benavides-Vaello, S., Strode, A., & Sheeran, B. C. (2013). Using technology in the delivery of mental health and substance abuse treatment in rural communities: A review. *The Journal of Behavioral Health Services & Research*, 40(1), 111–120. https://doi.org/10.1007/s11414-012-9299-6

Centers for Medicare & Medicaid Services. (2021, November 2). *List of telehealth services*. Retrieved November 4, 2021, from https://www.cms.gov/Medicare-General-Information/Telehealth/Telehealth-Codes

Hames, J. L., Bell, D. J., Perez-Lima, L. M., Holm-Denoma, J. M., Rooney, T., Charles, N. E., Thompson, S. M., Mehlenbeck, R. S., Tawfik, S. H., Fondacaro, K. M., Simmons, K. T., & Hoersting, R. C. (2020). Navigating uncharted waters: Considerations for training clinics in the rapid transition to telepsychology and telesupervision during COVID-19. *Journal of Psychotherapy Integration*, 30(2), 348–365. https://doi.org/10.1037/int0000224

Health Resources & Services Administration. (2020). *Shortage areas*. Retrieved December 9, 2020 from https://data.hrsa.gov/topics/health-workforce/shortage-areas

Hoogland, A. I., Mansfield, J., Lafranchise, E. A., Bulls, H. W., Johnstone, P. A., & Jim, H. S. L. (2020). eHealth literacy in older adults with cancer. *Journal of Geriatric Oncology*, 11(6), 1020–1022. https://doi.org/10.1016/j.jgo.2019.12.015

Kim, E. J., Marrast, L., & Conigliaro, J. (2020). COVID-19: Magnifying the effect of health disparities. *Journal of General Internal Medicine*, 35(8), 2441–2442. https://doi.org/10.1007/s11606-020-05881-4

Marcin, J. P., Shaikh, U., & Steinhorn, R. H. (2016). Addressing health disparities in rural communities using telehealth. *Pediatric Research*, 79(1–2), 169–176. https://doi.org/10.1038/pr.2015.192

National Academies of Sciences, Engineering, and Medicine. (2017). *Communities in action: Pathways to health equity*. National Academies Press. https://doi.org/10.17226/24624

Roll, J. M., Kennedy, J., Tran, M., & Howell, D. (2013). Disparities in unmet need for mental health services in the United States, 1997–2010. *Psychiatric Services*, 64(1), 80–82. https://doi.org/10.1176/appi.ps.201200071

Shahid, Z., Kalayanamitra, R., McClafferty, B., Kepko, D., Ramgobin, D., Patel, R., Aggarwal, C. S., Vunnam, R., Sahu, N., Bhatt, D., Jones, K., Golamari, R., & Jain, R. (2020). COVID-19 and older adults: What we know. *Journal of the American Geriatrics Society*, 68(5), 926–929. https://doi.org/10.1111/jgs.16472

Summers-Gabr, N. M. (2020). Rural–urban mental health disparities in the United States during COVID-19. *Psychological Trauma: Theory, Research, Practice, and Policy*, 12(S1), S222–S224. https://doi.org/10.1037/tra0000871

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

276                                          EGAN ET AL.

Young, A. S., Klap, R., Sherbourne, C. D., & Wells, K. B. (2001). The quality of care for depressive and anxiety disorders in the United States. *Archives of General Psychiatry*, *58*(1), 55–61. https://doi.org/10.1001/archpsyc.58.1.55

Ziller, E. C., Anderson, N. J., & Coburn, A. F. (2010). Access to rural mental health services: Service use and out-of-pocket costs. *The Journal of Rural Health*, *26*(3), 214–224. https://doi.org/10.1111/j.1748-0361.2010.00291.x

Received March 9, 2022
Revision received July 1, 2022
Accepted July 23, 2022 ∎

**E-Mail Notification of Your Latest Issue Online!**

Would you like to know when the next issue of your favorite APA journal will be available online? This service is now available to you. Sign up at https://my.apa.org/portal/alerts/ and you will be notified by e-mail when issues of interest to you become available!

Journal of Consulting and Clinical Psychology
2008, Vol. 76, No. 1, 158–162

Copyright 2008 by the American Psychological Association
0022-006X/08/$12.00   DOI: 10.1037/0022-006X.76.1.158

# BRIEF REPORTS

# Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities

Robert D. Morgan and Amber R. Patrick
Texas Tech University

Philip R. Magaletta
Federal Bureau of Prisons

In corrections, where staffing limitations tax an overburdened mental health system, telemental health is an increasingly common mode of mental health service delivery. Although telemental health presents an efficient treatment modality for a spectrum of mental health services, it is imperative to study how this modality influences key elements of the treatment experience. In this study, the authors compared inmates' perceptions of the working alliance, postsession mood, and satisfaction with psychiatric and psychological mental health services delivered through 2 different modalities: telemental health and face-to-face. Participants consisted of 186 inmates who received mental health services (36 via telepsychology, 50 via face-to-face psychology, 50 via telepsychiatry, and 50 via face-to-face psychiatry). Results indicate no significant differences in inmates' perceptions of the work alliance with the mental health professional, postsession mood, or overall satisfaction with services when telemental health and face-to-face modalities were compared within each type of mental health service. Implications of these findings are presented.

Keywords: telemental health, offender, inmate and correctional mental health services

*Telemental health* is the use of a communication device for a real-time service provision when the client and the provider are physically separated at the time the service is rendered (Vanden-Bos & Williams, 2000). Although there has been increased interest in telemental health (see Swansea, 2006), there remains a paucity of research examining the impact of this service delivery modality on the therapeutic relationship. In fact, no randomized, controlled outcome studies examining the effectiveness of this method of service delivery have been conducted.

Given the significance of the therapeutic relationship to the process of change (Lambert, Shapiro, & Bergin, 1986), the degree to which this relationship is impacted by the service delivery modality must be examined. This necessity is supported by the finding that characteristics of the therapeutic relationship, such as working alliance (Gaston, 1990), positively correlate with treat-

ment gains (see Horvath & Bedi, 2002; Martin, Garske, & Davis, 2000) and treatment satisfaction (Magaletta, Fagan, & Peyrot, 2000). Thus, it is relevant to question the impact of service delivery modality on the therapeutic relationship. In other words, is the traditional face-to-face service delivery modality superior to nontraditional and innovative modalities aimed at increasing access to care?

One setting that provides ample opportunity to study these issues is corrections. Several concerns salient in the correctional setting support the utility and highlight the advantages of delivering mental health services through telemental health. These concerns include service demands that challenge institutional resources (Magaletta, Fagan, & Ax, 1998). Moreover, inmates experience a larger number of psychological problems than the general public (Diamond, Wang, Holzer, Thomas, & Cruser, 2001). Importantly, telemental health offers these inmates increased access to mental health care as well as increased security for psychologists (Hipkins, 1997). Telemental health can also reduce the costs of transporting inmates from correctional to medical facilities, and it offers a broader range of mental health services—an important consideration given the increasing mentally ill population in criminal justice settings without concomitant increases in staff resources or services (Manderscheid, Gravesande, & Goldstrom, 2004). By using telemental health to link mentally ill inmates with specialty providers on a regular basis, the overall quality of care is improved (Magaletta et al., 1998).

A recent review of correctional telemental health services (Ax et al., 2007) revealed essentially two types of studies: program evaluation and client satisfaction. Program evaluations consistently

Robert D. Morgan and Amber R. Patrick, Department of Psychology, Texas Tech University; Philip R. Magaletta, Psychology Services Branch, Federal Bureau of Prisons, Washington, DC.

Robert D. Morgan and Amber R. Patrick contributed equally to this work and are listed alphabetically. The research contained in this document was coordinated in part by the Texas Department of Criminal Justice (Research Agreement 419-RM03). The contents presented in this article reflect the views of the authors and do not necessarily reflect the policies or opinions of the Texas Department of Criminal Justice, the Department of Justice, or the Federal Bureau of Prisons. We wish to thank Daryl Kroner for consultation on the statistical analyses.

Correspondence concerning this article should be addressed to Robert D. Morgan, Department of Psychology, MS 2051, Texas Tech University, Lubbock, TX 79409-2051. E-mail: robert.morgan@ttu.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

revealed cost containment as a benefit and staff resistance as a drawback. Evaluations of client satisfaction revealed that most clients are satisfied receiving services through this modality. Nevertheless, little is known about the impact of telemental health as a modality for service delivery. There remains a paucity of research on inmates' perception of telemental health compared with traditional face-to-face service delivery, and knowledge of how the modality of mental health service delivery impacts key elements of the treatment experience is needed (Krupinski et al., 2006; Tucker, Olfson, Simring, Goodman, & Bienefeld, 2006).

In this study, we examined how telemental health impacts aspects of the therapeutic relationship, namely the working alliance as well as inmates' mood, satisfaction, and general attitudes and perceptions toward mental health services delivered via telemental health. Given previous findings, we hypothesized that inmates receiving mental health services via telemental health would maintain a comparable working alliance with the treatment provider, with similar postsession responses regarding reactions to the session and satisfaction with their mental health service, compared with a separate group of inmates who received mental health services via a traditional face-to-face modality.

## Method

### Participants

Participants consisted of 186 adult male inmates who received mental health services (either psychology or psychiatry) in an adult correctional institution. Of the 186 participants, 50 received face-to-face psychological services in a general population correctional facility, 36 received telemental health psychological services in a general population correctional facility,[1] 50 received face-to-face psychiatric services in a psychiatric prison, and 50 inmates received telemental health psychiatric services in a general population correctional facility. Note that participants represented independent samples such that they were not receiving duplicate services (i.e., psychology and psychiatry, or telemental health and face-to-face). The psychiatric prison housed mentally or physically ill inmates unable to function effectively in a general population facility. The general population facilities housed mentally ill and nonmentally ill offenders alike.

Although inmates reportedly suffered from a range of psychiatric disorders, the majority suffered from mood disorders (e.g., bipolar disorder, major depressive disorder; 74%) and schizophrenia or other psychotic disorders (19%). Notably, inmates receiving telemental health services versus face-to-face services did not differ diagnostically for those receiving psychological services, $\chi^2(2, N = 34) = 1.677, p = .43$, or psychiatric services, $\chi^2(2, N = 61) = 2.73, p = .255$.

The mean age of participants was 31.8 years ($SD = 9.4$). The sample was composed of primarily Caucasian (50%), African American (22.6%), and Hispanic (21.5%) participants. Participants reported an average of 10.89 years of education ($SD = 1.9$). Whereas 19.9% of participants were reportedly married/partnered, the majority of inmates (80.1%) denied current involvement in a romantic relationship (single/nonpartnered, separated, or divorced). Participants were convicted of a variety of crimes (e.g., drug or alcohol offenses, murder, assault/battery, or robbery/theft), with 36% of inmates convicted of a violent crime and 58.6%

convicted of a nonviolent crime. Participants were serving a median sentence of 60 months, with 4 years being the modal sentence. At the time of this study, the inmate participants had served a median of 48 months and mode of 36 months of their adult life in prison and/or jail.

### Materials

The Client Satisfaction Questionnaire (CSQ-8; Larsen, Attkisson, Hargreaves, & Nguyen, 1979) is an eight-item, self-report measure, utilizing a 4-point Likert-type response scale to assess client satisfaction with mental health services. Initial measures of the CSQ-8 by Larsen et al. (1979) resulted in an alpha coefficient of .93, indicating good internal consistency. Furthermore, Larsen (1977) found an alpha coefficient of .92, again indicating high internal consistency. In addition, only one factor has consistently been yielded during factor analysis of the CSQ-8 (Gaston & Sabourin, 1992).

The Working Alliance Inventory (WAI; Horvath & Greenberg, 1989, 1994) is a 36-item questionnaire with three subscales used to assess different aspects of the working alliance. The three subscales assess the following: (a) client and therapist agreement on the goals of therapy; (b) client and therapist agreement on how to reach the goals of therapy; and (c) the degree of confidence, trust, comfort, and acceptance between the therapist and client. The WAI has both client and therapist versions; however, only the client version was utilized in this study. On the WAI the client is asked—using a 7-point Likert-type scale ranging from 1 (*never*) to 7 (*always*)—to indicate which statements best describe his or her experience of the therapeutic alliance. The WAI has high internal consistency, with Cronbach's alpha ranging from .89 to .92 for the global measure and the three subscales (Horvath & Greenberg, 1989). In addition, the WAI has good convergent validity (see Horvath & Greenberg, 1989; Safran & Wallner, 1991).

The Session Evaluation Questionnaire (SEQ; Stiles, 1980; Stiles & Snow, 1984a, 1984b) was also used in this study. The SEQ measures two basic dimensions of participants' postsession mood: positivity and arousal (Stiles & Snow, 1984b), which account for most of the mood variability in a variety of circumstances (Russell, 1978, 1979). The SEQ consists of 21 opposite adjective scales presented in a 7-point semantic differential format. The items are divided into two sections: session evaluation and postsession mood. The stem "This session was" precedes the first 11 items for session evaluation; sample items include bad–good and safe–dangerous. The stem "Right now I feel" precedes the second 10 items for postsession mood; sample items include happy–sad and angry–pleased. Factor analyses have supported the four-subscale structure of the SEQ, with good internal consistency for the four dimensions, with coefficient alphas ranging from .78 to .91 (Stiles & Snow, 1984a, 1984b).

### Procedure

Inmates were scheduled for a telemental health or face-to-face psychological or psychiatric mental health service session through

---

[1] The targeted number of participants in the telemental health psychology group was 50 inmates; however, because of an injury sustained by the participating therapist, the recruitment for this group was terminated prematurely.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

BRIEF REPORTS

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

regular institutional operational procedures, and they were recruited for participation in this study at the conclusion of one of their sessions (i.e., inmates were recruited following one of their regularly scheduled follow-up sessions). Inmates were assigned to the modality (telemental health vs. face-to-face) available at their prison and for the service (psychology or psychiatry) that was considered clinically necessary. For purposes of this study, telemental health referred to videoconferencing via secure satellite connection. Each psychological services session lasted approximately 30 min and generally focused on issues of adjustment and mental health stability (e.g., issues of institutional adjustment, symptom management, coping skills). Each psychiatric services session lasted approximately 20 min and focused generally on issues of symptom management (e.g., psychotropic medication reviews). One psychologist with a master's of arts degree and one psychiatrist facilitated all psychological and psychiatric sessions, respectively. Sessions were randomly attended; thus, participants were evaluated at different phases in their treatment.

After completion of their mental health session (regardless of treatment modality), inmates were asked to volunteer their participation in a study that evaluated the quality of mental health services. The only selection criterion, other than participating in a mental health session, was that the inmate had to be able to read and write in English. No incentives were offered, and participants were recruited only once. If they declined, there was no subsequent chance to participate. Inmates who declined participation returned to their housing unit or work assignment. Inmates who agreed to participate were provided a standard consent form and questionnaire packet. Participants were informed of the purpose and procedures of the study, were provided an opportunity to ask questions, and were then instructed to complete the consent form and all questionnaires. Participation was limited to one session (i.e., inmates completed the instruments on one occasion). All procedures

were approved through the Institution Review Boards at the Texas Tech University, the Texas Tech University Health Sciences Center, and the research branch of the Texas Department of Criminal Justice.

## Results

### Psychology Services (Telemental Health vs. Face-to-Face)

*Preliminary analyses.* Preliminary analyses assessed the demographic equivalence of inmates in the telemental health and face-to-face psychology services conditions. A series of independent $t$ tests and chi-square procedures resulted in no significant differences between groups on demographic variables ($p > .05$).

*Primary analyses.* A one-way multivariate analysis of variance procedure resulted in no significant differences between inmates receiving telemental health or face-to-face psychology services for working alliance (development of goals, reaching goals, or quality of relationship), $\Lambda(3, 82) = 0.59$, $p = .62$. There was no significant difference between inmates' evaluation of their psychology session (i.e., session depth, smoothness, positivity, or arousal) as measured by the SEQ, $\Lambda(4, 81) = 0.97$, $p = .43$, regardless of the mechanism of service delivery. Finally, inmates receiving psychology services via telemental health were similarly satisfied with the service they received (e.g., quality, met needs, would recommend, general satisfaction) when compared with inmates receiving psychology services via a traditional face-to-face delivery method, $\Lambda(8, 77) = 1.42$, $p = .20$. See Table 1 for descriptive statistics.

### Psychiatry Services (Telemental Health vs. Face-to-Face)

*Preliminary analysis.* A series of independent $t$ tests and chi-square procedures examined group differences in the psychiatric

Table 1

*Means (and Standard Deviations) for the WAI, SEQ, and CSQ-8 for Inmates Receiving Telehealth or Face-to-Face Mental Health Services*

| | Psychological services | | Psychiatric services | |
| --- | --- | --- | --- | --- |
| Questionnaire | Telehealth ($n = 36$) | Face-to-face ($n = 50$) | Telehealth ($n = 50$) | Face-to-face ($n = 50$) |
| WAI: Total score | 61.61 (16.3) | 63.98 (16.73) | 55.5 (13.45) | 59.02 (14.52) |
| WAI: Development of goals | 21.67 (5.24) | 21.98 (5.6) | 18.96 (3.85) | 19.7 (4.48) |
| WAI: Reaching goals | 20.47 (5.71) | 21.54 (5.69) | 18.33 (5.3) | 20.2 (5.58) |
| WAI: Quality of relationship | 19.47 (6.2) | 20.46 (6.2) | 18.18 (5.54) | 19.08 (5.78) |
| SEQ: Session depth | 18.85 (5.42) | 20.78 (5.48) | 18.71 (5.31) | 20.69 (6.39) |
| SEQ: Session smoothness | 20.74 (6.08) | 21.16 (6.24) | 19.39 (6.26) | 21.75 (6.3) |
| SEQ: Positivity | 20.52 (6.52) | 20.62 (5.78) | 18.14 (6.26) | 19.37 (7.01) |
| SEQ: Arousal | 14.87 (2.75) | 15.59 (3.53) | 15.01 (4.08) | 14.68 (4.49) |
| CSQ-1: Quality of services? | 2.94 (0.8) | 3.24 (0.87) | 2.78 (1.02) | 2.65 (0.97) |
| CSQ-2: Receive services you wanted? | 2.94 (0.8) | 3.04 (0.83) | 2.71 (0.94) | 2.80 (0.81) |
| CSQ-3: Program met your needs? | 2.64 (0.96) | 2.74 (1.01) | 2.65 (0.88) | 2.74 (0.88) |
| CSQ-4: Recommend our program? | 3.14 (0.72) | 3.28 (0.78) | 2.88 (0.9) | 2.96 (0.95) |
| CSQ-5: Satisfied with amount of help you received? | 2.81 (0.89) | 3.04 (0.9) | 2.76 (0.86) | 2.68 (0.84) |
| CSQ-6: Services helped you deal with problems? | 3.06 (0.83) | 3.18 (0.87) | 2.76 (0.86) | 3.04 (0.81) |
| CSQ-7: Satisfied with services you received? | 2.94 (0.83) | 3.08 (0.94) | 2.84 (0.8) | 2.82 (0.85) |
| CSQ-8: Seek help again from our program? | 3.28 (0.78) | 3.24 (0.9) | 2.92 (0.86) | 3.04 (0.78) |

*Note.* WAI = Working Alliance Inventory; SEQ = Session Evaluation Questionnaire; CSQ = Client Satisfaction Questionnaire.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

conditions. Results indicate significant differences for age ($t =$ 2.786, $p = .006$), educational history ($t = -2.156$, $p = .034$), years incarcerated ($t = 4.767$, $p < .001$), and months of mental health treatment ($t = 3.665$, $p < .001$). However, as age was the only variable to be significantly correlated ($p < .05$) with the dependent variables, it was the only demographic variable held as a covariate in subsequent analyses.

*Primary analysis.* A one-way multivariate analysis of covariance procedure resulted in no significant differences between inmates receiving telemental health or face-to-face psychiatric services for working alliance (development of goals, reaching goals, or quality of relationship), $\Lambda(3, 94) = 1.01$, $p = .39$. Similarly, there was no significant difference between inmates' evaluation of their psychiatry session (i.e., session depth, smoothness, positivity, or arousal), $\Lambda(4, 93) = 0.666$, $p = .61$, regardless of the mechanism of service delivery. Finally, inmates receiving psychiatric services via telemental health were similarly satisfied with the service they received (e.g., quality, met needs, would recommend, general satisfaction) when compared with inmates receiving psychiatric services via a traditional face-to-face delivery method, $\Lambda(8, 89) = 0.944$, $p = .49$. See Table 1 for descriptive statistics.

Power analyses were conducted for each of the primary analyses. Using Stevens's (2002, p. 200) table for power of Hotelling's $T^2$, we found that power for the primary analysis was between .48 and .54, except for the psychology services satisfaction analysis, which approximated .80. Stevens interprets power below .50 as inadequate and .80 as adequate power.

## Discussion

The purpose of this study was to assess and compare inmates' perceptions of the therapeutic relationship, inmates' postsession mood, and their satisfaction with mental health services delivered through two different modalities: telemental health and face-to-face. As hypothesized, there were no significant differences between telemental health and face-to-face delivery modalities for perceptions of the therapeutic relationship, postsession mood, or general satisfaction with services. Furthermore, this lack of a statistically significant difference held regardless of the type of mental health service received (i.e., psychological or psychiatric).

Findings preliminarily suggest that the modality of treatment does not influence key elements of the treatment experience, positively or negatively, and is congruent with emerging literature of telemental health outcomes research (Nelson & Palsbo, 2006; O'Reilly et al., 2007). Interestingly, the neutral relationship of treatment modality was found regardless of the role of the relationship for each type of service delivered. Whether the relationship focused upon general mental health and coping (i.e., relationship as the change agent) or medication management (i.e., a biological change agent), the neutral effect was seen.

These results are encouraging, as telemental health appears to offer an efficient means of service delivery without a loss in the quality of the therapeutic relationship. Given the demand for mental health services in criminal justice settings (Beck, & Maruschak, 2001; Manderscheid et al., 2004; Mears, 2004) and other underserved areas, such as rural locations (Holzer, Goldsmith, & Ciarlo, 2000), telemental health affords opportunities to reach more clients without relocating service providers geographically or importing them physically into the service setting. Thus, the option of developing these staff resources without paying for relocation costs (both monetary and personal for the provider) is a benefit for administrators, service providers, and the inmates in need of the services.

Results of this study are particularly encouraging for criminal justice systems. Telemental health transports information and data, not inmates. As such, it offers increased safety for service providers as well as increased security and decreased transportation costs for the criminal justice system. The use of telemental health, without negative impact on the therapeutic relationship, may also broaden the range of mental health services available to inmates. Additionally, the use of telemental health offers continuity of care for releasing inmates and represents a significant contribution from a public health perspective.

As with any naturalistic study, limitations of this study should be noted. With statistically nonsignificant results, issues of statistical power are a concern, and power for this study was limited by the small sample size and number of variables. Additionally, inmates were not randomly assigned to conditions, which may have introduced selection bias into the study. Among the bias suspected, inmates housed in the psychiatric prison likely suffered greater mental health impairment than did inmates housed in the general population facilities. Among the unknown bias, variance in sample characteristics, such as prior exposure to mental health services and problem severity, all remain possible.

Future studies should employ random assignment to ensure stability of these results across inmate samples as well as to offer generalizability of these results to other correctional populations (Krupinski et al., 2006). Future studies should also investigate the utility of telemental health with other female offenders, jail populations, youthful inmates, and federally incarcerated inmates. Future studies of this nature should also obtain data from clinicians, including their perceptions regarding the impact of telemental health on the therapeutic relationship.

Future research should also begin investigating outcome effectiveness of mental health services delivered via telemental health compared with face-to-face services. From a correctional perspective, administrators would want to know whether telemental health services resulted in reduced inmate disciplinary actions, decreased incidence of harm to self or others, and/or improved mental health functioning and symptom management compared with face-to-face services. Additionally, issues of service utilization should be examined. That is, does the availability of telemental health improve inmate service use, or does it create additional barriers? If there are barriers, are these differentially related to the inmates, the correctional system, and/or the treatment providers themselves?

This study represented an empirical investigation from the field and clearly indicated that the modality used for providing mental health services (i.e., telemental health vs. face-to-face) did not negatively impact key elements of the treatment experience. Specifically, the therapeutic relationship with the mental health professional, postsession mood, or overall satisfaction with services received were not different between telemental health and face-to-face treatment modalities. Importantly for administrators, mental health service providers, and inmates alike, this neutral effect was observed across two different types of mental health services. Thus, these results highlight efficient and economical service delivery options for underserved populations (inmates) and possi-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

bly to other underserved areas (rural geographic regions) without compromise to treatment integrity from the consumer's perspective.

## References

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment [Special issue]. *Criminal Justice and Behavior, 34,* 893–905.

Beck, A. J., & Maruschak, L. M. (2001). *Mental health treatment in prisons, 2000* (Bureau of Justice Statistics Special Report). Washington, DC: U.S. Department of Justice.

Diamond, P. M., Wang, E. W., Holzer, C. E., III, Thomas, C. R., & Cruser, D. A. (2001). The prevalence of mental illness in prison: Review and policy implications. *Administration and Policy in Mental Health, 29,* 21–40.

Gaston, L. (1990). The concept of the alliance and its role in psychotherapy: Theoretical and empirical considerations. *Psychotherapy, 27,* 143–153.

Gaston, L., & Sabourin, S. (1992). Client satisfaction and social desirability in psychotherapy. *Evaluation & Program Planning, 15*(3), 227–231.

Hipkins, J. H. (1997). Telemedicine in correctional systems. In R. L. Bashur, J. H. Sanders, & G. W. Shannon (Eds.), *Telemedicine: Theory and practice* (pp. 375–389). Springfield, IL: Charles C. Thomas.

Holzer, C. E., III, Goldsmith, H. F., & Ciarlo, J. A. (2000). The availability of health and mental health providers by population density. *Journal of the Washington Academy of Sciences, 86,* 25–33.

Horvath, A. O., & Bedi, R. P. (2002). The alliance. In J. C. Norcross (Ed.), *Psychotherapy relationships that work: Therapists contributions and responsiveness to patients* (pp. 37–69). New York: Oxford University Press.

Horvath, A. O., & Greenberg, L. S. (1989). The development and validation of the Working Alliance Inventory. *Journal of Counseling Psychology, 36,* 223–233.

Horvath, A. O., & Greenberg, L. S. (1994). *The Working Alliance: Theory research and practice.* New York: Wiley.

Krupinski, E., Dimmick, S., Grigsby, J., Mogel, G., Puskin, D., Speedie, S., et al. (2006). Research recommendations for the American Telemedicine Association. *Telemedicine Journal & E-Health, 12*(5), 579–589.

Lambert, M. J., Shapiro, D. A., & Bergin, A. E. (1986). The effectiveness of psychotherapy. In S. L. Garfield & A. E. Bergin (Eds.), *Handbook of psychotherapy and behavior change* (3rd ed., pp.157–211). New York: Wiley.

Larsen, D. L. (1977). *Enhancing client utilization of community mental health outpatient services.* Unpublished doctoral dissertation, University of Kansas.

Larsen, D. L., Attkisson, C. C., Hargreaves, W. A., & Nguyen, T. D. (1979). Assessment of client/patient satisfaction: Development of a general scale. *Evaluation & Program Planning, 2,* 197–207.

Magaletta, P. R., Fagan, T. J., & Ax, R. K. (1998). Advancing psychology services through telemental health in the Federal Bureau of Prisons. *Professional Psychology: Research & Practice, 29,* 543–548.

Magaletta, P. R., Fagan, T. J., & Peyrot, M. F. (2000). Telemental health in the Federal Bureau of Prisons: Inmates' perceptions. *Professional Psychology: Research & Practice, 31,* 497–502.

Manderscheid, R. W., Gravesande, A., & Goldstrom, I. D. (2004). Growth of mental health services in state and adult correctional facilities, 1988–2000. *Psychiatric Services, 55,* 869–872.

Martin, D. J., Garske, J. P., & Davis, M. K. (2000). Relation of the therapeutic alliance with outcome and other variables: A meta-analytic review. *Journal of Consulting and Clinical Psychology, 68,* 438–450.

Mears, D. (2004). Mental health needs and services in the criminal justice system. *Houston Journal of Health Law and Policy, 4,* 255–284.

Nelson, E., & Palsbo, S. (2006). Challenges in telemedicine equivalence studies. *Evaluation and Program Planning, 29,* 419–425.

O'Reilly, R., Bishop, J., Maddox, K., Hutchinson, L., Fisman, M., & Takhar, J. (2007). Is telepsychiatry equivalent to face-to-face psychiatry? Results form a randomized controlled equivalence trial. *Psychiatric Services, 58,* 836–843.

Russell, J. A. (1978). Evidence of convergent validity on dimensions of affect. *Journal of Personality and Social Psychology, 36,* 1152–1168.

Russell, J. A. (1979). Affective space is bipolar. *Journal of Personality and Social Psychology, 37,* 345–356.

Safran, J. D., & Wallner, L. K. (1991). The relative predictive validity of two therapeutic alliance measures in cognitive therapy. *Psychological Assessment: A Journal of Consulting and Clinical Psychology, 3,* 188–195.

Stevens, J. P. (2002). *Applied multivariate statistics for the social sciences* (4th ed.). Mahwah, NJ: Erlbaum.

Stiles, W. B. (1980). Measurement of the impact of psychotherapy sessions. *Journal of Consulting and Clinical Psychology, 48,* 176–185.

Stiles, W. B., & Snow, J. S. (1984a). Counseling session impact as viewed by novice counselors and their clients. *Journal of Counseling Psychology, 31,* 3–12.

Stiles, W. B., & Snow, J. S. (1984b). Dimensions of psychotherapy session impact across sessions and across clients. *British Journal of Clinical Psychology, 23,* 59–63.

Swansea, N. S. (2006). The use of telemedicine in psychiatry. *Journal of Psychiatric and Mental Health Nursing, 13,* 771–777.

Tucker, W., Olfson, M., Simring, S., Goodman, W., & Bienefeld, S. (2006). A pilot survey of inmate preferences for on-site, visiting consultant, and telemedicine psychiatric services. *CNS Spectrums, 11*(10), 783–787.

VandenBos, G. R., & Williams, S. (2000). The Internet versus the telephone: What is telemental health, anyway? *Professional Psychology: Research & Practice, 31,* 490–492.

Received April 19, 2007
Revision received October 15, 2007
Accepted October 17, 2007 ■

Psychological Services
2016, Vol. 13, No. 4, 373–379

© 2016 American Psychological Association
1541-1559/16/$12.00    http://dx.doi.org/10.1037/ser0000106

# Effectiveness of PTSD Telehealth Treatment in a VA Clinical Sample

Jena L. Wierwille and Nicole D. Pukay-Martin
Cincinnati VA Medical Center, Cincinnati, Ohio

Kathleen M. Chard
Cincinnati VA Medical Center, Cincinnati, Ohio, and The
University of Cincinnati

Meredith C. Klump
Cincinnati VA Medical Center, Cincinnati, Ohio

Over the past decade, the Veterans Health Administration has supported multiple national rollouts of evidence-based treatments for mental health disorders. Recent studies have shown, however, that the majority of veterans with mental health diagnoses are not utilizing psychotherapy services. In this article, we attempt to address one of the more commonly known barriers to treatment, distance to care. We do this by comparing the effectiveness of outpatient and telehealth cognitive processing therapy (CPT) and prolonged exposure (PE) Therapy for posttraumatic stress disorder (PTSD) in a Veteran clinical sample. Multilevel modeling analyses revealed statistically significant differences between the outpatient and telehealth treatments once baseline demographic and symptom severity differences were taken into account. Given that a number of randomized control studies have not found similar outcome differences, future research would benefit from examining whether the outcomes differences in the present study are because of treatment delivery method or sample differences. Veterans completing treatment via outpatient and telehealth delivery methods achieved clinically significant change in PTSD from pre- to posttreatment. These results suggest that delivering evidence-based treatment for PTSD via telehealth may be a viable treatment option for veterans who cannot easily access care because of geographic distance.

*Keywords:* posttraumatic stress disorder, cognitive processing therapy, prolonged exposure therapy, telehealth treatment, videoconferencing

Identifying innovative ways to expand the reach of evidence-based care for veterans with posttraumatic stress disorder (PTSD) is critical for veterans who may have limited access to effective mental health services. The Veterans Health Administration (VHA) has dedicated a tremendous amount of energy and resources to this effort in recent years and, as a result, veterans are increasingly making use of psychotherapy (Mott, Grubbs, Sansgiry, Fortney, & Cully, 2015). Despite these improvements, though, most veterans with a newly diagnosed mental health condition still receive little to no psychotherapy services up to 12 months after receiving their diagnosis (Cully et al., 2008; Mott, Hundt, Sansgiry, Mignogna, & Cully, 2014). One retrospective study found that in 2010, only 27% of veterans newly diagnosed with mental health diagnoses accessed psychotherapy within the first 12 months (Mott, Hundt, et al., 2014). Mott, Stanley, Street, Grady, and Teng (2014)

suggest that there are a number of barriers that impact treatment engagement, including stigma, insufficient knowledge of treatment options, and distance to care. While interventions such as advocacy and education may help to address the first two barriers, distance to care remains a fixed challenge for many veterans, particularly for those living in rural areas. According to the VHA Office of Rural Health (ORH), there are 5.3 million veterans living in rural communities, with approximately 57% enrolled in the Veterans Administration (VA) health care system.

In addition to the challenge of distance to care, Mott et al. (2015) suggest that veterans living in rural areas are more likely to be older, with lower annual incomes and higher rates of service-connection (i.e., a disability rating that reflects severity of an injury or disease incurred while on active duty and qualifies a veteran for increased access to services and benefits). Put together, these barriers to treatment suggest that attending weekly in-person psychotherapy may be a difficult task for a significant subset of the veteran population. In fact, the literature shows that compared with their urban counterparts, rural veterans not only utilize outpatient psychotherapy at a lower rate but also attend fewer sessions; the reverse is true when telehealth treatment is provided as an option, with a greater proportion of rural veterans than urban veterans accessing services (Mott et al., 2015). To ensure that all veterans are able to access care and remain engaged long enough to receive maximum treatment benefit, options for receiving psychotherapy need to be expanded. When considering treatment options, then, it is important to highlight those that are both gold standard and

This article was published Online First September 22, 2016.

Jena L. Wierwille and Nicole D. Pukay-Martin, Cincinnati VA Medical Center, Cincinnati, Ohio; Kathleen M. Chard, Cincinnati VA Medical Center and Department of Psychiatry and Behavioral Neuroscience, University of Cincinnati; Meredith C. Klump, Cincinnati VA Medical Center.

The contents do not represent the views of the U.S. Department of Veterans Affairs or the United States Government.

Correspondence concerning this article should be addressed to Jena L. Wierwille, who is now at Veterans Health Administration National Center for Organization Development, 11500 Northlake Drive, Cincinnati, OH 45249. E-mail: jena.wierwille@va.gov

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

WIERWILLE, PUKAY-MARTIN, CHARD, AND KLUMP

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

flexible, meaning that they can be delivered to the veteran in a way that is individualized and convenient.

Evidence-based treatments for PTSD such as cognitive processing therapy (CPT) and prolonged exposure (PE) delivered via telehealth (i.e., video teleconferencing) may offer veterans these assurances. Cited as evidence-based treatments by the Institute of Medicine (2007) and the Departments of Veterans Affairs and Defense (2003), CPT and PE are, by definition, gold-standard psychotherapies for PTSD. Research related to access and utilization of CPT and PE can be seen in the PTSD telehealth literature.

Examination of the impact and feasibility of empirically based treatments (EBTs) for PTSD via telehealth has grown significantly over the past decade (Fortney et al., 2015; Gros, Yoder, Tuerk, Lozano, & Acierno, 2011; Marchand et al., 2011; Morland et al., 2014; Niles et al., 2012; Strachan, Gros, Ruggiero, Lejuez, & Acierno, 2012; Thorp, Fidler, Moreno, Floto, & Agha, 2012; Tuerk, Yoder, Ruggiero, Gros, & Acierno, 2010). Findings are consistent in suggesting that this alternative method of service delivery offers several economic and logistical advantages, including reduced transportation costs and increased access to specialized care (Gros et al., 2013). These advantages may be especially notable for individuals seeking care that might otherwise be challenged by barriers such as child care issues, inflexible work schedules, travel distance, physical disabilities, and/or severe mental health conditions.

The first wave of randomized controlled trials (RCTs) on EBTs via telehealth focused primarily on practical considerations and found no differences for attendance, retention, participant satisfaction, or clinician satisfaction between telehealth and outpatient conditions (Frueh et al., 2007; Morland et al., 2004). By demonstrating comparable rates of attendance and retention, research suggests again that because of the practical advantages, telehealth treatment may be a helpful and more realistic treatment option for those that may have difficulty seeking outpatient treatment. Nevertheless, while demonstrating the feasibility of telehealth practice is an important contribution to the literature, it does not address the clinical issue of effectiveness.

Fortunately, more recent studies have expanded the literature to examine clinical outcomes, such as changes in PTSD and depression symptom severity. The findings are generally consistent in suggesting that, among group-based cognitive psychotherapies, there are no significant differences in symptom reduction between outpatient and telehealth treatment (Gros et al., 2013). Examples of these group-based cognitive psychotherapies include Group CPT and Group cognitive–behavioral therapy (CBT) for anger management. It is important to note, however, that this literature is primarily focused on group psychotherapy and is limited to a small number of studies with relatively small sample sizes. When studies involving individual exposure-based therapies are included, differences between treatment delivery methods emerge. In a review of this literature, Gros and colleagues (2013) suggest that there may be unique factors to consider when delivering individual exposure-based therapies via telehealth for PTSD, because two of three studies in their review demonstrated larger effect sizes for the outpatient condition compared with the telehealth condition. Although research has not yet determined the reason for the outcome discrepancies, one explanation that has been offered is that the effectiveness of imaginal exposure for PTSD may be negatively impacted when delivered via telehealth.

To date, no known studies have conducted a direct comparison of outpatient and telehealth treatment for both individual cognitive and exposure therapies in a clinical sample. Though RCTs are an important contribution to the literature, they are designed to capture outcomes under ideal rather than real-world circumstances. Comparing the delivery of EBPs via telehealth versus outpatient during the course of routine clinical practice would not only provide an opportunity for future research to evaluate the generalizability of the RCT literature on this topic, but also to identify potentially important pragmatic information related to the delivery of telehealth treatment in clinical settings.

The goal of the present study was to evaluate PTSD and depression symptom change for both individual CPT and PE, two well-established EBPs for PTSD, across treatment delivery methods (outpatient and telehealth) in a real-world clinical setting. Given the inconsistent findings in the literature as well as the limited number of non-RCT studies, no specific hypotheses were made with regard to outcomes.

## Method

The present effectiveness study used archival data that was collected during the course of conducting traditional clinical operations at a VA PTSD clinic. The use of this archival data was approved by the VA Medical Center Institutional Review Board (IRB).

### Participants

All veterans in the present study ($n = 221$) met criteria for PTSD according to the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text revision; *DSM–IV–TR*; American Psychiatric Association, 2000) and participated in outpatient or telehealth CPT or PE for PTSD. Diagnoses in outpatient treatment were made on the basis of the Clinician-Administered PTSD Scale (CAPS; Blake et al., 1995) interview, and those in telehealth treatment were made on the basis of information provided by the referring therapist, chart diagnoses, and scores on the Posttraumatic Checklist–Specific Version (PCL-S; Weathers, Litz, Herman, Huska, & Keane, 1993). Type of treatment including outpatient or telehealth and CPT or PE was determined by veteran choice as part of routine clinical practice.

Outpatient treatment was provided at a VA specialty trauma center in the Midwest by 30 certified CPT and PE providers. Three of the 30 outpatient clinicians housed in the specialty PTSD clinic also provided telehealth treatment through videoconferencing to veterans presenting to 15 VA-affiliated Community-Based Outpatient Clinics (CBOCs) in the Midwest. Provider certification in CPT requires completion of Web-based and live trainings, participation in group or individual consultation/supervision of at least two completed individual or group cases, and use of a standardized instrument to assess weekly PTSD symptom progress. Certification in PE requires participation in a live training and one-on-one supervision/consultation of at least two cases. Because all providers achieved certified provider status in CPT and PE, clinic policy did not mandate formal supervision; however, informal peer consultation as well as consultation with the clinic director and associate director was available as needed.

The current sample was drawn from veterans presenting to the telehealth and outpatient PTSD clinics between October 2012 and

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

March 2014. During this time period, 138 veterans were referred to the PTSD telehealth clinic. Of those referred, 115 attended an initial consult appointment (83.3% of referrals); 87 of those veterans started treatment (63.0% of referrals, 75.7% of those who attended initial appointment); and 85 veterans started CPT or PE (61.6% of referrals, 73.9% of those who attended initial appointment, 97.7% of those who started treatment). For the outpatient clinic, there was no data collected regarding how many people were referred and did not present for an initial consult appointment. A total of 246 veterans presented to the clinic for an initial consult appointment. Of those veterans, 176 started treatment (71.5% of those who attended initial appointment), and 136 started CPT or PE (55.3% of those who attended initial appointment, 77.2% of those who started treatment). Therefore, the final sample includes 136 veterans who attended at least one session of CPT or PE in the outpatient clinic and 85 veterans who attended at least one session of CPT or PE in the telehealth clinic.

Table 1 summarizes the number of veterans in each treatment group, as well as demographic and baseline characteristics of the sample. Period of service was defined as Vietnam Era (2/28/1961–5/7/1975), Post-Vietnam/Persian Gulf War (5/8/1975–9/10/2001), and Operation Iraqi Freedom/Operation Enduring Freedom/Operation New Dawn (OIF/OEF/OND) (9/11/2001–present). Veterans with imminent suicidal and/or homicidal intention(s), uncontrolled psychosis or mania, or treatment-interfering substance use were referred for other services to address these more pressing clinical concerns. All other comorbid disorders were allowed.

## Procedure

All veterans completed the PCL-S (Weathers et al., 1993), a 17-item, self-report measure of PTSD symptom distress; and the Beck Depression Inventory, Second Edition (BDI-II; Beck, Steer, & Brown, 1996), a 21-item self-report measure of depression symptom severity at pre- and posttreatment. Both measures have been shown to have excellent psychometric properties, including test–retest reliability and concurrent validity (Beck et al., 1996; Blanchard, Jones-Alexander, Buckley, & Forneris, 1996; Steer & Clark, 1997). Pretreatment scores reflect the first PCL-S and BDI-II scores recorded for each patient. Posttreatment scores reflect the last PCL-S and BDI-II scores recorded for each patient, which may have been collected at the final session prior to dropout or at the completion of treatment. All veterans included in the current study attended an intake session and at least one treatment session. Completion of treatment was defined as documented agreement between the patient and provider to terminate treatment because the full therapy protocol had been completed, sufficient symptom alleviation had occurred, or no symptom alleviation had occurred despite a majority of the protocol having been completed. Treatment completers attended an average of 11.29 sessions ($SD$ = 2.91), while noncompleters attended an average of 4.26 sessions ($SD$ = 2.86). Treatment sessions were conducted according to the CPT (Resick, Monson, & Chard, 2010) and PE (Foa, Hembree, & Rothbaum, 2007) manuals.

Table 1
*Differences in Sample Characteristics Between Individual Who Received Treatment Via Telehealth Versus Outpatient*

| Variable | Telehealth ($n$ = 85) | Outpatient ($n$ = 136) | $\chi^2$ or $t$ | $df$ | $p$ |
|---|---|---|---|---|---|
| Gender | | | .34 | 1 | .559 |
|   Male | 89.41% | 86.76% | | | |
|   Female | 10.59% | 13.24% | | | |
| Age $M(SD)$ | 47.13 (15.39) | 46.35 (38.01) | −.18 | 219 | .857 |
| Minority status | 14.12% | 14.71% | .02 | 1 | .904 |
| Service era | | | 13.43 | 2 | .001 |
|   Vietnam | 29.41% | 27.21% | | | |
|   Post-Vietnam/Persian Gulf | 48.24% | 27.94% | | | |
|   OEF/OIF | 22.35% | 44.85% | | | |
| Service connected | 60.00% | 20.59% | 35.37 | 1 | <.001 |
| Service connection amount | 56.67 (20.46) | 44.07 (27.35) | −2.30 | 76 | .024 |
| Type of treatment | | | 2.32 | 1 | .128 |
|   CPT | 72.94% | 81.62% | | | |
|   PE | 27.06% | 18.38% | | | |
| Dropout | 60.00% | 47.06% | 3.51 | 1 | .061 |
| Sessions attended | 7.31 (4.87) | 7.84 (4.34) | .85 | 219 | .399 |
| PTSD symptom severity[a] | | | | | |
|   Pretreatment, $M(SE)$ | 65.08 (1.25) | 60.67 (.94) | −2.82 | 996 | .005 |
|   Posttreatment, $M(SE)$ | 55.49 (1.85) | 44.12 (1.50) | −4.77 | 22,393 | <.001 |
| Depression symptom severity[a] | | | | | |
|   Pretreatment, $M(SE)$ | 32.11 (1.39) | 30.47 (.98) | −.99 | 2,032 | .323 |
|   Posttreatment, $M(SE)$ | 28.20 (1.97) | 22.36 (1.73) | −2.80 | 66 | .007 |

*Note.* OEF/OIF = Operation Enduring Freedom/Operation Iraqi Freedom; CPT = cognitive processing therapy; PE = prolonged exposure; PTSD = posttraumatic stress disorder. PTSD symptom severity was measured by the Posttraumatic Stress Disorder Checklist–Specific Version (PCL-S; Weathers et al., 1993). Depression symptom severity was measured by the Beck Depression Inventory–Second Edition (BDI-II; Beck, Steer, & Brown, 1996).
[a] Means, *SEs*, and $\chi^2$ statistics are based on multiple imputation dataset.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Data Analytic Plan

To evaluate baseline differences between telehealth and outpatient groups, $t$ tests for continuous demographic variables and $\chi^2$ analyses for categorical demographic variables were conducted. To test the main hypotheses regarding differences in treatment outcome between telehealth and outpatient samples, two multilevel models were estimated. In this analysis, time (pre- and posttreatment), telehealth status (telehealth vs. outpatient), and their interaction were included as predictors of PCL-S and BDI-II scores in two separate models. Demographic and treatment variables (i.e., gender [female vs. male], race [minority status vs. Caucasian], service era [Vietnam vs. Post-Vietnam/Persian Gulf vs. OEF/OIF], service connection status [service connected for PTSD: yes or no], treatment type [CPT vs. PE]) were included as covariates, and a random intercept was estimated. Time was modeled as a Level 1 variable nested within individual (Level 2), and all other predictors were included at Level 2. A diagonal covariance structure at Level 1 was specified for each model. A follow-up analysis was then conducted adding completer status (completer vs. dropout) and its interaction with time as predictors of PCL-S and BDI-II scores in separate multilevel models. To evaluate clinically significant improvement in PTSD symptoms, defined as a 10-point decrease on the PCL-S (Monson et al., 2008), a $\chi^2$ analysis was conducted comparing proportion of participants who experienced clinically significant improvement in outpatient versus telehealth conditions. All analyses were conducted using SPSS Version 22 (IBM Corp., 2013), and multiple imputation was used to account for missing data (Schafer, 1997).

Missing data was present on 4.1% of the values in the overall dataset. This included 51.1% of participants having missing data on one or more variables, with missing values primarily occurring on posttreatment outcome measures. The degree of missing posttreatment outcomes ranged from 4.5% on the PCL to 49.8% on the BDI-II. Although demographic information was available for all participants, there were a small number of cases with missing data for pretreatment PCL (2.3%) and BDI-II (4.5%) scores. To address this issue, the automatic imputation method in SPSS Missing Values Version 22 (IBM Corp., 2013) was used to generate multiple imputation data sets, and these data sets were used testing the study hypotheses. Values for PCL and BDI-II at pre- and posttreatment were imputed using all demographic variables (gender, age, minority status, service era, and service connection status), as well as telehealth status, completer status, treatment type, and number of sessions attended as indicators. Multiple imputation (MI) is a Bayesian approach to addressing missing data that involves replacing missing data values with estimates of plausible values over the course of a specified number of data sets. This procedure has the advantages of allowing for the calculation of standard statistical techniques using the total sample, while providing parameter estimates that are shown to be less biased than traditional approaches to missing data management, such as casewise deletion or mean replacement (Graham, 2009; Schafer & Graham, 2002). Typically, 5–10 MI data sets are sufficient to provide accurate parameter estimates. In this study, we generated 10 MI data sets, because this number shows a high degree of efficiency in providing unbiased parameter estimates even among data sets with large degrees of missing data (Schafer & Graham, 2002).

## Results

Results from analyses investigating pretreatment differences are displayed in Table 1. There were no significant differences between telehealth and outpatient groups in terms of gender, age, minority status, or type of treatment. Though the telehealth group had a 13% numerically higher dropout rate than the outpatient group (telehealth group = 60.00%, outpatient = 47.06%), $\chi^2(1) = 3.51$, $p = .061$, this difference did not reach statistical significance. Service era, service connection, PCL-S scores at pre- and posttreatment, and BDI-II scores at posttreatment differed significantly by telehealth status. A higher percentage of veterans receiving outpatient treatment were OIF/OEF/OND veterans, while a higher percentage of veterans receiving telehealth treatment were Post-Vietnam and Persian Gulf veterans (Table 1). Veterans in the telehealth group were more likely to be service connected, and of those who were service connected, the telehealth group had a higher level of service connection for PTSD. Veterans in the telehealth group also had higher PCL-S scores at pre- and posttreatment and higher BDI-II scores at posttreatment.

Results of the multilevel modeling analyses predicting PCL-S and BDI-II scores are displayed in Table 2. In the model (time, telehealth status, their interaction, and covariates) predicting PCL-S scores, the main effect of time and its interaction with telehealth status were significant. Although PCL-S scores decreased significantly from pre- to posttreatment for both groups, there was a greater decrease in scores in the outpatient than in the telehealth group. None of the covariates were statistically significant. Results for the model predicting BDI-II scores demonstrated a similar pattern; the main effect of time and its interaction with telehealth status were significant predictors. Though BDI-II scores decreased significantly from pre- to posttreatment for both groups, there was a greater decrease in scores in the outpatient than in the telehealth group.

In the follow-up analysis (time, telehealth status, completer status, time by telehealth status interaction, time by completer status interaction, and covariates) predicting PCL-S scores, there was a significant main effect for time, a significant interaction between time and telehealth status, and a significant interaction between time and completer status. Similar to Model 1, PCL-S scores decreased significantly from pre- to posttreatment for both groups, and there was a greater decrease in scores in the outpatient than in the telehealth group. Figure 1 illustrates this significant interaction between time and telehealth status. Additionally, PCL-S scores did not differ by completer status at pretreatment; however, completers had lower scores at posttreatment than noncompleters. Figure 2 illustrates this significant interaction between time and completer status. Again, no covariates were significant predictors of PCL-S scores. For the follow-up analysis predicting BDI-II scores, the interaction between time and completer status was significant. Similar to the pattern of results for PCL-S scores, BDI-II scores did not differ by completer status at pretreatment; however, completers had lower scores at posttreatment than noncompleters did. Time, telehealth status, and their interaction, as well as covariates, were not significant predictors of BDI-II scores.

The majority of participants in the outpatient (82.9%) and telehealth (73.2%) conditions who completed treatment achieved clinically significant improvement as measured by the PCL-S. There was no significant difference between condition in the number of

EFFECTIVENESS OF PTSD TELEHEALTH TREATMENT    377

Table 2

*Results From Multilevel Modeling Analyses Using Time, Telehealth Status, and Treatment Completion Status to Predict Posttraumatic Stress Disorder (PTSD) and Depression Symptom Severity Posttreatment*

| | PCL-S | | | | BDI-II | | | |
|---|---|---|---|---|---|---|---|---|
| Variable | B | SE | t | p | B | SE | t | p |
| Model 1 | | | | | | | | |
| Intercept | 61.90 | 2.07 | 29.82 | <.001 | 31.22 | 2.13 | 14.67 | <.001 |
| Time | −16.55 | 1.32 | −12.50 | <.001 | −8.11 | 1.72 | −4.70 | <.001 |
| Telehealth | 3.14 | 1.81 | 1.74 | .082 | .54 | 1.90 | .28 | .778 |
| Time*Telehealth | 6.95 | 2.16 | 3.22 | .001 | 4.20 | 2.05 | 2.04 | .044 |
| Female | 2.25 | 2.35 | .96 | .337 | 1.35 | 2.45 | .55 | .582 |
| Racial minority status | −.80 | 2.14 | −.38 | .708 | −2.77 | 2.19 | −1.26 | .207 |
| Service era | | | | | | | | |
| Vietnam | −1.43 | 1.93 | −.74 | .459 | −2.05 | 2.04 | −1.00 | .317 |
| Post-Vietnam/Persian Gulf | .64 | 1.84 | .35 | .727 | 2.41 | 1.91 | 1.26 | .209 |
| Service connected for PTSD | 2.66 | 1.76 | 1.51 | .131 | 1.48 | 1.76 | .84 | .401 |
| Treatment type | −2.14 | 1.82 | −1.18 | .239 | −1.16 | 1.89 | −.61 | .539 |
| Model 2 | | | | | | | | |
| Intercept | 63.04 | 2.25 | 28.07 | <.001 | 33.03 | 2.29 | 14.40 | <.001 |
| Time | −8.25 | 1.52 | −5.42 | <.001 | −3.96 | 2.98 | −1.33 | .205 |
| Telehealth | 2.82 | 1.81 | 1.55 | .120 | −.01 | 1.90 | −.01 | .995 |
| Completer | −1.68 | 1.53 | −1.10 | .272 | −3.00 | 1.64 | −1.83 | .068 |
| Time*Telehealth | 4.93 | 1.89 | 2.61 | .009 | 3.18 | 2.04 | 1.56 | .124 |
| Time*Completer | −15.69 | 1.82 | −8.61 | <.001 | −7.84 | 3.02 | −2.59 | .019 |
| Female | 1.46 | 2.33 | .63 | .532 | .19 | 2.39 | .80 | .936 |
| Racial minority status | −.28 | 2.11 | −.13 | .895 | −2.11 | 2.17 | −.97 | .332 |
| Service era | | | | | | | | |
| Vietnam | −1.22 | 1.90 | −.64 | .520 | −1.64 | 2.01 | −.82 | .415 |
| Post-Vietnam/Persian Gulf | .69 | 1.81 | .38 | .702 | 2.67 | 1.87 | 1.43 | .155 |
| Service connected for PTSD | 2.75 | 1.73 | 1.59 | .111 | 1.56 | 1.71 | .91 | .362 |
| Treatment type | −2.53 | 1.80 | −1.41 | .160 | −1.60 | 1.84 | −.87 | .383 |

*Note.* PCL-S = Posttraumatic Stress Disorder Checklist–Specific Version (PCL-S; Weathers et al., 1993); BDI-II = Beck Depression Inventory–Second Edition (BDI-II; Beck, Steer, & Brown, 1996). The comparison group for service era was Operation Enduring Freedom/Operation Iraqi Freedom veterans.

participants who demonstrated clinically significant improvement, $\chi^2(1) = 0.99$, $p = .319$.

## Discussion and Conclusion

Results of the present study suggest that even after baseline differences in demographics and PTSD symptom severity are taken into account, the effectiveness of CPT and PE for PTSD may not be comparable across treatment delivery modalities. Veterans who received CPT and PE treatment in the traditional outpatient setting experienced greater PTSD symptom reduction from pre- to posttreatment than veterans who received the same treatments in the telehealth setting. It is important to note that the present study demonstrated some meaningful baseline clinical differences between the telehealth and outpatient groups because this was a



*Figure 1.* Pre- to posttreatment change for veterans engaging in outpatient and telehealth treatment. This interaction is graphed using estimated marginal means from Model 2, in which time, treatment condition, completer status, the interaction between time and treatment condition, the interaction between time and completer status, and relevant covariates predict self-reported posttraumatic stress disorder (PTSD) symptoms.



*Figure 2.* Pre- to posttreatment change across outpatient and telehealth treatment modalities for veterans that completed versus did not complete treatment. This interaction is graphed using estimated marginal means from Model 2, in which time, treatment condition, completer status, the interaction between time and treatment condition, the interaction between time and completer status, and relevant covariates predict self-reported posttraumatic stress disorder (PTSD) symptoms.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

somewhat unexpected finding and may help to provide some explanation for the outcome differences between the two treatment delivery modalities. Veterans presenting for telehealth treatment, in comparison to veterans presenting for outpatient treatment, had a larger proportion of Post-Vietnam and Persian Gulf veterans, higher PTSD and depression symptom scores, and greater service connection for PTSD. These findings suggest that meaningful clinical differences may exist between veterans who present for telehealth treatment and veterans who present for outpatient treatment, with veterans in telehealth being potentially more severely disabled by PTSD. Given that RCTs have not consistently found outcome differences between outpatient and telehealth treatments (Acierno et al., 2016; Frueh et al., 2007; Morland et al., 2004), it is more likely that differences demonstrated in the present study are a result of the clinical sample and setting and, more specifically, characteristics of the veterans who presented for telehealth treatment.

Although not statistically significant, the dropout rate for the telehealth group was numerically higher than the outpatient group. Given that RCTs have found no differences in retention (Frueh et al., 2007; Morland et al., 2004), the differential dropout rate found in the present study is another indication that veterans who present for telehealth treatment may indeed be a unique population that are not only potentially more severely disabled, but also more at risk for dropping out of treatment prematurely. Regardless of how veterans received treatment, those who completed treatment experienced greater symptom alleviation than those who did not complete treatment. Mott et al. (2015) found that veterans in rural areas who had higher rates of service-connection (i.e., more severe PTSD disability) accessed telehealth services at higher rates when made available; however, they also found that this population is challenged by greater distance to care, older age, and more limited financial means. Future research would benefit from a more specific examination of baseline differences between veterans who undergo telehealth versus outpatient treatment as well as dropout rate comparisons across and within treatments and treatment delivery modalities. Future research would also benefit from an analysis of the reasons why participants who receive telehealth treatment choose to do so.

Despite the outcome differences for treatment modality in the present study, veterans who received outpatient and telehealth treatment achieved clinically significant change from pre- to post-treatment (Fortney et al., 2015; Gros et al., 2013; Morland et al., 2014). It remains, therefore, that for veterans who may not have the advantage of accessing both outpatient and telehealth services, telehealth treatment may be an effective alternative option to no treatment at all. In addition, no significant differences were found between CPT and PE for PTSD, suggesting that both evidence-based treatments lend themselves well to treatment delivery via telehealth.

One of the clearest strengths of the present study is the direct comparison of outpatient and telehealth delivery methods for two individual evidence-based treatments for PTSD. Additional strengths include a diverse and large clinical sample, certified and highly trained providers, and veteran choice for type of treatment. Compared with a randomized design, the present study was able to more closely explore the impact of telehealth treatment in a real-world clinical setting.

Limitations of the current study include a quasi-experimental design, lack of longitudinal follow-up data, limited matching variables, and no qualitative explanations for dropouts. Because of the nonrandomized nature of the present study, it is not possible to confidently interpret the nonsignificant findings as evidence of treatment equivalence between outpatient and telehealth treatment for CPT and PE. Rather, one must consider these findings in the context of the larger body of research literature and attempt to address the limitations of the present study in future research. Additional limitations that reduce the ability to interpret the findings include differences in diagnostic procedures and number of providers for the outpatient and the telehealth samples.

Providing patients with high-quality care that is both accessible and effective is arguably one of the most important responsibilities of mental health providers today, particularly those in the VHA that continue to incur a high volume of unique patients each year. While telehealth treatment clearly reduces many of the logistical barriers to accessing treatment, such as time, energy, and cost, it has not been historically clear whether or not its efficacy was comparable to treatment delivered in the more traditional outpatient setting. The present study suggests that although treatment outcomes for outpatient and telehealth treatments may not be comparable, both options provide the opportunity for clinically significant change from pre- to posttreatment. Regardless of treatment delivery method, most patients who engage in and complete CPT or PE for PTSD will achieve significant reductions in PTSD symptoms. Identifying how to increase the number of patients who complete treatment regardless of treatment delivery modality will be an ongoing and challenging but important scientific undertaking.

## References

Acierno, R., Gros, D. F., Ruggiero, K. J., Hernandez-Tejada, M. A., Knapp, R. G., Lejuez, C. W., . . . Tuerk, P. W. (2016). Behavioral activation and therapeutic exposure for posttraumatic stress disorder: A noninferiority trial of treatment delivered in person versus home-based telehealth. *Depression and Anxiety, 33,* 415–423. http://dx.doi.org/10.1002/da.22476

American Psychiatric Association. (2000). *DSM–IV–TR: Diagnostic and statistical manual of mental disorders* (4th ed., text revision). New York, NY: Author.

Beck, A. T., Steer, R. A., & Brown, G. K. (1996). *Manual for the Beck Depression Inventory-II.* San Antonio, TX: Psychological Corporation.

Blake, D. D., Weathers, F. W., Nagy, L. M., Kaloupek, D. G., Gusman, F. D., Charney, D. S., & Keane, T. M. (1995). The development of a Clinician-Administered PTSD Scale. *Journal of Traumatic Stress, 8,* 75–90. http://dx.doi.org/10.1002/jts.2490080106

Blanchard, E. B., Jones-Alexander, J., Buckley, T. C., & Forneris, C. A. (1996). Psychometric properties of the PTSD Checklist (PCL). *Behaviour Research and Therapy, 34,* 669–673. http://dx.doi.org/10.1016/0005-7967(96)00033-2

Cully, J. A., Tolpin, L., Henderson, L., Jimenez, D., Kunik, M. E., & Petersen, L. A. (2008). Psychotherapy in the Veterans Health Administration: Missed opportunities? *Psychological Services, 5,* 320–331. http://dx.doi.org/10.1037/a0013719

Departments of Veterans Affairs and Defense. (2003). *VA/DoD Clinical practice guideline for the management of post-traumatic stress.* Washington, DC: Veterans Health Administration, Departments of Veterans Affairs and Health Affairs, Department of Defense.

Foa, E. B., Hembree, E. A., & Rothbaum, B. O. (2007). *Prolonged exposure therapy for PTSD: Emotional processing of traumatic experi-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

ences therapist guide (Treatments that work). New York, NY: Oxford University Press. http://dx.doi.org/10.1093/med:psych/9780195308501.001.0001

Fortney, J. C., Pyne, J. M., Kimbrell, T. A., Hudson, T. J., Robinson, D. E., Schneider, R., . . . Schnurr, P. P. (2015). Telemedicine-based collaborative care for posttraumatic stress disorder: A randomized clinical trial. Journal of the American Medical Association Psychiatry, 72, 58–67. http://dx.doi.org/10.1001/jamapsychiatry.2014.1575

Frueh, B. C., Monnier, J., Yim, E., Grubaugh, A. L., Hamner, M. B., & Knapp, R. G. (2007). A randomized trial of telepsychiatry for posttraumatic stress disorder. Journal of Telemedicine and Telecare, 13, 142–147. http://dx.doi.org/10.1258/135763307780677604

Graham, J. W. (2009). Missing data analysis: Making it work in the real world. Annual Review of Psychology, 60, 549–576. http://dx.doi.org/10.1146/annurev.psych.58.110405.085530

Gros, D. F., Morland, L. A., Greene, C. J., Acierno, R., Strachan, M., Egede, L. E., . . . Frueh, B. C. (2013). Delivery of evidence-based psychotherapy via video telehealth. Journal of Psychopathology and Behavioral Assessment, 35, 506–521. http://dx.doi.org/10.1007/s10862-013-9363-4

Gros, D. F., Yoder, M., Tuerk, P. W., Lozano, B. E., & Acierno, R. (2011). Exposure therapy for PTSD delivered to veterans via telehealth: Predictors of treatment completion and outcome and comparison to treatment delivered in person. Behavior Therapy, 42, 276–283. http://dx.doi.org/10.1016/j.beth.2010.07.005

IBM Corp. (2013). IBM SPSS Statistics for Windows (Version 22.0) [Computer software]. Armonk, NY: Author.

Institute of Medicine. (2007). PTSD compensation and military service. Washington, DC: National Academies Press.

Marchand, A., Beaulieu-Prévost, D., Guay, S., Bouchard, S., Drouin, M. S., & Germain, V. (2011). Relative efficacy of cognitive–behavioral therapy administered by videoconference for posttraumatic stress disorder: A six-month follow-up. Journal of Aggression, Maltreatment & Trauma, 20, 304–321. http://dx.doi.org/10.1080/10926771.2011.562479

Monson, C. M., Gradus, J. L., Young-Xu, Y., Schnurr, P. P., Price, J. L., & Schumm, J. A. (2008). Change in posttraumatic stress disorder symptoms: Do clinicians and patients agree? Psychological Assessment, 20, 131–138. http://dx.doi.org/10.1037/1040-3590.20.2.131

Morland, L. A., Mackintosh, M. A., Greene, C. J., Rosen, C. S., Chard, K. M., Resick, P., & Frueh, B. C. (2014). Cognitive processing therapy for posttraumatic stress disorder delivered to rural veterans via telemental health: A randomized noninferiority clinical trial. The Journal of Clinical Psychiatry, 75, 470–476. http://dx.doi.org/10.4088/JCP.13m08842

Mott, J. M., Grubbs, K. M., Sansgiry, S., Fortney, J. C., & Cully, J. A. (2015). Psychotherapy utilization among rural and urban veterans from 2007 to 2010. The Journal of Rural Health, 31, 235–243. http://dx.doi.org/10.1111/jrh.12099

Mott, J. M., Hundt, N. E., Sansgiry, S., Mignogna, J., & Cully, J. A. (2014). Changes in psychotherapy utilization among veterans with depression, anxiety, and PTSD. Psychiatric Services, 65, 106–112. http://dx.doi.org/10.1176/appi.ps.201300056

Mott, J. M., Stanley, M. A., Street, R. L., Jr., Grady, R. H., & Teng, E. J. (2014). Increasing engagement in evidence-based PTSD treatment through shared decision-making: A pilot study. Military Medicine, 179, 143–149. http://dx.doi.org/10.7205/MILMED-D-13-00363

Niles, B. L., Klunk-Gillis, J., Ryngala, D. J., Silverbogen, A. K., Paysnick, A., & Wolf, E. J. (2012). Comparing mindfulness and psychoeducation treatments for combat-related PTSD using a telehealth approach. Psychological Trauma: Theory, Research, Practice, and Policy, 4, 538–547. http://dx.doi.org/10.1037/a0026161

Resick, P. A., Monson, C. M., & Chard, K. M. (2010). Cognitive processing therapy: Veteran/military version: Therapist's manual. Washington, DC: Department of Veterans' Affairs.

Schafer, J. L. (1997). Analysis of incomplete multivariate data. London, England: Chapman & Hall. http://dx.doi.org/10.1201/9781439821862

Schafer, J. L., & Graham, J. W. (2002). Missing data: Our view of the state of the art. Psychological Methods, 7, 147–177. http://dx.doi.org/10.1037/1082-989X.7.2.147

Steer, R. A., & Clark, D. S. (1997). Psychometric properties of the Beck Depression Inventory-II with college students. Measurement & Evaluation in Counseling & Development, 30, 128–136.

Strachan, M., Gros, D. F., Ruggiero, K. J., Lejuez, C. W., & Acierno, R. (2012). An integrated approach to delivering exposure-based treatment for symptoms of PTSD and depression in OIF/OEF veterans: Preliminary findings. Behavior Therapy, 43, 560–569. http://dx.doi.org/10.1016/j.beth.2011.03.003

Thorp, S. R., Fidler, J., Moreno, L., Floto, E., & Agha, Z. (2012). Lessons learned from studies of psychotherapy for posttraumatic stress disorder via video teleconferencing. Psychological Services, 9, 197–199. http://dx.doi.org/10.1037/a0027057

Tuerk, P. W., Yoder, M., Ruggiero, K. J., Gros, D. F., & Acierno, R. (2010). A pilot study of prolonged exposure therapy for posttraumatic stress disorder delivered via telehealth technology. Journal of Traumatic Stress, 23, 116–123.

Weathers, F. W., Litz, B. T., Herman, D. S., Huska, J. A., & Keane, T. M. (1993, November). The PTSD Checklist (PCL): Reliability, validity, and diagnostic utility. Paper presented at the 9th annual conference of the ISTSS, San Antonio, TX.

Received August 5, 2015
Revision received July 28, 2016
Accepted August 16, 2016 ■

**CLINICAL AND RESEARCH REPORTS**

# Examination of Potential Differences in Reporting of Sensitive Psychosocial Measures via Diagnostic Evaluation Using Computer Video Telehealth

W. Curt LaFrance, Jr., M.D., M.P.H., Wing Lam Natalie Ho, B.S., Alana Bhatla, B.S., Grayson Baird, Ph.D., Hamada Hamid Altalib, D.O., M.P.H., Linda Godleski, M.D.

**Objective:** The authors compared baseline characteristics and reporting of psychosocial measures among veterans with seizures who were evaluated in-clinic or remotely via computer video telehealth (CVT). It was hypothesized that the CVT group would report less trauma history, drug use, and comorbid symptoms compared with veterans seen in-clinic.

**Methods:** A cross-sectional design was used to compare 72 veterans diagnosed with psychogenic nonepileptic seizures (PNES) or concurrent mixed epilepsy and PNES who were consecutively evaluated by a single clinician at the Providence Veterans Affairs Medical Center (PVAMC) Neuropsychiatric Clinic. In-clinic evaluations of veterans were performed at the PVAMC Neuropsychiatric Clinic (N=16), and remote evaluations of veterans referred to the VA National TeleMental Health Center were performed via CVT (N=56). All 72 patients were given comprehensive neuropsychiatric evaluations by direct interview, medical examination, and medical record review. Veterans' reporting of trauma and abuse history, drug use, and psychiatric

comorbidities was assessed, along with neurologic and psychiatric variables.

**Results:** No significant differences were found between veterans evaluated in-clinic or remotely with regard to baseline characteristics and reporting of potentially sensitive information, including trauma and abuse history, substance use, and comorbid symptoms.

**Conclusions:** Veterans with PNES evaluated via telehealth did not appear to withhold sensitive or personal information compared with those evaluated in-clinic, suggesting that CVT may be a comparable alternative for conducting evaluations. Baseline evaluations are used to determine treatment suitability, and telehealth allows clinicians to gain access to important information that may improve or inform care.

*J Neuropsychiatry Clin Neurosci 2020; 32:294–301; doi: 10.1176/appi.neuropsych.19080177*

In the United States, many patients have problems accessing medical and mental health care, especially those living in areas without medical professionals who have expertise specific to their disorder (1). This gap has led to the rise of the use of computer video telehealth (CVT), a live video conference between the patient and remote clinician.

The use of CVT has been growing in recent years. Many studies have investigated the use of telehealth in evaluating patients for various psychiatric disorders and delivering treatment, but none have compared telehealth (face-to-face) with in-clinic (eye-to-eye) encounters examining their effects on divulging sensitive history among neuropsychiatric patients with nonepileptic seizures. Given the nature of the remote interview, patients may view a video medium as less personal and may report trauma history, drug use, or comorbid symptoms differently because of the delicate nature of this information.

With the increasing popularity of CVT, a number of studies have evaluated the effectiveness of telehealth therapy to treat various mental disorders (2). Uniformly, these studies showed telehealth to be a comparable and reliable alternative to in-clinic treatment and, for certain disorders, found similar clinical outcomes for patients who received CVT treatment and those who were seen in-clinic (3–6); one study reported that patient satisfaction was higher among those who received CVT treatment (7). Extensive literature has also reported on use of telehealth in diverse patient populations, with a range of ages and diagnoses (8). In the Department of Veterans Affairs (VA) health care system, a number of similar studies have evaluated the efficacy of CVT for disorders in the veteran population (9–13). Feasibility studies have investigated neuropsychiatric evaluations using CVT (14, 15). Although studies have compared psychiatric diagnoses obtained via in-clinic versus CVT

evaluations (16, 17), no study has addressed disclosure of sensitive history. In addition, this is the first and only study of telehealth evaluations of patients with nonepileptic seizures.

Clinically, patients may withhold information (18, 19), especially if rapport has not been established, and they could be more likely to do so if an interview is done remotely. Therefore, we hypothesized that patients interviewed remotely via telehealth may be less likely to report trauma history, drug use, or comorbid symptoms, compared with those seen in-clinic, given the delicate nature of this information and the remote nature of the interview. Thus this study aimed to examine use of CVT in patient evaluation at the Providence VA Medical Center (PVAMC) Neuropsychiatric Clinic and the VA National TeleMental Health Center (NTMHC) because patients might report symptoms or other sensitive information differently through teleconference, compared with in-clinic appointments. Patient evaluation is a critical component of care because the initial consultation informs many aspects of treatment. The purpose of this preliminary study was to examine psychosocial information disclosed during initial consultation obtained in-clinic or via telehealth by the same clinician for the same patient population. Examining any differences between these groups can provide insight about whether use of CVT affects patients when disclosing information to the clinician and whether evaluation via telehealth is a viable option before treatment of patients with psychogenic nonepileptic seizures (PNES).

## METHODS

### Design

The study was approved by the PVAMC Institutional Review Board. Veterans diagnosed as having PNES were referred for consultative neuropsychiatric evaluation by means of a semistructured examination. This approach has been used to conduct deep phenotyping in studies of civilians with PNES (20–23). For this cross-sectional study, we conducted a comprehensive chart review of veterans diagnosed as having PNES at the PVAMC Neuropsychiatric Clinic.

### Sample

All patients consecutively seen by a single clinician at the PVAMC Neuropsychiatric Clinic (N=72) from November 2012 to April 2018 met all enrollment criteria. Inclusion criteria for the sample were male and female veterans, ages 18–89, who were diagnosed as having video-EEG–confirmed PNES (a small percentage had routine EEG/ambulatory EEG–captured ictus and clinician-reviewed patient video of the patient's typical events, similar to captured episodes). Seizure diagnosis was established according to the International League Against Epilepsy PNES standards (24). Patients with concurrent mixed PNES and epilepsy (N=4) were also included.

### Locations

The 72 subjects were divided into two categories: local and remote. Local patients were evaluated in-clinic at the PVAMC. Remote patients located at other VA medical centers and the VA Epilepsy Centers of Excellence (ECOE) (25) across the nation were evaluated via CVT through interfacility consults with the VA NTMHC. The VA NTMHC offers videoconferencing technology for clinicians at VA sites to provide medication management alone, with, or without telepsychotherapy services and diagnostic assessments to veterans around the country (26). Patients evaluated remotely used CVT at their local VA medical center or community-based outpatient clinic, where VA staff (telehealth clinical technicians) checked in the patient, set up the videoconferencing equipment, and were available via instant messaging if any clinical issues arose during the evaluation. Local staff utilized routine standard safety measures if a patient had a seizure during the session or if the patient disclosed acute safety concerns.

### Neuropsychiatric Evaluation

Patients in the local group were evaluated in-clinic at PVAMC, and those in the remote group were seen via CVT at their local VA, which was facilitated by telehealth staff at the patient-side site. CVT was conducted using high-definition, encrypted video for all appointments, ensuring high-quality audio and video fidelity.

Evaluations for each veteran (local and remote) were completed over two appointments by a single clinician (W.C.L.), who is American Board of Psychiatry and Neurology double-board certified in neurology and in psychiatry, at the PVAMC Neuropsychiatry Consult Clinic. During these two appointments, the clinician interviewed the patient in the initial evaluation for symptom history, work-up, sociodemographic information, developmental history, and other clinical factors. In addition, past medical records were reviewed and documented for additional information. Sociodemographic characteristics obtained included age, sex, race/ethnicity, age at PNES onset, number of years of education, employment, disability status, marital status, and driving status. Developmental history included physical, verbal, emotional, and sexual trauma or abuse; history of psychotherapy; total number of current medications, such as antiepileptic drugs (AEDs), psychotropics, and over-the-counter medications, and past AEDs taken. Clinical factors that were collected included current and past substance use and abuse and history of traumatic brain injury. Seizure frequency was assessed by asking patients to estimate the total number of seizures they had the week and the month prior to the first examination and the average number of seizures they have per week. The second evaluation appointment consisted of mental status examination and neurocognitive testing; the diagnostic formulation and recommendations were then shared with the patient (and significant other, if present). Evaluations included neuropsychiatric cognitive tests, mental status and neurological

examinations, and DSM-5 criteria psychiatric diagnoses review, which included all mood, anxiety, psychotic, somatic symptom, substance use, and personality disorders. Diagnoses were made through a semistructured history and systemic symptom review; all other examination procedures were administered during the evaluation appointments. For patients seen remotely via CVT, neurological examination results were obtained by past medical record review from patients' local neurologists.

Psychosocial symptom measures were completed to evaluate comorbid symptoms and quality of life. They included the Beck Depression Inventory–II (BDI) (27), Beck Anxiety Inventory (BAI) (28), Family Assessment Device (29), Quality of Life in Epilepsy Inventory–31 (30), Global Assessment of Functioning (31), Short-Form 36 Health Survey (SF-36) (32), Symptom Checklist–90 (33), CAGE questionnaire (34), Posttraumatic Stress Disorder Checklist (35), Health Locus of Control (36), and Mini-Mental State Examination (37).

Finally, laboratory work-up was collected by reviewing past medical records. All records of brain MRI, video EEG, routine EEG, and ambulatory EEG and results were collected.

### Statistical Analysis

All statistical analyses were conducted with SAS Software 9.4 (SAS, Inc. Cary, N.C.). Demographic and clinical factor differences that are categorical were compared between local and remote patients by using a nonparametric Fisher's exact test with the FREQ procedure. Continuous and count demographic and clinical factors were examined by using generalized linear modeling, assuming a normal, negative binomial, and binomial distribution, when appropriate, with the GLIMMIX procedure. Time-to-event phenomena were examined by using median and the Wilcoxon test. Alpha was established a priori at the 0.05 level, and all interval estimates were calculated for 95% confidence. Because this study's purpose was to estimate potential differences between the telehealth group and the in-clinic group to inform hypothesis generation and subsequent power analyses for future studies, alpha correction was not used because a type I error is less important in this context than is a type II error (i.e., failing to find differences that do exist).

### RESULTS

Analyses of various demographic characteristics, clinical factors, medical examination results, and diagnoses revealed no major differences between the local cohort (N=16) and the remote cohort (N=56). Remote patients were represented across the United States (California, N=11; Northwest, N=4; Southwest, N=8; Midwest, N=11; Southeast, N=7; Northeast, N=5; and Greater New England, N=10). All patients in both cohorts attended both evaluation appointments. Overall, no significant differences between the two cohorts were found in sociodemographic characteristics, clinical factors, current disorders, neurological examination results, neuropsychiatric

cognitive test results, and laboratory results. Statistically significant between-group differences were found for current other somatoform disorders and panic disorder and in use of ambulatory EEG. These comparisons are shown in Tables 1–3.

Analysis of reporting of comorbid symptoms and developmental histories, including trauma-abuse and substance use, also showed no major differences between local and remote groups. However, scores on the BAI, BDI, and certain subscales of the SF-36 differed significantly between the groups (Table 4). No between-group significant differences were found in verbal, physical, and emotional trauma as an adult or as a child (Table 5). Patients seen via CVT did not report difficulties during the video teleconferencing with history or examination questions or procedures. Most patients seen via telehealth showed high levels of satisfaction on quality assessment surveys administered from the national telehealth office.

### DISCUSSION

Overall, the major characteristics of the cohorts evaluated in-clinic or via telehealth did not differ significantly. In terms of reported sensitive psychosocial information and comorbid symptoms, we found no statistically significant differences between the cohorts. Although a few statistically significant differences were found between the cohorts, examining multiple aspects of the two cohorts could lead to a type I error. However, in general, patients from both groups were similar in demographic characteristics and in their reporting of clinical factors and developmental histories.

Statistically significant differences between cohorts included the presence of somatoform disorders and panic disorder, scores on mood and anxiety symptom scales, and use of ambulatory EEG. The remotely evaluated CVT group had a higher frequency of panic disorder and other somatoform disorder diagnoses. However, all other medical diagnoses did not differ significantly between groups. Given the similarities between the two groups across all other major psychiatric diagnoses and demographic factors, we did not expect to find these diagnostic differences between veterans in New England (i.e., those evaluated locally) and veterans in other parts of the country; however, the difference might be due to differences in patients' reports of paroxysmal symptoms in different clinics. In clinics across the country that are not seizure specialty clinics, some PNES semiologies may have been diagnosed as panic disorder previously, and patients may have described some symptoms as anxiety or other somatic symptoms.

A significant between-group difference in the use of ambulatory EEG was also found. The frequency of ambulatory EEG in the local group was higher, compared with the remote group, which may simply reflect a difference in practice and availability of equipment at different VA locations.

No significant between-group differences were found in patients' reports of abuse and trauma in their developmental

**TABLE 1. Demographic and clinical characteristics of veterans with psychogenic nonepileptic seizures (PNES) evaluated in-clinic or via computer video telehealth[a]**

| Characteristic | In-clinic (N=16)[b] | | Telehealth (N=56)[c] | | p |
|---|---|---|---|---|---|
| | N | % | N | % | |
| Age (years) (mean [95% CI]) | 51.4 | [44.9, 57.8] | 48.3 | [44.7, 51.7] | 0.3982 |
| Age at onset of seizures (years) (median [interquartile range]) | 41.0 | [23.0, 58.0] | 37.0 | [24.0, 48.0] | 0.6020 |
| Years from seizure onset to PNES diagnosis (median [interquartile range]) | 1.9 | [0.6, 23.8] | 5.2 | [1.3, 17.1] | 0.4364 |
| White | 15 | 93.8 | 47 | 83.9 | 0.506 |
| Hispanic or Latino | 0 | — | 3 | 5.4 | 0.4866 |
| Male | 11 | 68.8 | 47 | 83.9 | 0.1761 |
| Biological family history of seizures | 5 | 31.3 | 12 | 21.4 | 0.7789 |
| Employment status | | | | | 0.2670 |
| Unemployed | 12 | 75.0 | 44 | 78.6 | |
| Employed | 2 | 12.5 | 10 | 17.9 | |
| Retired | 2 | 12.5 | 1 | 1.8 | |
| Receiving disability benefits | 12 | 75.0 | 45 | 80.4 | 0.1858 |
| Living situation | | | | | 0.3566 |
| Alone | 3 | 18.8 | 10 | 17.9 | |
| With spouse and/or family | 9 | 56.3 | 33 | 58.9 | |
| With friends | 0 | — | 3 | 5.4 | |
| With significant other | 3 | 18.8 | 10 | 17.9 | |
| Currently driving | 6 | 37.5 | 22 | 39.3 | 0.6862 |
| Seizure counts | | | | | |
| Average per week (mean [95% CI]) | 10.7 | [4.9, 23.1] | 14.4 | [9.6, 21.7] | 0.4943 |
| Average per month (mean [95% CI]) | 23.9 | [11.3, 50.6] | 42.0 | [28.4, 62.3] | 0.1880 |
| Total in the week prior to evaluation (mean [95% CI]) | 6.4 | [3.0, 13.5] | 10.8 | [7.2, 16.3] | 0.2231 |
| Current substance abuse | 9 | 56.3 | 24 | 42.9 | 0.5241 |
| Past substance abuse | 11 | 68.8 | 36 | 64.3 | 0.7362 |
| Marijuana | 2 | 12.5 | 15 | 26.8 | 0.2354 |
| Cocaine | 0 | — | 8 | 14.3 | 0.1088 |
| Heroin | 1 | 6.3 | 1 | 1.8 | 0.3379 |
| Stimulants | 0 | — | 7 | 12.5 | 0.1366 |
| Prescription drugs | 1 | 6.3 | 7 | 12.5 | 0.4830 |
| Alcohol | 7 | 43.8 | 29 | 51.8 | 0.5708 |
| Current tobacco use | 4 | 25.0 | 19 | 33.9 | 0.3029 |
| Current alcohol use | 5 | 31.3 | 20 | 35.7 | 0.6062 |
| Current illicit drug use | 4 | 25.0 | 9 | 16.1 | 0.6332 |
| Current marijuana use | 4 | 25.0 | 8 | 14.3 | 0.3105 |
| Number of current medications (mean [95% CI]) | 10.9 | [8.2, 14.6] | 13.9 | [12.0, 16.2] | 0.1426 |
| Currently taking AEDs | 14.0 | 87.5 | 44.0 | 78.6 | 0.7210 |
| Number of AEDs (mean [95% CI]) | 2.7 | [1.9, 3.7] | 2.6 | [2.2, 3.1] | 0.8334 |
| Number of months taking AEDs (cumulative) (mean [95% CI]) | 56.9 | [22.1, 146.6] | 57.7 | [28.5, 116.8] | 0.9809 |
| Currently taking benzodiazepines | 6 | 37.5 | 12 | 21.4 | 0.2044 |
| Currently taking antidepressants | 13 | 81.3 | 34 | 60.7 | 0.1281 |
| Currently taking optimized antidepressants | 7 | 43.8 | 25 | 44.6 | 0.6419 |
| Currently taking antipsychotics | 1 | 6.3 | 6 | 10.7 | 0.5950 |
| History of psychotherapy | 9 | 56.3 | 44 | 78.6 | 0.0546 |
| Supportive | 6 | 37.5 | 20 | 35.7 | 0.5154 |
| Behavioral | 0 | — | 3 | 5.4 | 0.5154 |
| Psychodynamic | 0 | — | 1 | 1.8 | 0.5154 |
| Marital or family | 0 | — | 3 | 5.4 | 0.5154 |
| Group | 0 | — | 5 | 8.9 | 0.5154 |
| Substance abuse | 1 | 6.3 | 1 | 1.8 | 0.5154 |
| Cognitive-behavioral | 1 | 6.3 | 7 | 12.5 | 0.5154 |
| Current psychotherapy | 7 | 43.8 | 29 | 51.8 | 0.4841 |
| Supportive | 6 | 37.5 | 17 | 30.4 | 0.3206 |
| Behavioral | 0 | — | 3 | 5.4 | 0.3206 |
| Group | 0 | — | 3 | 5.4 | 0.3206 |
| Cognitive-behavioral | 1 | 6.3 | 1 | 1.8 | 0.3206 |

[a] AEDs=antiepileptic drugs.
[b] The in-clinic group included the following racial classification: Native American, N=1.
[c] The telehealth group included the following racial classifications: Native American, N=1; Asian, N=1; African American, N=5; multiracial, N=2.

**TABLE 2. Psychiatric diagnoses of veterans with psychogenic nonepileptic seizures evaluated in-clinic or via computer video telehealth**

| Current diagnosis | In-clinic (N=16) N | In-clinic (N=16) % | Telehealth (N=56) N | Telehealth (N=56) % | p[a] |
|---|---|---|---|---|---|
| Anxiety disorder | 14 | 87.5 | 53 | 94.6 | 0.3216 |
| Posttraumatic stress disorder | 10 | 62.5 | 33 | 58.9 | 0.7973 |
| Generalized anxiety disorder | 6 | 37.5 | 28 | 50.0 | 0.3771 |
| Obsessive-compulsive disorder | 2 | 12.5 | 8 | 14.3 | 0.8555 |
| Panic disorder | 2 | 12.5 | 25 | 44.6 | **0.0192** |
| Mood disorder | 12 | 75.0 | 47 | 83.9 | 0.4129 |
| Other somatoform disorder | 13 | 81.3 | 55 | 98.2 | **0.0090** |
| Learning disorder | 3 | 18.8 | 14 | 25.0 | 0.6037 |
| Eating disorder | 0 | — | 1 | 1.8 | 0.5904 |
| Attention-deficit disorder | 2 | 12.5 | 2 | 3.6 | 0.1691 |
| Adjustment disorder | 1 | 6.3 | 2 | 3.6 | 0.6363 |
| Substance use disorder | 11 | 68.8 | 33 | 58.9 | 0.4773 |
| Schizophrenia | 0 | — | 1 | 1.8 | 0.5904 |
| Cognitive disorder, not otherwise specified | 11 | 68.8 | 48 | 85.7 | 0.1198 |
| Personality disorder | 12 | 75.0 | 30 | 53.6 | 0.1252 |
| Personality trait | 8 | 50.0 | 32 | 57.1 | 0.6121 |
| Axis II diagnosis (cumulative frequency)[b] | | | | | |
| Histrionic personality disorder | 0 | | 1 | | |
| Avoidant personality disorder | 2 | | 4 | | |
| Obsessive-compulsive personality disorder | 11 | | 30 | | |
| Borderline personality disorder | 1 | | 1 | | |
| Narcissistic personality disorder | 0 | | 2 | | |
| Dependent personality disorder | 1 | | 3 | | |
| Mixed personality disorder | 0 | | 1 | | |
| Personality disorder not otherwise specified | 1 | | 3 | | |
| Cluster B traits | 5 | | 18 | | |
| Cluster C traits | 3 | | 15 | | |
| More than one anxiety disorder | 12 | 75.0 | 36 | 64.3 | 0.3163 |
| More than one mood disorder | 4 | 25.0 | 15 | 26.8 | 0.7347 |
| More than one substance use disorder | 8 | 50.0 | 18 | 28.1 | 0.1434 |

[a] Bold indicates statistically significant difference between groups.
[b] Cumulative frequencies show the number of times a certain disorder was diagnosed in either group.

**TABLE 3. Results of medical examination of veterans with psychogenic nonepileptic seizures evaluated in-clinic or via computer video telehealth**

| Variable | In-clinic (N=16) N | In-clinic (N=16) % | Telehealth (N=56) N | Telehealth (N=56) % | p[a] |
|---|---|---|---|---|---|
| Brain MRI | 14 | 87.5 | 48 | 85.7 | 0.8555 |
| Normal | 4 | 25.0 | 18 | 32.1 | 0.6021 |
| Abnormal | 9 | 56.3 | 29 | 51.8 | |
| Routine EEG | 12 | 75.0 | 32 | 57.1 | 0.1963 |
| Abnormal | 4 | 25.0 | 11 | 34.4 | 0.8954 |
| Epileptiform activity | | | | | 0.7735 |
| None | 9 | 56.3 | 23 | 41.1 | |
| Spikes | 0 | — | 1 | 1.8 | |
| Sharps | 1 | 6.3 | 2 | 3.6 | |
| Slowing | 0 | — | 2 | 3.6 | |
| Generalized epileptiform discharge | 2 | 12.5 | 2 | 3.6 | |
| Ambulatory EEG | 5 | 31.3 | 5 | 8.9 | **0.0228** |
| Abnormal | 1 | 20.0 | 2 | 40.0 | 0.1819 |
| Epileptiform activity | | | | | 0.2439 |
| None | 4 | 25.0 | 3 | 5.4 | |
| Slowing | 0 | — | 1 | 1.8 | |
| Video EEG | 14 | 87.5 | 52 | 92.9 | 0.4941 |
| Abnormal | 4 | 28.6 | 13 | 25.0 | 0.8813 |
| Epileptiform activity | | | | | 0.5296 |
| None | 10 | 62.5 | 41 | 73.2 | |
| Spikes | 0 | — | 2 | 3.6 | |
| Sharps | 1 | 6.25 | 0 | — | |
| Slowing | 0 | 0.0 | 1 | 1.8 | |
| Generalized epileptiform discharge | 1 | 6.3 | 2 | 3.6 | |
| Other | 0 | — | 1 | 1.8 | |
| Elemental neurological examination: abnormal | 12 | 75 | 32 | 57 | 0.3166 |

[a] Bold indicates statistically significant difference between groups.

Both BAI and BDI scores were in the moderate-to-low-severity level in both groups, and the groups were not clinically different in severity. Ultimately, patients seen via CVT did not seem to underreport their comorbid symptoms, compared with those evaluated in-clinic. Statistically significant differences in certain subscales of the SF-36—physical functioning and general health—were noted. SF-36 general health scores were higher in the remote group, indicating better health, whereas physical functioning scores were higher in the local group, indicating better functioning. This may be a result of slight differences in physical symptoms or reporting of symptoms in local and remote groups. We did not find a response bias favoring either group. Because the symptom scales were administered and scored similarly across groups, we do not believe these differences were due to acquisition errors.

As noted in the introduction, prior studies have examined patients with other diagnoses, including depression and posttraumatic stress disorder (PTSD), seen in-clinic and via CVT. In a review of 452 studies, Hubley et al. (2) reported that establishment of rapport was much less of a concern to the patients than it was to their clinicians. Furthermore, in

history, which may indicate that use of CVT does not deter patients from reporting instances of trauma.

Another difference observed was in anxiety and depression symptoms, as indicated by symptom scale scores, which were higher in the remote group, compared with the local group. The greater number of panic disorder diagnoses in the remote group may have influenced the higher BAI scores in that group.

a study of a large sample (N=666), Engel et al. (9) showed that use of telecare in the management of PTSD and depression among military personnel improved outcomes, compared with usual care. Divulging sensitive information and establishing rapport, although not explicitly measured in prior studies, are integral components of successful treatment in such rapport-dependent psychiatric cases. In the study reported here, we built on this literature by assessing divulgence of sensitive topics directly and addressing not only psychiatric symptoms but also neurologic ones in a novel diagnostic group in which CVT evaluation has not yet been reported and in which stigma among patients, families (38), and clinicians (39) may limit full disclosure of information related to difficult topics.

In this study, we found similarities across groups in commonly reported clinical factors. AEDs were prescribed in this sample, sometimes to "cover" seizures (N=28) and also for reasons other than epilepsy. The reasons reported included migraine prophylaxis (N=7), mood stabilization (N=11), and pain treatment (N=16). The literature indicates that in the absence of one of these indications, patients with PNES and no epilepsy can be tapered off AEDs safely (40) because AEDs do not treat PNES. Seizure rates were similar across groups in our study. As in prior studies, we found variability in reported monthly and weekly seizure rates. We have found similar fluctuations in seizure occurrence rates over time in our prospective studies (41). Past studies have reported a diagnostic delay, with a mean of 7.2 years (SD=9.3 years) from symptom onset to diagnosis (42). In the study reported here, symptom onset to PNES diagnosis ranged from a median of approximately 2–5 years. We believe this shortened delay is a result of active efforts to address PNES by the VA ECOE and the NTMHC.

Limitations of this study included the relatively small sample size of the local group, and thus the results of this preliminary study are intended to be used to inform further evaluations of telehealth utility. We acknowledge that other CVT comparison studies have larger samples for different populations (i.e., patients with psychiatric conditions such as depression, PTSD, or bulimia); however, this is the first study to assess neuropsychiatric complexities in a cohort of patients with the conversion disorder PNES. The design was limited intentionally to patients evaluated by a single clinician at the PVAMC Neuropsychiatry Clinic to be able to compare the same diagnostic approach for evaluations locally and remotely. The study may be subject to selection bias. The sample may not be representative of the entire veteran population in the United States, either the local sample or the veterans using CVT; however, veterans in the remote group were referred through the VA ECOE and were distributed across the United States. We did not determine or categorize urban versus rural residents, which could be done in the future to inform development of distance-delivery methods. Given the national distribution of the CVT group, it was likely a

**TABLE 4. Scores on symptom measures of veterans with psychogenic nonepileptic seizures evaluated in-clinic or via computer video telehealth**

| Measure | In-clinic (N=16) | | Telehealth (N=56) | | $p^a$ |
|---|---|---|---|---|---|
| | M | 95% CI | M | 95% CI | |
| Beck Depression Inventory–II[b] | 25.0 | 23.0, 27.0 | 28.9 | 27.7, 30.1 | **0.0016** |
| Beck Anxiety Inventory[b] | 23.3 | 21.4, 25.3 | 28.5 | 27.3, 29.7 | **<0.001** |
| Global Assessment of Functioning | 51.1 | 48.6, 53.6 | 50.4 | 49.1, 51.7 | 0.6470 |
| CAGE questionnaire[b] | 0.6 | 0.3, 1.1 | 0.7 | 0.5, 1.0 | 0.6655 |
| Posttraumatic Stress Disorder Checklist[b] | 57.2 | 55.1, 59.3 | 56.8 | 55.5, 58.2 | 0.7719 |
| Health Locus of Control[b,c] | 57.3 | 53.2, 61.3 | 53.7 | 51.6, 55.8 | 0.1250 |
| Quality of Life in Epilepsy Inventory–31[c] | 37.6 | 34.7, 40.6 | 35.8 | 34.4, 37.3 | 0.2753 |
| Family Assessment Device | | | | | |
|   Problem solving | 2.4 | 1.8, 3.0 | 2.1 | 1.8, 2.5 | 0.4270 |
|   Communication | 2.4 | 1.8, 2.9 | 2.2 | 1.9, 2.5 | 0.6463 |
|   Roles | 2.4 | 1.8, 2.5 | 2.2 | 1.9, 2.5 | 0.5695 |
|   Affective responsiveness | 2.4 | 1.8, 3.0 | 2.3 | 2.0, 2.6 | 0.7811 |
|   Affective involvement | 2.3 | 1.7, 2.9 | 2.2 | 1.9, 2.5 | 0.6704 |
|   Behavior control | 1.9 | 1.3, 2.5 | 1.8 | 1.5, 2.1 | 0.7456 |
|   Global functioning | 2.3 | 1.7, 2.9 | 2.1 | 1.8, 2.4 | 0.4596 |
| Symptom Checklist–90[b,c] | | | | | |
|   Somatization | 70.0 | 63.2, 76.8 | 71.7 | 69.1, 74.3 | 0.6430 |
|   Obsessive-compulsive | 72.0 | 64.6, 79.4 | 74.3 | 71.5, 77.1 | 0.5596 |
|   Interpersonal sensitivity | 63.8 | 54.3, 73.3 | 68.6 | 65.1, 72.2 | 0.3454 |
|   Depression | 63.8 | 56.1, 71.6 | 73.0 | 70.1, 75.9 | **0.0309** |
|   Anxiety | 62.2 | 53.3, 71.1 | 72.9 | 69.5, 76.3 | **0.0279** |
|   Hostility | 63.8 | 54.1, 73.6 | 66.7 | 63.1, 70.4 | 0.5764 |
|   Phobic anxiety | 66.7 | 57.3, 76.1 | 71.2 | 67.7, 74.8 | 0.3642 |
|   Paranoid ideation | 59.2 | 49.7, 68.6 | 63.7 | 60.1, 67.3 | 0.3695 |
|   Psychoticism | 67.3 | 60.0, 74.6 | 72.2 | 69.4, 74.9 | 0.2196 |
|   Global severity index | 70.8 | 64.2, 77.5 | 74.9 | 72.4, 77.4 | 0.2576 |
|   Positive symptom distress index | 67.8 | 61.2, 74.4 | 68.5 | 66.0, 71.0 | 0.8500 |
| Short-Form 36 Health Survey[c] | | | | | |
|   Physical functioning | 47.5 | 44.6, 50.4 | 40.3 | 38.8, 41.7 | **<0.001** |
|   Pain | 32.7 | 30.0, 35.4 | 33.7 | 32.3, 35.2 | 0.4932 |
|   General health | 32.0 | 29.4, 34.8 | 36.3 | 34.8, 37.7 | **0.0083** |
|   Vitality | 27.5 | 25.0, 30.2 | 27.3 | 26.0, 28.6 | 0.8761 |
|   Social functioning | 39.6 | 36.8, 42.5 | 37.8 | 36.3, 39.3 | 0.2605 |
|   Mental health | 44.7 | 31.8, 57.5 | 43.5 | 36.7, 50.2 | 0.8673 |
| Mini-Mental State Examination | 27.3 | 22.0, 30.0 | 28.0 | 25.0, 30.0 | 0.1345 |

[a] Bold indicates statistically significant difference between groups.
[b] For these scales, a higher score indicates a worse condition. (Otherwise, higher scores indicate a better condition.)
[c] Scores are reported as T scores.

POTENTIAL DIFFERENCES IN REPORTING OF SENSITIVE PSYCHOSOCIAL MEASURES

TABLE 5. Developmental history reported by veterans with psychogenic nonepileptic seizures evaluated in-clinic or via computer video telehealth

| Trauma type and developmental stage | In-clinic (N=16) | | Telehealth (N=56) | | |
|---|---|---|---|---|---|
| | N | % | N | % | p |
| Physical | 8 | 50.0 | 28 | 50.0 | 0.9490 |
| As a child | 6 | 37.5 | 25 | 44.6 | 0.5900 |
| As an adult | 4 | 25.0 | 9 | 16.1 | 0.3849 |
| Verbal | 4 | 25.0 | 23 | 41.1 | 0.2635 |
| As a child | 4 | 25.0 | 23 | 41.1 | 0.1953 |
| As an adult | 1 | 6.3 | 1 | 1.8 | 0.3411 |
| Emotional | 8 | 50.0 | 28 | 50.0 | 0.9191 |
| As a child | 6 | 37.5 | 24 | 42.9 | 0.8056 |
| As an adult | 4 | 25.0 | 11 | 19.6 | 0.5873 |
| Sexual | 6 | 37.5 | 23 | 41.1 | 0.8992 |
| As a child | 5 | 31.3 | 18 | 32.1 | 0.9494 |
| As an adult | 3 | 18.8 | 10 | 17.9 | 0.9182 |
| Traumatic brain injury | 9 | 56.3 | 40 | 71.4 | 0.2876 |

representative sample of U.S. veterans. The seizure rate reports may have been subject to recall bias. As noted, the estimates of the number of seizures per week and per month were collected retrospectively. Prospectively collected daily seizure logs may better reflect seizure frequency; however, this approach was not part of the cross-sectional study.

Overall, the absence of significant major differences between the two cohorts in sociodemographic factors, medical diagnoses, and medical examination findings may mitigate potential concerns of reporting bias between patients evaluated in-clinic and remotely. Our results mirror those of in-person-only assessments conducted with patients with PNES in a well-described sample in the Northwest (43–47).

## CONCLUSIONS

An analysis of comorbid symptoms, substance abuse, medication use, history of trauma and abuse, and history of therapy did not show significant reporting differences between veterans evaluated in-clinic and via CVT. Patients evaluated remotely disclosed the same amount of sensitive information as those evaluated in-clinic, and use of telehealth did not seem to be a barrier to evaluation. Thus, this study shows promising early results for the use of CVT for evaluating complex, chronic, paroxysmal disorders such as PNES and epilepsy. Despite the prevalence of PNES, expertise about PNES is limited, and thus remote access to clinicians knowledgeable about the disorder is of utmost importance to overcome treatment gaps. Findings from this study may help clinicians gain more confidence about remote clinical evaluations, which over time, may become a standard, alternative method of evaluating patients with neuropsychiatric disorders. Such use of CVT may eliminate

one of the many barriers to accessing mental health care encountered by patients with seizures.

## AUTHOR AND ARTICLE INFORMATION

The Department of Psychiatry, Providence Veterans Affairs Medical Center (PVAMC), and Departments of Neurology and Psychiatry, Brown University, Providence, R.I. (LaFrance, Ho, Bhatla); the Division of Neuropsychiatry (LaFrance) and Division of Biostatistics (Baird), Rhode Island Hospital, Providence, R.I.; the Department of Neurology, Yale University, New Haven, Conn., and Department of Neurology, West Haven Veterans Affairs Medical Center, West Haven, Conn. (Altalib); and the Department of Psychiatry, Yale University, New Haven, Conn., and Department of Psychiatry, West Haven Veterans Affairs Medical Center, West Haven, Conn. (Godleski).

Send correspondence to Dr. LaFrance (william_lafrance_jr@brown.edu).

Supported by the Providence VA Center for Neurorestoration and Neurotechnology and a Siravo Foundation grant (to Dr. LaFrance).

This study is the result of work supported with resources and use of facilities at PVAMC.

The authors thank the PVAMC Center for Neurorestoration and Neurotechnology for assistance with this study, the staff of the VA National Telemental Health Center, and the VA Epilepsy Centers of Excellence.

The contents of this article do not represent the views of the U.S. Department of Veterans Affairs (VA) or the United States government.

Dr. LaFrance has served or currently serves on the editorial boards of *Epilepsia, Epilepsy and Behavior,* the *Journal of Neurology, Neurosurgery, and Psychiatry,* and the *Journal of Neuropsychiatry and Clinical Neurosciences;* he has received royalties from Cambridge University Press and Oxford University Press; he has received research support from the American Epilepsy Society, Brown University, the Center for Neurorestoration and Neurotechnology, the Department of Defense, the Epilepsy Foundation, NIH, Providence Veterans Affairs Medical Center, Rhode Island Hospital, and the Siravo Foundation; he serves on the Professional Advisory Board of the Epilepsy Foundation New England; he has received honoraria from the American Academy of Neurology for teaching an annual meeting annual course; and he has served as a clinic development consultant for Cleveland Clinic, Emory University, Oregon Health Sciences University, Spectrum Health, and the University of Colorado Denver. The other authors report no financial relationships with commercial interests.

Received August 10, 2019; revision received October 28, 2019; accepted November 18, 2019; published online Feb. 14, 2020.

## REFERENCES

1. Bashshur RL, Shannon GW, Krupinski EA, et al: National telemedicine initiatives: essential to healthcare reform. Telemed J E Health 2009; 15:600–610
2. Hubley S, Lynch SB, Schneck C, et al: Review of key telepsychiatry outcomes. World J Psychiatry 2016; 6:269–282
3. Bouchard S, Paquin B, Payeur R, et al: Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. Telemed J E Health 2004; 10:13–25
4. Day SX, Schneider PL: Psychotherapy using distance technology: a comparison of face-to-face, video, and audio treatment. J Couns Psychol 2002; 49:499–503
5. Hilty DM, Marks S, Wegelin J, et al: A randomized, controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. Psychiatry 2007; 4:58–65
6. O'Reilly R, Bishop J, Maddox K, et al: Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. Psychiatr Serv 2007; 58:836–843

7. Simon GE, Ludman EJ, Tutty S, et al: Telephone psychotherapy and telephone care management for primary care patients starting antidepressant treatment: a randomized controlled trial. JAMA 2004; 292:935–942

8. Chakrabarti S: Usefulness of telepsychiatry: a critical evaluation of videoconferencing-based approaches. World J Psychiatry 2015; 5:286–304

9. Engel CC, Jaycox LH, Freed MC, et al: Centrally assisted collaborative telecare for posttraumatic stress disorder and depression among military personnel attending primary care: a randomized clinical trial. JAMA Intern Med 2016; 176:948–956

10. Franklin CL, Cuccurullo LA, Walton JL, et al: Face to face but not in the same place: a pilot study of prolonged exposure therapy. J Trauma Dissociation 2017; 18:116–130

11. Frueh BC, Monnier J, Yim E, et al: A randomized trial of telepsychiatry for post-traumatic stress disorder. J Telemed Telecare 2007; 13:142–147

12. Luxton DD, Pruitt LD, Wagner A, et al: Home-based telebehavioral health for US military personnel and veterans with depression: a randomized controlled trial. J Consult Clin Psychol 2016; 84:923–934

13. Maieritsch KP, Smith TL, Hessinger JD, et al: Randomized controlled equivalence trial comparing videoconference and in person delivery of cognitive processing therapy for PTSD. J Telemed Telecare 2016; 22:238–243

14. Shore JH, Hilty DM, Yellowlees P: Emergency management guidelines for telepsychiatry. Gen Hosp Psychiatry 2007; 29:199–206

15. Turner TH, Horner MD, Vankirk KK, et al: A pilot trial of neuropsychological evaluations conducted via telemedicine in the Veterans Health Administration. Telemed J E Health 2012; 18:662–667

16. Kirkwood KT, Peck DF, Bennie L: The consistency of neuropsychological assessments performed via telecommunication and face to face. J Telemed Telecare 2000; 6:147–151

17. Ruskin PE, Reed S, Kumar R, et al: Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. Psychiatr Serv 1998; 49:1086–1088

18. Bugge C, Entwistle VA, Watt IS: The significance for decision-making of information that is not exchanged by patients and health professionals during consultations. Soc Sci Med 2006; 63:2065–2078

19. Sankar P, Jones NL: To tell or not to tell: primary care patients' disclosure deliberations. Arch Intern Med 2005; 165:2378–2383

20. LaFrance WC Jr, Alosco ML, Davis JD, et al: Impact of family functioning on quality of life in patients with psychogenic nonepileptic seizures versus epilepsy. Epilepsia 2011; 52:292–300

21. LaFrance WC Jr, Deluca M, Machan JT, et al: Traumatic brain injury and psychogenic nonepileptic seizures yield worse outcomes. Epilepsia 2013; 54:718–725

22. LaFrance WC Jr, Leaver K, Stopa EG, et al: Decreased serum BDNF levels in patients with epileptic and psychogenic nonepileptic seizures. Neurology 2010; 75:1285–1291

23. LaFrance WC Jr, Syc S: Depression and symptoms affect quality of life in psychogenic nonepileptic seizures. Neurology 2009; 73:366–371

24. LaFrance WC Jr, Baker GA, Duncan R, et al: Minimum requirements for the diagnosis of psychogenic nonepileptic seizures: a staged approach: a report from the International League Against Epilepsy Nonepileptic Seizures Task Force. Epilepsia 2013; 54:2005–2018

25. Altalib H, Cavazos J, Pugh MJ, et al: Providing quality epilepsy care for veterans. Fed Pract 2016; 33:26–32

26. Deen TL, Godleski L, Fortney JC: A description of telemental health services provided by the Veterans Health Administration in 2006–2010. Psychiatr Serv 2012; 63:1131–1133

27. Beck AT, Steer RA, Brown GK: Manual for the Beck Depression Inventory, 2nd ed. San Antonio, Tex, Psychological Corp, 1996

28. Beck AT, Epstein N, Brown G, et al: An inventory for measuring clinical anxiety: psychometric properties. J Consult Clin Psychol 1988; 56:893–897

29. Epstein NB, Baldwin LM, Bishop DS: The McMaster Family Assessment Device. J Marital Fam Ther 1983; 9:171–180

30. Vickrey BG, Perrine KR, Hays RD, et al: Quality of Life in Epilepsy—QOLIE-31: Scoring Manual, Version 1.0 ed. Santa Monica, Calif, RAND, 1993, pp 1–32

31. Endicott J, Spitzer RL, Fleiss JL, et al: The Global Assessment Scale: a procedure for measuring overall severity of psychiatric disturbance. Arch Gen Psychiatry 1976; 33:766–771

32. Ware JE Jr, Sherbourne CD: The MOS 36-item Short-Form Health Survey (SF-36): I. conceptual framework and item selection. Med Care 1992; 30:473–483

33. Derogatis LR: Symptom Checklist 90–R: Administration, Scoring, and Procedures Manual, 3rd ed. Minneapolis, National Computer Systems, Inc, 1994

34. Ewing JA: Detecting alcoholism: the CAGE questionnaire. JAMA 1984; 252:1905–1907

35. Blanchard EB, Jones-Alexander J, Buckley TC, et al: Psychometric properties of the PTSD Checklist (PCL). Behav Res Ther 1996; 34:669–673

36. Wallston BS, Wallston KA, Kaplan GD, et al: Development and validation of the Health Locus of Control (HLC) scale. J Consult Clin Psychol 1976; 44:580–585

37. Folstein MF, Folstein SE, McHugh PR: "Mini-Mental State": a practical method for grading the cognitive state of patients for the clinician. J Psychiatr Res 1975; 12:189–198

38. Friedman JH, LaFrance WC Jr: Psychogenic disorders: the need to speak plainly. Arch Neurol 2010; 67:753–755

39. Tolchin B, Baslet G, Dworetzky B: Psychogenic seizures and medical humor: jokes as a damaging defense. Epilepsy Behav 2016; 64(pt A):26–28

40. Oto M, Espie C, Pelosi A, et al: The safety of antiepileptic drug withdrawal in patients with non-epileptic seizures. J Neurol Neurosurg Psychiatry 2005; 76:1682–1685

41. Baird GL, Harlow LL, Machan JT, et al: Identifying seizure clusters in patients with psychogenic nonepileptic seizures. Epilepsy Behav 2017; 73:142–147

42. Reuber M, Fernández G, Bauer J, et al: Diagnostic delay in psychogenic nonepileptic seizures. Neurology 2002; 58:493–495

43. Salinsky M, Evrard C, Storzbach D, et al: Psychiatric comorbidity in veterans with psychogenic seizures. Epilepsy Behav 2012; 25:345–349

44. Salinsky M, Rutecki P, Parko K, et al: Psychiatric comorbidity and traumatic brain injury attribution in patients with psychogenic nonepileptic or epileptic seizures: a multicenter study of US veterans. Epilepsia 2018; 59:1945–1953

45. Salinsky M, Spencer D, Boudreau E, et al: Psychogenic nonepileptic seizures in US veterans. Neurology 2011; 77:945–950

46. Salinsky M, Storzbach D, Goy E, et al: Traumatic brain injury and psychogenic seizures in veterans. J Head Trauma Rehabil 2015; 30:E65–E70

47. Salinsky M, Storzbach D, Goy E, et al: Health care utilization following diagnosis of psychogenic nonepileptic seizures. Epilepsy Behav 2016; 60:107–111



COMMUNITY CASE STUDY
published: 03 February 2022
doi: 10.3389/fpsyt.2022.795296




# Expanding Access to Social Support in Primary Care *via* Telemedicine: A Pilot Study

David C. Fipps[1]*, Kristin S. Vickers[1], Beth Bergstedt[2] and Mark D. Williams[1]

[1] Department of Psychiatry and Psychology, Mayo Clinic, Rochester, MN, United States, [2] Social Work, Mayo Clinic, Rochester, MN, United States

The coronavirus pandemic quickly exposed the need for efficient and widespread implementation of telehealth services. Additionally, it further unveiled the impact of social and environmental barriers to healthcare in underserved, rural populations. This in-practice pilot study tested the utility of a geographically centralized social worker providing services between a patient and a primary care provider via telecommunication at two high volume rural outpatient family practice clinics. Outcome measures included patient and provider satisfaction. Twenty-two telehealth social work encounters occurred spanning both adult and pediatric patients. Data collected from patients, primary care providers, and social work staff revealed positive feedback. The data from our small pilot study demonstrated that social work triage delivered via a tablet was an acceptable and valued resource in busy primary care practices.

Keywords: pilot study, social determinants of health, coronavirus, COVID-19, telehealth, social work, primary care

OPEN ACCESS

**Edited by:**
*Joanna Lai,*
*United Nations International Children's*
*Emergency Fund (UNICEF),*
*United States*

**Reviewed by:**
*Suzie Xu Wang,*
*Leeds Beckett University,*
*United Kingdom*
*Tom Kingstone,*
*Keele University, United Kingdom*

**\*Correspondence:**
*David C. Fipps*
*fipps.david@mayo.edu*

**Specialty section:**
*This article was submitted to*
*Public Mental Health,*
*a section of the journal*
*Frontiers in Psychiatry*

**Received:** 14 October 2021
**Accepted:** 04 January 2022
**Published:** 03 February 2022

**Citation:**
*Fipps DC, Vickers KS, Bergstedt B*
*and Williams MD (2022) Expanding*
*Access to Social Support in Primary*
*Care via Telemedicine: A Pilot Study.*
*Front. Psychiatry 13:795296.*
*doi: 10.3389/fpsyt.2022.795296*

## INTRODUCTION

The coronavirus pandemic has opened multiple avenues of rapid advancements in methods of healthcare delivery with telemedicine being at the forefront of this change. Many clinical settings required rapid adjustments to their abilities to deliver services to patients safely. However, this pandemic also acted as a catalyst to further unveil the impact of social and environmental barriers to healthcare on underserved populations (1). These barriers, termed social determinants of health (SDOH), hold a strong influence on the health outcomes seen by many populations (2). These factors have been defined in various ways, but often include both environmental factors (e.g., transportation), and patient factors (depression). Primary care clinics have longitudinal relationships with their patients, allowing for more chances of identifying and addressing these SDOH (3). However, as primary care physicians (PCP) are generally tasked with an already heavy clinical patient load, they may feel they lack both the time and expertise, to address these social determinants of health (4). Social workers (SW) are often used as a conduit to address these contexts; however, unfortunately, there is a significant shortage of social work staff.

It has been estimated that 1 in 5 counties in the US have at least some unmet need for non-prescribing mental health professionals, and 8% of US counties have a severe shortage with over half of their needs unmet (5). In this study, rurality and per capita income were the best predictors of unmet need with a 1-point increase in rurality (on a 9-point Rural-Urban Continuum Code) corresponding to an increase in unmet need of 3.3 percentage points (5). Estimates from the National Association of Social workers indicate that more than 80 percent of licensed social workers who provide services to older adults practice in metropolitan areas, whereas only 3% practice in rural areas (6).

Primary care social work interventions have shown positive outcomes in reducing higher cost utilization (7, 8), improving mental health symptoms (9–11), improved medication and diet adherence (11), and improved social functioning (10). However, differentiation between on-site and virtual social work services is under studied. In some of the above literature, part of the intervention (especially follow up case management) occurred by phone. A systematic review of 10 years of technology-based interventions in social work practice (12) found only 6 small studies (out of 87 screened) describing a variety of approaches and targets. None of these were in primary care settings and the potential benefit of extended reach was described along with many of the challenges inherent in using technology (patient technical comfort and knowledge, concerns about confidentiality and privacy, and provider challenges with feasibility). Positive outcomes were in the categories of anxiety reduction, improved well-being, and staff satisfaction.

Delivering virtual SW services is not a new concept, however there is very little data regarding acceptability and best practices. As the coronavirus pandemic has catalyzed the use of virtual technology for patient care, there is clearly a need for data on evidence-based approaches to virtual encounters. In this context, this in-practice pilot study sought to explore the acceptability of a social work contact aimed at identifying and addressing emotional and social challenges (SDOH) delivered in real time via an electronic device from a central location. This study tested the utility of this immediate in-visit social work access delivered to primary care patients in two high-volume outpatient clinics. As there is currently a dearth of published information on the practicality of having a SW virtually imbedded as a part of the primary care team, this pilot study aimed to evaluate the acceptability of a geographically centralized SW providing services at the point of contact between a patient and PCP via the use of telecommunication technology. Furthermore, this study aimed to determine the best practice methods to efficiently accomplish this task with outcome measures focused on the satisfaction of both patients and healthcare staff.

## METHODS

This mixed method study as part of an in-practice pilot was presented to the Mayo Clinic Institutional Review Board (IRB) and was determined to not require formal review by the board. The study setting was two family medicine sites in Rochester, MN, a city of over 120,000 and the third largest city in Minnesota. The study started at one clinic (30 PCPs with a panel size of 23,996 patients) and then expanded to include an additional clinic (22 PCPs with a panel size of 18,926 patients). While Mayo Clinic primary care clinics (91 in total) are spread in much more rural settings, two Rochester sites were chosen as pilot sites due to rural clinic internet bandwidth concerns at that time. A team was organized that included telemedicine experts, social work and mental health providers, primary care and desk representatives, a qualitative researcher, and appropriate administrative staff. The research team consulted the telemedicine experts on how to appropriately utilize tele communication technology for this specific aims of this project. The identified goal was to find a tool

that would allow a distant social worker to interact in real time visually and verbally with a patient. This led to review of various electronic hardware and an electronic tablet was chosen based on several advantages including ease of use, mobility, the capability to control access to the institutions' intranet, and good visibility to the patient of a virtual social worker. A tablet was able to be available in any exam room that would be something easy for patients and providers to initiate.

## Acceptability

Using quality improvement plan-do-study-act (PDSA) cycles as described in the literature (13) this study initially explored issues that could arise around the location of the tablet within the clinic, how to ensure it was quickly brought to the room where a primary provider was seeing a patient and then cleaned and returned for the next patient, ways to notify the social worker when the patient was ready, and what to do in an emergency situation. From this acceptability workflow, the social worker collected data on all requests, her ability to respond, and estimates of resources needed (see **Figure 1**). The study initially started in one primary care physician clinic, but then spread to a 2nd clinic. Requests for social work point-of-care input (described as triage visits), missed opportunities, and patient and provider satisfaction with virtual triage were tracked throughout the study. Data were captured by on-site and Licensed Clinical Social Workers along with PDSA cycles on barriers, surveys, and interviews for patients and providers on satisfaction.

## Patient and Physician Satisfaction

The study targeted 30–50 triage visits to develop confidence in process and patient and provider opinion. Upon identifying low demand, missed opportunities, or negative feedback from patients or providers, the research team explored root causes. PDSA cycles of change were used to test ways to increase effective use of the service offered.

## Key Informants/Participants

To determine acceptability of these virtual social work consultations in primary care, three key informants were identified (1) the primary care providers ordering the social work consultation; (2) the patients participating in virtual social work consultation; and (3) social workers delivering the virtual consultation. Because this pilot was occurring during normal operation of the clinic and with actual patient visits, the design aimed to be minimally disruptive to patients, providers, social worker, and clinic staff. Data collection methods were designed to capture brief real-time feedback about the implementation of virtual social work visits.

## Data Collection
### Patient Opinion Data
A brief 3-item survey was developed to assess patient experience with virtual social work visit immediately following the visit. The survey consisted of a single ratings scale item: Rate your experience using a mobile device to connect to a social worker (1 = worst possible experience; 5 = best possible experience), and two qualitative open response questions; (1) What did

**FIGURE 1 |** Tele-social work triage workflow starting with the patient being seen by the primary care physician, followed by the tele-social work encounter, ending in consolidation and tracking of the consultation metrics.

you like best about this way of connecting to a social worker? (2) What did you like least about this way of connecting to a social worker? The survey also asked if the patient would accept a brief phone call within the week to share more of their opinions about the virtual social work visit. The brief survey was created to require only a few minutes for completion. The study assistant collecting survey data from patients also conducted the brief semi-structured qualitative interview over the phone to those who agreed to receiving a call. Within these brief, informal conversations, the study assistant asked patients what they remembered about the virtual visit, what they liked best and liked least, their expectations for the visit, any resources or follow-up they received, their familiarity and comfort with mobile/tablet technology, and whether they would recommend virtual visits to patients at clinics without on-site social workers. These brief interviews were structured as informal conversations and were not recorded. Rather, the study assistant, with years of experience with qualitative interviewing and data analysis, took brief notes including verbatim quotes from participants.

### Social Worker Data

Our study social worker (BB) was an experienced primary care social worker, with many years of experience with face-to-face and telephonic patient visits. She was new to virtual visit technology and format. BB was from another clinic, so was unfamiliar with the providers participating in this pilot study, to better replicate experience of virtual visits

with off-site social work not embedded in the clinic. BB kept a spreadsheet of patient and virtual visit information to track visit information such as reason for referral, referring provider, number of minutes connected, technology comments, and clinical recommendations/results of the consultation (e.g., referral, resources, services). The study assistant also interviewed BB about her experience delivering virtual visits, assessing what she liked best, least, feedback about the technology, and her opinion about patient experience based on her observations.

### Primary Care Provider Data

Providers assisting with this pilot study agreed to participate in a brief interview. The study assistant arranged these interviews by phone or in person at the provider's convenience to minimize disruption to clinical practice. These brief informal conversations included questions about the pros and cons of virtual social work visits using mobile device, the likelihood they would use this approach with patients, and how often they think they would use this approach to social work consultation.

### Approach to Analysis

Qualitative data from patient surveys, interviews, and provider surveys were coded by qualitative researchers not involved in delivery of the virtual visits (JH and KV). Data was coded independently using methods of content analysis to organize feedback into themes (i.e., similar perceptions, experiences, or recommendations described by multiple participants).

## RESULTS

During the initial trial at the first site, primary care providers initiated the process of virtual social work visits with tablet during the medical encounter for 18 patients. Of those referred, 15 resulted in a virtual visit. For clinical and logistical reasons, two patients were instead contacted by telephone and an alternate plan was made for a third patient. Ten of the 18 patients completing a virtual visit completed the brief survey immediately following the visit, and of those 10, 7 agreed to be contacted for a phone follow-up to collect more feedback. Of the 13 providers who made referrals for virtual consultations, 7 were available and completed a brief interview.

Our results included data from 22 social work visits over a 37-day timeframe. Two family practice sites were used. Roughly 82% of the visits used a tablet allowing a video conference and 3 encounters were conducted over the phone. The majority (68%) of the encounters involved adult patients (>18 years of age) with the average age being 33 (range 13-94). Over half (55%) of our patients triaged were male. The average time for the patient-social worker encounter was 44 min (ranging from 15 to 120 min). The SW staff allowed the length of the calls to flex with the subject matter and time available to see the patient. The majority of requests for utilization of the Social Work services were related to questions regarding community resources (45%) and mental health triage (45%). Of the 22 visits, no cases were sent to the emergency department, despite 3 cases being referred for a crisis/emergency assessment (previously these clinics would have sent these patients to an Emergency Department for this assessment).

Ten patients completed a brief satisfaction survey after using the tablet. Their feedback was based on a Likert scale from 1 to 5 (1 being worst and 5 being best). The mean rating of experience ranked 4.7/5 ($SD = 0.49$) with a score range from 4 to 5. All who participated in the survey indicated that they would recommend this service to other patients. Six of these patients agreed to be called for a brief interview regarding their experience. Qualitative themes from patient interviews included convenience (e.g., 004, female: *It's right there. No waiting for appointment…great way to take advantage of technology.*), technology challenges (e.g., 002, male, *There was a slight lag in the video and the sound;* 003 male, *I'm not an IT guy, so when the session has ended make sure it actually logs off*; 006 female: *the nurse setting it up had trouble getting the picture right and trouble with the cord too*), recommendation of tele social work for other patients (e.g., 007 male, *I would recommend it, I think it's a good idea actually*; 004 female *Absolutely I do* [recommend it]).

Seven primary care providers provided feedback after using this resource. Their feedback included themes of convenient, timely access to care (006, clinician at South clinic location: *I truly do not think the patient would have come in to see a social worker otherwise. As a provider, I cannot tell you how much better I felt knowing he had a visit and a plan was made when the patient needed it most),* and potential time savings for clinicians (e.g., 007, clinician at North clinic location, *I kept moving doing other stuff— kept working while the patient and social worker talked. Time-wise that was very useful).*

Feedback was also obtained from the social worker (BB) involved in this pilot study, with positive reviews overall. She noted particular benefit from the timely nature of the access to patient care, and the ability to see the faces of patents and staff. In addition, she indicated that patients of all ages appeared comfortable utilizing the technology and were gracious with trying new things and adapting to new situations. The social worker also noted that the concept of using a tablet (rather than an in-person encounter) was not a barrier with rapport. However, technical difficulties were perceived as a potential barrier to communication and care delivery. She provided these examples of technology challenges: Example 1: *I was doing a suicide assessment on an adult individual and there was a delay and an audio break up during an important question. I almost missed a facial expression that was not congruent with the response. I was able to go back and repeat the question, noting the facial response, for a more accurate account. Had I missed that, which I probably would not have in person, there could have been a very different outcome.* Example 2: *I was doing a trauma assessment on a young person and there were a number of break ups in the audio, as well as, difficulty hearing them speak. They were crying and speaking softly, because what they were talking about was difficult for them. It is hard to be attentive to the needs of the patient when the audio is breaking up during a serious and difficult discussion.* Example 3: *There was one instance where the family member of a patient had an angry look and I asked if I had missed something and they said the visual and verbal delays made her frustrated. Despite this, almost every patient and family member I spoke with appreciated the immediate response and ability to access services in a quick and efficient manner.*

## DISCUSSION

Considering that up to 80% of chronic illness and 90% of mental health problems are managed in the primary care setting (14), the need for evidence on practical interventions which can improve access to appropriate resources for social and psychosocial health, and thereby, health outcomes is paramount. This is of importance considering the time and resources are not always available for the individual primary care physician to address each individual social determinant of health (3, 4). Implementation of a social worker via tele communication allows a trained professional to be available to immediately link in to mitigate social issues, prepare the patient for therapy, and/or assist with alternative options to higher cost of care (such as emergency department visits).

Within the limitations of this in-practice pilot study it was demonstrated that social work triage was possible and valued by patients and providers for adults and children in busy primary care practices when delivered via a tablet, despite technical challenges. Patients of all ages seemed to accept the use of a virtual social worker without great difficulty. The PCPs were easily able to include this virtual resource into their busy workflow. The main challenges described in our feedback centered around encounters where the tool itself was not working well (not the concept of using a virtual tool for evaluation). It is worthy to note that in the timeframe of data collection, analysis, and

manuscript authorship, the technological advances –catalyzed by the coronavirus pandemic—have greatly improved the quality of the technology available to implement these virtual encounters. Thus, as technology continues to improve, the major drawbacks of technical and connection interruptions described in our study will likely continue to improve.

Considering that technology and connection interruptions were the major focus of negative feedback, practical methods to counteract this dilemma would be appropriate. For instance, one lesson learned for practical implementation could include having a backup tablet available, or utilization of other modes of communication (such as a phone call) to properly finish the encounter if interrupted. Furthermore, having staff trained in basic tablet/connection troubleshooting can be quite beneficial in these predicaments. These connection interruptions in the context of emergency situations, such as suicide risk assessments, are notable, and further implementation strategies can be considered that are similar to the best practices when conducting risk assessment interviews in person. This would include for virtual visits where the topic is already known to include suicidality, having staff, such as nursing staff, sit with the patient when alone, and during the video encounter to ensure patient's safety if technology and/or connection interruptions occur. As it is best practice to have a policy of approach for suicide risk assessment and action when a patient is voicing suicidal thought in person, similar policies would be appropriate in the context of the virtual clinical environment.

With the model of virtual use of a tablet, a centralized group of social workers could provide services for a number of clinics in a geographic area where they know the resources, thus limiting the need for small clinics to hire a portion of a social worker and the cost of transportation of a social worker driving to these sites. Furthermore, considering there are already models of social work staff providing virtual services to emergency rooms, these same social workers would make an excellent resource to create a pool of SW covering PCP practices. This is of value as these SW could use their experience for triaging patients to better help differentiate management of patients in distress between interventions in the primary care setting vs. presenting to the emergency department. The potential benefit of preventing unnecessary emergency room or hospital services may be even higher in rural areas considering the lack of social work resources (6). With excellent patient and provider satisfaction ratings, this project may provide pilot data for a larger and more rigorous study of clinical and cost outcomes.

## LIMITATIONS

This project includes the standard limitations seen in pilot studies: patients were not randomly assigned, outcome measures were limited to satisfaction surveys/interview, and there was no comparison group. Furthermore, conclusions are limited to the setting where the study was tested, thus cannot be expected to fully extrapolate to clinics in different locations and populations. Both sites involved in the project had experience with on-site

social work services which may bias their acceptance of this option. The project focused on the initial contact between a social worker and a new patient, and not on follow up visits and psychotherapy which are other roles of social workers in primary care sites.

## CONCLUSION

A geographically centralized social work service linked to several primary care clinics via a telemedicine resource is an attractive option to allow a social worker to virtually "step into" the office (using telemedicine) of a primary care physician and take over the care of a patient enough to identify and address social determinants, options for behavioral health, and potentially ways to avoid higher cost emergency services.

## DATA AVAILABILITY STATEMENT

The raw data supporting the conclusions of this article will be made available by the authors, without undue reservation.

## ETHICS STATEMENT

The studies involving human participants were reviewed and approved by Mayo Clinic Institutional Review Board. Written informed consent to participate in this study was provided by the participants' legal guardian/next of kin.

## AUTHOR CONTRIBUTIONS

KV and MW contributed to conception and design of the study. BB organized data from patient encounters. KV performed the statistical analysis. DF conducted the literature search, created the figure, and wrote the first draft of the manuscript. KV, BB, and MW edited sections. DF incorporated edits and expanded content. All authors contributed to manuscript revision, read, and approved the submitted version.

## FUNDING

The studies involving human participants was presented to the Mayo Clinic Institutional Review Board (IRB). No formal IRB review was required. Only those patients and providers who verbally agreed to be surveyed or interviewed were included and all information was deidentified.

## ACKNOWLEDGMENTS

Special thanks to Population Health, Center for Connected Care, CSHCD, ECH, Social Work, and Mayo Family Clinics Northeast & Southeast.

# REFERENCES

1. Abrams EM, Szefler SJ. COVID-19 and the impact of social determinants of health. *Lancet Respir Med.* (2020) 8:659–61. doi: 10.1016/S2213-2600(20)30234-4

2. Hood CM, Gennuso KP, Swain GR, Catlin BB. County health rankings: relationships between determinant factors and health outcomes. *Am J Prev Med.* (2016) 50:129–35. doi: 10.1016/j.amepre.2015.08.024

3. Allen K, Hazelett S, Jarjoura D, Wright K, Clough L, Weinhardt J. Improving stroke outcomes: Implementation of a postdischarge care management model. *J Clin Outcomes Manag.* (2004) 11:707–14.

4. Netting FE, Williams FG. Expanding the boundaries of primary care for elderly people. *Health Soc Work.* (2000) 25:233–42. doi: 10.1093/hsw/25.4.233

5. Thomas KC, Ellis AR, Konrad TR, Holzer CE, Morrissey JP. County-level estimates of mental health professional shortage in the United States. *Psychiatr Serv.* (2009) 60:1323–8. doi: 10.1176/ps.2009.60.10.1323

6. Whiteaker T, Weismiller T, Clark E. *Assuring the Suffiency of a Frontline Workforce: A National Study of Licensed Social Workers. Executive Summary.* Washington, DC: National Association of Social Workers (2006).

7. Matalon A, Nahmani T, Rabin S, Maoz B, Hart J. A short-term intervention in a multidisciplinary referral clinic for primary care frequent attenders: description of the model, patient characteristics and their use of medical resources. *Fam Pract.* (2002) 19:251–6. doi: 10.1093/fampra/19.3.251

8. Pande RL, Morris M, Peters A, Spettell CM, Feifer R, Gillis W. Leveraging remote behavioral health interventions to improve medical outcomes and reduce costs. *Am J Manag Care.* (2015) 21:e141–51.

9. Firth MT, Dyer M, Marsden H, Savage D, Mohamad H. Non-Statutory mental health social work in primary care: a chance for renewal? *Br J SocWork.* (2004) 34:145–63. doi: 10.1093/bjsw/bch038

10. Matalon A, Yaphe J, Nahmani T, Maoz B, Portuguez-Chitrit N. The effect of a multi-disciplinary integrative intervention on health status and general health perception in primary care frequent attenders. *Fam Syst Health.* (2009) 27:77–84. doi: 10.1037/a0014769

11. Rock BD, Cooper M. Social work in primary care: a demonstration student unit utilizing practice research. *Soc Work Health Care.* (2000) 31:1–17. doi: 10.1300/J010v31n01_01

12. Ramsey AT, Montgomery K. Technology-based interventions in social work practice: a systematic review of mental health interventions. *Soc Work Health Care.* (2014) 53:883–99. doi: 10.1080/00981389.2014.925531

13. Berwick DM. Developing and testing changes in delivery of care. *Ann Intern Med.* (1998) 128:651–6. doi: 10.7326/0003-4819-128-8-199804150-00009

14. National Institute for Health and Care Excellence. *Common Mental Health Problems: Identification and Pathways to Care.* Nice (2011). Available online at: https://www.nice.org.uk/guidance/cg123.

**Author Disclaimer:** The contents provided are solely the responsibility of the authors and do not necessarily represent the official views of HHS or any of its agencies.

**Conflict of Interest:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

**Publisher's Note:** All claims expressed in this article are solely those of the authors and do not necessarily represent those of their affiliated organizations, or those of the publisher, the editors and the reviewers. Any product that may be evaluated in this article, or claim that may be made by its manufacturer, is not guaranteed or endorsed by the publisher.

*Copyright © 2022 Fipps, Vickers, Bergstedt and Williams. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

# Guidelines for the Practice of Telepsychology

Joint Task Force for the Development of Telepsychology Guidelines for Psychologists

These guidelines are designed to address the developing area of psychological service provision commonly known as telepsychology. *Telepsychology* is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies, as expounded in the Definition of Telepsychology section of these guidelines. The expanding role of technology in the provision of psychological services and the continuous development of new technologies that may be useful in the practice of psychology present unique opportunities, considerations, and challenges to practice. With the advancement of technology and the increased number of psychologists using technology in their practices, these guidelines have been prepared to educate and guide them.

These guidelines are informed by relevant American Psychological Association (APA) standards and guidelines, including the "Ethical Principles of Psychologists and Code of Conduct" ("APA Ethics Code"; APA, 2002a, 2010) and the "Record Keeping Guidelines" (APA, 2007). In addition, the assumptions and principles that guide APA's "Guidelines on Multicultural Training, Research, Practice, and Organizational Change for Psychologists" (APA, 2003) are infused throughout the *Rationale* and *Application* subsections describing each of the guidelines. Therefore, these guidelines are informed by professional theories, evidence-based practices, and definitions in an effort to offer the best guidance in the practice of telepsychology.

The use of the term *guidelines* within this document refers to statements that suggest or recommend specific professional behaviors, endeavors, or conduct for psychologists. Guidelines differ from standards in that standards are mandatory and may be accompanied by an enforcement mechanism. Thus, guidelines are aspirational in intent. They are intended to facilitate the continued systematic development of the profession and to help ensure a high level of professional practice by psychologists. "Guidelines are created to educate and to inform the practice of psychologists. They are also intended to stimulate debate and research. Guidelines are not to be promulgated as a means of establishing the identity of a particular group or specialty area of psychology; likewise, they are not to be created with the purpose of excluding any psychologist from practicing in a particular area" (APA, 2002b, p. 1048). "Guidelines are not intended to be mandatory or exhaustive and may not be applicable to every professional or clinical situation. They are not definitive and they are not intended to take precedence over the judgment of psychologists" (APA, 2002b, p. 1050). These guidelines are meant to assist psychologists as they apply current standards of professional practice when utilizing telecommunication technologies as a means of delivering their professional services. They are not intended to change any scope of practice or define the practice of any group of psychologists.

The practice of telepsychology involves consideration of legal requirements, ethical standards, telecommunication technologies, intra- and interagency policies, and other external constraints, as well as the demands of the particular professional context. In some situations, one set of considerations may suggest a different course of action than another, and it is the responsibility of the psychologist to balance them appropriately. These guidelines aim to assist psychologists in making such decisions. In addition, it will be important for psychologists to be cognizant of and compliant with laws and regulations that govern independent practice within jurisdictions and across jurisdictional and international borders. This is particularly true when providing telepsychology services. Where a psychologist is providing services from one jurisdiction to a client/patient located in another jurisdiction, the law and regulations may differ between the two jurisdictions. Also, it is the responsibility of the psychologists who practice telepsychology to maintain and enhance their level of understanding of the concepts related to the delivery of services via telecommunication technologies. Nothing in these guidelines is intended to contravene any limitations set on psychologists' activities based on ethical standards, federal or jurisdictional statutes or regulations, or for those psychologists who work in agencies and public settings. As in all other circumstances, psychologists must be aware of the stan-

The "Guidelines for the Practice of Telepsychology" were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists established by the following three entities: the American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB), and the APA Insurance Trust (APAIT). The "Guidelines for the Practice of Telepsychology" were approved as APA policy by the APA Council of Representatives on July 31, 2013. The co-chairs of the joint task force were Linda Campbell and Fred Millán. Additional members of the task force included the following psychologists: Margo Adams Larsen, Sara Smucker Barnwell, Bruce E. Crow, Terry S. Gock, Eric A. Harris, Jana N. Martin, Thomas W. Miller, and Joseph S. Rallo. APA staff (Ronald S. Palomares, Deborah Baker, Joan Freund, and Jessica Davis) and ASPPB staff (Stephen DeMers, Alex M. Siegel, and Janet Pippin Orwig) provided direct support to the joint task force.

These guidelines are scheduled to expire as APA policy 10 years from July 31, 2013 (the date of their adoption by the APA Council of Representatives). After this date, users are encouraged to contact the APA Practice Directorate to determine whether this document remains in effect.

Correspondence concerning these guidelines should be addressed to the Practice Directorate, American Psychological Association, 750 First Street, NE, Washington, DC 20002-4242.

© 2013 American Psychological Association 0003-066X/13/$12.00
Vol. 68, No. 9, 791–800     DOI: 10.1037/a0035001

dards of practice for the jurisdiction or setting in which they function and are expected to comply with those standards. Recommendations related to the guidelines are consistent with broad ethical principles (APA Ethics Code, APA, 2002a, 2010), and it continues to be the responsibility of the psychologist to apply all current legal and ethical standards of practice when providing telepsychology services.

It should be noted that APA policy generally requires substantial review of the relevant empirical literature as a basis for establishing the need for guidelines and for providing justification for the guidelines' statements themselves (APA, 2002b, p. 1050). The literature supporting the work of the Joint Task Force on the Development of Telepsychology Guidelines for Psychologists (i.e., the Telepsychology Task Force) and the guidelines statements themselves reflect seminal, relevant, and recent publications. The supporting references in the literature review emphasize studies from approximately the past 15 years plus classic studies that provide empirical support and relevant examples for the guidelines. The literature review, however, is not intended to be exhaustive or to serve as a comprehensive systematic review of the literature that is customary when developing professional practice guidelines for psychologists.

## Definition of Telepsychology

*Telepsychology* is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies. Telecommunications is the preparation, transmission, communication, or related processing of information by electrical, electromagnetic, electromechanical, electro-optical, or electronic means (Committee on National Security Systems, 2010). Telecommunication technologies include but are not limited to telephone, mobile devices, interactive videoconferencing, e-mail, chat, text, and Internet (e.g., self-help websites, blogs, and social media). The information that is transmitted may be in writing or include images, sounds, or other data. These communications may be synchronous, with multiple parties communicating in real time (e.g., interactive videoconferencing, telephone), or asynchronous (e.g., e-mail, online bulletin boards, storing and forwarding of information). Technologies may augment traditional in-person services (e.g., psychoeducational materials posted online after an in-person therapy session) or be used as stand-alone services (e.g., therapy or leadership development provided over videoconferencing). Different technologies may be used in various combinations and for different purposes during the provision of telepsychology services. For example, videoconferencing and telephone may also be utilized for direct service, while e-mail and text are used for nondirect services (e.g., scheduling). Regardless of the purpose, psychologists strive to be aware of the potential benefits and limitations in their choices of technologies for particular clients in particular situations.

## Operational Definitions

The Telepsychology Task Force has agreed upon the following operational definitions for terms used in this document. In addition, these and other terms used throughout the document have a basis in definitions developed by the following U.S. agencies: the Committee on National Security Systems (2010), the U.S. Department of Health and Human Services, Health Resources and Services Administration (2010), and the U. S. Department of Commerce, National Institute of Standards and Technology (2008, 2011). Last, the terminology and definitions that describe technologies and their uses are constantly evolving, and therefore psychologists are encouraged to consult glossaries and publications prepared by agencies such as the Committee on National Security Systems and the National Institute of Standards and Technology, which represent definitive sources responsible for developing terminology and definitions related to technology and its uses.

The term *client/patient* refers to the recipient of psychological services, whether psychological services are delivered in the context of health care, corporate, supervision, and/or consulting services. The term *in-person,* which is used in combination with the provision of services, refers to interactions in which the psychologist and the client/patient are in the same physical space and does not include interactions that may occur through the use of technologies. The term *remote,* which is also used in combination with the provision of services utilizing telecommunication technologies, refers to the provision of a service that is received at a different site from where the psychologist is physically located. The term *remote* includes no consideration related to distance and may refer to a site in a location that is in the office next door to the psychologist or thousands of miles from the psychologist. The terms *jurisdictions* and *jurisdictional* are used when referring to the governing bodies at states, territories, and provincial governments.

Finally, there are terms within these guidelines related to confidentiality and security. *Confidentiality* means the principle that data or information is not made available or disclosed to unauthorized persons or processes. The terms *security* and *security measures* are terms that encompass all of the administrative, physical, and technical safeguards in an information system. The term *information system* is an interconnected set of information resources within a system and includes hardware, software, information, data, applications, communications, and people.

## Need for the Guidelines

The expanding role of telecommunication technologies in the provision of services and the continuous development of new technologies that may be useful in the practice of psychology support the need for the development of guidelines for practice in this area. Technology offers the opportunity to increase client/patient access to psychological services. Service recipients limited by geographic location, medical condition, psychiatric diagnosis, financial constraint, or other barriers may gain access to high-quality psychological services through the use of technology.

Technology also facilitates the delivery of psychological services by new methods (e.g., online psychoeducation, therapy delivered over interactive videoconferencing) and augments traditional in-person psychological services. The increased use of technology for the delivery of some types of services by psychologists who are health service providers is suggested by recent survey data collected by the APA Center for Workforce Studies (2008) and by the increasing discussion of telepsychology in the professional literature (Baker & Bufka, 2011). Together with the increasing use and payment for the provision of telehealth services by Medicare and private industry, the development of national guidelines for the practice of telepsychology is timely and needed. Furthermore, state and international psychological associations have developed or are beginning to develop guidelines for the provision of psychological services (Canadian Psychological Association, 2006; New Zealand Psychologists Board, 2011; Ohio Psychological Association, 2010).

## Development of the Guidelines

These guidelines were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists (Telepsychology Task Force) established by the following three entities: the American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB), and the APA Insurance Trust (APAIT). These entities provided input, expertise, and guidance to the Telepsychology Task Force on many aspects of the profession, including those related to its ethical, regulatory, and legal principles and practices. The Telepsychology Task Force members represented a diverse range of interests and expertise that are characteristic of the profession of psychology, including knowledge of the issues relevant to the use of technology, ethical considerations, licensure and mobility, and scope of practice, to name only a few.

The Telepsychology Task Force recognized that telecommunications technologies provide both opportunities and challenges for psychologists. Telepsychology not only enhances a psychologist's ability to provide services to clients/patients but also greatly expands access to psychological services that, without telecommunication technologies, would not be available. Throughout the development of these guidelines, the Telepsychology Task Force devoted numerous hours to reflecting on and discussing the need for guidance for psychologists in this area of practice; the myriad, complex issues related to the practice of telepsychology; and the experiences that they and other practitioners address each day in the use of technology. There was a concerted focus on identifying the unique aspects that telecommunication technologies bring to the provision of psychological services, as distinct from those present during in-person provision of services. Two important components were identified:

(1) the psychologist's knowledge of and competence in the use of the telecommunication technologies being utilized; and

(2) the need to ensure that the client/patient has a full understanding of the increased risks for loss of security and confidentiality when using telecommunication technologies.

Therefore, two of the most salient issues that the Telepsychology Task Force members focused on when creating this document were the psychologist's own knowledge of and competence in the provision of telepsychology and the need to ensure that the client/patient has a full understanding of the potentially increased risks for loss of security and confidentiality when using technologies.

An additional key issue discussed by the task force members was interjurisdictional practice. The guidelines encourage psychologists to be familiar with and comply with all relevant laws and regulations when providing psychological services across jurisdictional and international borders. The guidelines do not promote a specific mechanism to guide the development and regulation of interjurisdictional practice. However, the Telepsychology Task Force noted that while the profession of psychology does not currently have a mechanism to regulate the delivery of psychological services across jurisdictional and international borders, it is anticipated that the profession will develop a mechanism to allow interjurisdictional practice given the rapidity with which technology is evolving and the increasing use of telepsychology by psychologists working in U.S. federal environments such as the U.S. Department of Defense and the Department of Veterans Affairs.

## Competence of the Psychologist

**Guideline 1. Psychologists who provide telepsychology services strive to take reasonable steps to ensure their competence with both the technologies used and the potential impact of the technologies on clients/patients, supervisees, or other professionals.**

**Rationale.** Psychologists have a primary ethical obligation to provide professional services only within the boundaries of their competence based on their education, training, supervised experience, consultation, study, or professional experience. As with all new and emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists utilizing telepsychology aspire to apply the same standards in developing their competence in this area. Psychologists who use telepsychology in their practices assume the responsibility for assessing and continuously evaluating their competencies, training, consultation, experience, and risk management practices required for competent practice.

**Application.** Psychologists assume responsibility to continually assess both their professional and technical competence when providing telepsychology services. Psychologists who utilize or intend to utilize telecommunication technologies when delivering services to clients/patients strive to obtain relevant professional training to develop their requisite knowledge and skills. Acquiring

competence may require pursuing additional educational experiences and training, including but not limited to a review of the relevant literature, attendance at existing training programs (e.g., professional and technical), and continuing education specific to the delivery of services utilizing telecommunication technologies. Psychologists are encouraged to seek appropriate skilled consultation from colleagues and other resources.

Psychologists are encouraged to examine the available evidence to determine whether specific telecommunication technologies are suitable for a client/patient, based on the current literature available, current outcomes research, best practice guidance, and client/patient preference. Research may not be available in the use of some specific technologies, and clients/patients should be made aware of those telecommunication technologies that have no evidence of effectiveness. However, this, in and of itself, may not be grounds to deny providing the service to the client/patient. Lack of current available evidence in a new area of practice does not necessarily indicate that a service is ineffective. Additionally, psychologists are encouraged to document their consideration and choices regarding the use of telecommunication technologies used in service delivery.

Psychologists understand the need to consider their competence in utilizing telepsychology as well as their client's/patient's ability to engage in and fully understand the risks and benefits of the proposed intervention utilizing specific technologies. Psychologists make reasonable efforts to understand the manner in which cultural, linguistic, socioeconomic, and other individual characteristics (e.g., medical status, psychiatric stability, physical/cognitive disability, personal preferences), in addition to organizational cultures, may impact effective use of telecommunication technologies in service delivery.

Psychologists who are trained to handle emergency situations in providing traditional in-person clinical services are generally familiar with the resources available in their local community to assist clients/patients with crisis intervention. At the onset of the delivery of telepsychology services, psychologists make reasonable efforts to identify and learn how to access relevant and appropriate emergency resources in the client's/patient's local area, such as emergency response contacts (e.g., emergency telephone numbers, hospital admissions, local referral resources, clinical champion at a partner clinic where services are delivered, a support person in the client's/patient's life when available). Psychologists prepare a plan to address any lack of appropriate resources, particularly those necessary in an emergency, and other relevant factors that may impact the efficacy and safety of said service. Psychologists make reasonable efforts to discuss with and provide all clients/patients with clear written instructions as to what to do in an emergency (e.g., where there is a suicide risk). As part of emergency planning, psychologists are encouraged to acquire knowledge of the laws and rules of the jurisdiction in which the client/patient resides and of the differences of those laws from those in the psychologist's jurisdiction, as well as to document all their emergency planning efforts.

In addition, as applicable, psychologists are mindful of the array of potential discharge plans for clients/patients for whom telepsychology services are no longer necessary and/or desirable. If a client/patient recurrently experiences crises/emergencies, which suggests that in-person services may be appropriate, psychologists take reasonable steps to refer a client/patient to a local mental health resource or begin providing in-person services.

Psychologists using telepsychology to provide supervision or consultation remotely to individuals or organizations are encouraged to consult others who are knowledgeable about the unique issues telecommunication technologies pose for supervision or consultation. Psychologists providing telepsychology services strive to be familiar with professional literature regarding the delivery of services via telecommunication technologies, as well as to be competent with the use of the technological modality itself. In providing supervision and/or consultation via telepsychology, psychologists make reasonable efforts to be proficient in the professional services being offered, the telecommunication modality via which the services are being offered by the supervisee/consultee, and the technology medium being used to provide the supervision or consultation. In addition, since the development of basic professional competencies for supervisees is often conducted in person, psychologists who use telepsychology for supervision are encouraged to consider and ensure that a sufficient amount of in-person supervision time is included so that the supervisees can attain the required competencies or supervised experiences.

## Standards of Care in the Delivery of Telepsychology Services

***Guideline 2. Psychologists make every effort to ensure that ethical and professional standards of care and practice are met at the outset and throughout the duration of the telepsychology services they provide.***

***Rationale.*** Psychologists delivering telepsychology services apply the same ethical and professional standards of care and professional practice that are required when providing in-person psychological services. The use of telecommunication technologies in the delivery of psychological services is a relatively new and rapidly evolving area, and therefore psychologists are encouraged to take particular care to evaluate and assess the appropriateness of utilizing these technologies prior to engaging in, and throughout the duration of, telepsychology practice to determine if the modality of service is appropriate, efficacious, and safe.

Telepsychology encompasses a breadth of different psychological services using a variety of technologies (e.g., interactive videoconferencing, telephone, text, e-mail, Web services, and mobile applications). The burgeoning research in telepsychology suggests that certain types of interactive telepsychological interventions are equal in effectiveness to their in-person counterparts (specific therapies delivered over videoteleconferencing and telephone).

Therefore, before psychologists engage in providing tele-psychology services, they are urged to conduct an initial assessment to determine the appropriateness of the telepsychology service to be provided for the client/patient. Such an assessment may include the examination of the potential risks and benefits of providing telepsychology services for the client's/patient's particular needs, the multicultural and ethical issues that may arise, and a review of the most appropriate medium (video teleconference, text, e-mail, etc.) or best options available for the service delivery. It may also include considering whether comparable in-person services are available and why services delivered via telepsychology are equivalent or preferable to such services. In addition, it is incumbent on the psychologist to engage in a continual assessment of the appropriateness of providing telepsychology services throughout the duration of the service delivery.

**Application.** When providing telepsychology services, considering client/patient preferences for such services is important. However, it may not be solely determinative in the assessment of their appropriateness. Psychologists are encouraged to carefully examine the unique benefits of delivering telepsychology services (e.g., access to care, access to consulting services, client convenience, accommodating client special needs, etc.) relative to the unique risks (e.g., information security, emergency management, etc.) when determining whether or not to offer telepsychology services. Moreover, psychologists are aware of such other factors as geographic location, organizational culture, technological competence (both that of the psychologist and that of the client/patient), and, as appropriate, medical conditions, mental status and stability, psychiatric diagnosis, current or historic use of substances, treatment history, and therapeutic needs that may be relevant to assessing the appropriateness of the telepsychology services being offered. Furthermore, psychologists are encouraged to communicate any risks and benefits of the telepsychology services to be offered to the client/patient and to document such communication. In addition, psychologists may consider some initial in-person contact with the client/patient to facilitate an active discussion on these issues and/or to conduct the initial assessment.

As in the provision of traditional services, psychologists endeavor to follow the best practice of service delivery described in the empirical literature and professional standards (including multicultural considerations) that are relevant to the telepsychological service modality being offered. In addition, they consider the client's/patient's familiarity with and competency for using the specific technologies involved in providing the particular telepsychology service. Moreover, psychologists are encouraged to reflect on multicultural considerations and how best to manage any emergency that may arise during the provision of telepsychology services.

Psychologists are encouraged to assess carefully the remote environment in which services will be provided to determine what impact, if any, there might be on the efficacy, privacy, and/or safety of the proposed intervention offered via telepsychology. Such an assessment of the remote environment may include a discussion of the client's/patient's situation within the home or within an organizational context, the availability of emergency or technical personnel or supports, the risk of distractions, the potential for privacy breaches, or any other impediments that may impact the effective delivery of telepsychology services. Along this line, psychologists are encouraged to discuss fully with the clients/patients their role in ensuring that sessions are not interrupted and that the setting is comfortable and conducive to making progress in order to maximize the impact of the service provided, since the psychologist will not be able to control those factors remotely.

Psychologists are urged to monitor and assess regularly the progress of their client/patient when offering telepsychology services in order to determine if the provision of telepsychology services is still appropriate and beneficial to the client/patient. If there is a significant change in the client/patient or in the therapeutic interaction that causes concern, psychologists make reasonable efforts to take appropriate steps to adjust and reassess the appropriateness of the services delivered via telepsychology. Where it is believed that continuing to provide remote services is no longer beneficial or presents a risk to a client's/patient's emotional or physical well-being, psychologists are encouraged to thoroughly discuss these concerns with the client/patient, appropriately terminate their remote services with adequate notice, and refer or offer any needed alternative services to the client/patient.

## Informed Consent

**Guideline 3. Psychologists strive to obtain and document informed consent that specifically addresses the unique concerns related to the telepsychology services they provide. When doing so, psychologists are cognizant of the applicable laws and regulations, as well as organizational requirements, that govern informed consent in this area.**

**Rationale.** The process of explaining and obtaining informed consent, by whatever means, sets the stage for the relationship between the psychologist and the client/patient. Psychologists make reasonable efforts to offer a complete and clear description of the telepsychology services they provide, and they seek to obtain and document informed consent when providing professional services (APA Ethics Code, Standard 3.10). In addition, they attempt to develop and share the policies and procedures that will explain to their clients/patients how they will interact with them using the specific telecommunication technologies involved. It may be more difficult to obtain and document informed consent in situations where psychologists provide telepsychology services to their clients/patients who are not in the same physical location or with whom they do not have in-person interactions. Moreover, there may be differences with respect to informed consent between the laws and regulations in the jurisdictions where a

psychologist who is providing telepsychology services is located and those in the jurisdiction in which this psychologist's client/patient resides. Furthermore, psychologists may need to be aware of the manner in which cultural, linguistic, and socioeconomic characteristics and organizational considerations may impact a client's/patient's understanding of, and the special considerations required for, obtaining informed consent (such as when securing informed consent remotely from a parent/guardian when providing telepsychology services to a minor).

Telepsychology services may require different considerations for and safeguards against potential risks to confidentiality, information security, and comparability of traditional in-person services. Psychologists are thus encouraged to consider appropriate policies and procedures to address the potential threats to the security of client/patient data and information when using specific telecommunication technologies and to appropriately inform their clients/patients about them. For example, psychologists who provide telepsychology services should consider addressing with their clients/patients what client/patient data and information will be stored, how the data and information will be stored, how it will be accessed, how secure the information communicated using a given technology is, and any technology-related vulnerability to their confidentiality and security that is incurred by creating and storing electronic client/patient data and information.

**Application.**    Prior to providing telepsychology services, psychologists are aware of the importance of obtaining and documenting written informed consent from their clients/patients that specifically addresses the unique concerns relevant to those services that will be offered. When developing such informed consent, psychologists make reasonable efforts to use language that is reasonably understandable by their clients/patients, in addition to evaluating the need to address cultural, linguistic, and organizational considerations and other issues that may have an impact on a client's/patient's understanding of the informed consent agreement. When considering for inclusion in informed consent those unique concerns that may be involved in providing telepsychology services, psychologists may include the manner in which they and their clients/patients will use the particular telecommunication technologies, the boundaries they will establish and observe, and the procedures for responding to electronic communications from clients/patients. Moreover, psychologists are cognizant of pertinent laws and regulations with respect to informed consent in both the jurisdiction where they offer their services and the jurisdiction where their clients/patients reside (see Guideline 8 on Interjurisdictional Practice for more detail).

Besides those unique concerns described above, psychologists are encouraged to discuss with their clients/patients those issues surrounding confidentiality and the security conditions when particular modes of telecommunication technologies are utilized. Along this line, psychologists are cognizant of some of the inherent risks a given telecommunication technology may pose in both the equipment (hardware, software, other equipment components)

and the processes used for providing telepsychology services, and they strive to provide their clients/patients with adequate information to give informed consent for proceeding with receiving the professional services offered via telepsychology. Some of these risks may include those associated with technological problems and those service limitations that may arise because the continuity, availability, and appropriateness of specific telepsychology services (e.g., testing, assessment, and therapy) may be hindered as a result of those services being offered remotely. In addition, psychologists may consider developing agreements with their clients/patients to assume some role in protecting the data and information they receive from them (e.g., by not forwarding e-mails from the psychologist to others).

Another unique aspect of providing telepsychology services is that of billing documentation. As part of informed consent, psychologists are mindful of the need to discuss with their clients/patients prior to the onset of service provision what the billing documentation will include. Billing documentation may reflect the type of telecommunication technology used, the type of telepsychology services provided, and the fee structure for each relevant telepsychology service (e.g., video chat, texting fees, telephone services, chat room group fees, emergency scheduling, etc.). It may also include discussion about the charges incurred for any service interruptions or failures encountered, responsibility for overage charges on data plans, fee reductions for technology failures, and any other costs associated with the telepsychology services that will be provided.

# Confidentiality of Data and Information

***Guideline 4. Psychologists who provide telepsychology services make reasonable efforts to protect and maintain the confidentiality of the data and information relating to their clients/patients and inform them of the potentially increased risks of loss of confidentiality inherent in the use of the telecommunication technologies, if any.***

**Rationale.**    The use of telecommunications technologies and the rapid advances in technology present unique challenges for psychologists in protecting the confidentiality of clients/patients. Psychologists who provide telepsychology learn about the potential risks to confidentiality before utilizing such technologies. When necessary, psychologists obtain the appropriate consultation with technology experts to augment their knowledge of telecommunication technologies in order to apply security measures in their practices that will protect and maintain the confidentiality of data and information related to their clients/patients.

Some of the potential risks to confidentiality include considerations related to uses of search engines and participation in social networking sites. Other challenges in this area may include protecting confidential data and information from inappropriate and/or inadvertent breaches to es-

tablished security methods the psychologist has in place, as well as boundary issues that may arise as a result of a psychologist's use of search engines and participation on social networking sites. In addition, any Internet participation by psychologists has the potential of being discovered by their clients/patients and others and thereby potentially compromising a professional relationship.

**Application.** Psychologists both understand and inform their clients/patients of the limits to confidentiality and the risks of possible access to or disclosure of confidential data and information that may occur during service delivery, including the risks of others gaining access to electronic communications (e.g., telephone, e-mail) between the psychologist and client/patient. Also, psychologists are cognizant of the ethical and practical implications of proactively researching online personal information about their clients/patients. They carefully consider the advisability of discussing such research activities with their clients/patients and how information gained from such searches would be utilized and recorded, as documenting this information may introduce risks to the boundaries of appropriate conduct for a psychologist. In addition, psychologists are encouraged to weigh the risks and benefits of dual relationships that may develop with their clients/patients, due to the use of telecommunication technologies, before engaging in such relationships (APA Practice Organization, 2012).

Psychologists who use social networking sites for both professional and personal purposes are encouraged to review and educate themselves about the potential risks to privacy and confidentiality and to consider utilizing all available privacy settings to reduce these risks. They are also mindful of the possibility that any electronic communication can have a high risk of public discovery. They therefore mitigate such risks by following the appropriate laws, regulations, and the APA Ethics Code (APA, 2002a, 2010) to avoid disclosing confidential data or information related to clients/patients.

## Security and Transmission of Data and Information

### Guideline 5. Psychologists who provide telepsychology services take reasonable steps to ensure that security measures are in place to protect data and information related to their clients/patients from unintended access or disclosure.

**Rationale.** The use of telecommunication technologies in the provision of psychological services presents unique potential threats to the security and transmission of client/patient data and information. These potential threats to the integrity of data and information may include computer viruses, hackers, theft of technology devices, damage to hard drives or portable drives, failure of security systems, flawed software, ease of accessibility to unsecured electronic files, and malfunctioning or outdated technology. Other threats may include policies and practices of technology companies and vendors, such as tailored mar-

keting derived from e-mail communications. Psychologists are encouraged to be mindful of these potential threats and to take reasonable steps to ensure that security measures are in place for protecting and controlling access to client/patient data within an information system. In addition, they are cognizant of relevant jurisdictional and federal laws and regulations that govern electronic storage and transmission of client/patient data and information, and they develop appropriate policies and procedures to comply with such directives. When developing policies and procedures to ensure the security of client/patient data and information, psychologists may include considering the unique concerns and impacts posed by both intended and unintended use of public and private technology devices, active and inactive therapeutic relationships, and the different safeguards required for different physical environments, different staffs (e.g., professional vs. administrative staff), and different telecommunication technologies.

**Application.** Psychologists are encouraged to conduct an analysis of the risks to their practice settings, telecommunication technologies, and administrative staff in order to ensure that client/patient data and information are accessible only to appropriate and authorized individuals. Psychologists strive to obtain appropriate training or consultation from relevant experts when additional knowledge is needed to conduct an analysis of the risks.

Psychologists strive to ensure that policies and procedures are in place to secure and control access to client/patient information and data within information systems. Along this line, they may encrypt confidential client/patient data for storage or transmission and utilize such other secure methods as safe hardware and software and robust passwords to protect electronically stored or transmitted data and information. If there is a breach of unencrypted electronically communicated or maintained data, psychologists are urged to notify their clients/patients and other appropriate individuals/organizations as soon as possible. In addition, they are encouraged to make their best efforts to ensure that electronic data and information remain accessible despite problems with hardware, software, and/or storage devices by keeping a secure back-up version of such data.

When documenting the security measures to protect client/patient data and information from unintended access or disclosure, psychologists are encouraged to clearly address what types of telecommunication technologies are used (e.g., e-mail, telephone, video teleconferencing, text), how they are used, and whether the telepsychology services used are the primary method of contact or augment in-person contact. When keeping records of e-mail, online messaging, and other work using telecommunication technologies, psychologists are cognizant that preserving the actual communication may be preferable to summarization in some cases depending on the type of technology used.

# Disposal of Data and Information and Technologies

***Guideline 6. Psychologists who provide telepsychology services make reasonable efforts to dispose of data and information and the technologies used in a manner that facilitates protection from unauthorized access and accounts for safe and appropriate disposal.***

**Rationale.**  Consistent with the APA "Record Keeping Guidelines" (APA, 2007), psychologists are encouraged to create policies and procedures for the secure destruction of data and information and the technologies used to create, store, and transmit the data and information. The use of telecommunication technologies in the provision of psychological services poses new challenges for psychologists when they consider the disposal methods to utilize in order to maximally preserve client confidentiality and privacy. Psychologists are therefore urged to consider conducting an analysis of the risks to the information systems within their practices in an effort to ensure full and complete disposal of electronic data and information, plus the technologies that created, stored, and transmitted the data and information.

**Application.**  Psychologists are encouraged to develop policies and procedures for the destruction of data and information related to clients/patients. They also strive to securely dispose of software and hardware used in the provision of telepsychology services in a manner that ensures that the confidentiality and security of any patient/client information is not compromised. When doing so, psychologists carefully clean all the data and images in the storage media before reuse or disposal, consistent with federal, state, provincial, territorial, and other organizational regulations and guidelines. Psychologists are aware of and understand the unique storage implications related to telecommunication technologies inherent in available systems.

Psychologists are encouraged to document the methods and procedures used when disposing of the data and information and the technologies used to create, store, or transmit the data and information, as well as any other technology utilized in the disposal of data and hardware. They also strive to be aware of malware, cookies, and so forth and to dispose of them routinely on an ongoing basis when telecommunication technologies are used.

# Testing and Assessment

***Guideline 7. Psychologists are encouraged to consider the unique issues that may arise with test instruments and assessment approaches designed for in-person implementation when providing telepsychology services.***

**Rationale.**  Psychological testing and other assessment procedures are an area of professional practice in which psychologists have been trained, and they are uniquely qualified to conduct such tests. While some symptom screening instruments are already frequently being administered online, most psychological test instruments and other assessment procedures currently in use were designed and developed originally for in-person administration. Psychologists are thus encouraged to be knowledgeable about, and account for, the unique impacts of such tests, their suitability for diverse populations, and the limitations on test administration and on test and other data interpretations when these psychological tests and other assessment procedures are considered for and conducted via telepsychology. Psychologists also strive to maintain the integrity of the application of the testing and assessment process and procedures when using telecommunication technologies. In addition, they are cognizant of the accommodations for diverse populations that may be required for test administration via telepsychology. These guidelines are consistent with the standards articulated in the most recent edition of *Standards for Educational and Psychological Testing* (American Educational Research Association, American Psychological Association, and the Council on Measurement in Education, 1999).

**Application.**  When a psychological test or other assessment procedure is conducted via telepsychology, psychologists are encouraged to ensure that the integrity of the psychometric properties of the test or assessment procedure (e.g., reliability and validity) and the conditions of administration indicated in the test manual are preserved when adapted for use with such technologies. They are encouraged to consider whether modifications to the testing environment or conditions are necessary to accomplish this preservation. For example, a test taker's access to a cell phone, the Internet, or other persons during an assessment could interfere with the reliability or validity of the instrument or its administration. Further, if the individual being assessed receives coaching or has access to such information as potential test responses or the scoring and interpretation of specific assessment instruments because they are available on the Internet, the test results may be compromised. Psychologists are also encouraged to consider other possible forms of distraction which could affect performance during an assessment and which may not be obvious or visible (e.g., sight, sound, and smell) when utilizing telecommunication technologies.

Psychologists are encouraged to be cognizant of the specific issues that may arise with diverse populations when providing telepsychology and to make appropriate arrangements to address those concerns (e.g., language or cultural issues, cognitive, physical, or sensory skills or impairments, or age may impact assessment). In addition, psychologists may consider the use of a trained assistant (e.g., a proctor) to be on the premises at the remote location in an effort to help verify the identity of the client/patient, provide needed on-site support to administer certain tests or subtests, and protect the security of the psychological testing and/or assessment process.

When administering psychological tests and other assessment procedures when providing telepsychology services, psychologists are encouraged to consider the quality

of those technologies that are being used and the hardware requirements that are needed in order to conduct the specific psychological test or assessment. They also strive to account for and be prepared to explain the potential difference between the results obtained when a particular psychological test is conducted via telepsychology and when it is administered in person. In addition, when documenting findings from evaluation and assessment procedures, psychologists are encouraged to specify that a particular test or assessment procedure has been administered via telepsychology and to describe any accommodations or modifications that have been made.

Psychologists strive to use test norms derived from telecommunication technologies administration if such are available. Psychologists are encouraged to recognize the potential limitations of all assessment processes conducted via telepsychology and to be ready to address the limitations and potential impact of those procedures.

## Interjurisdictional Practice

**Guideline 8. Psychologists are encouraged to be familiar with and comply with all relevant laws and regulations when providing telepsychology services to clients/patients across jurisdictional and international borders.**

**Rationale.** With the rapid advances in telecommunication technologies, the intentional or unintentional provision of psychological services across jurisdictional and international borders is becoming more of a reality for psychologists. Such service provision may range from the psychologists or clients/patients being temporarily out of state (including split residence across states) to psychologists offering their services across jurisdictional borders as a practice modality to take advantage of new telecommunication technologies. Psychological service delivery systems within such institutions as the U.S. Department of Defense and the Department of Veterans Affairs have already established internal policies and procedures for providing services within their systems that cross jurisdictional and international borders. However, the laws and regulations that govern service delivery by psychologists outside of those systems vary by state, province, territory, and country (APA Practice Organization, 2010). Psychologists should make reasonable efforts to be familiar with and, as appropriate, to address the laws and regulations that govern telepsychology service delivery within the jurisdictions in which they are situated and the jurisdictions where their clients/patients are located.

**Application.** It is important for psychologists to be aware of the relevant laws and regulations that specifically address the delivery of professional services by psychologists via telecommunication technologies within and between jurisdictions. Psychologists are encouraged to understand what services the laws and regulations of a jurisdiction consider as telehealth or telepsychology. In addition, psychologists are encouraged to review the relevant jurisdictions' professional licensure requirements, the services and telecommunication modalities covered, and the information required to be included in providing informed consent. It is important to note that each jurisdiction may or may not have specific laws that impose special requirements for providing psychological services via telecommunication technologies. The APA Practice Organization (2010) has found that there are variations in whether psychologists are specified as a single type of provider or covered as part of a more diverse group of providers. In addition, there is wide diversity in the types of services and the telecommunication technologies that are covered by these laws.

At the present time, there are a number of jurisdictions without specific laws that govern the provision of psychological services utilizing telecommunication technologies. When providing telepsychology services in these jurisdictions, psychologists are encouraged to be aware of any opinions or declaratory statements issued by the relevant regulatory bodies and/or other practitioner licensing boards that may help inform them of the legal and regulatory requirements involved when delivering telepsychology services within those jurisdictions.

Moreover, because of the rapid growth in the utilization of telecommunication technologies, psychologists strive to keep abreast of developments and changes in the licensure and other interjurisdictional practice requirements that may be pertinent to their delivery of telepsychology services across jurisdictional boundaries. Given the direction of various health professions, and current federal priorities to resolve problems created by requirements of multijurisdictional licensure (e.g., the Federal Communications Commission's 2010 National Broadband Plan, the Canadian government's 1995 Agreement on Internal Trade), the development of a telepsychology credential required by psychology boards for interjurisdictional practice is a probable outcome. For example, nursing has developed a credential that is accepted by many U.S. jurisdictions that allows nurses licensed in any participating jurisdiction to practice in person or remotely in all participating jurisdictions. In addition, an ASPPB task force has drafted a set of recommendations for such a credential.

## Conclusion

It is important to note that it is not the intent of these guidelines to prescribe specific actions, but rather, to offer the best guidance available at present when incorporating telecommunication technologies in the provision of psychological services. Because technology and its applicability to the profession of psychology constitute a dynamic area with many changes likely ahead, these guidelines also are not inclusive of all other considerations and are not intended to take precedence over the judgment of psychologists or applicable laws and regulations that guide the profession and practice of psychology. It is hoped that the framework presented will guide psychologists as the field evolves.

## REFERENCES

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing*. Washington, DC: American Educational Research Association.

American Psychological Association. (2002a). Ethical principles of psychologists and code of conduct. *American Psychologist, 57,* 1060–1073. doi:10.1037/0003-066X.57.12.1060

American Psychological Association. (2002b). Criteria for practice guideline development and evaluation. *American Psychologist, 57,* 1048–1051. doi:10.1037/0003-066X.57.12.1048

American Psychological Association. (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. *American Psychologist, 58,* 377–402. doi:10.1037/0003-066X.58.5.377

American Psychological Association. (2007). Record keeping guidelines. *American Psychologist, 62,* 993–1004. doi:10.1037/0003-066X.62.9.993

American Psychological Association. (2010). *Ethical principles of psychologists and code of conduct including 2010 amendments*. Retrieved from http://www.apa.org/ethics/code/index.aspx

American Psychological Association Center for Workforce Studies. (2008). *2008 APA survey of psychology health service providers: Module D: Information on telepsychology, medication, and collaboration.* Retrieved from http://www.apa.org/workforce/publications/08-hsp/telepsychology/index.aspx

American Psychological Association Practice Organization. (2010). Telehealth: Legal basics for psychologists. *Good Practice, 41,* 2–7.

American Psychological Association Practice Organization. (2012, Spring/Summer). Social media: What's your policy? *Good Practice,* pp. 10–18.

Baker, D. C., & Bufka, L. F. (2011). Preparing for the telehealth world: Navigating legal, regulatory, reimbursement, and ethical issues in an electronic age. *Professional Psychology: Research and Practice, 42*(6), 405–411. doi:10.1037/a0025037

Canadian Psychological Association. (2006). *Ethical guidelines for psychologists providing psychological services via electronic media.* Retrieved from http://www.cpa.ca/aboutcpa/committees/ethics/psychserviceselectronically/.

Committee on National Security Systems. (2010). *National information assurance (IA) glossary.* Retrieved from https://www.cnss.gov/Assets/pdf/cnssi_4009.pdf

New Zealand Psychologists Board. (2011). *Draft guidelines: Psychology services delivered via the Internet and other electronic media.* Retrieved from http://psychologistsboard.org.nz/cms_show_download.php?id=141

Ohio Psychological Association. (2010). *Telepsychology guidelines.* Retrieved from http://www.ohpsych.org/psychologists/files/2011/06/OPATelepsychologyGuidelines41710.pdf

U.S. Department of Commerce, National Institute of Standards and Technology. (2008). *An introductory resource guide for implementing the Health Insurance Portability and Accountability Act (HIPAA) Security Rule.* Gaithersburg, MD: Author.

U.S. Department of Commerce, National Institute of Standards and Technology. (2011). *Glossary of key information security terms.* Gaithersburg, MD: Author.

U.S. Department of Health and Human Services, Health Resources and Services Administration. (2010). *Special report to the Senate Appropriations Committee: Telehealth licensure report.* Retrieved from http://www.hrsa.gov/healthit/telehealth/licenserpt10.pdf

Hindawi Publishing Corporation
International Journal of Telemedicine and Applications
Volume 2014, Article ID 168158, 7 pages
http://dx.doi.org/10.1155/2014/168158



*Research Article*

# Health-Related Quality of Life of Rural Clients Seeking Telepsychology Services

**Kevin R. Tarlow,[1] Carly E. McCord,[2] Timothy R. Elliott,[1] and Daniel F. Brossart[1]**

[1] Educational Psychology, Texas A&M University, College Station, TX 77843, USA
[2] School of Public Health, Texas A&M Health Science Center, 8441 Highway 47, Clinical Building 1,
  Suite 1300, Bryan, TX 77807, USA

Correspondence should be addressed to Carly E. McCord; cmccord@sph.tamhsc.edu

Received 31 May 2014; Accepted 27 October 2014; Published 19 November 2014

Academic Editor: Malcolm Clarke

Copyright © 2014 Kevin R. Tarlow et al. This is an open access article distributed under the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Sixty million US residents live in rural areas, but health policies and interventions developed from an urban mindset often fail to address the significant barriers to health experienced by these local communities. Telepsychology, or psychological services delivered by distance via technology, is an emerging treatment modality with special implications for underserved rural areas. This study found that a sample of rural residents seeking telepsychology services ($n = 94$) had low health-related quality of life (HRQOL), often due to cooccurring physical and mental health diagnoses including high rates of depression. However, a brief telepsychology treatment delivered to rural clients ($n = 40$) was associated with an improvement in mental health-related quality of life ($d = 0.70$, $P < .001$). These results indicate that despite the complex health needs of these underserved communities, telepsychology interventions may help offset the disparities in health service access in rural areas.

## 1. Introduction

Over 3.8 million of the 60 million rural United States residents live in Texas, which has more rural residents than any state in the country [1]. Approximately one in four rural residents has a mental illness or substance abuse problem [2]. However, the resources available to individuals living in rural areas are not equivalent to those available to their urban counterparts due to barriers such as lack of transportation, geographic isolation, low socioeconomic status, low educational attainment, and low rates of insurance coverage [3]. For instance, even though some mental health diagnoses occur at least as often in rural areas as in urban ones [4, 5], the negative impact of those diagnoses on health and quality of life may be greater in rural areas because of the barriers to availability, accessibility, and perceived stigma of mental health care services [6]. Rural-urban health disparities have been reported in groups ranging from clergy [7] to veterans [8].

Not only are rural residents confronted with unique barriers to service, but health care providers are less likely to deliver services in rural areas due to lower wages and compensation, increased ethical risk, and higher burn-out rates [9]. Given the range of rural health needs and the scarcity of specialty services, providers who do offer services in rural communities are often pressured to treat patients at the limits of their knowledge and expertise [10]. The unique features of the rural health care landscape require health policies, legislation, and interventions informed by these issues.

*Telehealth*, or the use of telecommunication technologies to provide health care services at a distance, is one way to offset the disparities in health care access found in rural areas. Telehealth describes a broad range of health-related services that may include use of internet, telephone, videoconferencing, email, chat, text messaging, and other technologies to improve access, affordability, and efficiency of service delivery. The American Psychological Association (APA) recently recognized the benefits of using *telepsychology* (i.e., psychological telehealth services) to increase access to underserved areas [11]. For the purposes of this paper, the term telepsychology is used to describe the delivery of individual psychotherapy via secure videoconferencing technology. In their guidelines for the use of this emerging treatment

modality, APA suggested that health service providers should utilize telepsychology when research evidence supports its use for a particular client or population (p. 8). However, APA also pointed out that outcomes research for telepsychology may be lacking for many clients due to the developing nature of the field. The purpose of this paper is to (a) better understand the health needs of rural clients seeking mental health care services and (b) establish an evidence basis for telepsychology's effectiveness with rural clients. Meeting these two goals is an important step to increasing mental health care access for underserved rural areas.

A major challenge to providing health care services to rural communities—telehealth or otherwise—is the diversity of the rural communities themselves. As sociologist Daryl Hobbs said, "When you have seen *one* rural community, you have seen *one* rural community" (emphasis in original, p. 397) [12]. Rural health policies and interventions should be empirically and *locally* informed, based on the needs and resources of each unique community. Creating sustainable initiatives to meet health needs in rural areas often requires local collaboration among community stakeholders, including clinicians, researchers, students, community leaders, and other policy makers [13].

Understanding a rural community's available health resources is a vital first step in locally informed policy and intervention development. *Community capacity* describes a community's ability to mobilize its social, political, and organizational capital to meet unmet needs [14]. This begins with an assessment of needs and is followed by the development of deliberate, collaborative intervention strategies. The "build it and they will come" mentality will not lead to sustainability in rural areas. Universities may be powerful facilitators of community capacity, but they must collaborate with local stakeholders and maintain those relationships beyond their inception [15].

In 2006, the Center for Community Health Development (CCHD) at the Texas A&M Health Science Center (http://www.cchd.us/) conducted a survey in the Brazos Valley—a region of Texas comprised of seven counties, all of which are federally designated Health Professional Shortage Areas (HPSAs). Texas has the highest percentage of HPSAs in the country [16]. The 2006 survey found that mental health and public transportation were among the top needs of the region. Over half of respondents reported having at least one day of "poor mental health" in the last month, and 62% of respondents reported needing mental health services and being unable to get the needed services [17].

In response to the identified health needs of the area, a "town and gown" partnership was created between Leon County (one of the seven Brazos Valley counties) and Texas A&M University to provide telepsychology services to the area. A locally appointed health resource commission mobilized resources in Leon County to provide a physical location to conduct the telepsychology services, and in 2009 advanced doctoral level students in the Counseling Psychology program at Texas A&M University began providing long-distance services under the supervision of a licensed psychologist [18].

It was expected that many Leon County residents seeking telepsychology services would present with cooccurring physical and mental health conditions. Consequently, assessment of client needs, issues, and response to telepsychology treatment required an evaluation of client health-related quality of life (HRQOL). HRQOL is a multidimensional construct of well-being often encompassing physical, mental, emotional, and social functioning [19, 20]. The Centers for Disease Control and Prevention (CDC) suggest that measures such as the Medical Outcomes Study Short Form (SF-12) [21] can be used to identify needed services, inform policy and legislation, and evaluate outcomes of health interventions [22].

Three other studies of similar size have evaluated the impact of telepsychology and telemedicine for mental health treatment on HRQOL using the SF-12v2. In one Canadian study, telepsychiatry outperformed in-person psychiatry for mental health improvement [23]. In two European studies that included German-speaking clients in The Netherlands, Germany, Austria, and Switzerland, internet-based cognitive behavioral therapy (CBT) interventions for grief and post-traumatic stress disorder (PTSD) outperformed the waitlist control group for mental health improvement [24, 25]. While all three studies found moderate to large effects of telehealth interventions on mental health status, no effects on physical health status were detected.

The current study was developed with two goals. First, given the barriers to health experienced by many rural communities, we wish to better understand the physical and mental health status of rural residents receiving telepsychology services. We compare the physical and mental health scores for participants in the current study with established HRQOL norms for the overall US population and with a national sample of depressed individuals. We expect that participants presenting for telepsychology services will have a lower HRQOL than both the national standardization sample and the national sample of depressed individuals. We also briefly review the depressive symptoms reported by participants in order to better describe the clinical features of the sample.

Second, we examine the possible impact of telepsychology services on client HRQOL in this underserved area. We expect that participants who received four sessions of telepsychology services will demonstrate significant improvements in mental health status. However, we were uncertain of the degree to which telepsychology services would affect physical health functioning.

These two goals are independent but related: *What are the physical and mental health needs of this population? And given barriers to other health services, is telepsychology an effective treatment option for this group?* Answering these questions is essential for empirically and locally informed health policy development. We expect that a range of stakeholders in and outside of the Brazos Valley would benefit from a better understanding of (a) the HRQOL of this rural community and (b) the increased health service options made possible by emerging areas such as telepsychology.

## 2. Methods

*2.1. Participants.* Participants in the current study resided in Leon County, Texas, and received telepsychology services between 2009 and 2012. Leon County is a federally designated Health Professional Shortage Area (HPSA) for both medical and mental health services [16]. Participants were predominantly low-income and were treated for a variety of presenting concerns, including depression, anxiety, bipolar disorder, posttraumatic stress disorder (PTSD), and relationship concerns.

Two samples of participants were analyzed for this study. Participants in a larger sample ($n = 94$) completed self-report measures of physical and mental health (SF-12v2; the Patient Health Questionnaire, PHQ-9) [26] during their first telepsychology session, and those data were used in the first part of the study to make descriptive comparisons with nationally representative samples. Within those 94 participants, a smaller group ($n = 40$) was reassessed with the SF-12v2 at the fourth session. Those follow-up data were used in the second part of the current study to evaluate the effectiveness of telepsychology.

There were several reasons that 54 individuals in the larger sample did not participate in the follow-up portion of the study. In some cases, participants dropped out of treatment before the fourth session ($n = 37$). Clients dropped out of treatment for a variety of known and unknown reasons. Some clients discontinued services because their presenting concerns were met before the fourth session. Others dropped out because they lacked transportation, found other treatment providers, moved from the area, or were incarcerated. In some cases participants continued to receive treatment; however their assigned counselor did not participate in the follow-up study ($n = 17$) and SF-12 data were not collected at the fourth session. No inclusion or exclusion criteria were implemented in selecting clients for the follow-up study; rather the follow-up group counselors elected to readminister the SF-12. Supporting analyses not reported here found that the follow-up group ($n = 40$) and the non-follow-up group ($n = 54$) did not have statistically significant differences on their initial levels of physical health (PCS), mental health (MCS), or depression (PHQ-9), and the two groups were demographically similar. Based on these analyses, the 54 individuals not assessed for the follow-up group are not believed to represent a qualitatively different population of individuals, as their physical health, mental health, and demographic attributes were not different.

For the larger sample ($n = 94$), participants ranged in age from 14 to 73 years ($M = 41.3$, SD = 13.6). There were 71 women (75.5%) and 23 men (24.5%). The sample reflected the racial and ethnic composition of the county [27], with 71 white (75.5%), 5 black or African American (5.3%), 6 Hispanic or Latino (6.4%), 1 Asian (1.1%), and 1 biracial participants (1.1%), with 10 participants (10.6%) not reporting a race or ethnicity.

For the smaller sample ($n = 40$), participants ranged in age from 14 to 62 years ($M = 40.6$, SD = 13.2). There were 34 women (85.0%) and 6 men (15.0%). There were 34 white (85.0%), 2 black or African American (5.0%), 2 Hispanic or Latino (5.0%), 1 Asian (2.5%), and 1 biracial participants (2.5%).

*2.2. Procedures.* Clients were either self-referred or referred by a local physician to the telepsychology clinic. Initial phone screenings were conducted to screen out dangerous suicidal or homicidal ideation/intent and active psychosis. Clients were then seen in an intake interview to determine the presenting problem and to develop a treatment plan. All clients were verbally administered several assessments during the intake interview, including the SF-12v2. No clients were intentionally excluded from data collection, as the measures are part of normal clinic protocol. The SF-12v2 was verbally administered again during the fourth session to assess response to treatment.

Counseling sessions were approximately 50 minutes long and conducted via videoconferencing technology. Both the client and counselor sit in front of a 42-inch high definition television screen with at secure T1 connection meeting HIPAA guidelines for encryption and confidentiality. Counselors were doctoral level students in the Counseling Psychology program at Texas A&M University. Students were trained in a scientist-practitioner model and encouraged to use evidence-based treatments with clients. Common therapeutic approaches used by counselors include cognitive behavioral therapy, cognitive processing therapy, acceptance and commitment therapy, and other humanistic approaches to address the presenting and emerging problems identified by clients during the course of therapy.

*2.3. Measures*

*2.3.1. SF-12v2.* The SF-12 [28] is a 12-item, self-report measure selected to measure health-related quality of life. A valid shorter version of the SF-36, the second edition of the SF-12 reproduces the total and composite scores with at least 90% accuracy. It is one of the most widely used health surveys in the world due to its proven practicality, utility, and psychometric stability [21]. The SF-12v2 yields two composite scores, the Physical Component Summary score (PCS) and the Mental Component Summary score (MCS), which reflect the overall level of physical and mental health status, respectively. Higher PCS scores indicate a higher level of physical functioning, and higher MCS scores indicate a higher level of mental and emotional functioning. PCS scores have an internal reliability coefficient of $\alpha = .89$, and MCS scores have an internal reliability coefficient of $\alpha = .86$. The two composite scores have strong statistical power, or the ability to detect true differences in health status when they occur [21].

The SF-12 includes norms so that individual and group scores can be compared to other relevant groups. The norming data was collected in 1998 from 7,069 individuals. Households were selected to match US census data on geographical region, market size, age, income, and household size. Scores are reported as standard T-scores with a mean of 50 and standard deviation of 10. However, other means and

TABLE 1: SF-12v2 norm comparisons.

| | Current study | | National depressed sample [21] | | National standardization sample [21] | |
|---|---|---|---|---|---|---|
| | PCS | MCS | PCS | MCS | PCS | MCS |
| Mean | 44.46 | 30.72 | 45.77 | 36.85 | 49.70 | 49.48 |
| SD | 15.30 | 12.46 | 12.10 | 10.82 | 9.93 | 9.87 |
| 25th percentile | 31.13 | 21.87 | 36.76 | 28.45 | 44.39 | 43.79 |
| 50th percentile | 46.45 | 27.99 | 47.06 | 36.79 | 53.28 | 52.01 |
| 75th percentile | 56.48 | 37.74 | 56.08 | 44.92 | 56.61 | 56.70 |
| Minimum | 16.16 | −0.54 | 10.62 | 5.73 | 6.59 | 5.73 |
| Maximum | 70.78 | 63.19 | 71.82 | 65.53 | 71.82 | 71.01 |
| N | 94 | 94 | 1,000 | 1,002 | 7,690 | 7,697 |

standard deviations have been calculated for specific groups. Some of the norms include a sample representative of the noninstitutionalized US population and subgroups based on gender, age, and common chronic health conditions such as diabetes, hypertension, depression, and arthritis [21].

*2.3.2. PHQ-9.* The brief Patient Health Questionnaire [26] was administered at intake to assess depressive symptomology. Each item on the assessment corresponds to a single criterion from the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.* The items are scored on a Likert scale with the following options: 0 = not at all, 1 = several days, 2 = more than half the days, and 3 = nearly every day. Total scores range from 0 to 27. A total score of 10 or greater is a widely used cut-off score used to indicate a probable major depressive disorder diagnosis [29]. Scores can be interpreted based on the total score as well to classify severity: 0–4 indicates no depression; 5–9 mild depression; 10–14 moderate depression, 15–19 moderately severe depression, and greater than or equal to 20 severe depression. PHQ-9 scores have demonstrated stable psychometric properties with a test-retest coefficient of .84 and internal consistency estimates of $\alpha$ = .86 and .89 [26].

*2.4. Analyses.* To assess the relative health status of the present study's clinical sample (as measured by the SF-12v2), physical (PCS) and mental (MCS) health status data for participants in the current study are compared with a national standardization sample and with a national sample of depressed individuals using one-way ANOVA with Bonferroni post hoc comparisons. Data are also presented indicating the proportion of participants who met criteria for depressive symptomology (as measured by cut-off scores on the PHQ-9).

Analytic methods consistent with similar outcomes research [23–25] were used to determine the efficacy of telepsychology for participants in the current study. Paired $t$-tests were used to examine the statistical significance of physical and mental health status improvement after four sessions of telepsychology services. The effect size of treatment was calculated with Cohen's $d$ for repeated measures [30].

## 3. Results

*3.1. Sample Description and Normative Comparisons*

*Health Status.* SF-12v2 data for clients are presented in Table 1 along with norms for a nationally representative sample of depressed individuals and norms for the general US population. A one-way ANOVA indicated that the samples in Table 1 had statistically significant differences for physical health status; $F(2, 8781) = 69.44$, $P < .001$. Bonferroni post hoc comparisons using Welch's $t$-tests indicated that the PCS scores for the rural telepsychology sample were not significantly different than the national depressed sample; $t(104) = −0.81$, ns. However, the telepsychology sample had lower PCS scores than the national standardization sample; $t(93) = −3.31$, $P = .001$. Thus, the rural telepsychology sample had a lower physical health status than the nationally representative sample of the overall US population, whereas their physical health status was similar to a national sample of depressed individuals.

A second one-way ANOVA indicated that the samples in Table 1 had statistically significant differences for mental health status; $F(2, 8790) = 844.12$, $P < .001$. Bonferroni post hoc comparisons using Welch's $t$-tests indicated that the rural telepsychology sample had lower MCS scores than both the national standardization sample, $t(94) = −14.54$, $P < .001$, and the national depressed sample, $t(106) = −4.61$, $P < .001$.

Not only do the participants in the current study have poorer mental health status on average than a national sample of depressed individuals, but they occupy the extreme low end of the distribution of mental health status for the overall population. The average participant in the Leon County sample (MCS = 30.72) falls about two standard deviations below the mean of mental health status for the US population, well below the average individual.

*Depression.* Seventy-nine participants in the current study (84.0%) scored a 10 or greater on the PHQ-9, which is the most commonly used cut-off score for diagnosing major depressive disorder [29]. Thirty-eight participants (40.4%) scored at or above 20 on the PHQ-9, indicating a severe level of depression. Forty participants (42.6%) reported suicidal thoughts or thoughts of self-harm occurring for at least

International Journal of Telemedicine and Applications

5

TABLE 2: HRQOL outcomes at fourth telepsychology session.

|  | Initial session | Fourth session | $P$ | Effect size |
|---|---|---|---|---|
| PCS | 44.12 (16.86) | 40.80 (14.64) | ns | — |
| MCS | 31.50 (12.81) | 40.23 (14.83) | <.001 | 0.70 |

Note: $n = 40$.

several days in the two weeks previous to their initial telepsychology session.

*3.2. Effect of Telepsychology on HRQOL.* Receiving four sessions of telepsychology services was associated with a statistically significant improvement in MCS scores between intake ($M = 31.50$, SD = 12.81) and session-four follow-up ($M = 40.23$, SD = 14.83), $t(39) = 4.43$, $P < .001$. An effect size for the improvement in mental health status was calculated using Cohen's $d$ for repeated measures, $d = 0.70$, a moderate sized effect [30]. There was not a statistically significant change in PCS scores between intake ($M = 44.12$, SD = 16.86) and follow-up ($M = 40.80$, SD = 14.64), $t(39) = -1.94$, $P = .060$. These results are summarized in Table 2.

Due to the small number of participants in the study and the small number of men ($n = 6$) and participants of color ($n = 6$), analyses to detect differential treatment response for gender and race/ethnicity lacked sufficient statistical power for any meaningful interpretation.

As expected, age was associated with lower physical health status. A post hoc analysis found that the age of participants in the follow-up group had a statistically significant correlation with the PCS score of clients at intake ($r = -.395$, $P = .012$), and a similar correlation was found between age and PCS score for the larger sample of 94 participants ($r = -.375$, $P < .01$). No statistically significant correlations between age and mental health status were found.

## 4. Discussion

This study found that the health-related quality of life (HRQOL) of rural Texas residents presenting for telepsychology services is indeed poor. While participants in this study reported physical health problems, their mental health status was exceptionally low, with the average participant's mental health status score falling about two standard deviations below the average for the US population. Individuals seeking telepsychology services had even lower mental health scores than a national sample of individuals diagnosed with major depressive disorder. This finding is consistent with other studies of rural and urban HRQOL differences [7, 8].

Providing psychological services to clients in a Health Professional Shortage Area (HPSA) poses several challenges. Individuals seeking treatment are expected to present with cooccurring physical and mental health diagnoses, as was the case in the current study's sample. Many clients in this study's sample reported a range of chronic health and disability issues in addition to psychological concerns such as depression, trauma, substance abuse, and anxiety. Even with access to telepsychology services, many clients (and their counselors)

may be undertreated for their physical health concerns. The ongoing lack of care experienced in rural HPSAs has clear implications for the provision of telepsychology services.

Despite the complexity of their presenting physical and mental health concerns, we found that telepsychology was effective at improving the mental health status of clients who were assessed after four sessions of therapy. These results add to the growing evidence base for telepsychology, and they show that this emerging treatment modality may be effective specifically for rural residents living in an underserved area. Our findings may be of special importance to health care providers in rural areas who have been encouraged to utilize telepsychology when outcomes research supports its use for that particular population [11].

While working in rural areas has its challenges, it is not without opportunities. As was seen in this study, utilizing academic-community partnerships provides opportunities to train future professionals in innovative service delivery models. There is also the potential for more collaborative care for health care consumers. In urban areas, it is virtually impossible for all the health providers to be familiar with the dozens or even hundreds of other providers in the area. But due to the small number of providers in rural areas, providers have the ability to know the names and faces of all other providers in the community. If interorganizational communication is encouraged and expected, community capacity can be built and consumers can expect more integrated care [31].

Sixty-two percent of individuals surveyed in the rural Brazos Valley region of Texas report being unable to access needed mental health services [4]. Given the numerous barriers to health experienced by many rural communities, it is possible that millions of rural US residents desire mental health care but are unable to access it. This study demonstrates that telepsychology services developed through an academic-community partnership are a viable option for rural residents in need of effective mental health care. Telepsychology is an emerging area of telehealth and telemedicine with rapidly growing evidence for its effectiveness, and its high accessibility has special implications for rural communities.

Limitations of the current study include the relatively small sample size, although this is a necessary aspect of studying groups living in sparsely populated areas. Due to the small number of participants, subsequent analyses lacked the statistical power to measure possible effects of gender or race/ethnicity on treatment outcome. While the focus of this study was on the response to a brief treatment (four sessions), future studies should also investigate the impact of long term treatment, especially given the chronic nature of many rural clients' presenting concerns. Counselors in the current study did not conduct a comprehensive assessment of all physical and mental health needs of clients; while global measures of HRQOL were used for this analysis, future studies may wish to investigate the prevalence and impact of specific diagnoses on response to telepsychology treatment. No clients were excluded from the study as long as they did not meet clinical exclusion criteria (e.g., high suicidal or homicidal risk, active psychosis); however several individuals seeking telepsychology treatment were unable to

receive services because of mobility restrictions. All sessions were conducted at the community health center in Leon County, and individuals without cars were unable to attend weekly sessions. While this is a limitation of this study's design, many telehealth and telemedicine interventions use technology to deliver services directly to patients' homes [32–34]. Telepsychology researchers may wish to study in-home services as well; however special considerations should be made to ensure client confidentiality and safety [11].

## Conflict of Interests

The authors declare that there is no conflict of interests regarding the publication of this paper.

## Acknowledgments

This research was supported by Grant no. D06RH07934 from the Office of Rural Health Policy, Health Resources and Services Commission. The findings and conclusions presented here are the authors' and do not necessarily represent the official position of the Office of Rural Health Policy.

## References

[1] U.S. Census Bureau, PctUrbanRural_State, 2010, http://www.census.gov/geo/reference/ua/ualists_layout.html.

[2] L. W. Roberts, J. Battaglia, and R. S. Epstein, "Frontier ethics: mental health care needs and ethical dilemmas in rural communities," *Psychiatric Services*, vol. 50, no. 4, pp. 497–503, 1999.

[3] C. M. Galambos, "Health care disparities among rural populations: a neglected frontier," *Health and Social Work*, vol. 30, no. 3, pp. 179–181, 2005.

[4] D. F. Brossart, M. L. Wendel, T. R. Elliott, H. E. Cook, L. G. Castillo, and J. N. Burdine, "Assessing depression in rural communities," *Journal of Clinical Psychology*, vol. 69, no. 3, pp. 252–263, 2013.

[5] T. Cellucci and P. Vik, "Training for substance abuse treatment among psychologists in a rural state," *Professional Psychology: Research and Practice*, vol. 32, no. 3, pp. 248–252, 2001.

[6] K. B. Smalley, C. T. Yancey, J. C. Warren, K. Naufel, R. Ryan, and J. L. Pugh, "Rural mental health and psychological treatment: a review for practitioners," *Journal of Clinical Psychology*, vol. 66, no. 5, pp. 479–489, 2010.

[7] A. Miles, R. J. Proescholdbell, and E. Puffer, "Explaining rural/non-rural disparities in physical health-related quality of life: a study of United Methodist clergy in North Carolina," *Quality of Life Research*, vol. 20, no. 6, pp. 807–815, 2011.

[8] W. B. Weeks, L. E. Kazis, Y. Shen et al., "Differences in health-related quality of life in rural and urban veterans," *American Journal of Public Health*, vol. 94, no. 10, pp. 1762–1767, 2004.

[9] S. L. Hastings and T. J. Cohn, "Challenges and opportunities associated with rural mental health practice," *Journal of Rural Mental Health*, vol. 37, pp. 37–49, 2013.

[10] L. G. Gamm, S. Stone, and S. Pittman, *Rural Healthy People 2010: A Companion Document to Healthy People 2010*, Texas A&M University System Health Science Center, Southwest Rural Health Research Center, College Station, Tex, USA, 2010.

[11] American Psychological Association, "Guidelines for the practice of telepsychology," *The American Psychologist*, vol. 68, pp. 791–800, 2013.

[12] D. L. Brown and L. E. Swanson, *Challenges for Rural American in the Twenty-First Century*, Pennsylvania State University Press, Pennsylvania, Pa, USA, 2003.

[13] C. E. McCord, T. R. Elliott, D. F. Brossart, and L. G. Castillo, "Mental health issues in rural areas," in *Rural Populations and Health: Determinants, Disparities, and Solutions*, R. Crosby, R. Vanderpool, M. Wendel, and B. Casey, Eds., pp. 323–339, Jossey-Bass, San Francisco, Calif, USA, 2012.

[14] E. J. Trickett, "Community psychology: individuals and interventions in community context," *Annual Review of Psychology*, vol. 60, pp. 395–419, 2009.

[15] C. E. McCord, T. R. Elliott, M. L. Wendel et al., "Community capacity and teleconference counseling in rural texas," *Professional Psychology: Research and Practice*, vol. 42, no. 6, pp. 521–527, 2011.

[16] Health Resources and Services Administration, "HPSA by state and county," 2008, http://hpsafind.hrsa.gov/HPSASearch.aspx.

[17] Center for Community Health Development, *Brazos Valley Health Status Assessment: Executive Report*, School of Public Health, College Station, Tex, USA, 2006.

[18] M. L. Wendel, D. F. Brossart, T. R. Elliott, C. McCord, and M. A. Diaz, "Use of technology to increase access to mental health services in a rural Texas community," *Family and Community Health*, vol. 34, no. 2, pp. 134–140, 2011.

[19] C. E. Ferrans, "Definitions and conceptual models of quality of life," in *Outcomes Assessment in Cancer*, J. Lipscomb, C. C. Gotay, and C. Snyder, Eds., pp. 14–30, Cambridge University Press, Cambridge, UK, 2005.

[20] World Health Organization, "The World Health Organization Quality of Life assessment (WHOQOL): position paper from the World Health Organization," *Social Science and Medicine*, vol. 41, pp. 1403–1409, 2005.

[21] J. E. Ware, M. Kosinski, D. M. Turner-Bowker, and B. Gandek, *User's Manual for the SF-12v2 Health Survey*, Quality Metric Incorporated, Lincoln, RI, USA, 2002.

[22] Centers for Disease Control and Prevention, "Health related quality of life," 2011, http://www.cdc.gov/hrqol/concept.htm.

[23] D. Urness, M. Wass, A. Gordon, E. Tian, and T. Bulger, "Client acceptability and quality of life - telepsychiatry compared to in-person consultation," *Journal of Telemedicine and Telecare*, vol. 12, no. 5, pp. 251–254, 2006.

[24] C. Knaevelsrud and A. Maercker, "Internet-based treatment for PTSD reduces distress and facilitates the development of a strong therapeutic alliance: a randomized controlled clinical trial," *BMC Psychiatry*, vol. 7, article 13, 2007.

[25] B. Wagner, C. Knaevelsrud, and A. Maercker, "Internet-based cognitive-behavioral therapy for complicated grief: a randomized controlled trial," *Death Studies*, vol. 30, no. 5, pp. 429–453, 2006.

[26] K. Kroenke, R. L. Spitzer, and J. B. Williams, "The PHQ-9: validity of a brief depression severity measure," *Journal of General Internal Medicine*, vol. 16, no. 9, pp. 606–613, 2001.

[27] U.S. Census Bureau, "State and county QuickFacts," 2010, http://quickfacts.census.gov.

[28] J. E. Ware Jr., M. Kosinski, and S. D. Keller, "A 12-item short-form health survey: construction of scales and preliminary tests of reliability and validity," *Medical Care*, vol. 34, no. 3, pp. 220–233, 1996.

[29] L. Manea, S. Gilbody, and D. McMillan, "Optimal cut-off score for diagnosing depression with the Patient Health Questionnaire (PHQ-9): a meta-analysis," *Canadian Medical Association Journal*, vol. 184, no. 3, pp. 191–196, 2012.

[30] J. Cohen, *Statistical Power Analysis for the Behavioral Sciences*, revised, Academic Press, New York, NY, USA, 1988.

[31] H. R. Clark, A. Ramirez, K. N. Drake et al., "Utilization of an interorganizational network analysis to evaluate the development of community capacity among a community-academic partnership," *Progress in Community Health Partnerships: Research, Education, and Action*, vol. 8, no. 1, pp. 41–51, 2014.

[32] S. Abbate, M. Avvenuti, and J. Light, "Usability study of a wireless monitoring system among Alzheimer's disease elderly population," *International Journal of Telemedicine and Applications*, vol. 2014, Article ID 617495, 8 pages, 2014.

[33] B. Lindberg, C. Nilsson, D. Zotterman, S. Söderberg, and L. Skär, "Using information and communication technology in home care for communication between patients, family members, and healthcare professionals: a systematic review," *International Journal of Telemedicine and Applications*, vol. 2013, Article ID 461829, 31 pages, 2013.

[34] A. Williams, R. LaRocca, T. Chang et al., "Web-based depression screening and psychiatric consultation for college students: a feasibility and acceptability study," *International Journal of Telemedicine and Applications*, vol. 2014, Article ID 580786, 9 pages, 2014.












Journal of Engineering
The Scientific World Journal
International Journal of Rotating Machinery
Journal of Sensors
International Journal of Distributed Sensor Networks
Advances in Civil Engineering
Hindawi
Submit your manuscripts at
http://www.hindawi.com
Journal of Control Science and Engineering
Journal of Robotics
Journal of Electrical and Computer Engineering
Advances in OptoElectronics
VLSI Design
International Journal of Navigation and Observation
Modelling & Simulation in Engineering
International Journal of Aerospace Engineering
International Journal of Chemical Engineering
International Journal of Antennas and Propagation
Active and Passive Electronic Components
Shock and Vibration
Advances in Acoustics and Vibration















# CE

## CONTINUING EDUCATION
## HOW TO MAKE THE MOST OF TELEPSYCHOLOGY AND STEER CLEAR OF COMMON PITFALLS

BY REBECCA A. CLAY

**W**hen psychologist Keren Chansky Suberri, PhD, moved her practice from southern New Jersey to Philadelphia in 2015, she didn't worry about finding office space convenient for her clients—primarily families of children with health-care problems. That's because she switched from in-person meetings to videoconferencing.

"I had become acutely aware that families' needs weren't being met because parents of children with special health-care needs weren't able to get to my office," says Suberri. It can be difficult for families of children with diabetes, seizure disorders and other serious issues to find appropriate childcare, she says. Plus, parents who've already taken a lot of time off for their children's medical appointments are often reluctant to take off more to see a psychologist. Others simply live far too far away to make regular visits.

Suberri's other clients like videoconferencing, too.

---

**CE credits:** 1
**Learning objectives:** After reading this article, CE candidates will be able to:
**1.** Discuss the growing demand for telepsychology services.
**2.** Discuss the common pitfalls for psychologists who offer telepsychology services.
**3.** Discuss the types of guidance offered by APA's Guidelines for the Practice of Telepsychology.

The technique works well with clients with agoraphobia, for instance, for whom "just going out of the house and into a doctor's setting is like climbing the Himalayas," says Suberri. Other clients appreciate the privacy of meeting with Suberri virtually from their own homes or offices. And, says Suberri, "For the younger generation, this is very natural."

Offering guidance to psychologists like Suberri who offer telepsychological services is the goal of APA's Guidelines for the Practice of Telepsychology. Adopted as APA policy in 2013, the guidelines lay out the issues psychologists should consider when providing services through telecommunication technologies. The guidelines, which offer evidence-based recommendations rather than mandatory requirements, cover such issues as how to assess whether telepsychology is appropriate, obtain informed consent, protect patient confidentiality and legally work across jurisdictions.

But many practitioners still aren't aware of the guidelines, says Linda Campbell, PhD, a University of Georgia professor in the counseling psychology program who co-chaired APA's guidelines task force. "I still see people on listservs asking if there are any policies on how to practice telepsychology," she says. Some practitioners have dangerously mistaken beliefs about telepsychology, she and others say. For example,

some clinicians use Skype and other unsecure platforms for videoconferencing, fail to adapt their informed-consent procedures or don't realize they need to be licensed in the states where their telepsychology patients live—all of which can put both patients and practitioners at risk.

Others may believe—falsely—that none of this applies to them, says task force co-chair Fred Millán, PhD, a private practitioner and psychology professor at the State University of New York at Old Westbury.

"Many don't understand they're already doing telepsychology," says Millán, explaining that the term encompasses telephone calls and emails as well as newer technologies such as chat, text and videoconferencing. And that lack of awareness can get people in trouble, he emphasizes. "If I'm a psychologist in New York and talking to my patient on the phone when that patient drives over the George Washington Bridge into New Jersey, that's now interjurisdictional practice," he says.

### MEETING A GROWING DEMAND
Demand for telehealth is growing. In a survey of 1,501 adults conducted by Nielsen on behalf of Accenture in 2016, more than two-thirds of respondents were at least somewhat interested in receiving health care virtually. When it came to mental health, 53 percent said they would



Many practitioners are unaware of the guidance available from APA's Guidelines for the Practice of Telepsychology.

## CE Corner

probably or definitely try virtual counseling or therapy, while 50 percent said the same for virtual group therapy. Yet only 21 percent had received any health care virtually.

Psychology is now catching up with medical providers, who got started with telemedicine about a decade ago, says psychologist Marlene Maheu, PhD, executive director of the Telebehavioral Health Institute. APA's guidelines are speeding that process along, she says. "When groups like APA come out with formal guidelines, it in essence legitimizes a practice in the eyes of the average practitioner," she says.

State policies are catching up to telepsychology's growing popularity, too, says Deborah Baker, JD, director of legal and regulatory policy in APA's Practice Directorate. While insurance companies typically look to Medicare as a model when making decisions about coverage, reimbursement and other issues, that hasn't worked in the telepsychology arena, says Baker. Medicare reimburses telehealth services only if they're provided to beneficiaries in rural areas or areas with health professional shortages and only when people receive the services in a clinical setting rather than their homes.

In the absence of a Medicare guidepost, insurers have made their own decisions, says Baker. Now a growing number of states are taking charge: 31 states and the District of Columbia have enacted mandates prohibiting insurers from refusing to cover telehealth services if they cover the same services delivered in person.

**ABOUT CE**

"CE Corner" is a continuing education article offered by the APA Office of CE in Psychology.

To earn CE credit, after you read this article, purchase the online exam at www.apa.org/ed/ce/resources/ce-corner.aspx. Upon successful completion of the test—a score of 75 percent or higher—you can immediately print your CE certificate.

The test fee is $25 for members and $35 for nonmembers. For more information, call (800) 374-2721.

### PUTTING THE GUIDELINES INTO PRACTICE

The guidelines offer guidance on several key issues:

■ **Competence.** Psychologists who provide telepsychology services should take reasonable steps to ensure they know what they're doing, both in terms of technology and its potential impact, the guidelines say. With technology evolving quickly, one-off training isn't enough, says task force member Jana N. Martin, PhD, chief executive officer of The Trust. What was top-of-the-line technology a year ago may no longer be, she warns. "You might think, 'I attended a workshop on how to use this encryption site, so I'm good,'" she says. "But we need to keep alert to how changes in technology, encryption and cyberattacks might impact the delivery of safe, confidential therapy."

Practitioners should also ensure their clients are tech-savvy, adds Campbell. "You don't want a client sending a confidential communication to a listserv by mistake," she says.

■ **Standards of care.** The guidelines urge psychologists to ensure they meet the same ethical and professional standards required for in-person services. Sometimes that may mean not using telepsychology. While a growing body of evidence suggests that some forms of telepsychology can be just as effective as their in-person counterparts, it's not appropriate for all clients, says Martin. Telepsychology may not be a good fit for some individuals, some diagnoses or some

age groups, such as very young children, she points out.

The psychologist's level of experience with telepsychology and the level of other support available are key factors in the decision, says Martin. Psychologists using telepsychology with patients with schizophrenia or psychosis who are in a clinically supervised patient site have less risk than psychologists providing telepsychology to patients with similar diagnoses in an unsupervised setting, such as patients' homes, she says. "It can be stressful and challenging for a provider who is new to telehealth to manage a difficult patient with a new modality," says Martin. "Psychologists benefit from fully examining the best fit for each patient, looking at many factors."

■ **Confidentiality and data security.** Three of the guidelines focus on the special privacy concerns inherent in using technology. Psychologists, these guidelines recommend, should make reasonable efforts to safeguard confidentiality and warn clients of the potentially increased risks, put security measures in place to protect information and dispose of data and technology properly. That means psychologists should never use Skype or FaceTime—which is news to many practitioners, says task force member Ronald S. Palomares, PhD, an assistant professor of school psychology at Texas Women's University. "People aren't thinking about the fact that when they click on 'I agree' in these apps, you're basically agreeing to turn over all transmissions to the parent company," says Palomares. "People



**Psychologists must comply with laws and regulations in the states, provinces or countries where their clients are.**

aren't aware that their sessions could be recorded and released."

Fortunately, says Palomares, more platforms are being developed that comply with the Health Insurance Portability and Accountability Act (see "A growing wave of online therapy" in the February *Monitor*). But as this technological "arms race" accelerates, he says, it's up to practitioners to ensure compliance. They should also insist on business associate agreements with these companies, just as they would for a billing company or legal firm.

■ **Informed consent.** Informed consent should address the unique concerns related to telepsychology, the guidelines say, adding that psychologists should also know the laws and regulations that apply to informed consent in both their own and their clients' jurisdictions. In addition to covering the potential privacy risks of telepsychology,

the informed-consent process could also include an explanation of how clients' information will be stored, accessed and protected. Another important area to include is what happens—including billing—after technology failures. "What if the image pixelates or the sound drops out?" says Maheu. "You need to cover that and have a plan."

■ **Testing and assessment.** Most test instruments and assessment approaches were designed for in-person use, the guidelines note. As a result, the guidelines urge psychologists using telepsychology for these purposes to find ways to maintain the integrity of testing. "You don't know if an individual may be getting answers or assistance from someone in the room you can't see," says Martin. One way to address those concerns is to have an onsite proctor—known as a "telepresenter" in the telehealth

community—who can also provide any technical assistance a client may need, the guidelines suggest.

■ **Cross-jurisdictional practice.** Psychologists must comply with laws and regulations in the states, provinces or countries where their clients are, the guidelines note. While the Department of Defense and Department of Veterans Affairs have policies that govern cross-jurisdictional services, states, provinces and countries vary. For Suberri, that has meant getting licensed in the 10 states where she provides telepsychology services—an expensive, time-consuming process, thanks to the lack of uniformity in requirements.

The Association of State and Provincial Psychology Boards is trying to solve the interjurisdictional practice problem by developing the Psychology Interjurisdictional Compact (PSYPACT), which would allow licensed psychologists to offer telepsychology services in participating states without having to get licensed in those additional states. "Licensing requirements across states vary," says Janet Orwig, MBA, PSYPACT's executive director. "PSYPACT levels requirements across states and sets a bar." Arizona has already enacted PSYPACT legislation, and several more states have introduced legislation to adopt the compact, says Orwig. PSYPACT will become operational once it is enacted in seven states, something Orwig hopes will be achieved by year's end. ■

■ **For more information** on earning CE credits for this article, go to www.apa.org/ed/ce/resources/ce-corner.aspx.

### RESOURCES

**A Practitioner's Guide to Telemental Health: How to Conduct Legal, Ethical, and Evidence-Based Teleractice**
Luxton, D.D., Nelson, E., & Maheu, M.M., 2016

**A Telepsychology Casebook: Using Technology Ethically and Effectively in Your Professional Practice**
Campbell, L., Millán, F., & Martin, J., eds., forthcoming

**Critical Concerns When Incorporating Teleractice in Outpatient Settings and Private Practice**
Palomares, R.S., Bufka, L.F., & Baker, D.C.
*Journal of Child and Adolescent Psychopharmacology*, 2016

STOCK ROCKET/ISTOCKPHOTO

9/18/23, 2:42 PM
How well is telepsychology working?
Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 279 of 329



APA.org    APA Style    APA Services    Divisions    About APA    Events    Join APA    Help    Log In    🛒 Cart(0)

**AMERICAN PSYCHOLOGICAL ASSOCIATION**

MEMBERS        TOPICS        PUBLICATIONS & DATABASES        SCIENCE        EDUCATION & CAREER        NEWS & ADVOCACY

COVER STORY

# How well is telepsychology working?

Researchers are pinpointing what we know—and what we need to learn—about these treatment options

By Zara Abrams      Date created: July 1, 2020      10 min read
*Vol. 51, No. 5*
*Print version: page 46*

Practice      Telehealth

❝ (javascript:toggleCitation();)

(javascript:toggleFeedback();)

𝐟 (#)

🐦 (javascript: openSocialShare('https://twitter.com/share?url=https%3a%2f%2fwww.apa.org%2fmonitor%2f2020%2f07%2fcover-telepsychology&via=APA&text=How+well+is+telepsychology+working%3...

in (javascript: openSocialShare('https://www.linkedin.com/shareArticle?mini=true&url=https%3a%2f%2fwww.apa.org%2fmonitor%2f2020%2f07%2fcover-telepsychology&title=How+well+is+telepsychology+working%3f&summary=Researchers+pinpoint+what+we+know%e2%80%94and+what+we+need+to+learn+%e2%80%94about+telepsychology+treatment+op...

✉ (javascript:openEmail('English');)

🖨 (javascript:printThis();)



With more than 90% of the U.S. population under stay-at-home orders this spring, telepsychology quickly became the sole option for many Americans in need of mental health care. To facilitate that care, Medicare, Medicaid,

private insurance companies, and state and federal regulatory agencies temporarily relaxed rules on telehealth.

"The pandemic has accelerated the shift toward telehealth," says clinical psychologist Adam Haim, PhD, who heads the Treatment and Preventive Intervention Research Branch at the National Institute of Mental Health (NIMH). "The whole paradigm of sitting in a room with a clinician and receiving an intervention in a 45-minute session has essentially been flipped on its head."

Even in non-pandemic times, delivering care remotely allows mental health providers to reach more people, including those who are geographically isolated or lack access to child care or transportation. It can also help address stigma for patients seeking psychological services for the first time, says Dhara Meghani, PhD, an assistant professor of clinical psychology at the University of San Francisco.

"For patients who have never before sought care from a therapist due to various barriers —including concern about being seen at a physical clinic— the option to obtain services online can be a port of entry into mental health care," she says.

And research to date shows mental health care delivered remotely—also known as telepsychology or teletherapy—is effective. Psychologists—along with psychiatrists, social workers and others—have built a substantial literature base on telehealth interventions that work for a variety of problems and populations. But experts say the COVID-19 crisis has revealed areas where the literature can be strengthened. More important, the attempt to rapidly roll out remote care has exposed the field's lack of readiness to broadly transition to the new modality.

"There's a lot of good that can come from this sudden uptake of telehealth," says Tim Heckman, PhD, senior associate dean for research and faculty affairs at the University of Georgia's College of Public Health, who has studied telehealth for decades. "But while we've spent a lot of time looking at what works, we got completely caught off guard in terms of disseminating and implementing telehealth on a large scale."

# Research to date

Research on telepsychology—which includes care delivered via phone, video or both—began around 1960. It grew out of a need to treat hard-to-reach populations, for instance when a forensic psychologist assessed a person in jail and referred them to a geographically distant provider for specialized care.

Since then, psychiatry research has tested remote care among veterans (Godleski, L., et al., *Psychiatric Services (https://doi.org/10.1176/appi.ps.201100206)* , Vol. 63, No. 4, 2012) and a range of age groups and conditions (Hilty, D.M., et al., *Telemedicine and e-Health*

(https://doi.org/10.1089/tmj.2018.0079), Vol. 19, No. 9, 2013), showing that the
modality can be effective and increase access to care. Psychologists have also
studied a range of populations to determine whether telehealth works, who it
best serves and how to deliver it most effectively—with promising results.
The U.S. Department of Veterans Affairs, for example, has conducted
numerous trials comparing PTSD interventions delivered in person versus by
videoconference, finding that the two methods are equally effective in the
majority of cases (Turgoose, D., et al., _Journal of Telemedicine and Telecare_
(https://doi.org/10.1177/1357633X17730443) , Vol. 24, No. 9, 2018). Systematic
reviews have also found that telepsychology delivered by video and phone is
effective for depression, anxiety and adjustment disorder (Varker, T., et al.,
_Psychological Services_ (https://doi.org/10.1037/ser0000239) , Vol. 16, No. 4,
2019), as well as for substance use, eating disorders and other problems in
children and adolescents (Slone, N.C., et al., _Psychological Services_
(https://doi.org/10.1037/a0027607) , Vol. 9, No. 3, 2012).

"What we've seen is that telehealth is essentially just as effective as face-to-
face psychotherapy—and retention rates are higher," says David Mohr, PhD,
director of the Center for Behavioral Intervention Technologies at
Northwestern University's Feinberg School of Medicine, who has spent his
career studying telepsychology and digital mental health.

One question is whether audio-only care delivered over the phone is as
effective as videoconferencing. Audio-only interventions have rarely been
reimbursed by insurers, but received temporary approval from Medicare
(https://www.apa.org/news/press/releases/2020/05/phone-only-telehealth-
medicare) , as well as Medicaid and private insurers at the state level, during
the pandemic. They are particularly useful for reaching lower-resource
populations who may not have access to a smartphone or reliable internet
connection, says Lynn Bufka, PhD, senior director for practice transformation
and quality at APA.

"We don't have sufficient head-to-head comparisons to know exactly how
audio-only compares to video, but we do know that treatment conducted
over the phone has shown positive benefits across a range of studies," she
says.

In one randomized controlled trial Mohr conducted comparing cognitive-
behavioral therapy (CBT) delivered face-to-face versus over the telephone to
325 patients with major depressive disorder, he found equivalent outcomes at
the end of treatment (_JAMA_
(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3697075/) , Vol. 307, No. 21,
2012). In fact, though treatment effects were slightly more lasting in the face-
to-face population, those patients were also more likely to drop out of
therapy.

Audio-only telepsychology was also found to reduce depression symptoms
among geographically isolated HIV-positive adults with depression
(_Behavioral Medicine_ (https://doi.org/10.1080/08964289.2016.1160025) , Vol. 43,
No. 4, 2017). In that study, Heckman looked at the effectiveness of eight

phone-based psychotherapy sessions. About a third of the patients treated experienced clinically meaningful reductions in their depressive symptoms.

"When you don't have the person in front of you, you pay attention to different things—the tone of their voice, the tempo of words and the breaths they're taking," says Colleen Stiles-Shields, PhD, a clinical psychologist and assistant professor at Rush University Medical Center in Chicago.

A study she conducted with Mohr and other colleagues found that therapeutic alliance did not suffer when CBT for depression was delivered by telephone as opposed to in person (*Journal of Consulting and Clinical Psychology* (http://doi.org/10.1037/a0035554) , Vol. 82, No. 2, 2014).

Still, some psychologists point to challenges with phone-based care. Clinical psychologist Marlene Maheu, PhD, founder and executive director of the Telebehavioral Health Institute (https://telehealth.org/) , says both patients and providers can easily become distracted by emails, text messages or the desire to multitask.

Platforms that offer text-based telepsychology services are even more problematic, Maheu says, and may actually prevent clinicians from fulfilling their legal and ethical obligations. For one, clinicians delivering text-based care through programs such as Talkspace and BetterHelp have very little information about a patient's surroundings, including where the person is located and who might be reading or influencing written exchanges. Clinicians also face the challenge of conducting assessments, establishing informed consent and fulfilling other professional obligations without visual and audio cues. And robust research supporting such platforms is limited—a study sponsored by Talkspace found its interventions were effective for 46% of participants but did not compare the platform with other ways of delivering care (Hull, T.D., & Mahan, K., *Telemedicine and e-Health* (https://doi.org/10.1089/tmj.2016.0114) , Vol. 23, No. 3, 2017).

Meghani says such platforms, which are not reimbursed by health insurers, may hold value for some consumers, such as patients with subthreshold symptoms or those contemplating entering therapy, "because they may provide adequate mental health maintenance or demystify 'talk therapy,'" but that stronger evidence is needed to support their widespread use.

Whether care is delivered by phone, video or otherwise, best practices start with ensuring that the client is in a safe and private location. Therapists should know the exact address where a patient is located so that they can notify the authorities if the person reports suicidal intention or another emergency occurs. To ensure confidentiality, therapists should work with their clients to find a quiet space where they won't be overheard, Maheu says.

Persistence is also key for reaching certain populations through telehealth, says Meghani, who founded Parentline (https://parentlineusf.com/) , a free telepsychology service based at the University of San Francisco for expectant and new parents.

"We offer flexibility with length and frequency of sessions and let them know that it's okay if they need to stop midway, which is an unconventional way of thinking about therapy," she says.

# Further research needed

Even before the pandemic put telehealth center stage, there were unanswered questions in the literature. For one, more studies are needed to determine whether remote care is sufficient to treat serious mental illnesses such as schizophrenia and psychotic disorder, Meghani says. In addition, Heckman says more randomized controlled trials comparing the same treatment delivered in person versus remotely could further strengthen the evidence base for telehealth, specifically in the areas of group therapy and for individuals with comorbidities.

But when COVID-19 hit, a whole new set of questions arose. "We've established the efficacy of telehealth and we've shown in trials that it's safe," Mohr says. "We know a lot less about what's going to happen now that we're rolling it out systemwide."

Practitioners are now facing decisions about which teleconferencing platform to use, how to accommodate clients with older devices and unreliable internet connections, how to minimize security risks, and how to supervise trainees and interns remotely, says Heckman.

New questions are also surfacing around patient engagement with teletherapy. While research so far has shown high levels of patient satisfaction with remote care (Jenkins-Guarnieri, M.A., et al., _Telemedicine and e-Health_ (https://doi.org/10.1089/tmj.2014.0165) , Vol. 21, No. 8, 2015), those switching over abruptly from in-person sessions may express concerns about adjusting to the new technology and mode of interaction, Meghani says. Future research should explore best practices for transitioning existing patients to teletherapy, as well as onboarding new patients.

The pandemic has also revealed gaps in provider competencies. Training that providers received to deliver in-person care may not translate to confidence —or competence—with telepsychology, says Maheu.

"It's as if the entire workforce was trained to drive automobiles and switched to 18-wheelers overnight," she says. "You may understand the rules of the road, but you don't know how that applies to the technology you're now using."

Clinicians must master the technology itself, including how to troubleshoot quality and connectivity issues. They may also need to adjust their workflow and ergonomic setup to accommodate the recent changes.

On top of that, navigating the psychotherapeutic process remotely requires specialized skills. For example, it can be difficult or impossible to pick up nonverbal cues such as fidgeting, or an odor that could indicate a patient is

intoxicated, when delivering services via phone or video, Meghani says. Additional training, such as the 36-hour program provided by Maheu's Telebehavioral Health Institute, can teach psychologists to conduct hygiene checks and gait analyses virtually to assess a patient's physical well-being.

Psychologists may also need to seek supplemental training on how to comply with legal and ethical obligations when delivering services by phone or video, as well as federal and state rules on interjurisdictional practice and mandated reporting.

But in the COVID-19 era, even those rules are in flux. The federal Centers for Medicare & Medicaid Services is now reimbursing mental health providers for delivering services via videoconferencing and phone. Many states are requiring private insurers to allow the same. The Office for Civil Rights in the U.S. Department of Health and Human Services is temporarily relaxing its enforcement of the Health Insurance Portability and Accountability Act, allowing providers to use less-secure platforms such as Skype and FaceTime. Some states are even temporarily suspending licensing requirements so that practitioners can treat patients across state lines.

While most federal agencies, state governments and private insurers may revert to their pre-pandemic policies once stay-at-home orders are lifted, Deborah Baker, JD, the director of legal and regulatory policy in APA's Office of Legal and Regulatory Affairs, predicts that we could see lasting effects from some of these shifts.

"States and private insurers may find that telehealth works pretty smoothly, which could open up an opportunity for advocacy to make some of those changes permanent," she says.

APA has partnered with state psychological associations and other organizations to advocate for extended coverage of telehealth at both the state and national levels.

Though widespread evidence-based telehealth is still a work in progress, psychologists agree that the current crisis is likely to accelerate the paradigm shift.

"If I had a crystal ball, I'd say that once the pandemic is over, delivery of care will not just return to the way it was before," Haim says. "Individuals now have an appetite for receiving care remotely, and that's likely to fundamentally change our care environment."

# Further reading

Guidelines for the Practice of Telepsychology
(https://www.apa.org/practice/guidelines/telepsychology)
APA, 2013

COVID-19 Information and Resources on Telepsychology
(https://www.apa.org/topics/covid-19/)

APA, 2020

Survey of Psychologists' Telebehavioral Health Practices: Technology Use,
Ethical Issues, and Training Needs (https://doi.org/10.1037/pro0000188)
Glueckauf, R.L., et al. *Professional Psychology: Research and Practice*, 2018

# Related and recent

 **Nearly 40% of psychologists have a waitlist** (/monitor/2023/09/psychologists-have-waitlist)
Psychologists serving children, teens, young adults, and specific ethnic populations are most in demand.

 **Measurement-based care is giving psychologists and their patients a better picture of treatment progress** (/monitor/2023/0/based-care-patien)
Consistent outcome monitoring can empower patients and reduce the chances that they will deteriorate during treatment.

 **Prescriptive authority gains new momentum** (/monitor/2023/06/authority-psychologi)
Legislative victories, new training opportunities, and a maturing of the field are giving prescriptive authority a new boost.

 **Column: Expanding how we think about the behavioral health workforce** (/monitor/2023/04/health-workforce)
A broader approach to behavioral health would lead to greater emphasis on prevention and early intervention.

 **New legislation will boost school mental health services** (/monitor/2023/04/bc school-mental-health-services)
There has been too little funding and too few

 **Practitioners are overworked and burned out, and they need our support** (/monitor/2023/04 covid-burnout)
The tremendous impact of the pandemic era pushed many

fill the need for public school mental health, but a federal law passed in June 2022 promises some relief.

to their limits.

ADVERTISEMENTADVERTISEMENT

CONTACT APA

## Advancing psychology to benefit society and improve lives

**ABOUT PSYCHOLOGY**
Science of Psychology
Psychology Topics

**STUDENTS**
Accredited Psychology Programs
Careers in Psychology
Online Psychology Laboratory
More for Students

**PUBLICATIONS & DATABASES**
APA Style
Books
Children's Books
Databases
DVD/Streaming Video
Journal Subscriptions
PsycNET® Journal Articles
More Publications & Databases

**NEWS & ADVOCACY**
Monitor on Psychology Magazine
Newsletters
Press Room
Advocacy from APA Services, Inc.

**STANDARDS & GUIDELINES**
Standards and Guidelines
Ethics

**CAREERS**
Find a Job with PsycCareers
Early Career Psychologists

**EVENTS & TRAINING**
APA Annual Convention
Continuing Education
Events Calendar
Training

**ABOUT APA**
Governance
APA Divisions
Directorates and Programs

APA Merch Store
Corporate Supporters
Advertise with Us

Work at APA
Donate
Contact Us

**MEMBERS**
Get Involved
Membership Benefits
More for Members

RENEW MEMBERSHIP

JOIN APA

Privacy Statement    Terms of Use    Accessibility    Website Feedback    Sitemap

FOLLOW APA      MORE

© 2023 American Psychological Association
750 First St. NE, Washington, DC 20002-4242
Telephone: (800) 374-2721; (202) 336-5500 | TDD/TTY: (202) 336-6123

REVIEWS & OVERVIEWS

# Identifying Core Competencies for Remote Delivery of Psychological Interventions: A Rapid Review

Gloria A. Pedersen, M.Sc., Kendall A. Pfeffer, M.Ed., M.A., Adam D. Brown, Ph.D., Kenneth Carswell, Ph.D., Ann Willhoite, M.A., Alison Schafer, Ph.D., Brandon A. Kohrt, M.D., Ph.D.

**Objective:** The COVID-19 pandemic led to a rapid shift toward remote delivery of psychological interventions and transition to voice-only and video communication platforms. However, agreement is lacking on key competencies that are aligned with equitable approaches for standardized training and supervision of remote psychological intervention delivery. A rapid review was conducted to identify and describe competencies that could inform best practices of remote services delivery during and after the COVID-19 pandemic.

**Methods:** Scopus, MEDLINE, and PsycINFO were searched for literature published in English (2015–2021) on competencies for synchronous, remote psychological interventions that can be measured through observation.

**Results:** Of 135 articles identified, 12 met inclusion criteria. Studies targeted populations in high-income countries (11 in the United States and Canada, one in Saudi Arabia) and focused on specialist practitioners, professionals, or trainees in professional or prelicensure programs working with adult populations. Ten skill categories were identified: emergency and safety protocols for remote services, facilitating communication over remote platforms, remote consent procedures, technological literacy, practitioner-client identification for remote services, confidentiality during remote services, communication skills during remote services, engagement and interpersonal skills for remote services, establishing professional boundaries during remote services, and encouraging continuity of care during remote services.

**Conclusions:** These 10 skills domains can offer a foundation for refinement of discrete, individual-level competencies that can be aligned with global initiatives promoting use of observational competency assessment during training and supervision programs for psychological interventions. More research is needed on identification of and agreement on remote competencies and on their evaluation.

*Psychiatric Services 2023; 74:292–304; doi: 10.1176/appi.ps.202100677*

The COVID-19 pandemic inhibited traditional in-person delivery of psychological interventions globally. Because mental health delivery systems are predominantly focused on in-person services, systems were either terminated or interrupted in 93% of countries during the pandemic (1). Concurrently, elevated rates of depression, anxiety, and general psychological distress were reported in both high-income countries (HICs) and low- and middle-income countries (LMICs), causing an escalation in the need for psychological services (2–6).

In response to the crisis, practitioners and programs in many countries have been trying to overcome disruption to in-person psychological services by swiftly shifting to delivery of remote services (1, 7). This is true in both HICs and LMICs, where a range of innovations for remote delivery has been implemented (8), including the provision of psychological interventions through task-sharing or collaborative care models by nonspecialists (e.g., persons without a mental health professional degree, such as community health workers or members of community-based organizations) (8–10).

Prior to the COVID-19 pandemic, international application of remote delivery of psychological treatments, and

**HIGHLIGHTS**

- The COVID-19 pandemic has led to heightened attention on synchronous delivery of psychological interventions through remote formats (e.g., telephone and voice-only and video digital platforms).

- A rapid review identified 12 articles covering 59 categories of competencies for synchronous remote delivery of psychological interventions that were harmonized into 10 core skill domains.

- Further research is needed to identify, agree upon, and evaluate the use of key competencies for training and delivery of remote psychological support, particularly in task-sharing and low-resource settings, to inform best practices of delivery of remote services during and after COVID-19.

telemedicine in general, was limited and varied considerably (11). Since the COVID-19 pandemic, many countries and regions have expanded their use of telemedicine to include psychological support. In a recent survey, 37% of 112 countries reported using telehealth technologies for mental health consultations (12). Despite the ongoing stark "digital divide" in online access or digital smartphone applications that exists in LMICs compared with HICs (13), training for and delivery of remote psychological support have been occurring globally (14–18), including for synchronous delivery, such as through urgent telephone calls via suicide or emergency hotlines and delivery of brief, evidence-based interventions over a video or telephone connection (19). Global initiatives have been launched with aims to support practitioners in adapting typical in-person psychological support and treatments to remote formats, particularly for synchronous practitioner-client care (e.g., direct care to a client via video or telephone connection, not including asynchronous methods such as Short Messaging Service [SMS], e-mail, self-help applications, or digital interventions) (20, 21).

For example, the World Health Organization (WHO) now provides brief e-learning courses on preparing for remote delivery of psychological support, highlighting unique considerations for remote services, such as distinct confidentiality issues, assessment of suicide, variation in verbal and nonverbal communications, and issues around technology and connectivity (www.whoequipremote.org). Similar initiatives include the Inter-Agency Standing Committee's release of guidance and operational considerations for implementation and delivery of remote mental health and psychosocial support programming across sectors (22) and the rapid distribution by the International Federation of Red Cross and Red Crescent Societies of the manual *Remote Psychological First Aid During the COVID-19 Outbreak,* which provides brief guidelines on using basic helping skills remotely to help people dealing with distress, primarily through voice-only connections, along with an online training package for teaching the skills (17, 23, 24).

The global adoption of remote psychological support and treatment delivery prompted by this crisis is predicted to continue a strong growth trajectory, and practitioner training in remote technologies has been encouraged (25). This training is particularly important in areas where COVID-19 has exacerbated existing inequities in mental health care. Approaches to training and supervision that support high-quality service provision in addition to availability of services and that are deployable in low-income settings must be prioritized (26, 27). Many global sectors identify the measurement and monitoring of practitioner competency as a key ingredient in ensuring high-quality care. Current examples include the not-for-profit physician-led organization, Accreditation Council for Graduate Medical Education (ACGME), which established core competencies required for "every resident and practicing physician" in the United States (28), and the ongoing consultation work led by the

WHO for drafting the *Global Competency Framework for UHC* to establish required competencies for primary health care workers globally (29). However, conceptualization and application of competency and competency frameworks are mixed within and across sectors and countries, thereby limiting common understanding and implementation into practice on a global level (30).

Given the growing number of resources being developed for remote-specific adaptations for psychological support, it is important to recognize the advantages and disadvantages of adapting in-person care techniques for use with remote modalities and to consider whether there are competencies that support synchronous remote delivery that could be fundamentally different from those used for in-person care. Therefore, we conducted a rapid review to identify the skills currently recognized as foundational to remote delivery of any psychological service, how they are described, and how they can be harmonized.

## METHODS

In this article, we use the term "remote psychological support"—also referred to as tele–mental health, tele–behavioral health, telepsychology, or teletherapy—to refer to the use of synchronous telecommunications, such as telephone and voice-only or videoconferencing connections, to deliver psychological interventions and associated mental health services by a specialist or nonspecialist practitioner directly to a client or patient. The term psychological support is more frequently used in global settings to capture the increasing use of task-sharing initiatives whereby trained and supervised nonspecialist practitioners deliver care. Task-sharing models are particularly prevalent in LMICs, where the gap between those in need of services and those who have access to such services or available resources is almost 90% (31, 32). Using a simplified systematic methodology, we conducted a rapid review to enable timely identification of competencies and inform ongoing delivery of remote psychological support during the COVID-19 pandemic.

Rapid review methods are similar to those of systematic reviews but are adjusted in a range of ways based on the topic and assessment needs in order to facilitate a streamlined approach to synthesizing evidence within a limited time frame. These reviews are often conducted to support decision making for program implementation or service delivery efforts responding to emerging needs or urgent matters—for example, humanitarian crises such as the COVID-19 pandemic (33, 34). Systematized guidance on conducting a rapid review is mixed (33), and a PRISMA checklist for standardizing rapid review processes is not yet available (35). Therefore, for this rapid review, we chose to adhere as closely as possible to a systematic review process in a limited time frame, including registration of a protocol on February 25, 2021 (PROSPERO, CRD 42021242534; Open Science, https://osf.io/s4b7m/), to clearly report our methods. We referred to previous reviews in similar areas

for expansion of search terms related to remote mental health services (36, 37).

## Operational Definition of Competency and Competency Measurement Type

We specified the operationalization of competency and competency measurement to promote conceptual clarity and comparability with existing frameworks and methods in this field. Mills and colleagues (30) defined competency as "The observable ability of a person, integrating knowledge, skills, and attitudes in their performance of tasks. Competencies are durable, trainable and, through the expression of behaviors, measurable." For this review, we focused on literature that highlights competencies that can be measured through observation, such as through standardized role-plays, a method that has been suggested over other competency measurement types (e.g., knowledge tests) (38, 39). This operationalization is consistent with freely available competency-driven training resources (40), and thus we anticipate that the results of this review can align with globally centered initiatives and can support the standardization of more equitable and less bespoke practices (e.g., specific to a certain organization, association, or setting) for measuring and monitoring competency. Moreover, competency evaluation approaches that use observational measurement with role-plays offer an assessment process distinct from quality and fidelity assessments that use live sessions (41) and may increase a practitioner's confidence and competency achievements prior to real-world delivery when such approaches are included in training and supervision (42–45), which aligns well with our overall aims for this study.

## Study Identification

On February 26, 2021, we searched Scopus, MEDLINE, and PsycINFO for published literature and guidelines for descriptions of competencies related to delivering remote psychological support during synchronous sessions and that are observable through direct practitioner-client interactions, such as skills unique to remote settings that can improve communication over remote modalities (e.g., technology skills), skills for optimizing interactions during voice-only or video-based interactions (e.g., using telephone or video-conferencing), or other foundational practitioner competencies that may be used for in-person services and have been adapted or modified for remote delivery (e.g., nonverbal communication, practices to ensure safety and privacy). We limited our search to peer-reviewed articles, published in the English language between 2015 and 2021, and we included any relevant articles identified during full-text review. (A sample search strategy is presented in the online supplement.) Database results were initially imported into EndNote X9 (46), a reference management system, and then imported into Covidence (47), a Web-based software platform for streamlining systematic reviews, for removal of duplicates, screening, and data extraction.

## Study Eligibility Criteria

Inclusion and exclusion criteria were created and agreed upon by two authors who are experts in systematic reviews and competencies (G.A.P., B.A.K.) (see online supplement for details). We included articles that focused on or included competencies involving practitioners or practitioners-in-training over age 18 who were delivering any mental health–related intervention or care and who included a session or component of synchronous remote connection for direct practitioner-beneficiary interaction over video-conferencing or voice-only platforms. We excluded articles that focused on or had competencies involved with in-person delivery components, non–mental health–related interventions or care, asynchronous treatments or intervention components, or treatment-specific techniques or competencies and components otherwise not observable through practitioner-client sessions or not adaptable or modifiable to remote scenarios. Screening processes were streamlined to one author-reviewer (G.A.P.), who conducted title and abstract screening and full-text screening and who conferred with a second author-reviewer (B.A.K.) regarding any discrepancies. To support rigor, a third author-reviewer (K.A.P.) confirmed exclusion of full-text articles. During full-text screening, if an article included mixed components of remote and in-person delivery or common and treatment-specific techniques, it was included for the extraction stage.

## Data Extraction and Analysis

Predetermined extraction criteria for each eligible article included general study information (study design and type, setting, and population type for providers), label and description of guideline or skill, and any behaviors or other attributes included with the description. Iterative creation of extraction criteria was optional if other relevant information presented itself throughout the extraction process. These categories were inserted into Covidence, and one author (G.A.P.) carried out the initial extraction of the included articles. Any data related to the inclusion and extraction criteria were extracted, regardless of whether the article had mixed components—e.g., synchronous and asynchronous or remote and in-person delivery. To ensure accuracy in reporting, any surrounding information that may have supported comprehension of or that gave additional context to the criteria-matched data was also extracted. Another author (K.A.P.) checked the extracted data for accuracy and consistency by using the "check data" form in Covidence, which allows for direct comparisons per category and corrections as needed alongside the article being extracted. Final data were exported from Covidence into a spreadsheet to prepare for analysis, wherein an in-depth mapping and matching exercise was conducted to identify and consolidate core skill domains across articles. The mapping and matching exercise was done in three stages: mapping and matching labels of competency categories extracted from the articles to create overarching domains, mapping the corresponding label descriptions within each domain, and in-depth description matching across domains.

## RESULTS

The search identified 135 articles. Twelve articles met inclusion criteria (48–59). (A flow diagram of the identification process is available in the online supplement.) Study types included guidance documents (e.g., guidelines, program guidance overview, and in-depth guidance commentary; N=5) (48–52), narrative reviews (N=3) (53–55), a scoping review (N=1) (56), a task force review of guidelines (N=1) (57), a case series (N=1) (58), and a feasibility study (N=1) (59). All studies took place in HICs. Most were reported from the United States and Canada (N=11), and one study was reported from Saudi Arabia (57). Each article focused its guidance or considerations on practitioner conduct or training principles for specialist practitioners or professionals or on trainees or students in a prelicensure or professional program; all were working with adult populations. Within the scope of their work, the authors of seven articles (58%) referenced the American Psychological Association's telepsychology guidelines (48, 50, 56, 59), and three articles (25%) referenced the ACGME requirements for training and preparing resident and fellow physicians (48, 53, 54). Four articles mentioned work with youth populations; these articles suggested that the same procedures used with adults be followed with modifications as needed, such as paying attention to youths' developmental status (48, 49, 51, 52). Summary descriptions of included articles can be found in Table 1.

### Identification of Competency Categories Related to Remote Psychological Support

Four articles (33%) provided an operational definition of competency, with definitions differing across the articles (48, 53, 54, 58):

> "Professional competence can be viewed as the habitual and judicious use of communication, knowledge, technical skills, clinical reasoning, emotions, values, and reflection in daily practice for the benefit of the individual and community served. Competence requires that practitioners possess the knowledge and skills needed to ensure meeting minimum expectations for the quality of professional services provided." (58)

> "ACGME defines milestones as competency-based developmental outcomes (e.g., knowledge, skills, attitudes, and performance) that can be demonstrated progressively by residents and fellows from the beginning of their education through graduation to the unsupervised practice of their specialties." (48)

Only two of the 12 included articles (17%) referenced competency measurement, both of which included observational measurement through simulation methods, but there was not a universally preferred method of measurement across articles (53, 59).

A total of 59 competency categories with descriptions of knowledge, attitudes, or skill sets related to remote psychological interventions were identified across articles, ranging from two to eight categories per article. Terminology and framing varied across articles, such as using direct labeling ("skill," "competence," or "competency") with or without the related stage or topics of remote psychological interventions (e.g., "Competency 1," "general telemental health competence," or "telepsychology technical skills") (42, 50, 58), omitting any reference to "skill" or "competency" and referring only to it as a scenario, domain, or stage in practice (e.g., "client care," "management and treatment planning," or "telepsychology practice domain") (49, 53, 56). Some articles used a category such as "best practices" to describe behaviors or actions (e.g., "Examples of best practices include the use of settings in which the patient's video screen should not include picture-in-picture because self-reflected image can inhibit the patient's communication") (59).

Within and across articles, descriptions of competency categories varied in style (e.g., checklists and paragraphs), detail, and length (e.g., in-depth descriptions with five to seven sentences or four or more bullets or brief descriptions using one or two bullets or a phrase). All articles included either operative descriptions (N=10, 83%) or some reference to a behavior that a practitioner could show an observer. Descriptions utilized present or past tense, or sometimes both, and sometimes included both unobservable (e.g., completed before or between sessions) and observable (e.g., performed during a session with a client or patient) knowledge, attitudes, or skills in a sequence of events involving multiple interactions or timepoints. For example, "Within their knowledge of local resources, providers should have knowledge of or be acquainted with local in-person and emergency resources" (56); or "Technological competence includes possessing adequate knowledge of and familiarity with the various technologies being used in the practice of tele–mental health. . . . Practitioners should possess adequate familiarity with systems used so that they can make needed adjustments to settings used to ensure that auditory and visual quality are sufficient for optimal professional services to be provided as well as to provide instruction to clients on the use of these systems" (58). (A table in the online supplement presents other examples of various description types from four articles.)

### Harmonization of Core Skill Domains

The 59 competency categories from each article were inserted into a matrix to guide the mapping and matching exercise for identifying core domains (Figure 1). After label mapping and descriptive mapping, we generated a consolidated list of 10 domains common across articles.

Table 2 presents the domain name, general description of the domain, and the referenced articles that contributed to the domain creation. The 10 domains included remote-specific skills (e.g., use of technology during remote delivery) and skills that can be used for in-person delivery with varying degrees of adaptation for remote settings (e.g., communication skills). The domains were prioritized by the number of articles mentioning the guidance and are as follows: emergency and safety protocols (N=10 articles), facilitating communication over remote platforms (N=8), remote consent procedures (N=7), technological literacy

**TABLE 1. Summary descriptions of 12 articles reviewed for identification of observable competencies in remote psychological support**

| Article | Target country | Target population | Describes synchronous psychological treatment | Describes guidelines for remote psychological support | Defines competency for psychological support practitioner | Describes observable behaviors during remote practitioner-client interaction | Describes competencies unique to synchronous remote modality | Describes in-person competencies adaptable for remote delivery |
|---|---|---|---|---|---|---|---|---|
| Alqahtani et al., 2021 (57) | Saudi Arabia | Practitioners: clinical psychologists | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Barnett and Kolmes, 2016 (58) | United States | Practitioners: mental health clinicians | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Danesh et al., 2019 (59) | United States | Students: prelicensure graduate mental health nurse practitioners, undergraduate nursing and social work students | ✓ | ✓ | | ✓ | ✓ | ✓ |
| DeJong, 2018 (48) | United States | Practitioners: psychiatrists | | ✓ | ✓ | ✓ | | ✓ |
| Hames et al., 2020 (49) | United States | Students: graduate psychology students | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Hilty et al., 2015 (53) | Canada, United States | Trainees: advanced medical students, early residents, others in graduate medical training | | ✓ | ✓ | ✓ | | ✓ |
| Hilty et al., 2018 (54) | Canada, United States | Practitioners: psychologists, social workers, marriage and family therapists, psychiatrists | ✓ | | ✓ | ✓ | ✓ | ✓ |
| McCord et al., 2015 (50) | United States | Students: doctoral, counseling psychology students | | ✓ | | ✓ | ✓ | ✓ |
| McCord et al., 2020 (56) | United States | Practitioners: psychologists; students: postgraduate psychology students | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Sabin and Skimming, 2015 (55) | United States | Practitioners: psychiatrists | | ✓ | | ✓ | | ✓ |
| Shore et al., 2018 (51) | United States | Practitioners: psychiatrists; trainees: psychiatry trainees | ✓ | ✓ | | ✓ | ✓ | ✓ |
| American Psychiatric Association and American Telemedicine Association, 2018 (52) | United States | Practitioners: psychiatrists; trainees: psychiatry trainees | | ✓ | | ✓ | ✓ | ✓ |

(N=7), confidentiality and privacy during remote services (N=7), practitioner-client identification for remote services (N=5), verbal and nonverbal communication during remote services (N=4), engagement and interpersonal skills for remote services (N=4), establishing professional boundaries during remote services (N=4), and encouraging continuity of care during remote services (N=1). Although harmonization into domains was possible, descriptions from articles varied within domains. Examples of these description variations are presented below (a table with exact descriptions per article per domain is available in the online supplement.)

*Domain 1: Emergency and safety protocols during remote services.* All 10 articles (83%) contributing to this domain had some description related to a practitioner's ability to screen for risk of or handle emergencies (48, 51–59). Seven of the 10 articles (70%) included reference to having a protocol or plan in place or included action steps to determine risk, such as, "Check on need for an emergency protocol," "a plan for addressing acute safety issues," and "Providers should have protocols in place." Seven articles (70%) included specifications for practitioners' knowledge of local resources, "Must be aware of local emergency resources," or of a service or "backup" local to the client or patient. Two of these seven articles also included guidance for practitioners to discuss with clients or patients the "importance of having consistency" in location and for practitioners to be aware of their location and any changes to ensure relevant emergency resource knowledge.

*Domain 2: Facilitating communication over remote platforms.* The eight articles (67%) included in this domain all had some reference to the practitioner's creation of an environment that can enhance engagement with the client (50–53, 55–57, 59). Five of the eight articles (63%) had specific descriptions to address placement and height of the camera at an "ideal position" with "face clearly visible to the other person" and "close to the patient's eye level." Two articles (25%) had instructions to turn off the picture-in-picture feature on the client's side. Three (38%) directed the practitioner to secure an agreeable physical environment on the sides of both the practitioner and the client by using "well-placed lights." Three (38%) had general guidance for "maximizing comfort" or to "minimize distractions" or "clarify and amplify communication."

*Domain 3: Remote consent procedures.* The seven articles (58%) in this domain included descriptions of addressing and discussing with the client the nuances of consent procedures as consent relates to remote delivery (49–52, 55–57). This included four articles (57%) with guidance for the practitioner to explain "benefits, risks, and limitations" related to remote psychological support, such as drawbacks to not being able to see full body language, potential Internet security breaches, or, in the case of one article, discussing circumstances for discontinuation of

remote services if they can no longer be provided safely. Three of the seven articles (43%) had guidance for discussing possible alternatives to remote support and for establishing expectations for client-practitioner interactions in and outside sessions.

*Domain 4: Technological literacy.* The seven articles (58%) in this domain had skill descriptions regarding the practitioner's level of knowledge and familiarity with technology and the practitioner's skill set for clearly communicating with and guiding the client through such mediums (50–52, 55–58). Guidance included making technical modifications with devices or Internet connections, such as adjusting volumes and checking microphones, cameras, video display, and wiring for a strong Internet connection on both receiver ends (N=5 articles, 71%), assessing the client's comfort and past experiences with technology or videoconferencing (N=2, 29%), maintaining communication about potential issues and disruptions with remote modalities (N=2, 29%), and establishing a back-up plan in case of disruption (N=2, 29%).

*Domain 5: Confidentiality and privacy during remote services.* Seven of the 12 articles (58%) included descriptions of ways practitioners may address confidentiality and privacy processes or issues during remote services (48, 49, 53–56, 59). These typically involved adjustments to existing in-person confidentiality and privacy procedures, such as "Use telepsychology regulations, and if none, apply judgment to convert in-person ones," or additions to existing laws, such as a practitioner's conducting a standard HIPAA privacy and security discussion with the client while also adjusting "behavior context, e.g., institutional, local, regional," or additionally explaining how "digital health information will be protected and kept from outside interference during the course of telephone, video, email, or



**FIGURE 1.** Mapping and matching exercise for identifying core domains across the 12 included articles

COMPETENCIES FOR REMOTE PSYCHOLOGICAL INTERVENTIONS: RAPID REVIEW

**TABLE 2. Ten skill domains identified for remote psychological support and the corresponding reviewed articles**

| Domain | Domain description | Contributing articles |
|---|---|---|
| Domain 1: Emergency and safety protocols for remote services | Practitioner assesses for risk to or from the client, including client harm to self, to others, or from others. Safety protocols should be put into place with the client, including a plan in case of emergency. Plans may need to include local support services near the client's physical location. Practitioner confirms client understands risk and safety procedures and asks for feedback and clarification as needed. | Alqahtani et al., 2021 (57); Barnett and Kolmes, 2016 (58); Danesh et al., 2019 (59); DeJong, 2018 (48); Hilty et al., 2015 (53); Hilty et al., 2018 (54); McCord et al., 2020 (56); Sabin and Skimming, 2015 (55); Shore et al., 2018 (51); American Psychiatric Association and American Telemedicine Association, 2018 (52) |
| Domain 2: Facilitating communication over remote platforms | Practitioner should create the environment in which to emulate remote psychological support to ensure full engagement and high-quality care delivery. This includes addressing factors of distractibility and confidentiality for both the practitioner and the client(s), such as limiting distractions and assessing the environment for any unexpected disruptions, including understanding the location where the client is receiving the session and any potential interruptions or breaches to privacy. | Alqahtani et al., 2021 (57); Danesh et al., 2019 (59); Hilty et al., 2015 (53); McCord et al., 2015 (50); McCord et al., 2020 (56); Sabin and Skimming, 2015 (55); Shore et al., 2018 (51), American Psychiatric Association and American Telemedicine Association, 2018 (52) |
| Domain 3: Remote consent procedures | Practitioner should clearly discuss, without jargon and in lay language, any possible risks and benefits, suitability of telecommunication, and possible alternatives with the client before delivering remote psychological support. This includes abiding by local and national ethics and laws, as well as specific policies and protocols related to the practitioner's organization, program, or credentialing body as applicable. Expectations and guidelines for conduct of sessions and engagement with the client are discussed, and the client must provide consent either verbal or written. Documentation procedures and any other communications or processes should be included during the consent process so that the client(s) or caregiver has full capacity and is knowledgeable for giving or refusing consent. | Alqahtani et al., 2021 (57); Hames et al., 2020 (49); McCord et al., 2015 (50); McCord et al., 2020 (56); Sabin and Skimming, 2015 (55); Shore et al., 2018 (51); American Psychiatric Association and American Telemedicine Association, 2018 (52) |
| Domain 4: Technological literacy | Practitioner is familiar with and has knowledge of various technologies and related requirements for using telecommunications to deliver mental health services. Practitioner is aware of various hardware and software, Internet connection types and variabilities, and security measures and precautions for ensuring privacy and confidentiality and can clearly communicate this to the client, guiding the client through such mediums to ensure comfort and accessibility. | Alqahtani et al., 2021 (57); Barnett and Kolmes, 2016 (58); McCord et al., 2015 (50); McCord et al., 2020 (56); Sabin and Skimming, 2015 (55); Shore et al., 2018 (51), American Psychiatric Association and American Telemedicine Association, 2018 (52) |
| Domain 5: Confidentiality and privacy during remote services | Practitioner ensures confidentiality and privacy for any remote psychological support session and should adjust when or if full privacy cannot be reached on either the practitioner's or the client's side. Discussions are held with the client to maximize confidentiality and private settings, including brainstorming or finding ways for confidential discussions if the client or practitioner has people nearby or similar security breaches (e.g., set up a code word). | Danesh et al., 2019 (59); DeJong, 2018 (48); Hames et al., 2020 (49); Hilty et al., 2015 (53); Hilty et al., 2018 (54); McCord et al., 2020 (56); Sabin and Skimming, 2015 (55) |
| Domain 6: Practitioner-client identification for remote services | Practitioners identify themselves clearly to the client(s) or caregivers, including offering credentials and location. Practitioner confirms client identification and how the client would like to be called or referred to and confirms location of client. | Alqahtani et al., 2021 (57); McCord et al., 2020 (56); Sabin and Skimming, 2015 (55); Shore et al., 2018 (51); American Psychiatric Association and American Telemedicine Association, 2018 (52) |

*continued*

**TABLE 2,** *continued*

| Domain | Domain description | Contributing articles |
|---|---|---|
| Domain 7: Verbal and nonverbal communication during remote services | Practitioner uses clear verbal and nonverbal communication skills during remote interaction and adjusts as needed to promote awareness and engagement with body language. | Alqahtani et al., 2021 (57); DeJong, 2018 (48); Hilty et al., 2018 (54); McCord et al., 2015 (50) |
| Domain 8: Engagement and interpersonal skills for remote services | Practitioner ensures a therapeutic alliance with the client, building trust and rapport over remote communications during psychological support sessions. | Alqahtani et al., 2021 (57); Hilty et al., 2015 (53); Hilty et al., 2018 (54); American Psychiatric Association and American Telemedicine Association, 2018 (52) |
| Domain 9: Establishing professional boundaries during remote services | Practitioner is aware that remote psychological support sessions can create confusing or inconsistent interpretations in professional boundaries and relationship in terms of telecommunication modalities between the practitioner and the client and should discuss with the client specific dates and times the practitioner is available for contact, guidelines on what telecommunications are acceptable during and between sessions (e.g., text messaging), and what should be avoided (e.g., "friending" on social media platforms). | DeJong 2018 (48); McCord et al., 2020 (56); Shore et al., 2018 (51); American Psychiatric Association and American Telemedicine Association, 2018 (52) |
| Domain 10: Encouraging continuity of care during remote services | Practitioner should encourage continuity of care, particularly if interactions over telecommunications are brief or single session, by discussing with the client ways to engage therapeutically to promote well-being and other options and referral resources according to the client's needs. | Sabin and Skimming, 2015 (55) |

text-based therapeutic services." Some articles had descriptions of specific adjustments the practitioner could make to enhance and ensure privacy, such as "using headphones" or "adding white noise," planning sessions when children can be supervised by others, and moving the camera around to show the practitioner's space to the client.

*Domain 6: Practitioner-client identification for remote services.* Five of the 12 articles (42%) included steps or guidance for practitioners to identify themselves and clients before remote services begin or during the first session of remote treatment or services (51, 52, 55–57). Among these articles, identification methods included having introductions or verification of the practitioner's and client's identity (N=5 articles, 100%), introducing other parties present on both sides (N=1, 20%), providing the practitioner's certification or credentials (N=4, 80%), confirming the location of the practitioner (N=2, 40%) and of the client (N=3, 60%), and exchanging immediate contact information between the practitioner and the client (telephone, text, or e-mail) and other relevant support people (N=2, 40%).

*Domain 7: Verbal and nonverbal communication in remote services.* In four articles (33%), authors gave suggestions and guidance on ways that practitioners could facilitate clear verbal and nonverbal communication during remote services (48, 50, 54, 57). Nonverbal communication recommendations varied across the four articles and included having an "appropriate appearance" or "appropriate posture" or

presenting as "well-appearing"; instructing the practitioner to "listen more and speak less"; listing options for how the practitioner can make facial expressions "very clear to the client," such as zooming the camera in on the practitioner or the client's face or zooming out for a better view of the client's body language; and, more generally, instructing the practitioner to "optimize one and other's telepresence." Verbal communication recommendations were identified in two of the four articles, either with specific instructions (e.g., "ask open questions" and "summarize outcomes") or more broad instruction to the practitioner to "amplify communication (i.e., 15%) based on video literature" and to "troubleshoot communication difficulties."

*Domain 8: Engagement and interpersonal skills for remote services.* We identified four articles (33%) that explicitly referenced behaviors that a practitioner could perform to enhance rapport building and therapeutic alliance, although these behaviors sometimes overlapped with the verbal and nonverbal communication domain (52–54, 57). References were made for the practitioner to "establish therapeutic alliance, build trust and rapport" and to "adjust to technology (e.g., replace handshakes with verbal comment)"; guidance was provided for the practitioner to be attentive to technology and how it affects "patient rapport and communication."

*Domain 9: Establishing professional boundaries during remote services.* Four articles (33%) covered guidance on ways

that practitioners could mitigate ambiguity in professional boundaries that arises during remote services (48, 51, 52, 56). Suggestions for practitioners varied from general statements, such as for the practitioner to describe the "appropriate interpersonal and online relationship boundaries," to more specific suggestions. Specific suggestions involved practitioner guidance to discuss and document with the client when and how the practitioner will communicate, including detailing the technology medium (e.g., video, text, or e-mail); business hours and response times; and when, where, or whom to contact in an emergency. Issues involving a practitioner's personal and professional social media presence and clear boundaries on these platforms were also mentioned in one article.

*Domain 10: Encouraging continuity of care during remote services.* One article (8%) covered the topic of the importance of a practitioner's encouraging continuity of care during remote services, particularly to cover remote-characteristic services, such as a brief call or a single session (55). The authors of this article emphasized that "Even if the telepsychiatric meeting is a single appointment, the psychiatrist is responsible for giving the patient clear guidance about what to do next." They also offered options to address levels of urgency with "reasonable actions," such as managing this step with a "relatively healthy and well-functioning patient" by advising the person on how to find a referral and with "a patient with emergent clinical needs and significant risk factors," which may require the practitioner to schedule a follow-up appointment to check in with the client.

## DISCUSSION

We conducted a rapid review to synthesize evidence of observable competencies for remote psychological support services to aid in decision making and program implementation for training and delivery of remote psychological support during the COVID-19 pandemic and thereafter. Observable knowledge, attitudes, or skills unique to remote delivery with adult clients and in-person knowledge, attitudes, or skills modified for remote delivery with adult clients were identified across 12 peer-reviewed articles. Operationalization and framing varied across articles, which supported the need for the harmonization procedure in this rapid review. We did not identify any published literature from LMICs for this review, and thus our results are limited to high-income settings. Consequently, the core skill domains may capture techniques or processes that may need adaptation for the technical, logistical, legal, social, and cultural contexts wherein roughly 85% of the world's population lives (32). For example, issues related to confidentiality and the practical elements that constitute privacy during remote services are likely to vary dramatically and are not well represented by the seven articles identified in this review. Moreover, although the skill domains described in

this review pertain to unique aspects of using remote modalities to deliver psychological support, the standard of clinical care provided should ideally meet the accepted requirements for the given treatment setting.

Many of the guidelines and considerations found in the articles were tailored toward existing organizational structures, practices, ethics, and laws, which may represent a barrier to generalizing these competencies, especially in the case of nonspecialist practitioners who are not typically connected to professional mental health associations. For example, several articles in this review offered guidance on ethical and legal compliance, primarily around health laws based in the United States (e.g., HIPAA), which may not be relevant for training in other settings and may create obstacles for implementation of psychological interventions designed for humanitarian settings that encourage multisectoral coordination for a whole-person and whole-society approach to mental health (60). Other skills identified in articles were specific to a particular setting, such as inpatient units, or for remote care that takes place within a specific organizational infrastructure (e.g., delivered in supervised emergency settings at a hospital or delivered in tandem with trained technical specialists). Moreover, because of their length, some of the guidance and competency frameworks in the included articles may not be feasible to implement in lower-resourced or humanitarian settings or in emergencies, such as the COVID-19 pandemic, given the already extremely short timelines and lack of funding and human resources.

A recent survey found that almost 50% of the countries that promptly adopted remote psychological support to address disruptions to in-person services due to COVID-19 were low-income countries (61). Yet only 35% of those living in low-resource countries have Internet access, compared with 80% in higher-resourced countries (62); telecommunication status ranges widely across global regions in terms of policy, innovation, infrastructure, and technology (e.g., digital apps and video consultation platforms), with advancements predominantly being led in high-income settings (11). Although digital technologies are rapidly progressing in high-income settings and changing the way in which therapy is delivered (e.g., self-help digital applications and virtual reality) (63), a cooperative effort must be made to meet the varying social, environmental, and resource needs and to inform optimal use of remote delivery methods (13, 64).

As such, more evidence on implementation, training, and delivery of remote psychological support and related competency assessments in low-resource countries is needed to fully capture key competencies that support safe and effective remote care and to inform best practices for remote delivery. In terms of competencies for synchronous remote modalities, such as video connections or voice-only with telephones, standardizing the use of common definitions, applications, and measurement strategies could be a start. For example, having clear distinctions of how to measure competency alongside the framework and formatting competency

descriptions with concise, simple descriptions of actionable behaviors could enhance adaptability and feasibility of implementing observational competencies into practice across an array of global organizations and programs.

Also, future research on and implementation of competencies and assessments would ideally align with current global initiatives that offer and promote the use of competency assessment tools that can be measured observationally, such as those paired with structured role-plays. An initiative led by the WHO and UNICEF called Ensuring Quality in Psychological Support (EQUIP) (www.equipcompetency.org) aims to improve the competence of practitioners and the consistency and quality of psychological support training, supervision, and service delivery by providing resources, tools, and guidance for assessment and enhancement of essential competencies and use of competency-driven approaches in training and supervision programs (40). EQUIP supports competency tools paired with standardized role-plays for observational assessment, such as the ENhancing Assessment of Common Therapeutic factors (ENACT) tool (65, 66) that covers foundational helping skills (e.g., communication, empathy, rapport building, and confidentiality) in the delivery of psychological support to adults, including among nonspecialists and for manualized interventions (67). ENACT has been widely implemented in a range of countries and humanitarian settings (40, 68–72) and has been successfully used in remote training of nonspecialists for delivery of a brief psychological intervention during the COVID-19 pandemic (19). The online supplement contains a draft observational evaluation tool for remotely delivered psychological interventions (ENACT-Remote) that training and implementing organizations can pilot test for remote competency assessment in the context of the COVID-19 pandemic and other expansions of tele–mental health services.

This review had some limitations. Because it focused only on common competencies that are observable during a practitioner-client interaction in a remote session, the goal was to address individual-focused competencies that are not tailored to certain licensures, treatments, programs, or organizational infrastructures. Therefore, we specifically designed our protocol to exclude identification of certain skills and competencies from this review and cannot report on them at this time: "higher-order" or "internal" skills (e.g., conceptual decision making, reflection, and mindfulness), skills that are not directly observable during synchronous care (e.g., competencies demonstrated between sessions or prior to or after a session or certain knowledge or certain attitudes), skills that are related to therapeutic change but likely remain consistent for remote or in-person sessions (e.g., promoting hope and providing psychoeducation), and tailored skills (e.g., treatment, organization, and infrastructure specific). Furthermore, this review did not identify skills specific to practitioners who work with youths, and thus our results are limited to practitioners who work with adults. We

recognize the benefit of these areas and encourage our fellow researchers to explore these areas further, such as reviewing existing child-focused competencies and competency frameworks available in both high-income and low-income settings that could be used for remote settings (73, 74).

Because of the rapid nature of this review, we limited our search to three databases and did not include gray literature. In addition, the evidence identified and summarized in this review is limited to high-income settings. Therefore, we cannot say we have comprehensively represented all core skill domains for remote psychological support nor have we refined them as discrete observational competencies useable in observational assessments. We have summarized and distilled results from only the published literature. Future exercises, such as a Delphi process wherein a group of field experts could participate in several rounds of surveying, could be considered to support consensus among these skill domains, along with other research studies and exercises involving implementation across more diverse global settings. Furthermore, the processes of this rapid review did not include an assessment of the quality of each included study, and thus we cannot determine the overall quality of the evidence at this time. Although this review highlighted core skill domains identified for the synchronous delivery of remote psychological support, it cannot be generalized for asynchronous methods.

As the field of remote psychological support develops, identifying competencies used in asynchronous methods and how these pair with the skill domains identified in this review could be beneficial for supporting enhanced and effective remote delivery of care. For example, identifying core skills around the use of digital applications or SMS messaging between sessions that support consistency during delivery of synchronous remote psychological support or that strengthen treatment adherence and relationship building when hybrid techniques are used (in-person and remote sessions) would be an important step in this field.

## CONCLUSIONS

Standardized and observable, individual-level competencies can form a foundation for training, evaluation, and research to ultimately support safe and effective delivery of remote psychological support. Common definitions, applications, and measurement strategies for remote care competencies could enhance adaptability and support feasible adaptation and implementation across organizations and settings, particularly in contexts where financial and human resources available for mental health and psychosocial support services are already limited. The core skill domains formulated in this review show that harmonizing remote-specific skills and in-person skills modified for remote delivery is possible. Future work is warranted, such as identification of and agreement on a full scope of remote competencies that are representative of low-resource settings. Future research could explore the modification and adaptation of these domains into concrete

competencies that align with existing global competency assessment tools and observational measurement strategies.

## AUTHOR AND ARTICLE INFORMATION

Division of Global Mental Health, Department of Psychiatry and Behavioral Sciences, George Washington University, Washington, D.C. (Pedersen, Kohrt); Department of Psychology, New School for Social Research, New York City (Pfeffer, Brown); Department of Psychiatry, New York University School of Medicine, New York City (Brown); Department of Mental Health and Substance Use, World Health Organization, Geneva (Carswell, Schafer); Child Protection in Emergencies, Child Protection, Programme Division, UNICEF, New York City (Willhoite). Send correspondence to Ms. Pedersen (gapedersen@gwu.edu).

This work was funded by the National Institutes of Health (COVID-19 supplement to R01MH120649; Dr. Kohrt, principal investigator).

The authors alone are responsible for the views expressed in this article, which do not necessarily represent the views, decisions, or policies of the institutions with which the authors are affiliated.

The authors report no financial relationships with commercial interests.

Received November 30, 2021; revisions received March 1 and May 9, 2022; accepted May 20, 2022; published online December 7, 2022.

## REFERENCES

1. The Impact of COVID-19 on Mental, Neurological and Substance Use Services: Results of a Rapid Assessment. Geneva, World Health Organization, 2020. https://www.who.int/publications/i/item/978924012455

2. Kumar M, Kumar P: Impact of pandemic on mental health in lower- and middle-income countries (LMICs). Glob Ment Health 2020; 7:e35

3. Tee M, Wang C, Tee C, et al: Impact of the COVID-19 pandemic on physical and mental health in lower and upper middle-income Asian Countries: a comparison between the Philippines and China. Front Psychiatry 2021; 11:568929

4. Li L, Li F, Fortunati F, et al: Association of a prior psychiatric diagnosis with mortality among hospitalized patients with coronavirus disease 2019 (COVID-19) infection. JAMA Netw Open 2020; 3:e2023282

5. Ettman CK, Abdalla SM, Cohen GH, et al: Prevalence of depression symptoms in US adults before and during the COVID-19 pandemic. JAMA Netw Open 2020; 3:e2019686

6. Panchal N, Kamal R, Cox C, et al: The Implications of COVID-19 for Mental Health and Substance Use. Oakland, CA, Kaiser Family Foundation, 2021. https://www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/

7. Policy Brief: COVID-19 and the Need for Action on Mental Health. New York, United Nations, 2020. https://unsdg.un.org/sites/default/files/2020-05/UN-Policy-Brief-COVID-19-and-mental-health.pdf

8. Kola L, Kohrt BA, Hanlon C, et al: COVID-19 mental health impact and responses in low-income and middle-income countries: reimagining global mental health. Lancet Psychiatry 2021; 8:535–550

9. Barbui C, Purgato M, Abdulmalik J, et al: Efficacy of psychosocial interventions for mental health outcomes in low-income and middle-income countries: an umbrella review. Lancet Psychiatry 2020; 7:162–172

10. Singla DR, Kohrt BA, Murray LK, et al: Psychological treatments for the world: lessons from low- and middle-income countries. Annu Rev Clin Psychol 2017; 13:149–181

11. Bhaskar S, Bradley S, Chattu VK, et al: Telemedicine across the globe—position paper from the COVID-19 Pandemic Health System Resilience PROGRAM (REPROGRAM) International Consortium (part 1). Front Public Health 2020; 8:556720

12. Second Round of the National Pulse Survey on Continuity of Essential Health Services During the COVID-19 Pandemic: January–March 2021: Interim Report. Geneva, World Health Organization, 2021. https://www.who.int/publications/i/item/WHO-2019-nCoV-EHS-continuity-survey-2021.1

13. Makri A: Bridging the digital divide in health care. Lancet Digital Health 2019; 1:e204–e205

14. Joshi U, Naslund JA, Anand A, et al: Assessing costs of developing a digital program for training community health workers to deliver treatment for depression: a case study in rural India. Psychiatry Res 2022; 307:114299

15. Wainberg ML, Gouveia ML, Stockton MA, et al: Technology and implementation science to forge the future of evidence-based psychotherapies: the PRIDE scale-up study. Evid Based Ment Health 2021; 24:19–24

16. Wainberg ML, Lovero KL, Duarte CS, et al: Partnerships in research to implement and disseminate sustainable and scalable evidence-based practices (PRIDE) in Mozambique. Psychiatr Serv 2020; 72:802–811

17. Francis B, Juares Rizal A, Ahmad Sabki Z, et al: Remote Psychological First Aid (rPFA) in the time of Covid-19: a preliminary report of the Malaysian experience. Asian J Psychiatr 2020; 54:102240

18. Rahman A, Naslund JA, Betancourt TS, et al: The NIMH global mental health research community and COVID-19. Lancet Psychiatry 2020; 7:834–836

19. McBride K, Harrison S, Mahata S, et al: Building mental health and psychosocial support capacity during a pandemic: the process of adapting problem management plus for remote training and implementation during COVID-19 in New York City, Europe and East Africa. Intervention 2021; 19:37–47

20. Liberal SP, Bordiano G, Lovisi GM, et al: Implementation of a telemental health service for medical students during the COVID-19 pandemic [in Portuguese]. Rev Bras Educ Méd 2021; 45:e202

21. Diwan MN, Ali Awan H, Aamir A, et al: Telepsychiatry in low- and middle-income countries during COVID-19: pandemic, barriers, and road ahead. J Nervous Ment Dis 2021; 209:144–146

22. Operational Considerations for Multisectoral Mental Health and Psychosocial Support Programmes During the COVID-19 Pandemic. Geneva, Inter-Agency Standing Committee Reference Group MHPSS, 2020. https://interagencystandingcommittee.org/system/files/2020-06/IASC%20Guidance%20on%20Operational%20considerations%20for%20Multisectoral%20MHPSS%20Programmes%20during%20the%20COVID-19%20Pandemic.pdf

23. Remote Psychological First Aid During the COVID-19 Outbreak: Interim Guidance–March 2020. Copenhagen, International Federation of Red Cross and Red Crescent Societies, 2020. https://reliefweb.int/sites/reliefweb.int/files/resources/IFRC-PS-Centre-Remote-Psychological-First-Aid-during-a-COVID-19-outbreak-Interim-guidance.pdf

24. Online Psychological First Aid Training for COVID-19. Copenhagen, International Federation of Red Cross and Red Crescent Societies, Psychosocial Centre, 2020. https://pscentre.org/?resource=online-pfa-training-for-covid-19

25. Wind TR, Rijkeboer M, Andersson G, et al: The COVID-19 pandemic: the "black swan" for mental health care and a turning point for e-health. Internet Interv 2020; 20:100317

26. Kola L, Kohrt BA, Acharya B, et al: The path to global equity in mental health care in the context of COVID-19. Lancet 2021; 398:1670–1672

27. Jordans MJD, Kohrt BA: Scaling up mental health care and psychosocial support in low-resource settings: a roadmap to impact. Epidemiol Psychiatr Sci 2020; 29:e189

28. Edgar L, Mclean S, Hogan SO, et al: The Milestones Guidebook. Chicago, Accreditation Council for Graduate Medical Education,

2020. https://www.acgme.org/globalassets/milestonesguidebook.pdf

29. Development of a Global Competency Framework for UHC. Geneva, World Health Organization, 2019. https://www.who.int/news/item/30-04-2019-development-of-a-global-competency-framework-for-uhc

30. Mills JA, Middleton JW, Schafer A, et al: Proposing a re-conceptualisation of competency framework terminology for health: a scoping review. Hum Resour Health 2020; 18:15

31. Alloh FT, Regmi P, Onche I, et al: Mental health in low-and middle income countries (LMICs): going beyond the need for funding. Health Prospect 2018; 17:12–17

32. Prydz EB, Wadhwa D: Classifying Countries by Income. Washington, DC, World Bank, 2019. https://datatopics.worldbank.org/world-development-indicators/stories/the-classification-of-countries-by-income.html

33. Tricco AC, Antony J, Zarin W, et al: A scoping review of rapid review methods. BMC Med 2015; 13:224

34. Konnyu KJ, Kwok E, Skidmore B, et al: The effectiveness and safety of emergency department short stay units: a rapid review. Open Med 2012; 6:e10–e16

35. Stevens A, Garritty C, Hersi M, et al: Developing PRISMA-RR, A Reporting Guideline for Rapid Reviews of Primary Studies (Protocol). Oxford, Equator Network, 2018. https://www.equator-network.org/wp-content/uploads/2018/02/PRISMA-RR-protocol.pdf

36. Sunderji N, Crawford A, Jovanovic M: Telepsychiatry in graduate medical education: a narrative review. Acad Psychiatry 2015; 39:55–62

37. Chike-Harris KE, Durham C, Logan A, et al: Integration of tele-health education into the health care provider curriculum: a review. Telemed J E Health 2020; 27:137–149

38. Miller GE: The assessment of clinical skills/competence/performance. Acad Med 1990; 65:S63–S67

39. Fairburn CG, Cooper Z: Therapist competence, therapy quality, and therapist training. Behav Res Ther 2011; 49:373–378

40. Kohrt BA, Schafer A, Willhoite A, et al: Ensuring Quality in Psychological Support (WHO EQUIP): developing a competency global workforce. World Psychiatry 2020; 19:115–116

41. Ottman KE, Kohrt BA, Pedersen GA, et al: Use of role plays to assess therapist competency and its association with client outcomes in psychological interventions: a scoping review and competency research agenda. Behav Res Ther 2020; 130:103531

42. Gifford V, Niles B, Rivkin I, et al: Continuing education training focused on the development of behavioral telehealth competencies in behavioral healthcare providers. Rural Remote Health 2012; 12:2108

43. Dorsey S, Lyon AR, Pullmann MD, et al: Behavioral rehearsal for analogue fidelity: feasibility in a state-funded children's mental health initiative. Adm Policy Ment Health 2017; 44:395–404

44. Beidas RS, Cross W, Dorsey S: Show me, don't tell me: behavioral rehearsal as a training and analogue fidelity tool. Cogn Behav Pract 2014; 21:1–11

45. Cross WF, Seaburn D, Gibbs D, et al: Does practice make perfect? A randomized control trial of behavioral rehearsal on suicide prevention gatekeeper skills. J Prim Prev 2011; 32:195–211

46. EndNote, X9 ed. Philadelphia, Clarivate, 2013

47. Covidence Systematic Review Software. Melbourne, Veritas Health Innovation, 2021

48. DeJong SM: Professionalism and technology: competencies across the tele-behavioral health and e-behavioral health spectrum. Acad Psychiatry 2018; 42:800–807

49. Hames JL, Bell DJ, Perez-Lima LM, et al: Navigating uncharted waters: considerations for training clinics in the rapid transition to telepsychology and telesupervision during COVID-19. J Psychother Integr 2020; 30:348–365

50. McCord CE, Saenz JJ, Armstrong TW, et al: Training the next generation of counseling psychologists in the practice of tele-psychology. Couns Psychol Q 2015; 28:324–344

51. Shore JH, Yellowlees P, Caudill R, et al: Best practices in videoconferencing-based telemental health April 2018. Telemed J E Health 2018; 24:827–832

52. Best Practices in Videoconferencing-Based Telemental Health (April 2018). Washington, DC and Arlington, VA, American Psychiatric Association and American Telemedicine Association, 2018. https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Telepsychiatry/APA-ATA-Best-Practices-in-Videoconferencing-Based-Telemental-Health.pdf

53. Hilty DM, Crawford A, Teshima J, et al: A framework for telepsychiatric training and e-health: competency-based education, evaluation and implications. Int Rev Psychiatry 2015; 27:569–592

54. Hilty DM, Maheu MM, Drude KP, et al: The need to implement and evaluate telehealth competency frameworks to ensure quality care across behavioral health professions. Acad Psychiatry 2018; 42:818–824

55. Sabin JE, Skimming K: A framework of ethics for telepsychiatry practice. Int Rev Psychiatry 2015; 27:490–495

56. McCord C, Bernhard P, Walsh M, et al: A consolidated model for telepsychology practice. J Clin Psychol 2020; 76:1060–1082

57. Alqahtani MMJ, Alkhamees HA, Alkhalaf AM, et al: Toward establishing telepsychology guideline. Turning the challenges of COVID-19 into opportunity. Ethics Med Public Health 2021; 16:100612

58. Barnett JE, Kolmes K: The practice of tele-mental health: ethical, legal, and clinical issues for practitioners. Pract Innov 2016; 1:53–66

59. Danesh V, Rolin D, Hudson SV, et al: Telehealth in mental health nursing education: health care simulation with remote presence technology. J Psychosoc Nurs Ment Health Serv 2019; 57:23–28

60. IASC Guidelines on Mental Health and Psychosocial Support in Emergency Settings, 2007. Geneva, Inter-Agency Standing Committee, 2007

61. COVID-19 Disrupting Mental Health Services in Most Countries, WHO Survey. Geneva, World Health Organization, 2020. https://www.who.int/news/item/05-10-2020-covid-19-disrupting-mental-health-services-in-most-countries-who-survey. Updated Oct 5, 2020

62. Connecting for Inclusion: Broadband Access for All World Bank Group. Washington, DC, World Bank, 2022. https://www.worldbank.org/en/topic/digitaldevelopment/brief/connecting-for-inclusion-broadband-access-for-all

63. Fairburn CG, Patel V: The impact of digital technology on psychological treatments and their dissemination. Behav Res Ther 2017; 88:19–25

64. Road Map for Digital Cooperation. New York, United Nations, 2020. https://www.un.org/en/content/digital-cooperation-road-map/assets/pdf/Roadmap_for_Digital_Cooperation_EN.pdf

65. Kohrt BA, Jordans MJD, Rai S, et al: Therapist competence in global mental health: development of the ENhancing Assessment of Common Therapeutic factors (ENACT) rating scale. Behav Res Ther 2015; 69:11–21

66. Kohrt BA, Mutamba BB, Luitel NP, et al: How competent are non-specialists trained to integrate mental health services in primary care? Global health perspectives from Uganda, Liberia, and Nepal. Int Rev Psychiatry 2018; 30:182–198

67. Pedersen GA, Lakshmin P, Schafer A, et al: Common factors in psychological treatments delivered by non-specialists in low- and middle-income countries: manual review of competencies. J Behav Cogn Ther 2020; 30:165–186

68. Sikander S, Lazarus A, Bangash O, et al: The effectiveness and cost-effectiveness of the peer-delivered Thinking Healthy Programme for perinatal depression in Pakistan and India: the SHARE study protocol for randomised controlled trials. Trials 2015; 16:534

69. Zafar S, Sikander S, Hamdani SU, et al: The effectiveness of Technology-assisted Cascade Training and Supervision of community health workers in delivering the Thinking Healthy Program for perinatal depression in a post-conflict area of Pakistan—study protocol for a randomized controlled trial. Trials 2016; 17:188

70. Hamdani U, Akhtar P, Zill EH, et al: WHO Parents Skills Training (PST) programme for children with developmental disorders and delays delivered by Family Volunteers in rural Pakistan: study protocol for effectiveness implementation hybrid cluster randomized controlled trial. Glob Ment Health 2017; 4:e11

71. Sangraula M, Turner EL, Luitel NP, et al: Feasibility of Group Problem Management Plus (PM+) to improve mental health and functioning of adults in earthquake-affected communities in Nepal. Epidemiol Psychiatr Sci 2020; 29:e130

72. Jordans MJD, Aldridge L, Luitel NP, et al: Evaluation of outcomes for psychosis and epilepsy treatment delivered by primary health care workers in Nepal: a cohort study. Int J Ment Health Syst 2017; 11:70

73. Jordans MJD, Coetzee A, Steen HF, et al: Assessment of service provider competency for child and adolescent psychological treatments and psychosocial services in global mental health: evaluation of feasibility and reliability of the WeACT tool in Gaza, Palestine. Glob Ment Health 2021; 8:e7

74. DeJong SM: Pediatric Telepsychiatry Curriculum: Graduate Medical Education (GME) and Continuing Medical Education (CME). Washington, DC, American Academy of Child and Adolescent Psychiatry, 2020. https://www.aacap.org/App_Themes/AACAP/Docs/clinical_practice_center/business_of_practice/Telepsych/Pediatric_Telepsychiatry_Curriculum_Oct_2020-web.pdf

## Call for Policy Article Submissions
## Topic: Behavioral Health Workforce Shortages

*Psychiatric Services* is pleased to call for policy article submissions. Twice per year, the *Psychiatric Services* Policy Advisory Group will select a high-priority policy topic. Submissions should provide a critical analysis of the topic and present a balanced overview of potential policy strategies at the federal, state, tribal, or local levels. Authors should take care to avoid making overtly political or partisan claims. Please see below for additional information about how to submit a manuscript for consideration.

The first high-priority policy topic will be behavioral health workforce shortages. Specific issues to address may include team-based care, telehealth, collaborative and integrated care models, peer roles, insurance acceptance, and scope of practice.

### Additional information

- Articles may be submitted as either a Policy Review (4,000–6,000 words) or an Open Forum (1,600 words).
- Authors should follow the format requirements for the article type being submitted as outlined in the journal's author guidelines (ps.psychiatryonline.org/ps_ifora)
- When submitting a manuscript for consideration, authors should mention the solicitation and policy topic in a cover letter as part of the submission.
- All submissions will undergo the journal's standard peer review process.
- Submission deadline: June 30
- Authors are invited to send questions about this call for policy article submissions to psjournal@psych.org.

9/18/23, 2:45 PM        Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR        Document 8253-2        Filed 05/28/24        Page 300 of 329



🔍 Menu          🔍 Search                                    🛒 Cart

Home  >  Archives of Women's Mental Health  >  Article

Review Article | Published: 17 May 2019

# Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and meta-analysis

Siobhan A. Loughnan ✉, Amy E. Joubert, Ashlee Grierson, Gavin Andrews & Jill M. Newby

Archives of Women's Mental Health  **22**, 737–750 (2019)

**3433** Accesses | **53** Citations | **16** Altmetric | Metrics

## Abstract

Perinatal anxiety and depression are common and associated with negative outcomes if left untreated. Internet-delivered treatments can improve treatment accessibility and have demonstrated effectiveness in treating anxiety and depression in the general adult population. However, little is known about how effective and acceptable these interventions are for perinatal women. This paper describes a systematic review and preliminary meta-analysis of internet-delivered psychological interventions for the treatment of clinical anxiety and depression in

9/18/23, 2:45 PM          Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

. Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 301 of 329

perinatal women. A systematic search was carried out of seven electronic databases. Seven studies evaluating six distinct internet-delivered psychological interventions were identified. Of the seven studies included, two were open trials and five were randomized controlled trials with a total of 595 participants. Preliminary findings indicate large improvements in depression (Hedges $g$ = 1.67; 95% CI 1.38–1.96) and anxiety (Hedges $g$ = 1.08; 95% CI 0.80–1.36) from pre- to post-treatment. However, between-group differences between interventions and control conditions were only moderate for depression (Hedges $g$ = 0.60; 95% CI 0.43–0.78) and anxiety (Hedges $g$ = 0.54; 95% CI 0.24–0.85). While our preliminary findings are promising, this review identifies an area of research still in its early stages with significant gaps in the literature that need to be addressed. Further research is needed to establish the efficacy and acceptability of these interventions in this population, especially for antenatal depression and anxiety disorders.

---

This is a preview of subscription content, access via your institution.

---

Access options

Buy article PDF

9/18/23, 2:45 PM          Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 302 of 329

USD 39.95

Price excludes VAT (USA)
Tax calculation will be finalised during checkout.

Instant access to the full article PDF.

Rent this article via DeepDyve.

Learn more about Institutional subscriptions

## References

Andrews G, Cuijpers P, Craske MG, McEvoy P, Titov N (2010) Computer therapy for the anxiety and depressive disorders is effective, acceptable and practical health care: a meta-analysis. PLoS One 5(10):e13196

Andrews G, Basu A, Cuijpers P, Craske MG, McEvoy P, English C, Newby JM (2018) Computer therapy for the anxiety and depressive disorders is effective, acceptable and practical health care: an updated meta-analysis (in press). J Anxiety Disord 55:70–78

Ashford MT, Olander EK, Ayers S (2016) Computer- or web-based interventions for perinatal mental

9/18/23, 2:45 PM          Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 303 of 329

health: a systematic review. J Affect Disord 197:134–146

Balk EM, Earley A, Patel K, Trikalinos TA, Dahabreh IJ (2012) Empirical assessment of within-arm correlation imputation in trials of continuous outcomes. Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK115797/pdf/Bookshelf_NBK115797.pdf: Agency for Healthcare Research and Quality

Beck AT, Steer RA, Brown GK (1996) Beck depression inventory (2nd edition) - manual. The Psychological Corporation, San Antonio, TX

Borenstein M, Hedges LV, Higgins J, Rothstein HR (2010) A basic introduction to fixed-effect and random-effects models for meta-analysis. Res Synth Methods 1(2):97–111

Carlbring P, Andersson G, Cuijpers P, Riper H, Hedman-Lagerlöf E (2018) Internet-based vs. face-to-face cognitive behavior therapy for psychiatric and somatic disorders: an updated systematic review and meta-analysis. Cogn Behav Ther 47(1):1–18

9/18/23, 2:45 PM          Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 304 of 329

Cohen J (1988) Statistical power analysis for the behavioral sciences, 2nd edn. Lawrence Earlbaum Associates, Hillsdale, NJ

Cox JL, Holden JM, Sagovsky R (1987) Detection of postnatal depression: development of the 10-item Edinburgh Postnatal Depression Scale. Br J Psychiatry 150:782–786

Cuijpers P, Brännmark JG, van Straten A (2008) Psychological treatment of postpartum depression: a meta-analysis. J Clin Psychol 64(1):103–118

Cuijpers P, Donker T, van Straten A, Li J, Andersson G (2010a) Is guided self-help as effective as face-to-face psychotherapy for depression and anxiety disorders? A systematic review and meta-analysis of comparative outcome studies. Psychol Med 40(12):1943–1957

Cuijpers P, Smit F, Bohlmeijer E, Hollon SD, Andersson G (2010b) Efficacy of cognitive–behavioural therapy and other psychological treatments for adult depression: meta-analytic study of publication bias. Br J Psychiatry 196(3):173–178

9/18/23, 2:45 PM          Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 305 of 329

Danaher BG, Milgrom J, Seeley JR, Stuart S, Schembri C, Tyler MS, … Kosty DB (2013) MomMoodBooster web-based intervention for postpartum depression: feasibility trial results. J Med Internet Res 15(11)

Dennis CL, Chung-Lee L (2006) Postpartum depression help-seeking barriers and maternal treatment preferences: a qualitative systematic review. Birth 33(4):323–331

Dennis CL, Falah-Hassani K, Shiri R (2017) Prevalence of antenatal and postnatal anxiety: systematic review and meta-analysis. Br J Psychiatry 210:315–323. https://doi.org/10.1192/bjp.bp.116.187179

Duval S, Tweedie R (2000) Trim and fill: a simple funnel-plot–based method of testing and adjusting for publication bias in meta-analysis. Biometrics 56(2):455–463

Forsell E, Bendix M, Holländare F, von Schultz BS, Nasiell J, Blomdahl-Wetterholm M, … Söderberg E (2017) Internet delivered cognitive behavior therapy for antenatal depression: a randomised controlled trial. J Affect Disord 221:56–64

9/18/23, 2:45 PM                Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 306 of 329

Goodman JH (2009) Women's attitudes, preferences, and perceived barriers to treatment for perinatal depression. Birth 36(1):60–69

Hedges LV (1981) Distribution theory for Glass's estimator of effect size and related estimators. J Educ Stat 6(2):107–128

Hedman E, Ljótsson B, Kaldo V, Hesser H, El Alaoui S, Kraepelien M, … Andersson G (2014) Effectiveness of internet-based cognitive behaviour therapy for depression in routine psychiatric care. J Affect Disord 155:49–58

Higgins J, Green SM (2011) Cochrane handbook for systematic reviews of interventions version 5.1.0 [updated March 2011]. Retrieved from www.handbook.cochrane.org

Kim DR, Hantsoo L, Thase ME, Sammel M, Epperson C (2014) Computer-assisted cognitive behavioral therapy for pregnant women with major depressive disorder. J Women's Health 23(10):842–848

Kroenke K, Spitzer R, Williams J (2001) The PHQ-9: validity of a brief depression severity measure

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 307 of 329

[electronic version]. J Gen Intern Med 16(9):606–
613

Lau Y, Htun TP, Wong SN, Tam WSW, Klainin-
Yobas P (2017) Therapist-supported internet-based
cognitive behavior therapy for stress, anxiety, and
depressive symptoms among postpartum women: a
systematic review and meta-analysis. J Med Internet
Res 19(4)

Lee EW, Denison FC, Hor K, Reynolds RM (2016)
Web-based interventions for prevention and
treatment of perinatal mood disorders: a systematic
review. BMC Pregnancy Childbirth 16(1):38

Loughnan SA, Wallace M, Joubert AE, Haskelberg
H, Andrews G, Newby JM (2018) A systematic
review of psychological treatments for clinical
anxiety during the perinatal period. Arch Women's
Mental Health 21:481–490.
https://doi.org/10.1007/s00737-018-0812-7

Lovibond P, Lovibond (1995) Manual for the
depression anxiety stress scales. In: The Psychology
Foundation of Australia Inc

Case 2:90-cv-00520-KJM-SCR   Document 8253-2   Filed 05/28/24   Page 308 of 329

Milgrom J, Danaher BG, Gemmill AW, Holt C, Holt CJ, Seeley JR, … Ericksen, J. (2016) Internet cognitive behavioral therapy for women with postnatal depression: a randomized controlled trial of MumMoodBooster. J Med Internet Res 18(3)

Moher D, Liberati A, Tetzlaff J, Altman DG (2009) Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. PLoS Med 6(7):e1000097

Montgomery SA, Asberg M (1979) A new depression scale designed to be sensitive to change. Br J Psychiatry 134(4):382–389

Nieminen K, Andersson G, Wijma B, Ryding E-L, Wijma K (2016) Treatment of nulliparous women with severe fear of childbirth via the Internet: a feasibility study. J Psychosom Obstet Gynecol 37(2):37–43

O'Mahen HA, Woodford J, McGinley J, Warren FC, Richards DA, Lynch TR, Taylor RS (2013) Internet-based behavioral activation—treatment for postnatal depression (Netmums): a randomized controlled trial. J Affect Disord 150(3):814–822

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 309 of 329

O'Mahen H, Richards D, Woodford J, Wilkinson E, McGinley J, Taylor R, Warren F (2014) Netmums: a phase II randomized controlled trial of a guided Internet behavioural activation treatment for postpartum depression. Psychol Med 44(8):1675–1689

Pugh NE, Hadjistavropoulos HD, Dirkse D (2016) A randomised controlled trial of therapist-assisted, internet-delivered cognitive behavior therapy for women with maternal depression. PLoS One 11(3):e0149186

Sockol L, Epperson CN, Barber JP (2011) A meta-analysis of treatments for perinatal depression. Clin Psychol Rev 31(5):839–849

Spitzer RL, Kroenke K, Williams JB, Löwe B (2006) A brief measure for assessing generalized anxiety disorder: the GAD-7. Arch Intern Med 166(10):1092–1097

Stein A, Pearson RM, Goodman SH, Rapa E, Rahman A, McCallum M, … Pariante CM (2014) Effects of perinatal mental disorders on the fetus and child. Lancet 384(9956):1800–1819

9/18/23, 2:45 PM          Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 310 of 329

Wijma K, Wijma B, Zar M (1998) Psychometric aspects of the W-DEQ; a new questionnaire for the measurement of fear of childbirth. J Psychosom Obstet Gynecol 19(2):84–97

Woody C, Ferrari A, Siskind D, Whiteford H, Harris M (2017) A systematic review and meta-regression of the prevalence and incidence of perinatal depression. J Affect Disord 219:86–92

Woolhouse H, Brown S, Krastev A, Perlen S, Gunn J (2009) Seeking help for anxiety and depression after childbirth: results of the maternal health study. Arch Womens Ment Health 12(2):75–83

## Funding

This study was supported by the Australian Rotary Health and the David Henning Memorial Foundation in the form of a Ph.D. scholarship awarded to Siobhan Loughnan. Jill Newby is supported by an Australian National Health and Medical Research Council (NHMRC)/Medical Research Future Fund Career Development Fellowship (1145382).

## Author information

### Authors and Affiliations

**Clinical Research Unit for Anxiety and Depression (CRUfAD), UNSW School of**

9/18/23, 2:45 PM    Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 311 of 329

**Psychiatry, Level 4, O'Brien Centre, St Vincent's Hospital, 394 Victoria Street, Sydney, New South Wales, 2010, Australia**

Siobhan A. Loughnan, Amy E. Joubert, Ashlee Grierson, Gavin Andrews & Jill M. Newby

**School of Psychiatry, University of New South Wales, Sydney, Australia**

Siobhan A. Loughnan, Ashlee Grierson & Gavin Andrews

**School of Psychology, University of New South Wales, Sydney, Australia**

Amy E. Joubert & Jill M. Newby

## Contributions

SL, JN, and GA designed the study and wrote the protocol and search strategy. SL, AJ, and AG conducted the searches, screened the titles, abstracts, and full-texts for eligibility for inclusion into the meta-analysis, and coded the risk of bias of all RCTs. SL extracted the data from the manuscripts, independently checked by AJ, and conducted the data analysis with supervision from JN. All authors contributed to and have approved the final version of the manuscript for publication.

## Corresponding author

Correspondence to Siobhan A. Loughnan.

## Ethics declarations

### Conflict of interest

9/18/23, 2:45 PM        Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 312 of 329

The authors declare that they have no conflict of interest.

## Protocol and registration

The protocol for this systematic review was developed according to the *Cochrane Handbook for Systematic Reviews of Interventions* (Higgins and Green 2011) and was registered with PROSPERO [CRD42016038032]. All reporting of this systematic review follows the PRISMA guidelines (Moher et al. 2009).

## Disclaimer

NHMRC, Rotary Health Australia, and the David Henning Memorial Foundation had no role in the study design, collection, data analysis or interpretation of the data, writing the manuscript, or the decision to submit the paper for publication.

# Additional information

## Publisher's note

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

# Appendix

## PsychINFO Search

1. (Perinatal OR peripartum OR antenatal OR antepartum OR prenatal OR pregnan* OR postnatal OR postpartum OR birth OR (after

birth)).mp. [mp = title, abstract, heading word, table of contents, key concepts, original title, tests & measures]

2. (Well-being OR (mental health) OR (mental disorder) OR psychopathology OR (psychological disorder) OR anxiety OR (anxiety disorder) OR stress OR depression OR (major depressive disorder) OR (major depression) OR affective OR mood OR emotion* OR unipolar OR (baby blues) OR psychosocial) mp. [mp = title, abstract, heading word, table of contents, key concepts, original title, tests & measures]

3. (Intervention OR treatment OR therap* OR (treatment outcome) OR self-help OR counsel$ing OR psychotherapy* OR bibliotherapy OR (behave$ change) OR CBT OR (cognitive behave$ therapy) OR (cognitive therapy) OR (interpersonal psychotherapy) OR (psychodynamic therapy) OR relaxation).mp. [mp = title, abstract, heading word, table of contents, key concepts, original title, tests & measures]

4. (Internet OR computer OR computer* OR online OR web OR e-therapy OR e-mental OR e-health OR telehealth OR telecare OR teletherapy OR telemedicine OR telemental OR technolog* OR virtual OR cyber OR cyberpsychology OR cybertherapy OR iCBT OR cCBT OR web-based

9/18/23, 2:45 PM        Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and met…

Case 2:90-cv-00520-KJM-SCR        Document 8253-2        Filed 05/28/24        Page 314 of 329

OR web-guided OR web-supported OR web-delivered OR web-assisted OR web-aided OR web-facilitated OR computer-based OR computer-guided OR computer-supported OR computer-delivered OR computer-assisted OR computer-aided OR computer-facilitated OR internet-based OR internet-guided OR internet-supported OR internet-delivered OR internet-assisted OR internet-aided OR internet-facilitated OR online-based OR online-supported OR online-delivered OR online-assisted OR online-aided OR online-facilitated). mp. [mp = title, abstract, heading word, table of contents, key concepts, original title, tests & measures]

5.  1 and 2 and 3

6.  limit 4 to (human, adulthood, and English language)

## Rights and permissions

[Reprints and Permissions](#)

## About this article

### Cite this article

Loughnan, S.A., Joubert, A.E., Grierson, A. *et al.* Internet-delivered psychological interventions for clinical anxiety and depression in perinatal women: a systematic review and meta-analysis. *Arch Womens Ment Health* **22**, 737–750 (2019). https://doi.org/10.1007/s00737-019-00961-9

Case 2:90-cv-00520-KJM-SCR          Document 8253-2          Filed 05/28/24          Page 315 of 329

Received                    Accepted                    Published

11 June 2018                18 March 2019               17 May 2019

Issue Date

December 2019

DOI

https://doi.org/10.1007/s00737-019-00961-9


Keywords

**Pregnancy**          **Postpartum**          **Anxiety**


**Depression**          **Internet**

9/19/23, 9:00 AM    Patient Perceptions of Telemental Health: Systematic Review of Direct Comparisons to In-Person Psychotherapeutic Treatments | …

Case 2:90-cv-00520-KJM-SCR    Document 8253-2    Filed 05/28/24    Page 316 of 329



🏠 **Telemedicine and e-Health**  >  ***VOL. 21, NO. 8 |***  Original Research                  normal

# Patient Perceptions of Telemental Health: Systematic Review of Direct Comparisons to In-Person Psychotherapeutic Treatments

Michael A. Jenkins-Guarnieri, Larry D. Pruitt, David D. Luxton, and Kristine Johnson

**Published Online:** 28 Jul 2015 | **Doi:** https://doi.org/10.1089/tmj.2014.0165

## Abstract

*Background:Although there is growing empirical support for the clinical efficacy of telemental health (TMH) treatments, questions remain about how patient perceptions of the TMH treatment process may compare with those of traditional in-person psychotherapy treatments.**Materials and Methods:**Through a systematic review, we specifically examine measures of patient treatment satisfaction and therapeutic alliance in studies that included direct comparisons of video teleconferencing or telephone-based psychotherapeutic TMH treatments with in-person treatment delivery. We performed a comprehensive search of the PsychINFO and MEDLINE databases for articles published in the last 10 years (2004–2014) on TMH treatments that included in-person comparison groups, yielding 552 initial results with 14 studies meeting our full inclusion criteria.**Results:**The findings generally show comparable treatment satisfaction as well as similar ratings of therapeutic alliance. Some results suggested the potential for decreased patient comfort with aspects of group treatment delivered via TMH.**Conclusions:**We discuss implications for providing psychotherapeutic treatments via TMH and review practice recommendations for assuring and enhancing satisfaction with TMH services.*

## Access content

To read the fulltext, please use one of the options below to sign in or purchase access.

Personal login
Institutional Login

We use cookies to give you a better experience on liebertpub.com. By continuing to use our site, you are agreeing to the use of cookies as set in our Cookie Policy.

OK

Case 2:90-cv-00520-KJM-SCR     Document 8253-2     Filed 05/28/24     Page 317 of 329

**Article Pay Per View Purchase: 24 hours to view or download: TMJ**

**$51.00**

 Add to cart

Restore content access

This functionality works only for purchases made as a guest

**Subscribe/Renew** 

**Recommend This Title**

**Sign Up for TOC Alerts**

## ⚠ Society Access

If you are a member of a society that has access to this content please log in via your society website and then return to this publication.

  

© 2023 Mary Ann Liebert, Inc., publishers. All rights reserved, USA and worldwide.
Call us toll free at (800) M-LIEBERT (800-654-3237).

 

We use cookies to give you a better experience on liebertpub.com. By continuing to use our site, you are agreeing to the use of cookies as set in our Cookie Policy.

OK

Professional Psychology: Research and Practice
2011, Vol. 42, No. 6, 405–411

© 2011 American Psychological Association
0735-7028/11/$12.00    DOI: 10.1037/a0025037

# Preparing for the Telehealth World: Navigating Legal, Regulatory, Reimbursement, and Ethical Issues in an Electronic Age

Deborah C. Baker and Lynn F. Bufka
American Psychological Association, Washington, DC

As technology advances, psychologists increasingly have the opportunity to engage with patients or other users of psychological services via less traditional methods. However, little guidance exists to prepare psychologists to navigate the legal, regulatory, reimbursement, and ethical issues that can arise when providing psychological services via technology. A review of relevant state and federal laws reveals inconsistencies even in the terminology used to describe provision of services via technology with some referring to "telehealth," others to "telemedicine," and others using additional terms. The following overview of laws, regulations, and existing guidelines in the area of telehealth and telemental health provides some preliminary guidance for psychologists as they attempt to meet the needs of their patients using available and emerging technologies. Specific issues addressed include the applicability of the HIPAA Privacy and Security Rules, informed consent and reimbursement by third party payers.

*Keywords:* telehealth, telemental health, privacy, security, reimbursement, technology

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

With the proliferation of wireless devices such as smart phones and PDAs, and the availability of Internet-based videoconferencing and social networking, health care providers are able to connect easily and virtually with patients without requiring face-to-face encounters. Whether the communications are limited to scheduling appointments or involve providing psychological interventions remotely, using this technology for delivery of health care services has raised unique issues relating to how these services are coordinated and delivered virtually. While using technology to provide virtual services can enhance and increase access to care, such as for rural populations or linguistic minorities, the technology itself creates new challenges and potential risks that psychologists need to carefully consider. Not only are psychologists ethically obligated to attain and maintain competency in specific practice areas and/or in working with specific populations, psychologists who use telehealth technology must also be competent in using the technology. Psychologists, like other health care providers, confront a lack of uniformity and clear guidance on legal, regulatory, and ethical requirements regarding reimbursement policies, privacy and security issues, and even best practices for using this technology to provide psychological services.

This lack of uniformity begins with the threshold issue of what we should call this particular area of practice. Various terms such as "telehealth," "telemedicine," "e-health," and even "m-health" are used by the provider community, legislators, policymakers, and payers. Telehealth is often used as the broader term to describe electronic information and telecommunications technology used to support and improve clinical health services, health administration, patient information, public health, and professional education and supervision. Telemedicine is often used to refer to the narrower category of delivery and support of clinical services. However, the terms are frequently used interchangeably as there is yet no universal definition or term used by legislators, policymakers, government agencies, and payers. Within the realm of behavioral health, terms such as "telemental health," "e-mental health," "telepsychology," or "telepsychiatry" are often used. Telepsychology is further complicated in that this term is sometimes used to describe all psychological services, including those outside of health care, that are delivered via technology. For purposes of this article, telehealth is used to define the delivery of clinical health care services via technology. Telemental health is used when specifically referring to behavioral health care services delivered through technology.

---

*Editor's Note.* This is one of 19 accepted articles received in response to an open call for submissions on Telehealth and Technology Innovations in Professional Psychology.—MCR

---

DEBORAH C. BAKER received her JD from the T.C. Williams School of Law at the University of Richmond. She is the Director for Prescriptive Authority & Regulatory Affairs within the Practice Directorate's Office of Legal & Regulatory Affairs at the American Psychological Association. Her professional interests include telehealth as well as prescriptive authority, licensure, scope of practice, and other legal and regulatory issues.

LYNN F. BUFKA received her PhD from Boston University. She is the Assistant Executive Director of Practice Research and Policy for the American Psychological Association. Her areas of policy and research include telehealth, practice and clinical treatment guidelines, evidence based practice, licensure, functioning, classification, treatment outcomes, and research on practice patterns and trends.

Special thanks to Abere Sawaqdeh, Practice Research and Policy, Practice Directorate, American Psychological Association, for her efforts in preparing this article for publication and to Alan Nessman, Legal and Regulatory Affairs, Practice Directorate, American Psychological Association for his valuable legal insights.

CORRESPONDENCE CONCERNING THIS ARTICLE should be addressed to Deborah Baker, Legal and Regulatory Affairs, Practice Directorate, American Psychological Association, 750 First St., NE, Washington, DC 20002. E-mail: dbaker@apa.org

BAKER AND BUFKA

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Regardless of which term is used, it is important to take note as to how the term is defined in specific contexts. For example, some payers may define telehealth services narrowly, limiting reimbursement only to services provided using interactive audio-video conferencing. Some telehealth laws may only recognize certain provider types, such as physicians only or medical providers including only physicians, nurses, and physician assistants.

As part of a 50-state review examining state laws, regulations, and psychology board policies and an informal phone survey of nearly all licensing boards around the country, the American Psychological Association (APA) Practice Directorate reviewed those state telehealth provisions, licensure/interjurisdictional practice issues, and any enforcement activity by licensing boards against psychologists using telehealth technology (American Psychological Association Practice Organization [APAPO], 2010). A few states have enacted telehealth or telemedicine laws applicable to psychologists. However, most states do not have specific telehealth provisions directly applicable to psychologists defining how they may use telehealth. A number of organizations have, however, written guidelines to provide information for individuals desiring to provide telehealth services, and psychologists may find these useful sources of information.[1]

Although the use of telehealth has not yet been widely adopted by legislators, policymakers, providers, or payers throughout the United States, psychologists interested in telehealth who live in jurisdictions lacking telehealth laws may not be automatically precluded from using telehealth so long as they carefully consider the relevant issues that impact telehealth practice and determine whether telehealth is appropriate for use in their practice. Issues specific to telehealth provision of psychological services across state lines require a separate review of laws related to interjurisdictional licensure and the possibility of unauthorized practice that will not be addressed in this article (APAPO, 2010). Instead, the focus of this article is on various legal and regulatory issues involving informed consent, patient confidentiality and security, and reimbursement. Although much provider to provider consultation is provided via technology and supervision of services certainly could be provided in this fashion, few laws or regulations specifically address these areas. Interestingly, few laws and regulations cover the provision of services via telephone either, although this is probably the technology most frequently used by psychologists in the delivery of care. Given the absence of legal and regulatory guidance, these areas are excluded from the focus of this article. It is incumbent upon the psychologist to become educated on any and all relevant laws that may impact the delivery of telehealth services, including state laws governing scope of practice issues. Both the APA and the Association of State and Provincial Psychology Boards (ASPPB) Model Acts for Licensure of Psychologists note that psychology may be practiced via electronic or telephonic needs but provide no further guidance. Lastly, psychologists should also consult with their malpractice insurance carrier for guidance as to whether telehealth services are covered.

## Informed Consent

To date, a few states have enacted laws regulating how licensed psychologists may use telehealth in providing services to state residents (APAPO, 2010). In those states, telehealth is specifically defined in either statute or regulation, often spelling out what kinds of technology or communication are regulated. Furthermore, those state laws outline what information ought to be disclosed by the psychologist to the patient before providing services using telehealth communications. Although state requirements may vary, the underlying purpose for disclosure is intended to protect the client from risks inherent in furnishing services via telehealth.

Additionally, a number of state psychology licensing boards have issued an opinion or policy statement on the use of electronic communications or technology in providing psychological services. While these policies may not have the same weight as state statutes or regulations, they do provide some guidance for psychologists regarding appropriate practices as well as how boards might respond to complaints received involving a psychologist providing telehealth or telepsychological services. Similarly, those state board opinions have emphasized that psychologists must give careful consideration to the potential risks unique to telehealth as compared with face-to-face encounters.

For example, in Massachusetts, North Carolina, and Texas, the psychology licensing boards advise that psychologists must carefully consider issues such as informed consent, patient confidentiality, competency, and security before using telepsychology. Also, those board statements strongly encourage psychologists to advise patients about the possibility of technology failure and discuss methods of alternative communication in the event of technology failure; explain the procedure for contacting the psychologist when off-line; inform patients about using encryption methods to ensure secure communications, the potential risks to confidentiality when using unsecured communications, and whether and how electronic information produced during the telehealth encounters are stored and accessed. Those board statements also recognize the challenges of verifying client identity and determining whether the client is a minor, dealing with potential misunderstandings when visual cues are missed or unseen, and identifying a local mental health professional for crisis intervention or assistance.[2]

While most states have not enacted telehealth laws specific to psychologists or issued psychology board opinions on providing psychological services through electronic means, there are other relevant laws that psychologists ought to consider before engaging in telehealth services. For example, several states have enacted specific informed consent requirements for telehealth services—in addition to existing informed consent requirements—even in the absence of any state telehealth laws. As of spring 2011, the following states require health care providers including psycholo-

---

[1] For example, Ohio Psychological Association: Telepsychology Guidelines; Canadian Psychological Association: Ethical Guidelines for Psychologists Providing Psychological Services via Electronic Media; American Telemedicine Association: Evidence-Based Practice for Telemental Health, Practice Guidelines for Videoconferencing-Based Telemental Health; American Psychiatric Association: Telepsychiatry Via Videoconferencing Resource Document; American Counseling Association: Code of Ethics; American Mental Health Counselors Association: Code of Ethics; and National Association of Social Workers: Standards for Technology and Social Work Practice.

[2] Those states where the psychology licensing board has issued an opinion or statement about the issue of telepractice or provision of services using electronic means include Florida, Massachusetts, New York, North Carolina, Texas, and Wisconsin.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

gists to obtain informed consent for telehealth services, including telepsychology services: Arizona, California, Kentucky, Oklahoma, Texas, Vermont, and Wisconsin. At a minimum, these states require psychologists to meet the same legal and ethical standards applicable to psychological services provided in-person. It is important to note that most of these states define telehealth as strictly limited to real-time audio-video conferencing.

Some of the above-mentioned states have broader requirements for what constitutes a valid telehealth informed consent. Those states specify that the informed consent must be provided verbally and in writing to the patient. The informed consent for telehealth must include notice of the patient's right to withhold or withdraw consent at any time without affecting the patient's right to future care, treatment, or program benefit; description of the potential risks and consequences of using telehealth; applicability of existing patient confidentiality and patient access protections; and assurances that patient-identifiable images or information from the telehealth encounter would not be disseminated to researchers or others without patient consent. In addition, providers must include the signed consent in the patient's record (Arizona's Telemedicine Statute, 2004; Telemedicine Development Act of 1996, Oklahoma Telemedicine Act, 1997). However, informed consent for telehealth is not required for telehealth consultations where the patient is not directly involved (e.g., consultation between providers) or in emergency situations when patient consent cannot be obtained easily or in a timely manner.

Other informed consent requirements may include notification to the patient about how electronic patient communications are stored, description of who may access those communications, discussion of when the psychologist would respond to routine electronic messages and under what circumstances the psychologist would use alternative (nonelectronic) communications for emergency purposes, and a description outlining the psychologist's reporting requirements mandated by state law (e.g., reports of possible patient self-harm or harm to others, or suspected cases or abuse) (Kentucky's Telehealth and Telepsychology Regulation, 2011). For example, Vermont specifies that psychologists must provide certain information, such as the psychologist's location, licensure, and training and where and how to make a complaint, if necessary, to patients in advance of providing services via the Internet or other electronic means (Vermont's Telepractice Regulation, 1999).

There is a great deal of consistency among the various state laws and board policies regarding mandatory or recommended disclosures that psychologists provide to patients before conducting telemental health services. Many of these informed consent requirements are mentioned in guidelines developed by other professional organizations that have examined the use of technology in providing health care services. Informed consent is especially important when providing telemental health services as there is a greater risk for miscommunications or misunderstandings that may be experienced negatively by the patient and potentially construed as abandonment or negligence. For psychologists who practice in jurisdictions that do not have any telehealth state laws or psychology board opinions, the above-described requirements provide a good deal of guidance as to what basic information, at minimum, ought to be disclosed to the patient and included as part of a valid informed consent for telemental health services.

## Privacy and Security

The Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104–191, sets the federal privacy and security standards that will apply to most psychologists providing telemental health services. (There may also be state privacy and security laws that apply.) Typically, HIPAA applies when providers, including psychologists, electronically transmit patients' health information in relation to a claim for insurance or other third party reimbursement (APAPO, 2010).

The two relevant rules under HIPAA are the Privacy Rule and the Security Rule. The predominant focus of the Privacy Rule is on the rules governing intentional disclosures of protected health information (PHI). The rule, however, also requires covered health providers including psychologists to use reasonable safeguards to protect patients' PHI from unauthorized and unintended disclosures or uses (HIPAA Administrative Simplification Rules, 2003). But the Privacy Rule does not mandate specific actions or practices that must be taken to comply with the reasonable safeguards requirement. The Privacy Rule applies to PHI in all forms: electronic, paper, and verbal.

Protecting against unintended and/or malicious disclosure, alteration, or loss of electronic PHI is the primary focus of the Security Rule. This rule is narrower than the Privacy Rule in that it only applies to electronic PHI. Accordingly, the Security Rule applies primarily to practitioners who store or transmit electronic PHI. As discussed below, the Security Rule does not apply to communication with patients by videoconference, fax, or telephone.

As with the safeguards requirement under the Privacy Rule, the Security Rule does not mandate specific security measures or technology, such as encryption or password protection. Like the Privacy Rule, the Security Rule acknowledges the need for a flexible approach in establishing and implementing physical and technical safeguards. The Security Rule is "technology neutral" and does not require use of any specific technologies. In part, this reflects a recognition that technology and its attendant security risks and fixes change rapidly. A number of common security mechanisms include passwords, digital signatures, firewalls, data encryption, encryption over public networks, backup systems, and disaster recovery plans (Kumekawa, 2001).

## E-mail and Videoconferencing

According to the Health and Human Services (HHS) Office for Civil Rights, the division charged with enforcing HIPAA, covered entities may communicate with patients electronically so long as reasonable safeguards are used when doing so. Examples of safeguards may include securing locations and equipment and implementing technical solutions to mitigate risks and workforce training. Practitioners communicating by email will also need to be fully compliant with the Security Rule (U.S. Department of HHS & The Office of the National Coordinator, 2008). Because the Privacy Rule's safeguards standard and the general approach of the Security Rule are flexible, providers are not required to comply with specific proscriptions for handling protected health information. Rather, providers and other covered entities can implement policies and practices most appropriate to the size, function, and needs of the individual provider or organization. The focus is on reasonableness.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Neither the Privacy Rule nor the Security Rule prohibits the use of email in communicating with patients nor necessarily requires encryption be used. That does not obviate the provider's duty to use other reasonable safeguards to protect privacy, such as checking email addresses for accuracy or limiting the amount or kinds of information contained in unencrypted communications.

In most cases, telemental health services rely on live audio-videoconferencing, not store-and-forward technology (asynchronous communications such as email or text messages which do not necessarily have real-time responses). While many university hospital organizations and other large health care delivery systems have private secure networks to receive, store, and transmit patient data, psychologists working in solo or small practices must use commercially available technology and applications (Milby, 2010). Videoconferencing is not considered the transmission of electronic PHI and therefore, the Security Rule is not applicable but the Privacy rule is (U.S. Department of HHS & The Office for Civil Rights, 2010). It is often unclear whether the commercially available software, web-based applications, or devices comply with HIPAA and other privacy laws.[3]

Overall, the basic Privacy Rule considerations for web-based videoconferencing for telemental health care are *what* potential risks to confidential patient information might using telehealth technology pose and *how* those risks can be appropriately minimized. Potential risks might include difficulty in verifying a patient's identity (this might be less of an issue when using telehealth with a longstanding patient and/or using videoconferencing); ensuring privacy at both the provider's location and the patient's location (unless expressly waived by the patient); potential disruptions in technology (e.g., Internet service); storing and maintaining information that is created or collected during the telehealth encounter (e.g., is the encounter being recorded?); assessing the potential for unauthorized access to such information if stored and maintained separately from other protected information; as well as potential risks for unintended or unauthorized disclosure if using unsecured communications when discussing or transmitting protected health information (Johnson & Bendixen, 2005).

Regardless of the specific technologies that covered providers might use in providing telehealth, the primary focus is ensuring against unauthorized or unintended disclosures of confidential patient information with particular attention paid to those risks unique to telehealth. How that is done and what kind of technology to use should be part of the risk assessment and management process, which may require consulting with IT professionals.

## Telehealth Reimbursement

Despite the promise of harnessing telehealth technology to promote more efficient health care delivery and to improve access to health care services, the growth of telehealth programs has not been as robust as anticipated for the past couple of decades. One often cited reason for the underutilization of telehealth services is the absence of consistent, comprehensive reimbursement policies. This lack of an overall telemedicine reimbursement policy stems from "the multiplicity of payment sources and policies within the current United States health care system" where the vast majority of health care costs are paid by private insurers, Medicare, and Medicaid (Office for the Advancement of Telehealth, 2003, p. 2). While there is a lack of universal reimbursement for telehealth

services, there has been some progress, albeit piecemeal, among public and private payers (Eder-Van Hook, Burgiss, & Waters, 2006).

However, a significant challenge in evaluating reimbursement policies is that many providers do not bill telehealth services differently than face-to-face services unless specifically required to do so, such as under Medicare. Without special modifiers or special CPT codes to track telehealth utilization, it is difficult to calculate accurately the volume of telehealth reimbursement (Brown, 2006).

### Medicare

The Balanced Budget Act of 1997 (BBA) was the first federal law mandating Medicare reimbursement for certain telemedicine services. It is important to note that Medicare uses the term "telemedicine" rather than "telehealth." In 2000, Congress sought to address some of the limitations on Medicare reimbursement for telemedicine services in the Benefits Improvement and Protection Act of 2000 (BIPA), which was incorporated into the 2001 Consolidated Appropriations Act (Pub. L. No. 106–554). BIPA effected several changes to telemedicine reimbursement but still continues to limit coverage to only patients living in certain regions of the United States and receiving services at approved sites via live audio-video communications (Fleischer & Dechene, 2010; Whitten & Buis, 2007).

According to Section 15516 of the Medicare Carriers Manual, psychologists are included in the list of qualifying practitioners who may bill Medicare for telemedicine services. Section 15516 also provides that Medicare reimbursement for telemedicine services would be on par with reimbursement for the same service provided in-person (Center for Medicare and Medicaid Services [CMS], 2003). The conditions for coverage mandate using interactive audio-video telecommunications to permit real-time communications between the provider and Medicare beneficiary. While psychologists are eligible to provide covered telehealth services under Medicare and receive reimbursement, only services provided in rural health professional shortage areas (HPSA) or in a county outside of a Metropolitan Statistical Area (MSA) are eligible. If the patient is not a beneficiary located in a non-MSA or rural HPSA, the psychologist cannot bill Medicare for telehealth services. The kinds of settings where the patient must be when the service is delivered are further detailed in the CMS's guidance but

---

[3] A question that APA Practice often receives from members regarding telehealth is whether it is appropriate to use Skype for communicating with and providing services to clients. Skype is a peer-to-peer voice-over-internet protocol (VOIP), which is "a technology that allows you to make voice calls using a broadband Internet connection instead of a regular (or analog) phone line" and "encrypts calls end-to-end, and stores user information in a decentralized fashion" (Federal Communications Commission, 2010). Skype appears to rely on user PCs to help carry voice communications. Although Skype purports to use Advanced Encryption Standard, or AES (which has been approved by the National Security Agency for encryption of top-secret information), there still appears to be a lack of consensus among both the provider and IT communities as to whether it is sufficiently secure for providing telehealth services. There are also other concerns about whether the transmission quality is adequate for telemental health services where visual and nonverbal cues are very important (Baset and Shulzrinne, 2004).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

it is important to note that the patient's home is *not* an eligible setting (CMS, 2003). Additional CMS guidance lists the specific CPT codes (current procedural terminology) which are eligible for reimbursement for telehealth services, including many services typically provided by psychologists, and this list continues to evolve (CMS, 2011).

When submitting claims for telemedicine services, providers must use the appropriate telehealth modifier (GT) with the appropriate billing code (e.g., CPT or health care common procedure coding system [HCPCS]) for professional service. The GT modifier indicates "interactive audio and video telecommunications system" was used in providing the professional service. This modifier certifies that a Medicare beneficiary was present at an eligible originating site (located in either a non-MSA or rural HPSA) when the telemedicine service was provided. But CMS does not appear to specify what kind of audio–video technology must be used when furnishing telemedicine services (CMS, 2009). Under Medicare's current policies, psychologists are allowed to provide psychological services remotely to patients so long as the patient is a Medicare beneficiary, living in a rural HPSA or non-MSA area, and is receiving services at an approved site. This precludes the psychologist from providing services virtually to a patient at home or from using technology other than live audio-video communications (e.g., no emails, faxes, or phone calls).

As evidence of increasing support for telehealth services, CMS recently issued its final rule on telehealth credentialing and privileging. Instead of having to complete an often burdensome credentialing and privileging process for each health care provider who will consult remotely with a patient, hospitals may now implement a more streamlined process, accepting privileging by proxy. This means that a hospital may grant privileges to a telehealth provider at another hospital by accepting the privileging and credentialing decisions of the other hospital (Telemedicine Credentialing and Privileging, 2011). Therefore, a psychologist who is credentialed at a local hospital but not at the hospital where the patient is located may be privileged by proxy and thereby able to provide services remotely to the hospital patient. This recent change is important because the new rule reduces the administrative and financial burdens on hospitals for credentialing telehealth providers, such as psychologists, and would encourage those hospitals participating in Medicare and Medicaid to use telehealth services thereby potentially increasing the availability of services to hospital patients, including psychological services.

## Medicaid

Medicaid is a joint federal-state program providing health care services to individuals and families with low incomes and limited resources. Medicaid programs are administered by the states, but federal law has established certain minimum requirements for states to follow in order to qualify for federal Medicaid funding. Because federal law is silent as to whether Medicaid reimbursement for telehealth is mandatory, states have the option to offer Medicaid reimbursement. CMS requires that states allowing Medicaid reimbursement for telehealth determine the scope of coverage that might include eligible providers and services as well as acceptable technologies or formats. Ultimately, states have the discretion whether to reimburse telehealth, so as a result Medicaid reimbursement can vary widely in terms of the types of services

eligible for reimbursement, eligible distant providers, and payment methodologies. As many as 35 states allow for at least some reimbursement for telehealth services (Office for the Advancement of Telehealth, 2003). An area of expansion in Medicaid reimbursement is for *behavioral* telehealth. A 2003 survey conducted by a group at Boise State University, Idaho State University Institute of Rural Health, and the Idaho Division of Medicaid found that at that time only eight states reimbursed for telemental health services (Brown, 2006). A report from the American Telemedicine Association (ATA) suggests that reimbursement for psychological services using telehealth is now available in as many as 13 states under Medicaid: Alaska, Arizona, California, Colorado, Hawaii, Kansas, Maine, Michigan, Nebraska, North Carolina, Oklahoma, Utah, and Virginia (American Telemedicine Association, 2011; Center for Telehealth & E-Health Law, 2010; TeleHealth Connections for Children & Youth Project, 2005).

Nevertheless, it is incumbent upon psychologists who may be interested in providing psychological services using telehealth to Medicaid-eligible patients to contact their state Medicaid director to confirm whether telehealth reimbursement is available, whether psychologists are eligible to provide telehealth services and/or whether psychological services are covered, and what terms and conditions, if any, apply as well as what billing requirements exist for telehealth reimbursement.

## Private Payers

While a significant percentage of telehealth reimbursement comes from public payers, telehealth reimbursement by private payers is a growing trend. To date, 12 states have enacted legislation requiring insurance companies to pay for services delivered through telehealth.[4] Several additional states allow for telehealth reimbursement under certain circumstances. Arizona and New Mexico allow for coverage of telehealth services but do not make reimbursement by private payers mandatory. North Dakota seems to allow for telehealth services in certain workers' compensation claims.

For those states with statutory telehealth reimbursement mandates, the relevant terms and conditions for reimbursement can vary. All 12 states mandate coverage of telehealth services by private payers if those health care services would otherwise be covered when provided face-to-face. However, very few of those statutes require that payers reimburse for telehealth services at the same rate as traditional face-to-face services. While only one state limits reimbursement to physicians, the other laws appear to include psychologists. Nevertheless, it is important to check your state law or contact your state insurance commissioner to confirm the scope and applicability of any such law.

It is difficult to determine accurately how many of the private insurance and managed care companies are reimbursing for telehealth services as special codes or CPT modifiers are often not used when billing for such services. A 2003 survey by the ATA and AMD Global Telemedicine identified 72 telehealth programs that provided billable telehealth services but only 38 programs in 25 states were receiving reimbursement from private payers. Sur-

---

[4] California, Colorado, Georgia, Hawai'i, Kentucky, Louisiana, Maine, New Hampshire, Oklahoma, Oregon, Texas, and Virginia.

BAKER AND BUFKA

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

vey findings also suggested that private payers tended to follow Blue Cross/Blue Shield (BC/BS) on the issue of telehealth reimbursement rather than Medicare. BC/BS was identified as reimbursing for telehealth services in 21 states. The survey also noted 100 other private payers were providing telehealth reimbursement (ATA & AMD Global Telemedicine, 2004).

Whitten and Buis (2007) conducted a survey to update the ATA/AMD findings. Of the 63 survey respondents providing billable telehealth services, 57% reported that they receive private payer reimbursement. The data noted approximately 130 private payers reimbursing for approximately 75 (unidentified) clinical specialty services. 81% of respondents reported very little difference in reimbursement rates (Whitten & Buis, 2007).

Psychologists who are interested in seeking private payer reimbursement for telehealth services should first determine whether there is a state reimbursement mandate and, if so, check with the state insurance commissioner as to the law's requirements. If no mandate exists, psychologists might consider contacting each payer directly about its telehealth reimbursement policies. The anecdotal data suggests that many payers are voluntarily covering telehealth and, in many instances, without any differences in reimbursement rates between telehealth and in-person services.

## Psychology's Current Role in the Telehealth World

Currently, the APA has no official policy regarding psychology's role in telehealth. In 1997, the APA Ethics Committee issued a statement addressing psychological services provided by telephone, teleconferencing, and the Internet. That 1997 statement noted that the APA Ethics Code did not prohibit such practices and recommended that psychologists consider relevant ethical standards, such as boundaries of competence, informed consent, and confidentiality. However, that statement was based on the 1992 Ethics Code which has since been superseded by the 2003 Ethics Code.

Since then, APA has not issued any further guidance or clarification about how psychologists ought to proceed in using telehealth technologies for providing psychological services. There have been an increasing number of policy statements and guidelines developed by other professional health care organizations addressing the use of telehealth and/or electronic provision of services. Organizations such as the Ohio Psychological Association, Canadian Psychological Association, ATA, and the American Psychiatric Association have developed guidelines on the provision of telemental health services. Other organizations have addressed this issue as part of their ethical codes or in position statements.

With the rising increase in federal and state laws and regulations relating to delivery of telehealth services as well as the growth in telehealth reimbursement by private and public payers, there is a need for greater clarity and guidance on how the psychology practice community can safely and effectively use this technology to benefit patients.

In February 2011, the APA Council of Representatives directed the formation of a task force to develop guidance specific to psychologists on the use of telehealth technologies in providing psychological services. This task force, which will also include representation from ASPPB and the APA Insurance Trust (APAIT), is charged with evaluating ethical, legal, risk manage-

ment, and practice issues (including licensure and interstate practice) arising out of telepsychological practice. The anticipated issues that the task force will explore will include current research on efficacy and cost-effectiveness in comparing telehealth to face-to-face interventions; licensure and mobility issues as well as interstate practice concerns; existing federal and state laws regulating telehealth practice; patient confidentiality, privacy, and security issues; and reimbursement.

At the same time, APA is continuing to host telehealth programming and workshops to educate members on research findings, current practice models, and legislative and regulatory policies. With a greater awareness about telehealth issues prompted by the APA-ASPPB-APAIT task force's work, the psychology community may approach this evolving practice area with greater confidence and understanding and use this technology to reach more patients and provide care more efficiently.

## Conclusion

In light of the myriad federal and state laws and regulations, payer policies, technological challenges, and heightened privacy concerns triggered by telehealth practice, it can be a very confusing and challenging practice area for psychologists to navigate. This is particularly complicated as the most common practice, provision of services via telephone, is typically not addressed and often even excluded in laws, regulations, policies, and guidelines. Aside from a few states like California, Kentucky, or Vermont, most states do not have telehealth laws governing psychologists. Psychology licensing boards in several other states have considered the issue, and those board statements do offer some limited guidance for psychological practice.

Until the APA develops guidance for the psychology community, practicing psychologists must cobble together an understanding about the relevant laws regarding informed consent, patient confidentiality, privacy and security, and reimbursement to evaluate the benefits and risks—both to the psychologist and the patient—that telehealth might pose. This is in addition to the competency that the psychologist ought to attain in using the technology itself and in understanding when and for whom electronic-based interventions would be appropriate.

Nevertheless, the world of telehealth is moving forward, spurred in part by the push toward adoption of electronic health records and health information technology. As a result, it appears to be inevitable that psychologists will be confronted with situations where they may need to use technology with some of their patients. A better understanding of the common issues that psychologists might encounter with using technology may strengthen the provision of quality services.

## References

American Psychological Association Practice Organization. (2010). Telehealth: Legal basics for psychologists. *Good Practice, 41,* 2–7.

American Telemedicine Association. (2011). State telemedicine policy center. Retrieved from http://www.americantelemed.org/i4a/pp./index.cfm?pageID=3604

American Telemedicine Association & A. M. D. Global Telemedicine. (2004). Private payer reimbursement information directory. Retrieved from http://www.amdtelemedicine.com/telemedicine-resources/private_payer.html

Arizona's Telemedicine Statute, 36 Ariz. Rev. Stat. § 36–3601 et seq. (2004).

Baset, S. A., & Schulzrinne, H. (2004). An analysis of the Skype peer-to-peer internet telephony protocol. New York, NY: Columbia University, Department of Computer Science.

Brown, N. A. (2006). State Medicaid and private payer reimbursement for telemedicine: An overview. *Journal of Telemedicine and Telecare, 12,* 32–39.

Center for Medicare and Medicaid Services. (2003). Carriers manual Pt. 3 - Claims process. Retrieved from https://www.cms.gov/Transmittals/Downloads/R1798B3.pdf

Center for Medicare and Medicaid Services. (2009). Telehealth services fact sheet. Retrieved from http://www.telemedicine.com/pdfs/TelehealthSrvcsfctsht.pdf

Center for Medicare and Medicaid Services. (2011). Physicians/nonphysician practitioner. In *Medicare claims processing manual* (12). Retrieved from http://www.cms.gov/manuals/downloads/clm104c12.pdf

Center for Telehealth & E-Health Law. (2010). Reimbursement overview. Retrieved from http://www.ctel.org/expertise/reimbursement/reimbursement-overview/ Code of Federal Regulations, 42 C. F. R § 482, 485 (2010).

Eder-Van Hook, J., Burgiss, S. G., & Waters, R. J. (2006). *Medicaid policies on telehealth services: A comparative analysis*. Washington, DC: Center for Telehealth & E-Health Law.

Federal Communications Commission. (2010). Voice-over-internet protocol frequently asked questions. Retrieved from http://www.fcc.gov/voip/

Fleischer, L. D., & Dechene, J. C. (2010). *Telemedicine and e-health law*. New York, NY: Law Journal Press.

Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104–191, 104 Cong. (1996). Retrieved from http://www.hhs.gov/ocr/privacy/hipaa/ administrative/statute/hipaastatutepdf.pdf

HIPAA Administrative Simplification Rules. 45 C. F. R. pt. 160, 162, 164. (2003). Retrieved from http://www.hhs.gov/ocr/privacy/hipaa/administrative/index.html

Johnson, J., & Bendixen, R. (2005). Telehealth. In W. C. Mann (Ed.), *Smart technology for aging, disability, and independence: The state of the science* (pp. 207–208). Hoboken, NJ: Wiley.

Kentucky's Telehealth and Telepsychology Regulation, 201 Ky. Admin. Regs. § 26–310 (2011).

Kentucky's Telepsychology Statute, Ky. Rev. Stat. Ann. 26 § 319–140 (2000).

Kumekawa, J. (2001). Health information privacy protection: Crisis or common sense? *Online Journal of Issues in Nursing, 6.* Retrieved from www.nursingworld.org/MainMenuCategories/ANAMarketplace/ANAPeriodicals/OJIN/TableOfContents/Volume62001/No3Sept01/PrivacyProtectionCrisis.aspx

Massachusetts Board of Registration of Psychologists. (March 2006). *Provision of Services Via Electronic Mean.* Retrieved from http://www.mass .gov/?pageID=ocarterminal&L=6&L0=Home&L1=Licensee&L2=Division+of+Professional+Licensure+Boards&L3=Board+of+Registration+of+Psychologists&L4=Statutes+and+Regulations&L5=Board+Policies+and+Guidelines&sid=Eoca&b=terminalcontent&f=dpl_boards_py_policy_electronic_services&csid=Eoca

Medicare and Medicaid Programs: Changes Affecting Hospital and Critical Access Hospital Conditions of Participation: Telemedicine Credentialing and Privileging, 76 Federal Register 25550 (2011) (to be codified at 42 CFR Part 482, 485).

Milby, S. (2010). The new meaning of a house call: Wanna Skype, Dr. Gupta? NewBizViews. Retrieved from http://www.newbizviews.com/2010/04/12/the-new- meaning-of-a-house-call-wanna-skype-dr-gupta/

North Carolina Psychology Board. (March 2005). *Provision of Services Via Electronic Means.* Retrieved from http://www.ncpsychologyboard.org/office/ElectronicServices.htm

Office for the Advancement of Telehealth. (2003). *Telemedicine reimbursement report* (Contract #02-HAB-A215304). Retrieved from ftp://ftp.hrsa.gov/telehealth/licen.pdf

Oklahoma Telemedicine Act, OK. St. Ann. § 36–6801 et seq. (1997).

TeleHealth Connections for Children and Youth Project. (2005). *Telemedicine for CSHCN: A state-by-state comparison of Medicaid reimbursement policies and Title V activities.* Gainesville, FL: University of Florida, Institute for Child Health Policy. Retrieved from http://www.ichp.ufl.edu/documents/Telemedicine%20in%20Medicaid%20and%20Title%20V%20Report.pdf

Telemedicine Development Act of 1996, Cal. Bus. & Prof. Code § 2290.5 (1996).

Texas State Board of Examiners of Psychologists. (December 1999). *Telepractice Policy Statement.* Retrieved from http://www.tsbep.state.tx.us/newsletter_12_2.html

U.S. Department of Health and Human Services & The Office for Civil Rights. (2010). Health information privacy security rule frequently asked questions. Retrieved from http://www.hhs.gov/ocr/privacy/hipaa/faq/; http://www.hhs.gov/ocr/privacy/hipaa/faq/securityrule/index.html

U.S. Department of Health and Human Services & The Office of the National Coordinator. (2008). The nationwide privacy and security framework for electronic exchange of individually identifiable health information: Privacy and security framework safeguards principle and FAQs. Retrieved from http://www.hhs.gov/ocr/privacy/hipaa/understanding/special/healthit/index.html

Vermont's Telepractice Regulation, 26 Vt. Stat. Ann. § 3018 (1999).

Whitten, P., & Buis, L. (2007). Private payer reimbursement for telemedicine services in the United States. *Telemedicine Journal E-Health, 13,* 15–23.

Received March 11, 2011
Revision received March 16, 2011
Accepted June 21, 2011 ∎

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.



### INTERIM ETHICAL GUIDELINES FOR PSYCHOLOGISTS PROVIDING PSYCHOLOGICAL SERVICES VIA ELECTRONIC MEDIA[1]

#### INTRODUCTION

These guidelines apply to the evolving and increasing practice of providing e-services to clients; that is, providing services through electronic media (e.g., telephone, video-conferencing, e-mail, chat rooms). The guidelines apply to services that require a contractual relationship between a psychologist and client; they do not apply to the use of these media to provide general educational or resource information.

The guidelines are derived from the ethical principles and values of the *Canadian Code of Ethics for Psychologists* (CPA, 2017)*,* which provides an ethical framework and standards for the professional activities of all members of the Canadian Psychological Association, or of members of other bodies that endorse or have adopted this *Code*. However, the guidelines address issues that are unique to the use of electronic media; they do not duplicate relevant standards in the *Code*. As such, the guidelines should be used in conjunction with the most recent version of the *Code*. Each guideline is referenced with one or more Ethical Values used in the *Code*.

As significant new technology is emerging continuously, the guidelines avoid being technology specific.

#### GUIDELINES

#### Principle I: Respect for Dignity of Persons and Peoples

1.   When obtaining informed consent for electronic provision of services, psychologists include information about the particular nature, risks (including possible insufficiency, misunderstandings due to lack of visual clues, and technology failure), benefits (including appropriateness and advantages *re*

---

[1] Approved in principle by the Board of Directors of the Canadian Psychological Association (CPA) in 2006. (Updated 2020).

distance, convenience, comfort), reasonable alternative service options (e.g., in-person services, local services from an available health service provider of another discipline), and privacy limitations (including the possibility of interception of communications) of providing services through the particular electronic medium/media to be used. (*Informed Consent*)

2. Psychologists providing services to clients for whom capacity to consent or freedom of consent may be an issue arrange for an in-person contracting session, either with themselves or with another qualified health care practitioner. (*Informed Consent, Freedom of Consent*)

3. If a substitute decision maker is needed to provide consent (e.g., a parent), the identity of the substitute decision maker is verified in person, either with themselves or with another qualified health practitioner. (*Protection for Vulnerable Persons*)

4. Psychologists educate themselves regarding current practices and security devices for electronic communications, and use those systems and practices that are reasonably available, and that best protect their clients' privacy. (*Privacy, Confidentiality*)

5. Psychologists inform clients of their security practices, and reach agreements with clients regarding maximization of security for each client, including whether the client will require any special equipment (e.g., special software) to access and transmit information and, if so, whether the psychologist provides the special equipment as part of the services. (*Privacy, Confidentiality*)

6. In situations where it is difficult to verify the identity of the client being served electronically, steps are taken to address impostor concerns (e.g., by use of identity code words or numbers). (*Privacy, Confidentiality*)

***Principle II: Responsible Caring***

1. Psychologists keep up to date with the e-service literature, including research literature regarding the efficacy and effectiveness of services using electronic media, and take this literature into consideration when deciding what services to provide to which clients, with what methods, and under which circumstances. (*Competence, Maximize Benefit*)

2. Psychologists do not attempt to address a problem using electronic media unless they have demonstrated their competence to do it in in-person services. (*Competence*)

3. Psychologists ensure that prospective clients for e-services receive an adequate assessment of their needs. If the type of service being offered requires in-person assessment, psychologists provide such assessment or arrange for another health

care provider to conduct the assessment prior to beginning e-services. (*Risk/Benefit Analysis*)

4.  Psychologists develop e-service plans that are consistent with the client's needs and the limitations of e-services. (*Maximize Benefit*)

5.  The client's record includes hard copies of all online communications of a material nature, and notes regarding contacts of a material nature using other electronic media. (*Maximize Benefit*)

6.  Prior to beginning e-service, the psychologist obtains from the client the name and phone number(s) of someone for the psychologist to contact in an emergency. (*Maximize Benefit, Minimize Harm*)

7.  Prior to beginning e-services, psychologists discuss with clients the procedures to be followed in an emergency. Psychologists collaborate with clients to identify a qualified health care provider (e.g., the family physician) who can provide local back-up assistance, and to determine the local crisis hotline telephone number and local emergency telephone numbers. (*Maximize Benefit, Minimize Harm*)

8.  Psychologists make adequate plans for accessing and responding to messages left by clients in electronic form during times of psychologists' unavailability, illness, or incapacity. (*Maximize Benefit, Minimize Harm*)

9.  Psychologists inform clients of alternative communication procedures if there is a technology failure. (*Maximize Benefit, Minimize Harm*)

10. If a client is receiving only e-services (i.e., not combined with any in-person services), and it becomes evident that the client would receive significantly greater benefit from in-person services, and such services are available, psychologists provide in-person services or refer the client to a qualified professional who can provide such service. (*Maximize Benefit, Minimize Harm*)

### *Principle III: Integrity in Relationships*

1.  Psychologists set appropriate boundaries with clients regarding their availability. (*Avoidance of Conflict of Interest*)

2.  Psychologists ensure that the possible convenience and financial advantages of providing e-services are never allowed to outweigh the best interests of clients. (*Avoidance of Conflict of Interest*)

3.  Psychologists inform themselves of jurisdictional requirements regarding licensure or certification, and are licensed or certified in any jurisdiction that requires licensure or certification of psychologists providing e-services to persons who reside in that jurisdiction. This may include being licensed or certified both in a client's home jurisdiction, as well as being licensed or certified in the psychologist's own home jurisdiction. (*Reliance on the Discipline*)

3

*Principle IV: Responsibility to Society*

1. To prevent the loss of security of assessment techniques, psychologists do not administer electronically any psychological tests for which such administration would put the security of the assessment techniques at risk or would violate any copyright restrictions. (*Beneficial Activities*)

2. Psychologists obtain, where feasible, liability insurance coverage for their e-services. (*Beneficial Activities*)

3. Psychologists provide to clients relevant contact information (e.g., mailing address, phone number, fax number, Website address, and/or e-mail address) of all appropriate certification/regulatory bodies. (*Beneficial Activities*)

4. Psychologists familiarize themselves with and honour the relevant laws and regulations of all jurisdictions to which they provide e-services. This includes such matters as age of consent or definitions of capacity to consent, and requirements for mandatory reporting. (*Respect for Society*)

**References**

Canadian Psychological Association. (2017). *Canadian code of ethics for psychologists. Fourth edition.* Ottawa, ON: Author. Retrieve from https://cpa.ca/docs/File/Ethics/CPA_Code_2017_4thEd.pdf

**Examples of Other Relevant Guidelines**

Association of Canadian Psychology Regulatory Organizations. (2011). *Model standards for telepsychology service delivery.* Retrieve from http://www.acpro-aocrp.ca/documents/ACPRO%20Model%20Standards%20for%20Telepsychology%20Service%20Delivery.pdf

eHealth Ethics Initiative. (2000). *eHealth code of ethics.* Retrieve from http://www.ihealthcoalition.org/wp-content/themes/IHC-theme/code0524.pdf

International Society for Mental Health Online. (2000). *Suggested principles for the online provision of mental health services.* Retrieve from http://ismho.org/resources/archive/suggested-principles-for-the-online-provision-of-mental-health-services/

Joint Task Force for the Development of Telepsychology Guidelines for Psychologists. (2013). *Guidelines for the practice of telepsychology.* Retrieve from https://www.apa.org/practice/guidelines/telepsychology

4

National Board for Certified Counselors. (2016) Policy regarding the provision of
        distance professional services. Retrieve from
        https://www.nbcc.org/Assets/Ethics/NBCCPolicyRegardingPracticeofDistanceCo
        unselingBoard.pdf

Psychologists Board of New Zealand. (2011.) *Draft guidelines: Psychology services
        delivered via the internet and other electronic media.* Retrieve from
        http://www.psychologistsboard.org.nz/cms_show_download.php?id=141