Full Access

# Chapter 34.  Psychotherapy and Cyberspace

**Edited by:**
Peter Yellowlees, M.D., M.B.B.S.
,
Jay Shore, M.D., M.P.H.
https://doi.org/10.1176/appi.books.9781615375233.gg34

- **Sections**
- **Excerpt**

- Tools
- **Share**

**Peter Yellowlees, M.D., M.B.B.S.Jay Shore, M.D., M.P.H.**

The practice of telepsychiatry is usually defined as the use of videoconferencing to perform psychiatric consultations. In this chapter we are more inclusive and include any clinical interactions that are mediated or enabled by technology in which the doctor or therapist and the patient are not physically together. So although the practice of using videoconferencing for psychiatric assessment and treatment is more than 60 years old and telephony has been used for more than a century, email, secure texting, and home monitoring using multiple smartphone-based mobile devices are much more recent.

In the past decade the technical and economic barriers that have slowed the adoption of telepsychiatry have almost disappeared with the advent of web- and cloud-based systems, mobile computing, the impact of commercial telemedicine service companies, and a growing body of evidence and telehealth research. Now we can see patients securely and in high definition on a laptop, tablet, or smartphone at minimal cost using video systems that function well in parallel with most electronic medical records and, in many cases, are already integrated into them. As of 2020 mobile devices dominate the global market for internet access and will soon become the primary way that digital technologies are used to deliver mental health care.

At the same time, with the rise in younger, more technologically savvy providers and patients from the millennial and Generation Z populations, expectations about how psychotherapy and other medical and mental health treatments can be provided are changing. These younger generations are beginning to influence how health care is delivered (Nakagawa and Yellowlees 2020) as patients and providers expect care to be available anytime, anywhere, just like most other services in their lives. Using technology to deliver mental health care, including psychotherapy, aligns with the integration of technology in their day-to-day life.

Finally, the advent of coronavirus SARS-CoV-2 disease (COVID-19), a tragic global pandemic that is still raging at the time of writing, has been a major driver of the use of telepsychiatry and other mental health technologies. In the United States, most psychiatrists and therapists have taken to using technologies, especially video and telephony, to connect with their patients and to continue therapy with those who are sheltering in place. This has allowed both therapists and patients to remain separated and safe from infection while enabling continuing mental health care to be provided.

The opportunity for mental health professionals to engage in psychotherapy with their patients is here, and many thousands of patients have already benefited. The future will likely bring many mental health professionals working increasingly in a hybrid model, both in person and online, using the strengths of both approaches to improve patient care. Technologies are gradually changing the therapist-patient relationship, softening its boundaries, and making it more of an anytime, anywhere collaborative partnership, something that will be especially helpful when practicing the range of psychotherapies described throughout this book.

A significant amount of research has demonstrated the advantages of telepsychiatry beyond increasing access to care, and since 2015, the scientific literature has dramatically expanded, so that discussion of the use of technologies in mental health care has now become mainstream in almost all academic and clinical settings. Post COVID-19 this will continue.

The use of videoconferencing leads to high patient and provider satisfaction ratings and achieves health outcomes equivalent to in-person care (Bashshur et al. 2016; Hilty et al. 2013). Trials of multiple types of brief therapy, particularly dynamic and cognitive-behavioral approaches, have demonstrated outcomes equivalent to those of in-person care, and some studies with veterans using evidence-based prolonged exposure therapy for PTSD have led to better outcomes than in-person therapy (Fortney et al. 2015a). Younger patients often prefer telepsychiatry over in-person encounters, and it has been noted that telepsychiatry encourages intimate conversations (Yellowlees et al. 2015) and unique clinical observational opportunities such as the patient's home environment. Indeed, telepsychiatry may be preferable to traditional clinic consultations for patients who have paranoia, anxiety, or PTSD (Chan et al. 2015). A number of dynamic issues in psychoanalytically oriented therapy have been examined and discussed (Kocsis and Yellowlees 2018), especially some advantages of seeing patients on video through the use of virtual space.

An increasing number of textbooks have been written describing the use of telepsychiatry (Yellowlees and Shore 2018), and other texts on mental health topics now frequently include chapters summarizing the major technological issues of importance and relevance (Saeed et al., in press; Waugh et al. 2018; Yellowlees 2018; Yellowlees and Liu 2020; Yellowlees and Shore 2019). Finally, several mental health journals have published collections of papers focused on telepsychiatry, telepsychology, and other mental health technologies (Shore 2019; Shore et al. 2020a), and the two major telemedicine journals, the *Journal of Telemedicine and eHealth* and the *Journal of Telemedicine and Telecare*, routinely publish papers about telemental health.

Telepsychiatry is already used in a wide variety of settings beyond the home, and during the COVID-19 pandemic many patients have been receiving care in their parked vehicles using mobile phones, often outside their clinics, so much so that some have said that the car is the new therapy room. In outpatient clinics, many of which have become virtual hubs, with providers and patients all based in their homes, telepsychiatry is used for diagnosis and treatment, which can include medication management, individual psychotherapy, and group psychotherapy from a range of mental health professionals (Yellowlees et al. 2020). At the beginning of the pandemic, when hospitals were being overwhelmed by patients, group sessions for health care workers, using the principles of psychological first aid, were commonly offered by videoconferencing. One of us (P.Y.) cofacilitated a number of these "Zoom debriefing" sessions with groups of surgeons who were very committed to providing excellent care in situations that were potentially dangerous for themselves and their families. For these physicians the risk of spreading infections to their own families was substantial and frightening, and they were relieved to be able to ventilate and discuss their emotional responses to their situation via video.

Telemental health can also be used for consultations in primary care; with the emergency department; and with specialist clinics, including pain, obesity, and surgery clinics. Apps are increasingly being integrated into standard inpatient and outpatient treatment programs for both monitoring and therapy. Elsewhere, telepsychiatry is being used in colleges, universities, medical and nursing schools, and mental health facilities for consultation and education, as well as in correctional, substance use, and rehabilitation settings, and by pharmaceutical companies in drug trials. The technologies and processes have been implemented and used for all ages (children, adults, elderly people) and have been especially useful for language and sign interpretation to cross cultures and aid deaf people. Automated language interpretation systems are being developed that transcribe and interpret languages in near–real time from recorded asynchronous telepsychiatry conversations, and avatar therapists, trained to react to patients' movement and language, are no longer a fantasy of the future but are being developed to deliver treatment for PTSD to veterans.

## What Drivers Are Causing the Doctor-Patient Relationship to Change and Encourage the Use of All Types of Online and Hybrid Psychotherapy?

There are three main drivers of change: 1) technological improvements and the move to mobile devices, 2) changing demographics as younger populations dominate the health care market, and 3) the COVID-19 global pandemic, which is requiring social distancing and care in the home to ensure the safety of providers and patients.

### Technological Changes

Advances in technology are rapidly changing the practice of mental health professionals. These advances include the development of the internet, increasingly ubiquitous

broadband access, and the miniaturization of computers and integration of computing power in smartphones and smartwatches. Altered patient expectations and a shift toward consumer-driven health care, as well as the decreasing cost of technology and increasing need for better access to psychiatrists, who are in increasingly short supply, are other change drivers. Much of what is true of videoconferencing on fixed and mobile devices also applies to telephony and email, both of which are equally important in their impacts on the therapist-patient relationship.

Since 2015, the typical smartphone has been equipped with forward-facing and rear-facing high-resolution video cameras, a high-resolution display, internet connectivity, audio inputs and outputs—via a microphone, speaker, headset port, and Bluetooth connections—and advanced processing power. All of these features make smartphones ideal for a new class of applications providing on-the-go mobile telemental health (Chan et al. 2014).

One of us (P.Y.) has taken advantage of the dramatic improvements in mobile devices and no longer owns a desktop computer or a fixed telephone line at home. Instead, he use three wireless mobile devices—laptop, iPad, and iPhone—with a large computer screen that any of these devices can be plugged into if preferred for all his professional and personal activities. During the COVID-19 pandemic, P.Y. has seen all of his patients at home.

P.Y. uses three types of videoconferencing with patients (Extended Care via Epic, Zoom, and Webex) and three versions of the Epic electronic medical record (Epic, Haiku, and Canto), available on his three mobile devices, all connected via apps or a virtual private network to UC Davis Health servers. He is able to see patients and supervise residents, often situated in three different home environments at once, while using apps for education and monitoring.

Why does he do all of this? In reality all that P.Y. is doing is following international trends on the use of mobile devices, as described by Deyan G (2020). Although most mental health professionals likely still use fixed computers, younger generations of physicians and mental health clinicians are rapidly switching to fully mobile devices. The global figures, as described by Deyan G (2020), are astonishing and explain why such devices are the future of mental health in cyberspace.

Worldwide in 2020 there were 3.5 billion smartphone users, with 1.5 billion new smartphone sales and 7.9 billion mobile broadband subscriptions (104% of the world's population), with almost 10 billion smartphones in use. Globally, 67% of all users access the internet by smartphone; 81% of Americans own smartphones, and 47% of them say they could not live without them. In China (the leader in smartphone traffic) 99.3% of internet users go online using mobile devices, and globally, 56% of all website traffic in 2019 was generated by smartphones (Deyan G 2020).

The value of mobile apps and advertising is astonishing. In America, of the internet time spent on smartphones, 90% is via an app, with only 10% being via the general internet. In 2019 there were 204 billion app downloads globally, and revenue from advertising in

those apps was worth $201 billion (Deyan G 2020). App store revenue itself was worth more than $100 billion in 2020, with 76% from games and 24% from app sales, with apps projected to generate $190 billion in direct revenue in 2020.

Seventy percent of YouTube traffic is mobile, and 70% of time spent watching or listening to media is spent on smartphones or mobile devices. Not surprisingly, 68% of Twitter users are on smartphones. The consequence of this is that the average user checks their phone 58 times per day, and 66% report being addicted to their phones. Globally, 14 million jobs are directly related to the mobile industry currently, and by 2025, it is projected that 80% of global connections will be by smartphones (Deyan G 2020).

It is hardly surprising that we conclude that most mental health care in the future, when it is online, will be delivered in mobile environments, especially when we look at how smartphones are used today (Deyan G 2020). Currently, 49% of emails are already read on smartphones, and 90% of internet searches use Google. Female college students average 10 hours per day on their cell phones. For consumers in the United States, YouTube is their favorite app (81%), followed by Facebook (76%). Forty percent of all products in the United States are purchased via smartphone; 80% of shoppers use phones inside stores for reviews and to check prices, and 85% of travelers use mobile devices to book travel (Deyan G 2020).

What other advantages do mobile devices bring? They not only provide an audiovisual medium for mobile telepsychiatry but also serve as intelligent information-gathering devices for objective data. The typical smartphone is equipped with accelerometers to detect the position of the smartphone and estimate the activity of the user and Wi-Fi and GPS to locate the user, as well as software that can capture the user's interactions. These devices already provide even more, and more accurate, patient-reported data than do standard paper assessments, and wearable devices extend the functionality of smartphones with additional Bluetooth-enabled sensors that can be worn as jewelry or embedded in smartwatches or in clothing. These sensors can provide quantified data that can detect gait and movement disorders.

Novel forms of interventions are more accessible. A vast body of literature discusses computerized and internet therapeutic interventions, including improving cognition with video games, the use of virtual reality equipment for the treatment of anxiety disorders and PTSD, and internet-based cognitive therapies (Chan et al. 2017). Smartphone apps have made these interventions more portable, more accessible, and more affordable for typical users. Psychoeducation materials and bibliotherapy are more interactive on mobile platforms, and traditional worksheets and therapy homework, such as those found in cognitive-behavioral therapy (CBT), can be made interactive to increase patient engagement and retention. Wearable apps for heads-up displays have been developed to analyze facial emotions and track vital signs, and apps can even intervene in a patient with a substance use disorder at risk of relapse, alerting its user when they approach a liquor store and coaching them through difficult social situations where alcohol is readily available, such as weddings.

The common theme with these applications is the digitization and automation of much of the range of traditional therapies, making them available to patients between sessions with the therapist or perhaps supplementing traditional therapy with an "avatar therapist" between sessions. Good examples built by the U.S. Department of Veterans Affairs that act like a "therapist in the pocket" are CBT-i Coach and PTSD Coach. The potential also exists for the human therapist to be replaced entirely with a technology-based avatar that is trained to respond therapeutically to movements and language (Yellowlees et al. 2012).

Unfortunately, a downside to all these applications is that they are only occasionally backed by the latest research. The amount of financial capital flowing into the development of such devices has increased faster than the amount of research, meaning that clinical validation is not yet ready for most, and new unvetted technologies should be approached with caution despite a number of methodologies being developed to enable users to objectively evaluate them (Torous et al. 2018). In summary, the combination of massive increases in the number of mobile devices and the widespread development of multiple apps and sensors will increasingly affect the mental health professional–patient relationship, potentially making it a 24-7 cross-cultural anytime, anywhere hybrid process (Chan et al. 2015).

## Intergenerational Changes

The health care industry has been relatively slow in adapting to the social and technological changes of the past 50 years, especially at the doctor-patient interface, but that is changing with the advent of the millennial and Generation Z groups of clinicians and patients. Most of the impact of information technology in health care until the last decade has been through administrative, population-based, and electronic record systems. Hence, despite the emergence of many telemedicine and mobile technologies— and the development of more patient-centric policies and movements—the conventional in-person doctor-patient interaction is still the core of most clinical practice. Prior to the COVID-19 pandemic, most physicians and mental health professionals still practiced by preference in a broadly conservative provider-centric manner, in which communication with patients was generally in person and the use of information and communication technologies for clinical care directly with patients was still less than many patients would like (Yellowlees and Shore 2018).

The advent of advanced information and communication technologies has led to dramatic changes in all aspects of human life, so much so that young people born after the advent of the internet in 1989 are often referred to as *digital natives*. This generation was raised in an environment in which living in both real and virtual worlds simultaneously is commonplace and accepted. Many see the traditional approach to health care—in which the patient always has to physically travel to consult with a doctor—as outmoded and inconvenient, costly, and excessively time-consuming. They want to be able to receive their health care in a more accessible and immediate manner, like most other services in their lives. Nakagawa and Yellowlees (2020) documented the differences between the various generations involved in health care and the impact that these differences are having on the use of technology for patient care, across medicine,

and especially for mental health purposes. They summarized their conclusions as follows:

Younger physicians will drive technological advancement and integration faster than previous generations, allowing technology to adapt more quickly to serve the needs of clinicians and patients. These changes will improve efficiency, allow more flexible working arrangements, and increase convenience for patients and physicians. The next generation of physicians will use technology to support their work and lifestyle preferences, making them more resilient to burnout than previous generations. (Nakagawa and Yellowlees 2020)

Nakagawa and Yellowlees (2020) noted that baby boomers and Gen Z are quite different in their cognitive styles, communication preferences, and information consumption; older generations such as traditionalists and baby boomers lived in a world with less digital technology and more limited sources of information to focus on. Younger generations have more digital distractions with the internet, social media, and many potential sources of information to manage. However, they are also better suited to cognitively multitask, and because the current health care system requires physicians to process and manage so much digital information, they are naturally more adept and efficient at managing the digital aspects of their work.

Unfortunately, most technology-related decisions in health care are still made by baby boomers, leaders who shepherded the use of faxes, pagers, and electronic medical records and who had to learn and understand the technologies as they were being developed rather than being enveloped by them since birth. When digital natives are finally in the position to craft policies and champion technologies in health care, their approach will likely be very different from that of prior generations. As such, the millennials and Gen Z, the first groups of practicing mental health professionals who are digital natives, will likely manage technology, and technological change, very differently and will greatly enhance the use of cyberspace for mental health practice and psychotherapy.

## COVID-19-Related Changes

COVID-19 triggered an unprecedented easing of inhibitory regulations in relation to reimbursement for video and telephony, licensing, technical security, and geography. This dramatically accelerated telemedicine adoption, ensuring that patients and mental health professionals were able to keep physically safe in the new era of social distancing, as described in the Telepsychiatry Toolkit on the American Psychiatric Association website (www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit). At the University of California, Davis, for example, the psychiatry outpatient service converted from mostly in-person office visits to fully virtual in 3 days, and the rest of the health system converted to a largely virtual operation in 1 week (Yellowlees et al. 2020). As the pandemic continued, 8 months later in November the UC Davis psychiatric outpatients remained 100% virtual, with not only no loss of patients but also half the prior number of no-show appointments, whereas only 15%–20% of all patients attending medical and surgical outpatient appointments continued to be seen on video. In the psychiatric

clinic, all long-term therapy patients had converted to video, and psychiatry and psychology residents were being fully trained to deliver both dynamic and cognitive-behavioral psychotherapy via video by their usual faculty supervisors, all working from home. A series of previously in person trauma groups was successfully transitioned to video group meetings.

Similar accounts have been published about the transition to telemedicine for other psychiatric services, including advice on the use of video visits for psychotherapy (Cowan et al. 2020). At the Centre for Addiction and Mental Health, the largest psychiatric hospital in Canada, virtual care visits increased from approximately 350 per month to almost 3,000, an increase of more than 850%, from March to April 2020. Kaiser Permanente, the largest managed care organization in the United States, with 12 million plan members, moved rapidly to deliver 90% of its psychiatric care virtually, and an unpublished survey of 20 American psychiatrists by Peter Yellowlees found that all of them changed to fully virtual practices because of the COVID-19 pandemic, although most had not used telepsychiatry previously. Others have noted how apps and other forms of online care rapidly grew more popular, with Talkspace, an app offering text messages and therapy sessions, reporting a 65% increase in clients since the pandemic started (Perrone 2020).

In the United States, just 5% of Medicare psychiatrists provided at least one telemedicine visit in 2018. With COVID-19, the workload of many physicians changed dramatically, as did the way that they performed their work, and on the whole, physicians took to using video very well. The number of video visits paid for by insurers increased nationally by more than 4,000% in March 2020 in comparison with previous years and then by 8,800% to more than 14% of total reimbursed visits in April (FAIR Health 2020), with about half of these visits being for mental health needs.

This is progress, and these advances should not be temporary. Although COVID-19 was the trigger, the underlying benefits of increased telemedicine and remote care should be made permanent, and many patients and mental health clinicians, having now experienced the ease of virtual visits without artificial regulatory barriers, want to retain the positive consequences of this rapid technological adoption and a more consumer-driven care model. All types of therapy as described throughout this book can be delivered online, and following the start of the COVID-19 emergency, it is likely that all of them have already been so delivered.

Technologies such as telemedicine were also used to enable altered clinical workflows in response to COVID-19. These included hybrid rounding, which became popular with inpatient medical and psychiatric teams divided in space but connected by video in order to minimize exposure and use of personal protective equipment. Hybrid rounding has been in practice for quite some time in intensive care units, but COVID-19 expanded the potential of this practice across many inpatient services and also enabled services to be conferenced to and from community sites, such as dialysis or hospice care units, where a number of psychiatrists and other mental health professionals work.

COVID-19-related school closures also created an unexpected strain on working parents. The use of telemedicine allowed many clinicians, including some residents and fellows, to work at least part-time from home, alleviating some childcare burdens—a move that would have been unimaginable before COVID-19. Residents continued their training programs, with virtual didactics and mentoring; meetings and social gatherings over video; and regular check-ins and buddy systems via email, phone, and text, all rapidly put in place. These changes, driven by COVID-19 speeding up the adoption of teleworking for all clinicians during conventional office hours, at night, and on weekends, are also a reflection of generational shifts as more millennials become practicing clinicians and demand such choices, as described in the subsection "Intergenerational Changes." COVID-19 offered an opportunity to test more time and geographically flexible working arrangements that will likely lead to long-term workplace solutions that offer increased flexibility and further support the well-being of clinicians and their families, allowing clinicians to offer online psychotherapies literally anytime, anywhere.

The COVID-19 increase in videoconferencing has highlighted several issues associated with telemental health. Many patients still face challenges using and accessing videoconferencing due to both comfort and capacity as well as the *digital divide*, namely, bandwidth limitations constricting patients' access to technology. This concept also includes the wider impacts of social determinants of health that restrict access, including social and community context, education, economics, and health care systems issues (Ramsetty and Adams 2020). The consequence is that COVID-19 has also led to a significant increase in the use of the telephone to manage patients, with a recent survey of American Psychiatric Association members indicating that up to 25% were using only the telephone for telehealth encounters because of either access or other patient barriers (American Psychiatric Association 2020b). The literature on psychiatric treatments via telephone has been limited to structured evidence-based therapies (Everitt et al. 2019) and interactive voice response treatments (Rose et al. 2017). This literature is sparse or absent with regard to the ability of therapists to complete full psychiatric assessments, conduct treatments, and administer the full range of psychotherapy via the telephone compared with in-person or video interactions outside the aforementioned areas. Current clinical activity in this area appears to be occurring on a case-by-case basis depending on provider comfort, patient characteristics, technology access, and social circumstances. It remains in the domain of the individual provider to weigh the benefits of phone-based treatment (access and availability) compared with the risks (sparse guides on pairing appropriate treatments with patients) and to exercise their judgment on providing the best treatment possible during COVID-19.

Another major COVID-19-related issue is a concept getting wide attention: *videoconferencing fatigue* or *Zoom fatigue*, named by the press after a popular videoconferencing platform. The media and public have associated this concept specifically with videoconferencing, and because it is new to the vernacular, the current data for this are largely anecdotal. Given the need to make large aspects of work and personal life virtual, some fatigue with technologies is not surprising, but arguably, the causation is more complex and multifactorial. Possible contributors to this fatigue include having to rapidly adapt to a new set of clinical and administrative skills (e.g.,

videoconferencing) without a full implementation process or training. One also cannot discount the impact that living in quarantine during an international pandemic has on overall stress and energy. Although no single solution for this fatigue exists, using best practices for videoconferencing, including the following, may help to alleviate some of these issues:

- Assure adequate training, knowledge, and skills in the use of videoconferencing.
- Develop comfortable work spaces with attention to lighting, air flow, and ergonomics (e.g., chairs, monitors).
- Take breaks and schedule a diversity of work (e.g., administrative, calls) throughout the day between videoconferences and vary the types of videoconferencing.
- Use team-based approaches to virtual work, making sure to connect as a team with additional time for team bonding and informal discussions.
- Work to reach out and connect with team members at a human level; according to Mark Twain, "Against the assault of laughter, nothing can stand."

Organizations should make sure they offer training in best practices for virtual group meetings and facilitations (e.g., have an agenda, draw out quiet individuals, attempt to have equal participation).

## How Can Patients Be Matched With Virtual Therapies?

A growing and robust literature demonstrates the effectiveness of all therapy in general delivered over videoconferencing (Bashshur et al. 2014; Chherawala and Gill 2020; Hubley et al. 2016) as well as therapy tailored to specific diagnoses (Shore et al. 2020a) and specific therapies or modalities (Wright and Mishkind 2020). A crucial task for the therapist is to appropriately pair the patient's problem with the planned therapy and determine the best technology to deliver the treatment. This should be accomplished in an organized and stepwise fashion by first assessing the patient and then matching the treatment and selecting the delivery method.

An initial session, which can be conducted over video, should include assessments of the patient's history and diagnosis and the problem to be addressed as well as their technology access (bandwidth, equipment, privacy), setting (office, home, other), therapy and technology preferences, and prior experience and comfort with technology. The therapist should recognize that prior experience with technology and the type of technology used may affect the therapeutic alliance, rapport, and engagement (Hubley et al. 2016; Lopez et al. 2019). This information can then be synthesized with the clinician's training, experience, and knowledge to recommend specific treatment.

Evidence is variable across different types of therapies regarding their use in videoconferencing, with some having a more robust literature base and documentation, such as the literature around CBT for depression, and others having scant or no description in the telepsychiatry literature, such as dynamic psychotherapy. The COVID-19 pandemic and subsequent public health response have caused widespread

virtualization of health care to address social distancing requirements. Under the COVID-19 emergency almost all therapies have been virtualized to some extent, even those lacking a more detailed formal literature and evidence base (Chherawala and Gill 2020; Shore et al. 2020a). It is anticipated that the literature will continue to catch up with current practice in the coming years as the experience of therapy during the COVID-19 pandemic is described and documented. Because we know that psychotherapy can be delivered over video, it is reasonable to argue that an individual literature exploration consisting of randomized controlled trials for each individual type of therapy is not required at this point. Indeed, even before COVID-19, research in this area had moved beyond effectiveness trials comparing in-person to virtual treatments to new treatments in which technology is an integral part of the intervention.

Delivery through videoconferencing has been investigated for a number of structured evidence-based psychotherapies. Medication management, with its associated psychoeducation and supportive therapies, was one of the first applications of telepsychiatry (Hubley et al. 2016). Many of these have modifications and adaptations for remote delivery, including cognitive-behavioral therapy, family-focused therapy, and prolonged exposure therapy (Dausch et al. 2009; Hubley et al. 2016; Olden et al. 2017). Often, these therapies have specified and manualized adaptations for their administration through videoconferencing or other technologies that can guide the clinician. Other types of individual psychotherapies, including dynamic, psychoanalytic, and supportive therapies, have been successfully completed via videoconferencing, although the literature is less complete outside descriptive papers and proffered best practices. A small but longer-standing body of literature discusses group modalities for telepsychiatry, including structured or limited group treatments, supportive groups, and marital and family treatments (Dausch et al. 2009; Lopez et al. 2019; Van Voorhees et al. 2019). Team-based approaches to treatment that blend in-person and virtual visits with behavioral health team members to deliver an array of interventions, including group and individual therapy, have been well documented and include virtual integrated care services and substance use interventions (Shore 2019).

When selecting the recommended psychotherapy, clinicians should also strongly consider the technology used for the treatment. Although the majority of the literature has focused on synchronous videoconferencing, experience with web-based therapies, apps, text, and email in both real time (synchronous) and asynchronous time is emerging and expanding (Chan et al. 2017). These interventions can be stand-alone, such as a randomized controlled trial that demonstrated the effectiveness of a text message–based maintenance intervention for major depressive disorder after inpatient CBT (Schlicker et al. 2018). Alternatively, technologies or modalities can be combined together or used in conjunction with in-person treatment. For example, a CBT web-based treatment model that covers a range of cognitive-behavioral skills (Shi et al. 2019) was shown to be effective for outpatient substance use treatment as an add-on and as a stand-alone treatment. Other web-based treatments have been developed to support in-person treatment (computer-assisted therapy) such as in the case of psychotherapy for depression (Thase et al. 2018). Mobile apps offer promise in terms of variety, portability, and conveyance but remain in the early stage of development, with limited information on their effectiveness (Wright et al. 2019).

# What Are the Practical and Psychotherapeutic Advantages of Telehealth for Patients and Therapists?

## Convenience, Safety, and Satisfaction

In this era of an increasingly patient-focused approach to care, the scientific literature on telemedicine for many years has shown the remarkable trend that patients express continuously high satisfaction rates once they have experienced telemedicine in many different clinical specialties, from psychiatry to surgery (Hilty et al. 2013). Although many factors contribute to patient satisfaction, one that is repeatedly mentioned in the literature is the convenient empathic connection that patients feel that they can make with their telemedicine providers. This may be because of the greater and more direct amount of eye contact that tends to occur in telemedicine consultations compared with the typical in-person consultation. Other reasons for the high satisfaction rates include reduced patient anxiety resulting from patients being seen in or close to their homes in personally comfortable and nonintimidating surroundings, with added benefits from savings in reduced travel time and cost as their therapists are "beamed in" from afar. Psychiatrists and other mental health professionals have certainly found delivering online therapies to be more convenient and physically safe during COVID-19, although some have expressed doubts about efficacy. The U.S. Department of Health and Human Services (2020) was unequivocal in its advice:

We encourage health care providers to adopt and use telehealth as a way to safely provide care to your patients in appropriate situations, including: routine health care, like wellness visits; medication consultation; dermatology (skin care); eye exams; nutrition counseling; mental health counseling.

## Power

A subtler issue concerns the power relationship between doctor and patient; in the in-person relationship, the doctor typically has more authority and the psychological advantage of being in their own clinic or environment. Patients tend to feel more in control during video consultations and can, if they wish, literally switch off the doctor on their end and leave the consultation without any physical embarrassment or loss of face. Much has been written about the power issues between doctors and patients (Yellowlees and Shore 2018), but it seems clear that the online relationship, in most situations, tends to be more egalitarian than the one that occurs in person. This is something that today's patients, with their need for more patient-focused care approaches, greatly value. The environment of the patient's home or workplace, by virtue of its familiarity, likely has a containing effect for the patient, which may help the patient to feel more at ease both in initiating therapy and in being honest and forthcoming with the therapist. Similarly, the therapist has the option to see the patient from a setting that is more containing for them, such as the comfort of the therapist's own desk space at their office—which is not typically a portion of the office shared with the patient—or even from the therapist's home. This geographical relocation may help both parties to feel more relaxed or settled and could foster the development of psychotherapeutic intimacy.

Kocsis and Yellowlees (2018) noted that the patient frequently experiences a greater sense of physical and psychological control over the session in online psychotherapy; simultaneously, the therapist is less likely to be successful with a paternalistic approach. This combination means that in general, treatment styles are more likely to be patient centered. Traditional in-person psychotherapy gives the therapist the advantage of conducting sessions from the familiarity of their office or clinic, which is an unfamiliar space for the patient. Coupled with the increased eye contact and the use of the virtual space, as described in the subsection "Virtual Space," all of these factors combine to drive the relationship into a more egalitarian space (Yellowlees 2018).

## Hybrid Care

The use of a hybrid model combining in-person therapy and telepsychotherapy was described in detail by Yellowlees and Shore (2018, p. 254), who defined a hybrid psychiatrist as a clinician who

interacts with patients both in person and online so that their doctor-patient relationship crosses both environments. The addition of interactions via videoconferencing, e-mail, text messaging and telephony leads to improved access and interactions at times and places not possible with care restricted to the in-person venue. This hybrid practice is becoming a preferred model of care for many physicians as secure messaging is incorporated into electronic medical record (EMR) systems. It is especially relevant to telepsychiatry as a range of video technologies, text-based systems, and apps can readily complement in-person care depending on the psychiatrist's and patient's preferences. . . . The incorporation of online models of care into practice can strengthen the doctor-patient relationship by increasing empathy and forming a trusting therapeutic bond.

The American Psychiatric Association (2020a) has published a guidance document for members about opening their practice during COVID-19 with the following advice:

The safest way to continue providing treatment is through telehealth when feasible, particularly if this has been a viable option to date. Many patients may want to continue working in a hybrid way, with a mix of in-person and telehealth visits.

It is likely that in the post-COVID-19 world, many, if not most, mental health professionals will continue to practice in this hybrid manner, seeing patients both online and in person, depending on mutual convenience and preference. This may well lead to the development of a number of novel future psychotherapies that take the best aspects of both in-person and online models of care and therapy and combine them. This is already happening, with Fortney et al. (2015a) describing the use of online video sessions with veterans who have PTSD as an engagement strategy to eventually lead to them attending in-person group sessions.

## Teamwork

Another significant advantage of video consultations over traditional in-person clinical care is that they give us the ability to work more effectively in teams; across disciplines; and with patients, their families, and local providers (Fortney et al. 2015a; Hilty et al. 2013; Yellowlees and Shore 2018) in a collaborative care model, especially in primary care. This involves working within the concept of the primary care medical home, for which Myers et al. (2015) showed how short-term therapies can be integrated into a collaborative team-based model of care for children with ADHD. Fortney et al. (2015b) demonstrated that online video cognitive-behavioral psychotherapy sessions can actually lead to enhanced in-person care if they are added to usual care. Their research showed that video-based psychotherapy was actually more effective than in-person psychotherapy with patients with PTSD and that the evidence-based psychotherapy given online had better fidelity than that given in person. In some of his studies Fortney also showed that in this group of typically avoidant veterans with PTSD, the use of this hybrid model of online and in-person care actually led to enhanced patient engagement, as well as improved clinical outcomes. This work has led to the Study to Promote Innovation in Rural Integrated Telepsychiatry (SPIRIT) trial, for which Fortney and his team have been funded to compare the outcomes of team-based telepsychiatry collaborative care with traditional telepsychiatry individual referrals and treatments (Fortney et al. 2020). It will be fascinating to see whether the telepsychiatry team-based care in this pragmatic comparative effectiveness trial for patients with bipolar disorder or PTSD has better outcomes than the traditional telemental health treatment process.

Clearly, many of the therapies described in this book involve the use of groups or teams of therapists or patients, and the ability to bring everyone together in a single online video room makes group sessions very much more convenient and easy to attend. A number of studies have examined group therapy delivered by video, ranging from that of Xie et al. (2013), who demonstrated the effectiveness of video for teaching parent training skills to parents of children with ADHD, to numerous papers examining the effectiveness of video group therapy in veterans with PTSD (Morland et al. 2015).

A final recent example is the group therapy meetings delivered over video by Alcoholics Anonymous and related organizations that were introduced as a result of COVID-19. These have been taken up enthusiastically by many patients with alcohol and substance use disorders, with some meetings involving more than 500 attendees from many states or countries. Anecdotal stories given to us by some attendees indicate that these meetings have been very positive.

## Virtual Space

Online consultation addresses the two major weaknesses of in-person consultation, *physical access* and the *power differential*, as already described in the subsections "Convenience, Safety, and Satisfaction" and "Power," and adds a third component that is clinically useful: the existence and use of a *virtual space* between the patient and therapist. There are two components of the virtual space that affect both provider and patient: physical and psychological, as described in detail by Yellowlees and Shore (2018) and Yellowlees et al. (2015).

At the most basic level, the *physical space* and separation for providers enhance a feeling of safety, particularly when seeing patients who are physically dangerous or who inhabit potentially dangerous environments, such as correctional institutions. Interestingly, this feeling of safety also allows providers to give much more direct feedback to patients about their diagnosis and treatment plan than they might give in consultations where the patient is physically present in the room. This is especially true if this feedback involves comments on substance-related, behavioral, or personality-focused issues that the patient may not wish to hear about or may disagree with. From the patient's perspective, it is also common for patients living in small communities, which are increasingly being serviced by telemedicine, to prefer to see a physician who does not live in their community to decrease the probability of a loss of confidentiality.

The *psychological space* and distancing are much more important and have differing impacts on providers and patients. It is possible to have intense, intimate, and empathic relationships over videoconferencing. Many long-distance relationships are started and maintained on easily available videoconferencing software platforms all around the world and in all cultures. These systems allow users to clearly show and detect emotions, connect with each other, and interact empathically on today's high-quality video systems with which they can see and hear each other over video and audio that have the quality of high-definition television. The psychological extra distance that both partners in the consultation frequently initially notice tends to reduce markedly after a few minutes.

The psychological space is especially important for patients and frequently allows them to have more intimate conversations with their providers than they would have in a physical consultation. Religions around the world have understood the importance of this virtual space for centuries, with parishioners in a confessional box telling intimate stories about themselves to a priest who is close by and who they know is listening but who is distant and not physically seen. Similarly, when the topic of conversation is possibly embarrassing, stigmatizing, or awkward, people find it easier to discuss it on video or online and respond more honestly when there is a small amount of virtual distance or virtual space, compared with an in-person interview (Yellowlees and Shore 2018). For instance, a woman who has just been raped may feel uncomfortable talking to a male therapist in the same room. The extra distance of a video consultation makes even someone who is well known and trusted appear just a bit more distant and therefore the discussion is less threatening or potentially embarrassing.

For providers, the psychological space allows them to be simultaneously part of the consultation but also more of an objective observer of the consultation. This occurs most commonly when seeing children with behavioral disorders; often, mental health professionals engage the child's parents initially to take a history from them, but at the same time they can observe through the video the child's behavior, the interactions between the child and the parents, and the parents' parenting and disciplinary skills. Such objective observation is more difficult in the in-person consultation because the family in this situation tends to be much more aware of the physician's physical presence (Pakyurek et al. 2010).

**Return of the Home Visit**

Since the introduction of smartphones and mobile devices such as tablets in about 2007, it has suddenly become possible to easily connect with patients directly in their homes, their workplaces, social environments, and their vehicles rather than having to see them in primary care clinics, which has been the case with traditional telepsychiatry. This has revolutionized the practice of telemental health, especially following the adaptation of American Telemedicine Association guidelines for delivering video mental health care at home or in community settings (Shore et al. 2018). These guidelines importantly included standard operating procedures to ensure patient safety.

Most telepsychiatrists now deliver care direct to patients in nonclinical community settings routinely. It should be noted that patient privacy still warrants careful attention even in home settings because many patients live in space shared with others, and ensuring the availability of a quiet, secluded space in the patient's home is essential. The home offers many more opportunities to get to know patients and to further deepen understanding and the level of the doctor-patient relationship. It is possible to take a tour of the home and garden and thereby discover a patient's interests such as art, from pictures on the walls, or sports, from memorabilia on counters. Equally, it is possible to see how a patient lives more easily than when meeting them only in a clinic. Is their home neat and tidy or chaotic? Do they have personal space? Do they have pets, and how do they look after them? What about others in the family? Can you speak to parents, partners, and children and perhaps get a better idea of the patient's relationships and the views of people important in their lives about how the patient is coping? Does the patient have food in the house? Is there a surprising number of bottles of alcohol in evidence? Is there a suggestion of disorganization, with unwashed plates in the kitchen and dirty clothes on the floor? Does the patient have a sense of pride and commitment to their home, and are they interested in gardening and prepared to show you around not just the house but also the garden and immediate locality to give you more of an idea of how and where they live?

Answers to these sorts of questions used to be obtained only by literally making physical home visits, but now that making such visits virtually is possible, this extra knowledge can often be easily obtained and used to help the patient. We mentioned at the beginning of this chapter how the new therapy room is the equivalent of the car and how the ability to connect to people's homes during the COVID-19 pandemic has allowed many thousands of patients to continue receiving psychotherapy in many different forms, and it will continue to do so in future.

# Why Do Some Patients Prefer Telepsychiatry to In-Person Care for Therapy?

Increasing numbers of patients prefer to be seen through telemedicine rather than in person for a range of reasons, including personal preference, convenience, cost, and stigma minimization. These individuals include not only patients who are anxious,

avoidant, shy, or paranoid but also those who are reticent to see physicians at the best of times, such as young males, as well as many from younger generations who see video interactions as being not only normal but preferred. Some new telemedicine services specifically target people with stigmatized disorders, such as erectile dysfunction, baldness, and HIV, offering a combination of highly private medical assessments, prescribing, and counseling. Many patients are still afraid of seeing psychiatrists, but some feel calmer about the process if they can have the consultation at a distance on video, either from their primary care clinic or, increasingly, from home. Obviously, with the recent drivers of telepsychiatry, namely, COVID-19, mobile devices, and the younger age demographics of both patients and therapists, these patients have been joined by many others for whom telepsychiatry initially became essential to continue their care but who now have become accustomed to this modality.

A number of video consultation services to the home that are offered as part of concierge practices or through privately owned telepsychiatry companies have emerged and are marketed as a more convenient time-saving service that improves access to physicians and therapists. These services tend to attract as patients individuals who are VIPs or celebrities, as well as doctors, lawyers, and businesspeople who have psychiatric or substance-related disorders or who just prefer more privacy for all of their health care, perhaps because they have a stigmatized disorder. These people prefer to have their consultations in extreme privacy for many reasons and often wish to be seen from their homes, which has been possible via mobile devices in recent years, as well as pay cash for services. This ensures that their psychiatric history is not potentially available to insurance company databases and ends the possibility of the VIP being photographed and "outed" outside a therapist's office.

Finally, increasing numbers of patients are seeking video opinions from physicians who are known to be national or international experts in a particular area but who are otherwise inaccessible. This is especially important for patients with rare diseases, those who wish to receive unusual or highly specialized treatments from acknowledged national experts, or those who wish to have an unusual therapy for which no locally licensed or trained practitioners are available.

After years of practice by many psychiatrists and psychotherapists, the consensus of the field is clear that any type of patient may be seen using videoconferencing (Bashshur et al. 2016). The only absolute contraindications to a psychiatric interview are if the patient refuses to attend, as some do, or if they are actively acting out and demonstrating dangerous behavior to themselves or others at the time of the interview. However, a number of groups of patients have other specific psychotherapeutic issues that are of importance and should be considered, as described by Kocsis and Yellowlees (2018).

## Patients With Psychotic Disorders

Some patients with psychotic disorders may do better receiving therapy by video than in person because they often feel unsafe by virtue of their illness and may feel more at ease when the provider is not in the room and they are distanced by video. Sharp et al. (2011) found that psychiatric care through videoconferencing was well tolerated by

patients with psychotic disorders and that the increased physical and psychological distance afforded by the modality may reduce anxiety in this population. For especially paranoid patients, offering to temporarily point the camera away from them (so that the provider has only audio information but the patient can still both see and hear the provider) may provide enough distance that the patient feels safer. Additionally, the therapist may feel safer with the removal of the threat of physical harm by patients with psychotic disorders who are potentially assaultive. This enables the therapist to be both more relaxed and more direct when communicating with such patients. Many county mental health systems now routinely hold telepsychiatry clinics for patients with chronic psychoses where supportive psychotherapy and medication management are provided by a psychiatrist from afar, often in tandem with a local caseworker sitting in with their patient.

## Highly Anxious Patients

Psychotherapy over video may be particularly helpful for anxious patients who have difficulty with leaving the home, especially if their difficulty is related to agoraphobia or other phobias (Morland et al. 2015), which has been the case with many patients during the COVID-19 pandemic. With a video-based modality, patients who might otherwise delay or forego treatment can access a therapeutic relationship in a way that feels safe for them. If a cognitive-behavioral therapeutic model is used for treatment, having the patient eventually come to the therapist's office could be set as a goal for therapy or could specifically serve as one of the steps in a set of gradually escalating exposures (Kocsis and Yellowlees 2018).

## Autistic Patients

Autistic patients struggle with tolerating novel environments, and many have difficulty with the social norms and sensory experience of visiting the office of a doctor or therapist. Many higher-functioning autistic persons enjoy using computers and find a sense of community online, such that they may feel more comfortable with this modality for receiving psychiatric and psychotherapeutic care, and a number of such programs have transitioned to an online modality during the COVID-19 pandemic.

## Children and Teens

Younger children may be less nervous at home than in a therapist's office, and thus the therapist may get a more accurate picture of the child's everyday behavior from the less intrusive vantage of telepsychotherapy (Pakyurek et al. 2010). Additionally, many teens today spend a considerable amount of time online, and they may be more comfortable using online modalities to obtain mental health services.

## Traumatized Patients

Patients with significant childhood abuse histories may have an especially difficult time feeling safe around the authority figure of the doctor or therapist. For victims of sexual

abuse or rape, the intimate setting of the therapist's office and the potential gender difference between patient and provider may cause considerable anxiety. An online approach may help to build important initial rapport and safety. Morland and colleagues (2015) conducted several studies examining the use of teleconferencing for delivery of psychotherapeutic treatments in both veteran and nonveteran populations with PTSD. This work has shown that cognitive processing therapy (both individual and group) and CBT over videoconference are not inferior to in-person delivery of these modalities. The advantages of telepsychotherapy, as well as the potential for increased privacy, may make this modality preferable for treatment of some patients with PTSD.

**Patients With Personality Disorders**

Telepsychiatry for patients with personality disorders has been discussed in detail by Kocsis and Yellowlees (2018), who concluded that more research is needed to assess the particular aspects of caring for this group of patients online. They suggested that a hybrid approach or exclusively in-person sessions may be necessary for some patients at the beginning of treatment because many patients with personality disorder may struggle without the literal, concrete presence of the therapist in the room. They noted that when caring for these patients, the therapist will have to be attentive to setting boundaries and maintaining a consistent frame just as in person. Morland et al. (2015) noted that a specific discussion of boundaries is important for the effective delivery of psychotherapy over video because Morland observed some of her patients engaging in multitasking activities such as cooking during therapy sessions taking place at home. An area of particular importance for this group of patients is the maintenance of boundaries around times of access to the therapist to ensure that the therapist does not become burned out responding to every patient contact any time of the day or night.

# What Clinical and Organizational Skills Do Therapists Require to Work Successfully Online With Their Patients?

For any therapist wanting to work in this area, the first thing to review is the website for the American Telemedicine Association (www.americantelemed.org). The most important document to download is the mental health guidelines from 2018, which cover in detail all the technical, clinical, administrative, and legal issues anyone will need to be aware of to successfully practice online mental health and to provide short-term online psychotherapy. Equally important is a detailed downloadable list of state and licensing regulations and rules for all 50 states available from the American Telemedicine Association (www.americantelemed.org). The other key website is the American Psychiatric Association's (2021) Telepsychiatry Toolkit, which includes multiple written resources and more than 30 video clips describing differing aspects of telepsychiatry practice. A textbook covering most aspects of telepsychiatry, from planning to implementation, describes the following practical issues (Yellowlees and Shore 2018):

- Planning the overall implementation of video services and teleconsultations to provide the therapy that you wish to undertake
- Type of technology to be used and a needs analysis
- Technical and media training, clinical policies required, knowledge and implementation of administrative and safety guidelines, possible staffing, and role changes in the clinic
- Business aspects (e.g., understanding legal, licensing, and local regulations; credentialing; and billing and payment issues)

The key clinical policies that most practices will need to address are as follows:

- Release of information and informed consent as required by your state
- Intake procedures, appointment scheduling, synchronizing schedules at all sites, and staff roles and responsibilities
- Ensuring privacy and confidentiality; use of electronic medical records; and the transmission of prescriptions, laboratory orders, and progress notes as necessary

## How Will We Practice in the Future?

Telepsychiatry allows practitioners to practice routinely in a hybrid manner, with patients seeing individuals both in person and online, depending on the practitioner's and patient's mutual convenience and wishes. In the future telepsychiatry will increasingly be considered a best practice that improves, augments, and replaces some of our current in-person practices with primarily mobile technologically driven and supported interventions, as described in this chapter.

The future psychiatrist-patient relationship will be a hybrid form, both in person and online. This relationship will include the core strengths of the traditional in-person medical consultation, which has long been the gold standard for practice, in which there is immediacy and trust in the personal interaction and use of the relationship, through transference and countertransference, can lead to healing and support. This will be supplemented and improved by online interactions through multiple modalities: video, text, apps, virtual reality, and artificial intelligence. These provide patients better convenience and improved access to their providers, potentially anytime, anywhere, and make the whole relationship more egalitarian, whatever the type of psychotherapy being used. For providers the online component of the relationship may also be more convenient, allowing them to work from home at preferred times and freeing them from the typical business week practice while also enhancing their safety with certain patient groups.

The practice of psychiatry, and mental health more generally, is changing and promises to be very different in future decades. Even more nascent, but potentially more intriguing, is the future use of automated computerized programs such as chatbots to provide psychotherapy by using ever-expanding artificial intelligence (AI) technologies. These chatbots are AI programs that attempt to simulate human conversation and interactions (Moore and Caudill 2019), and although AI is still in a conceptual and

experimental stage, the potential for AI collaboration and support of traditional therapists both brings with it an exciting potential but also raises a host of ethical, quality-of-care, and workforce issues that will need to be appropriately addressed and navigated.

Some therapists will, of course, always prefer to practice completely or almost entirely in person, and many patients will prefer this modality. Ensuring that such choices continue to be available is important, whatever revolutionary changes in mental health practice in cyberspace become available over time. Ensuring that AI is used to enhance and support the human connection between therapist and patient and not to diminish it will be important.

### Key Points

1. Telepsychiatry outcomes and patient satisfaction rates are similar to in-person care, with some patients and providers preferring online care, especially when delivered to and from their homes.
2. The hybrid doctor-patient relationship, both in-person and online, in the post-pandemic world is likely to become increasingly common.
3. Online psychotherapy has become common in recent years, driven by technological improvements and the move to mobile devices, changing demographics with younger patients and providers, and the need for safety and social distancing during the pandemic.
4. Online psychotherapy has a number of advantages over in-person therapy, especially the use of the "virtual space" in the consultation, and differing technologies can be matched to the needs of individual patients.

## References

- American Psychiatric Association: Guidance document on reopening practices. Washington, DC, American Psychiatric Association, 2020a. Available at: www.psychiatry.org/psychiatrists/covid-19-coronavirus. Accessed August 24, 2020.
- American Psychiatric Association: Psychiatrists use of telepsychiatry during COVID-19 public health emergency: survey results. Washington, DC, American Psychiatric Association, June 2020b. Available at: www.psychiatry.org/File%20Library/Psychiatrists/Practice/Telepsychiatry/APA-Telehealth-Survey-2020.pdf. Accessed August 28, 2020.
- American Psychiatric Association: Telepsychiatry Toolkit. Washington, DC, American Psychiatric Association, 2021. Available at: www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit. Accessed October 11, 2021.
- Bashshur RL, Shannon GW, Smith BR, et al: The empirical foundations of telemedicine interventions for chronic disease management. Telemed J E Health 20(9):769–800, 2014

- Bashshur RL, Shannon GW, Bashshur N, et al: The empirical evidence for telemedicine interventions in mental disorders. Telemed J E Health 22(2):87–113, 2016

- Chan SR, Torous J, Hinton L, et al: Mobile tele-mental health: increasing applications and a move to hybrid models of care. Healthcare (Basel) 2(2):220–233, 2014

- Chan S, Parish M, Yellowlees P: Telepsychiatry today. Curr Psychiatry Rep 17(11):89, 2015

- Chan S, Godwin H, Gonzalez A, et al: Review of use and integration of mobile apps into psychiatric treatments. Curr Psychiatry Rep 19(12):96, 2017

- Chherawala N, Gill S: Up-to-date review of psychotherapy via videoconference: implications and recommendations for the RANZCP Psychotherapy Written Case during the COVID-19 pandemic. Australas Psychiatry 28(5):517–520, 2020

- Cowan A, Johnson R, Close H: Telepsychiatry in psychotherapy practice. Innov Clin Neurosci 17(4–6):23–26, 2020

- Dausch BM, Miklowitz DJ, Nagamoto HT, et al: Family focused therapy via videoconferencing. J Telemed Telecare 15(4):211–214, 2009

- Deyan G: 67+ revealing smartphone statistics for 2020. Techjury, July 31, 2020. Available at: https://techjury.net/blog/smartphone-usage-statistics/#gref. Accessed October 8, 2021.

- Everitt HA, Landau S, O'Reilly G, et al: Assessing telephone-delivered cognitive-behavioural therapy (CBT) and web-delivered CBT versus treatment as usual in irritable bowel syndrome (ACTIB): a multicentre randomised trial. Gut 68(9):1613–1623, 2019

- FAIR Health: Monthly telehealth regional tracker. New York, FAIR Health, 2020. Available at: www.fairhealth.org/states-by-the-numbers/telehealth. Accessed February 14, 2022.

- Fortney JC, Pyne JM, Kimbrell TA, et al: Telemedicine-based collaborative care for posttraumatic stress disorder: a randomized clinical trial. JAMA Psychiatry 72(1):58–67, 2015a

- Fortney JC, Pyne JM, Turner EE, et al: Telepsychiatry integration of mental health services into rural primary care settings. Int Rev Psychiatry 27(6):525–539, 2015b

- Fortney JC, Heagerty PJ, Bauer AM, et al: Study to Promote Innovation in Rural Integrated Telepsychiatry (SPIRIT): rationale and design of a randomized comparative effectiveness trial of managing complex psychiatric disorders in rural primary care clinics. Contemp Clin Trials 90:105873, 2020

- Hilty DM, Ferrer DC, Parish MB, et al: The effectiveness of telemental health: a 2013 review. Telemed J E Health 19(6):444–454, 2013

- Hubley S, Lynch SB, Schneck C, et al: Review of key telepsychiatry outcomes. World J Psychiatry 6(2):269–282, 2016

- Kocsis BJ, Yellowlees P: Telepsychotherapy and the therapeutic relationship: principles, advantages, and case examples. Telemed J E Health 24(5):329–334, 2018

- Lopez A, Schwenk S, Schneck CD, et al: Technology-based mental health treatment and the impact on the therapeutic alliance. Curr Psychiatry Rep 21(8):76, 2019

- Moore JR, Caudill R: The bot will see you now: a history and review of interactive computerized mental health programs. Psychiatr Clin North Am 42(4):627–634, 2019

- Morland LA, Poizner JM, Williams KE, et al: Home-based clinical video teleconferencing care: clinical considerations and future directions. Int Rev Psychiatry 27(6):504–512, 2015

- Myers K, Vander Stoep A, Zhou C, et al: Effectiveness of a telehealth service delivery model for treating attention-deficit/hyperactivity disorder: a community-based randomized controlled trial. J Am Acad Child Adolesc Psychiatry 54(4):263–274, 2015

- Nakagawa K, Yellowlees P: Inter-generational effects of technology: why millennial physicians may be less at risk for burnout than baby boomers. Curr Psychiatry Rep 22(9):45, 2020

- Olden M, Shingleton R, Finkelstein-Fox L, et al: Telemedicine exposure therapy and assessment for PTSD: a systematic clinical practice narrative review. J Technol Behav Sci 1(1–4):22–31, 2017

- Pakyurek M, Yellowlees P, Hilty D: The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? Telemed J E Health 16(3):289–292, 2010

- Perrone M: Virus drives new demand for Talkspace's online therapy. May 10, 2020. Available at: https://abcnews.go.com/US/wireStory/virus-drives-demand-talkspaces-online-therapy-70603681. Accessed October 8, 2021.

- Ramsetty A, Adams C: Impact of the digital divide in the age of COVID-19. J Am Med Inform Assoc 27(7):1147–1148, 2020

- Rose GL, Badger GJ, Skelly JM, et al: A randomized controlled trial of brief intervention by interactive voice response. Alcohol Alcohol 52(3):335–343, 2017

- Saeed SA, Shore JH, Yellowlees P: Using technology for providing care, in Textbook of Psychiatric Administration and Leadership, 3rd Edition. Edited by Saeed S, Lauriello J, Roberts LW. Washington, DC, American Psychiatric Association Publishing, in press

- Schlicker S, Ebert DD, Middendorf T, et al: Evaluation of a text-message-based maintenance intervention for major depressive disorder after inpatient cognitive behavioral therapy. J Affect Disord 227:305–312, 2018

- Sharp IR, Kobak KA, Osman DA: The use of videoconferencing with patients with psychosis: a review of the literature. Ann Gen Psychiatry 10(1):14, 2011

- Shi JM, Henry SP, Dwy SL, et al: Randomized pilot trial of web-based cognitive-behavioral therapy adapted for use in office-based buprenorphine maintenance. Subst Abus 40(2):132–135, 2019
- Shore JH: Best practices in tele-teaming: managing virtual teams in the delivery of care in telepsychiatry. Curr Psychiatry Rep 21(8):77, 2019
- Shore JH, Yellowlees P, Caudill R, et al: Best practices in videoconferencing-based telemental health April 2018. Telemed J E Health 24(11):827–832, 2018
- Shore JH, Schneck CD, Mishkind M, et al: Advancing treatment of depression and other mood disorders through innovative models of telepsychiatry. Focus Am Psychiatr Publ 18(2):169–174, 2020a
- Shore JH, Schneck CD, Mishkind MC: Telepsychiatry and the coronavirus disease 2019 pandemic: current and future outcomes of the rapid virtualization of psychiatric care. JAMA Psychiatry 77(12):1211–1212, 2020b
- Thase ME, Wright JH, Eells TD, et al: Improving the efficiency of psychotherapy for depression: computer-assisted versus standard CBT. Am J Psychiatry 175(3):242–250, 2018
- Torous J, Firth J, Huckvale K, et al: The emerging imperative for a consensus approach toward the rating and clinical recommendation of mental health apps. J Nerv Ment Dis 206(8):662–666, 2018
- U.S. Department of Health and Human Services: Telehealth: delivering care safely during COVID-19. Washington, DC, U.S. Department of Health and Human Services, July 15, 2020. Available at: www.hhs.gov/coronavirus/telehealth/index.html. Accessed October 11, 2021.
- Van Voorhees EE, Dillon KH, Wilson SM, et al: A comparison of group anger management treatments for combat veterans with PTSD: results from a quasi-experimental trial. J Interpers Violence 36(19–20):NP10276–NP10300, 2019
- Waugh M, Yellowlees PM, Dixon R, et al: Telepsychiatry, in Understanding Telehealth. Edited by Rheuban KS, Krupinski EA. New York, McGraw Hill, 2018, pp 125–132
- Wright JH, Mishkind M: Computer-assisted CBT and mobile apps for depression: assessment and integration into clinical care. Focus Am Psychiatr Publ 18(2):162–168, 2020
- Wright JH, Mishkind M, Eells TD, et al: Computer-assisted cognitive-behavior therapy and mobile apps for depression and anxiety. Curr Psychiatry Rep 21(7):62, 2019
- Xie Y, Dixon JF, Yee OM, et al: A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with ADHD. Telemed J E Health 19(3):192–199, 2013
- Yellowlees P: Telepsychiatry, in The Art and Science of Brief Psychotherapies: A Practitioner's Guide, 3rd Edition. Edited by Dewan M, Steenbarger B, Greenberg R. Washington, DC, American Psychiatric Association Publishing, 2018, pp 303–314

- Yellowlees PM, Liu B: Suicide prevention programs, in The American Psychiatric Association Publishing Textbook of Suicide Risk Assessment and Management, 3rd Edition. Edited by Gold L, Frierson RL. Washington, DC, American Psychiatric Association Publishing, 2020, pp 391–402

- Yellowlees PM, Shore J: Telepsychiatry and Health Technologies: A Guide for Mental Health Professionals. Washington, DC, American Psychiatric Association Publishing, 2018

- Yellowlees PM, Shore JH: Hybrid practitioners and digital treatments, in The American Psychiatric Assocation Publishing Textbook of Psychiatry. Edited by Roberts LW. Washington, DC, American Psychiatric Association Publishing, 2019, pp 1041–1056

- Yellowlees PM, Holloway KM, Parish MB: Therapy in virtual environments—clinical and ethical issues. Telemed J E Health 18(7):558–564, 2012

- Yellowlees P, Chan SR, Parish MB: The hybrid doctor-patient relationship in the age of technology—telepsychiatry consultations and the use of virtual space. Int Rev Psychiatry 27(6):476–489, 2015

- Yellowlees P, Nakagawa K, Pakyurek M, et al: Rapid conversion of an outpatient psychiatric clinic to a 100% virtual telepsychiatry clinic in response to COVID-19. Psychiatr Serv 71(7):749–752, 2020

**AMERICAN PSYCHOLOGICAL ASSOCIATION**
SERVICES, INC.

Home (/) › Practice (/practice) › PracticeUpdate (/practice/update) › 2012 (/practice/update/2012) › 07-30 (/practice/update/2012/07-30) ›

**PracticeUpdate (/practice/update/) | July 30, 2012 (/practice/update/2012/07-30/)**

# Research roundup: Telepsychology

This issue's roundup presents recent research and practical implications related to telepsychology

**By Practice Research and Policy Staff**

**July 30, 2012—**Telepsychology refers to the provision of psychotherapy or other psychological services through technology media that can accommodate geographical distance between healthcare providers and patients, such as telephone, e-mail, internet-based communications, and videoconferencing. It offers an innovative strategy to avert some of the obstacles people face in accessing and adhering to needed care. Technological advancement is fast-paced and inherently new, teeming with challenges and opportunities. This issue's Research Roundup reviews recent research on telepsychotherapy that highlights some of these challenges and opportunities.

Yuen, E. K., Goetter, E. M., Herbert, J. D., & Forman, E. M. (2012). Challenges and opportunities in internet-mediated telemental health. *Professional Psychology: Research and Practice, 43*(1), 1-8.
**Summary**

Yuen and colleagues summarize some of the latest professional literature and highlight challenges and opportunities for psychologists in the realm of telepsychology. Internet-based services have the potential to bridge the gap created by logistical barriers to healthcare, such as scheduling conflicts, transportation, childcare, location and lack of services, lack of access to

services, disabilities, incarceration, and stigma. This would yield pivotal benefits to a wide range of individuals currently unable to attain the psychological care they need. Technology's rapid growth presents the opportunity to remotely administer consultations, treatments, assessments, and even supervision and training for mental health professionals via videoconferencing, websites, and handheld mobile devices.

Though limited, studies have thus far found encouraging evidence for the effectiveness of internet-mediated telepsychotherapy, with results comparable to in-person treatments. Websites can be used to educate and inform patients, and have been shown to support symptom reduction in anxiety disorders, depression, and behavioral health problems. Likewise, videoconferencing has proven beneficial in treating social anxiety disorders, anxiety in cancer patients, and depression in adolescents and children. Handheld devices used in telepsychology include landline telephones, mobile phones, and increasingly smartphones, which may facilitate videoconferencing, internet access, and downloadable applications.

With any of these options come new challenges: finding a secure and private internet/telephone connection, access to technology, need for encryption and password protection when transferring confidential written material (assessments, homework assignments, etc.), and limited observation (body language, micro-expressions, hygiene, eye contact, physiological responses, etc.). Advances in technology will soon likely eliminate some of these challenges, but until then it is imperative that the therapist and patient fully understand the potential threats to privacy, the proper use of the technology, and how to address connection failures and maintain the flow of the session.

**Practical Implications**

When used efficiently, telepsychology resources will increase convenience for both patient and therapist, but only if proper training and necessary

adjustments are made to maintain quality care. Psychologists may need to become more familiar with data security within computerized formats, and larger practices should consider utilizing an information technology specialist.

**Smith, R. E., Fagan, C., Wilson, N. L., Chen, J., Corona, M., Nguyen, H., Racz, S., & Shoda, Y. (2011). Internet-based approaches to collaborative therapeutic assessment: New opportunities for professional psychologists.** *Professional Psychology: Research and Practice, 42(6)*, 494-504.

**Summary**

Technology has the ability to improve the speed, consistency, and convenience of collaborative assessment, which involves the client as an active participant in therapeutic activities, such as ongoing tracking of psychological symptoms, journaling and other homework assignments, and graphic feedback in and outside sessions. One tool being developed at the University of Washington comprises over 30 assessments that can be completed on a computer, tablet, or smartphone. A computerized diary system provides a secure and confidential mechanism for the client to communicate daily entries to the clinician, and allows clients to choose from a variety of formats: rating scales, checklists, free text, and any combination.

Prior to sessions, clinicians can use client feedback to make therapeutic adjustments as necessary. During sessions, clinicians will be able to provide concise feedback to patients by pointing out patterns and highlighting elements of the entries. Moreover, access to real-time out-of-session client feedback (such as homework assignments), will enable clinicians to better assess progress and improve session planning, thus increasing assessment efficiency and effectiveness.

While the benefits to a system like this may be substantial, there are issues that arise with the use of telepsychology. For example, clients in lower socioeconomic groups or rural locations may have difficulty obtaining

internet access as frequently as is required. This could be especially counterproductive to treatment if it becomes a source of stress or frustration for the client.

## Practical Implications

Using Internet-based collaborative assessments, clinicians will be able to better utilize their expertise to design session plans addressing the client's most current state. Using technology to provide an ongoing platform for assessment could aid the clinician in ways not previously possible, not only as a supplemental therapeutic tool, but also as a convenient source of pre-treatment patient feedback to ease the discomfort and unfamiliarity of a client's first session.

Mohr, D. C., Ho, J., Duffecy, J., Reifler, D., Sokol, L., Burns, M.N., Jin, L., & Siddique, J. (2012). Effect of telephone-administered vs face-to-face cognitive behavioral  therapy on adherence to therapy and depression outcomes among primary care  patients. *The Journal of the American Medical Association, 307*(21), 2278-2284.

## Summary

Among primary care patients diagnosed with depression, most indicate a preference for psychotherapy over antidepressant medication. However, many patients do not or cannot participate in psychotherapy due to access barriers.

In this study, 325 primary care patients diagnosed with Major Depressive Disorder were randomized to receive cognitive behavior therapy from a psychologist either by telephone (T-CBT) or face-to-face. The T-CBT group had a significantly lower attrition rate (20.9 percent) than the face-to-face CBT group (32.7 percent). For both groups, therapist-rated and self-reported symptoms of depression showed significant improvements post treatment, when compared to baseline. However, at a six-month follow-up, patients who had received face-to-face CBT were significantly less depressed than

those who had received T-CBT, suggesting that while T-CBT may increase adherence to psychotherapy, the effects of face-to-face psychotherapy may be more durable over time.

## Practical Implications

Telephone CBT can be effective for typical patients in primary care, and it appears to reduce some of the barriers to regular psychotherapy attendance. However, this study does not identify characteristics of patients who are more likely to sustain gains over time—a better understanding of these factors will enable psychologists to determine whether phone psychotherapy is likely to benefit a particular individual. T-CBT is a reasonable option to improve access and provide therapy to underserved individuals who otherwise cannot or will not access psychotherapy. However, the benefits appear to diminish over time compared to face-to-face psychotherapy, and psychologists will want to evaluate alternate methods to enhance gains post-treatment.

Mohr, D.C., Carmody, T., Erickson, L., Jin, L., &Leader, J. (2011). Telephone- administered cognitive behavioral therapy for veterans served by community-based  outpatient clinics. *Journal of Consulting and Clinical Psychology, 79*(2), 261-265.

## Summary

In a trial examining the efficacy of telephone-administered cognitive behavioral therapy (T-CBT) in treating depression, 85 veterans (mean age 55.9 years) with Major Depressive Disorder (MDD) from six rural community-based out-patient clinics (CBOCs) in California and Illinois were randomized into one of two treatment conditions: T-CBT, or treatment as usual (TAU) through the CBOC. None of the participants included in this study had previously received psychotherapy. In the T-CBT condition, three licensed psychologists, trained in CBT with experience working with veterans in the VA, delivered sixteen 45-50 minute sessions over the course of 20 weeks (allowing four extra weeks for session cancellations). In the TAU

condition, participants were free to access all of the available mental health services offered by the CBOCs, yet over the 20 week course of the study, little care was sought by participants in this condition. This resulted in a TAU condition that was fairly minimal compared to typical TAU conditions, which often require regular participation, such as ongoing community based psychotherapy.

Over the course of study, therapist-reported measures of patient change showed significant time effects from baseline through week 20, but they did not show significant treatment effects. While both groups showed a similar reduction in levels of depression, both the client-rated and the therapist-rated measures produced average scores that still fell in the clinically depressed range. No differences were found between veterans using T-CBT as compared to TAU for patient-reported measures, or standardized psychiatric interviews assessing major depressive episodes; there were also no significant time by treatment interactions; and, there were no significant differences between the treatments at a six-month follow-up. Given that the TAU condition was so minimal, researchers questioned whether patient expectations of therapy within this population may have affected the outcomes.  In contrast to this study, prior research suggests that T-CBT can be an effective treatment for depression. The researchers discuss three main reasons why this study's findings seem to diverge from others: non-significant trials may be under-published, therefore, the benefits of T-CBT may be overestimated; published randomized clinical trials often have small effect sizes, thus it may not be possible to detect a difference between T-CBT and TAU in real world treatment settings with less stringent controls; and, it is possible that veterans are less amenable to telephone psychotherapy than other populations that have been studied.

**Practical Implications**

The divergence between this study and other published research evaluating telephone psychotherapy for depression indicates that more research must

be done to determine which populations might benefit from T-CBT. A patient's aptitude for technology and their expectations for psychotherapy may moderate the benefits of technology-delivered or technology-aided therapy.

**Warmerdam, L., Van Straten, A., Twisk, J., Riper, H., & Cuijpers, P. (2008). Internet- based treatment for adults with depressive symptoms: Randomized controlled trial.** *Journal of Medical Internet Research, 10*(4).
**Summary**

Internet-based CBT was compared to a short intervention concentrating on problem solving therapy for the treatment of depressive symptoms among adults. In the study, 263 participants who met the minimum score requirement on a depressive symptoms scale were randomized to one of three treatments: Internet-based cognitive behavioral therapy (CBT), Internet-based short-intervention problem-solving therapy (PST), or waitlist (WL).

The internet interventions were both highly structured, self-administered programs supplemented by supporting emails from Masters-level students of clinical psychology detailing weekly assignments, and providing assignment feedback. PST consisted of one session per week for five weeks; it focused on strategizing solutions for problems the participant categorized as "solvable," and creating a plan for the future. CBT consisted of one session per week for eight weeks, plus a ninth session at twelve weeks; it followed a highly structured psycho-educational model specific to CBT for depression, which views problems as learned or unlearned behavioral/cognitive patterns that are modified by using coping skills and increasing pleasant activities.

Questionnaires assessing depression, anxiety, and quality of life were completed by participants before treatment, and at five, eight and twelve

weeks. After five weeks of treatment, the PST group showed significant improvements in all three questionnaire scores compared to WL.

After eight weeks, as compared to the WL, both CBT and PST showed significant improvements, which was maintained after twelve weeks. No significant differences were found between the CBT and PST on the assessment scores at weeks eight and twelve, but patients who received PST exhibited a significantly faster response to treatment than CBT, by having significantly improved scores at week five. There was a high attrition rate for both CBT (61.4 percent) and PST (62.5 percent); and those who adhered to the treatment had significantly higher levels of education and significantly lower depression scores at baseline than those who did not complete treatment.

## Practical Implications

Internet-based psychotherapy is designed to be completed entirely from home (or other desired internet-accessible location) with minimal client-therapist interaction. However, the high attraction rate indicates that this approach may only be effective for self-motivated individuals who adhere to the program.

A clinician must consider the patient's level of independence and need for personal contact with the therapist, and discuss these issues with the patient, when considering whether or not to suggest a program like Internet-based CBT or PST. This form of treatment may be ideal for some patients, but for others it may not provide sufficient interactions with the treatment provider.

Rees, C. S., & Stone, S. (2005). Therapeutic alliance in face-to-face versus videoconferenced psychotherapy. *Professional Psychology: Research and Practice, 36*(6), 649-653.

**Summary**

Videoconferencing is another form of telepsychology that can reduce barriers to psychotherapy, but few psychologists offer or provide it as an option. It is possible that psychologists' traditional understanding of the therapeutic alliance, and the environment in which it is created, prompts wariness regarding the use of videoconferencing.

Based on previous research, which concluded that psychologists harbor negativity toward the use of videoconferencing in therapy, researchers hypothesized that psychologists would rate therapeutic alliance as being higher when psychotherapy is provided face-to-face versus via videoconferencing. Thirty clinical psychologists were randomly assigned to watch a twenty minute excerpt from a therapy session conducted in one of two formats: face-to-face or videoconferencing.

Other than the format, the sessions in each condition were identical. The psychologists then rated the therapeutic alliance between the therapist and client for each format using an instrument designed to be completed from the perspective of a third party observer. The instrument's total score is the sum of two scores: the bond from the client's point of view (such as therapist's warmth, kindness, sincerity), and how well the therapist and patient work together to understand and abate the issue at hand. The group of psychologists who viewed the videoconferencing session had a significantly lower mean total score (M = 61.05) than the group who viewed the face-to-face session (M = 69.08). Additionally, the psychologists viewing the videoconferencing session rated the bond from the client's point of view as significantly lower than those who viewed the face-to-face session. However, there was not a significant difference between the session formats on the psychologists' ratings of how well the therapist and patient worked together.

**Practical Implications**

The quality of the therapeutic alliance is a prominent concern many psychologists have regarding telepsychology, and specifically whether it is possible to establish the as strong an alliance via technology as in person. This article, though several years old, is still a relevant examination of the effects of psychologists' perceptions about the therapeutic alliance. So, it would be interesting to see whether or not these results have changed with the rapid growth in technology use since 2005. Although psychologists rated the therapeutic alliance higher for face-to-face versus videoconferencing psychotherapy, the reasons for this are unclear. More study is needed to determine if there is a true difference, or if psychologists have a bias in favor of face-to-face psychotherapy, as the authors propose. Regardless, given the importance attributed to therapeutic alliance as a predictor of treatment response and adherence, psychologists using videoconferencing for psychotherapy may want to use a client-rated measure of the therapeutic alliance, or otherwise pay particular attention to the client's impression of the therapist, to gage the therapeutic bond and maximize treatment response.

## Ending Notes

Telepsychology has the potential to improve access to services, the quality of mental health care, and convenience of treatment for both providers and clients. More research is necessary to understand the limitations inherent in telepsychology and to address the challenges for patients and providers.

Before providing an intervention via technology, psychologists should consider whether it is the best route for the patient and the clinician—this includes attention to current inter- and inner state laws regarding the specific uses of telepsychology, how session layout and involvement translate and adjust to the new format, and to issues of payment/reimbursement for services that may differ by format.

For more information on payment and reimbursement, see Reimbursement for Telehealth (/practice/good-practice/telehealth-services.pdf) (PDF, 792KB)

Services in the Spring 2011 issue of Good Practice.

**Find this article at:**

https://www.apaservices.org/practice/update/2012/07-30/telepsychology

Professional Psychology: Research and Practice

© 2018 American Psychological Association
0735-7028/18/$12.00

2018, Vol. 49, No. 3, 205–219
http://dx.doi.org/10.1037/pro0000188

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

# Survey of Psychologists' Telebehavioral Health Practices: Technology Use, Ethical Issues, and Training Needs

Robert L. Glueckauf
Florida State University

Marlene M. Maheu
Telebehavioral Health Institute, Inc., Cheyenne, Wyoming

Kenneth P. Drude
Dayton, Ohio

Brittny A. Wells
University of Central Florida

Yuxia Wang and David J. Gustafson
Florida State University

Eve-Lynn Nelson
University of Kansas

As telecommunication technologies have become more widely available and affordable, opportunities for psychologists to engage in telebehavioral health (TBH) have expanded greatly. A national sample of 164 professional psychologists completed a 28-item survey focusing on (a) current and anticipated use of telecommunication technologies in delivering TBH services, (b) types of telecommunication modalities currently used in clinical practice, (c) ethical and legal/regulatory concerns related to delivery of TBH services, and (d) educational and training needs for TBH practice. Associations between demographic factors (i.e., age, gender, practice setting, practice region, and years since completion of highest academic degree) and responses on survey items were examined. In descending order, the technologies most commonly used by psychologists were: landline telephone, mobile telephone, e-mail, and videoconferencing. A lower proportion of psychologists working in public settings used landline telephones, mobile telephones, or e-mail to deliver TBH than that of psychologists engaged in independent practice. In regard to respondents' age, the proportion of psychologists delivering TBH collapsed across technologies was substantially higher among respondents 37 years of age or older compared with that of 36-year-olds or younger. Respondents also noted several ethical/legal barriers in providing TBH services, particularly managing emergencies, licensure requirements, and uncertainties about security, as well as confidentiality, Health Insurance Portability and Account Act (HIPAA) compliance, and malpractice insurance coverage. Overall, a substantial discrepancy was noted between psychologists' positive appraisals of

ROBERT L. GLUECKAUF received his MS and PhD in clinical psychology from Florida State University. He is Professor in the Department of Behavioral Sciences & Social Medicine at the Florida State University College of Medicine and research director of the Tallahassee Memorial HealthCare Memory Disorder Clinic. His research interests lie in the development and evaluation of telehealth-based interventions for individuals with chronic health conditions and their family care partners, outcomes measurement, and spirituality and health.

MARLENE M. MAHEU received her MA and PhD in clinical psychology from the California School of Professional Psychology-San Diego. She is founder and executive director of the Telebehavioral Health Institute, Inc. Her areas of professional interest include telebehavioral health professional training and consultation on legal and ethical best practices for telehealth and various technologies.

KENNETH P. DRUDE received his PhD in counseling psychology from the University of Illinois. He currently serves on the Ohio Board of Psychology and has an outpatient practice in the Dayton, Ohio area. His areas of professional interest include telebehavioral training, practice, policy, and standards.

BRITTNY A. WELLS received her DrPH from the Institute of Public Health at Florida A&M University. She is Assistant Professor of Health Professions at the University of Central Florida. Her research interests focus on investigating how work-related experiences impact health outcomes for Black women.

YUXIA WANG received her MPH from the University of Kentucky. She is currently data analyst in the Department of Behavioral Sciences and Social Medicine at the Florida State University. Her research interests lie in the field of biostatistics, particularly data management and data analysis.

DAVID J. GUSTAFSON received his MS in Experimental Psychology from Florida State University. His research interests focus on program evaluation and measurement, particularly large-scale instrument development and analysis, as well as standard setting at state and national levels.

EVE-LYNN NELSON received her PhD in clinical psychology from the University of Kansas. She is Professor at the University of Kansas Medical Center and directs the University of Kansas Center for Telemedicine & Telehealth. Her research interests focus on the evaluation of evidence-supported, patient-centered approaches in underserved communities, including evaluation of videoconferencing technologies to deliver clinical and educational programming.

WE ARE GRATEFUL TO David J. Gustafson, who passed away during the course of the study, for his outstanding contributions in designing the survey and data analytic approach. We also thank Linda Jamison for her editorial assistance in preparing this article for publication.

CORRESPONDENCE CONCERNING THIS ARTICLE should be addressed to Robert L. Glueckauf, Department of Behavioral Sciences and Social Medicine, College of Medicine, Florida State University, 1115 West Call Street, Tallahassee, FL 32306-4300. E-mail: robert.glueckauf@med.fsu.edu

TBH and actual implementation, underscoring the ongoing barriers in the adoption of telehealth technologies in practice. Future directions addressed the need for training and education in TBH best practices.

---

**Public Significance Statement**

A sample of 164 professional psychologists completed a 28-item survey focusing on (a) their current and anticipated use of telecommunication technologies in clinical practice (also known as telebehavioral health [TBH]), (b) ethical and legal concerns in delivering TBH services, and (c) their specific education and training needs for TBH practice. A substantial discrepancy was found between psychologists' current moderately low TBH implementation levels and their future positive expectations offering such services, underscoring the need for education about ethical guidelines, legal requirements, and models for best practice.

---

*Keywords:* telehealth, psychology, ethics, training, practice

Research on behavioral health professionals' knowledge, attitudes, and uses of telehealth has grown in importance and scope over the past decade. Telebehavioral health (TBH) services are likely to play a key role in the evolving health care system, both in meeting the needs of persons with mental health difficulties and in improving efficiency and cost-effectiveness of treatment delivery.

Although most TBH survey studies have incorporated a mixture of professionals from various behavioral health disciplines (Centore & Milacci, 2008; Deen, Withers, & Hellerstein, 2013; Ford, Avey, Deruyter, Whipple, & Rivkin, 2012; Jameson, Farmer, Head, Fortney, & Teal, 2011; Maheu & Gordon, 2000; Simms, Gibson, & O'Donnell, 2011; Wells, Mitchell, Finkelhor, & Becker-Blease, 2007), a smaller, but nonetheless suggestive, group of investigations has focused on knowledge, attitudes, and practice patterns of single professions, such as psychologists (Cooper & Neal, 2015; McMinn, Bearse, Heyne, Smithberger, & Erb, 2011; McMinn, Buchanan, Ellens, & Ryan, 1999; Mora, Nevid, & Chaplin, 2008; Perle et al., 2013; Wangberg, Gammon, & Spitznogle, 2007), social workers (Finn, 2002, 2006), marriage and family therapists (Hertlein, Blumer, & Smith, 2014), and psychiatric residents and fellows (Glover, Williams, Hazlett, & Campbell, 2013). The majority of these studies have been performed using samples of U.S. behavioral health professionals.

In examining the findings of psychologist-specific TBH survey research, demographic and background factors (e.g., age, gender, length of professional career, and theoretical orientation) typically have not correlated significantly with respondents' knowledge and attitudes about the use of telecommunication modalities (e.g., McMinn et al., 2011; Perle et al., 2013). Exceptions include Perle et al.'s (2013) study that showed respondents under 45 years of age (i.e., a combination of licensed psychologists and psychology doctoral graduate students) were more receptive than those 45 years of age and older in the use of TBH interventions as an adjunct to in-person services and as a stand-alone intervention. Mora et al. (2008) found that male psychologists were more likely to endorse the use of e-mail, chat, and teleconferencing with clients than their female counterparts. Furthermore, several studies have shown that psychologists with a cognitive–behavioral orientation reported more favorable appraisals of telepractice than those with a psychodynamic or psychoanalytic perspective (Mora et al., 2008; Perle et al., 2013).

Note also that TBH survey studies have included a variety of psychologist samples across geographical regions, such as American Psychological Association (APA) members primarily involved in independent practice (e.g., McMinn et al., 1999, 2011; Perle et al., 2013) and state psychological association members (Mora et al., 2008). However, comparisons between knowledge and attitudes about TBH between psychologists working in independent practice and public settings and across geographical areas were not performed.

In regard to the use of telecommunication technologies, previous research has assessed which modalities psychologists use or would consider using in their clinical practice (Cooper & Neal, 2015; McMinn et al., 1999, 2011). The most consistent finding across these studies has been the limited use of telecommunication modalities in delivering services to clients. Of those technologies adopted by psychologists in delivering clinical services, synchronous applications (e.g., web-based videoconferencing) were used substantially more often than those asynchronous in nature (e.g., e-mail and texting; Mora et al., 2008; Perle et al., 2013). In contrast, the highest overall rates of technology use were obtained for administrative or nonclinical functions, such as billing and word processing. Although these studies have provided an important "first take," significant gaps persist in our knowledge about the proportion of psychologists who use or intend to use which types of technologies with which client populations.

Turning to legal and regulatory issues, previous survey studies provided preliminary evidence suggesting psychologists have minimal knowledge of laws and regulations relevant to telepractice (Maheu & Gordon, 2000; Mora et al., 2008; Perle et al., 2013). Psychologists reported little or no awareness of laws regulating TBH practices in their home state. They also had limited knowledge about restrictions in providing TBH services to clients located in jurisdictions where they were not licensed to practice.

Next, several studies indicated psychologists were concerned about the ethics of TBH practice (McMinn et al., 1999, 2011; Perle et al., 2013). A repeated and prominent ethical issue was uncertainty about client confidentiality in using telecommunication technologies. Other common concerns included how to manage client crises in the online context and the empirical evidence supporting the efficacy of telehealth services.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Based on these findings, several authors have advocated for training in TBH in psychology graduate programs and continuing education after completing terminal degrees (Callan, Maheu, & Bucky, 2017; McMinn et al., 1999, 2011). Nonetheless, limited information has been garnered ascertaining the education and training needs of psychology graduate students, interns/postdoctoral fellows, and psychologists (Duncan et al., 2013). Designing effective educational programs to ameliorate such shortcomings is predicated on conducting assessments of specific needs and anticipated telehealth practice requirements.

Thus, the primary objectives of the current study were to address limitations in our understanding about the influence of practice settings and region of practice on TBH attitudes and knowledge, the characteristics and proportion of psychologists planning to offer or currently providing TBH services, as well as their educational and training needs and barriers to adopting technologies for delivering TBH services. Furthermore, a comprehensive analysis was performed to examine associations between background factors (i.e., age, gender, primary region of work, primary work setting and years engaging in professional practice since obtaining highest degree) and psychologists' use of telecommunication technologies, types of online services currently provided to clients, TBH education and training needs, and ethical and legal concerns related to the delivery of TBH services.

## Method

### Participants

Behavioral health professionals from multiple disciplines were recruited using a variety of strategies, including mailings to 209 national and regional/state psychological, social work, and counseling associations. Other recruitment efforts included postings on behavioral health professional listservs, announcements in print publications, and distributing survey information at APA annual conventions. The current study focused exclusively on the responses of a subset of 164 respondents identifying as professional psychologists. Because of survey distribution across multiple settings and media outlets, specific survey response rates could not be calculated.

Standard survey follow-up procedures were not deployed in the current study because all surveys were completed anonymously on SurveyMonkey (2017). However, to enhance sample accrual among psychologists, we manually distributed flyers at three consecutive APA national conventions (i.e., 2013–2015). The URL of the survey was inserted in the narrative of the flyer. We also conducted an e-mail campaign over the same time period requesting APA State Association executive directors to publish brief announcements about the TBH survey study in their respective newsletters. However, we were unable to obtain data on the number of State Associations that published announcements in their newsletters, as well as the frequency of publication by each association.

The current investigation was approved by the Florida State University Institutional Review Board. Respondents were included in the study if they were (a) doctoral-level psychologists in the United States or its territories, and (b) provided clinical or counseling services. To ensure anonymity, participants were not asked to disclose personal information about the specific contents of

online services they offered and were assured no personal data would be collected that potentially could identify them, such as e-mail addresses.

### Instrumentation

A five-person team of four doctoral-level psychologists and a master's-level program evaluation specialist with TBH expertise across diverse populations and practice settings met monthly for eight sessions to finalize the wording and selection of items within each domain. The 28-item survey instrument focused on five key domains: providers' use of telecommunication modalities; client population characteristics; professional, ethical, and legal/regulatory issues; and telehealth training and practice. Item contents from previous telehealth surveys from the United States and Canada (Centore & Milacci, 2008; Finn, 2006; Finn & Barak, 2010; Menon & Rubin, 2011; McMinn et al., 2011; Mora et al., 2008; Wells et al., 2007) were also examined and modified for use in the current survey instrument.

### Procedures

Prospective participants were given a link to the secure online survey located on SurveyMonkey (2017). They initially accessed the informed consent form, followed by an introduction to the survey and the 28-item questionnaire. Participants were told the objectives of the study were to gather information about (a) telecommunication technologies "presently used or intended to use in delivering online counseling," (b) "types of online services currently provided or would consider providing" in the future, (c) "perceptions about training needs in the provision online counseling," and (d) "ethical or legal concerns in the performance of online mental health counseling." The term, online counseling was defined as "any type of counseling for mental health, as well as substance abuse, or coaching using telecommunication technologies, such as internet, telephone, videoconferencing, or e-mail."

Participants subsequently received the following instructions, "It is helpful if you answer every item; however, you can skip any item except those marked with an asterisk (*). There are no right or wrong answers to the survey." Note that the required items marked with an asterisk were the two inclusion criteria listed above and seven additional items (i.e., whether they read and understood the informed consent form and agreed to participate in this study, age bracket, gender, profession, primary work setting, primary state or U.S. territory where they worked, and years worked as a mental health service provider since obtaining their highest academic degree).

The online survey took approximately 10 min to complete. The time frame of data collection was January 2013 to December 2016. The researchers subsequently downloaded the data from Survey-Monkey (2017) to Statistical Analysis System Version 9.4 (SAS, 2017) for statistical analysis.

### Data Analytic Strategy

Analysis of the findings of the present study was divided into three steps. First, descriptive statistics were calculated on the demographic and background characteristics of survey respondents. These statistics included psychologist's age, gender, pri-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

mary region of work (Northeast, Midwest, South, or West), primary work setting (independent or public practice), and years worked since obtaining highest academic degree. The primary regions of work (West, Midwest, Northeast, and South) were derived from the U.S. Census Bureau's regions (U.S. Census Bureau, 2015). Independent practice settings included independent practice, small group practice (two to nine practitioners), and large group practice (10 or more practitioners). Public practice settings consisted of health or behavioral health clinics, hospitals, military and university health care facilities, and the U.S. Department of Veterans Affairs.

A bracketing strategy was used in collecting data on psychologists' age, years worked since obtaining highest academic degree, average hours per week currently spent in online practice, percentage of practice currently delivering online counseling, and percentage of practice participants would like to spend in delivering online services in the future. This survey procedure was employed as a participant time-saving measure and to facilitate statistical analysis. However, an ambiguity emerged in analyzing the age factor. Psychologists' age was grouped originally into the following categories: 18–26, 27–36, 37–46, 47–56, 57–64, and 65 and older. Only one participant fell between the ages of 18 and 26 and most likely was located at the higher end of this age bracket (e.g., 26 years of age). As a result, we opted to place all respondents between 18 and 36 into the bracket, 36 years of age and younger.

The second step of the data analysis was descriptive in nature, focusing on response patterns (e.g., percentage of "yes," "no," or "unsure" responses) associated with the primary content dimensions of the survey. Note that five items contained multiple response options for which 0, 1, or more response categories could be checked. To simplify the analysis of findings from these survey items, only single-response options (e.g., % of psychologists using landline or mobile phone) rather than combined-response options (e.g., % of psychologists using a combination of landline and mobile phone) were calculated.

The third step of data analysis examined associations between participants' background factors and their responses to individual survey items. All chi-square and Fisher's exact tests, except two Likert-formatted items, examined the association of dichotomous or trichotomous endorsements (e.g., yes/no or yes/no/unsure) and the four background factors. Only statistically significant tests of association ($ps \leq .05$) were reported.

Finally, the results of both descriptive analysis of survey item responses and tests of association were organized into four content areas to simplify interpretation. The four content areas were (a) preference and use of telecommunication modalities, (b) age of clients, (c) professional, ethical, and legal/regulatory issues, and (d) telehealth training and practice.

## Results

### Sample Characteristics

As shown in Table 1, the largest proportion (63%) of respondents was approximately evenly divided between the 47 to 56 age group ($n = 50$) and the 57 to 64 age group ($n = 54$). Nearly 22% of the sample was between the ages of 36 or younger ($n = 14$) and between the ages of 37 and 46 ($n = 22$). The remaining 15% ($n =$

**Table 1**
*Background Characteristics of Doctoral-Level Psychologists (N = 164)*

| Respondent characteristics | $n$ (%) |
| --- | --- |
| Age (years) | |
| 36 and younger | 14 (8.54) |
| 37–46 | 22 (13.41) |
| 47–56 | 50 (30.49) |
| 57–64 | 54 (32.93) |
| 65 and older | 24 (14.93) |
| Gender | |
| Female | 96 (58.54) |
| Male | 68 (41.46) |
| Primary region of work | |
| Northeast | 25 (15.24) |
| Midwest | 59 (35.98) |
| South | 56 (34.15) |
| West | 24 (14.63) |
| Primary work setting | |
| Private practice | 127 (77.44) |
| Public practice | 37 (22.56) |
| Years worked since obtaining highest academic degree | |
| 0–10 | 31 (19.51) |
| 11–20 | 42 (25.61) |
| 21–30 | 60 (36.59) |
| 31 or more | 30 (18.29) |

24) of the study sample was Age 65 or older. There were also substantially more female (59%) than male participants (41%).

The most common work setting of psychologists was independent practice ($n = 127$), including independent (one practitioner), small-group (two to 10 practitioners), and large-group (10 or more practitioners) practice arrangements. A minority of respondents ($n = 37$) worked in a public or institutional setting, including behavioral health clinics, hospitals, military or Department of Veterans Affairs, and universities. Regarding region of work, 70% were divided between Midwestern ($n = 59$) and Southern ($n = 56$) states. The remaining 30% of psychologists were approximately evenly split between Northeastern ($n = 25$) and Western ($n = 24$) states. Last, the largest cohort of participants ($n = 60$) completed their highest academic degree 21 to 30 years prior to completion of the telehealth survey. The remainder of respondents had attained their highest academic credential 0 to 10 years ($n = 32$), 11 to 20 years ($n = 42$), and 31 or more years ($n = 30$) prior to completing the survey.

### Descriptive Analysis of Survey Item Responses

**Preference and use of telecommunication modalities.** As shown in Table 2, over half of psychologists (57%) reported 0 hr per week using telecommunication technologies to deliver counseling services. However, a sizable minority (37%) reported deploying online modalities to deliver counseling services an average of 1 to 5 hr weekly, and 5.5% delivered online counseling an average of 6 or more hours weekly. This pattern was replicated in the survey item querying the percentage of psychologists' practice currently delivered online. Fifty-two percent of respondents indicated that none of their current practice was delivered online, 37.5% reported 1% to 9% of their services performed online, and 10% reported 10% to 100% of their practice was delivered using

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 2

*Number and Percentage of Responses on Questions Related to Preferences and Use of Telecommunication Modalities and Age of Clients Served (N = 164)*

| Survey question | Very | Moderately | Slightly | Not at all | Missing |
|---|---|---|---|---|---|
| | | | Response options, *n* (%) | | |
| How comfortable are you, or would you be, delivering online counseling services? | 37 (22.98) | 58 (36.02) | 37 (22.98) | 29 (18.01) | 3 (1.83) |
| How confident would you be providing online counseling services via telehealth technology without an initial in-person assessment? | 13 (8.08) | 26 (16.05) | 30 (18.52) | 93 (57.41) | 2 (1.22) |
| | 0 (none) | 1–5 | 6 and above | Missing | |
| How many hours per week on average do you deliver online counseling? | 93 (57.06) | 61 (37.42) | 9 (5.52) | 1 (.6) | |
| | 0 (none) | 1%–9% | 10%–100% | Missing | |
| What percentage of your practice is currently delivered online? | 85 (52.47) | 61 (37.65) | 16 (9.88) | 2 (1.22) | |
| What percentage of your practice would you like to deliver online? | 35 (21.60) | 44 (27.16) | 83 (51.23) | 2 (1.22) | |

| | Yes | No |
|---|---|---|
| Which telecommunications tools have you used in the last year to deliver counseling services at a distance to clients?[a] | | |
|    Landline telephone | 104 (63.41) | 60 (36.59) |
|    Mobile phone | 84 (51.22) | 80 (48.78) |
|    Chat room or instant message | 5 (3.05) | 159 (96.95) |
|    E-mail | 62 (37.80) | 102 (62.20) |
|    Video conferencing | 42 (25.61) | 122 (74.39) |
|    Online telephone | 10 (6.10) | 154 (93.90) |
|    Online telephone conferencing service | 10 (6.10) | 154 (93.90) |
|    Smart phone application ("App") | 11 (6.71) | 153 (93.29) |
|    Other (e.g., pager) | 5 (3.05) | 159 (96.95) |
|    None | 35 (21.34) | 129 (78.66) |
| Which of the following communication technologies do you consider useful for online counseling?[a] | | |
|    Telephone (landline or mobile) | 122 (74.39) | 42 (25.61) |
|    E-mail | 63 (38.41) | 101 (61.59) |
|    Video conferencing | 119 (72.56) | 45 (27.44) |
|    Texting | 27 (16.46) | 137 (83.54) |
|    None | 10 (6.10) | 154 (93.90) |
| What age groups do you currently serve at a distance?[a] | | |
|    Adults | 91 (55.49) | 73 (44.51) |
|    Elderly | 15 (9.15) | 149 (90.85) |
|    Children | 5 (3.05) | 159 (96.95) |
|    Adolescents | 20 (12.20) | 144 (87.80) |

[a] Survey question for which respondents were prompted to choose "all that apply."

telecommunication technologies. In contrast, 51% of respondents indicated in the future they would like to deliver online 10% to 100% of their services.

In assessing the extent of technology use, psychologists were asked to endorse the specific "telecommunications used in the last year to deliver counseling services at a distance to clients." Note that no constraints were placed on the minimum number of times they used specific telecommunication modalities. More than half of psychologists reported using landline (63%) or mobile phones (51%) to deliver counseling services during the previous year. A lower percentage of psychologists reported using e-mail (38%) or videoconferencing (26%) for TBH services. Substantially smaller utilization rates were reported for smart phone applications (7%), online telephone (6%), online telephone conferencing services (6%), chat room or instant message (3%), or "other" (e.g., pager; 3%). Last, over one fifth of respondents (21%) reported not using any of the aforementioned technologies over the year prior to completing the survey.

In examining psychologists' perceptions of the usefulness of various telecommunication modalities, respondents' endorsements mirrored their current usage of telecommunication tools (see Table 2), with only one exception. Although a small proportion of psychologists (26%) reported using videoconferencing technology over the previous year, nearly three fourths (73%) of respondents considered videoconferencing useful as a vehicle for service delivery.

Shifting to concerns about the use of TBH, 75% of psychologists were slightly or not at all confident they could provide "online counseling" services without an initial in-person assessment. In a similar vein, they also were evenly divided (32.7% reported "yes," 32.7% reported "no," 34.6% reported "unsure") regarding their beliefs about the "average mental health professional's" capacity to screen effectively at-risk clients using TBH technologies. Although most psychologists (59%) reported they were moderately or very comfortable using telecommunication technologies, a sizable minority indicated they were only slightly (23%) and not at all (18%) comfortable providing TBH.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

**Age groups of clients served.** Respondents specified the age groups (i.e., children, adolescents, adults and elderly) they currently served and how they provided counseling services to them via TBH. Similar to the questions about use of various telecommunication modalities, no limitations were placed on the minimum number of times or proportion of time psychologists used telecommunication technologies in providing online services to each of the four age groups. Over half (55%) of psychologists reported delivering TBH services to adults. In contrast, substantially smaller percentages of psychologists provided such services to children (3%), adolescents (12%) and elderly (9%; see Table 2).

**Professional, ethical, and legal regulatory issues.** Although most psychologists (80%) considered it ethical for licensed mental health professionals to deliver TBH, only 58% were aware of state and federal laws or regulations governing such activities. Buttressing this finding, over one fourth of respondents (27%) were unsure whether it was legal to provide TBH to clients outside the state in which they were currently licensed. Furthermore, over one third (35%) of respondents indicated it was legal to provide TBH across state lines by calling themselves a "coach" instead of a psychologist. An additional 40% were unsure whether this action was legal. In a similar vein, 72.6% of psychologists reported concerns about licensure issues (see Table 3).

Security, confidentiality and Health Insurance Portability and Accountability Act (HIPAA, 1996) compliance were the primary concerns related to the use of telecommunication modalities (79%). A high percentage of psychologists (74%) were unsure whether their malpractice carrier covered TBH services. Overall, 98% of respondents reported having at least one area of concern related to TBH practice.

**Telehealth training and practice.** Ninety-six percent of respondents indicated that "mental health professionals should undergo training about the clinical, legal, and/or ethical issues related to telehealth." A very high percentage of respondents (90%) also reported such practitioners should receive training on technical issues surrounding delivery of telehealth services.

Turning to concerns about TBH training and practice, 52% of psychologists reported inadequate skills in managing emergency situations when using online counseling modalities. A substantial minority (39%) also endorsed insufficient TBH training or education, and 24% reported a lack of available telehealth education or training programs.

Last, respondents provided information about their knowledge of current TBH guidelines or standards published by professional associations. Over half of psychologists (55%) indicated they were aware of relevant professional association guidelines. The most frequently identified guidelines were the American Telemedicine Association (15%), followed by American Counseling Association (10%) and American Psychiatric Association (9%; see Table 3).

## Associations Between Background Characteristics and Survey Responses

**Preferences and use of telecommunication technologies.** A statistically significant association was found between psychologists' age and use of landline telephone, $\chi^2(4, N = 164) = 17.01$, $p = .002$. As psychologists' years of age increased, the overall pattern of use of landline telephone concomitantly increased. The proportion of respondents 36 years of age or younger using land-line telephone communication to deliver TBH was substantially lower than their counterparts 37 to 46 years old, who, in turn, used landline telephone to provide services in lower proportion than psychologists 47 years of age or above (see Table 4).

A different pattern of associations emerged between psychologists' age and use of e-mail, $\chi^2(4, N = 164) = 11.03$, $p = .03$, online telephone (Fisher's exact test, $p = .05$), online telephone conferencing (Fisher's exact test, $p = .05$), and videoconferencing, $\chi^2(4, N = 164) = 12.34$, $p = .03$. A substantially higher proportion of respondents ages 57 to 64 used these four telecommunication modalities in delivering services than psychologists 56 years of age or younger and those 65 years or older. In contrast, no statistically significant relationships were found between psychologists' age and the use of mobile phone, chat room or instant message, and smart phone applications ("apps") in delivering counseling services.

Last, the relationship between age and delivery of TBH services was examined collapsing across all telecommunication modalities. The proportion of psychologists delivering services differed significantly across age groups, $\chi^2(4, N = 163) = 12.26$, $p = .02$. A substantially greater proportion of psychologists 37 years of age and older provided TBH 1 or more hours per week than that of 36-year-olds and younger.

In regard to gender, only use of online telephone conferencing systems in providing services differentiated significantly between male and female psychologists (Fisher's exact test, $p = .02$). A higher proportion of male practitioners reported using online teleconference system technologies than did female providers.

Turning to work setting, significant associations were found between type of work setting and telecommunication mode. A significantly higher proportion of psychologists in independent practice reported using landline telephones, $\chi^2(1, N = 164) = 4.49$, $p = .03$, e-mail, $\chi^2(1, N = 164) = 7.25$, $p = .007$, and mobile phones, $\chi^2(1, N = 164) = 11.19$, $p = .0008$, in providing services than did psychologists working in public settings (see Table 4).

In regard to primary region of work, only one statistically significant association was found between region of work and use of telecommunication technologies to deliver services (Fisher's exact test, $p = .04$). Collapsing across all telecommunication modalities, a substantially higher proportion of psychologists in the Northeast and West provided TBH than that of psychologists in the Midwest and South. Finally, no significant relationships were found between years of practice since obtaining final academic credentials and use of distance modalities.

**Age groups of clients served.** Tests of association were performed between the age groups of clients (i.e., children, adolescents, adults and elderly) provided TBH and psychologists' age. A statistically significant association was found between adults served via telecommunication technologies and psychologists' years of age, $\chi^2(4, N = 164) = 15.65$, $p = .004$. A substantially higher proportion of psychologists between 37 and 64 years of age provided TBH to adults than psychologists 36 years of age and younger and those 65 years of age and older. In contrast, no significant associations were found between the other two age groups (i.e., children and elderly) and psychologists' age in the use of TBH.

In regard to work setting, a significantly higher proportion of psychologists in independent practice reported using technology

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 3
Number and Percentage of Responses on Survey Questions Related Professional, Ethical, and Legal Regulatory Issues and TBH Training and Practice (N = 164)

| Survey question | Response options, n (%) | | | | |
|---|---|---|---|---|---|
| | Yes | No | Unsure | N/A | Missing |
| Does your malpractice carrier cover you for delivering online counseling? | 22 (13.75) | 10 (6.25) | 119 (74.38) | 9 (5.63) | 4 (2.44) |
| Do you think it is ethical for LICENSED mental health professionals to deliver services online or via other telehealth technologies? | 130 (79.75) | 6 (3.68) | 27 (16.56) | — | 1 (.6) |
| Do you believe it is legal to practice over state lines using telecommunications technology if you call yourself a "coach"? | 57 (35.40) | 39 (24.22) | 65 (40.37) | — | 3 (1.83) |
| Do you think it is legal for licensed professionals to provide services online to someone who is located in a state in which you are NOT licensed? | 16 (9.94) | 102 (63.35) | 43 (26.71) | — | 3 (1.83) |
| Do you think mental health practitioners should undergo any training about the technical issues of telehealth? | 148 (90.24) | 5 (3.05) | 11 (6.71) | — | — |
| Do you think mental health practitioners should undergo any training about clinical, legal, and/or ethical issues in telehealth? | 157 (96.32) | 3 (1.84) | 3 (1.84) | — | 1 (.61) |
| Do you think the average mental health professional can effectively screen for "at risk" clients (dangerous to self or others) using telehealth technology? | 53 (32.72) | 53 (32.72) | 56 (34.57) | — | 2 (1.22) |
| Are you aware of any state or federal law/s or regulation/s that govern the delivery of counseling services provided online or via other telehealth technologies? | 92 (57.50) | 68 (42.50) | — | — | 4 (2.44) |
| Are you aware of any guidelines or standards for online counseling and therapy published by these professional associations?[a] | | | | | |
| American Counseling Association | 16 (9.76) | 148 (90.2) | | | |
| American Medical Association | 10 (6.10) | 154 (93.9) | | | |
| American Psychiatric Association | 15 (9.15) | 149 (90.85) | | | |
| American Telemedicine Association | 25 (15.24) | 139 (84.76) | | | |
| Employee Assistance Professional Association | 1 (.61) | 163 (99.39) | | | |
| National Association of Alcoholism and Drug Abuse Counselors | 1 (.61) | 163 (99.39) | | | |
| Not aware of any | 91 (55.49) | 73 (44.51) | | | |
| Other | 32 (19.51) | 132 (80.49) | | | |
| What are your concerns with online counseling?[a] | | | | | |
| Security/confidentiality or HIPAA compliance | 130 (79.27) | 34 (20.73) | | | |
| Equipment costs | 35 (21.34) | 129 (78.66) | | | |
| Licensure issues | 119 (72.56) | 45 (27.44) | | | |
| Lack of personal training or education in this area | 64 (39.02) | 100 (60.98) | | | |
| Lack of available education or training programs in this area | 40 (24.39) | 124 (75.61) | | | |
| Lack of direction from my professional association | 40 (24.39) | 124 (75.61) | | | |
| Lack of supporting research | 44 (26.83) | 120 (73.17) | | | |
| Inability to handle emergency situations | 85 (51.83) | 79 (48.17) | | | |
| Tried online therapy practice and decided it was not for me | 4 (2.44) | 160 (97.56) | | | |
| Don't know how to get started with online practice | 17 (10.37) | 147 (89.63) | | | |
| Don't understand issues involved with online practice | 16 (9.76) | 148 (90.24) | | | |
| Don't have any concerns | 3 (1.83) | 161 (98.17) | | | |
| Don't know how to get started with online practice | 17 (10.37) | 147 (89.63) | | | |

Note. TBH = telebehavioral health; N/A = not applicable; HIPAA = Health Insurance Portability and Accountability Act.
[a] Survey question for which respondents were prompted to choose "all that apply."

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 4

*Significant Chi-Square Results for Survey Questions Related to Preferences and Use of Telecommunication Modalities and Age Group of Clients Served by Respondent Characteristics (N = 164)*

| Survey question[a] | Background characteristic | Factor levels | % Affirmative | p value |
|---|---|---|---|---|
| How many hours per week (1 hr or above vs. 0 hr) on average do you deliver online counseling?[20] | Age (years) | 36 and younger | 14.29 | .0155 |
| | | 37–46 | 66.67 | |
| | | 47–56 | 34.00 | |
| | | 57–64 | 50.00 | |
| | | 65 and older | 41.67 | |
| What percentage (1% or higher vs. 0%) of your practice is currently delivered online? | Age (years) | 36 and younger | 35.71 | .0049 |
| | | 37–46 | 71.43 | |
| | | 47–56 | 32.00 | |
| | | 57–64 | 60.38 | |
| | | 65 and older | 37.50 | |
| | Primary region of work | Northeast | 66.67 | .0175 |
| | | Midwest | 37.93 | |
| | | South | 41.07 | |
| | | West | 66.66 | |
| Which telecommunication tools have you used (yes vs. no) in the last year to deliver counseling services at a distance to clients? | | | | |
| Landline telephone | Age (years) | 36 and younger | 21.43 | .0019 |
| | | 37–46 | 54.55 | |
| | | 47–56 | 60.00 | |
| | | 57–64 | 77.78 | |
| | | 65 and older | 70.83 | |
| | Primary work setting | Private | 67.72 | .0341 |
| | | Public | 48.65 | |
| Mobile phone | Primary work setting | Private | 52.27 | .0008 |
| | | Public | 27.03 | |
| E-mail | Age (years) | 36 and younger | 28.57 | .0262 |
| | | 37–46 | 27.27 | |
| | | 47–56 | 28.00 | |
| | | 57–64 | 55.56 | |
| | | 65 and older | 33.33 | |
| | Primary work setting | Private | 43.31 | .0071 |
| | | Public | 18.92 | |
| Which telecommunication tools have you used (yes vs. no) in the last year to deliver counseling services at a distance to clients? | | | | |
| Video conferencing | Age (years) | 36 and younger | 7.14 | .0150 |
| | | 37–46 | 40.91 | |
| | | 47–56 | 16.00 | |
| | | 57–64 | 37.04 | |
| | | 65 and older | 16.67 | |
| Telephone | Age (years) | 36 and younger | .00 | .0480[b] |
| | | 37–46 | 4.55 | |
| | | 47–56 | 2.00 | |
| | | 57–64 | 14.81 | |
| | | 65 and older | .00 | |

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 4 (continued)

| Survey question[a] | Background characteristic | Factor levels | % Affirmative | p value |
| --- | --- | --- | --- | --- |
| Online telephone conferencing service | Age (years) | 36 and younger | .00 | .0453[b] |
| | | 37–46 | 4.55 | |
| | | 47–56 | .00 | |
| | | 57–64 | 12.96 | |
| | | 65 and older | 8.33 | |
| | Gender | Male | 11.76 | .0171[b] |
| | | Female | 2.08 | |
| Which of the following technologies do you consider useful (yes vs. no) for online counseling? | | | | |
| Videoconferencing | Primary region of work | Northeast | 72.00 | .0223 |
| | | Midwest | 59.32 | |
| | | South | 80.36 | |
| | | West | 87.50 | |
| What age groups do you currently serve (yes vs. no) using technology? | | | | |
| Adults | Age (years) | 36 and younger | 7.14 | .0128 |
| | | 37–46 | 45.45 | |
| | | 47–56 | 12.00 | |
| | | 57–64 | 29.63 | |
| | | 65 and older | 25.00 | |
| | Region of work | Northeast | 68.00 | .0371 |
| | | Midwest | 44.07 | |
| | | South | 53.57 | |
| | | West | 75.00 | |
| | Primary work setting | Public | 62.20 | .0013 |
| | | Private | 32.43 | |
| Adolescents | Primary work setting | Private | 14.96 | .0477 |

[a] For online counseling delivery items, hours and percentage of use were collapsed into two categories (1 hr or above vs. 0 hr, and 1% or higher vs. 0%). For telebehavioral health tools, groups served and usefulness items were coded yes–no.    [b] Fisher's exact tests were performed instead of chi squares.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

when serving adolescents, $\chi^2(1, N = 164) = 4.02$, $p = .04$, and adults, $\chi^2(1, N = 164) = 10.28$, $p = .001$, than that of psychologists in public practice (see Table 4). No significant associations were found between the other two age groups (i.e., children and elderly) and clinician's work setting in performing TBH.

Next, only one significant association was found between region of practice and the age groups of clients served, $\chi^2(4, N = 164) = 8.48$, $p = .04$. Substantially higher proportions of psychologists across the Northeast, South, and West provided TBH to adults than those in the Midwest. No significant associations were found between the other three age groups (i.e., children, adolescents, and elderly) and region of practice in conducting TBH. Last, no significant relationships were found between psychologists' gender and years worked since obtaining highest academic degree and the age groups of clients served via TBH.

**Professional, ethical, and legal regulatory issues.** As shown in Table 5, tests of association were performed between TBH ethical and legal concerns and psychologists' characteristics. A significant association was found between ethical concerns about TBH delivery and psychologists' age (Fisher's exact test, $p = .02$). A substantially higher proportion of psychologists 37 years of age and older indicated the delivery of TBH by licensed providers was ethical compared with that of psychologists 36 years of age and younger. This pattern was replicated in comparing the responses of psychologists who endorsed "unsure" about the ethics of TBH practice. A substantially higher proportion of psychologists 36 years of age or younger reported uncertainty whether licensed professionals should engage in TBH practice than that of psychologists 37 years of age or older.

A significant correlation was obtained between awareness of TBH laws/regulations and respondents' years of age, $\chi^2(4, N = 160) = 11.17$, $p = .02$. A substantially higher proportion of psychologists between 37 to 64 years of age reported being "aware of telehealth laws and regulations" at the state and federal level than both psychologists Age 36 or younger and 65 or above. A statistically significant relationship also was found between TBH licensure concerns and age of respondents, $\chi^2(4, N = 164) = 12.32$, $p = .02$. In contrast, a substantially higher proportion of psychologists Ages 37 and older endorsed licensure concerns in delivering TBH services than that of psychologists 36 years of age and younger (see Table 5).

Turning to work setting, a significant relationship was found between malpractice insurance coverage and work setting (Fisher's exact text, $p = .03$). A similar proportion of independent practice and public sector psychologists endorsed "yes" on having malpractice insurance coverage. A different pattern emerged for psychologists who were "unsure" about their malpractice coverage in providing TBH. The proportion of psychologists in independent practice endorsing "unsure" was substantially higher than that of psychologists in public settings. Finally, no statistically significant relationships were found among survey items assessing professional, ethical, and legal regulatory concerns about TBH practice and psychologists' gender, primary region of work, and years worked since obtaining highest academic degree.

**TBH training and practice.** A significant association was obtained between psychologists' concerns about lack of direction from their professional association in conducting TBH and psychologists' gender, $\chi^2(1, N = 164) = 7.69$, $p = .006$. A signifi-

Table 5
*Chi-Square Results for Survey Questions Related to Professional, Ethical, and Legal Regulatory Issues and Telehealth Training and Practice by Respondent Characteristics (N = 164)*

| Survey question | Respondent characteristic | Factor levels | % Affirmative | *p* value |
|---|---|---|---|---|
| Does your malpractice carrier cover you for delivering online counseling (yes vs. no vs. unsure)?[a] | Primary work setting | Private<br>Public | 13.01<br>16.22 | .0304[b] |
| Do you think it is ethical for LICENSED mental health professionals to deliver services online or via other telehealth technologies (yes vs. no vs. unsure)? | Age (years) | 36 and younger<br>37–46<br>47–56<br>57–64<br>65 and older | 57.14<br>90.48<br>76.00<br>87.04<br>75.00 | .0239[b] |
| Are you aware of any state or federal law/s or regulation/s that govern the delivery of counseling services provided online or via other telehealth technologies (yes vs. no)? | Age (years) | 36 and younger<br>37–46<br>47–56<br>57–64<br>65 and older | 41.67<br>66.67<br>68.00<br>59.26<br>30.43 | .0247 |
| What are your concerns with online counseling (yes vs. no)? | | | | |
| Licensure issues | Age (years) | 36 and younger<br>37–46<br>47–56<br>57–64<br>65 and older | 35.71<br>81.82<br>76.00<br>70.37<br>83.33 | .0151 |
| Lack of available education or training programs in this area | Gender | Male<br>Female | 47.92<br>26.47 | .0055 |
| Lack of direction from my professional association | Years worked since obtaining highest academic degree | 0–10 years<br>11–20 years<br>21–30 years<br>31 or more years | 43.75<br>9.52<br>23.33<br>26.67 | .0087 |

[a] For the malpractice and ethics items, the response categories were "yes," "no," or "unsure." For the concerns about online counseling, response categories were either "yes" or "no."     [b] Fisher's exact tests were performed instead of chi squares.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

cantly higher proportion of female psychologists reported concern about lack of direction from their professional associations for using TBH than that of male psychologists.

Of those who reported concern about lack of education or training in TBH, a significantly higher proportion of psychologists practicing between 0 and 10 years reported concern about lack of education or training in TBH than those with 11 or more years of practice since obtaining their highest academic degree, $\chi^2(3, N = 164) = 11.66, p = .009$ (see Table 5). No significant relationships were found between respondents' concerns about TBH training and the remaining background factors (i.e., psychologists' age, gender, primary region of work, and work settings).

## Discussion

The key findings from the descriptive statistics of survey items and tests of association are discussed first, organized according to the four primary item content domains (i.e., preference and use of telecommunication modalities; age group of clients served; professional, ethical, and legal regulatory issues; and telehealth training and practice). Next, the methodological limitations of the current study are described, followed by future directions for research on psychologists' use of TBH technologies, their ethical and legal concerns, and needs for telehealth training and practice.

### Preference and Use of Telecommunication Modalities

The majority of survey respondents (57%) did not use telecommunication technologies to deliver psychological services. Thirty-seven percent of respondents provided TBH services 1 to 5 hr per week and the remaining engaged in TBH practice for 6 or more hours per week. In descending order, the technologies used by psychologists were landline telephone (63%), mobile telephone (51%), e-mail (38%), and videoconferencing (26%). Substantially lower endorsement rates were reported for other telecommunication modes, such as smart phone applications, online telephone, online telephone conferencing services, chat rooms, or instant messaging.

Although the respondents' overall use of telecommunication modalities was moderately low, over half (51%) indicated they would like to deliver 10% to 100% of their services online in the future. Buttressing the prospects of increased utilization of TBH technologies, 73% of psychologists considered videoconferencing useful as a tool for service delivery. Of particular note is the number of respondents using e-mail to deliver psychological services over the past year (38%). This estimate has increased sharply since the 2008 APA practice survey reported 9.8% of psychologists used e-mail for clinical purposes (Michalski, Mulvey, & Kohout, 2010).

Despite the growth in telecommunication use, significant discrepancies emerged between actual implementation of TBH services and psychologists' positive appraisals of their usefulness in clinical practice. This finding is consistent with previous studies outlining barriers to provider use of telehealth (Brooks, Turvey, & Augusterfer, 2013) and is particularly important in light of mounting pressures from federal agencies on behavioral health providers to adopt technology in value-based purchasing (Smith, Myers, Sederer, & Berezin, 2016) and pay-for-performance models (Stewart, Lareef, Hadley, & Mandell, 2017), both of which rely on

telecommunication technologies to decrease costs and improve efficiencies.

Three possible explanations for these discrepancies may account for the limited uptake of TBH training by psychologists. First, the inflection point for telehealth adoption had not been reached at the time of completion of the TBH survey. Current leaders of health care reform have judged telehealth a viable option for curtailing the growth of health care costs. This expectation is reflected by the upward trend in adoption of telehealth by employers, hospitals, and health care plans, as well as the introduction of multiple, federal health care reforms with core telehealth components (Simon, 2017; Wicklund, 2017).

Second, insurers and state licensing boards in other health disciplines (e.g., nursing) have recently begun to require certification in telehealth. Such activity is putting pressure on clinicians who are untrained to document their expertise. In a related vein, the Association for State and Provincial Psychology Boards released PSYPACT in 2015. The goal of PSYPACT to facilitate the practice of telepsychology and temporary in-person psychology across jurisdictions (PSYPACT, 2017). APA has endorsed PSYPACT's proposal to coordinate state licensing boards with a model act for interjurisdictional practice and telepsychology, along with requirements for professional training. As PSYPACT garners endorsements from state psychology boards across the country, psychologists' priorities in obtaining TBH training are likely to increase.

Third, a lack of identified competencies may have left psychologists guessing about the specific skill sets and risk management procedures required for TBH practice. Under such conditions, it is not surprising survey respondents may have been reluctant to pursue TBH training opportunities. Note, however, that a recent development may help in reducing this ambiguity. Several articles specifying the competencies for TBH practice have been published over the past few years (e.g., Hilty et al., 2015, 2017; Johnson, 2014; Maheu et al., 2017).

### Age Groups of Clients Served

The majority (55%) of respondents indicated they had provided TBH services to adult clients. In contrast, substantially smaller percentages of psychologists provided TBH to children (3%), adolescents (12%), and elderly (9%). This discrepant pattern of results may be attributable to two factors: (a) discretionary income to obtain TBH services, and (b) convenience in accessing such services. First, adults in the United States between 22 and 64 report higher annual incomes than other age groups, thus providing discretionary funds to obtain TBH from psychologists. This age cohort also may be more receptive to such services because of increased exposure and normalization of TBH in the work place, particularly the incorporation of telehealth-based employee assistance programs. Second, adults are likely to prefer the convenience of TBH services, particularly elimination of travel time to health care settings and greater control of the session environment (e.g., in-home service delivery; Luxton, Nelson, & Maheu, 2016; Maheu, Pulier, Wilhelm, McMenamin, & Brown-Connolly, 2004).

Although adults represented the highest user group of TBH in the current survey, the utilization pattern of TBH services across age groups is likely to change over the next few decades. With the aging of adults born from 1946 through 1960, the percentage of

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

technology-savvy older adults receiving online psychological services is expected to increase substantially. The older generation comprises one of the fastest growing sectors of the U.S. population purchasing health-care-related technology and services (Brenner, 2013; Desilver, 2013).

## Professional, Ethical, and Legal Regulatory Issues

In examining psychologists' responses to survey items related to TBH professional, ethical, and legal/regulatory concerns, three issues merit special attention. First, over half (52%) of respondents reported inadequate skills in managing crisis situations in the context of online practice. Handling emergencies, such as suicide risk and child abuse, is one of the core competencies of practicing psychologists, requiring specialized knowledge and skills for effective TBH. Psychologists new to online practice may be unaware of the necessity for obtaining background information about how and when to develop a proper informed consent procedure. They also may be uninformed about the need to establish a safety net of resources and emergency contact information in the communities of clients they serve. This lack of clarity about legal and regulatory requirements for such issues is problematic in light of the growing number of psychologists who currently use or plan to incorporate videoconferencing in their practices.

A second major concern focused on ethical issues related to security, confidentiality, and HIPAA compliance in the use of telecommunication technologies. Seventy-nine percent of respondents endorsed items suggesting concerns about security, confidentiality, and HIPAA. Although these ethical issues were noted across all age groups, a substantially greater proportion of psychologists 36 years of age and younger felt unsure about TBH ethical requirements compared with their counterparts 37 years of age and older. These findings underscore the need for doctoral and postdoctoral programs to expand their ethics curriculum, incorporating TBH within the framework of essential readings and illustrative vignettes.

A third key concern centered on ambiguities and misinformation about licensure and regulatory issues. Forty-two percent of psychologists reported that they were unaware of any state or federal laws or regulations governing telepractice over state lines. Twenty-seven percent of psychologists indicated they were unsure whether it was legal to provide TBH services to clients *outside* the state(s) in which they were licensed. Furthermore, 35% of respondents erroneously believed it was legal to provide TBH across state lines by identifying themselves as a coach instead of a licensed psychologist. Although it is unclear to what extent psychologists selectively identify as coaches or psychologists to conduct TBH across state lines, this practice is both unethical and illegal. Further research is required to determine the prevalence of dual identification (i.e., licensed psychologist and health coach) and to what extent this dual identification influences TBH practices across state lines.

In addition to regulations governing interstate practice, psychologists reported uncertainty about malpractice insurance coverage. A large majority of respondents (74%) were unsure whether their current malpractice carrier covered delivery of TBH. This finding suggests that a substantial proportion of psychologists currently practicing TBH may be unaware of potential liability risks and the specific action steps to remedy this information gap. Professional associations (e.g., APA) should consider providing information about TBH liability coverage by major insurance companies to protect their members from unanticipated financial losses.

## TBH Training and Practice

Two major themes emerged in examining the pattern of survey findings on TBH training and practice: (a) inadequate preparation of early career psychologists, and (b) uncertainties about uptake of continuing education among practitioners. A substantially higher proportion of early career psychologists (i.e., 0 to 10 years in practice) reported concern about lack of education or training in telehealth than that of psychologists falling within the middle to late career range (i.e., 11 or more years of practice). This finding underscores the importance of educating faculty members of psychology pre- and postdoctoral training programs about the need to prepare their students for TBH practice (Callan et al., 2017). Early career psychologists should be conversant with peer-reviewed research supporting the incorporation of TBH into standard clinical practice and receive hands-on training with telecommunication modalities (Luxton et al., 2016; Maheu et al., 2004). This is especially important in light of the federal government's commitment to increase access to and uptake of behavioral health services. TBH is a key mechanism for accomplishing this goal. Thus, it is incumbent on pre- and postdoctoral psychology training programs to equip students with the knowledge and skills they require to function effectively in our evolving health care system.

Turning to continuing education of practitioners, a contradiction emerged between the sizable minority of respondents (39%) endorsing insufficient personal training or education in TBH and the availability of APA-sponsored workshops at national conferences, federal agency resources, and expert online training courses. APA has offered continuing TBH education symposia and workshops at national conferences dating back to 1995. APA also has provided webinars and other training opportunities for psychologists. Furthermore, a plethora of training resources are available to practitioners, ranging from those produced by large federal entities (e.g., United States Health and Human Services, Substance Abuse and Mental Health Services Administration, and Telehealth Resource Centers) to national and state professional associations, as well as specialized private training organizations available online (e.g., Telebehavioral Health Institute). Nonetheless, the widespread availability of training resources has not translated into positive appraisals of adequate professional training and education in TBH.

Two possible explanations are offered to account for these inconsistencies. First, it is possible that psychologists are aware of training and education inadequacies in TBH but have placed a low priority on acquiring competencies in this domain of practice. As noted previously, they may not have perceived the marketing advantages of TBH because of both lower insurance reimbursement and private payer demand for such services.

Second, survey respondents may not have been members of APA or other national organizations, and as a result, they may have received little exposure to information about TBH training resources. As Sladek (2011) asserted, most licensed professionals no longer become members of national or state professional associations. This trend suggests the need for alternative methods in broadcasting continuing education opportunities, such as state regulatory boards (Hilty et al., 2017), web-based continuing edu-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

cation outlets, graduate education, and professional training institutions (Callan et al., 2017; Luxton et al., 2016; Maheu et al., 2004).

## Limitations and Future Directions for Research

The primary limitations of the present study were the disproportionate number of respondents working in independent practice settings, lack of information about race/ethnicity and community characteristics, small sample size of early career psychologists, and reliance on close-ended questions. First, 77% of survey respondents indicated their primary work setting was independent or group independent practice, whereas the remainder (23%) provided psychological services in public organizations (e.g., health or behavioral health clinic, hospital, military or veterans affairs facilities; see Table 1). This finding was inconsistent with the general employment pattern of psychologists providing clinical services across the United States. The 2015 APA Survey of Psychology Health Service Providers (Hamp, Stamm, Lin, & Christidis, 2016) reported the primary work setting of the majority of psychologists (55%) was located in the public domain (e.g., educational institutions and hospitals).

Note, however, that the largest *single* sector of primary work employment of psychologists consisted of private independent and group practice. Forty-five percent of U.S. psychologists provide direct service in independent practice settings (Hamp et al., 2016). Further supporting the external validity of the current investigation, no differences were found on gender between TBH (58.5% female) and APA (59.2% female) survey respondents. Nonetheless, caution should be exercised in generalizing the results of the present study, particularly the uses of and preferences for telecommunication technologies, to the overall cohort of practicing psychologists in the United States.

A second shortcoming of the current study was the failure to include survey items identifying psychologists' race/ethnicity and community of residence. The former was inadvertently omitted during the construction of the survey. This substantial error was discovered too late in the data collection process to be remediated. Psychologists' community of residence (e.g., urban, suburban, and rural) was also excluded to limit the time and effort required to complete the survey. It is possible the use of TBH may have been differentially associated with race/ethnicity and type of community in which respondents resided. Future research on the relationship between psychologists' characteristics and incorporation of TBH in clinical practice will include these variables.

Third, the number and percentage of the subsample of respondents 36 years of age and younger (i.e., early career psychologists) was small ($n = 14$; 8.5%). The recruitment strategy of the present study was to cast a broad net across state associations and practice organizations. The incorporation of sample stratification on the variable of age was considered impractical for the purposes of this initial TBH practice survey. However, the percentage of the current survey's early career subsample was similar to that of early career psychologists in the 2015 APA survey (i.e., 5.4%), thus lending credibility to the generalizability of the findings (see APA, 2016). This is particularly the case for tests of association between psychologists' age and their use of telecommunication technologies and concerns about TBH education and training.

Fourth, the survey instrument relied exclusively on a closed-ended, rating-scale format. This approach was used to increase the probability of obtaining a reasonable sample size and completion of a large proportion of the survey items. Although both these goals were obtained, ambiguities emerged in interpreting differences between psychologists' use of telecommunication technologies in clinic practice and their deployment of specific telecommunication modalities. For example, on Item 22 of the survey, 57% of psychologists reported an average of 0 hr per week using telecommunication technologies to deliver counseling services, whereas on Item 9, more than half of psychologists endorsed using landline (63%) or mobile phones (51%) to deliver counseling services during the previous year. It appears likely psychologists' average number of hours per week using telecommunication technologies in clinical practice was moderately low. However, specific technologies, such as landline or mobile phones, may have been incorporated in clinical practice to supplement in-person services. Thus, the framing and wording of technology use items may have led to different response patterns.

Future directions for research include replication of the study with a larger sample of respondents and modification of the survey methodology. First, a nationwide telephone survey is recommended to assess the reliability of the current findings and to test for changes in the psychologists' use of and preference for telecommunication technologies and client populations served online as well as professional practice and education and training concerns. Second, the survey methodology should be modified to permit the incorporation of open-ended questions. Such items will gather more fine-grained descriptive information on time spent in TBH practice, the range of technologies deployed and their level of usage, as well as psychologists' ethical, regulatory, and legal concerns in the use of technology and needs for education and training. Third, future research is needed to enhance knowledge about two important issues: (a) the relationship between practitioners' knowledge about TBH ethical, legal, and regulatory issues and the extent of telecommunication technology use, and (b) the best methods for ensuring psychologists obtain the competencies required for effective TBH practice.

## Final Note

The findings of the current study underscore the need for educational institutions and their faculty members to provide training opportunities to integrate TBH at both the graduate and postgraduate levels. Early career psychologists and experienced practitioners need to be knowledgeable about the technological, logistical, ethical, and regulatory requirements of TBH. They also require hands-on training with telecommunication tools that match the needs and preferences of the populations they serve (Gifford, Niles, Rivkin, Koverola, & Polaha, 2012; Luxton et al., 2016; Maheu et al., 2004). Opportunities to bridge the gap between the behavioral health needs of the public and limited access to professional services are rapidly expanding, and TBH is a potential solution. Psychologists need to prepare themselves to accomplish this important goal.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

# References

American Psychological Association. (2016). 2015 APA survey of psychology health service providers. Retrieved from http://www.apa.org/workforce/publications/15-health-service-providers/report.pdf

Brenner, J. (2013). The first cell phone call: Excerpt from "Networked: The New Social Operating System." Pew Research Center. Retrieved from http://www.pewinternet.org/2013/04/03/the-first-cell-phone-call-excerpt-from-networked-the-new-social-operating-system/

Brooks, E., Turvey, C., & Augusterfer, E. F. (2013). Provider barriers to telemental health: Obstacles overcome, obstacles remaining. Telemedicine and e-Health, 19, 433–437. http://dx.doi.org/10.1089/tmj.2013.0068

Callan, J. E., Maheu, M. M., & Bucky, S. F. (2017). Crisis in the behavioral health classroom: Enhancing knowledge, skills, and attitudes in telehealth training. In M. Maheu, K. Drude, & S. Wright (Eds.), Career paths in telemental health (pp. 63–80). New York, NY: Springer. http://dx.doi.org/10.1007/978-3-319-23736-7_5

Centore, A., & Milacci, F. (2008). A study of mental health counselors' use of and perspectives on distance counseling. Journal of Mental Health Counseling, 30, 267–282. http://dx.doi.org/10.17744/mehc.30.3.q871r684n863u75r

Cooper, S. E., & Neal, C. (2015). Consultants' use of telepractice: Practitioner survey, issues, and resources. Consulting Psychology Journal: Practice and Research, 67, 85–99. http://dx.doi.org/10.1037/cpb0000015

Deen, S. R., Withers, A., & Hellerstein, D. J. (2013). Mental health practitioners' use and attitudes regarding the Internet and social media. Journal of Psychiatric Practice, 19, 454–463. http://dx.doi.org/10.1097/01.pra.0000438184.74359.88

Desilver, D. (2013). Texting while driving may be common, but it's illegal in most states. Pew Research Center. Retrieved from http://www.pewresearch.org/fact-tank/2013/11/15/texting-while-driving-may-be-common-but-its-illegal-in-most-states/

Duncan, A., Nelson, E., Maheu, M., Glueckauf, R., Drude, K., & Gustafson, D. (2013). Technology training in psychology internships. Poster presented at the Association of Behavioral and Cognitive Therapies, Nashville, TN.

Finn, J. (2002). MSW student perceptions of the efficacy and ethics of internet-based therapy. Journal of Social Work Education, 38, 403–419. http://dx.doi.org/10.1080/10437797.2002.10779107

Finn, J. (2006). An exploratory study of email use by direct service social workers. Journal of Technology in Human Services, 24, 1–20. http://dx.doi.org/10.1300/J017v24n04_01

Finn, J., & Barak, A. (2010). A descriptive study of e-counsellor attitudes, ethics, and practices. Counselling & Psychotherapy Research, 10, 268–277. http://dx.doi.org/10.1080/14733140903380847

Ford, T., Avey, J., Deruyter, J., Whipple, J. L., & Rivkin, I. (2012). Providers' voices on telebehavioral health: Survey of an outpatient counseling agency in Alaska. Psychological Services, 9, 316–317. http://dx.doi.org/10.1037/a0026154

Gifford, V., Niles, B., Rivkin, I., Koverola, C., & Polaha, J. (2012). Continuing education training focused on the development of behavioral telehealth competencies in behavioral healthcare providers. Rural and Remote Health, 12, 2108.

Glover, J. A., Williams, E., Hazlett, L. J., & Campbell, N. (2013). Connecting to the future: Telepsychiatry in postgraduate medical education. Telemedicine and e-Health, 19, 474–479. http://dx.doi.org/10.1089/tmj.2012.0182

Hamp, A., Stamm, K., Lin, L., & Christidis, P. (2016). 2015 APA survey of psychology health service providers. American Psychological Association Center for Workforce Studies. Retrieved from http://www.apa.org/workforce/publications/15-health-service-providers/report.pdf

Health Insurance Portability and Account Act of 1996, Pub. L. No 104–191, 110 Stat. 1936 (1996). Retrieved from https://www.gpo.gov/fdsys/pkg/PLAW-104publ191/pdf/PLAW-104publ191.pdf

Hertlein, K., Blumer, M., & Smith, J. (2014). Marriage and family therapists' use and comfort with online communication with clients. Contemporary Family Therapy: An International Journal, 36, 58–69. http://dx.doi.org/10.1007/s10591-013-9284-0

Hilty, D. M., Crawford, A., Teshima, J., Chan, S., Sunderji, N., Yellowlees, P. M., . . . Li, S. T. (2015). A framework for telepsychiatric training and e-health: Competency-based education, evaluation and implications. International Review of Psychiatry, 27, 569–592. http://dx.doi.org/10.3109/09540261.2015.1091292

Hilty, D. M., Maheu, M. M., Drude, K., Wall, K., Long, R., Hertlein, K., & Luoma, T. (2017). Telebehavioral health, telemental health, e-Therapy and e-Health competencies: The need for an interprofessional framework. Journal for Technology in Behavioral Science, 2, 171–189. http://dx.doi.org/10.1007/s41347-017-0036-0

Jameson, J. P., Farmer, M. S., Head, K. J., Fortney, J., & Teal, C. R. (2011). VA community mental health service providers' utilization of and attitudes toward telemental health care: The gatekeeper's perspective. The Journal of Rural Health, 27, 425–432. http://dx.doi.org/10.1111/j.1748-0361.2011.00364.x

Johnson, G. (2014). Toward uniform competency standards in telepsychology: A proposed framework for Canadian psychologists. Canadian Psychology, 55, 291–302. http://dx.doi.org/10.1037/a0038002

Luxton, D., Nelson, E., & Maheu, M. (2016). A practitioner's guide to telemental health: How to conduct legal, ethical, and evidence-based telepractice. Washington, DC: American Psychological Association. http://dx.doi.org/10.1037/14938-000

Maheu, M., & Gordon, B. L. (2000). Counseling and therapy on the Internet. Professional Psychology: Research and Practice, 31, 484–489. http://dx.doi.org/10.1037/0735-7028.31.5.484

Maheu, M. M., Drude, K., Hertlein, K., Lipshutz, R., Wall, K., Long, R., & Hilty, D. M. (2017). An interprofessional framework for telebehavioral health competencies. Journal for Technology in Behavioral Science, 2, 190–210. http://dx.doi.org/10.1007/s41347-017-0038-y

Maheu, M. M., Pulier, M. L., Wilhelm, F. H., McMenamin, J. P., & Brown-Connolly, N. E. (2004). The mental health professional and the new technologies: A handbook for practice today. Mahwah, NJ: Erlbaum.

McMinn, M. R., Bearse, J., Heyne, L. K., Smithberger, A., & Erb, A. L. (2011). Technology and independent practice: Survey findings and implications. Professional Psychology: Research and Practice, 42, 176–184. http://dx.doi.org/10.1037/a0022719

McMinn, M. R., Buchanan, T., Ellens, B. M., & Ryan, M. K. (1999). Technology, professional practice, and ethics: Survey findings and implications. Professional Psychology: Research and Practice, 30, 165–172. http://dx.doi.org/10.1037/0735-7028.30.2.165

Menon, G. M., & Rubin, M. (2011). A survey of online practitioners: Implications for education and training. Journal of Technology in Human Services, 29, 133–141. http://dx.doi.org/10.1080/15228835.2011.595262

Michalski, D., Mulvey, T., & Kohout, J. (2010). 2008 APA Survey of psychology health service providers. APA Center for Workforce Studies. Retrieved from http://www.apa.org/workforce/publications/08-hsp/report.pdf

Mora, L., Nevid, J., & Chaplin, W. (2008). Psychologist treatment recommendations for Internet-based therapeutic interventions. Computers in Human Behavior, 24, 3052–3062. http://dx.doi.org/10.1016/j.chb.2008.05.011

Perle, J. G., Langsam, L. C., Randel, A., Lutchman, S., Levine, A. B., Odland, A. P., . . . Marker, C. D. (2013). Attitudes toward psychological telehealth: Current and future clinical psychologists' opinions of internet-based interventions. Journal of Clinical Psychology, 69, 100–113. http://dx.doi.org/10.1002/jclp.21912

PSYPACT. (2017). Psychology Interjurisdictional Compact (PSYPACT). Retrieved from http://www.asppb.net/index8cc9.html?page=PSYPACT

SAS. (2017). SAS (Version 9.4). Retrieved from https://www.sas.com/en_us/software/stat.html

Simms, D. C., Gibson, K., & O'Donnell, S. (2011). To use or not to use: Clinicians' perceptions of telemental health. *Canadian Psychology, 52,* 41–51. http://dx.doi.org/10.1037/a0022275

Simon, J. (2017). Large employers revamping health care cost reduction strategies. Retrieved from https://www.plansponsor.com/news/benefits/

Sladek, S. L. (2011). *The end of membership as we know it: Building the fortune-flipping, must-have association of the next century.* Washington, DC: ASAE Association Management Press.

Smith, T., Myers, R., Sederer, L., & Berezin, J. (2016). How value-based payment arrangements should measure behavioral health. Health Affairs Blog. Retrieved from http://healthaffairs.org/blog/2016/11/29/how-value-based-payment-arrangements-shouldmeasure-behavioral-health/

Stewart, R. E., Lareef, I., Hadley, T. R., & Mandell, D. S. (2017). Can we pay for performance in behavioral health care? *Psychiatric Services, 68,* 109–111. http://dx.doi.org/10.1176/appi.ps.201600475

SurveyMonkey. (2017). Retrieved from https://www.surveymonkey.com

U.S. Census Bureau. (2015). Geographic terms and concepts – Census divisions and Census regions. Retrieved from https://www.census.gov/geo/reference/gtc/gtc_census_divreg.html

Wangberg, S. C., Gammon, D., & Spitznogle, K. (2007). In the eyes of the beholder: Exploring psychologists' attitudes towards and use of e-therapy in Norway. *CyberPsychology & Behavior, 10,* 418–423. http://dx.doi.org/10.1089/cpb.2006.9937

Wells, M., Mitchell, K. J., Finkelhor, D., & Becker-Blease, K. A. (2007). Online mental health treatment: Concerns and considerations. *Cyber-Psychology & Behavior, 10,* 453–459. http://dx.doi.org/10.1089/cpb.2006.9933

Wicklund, E. (2017). Congress is coming at CMS from all angles with telehealth bills. Retrieved from https://mhealthintelligence.com/news/congress-is-coming-at-cms-from-all-angles-with-telehealth-bills

Received September 10, 2017
Revision received March 3, 2018
Accepted March 8, 2018 ∎

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

JOURNAL ARTICLE

# Telehealth: Implications for Social Work Practice  Get access

,

*Social Work*, Volume 47, Issue 2, April 2002, Pages 153–161,

https://doi.org/10.1093/sw/47.2.153

**Published:** 01 April 2002     **Article history** ▾

## Abstract

Telehealth, the use of modern information technology to deliver
health services to remote locations, poses both opportunities
and problems for social work. Home health "visits" featuring a
social worker in one state and a patient in another, therapy on
the Internet, and the transmission of patient records across
state and national boundaries raise important ethical and legal
questions. This article examines how modern communications
technologies such as e-mail, interactive e-mail, and interactive
videoconferencing affect social work practice, with emphasis on
the legal, ethical, and relationship issues raised.

**Issue Section:**  Articles

© 2002 National Association of Social Workers, Inc.

You do not currently have access to this article.

## Sign in                                  ❶ Get help with access



## NASW PRESS

### National Association of Social Workers members

Sign in through society site

---

### Personal account

- Sign in with email/username & password
- Get email alerts
- Save searches
- Purchase content
- Activate purchases and trials

Sign in          Register

---

### Institutional access

Sign in through your institution

Sign in with a library card

Sign in with username / password

Recommend to your librarian

### Institutional account management

Sign in as administrator

## Purchase

Subscription prices and ordering for this journal

Purchasing options for books and journals across Oxford Academic

## Short-term Access

To purchase short-term access, please sign in to your personal account above.

Case 2:90-cv-00520-KJM-SCR       Document 8253-3      Filed 05/28/24      Page 54 of 329

Don't already have a personal account? Register

Telehealth: Implications for Social Work Practice – 24 Hours access

EUR €36.00          GBP £32.00          USD $39.00

## Rental



This article is also available for rental through DeepDyve.

**MARKETPLACE TRENDS AND OPPORTUNITIES**

# Telehealth: Legal Basics for Psychologists

*A 50-state review of telehealth laws and rules yields guidance for psychologists considering telehealth services delivery.*



With rapid advances in technology, gone are the days when interactions between health care professionals and patients are limited to in-person communication.

While statistics may be scant, a U.S. Department of Commerce analysis[1] sheds some light on the potential growth of telehealth services. The federal government analysis cited two market research studies from 2008 that found "the [U.S.] market for telemedicine devices and services is forecast to exceed $1.8 billion by the year 2013[2] and that the market is expected to grow at a five-year compound annual growth rate of 56 percent."[3]

And though this trend may not yet have had a broad impact on psychology practice, an increasing number of psychologists are raising questions about the possibility of providing telehealth services in their state and across state lines. Psychologists want to know whether existing law allows them to provide telehealth services and, if so, whether additional legal requirements or restrictions apply.

[1] U.S. Department of Commerce, International Trade Administration, Manufacturing and Services, Office of Health and Consumer Goods. (2009, June 25). *Telemedicine: an important force in the transformation of healthcare.* Retrieved June 7, 2010, from http://www.ita.doc.gov/td/health/telemedicine_2009.pdf

[2] Marketwire. (2008, July 23). *Telemedicine revenues to exceed $1.8 billion by 2013, report projects.* Retrieved June 7, 2010, from http://www.marketwire.com/press-release/Telemedicine-Revenues-to-Exceed-18-Billion-by-2013-Report-Projects-882137.htm

[3] Chang. Christine. (2008, November 13). Intel's health guide puts telehealth in the spotlight (analyst's opinion). *Datamonitor.* Retrieved June 7, 2010, from http://www.americantelemed.org/files/public/IntelsHealthGuidePutsTelehealthinSpotlight.pdf

This article reflects the results of a recent 50-state review of telehealth laws by the American Psychological Association (APA) Practice Directorate's Legal and Regulatory Affairs Department, including telehealth laws that apply specifically to psychologists as well as rules that apply in states without psychology-specific telehealth laws. Further, we discuss the results of a 50-state telephone survey of state psychology boards on enforcement activity related to providing telehealth services. The article concludes with a framework for practitioners to identify relevant legal provisions when they consider providing telehealth services.

## WHAT IS TELEHEALTH?

The term "telehealth services" can be defined broadly to include all interactions that are not in-person between health care professionals and their patients. Organizations that have developed telehealth guidelines for health care practitioners often use this definition. Regulators and insurers, however, often use much narrower definitions of telehealth services, depending on what particular services they are trying to regulate or reimburse. So there is no universal definition of telehealth services.

Differing definitions of telehealth appear in various federal and state laws, reimbursement policies, organization or facility policies or treatment guidelines, with the definition changing depending on the purpose and/or coverage terms of the law or policy at issue. For example, many definitions include only telehealth services furnished via audio-video devices, excluding phone and e-mail. Reimbursement policies using that definition would pay only for services that were furnished using audio-video devices.

Other definitions are specific to the type of provider. For example, general telehealth laws may define "provider" in a way that includes physicians but excludes psychologists. In that case, the psychologist would not be subject to the law's restrictions, nor would the psychologist benefit from any of the law's permissions.

## State Laws on Telehealth

While our review did not find any state that prohibits the provision of telehealth services, some states have specific telehealth laws imposing special requirements when services are furnished via telehealth, as discussed below. In the absence of a specific telehealth law, psychologists should assume that existing licensure and ethical requirements apply when providing telehealth services.

When analyzing state telehealth laws, it is helpful to focus on three factors: who is covered by the law; what services are covered by the law; and what the law requires.

## Providers Covered by Telehealth Laws

We found 22 states that have telehealth laws, but only three of those (California, Kentucky and Vermont) apply to psychologists. We also discovered that telehealth laws generally fall into two categories: those that cover multiple providers (general telehealth laws); and those that cover a single type of provider, usually via the provider's licensure law (psychologist-specific laws).

Of the three telehealth laws that apply to psychologists, two are general laws covering multiple providers (California and Kentucky), while the third is psychologist-specific (Vermont). Laws in the 19 additional states with telehealth laws do not appear to apply to psychologists at this time. However, psychologists should be aware of these laws. As telehealth becomes more prevalent among psychologists and other mental health professionals, states may apply their general state laws to these providers.

## ARE SPECIAL CREDENTIALS NEEDED?

Many states take the view that practitioners should be separately licensed or credentialed to furnish services via telehealth. For example, some psychologists know of physicians who are required to have a special credential. But no state thus far has imposed that obligation on psychologists, meaning they are not yet required to obtain a special "telehealth" license or credential in order to provide telehealth services.

## Services Subject to Telehealth Laws

Information about what services are covered by telehealth laws usually is found in the law's definition of telehealth services. California and Kentucky have a somewhat narrow

*continued on page 4*

# Telehealth: Legal Basics for Psychologists *continued from page 3*

definition of telehealth covering interactive audio, video or other "electronic media" used in the delivery of health care for "diagnosis, consultation, treatment, transfer of health information" and education. (See Cal. Bus. & Prof. Code § 2290.5(a)(1); KRS § 319.140.) California specifically defines "electronic media" to exclude phone conversations and email messages between patients and providers, and specifies that its law does not apply to interactions where the patient is not directly involved – for example, consultations between two providers where the patient is not present.

Vermont, on the other hand, uses a much broader definition of telehealth that includes services furnished via the "internet or other electronic means." The law does not specify any services as being excluded.

## What the Telehealth Laws Require

All three laws include provisions related to disclosure of information to the client, though the requirements are different under each law. These disclosure requirements appear to be intended to protect the client from risks inherent in furnishing services via telehealth. Examples include potential risks to privacy and confidentiality, or the fact that a client may not ever visit the psychologist's office and would not necessarily know the applicable state psychology board should he or she want to file a complaint.

*"In addition to requiring certain disclosures, telehealth laws sometimes include language to make clear that existing laws apply to telehealth services."*

California requires that providers inform their clients about: potential risks, consequences and benefits of telehealth; the right to withhold or withdraw consent to treatment; the fact that all confidentiality protections apply, as do existing laws regarding the patients' right to access their health information; and the stipulation that information obtained from telehealth services cannot be shared for research purposes absent the client's consent. All this information must be included in both a verbal and written informed consent from the patient before any telehealth services are furnished. Failure to comply with these requirements constitutes



unprofessional conduct and the psychologist could be subject to disciplinary action for noncompliance.

Like California, Kentucky requires that psychologists obtain the patient's informed consent prior to providing telehealth services, but the law does not specify what must be included in the consent.

Similarly, Vermont requires that psychologists disclose certain specified information to their patients, such as their name, location, type of license, jurisdiction where licensed, what they are licensed and trained to do and to whom the client can make a complaint and how.

In addition to requiring certain disclosures, telehealth laws sometimes include language to make clear that existing laws apply to telehealth services. The Kentucky telehealth law, for example, states that all confidentiality requirements in state laws and regulations apply to telehealth interactions. Vermont law makes clear that psychologists must be licensed in Vermont as psychologists in order to provide telehealth services and that telehealth services are subject to the Vermont Psychology Board's laws and rules.

## Psychology Board Opinions on Telehealth

In states that do not have specific telehealth laws, opinions or declaratory statements issued by state psychology boards provide a valuable source of information. These opinions are often provided in response to an inquiry about telehealth, and they indicate how the board believes its laws would apply to telehealth services and how the board might enforce the

laws if it received a complaint against a psychologist. Licensing boards in Colorado, Florida, Georgia, Massachusetts, North Carolina, Texas, Virginia and Wisconsin have issued statements or opinions on telehealth. In nearly all of these opinions, the board emphasizes that psychologists must consider carefully the potential challenges posed by telehealth services – for example, verifying client identity, dealing with limited or lack of visual and other cues, obtaining informed consent, recognizing potential confidentiality and privacy problems and taking the necessary steps to protect confidentiality, ensuring computer security and dealing with potential technology failure as well as addressing billing/payment issues.

In addition to written opinions, we were also informed of verbal opinions and reliance on opinions of other practitioner licensing boards. For example, the staff of one state board informed us that telephone therapy would be acceptable so long as the initial consultation between the patient and psychologist was in-person. Another board told us that it relied on the telehealth opinion written by the counseling board in that state. Where state psychology licensing boards do not have written policies in place, some boards may have considered the issue of telehealth and adopted an informal policy. Psychologists should keep themselves appised of any telehealth-related policy their state board may follow. (See the section "A Framework for Identifying Legal Limits on Telehealth for Psychologists" on page 6 for additional information.)

### State Laws on Practicing Across State Lines

Another key issue for many psychologists (and health providers in general) is the complex legal question of whether psychologists may provide telehealth services across state lines to a client located in a state where the psychologist is not licensed, or whether the psychologist may travel out of the state where he or she is licensed but continue to provide services to patients in the home state.

There is a strong legal argument that when providing psychology services, the "service" is furnished both where the psychologist is located and where the client is located, and psychologists must be licensed in both locations. Psychology boards generally take this position as well. (In the absence of a specific law to the contrary, this rule is generally accepted for all health care providers.)

Accordingly, state psychology boards told us that they would view the practices described earlier as providing psychological services in their state without a license. If a client complained to his or her state psychology board about a matter that involved telehealth services, that psychology board could find that the psychologist violated the state's law and impose a sanction. Further, the psychology board in the client's state might notify the psychologist's home state board, which would generally have the authority to impose its own sanctions.

Several states have issued official written opinions to make clear their view that they can regulate out-of-state psychologists who provide telehealth services. Examples include Florida, Georgia, Massachusetts, North Carolina, Texas and Wisconsin. Some of these opinions address the issue of psychologists who are temporarily away from their home state and wish to continue providing therapy to their in-state clients, while others address the issue of psychologists who wish to furnish services to out-of-state clients.



In Florida, the psychology board responded to an inquiry submitted by an Ohio psychologist who was planning to live part-time in Florida. The psychologist asked whether treating his Ohio patients using telecommunications, including email and videoconferencing, while in Florida required psychology licensure in Florida. The board determined that such a situation did constitute the practice of psychology in Florida, thereby requiring licensure in that state.

*continued on page 6*

# Telehealth: Legal Basics for Psychologists *continued from page 5*

In Texas, the psychology board issued an opinion stating that an "individual who is physically located in another state shall be considered to be practicing psychology in Texas and therefore, subject to the [Psychologists' Licensing] Act, if a recipient of psychological services provided by the individual is physically located in the state of Texas." North Carolina and Massachusetts have issued similar opinions.

Though psychology licensing laws generally require licensure in both the state where the psychologist is located and the state where the patient is located, psychologists can achieve what they need in many states on a temporary basis through temporary or guest licensure provisions. Under these provisions, states permit psychologists who are licensed in another state to practice for some fixed number of days per year in their state. Additional requirements sometimes apply, such as advance notification and/or approval of temporary practice by the psychology board. State provisions vary considerably and any psychologist relying on these provisions must understand them well.

 **HELPFUL ONLINE TOOLS**

**A chart summarizing the results of our 50-state review of telehealth is available online (apapracticecentral.org/advocacy/state/telehealth-slides.pdf) at Practice Central**, the APA Practice Organization website. The chart identifies the availability of temporary/guest licensure on a state-by-state basis, along with additional details related to telehealth services delivery in each state. Please note that this chart does not substitute for the psychologist speaking to the applicable state board about the state's temporary licensure provisions.

Another tool that some psychologists may find useful is the Interjurisdictional Practice Certificate (IPC), recently adopted by the Association for State and Provincial Psychology Boards (ASPPB). This certificate is intended to facilitate temporary practice in other states by licensed psychologists. Additional information is available on the ASPPB website **(asppb.net)**.

## Enforcement Activity When Practicing Telehealth Across State Lines

Very few legal cases address the issue of practicing telehealth across state lines. Those we found address laws that apply specifically to physicians. Since not all enforcement actions result in lawsuits, we conducted a survey of state psychology boards to determine the level of enforcement activity regarding telehealth practice across state lines. None of the boards reported any significant enforcement activity.

Generally, when asked about telehealth, psychology board representatives said that they had not received any complaints in this area and therefore had not taken any action. The boards generally believed that they have the authority to take action if a complaint were to arise about services being provided by an out-of-state psychologist.

Being aware of health care professionals who provide telehealth services across state lines on a routine basis may lead other practitioners to think that it must be legal to engage in such activity. That conclusion is not necessarily warranted. Some health care professionals seem to be willing to take the risk that enforcement action may be taken against them given scant enforcement actions thus far.

## A Framework for Identifying Legal Limits on Telehealth for Psychologists

If a licensed psychologist is interested in providing telehealth services and is practicing in a state that lacks telehealth laws or clear policies, the issue of risk management arises. Taking the following steps may help mitigate the risk of delivering telehealth services.

First, check with the psychology licensing board to confirm whether the board has considered the issue of telehealth and has issued any related policies – written as well as verbal. The field of telehealth is fluid and evolving. Checking periodically on psychology board policies, as well as general state laws and regulations related to telehealth, is prudent.

In general, information about psychology licensing laws, regulations and board policies can be found on the state psychology board's website. Licensing board contact information is available online at the Association of State and Provincial Psychology Boards website at asppb.net.

State laws, including telehealth laws if enacted in your state, generally can be found on your state legislatures' website. To access that website, try entering the name of your state followed by the word "legislature" into a search engine such as Google™. The Center for Telehealth and E-Health Law (telehealthlawcenter.org) is another useful online resource for information on general telehealth laws.

Second, it is important to contact your malpractice carrier to confirm whether telehealth services – in-state and/or across jurisdictional lines – would be covered under your malpractice policy.

Third, if you are interested in providing services across state lines, determine whether psychology licensing laws in the applicable states have temporary or guest licensure provisions that allow out-of-state psychologists to provide services for a short period of time. Temporary or guest licensure might be an attractive option for a psychologist whose patient might be in another state on a short-term basis. Not all states allow for temporary licensure. You need to understand clearly what states provide for guest licensure, how many days during a calendar year you may provide services under such licensure and whether you must obtain advance approval from the psychology board. If you do provide services across state lines, you should also be aware of the other state's requirements for providing psychological services, such as patient consent, confidentiality and duty to warn.

Another option is getting licensed in other states where your patients may be regularly located – for example, if you work in Florida and a significant percentage of your clients spend summers in other states. While licensure in multiple jurisdictions may result in increased costs (for example, licensure fees) and time commitment (such as to meet continuing education requirements), it would also lessen the risks posed by practicing across state lines.

## Additional Considerations When Providing Telehealth Services

In addition to looking into laws and regulations that govern a psychologist's provision of telehealth services, many general laws and ethical requirements have special implications when considered in light of telehealth. These would include, but not be limited to, federal and state privacy and security requirements, confidentiality and

informed consent requirements and ethical standards. For example, use of telehealth may require specific disclosures about the limits of telehealth services, the potential for disruption in services and potential risks to confidentiality. Ethical requirements continue to apply to psychologists whenever they are rendering services, including when doing so via telehealth.

Reimbursement considerations are also important. While most payers are not yet reimbursing generally for telehealth services, there seems to be growing acceptance among insurers related to using audio-video technologies in certain situations. For example, Medicare allows for coverage of telehealth services provided in certain designated settings to beneficiaries located in rural areas. It is important to check with any applicable payer(s) to find out their reimbursement policies before providing and billing for telehealth services. A more detailed discussion of reimbursement and other topics related to telehealth will be the subject of future articles from the APA Practice Organization.

---

### TELEHEALTH GUIDELINES

The two organizations identified below have published guidelines on providing mental health services via telehealth that some practitioners may find useful.

Ohio Psychological Association. (2008, April 12, updated 2010). *Telepsychology guidelines.* Retrieved July 7, 2010, from http://bit.ly/OHtelepsych

American Telemedicine Association. (2009, October). *Practice guidelines for videoconferencing-based telemental health.* Retrieved June 7, 2010, from http://bit.ly/telemed

Check for updates

*Article*

# Telehealth, friend and foe for health care social work

*Qualitative Social Work*
2021, Vol. 20(1–2) 399–403
© The Author(s) 2020
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/1473325020973358
journals.sagepub.com/home/qsw

$SAGE

## Margaret A Cristofalo 
Seattle University, USA

### Abstract
The author describes her experience as a health care social worker with the proliferation of telehealth as the standard medium of intervention with patients since the onset of the COVID-19 pandemic. As a practicing health care social worker for more than twenty years, she describes the advent of telehealth, her introduction to it, and current experience in her outpatient practice setting. She delineates the surprising benefits it has provided to patients during the pandemic. She also outlines the threats it poses in the increasingly corporatized US health care environment to social work values and the well-being of social work's focal populations, the vulnerable, oppressed, and those living in poverty. She emphasizes the need for vigilance and advocacy by social workers as the pandemic progresses and recedes.

### Keywords
Health, disasters, critical reflection, hospitals, mental health, social work practice

Prior to my academic career, I was a health care social worker for over twenty years, beginning in 1997. I practiced in urban outpatient clinics and emergency departments, and on hospital inpatient floors, and continue to practice a couple times a month in an urgent care clinic. Throughout my years as a clinical social worker, I participated in city-wide disaster drills, worked during global disease

**Corresponding author:**
Margaret A Cristofalo, Seattle University, 901 12th Avenue, PO Box 222000, Casey Hall 330-03, Seattle, WA 98122, USA.
Email: cristofm@seattleu.edu

threats, and navigated calamities generated by nature and humans. Nothing approaching the magnitude of the catastrophe of COVID-19 was part of my practice experience.

As a health care social worker, I saw patients exclusively in person until COVID-19. The remedy given to many health care workers, including social workers, when the risk of physical exposure to others due to the pandemic outweighed the benefits, has been telehealth. When I started practicing social work, telehealth was not being used in any health setting where I practiced. There was not even an electronic health record (EHR) in the urban, level 1 trauma center where I started my career.

Fifteen years later, I was introduced to telehealth. Managers in the medical system where I worked equipped our five emergency departments on different campuses, all understaffed with social workers, with telehealth stations. With telehealth at our disposal, it was argued, a social worker at one emergency room could assess patients at another campus that was lacking a social worker for any given shift. Most of our interventions were for individuals in crisis, including those presenting with emergent mental health issues, substance abuse, and interpersonal violence, patients for whom telehealth could actually add more stress, and who are also difficult to assess on a screen. None of these were acknowledged as valid barriers by hospital leadership to delivering ethical, effective social work interventions. For example, when I evaluated a homeless patient with psychosis there was a risk that telehealth could exacerbate symptoms of paranoia as well as a risk that I would get an inadequate psychiatric assessment because I could not fully use all my senses in the two-dimensional, virtual environment.

There were plenty of social workers in our urban area to fully staff all the emergency departments at rates of modest compensation, but at the time a new, highly profitable, health care chain had purchased our medical system. The use of telehealth in this case replaced social workers and their attendant salaries and benefits with technology, thereby saving money. At that time there was also relatively little research about the effects of telehealth interventions on health care providers and patients. There were also some professional contraindications to utilization of telehealth with patients with common presentations in the emergency department setting, such as suicidality. My first experience with telehealth was concerning at best. We were short changing, if not doing harm to patients, to increase profits.

Given that I considered that experience, my only experience utilizing telehealth, a serious ethical issue, I was pleasantly surprised to see some benefits to health care social workers and their patients in the current pandemic. Beyond the obvious protection of infection prevention for all involved, it has expanded the capacity of the stressed and inadequate mental health system in my geographic area, in which clinical social workers are responsible for a significant amount of the service provision. When various insurance entities, including Medicare, expanded reimbursement for telehealth, particularly teletherapy, at the start of the pandemic, more individuals were able to access services (Center for Medicare and Medicaid Services, 2020). This was enhanced by additional adaptations, such as the relaxation of HIPAA standards in telehealth delivery (US Department of Health and

Human Services, 2020) and in my state, insurance parity for health services offered via telehealth (State of Washington Office of the Governor, 2020). Those who are disabled, homebound, have no access to or cannot afford transportation or childcare, live in rural areas, or cannot travel outside their homes due to medical or mental health conditions currently have more access to health and psychosocial services in many cases.

The urgent care clinic in which I work, a small space with no openable windows, and a constant influx of patients with COVID symptoms, has not been immune to personal protective equipment shortages, leaving staff members sometimes feeling inadequately safeguarded. I have the option of seeing patients with COVID symptoms using telehealth from the social work office rather than in person. That is, if the telehealth technology is functioning properly on any given day. My work setting did not have and did not need the infrastructure for internal telehealth prior to COVID, so it is a work in progress.

Despite telehealth's advantages during this pandemic, as a health care social worker I still have serious concerns about its potential to steamroll social work values. As social workers, I believe we need to look at telehealth through the lens of patients and their well-being in general, but more specifically and importantly through the lens of our populations of focus, the vulnerable, oppressed, and those living in poverty (National Association of Social Workers, 2018: Preamble). The introduction of telehealth as a standard way of interacting for health care social workers during the pandemic is potentially dangerous in the climate of increasingly corporatized health care in the United States. For example, a recent article in the *New York Times* (Drucker, 2020) references a medical center in my city as part of a group of wealthy hospital chains across the United States that received billions of dollars in bailout money intended for struggling health care organizations. This multibillion dollar "not-for-profit" institution behaves like a corporation, investing in hedge funds, running venture capital funds, working with private equity firms, and generating over ten billion dollars in cash yearly.

Despite not having shareholders to whom they are accountable for generating profits and stated missions that usually mention the health and well-being of patients, these medical Goliaths are focused heavily on monetary gain, and stray far from any practical emphasis on social justice. As a health care social worker, I have lived the progression of this trend of corporatization over my twenty plus years of practice. The result, in my sphere of health care social work, has been understaffing and decreased resources for vulnerable patients, resulting in an intensification of an already inequitable two-tier health care system, substandard care, and social worker burnout. Given the recent, rapid proliferation of telehealth due to COVID, the increased corporatization and privileging of profits by some health care organizations, and the financial hardship experienced by many health care organizations, there are monetary incentives to retain telehealth as the standard medium of care as the pandemic progresses and recedes.

Telehealth in the hands of corporatized health care has the potential to seriously compromise our professional Code of Ethics (National Association of Social

Workers, 2018: Ethical Principles) values of social justice, dignity and worth of the person, importance of human relationships, and competence.

Telehealth can create significant inequities in access to and quality of care. First, there are people who do not have access to computers, high quality WIFI, or both. Where does the proliferation of telehealth leave the homeless with regard to health care access, for example? There are many others who have access to the technology but cannot reliably benefit from it due to physical or mental disabilities, such as hearing impairments, effects of traumatic brain injury, or language barriers. Health care facilities generally use in person language interpreters, or increasingly, interpreters accessed through a separate, portable, video screen, creating a novel, cumbersome, double telehealth arrangement for social work practitioners and patients. There is another group of individuals who have access to computers, WIFI, and the physical and mental capacities to fully engage with telehealth, but lack the privacy needed to speak with health care workers. For example, there are those living in cramped quarters, including homeless shelters, and in households with challenging acoustics or interpersonal violence. Many of these patients are more likely to be uninsured or insured with Medicaid or Medicare, which generally reimburse at lower rates than private insurance, giving financial incentives for health care organizations to leave these patients out by privileging telehealth.

There are concerns surrounding the social work value of dignity and worth of the person, such as patients' self-determination and best interests. If telehealth continues to dominate the health care experience, patients might not be able to choose what they deem best for them based on preferences, culture, language, abilities, and other personal circumstances. Telehealth research is relatively new and there are contradictions about contraindications for certain types of patients and problems, such as individuals experiencing mental health crises. It is a service modality that ideally needs to be thoughtfully assessed on a patient by patient basis to maximize benefits and avoid harm.

Alignment with the social work value of competence in telehealth interventions has, in my clinical experience, lagged behind delivery due to the speed with which the pandemic unfolded. However, in my prior experience with telehealth there was also no training in effective delivery or successful navigation of legal and ethical complexities. As anyone who was precipitously thrown into interpersonal interaction by video for teaching or social work practice due to the pandemic knows, there is a steep learning curve in technology, legal and ethical considerations, and high-quality service delivery. In many cases I did not know what I did not know until specific issues surfaced during sessions. General training for intervention with telehealth participants is essential, but specialized training is also necessary for all the accommodations and techniques needed to adapt to a variety of individual characteristics, settings, and circumstances.

Finally, there is the consideration of the value of the importance of human relationships. In many health care settings, interventions by social workers are interdisciplinary and highly interactive. There is much lost in clinician understanding, and patient care and well-being in the absence of collaboration with other

health professionals in real time, often challenging to accomplish when utilizing telehealth. For patients and social workers alike, there are intangible benefits from in-person, human contact that inexplicably, positively affect the quality of the rapport and relationship, and ultimately healing.

Telehealth has always been a potential friend as well as a foe for health care clinicians, including social workers, but there is a clear risk that the disadvantages of this technology will potentially be exacerbated as we move through, and hopefully out, of the COVID-19 pandemic. I see my tasks in my role as a health care social worker as remaining constantly vigilant about the many complex ways, on mezzo and macro levels, that telehealth can be exploited for profit and convenience to the detriment of the vulnerable, oppressed, and those living in poverty, and advocating to prevent it.

## Declaration of conflicting interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## ORCID iD

Margaret A Cristofalo  https://orcid.org/0000-0001-6853-7056

## References

Center for Medicare and Medicaid Services (2020) *Medicare telemedicine health provider fact sheet*. Available at: www.cms.gov/newsroom/fact-sheets/medicare-telemedicine-health-care-provider-fact-sheet (accessed 1 July 2020).

Drucker J, Silver-Greenberg J and Kliff S (2020) Wealthiest hospitals got billions in bailout for struggling health providers. *New York Times*, 25 May.

National Association of Social Workers (2018) *Code of ethics of the National Association of Social Workers*. Available at: www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English (accessed 1 July 2020).

State of Washington Office of the Governor (2020) *Proclamation of the Governor Amending Proclamation 20-05, 20-09 Telemedicine*. Available at: www.governor.wa.gov/sites/default/files/proclamations/20-29%20Coronovirus%20OIC%20%28tmp%29.pdf?utm_medium=email&utm_source=govdelivery (accessed 1 July 2020).

US Department of Health and Human Services (2020) *Notification of enforcement discretion for telehealth remote communications during the COVID-19 nationwide public health emergency*. Available at: www.hhs.gov/hipaa/for-professionals/special-topics/emergency-preparedness/notification-enforcement-discretion-telehealth/index.html (accessed 1 July 2020).

REAPPRAISAL

# Telemental health: a status update

ELIAS ABOUJAOUDE[1], WAEL SALAME[2], LAMA NAIM[2]

[1]OCD Clinic, Stanford University School of Medicine, Stanford, CA, USA; [2]Department of Psychiatry, Lebanese American University, Beirut, Lebanon

*A rather large body of literature now exists on the use of telemental health services in the diagnosis and management of various psychiatric conditions. This review aims to provide an up-to-date assessment of telemental health, focusing on four main areas: computerized CBT (cCBT), Internet-based CBT (iCBT), virtual reality exposure therapy (VRET), and mobile therapy (mTherapy). Four scientific databases were searched and, where possible, larger, better-designed meta-analyses and controlled trials were highlighted. Taken together, published studies support an expanded role for telepsychiatry tools, with advantages that include increased care access, enhanced efficiency, reduced stigma associated with visiting mental health clinics, and the ability to bypass diagnosis-specific obstacles to treatment, such as when social anxiety prevents a patient from leaving the house. Of technology-mediated therapies, cCBT and iCBT possess the most efficacy evidence, with VRET and mTherapy representing promising but less researched options that have grown in parallel with virtual reality and mobile technology advances. Nonetheless, telepsychiatry remains challenging because of the need for specific computer skills, the difficulty in providing patients with a deep understanding or support, concerns about the "therapeutic alliance", privacy fears, and the well documented problem of patient attrition. Future studies should further test the efficacy, advantages and limitations of technology-enabled CBT, as well as explore the online delivery of other psychotherapeutic and psychopharmacological modalities.*

**Key words:** Telemental health, telepsychiatry, Internet-mediated cognitive behavioral therapy, virtual reality exposure therapy, mobile therapy, mobile apps, short message service, depression, social phobia, specific phobias, post-traumatic stress disorder, obsessive-compulsive disorder

*(World Psychiatry 2015;14:223–230)*

The delivery of mental health services via telecommunication systems is having a remarkable expansion. For example, nearly 6% of all mobile health applications are now devoted to mental health (1).

Telemental health uses computer programs, Internet programs, teleconferencing, and smartphone applications for the remote delivery of mental health services, including diagnosis, assessment, symptom tracking, and treatment.

The aim of this paper is to review the current state of telemental health, focusing on its four main areas: computerized CBT (cCBT), Internet-mediated CBT (iCBT), virtual reality exposure therapy (VRET), and mobile therapy (mTherapy).

Articles were identified using PubMed, PsycINFO, ScienceDirect, and Wiley Online Library. The search was conducted using the terms "telepsychiatry", "telemental health", "computerized cognitive behavioral therapy", "assisted computerized psychotherapy", "unassisted computerized psychotherapy", "Internet therapy", "mobile cognitive behavioral therapy", "mobile therapy", "virtual reality exposure therapy", "virtual reality therapy", and "remote cognitive behavioral therapy". Google Scholar and Metacrawler search engines were also used to help identify unpublished material and book chapters.

The studies included in the review were limited to those published in English, with no restrictions placed on the country or year of publication. To the extent allowed by the literature, well-designed meta-analyses and larger, controlled trials with clearly defined outcome measures and inclusion and exclusion criteria were highlighted.

## COMPUTERIZED AND INTERNET-MEDIATED CBT

Several forms of technology-enabled psychotherapy now exist. They differ in important ways with respect to the technology platform, level of clinician involvement, and type of therapy.

cCBT refers to the use of software programs to deliver standardized, automated psychotherapy via personal computers, CD-ROMs and desktop programs, or through interactive voice response (IVR) telephone systems. It dates back to the 1980s (2) and has been the first technology-enabled therapy delivery system to be formally studied.

Since conventional CBT is often a manualized, standardized treatment, it was thought to lend itself well to the use of technology in a way that minimized therapist involvement beyond the initial steps of program design (3). Thus, exploration of computer programs that would "conduct" CBT with patients began relatively early, before the Internet became a widespread phenomenon and the cornerstone of telemedicine and telemental health today (4).

Via specifically designed software programs, cCBT allows individuals to self-diagnose, personalize treatment goals, and employ standardized therapy tools to achieve symptom control and relapse prevention. It involves variable levels of therapist intervention: standalone or unassisted cCBT generally refers to the independent use of a standardized, software-based treatment program that almost completely bypasses the therapist (5), whereas guided or assisted cCBT typically incorporates minimal therapist involvement (6-8).

Beyond cCBT, the last decade has witnessed the remarkable growth of Internet-mediated psychotherapy. Several studies have explored the delivery of various psychotherapeutic approaches via the Internet, including interpersonal psychotherapy and online psychoeducation. However, most of the existing psychotherapy literature investigating the use of the Internet has focused on the delivery of CBT, an approach that has at times been called iCBT (e.g., 2,9).

Like cCBT, iCBT includes unassisted programs (5) as well as programs that incorporate minimal therapist involvement, usually via email or text message exchanges (assisted iCBT) (10). A third form of iCBT is "real-time" iCBT, which consists of live online conversations with "full" therapist involvement, and it may or may not include a video conferencing component (11,12).

## Efficacy

Several meta-analyses have examined the efficacy of technology-enabled CBT. A meta-analysis of 14 randomized controlled trials (RCTs) and 2,976 subjects compared both assisted and unassisted cCBT to either waitlist or traditional CBT in the treatment of adult depression (13). cCBT showed a moderate post-treatment effect size on depressive symptoms when compared to the waitlist group, with equivalent outcomes compared to traditional CBT. However, traditional CBT performed better than cCBT in functional improvement and symptom reduction at the long-term follow-up points and was associated with lower dropout rates.

A large iCBT meta-analysis included 108 trials, of which 104 reported on clinical efficacy (N=9,410) and eight on cost-effectiveness (N=2,964) (2). Studies varied considerably in methodologies, outcome measures and conditions treated, and compared either unassisted iCBT to assisted iCBT or one of those interventions to a waitlist control or face-to-face therapy. Among the studies, 12 RCTs compared iCBT to traditional CBT in the treatment of depressive symptoms, social phobia, panic disorder, specific phobia (arachnophobia), sexual dysfunction and body dissatisfaction. Pooled results from the RCTs demonstrated similar efficacy on outcome measures as determined by effect size.

The literature on real-time iCBT with or without videoconferencing is more limited. In an RCT of adult subjects with major depressive disorder, 197 participants were assigned to ten sessions over 16 weeks of real-time iCBT with a live therapist and without videoconferencing, and 148 participants to an eight-month waitlist. Subjects in both groups continued to receive "usual care" by their general practitioners. At the four-month follow-up, 38% of subjects in the real-time iCBT vs. 24% in the control group responded, based on the Beck Depression Inventory (11).

Also, a study of 26 subjects (mean age: 30) with mood or anxiety disorders randomly assigned participants to either real-time iCBT with videoconferencing or traditional CBT. Participants received 12 weekly one-hour sessions and a follow-up session six weeks post-treatment. Real-time iCBT with videoconferencing was associated with a statistically significant reduction in symptoms of depression (p<0.001), anxiety (p<0.001) and "stress" (p<0.001), and had a similar efficacy to traditional CBT (3).

A more recent RCT investigated the efficacy of exposure and response prevention based CBT in the treatment of obsessive-compulsive disorder (OCD) in 30 subjects randomly assigned to 12 weeks of real-time iCBT with videoconferencing (N=10), self-help book-based exposure and response prevention (N=10), or a waitlist group (N=10). Post-treatment assessment demonstrated the superiority of real-time iCBT with videoconferencing: six participants (60%) receiving this treatment option achieved "clinically significant" improvement as assessed by the Yale-Brown Obsessive-Compulsive Scale; one participant (10%) demonstrated "reliable change" in response to self-help; and all participants in the waitlist group demonstrated "no change" (14).

Finally, group technology-enabled therapy has also received some research attention. A study compared the efficacy of real-time group iCBT with videoconferencing to face-to-face group CBT. It asked 18 subjects with depression or anxiety to select between the two interventions. Eight chose real-time iCBT with videoconferencing and appeared along the perimeter of the screen with the therapist in the center and could interact with one another and the therapist in real time; 10 chose traditional CBT. Subjects in both groups received 13 weekly one-hour group sessions. No significant difference was seen in efficacy, with approximately 60% in each group responding (15).

## Special populations

Technology-enabled therapies have been studied for their potential use in special populations, including children and adolescents (16,17) and medically ill psychiatric patients (18).

A recent meta-analysis examined the efficacy of one unassisted iCBT program (BRAVE-ONLINE) and three assisted iCBT programs (BRAVE, COPE-A-LOT and "Think, Feel, Do") in the treatment of childhood anxiety disorders. Data from seven studies (five controlled trials, one case study and one cohort study) and 240 subjects aged 7 to 16 collectively demonstrated the efficacy of unassisted and assisted iCBT, with results comparable to those of traditional CBT (19).

Similarly, a study in 31 child and adolescent subjects with OCD (mean age: 11) randomly assigned participants to family real-time iCBT with a live therapist and videoconferencing or to a waitlist control. Participants received 14 family-based sessions and were assessed at one week and three months post-treatment. Subjects assigned to the waitlist group were assessed at four weeks post-randomization. Results demonstrated the superiority of real-time iCBT with videoconferencing: 81% response and 56% remission rates were seen among participants receiving iCBT, compared to 13% response and remission rates in the waitlist group (12).

Telemental health interventions in patients who have medical comorbidities have received some research attention as well. An RCT of 56 subjects with fibromyalgia and mild to moderate depression or anxiety randomly assigned participants to either six weeks of minimally assisted iCBT or continued unchanged pharmacological treatment. Subjects were assessed at one, six and 12 weeks post-intervention. At all assessment points, iCBT was associated with a significant

20151545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

20515543, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

reduction in both the Fibromyalgia Impact Questionnaire scores and tender point sensitivity as assessed via physical examination (18).

### Prevention

Several studies have explored the role of technology-enabled therapies in the prevention of psychiatric illness. One RCT tested the efficacy of unassisted iCBT in preventing depression in 163 university students who were randomly assigned to either five weeks of unassisted iCBT or a waitlist control. Subjects who received unassisted iCBT had significantly less depressive symptoms and improved literacy about depression at study end. The dropout rate, however, was significantly higher within the unassisted iCBT group compared to the control group (46.9 vs. 28.0%) (5).

In a relapse prevention study of iCBT in partially remitted depression, 303 subjects were randomly assigned to one of three interventions: unassisted iCBT, traditional therapy, or unassisted iCBT combined with traditional therapy (6). Individuals assigned to unassisted iCBT or unassisted iCBT combined with traditional therapy received nine online sessions. No statistically significant difference was seen in response and remission rates between unassisted iCBT and either traditional therapy or unassisted iCBT combined with traditional therapy. However, data at the 12-month follow-up demonstrated that traditional therapy was associated with a lower relapse rate compared to unassisted iCBT (20.7 vs. 31.3%).

Another study tested assisted iCBT in the prevention of relapse in partially remitted depression by randomly assigning 84 subjects to ten weeks of either 16 sessions of assisted iCBT or a waitlist control (7). Assessment at the 24-month follow-up demonstrated a significantly lower relapse rate in the assisted iCBT compared to the control group (13.7 vs. 60.9%).

Finally, a study examined the impact of minimally guided iCBT on the relapse of severe health anxiety (hypochondriasis) at six and 12 months after the conclusion of an RCT. Minimally guided iCBT yielded significantly better symptom control as well as increased cost-effectiveness compared to the waitlist control (20).

### VIRTUAL REALITY EXPOSURE THERAPY

VRET refers to the use of virtual reality to conduct exposure therapy by mimicking real-life situations. The earliest experimental attempts on the use of virtual reality exposure as a treatment modality date back to 1992 (21), but it was only recently that the digital revolution brought about head-mounted displays, computer automated virtual environments, motion sensors and other sophisticated tools, making VRET environments more realistic, immersive and interactive. That, combined with the decreasing cost of the technology involved, has made VRET a potentially viable alternative to *in vivo* exposure therapy, and one that seems on the way to broader adoption (22).

VRET is generally conducted over six to 12 sessions, each lasting between 45 and 60 min (23). It has received less research attention than cCBT or iCBT, but efficacy data suggest its potential role in the treatment of several psychiatric conditions, including phobias, post-traumatic stress disorder (PTSD), OCD and substance use disorders.

### Efficacy

#### Social anxiety disorder (social phobia)

Multiple studies provide evidence in support of VRET in the treatment of social anxiety disorder and public speaking anxiety. In a study of 41 subjects with social anxiety disorder, subjects participated in four sessions of cognitive restructuring, followed by four virtual sessions that targeted particular feared social settings (e.g., conference room, classroom, large auditorium). The study provided evidence that environments that better mimicked the feared scenario outperformed those that did not (24). A similar outcome was observed in a controlled trial that compared VRET to conventional CBT in the treatment of public speaking anxiety in a total of eight subjects. Participants were asked to deliver a speech before a real-life audience of five to nine individuals before and after completing four VRET sessions. All participants reported subjective improvement in public speaking anxiety immediately following, and several months after, the intervention (25).

Another study (N=88) compared the efficacy of 12 sessions of conventional CBT, 12 sessions of VRET, and a waitlist control in social anxiety disorder. VRET and conventional CBT proved equally superior to the waitlist group, with sustained improvement at one-year follow-up (26).

#### Specific phobias

Clinical trials of VRET in the treatment of specific phobias have also provided promising evidence. Several studies have explored the treatment of agoraphobia using VRET and have demonstrated superiority over a waitlist control (e.g., 27,28). A larger, more recent study assessed the efficacy of VRET in 80 subjects with long-standing (five years or more) agoraphobia. Subjects were randomly assigned to one of three groups: CBT with drug therapy ("CBT group"), N=30; CBT with drug therapy and VRET ("VRET group"), N=30; and drug therapy alone ("drug group"), N=20. Individuals in both the "CBT group" and the "VRET group" received five sessions of psychoeducation and cognitive restructuring, followed by six sessions of CBT or CBT and VRET. Both interventions were associated with clinical improvement, but VRET was associated with better adherence (29).

225

20515545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Claustrophobia has also received attention as a possible target for VRET. One study tested VRET in four subjects with claustrophobia, exposing them to eight virtual environments of increasing claustrophobic severity. Results demonstrated the efficacy of VRET both immediately after, and at the three-month follow-up (30). Another study in six subjects with claustrophobia suggested benefit from VRET, with the benefit shown to extend into real-life situations (31).

At least two controlled trials have demonstrated improved clinical outcomes for VRET vs. waitlist and equal benefit for VRET and conventional exposure therapy in the treatment of aviophobia (21,32,33). Finally, small studies have demonstrated improvement from VRET in the treatment of acrophobia (34,35).

### Post-traumatic stress disorder

The first use of virtual reality in PTSD treatment involved a Vietnam War veteran (36), with a subsequent study in ten Vietnam War veterans demonstrating statistically significant reductions in both anxiety and avoidance levels that persisted at the three- and six-month follow-up points (37).

Other studies have suggested the efficacy of VRET in the treatment of PTSD resulting from non-war traumas. For example, a controlled study in subjects with PTSD stemming from the September 11, 2001 terrorist attacks compared VRET to a waitlist group. Of the 13 subjects who received VRET, five were resistant to previous treatments, and, of the ten receiving VRET who completed the study, nine experienced statistically significant improvement (38). Similarly, a study in ten subjects with PTSD resulting from abuse, crime assault or car accident randomly assigned participants to either conventional CBT or VRET. Both treatment modalities resulted in significant improvement in core PTSD symptoms (39). Finally, one article reviewed the possible role of VRET in the treatment of post-fall PTSD-like symptoms in elderly patients, providing evidence in favor of VRET and noting its ease of use in that patient population when compared to *in vivo* exposure (40).

### Obsessive-compulsive disorder

Data on using VRET in the treatment of OCD are limited, in part because of the difficulty and cost of building programs that simulate the wide variability in OCD triggers among patients. However, a study comparing 30 subjects with OCD to 27 matched controls yielded an increased level of compulsive checking among subjects with OCD in response to virtual triggers compared to the control group, which suggested a role for VRET in OCD treatment and led to a subsequent, uncontrolled study in 24 subjects with arranging compulsions. Results from that study showed a decrease in OCD-related anxiety in response to VRET (41).

### Substance use disorders

Treatment of drug dependence often involves strengthening the ability to resist using drugs when faced with triggers that provoke craving. Conventional CBT therapists usually rely on photographs and films to elicit craving, but have difficulty mimicking the behavior's typical setting. The need to better simulate real-life situations has led to the investigation of virtual reality as a more immersive environment in which to conduct therapy.

An early study investigating VRET in the treatment of five heroin-dependent subjects incorporated virtual cues that typically elicit craving. Both subjective (e.g., anxiety) and objective (e.g., autonomic activation) measures suggested the ability of virtual exposure to trigger real-life responses (42). More recently, a sample of 47 chronic smokers demonstrated hyperarousal when exposed to virtual smoking paraphernalia (43). To our knowledge, no study has compared VRET to conventional CBT in the treatment of substance use.

### Other conditions

VRET has been preliminarily explored in the treatment of other conditions as well. For example, a study in 34 female subjects with eating disorders compared the efficacy of conventional CBT alone to CBT with VRET. Both groups demonstrated statistically significant improvement in body image, but participants receiving CBT with VRET showed greater improvement at the one-year follow-up point (44).

Further, and despite fear that virtual simulations might exacerbate symptoms in conditions already characterized by impaired reality testing, studies are beginning to assess VRET in psychotic individuals, with one schizophrenia trial (N=91) suggesting improved assertiveness and conversational abilities with VRET, as well as higher interest by subjects in virtual environment platforms than conventional treatment settings (45).

## MOBILE THERAPY

mTherapy refers to the use of mobile phone devices, smartphones and mobile applications or "apps" in the delivery of mental health services. Its popularity has grown rapidly, as indicated by the title, "*Smartphone apps become surrogate therapists*", of a 2012 lay press article (46). Indeed, survey data suggest that mTherapy interventions may be favored over other telemental health tools by health care consumers (47).

Currently, over 3,000 mental health apps exist in Apple's App Store and Google's Google Play (48). They offer help with diagnosing (49), self-monitoring (1,48), symptom tracking and documentation (50), adherence to traditional therapy (51), and appointment and therapy homework reminders

20515545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(48). They can also provide convenient means for interacting with therapists between appointments (52). Although the literature on their efficacy remains scarce, some preliminary outcome data exist covering the more common forms of mTherapy.

## Mobile apps

Mobile apps are the main form of mTherapy and include self-monitoring apps (52), apps that enhance self-awareness (53), apps that help with self-regulation (54), and CBT-inspired apps (mCBT) (55). A randomized trial of a self-monitoring app assigned 18 subjects to seven days of monitoring. The study demonstrated superiority over retrospective questioning about depression and stress (52). That was explained by decreased memory bias when gathering data and recording behaviors and thoughts as they occurred in real-life situations.

Another RCT in 118 depressed subjects aged 14 to 24 randomly assigned individuals to the use of mobile self-monitoring apps that tracked mood, stress level, and daily activities (N=68) or to a control group (N=46) where only daily activities were monitored. The use of mobile self-monitoring apps was associated with increased "emotional self-awareness", decreased depressive symptoms, rapid symptom improvement, and time savings compared to the control group (53).

Preliminary data from RCTs suggest benefit from mobile CBT as well. In one study, male subjects were assigned to one of two interventions: 11 received mobile CBT and 12 were assigned to waitlist. Individuals in the mobile CBT group received three group meetings conducted by a psychologist, in addition to self-reporting between meetings via a mobile CBT app that focused on clarifying personal values, goal setting, relaxation, mindfulness, and acceptance tools. It was hypothesized that between-meeting self-reporting would improve the continuity and impact of the face-to-face intervention. Indeed, mobile CBT was associated with a greater reduction in depressive symptoms than the control group at post-treatment, in addition to an improvement in reported overall health and working ability (55).

Another RCT in 35 subjects (mean age: 41 years) with major depressive disorder randomly assigned 15 to mobile CBT and 20 to cCBT. The "Get Happy" mobile app was used and consisted of six lessons to be completed over eight weeks. Both mobile CBT and cCBT were associated with a statistically significant reduction in depressive symptoms post-treatment and at the three-month follow-up (56).

A more recent study compared the efficacy of apps for mobile CBT and for mobile interpersonal therapy in treating social anxiety disorder. Fifty-two subjects were randomly assigned to receive either mobile CBT (N=27) or mobile interpersonal therapy (N=25). Mobile CBT performed better than mobile interpersonal therapy as measured by the Liebowitz Social Anxiety Scale, both post-treatment and at the three-month follow-up (between group Cohen's d=0.64) (57).

## Text messaging or short message service

Text messaging, or short message service (SMS), has been used as an mTherapy intervention that allows for the immediate delivery of interventional messages and reminders of health goals, appointments and therapy homework (58). Preliminary studies have investigated it in the treatment of conditions such as major depression and psychotic disorders.

A study in 54 subjects with major depression and comorbid alcohol use disorder randomly assigned participants to either receiving twice-daily supportive text messages (N=26), or to a waitlist group where participants received "thank you" text messages once every 14 days (N=28). Subjects were followed for up to three months. Results, as assessed by the Beck Depression Inventory, showed a statistically significant difference in favor of text messaging when compared to the waitlist control (59).

## Phone calls

Voice phone calls are an older form of mTherapy and have been used in the treatment of various psychiatric conditions, including anxiety disorders and depression. An RCT assessed phone-based psychotherapy in the reduction of suicidal ideation and self-harm by randomly assigning 68 subjects to either brief phone treatment alongside traditional face-to-face psychotherapy (N=34) or only face-to-face psychotherapy (N=34). Voice calls focused on mood assessment, provision of reassurance, problem-solving, and medication training. Assessment at six and 12 months following therapy initiation revealed that subjects also receiving phone psychotherapy had significantly less suicidal ideation and other depressive symptoms (60).

## DISCUSSION

To a large degree, the potential advantages of telemental health mirror those of telemedicine and include improved access to care, especially for patients who live in areas that are under-served by mental health professionals, who have physical limitations that limit their ability to obtain traditional care, or whose work or other responsibilities prevent them from commuting to a regular clinic. In addition, the reduced need for office-related infrastructure may help contain costs and improve efficiency, helping make health care services more affordable overall. Advantages that are more specific to telemental health include reducing the stigma attached to visiting mental health facilities, as well as the ability to bypass diagnosis-specific obstacles to treatment (e.g., social anxiety-

20515543, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

or OCD-related fear of leaving the house or visiting a treatment setting).

Still, telemental health in its various manifestations remains somewhat controversial, in part because of ongoing concerns among patients and professionals about how technology platforms might impact the "therapeutic alliance" (61). Other problems include the lack of sufficient support, the inability to provide users with a deep understanding of their conditions, and the need for specific computer skills (62). Moreover, while CBT (and, by extension, exposure and response prevention) has been investigated to some degree, little data are available on other common forms of psychotherapy, and virtually no data exist on technology-assisted psychopharmacological care.

Of all technology-mediated therapies, cCBT and iCBT have been researched the most. Compared to cCBT, which was once limited to CD-ROMs and installable programs that required individuals to independently complete activities in the absence of therapist guidance, iCBT appears to be an advance in that it offers access to a broader variety of CBT programs, while also providing the opportunity for varying levels of therapist guidance. Research studies point to many successes for cCBT and iCBT across several psychiatric disorders and support a role for these interventions in modern psychotherapy delivery. Still, a major limitation of cCBT and, perhaps to a lesser degree, iCBT appears to be patient attrition (16).

VRET is a younger technology-enabled therapy that may possess advantages over traditional forms, especially when it comes to recreating challenging exposure situations, such as airplanes (for aviophobia) or bar settings (for alcohol-related disorder). Compared to traditional CBT, VRET may have the added advantage of additional control over the exposure exercise and a sense of increased safety when confronting phobic stimuli (63). This therapy, however, remains inadequately tested and not widely available, in part due to the need for infrastructure investment and training (64). With the increased availability and affordability of simulation technology, as evidenced by the current availability of highly sophisticated and immersive video games, VRET may become a more reasonable adjunct to, or possibly replacement for, conventional exposure therapy in certain disorders.

The most recent chapter in the digital revolution has been the dramatic rise of mobile technologies, including smartphones and associated apps. A parallel move has occurred within telemental health, where mental health apps have seen remarkable growth. Among other goals, they purport to help with self-monitoring and the very targeted delivery of therapeutic interventions. Compared to other forms of telemental health, a main advantage of mTherapy is its portability, which can make available data on behaviors, thoughts and coping strategies in real time, and help design highly specific, contextualized interventions. High attrition rates and respondent fatigue, however, seem to be serious limitations with mTherapy as well (52), and further evidence about efficacy is needed.

## CONCLUSIONS

It has been estimated that up to 50% of all health care services will be conducted electronically by 2020 (65). Telemental health has been an integral part of the telemedicine movement and, given the "hands off" nature of many mental health services and the reduced need for treatment tools such as physical exams, lab tests and radioimaging, it may be poised to grow even faster than other medical fields.

So far, however, the rise of telemental health has generally outpaced scientific research, which limits the ability to make strong recommendations, especially when the substitution of online platforms for conventional care is being considered. Randomized clinical trials of adequate size and representation are clearly needed in order to establish the efficacy, safety and treatment adherence of available interventions, as well as to test some woefully understudied ones, such as Internet-enabled psychopharmacological care.

In addition, concerns about data and interaction confidentiality as well as compliance with health information regulations, such as the Health Insurance Portability and Accountability Act in the U.S., remain an obstacle to adoption by patients and providers alike and should be prioritized. Finally, insurer reimbursement needs to be assessed and advocated for in the case of interventions that have been shown to be effective and secure, especially if conventional alternatives are inaccessible, too expensive or insufficient on their own.

## References

1. Donker T, Petrie K, Proudfoot J et al. Smartphones for smarter delivery of mental health programs: a systematic review. J Med Internet Res 2013;15:e247.
2. Hedman E, Ljótsson B, Lindefors N. Cognitive behavior therapy via the Internet: a systematic review of applications, clinical efficacy and cost-effectiveness. Expert Rev Pharmacoecon Outcomes Res 2012;12:745-64.
3. Stubbings DR, Rees CS, Roberts LD et al. Comparing in-person to videoconference-based cognitive behavioral therapy for mood and anxiety disorders: randomized controlled trial. J Med Internet Res 2013;15:e258.
4. Selmi PM, Klein MH, Greist JH et al. Computerized assisted cognitive-behavioral therapy for depression. Am J Psychiatry 1990;147:51-6.
5. Lintvedt OK, Griffiths KM, Sørensen K et al. Evaluating the effectiveness and efficacy of unguided internet-based self-help intervention for the prevention of depression: a randomized controlled trial. Clin Psychol Psychother 2013;20:10-27.
6. de Graaf LE, Gerhards SA, Arntz A et al. One-year follow-up results of unsupported online computerized cognitive behavioural therapy for depression in primary care: a randomized trial. J Behav Ther Exp Psychiatry 2011;42:89-95.
7. Holländare F, Anthony SA, Randestad M et al. Two-year outcome of internet-based relapse prevention for partially remitted depression. Behav Res Ther 2013;51:719-22.
8. Knowles SE, Toms G, Sanders C et al. Qualitative meta-synthesis of user experience of computerised therapy for depression and anxiety. PLoS One 2014;9:e84323.

20151545, 2015, 2, 3, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

9. Andersson G, Titov N. Advantages and limitations of Internet-based interventions for common mental disorders. World Psychiatry 2014;13:4-11.

10. Andersson G, Cuijpers P, Carlbring P et al. Guided Internet-based vs. face-to-face cognitive behavior therapy for psychiatric and somatic disorders: a systematic review and meta-analysis. World Psychiatry 2014;13:288-95.

11. Kessler D, Lewis G, Kaur S et al. Therapist-delivered internet psychotherapy for depression in primary care: a randomized controlled trial. Lancet 2009;374:628-34.

12. Storch EA, Caporino NE, Morgan JR et al. Preliminary investigation of web-camera delivered cognitive-behavioral therapy for youth with obsessive-compulsive disorder. Psychiatry Res 2011; 189:407-12.

13. So M, Yamaguchi S, Hashimoto S et al. Is computerised CBT really helpful for adult depression?: A meta-analytic re-evaluation of CCBT for adult depression in terms of clinical implementation and methodological validity. BMC Psychiatry 2013;13:113.

14. Vogel PA, Solem S, Hagen K et al. A pilot randomized controlled trial of videoconference-assisted treatment for obsessive-compulsive disorder. Behav Res Ther 2014;63C:162-8.

15. Khatri N, Marziali E, Tchernikov I et al. Comparing telehealth-based and clinic-based group cognitive behavioral therapy for adults with depression and anxiety: a pilot study. Clin Interv Aging 2014;9:765-70.

16. Richardson T, Stallard P, Velleman S. Computerised cognitive behavioural therapy for the prevention and treatment of depression and anxiety in children and adolescents: a systematic review. Clin Child Fam Psychol Rev 2010;13:275-90.

17. Vigerland S, Ljotsson B, Gustafsson F et al. Attitudes towards the use of computerized cognitive behavior therapy (cCBT) with children and adolescents: a survey among Swedish mental health professionals. Internet Interv 2014;1:111-7.

18. Menga G, Ing S, Khan O et al. Fibromyalgia: can online cognitive behavioral therapy help? Ochsner J 2014;14:343-9.

19. Rooksby M, Elouafkaoui P, Humphris G et al. Internet-assisted delivery of cognitive behavioural therapy (CBT) for childhood anxiety: systematic review and meta-analysis. J Anxiety Disord 2014;29C:83-92.

20. Hedman E, Andersson E, Lindefors N et al. Cost-effectiveness and long-term effectiveness of internet-based cognitive behaviour therapy for severe health anxiety. Psychol Med 2013;43:363-74.

21. Krijn M, Emmelkamp PM, Olafsson RP et al. Virtual reality exposure therapy of anxiety disorders: a review. Clin Psychol Rev 2004;24:259-81.

22. Meyerbröker K, Emmelkamp PM. Virtual reality exposure therapy in anxiety disorders: a systematic review of process-and-outcome studies. Depress Anxiety 2010;27:933-44.

23. Powers MB, Emmelkamp PM. Virtual reality exposure therapy for anxiety disorders: a meta-analysis. J Anxiety Disord 2008;22: 561-9.

24. Price M, Mehta N, Tone EB et al. Does engagement with exposure yield better outcomes? Components of presence as a predictor of treatment response for virtual reality exposure therapy for social phobia. J Anxiety Disord 2011;25:763-70.

25. Anderson PL, Zimand E, Hodges LF et al. Cognitive behavioral therapy for public-speaking anxiety using virtual reality for exposure. Depress Anxiety 2005;22:156-8.

26. Safir MP, Wallach HS, Bar-Zvi M. Virtual reality cognitive-behavior therapy for public speaking anxiety: one-year follow-up. Behav Modif 2012;36:235-46.

27. Vincelli F, Anolli L, Bouchard S. Experiential cognitive therapy in the treatment of panic disorders with agoraphobia: a controlled study. Cyberpsychol Behav 2003;6:321-8.

28. Botella C, Villa H, Garcia-Palacios A et al. Clinically significant virtual environments for the treatment of panic disorder and agoraphobia. Cyberpsychol Behav 2004;7:527-35.

29. Castro W, Sanchez M, Gonzalez C et al. Cognitive-behavioral treatment and antidepressants combined with virtual reality exposure for patients with chronic agoraphobia. Int J Clin Health Psychol 2014;14:9-17.

30. Botella C, Banos R, Villa H et al. Virtual reality in the treatment of claustrophobic fear: a controlled, multiple-baseline design. Behav Ther 2000;31:583-95.

31. Malbos E, Mestre DR, Note ID et al. Virtual reality and claustrophobia: multiple components therapy involving game editor virtual environments exposure. Cyberpsychol Behav 2008;11:695-7.

32. Rothbaum B, Hodges L, Smith S. A controlled study of virtual reality exposure therapy for fear of flying. J Consult Clin Psychol 2000;68:1020-6.

33. Rothbaum BO, Page A, Zimand E et al. Virtual reality exposure therapy and standard therapy in the treatment of fear of flying. Behav Ther 2006;37:80-90.

34. Rothbaum BO, Hodges L. The use of virtual reality exposure in the treatment of anxiety disorders. Behav Modif 1999:23:507-25.

35. Emmelkamp PMG, Krijn M, Hulsbosch AM. Virtual reality treatment versus exposure in vivo: a comparative evaluation in acrophobia. Behav Res Ther 2002;40:509-16.

36. Rothbaum BO, Hodges L, Alarcon R. Virtual reality exposure therapy for PTSD Vietnam veterans: a case study. J Trauma Stress 1999;12:263-71.

37. Rothbaum BO, Hodges L, Ready D. Virtual reality exposure therapy for Vietnam veterans with post-traumatic stress disorder. J Clin Psychiatry 2001;62:617-22.

38. Difede J, Hoffman H. Virtual reality exposure therapy for World Trade Center post-traumatic stress disorder: a case report. Cyberpsychol Behav 2002;5:529-35.

39. Banos R, Guillen V, Quero S et al. A virtual reality system for the treatment of stress-related disorders: a preliminary analysis of efficacy compared to a standard cognitive behavioral program. Int J Hum Comput Stud 2011;69:602-13.

40. Bloch F, Rigaud A, Kemoun G. Virtual reality exposure therapy in posttraumatic stress disorder: a brief review to open new opportunities for post-fall syndrome in elderly subjects. Eur Geriatr Med 2013;4:427-30.

41. Kim K, Kim CH, Kim SY et al. Virtual reality for obsessive-compulsive disorder: past and the future. Psychiatry Investig 2009;6:115-21.

42. Kuntze M, Stoemer R, Mager R et al. Immersive virtual environments in cue exposure. Cyberpsychol Behav 2001;4:497-501.

43. Garcia-Rodriguez O, Pericot-Valverde I, Gutierrez J et al. Validation of smoking-related virtual environments for cue exposure therapy. Addict Behav 2012;37:703-8.

44. Marco JH, Perpiná C, Botella C. Effectiveness of cognitive behavioral therapy supported by virtual reality in the treatment of body image in eating disorders: one year follow-up. Psychiatry Res 2013;209:619-25.

45. Park KM, Ku J, Choi SH et al. A virtual reality application in role-plays of social skills training for schizophrenia: a randomized, controlled trial. Psychiatry Res 2011;189:166-72.

46. Landau E. Smartphone apps become 'surrogate therapists'. CNN Research, September 2012.

47. Torous J, Friedman R, Keshavan M. Smartphone ownership and interest in mobile applications to monitor symptoms of mental health conditions. JMIR Mhealth Uhealth 2014;2:e2.

48. Chan S, Torous J, Hinton L et al. Mobile tele-mental health: increasing applications and a move to hybrid models of care. Healthcare 2014;2:220-33.

49. Deslich S, Stec B, Tomblin S et al. Telepsychiatry in the 21st century: transforming healthcare with technology. Perspect Health Inf Manag 2013;10:1f.

50. Depp CA, Mausbach B, Granholm E et al. Mobile interventions for severe mental illness: design and preliminary data from three approaches. J Nerv Ment Dis 2010;198:715-21.

20515545, 2015, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [19/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

51. Hilty DM, Ferrer DC, Parish MB et al. The effectiveness of tele-mental health: a 2013 review. Telemed J E Health 2013;19:444-54.
52. Reid SC, Kauer SD, Dudgeon P et al. A mobile phone program to track young people's experiences of mood, stress and coping. Development and testing of the mobiletype program. Soc Psychiatry Psychiatr Epidemiol 2009;44:501-7.
53. Kauer SD, Reid SC, Crooke AHD et al. Self-monitoring using mobile phones in the early stages of adolescent depression: randomized controlled trial. J Med Internet Res 2012;14:e67.
54. Morris ME, Kathawala Q, Leen TK et al. Mobile therapy: case study evaluations of a cell phone application for emotional self-awareness. J Med Internet Res 2010;12:e10.
55. Lappalainen P, Kaipainen K, Lappalainen R et al. Feasibility of a personal health technology-based psychological intervention for men with stress and mood problems: randomized controlled pilot trial. JMIR Research Protoc 2013;2:e1.
56. Watts S, Mackenzie A, Thomas C et al. CBT for depression: a pilot RCT comparing mobile phone vs. computer. BMC Psychiatry 2013;13:49.
57. Dagöö J, Asplund RP, Bsenko HA et al. Cognitive behavior therapy versus interpersonal psychotherapy for social anxiety disorder delivered via smartphone and computer: a randomized controlled trial. J Anxiety Disord 2014;28:410-7.
58. Klasnja P, Pratt W. Healthcare in the pocket: mapping the space of mobile-phone health interventions. J Biomed Inform 2012;45:184-98.
59. Agyapong VI, Ahern S, McLoughlin DM et al. Supportive text messaging for depression and comorbid alcohol use disorder: single-blind randomised trial. J Affect Disord 2012;141:168-76.
60. Marasinghe RB, Edirippulige S, Kavanagh D et al. Original article of mobile phone-based psychotherapy in Q Effect suicide prevention: a randomized controlled trial in Sri Lanka. J Telemed Telecare 2012;18:151-5.
61. Gega L, Smith J, Reynolds S. Cognitive behaviour therapy (CBT) for depression by computer vs. therapist: patient experiences and therapeutic processes. Psychother Res 2013;23:218-31.
62. Gerhards SA, Abma TA, Arntz A et al. Improving adherence and effectiveness of computerised cognitive behavioural therapy without support for depression: a qualitative study on patient experiences. J Affect Disord 2011;129:117-25.
63. Malbos E, Rapee RM, Kavakli M. A controlled study of agoraphobia and the independent effect of virtual reality exposure therapy. Aust N Zeal J Psychiatry 2013;47:160-8.
64. Wald J, Taylor S. Preliminary research on the efficacy of virtual reality exposure therapy to treat driving phobia. Cyberpsychol Behav 2003;6:459-65.
65. Weinstein RS, Lopez AM, Joseph BA et al. Telemedicine, telehealth, and mobile health applications that work: opportunities and barriers. Am J Med 2014;127:183-7.

DOI 10.1002/wps.20218

9/19/23, 8:57 AM
Telemental health: Clinical, technical, and administrative foundations for evidence-based practice.

Case 2:90-cv-00520-KJM-SCR     Document 8253-3     Filed 05/28/24     Page 74 of 329

 
(/) (https://www.apa.org/)

**APA PsycNet** ®

# Telemental health: Clinical, technical, and administrative foundations for evidence-based practice.

↪ EXPORT    ★ Add To My List    ✉    🖨    ⤴

Cited by 20 (/search/citedBy/2012-27199-000)

Book     Database: APA PsycInfo

Myers, Kathleen (Ed) (/search/results?term=Myers,%20Kathleen&latSearchType=a)     Turvey, Carolyn L. (Ed) (/search/results?term=Turvey,%20Carolyn%20L,&latSearchType=a)

## Citation

Myers, K., & Turvey, C. L. (Eds.). (2013). *Telemental health: Clinical, technical, and administrative foundations for evidence-based practice.* Elsevier.

## Abstract

Telemedicine has been "just around the corner" for decades. How do we know that its time has truly come? The chapters in *Telemental Health: Clinical, Technical, and Administrative Foundations for Evidence-based Practice* illustrate again and again that the convergence of unmet mental health need, technologic advances, changes in health care structure, a growing evidence base and clinical practice history make the time now. This book aims to facilitate the process by convincing readers interested in health innovation that a powerful solution is at our fingertips, and concerted efforts to promote telemental health will benefit all. (PsycInfo Database Record (c) 2022 APA, all rights reserved)

© 2023 American Psychological Association.
750 First Street NE, Washington, DC 20002-4242

  

REAPPRAISAL

# Telemental health: a status update

Elias Aboujaoude[1], Wael Salame[2], Lama Naim[2]

[1]OCD Clinic, Stanford University School of Medicine, Stanford, CA, USA; [2]Department of Psychiatry, Lebanese American University, Beirut, Lebanon

*A rather large body of literature now exists on the use of telemental health services in the diagnosis and management of various psychiatric conditions. This review aims to provide an up-to-date assessment of telemental health, focusing on four main areas: computerized CBT (cCBT), Internet-based CBT (iCBT), virtual reality exposure therapy (VRET), and mobile therapy (mTherapy). Four scientific databases were searched and, where possible, larger, better-designed meta-analyses and controlled trials were highlighted. Taken together, published studies support an expanded role for telepsychiatry tools, with advantages that include increased care access, enhanced efficiency, reduced stigma associated with visiting mental health clinics, and the ability to bypass diagnosis-specific obstacles to treatment, such as when social anxiety prevents a patient from leaving the house. Of technology-mediated therapies, cCBT and iCBT possess the most efficacy evidence, with VRET and mTherapy representing promising but less researched options that have grown in parallel with virtual reality and mobile technology advances. Nonetheless, telepsychiatry remains challenging because of the need for specific computer skills, the difficulty in providing patients with a deep understanding or support, concerns about the "therapeutic alliance", privacy fears, and the well documented problem of patient attrition. Future studies should further test the efficacy, advantages and limitations of technology-enabled CBT, as well as explore the online delivery of other psychotherapeutic and psychopharmacological modalities.*

**Key words:** Telemental health, telepsychiatry, Internet-mediated cognitive behavioral therapy, virtual reality exposure therapy, mobile therapy, mobile apps, short message service, depression, social phobia, specific phobias, post-traumatic stress disorder, obsessive-compulsive disorder

*(World Psychiatry 2015;14:223–230)*

The delivery of mental health services via telecommunication systems is having a remarkable expansion. For example, nearly 6% of all mobile health applications are now devoted to mental health (1).

Telemental health uses computer programs, Internet programs, teleconferencing, and smartphone applications for the remote delivery of mental health services, including diagnosis, assessment, symptom tracking, and treatment.

The aim of this paper is to review the current state of telemental health, focusing on its four main areas: computerized CBT (cCBT), Internet-mediated CBT (iCBT), virtual reality exposure therapy (VRET), and mobile therapy (mTherapy).

Articles were identified using PubMed, PsycINFO, ScienceDirect, and Wiley Online Library. The search was conducted using the terms "telepsychiatry", "telemental health", "computerized cognitive behavioral therapy", "assisted computerized psychotherapy", "unassisted computerized psychotherapy", "Internet therapy", "mobile cognitive behavioral therapy", "mobile therapy", "virtual reality exposure therapy", "virtual reality therapy", and "remote cognitive behavioral therapy". Google Scholar and Metacrawler search engines were also used to help identify unpublished material and book chapters.

The studies included in the review were limited to those published in English, with no restrictions placed on the country or year of publication. To the extent allowed by the literature, well-designed meta-analyses and larger, controlled trials with clearly defined outcome measures and inclusion and exclusion criteria were highlighted.

## COMPUTERIZED AND INTERNET-MEDIATED CBT

Several forms of technology-enabled psychotherapy now exist. They differ in important ways with respect to the technology platform, level of clinician involvement, and type of therapy.

cCBT refers to the use of software programs to deliver standardized, automated psychotherapy via personal computers, CD-ROMs and desktop programs, or through interactive voice response (IVR) telephone systems. It dates back to the 1980s (2) and has been the first technology-enabled therapy delivery system to be formally studied.

Since conventional CBT is often a manualized, standardized treatment, it was thought to lend itself well to the use of technology in a way that minimized therapist involvement beyond the initial steps of program design (3). Thus, exploration of computer programs that would "conduct" CBT with patients began relatively early, before the Internet became a widespread phenomenon and the cornerstone of telemedicine and telemental health today (4).

Via specifically designed software programs, cCBT allows individuals to self-diagnose, personalize treatment goals, and employ standardized therapy tools to achieve symptom control and relapse prevention. It involves variable levels of therapist intervention: standalone or unassisted cCBT generally refers to the independent use of a standardized, software-based treatment program that almost completely bypasses the therapist (5), whereas guided or assisted cCBT typically incorporates minimal therapist involvement (6-8).

Beyond cCBT, the last decade has witnessed the remarkable growth of Internet-mediated psychotherapy. Several studies have explored the delivery of various psychotherapeutic approaches via the Internet, including interpersonal psychotherapy and online psychoeducation. However, most of the existing psychotherapy literature investigating the use of the Internet has focused on the delivery of CBT, an approach that has at times been called iCBT (e.g., 2,9).

Like cCBT, iCBT includes unassisted programs (5) as well as programs that incorporate minimal therapist involvement, usually via email or text message exchanges (assisted iCBT) (10). A third form of iCBT is "real-time" iCBT, which consists of live online conversations with "full" therapist involvement, and it may or may not include a video conferencing component (11,12).

## Efficacy

Several meta-analyses have examined the efficacy of technology-enabled CBT. A meta-analysis of 14 randomized controlled trials (RCTs) and 2,976 subjects compared both assisted and unassisted cCBT to either waitlist or traditional CBT in the treatment of adult depression (13). cCBT showed a moderate post-treatment effect size on depressive symptoms when compared to the waitlist group, with equivalent outcomes compared to traditional CBT. However, traditional CBT performed better than cCBT in functional improvement and symptom reduction at the long-term follow-up points and was associated with lower dropout rates.

A large iCBT meta-analysis included 108 trials, of which 104 reported on clinical efficacy (N=9,410) and eight on cost-effectiveness (N=2,964) (2). Studies varied considerably in methodologies, outcome measures and conditions treated, and compared either unassisted iCBT to assisted iCBT or one of those interventions to a waitlist control or face-to-face therapy. Among the studies, 12 RCTs compared iCBT to traditional CBT in the treatment of depressive symptoms, social phobia, panic disorder, specific phobia (arachnophobia), sexual dysfunction and body dissatisfaction. Pooled results from the RCTs demonstrated similar efficacy on outcome measures as determined by effect size.

The literature on real-time iCBT with or without videoconferencing is more limited. In an RCT of adult subjects with major depressive disorder, 197 participants were assigned to ten sessions over 16 weeks of real-time iCBT with a live therapist and without videoconferencing, and 148 participants to an eight-month waitlist. Subjects in both groups continued to receive "usual care" by their general practitioners. At the four-month follow-up, 38% of subjects in the real-time iCBT vs. 24% in the control group responded, based on the Beck Depression Inventory (11).

Also, a study of 26 subjects (mean age: 30) with mood or anxiety disorders randomly assigned participants to either real-time iCBT with videoconferencing or traditional CBT. Participants received 12 weekly one-hour sessions and a follow-up session six weeks post-treatment. Real-time iCBT with videoconferencing was associated with a statistically significant reduction in symptoms of depression (p<0.001), anxiety (p<0.001) and "stress" (p<0.001), and had a similar efficacy to traditional CBT (3).

A more recent RCT investigated the efficacy of exposure and response prevention based CBT in the treatment of obsessive-compulsive disorder (OCD) in 30 subjects random-

ly assigned to 12 weeks of real-time iCBT with videoconferencing (N=10), self-help book-based exposure and response prevention (N=10), or a waitlist group (N=10). Post-treatment assessment demonstrated the superiority of real-time iCBT with videoconferencing: six participants (60%) receiving this treatment option achieved "clinically significant" improvement as assessed by the Yale-Brown Obsessive-Compulsive Scale; one participant (10%) demonstrated "reliable change" in response to self-help; and all participants in the waitlist group demonstrated "no change" (14).

Finally, group technology-enabled therapy has also received some research attention. A study compared the efficacy of real-time group iCBT with videoconferencing to face-to-face group CBT. It asked 18 subjects with depression or anxiety to select between the two interventions. Eight chose real-time iCBT with videoconferencing and appeared along the perimeter of the screen with the therapist in the center and could interact with one another and the therapist in real time; 10 chose traditional CBT. Subjects in both groups received 13 weekly one-hour group sessions. No significant difference was seen in efficacy, with approximately 60% in each group responding (15).

## Special populations

Technology-enabled therapies have been studied for their potential use in special populations, including children and adolescents (16,17) and medically ill psychiatric patients (18).

A recent meta-analysis examined the efficacy of one unassisted iCBT program (BRAVE-ONLINE) and three assisted iCBT programs (BRAVE, COPE-A-LOT and "Think, Feel, Do") in the treatment of childhood anxiety disorders. Data from seven studies (five controlled trials, one case study and one cohort study) and 240 subjects aged 7 to 16 collectively demonstrated the efficacy of unassisted and assisted iCBT, with results comparable to those of traditional CBT (19).

Similarly, a study in 31 child and adolescent subjects with OCD (mean age: 11) randomly assigned participants to family real-time iCBT with a live therapist and videoconferencing or to a waitlist control. Participants received 14 family-based sessions and were assessed at one week and three months post-treatment. Subjects assigned to the waitlist group were assessed at four weeks post-randomization. Results demonstrated the superiority of real-time iCBT with videoconferencing: 81% response and 56% remission rates were seen among participants receiving iCBT, compared to 13% response and remission rates in the waitlist group (12).

Telemental health interventions in patients who have medical comorbidities have received some research attention as well. An RCT of 56 subjects with fibromyalgia and mild to moderate depression or anxiety randomly assigned participants to either six weeks of minimally assisted iCBT or continued unchanged pharmacological treatment. Subjects were assessed at one, six and 12 weeks post-intervention. At all assessment points, iCBT was associated with a significant

20155343, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

20515545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

reduction in both the Fibromyalgia Impact Questionnaire scores and tender point sensitivity as assessed via physical examination (18).

## Prevention

Several studies have explored the role of technology-enabled therapies in the prevention of psychiatric illness. One RCT tested the efficacy of unassisted iCBT in preventing depression in 163 university students who were randomly assigned to either five weeks of unassisted iCBT or a waitlist control. Subjects who received unassisted iCBT had significantly less depressive symptoms and improved literacy about depression at study end. The dropout rate, however, was significantly higher within the unassisted iCBT group compared to the control group (46.9 vs. 28.0%) (5).

In a relapse prevention study of iCBT in partially remitted depression, 303 subjects were randomly assigned to one of three interventions: unassisted iCBT, traditional therapy, or unassisted iCBT combined with traditional therapy (6). Individuals assigned to unassisted iCBT or unassisted iCBT combined with traditional therapy received nine online sessions. No statistically significant difference was seen in response and remission rates between unassisted iCBT and either traditional therapy or unassisted iCBT combined with traditional therapy. However, data at the 12-month follow-up demonstrated that traditional therapy was associated with a lower relapse rate compared to unassisted iCBT (20.7 vs. 31.3%).

Another study tested assisted iCBT in the prevention of relapse in partially remitted depression by randomly assigning 84 subjects to ten weeks of either 16 sessions of assisted iCBT or a waitlist control (7). Assessment at the 24-month follow-up demonstrated a significantly lower relapse rate in the assisted iCBT compared to the control group (13.7 vs. 60.9%).

Finally, a study examined the impact of minimally guided iCBT on the relapse of severe health anxiety (hypochondriasis) at six and 12 months after the conclusion of an RCT. Minimally guided iCBT yielded significantly better symptom control as well as increased cost-effectiveness compared to the waitlist control (20).

## VIRTUAL REALITY EXPOSURE THERAPY

VRET refers to the use of virtual reality to conduct exposure therapy by mimicking real-life situations. The earliest experimental attempts on the use of virtual reality exposure as a treatment modality date back to 1992 (21), but it was only recently that the digital revolution brought about head-mounted displays, computer automated virtual environments, motion sensors and other sophisticated tools, making VRET environments more realistic, immersive and interactive. That, combined with the decreasing cost of the technology involved, has made VRET a potentially viable alternative to *in vivo* exposure therapy, and one that seems on the way to broader adoption (22).

VRET is generally conducted over six to 12 sessions, each lasting between 45 and 60 min (23). It has received less research attention than cCBT or iCBT, but efficacy data suggest its potential role in the treatment of several psychiatric conditions, including phobias, post-traumatic stress disorder (PTSD), OCD and substance use disorders.

## Efficacy

### Social anxiety disorder (social phobia)

Multiple studies provide evidence in support of VRET in the treatment of social anxiety disorder and public speaking anxiety. In a study of 41 subjects with social anxiety disorder, subjects participated in four sessions of cognitive restructuring, followed by four virtual sessions that targeted particular feared social settings (e.g., conference room, classroom, large auditorium). The study provided evidence that environments that better mimicked the feared scenario outperformed those that did not (24). A similar outcome was observed in a controlled trial that compared VRET to conventional CBT in the treatment of public speaking anxiety in a total of eight subjects. Participants were asked to deliver a speech before a real-life audience of five to nine individuals before and after completing four VRET sessions. All participants reported subjective improvement in public speaking anxiety immediately following, and several months after, the intervention (25).

Another study (N=88) compared the efficacy of 12 sessions of conventional CBT, 12 sessions of VRET, and a waitlist control in social anxiety disorder. VRET and conventional CBT proved equally superior to the waitlist group, with sustained improvement at one-year follow-up (26).

### Specific phobias

Clinical trials of VRET in the treatment of specific phobias have also provided promising evidence. Several studies have explored the treatment of agoraphobia using VRET and have demonstrated superiority over a waitlist control (e.g., 27,28). A larger, more recent study assessed the efficacy of VRET in 80 subjects with long-standing (five years or more) agoraphobia. Subjects were randomly assigned to one of three groups: CBT with drug therapy ("CBT group"), N=30; CBT with drug therapy and VRET ("VRET group"), N=30; and drug therapy alone ("drug group"), N=20. Individuals in both the "CBT group" and the "VRET group" received five sessions of psychoeducation and cognitive restructuring, followed by six sessions of CBT or CBT and VRET. Both interventions were associated with clinical improvement, but VRET was associated with better adherence (29).

225

20151545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Claustrophobia has also received attention as a possible target for VRET. One study tested VRET in four subjects with claustrophobia, exposing them to eight virtual environments of increasing claustrophobic severity. Results demonstrated the efficacy of VRET both immediately after, and at the three-month follow-up (30). Another study in six subjects with claustrophobia suggested benefit from VRET, with the benefit shown to extend into real-life situations (31).

At least two controlled trials have demonstrated improved clinical outcomes for VRET vs. waitlist and equal benefit for VRET and conventional exposure therapy in the treatment of aviophobia (21,32,33). Finally, small studies have demonstrated improvement from VRET in the treatment of acrophobia (34,35).

### Post-traumatic stress disorder

The first use of virtual reality in PTSD treatment involved a Vietnam War veteran (36), with a subsequent study in ten Vietnam War veterans demonstrating statistically significant reductions in both anxiety and avoidance levels that persisted at the three- and six-month follow-up points (37).

Other studies have suggested the efficacy of VRET in the treatment of PTSD resulting from non-war traumas. For example, a controlled study in subjects with PTSD stemming from the September 11, 2001 terrorist attacks compared VRET to a waitlist group. Of the 13 subjects who received VRET, five were resistant to previous treatments, and, of the ten receiving VRET who completed the study, nine experienced statistically significant improvement (38). Similarly, a study in ten subjects with PTSD resulting from abuse, crime assault or car accident randomly assigned participants to either conventional CBT or VRET. Both treatment modalities resulted in significant improvement in core PTSD symptoms (39). Finally, one article reviewed the possible role of VRET in the treatment of post-fall PTSD-like symptoms in elderly patients, providing evidence in favor of VRET and noting its ease of use in that patient population when compared to *in vivo* exposure (40).

### Obsessive-compulsive disorder

Data on using VRET in the treatment of OCD are limited, in part because of the difficulty and cost of building programs that simulate the wide variability in OCD triggers among patients. However, a study comparing 30 subjects with OCD to 27 matched controls yielded an increased level of compulsive checking among subjects with OCD in response to virtual triggers compared to the control group, which suggested a role for VRET in OCD treatment and led to a subsequent, uncontrolled study in 24 subjects with arranging compulsions. Results from that study showed a decrease in OCD-related anxiety in response to VRET (41).

### Substance use disorders

Treatment of drug dependence often involves strengthening the ability to resist using drugs when faced with triggers that provoke craving. Conventional CBT therapists usually rely on photographs and films to elicit craving, but have difficulty mimicking the behavior's typical setting. The need to better simulate real-life situations has led to the investigation of virtual reality as a more immersive environment in which to conduct therapy.

An early study investigating VRET in the treatment of five heroin-dependent subjects incorporated virtual cues that typically elicit craving. Both subjective (e.g., anxiety) and objective (e.g., autonomic activation) measures suggested the ability of virtual exposure to trigger real-life responses (42). More recently, a sample of 47 chronic smokers demonstrated hyperarousal when exposed to virtual smoking paraphernalia (43). To our knowledge, no study has compared VRET to conventional CBT in the treatment of substance use.

### Other conditions

VRET has been preliminarily explored in the treatment of other conditions as well. For example, a study in 34 female subjects with eating disorders compared the efficacy of conventional CBT alone to CBT with VRET. Both groups demonstrated statistically significant improvement in body image, but participants receiving CBT with VRET showed greater improvement at the one-year follow-up point (44).

Further, and despite fear that virtual simulations might exacerbate symptoms in conditions already characterized by impaired reality testing, studies are beginning to assess VRET in psychotic individuals, with one schizophrenia trial (N=91) suggesting improved assertiveness and conversational abilities with VRET, as well as higher interest by subjects in virtual environment platforms than conventional treatment settings (45).

### MOBILE THERAPY

mTherapy refers to the use of mobile phone devices, smartphones and mobile applications or "apps" in the delivery of mental health services. Its popularity has grown rapidly, as indicated by the title, "*Smartphone apps become surrogate therapists*", of a 2012 lay press article (46). Indeed, survey data suggest that mTherapy interventions may be favored over other telemental health tools by health care consumers (47).

Currently, over 3,000 mental health apps exist in Apple's App Store and Google's Google Play (48). They offer help with diagnosing (49), self-monitoring (1,48), symptom tracking and documentation (50), adherence to traditional therapy (51), and appointment and therapy homework reminders

20518545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(48). They can also provide convenient means for interacting with therapists between appointments (52). Although the literature on their efficacy remains scarce, some preliminary outcome data exist covering the more common forms of mTherapy.

### Mobile apps

Mobile apps are the main form of mTherapy and include self-monitoring apps (52), apps that enhance self-awareness (53), apps that help with self-regulation (54), and CBT-inspired apps (mCBT) (55). A randomized trial of a self-monitoring app assigned 18 subjects to seven days of monitoring. The study demonstrated superiority over retrospective questioning about depression and stress (52). That was explained by decreased memory bias when gathering data and recording behaviors and thoughts as they occurred in real-life situations.

Another RCT in 118 depressed subjects aged 14 to 24 randomly assigned individuals to the use of mobile self-monitoring apps that tracked mood, stress level, and daily activities (N=68) or to a control group (N=46) where only daily activities were monitored. The use of mobile self-monitoring apps was associated with increased "emotional self-awareness", decreased depressive symptoms, rapid symptom improvement, and time savings compared to the control group (53).

Preliminary data from RCTs suggest benefit from mobile CBT as well. In one study, male subjects were assigned to one of two interventions: 11 received mobile CBT and 12 were assigned to waitlist. Individuals in the mobile CBT group received three group meetings conducted by a psychologist, in addition to self-reporting between meetings via a mobile CBT app that focused on clarifying personal values, goal setting, relaxation, mindfulness, and acceptance tools. It was hypothesized that between-meeting self-reporting would improve the continuity and impact of the face-to-face intervention. Indeed, mobile CBT was associated with a greater reduction in depressive symptoms than the control group at post-treatment, in addition to an improvement in reported overall health and working ability (55).

Another RCT in 35 subjects (mean age: 41 years) with major depressive disorder randomly assigned 15 to mobile CBT and 20 to cCBT. The "Get Happy" mobile app was used and consisted of six lessons to be completed over eight weeks. Both mobile CBT and cCBT were associated with a statistically significant reduction in depressive symptoms post-treatment and at the three-month follow-up (56).

A more recent study compared the efficacy of apps for mobile CBT and for mobile interpersonal therapy in treating social anxiety disorder. Fifty-two subjects were randomly assigned to receive either mobile CBT (N=27) or mobile interpersonal therapy (N=25). Mobile CBT performed better than mobile interpersonal therapy as measured by the Liebowitz Social Anxiety Scale, both post-treatment and at the three-month follow-up (between group Cohen's d=0.64) (57).

### Text messaging or short message service

Text messaging, or short message service (SMS), has been used as an mTherapy intervention that allows for the immediate delivery of interventional messages and reminders of health goals, appointments and therapy homework (58). Preliminary studies have investigated it in the treatment of conditions such as major depression and psychotic disorders.

A study in 54 subjects with major depression and comorbid alcohol use disorder randomly assigned participants to either receiving twice-daily supportive text messages (N=26), or to a waitlist group where participants received "thank you" text messages once every 14 days (N=28). Subjects were followed for up to three months. Results, as assessed by the Beck Depression Inventory, showed a statistically significant difference in favor of text messaging when compared to the waitlist control (59).

### Phone calls

Voice phone calls are an older form of mTherapy and have been used in the treatment of various psychiatric conditions, including anxiety disorders and depression. An RCT assessed phone-based psychotherapy in the reduction of suicidal ideation and self-harm by randomly assigning 68 subjects to either brief phone treatment alongside traditional face-to-face psychotherapy (N=34) or only face-to-face psychotherapy (N=34). Voice calls focused on mood assessment, provision of reassurance, problem-solving, and medication training. Assessment at six and 12 months following therapy initiation revealed that subjects also receiving phone psychotherapy had significantly less suicidal ideation and other depressive symptoms (60).

### DISCUSSION

To a large degree, the potential advantages of telemental health mirror those of telemedicine and include improved access to care, especially for patients who live in areas that are under-served by mental health professionals, who have physical limitations that limit their ability to obtain traditional care, or whose work or other responsibilities prevent them from commuting to a regular clinic. In addition, the reduced need for office-related infrastructure may help contain costs and improve efficiency, helping make health care services more affordable overall. Advantages that are more specific to telemental health include reducing the stigma attached to visiting mental health facilities, as well as the ability to bypass diagnosis-specific obstacles to treatment (e.g., social anxiety-

20515545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

or OCD-related fear of leaving the house or visiting a treatment setting).

Still, telemental health in its various manifestations remains somewhat controversial, in part because of ongoing concerns among patients and professionals about how technology platforms might impact the "therapeutic alliance" (61). Other problems include the lack of sufficient support, the inability to provide users with a deep understanding of their conditions, and the need for specific computer skills (62). Moreover, while CBT (and, by extension, exposure and response prevention) has been investigated to some degree, little data are available on other common forms of psychotherapy, and virtually no data exist on technology-assisted psychopharmacological care.

Of all technology-mediated therapies, cCBT and iCBT have been researched the most. Compared to cCBT, which was once limited to CD-ROMs and installable programs that required individuals to independently complete activities in the absence of therapist guidance, iCBT appears to be an advance in that it offers access to a broader variety of CBT programs, while also providing the opportunity for varying levels of therapist guidance. Research studies point to many successes for cCBT and iCBT across several psychiatric disorders and support a role for these interventions in modern psychotherapy delivery. Still, a major limitation of cCBT and, perhaps to a lesser degree, iCBT appears to be patient attrition (16).

VRET is a younger technology-enabled therapy that may possess advantages over traditional forms, especially when it comes to recreating challenging exposure situations, such as airplanes (for aviophobia) or bar settings (for alcohol-related disorder). Compared to traditional CBT, VRET may have the added advantage of additional control over the exposure exercise and a sense of increased safety when confronting phobic stimuli (63). This therapy, however, remains inadequately tested and not widely available, in part due to the need for infrastructure investment and training (64). With the increased availability and affordability of simulation technology, as evidenced by the current availability of highly sophisticated and immersive video games, VRET may become a more reasonable adjunct to, or possibly replacement for, conventional exposure therapy in certain disorders.

The most recent chapter in the digital revolution has been the dramatic rise of mobile technologies, including smartphones and associated apps. A parallel move has occurred within telemental health, where mental health apps have seen remarkable growth. Among other goals, they purport to help with self-monitoring and the very targeted delivery of therapeutic interventions. Compared to other forms of telemental health, a main advantage of mTherapy is its portability, which can make available data on behaviors, thoughts and coping strategies in real time, and help design highly specific, contextualized interventions. High attrition rates and respondent fatigue, however, seem to be serious limitations with mTherapy as well (52), and further evidence about efficacy is needed.

## CONCLUSIONS

It has been estimated that up to 50% of all health care services will be conducted electronically by 2020 (65). Telemental health has been an integral part of the telemedicine movement and, given the "hands off" nature of many mental health services and the reduced need for treatment tools such as physical exams, lab tests and radioimaging, it may be poised to grow even faster than other medical fields.

So far, however, the rise of telemental health has generally outpaced scientific research, which limits the ability to make strong recommendations, especially when the substitution of online platforms for conventional care is being considered. Randomized clinical trials of adequate size and representation are clearly needed in order to establish the efficacy, safety and treatment adherence of available interventions, as well as to test some woefully understudied ones, such as Internet-enabled psychopharmacological care.

In addition, concerns about data and interaction confidentiality as well as compliance with health information regulations, such as the Health Insurance Portability and Accountability Act in the U.S., remain an obstacle to adoption by patients and providers alike and should be prioritized. Finally, insurer reimbursement needs to be assessed and advocated for in the case of interventions that have been shown to be effective and secure, especially if conventional alternatives are inaccessible, too expensive or insufficient on their own.

## References

1. Donker T, Petrie K, Proudfoot J et al. Smartphones for smarter delivery of mental health programs: a systematic review. J Med Internet Res 2013;15:e247.
2. Hedman E, Ljótsson B, Lindefors N. Cognitive behavior therapy via the Internet: a systematic review of applications, clinical efficacy and cost-effectiveness. Expert Rev Pharmacoecon Outcomes Res 2012;12:745-64.
3. Stubbings DR, Rees CS, Roberts LD et al. Comparing in-person to videoconference-based cognitive behavioral therapy for mood and anxiety disorders: randomized controlled trial. J Med Internet Res 2013;15:e258.
4. Selmi PM, Klein MH, Greist JH et al. Computerized assisted cognitive-behavioral therapy for depression. Am J Psychiatry 1990;147:51-6.
5. Lintvedt OK, Griffiths KM, Sørensen K et al. Evaluating the effectiveness and efficacy of unguided internet-based self-help intervention for the prevention of depression: a randomized controlled trial. Clin Psychol Psychother 2013;20:10-27.
6. de Graaf LE, Gerhards SA, Arntz A et al. One-year follow-up results of unsupported online computerized cognitive behavioural therapy for depression in primary care: a randomized trial. J Behav Ther Exp Psychiatry 2011;42:89-95.
7. Holländare F, Anthony SA, Randestad M et al. Two-year outcome of internet-based relapse prevention for partially remitted depression. Behav Res Ther 2013;51:719-22.
8. Knowles SE, Toms G, Sanders C et al. Qualitative meta-synthesis of user experience of computerised therapy for depression and anxiety. PLoS One 2014;9:e84323.

20515545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

9. Andersson G, Titov N. Advantages and limitations of Internet-based interventions for common mental disorders. World Psychiatry 2014;13:4-11.

10. Andersson G, Cuijpers P, Carlbring P et al. Guided Internet-based vs. face-to-face cognitive behavior therapy for psychiatric and somatic disorders: a systematic review and meta-analysis. World Psychiatry 2014;13:288-95.

11. Kessler D, Lewis G, Kaur S et al. Therapist-delivered internet psychotherapy for depression in primary care: a randomized controlled trial. Lancet 2009;374:628-34.

12. Storch EA, Caporino NE, Morgan JR et al. Preliminary investigation of web-camera delivered cognitive-behavioral therapy for youth with obsessive-compulsive disorder. Psychiatry Res 2011;189:407-12.

13. So M, Yamaguchi S, Hashimoto S et al. Is computerised CBT really helpful for adult depression?: A meta-analytic re-evaluation of CCBT for adult depression in terms of clinical implementation and methodological validity. BMC Psychiatry 2013;13:113.

14. Vogel PA, Solem S, Hagen K et al. A pilot randomized controlled trial of videoconference-assisted treatment for obsessive-compulsive disorder. Behav Res Ther 2014;63C:162-8.

15. Khatri N, Marziali E, Tchernikov I et al. Comparing telehealth-based and clinic-based group cognitive behavioral therapy for adults with depression and anxiety: a pilot study. Clin Interv Aging 2014;9:765-70.

16. Richardson T, Stallard P, Velleman S. Computerised cognitive behavioural therapy for the prevention and treatment of depression and anxiety in children and adolescents: a systematic review. Clin Child Fam Psychol Rev 2010;13:275-90.

17. Vigerland S, Ljotsson B, Gustafsson F et al. Attitudes towards the use of computerized cognitive behavior therapy (cCBT) with children and adolescents: a survey among Swedish mental health professionals. Internet Interv 2014;1:111-7.

18. Menga G, Ing S, Khan O et al. Fibromyalgia: can online cognitive behavioral therapy help? Ochsner J 2014;14:343-9.

19. Rooksby M, Elouafkaoui P, Humphris G et al. Internet-assisted delivery of cognitive behavioural therapy (CBT) for childhood anxiety: systematic review and meta-analysis. J Anxiety Disord 2014;29C:83-92.

20. Hedman E, Andersson E, Lindefors N et al. Cost-effectiveness and long-term effectiveness of internet-based cognitive behaviour therapy for severe health anxiety. Psychol Med 2013;43:363-74.

21. Krijn M, Emmelkamp PM, Olafsson RP et al. Virtual reality exposure therapy of anxiety disorders: a review. Clin Psychol Rev 2004;24:259-81.

22. Meyerbröker K, Emmelkamp PM. Virtual reality exposure therapy in anxiety disorders: a systematic review of process-and-outcome studies. Depress Anxiety 2010;27:933-44.

23. Powers MB, Emmelkamp PM. Virtual reality exposure therapy for anxiety disorders: a meta-analysis. J Anxiety Disord 2008;22:561-9.

24. Price M, Mehta N, Tone EB et al. Does engagement with exposure yield better outcomes? Components of presence as a predictor of treatment response for virtual reality exposure therapy for social phobia. J Anxiety Disord 2011;25:763-70.

25. Anderson PL, Zimand E, Hodges LF et al. Cognitive behavioral therapy for public-speaking anxiety using virtual reality for exposure. Depress Anxiety 2005;22:156-8.

26. Safir MP, Wallach HS, Bar-Zvi M. Virtual reality cognitive-behavior therapy for public speaking anxiety: one-year follow-up. Behav Modif 2012;36:235-46.

27. Vincelli F, Anolli L, Bouchard S. Experiential cognitive therapy in the treatment of panic disorders with agoraphobia: a controlled study. Cyberpsychol Behav 2003;6:321-8.

28. Botella C, Villa H, Garcia-Palacios A et al. Clinically significant virtual environments for the treatment of panic disorder and agoraphobia. Cyberpsychol Behav 2004;7:527-35.

29. Castro W, Sanchez M, Gonzalez C et al. Cognitive-behavioral treatment and antidepressants combined with virtual reality exposure for patients with chronic agoraphobia. Int J Clin Health Psychol 2014;14:9-17.

30. Botella C, Banos R, Villa H et al. Virtual reality in the treatment of claustrophobic fear: a controlled, multiple-baseline design. Behav Ther 2000;31:583-95.

31. Malbos E, Mestre DR, Note ID et al. Virtual reality and claustrophobia: multiple components therapy involving game editor virtual environments exposure. Cyberpsychol Behav 2008;11:695-7.

32. Rothbaum B, Hodges L, Smith S. A controlled study of virtual reality exposure therapy for fear of flying. J Consult Clin Psychol 2000;68:1020-6.

33. Rothbaum BO, Page A, Zimand E et al. Virtual reality exposure therapy and standard therapy in the treatment of fear of flying. Behav Ther 2006;37:80-90.

34. Rothbaum BO, Hodges L. The use of virtual reality exposure in the treatment of anxiety disorders. Behav Modif 1999;23:507-25.

35. Emmelkamp PMG, Krijn M, Hulsbosch AM. Virtual reality treatment versus exposure in vivo: a comparative evaluation in acrophobia. Behav Res Ther 2002;40:509-16.

36. Rothbaum BO, Hodges L, Alarcon R. Virtual reality exposure therapy for PTSD Vietnam veterans: a case study. J Trauma Stress 1999;12:263-71.

37. Rothbaum BO, Hodges L, Ready D. Virtual reality exposure therapy for Vietnam veterans with post-traumatic stress disorder. J Clin Psychiatry 2001;62:617-22.

38. Difede J, Hoffman H. Virtual reality exposure therapy for World Trade Center post-traumatic stress disorder: a case report. Cyberpsychol Behav 2002;5:529-35.

39. Banos R, Guillen V, Quero S et al. A virtual reality system for the treatment of stress-related disorders: a preliminary analysis of efficacy compared to a standard cognitive behavioral program. Int J Hum Comput Stud 2011;69:602-13.

40. Bloch F, Rigaud A, Kemoun G. Virtual reality exposure therapy in posttraumatic stress disorder: a brief review to open new opportunities for post-fall syndrome in elderly subjects. Eur Geriatr Med 2013;4:427-30.

41. Kim K, Kim CH, Kim SY et al. Virtual reality for obsessive-compulsive disorder: past and the future. Psychiatry Investig 2009;6:115-21.

42. Kuntze M, Stoemer R, Mager R et al. Immersive virtual environments in cue exposure. Cyberpsychol Behav 2001;4:497-501.

43. Garcia-Rodriguez O, Pericot-Valverde I, Gutierrez J et al. Validation of smoking-related virtual environments for cue exposure therapy. Addict Behav 2012;37:703-8.

44. Marco JH, Perpiná C, Botella C. Effectiveness of cognitive behavioral therapy supported by virtual reality in the treatment of body image in eating disorders: one year follow-up. Psychiatry Res 2013;209:619-25.

45. Park KM, Ku J, Choi SH et al. A virtual reality application in role-plays of social skills training for schizophrenia: a randomized, controlled trial. Psychiatry Res 2011;189:166-72.

46. Landau E. Smartphone apps become 'surrogate therapists'. CNN Research, September 2012.

47. Torous J, Friedman R, Keshavan M. Smartphone ownership and interest in mobile applications to monitor symptoms of mental health conditions. JMIR Mhealth Uhealth 2014;2:e2.

48. Chan S, Torous J, Hinton L et al. Mobile tele-mental health: increasing applications and a move to hybrid models of care. Healthcare 2014;2:220-33.

49. Deslich S, Stec B, Tomblin S et al. Telepsychiatry in the 21st century: transforming healthcare with technology. Perspect Health Inf Manag 2013;10:1f.

50. Depp CA, Mausbach B, Granholm E et al. Mobile interventions for severe mental illness: design and preliminary data from three approaches. J Nerv Ment Dis 2010;198:715-21.

20151545, 2015, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/wps.20218, Wiley Online Library on [18/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

51. Hilty DM, Ferrer DC, Parish MB et al. The effectiveness of telemental health: a 2013 review. Telemed J E Health 2013;19:444-54.
52. Reid SC, Kauer SD, Dudgeon P et al. A mobile phone program to track young people's experiences of mood, stress and coping. Development and testing of the mobiletype program. Soc Psychiatry Psychiatr Epidemiol 2009;44:501-7.
53. Kauer SD, Reid SC, Crooke AHD et al. Self-monitoring using mobile phones in the early stages of adolescent depression: randomized controlled trial. J Med Internet Res 2012;14:e67.
54. Morris ME, Kathawala Q, Leen TK et al. Mobile therapy: case study evaluations of a cell phone application for emotional self-awareness. J Med Internet Res 2010;12:e10.
55. Lappalainen P, Kaipainen K, Lappalainen R et al. Feasibility of a personal health technology-based psychological intervention for men with stress and mood problems: randomized controlled pilot trial. JMIR Research Protoc 2013;2:e1.
56. Watts S, Mackenzie A, Thomas C et al. CBT for depression: a pilot RCT comparing mobile phone vs. computer. BMC Psychiatry 2013;13:49.
57. Dagöö J, Asplund RP, Bsenko HA et al. Cognitive behavior therapy versus interpersonal psychotherapy for social anxiety disorder delivered via smartphone and computer: a randomized controlled trial. J Anxiety Disord 2014;28:410-7.
58. Klasnja P, Pratt W. Healthcare in the pocket: mapping the space of mobile-phone health interventions. J Biomed Inform 2012;45:184-98.
59. Agyapong VI, Ahern S, McLoughlin DM et al. Supportive text messaging for depression and comorbid alcohol use disorder: single-blind randomised trial. J Affect Disord 2012;141:168-76.
60. Marasinghe RB, Edirippulige S, Kavanagh D et al. Original article of mobile phone-based psychotherapy in Q Effect suicide prevention: a randomized controlled trial in Sri Lanka. J Telemed Telecare 2012;18:151-5.
61. Gega L, Smith J, Reynolds S. Cognitive behaviour therapy (CBT) for depression by computer vs. therapist: patient experiences and therapeutic processes. Psychother Res 2013;23:218-31.
62. Gerhards SA, Abma TA, Arntz A et al. Improving adherence and effectiveness of computerised cognitive behavioural therapy without support for depression: a qualitative study on patient experiences. J Affect Disord 2011;129:117-25.
63. Malbos E, Rapee RM, Kavakli M. A controlled study of agoraphobia and the independent effect of virtual reality exposure therapy. Aust N Zeal J Psychiatry 2013;47:160-8.
64. Wald J, Taylor S. Preliminary research on the efficacy of virtual reality exposure therapy to treat driving phobia. Cyberpsychol Behav 2003;6:459-65.
65. Weinstein RS, Lopez AM, Joseph BA et al. Telemedicine, telehealth, and mobile health applications that work: opportunities and barriers. Am J Med 2014;127:183-7.

DOI 10.1002/wps.20218

**JMIR Mental Health**
Internet interventions, technologies and digital innovations for mental health and behaviour change

About    Search    Archive    Current Issue    Submit    Editorial Board

JMIR Ment Health. 2021 Jul; 8(7): e26187.                    PMCID: PMC8323764
Published online 2021 Jul 29. doi: 10.2196/26187: 10.2196/26187                    PMID: 34114956

# Tele–Mental Health for Reaching Out to Patients in a Time of Pandemic: Provider Survey and Meta-analysis of Patient Satisfaction

Monitoring Editor: John Torous

Reviewed by Veronika Strotbaum and Peter Yellowlees

Raffaele Mazziotti, PhD[1,2] and Grazia Rutigliano, MD, PhD[⊠3]

[1] Institute of Neuroscience, National Research Council (CNR), Pisa, Italy

[2] Department of Neuroscience, Psychology, Drug Research and Child Health (NEUROFARBA), University of Florence, Florence, Italy

[3] Department of Pathology, University of Pisa, Pisa, Italy

Grazia Rutigliano, Department of Pathology, University of Pisa, via Savi, 10, Pisa, 56126, Italy, Phone: 39 3496117744, Email: grazia.rutigliano.gr@gmail.com

[⊠]Corresponding author.

Corresponding Author: Grazia Rutigliano grazia.rutigliano.gr@gmail.com

Received 2020 Dec 1; Revisions requested 2021 Feb 7; Revised 2021 Feb 13; Accepted 2021 May 13.

Copyright ©Raffaele Mazziotti, Grazia Rutigliano. Originally published in JMIR Mental Health (https://mental.jmir.org), 29.07.2021.

This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Mental Health, is properly cited. The complete bibliographic information, a link to the original publication on https://mental.jmir.org/, as well as this copyright and license information must be included.

## Abstract

### Background

The COVID-19 pandemic threatened to impact mental health by disrupting access to care due to physical distance measures and the unexpected pressure on public health services. Tele–mental health was rapidly implemented to deliver health care services.

### Objective

The aims of this study were (1) to present state of the art tele–mental health research, (2) to survey mental health providers about care delivery during the pandemic, and (3) to assess patient satisfaction with tele–mental health.

## Methods

Document clustering was applied to map research topics within tele–mental health research. A survey was circulated among mental health providers. Patient satisfaction was investigated through a meta-analysis of studies that compared satisfaction scores between tele–mental health and face-to-face interventions for mental health disorders, retrieved from Web of Knowledge and Scopus. Hedges g was used as the effect size measure, and effect sizes were pooled using a random-effect model. Sources of heterogeneity and bias were examined.

## Results

Evidence on tele–mental health has been accumulating since 2000, especially regarding service implementation, depressive or anxiety disorders, posttraumatic stress disorder, and special populations. Research was concentrated in a few countries. The survey (n=174 respondents from Italy, n=120 international) confirmed that, after the onset of COVID-19 outbreak, there was a massive shift from face-to-face to tele–mental health delivery of care. However, respondents held skeptical views about tele–mental health and did not feel sufficiently trained and satisfied. Meta-analysis of 29 studies (n=2143) showed that patients would be equally satisfied with tele–mental health as they are with face-to-face interventions (Hedges $g$=−0.001, 95% CI −0.116 to 0.114, $P$=.98, $Q$=43.83, $I^2$=36%, $P$=.03) if technology-related issues were minimized.

## Conclusions

Mental health services equipped with tele–mental health will be better able to cope with public health crises. Both providers and patients need to be actively engaged in digitization, to reshape their reciprocal trust around technological innovations.

**Keywords:** telepsychiatry, telepsychology, e-mental health, document clustering, survey, COVID-19, access to care, patient satisfaction, mental health, tele–mental health, review, telemedicine, satisfaction, access

## Introduction

In March 2020, a COVID-19 outbreak spread throughout the globe reaching the size of a pandemic. Most governments responded with physical distancing measures. In this science fiction–like context, mental health is expected to pay a heavy toll [1]. Paradoxically, in a time of increased mental health vulnerability, access to care had to be restricted by pausing nonurgent outpatient services, closing day centers, and reducing home visits [2-6]. There was one recourse to address re-

duced access to care—tele–mental health was used to reach out and support patients [2,9]. In most health care organizations, personnel had limited previous experience, and there were little or no regulations in place [10].

The term *tele–mental health* refers to the remote delivery of mental health care using telecommunications, such as telephone, email, interactive video, digital imaging, and health care monitoring devices [10-12]. The evolution of tele–mental health can be modeled with the double-peak effect Gartner Hype Cycle [13], which describes the course of new technological discoveries integrating special or unusual circumstances (ie, the COVID-19 pandemic) (Figure 1). The Gartner Hype Cycle has served as a useful descriptive model in other medical fields, such as the ultra-high risk for psychosis paradigm [14,15]. According to the Gartner Hype Cycle, new technologies trigger inflated expectations in the short term, and in the long term, expectations are largely underestimated. For tele–mental health, the innovation trigger (stage 1) was the set-up, in 1959, of the first television links between the Nebraska Psychiatric Institute and the Norfolk State Hospital for providing therapy, consultation-liaison psychiatry, and medical student training. Over subsequent years, tele–mental health became increasingly common (stage 2, inflated expectations), expanding in scope to several diagnostic and therapeutic applications, and geographically, from the United States to other countries, in particular, to Australia and Canada. Much enthusiasm developed around tele–mental health's ability to reach remote rural areas, which suffer from systemic mental health care shortages. By the 2000s, evidence on the use of tele–mental health had accumulated, demonstrating its (1) validity and efficacy in several mental disorders, (2) applicability to different patient populations (eg, war veterans, comorbid medical conditions) and age groups, (3) versatility (diverse cultures), and (4) ability to increase access to care [16]. Despite encouraging evidence and endorsement in clinical guidelines, the adoption of tele–mental health has been slow and scattered, owing to several barriers from clinicians' perspectives, such as concerns regarding ability to establish a good doctor–patient rapport, confidentiality and data protection, safety, technology-related factors, and financial and legal aspects (stage 3, trough of disillusionment) [17]. The COVID-19 crisis has boosted the attention paid to tele–mental health. In an incredibly short time, a broad array of educational resources, toolkits, and guidelines have been made available. Mental health professionals from around the globe have joined forces and shared their experiences in an effort to provide the best care to patients during this terrible time. The digitization of the field of medicine has become a matter of public interest (stage 4, slope of enlightenment). We will find out, in the years to come, whether this unexpected massive public effort will crystallize into mental health service organization and resource allocation (stage 5, plateau of applicability).

In this study, we provide an analysis of state-of-the-art scientific publications on tele–mental health by applying document clustering to map prominent research topics in the field. We surveyed mental health professionals about their experiences of care delivery during the pandemic, especially regarding their use of and attitudes toward tele–mental health. Patients' perspectives on tele–mental health were assessed through a systematic review and meta-analysis of satisfaction with tele–mental health compared to face-to-face interventions.

## Methods

### Analysis of Scientific Publications

**Data Collection**  The publication search was performed using Scopus advanced search [18], with the following search formula:

*TITLE-ABS-KEY ( telepsychiatry ) OR TITLE-ABS-KEY ( telepsychology ) OR TITLE-ABS-KEY ( telepsychotherapy ) AND ( LIMIT-TO ( PUBSTAGE , "final" ) ) AND ( LIMIT-TO ( DOCTYPE , "ar" ) ) AND ( LIMIT-TO ( SRCTYPE , "j" ) ) AND ( LIMIT-TO ( LANGUAGE , "English" ) )".*

We restricted the search to articles describing original research performed in the field of tele–mental health, while excluding review papers. Results (653 articles on June 4, 2020) were exported in .csv format, with as much information as possible.

**Data Analysis**  After excluding 212 articles for having no relation with tele–mental health (manual filtration) or no abstract, the remaining corpus of 441 articles was imported to Python (version 3; Pandas package, version 1.2.3). Abstracts and titles were concatenated and tokenized (NLTK package, version 3.5). After part-of-speech tagging (filtering only nouns, adjectives and verbs) and lemmatization, common stop words were removed, and stemming was performed. We calculated bigrams (gensim, version 3.8.1) and subsequently removed an array of stop words with broad meanings, such as "paper," "method," "analyze," and other terms that appear in almost every paper. Each tokenized abstract was transformed into a numerical multidimensional representation (TfidfVectorizer, version 0.22.1), which transforms the tokens into an array of term frequency–inverse document frequency values. The similarity between documents was computed with cosine distance between term frequency–inverse document frequency vectors and visualized with *t*-distributed stochastic neighbor embedding, which was used to perform hierarchical density-based spatial clustering of applications with noise [19]. The code is freely available [20].

## Provider Survey

We developed an Italian-language web-based survey targeting mental health providers to map (an English-language version was circulated in an international network of mental health providers.): (1) COVID-19–related disruptions in care provision; (2) tele–mental health use during and prior to the COVID-19 pandemic; (3) tele–mental health intention-to-use; and (4) attitude toward tele–mental health. Sociodemographic (age and gender), employment role, setting, and geographic area information was collected. The survey, designed to be completed within 10 to 15 minutes, consisted of 6 sections, with 21 multiple- or forced-choice questions and 15 Likert-scale questions. The survey was shared through email invitations and social media. The survey remained open for 20 days (from May 30, 2020 to June 20, 2020). All respondents provided informed consent.

## Meta-analysis of Patients' Satisfaction With Tele–Mental Health Interventions

**Search Strategy and Selection Criteria**  A systematic review and meta-analysis were conducted based on the Population, Intervention, Comparisons, Outcomes and Study Design (PICOS [21]) strategy. We used a 2-step search strategy. First, we searched the Web of Knowledge (Thomson Reuters) and Scopus databases, using the following terms:

*(telepsychiatry OR telepsychiatric OR telepsychology OR teletherapy OR tele-mentalhealth OR e-mental) AND (satisfaction).*

The search was extended until June 10, 2020. Second, we implemented an electronic manual search of the reference lists of the retrieved articles. Duplicate references were manually removed. Articles were screened by title and abstract, and the full-texts of remaining articles were further inspected for eligibility against a priori defined inclusion and exclusion criteria.

We included original articles written in English that included patients with a diagnosis of any mental disorders and whose study design included both tele–mental health and face-to-face groups that reported satisfaction scores for both groups. Articles were excluded if they only reported data on service acceptability, credibility, and working alliance; failed to report enough data for meta-analysis (authors were contacted to obtain missing data); or presented data from overlapping data sets (in which case, we selected the largest one).

Literature search, study selection, and data extraction were performed by both authors independently. Disagreement was resolved by discussion. The study followed PRISMA (Preferred Reporting Items for Systematic Reviews and Meta-Analyses [21]) guidelines (Table S1 in Multimedia Appendix 1). The protocol was registered in PROSPERO (CRD42020192299).

Data Extraction   We extracted author, publication year, setting (country, underserved area), mental disorder diagnosis, population type, study design, intervention type, intervention duration, intervention modality, satisfaction scale, number of participants in the tele–mental health and face-to-face group, age, and gender. As a measure of satisfaction, we extracted mean satisfaction score, standard deviation, or standard error of the mean, $t$ test statistic, or $P$ value of the $t$ test, if the normality assumption was met in the original paper (Methods S1 in Multimedia Appendix 1).

Data Analysis   The meta-analysis was performed using R (version 4.0.0, The R Project; meta [22], metaphor [23], dmetar [24] packages). We calculated Hedges $g$ and relative standard error. Since high heterogeneity was expected, we pooled effect sizes using a random-effect model [25]. We assessed between-study heterogeneity using the $Q$ statistic and quantified total variability using the $I^2$ index [26]. To assess the robustness of results, we performed influence analyses with graphical display of heterogeneity plots [27], by sequentially fitting our meta-analysis model to all $2^{k-1}$ possible combinations of the studies. We applied 3 clustering algorithms—$k$-means, density-based spatial clustering of applications with noise, and the Gaussian mixture model—to detect studies with heavy influences on the overall effect size estimate. Sensitivity analyses were conducted by removing these heavy-influence studies and re-running the meta-analysis (Methods S2 in Multimedia Appendix 1). We performed subgroup analyses with mixed-effect models to determine the influence of predefined categorical moderators: mental disorder diagnosis, population type, underserved area, study design, intervention type, and satisfaction scale. Meta-regression models were fit to investigate the influence of predefined continuous predictors: publication year, mean age, proportion of females, intervention duration, and sample size. We assessed publication bias with the Egger test [28], and risk of bias was examined with the revised Cochrane tool for randomized trials [29].

## Analysis of State-of-the-Art Scientific Publications

The field was pioneered in 1973, by a paper published in the *American Journal of Psychiatry*, which described an interactive television system that connected Massachusetts General Hospital and a medical station in Boston (United States) [30]. In 1986, a group from McGill University (Canada) [31] published the first case-control study, which found no substantial difference between tele–mental health and face-to-face in terms of satisfaction among patients and providers. It was only in 1995 that a systematic interest developed, and the annual number of articles began to grow steadily, to reach 39 records in 2019. We expect a further surge in 2020, from a renewed interest for tele–mental health caused by the COVID-19 pandemic. Annual number of articles and sum of citations followed the same pattern until 2010. Then, the sum of citation declined, because more time is required for newly published articles to accumulate citations (Figure 2A).

Only 10 articles had more than 100 citations each (range 120-244; Table S2 in Multimedia Appendix 1). Of these, 1 was the above-mentioned study published in 1986 [31], 8 were published between 2000 and 2010 [32-39], and 1 was published in 2013 [40]. All top-cited articles, except one [37], were controlled trials. The 10 top articles came from only 4 countries—United States, Canada, Australia, and United Kingdom—which are the countries contributing the most to the whole article data set (N=363 articles, 82%; Figure S1A in Multimedia Appendix 1). In the remaining countries, including Italy, that delivered 5 articles or less, tele–mental health research might be at an early stage, corresponding to scarce, if not absent, applications. In terms of international cooperation, the main hub countries are United States, United Kingdom, Australia, and Canada. Other cooperation patterns are more scattered, possibly being more occasional (Figure S1B in Multimedia Appendix 1).

Document clustering identified 36 topics (Figure 2B). The top 10 topics (Table S3 in Multimedia Appendix 1) encompass 34% proportion of the data set. Of these, 6 are specific subjects concerning issues related to the implementation of tele–mental health services. Two topics regard tele–mental health interventions for depressive or anxiety disorders and posttraumatic stress disorder. Finally, 2 topics are focused on the use of tele–mental health in peculiar populations, such as children and adolescents, and patients with neurocognitive deficits (Figure 2B, Figure S1C, and Table S3 in Multimedia Appendix 1).

## Providers' Responses to the Survey

The survey was completed by 174 Italian mental health care providers, 112 (64.4%) of whom were female. Most respondents (75/174, 43.1%) were between 30 and 40 years old. The most represented region was Tuscany (n=42), followed by Lombardy (n=37) and Apulia (n=28) (Figure S2A in Multimedia Appendix 1), and 67.8% of respondents (n=118) were employed in the public sector, including inpatient or outpatient clinics, hospitals, psychiatric residential facilities, residences for the implementation of safety measures, and addiction treatment services, while 56 (32%) worked in the private sector, either in solo or group (n=4) settings. Our sample consisted of

that is, specialized nurses and professionals providing rehabilitative and educational interventions. The majority of the sample (134/174, 77.0%) reported that COVID-19 disrupted their normal service provision. The main reason (55%) was a reduction (or block) in nonurgent services, sometimes accompanied by conversion of structures to COVID clinics. Lockdown was the culprit in 44% of cases, while disruption was directly caused by the virus, that is, being infected or quarantined following contact with someone infected, in 2 cases. The median of COVID-19-related disruption was 7/10 (IQR 5-8) (Figure 3A).

During the pandemic, the rate of respondents providing any services through tele–mental health doubled, passing from 47.7% (83/174) to 92.5% (161/174); 68% respondents reported using mostly or exclusively tele–mental health (vs 1/174, or 0.6%, prior to the pandemic) (Figure 3B). Psychologists reported the highest rate of tele–mental health almost exclusive use (56/63, 89%), compared with psychiatrists (45/83, 54%) and other mental health workers (17/28, 61%) ($\chi_6^2$=45.97, $P$<.001) (Figure 3B). Respondents provided a variable amount of care provisions through tele–mental health, in contrast to their previous practice, where tele–mental health was used for less than 25% of care provisions in 82% of cases (Figure S2B in Multimedia Appendix 1). The use of telephone, instant messaging tools, emails remained stable, while we observed a 3.7-fold increase in the use of video-based teleconferencing (Figure 3C). Even if most respondents (132/174, 75.8%) found tele–mental health much or very much useful during the COVID-19 crisis (Figure S2C in Multimedia Appendix 1), 82% (143/174) envisaged to reduce tele–mental health use after the pandemic was over. Half of respondents had to resort to personal telecommunications at their own initiative, as only a small fraction of work settings were adequately equipped (31/118, 26.2% and 19/56, 33.9% in the public and private sector, respectively); however, an effort was made by the Italian National Health System to strengthen tele–mental health during the crisis, as reported by 28% of those in public work settings.

Depression and anxiety disorders were deemed amenable to tele–mental health interventions by a large portion (70/174, 40.2%) of our sample. On the contrary, schizophrenia and other psychotic disorders, substance use disorders and major neurocognitive disorders ranked low (Figure S2D in Multimedia Appendix 1). One-third of respondents (50/174, 28.7%) considered tele–mental health particularly useful for underserved populations, but 25% (44/174) would offer tele–mental health to any population group (Figure S2E in Multimedia Appendix 1).

Providers' global attitude was skeptical. Only 21.3% of respondents (37/174) thought that tele–mental health was as valid, accurate and effective as face-to-face; 66.1% (115/174) were not positive about the ability to establish a good doctor–patient relationship. Most (132/174, 75.9%) did not believe that tele–mental health could reduce the barrier of stigma. Less than half of respondents felt somewhat or very much trained and satisfied with tele–mental health (Figure 3D).

We received 120 responses from mental health providers from the 5 continents, which replicated Italian data, except for a more positive attitude toward tele–mental health interventions, in terms of: ability to reduce stigma (70/120, 58.3%); feeling prepared and satisfied with tele–mental health care (91/120, 75.8% and 80/120, 66.7%, respectively) (Results S1, Figures S3 and S4 in Multimedia Appendix 1).

Eligibility screening of 247 articles yielded 41 articles (Figure S5 in Multimedia Appendix 1). Of these, 12 could not be included in the meta-analysis because they did not report enough data for computation (Table S4 in Multimedia Appendix 1). The final sample included 29 studies (Table 1), contributing data from 2143 patients (tele–mental health: n=1039; face-to-face: n=1104; 34% female), with mean age of 39.4 years (SD 14.3). The average sample size was 74 (range 12 to 254). The majority (n=19) of studies were conducted in the United States. Approximately half (n=13) of studies reported on tele–mental health in remote geographic areas, such as Thunder Bay in Canada [33,41], the Hawaiian Islands [42-44] and Pacific northwest of the United States [45], rural Australia [46], or targeted underserved communities, such as Native American communities [47], Hispanic communities [48], low-income patients with HIV [49], and inmates of correctional institutions [50-52]. The most represented diagnosis was depression or anxiety disorders (n=11), followed by posttraumatic stress disorder (n=6), alcohol or substance use disorders (n=3), and attention deficit hyperactivity disorder or disruptive disorders (n=2); 7 studies included individuals with any mental disorder. Thirteen studies recruited only adult individuals, while 3 recruited children or adolescents and their caregivers. Most studies offered services to special populations, such as military personnel or veterans (n=10) and individuals in correctional settings (n=3). Eleven studies used telepsychiatry (8 providing consultations and 3 assessment), 17 studies used telepsychology or counseling, and 1 study used both; most studies (n=24) were randomized controlled trials. Mean follow-up was 227 days (range 90 to 540 days) for telepsychiatry and 70 days for telepsychology. The preferred modality was video-based teleconferencing (n=24), the rest were telephone- or web-based interventions. Patient satisfaction was assessed with standardized validated scales in 21 studies; 8 studies used custom tools.

Our meta-analysis revealed no difference in patient satisfaction between tele–mental health and face-to-face interventions (Hedges $g=-0.001$, 95% CI $-0.116$ to $0.114$, $P=.985$; Figure S6 in Multimedia Appendix 1). There was moderate between-study heterogeneity ($Q=43,83$, $I^2=36\%$, $P=.03$).

The graphical display of heterogeneity plot formed a symmetric distribution, around $g=0$, slightly deviating toward a pattern with positive effect sizes and moderate heterogeneity (peak around 50%) (Figure S7 in Multimedia Appendix 1). Clustering algorithms detected one study [64] that explained the shift toward higher heterogeneity estimates (Figures S7 and S8 in Multimedia Appendix 1). After removing this study, heterogeneity became nonsignificant ($Q=32.51$, $I^2=17\%$, $P=.214$); however, the overall effect size, though slightly more negative (ie, favoring face-to-face over tele–mental health), was not impacted (Hedges $g=-0.032$, 95% CI $-0.132$ to $0.068$, $P=.531$; Figure S11 in Multimedia Appendix 1). These findings were corroborated by other influence diagnostics (Results S2, Figures S9 and S10 in Multimedia Appendix 1).

Subgroup analyses, performed after removing [64], did not show any significant differences between mental disorder diagnoses ($P=.341$), population types ($P=.813$), served vs underserved area ($P=.683$), study designs ($P=.392$), and satisfaction scales ($P=.407$) (Figures S12-16 in Multimedia Appendix 1). No significant difference emerged between telepsychiatry vs telepsychology studies, excluding studies providing assessment (total between group heterogeneity $Q=0.176$,

$df$=1, $P$=.457. While there was virtually no heterogeneity among telepsychology studies (n=17, $Q$=15,66, $I^2$=0%, $P$=.468), we found moderate to substantial heterogeneity among telepsychiatry studies (n=7, $Q$=15.78, $I^2$=62%, $P$<.05) ([Figure 4](#)). None of the meta-regression models yielded significant results (publication year: $P$=.417; age: $P$=.207; gender: $P$=.433; intervention duration: $P$=.531; sample size: $P$=.588) (Figures S17-21 in [Multimedia Appendix 1](#)).

No publication bias was detected ($t$=0.17, $P$=.867; Figure S22 in [Multimedia Appendix 1](#)). There was a high risk of bias for 9 studies, some concerns for 14 studies, and low risk for 6 studies (Figure S24 in [Multimedia Appendix 1](#)). The main weakness was due to missing outcome data, as satisfaction scores were generally available for a fraction of randomized participants, which ranged from 36% [65] to 100% [62,63] and varied between intervention arms in the same study (eg, 44% vs 100% in the tele–mental health and face-to-face arms, respectively [63]) (Figures S23 and S24 in [Multimedia Appendix 1](#)).

## Discussion

The field of tele–mental health has been continuously evolving since 2000. Such progress was limited to a few countries, namely United States, United Kingdom, Australia and Canada. This might be related to uneven incomes and scientific or technological levels among countries. In addition, tele–mental health may represent a valuable approach to overcome "the tyranny of distance" [46] in countries where substantial portions of the population live in remote rural areas and have unequal access to care. We found that a large amount of tele–mental health literature evaluates (1) service-centered parameters, such as feasibility, acceptability, and sustainability, and (2) care-centered parameters, such as therapeutic alliance, treatment outcome, and patient satisfaction. Depression and posttraumatic stress disorder stand out among the top 10 research topics. Evidence supporting the efficacy of tele–mental health interventions for depression, anxiety, and posttraumatic stress disorders is abundant and robust [67-69]. Another prominent research topic is children and adolescent, a population considered more suited to tele–mental health since they are perceived as digital natives. Two meta-reviews showed that tele–mental health is a valid option for youth with depression and anxiety, while its clinical benefits for autism spectrum disorder, attention deficit hyperactivity disorder, psychosis, and eating disorders remain questionable [70,71]. Tele–mental health has been proven to alleviate pressure on emergency departments (third research topic) [72,73].

Research in tele-mental health did not translate into policy changes and resource allocation. The World Psychiatric Association–Lancet Psychiatry Commission on the Future of Psychiatry has defined 6 core considerations to be met for technological innovations to transform health care: (1) patient and clinician engagement; (2) clinical evidence and standards; (3) clinical systems integration; (4) digital trust, ethics, and transparency; (5) interoperability and scalability; (6) data science and methods [74]. At present, tele–mental health has partially met these targets, due to factors related to both clinicians and patients. Clinicians are often reluctant to adopt tele–mental health because of concerns about the ability to establish a satisfying doctor–patient relationship and lack of knowledge of relevant privacy, transparency, and confidentiality issues [75,76]. A digital divide exists among patients, which excludes a large share of them from tele-mental health interventions [74,77].

When COVID-19 started its inexorable march over the planet, very few countries were sufficiently equipped with tele–mental health technologies, trained clinicians, and guidelines [10,78]. Italy was no exception. Less than one-third of respondents deemed their tele–mental health service to be adequate prior to COVID-19. Care provision was massively disrupted. Qualitative reports have been published, that mostly refer to the situation of the Italian National Health System in Lombardy, which was the most affected Italian region [2-6]. All reports agree that COVID-19 initiated an abrupt transition to tele–mental health delivery of care [2,4-6]. We observed that this change was more evident for psychologists, compared with physicians, probably because physicians carry out part of their clinical activity in in-patient units (COVID-positive patients with serious psychiatric conditions were still admitted to hospital wards) [5] and need to perform physical examinations, while psychotherapy may be more easily conducted remotely. We are aware that the relatively small number of respondents (n=174) hampers generalizability of our observations. Nevertheless, our findings were fully replicated by responses of international mental health professionals (Figure S3 in Multimedia Appendix 1). Also, similar trends have been reported by others in several countries. In China, when the novel human coronavirus (SARS-CoV-2) emerged in December 2019, there was rapid implementation of mental health hotlines and hospital tele–mental health services. In some cases, as the West China Hospital of Sichuan University, tele–mental health services collaborated with courier services to deliver medication to patients' homes [8]. In most European countries there was a boost in tele–mental health use and value, and regulatory barriers were substantially lifted [79,80]. An analysis of electronic health record data showed a substantial shift from face-to-face to tele–mental health contacts in London, United Kingdom after lockdown measures [81]. These findings are paralleled by those in Australia and Africa [82,83]. In May 2020, the American Psychiatric Association surveyed its members on the matter, and responses from 500 American psychiatrists grossly replicated our findings of a major transition to tele–mental health use—in a couple of months the percentage of respondents seeing more than 75% of their patient caseload via tele–mental health increased from 2.1% to 84.7% [84]. In addition, respondents reported that satisfaction was high or very high among patients first assessed via tele–mental health [84], and Sammons et al [85] reported a similar adaptation to COVID-19 among psychologists in the Trust and National Register (United States).

Half of respondents used personal tools on their own initiative. If, from one side, these spontaneous efforts are to be commended because they allow the system to rapidly adjust to unexpected stressors, then from the other, uncoordinated and uneducated use of such tools might increase the risk of breaches in consent processes, privacy, and data protection or may lack appropriate emergency management plans. We advocate that mental health departments be digitized in order to improve their resilience in face of public health emergencies [2]. Such technological leaps will only be successful if complemented with proper training and supported by policy changes. Conveniently, open-access resources have been flourishing during the last months; we recommend the practical guidance developed by the Oxford Precision Psychiatry Lab [12], and the American Psychiatric Association Toolkit [11]. A better understanding of best practices could modify skeptical views such as those we recorded in our survey. It has been reported that clinicians had a gatekeeper role against tele–mental health, and their concerns were mainly related to the ability to build a meaningful doctor–patient relationship [17]. The integration of tele–mental health in mental health care implies a transition from the current centralized model of care to a more distributed model, in order to re-define the equilibrium between clinicians and patients' re-

sponsibilities. Many issues regarding standard of care, access to data, clinicians' compensation remain open, thus it is no surprise that clinicians may feel uncomfortable. Research that explicitly addresses these issues will be needed. It will be fundamental to ensure that clinicians' needs and desires are heard effectively. Formal education about the role of technology in care provision will have to be implemented starting from medical school, without neglecting colleagues who may be less familiar with technology because they have practiced for years before the advent of smartphones and their application in health care. Furthermore, the field will need to meet some key requirements to support the transformation. Borrowing from the recommendations issued by the World Psychiatric Association–Lancet Psychiatry Commission [74] and the American Psychiatric Association [84], we maintain that (1) both psychiatrists and patients should be engaged in all phases of tele–mental health development and implementation and not only as final users; (2) patients' routine screening should include an assessment of digital access, literacy, and comfort, and specialized education, technical support, and internet (or device) access programs should be offered to improve treatment delivery (especially to vulnerable populations, eg, older people, homeless people, asylum seekers); (3) a tele–mental health ethical code will be needed, to reassure patients about confidentiality and safety issues and help them making informed decisions; (4) tele–mental health sustainability and scalability should be promoted, to avoid care fragmentation and abate costs; (5) current regulations should be reviewed regarding remote drug prescription, use of audio-only communications for patients' assessment and management, and service frequency in in-patient settings and nursing facilities; (6) careful considerations should be made about compensations and national health insurance programs. These considerations apply, not only to tele–mental health, but also, to digital psychiatry. The last decade has witnessed an expansion in smartphone apps, wearable sensors and other technologies for digital phenotyping of patients suffering from mental disorders, which has been accompanied by the growing use of artificial intelligence in health care. This expansion has mainly been driven by the opportunities offered by technological advancement, which often lack adequate scientific and clinical roots. Research, funded by government programs, will be needed [86]: for instance, digitization is one of the pillars of the €750-billion Next Generation European Union plan (equivalent to approximately US $891 billion), which aims to support recovery from the COVID-19 crisis and also to invest in the future and resilience of our society.

To focus on service users, we investigated how tele–mental health compares to face-to-face interventions in terms of patient satisfaction, because this is a crucial influence on treatment outcome, particularly in mental health [87,88]. We performed a systematic review and meta-analysis, which did not detect a significant difference in satisfaction between tele–mental health and face-to-face ($P$=.985). Because studies were moderately heterogeneous, we applied 2 methods to explore heterogeneity. Both methods showed that one study—Haghnia et al 2019 [64], alone—explained much of the heterogeneity. This study was conducted in Iran, whose conditions might be different from high-income countries. The economic impact, difficulties of travelling, and accommodation requirements associated with face-to-face visits might be more burdensome for people living in the Middle East and justify the higher satisfaction scores found in patients treated by tele–mental health [89]. However, this study had marginal influence on the global effect size. Subgroup analyses showed homogeneity among studies focusing on psychotherapy, as opposed to those focusing on telepsychiatry interventions, which yielded substantially heterogeneous effect sizes. Psychiatric consultations are characterized by high variability, consisting of meetings of variable duration,

separated by variable intervals, with variable content based on patients' incidental needs and medication management. On the contrary, psychotherapies are "healing relationships" [90] developing over a series of evenly distributed contacts of preestablished duration that use evidence-based (often manualized) methods [91]. A previous systematic review [88], which compared tele–mental health to face-to-face–delivered psychotherapeutic interventions, similarly found that patients were equally satisfied with both approaches but highlighted limitations (some of which are also relevant to our study). Most studies included in our review were affected by some risk of bias from high attrition rates, which led to small, underpowered sample sizes. Satisfaction scores were available just for the fraction of patients who remained in treatment. It is plausible that dissatisfaction with treatment was responsible for participants dropping out of the studies and becoming unavailable for satisfaction assessment. However, attrition rates in the 2 treatment arms (tele–mental health vs face-to-face) were similar, most likely causing satisfaction score inflation in both arms with negligible impact on the difference. A selection bias could have been introduced even before randomization, since 6 studies [49,56,57,62,63,87] excluded eligible participants who did not have access to computer and internet connection. In 16 studies [33,34,38,41-48,50-53,60] tele–mental health sessions were held in rooms fully equipped with high-definition video-based teleconferencing units and broadband internet access. In 2 studies, tele–mental health interventions were performed at home, but participants were provided with videophones [58] or computers [55] and a dedicated line. Therefore, in most cases, technology-based factors, which contribute to shape patient satisfaction [88], could have been minimized. This limits the generalizability of their results to ecological contexts: (1) many patients may be marginalized due to lack of access to technology and skills; and (2) problems with video definition, audio lag, or connection could dampen the perceived consultation quality. Another limitation is that we only considered overall patient satisfaction. This is a complex clinical outcome that includes several factors related to patient, disease, provider, therapy, environment, and technology [87]. Rohland et al [92] showed that patients rated tele–mental health higher than face-to-face for convenience, ease, technical skills, attention given, and time spent, while face-to-face was preferable to tele–mental health for self-reporting outcome, helpfulness, and eye contact. It has been suggested that tele–mental health patients develop lower levels of therapeutic alliance, resulting in worse continuity of care [38,93,94], but data are still inconclusive. Whether the relative preference for tele–mental health or face-to-face care has an impact on clinical outcomes in specific domains needs to be determined in future longitudinal studies.

In conclusion, evidence for the use of tele–mental health is robust, but it is concentrated in a few countries. The initial enthusiasm around tele–mental health did not translate to clinical application. During the COVID-19 pandemic, many mental health professionals resorted to tele–mental health, not without some aversion, feeling that "they had no other choice [6]." It is advisable that mental health services should become equipped with tele–mental health to increase the ability to efficiently cope with public health crises. We believe that this does not necessarily contradict the preferences of both clinicians and patients for in-person meaningful therapeutic rapports.

## Acknowledgments

This work was supported by the University of Pisa (PRA 2020-21 awarded to GR).

## Abbreviations

COVID-19        coronavirus disease 2019

HIV        human immunodeficiency virus

## Appendix

### Multimedia Appendix 1

Supplementary information.

## Footnotes

Contributed by

Authors' Contributions: GR and RM designed the study. GR and RM designed the survey; performed the literature search, study selection, data extraction, and data analysis; and prepared the figures. GR wrote the first draft of the manuscript with input from RM.

Conflicts of Interest: None declared.

## References

1. Marazziti D, Stahl SM. The relevance of COVID-19 pandemic to psychiatry. *World Psychiatry.* 2020 Jun;19(2):261. doi: 10.1002/wps.20764. doi: 10.1002/wps.20764. [PMCID: PMC7215065] [PubMed: 32394565] [CrossRef: 10.1002/wps.20764] [CrossRef: 10.1002/wps.20764]

2. de Girolamo G, Cerveri G, Clerici M, Monzani E, Spinogatti F, Starace F, Tura G, Vita A. Mental health in the coronavirus disease 2019 emergency-the Italian response. *JAMA Psychiatry.* 2020 Sep 01;77(9):974–976. doi: 10.1001/jamapsychiatry.2020.1276. [PubMed: 32352480] [CrossRef: 10.1001/jamapsychiatry.2020.1276]

3. Percudani M, Corradin M, Moreno M, Indelicato A, Vita A. Mental health services in Lombardy during COVID-19 outbreak. *Psychiatry Res.* 2020 Jun;288:112980. doi: 10.1016/j.psychres.2020.112980. http://europepmc.org/abstract/MED/32315881. [PMCID: PMC7152889] [PubMed: 32315881] [CrossRef: 10.1016/j.psychres.2020.112980]

4. Carpiniello B, Tusconi M, di Sciascio Guido, Zanalda E, di Giannantonio Massimo, Executive Committee of the Italian Society of Psychiatry Mental health services in Italy during the COVID-19 pandemic. *Psychiatry Clin Neurosci.* 2020 Aug;74(8):442–443. doi: 10.1111/pcn.13082. http://europepmc.org/abstract/MED/32515525. [PMCID: PMC7300857] [PubMed: 32515525] [CrossRef: 10.1111/pcn.13082]

5. D'Agostino A, Demartini B, Cavallotti S, Gambini O. Mental health services in Italy during the COVID-19 outbreak. *Lancet Psychiatry.* 2020 May;7(5):385–387. doi: 10.1016/S2215-0366(20)30133-4. http://europepmc.org/abstract/MED/32353266. [PMCID: PMC7185925] [PubMed: 32353266] [CrossRef: 10.1016/S2215-0366(20)30133-4]

6. Fagiolini A, Cuomo A, Frank E. COVID-19 diary from a psychiatry department in Italy. *J Clin Psychiatry.* 2020 Mar 31;81(3):20com13357. doi: 10.4088/JCP.20com13357. http://www.psychiatrist.com/JCP/article/Pages/covid-diary-from-a-psychiatry-department-in-italy.aspx. [PubMed: 32237301] [CrossRef: 10.4088/JCP.20com13357]

7. Zhou X, Snoswell CL, Harding LE, Bambling M, Edirippulige S, Bai X, Smith AC. The role of telehealth in reducing the mental health burden from COVID-19. *Telemed J E Health.* 2020 Apr;26(4):377–379. doi: 10.1089/tmj.2020.0068. [PubMed: 32202977] [CrossRef: 10.1089/tmj.2020.0068]

8. Zhou J, Liu L, Xue P, Yang X, Tang X. Mental health response to the COVID-19 outbreak in China. *Am J Psychiatry.* 2020 Jul 01;177(7):574–575. doi: 10.1176/appi.ajp.2020.20030304. [PubMed: 32375540] [CrossRef: 10.1176/appi.ajp.2020.20030304]

9. Kalin ML, Garlow SJ, Thertus K, Peterson MJ. Rapid implementation of telehealth in hospital psychiatry in response to COVID-19. *Am J Psychiatry.* 2020 Jul 01;177(7):636–637. doi: 10.1176/appi.ajp.2020.20040372. [PubMed: 32605442] [CrossRef: 10.1176/appi.ajp.2020.20040372]

10. Pereira-Sanchez V, Adiukwu F, El Hayek S, Bytyçi Drita Gashi, Gonzalez-Diaz JM, Kundadak GK, Larnaout A, Nofal M, Orsolini L, Ramalho R, Ransing R, Shalbafan M, Soler-Vidal J, Syarif Z, Teixeira ALS, da Costa MP. COVID-19 effect on mental health: patients and workforce. *Lancet Psychiatry.* 2020 Jun;7(6):e29–e30. doi: 10.1016/S2215-0366(20)30153-X. http://europepmc.org/abstract/MED/32445691. [PMCID: PMC7239628] [PubMed: 32445691] [CrossRef: 10.1016/S2215-0366(20)30153-X]

11. Telepsychiatry. *American Psychiatric Association.* [2020-06-30]. https://www.psychiatry.org/psychiatrists/practice/telepsychiatry.

12. Digital technologies and telepsychiatry. *Oxford Health Biomedical Research Centre.* [2020-06-30]. https://oxfordhealthbrc.nihr.ac.uk/our-work/oxppl/table-5-digital-technologies-and-telepsychiatry/

13. Understanding Gartner's Hype Cycles. *Gartner.* [2020-07-02]. https://www.gartner.com/en/documents/3887767/understanding-gartner-s-hype-cycles.

14. Fusar-Poli P. The Hype Cycle of the clinical high risk state for psychosis: the need of a refined approach. *Schizophr Bull.* 2018 Mar;44(2):250–253. doi: 10.1093/schbul/sbx181. [CrossRef: 10.1093/schbul/sbx181]

15. Fusar-Poli P, Davies C, Solmi M, Brondino N, De Micheli A, Kotlicka-Antczak M, Shin JI, Radua J. Preventive treatments for psychosis: umbrella review (just the evidence) *Front Psychiatry.* 2019;10:764. doi: 10.3389/fpsyt.2019.00764. doi: 10.3389/fpsyt.2019.00764. [PMCID: PMC6917652] [PubMed: 31920732] [CrossRef: 10.3389/fpsyt.2019.00764] [CrossRef: 10.3389/fpsyt.2019.00764]

16. O'Keefe Molly, White K, Jennings JC. Asynchronous telepsychiatry: a systematic review. *J Telemed Telecare.* 2021 Apr;27(3):137–145. doi: 10.1177/1357633X19867189. [PubMed: 31357908] [CrossRef: 10.1177/1357633X19867189]

17. Cowan KE, McKean AJ, Gentry MT, Hilty DM. Barriers to use of telepsychiatry: clinicians as gatekeepers. *Mayo Clin Proc.* 2019 Dec;94(12):2510–2523. doi: 10.1016/j.mayocp.2019.04.018. [PubMed: 31806104] [CrossRef: 10.1016/j.mayocp.2019.04.018]

18. Deng Z, Wang R, Chen Z, Wang Y. Bibliometric analysis of reflexive epidermal Peer review research from 1984 to 2019. *Front Immunol*. 2020;11:259. doi: 10.3389/fimmu.2020.00259. doi: 10.3389/fimmu.2020.00259. [PMCID: PMC7080701] [PubMed: 32226424] [CrossRef: 10.3389/fimmu.2020.00259] [CrossRef: 10.3389/fimmu.2020.00259]

19. Campello R, Ricardo JG, Moulavi D, Sander J. Density-based clustering based on hierarchical density estimates. Advances in Knowledge Discovery and Data Mining; Pacific-Asia Conference on Knowledge Discovery and Data Mining; April 14-17; Gold Coast, Australia. 2013. pp. 160–172. [CrossRef: 10.1007/978-3-642-37456-2_14]

20. Telemental_health. *GitHub*. [2020-07-01]. https://github.com/raffaelemazziotti/telemental_health.

21. Moher David, Liberati Alessandro, Tetzlaff Jennifer, Altman Douglas G, PRISMA Group Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. *PLoS Med*. 2009 Jul 21;6(7):e1000097. doi: 10.1371/journal.pmed.1000097. https://dx.plos.org/10.1371/journal.pmed.1000097. [PMCID: PMC2707599] [PubMed: 19621072] [CrossRef: 10.1371/journal.pmed.1000097]

22. Balduzzi Sara, Rücker Gerta, Schwarzer Guido. How to perform a meta-analysis with R: a practical tutorial. *Evid Based Ment Health*. 2019 Nov;22(4):153–160. doi: 10.1136/ebmental-2019-300117. [PMCID: PMC10231495] [PubMed: 31563865] [CrossRef: 10.1136/ebmental-2019-300117]

23. Viechtbauer W. Conducting meta-analyses in with the metafor package. *J Stat Soft*. 2010;36(3):1–48. doi: 10.18637/jss.v036.i03. [CrossRef: 10.18637/jss.v036.i03]

24. Harrer M, Cuijpers P, Furukawa T, Ebert D. *Doing Meta-Analysis With R: A Hands-On Guide*. Boca Raton, Florida: CRC Press; 2021.

25. DerSimonian R, Laird N. Meta-analysis in clinical trials revisited. *Contemp Clin Trials*. 2015 Nov;45(Pt A):139–45. doi: 10.1016/j.cct.2015.09.002. http://europepmc.org/abstract/MED/26343745. [PMCID: PMC4639420] [PubMed: 26343745] [CrossRef: 10.1016/j.cct.2015.09.002]

26. Higgins JPT, Thompson SG. Quantifying heterogeneity in a meta-analysis. *Stat Med*. 2002 Jun 15;21(11):1539–58. doi: 10.1002/sim.1186. [PubMed: 12111919] [CrossRef: 10.1002/sim.1186]

27. Olkin I, Dahabreh IJ, Trikalinos TA. GOSH - a graphical display of study heterogeneity. *Res Synth Methods*. 2012 Sep;3(3):214–23. doi: 10.1002/jrsm.1053. [PubMed: 26062164] [CrossRef: 10.1002/jrsm.1053]

28. Egger M, Davey Smith G, Schneider M, Minder C. Bias in meta-analysis detected by a simple, graphical test. *BMJ*. 1997 Sep 13;315(7109):629–34. doi: 10.1136/bmj.315.7109.629. http://europepmc.org/abstract/MED/9310563. [PMCID: PMC2127453] [PubMed: 9310563] [CrossRef: 10.1136/bmj.315.7109.629]

29. Sterne JAC, Savović J, Page MJ, Elbers RG, Blencowe NS, Boutron I, Cates CJ, Cheng H, Corbett MS, Eldridge SM, Emberson JR, Hernán Miguel A, Hopewell S, Hróbjartsson Asbjørn, Junqueira DR, Jüni Peter, Kirkham JJ, Lasserson T, Li T, McAleenan A, Reeves BC, Shepperd S, Shrier I, Stewart LA, Tilling K, White IR, Whiting PF, Higgins JPT. RoB 2: a revised tool for assessing risk of bias in randomised trials. *BMJ*. 2019 Aug 28;366:l4898. doi: 10.1136/bmj.l4898. [PubMed: 31462531] [CrossRef: 10.1136/bmj.l4898]

30. Dwyer T F. Telepsychiatry: psychiatric consultation by interactive television. *Am J Psychiatry*. 1973 Aug;130(8):865–9. doi: 10.1176/ajp.130.8.865. [PubMed: 4716685] [CrossRef: 10.1176/ajp.130.8.865]

31. Dongier M, Tempier R, Lalinec-Michaud M, Meunier D. Telepsychiatry: psychiatric consultation through two-way television. a controlled study. *Can J Psychiatry*. 1986 Feb;31(1):32–4. doi: 10.1177/070674378603100107. [PubMed: 3512068] [CrossRef: 10.1177/070674378603100107]

32. Titov N, Andrews G, Davies M, McIntyre K, Robinson E, Solley K. Internet treatment for depression: a randomized controlled trial comparing clinician vs. technician assistance. *PLoS One*. 2010 Jun;5(6):e10939. doi: 10.1371/journal.pone.0010939. http://dx.plos.org/10.1371/journal.pone.0010939. [PMCID: PMC2882336] [PubMed: 20544030] [CrossRef: 10.1371/journal.pone.0010939]

33. O'Reilly R, Bishop J, Maddox K, Hutchinson L, Fisman M, Takhar J. Is telepsychiatry equivalent to face-to-face psychiatry? results from a randomized controlled equivalence trial. *Psychiatr Serv*. 2007 Jun;58(6):836–43. doi: 10.1176/ps.2007.58.6.836. [PubMed: 17535945] [CrossRef: 10.1176/ps.2007.58.6.836]

34. Ruskin PE, Silver-Aylaian M, Kling MA, Reed SA, Bradham DD, Hebel JR, Barrett D, Knowles F, Hauser P. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. *Am J Psychiatry*. 2004 Aug;161(8):1471–6. doi: 10.1176/appi.ajp.161.8.1471. [PubMed: 15285975] [CrossRef: 10.1176/appi.ajp.161.8.1471]

35. Elford R, White H, Bowering R, Ghandi A, Maddiggan B, St John K, House M, Harnett J, West R, Battcock A. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare*. 2000;6(2):73–82. doi: 10.1258/1357633001935086. [PubMed: 10824374] [CrossRef: 10.1258/1357633001935086]

36. Fortney JC, Pyne JM, Edlund MJ, Williams DK, Robinson DE, Mittal D, Henderson KL. A randomized trial of telemedicine-based collaborative care for depression. *J Gen Intern Med*. 2007 Aug;22(8):1086–93. doi: 10.1007/s11606-007-0201-9. http://europepmc.org/abstract/MED/17492326. [PMCID: PMC2305730] [PubMed: 17492326] [CrossRef: 10.1007/s11606-007-0201-9]

37. May C, Gask L, Atkinson T, Ellis N, Mair F, Esmail A. Resisting and promoting new technologies in clinical practice: the case of telepsychiatry. *Soc Sci Med*. 2001 Jun;52(12):1889–901. doi: 10.1016/s0277-9536(00)00305-1. [PubMed: 11352414] [CrossRef: 10.1016/s0277-9536(00)00305-1]

38. Frueh BC, Monnier J, Yim E, Grubaugh AL, Hamner MB, Knapp RG. A randomized trial of telepsychiatry for post-traumatic stress disorder. *J Telemed Telecare*. 2007;13(3):142–7. doi: 10.1258/135763307780677604. [PubMed: 17519056] [CrossRef: 10.1258/135763307780677604]

39. Raue P, Schulberg H, Heo M, Klimstra S, Bruce M. Patients' depression treatment preferences and initiation, adherence, and outcome: a randomized primary care study. *Psychiatr Serv*. 2009 Mar;60(3):337–43. doi: 10.1176/appi.ps.60.3.337. http://europepmc.org/abstract/MED/19252046. [PMCID: PMC2710876] [PubMed: 19252046] [CrossRef: 10.1176/appi.ps.60.3.337]

40. Titov N, Dear BF, Johnston L, Lorian C, Zou J, Wootton B, Spence J, McEvoy PM, Rapee RM. Improving adherence and clinical outcomes in self-guided internet treatment for anxiety and depression: randomised controlled trial. *PLoS One*. 2013 Jul;8(7):e62873. doi: 10.1371/journal.pone.0062873. http://dx.plos.org/10.1371/journal.pone.0062873. [PMCID: PMC3701078] [PubMed: 23843932] [CrossRef: 10.1371/journal.pone.0062873]

41. Bishop JE, O'Reilly RL, Maddox K, Hutchinson LJ. Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *J Telemed Telecare*. 2002;8(4):217–21. doi: 10.1258/135763302320272185. [PubMed: 12217104] [CrossRef: 10.1258/135763302320272185]

42. Greene CJ, Morland LA, Macdonald A, Frueh BC, Grubbs KM, Rosen CS. How does tele-mental health affect group therapy process? Secondary analysis of a noninferiority trial. *J Consult Clin Psychol*. 2010 Oct;78(5):746–50. doi: 10.1037/a0020158. [PubMed: 20873910] [CrossRef: 10.1037/a0020158]

43. Morland LA, Pierce K, Wong MY. Telemedicine and coping skills groups for Pacific Island veterans with post-traumatic stress disorder: a pilot study. *J Telemed Telecare*. 2004;10(5):286–9. doi: 10.1258/1357633042026387. [PubMed: 15494087] [CrossRef: 10.1258/1357633042026387]

44. Morland LA, Mackintosh MA, Greene CJ, Rosen CS, Chard KM, Resick P, Frueh BC. Cognitive processing therapy for posttraumatic stress disorder delivered to rural veterans via telemental health: a randomized noninferiority clinical trial. *J Clin Psychiatry.* 2014 May;75(5):470–6. doi: 10.4088/JCP.13m08842. [PubMed: 24922484] [CrossRef: 10.4088/JCP.13m08842]

45. Tse YJ, McCarty CA, Stoep AV, Myers KM. Teletherapy delivery of caregiver behavior training for children with attention-deficit hyperactivity disorder. *Telemed J E Health.* 2015 Jun;21(6):451–8. doi: 10.1089/tmj.2014.0132. [PMCID: PMC4458734] [PubMed: 25719609] [CrossRef: 10.1089/tmj.2014.0132]

46. Dossetor D, Nunn K, Fairley M, Eggleton D. A child and adolescent psychiatric outreach service for rural New South Wales: a telemedicine pilot study. *J Paediatr Child Health.* 1999 Dec;35(6):525–9. doi: 10.1046/j.1440-1754.1999.00410.x. [PubMed: 10634976] [CrossRef: 10.1046/j.1440-1754.1999.00410.x]

47. Shore JH, Brooks E, Savin D, Orton H, Grigsby J, Manson SM. Acceptability of telepsychiatry in American Indians. *Telemed J E Health.* 2008 Jun;14(5):461–6. doi: 10.1089/tmj.2007.0077. http://europepmc.org/abstract/MED/18578681. [PMCID: PMC2998941] [PubMed: 18578681] [CrossRef: 10.1089/tmj.2007.0077]

48. Chong J, Moreno F. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. *Telemed J E Health.* 2012 May;18(4):297–304. doi: 10.1089/tmj.2011.0126. [PubMed: 22424078] [CrossRef: 10.1089/tmj.2011.0126]

49. Himelhoch S, Medoff D, Maxfield J, Dihmes S, Dixon L, Robinson C, Potts W, Mohr DC. Telephone based cognitive behavioral therapy targeting major depression among urban dwelling, low income people living with HIV/AIDS: results of a randomized controlled trial. *AIDS Behav.* 2013 Oct;17(8):2756–64. doi: 10.1007/s10461-013-0465-5. [PMCID: PMC10839944] [PubMed: 23644816] [CrossRef: 10.1007/s10461-013-0465-5]

50. Brodey BB, Claypoole KH, Motto J, Arias RG, Goss R. Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatr Serv.* 2000 Oct;51(10):1305–7. doi: 10.1176/appi.ps.51.10.1305. [PubMed: 11013332] [CrossRef: 10.1176/appi.ps.51.10.1305]

51. Manguno-Mire G, Thompson JJ, Shore J, Croy C, Artecona J, Pickering J. The use of telemedicine to evaluate competency to stand trial: a preliminary randomized controlled study. *J Am Acad Psychiatry Law.* 2007;35(4):481–9. [PubMed: 18086740]

52. Morgan RD, Patrick AR, Magaletta PR. Does the use of telemental health alter the treatment experience? inmates' perceptions of telemental health versus face-to-face treatment modalities. *J Consult Clin Psychol.* 2008 Feb;76(1):158–62. doi: 10.1037/0022-006X.76.1.158. [PubMed: 18229993] [CrossRef: 10.1037/0022-006X.76.1.158]

53. Xie Y, Dixon JF, Yee OM, Zhang J, Chen YA, Deangelo S, Yellowlees P, Hendren R, Schweitzer JB. A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with ADHD. *Telemed J E Health.* 2013 Mar;19(3):192–9. doi: 10.1089/tmj.2012.0108. [PubMed: 23405952] [CrossRef: 10.1089/tmj.2012.0108]

54. Baca CT, Manuel JK. Satisfaction with long-distance motivational interviewing for problem drinking. *Addict Disord Their Treat.* 2007 Mar;6(1):39–41. doi: 10.1097/01.adt.0000210708.57327.28. [CrossRef: 10.1097/01.adt.0000210708.57327.28]

55. Hulsbosch AM, Nugter MA, Tamis P, Kroon H. Videoconferencing in a mental health service in The Netherlands: A randomized controlled trial on patient satisfaction and clinical outcomes for outpatients with severe mental illness. *J Telemed Telecare.* 2017 Jun;23(5):513–520. doi: 10.1177/1357633X16650096. [PubMed: 27236703] [CrossRef: 10.1177/1357633X16650096]

56. Berger T, Krieger T, Sude K, Meyer B, Maercker A. Evaluating an e-mental health program ("deprexis") as adjunctive treatment tool in psychotherapy for depression: results of a pragmatic randomized controlled trial. J Affect Disord. 2018 Dec;227:455–462. doi: 10.1016/j.jad.2017.11.021. [PubMed: 29154168] [CrossRef: 10.1016/j.jad.2017.11.021]

57. Hungerbuehler I, Valiengo L, Loch AA, Rössler Wulf, Gattaz WF. Home-based psychiatric outpatient care through videoconferencing for depression: a randomized controlled follow-up trial. JMIR Ment Health. 2016 Aug 03;3(3):e36. doi: 10.2196/mental.5675. https://mental.jmir.org/2016/3/e36/ [PMCID: PMC4989121] [PubMed: 27489204] [CrossRef: 10.2196/mental.5675]

58. Egede LE, Acierno R, Knapp RG, Walker RJ, Payne EH, Frueh BC. Psychotherapy for depression in older veterans via telemedicine: effect on quality of life, satisfaction, treatment credibility, and service delivery perception. J Clin Psychiatry. 2016 Dec;77(12):1704–1711. doi: 10.4088/JCP.16m10951. [PubMed: 27835713] [CrossRef: 10.4088/JCP.16m10951]

59. Luxton DD, Pruitt LD, Wagner A, Smolenski DJ, Jenkins-Guarnieri MA, Gahm G. Home-based telebehavioral health for U.S. military personnel and veterans with depression: a randomized controlled trial. J Consult Clin Psychol. 2016 Nov;84(11):923–934. doi: 10.1037/ccp0000135. [PubMed: 27599225] [CrossRef: 10.1037/ccp0000135]

60. Stubbings DR, Rees CS, Roberts LD, Kane RT. Comparing in-person to videoconference-based cognitive behavioral therapy for mood and anxiety disorders: randomized controlled trial. J Med Internet Res. 2013 Nov 19;15(11):e258. doi: 10.2196/jmir.2564. https://www.jmir.org/2013/11/e258/ [PMCID: PMC3842436] [PubMed: 24252663] [CrossRef: 10.2196/jmir.2564]

61. Lovell K, Cox D, Haddock G, Jones C, Raines D, Garvey R, Roberts C, Hadley S. Telephone administered cognitive behaviour therapy for treatment of obsessive compulsive disorder: randomised controlled non-inferiority trial. BMJ. 2006 Oct 28;333(7574):883. doi: 10.1136/bmj.38940.355602.80. http://europepmc.org/abstract/MED/16935946. [PMCID: PMC1626332] [PubMed: 16935946] [CrossRef: 10.1136/bmj.38940.355602.80]

62. King VL, Stoller KB, Kidorf M, Kindbom K, Hursh S, Brady T, Brooner RK. Assessing the effectiveness of an internet-based videoconferencing platform for delivering intensified substance abuse counseling. J Subst Abuse Treat. 2009 Apr;36(3):331–8. doi: 10.1016/j.jsat.2008.06.011. [PubMed: 18775625] [CrossRef: 10.1016/j.jsat.2008.06.011]

63. King VL, Brooner RK, Peirce JM, Kolodner K, Kidorf MS. A randomized trial of web-based videoconferencing for substance abuse counseling. J Subst Abuse Treat. 2014 Jan;46(1):36–42. doi: 10.1016/j.jsat.2013.08.009. http://europepmc.org/abstract/MED/24035556. [PMCID: PMC3818495] [PubMed: 24035556] [CrossRef: 10.1016/j.jsat.2013.08.009]

64. Haghnia Y, Samad-Soltani T, Yousefi M, Sadr H, Rezaei-Hachesu P. Telepsychiatry-based care for the treatment follow-up of Iranian war veterans with post-traumatic stress disorder: a randomized controlled trial. Iran J Med Sci. 2019 Jul;44(4):291–298. doi: 10.30476/IJMS.2019.44944. http://europepmc.org/abstract/MED/31439972. [PMCID: PMC6661519] [PubMed: 31439972] [CrossRef: 10.30476/IJMS.2019.44944]

65. Gros DF, Lancaster CL, López Cristina M, Acierno R. Treatment satisfaction of home-based telehealth versus in-person delivery of prolonged exposure for combat-related PTSD in veterans. J Telemed Telecare. 2018 Jan;24(1):51–55. doi: 10.1177/1357633X16671096. [PubMed: 27672059] [CrossRef: 10.1177/1357633X16671096]

66. Botella C, Gallego MJ, Garcia-Palacios A, Guillen V, Baños RM, Quero S, Alcañiz M. An internet-based self-help treatment for fear of public speaking: a controlled trial. Cyberpsychol Behav Soc Netw. 2010 Aug;13(4):407–21. doi: 10.1089/cyber.2009.0224. [PubMed: 20712499] [CrossRef: 10.1089/cyber.2009.0224]

67. Olthuis JV, Watt MC, Bailey K, Hayden JA, Stewart SH. Therapist-supported Internet cognitive behavioural therapy for anxiety disorders in adults. *Cochrane Database Syst Rev.* 2015 Mar 05;(3):CD011565. doi: 10.1002/14651858.CD011565. [PubMed: 25742186] [CrossRef: 10.1002/14651858.CD011565]

68. Andrews G, Basu A, Cuijpers P, Craske M, McEvoy P, English C, Newby J. Computer therapy for the anxiety and depression disorders is effective, acceptable and practical health care: an updated meta-analysis. *J Anxiety Disord.* 2018 Apr;55:70–78. doi: 10.1016/j.janxdis.2018.01.001. https://linkinghub.elsevier.com/retrieve/pii/S0887-6185(17)30447-4. [PubMed: 29422409] [CrossRef: 10.1016/j.janxdis.2018.01.001]

69. Sunjaya AP, Chris A, Novianti D. Efficacy, patient-doctor relationship, costs and benefits of utilizing telepsychiatry for the management of post-traumatic stress disorder (PTSD): a systematic review. *Trends Psychiatry Psychother.* 2020;42(1):102–110. doi: 10.1590/2237-6089-2019-0024. doi: 10.1590/2237-6089-2019-0024. [PubMed: 32321088] [CrossRef: 10.1590/2237-6089-2019-0024] [CrossRef: 10.1590/2237-6089-2019-0024]

70. Domhardt M, Steubl L, Baumeister H. Internet- and mobile-based interventions for mental and somatic conditions in children and adolescents. *Z Kinder Jugendpsychiatr Psychother.* 2020 Jan;48(1):33–46. doi: 10.1024/1422-4917/a000625. https://econtent.hogrefe.com/doi/abs/10.1024/1422-4917/a000625?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed. [PubMed: 30422059] [CrossRef: 10.1024/1422-4917/a000625]

71. Hollis C, Falconer CJ, Martin JL, Whittington C, Stockton S, Glazebrook C, Davies EB. Annual research review: digital health interventions for children and young people with mental health problems - a systematic and meta-review. *J Child Psychol Psychiatry.* 2017 Apr;58(4):474–503. doi: 10.1111/jcpp.12663. [PubMed: 27943285] [CrossRef: 10.1111/jcpp.12663]

72. Costanza A, Mazzola V, Radomska M, Amerio A, Aguglia A, Prada P, Bondolfi G, Sarasin F, Ambrosetti J. Who consult an adult psychiatric emergency department? pertinence of admissions and opportunities for telepsychiatry. *Medicina (Kaunas)* 2020 Jun 13;56(6):295. doi: 10.3390/medicina56060295. https://www.mdpi.com/resolver?pii=medicina56060295. [PMCID: PMC7353920] [PubMed: 32545811] [CrossRef: 10.3390/medicina56060295]

73. Deslich S, Stec B, Tomblin S, Coustasse A. Telepsychiatry in the 21(st) century: transforming healthcare with technology. *Perspect Health Inf Manag.* 2013;10:1f. http://europepmc.org/abstract/MED/23861676. [PMCID: PMC3709879] [PubMed: 23861676]

74. Bhugra D, Tasman A, Pathare S, Priebe S, Smith S, Torous J, Arbuckle MR, Langford A, Alarcón RD, Chiu HFK, First MB, Kay J, Sunkel C, Thapar A, Udomratn P, Baingana FK, Kestel D, Ng RMK, Patel A, Picker LD, McKenzie KJ, Moussaoui D, Muijen M, Bartlett P, Davison S, Exworthy T, Loza N, Rose D, Torales J, Brown M, Christensen H, Firth J, Keshavan M, Li A, Onnela J, Wykes T, Elkholy H, Kalra G, Lovett KF, Travis MJ, Ventriglio A. The WPA-Lancet Psychiatry Commission on the future of psychiatry. *Lancet Psychiatry.* 2017 Oct;4(10):775–818. doi: 10.1016/S2215-0366(17)30333-4. [PubMed: 28946952] [CrossRef: 10.1016/S2215-0366(17)30333-4]

75. Schueller SM, Washburn JJ, Price M. Exploring mental health providers' interest in using web and mobile-based tools in their practices. *Internet Interv.* 2016 May;4(2):145–151. doi: 10.1016/j.invent.2016.06.004. http://europepmc.org/abstract/MED/28090438. [PMCID: PMC5231655] [PubMed: 28090438] [CrossRef: 10.1016/j.invent.2016.06.004]

76. Goldstein F, Glueck D. Developing rapport and therapeutic alliance during telemental health sessions with children and adolescents. *J Child Adolesc Psychopharmacol.* 2016 Apr;26(3):204–11. doi: 10.1089/cap.2015.0022. [PubMed: 26491890] [CrossRef: 10.1089/cap.2015.0022]

77. Weightman M. Digital psychotherapy as an effective and timely treatment option for depression and anxiety disorders: Implications for rural and remote practice. *J Int Med Res.* 2020 Jun 12;48(6):030006052092868. doi: 10.1177/0300060520928686. [PMCID: PMC7294488] [PubMed: 32527170] [CrossRef: 10.1177/0300060520928686]

78. Ramalho R, Adiukwu F, Gashi Bytyçi Drita, El Hayek S, Gonzalez-Diaz JM, Larnaout A, Grandinetti P, Kundadak GK, Nofal M, Pereira-Sanchez V, Pinto da Costa M, Ransing R, Schuh Teixeira AL, Shalbafan M, Soler-Vidal J, Syarif Z, Orsolini L. Telepsychiatry and healthcare access inequities during the COVID-19 pandemic. *Asian J Psychiatr.* 2020 Oct;53:102234. doi: 10.1016/j.ajp.2020.102234. http://europepmc.org/abstract/MED/32585636. [PMCID: PMC7296313] [PubMed: 32585636] [CrossRef: 10.1016/j.ajp.2020.102234]

79. Gerke S, Stern AD, Minssen T. Germany's digital health reforms in the COVID-19 era: lessons and opportunities for other countries. *NPJ Digit Med.* 2020;3:94. doi: 10.1038/s41746-020-0306-7. doi: 10.1038/s41746-020-0306-7. [PMCID: PMC7351985] [PubMed: 32685700] [CrossRef: 10.1038/s41746-020-0306-7] [CrossRef: 10.1038/s41746-020-0306-7]

80. Corruble E. A viewpoint from Paris on the COVID-19 pandemic: a necessary turn to telepsychiatry. *J Clin Psychiatry.* 2020 Mar 31;81(3):20com13361. doi: 10.4088/JCP.20com13361. http://www.psychiatrist.com/JCP/article/Pages/a-viewpoint-from-paris-on-covid.aspx. [PubMed: 32237302] [CrossRef: 10.4088/JCP.20com13361]

81. Stewart R, Martin E, Broadbent M. Mental health service activity during COVID-19 lockdown: South London and Maudsley data on working age community and home treatment team services and mortality from February to mid-May 2020. *medRxiv. Published online on June 16, 2020.* 2021 doi: 10.1101/2020.06.13.20130419. https://www.medrxiv.org/content/medrxiv/early/2020/06/16/2020.06.13.20130419.full.pdf. [CrossRef: 10.1101/2020.06.13.20130419]

82. David KB, Solomon JK, Yunusa I, Lawal BK, Marshal CS, Okereke M, Ozuluoha CC. Telemedicine: an imperative concept during COVID-19 pandemic in Africa. *Pan Afr Med J.* 2020;35(Suppl 2):129. doi: 10.11604/pamj.supp.2020.35.25281. https://www.panafrican-med-journal.com/content/article/35/129/full/ [PMCID: PMC7687473] [PubMed: 33282084] [CrossRef: 10.11604/pamj.supp.2020.35.25281]

83. Looi JC, Pring W. Private metropolitan telepsychiatry in Australia during Covid-19: current practice and future developments. *Australas Psychiatry.* 2020 Oct;28(5):508–510. doi: 10.1177/1039856220930675. [PubMed: 32484737] [CrossRef: 10.1177/1039856220930675]

84. APA calls for comprehensive telehealth coverage. *American Psychological Association Services, Inc.* 2020. Apr 02, [2020-06-13]. https://www.apaservices.org/practice/reimbursement/health-codes/comprehensive-telehealth-coverage.

85. Sammons MT, VandenBos GR, Martin JN. Psychological practice and the COVID-19 crisis: a rapid response survey. *J Health Serv Psychol.* 2020 May 08;:1–7. doi: 10.1007/s42843-020-00013-2. http://europepmc.org/abstract/MED/32395720. [PMCID: PMC7209971] [PubMed: 32395720] [CrossRef: 10.1007/s42843-020-00013-2]

86. Moreno C, Wykes T, Galderisi S, Nordentoft M, Crossley N, Jones N, Cannon M, Correll CU, Byrne L, Carr S, Chen EYH, Gorwood P, Johnson S, Kärkkäinen Hilkka, Krystal JH, Lee J, Lieberman J, López-Jaramillo Carlos, Männikkö Miia, Phillips MR, Uchida H, Vieta E, Vita A, Arango C. How mental health care should change as a consequence of the COVID-19 pandemic. *Lancet Psychiatry.* 2020 Sep;7(9):813–824. doi: 10.1016/S2215-0366(20)30307-2. http://europepmc.org/abstract/MED/32682460. [PMCID: PMC7365642] [PubMed: 32682460] [CrossRef: 10.1016/S2215-0366(20)30307-2]

87. Pruitt LD, Vuletic S, Smolenski DJ, Wagner A, Luxton DD, Gahm GA. Predicting post-treatment client satisfaction between behavioural activation for depression delivered either in-person or via home-based telehealth. *J Telemed Telecare.* 2019 Sep;25(8):460–467. doi: 10.1177/1357633X18784103. [PubMed: 29976097] [CrossRef: 10.1177/1357633X18784103]

88. Jenkins-Guarnieri MA, Pruitt LD, Luxton DD, Johnson K. Patient perceptions of telemental health: systematic review of direct comparisons to in-person psychotherapeutic treatments. *Telemed J E Health.* 2015 Aug;21(8):652–60. doi: 10.1089/tmj.2014.0165. [PubMed: 25885491] [CrossRef: 10.1089/tmj.2014.0165]

89. Harper Shehadeh MJ, Abi Ramia J, Cuijpers P, El Chammay R, Heim E, Kheir W, Saeed K, van Ommeren M, Van't Hof Edith, Watts S, Wenger A, Zoghbi E, Carswell K. Step-by-step, an e-mental health intervention for depression: a mixed methods pilot study from Lebanon. *Front Psychiatry.* 2019;10:986. doi: 10.3389/fpsyt.2019.00986. doi: 10.3389/fpsyt.2019.00986. [PMCID: PMC7034323] [PubMed: 32116815] [CrossRef: 10.3389/fpsyt.2019.00986] [CrossRef: 10.3389/fpsyt.2019.00986]

90. Lemert EM, Frank JD. *Persuasion and Healing: A Comparative Study of Psychotherapy.* Baltimore: John Hopkins University Press; 1991.

91. Campbell LF, Norcross JC, Vasquez MJT, Kaslow NJ. Recognition of psychotherapy effectiveness: the APA resolution. *Psychotherapy (Chic)* 2013 Mar;50(1):98–101. doi: 10.1037/a0031817. [PubMed: 23505985] [CrossRef: 10.1037/a0031817]

92. Rohland B. Telepsychiatry in the heartland: if we build it, will they come? *Community Ment Health J.* 2001 Oct;37(5):449–59. doi: 10.1023/a:1017536230944. [PubMed: 11419521] [CrossRef: 10.1023/a:1017536230944]

93. Farabee D, Calhoun S, Veliz R. An experimental comparison of telepsychiatry and conventional psychiatry for parolees. *Psychiatr Serv.* 2016 May 01;67(5):562–5. doi: 10.1176/appi.ps.201500025. [PubMed: 26725291] [CrossRef: 10.1176/appi.ps.201500025]

94. Newbould L, Mountain G, Ariss S, Hawley M. Remote health care provision in care homes in England: an exploratory mixed methods study of Yorkshire and the Humber. *Technologies.* 2019 Feb 15;7(1):24. doi: 10.3390/technologies7010024. http://paperpile.com/b/69gCR7/udws. [CrossRef: 10.3390/technologies7010024]

# Figures and Tables

## Figure 1



The double-peak effect Gartner Hype Cycle describes the course of tele–mental health, integrating the COVID-19 pandemic as a special or unusual circumstance.



State-of-the-art of tele–mental health scientific publications: (A) Number of articles by year (blue bars) and the sum of citations for annual articles (green dotted line) and (B) Document clustering (total identified topics: 36) showing emerging COVID-19–related topics (pink dots, arrow) in relation to the top 10 topics (legend). PTSD: posttraumatic stress disorder; t-SNE: t-distributed stochastic neighbor embedding.

Figure 3



Italian providers' responses to the survey on the use of tele–mental health during the COVID-19 pandemic: (A) COVID-19–related disruption in mental health service provision; (B) number of physicians, psychologists, and other mental health professionals offering services exclusively face-to-face, mostly face-to-face, mostly by tele–mental health, or exclusively by tele–mental health during and prior to the pandemic; (C) tele–mental health tools used during and prior to the pandemic; and (D) providers' attitude toward tele–mental health. EHR: electronic health record; IM: instant messaging; STM: supported telemedicine systems; VTC: video-based teleconferencing.

Table 1

Studies included in the meta-analysis.

| Diagnosis, study type | Population | Age[a] | F (%)[b] | Intervention[c] | Measure | T n |
|---|---|---|---|---|---|---|
| **Attention-deficit hyperactivity disorder** | | | | | | |
| RCT[d] [45] | Children and caregivers | 9.3 | 30 | Caregiver behavior training; 25 weeks | CSQ[e]-ADHD | – |
| RCT [53] | Children and caregivers | 10.4 | 32 | Group parent training; 10 weeks | Custom | 8 |
| **Alcohol use disorder** | | | | | | |
| Pilot [54] | Volunteers | 36.6 | 43 | 2 motivational interviews (phone also) | Custom | 2 |
| **Any mental disorder** | | | | | | |
| RCT [55] | Patients (severe) | 46.3 | 48 | Telepsychiatry; 18-month follow-up | GGZ[g] | 3 |
| RCT, eq [33] | Outpatients | — | 63 | Telepsychiatry; 4-month follow-up | CSQ-8 | 1 |
| Comp[h], pilot [46] | Children and adolescents | 12.3 | 28 | Telepsychiatry | Survey | 1 |
| Test–retest [47] | American Indian veterans | 54 | 0 | Telepsychiatry | Custom | 5 |
| Comp [50] | Forensic psychiatric patient inmates | 34.2 | — | Interview | Survey[i] | 2 |
| Comp [52] | Correctional institution inmates | 31.8 | 0 | Telepsychiatry or telepsychology | CSQ-8 | 8 |
| RCT [51] | Forensic psychiatric patient inmates[j] | 42 | 43 | Competency test[k] | Custom | 1 |
| **Major depressive disorder** | | | | | | |
| RCT [34] | Veterans | 49.7 | 12 | Telepsychiatry; 6-month follow-up | Custom | 4 |
| RCT, pilot [41] | Outpatients | — | 62 | Telepsychiatry; 4-month follow-up | CSQ-8 | 8 |
| RCT [48] | Low-income Hispanic patients | 43 | 88 | Telepsychiatry; 6-month follow-up | VSQ[l]-9 | 6 |

[a]Mean, in years.

[b]Percentage of female individuals included in each study.

[c]The intervention used video-based teleconferencing, unless otherwise indicated.

[d]RCT: randomized controlled trial—eq indicates equivalence, NI indicates noninferiority, and prag indicates pragmatic.

[e]CSQ: Client Satisfaction Questionnaire = 8, 9, and ADHD indicate the 33-item, 9-item, and attention-deficit hyperactivity dis-order versions, respectively.

[f]Data were not provided.

[g]GGZ Thermometer.

[h]Comp: comparative study.

[i]Group Health Association of America Consumer Satisfaction Survey.

[j]Patients with Schizophrenia spectrum disorders and mental retardation.

[k]Georgia Court Competency Test Mississippi State Hospital revision.

[l]VSQ: Visit-specific Satisfaction Questionnaire.

[m]CBT: cognitive behavioral therapy.

[n]SIMH: Satisfaction Index Mental Health.

[o]CPOSS-VA: Charleston psychiatric outpatient satisfaction scale: Veteran Affairs version.

[p]Minor depressive disorder was also included.

[q]Getgoing program.

[r]Social and emotional rehabilitation.

[s]Imo voice calls, text messaging, Telegram, and Skype.

[t]Talk to me, a self-administered program.

## Figure 4



Forest plot of satisfaction scores for tele–mental health vs face-to-face interventions according by intervention type. Positive values favor tele–mental health, while negative values favor face-to-face.

Psychological Services
2016, Vol. 13, No. 1, 20–30

© 2015 American Psychological Association
1541-1559/16/$12.00    http://dx.doi.org/10.1037/ser0000042

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

# Telepsychological Services With Criminal Justice and Substance Abuse Clients: A Systematic Review and Meta-Analysis

Ashley B. Batastini
Texas Tech University

Christopher M. King
Drexel University

Robert D. Morgan and Brieann McDaniel
Texas Tech University

Recent years have seen the incorporation of telepsychology into poorly accessed, rural, and underserved settings, including criminal justice and substance abuse treatment. A systematic search of the literature on telepsychological and related services with justice-involved and substance abuse clients revealed numerous descriptive reports, but few empirical studies. The results of 3 studies of criminal justice participants and 2 studies of substance-abuse participants were subjected to a series of 5 outcome-specific meta-analyses (mental health symptoms, therapeutic processes, program engagement, program performance, and service satisfaction). These 5 studies, all of which utilized a comparison group, contributed a total of 342 participants and 14 total effect sizes. Summary data on 3 additional uncontrolled studies are also presented. Results indicated that telepsychological outcomes were at least comparable with in-person outcomes. This review serves as an initial reference for clinicians and policymakers working with criminal justice and substance abuse clients, but also highlights the need for more rigorous scientific investigation into the nuances of telepsychological practice.

*Keywords:* criminal justice, forensic, substance abuse, telepsychology, videoconferencing

Approximately 1 in every 35 adults in the United States is either incarcerated in a local, state, or federal correctional facility, or on probation or parole (Glaze & Kaeble, 2014). Many of these individuals have been sentenced for drug- or alcohol-related crimes (Carson, 2014; Herbermann & Bonczar, 2014). Although not all individuals involved in crime are also involved in substance misuse, and vice versa, substance abuse has been identified as a primary risk factor for both general and violent criminal recidivism (Andrews & Bonta, 2010; Dowden & Brown, 2002). Additionally, individuals with substance use problems, like offenders in general, have high rates of co-occurring antisocial personality disorder (Brooner et al., 2010), demonstrate similar patterns of cognitive thinking errors (Walters, 2012), and are often described as difficult to engage in the treatment process (Elliott, 2002; Little & Robinson, 1988; Shaffer & Simoneau, 2001). Given the substantial overlap between clients who are served by the criminal justice and substance abuse treatment systems, some (e.g., Gendreau, 1995)

have questioned why the literature on offender assessment and treatment has been largely overlooked by substance abuse treatment professionals.

Furthermore, criminal justice and substance abuse clients often present with a range of challenging psychiatric issues. Among adult substance abuse clients, it has been estimated that 2.3 million have a co-occurring serious mental illness (SMI; e.g., psychotic disorder, mood disorder). Mental health problems are even more common among incarcerated populations (Sarteschi, 2013). Among jailed inmates in the United States, Steadman et al. (2009) reported an estimated SMI prevalence rate (including PSTD) of 17.1% for men and 34.3% for women in 2007, whereas James and Glaze (2006) earlier indicated that more than half of all jail and prison inmates across the country reported experiencing a mental health problem. Unfortunately, psychosocial programming for inmates often lacks sufficient funding and resources (Manfredi, Shupe, & Batki, 2005). Individuals involved in crime or substance misuse represent highly prevalent, often intersecting, groups with high needs that include mental health services.

The rising costs of health care in general, and the potential for burnout among providers who deliver mental health services to resistant or challenging clients, are some of the major barriers to treatment access among underserved populations. This is particularly true in correctional settings, where many facilities are sparsely located in remote areas, often leading to undesirable, lengthy commute times for providers (Manfredi et al., 2005). Conversely, transferring inmates from their secured environment to community-based mental health treatment is costly (Zollo, Kienzle, Loeffelholz, & Sebille, 1999; Magaletta, Fagan, & Ax,

This article was published Online First July 20, 2015.

Ashley B. Batastini, Department of Psychological Sciences, Texas Tech University; Christopher M. King, Department of Psychology, Drexel University; Robert D. Morgan and Brieann McDaniel, Department of Psychological Sciences, Texas Tech University.

We thank Nina MacLean and Stephanie Van Horn, Department of Psychological Sciences, Texas Tech University, for their feedback regarding the coding manual and assistance with determining inter-rater reliability.

Correspondence concerning this article should be addressed to Robert D. Morgan, Department of Psychological Sciences, MS 2051, Texas Tech University, Lubbock, TX 79409-2051. E-mail: robert.morgan@ttu.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

1998) and can compromise the safety of the public, escorting correctional staff, and the inmate patient (Zaylor, Nelson, & Cook, 2001). The prevalence of substance misuse in rural communities is also concerning, particularly given that detoxification and intensive recovery centers tend to be located elsewhere (Lenardson, Hartley, Gale, & Pearson, 2014). In an effort to remedy some of these challenges to service delivery and receipt, telehealth has been gaining attention in correctional and substance abuse contexts (Benavides-Vaello, Strode, & Sheeran, 2013; Manfredi et al., 2005).

Telehealth is a broad term for data transmission systems used by health care providers to deliver treatment over distances. It includes discipline-specific variants, such as telemedicine, telepsychology, and telepsychiatry. In the current state of technology, these services typically involve real-time, audiovisual monitors that connect agencies in need of services (remote sites) to agencies that render such services (hub sites; Ax et al., 2007). The existing literature specifically on telepsychological and related mental health services suggests that it is cost-effective, perceived by clients as acceptable, and is associated with assessment and treatment outcomes that are comparable with traditional in-person service modalities (Antonacci, Bloch, Saeed, Yildirim, & Talley, 2008; Backhaus et al., 2012; Batastini, McDonald, & Morgan, 2013; Khalifa, Saleem, & Stankard, 2008; United States Department of Justice, Office of Justice Programs, National Institute of Justice, 2002). Therefore, the use of telepsychology may be a key strategy for reducing relapse and recidivism among substance abuse and offender clients.

Although the current research base for telepsychology is promising (see Batastini et al., 2013), it is also limited in many important respects. For instance, to our knowledge, there are currently no systematic or quantitative reviews that examine the impact of telepsychology on mental health, behavioral functioning, and service-related variables (e.g., satisfaction) with either substance abuse clients or those involved in the justice system. A meta-analytic approach is well suited for clarifying the state of the empirical evidence in this area for clinicians and administrators contemplating whether telepsychology is worth investing in, and for highlighting missing pieces in the current evidence base for researchers to address in future studies.

Therefore, the purpose of the present study was to quantitatively summarize all identified empirical evaluations of telepsychological services that involve videoconferencing equipment (i.e., technology with audio and visual inputs and outputs) and criminal justice-involved or substance abuse clients. Specifically, we sought to examine the extent to which telepsychology (and related mental health services) compares with traditional in-person services on the following variables, which were derived from an initial review of identified primary studies: (a) satisfaction of service delivery; (b) perception of therapeutic process; (c) program involvement (i.e., engagement and performance); and (d) detection of mental health symptoms. It was hypothesized that services delivered to criminal justice or substance abuse clients via videoconferencing would not differ significantly from those delivered in-person across these outcome domains, and that pooled effect sizes within each outcome domain would be small.

## Method

### Data Sources and Study Selection

Keywords related to *telehealth*, *telemedicine*, *telepsychology*, and *telepsychiatry* were entered into 38 electronic databases and Internet search engines (e.g., PsycINFO, Medline, Criminal Justice Abstracts, Google Scholar, PsycCRITIQUES, and Science & Technology Collection). Reference lists of review articles (e.g., Antonacci et al., 2008; Backhaus et al., 2012; Young, 2012) and chapters in an edited book on telemental health services (Myers & Turvey, 2013) were also examined. In total, five research assistants conducted 43 independent searches. In addition, an updated literature search was conducted prior to the submission of this study for publication.

To be included in the meta-analysis, studies had to (a) be published in English, (b) use a between-groups comparison design, (c) evaluate a mental health (i.e., psychological or psychiatric) assessment or treatment service, (d) target justice-involved or substance abuse clients, and (e) use a telecommunication service delivery system that transmitted live audio and visual information simultaneously. Studies also had to (f) report sufficient information to allow for a calculation of effect size estimates. When data were insufficiently described in a published report, the study's primary author was contacted in an attempt to ascertain needed details. Studies that only examined a nonmental health service (e.g., medical services) were excluded from the review.

Initially, a total of 504 articles related to telehealth services in general were identified for further review. The first (A.B.B.) and second (C.M.K.) authors, along with four trained research assistants, preliminarily categorized all studies as either "meets criteria," "does not meet criteria," or "uncertain." An examination of interrater reliability for this stage of the sorting process, using 50 randomly selected articles (10%), yielded an intraclass correlation of 0.87. The first and second authors then verbally discussed each article categorized as "uncertain" to determine whether it satisfied the inclusion criteria. A total of 14 articles (2.7%) were identified through a review of their titles and abstracts as specific to forensic, correctional, or substance abuse clients. After using a coding form to systematically review each of these articles, only five were determined to be appropriate for inclusion in the meta-analyses (1.0%). The other studies either lacked adequate methodological features (e.g., did not use a comparison or control group), measured outcomes in a way that could not be meaningfully combined to calculate effect size estimates, or reported insufficient statistical details (in conjunction with study authors not returning our requests for additional information). The final inclusion rate in this study was found to be lower than two other meta-analyses of telepsychological services among patients with posttraumatic stress (cf. 6.7%; Sloan, Gallagher, Feinstein, Lee, & Pruneau, 2011) and depression (cf. 9.7%, Osenbach, O'Brien, Mishkind, & Smolenski, 2013).

### Article Coding

Once identified as meeting inclusionary criteria, each article was randomly assigned to three independent coders trained in the use of a standardized study coding form created by the authors. Coders included the first (A.B.B.), second (C.M.K.), and fourth (B.M.)

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

authors, as well as five other graduate and undergraduate research assistants. The following items were coded: reference information (e.g., article title, authors, publication year, population of interest); site descriptors (i.e., where services were provided vs. where they were received); technology used (e.g., software program, data transmission network, quality of video resolution); sample descriptors (e.g., sample size, attrition rate, demographic and clinical composition of sample); therapist descriptors (e.g., gender, ethnicity, educational level); treatment descriptors (e.g., type of service, number of sessions, length of sessions); research design (e.g., within- or between-subjects, method of group assignment); and research results (i.e., outcomes of interest and the corresponding descriptive and inferential statistics). All variables required two thirds coding agreement. Across the initial 14 studies identified as relating to criminal justice or substance abuse populations, the rate of two thirds agreement among coders for all variables in the aggregate was approximately 91%. When two thirds agreement did not occur (i.e., about 9% of the time taking all variables together), doctoral-level graduate student coders discussed each discrepancy and came to a final consensus on the appropriate coding decision. The discrepancy process was limited to graduate student participation given their advanced training in research methodology and statistical analysis.

## Calculation of Effect Sizes and Analysis Methods

The five identified studies that were rated as having sound scientific integrity either used random assignment (King, Brooner, Peirce, Kolodner, & Kidorf, 2014; King et al., 2009; Manguno-Mire et al., 2007) or a comparison group that, although nonrandom and nonmatched, had minimal demographic differences with the telepsychology group (Brodey, Claypoole, Motto, Arias, & Goss, 2000; Morgan, Patrick, & Magaletta, 2008). Three additional studies were identified as relevant to this review, meaning that they were more than just descriptive studies, but used designs of lesser scientific quality. One used a repeated-measures design (Zaylor, Nelson, & Cook, 2001); another was correlational in nature (i.e., the association between psychiatrist and patient ratings of symptomatology during videoconferencing sessions; Nelson, Zaylor, & Cook, 2004); and the third would violate the assumption of independence if it were treated as a group contrast (written communication with the primary author confirmed that some participants were assessed across multiple years of the study; Fox, Connor, McCullers, & Waters, 2008). Mindful of the concern of comparing apples with oranges in meta-analysis (Lipsey & Wilson, 2001), these three studies were excluded from further quantitative analysis. However, because so few nondescriptive, empirical studies have been published in this area, the results of these three studies are described in Table 1. Only between-subjects studies that compared the effects of telepsychological and in-person service delivery modalities were quantitatively combined.

The standardized mean difference (*d*) was selected as the measure of effect size (*ES*), interpreted by reference to the conventions of 0.20 (small), 0.50 (medium), and 0.80 (large; Cohen, 1988; Lipsey & Wilson, 2001). Means and standard deviations were used whenever reported to calculate *ES*s using a formula described by Lipsey and Wilson (2001, p. 48). When descriptive statistics were not reported by primary studies, *ES*s were estimated using formulas available for significance-testing statistics (see Lipsey & Wil-

son, 2001, Appendix B). A small samples correction (Hedges, 1981) was applied to all *ES*s, which has been recommended as a matter of course in meta-analysis using the standardized mean difference due to the tendency of small samples to yield inflated values (Wilson, 2011; see also Lipsey & Wilson, 2001). *ES*s were coded so that a positive value indicated that telepsychology services outperformed comparable in-person services.

The relied-upon primary studies examined a variety of different outcomes. Including all of these studies in a single meta-analysis would have been inappropriate; however, available outcome variables could be grouped together into five thematic domains: mental health symptoms, therapeutic processes/instrumental outcomes, program engagement, program performance, and service satisfaction (see Table 3). Therefore, separate univariate meta-analyses were conducted for each outcome.

Some studies reported multiple *ES*s that could be classified under one or more of these general outcomes. Accordingly, *ES*s of the same outcome class within a given study were averaged so that each study only contributed a single *ES* to the outcome domain. For example, postsession positive mood and postsession arousal level were collapsed into a single mental health *ES* for the Morgan et al. (2008) study. In other cases, some studies (e.g., King et al., 2014) contributed an *ES* to more than one outcome domain (see Table 3). Furthermore, if studies broke out *ES*s by type of provider or service (e.g., psychological or psychiatric; Morgan et al., 2008), a single averaged *ES* was calculated.

Procedures outlined in Lipsey and Wilson (2001) were used to conduct a random effects meta-analysis for each outcome domain. First, to account for the sample sizes (or precision) of contributing studies, the small-samples-corrected *ES*s within each respective outcome class were weighted by the inverse of their estimated variance. The variance estimates were calculated consistent with a random effects model via the method-of-moments approach because of the methodological variability of the primary studies, and the inability to test for systematic factors (discussed below) that might account for any remaining variability in the distribution of *ES*s beyond participant-level sampling error. Thus, each variance calculation consisted of two components: an estimate of the variance attributable to participant-level sampling error plus the estimated variance attributed to random, between-studies sources (i.e., random effects variance). The associated 95% confidence intervals for the mean *ES*s were then calculated. Next, homogeneity of the *ES* distributions was assessed using the *Q* statistic (significant values indicate a heterogeneous distribution) and $I^2$ statistic (interpreted using the benchmarks of 25, 50, and 75% as indicative of low, medium, and high heterogeneity, respectively; Cochran, 1954; Higgins, Thompson, Deeks, & Altman, 2003; Huedo-Medina, Sánchez-Meca, Marín-Martínez, & Botella, 2006). Exploratory Software for Confidence Intervals (ESCI; Cumming, 2011) was used to calculate random-effects mean *ES*s, 95% confidence intervals, and homogeneity statistics. Although we suspect that publication bias is not a major concern in this area of research given that nonsuperiority findings would likely be published in support of the feasibility of telepsychological services, Orwin's (1983) fail-safe *N* procedure was used to examine the potential impact of publication bias. This approach determines how many hypothetical unpublished studies—studies placed in the file drawer because they found no effect (*ES* = 0)—it would take to substan-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 1
*Methodological Features of Relevant Studies That Were Not Meta-Analyzed*

| Study | Sample type | Connection mode; software used | Sample size; research design | Hub site; remote site | Questions investigated | Outcome category; measures; results | Summary of findings |
|---|---|---|---|---|---|---|---|
| Fox et al. (2008) | Criminal justice | Unknown; unknown | 190; Partially Longitudinal and Partially Cross-Sectional (i.e., Not All Participants Were Unique at Each Study Wave) | General medical center; correctional facility | Was the introduction of a telepsychological service associated with improved attainment of individual's program goals? | Program performance; GAS; proportion of goals attained at baseline (pre-telepsychological service) and year 1 and year 2 (during telepsychological service); education (80, 82, 88), family (10, 15, 48)[*], health (7.5, 5.5, 42)[*], personality (70, 65, 80), social skills (78, 80, 94)[*]; year 1 and baseline[a] and year 2 versus year 1[a] and baseline[a] in multivariate analysis of number of goals attained | Significant increases in the proportion of juveniles who attained goals in the areas of family, health, and social skills from pre-implementation of a telepsychological service to year 2 of the service; Multivariate analysis yielded a consistent result |
| Nelson et al. (2004) | Criminal justice | ISDN; unknown | 103 psychiatric consultations completed by 62 unique inmates; cross-sectional | General medical center; correctional facility | How do clients' ratings of their mental health functioning compare with clinicians' ratings in the context of a telepsychological service? | Mental health symptoms; SCL-90-R and CGI; $R = .35$[*] | A significant, medium-strength correlation was found between self-reported overall symptoms and clinician rated illness severity |
| Zaylor et al. (2001) | Criminal justice | ISDN; unknown | 45; repeated measures | General medical center; correctional facility | Does A telepsychological service lead to symptom improvement over time from both the clinician's perspective and the client's perspective? | Mental health symptoms; SCL-90-R and CGI; $Ms$ and $SDs$ for SCL-90-R at baseline (pre-telepsychological service) and time 1 and time 2 (during telepsychological service): 2.42 (0.67), 2.21 (0.69), 2.07 (0.72)[*]; ANOVA time effect[*]; polynomial contrasts[*]; $Ms$ and $SDs$ For CGI at baseline and time 1 and time 2: 3.06 (1.43), 2.79 (1.25), 2.22 (1.09)[*]; ANOVA time effect[*]; polynomial contrasts[*] | Client distressed decreased over time following repeated receipt of a telepsychological service, both from the clinician's perspective and the client's perspective |

*Note.* CGI = Clinical Global Impression Scale—Severity Index; GAS = Goal Attainment Scale; ISDN = Integrated Services Digital network; SCL-90-R = Symptom Rating Checklist-90-Revised.
[*] $p \le .05$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

tially reduce a mean *ES* (operationally defined as a small *ES* of 0.20; Zakzanis, 2001).

Moderator analyses were not conducted because of the small number of *ES*s available for each outcome domain. More specifically, the limited variation in potential moderator variables, on top of unequal cell sizes due to missing moderator variable data, would have severely limited the inferential validity of moderator analyses (see Field & Gillett, 2010).

### Results

#### Summary of Reviewed Studies

The methodological features, unadjusted *ES*s, and corresponding standard errors for each of the five meta-analyzed studies are provided in Tables 2 and 3. Publication dates ranged from 2000 to 2014. The studies examined a variety of outcomes using a variety of different measures. Sample sizes ranged from relatively small to relatively large. There was also relatively large variability in ESs within and across outcome domains. All studies were published in peer-reviewed journals.

#### Outcome Measures and Research Designs

The type of mental health service that was evaluated varied across studies. One study involved a general psychiatric consultation services (Brodey et al., 2000); another involved either psychiatric or psychological services (Morgan et al., 2008); still another involved competency assessment services (Manguno-Mire et al., 2007); and 2 others involved Internet-based videoconferencing treatment groups (King et al., 2014; King et al., 2009). Although all of the studies utilized a comparison group, only five employed a random assignment procedure (King et al., 2014; King et al., 2009; Manguno-Mire et al., 2007).

#### Participant Descriptors

Three studies used criminal justice samples (either pre- or posttrial; Brodey et al., 2000; Manguno-Mire et al., 2007; Morgan et al., 2008), and two others used samples of non–justice-involved clients with substance use problems (King et al., 2014; King et al., 2009). All studies used adult samples, with the average reported age of participants ranging from 32 to 42 years. Participant sex was mixed (i.e., neither sex > 80%) in three studies (King et al., 2014; King et al., 2009; Manguno-Mire et al., 2007), exclusively male in one (Morgan et al., 2008), and unreported in another (Brodey et al., 2000). Four studies had multicultural samples (i.e., no race or ethnicity > 80%; King et al., 2009, 2014; Manguno-Mire et al., 2007; Morgan et al., 2008); the other did not report race/ethnicity information (Brodey et al., 2000). A majority of studies reported information about participants' psychiatric diagnoses: mood disorders predominated in one (Morgan et al., 2008), substance use disorders in two others (King et al., 2014; King et al., 2009), and psychotic disorders in another (Manguno-Mire et al., 2007). Attrition rates were reported in three studies, ranging from 0.02 (Brodey et al., 2000) to 26 (King et al., 2009) and 31% (King et al., 2014).

#### Sites and Services

The remote site in two studies was a jail or prison (Brodey et al., 2000; Morgan et al., 2008); the other remote sites were a psychiatric hospital (Manguno-Mire et al., 2007) and participants' homes (King et al., 2014; King et al., 2009). General medical centers (Brodey et al., 2000; Morgan et al., 2008) and outpatient substance abuse clinics (King et al., 2014; King et al., 2009) were the most common hub sites, utilized in two studies each, followed by a medical school (Manguno-Mire et al., 2007). (Although hub site details were omitted in the original Morgan et al. [2008] report, the study's first author, also a coauthor of the present study [R.D.M.], confirms that it was a university medical center.) Telepsychology and in-person participants received services at the same site in three studies (Brodey et al., 2000; Manguno-Mire et al., 2007; Morgan et al., 2008); in-person participants received services at a different location in the other two (King et al., 2014; King et al., 2009).

#### Technology Utilized

The communication transmission technology that was used varied across studies; reports that included this information indicated use of Internet, local area network (LAN), or satellite connections. Studies did not typically include detailed information about both video input and output setups, but across studies, it was observed that both participants and providers tended to utilize a combination of a computer-connected video recording device (e.g., video camera or dedicated webcam) and either a TV screen or computer monitor. No studies reported resolution details for output devices and only one (King et al., 2009) reported technological problems that were encountered and how they were handled. Specifically, King et al. (2009) reported that some participants initially had trouble accessing the Internet and registering and downloading the necessary program. However, in a subsequent 2014 study by King and colleagues, the authors apparently anticipated such problems by making a technician available to assist participants with technological support.

#### Relevant Studies Not Meta-Analyzed

Three studies were considered relevant to this review, but did not meet the inclusion criteria for meta-analytic review because of limitations with regard to their research designs. Important methodological features and outcomes for these three studies are provided in Table 1.

#### Meta-Analytic Results

Tables 2 and 3 provide summaries of the methodological features and individual results of the meta-analyzed studies, whereas the results of the meta-analyses are provided in Table 4.

Very small mean *ES*s favoring in-person services were observed for mental health symptoms and service satisfaction, whereas small mean *ES*s favoring telepsychology services were observed for therapeutic processes and program engagement. However, all of the 95% confidence intervals around these four mean *ES*s contained 0. Thus, there was a lack of clear evidence of the superiority of telepsychology or in-person services for these outcomes. One potential interpretation, then, is that both service

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 2
*Methodological Features of Meta-Analyzed Studies*

| Study | Sample type | Sample size (telepsychological service group/in-person service group); research design | Connection mode; software used | Hub site; remote site | Questions investigated | Outcomes |
|---|---|---|---|---|---|---|
| Brodey et al. (2000) | Criminal justice | 23/20; comparison group (non-random, non-matched) | Unknown; unknown | General medical center; correctional facility | How did the service satisfaction of telepsychological examinees (single evaluation session) compare with in-person examinees? Did the severity of mental health symptomology differ between the two groups? | Mental health symptoms; service satisfaction |
| King et al. (2014) | Substance abuse | 50/35; comparison group (random assignment) | Internet; unknown | Outpatient substance abuse program; same as hub site | Was a telepsychological service (12-weeks of individual counseling) associated with higher rates of counseling attendance and greater treatment satisfaction? How did drug-positive urine samples and therapeutic alliance compare between telepsychological service recipients and in-person service recipients? | Therapeutic processes; program performance; program engagement; service satisfaction |
| King et al. (2009) | Substance abuse | 50/17; comparison group (random assignment) | Internet; unknown | Outpatient substance abuse program; client's home | Would telepsychological service (therapy groups meeting twice per week) recipients and in-person service recipients appear comparable with respect to the outcomes of counseling adherence, drug use, returns to less-intensive care, and treatment satisfaction? | Program performance; program engagement; service satisfaction |
| Manguno-Mire et al. (2007) | Criminal justice | 11/10; comparison group (random assignment) | LAN; Polycom | Higher education (college); forensic mental health center | Would the results of a competence assessment tool be comparable when rated via telepsychology technology versus in person? | Mental health symptoms; service satisfaction |
| Morgan et al. (2008) | Criminal justice | 86/100; comparison group (non-random, non-matched) | Satellite; unknown | University medical center; correctional facility | Would therapeutic alliance, post-session reactions, and service satisfaction be comparable for inmates receiving a single-session telepsychological service versus a single comparable in-person service? | Mental health symptoms; therapeutic processes; service satisfaction |

*Note.* LAN = local area network. For the Morgan et al. (2008) study, reported telepsychological service and in-person service sample sizes include both psychological and psychiatric services (ns for telepsychology = 36, telepsychiatry = 50, in-person psychology = 50, in-person psychiatry = 50).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 3

*ES Statistics by Meta-Analyzed Study and Outcome*

| Outcome categories and measures | Studies | N | ES | 95% CI |
|---|---|---|---|---|
| **Mental health symptoms** | | | | |
| 1. GCCT-MSH (difference score between two clinical raters when both raters were present in person versus when one was present in person and the other via remote connection) | Manguno-Mire et al. (2007) | 21 (11/10) | 0.59 | [−0.29, 1.46] |
| 2. GSI from BSI | Brodey et al. (2000) | 43 (23/20) | −0.21 | [−0.81, 0.39] |
| 3. SEQ (average of positivity and arousal subscales for psychology and psychiatry conditions combined) | Morgan et al. (2008) | 186 (86/100) | −0.09 | [−0.38, 0.20] |
| **Therapeutic processes** | | | | |
| 1. HAQ-II (patient version) | King et al. (2014) | 56 (22/34) | 0.63 | [0.08, 1.18] |
| 2. WAI and SEQ (average of depth and smoothness subscales for psychology and psychiatry conditions combined) | Morgan et al. (2008) | 186 (86/100) | −0.21 | [−0.50, 0.08] |
| **Program performance** | | | | |
| 1. Drug-positive urinalysis and % returned to less intensive level of care (combined) | King et al. (2009) | 37 (20/17) | 0.36 | [−0.30, 1.01] |
| 2. Drug-positive urinalysis | King et al. (2014) | 59 (24/35) | 0.62 | [0.09, 1.15] |
| **Program engagement** | | | | |
| 1. Counseling attendance (M sessions attended) | King et al. (2009) | 37 (20/17) | 0.03 | [−0.62, 0.68] |
| 2. Counseling attendance (M sessions attended) | King et al. (2014) | 59 (24/35) | 0.69 | [0.15, 1.22] |
| **Service satisfaction** | | | | |
| 1. CSQ-8 | King et al. (2014) | 59 (24/35) | 0.11 | [−0.41, 0.63] |
| 2. CSQ-8 (average total scores for psychology and psychiatry conditions combined, calculated using the original raw data) | Morgan et al. (2008) | 186 (86/100) | −0.17 | [−0.46, 0.12] |
| 3. M of 10 researcher-developed patient satisfaction questions | Manguno-Mire et al. (2007) | 21 (11/10) | −0.17 | [−1.03, 0.69] |
| 4. Overall satisfaction question from Group Health Association of American Consumer Satisfaction Survey | Brodey et al. (2000) | 43 (23/20) | −0.09 | [−0.69, 0.51] |
| 5. Overall satisfaction question from Patient Satisfaction Survey | King et al. (2009) | 37 (20/17) | 0.06 | [−0.59, 0.71] |

*Note.* BSI = Brief Symptom Inventory; CSQ-8 = Client Satisfaction Questionnaire; Georgia Court Competency Test—Mississippi State Hospital revision (GCCT-MSH); GSI = Global Severity Index; SEQ = Session Evaluation Questionnaire; HAQ-II = Helping Alliance Questionnaire II; WAI = Working Alliance Inventory. $N$ = total sample size (telepsychological service/comparison subgroup sizes); ES = standardized mean difference (before small samples correction); 95% CI = ninety-five-percent confidence interval. Positive values indicate that results favored telepsychological services over in-person services.

Table 4

*Random-Effects Meta-Analyses of Telepsychological Services Versus In-Person Services*

| Outcome | $d$ | 95% CI | $t$ | $p$ | $Q$ | $I^2$ | $n$ | $k$ | Fail-safe $N$ |
|---|---|---|---|---|---|---|---|---|---|
| Mental health symptoms | −0.04 | [−0.34, 0.27] | −0.23 | .82 | 2.40 | 16.5% | 250 | 3 | — |
| Therapeutic processes | 0.18 | [−0.64, 0.99] | 0.42 | .67 | 7.10* | 85.9% | 242 | 2 | — |
| Program performance | 0.50 | [0.10, 0.91] | 2.44 | .01 | 0.38 | 0.0% | 96 | 2 | 3 |
| Program engagement | 0.38 | [−0.26, 1.02] | 1.16 | .25 | 2.43 | 58.8% | 96 | 2 | 2 |
| Service satisfaction | −0.09 | [−0.30, 0.12] | −0.81 | .42 | 1.02 | 0.0% | 342 | 5 | — |

*Note.* Fail-safe *n* values are only reported for *ES*s > .2 because the *ES* criterion value was set at .2 (a small *ES*). $d$ = standardized mean differences (with small samples correction applied to contributing *ES*s); 95% CI = ninety-five-percent confidence interval; $t$ = null hypothesis test statistic; $Q$ = weighted sum of squares between studies; $I^2$ = proportion of total variance attributable to true variation in *ES*; $n$ = total number of participants across studies; $k$ = number of studies. Positive values indicate that telepsychological services were associated with better outcomes than were in-person services.
* Significant $p$ value (.008) suggests that the null hypothesis of *ES* homogeneity should be rejected.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

modalities perform comparably on these outcomes. More studies are needed to substantiate this possibility given the small number of meta-analyzed *ES*s and the medium and high heterogeneity of some of the *ES* distributions.

The largest observed mean *ES* was for program performance; here, telepsychology services were found to outperform in-person services by a medium magnitude. The corresponding 95% confidence interval did not include 0, and low heterogeneity was observed between the two contributing *ES*s. Consequently, some preliminary confidence can be placed in this finding, although more studies are clearly needed to corroborate it since the observation is based on only two *ES*s. Three additional or unpublished studies would hypothetically be needed to reduce this medium *ES* to a small *ES*.

## Discussion

Given the rate at which telecommunication systems are being integrated into mental health care in general, and the challenges inherent in treating complex clients such as those with substance abuse problems and criminal justice involvement, this systematic review sought to collect, organize, and (to the extent possible) empirically summarize the current literature base on the use of telepsychology services with these populations. Only studies in which (a) telepsychology (or mental health-related) services were compared with (b) similar services delivered in person were meta-analyzed. Empirical studies that used other research designs (e.g., repeated measures, correlational) were also summarized (see Table 1). Overall, results suggested that the application of videoconferencing to mental health service provision is associated with assessment and treatment outcomes that are grossly equivalent to traditional in-person approaches. That is, being physically present in the room with a client does not appear to be a necessary therapeutic component for gathering adequate clinical information or producing desired treatment effects. In addition, the use of videoconferencing alone does not seem to inhibit clients' willingness to participate and engage in services. In spite of the small number of articles the met inclusionary criteria for statistical comparisons, results of the present study provide cautious optimism for implementing technology-based interventions.

The most compelling discovery from this review was not only the scarcity of scientifically sound evidence, but also the rarity of any evidence whatsoever. Few available studies used randomized or quasi-experimental designs. Only three studies of criminal justice clients (Brodey et al., 2000; Manguno-Mire et al., 2007; Morgan et al., 2008), and two studies of substance abuse clients (King et al., 2009, 2014), implemented group equivalence procedures. Other identified studies were significantly limited by the lack of a controlled comparison group. Additionally, sample sizes across studies tended to be small, which both reduced the power to detect significant differences, and decreased the precision of effect size estimates. Thus, the possibility remains that more reliable and sizable differences existed between telepsychology and in-person services than were detected via significance difference testing and precision estimation techniques.

Regarding the five outcome domains that were studied—mental health symptoms, therapeutic process, program performance, program engagement, and service satisfaction—findings may have limited generalizability. In interpreting results, it is important to take into account how each domain was operationalized and which studies were included in the meta-analytic comparison. For example, implications for treatment programming are limited to substance abuse clients, as none of the criminal justice-based studies examined the implementation of a comprehensive program for these clients. Although Morgan et al. (2008) evaluated psychological and psychiatric consultations, these service contacts appeared to be brief in nature (one session) and no follow-up data were collected. Thus, there is currently more evidence (though additional data are still greatly needed) that videoconferencing can effectively produce desired changes (e.g., abstinence) for substance abuse clients versus justice-involved clients. Conversely, implications for clinical assessment are limited to criminal justice contexts, as neither of the studies with substance abuse clients examined the detection of mental health symptoms. Although it is likely that this finding would generalize to substance abuse clients, it is possible that diagnostic or treatment-needs assessments may need to consider other factors unique to this group. For example, Farabee and colleagues (1993) found that substance abuse outpatients who were not referred by the criminal justice system rated their drug problems as less severe, and had an increased desire to seek help via treatment, compared with criminal-justice-referred outpatients with substance abuse problems.

Another consideration that impacts the interpretation of the current findings is the fact that this meta-analytic review attempted to "accept" several null hypotheses (i.e., that there were no significant or meaningful differences between service delivery modality). It is traditionally assumed that one can only fail to reject,

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

rather than accept, a null hypothesis, for the absence of evidence is not the same as evidence of nonexistent differences (Jaykaran, Saxena, Yadav, & Kantharia, 2011). Although efforts to prove the null hypothesis are often seen as controversial, an outright dismissal of this concept is also inconsistent with current practice (Cortina & Folger, 1998; Frick, 1995; Walker & Nowacki, 2011). Frick (1995), for instance, suggests that the null hypothesis can be defensibly accepted if (a) the null is plausible, (b) results are consistent with the null, and (c) a "good [methodological] effort" is made to find a statistically significant effect (p. 137).

Accordingly, we recommend that future studies comparing the effects of telepsychology with in-person modalities follow contemporary noninferiority testing recommendations before concluding that obtained results are consistent with a noninferiority hypothesis. These recommendations include ensuring that the study is sufficiently powered, using a larger critical alpha value such as $p > .20$, looking for effect sizes (and corresponding precision estimates) below the conventional "small" threshold (e.g., $d < .20$), and establishing equivalence margins and conducting a two one-sided test (TOST) procedure (Walker & Nowacki, 2011). All of these procedures help to reduce the likelihood of committing a type-II error (incorrectly failing to reject a null hypothesis). None of the studies analyzed in the present review used such criteria, and exact $p$ values were not consistently reported. Although most of the significance values obtained via meta-analytic procedures were consistent with the interpretation that telepsychology was noninferior to in-person services (the significance values for 4 of 5 outcome domains were greater than $p = .20$), ES estimates were imprecise, with 95% confidence intervals typically well beyond $-.20$ to $.20$.

Despite these limitations, this review can serve as an initial reference and starting point for clinicians and administrators who are considering adopting telecommunications in their correctional or substance abuse treatment settings. The results of this review also highlight the need for substantially more research in this area, and especially research using rigorous methodological designs. There are a number of empirical questions that remain unanswered. For instance, what is the extent of services that can be feasibly provided? Although the King et al. (2009, 2014) studies provide some indication for substance abuse treatment, it is unclear whether intensive intervention services could be successfully provided through audio-video equipment, especially for justice-involved clients. Longitudinal studies that examine various longer-term individual and group therapy treatments (e.g., competency restoration, violence prevention, parenting training, 12-steps-style groups), as well as interventions that involve multiple interpersonal systems (e.g., community correction officers, family members, educators, medical practitioners) are also needed. In addition, a variety of behavioral outcomes (e.g., prison disciplinary infractions, community supervision violations, association with antisocial or substance using peers) and technology-related factors (e.g., quality of audio/video inputs, type and frequency of reported problems) would ideally be measured and reported.

Regarding forensic mental health assessment, only one study (Manguno-Mire et al., 2007) looked at the interrater reliability of adjudicative competency evaluations across telecommunication and in-person modalities. Not only is more evidence needed to support the use of videoconferencing for competency determinations, but there is also, as of yet, no evidence to support its use for

other, potentially more complicated and litigious legal questions, such as mental state (e.g., insanity, diminish capacity) and predictions of risk (e.g., violent or sexual recidivism). Future studies might also compare telepsychology and in-person evaluator opinions with respect to ultimate case determinations made by the courts and subsequent treatment outcomes (e.g., length of hospital stay for restoration service). Relatedly, studies that examine legal decision makers' perceptions of nontraditional service provision would make important contributions. For example, do jurors perceive forensic evaluators who conduct interviews via videoconferencing to be less credible than an evaluator who meets with a defendant in person?

As for clinical assessments more generally, there are currently no studies that have examined the ability of telepsychological evaluations to detect cognitive or psychiatric response styles (e.g., under or over reporting). In addition, telepsychological services likely present more obstructions to nonverbal disturbances than is the case with observing a client in person (Magaletta et al., 1998; Magaletta et al., 2000). For example, depending on a provider's vantage point and audio-visual clarity, he or she may not be able to detect relevant behaviors such as fidgeting under the table or tearfulness. Likewise, indications of interpersonal deficits may be overlooked. Such barriers may lead to inaccuracies in diagnosis or other clinical opinions. Studies delineating these sorts of microlevel issues are needed.

In addition to understanding the types of telepsychology services that can be feasibly provided, it is important to identify which types of clients are most likely to benefit from these services. The one study of telepsychological treatment with juvenile offenders (Fox et al., 2008) demonstrates some evidence about the interaction of age and service delivery modality. However, none of the studies included in this review stratified their samples by demographic variables, such as gender, age, risk level (e.g., psychiatric or substance use relapse, criminal recidivism), cognitive or intellectual functioning, psychiatric diagnosis, offender type (e.g., sexual, violent, nonviolent), or socioeconomic status. It may very well be, for example, that criminal justice–involved clients with hallucinations or paranoid ideations may have difficulty establishing rapport with a provider who is communicating with them through a TV screen (Magaletta et al., 2000). It is also possible that clients with less familiarity with technology, such as older clients, will feel less comfortable than their more technologically savvy peers. These and other obvious hypotheses need to be subjected to empirical investigation. Ultimately, we anticipate that future research will support the conclusion that telepsychology is an effective modality for reaching underserved populations, and is as clinically appropriate (i.e., effective) for most clients as the more traditional in-person treatment modality.

## References

References marked with an asterisk indicate studies included in the meta-analysis.

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct*. New Providence, NJ: Matthew Bender.

Antonacci, D. J., Bloch, R. M., Saeed, S. A., Yildirim, Y., & Talley, J. (2008). Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: Implications for forensic and correctional psychiatry. *Behavioral Sciences & the Law, 26,* 253–269. http://dx.doi.org/10.1002/bsl.812

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment. *Criminal Justice and Behavior, 34,* 893–905. http://dx.doi.org/10.1177/0093854807301555

Backhaus, A., Agha, Z., Maglione, M. L., Repp, A., Ross, B., Zuest, D., . . . Thorp, S. R. (2012). Videoconferencing psychotherapy: A systematic review. *Psychological Services, 9,* 111–131. http://dx.doi.org/10.1037/a0027924

Batastini, A. B., McDonald, B., & Morgan, R. D. (2013). Videoteleconferencing in forensic and correctional practice. In K. Myers & C. L. Turvey (Eds.), *Telemental health: Clinical, technological, and administrative foundations of evidence-based practice* (pp. 251–271). Waltham, MA: Elsevier. http://dx.doi.org/10.1016/B978-0-12-416048-4.00013-0

Benavides-Vaello, S., Strode, A., & Sheeran, B. C. (2013). Using technology in the delivery of mental health and substance abuse treatment in rural communities: A review. *The Journal of Behavioral Health Services & Research, 40,* 111–120. http://dx.doi.org/10.1007/s11414-012-9299-6

*Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatric Services, 51,* 1305–1307. http://dx.doi.org/10.1176/appi.ps.51.10.1305

Brooner, R. K., Disney, E. R., Neufeld, K. J., King, V. L., Kidorfk, M., & Stoller, K. B. (2010). Antisocial personality disorder in patients with substance use disorders. In E. V. Nunes, J. Selzer, P. Levounis, & C. A. Davies (Eds.), *Substance dependence and co-occurring psychiatric disorders: Best practices for diagnosis and treatment* (pp. 1–26). Kingston, NJ: Civic Research Institute.

Carson, E. A. (2014). *Prisoners in 2013* (NCJ 247282). Retrieved from http://www.bjs.gov/content/pub/pdf/p13.pdf

Cochran, W. G. (1954). The combination of estimates from different experiments. *Biometrics, 10,* 101–129. http://dx.doi.org/10.2307/3001666

Cohen, J. (1988). *Statistical power analysis for the behavioral sciences* (2nd ed.). Hillsdale, NJ: Erlbaum.

Cortina, J. M., & Folger, R. G. (1998). When is it acceptable to accept a null hypothesis: No way, Jose? *Organizational Research Methods, 1,* 334–350. http://dx.doi.org/10.1177/109442819813004

Cumming, G. (2011). *Exploratory software for confidence intervals* (Version July 24 2012) [Computer software]. Retrieved from http://www.latrobe.edu.au/psy/research/cognitive-and-developmental-psychology/esci

Dowden, C., & Brown, S. L. (2002). The role of substance abuse factors in predicting recidivism: A meta-analysis. *Psychology, Crime & Law, 8,* 243–264. http://dx.doi.org/10.1080/10683160208401818

Elliott, W. N. (2002). Managing offender resistance to counseling— The "3 R's." *Federal Probation, 66,* 43–49.

Farabee, D. J., Nelson, R., & Spence, R. (1993). Psychosocial profiles of criminal justice- and noncriminal justice-referred substance abusers in treatment. *Criminal Justice and Behavior, 20,* 336–346. http://dx.doi.org/10.1177/0093854893020004002

Field, A. P., & Gillett, R. (2010). How to do a meta-analysis. *British Journal of Mathematical and Statistical Psychology, 63,* 665–694. http://dx.doi.org/10.1348/000711010X502733

Fox, K. C., Connor, P., McCullers, E., & Waters, T. (2008). Effect of a behavioural health and specialty care telemedicine programme on goal attainment for youths in juvenile detention. *Journal of Telemedicine and Telecare, 14,* 227–230. http://dx.doi.org/10.1258/jtt.2008.071102

Frick, R. W. (1995). Accepting the null hypothesis. *Memory & Cognition, 23,* 132–138. http://dx.doi.org/10.3758/BF03210562

Gendreau, P. (1995). Technology transfer in the criminal justice field: Implications for substance abuse. *National Institute on Drug Abuse Research Monograph Series: Reviewing the Behavioral Science Knowledge Base on Technology Transfer, 155,* 198–208.

Glaze, L. E., & Kaeble, D. (2014). *Correctional populations in the United States, 2013* (NCJ 248479). Retrieved from http://www.bjs.gov/content/pub/pdf/cpus13.pdf

Hedges, L. V. (1981). Distribution theory for Glass's estimator of effect size and related estimators. *Journal of Educational Statistics, 6,* 107–128. http://dx.doi.org/10.2307/1164588

Herbermann, E. J., & Bonczar, T. P. (2014). *Probation and parole in the United States, 2013* (NCJ 248029). Retrieved from http://www.bjs.gov/content/pub/pdf/ppus13.pdf

Higgins, J. P., Thompson, S. G., Deeks, J. J., & Altman, D. G. (2003). Measuring inconsistency in meta-analyses. *BMJ: British Medical Journal, 327,* 557–560. http://dx.doi.org/10.1136/bmj.327.7414.557

Huedo-Medina, T. B., Sánchez-Meca, J., Marín-Martínez, F., & Botella, J. (2006). Assessing heterogeneity in meta-analysis: $Q$ statistic or $I^2$ index? *Psychological Methods, 11,* 193–206. http://dx.doi.org/10.1037/1082-989X.11.2.193

James, D. J., & Glaze, L. E. (2006). *Mental health problems of prison and jail inmates* (NCJ 213600). Retrieved from http://www.bjs.gov/content/pub/pdf/mhppji.pdf

Jaykaran, Saxena, D., Yadav, P., & Kantharia, N. D. (2011). Nonsignificant P values cannot prove null hypothesis: Absence of evidence is not evidence of absence. *Journal of Pharmacy and Bioallied Sciences, 3,* 465–466. http://dx.doi.org/10.4103/0975-7406.84470

Khalifa, N., Saleem, Y., & Stankard, P. (2008). The use of telepsychiatry within forensic practice: A literature review on the use of videolink. *Journal of Forensic Psychiatry & Psychology, 19,* 2–13. http://dx.doi.org/10.1080/14789940701560794

*King, V. L., Brooner, R. K., Peirce, J. M., Kolodner, K., & Kidorf, M. S. (2014). A randomized trial of Web-based videoconferencing for substance abuse counseling. *Journal of Substance Abuse Treatment, 46,* 36–42. http://dx.doi.org/10.1016/j.jsat.2013.08.009

*King, V. L., Stoller, K. B., Kidorf, M., Kindbom, K., Hursh, S., Brady, T., & Brooner, R. K. (2009). Assessing the effectiveness of an Internet-based videoconferencing platform for delivering intensified substance abuse counseling. *Journal of Substance Abuse Treatment, 36,* 331–338. http://dx.doi.org/10.1016/j.jsat.2008.06.011

Lenardson, J. D., Hartley, D., Gale, J. A., & Pearson, K. B. (2014). Substance use and abuse in rural America. In J. C. Warren, K. B. Smalley, J. C. Warren, & K. B. Smalley (Eds.), *Rural public health: Best practices and preventive models* (pp. 95–114). New York, NY: Springer.

Lipsey, M. W., & Wilson, D. B. (2001). *Practical meta-analysis*. Thousand Oaks, CA: Sage.

Little, G. L., & Robinson, K. D. (1988). Moral reconation therapy: A systematic step-by-step treatment system for treatment resistant clients. *Psychological Reports, 62,* 135–151. http://dx.doi.org/10.2466/pr0.1988.62.1.135

Magaletta, P. R., Fagan, T. J., & Ax, R. K. (1998). Advancing psychology services through telehealth in the Federal Bureau of Prisons. *Professional Psychology: Research and Practice, 29,* 543–548. http://dx.doi.org/10.1037/0735-7028.29.6.543

Magaletta, P. R., Fagan, T. J., & Peyrot, M. F. (2000). Telehealth in the federal bureau of prisons: Inmates' perceptions. *Professional Psychology: Research and Practice, 31,* 497–502. http://dx.doi.org/10.1037/0735-7028.31.5.497

Manfredi, L., Shupe, J., & Batki, S. L. (2005). Rural jail telepsychiatry: A pilot feasibility study. *Telemedicine and e-Health, 11,* 574–577. http://dx.doi.org/10.1089/tmj.2005.11.574

*Manguno-Mire, G. M., Thompson, J. W., Jr., Shore, J. H., Croy, C. D., Artecona, J. F., & Pickering, J. W. (2007). The use of telemedicine to evaluate competency to stand trial: A preliminary randomized controlled study. *Journal of the American Academy of Psychiatry and the Law, 35,* 481–489.

*Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use of telemental health alter the treatment experience? Inmates' perceptions of

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

telemental health versus face-to-face treatment modalities. *Journal of Consulting and Clinical Psychology, 76,* 158–162. http://dx.doi.org/10.1037/0022-006X.76.1.158

Myers, K., & Turvey, C. L. (2013). *Telemental health: Clinical, technical, and administrative foundations for evidence-based practice.* Waltham, MA: Elsevier.

Nelson, E. L., Zaylor, C., & Cook, D. (2004). A comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. *Telemedicine Journal and e-Health, 10,* S-54-59–S. http://dx.doi.org/10.1089/tmj.2004.10.S-54

Orwin, R. G. (1983). A fail-safe *N* for effect size in meta-analysis. *Journal of Educational Statistics, 8,* 157–159. http://dx.doi.org/10.2307/1164923

Osenbach, J. E., O'Brien, K. M., Mishkind, M., & Smolenski, D. J. (2013). Synchronous telehealth technologies in psychotherapy for depression: A meta-analysis. *Depression and Anxiety, 30,* 1058–1067. http://dx.doi.org/10.1002/da.22165

Sarteschi, C. M. (2013). Mentally ill offenders involved with the U.S. criminal justice system: A synthesis. *SAGE Open, 3,* 1–11. http://dx.doi.org/10.1177/2158244013497029

Shaffer, H. J., & Simoneau, G. (2001). Reducing resistance and denial by exercising ambivalence during the treatment of addiction. *Journal of Substance Abuse Treatment, 20,* 99–105. http://dx.doi.org/10.1016/S0740-5472(00)00152-5

Sloan, D. M., Gallagher, M. W., Feinstein, B. A., Lee, D. J., & Pruneau, G. M. (2011). Efficacy of telehealth treatments for posttraumatic stress-related symptoms: A meta-analysis. *Cognitive Behaviour Therapy, 40,* 111–125. http://dx.doi.org/10.1080/16506073.2010.550058

Steadman, H. J., Osher, F. C., Robbins, P. C., Case, B., & Samuels, S. (2009). Prevalence of serious mental illness among jail inmates. *Psychiatric Services, 60,* 761–765. http://dx.doi.org/10.1176/ps.2009.60.6.761

United States Department of Justice, Office of Justice Programs, National Institute of Justice. (2002). *Implementing telemedicine in correctional facilities* (NCJ 190310). Retrieved from https://www.ncjrs.gov/pdffiles1/nij/190310.pdf

Walker, E., & Nowacki, A. S. (2011). Understanding equivalence and noninferiority testing. *Journal of General Internal Medicine, 26,* 192–196. http://dx.doi.org/10.1007/s11606-010-1513-8

Walters, G. D. (2012). Substance abuse and criminal thinking: Testing the countervailing, mediation, and specificity hypotheses. *Law and Human Behavior, 36,* 506–512. http://dx.doi.org/10.1037/h0093936

Wilson, D. B. (2011). *Calculating effect-sizes* [PowerPoint slides]. Retrieved from http://www.campbellcollaboration.org/artman2/uploads/1/2_D_Wilson__Calculating_ES.pdf

Young, L. B. (2012). Telemedicine interventions for substance-use disorder: A literature review. *Journal of Telemedicine and Telecare, 18,* 47–53. http://dx.doi.org/10.1258/jtt.2011.110608

Zakanis, K. K. (2001). Statistics to tell the truth, the whole truth, and nothing but the truth: Formulae, illustrative numerical examples, and heuristic interpretation of effect size analyses for neuropsychological researchers. *Archives of Clinical Neuropsychology, 16,* 653–667. http://dx.doi.org/10.1093/arclin/16.7.653

Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. *Journal of Telemedicine and Telecare, 7,* 47–49. http://dx.doi.org/10.1177/1357633X010070S119

Zollo, S., Kienzle, M., Loeffelholz, P., & Sebille, S. (1999). Telemedicine to Iowa's correctional facilities: Initial clinical experience and assessment of program costs. *Telemedicine Journal, 5,* 291–301. http://dx.doi.org/10.1089/107830299312041

Received March 1, 2015
Revision received May 14, 2015
Accepted May 19, 2015 ■

# Telepsychology: Research and Practice Overview

Eve-Lynn Nelson, PhD[a,b,*], Thao N. Bui, MA[c],
Sarah E. Velasquez, MA[b]

**KEYWORDS**
- Telepsychology • Child telemental health
- Videoconferencing • Telemedicine

The rationale that drives growing psychiatric services over televideo has also led to telepsychology interest and practice. There are significant workforce shortages for psychologists with expertise in evidence-supported therapies with children, particularly in nonmetropolitan areas. For example, urban/suburban areas have approximately 39 psychologists per 100,000 residents, whereas rural areas have less than half the number of psychologists, with approximately 16 psychologists per 100,000 residents.[1] Telepsychology, or psychology services delivered by real-time videoconferencing, helps bridge this access gap.

This article first reviews the telepsychology literature and then builds on early telepsychology guidance for the current practice environment. The practicalities of telepsychology implementation and the lessons drawn from the more well-established telepsychiatry practice are described. Although promising, telepsychology research is in its early stages and information can also been gained from best practice guidelines/documents. As such, the authors also provide an update to pioneering interdisciplinary telehealth principles presented a decade ago.[2]

The authors have nothing to disclose.
[a] Pediatrics Department, University of Kansas Medical Center, G005 HC Miller, Mail Stop 4004, 3901 Rainbow Boulevard, Kansas City, KS 66160, USA
[b] University of Kansas Center for Telemedicine and Telehealth, University of Kansas Medical Center, 2012 Wahl Annex, Mail Stop 1048, 3901 Rainbow Boulevard, Kansas City, KS 66160, USA
[c] Clinical Psychology Program, University of Kansas, 426 Fraser Hall, 1415 Jayhawk Boulevard, Lawrence, KS 66045, USA
* Corresponding author. University of Kansas Center for Telemedicine and Telehealth, University of Kansas Medical Center, 2012 Wahl Annex, Mail Stop 1048, 3901 Rainbow Boulevard, Kansas City, KS 66160.
*E-mail address:* enelson2@kumc.edu

Child Adolesc Psychiatric Clin N Am 20 (2011) 67–79
doi:10.1016/j.chc.2010.08.005                    **childpsych.theclinics.com**
1056-4993/11/$ – see front matter © 2011 Elsevier Inc. All rights reserved.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| **ALABAMA** | NO | NO | NO | NO | *Code of Ala. § 34-26-41*<br><br>(f) f) An individual who possesses a valid license to practice psychology independently at the doctoral level, by any jurisdiction recognized by the Association of State and Provincial Psychology Boards, may practice psychology in Alabama for no more than 30 days each calendar year without applying for a license to practice psychology in Alabama, unless otherwise exempted pursuant to this chapter. This authority to practice does not apply to a psychologist who has been denied licensure in Alabama, is a legal resident of Alabama, or intends to practice full-time or a major portion of his or her time in Alabama. | *Code of Ala. §34-26-42*<br><br>Class B Misdemeanor: $500-5000 fine per occurrence plus court costs |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| ALASKA | NO | NO | NO | NO | *12 Alaska Admin. Code 60.035 - Courtesy license*<br><br>(a) A courtesy license authorizes the licensee to practice psychology for no more than 30 days in a 12-month period. An applicant will only be issued one courtesy license in that person's lifetime. A courtesy licensee shall submit a report to the board each month during the period of courtesy licensure indicating the number of days practiced under the courtesy license during the month. A courtesy license does not authorize the licensee to conduct a general psychology practice or to perform services outside the scope of practice of psychology that is specified on the | *Alaska Stat. § 08.86.210*<br><br>Class B Misdemeanor: possible fine up to $2000 AND/OR possible imprisonment up to 90 days |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | courtesy license.<br><br>(b) The board or its designee will issue a one-time courtesy license to an applicant who meets the requirements of this section. | |
| **ARIZONA** | *ARS § 36-3601 et seq.*<br><br>Psychologists are included under the definition of "health care providers" who may practice telemedicine in the state.<br><br>Telemedicine is the practice of health care delivery, diagnosis, consultation and treatment and the transfer of medical data through interactive audio, video or data communications that | NO | NO | SB 1353 enacted 4/8/13 codified as *ARS §20-841.09, §20-1057.13, §20-1376.05 & §20-1406.05*<br><br>For policies issued on or after Jan 1, 2015, private payers are required to provide coverage for live video consultations when treating specific conditions (mental health disorders & neurological diseases included) & originating site is in a rural area (area in a county < 900,000 population or area in county with > | *A.R.S. § 32-2075(4)*<br><br>Licensed out-of-state psychologist may provide services within his/her customary area of practice within the state up to 20 days per year.<br><br>The psychologist must inform the client or public of the limited nature of these activities and services & that the psychologist is not licensed in this state. | *A.R.S. § 32-2084*<br><br>Class 2 Misdemeanor: possible fine up to $750 AND/OR possible imprisonment up to 4 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | occur in the physical presence of the patient | | | 900,000 but proximity to nearest city of 500,00 is > 30 miles) | | |
| ARKANSAS | NO | NO | NO | NO | NO | *A.C.A. § 17-97-301*<br><br>Misdemeanor: fine of $500-$1,000 |
| CALIFORNIA | *Cal. Bus. & Prof. Code §§ 2904.5, 2290.5*<br><br>CA licensure is required to provide telehealth services to CA residents; telehealth includes live interactive and store & forward technologies; patient's verbal consent must be obtained prior to delivery of telehealth services & documented in patient's record.<br><br>Failure to obtain patient consent in advance constitutes | *Cal. Bus & Prof. Code § 2904.5 – Applicability of Telemedicine Provisions of Section 2290.5* | See CA Board of Psychology's "Notice to California Consumers Regarding the Practice of Psychology on the Internet" available online at http://www.psychboard.ca.gov/consumers/internet-thrpy.shtml | *Cal. Health & Safety Code § 1374.13; Cal. Ins. Code § 10123.85; Cal. Welfare & Institutions Code §§ 14132.72, 14132.725*<br><br>Private payers cannot require in-person contact between a health care provider and patient or limit the type of setting where services are provided before payment is made for covered telehealth services, subject to coverage terms and conditions | *Cal. Bus & Prof Code §2912 – Out of State Psychologists - Exemption*<br><br>Nothing in this chapter shall be construed to restrict or prevent a person who is licensed as a psychologist at the doctoral level in another state or territory of the United States or in Canada from offering psychological services in this state for a period not to exceed 30 days in any calendar year. | *Cal. Bus & Prof Code §2970*<br><br>Misdemeanor: fine not exceeding $2,000 AND/OR imprisonment in county jail not exceeding 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | unprofessional conduct. | | | | | |
| **COLORADO** | NO | NO but see *C.R.S. § 12-36-106 (1) (g)* authorizing delivery of telemedicine by licensed providers within their scope of practice | *State Board of Psychologist Examiners Policies § 30-1* Policy recommends initial in-person visit prior to using telehealth & outlines issues that must be addressed by the psychologist & patient at the outset as well as the challenges posed by services provided remotely or electronically. http://cdn.colorado. gov/cs/Satellite/DO RA- Reg/CBON/DORA/1 251632089838 | YES but limited to rural areas – see *C.R.S. § 10-16-123* Face-to-face contact between the provider and patient is not required if the patient lives in a county with 150,000 or fewer residents References definition of telemedicine as found in C.R.S. 12-36-106(1)(g), meaning the use of advanced technology, including, but not limited to, interactive audio, interactive video, or interactive data communication. | *C.R.S. § 12-43-215(9)* Out-of-state psychologists licensed in another state may perform certain activities or services without CO license if: (a) Performed within the scope of the person's license or certification; (b) Do not exceed 20 days per year in this state; (c) Are not otherwise in violation of this article; and (d) Disclosed to the public that the person is not licensed or certified in this state. | *C.R.S. § 12-43-226* Class 2 Misdemeanor (1st offense):  Fine of $250-1,000 &/OR imprisonment of 3-12 months Class 6 Felony (subsequent offense) :  Fine of $1,000-100,000 &/OR imprisonment of 12-18 months |
| **CONNECTICUT** | NO | NO | NO | NO | NO | *Conn. Gen. Stat. § 20-193* (amended by 2013 Ct. SB 983, Section 82) |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | | Class D Felony:  Fine not to exceed $5,000 &/OR possible imprisonment for a term not less than 1 year nor more than 5 years |
| DELAWARE | *CDR 24-3500 -- Section 18.0 Telepsychology*<br><br>"Telepsychology" includes telephone, email, Internet-based communications, & videoconferencing.<br><br>Must be licensed to provide telepsychology services to DE residents. Obtain patient consent; use secure communications where feasible; document risk-benefit analysis; develop written emergency contingency plan | NO | NO | NO | *24 Del. C. §3510*<br><br>Out-of-state psychologists licensed in another jurisdiction may provide services without a DE license if they do not exceed an "aggregate of 6 days of professional services as a psychologist, per calendar year." | *24 Del. C. § 3520*<br><br>Misdemeanor: For 1st offense, fine of $500-1,000 for each offense &/OR possible imprisonment up to 1 year<br><br>2nd or subsequent offense: fine of $1,000-2,000 for each offense &/OR possible imprisonment up to 1 year. |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.   Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | NO | NO | See DC Board of Psychology newsletter (Spring 2013) available online at http://doh.dc.gov/sites/default/files/dc/sites/doh/release_content/attachments/Psych%20newsletter%20Spring%202013%20email%20post.pdf | | *D.C. Code § 3-1205.02*<br><br>Health professionals authorized to practice in any state adjoining DC may treat patients in DC if: the health professional does not have an office or other regularly appointed place in DC to meet patients; Registers with the appropriate board and pays the registration fee prior to practicing DC; and The state in which the individual is licensed allows DC licensed health professionals to practice in that state under the conditions set forth in this section.<br><br>Health professionals practicing in the District pursuant to subsection (a)(4) of this section shall not see patients or clients in the office or | *D.C. Code § 3-1205.14*<br><br>Civil penalty: fine up to $5,000 for each violation<br><br>Issuance of cease & desist order pursuant to D.C. Code § 3-1205.16 |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | other place of practice of a DC licensee, or otherwise circumvent the provisions of this chapter. | |
| **FLORIDA** | NO | *Fla. Stat. § 490.003(4)(a)*<br><br>Psychological services may be rendered to individuals, couples, families, groups, and the public <u>without regard to place of service</u>.<br><br>(Cited by board in declaratory statement) | See Board's opinion dated 06/05/06 stating that teletherapy constitutes practice of psychology requiring Florida licensure --<br>http://www.doh.state.fl.us/mqa/psychology/Petitions/DOH_06-0976.pdf<br><br>See Board's declaratory statement dated 02/16/12 stating that FL licensed psychologist in MI may provide telepsychology to FL patients --<br>http://doh.state.fl.us/mqa/declaratory/psychology/DOH-12- | NO | *Fla. Stat. § 490.014(2)(e)*<br><br>Licensed out-of-state psychologist may practice no more than 5 days in any month and no more than 15 days in any calendar year<br><br>Licensure requirements in the psychologist's home state must be equivalent to or exceed FL's licensing requirements | *Fla. Stat. § 490.012(4)*<br><br>1st Degree Misdemeanor: Possible fine up to $1,000 &/OR possible imprisonment not to exceed 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | 0324-DS-MQA.pdf | | | |
| GEORGIA | *O.C.G.A. § 33-24-56.4 -- Georgia Telemedicine Act*<br><br>*Telemedicine is defined as the use of audio, video, or data communications for health care delivery, diagnosis, consultation, treatment, or transfer of medical data used or obtained during a medical visit with a patient*<br><br>*Standard telephone, facsimile transmissions, unsecured e-mail, or a combination thereof are excluded* | *Ga. Comp. R. & Regs. r. 510-5-.07(2) -- Representation of Services.*<br><br>*Practicing via Electronic Transmission. The provision of psychological services by electronic transmission (e.g. internet, telephone, computer...) must meet the same legal and ethical standards as psychological services provided in person. This rule applies to both psychologists who are licensed in Georgia and to other psychologists residing elsewhere who are providing psychological services to clients/patients in Georgia who must meet the requirements of section 510-9-.03. The Georgia Board will* | NO | *O.C.G.A. § 33-24-56.4 - Payment for telemedicine services*<br><br>*Private payers cannot refuse to cover services provided via telehealth so long as provider followed generally accepted health care practices and standards prevailing in the applicable professional community at the time the services were provided* | *O.C.G.A. § 43-39-7; Ga. Comp. R. & Regs. r. 510-9-.03*<br><br>*(8) An individual licensed to practice psychology in another jurisdiction may practice psychology in Georgia without applying for a license, so long as the requirements for a license in the other jurisdiction are equal to or exceed the requirements for licensure in Georgia, and the psychologist limits that person's practice in Georgia to no more than 30 days per year, as defined in the rules and regulations of the board.*<br><br>*Board rules require advance permission for limited practice –* | *O.C.G.A. § 43-39-19*<br><br>Misdemeanor:  Possible fine of $100-$1000 &/or imprisonment up to 12 months |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | report out of state psychologists to their respective licensing boards for practicing psychology via these means in the state of Georgia without a Georgia license. | | | submit at least 5 days before the intended practice  either IPC attestation form issued by ASPPB, or verification form from the state licensing board indicating no history of disciplinary action | |
| **HAWAII** | NO | NO | NO | *HRS § 431:10A-116.3 –* *Coverage for telehealth* "Telehealth" is defined as including but not limited to real-time video conferencing-based communication, secure interactive and non-interactive web-based communication, & secure asynchronous information exchange Standard telephone contacts, facsimile transmissions, or email text are excluded Private payers cannot require face-to-face | *HRS § 465-9* Licensed out-of-state psychologist may practice for a period not to exceed 90 days in any calendar year Must petition the board for a temporary permit in advance Licensure requirements in the psychologist's home state must be equivalent to or exceed HI's licensing requirements | *HRS § 465-15 (b)* Misdemeanor:  Possible fine of $1,000 for each violation &/OR imprisonment not more than 1 year |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | contact as a prerequisite for payment for telehealth services subject to coverage terms & conditions<br><br>No reimbursement for a telehealth consultation between health care providers unless a provider-patient relationship exists between the patient and one of the health care providers involved in the telehealth interaction | | |
| **IDAHO** | YES – *Idaho Code § 54-2305 (11)*<br><br>Authorizes the psychology licensing board to develop standards & requirements addressing the use of communication technology in the practice of | NO | NO | NO | *IDAPA 24.12.01.300*<br><br>Psychologists licensed in another state may practice in ID for a period not to exceed 30 days within a calendar year if they hold an interjurisdictional practice certificate (IPC) issued by ASPPB. | *Idaho Code § 54-2310*<br><br>Misdemeanor:  Possible fine up to $1,000 &/or imprisonment up to 6 months |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | psychology, including supervision. | | | | Those psychologists are required to notify the Board of their intent to practice and provide documentation of their status. | |
| ILLINOIS | NO | NO | NO | NO | *225 ILCS 15/11.5*<br><br>Licensed out-of-state psychologists may obtain a temporary permit authorizing the rendering of clinical psychological services in IL for up to 10 calendar days per year, consecutively or in aggregate | *225 ILCS 15/16.5*<br><br>Civil penalty up to $10,000 for each offense as determined by the Department of Financial and Professional Regulation |
| INDIANA | NO<br><br>But there seems to be a collaborative effort between IPA & the state psychology board to develop telepsychology policies<br><br>http://www.in.gov/pl | NO | NO | NO | *Burns Ind. Code Ann. § 25-33-1-4.5*<br><br>Licensed out-of-state psychologists may obtain a temporary psychology permit limited by terms and conditions considered appropriate by the board. | *Burns Ind. Code Ann. §25-33-1-15; 35-50-3-2*<br><br>Class A misdemeanor: Possible fine up to $5,000 &/or imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | a/files/Psychology_N ewsletter_-_March_2012.pdf<br><br>http://www.indianap sychology.org/pdf/ne wsletters/newsletter _sept_12.pdf | | | | A psychologist may practice under a limited scope psychology permit not more than 30 days every 2years. | |
| **IOWA** | NO | NO | NO | NO<br><br>But Iowa has developed a state-based telecommunications network that may be used for telemedicine purposes<br>*See Iowa Code § 8D.1 et seq.; 751 IAC 7.1 ; 751 IAC 7.11* | *Iowa Code § 154B.3(5) 645 IAC 240.8*<br><br>Licensed out-of-state psychologists may practice for a period not to exceed 10 consecutive business days or 15 business days in any 90 day period<br><br>Must file a summary of intention to practice in IA & licensure verification in advance with the board<br><br>Licensure requirements in the psychologist's home state must be equivalent to or exceed IA's licensing | *Iowa Code § 147.83 -- Permanent Injunction; Iowa Code § 147.86; Iowa Code § 903.1 (1)(b)*<br><br>Serious Misdemeanor: Possible fine of $315-$1,875 &/or imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | requirements | |
| **KANSAS** | NO | *KAR 102-1-19 – Services rendered to individuals located in this state*<br><br>Each person, regardless of the person's location, who engages in either of the following activities shall be deemed to be engaged in the practice of psychology in this state and shall be required to have a license, issued by the board, to practice psychology as a licensed psychologist:<br>• If he/she engages in the practice of psychology, providing services to one or more individuals located in this state; or<br>• Represents oneself to be a psychologist available to provide psychological | NO | NO | *K.S.A. § 74-5316a*<br><br>Licensed out-of-state psychologists must obtain a temporary permit from the licensing board in order to practice for no more than 15 days per year Must demonstrate good cause to Board for request to extend temporary permit for additional 15 days<br><br>Any psychology services rendered within any 24-hour period shall count as one entire day of psychology services. | *K.S.A. § 74-5316a*<br><br>The licensing board may issue a cease and desist order &/OR assess a fine of up to $ 1,000 per day, for failure to obtain a temporary permit to practice psychology in KS<br><br>*K.S.A. § 74-5341; K.S.A. § 21-6602; K.S.A. § 21-6611*<br><br>Class A Misdemeanor : Possible fine up to $2,500 &/OR imprisonment up to 1 year |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | services to one or more individuals located in this state. | | | | |
| KENTUCKY | *Kentucky Rev. Stat. § 319.140; 201 KAR 26:310*<br><br>"Telehealth" is defined as the use of audio, video, or other electronic means to deliver health care<br><br>Must obtain patient's informed consent & maintain confidentiality of patient information, including electronic data | *201 KAR 26:310(3)*<br><br>"Telepsychology" is defined as the practice of psychology between a psychologist & patient using electronic communication technology; or two-way, interactive, simultaneous audio and video | NO | *KRS § 304.17A-138*<br><br>A telehealth consultation shall not be reimbursable under this section if it is provided through the use of an audio-only telephone, facsimile machine, or electronic mail.<br><br>*806 KAR 17:270 -- Telehealth claim forms & records* | *KRS § 319.015(8)*<br><br>Licensed out-of-state psychologists may practice for no more than 30 days every 2 years<br><br>Must register with the board prior to engaging in temporary practice or must hold a current, valid Interjurisdictional Practice Certificate issued by ASPPB<br><br>*201 KAR 26:215(6) – Nonresident status*<br><br>A licensed out-of-state psychologist may engage in temporary practice of telepsychology if he/she receives prior board approval and complies with the above | *KRS § 319.990*<br><br>Misdemeanor: Possible fine up to $500 &/OR possible imprisonment up to 6 months for each violation<br><br>Licensing board may also recover investigative expenses including reasonable attorney fees relating to the prosecution of those found guilty of violating of practicing psychology without a license |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | requirements for temporary practice | |
| **LOUISIANA** | NO | NO – not specified in statute or regulation but see licensing board opinion | YES<br><br>See Louisiana State Board of Examiners of Psychologists Opinion #013-Telepsychology Issued: March 29, 2012, available online at http://www.lsbep.org/pdfs/News_vol25.pdf | *La. R.S. 22:1821(E)*<br><br>Appears to be limited to physicians only; reimbursement must be at least 75% of the "the reasonable and customary amount of payment, benefit, or reimbursement which that licensed physician receives for an intermediate office visit"<br><br>*La. R.S. 37:1262*<br><br>"Telemedicine" is defined as the practice of health care delivery, diagnosis, consultation, treatment, and transfer of medical data using interactive telecommunication technology that enables a health care practitioner and a | *La. R.S. 37:2365(D); LAC 46:LXIII.1001*<br><br>Licensed out-of-state psychologists may practice psychology in LA for a period not to exceed 30 days in any calendar year<br><br>However, he/she must be associated with a psychologist who is licensed in & a resident of Louisiana<br><br>The out-of-state psychologist's state also must have a similar license exception privilege in place | *La. R.S. 37:2360*<br><br>Misdemeanor – Possible fine of $100-$500 &/OR possible imprisonment up to 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | patient at two locations separated by distance to interact via two-way video and audio transmissions simultaneously." Phone calls or emails between a provider & patient are excluded as are consultations between providers. | | |
| MAINE | NO | NO | NO | *24-A M.R.S. § 4316 – Coverage for telemedicine services* "Telemedicine" is defined as the delivery of health care services, means the use of interactive audio, video or other electronic media for the purpose of diagnosis, consultation or treatment. " Audio-only telephone, facsimile machine or e-mail excluded | *32 M.R.S. § 3812* The "use of occasional services of qualified consultant psychologists from another state or jurisdiction or the use of the services of organizations from another state or jurisdiction employing qualified psychologists does not constitute the unlawful practice of psychology." *CMR 02-415-001 (13)* | *32 M.R.S. § 3814; 10 M.R.S. § 8003-C; 17-A M.R.S. § 1301; 17-A M.R.S. § 4-A* Criminal penalty (Class E crime): Fine up to $1,000 &/OR imprisonment up to 1 year Civil penalty: Fine of not less than $1,000 but not more than $5,000, each violation Permanent injunction (including costs of investigation & attorneys' |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | Private payers must cover telehealth services, subject to coverage terms & conditions | "Occasional services" means consultation within Maine by a psychologist licensed in another state or jurisdiction but not licensed by the board, subject to the provisions of Chapter 9 of the board's rules. "Occasional services" does not include psychotherapy.<br><br>*CMR 02-415-009(3)*<br><br>A psychologist not licensed by the board who provides "occasional services" as defined above shall notify the board in writing each time the psychologist consults in Maine on a form provided by the board.<br><br>Such consultation may not occur more than 10 days in a calendar year. Consultation in Maine | fees) |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | beyond this 10-day period will only be permitted in exigent circumstances. | |
| MARYLAND | NO | NO | NO<br><br>But see Spring 2011 newsletter of the Maryland Board of Examiners of Psychologists for status of board's work in this area<br><br>http://dhmh.maryland.gov/psych/pdf/MarchNewsletterSpring2011.pdf | *Md. INSURANCE Code Ann. § 15-139*<br><br>"Telemedicine" is defined as the delivery of health care services, the use of interactive audio, video, or other telecommunications or electronic technology by a licensed health care provider to the patient who is a different site.<br><br>Phone calls, faxes & email messages between the provider & patient are excluded.<br><br>Private payers must provide coverage for telehealth services subject to coverage terms & conditions | *Md. HEALTH OCCUPATIONS Code Ann. § 18-301(d); COMAR 10.36.01.07(4)*<br><br>Board may authorize a non-resident to practice without a license if the Board finds that circumstances warrant & subject to any limitations the Board imposes<br><br>In authorizing an exception, the Board: (a) Shall determine whether the circumstances warrant an exception to licensure, taking into account the: (i) Qualifications of the nonresident psychologist, (ii) Psychological services to be provided, | *Md. HEALTH OCCUPATIONS Code Ann. § 18-401, § 18-404, § 18-317.1.*<br><br>Criminal penalty (misdemeanor): possible fine up to $10,000 &/OR imprisonment up to 1 year for each violation.<br><br>Civil penalty: possible fine up to $50,000 to be assessed by the Board |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | and (iii) Duration of the exception to licensure; and (b) May impose any limitations on the psychologist's practice of psychology that the Board considers to be appropriate. See FAQs on licensing board website: http://dhmh.maryland.gov/psych/SitePages/FAQ.aspx | |
| **MASSACHUSETTS** | NO | NO | See March 2006 policy of MA Board of Registration of Psychologists available online: http://www.mass.gov/?pageID=ocaterminal&L=6&L0=Home&L1=Licensee&L2=Division+of+Professional+Licensure+Boards&L3=Board+of+Registration+of+Psychologists&L4=Statut | *ALM GL ch. 175, § 47BB -- Telemedicine.* "Telemedicine" is defined as the delivery of health care services, using interactive audio, video or other electronic media for the purpose of diagnosis, consultation or treatment. Audio-only phones, | *ALM GL ch. 112, § 123 (a) -- Activities Excluded From Penalty Provisions* The penalties in § 122 shall not apply to: (a) persons eligible for licensure under §119 who provide consultative services for a fee no more than 1 day/month | *ALM GL ch. 112, § 122* Possible fine up to $500 &/OR imprisonment up to 3 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | es+and+Regulations &L5=Board+Policies +and+Guidelines&si d=Eoca&b=terminal content&f=dpl_boar ds_py_policy_electr onic_services&csid= Eoca | faxes or emails are excluded<br><br>Coverage of telemedicine services may be limited to those health care providers in a telemedicine network approved by the insurer. | *ALM GL ch. 112, § 124*<br><br>A nonresident psychologist may obtain a temporary license to practice in MA up to 1 year if he/she registers with the board & practices in consultation with, or under the supervision of, a licensed psychologist or possesses qualifications acceptable to the board. | |
| **MICHIGAN** | NO | NO | NO | *MCLS § 500.3476; MCLS § 550.1401k*<br><br>"Telemedicine" means the use a real-time, interactive audio or video, or both, telecommunications system for the health care professional to examine and interact with the patient at the time the services are provided.<br><br>Private payers cannot | Generally, NO but there is an exception for those who live in adjacent states<br><br>*MCLS § 333.16171(h) License for practice of health profession; exemptions.*<br><br>An individual residing adjacent to the land border between this state and an adjoining state who is authorized under the laws of that | *MCLS § 333.16294*<br><br>Practice without a license constitutes a felony<br><br>*MCLS § 750.503*<br><br>If a person is convicted of a felony for which no punishment is specially prescribed, felony punishable by imprisonment up to 4 years &/or a fine up to $5,000 |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | require face-to-face contact between a health care professional & patient for services appropriately provided through telemedicine.<br><br>Telehealth services must be covered, subject to contract terms & conditions. | state to practice a health profession and whose practice may extend into this state, but who does not maintain an office or designate a place to meet patients or receive calls in this state. | |
| MINNESOTA | NO | NO | NO | Only for Medicaid – Minn. Stat. *§ 256B.0625* | *Minn. Stat. § 148.916(1)*<br><br>Licensed out-of-state psychologists may practice in the state for no more than 7 calendar days<br><br>But if more than 7 days, the psychologist must obtain approval from the Board for guest licensure.<br><br>Practice under guest licensure may not exceed 9 consecutive months per calendar year | *Minn. Stat. § 146.18; Minn. Stat. § 609.02; Minn. Stat. § 609.125; Minn. Stat. § 609.033*<br><br>Misdemeanor:  Possible fine up to $1,000 &/OR imprisonment up to 90 days |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Approval for guest licensure must be received at least 30 days prior to anticipated practice in MN | |
| **MISSISSIPPI** | NO | *Miss. Code Ann. § 73-31-3(d)(iii), § 73-31-14(3)*<br><br>The practice of psychology shall be construed within the meaning of this definition without regard to whether payment is received for services rendered and without regard to the means of service provision (e.g., face-to-face, telephone, Internet, or telehealth).<br><br>Applicants awaiting licensure in Mississippi are prohibited from the practice of psychology without a temporary license issued by the | NO | *Miss. Code Ann. § 83-9-351*<br><br>"Telemedicine" is defined as the delivery of health care services such as diagnosis, consultation, or treatment through the use of interactive audio, video, or other electronic media.<br><br>Must be "real-time" consultation<br><br>Use of audio-only telephone, fax or e-mail excluded<br><br>Private payers must provide coverage for telehealth services to same extent as in- | *Miss. Code Ann. §73-31-14(2); CMSR 50-021-3201 – Rule 4.7(B)*<br><br>Out-of-state licensed psychologists may apply to the board for a temporary practice certificate to engage in practice on temporary basis in MS.<br><br>That practice must be limited in scope and duration, not exceeding 30 days during a consecutive 12-month period.<br><br>May be subject to a jurisprudence exam at the board's discretion | *Miss. Code Ann. §73-31-23; Miss. Code Ann. §73-31-25*<br><br>Misdemeanor:  Possible fine up to $300 &/OR possible imprisonment up to 60 days for each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | board. For the purposes of this subsection, the practice of psychology shall be construed without regard to the means of service provision (e.g., face-to-face, telephone, Internet, telehealth). | | person services but may limit coverage to providers in a telemedicine network approved by the payer. | | |
| **MISSOURI** | NO | NO | NO | 2013 HB 986 to be codified as *§376.1900.1 R.S.Mo*, effective Jan 1, 2014<br><br>"Telehealth" has the same meaning as defined under *§208.670 R.S. Mo*. -- the "use of medical information exchanged from one site to another via electronic communications to improve the health status of a patient."<br><br>Private payers must provide coverage for telehealth services to same extent as in- | *§ 337.045(5) R.S.Mo*<br><br>Licensed out-of-state psychologist may practice for no more than 10 consecutive business days in any 90 day period, or in aggregate may not exceed 15 business days in any 9-month period | *§ 337.065(1) R.S.Mo; § 560.011 R.S.Mo; § 560.016 R.S.Mo*<br><br>Class A Misdemeanor: possible fine up to $1,000 &/OR possible imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | person services but may limit coverage to providers in a telemedicine network approved by the payer | | |
| **MONTANA** | NO | *MONT. ADMIN. R. 24.189.301*<br><br>(1) "Defined professional relationship" means a relationship in which a licensee or license applicant provides diagnostic, assessment and/or therapeutic services to a client. A defined professional relationship shall be initially established in a context where services are provided:<br>(a) in person and face-to-face; or<br>(b) transmitted via electronic or related methods. If provided under this subsection, the context must also | NO | SB 270 (2013).to be codified under Title 33, Chapter 22, Part 1, effective 1/1/2014<br><br>"Telehealth" is defined the use of interactive audio, video, or other telecommunications technology to deliver health care services.<br><br>Includes real-time and store-&-forward technology; but excludes audio-only phone, fax or email<br><br>Must be delivered through secure communications compliant with HIPAA<br><br>Private payers must provide coverage for | *Mont. Code Anno. § 37-17-104 (1)(d); MONT. ADMIN. R. 24.189.414*<br><br>Licensed out-of-state psychologists may render consulting psychological services not to exceed in the aggregate60 days during a calendar year.<br><br>If services exceed 10 days in a calendar year, the psychologist must submit a notarized form to the Dept. of Labor & Industry in advance as to the nature, extent & duration of the services to be provided in the state.<br><br>Notification shall be provided to the board | *Mont. Code Anno. §37-17-312*<br><br>Misdemeanor:  Possible fine up to $500 &/OR imprisonment in county jail up to 6 months |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | be: (i) two-way; (ii) interactive; (iii) real-time; (iv) simultaneous; (v) continuous; and (vi) providing for both audio and visual interaction. *MONT. ADMIN. R. 24.189.607(4)(d)(ii)(A)* also allows for teleconferencing (two-way, interactive, real time, simultaneous, continuous, and provides audio &visual interaction) as substitute for face-to-face postdoctoral supervision | | telehealth services to same extent as in-person services | each year nonresident psychological services are rendered. A letter verifying termination of said services shall be filed with the board at the time of termination. | |
| **NEBRASKA** | NO | NO | NO | NO for private insurance but yes for NE Medicaid (*see R.R.S. Neb. §71-8501 et seq.*) | *R.R.S. Neb. § 38-3119; 172 NAC 155-004.03* Licensed, out-of-state psychologists may provide services in NE so long as they do not provide more than an | *R.R.S. Neb. § 38-3130(2); 172 NAC 155-004.03; 172 NAC 155-012* Class II misdemeanor: possible fine up to $1,000 &/OR possible imprisonment up to 6 |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | aggregate of 30 days of professional services during the 12 month period beginning with the first date of issuance may be issued a letter to practice.<br><br>Requirements for a license in the other jurisdiction are equal to or exceed NE"s licensure requirements<br><br>Must notify DHHS - Regulation & Licensure of the nature and location of their practice and provide evidence of their licensure in another jurisdiction to obtain a letter permitting temporary practice | months<br><br>An individual who practices prior to issuance of a credential for temporary practice is subject to assessment of an Administrative Penalty, or such other action as provided in the statutes and regulations governing the credential.<br><br>Administrative penalty may be $10 per day, not to exceed a total of $ 1,000 for practice without a credential. |
| **NEVADA** | NO | NO | See FAQs on State of Nevada Board of Psychological Examiners website: http://psyexam.nv.g | NO | *Nev. Rev. Stat. Ann. §641.410; NAC 641.180*<br><br>Licensed, out-of-state psychologists may practice in NV without a | *Nev. Rev. Stat. Ann. §641.440; §193.140*<br><br>Gross misdemeanor: possible fine up to $2,000 &/OR imprisonment in |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | ov/FAQs/<br><br>In Nevada, psychologists licensed in another state cannot provide services to residents without a license. This includes teletherapy of any type. | | license so long as he/she does not practice more than 30 days in a calendar year **&** if the psychologist is invited as a consultant by a NV-licensed psychologist.<br><br>Licensure requirements for other jurisdiction must meet licensure requirements for NV.<br><br>The application for approval to practice as a consultant in NV must be submitted at least 30 days before the psychologist intends to begin practice in this State.<br><br>The application must be approved before practicing as a consultant in NV. | county jail up to 364 days |
| **NEW HAMPSHIRE** | *RSA 329-B:16*<br><br>Persons licensed by | *RSA 329-B:2(7)(h)*<br><br>Provision of any of | See Feb. 17, 2012 statement of interpretation by | *RSA 415-J: 1 et seq.—New Hampshire Telemedicine Act* | *RSA 329-B:20(I)*<br><br>Licensed, out-of-state | *RSA 329-B:17*<br><br>Class A Misdemeanor (for |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | the board who practice electronically shall be subject to standards of care for the practice of telemedicine and telehealth for psychology established by the board pursuant to rules adopted under RSA 541-A. | these services or activities by any means, including electronic or telephonic constitutes the practice of psychology | the NH Board of Mental Health Practice, which regulated psychologists prior to July 1, 2013<br><br>http://www.nh.gov/ mhpb/documents/o ut-of- statepractice.htm | "Telemedicine" is defined as the use of audio, video, or other electronic media for the purpose of diagnosis, consultation, or treatment.<br><br>Audio-only telephone or fax excluded.<br><br>Private payers must provide coverage for telehealth services to same extent as in-person services. | psychologists may temporarily practice in NH if no more than 30 days per year.<br><br>Licensure requirements in the psychologist's home state must be equal to or exceed NH's requirements for licensure.<br><br>The out-of-state psychologist must hold one of the following credential: ASPPB's CPQ or IPC; ABPP; NR's HSP certification; or other equivalent qualifications determined by the board. | a natural person): possible fine up to $2,000 &/OR possible imprisonment up to 1 year, each violation<br><br>Felony if committed by any other person (§330-A:23) |
| **NEW JERSEY** | NO | NO | NO | NO | *N.J. Stat. § 45:14B-6(d)*<br><br>Licensed out-of-state psychologists may practice in NJ without a license for not more than 10 consecutive business days or 15 | *N.J. Stat. § 45:1-11; N.J. Stat. § 45:1-18.2*<br><br>Possible civil penalty up to $10,000 for the first violation & up to $20,000 for the second and each subsequent violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | business days in any 90-day period subject to following conditions:<br><br>Resides outside of NJ; major practice is outside of NJ: provides Board with summary of qualifications & minimum of 10 days' advance written notice of intention to practice; & home state's licensing requirements must be equivalent to NJ's licensing requirements | |
| **NEW MEXICO** | NO | NO | NO | 2013 N.M. Laws, Chap. 105 (SB 69) to be codified as *N.M. Stat. Ann. § 13-7-14, § 59A-22-49.3, § 59A-23-7.12, § 59A-46-50.3, § 59A-47-45.3?*<br><br>"Telemedicine" is defined as the use of interactive simultaneous audio & video or store & forward technology | *N.M. Stat. Ann. § 61-9-10.1(A); NMAC 16.22.5.13*<br><br>Licensed out-of-state psychologists may obtain a temporary license to practice for up to 6 months in NM<br><br>Temporary license temporary license may be extended at the discretion of the board | *N.M. Stat. Ann. § 61-9-14*<br><br>Misdemeanor: Possible fine up to $1,000 &/or imprisonment up to 3 months for each violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | using information and telecommunications technologies by a health care provider to deliver health care services at a site other than the site where the patient is located<br><br>Telemedicine used to provide clinical services shall be encrypted and shall conform to state and federal privacy laws.<br><br>Private payers must provide coverage for telehealth services to same extent as in-person services. | with a written request 30 days prior to the expiration, stating the reason for extension. | |
| **NEW YORK** | NO<br><br>But there is a provision governing hospital credentialing/ privileging of health care practitioners providing | NO | Telepractice Guideline issued by the NYS Office of the Professions available online: http://www.op.nysed.gov/prof/psych/psychtelepracticeguide.htm | NO | *NY CLS Educ § 7605 (8); 8 NYCRR § 72.5*<br><br>Licensed out-of-state practitioner may practice may engage in temporary period up to 10 consecutive business days in any period of 90 | *NY CLS Educ § 6512; NY CLS Penal § 70.00; CLS Penal § 80.00*<br><br>Class E felony: possible fine up to $5,000 &/or imprisonment up to 4 years |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | telemedicine services – *see*  NY CLS Pub Health § 2805-u<br><br>"Telemedicine" is defined as the delivery of clinical health care services through real-time two-way electronic audio-visual communications. The health care practitioner providing telemedicine must be licensed to practice in NY State. | | | | consecutive days or in the aggregate no  more than 15 business days in any such 90-day period.<br><br>They must file with the department before practicing<br><br>This is a one-time practice exemption. | |
| **NORTH CAROLINA** | NO | NO | See March 2005 opinion of NC Psychology Board available online: http://ncpsychology board.org/office/Ele ctronicServices.htm | NO | *N.C. Gen. Stat. § 90-270.4(f); 21 N.C.A.C. 54.1610*<br><br>Licensed out-of-state psychologists may practice for up to 5 days in any calendar year.<br><br>Nonresident psychologists shall submit to the Board a | *N.C. Gen. Stat. §90-270.17; N.C. Gen. Stat. § 14-3; N.C. Gen. Stat. § 15A-1340.23*<br><br>Class 2 misdemeanor: possible fine up to $1,000 &/OR imprisonment of more than 30 days up to 6 months, each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | written statement from their home state verifying licensure in good standing with a written description of their intended practice at least 5 working days prior to engaging in temporary practice in NC | |
| NORTH DAKOTA | NO | *N.D. Cent. Code § 43-51-02 -Location of practice of an occupation or profession*<br><br>The provision of services to an individual in this state which fall within the standard of practice of a profession or occupation regulated by a board, regardless of the means by which the services are provided or the physical location of the person providing those services, constitutes the practice of that | NO | NO | *N.D. Cent. Code, §43-32-30(2); N.D. Cent. Code, § 43-51-05; N.D. Admin. Code 66-02-01-16*<br><br>Licensed out-of-state psychologists may practice temporarily in ND for up to 30 days in any calendar year<br><br>The 1-year period commences on the date the written application is approved by the board.<br><br>The application must include verified documentation that the | *N.D. Cent. Code, §43-32-31*<br><br>Class B Misdemeanor: possible fine up to $1000 dollars &/OR imprisonment up to 30 days<br><br>Civil injunction remedy also available |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | occupation or profession in this state and is subject to regulation by the appropriate board in this state. | | | nonresident psychologist is licensed in good standing; the nature of the services to be provided; & explanation of when the services are to be provided. | |
| **OHIO** | *OAC Ann. 4732-3-01(S); OAC Ann. 4732-13-03, 4732-13-04 (supervision); & OAC Ann. 4732-17-01*<br><br>"Telepsychology" is defined as the practice of psychology by distance communication technology such as but not necessarily limited to telephone, email, Internet-based communications, and videoconferencing.<br><br>In order to practice telepsychology in the state of Ohio one | See OAC Ann 4732-3-01 | NO | NO | *ORC Ann. 4732.22(B); OAC Ann. 4732-5-02(B)(2)*<br><br>Licensed out-of-state psychologists may practice temporarily in OH for not more than 30 days a year<br><br>Must submit an application prior to practicing in Ohio indicating that home state's licensure requirements are equal to or exceed OH's licensing requirements<br><br>Holding an active inter-jurisdictional practice certificate (IPC) issued | *ORC Ann. 4732.99*<br><br>Possible fine of $100-500 &/OR imprisonment of 6 months up to 1 year, each violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | must hold a current, valid license issued by the state board of psychology or shall be a registered supervisee of a licensee being delegated telepsychology practices. | | | | by ASSPB shall be deemed to qualify for permission to practice | |
| **OKLAHOMA** | *36 Okl. St. § 6801 et seq  -- Oklahoma Telemedicine Act*<br><br>"Telemedicine" is defined as the practice of health care delivery, diagnosis, consultation, treatment, including but not limited to, the treatment and prevention of strokes, transfer of medical data, or exchange of medical education information by means of audio, | NO but psychologists are included in the list of providers authorized to provide services under the Telemedicine Act | See *Kennedy v. Freeman,* 919 F.2d 126 (1990) (out-of-state doctor had sufficient contacts with OK for OK court to assert personal jurisdiction in medical malpractice action)<br><br>http://www.leagle.com/decision/19901045919F2d126_11003<br><br>See OK AG Opinion 00-041 addressing the ability of dental board to regulate | *36 Okl. St. § 6803*<br><br>Health care service plans, disability insurer programs, workers' compensation programs, or state Medicaid managed care program contracts shall provide coverage of telehealth services, subject to contract terms & conditions. | *59 Okl. St. § 1353(9 )*<br><br>Licensed out-of-state psychologists may practice temporarily for no more than an aggregate 5 days during any year.<br><br>He/she must inform the Board prior to initiation of services. | *59 Okl. St. § 1374*<br><br>Misdemeanor:  possible fine up to $500 &/OR imprisonment up to 6 months, each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | video, or data communications.<br><br>Consultation by phone or fax is excluded<br><br>Provider must obtain written patient consent prior to engaging in telehealth.  See *36 Okl. St. § 6804* for what must be specifically included in the informed consent | | dental services provided via internet in OK<br><br>http://www.oklegal. onenet.net/oklegal- cgi/ifetch?okag+125 6050667529+F | | | |
| **OREGON** | NO | NO | NO | *ORS § 743A.058*<br><br>"Telemedical" means delivered through a two-way video communication that allows a health professional to interact with a patient who is at an originating site as defined in the statute.<br><br>Private payers must | *ORS § 675.063; Or. Admin. R. 858-010-0055*<br><br>Licensed, out-of-state psychologists must obtain a limited (visitor's) permit to engage in temporary practice in OR.<br><br>A visitor's permit shall be effective for no more than 30 days in a 12 | *ORS § 675.990; ORS § 161.615;  ORS § 161.635*<br><br>Class C Misdemeanor: possible fine up to $6,250 &/OR imprisonment up to 1 year<br><br>*ORS § 675.150 --* Injunction remedy |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | provide coverage for telehealth services, subject to contract terms & conditions. | month period.<br><br>The licensure requirements for the psychologist's home state must be essentially equivalent to those required in OR. | |
| **PENNSYLVANIA** | NO | NO | See *Guideline Regarding Requirements for Provision of Psychological Services Regardless of Delivery Method*, available on the State Board of Psychology's website: http://www.portal.state.pa.us/portal/server.pt/community/state_board_of_psychology/12521/licensure_information/572083 | NO | *63 P.S. § 1203(7); 49 Pa. Code § 41.52(c)*<br><br>Licensed, out-of-state psychologists must obtain advance permission from the Board to practice on temporary assignment in PA.<br><br>Temporary practice is limited to up to 6 months.<br><br>Only 1 additional 6-month extension may be granted. Requests for extension must be submitted in writing to the Board. | *63 P.S. § 1211*<br><br>Misdemeanor: Possible fine up to $ 1,000 &/or imprisonment up to 6 months<br><br>For additional violations, possible fine not less than $2,000 &/or imprisonment not less than 6 months up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Licensed, out-of-state psychologists on temporary assignment in PA for an aggregate of no more than 14 days are exempted from the notification requirement. | |
| **RHODE ISLAND** | NO | NO | Email communication from RI Board Administrator dated 4/20/10 indicates that the RI psychology board views provision of telemental health services as requiring licensure in RI. It may also be possible to provide services under temporary licensure provision. It should be noted that the board equates 1 teletherapy session to 1 calendar day of the 10 calendar day limit. | NO | *R.I. Gen. Laws § 5-44-23(h); CRIR 14-140-036(2.9)*<br><br>Licensed out-of-state psychologists may practice temporarily up to 10 calendar days per calendar year with no more than 5 days of this activity occurring consecutively | *R.I. Gen. Laws § 5-44-21*<br><br>Misdemeanor: Possible fine up to $500, each offense |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| **SOUTH CAROLINA** | NO | *S.C. Code Ann. § 40-55-50*<br><br>(C) A person is deemed to be practicing as a psychologist within the meaning of this chapter if the person engages in any of the activities enumerated in subsection (A) electronically within this State including, but not limited to, by means of the internet, phone lines, and personal computer modems. | NO | NO | *S.C. Code Ann §40-55-110*<br><br>Licensed, out-of-state psychologists must obtain a temporary permit from the Board to practice temporarily for a period not to exceed 60 days within a calendar year<br><br>Must demonstrate that the home state's licensing requirements are equivalent to SC's requirements. | *S.C. Code Ann §40-55-170*<br><br>Felony:  possible fine up to $50,000 &/or imprisonment up to 1 year |
| **SOUTH DAKOTA** | NO | NO | NO | NO | *S.D. Codified Laws § 36-27A-2 (4)*<br><br>Licensed out-of-state psychologists engage in temporary practice up to no more than an aggregate of 20 days during any 1 year.<br><br>If exceed 10 consecutive | *S.D. Codified Laws §36-2-2; S.D. Codified Laws § 22-6-2*<br><br>Class 2 misdemeanor: possible fine of $500 &/OR 30 days imprisonment in a county jail, each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | days of practice in any year, then must report to the board in writing the nature and extent of practice in SD. | |
| TENNESSEE | NO | NO | NO | NO | *Tenn. Code Ann. § 63-11-211(b)(5)*<br><br>Licensed, out-of-state psychologists may practice up to 12 days per year for such purposes as special training or consultation, speciation evaluation or intervention, or serving as an expert witness | *Tenn. Code Ann. § 63-11-206(a); Tenn. Code Ann. § 40-35-111(e)(2)*<br><br>Class B misdemeanor: possible fine up to $500 &/OR imprisonment up to 6 months |
| TEXAS | *Tex. Ins. Code §1455.001 et seq.* (health care coverage)<br><br>*Tex. Occ. Code §111.001 et seq.* (informed consent, patient confidentiality)<br><br>*Tex. Occ. Code* | NO | See December 1999 telepractice policy statement of Texas State Board of Examiners of Psychologists available online: http://tsbep.texas.gov/files/newsletters/1999Fall.pdf | *Tex. Ins. Code §1455.004*<br><br>Private payers must provide coverage for telehealth services, subject to contract terms & conditions. | *Tex. Occ. Code § 501.263; 22 TAC § 463.27*<br><br>Licensed, out-of-state psychologists must obtain a temporary permit to practice in TX.<br><br>The home state's licensing requirements must be substantially | *Tex. Occ. Code § 501.502; Tex. Occ. Code § 501.503; Tex. Penal Code § 12.21; 22 TAC § 470.22*<br><br>Civil penalty of $1,000 for each day of violation<br><br>Class A Misdemeanor: possible fine up to $4,000 &/OR imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
|  | §106.001  The fact that an activity occurs through the use of the Internet does not affect a licensing authority's power to regulate an activity or person that would otherwise be regulated under this title.  Tex. Gov't Code §531.001(7)  Telehealth service" means a health service, delivered by a licensed or certified health professional acting within the scope of their license or certification and that requires the use of advanced telecommunications technology, other than phone or fax, including: |  |  |  | equal to the licensing requirements in TX.  The temporary permit is valid only for a period up to 30 days as specified by the board and for the limited purpose approved by the board.  A person holding a temporary license issued under this chapter shall display a sign indicating that the license is temporary. The sign must be approved by the board and displayed in every room in which the person provides psychological services.  Yes (Tex. Occ. Code §501.263; 22 TAC §463.27) | Each day a violation continues or occurs is a separate violation |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | (A) compressed digital interactive video, audio, or data transmission; (B) clinical data transmission using computer imaging by way of still-image capture and store and forward; and (C) other technology that facilitates access to health care services or medical specialty expertise. | | | | | |
| **UTAH** | NO | Utah Code Ann. § 58-61-102(10)  "Remotely" is defined as communicating via Internet, telephone, or other electronic means that facilitate real-time audio or visual interaction between individuals when they are not physically present in the same room at the same time. | NO | NO | Utah Code Ann. § 58-61-307(2)(k)  An individual who is licensed, in good standing, to practice mental health therapy elsewhere in the US outside of Utah may provide short term transitional mental health therapy remotely to a client in Utah only if: (i) the individual is | Utah Code Ann. § 58-61-501; § 58-61-503; Utah Code Ann. § 76-3-203; § 76-3-301  3rd degree felony: possible fine up to $5,000 &/or imprisonment up to 5 years |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | *Utah Code Ann. § 58-61-307(2)(k)*<br><br>Short-term telemental health services may be provided in UT from another state if the nonresident psychologist meets certain specified conditions (further described in column #5) | | | present in the state or territory where the individual is licensed to practice mental health therapy;<br>(ii) the client relocates to Utah;<br>(iii) the client is a client of the individual immediately before the client relocates to Utah;<br>(iv) the individual provides the short term transitional mental health therapy to the client only during the 45 day period beginning on the day on which the client relocates to Utah;<br>(v) within 10 days after the day on which the client relocates to Utah, the individual provides written notice to the division of the individual's intent to provide short term transitional mental health therapy remotely to the client; and<br>(vi) the individual does | |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | not engage in unlawful conduct or unprofessional conduct. | |
| **VERMONT** | *26 V.S.A. § 3018 – Telepractice*<br><br>Licensees who provide services regulated under this chapter by means of the internet or any other electronic means are deemed to provide such services in this state, and are subject to the jurisdiction of the board. The board may take disciplinary or other action against such licensees. Action taken by the board does not preclude any other jurisdiction from also taking disciplinary or other action against such licensees. | *CVR 04-030-270(6.8) – Telepractice*<br><br>(a) Telepractice is governed 26 V.S.A. § 3018. Professionals who provide service via the Internet or other electronic means should provide as much information as possible to individuals who access their services.<br><br>(b) Psychologists from other jurisdictions providing telepractice services to persons in Vermont are deemed to be practicing in Vermont. They must be licensed by the Board and must comply with the disclosure requirements of Rule 6.8. | See board website for disclosures required for telepractice:<br>http://vtprofessionals.org/opr1/psychologists/telepractice.asp | *8 V.S.A. § 4100k - Coverage for telemedicine services*<br><br>"Telemedicine" means the delivery of health care services such as diagnosis, consultation, or treatment through the use of live interactive audio & video over a secure connection that complies with HIPAA.<br><br>Audio-only telephone, e-mail, or fax excluded.<br><br>Coverage for telehealth services is required, subject to contract terms & conditions.<br><br>A health insurance plan may limit coverage to providers in the plan's network and may | *CVR 04-030-270(1.8)*<br><br>Licensed, out-of-state psychologists must obtain a temporary license to practice in VT.<br><br>Temporary practice is limited up to 10 days, or 80 hours in a 12-month period.<br><br>No applicant may be issued more than two temporary licenses. | *26 V.S.A. § 3002; 26 V.S.A. § 3003; 3 V.S.A. § 127*<br><br>Injunction & civil penalty up to $1,000<br><br>Criminal penalty: possible fine up to $5,000 &/or imprisonment up to 1 year |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

## Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | (c) Vermont licensed psychologists who provide telepractice services to clients outside of Vermont remain under the jurisdiction of the Board. They shall comply with the disclosure requirements of Rule 6.8 and shall specifically disclose: (1) Name, location, and telephone number of the psychologist; (2) What the psychologist is licensed and trained to do; and (3) The limits and limitations of Internet practice and service delivery. | | require originating site health care providers to document the reason the services are being provided by telemedicine rather than in-person. | | |
| VIRGINIA | NO | NO | Based on a communication with staff of the Virginia Board of Psychology, see 115: 1.4 available online -- | *Va. Code Ann. § 38.2-3418.16* "Telemedicine" is defined as the delivery of health care services, means the use of | *Va. Code Ann. § 54.1-3601(6), (7)* Licensed, out-of-state psychologists may practice temporarily if consulting with VA | *Va. Code Ann. § 54.1-2401* Civil penalty up to $5,000, each violation *Va. Code Ann. § 54.1-111; Va. Code Ann. § 18.2-10;* |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | http://www.dhp.virginia.gov/counseling/counseling_guidelines.htm | interactive audio, video, or other electronic media used for the purpose of diagnosis, consultation, or treatment.<br><br>Audio-only telephone, electronic mail message, or facsimile transmission is excluded<br><br>Coverage for telehealth services is required, subject to contract terms & conditions. | licensed psychologists, or when issued a temporary license by the Board to participate in continuing education programs or rendering psychological services without compensation to any patient at clinics for indigent/uninsured | *Va. Code Ann. § 18.2-11*<br><br>Class 1 misdemeanor: possible fine up to $2,500 &/or imprisonment up to 12 months<br><br>Subsequent offense within 36-month period constitutes class 6 felony Possible fine up to $2,500 &/or imprisonment of 1-5 years or in court's discretion up to 12 months |
| **WASHINGTON** | NO | NO | NO | NO | *Rev. Code Wash §18.83.082; WAC § 246-924-480; WAC § 246-924-483*<br><br>Licensed, out-of-state psychologists may petition the Board for a temporary permit to practice within the state for a period not to exceed 90 days in a calendar year. | *Rev. Code Wash. (ARCW) § 18.83.180; ARCW §9.92.020*<br><br>Gross Misdemeanor: Possible fine up to $5,000 &/or imprisonment up to 364 days |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Licensure requirements in the psychologist's home state must meet or exceed those requirements for licensure in WA.<br><br>A national background check may be required; however, the temporary practice permit may be issued while the check is completed if the psychologist meets certain conditions specified in WAC § 246-924-483. | |
| **WEST VIRGINIA** | NO | NO | See Board policy statement on Telepsychology – Skype, available online:<br><br>http://www.wvpsychbd.org/policy_statements.htm | NO | *W. Va. Code* §30-21-3<br><br>Licensed, out-of-state psychologists may practice for a period not to exceed 10 days in any calendar year<br><br>Must not establish a regular place of practice in the state | *W. Va. Code* § 30-21-13<br><br>Misdemeanor: Possible fine up to $500 &/OR imprisonment up to 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | Licensure requirements in the psychologist's home state must meet or exceed the licensing requirements in WV<br><br>Must petition the board in advance | |
| **WISCONSIN** | NO | *Wis. Adm. Code Psy 2.14(2)*<br><br>A psychologist provides psychological services in this state whenever the patient or client is located in this state, regardless of whether the psychologist is temporarily located in this state or is providing services by electronic or telephonic means from the state where the psychologist is licensed. | NO | NO | *Wis. Stat. § 455.03; Wis. Adm. Code Psy 2.14(1)*<br><br>Licensed, out-of-state psychologists may engage in temporary practice so long as he/she does not more than 60 working days in any year without holding a license.<br><br>The psychologist's home state requirements for psychology licensure must be equivalent to or higher than the requirements for licensure in WI.<br><br>If temporary practice exceeds 20 working | *Wis. Stat. § 455.11*<br><br>Possible fine up to $200 &/OR imprisonment up to 6 months |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | days within a year, the psychologist must report to the Board the nature & extent of practice. | |
| **WYOMING** | NO | NO | See reference to "telepsychology" in June 11, 2012 Board newsletter available online at: http://plboards.stat e.wy.us/psychology/ pdf/Newsletters/1st EditionNewsletterJu ne2011.pdf | NO | *Wyo. Stat. § 33-27-117 (e); WCWR 024-068-003(1)(c)*<br><br>Licensed, out-of-state psychologists must obtain a temporary license, which allows practice up to 30 working days in 1 year.<br><br>Temporary license is available if the licensing requirements in the psychologist's home state meets or exceeds WY's licensing requirements.<br><br>If temporary practice exceeds 20 working days in 1 year, the psychologist must report the nature and extent of his/her | *Wyo. Stat. § 33-27-119*<br><br>Misdemeanor:  possible fine up to $750 &/OR imprisonment up to 6 months, each violation |

*Disclaimer*:  This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA.  APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information.  Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

American Psychological Association
Practice – Legal & Regulatory Affairs
October 2013

# Telepsychology 50-State Review

| STATE | Telehealth/ Telepsychology Statutes and/or Regulations | Practice of Psychology defined to include specifically telepsychology? | Licensing Board Advisory Opinions | Telehealth Coverage Mandate | Temporary / Guest Practice Provision | Penalties for Unauthorized practice of psychology without a license |
|---|---|---|---|---|---|---|
| | | | | | practice in WY to the board | |

*Disclaimer*: This document does not constitute legal advice and should not be relied upon, as it is not routinely updated and was prepared with information from other sources, whose accuracy was not independently verified by APA. APA strongly encourages the reader to independently verify the information contained herein and/or consult with independent legal counsel if the reader intends to use or otherwise rely on such information. Because the law and related information continually change and because APA relied on other sources to compile information contained herein, APA cannot guarantee the completeness, currency or accuracy of this document.

 APA 2024 registration is now open. Register today to save.

🔵 **AMERICAN PSYCHOLOGICAL ASSOCIATION**

TOPICS    PUBLICATIONS & DATABASES    RESEARCH & PRACTICE    EDUCATION & CAREER    NEWS & ADVOCACY

# Telepsychology, Medication, and Collaboration Module

Tanya Jacobsen, MAPP and Jessica Kohout, PhD
APA Center for Workforce Studies
April 2010

Main Report: Underline 2008 APA Survey of Psychology Health Service Providers (/workforce/publications/08-hsp)

| | |
|---|---|
| Module A: | Doctoral Internship (/workforce/publications/08-hsp/doctoral-internship) |
| Module B: | Insurance (/workforce/publications/08-hsp/insurance) |
| Module C: | Client Complexity and Provider Revenue (/workforce/publications/08-hsp/revenue) |
| Module D: | Information on Telepsychology, Medication and Collaboration |

**COLLAPSE ALL**

— **Report Text**

## Introduction

The objective of the *2008 APA Survey of Psychology Health Service Providers* was to gain a broad understanding of those psychologists providing health services in the United States. Prior research in this area has focused primarily on APA members, which presents problems for generalizability of the data to nonmember providers. This study attempted to address these limitations by including non–APA member participants.

Specifically, this brief report or module focuses on health service providers' (HSPs') use of telepsychology in providing services, proportion of client caseload on psychotropic medication and HSP actions regarding psychotropic medication, and collaboration with other professionals. Telepsychology refers to health services that are provided to patients/clients by a health professional in which parties are physically separated when the service is rendered. Various media, such as Internet chat rooms, videoconference, email and phone, are used as mechanisms to enable communication between the parties.

While the vast majority of responses to this particular section of the survey came from APA member psychologists, the data gathered from this effort will be valuable to the Association's planning for the entire psychology workforce. As a whole, it is hoped that this research will provide a better understanding of HSPs' behavior regarding telepsychology, psychotropic medication and collaboration. Furthermore, these data may indicate changes in utilizing technology to provide services by comparing these data to previous studies on telepsychology.

## Methodology

The first part of the sample included 34,289 APA members identified as working as and/or trained as "health service providers" and holding a doctoral degree in psychology. In other words, the membership sample included members

engaged in professional practice or potentially eligible to do so by merit of learning & education/background sufficient for licensure in most jurisdictions.

Additionally, a roster of licensed, doctoral-level psychologists in the United States was purchased by CWS in April 2008, from a vendor able to compile a listing of individuals with state-issued professional licenses in psychology. The vendor culled duplicate entries across states and forwarded this list of 99,350 names and mailing addresses on to CWS. This list was then compared against the member sample of HSPs to remove duplicate records.

For the first wave in September 2008, an email invitation was sent to 23,818 members identified as licensed by one or more state licensing agencies/boards and having a valid email address on file with APA. Three follow-up reminders were sent to nonrespondents one week apart.

The second email distribution was sent in October to 10,471 members with unconfirmed licensure status (names not appearing on the purchased list) and valid email addresses on file with APA. Nonrespondents from this distribution received three followup reminders also spaced one week apart.

Third, 10,000 randomly selected licensed psychologists (members and nonmembers) were mailed a paper version of the survey along with a URL address to access the online version from an Internet-accessible personal computer. The paper instrument did not include questions pertaining to this telepsychology, medication and collaboration module. However, 83 of the 5,486 online responses received overall, which included 11 of the 1,296 online responses received for this module, were identified as originating from the general survey URL provided to those included in the paper distribution. As such, the respondents for this module consisted of APA members and non-members.

Only fully completed and submitted online surveys were included in analysis; data from partial or saved surveys were excluded. Four modules were randomly assigned across 5,486 members of the sample. This telepsychology, medication and collaboration module was completed by 1,296 participants. This brief focuses on the results from those chosen to participate in this section of the survey.

Given the exploratory nature of this study, only proportions and frequencies were reported; no distinction between members and nonmembers is implied beyond descriptive convenience.

# Module Results

This module was quite broad in that it included a total of eight questions on four different topics.

- hours spent on various work activities (Table 2)
- use of telepsychology to provide health services (Tables 3-3b)
- client caseload on psychotropic medication and related actions (Tables 4 and 4a)
- collaboration with other professionals (Tables 5-5b)

In addition to these questions, Table 1 provides demographic characteristics for all respondents to this module.

Table 1 (index.aspx?tab=4) summarizes general demographic characteristics of those responding to questions in this module. Missing values were excluded prior to analysis. Consistent with other CWS studies, more than three fourths (78 percent) of respondents held a PhD while nearly one fifth (19 percent) indicated that they held a PsyD. Just under 4 percent reported an EdD. The median age for participants responding to this module was 54. Women were in the slight majority (54 percent) and 89 percent of respondents identified as white, not Hispanic. The largest minority group was Spanish/Latino/Hispanic (4 percent) followed by black/African American at 3 percent. Just over 2 percent had multiple races or ethnic backgrounds, while about 1 percent was Asian. The race/ethnicity categories for this module were consistent with the full population of those surveyed in this full effort, as well as the other sub-groups

analyzed in the other methods. Less than 3% reported actually. Among those that chose to respond to the sexual orientation item, 8 percent identified as gay, lesbian, or bisexual.

Table 2 (index.aspx?tab=4) breaks out the average number of typical weekly work hours by type of work activity for psychology health service providers' primary and secondary work positions. A large majority (84 percent) of respondents spent time providing direct client patient care in their primary position and 27 percent in a secondary position. Direct care had the highest mean number of work hours in both primary (22 hours, SD=12.59) and secondary (10 hours, SD=12.04) positions compared to other work activities. Over two thirds (70 percent) reported doing educational activities in their primary position, spending an average of 9 hours (SD=10.06) per week. In both primary and secondary work positions, basic and applied research had the second highest average number of typical weekly hours: 12 hours, SD=12.51 and 7 hours, SD=7.09 respectively. However, research was the least common activity among HSPs, with one fifth in their primary position and 3 percent in a secondary position reporting they conducted research in the past typical week. While this table gives an overview of typical weekly work hours by type of activity, there was substantial variation in the work hours as evidenced by the high standard deviations. HSPs' typical work activities and hours depend on numerous factors such as employment setting and position, whether they're working full time or part time, and the number of work positions they hold.

Table 3 (index.aspx?tab=4) shows health service providers' use of telepsychology in delivering health services. Telepsychology refers to health services that are provided to patients/clients by a health professional in which parties are physically separated when the service is rendered. Various media, such as Internet chat rooms, videoconference, email and phone are used as mechanisms to enable communication between the parties. Respondents were considered users of telepsychology if they indicated using at least one type of media as shown in Table 3a. A large majority (87 percent) said they use telepsychology, whereas only 13 percent never used telepsychology to deliver health services.

Table 3a (index.aspx?tab=4) shows the frequency of telepsychology use for different types of media.

## Telephone

The telephone, including cell phones, was the most frequently used technology among respondents for providing direct health services. Eighty-five percent used the telephone, of which over a third (35 percent) used it once a week or more. Another 22 percent used the phone two or three times a month, and slightly less (17 percent) once a month. Just over a quarter (26 percent) indicated they only use the telephone to provide services several times a year or less.

Overall telephone use for providing health services in 2008 was similar to results found in a telehealth survey conducted in 2000, where 82 percent percent used the telephone (not including cell phones, which was asked separately) for individual, group or family treatment and assessment. However, there has been an increase in the frequency with which the telephone was used. In 2000, of those who used the telephone, most often use was less than monthly (46 percent), whereas in 2008, most (35 percent) provided direct health services via telephone once a week or more (Randall & Kohout, 2001).

## Email

Email was the second most frequently used technology for health service providers with 45 percent of respondents indicating they used email to provide direct health services. Although just under half (47 percent) of those using email only used it several times a year or less, 22 percent used it once a week or more. Just under one third used email to provide services two or three times a month or once a month, 16 percent and 15 percent respectively.

In the span of eight years, there has been a large increase (32 percent) in the proportion of health service providers using email to provide health services. In 2000, email was rarely used for clinical practice with only 13 percent of

respondents reporting any use of this technology for individual, group, or family treatment and assessment, and of those most often (71 percent) less than monthly (Randall & Kohout, 2001).

## Listservs

Listserv technology was used much less than telephone or email for providing direct health services, yet it was more common than videoconferencing, podcasts, or chat rooms. Of the 13 percent of respondents who reported using listservs to provide services, 37 percent used listservs once a week or more. About the same proportion (39 percent) rarely used listservs — several times a year or less. Thirteen percent provided services via listservs two or three times a month, and the remaining 11 percent once a month.

## Video Conference

Compared with the above media, respondents rarely relied on videoconference technology; only 7 percent used Internet videoconferencing and 6 percent non-Internet videoconferencing.

For those who used internet videoconferencing, over three-quarters (78 percent) only used it several times a year or less. Eight percent used it once a month, 5 percent two or three times a month, and 9 percent once a week or more.

Non-Internet videoconference was used somewhat more frequently than Internet videoconferencing. Yet the majority of users (67 percent) only indicated using non-Internet videoconferencing several times a year or less. Seventeen percent used it once a month, 6 percent two or three times a month, and 11 percent once a week or more.

Although videoconference technology is still rarely used in providing health services, it has tripled in use since 2000 where videoconference use was 2 percent for individual, group, or family treatment and assessment, and 1 percent for clients in crisis, routine treatment or assessment, or for clients not previously met face to face (Randall & Kohout, 2001).

## Podcast

A large majority of psychology health service providers (97 percent) said they never use podcasts to provide direct health services. Of the 3 percent providing services via podcasts, about half (53 percent) only used them several times a year or less. However, one quarter (25 percent) used podcasts regularly — once a week or more. Nineteen percent used them two or three times a month, and 3 percent once a month.

## Internet Chat Room

The least used media for providing services was an Internet chat room. Only 1 percent of respondents indicated they use chat rooms to provide direct health services. This is similar to results found in 2000 where chat-room/chat-channel was employed by only 1 percent of respondents for individual, group, or family treatment and assessment, and less than 1 percent for clients in crisis, routine treatment or assessment, and for clients not previously met face to face (Randall & Kohout, 2001).

## Summary

Use of different technologies in providing direct health services varied greatly. Telephone was used by a large majority (85 percent) followed by email, which was used by about half of respondents. When telepsychology was used, it was most commonly employed several times a year or less, except for the telephone where most used it once a week or more. Listservs and videoconferencing were rarely used, and podcasts and Internet chat rooms were almost never used to provide services (see table 3a).

Table 3b (index.aspx?tab=4) shows the types of services that are provided when using telepsychology. It should be noted that respondents could select multiple options.

Most commonly, 72 percent of respondents indicated they used telepsychology to schedule appointments; however, it should be pointed out that this would not be considered direct health services. Over half of respondents said they used telepsychology for communication in between sessions (65 percent), providing resources (63 percent), or to make referrals (62 percent), which may or may not be considered direct health services depending on the situation. For categories that are clearly direct health services, telepsychology was used by more than a third of respondents for consulting (37 percent) or psychotherapy (34 percent), about one fifth (21 percent) for counseling, and 17 percent for supervision. Six percent of respondents provided other types of services through telepsychology.

Table 4 (index.aspx?tab=4) indicates the distribution of the proportion of health service providers' client caseload that was currently being treated with psychotropic medication. On average, half (50 percent, SD 27.9) of the client caseload was on psychotropic medication. Only 5 percent of respondents indicated that none of their clients was medicated and about 3 percent said all of their clients were on medication. About one in five respondents (19 percent) indicated that 20 percent or less of their caseload was on medication. Nearly half (47 percent) of respondents currently had 21-60 percent of their caseload on medication, and the remaining third (34 percent) had a caseload with 61-100 percent of clients on psychotropic medication.

Table 4a (index.aspx?tab=4) shows how often health service providers take certain actions for clients on psychotropic medication. Most commonly (90 percent), providers indicated they talk with prescribing physicians; two thirds did this somewhat often and 24 percent always.

Over half of respondents made recommendations regarding medication and/or provided information literature to clients about medication. Just over half (52 percent) said they would make medication recommendations somewhat often, and 5 percent always; however, 39 percent indicated not at all. For providing information about medication, 51 percent did this somewhat often, 9 percent always, and 35 percent not at all.

Psychology health service providers almost never prescribed medication for their clients. Eighty-three percent said they prescribe not at all and 16 percent indicated this question was not applicable. Less than 1 percent prescribed medication at all. Nineteen percent of respondents took various other actions regarding medication that did not fit into one of these categories. It is still the case that psychologists' ability to prescribe is constrained by state laws.

Table 5 (index.aspx?tab=4) lists a large variety of professionals with whom health service providers collaborate. Collaboration could be with either individuals or groups, and it could also include one-time referrals or interactions with those working in the same practice or business.

The vast majority of respondents (93 percent) collaborated with other psychologists, closely followed by psychiatrists (89 percent). Over three quarters (79 percent) worked with primary care physicians and more than two thirds (72 percent) with social workers.

About half of respondents indicated working with nurse practitioners (51 percent), specialty care physicians (50 percent) or attorneys (49 percent). Nearly one third (33 percent) collaborated with clinical nurses, and over a quarter worked with court system personnel (29 percent) or physicians assistants (27 percent).

Just under a quarter (24 percent) of health service providers collaborated with probation officers and registered dietitians. Less than 20 percent of respondents indicated collaborating with: physical therapists (19 percent), EAP personnel (18 percent), law enforcement personnel (17 percent), alternative medicine practitioners (13 percent), and human resources (13 percent). Very few collaborated with personal trainers (3 percent), and 15 percent indicated that they collaborated with other professionals not listed. In sum, most psychology health service providers work with other psychologists and psychiatrists, but overall they collaborate with myriad professionals.

Table 5a (index.aspx?tab=4) ranks the types of activities/issues that were involved in collaborations with other

professionals listed in Table 5.

Most health service providers (84 percent) collaborated for the provision of psychological services (e.g., if a primary care physician (PCP) refers a patient to someone for treatment). The second most common type of collaboration was making referrals for psychological services (72 percent).

Between 50 and 60 percent of respondents said they collaborated on the following issues: health conditions (59 percent), treatment adherence (56 percent), consulting on treatment approaches that can be used (56 percent), and medication suggestions (50 percent). Forty percent indicated they collaborated with other professionals on screening for mental health problems, pediatric issues, etc., and 37 percent on lifestyle changes.

One quarter (25 percent) of respondents collaborated on provision of training, and 22 percent worked with others for forensic assessment. Just 8 percent said they collaborated with other professionals on other activities or issues.

Table 5b (index.aspx?tab=4) analyzes how often psychology health service providers collaborate with other health care providers or other professionals. It is important to note that collaboration could include interactions with those in the same practice or business. Most often (34 percent) respondents collaborated once a week or more followed closely by daily collaboration (31 percent). About one in five respondents (19 percent) collaborated two or three times a month, and 8 percent each collaborated just once a month or several times a year or less. Almost no respondents (less than 1 percent) indicated that they never collaborate with other professionals.

# Module Conclusion

Psychology health service providers' use of telepsychology to provide direct health services has increased over the past eight years with 87 percent using telepsychology in 2008. Most notable is the increased frequency in using the telephone and email to provide services. These and other media are used to provide a variety of services, most often to schedule appointments, communicate between sessions, provide resources, and make referrals. Yet over one third indicated they used telepsychology for consulting and psychotherapy. The increased use of technology in providing health services has important implications including ethical concerns such as confidentiality and liability, as well as quality of care, reimbursement and accessibility.

Another trend in health care has been the development of new psychotropic medications. The vast majority of health service providers had clients who were taking psychotropic medication, and these clients made up half of HSPs' caseload on average. As would be expected, a large majority of providers talked with prescribing physicians regularly, and over half made recommendations regarding medication and/or provided information literature to clients about medication.

HSPs worked in many different types of positions and settings throughout the U.S. They also collaborated with a variety of other professionals, most commonly other psychologists and psychiatrists, followed closely by primary care physicians and then social workers. While these were the most common, respondents worked with a diverse range of professionals. The top activities involved in collaborations were the provision of psychological services and making referrals for psychological services. Over half indicated that they collaborated either on a daily basis or at least once a week.

In sum, health service provider psychologists were increasingly using technology in providing services, had many clients who were being treated with psychotropic medication and collaborated often with numerous other professionals in their work.

– **References**

Randall, G., & Kohout, J. *Report of the 2000 Board of Professional Affairs APA Telehealth Survey*. February, 2001. APA Research Office.

---

## – Appendices

---

Appendix: Partial Instrument — Telepsychology and Collaboration Module⤢ (/workforce/publications/08-hsp/telepsychology/appendix.pdf)

---

## – Tables

---

| | |
|---|---|
| Table 1 | Demographic and Educational Characteristics of Psychology Health Service Providers: 2008⤢ (/workforce/publications/08-hsp/telepsychology/table-01.pdf) (PDF, 12KB) |
| Table 2 | Number of Hours per Week Spent on Work Activities for Primary and Secondary Positions for Psychology Health Service Providers: 2008⤢ (/workforce/publications/08-hsp/telepsychology/table-02.pdf) (PDF, 9KB) |
| Table 3 | Use Telepsychology to Deliver Health Services⤢ (/workforce/publications/08-hsp/telepsychology/table-03.pdf) (PDF, 10KB) |
| Table 3a | Telepsychology Media Used in Providing Direct Health Services⤢ (/workforce/publications/08-hsp/telepsychology/table-03a.pdf) (PDF, 10KB) |
| Table 3b | Types of Services Provided Using Telepsychology⤢ (/workforce/publications/08-hsp/telepsychology/table-03b.pdf) (PDF, 9KB) |
| Table 4 | Client Caseload Currently on Psychotropic Medication, 2008⤢ (/workforce/publications/08-hsp/telepsychology/table-04.pdf) (PDF, 9KB) |
| Table 4a | Frequency of Health Service Provider Actions for Clients on Psychotropic Medication⤢ (/workforce/publications/08-hsp/telepsychology/table-04a.pdf) (PDF, 10KB) |
| Table 5 | Collaboration* with Other Professionals⤢ (/workforce/publications/08-hsp/telepsychology/table-05.pdf) (PDF, 10KB) |
| Table 5a | Activities Involved in Collaborations with Other Professionals⤢ (/workforce/publications/08-hsp/telepsychology/table-05a.pdf) (PDF, 10KB) |
| Table 5b | Frequency of Collaboration with Other Health Care Providers and Other Professionals⤢ (/workforce/publications/08-hsp/telepsychology/table-05b.pdf) (PDF, 10KB) |

---

## – Acknowledgments

---

The *2008 APA Survey of Psychology Health Service Providers* is a product of the Center for Workforce Studies, a unit within the Science Directorate of the American Psychological Association. The authors are grateful for the continued support of Dr. Steven Breckler, Executive Director for the Science Directorate, and Dr. Norman Anderson, Chief Executive Officer and Executive Vice President of the APA. We would also like to recognize the cross-directorate collaboration made possible by Dr. Lynn Bufka, Assistant Executive Director for Practice Research and Policy. We also thank Daniel Michalski, MPA for his work with sampling and analyses and Victoria Pagano for assistance with data tables and cleaning. Special thanks to Marlene Wicherski for assistance on all aspects of this study but especially, methodology and sampling.

Date created: 2010

f
(#)

X (javascript: openSocialShare('https://twitter.com/share?url=https%3a%2f%2fwww.apa.org%2fworkforce%2fpublications%2f08-hsp%2ftelepsychology&via=APA&text=Telepsychology%2c+medication%2c+and+collaboration+module%3a+2008+APA+survey+of+psychology+health+serv

### Current Module

- Download full module ⬀ (PDF, 723KB)

### More from CWS

- Browse CWS Publications
- Presentations
- CWS Publications

ADVERTISEMENTADVERTISEMENT

CONTACT CWS

## Advancing psychology to benefit society and improve lives

**ABOUT PSYCHOLOGY**

Science of Psychology

Psychology Topics

**STUDENTS**

Accredited Psychology Programs

Careers in Psychology

Online Psychology Laboratory

More for Students

**PUBLICATIONS & DATABASES**

APA Style

Books

Children's Books

Databases

DVD/Streaming Video

Journal Subscriptions

APA PsycNET® Journal Articles

More Publications & Databases

**NEWS & ADVOCACY**

Monitor on Psychology Magazine

Newsletters

Press Room

Advocacy from APA Services, Inc.

**STANDARDS & GUIDELINES**

Standards and Guidelines

Ethics

**CAREERS**

Find a Job with PsycCareers

Early Career Psychologists

**EVENTS & TRAINING**

APA Annual Convention

Continuing Education

Events Calendar

Training

**ABOUT APA**

Governance

APA Divisions

Directorates and Programs

APA Merch Store

Corporate Supporters

Advertise with Us

Work at APA

Donate

Contact Us

**MEMBERS**

Get Involved

Membership Benefits

More for Members

RENEW MEMBERSHIP

JOIN APA

Cookies     Privacy Statement     Terms of Use     Accessibility     Website Feedback
Sitemap

FOLLOW APA        MORE

© 2024 American Psychological Association
750 First St. NE, Washington, DC 20002-4242
Telephone: (800) 374-2721; (202) 336-5500 | TDD/TTY: (202) 336-6123

Professional Psychology: Research and Practice
2000, Vol. 31, No. 2, 170–178

Copyright 2000 by the American Psychological Association, Inc.
0735-7028/00/$5.00    DOI: 10.1037//0735-7028.31.2.170

# Ten Interdisciplinary Principles for Professional Practice in Telehealth: Implications for Psychology

Geoffrey M. Reed and Christopher J. McLaughlin
American Psychological Association

Kathleen Milholland
Riverview, Florida

Emerging telecommunications technology is changing psychological practice by enabling the provision of services across time and distance, yet there are significant concerns about these applications. In response to developments in *telehealth*—the term used for health services provided through these technologies—an interdisciplinary group developed a series of principles to inform health care practice. In this article, the authors review these principles and their implications for psychological telehealth, emphasizing that psychologists' ethical and professional requirements do not change with the introduction of a new tool. The principles provide a framework of critical ethical and professional issues that psychologists must consider in undertaking telehealth practice.

*Telehealth* has been broadly defined as the removal of time and distance barriers to the delivery of health care services or related health care activities (Milholland, 1997). Nickelson (1998) has provided a more explicit definition of telehealth as "the use of telecommunications and information technology to provide access to health assessment, intervention, consultation, supervision, education, and information across distance" (p. 527). Telehealth technologies are used by a variety of health care professionals to offer

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

GEOFFREY M. REED received his PhD in clinical psychology from the University of California, Los Angeles, in 1989. He is currently assistant executive director for professional development in the American Psychological Association (APA) Practice Directorate, where his work focuses on the development and implementation of programs related to expanding opportunities for professional psychology.

CHRISTOPHER J. MCLAUGHLIN received his BS in human development and social policy from Northwestern University in 1988 and subsequently attended the Harris Graduate School of Public Policy Studies at the University of Chicago. He is currently director of professional development in the APA Practice Directorate, with primary responsibility for staff support of the APA Board of Professional Affairs. He has edited and contributed to four books dealing with health workforce policy and health care delivery.

KATHLEEN MILHOLLAND, RN, received her PhD in nursing from the University of Maryland in 1989. Dr. Milholland practiced critical care nursing for many years, then she served for 7 years as senior policy fellow for Nursing Practice and Health Policy at the American Nurses Association, where she was influential in the recognition of nursing informatics as a nursing specialty and in writing scope of practice and standards of practice for nursing informatics. From March 1998 to November 1999, Dr. Milholland served as research associate professor for the Lewis and Leona Hughes Endowed Chair in Nursing Informatics at the College of Nursing, University of South Florida. Dr. Milholland now maintains an independent practice in informatics in Riverview, FL.

THE PRINCIPLES ELABORATED IN THIS ARTICLE are revised from the Core Principles developed by the Interdisciplinary Telehealth Standards Working Group. Members of the working group included Kathleen Milholland, American Nurses Association; and Geoffrey M. Reed, APA (co-chairs); Sandi Dahl, BSN, MA, RN, American Academy of Ambulatory Care Nursing; Michael Fitzmaurice, PhD, Agency for Health Care Policy and Research; Jack Front, PT, MBA, American Physical Therapy Association; James G. "Gil" Hill, APA; Carolyn Hutcherson, RN, MSN, National Council of State Boards of Nursing; Michele Johnson, American Academy

of Family Physicians; Holly Kaplan, CCC-A, PhD, American Speech Language Hearing Association; Cynthia Kohuth, RN, American Telemedicine Association; Kathy Lewis, PT, Federation of State Boards of Physical Therapy; Christopher J. McLaughlin, APA; Maureen T. McSwiggan-Hardin, RN, MS, CS, Medical College of Georgia; Anna R. Nickels, RNC, BSN, Association of Women's Health, Obstetric, and Neonatal Nurses; David Nickelson, PsyD, JD, APA; Lt. Col. Melissa Rank, United States Air Force; Elizabeth H. Saindon, Esq., Arent, Fox, Kintner, Plotkin, & Kahn; Rita Vandivort, ACSW, National Association of Social Workers; James Vrac, International Association of Boards of Examiners in Optometry; Cathy June Wasem, MN, RN, Federal Office of Rural Health Policy; Lt. Col. Sarah Wright, United States Air Force, Office of the Surgeon General; and Joan R. Yuan, RN, CS, MSN, Home Health Nurses Association. The presence of an organization's representative on the working group does not imply formal endorsement of the Core Principles on the part of that organization.

THE CORE PRINCIPLES DEVELOPED BY THE WORKING GROUP have been approved by the American Academy of Ambulatory Care Nursing; American College of Nurse Practitioners; American Nurses Association; Association of Women's Health, Obstetric, and Neonatal Nurses; Federation of State Boards of Physical Therapy; International Association of Boards of Examiners in Optometry; International Society of Psychiatric Mental Health Nurses (formerly the Association of Child and Adolescent Psychiatric Mental Health Nurses; International Society of Psychiatric Clinical Liaison Nurses; and the Society for Education and Research in Psychiatric-Mental Health Nursing); National Association of Social Workers; and the United States Air Force Medical Service. These principles have been submitted to the APA Board of Professional Affairs Working Group on Professional Practice Issues in Telehealth for their consideration in the development of relevant APA policy.

CORRESPONDENCE CONCERNING THIS ARTICLE should be addressed to Geoffrey M. Reed, Practice Directorate, American Psychological Association, 750 First Street, NE, Washington, DC, 20002–4242.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

a range of services, including initial screenings, diagnostic exams, consultations, and short-term interventions (DeLeon, 1997; Glueckauf et al., 1999).

Although some of the technologies currently being used in telehealth are new, it is important to remember that health care professionals have been using some forms of telehealth for many years. A psychologist who provides telephone support to a patient in crisis is practicing telehealth. In fact, the telephone has become a standard mode of communication for conducting screening interviews, follow-up sessions, and crisis intervention (Haas, Benedict, & Kobos, 1996). Thus, telehealth is not a new form of practice, a new domain where no rules apply. Rather, the term *telehealth* refers to the use of technological tools that may be incorporated, with appropriate limitations and accommodations, into various established forms of health care, including the professional practice of psychology.

Like any technology, telehealth is inherently neither good nor bad and can be used in the service of a variety of ends. Although telehealth services are frequently touted as ways to expand access to health care, particularly among rural and other underserved populations, telehealth can also be used to restrict access. For example, some organized health care delivery systems are currently using telephone triage based on computerized algorithms as a precondition of medical treatment, with financial penalties for members who seek medical attention directly. Telehealth technologies may be used in the service of quality enhancement or in the service of cost containment. They may extend and enhance the client–practitioner relationship or contribute to its fragmentation. Telehealth technologies can be used to give providers and patients more freedom or to exploit them.

Currently, the development and implementation of telehealth technology is being driven primarily by commercial market interests. If the technology drives consumer applications and systems development, rather than the technology being responsive to the real health care needs of its users, the result could be extremely costly and elaborate systems that do not deliver better—or even effective—health care (Newman, 1998).

To counter the commercial interests that currently predominate, health care professionals and health care consumers must speak with a strong and unified voice. The technological tools involved in telehealth must be applied and evaluated in the light of existing standards and values for professional health care practice. It is our position that health care professions—rather than government agencies, health care delivery systems, or technology vendors—must assume primary responsibility for this evaluation and for any interpretation and extension of their own policies necessary to make them applicable to telehealth.

Yet, up to now, the professional voice has been quite weak. We believe that one reason for the professions' lack of influence in the development of telehealth technologies and policy is the fragmentation among health professions, which tend to view one another as competitors rather than collaborators, even in circumstances in which the interests of all health care professions rise and fall together. Although all health professions have core professional standards that are basically quite similar, differences in the language used to describe them impede communication. Rather than agreeing on integrated strategies and priorities, we approach legislative and policy advocacy with what appear to be different demands and priorities. This confuses legislators and policymakers

and undermines our effectiveness. It also leaves us vulnerable to the perception that we represent only the interests of our own guilds rather than the interests of the patient.

The interdisciplinary principles we elaborate on in this article were developed in response to the policy environment surrounding telehealth. An important factor in federal policy in this area is the Joint Working Group on Telemedicine (JWGT), which was convened in 1995 by the Secretary of the Department of Health and Human Services (see Nickelson, 1996). Originally administered by the Office of Rural Health Policy, the JWGT is now coordinated by the federal Office for the Advancement of Telehealth, created in 1998. The JWGT is an ad hoc group of representatives from federal agencies, departments, and programs with significant telehealth activities that shares information and data and provides recommendations regarding federal telehealth policy. The meetings of the JWGT are open to the public and are attended by representatives of a number of health professions, including American Psychological Association (APA) staff.

In 1997, as Congress considered legislation authorizing Medicare spending for telehealth services, the JWGT identified for its specific attention the need for clinical standards for practice in this area. In response to the JWGT's plans, 41 representatives from different professional associations and health care organizations came together at a meeting hosted by the American Nurses Association on May 13, 1997. The representatives attending this meeting believed that clinical standards were more appropriately the jurisdiction of the health care professions than of the federal government but were aware that the JWGT was in a position to influence federal legislative and regulatory policy in this area. These representatives charged a smaller Interdisciplinary Telehealth Standards Working Group, cochaired by Geoffrey M. Reed and Kathleen Milholland (Christopher J. McLaughlin served as a member), with taking the lead in this area by identifying basic principles and standards that would be appropriate for telehealth practice across the health care professions.

The working group identified five compelling reasons for interdisciplinary collaboration in this area. First, the most basic reason is to protect clients who may be recipients of telehealth services. The protection of patients has always been a core aspect of health care professionals' responsibilities. Second, it appeared that health care professions could participate more meaningfully in the development of telehealth policy—and thus more effectively serve and protect their clients—if all professions could speak with a unified voice, rather than each profession offering a different set of conceptualizations and proposals.

The third reason is the pace of technological development and change. Not only do rapidly evolving telehealth technologies have the potential to serve as useful tools in the delivery of services but in many cases they may also change in unpredictable ways the nature of the services themselves. For example, the American Academy of Radiology is concerned about the electronic transmission of images, many nursing organizations are extremely troubled by developments in the area of telephone triage, and the field of psychology appears to be most concerned at present with the use of interactive video technology for psychological assessment and intervention. Given that telehealth applications are evolving so rapidly, each profession must attend to those aspects most relevant to its own practice. At the same time, the working group believed

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

that interdisciplinary collaboration would help to ensure optimal overarching policies and applications.

Fourth, health care professionals of all kinds have been seeking guidance and support from their professional associations and boards in regard to incorporating emerging telehealth technologies into their practice. At present, these issues are not specifically addressed by professional ethics codes, standards, or practice guidelines. An agreement regarding core principles that apply across disciplines was seen as an important foundation for each profession in providing guidance to its members.

Finally, the working group was aware of the danger of allowing technology to be the driving force in the development of telemedicine, what Baschur (1997) called "a solution looking for problems" (p. 114). Health care professions are more likely to stimulate the development of systems that respond to real clinical needs if the various disciplines agree on their requirements.

The working group believed that the principles they developed could be used as bases for the development of more profession-specific and setting-specific policies. In our opinion, it is particularly important for the profession of psychology to develop such policies because mental health services are the most frequently used telehealth activities (American Medical Association, 1997). To the extent that efforts by different professions, including psychology, are based on interdisciplinary agreement regarding basic principles and definitions, the resulting policies will be more conceptually compatible and therefore more effective. The follow-ing sections provide a revised version of the Core Principles developed by the interdisciplinary working group (Interdisciplinary Telehealth Standards Working Group, 1999), with specific consideration of the implications of these principles for professional psychology.

### Core Principles for Telehealth Practice

The Core Principles for telehealth practice that follow (summarized in Table 1) are intended to protect clients receiving telehealth services, provide common ground for different health care professions, and provide a basis for additional development of professional and clinical standards and telehealth practice guidelines as determined to be appropriate by each health care profession.

*Principle 1: The basic standards of professional conduct governing each health care profession are not altered by the use of telehealth technologies to deliver health care, conduct research, or provide education. Developed by each profession, these standards focus in part on the practitioner's responsibility to provide ethical and high-quality care.*

Standards of professional conduct such as the "Ethical Principles of Psychologists and Code of Conduct" of the APA (herein-

Table 1
*Ten Interdisciplinary Principles for Professional Practice in Telehealth*

| | |
|---|---|
| Principle 1 | The basic standards of professional conduct governing each health care profession are not altered by the use of telehealth technologies to deliver health care, conduct research, or provide education. Developed by each profession, these standards focus in part on the practitioner's responsibility to provide ethical and high-quality care. |
| Principle 2 | Confidentiality of client visits, client health records, and the integrity of information in the health care information system is essential. |
| Principle 3 | All clients directly involved in a telehealth encounter must be informed about the process, its attendant risks and benefits, and their own rights and responsibilities, and must provide adequate informed consent. |
| Principle 4 | Services provided via telehealth must adhere to the basic assurance of quality and professional health care in accordance with each health care discipline's clinical standards. |
| Principle 5 | Each health care discipline must examine how its patterns of care delivery are affected by telehealth and is responsible for developing its own processes for assuring competence in the delivery of health care via telehealth technologies. |
| Principle 6 | Documentation requirements for telehealth services must be developed that assure documentation of each client encounter with recommendations and treatments, communication with other health care providers as appropriate, and adequate protections for client confidentiality. |
| Principle 7 | Clinical guidelines in the area of telehealth should be based on empirical evidence, when available, and professional consensus among involved health care disciplines. |
| Principle 8 | The integrity and therapeutic value of the relationship between client and health care practitioner should be maintained and not diminished by the use of telehealth technology. |
| Principle 9 | Health care professionals do not need additional licensing to provide services via telehealth technologies. At the same time, telehealth technologies cannot be used as a vehicle for providing services that otherwise are not legally or professionally authorized. |
| Principle 10 | The safety of clients and practitioners must be ensured. Safe hardware and software, combined with demonstrated user competence, are essential components of safe telehealth practice. |

after APA Ethics Code; APA, 1992) are authoritative statements by health care professions that describe the values and responsibilities for which their members are accountable. In combination with state licensing laws, which are often based on these standards, they serve to protect the public. Standards of professional conduct remain relatively stable over time because they reflect the underlying philosophical values of the profession rather than being intended to address specific situational issues. In rare cases, evolving technologies may require changes in or additions to standards of professional conduct, but these standards should not be changed merely because new technologies or modes of treatment make them difficult to meet.

The APA Ethics Committee has made a preliminary review of the APA Ethics Code to determine its relevance to practice through the use of telehealth technologies. The committee issued a statement, "Services by Telephone, Teleconferencing, and Internet" (APA Ethics Committee, 1998) that noted,

Until such time as a more definitive judgment is available, the Ethics Committee recommends that psychologists follow Standard 1.04c, Boundaries of Competence, which indicates that "In those emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists nevertheless take reasonable steps to ensure the competence of their work and to protect patients, clients, students, research participants, and others from harm." Other relevant standards include Assessment (Standards 2.01–2.10), Therapy (Standards 4.01–4.09, especially 4.01 Structuring the Relationship and 4.02 Informed Consent to Therapy), and Confidentiality (Standards 5.01–5.11). Within the General Standards section, . . . [of] particular relevance are 1.03, Professional and Scientific Relationship; 1.04 (a, b, and c), Boundaries of Competence; 1.06, Basis for Scientific and Professional Judgments; 1.07a, Describing the Nature and Results of Psychological Services; 1.14, Avoiding Harm; and 1.25, Fees and Financial Arrangements. Standards under Advertising, particularly 3.01–3.03, are also relevant. (p. 979)

Standards of professional conduct such as the APA Ethics Code are intended to be general and are unlikely to change simply as a result of developing telehealth technology. However, health care professions, including psychology, may need to develop interpretations of their standards of professional conduct as they apply to telehealth services that provide members with guidance in this area. Until such statements emerge, psychologists wishing to provide services through the use of telehealth technologies should review the sections of the APA Ethics Code listed earlier, then carefully think about the service that they hope to offer. The practitioner should be confident that the service to be provided using telehealth meets all the standards required for face-to-face psychological service and should be able to articulate the justification for this conclusion. If the standards cannot be met easily, or if the standards are met to a lower degree than they would be in face-to-face service, practitioners should reconsider offering the service. They must also be aware of the psychology licensing laws and any regulations specifically related to telehealth service provision both in their state of licensure and the state(s) where potential clients reside to be sure that they are legally authorized to perform the activity.

*Principle 2: Confidentiality of client visits, client health records, and the integrity of information in the health care information system is essential.*

A standard of professional conduct that is common to all health care professionals is the responsibility to protect client confidentiality. Because of the particularly sensitive nature of mental health records, this issue is especially important for psychologists. Standard 5 of the APA Ethics Code (privacy and confidentiality) describes psychologists' obligations in this area, which do not change with the use of telehealth technologies.

E-mail, Internet-based data transmission, electronic medical records, and interactive videoconferencing pose complex and difficult issues for psychologists. For example, during a two-way interactive videoconference it may be difficult for psychologists to determine whether a client is truly alone because a family member or another person may be outside the range of the camera. This may be particularly relevant in treating children and adolescents. Partners or children may interrupt communications, overhear communications, or attempt to access a computer or video record. Securing the confidential transmission of data is an equally daunting challenge. Although data encryption technology is constantly improving, the possibility that information transmitted via E-mail or the Internet may be intercepted by a third party is a constant threat.

*Principle 3: All clients directly involved in a telehealth encounter must be informed about the process, the attendant risks and benefits, and their own rights and responsibilities, and must provide adequate informed consent.*

All health professions have standards of professional conduct related to the parameters of the treatment relationship between practitioner and client and the informed consent process. Because of the particular nature of the treatment relationship and the vulnerability of the populations with which they work, this is a particularly important issue for psychologists. Standards 4.01 and 4.02 of the APA Ethics Code elaborate on the responsibilities of the practitioner in structuring the therapeutic relationship and obtaining informed consent from the client.

Practitioners must be clear about the type of service they are providing and the type of relationships they are offering clients when using telehealth. If an educational service is being provided, the practitioner must state this clearly, emphasizing that the information is not to be considered psychotherapeutic. If a psychological service is being provided, the practitioner is responsible for ensuring that Standards 4.01 and 4.02 are met just as they must be met if the service is provided in person.

*Principle 4: Services provided via telehealth must adhere to the basic assurance of quality and professional health care in accordance with each health care discipline's clinical standards.*

The working group agreed on the term *clinical standards* to refer to statements regarding the most permanent knowledge, skills, and core competencies required of health care practitioners in their respective professions. Clinical standards focus on the

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

application of didactic knowledge in the form of clinical skills enacted in client interactions. That is, some health care professions, including nursing, have specific behavioral descriptions of the responsibilities and activities expected of their members in specific clinical situations. The profession of psychology has not issued similarly explicit statements, in part because the nature and variability of the work makes it impossible to create descriptions at such a level of specificity that would apply to the entire range of clinical roles and situations. APA's "General Guidelines for Providers of Psychological Services" (APA, 1987) contain recommendations for psychologists regarding various aspects of their general conduct but are not as detailed or as directive as the clinical standards for some other professions. However, clinical standards are often implicit in the requirements of educational programs, practica and internships, licensing examinations, and other certification processes (such as those established by the American Board of Professional Psychology).

Over time, the knowledge base, skill set, and core competencies needed to practice in the area of telehealth may develop to the point that they provide sufficient and salient enough content for some health professions to create performance standards specifically focused on telehealth. The working group concluded that telehealth technology does not yet provide a sufficient content base, is not yet widely enough applied, and is evolving too rapidly for such standards to be appropriate at this time. Eventually, telehealth technologies may become universal enough within particular professions that the ability to use them will simply be conceptualized as core competencies for practice, making specific statements focused on telehealth superfluous. Some of these issues are considered further in the discussion of certification under Principle 5.

The more important issue raised in Principle 4 arises from the obligation to assure quality in health care. The most common question regarding quality is whether health care services provided via telehealth are at least as good as alternative, face-to-face services. Evaluating this is quite simple conceptually but extremely complex in practice. There is very little research on the effectiveness of telehealth services, particularly as compared with face-to-face services, though such research is currently underway (see Glueckauf et al., 1999; Hufford, Glueckauf, & Webb, 1999).

At the level of health policy, it is sometimes quite easy to answer the question about the relative quality of telehealth services compared with services that otherwise would be available. According to the most recently available statistics, more than 20% of the U.S. population live in rural areas (U.S. Bureau of the Census, 1998), where access to specialty and even primary care is very limited. When such care is urgently needed, it generally requires travel to a metropolitan area at great expenses of time and money. Specific populations, such as Native Americans on isolated reservations, military personnel in remote locations, prison inmates, and homebound individuals, may have even more limited access to health care. In these cases, alternative services are often unavailable, inadequate, or extremely expensive, and there is little question that making some health care services accessible through telehealth represents an improvement.

On the other hand, telehealth services have often been discussed as ways of providing services to underserved urban populations (Muller, et al., 1977; Whitten & Cook, 1999), generally ethnic minorities who are isolated because of their poverty or their culture

and have difficulty accessing traditional health care services. In these cases, basic structural characteristics of health care funding and delivery in the United States, not geographical isolation, are the causes of poor health care access. For these populations, we believe that the question should not be framed in terms of whether telehealth services are as good or better than the health care they are receiving but whether telehealth services are as good or better than health care that could be provided with appropriate resource allocation. If telehealth services are inferior but cheaper, they may simply paper over the deep divide between the health care that is accessible to the affluent and that available to the poor.

The obligation to assure health care quality also has implications at the level of the individual health care professional. Psychologists who wish to offer telehealth services need to think through whether they can competently offer the service in this modality, as described under Principle 2. In addition, psychologists must consider the results they would expect to achieve if the service were delivered face-to-face, whether they expect that they can achieve the same or better results using telehealth, and what indicators they will use to assess whether these results are being achieved.

*Principle 5: Each health care discipline must examine how its patterns of care delivery are affected by telehealth and is responsible for developing its own processes for assuring competence in the delivery of health care via telehealth technologies.*

In Principle 5, the working group took the important position that it is the responsibility of health care professions to assure the competence of their own members. In taking the position that the government and other oversight entities should not be involved in regulating the behavior of health care professionals at this level, health care professions obligate themselves to take leadership in this area. Given the considerable attention currently being devoted to this area by the federal government and by organizations such as the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), health care professions must initiate serious efforts in this direction if they wish to avoid having others do so for them.

A variety of mechanisms function to assure the competence of psychologists. These include training requirements, accreditation requirements, licensing requirements, licensing exams, and continuing education requirements. However, pointing to these general requirements as evidence of psychology's competence in a specific area has sometimes proved to be insufficient. There are two other mechanisms that organized psychology has sometimes used to facilitate the demonstration of competence by its members.

The first such mechanism is practice guidelines. Practice guidelines consist of recommendations to the professional related to his or her conduct and the issues to be considered in particular areas of clinical practice. They do not focus on client outcomes or recommendations for specific treatments or specific clinical procedures at the client level. (The working group made a distinction between practice guidelines and clinical guidelines, which focus at the client level on the delivery of specific treatments and are discussed in the section on Principle 7.) An example of practice guidelines is APA's "Guidelines for Child Custody Evaluations in Divorce Proceedings" (APA, 1994), which focus on recommended conduct and considerations for the practitioner in this area rather than providing algorithms for making decisions about custody

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

recommendations in individual cases. Practice guidelines are generally based on expert and professional consensus about best professional procedures in a particular area. Practice guidelines do not cover every aspect of professional functioning. They are most often directed toward areas in which there is some controversy or question and may be particularly helpful as an aspect of risk management or in circumstances in which health care practice comes into contact with the judicial system.

The health care professions also use certification as a mechanism for assuring competence among their members. Various types of certification are offered for professional specialties and proficiencies in specific areas of practice requiring additional training or experience that is not common to all practitioners in a given profession. An individual practitioner can be certified as a specialist in an area of clinical practice (e.g., emergency medicine, pediatric nursing, neuropsychology) or certified in a particular proficiency, skill, or technique (e.g., cardiopulmonary resuscitation). APA has not been involved in the certification of specialists, which is performed by organizations such as the American Board of Professional Psychology. However, APA's College of Professional Psychology was created to develop certifications in proficiency areas when credentialing in a given service is deemed necessary in the marketplace.

Although it is likely that a variety of certification programs in telehealth will spring up on the basis of their perceived marketability, the working group concluded that it is unwise at this time to formalize or legitimize them as professional requirements. The application of telehealth technology will vary substantially according to profession, and the potential content of a certification in telehealth has not yet sufficiently developed. Eventually, patterns of service delivery via telehealth technology may become evolved and elaborate enough to justify health care professions developing certification processes in this area. The working group took the position that it is best to leave to the individual professions any decisions as to when certification should be conceptualized, the content of that certification, and the processes through which certification should be granted.

Alternatively, telehealth technology may eventually become sufficiently integrated into patterns of training and practice that all members of various health professions will be expected to be proficient with relevant technologies and a specific certification will be unnecessary. The working group maintained that under no circumstances should certification in telehealth by a particular profession or by a separate organization be used as a justification or mechanism for excluding qualified members of other professions from using telehealth technologies in the conduct of their professional practice.

*Principle 6: Documentation requirements for telehealth services must be developed that assure documentation of each client encounter with recommendations and treatments, communication with other health care providers as appropriate, and adequate protections for client confidentiality.*

Documentation requirements for health care services are determined in part by state and federal laws and in part by the institutional policies of health care systems and the requirements of payors. In addition, all health care professions have standards of professional conduct that address the management of client records in clinical practice. Beyond the need to meet these requirements, there are a number of other important reasons for appropriate documentation of health care services (APA, 1993). Conscientious record keeping benefits the client by allowing health care professionals to review the delivery of services and it provides the client's history and current status. Keeping up-to-date records also benefits health care professionals by guiding them to plan and implement an appropriate course of services, review their work, and self-monitor more precisely. In addition, well-documented records may help to protect health care professionals from professional liability if they become subjects of legal or ethical proceedings. For psychologists, specific requirements for clients' records are found in the APA Ethics Code and additional guidance is provided in the APA's "Record Keeping Guidelines" (APA, 1993).

The use of telehealth modalities does not change client record requirements, but this environment does introduce additional factors. For example, in some electronic media, such as E-mail, a permanent verbatim electronic record of any interactions between the client and the health care professional is produced by the computer that transmits the E-mail messages. Health care professionals using two-way video for interactions with clients may choose to make and keep videotapes as records of these contacts. Health care professionals should be aware that these contain vastly more information than would ordinarily be retained in a paper record and may include information that would not be in the client's best interests to release to others. Health care professionals may find themselves in situations where they are legally compelled to turn over videotapes and electronic transcripts to outside parties if these have been retained.

Psychologists will need to think through the procedures they use for keeping client records of telehealth services to ensure that these meet the requirements and recommendations in the documents identified earlier. They must also think through how they will manage communications with other health care professionals (e.g., a client's primary care physician) regarding telehealth encounters. Electronic communications may introduce the potential for interception or inappropriate access to the information by persons other than the intended recipient. When conflicts or potential conflicts appear to exist, psychologists should "use their education, skills, and training to identify the relevant issues, and to attempt to resolve [them] . . . in . . . a way that, to the maximum extent feasible, conforms both to law and to professional practice, as required by ethical principles" (APA, 1993, p. 985).

*Principle 7: Clinical guidelines in the area of telehealth should be based on empirical evidence, when available, and professional consensus among involved health care disciplines.*

In contrast to practice guidelines, which are described under Principle 5, clinical guidelines provide specific recommendations about treatments to be offered to clients. Clinical guidelines are client-directed or client-focused rather than practitioner-focused. They are condition- or treatment-specific (e.g., major depression, pediatric immunizations, mammography) and are most often targeted to conditions that are common or costly because supporting

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

best practices and reducing practice variation in these areas are likely to have the greatest benefits.

It appeared to the working group that at this time there is neither the empirical nor the experiential basis that would be necessary to develop clinical guidelines focusing on the use of telehealth technologies. More important, however, is the fact that clinical guidelines are generally intended to be specific to a particular condition or clinical situation, as described earlier. It seems unlikely that it will be appropriate to develop guidelines based on the medium or tool used to deliver services rather than on the purpose or condition for which the tool is used. However, existing clinical guidelines will need to be examined both by their developers and by individual health care professionals to determine whether telehealth technologies are appropriate mechanisms for delivering the treatments recommended by these guidelines. Research will be needed to determine whether the outcomes of treatments delivered via telehealth are equivalent to those of more traditional modes of service delivery.

*Principle 8: The integrity and therapeutic value of the relationship between client and health care practitioner should be maintained and not diminished by the use of telehealth technology.*

Practitioners in all health care professions appreciate the special nature of the therapeutic relationship between the client and the practitioner. The presence of covenants or oaths for care (e.g., Hippocratic, Nightingale) in some professions exemplify practitioner commitment to the value of this relationship. Psychology has placed a special emphasis—and has provided a good deal of empirical research—on the importance of the therapeutic relationship in the treatment process. Psychologist Barbara Gutek (1995), in her analysis of service interactions in late 20th-century America, wrote of the distinction between relationships and encounters:

> *Relationships* occur when a customer has repeated contact with a particular provider . . . they get to know each other, both as individuals and as role occupants. They expect and anticipate future interaction, and over time develop a history of shared interaction that they can draw on whenever they interact . . . [thus] relationships become more efficient over time. Relationships . . . are not simply friendships and they are conceptually distinct from informal contacts. Instead, relationships are based on the formal organizational structure and on role expectations.
>
> *Encounters*, in contrast . . . typically consist of a single interaction between a customer and a provider, and they are typically fleeting rather than lengthy. Over time, the customer's successive contacts involve different providers . . . so that . . . provider and customer are strangers to each other. Most important, each of these providers is expected to be functionally equivalent. (pp. 7–8)

Many health professionals feel that organizational changes in the health care delivery system and the increasing dominance of managed care systems are accelerating movement away from the therapeutic relationship and toward health-related service encounters. As though guided by the industrial principles of the assembly line, health care is increasingly being broken down into smaller and smaller discrete units of service offered by generic providers. For example, when sick individuals contact telephone triage systems as they are required to do in order to get medical care, they

may be met with the generic greeting, "Hello, you are speaking to a nurse." There are important questions about the extent to which this trend can continue and still provide the necessary ingredients of a therapeutic relationship.

Telehealth technologies have the potential to contribute to the further diminution of the relationship in treatment. It is not hard to imagine a future cottage industry of psychologists sitting at computer terminals, providing services to individuals at remote locations. However, telehealth can also be used to enhance a coordinated therapeutic relationship by, for example, providing home monitoring or continuing contact when face-to-face services are not options. Advice from the professions on maintaining standards of professional conduct when using telehealth technologies will help to ensure that they do not contribute to the further fragmentation of health care delivery.

*Principle 9: Health care professionals do not need additional licensing to provide services via telehealth technologies. At the same time, telehealth technologies cannot be used as a vehicle for providing services that otherwise are not legally or professionally authorized.*

The scope of practice of a health care profession is the range of services or clinical activities that a member of the profession is authorized to offer. Scope of practice is determined four ways:

1. At the state level, scope of practice is defined by licensing laws and related regulations. Licensing laws may explicitly include or exclude specific health care services from the activities authorized for individuals licensed as members of a particular profession.

2. At the professional level, scope of practice refers to the activities or services defined by each health care profession as aspects of that profession's practice. Professional scope of practice is always broader than individual scope of practice because not all of the activities comprising a profession's practice can be conducted by all members of a profession.

3. At the individual level, scope of practice is defined by training and competence to provide services.

4. Finally, a fourth level of scope of practice may exist for practitioners working in health care systems where the system may specify the activities that members of various professions may perform in its facilities.

Individual scopes of practice for many health care practitioners will change as they gain competence in providing services through new technologies. These technologies may also change system scopes of practice. However, the interdisciplinary working group believes that state and professional scopes of practice should not be changed as a result of the development of telehealth technology. State licensing law is based on each state's constitutional responsibility to protect its citizens, and professional scope of practice is driven by the obligations of each profession to ensure ethical and high quality service.

Principle 9 makes it quite clear that professional scope of practice is not changed by the introduction of telehealth tools as technologies for service delivery. In a similar way, the scope of practice defined in state licensure does not need to be changed to include service with these new tools. By asserting that licensure changes are not necessary, this principle addresses concerns within the health care professions and within policymaking bodies that

some professions or individual professionals may attempt to use telehealth service as a vehicle for expanding the scope of practice permitted under their existing licensing laws.

This does not mean that state licensure is not a critical issue in relation to the provision of services via telehealth technologies. Because licensure is state-based, the fact that telehealth services can be provided across state and national boundaries creates complexities for the provider wishing to provide service via telehealth technologies. Currently, the national associations of state licensing boards for many health professions are reviewing this complex issue and some are proposing national licensure, portability, or other changes in state licensing laws to address the concerns of practitioners wishing to provide telehealth services. Until changes in state licensing laws take place, and the changes are consistent in every state, psychologists must remain aware of the legal implications and potential risk of providing a service through telehealth in a state where the practitioner is not licensed.

*Principle 10: The safety of clients and practitioners must be ensured. Safe hardware and software, combined with demonstrated user competence, are essential components of safe telehealth practice.*

A major concern about telehealth technologies is the competent and safe technical use of the equipment by both the practitioner and the client. Practitioners will need to learn how to use telehealth tools correctly and will be responsible for maintaining their technical proficiency. Depending on the technology used, clients may need to demonstrate proficiency in the use of the tools. Practitioners may be held responsible for developing and ensuring client proficiency. If service is provided by a health system, the system will need to ensure that the technical specifications of the equipment are capable of meeting clinical needs. Vendors of telehealth equipment will need to be responsible for providing the information that will enable clients and practitioners to be technically proficient in its use.

Some telehealth applications will require little technical expertise on the part of the practitioner, whereas others will require more sophisticated knowledge of the technology being used. In cases where a telehealth service requires a certain level of technical expertise and equipment, technical standards for the provision of telehealth will be required by the profession. Technical standards address the properties of the equipment, hardware, software, or data transmission that are required in order for a particular service, assessment, or test to be delivered in a valid and reliable fashion. Standards in other fields will also likely be developed as telehealth technology evolves. At this time, the types of equipment that psychologists are most likely to use in the provision of telehealth services, such as two-way interactive videoconferencing, are not sophisticated enough to warrant technical standards. However, if virtual reality technology ever succeeds in replicating the face-to-face interaction and all of its sensory cues to such a degree that psychotherapy can be easily provided through such a system, technical standards will probably be necessary.

Conclusion

The principles developed by the Interdisciplinary Telehealth Standards Working Group make clear that the basic requirements

for health care professionals do not change with the introduction of the tools provided by telehealth technologies. For psychologists, the requirements of the APA Ethics Code must guide their behavior when providing services via telehealth just as in any other practice setting. These include ethical principles related to client confidentiality and informed consent. In a similar way, standards for the quality of health services should not be relaxed, either at an individual or a policy level, simply because services are delivered using a different medium. There is no change in the obligation of practitioners to document their activities or to safeguard the integrity of medical records. The working group also asserted that a health care profession's licensed scope of practice should not change simply because of these new technologies and that additional licensure should not be necessary in order for health care professionals to use them.

Health care in the United States has undergone major change and upheaval over the past two decades. Managed care advocates have promoted a view of health care professionals as wasteful and irresponsible in their provision of services when left to their own devices. Health care systems have pursued goals of reducing practice variation and standardizing care. Professionals have increasingly been expected to accept roles as interchangeable providers offering health care based on the service encounter rather than the relationship. This environment has encouraged the proliferation of increasingly specific rules (i.e., standards, guidelines, practice parameters, critical pathways, best practices, etc.) for the provision of care. In some cases, these efforts undoubtedly enhance the quality and cost-effectiveness of health care. On the other hand, in the face of anxiety related to the costs, quality, and viability of the U.S. health care system, it seems as though a fantasy has been offered that if the behavior of health care professionals can be regulated closely enough, everything will be all right.

The trend toward microregulation of health professionals runs contrary to the faith that professional psychology has traditionally held in the training, competence, and judgment of its practitioners. (This may be one reason why many psychologists appear to have such a difficult time with the current culture of health care.) Organized psychology has generally based its policies on the assumption that, given the appropriate provision of relevant information, highly trained doctoral-level psychologists are capable of making appropriate decisions about the provision of care within the boundaries of their own competence. In our opinion, this assumption is appropriate and should be extended to the use of telehealth technologies.

As health care professionals integrate telehealth into the services they deliver, it is most appropriately left to each profession to determine what additional guidance is needed by its members. It is also most appropriate for the profession to provide that guidance. An important component of future steps in that direction will be the participation of consumers and patient advocacy groups. The interdisciplinary principles described earlier are intended to provide a framework for such efforts by professional psychology.

References

American Medical Association. (1997, November 10). Telemedicine triples in one year, survey says. *American Medical News, 40*(42), p. 17.
American Psychological Association. (1987). General guidelines for providers of psychological services. *American Psychologist, 42*, 712–723.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

American Psychological Association. (1992). Ethical principles of psychologists and code of conduct. *American Psychologist, 47,* 1597–1611.

American Psychological Association. (1993). Record keeping guidelines. *American Psychologist, 48,* 984–986.

American Psychological Association. (1994). Guidelines for child custody evaluations in divorce proceedings. *American Psychologist, 49,* 677–680.

American Psychological Association Ethics Committee. (1998). Services by telephone, teleconferencing, and internet: A statement by the Ethics Committee of the American Psychological Association. *American Psychologist, 53,* 979.

Baschur, R. L. (1997). Critical issues in telemedicine. *Telemedicine Journal, 3,* 113–126.

DeLeon, P. (1997). Steadily evolving into the 21st century: Telehealth. *Psychotherapy Bulletin, 33*(1), 9–13.

Glueckauf, R. L., Hufford, B., Whitton, J., Baxter, J., Schneider, P., Kain, J., & Vogelgesang, S. (1999). Telehealth: Emerging technology in rehabilitation and health care. In M. G. Eisenberg, R. L. Glueckauf, & H. H. Zaretsky (Eds.), *Medical aspects of disability: A handbook for the rehabilitation professional* (2nd ed., pp. 625–639). New York: Springer.

Gutek, B. A. (1995). *The dynamics of service: Reflections on the changing nature of customer/provider interactions.* San Francisco: Jossey-Bass.

Haas, L. J., Benedict, J. G., & Kobos, J. C. (1996). Psychotherapy by telephone: Risks and benefits for psychologists and consumers. *Professional Psychology: Research and Practice, 27,* 154–160.

Hufford, B. J., Glueckauf, R. L., & Webb, P. M. (1999). Home-based interactive videoconferencing for adolescents with epilepsy and their families. *Rehabilitation Psychology, 44,* 1–18.

Interdisciplinary Telehealth Standards Working Group. (1999). *Core principles in telehealth.* Washington, DC: American Nurses Publishing.

Milholland, D. K. (1997, April). Telehealth: A tool for nursing practice. *Nursing Trends and Issues, 2,* 4.

Muller, C., Marshall, C. L., Krasner, M., Cunningham, N., Wallerstein, E., & Thomstad, B. (1977). Cost factors in urban telemedicine. *Medical Care, 15,* 251–259.

Newman, R. (1998, May). How are telehealth and managed-care alike? *APA Monitor,* p. 25.

Nickelson, D. W. (1996). Behavioral telehealth: Emerging practice, research, and policy opportunities. *Behavioral Sciences and the Law, 14,* 443–457.

Nickelson, D. W. (1998). Telehealth and the evolving health care system: Strategic opportunities for professional psychology. *Professional Psychology: Research and Practice, 29,* 527–535.

U.S. Bureau of the Census (1998). *Statistical abstract of the United States* (118th ed.). Washington, DC: Berman Associates.

Whitten, P. S., & Cook, D. J. (1999). School-based telemedicine: Using technology to bring health care to inner-city children. *Journal of Telemedicine and Telecare, 5*(Suppl. 1), 23–25.

Received April 9, 1999
Revision received September 13, 1999
Accepted November 24, 1999 ■




🏠 **Telemedicine and e-Health**   >   **VOL. 19, NO. 6 |**  Special Section on Telemental Health             normal

# The Effectiveness of Telemental Health: A 2013 Review

Donald M. Hilty, Daphne C. Ferrer, Michelle Burke Parish, Barb Johnston, Edward J. Callahan, and Peter M. Yellowlees

**Published Online:** 22 May 2013 | **Doi:** https://doi.org/10.1089/tmj.2013.0075

## Abstract

***Introduction:***The effectiveness of any new technology is typically measured in order to determine whether it successfully achieves equal or superior objectives over what is currently offered. Research in telemental health—in this article mainly referring to telepsychiatry and psychological services—has advanced rapidly since 2003, and a new effectiveness review is needed.***Materials and Methods:***The authors reviewed the published literature to synthesize information on what is and what is not effective related to telemental health. Terms for the search included, but were not limited to, telepsychiatry, effectiveness, mental health, e-health, videoconferencing, telemedicine, cost, access, and international.***Results:***Telemental health is effective for diagnosis and assessment across many populations (adult, child, geriatric, and ethnic) and for disorders in many settings (emergency, home health) and appears to be comparable to in-person care. In addition, this review has identified new models of care (i.e., collaborative care, asynchronous, mobile) with equally positive outcomes.***Conclusions:***Telemental health is effective and increases access to care. Future directions suggest the need for more research on service models, specific disorders, the issues relevant to culture and language, and cost.

## Access content

To read the fulltext, please use one of the options below to sign in or purchase access.

---

Personal login

Institutional Login

OpenAthens

Register for access

We use cookies to give you a better experience on liebertpub.com. By continuing to use our site, you are agreeing to the use of cookies as set in our Cookie Policy.

OK

**$51.00**

🛒 Add to cart

**Restore content access**

This functionality works only for purchases made as a guest

**Subscribe/Renew**                                                                                    �septembre

**Recommend This Title**                                                                               ➥

**Sign Up for TOC Alerts**

⚠️ **Society Access**

If you are a member of a society that has access to this content please log in via your society website and then return to this publication.





© 2023 Mary Ann Liebert, Inc., publishers. All rights reserved, USA and worldwide.
Call us toll free at (800) M-LIEBERT (800-654-3237).



We use cookies to give you a better experience on liebertpub.com. By continuing to use our site, you are agreeing to the use of cookies as set in our Cookie Policy.

OK



🏠 **Telemedicine and e-Health**  >  **VOL. 22, NO. 2** |  Original Research            normal

# The Empirical Evidence for Telemedicine Interventions in Mental Disorders

Rashid L. Bashshur, Gary W. Shannon, Noura Bashshur, and Peter M. Yellowlees

Published Online: 27 Jan 2016 | Doi: https://doi.org/10.1089/tmj.2015.0206

## Abstract

***Problem and Objective:****This research derives from the confluence of several factors, namely, the prevalence of a complex array of mental health issues across age, social, ethnic, and economic groups, an increasingly critical shortage of mental health professionals and the associated disability and productivity loss in the population, and the potential of telemental health (TMH) to ameliorate these problems. Definitive information regarding the true merit of telemedicine applications and intervention is now of paramount importance among policymakers, providers of care, researchers, payers, program developers, and the public at large. This is necessary for rational policymaking, prudent resource allocation decisions, and informed strategic planning. This article is aimed at assessing the state of scientific knowledge regarding the merit of telemedicine interventions in the treatment of mental disorders (TMH) in terms of feasibility/acceptance, effects on medication compliance, health outcomes, and cost.****Materials and Methods:****We started by casting a wide net to identify the relevant studies and to examine in detail the content of studies that met the eligibility criteria for inclusion. Only studies that met rigorous methodological criteria were included. Necessary details include the specific nature and content of the intervention, the research methodology, clinical focus, technological configuration, and the modality of the intervention.****Results:****The published scientific literature on TMH reveals strong and consistent evidence of the feasibility of this modality of care and its acceptance by its intended users, as well as uniform indication of improvement in symptomology and quality of life among patients across a broad range of demographic and diagnostic groups. Similarly, positive trends are shown in terms of cost savings.****Conclusion:****There is substantial empirical evidence for supporting the use of telemedicine interventions in patients with mental disorders.*

## Access content

To read the fulltext, please use one of the options below to sign in or purchase access.

We use cookies to give you a better experience on liebertpub.com. By continuing to use our site, you are agreeing to the use of cookies as set in our Cookie Policy.

OK

9/19/23, 7:43 AM    Therapist Factors in Internet-Delivered Cognitive Behavioural Therapy for Major Depressive Disorder: Cognitive Behaviour Therap…

Case 2:90-cv-00520-KJM-SCR    Document 8253-3    Filed 05/28/24    Page 193 of 329

 Log in | Register   Cart

Home ▸ All Journals ▸ Cognitive Behaviour Therapy ▸ List of Issues ▸ Volume 38, Issue 4
▸ Therapist Factors in Internet-Delivered ....

**Cognitive Behaviour Therapy** ›
Volume 38, 2009 - Issue 4

| 1,284 | 32 | 1 |
|-------|-----|---|
| Views | CrossRef citations to date | Altmetric |

Original Articles

# Therapist Factors in Internet-Delivered Cognitive Behavioural Therapy for Major Depressive Disorder

**Jonas Almlöv** ✉, **Per Carlbring, Thomas Berger, Pim Cuijpers** & **Gerhard Andersson**

Pages 247-254 | Received 30 Mar 2009, Accepted 10 Jun 2009, Published online: 02 Oct 2009

❝ Cite this article    🔗 https://doi.org/10.1080/16506070903116935



Sample our
Behavioral Sciences
Journals
>> **Sign in here** to start your access
to the latest two volumes for 14 days

 Full Article     Figures & data     References     Citations     Metrics

 Reprints & Permissions    Read this article

## Abstract

Internet-delivered cognitive behavioural therapy (CBT) can be an effective method for treating major depression, but it often works best when therapist support is provided in the form of e-mail support or telephone calls. The authors investigated whether there were any intraclass correlations within therapists when delivering CBT for major depression via the Internet. They included data from two trials involving 10 therapists treating a total of 103 patients. The results of a nested one-way model in which participants were treated as raters for different therapists indicated that measures

Case 2:90-cv-00520-KJM-SCR    Document 8253-3    Filed 05/28/24    Page 194 of 329

pertaining to symptom reductions (Beck Depression Inventory, Montgomery-Åsberg Depression Rating Scale–Self Report, and Beck Anxiety Inventory) did not support a clustering of data within therapists. However, the outcome on a secondary measure of life satisfaction (Quality of Life Inventory) yielded a significant intraclass correlation coefficient for therapists ($r$ = .24, $p$ = .001). The authors propose that text-based treatments are less sensitive to therapist effects when it comes to the primary symptom measures, but that treatment effects not directly targeted by the specific treatment program may be more dependent on the way the support is given and by whom (therapist effect). Limitations of the study are discussed.

🔍 **Keywords:** Internet   major depression   therapist factors   nested models.

## Acknowledgments

This study was prepared with the support from a research grant provided by the Swedish Research Council. We acknowledge our co-workers in the Klara and Stella projects.

❮ **Previous** article          **View** issue table of contents          **Next** article ❯

Log in via your institution

❯  🏛  Access through your institution

Log in to Taylor & Francis Online

❯   Log in

Restore content access

❯   Restore content access for purchases made as guest

9/19/23, 7:43 AM  Therapist Factors in Internet-Delivered Cognitive Behavioural Therapy for Major Depressive Disorder: Cognitive Behaviour Therap…

Case 2:90-cv-00520-KJM-SCR     Document 8253-3     Filed 05/28/24     Page 195 of 329

## Purchase options *

Save for later

### PDF download + Online access
- 48 hours access to article PDF & online version
- Article PDF can be downloaded
- Article PDF can be printed

**USD 50.00**

🛒 Add to cart

### Issue Purchase
- 30 days online access to complete issue
- Article PDFs can be downloaded
- Article PDFs can be printed

**USD 126.00**

🛒 Add to cart

* Local tax will be added as applicable

## Related Research ⓘ

**People also read**          Recommended articles          Cited by 32

Clinical efficacy and economic evaluation of online cognitive behavioral therapy for major depressive disorder: a systematic review and meta-analysis ›

Elayne Ahern et al.
Expert Review of Pharmacoeconomics & Outcomes Research
Published online: 30 Nov 2017

Internet-based vs. face-to-face cognitive behavior therapy for psychiatric and somatic disorders: an updated systematic review and meta-analysis ›

Per Carlbring et al.
Cognitive Behaviour Therapy

Internet-Based and Other Computerized Psychological Treatments for Adult Depression: A Meta-Analysis  ›

Gerhard Andersson et al.

Cognitive Behaviour Therapy

Published online: 15 Dec 2009

View more

9/19/23, 7:43 AM    Therapist Factors in Internet-Delivered Cognitive Behavioural Therapy for Major Depressive Disorder: Cognitive Behaviour Therap…

Case 2:90-cv-00520-KJM-SCR    Document 8253-3    Filed 05/28/24    Page 197 of 329

## Information for

Authors

R&D professionals

Editors

Librarians

Societies

## Opportunities

Reprints and e-prints

Advertising solutions

Accelerated publication

Corporate access solutions

## Open access

Overview

Open journals

Open Select

Dove Medical Press

F1000Research

## Help and information

Help and contact

Newsroom

All journals

Books

## Keep up to date

Register to receive personalised research and resources
by email

 Sign me up

  

 

Copyright © 2023 Informa UK Limited    Privacy policy    Cookies    Terms & conditions

Accessibility

Registered in England & Wales No. 3099067
5 Howick Place | London | SW1P 1WG

# Treatment for Anxiety and Depression via Clinical Videoconferencing: Evidence Base and Barriers to Expanded Access in Practice

Peter W. Tuerk, Ph.D., Stephanie M. Keller, Ph.D., Ron Acierno, Ph.D.

This review summarizes six decades of clinical outcome research relevant to evidence-based practices for depression and anxiety delivered via clinical videoconferencing. The authors conducted a literature search of previous systematic reviews and an updated search of publications specific to anxiety and depression. Overall, strong evidence supports the safety and clinical effectiveness of administering evidence-based psychotherapy for anxiety and depression via clinical videoconferencing among heterogeneous populations and age ranges, and in multiple care settings, with similar outcomes to in-person care. Despite the overall clinical effectiveness of the modality, the authors discuss common logistical and institutional barriers to long-term effective implementation. Future systems-level research is required to investigate replicable and sustainable models for implementing and expanding access to evidence-based psychotherapies via clinical videoconferencing.

*Focus 2018; 16:363–369; doi: 10.1176/appi.focus.20180027*

In this article, we review evidence-based practices (EBPs) for anxiety and depression delivered via clinical videoconferencing with the goal of providing a narrative summary for practicing clinicians. The topic of clinical videoconferencing (often referred to as *telehealth, telemental health, telemedicine,* or *telepsychiatry*) is expansive; even when the focus is significantly narrowed to include only clinical videoconferencing modalities for anxiety and depression, evidence related to feasibility, satisfaction, clinical outcomes, implementation, and logistics are relevant and available. Naturally, these topics can be and are further demarcated by particular patient populations and care settings. What is gained by inclusion and breadth of knowledge in one area is necessarily borrowed from depth or detail in any other particular area (1). However, consistent themes have emerged in the literature, such as broad patient satisfaction and, more recently, broad clinical effectiveness related to behavioral interventions conducted via the modality.

However, the vast majority of peer-reviewed information regarding clinical videoconferencing was generated by early adapters (2). Thus, much of the information available is understandably based on the motivations, skill sets, resources, and interests of telehealth champions, which could be viewed as somewhat threatening the external validity or relevance of findings to the field in general. This is often immediately obvious to independent clinicians attempting to implement telehealth without sufficient institutional support, as well as to institutions attempting the same without sufficient clinician interest. Yet, champion-related bias in the literature is somewhat counterbalanced by the sheer

scale of consistently positive findings in diverse treatment settings and a broad, robust, and stepwise literature base related to the modality in general, which is often obscured in any one diagnosis- or treatment-specific study. Even thorough review articles, often organized by clinical population or treatment setting, rather than chronologically or by method, sometimes do not convey the narrative arc and history of how and what is known and not known about clinical videoconferencing.

To be clear, an abundance of evidence now supports the safety, effectiveness, and utility of clinical videoconferencing for behavioral interventions across many patient populations and clinical settings, but the disconnect between champion-generated information and the needs of the field is continually highlighted by findings pointing to consistent provider concerns regarding the initiation of clinical videoconferencing (3–5). Common apprehensions raised by providers range from broad clinical concerns, such as patient safety, to finer grained logistical barriers, such as exchanging treatment materials between patient and provider (e.g., self-rating scales) (6). Notably, provider-level concerns regarding the initiation of clinical videoconferencing persist even while institutional-level adoption of telehealth is bourgeoning (7), with 42% of U.S. hospitals having some form of telehealth capability and the commensurate expectation that providers will make use of those capabilities (8). Indeed, the field has progressed to the point where providers who may not be inherently interested in offering clinical videoconferencing services often find themselves compelled to do so. This is concerning given that evidence suggests the quality

and sustainability of such services hinge on clinician acceptance (9–11) and that such acceptance can be biased by pretreatment assumptions regarding the effectiveness and practicality of the modality (5).

Although in aggregate the literature provides sufficient information to help address most provider concerns, it can be difficult to know which resources to access. Accordingly, in line with the goal to provide relevant information for practicing clinicians, we endeavor to convey a thorough but succinct summary and narrative review of clinical videoconferencing for anxiety and depression to address initial clinical concerns. In so doing, we briefly summarize systematic reviews related to behavioral telehealth in general and consider more recent evidence related to anxiety and depression not included in previous reviews.

## METHODS

In this review, we gather and organize provider-relevant information regarding clinical videoconferencing in general to serve as a backdrop for information specifically related to the treatment of anxiety and depression. Accordingly, we conducted two separate searches using EBSCOhost, which consists of 35 databases, including MEDLINE and PsycINFO. The first search, conducted through May 20, 2018, targeted systematic review articles related to behavioral interventions via clinical videoconferencing. Thus, reviews related to nonclinical outcomes such as program costs or technology platforms were excluded. A second search identified more recent publications not included in the identified reviews. This search spanned from January 1, 2012, to May 20, 2018, and targeted individual studies related to clinical videoconferencing for anxiety spectrum and depressive disorders only. The bibliographies of all identified publications were also cross-referenced with the search results to identify potential additional publications.

Results from the first search were used to construct a narrative summary of systematic reviews related to behavioral telehealth in general. We then used results from both searches to construct a summary of evidence related to the treatment of anxiety and depression with EBPs, specifically organized by methodology type, including the following a priori categories: clinical case studies, noncontrolled trials and nonrandomized group comparisons, randomized controlled trials (RCTs), and randomized noninferiority trials.

## RESULTS

### Summary of Systematic Reviews Related to Behavioral Telehealth

Before the onset of rigorous noninferiority trials of specific EBPs via telehealth, the field had generated sizable amounts of data related to telepsychiatry and telemental health, in general, and a number of summative reviews. This substantial body of reviewed literature provided important information regarding the feasibility and safety of and satisfaction with clinical videoconferencing. In particular, three separate but sequentially staged reviews spanning the literature from 1970 to 2008 considered 279 peer-reviewed investigations, taking care to not overlap or double count individual citations (12–14). The reviewers found that, taken together, earlier investigations, including mostly case studies and novel telehealth applications, provided strong evidence for patient satisfaction, safety, and the reliability of clinical assessment via clinical videoconferencing (12, 13). However, in the earlier literature reviewers emphasized a general lack of methodological rigor and minimal evidence related to cognitive-behavioral therapy (CBT) outcomes for specific mental health diagnoses. Reviewed studies leading up to 2008 contained more direct comparisons of clinical videoconferencing versus in-person care, including manualized CBT treatments that demonstrated comparable clinical outcomes, while also substantially supporting earlier findings related to high patient satisfaction ratings and patient safety (13). Here, too, however, reviewers noted that a lack of random assignment, small sample sizes, or both prevented definitive conclusions regarding relative clinical outcome effect sizes of in person versus clinical videoconferencing care.

Notably, two independent reviews of telepsychiatry publications spanning from 1965 to 2003 (15, 16), one spanning from 1998 to 2006 (17), one spanning from 1997 to 2008 that examined depression (but included only four studies specific to clinical videoconferencing) (18), one spanning from 1997 to 2010 (19), one spanning from 2000 to 2012 (20), one spanning from 2000 to 2016 (21), one spanning from 2003 to 2013 (22), and one specifically related to the treatment of anxiety disorders spanning from 2004 to 2014 (23) all contained strikingly similar conclusions. These nine systematic reviews, conducted in overlapping but progressing timeframes, conveyed strong evidence for behavioral telehealth's feasibility, acceptability, and patient satisfaction and also noted positive and significant clinical outcomes across multiple contexts that were consistently on par with in-person care. However, all also conveyed the need for continued and more rigorous research for definitive conclusions regarding equivalency and noninferiority of clinical outcomes. Also notable was a subtle but reoccurring theme in many of the reviews that provider satisfaction with clinical videoconferencing, although adequate, still often lagged behind patient satisfaction, mostly because of administrative (e.g., new or different scheduling procedures, room logistics, or note requirements) or technical issues (e.g., quality of conferencing software or equipment) rather than clinical concerns.

### Clinical Videoconferencing Evidence-Based Practices for the Treatment of Anxiety and Depression

Here we consider only studies specifically related to clinical videoconferencing to address anxiety spectrum and depressive disorders. The presentation of investigations is primarily organized by methodological design rather than

**TABLE 1. Reviewed EBP Clinical Videoconferencing Studies for Anxiety and Depression by Design Type[a]**

| Publication | Design (N=Telehealth/Control) | Diagnosis | Treatment |
|---|---|---|---|
| Manchanda et al., 1998 (28) | Case study | Anxiety, depression | CBT |
| Cowain, 2001 (26) | Case study | Panic disorder, agoraphobia | CBT w/exposure |
| Himle et al., 2006 (27) | Case study | OCD | CBT, ERP |
| Goetter et al., 2013 (28) | Case study | OCD | CBT, ERP |
| Tuerk et al., 2009 (30) | Case study | PTSD or SUD | CBT, PE |
| Hassija and Gray, 2009 (29) | Case study | PTSD | CBT w/exposure |
| Bouchard et al., 2000 (39) | Noncontrolled (N=8) | Panic, agoraphobia | CBT w/exposure |
| Griffiths et al., 2006 (40) | Noncontrolled (N=15) | Anxiety, depression | CBT |
| Yuen et al., 2013 (41) | Noncontrolled (N=24) | Social anxiety | ABBT |
| Morland et al., 2011 (38) | Noncontrolled (N=13) | PTSD | Group CBT |
| Stewart et al., 2017 (37) | Noncontrolled (N=15) | PTSD | TF-CBT |
| Hassija and Gray, 2011 (31) | Noncontrolled (N=15) | PTSD, depression | PE or CPT |
| Goetter et al., 2014 (34) | Noncontrolled (N=15) | OCD | ERP |
| Bouchard et al., 2004 (42) | Between groups (N=11/10) | Panic, agoraphobia | CBT w/exposure |
| Germain et al., 2009 (36) | Between groups (N=16/32) | PTSD | CBT w/exposure |
| Gros et al., 2011 (35) | Between groups (N=62/27) | PTSD | CBT w/exposure |
| Tuerk et al., 2010 (32) | Between groups (N=12/35) | PTSD, depression | PE |
| Himle et al., 2012 (33) | RCT (N=10/10) | Tic disorder | CBIT |
| De Las Cuevas et al., 2006 (50) | RCT (N=70/70) | Mixed *ICD-10* | MM or CBT |
| Stubbings et al., 2013 (47) | RCT (N=14/12) | Mood or anxiety disorder | CBT |
| Choi et al., 2014 (51) | RCT (N=43/42) | Depression | PST |
| Storch et al., 2011 (48) | RCT (N=16/15)[b] | OCD | ERP |
| Fortney et al., 2007 (53) | RCT (N=189/241) | Depression | CC |
| Fortney et al., 2013 (54) | RCT (N=179/185) | Depression | CC |
| Moreno et al., 2012 (55) | RCT (N=80/70)[c] | Depression | MM |
| Nelson et al., 2003 (52) | RCT (N=14/14) | Depression | CBT |
| Ruskin et al., 2004 (49) | RCT (N=59/60) | Depression | MM w/counseling |
| Strachan et al., 2012 (43) | RCT (N=20/20) | Depression, PTSD | BATE |
| Frueh et al., 2007 (46) | RCT (N=17/21) | PTSD | CBT |
| Yuen et al., 2013 (41) | RCT (N=23/29) | PTSD | PE |
| Ziemba et al., 2014 (44) | RCT (N=9/9) | PTSD | CBT |
| Egede et al., 2015 (60) | RCT noninferiority (N=120/121) | Depression | BA |
| Acierno et al., 2016 (57) | RCT noninferiority (N=111/121) | Depression, PTSD | BATE |
| Acierno et al., 2017 (56) | RCT noninferiority (N=74/76) | PTSD | PE |
| Moreland et al., 2014 (58) | RCT noninferiority (N=61/64) | PTSD | CPT |

[a] ABBT, acceptance-based behavior therapy; BA, behavioral activation; BATE, behavioral activation with therapeutic exposure; CBIT, comprehensive behavioral intervention for tics; CBT, cognitive-behavioral therapy; CC, collaborative care; CPT, cognitive processing therapy; ERP, exposure with response prevention; MM, medication management; OCD, obsessive-compulsive disorder; PE, prolonged exposure; PST, problem-solving therapy; PTSD, posttraumatic stress disorder; RCT, randomized controlled trial; SUD, substance use disorder; TF-CBT, trauma-focused cognitive-behavioral therapy; w/, with.
[b] Waitlist control.
[c] Treatment-as-usual control.

disorder to provide a stepwise view that reflects the development of the evidence base as a whole. Table 1 lists the reviewed studies.

*Clinical case studies.* By the 2000s, telehealth research in the behavioral realm had shifted from a focus on feasibility and acceptability to clinical effectiveness (24). Clinical case studies documenting traditional process-related outcomes also began documenting large reductions in symptoms as determined by standardized and validated measures of major depression (25), agoraphobia (26), obsessive-compulsive disorder (27, 28), and posttraumatic stress disorder (PTSD) (29, 30).

As expected, EBP researchers often incorporated their earlier case studies into integrated platforms of research, carefully building evidence and expertise for the execution of larger sample pilot research. For example, four of the separate research teams cited earlier (27–30) followed their case studies with larger trials (31–34). This fairly common

and predictable pattern is notable for at least two reasons. The accumulation of knowledge, comfort, confidence, practice, and logistical expertise in clinical videoconferencing paved the way, first, for future within-group research and, second, for within-group competent implementation. From this perspective, it is perhaps easier to understand the gulf between many clinicians who remain skeptical about initiating clinical videoconferencing (3, 5) and researchers of the modality, who are often the most vocal advocates as a result of years of practice and familiarity with its strengths and weaknesses.

*Noncontrolled trials and nonrandomized group comparisons.* Small- to medium-sized investigations of EBPs delivered via clinical videoconferencing span ecologies and settings. Funded and unfunded research projects are often able to take advantage of existing telehealth infrastructures in health care networks to investigate the impact of EBPs

delivered via this modality. For example, investigations of treatments for PTSD delivered in established telehealth ecologies have demonstrated positive effects for general trauma-related CBT protocols, including common components of exposure and cognitive restructuring (31, 35, 36), and for specific protocols, such as prolonged exposure (32), trauma-focused CBT (37), and group cognitive processing therapy (38). Notably, only one nonrandomized investigation demonstrated a statistically significant advantage for the in-person comparison group (35), although the authors interpreted the effect to be related to a larger-than-normal effect size in the in-person arm rather than a deficiency in the telehealth arm. Other studies, such as investigations of CBT for panic disorder with agoraphobia (39) and CBT for anxiety and depression (40), avoided the use of existing telehealth infrastructures to study clinical effects specifically when initiating new programming, and another study of acceptance-based behavior therapy for social anxiety disorder (41) used a widely available commercial Web-based application for videoconferencing. Although these investigations lacked randomized controls, they all demonstrated positive clinical effects, with no overt indications that clinical videoconferencing was less effective than standard in-person care. Moreover, such studies confirmed and extended findings related to patient safety and, overall, firmly established that logistical, administrative, and technological issues in clinical videoconferencing were the source of provider concerns regarding effective implementation, rather than concerns about patient-provider clinical dynamics or therapeutic alliance, which were uniformly robust in clinical videoconferencing CBT contexts (42).

*Randomized controlled trials.* The advent of RCTs investigating specific CBT protocols for anxiety spectrum and depressive disorders delivered via clinical videoconferencing largely ameliorated concerns that the positive clinical outcomes found in uncontrolled trials were the result of self-selection, therapist selection, or other confounding factors. Three RCTs demonstrated robust CBT treatment effects for PTSD, with no differences in primary clinical outcomes between the clinical videoconferencing and in-person groups (43–45), and a fourth RCT that investigated group social skills training for PTSD delivered either by a therapist in the treatment room or via video conferencing (46) demonstrated modest clinical change but also found no differences between the groups. RCTs of CBT for anxiety (47), childhood tic disorder (33), and obsessive-compulsive disorder among youth (48) also demonstrated large treatment effects for the clinical videoconferencing conditions with no differences between in-person and telehealth groups on primary clinical outcome measures.

Similarly, clinical videoconferencing RCTs for the treatment of depression using medication management and supportive counseling (49), medication management and CBT (50), and problem-solving therapy (51) evidenced clinical benefit and no differences in outcomes between the clinical videoconferencing and in-person groups. One RCT that used CBT for childhood depression (52) did evidence between-group differences, but they favored the clinical videoconferencing group, which demonstrated a faster rate of improvement.

RCTs investigating the management of depression have also revealed substantially better clinical results for telehealth-facilitated collaborative care in rural clinics compared with treatment as usual (53) and for telehealth collaborative care compared with office-based collaborative care (54), as well as better results for home-based medication management compared with primary care treatment as usual for underserved populations (55). These collaborative care examples used telehealth to facilitate augmented levels of care and services that would not have been achievable without the use of technology. Thus, although measurable benefits related to augmented services are not surprising, the use of treatment-as-usual control conditions was an ecologically valid methodological choice. These studies and collaborations also generated a good deal of pragmatic process-oriented and logistical knowledge for the field.

*Randomized noninferiority trials.* More recently, the field has generated rigorous, gold-standard evidence in support of clinical videoconferencing modalities for PTSD and depression. Large-sample noninferiority (i.e., "as good as") trials have demonstrated that CBT protocols delivered via video conferencing are no less effective than in-person therapy for the treatment of PTSD with prolonged exposure (56), behavioral activation and therapeutic exposure (57), and cognitive processing therapy (58). Another equivalency trial of cognitive processing therapy did not meet statistical significance for equivalence as a result of larger-than-expected treatment dropout in both arms (59), although the demonstrated effects of the two groups were very similar. Notably, the reported pretreatment-posttreatment effect sizes for the noninferiority cognitive processing therapy (58) and prolonged exposure (57) trials were $d$=0.72 and $d$=1.24 (55), respectively, indicating that videoconferencing modalities produce similar results to in-person care even when treatment effects span from large to very large. In other words, the clinical videoconferencing modalities are not merely providing a medium for nonspecific effects such as warmth, empathy, and positive regard but are also conveying the specific and longer term effective components of treatment. One large-scale rigorous noninferiority trial investigating diagnosis remission rates for behavioral activation in 241 older adults with depression also demonstrated noninferiority for clinical videoconferencing compared with in-person care, with 12-month remission rates of 43% and 48%, respectively (60).

## DISCUSSION

The investigations summarized here demonstrate that clinical videoconferencing has been used to deliver feasible,

acceptable, safe, and effective evidence-based care for anxiety and depression to patients across the life course, in both individual and group formats as well as in real-world standard care settings, collaborative care settings, and, importantly, in unsupervised settings, as five of the trials (two RCTs, two RCT noninferiority, one noncontrolled) examined exposure or exposure with response prevention delivered via videoconferencing directly into clients' homes (34, 45, 48, 56, 57). Notably, this summary is limited to clinical videoconferencing for anxiety and depression only, although outcome data supportive of the modality have emerged across a wide range of behavioral interventions, for example, diverse contexts such as smoking cessation (61) and bulimia nervosa (62).

Although the results of this and previous reviews are supportive of clinical videoconferencing in general, many compelling theoretical and logistical complications exist in relation to the modality for particular diagnoses, treatments, or populations that merit careful and continued investigation. However, at this point, without such identified a priori or compelling counterindications, we believe it is likely unnecessary to cycle through each and every behavioral EBP to validate the efficacy of clinical videoconferencing compared with in-person care.

Telehealth's ability to overcome geographic and stigma-related barriers to care can increase access and encourage utilization by lowering costs to patients in terms of transportation, travel time, missed work (63–65), and child care costs, which are particularly salient issues for those who live in rural areas (66, 67). Yet, there are additional factors to consider that may complicate the effective delivery of telemental health services, including the availability of EBP-trained therapists, unintentional or paradoxical consequences related to expanding referral streams, and institutional nonalignment.

Too few therapists are trained in or regularly provide EBPs in general (68). Moreover, there is nothing inherent in the expansion of telehealth infrastructures that dictates commensurate expansion of EBP-trained and practicing therapists. Therefore, although the field is potentially widening the pool of patients who can benefit from EBPs, there is not always structural support (or intention) to increase the number of EBP-trained providers in facilities. Accordingly, when and where total EBP capacity is not increased (via training or hiring more EBP therapists), we must take care to not confuse shifting access to EBPs with expanding access to EBPs. Although the telehealth literature often focuses on the importance of institutional- and provider-level engagement in addressing barriers to technology adoption (3), the availability of human resources, hiring, training, and capacity to use those technologies specifically for EBPs is often an unaddressed assumption, or beyond the scope of investigations. Overall, the growth of telehealth capacity in health care systems does not solve EBP access issues but merely provides another front in ongoing efforts to disseminate evidence-based care practices. Indeed, without careful and

ongoing attention, telehealth infrastructures specifically built for the delivery of evidence-based care often end up being used for general or supportive counseling.

Outside the context of EBP research trials, expanded telehealth capacity can actually threaten EBP programming in health care systems for a number of different but converging reasons. The typical difficulty of developing and maintaining tailored referral streams for specialty mental health care programming is amplified in telehealth settings, where referring providers and teams are not located in the same place (2). In addition, because telehealth channels often connect providers to stressed or overcommitted rural clinics that may have limited in-person resources, the comparative demand for supportive counseling or case management may be high. At the same time, there is often pressure on teleproviders to accept new referrals, regardless of diagnosis or specific treatment needs, to demonstrate productivity or not threaten fragile or developing referral streams. Also, telehealth implementation is almost always associated with an increased administrative burden on providers (e.g., training, new billing models, information technology issues), even without consideration of at-distance material exchange of EBP self-assessments, worksheets, and psychoeducation materials. These additional logistical considerations can and do influence provider decisions regarding whether or how rigorously (i.e., delivering with fidelity to the protocol) to implement EBPs over telehealth modalities.

Last, institutional nonalignment between managers and clinicians regarding the motivations for telehealth development can also be a barrier to EBP implementation (69). For example, providers may be motivated to use telehealth to expand access to EBP specialty care for a specific diagnosis, managers may primarily want to expand the facility catchment area, and remote referrers may be motivated by a need to address transient triage overflow. These are three different goals with competing needs, metrics, and assumptions. Although the implementation of sustainable and effective EBP telehealth programming in health care systems requires careful planning and collaboration and a good deal of trial and error, a number of resources are available to help clinicians and managers navigate implementation while not reinventing the wheel (1, 70, 71).

The survey of clinical videoconferencing research presented here counters an easily made assumption that the wide-scale use of platforms such as Skype and Facetime are in themselves evidence for the application and utility of clinical videoconferencing. In other words, the impetus for clinical videoconferencing could be viewed as a presupposed eventuality of the field merely reacting to evolving mores regarding the acceptance and expectation of telecommunication modalities (72). Although there is some truth to that sentiment, the current state of the clinical videoconferencing evidence base is the result of six decades of stepwise and systematic research. Accordingly, the argument for delivering EBPs via telehealth is not simply that

video chat is popular or in demand but rather that it is effective.

## CONCLUSION

The amassed evidence base related to the efficacy and effectiveness of clinical videoconferencing in the past decade, in conjunction with previous decades' research related to acceptability and safety, firmly establishes clinical videoconferencing as a valid medium for delivering EBPs for anxiety and depression in general. However, initiating clinical videoconferencing increases workload for clinicians related to a variety of administrative and logistical issues and creates new challenges for implementing and sustaining EBP care for new referral sources. Accordingly, future systems-level research is required to investigate replicable and sustainable models for implementing and expanding access to EPBs via clinical videoconferencing.

### AUTHOR AND ARTICLE INFORMATION

Dr. Tuerk and Dr. Keller are with the Department of Psychiatry and Behavioral Sciences, Medical University of South Carolina, Charleston; Dr. Acierno is with the College of Nursing, Medical University of South Carolina. Dr. Tuerk is also with the Sheila C. Johnson Center for Clinical Services, Department of Human Services, University of Virginia, Charlottesville; Dr. Keller and Dr. Acierno are also with the Ralph H. Johnson VA Medical Center, Charleston, South Carolina. Send correspondence to Dr. Tuerk (e-mail: pwt3g@virginia.edu).

Dr. Tuerk receives compensation or royalties related to telehealth consultation, projects, and publications from the Cohen Veterans Network, Virtually Better Inc., and Springer International. Dr. Keller and Acierno report no financial relationships with commercial interests.

### REFERENCES

1. Tuerk PW, Shore P (eds): Clinical Videoconferencing in Telehealth: Program Development and Practice. Cham, Switzerland, Springer, 2014
2. DeGaetano N, Shore J: Conducting a telehealth needs assessment; in Clinical Videoconferencing in Telehealth. Cham, Switzerland, Springer, 2015
3. Brooks E, Turvey C, Augusterfer EF: Provider barriers to telemental health: obstacles overcome, obstacles remaining. Telemed J E Health 2013; 19:433–437
4. Jameson JP, Farmer MS, Head KJ, et al: VA community mental health service providers' utilization of and attitudes toward telemental health care: the gatekeeper's perspective. J Rural Health 2011; 27:425–432
5. Rees CS, Stone S: Therapeutic alliance in face-to-face versus videoconferenced psychotherapy. Prof Psychol Res Pr 2005; 36:649–653
6. Luxton D, Pruitt L, Jenkins-Guarnieri M: Clinical assessment in clinical videoconferencing; in Clinical Videoconferencing in Telehealth. Cham, Switzerland, Springer, 2015
7. Dorsey ER, Topol EJ: State of telehealth. N Engl J Med 2016; 375:154–161
8. Adler-Milstein J, Kvedar J, Bates DW: Telehealth among US hospitals: several factors, including state reimbursement and licensure policies, influence adoption. Health Aff (Millwood) 2014; 33:207–215
9. Wade VA, Eliott JA, Hiller JE: Clinician acceptance is the key factor for sustainable telehealth services. Qual Health Res 2014; 24:682–694
10. Harris E, Younggren JN: Risk management in the digital world. Prof Psychol Res Pr 2012; 42:412–418
11. Speedie SM, Ferguson AS, Sanders J, et al: Telehealth: the promise of new care delivery models. Telemed J E Health 2008; 14:964–967
12. Frueh BC, Deitsch SE, Santos AB, et al: Procedural and methodological issues in telepsychiatry research and program development. Psychiatr Serv 2000; 51:1522–1527
13. Richardson LK, Frueh BC, Grubaugh AL, et al: Current directions in videoconferencing tele-mental health research. Clin Psychol (New York) 2009; 16:323–338
14. Monnier J, Knapp RG, Frueh BC: Recent advances in telepsychiatry: an updated review. Psychiatr Serv 2003; 54:1604–1609
15. Hilty DM, Liu W, Marks SL, et al: The effectiveness of telepsychiatry: a review. Canadian Psychiatric Association Bulletin 2003; 10:10–17
16. Hilty DM, Marks SL, Urness D, et al: Clinical and educational telepsychiatry applications: a review. Can J Psychiatry 2004; 49:12–23
17. Norman S: The use of telemedicine in psychiatry. J Psychiatr Ment Health Nurs 2006; 13:771–777
18. García-Lizana F, Muñoz-Mayorga I: Telemedicine for depression: a systematic review. Perspect Psychiatr Care 2010; 46:119–126
19. Backhaus A, Agha Z, Maglione ML, et al: Videoconferencing psychotherapy: a systematic review. Psychol Serv 2012; 9:111–131
20. Gros DF, Morland LA, Greene CJ, et al: Delivery of evidence-based psychotherapy via video telehealth. J Psychopathol Behav Assess 2013; 35:506–521
21. Hubley S, Lynch SB, Schneck C, et al: Review of key telepsychiatry outcomes. World J Psychiatry 2016; 6:269–282
22. Hilty DM, Ferrer DC, Parish MB, et al: The effectiveness of telemental health: a 2013 review. Telemed J E Health 2013; 19:444–454
23. Rees CS, Maclaine E: A systematic review of videoconference-delivered psychological treatment for anxiety disorders. Aust Psychol 2015; 50:259–264
24. Hilty DM, Yellowlees PM, Tuerk PW, et al: Program evaluation and modification: supporting pragmatic data-driven clinical videoconferencing (CV) services; in Clinical Videoconferencing in Telehealth. Cham, Switzerland, Springer, 2015, pp 105–130
25. Manchanda M, McLaren P: Cognitive behaviour therapy via interactive video. J Telemed Telecare 1998; 4(Suppl 1):53–55
26. Cowain T: Cognitive-behavioural therapy via videoconferencing to a rural area. Aust N Z J Psychiatry 2001; 35:62–64
27. Himle JA, Fischer DJ, Muroff JR, et al: Videoconferencing-based cognitive-behavioral therapy for obsessive-compulsive disorder. Behav Res Ther 2006; 44:1821–1829
28. Goetter EM, Herbert JD, Forman EM, et al: Delivering exposure and ritual prevention for obsessive-compulsive disorder via videoconference: clinical considerations and recommendations. J Obsessive Compuls Relat Disord 2013; 2:137–145
29. Hassija CM, Gray MJ: Telehealth-based exposure therapy for motor vehicle accident-related posttraumatic stress disorder. Clin Case Stud 2009; 8:84–94
30. Tuerk P, Brady KT, Grubaugh AL: Clinical case discussion: combat PTSD and substance use disorders. J Addict Med 2009; 3:189–193
31. Hassija C, Gray MJ: The effectiveness and feasibility of videoconferencing technology to provide evidence-based treatment to rural domestic violence and sexual assault populations. Telemed J E Health 2011; 17:309–315
32. Tuerk PW, Yoder M, Ruggiero KJ, et al: A pilot study of prolonged exposure therapy for posttraumatic stress disorder delivered via telehealth technology. J Trauma Stress 2010; 23:116–123
33. Himle MB, Freitag M, Walther M, et al: A randomized pilot trial comparing videoconference versus face-to-face delivery of behavior therapy for childhood tic disorders. Behav Res Ther 2012; 50:565–570

34. Goetter EM, Herbert JD, Forman EM, et al: An open trial of videoconference-mediated exposure and ritual prevention for obsessive-compulsive disorder. J Anxiety Disord 2014; 28:460–462

35. Gros DF, Yoder M, Tuerk PW, et al: Exposure therapy for PTSD delivered to veterans via telehealth: predictors of treatment completion and outcome and comparison to treatment delivered in person. Behav Ther 2011; 42:276–283

36. Germain V, Marchand A, Bouchard S, et al: Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. Cogn Behav Ther 2009; 38:42–53

37. Stewart RW, Orengo-Aguayo RE, Cohen JA, et al: A pilot study of trauma-focused cognitive–behavioral therapy delivered via telehealth technology. Child Maltreat 2017; 22:324–333

38. Morland LA, Hynes AK, Mackintosh MA, et al: Group cognitive processing therapy delivered to veterans via telehealth: a pilot cohort. J Trauma Stress 2011; 24:465–469

39. Bouchard S, Payeur R, Rivard V, et al: Cognitive behavior therapy for panic disorder with agoraphobia in videoconference: preliminary results. Cyberpsychol Behav 2000; 3:894–895

40. Griffiths L, Blignault I, Yellowlees P: Telemedicine as a means of delivering cognitive-behavioural therapy to rural and remote mental health clients. J Telemed Telecare 2006; 12:136–140

41. Yuen EK, Herbert JD, Forman EM, et al: Acceptance based behavior therapy for social anxiety disorder through videoconferencing. J Anxiety Disord 2013; 27:389–397

42. Bouchard S, Paquin B, Payeur R, et al: Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. Telemed J E Health 2004; 10:13–25

43. Strachan M, Gros DF, Ruggiero KJ, et al: An integrated approach to delivering exposure-based treatment for symptoms of PTSD and depression in OIF/OEF veterans: preliminary findings. Behav Ther 2012; 43:560–569

44. Ziemba SJ, Bradley NS, Landry L-AP, et al: Posttraumatic stress disorder treatment for Operation Enduring Freedom/Operation Iraqi Freedom combat veterans through a civilian community-based telemedicine network. Telemed J E Health 2014; 20:446–450

45. Yuen EK, Gros DF, Price M, et al: Randomized controlled trial of home-based telehealth treatment in in-person prolonged exposure for combat-related PTSD in veterans: preliminary results. J Clin Psychol 2015; 71:500–512

46. Frueh BC, Monnier J, Yim E, et al: A randomized trial of telepsychiatry for post-traumatic stress disorder. J Telemed Telecare 2007; 13:142–147

47. Stubbings DR, Rees CS, Roberts LD, et al: Comparing in-person to videoconference-based cognitive behavioral therapy for mood and anxiety disorders: randomized controlled trial. J Med Internet Res 2013; 15:e258

48. Storch EA, Caporino NE, Morgan JR, et al: Preliminary investigation of web-camera delivered cognitive-behavioral therapy for youth with obsessive-compulsive disorder. Psychiatry Res 2011; 189:407–412

49. Ruskin PE, Silver-Aylaian M, Kling MA, et al: Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry 2004; 161:1471–1476

50. De Las Cuevas C, Arredondo MT, Cabrera MF, et al: Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemed J E Health 2006; 12:341–350

51. Choi NG, Hegel MT, Marti N, et al: Telehealth problem-solving therapy for depressed low-income homebound older adults. Am J Geriatr Psychiatry 2014; 22:263–271

52. Nelson EL, Barnard M, Cain S: Treating childhood depression over videoconferencing. Telemed J E Health 2003; 9:49–55

53. Fortney JC, Pyne JM, Edlund MJ, et al: A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med 2007; 22:1086–1093

54. Fortney JC, Pyne JM, Mouden SB, et al: Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: a pragmatic randomized comparative effectiveness trial. Am J Psychiatry 2013; 170:414–425

55. Moreno FA, Chong J, Dumbauld J, et al: Use of standard webcam and Internet equipment for telepsychiatry treatment of depression among underserved Hispanics. Psychiatr Serv 2012; 63:1213–1217

56. Acierno R, Knapp R, Tuerk P, et al: A non-inferiority trial of prolonged exposure for posttraumatic stress disorder: in person versus home-based telehealth. Behav Res Ther 2017; 89:57–65

57. Acierno R, Gros DF, Ruggiero KJ, et al: Behavioral activation and therapeutic exposure for posttraumatic stress disorder: a non-inferiority trial of treatment delivered in person versus home-based telehealth. Depress Anxiety 2016; 33:415–423

58. Morland LA, Mackintosh MA, Greene CJ, et al: Cognitive processing therapy for posttraumatic stress disorder delivered to rural veterans via telemental health: a randomized noninferiority clinical trial. J Clin Psychiatry 2014; 75:470–476

59. Maieritsch KP, Smith TL, Hessinger JD, et al: Randomized controlled equivalence trial comparing videoconference and in person delivery of cognitive processing therapy for PTSD. J Telemed Telecare 2016; 22:238–243

60. Egede LE, Acierno R, Knapp RG, et al: Psychotherapy for depression in older veterans via telemedicine: a randomised, open-label, non-inferiority trial. Lancet Psychiatry 2015; 2:693–701

61. Carlson LE, Lounsberry JJ, Maciejewski O, et al: Telehealth-delivered group smoking cessation for rural and urban participants: feasibility and cessation rates. Addict Behav 2012; 37:108–114

62. Mitchell JE, Crosby RD, Wonderlich SA, et al: A randomized trial comparing the efficacy of cognitive-behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. Behav Res Ther 2008; 46:581–592

63. Bose U, McLaren P, Riley A, et al: The use of telepsychiatry in the brief counselling of non-psychotic patients from an inner-London general practice. J Telemed Telecare 2001; 7(Suppl 1):8–10

64. Trott P, Blignault I: Cost evaluation of a telepsychiatry service in northern Queensland. J Telemed Telecare 1998; 4(Suppl 1):66–68

65. Bolton AJ, Dorstyn DS: Telepsychology for posttraumatic stress disorder: a systematic review. J Telemed Telecare 2015; 21:254–267

66. Hogan MF: The President's New Freedom Commission: recommendations to transform mental health care in America. Psychiatr Serv 2003; 54:1467–1474

67. Beachler M, Holloman C, Herman J: Southern rural access program: an overview. J Rural Health 2003; 19(Suppl):301–307

68. Cully JA, Jameson JP, Phillips LL, et al: Use of psychotherapy by rural and urban veterans. J Rural Health 2010; 26:225–233

69. Bunduchi R, Smart A, Charles K, et al: When innovation fails: an institutional perspective of the (non) adoption of boundary spanning IT innovation. Inf Manage 2015; 52:563–576

70. Myers K, Turvey C (eds): Telemental Health: Clinical, Technical, and Administrative Foundations for Evidence-Based Practice. London, Elsevier, 2013

71. Luxton DD, Nelson E-L, Maheu MM: A Practitioner's Guide to Telemental Health: How to Conduct Legal, Ethical, and Evidence-Based Telepractice. Washington, DC, American Psychological Association, 2016

72. Maheu MM, Pulier ML, McMenamin JP, et al: Future of telepsychology, telehealth, and various technologies in psychological research and practice. Prof Psychol Res Pr 2012; 46:613–621

A TREATMENT IMPROVEMENT PROTOCOL

# Using Technology-Based Therapeutic Tools in Behavioral Health Services

## TIP 60





Substance Abuse and Mental Health Services Administration

**SAMHSA**

www.samhsa.gov • 1-877-SAMHSA-7 (1-877-726-4727)

**A TREATMENT IMPROVEMENT PROTOCOL**

# Using Technology-Based Therapeutic Tools in Behavioral Health Services

# TIP 60

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Substance Abuse and Mental Health Services Administration
Center for Substance Abuse Treatment

1 Choke Cherry Road
Rockville, MD 20857

## Acknowledgments

This publication was produced under the Knowledge Application Program (KAP) contract numbers 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 and 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 with the Substance Abuse and Mental Health Services Administration (SAMHSA), U.S. Department of Health and Human Services (HHS). Christina Currier and Suzanne Wise served as the Contracting Officer's Representatives, and Candi Byrne served as KAP Project Coordinator.

## Disclaimer

The opinions expressed herein are the views of the consensus panel members and do not necessarily reflect the official position of SAMHSA or HHS. No official support of or endorsement by SAMHSA or HHS for these opinions or for the instruments or resources described is intended or should be inferred. The guidelines presented should not be considered substitutes for individualized client care and treatment decisions.

## Public Domain Notice

All materials appearing in this volume except those taken directly from copyrighted sources are in the public domain and may be reproduced or copied without permission from SAMHSA or the authors. Citation of the source is appreciated. However, this publication may not be reproduced or distributed for a fee without the specific, written authorization of the Office of Communications, SAMHSA, HHS.

## Electronic Access and Copies of Publication

This publication may be ordered from or downloaded from SAMHSA's Publications Ordering Web page at http://store.samhsa.gov. Or, please call SAMHSA at 1-877-SAMHSA-7 (1-877-726-4727) (English and Español).

## Recommended Citation

Substance Abuse and Mental Health Services Administration. *Using Technology–Based Therapeutic Tools in Behavioral Health Services.* Treatment Improvement Protocol (TIP) Series 60. HHS Publication No. (SMA) 15-4924. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2015.

## Originating Office

Quality Improvement and Workforce Development Branch, Division of Services Improvement, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, 1 Choke Cherry Road, Rockville, MD 20857.

HHS Publication No. (SMA) 15-4924
Printed 2015

# Contents

Consensus Panel ................................................................................................... v

What Is a TIP? ..................................................................................................... vii

Foreword .............................................................................................................. ix

How This TIP Is Organized ................................................................................ xi

PART 1: A PRACTICAL GUIDE FOR THE PROVISION OF BEHAVIORAL HEALTH SERVICES ............................................................................................ 1

Part 1, Chapter 1 ................................................................................................... 3

Introduction ..................................................................................................... 3

The Potential Utility of Technology-Based Therapeutic Tools ........................ 5

An Overview of Behavioral Health Technologies .............................................. 8

Emerging Technologies and Future Opportunities ......................................... 17

Integrating Technology Into Existing Services ................................................ 20

Legal and Ethical Issues To Consider .............................................................. 21

Electronic Health Records .............................................................................. 28

Concluding Comments ................................................................................... 30

Part 1, Chapter 2 ................................................................................................ 33

Introduction ................................................................................................... 33

Vignette 1: Implementing a Web-Based Prevention, Outreach, and Early Intervention Program for Young Adults ......................................................... 34

Vignette 2: Using Computerized Check-In and Monitoring in an Extended Recovery Program ........................................................................................... 48

Vignette 3: Conducting a Telephone- and Videoconference-Based Pretreatment Group for Clients With Substance Use Disorders ............................................ 61

Vignette 4: Incorporating TAC Into Behavioral Health Services for Clients Who Are Hearing Impaired .......................................................................... 74

Vignette 5: Using Smartphones To Support Recovery for Clients With CODs .................. 83

**PART 2: AN IMPLEMENTATION GUIDE FOR BEHAVIORAL HEALTH PROGRAM ADMINISTRATORS** ........................................................... 95

**Part 2, Chapter 1** ................................................................................. 97
    Introduction ....................................................................................... 97
    Adoption and Sustainability Considerations ................................... 100
    Technological Capacity Considerations ........................................... 108
    Budgeting Considerations ................................................................ 114
    Vendor and Consultant Selection Considerations ........................... 115
    Data Management Considerations .................................................... 116
    Privacy and Confidentiality Considerations .................................... 117
    Regulatory Considerations ............................................................... 120

**Part 2, Chapter 2** ................................................................................. 123
    Introduction ..................................................................................... 123
    Tools for Clinicians .......................................................................... 123
    Staff Recruitment and Supervision ................................................. 131
    Sample Telehealth Policies .............................................................. 131

**Appendix A—Bibliography** ................................................................. 139

**Appendix B—Stakeholders Meeting Participants** .............................. 169

**Appendix C—Field Reviewers** ........................................................... 173

**Appendix D—Acknowledgments** ........................................................ 175

**Index** .................................................................................................... 177

**Exhibits**
    Exhibit 1.1-1: Principles To Guide TAC in the Behavioral Health Arena ............................. 5
    Exhibit 1.1-2: Types of Prevention as Described by the Institute of Medicine ...................... 7
    Exhibit 1.1-3: Examples of Technology-Based Therapeutic Tools Across Technological Categories ........................................................................................... 18
    Exhibit 1.1-4: Areas of Concern for Mobile Computing Devices .......................... 23
    Exhibit 1.1-5: The Benefits of Using an EHR System .......................................... 29
    Exhibit 1.2-1: Randomized Controlled Trial of Depression Follow-Up Care via Online Messaging .................................................................................... 60
    Exhibit 2.1-1: Responsibilities of Stakeholders in the Technology Adoption Process ........ 102
    Exhibit 2.1-2: Technological Competencies Required of Clinical Staff ...................... 105
    Exhibit 2.2-1: Glossary of Common Technology Terms .................................... 124
    Exhibit 2.2-2: Statements To Elicit Responses From Online Clients ..................... 126
    Exhibit 2.2-3: Common Emoticons and Acronyms in Text-Based Communications ........ 127
    Exhibit 2.2-4: Considerations Regarding the Appropriateness of TAC ............................. 128
    Exhibit 2.2-5: Technological Competencies for Supervision ................................ 132

.

# Consensus Panel

Note: The information given indicates each participant's affiliation as of 2011, when the panel was convened, and may no longer reflect the individual's current affiliation.

## Consensus Panels Chair

**Lisa A. Marsch, Ph.D.**
Director, Center for Technology and
    Behavioral Health
Dartmouth Psychiatric Research Center
Hanover, NH
Former Director, Center for Technology and
    Health
National Development and Research
    Institutes
New York, NY

## Part 1 Consensus Panelists

**Thomas J. Kim, M.D., M.P.H.**
Austin, TX

**Sarah Lord, Ph.D.**
Principal Investigator, Center for Technology
    and Health
National Development and Research
    Institutes
Cambridge, MA

**Richard N. Rosenthal, M.D.**
Chairman, Department of Psychiatry
St. Luke's-Roosevelt Hospital Center
New York, NY

**Cynthia B. Sternfeld, Ed.S.**
Lambertville, NJ

**Nancy R. VanDeMark, M.S.W., Ph.D.**
Wheat Ridge, CO

## Part 2 Consensus Panelists

**Thelma McClosky Armstrong, M.A.**
Director
Eastern Montana Telemedicine Network
Billings, MT

**Nancy R. VanDeMark, M.S.W., Ph.D.**
Wheat Ridge, CO

# What Is a TIP?

Treatment Improvement Protocols (TIPs) are developed by the Substance Abuse and Mental Health Services Administration (SAMHSA) within the U.S. Department of Health and Human Services (HHS). Each TIP involves the development of topic-specific best-practice guidelines for the prevention and treatment of substance use and mental disorders. TIPs draw on the experience and knowledge of clinical, research, and administrative experts in various forms of treatment and prevention. TIPs are distributed to facilities and individuals across the country. Published TIPs can be accessed via the Internet at http://store.samhsa.gov.

Although each consensus-based TIP strives to include an evidence base for the practices it recommends, SAMHSA recognizes that behavioral health is continually evolving, and research frequently lags behind the innovations pioneered in the field. A major goal of each TIP is to convey "front-line" information quickly but responsibly. If research supports a particular approach, citations are provided. When no citation is provided, the information is based on the collective clinical knowledge and experience of the consensus panel.

# Foreword

The Substance Abuse and Mental Health Services Administration (SAMHSA) is the agency within the U.S. Department of Health and Human Services that leads public health efforts to advance the behavioral health of the nation. SAMHSA's mission is to reduce the impact of substance abuse and mental illness on America's communities.

The Treatment Improvement Protocol (TIP) series fulfills SAMHSA's mission by providing evidence-based and best practice guidance to clinicians, program administrators, and payers. TIPs are the result of careful consideration of all relevant clinical and health services research findings, demonstration experience, and implementation requirements. A panel of nonfederal clinical researchers, clinicians, program administrators, and patient advocates debates and discusses their particular area of expertise until they reach a consensus on best practices. Field reviewers then review and critique this panel's work.

The talent, dedication, and hard work that TIP panelists and reviewers bring to this highly participatory process have helped bridge the gap between the promise of research and the needs of practicing clinicians and administrators to serve, in the most scientifically sound and effective ways, people in need of behavioral health services. We are grateful to all who have joined with us to contribute to advances in the behavioral health field.

**Kana Enomoto, M.A.**
Acting Administrator
Substance Abuse and Mental Health Services Administration

**Daryl W. Kade, M.A.**
Acting Director
Center for Substance Abuse Treatment
Substance Abuse and Mental Health Services Administration

.

# How This TIP Is Organized

This Treatment Improvement Protocol (TIP) is divided into three main parts:

- Part 1: *A Practical Guide for the Provision of Behavioral Health Services*
- Part 2: *An Implementation Guide for Behavioral Health Program Administrators*
- Part 3: *A Review of the Literature*

Part 1 consists of two chapters and introduces behavioral health service providers to various technology-based treatment and prevention tools and interventions. It also explains how those technologies are applicable to various behavioral health services and settings. Part 1, Chapter 1, introduces principles to guide technology-assisted care (TAC) in the behavioral health arena. This section addresses:

- The potential benefits and drawbacks of incorporating technology into treatment and prevention, particularly for clients with unique service needs, as both stand-alone methods and as adjuncts to face-to-face services.
- Specific technologies with applicability to behavioral health, including emerging technologies and their potential applications in the context of behavioral health services.
- Ways to integrate technology into existing services.
- Issues of ethics and legality as well as cultural competence.
- Electronic health records.

Part 1, Chapter 2 consists of vignettes that demonstrate the application of TAC in behavioral health services. Designed for maximum latitude of use by supervisors and front-line professionals, the guidelines for TAC appear in the form of master clinician notes, how-to notes, and other teaching tools that demonstrate how a given technology can be applied clinically, how to identify potential pitfalls, and how to manage problems that might arise.

Part 2 of the TIP consists of two chapters and serves as an implementation guide for behavioral health program administrators and clinicians who wish to develop or expand the use of TAC by their programs. It covers:

- Programmatic considerations for the adoption and sustainability of TAC, including approaches administrators can use to involve staff members in the planning and implementation process.
- Technological capacity and budgeting considerations for technology-based treatment and prevention efforts.
- Methods for selecting technology-related vendors and consultants.
- Data management issues involved in TAC.

- Privacy, confidentiality, and regulatory concerns, including the establishment of relevant policies and procedures for ensuring confidentiality, managing client crises, and deciding when and how to apply electronic media in client care.
- TAC-related management of clinical supervision of counselors, TAC-related training and staff development, and the need for personnel trained in specific technologies and methods.
- Specific practical examples of how TAC has been incorporated into existing programs.

Part 3 of the TIP includes an analysis of the available literature on technology-based assessment and interventions targeting behavioral health, including journal articles, books, pamphlets, and electronic resources; links to select abstracts of the most cogent literature on the topic; and a comprehensive general bibliography of the relevant literature. The literature review is only available online at the Substance Abuse and Mental Health Services Administration (SAMHSA) Store (http://store.samhsa.gov).

## Terminology

The following terms are broad in scope and denote concepts frequently referenced throughout the TIP. Detailed definitions of terms describing specific types of technology appear throughout Part 1, Chapter 1, and are summarized in Exhibit 2.2-1.

**Behavioral health.** Throughout the TIP, the term "behavioral health" appears. Behavioral health refers to a state of mental/emotional being and/or choices and actions that affect wellness. Behavioral health problems include substance use disorders, serious psychological distress, suicidality, and mental illness. This includes a range of problems from unhealthy stress to diagnosable and treatable diseases like serious mental illness and substance use disorders, which are often chronic in nature but from which people can and do recover. The term is also used in this TIP to describe the service systems encompassing the promotion of emotional health, the prevention of mental and substance use disorders, substance use and related problems, treatments and services for mental and substance use disorders, and recovery support. Because behavioral health conditions, taken together, are the leading causes of disability burden in North America, efforts to improve their prevention and treatment will benefit society as a whole. Efforts to reduce the impact of mental and substance use disorders on America's communities, such as those described in this TIP, will help achieve nationwide improvements in health.

**Electronic media.** This term is used in the broadest sense, covering everything from technology-based therapeutic tools to the use of social media for treatment or prevention.

**Prevention.** Technology can be used in prevention activities to foster the SAMHSA mission, which is "to reduce the impact of substance abuse and mental illness on America's communities" (SAMHSA, 2014b, p. 4). The term "prevention" covers a broad set of services, interventions, and supportive activities that promote resilience.

**Recovery.** This term reflects a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential (SAMHSA, 2012). Major dimensions that support a life in recovery, as defined by SAMHSA (2012), include:
- *Health:* overcoming or managing one's disease(s) or symptoms as well as making healthy, well-informed choices that facilitate physical and emotional well-being.
- *Home:* having a safe, stable place to live.

- *Purpose:* engaging in meaningful daily activities, such as a job, education, volunteer work, caring for family members, or creative pursuits; having sufficient independence, income, and resources to participate in society.
- *Community:* maintaining relationships and social networks that provide support, friendship, love, and hope.

**Substance use disorders.** Throughout the TIP, this term applies to substance use disorders of all varieties and levels of severity. Usage reflects current terminology as described in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition (DSM-5; American Psychiatric Association, 2013). In general, the distinction between substance abuse and substance dependence in prior DSM editions related to the requirement of tolerance to or withdrawal from alcohol or other substances as a diagnostic criterion for substance dependence but not for substance abuse. If a particular drug (e.g., cocaine, amphetamines, marijuana) did not typically produce clear signs of tolerance or dependence, a diagnosis of substance dependence still indicated high severity or intense compulsivity, whereas a diagnosis of substance abuse denoted less severe symptoms (e.g., continued use despite negative consequences and/or knowledge of detrimental social and health effects of use). The distinction between "abuse" and "dependence" thus carried a connotation of severity, which is now a codified part of the diagnosis of substance use disorder in DSM-5.

**Technology-assisted care.** This term and its abbreviation, TAC, are used throughout the TIP to refer to the broad range of interventions and enhancements to traditional care models possible through the use of technological tools and to the range of behavioral health service delivery settings within which technology can contribute to care delivery.

# Part 1: A Practical Guide for the Provision of Behavioral Health Services

# Part 1, Chapter 1

## IN THIS CHAPTER

- Introduction
- The Potential Utility of Technology-Based Therapeutic Tools
- An Overview of Behavioral Health Technologies
- Emerging Technologies and Future Opportunities
- Integrating Technology Into Existing Services
- Legal and Ethical Issues to Consider
- Electronic Health Records
- Concluding Comments

## Introduction

Digital media and resources, such as email, smartphone/tablet applications (apps), online forums, Web sites, DVDs, CD-ROMs, blogs, computer software, online social networks, telephone and televideo communication, and mobile devices are becoming universal in our culture. The use of electronic media and information technologies in behavioral health treatment, recovery support, and prevention programs is rapidly gaining acceptance. Technology-based assessments and interventions are important therapeutic tools that clinicians can integrate into their work with clients. Additionally, technology allows alternative models of care to be offered to clients with specific needs that limit their ability to participate or interest in participating in more conventional interventions targeting behavioral health. Technology-assisted care (TAC) can transcend geographic boundaries to reach many people otherwise unable to access services and is useful in a wide variety of settings, including Web-based interventions offered in the home, community organizations, schools, emergency rooms, and healthcare providers' offices, as well as via mobile devices and online social networks. Furthermore, TAC is often accessible on demand at the user's convenience, thus reducing barriers to accessing care.

As of 2014, 87 percent of the population used the Internet (Pew Research Center [PRC], 2014), and only 7 percent of those who did not use the Internet lacked access to it (PRC, 2013). In 2012, 72 percent of Internet users reported seeking health information online (PRC, 2013). This represents a substantial increase from 2009, when only 61 percent of adults reported looking for health information online (Jones & Fox, 2009). Moreover, 90 percent of people now own a cell phone (PRC, 2014) and 64 percent own a smartphone (PRC, 2015); of those with a smartphone, 62 percent reported having used it to acquire some type of health-related information (PRC, 2015). The number of adults who have an

account with an online social network increased from 8 percent in 2005 to 46 percent in 2009 (Lenhart, 2009c). Currently, 74 percent of adults who use the Internet use a social networking site, with 89 percent of those ages 18 to 29 and 82 percent of those ages 30 to 49 reporting use (Duggan et al., 2015). As a result of these considerable increases in overall online access, TAC could potentially have a significant impact on public health. Major strides have already been made in the promotion and use of telemedicine, including tele-behavioral health.

The rapid growth of these resources requires a carefully planned response by treatment and prevention programs targeting behavioral health. In addition to relevant staff development and training, this response needs to address the specific electronic resources applicable to each program, the contexts in which those resources will be most useful, the benefits and risks of using them, the methods for preparing clients to accept and use these resources, and an organizational commitment to evaluating the effectiveness and utility of specific technologies. New technologies represent new means of communication; messages must be tailored to the technology and the issues at hand. For example, an email message will most likely need to be different from a text message. Use of advanced technologies also requires consideration of a number of legal and ethical issues, such as confidentiality, scope of practice, state licensure regulations, privacy, data security, consent management, and the potential for misuse.

## Goal and Scope of This TIP

This Treatment Improvement Protocol (TIP) provides an overview of current technology-based assessments and interventions (including treatment, recovery support, relapse prevention, and prevention-focused interventions) targeting behavioral health, and

it summarizes the evidence base supporting the effectiveness of such interventions. It also examines opportunities for TAC in the behavioral health arena—particularly in improving early access to care, client engagement in and commitment to treatment and recovery, client education, specific treatment interventions, relapse prevention and recovery management, extended recovery, community engagement, mental health promotion, and substance use disorder prevention, among other areas. This TIP addresses how behavioral health service providers can use Web sites, telephone and televideo resources, smartphones, and other portable devices and electronic media for education, outreach, and direct client services. It emphasizes use of TAC with clients who might not otherwise receive treatment or whose treatment might be impeded by physical disabilities, rural or remote geographic locations, lack of transportation, employment constraints, or symptoms of mental illness. This TIP emphasizes the use of TAC with those who might not seek treatment in conventional settings and/or who have personal preferences that limit access to conventional services.

It is definitely not the intent of this TIP to suggest that electronic media should replace in-person client contact. Instead, this TIP focuses on how TAC, when incorporated into mental and substance use disorder treatment and prevention efforts, can supplement existing methods and also provide services to clients who might not otherwise receive this help. It is also not the intent of this TIP to promote any particular technology-based therapeutic tools or any of the companies that develop or host these tools, but rather, to broadly highlight the promise of TAC by providing specific examples. This TIP does not explicitly address how use of TAC in behavioral health service delivery intersects with changing healthcare laws in the United States, but it does suggest that TAC may significantly increase

the quality of care delivered and the success of integrating behavioral healthcare with disease prevention and management.

In short, evidence-based TAC has the potential to reach more clients and help engage and retain them in services in a cost-effective manner. This TIP provides treatment and prevention workers in the behavioral health arena with the resources they need to use various technologies in their practice and to recognize the limits and ethical considerations involved in using them. It also provides behavioral health program administrators with the information they need to integrate and expand the use of technologies in their systems of care.

## Principles for Using Technology-Based Therapeutic Tools

The content of this TIP was developed with continual input from a consensus panel of behavioral health clinicians, behavioral health program administrators, and federal agencies with significant experience, expertise, or interest in the provision of TAC in the behavioral health arena. The panel identified several key principles to guide TAC in behavioral health services. These principles provide overall guidance for the use of any type of electronic media or information technology targeting behavioral health, and as such, all sections of this TIP align with these overarching principles (Exhibit 1.1-1).

# The Potential Utility of Technology-Based Therapeutic Tools

Technology-based assessments and interventions are of use in a variety of ways, and they may also be clinically meaningful along an entire spectrum of behavioral health services, including screening, assessment, prevention, treatment, recovery management, and con-

tinuing care. The use of technology, such as a computer or a mobile device, in screening for and assessing individuals' behavioral health needs may allow for the efficient, standardized, and cost-effective collection of clinically relevant client information in diverse settings. This can be particularly important in healthcare settings where clinicians trained in behavioral health assessment procedures are not readily available and where opportunities to identify individuals who may benefit from behavioral health interventions are missed. TAC gives clients access to screening, intervention, and oversight by trained behavioral

---

**Exhibit 1.1-1: Principles To Guide TAC in the Behavioral Health Arena**

The following key principles guide TAC in the behavioral health arena. All sections of this TIP were developed to align with these principles:

- Clinical judgment is fundamental and should drive decisions regarding the use of technology. Clinical judgment, and not merely the existence of a given technology, should guide the application of said technology in clinical contexts.
- Practitioners should use technological solutions only within their realm of professional competence and scope of practice.
- The way technology-based tools are used may differ across populations and settings.
- Clinicians and clients should thoughtfully consider and discuss the risks and benefits of technology-based tools as part of the therapeutic process.
- Technology can offer value for individuals and their families along the entire spectrum of behavioral health services. This may include screening, assessment, prevention, treatment, recovery management, and continuing care.
- Maintaining security and confidentiality in TAC is the responsibility of all parties engaged in such care.
- Clinicians, clients, and other stakeholders should continually work together to shape, maintain, and refine models for the adoption and use of technology-based therapeutic tools in treatment.

**It's Not About the Technology**

New technologies, such as telehealth, help improve healthcare services. For technology to succeed in doing so, it must work for the people it is meant to help; it must aid not only clients, but also the professionals providing their care. Telehealth helps ensure that clients who are veterans get the right care in the right place at the right time. It aims to make the home the preferred place of care whenever possible.

*Source: U.S. Department of Veterans Affairs (VA) Telehealth Services (http://www.telehealth.va.gov)*

health staff members in remote locations. Brief computerized screenings can identify individuals with varying levels and types of behavioral health needs and can identify the differing resources and services that may be helpful to them. These brief screenings may also be useful as a less intensive therapeutic option for individuals not willing to seek professional care actively at a given point in time.

TAC allows behavioral health service providers and their clients to communicate directly at the same time (synchronously) or at separate times (asynchronously). For instance, distance counseling approaches in which clients and clinicians interact in real time online or by phone exemplify synchronous communication, whereas text-based communication (e.g., text messaging, emails) between a clinician and client may be asynchronous; one sends a message, but the other may not reply until later. This chapter discusses technology-based therapeutic tools that fall in both general categories and may be integrated into treatment and prevention activities.

Technology-based interventions targeting behavioral health may be used as "clinician extenders," or additional tools used by clinicians that can also be made available to clients (Bickel, Marsch, & Budney, 2013; Carroll &

Rounsaville, 2010; Marsch, 2011b). For example, distance counseling approaches may fill a treatment gap for those who cannot readily access care in their local communities: individuals in rural or remote settings, people who are unable to commute to behavioral health service providers' offices, and/or people uninterested in traditional service delivery models. Additionally, by offering TAC to clients (e.g., encouraging clients to complete online skills training modules), clinicians may increase their time availability for clients with multiple challenges; focus more of their time on the delivery of services that require their clinical expertise and interaction with clients; and enable clients to review repetitive but clinically important content, such as psychoeducational material, without having to devote extensive time to such activities themselves.

E-therapeutic tools can also serve as clinician extenders by helping clinicians work with a larger number of clients and/or for longer periods of time (e.g., online counseling offered as relapse prevention after a more intensive treatment episode), which allows them to have a greater impact with their service delivery. When used in this manner, TAC offers great potential for extending the benefits of treatment as well as allowing clients to access care when they need it the most. Time flexibility is another potential benefit of TAC, particularly through incorporation of technologies that enable asynchronous communication between clinicians and clients—making services available on demand at times that are convenient for clients. As a result, TAC allows widespread access to therapeutic support, thereby creating unprecedented models of intervention delivery and reducing barriers to accessing care.

The anonymity afforded by TAC (e.g., when conducted via online anonymous support groups) may be appealing to individuals when addressing sensitive topics such as substance

use and other risky behaviors (Des Jarlais et al., 1999; Ramo, Hall, & Prochaska, 2011). Anonymity, however, can also be a problem for behavioral health clinicians. It can create legal and ethical issues when there is no informed consent, when reportable use issues arise, when clients potentially pose a danger to themselves or others, and when the counselor can't verify whether the client lives in a state or region where the counselor is licensed, among a variety of other circumstances.

When information technology is used to deliver behavioral health interventions, new information can be incorporated easily and exported quickly. This is particularly true for Web- or mobile-based TAC, because updates in program content can be incorporated centrally and made available to all end users at the same time. Thus, TAC has the potential to offer the latest scientific advances in behavioral health services rapidly and continuously. TAC facilitates linkages to services and support systems in the community through:

- Online resources or decision support systems to help individuals make choices about their own care.

- Online collaborative care/case management models for clinicians, which enable coordination of services among a network of providers and their clients (and sometimes clients' extended networks of family members and/or significant others).
- The ability to reach large populations (especially when delivered in nonspecialty settings, such as universal prevention efforts using online technologies).

Technology can play a role across the spectrum of prevention efforts (Exhibit 1.1-2).

The use of technology also offers individuals the opportunity for personalized recovery monitoring and management, including links to online or mobile recovery support groups (sometimes called virtual support groups). This may allow for new models of care in which individuals can take ownership of monitoring their own care and recovery.

The main costs of technology-based therapeutic tools are associated with completing initial development, keeping up with the latest research, training new staff members, and



**Exhibit 1.1-2: Types of Prevention as Described by the Institute of Medicine**

Prevention — Universal: Targets an entire population — Selective: Targets subset of the population considered at risk — Indicated: Targets individuals who are exhibiting early signs of problem behaviors

Treatment — Case Identification — Standard Treatment for Known Disorders

Maintenance — Compliance With Long-term Treatment (Goal: Reduction in Relapse and Recurrence) — Continuing Care (Including Rehabilitation)

Promotion

*Source: Institute of Medicine, 2009. Used with permission.*

evaluating effectiveness. Deployment costs are relatively limited and are associated with bandwidth for online access, technical support, licensing of the technology, and ongoing equipment maintenance and support. Thus, technology-based assessment and intervention tools may be cost effective and offer considerable utility for many resource-constrained service settings. Overall, TAC, when appropriately applied, holds great potential to have a significant impact on public health.

# An Overview of Behavioral Health Technologies

This section provides an overview of specific technologies and their potential applications in behavioral health. This section is organized by types of technology, including telephone/audio counseling and video/Web conferencing tools; self-directed, Web-based, and desktop computer-based therapeutic tools; Web-based text communication (e.g., email, chat, forums); and mobile technologies. There is considerable overlap across these categories. For example, online counseling can refer broadly to any behavioral health service delivered via the Internet, even though delivery to clients can occur via a wide range of delivery platforms (e.g., computers, mobile devices). Nevertheless, the categories establish conceptual clarity and consistency with the approach taken in the literature by Maheu, Pulier, Wilhelm, McMenamin, and Brown-Connolly (2004).

For each category of technology, you will find a brief description and a review of its applications in assessment, prevention, treatment, and recovery support efforts targeting behavioral health. Several examples of how each type of technology has been applied in behavioral health programs are also provided (see Part 2,

Chapter 2, for more real-world program examples).

Although this overview discusses technology and the many ways in which it can be used in detail, clinicians must be careful not to let the technology itself determine how it is integrated into clinical care. Technologies evolve rapidly, and new technologies are emerging all the time; clinicians should consider how a given tool will enhance clinical services and select only those technologies that are likely to be most beneficial to their clinical work and that they and their clients can use competently. Technologies and information technology tools serve supportive roles that enable clinicians to provide enhanced care under particular circumstances; in no way can they replace traditional methods and service delivery. Clinical need and clinical benefit should drive the use of technology—not the other way around!

Some e-therapeutic tools are more effective than others; among these are tools that integrate evidence-based content and evidence-based approaches for technology-dependent delivery (e.g., tools based on research into the optimal use of educational and informational technologies that allow for interactivity, modularity, and multimedia approaches in promoting behavior change; Aronson, Plass, & Bania, 2012; Bickel, Marsch, Buchhalter, & Badger, 2008; Campbell et al., 2014; Consolvo, Landay, & McDonald, 2009; Danaher, McKay, & Seeley, 2005; Gustafson et al., 2014; Ritterband & Tate, 2009; Webb, Joseph, Yardley, & Michie, 2010). Although TAC can mimic aspects of traditionally delivered, in-person behavioral health services, it differs in a number of ways. For example, self-directed, technology-based interventions, such as online skills training programs, cannot optimally engage clients in role-play; however, they can help ensure that clients are active participants in the learning process and can

document what content clients have or have not mastered in a given program (Marsch et al., 2013). As a result, technology-based approaches to behavioral health assessment and intervention should not be held to the same standards as traditional models of care; rather, consider what technology can do well and what it can do less well when embracing a TAC approach. Technology-based approaches should still be evaluated with the same rigor as traditional approaches and need to show evidence of empirical support before they are used in clinical settings (Kiluk et al., 2011). The use of technology warrants the same types of considerations as traditional care, such as being sure the client is benefiting from its incorporation into treatment, considering how and when to terminate its use in the context of the client's best interests, and monitoring the treatment process to note whether any modifications to the technology will be necessary.

## Telephone/Audio Counseling and Video/Web Conferencing Tools

### Understanding these technologies

Telephone or audio counseling allows for synchronous communication and delivers behavioral health services to clients via the telephone (the terms "telephone" and "audio" are used interchangeably hereafter). Telephone-based counseling services have existed for decades, so they no longer reflect use of a new technology, but this type of technology-dependent service delivery is still promising. Telephone counseling is distinct from interactive voice response (IVR) and therapeutic interactive voice response (TIVR) technologies, in that telephone counseling typically involves clients' verbal communication with a clinician by phone in real time, whereas IVR and TIVR approaches typically require clients to communicate verbally with a computer database by phone (e.g., interacting vocally with a computerized menu

of options and receiving automated feedback based on their input).

Video or Web conferencing can be conducted in a number of ways, but it typically involves a behavioral health specialist evaluating and providing consultation or counseling to a client via live, two-way, interactive audio/video connection. Synonymous terms include online counseling, Web therapy, distance counseling, telemental health, cybercounseling, and behavioral telehealth. The Health Resources and Services Administration's Web site (http://www.hrsa.gov/ruralhealth/about/teleh alth) defines telehealth as "the use of electronic information and telecommunications technologies to support long-distance clinical healthcare, patient and professional health-related education, public health and health administration."

Telephone-based counseling is already a common practice, and video or Web conferencing as well as other types of telehealth approaches are rapidly growing in acceptability. The increasing availability and reduced cost of voice over Internet protocols (VOIPs), broadband connections, and video quality are making telehealth models more accessible to large numbers of individuals. The distinction between these approaches has diminished with the ever-growing availability of mobile phones and tablets, which often include video technology and thus allow for more efficient use of telephone- and video-based therapeutic interventions. Many states have, and some are developing, specific laws, rules, and regulations regarding telehealth interventions.

### Applying these technologies to behavioral health

Reviews of the scientific literature on telephone-based counseling have underscored the utility of this approach in a number of areas, such as physical activity and dietary behavior

9

change (Eakin, Lawler, Vandelanotte, & Owen, 2007), smoking cessation (Meites & Thom, 2007), and improvement of mental status and quality of life (Mohr, Carmody, Erickson, Jin, & Leader, 2011; Piette et al., 2011). This approach also increases follow-up capabilities in healthcare settings (Racine, Alderman, & Avner, 2009) via telephone-based contacts or visits. Additionally, interventions via telephone can be clinically useful tools when addressing the behavioral health needs of clients in primary care settings (Glasgow, Bull, Piette, & Steiner, 2004; Jordan, Ray, Johnson, & Evans, 2011). Several studies have demonstrated the feasibility, acceptability, and efficacy of using the telephone to obtain data regarding their substance use from adolescents receiving treatment for substance use disorders and to provide telephone-based counseling interventions targeting substance use among youths (Burleson & Kaminer, 2007; Kaminer, Burleson, Goldston, & Burke, 2006; Kaminer & Napolitano, 2004). These studies highlight the efficacy of telephone-based interventions and suggest that youths may prefer telephone-based interventions to in-person counseling. Recent review papers also support the use of telephone-delivered behavioral counseling as a tool for improving health in people with chronic illness (Muller & Yardley, 2011).

Telephone-based IVR interventions have been shown to have considerable clinical utility in areas such as the behavioral management of chronic pain (Naylor, Keefe, Brigidi, Naud, & Helzer, 2008) and as part of posttreatment smoking cessation efforts (Regan, Reyen, Lockhart, Richards, & Rigotti, 2011). As telephones, including mobile phones, have been a routine part of life for so long, research typically shows that both clinicians and clients are comfortable with telephone-based counseling. Indeed, many clients consider telephone counseling a satisfying and helpful process (Reese, Conoley, & Brossart, 2002, 2006).

Video conferencing/telehealth approaches have been increasingly useful to a wide range of clients, including individuals in remote locations (e.g., Alaskan Native villages), the elderly, military personnel, individuals who are hearing impaired, and incarcerated individuals (Simpson & Morrow, 2010), as well as those with serious mental illness (SMI; Sharp, Kobak, & Osman, 2011). Although more research is needed, data to date suggest that

### HealthCall and HealthCall-S

The growing use and affordability of smartphones continues to stimulate their use by researchers for gathering data and developing innovations in behavioral health clinical applications with IVR systems. For example, to monitor substance use, Hasin, Aharonovich, and Greenstein (2014) developed HealthCall-S as an adaptation of the HealthCall IVR programs that have been used in research and clinical practice for more than 5 years. HealthCall's self-monitoring component allows users to monitor their drinking by answering questions about their behaviors; they "receive reinforcement for doing so (e.g., 'We're glad you called')" (Hasin et al., 2014, p. 2). Clients also receive personalized feedback through in-person interactions with a staff member, as the contributors to the development of HealthCall found that participants preferred a combination of technology-based and interpersonal support interventions. HealthCall-S was specifically designed to take advantage of smartphone capabilities and to do so with input from clients themselves; a pilot study showed its acceptability by clients and some limited evidence of its possible usefulness in promoting abstinence among individuals with both HIV and alcohol dependence. Another study that highlighted the role of smartphones in managing symptoms of mental illness was a pilot study of a smartphone intervention with clients who had schizophrenia; results showed acceptability and preliminary efficacy for reducing symptoms in clients over the course of the month-long study (Ben-Zeev et al., 2014).

video conference-based interventions produce outcomes comparable to more traditionally delivered in-person counseling and may provide a useful alternative when in-person counseling is not possible (García-Lizana & Muñoz-Mayorga, 2010b; Norman, 2006). Additionally, some evidence suggests that clients may participate in counseling sessions more if they are offered in a distance telehealth environment as an alternative or an adjunct to in-person settings (Day & Schneider, 2002).

## Self-Directed, Web-Based, and Computer-Based Therapeutic Tools

### Understanding these technologies

Self-directed, technology-based therapeutic tools are typically assessments and interventions provided as stand-alone programs via technology-based platforms. These programs are self-directed in the sense that clients can access and use them with or without assistance from a clinician. Often, these programs enable both clients and providers to access helpful

> **Telehealth Video Session Produced by the National Frontier and Rural Addiction Technology Transfer Center**
>
> The Substance Abuse and Mental Health Services Administration (SAMHSA)-funded Addiction Technology Transfer Center (ATTC) Network has designated its National Frontier and Rural (NFAR) ATTC as the focus area lead for the delivery of addiction-related telehealth services to frontier and rural communities. Telemental health, addiction, and training services were first introduced into frontier and rural areas decades ago (LaMendola, 1997). NFAR provides free resources and ongoing "Telehealth Tuesdays," including an easily accessible 15-minute counseling session video with a client in continuing care, all of which are available online (http://www.attcnetwork.org/national-focus-areas/content.aspx?rc-frontierrural&content=STCUSTOM1).

information. For example, clinicians may receive updates about client activity from the program, and clients may access help in determining how to use and benefit optimally from the program.

These therapeutic tools are accessible online (e.g., interactive, Web-based coping skills training programs; Web-based behavioral management software) or as computer-based programs run from a DVD or a flash drive on a local machine. Computer-based programs that are not Web based may have utility in specific settings where Internet access is limited, such as in criminal justice settings and certain residential treatment programs. However, Web-based, self-directed therapeutic tools offer a number of advantages, including the ability to update centrally and deploy content within a given program as needed (e.g., when new information becomes available that is important for an entire population to receive), the ability to track user activity within a program over time via unique login information, and aggregation of user activity data across client groups (e.g., to allow a provider to review summary information of all of his or her clients). Although the Internet and online assessment and intervention tools are accessible via mobile devices (mobile phones, tablets, and other devices), this section focuses on therapeutic tools accessed primarily via desktop or laptop computers. Therapeutic tools accessible via mobile devices are described later in this chapter.

### Applying these technologies to behavioral health

Interventions that incorporate computer-based, self-directed interactive technology have been used to assess behavioral health, to provide services, and to promote health behaviors related to diabetes (Wise, Dowlatshahi, Farrant, Fromson, & Meadows, 1986), eating disorders (Tate, 2011), substance use disorder

*Using Technology-Based Therapeutic Tools in Behavioral Health Services*

prevention (Chiauzzi, Brevard, Thurn, Decembrele, & Lord, 2008; Chiauzzi, Green, Lord, Thum, & Goldstein, 2005; Hester & Delaney, 1997; Marsch, Bickel, & Badger, 2007; Schinke, Schwinn, & Cole, 2006; Schinke, Schwinn, Di Noia, & Cole, 2004; Schinke, Schwinn, & Ozanian, 2005), HIV/AIDS prevention (Marsch & Bickel, 2004; Marsch et al., 2011; Noar, Black, & Pierce, 2009), and methadone maintenance treatment (Marsch et al., 2013). Computerized treatments for mental disorders have been most widely developed and extensively used for anxiety, traumatic stress, and depressive disorders (Barlow, Ellard, Hainsworth, Jones, & Fisher, 2005; Newman, Consoli, & Taylor, 1997; Newman, Kenardy, Herman, & Taylor, 1997; Selmi, Klein, Greist, Sorrell, & Erdman, 1991). Computer-based interventions to treat these disorders may, in part, reflect the manuals developed for cognitive–behavioral treatments of these disorders. Treatments that have been broken down into discrete procedures as part of the production of a treatment manual are easy to adapt for computer-based interventions. For example, computer programs have successfully implemented such mental health techniques as cognitive restructuring (Selmi, Klein, Greist, Sorrell, & Erdman, 1990), relaxation training (Buglione, DeVito, & Mulloy, 1990), systematic desensitization (Chandler, Burck, Sampson, & Wray, 1988), and self-exposure (Carr, Ghosh, & Marks, 1988). Furthermore, an interactive, Web-based intervention called the Therapeutic Education System (Bickel et al., 2008; Campbell et al., 2014) effectively delivers cognitive–behavioral therapy/community reinforcement approach treatment for individuals with substance use disorders and may be as effective as counseling delivered by highly trained clinicians. A computerized program for substance use disorders that is theoretically grounded in cognitive–behavioral therapy (the CBT4CBT program; Carroll et al., 2008; Carroll et al., 2014) can significantly enhance outcomes when provided as an adjunct to traditional treatment for substance use disorders, and other programs have effectively integrated motivational interviewing approaches (Hester, Squires, & Delaney, 2005; Ondersma, Chase, Svikis, & Schuster, 2005; Ondersma, Svikis, & Schuster, 2007) that target alcohol and other substance use disorders.

An automated, Internet-based contingency management (abstinence reinforcement) intervention called Mōtiv8, which obtains video-based evidence of smoking behavior and reinforces evidence of behavior change (e.g., smoking reduction, abstinence), has produced outcomes that generally meet or exceed the effects produced by nicotine replacement therapies (Dallery & Glenn, 2005; Dallery, Glenn, & Raiff, 2007). An interactive decision support system has shown great promise in helping individuals with SMI initiate smoking cessation treatment (Brunette et al., 2011).

The use of computers may help increase behavioral health counselors' awareness of

## Computer-Based Training for Cognitive–Behavioral Therapy

Investigators are conducting a randomized clinical trial (Clinical Trial NCT 01615497) of a Web-based version of a computer-based training for a cognitive–behavioral therapy program called CBT4CBT, which was specifically designed to address alcohol use. Clinical Trial NCT 01615497 is evaluating CBT4CBT's effectiveness relative to standard outpatient counseling in a substance use disorder treatment unit. CBT4CBT teaches basic coping skills, offers video-based examples of effective use of coping skills in various realistic situations, and allows clients in substance use disorder treatment to practice and review new skills.

*Source:*
*http://www.clinicaltrials.gov/show/nct01615497*

community-based resources for client referrals (Carise, Gurel, McLellan, Dugosh, & Kendig, 2005). Additionally, research evaluating computerized tools for providing screening, brief intervention, and referral to treatment for behavioral health needs has generated promising results to date (Vaca, Winn, Anderson, Kim, & Arcila, 2011; see Part 3 of this TIP, the online literature review, for more information). Interactive computer games targeting various areas of behavioral health have also shown promise (Foley & Maddison, 2010), including games that use virtual coaches (Watson, Bickmore, Cange, Kulshreshtha, & Kvedar, 2012). Overall, literature reviews on the use of computer-generated health behavior interventions underscore the effectiveness of such interventions in producing health behavior change (Moore, Fazzino, Garnet, Cutter, & Barry, 2011; Revere & Dunbar, 2001; Tate & Zabinski, 2004; Taylor & Luce, 2003; Wantland, Portillo, Holzemer, Slaughter, & McGhee, 2004). Comparisons of computer-delivered interventions with person-delivered interventions generally report comparable outcomes (Marsch & Bickel, 2004; Marsch et al., 2007; White et al., 2010).

## Web-Based Text Communication: Email, Chat, Forums, Electronic Mailing Lists, and Social Networks

### Understanding these technologies

This section focuses on text-based communication that may be useful in the behavioral health arena, with a particular focus on email, chat rooms, electronic mailing lists, and forums. Text-based communication that most frequently occurs via mobile devices (e.g., text messaging) is described later in this chapter.

Chat rooms typically refer to open "rooms" online in which individuals can come and go as they wish and communicate synchronously with any or all participants in the chat room.

Many, but not all, chat rooms that focus on behavioral health are moderated by a clinician who posts comments, guides discussions, and sometimes screens comments written by others before allowing them to post. Whether chat rooms are overseen by clinicians or by peers, they typically include guidelines for participation, with designated moderators who monitor content to ensure that participants remain on topic and are appropriate and respectful. Instant messaging typically refers to a private, real-time communication between two or more people in a secure (not public) chat room. However, privacy issues can become an issue in chat rooms, particularly those that are not monitored.

Online support forums are typically organized in a bulletin board format that allows users to post anonymous, text-based communications. Online support groups typically enable asynchronous communication, as do electronic mailing lists (email lists that do not require logging in to a Web site to view postings). For example, the support forum Patients Like Me (http://www.patientslikeme.com) offers Web-based exchanges of information among clients or interested parties related to numerous health conditions and disorders, including types of depression ranging from major depressive disorder to postpartum depression.

Online social networks let members keep in contact with others and/or meet new people. These sites offer a number of elements, including blogs, pictures, chat and private messaging capabilities, and videos. At the time of this writing, Facebook is one of the most popular online social networks. As of March 31, 2015, Facebook reported 1.44 billion monthly users and 936 million daily users worldwide (Facebook, 2015). Facebook has collaborated with several suicide prevention efforts, including those of SAMHSA, to offer unique forms of prevention through social media (for more

information, see http://blog.samhsa.gov/2011/12/13/facebook-provides-first-of-a-kind-service-to-help-prevent-suicides/). Although the online social network of the moment may change over time, online social networks will likely persist, offering considerable potential to function as platforms for behavioral health screenings, brief interventions, and referrals to care. Note that it is possible to set up semi-private online social networks (often within larger online social networks) composed of individuals with common interests (e.g., smoking cessation). For more about social networks and introductory information, see "Emerging Technologies and Future Opportunities" later in this chapter and "Internet Security and Privacy Considerations for Clinicians and Clients" in Part 2, Chapter 2.

## Applying these technologies to behavioral health

Text-based communication can be used in a number of ways in the behavioral health arena. Email can be used for routine contacts, such as setting appointments, or for therapeutic purposes, such as following up on counseling sessions (e.g., to send motivational messages encouraging clients to engage in specific therapeutic activities between scheduled counseling sessions) or actually conducting some portion of counseling. Emails, encrypted or unencrypted, can be automated (e.g., system-generated prompts to encourage clients to keep daily diaries) or generated by providers. Providers can choose to accept and monitor email responses from clients, allowing for dialog, or they can limit communication to one-sided messages sent from the clinician to the client. Email has utility in addressing issues such as eating disorders, smoking cessation, work stress, and weight-loss counseling (Polosa et al., 2009). As with all forms of electronic communication, compliance with the Health Insurance Portability and Accountability Act (HIPAA) and other federal and state regulations regarding privileged communication is a primary concern.

Chat counseling in chat rooms or via instant messaging can achieve purposes similar to those of email but typically requires more abbreviated interactions (e.g., abbreviated words, emoticons; Derrig-Palumbo, 2010). Chat counseling can target an array of behavioral health issues, including problematic alcohol use (Blankers, Koeter, & Schippers, 2011), stress management (Hasson, Brown, & Hasson, 2010), and HIV prevention (Rhodes et al., 2010).

Online social networks can be an excellent forum for conducting online surveys and assessments related to behavioral health (Lord, Brevard, & Budman, 2011). Research into optimal uses of online social networks for behavioral health interventions is still in its infancy, but work to date underscores the potential utility of this platform in engaging hard-to-reach populations (Levine et al., 2011) and promoting behavior change (Moreno et al., 2009), particularly when offered in the context of online communities or support groups that target specific behavioral health issues (Griffiths, Calear, & Banfield, 2009; Selby, van Mierlo, Voci, Parent, & Cunningham, 2010). However, online social networks can be problematic due to their general lack of HIPAA compliance and because of the tendency of clients to post private information in public forums. Additionally, providers who use such networks are faced with how to act on their legal and ethical duties in such venues. Many service delivery organizations, state governance groups, and funders use online survey instruments, either within social platforms or as stand-alone tools, to assess targeted population needs for planning activities or to collect satisfaction data.

## Mobile or Handheld Technologies

### Understanding these technologies

The term "mobile devices" refers to a number of types of handheld and mobile computers, but it most frequently denotes mobile phones and includes both smartphones (handheld computers that can run a complete operating system and thus can function as a platform for app developers) and feature phones (mobile phones that have less computing capacity than smartphones). The popularity of mobile phones has increased dramatically in recent years. Global penetration of mobile cellular subscriptions has reached 87 percent and currently stands at 79 percent in the developing world, with about 6 billion mobile phone subscriptions worldwide; mobile broadband subscriptions have grown 45 percent annually over the past 4 years, and today, there are twice as many mobile broadband as fixed broadband subscriptions (ITU, 2011b). Given the widespread use, ease of use, portability, and high level of computing capacity of even basic feature phones, these technologies offer great potential for affecting public health and healthcare delivery.

### Applying these technologies to behavioral health

Mobile devices can be used for a wide variety of therapeutic purposes, including:

- Mobile data collection tools to obtain data about users' emotional states and behavior in real time (e.g., ecological momentary assessment; Shiffman, 2009).
- Short messaging services (SMS), also known as text messaging or texting, which typically allows a limited amount of data to be transmitted (usually between cell phones). SMS is easy to use and allows for data to be entered into a database and monitored in real time (Lim, Hocking, Hellard, & Aitken, 2008; Merz, 2010),

which in turn facilitates the sending of messages that encourage client/recipient engagement in health promotion and/or treatment-related activities.

- Applications embedded on mobile devices and/or accessed on servers via mobile devices to provide in-the-moment interventions designed to reduce health risk behavior. Although many apps are accessed primarily on mobile phones, these software programs are often accessible on a wide array of hardware, including tablets and other computer platforms.

The use of mobile devices for collecting data in real time has led to enormous advances in understanding the behavior states of individuals. Collection of real-time data via these devices can provide data that are more accurate than data obtained via retrospective recall (Ben-Zeev, McHugo, Xie, Dobbins, & Young, 2012; Shiffman, 2009). Data collection via mobile devices in real time also offers the opportunity to provide in-the-moment interventions in response to participants' behavior state, addressing their mood, medication regimen compliance status, symptoms, or functioning (Granholm, Ben-Zeev, Link, Bradshaw, & Holden, 2012). Offering evidence-based interventions via mobile devices and apps holds great promise for enabling access to behavioral health services outside of formal treatment settings and when individuals may be most likely to engage in risky behavior. Participation in therapeutic activities in one's natural environment and outside of formal systems of care may enhance outcomes (Carroll et al., 2008; Carroll, Nich, & Ball, 2005), enabling more generalization of skills as applied in real-world settings.

The scientific literature on mobile phone-based interventions, although limited to date, suggests that they may hold great promise. One-sided text messages, for instance, from

provider to consumer, have shown considerable utility in promoting treatment compliance (e.g., for asthma, diabetes, medication management; Franklin, Waller, Pagliari, & Greene, 2003, 2006; Tasker, Gibson, Franklin, Gregor, & Greene, 2007) and self-monitoring of health behavior, such as healthy eating and exercise. Text message prompts can also significantly improve attendance at medical appointments (Chen, Fang, Chen, & Dai, 2008; Downer, Meara, Da Costa, & Sethuraman, 2006; Leong et al., 2006) and compliance with vaccinations (Villela et al., 2004). Moreover, these prompts show promise in weight loss (Gerber, Stolley, Thompson, Sharp, & Fitzgibbon, 2009; Shapiro et al., 2008) and HIV risk reduction (Juzang, Fortune, Black, Wright, & Bull, 2011).

More recent developments in mobile technology enable the continuous tracking and monitoring of health information as well as interactive programming on mobile phone platforms. Additionally, two-way text messaging may allow clients to input data that lead to in-the-moment interventions delivered in real time, enabling clients to connect with behavioral

health service providers in many different settings. This technology has facilitated the development of more sophisticated mobile interventions to promote behavior change, including weight loss (Joo & Kim, 2007; Patrick et al., 2009) and diabetes management (Cho, Lee, Lim, Kwon, & Yoon, 2009; Kim & Kim, 2008; Quinn et al., 2008). One example of using advances in programming and adaptive algorithms to permit apps to select content based on an individual's characteristics and prior responses is a program that provided text messages and other information to employees with diabetes that enabled each employee to regulate the number of text messages that the employee would receive (Nundy et al., 2014). By being sensitive to how an employee felt about the number of text messages received, the researchers hoped to build engagement with and acceptance of the program and its use. Evidence showed that their client-centered efforts worked; many participants were happy to receive several messages a day, with one employee stating that the messages made him feel that he did not have to handle the complexities of his diabetic condition entirely on his own.

---

### PTSD Coach

PTSD Coach is an app created by the VA's National Center for PTSD and the U.S. Department of Defense's National Center for Telehealth and Technology. This app helps users learn about and manage symptoms that commonly occur after trauma. Features include:



- Reliable information on posttraumatic stress disorder (PTSD) and treatments that work.
- Tools for screening and tracking symptoms.
- Convenient, easy-to-use skills to help clients handle stress symptoms.
- Direct links to support and help.
- Continuous accessibility; the app is available to clients whenever they need it, wherever they are, so long as they have an appropriate, enabled device.

Together with professional treatment, PTSD Coach provides clients who have or may have PTSD with dependable, trustworthy resources. Family and friends can also learn from this app. As of February 2014, PTSD Coach has been downloaded 138,000 times in 84 countries.

*Source: http://www.ptsd.va.gov/public/pages/PTSDCoach.asp*

Mobile phone-based interventions show promise in reducing smoking and alcohol use (Brendryen, Drozd, & Kraft, 2008; Brendryen & Kraft, 2008; Free et al., 2009; Haug et al., 2008; Lazev, Vidrine, Arduino, & Gritz, 2004; Obermayer, Riley, Asif, & Jean-Mary, 2004; Riley, Obermayer, & Jean-Mary, 2008; Rodgers et al., 2005; Weitzel, Bernhardt, Usdan, Mays, & Glanz, 2007; Whittaker et al., 2009). Mobile devices can also function as tools to prevent substance use disorder relapse (McTavish, Chih, Shah, & Gustafson, 2012). Embedding elements of cognitive–behavioral therapy on mobile devices can significantly increase treatment retention and improve abstinence as part of outpatient substance use disorder treatment (Marsch, 2011a).

It is important to understand the empirical support for various mobile interventions before recommending their use in clinical contexts. In addition to reviewing published studies that evaluate various technology-based tools, including studies covered in Part 3 of this TIP (available online), some centralized resources are available to help individuals evaluate the empirical support for many technology-based

behavioral health tools (e.g., http://www.c4tbh.org/technology-in-action/program-reviews; Maheu, Pulier, & Roy, 2013; http://nrepp.samhsa.gov; http://www.telementalhealthcomparisons.com.

Exhibit 1.1-3 provides examples of technology-based therapeutic tools targeting differing areas of behavioral health and using various types of electronic media.

# Emerging Technologies and Future Opportunities

Significant developments in technology continue to emerge and offer great promise for integration into behavioral health services. Ubiquitous computing (sometimes called ubicomp or pervasive computing) and ambient intelligence are rapidly evolving fields in which human–computer interactions are embedded into everyday objects and activities. Ubiquitous or pervasive computing typically refers to technologies that "weave themselves into the fabric of everyday life until they are indistinguishable from it" (Weiser, 1991, p. 94). For example, ubiquitous computing technologies may include sensors to assess physiological states. Such sensors are worn by individuals on their bodies or are embedded within mobile devices, allowing the unobtrusive and objective measurement of psychophysiological states, as well as biological and environmental variables, in real time (e.g., via interaction between the sensors and mobile computing devices). One example of this approach is a suite of wearable sensors that collect and process cardiovascular, regulatory, and thermoregulatory measurements to infer stress as individuals move through their daily lives (Ertin et al., 2011). Other sensors infer physical activity, social interactions, and behavioral risk factors by capturing and interpreting a variety of characteristics of speech via smartphone (Choudhury et al., 2008). Barnett, Tidey,

---

## Text-Based Smoking Cessation

Text messaging interventions provided via mobile devices can increase smoking cessation, particularly among higher-income individuals. One such intervention, txt2stop, can more than double biochemically verified smoking cessation (Free et al., 2013). Compared with standard support, the txt2stop intervention, which delivered five text messages per day for the first 5 weeks and allowed users to text the words "crave" or "lapse" to receive an instant message of support when a craving struck, produced 10.7 percent continued abstinence at 6-month follow-up, compared with just 4.9 percent continued abstinence among participants who had received standard smoking cessation services (National Institute for Health Research Clinical Research Network, 2011).

**Exhibit 1.1-3: Examples of Technology-Based Therapeutic Tools Across Technological Categories**

| | |
|---|---|
| Telephone/audio conferencing | **Telephone Monitoring and Brief Counseling Intervention:** 15-minute phone calls weekly between counselor and client; accompanying client workbook targeting substance use (McKay et al., 2004). |
| Video/Web conferencing | **VA National Telehealth Services:** Designed for counselors to treat numerous diagnoses in VA clients via multiple treatment modalities in a wide range of settings (http://www.telehealth.va.gov/real-time/index.asp). |
| Self-directed, web-based tools | **Online, Tailored Interventions Targeting Obesity and Eating Disorders:** Self-directed, Internet-based behavioral treatment (Tate, 2011). |
| Email | **Email-Based Psychotherapy:** Therapeutic intervention targeting depression (Vernmark et al., 2010). |
| Chat | **Internet Chat as Aftercare:** An 8- to 10-session online chat-based continuing care intervention to facilitate transfer from inpatient to outpatient psychiatric care (Golkaramnay, Bauer, Haug, Wolf, & Kordy, 2007). |
| Text | **txt2stop:** Mobile phone text messaging intervention to promote smoking cessation (Free et al., 2011; see the Text-Based Smoking Cessation box in the "Mobile or Handheld Technologies" section of this chapter). |
| Forums | **Schizophrenia Online Access to Resources:** Online therapeutic forum for individuals with SMI (and their supporters) that focuses on helping individuals solve problems, achieve personal goals, and meet personal needs (Rotondi et al., 2010). |
| Tools for mobile/handheld devices | **Addiction Comprehensive Health Enhancement Support System:** Personalized monitoring/support for individuals in recovery from substance use disorders; global positioning system to detect when users are nearing high-risk environments; personalized stories of recovery experiences; links to support network (Gustafson et al., 2011).<br><br>**PTSD Coach:** See the "PTSD Coach" box in the "Mobile or Handheld Technologies" section of this chapter. |
| Emerging technologies | **National Center for Telehealth and Technology (T2):** Provides innovative solutions in health technologies for traumatic brain injuries and psychological health through such mobile apps as T2 Mood Tracker and Breathe2Relax, among other efforts (http://t2health.dcoe.mil/apps/t2-mood-tracker).<br><br>**AutoSense:** Wearable sensor suite for inferring stress (Ertin et al., 2011). |

Murphy, Swift, and Colby (2011) conducted a pilot contingency management study using a transdermal alcohol sensor that measures the very small amount of ingested alcohol that is excreted though the skin. The Secure Continuous Remote Alcohol Monitoring bracelet

used in this pilot study is being used in veterans' treatment courts, including the Center for Substance Abuse Treatment (CSAT)/Justice for Vets collaborative Mentor Court in Tulsa, OK (http://www.justiceforvets.org/veteran-mentor-courts).

Ambient intelligence refers to an intelligent environment or an intelligent service system that can anticipate, adapt to, and meet users' needs. Although these evolving technologies (such as smart homes) have only just started to be applied to behavioral health, they could have a marked impact on the field, incorporating many of the technologies already available and in use. These approaches could allow for real-time, unobtrusive psychophysiological measurement and on-demand, continuous access to tailored support, education, and interventions targeting behavioral health. For example, ubicomp tools can obtain real-time data on physiological and environmental factors that precede and follow risk behavior (or healthy behavior) and can provide in-the-moment interventions that are responsive to these factors. These tools may enable unprecedented levels of tailoring for individuals over time. However, such efforts will, of course, require careful consideration of issues related to disclosure, consent, and privacy.

The term "virtual" often refers to anything that takes place online rather than in the real world, but for the purposes of this TIP, "virtual reality" (VR) refers specifically to technology that reproduces realistic conditions and/or computerizes certain aspects of monitoring and/or data collection. The use of VR in helping veterans with PTSD is just one glimpse of the types of future progress that may be achievable with these new technologies.

VR allows users to visualize, manipulate, and interact with computers and highly complex data (Aukstakalnis and Blattner, 1992). Extensive and promising work has been conducted for more than 15 years in the use of VR to treat combat-related PTSD. Comparing VR with the use of aircraft simulators to train pilots, Brennan (2013) described VR's ability to create "context-relevant simulated environments where assessments and treatment of cognitive, emotional, and motor processes can take place…extend[ing] the skills of the clinician by allowing the clinician to precisely and systematically deliver complex, dynamic, and ecologically relevant stimulus presentations…within which sophisticated interaction, behavior tracking, performance recording, and physiological monitoring can occur" (pp. 377–378).

In addition to more than 190 clinical trials related to VR and exposure therapy for PTSD and other health-related uses of VR (see the "VR and ClinicalTrials.gov" box on the next page), the Army's immersion VR system has produced advances in measurement capabilities, such as the development of a measure for a stress indicator referred to as allostatic load (AL). Allostasis is how the body tries to maintain stability in the face of acute stress. The Army has used VR to develop a measure of AL based on inflammatory, metabolic, cardiovascular, adrenal, and renal systems of the body. According to Brennan (2013), AL gauges the cumulative negative impact of the stresses of daily life, indicating how a person is influenced by such stress in the long term. The concept of AL has led to research on the differences in how people experience stress and on possible measures of resiliency to stress. Thus, the use of VR for research and treatment may not only expand the range of knowledge and the options for treatment, but also lead to a higher level of understanding and experience than has been possible in the past.

**VR and ClinicalTrials.gov**

A search for VR in the http://www.clinicaltrials.gov search engine in early May 2014 yielded 190 clinical trials with topics such as:

- Exposure therapy for PTSD.
- Rehabilitation after a stroke.
- Balance training exercises in older adults.
- Weight loss through the use of a VR platform, Second Life, compared with face-to-face methods.
- Medical and scientific training and education, such as the effects of marijuana.
- Wearable sensors.
- Other physical conditions (e.g., pain and memory conditions) and behavioral conditions (e.g., anxiety management, social phobia, agoraphobia, panic disorder, autism spectrum disorder, attention deficit hyperactivity disorder, smoking cessation, fear of flying).

# Integrating Technology Into Existing Services

The ever-widening range of technology-based therapeutic tools becoming available may seem daunting as you attempt to determine which tools will be the most useful in providing TAC to your clients. This section outlines several issues to consider when integrating electronic technologies into your work. First and foremost, you must maintain awareness of the scope of your professional competence and work within its boundaries even as you explore TAC approaches. It is also important to understand which technology-based therapeutic tools have been shown to be the most effective, as not all such tools have both evidence-based content and evidence-based guidance for use. An ethical behavioral health service provider considers available evidence supporting the incorporation of a given technology-based intervention into clinical practice. Rather than use a technology-based intervention merely because the opportunity exists, review

such interventions to ascertain which have been shown to produce optimal outcomes in contexts similar to those in which you will be working (see Part 3 of this TIP, available online, for many such reviews).

Additionally, the types of technology-based tools that will be most useful depend on the audiences being targeted and the settings in which those tools will be used. For example, self-directed, technology-based interventions and asynchronous forms of technology-based communication may be particularly useful with specific subgroups of clients, such as those with social phobias. The same types of technology-based interventions may elicit more honest communication with clients due to the perceived anonymity or confidentiality they enable; clients may be more comfortable addressing particularly sensitive topics in front of a computer screen or a mobile device than during in-person communication. Asynchronous communication and self-directed, technology-based tools can also be particularly useful to people who don't routinely have access to a private space where they can talk on the phone or through VOIP to a clinician but do have access to a computer or mobile device.

In some cases, however, the use of technology in therapy is contraindicated. For client populations that include individuals who are experiencing significant emotional distress or complex situations (such as domestic violence), counselors must give careful thought to how to use technology appropriately to enhance care. Clients who are actively suicidal, homicidal, or severely emotionally distressed may not be good candidates for online care (CSAT, 2009c; International Society for Mental Health Online–Clinical Study Group, 2010; Stofle, 2001). Keep in mind that self-directed and asynchronous tools cannot convey your clients' nonverbal cues (e.g., intoxication, crying) and may not be ideal for clients

who find typing difficult or frustrating. Clients who are isolated and crave social interaction or feel the need to get out of the house may not be good candidates for technological interventions that decrease in-person contacts.

By contrast, self-directed and asynchronous tools may be particularly appealing to teens and young adults who have grown up on the Internet and spend most of their time interacting with some technology. A Kaiser Family Foundation study (Rideout, Foehr, & Roberts, 2010) found that the exposure to media of children and teenagers 8 to 18 years old increased roughly 20 percent from 2004 to 2009. Estimates of the amount of total recreational use of all devices, per day, every day of the week, reached almost 7.5 hours in 2009.

Several studies underscore the acceptability and appeal to youths of computer-delivered interventions relative to more traditional models of care. For example, among the most significant barriers to adolescents' participation in substance use disorder treatment is dislike for their counselors, discomfort talking about personal problems with another person, and finding counseling unhelpful (Mensinger, Diamond, Kaminer, & Wintersteen, 2006). As a result, computer-based counseling may be appealing to youths. Indeed, youths may prefer Internet-delivered substance use disorder interventions over more traditional interventions (Chambers, Connors, & McElhinney, 2005). Many youths report that they find interactive computer learning environments preferable to traditional learning environments, in that computer-based learning allows them to solve problems actively and independently while still receiving individualized feedback (McKinsey and Company & U.S. National Information Infrastructure Advisory Council, 1995; Roker & Coleman, 1997).

Additionally, a growing body of research has highlighted the utility of technology for health promotion among aging populations, including the promotion of health-related knowledge and functional longevity (Tse, Choi, & Leung, 2008). Furthermore, computerized cognitive remediation tools designed to enhance cognitive skills through exercises that target problem solving, attention, memory, and abstract reasoning have been shown to have promise in populations with SMI as well as among individuals with substance use disorders (McGurk, Twamley, Sitzer, McHugo, & Mueser, 2007; Pedrero-Perez, Rojo-Mota, Ruiz-Sanchez de Leon, Llanero-Luque, & Puerta-Garcia, 2011).

A key benefit of telephone-based counseling is the accessibility of phones (including cell phones) to a number of populations. Thus, phone-based counseling has broad appeal and utility. It is, however, important to add that the use of technology for technology's sake does not help the clinician or the client. Any use of technology should engage both the clinician and the client, making the use of time more effective and valuable for both.

## Legal and Ethical Issues To Consider

Ethical considerations in TAC are often extensions of (and in many cases, overlap with) ethical considerations in traditionally delivered behavioral health services. However, some unique considerations arise for TAC. As clinical practices differ in various settings, it is not possible to cover every possible ethical and legal consideration relevant to the incorporation of technology into behavioral health services. That said, this section addresses some of the most significant ethical and legal issues to consider when providing TAC.

21

## Confidentiality, Privacy, and Security

The use of technology-based therapeutic tools in behavioral health warrants a number of considerations related to confidentiality, privacy, and security. As in traditional clinical scenarios, ethical principles and procedures related to protecting clients' privileged information (confidentiality), protecting clients' rights to control access to their information (privacy), and protecting client data from being accessed without authorization (security) are of paramount importance. However, some unique considerations arise when collecting data and/or delivering interventions using electronic media.

Text-based communications provide a literal transcript of communication between you and your clients (e.g., email, online moderated chat forums) or among groups of clients (e.g., online support groups), but this mode of communication poses certain risks. For example, if a mobile device is used for communicating with a client via text, depending on the settings and device properties, messages stored on the mobile device as well as those sent from the device are likely unencrypted and vulnerable to security threats. Email messages are also usually unsecured and can be accessed by third parties. Even if emails are deleted by both the sender and recipient, they may be preserved by other third parties, such as Internet service providers (ISPs). As mentioned in Exhibit 1.1-1, managing security and confidentiality in TAC is the responsibility of all parties engaged in their use.

A thorough discussion of the broad set of security issues related to the use of mobile devices in the general healthcare environment is beyond the scope of this TIP. The U.S. Food and Drug Administration (FDA) has been issuing guidance as to which sorts of technologies are considered medical devices and which are considered health or medical apps

that do not require approval from the FDA as medical devices. In general, apps that pose lower risk to the public will not be required to seek review as medical devices. The FDA (2014) has described some of these low-risk devices as apps that:

- Help people maintain coping skills.
- Alert people with asthma of environmental conditions.
- Prompt users to check on possible drug interactions with food, herbs, or other medications.
- Use videos to motivate patients to do their physical therapy at home.
- Provide information or screening, counseling, and preventive recommendations from well-known and established authorities.
- Enable a clinical conversation to be recorded for review after the visit.
- Allow users to track behaviors related to diets, exercise, and sleep.
- Engage in mind-challenging tests or games.

Apps that may constitute a risk to patients or others if the device fails to work properly require approval as medical devices. For example, certain devices relay heart function data to medical services that monitor a patient's heart function; if such a device provided false information or failed to operate, it could endanger the patient (FDA, Center for Devices and Radiological Health & Center for Biologics Evaluation and Research, 2013).

The HealthIT.gov Web site (http://www.healthit.gov/providers-professionals/your-mobile-device-and-health-information-privacy-and-security), operated by the Office of the National Coordinator (ONC) for Health Information Technology, offers a number of resources for healthcare providers related to using mobile devices in a way that helps protect and secure client health information. Exhibit 1.1-4, adapted

## Exhibit 1.1-4: Areas of Concern for Mobile Computing Devices

| Area of Concern | Considerations | Threat Level | Threat Type: Privacy (P)/ Security (S) |
|---|---|---|---|
| DEVICE | | | |
| Access control | Control over the user authorization process required to access the device | High | P S |
| Encryption | Technology in place to protect data at rest | High | P S |
| Updates | How and when the device is updated | Moderate | S |
| Software vulnerabilities | Weaknesses in the platform and operating system that may allow unauthorized access to the device | Moderate | S |
| Backups | How, when, and where backups are handled | High | P S |
| Mobile malware | Viruses and other malicious software that can steal data, capture keystrokes, or perform other compromising actions | Moderate | P S |
| Remote management | How the device is managed remotely, if at all, including ability to restrict application access or Web access, encrypt data, remotely wipe data, and so on | High | P S |
| Device-specific issues | Issues specific to mobile computing devices but not other computing platforms, such as inability to truly erase mobile device storage | High | P S |
| Platform-specific issues | Issues specific to each mobile computing device platform, such as password storage, application backgrounding or suspending, and so forth | Moderate | P S |
| APPLICATION | | | |
| Access control | Control over the user authorization process required to access the application, including session initiation and management and least-privilege access | High | P S |
| Inappropriate storage | What information the application stores and whether the level and sensitivity of information support local storage | High | P S |
| Insecure storage | Ensuring that data are stored in an adequately encrypted fashion. | High | P S |
| Insecure transport | Ensuring that sensitive data transported over the network are encrypted, including usernames and password, management information, and other data; does the application force the use of encrypted technologies? | High | P S |
| Updates | How and when the application is updated | Moderate | S |
| Software vulnerabilities | Weaknesses that may allow unauthorized access to the application | Moderate | P S |
| Backups | How and where backups are handled | High | P S |

*(Continued on the next page.)*

23

*Using Technology-Based Therapeutic Tools in Behavioral Health Services*

**Exhibit 1.1-4: Areas of Concern for Mobile Computing Devices (continued)**

| Area of Concern | Considerations | Threat Level | Threat Type: Privacy (P)/ Security (S) |
|---|---|---|---|
| Data leakage | Potential for leaking sensitive information, such as user name, device ID, location, and so forth | Low | P |
| Platform-specific issues | Ways in which the application uses, disables, or works around platform-specific security issues | Moderate | P S |
| Back-end server | Server security, presence of a firewall, and protection against normal application security flaws like structured query language injection, misconfigurations, and so forth | High | P S |

*Source: Healthcare Information and Management Systems Society (HIMSS), 2011. Adapted with permission.*

from HIMSS (2011), describes considerations to address in the particular uses of an app. For current information on app security issues, refer to the HIMSS Web site (http://www.himss.org).

New information about the regulation of mobile medical apps is rapidly developing. The FDA Web site lists examples of mobile medical apps that it will (http://www.fda.gov/MedicalDevices/DigitalHealth/MobileMedicalApplications/ucm368743.htm) and will not (http://www.fda.gov/MedicalDevices/DigitalHealth/MobileMedicalApplications/ucm388746.htm) seek to regulate. For a detailed overview of the issues related to the regulatory framework emerging for digital medicine, including developments outside of the United States, Elenko, Speier, and Zohar (2015) provide a cogent review and analysis.

In the United States, text-based communications between providers and clients are protected under HIPAA and some state laws that cover protected health information (PHI), but they can be subpoenaed from providers or ISPs. Text-based communications between a counselor and a child or adolescent pose unique risks, as parents typically have a legal right to view their children's medical records—which may include some types of communication (Recupero, 2008). HIPAA does not explicitly address the use of some technologies, such as SMS and cell phones. However, several guidelines regarding clinical use of such technologies are available, including the National Institute on Standards and Technology's guidelines for mobile device security, which address potential security issues that must be managed when using such devices for therapeutic purposes (Jansen & Scarfone, 2008), and the ONC Web site on privacy and security for providers and professionals. For example, the subscriber identity module card on a mobile device stores text messages and identifies users of cell phones to the cell phone network. This raises important questions regarding the physical security of the mobile device, along with the importance of encrypting text messages. Encryption is available for telephone communication as well, although it can be cost prohibitive. VOIPs, which enable phone communication over the Internet, typically allow for more accessible encryption technology.

An option with increased security is the use of secure, Web-based messaging systems that allow providers to email clients with a prompt

to log in to a password-protected Web site to retrieve a message (rather than sending the message through multiple servers, as with normal email). You may wish to set up password protection, automatic logouts, firewalls, audit trails, encryption, and authentication for any programs that you use. Also consider whether to include transcripts of electronic communication with clients in client records.

Online counseling services allow for tracking of clients' Internet protocol addresses. This information does not automatically reveal the exact geographic location of a client, but an ISP may be able to provide such information in an emergency. Large online counseling service providers often use proprietary systems for communicating with clients. These systems may include encrypted chat stream identifiers, storage of text communication with clients, and emergency procedures for locating a client's local hospital or police station (Derrig-Palumbo, 2010), which may help effectively manage several of the confidentiality issues reviewed thus far. Ascertaining the security of technology-based communications between providers and clients is important, given that third parties can potentially access such communication. That said, the largest risks are typically low tech and include sending an email to the wrong address, posting one's password in a place visible to others, forgetting to log off, or using an employer-hosted email server (Sands, 2004).

There are a number of legal considerations related to online counseling models. Inter-jurisdictional issues (licensure laws and regulations) that apply when practicing across state lines, for example, must be understood. State licensing boards typically require that a practitioner providing services in a different state also has a license to practice in that state. States also vary in their mandatory reporting laws, such as those related to concerns about

---

### The Distance Certified Counselor

The Center for Credentialing and Education, a subsidiary of the National Board for Certified Counselors, offers a certification called the Distance Certified Counselor, which identifies providers who have met established standards in distance counseling. It is a critical responsibility of clinicians to stay abreast of the evolution of legal issues and best practice guidelines and to implement these in their own work (Maheu, McMenamin, & Pulier, 2013).

---

abuse of and/or harm to self or others. Additionally, you should be aware of ethical standards and guidelines regarding online counseling models provided by professional organizations. You should further be aware that online counseling best practice guidelines may vary with the specific system and tools you use to deliver TAC. As technology and ethical issues continue to evolve, it is important to obtain professional training and certification.

Clear policies should dictate the use of various technologies to communicate with clients. Establish your own policies (in compliance with your organization's overarching policies) based on your understanding of the risks and benefits of various approaches and clearly communicate this policy to all clients. Ideally, these policies would differentiate between what constitutes PHI and what does not. Many professional organizations offer standards and guidelines in this arena and may be able to help you formulate your own policies as well.

Policies on the use of communication technologies should address issues such as which technologies providers are willing to use in communicating with their clients, when each technology is and is not appropriate for use, and what the potential risks and benefits of using each technology may be. These policies should also cover the extent to which other

Using Technology-Based Therapeutic Tools in Behavioral Health Services

## Essential Elements of Informed Consent To Participate in TAC

Services process and alternatives:
- Whether communication will be synchronous or asynchronous
- Response standards and scheduling
- Frequency of interactions
- Misunderstandings (text-based and video-based risks)
- Alternative treatments or delivery approaches

Individuals who may have access to clinical information:
- Other providers on both ends of a Web conferencing exchange
- Technical staff members required to operate or maintain the technology
- Other participants in groups or chats
- Supervisors
- Program evaluators or quality assurance monitors

Potential benefits of the service:
- Access to services
- Privacy
- Reflection time
- Access to specialists and supervisors

Confidentiality of communications and records:
- Confidentiality laws that apply to clinical exchanges using technology
- Legal exceptions that apply to telemental healthcare or telemedicine just as they do to in-person clinical work, including child abuse, elder abuse, medical emergencies, threats of violence, or danger to self, as dictated by state and federal laws

Privacy and privacy risks:
- What is being transmitted, including identifiable images, clinical information, appointment reminders, and billing information
- Form of transmission, including attempts to protect privacy using encryption
- Privacy risks inherent in transmission, such as failures of technology, and unauthorized access to electronic information
- Storage/destruction policies for electronic communications (e.g., text messages, emails)

Roles and credentials of all individuals involved in service delivery:
- Names, roles, and credentials of all providers who participate in clinical care and how the client can confirm credentials (includes providers on both ends of a telemedicine exchange)
- Billing or administrative staff members who may contact clients about administrative issues

Emergency procedures:
- Expectations for response to postings, emails, telephone calls, or text messages
- Contact information and procedures if immediate follow-up is needed
- Emergency/crisis services contact information
- Steps providers may take if concerned about safety of a client

Ways for clients to protect their privacy:
- Controlling access to communications through establishing passwords, deleting cookies, and controlling computer access
- Understanding the risks of sharing email accounts
- Limiting or preventing the provision of identifying information on social media
- Identifying Internet security risks
- Installing virus, spyware, and malware detection software

*(Continued on the next page.)*

26

---

**Essential Elements of Informed Consent To Participate in TAC (continued)**

Charges and payment:
- What the charges for services are, including email exchanges, telephone calls, and text messages
- How charges will be billed
- What the charges will be for no-shows

Service disruptions:
- Ways to handle service disruptions
- Potential impact of service disruptions on privacy or confidentiality
- Alternative ways to contact the provider

Regulatory agencies and grievances:
- Who regulates the service provided
- What are the internal and external channels and contact information for filing a grievance

---

staff members in a clinical practice may access technology-based communications with clients. These policies should additionally ensure that clients do not assume that there will be real-time communication with clinicians (e.g., a policy to inform clients that they should not use a technology-based intervention to contact their clinician when in crisis, such as when experiencing suicidal or homicidal ideation, making plans, and/or exhibiting intent). All providers should put their TAC policies in writing and clearly communicate them to clients at the start of the therapeutic relationship using an informed consent agreement. It is also helpful to have clients sign off on these policies to acknowledge that they have reviewed them and agree to comply.

SAMHSA offers confidentiality and health privacy resources (CSAT, 2004c; http://www.samhsa.gov/healthprivacy). For information on providing TAC to veterans, see the planned TIP, *Reintegration–Related Behavioral Health Issues in Veterans and Military Families* [SAMHSA, planned e]).

## Informed Consent

Providers of technology-assisted services are bound by the same legal and ethical requirements and standards of practice that apply to in-person service delivery; however, technology introduces some additional risks and benefits that should be covered with participants in technology-assisted services. The risks and considerations vary by type of technology used, as well as the type of service delivered. The box beginning on the previous page outlines some of the more common considerations related to technology-facilitated care.

## The Digital Divide and Healthcare Disparities

Although Internet and mobile phone access is rapidly increasing all over the world, some populations may have greater access to these technologies than others. Variables that influence access include rural versus urban locations; socioeconomic status; and various demographic characteristics, such as age. Even with access, some people may not be able to engage in TAC readily due to challenges with technological literacy, health literacy, or reading literacy. Additionally, some technology-based tools and interventions may not be accessible to or perceived as useful by various groups if they don't address individuals' needs in a culturally responsive manner. Clients will benefit from tools that are in the language with which they have the greatest facility.

TAC offers great potential to lessen the digital divide and address healthcare disparities

27

that exist in many traditional models of care. For example, although White Americans (80 percent) are more likely to use the Internet than African (72 percent) or Hispanic (61 percent) Americans, African Americans are the most active users of the Internet via mobile devices. The rate of increase in the use of mobile devices to access the Internet among minority groups has, since 2007, remained at roughly twice the national average—for example, 141 percent increased use for African Americans versus the 73 percent national average (Horrigan, 2009). By offering interventions on a wide variety of platforms to capitalize on the technology most frequently used by various target populations (e.g., developing interventions for mobile devices for specific minority groups), TAC may offer a new service delivery model that could substantially reduce the healthcare disparities present in many traditional care models (Gibbons, 2007). For examples of the use of TAC with Native American populations, see the planned TIP, *Behavioral Health Services for American Indians and Alaska Natives* (SAMHSA, planned b).

Technology-based therapeutic tools not only offer clinical information and support to diverse audiences, but also provide social and supportive functions that may be absent or inaccessible to certain populations via traditional healthcare systems. Because TAC can provide information tailored and responsive to each individual's level of understanding and needs, this approach can accommodate diverse users with differing cultural needs and varying levels of health, technological, and reading literacies (Gibbons et al., 2011).

Legislation and policy changes may soon promote broadband access and digital competence, reducing the digital divide. On May 28, 2015, the Federal Communications Commission (FCC) received proposed changes to the Lifeline Program, which has existed since the mid-1980s and was originally designed to help people with low incomes pay for phone services; proposed changes would allow the program to support broadband access for low-income individuals (FCC, 2015). Today, households with incomes of $150,000 or above have easy access to broadband services, whereas slightly less than half of households with incomes below $25,000 can access such services; moreover, almost half of low-income families have had to cancel or suspend smartphone services due to costs (FCC, 2015). As of June 2015, drafts of proposed legislation had been introduced to the United States Senate: The Broadband Adoption Act (Senate Bill 1472, 2015) and the Digital Learning Equity Act (Senate Bill 1606, 2015). Passage of such types of legislation and related policy changes may help narrow the digital divide.

## Electronic Health Records

Another important consideration in using technology-based therapeutic tools in the behavioral health arena is electronic health records (EHRs), which are also called electronic medical records (EMRs). The terms are often used interchangeably, but an EMR typically refers to an individual's patient record created in a single healthcare setting, whereas an EHR typically collects data cumulatively across healthcare settings. EHRs are part of a larger effort to promote meaningful use of health information technology that improves healthcare and enhances information exchange among healthcare professionals. The Health Information Technology for Economic and Clinical Health Act of 2009 and the Patient Protection and Affordable Care Act of 2010 emphasize the widespread and meaningful use of EHRs, which are intended to improve recordkeeping, outcomes reporting, patient transitions across providers (along with their medical records), and quality of patient care (by increasing communication across providers and reducing medical errors). The three main

components of meaningful use are the use of a certified EHR in a meaningful manner, the electronic exchange of health information to improve quality of healthcare, and the use of certified EHR technology to submit clinical quality measures and other measures.

Research and development efforts with EHRs are rapidly expanding in the United States and elsewhere. A complete review of EHRs is beyond the scope of this TIP, but the evolution of EHRs and their application in healthcare settings are well characterized in a number of existing resources. The Agency for Healthcare Research and Quality and the ONC for Health Information Technology provide details on EHRs online (http://www.ahrq.gov; http://www.healthit.gov).

EHRs offer considerable promise for collecting data on clients' behavioral health along with other medical issues, which may enhance client-centered care and public health. Limited work to date has focused on the inte-

gration of EHRs that include behavioral health data with other technology-based therapeutic tools targeting behavioral health; combining them may markedly influence behavioral health services. For example, Web-based or mobile interventions that collect data as part of screening or assessment activities could code those data in a format that is compatible with EHRs and then interface with EHRs to update relevant information. Such data would provide a richer, more comprehensive picture of clients' behavioral health. Information collected on a client's behavioral health in real time via a mobile application may allow for a better characterization of the client than information collected only during in-person appointments with behavioral health service providers. Such information may enable providers to manage clients' behavioral health more effectively (Exhibit 1.1-5).

At this time, there are no national standards for the collection of data on clients' behavioral



**Exhibit 1.1-5: The Benefits of Using an EHR System**

**Physician workflow**

| Metric | Value |
|---|---|
| Accessed patient chart remotely | 74 |
| Alerted to critical lab value | 52 |
| Alerted to potential medication error | 43 |
| Reminded to provide preventive care | 40 |
| Reminded to provide care meeting clinical guidelines | 38 |
| Identified needed lab tests | 29 |
| Facilitated direct communication with patient | 25 |

**Patient-related outcomes**

| Metric | Value |
|---|---|
| Enhanced overall patient care | 74 |
| Ordered more on-formulary medications | 44 |
| Ordered fewer tests due to lab results' availability | 30 |

Percent of physicians who experienced benefit within past 30 days

*Source: Jamoom et al., 2012. Reproduced from material in the public domain.*

health, and incompatibility among different types of EHRs impedes the efficient sharing of data. Little research to date has focused on effective strategies for integrating data from technology-based therapeutic tools into EHRs. However, SAMHSA; the National Quality Forum; Health Language, Inc.; and several other groups are working to fill these gaps. For example, several institutes at the National Institutes of Health, in collaboration with the Society of Behavioral Medicine, have launched an initiative to identify common data elements for client-reported measures of behavioral health, which can be used in EHRs (http://www.sbm.org/UserFiles/file/EHR_Meeting_May_2-3-2011--Executive_Summary.pdf). These common data elements, such as measures of quality of life, eating patterns, substance use, anxiety and depression, and stress, could be used in primary care and public health settings to screen clients for behavioral health risk factors. Doing so could lead to a number of possible benefits, including improved clinical decision making (with greater involvement of clients in shared decisions) and delivery of tailored, brief interventions in these settings.

Emerging research and development efforts will be especially important as behavioral healthcare is increasingly integrated into other healthcare settings and, as a result, is less confined to specialty treatment programs. For example, the 2010 National Drug Control Strategy from the White House Office of National Drug Control Policy (ONDCP) set several goals to integrate treatment for substance use disorders into an array of healthcare settings and not confine such treatment to specialty addiction treatment programs (ONDCP, 2010), and these goals as well as additional goals to increase integration have continued to be part of ONDCP's strategies (ONDCP, 2013). A key strategic action to meet this goal involves expanding addiction treatment into

community health centers (CHCs) and other settings that service low-income populations most often in need of treatment for substance use disorders and mental illness. A critical issue will be maintaining the specifications of Title 42, Part 2, of the Code of Federal Regulations, the confidentiality regulations that govern privacy and confidentiality of records related to substance use disorder treatment. Technology-based approaches to assessing clients' behavioral health and evidence-based interventions that are responsive to clients' behavioral health risk factors may enable clinicians to conduct these activities with excellent fidelity and at low cost for broad client bases. The flexibility and ease of use of technology-delivered approaches can promote access to behavioral health services for hard-to-reach populations who use CHCs and other nonspecialty healthcare settings for other medical services. A technological infrastructure allows collection and storage of select client data; this improves coordination of and continuity of care and activity reporting that facilitates service reimbursement.

Technology-based tools are also growing in use in terms of self-help techniques entirely outside of any formal healthcare-related activities. Many health-promoting apps suggest, but do not require, coordination with healthcare professionals. It is too early to tell which technology-based tools may be helpful as stand-alone, wholly self-directed interventions and which may facilitate coordination and cooperation. Whatever the future holds, TAC is especially likely to enhance the capacity of primary care organizations to attend to the behavioral health needs of their clientele.

## Concluding Comments

TAC is widely applicable in targeting behavioral health and may be clinically useful across a spectrum of behavioral health and physical health services, including screening,

assessment, prevention, treatment, recovery management, and continuing care. Various electronic media are of use in behavioral health services and enable entirely new models of behavioral health service delivery. This is an exciting time for harnessing technology to increase the quality and reach of effective behavioral health services, but a carefully planned approach for embracing TAC is essential to grant behavioral health service providers and program administrators—as well as their clients—the greatest benefit.

# Part 1, Chapter 2

## IN THIS CHAPTER

- Introduction
- Vignette 1: Implementing a Web-Based Prevention, Outreach, and Early Intervention Program for Young Adults
- Vignette 2: Using Computerized Check-In and Monitoring in an Extended Recovery Program
- Vignette 3: Conducting a Telephone- and Videoconference-Based Pretreatment Group for Clients With Substance Use Disorders
- Vignette 4: Incorporating TAC Into Behavioral Health Services For Clients Who Are Hearing Impaired
- Vignette 5: Using Smartphones To Support Recovery for Clients With CODs

## Introduction

In this chapter, you will meet several counselors who provide technology-assisted care (TAC) to clients who have mental or substance use disorders in various settings, including a student counseling center in a community college; an inpatient co-occurring disorders (CODs) unit in a large city; an Assertive Community Treatment (ACT) team at a community mental health center's (CMHC's) day hospital program; a pretreatment group in a rural area; a community behavioral health agency in a small city; and a CMHC that serves several counties. Each vignette begins by describing the setting, learning objectives, strategies and techniques, and counselor skills and attitudes specific to that vignette. Then a description of the client's situation and current symptoms is given. Each vignette provides counselor–client dialog to facilitate learning, along with:

- **Master clinician notes:** comments from the point of view of an experienced clinician about the strategies used, possible alternative techniques, and insights into what the client or prospective client may be thinking.
- **How-to boxes:** step-by-step information on how to implement a specific intervention.

The master clinician represents the combined experience of the contributors to this Treatment Improvement Protocol (TIP). Master clinician notes assist behavioral health counselors at all levels: beginners, those with some experience, and veteran practitioners. Before using the described techniques, it is your responsibility to determine if you have sufficient training in the skills required to use the techniques and to ensure that you are practicing within the

*Using Technology-Based Therapeutic Tools in Behavioral Health Services*

legal and ethical bounds of your training, certifications, and licenses. It is always helpful to obtain clinical supervision in developing or enhancing clinical skills. For additional information on clinical supervision, see TIP 52, *Clinical Supervision and the Professional Development of the Substance Abuse Counselor* (Center for Substance Abuse Treatment, 2009b). As you are reading, try to imagine yourself throughout the course of each vignette in the role of the counselor. This chapter presents five vignettes, which can be briefly summarized as follows.

**Vignette 1: Implementing a Web-Based Prevention, Outreach, and Early Intervention Program for Young Adults.** This vignette discusses administrative issues in developing and implementing a Web-based prevention and intervention program and then demonstrates the capability of such a program to meet the stress management needs of a college student.

**Vignette 2: Using Computerized Check-In and Monitoring in an Extended Recovery Program.** This vignette demonstrates how computerized check-in and monitoring can support recovery for clients with co-occurring substance use disorders and serious mental illness (SMI).

**Vignette 3: Conducting a Telephone- and Videoconference-Based Pretreatment Group for Clients With Substance Use Disorders.** This vignette demonstrates how to serve clients in a rural area who are on a wait list for treatment by providing a pretreatment group conducted using video and telephone conferencing.

**Vignette 4: Incorporating TAC Into Behavioral Health Services for Clients Who Are Hearing Impaired.** This vignette describes ways in which TAC can support intake, assessment, referral, treatment, and continuing care for clients who are hearing impaired, a specific group of people for whom technology plays a particularly important role in access to care. Deaf clients and others in the Deaf community may prefer the term "Deaf" over "hearing impaired," and you should adjust the terminology you use accordingly.

**Vignette 5: Using Smartphones To Support Recovery for Clients With CODs.** This vignette illustrates how mobile phone applications (apps) can be used to help clients with mental illness regulate their emotional responses, enhance the therapeutic alliance (between the client and counselor), and engage in effective coping strategies.

# Vignette 1: Implementing a Web-Based Prevention, Outreach, and Early Intervention Program for Young Adults

## Overview

This vignette introduces a prevention, outreach, and early intervention program that young adults can access via portable devices, such as smartphones and tablets, as well as via desktop computers. The program delivers intervention content through engaging technologies, including audio, video, text, and other interactive tools. It offers personalized assessments for alcohol, drug, and tobacco use; sexual health and sexually transmitted disease (STD) prevention; stress; nutrition; and other issues young adults may face. The program also offers psychoeducation, goal setting, action planning, cognitive–behavioral therapy (CBT), and skill-building tools. Programs like this one are packaged primarily for colleges and universities, but they can be customized to

meet the needs of any population. This vignette first discusses some of the administrative issues in developing and implementing a Web-based prevention and intervention program; the second part of the vignette demonstrates the capability of such a program to meet the stress management needs of a college student. It then shows how the program might supplement early intervention efforts with an individual who is receiving counseling for a substance use disorder.

## Learning Objectives

- Understand how to incorporate online screening tools into a larger program of prevention, screening, and early intervention for behavioral health difficulties.
- Identify individuals who need assistance and support by using an online screening tool for stress management.
- Use computer-assisted technologies to supplement ongoing counseling efforts and to extend traditional treatment services by providing support, education, and specific interventions.
- Become aware of issues that can arise when applying a technologically enriched, broad-based prevention and early intervention program with a specific target population.
- Evaluate the cost effectiveness of prevention and early intervention programs that include computer-assisted technologies.

## Setting

John is a counselor in a local behavioral health center; his responsibilities include coordinating mental health and substance use disorder outreach and treatment services for students at the local community college. John and his two colleagues are seeing a significant increase in the number of stress-related requests for services from the student population. His center's resources are limited, so John has begun investigating online, client-driven tools that can be used with college-aged students in hopes of integrating such tools into his center's services. Students can access these resources from their computers or mobile devices. He hopes to be able to identify and appropriately serve three groups of people who may use behavioral health services: those with situational stress reactions, those who are experiencing significant stress and are at risk of more serious problems, and those who need acute care for pressing mental and/or substance use disorders.

In Part 1 of John's story, he searches for appropriate tools and meets with his program director to explore program development and implementation issues. In Part 2, John meets with Amy, a student experiencing significant stress, and helps her use the stress management component of the program to be able to continue in school and manage her school work. In Part 3, a student uses the program as an adjunct to counseling and mutual-help programs to address his drinking problem.

## John's Story

### Part 1: Providing targeted services

John, a senior counselor and college outreach coordinator for a local behavioral health center, is meeting with his program director, Nancy, to discuss how to provide better and more targeted services to students at the local college.

JOHN: I'm pulling my hair out with all these students coming in. I don't know why they're coming now. Maybe it's because it's the end of the semester, or maybe students have only just now

begun to understand how they can benefit from help. We've just had an onslaught—more than we can really handle.

NANCY: What are the numbers?

JOHN: As you know, just three of us are handling this community college contract, and we've had 10 to 12 new students a week. They're coming in for stress-related issues and substance use. Alcohol problems are on the rise, and we're also seeing a lot more students smoking marijuana. Some of these kids are really under a huge amount of stress, but then again, I don't think others really need intensive services.

NANCY: So what are you thinking would be the best way to handle this increase?

JOHN: Well, I've done a little research, and I found some online resources that look pretty good. One is a comprehensive package for stress management, alcohol and drug use, nutrition, sexual health, and a variety of other topics. In this particular program, the students can go to the program Web site on their own, using a desktop computer, a laptop, a tablet, or even a smartphone. The site does some neat stuff based on education and CBT. There are a lot of cool tools that mirror things we already do clinically with students regarding prevention and relaxation. I wanted to talk with you about maybe integrating the package into our system of care.

NANCY: Do you know of any other college that's using this kind of program?

JOHN: Well, I don't have much spare time, you know? But I did some homework, and it seems like a number of colleges use this particular program. Some of them resemble our college, with an urban location, lots of commuting students, and limited treatment services for substance use and mental disorders. Some require all freshmen to do an orientation to the Web site, but others require that all students participate in just the alcohol and drug use part of the program. It looks like there are some data about the results and some evidence to support its use. I think it's pretty credible. What I like is that it's all contained in one package—just one stop and you'd have a range of resources to meet the variety of significant needs here in the college community.

NANCY: Can we get references from some of these other schools? I'd like to talk to them first. Also, I'm a little concerned about the all-inclusive package; it might be the case that not all elements of the package are high quality. We'll need to check into that.

JOHN: That's a good idea. I'll contact the colleges and talk to some of our colleagues there. I'll ask them about their experience with the program.

NANCY: I'd like to know whether there are other programs or other kinds of options. We could find out what the advantages or disadvantages are with them. I'd also be interested in how they measure success, and if we would measure it in the same way.

**Master Clinician Note:** Not everything that sounds good is good! Behavioral health service providers and program administrators must always ask questions and critically examine the evidence to determine whether a particular technology works or does what it purports to do. The National Registry of Evidence-Based Programs and Practices (NREPP) may have helped John and Nancy find some clarity as they struggled with these concerns. NREPP is supported by the Substance Abuse and Mental Health Services Administration (SAMHSA) and reviews programs and services that voluntarily seek such review. The NREPP Web site offers information and assistance related to identifying and assessing the evidence-based qualifications of any program (http://nrepp.samhsa.gov). John and Nancy could also decide to collect information about the results of whatever program they decide to use; doing so could help them determine how well the program is working with their population.

Other helpful Web sites include:
http://www.collegedrinkingprevention.gov/NIAAACollegeMaterials/Default.aspx

http://www2.edc.org/cchs/projects.html

http://www.dartblog.com/images/NH%20Alcohol%20Best%20Practices.pdf

JOHN: There are similar tools online that help kids handle stress better and improve their time management abilities, and some have risk reduction programs attached to their substance use packages.

NANCY: I think we'd be better off using what has been tested on other campuses with a similar group of people who have similar problems. Of course, there may also be some new, relatively untested programs that look good too.

JOHN: That makes sense.

NANCY: On the other hand, I know there is a lot of stuff out there already, some of it pretty well documented. I wonder if we can make up our own package, from scratch, to reduce costs.

### Characteristics of Digital Comprehensive Assessment Tools

- Use of digital tools saves time and cost; it can also free up clinicians' schedules so that they can focus on other issues.
- Many comprehensive digital assessment tools are evidence based, provide reliable and concise information, and can address a broad range of issues relevant to specific populations, such as college students.
- Reporting features are available in some such tools; these features can assist clinicians in treatment planning.
- Digital assessment tools can reach people in need who are reluctant to access services through traditional delivery methods.
- Such tools can help provide ongoing client assessment.
- Some such tools are available to the consumer 24 hours a day, 7 days a week.
- Using digital assessment tools can provide continuity of care with automated message reminders about appointments, medication reminders, or preventive health facts.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

---

### Examples of Outreach, Screening, and Early Intervention Programs for College Students

- **MyStudentBody (http://www.mystudentbody.com):** This Web site contains a suite of online behavioral health interventions targeting risk issues central to young adults, including alcohol and drug use, tobacco use, HIV/STD prevention and sexual health promotion, stress, and nutrition. The interventions are grounded in motivational enhancement and evidence-based behavior change principles.
- **eCHECKUP TO GO (http://www.echeckuptogo.com):** This Web site provides online personal alcohol risk assessment and motivational feedback. In addition, psychoeducational and interactive tools build awareness of the consequences of alcohol use and support social norms.
- **AlcoholEdu (http://www.everfi.com/alcoholedu-for-college):** This online alcohol education program aims to reduce alcohol use and associated risks. It incorporates video, audio, and interactive tools to promote awareness about risky alcohol use and skills to avoid risky drinking.
- **Drinker's Check-Up (http://www.drinkerscheckup.com):** This Web site provides online alcohol risk assessments for individuals. There are three sections to the site: "Looking at your drinking," "Getting feedback," and "Deciding whether or not to change." The instrument is brief and non-judgmental about alcohol use.

---

JOHN: Well, that's a choice we'll have to make. We could just find a couple of packages that address stress management and alcohol and drug use and not get into other issues, because there are packages that deal with these two issues specifically. The other option is to go in a more comprehensive direction, but the choices in that direction are more limited, at least right now.

The other thing that I think is important is deciding what level of stress, impairment, or pathology we're going to address. Do we want to take a broad approach, something to introduce all students to various problems and options? Do we want to screen for certain problems like stress, alcohol, and drugs? Do we want to offer options for people with significant situational stress? What about supplemental interventions for students with pretty serious alcohol and drug or mental health problems? Let's clarify our goals first and how we would measure our desired outcomes. That'll bring clarity in choosing a program.

Another issue is the evidence base for these programs. At least one is listed in NREPP (http://nrepp.samhsa.gov), and some of the smaller, less comprehensive packages probably have some research behind them, too. We also want to look at the evidence in the evidence-based program. Is it one small trial or more substantial research that supports the program? There's a lot to think about here.

NANCY: Yeah, there is. Did you find any data to suggest that any of these programs would either cost us more or save us money in the long run?

JOHN: Well, some of the programs definitely have costs involved. Some charge on a per-use basis, others seem to have a yearly subscription, and I would imagine there are some programs you can just buy outright. As for savings, if we can serve more students with the resources we have, then that cuts costs per unit of service. That would help us meet our goals more efficiently. Maybe we can do a pilot program for a year or so with some specific funding to try to understand the program's effectiveness, costs, and benefits.

NANCY: Don't you think this will increase the client flow, rather than reducing it?

JOHN: I'm hoping it'll reduce our workload and increase the client flow at the same time. We'll be screening more effectively by having students do a self-assessment. Students, before they decide to come in to see us in person, can take a computer-assisted self-assessment, learn a little about stress management, and then self-screen for substance use disorders and mental illness. Kids who are really in crisis and need immediate services will be able to bypass that and come right to us. It also lets us free up treatment time by providing online psychoeducational information at different stages in a client's change process.

It would also be more efficient in terms of our staff workload. If young people at lower risk receive education and a brief intervention online, we can spend more of our time on those kids who are struggling with more intransigent issues. The risk profile that the program creates after someone takes the personal risk assessment can be a really helpful reference if the individual does come to see us. It's a good place to start; it shows what he or she has been doing and offers strategies to reduce risks for that person.

NANCY: What about information technology (IT) support? Do we need any other system supports? We also need to think about liability and make sure we are covered there. What happens if the person is suicidal? We'll need a good response plan in place, and we have to make sure we monitor results to look for signs of danger.

JOHN: This particular resource that I looked at, and maybe others out there, actually runs on a server at the company that administers the program, and no software is installed on our system. We're not in charge of making it run. We'll need to make sure that the company we choose has a good tech support team and find out how they support clients. We'd also need to know how fast they respond to problems. The other schools that use these programs could give us a good idea.

NANCY: But I'm sure that counselors will have to provide some tech support to help students who need help accessing the program. We would also need to ensure that our clinical team is adequately trained and feels comfortable using the technology before we roll it out.

JOHN: If we were to recommend this program to students who come into the clinic, we would have to know, for instance, if they have enough bandwidth in their dorm room or at home to run it and access the videos and interactive activities on the Web site. I would also want to check with the IT staff at some other colleges to see if they have the capacity for students to use the program over the college wireless network. Of course, if students access the program on their own time with their own computers or mobile devices off campus, these issues may not be as significant. Regardless, we'll have the clients sign an informed consent form detailing their understanding of the benefits and potential hazards involved in working with us online.

NANCY: Does this program meet the capability requirements that the college recommends for student computer use? We should ensure that all students have access to the same service.

JOHN: I think it would be important to see if they could access it via their mobile devices, because most students have smartphones now. I think they can also access all of the program elements from a desktop or laptop.

NANCY: So what happens? They answer a bunch of questions about their stress and they get recommendations? What happens if they answer yes to all the questions, and they are at very high risk for suicide? How does it work then, when there is no actual person with them?

JOHN: Well, most programs don't assess specifically for suicide. It looks like most of them warn users who are experiencing acute stress or are having suicidal thoughts or behaviors to call an emergency number or hotline like the National Suicide Prevention Lifeline.

NANCY: Is there a message or a warning that says, "If you are experiencing extreme stress or other serious problems and you want to talk to a person live, here's what you should do?"

JOHN: What I really liked about this program is that when you subscribe, you can personalize the resources page to list the local resources in the community, at the community college, and at the health center. If someone is in crisis, they can call the emergency number here at the center.

There's another issue here that I don't want to overlook. Some kids from the college struggle with significant mental health and addiction crises—they're disabled with anxiety, have thought disorders, are depressed, or are drug dependent and scared to seek help. If this program can facilitate their entry into care, then we've provided a great service, and by intervening early, we may help them stabilize and begin recovery rather than getting worse before seeking treatment.

NANCY: You're probably right. Maybe some evaluative research after the program starts can help us track stabilization. How about the issue of confidentiality—we could potentially be collecting a lot of data on a broad spectrum of students. How do these programs control for that?

JOHN: In this particular program, data are stored on a secure server, not on an individual's computer or mobile phone. Each individual has a unique username and password they can use to access the program. There are algorithms behind the data so that individuals receive personalized feedback based on their response profile. There's also an administrative dashboard where administrators can see aggregate data as well as usage patterns.

---

**Issues To Consider in Developing a Web-Based Outreach and Early Intervention Program**

- Is the developer well known? Can the developer's references be checked? Does the developer have prior experience developing similar TAC programs? Is the program well supported by the developer?
- Are there empirical data to support that the program works? With which populations does it work? Are there published data? Does the program explicitly use evidence-based principles to guide behavior change?
- Are there a clear plan and resource list for users in significant distress or at high risk for self-harm?
- Is there assurance that all data entered into the system by participants are confidential and encrypted?
- Where will data be hosted, stored, backed up, and maintained?
- How will you obtain participant feedback about the program? How will you use that feedback in program development? Is the feedback aggregated or individual client data?
- Is there an administrative dashboard to monitor aggregate participant responses? Do these aggregate data reflect levels of impairment and actions taken by participants? Do the provided measures reflect the kinds of problems or questions participants have?

NANCY: So we would want to put something on the site about all of the 24-hour resources—hotlines and that sort of thing—that people can use in a crisis. It sounds interesting. Seems like there are a few more steps to take, but I think it's something that we should pursue.

JOHN: I agree. The program I'm thinking about tracks outcomes; we'd know how many students use it. We could ask students to evaluate it to see whether it's helping and what the limitations are. Maybe before we subscribe to the program, we could ask some students to get involved. That would take some of the burden off of us and help us test it to figure out what the best options are and whether they really meet the needs of the students.

After the meeting with Nancy, John researches the questions his administrator raised. He develops a plan that the university and the mental health center accept. They do live interviews with three companies that appear to meet their criteria, test each program, and check references. After analyzing their findings, they choose a program and begin a 1-year trial.

### Part 2: Using screening tools to measure stress

This part of the vignette demonstrates how an online screening program can help students self-identify issues and situations in their lives that need attention.

As part of the program initiation, John is doing some trial demonstrations in classes on campus to gather data and establish a baseline stress level for students at his college. Next year, the program will be administered to all incoming freshmen, to at-risk students (students on academic probation, with disciplinary problems, or in violation of the college alcohol and drug use policy), and to any students who self-identify as needing counseling services. In conjunction with his audiovisual presentation, John describes a series of perceived stress situations and poses questions about alcohol and drug use in the past week to the students. He uses polling software to allow students to respond immediately to the questions, and then he reveals the aggregate classroom levels for each question in graphic form. John then invites students to assess where they stand in relation to the group average; some students are experiencing a good bit of stress, and some of these students may be drinking to cope with that stress at times.

He then tells the class that they can use the online program to learn more about stress and how to manage feeling overloaded without having to go to a therapist or counselor right away; he lets them know that they can take a personal assessment, get feedback, learn about stress and how it affects the body, and practice some healthy coping skills (e.g., exercise, meditation, deep breathing, music) to counteract those effects. John makes sure to tell them that, if after trying out the program, or even without reviewing the program, they want to seek professional help, they can visit his clinic or check the program Web site for contact information on other local resources.

After conducting one such classroom presentation, John stays to answer questions. Several students approach him, one of whom is Amy. She is concerned about some of her scores on the stress scale, which are higher than those of her peers. John makes an appointment for her to come to the mental health center so that they can talk in more detail.

JOHN: So Amy, how are you?

AMY: Sorta bad. I'm worried because my score on the stress test that you gave us in class yesterday was in the high range. I know I've been under a lot of pressure, but it worries me that my

scores are so high. I really do think I'm having trouble concentrating. My grades aren't as good as they need to be to keep my scholarship, I'm having trouble sleeping, and the few friends I do have here tell me I'm being grouchy.

JOHN: Well, I'm glad you came in. Is there anything you're worried about?

AMY: I don't know if I'd call it worried. I'm from out of town. I'm here on full scholarship. I'm supposed to maintain a 3.0 grade point average, but last semester, I got a 2.8. So that's not good.

JOHN: Well, what happened?

AMY: The work is really hard, and I'm having trouble focusing. Maybe I just don't belong here.

JOHN: How do you think I could be helpful?

AMY: Fix me!

JOHN: What would that mean—to fix you?

AMY: If I lose my scholarship, I'm in trouble. I really need to get my grades up, so that's really stressing me. Then, on the other hand, because I'm so stressed, I have trouble sleeping, trouble motivating myself to study, trouble with almost everything. *[She begins to tear up.]*

JOHN: So, if I understand correctly, you need to find a way to bring your grades up, and that'll take off a lot of stress? Reducing the stress some will make it easier for you to get your grades up.

AMY: I guess so. I started feeling terrible; now I'm eating more, and I'm 10 pounds heavier than when I got here last fall. I spend so much time studying that I haven't made a lot of friends. Other people go out and have a good time, and I spend most of my time in my dorm room.

JOHN: Things are piling up.

AMY: I'm not sure that this school is the right place for me. But I also don't think I need counseling or therapy. By the time I get ready to come over here, then get back to the dorm, I've wasted at least a couple of hours that I could spend writing a paper or being in the library. I just need to get my grades up.

---

### Advantages and Disadvantages of Using Web-Based Programs in Counseling

Advantages:
- Encourage self-assessment
- Reinforce stress management strategies/plans
- Foster provision of well-developed, clear action plans
- Open additional avenues for noncrisis support

Disadvantages:
- Lack the immediacy of in-person meetings
- Pose potential difficulties with understanding how to use the program
- Provide diagnostics without clear, scheduled follow-up and action plan
- Are contraindicated for work with suicidal, homicidal, or psychotic clients

In gauging the advantages and disadvantages of using Web-based counseling—or, indeed, any given technology in clinical practice—remember that, as always, use of good clinical judgment is imperative.

JOHN: I can understand your feeling that coming here just adds something else to your workload. But would you be willing to check something out? I have an idea about helping you get started on taking some action without having to come over here—something you can do on your own time, if you're willing to explore it.

AMY: Sure! It won't hurt.

JOHN: How are you with technology? Do you go online? Are you on Facebook?

AMY: Sure.

JOHN: Would you be willing to check out a Web site? It's the program I spoke about in class.

AMY: Well, I guess so.

JOHN: The first thing you'll do in the program is log in with a username and password that you devise, so that all of your information is confidential and accessible only to you. Once you're logged into the program, you'll then complete a personal profile that includes questions about your level of stress, the kinds of things that stress you out, and what you currently do to manage stress when you're feeling overloaded. It's a slightly longer version of the questionnaire you took in the classroom. You'll get feedback, tips, and information based on your profile. Then you'll have access to the information, interactive tools, and other activities in the program that you can review in whatever order you wish, whenever you wish. The tools and activities will help you identify triggers for what stresses you out, strengthen your coping skills for managing stress in healthy ways, and learn how to avoid stress, such as through time management strategies and getting good sleep. You can use these tools however you want, and you can add the ones that you find particularly helpful to a personal, interactive action plan that you can develop.

AMY: Can I use my phone to get into the program, or just my laptop?

JOHN: Do you have a smartphone?

AMY: Yeah.

JOHN: Then you can use your phone. Why don't I give you the link to the Web site? You can check it out right now.

AMY: You mean right now, like here in your office?

JOHN: Yes, let's be sure you can access the program. Then we'll take a minute to look over some of the content and see if you have any questions.

---

### How To Encourage Clients To Use, and Continue Using, Web-Based Programs

- Give clear instructions about what to expect from the program and how to access the Web site.
- Demonstrate access and use of the program before the client leaves your office.
- Emphasize confidentiality and protection of private information (e.g., via passwords).
- Use a reminder system, such as text messaging, email, or an electronic calendar.
- Invite clients to report, in and out of the office, their successes and struggles with the program.
- Use secure video conferencing, encrypted email, or secure text messages to highlight client improvements and thereby promote motivation to continue using the program.

AMY: *[Amy accesses the Web site on her cell phone.]* This is pretty cool. There's a lot of stuff here.

JOHN: It's a comprehensive program to help people manage a variety of situations in their lives. I'm particularly interested in you looking into the stress management resources in the program. You can go on there and pick out the ones that you think will best meet your needs.

AMY: I don't know what that means.

JOHN: When you access the program, you'll answer some questions. Then you'll get feedback, just like you did in class earlier in the week. Based on your profile, it will highlight areas for you to check out on the site. I remember that you mentioned time management; this program has some tools to help you with that and also some other stress management techniques, like meditation and mindfulness.

AMY: I'm not really into that new-age stuff.

JOHN: Some people think of it as new-age stuff, but it might be something that you want to check out.

AMY: Is it like stretching?

JOHN: Something like that—stretching your mind.

AMY: That sounds interesting. How does that work?

JOHN: Well, it involves several steps. There are some assessment tools to help you evaluate how you use your time, and the program will give you information about ways to manage your time better. There are even some functions that actually help you make a plan for how you can use your time more effectively. Just go on the Web site and choose the time management and stress management tools you'd like to start with.

AMY: I'm not sure about this, but I'll check it out.

JOHN: Let's check back in a few days. Check out the program, and then we can talk about it.

AMY: But it was a hassle to come here. Is it okay for me to just send you an email or a text?

JOHN: Well, my reservation about that is that email isn't confidential. What if we do this: We have an encrypted email system here at the center, so I'll send you an email through that system right now. Then, when you reply to let me know how things are going in a week or so, that reply email will be encrypted. But be aware that anyone who might have access to your phone or your email will have access to our communication. Are you okay with that?

AMY: Well, not really. Maybe I should just give you a call.

JOHN: Okay, I'll look forward to your call in a few days. Do you have Skype or a similar video conferencing app on your computer?

AMY: Yeah. I use it with my parents every week and call friends back home with it.

JOHN: Great. Just call me, and we can videochat. My email is john@localbhc.com.

AMY: Okay. I like the idea of not having to come here every week. I'll just use the Web site in the next couple of weeks and check in by videochat to let you know how things are going.

JOHN: Sounds good. It was great to meet you, and I look forward to working with you.

AMY: Yeah. Me too.

During the next month, Amy uses the Web site on a number of occasions. She especially benefits from the time management, stress management, and sleep-related components of the program. She and John have two videochats during this month. She assures John that she will call if she begins to experience more distress than she is comfortable handling on her own.

> **Master Clinician Note:** Counselors and administrators should be sure that clients fully understand how their agency's Web-based communications system works so that clients have realistic expectations about counselor availability, how long it may be before they receive responses to messages they send, and how the system is monitored. For example, will clients receive feedback? What are the client's expectations about feedback?

### Part 3: Using Web-based interventions to support addiction recovery

Pete is referred to the student counseling center for violating the campus alcohol use policy; campus police found him sleeping in his car in the student parking lot, smelling strongly of alcohol and with an open six-pack of beer on the passenger-side floor of his vehicle. He was referred to the campus alcohol and drug policy office, where he was, in turn, referred to John's behavioral health center for an assessment. The following section of John's vignette details John's first meeting with Pete.

JOHN: Sounds like you have a lot going on, Pete. Do you have an idea of what you want right now?

PETE: I've tried to cut back on my drinking, and sometimes it works, but then I go back to it.

JOHN: What kinds of things have you tried?

PETE: Just willpower. I'll get drunk, then I'll feel terrible and miss class. My girlfriend threatened to break up with me because she said I got out of control one night. I just feel like I have to cut back, but I haven't been very successful doing that. Night before last, I drank a lot and then had to be at class yesterday morning. Between classes I went to the car, just to have a beer to take the edge off, and I guess I went to sleep. I must have been sleeping about 30 minutes when the cops rapped on the window and woke me up.

JOHN: Do you have some concerns about your drinking?

PETE: Yeah, but I've seen celebrity rehabilitation shows on reality TV, and I don't need that. I don't need to be sent away. I've tried Alcoholics Anonymous (AA), and there were some older folks in there who were fanatics. I don't want to be a fanatic about it. I just want to cut back on my drinking.

[John and Pete explore Pete's drinking history. Pete is cooperative in revealing a history of heavy drinking that began about 8 years ago and really became a problem while he was stationed at

remote sites in the Air Force. Since his discharge 6 months ago, he has continued to drink daily. Upon returning to his hometown, he found that most of his old friends had moved on and weren't available. He started community college 3 months ago, but he hasn't really made friends. Mostly, he hangs out in his room at his parents' home or in a local pub, where he has met a few people. He has been dating a woman he met at the orientation session for the community college. He likes her a lot.]

JOHN: Well, let's talk for a few minutes about what you might want to do about your drinking. You say you aren't interested in treatment or in AA.

PETE: No! I don't want to go in front of a bunch of people and talk about my drinking.

[John continues to help Pete explore his options, including AA, other mutual-help programs, and inpatient and outpatient care, but Pete is adamant that he doesn't want community-based services. John assesses and does not find the need for detoxification or acute medical care. Pete must accept the recommendations of the counseling center as a condition of his staying in school, so John does have some clout, but at the same time, he wants Pete to feel ownership of his treatment plan. They settle on a three-pronged approach that includes an 8-week assessment group in which students with campus alcohol or drug infractions evaluate their substance use in a structured educational/discussion group setting at the college counseling center, completion of a Web-based alcohol and drug self-assessment that is part of the Web-based program adopted by the counseling center (along with a brief drug prevention education program that is part of the same package), and attendance at 10 online AA meetings.]

PETE: I have some reservations about this online AA thing. You say I don't have to give my name? All I have to do is go to the site and sign in?

JOHN: That is the beauty of it. You just go to this Web site. It operates similarly to other AA meetings and services. The Web site is http://www.aa-intergroup.org. All you need to do is sign in and then choose whether you want to attend an online meeting via videochat or telephone. The site also has chat rooms, email lists, and discussion forums. There are groups for specific populations, such as military personnel and veterans; people who are hearing impaired; gay,

---

**Evidence-Based Alcohol and Drug Use Prevention Education Programs for College-Aged Populations**

Evidence-based online alcohol and drug use prevention education programs for college-aged populations (e.g., MyStudentBody, AlcoholEdu, eCHECKUP TO GO) are grounded in motivational enhancement and social learning theories. Such programs typically include a self-assessment with personalized feedback to build motivation for behavior change and education about the risks of alcohol and drug use to promote accurate risk perceptions. The more comprehensive online programs (i.e., MyStudentBody, AlcoholEdu) also offer audio or video peer stories and interactive tools that foster coping skills for reducing alcohol and drug use and help individuals develop their own action plans for change. Most of the available online programs are subscription based, so that a participating college/university can subscribe for use by their entire student body or by targeted risk populations. For more information, visit:
- http://www.mystudentbody.com
- http://www.everfi.com/alcoholedu-for-college
- http://www.echeckuptogo.com

lesbian, bisexual, and transgendered people; and even groups for specific areas of the country. You have lots of choices. Some meetings are open and can be attended by anyone, regardless of whether they use alcohol or have a drinking problem; other meetings are closed to all but people who have a drinking problem and a desire to quit drinking.

PETE: Does that mean that I have to have a desire to quit drinking totally?

JOHN: Well, I think for your first few meetings, you can be undecided about whether you want to stop totally. Part of the agenda for the next couple of months—the assessment group, the online meetings, and the work on the Web site that we discussed you using—is to help you decide what you need to do.

PETE: I guess I'd be willing to try it. I can't guarantee that I'll want to quit drinking entirely, but I'd be willing to try the treatment plan we've laid out and see what it's like.

JOHN: That seems fair enough.

PETE: There is something I haven't told you—my girlfriend says that I have to do whatever you recommend, or she won't go out with me anymore. I really don't know how much I actually want to do all of this stuff, but I'm willing to do it to keep my girlfriend and to stay in school.

JOHN: So the stakes are high and it might be worth it to take the risk.

PETE: Yeah!

Pete completed all three sections of his treatment plan. He attended an online AA group, which offered a good introduction to how AA works and dispelled some myths Pete had subscribed to about what meetings would be like. No participants were from his area of the country, but in the assessment group, he did meet two other men who attend Young People in AA, an AA group for people ages 16 to 27. He has attended two meetings with them and says he got a lot from attending. His attendance at online AA helped him make the transition to local meetings. He has had no alcohol in 3 weeks now and came to the decision to stop drinking of his own accord. He completed the alcohol and drug use section of the Web-based program and used the summary report of his risk profile and feedback in his work with John. Pete appreciates the ongoing ability to access the program online to reassess his risks and review material to reinforce his action plan for sobriety. Pete also has a friend who was willing to go to AA but did not have a car, so Pete introduced him to online AA, thus expanding his friend's access to AA support and giving Pete the opportunity to experience how helping others can be part of his own recovery.

### Online Recovery Support

Online recovery support communities (some specifically for young people), such as AA and Marijuana Anonymous, hold online meetings that allow participation through the telephone or through voice or text chat features on a computer or mobile phone. Reliable online recovery resources include:

- http://www.aa-intergroup.org
- http://www.marijuana-anonymous.org
- http://www.smartrecovery.org
- http://www.facebook.com/youngpeopleinrecovery

# Vignette 2: Using Computerized Check-In and Monitoring in an Extended Recovery Program

## Overview

This vignette demonstrates how computerized check-in and monitoring can support recovery for clients with co-occurring substance use disorders and SMI. The vignette includes examples of how checking in via a desktop computer, tablet, or mobile phone can benefit both clients and staff members in managing recovery; how to build clients' engagement with the check-in process as part of their recovery plan; how to teach the basics of computer use to clients who are not already computer literate; how computerized check-in can more readily involve hard-to-engage clients in taking responsibility for their recovery; and how to help clients use technology to maintain a connection to treatment resources after formal treatment has been completed. These technologies can be useful in a variety of behavioral health settings to help clients maintain self-management, recognize potential relapse factors, and see long-term progress in recovery.

## Learning Objectives

- Identify how a computerized check-in process can be used in behavioral health settings.
- Introduce skills for counselors in educating clients, particularly those who are not computer literate, to the use of computers for check-in and monitoring.
- Address problems that can arise when clients do not check in or are unable to complete the check-in process.
- Demonstrate how to use a computerized check-in process to monitor progress and changes over time for a client in recovery from CODs. The term "co-occurring disorders" indicates that a person has both a substance use disorder and a mental disorder and that neither disorder is caused by the other; both are independent disorders that warrant individual treatment.
- Engage clients in taking responsibility for their recovery process.

## Setting

Sondro is completing short-term restabilization in an inpatient CODs unit in a large city. He has been hospitalized on multiple occasions. He typically does well in the hospital and for a short time after release. After that, however, he tends to disappear from treatment, not take prescribed medication, use drugs, and show signs of paranoid thinking, all of which cascades into Sondro ending up homeless, unable to take care of himself, physically ill, and at serious risk for psychological and physical trauma. The staff wants to provide continuity of care that may help Sondro stay on track in his recovery. If unit staff can help him identify early symptoms, intervention may be possible before he gets out of control.

Staff members identify two approaches in care that may help Sondro achieve these goals. First, they recommend a transition from inpatient care to an intensive outpatient day treatment setting. After completing the day program, he will receive intensive support and monitoring by the ACT team at the local CMHC. ACT services are specialized, intensive services that often go beyond the traditional delivery model of care, which can be limited to the client coming into a clinic and having little access to after-hours contact. Some ACTs offer availability 24 hours a day, 7 days a week, for some type of service; many include contacts with clients outside of the clinic setting.

Sondro's various service providers have agreed to a high level of treatment consistency and communication. One unifying element in Sondro's transition through these treatment environments is a computerized check-in process that Sondro will complete daily. The variables monitored by the check-in process are identified in the vignette. A significant benefit of the check-in process is the opportunity for Sondro to participate more actively in his own care and recovery.

## Sondro's Story

### Part 1: Developing client and counselor collaboration to support recovery

The treatment team wants to coordinate Sondro's care and transitions among the inpatient program, day treatment program, and ACT team services so as to provide ongoing care. Sondro will be attending the day hospital for a month to 6 weeks following his discharge from the inpatient unit for CODs. As in the past, Sondro has had a relatively uneventful inpatient stay. Once he gets back on his medications, regains physical strength, gets clean from cocaine, sleeps better, and feels safer, his paranoid ideation begins to diminish. He begins to engage with other clients; assumes responsibility for taking care of his physical needs; participates in group therapy on the unit; and, in general, appears contented. But the staff knows that when he leaves the hospital, he is at a high risk for relapse. He doesn't consistently take his medications, starts using crack cocaine, and loses his money and housing; particularly once he starts using cocaine, his paranoid ideation begins to manifest. The inpatient staff members, in consultation with the CMHC day hospital program staff and the ACT team, meet with Sondro to develop a comprehensive treatment and recovery plan. An essential part of this plan involves daily completion of a computerized check-in form, which monitors Sondro's functioning.

In this scene, Sondro is meeting with Irene, a nurse on the inpatient unit, and Mark, a member of the ACT team. Sondro has been active in developing his treatment and recovery plan, but he has some reservations about the computerized check-in process.

MARK: Sondro, we are all really excited about you, the inpatient and day hospital, and the ACT team all working together to create a really strong treatment and recovery plan for you this time. We really think this plan will make a difference in your recovery. I understand you have some concerns about using the check-in form, and we want to talk about that with you.

SONDRO: *[after a brief pause]* Yeah, I don't know about that.

MARK: Can you tell us a bit about your concerns?

---

### Situations in Which a Check-In Process Can Be Particularly Beneficial

- Transitions from a higher to a lower level of care (e.g., from inpatient detoxification to an intensive outpatient program [IOP], from residential treatment to a halfway house)
- Periods of obviously increased stress (e.g., loss of domicile or intimate relationship, death of a loved one) with risk of relapse to substance use or exacerbation of mental illness
- Adjustments or alterations of medication for mental or substance use disorders
- Increases in a client's need for motivation and support to continue treatment (feedback on the client's own responses can be very useful)
- Repeated readmissions and difficulties in linking levels of care in recovery
- Introductions of new treatment methods or approaches not familiar to the client

SONDRO: Well, I just don't know about what you want me to do there in the mornings.

> **Master Clinician Note**: Clients who express reservations about a technology-based intervention, as Sondro is doing, may be reacting to a combination of discomfort with using a computer, the introduction of something new into their daily regimen, and a manifestation of symptoms related to substance use or mental illness. For Sondro, part of what drives his reluctance is suspiciousness resulting from his paranoid illness. Staff members have already ensured that Sondro has basic literacy skills to handle questions on the computer screen, but it is worth noting that a lack of basic literacy skills can contribute to client resistance in situations like Sondro's.

MARK: Well, Sondro, why don't we work with you on this to help you get comfortable with the computer? You can try it out every day for the last few days you're here on the unit, and we'll have somebody right there with you in case you have questions. We can also maybe show you the computer you'll be using when you get to the day hospital. Would that take care of some of your concerns?

SONDRO: Well, I don't know.

MARK: I can understand that you have reservations. Is one of those that you worry about who might have access to the information?

SONDRO: Maybe a little.

MARK: I can reassure you that only the treatment team where you are currently in treatment—like right now, you're in the inpatient unit—and I will have access to the information. We do want to know how you're doing, and we especially want to be able to show you how much you're improving over time. The information you enter into the check-in form can tell us that.

SONDRO: So what kind of information does this thing collect?

---

### How To Engage Clients With Automated Check-In Systems

To appeal to clients, there must be some noticeable benefit in the use of any type of automated clinical tool. The following strategies help increase the likelihood that clients will use and benefit from an automated check-in system:

- Encourage the client to tailor the information exchanged to his or her own recovery goals.
- Give something back. The benefits of one-way reporting to a clinician on symptoms may not be obvious. Helpful responses, delivered either in person or via automated messaging, should be tailored to the client's needs and desires.
- Allow the client to practice using the system with a staff member present to assist with the process and answer any questions that arise.
- Be clear and direct about the risks and benefits of participation, and encourage the client to make his or her own choice about participating.
- Engage peers who have found the system useful to help the client acknowledge benefits and practice using the system.
- Overcome equipment-related barriers by providing access to necessary devices, such as mobile phones, tablets, or computers.
- Use motivational interviewing to assess the client's willingness, plans to engage, and perceived obstacles.

MARK: Mostly, it's just information about how you're doing. For instance, we'll ask some questions about whether you're enjoying life, whether you're taking your meds, how your housing situation is going. We'll ask you about whether you're having cravings or feeling shaky about your recovery and whether you're having any symptoms, stuff like that. It takes about 10 minutes to complete, maybe a little longer until you get used to it.

SONDRO: Couldn't you just ask me the questions?

MARK: Well, we could, and we probably will continue to ask you some of them throughout the course of a day. But what we really want to do here is help you figure out where you're at when you feel the most comfortable, so when things start to go haywire, you'll notice, and you can kick up your wellness/recovery action plan. If you want, you can ask us to help you out, too.

There's one other thing that I didn't mention earlier. The questions on the check-in form are customized to you. Everybody who uses the program has the questions written specifically to address their needs. Of course, there are some that are the same for everybody, like, "How do you feel this morning?" But then there will be some questions for you about your housing, because that's been a problem in the past; about your disability money and whether it's secure; about whether you're taking your meds—things that you've said you want help with and worry about.

SONDRO: What if I get the questions wrong?

MARK: There aren't really any right or wrong answers—just your thoughts on how you're doing. And if you need help answering some of the questions, there will be someone available to help you. I think you'll see that it is really pretty easy and gives you time to think every day about how you're doing and what you need for that day.

SONDRO: Uh huh. What if I don't want to do it?

IRENE: Nobody's going to force you to do anything you don't want to do. We do believe this will be helpful, and we think you'll find it helpful, too, as we go along. But you have to give it a try if any of us are going to be able to see whether it works. A person will be there to help you with the computer and with completing the questions when you get to the day hospital.

MARK: So what do you think?

SONDRO: I guess I can give it a try. I'm a little concerned about people collecting data about me on computers.

MARK: I can understand that. Let me assure you that the information is for our staff—the people you know—and the only data are about how you are doing and what you have said you wanted us to help you with. For now, could you and I just give it a trial run? There's a computer here on the unit, right by the nurses' station, just for clients. I want to show you how to log in, access your own check-in form, work a keyboard, what kind of responses you'd put in, and so forth.

SONDRO: I can work a computer. I know how to use a keyboard. Just show me the form.

MARK: Okay, let's do it.

### How To Help Clients Overcome Resistance to Computerized Check-Ins

Common points of resistance that clients have to computerized check-in include:
- Reluctance (shame, embarrassment) about using a computer because of a lack of exposure to the technology and training in how to use it.
- Limited reading skills or illiteracy.
- Ambivalence about recovery—about having their craving, substance use, and mental illness symptoms logged for clinicians to see and reflect back to them.
- Annoyance at being made to do something by someone they perceive as more powerful.
- General concern or anxiety about doing something new.
- Fear that the information provided will be used against them.

To overcome resistance to computerized check-in, you can use the same strategies you might use to motivate clients to complete paper check-in forms or other tasks:
- Help clients see the value of check-in so they will want to do it on their own.
- Help clients link progress toward one of their goals with the use of the program.
- Use motivational interviewing skills when starting clients on a new task.
- Work with clients to identify and overcome perceived obstacles to using the program.
- Emphasize the importance of collecting data for clients' well-being.
- Help clients feel like they are part of their own recovery teams by completing check-in.

Mark and Sondro do a trial run on the computer on the inpatient unit. Mark helps Sondro access the program and helps him create a username and password, and then Sondro completes the check-in process without problems. Sondro's username and password are stored by Mark in case Sondro forgets or wants to change them. Mark also emphasizes that Sondro needs to keep his password and user name secure and explains to him how to do so. The questionnaire takes about 12 minutes to complete. He does take some time to read the more detailed questions about drug use and asks Mark about one of the drugs listed (ketamine), saying he isn't familiar with it. Mark also asks Sondro to choose some questions that he would like to include in his check-in form from a list of optional questions. Sondro picks one about attending 12-Step meetings and another about physical exercise, two aspects of his relapse prevention plan that he has struggled to maintain in the past. A sample check-in form is presented in Part 2, Chapter 2, of this TIP.

### How To Facilitate Client Computer Access in Treatment Settings

- Create private spaces where clients using computers can't be seen by rest of the client population.
- Provide trained staff members or peers to help troubleshoot.
- Make available written how-to sheets about operating the hardware or accessing support sites.
- Attend to Internet privacy and security standards by installing up-to-date virus, spyware, and malware protections.
- Protect client privacy by setting machines to delete cookies, search histories, and other private information that may otherwise be stored on the computer.
- Provide easily accessible links to support and education sites that you know are reputable.
- Block access to nontreatment sites to ensure that clients spend computer time on treatment-relevant activities rather than personal business (e.g., visiting social media sites).
- Offer basic computer classes taught by volunteers from the community.
- Consider firewall implications when using networked computers for client access to protect against unauthorized access to electronic clinical record systems or other confidential business applications.

> ## Check-In Example
>
> In a psychiatric inpatient and day treatment program in Western Australia, touchscreen access has been provided to clients participating in CBT groups. Clients complete the World Health Organization-5 Well-Being Index, a five-item measure of psychological well-being, each day. Therapists provide clients with a printout graphing their progress compared with expected progress and discuss results with clients in a weekly group. Therapists can use the well-being trend information to discuss treatment progress and realign treatment plans with their clients. An evaluation of the use of the touchscreen check-in demonstrated high levels of staff and client satisfaction with the tool, and client reports indicated that use of the technology increased their discussions with therapists about treatment progress and enhanced their understanding of their progress.
>
> *Source: Newnham, Doyle, Sng, Hooke, & Page, 2012.*

Sondro completes his inpatient stay without incident, filling out the check-in form each morning after breakfast. On the last two days of his inpatient stay, he works with a case manager to make the transition to a group home, where he will live for 3 months. After his stay in the group home, he will move to permanent supportive housing. Despite some distress about transitioning to the group home, he is compliant and shows no resistance in leaving the unit.

### Part 2: Service provider collaboration

Mark meets Audrey, Sondro's primary counselor on the CODs day hospital unit. Audrey is not familiar with the check-in process and has questions about its efficacy.

MARK: Audrey, thank you for meeting with me today. I've gotten permission from Sondro to talk to you. I want to explain a little about the ACT team. Do you know what it is?

AUDREY: Well, we've worked with ACT teams before, but primarily as a referral resource when people leave the day hospital unit, so could you fill me in a bit?

MARK: Sure. ACT stands for assertive community treatment. It's a treatment approach that uses interdisciplinary staff members to provide community-based treatment and daily contact with clients, including services after hours. The team provides direct interventions to maintain stability of housing and entitlements and supports client compliance with prescribed medication regimens. When clients begin to relapse to drug use or mental illness, the team provides assertive treatment to reengage the client in recovery-oriented activities and family or peer support systems. Our ACT team is assigned to Sondro. I'm the case coordinator, but I want to emphasize that everyone on the team will be involved with Sondro's recovery. We'd like to work closely with you and your program to ensure that Sondro gets the best care possible from all of us.

---

**Master Clinician Note:** The privacy and confidentiality standards and regulations that typically apply to behavioral health services, including Title 42, Part 2, of the Code of Federal Regulations (CFR), Confidentiality of Alcohol and Drug Abuse Patient Records and the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, also apply to electronic exchanges. As with any exchange of health records that are subject to 42 CFR Part 2, clients must provide written consent to share information across providers. Many states have laws that require consent for sharing information related to mental health. Offering clear, simple descriptions of the ways confidential information will be exchanged and providing a rationale for the exchange, along with an explanation of the risks and benefits associated with electronic information exchange, will help clients make informed choices about how their information is shared across providers and organizations. Providers must ensure that transmission of protected health and other confidential information is completed securely. See Part 2, Chapter 1, for more information on secure email and Web access.

---

AUDREY: That sounds great, and I look forward to working with you. Will you be involved with Sondro while he's here in the day hospital?

MARK: On an as-needed basis, yes. We want to collaborate on his care so that the transitions can be smooth and less traumatic. In addition to communicating with you and your staff, we also want to use a new tool that we think is especially useful for clients like Sondro, who in early recovery are particularly susceptible to relapse because of the combination of substance use and mental disorders. We have this computer-based program that'll help all of us facilitate Sondro's care. We don't want Sondro to disappear and then find out after a couple of days that he's begun using again or has been staying in a crack house. We want to find out early when he starts to lose momentum in terms of his recovery. The things that this program will track are the same things that you pay attention to: his participation in meetings, what his abstinence looks like, whether he's accessing intensive outpatient services and coming on time, how connected he is. It also tracks things that we look at in terms of mental health. Is he taking his medication? Is he having troublesome symptoms? Are the symptoms getting better or worse? You have a client computer that he can use here on the first floor, and every day, he'll check in. It allows us to go to the Web site and see how he's doing. This means that at the beginning of each day, even if we haven't asked about those things, we'll know how he's doing because the information will all be there. And there's another section of this site that will allow you and me to coordinate his care and communicate with one another.

AUDREY: Do you think he's actually going to tell the truth if he starts using drugs again?

MARK: We won't know for sure that he is telling the truth about every detail. But we'll also have some objective data in the mix—for instance, he is either using the check-in process or he is not. And we'll know if he checks in and says he is going to treatment, but you haven't seen him there. Then I'll know that, too, and I'll send someone on the team out to find him and offer him support.

> **Master Clinician Note:** In general, studies of computer-assisted self-interview instruments demonstrate that clients are sometimes more forthcoming about sensitive, embarrassing, or shameful information when disclosing to a computer program than they are during in-person interviews (Islam et al., 2012; Richens et al., 2010). Web-based daily completion of check-in forms build on these studies by providing clients an opportunity to check in without talking directly to providers. A daily check-in process also provides a structure for collaboration between the client and the provider and a way for the client to be more actively engaged in recovery.

AUDREY: I don't see how this is any different from what I get from him every day. I see whether he is there, I analyze his urine screens, I observe his participation and see when he's getting upset. It isn't too hard to tell when people are getting sick again. Frankly, it just seems like another kind of paperwork.

MARK: I can see how it would appear that way, and no, we don't want to add to your workload. In fact, we think it will actually reduce it, eventually. This is a little more work on the front end; it's a change in routine as we're introducing a new treatment modality. The good news is that you can use the information from the check-in form in your clinical record keeping and reduce some of your charting. But more importantly, it's an opportunity for Sondro to participate in his recovery. Here's a printout of the check-in form we use. It's pretty comprehensive and, at the same time, pretty quick to complete. Your role in Sondro's care is still of the utmost importance, and your clinical judgment in determining how Sondro is doing will never be replaced. This is simply a tool to allow Sondro to play a greater role in his recovery and assist him with recognizing the warning signs that may indicate potential difficulties in his recovery.

> **Master Clinician Note:** To support the client in repeatedly filling out the check-in form over time, the form must be relatively brief in length, take only a few minutes to fill out, and be meaningful to the client to sustain the motivation to complete it each day. The goal is to identify a few questions that are meaningful and important to both the client and the provider.

AUDREY: So I just have to pay attention to whether something is going wrong. What do we do when the data indicate that Sondro is headed for problems?

MARK: Well, first, we'll compare notes and get a better picture of what's happening. We can then talk with Sondro about our concerns and modify the treatment plan to better address the situation at hand. Our broad treatment goals for Sondro will always be to support his recovery from his substance use disorder; manage his mental illness; and help him maintain adequate family, housing, health, financial, social, and other supports that he needs to make it in the

---

### Alternative Approaches for Conducting Check-Ins

- Voicemail or interactive voice response systems
- Mobile phone applications
- Secure Web-enabled tablets or personal computers
- Structured email
- Paper and pencil checklists entered into a computer tracking system

community. We both know it's going to be a long haul for Sondro, but I think the computer-assisted check-in process will be a great boost to him, especially in his early recovery.

AUDREY: Are any of the questions on this check-in form going to be about his drug use?

MARK: Yes, he will be asked about things like cravings, slips, getting to his meetings outside of his IOP, if he is having any troubles there—for instance, with other clients, because you won't always be around to monitor him. Also, we can customize the form to include information specific to your program, information you particularly would like to have. In fact, we asked Sondro to identify the relapse risk factors that were most important to him, and he identified attending meetings and participating in his exercise group as areas he would like to track. The data the check-in form collects can help him see the connections between his symptoms and his behavior.

> **Master Clinician Note:** The ability to customize the check-in form creates clinician buy-in by meeting the needs of their programs and also produces client buy-in, as clients can add items they identify as important metrics of their own recovery. Initially, it is helpful to ensure that support staff members also understand the program, can adequately answer client questions, and are supportive of their clients' use of the program.

AUDREY: Well, it sounds interesting.

MARK: Good. I don't want to lose sight of one of the things I consider most important. In terms of his recovery, this is a proactive act on Sondro's part every morning. He takes a greater stake in his recovery by completing this form. It's one more step in involving him in his own recovery.

AUDREY: You're right, and I'm willing to give it a shot. Maybe Sondro's case is a good one with which to try this out.

### Part 3: Maintaining the recovery connection after IOP completion

Sondro is doing well, staying abstinent, taking his meds regularly, and has seen the ACT team psychiatrist at the CMHC for a medication check. His stay in the IOP was extended by 2 weeks to give him more time to stabilize. His contact with the ACT team has been primarily to support his IOP stay and to help him make adjustments in the community. The team is working with a local housing agency to help Sondro obtain permanent supportive housing in the community. In the meantime, he continues to live in the group home. He has regularly attended sessions at the IOP with only a couple of setbacks that were subsequently resolved. One occurred during a week when Audrey went on vacation; Sondro became suspicious and upset with the counselor who was leading the group for that week. The other occurred when Sondro got angry at another client in the group and refused to come back to the group for 2 days. With help from Audrey, he relented and reengaged with the group. After the first week of practice, completing his check-in form became a regular part of his day, and he reported that he actually enjoyed letting people know how he was doing. He felt proud to be able to report his progress and knew that both Mark and Audrey were aware of his reports. On a couple of occasions, Audrey used information provided by the check-in process as part of her ongoing monitoring and to give feedback to Sondro about his progress. Together, they charted trends and positive changes that Sondro had made.

## Part 4: Sondro graduates from the IOP

Sondro has graduated and will not have day-to-day contact with the IOP staff any longer. Mark meets with Audrey about the recovery plan the IOP developed with Sondro, which includes checking in daily. Mark also introduces the idea of sending text message reminders to Sondro. These may be particularly important once he leaves the group home to enter permanent supportive housing in the community. Audrey will not be as involved because Sondro is no longer in her program. After a few months, if Sondro is doing well, the frequency of the Web-based check-in process can be reduced, but for now, the staff members of both programs think that sticking with the current frequency is best so as not to introduce another change in Sondro's life.

MARK: Sondro has graduated from your program and seems to be doing really well. Is that your impression, too?

AUDREY: I'm really happy for him. He has done well. He's still at high risk, and in just 24 hours, he can go right off the edge, but he'll be in our once-a-week continuing care group. If we see him getting shaky in his abstinence, we'll address that. If I think he is showing significant symptoms of mental illness, I'll call the ACT team. We can't enforce his attendance, but we expect that he will continue. He's been going to the Double Trouble in Recovery group that meets here every day, too, and we hope he will continue that, so we're really happy with his outcome. I have to say that I'm impressed at the data that we got back from the check-in process. We were really surprised. I didn't have much belief that it would make a difference, but it was nice for me to be able to get a quick picture, in a matter of minutes, of Sondro's functioning in a broad sense. I think the messages that appeared when he logged on to the system really helped him see that we were looking at the information and recognizing his positive progress.

> **Master Clinician Note:** Double Trouble in Recovery is a 12-Step program for people with CODs. It is based on the 12 Steps and 12 Traditions of AA. Other programs, such as Dual Recovery Anonymous, may also be available in your area. Sometimes, the term "double trouble" is used to indicate that someone has a substance use disorder and also has a process addiction, or that someone participates in multiple 12-Step programs.

MARK: We'll still be monitoring and reinforcing his progress by having him check in. There could be a shift to a smartphone for the morning check-in process as he moves out into the community, but it will function in the same way as the desktop here at your program. Right now, the cost of a smartphone might be prohibitive for him, but in the future, the cost may come down. I'm also happy that he's willing to go to your continuing care and the Double Trouble group. I think we'll build in some reminders on the morning check-in process for Sondro about attending those meetings.

AUDREY: He's supposed to be going every day. Often, we find that he has trouble bonding in those groups, but we're going to support him in doing that. He seems happy there so far. I'm going to report to our administrator that we ought to do this check-in process for all our clients.

[Later, Mark meets with Sondro after his graduation ceremony from the day hospital program.]

MARK: So, Sondro, things seem to be working out fine. You're doing a great job.

SONDRO: Thank you.

MARK: You've had trouble for many years, and this time you really walked the walk. You're maintaining your abstinence, going to your outpatient treatment, taking your meds so the symptoms don't get in your way, and working on your physical health by participating in a walking group to get some exercise. I think you have a lot to be proud about.

SONDRO: That computer thing, it's pretty cool. It's not too hard and I like the color bars. When it's all green, I feel good. I like that when I finish, if I'm doing well, the bar turns green, and if I'm having a few troubles, it turns yellow. I haven't had but a few days where the bar was red, meaning I'm in big trouble.

MARK: That's the idea—for you to be in charge of your recovery. Checking in is one part of that, just like being in charge of keeping appointments, taking your meds, and being aware of times when you might need additional help. Audrey told me you now have a cell phone.

SONDRO: I do, but I'm worried that people can find me too easy.

MARK: Well, you don't mind us finding you, I hope.

SONDRO: No, you're okay.

MARK: Do you have text messaging on your phone?

SONDRO: Sure, but I don't know how to use it.

MARK: Well, if we show you how to receive your messages, how would you feel if we sent you text messages now and then—just little reminders? They'll help you stay on track. Do you think that might be helpful?

SONDRO: Well, if it's from you, I'm okay with that.

---

### How To Talk With Clients About Using Technology in Their Care

Discussing the risks and benefits of using technology differs little from other discussions about changes to the treatment plan. Here are a few tips:

- Be honest. Don't oversell either the risks or the benefits associated with using technology. Discuss the ways the technology may be helpful and the risks associated with using technology as a tool.
- Honor and support client preferences. Ultimately, each client must decide whether to participate. It is a sign of recovery to make informed decisions about one's own life and treatment.
- Use change sampling. Allow clients to agree to a short trial of at least one aspect of a given technology-based tool or intervention, followed by a discussion of the experience and a renegotiation of consent to participate. It is helpful to demonstrate the use of the technology and then have clients try it in your presence to ensure that they are able to use it appropriately.
- Enlist peers. Other clients or past clients who have successfully used the technology can be effective champions and provide clear and honest feedback about the ways it helped or hindered their recovery experiences.
- Give back. No one likes to spend time doing something that has no personal payoff. Help clients identify the ways the technology might help them. If the benefit to clients is distant, find ways to enhance the incentives to participate.

> ### How To Design Supportive Messages
>
> Having a collection of brief messages to reinforce recovery can provide a quick and efficient way to help sustain motivation:
> - Ask clients to help design and select the messages that are important to them.
> - Tailor messages slightly to the circumstances of the client; for example, if you know that a specific holiday is hard for a client, send a message on that day or a few days prior, acknowledging the challenges and giving a tip for dealing with stress.
> - Phrase messages positively—emphasize what can be done, rather than what should be avoided.
> - Use peer support staff or peer counselors to send messages. These individuals can have a different type of credibility than professional staff members.

MARK: We'll send you text message reminders about ways to keep progressing and to give you a little push now and again. The messages won't include anything really personal; they'll just be reminders to do things or positive messages about your progress. We'll help you remember to take your meds, and we can text you as many times a day as you want. Does that sound reasonable?

SONDRO: Sure.

> **Master Clinician Note:** Consider fine-tuning text messages for anniversaries, particularly those of stressful events, or to serve as reminders of specific appointments. Sending messages at a particular time of day or week to correspond to client needs can be helpful. If clients will regularly receive texts from you, you should be aware of their cellular plan costs for text messaging so that costs do not become burdensome.

MARK: We could send the text message at the times when you need it the most. What time of day is most difficult for you?

SONDRO: Six o'clock can be pretty tough. I have to be careful around then.

MARK: Well then, we will send your messages at six o'clock. Could you give me your phone number?

SONDRO: I could do that.

MARK: I'll check in with you to find out whether you think this is helpful. If it's not helpful, we can talk about it and stop if you want, or change it up to be more helpful.

SONDRO: What about the computer thing? The thing I do every morning.

> ### Multiple Uses of Smartphone Apps
>
> Kuhn et al. (2014) conducted a preliminary evaluation of PTSD Coach. Their focus groups with users/clients revealed the many ways in which the app was found to be helpful—learning about symptoms, managing symptoms, tracking symptoms, feeling one could do something about one's own posttraumatic stress disorder (PTSD), knowing when
>
> 
>
> the symptoms were better or worse, accessing resources, overcoming prejudice and myths, providing a way to talk about experiences, and so forth. Clinicians and clients should consider all the possible ways to use apps.

---

**Master Clinician Note:** Text messages are rarely secure or encrypted. Anyone with access to the client's cell phone can easily access his or her text messages. Even after they are erased, they may be accessible on the subscriber identity module card in the phone. Thus, if counselors use text messaging for reminders, support, or other purposes, they might want to keep messages vague and not reveal personal data. The client needs to provide specific informed consent related to the specific benefits and hazards of participating in online care. That said, the use of encrypted and secure communications as part of electronic health record (EHR) systems is growing rapidly. See Exhibit 1.2-1 for a research example.

---

MARK: I think you should keep doing it for a while, because you're going through a big change now. Maybe soon we can arrange for you to do it from your phone instead. Would that be okay?

SONDRO: I like the computer thing. I like checking in every day.

MARK: You can use it every day for as long as you feel you need to.

SONDRO: Let's keep it like it is for now. I don't like change a lot.

MARK: Sounds good. Sondro, I just want you to know how proud we are of you and your accomplishments. You are really doing well. Keep up that good work.

---

### Exhibit 1.2-1: Randomized Trial of Depression Follow-Up Care via Online Messaging

Simon and colleagues (2011) used their medical record system's capabilities to track prescriptions, make lab results viewable by clients, and allow clients to register for online messaging. They then compared the online messaging approach with usual primary care follow-up for clients who recently filled a new prescription for an antidepressant associated with a diagnosis of certain depressive disorders. Results showed the promise of such programs for increasing compliance and improving the rate of client satisfaction with depression treatment. The authors constructed automated online responses even for complex situations. For example, the suggested online response that follows is for use with clients who have reported, through online questioning, currently having few symptoms of depression and taking their medication but experiencing moderate or severe side effects.

"It seems that you are not having significant symptoms of depression now. But the medication is causing significant side effects. Do you think you can keep taking [it] a while to see if the side effects get better? Or do we need to talk with your doctor about trying some other treatment?" (p. 700).

The text message above can be customized for each client by the care manager (in this case, an experienced registered nurse with an added certification in psychiatry) based on information in the client's medical record as well as prior text messages exchanged. Each suggested online text message response is coupled with advice to providers regarding follow-up communication (in the above case, to "await response from patient. If side effects not tolerable, contact physician regarding need for alternative treatment. If tolerable, re-assess at next monitoring point," p. 700). Client monitoring and text-based communications are embedded into an overall program, including necessary informed consents, training, and supervision. For more information, see Part 3, Section 1, of this TIP (the online-only literature review).

*Source: Simon et al., 2011.*

# Vignette 3: Conducting a Telephone- and Videoconference-Based Pretreatment Group for Clients With Substance Use Disorders

## Overview

This vignette demonstrates how clients in a rural area who are on a wait list for treatment can be served by a pretreatment group conducted through video and telephone conferencing. Behavioral health programs in rural areas present some specific and unique challenges for service delivery. One of these challenges is limited access to care because of a widely dispersed population, geographic obstacles such as mountain ranges, travel expenses, accessibility of transportation, and frequent inclement weather. It is common in rural areas for clients to have to travel more than 100 miles to receive services. To address this issue, many programs have instituted a variety of telemental health services, using telephone, video conferencing, email, Web-based check-ups, and educational supports. Telehealth can be used for clients who are currently on wait lists and also as a primary tool. For example, Alaskan Native remote villages use telehealth as a primary healthcare tool; often, individuals go to the clinic in the village to access telehealth services delivered by a health aide or nurse.

Another issue facing many smaller programs in rural areas with a dispersed population is the wait time between when a client makes a decision to access help and when treatment services actually begin. This can range from just a few days to more than a month, depending on such issues as transportation, child care, employment, and an available treatment slot in either residential or outpatient services. In response, some programs have developed pretreatment groups conducted via telephone and/or video conferencing. Clients waiting to enter treatment are encouraged to use the group until other program services are available. This vignette depicts a pretreatment group that uses video conferencing on a secure network along with traditional telephone service.

## Learning Objectives

- Identify circumstances in which telephone and video conferencing groups may be useful means of providing treatment and support for behavioral health concerns.
- Demonstrate skills in establishing and maintaining a supportive environment in telephone and video conferencing groups.
- Illustrate strategies for preventing or overcoming technological challenges when planning or facilitating telephone and video conferencing groups.
- Develop knowledge of the primary privacy, confidentiality, and anonymity concerns inherent in telephone and video conferencing groups, and learn strategies to minimize them.

## Setting

Harry is a recovery coach assigned to lead a group that meets twice weekly at noon. He is fairly new on the job, but he has experience working in a group home where he ran groups before becoming a recovery coach. He was cofacilitator of the group for a month before taking over the leadership role, and Harry has now been leading the group for 3 weeks.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

The first scene is a meeting between Harry and his clinical supervisor, Joanne. They go over the agenda for the group and the list of clients who will be participating. Joanne offers supportive advice on managing some issues that may arise in the group. The second scene is a group meeting attended by five clients. In this session, Harry uses an icebreaker that invites too much discussion and raises issues that cannot be addressed in the group. He also has to deal with a client who may be intoxicated. Prior to the next group, Harry checks in with Joanne and gets additional support and information. They specifically prepare for one client situation that may present a problem for the group. In the second group meeting, Harry must address a confidentiality issue.

## Harry's Story

### Part 1: Meeting with a supervisor

Harry meets with his supervisor, Joanne, shortly before meeting with the group. He and Joanne cover some of the basic objectives of the group, the group format, the ground rules for participants, and concerns Harry has. Joanne, who has experience with telephone-based and video conference-based counseling, works with Harry to help him manage any glitches that might arise.

HARRY: I think I'm pretty well set up for the group today at noon. We have five participants.

Dee, who is in her third week in the group, is trying to arrange child care for when she's in intensive outpatient care. The problem is that her husband is a truck driver and on the road for up to 2 weeks at a time. In the meantime, she is attending online AA meetings, has a sponsor, and is going to two AA meetings a week in her community. She's been clean now for three and a half weeks. I'm concerned about her losing her motivation for treatment. She uses her computer to access our video conferencing system to attend the group.

Bobby—he's 26 years old—was arrested about a month ago for driving under the influence of substances, did 25 days in jail, and is now out on the condition from the court that he enrolls in treatment. He was in the center last week for assessment and is third on the list for an inpatient bed. It's going to be tough for him to stay sober outside. He lives way out in the country with his parents, and what's keeping him sober right now is basically having no driver's license and no way to get booze. He accesses our services via telephone through our secure video conferencing network.

Gene first connected with our program about a year ago and has a long history of pain pill addiction and alcohol and marijuana use. He is a disabled veteran but comes to our center because the closest service center available through the U.S. Department of Veterans Affairs (VA) is so far away. Lately, he's really been struggling. We have him scheduled for our ongoing recovery group. He only lives about an hour away and thinks he can make it for the weekly group. He's accessing the group through the video conferencing system.

This will be Mary's first group. She was just in yesterday. She's a widow—her husband died a couple of years ago, and she manages a ranch that she and her husband owned. The kids are all grown and have moved away, but they've gotten increasingly more concerned that their mother is getting drunk every night. Last week, she was drunk and called her daughter, who lives in Minneapolis, and started talking about not being able to go on, and how the ranch was too much, and how much she missed her husband. She scared the daylights out of her daughter, so the kids all came in last weekend and did their own version of an intervention. The youngest son, who's on break from

62

college this month, is staying with her for now and brought her to the center yesterday. She'll start in the IOP next Monday. We also have her scheduled for a mental health consultation next week to get a measure on her depression. She's never used video conferencing before, but her son will set it up for her on his laptop and get her started.

That leaves Morris, who only attends the group about half the time. I'm assuming that when he doesn't, he's drinking. At least, that usually seems to be the case. Morris just really resists treatment, but is amenable to at least participating in the group and staying connected to us that way. He calls in via telephone through our secure network. He lives here in town and would probably be a good candidate for our IOP. Every time we get him in, though, he finds a way to sabotage it. He pretty clearly has some mental health issues, maybe involving PTSD, that scare him away from treatment. Our goal is just to stay connected with him and maybe help him move from pre-contemplation/contemplation to actually getting in treatment. But, if we push, he just runs away.

JOANNE: Well, what an interesting group of people. Pretty diverse. But, you know, all of these folks are going to get some help today because of our video and telephone outreach. Otherwise, they wouldn't keep in contact with us, and we'd have no sense of how they were doing. This is a valuable program. It not only offers people some immediate help, but also keeps them connected to us until they can enter more formal treatment.

So, you're comfortable with the format? Two people are going to be telephoning in; three will be on video. The group lasts about 45 to 50 minutes, sometimes a little longer. We're not doing treatment, just preparing people for treatment—helping them maintain momentum, providing some education. Many of the folks in these groups have recently moved from precontemplation to contemplation, or from contemplation to preparation, and we want to help them hold on to their new outlook and goals.

Everyone will be connecting through our secure and encrypted video conferencing network. They know that they'll hear and not see each other, but that you'll be able to see all of the folks that are accessing via video, and, of course, the ones with video can see you. Each participant will have signed an informed consent form prior to joining the group, which can be done in person or through an online document signature system.

HARRY: I've had something of a problem with clients interrupting each other. It's not my style to be too directive, but I've learned to call on folks who aren't saying much and, on a couple of occasions, I've had to ask someone to wait until another person finishes talking. It seems like, for most people, after a while they learn to pause until there is a break in the conversation.

JOANNE: I think it's easier when all clients can see each other, as it is in our long-term recovery video group. But here, for confidentiality reasons, clients only see an avatar of other clients.

> **Master Clinician Note:** An avatar is an icon, picture, character, or graphic that represents a person's online identity. Using an avatar allows a person to portray an online identity without revealing their real image. In most situations, the counselor can see each client via the video feed, and each client can see the counselor, but clients do not see actual images or video feeds of the other participants.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

## Comparison of Use of Telephone Versus Video Conferencing

### Telephone

| Advantages | Disadvantages |
|---|---|
| • Convenient for clients, especially when transportation or childcare barriers exist | • Lack of visual cues can inhibit communication |
| • Enhanced privacy and/or anonymity for clients compared with in-person or video formats | • May be experienced by clients and staff members as less personal than in-person or video interactions |
| • Low cost to clients and organizations | • Dropped calls, poor audio, and lack of security if using mobile phones or, to a lesser degree, land lines |
| • No Internet connection, cameras, or other special equipment needed | • Inability to see environment where client is participating (e.g., whether there are distractions, others present) |
| • Minimal training on equipment required for clients and staff members | • Leader needs special skills in engagement, keeping clients involved, and making sure all clients participate |
| • Less potential for technical problems (no video issues) | |
| • Can be used to expand treatment capacity at a low cost | |
| • Allows for convening clients with similar problems who are spread over a large geographic area | |

### Video

| Advantages | Disadvantages |
|---|---|
| • Convenient for clients, especially when transportation or childcare barriers exist | • Requires that clinician and clients have some technical resources and knowledge |
| • Provides clinicians with more visual cues to judge the condition of clients and ensure successful communication | • Requires Internet connection, cameras, and special equipment for clinicians and clients; creates more opportunities for technical glitches |
| • Expands treatment capacity at a low cost | • May be experienced by clients and clinicians as less personal than in-person encounters |
| • Some clients are more comfortable initially with the degree of separation provided by video conferencing over in-person contact | |
| • Allows for convening clients with similar problems who are spread over a large geographic area | |
| • Saves clients the cost and time of travel and opens up opportunities for clinicians to work from home or remote locations | |

JOANNE: Now, the usual flow of the group is that you begin with a check-in and maybe give people an icebreaker, just to help them get started. I think the one you used last Thursday was great: "The best thing that has happened to me today is…" You want to just get a feel for how people are doing, whether there are any crises and special problems that need to be addressed. Of course, if the problem is unique to them, or serious, you'll want to let the person know you'll be following up with them after the group ends. Early on, you want to get everyone engaged in the discussion. I also find it useful to go over the ground rules quickly with every group.

HARRY: In the other groups I've run, I've found it's best to let the initial interaction run for maybe 10 to 15 minutes. By then, I'll have a feel for how people are doing and whether there are any pressing needs. I will have been able to invite quieter people to get involved and to set the

> **Ground Rules for Pretreatment Telephone or Video Groups**
>
> Most of the rules applying to in-person groups are also important in telephone and video conferencing groups; however, some issues become magnified when group members are dispersed. The following rules help minimize issues that can arise in telephone and video conferencing groups:
> - One person talks at a time.
> - For conference calls, callers say their names before they speak, because callers might not recognize each other's voices.
> - Everyone has an opportunity to talk.
> - Everyone should minimize noise and other distractions during the group and use the mute button if needed.
> - No one other than the group members and leader should be viewing or listening in unless they have permission from the group leader and the group is aware that someone else is participating.
> - Participants are encouraged to control disclosure of their identities to others in the group by using only first names and avatars rather than their real likenesses or surnames.
> - Indepth or highly sensitive discussions between clinicians and clients should be scheduled outside the group setting.
> - The same group rules related to respect, honesty, and confidentiality used in in-person groups also apply to video and telephone groups.

tone for the session. Then, for the educational part of the group, Willie, from the IOP, is going to come in and talk a bit about that program and how it operates.

As you know, Willie can talk from both sides of the fence, as both a counselor and a client. He does a great job of helping people develop hope that things can get better and that recovery is possible. He's also great about getting people to ask the right questions: "What if I know somebody in the group," "What if I need to miss a session," "What happens to confidentiality if my cousin works for the mental health center," "Can she read my records," those sorts of things. His confidence about recovery inspires people who may still be on the fence about treatment.

JOANNE: Well, Harry, it sounds like you're about ready to go. Now, you know if you have a problem, all you have to do is buzz me and I'll come right in. Sometimes, people need to be taken off the group for a while, and I'll handle that for you if it comes up. If somebody is creating a problem for the group, or if you need some support, just let me know.

> **Master Clinician Note:** When doing treatment groups with clients who are not all physically present in one room, it helps to have a backup person or a cofacilitator who can assist when a client becomes disruptive, has emergency needs, or exhibits some other pressing issue that needs to be handled individually, away from the group. In working with clients on the telephone, this may mean establishing a new call between the backup counselor and the client in crisis. With video conferencing, there should be arrangements to redirect the connection of the client in crisis to a separate, private monitor staffed by the cofacilitator.

HARRY: Sure will, Joanne. Thanks for the support.

## Part 2: The group meeting

Harry signs into the secure network about 10 minutes early. The first to call in is Morris, who has attended this group before. He and Harry chat for a bit, waiting for others to arrive. The

next to arrive are Mary and her son. Once Mary is established online, the son leaves his mother alone in the room. Harry speaks briefly with Mary, who isn't very communicative. Harry has a video connection with Mary and observes that she seems anxious. Dee arrives soon after Mary. The microphone on her laptop seems to exaggerate the noise of her children playing and the sound of the television in the next room. Harry asks Dee if she would feel comfortable shutting the door to the next room, and she obliges. Right at start time for the group, Gene appears on-screen. He looks disheveled, like he just got up, and is drinking coffee from a large mug.

HARRY: Okay folks, it's time to start, and we have Morris, Mary, Dee, and Gene attending. There may be one other person joining us, but let's begin.

MARY: Am I supposed to be able to see all these other people? I can see me and you, but I only see silly pictures of the others. On Skype, when my son sets me up to see my grandchildren, we all see each other.

HARRY: Actually, Mary, in this group, what you see on the screen are avatars, or images representing people. For this group, we do that for confidentiality reasons, and because some people are calling in via telephone. So, I can see you and you can see me, but the group members can't see each other. Unlike with Skype, we use a special teleconferencing network that you call into on your computer. It's a secure network that ensures confidentiality.

MARY: Thank you.

HARRY: Okay, let's start with folks giving their first names, and maybe each of you can say a little bit about yourselves and let us know how you are doing.

MORRIS: Well, I'm Morris, and I come to the group when I'm not busy with other stuff.

DEE: *[after a pause]* Well, I'm Dee, and I'm a housewife outside of Seradona. I have three kids who are out of school today, and you'll probably hear them in the background.

MARY: *[after a pause]* I'm Mary, and I own a ranch outside of town. My husband died last year, and my kids think I'm drinking too much. I don't see how this is going to help me. I'm already too overloaded and have too much to do, and now they want me to do this silly thing. Sure, I

---

**Technical Considerations for Video and Telephone Groups**

- Use a secure teleconferencing network or land-based telephone conferencing system to protect privacy.
- Consider adequate bandwidth at provider and client ends of the transmission to facilitate adequate image resolution.
- Anticipate fluctuating bandwidth demands when relying on public Internet.
- Address the need for encryption of information on provider and client ends of transmission to ensure privacy. Depending on the service, this may require software to be downloaded and set up by the client.
- Test audio equipment to troubleshoot inadequate audio quality. Choose technology that can run on very low bandwidth if possible.
- Ensure that your technology allows you to mute or remove disruptive members in the group.
- Provide a land-based telephone line for backup.
- Ask clients to test the system prior to the group meeting time.

drink, been drinking all my life. But I don't get looped and I don't drive drunk, so I don't even know why I'm here. Running a ranch is hard work, and keeping up with a bunch of cowboys is even tougher. My husband used to take care of that. Now he's gone, and I'm stuck with it. Am I talking too much? Just tell me to shut up if I am. I'm just frankly pissed that I have to do this.

HARRY: Thanks, Mary. Maybe we can get back to this in a minute. Let's hear from Gene.

GENE: Uh, I'm Gene. I just got up. I don't sleep at night, so at three o'clock this morning I finally took a sleeping pill, and it knocked me on my butt. Now it's noon, and I'm hardly awake.

HARRY: Well, Gene, and all of you, I'm glad you've joined us today. I'm Harry, and I'm the leader of the group. My job here at the center is to work as a recovery coach. I work with people who are thinking about changing their alcohol and drug use, run some groups, help people make connections in the community for recovery needs like healthcare or financial assistance, and just try to help people get started in recovery. For those who are new to this group, I'd like to start by describing the purpose of this meeting.

[Harry proceeds to describe the rules of the group briefly. (For more information on group rules, refer back to the "Ground Rules for Pretreatment Telephone or Video Groups" box earlier in this vignette.) Harry also explains the goals of the group, stating that the group is one of the program's online resources and that clients who take part are often doing so to receive some assistance without always having to visit the agency. Assistance can include information that comes from Harry, from other clients who are part of the group on the call, or from other staff members or workers from outside the agency who attend the group sometimes to address certain specific issues.]

HARRY: The goals of this group are to gain assistance from each other as well as from the group process itself; for those who are new to the group, some of its workings will become clear as the group process unfolds. If there are any questions at any time, just let me know. So, let's begin with me asking you to think about something for a minute. If you could have anything you need at your disposal today, what would you like to have?

MORRIS: I don't understand. Is this a test or something?

HARRY: No, I'm just wondering what you might need in your life today—what would help you live a better life today?

DEE: Well, I know the answer to that one right away. I need my husband to be home more. He's a long-haul driver and does cross-country runs for 12 consecutive days. Then he's back home for 4 days and sleeps most of that time, and then he's on the road again. So, it's like I'm a single mom almost all the time. I know he gets lonely too. He calls me a half dozen times a day, telling me where he is and what the conditions are like. It's a boring job. We live a pretty good ways from town, so when the school bus picks up the two older kids and it's just me and the baby here at home, there's not a lot to do but answer the phone and drink a few beers. Then he gets upset when he calls 'cause he can tell I'm drinking, and then we both get upset, and I just have another beer. I'm doing okay today, though. It's just past noon, and I haven't had a beer yet.

[Harry quickly considers the options of where to head at this point. This is not a treatment group, but Dee is clearly asking for support. On the other hand, if he ventures into working with

Dee, he might leave other group members feeling disengaged. If he invites other group members to engage with Dee to support her, he will have drifted from the agenda of the group, and the other group members will probably just get into giving advice. He decides to briefly support Dee's efforts to resist drinking and makes a mental note to get back to Dee for an individual video session later this afternoon.]

> **Master Clinician Note:** Just like in any group, it's often tricky in telephone and video groups to deal with individual issues while keeping the whole group engaged. If group members cannot see each other, they are even more easily disengaged from these exchanges. Communicate to the individual that you support his or her struggles and will have time to talk individually about the situation later. Once this has been accomplished, you can reinitiate group interaction.

HARRY: Dee, congratulations on not drinking today. That's a good step in the right direction. I'm wondering if we can talk briefly at the end of group today about the issue you raised. Would that be okay?

DEE: Sure.

HARRY: Okay, that's great. What might the rest of you need, if you could have whatever you want today?

[With Harry's support, each group member contributes to the discussion, describing his or her needs. Gene, who has chronic pain, would like pain relief. Mary would like her husband back, alive and running the ranch. Morris would like some friends. Harry briefly suggests that Morris might make some friends in the treatment program if he is willing to attend, but Morris rejects the idea. Harry has hints of regret that he used this particular question in this group. His objective was to get everyone involved, but it ended up raising issues that could not really be discussed and resolved in this kind of group. Harry does encourage Gene to raise the chronic pain issue with his counselor at the center and to make that a particular goal for his treatment. He also encourages Mary to talk about her need for support with her son and to begin making plans with him and her other children for getting some help in running the ranch.]

HARRY: Let's move on now to our special guest. We've invited Willie from our IOP to talk with us today. Willie, I want to welcome you into the group. On video, we have Mary, Dee, and Gene. On the phone, we have Morris.

WILLIE: Good afternoon, everyone. I'm delighted to be here today to tell you a bit about the center's IOP, to talk a little about treatment and recovery in general, and to answer any questions you may have.

Willie proceeds to describe the IOP, interacting with the four group participants and, in particular, describing his own experiences with recovery and using them as a framework for helping clients begin to consider their own expectations, through group discussion, about what recovery might be like for them.

In the meantime, Harry has gotten a notice on the monitor that someone else is trying to enter the conference. He steps into Joanne's office and answers on her telephone. The call is from Bobby, the group participant who did not check in with the group this morning. While Willie

continues to direct the group, Harry speaks with Bobby alone. Bobby seems to be intoxicated; he is slurring his words, rambling, and making different excuses for being late for the group. Harry asks Bobby if he has been drinking. Bobby deflects the question and continues to ramble about why he is late for the group. Harry does a quick clinical assessment of Bobby, checks that he isn't a high risk for suicide, and gives him a suicide hotline number. He also offers to help Bobby make arrangements to enter detoxification, which Bobby declines, and checks Bobby's plans for the day to ensure that he isn't driving. He closes the call by asking Bobby to call in the morning, when Harry thinks it's less likely that Bobby will be drinking.

After making arrangements with Bobby to call the next morning, Harry returns to the group. As Willie wraps up his presentation, Harry becomes more engaged in the group process and thanks Willie for his participation. Harry then invites group members to comment on what they have gotten from today's discussion. Harry mentions that he talked to Bobby offline during Willie's presentation and hopes that Bobby will be able to attend group on Thursday. He reminds Dee of their telephone appointment at 4:00 p.m.; encourages all participants to get or stay engaged in a 12-Step program or other mutual-help group in their area or over the Web; reminds them that if anything comes up that they would like to discuss, they can feel free to give him a call; and closes the group with a reminder of the next group meeting, which is Thursday at noon. He will email each group member a reminder of the Thursday meeting.

Following the group meeting, Harry drops into Joanne's office to get her thoughts about handling the issue of Bobby being intoxicated and Harry not letting him join the group. Joanne agrees that inviting a person who is probably intoxicated into a group of people in early recovery would be detrimental. Harry was careful not to be judgmental with Bobby about his alcohol use, but, at the same time, firm in not allowing him to participate in the group while intoxicated. Harry also made an appointment for Bobby to call at 9:00 a.m. tomorrow and discouraged drinking in the interim.

### Part 3: Supervision

In supervision later in the week, Harry and Joanne meet to review the group process and discuss Harry's concerns about the group meeting. Bobby did not call after the group. Harry plans to telephone him on Wednesday to remind him of the group meeting tomorrow at noon. Dee kept her 4:00 p.m. appointment and arranged a video conference session with a counselor on Friday. In the interim, Harry encouraged her to employ a neighbor's teenage daughter to babysit while she goes to an AA meeting in her local community. The small AA group only meets twice a week, but it gives Dee a chance to meet some people in recovery and get out of the house. Dee also reported that her husband strongly supports her efforts to quit drinking and get help. Harry and Joanne go over plans for the group tomorrow. The guest is going to be a local AA member who will speak briefly about opportunities to attend AA and other 12-Step and support meetings in the community and online. Harry is going to give more thought to the questions he asks to get people involved in the group, and he will try not to ask questions for which there may be potentially complicated answers that cannot be addressed adequately in the brief group setting.

> **Locating Online and In-Person Mutual Support Groups**
>
> Online and in-person mutual-help groups can be important resources for clients participating in tele-phone or video conferencing groups. A range of mutual-help resources are available online. Although some clients will be very sophisticated users of social media, others will need advice about how to protect their privacy when using social media. See Part 2, Chapter 2, for a link to safety tips for social networking. The following resources may help you select reputable mutual-help groups:
>
> - Substance Abuse In Brief Fact Sheet: An Introduction to Mutual Support Groups for Alcohol and Drug Abuse (http://store.samhsa.gov/product/An-Introduction-to-Mutual-Support-Groups-for-Alcohol-and-Drug-Abuse/SMA08-4336)
> - Faces and Voices of Recovery: Guide to Mutual Aid Resources (http://www.facesandvoicesofrecovery.org/resources)

## Part 4: The second group meeting

Harry opens the televideo meeting space about 10 minutes before the group is scheduled to begin. Mary is the first to check in, but she cannot be heard because she has pressed the mute button on her computer. Harry quickly calls her home telephone number and helps her activate the speaker on her computer. In rapid order, Morris (telephone), Dee (video), Gene (video), and Bobby (telephone) come online.

HARRY: Welcome, folks. We have everyone who is scheduled to be here online. Morris and Bobby are connecting with us by telephone.

A loud screech can be heard in the background. Harry's console indicates that it is coming from Bobby's telephone.

HARRY: Bobby, there might be a problem with your phone. Are you on a cell or landline?

BOBBY: I'm driving to the store and I'm on my cell. I gotta get to the store and cash my check and get some cigarettes.

HARRY: *[trying not to show exasperation]* Bobby, I appreciate you making the effort to connect with us today; that is, for sure, a step in the right direction. However, I am concerned that you're driving while on the phone. Can you put the phone down, find a safe place to park, and then pick the phone back up? We won't hang up; we'll wait for you. If not, would you give me a call this afternoon when you get back home, maybe around two o'clock? Would that work for you?

> **Master Clinician Note:** Although land-based telephone connections tend to be slightly more stable than cellular connections, it is no longer realistic to require clients to access telehealth services through land lines only. Many people do not have land lines in their homes anymore and rely solely on their mobile phones for telephone-based communications; public payphone landlines are less and less common and are often in highly trafficked locations that might well compromise client confidentiality. Security issues to consider when using mobile phones are addressed elsewhere in this chapter. As for connectivity issues and reception-dependent quality of audio and video transmissions from clients using mobile phones, you may consider asking clients to try out various easily accessible locations prior to accessing telehealth services so that they can select a location with adequate, stable reception. They can then plan to be, and remain, in that location for the duration of their participation in telephone- and/or videoconference-based behavioral health services.

> ### How To Manage Challenging Interactions in Telephone or Video Group Meetings
>
> - Have a backup clinician help with crises or difficulties as you continue with the group.
> - Encourage the use of appointments outside the group session to address sensitive issues.
> - Do quick status checks with each participant to identify any issues that need to be addressed either in group or after the group.
> - Establish clear group rules and norms in the beginning; reinforce them during each session.
> - Consider practicing your protocols with a peer before your first session.
> - Use structure (e.g., check-ins, topical discussions) to ensure that everyone has a chance to talk.
> - Have resource lists available to provide referrals quickly.

BOBBY: *[defensively]* Well, man, I gotta get my check cashed and I'm outta smokes. Sometimes you just gotta do what you gotta do.

[Bobby hangs up. Harry is concerned that he is talking with a person who is probably violating the law by driving without a license; Bobby's was revoked for driving while under the influence. Harry will consult with Joanne as soon as the group is finished to see what he should do. He is also aware that the rest of the group was listening in on the interaction.]

MORRIS: Well, I'm glad you got rid of him. I don't like him.

DEE: He kind of gives me the creeps.

GENE: Well, I think the guy is just doing what he's got to do.

HARRY: Guys, I'm concerned that we're going to sit here and critique Bobby. Instead, let's move on to our agenda for the day. Suppose we start with a check-in. How about checking in by giving us your first name and what you would like to get out of today's meeting?

DEE: Well, I'm Dee, and I want to let you know that I did hire the neighbor's girl as a babysitter, and I went to a meeting in town last night. It was only six old guys and me, but you know what? They were friendly, and I felt welcome, and they invited me to come back. I wouldn't say it was a good time, but it was nice to get out of the house, and I felt welcomed at the meeting. One of those guys got sober before I was even born. Can you imagine? Somebody hasn't had a drink in 34 years! He was a hoot. I'm surprised he can even remember back then.

MARY: Honey, some of us aren't as slow as we look. I'm pushing 70 and I still run a ranch!

HARRY: Mary, introduce yourself and tell us what you would like to get out of today's meeting.

MARY: Oh, sorry. I'm Mary, and I don't know what I need to get out of this. I guess what I need to get out of this is to *get out* of this. My kids put me up to it. Forced me, actually, and it looks like they're going to stay on me until I cut back on my two or three drinks in the evening. You know, there isn't much to do on the ranch after about seven o'clock at night.

HARRY: Okay, so what you would like to do is complete the program?

MARY: I guess that puts it pretty clearly.

---

**Master Clinician Note:** Notice that rather than fighting resistance, Harry asks Mary to identify her own goals for participating. This can be an effective way to create ownership for change. Asking clients to identify what they want helps to refocus them on their own goals rather than on goals others may have for them.

---

HARRY: Okay, who else is here?

MORRIS: Well, I'm Morris. I just want to say…Dee, I figured out, you being from outside Seradona and all, that I went to school with your sister, Jan. Actually, I had a crush on her, but she wouldn't go out with me. I think you're a little older than her, and you married Billy Rogers and then y'all got a divorce, right? *[after a long silence]* Did I say the wrong thing?

HARRY: Well, Morris, I think we want to help people keep their anonymity here, to preserve people's confidentiality, you know. That's why we only use first names. You might, particularly in a small place like where we live, figure out who some group members are or who they're married to. But I think it's always wise to let them decide what to share and what they want people to know about them and their personal lives. Otherwise, it can feel dangerous, kind of like they're being exposed.

MORRIS: Well, I was just trying to be friendly.

HARRY: I understand that. I don't think you were trying to expose anyone intentionally. Dee, you have anything to say about what's happening?

DEE: Yes, I know who you are. I think I'd rather you not be talking about me in the group, but I don't think you meant anything mean by it. So, let's just forget it—especially the part about Billy Rogers.

MORRIS: Well, I'm really, really sorry.

GENE: Could we just move on here?

[Harry begins to think he is getting in over his head, but he doesn't think it would be appropriate to call Joanne in. He does make note of items to discuss with Joanne after the group.]

HARRY: Gene, you're the last check-in. What would you like to get out of today's meeting?

---

### How To Manage Confidentiality During Telephone or Video Group Meetings

- Review privacy and anonymity guidelines with each client before they join the group and again as a group whenever new members join.
- Help clients differentiate between anonymity and confidentiality; honor both in the group.
- Mail or email a confidentiality statement/agreement to clients before the group begins.
- Remember to cover traditional confidentiality and anonymity concerns as well as those that are unique to telephone and video groups, such as other people entering a room when a group member is online.
- Distribute a sheet of safety tips about Internet privacy and risk to clients at the time they enroll in group (see Part 2, Chapter 2, for links to sample safety tips).
- Connect clients with options for online support that do not compromise privacy, such as mutual-help groups, chats, and blogs.

---

> ### How To Get Assistance During Telephone or Video Group Meetings
>
> When scheduling telephone or video groups, plan for backup support to help manage unexpected situations. Ideally, support will consist of a second clinician who is on call and technology that allows this clinician to take a client into a separate discussion if necessary. Remember to:
>
> - Let the group know what is going on. They may not be able to see, hear, or detect concerns as you can. Tell them if you need to exit the group and how long you expect to be gone.
> - Deescalate the situation by offering individual support from another clinician or by offering to engage with the client one-on-one after the group. Schedule a follow-up session immediately after the group, if needed.
> - Avoid disclosing personal information about any individual in group. Stick to statements like, "It sounds like you could use some extra support," or, "Let's talk more about this after group," which communicate to the other group participants, without disclosing additional information, that you are planning to follow up with the client in need.

GENE: Well, I'm Gene. And I called in today especially because I'm feeling pretty shaky. I'm craving bad. I've really tried not to take the pain pills for a couple of days now—three, actually. I've smoked some, but no booze and no pain pills, and I'm beginning to feel my skin crawling. Like I'm itching.

HARRY: Gene, I'm wondering if you think you need to talk to someone now about coming into the center. Sounds like you may be having some withdrawals.

GENE: Damned right I'm withdrawing. Man, I need something.

HARRY: Okay, right now, let me put the group on mute for a minute and I'm going to make a phone call and see what we can do.

[Harry mutes the group and calls Joanne. Joanne answers and agrees to take Gene offline, do a quick evaluation, and arrange for any care he may need. Harry returns to the group and unmutes his line.]

HARRY: Gene, I'm going to switch you over to Joanne. You may remember her from your evaluation session here at the center a couple of weeks ago. She's going to talk with you personally, and the two of you can make some decisions about what needs to happen. Is that okay with you?

GENE: That sounds about right.

HARRY: Okay, everyone. Hold on for a minute while I mute the group and help Gene get connected to Joanne; I'll be right back with you after that.

[Harry connects Gene and Joanne, makes introductions, and then returns to the group, unmuting his audio feed once more.]

HARRY: Okay, everyone, I'm back. Next, I want to introduce our guest this morning, Michael, who is a graduate of our program and a person who is active in mutual-help groups in the community. Michael, welcome to the group.

> **How To Manage an Exchange of Personal Information in an Online Group**
>
> Clients may wish to exchange personal information for a variety of reasons. Clinicians can help clients manage their privacy in the following ways:
> - Review guidelines for anonymity regularly in groups and individually.
> - Distribute information about how to control access to private/identifying information before the clients participate in online interactions.
> - Take clients temporarily offline to reinforce privacy when needed.
> - Support out-of-group discussions through chats, blogs, and other mutual-help options.
> - Facilitate talks among participants who wish to share personal information as needed.
> - Invite guest speakers to discuss Internet privacy concerns and protections.

[Michael introduces himself and talks about his experience in mutual support groups in the area. He answers several questions about anonymity in the groups, groups for women, relapse, and other topics. After about 15 minutes, he turns the meeting back over to Harry.]

HARRY: Well, folks, I think that about takes all the time we have for today. Before we stop, are there any closing questions or comments?

MORRIS: Dee, I still feel terrible about what I said. I only meant to see if you were Jan's sister.

DEE: No problem.

HARRY: Dee, I'm wondering if you and Morris would like to meet for just a few minutes after the group is over for you guys to clear the air over anything left over from today?

DEE: I really don't need to.

MORRIS: Me either. I feel bad about saying what I said, but I'm glad Dee isn't upset with me.

Harry closes the meeting, reminding people about confidentiality of information the group shares, about the time for the next group meeting, and about calling him or other staff members if they have questions or if something comes up for them over the weekend. Harry has also kept a list of items that he needs to discuss in his next supervision session with Joanne. He remembers that Bobby is supposed to call around 2:00 p.m. and makes a mental note to await the call.

# Vignette 4: Incorporating TAC Into Behavioral Health Services for Clients Who Are Hearing Impaired

## Overview

TAC offers a variety of previously unavailable options for individuals with special needs to access treatment. These special populations include people who live in rural and remote areas, people with disabilities that limit access, individuals whose employment limits their options for regularly scheduled services, and people who will not access services through conventional (e.g., office visits, in-person counseling) methods. Additionally, TAC opens up the possibility of maintaining contact when not in session by using motivational messages, simple wellness check-ins, appointment reminders, and other options.

Some individuals who are hearing impaired consider themselves part of a community that, in fundamental ways, has its own cultural identity; individuals in this community prefer the term "Deaf," which does not directly reference impairment. To promote cultural competence, the counselor in this vignette follows the client's wishes and uses the terminology most conducive to recognizing and respecting the client's cultural beliefs and identity. In all other areas of the TIP, the term "hearing impaired" is used to refer to individuals who are Deaf or hard of hearing, but in Vignette 4, the terminology reflects the preferences of the Deaf community.

This vignette describes ways in which technology can support intake, assessment, referral, treatment, and continuing care for Deaf clients, a specific group of people for whom technology plays an important role in access to care. It also addresses ways in which Web-based technologies and supports can help deliver behavioral health services to the Deaf population. The use of computers, smartphones, and other Internet-supported devices enables users to have in-person conversations as well as typed and video-based communication in real (synchronous) time. In addition, some recovery resources, once only available in print form, can now come to life in American Sign Language (ASL) for Deaf users. The 12 Steps, daily affirmations, and other valuable tools are now available for Deaf consumers in video form and can be viewed via the Web.

## Setting

The county behavioral health agency is located in a small city and provides outpatient services to residents who may live as far as 30 miles away. The agency provides accessible services to clients with disabilities, including Deaf individuals seeking help. There is no one on staff, however, who is fluent in ASL or has extensive knowledge of culturally appropriate treatment for Deaf clients.

## Learning Objectives

- Identify how TAC can enhance accessibility and treatment for Deaf clients.
- Explore special considerations and options for treating Deaf clients who have mental or substance use disorders.
- Understand a variety of accessibility issues in providing services to Deaf clients and how TAC may be an avenue for addressing these issues.
- Learn privacy and special counseling considerations when using TAC.
- Learn how to use Web-based supports to enhance client outcomes.

## Maria's Story

### Part 1: Beginning to work with an interpreter

Maria is a staff counselor at the county behavioral health agency who had some experience working with Deaf clients during her internship in graduate school. Her new client, Mike, is a 32-year-old Deaf man who has been referred to Maria's agency by the court for substance use disorder assessment. Maria makes a few calls and does some Internet searches; she learns that there are a few different treatment options for Deaf clients. One is a mainstream program using an interpreter in a local agency with inpatient and IOP options, both designed primarily for clients who can hear. Another option is for the client to attend a specialized treatment program that is linguistically and culturally appropriate for a Deaf client, with staff members who are able to communicate directly in ASL. For example, the Minnesota Chemical Dependency Program for

Using Technology-Based Therapeutic Tools in Behavioral Health Services

> **Considerations Prior to Your First Session With a Deaf Client**
>
> - ASL will require a certified interpreter who is competent in the language of the client.
> - Interpreter referral services are sometimes administered through the state by an outside agency or through a contract with the state. Payment of interpreters is typically provided by the agency if they are required by law to provide accessible services under the Americans With Disabilities Act.
> - A client may choose not to work with a specific interpreter because they do not find the person to be a good language match or because the Deaf community is small and there may be a potential for dual relationships.
> - A client who seems unwilling to work with all available interpreters may be doing so for a variety of reasons—therapeutic resistance may be one of them.

Deaf and Hard of Hearing Individuals (MCDPDHHI) in Minneapolis, MN, accepts clients from across the United States.

She understands that to work with Mike, she needs more information, so Maria contacts her State Division of the Deaf and Hard of Hearing to consult with their behavioral health and accessibility expert, Vernon. The administrative assistant at the division explains that Vernon will contact her using a video relay service, an accessibility service that provides interpreters to facilitate communication between people who use the phone and people who use video streaming for remote communication. A short time later, an operator/interpreter calls Maria via video relay. The operator explains that Maria is receiving a call from a person who uses sign language to communicate and that she will interpret back and forth between the two of them. The operator is looking at a monitor and can see Vernon, and she is wearing a headset to hear Maria over the phone. The operator explains that Maria should just communicate as though she is talking directly to the caller.

VERNON: *[signing]* Hi, Maria. I'm Vernon, and I got your message about seeing a Deaf person with a substance use problem. I'll be happy to help with issues of accessibility and any other issues you want to discuss.

MARIA: *[through the interpreter]* Thanks, Vernon. Yes, I worked with a few Deaf people in graduate school, but there seems to be a lot of new technology, and I'm delighted that you're here to help. For confidentiality purposes, let's refer to my client as "M," if that's okay with you.

VERNON: Sure.

> **Master Clinician Note**: Maria speaks at a natural pace on the phone. She remembers to clarify with Vernon the meaning of any acronyms she uses, just as she would with anyone who might not be familiar with the lingo or jargon of her field.

MARIA: At the substance use disorder program, we have a standard protocol for assessment, and fortunately, the instruments we use are also available in ASL digitally and are accessible on the Internet. We'll have two interviews to collect data and decide on a treatment plan. We'll need an interpreter for the interviews, and the assessment instruments will be administered during one of the interviews.

**How To Identify Your Client's Preferred Methods of Communication When Not In Person**

Consider the following issues:
- Can the client talk and hear on the telephone?
- Does the client have access to high-speed Internet, Web cams, and monitors for videophone-based communications? Videophone technology enables ASL users to communicate with each other directly in real time. It is secure and private.
- Does the client typically use a video relay service? Such services combine the use of telephone and videophone technology to facilitate calls between people who communicate in ASL and people who communicate through speech and hearing. Callers dial dedicated numbers that connect them to a relay interpreter who is fluent in spoken English and ASL. The interpreter places and then translates the call. The interpreter sits in front of a Web cam and monitor and wears a headset, enabling him or her to see and be seen by the ASL user and to hear and be heard by the spoken-English user. The technology is secure and private, and the interpreters are certified and adhere to strict ethical guidelines.
- Is the client comfortable communicating in written English? Text messaging or email communication is preferred more commonly by clients who have competence with written English.
- Have you alerted the office staff members at your agency that they may receive calls from video relay services? Some agencies require all clients to work through the front desk to contact their counselors.
- Does your agency allow for appointment communications to happen via email or text messaging? For some Deaf clients, this is more effective and direct than video relay.

VERNON: I'm sending you two email attachments with information about determining your client's preferred way of communicating between sessions and about issues to consider when working with interpreters. You may already know that many Deaf people do not speak English as a primary language and may not understand written notes, including email and text messages.

MARIA: Yes, I remember that from my graduate school days. Okay, I've received your email attachments and I'm looking them over now.

VERNON: Do you know M's comfort level or competence with written English?

MARIA: I know that he graduated from the state school for the Deaf, but I was told by the probation officer that he had a hard time completing the written forms required by the court.

**Master Clinician Note:** Maria thinks she will need an interpreter for her client to participate in certain aspects of the intake and treatment process. She is aware that the interpreter will not take the place of clinical staff, nor will the interpreter take on roles typically executed by program staff. She also knows that if assessments and materials used in intake, treatment, or continuing care require reading or writing, they may not be appropriate for use with her Deaf client.

VERNON: Be aware that the interview will probably take longer than it would with a hearing client. The interpreter should be there a little early to meet you and work out details. Now, let's move on to the second attachment about issues to consider in working with Deaf clients and interpreters. It's important that you talk with the interpreter about any terminology or acronyms that are specific to what you'll be discussing. Some examples include terms like AA, tolerance,

Using Technology-Based Therapeutic Tools in Behavioral Health Services

---

**Certified Deaf Interpreters**

The Registry of Interpreters for the Deaf certifies trained individuals who are Deaf or hard of hearing to serve as interpreters. CDIs have proficient communication skills, have received interpreter training, and possess knowledge and understanding of Deaf culture and the Deaf community, as well as language fluency to help enhance communication. State departments that oversee services for Deaf individuals can be excellent resources for treatment programs that need interpreter services. For more information, see the Registry of Interpreters for the Deaf Web site (http://www.rid.org/rid-certification-overview/cdi-certification/).

---

withdrawal, and so on. Many interpreters specialize in mental health and/or addictions work and may have greater facility with the lingo than those who don't have this specific training or skill.

VERNON: Are you familiar with the term "CDI"?

MARIA: No, I'm not.

VERNON: Okay, I think it is important that you know something about Certified Deaf Interpreters. So, I'm sending you another email about working with a CDI.

MARIA: Vernon, I have one last question. If M and I wanted to call the specialized treatment program for Deaf individuals from my office, would it be all right to use Skype? We don't have a videophone here, and I want M to be able to communicate directly with the Deaf and signing staff there if he has any questions.

VERNON: That's a great question. Presently, many individuals who are Deaf and businesses and organizations that employ Deaf people have access to videophones. Unfortunately, Skype does not have the picture or streaming quality of videophones, which can cause choppiness in the sign language. Additionally, Skype doesn't have the security and privacy features that would be necessary for the type of conversation that you and M may need to have with another agency. There are companies that provide secure Web and multiparty video conferencing software and online services. If security isn't a concern, some Deaf clients may choose Skype or iChat to keep in touch with hearing family members. The chat feature enables users to type back and forth in the event that signing is too choppy, or if hearing family members don't sign. This tool can be used when clients are in an inpatient program and want to be able to call hearing family members to talk. It can also be used by Deaf and hearing individuals in recovery for support between meetings.

At the end of their conversation, Maria and Vernon exchange contact information, and Vernon tells her that he will send her links to additional resources. Vernon explains that the best way to reach him is by email for the most immediate response.

### Part 2: First session with the client

Maria is ready for her first session with Mike. She has hired an interpreter through her agency. Maria has already chatted with Mike via video relay and has prepared the staff at the front desk to receive both the interpreter and the new client. She has asked the interpreter to come in a few minutes early so that she can review forms and her agenda for the first session. After meeting with Maria, the interpreter returns to the waiting room to wait for the client. When Mike

> ### How To Set Up the Space To Work With an Interpreter
>
> - Ensure that the room is well-lit with overhead lighting, as opposed to a window as the sole light source—this will prevent anyone from being backlit and in silhouette, which makes it difficult to see faces.
> - Leave enough room for each person in the meeting to sit comfortably with the interpreter seated next to the hearing person. The client needs to be able to have visual access to both the counselor and the interpreter.
> - Reduce all visual distractions.
> - Speak naturally and look directly at the client, directing all communication to the client. Do not ask the interpreter, for example, to "Ask the client if he…" Rather, direct all communication to the client. The interpreter will let you know if your pace is too fast.
> - There may be a lag during communication between the interpreter and the client. This may happen for a variety of reasons:
>   - The client may not be familiar with terminology or may use different signs from those the interpreter is using.
>   - The interpreter may need to back up if there was a communication error that needs to be corrected.
>   - The client may be asking questions that are relevant to the communication but not the content.
> - It is important to have the Deaf person's attention before speaking. To get a Deaf person's attention, it is appropriate to tap on the shoulder or wave gently. Make sure to look directly at the Deaf person while speaking, even though your natural tendency may be to look at the interpreter. Eye contact is important when communicating with Deaf people. Be aware that if you look away or look elsewhere, it may be distracting for the Deaf person.

arrives, Maria invites him and the interpreter into the session. She asks Mike and the interpreter what the best seating arrangement would be. Mike requests that the interpreter sit next to Maria across the table, explaining that this will enable him to see both Maria and the interpreter. They begin by completing the intake forms.

MARIA: I'm glad you're here today, Mike. It's nice to meet you.

MIKE: It's nice to meet you, too. I'm not sure how to tell you about my problems. I never had to come to counseling before. I had to come here because everyone says I drink too much, and sometimes I steal pills from my family.

[Mike proceeds to provide Maria with information about his alcohol and drug use.]

MARIA: Lots of people come here because they are having problems related to their alcohol and drug use. We have plenty of time to talk about that, but to begin with, you'll need to complete these forms so that the agency will have all of the information they need about you. These are forms that everyone who comes here completes. Some forms are for insurance, some are for us to know more about you, and some tell you about us and the work we do. Often, people have questions, so I'll be right here in case you need any help.

[Soon after completing basic demographic information, Mike indicates that he doesn't know several of the words or how to spell the answers to the questions. Maria works through the interpreter to help Mike complete the form. She acknowledges that he understands most of the concepts but is not confident in his ability to read and write.]

> ## Substance Use Disorder Screening Tools Developed for Use With Deaf Clients
>
> **The Substance Abuse Screener in American Sign Language (SAS-ASL)** is an accurate and brief questionnaire specifically developed and validated for the Deaf population to screen for substance use disorders among Deaf adults in behavioral health, vocational rehabilitation, and social service settings. The screener is available through the SASSI Institute Scoring and Report Service (http://www.sassi.com/srs/). Counselors who register to use the Scoring and Report Service can access the link to the SAS-ASL video questionnaire via the Internet and download support materials and the paper version of the questionnaire used by clients to record their responses. Completed questionnaires are sent in for automated scoring, and a report on client results, along with identification of key issues affecting each client, is returned to the counselor via email or fax. It is important to let clients know that this process is secure and confidential.
>
> **The Global Appraisal of Individual Needs–Short Screener ASL Version (GAIN–SS-ASL)** is a 23-item screening tool to identify mental and substance use disorders. It is administered interactively through Chestnut Health System's Web portal using videotaped clips in ASL; clients answer items by clicking on the choice that best fits them. The instrument screens in four areas: internalizing disorders (e.g., depression, anxiety), externalizing disorders (e.g., attention deficit hyperactivity disorder, conduct disorder), substance use disorders, and crime/violence problems. The instrument is scored via computer, and two narrative reports on the individual's results are produced. Results can be used on the individual level as a measure of change over time and on a quality assurance/program planning level. As a screening instrument, the GAIN–SS-ASL does not provide a diagnosis, but it does accurately identify individuals who most likely have a disorder that would be identified with a longer assessment or clinical interview. Early tests with the GAIN–SS-ASL indicate that the instrument is appropriate for use with adults who are Deaf or hard of hearing and are 18 years of age and older. The written language form of the GAIN–SS-ASL is available in English and Spanish, as well as other languages. For more information on the GAIN–SS-ASL, visit the GAIN Coordinating Center Web site (http://gaincc.org/gainss).

MARIA: Next, we need to find out more about your drug and alcohol use. Today, we are going to use the computer to complete an assessment. You'll watch the monitor and answer the questions, which will be signed in ASL. Then I'll send your answers to a company that scores the assessments. The results will be sent back to me, and we'll look at them before our next session. This will help us to get a better idea about what kinds of treatment options might be best for you. Is this acceptable to you?

MIKE: Wow, that's cool. So I just watch and complete the form? I'm happy that all of this is available for me in ASL. You used video relay to call me, and you have an interpreter, and now this. I really appreciate it all. English is hard for me.

> **Master Clinician Note:** Finding direct, efficient ways to communicate can be frustrating for Deaf clients, who—until recently, with technological advancements—often had to rely on other people and/or antiquated methods to overcome communication challenges. Many (but not all) Deaf people were early adopters of technologies such as computers, handheld devices, and high-speed Internet for video streaming. This has enabled easier communication via email, videophone, and text messaging. Clinicians' willingness to use these technologies enhances access and supports the therapeutic alliance.

MARIA: I'm glad that these things are helping you. It's really important that you be able to fully participate in your treatment.

Before the session ends, Maria tells Mike that they'll discuss the assessment results and plan next steps at their next meeting. She also asks Mike if video relay is a good way for them to communicate. Mike says that video relay is fine and that email and text messages are okay, too. At this time, Maria takes a moment to let Mike know that their communication via email and text will be limited to brief communications about appointment times or quick questions he may have. She explains that email and text messages are not going to be used for counseling because she wants to have direct and comprehensive communication with him whenever possible, and because neither text nor email is confidential.

### Part 3: Maria meets with Mike to discuss treatment planning

Maria and Mike discuss his assessment, which indicates that inpatient residential treatment is his best option. Maria presents Mike with two options. The first option allows Mike to go to a community-based inpatient treatment program for hearing people and use a program-provided interpreter for 6 hours a day. This would mean that he could participate in most of the group meetings and some counseling sessions, but there would be no interpreter for events outside the designated 6 hours. He would also be able to attend an interpreted AA meeting if program staff members can drive him there; however, this depends on staffing and available transportation.

Mike wants to know whether there will be other Deaf people in the program and whether friends and family can visit him; he has reservations because, in previous treatment situations, he found it difficult to communicate, and he believed that people were mad at him and thought he didn't try hard enough. He wants to go to treatment closer to home so that it will be easier to get home if he doesn't like it. Maria assures him that treatment is voluntary and that neither program will force him to stay if he doesn't want to.

The second option is for Mike to attend an intensive outpatient program that provides lodging and is designed specifically for Deaf people. Maria knows of a hospital-based treatment program that offers both acute care and residential programs, depending on client need. It is staffed by Deaf and hearing providers who are fluent in sign language so that all group sessions, psychoeducational groups, and individual counseling sessions happen through direct communication. Deaf clients also attend 12-Step meetings in the community, as well as within the general treatment program, which are interpreted by staff interpreters. All staff members, including interpreters, are trained and knowledgeable about Deaf culture, ASL, substance use disorders, and 12-Step culture.

Mike is concerned that leaving the state will be a problem, and he is worried about how he will afford this arrangement. Maria explains that Mike's Medicaid will cover the cost and assures him that she'll work with him to figure out how to cover his airfare expenses.

MIKE: What if these people don't communicate like me? I do all right with my family. We have our own words, but that may not work with people in Minnesota.

MARIA: Mike, I think we'll just have to see how that works. A lot of Deaf people from all over the country go to this program and they seem to do okay. They have videophones and computers and, as I said, all the counselors use ASL.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

| Substance Use Disorder Resources for Deaf People in Treatment and Recovery | |
| --- | --- |
| **Organization** | **Types of Resources** |
| MCDPDHHI: http://www.mncddeaf.org | Treatment articles on the Web site, recovery materials in print and via video and live videostreaming on the Web |
| Deaf Off Drugs and Alcohol (DODA): http://www.dodarecovery.org | Deaf AA and support group meetings, daily thoughts/affirmations, and meditation in ASL |
| AA: http://www.aa.org/ | Live online chat, interpreted meetings, Web-based Deaf AA meetings |
| E-Michigan Deaf and Hard of Hearing People: http://www.michdhh.org/ | AA steps in ASL videos, 12 Steps interpreted into ASL |

MIKE: Can I come home if I'm not happy there?

MARIA: The program is voluntary, and you can leave if you aren't satisfied with it. In fact, let's call the treatment program now.

Maria and Mike call the intake coordinator at the Deaf-specialized treatment program. Mike participates through the interpreter. The call helps Mike feel comfortable with the decision to go to the specialized program. The intake coordinator also tells Mike about some resources he can use in the days leading up to his departure for Minnesota and emails the list to Maria and Mike.

### Part 4: Working with the client to address frustrations

Mike is in Minnesota. Maria has not heard from the treatment program staff, but she has received three emails from Mike, and he has called her twice via video relay. He complains about not feeling as competent as other clients with the language and pace of the program, not feeling included by the group, and not liking that the entire staff knows his business. Mike has told Maria he is going to quit the program. Each time he calls her, Maria asks Mike if he has shared this with his counselor in the program, and he deflects the question. Maria has concerns about diluting Mike's treatment, so she asks if it is okay for the two of them to have a conversation with his counselor. Mike is hesitant, but agrees. Maria reminds him that it is not her practice to have extensive conversations by email or videophone. Mike tells Maria that he will tell his counselor. Mike's counselor is Deaf, so a staff interpreter in Minnesota will translate the call.

> **Master Clinician Note:** Deaf clients in treatment will likely present with the same types and levels of resistance that hearing clients do. It is important that the referring clinician not dilute the treatment process or enable the client not to develop a therapeutic relationship with staff members at the treatment program. Clinicians should remind clients that emails may not be confidential and may not be an effective medium for counseling.

During the phone conversation among Mike, Maria, and Mike's counselor, Mike expresses his fear and resentment, and they agree that Mike needs to bring his concerns to the program staff if he has any hope of getting support. Maria can't help Mike with his problems in treatment, but the program staff can. They agree that Mike and Maria will resume their work together when it is time for discharge. After Mike returns home, he will see Maria for continuing care planning.

The telephone call seems to help Mike feel safer in the program. He understands that the treatment team is working with him and not against him, and he begins to ask for help from the staff and the other clients in the program. He stops complaining, starts to feel connected in a way that he never has before, and begins to value much of what he resisted in the beginning. This feeling of connection extends to his experience at the AA meetings he attends, and soon, he is participating in all aspects of treatment.

### Part 5: Helping the client engage with community-based supports

Mike is back home and is at his first meeting with Maria since returning from Minnesota. Maria is working with an interpreter and is discussing the community-based supports that Mike can use in his recovery. She gives him a list of the interpreted AA meetings in the state. The closest interpreted meeting is 20 minutes away, and the other two weekly meetings are almost an hour away. Maria discusses online AA meetings with Mike, and he is ready and able to participate. His plan is to log on to the online AA meetings and the daily Deaf Sober Chat. He has also been enjoying the daily recovery affirmations on the DODA Web site and uses them each day.

MARIA: *[speaking to Mike through an interpreter]* Well, Mike, you look great. Did you have a good trip home?

MIKE: *[signing through an interpreter]* Yes. My family was glad to see me.

MARIA: So, you have the list of AA meetings and you are going to attend meetings regularly?

MIKE: I can make the one with an interpreter that's close to my home every week. They only have the interpreter that one time during the week. I'm also going to Deaf AA meetings online.

Maria and Mike discuss the importance of developing a network of people who will help him stay abstinent. Mike explains that the Deaf community is wherever Deaf people are. He is willing to drive some distance to have Deaf sober friends. Mike explains that he learned in treatment that he used alcohol to avoid feelings of isolation and loneliness related to growing up around people without hearing impairment; he had known very few people who could sign, except for when he was at the School for the Deaf. He explains that going to family parties, or even going to community events, left him feeling stupid and alone. He tells Maria that he is not strong enough in his recovery to go to a meeting without other Deaf people, which may make him feel alone again. He doesn't believe he will get any benefit from a meeting that is not accessible. Mike agrees to continue seeing Maria twice a week; as he stabilizes in recovery, the frequency of visits will diminish.

# Vignette 5: Using Smartphones To Support Recovery for Clients With CODs

## Overview

This vignette illustrates how to use apps to help clients with CODs regulate their emotional responses, to enhance the therapeutic alliance, and to foster clients' use of effective coping strategies. The vignette demonstrates how to help address client resistance to using a mobile phone or tablet app, how the app can be personalized to meet the needs of a specific client, how the app is applied in a crisis situation, and how to motivate counselors to use apps in their practice.

## Learning Objectives

- Use apps to assist a client who experiences severe and persistent mental illness.
- Introduce the client to the idea of apps with a mobile phone to support recovery.
- Understand how a mobile phone app can be applied during a client crisis.
- Adapt apps for a wide variety of mental and substance use disorders.

## Setting

Betty is a counselor in a comprehensive CMHC that serves several counties. She carries a caseload of approximately 70 clients. Many of these clients are seen weekly, and others, biweekly; she sees a few who are in ongoing recovery on an as-needed basis. Given the size of her caseload, using treatment extenders, or ways to expand treatment beyond weekly or biweekly office visits, is imperative. Treatment extenders are particularly important for clients who need a lot of reassurance, who frequently experience life crises and need immediate support, who need assistance in making everyday decisions, or for whom not being able to access their counselor as needed represents abandonment. Because many people with whom Betty works own mobile phones that can access the Web, she explores Internet apps that can be of use. This vignette demonstrates how she uses some of those apps in her practice.

Joan is a 29-year-old single woman who lives alone and has struggled with depression, bulimia, posttraumatic stress, and alcohol use disorder for the past 8 years. Her alcohol use and other self-destructive behaviors are primarily triggered by posttraumatic stress reactions. After a suicide attempt while intoxicated about a year ago, she began seeing Betty at the CMHC. At first, her attendance was sporadic. Slowly, Joan has become less fearful of treatment, and her relationship with Betty has become very important to her. Although she now attends her treatment appointments regularly, she still has frequent crises in her life, which are often related to interpersonal issues and posttraumatic stress reactions. During these crises, she has few resources to fall back on and is at risk of self-harm through alcohol use, suicidal behavior, and bingeing and purging.

Joan seems to be an ideal candidate for treatment extenders that would help her stay connected to Betty and to her recovery. In the first scene of this vignette, Betty introduces the idea of treatment extenders through mobile phone apps to Joan, and the apps are used during a crisis situation in Joan's life. In the second scene, Joan and Betty discuss, in an office session, how the app worked. Betty then meets with other staff members, describes using treatment extenders, and invites other clinicians to consider how they might use mobile phone or tablet apps.

## Betty's Story

### Scene 1: Introducing treatment extenders to the client

The session begins with Betty introducing Joan to the idea of incorporating mobile apps into treatment. She explains that they don't replace current treatment, but rather act as adjuncts to support the gains Joan is making and to help Joan manage strong emotions and stress reactions in her life as they occur. Joan has expressed some reluctance about using the apps.

BETTY: So, you seem to have some concerns about this technology that we might use in addition to what we already do. This is not going to take anything away; this is to add on. Tell me a little bit about what your concerns are.

JOAN: My fear is that you're just turning me over to a mechanical device, and I need more than that. I really need your support.

BETTY: So, you're having concerns about being distanced from me or not being able to connect with me if we use this device.

JOAN: Yeah. Because what you're saying is, "Don't call me; press this button instead."

BETTY: So, if you learn how to use this and get pretty good with it over time, you think there may be more risk of distancing from me. I can understand your fear of losing our connection, but I want to assure you that this isn't going to replace what we currently do in treatment—that is, you seeing me weekly, and the two of us talking on the telephone when you have strong emotional reactions or feel that you are in a crisis. It just supplements that, and perhaps it can help you manage some of those difficult situations better.

JOAN: Well, you've always been honest and straightforward with me. That's been really important to me. It really scares me that I might lose my connection with you.

BETTY: I want you to know that I value our connection. There's no way that I would allow the device to interfere with that. I don't want to be replaced with a machine, either. If we try this mobile apps idea and it isn't working, I'll definitely be the first to say we should drop it. But I really do believe it's going to help, and I want to see you give it a try. I firmly believe that this is a way for you to actually feel more attended to, rather than less.

> **Master Clinician Note:** The counselor walks a fine line between pushing Joan to try the app and allowing Joan's fears to limit her in trying something that could be really helpful. Betty chooses to take a middle-ground approach of encouraging Joan to try the app, but acknowledging that if it isn't working, they can give it up.

JOAN: That sounds good. I'm just still afraid that you're going to be less available to me.

BETTY: The way the app works makes me actually more available, in a sense, because if you're really in trouble, the system can tell me. If you're sensing that you are getting overwhelmed by emotions, you can contact me or the on-call counselor directly. The app will give you, in addition to our relationship, a way to adopt additional coping strategies when you're having trouble. Okay? If you get more distressed—maybe thinking about drinking, binge eating, or feeling overwhelmed with feelings—then access the app and immediately begin the process of getting back into a safer space. The app is just another tool to help you better manage your symptoms.

JOAN: It sounds complicated.

BETTY: Well, let's just take a minute to look at the app.

JOAN: Okay. I just want to be able to talk to you if I'm in crisis or if I feel like I'm losing it.

BETTY: Right. Again, what's the evidence that you have from our prior relationship up to this time that I'm not available to you?

JOAN: Oh, it's not that you haven't been available, although you do remember that you have cancelled appointments on me.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

BETTY: Well, sometimes emergencies happen, and there have also been times where I've had to change my schedule around to be able to see you in an emergency. But the bigger issue is that, to the extent I'm able, you can count on me to be there for you, and no app is going to replace that.

JOAN: I do like the idea that maybe I could develop better skills and not be freaking out or getting myself in deeper trouble.

BETTY: So, the idea is to know that the app is there and it's available for you when you need it. At the same time, because you know it's there, you can immediately use the tools to assist in managing difficult situations. So can we agree that we are at a point where you're willing to try the app and see how it works?

JOAN: Yeah, that sounds about right.

BE TTY: I'd like to show you how this tool could work for you. First, let's develop a list of the situations and events that are difficult for you; we can call these trigger events. For each trigger event, let's talk about the coping strategies that tend to work for you—things like coping statements, meditation, and visualization of the ocean, which you've talked about before. We can then enter this information into the app so that you can have reminders for how to cope immediately in those moments when you feel overwhelmed.

[Betty and Joan spend the rest of the session talking about trigger events and identifying effective coping strategies that Joan can use. At the next session, Betty works with Joan to load this information into the app on her mobile phone. They do this on Betty's office desktop computer by simply following the instructions that come with the app. Joan has recorded some self-affirmations and lines of poetry that have helped her manage stressful events in the past. She has also downloaded a photo of her favorite beach. Joan enters all of this information into the app

> ### Helpful Features in Phone- or Tablet-Based Mobile Applications
>
> - Voice recordings of self-management strategies: people, places, things, mantras, sounds, proverbs, or other self-affirming tools that are personal destressors and support cognitive and emotional regulation and reorganization
> - Visuals of soothing people, places, and things to access on demand
> - Self-assessments with personalized feedback
> - Relaxation exercises and recordings of guided meditations
> - Contact list of the user's positive support system
> - Interactive goal-setting tool customized to address the user's issues (e.g., identification of triggers, self-identified coping strategies)
> - Voice recordings of counselors or others presenting coping reminders
> - Peer stories of how others have coped with triggers
> - Secured social networks to reduce the user's sense of being alone
> - Reminders to the user not to post confidential or sensitive information on unsecure networks
> - Secure texting and email functions to facilitate communication with counselors
> - Help now/panic button for direct text/call to counselors or other treatment resources
> - Camera/video to take pictures of stressful (or peaceful) contexts to send to counselors and/or to compile in a coping skills and resources kit
> - Heart rate monitor to help the user regulate breathing
> - Virtual (avatar) life coach or chum
> - Journal entry function to log events and the user's responses

system, which then uploads it onto her mobile phone. Once loaded, Joan sees that the app includes a "My Action Plan" icon. When she clicks on this feature, she sees her trigger situations along with the associated coping tools that she has loaded into the system. Joan is impressed with the other features of the app, including a panic button as well as a "Get Connected" feature that allows her to hear from others who experience similar challenges in coping with strong emotional reactions. She also appreciates that, to increase her phone's security, she has to enter a user name and password that limits others' access to her information.]

BETTY: I'd like you to try out this app for a week or so, and when we see each other again, let's talk about what you think of it. I'll be interested in your feedback about using it.

JOAN: I'm willing to give it a whirl.

> **Master Clinician Note:** Technology-based treatment extenders do not replace standard treatment and should augment, but not supercede, the help and support of a counselor. In discussing with clients the use of a treatment extender such as the mobile phone app Betty asks Joan to try, emphasize that you, the counselor, will still be available. However, just as in standard treatment, you may not always be available on a moment's notice. Also be sure to discuss confidentiality and privacy issues related to the use of apps and other technologies, as well as responsibility and accountability for proper use. As with any therapeutic relationship, introduction of a new technology-based strategy needs to be transparent, clearly stated, and offered in the context of a trusting, supportive therapeutic alliance.

Betty and Joan sum up the session and agree on an appointment time for the following week. A couple of weeks later, Joan experiences a crisis. She is blindsided by conflict that she witnesses in a mutual-help program and later identifies the situation as a posttraumatic stress trigger. Rather than leaving the meeting, she decides to try the mobile app and to text Betty. Betty responds with a quick, supportive text message and schedules a brief telephone appointment with Joan for a couple of hours later. She encourages Joan to use the app, particularly with regard to regulating her emotions and getting more grounded. Later that evening, Joan sends a message through the app to Betty saying she is not drinking or engaging in other self-harming behaviors, has used the app, appreciates the brief phone contact with Betty, and has talked with another friend at the meeting, who offered her a different take on the confrontation that occurred at the meeting.

### Part 2: A session after the crisis

Joan and Betty are meeting in Betty's office. After some initial settling in, Betty asks about Joan's experience in using the app during the crisis situation earlier that week.

BETTY: So, how's it going? I'm really interested to hear how this phone-based tool worked for you when you had that problem at the meeting earlier in the week.

JOAN: Well, Tuesday, when I almost lost it at the meeting, it was really nice to know that I had some connection to you through this app. When I get triggered, and especially when I'm totally not prepared for it, I really lose it. It's been a problem for me forever, as you know, in relationships. Using the app to help me get grounded really helped. I don't know how much of it was the content on the app and how much of it was just that I had an alternative to feeling out of control,

Using Technology-Based Therapeutic Tools in Behavioral Health Services

but I really appreciated hearing right then, in the moment, that you would get back to me—and I also appreciated that you then really did get back to me within an hour or two.

BETTY: Right.

JOAN: So, I didn't spiral. That felt really good.

BETTY: How did it feel for you to manage? You went outside just briefly, got yourself re-grounded, went back in, and stayed for the rest of the meeting, which is really something, especially given what you've been through in the past year. How'd it feel to master that?

JOAN: Wonderful. You know my history—I get so reactive in relationships and friendships.

BETTY: Yep.

JOAN: The idea that the app could be there to back me up was really great…the conflict just brought back all this childhood stuff about, "I can't handle this, nobody knows I exist, and I'm going to fall apart, and there's nothing I can do to help that," and I'm not in that place anymore.

BETTY: So, you felt safer and more able to manage your reactions.

JOAN: Well, the phone felt something like a lifeline. I know it's just a phone, and the app is just an app. But you're right, it is about safety and security for me—and with this, I have something to support me, to fall back on. One thing that really helped is the app's action plan and instructions about what to do and how to handle myself. I liked the idea that we could fine tune the app especially for me, and that we can continue to do so over time as my needs change.

BETTY: I would like for us to focus for a minute on how the app helped you change your thoughts when you saw the conflict. Did you feel the need to run away or feel unable to protect

---

### Using an Action Plan Tool

An action plan tool allows a client (in this case, Joan), in concert with a counselor, to identify and add triggers related to a variety of circumstances, as well as coping strategies for each trigger, into an app. If Joan finds herself in the midst of an emotional, interpersonal, or physical trigger, she can access the tool to remind herself of the coping strategies she and her counselor identified together. The action plan tool thus allows clients to track their own responsivity via the tool, and data about responsivity can be used by counselors as well.

For example, Joan has identified phone calls with her mother, work overload, and lack of sleep as triggers for feeling overwhelmed. She has indicated that breathing exercises and access to her recorded self-affirmations help her settle down after a phone call with her mother. When Joan receives a call from her mother and begins to have the familiar feeling of her stomach tightening, Joan accesses the action plan tool on her phone. She goes through the brief breathing exercise and then listens to the affirmations she has recorded for this trigger. Afterward, she accesses the action plan tracker and records the trigger event, what she was thinking during the event, how she was feeling during the event, and what she did to cope. She then indicates how helpful her response was in calming her down on a scale of 1 to 10. These data are all tracked and logged for future reference.

In a discussion with her counselor, Joan acknowledges that seeing conflicts can also be a trigger for her to feel inadequate and shamed. She adds this trigger to the action plan tool and downloads an audio file featuring sounds of the ocean from the Web to include in her coping toolkit.

> ### Texting and Confidentiality
>
> Texting via cell phones and other devices is quick and convenient—but not secure. Some apps allow for more secure texting and instant messaging, such as demonstrated in this vignette, where text messages are encrypted before sending. However, encryption is not typical in standard mobile phone texting. It is best that, if texting is used at all for counselor–client communication, both parties agree beforehand to a code strategy so that texts divulge minimal information.
>
> Advise clients that text messaging on mobile phones is not encrypted and can be intercepted by others using relatively inexpensive equipment. Text messages can be retrieved by anyone with access to either party's cell phone. Even if the message has been erased, it may still reside in the phone's memory card for a period of time.

yourself while you were in that situation? What I'm interested in you exploring is how those responses come up and cause thoughts and feelings of being unsafe. When you understand how those thoughts and feelings get triggered, you can then use the app to help you get grounded and refute negative thoughts and feelings.

[Joan and Betty discuss how, when an emotional or interpersonal interaction triggers a recollection of experiences in her past, Joan begins having feelings about being abandoned, alone, invisible, and unprotected. Behaviors resulting from these emotions lead to trouble, such as attacking others, running away, and self-harming.]

JOAN: I just like the idea that I can handle these situations better. They take such a toll on me, especially in relationships. It's really exciting to know I have options and that I can manage things myself, by using our relationship and the app on my phone.

BETTY: Fantastic. I'm really glad to hear it. It sounds like you're starting to see how this technology can help you. It doesn't interfere with or take away from our relationship, but it can support what we do and put you in charge when it comes to working through tough situations.

> **Master Clinician Note:** To help personalize Joan's action plan tool, her counselor could ask Joan to use the app to document each time she feels overwhelmed with feelings or experiences a posttraumatic stress reaction. She might do this, for instance, for a month. The creation of a marker could then elicit an immediate set of quick self-assessments (e.g., ecological momentary assessments [EMAs]) to gather more details about the event:
> - What was the situation that initiated the reaction?
> - What thoughts was Joan having?
> - What feelings was she having?
> - What did she do?
> - How did she feel about her response?
>
> EMA data can help Joan and her counselor develop an even more effective action plan for triggers. This type of real-time treatment approach could be very helpful in building an effective collaboration plan.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

JOAN: It occurs to me that not having many resources had a lot to do with why I drank all these years. The only way I knew to cope was to drink, but with what I've learned in AA, and what I've gotten from you and the app, I'm learning that I really can control life and my emotions.

BETTY: So you can get through it.

JOAN: Yeah. But still, it's so important for me to know that you were there.

BETTY: Yeah. I'm not planning on going anywhere.

JOAN: You'd better not.

### Part 3: Helping clinicians buy in to the use of mobile phone/tablet apps

Betty and four peers meet for group peer supervision. Betty describes how successful the smartphone app has been in helping Joan. Liz, who has also used the app with several clients, offers support.

BETTY: I went to a workshop on helping clients with co-occurring posttraumatic stress and substance use disorders engage more readily in the use of coping skills. In stressful situations, particularly if they also have a history of psychological trauma, they can easily spiral into self-defeating and negative behaviors that alienate them from others. In the workshop, the leader introduced the idea of using computer-based apps to help clients stay more grounded in situations

---

**How To Build Client Buy-In to Adopting Technology in Treatment**

- Closely monitor the therapeutic alliance, as you would with any change that might potentially affect the treatment relationship.
- Address what the technology can and cannot do by using clear communication and ensuring transparency. Discuss the client's expectations of how the technology will augment treatment.
- Ensure that the technological application meets client needs.
- Ask for the client's suggestions about how the technology-based tool can be used, eliciting feedback about the tool before actually integrating it into treatment. How can the app be helpful or not so helpful?
- Do some test runs with the tool so that the client knows its purpose and how to use it before incorporating the app into daily use.
- Pay attention to client feedback about interest in using the tool, understanding of instructions about how to use it, perceptions of its use, and expectations about the results of using the app.
- Ensure that the technology is accessible to the client. For instance, does the client have a mobile phone? How does the client normally use the phone, and what would be helpful in terms of its use? What kinds of training might the client need to use the app effectively? Are the language and functioning of the tool or application appropriate for the client? Does the client understand the costs that may be associated with using the technology?
- Explain how the information and data gathered from the technology-based tool will be used in treatment. Discuss ways that this information can build collaboration and self-management in the treatment environment to help the client achieve greater autonomy.
- Clarify who has access to the technology and the information it may collect about the client. What data can the clinician access? What data can the client access? Who authorizes this access, and what is the process for obtaining permission? How can this information be integrated with other records? Can information be shared with another clinician in the case of transfer of care? How long is this information stored? Is it encrypted in resting state? What information, if any, will be integrated into the client's EHR?

> **Advice to Clinical Supervisors and Program Administrators:** Helping Counselors
> Buy In to Using Mobile Phone Apps as Treatment Supports
>
> • Help counselors see the value of the app for themselves and for their clients.
> • Focus on how the app can enhance or augment counselors' jobs—not replace them!
> • Elicit counselor feedback about the application and how it can potentially be used; also request
>   feedback on whether they anticipate that it will be helpful or unhelpful.
> • Offer training and technological assistance for use of the app with clients.
> • Make shared decisions about adopting technology within your behavioral health agency.
> • Clearly define measures of success so counselors can monitor effectiveness.

where they otherwise might feel unsafe. When I got back, I looked for clients in my caseload
who meet this profile and who might be willing to try an app I found through the workshop.

TED: It's an interesting idea. It seems that the key is your belief in the app's ability to help; that
made it a lot easier to get buy-in from the client. I think I would need to know more before I
could try to convince someone else to use it.

ERIC: I'm also impressed by how well your client has done using this app, and I'd like other cli-
ents to use it as well. I think I'd like to learn more about different apps and how to use them—but
I'll need help from you and some coaching on how to actually incorporate them into treatment.

BETTY: Maybe we could set up some training sessions. Along with training, you'll really just
need to try it out for yourselves. That's what made me a believer. There are lots of other ways to
apply apps in a community behavioral health services program like ours—not just with people on
the personality disorder spectrum. Of course, we need evidence that an app is effective. Anyone
can put an app up on the Web, but it doesn't mean that its effectiveness has been researched.

> **Master Clinician Note:** Other possible uses of apps in behavioral health include:
> • As recovery support tools that link people in recovery to virtual support
>   communities; personalized reminders of people, places, and things to avoid;
>   favorite slogans in mutual-help groups; and a variety of supportive Web sites.
> • As tools for monitoring and tracking patterns in specific areas of health (e.g.,
>   blood pressure, nutrition, blood sugar levels, alcohol consumption, exercise).
> • As tracking tools to set personal goals and monitor progress toward them.

REBECCA: I don't know. Will people actually use it when they're in a crisis? It just sounds a
little weird to think of someone saying, "Oh, I'm in a crisis, let me use my smartphone app."

LIZ: I thought exactly that. But I've been using this system with someone who has an extended
history with the agency. From what I've noticed over the past couple of months, the number of
emergency calls I get from him has gone down. Now, he's more likely to come in and tell me he
had a crisis but resolved it on his own. When he begins to feel strong emotions or is in a crisis,
he can use the app. The app sends him supportive prompts and has a panic button that will alert
me when he's feeling overwhelmed and let me know that I should reach out to him.

Early on, he did hit the button to connect with me, but it wasn't any different from if he called
or paged me and got me or whoever was on call. Over the past several weeks, we've done a de-
briefing after each of the episodes that he's had, and he's feeling really good about being able to

Using Technology-Based Therapeutic Tools in Behavioral Health Services

ride out episodes of emotional dysregulation successfully, whereas before, he felt overwhelmed in situations that would typically trigger him. He was able to use the app to navigate his way through the situations on his own, but he knew that I was available through the panic button.

He still becomes overwhelmed with feelings at times and needs support to overcome self-defeating thoughts, but he's been able to stay at work or engaged in a conversation instead of storming out of a situation or getting angry. There's a real difference in his capacity to turn to using the app rather than getting explosive. We may want to consider using this app as a team and making it an integral part of our treatment efforts, not just an isolated experiment.

TED: That sounds great, Liz, but what's it going to cost? Does the client have to pay for the app? Who buys the smartphones for people to use?

LIZ: Well, a lot of people already have smartphones today. The other cost is having a data plan that allows people to access the Internet. So, for most people, the cost is minimal.

> **Master Clinician Note:** The difference between smartphones and feature phones is not hard and fast, but smartphones tend to have greater screen size and resolution, higher processing power, and a more powerful and versatile operating system. Many apps require a smartphone. However, technology is rapidly developing, and features and options are quickly evolving toward feature phones having the processing power once reserved for cutting-edge smartphones.

REBECCA: That's great, but I'm not so sure that all our clients will grasp the technology.

LIZ: This just requires using a mobile phone. This is really easy.

BETTY: Very easy.

TED: What about me? I'm not very tech savvy.

BETTY: You don't need to know much of anything that you don't already know. Can you operate a mobile phone or a laptop?

TED: Most of the time.

LIZ: This app was designed to be very user friendly. There's a program that you use on your desktop computer to help the client customize the app so that it helps them respond to triggers with positive coping skills. The beauty of this is that the clients, with a little help from you, come up with their own trigger events, and they devise their own repertoire of coping responses. It's really personalized, not a one-size-fits-all approach. You can update applications on your desktop, or in some cases, the client's computer or even their mobile phone—any system that can access the app. The portability of mobile phones and tablets means that clients could carry coping tools with them wherever they go, even outside the treatment setting, and access them anytime, anywhere. Mobile technology like this could really enhance and extend the work we do.

REBECCA: You actually made a very good pitch.

BETTY: Are there concerns? Does anybody else have issues?

REBECCA: How do I know that it's actually working?

LIZ: Well, it's really up to the client whether to use the device. That's where it becomes really important for clients to buy in to the idea of using the app.

REBECCA: Would I have to remind clients to use it or anything?

BETTY: Like any other treatment effort, you work with the client to help them get the most benefit. As people get comfortable with the app, it becomes more and more of a regular process. You might raise the question of how your client is using the app periodically when you have sessions, but my experience has been that clients want to tell me how it has worked for them.

TED: How do you download the app? Do you plug the client's phone into your computer?

BETTY: Yeah, or you can download it wirelessly by searching for the app through the client's wireless provider storefront. We can even set it—with the client's permission and informed consent, of course—so that you get a flag on your computer when the client is using it. It's client driven; it's there for clients to use when they need it. The client identifies the triggers and the coping skills that will help. The app lets clients build a list of resources, affirmations, supports, and alternatives that are uniquely theirs and are constantly at their disposal. So, every time a client successfully uses the app, they're affirming their own sense of agency and accomplishment.

TED: Are data transmitted back to us? How do we use this? How do you use it in treatment?

> **Master Clinician Note:** Advise clients using apps that may contain confidential information to use a lock and password system on their mobile phone or tablet. Otherwise, anyone with access to the device can use the app and read the content.

BETTY: If your client agrees, you can be notified every time they open the app. Of course, we don't know how well it works until we see the client and ask. But we do know that it's being used. So, when the client comes in, you can say something to the effect of, "Well, I see you

**Examples of Ready-To-Use Behavioral Health Apps**

- **DBT Diary Card and Skills Coach:** Available online (http://itunes.apple.com/us/app/dbt-diary-card-skills-coach/id479013889?mt=8), this customizable dialectical behavioral therapy (DBT) orientation app offers a skills reference guide, an emotions reference guide with tracking capability, and a behavior reference guide with tracking capability.
- **DBT Diary:** Available from PsychDataSystems, LLC, this app records urges, emotions, and skills used. Clients can review their diary entries at any time and email diary reports to counselors.
- **DBT Coach:** Available online (http://www.diarycard.net/), this interactive mobile phone app for individuals with borderline personality disorder and a substance use disorder is designed to support and enhance DBT skills.
- **PTSD Coach**: Available online (http://t2health.dcoe.mil/apps/ptsd-coach), this app was collaboratively developed by T2 and the VA National Center for PTSD to emphasize self-assessment, symptom management, and access to support.
- **Breathe2Relax:** Available online (http://t2health.dcoe.mil/apps/breathe2relax), this portable stress management tool with hands-on diaphragmatic breathing exercises includes graphics, animation, narration, and videos.
- **Stress Tracker:** Available at no cost through iTunes (follow the link at http://otswithapps.com/2012/06/25/stress-tracker-app-for-ios-free-and-android/), this cognitive–behavioral therapy app uses mindfulness principles and emphasizes stress management.

opened the app twice last week," and then you talk about what happened. Perhaps you'll have the opportunity to further customize the app so that it's even more responsive next time.

LIZ: Right. I think the best feedback I've gotten is when my client comes in and says, "Oh, by the way, I used the app twice last week, but I didn't call you because I didn't need to."

REBECCA: That sounds pretty convincing, but one thing we're not talking about is that it sounds like this program is going to replace what I've spent years learning to do.

LIZ: Not at all. It's an appropriate resource and extension—but it's not treatment. It's an adjunct, a support. This app doesn't replace the treatment you provide, just as the treatment you provide doesn't only include phone-based counseling. This is just another therapeutic tool; it will never replace the type of therapy that a human counselor can provide. I think we're a long way from when treatment will be achieved by plugging into a computer or mobile phone. There is a lot that we, as providers, can offer our clients that a smartphone app just can't. But there is one thing a smartphone app can do that we can't—be with the client 24 hours a day, 7 days a week.

TED: Good point.

REBECCA: It sounds like it may help in a lot of situations. I'm willing to give it a try.

LIZ: Yeah, this is a chance to try it out. Let's reconvene after a month of each using it on a trial basis with a few clients, and we'll talk again about what we think and how to proceed.

---

**Master Clinician Note:** In general, the discussions in this vignette relate to the positive aspects of using mobile apps. However, the possible cons, or pitfalls, for each client or situation need to be taken into consideration. For example, in this particular vignette, Joan is willing to go along with her counselor's obvious interest in giving the app a try, but because Joan may be more sensitive to stress, it is not difficult to imagine some aggravating technological difficulty (e.g., running out of battery power), combined with sudden real-life stressors, increasing rather than decreasing the stress of a difficult situation for Joan. In-session rehearsals focused on how to manage or respond to the likely occurrence of app or other technological problems are warranted. Remember that what may be beneficial for one client may not be for another. For example, the use of an app could worsen a client's tendency to isolate or avoid social interactions. You must always assess the appropriateness of using any app in the context of the client's perspectives and possible reactions. (See also Part 2, Chapter 2, "Determining the Appropriateness of TAC for Clients.")

---

# Part 2: An Implementation Guide for Behavioral Health Program Administrators

# Part 2, Chapter 1

## IN THIS CHAPTER

- Introduction
- Adoption and Sustainability Considerations
- Technological Capacity Considerations
- Budgeting Considerations
- Vendor and Consultant Selection Considerations
- Data Management Considerations
- Privacy and Confidentiality Considerations
- Regulatory Considerations

## Introduction

This chapter targets behavioral health program administrators who wish to adopt or expand technology-assisted care (TAC) in their organizations, as well as clinical supervisors and behavioral health service providers who work in small practices and fulfill administrative roles. It covers programmatic, technological, budgeting, vendor selection, data management, privacy and confidentiality, and regulatory considerations likely to arise during adoption of technology-based interventions. As discussed in Part 1, with technology comes great potential to expand access to behavioral health services and to improve outcomes; however, TAC also creates new challenges for administrators.

TAC offers an array of opportunities in the prevention and treatment of mental and substance use disorders. It has the potential to reach historically underserved populations, improve overall quality of care, and enhance the efficiency and effectiveness of service delivery. Specifically, the use of technology has been demonstrated to improve access to services for diverse and potentially underserved groups, such as people who are geographically isolated (Finfgeld-Connett & Madsen, 2008; Griffiths & Christensen, 2007), women (Finfgeld-Connett & Madsen, 2008; Lieberman & Huang, 2008; Spek, Nyklicek, Cuijpers, & Pop, 2008), people who are Deaf and hard of hearing (Moore, Guthmann, Rogers, Fraker, & Embree, 2009), veterans (Barnwell, Juretic, Hoerster, Van de Plasch, & Felker, 2012; Godleski, Darkins, & Peters, 2012; Koch, 2012), substance use disorder treatment clients (King et al., 2009), older adults (Ramos-Ríos, Mateos, Lojo, Conn, & Patterson, 2012), and college students (Saitz et al., 2007). Telephone- and Web-based services have been shown to be particularly useful to people with demanding schedules (Mohr et al., 2010), and video conference-based services have achieved favorable outcomes in a variety of therapeutic formats with diverse populations (Backhaus et al., 2012).

Technology can also improve the quality and effectiveness of care. It provides an efficient means of intervening with individuals at early stages of risk for problems, such as with people who use alcohol but are not yet dependent (Postel, de Jong, & de Haan, 2005; Riper et al., 2008), and it presents new opportunities to manage care over time for people with chronic conditions (Drake & Bond, 2010; Wisdom, Ford, & McCarty, 2010). Although the cost-effectiveness of TAC has not been established (Tate, Finkelstein, Khavjou, & Gustafson, 2009), there is some evidence that Web-based therapy can be equally as effective as in-person care in building a strong therapeutic alliance (Abbott, Klein, & Ciechomski, 2008; Hanley & Reynolds, 2009), helping people change behaviors (Webb, Joseph, Yardley, & Michie,

2010), and reducing negative symptoms (Barak, Klein, & Proudfoot, 2009; Sloan, Gallagher, Feinstein, Lee, & Pruneau, 2011). The use of guided mutual help or social networking as an adjunct to professional services presents new avenues for recovery support with minimal clinical intervention (Farvolden, Cunningham, & Selby, 2009). In particular, Web-based and other computerized treatments for depression have demonstrated effectiveness, especially when coupled with support from a counselor (Andersson & Cuijpers, 2009). Thus, TAC can address some pressing needs in behavioral health organizations, including expansion of access to services and enhancement of the efficiency of care.

TAC also presents new opportunities for clients to direct their own care. Technology can provide expanded accessibility for individuals who are isolated from services and support outside of scheduled sessions, offer new avenues for support, and provide opportunities for self-paced intervention. It allows for the provision of immediate feedback to clinicians, clients, and administrators on the outcomes of services at both individual and aggregate levels (Drake & Bond, 2010). Symptom monitoring systems that feed client data back to clinicians present options for tailoring services to be more responsive to the real-time challenges clients face. Web-based performance monitoring systems that provide immediate ratings of clients' perceptions of care are useful in more quickly addressing client concerns (Forman et al., 2007). Medication compliance technologies and remote client monitoring systems can improve medication compliance and allow remote monitoring of medication reactions (Center for Technology and Aging, 2010).

TAC can expand the tools available to coordinate services across providers and organizations. For example, using teleconferencing to coordinate services for an adolescent and his

## Potential Benefits of TAC

- Expand access to prevention and wellness information.
- Extend clinician availability.
- Reduce the burden on clients associated with repeating intake and assessment information.
- Increase the accuracy of reporting risky behaviors.
- Reach populations that have traditionally been difficult to engage.
- Present opportunities for remote registrations and preregistrations.
- Improve anonymity for clients in small communities.
- Increase access to specialists.
- Connect clients to others with similar problems.
- Tailor services to meet individual needs and preferences.
- Give clients flexibility in how and when to acquire new information or skills.
- Enhance consistency of service delivery.
- Improve frequency and timeliness of care.
- Focus clinicians' time on the clients most in need of intensive services.
- Improve interagency care coordination.
- Increase cost-effectiveness of services.
- Enhance access to clinical supervision.

or her family, who are involved across multiple systems spanning various geographic areas, can improve communication among providers, enabling them to present consistent expectations for the adolescent and family members. In addition to enhancing direct services, TAC offers new ways to train and supervise the behavioral health workforce (Hoge et al., 2007; Institute of Medicine, 2006). Innovations, such as self-paced cognitive–behavioral therapy training combined with Web conferencing and the use of digital recordings to perform clinical supervision, demonstrate the potential of Web-based training as a flexible and cost-effective approach in real-world settings (Byrne & Hartley, 2010; Weingardt, Cucciare, Bellotti, & Lai, 2009; Weingardt, Villafranca, & Levin, 2006). Telesupervision can be especially valuable in rural areas, enabling clinicians to access expertise that is not otherwise available in their local communities and improving access to supervision in crisis situations (Kanz, 2001; McAdams & Wyatt, 2010; Wood, Miller, & Hargrove, 2005).

As with any new opportunity, the adoption of new technology also presents administrative challenges. Despite the potential to improve access for some populations, TAC may involve greater risk for dropout than traditional in-person services (Andersson, Carlbring, & Grimlund, 2008; Farvolden et al., 2009), and disparities in access to technology resources may accentuate the gap in treatment access for people at lower income levels (King et al., 2009). The use of TAC in the behavioral health field introduces new challenges in traditional aspects of client–provider interaction, such as building a therapeutic alliance (Shore, Savin, Novins, & Manson, 2006). Furthermore, TAC creates unique ethical and legal concerns that you, as a behavioral health program administrator, will need to address (Mallen, Vogel, & Rochlen, 2005). These challenges range from responding to situations

> ### Examples of Comprehensive Web-Based Treatment Programs
>
> Comprehensive Web-based programs, such as the following, offer online recovery services that incorporate screening and assessment, live group counseling and peer support groups, individual counseling and coaching, journaling, secure email, and chat rooms:
>
> - **Anxiety Online** (https://www.anxietyonline.org.au/default.aspx) is a comprehensive Internet-based treatment clinic for people with anxiety disorders funded by the Australian Department of Health and Ageing. The site provides information, assessment, therapist-assisted treatment, and mutual-help programs.
> - **Prochange.com** (http://www.prochange.com) is a set of online behavior change programs targeting a range of populations and problems, including stress, weight management, domestic violence, depression, smoking cessation, medication compliance, and teens in relationships. The programs are empirically based and use self-directed approaches as well as coaching.

in which clients pose a danger to themselves or others to implementing systems that ensure the confidentiality and privacy of clinical information shared through emails or text messages (Mallen, Vogel, Rochlen, & Day, 2005).

Regulations and financing policies have been slow to keep pace with changing technology. This can create confusion and risk as you attempt to implement and finance TAC. Although federal agencies and professional licensing organizations have begun to address licensure portability and cross-jurisdictional certification, not all regulatory agencies or funders have addressed such issues as licensing standards dictating in-person contact, signatures of acknowledgment, and geographically bound service jurisdictions (McGinty, Saeed, Simmons, & Yildirim, 2006).

TAC introduces new challenges and opportunities related to managing and supervising the behavioral health workforce. In addition to clinical and cultural competence, technological competence is becoming more important for clinical staff members (Midkiff & Wyatt, 2008). Technology also offers new avenues for supporting the workforce through Web-based or software-based training, decision support, and video conferencing (Institute of Medicine, 2006). The use of technology to deliver services in your organization requires that you have a working knowledge of the range of available technologies, including the strengths and weaknesses of each and the technological capacity each requires (e.g., bandwidth, special equipment, data storage). You must develop organizational expertise in risks related to privacy, confidentiality, and security and in the protections needed to minimize organizational liability and manage those risks.

Nonetheless, the challenges presented by TAC are no more daunting than those encountered when adopting other innovations. Many of the same tools and techniques that you may well routinely use to plan for and implement new service delivery approaches are suited to planning for and adopting technology-mediated service delivery. This chapter provides behavioral health program administrators, as well as clinical supervisors and providers in smaller agencies who may bear certain administrative responsibilities, with information they need to help thoughtfully navigate the risks and challenges associated with the use of technology to deliver behavioral health services.

# Adoption and Sustainability Considerations

Technology is a means for delivering services rather than an end in itself. Therefore, clear goals for introducing technology-based interventions are essential. This section outlines a process for planning for and monitoring the success of TAC implementation; it addresses who should participate in TAC planning, strategies to consider when planning TAC for specific populations, and other considerations associated with the use of certain technologies. This section also discusses selection and training of staff members to incorporate TAC into their practice, as well as the provision of adequate supervision for TAC.

The process of considering and adopting technological innovations involves identifying the need or problem to be addressed, assembling a planning team, designing the service delivery process, selecting the technologies that best support service delivery, implementing and continuous monitoring, and maintaining process improvement. As with all new programs, thoughtful implementation that includes feedback from relevant stakeholders can help overcome implementation barriers and enhance the success of the project. A wide range of stakeholders—including administrators, supervisors, counselors, clients, and technology experts—should be involved in developing TAC processes. Behavioral health service providers who plan to incorporate TAC into their practice may not necessarily be technology experts, but they should have the ability to conceptualize how technology can be incorporated into service provision, and they need to be inquisitive about the use of technology to support care.

## Strategic Goals

Strategic questions, such as the potential for specific technology-based approaches to promote partnerships with primary healthcare providers or other key community partners, will shape the direction of planning and elucidate a central role for administrators in establishing the overall goals for any given technology

intervention. The adoption of technology for staff supervision or training can assist your organization in reaching strategic goals related to staff recruitment or retention, and it can also help address process improvement challenges. Issues of positioning in the market, competitive advantage, improvements to customer service, and adding value for purchasers also drive the establishment of clear goals.

## Planning Team

To foster successful planning, involve stakeholders with a range of skills and perspectives and focus on improvements in clinical care and business processes. Your planning team must make many decisions about the clinical goals of the TAC your agency provides; the content of TAC intervention that will be most responsive to the needs of the population your agency serves; the particular technologies that best complement TAC goals; and the technological, clinical, and administrative infrastructures required for implementation. Exhibit 2.1-1 outlines roles and responsibilities of various stakeholders in the technology adoption process.

## Population-Specific Considerations

Most of the same considerations regarding cultural responsiveness and appropriateness that apply to in-person interventions also apply to technology-based interventions. In addition to the issues that you already typically consider, it is important to think about the suitability of various technological approaches to the strengths and needs of your intended service population. For example, you should avoid text-based approaches in situations where the target population has limited English proficiency or limited literacy skills, and you should establish clear protocols to assess literacy rather than relying on professionals to assess this skill without formal support. Interventions that include transmission of images

may be sensitive for certain cultural and ethnic groups, and digital applications intended to serve older adults must have options for large text sizes and follow elder-friendly digital design principles. Certain groups, such as African Americans, Latinos, and young adults, are more likely than older Whites to use mobile devices as their primary source of Internet access, whereas people over the age of 65 and those with lower incomes are least likely to own a smartphone (Smith, 2010; Smith, Rainie, & Zickuhr, 2011).

Certain populations may significantly benefit from the use of technology to deliver services. For example, technology offers opportunities to improve treatment services for individuals who are hearing impaired by overcoming some challenges in communicating with hearing individuals, expanding the mechanisms for Deaf people to communicate with each other, and offering enhanced access to culturally specific treatment and support (Pollard, Dean, O'Hearn, & Haynes, 2009). It is also important to consider how much technical support your agency will need to implement a particular technological approach based on the problems and needs of the populations to be served. This will drive your decisions about which aspects of the intervention to automate and which aspects counselors should direct (Andersson, Carlbring, Berger, Almlöv, & Cuijpers, 2009). Thus, it is crucial to conduct a review of the strengths and needs of the population to be served and to include former and potential clients in the planning and implementation process. Doing so will help you match TAC to their needs and ensure greater usefulness to the group being served (Forducey, Glueckauf, Bergquist, Maheu, & Yutsis, 2012).

## Factors Influencing Successful Adoption of New Practices

Implementing new practice patterns or technologies can be challenging for organizations.

Using Technology-Based Therapeutic Tools in Behavioral Health Services

## Exhibit 2.1-1: Responsibilities of Stakeholders in the Technology Adoption Process

| | Establish Goals and Team | Design or Refine Service Delivery | Select Technology and Field Test | Implement | Monitor |
|---|---|---|---|---|---|
| **Administrators** | • Define a strategic plan.<br>• Identify opportunities and challenges.<br>• Convene a team.<br>• Assess risk and regulatory landscape.<br>• Develop a business plan, including funding sources and budget.<br>• Consider an evaluation component. | • Ensure availability of team and other design resources. | • Plan for funding and sustainability.<br>• Identify performance monitoring and evaluation strategies. | • Ensure availability of needed resources. | • Review reports and monitor success of implementation and evaluation. |
| **Clinicians and Supervisors** | | • Conduct workflow and workload analysis.<br>• Communicate with clinical staff about needs and preferences. | • Field test the application.<br>• Develop program materials and consent forms.<br>• Develop supervision and training protocols.<br>• Provide troubleshooting and support. | • Discuss implementation expectations with clinical staff.<br>• Conduct supervision.<br>• Provide troubleshooting and support.<br>• Monitor fidelity to evidence-based practices. | • Monitor staff and client/consumer feedback. |
| **Technology Experts** | | • Expose clinical staff to new tools.<br>• Present technology and delivery alternatives. | • Price out alternative approaches.<br>• Coordinate evaluation of technology options.<br>• Troubleshoot technology challenges during testing.<br>• Analyze privacy and security features. | • Coordinate purchase and installation of hardware and software. | |
| **Clients and Consumers** | | • Consult on client/consumer needs and preferences. | • Test application.<br>• Review consents and other program materials. | • Provide feedback on ease of use and effectiveness. | • Review ease of use and effectiveness. |

However, research in the area of implementation offers some useful lessons. Individuals tend to adopt an innovation when they believe there is a need for the innovation, see the benefit in the new practice, and have the skills and confidence to implement the innovation (Meyer, Clarke, Troke, & Friedman, 2012). You can support clinicians by identifying how technology can be used to solve problems that are relevant to the key stakeholders. You should also consider providing training and support for, and involving clinicians in, service planning processes (Meyer et al., 2012). When adopting new technologies, the level of support from top management and the degree of assistance and support available to service providers are critical. (Jeyaraj, Rottman, & Lacity, 2006; Meyer et al., 2012). For example, ensuring ease of access to the equipment, having adequate support for operating the technology, and providing sufficient time for clinicians to learn the technology can promote the successful adoption of new practices. Clinicians and supervisors on the planning team must think carefully about how the introduction of TAC will change the flow of work for staff members (McGinty et al., 2006); they must also consider how to ensure that efficiencies are gained, or at least maintained, as the agency introduces TAC to the workflow. Successful implementation requires a well-developed business plan and identification of challenges before creating a mechanism to measure success (Meyer et al., 2012).

The Network for the Improvement of Addiction Treatment (NIATx, 2013), a division of the University of Wisconsin's Center for Health Enhancement Systems Studies, developed an effective process improvement system. NIATx identifies five principles for effective implementation of change:

- Focus on an important problem to be solved by implementing the change.
- Identify a change leader.

## Implementing a Therapeutic Workplace

A Web-delivered, employment-based intervention for people who inject drugs called the Therapeutic Workplace has reliably produced marked reductions in drug use and underscores the potential of long-term behavioral workplace interventions to be as therapeutic as long-term therapeutic agents in the treatment of substance dependence. The intervention computerizes a contingency reinforcement program that requires medication compliance for the client to be allowed to attend work and can also increase or decrease payment for the work, depending on abstinence as determined by urinalysis.

*Source: Holtyn et al., 2014.*

- Look to other organizations for ideas.
- Pilot the change on a small scale and make adaptations prior to large-scale implementation.
- Understand and involve clients in the change process.

The Substance Abuse and Mental Health Services Administration's (SAMHSA's) Strengthening Treatment Access and Retention State Initiative (STAR-SI) supported NIATx and others (Molfenter, Boyle, Holloway, & Zwick, 2015) in conducting case studies of the use of telemedicine in addiction treatment. In each case study, treatment providers identified factors impeding or facilitating the sustainability and use of TAC, which they were most interested in conducting via videoconferencing and mobile devices. Impediments included costs, lack of reimbursement, unease with technology, lack of models to follow, and concerns about confidentiality. Facilitating factors included local success stories about TAC, champions of TAC, and a strong need to increase access and improve services. One notable STAR-SI effort is the Recoveration program (https://www.recoveration.org), which provides

103

information, support, and distance counseling to consumers (Molfenter et al., 2015).

## Staff Recruitment and Training

Counselors who have strong in-person counseling skills will not necessarily be skilled in delivering TAC. Therefore, assessing the technological competence of the workforce and helping staff members develop a sense of self-efficacy with the technology will help increase the success of technology adoption (Andre, Ringdal, Loge, Rannestad, & Kaasa, 2008; Wisdom et al., 2010). As with any new practice, clinicians need to establish competence and develop self-efficacy with the intervention prior to engaging in service delivery (Andre et al., 2008; Maheu & Gordon, 2000; Midkiff & Wyatt, 2008).

To build competence and confidence, behavioral health service providers must have the opportunity to practice integrating services and technology prior to their first client interactions (Abbott et al., 2008; Wood et al., 2005). This might include hands-on practice with the technology before using it with a client, as well as supervised interactions with clients using the technology prior to independent activity. Providers must be comfortable enough with the technology to be able to answer clients' questions, talk about potential privacy and security risks, and troubleshoot technological problems with clients (Ragusea & VandeCreek, 2003). An alternative approach is to use technology that has built-in support and can assist with training clients.

Building competence in staff members should be an ongoing activity. The skills of clinicians and other staff members involved with the technology should be reassessed regularly, and you should have plans in place to institute additional training and support to help staff members who may struggle with the technology or experience new concerns as their competence with the technology advances. Professional associations, such as the American Psychological Association, have begun to develop specific guidelines for the ongoing evaluation of providers' skills and their effectiveness. Exhibit 2.1-2 outlines some of the technological competencies required to implement TAC in behavioral health services.

## Clinical Supervision of Technology-Based Care

The challenges that emerge in the recruitment and training of clinical supervisors to oversee the delivery of TAC are similar to those that arise in preparing clinicians to deliver traditional care (Mallen, Vogel, & Rochlen, 2005). Supervisors need to have advanced knowledge of the technology, experience in delivering TAC, well-developed strategies for building relationships using technology, an understanding of the common ethical concerns related to its use, and experience in identifying and averting crises among clients participating in TAC. Additional competencies are required when clinical supervisors use technology to deliver supervision and when they supervise clinicians who are conducting TAC.

## Technology-Mediated Supervision

The use of technology increases the flexibility and accessibility of supervision and presents new avenues for clinicians in remote areas to seek support and expert advice (Abbass et al., 2011; Barnett, 2011; Byrne & Hartley, 2010; Kanz, 2001; Murphy & Mitchell, 1998; Wood et al., 2005). Additionally, using technology to deliver supervision can reduce the stress associated with travel and provide an opportunity for people working in similar specialties to share expertise despite distance (Marrow, Hollyoake, Hamer, & Kenrick, 2002). A variety of tools can be used to deliver supervision, including telephone conferencing, Web cams to record clinical sessions that are discussed in supervision later, email exchanges,

## Exhibit 2.1-2: Technological Competencies Required of Clinical Staff

| Knowledge | Skills | Attitudes |
|---|---|---|
| • How the technology works<br>• Common technology terms<br>• Ways that technology can enhance practice<br>• Common ethical challenges related to use of technology<br>• Privacy, confidentiality, and informed consent issues with use of the technology, including the Health Insurance Portability and Accountability Act (HIPAA), Title 42, Part 2, of the Code of Federal Regulations (CFR), and other legal requirements<br>• Security risks that clients and providers may encounter and steps to minimize risks<br>• Emoticons and acronyms clients may often use and boundary concerns surrounding their use in a professional relationship<br>• Policies on scope of practice, coordination of care, security, informed consent and privacy, mandatory reporting, handling emergencies, keeping electronic records, security, and addressing privacy or security violations | • Access the Internet for information<br>• Communicate with clients and peers using technology<br>• Use technology with ease<br>• Provide basic troubleshooting<br>• Interact with others effectively using technology (e.g., video conferencing users understand how to frame the picture and look into the camera; text-based communication users can convey emotion in writing)<br>• Minimize privacy, confidentiality, and security risks to clients<br>• Establish and maintain relationships using technology<br>• Have effective writing skills, especially regarding emoticon and text etiquette when using text-based communication in the context of professional relationships<br>• Build referral relationships in the community, including emergency referrals | • Willingness to learn and use technology to support practice<br>• Interest in adoption of new practice techniques<br>• Willingness to work through technology interruptions and glitches<br>• Recognition of the importance of clients and counselors always understanding what the other means when using symbols (e.g., counselors state how they interpret clients' use of symbols and ask clients to confirm accuracy; they clarify meanings of any symbols they themselves use to avoid misinterpretation) |

online discussions or chats, store-and-forward technologies, and video conferencing. Some technologies are better suited than others to individual and organizational strengths, needs, and resources; therefore, supervisors should think critically about how technology may be most useful for the needs of the individual or group participating in supervision. It is also important to consider how the use of technology will improve care (Stamm, 1998). Use of email or Web-based supervision may improve access to and quality of care in rural areas or in cases where specialty knowledge is required, but it may detract from quality in areas where adequately trained supervisors are plentiful and in-person contact is accessible.

State licensing regulations may restrict or impose specific requirements on the delivery of supervision using technology. In some cases, it may be useful to supplement technology-mediated contacts with in-person supervision (Vaccaro & Lambie, 2007). These blended approaches that combine in-person contact, video conferencing, email, and asynchronous discussions provide flexibility in responding to the unique learning preferences of the supervisees and afford supervisors the ability to tailor their methods of communicating various types of information (Wood et al., 2005).

Clinical supervisors must communicate clearly and encourage supervisees to raise questions about the meaning of the communication,

## Examples of Technology-Supported Clinical Supervision

**Clinical supervisor's supervision, Phoenix House:** This supervision approach consists of monthly telephonic supervision sessions with 10 to 15 clinical supervisors focused on issues arising in clinical supervision.

**Web-based treatment and cybersupervision, Treatment Alternatives for Safe Communities Illinois:** Clinicians conduct live counseling sessions with a laptop equipped with a Web cam. The clinical supervisor views the session live and meets online with the clinician after the session using video conferencing or telephone to debrief the session.

**Use of store-and-forward technologies for recording sessions to be used in supervision:** Store-and-forward products are available that allow the clinician to record live sessions with a remotely connected client, tag the recording prior to or during the supervisor session, and then immediately access the session recording. The recording can be played during a tele-supervision session where the remote supervisor can stop and start the recording on a portion of the screen while interacting with the supervisee on another portion of the screen using live video conferencing.

especially when using text-based communication (e.g., email) where visual cues are not available. Supervision benefits from use of a more structured format with clear guidelines, responsibilities, and expectations (Graf & Stebnicki, 2002). However, many of the same considerations that arise with using technology to deliver care are also present for technology-mediated clinical supervision. Clinical, legal, and technological training and support are essential for averting frustration and ensuring the effectiveness of supervision (Abbass et al., 2011; Maheu, McMenamin, & Pulier, 2013; Marrow et al., 2002; Vaccaro & Lambie, 2007). Because supervision relies on an exchange of clinical information across participants, supervisors and clinicians must be well

versed in strategies that minimize risks to clients associated with data integrity, data security, privacy, and confidentiality.

As with any exchange of clinical information, your agency should have a policy to inform clients of the ways in which the supervision process will use and protect their data. Give clients a chance to consent to their information being shared (e.g., teleconferencing) and explain how the information will be used (Abbass et al., 2011; also see the Master Clinician Note on p. 52). Clinical supervisors delivering supervision via technology also need to be well versed in the state regulations dictating the delivery of technology-mediated supervision, and they must have an understanding of the risks when state regulations do not specifically address the use of technology. For a checklist of competencies for supervisors conducting supervision of TAC and using technology in supervision, see Exhibit 2.2-5 in Part 2, Chapter 2.

## Continuous Monitoring and Evaluation

As an administrator, you can facilitate effective adoption of new interventions by putting a system in place to monitor and respond to implementation successes and challenges. Organizational cultures that support ongoing use of data to analyze problems and make needed corrections fare better in the adoption of new practices than those that do not typically rely on structured process improvement (Wisdom et al., 2010). Although continuous monitoring and evaluation can be viewed as an end stage of implementation, planning teams must grapple with the types of data necessary to conduct monitoring and evaluation activities during the initial phases of planning. Selection of data elements depends on the strategic goals of the project and the plans for sustainability; data elements should include both process and outcome measures. For example, process measures such as usage rates, dropout rates,

### Data Elements To Consider in Monitoring the Impact of TAC

| Process | Outcome |
|---|---|
| • Technology/intervention usage rates | • Rates of hospitalization or other high-cost services |
| • Demographic characteristics of clients | |
| • Dropout and retention rates | • Criminal justice recidivism rates |
| • Staff satisfaction | • Changes in symptoms or behaviors experienced by clients |
| • Client satisfaction | |
| • Equipment malfunctioning rates or downtime | • Cost effectiveness or cost offsets |
| • Fidelity or compliance measures | • Number and types of relapses in substance use or mental health symptoms |
| • Costs of care | |
| • Workflow or business process changes | |

staff perceptions of the challenges and successes of implementation, compliance with the key ingredients of the intervention, and demographic characteristics of the client population can provide helpful information to refine technology-based interventions. Outcomes—including changes in hospitalization rates, symptom changes, and cost effectiveness—can help stakeholders buy into the concept of TAC and promote its sustainability in practice. A system for refining or enhancing TAC is critical to ongoing success.

## Disaster Planning

As essential community providers, many behavioral health organizations are required to have disaster plans. In addition to resources such as SAMHSA's Disaster Technical Assistance Center (http://www.samhsa.gov/DTAC/), organizations may consider the ways in which technology can assist in responding effectively to disasters. Technology has the potential to be useful in addressing certain challenges that commonly result from disasters, such as by allowing access to information about medications or health histories via the Internet and enabling communication via text messaging, cell phones, and reverse 911 calling to disseminate information and dispatch providers.

Technology can help ensure that professionals from outside the jurisdiction are properly

### GO2AID

In a disaster, it's essential that behavioral health responders have the resources they need, when and where they need them. SAMHSA's GO2AID—Field Resources for Aiding Disaster Survivors application makes it easy to provide quality support. You can perform predeployment preparation, on-the-ground assistance, postdeployment resource delivery, and more, all at the touch of a button:

- **Be focused.** Spend less time worrying about logistics so you can focus on what really matters—the people in need.
- **Be prepared.** Rely on and access predownloaded resources on your phone in case of limited Internet connectivity.
- **Be confident.** Review key preparedness materials so you're confident about providing the best support possible.
- **Share resources easily.** Send information to colleagues and survivors via text message or email, or transfer to a computer for printing.

*Source: SAMHSA, 2013c.*



licensed and credentialed during disasters. In more widespread disaster environments, state regulations for licensure and practice may be waived for providers coming from outside the disaster area; teleconferencing, long-distance telephone consults, and other technology-based services may be allowed by state regulators on a temporary basis. The use of telemedicine, a cornerstone of most current disaster service plans, can bring remotely located providers to the affected area without the logistical challenges of travel (Yellowlees, Burke, Marks, Hilty, & Shore, 2008). Some states offer reciprocity specifically for physicians and nurses practicing telehealth in disaster environments; however, others do not offer such reciprocity, creating challenges during disasters. The Emergency Medical Assistance Compact (EMAC) provides protections for medical personnel who provide care across state boundaries during natural disasters and other emergency situations. See the EMAC Web site for more information about the compact (http://www.emacweb.org).

When considering how technology can be used in a disaster, think about how internal organizational communication as well as communication with other critical providers or responders might be affected. For example, having charged cell phones programmed with critical contacts may be vital to effective communication. This may include a plan to communicate with pharmacies to ensure that clients or disaster victims have access to needed medications. In addition to using technology to assist in disaster response, you and your implementation team must plan for technology failures in the event of disasters as reliance on technology to conduct business increases. This includes backup power sources, access to electronic health records (EHRs), systems of communication with other providers and local authorities, and access to provider credentialing records.

# Technological Capacity Considerations

TAC requires a level of expertise in information technology that was not often required of behavioral health organizations in the past. This section addresses considerations for technological capacity based on the type of technology to be adopted.

## Data Security

HIPAA dictates the privacy and security safeguards required for the protection of protected health information (PHI). The security aspects of these rules, which address how health data are accessed, transmitted, and stored (U.S. Department of Health and Human Services [HHS], 2006; HHS, Office of the Secretary, 2013), must be considered when implementing TAC. HIPAA also addresses who is authorized to access data and how access restrictions are implemented. Organizations must establish a password management system that controls access to client data on devices owned and controlled by the organization, as well as remote devices or devices accessed from remote locations. In addition, organizations are advised to have policies that address lost and stolen passwords, automatic session logouts for unattended work stations, and virus protection on all computer equipment and other devices that store PHI (HHS, 2006).

### Business Associate Agreements

Business associate agreements are required between HIPAA-covered healthcare providers and those performing business functions on behalf of providers, such as by providing technology solutions. The Office for Civil Rights Resources, which enforces HIPAA, offers resources related to such agreements on their Web site (http://www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/contractprov.html).

> ### Additional Data Security Resources
>
> - HHS HIPAA Security Guidance (http://www.hhs.gov/ocr/privacy/hipaa/administrative/securityrule/remoteuse.pdf)
> - Guide to Storage Encryption Technologies for End User Devices: Recommendations of the National Institute of Standards and Technology (http://csrc.nist.gov/publications/nistpubs/800-111/SP800-111.pdf)
> - National Institute of Standards and Technology Guidelines on Electronic Mail Security (http://csrc.nist.gov/publications/nistpubs/800-45-version2/SP800-45v2.pdf)

Staff training effectively addresses many security risks, so dissemination of these policies is critical. Training should include information about risks associated with password sharing, saving logins and passwords in unsecured locations, and forgetting to log off.

HIPAA requires policies that prohibit the transmission of PHI via unsecured email and provide for email encryption. In addition, policies about remote access to PHI via networks and Web-based email are necessary (HHS, 2006). Data storage security as defined by HIPAA includes encryption of stored data and backups and policies about storage of PHI on devices that are outside the physical control of the organization, such as laptops, universal serial bus (flash) drives, and personal digital assistant devices (HHS, 2006). Policies must address the handling of security violations, equipment repair, and disposal of technologies no longer in use, and procedures must be put in place to train staff members on policies initially and on an ongoing basis.

These are just a few privacy and security issues to consider. The Office of the National Coordinator for Health Information Technology provides more comprehensive guidance and resources on compliance with HIPAA when implementing health information technology solutions (http://www.healthit.gov/providers-professionals/ehr-privacy-security/resources).

## Video and Web Conferencing

The video conferencing systems telehealth and telemental health programs typically use take a hub-and-spoke approach to delivery, meaning that clients travel to a local health or behavioral health center to access services that are not available in their community. This model has the advantage of averting some of the technological, privacy, and security complications associated with clients accessing services in their homes. The implementation planning process should inform assessment of the technological infrastructure necessary to deliver TAC. If video conferencing will be central to the intervention, issues of bandwidth, image resolution, display size, and audio quality on both sides of the exchange are central to its effectiveness. Issues of bandwidth are particularly important for video conferencing. If using public Internet for video conferencing, it is important to consider fluctuations in Internet use and the impact of that use on speed. For instance, high Internet use times on the public

> ### Resources on Video and Web Conferencing
>
> - American Telemedicine Association Telemedicine Standards & Guidelines: http://www.americantelemed.org/resources/standards/ata-standards-guidelines
> - National Center for Telehealth & Technology T2 Telehealth Programs: http://t2health.org/programs-telehealth.html
> - Health Resources and Services Administration (HRSA) Telehealth: http://www.hrsa.gov/ruralhealth/about/telehealth/
> - Telehealth Resource Centers: http://www.telehealthresourcecenter.org
> - Addiction Technology Transfer Center Network: http://www.nattc.org

## Video Conferencing During National Depression Screening Day

Video conferencing has increased awareness of issues and resources related to depression during National Depression Screening Day, an annual event run by Screening for Mental Health, Inc. (SMH) since 1991 (SMH, 2012). In one example, a lecture was broadcast to regional video conferencing sites through a coordinated effort among hospitals and regional mental health centers. After the lecture, local staff administered a screening tool to community members. If screening indicated possible depression, local staff connected the person with a professional for evaluation and counseling.

network may limit available bandwidth and slow the transmission to an unacceptable level.

Internet connectivity and bandwidth must be sufficient at both ends of the transmission. Bandwidth and encryption are as important for the client participating from home as for the primary transmission site. In addition, data security and storage are essential to consider and are related to unique risks when transmitting client images using video conferencing. Various videophone and video conferencing technologies are available and offer a range of solutions to these challenges. Audio Web conferencing can be used to conduct group discussions over the Internet. A number of vendors sell access to products useful for Web conferencing. Audio technologies are typically more familiar to providers and generally pose few challenges. However, mobile phone use for Web conferencing raises some privacy and security concerns. See the "Telephone/Audio Conferencing" section for additional information.

For providers, ease of use of the technology is important. Some approaches using video and Web conferencing require technology experts to operate and troubleshoot the equipment but still demand at least some technical skill from clinicians. Other models rely on clinicians to perform their own troubleshooting, requiring more advanced technical skills.

The physical location of counselors and clients while they participate in audio/video conferencing has implications for privacy. The American Telemedicine Association (2009b) addresses physical location requirements, including visual and audio privacy, room lighting, backdrops, and ergonomic considerations. Organizations should consider adopting policies that require individuals to introduce themselves upon entering the room during a session and that encourage discussing the privacy of clients' locations with clients at the beginning of each session. Planning teams need to grapple with these issues in advance of TAC delivery and have plans for monitoring and adjusting their

## Telephone-Based Continuing Care

Telephone-based continuing care has been demonstrated to hold promise as a strategy to maintain more frequent contact with clients without the barriers associated with travel to treatment sites. In one study, clients completing an intensive outpatient program for substance use disorders were randomly assigned to in-person counseling twice weekly or to weekly telephone monitoring with a monthly support group. The outcomes of the clients participating in telephone continuing care were as positive as the outcomes of the clients who had in-person counseling (McKay, Lynch, Shepard, & Pettinati, 2005).

Based on these findings, AspenPointe TeleCare (http://www.aspenpointe.org) has implemented a telephone-based recovery support program for adults completing treatment for substance use disorders. For up to 2 years following enrollment in outpatient treatment, recovery case managers conduct brief telephone calls to help clients manage relapse risk and bolster mutual-help activities. Calls occur weekly early in recovery, but as clients maintain recovery and build support, the frequency reduces to monthly.