Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
1676 N. California Boulevard, Suite 620
Walnut Creek, CA 94596
Telephone: (925) 746-8460
Fax: (925) 746-8490
E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S JUNE 5, 2024 PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE: SP15.1/SP15.1E (OUT OF CELL ACTIVITIES-YARD)** |

**INTRODUCTION**

On June 5, 2024, the Special Master presented a proposal to resolve a dispute concerning indicators SP15.1 and SP15.1E, which are intended to measure whether patients in Mental Health Crisis Beds (MHCB) and Psychiatric Inpatient Programs (PIP) are offered "yard."[1]  SP15.1 was remediated by the Special Master's data expert as of June 23, 2023.  Yet now, without any significant change or extraordinary circumstance, the Special Master seeks to not only re-open a remediated indicator, but require a minimum amount of yard time for MHCB patients. Such a

---

[1] A copy of the Special Master's *Proposed Resolution of Data Remediation Dispute: SP15.1/SP15.1E (Out of Cell Activities- Yard)* is attached at Appendix A, (Proposal).

1

Defs.' Obj. to Proposed Resolution Re SP15.1/SP15.1E (2:90-cv-00520 KJM-DB (PC))

20072732.1

1   requirement is unsupported by long-established mental health and custodial policies which do not

2   have any required number of hours patients must be offered for yard each week.

3        The Special Master's framing of the dispute as simply a disagreement regarding the

4   accuracy and transparency of reporting whether patients are "attend[ing] out of cell activities

5   consistent with their custody designation" is inaccurate for several reasons.  First, the indicators at

6   issue measures whether patients were offered yard, not whether they attended yard, an approach

7   that is not changed by the Special Master's Proposal.  Most importantly, what the Special Master

8   is actually proposing is a material change to the *Coleman* remedy.  As its legal and factual

9   support, the Proposal misinterprets prior suicide prevention reports, Title 15, and the Program

10  Guide, and ignores the fact that the Program Guide has never included a requirement to offer a set

11  number of minimum yard time to MHCB patients.

12       Even if the court disagrees with the above, data remediation is not the forum to resolve the

13  dispute presented on SP15.1 because the issues involve Defendants' objections to Mr. Hayes'

14  new ten-hour standard for MHCB out-of-cell time that are currently pending before this Court.

15  (ECF No. 8179 at 52 to 60.)  The dispute presented on SP15.1E and the issue of whether the

16  *Coleman* remedy requires that Defendants offer PIP patients a required minimum of ten-hours of

17  out-of-cell time is pending before this Court.  (*See* ECF Nos. 8207, 7838; and 8230.)  And the

18  validity of the August 23, 2023 order setting minimum treatment thresholds is also on appeal to

19  the Ninth Circuit Court of Appeal.  (*Coleman v Newsom*, Case No. 23-2485.)

20       Defendants request that the Court reject the Proposal and instead resolve the dispute in a

21  way that embraces the established remedy in this case.  Alternatively, resolution of this dispute

22  should be deferred until Defendants' objections regarding the Hayes' sixth re-audit and Plaintiffs'

23  motion to clarify the court's August 23, 2023 order are resolved.  It is time to stop using data

24  remediation to create new policies and expand the remedy, and it is inappropriate for the Special

25  Master to use data remediation to provide recommendations on issues currently before the Court.

26  / / /

27  / / /

28

Defs.' Obj. to Proposed Resolution Re SP15.1/SP15.1E (2:90-cv-00520 KJM-DB (PC))

20072732.1

1    **I.    THE PROPOSAL ON SP15.1 IMPROPERLY SEEKS TO RE-OPEN A REMEDIATED**
2    **INDICATOR AND EXPAND THE *COLEMAN* REMEDIAL PLAN**

3    SP15.1 measures whether patients in the MHCB who have had an initial Interdisciplinary

4    Treatment Team (IDTT) meeting and are not clinically restricted from yard time were offered

5    yard.  (Cartwright Decl., Exhibit A.)  The documentation for the remediated indicator shows the

6    numerator as "how many patients have documentation in the 114-A identifying yard was

7    offered?"  (Cartwright Decl. ¶ 3, Exhibit A.)  The denominator presents the sum of responses to

8    the question "how many patients who have had an initial IDTT are NOT restricted from yard time

9    (due to clinical reason) by the clinical team?"  (*Id.*)  The Proposal would expand these questions

10   to provide the number hours of yard offered to each patient per week and redesign the indicators "to

11   accommodate a minimum threshold for weekly yard time offered to patients in MHCBs and PIPs."

12   (Proposal at 2-3.)  The Proposal further recommends the indicators' language be modified to measure

13   the Program Guide requirement against a minimum threshold to measure whether patients were

14   offered yard on a weekly basis "consistent with the custody designation", or to "measure whether

15   patients were offered clinically-approved yard at a minimum of ten hours per week."  (Proposal at 3.)

16   Clearly, the Special Master's "options" are not acceptable alternatives because they reflect material

17   modifications of the remedial plan.

18        **A.    The Proposal Fails to Justify Revisiting SP15.1, a Fully Remediated**
             **Indicator.**
19

20   The data remediation process is built on the need for agreement at each of the five steps and

21   the multiple layers of review by the Special Master's experts and Plaintiffs' counsel.  Only after

22   agreement is reached and the documentation for each indicator is reviewed several times at

23   different stages is an indicator remediated, a step which lies solely in the hands of the Special

24   Master's data expert.  As a result, remediated indicators reflect the stakeholders' agreement and

25   the operative policies concerning the provision and monitoring of yard for MHCB patients.  The

26   Special Master should not be allowed now to renege on the stakeholders' agreement.

27   SP15.1 was thoroughly assessed and approved by the Special Master and Plaintiffs through

28   the data remediation process.  The Proposal does not state or suggest that the stakeholders did not

3

1  follow the court-ordered data remediation process.  The indicator and its related business rules

2  completed the five-step validation and verification process.  (Cartwright Decl. ¶ 4.)  The

3  stakeholders' agreement is memorialized through communications between the Special Master

4  team, Plaintiffs and Defendants.  These communications demonstrate that there were no

5  outstanding stakeholder[2] disputes concerning SP15.1 and that the Special Master's data expert

6  remediated the indicator.

7      SP15.1 was discussed over the course of four BRMR meetings between March and April

8  2023 with the Special Master's team and Plaintiffs' counsel. (Cartwright Decl. at ¶ ¶ 5 -11,

9  Exhibits B - G.)  As part of these discussions, each stakeholder comment was reviewed and either

10  addressed through revisions to the documentation or resolved based on the agreement that no

11  changes were necessary. (*Id.* at ¶ 6.)  On April 13, 2023, CDCR's Office of Legal Affairs (OLA)

12  sent an e-mail notifying the stakeholders that CDCR had split the SP15 indicator into five

13  separate indicators and provided new language for the underlying audit in response to comments

14  that occurred during the BRMR meeting. (Cartwright Decl. at ¶ 6, Exhibit B.)  The e-mail noted

15  that absent any issues, CDCR was going to move the indicators to the approvals stage of the

16  process. (*Id.*)  On April 14, 2023, Deputy Special Master Kerry Walsh and Plaintiffs' counsel

17  responded affirmatively to Ms. Thind's email.  (Cartwright Decl. at ¶ 7, Exhibit C.)

18      SP15.1 moved quickly through Step 3, 4, and 5 of the data remediation process and was

19  released to stakeholders for final review on June 5, 2023.  (Cartwright Decl. at ¶ 8, Exhibit D.)

20  On June 16, 2023, Plaintiffs' counsel emailed CDCR and the Special Master's team noting a few

21  minor edits to the SP15.1 documentation and providing their final review for the Special Master's

22  data expert, Dr. Potter. (Cartwright Decl. at ¶ 9, Exhibit E.)  As part of their final review,

23  Plaintiffs stated that they had no unresolved disputes regarding SP15.1. (*Id.*)  On June 26, 2023,

24  CDCR OLA responded to Plaintiffs' counsel and the Special Master's team and addressed each

25  of the corrections previously requested by Plaintiffs. (*Id.* at ¶ 10, Exhibit F.)  Plaintiffs quickly

26  responded stating that the "email resolves the issues we identified in our prior emails." (*Id.*)  Only

27

28  _____

[2] Collaboratively, Defendants, Plaintiffs, and the Special Master's team are referred to as "the stakeholders" for the purposes of the data remediation project.

20072732.1

1   after the above-described numerous steps of review by all stakeholders and their agreement that

2   no further concerns existed was the indicator remediated.

3         On August 7, 2023, the Special Master's data expert, Dr. Dan Potter, confirmed that SP15.1

4   was remediated as of June 23, 2023.  (Cartwright Decl. ⁋ 11, Exhibit G.)  It was only after SP15.1

5   was remediated that the Special Master first suggested changes to the audit questions underlying

6   the indicator that include a ten-hour minimum requirement.  (Cartwright Decl. at ⁋ 12.)  On April

7   8, 2024, the Special Master team suggested that the numerator for SP15.1E be revised to add the

8   italicized text to the indicator's documentation:  "[2]  Of those, how many patients have

9   documentation in the 114-A or NCAT identifying yard was offered, *based on their custody*

10  *designation?  o RHU patients are required to be offered at least 10 hours per week*;" and "[11]

11  Of those, how many patients have documentation in the 114-A or NCAT identifying dayroom

12  was offered, *according to patient's custody designation?*  (Cartwright Decl., ⁋ 13, Exhibit H

13  (4/8/24 e-mail from Deputy Special Master Kerry's Walsh.)

14        The April 8 request attempted to modify the remediated MHCB indicator along with the

15  extended PIP indicator despite the fact that both items had already completed validation,

16  approvals, and verification. (Cartwright Decl., Exhibits I and J.)  The Proposal discards that work

17  along with the stakeholders' final decision on the scope of SP15.1.  The suggestion that this

18  indicator needs to be significantly revised and remediated all over again is concerning.  If the

19  Special Master can simply re-open a remediated indicator because he wants to change its scope or

20  to expand the *Coleman* remedy, data remediation will effectively never end.

21       **B.    The Proposal Ignores the Court-Ordered Dispute Resolution Process.**

22        There is no process in place to review whether a remediated indicator should be subject to

23  another round of remediation.  The Special Master's Proposal incorrectly states, "[s]tep one of the

24  original dispute resolution process provided that disputes related to already remediated indicators

25  would be submitted directly to the Special Master and CDCR Secretary for resolution."  (Proposal

26  at 1, fn. 1.)  But that statement does not appear in the text of the dispute resolution process, which

27  is the likely reason that the Proposal does not provide a pin cite in support of the statement.  Step

28  One of the agreed upon dispute resolution process referenced by the Special Master requires that

5

Defs.' Obj. to Proposed Resolution Re SP15.1/SP15.1E (2:90-cv-00520 KJM-DB (PC))

20072732.1

1   the stakeholders discuss all key indicators "in BRMR and endeavor to resolve all disputes during

2   the time allotted for discussion of that indicator…." (ECF No. 7556-2 at 2.)  Step One goes on to

3   discuss the various types of data remediation disputes and whether those disputes should be part

4   of the data remediation process or a separate process.  (*Id.*)  Step Two then states "[i]f after two

5   weeks' discussion in BRMR/QAC, disagreements remain … the indicator will be put on hold and

6   the disagreement will be referred to the First Level Review Team." (*Id.*)[3]  As drafted and adopted,

7   the agreement contemplated disputes arising during BRMR or QAC discussions.  Both of those

8   discussions occur during the validation step of the remediation process.  If changes are made

9   subsequent to the validation step, such as during verification, the changes are reviewed by

10  Plaintiffs' counsel and the Special Master and brought back to validation if necessary.  Additional

11  steps following remediation are not set forth in the process because it was never contemplated

12  that remediated indicators would be part of the court-ordered dispute resolution process.  (*See*

13  ECF No. 8008.)

14      If the Court accepts the Special Master's suggestion that the dispute resolution process

15  permits stakeholders to challenge indicators that were previously remediated and agreed upon,

16  such new disputes should only be allowed as outlined in Subsection (e) of Step One.  That

17  subsection states:

18      "For all other types of disputes, the dispute will be resolved through the dispute
        resolution process outlined below. **No new or settled disputes about an**
19      **indicator, shall be raised after the BRMR process is complete except in the**
        **case when** an indicator was revised after the BRMR and **the dispute involves that**
20      **revision, or under extraordinary, changed circumstances**; in the latter instance,
        the dispute shall be brought directly to the Special Master and Secretary for
21      resolution." (ECF No. 7556-2 at 2.)

22

23      In the case of SP15.1, the remediated indicator measures whether MHCB patients were

24  offered yard without a requirement to document the amount of yard time offered to patients and

25  without any suggestion that there is a minimum number of required hours.  (Cartwright Decl.,

26  Exhibit K.)  No changes were made to the remediated SP15.1 indicator that would support now

27      [3] Defendants acknowledge that the Court removed Step Two of the Dispute Resolution
        Process in the October 11, 2023 order. (ECF No. 8008.)  The language regarding Step Two is
28  incorporated here to show the intent of the parties with respect to the process.

20072732.1

1   adding a requirement that it document the number of yard hours offered or implement a required

2   minimum number of hours of yard each patient must be offered each week.

3          The Proposal fails to point out any post-BRMR revisions to the remediated indicator, or any

4   extraordinary changed circumstances that would allow stakeholders to raise a new dispute to this

5   indicator.  The Special Master agreed to the dispute resolution process (*see* ECF No. 7715 at 42-

6   44) but has now seemingly abandoned that agreement to allow his team to reopen remediated

7   indicators without adequate justification.  This attempt to reopen a remediated indicator absent a

8   new policy or extraordinary, changed circumstances calls into question the finality of the data

9   remediation process.

10         As stated above, the Special Master approved the remediation of SP15.1, including the

11  scope of the indicator as a measure of whether yard is offered to MHCB patients.  The agreement

12  on this indicator did not include any additional documentation requirements concerning the

13  amount of yard time offered to patients or a ten-hour minimum weekly yard requirement.  After

14  all of the work that went into negotiating, designing, and reaching agreement on SP15.1, the

15  Special Master's new position that SP15.1 is "inadequate" is disappointing and cannot be squared

16  with his previous approval of the indicator.

17         Also of concern to Defendants, and presumably this Court, is the impact the Proposal will

18  have on other remediated suicide prevention indicators.  If the Proposal is accepted and adopted,

19  all indicators that address out-of-cell time, not just yard time, will be impacted.  The Proposal will

20  require Defendants to revise SP15.1/SP15.1E, and to revise or decommission at least

21  SP15.5./SP15.5E, which measures whether dayroom was offered.  (*See* Cartwright Decl. at ¶ 15.)

22         The Court should not permit late stage efforts to modify previously remediated indicators,

23  particularly in light of this Court's reminders that remedial planning has been substantially

24  complete for at least four years and new indicators should generally be limited to indicators

25  required by court approved updates to the remedial plans (ECF No. 7847 at 8, citing ECF No.

26  6996 at 9-10), and that data remediation must be brought to a conclusion as expeditiously as

27  possible.  (ECF No. 8181 at 6.)

28

20072732.1

**C.    The Hayes Monitoring and Reporting do not Support the Proposal.**

The Proposal states that the remediated SP15.1 is an "inadequate substitute for the Special Master's suicide prevention expert's monitoring…" (Proposal at 2), and that Mr. Hayes's monitoring between 2014 and 2019 focused on the "basic premise" that MHCB patients clinically approved for out of cell activities were offered them.  (Proposal at 5.)  This "basic premise" does not appear to be clearly articulated in the Hayes reports and even if it were, it does not provide a basis for imposing a new remedial requirement.  In fact, this is a brand new concept created by the Special Master and his expert; it is not a concept that Mr. Hayes historically relied upon or, more importantly, reported on prior to the remediation of indicator SP15.1.  And the Special Master readily admits that the standard applied by suicide prevention expert Hayes through his fifth re-audit was whether yard was *offered* to MHCB patients.  (*See* ECF Nos. 5672 at 7-10, 5994 at 13-15, 6879 at 24, 6879-1 at 16-19, 7636 at 28, 7636-1 at 26-32, 8143-1 at 27-34.)  There is no claim—beyond a "basic premise"— that Hayes monitored, tracked, and reported the number of hours offered to each patient on a weekly basis.

Notably, the Proposal omits any reference to the record before this Court that shows Mr. Hayes audited to a ten-hour per week standard, because he didn't.  The Proposal references Hayes' review of 114A forms in his report on his fifth re-audit as evidence that he looked at whether MHCB patients were offered showers on a daily basis.  (Proposal at 5.)  But this reference in one monitoring report hardly demonstrates that Hayes audited or even considered imposing a ten-hour minimum requirement for yard offered to MHCB patients.

Not until after six audits of CDCR's suicide prevention practices, has Mr. Hayes decided to add a new requirement to his suicide prevention standards.  (ECF No. 8134 (Hayes March 1, 2024 Report.)  Without any notice to Defendants, and certainly no discussion, Mr. Hayes unilaterally decided that to be compliant, CDCR must demonstrate that it is offering all MHCB patients a minimum of ten hours of yard each week.  The acknowledgment from both Mr. Hayes and Special Master that this was new to the sixth re-audit supports Defendants' position that the proposed minimum has not in fact been part of the prior monitoring.

**D.     Existing Regulations and the Program Guide do not Support the Proposal.**

The Proposal explains this newly minted compliance standard was derived "from the current CDCR requirement that maximum security/RHU incarcerated persons were required to be offered a minimum of ten hours of yard per week" and the February 2017 Mental Health Crisis Bed Privileges memorandum that provides MHCB patients "shall attend out-of-cell activities consistent with their custody designation." (Proposal at 1, 4, and 5.) The Proposal concludes that because CDCR is required to offer ten hours per week of out-of-cell activities for maximum security patients in the MHCB, it would therefore be reasonable to expect that more hours of out of cell activities would be offered to all MHCB patients. This reasoning misinterprets Title 15 and the February 2017 Mental Health Crisis Bed Privileges memorandum.

First, a patient's housing in RHU prior to an MHCB admission or their maximum (Max) custody designation does not result in a minimum requirement for yard time. (Cartwright Decl. Exhibit I.) Section 3348(i) of Title 15 does requires that incarcerated persons assigned to an RHU be offered a minimum of 10 hours of exercise per week, but this requirement is limited to inmates "assigned to RHU." There is no provision in Title 15 that extends the requirements to RHU patients who are transferred to a crisis bed. In other words, the exercise requirement does not follow a patient solely because of their Max custody status. Thus, contrary to the Special Master's reading, Title 15 does not require that CDCR offer MHCB patients a minimum of ten hours of out-of-cell time or yard time.

Second, the 2017 MHCB memorandum is likewise unavailing as support for this new requirement. This long-standing memorandum sets no minimum requirement for yard time. (ECF No. 7333-1 at 379.) It *cannot* be read any other way and in fact, the Hayes audit reporting supports Defendants' position. The February 14, 2017 policy was released in response to concerns and a recommendation raised in Mr. Hayes's initial audit. (*See* ECF No. 5259 at 33, and 34 (finding in Hayes 2015 report on his initial audit that the "allowance of visits, telephone calls or yard for an MHCB inmate is not addressed" by the Program Guide and recommending that "CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address" this issue).)

9

Defs.' Obj. to Proposed Resolution Re SP15.1/SP15.1E (2:90-cv-00520 KJM-DB (PC))

20072732.1

1    Mr. Hayes has audited the 2017 policy five times since its inception and has never

2    recommended or suggested that the policy be revised to require that MHCB patients be offered a

3    minimum of 10 hours of yard time or any other minimum.  (*See* ECF Nos. 5672 at 7-10, 5994 at

4    13-15, 6879 at 24, 6879-1 at 16-19, 7636 at 28, 7636-1 at 26-32, 8143-1 at 27-34.)  In fact, during

5    his fourth re-audit, Mr. Hayes recommended that CDCR stop issuing memorandums and instead

6    "begin focusing on development of CAPs for each of the facilities…found to have deficient

7    practices for possession and privileges afforded MHCB patients."  (ECF No. 6879-1 at 19.)

8    Likewise, the Special Master has never recommended minimum thresholds for this population.

9    Instead, he has twice reported to the court that compliance with Hayes Recommendation 32

10    requires that CDCR "ensure that each audited CDCR facility with a MHCB unit maintain at least

11    90 percent compliance with adequate practices regarding possessions and privileges afforded

12    MHCB patients as *required by policy*."  (ECF Nos. 6879 at 24 and 7636 at 28, emphasis added.)

13    The Special Master has now revealed for the first time that the 2017 memorandum's

14    statement that MHCB patients be offered yard and other out of cell activities "consistent with

15    their custody designation" means there must be a minimum requirement for out of cell time.  But

16    the Special Master's reading of the 2017 memorandum is inconsistent with past monitoring

17    practices and more importantly with Title 15 and the application of custody designations.  While

18    an incarcerated person's custody designation may affect what times of day they can be out of cell

19    due to count times and the level of custody supervision required; there is no custody designation

20    that alone requires a certain amount of out-of-cell time.  (See Title 15, section 3377.1.)  The idea

21    that there is some consistent minimum requirement in place is unsupported.

22    Regardless, the Special Master should not unilaterally modify an indicator when this issue

23    is already pending before the Court.  As noted in the Special Master's proposed resolution

24    regarding SP15.1, Mr. Hayes began using the 10-hour out-of-cell time minimum threshold as part

25    of the Sixth Re-audit.  Defendants objected to the use of that threshold in their response to Mr.

26    Hayes' report. (ECF No. 8179 at 52 to 60.)  Defendants' objections are currently pending before

27    the court and should be resolved in that forum rather than through a tardy dispute with a

28    previously remediated indicator.

Defs.' Obj. to Proposed Resolution Re SP15.1/SP15.1E (2:90-cv-00520 KJM-DB (PC))

20072732.1

## II.   THE PROPOSAL ON SP15.1E IS ALREADY BEFORE THE COURT.

According to the agreed upon documentation for SP15.1E, this indicator measures whether patients in the PIPs who have had an initial Interdisciplinary Treatment Team meeting and are not restricted from yard time were offered yard.  (Cartwright Decl., Exhibit K.)

The Special Master recommends revising SP15.1E to measure whether PIP patients are offered ten hours of out-of-cell time each week.  The Special Master's basis for recommending the minimum standard is a reference to CDCR's draft policy regarding out-of-cell time for PIP patients that was developed in response to the Court's August 23, 2023 order.  (Proposal at 7.)

The Proposal ignores that the August 23 order is the subject of Plaintiffs' motion for clarification.  (ECF No. 8207; ECF No. 7838; and ECF No. 8230.),  Also, the validity of the August 23, 2023 order setting minimum treatment thresholds is on appeal to the Ninth Circuit Court of Appeal.  (*Coleman v Newsom*, Case No. 23-2485.)

The validity of the Proposal is squarely before this Court.  Data remediation is not the place to litigate whether a policy should be expanded to provide a minimum threshold.  If the Court is not inclined to reject the Proposal outright, it should defer resolving this dispute until litigation of the issues related to the August 23, 2023 order is complete.

### CONCLUSION

The Special Master's proposed resolution for this dispute is inconsistent with the clear language of the Program Guide and with remediated indicators.  As noted by the Court during the April 22, 2022 status conference "[t]he data remediation project should not be resolving policy disputes." (4/22/2022 transcript at 29:25-30:1.)  The agreed upon data remediation dispute resolution process echoed this sentiment by including that requests for new policies are not disputes properly raised within data remediation.  Instead, such requests "should move to the meet and confer process." (ECF No. 7556-2 at 2.)   The Proposal does not include a reference to any current requirement in the Program Guide or other policy or regulation that sets a minimum number of hours a MHCB patient must receive each week.  And the suggestion that this dispute should impose a minimum threshold for SP15.1 and SP15.1E based on disputes that are currently

11

Defs.' Obj. to Proposed Resolution Re SP15.1/SP15.1E (2:90-cv-00520 KJM-DB (PC))

20072732.1

1  pending before this Court and the Ninth Circuit Court of Appeals ignores the rules of court and

2  violates Defendants' due process rights.  Requests or recommendations for a new policy should

3  follow established processes that afford all parties appropriate due process.

4       Defendants request that this Court reject the Special Master's proposal to resolve the data

5  remediation dispute on indicators SP15.1 and SP15.1E.  Instead, the Court should confirm the

6  remediated SP15.1 and verified SP15.1E indicators that were previously agreed to and order the

7  Special Master to remediate SP15.1E.  Alternatively, the Court should defer resolution of the

8  Special Master's Proposals until the issues currently pending before this Court and the Ninth

9  Circuit Court of Appeals have been resolved.

10                                  **CERTIFICATION**

11       Defendants' counsel certify that they reviewed the following orders relevant to this filing:

12  ECF Nos. 640, 1773, 5726, 6846, 6996, 7216, 7283, 7305, 7456, 7541, 7847, 8008, 8028, 8069,

13  8078, 8121, and 8181, 8209, 8219, and 8242.

14   Dated: June 12, 2024                    Respectfully submitted,

15                                           ROB BONTA
                                             Attorney General of California
16                                           DAMON MCCLAIN
                                             Supervising Deputy Attorney General
17

18                                           */s/ Elise Owens Thorn*
                                             Elise Owens Thorn
19                                           Deputy Attorney General
                                             *Attorneys for Defendants*
20

21  Dated:  June 12, 2024                    HANSON BRIDGETT LLP

22
                                             */s/ Samantha D. Wolff*
23                                           PAUL MELLO
                                             SAMANTHA D. WOLFF
24                                           *Attorneys for Defendants*

25

26

27

28

20072732.1

# APPENDIX A

**Special Master's Proposal[1] for Resolving Data Remediation Dispute: SP15.1/SP15.1E (Out of Cell Activities-Yard)**

I.     Brief Statement of Dispute

This dispute relates to the stakeholders' disagreement regarding the most accurate and transparent[2] method of measuring whether patients in MHCBs and PIPs[3] are "attend[ing] out of cell activities *consistent with their custody designation,*" as required by CDCR's "Mental Health Crisis Bed Privileges Revision" policy effective February 14, 2017, which is incorporated into the Program Guide.  *See* 2021 Program Guide Update, ECF No. 7333-1 at 379.  The CDCR policy defines out-of-cell activities as including "access to dayroom, recreational activities, yard, and any additional recreational therapy deemed appropriate by the MHCB IDTT."  *Id.*

---

[1] This proposed resolution is made in accordance with the Court's October 11, 2023 Order modifying the data remediation dispute resolution process.  ECF No. 8008 at 2.  Step one of the original dispute resolution process provided that disputes related to already remediated indicators would be submitted directly to the Special Master and CDCR Secretary for resolution.  *See* ECF No. 7556-2.  The Court's October 11, 2023 order modified the original dispute resolution process to eliminate steps between the unsuccessful discussions in BRMR and the Special Master's recommendation to resolve the dispute, including removing the Secretary from the process.  *See* ECF No. 8008 at 2 (removing step two of the dispute resolution process).  With respect to disputes regarding remediated indicators, a hyper-technical reading of the original and revised dispute resolution processes could suggest the need to first present this dispute to the Special Master and Secretary for resolution.  However, in this instance defendants made their position regarding this dispute entirely clear, and the Special Master determined that, despite his high regard for the Secretary, using the dispute resolution process outlined in the Court's October 11, 2023 Order (ECF No. 8008) would be the most efficient use of judicial and taxpayer resources as well as the most expedient way to resolve this dispute.

[2] *See* May 24, 2023 Order, ECF No. 7847 at 12 ("[T]he main purpose of data remediation is to ensure the transparency and accuracy of defendants' mental health data reporting.") (citing *Golding I*, 424 F. Supp. 3d at 929).

[3] SP15.1 is considered an "extended" indicator because it was an indicator originally designed to measure requirements in CDCR's MHCB setting that has been "extended" to measure related requirements in the PIPs.  *See* ECF No. 7863 at 40-42.

Defendants' preferred approach to SP15.1/SP15.1E measures only if yard was offered but does not provide any insight into how frequently or for what duration of time yard was offered to patients in these settings. In other words, the defendants' proposed indicator would *not* measure the Program Guide requirement that "IPs admitted to the MHCB shall attend out-of-cell activities *consistent with their custody designation unless specifically restricted by the MHCB IDTT*." The Special Master's suicide prevention expert, Mr. Lindsay Hayes, has monitored this requirement by reporting the frequency and duration of weekly out-of-cell activities, most recently utilizing a ten-hour per week threshold, which is the minimum number of hours of out-of-cell time incarcerated persons at the highest custody levels must be offered under California regulations. 15 Cal. Code Regs. §3348.

In addition, the Special Master's experts had previously offered to combine SP15.1 (yard) with SP15.5 (dayroom), but the defendants did not agree, choosing instead to create two indicators to measure similar out-of-cell activities.

II.    Date Proposed Resolution was Delivered to the Parties

This proposed resolution was delivered to the parties on June 5, 2024.

III.    Special Master's Proposed Resolution

At minimum, the Special Master proposes that the documentation for SP15.1/SP15.E be modified to report the number hours of yard offered to each patient per week. At present, the documentation for these indicators only answers the question of where *any* yard time was offered, which is an inadequate substitute for the Special Master's suicide prevention expert's monitoring of this Program Guide requirement.

The Special Master also proposes that these indicators be designed to accommodate a minimum threshold for weekly yard time offered to patients in MHCBs and PIPs.[4] The Special Master and his experts have previously offered, and continue to recommend two options to measure the Program Guide requirement against a minimum threshold in this context: CDCR could either modify the indicator's language 1) to measure whether patients were offered clinically-approved yard on a weekly basis "consistent with the custody designation", or 2) to measure whether patients were offered clinically-approved yard at a minimum of ten hours per week.

Either of these options is sufficient to measure the relevant Program Guide requirement but the Special Master suggests utilizing the ten-hour threshold because it is most consistent with Mr. Hayes' recent monitoring and, compared to measuring against individual patients' custody designation, is more straightforward to operationalize from a monitoring perspective.  Moreover, ten-hours per week is a conservative threshold as it is based on the minimum number of hours that incarcerated persons at the highest custody levels are entitled to in CDCR institutions.

---

[4] The Special Master presents this proposed resolution on the merits of the dispute but acknowledges the resolution may be implicated by the Court's resolution of defendants' objections to the Special Master's suicide prevention expert, Mr. Lindsay Hayes' most recent suicide prevention re-audit report.  *See* ECF No. 8179 at 24, 29; April 8, 2024 Order, ECF No. 8192; *see also* ECF Nos. 8198, 8208, 8227, 8238, 8241, 8249.  With respect to the PIPs, it is important to note that the number of hours of out of cell activities offered to PIP patients may be impacted the resolution of plaintiffs' motion to modify the court's order regarding minimum treatment standards in the PIPs.  *See generally* ECF No. 8207.  Accordingly, it is imperative that these indicators be designed to accommodate any minimum threshold the court may establish.

IV.    <u>Brief Statement of Reasons for the Proposed Resolution</u>

*A. Background*

Mr. Hayes initially monitored the provision of out-of-cell activities according to the following limited guidance provided in the *Program Guide*: "Rehabilitation therapy may include activities such as indoor or outdoor recreation" for MHCB patients. Program Guide 12-5-14. Accordingly, Mr. Hayes's initial monitoring was limited to whether MHCB patients were *offered any out-of-cell time*, as well as included discussion regarding MHCB staff misinterpreting the *Program Guide* and prohibiting certain patients (e.g., those on maximum security and on suicide observation status) from being offered such privileges.

CDCR released its first "Mental Health Crisis Bed Privileges" memorandum on June 23, 2016 which stated, in part, that "Out-of-cell activity shall be assigned according to the IP's <u>designated custody level</u>." Several months later on February 14, 2017, CDCR released a slightly revised version of the "Mental Health Crisis Bed Privileges" which continued to state, in part, that "IPs admitted to the MHCB shall attend out-of-cell activities consistent with their <u>custody designation</u>[5] unless specifically restricted by the MHCB IDTT." ECF No. 7333-1 at 379.  These policies were repeatedly cited in Mr. Hayes's Second Reaudit report (ECF No. 5672 at 10-12), Third Reaudit Report (ECF No. 5994 at 13-15), and Fourth Reaudit Report (ECF No. 6879-1 at 16-19.

---

[5]Custody designation means Maximum, Close A, Close B, Medium, and Minimum custody. In theory, when a Minimum or Medium custody patient is admitted to the MHCB, they should be offered the same amount of yard time as an incarcerated person would be on the mainline. Unless restrictions exist, a mainline incarcerated person would normally be offered yard every day for several hours. On the other extreme, maximum custody IPs are required (pursuant to Title 15) to be offered a minimum of ten hours per week out of cell time.

Based upon the chronic problem of MHCB staff misinterpreting both *Program Guide* and MHCB privileges memoranda, rather than focusing on the number of hours of out-of-cell activities (OCA), much of Mr. Hayes' subsequent monitoring (2014 through 2019) continued to focus upon the basic premise as to whether all MHCB patients clinically-approved for out-of-cell activities (including maximum security and those on suicide observation) were consistently being offered such privileges.

Beginning with his Fifth Reaudit Report (2021-2022), Mr. Hayes began including a separate section in each facility assessment that addressed out-of-cell activities (OCAs), as well discussion regarding both the offering and <u>frequency</u> of OCAs (see e.g., RJD where the following was found: "Most 114-A forms that were reviewed indicated that yard was offered *on a daily basis* to MHCB patients," ECF No. 7636-1 at 185).

During the Sixth Reaudit,  Mr. Hayes began to measure against the "ten-hour" per week threshold to measure the adequate frequency of out- of-cell activities (see, e.g., CHCF where the following was found: "However, although all of the patients had been approved for out-of-cell activities by providers, almost none were offered yard and/or dayroom consistent with ten hours per week," ECF No. 8143-1 at 28). The "ten hours per week" threshold was derived from the current CDCR requirement that maximum security/RHU incarcerated persons were required to be offered a minimum of ten hours of yard per week. Consistent with the requirements of the above cited "Mental Health Crisis Bed Privileges" memorandum of February 2017 that MHCB patients "shall attend out-of-cell activities consistent with their <u>custody designation</u>," CDCR would be required to offer ten hours per week of out-of-cell activities for maximum security/RHU patients housed in the MHCB.  Therefore, it would be reasonable to expect that more hours of OCAs would be offered to MHCB patients who had custody designations lower

than maximum security/RHU. As a reasonable compromise for purposes of monitoring, Mr. Hayes had previously utilized the ten-hour per week threshold for patients of all security levels.

Finally, it is noteworthy that the defendants utilized this same ten-hour threshold for weekly yard and dayroom activities in its draft memorandum titled "Psychiatric Inpatient Program Minimum Offering of Unstructured Activity."[6]

B. *Analysis*

The Special Master acknowledges that CDCR's existing MHCB privileges memo does not include a specific minimum number of hours of out-of-cell activities that must be offered to MHCB patients. However, it is undisputed that CDCR must offer MHCB patients out of cell activities "consistent with their custody designation" unless restricted by the IDTT for clinical reasons. With respect to the PIPs, the question of a minimum standard for out-of-cell activities is before the court in the form of plaintiffs' motion to modify the court's order regarding minimum treatment standards in the PIPs. *See generally* ECF No. 8207.

Because the current design of SP15.1/SP15.1E only reports whether any yard time was offered to patients in MHCBs and PIPs, it results in neither an accurate nor transparent measurement of CDCR's satisfaction of the underlying remedial requirement that patients be offered yard and other out of cell activities "*consistent with their custody designation*." As currently constituted, the indicator renders the Program Guide requirement that patients be offered out-of-cell activities "consistent with their custody designation" a nullity.

In addition, the indicator's design must be reconciled with Mr. Hayes' monitoring in this area, which is not limited to assessing merely whether yard was offered, but also reports duration

---

[6]This draft memorandum was forwarded to the Special Master by CDCR's Office of Legal Affairs on February 24, 2024. See related discussion *supra* note 4.

and frequency of offered yard time per week as well as whether patients were offered a minimum of ten hours per week of out-of-cell activities.  *See* ECF No. 8143-1 at 28.

CDCR has options to more closely align SP15.1/SP15.1E's documentation with the underlying policy requirement (i.e., that patients be offered out-of-cell activities, including yard, consistent with their custody designation) as well as Mr. Hayes' monitoring practices, as required by the Court's orders.  *See* ECF No. 7847 at 7.

At minimum, the documentation for SP15.1 and SP15/1E must be modified to report the number hours of yard offered to each patient per week.  These indicators must also be designed to accommodate measurement against a minimum threshold, particularly in light of the Court's ongoing consideration of minimum treatment standards in the PIPs, which includes standards for out-of-cell time.

As noted, the Special Master and his experts have previously offered, and continue to recommend two options to measure this Program Guide requirement against a minimum threshold in this context: CDCR could either modify the indicators' language 1) to measure whether patients were offered clinically-approved yard on a weekly basis "consistent with the custody designation," or 2) to measure whether patients were offered clinically-approved yard at a minimum of ten hours per week.

Either of these options is sufficient to measure the relevant Program Guide requirement but the Special Master suggests utilizing the ten-hour threshold because it is most consistent with Mr. Hayes' recent monitoring and, compared to measuring against individual patients' custody designation, is more straightforward to operationalize from a monitoring perspective.  Moreover, ten-hours per week is a conservative threshold as it is based on the minimum number of hours that incarcerated persons at the highest custody levels are entitled to in CDCR institutions.

In addition, the Special Master again offers to reintroduce his expert team's previous recommendation to combine SP15.1 (yard) with SP15.5 (dayroom) into one indicator to measure out-of-cell activities.