DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:  (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:  (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
ADRIENNE SPIEGEL – 330482
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E**<br><br>Judge:  Hon. Kimberly J. Mueller |

[4514244.6]

## INTRODUCTION

Defendants' primary argument as to why the Court should not adopt the Special Master's proposal for SP10/10E (*See* Khabbaz Decl. **Exhibit 1** "Special Master Proposed Resolution")[1] is essentially that the indicator was already remediated through the normal process and therefore cannot be amended. *See* ECF No. 8273. Defendants do not attempt to dispute that the proposal relates to measuring something required and measured by the Special Master. Defendants' procedural objections should not bar necessary and appropriate monitoring of whether nursing staff asked all questions required during intake screening, especially as last year saw one of the highest suicide rates in CDCR. The Court should overrule Defendants' objections and adopt the Special Master's proposal.[2]

## I.   STANDARD OF REVIEW

"The Special Master is well-suited to resolve any disputes regarding whether and indicator must be modified to capture what he has monitored …." ECF No. 7847 at 8. Because "[h]is resolution of these disputes will be grounded in established facts of record concerning the scope of his monitoring and his knowledge of the requirements of all court orders in this action," the Special Master's data dispute decisions will be reversed only if they are clearly erroneous. *Id.* at 8-9. A finding is "clearly erroneous if, on review of the entire evidence, the reviewing court arrives at the firm conviction that the finding is mistaken." *In re U.S.A. Motel Corp.*, 450 F.2d 499, 503 (9th Cir. 1971); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court as more than just maybe or probably wrong; it must …

---

[1] Defendants failed to attach the Special Master Proposed Resolution for SP10/SP10E, so Plaintiffs have attached it to their briefing.

[2] Defendants also argue that the Court should defer ruling on the Special Master's proposed resolution related to this dispute because Defendants have related pending objections to Mr. Hayes' Sixth Re-Audit before the Court (ECF No. 8179). But as Plaintiffs recently explained in their response to Defendants' objections to the Hayes Sixth Re-Audit, the Court has previously overruled nearly identical objections, ECF No. 8282 at 55-56 (citing ECF No. 7696 at 20). The Court need not defer its ruling on this proposal pending the resolution of the objections of the Sixth Re-Audit, as the Court can decide based on the existing record whether the reporting proposed by the Special Master is required.

[4514244.6]

1

strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." (internal citations and quotation marks omitted)). The objecting party has the burden of proving clear error. *See Oil, Chemical & Atomic Workers Int'l Union v. N.L.R.B.*, 547 F.2d 575, 580 (D.C. Cir. 1976).

## II. THE SPECIAL MASTER'S FINDINGS ARE NOT CLEARLY ERRONEOUS AND HIS RECOMMENDATION IS FULLY SUPPORTED

Defendants have not proven clear error in the Special Master's finding that SP10 and SP10E must be modified "to include measurement of the completeness of the initial screening (i.e., whether all required questions were asked by nursing staff)" because the current scope does not align "with the Special Master's suicide prevention expert's (Mr. Lindsay Hayes') monitoring practices." Special Master Proposal at 2.

Defendants do not substantively dispute the Special Master's claim that the indicator as currently designed does not align with his suicide prevention expert Lindsay Hayes's monitoring. As the Special Master notes, and as the record reflects, Mr. Hayes audits both the adequacy of confidentiality in the process and the adequacy of the intake screening form and completeness of the intake process. Special Master Proposal at 3. This includes whether nursing staff asked all of the questions required on intake screening form.[3] *Id.* at 3. At present, SP10/10E only measures whether the screening was confidential, omitting an essential part of compliance. *Id.* at 7. That is clearly insufficient under this Court's orders. *See* ECF No. 7847 at 7 ("Each key indicator must substantively

---

[3] Notably, the requirement in question is one with which CDCR has persistently struggled to comply. For example, Mr. Hayes found in his first audit that staff were "failing to ask all of the required questions." ECF No. 5259 at 5 (adopted in full by ECF No. 5271). His third re-audit found one institution used an "abbreviated" screening in contravention of policy. ECF No. 5993-1 at 5 (adopted in full by ECF No. 6212). His fifth re-audit noted "problems continued to be found with accurate completion of all … questions on the form." ECF No. 7636-1 at 12 (adopted in full by ECF No. 7696). And in his most recent sixth re-audit, pending before the court, Mr. Hayes found "there continue to be multiple audited facilities in which nurses did not always ask all 15 mental health/suicide risk questions on the Initial Health Screening form. ECF No. 8143 at 9. Particularly at a time when Defendants' suicide rate for 2023 was among the highest on record, *see* ECF No. 8282 at 7, it is critically necessary that Defendants be required to measure and report on this important suicide prevention measure.

1  track the areas the Special Master has monitored so that the court can assess defendants'
2  compliance with the Eighth Amendment … Thus, each key indicator must be designed and
3  operationalized to accurately capture the corresponding information gathered and reported
4  on by the Special Master as part of his monitoring responsibilities."); *see also id.* at 7
5  (CQIT key indictors should "replicate" the Special Master's monitoring).

6        The Court's orders therefore clearly require Defendants to measure this require-
7  ment. The only question, then, is when and how.  Plaintiffs are aware of three possibilities:
8  (1) accept that the existing design of SP10/10E has been remediated but does not conform
9  to the Court's requirements, and thus must be revised to do so as part of the yet-undefined
10 annual review process, (2) require Defendants to create a new indicator, or (3) adopt the
11 Special Master's recommendation that SP10/10E be modified to measure and report on the
12 required information.  *See* Special Master Proposal at 7.

13       Option three, as the Special Master recommends, most efficiently achieves the
14 parties' and Court's shared desire to conclude the data remediation process expeditiously
15 while not losing sight of the need to get the indicators substantively right.  *See* ECF No.
16 8273 at 7.  Option one merely kicks the can on work that unquestionably must be done to
17 accurately measure the suicide prevention requirements Mr. Hayes audits.  It also subjects
18 this important indicator to a process that is not yet defined and as to which the stakeholders
19 disagree on the contours and appropriate process.  Option two would require unnecessary
20 work to create a new indicator, including preparation of documentation, BRMR discus-
21 sions, and the other steps of the verification and validation process.  That would only delay
22 the process, even though all parties have agreed the suicide prevention indicators are their
23 top priority for remediation.

24       Option three is clearly the most efficient resolution.  The addition suggested in the
25 Special Master's proposal will not be burdensome, nor do Defendants claim it will be.  The
26 indicator in question is built on information gathered from an in-person audit that already
27 requires in-person observation of R&R initial health screenings, and Defendants admit
28 they already gather the necessary information as part of their SPRFIT audit (ECF No. 8273

[4514244.6]

3

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E

1  at 6 (citing ECF No. 8179 at 28-38))—they just refuse to report on it as part of CQIT

2  because it is a "separate requirement[]." *See* ECF No. 8273 at 2.  That is a distinction

3  without a difference.  Given CDCR has asked this Court to rely on its SPRFIT audits in

4  lieu of Mr. Hayes's auditing findings (ECF No. 8179 at 10), CDCR's refusal to subject

5  their existing audit that assesses whether nursing staff are asking all necessary intake

6  screening questions to the rigor of the data remediation process makes no sense.  While

7  minor modifications will be necessary to the indicator itself to report on compliance, it

8  would certainly be less work than building an entirely new indicator and more expeditious

9  than deferring the same work required to modify SP10/10E to the annual review process.

10  Indeed, while Defendants complain the Special Master's requested changes to

11  SP10/10E are too late in the process, there is no question the existing process is extremely

12  complex and requires some flexibility from all parties to reach the right result.  After all,

13  Defendants themselves in November 2023 decided to re-do two indicators, one of which

14  had previously been declared fully remediated based on comments from the Special Master

15  in order to expand the indicators to align with their audit requirements.  *See* Khabbaz Decl.

16  ¶ 3, **Exhibit 2**.  And Defendants have agreed to make revisions requested by the Special

17  Master late in the process in other contexts, including in response to the Court's order to

18  remediate 41 pending indicators.  *See* Khabbaz Decl. ¶¶ 4-5 (Defendants agreed to make

19  requested changes to the already-remediated non-PIP versions of some indicators on that

20  list); *see also* ECF No. 8181 at 4.  Their refusal to do so here, when the changes are very

21  clearly necessary to conform the key indicator to Mr. Hayes's audit, merely causes

22  additional unwarranted delay that cannot be reconciled with Defendants' stated desire to

23  conclude the data remediation process as fast as possible.

24  Finally, Defendants recitation of their version of the SP10/10E discussions appears

25  to be insinuating that the Special Master waived his requested changes.  ECF No. 8273 at

26  4-5; Cartwright Decl. ¶¶ 6-7.  Assuming arguendo the Special Master, who is tasked with

27  ensuring compliance with this Court's orders, can even be said to have waived his

28  obligation to do so, that did not happen here, and Defendants cannot establish the requisite

[4514244.6]  4

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E

1  clear error to show that it did.  The Special Master's report makes clear his team repeatedly
2  and specifically asked that the completeness of the intake screening be captured and
3  reported on in a key indicator—SP10/10E, or elsewhere—and did not receive a clear
4  answer.  Special Master Proposal at 4-6.  Those discussions spanned back to 2021, when
5  the scope of the full slate of key indicators and what they would measure was completely
6  opaque and indeed unknown, and when the data remediation process itself was still being
7  formulated.  And the parties' agreement to decommission the indicator purporting to
8  measure "Percentage of Observed R&R Screens with Correct Documentation Used" was
9  predicated on the Special Master's and Plaintiffs understanding that this was because the
10 indicator in question measured use of an obsolete form—not that they were agreeing not to
11 measure the completeness of the nursing screening.  Special Master Proposal at 6; *see also*
12 ECF No. 7863 at 38.  Even if Defendants' recitation of the relevant history was correct that
13 the parties knowingly agreed SP10/10E would not measure completeness of the audit, all it
14 establishes is that a new indicator must be built to do so.  As the Special Master reports, at
15 no point in the data remediation process did Plaintiffs or the Special Master concede that it
16 would be acceptable to not measure whether all the questions were asked during intake
17 screenings at all, even if Defendants are correct that the parties agreed it would not be in
18 SP10/10E.  Special Master Proposal at 6.

### III.   THE COURT SHOULD ADOPT THE SPECIAL MASTER'S PROPOSAL AS TO SP10E

21        Defendants claim that the dispute as it relates to the extended version of the
22 indicator, SP10E, is not ripe for resolution.  ECF No. 8273 at 8.  But, according to its
23 objections, CDCR is currently looking into changes to SP10E that are unrelated to the
24 Special Master's proposal.  Notably, Defendants do not represent that in doing so they will
25 also modify the indicator to measure the completeness of the intake screening.
26        It is ironic that CDCR simultaneously argues in its objections here that remediated
27 indicators should be precluded from the dispute resolution process but that an indicator
28 pending remediation is too ripe for the dispute resolution process.  But their objection as to

SP10E should be overruled regardless.  The proposal from the Special Master is that CDCR must measure whether all the intake screening questions are asked for everyone who receives a screening: PIP or non-PIP.  Whether CDCR will be able to separate this data will not affect the resolution; if the Court rules that CDCR must measure this requirement, they can work out how the information is presented.

## CONCLUSION

The Court should overrule Defendants' objections and adopt the Special Master's proposal requiring CDCR to modify SP10/10E to measure the completeness of the intake screenings by reporting whether all required questions were asked.

## CERTIFICATION

Plaintiffs' counsel certifies that she reviewed the following orders in preparing this filing: ECF Nos. 5271, 6212, 7847, 7696, 8008, 8181.

DATED:  June 20, 2024              Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Luma Khabbaz*
    Luma Khabbaz

Attorneys for Plaintiffs

[4514244.6]

6

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E