1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:   (510) 280-2621

5   CLAUDIA CENTER – 158255
    DISABILITY RIGHTS EDUCATION
6   AND DEFENSE FUND, INC.
    Ed Roberts Campus
7   3075 Adeline Street, Suite 210
    Berkeley, California  94703-2578
8   Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
ADRIENNE SPIEGEL – 330482
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

11  Attorneys for Plaintiffs

12

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16  RALPH COLEMAN, et al.,

17              Plaintiffs,

18       v.

19  GAVIN NEWSOM, et al.,

20              Defendants.

21

22

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF LUMA KHABBAZ IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E**

Judge:   Hon. Kimberly J. Mueller

23

24

25

26

27

28

[4515174.3]

DECL. OF LUMA KHABBAZ ISO PLS.' RESPONSE TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S
PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E

1     I, Luma Khabbaz, declare:

2     1.     I am an attorney duly admitted to practice before this Court.  I am an

3 associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4 Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a

5 witness, I could competently so testify.  I make this declaration in support of Plaintiffs'

6 Response to Defendants' Objections to Special Master's Proposed Resolution of Data

7 Remediation Dispute Re SP10/10E.

8

9     2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Special

10 Master's Proposed Resolution of Data Remediation Dispute regarding SP10/SP10E, which

11 Defendants omitted from their objections to the proposed resolution.

12     3.     On November 27, 2023, Sundeep Thind, counsel for Defendants, sent

13 Plaintiffs and the Special Master team an email with the subject line: "Coleman: CDCR's

14 Proposal for SP14: MHCB Records with Rationale for Limited Issue & SP13 Observation

15 Orders Reviewed That Are Properly Documented."  Attached as **Exhibit 2** is a true and

16 correct copy of this email.  In the November 27, 2023 email, Ms. Thind noted that

17 although the Special Master's data expert Dan Potter had declared SP14 "fully remediated"

18 in September 2022, CDCR later agreed to make significant changes to the indicator based

19 on later feedback from the Special Master's team, and also decided to "redo the docu-

20 mentation" for that indicator and SP13 to align the audit questions for both of those

21 indicators with the Special Master's recommendations.  Ms. Thind stated that "SP13 and

22 SP14 will need to restart data remediation and go through all steps of the process—from

23 start to finish, including validation, reprogramming, and verification—again."

24     4.     After the Court ordered the Special Master to "take all steps necessary" to

25 mark 41 indicators as remediated by April 25, 2024, *see* ECF No. 8181 at 7, the Office of

26 the Special Master sent Plaintiffs and Defendants spreadsheets with their comments on the

27 status of each of the indicators.  These spreadsheets also solicited comments from

28

[4515174.3]

DECL. OF LUMA KHABBAZ ISO PLS.' RESPONSE TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S
PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E

Plaintiffs and responses by Defendants. I reviewed the Special Master's and Defendants' comments and worked on the comments we inserted into the spreadsheet.

5.      Among the 41 indicators were some indicators that were the extended PIP versions of indicators that Dr. Potter had already marked as remediated. For some indicators, the Special Master requested changes to be applied to the remediated original indicator as well as the extended one. CDCR accepted changes to 14 remediated indicators requested by the Special Master during this process. For five remediated indicators, CDCR agreed to take the Special Master's suggestion as an improvement idea for the annual review process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 20th day of June, 2024.

*/s/ Luma Khabbaz*
Luma Khabbaz

[4515174.3]

2

DECL. OF LUMA KHABBAZ ISO PLS.' RESPONSE TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S
PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE RE SP10/SP10E

# Exhibit 1

**Special Master's Proposal[1] for Resolving Data Remediation Dispute: SP10/10E (Percentage of Observed R&R Screens in Confidential Setting)[2]**

I.    Brief Statement of Dispute

This dispute relates to the scope of the provisionally approved indicator originally titled "Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used." *See supra* note 2. Specifically, defendants currently refuse to modify the indicator to report whether the nursing staff performing intake screening asked all mental health/suicide risk questions on the intake screening form. This dispute applies both to intake screening in the outpatient (SP10) and psychiatric inpatient program (PIP) (SP10E) settings.

II.    Date Proposed Resolution was Delivered to the Parties

This proposed resolution was delivered to the parties on June 5, 2024.

---

[1] This proposed resolution is made in accordance with the Court's October 11, 2023 Order modifying the data remediation dispute resolution process. ECF No. 8008 at 2. Step one of the original dispute resolution process provided that disputes related to already remediated indicators would be submitted directly to the Special Master and CDCR Secretary for resolution. *See* ECF No. 7556-2. The Court's October 11, 2023 order modified the original dispute resolution process to eliminate steps between the unsuccessful discussions in BRMR and the Special Master's recommendation to resolve the dispute, including removing the Secretary from the process. *See* ECF No. 8008 at 2 (removing step two of the dispute resolution process). With respect to disputes regarding remediated indicators, a hyper-technical reading of the original and revised dispute resolution processes could suggest the need to first present this dispute to the Special Master and Secretary for resolution. However, in this instance defendants made their position regarding this dispute entirely clear, and the Special Master determined that, despite his high regard for the Secretary, using the dispute resolution process outlined in the Court's October 11, 2023 Order (ECF No. 8008) would be the most efficient use of judicial and taxpayer resources as well as the most expedient way to resolve this dispute.

[2] The related provisionally approved indicator was entitled "Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Document Used." ECF No. 7151 at 22. The stakeholders subsequently agreed to incorporate 'reception centers screens' into a separate indicator, and this indicator was then revised to "Percentage of Observed R&R Screens in Confidential Setting and Correct Documentation Used."

III.    <u>Special Master's Proposed Resolution</u>[3]

In order to align the scope of this provisionally approved key indicator with the Special

Master's suicide prevention expert's (Mr. Lindsay Hayes') monitoring practices,[4] the Special

Master proposes CDCR modify SP10 and SP10E[5] to include measurement of the completeness

of the initial screening (i.e. whether all required questions were asked by nursing staff).

While a new indicator measuring the completeness of the initial screening process would

satisfy the Special Master's substantive concerns as to the scope of the indicator matching Mr.

Hayes' monitoring, the inefficiency of creating a separate indicator would not promote the goal

of "ensur[ing] timely completion of [data] remediation."  ECF No. 8181 at 6.

IV.    <u>Brief Statement of Reasons for the Proposed Resolution</u>

*A.  Mr. Hayes' Monitoring Practices Related to Intake Screening*

As indicated above, the Special Master's proposed resolution is required to align the

provisionally approved key indicator in question with Mr. Hayes' monitoring practices and, thus,

---

[3] The Special Master presents this proposed resolution on the merits of the dispute but acknowledges the resolution may be implicated by the Court's resolution of defendants' objections to the Special Master's suicide prevention expert, Mr. Lindsay Hayes' most recent suicide prevention re-audit report (ECF No. 8143-1).  *See* ECF No. 8179 at 24, 29; April 8, 2024 Order, ECF No. 8192; *see also* ECF Nos. 8198, 8208, 8227, 8238, 8241, 8249.

[4] *See, e.g.*, May 24, 2023 Order, ECF No. 7847 at 7 ("CQIT's purposes are to accurately measure remedial requirements and transition monitoring from the Special Master to defendants.  Each key indicator must substantively track the areas the Special Master has monitored so the court can assess defendants' compliance with the Eighth Amendment.  The business rules for each key indicator must be written so that the court can rely on defendants' data in assessing their compliance.  Thus, each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities.").

[5] SP10E is considered an "extended" indicator because it was an indicator originally designed to measure requirements in CDCR's outpatient mental health setting that has been "extended" to measure related requirements in the inpatient programs (i.e. CDCR's PIPs).  *See* ECF No. 7863 at 40-42.

to ensure the indicator is "designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities."  May 24, 2023 Order, ECF No. 7847 at 7.

Mr. Hayes' original audit of 2013-2014 focused on two aspects of intake screening: "1) the adequacy of the intake screening form and the completeness of nursing staff's conduct of the intake process, and 2) the adequacy of privacy and confidentiality during the process" (ECF No. 5259 at 9, adopted in full by ECF Nos. 5271 and 6973.)

Mr. Hayes' original audit report included four recommendations: revision of the "Initial Health Screening form (CDCR Form 7277) . . . to omit compound questions and include separate direct questions" (Recommendation 5, see ECF No. 6879 at 15), requiring intake screening to "be conducted only in the nurse's office within an R&R unit" (Recommendation 6, id. at 17), and the current recommendations 7 and 8, which measure adequacy (i.e., completeness) of intake screening (Rec. 7) in a confidential environment (Rec. 8).

From the time of the first audit and continuing through the most recent Sixth Re-audit, Mr. Hayes has always reported on whether nursing staff asked all of the questions required on intake screening.[6] Mr. Hayes' Fifth Reaudit Report expressly tied the accurate completion of all

---

[6] *See* ECF No. 5259 at 11 ("[d]uring this reviewer's observations of the intake process at several prisons, nurses often asked inmates only whether they had previously attempted suicide, but not whether they were currently suicidal") (emphasis in original); ECF No. 5396 at 6 ("[e]arlier audits by this reviewer found that nursing staff were not always asking all intake questions as required"); ECF No. 5671-1 at 4 ("[p]roblems found in [two] facilities . . . included observations of nursing staff not asking all of the screening questions related to mental health and suicide risk. . . "); ECF No. 5993-1 at 5 ("[a]t DVI, this reviewer observed a nurse failing to ask all of the mental health and suicide risk questions during the intake screening process. When asked why all the questions were not asked, this reviewer was informed by the nurse that an "abbreviated" screening was completed if the county transfer form did not include any documentation of prior mental health or suicide history. Such a response was problematic for several reasons: CDCR policy required that all questions be asked; an individual could certainly become suicidal following their county jail confinement and transfer to CDCR; and despite not asking all of the

required intake screening questions to Recommendation 7 (ECF No. 7636-1 at 12). The court has adopted in full the relevant findings and recommendations in each of Mr. Hayes' reports. *See* ECF Nos. 5271, 5429, 5762, 6212, 6973, 7696.

Notably, defendants have historically acknowledged that Mr. Hayes' suicide prevention recommendations include the requirement that nursing staff accurately complete intake screening forms. *See, e.g.*, ECF No. 6898 at 7 (requesting that Mr. Hayes break down compliance information for Recommendations 6, 7, and 8 into three areas, including "quality of administering the screening question); ECF No. 7654 at 7 (arguing that "isolated and de minimus occurrence[s]" of nursing failure to complete the intake screening form "cannot equate to institutional noncompliance, much less systemic noncompliance."). In fact, review of the defendants' SPRFIT regional coordinator reports demonstrates that CDCR is currently auditing whether nursing staff are asking all mental health/suicide risk questions on the intake screening form. As such, the rationale for defendants' continued opposition to this reasonable modification remains unclear.

### B. Stakeholders' Consideration of this Provisionally Approved Key Indicator

The stakeholders' consideration of this indicator began as early as a September 8, 2021 BRMR meeting, during which the Special Master's data expert identified the need for the indicator to measure both confidentiality of the screening process and whether all of the intake

---

required questions, the nurse entered "no" to all mental health and suicide risk responses in the EHRS for the screened inmates observed by this reviewer.'); ECF No. 6879-1 at 8 (nurse at CMF "observed to be conflating most of the questions regarding mental health and suicide risk"); ECF No. 7636-1 at 12 ("[p]roblems associated with accurate completion of the Initial Health Screening form . . . have not been resolved, problems continued with accurate completion of all 15 mental health suicide risk inquiry questions of the form (Recommendation 7)").

screening questions had been asked.  CDCR staff represented that they would research the issue and bring it back.

In written comments on the indicator provided to defendants on October 12, 2021, the Special Master's data team again questioned why the indicator was limited to measuring confidentiality and did not include "measuring quality/completion of the MH Screen?"  *See* Exhibit A at 1.

In subsequent written comments, dated May 6, 2022, on a later iteration of the indicator, the Special Master's data team again asked if the indicator was limited to confidentiality or whether it "also include[d] completeness of the nursing screening?"  *See* Exhibit B at 1.  The Special Master's data team specifically asked, if SP10 was in fact only intended to measure confidentiality, "will there be another indicator or indicator(s) that covers" the completeness of the screening (i.e., whether all 15 questions were asked)."  *Id.*

 On a parallel track to the stakeholders' consideration of SP10, the Special Master's data team and defendants were also working to reconcile their respective understanding of the scope of the provisionally approved indicators.  In written comments from January 2022, regarding the so called "key indicator crosswalk," the Special Master's data team again indicated that measurement of the adequacy of reception center (RC) and receiving and release (R&R) screens must account for "timeliness, *completeness*, and privacy/confidentiality."  While CDCR noted that Timely R&R screens was not one of the department's then-existing indicators, they did not object at that time to the Special Master's identification of the need to measure *completeness* of the various screens conducted in RCs and R&R.  *See* Exhibit C at 15.

Finally, in the first of a series of letters exchanged between the parties regarding decommissioning certain indicators as duplicative or obsolete in late 2022-early 2023, CDCR reported that the "Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used" would be split into three indicators: "1. Percentage of Observed Reception Center MH Screens in Confidential Setting; 2. Percentage of R&R Screens in Confidential Setting; and 3.  Percentage of Observed R&R Screens *with Correct Documentation Used*."  CDCR recommended decommissioning the "correct documentation used" prong of this split indicator because "it pre-date[d] EHRS implementation."  *See* ECF No. 7863-1 at 60-61.

However, nowhere in defendants' correspondence, nor in related business rules and methodology review (BRMR) discussions, did CDCR disclose that their decision to decommission a specific, obsolete audit component (i.e., whether the correct *paper* form was used) would preclude measurement of the completeness of the nursing screening.  Nor did the Special Master's data team ever agree to forego measuring this material component of Mr. Hayes' auditing.[7]

 Notwithstanding all of the above, SP10 advanced to the latter stages of the remediation process without measuring the completeness of the nursing screen component of this remedial requirement.

---

[7] In a May 7, 2024 letter, defendants represented that the 2022 BRMR discussions resulted in an agreement among the stakeholders that "whether all questions were asked" would not become part of SP10.  *See* Exhibit D at 7.  The Special Master, his suicide prevention expert, and his data team have a different understanding of those discussions.   While there were discussions about limiting this indicator's scope to confidentiality, the Special Master's data team never agreed to cease measuring completeness of the nursing screens; to do so would substantially deviate from Mr. Hayes' historic auditing practice and, thus, run afoul of the Court's guidance regarding the purpose of scope of data remediation.  *See, e.g.*, May 24, 2023 Order, ECF No. 7847 at 7.

In conclusion, a critical component to any suicide prevention program is ensuring that all screening questions are asked in a confidential environment. It would be illogical to only measure confidentiality without completeness as to whether all screening questions were asked. Mr. Hayes has been consistently measuring the defendants' ability to provide both confidentiality and completeness of screening since 2013. The originally revised indicator agreed to by the stakeholders was titled "Percentage of Observed R&R Screens in Confidential Setting *and Correct Documentation Used*." Consistent with Mr. Hayes's monitoring, review of CDCR's SPRFIT regional coordinator reports reveals CDCR is currently auditing both confidentiality *and* whether nursing staff are asking all mental health/suicide risk questions on the intake screening form. The Special Master is simply requesting that the Court order a correction to the omission of a material aspect of what Mr. Hayes monitors by revising SP10 and SP10E so that these indicators measure both confidentiality and completeness of the intake screening process in both the outpatient and inpatient settings.

As noted above, while a new indicator measuring the completeness of the initial screening process would satisfy the Special Master's substantive concerns as to the scope of the indicator matching Mr. Hayes' monitoring, the inefficiency of creating a separate indicator would not promote the goal of "ensur[ing] timely completion of [data] remediation."  ECF No. 8181 at 6.

# EXHIBIT A

**Comments for CQIT Items Provided for Review on 10/5/2021**

Response Due 10/12/2021

**Rule - Observed Reception Center MH Screens in Confidential Setting**

**KPI - Percent of RC MH Screens In Conf Setting**

- Why is this measurement solely limited to 'observing the confidential setting'?

- Similar to the SRASHE audit, why is this not measuring quality/completion of the MH Screen?

- CDCR's "Reception Center Suicide Prevention Reporting Expectations," effective January 27, 2021, requires that RC clinicians 1) review the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS prior to completing the RC screen; 2) request inmates sign ROI forms; and 3) complete SRASHEs when appropriate.

- Why are these requirements not part of CAT?

- If the 'confidential setting is being audited, it should include another requirement of 'were suicide prevention placards displayed in designated areas' of the confidential setting.

**Rule - Quality of Selected SRASHE Documentation**

**KPI - Quality of Selected SRASHE Documentation**

- It looks like the scoring is only using the data for questions 1-3 (as defined in the "Numerator" box) and those would total to 11 points. So in order to pass, the only item that can be missed is the inclusion of protective factors (worth 1 point). All the others are worth 2 points or no points. Yet in the pop up for "Quality of Selected SRASHE Documentation" the narrative under the heading "Memo: REVISION TO THE SUICIDE RISK EVALUATION MENTORINGN PROGRAM 3/15/2016" says "When an SRE is determined, by either audit process, to not meet standards (defined as "no" on two or more items)..." so if someone missed two items, the highest score they could have would be an 8 (3 points missed) which is not 10 points. This is conflicting information.

  o Additionally, if they scored 8 out of 11 possible points, that would be a passing score of 72.7%

- Why is question #5 not included in the overall scoring? Is it measured somewhere else? What's the total number possible for question #5 (i.e., how many "steps" are scored)?

- In the pop out there is discussion about how staff should determine risk. Is there any assessment of whether that determination was a reasonable one? The audit looks to see if staff included discussion of the various factors, but not whether or not they considered these factors appropriately. This is often a problem.

- In the exclusions section – why are these staff not audited? Seems that it would be important to audit all SRASHEs being completed by current staff, especially those done by psychiatrists and

PIP staff. I can understand not including staff who have left the facility, but only if they are no longer employed by CDCR.

- This item measures quality of SRASHE, but is there another item that measures if a SRASHE was completed as required, i.e., when emergent/urgent referral received for SI, SI, or SA?

- Under Exceptions, why are 'line staff who do not routinely complete SRASHEs being excluded? - these are exactly the clinicians who need to be included; why are psychiatrists being excluded? - they should not receive a free pass because of their non-compliance with policy; why are supervisors excluded - they are required to review completed SRASHEs, as well as conduct CAT audits; why are PIP clinicians excluded?

- The SRASHE is currently being revised in another workgroup. How will this revision effect this CAT?

- "Exception" section. Why are staff listed in # 1 through 4 excluded from the sample? I would think these would be staff who should be included as they are line staff who do not usually complete a SRASHE, specialist or supervisors who do not usually complete a SRASHE, psychiatrists, and PIP staff. By excluding these staff the audit is not a true reflection of the system, but a hand picked subset of staff, which could inflate compliance.

**Data Element - CAT #7**

- The following may or may not apply…but any ability to change the language in the CAT tool, item 2 regarding details of previous suicide attempts…if not outside the scope of this review, I'd suggest adding wording that says, "…are <u>sufficient</u> details of the previous attempt provided?

- Should question #4 also ask if the Safety Plan was completed if clinically indicated?

- Why is #4 not scored?

- No. 1: There should be another question to address situation in which patient <u>refuses</u> the SRASHE, such as was SRASHE completed without participation? Was patient placed on suicide observation based upon refusal? etc.

- No. 5: Safety planning is being revised and the seven-step SPI is being eliminated. Therefore, the tool will need to be revised.

# EXHIBIT B

# KPI:

## Percentage of Observed ~~R&R Screens~~ <u>Initial Health Screenings</u> in a Confidential Setting

~~Draft saved 3/12/2022~~

## Summary

Percentage of observed ~~Receiving and Release (R&R)~~ <u>Initial Health</u> <u>Screenings</u> ~~screens~~ that were conducted in a confidential setting.

| Numerator | Denominator |
|---|---|
| The sum of the number of "yes" responses entered in the following question in <u>CQIT Audit: R & R Screens</u> from the denominator:<br><br>• Was the screen conducted in a confidential setting ~~unless there is a safety risk that requires an officer in proximity?~~<br><br> | The sum of the number of completed <u>CQIT Audits: R&R screens</u> audits during the on-site review period |

## Component Business Rules

Observed ~~R&R screens~~ <u>Initial Health Screenings</u> in a confidential setting

## Reporting Location

The institutions and placement where the CQIT audit was completed

## Pop-up

<u>Click here for general pop up information</u>
KPI specific pop up information: TBD

## Release Note

There is no relevant release note on or after Release Note 15.0

Commented [PD1]: SM-LH Question: What is the scope of what is measured and reported with this indicator?

I.e., is this indicator limited to confidential, or also include completeness of the nursing screening? If not, will there be another indicator or indicator(s) that covers this?

Do auditors check if suicide prevention posters are displayed inside the nurse's office?

Does the auditor check to see if the correct EHRS records are also entered as part of the completeness question?

Commented [LY2R1]: Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

Commented [LY3]: 6/27/2022: per QAC recommendation, change R&R screen to the actual screen name. changing made after this went through SM/SH review.

Commented [PD4]: SM-DP Potential Barrier: Stakeholders need access to pre and post SH, BRMR, CAPC word documents, including comments.

Commented [LY5R4]: Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

Commented [LY6]: add "s" on screening

Commented [LY7R6]: done

Commented [PD8]: SM-LH Possible Barrier: There should not be 'a safety reason that requires an officer in proximity." Facilities were previously informed during SM's suicide prevention assessments that they were to install TTMs in nurse's offices for safety reasons. The door should always be closed and the officer on the outside.

Given this should, "unless there is a safety risk that requires an officer in proximity" be struck from the question?

Commented [LY9R8]: bring back re: safety (see below)

Commented [LY10R8]: Comment resolved at BRMR: all questions/comments addressed, all changes applied to the SPO document

+CQIT change

Commented [WJ11]: PL-JW - Improvement Idea: Consider linking the Glossary term definition here so stakeholders can easily follow the link to find out what "placement" means.

Commented [LY12R11]: Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document at this time

+ will change when placement page is approved and built

**Additional Information**
Refer to ~~CQIT Guidebook (Version 2.3.22)~~CQIT Guidebook (Version 6.30.22) for additional information on the audit, including sampling requirements.

> **Commented [WJ13]:** PL-JW - **Barrier:** See below comment re: lack of information in Guidebook about sampling methodology.
>
> **Commented [LY14R13]:** see below

**Rationale**
None

**Known Issues**
None found

**Potential limitations**
None

**Verification**

**FAQs**

[CAPC] **Approval Date**

The date the KPI was approved by the Mental Health Change Committee (CAPC: Change Advisory Prioritization Committee)

| **Observed ~~R & R screens~~ Initial Health Screenings in a Confidential Setting (501220)** |
|---|
| **Category** |
| Suicide Prevention |
| Observed ~~R & R Screens~~ Initial Health Screenings in a Confidential Setting |

| **Links** |
|---|
| Performance Report |

EDA Result

# BR:

# Observed ~~R & R Screens~~ Initial Health Screenings in a Confidential Setting

~~Draft saved 3/15/2022~~

**Commented [PD15]:** SM-DP Potential Barrier: Stakeholders need access to pre and post SH, BRMR, CAPC word documents, including comments.

**Commented [LY16R15]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

| Observed ~~R & R screens~~ Initial Health Screenings in a confidential setting |
| --- |
| **Effective Period** |
| TBD |
| **First Release Date:** |
| N/A |

| Links |
| --- |
| KPI Link |
| Workflow Link |
| On Demand Homepage Link |

## Overview

Measurement of ~~Oo~~observed ~~Receiving and Release (R&R) screens~~ Initial Health Screenings in a confidential setting.

**Commented [PD17]:** SM-DP Consistency: BR's do not usual mention percentages. Suggest "Observed Receiving and Release (R&R) screens in a confidential setting"

**Commented [LY18R17]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

## Policy

**MEMO 2/7/2020 CLINICAL CONTACTS AND DOCUMENTATION**

A confidential setting affords confidentiality of sight and sound from other inmates and confidentiality of sound from staff members per the confidentiality guidelines in the Mental Health Services Delivery system Program Guide 12-1-12

Memo:  10/7/2015 EVALUATIONS IN PRIVATE AND CONFIDENTIAL SETTINGS

The purpose of this memorandum is to remind institutions all health screenings and evaluations, including emergency mental health evaluations, shall be conducted in a private confidential setting that affords confidentiality of sight and sound from other inmates and staff members.  When evaluations are conducted in an area where other inmates and staff hear the evaluation, inmate-patients (IPs) are less likely to disclose pertinent information that may impact treatment decisions.  Private settings encourage full disclosure and open candid responses from IP's.

MHPG (2021) 12-2-4 Reception Center Mental Health Assessment

C. PROCEDURES TO IMPLEMENT POLICIES

1. Initial Health Screening of Inmates at Receiving and Release
All inmates arriving at a RC shall be interviewed utilizing a standard set of questions (CDCR 7277, *Initial Health Screening*) regarding their medication needs or need for immediate referral for crisis care under the supervision of a Registered Nurse (RN). Medical staff or equivalent staff trained in the procedures for the standardized health screening and mental health referrals, shall review available documentation from committing jurisdictions regarding mental health treatment. This includes a

**Commented [PD19]:** TR-improvement idea.  The policy referenced is for RC patients, while that limitation is not noted anywhere else in this indicator.  It needs to be stated very clearly that this indicator includes all R&Rs and arrivals of patients at all institutions.

**Commented [LY20R19]:** Comment resolved at BRMR: all questions/comments addressed, all changes applied to the SPO document

~~review of medications provided at County facilities or observed behavior that may indicate a need for mental health treatment.~~

~~This interview shall be conducted in an environment which is sufficiently private and confidential to encourage full disclosure and open, candid responses. Inmates who are unable to speak English shall be provided with necessary interpreters. Where a need for emergency or urgent psychiatric review is identified, a direct referral to a psychiatrist shall take place, utilizing a standard CDCR 128-MH5, *Mental Health Referral Chrono.*~~
~~The original 128-MH5, *Mental Health Referral Chrono,* shall be sent to the psychiatrist and a copy to the mental health office for data entry and filing. These Chrono's should be hand delivered or this information relayed by telephone, if necessary. Emergency referrals shall be made and responded to immediately. Urgent referrals, including medication assessment or review, shall be responded to within 24 hours. Observation of possible mental health symptoms not requiring emergency attention may also be documented on a staff referral chrono and forwarded to the mental health office within the next working day. Clinical evaluation and health transfer information from committing counties relating to a need for medical or mental health care or assessment are to be placed in the inmate's Unit Health Record (UHR).~~

## Rule Population
All inmates that receive an ~~R & R screen~~ Initial Health Screenings.

## Trigger
Completion of  CQIT Audit: ~~R & R Screens~~

## Exception
None

## Suspending Events
None

## Fulfillment
Completion of CQIT Audit: R & R Screens

**Commented [WJ21]: PL-JW - Question/Possible Barrier:** This Rule Population assumes that all individuals who arrive at R&R have a screen completed. Is there a separate KPI that measures whether, indeed, all individuals who arrive at R&R are screened, consistent with Program Guide requirements. See Program Guide 12-2-4 ("All inmates arriving at a RC shall be [screened].") If not, how can CDCR determine whether this core aspect of the Program Guide requirement is being adhered to?

**Commented [LY22R21]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

--> new indicator process

**Time Frame**
n/a

**Release Note**
There are no relevant release notes on or after Release Note 15.0.

**Rationale**
None

**Known Issues**
None found.

**Potential limitations**
Global CQIT limitations

**Additional Info**
Refer to CQIT Guidebook (Version 2.3.22) for additional information on the audit, including sampling requirements

> Commented [WJ23]: PL-JW - Barrier: See below comment re: lack of information in Guidebook about sampling methodology.
>
> Commented [LY24R23]: see below

**Verification**

**FAQs**
None

**Approval Date**

The date the Business Rule was approved by the Mental Health Change Committee
(CAPC: Change Advisory Prioritization Committee)

# DE: CQIT: **CQIT Audit R & R Screens**

CQIT Audit: R & R Screens

## Overview

An on-site Continuous Quality Improvement Tool audit item measuring whether ~~R&R Screen~~ Initial Health Screenings were completed in a confidential setting and , all question asked ~~and the correct documentation was used~~

## Data Pathway

CQI Tool -> Dashboard -> R&R Intake

**Commented [WJ25]:** PL-JW Barrier/Question: What sort of safety risk would require an officer in close proximity? There are two key substantive components to this indicator: (1) confidentiality; and (2) if there is no confidentiality, an adequate safety justification for breaking confidentiality. As written, this indicator and the matching Guidebook language address the first aspect of this indicator, but not the second. A question asking about the safety risk, and whether that risk justifies breaking confidentiality, should be included in this KPI where applicable.

**Commented [LY26R25]:** bring back re: safety

**Commented [LY27R25]:** Comment resolved at BRMR: all questions/comments addressed, all changes applied to the SPO document

see above

**Commented [WJ28]:** PL-JW - Question/Improvement Idea: How do auditors determine what "confidential" means in Question 1? The February 3, 2022 Guidebook does not provide guidance. From monitoring tours, we understand that the door is often and inappropriately left open during screening because staff may not understand what constitutes a confidential setting.

**Commented [LY29R28]:** bring back: SM-LH input & policy re: conf.

**Commented [LY30R28]:** Comment resolved at BRMR: all questions/comments addressed, all recommendation(s) applied in the SPO document

**Commented [WJ31]:** PL-JW Question/Possible Barrier: Is there a separate KPI that measures whether correct documentation was used (Question 3 on the below audit)? If not, why is this audit question not included in this indicator? Using the correct documentation is an impo... [1]

**Commented [LY32R31]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

**Commented [WJ33]:** PL-JW Improvement Idea: Question 3 and page 32 of the February 3, 2022 Guidebook ask auditors only whether "the correct documentation" was used. The question and Guidebook do not provide gui... [2]

**Commented [LY34R33]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document [3]

**Commented [WJ35]:** PL-JW Question/Possible Barrier: Does a separate indicator measure whether all screening questions were asked (Question 2 on the audit)? Ensuring that staff ask patients all the required screening quest... [4]

**Commented [LY36R35]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document



**Automation**

None

**Known Issues**

None

**Potential limitations**

None

**Additional Information**

Refer to the ~~CQIT Guidebook (Version 2.3.22)~~ CQIT Guidebook (Version 6.30.2022) for additional information on the audit, including sampling requirements.

*Footnote: The information in the demographic section on the screenshot is an example. Institution, area, date, etc., will be different in the actual audit.*

**Verification**

**FAQs**

**Data Source**

CQIT/Site Visit Audit Tool

Excerpt from CQIT Guidebook (Version 2.3.22)

R&R Screen [R&R Intake]
a) General Instructions:
- Observe R&R ~~process~~ Initial Health Screening in each R&R area to see if they are conducted confidentially barring any safety and security concerns.
- Check to see if all of the questions are being asked.
  - ◆○ Refer to EHRS Initial Health Screening PowerForm
- Respond for each R&R Initial Health Screening observed (e.g., if five are observed, complete the audit five times.
  - Sample size: 5 inmates/per nurse assigned to perform screens during the observation of the R&R screening processing. If there are less than 5 inmates screens per nurse, observe all.
- CQIT Audit Field (see CQIT Audit Fields section for field definition):
  - ○ CDCR #
  - ○ Sub Area
b) Standardized Questions:
1. Was the screen conducted in a confidential setting ~~unless there is a safety risk that requires an officer in proximity~~?
   1. a. Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.

**Commented [WJ37]:** PL-JW Barrier: Page 32 of the February 3, 2022 Guidebook does not actually state what the sampling requirements are. It should be revised to include sampling requirements. Currently, it states:

R&R Screen [R&R Intake]
a) General Instructions:
  Observe R&R process to see if they are conducted confidentially barring any safety and security concerns.
  Check to see if all of the questions are being asked.
  Respond for each R&R Screen observed (e.g., if five are observed, complete the audit five times)
  CQIT Audit Field (see CQIT Audit Fields section for field definition):
    o CDCR #

b) Standardized Questions:
  1. Was the screen conducted in a confidential setting unless there is a safety risk that requires an officer in proximity?
  2. Were all questions asked?
  3. Was the correct documentation/form used?

**Commented [LY38R37]:** being back on LH input re: whether 5 is appropriate.

**Commented [LY39R37]:** bring back:
Possible fix
"Sample size: 5 inmates/per nurse assigned to perform screens during the observation of the R&R screening processing. If there are less than 5 inmates screens per nurse, observe all."

**Commented [LY40R37]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

CDCR accepted BRMR/Dan's language

+ CQIT change

**Commented [PD41]:** SM-DP Barrier: Please add instructions on the number of RC Screens to observe and guidance for when there are not that many available to observe. Let's review on bring-back.

**Commented [LY42R41]:** see above re: bring back on sample =5

**Commented [LY43R41]:** Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document.

Changes requested logged for CQIT GB.

**Commented [PD44]:** SM-DP Question/Improvement: How should the answers be recorded? Can the instructions and question 2 of this audit take this into account.

**Commented [LY45R44]:** not related to this indicator

2.  Were all questions asked?
3.  Was the correct documentation/form used?

     3. a. Correct document: Initial Health Screening PowerForm

**Commented [LY46]:** for Post CAPC: this question was removed in the newest version of CQIT GB released AFTER this indicator was presented for the first time in BRMR.

see MH Reporting - CQI On Site Audit Guidebook 6.30.22.pdf - All Documents (sharepoint.com)

**Page 7: [1] Commented [WJ31]    Winter, Jessica@CDCR    5/6/2022 10:24:00 AM**

**PL-JW Question/Possible Barrier**: Is there a separate KPI that measures whether correct documentation was used (Question 3 on the below audit)? If not, why is this audit question not included in this indicator? Using the correct documentation is an important aspect of the Program Guide requirement this indicator purports to measure.

**Page 7: [2] Commented [WJ33]    Winter, Jessica@CDCR    5/6/2022 10:25:00 AM**

**PL-JW Improvement Idea**: Question 3 and page 32 of the February 3, 2022 Guidebook ask auditors only whether "the correct documentation" was used. The question and Guidebook do not provide guidance on what "correct documentation" means. It would be more clear to ask: "Was the correct documentation (CDCR 7277 form - Initial Health Screening) used?"

**Page 7: [3] Commented [LY34R33]    Leung, Pak Yan@CDCR    7/6/2022 12:22:00 PM**

Comment resolved at BRMR: all questions/comments addressed, no changes applied to the SPO document

+ CQIT change

**Page 7: [4] Commented [WJ35]    Winter, Jessica@CDCR    5/6/2022 10:28:00 AM**

**PL-JW Question/Possible Barrier**: Does a separate indicator measure whether all screening questions were asked (Question 2 on the audit)? Ensuring that staff ask patients all the required screening questions is a critical aspect of the Program Guide requirement this indicator purports to measure. *See* Program Guide Section 12-2-4, cited above ("All inmates arriving at a RC shall be interviewed utilizing a standard set of questions (CDCR 7277, *Initial Health Screening*)"). The CQI Guidebook and current version of the audit tool both ask auditors whether all screening questions were asked. The question whether all screening questions were asked should be made its own KPI.

Alternatively, this KPI and BR could be revised to require favorable responses not only to the confidentiality, safety risk, and documentation questions, but also to the question whether all questions were asked.

# EXHIBIT C

**Items on Special Master's and Plaintiffs' Key Indicator List That Don't Match CDCR's Key Indicators**

*(either they do not exist or verbiage is different)*

Color key:

| Resolved |
|---|
| Partially Resolved |
| Unresolved |
| Ongoing Review by SM Group |

| Indicator Title from SM or Ps lists | Source | CDCR Interpretation/Indicators That Address This | Special Master's Team Responses/Comments Regarding Indicators | CDCR responses | Special Master's Team Responses/Comments Regarding Indicators 01/06/2022 | Current Status 01/24/2022 |
|---|---|---|---|---|---|---|
| Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | Special Master's Team | This request aligns with three different indicators: 2 new ones which are not on the list we provided but are being coded by CCHCS QM- <br>1. Timely documentation of suicide watch, timely doc. of suicide precaution, and one prior indicator for general inpatient nursing rounds: 501329 <br>2. Percentage of nursing rounds clearly marked, on time, and documented on correct form | Concur with the following indicators: <br>1. Timely documentation of suicide watch, timely documentation of suicide precaution. <br>2. Percentage of nursing rounds clearly marked, on time, and documented on correct form (Agree that once coding is done, the timeliness part of this indicator should be removed because it will be subsumed in the automated | SM team and CDCR agree and will prep the following for this item: <br>• Timely documentation of suicide watch <br>• Timely documentation of suicide precaution <br>• *Percentage of nursing rounds clearly marked, on time, and documented on correct form <br><br>*SM team and CDCR agree that once coding is done, the timeliness part of this indicator should be removed because it will be subsumed in the | No Change <br><br>CDCR 12/13/2021: "We will prep these per concur discussion" | **Status: Resolved** <br><br>CDCR will prep the following for this item: <br>• Timely documentation of suicide watch <br>• Timely documentation of suicide precaution <br>• *Percentage of nursing rounds clearly marked, on time, and documented on correct form <br><br>*Once coding is done, the timeliness part of this indicator should be removed because it will be subsumed in the |

| Indicator Title from SM or Ps lists | Source | CDCR Interpretation/Indicators That Address This | Special Master's Team Responses/Comments Regarding Indicators | CDCR responses | Special Master's Team Responses/Comments Regarding Indicators 01/06/2022 | Current Status 01/24/2022 |
|---|---|---|---|---|---|---|
| | | (once coding is done, the timeliness part of this indicator will be removed as it will be subsumed in the automated measure for timeliness of rounds) | measure for timeliness of rounds) | *automated measure for timeliness of rounds* | | *automated measure for timeliness of rounds.* |

| Emergency Response Procedures for Self-Injurious behaviors and suicide attempt | Special Master's Team | Indicator we have is: 837s for self-harm incidents in which there was a delay of more than 4 minutes for cell entry. | SM Team indicator: 837s for self-harm incidents in which there was a delay of more than 4 minutes for cell entry, including presence of required items: "emergency response bag" (ambu bag, cut-down tool, etc.) | Consider decommissioning this indicator label; create new indicator that measures emergency response procedures. | The Special Master's Team concurs with decommissioning this indicator label and creating a new indicator that measures emergency response procedures to include: 1) timeliness of response for self-harm incidents 2) whether appropriate equipment was present 3) whether appropriate procedures/protocols were followed | **Status: Resolved**<br><br>1. CDCR and the Special Master's Team agree that the provisionally approved indicator label " Emergency Response Procedures for Self-Injurious behaviors and suicide attempt" should be decommissioned.<br><br>2. CDCR will create a new indicator that measures emergency response procedures to include the following: a) timeliness of response for self-harm incidents. b) whether appropriate equipment was present. c) whether appropriate procedures/protocols were followed.<br><br>1/28/22: CDCR response: While we agree to decommissioning old indicator and creating a new indicator to measure emergency response procedures, the prior indicator measured response timelines. Additional of the following items |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | <span style="color:red">would be additional components not part of an item currently on the KPI list:the following items would be additional components not part of an item currently on the KPI list:</span> b) whether appropriate equipment was present.<br>c) whether appropriate procedures/protocols were followed.<br>b) whether appropriate equipment was present.<br>c) whether appropriate procedures/protocols were followed. |
| Emergent/urgent MH referrals that result in SRASHEs | Special Master's Team | Current KPI that includes this business rule:<br>Suicide Risk Evaluation (this measures timeliness with Suicide Risk Evals). | SM Team indicator - SRASHEs - Emergent/Urgent Mental Health Referrals for SI/SIB/SA.<br>In addition to measuring timeliness with Suicide Risk Evals, the indicator should also measure that all referrals for SI, SIB, and SA result in completion of SRASHE.<br>(Note that emergency referrals continued to be mislabeled as urgent referrals, a continuing problem during Lindsay Hayes's current | SM team and CDCR agrees to prep the following for this items. In additional, we will invite Lindsay to the meeting when discussion these items:<br>• SRE after Urgent MH Consult for Suicidality<br>• SRE after Emergent MH Consult for Suicidality<br>• SRE after Emergent MH Consult for | No change | **Status: Resolved**<br><br>CDCR will prep the following for this indicator:<br>a) SRE after Urgent MH Consult for Suicidality.<br><br>b) SRE after Emergent MH Consult for Suicidality.<br><br>c) SRE after Emergent MH Consult for Suspected Intentional Drug Overdose.<br><br>d) SRE after Urgent MH Consult for Suspected |

**Commented [CL1]:** Slight revision here: The items below would be proposed business rules for the Timely Suicide Risk evaluation indicator. When we discuss, we will also need to review if inclusion of each of these business rules is possible with our current system (if not it isn't impossible, but we may have to discuss changes to EHRS, etc.). We do not disagree that a SRE is required after these events.

| | | | rounding. This cannot be automated and would rely on manual chart reviews) | Suspected Intentional Drug Overdose<br>• SRE after Urgent MH Consult for Suspected Intentional Drug Overdose | | Intentional Drug Overdose.<br><br>Lindsay will attend meetings regarding above.<br><br>1/28/22: CDCR response: The tmely SREs indicator will be prepped, the items above describe business rules that could be a part of that indicator. If these items are required per policy, they would be included as business rules. |
|---|---|---|---|---|---|---|
| Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | Special Master's Team | Indicator That measures this: Discharges from MHCB with clinician review of d/c summary.<br><br>This does NOT measure completion or review of SRASHE. This audit looks to see if the receiving clinician documented they reviewed the discharge summary. | SM Team indicator: Discharges from MHCB: Supervisor/Receiving Clinician Reviews<br>There are two items to be measured:<br>1) Supervisor Review of MHCB D/C Summary/SRASHE to include safety plan when indicated<br>(This would measure whether or not the MHCB Supervisor reviewed the SRASHE/Safety Plan, when indicated, at the time of clinical discharge) | Item 1 is new indicator. Not in MHPG. | The Special Master's Team does not propose development of a new indicator regarding "Supervisor Review of MHCB D/C Summary/SRASHE to include safety plan when indicated."<br><br>The Special Master's Team notes that CDCR agrees to prep the current indicator regarding "Receiving Clinician Review of MHCB D/C Summary/SRASHE" | **Status: Resolved**<br><br>CDCR will prep its current indicator: Receiving Clinician Review of MHCB D/C Summary/SRASHE |

|  |  |  | 2) Receiving Clinician Review of MHCB D/C Summary/SRAS HE (This would measure whether or not clinician who received the patient upon discharge from MHCB reviewed the D/C Summary/SRASHE/safety plan) |  |  |  |
|---|---|---|---|---|---|---|
| Seclusion, Frequency, and Duration | Special Master's Team | Current Indicator: seclusion rate

Duration not calculated | SM Team indicator: Seclusion Rate and Duration

Total number of seclusion episodes by month by mean, median and range of duration being reported. Also, the number of unique individuals being secluded should also be measured. | Current report allows drill down to see which patients were on seclusion and restraint. Adding duration statistic would be new indicator. We will prep and review presentation. Details can show individual details, but we cannot present data in the way described here as an indicator in performance report.

CDCR suggests Prep and consider adding information to the existing detail column. | The Special Master's Team proposes including "restraint" in the indicator label.

CDCR 1/7/2022: "We have a separate indicator that measure restraint"

The Special Master's Team notes that CDCR indicated its current report allows drill down to see which patients were on seclusion and restraint and that adding duration statistic would be new indicator.

The Special Master's Team notes that CDCR will prep, and review presentation and those details can show individual details but cannot present data in the way described here as an indicator in performance report.

The Special Master's Team agrees with CDCR to prep | **Status: Resolved**

1. CDCR's current report allows drill down to see which patients were on seclusion.

2. CDCR will prep, and review presentation to show individual details to include duration.

3. CDCR has a separate indicator that measures "restraint." |

|  |  |  |  |  | and consider adding information to the existing detail column. |  |
|---|---|---|---|---|---|---|
| Additional Use of Force (Specificity to be determined) | Special Master's Team | Specificity needed to complete work on this | SM Team indicator:  Numbers and Percentages of Immediate and Controlled Use of Force by level of care (CCCMS, EOP, MHCB, ICF, and ACUTE patients, non-MHSDS) | SM team and CDCR agree to prep the following for this item: <br> • UOF involving MH inmates <br> The indicator went through BRMR on 12/15/2021. The indicator will have drilldown allow user to look at immediate UOF vs controlled UOF. Like other indicators on our Performance report, drilldown by LOC is available. | No change | **Status: Resolved** <br><br> CDCR will prep the following: UOF involving MH inmates. <br><br> The indicator went through BRMR on 12/15/2021. The indicator will have drilldown allow user to look at immediate UOF vs controlled UOF. Similar to other indicators on CDCR's Performance report, drilldown by LOC is available. |
| NDS Timely Expedited Transfer | Special Master's Team | Percentage of required NDS transfers that occurred within 72 hours. | SM Team indicator: Number and Percentage of required NDS transfers that occurred within 72 hours. | • Percentage of required NDS transfers that occurred within 72 hours. | The Special Master's Team agrees with measuring percentage of required NDS transfers that occurred within 72 hours. | **Status: Resolved** <br><br> CDCR will measure the percentage of required NDS transfers that occurred within 72 hours. |
| MHCB Daily Provide Checks | Special Master's Team | MHCB daily provider contacts (psychologist and/or psychiatrist), CSW only on weekends. <br><br> Indicator says "provide". Assume this was a typo to say "provider" | SM Team indicator: MHCB daily provider contacts (psychologist and/or psychiatrist), CSW only on weekends. Indicator should delineate weekdays and weekends | SM team and CDCR agrees to prep the following for this item: <br> - MHCB Daily Provider Contact <br> This item went through BRMR. Description at patient level shows when contact was due. | The Special Master's Team and CDCR agree to prep the following for this item: <br> MHCB Daily Provider Contact <br> This item went through BRMR. Description at patient level shows when contact was due. | **Status: Resolved** <br><br> 1. CDCR has prepped the following: <br> MHCB Daily Provider Contact <br> This item went through BRMR. Description at patient level shows when contact was due. |

|  |  |  |  | SM team asked about drilldown by weekend. CDCR will add this to our improvement idea log if determined essential. Currently, staff can sort existing report and can view the data by weekday and weekends if needed. | There is a Business Requirement that two of the contacts must be done by a psychiatrist every week. The Special Master's Team proposes that this requirement also be included in Business Rule. <br><br> CDCR 1/7/2022: "This is measured in Timely Psychiatrist Contact" | 2. The Business Requirement that two of the contacts must be done by a psychiatrist every week is measured in "Timely Psychiatrist Contact" in the Performance Report. <br><br> 3. Currently, CDCR staff can sort existing report and can view the data by weekday and weekends if needed. |
|---|---|---|---|---|---|---|
| ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | Special Master's Team | CDCR has two different indicators re ASU intake status: <br><br> ASU Intake Inmates Appropriately Housed: measures if patients are double celled or in an intake cell as required for first 72 hours. <br><br> ASU inmates on 21 day intake status with markers posted: measures if inmates have an intake placard on their door for first 21 days in ASU. | SM Team indicators: <br> 1. ASU Intake Inmates Appropriately Housed: measures if patients are double celled or in a retrofitted intake cell as required for first 72 hours. <br> 2. ASU inmates on 21 day intake status with markers posted: measures if inmates have an intake placard on their | 1. First item is prepped and pending stakeholder review. <br> 2. Item 2 DAI would like to decommission. <br><br> DAI uses SOMS report to identify new ASU inmates. Per DAI this is an outdated process now that we have 30 minute welfare checks. <br><br> Current focus to cover this: <br> a. Percentage of ASU Welfare Checks audited | The Special Master's Team observes that CDCR indicated that the following item is prepped and pending stakeholder review: ASU Intake Inmates Appropriately Housed: measures if patients are double celled or in a retrofitted intake cell as required for first 72 hours. <br><br> The Special Master's Team concurs that the following item should be decommissioned: ASU inmates on 21 day intake status with markers posted: | **Status: Resolved** <br><br> 1. The indicator " ASU Intake Inmates Appropriately Housed: measures if patients are double celled or in an intake cell as required for first 72 hours" has been prepped and is awaiting stakeholders' review. <br> 2. CDCCR and the Special Master's Team agree that the item "ASU inmates on 21-day intake status with markers posted: measures if inmates have an intake placard on their door for first |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | door for first 21 days in ASU. | that were not completed on time and staggered<br>b. Cells reviewed where inmates are allowed approved entertainment devices. | measures if inmates have an intake placard on their door for first 21 days in ASU.<br><br>The Special Master's Team notes that current focus is to cover this:<br>a. Percentage of ASU Welfare Checks audited that were not completed on time and staggered<br>b. Cells reviewed where inmates are allowed approved entertainment devices.<br><br>The Special Master's Team proposes that the above two items should be automated if feasible.<br><br>CDCR 1/7/2022: "We are looking at a DAI report for welfare check completion automation. Entertainment appliances cannot be automated because the LTs check to physically see if inmates have the device." | 21 days in ASU" should be decommissioned.<br>3. CDCR already measures:<br>a) Percentage of ASU Welfare Checks audited that were not completed on time and staggered.<br>b) Cells reviewed where inmates are allowed approved entertainment devices.<br>4. CDCR is reviewing whether welfare completion can be automated.<br>5. Entertainment device checks cannot be automated. It is measured by physically checking for presence or absence. |
| SREs that Met All Audit | Special Master's Team | Quality of SRE (Risk Assessment) | SM Team indicator: Quality of SRE (Risk Assessment) | SM team and CDCR agrees to prep the following for this item. This item is prepped: | No change | **Status: Resolved**<br><br>CDCR has prepped the below: |

| Criteria | | | (Note: measure compliance with clinical chart audit criteria) | - Quality of SRE (Risk Assessment) | | Quality of SRE (Risk Assessment) |
|---|---|---|---|---|---|---|
| Percentage of mental health OHU stays 48 hours or less | Special Master's Team | Decommissioned because MH no longer uses MH OHUs. Replaced with timely MHCB transfers. | Agree - MH OHUs no longer exists – Indicator not required (Note: In event CSP/SAC's "MCBHU" or other unlicensed MHCB is utilized, length of stay is required to be reported) | SM team and CDCR agrees to decommission this since OHU no longer exists.

Remove from KPI list | No change | **Status: Resolved**

CDCR and the Special Master's team agree that the provisionally approved indicator "Percentage of mental health OHU stays 48 hours or less" should be decommissioned and removed from the KPI list. |
| Percentage of MH-7s required completed prior to ASU placement | Special Master's Team | Replaced by ASU pre-screens (MH-7 is not the ASU prescreen form in EHRS) | Agree - duplicated indicator | SM team and CDCR agrees this is a duplicated indicator.

Remove from KPI list | No change | CDCR and the Special Master's team agree that the provisionally approved indicator "Percentage of MH-7s required completed prior to ASU placement" should be decommissioned and removed from the KPI list. |
| Staff that report having computers for all out of cell clinical appointments. | Special Master's Team | This item was measured one time years ago and is not measured ongoing. All staff now have computers. | | With EHRS all clinicians received computers. CDCR recommends decommissioning this indicator. | The Special Master's Team agrees that indicator should be decommissioned. | CDCR and the Special Master's team agree that the provisionally approved indicator "Staff that report having computers for all out of cell clinical appointments" should be decommissioned |

| | | | | | | and removed from the KPI list. |
|---|---|---|---|---|---|---|
| Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | Special Master's Team | Current indicator: Percentage of RVRs issued to CCCMS, EOP, MHCB, ICF, and ACUTE patients | SM Team indicator: Numbers and Percentage of RVRs by level of care (CCCMS, EOP, MHCB, ICF, and ACUTE patients, non-MHSDS) | CDCR will prep the following for this indicator:<br>• Numbers and Percentage of RVRs by level of care (CCCMS, EOP, MHCB, ICF, and ACUTE patients, non-MHSDS)<br><br>Prior manual audit may be replaced by automated DAI report. CDCR is researching and will discuss at BRMR re status.<br><br>Drilldown will allow users to look at the data by LOC | No Change | **Status: Partially Resolved**<br><br>1. CDCR will prep the following for this indicator:<br>• Numbers and Percentage of RVRs by level of care (CCCMS, EOP, MHCB, ICF, and ACUTE patients, non-MHSDS)<br><br>2. Prior manual audit may be replaced by automated DAI report. CDCR is researching and will discuss at BRMR<br><br>3. Drilldown will allow users to look at the data by LOC |
| Patients in Alt Housing on continuous observation and provided suicide-resistant bed | Special Master's Team | Two separate indicators on CDCR list:<br>1. Percentage of patients in alt housing with a bed;<br>2. Patients referred to MHCB on continuous direct visual observation | SM Team indicator: Use of Alternative Housing Include: 1) housed in designated area with a bed, 2) observed on 1:1 basis. Also track percentage of MHCB placements from alternative housing and rescinded orders back to housing | Item 1 and two are measured, although "designated area" is written about in report (not a KPI).<br><br>We do not measure this MHCB rescissions as a KPI. This would be a new indicator. We do have other patient level reports that provide this | The Special Master's Team notes that both 1. Percentage of patients in alt housing with a bed and 2. Patients referred to MHCB on continuous direct visual observation are measured. | **Status: Partially Resolved**<br><br>1. CDCR already measures:<br>a) Percentage of patients in alt housing with a bed; and<br>b) Patients referred to MHCB on continuous direct visual observation. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | from alternative housing. Note: MHCB placement or return to housing within 24 hours is tracked using another indicator. | information, but they are not indicators. CDCR recommends prep current indicators in column 3 regarding patients in alt housing with a bed and patients referred to MHCB on continuous direct visual observation. | The Special Master's Team restates our proposal that measurement of item 1 should track if alternative housing occurred in a designated (approved area) area. The Special Master's Team acknowledges the MHCB rescissions are not measured as a KPI and that CDCR has patient level reports that provide this information and agrees that there is not a need for a KPI regarding MHCB rescissions. The Special Master's Team agrees with CDCR recommendation to prep current indicators: 1. Percentage of patients in alt housing with a bed and 2. Patients referred to MHCB on continuous direct visual observation regarding patients in alt housing with a bed and patients referred to MHCB on continuous direct visual observation. | 2. The Special Master's Team proposes that CDCR also provide documentation regarding whether alternative housing occurred in a designated (approved area) in the SharePoint Wiki, with link or information regarding how they can be accessed. 3. The Special Master's Team proposes that CDCR provide documentation regarding rescissions from alternative housing in the SharePoint Wiki, with link or information regarding how they can be accessed and should not be a KPI. CDCR response: The original indicator on the key indicator list was "continuous observation and provided suicide-resistant bed", now this request adds if alt housing is in approved location, and rescissions for MHCB referrals". The two |

| | | | | | CDCR 1/7/2022 regarding designated alternative housing area: "We do audit for this and write about it in reports, but there is no KPI for this item." | CDCR indicators documented here measure, with two separate indicators, the items on the original key indicator list. The additional items are new KPIs |
|---|---|---|---|---|---|---|
| Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs. MHCB, Alternative Housing, DSH, and PIPs | Special Master's Team | Our indicator label: Discharge Follow ups | SM Team indicator: Discharge Follow ups - Five Day Follow up and 30 Minute Checks Two separate measurements: 1. Timely Five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and Psychiatric Inpatient Program (PIP) returns 2. Timely Clinical and Custody 30-minute Discharge Checks for non-ASU inmates returning from MHCB, Alternative Housing, and PIP | SM team and CDCR agrees to prep the following for #1: - Discharge Follow ups CDCR propose to prep the following for #2: - Custody follow ups for MHCB discharge - note this can be updated to include ICF and ACUTE discharges if supported by policy (policy will be included in prep) | No change regarding SM team and CDCR agreement to prep the following for #1: Discharge Follow ups The Special Master's Team agrees with CDCR proposal to prep the following for #2: Custody follow ups for MHCB discharge - note this can be updated to include ICF and ACUTE discharges if supported by policy (policy will be included in prep) | Status: Partially resolved 1. CDCR will prep Discharge Follow ups for 1.Timely Five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and Psychiatric Inpatient Program (PIP) returns. 3. The Special Master's observes that the provisionally approved indicator include custody follow ups for MHCB discharge as well as Alternative Housing, DSH, and PIP returns. This indicator should be updated to |

| | | | | | | include ICF and ACUTE.<br><br>CDCR Response: CDCR researches all policy requirements for business rule review. If policy supports custody discharge checks for acute and ICF discharges, they would be included. |
|---|---|---|---|---|---|---|
| Timely Admissions to Inpatient Care<br><br>Timely admission to MHCB<br><br>Inpatient Transfer Deadlines for PIPs and DSH | Special Master's Team | Redundant request. Same as timely admission to MHCB and DSH and PIP timely admission.<br><br>ONLY timely admission to MHCB is a current indicator on MH reporting. ICF and ACUTE timelines reported monthly by HCPOP. | SM Team indicator: Timely admission to MHCB, ICF and ACUTE (Note: Add ICF and ACUTE as MH indicator noting source is HCPOP) | SM team and CDCR agrees to prep Timely admission to MHCB. This has been completed and went to BRMR.<br><br>Regarding ICF and ACUTE transfers these are provided to the court by HCPOP. Will establish a documentation plan for SP. | No change regarding SM team and CDCR agreement to prep Timely admission to MHCB. This has been completed and went to BRMR.<br><br>Regarding ICF and ACUTE transfers, the Special Master's Team proposes that considering these are key indicators, the data should be brought into the performance report.<br>CDCR 1/7/2022: 'Not possible because of where the data are and how the current court reports are done. Consider putting documentation about these reports in the SP Wiki, with link or | **Status: Partially Resolved**<br><br>1. "Timely admission to MHCB" has been completed and was sent to BRMR.<br><br>3. CDCR is considering putting documentation about in the SharePoint Wiki, with link or information regarding how they can be accessed for the following two items: "Timely Admissions to Inpatient Care" and "Inpatient |

| | | | | | information regarding how they can be accessed." | Transfer Deadlines for PIPs and DSH"

CDCR Response: "Timely Admission to Inpatient Care" will not be its own indicator; instead "Timely Admission to MHCB, and "Timely Admission to ICF and ACUTE", will be their own. Timely admission to MHCB is complete.  SP documentation for Timely Admission to Acute and ICF will be included, but we need to establish how to document since HCPOP report (and court report) is source of truth for this. |
|---|---|---|---|---|---|---|
| Allocated and filled positions is on Key Indicator list, but so is: Chief Psychologist Clinical Social Worker Staff Psychologist Recreation Therapist | Special Master's Team | Allocated and filled positions – reported on CQI report as numbers | SM Team indicator: Numbers and percentages of ALL allocated and filled mental health positions by classification/discipline | These data comes from the Hire Tracking System Report which is now a web based report/application HR uses. The methodology of that tracking were negotiated and agreed upon with the SM team and other stakeholder.

Will establish a documentation plan for | The Special Master's Team proposes that considering these are key indicators, the data should be brought into the performance report.

CDCR via email 1/12/2022: "This is one of those items similar to some of the CCHCS and HCPOP reports where MH wouldn't repeat a report, | **Status: Partially Resolved**

CDCR reported via email on 1/12/2022: "This is one of those items similar to some of the CCHCS and HCPOP reports where MH wouldn't repeat a report, but we need to get the methodology documentation and a link to the existing report within our sharepoint. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Senior Psychiatrist (supervisor) Senior Psychiatrist (specialist) Senior Psychologist (supervisor) Staff Psychiatrist Supervising psychiatric social worker | | | | SP using existing data source. | but we need to get the methodology documentation and a link to the existing report within our sharepoint. We are working with our staffing team to develop what report we can link to within our SP wiki (if this is possible) along with methodology for the report (again if possible given this is a CCHCS HR report)." | We are working with our staffing team to develop what report we can link to within our SP wiki (if this is possible) along with methodology for the report (again if possible given this is a CCHCS HR report)."<br><br>CDCR Response 1/28/22: Recommend changing status to resolved. We will have SP documentation on staffing, although it may link to an outside HR report. |
| MH Screens (this is on key indicator list as follows, but currently only MH screens is an indicator): <br>- ASU Pre-screens <br>- MH Screens <br>- MH screens (RC screens) | Special Master's Team | Timely MH Screens – now will be three separate indicators: <br>- ASU pre screens <br>- ASU GP screens <br>- Timely RC Screen <br>These are about screens being done within MHPG timelines and assumes that is what is meant by the items listed in the first column on the special master's key indicator list. | SM Team indicators: <br>- ASU pre screens <br>- ASU GP screens <br>- Timely RC Screen <br>- Timely R&R Screen <br>(Note: measure timeliness, completeness and privacy/confidentiality) | SM team and CDCR agrees to prep the following for this item: <br>• ASU Pre Screen (done) <br>• ASU GP Screen <br>• RC Screen <br><br>Timely R&R screen is not measured currently. This is a new indicator. | No change regarding the SM team and CDCR agreement to prep the following for this item: <br>• ASU Pre Screen (done) <br>• ASU GP Screen <br>• RC Screen <br><br>The Special Master's Team proposes to CDCR that Timely R&R screen should be prepped to be measured as a key indicator. | Status: Partially Resolved <br><br>1. CDCR will prep: <br>• ASU Pre Screen (done) <br>• ASU GP Screen <br>• RC Screen <br><br>3. The Special Master's Team proposes to CDCR that Timely R&R screen should be prepped to be measured as a key indicator. <br><br>CDCR Response 1/26/22: Timely R&R Screen is not a current |

| | | | | | | indicator and therefore adding this item is outside the scope of our data remediation process. |
|---|---|---|---|---|---|---|
| Safety planning to reduce suicide risk | Special Master's Team | Quality of Safety Plan Interventions | SM Team indicator: Safety Planning for Suicidal Patients in MHCBs | Need further clarification | The Special Master's Team proposes that the provisionally approved indicator, "Safety planning to reduce suicide risk" should be labelled "Safety Plan Completion for Suicidal Patients - CMHCB/Alternative Housing." This will measure whether safety plans are timely completed prior to a patient's discharge from an MHCB or alternative housing.<br><br>CDCR 1/10/2022: "CDCR Currently has an indicator for timely Suicide Risk evaluations. Timeliness of safety plans is a new indicator." | **Status: Unresolved**<br><br>CDCR 1/10/2022: "CDCR Currently has an indicator for timely Suicide Risk evaluations. Timeliness of safety plans is a new indicator."<br><br>The Special Master's Team proposes that the provisionally approved indicator, "Safety planning to reduce suicide risk" to should be re- labelled "Safety Plan Completion for Suicidal Patients - CMHCB/Alternative Housing" and prepped as a KPI.<br><br>1/28/22: CDCR Response: Timeliness of safety plans is a new indicator as it does not currently exist. |
| Suicide-resistant MHCBs | Special Master's Team | Not a current indicator. | SM Team indicator - Suicide-resistant MHCBs Note: MHCBs previously found to be suicide-resistant can fall into disrepair (see current example at CCWF where MHCB unit is closed for six months for | Not current indicator. | The Special Master's Team proposes that CDCR develop "Suicide-resistant MHCBs" as an indicator and determine frequency data gathering. E.g., annual, or semi-annual. | **Status: Unresolved**<br><br>The Special Master's Team proposes that CDCR develop "Suicide-resistant MHCBs" as an indicator and determine frequency data |

| | | | renovation) or patients find creative ways to engage in self-harm. TBD: Frequency, i.e. annual or semi-annual. | | | gathering. E.g., annual, or semi-annual.<br><br>CDCR will prep this; frequency will be identified at the business rule level. Recommend changing this to resolved status. |
|---|---|---|---|---|---|---|
| Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | Special Master's Team | Specific MAPIP Measures needed | SM Team indicator: MAPIP Psychiatry and Nursing Measures All MAPIP measures relevant to diagnostic monitoring regarding antipsychotics, clozapine, mood stabilizers, and antidepressants and nursing measures regarding medication continuity, compliance with PC 2602, medication preparation and medication administration. **(See attached)** | CDCR psychiatry team is reviewing measures. The items that are MH specific on CCHCS dashboard, which includes the items provided by SM's team, would be included. | The Special Master's Team acknowledges that CDCR psychiatry team is reviewing the MAPIP measures. | **Status: Unresolved**<br><br>CDCR psychiatry team is reviewing the MAPIP measures.<br><br>1/26 CDCR update: Recommend change status to resolve. CDCR Psychiatry team reviewed and agrees with the list provided by SM's team (see attached). |
| Sustainability Process | Special Master's Team | This is a type of audit process, not an indicator. We have one indicator (not yet coded) that is listed on the KPI list that measures a component of sustainable process (also on special | Under Review by SM Team | | Ongoing review by the Special Master's Team | Ongoing review by the Special Master's Team |

| | | master's key indicator list) Cases with documentation of appropriateness of LOC discussed for patients identified by 7388B as potentially requiring higher LOC | | | | |
|---|---|---|---|---|---|---|
| EOP HUB certification | Special Master's Team | This is an audit process that includes monitoring of multiple indicators. Not an indicator. | Under Review by SM Team | The EOP HUB cert is a collection of current indicators. We have a current EOP HUB cert report. | Ongoing review by the Special Master's Team | Ongoing review by the Special Master's Team |
| PIP | Special Master's Team | This is a topic not indicator. Need to establish which PIP indicators would be measured. | Under Review by SM Team | | Ongoing review by the Special Master's Team | Ongoing review by the Special Master's Team |
| Custody and MH partnership collaboration | Special Master's Team | This is a topic. No indicators except for ASU morning meeting measure that measures partnership. | Under Review by Special Master's Team | | Ongoing review by the Special Master's Team | Ongoing review by the Special Master's Team |

# EXHIBIT D

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                   GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



May 7, 2024


Kerry Walsh
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

**VIA EMAIL ONLY**

Kerry,

I write in response to your email dated May 2, 2024, regarding the eight indicators still pending remediation. Defendants continue to have significant concerns regarding the new approach the Special Master is taking to data remediation, as well as specific responses to the Special Master's most recent comments on the eight indicators still pending remediation, as detailed below.

    I.      Defendants Continue to Have Concerns Regarding the Deviation from the Agreed Upon Data Remediation Process.

Again, I must reiterate Defendants concerns regarding the Special Master's approach to the final review of the indicators pending remediation over the last month.

The current approach is drastically different than has been understood and adhered to up to this point. Our specific concerns were articulated most recently during the data remediation meeting on April 30, 2024. Defendants also raised these concerns in the responses to the 41 indicators provided on April 11th and April 15th, in the responses regarding re-verification of extended indicators and the Special Master's request for new sub-statistics, both sent on April 15th, and in the response to the indicators pending remediation in Category C sent on April 24, 2024. The Special Master has not responded to these concerns.

The approach taken with these indicators, especially the eight still pending remediation, is troubling. Following a status conference held on March 28, 2024, the court issued an order on April 2, 2024 noting "the parties agree one group of 41 [indicators] has proceeded through all five steps of the data remediation process" and directing the Special Master to "take all steps necessary" to remediate the 41 indicators no later than April 26, 2024. [1] (ECF No. 8181 at 3, 7.)

---

[1] The Special Master recommended SP24E Discharges from MHCB with clinician review of d/c summary be removed from the list of 41 indicators pending remediation because the stakeholders mutually agreed it was not intended for this indicator to be extended to the Psychiatric Inpatient Program. Therefore, the total number of indicators the Special Master has been ordered to remediate in this group is now down to 40.

Special Master
Page 2

The court's order acknowledged that the 41 indicators were at the finish line of the data remediation process and provided clear direction to remediate the indicators at a pace unseen before in this process. Yet, to accomplish this herculean effort, the Special Master has deviated from the process not to make remediation faster, but instead to create additional burdensome steps and raise new potential disputes to achieve that result.

As detailed in the April 24, 2024 letter, after the underlying indicators have been completely remediated and after the extended indicators have also completed validation, approvals, programming, and verification, as necessary, the Special Master now seeks to revise the indicators such that CDCR would have to move both sets, the extended indicator and the underlying remediated indicator, back to the validation stage of the data remediation process. This would require both the Psychiatric Inpatient Program (PIP) and non-PIP versions of the indicators to undergo approvals, programming, verification, and ultimately remediation yet again due to the changes being proposed, making it impossible to meet the deadline to remediate these indicators.

Per the agreed upon process, "[n]o new or settled disputes about an indicator shall be raised after the BRMR process is completed except in the case when an indicator was revised after the BRMR and the dispute involves that revision, or under extraordinary, changed circumstances and the dispute stems from those circumstances…." (ECF No. 7556-2 at 2.) There were no significant changes to these indicators after completing Business Rules and Methodology and Review (BRMR) meeting at the validation step of the process[2], nor are there any changed circumstances necessitating revisions beyond what is needed to extend the indicators to the PIPs. Despite Defendants' repeated concerns, the Special Master continues to press for new revisions to remediated indicators which have already completed data remediation. (*See diagram of six-step data remediation process* ECF No. 8195 at 2.)

Requests to revise remediated indicators without significant changed circumstances were not contemplated by the agreed upon data remediation process, as all stakeholders[3] agree on indicators prior to remediation by the Special Master's data expert. These types of requests undermine the data remediation process. It also calls the entire data remediation process into question if prior agreements by the stakeholders that are approved by the Special Master's data expert can be tossed aside in favor of new revisions or standards.

II.      Responses to Requests for Eight Indicators Pending Remediation

Despite these significant concerns regarding the Special Master's requests and the effects on data remediation, Defendants are mindful of the May 10th deadline and provide specific responses to each of the remaining eight indicators below.

---

[2] Validation is step two (out of six) "that requires input and consideration by both parties as to what is specifically required by each indicator and its corresponding remedial requirement so that it is accurately measured." (ECF No. 8195 at 2.)

[3] Collaboratively, Defendants, Plaintiffs, and the Special Master's team are referred to as "the stakeholders" for the purposes of the data remediation project.

Special Master
Page 3

1. SC2E: RVRs Recommended for Mitigation with Custody Documentation; SC3E: RVR MHAs where Captain Disagreed with Documenting in an Alternative Manner[4]; and SC9E: RVRs Recommended for Mitigation That Were Mitigated

The Special Master has several requests for the three rules violation report (RVR) related indicators. First, for SC2E and SC9E, the Special Master requests Defendants revise the audit to include a question that captures the number of relevant cases reviewed and to use the new question in the denominators. CDCR understands the concern regarding the recently revised denominator and agrees that further revisions are necessary. CDCR will revise the denominator question for both indicators to the following: *Number of RVRs reviewed where the MH Clinician recommended mitigation (in SOMS, RVR Mental Health Assessment question 4).*

Second, the Special Master requests all three indicators be revised to provide PIP-specific data and reporting. The May 2, 2024 email erroneously states that the Division of Adult Institutions (DAI) indicated that PIP-specific data was available for SC2E and SC9E either by MHI or housing unit. This is not correct. During the April 30th data remediation meeting, a representative from DAI stated that the underlying report used to focus the sample of reviewed RVRs could be filtered by patient MHI or housing unit. However, Dr. Cartwright also clarified that while that filtering capability was available on the underlying report, patient MHI and housing unit were not available filter options on the indicators themselves as they were institution-wide indicators. This was also explained in Defendants April 15th and April 24th responses regarding these indicators.

During the April 30, 2024 data meeting, the Special Master's data expert stated that his team always anticipated that the extended PIP indicators would have the ability to provide PIP specific information. However, this expectation was not clearly relayed to CDCR until very recently. As previously explained, SC2E, SC3E, and SC9E were not created to allow filtering between PIP and non-PIP data. The most straightforward way to provide separate PIP and non-PIP data without significantly revising the indicators is to run the audit underlying the indicators twice per reporting period for institutions with PIPs, once for the PIP and once for the non-PIP. This will result in separate compliance statistics for the PIP and non-PIP side of institutions with PIPs.

CDCR agrees to run the audit twice for all the above referenced indicators and to provide separate summary statistics for each audit. For SC2E and SC9E that review a sample of RVRs, CDCR will divide the agreed upon sample of 20 between the PIP and non-PIP audits. Thus, for institutions with PIPs, CDCR will review RVRs for 10 non-PIP patients and 10 PIP patients every quarter for SC2E and SC9E. The sample for institutions without PIPs will remain the same.

---

[4] Upon review, the current indicator name for SC3 does not appropriately capture what is being measured. CDCR proposes changing the indicator name to the above to appropriate reflecting what is being measured. CDCR will revise the documentation to reflect the new indicator name. Please let us know if you have any concerns with this non-substantive revision.

To implement this change, CDCR will have to build a new program area for the PIPs in the Continuous Quality Improvement (CQI) Tool, which will require re-programming and re-verification. The work required to accommodate this late request may not be completed by the May 10th deadline for remediation of this indicator.

Finally, the Special Master requests that CDCR provide updated documentation regarding the use of the underlying Strategic Offender Management System (SOMS) report, including column and parameter definitions for stakeholder validation. The underlying SOMS report was created solely to provide a list of RVRs from the reporting period and allow CDCR to focus the sample sizes for several of the RVR indicators by allowing auditors to filter for certain types of RVRs. This report is not a key indicator and will not be remediated.

This request from the Special Master's team is similar to a recently resolved request for AC5.2: Monthly Review of EOP Mod Treatment. Per the Guidebook instructions for AC5.2, supervisors will use CDCR's operational Appointments Report to view the completed and refused appointments for each EOP mod patient to determine if that patient was offered treatment consistent with the treatment plan in effect during that time. The Special Master's data expert asked CDCR to provide documentation for the Appointments Report, but CDCR did not agree because the report is operational and will not be remediated. Instead, the stakeholders agreed that CDCR would provide a link to the Appointments Report and include an explanation of how to filter the report to provide the required information.

CDCR will take a similar approach with the SOMS report for SC2E, SC3E, and SC9E. CDCR will not create separate documentation for the SOMS report.[5]

   2.   SC7E: Thermometer Checks Completed and Accurate

The Special Master requests Defendants revise the indicator denominator as follows:

"The count of completed CQIT audit: Custody Housing Review audits during the on-site review period **which were performed between May and October**" or otherwise update the KPI documentation to reflect that only Custody Housing Review audits done between May and October should be included.

Please note the requested change is to SC7, which was remediated on July 29, 2022, not SC7E, as it is not specific to the PIPs. CDCR recognizes the concern raised by the Special Master's team and will revise the denominator for SC7. However, upon review, changing the denominator will not be enough to address this issue. "N/A" is an available answer option for the questions in the audit underlying SC7. CDCR will revise the audit instructions to require the auditors to input an "N/A" answer to the audit questions underlying SC7 from November to April. This change

---

[5] The Special Master also asks for similar information for the SOMS report used to answer the first 10 questions in the audit. The first ten questions in the referenced audit relate to remediated indicators other than SC2, SC3, and SC9. CDCR will create the documentation as detailed above but will not make further revisions to documentation for other remediated indicators.

Special Master
Page 5

will require revisions to the documentation and the Guidebook, as well as re-programming and re-verification.

The Special Master also requests that SC7E be revised to provide PIP-specific data and reporting. As indicated above, during the April 30, 2024 data meeting, the Special Master's data expert stated that his team always anticipated that the extended PIP indicators would have the ability to provide PIP specific information. However, this expectation was not clearly relayed to CDCR until very recently.

As previously explained, SC7E was not created to allow filtering between PIP and non-PIP data. The most straightforward way to provide separate PIP and non-PIP data without significantly revising the indicator is to run the audit underlying the indicator twice per reporting period for institutions with PIPs, once for the PIP and once for the non-PIP. This will result in separate compliance statistics for the PIP and non-PIP side of institutions with PIPs.

CDCR agrees to run the audit underlying SC7E twice at institutions with PIPs and to provide separate summary statistics for the PIP and non-PIP. To implement this change, CDCR will have to build a new program area for the PIPs in the CQI Tool, which will require re-programming and re-verification.

CDCR has begun making the above changes and will provide the Guidebook and documentation changes to the Special Master's team and Plaintiffs' counsel for review. However, the work required to accommodate these late requests will likely not be completed by the May 10th deadline for remediation of this indicator.

  3.  SP19E: Health Care Staff Current with Suicide Prevention

The Special Master requests Defendants add the following language to the KPI documentation: *"The pop-up summary table includes separate percentages for Medical, Mental Health, and Nursing staff current with Suicide Prevention Training."*

Please note the requested change is to SP19, which was remediated on December 15, 2023, not SP19E, as it is not specific to the PIPs. Further, the request from the Special Master is based on a concern that the version history will not show changes to the pop-up screenshot, which already includes separate percentages for medical, mental health, and nursing staff, as noted in our April 24, 2024 letter. As discussed during the data remediation meeting on April 30, 2024, the version history will show if the screenshot is replaced, thus the additional language requested by the Special Master's team is unnecessary. However, to move this indicator forward, CDCR will add the requested language to the "Pop-Up" section on the KPI documentation.

During the April 30, 2024 data remediation meeting, Mr. Hayes revealed that he will not report the agreed upon summary statistic, which is a sum of the training compliance for medical, mental health, and nursing staff, in future monitoring. The summary statistic of each remediated indicator, including the numerator and denominator, was painstakingly negotiated by all stakeholders, including the Special Master's team, during the data remediation process.

Confirmation that the Special Master's data expert will not report on the agreed upon summary statistic, and instead will report separately on sub-statistics for each group of staff, is disheartening; it calls into question the agreements made by the Special Master's team during data remediation and undermines the entire data remediation process.

4. SP6E: Required MH Clinical Staff with Completed SRE Mentoring and Biennial Training

The Special Master requests Defendants add the following language to the KPI documentation: *"The pop-up summary table includes separate percentages for staff current with required Biennial Training and Initial SRE Mentoring."*

Please note the requested change is to SP6, which was remediated on November 22, 2023, not SP6E, as it is not specific to the PIPs. Further, the request from the Special Master's team is based on a concern that the version history will not show changes to the pop-up screenshot, which already includes separate percentages for medical, mental health, and nursing staff, as noted in our April 24, 2024 letter. As discussed during the data remediation meeting on April 30, 2024, the version history will show if the screenshot is replaced, thus the additional language requested by the Special Master's team is unnecessary. However, to move this indicator forward, CDCR will add the requested language to the "Pop-Up" section on the KPI documentation.

As detail above, Mr. Hayes revealed that he will not report the agreed upon summary statistic for SP19E. CDCR is concerned that Mr. Hayes will take a similar approach with SP6E. The summary statistic of each remediated indicator, including the numerator and denominator, was painstakingly negotiated by all stakeholders, including the Special Master's team, during the data remediation process. Such deviation from an agreed upon and remediated summary statistic undermines the entire data remediation process.

5. SP10E: Observed Initial Health Screenings in a Confidential Setting

The Special Master requests Defendants revise the audit instructions to include PIP-specific intake screening, and requests that the reporting interface allow such data to be reported. For the first time, the Special Master also requests that CDCR revise the remediated indicator to include a question regarding whether the 16 mental health suicide risk questions were all asked.

The first request from the Special Master is specific to the PIP extension of SP10. As noted during the data remediation meeting on April 30, 2024, despite the review of SP10E by Plaintiffs and the Special Master's team, the Special Master's team now believes the indicator was not in fact extended to the PIPs. The request by the Special Master's team is essentially a re-write of the indicator to include the PIPs. During the April 30th discussion, Dr. Cartwright asked the Special Master's team how SP10E made it nearly through the data remediation process without the Special Master's team raising these concerns. We have not received a response to that question.

Special Master
Page 7

CDCR is reviewing the Special Master's concerns but needs more time to determine what changes to SP10E may be appropriate. While assessing the substantive revisions that have been requested, CDCR will also consider how PIP specific data may be provided. As noted in Defendants April 11th response regarding SP10E, the indicator as currently designed cannot filter between PIP and non-PIP data nor provide separate reporting. As with SC2E, SC3E, SC7E, and SC9E, the Special Master only recently made clear that separate reporting was recommended for the PIP extension indicators. CDCR will not be able to appropriately consider how best to revise SP10E to address the Special Master's concerns and move the revised version of the indicator through the necessary data remediation steps by the May 10th deadline.

The second request from the Special Master asks Defendants to add a question to SP10, which was remediated on April 3, 2023, not SP10E, as it is not specific to the PIPs.[6] This request was not raised in the previous correspondence from the Special Master's team on April 8, 2024 regarding the 41 indicators pending remediation. This request was also not raised during the April 30, 2024 data remediation meeting. The continuing requests for revisions to remediated indicators are incredibly concerning, as detailed above.

SP10 was remediated by the Special Master's data expert on April 3, 2023 without the question requested by the Special Master. Remediation occurred only after review and discussion of the indicator between Defendants, Plaintiffs, and the Special Master's team. Although the indicator was originally titled Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used, the title and scope of the indicator was revised during the initial discussions in 2022. During those initial discussions, the stakeholders agreed that correct documentation in this indicator was interpreted as whether the correct form was used. It was not interpreted to measure whether all questions were asked. The stakeholders agreed to exclude questions regarding correct documentation from the indicator as there is only one appropriate form for this nursing audit in the non-PIP setting.

Whether all mental health questions on the initial health screening were asked was discussed in 2022. The stakeholders, including the Special Master's team, agreed that whether all questions were asked would be part of the Guidebook, but not part of the SP10 indicator.[7] Instead, the parties and the Special Master's team agreed during validation of SP10 that the only question in the indicator would pertain to confidentiality.

The Special Master and his experts had the chance to review SP10 during the initial validation process. They did so and approved of the content and scope of the indicator resulting in

---

[6] Defendants sent an email to Kerry Walsh on May 3, 2024 requesting clarification regarding whether the request to add a question to SP10 applied only to the PIPs or also to the non-PIPs. Defendants have not received a response. Given the looming deadline, Defendants have provided this response based on the understanding that the Special Master is requesting this change for SP10 and not only for SP10E. Please let us know if the request was meant to apply only to SP10E.

[7] The Guidebook audit underlying SP10 includes the following questions: (2) Did the nurse(s) complete the intake medical screening by asking all 16 required questions, including both questions (#3, #16) pertaining to bad news?; and (3) Were all questions asked? (ECF No. 8180-6 at 133.) These questions are asked by auditors when on-site but are not included in an indicator.

remediation by the Special Master's data expert. Defendants will not disregard prior agreements in data remediation and re-open remediated indicators for substantive revisions unless there is a significant changed circumstance.

    6.   SP15.1E MHCB and Acute/ICF Out of Cell Time- Yard

The Special Master requests that Defendants revise the indicator to apply a 10-hour per week threshold of out of cell time for MHCB and PIP patients. Please note the requested change would require changes to both SP15.1E as well as to SP15.1, which was remediated on June 26, 2023.

As explained in Defendants' April 24, 2024 letter in response to the indicators pending remediation in Category B, there is currently no policy setting a minimum requirement for yard time for patients in the MHCB or PIPs, regardless of their custody status. CDCR's long established MHCB privileges memo, which is referenced in the Special Master's email, sets no minimum threshold. (ECF No. 7333-1 at 379.) The February 14, 2017 policy was released in response to concerns and a recommendation raised in Mr. Hayes's initial audit. (ECF No. 5259 at 33, 34, finding that the "allowance of visits, telephone calls or yard for an MHCB inmate is not addressed" by the Program Guide and recommending that "CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address" this issue.) The draft policy was discussed with the Special Master's suicide prevention expert and Plaintiffs at numerous all parties' meetings in 2016 and 2017 including on September 28, 2016, December 7, 2016, December 19, 2016, and January 19, 2017. The parties came to final agreement during the January 19, 2017 meeting. The final memo was issued on February 14, 2017 and next steps were discussed during the February 16, 2017 all parties meeting. Since that time, CDCR has worked to implement and fully comply with the 2017 policy.

Mr. Hayes has audited the 2017 policy five times since its inception and has never recommended that the policy be revised to set a minimums threshold. (*See* ECF Nos. 5672 at 7-10, 5994 at 13-15, 6879 at 24, 6879-1 at 16-19, 7636 at 28, 7636-1 at 26-32, 8143-1 at 27-34.) In fact, during his fourth reaudit, Mr. Hayes recommended that CDCR stop issuing memorandum and instead "begin focusing on development of CAPs for each of the facilities…found to have deficient practices for possession and privileges afforded MHCB patients." ECF No. 6879-1 at 19. Likewise, the Special Master has never recommended minimum thresholds for this population and instead twice reporting to the court that for CDCR to be found compliant with this part of Mr. Hayes's Recommendation 32, CDCR "should ensure that each audited CDCR facility with a MHCB unit maintain at least 90 percent compliance with adequate practices regarding possessions and privileges afforded MHCB patients as *required by policy*." (ECF Nos. 6879 at 24 and 7636 at 28, emphasis added.)

Notably, during the data remediation meeting on April 30, 2024, the Special Master's suicide prevention expert admitted there is currently no policy underlying the request for 10-hour threshold for MHCB and PIP patients.

Finally, in addition to the robust negotiation of the 2017 policy and subsequent years of monitoring detailed above, the 2017 policy was also discussed at length by the stakeholders in

Special Master
Page 9

the development of SP15.1. Remediation occurred only after review and discussion of the indicator by Defendants, Plaintiffs, and the Special Master's team. After initial validation, the Special Master's team, including the Special Master's suicide prevention expert, approved of the content and scope of the audit resulting in remediation of the indicator by the Special Master's data expert on June 26, 2023. Defendants will not disregard prior agreements in data remediation and re-open a remediated indicator for substantive revisions unless there is a substantive change to the policy underlying the indicator.

### III.    Conclusion

As articulated above, Defendants have serious concerns with the new approach for the review of the indicators pending remediation as set forth in the Special Master's emails on April 8, 10, 12, 22, and May 2, 2024. Such significant changes, including revisions to already remediated indicators, jeopardizes not only the looming deadline for the remediation of these indicators, but completion of the data remediation project as a whole. If, however, the Special Master reverts to the prior process, Defendants believe timely completion of this work is possible.

Respectfully,

*/s/ Melissa C. Bentz*

MELISSA C. BENTZ
Attorney IV
Office of Legal Affairs
California Department of Corrections & Rehabilitation

# Exhibit 2

**Luma Khabbaz**

| | |
|---|---|
| **From:** | Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov> |
| **Sent:** | Monday, November 27, 2023 6:07 PM |
| **To:** | Coleman Special Master; Coleman Team - RBG Only; Steve Fama |
| **Cc:** | Worrell, Wendy; Steven Cartwright; Travis Williams; Amber Carda; Kirby, Melissa@CDCR; Garland, Latoya@CDCR; Nguyen, Tiffany@CDCR; Nick Weber; Melissa Bentz |
| **Subject:** | Coleman: CDCR's Proposal for SP14: MHCB Records with Rationale for Limited Issue & SP13 Observation Orders Reviewed That Are Properly Documented |

[EXTERNAL MESSAGE NOTICE]

All,

In September 2022, as the Suicide Prevention Guidebook was awaiting final approval, the documentation for SP14 MHCB Records with Rationale for Limited Issue was submitted to Dr. Potter, the Special Master's data expert, for its ultimate remediation endorsement. On October 7, 2022, Dr. Potter notified CDCR that SP14 had been remediated on September 22, 2022. However, on December 30, 2022, the Special Master's team raised concerns regarding the remediated indicator's alignment with the audit, prompting the removal of its remediated status. CDCR addressed most of the concerns by integrating the Suicide Prevention Guidebook with the CQIT Guidebook.

On May 3, 2023, CDCR addressed the two remaining issues, which included the addition of new question number four ("For every day the patient was on partial issue, not including today, did the order and/or progress note authorize non-suicide observation (e.g., 30-minute nursing checks)?") and a terminology change from "Limited" to "Partial," via email to the Special Master's team, and received their approval via email on May 9, 2023. These changes, as depicted by the table below, were approved by the Change Advisory Prioritization Committee (CAPC) on May 18, 2023, and were integrated into subsequent releases of the CQIT Guidebook. On June 19, 2023, SP14's documentation was re-published and released to statewide users for Plaintiffs' and Dr. Potter's final review.

| Before | After |
|---|---|
| • Limited issue is anything less than: | • Partial issue is anything less than: |
| • Randomly select 10 patients who are on limited issue and use their health record to respond to the following questions. If there are less than 10, review all. | • Randomly select 10 patients who are on partial issue and use their health record to respond to the following questions. If there are less than 10, review all. |
| 2. For every day the patient was on limited issue, NOT including today, is there a progress note justifying limited issue? | 2. For every day the patient was on partial issue, NOT including today, is there a progress note justifying partial issue? |
| 3. For every day the patient was on limited issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify limited issue in the observation order and in the progress note? | 3. For every day the patient was on partial issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify partial issue in the observation order and in the progress note? |
| NEW QUESTION ADDED | 4. For every day the patient was on partial issue, not including today, did the order and/or progress note |

| | authorize non-suicide observation (e.g., 30-minute nursing checks)? |
|---|---|
| 4. For every day the patient was on limited issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note? | 5. For every day the patient was on partial issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note? |

On June 14, 2023, the Special Master requested CDCR expand SP14 to include patients in CDCR's Psychiatric Inpatient Programs (PIP). On June 28, 2023, CDCR agreed to extend SP14 to the PIP. In an effort to move indicators through the data remediation process in a timely manner, on August 18, 2023, while SP14 was still waiting for its final review, CDCR requested that Plaintiffs and the Special Master's team re-review SP14 as an indicator that required little to no revision to extend to the PIP and requested feedback no later than noon on August 25, 2023.

On August 30, 2023, after CDCR did not receive a response from the Special Master's team, CDCR emailed the Special Master's team asking if SP14 could be classified as remediated since the concerns raised in December 2022 were adequately addressed and implemented in the latest version of the CQIT Guidebook. The Special Master's team requested a discussion on this proposal at an upcoming BRMR meeting. CDCR placed this item on the agenda for the BRMR meeting on September 12.

At the September 12, 2023 BRMR meeting, SP14 was discussed in conjunction with the sampling discussion for several suicide prevention indicators. During this meeting, the Special Master's team conveyed that the current state of this indicator did not fully align with their audit requirements, but that they would re-review the CQIT Guidebook and let CDCR know if they had additional concerns. On September 20, 2023, the Special Master's team conducted an extensive review of SP14 and provided additional written feedback. In their email, the Special Master's team requested SP14 be expanded to include five questions in the CQIT Guidebook for the audit underlying this indicator, which were not previously part of this indictor's measurement. The five questions the Special Master's team recommended for inclusion in SP14 are identified in **bold font** in the table below.

CDCR agrees to add the five additional questions the Special Master's team recommended in their September 20 email. However, upon further evaluation, CDCR believes that some of the five questions would fit better into the measurement of SP13 Observation Orders Reviewed That Are Properly Documented (SP13), which is closely related to SP14, since the same underlying audit feeds into both indicators. CDCR created the table below to show how we envision dividing the below questions between indicators SP13 and SP14.

| CQIT GB Questions (Version 7/6/2023) Hayes Item 3 | SP13 - Observation Orders Reviewed that Are Properly Documented | SP14 - MHCB Records with Rationale for Partial Issue | CDCR's Responses to the Special Master's September 20, 2023 email. |
|---|---|---|---|
| 1. **Does patient clothing issue on the Adaptive Support Form (CDCR 128 C-2) or other authorized form on the cell door for each patient match what each patient has been issued?** | ☑ ADD TO | | **Response:** *This question is currently not included in either indicators SP13 or SP14 however, our proposal will be to add this the numerator of SP13* |

| | | | |
|---|---|---|---|
| 2. For every day the patient was on partial issue, NOT including today, is there a progress note justifying partial issue?<br> ○ Vague statements such as "suicide prevention" should not be considered adequate justification.<br> ○ The justification should be written by the provider who writes and updates the physician's order every calendar day. | ☑ REMOVE | ☑ KEEP | **Response:** *Currently included in the numerators of SP13 and SP14. Our proposal will be to remove this from the numerator of SP13 and keep it in the numerator of SP14 as this better aligns with the overall intent of the way these indicators are structured.* |
| 3. For every day the patient was on partial issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify partial issue in the observation order and in the progress note?<br> ○ The justification in the progress note should detail the patient's unique risk factors and clinical need. | ☑ REMOVE | ☑ ADD TO | **Response:** *Currently included in the numerator of SP13. Our proposal will be to remove this from the numerator of SP13 and add it to the numerator of SP14 as this better aligns with the overall intent of the way these indicators are structured* |
| 4. For every day the patient was on partial issue, NOT including today, did the order and/or progress note authorize non-suicide observation (e.g., 30-minute nursing checks)? | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |
| 5. For every day the patient was on partial issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note? | ☑ REMOVE | ☑ ADD TO | **Response:** *Currently included in the numerator of SP13. Our proposal will be to remove this from the numerator of SP13 and add it to the numerator of SP14 as this better aligns with the overall intent of the way these indicators are structured* |
| 6. Are specific orders for suicide precaution documented? | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |
| **7. Based on observation and chart review, were safety smocks only utilized for patients on Suicide Watch or Suicide Precaution?** | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |

| | | | |
|---|---|---|---|
| **8.** | **Based on observation and chart review, were safety smocks appropriately ordered (not offered with 'partial issue' clothing or because patient complained of being cold, etc.)?** | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |
| **9.** | **Were all patients not on Suicide Watch for Suicide Precaution in full issue clothing (this includes pants or jumpsuit)?** | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |
| 10. | Was there a daily provider order that justified clothing, property, and out-of-cell activities for patients on either Suicide Watch or Suicide Precaution? | | ☑ ADD TO | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP14 - MHCB Records with Rationale for Partial Issue* |
| 11. | Are orders for observation reordered daily until the patient is clinically removed from suicide precautions? | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |
| 12. | Are there any patients who were maintained on suicide precautions for the duration of stay, regardless of the clinical presentation of the patient?<br>  ○ If yes, enter their CDCR number in the comment box. | | ☑ ADD TO | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP14 - MHCB Records with Rationale for Partial Issue* |
| **13.** | **Do patients possess all ordered items and only those items?** | ☑ ADD TO | | **Response:** *Currently this question is not included in ether indicator. Our proposal is to add this to SP13 - Observation Orders Reviewed that Are Properly Documented* |

CDCR proposes to redo the documentation for SP14 and SP13 to ensure that the indicators measure all 13 questions depicted in the chart above—this goes beyond the recommendation from the Special Master's team to only include the five questions in **bold font** above. While reviewing the Special Master's September 20 email, CDCR decided it would be beneficial to also measure responses to the five remaining questions which were not previously measured within SP13 and SP14 but are a part of the same underlying audit. SP13 relates to reviewing actual orders during the on-site review and CDCR believes it is necessary to include additional questions that will assist with capturing the totality of the partial issue concept, along with all its parts. The same applies to SP14; CDCR believes there are additional areas of patient care that should be audited apart from situations where patients are not in need of partial issue. For example, question 12 from the table above asks: "Are there any patients who were maintained on suicide precautions for the duration of the stay, regardless of the clinical presentation of the patient?" CDCR will use this question to help ensure patients are kept on suicide precautions only so long as clinically indicated.  Due to these extensive revisions, SP13 and SP14 will

need to restart data remediation and go through all steps of the process— from start to finish, including validation, reprogramming, and verification – again. Once the documentation for SP13 and SP14 is recreated, it will be shared again with Plaintiffs and the Special Master's team through stakeholder review and final approval via email.

Preliminarily, CDCR proposes the following changes to SP13's and SP14's numerators:

## SP13 - Observation Orders Reviewed that Are Properly Documented

| Section | Current Language | Proposed Changes |
|---|---|---|
| KPI Title | Observation Orders Reviewed that Are Properly Documented | Onsite Observation of MHCB and Acute/ICF Partial Issue Orders Reviewed that Are Properly Documented |
| Summary | Percentage of observation orders reviewed while that are properly documented. | Percentage of observation orders reviewed while onsite that are properly documented. |
| Numerator | The number of the CQIT: Observation and Issue Orders audits from the denominator for which the response to all following questions is **YES**:<br>• (CQIT Q#2) For every day the patient was on partial issue, NOT including today, is there a progress note justifying partial issue?<br>• (CQIT Q#3) For every day the patient was on partial issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify partial issue in the observation order and in the progress note?<br>• (CQIT Q#5) For every day the patient was on partial issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note? | The number of the CQIT: Observation and Issue Orders audits from the denominator for which the response to all following questions is **YES**:<br>• (**Add** CQIT Q#1) Does patient clothing issue on the Adaptive Support Form (CDCR 128 C-2) or other authorized form on the cell door for each patient match what each patient has been issued?<br>• (**Remove** CQIT Q#2 from SP13 and add to SP14) For every day the patient was on partial issue, NOT including today, is there a progress note justifying partial issue?<br>• (**Remove** CQIT Q#3 from SP13 and add to SP14) For every day the patient was on partial issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify partial issue in the observation order and in the progress note?<br>• (**Add** CQIT Q#4) For every day the patient was on partial issue, NOT including today, did the order and/or progress note authorize non-suicide observation (e.g., 30-minute nursing checks)?<br>• (**Remove** CQIT Q#5 from SP13 and add to SP14) For every day the patient was on partial issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note?<br>• (**Add** CQIT Q#6) Are specific orders for suicide precaution documented?<br>• (**Add** CQIT Q#7) Based on observation and chart review, were safety smocks only utilized for patients on Suicide Watch or Suicide Precaution?<br>• (**Add** CQIT Q#8) Based on observation and chart review, were safety smocks |

|  | appropriately ordered (not offered with 'partial issue' clothing or because patient complained of being cold, etc.)? <br> • **(Add** CQIT Q#9) Were all patients not on Suicide Watch for Suicide Precaution in full issue clothing (to include pants or jumpsuit)? <br> • **(Add** CQIT Q#11) Are orders for observation reordered daily until the patient is clinically removed from suicide precautions? <br> • **(Add** CQIT Q#13) Do patients possess all ordered items and only those items? |
|---|---|

## SP14 - MHCB Records with Rationale for Partial Issue

| Current Numerator | Proposed new numerator |
|---|---|
| Number of "Yes" responses to the following question in CQIT: Observation and Issue Orders from the denominator: <br> • (CQIT Q#2) For every day the patient was on partial issue, NOT including today, is there a Progress note justifying partial issue? | Number of "Yes" responses to the following question in CQIT: Observation and Issue Orders from the denominator: <br> • (Keep CQIT Q#2 and Remove from SP13) For every day the patient was on partial issue, NOT including today, is there a Progress note justifying partial issue? <br> • **(Add** CQIT Q#3 Remove from SP13) For every day the patient was on partial issue, NOT including today, did the clinician refrain from using vague terms such as "suicide obs, or/and suicide eval" to justify partial issue in the observation order and in the progress note? <br> • **(Add** CQIT Q#5 Remove from SP13) For every day the patient was on partial issue, NOT including today, are decisions about observation level (e.g., SW/SP) justified in the progress note? <br> • **(Add** CQIT Q#10) Was there a daily provider order that justified clothing, property, and out-of-cell activities for patients on either Suicide Watch or Suicide Precaution? <br> • **(Add** CQIT Q#12) Are there any patients who were maintained on suicide precautions for the duration of stay, regardless of the clinical presentation of the patient? |

Please let us know if you have any concerns with CDCR's proposed approach for SP13 and SP14 no later than **noon on Friday, December 1, 2023**. If this approach is acceptable, CDCR will send out a further communication to show how we anticipate extending these indicators to apply to the PIP population.

Thank you,

*Sundeep Thind*

Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

***Pronouns – She, her, hers***

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.