1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                    No. 90-cv-0520 KJM DB

12                        Plaintiffs,          ORDER FINDING DEFENDANTS
                                               IN CIVIL CONTEMPT AND
13          v.                                 ORDERING PAYMENT OF FINES

14   GAVIN NEWSOM, et al.,

15                        Defendants.

16

17

# Table of Contents

I.    INTRODUCTION .................................................................................... 4

II.   BACKGROUND ..................................................................................... 6

    A.   Initial Efforts to Remediate Unconstitutional Mental Health Staffing Levels (1995-1999) ................................................................................. 9

    B.   Initial Staffing Proposals Approved/Compliance Efforts Continue (1999-2009) ........... 10

    C.   Staffing Plan Adopted (2009) ...................................................... 13

    D.   October 2017 Order Requiring Compliance........................................ 17

    E.   Unexpected Tours and Detours ..................................................... 19

        1.   Defendants' Unilateral Tours .................................................. 19

        2.   Whistleblower Report/Parallel Settlement Proceedings ..................... 20

        3.   Onset and Impact of COVID-19 Pandemic .................................. 21

        4.   Post-Pandemic: Refocusing on Staffing Enforcement ....................... 22

    F.   Parallel Expansion of Telepsychiatry .......................................... 25

    G.   2023 Enforcement Proceedings .................................................... 26

III.  LEGAL STANDARDS................................................................................ 29

IV.  THRESHOLD EVIDENTIARY ISSUES.................................................... 34

    A.   Parties' Undisputed Facts .......................................................... 34

    B.   Motion to Strike and Request for Judicial Notice ........................... 34

V.   FACTUAL FINDINGS AND CONCLUSIONS OF LAW ............................... 35

    A.   Specific and Definite Court Order as Prerequisite .......................... 35

    B.   Undisputed Mental Health Staffing Fill Rates ............................... 38

    C.   Actual Compliance Defense ........................................................ 39

    D.   Substantial Compliance Defense .................................................. 40

        1.   Substantial Compliance with 90 Percent Threshold?....................... 40

        2.   Substantial Compliance Based on Reasonable Steps?....................... 41

          a)  Defendants' Expert Testimony ............................................ 41

          b)  Defendants' Testimony from CDCR/CCHCS Employees ................. 46

             (i) Staffing Adjustment ...................................................... 46

             (ii)   Expansion of Telemental Health ................................... 47

             (iii)  Salary and Financial Incentives................................... 49

             (iv)   Streamlined Hiring Processes/New Marketing and  Recruiting Efforts............. 50

             (v)   Contracts with Registry Providers................................. 51

          c)  Plaintiffs' Rebuttal Expert ................................................ 52

          d)  Plaintiffs' Testimony from CDCR Employees ........................... 55

           e)  Defendants Have Not Shown Substantial Compliance Based on Taking All Reasonable Steps ............................................... 55

        3.   Non-Compliance as Inadvertent Result of COVID-19 Pandemic ............... 59

        4.   Summary.................................................................................. 63

1      E.     Impossibility ................................................................................ 63

2      F.     Defendants' Supplemental Briefing .......................................... 64

3      G.     Overall Summary ....................................................................... 65

4   VI.   CONCLUSION ................................................................................ 71

5

6

1   Plaintiffs are a class of approximately 34,079 California state prisoners with serious

2 mental disorders.  This class, which currently continues to increase in size and whose number

3 defendants project will remain close to 30,000 through 2028, *see generally* ECF No. 8259 at 15–

4 29 (totaling average daily census rates across all mental health programs),[1] has more than doubled

5 since the start of this action.  The class has been waiting for nearly three decades for the state to

6 meet its constitutional obligations when it comes to the delivery of mental health care.

7 Defendants are officials at the highest levels of California's executive branch:  California

8 Governor Gavin Newsom, California Department of Corrections and Rehabilitation (CDCR)

9 Secretary Jeff Macomber, Undersecretary for Health Care Services for CDCR Diana Toche,

10 D.D.S., Deputy Director of the Statewide Mental Health Program for CDCR Amar Mehta,

11 M.D., Director of California Department of State Hospitals (DSH) Stephanie Clendenin, and

12 Director of the California Department of Finance Joe Stephenshaw.[2]

13   This order addresses one area in which defendants have not met their constitutional duties,

14 namely adequate mental health staffing.  As defendants have known it would, the court finds

15 defendants in civil contempt and imposes fines of $111,939,244.00[3], as explained in detail below.

16 **I.  INTRODUCTION**

17   In 1995, the court first found overwhelming evidence of significant and chronic

18 understaffing among mental health care service provider positions in California's prison system,

19 together with other significant deficiencies rising to the level of an Eighth Amendment violation.

---

[1] Because of the volume of filings on the docket, including numerous filings filed on the same date, the court deviates from conventional Blue Book citation format and cites directly to the docket number as a short citation form throughout this order.  References to page numbers in documents filed in the court's Electronic Case Filing (ECF) system are to the page numbers assigned by the ECF system and located in the upper right-hand corner of the page.

[2] Since this action began in 1990, many different individuals have served in the public offices now occupied by the current defendants.  The duties this court has imposed on prior defendants run to their successors.  *See* Fed. R. Civ. P. 25(d).

[3] The court tasked defendants with calculating and reporting fines monthly, *see* Feb. 28, 2023 Order, ECF No. 7742, Jan. 23, 2024 Order, ECF No. 8116.  As discussed below, the court now imposes the fines that have accumulated since April 1, 2023.  The fines imposed by this order are those reported by defendants in the last report filed before this order, ECF No. 8254, totaling $125,599,163.00, minus $13,659,919.00 in fines that accumulated in February and March 2023, *see* ECF No. 7824 at 23.

The court directed defendants to remediate the violation.  In 1999, the court ordered defendants to comply with designated staffing ratios.  In 2002, with the violation continuing, the court ordered defendants to maintain staffing levels without exceeding a 10 percent vacancy rate.  In 2009, with the violation still continuing, the court ordered defendants to develop a formal Staffing Plan to address and remediate structural impediments to compliance.  That Plan incorporated refined staffing ratios that remain in effect today.  In October 2017, given that defendants had achieved only fleeting compliance for a brief period, without the required sustained compliance, the court ordered full compliance with the required staffing levels.

Following a detour to address a whistleblower report and take account of the COVID pandemic, the court recently turned its full focus to enforcement.  On February 28, 2023, the court issued its order setting out a framework for staffing enforcement, including a system of fines to begin accumulating, on paper, on March 31, 2023.  If fines accumulated for more than three consecutive months the court said it would set the matter for hearing on findings of contempt and actual payment of fines.  On June 12, 2023, the court found fines had accumulated for three consecutive months.  In other words, faced with the threat of fines,  defendants still had not complied with their obligations to the plaintiff class, and they did not dispute their noncompliance.  In late 2023, the court presided over evidentiary proceedings to decide whether and how to enforce its prior orders.  Defendants acknowledge they are required to comply with their constitutional obligations to the plaintiff class.  Defendants do not dispute the October 10, 2017 order is sufficiently specific and definite as to its terms to support enforcement.  They do not and cannot contend they have actually complied in full with the October 10, 2017 order. They instead contend they have achieved "actual and substantial compliance" with the 90 percent fill rate requirement across some classifications in some periods of time, and assert the defenses of substantial compliance and impossibility.  During the evidentiary proceedings, defendants did not, however, submit sufficient evidence to support those defenses.

On March 8, 2024, the court issued a tentative ruling, reading it in open court, announcing the court's intention to hold some or all of the defendants in contempt and impose fines as sanctions until defendants achieve compliance in delivering the critically necessary, long-overdue

1  staffing relief for members of the plaintiff class.[4]  Prior to making a final ruling, as agreed by the

2  parties, the court referred the question of staffing compliance to a Ninth Circuit Mediator for a

3  sixty day period.  The Ninth Circuit Mediator met with the parties for three days of discussion, on

4  March 29, 2024, April 12, 2024, and May 10, 2024.[5]  *See* ECF Nos. 8174, 8197, 8232.  At the

5  conclusion of the third session, the Mediator informed the court the parties had exhausted their

6  discussions.  ECF No. 8234.  Therefore, as the court indicated on March 8, 2024, it now has no

7  choice but to issue this order as its final formal decision.  This order confirms the court's tentative

8  decision, provides a complete explanation of the background leading to the decision, and takes

9  account of the supplemental briefing the court allowed the parties to file after they exhausted

10  settlement.  *See* ECF Nos. 8235 (May 14, 2024 Minute Order), 8251 (Plaintiffs' Supplemental

11  Brief), 8260 (Defendants' Response), 8266 (Plaintiffs' Reply).

12  **II.    BACKGROUND**

13          The following background is based on the full record before the court, including the

14  record previously established by evidence and documents of which the court takes judicial notice,

15  as well as the record created during the evidentiary hearing in 2023.  Fed. R. Evid. 201; *see*

16  *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), *aff'd*, 645 F.2d 699

17  (9th Cir. 1981) (citing *Shuttlesworth v. Birmingham*, 349 U.S. 147, 157 (1969), *Egan v. Teets*,

18  251 F.2d 571, 577 n.10 (9th Cir. 1957), and 9 C. Wright & A. Miller, Federal Practice and

19  Procedure § 2410 at 359 (1971)).

20          In 1995, after a 1993 bench trial, the court found overwhelming evidence of significant

21  and chronic understaffing among mental health care service providers in California's prison

22  system, rising to the level of a violation of the Eighth Amendment.  *Coleman v. Wilson*,

23  912 F. Supp. 1282, 1307–08 (E.D. Cal. 1995).[6]  The pervasive harm to California's seriously

---

        [4] Staffing is not the only area in which defendants have not achieved compliance, but it is
the only issue addressed by this order.

        [5] At the parties' request, the court extended the sixty day period for an additional two days
to include a further session on May 10, 2024.  ECF No. 8197.

        [6] A United States Magistrate Judge presided over the 1993 bench trial, in accordance with
28 U.S.C. § 636(b)(1)(B).  On June 6, 1994, the magistrate judge issued extensive findings and
recommendations resulting from the court trial.  June 6, 1994 F. & R., ECF No. 547.  The court's

1   mentally ill inmates caused by this understaffing was obvious.  *See id.* at 1316.  The vacancy rate

2   in authorized[7] mental health care positions was twenty-five percent, dating back to fiscal year

3   1991-1992 at least.  *Id*. at 1306 n.30.  Today, the vacancy rate in CDCR's Mental Health Services

4   Delivery System (MHSDS) is higher: it is greater than twenty-nine percent among psychiatrists,

5   psychologists, social workers, recreation therapists, and medical assistants, collectively, exclusive

6   of mental health staff in CDCR's Psychiatric Inpatient Programs (PIPs).[8]  Specifically, defendants

7   report a total of 2254.5 authorized mental health staff positions for April 2024, of which 1590.69

8   are filled, for a fill rate of 70.56 percent.  *See* Defs.' Monthly Mental Health Staffing Vacancy

9   Reps. at 23, ECF No. 8254.[9]  The ongoing harm to the plaintiff class caused by these high

10   vacancy rates is as clear today as it was thirty years ago and the harm persists despite multiple

11   court orders requiring defendants to reduce those rates.

12   /////

13   /////

14   /////

15   /////

16   /////

17   /////

---

1995 order was based on its review of those findings and recommendations and the parties' responses to them.  *Coleman v. Wilson*, 912 F. Supp. at 1293.

   [7] In this order, the court uses the terms "authorized" and "allocated" interchangeably when referring to numbers of mental health staff positions defendants have determined they need for any particular period.

   [8] CDCR's MHSDS has programs at each of four levels of care: Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient Program (EOP), Mental Health Crisis Beds (MHCBs), and inpatient programs that provide both acute and intermediate levels of inpatient care.  *See generally* 2021 Program Guide Update, ECF No. 7333-1.  For reasons explained below, the court's enforcement proceedings have focused on inadequate mental health staffing levels across the CCCMS, EOP, and MHCB levels of care.  *See* Mar. 17, 2023 Order, ECF No. 7766.

   [9] Since March 2018 the state has filed monthly reports identifying psychiatrist vacancy rates at each CDCR prison and systemwide.  *See* Feb. 15, 2018 Order at 5, ECF No. 5786; Stipulated Fact No. 12, Joint List of Stipulated Facts, ECF No. 7956.  On January 18, 2023, the court expanded this monthly reporting requirement to include fill or vacancy rates for all psychologist, clinical social worker, recreation therapist, and medical assistant classifications. Jan. 18, 2023 Order, ECF No. 7704; Stipulated Fact No. 15, ECF No. 7956.



*See Coleman v. Wilson*, 912 F. Supp. at 1306 n.30 (1992/93 rates); ECF No. 8254 at 23 (April 2024).

Moreover, the population of seriously mentally ill inmates has more than doubled over the course of the remedial phase of this action, requiring significant increases in mental health staffing levels. Defendants have not, however, kept pace with the increased need for staff caused by this population growth.



*See* Special Master's R. & R. on Defs.' Revised Program Guide at 3, ECF No. 1749 (1997 MHSDS Population); 3/25/2024 MHSDS Mgmt. Info. Summ. (MIS) Report (provided by Coleman Special Master from CDCR Secure Website for Monthly Reports) (2024 MHSDS Population).[10]

---

[10] The court takes judicial notice of this document. *See* Fed. R. Evid. 201(b).

1    Since late 1995, the court has overseen remedial efforts through four main stages

2 described below. [11]   The entire time, the court and its Special Master have adhered to a "carefully

3 constructed . . . process . . . intended to moderate court intrusion into defendants' own remedial

4 efforts . . . arguably more respectful of defendants' knowledge of their operations and their

5 management prerogatives than a process whereby oversight is transferred to a receivership. . .

6 [and] more hopeful that defendants can best determine how to meet their constitutional

7 obligations" to the plaintiff class.  *Coleman v. Newsom*, 424 F. Supp. 3d 925, 929 (E.D. Cal.

8 2019).  A graphic timeline plotting key dates illustrates how many years and remedial stages have

9 passed since the court originally ordered constitutionally adequate staffing:

10

| 1995-1999 | 1999 | 2009 | 2017 | 2023 |
|---|---|---|---|---|
| Court appointed Special Master guides initial development of staffing ratios and other remedial steps required to achieve adequate mental health staffing levels. | Court provisionally approves first set of staffing ratios and issues a series of orders setting maximum vacancy rates; maximum staffing vacancy rate ultimately set at 10 percent. | Defendants file court-ordered staffing plan with updated Staffing ratios | Court orders full compliance with staffing remedies within one year | Court holds staffing enforcement proceedings |

11 The court references these stages in its review of relevant background below, while also

12 explaining the unexpected detours between 2017 and 2023 due to the COVID-19 pandemic,

13 among other factors.

14    **A.    Initial Efforts to Remediate Unconstitutional Mental Health Staffing Levels**
15        **(1995-1999)**

16    At the time of trial in 1993, defendants had both insufficient numbers of authorized mental

17 health staff positions and a twenty-five percent vacancy rate among the positions that were

18 authorized.  *Coleman v. Wilson*, 912 F. Supp. at 1306 & n.30.  Based on the trial record, the court

19 had identified the need to focus on staffing ratios to ensure sufficient staffing tied to the number

20 of plaintiff class members.  *See* ECF No. 547 at 39 (for at least a decade prior to the trial,

21 defendants had not had a "method for determining necessary mental health staffing ratios"),

---

[11] *See Coleman v. Wilson*, 912 F. Supp. at 1324, *see also generally* December 11, 1995
Order of Reference, ECF No. 640.

1     *adopted by Coleman v. Wilson*, 912 F. Supp. 1282.  Staffing ratios "determine[ ] the number of

2     mental health staff, . . . needed to provide the services required to be delivered by th[ose]

3     program[s] to a specific number of inmate/patient participants."  Special Master's

4     Recommendations for Staffing Ratios at 3, ECF No. 994.  Then-existing staffing vacancies also

5     contributed significantly to defendants' Eighth Amendment staffing violation.  *See Coleman v.*

6     *Wilson*, 912 F. Supp. at 1318; *see also, e.g.*, Special Master's Report on Plans, ECF No. 850 at

7     15–19 (first report from Special Master on remedial plans describing "vacancy rates of better than

8     20 percent in some key positions" and "undisputed need" to address this issue, among others).

9          In early 1996, the court ordered defendants to submit numerous remedial plans to the

10    Special Master, including staffing ratios to govern staffing at each level of care of the MHSDS as

11    well a recruitment plan to reduce ongoing mental health staff vacancy rates, and directed the

12    Special Master to review the plans, "reconcil[e] any differences among" the Special Master's

13    experts and the parties, and submit "the resulting fully developed plans to the court for approval."

14    February 7, 1996 Order at 2, ECF No. 659.

15         In June 1997, the Special Master submitted for approval an initial series of court-ordered

16    remedial plans and reported he would need additional time to review and monitor defendants'

17    plans for staffing ratios and recruitment before he could submit them to the court for approval.

18    ECF No. 850 at 15–18.  In May 1999, after additional work, the Special Master recommended the

19    court give provisional approval to most of defendants' mental health staffing ratios and require

20    reductions in certain mental health staff vacancy rates, and that defendants be required to develop

21    a retention plan for CDCR psychiatrists.  *See* Special Master's Report on Staffing Vacancies,

22    ECF No. 1032; *see also* Notice of Filing of Special Master's Suppl. Recommendations on

23    Staffing Ratios & Admin. Segregation, ECF No. 1033.

24         **B.      Initial Staffing Proposals Approved/Compliance Efforts Continue (1999-2009)**

25         In July 1999, the court adopted the Special Master's recommendations in his May 1999

26    reports.  *See generally* July 26, 1999 Order, ECF No. 1055.  The court provisionally approved the

27    set of staffing ratios the Special Master recommended, with limited exceptions requiring

28    additional work.  *Id*. at 4–5.  The court also ordered defendants to "reduce the vacancy rates

1   among psychiatrists to 25 percent or less and among psych social workers to ten percent or less,"

2   and to reduce the use of contract psychiatrists.  *Id*. at 4.

3         The court and the Special Master then sought to bring greater focus to staffing remediation

4   by refining requirements for reduction of vacancy rates and monitoring the efficacy of the

5   provisionally approved staffing ratios.  In 2002, after reviewing the results of defendants' ongoing

6   efforts to reduce mental health staffing vacancy rates, the court ordered defendants to maintain a

7   maximum vacancy rate of ten percent among psychiatrists, psychologists, and social workers.  *See*

8   June 13, 2002 Order at 4, ECF No. 1383.  The maximum ten percent vacancy rate also now applies

9   to recreation therapist and medical assistant positions.  *See generally* Apr. 11, 2023 Order, ECF

10  No. 7806.

11        In March 2006, the court gave final approval to most provisions of defendants' remedial

12  plan for the delivery of mental health care to class members, and ordered immediate

13  implementation of the remedial plan, including finalization of staffing ratios sufficient to support

14  this required implementation.  *See generally* Mar. 3, 2006 Order, ECF No. 1773.  The remedial

15  plan is known as the Program Guide.[12]  *See, e.g.,* Sep. 3, 2020 Order at 4, ECF No. 6846.

16        Between 1997 and 2007, the population of inmates with serious mental disorders more than

17  doubled, rising from 14,293 inmate patients in July 1997, ECF No. 1749 at 3, to 32,958 in May

18  2007, Special Master's Resp. to Ct.'s May 17, 2007 Req. for Info. at 2, ECF No. 2253.  The

19  following bar graph illustrates this rise in the population of seriously mentally ill inmates.

---

[12] "The Program Guide is defendants' plan, approved by the court, to remedy identified violations in the delivery of mental health care to the plaintiff class."  Sept. 3, 2020 Order at 4, ECF No. 6846.  The Program Guide originated as the set of plans, policies and protocols the court provisionally approved in June 1997.  *See* ECF No. 1749 at 2; *see also* ECF No. 1773 at 2.  In early 2006, after several years of monitoring by the Special Master and revision and updating by the parties under his supervision, the Special Master submitted defendants' January 2006 Revised Program Guide to the court, recommending final approval of most of its provisions.  *See generally* ECF No. 1749; *see also* Jan. 2006 Revised Program Guide, ECF No. 1753.  On March 3, 2006, the court approved the undisputed provisions of the January 2006 Revised Program Guide and ordered defendants "to immediately implement all such provisions."  ECF No. 1773 at 2.  The Program Guide was updated in 2009, in 2018, and in 2021.  *See* ECF No. 6846 at 4; *see also* Feb. 7, 2022 Order, ECF No. 7456 (approving 2021 Program Guide Update, ECF No. 7333-1).

1



2  *See* ECF No. 1749 at 3 (July 1997 and October 2005); Special Master's Fifteenth Monitoring Rep.,
3  ECF No. 1746-3 at 53 (May 2005); Suppl. to Special Master's Sixteenth Monitoring Rep., ECF
4  No. 2082 at 43 (January 2006); ECF No. 2253 at 2 (May 2007).

5      As the number of seriously mentally ill inmates incarcerated in California's prisons

6  continued to rise, so too did the number of mental health staff positions required to keep pace.

7  The population increase erased, among other things, "the progress made by defendants in

8  maintaining adequate [mental health] staffing . . . ."  July 23, 2007 Order at 6, ECF No. 2320.  In

9  2007, at the court's request, the Chief Judge of the United States Court of Appeals for the Ninth

10  Circuit convened a three-judge court to consider prison overcrowding.  July 26, 2007 Order, ECF

11  No. 2328.  After trial proceedings the three-judge court found overcrowding was the "primary

12  cause" of ongoing constitutional violations in the delivery of both medical and mental health care

13  in California's prisons, including severe understaffing in CDCR's MHSDS, and ordered

14  defendants to reduce the general prison population.  *See Coleman v. Schwarzenegger*,

15  922 F. Supp. 2d 882 (E.D. Cal. & N.D. Cal. 2009), *aff'd*, *Brown v. Plata*, 563 U.S. 493 (2011).

16  Defendants' compliance with that order has resulted in a significant decrease in the general prison

1 population in California but the population of seriously mentally ill inmates has not declined in

2 corresponding fashion and today it is the size it was at the time of the three-judge court

3 proceedings. *Id.* at 898 ("There are currently over 34,000 inmates identified as seriously mentally

4 ill in the state's prisons.").

5       **C.**     **Staffing Plan Adopted (2009)**

6       During the third stage, the court continued to prod defendants by ordering them to develop

7 a staffing plan to finally resolve all outstanding issues with mental health staffing. June 18, 2009

8 Order at 2, ECF No. 3613. On September 30, 2009, defendants filed their Staffing Plan. ECF

9 No. 3693; *see also* Stipulated Fact No. 3, ECF No. 7956. The 2009 Staffing Plan cured the

10 state's prior failure to adequately estimate its mental health staffing needs, a failing identified by

11 expert testimony in the three-judge court proceedings. *See Brown v. Plata*, 563 U.S. at 518 n.5;

12 *Coleman v. Brown*, 938 F. Supp. 2d 955, 984 (E.D. Cal. 2013). In late 2009, the CDCR

13 defendants "submitted a budget change proposal to the California Legislature to 'fully

14 implement' the staffing model . . . in the 2009 Staffing Plan. . . . The budget change proposal

15 described the critical flaws in defendants' prior staffing model, and represented that the 2009

16 Staffing Plan 'identifies appropriate staffing levels to meet constitutional standards . . . .'" *Id.*

17 (quoting Ex. K to Decl. of Jane E. Kahn in Support of Pls.' Resp. to Defs.' Mot. to Strike or

18 Modify Portions of the Twenty–Fifth Round Monitoring Report of the Special Master, filed

19 Feb. 11, 2013 (Ex. K to Decl. Kahn) (ECF No. 4325) at 93, 95).

20       Prior to 2017, CDCR delegated provision of inpatient mental health care for class

21 members to the California Department of Mental Health (DMH), now known as the California

22 Department of State Hospitals (DSH). *See* Aug. 23, 2023 Order at 2, ECF No. 7924. For that

23 reason, the staffing ratios in the 2009 Staffing Plan cover mental health staffing at the CCCMS,

24 EOP, and MHCB levels of care. *See supra* note 7 (describing levels of care);[13] *see also*

_____

      [13] In 2017, CDCR assumed responsibility for all inpatient mental health programs except three programs operated by DSH, one at Atascadero State Hospital (ASH), one at Coalinga State Hospital (CSH), and one at Patton State Hospital (PSH). ECF No. 7924 at 3–4. As required by the court, defendants have developed separate staffing plans for the PIPs operated by CDCR and the DHS inpatient programs. *See* CDCR PIP Staffing Plan, ECF No. 7921; DSH Staffing Plan, ECF No. 7078-1. In December 2022, the court approved the DSH Staffing Plan. December 20,

1   Stipulated Fact No. 4, ECF No. 7956.  The table below sets out the staffing ratios that pre-dated

2   the court-ordered 2009 Staffing Plan, and the staffing ratios in the 2009 Staffing Plan.

3

| Position | Level of Care | [Pre-2009] Staffing Ratios (Averages) | 2009 Staffing Plan Ratios |
|---|---|---|---|
| *Primary Clinician* | CCCMS-GP[14] | 1:94 | 1:97 |
| | CCCMS-RC[15] Treatment | 1:66 | 1:80 |
| | CCCMS-ASU[16] and Condemned Unit | 1:18 | 1:25 |
| | CCCMS-SHU[17] | 1:33 | 1:50 |
| | EOP-GP | 1:21 | 1:26 |
| | EOP-RC | 1:21 | 1:18 |
| | EOP- ASU and Condemned Unit | 1:9 | 1:11 |
| | PSU[18] | 1:12 | 1:12 |
| | | | |
| *Staff Psychiatrist* | CCCMS-GP | 1:315 | 1:280 |
| | CCCMS-RC Intake and Screening | -- | 1:33 |
| | CCCMS-RC Treatment | 1:301 | 1:200 |
| | CCCMS-ASU and Condemned Unit | 1:98 | 1:125 |
| | CCCMS-SHU | 1:149 | 1:200 |
| | EOP-GP | 1:99 | 1:120 |
| | EOP-RC | 1:99 | 1:120 |

---

2022 Order at 10, ECF No. 7688.  In October 2023, the court ordered defendants to maintain a ten percent maximum staff vacancy rate in the CDCR PIPs and come into complete compliance with the staffing ratios in the CDCR PIP Staffing Plan, subject to that vacancy rate, within six months. *See generally* Oct. 11, 2023 Order, ECF No. 8009.  The court has set a status conference for June 27, 2024 on, among other matters, defendants' compliance with the October 11, 2023 order. *See* Nov. 15, 2023 Order at 5, ECF No. 8066; Apr. 18, 2024 Order at 2, ECF No. 8205; June 12, 2024 Minute Order, ECF No. 8270.

[14] General Population.

[15] Reception Center.

[16] Administrative Segregation Unit.

[17] Segregated Housing Unit.

[18] Psychiatric Services Unit.

| | | | |
|---|---|---|---|
| | EOP-ASU and Condemned Unit | 1:58 | 1:64 |
| | PSU | 1:64 | 1:64 |
| | MHCB | 1:8 | 2.5:25 |
| | MH-OHU[19] | -- | 1:9 |
| | | | |
| *Senior Psychiatrist, Supervisor* | MHCB | 1:133 | 1:50 |
| | MH-OHU | -- | 1:150 |
| | | | |
| *Psychologist* | CCCMS-RC Intake and Screening | -- | 1:11 |
| | MHCB | 1:6 | 1.18:10 |
| | MH-OHU | -- | 1:4.37 |
| | | | |
| *Senior Psychologist, Supervisor* | CCCMS-GP | 1:1163 | 1:1200 |
| | CCCMS-RC Intake and Screening | -- | 1:200 |
| | CCCMS-RC Treatment | No existing standard | 1:960 |
| | CCCMS-ASU and Condemned Unit | 1:195 | 1:150 |
| | CCCMS-SHU | 1:648 | 1:300 |
| | EOP-GP | 1:160 | 1:150 |
| | EOP-RC | 1:160 | 1:175 |
| | EOP-ASU and Condemned Unit | 1:76 | 1:66 |
| | PSU | 1:76 | 1:64 |
| | MHCB | 1:59 | 1:50 |
| | MH-OHU | -- | 1:35 |
| | | | |
| *Licensed Clinical Social Worker* | MHCB | 1:11 | 1:50 |
| | | | |

---

[19] Mental Health Outpatient Housing Unit.

| Supervising Psychiatric Social Worker | CCCMS-GP | None | 1:1200 |
|---|---|---|---|
| | CCCMS-RC Treatment | None | 1:960 |
| | | | |
| Recreational Therapist | CCCMS-ASU and Condemned Unit | 1:476 | 1:150 |
| | CCCMS-SHU | 1:324 | 1:150 |
| | EOP-GP | 1:53 | 1:45 |
| | EOP-RC | 1:53 | 1:45 |
| | EOP- ASU and Condemned Unit | 1:53 | 1:45 |
| | PSU | 1:62 | 1:45 |
| | MHCB | 1:62 | 1.76:25 |
| | MH-OHU | -- | 1:10 |

*See* Stipulated Fact No. 6, ECF No. 7956.

Since the 2009 Staffing Plan's adoption, with minimal modifications approved by the court, *see* Feb. 28, 2023 Order at 7, ECF No. 7742 (citing Jan. 27, 2021 Order, ECF No. 7035, and Joint Resp. to Orders of March 16 and March 30, 2022 Re: Supervisory Psychiatry Staffing, ECF No. 7526),[20] this Plan has been a necessary component of defendants' remedial plans, which they must fully implement to remedy the ongoing constitutional violations in this action, *see*, *e.g.*, ECF No. 6846 at 5; *see also* Jan. 6, 2023 Order at 2, ECF No. 7699 (defendants' 2009 Staffing Plan, if implemented, will bring state into constitutional compliance).

/////

---

[20] The first modification, adopted in January 2021, adds new staff psychiatrist ratios for CCCMS inmates who have been off medications for at least six months, redirects certain psychiatrist positions designated for crisis intervention on weekends and holidays to a telepsychiatrist pool that provides after hours coverage at all institutions seven days a week, and adds a policy for use of psychiatric nurse practitioners in certain positions held by psychiatrists. *See* ECF No. 7035 at 2 (citing Adjustments to 2009 Staffing Plan, ECF No. 6978-1). The second, agreed to by the parties and subject to their ongoing review, changes the formula for allocating Chief Psychiatrists and Senior Psychiatrist Supervisors. *See* ECF No. 7526; *see also* Parties' Joint Report in Resp. to Jan. 5, 2024 Min. Order on Defs.' Mar. 4, 2021 On-Site Psychiatry Supervisor Proposal, ECF No. 8113.

1   There is no dispute that the ratios in the 2009 Staffing Plan resolved prior inadequacies in

2   authorizing sufficient numbers of mental health staff positions for defendants to comply with the

3   Eighth Amendment.

4   **D.    October 2017 Order Requiring Compliance**

5   In October 2017, after several more years of remedial work without achievement of

6   adequate mental health staffing levels, the court concluded that enforcement proceedings would

7   be required.  *See generally* October 10, 2017 Order, ECF No. 5711 (appended as Attachment A).

8   In court filings leading up to the court's issuance of that order, defendants contended it was time

9   to reevaluate the staffing ratios for psychiatrists set in the 2009 Staffing Plan.  *Id*. at 12 (quoting

10  Defs.' Resp. to Rep. on Staffing at 4, ECF No. 5591).  In the October 2017 order, the court

11  rejected defendants' sweeping suggestion, finding defendants had not begun to meet the "heavy

12  burden" required to justify revision of those ratios and that there was "scant evidence in the

13  record to suggest this change would advance remediation of the Eighth Amendment violation in

14  this case [and] strong evidence that such a change would slow progress toward the end of federal

15  court oversight."  *Id*. at 14, 18, 19.  The court left room only for defendants to raise with the

16  Special Master whether full implementation of the psychiatric medical assistant (PMA) program

17  defendants proposed in 2015 might allow adjustment of psychiatrist staffing ratios.  *Id*. at 4, 19.[21]

18  In addition, the court ordered defendants to develop a telepsychiatry policy as an

19  addendum to the Program Guide and set general parameters for that policy.  *Id*. at 21 (quoting

20  ECF No. 5564 at 15–17), 23, 30 ("[t]elepsychiatry should serve as a supplement, rather than a

21  substitute, for on-site psychiatry and should only be used when institutions are unable to recruit

22  psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists";

23  recommendations by the Special Master concerning the use of telepsychiatry at CCCMS, EOP,

24  and MHCB levels of care should be incorporated into policy).

---

[21] In April 2023, the court found defendants had "effectively abandoned their original
PMA proposal without informing the Special Master or the court" based on defendants' March
2023 report informing the court that the PMA plan "has 'evolved over the last seven years into
the current medical assistant classification'" under which medical assistants serve only as
telepresenters.  ECF No. 7806 at 5 (quoting ECF No. 7761 at 9–10).

17

Further, the court found defendants' January 2017 updated plan in aid of implementation of the 2009 Staffing Plan did not include the timeline for completion the court had required in a prior order. *Id*. at 11 (citing Aug. 9, 2016 Order at 6, ECF No. 5477). The court emphasized it was "past time for defendants to complete the task of hiring sufficient mental health staff to come into compliance with the Eighth Amendment and orders of this court." *Id*. The court observed that "further orders requiring specific remedial measures" "would in a number of instances be redundant and, more importantly, would tip the balance unacceptably toward micromanagement and substitute this court's judgment for that of prison administrators." *Id*. at 27. In his February 2017 report, the Special Master reported without objection that by November 2016, the population of seriously mentally ill inmates had reached 36,645 and was higher than it had been in June 2008 "at the height of CDCR's [inmate] population crisis." ECF No. 5564 at 22. In view of these undisputed facts the court in its order noted serious questions about whether defendants could ever achieve constitutionally adequate mental health staffing levels "as long as the size of the mentally ill population in California's prison system remains at current levels or continues to grow." ECF No. 5711 at 28.

The court set a one-year deadline for the CDCR defendants[22] to "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." *Id*. at 30; *see also* Stipulated Fact No. 7, ECF No. 7956. The court set a further status conference for October 11, 2018, directed defendants to complete the telepsychiatry policy addendum so they could implement it before the one-year deadline, and directed the parties to file a joint status report thirty days prior to the October 2018 status conference "addressing, as necessary, issues pertaining to enforcement of [the October 10, 2017] order and to durability of the staffing remedy." *Id*. at 30–31. The schedule set by the court did not hold, as detailed below.

---

[22] The CDCR defendants are, collectively, the CDCR Secretary, the CDCR Undersecretary for Health Care Services, and the Deputy Director of the Statewide Mental Health Program for CDCR.

1        **E.**      **Unexpected Tours and Detours**

2            **1.**      **Defendants' Unilateral Tours**

3        After issuance of the October 2017 order, defendants did not follow the court's directives

4 limiting the remaining staffing remedial work to be done.  Instead, they retained consultants to

5 unilaterally tour several CDCR prisons in December 2017 and January 2018 to support a review

6 of their staffing plan.  *See generally* Corrected Decl. of McClain, ECF No. 5781; McClain Decl.

7 Ex. A, ECF No. 5781-1.  Plaintiffs then moved for case management orders and sanctions.  Pls.'

8 Mot. Case Mgmt. & Sanctions, ECF No. 5764-1.  To keep the case on track, the court required

9 defendants to provide to the Special Master and plaintiffs the findings of the staffing consultants

10 defendants had retained and directed the Special Master to "take all steps necessary to create a

11 complete factual record" for the court to resolve (1) whether defendants could "hire a sufficient

12 number of psychiatrists, through salary adjustments, forensic psychiatric fellowships, exhaustion

13 of clustering, and other recruiting and retention efforts," (2) the role of telepsychiatry in

14 remediating the psychiatrist staffing shortages, and (3) whether any adjustments to psychiatrist

15 staffing ratios could be made consistent with the requirements of the Eighth Amendment.  ECF

16 No. 5786 at 2–5.

17        In May 2018 defendants presented a proposal to the Special Master and plaintiffs to

18 eliminate certain positions allocated in the 2009 Staffing Plan.  *See* July 3, 2018 Order at 2, ECF

19 No. 5850.  The court allowed the parties to continue discussions supervised by the Special Master

20 until the hearing set for October 2018.  *Id*. at 3.  In addition, given defendants' delays in the

21 development of the telepsychiatry policy the court had required in its October 10, 2017 order, the

22 court directed the Special Master to propose a final telepsychiatry policy, *id*. at 4–7, and added

23 defendants' proposed expansion of the use of telepsychiatry to the October 2018 hearing, ECF

24 No. 5928 at 2.  All the court's efforts remained firmly focused on the one-year deadline set in the

25 October 10, 2017 order, and geared toward enforcement proceedings if needed beginning in

26 October 2018.

27 /////

1        **2.      Whistleblower Report/Parallel Settlement Proceedings**

2        On October 5, 2018, ten days before the court's scheduled proceedings, both parties filed

3   unanticipated requests:  plaintiffs sought a status conference and defendants sought a stay of

4   proceedings.  *Coleman v. Newsom*, 424 F. Supp. 3d at 929.  The requests arose from allegations

5   challenging defendants' data collection and reporting, contained in a whistleblower report sent to

6   the *Plata*[23] Receiver by Dr. Michael Golding, Chief Psychiatrist for CDCR.  *Id*. at 928–29.  Given

7   the serious allegations in the report, and their implications for the record on which the court

8   would rely, the court continued the October 2018 hearing and appointed a Neutral Expert to

9   investigate the allegations.  *See generally* Dec. 14, 2018 Order, ECF No. 6033.

10       In the same time frame, on December 18, 2018, to keep the case moving forward, the

11  court ordered the parties to a settlement conference before another district judge "to focus on

12  whether mentally ill inmates can be located in fewer total institutions to address persistent

13  impediments" to completion of the staffing remedy, among other issues.  Dec. 18, 2018 Min.

14  Order, ECF No. 6050; *see also, e.g.*, Rep.'s Tr. of Proc. Re: Status Conf. (RT 12/14/18)[24] at 41–

15  42, ECF No. 6054.  While the first of four meetings with the settlement judge had some limited

16  success, *see* Joint Status Rep. Re: Settlement Conference and Custody and Mental Health

17  Partnership Plan, ECF No. 6103 at 2–3, none resulted in agreements that materially advanced the

18  staffing remedy.  *See* Mins. Settlement Conference, ECF Nos. 6125, 6397, 6449.

19       After the neutral investigator completed his investigation and report, the court held a

20  focused two-day evidentiary hearing in October 2019, and then made extensive findings,

21  including that "defendants ha[d] knowingly presented misleading information to the court in

22  numerous areas critical to the remedy in this case and measuring compliance with that remedy."

23  *Coleman v. Newsom*, 424 F. Supp. 3d at 952.  Drawing on the record and its experience with the

24  case to that point, the court reminded the parties that absent "a transformational and pragmatic

25  alternative to the prison as de facto mental health hospital . . . the staffing remedy in this case

---

[23] *Plata v. Newsom*, No. 01-1351 (N.D. Cal.).

[24] Throughout this order, citations to the date of a Reporter's Transcript (RT) of proceedings are to the date on which a proceeding took place and not the date the transcript was filed.

1    calls for defendants' staffing plan in the context of the Program Guide to chart the way forward

2    and be put front and center." *Id.* at 957–58.  The court subsequently ordered an extensive data

3    remediation project, supervised by the Special Master, which began in 2020.  November 16, 2023

4    Order at 2, ECF No. 8069.  The court expects this project to be completed promptly and will be

5    issuing a separate order to that effect soon.

6          Proceedings on the whistleblower reports and the unsuccessful settlement efforts

7    sidetracked further staffing enforcement through the end of 2019.

8                    **3.        Onset and Impact of COVID-19 Pandemic**

9          In early 2020, the court signaled it would return to enforcement of the October 10, 2017

10   order.  Jan. 7, 2020 Order at 5, ECF No. 6441.  However, in March 2020, the COVID-19

11   pandemic overtook the court's plans as it became clear the world was facing a public health crisis,

12   with attendant impacts on California's prison system and the delivery of mental health care to

13   class members.  *See*, *e.g.*, Mar. 17, 2020 Order at 1–2, ECF No. 6509.  The onset of the pandemic

14   precipitated a series of court proceedings focused primarily on the pandemic's impact on

15   compliance with court orders.  *See* Apr. 3, 2020 Order, ECF No. 6572; Apr. 10, 2020 Order, ECF

16   No. 6600; Mins. Status Conference, ECF Nos. 6546, 6571, 6602, 6619, 6651, 6665, 6692, 6712,

17   6740, 6778.  During this time, defendants "issued guidance to the field on providing mental

18   health care during a state of emergency, taking into account potential staffing pressures and

19   movement restrictions."  CDCR COVID Plan at 7, ECF No. 6616.  In late July 2020, the court

20   acknowledged several stipulations the parties filed "relating to operation of the Program Guide

21   during the COVID-19 pandemic."  July 28, 2020 Order at 1, ECF No. 6791; *see also* ECF No.

22   6679 at 9 & App. A; App. A, ECF No. 6718; App. A, ECF No. 6761 (Stipulations).

23         The court did not approve the stipulations. *See generally* ECF No. 6791.  Instead, the

24   court emphasized that constitutional requirements for the delivery of mental health care to the

25   plaintiff class were established in the Program Guide, acknowledged plaintiffs had decided not to

26   challenge several identified departures from the Program Guide for a period of ninety days, and

27   stressed that the court continued "to expect defendants will comply with the requirements of the

28   Program Guide to the full extent possible while also complying with the best public health

                                                21

1    practices applicable to those persons in the *Coleman* class under the circumstances of the

2    COVID-19 pandemic." *Id*. at 3.

3              **4.        Post-Pandemic: Refocusing on Staffing Enforcement**

4              By July 2020, the court prepared to resume enforcement of Program Guide provisions and

5    staffing requirements, while noting the COVID-19 pandemic continued to impact prison

6    operations.  *See generally* July 2, 2020 Order, ECF No. 6750.  After considering briefs filed by

7    the parties, the court determined it was time to move forward with staffing enforcement taking

8    account of lessons learned during the pandemic.  *See generally* July 30, 2020 Order, ECF No.

9    6794.  Initially, the court directed the parties to file briefs addressing specific questions about

10   what it would take for defendants to come into compliance, including regarding the size of the

11   mentally ill inmate population defendants could serve at existing levels of mental health staff, and

12   what other remedies were available to the court to enforce the requirements of its October 10,

13   2017 order; the court set the matter for hearing in September 2020, *id*. at 8, and subsequently

14   denied a defense request to continue the hearing date, *see* Aug. 26, 2020 Order at 4–5, ECF No.

15   6838.

16             After the September 2020 hearing, the court  required defendants to promptly provide

17   specific and detailed information describing "the number of class members at each level of the

18   . . . MHSDS that can be served by the current filled mental health staffing positions using the

19   positions and ratios set out in the 2009 Staffing Plan, including telepsychiatrists as authorized

20   under the provisionally approved telepsychiatry policy, as well as regular contractors, and

21   allowing for a ten percent vacancy rate."  Sept. 25, 2020 Order at 2, ECF No. 6886.  The court

22   also signaled it would consider an agreement of the parties, approved by the Special Master,

23   concerning the use of psychiatric nurse practitioners (PNPs) and allowed defendants to provide a

24   second set of calculations identifying the number of class members who would be served with the

25   addition of PNPs.  *Id*.

26             Defendants' response to the order included some additional calculations, but defendants

27   qualified those with sweeping contentions, including an assertion that "any analysis of staffing

28   ratios that accepts as a premise the methodologies and assumptions underlying the 2009 Staffing

1    Plan is, itself, inherently flawed." Resp. to Sept. 25, 2020 Order at 3, ECF No. 6896. The court

2    rejected defendants' assertion that the 2009 Staffing Plan was "outdated and substantially flawed"

3    as unsupported by evidence. ECF No. 6938 at 6 (quoting ECF No. 6853 at 32). At the same

4    time, the court recognized defendants had proposed certain revisions to the 2009 Staffing Plan

5    "that may well warrant consideration" and that the Special Master found those revisions could be

6    finalized soon. *Id*. The court granted the parties another month to finalize the proposals and

7    ready them for discussion at a fourth quarterly status conference in December 2020. *Id*. at 8.

8    This proposal led to the court's approval of a first set of revisions to the 2009 Staffing Plan on

9    January 27, 2021, ECF No. 7035, as follows:

10       o   Add new staff psychiatrist ratios for CCCMS inmates off medications for at
11          least six months:

12             CCCMS GP, Off meds        1:675

13             CCCMS ASU/CON[25], Off meds    1:303

14             CCCMS SHU, Off meds      1:483

15       o   Redirect .52 psychiatrist positions from each institution for crisis
16          intervention on weekends and holidays to a telepsychiatrist pool providing
17          after-hours coverage seven days a week at all institutions.

18   ECF No. 6978-1 at 3–4 (approved by ECF No. 7035); Stipulated Fact Nos. 8 and 9, ECF

19   No. 7956. Since January 2021, defendants have adjusted their monthly reports on psychiatrist

20   vacancies to reflect these modifications. Stipulated Fact No. 10, ECF No. 7956.

21         During 2021, the court continued to focus on the levels of care required by the Program

22   Guide. *See*, *e.g.*, Feb. 18, 2021 Order at 2, ECF No. 7064. In July 2021, the parties committed to

23   additional settlement conferences. *See* July 26, 2021 Order, ECF No. 7246. Before the court

24   could schedule the settlement conferences, however, the court faced the need to address two other

25   unexpected issues raised by emails the Special Master received from defense counsel. July 20,

26   2021 Min. Order, ECF No. 7255. One of the defendants' emails suggested certain staffing issues

27   were unresolved; in a minute order the court confirmed it had resolved those issues. *Id*. (citing

---

[25] Condemned Unit.

1    ECF Nos. 6938, 7035). Defendants' other email raised again the prospect of staffing tours by

2    defense experts, notwithstanding the court's prior orders following the unilateral tours conducted

3    by defendants in 2017 and 2018. *See generally* ECF No. 5786; Feb. 21, 2018 Order, ECF No.

4    5794; ECF No. 7255. At a status conference on August 4, 2021, the court confirmed discovery

5    was closed in this action, and only "narrow issues" remained with respect to staffing

6    requirements. The court said it was aware of current staffing vacancy rates, and that at that time

7    it was "inclined" not to revisit staffing enforcement "any time soon." Rep.'s Tr. of Proc. (RT

8    8/4/21) at 7:16–8:4, ECF No. 7267. In open court, defendants Dr. Amar Mehta and then-CDCR

9    Secretary Allison represented "the [new] tours were part of CDCR's ongoing efforts to improve

10    their system." Aug. 25, 2021 Order at 2, ECF No. 7283. The court accepted at face value

11    defendants' representation that the tours were in aid of compliance with the required remedy in

12    this action, rather than further litigation, and "confirm[ed] its instruction to the Special Master not

13    to attend the staffing tours so that his energy and resources can remain focused on the Twenty-

14    Ninth Monitoring Round and participation in all upcoming settlement conferences." *Id.* at 2–4.

15    Given "[s]ystemwide staff vacancy rates among psychiatrists ha[d] recently been below the court

16    ordered ten percent vacancy rate" the court confirmed it was "not inclined" to revisit the question

17    of staffing enforcement. *Id.* at 3.

18         Between September 15 and December 13, 2021, a settlement judge, this time a magistrate

19    judge, convened several settlement conferences. *See* Mins., ECF Nos. 7313, 7338, 7364, 7394.

20    Through these discussions, the parties resolved one dispute related to staffing, namely, they

21    stipulated to an eighteen-month trial period for defendants to implement new criteria for

22    allocating Chief Psychiatrist and Senior Psychiatrist Supervisor positions, during which time

23    plaintiffs agreed not to seek enforcement of the 1:50 ratio for Senior Psychiatrist Supervisors in

24    the 2009 Staffing Plan. ECF No. 7526. The parties initially agreed to an eighteen month pilot

25    period for these new criteria, ECF No. 7526, which they renewed in January of this year. ECF

26    No. 8113 at 2.[26]

_____

    [26] The pilot need not be completed and any issues finally resolved before the court
enforces its October 10, 2017 order, as final resolution of these allocations will not have a

1    The settlement conferences concluded at the end of 2021 with no further agreements

2  related to staffing.  On February 28, 2023, the court ordered its October 10, 2017 order deemed

3  modified by the January 27, 2021 order, ECF No. 7035, approving the revisions to certain staffing

4  ratios in the 2009 Staffing Plan as set out in Section II(G)(3), *supra*, as well as the PNP policy, *id.*

5  and the parties' April 22, 2022 agreement concerning allocation of psychiatric supervisors, ECF

6  No. 7526.  ECF No. 7742 at 7.  The court's order modifying the October 10, 2017 order is

7  attached to this order as Attachment B and incorporated herein.

8        **F.      Parallel Expansion of Telepsychiatry**

9        Consistent with defendants' stated plans, further informed by their experience during the

10  COVID-19 pandemic,  *see*, *e.g.*, ECF No. 7196 at 9–11, 14–27, defendants continued to expand

11  their use of telepsychiatry.  In December 2022, the Special Master reported that by the time of

12  their August 31, 2022 monthly psychiatry vacancy report defendants had a total of 98.50

13  allocated telepsychiatry positions, ECF No. 7682 at 40 n.29, an increase of 61.5 authorized

14  positions from the thirty-seven positions reported in 2016.  Eighty-nine of the authorized

15  telepsychiatrist positions were filled.  *Id.* at 40.  CDCR had 103 telepsychiatry offices located in

16  six telepsychiatry hubs throughout the state.  *Id*. at 40 n.27.  However, only thirteen

17  telepsychiatrists worked from the hub offices; the rest worked at home, with the record unclear as

18  to why.  *Id*. at 40.

19        Then in April 2023, the court gave final approval to the parties' agreed telepsychiatry

20  policy.  Apr. 12, 2023 Order, ECF No. 7807.  In giving final approval to this policy, the court

21  rejected a revised policy defendants proposed, on grounds the court's October 10, 2017 and

22  July 3, 2018 orders controlled the substantive parameters of telepsychiatry, that defendants'

23  proposed revised policy differed materially from specific provisions of those orders and,

24  therefore, defendants were required to seek relief from those orders before any proposed revised

25  policy could be adopted.  *Id*. at 9.  In May 2023, the court approved the parties' stipulation

26  concerning use of telepsychiatry from home offices.  May 9, 2023 Order, ECF No. 7830.  In

material impact on defendants' staffing levels for purposes of these staffing enforcement
proceedings.

1   approving the stipulation, the court observed that the Special Master's next round of monitoring

2   "[would] be of great utility to the court and to all stakeholders" in evaluating whether the revised

3   policy had sufficient safeguards to ensure continued quality of care in the practice of

4   telepsychiatry from home.  *Id*. at 4–5.

5       That same month, defendants appealed the court's April 2023 order approving the

6   telepsychiatry policy, without having filed a Rule 60 motion.  ECF No. 7834; *see generally*

7   Docket, *Coleman v. Newsom*, No. 23-15755 (9th Cir.).  Defendants' appeal remains pending

8   before the court of appeals.  The court has continued to make clear it has never closed to the door

9   to further expansion of defendants' use of telepsychiatry and telemental health, through

10  appropriate means.  *See*, *e.g.,* Rep.'s Tr. of Hr'g (RT 9/29/23) at 9–10, ECF No. 8013.

11      **G.      2023 Enforcement Proceedings**

12      The court's tentative conclusion in mid-2021, that the need for staffing enforcement may

13  have become moot in light of improved vacancy rates among psychiatrists, *see* ECF No. 7283 at

14  3, soon proved incorrect.  Over several months in 2022, the court received increasing numbers of

15  letters and emails "from individuals and union leaders concerning mental health staffing levels in

16  the state's prison system."  Dec. 2, 2022 Order at 1, ECF No. 7675.  The court directed the

17  Special Master to file charts showing institutional and systemwide vacancy rates for

18  psychologists, clinical social workers, recreation therapists, and medical assistants.  *Id*.  Those

19  charts showed that in September 2022 vacancy rates had spiked up again: among psychologists

20  the rate was 33.1 percent, among social workers 30.02 percent, among recreation therapists 26.3

21  percent, and among medical assistants 47.9 percent.  Special Master's Resp. to Dec. 1, 2022

22  Order at 2–5, ECF No. 7677.  Defendants' monthly psychiatrist vacancy report for September

23  2022 showed a vacancy rate of 17 percent among psychiatrists, ECF No. 7645 at 5, which

24  remained the same in October 2022, ECF No. 7674 at 5.  The court thus returned to consider

25  enforcement.

26  /////

27  /////

28  /////

On January 6, 2023, the court issued an order outlining the need for staffing enforcement, among several other areas of noncompliance in this action.  ECF No. 7699 at 2–3.[27]  On January 18, 2023, the court ordered defendants to expand their monthly vacancy reports to include "fill or vacancy rate information for all psychologist classifications, all clinical social worker classifications, all recreation therapist classifications and all medical assistant classifications," data it previously had not required given the apparently stable vacancy rates in these classifications in October 2017 and thereafter.  ECF No. 7704 at 2.  On February 28, 2023, the court issued its order setting out a framework for staffing enforcement, including a system of fines to begin accumulating, on paper, on March 31, 2023.  ECF No. 7742 at 5–6, *amended by* Apr. 7, 2023 Order, ECF No. 7804.  The court indicated that if fines accumulated for more than three consecutive months it would set the matter for hearing on findings of contempt and actual payment of fines.  ECF No. 7742 at 7.  As reflected in that order, given all that transpired between October 2018 and February 2023, the court will not consider imposing sanctions for defendants' non-compliance for any period prior to the end of March 2023.  On March 17, 2023, the court confirmed that vacancies in the CDCR PIPs, though reported in defendants' monthly vacancy reports, are not within the scope of these enforcement proceedings.  ECF No. 7766.

On June 12, 2023, the court found fines had accumulated for three consecutive months and, accordingly, set the enforcement proceedings for September 29, 2023.  June 12, 2023 Order at 2, CF No. 7856.

Between September 29, 2023 and October 5, 2023, the court held the focused evidentiary hearing to inform its consideration of findings of contempt and whether to order payment of the accumulated fines because of the persistent and ongoing mental health staffing shortages in

---

[27] The court invited the United States Attorney General to "advise the court whether he will participate in this action until its conclusion, assuming the role of *amicus* at a minimum."  ECF No. 7699 at 5.  The United States accepted the court's invitation in part and filed a response to the January 2023 order, ECF No. 7713, appeared at a status conference on February 10, 2023, ECF No. 7723, and filed a response to two motions filed by plaintiffs, ECF No. 7846.  In its filings, the United States "agree[d] that adequate staffing is essential to ensuring constitutional mental health care" and identified models for remediation and enforcement it had pursued in other cases, including imposition of fines "structured to motivate compliance."  ECF No. 7713 at 5–7.

1    CDCR's MHSDS.  *See* Mins. Enf't Hr'g, ECF Nos. 7986, 7996, 7998, 8000.  The parties filed

2    opening briefs, Defs. Opening Br., ECF No. 7951; Pls.' Opening Br., ECF No. 7952, and closing

3    briefs, Defs.' Closing Br., ECF No. 8019; Pls.' Closing Br., ECF No. 8021; Pls.' Notice of Errata,

4    ECF No. 8023.  With their closing briefs, the parties filed motions addressing the evidentiary

5    record: defendants filed a motion to strike hearsay, Mot. Strike, ECF No. 8018, and plaintiffs

6    filed a request for judicial notice, Req. Judicial Notice, ECF No. 8020, and a notice of errata,

7    Notice of Errata, ECF No. 8022.  Each party opposes the other's motion regarding the evidence,

8    Pls.' Opp'n to Defs.' Mot. Strike, ECF No. 8035; Defs.' Objs. to Pls' Req. for Judicial Notice,

9    ECF No. 8044, and defendants have filed a reply to plaintiffs' opposition to the motion to strike,

10   Reply Mot. Strike, ECF No. 8047.[28]  As the court directed, Oct. 24, 2023 Order, ECF No. 8031,

11   the parties also filed focused supplemental briefs, Defs.' Suppl. Br., ECF No. 8045; Pls.' Suppl.

12   Br., ECF No. 8046.  The court heard closing arguments on November 2, 2023.  Mins. Enf't Hr'g,

13   ECF No. 8050.  As noted above, on March 8, 2024, the court issued a tentative ruling, reading it

14   in open court and filing it on the docket.  Minutes for Status Conference, ECF No. 8146; Mar. 8,

15   2024 Bench Order, ECF No. 8147.  The court referred the matter to the Ninth Circuit Mediator,

16   and concluded the referral after the parties' third session on May 10, 2024.  May 14, 2024 Minute

17   Order, ECF No. 8234.  With leave of court, ECF No. 8235, the parties filed further supplemental

18   briefing, completing the record for the court's final ruling here.  *See* ECF Nos. 8251 (Pls.' Suppl.

19   Brief), 8260 (Defs.' Resp.), 8266 (Pls.' Reply).

20        The court first sets out the applicable legal standards below, and then articulates its

21   findings of fact and conclusions of law.

---

[28] The court resolves defendants' motion to strike by separate order.  Plaintiffs seek judicial notice of six documents filed in two other class action lawsuits, appended as Exhibits A through F to their request for judicial notice, to support their arguments there are other steps defendants could take to comply with the court's orders.  For the reasons explained in this order, defendants have failed to meet their burden to show, among other matters, they have taken all reasonable steps available to them to comply with the court's staffing orders.  The court has not relied on any of the documents tendered by plaintiffs in reaching this conclusion.  Plaintiffs also ask the court to take judicial notice of two calculators used to determine state and federal inflation rates.  The court has relied only on the testimony of plaintiffs' expert with respect to the rate of inflation and finds no serious dispute over this testimony.  For all these reasons, the court will deny plaintiffs' request for judicial notice as unnecessary.

1    **III.    LEGAL STANDARDS**

2    State officials have "primary responsibility for curing" constitutional violations in the

3    scope of their jurisdiction. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (citing *Milliken v.*

4    *Bradley*, 433 U.S. 267, 281 (1977)), *abrogated on other grounds by Dep't of Agric. Rural Dev.*

5    *Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024). Where those officials "fail in their affirmative

6    obligations . . . judicial authority may be invoked." *Id.* (quoting *Swann v. Charlotte-Mecklenburg*

7    *Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Where a court has issued orders to remedy identified

8    constitutional violations and those orders remain disobeyed, the court has "ample authority to go

9    beyond earlier orders" and enter an order necessary to "bring an ongoing violation to an

10    immediate halt." *Id.* at 687 & n.9. The court's inherent authority includes the power to "enforce

11    compliance with [its] lawful orders through civil contempt." *Shillitani v. United States*,

12    384 U.S. 364, 370 (1966) (citing *United States v. United Mine Workers of America*, 330 U.S. 258,

13    330–32 (1947) (hereafter *UMWA*)).

14    A "district court has 'wide latitude in determining whether there has been a contemptuous

15    [defiance] of its order.'" *Stone v. City of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992)

16    (quoting *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984)). A district court's contempt

17    findings and imposition of sanctions are reviewed for abuse of discretion, and "deference to the

18    district court's exercise of discretion is heightened where the court has been overseeing a large,

19    public institution for a long period of time." *Id.* (citing *Rufo v. Inmates of Suffolk County Jail*,

20    112 S. Ct. 748, 765 (1992) (O'Connor, J., concurring) and *Hutto*, 437 U.S. at 688).

21    "Under traditional principles of equity practice, courts have long imposed civil contempt

22    sanctions to 'coerce the defendant into compliance' with an injunction or 'compensate the

23    complainant for losses' stemming from the defendant's noncompliance with an injunction."

24    *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *UMWA*, 330 U.S. at 303–04). Of

25    course, "civil contempt is a 'severe remedy'" and "should not be resorted to where there is [a] *fair*

26    *ground of doubt* as to the wrongfulness of the defendant's conduct." *Id.* at 1801–02 (emphasis

27    and alteration in original) (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618

28    (1885)). This standard is grounded in "principles of 'basic fairness [which] requir[e] that those

1    enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil

2    contempt." *Id.* at 1802 (second alteration in original) (quoting *Schmidt v. Lessard*, 414 U.S. 473,

3    476 (1974)).

4          A court's finding of civil contempt must be based on "clear and convincing evidence that

5    the [alleged] contemnors violated a specific and definite order of the court." *Stone*, 968 F.2d at

6    856 n.9 (citing *Balla v. Idaho St. Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989)). The "clear-

7    and-convincing-evidence" standard requires proof that "place[s] in the ultimate factfinder an

8    abiding conviction that the truth of [the] factual contentions [of the party with the burden of

9    proof] are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal

10   citation omitted). The focus of civil contempt proceedings is on the violation of the court order;

11   "a contempt proceeding does not open to reconsideration the legal or factual basis of the order

12   alleged to have been disobeyed . . . ." *United States v. Rylander*, 460 U.S. 752, 756 (1983)

13   (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)); *see also UMWA*, 330 U.S. at 290–93 (court

14   orders cannot be ignored and must be obeyed unless and until they are set aside through process

15   of judicial review); *Stone*, 968 F.2d at 857 n.11 (quoting *Balla*, 869 F.2d at 465).

16         The standard for a finding of civil contempt is "generally an *objective* one," though

17   subjective intent is not always irrelevant; civil contempt may be found "when a party acts in bad

18   faith." *Taggart*, 139 S. Ct. at 1802 (emphasis in original) (citing *Chambers v. NASCO, Inc.*,

19   501 U.S. 32, 50 (1991)). As a rule, a party's subjective but objectively unreasonable belief that it

20   is complying with the order does not protect the party from a finding of civil contempt, nor does

21   "the absence of wilfulness [sic] . . . relieve from civil contempt." *Id.* (quoting *McComb v.*

22   *Jacksonville Paper Co.*, 336 U.S.187, 191 (1949)); *see also Stone*, 968 F.2d at 856 (in general

23   "intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense" to a

24   finding of such contempt (citing *McComb*, 336 U.S. at 191)).[29] On the other hand, a court should

_____

[29] In their supplemental briefing, defendants cite *Shillitani* for the proposition that
willfulness is an element of civil contempt. *See* ECF No. 8260 at 11 ("But this misses the point
of civil contempt which is to 'enforce compliance' where a party 'willfully disobeys a specific
and definite order requiring him to do or refrain from doing an act.' *Shillitani v. U.S.*,
384 U.S. 364, 371 (1966); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983)"). The

1    not find civil contempt where the evidence shows the alleged contemnor's action "appears to be

2    based on a good faith and reasonable interpretation of the [court's order]." *In re Dual-Deck*

3    *Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quoting *Vertex*

4    *Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)).  If the record

5    shows violation of a clear and definite court order, the burden "shifts to the [alleged] contemnors

6    to demonstrate why they were unable to comply." *Stone*, 968 F.2d at 856 n.9; *see also Toussaint*

7    *v. McCarthy*, 597 F. Supp. 1427, 1430 (N.D. Cal. 1984).  Defenses available to a contemnor

8    include substantial compliance with the court's order, or a showing that compliance is impossible.

9    If alleged contemnors show "substantial compliance," "technical or inadvertent [sic] violations of

10   the order will not support a finding of civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*,

11   787 F.2d 1376, 1379 (9th Cir. 1986) (citations omitted).

12          To succeed on a defense of substantial compliance, alleged contemnors must show they

13   "took *all* reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th

14   Cir. 2016) (emphasis in original) (citation omitted).  *Kelly* involved contempt proceedings against

15   the warden of an Idaho prison and Corrections Corporation of America (CCA) for failing to

16   comply with a settlement agreement that required CCA to staff the prison "with a specified

17   number of security personnel." *Id*. at 1091.  Plaintiffs in *Kelly* moved for contempt after it came

18   to light that "CCA's employees had falsified staffing records to represent that correctional

19   officers were staffing mandatory security posts when, in fact, those posts had been vacant for a

20   total of nearly 4,800 hours during a seven-month period . . . ." *Id*. at 1091–92.  The court of

21   appeals found CCA had emphasized "the steps it took to comply with the settlement agreement,"

22   for example increasing the "number of budgeted security staff positions" at the prison, but that

23   CCA had "fail[ed] to mention other reasonable steps it could have taken," namely actually filling

24   "a substantial number of those budgeted positions." *Id*. at 1096.

25          An alleged contemnor's failure to comply with a court order even when faced with a

26   "threat [of] harsh monetary sanctions" can support a finding that the alleged contemnor failed to

language defendants attribute to *Shillitani* is actually in *Shuffler* and the holdings of *McComb* and
*Taggart* are controlling.

31

1    take all reasonable steps to comply with the order. *Stone*, 968 F.2d at 857 (citing *Toussaint*,

2    597 F. Supp. at 1430).  In *Stone*, the district court found the City of San Francisco in contempt for

3    failing to comply with terms "of a consent decree governing population levels at one of the City's

4    jails." *Id.* at 852.  The court of appeals affirmed the district court's finding that the City had not

5    taken every reasonable step to comply with the consent decree based on evidence that (1) over a

6    nine year period since the decree was entered the jail's population was "often . . . above the

7    prescribed limits," including for the eight months preceding entry of the contempt order; and

8    (2) the City had failed to comply with the required population levels despite pendency of the

9    contempt motion and the attendant threat of "harsh monetary sanctions." *Id*. at 857.  The court of

10   appeals also affirmed the district court's finding that where there was evidence the City should

11   have known the jail population was going to increase, the City should have taken additional steps

12   to reduce the overcrowding. *Id*. at 858.  The court of appeals held these two factors were

13   sufficient to support the district court's determination "that the City had not taken every

14   reasonable step to comply with the consent decree." *Id*. at 857.

15          Delay in complying with a clear court order also can demonstrate a failure to take all

16   reasonable steps to comply with the order. *Toussaint*, 597 F. Supp. at 1430.  In *Toussaint*, the

17   court found four correctional staff, including the Warden of California State Prison at Folsom in

18   contempt for failing to comply with a court order setting limits on double-celling in segregation

19   units at the prison and required the defendants to end "with all reasonable dispatch" all double-

20   celling that exceeded those limits. *Id.*  The court held the eight-month delay in complying with

21   the injunction violated the order to end double-celling "with all reasonable dispatch" and the

22   defendants therefore had the burden "to show 'categorically and in detail' why they were unable

23   to end double-celling sooner." *Id*. (citations omitted).  The court also held defendants failed to

24   meet their burden: they showed only that they had taken inadequate and ineffectual steps for the

25   first three months after the court's order, had waited three months to formulate a plan to end

26   double-celling, and the plan was inadequate because it took five more months to come into

27   compliance with the order. *Id*. at 1431.

28   /////

32

1    As noted, impossibility also is a defense to civil contempt.  Civil contempt sanctions may

2  not be imposed "when it is clearly established that the alleged contemnor is unable to comply

3  with the terms of the order." *Turner v. Rogers*, 564 U.S. 431, 442 (2011)) (quoting *Hicks v.*

4  *Feiock*, 485 U.S. 624, 638 n.9 (1988)).  The alleged contemnor has the "burden of production"

5  when raising an impossibility defense, *Rylander*, 460 U.S. at 757, and "must show 'categorically

6  and in detail' why he is unable to comply,'" *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1241

7  (9th Cir. 1999) (quoting *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir.

8  1973)).

9    Also as noted above, the court may use its civil contempt powers "for either or both of

10 two purposes; to coerce the defendant into compliance with the court's order, and to compensate

11 the complainant for losses sustained." *UMWA*, 330 U.S. at 303–04; *see also Taggart*, 139 S. Ct.

12 at 1801.  Sanctions for civil contempt are considered nonpunitive and "avoidable through

13 obedience" to the court's order.  *Int'l Union, United Mine Workers of Am. v. Bagwell*,

14 512 U.S. 821, 827, 831 (1994).  Where the court imposes coercive contempt fines, the

15 requirement of an "opportunity to purge," i.e., "reduce or avoid the fine through compliance" is

16 what distinguishes civil from criminal contempt; civil contempt fines are fundamentally

17 conditional in nature.  *Id.* at 829 (citing *Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 590 (1947));

18 *see also Hicks*, 485 U.S. at 632–33; *United States v. Ayres*, 166 F.3d 991, 997 (9th Cir. 1999)

19 ("Civil contempt sanctions . . . are only appropriate where the contemnor is able to purge the

20 contempt by his own affirmative act . . . .").  Consequently, civil contempt sanctions "may be

21 imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Bagwell*,

22 512 U.S. at 827.  "Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.*  In

23 contrast, unlike here, a court exercises its criminal contempt power only when it intends to punish

24 the contemnor and vindicate the court's authority.  *UMWA*, 330 U.S. at 302.

25   In imposing coercive sanctions, the court "must . . . consider the character and magnitude

26 of the harm threatened by continued contumacy, and the probable effectiveness of any suggested

27 sanction in bringing about the result desired." *Id.* at 304.  "[A] party's good faith, even where it

28 does not bar civil contempt, may help to determine an appropriate sanction." *Taggart*, 139 S. Ct.

1   at 1802.  In contempt cases, the court should use "[t]he least possible power adequate to the end

2   proposed."  *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (quoting

3   *United States v. Wilson*, 421 U.S. 309, 319 (1975)).

4   **IV.    THRESHOLD EVIDENTIARY ISSUES**

5           **A.    Parties' Undisputed Facts**

6           Before the evidentiary hearing, on September 22, 2023, the parties filed a Joint List of

7   Stipulated Facts.  ECF No. 7956.  The court accepts those facts as established.  Throughout this

8   order, the court cites to these facts to the extent applicable.  It is appended as Attachment C and

9   incorporated in full in this order.

10          **B.    Motion to Strike and Request for Judicial Notice**

11          As noted above, defendant's filed a motion to strike certain excerpts of plaintiffs'

12  testimony as inadmissible hearsay, and plaintiffs filed a request for judicial notice.  As explained

13  in the separate order issued concurrently with this order, the court **grants in part and denies in**

14  **part the motion to strike**.

15          Plaintiffs ask the court to take judicial notice of six documents filed in *Plata v. Newsom*

16  concerning waivers of state law required to effect adequate levels of medical staffing in CDCR as

17  well as a coordination agreement between this action and *Plata*.  Plaintiffs contend these

18  documents are relevant to support plaintiffs' position that defendants can take the reasonable step

19  of requesting waivers of state law to come into compliance with this court's staffing orders.  The

20  court does not need to take judicial notice of these documents.  The court has waived other

21  provisions of state law in this action at the request of the parties, and cited the legal authority

22  governing such waivers in doing so.  *See, e.g.*, ECF No. 5592.  Defendants do not dispute they

23  could request waivers of state law to come into compliance with the court's staffing orders but

24  they contend "less intrusive measures exist which should be given time for implementation."

25  ECF No. 8260 at 13.  The court does not require additional evidence to determine defendants

26  have this step available to them and currently have chosen not to take it.  Plaintiffs also request

27  judicial notice of two government consumer price index calculators to support plaintiffs'

28  challenge to defendants' impossibility defense.  This too is unnecessary; as explained, defendants

1    have not met their burden on the impossibility defense.  For all these reasons, the court **denies the**

2    **request for judicial notice**.

3        The court's factual findings below take account of these evidentiary rulings.

4    **V.    FACTUAL FINDINGS AND CONCLUSIONS OF LAW**

5        More than six years ago the court first put defendants on notice it would issue

6    enforcement orders as necessary to obtain compliance with its October 10, 2017 order.  ECF

7    No. 5711 at 27–28, 31.  Due to intervening events more than five years have passed since

8    expiration of the one-year deadline the court set in that order.  Altogether, the plaintiff class has

9    been awaiting compliance for more than twenty-eight years.

10       Defendants acknowledge they are required to comply with their constitutional obligations

11   to the plaintiff class.  *See, e.g.*, RT 9/29/2023 at 21:20–23, ECF No. 8013.  They do not, and

12   could not, contend they have actually complied with the October 10, 2017 order.  They instead

13   contend they have achieved "actual and substantial compliance" with the 90 percent fill rate

14   requirement across some classifications in some periods of time, *see, e.g.*, ECF No. 8019 at 15,

15   and assert the defenses of substantial compliance and impossibility.

16       **A.    Specific and Definite Court Order as Prerequisite**

17       In its October 10, 2017 order, the court required the CDCR defendants, within one year, to

18   "take all steps necessary to come into complete compliance with the staffing ratios in their 2009

19   Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002

20   order."  ECF No. 5711 at 30.  In the same order, the court indicated it would address "as

21   necessary, issues pertaining to enforcement of th[e] order and to durability of the staffing

22   remedy."  *Id*. at 31.

23       Defendants do not dispute the October 10, 2017 order is sufficiently specific and definite

24   as to its terms to support enforcement.  *See* ECF No. 7951 at 5 ("At issue in these proceedings is

25   whether the State has failed to comply with this court's 90% staffing mandate across five mental

26   health classifications . . . ."), 8 ("This proceeding concerns staffing vacancy rates among CDCR

27   psychiatrists, psychologists, clinical social workers, recreation therapists, and medical

28   assistants.").  Defendants do not dispute they did not come into compliance with the October 10,

35

1    2017 order within the one-year deadline the court originally set in the order. *See id*. at 9–10,

2    ECF No. 7951, *see also* ECF No. 8019 at 14–15.[30][31]  Defendants also do not dispute they have

3    */////*

---

[30] Defendants rely extensively on their Exhibit 12, the CCHCS Coleman Request Filled Vacancy Report, DEFS-012; RT 10/3/23 at 77:19–23, ECF No. 8013-1 (testimony of Jasinda Muhammad), as the factual basis for asserted periods of compliance among the mental health classifications at issue, *see, e.g.*, ECF No. 8019 at 14–15.  The parties stipulated to the admissibility of this exhibit. Second Am. Joint Stipulated Ex. List at 2, ECF No. 8002. Defendants' Exhibit 12 consists of a series of charts showing monthly fill rates among the five classifications from January 2013 through December 2022. DEFS-012.  For purposes of this order, the court has relied on the exhibit to the extent it supports defendants' acknowledgement they have not at any point since October 2018 come into full compliance with the ratios in their 2009 Staffing Plan at the ten percent maximum vacancy rate required by the court's June 13, 2002 order.  For the following reasons, the court has not relied on the exhibit for the specific numbers set out within it.  First, the exhibit includes fill rates for the CDCR PIPS. *See, e.g.,* DEFS-012.002 at n.2; RT 10/3/23 at 80:4–6, ECF No. 8013-1.  As noted above, defendants' compliance with CDCR PIP staffing requirements is not at issue in these proceedings, ECF No. 7766, and beyond the general assertion that inclusion of the PIP fill rates in the charts in Exhibit 12 would "decrease the fill rates," RT 10/3/23 at 80:7–9, ECF No. 8013-1, defendants provide no specific evidence of non-PIP fill rates for the period covered by this exhibit.  Moreover, the court has compared the fill rate data for psychiatrists in Exhibit 12 with the fill rate data for psychiatrists provided in defendants' monthly vacancy reports filed since March 2018.  That comparison reveals the psychiatrist fill rate data provided in the majority of monthly vacancy reports is different from the psychiatrist fill rate data for the same months in defendants' Exhibit 12, with differences among reported allocation numbers and reported fill numbers and no discernible explanation for these differences.

Plaintiffs offered their exhibits 49 through 98 as evidence of fill rates in the mental health classifications at issue in these proceedings. *Id*. at 193.  A sample comparison of one of those exhibits, PL-089.003, reveals a comparable problem.  Plaintiffs' Exhibit 89 is a CCHCS Mental Health Institution Vacancies Report showing vacancies "as of February 2022." PL-089.003.  It shows a total of 354.50 allocated psychiatrist positions (31 Chief Psychiatrists, 19 Senior Psychiatrists, and 255 Staff Psychiatrists); defendants' Exhibit 12 reports a total of 389 authorized psychiatrist positions for both January 2022 and February 2022, DEFS-012.004; and defendants' monthly vacancy report for February 2022, ECF No. 7518, reports a total of 347 allocated psychiatrist positions.

All the data providing the basis for these reports is compiled and provided by defendants. The inconsistencies among the reports preclude the court from making precise numerical findings concerning the exact fill rates for any mental health classification for any of the months covered by defendants' Exhibit 12.  Regardless, for purposes of these proceedings the key fact is undisputed: Defendants have not complied with the October 10, 2017 order and they remain out of compliance.

[31] As set out in footnote 29 above and throughout this order, citations to exhibits offered at hearing are indicated by PL or DEFS followed by the exhibit number and the Bates-stamped page number.  All exhibits identified in this manner throughout this order were admitted at hearing and have not been filed on the docket in this action.

36

1    not sustainably filled all five MHSDS mental health classifications at or above the required 90

2    percent fill rate at any point since the October 2018 deadline.

3          The parties do dispute whether the October 2017 order itself allows for substantial

4    compliance through defendants' filling of allocated staff positions "to something less than the

5    90% threshold," as defendants contend it does.  *See* ECF No. 7951 at 16; *see also* ECF No. 8019

6    at 17 (the court's orders establish a "90% fill rate threshold"; substantial compliance with that

7    threshold "must therefore equate to something less than 90%").  Plaintiffs disagree, contending

8    the October 2017 order requires 100 percent compliance with the 2009 Staffing Plan, as modified,

9    and the ten percent maximum vacancy rate defines the floor of what constitutes "substantial

10   compliance" with the 2009 Staffing Plan staffing ratios, as modified.  ECF No. 7952 at 7.

11         By its terms, the October 10, 2017 order requires "complete compliance with the staffing

12   ratios in the[ ] 2009 Staffing Plan and the maximum ten percent vacancy rate required by the

13   court's June 13, 2002 order."  ECF No. 5711 at 30.  That is, the order imposes two conjunctive

14   requirements: (1) 100 percent compliance with the staffing ratios in the 2009 Staffing Plan and

15   (2) compliance with the maximum ten percent vacancy rate set by the June 13, 2002 order.  Taken

16   together, these two requirements mean defendants must allocate 100 percent of the positions

17   required by the staffing ratios in the 2009 Staffing Plan and have no more than a ten percent

18   vacancy rate systemwide in any of the five classifications at issue.  The order does not provide a

19   basis for the position that anything greater than a ten percent vacancy rate can be considered

20   substantial compliance.

21         Moreover, it is settled that the staffing ratios in the 2009 Staffing Plan are grounded in the

22   requirements of the Eighth Amendment as those have been developed in this expansive and

23   complex class action.[32]  This settled finding cannot be revisited in these contempt proceedings.

24   *See Rylander*, 460 U.S. at 756; *UMWA*, 330 U.S. at 290–93; *Stone*, 968 F.2d at 857 n.11.[33]  For

_____

[32] *See* July 9, 2019 Order at 6, ECF No. 6214 ("[I]n a case of this magnitude and
complexity 'the standards for compliance with the Eighth Amendment must and indeed "can only
be developed contextually."'" (quoting *Coleman v. Brown*, 938 F. Supp. 2d at 971 (in turn
quoting *Coleman v. Wilson*, 912 F. Supp. at 1301))).

[33] Despite the court's clear findings to the contrary, defendants continue to challenge the
settled principle that the staffing ratios in the 2009 Staffing Plan are necessary to complete

1    all of these reasons, 100 percent compliance with the staffing ratios and 100 percent compliance

2    with the maximum ten percent vacancy rate are the starting points for the court's assessment of

3    whether defendants are in substantial compliance with its October 10, 2017 order, as modified by

4    the court's approval of changes to certain staffing ratios in the 2009 Staffing Plan and the PNP

5    policy, and the parties' agreement to proceed with implementation of certain changes to ratios for

6    allocations of psychiatric supervisors.  ECF No. 7742 at 7.  One hundred percent compliance with

7    both measures is also the benchmark against which the court assesses defendants' impossibility

8    defense.  Taken together, defendants must maintain at least a ninety-percent fill rate in all mental

9    health classifications to comply with these two measures, as required by the October 10, 2017

10   order.  Defendants have the burden to establish their defenses for non-compliance with that order.

11              **B.    Undisputed Mental Health Staffing Fill Rates**

12          In evaluating whether defendants have met their burden, the court finds it is undisputed

13   that defendants have not achieved durable compliance with the October 10, 2017 order, and they

14   remain out of compliance with that order.  As noted above, given all that transpired between

15   October 2018 and February 2023, the court will not impose sanctions for defendants' non-

16   compliance with the court's October 10, 2017 order, as modified, for any period prior to the end

17   of March 2023.

18          The chart below covers the period from April 2023 through April 2024, the period during

19   which fines have accumulated to date.  Entries in black show fill rates in compliance with staffing

20   ratios at the ten percent maximum vacancy rate; entries in red show fill rates out of compliance

21   with the required ten percent maximum vacancy rate.

---

remediation of the Eighth Amendment violation in this action.  *See* ECF No. 8045 at 2–3.  The court disregards this assertion and will disregard it going forward.  Defendants are cautioned the court will entertain or act on an appropriate motion to strike or for sanctions or both if they continue to raise this argument without making an appropriate showing why the court should revisit these established principles.  *Cf. Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016) ("law of the case doctrine generally prohibits a court from considering an issue that has already been decided by that same court or a higher court in the same case . . . doctrine is concerned primarily with efficiency, and should not be applied when" evidence changes substantially, "controlling law has changed, or when applying the doctrine would be unjust").  These criteria track the requirements for seeking reconsideration of this court's orders.  *See* Fed. R. Civ. P. 60(b); E.D. Cal. L.R. 230(j).

1

**FILL RATES FROM APRIL 2023-APRIL 2024**

2

|  | Psychiatrists | Psychologists | Social Workers | Medical Assistants | Recreation Therapists |
|---|---|---|---|---|---|
| Apr 2023 | 90% | 65% | 73% | 76% | 91% |
| May 2023 | 94% | 65% | 75% | 77% | 92% |
| June 2023 | 93% | 64% | 76% | 78% | 91% |
| July 2023 | 89% | 62% | 73% | 68% | 88% |
| Aug 2023 | 91% | 62% | 74% | 69% | 90% |
| Sep 2023 | 89% | 61% | 73% | 71% | 89% |
| Oct 2023 | 90% | 61% | 73% | 76% | 90% |
| Nov 2023 | 87% | 60% | 72 % | 79% | 87% |
| Dec 2023 | 87% | 60% | 72% | 86% | 87% |
| Jan 2024 | 86% | 61% | 74% | 86% | 57% |
| Feb 2024 | 85% | 59% | 71% | 85% | 58% |
| Mar 2024 | 86% | 59% | 71% | 85% | 51% |
| Apr 2024 | 87% | 60% | 83% | 92% | 77% |

3

4   *See* Defs.' Ex. 13; ECF No. 7984 at 5–9; ECF No. 8043 at 5–9; ECF No. 8075 at 5–9; ECF No.

5   8104 at 5–9; ECF No. 8120 at 5–9; ECF No. 8142 at 5–9; ECF No. 8177 at 5–9; ECF No. 8223 at

6   5–9; ECF No. 8254 at 5–9.

7       **C.      Actual Compliance Defense**

8           Defendants contend they have "met the court-imposed 90% fill rate for various

9   classifications at various points in time – and in many instances, for sustained periods of time and

10  well above the 90% threshold." ECF No. 7951 at 5. In their post-hearing brief, they repeat this

11  argument, saying they cannot be found in contempt for classifications and time periods where the

12  fill rate was above 90 percent. In essence, defendants contend that filling some classifications to

13  90 percent for some periods of time precludes a finding of contempt as to classifications that were

14  filled to 90 percent or above during any part of the relevant period from October 2018 to now.

15  *E.g.*, ECF No. 8019 at 15–16. This argument is misplaced.

16          As the evidence shows and defendants acknowledge, the data "show[] how compliance

17  has varied over time." ECF No. 8019 at 15. Some compliance with some requirements contained

18  in the October 10, 2017 order is not actual compliance with that order. Defendants do not

19  contend, nor could they, that they have actually complied with the October 10, 2017 order, as

20  modified by ECF No. 7742.

21  /////

22  /////

39

1    The periods defendants cite are, at best, periods of partial compliance, and the appropriate

2    question is whether monetary sanctions for contempt should extend to those periods of partial

3    compliance.  The answer to that question is no, because—as the court has already determined—

4    any monetary sanctions for noncompliance are to be grounded in vacancy rates in any one mental

5    health staffing classification that exceed the ten percent cap, and only on or after March 31, 2023.

6    The fine structure does not include sanctions for vacancy rates below the ten percent cap, or

7    before the March 2023 date.

8         **D.    Substantial Compliance Defense**

9              **1.    Substantial Compliance with 90 Percent Threshold?**

10   Defendants also contend they are in substantial compliance with the 90 percent fill rate

11   required by the court's orders.  ECF No. 8019 at 13.  The substantial compliance defense has

12   three prongs: (1) defendants have achieved at, above, or near a 90 percent fill rate among the five

13   classifications individually for various and significant periods of time, including after the court's

14   February 28, 2023 order, *see*, *e.g.*, *id*. at 14–16; (2) they "have taken all reasonable measures to

15   improve fill rates" where those have fallen short, including, they say, through twice yearly review

16   of staffing allocations; expansion of telework opportunities for mental health clinicians; "salary

17   and financial incentives"; streamlining processes for hiring; expansion of marketing and

18   advertising efforts; contracting with the leading national recruiter for clinicians; and contracting

19   with registry providers, *id*. at 18–26;[34] and (3) their "failure to reach required staffing thresholds,

20   . . . , was the inadvertent result of the COVID-19 pandemic and its lasting changes on the labor

21   economy, *id*. at 17.  The court addresses the first two prongs of defendants' substantial

22   compliance defense as a prerequisite to resolving the third, and then turns to the third prong.

23   To the extent defendants argue they have achieved substantial compliance through their

24   filling of allocated staff positions "to something less than the 90% threshold," ECF No. 7951 at

25   16; *see also* ECF No. 8019 at 17 (court's orders establish "90% fill rate threshold"; substantial

---

[34] Defendants also contend several other measures proposed by plaintiffs are
"*unreasonable* measures" they are not required to implement to avoid contempt.  *Id*. at 28
(emphasis in original).

1    compliance with that threshold "must therefore equate to something less than 90 percent."), the

2    court has clarified above defendants' interpretation of the October 2017 order is incorrect.  The

3    order's requirement of "complete compliance with the staffing ratios in the[ ] 2009 Staffing Plan

4    and the maximum ten percent vacancy rate required by the court's June 13, 2002 order," ECF No.

5    5711 at 30, means defendants must allocate 100 percent of the positions required by the staffing

6    ratios in the 2009 Staffing Plan and have no more than a ten percent vacancy rate per position

7    among those allocated positions.  It is undisputed defendants have not met this requirement at any

8    point since March 31, 2023, and that they are still out of compliance.

9                **2.        Substantial Compliance Based on Reasonable Steps?**

10           Defendants also contend they are otherwise in substantial compliance with the October 10,

11    2017 order.  Defendants focus this argument on periods where they contend they have achieved a

12    90 percent fill rate across some but not all mental health staffing classifications.  Again, the

13    periods defendants focus on are periods of partial compliance with the requirements of the

14    October 10, 2017 order; these periods do not demonstrate substantial compliance.  Furthermore,

15    to demonstrate substantial compliance, defendants must show they have taken "*all* reasonable

16    steps to comply with the" court's October 10, 2017 order, *Kelly*, 822 F.3d at 1096 (emphasis in

17    original), leaving only "technical or inadvertant [sic] violations of the order," *General Signal*

18    *Corp.*, 787 F.2d at 1379 (citations omitted).

19                    **a)        Defendants' Expert Testimony**

20           In support of their defense that they have taken reasonable steps, defendants first offered

21    testimony from a labor economist, Dr. Erica Greulich, together with a report Dr. Greulich

22    prepared with another economist, Dr. Jessica Dutra.  *See* DEFS-005.  For the past eighteen years,

23    Dr. Greulich has worked as a consultant in labor economics with Secretariat Economists and their

24    predecessor firm, Economists Incorporated.  RT 9/29/23 at 33:1–23, ECF No. 8013.  She is

25    currently an economist and Director with Secretariat Economists.  DEFS-005.007.  Dr. Greulich

26    testified that her "overarching opinion" in this matter "is that in light of labor market conditions

27    and prevailing current and . . . recent compensation levels, . . . CDCR has taken reasonable

28    measures to enhance employment and to meet its Court-mandated employment levels and

                                           41

1   vacancy rates among the five classifications of mental health employees that are at issue."

2   RT 9/29/23 at 45:9–14, ECF No. 8013.  Dr. Greulich bases her opinion on a "comprehensive"

3   literature review, "which included academic publications, trade press, press articles, policy

4   studies, government reports, [and] projections, to assess whether, and the extent to which, there is

5   a labor market shortage" for the five mental health classifications that must be filled as required

6   by the court's October 10, 2017 order.  *Id*. at 38:4–12.  She analyzed data CDCR provided to her

7   "relevant to their efforts and their compensation and their staffing levels."  *Id*. at 38:15–17.  She

8   also analyzed data from "publicly-available sources, such as the Bureau of Labor Statistics, the

9   Federal Bureau of Prisons, and the US Census Bureau."  *Id*. at 38:18–21.  As described below,

10  she performed regression analyses[35] with the publicly available data she reviewed and the data

11  provided by CDCR.  *Id*. at 38:22–24.  And she reviewed certain filings in this action.  *Id*. at

12  38:25–39:1.[36]

13        Dr. Greulich's literature review showed a shortage of mental health professionals

14  nationwide and in California.  *Id*. at 45:17–23.  Her opinion that CDCR has taken reasonable

15  measures to comply with the court's order was based on her finding that "CDCR has had some

16  degree of success in achieving lower vacancy rates among the five classifications at issue

17  between 2018 and 2022," particularly with the use of telepsychiatry, and her finding that "CDCR

18  inmates have much greater access to mental health professionals than does the general population

19  in California."  *Id*. at 46:5–22.  Dr. Greulich testified the vacancies among the five classifications

20  of mental health professionals "have persisted . . . despite the fact that" between 2018 and 2022

21  CDCR paid salaries that "consistently exceeded the average salaries paid to such providers in the

22  state of California and nationwide."  *Id*. at 47:16–21; *see also id*. at 95:10–109:6.  She opined that

23  neither the compensation differences nor other financial benefits and other incentives offered by

---

[35] Dr. Greulich testified that "regression analysis is a statistical tool [that] measures relationships between variables," where variables are "anything that can be measured [or] quantified," and allows "economists to test a hypothesis or theory about whether there is a relationship or not between two variables" and, if so, what that relationship is.  *Id*. at 117:15–118:3.

[36] Dr. Greulich also reviewed the report from plaintiff's expert, Dr. Brown, and attended his deposition, but after her report was complete.  *Id*. at 39:2–8.

1    CDCR had a significant impact on employment rates in these classifications, and that, given the

2    labor shortages, she had not "found evidence to suggest that this would be any different in the

3    future." *Id*. at 48:6–25.

4         Dr. Greulich explained an "economic shortage" of providers is found in areas where

5    individuals have need for more care and are able to pay for that care but the need for care

6    "persists" in the area. *Id*. at 56:14–25.  Based on information gleaned from her literature review,

7    she testified "a large percentage" of "county health behavioral agencies in California have

8    experienced hiring difficulties," buttressing the finding of a labor shortage.  *Id*. at 59:18–60:2.

9    She also testified large numbers of psychiatrists and psychologists are expected to retire from the

10   labor force soon, which will exacerbate the shortages.  *Id*. at 58:21–59:13.

11        Dr. Greulich further testified that literature she reviewed "indicates that COVID

12   exacerbated existing shortages of mental health provision and essentially expanded recruitment

13   and retention problems that had previously existed to . . . additional behavioral health

14   professions."  *Id*. at 62:2–6.  And she testified that articles she included in her review showed that

15   other correctional systems besides CDCR are having difficulty hiring mental health providers.  *Id*.

16   at 66:4–6.  Dr. Greulich testified that Kaiser Permanente has had difficulties hiring and retaining

17   mental health workers in California for at least ten years, *id*. at 66:22–67:4, and recent studies

18   show long waitlists for mental health care services and difficulty getting appointments, *id*. at

19   67:19–68:8.

20        Dr. Greulich testified she had not "sought to figure out exactly why" the vacancy rate

21   among psychologists has been increasing since late 2020, but that the increase "is certainly

22   consistent with the existence of the COVID-19 pandemic."  *Id*. at 75:21–76:1.  On cross-

23   examination, she confirmed she had "not done a causal analysis to assess whether or not COVID

24   is a causal factor" and she would "need to think more about whether there is even data available

25   to do such an analysis."  *Id*. at 173:6–8.  She also opined that the use of telehealth had increased

26   since the COVID pandemic began and the inability to offer a telehealth option could negatively

27   affect mental health hiring.  *Id*. at 76:14–21.  She had similar findings with respect to vacancy

28   rates among social workers.  *Id*. at 77:4–78:2.

1        Dr. Greulich also performed a supply and demand analysis covering the five-year period

2  between 2018 and 2022. *Id*. at 85:1–88:9. The resulting analysis suggests that during this period

3  the inmate population in CDCR had far greater access to psychiatrists, psychologists and social

4  workers than did the general public in California, *id*. at 85:1–91:23, and the demand for mental

5  health services among CDCR inmates also was greater than that among the general California

6  population, *id*. at 92:9–93:6. Overall, her formal opinion was that, given relative supply and

7  demand numbers, CDCR inmates have "consistently had relatively greater access" to mental

8  health providers than the general population in California. DEFS-005.050; RT 9/29/23 at 93:20–

9  94:8, ECF No. 8013. This opinion supported her conclusion that CDCR has taken reasonable

10  steps to hire and retain mental health professionals. *Id*. at 83:9–15. On cross-examination, she

11  explained the data supporting this opinion comprised solely numbers of providers and patients,

12  and not any information about how much time inmates spent with mental health providers. *Id*. at

13  159:5–10.

14        Dr. Greulich testified that CDCR's offering dual appointments to clinicians, namely, the

15  opportunity to earn up to 25 percent more for working up to ten hours a week at a second

16  position, has not affected the vacancy rate. *Id*. at 111:13–112:5. Higher fringe benefits offered

17  by CDCR compared to state and nationwide averages also have not impacted vacancy rates. *Id*.

18  at 113:9–114:18. And she testified that higher pay to registry providers between 2018 and 2022

19  did not increase either "registry employment or registry filled positions." *Id*. at 115:21–116:1.

20        Dr. Greulich conducted two regression analyses, one using the number of filled civil

21  service positions at CDCR, and one using CDCR's net hires[37] among psychiatrists, psychologists,

22  and clinical social workers, to determine whether the "higher levels of compensation CDCR has

23  offered relative to statewide or nationwide averages" are associated with greater fill rates or net

24  hires. *Id*. at 118:14–119:7. In these analyses, she included as independent variables CDCR pay,

25  benchmark pay (California or U.S. averages), the number of authorized positions in CDCR as a

26  measure of demand, a "time trend" to "capture and control for . . . anything that is . . . changing

_____

[37] Net hires are the number of hires in a particular time frame minus the number of people
who left employment during the same time frame. *Id*. at 119:21–24.

44

1    smoothly, increasing . . . or decreasing over time," and the COVID-19 pandemic. *Id*. at 119:12–

2    120:21.  The results of her analysis showed, with limited exceptions, no "statistically significant

3    relationship between CDCR pay and filled positions for the five classifications at issue." *Id*. at

4    126:22–127:2, 128:19–129:5, 130:6–132:13.

5         On cross-examination, Dr. Greulich confirmed she was not "offering the opinion that it's

6    impossible for CDCR to hire psychologists." *Id*. at 174:10–12.  And she agreed, in theory, that

7    CDCR could "potentially" return to the ten percent vacancy rate for social workers it had

8    maintained from October 2018 through August 2021, though that would be "more difficult" in

9    "current labor market conditions" and a "more feasible concept" if those conditions changed.

10   Rep.'s Tr. of Proc. (RT 10/3/23) at 6:4–10, ECF No. 8013-1.  She confirmed CDCR's relative

11   success in hiring recreation therapists. *Id*. at 6:19–7:4.  And she testified she was unaware of

12   "anything that precludes CDCR from offering more than the minimum base salary to medical

13   assistants" and that paying more than the minimum was "one of many things" CDCR could do to

14   hire and retain more medical assistants. *Id*. at 8:18–25.  She confirmed she did not attempt any

15   analysis to learn "whether there would be a statistically significant relationship if CDCR were to

16   offer higher salaries"; she testified this would not be possible without knowing how many

17   positions would be filled at higher salaries. *Id*. at 10:1–24.  She agreed that increasing

18   compensation "is one of many options" in CDCR's "arsenal" and "a way to enhance hiring" and

19   "increase retention." *Id*. at 13:20–14:3.  She also confirmed CDCR could offer salary premiums

20   but she had no opinion about the size of the pay increase that would be required to fill the

21   vacancies, or how improved working conditions, beyond the use of telemental health, might

22   increase fill rates. *Id*. at 14:20–15:12.  Dr. Greulich had done no exit interviews with departing

23   mental health employees to learn their reasons for leaving CDCR. *Id*. at 15:18–23.  She said she

24   did not know all steps CDCR had taken to hire the required number of mental health providers

25   and, therefore, she could not opine whether CDCR had taken all available reasonable steps. *Id*. at

26   22:19–25:9.

27   /////

28   /////

45

1       **b)**       **Defendants' Testimony from CDCR/CCHCS Employees**

2       Defendants also offered testimony from several CDCR/CCHCS employees, including

3 Jasinda Muhammad, Deputy Director of Human Resources for CCHCS; Angela Ponciano,

4 Deputy Director for CCHCS Business Services; Dr. Toni Martello, Assistant Deputy Director of

5 Telemental Health Services of CDCR's Statewide Mental Health Program; and Dr. Amar Mehta,

6 Deputy Director of the CDCR's Statewide Mental Health Program. *See* Stipulated Facts Nos.

7 24–27, ECF No. 7956. Ms. Muhammad and Ms. Ponciano testified to salary and hiring steps

8 defendants have taken, while Dr. Martello testified concerning the current use of telepsychiatry

9 and planned use of telemental health. Dr. Mehta provided a general overview of the MHSDS,

10 the size of the inmate population it serves, treatment options available in the system, staff

11 positions and staffing allocations, the increase in vacancy rates among psychologists and social

12 workers in particular, CDCR's plans and goals for increased use of telemental health, and efforts

13 to improve working conditions for clinicians. He testified he "honestly could not think of

14 anything else" he could do at his level, and subject to the rules that apply to his position, to

15 improve fill rates, nor had he "heard ideas from other people." Rep.'s Tr. of Hr'g, (RT 10/4/23)

16 at 105:17–22, ECF No. 8013-2. "If there were, [he] would be doing them." *Id.* at 105:21–22.

17 The details of this defense testimony regarding reasonable steps are summarized below.

18                           **(i)  Staffing Adjustment**

19       Twice a year, in January and July, defendants "true up" the number of allocated mental

20 health staff positions by applying the 2009 Staffing Plan ratios as modified, to account for the

21 number of patients at each level of care at each institution. *Id.* at 74:16–75:12. After CDCR

22 calculates these allocations, institutions "need to hire to" the allocated staff levels "moving

23 forward." *Id.* at 75:10–12. As defendants point out in their closing brief, mental health staffing

24 vacancies will rise when new positions are allocated until those positions are filled. *See* ECF

25 No. 8019 at 19. There is no dispute over defendants' practice of truing up their staffing

26 allocations this way on a semiannual basis, and it is a reasonable step as part of defendants'

27 efforts to comply with the October 10, 2017 order.

28 /////

1                          **(ii)      Expansion of Telemental Health**

2             It is undisputed defendants' expanded use of telepsychiatry has helped to reduce

3    psychiatric staffing vacancies.  *See* RT 10/3/23 at 76:24–77:4, 225:20–23, ECF No. 8013-1.

4    Dr. Martello testified defendants plan to expand the use of telemental health to psychology and

5    social work positions as part of their effort to combat clinical vacancies and improve recruitment

6    and retention rates for these clinical classifications.  *See, e.g.*, RT 10/4/23 at 9:21–10:16, ECF

7    No. 8013-2 (defendants are not adding new psychologist and social worker positions; they are

8    using telemental health to help fill existing psychologist and social workers positions that are

9    vacant).  Defendants currently are rolling out their proposed expanded telemental health program,

10   *id.* at 92:18–21, which is in the "very early" stages of implementation, RT 10/3/23 at 221:16–23,

11   ECF No. 8013-1.[38]  They intend to use the planned expansion of telemental health to help fill

12   existing staffing vacancies in psychologist and social worker positions.  *Id.* at 225:3–7.

13            In May 2023, defendants submitted a budget change proposal (BCP) to the California

14   Legislature in aid of this proposed expansion.  DEFS-001; RT 10/4/23 at 92:22–93:9, ECF

15   No. 8013-2.  In the BCP defendants sought funding for supervisory and support positions

16   necessary to expand the use of telemental health.  They did not seek funding for the underlying

17   clinical positions required for the program to work; as noted above, these positions will be

18   "drawn from existing allocated vacancies at the institutions."  RT 10/3/23 at 236:2–18, ECF

19   No. 8013-1; *see also* RT 10/4/23 at 9:21–10:16, ECF No. 8013-2.  Specifically, they sought

---

[38] On September 5, 2023, the parties filed a joint report as the court had required, setting out areas of agreement and disagreement concerning defendants' draft Telemental Health Services Policy.  ECF No. 7935.  On December 15, 2023, the court ordered the parties to "meet and confer under the supervision of the Special Master to clarify whether, and if so what, outstanding disputes remain over defendants' Telemental Health Services Policy."  ECF No. 8087 at 2.  The court has ordered the Special Master to file a short report on the outcome of those discussions together with a proposed Telemental Health Services policy for the court's approval.  *Id.*  The Special Master filed his report on March 21, 2024.  ECF No. 8165.  The court extended the deadline for the parties to respond to the Special Master's report.  *See* Apr. 2, 2024 Am. Stip. and Order, ECF No. 8182.  The parties filed responses to the Special Master's report on May 28, 2024.  ECF Nos. 8252 (Pls.' Objs.), 8253 (Defs.' Resp.).  Plaintiffs' request to respond to defendants' objections, ECF No. 8256, opposed in part by defendants, ECF No. 8258, is pending before the court.

1   85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and
2   $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million
3   General Fund in 2025-26 and ongoing to expand the use of Tele-Mental Health
4   services to include psychology and social work in addition to psychiatry.

5   DEFS-001.001.

6       The legislature approved the BCP and in June 2023 defendants hired an Assistant Deputy

7   Director "to help expand telemental health services to include other classifications, including

8   psychology and social work, and also to help to oversee the telepsychiatry program." RT 10/3/23

9   at 200:1–19, ECF No. 8013-1.  Defendants plan to hire an initial complement of supervisory and

10  support staff first before hiring any telepsychologists or telesocial workers. *Id*. at 225–26.  At the

11  time of hearing, defendants had 44 applicants for a chief psychologist position and 13

12  applications for senior positions. *Id*. at 223. They had filled one of two supervising psychiatric

13  social worker I positions. *Id*. at 226.  Dr. Martello anticipated defendants would start to hire

14  telepsychology line staff in early 2024, *id*. at 224, and that it "will probably take a couple years"

15  for the program to "reach[ ] its full potential." *Id*.

16      Defendants plan to "redirect 100 existing psychologist and clinical social workers

17  positions to serve in the Telemental-Health Program." DEFS-001.004.  According to

18  Dr. Martello's testimony, the redirected positions will be drawn from current vacancies. *See* RT

19  10/4/23 at 9:21–10:16, ECF No. 8013-2.  In other words, full implementation of the program, not

20  anticipated for two years, *see id*. at 20:5–22, would fill a maximum of 100 vacancies among

21  psychologists and social workers.[39]  And it is entirely possible other on-site vacancies would be

22  created in the process: on cross-examination, Dr. Martello testified CDCR has no policy to

23  prevent on-site psychologists and social workers from taking redirected telemental health

24  positions, *id*. at 33:24–34:11, nor has CDCR created a pay differential for on-site psychologists

25  and social workers similar to the one it has for psychiatrists to incentive on-site clinical services,

26  i*d*. at 31:21–32:15.  On cross-examination plaintiffs' counsel also elicited testimony from

27  Dr. Martello that the number of telemental health positions currently planned will not come close

[39] The BCP breaks down the 100 line staff positions into "66-77 psychologists and 30-41 social workers."  DEFS-001.004.

to filling the current vacancies among psychologists and social workers.  *See id*. at 20:25–24:6

(adding 77 telepsychologists to existing positions would still leave defendants with approximately

200 vacancies more than required by the 90% fill rate; adding 41 tele-social workers would still

leave defendants with approximately 25 vacancies more than required by the 90% fill rate).

Even if implemented today, and even if all the telemental health positions were filled with

new hires rather than internal staff transfers from positions that are currently on-site, defendants'

telemental health program would not be sufficient to relieve the present vacancies among clinical

psychologists and clinical social workers.  The court recognizes there are many variables that

affect this calculation, including changes in staffing allocations and vacancy rates over time, and

defendants may also reduce vacancy rates through hiring on-site line staff; the point here is that

defendants' telemental health program alone, which will not be fully implemented for at least two

years, is insufficient to bring defendants into compliance with the October 10, 2017 order, as

modified.

### (iii)    Salary and Financial Incentives

Dr. Greulich's testimony also covered the impact of CDCR's steps with respect to salaries

and financial incentives on mental health staffing vacancy rates.  She testified that between 2018

and 2022 CDCR paid salaries and benefits for mental health positions above statewide and

national averages, and her analyses led her to conclude it was unlikely CDCR could reduce its

staffing vacancies through higher salaries and additional financial incentives.  *See* DEFS-005.081.

Defendants also offered testimony and documentary evidence of recently negotiated

collective bargaining agreements with unions representing mental health staff.  *See* RT 10/3/23 at

63:10–70:5, ECF No. 8013-1 (testimony of Jasinda Muhammad); RT 10/4/23 at 97:16–98:4,

100:24–101:8, ECF No. 8013-2 (testimony of Dr. Mehta); DEFS-006 through DEFS-011.  These

new collective bargaining agreements include general salary increases, special salary adjustments,

recruitment and retention salary differentials for on-site patient care, additional workload pay, pay

differentials, differential increase for providing clinical supervision to unlicensed individual,

recruitment and retention bonuses of $10,000 for newly hired psychologists and social workers,

and wage equity adjustments.  RT 10/3/23 at 63:10–70:5, ECF No. 8013-1; DEFS-006 through

DEFS-008.  Defendants did not provide projections demonstrating how they expect the new agreements to affect vacancy rates, although Ms. Muhammad, the Deputy HR Director, expressed optimism they will help.  *See* RT 10/3/23 at 89:15–19, ECF No. 8013-1.  Regarding the ability to make detailed projections, Dr. Mehta conceded it would be possible, with some intelligent estimating, but testified defendants had not made such projections as a planning tool or otherwise.  RT 10/4/23 at 120:20–121:2, ECF No. 8013-2.

Ms. Muhammad also testified that as a rule, new state service employees are hired at the minimum end of the salary range for the classification into which they are hired.  RT 10/3/23 at 74:13–15, ECF No. 8013-1.  Certain classifications, including psychiatrists, psychologists, and clinical social workers are eligible for "hiring above minimum," or HAM.  *Id*. at 74:15–75:4.  "Recruitment challenges" and "extraordinary skills for new employees" are among the factors CCHCS considers in determining a HAM for a new employee.  *Id*. at 74:20–23. On cross-examination, Ms. Muhammad testified that recreation therapists and medical assistants are also "eligible" to be hired above the minimum salary range, though not necessarily through the HAM process, *id*. at 106:11–15, and she confirmed that CCHCS/CDCR always presents initial mental health hiring offers "at the starting minimum salary in the range," *id*. at 106:16–19.

### (iv)    Streamlined Hiring Processes/New Marketing and Recruiting Efforts

Defendants also offered evidence of recent changes to their hiring processes.  Specifically, as Ms. Muhammad explained, in 2021, they "centralized some of the hiring for psychologists, psychiatrists, and clinical social worker[s]."  *Id*. at 36:16–17.

In January 2022, defendants rolled out a new process for one-day end-to-end hiring events, *id*. at 37:5–7, allowing all steps in the hiring process except credentialing to happen in one day, *id*. at 37:10–38:11, 113:12–15.  In 2022, these events resulted in 47 job offers in the five staffing classifications at issue here.  *Id*. at 38:21–23.  Twenty-two of the individuals extended offers have started work, with eight others pending at the time of hearing.  *Id*. at 38:23–24.  Ten events in 2023 held by the time of these enforcement proceedings had resulted in 31 job offers, /////

50

1    with 14 started and ten pending.  *Id*. at 38:25–39:10.  Three more such events were scheduled yet

2    in 2023.  *Id*. at 39:11–15.

3        Ms. Muhammad also testified that defendants have rolled out at one prison a

4    "streamlined" hiring process for non-one-day-event hires, *id*. at 126:11–4, that will "potentially

5    reduce the time to hire to about 55 business days for nonclinical staff and about 65 [business]

6    days for clinical staff," *id*. at 41:9–25, as compared to the average of 108 business days it takes

7    without streamlining the process, *id*. at 128:15–24.  And they have implemented some new

8    marketing efforts, including "social media and digital radio advertisement, a campaign designed

9    to lift the veil on correctional health care" and "marketing pushes, which is . . . a release of

10   marketing materials centered around mental health employees . . . ."  *Id*. at 45:14–22.  In 2022,

11   defendants entered into a contract with Merritt Hawkins, a national recruiter of medical staff, to

12   recruit psychologists and social workers, but that contract "didn't yield the results" defendants

13   "had hoped for."  *Id*. at 47:4–48:5.  Ms. Muhammad testified she attributed this to the challenges

14   with staffing and staffing shortages, a number of referrals not wanting to work for correctional

15   agencies, and particular challenges presented by institutions in remote locations.  *Id*. at 48:7–14.

16       In June 2023, defendants created a regional hiring unit to focus solely on hiring

17   psychologists and clinical social workers and transferred the hiring of these classifications from

18   centralized hiring to provide additional focus and resources.  *Id*. at 42:7–25.

19                    **(v)    Contracts with Registry Providers**

20       As discussed above, defendants have relied on outside contractors to fill staffing vacancies

21   for more than two decades.  Angela Ponciano testified that defendants currently have a three-year

22   contract with Management Solutions, a registry contract provider, to provide temporary staff to

23   fill vacancies "in the mental health program as a result of resignations, retirements, and staff out

24   on long-term leave."  *Id*. at 142:17–22, 144:10–145:9.  That contract, which began in 2022, "is set

25   to expire in 2025" with "three optional years to extend."  *Id*. at 145:7–9.[40]  The contract with

26   Management Solutions "requires that they offer a comparable, competitive rate to the

---

[40] Prior to contracting with Management Solutions, CDCR had a five-year contract with a
different mental health registry.  *Id*. at 157:7-10.

1    marketplace." *Id*. at 154:18–20.  The current contract was amended in April 2023 to provide

2    higher registry rates for psychiatrists, psychologists, and licensed clinical social workers at

3    several institutions to address programming and operational needs, *id*. at 161:10–162:18.  It was

4    also amended in September 2023 to provide higher rates for medical assistants.  *Id*. at 189:4–8.

5    Rates for psychiatrists remained at rates set in 2020 and are still deemed "competitive."  *Id*. at

6    159:4–9.

7          Ms. Ponciano testified it is more expensive for defendants to use registry contract

8    providers to fill mental health staff positions than to hire permanent civil service employees;

9    registry workers are paid at a higher rate than those in civil service and defendants must pay

10   Management Solutions its fees as well as the registry workers they provide.  *Id*. at 143:12–21.

11   Defendants fund registry staffing with a dedicated budget line item and salary savings from

12   allocated but unfilled mental health positions.  *Id*. at 163:6–15.

13         Ms. Ponciano explained that requests for contract providers to fill existing or anticipated

14   vacancies are initiated by the individual prisons where the vacancies exist or will occur.  *Id*. at

15   148:19–23, 150:4–12.  Currently it takes "less than sixty days" for registry workers to be assigned

16   and start working at prisons after they are requested.  *Id*. at 148:22–150:3.  Ms. Ponciano testified

17   that Management Solutions has not been able to fill all requests for contract providers, *id*. at

18   155:5–8; however, the rate of registry hiring has "significantly increased" under the current

19   contract with Management Solutions because (1) "the new contract now has the rates that are

20   comparable and competitive in the marketplace for registry for psychologists and licensed clinical

21   social workers" and (2) "the demand is higher" so "the rate of hire" reflects the increased number

22   of requests for those clinicians, *id*. at 171:16–23.  Ms. Ponciano testified that "over half" of the

23   registry providers travel from outside California to work in the state's prisons.  *Id*. at 174:3–7.

24                         **c)      Plaintiffs' Rebuttal Expert**

25         Plaintiffs contend defendants have not taken all the reasonable steps available to them to

26   comply with the court's October 10, 2017 order and, therefore, defendants are not in substantial

27   compliance with that order.  Plaintiffs also offered expert testimony from Dr. Timothy Brown,

28   Associate Adjunct Professor of Health Economics and Associate Director for Research at the

                                                    52

1    Berkeley Center of Health Technology at the School of Public Health, University of California,

2    Berkeley.  RT 10/4/23 at 148:12–149:10, ECF No. 8013-2.  Dr. Brown testified as an expert in

3    health economics, an applied field of economics that takes "the standard fields of economics and

4    appl[ies] them specifically to health care."  *Id*. at 152:1–3, 154:11–156:8.

5           Dr. Brown testified that according to a report from the Health Resources and Service

6    Administration (HRSA) of the federal government, in 2023 there were 40 percent more

7    psychologists than required to meet the clinical need for psychologist services in California and

8    130 percent more social workers nationwide than required to meet clinical need.  *Id*. at 157:2–10,

9    157:22–158:1, 161:17–20.  He testified it is his opinion there are more than enough clinicians to

10   meet clinical need, and that it "should be . . . feasible" for CDCR to hire enough clinicians to

11   meet the court-ordered requirements.  *Id*. at 162:15–18.  Dr. Brown also testified that at the peak

12   of the COVID-19 pandemic, "unemployment was about 15 percent" but it has returned to pre-

13   pandemic levels of about four- and one-half percent.  *Id*. at 162:19–25.

14          Dr. Brown opined defendants had not taken all reasonable steps to fill staffing vacancies

15   because (1) the most recent union contracts do not keep up with the 17 percent inflation rate

16   between 2020 and 2023 and "the actual purchasing power" of the wages in the newest agreement

17   is "less than it was pre-COVID," *id*. at 163:9–13; and (2) CDCR's salary ranges do not provide

18   sufficient economic incentive to get people to move to "less desirable" locations where clinicians

19   are needed, *id*. at 163:16–164:3.  He testified that 21 of California's 33 prisons are located in

20   areas designated by the federal government as a health provider shortage area (HPSA) for mental

21   health clinicians, and 16 of the CDCR prisons "are recognized as a health professional shortage

22   facility."  *Id*. at 167:13–168:5.  HPSAs are places where "there are clinically not enough

23   psychologists and other health professionals to meet the needs of the people who are there" and

24   they tend to be rural areas.  *Id*. at 168:5–7.  He testified defendants must pay a "much higher

25   wage" to get the required number of clinicians to move to these locations.  *Id*. at 168:1–14.

26          In his expert report, Dr. Brown provided a table estimating "real wage increases" that he

27   opined would be required to increase mental health staffing fill rates in CDCR to the required

28   90 percent.  *See* PL-025.038.  He testified he used a formula to determine the estimates based on

1    (1) the wages currently offered; (2) the fill rate or vacancy rate in a particular prison; and

2    (3) the measure of elasticity, i.e., "how sensitive are people to wages" and other incentives when

3    moving to particular areas. RT 10/4/23 at 169:12–170:7, ECF No. 8013-2.  From this, he

4    concluded CDCR would need to offer wages between 57.1 percent and 285.7 percent higher than

5    a starting market wage to increase its supply of mental health clinicians. PLS-025.040.  He

6    testified this wage increase could be implemented using a "trial and error" approach, which he

7    opined is the way "[e]mployers usually determine the necessary real wage rate to incentivize

8    employment in undesirable jobs . . . ." PL-025.003.  He testified the trial-and-error approach

9    involves advertising a salary range with a low end and a high end, offering candidates a wage in

10   the middle of the advertising range and informing them the offer is subject to negotiation, then

11   working toward an agreed-upon salary. RT 10/4/23 at 172:1–11, ECF No. 8013-2.  If several

12   trials fail to result in hires, the salary range must be adjusted upward, *id.*; it is necessary to keep

13   raising wages until the required staffing levels are achieved, *id.* at 173:5–10.  Dr. Brown also

14   testified the process must be rapid where, as here, the professional fields are competitive and

15   candidates often receive multiple offers. *Id.* at 174:1–10.

16        He testified that CDCR's practice of extending all job offers at the lowest end of CDCR's

17   salary scale puts CDCR at a "massive disadvantage" because other employers "try to pay in order

18   to hire" and the practice also ignores the real wage requirements of markets. *Id.* at 174:11–21.

19   He opined that "[i]n the context of prisons, and particularly rural prisons, significant real wage

20   increases are necessary to yield significant impacts in mental health professional supply.  Rates of

21   appropriate economic incentives are achievable, but CDCR has not yet offered significant

22   economic incentives to increase the supply" of necessary mental health staff.  PL-025.045.  He

23   also testified that CDCR's current time to hire, 108 days on average, or even its aspirational time

24   to hire, 65 days, is too long, especially where candidates have other offers. *Id.* at 174:22–175:13.

25        On cross-examination, Dr. Brown testified CDCR was paying "consistently above

26   benchmarks for California wages and for national wages" for psychiatrists, psychologists, clinical

27   social workers, and recreation therapists. *Id.* at 188:22–189:17.  He also testified that, although

28   he was critical of Dr. Greulich's regression analyses, he did not conduct his own regression

54

1   analysis to determine "whether or not there is a relationship between salaries and net hires or

2   salaries and filled positions." *Id*. at 189:21–191:9.

3                    **d)      Plaintiffs' Testimony from CDCR Employees**

4           Plaintiffs also offered testimony from four CDCR employees: Dr. Alexandra David, Chief

5   of Mental Health at the California Medical Facility; Dr. Kelley Franceschi, Chief of Mental

6   Health at the California Health Care Correctional Facility (CHCF) between April 2021 and

7   September 2023; Dr. Shelly Minor, Chief Psychologist for the Intermediate Program at CHCF;

8   and Angela Reinhold, a Supervising Licensed Clinical  Social Worker at California Correctional

9   Institution in Tehachapi.  *See* Stipulated Fact Nos. 29–31, 33, ECF No. 7956.  These witnesses

10  testified to vacancy rates at their respective institutions, delays in hiring, working conditions at

11  their respective institutions, and the impact of staffing shortages on patient care at their respective

12  institutions.

13                   **e)      Defendants  Have  Not  Shown  Substantial  Compliance**
14                   **Based on Taking All Reasonable Steps**

15          To successfully defend against a finding of civil contempt based on substantial

16  compliance, defendants must show by clear and convincing evidence that they have taken "*all*

17  reasonable steps to comply with" the court's October 10, 2017 order.  *Kelly*, 822 F.3d at 1096

18  (emphasis in original).  They have not.

19          Defendants have taken some steps to change their hiring practices.  They have started one

20  day hiring events, and they are aiming to cut the time to hire using standard hiring practices from

21  108 days to 65 days.  The one day hiring events are systemwide, not just focused on mental health

22  clinicians, and in three years have resulted in nowhere near the number of hires required to reach

23  court-ordered mental health staffing levels.

24          Defendants also have not shown they have taken all steps to raise salary levels, benefit

25  structures, and recruitment and retention bonuses to the levels necessary to exhaust all efforts to

26  fill mental health staffing vacancies.  It is undisputed that salaries in the most recent union

27  agreements do not keep up with the rate of inflation that occurred during COVID, leaving CDCR

28  mental health clinicians at a wage with "actual purchasing power" lower than it was before

1    COVID.  Defendants contend inflation rates are irrelevant to Dr. Greulich's analysis, on which

2    they rely to support their conclusions they have taken all reasonable financial steps, and that

3    further hiring is impossible in the current labor market.  Specifically, defendants argue that

4    Dr. Greulich's analysis was based on a relationship between CDCR salaries and benchmark

5    salaries, and whether or not both were adjusted for inflation is irrelevant because the relationship

6    between the two would remain the same.  *See* ECF No. 8018 at 32.  Defendants did not offer any

7    evidence they have even attempted to analyze what wages and benefits they would have to offer

8    mental health clinicians to fill staffing vacancies, let alone that they have increased wages and

9    benefits sufficiently to fill those vacancies.  Defendants did not argue it would be impossible to

10   raise wages and benefits, nor would that argument be cognizable in these proceedings.  It is well-

11   established "that financial constraints do not allow states to deprive persons of their constitutional

12   rights."  *Stone*, 868 F.2d at 858.

13       It also is undisputed that defendants generally offer new employees salaries at the

14   minimum of the classification's salary range, regardless of prior experience or compensation.

15   RT 10/3/23 at 74:11–16, 107:13–18, ECF No. 8013-1.  The state does have a process for offering

16   new employees an initial salary above the minimum end of the salary range where there is a

17   "documented history of recruitment difficulties for the position and the candidate has

18   extraordinary qualifications."  *Id*. at 106:2–6.  Under no circumstances do defendants offer initial

19   salaries above the state's set salary ranges. *Id*. at 109:25–110:2; *see* Defs.' Updated Salary

20   Schedules at 2, ECF No. 8089-1 (current monthly salary schedule for staff psychiatrists has four

21   ranges, with the lowest minimum salary at $13,210 and the highest maximum salary at $29,492;

22   for clinical psychologists three ranges, with the lowest minimum salary at $6,610 and the highest

23   maximum salary at $13,201; for clinical social workers seven ranges with the lowest minimum

24   salary at $4,914 and the highest maximum salary at $10,011; for recreation therapists three ranges

25   with the lowest minimum salary at $3,617 and the highest maximum salary at $9,380; and for

26   medical assistants one range between $3,566 and $4,690).

27       The court is not persuaded by defendants' expert testimony, which they offered to call into

28   question the utility of wages and financial incentives to comply with the October 2017 order.  As

56

1    plaintiffs correctly argue, Dr. Greulich's testimony shows the salary and benefit packages offered

2    by defendants in the past were insufficient to close the gap.  That evidence sheds no light on what

3    future wage and benefit packages could or should look like or how quickly hiring needs to be

4    accomplished, to incentivize hiring and retention.  Dr. Greulich's testimony, by her own

5    admission, does not establish it is impossible to know "whether there would be a statistically

6    significant" impact on hiring and/or vacancy rates if CDCR were to offer higher salaries, both

7    considering her other testimony that increasing compensation "is one of many options" in

8    CDCR's "arsenal" and "a way to enhance hiring" and "increase retention."  RT 10/3/23 at 13:20–

9    14:3, ECF No. 8013-1.  Moreover, even though the court need not reach it, Dr. Brown's

10   testimony provided a reasonable explanation for the way in which defendants' adherence to the

11   practice of starting hiring offers at the minimum end of the salary ranges contributes substantially

12   to defendants' failure to comply with the court's staffing orders.

13         Fundamentally, the overall record reflects defendants are following a "business as usual"

14   approach to hiring, recruitment and retention that does very little if anything to transform the

15   bureaucracy within which the hiring practices are carried out.  While defendants have nibbled

16   around the edges, they have failed to take several steps they have not shown are unavailable to

17   them to achieve the needed transformation, or, most importantly, to recognize the urgent need for

18   additional mental health staff.  To the extent they have launched new hiring initiatives they have

19   done so within the months leading up to the evidentiary hearing, without the urgency required to

20   finally solve the understaffing crisis and avert the hearing.

21         Defendants' increasing reliance on telemental health as a future solution suffers from the

22   same lack of urgency despite defense witnesses' optimistic descriptions.  Defendants have not

23   sought court approval as necessary to ensure consistency with the remedy in this case, or

24   demonstrated they can quickly enough roll out some or all the proposed program expansion.

25   Even by their own descriptions, defendants' planned use of telemental health will not remedy the

26   significant ongoing vacancies in psychologist and social worker positions.  As discussed above,

27   even with full implementation, not anticipated for two years, and if no internal transfers to

28   telemental health left currently filled on-site positions vacant, defendants' telemental health

1    program would not come close to relieving the present vacancies among clinical psychologists

2    and clinical social workers.

3         Moreover, defendants offer no evidence showing other steps they could have taken and

4    suggested by the record are unreasonable, including but not limited to clustering of mentally ill

5    inmates to limit the number of mental health programs in hard-to-recruit locations and reduction

6    of the total population of seriously mentally ill inmates.  Defendants contend in conclusory

7    fashion that both steps would be "unreasonable," but have presented no evidence at hearing to

8    support that contention.  To the contrary, Dr. Martello testified that defendants are intentionally

9    hiring telepsychiatrists from metropolitan rather than rural areas because there are more

10   candidates in metropolitan areas.  *Id*. at 229:18–24.  Her testimony supports at least an inference

11   that clustering mentally ill inmates near urban areas could aid recruitment of on-site staff as well

12   as telemental health clinicians.  And other parts of the record, particularly defendants' June 2021

13   Report on Lessons Learned from the COVID pandemic and certain aspects of defendants'

14   updated 2017 staffing plan, support an inference that at least some reasonable steps in these areas

15   might still be available to defendants.  In any event, nothing in the record enables the court to

16   determine by clear and convincing evidence these steps are not available.

17        Similarly, defendants called only one named defendant as a witness, Dr. Amar Mehta,

18   CDCR's Deputy Director for Mental Health Services.  At hearing, Dr. Mehta testified he could

19   not think of anything else he could do "at [his] level" and "pursuant to the rules that apply" to

20   him, to fill staffing vacancies to court-ordered levels.  RT 10/4/23 at 105:17-22, ECF No. 8013-2.

21   All the other defendants in this action are at higher levels of authority within CDCR or the State

22   of California, with more authority than Dr. Mehta and without question more options available to

23   them.  The absence of any testimony from any of these defendants leaves a gaping hole in the

24   record regarding what all available reasonable steps actually are.

25        For the foregoing reasons, the court finds by clear and convincing evidence defendants

26   have not taken all reasonable steps available to them and so in this respect have not substantially

27   complied with the court's October 10, 2017 order.

28   /////

### 3. Non-Compliance as Inadvertent Result of COVID-19 Pandemic

Defendants also contend their non-compliance with the October 10, 2017 order is an inadvertent result of the COVID-19 pandemic. For this argument to succeed as a defense to civil contempt, defendants would first have to show substantial compliance with the October 10, 2017 order, and then that only "technical or inadvertent" violations remain. *See General Signal Corp.*, 787 F.2d at 1379. For the reasons explained above, defendants have not shown substantial compliance with the October 10, 2017 order. Nor is the court persuaded by their contention that the ongoing violation of that order has been caused solely by the COVID-19 pandemic.

There is no dispute the COVID-19 pandemic had a disruptive influence on mental health staffing levels and delivery of care in CDCR's prisons. *See* ECF No. 6938 at 2 ("COVID-19 persists and has not been suppressed, with ongoing effects on all aspects of delivery of mental health care to class members."). At the same time, the court confirmed three years ago the need to manage the pandemic "co-exists with defendants' Eighth Amendment obligation to employ a sufficient number of competent mental health staff" and "[t]he COVID-19 pandemic did not excuse defendants' initial noncompliance, nor does it fully excuse defendants' ongoing noncompliance with the October 10, 2017 order; it also does not provide a basis for permanent exemption from compliance." *Id*. (citing *Coleman v. Wilson*, 912 F. Supp. at 1305). Defendants did not appeal this order, and have not otherwise shown those findings should be revisited now.

On the merits, the impacts of the COVID-19 pandemic began in early 2020, more than a year after October 2018, when defendants should already have been in full compliance with the October 10, 2017 order, and well over a decade after the court set the maximum staffing vacancy rate and ordered the staffing plan that are the subject of enforcement here.

The following charts show the number of filled and unfilled positions by classification as well as the vacancy rates for April 2023 through April 2024, the period during which fines have been accruing to date:

59

| Classification | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan |
|---|---|---|---|---|---|---|---|---|---|---|
| Psychiatrists | | | | | | | | | | |
| Allocated | 314.3 | 314.3 | 314.3 | 320.3 | 320.3 | 320.3 | 320.3 | 324.8 | 324.8 | 331.,3 |
| Filled | 283.8 | 293.99 | 292.39 | 283.7 | 291.88 | 284.21 | 289.48 | 281.37 | 282.16 | 284.62 |
| Unfilled | 30.48 | 20.31 | 21.91 | 36.60 | 28.42 | 36.09 | 30.82 | 43.43 | 42.64 | 46.68 |
| % Filled | **90%** | **94%** | **93%** | **89%** | **91%** | **89%** | **90%** | **87%** | **87%** | **86%** |
| Psychologists | | | | | | | | | | |
| Allocated | 994.3 | 994.3 | 994.3 | 1009.8 | 1009.8 | 1009.80 | 1009.80 | 1025.30 | 1025.30 | 1018.3 |
| Filled | 647.84 | 648.53 | 639.69 | 628.93 | 627.7 | 617.33 | 619.30 | 616.34 | 615.23 | 624.73 |
| Unfilled | 346.36 | 345.77 | 354.61 | 380.87 | 382.1 | 392.47 | 389.70 | 408.96 | 410.07 | 393.57 |
| % Filled | **65%** | **65%** | **64%** | **62%** | **62%** | **61%** | **61%** | **60%** | **60%** | **61%** |
| Clinical Social Workers | | | | | | | | | | |
| Allocated | 387.80 | 387.80 | 387.80 | 396.80 | 396.80 | 396.80 | 396.80 | 402.30 | 402.30 | 401.8 |
| Filled | 284.98 | 290.63 | 296.05 | 290.95 | 294.06 | 288.82 | 288.38 | 290.87 | 291.13 | 297.65 |
| Unfilled | 102.82 | 97.17 | 91.75 | 105.85 | 102.74 | 107.98 | 108.42 | 111.43 | 111.17 | 104.15 |
| % Filled | **73%** | **75%** | **76%** | **73%** | **74%** | **73%** | **73%** | **72%** | **72%** | **74%** |
| Recreation Therapists | | | | | | | | | | |
| Allocated | 274.60 | 274.60 | 274.60 | 281.10 | 281.10 | 281.10 | 281.10 | 291.60 | 291.60 | 305.1 |
| Filled | 249.26 | 253.81 | 250.41 | 247.36 | 253.60 | 248.68 | 251.99 | 253.91 | 254.13 | 261.29 |
| Unfilled | 25.34 | 20.79 | 24.19 | 33.74 | 27.40 | 32.32 | 29.11 | 37.69 | 37.47 | 43.81 |
| % Filled | **91%** | **92%** | **91%** | **88%** | **90%** | **89%** | **90%** | **87%** | **87%** | 86% |
| Medical Assistants | | | | | | | | | | |
| Allocated | 80.00 | 80.00 | 80.00 | 86.00 | 86.00 | 86.00 | 86.00 | 86.00 | 86.00 | 137 |
| Filled | 60.42 | 61.76 | 62.23 | 58.28 | 59.03 | 61.10 | 65.18 | 68.02 | 73.92 | 77.61 |
| Unfilled | 19.58 | 18.24 | 17.77 | 27.72 | 26.97 | 24.90 | 20.82 | 17.98 | 12.08 | 59.39 |
| % Filled | **76%** | **77%** | **78%** | **68%** | **69%** | **71%** | **76%** | **79%** | **86%** | **57%** |

1

1

| Classification | Feb | Mar | Apr |
|---|---|---|---|
| Psychiatrists | | | |
| Allocated | 331.3 | 331.3 | 331.3 |
| Filled | 280.49 | 284.29 | 286.71 |
| Unfilled | 50.81 | 47.01 | 44.59 |
| % Filled | **85%** | **86%** | **87%** |
| Psychologists | | | |
| Allocated | 1054.3 | 1066.3 | 1055.3 |
| Filled | 619.44 | 626.33 | 632.81 |
| Unfilled | 434.86 | 439.97 | 423 |
| % Filled | **59%** | **59%** | **60%** |
| Clinical Social Workers | | | |
| Allocated | 425.80 | 425.80 | 385.8 |
| Filled | 303.43 | 304.54 | 319.05 |
| Unfilled | 122.37 | 121.26 | 66.75 |
| % Filled | **71%** | **72%** | **83%** |
| Recreation Therapists | | | |
| Allocated | 305.10 | 305.10 | 274.60 |
| Filled | 259.29 | 260.41 | 253.81 |
| Unfilled | 45.81 | 44.69 | 20.79 |
| % Filled | **85%** | **85%** | **92%** |
| Medical Assistants | | | |
| Allocated | 137.00 | 137.00 | 80.00 |
| Filled | 79.76 | 81.45 | 61.76 |
| Unfilled | 57.24 | 67.00 | 18.24 |
| % Filled | **58%** | **59%** | **77%** |

2

1   *See* ECF Nos. 7849 (April), 7866 (May), 7898 (June); Stipulated Fact No. 17, ECF No. 7956

2   (July); ECF Nos. 7984 (August), 8043 (September), 8075 (October), 8104 (November), 8120

3   (December),[41] 8142 (January),[42] 8177 (February), 8223 & 8245 (March), 8254 (April).

4           Dr. Greulich testified to a "correlation" between COVID-19 and staffing vacancies, but

5   not to a causal connection between the two.  And plaintiffs' expert testified without rebuttal that

6   employment rates have generally returned to pre-COVID-19 levels, RT 10/4/23 at 162:19–163:2,

---

[41]  In their monthly vacancy report filed January 31, 2024, covering mental health staffing rates for December 2023, ECF No. 8120, defendants include a letter from defendant Dr. Mehta in which he explains "the allocations reflected in [that monthly vacancy report] are, in some instances, more positions than the 2009 Staffing Plan requires" due to planned expansion of the number of EOP programs due to increases in the EOP population and additional allocations at four prisons in November 2023 and one prison in March 2023.  ECF No. 8120 at 24.  In ECF No. 8142, defendants include another letter from Dr. Mehta stating that the additional allocations in November 2023 totaled 36 positions and the additional allocations in March 2023 totaled 11 positions.  ECF No. 8142 at 24.  Dr. Mehta explains that during December 2023, EOP patients were transferred to new units and certain positions remained allocated at the institutions where they had been assigned prior to the transfers.  ECF No. 8120 at 24.  Defendants also represent in footnotes that "[c]hief and senior positions have been allocated in the aggregate above and beyond what is required by the 2009 Staffing Plan."  *Id*. at 5-8.

        The court has generated the chart in this order using the numbers and fill rates reported by defendants, *id*. at 5-9, without attempting to adjust either based on the additional allocations described in Dr. Mehta's letter and the footnotes at pages 5 to 8 of the monthly report.  The number of additional allocations does not make a material difference in the court's finding of noncompliance with its orders.

[42]  Dr. Mehta's letter referenced above in note 41 also states that the allocations in the monthly vacancy report for January 2024, filed February 29, 2024, "in some instances, represent more positions than the 2009 Staffing plan requires."  ECF No. 8142 at 24.  Dr. Mehta explains that due to the planned expansion of EOP programs to address the increasing EOP population, in March 2023 and November 2023 CDCR had allocated "*additional limited-term*" positions in certain classifications at certain institutions over and above the number required by the 2009 Staffing Plan and, at the same time, allocated new positions "in the new unfilled units during the activation process."  *Id*. (emphasis in original).  Dr. Mehta also explains that in January 2024, CDCR allocated "*additional permanent* positions totaling 40.84 positions above 2009 Staffing Plan requirements" and that these extra allocations are reflected in the vacancy report for January 2024.  *Id*. at 25 (emphasis in original).  Defendants again represent in footnotes that "[c]hief and senior positions have been allocated in the aggregate above and beyond what is required by the 2009 Staffing Plan."  *Id*. at 5-8.  Here as well, this information does not materially affect the court's finding of noncompliance.

1    ECF No. 8013-2, giving rise to an inference that ongoing staffing shortfalls are far less likely

2    attributable to the pandemic than those seen one or two years ago. In addition, as discussed above

3    the court finds clear and convincing evidence at hearing showed defendants have not taken all

4    reasonable steps, including further raising salaries, to counteract attrition caused by the pandemic;

5    indeed, the evidence suggests that attrition is due at least in part to defendants' failure to offer

6    salaries adequate or hire quickly enough to attract more mental health staff.

### 4.    Summary

8         For the reasons explained above, defendants have not met their burden of showing

9    substantial compliance, including by taking all reasonable steps to comply with the court's

10    October 10, 2017 order. Among other things, the record demonstrates additional reasonable steps

11    defendants have not taken in the face of increasing mental health staffing shortages. Nor are the

12    ongoing violations of the October 10, 2017 order "technical or inadvertent." They are serious and

13    consequential, negatively so. Defendants are not in substantial compliance with the October 10,

14    2017 order to avoid a finding of contempt.

### E.    Impossibility

16         During his opening statement, counsel for defendants acknowledged impossibility is not a

17    defense to defendants' Eighth Amendment obligations in this case. *See* RT 9/29/23 at 21, ECF

18    No. 8013; *see also* ECF No. 8045 at 2. Impossibility, however, is a defense to civil contempt.

19    Specifically, defendants contend that statewide and nationwide shortages of mental health care

20    providers make it impossible for them to comply across all categories of providers with the

21    90 percent minimum fill rate required by the October 10, 2017 order. ECF No. 8019 at 26–28.

22    Defendants have the burden of producing evidence that it is impossible for them to comply with

23    the court's order. *Rylander*, 460 U.S. at 757. To meet this burden, defendants' evidence must

24    show "categorically and in detail" why it is impossible for them to comply. *F.T.C.*, 179 F.3d at

25    1241 (quoting *NLRB*, 473 F.2d at 616). This "burden is difficult to meet" and may be

26    "particularly strict" in cases where, as here, the needs of a plaintiff class "are urgent." *Fortin v.*

27    *Comm'r of Mass. Dept. of Public Welfare*, 692 F.2d 790, 796–97 (1st Cir. 1982) (collecting

28    authority). Defendants have not met their burden.

1          Defendants rely principally on the testimony of their expert witness, Dr. Greulich,

2    concerning present shortages among mental health professionals.  *See* ECF No. 8019 at 26–27.

3    Dr. Greulich did testify to labor shortages among mental health professionals across California

4    and the United States.  *See*, *e.g.*, RT 9/29/23 at 45:20–24, 49:17–18, 50:22–51:9, 53:14–22, 57:9–

5    16, 58:2–8, ECF No. 8013.  She also testified, however, that she does not opine it is impossible

6    for defendants to hire psychologists or medical assistants in the current labor market.  *Id*. at

7    167:14–16, 174:10–12; RT 10/3/23 at 7:21–23, ECF No. 8013-1.  Similarly, Dr. Mehta testified

8    on cross-examination that he did not know if it was impossible to fill the vacancies.  *See* RT

9    10/4/23 at 121:20–122:2.

10          Fundamentally, the record before the court shows it may be more difficult or expensive

11   for defendants to fill existing mental health vacancies sufficient to comply with the 90 percent fill

12   rate required by the court's order.  But none of the evidence establishes defendants' compliance

13   with the October 10, 2017 order is impossible.

14          Defendants have not met their burden of showing that compliance with the October 10,

15   2017 order is impossible so as to avoid a finding of contempt.

16          **F.     Defendants' Supplemental Briefing**

17          In their supplemental brief, defendants argue that additional measures they are

18   undertaking demonstrate their "commitment . . . to improve staffing fill rates" and that "the State

19   has never willfully ignored the Court's order on staffing."  ECF No. 8260 at 6.  Defendants ask

20   the court to "hold in abeyance the imposition of fines" so that defendants can focus on improving

21   mental health care staffing.  *Id*.  Plaintiffs' oppose defendants' request to hold the fines in

22   abeyance, observing that "at least two of the 'specific actions' Defendants identify are not new at

23   all" and, in any event, that defendants' recent action is "too little too late."  ECF No. 8266 at 2.

24          As outlined above, to impose coercive civil contempt sanctions, the court is required to

25   find (1) defendants are not in actual compliance with the court's orders; (2) defendants have not

26   taken all reasonable steps available to them to comply with the court's orders and that their non-

27   compliance is neither "technical" nor "inadvertent"; and (3) compliance is not impossible.

28   Willful disregard of the court's orders is not an element of civil coercive contempt.  The

1  additional steps defendants are now taking, while laudable and necessary, support the court's

2  finding that prior to the contempt hearing defendants had not taken all reasonable steps available

3  to them to comply with the court's October 10, 2017 order and achieve and maintain compliance

4  with their 2009 Staffing Plan and the ten percent maximum vacancy rate.  Moreover, nothing in

5  the court's imposition of contempt sanctions precludes or is at odds with the need for defendants'

6  continued focus on implementation of a complete staffing remedy.  To the contrary, the sanctions

7  imposed here are necessary to sharpen that focus and magnify defendants' sense of urgency to

8  finally achieve a lasting remedy for chronic mental health understaffing in the state's prison

9  system.  Defendants' request to hold imposition of fines in abeyance is denied.

10           **G.     Overall Summary**

11           For all the reasons set forth above, the CDCR defendants are in ongoing violation of this

12  court's October 10, 2017 order.  It is undisputed defendants understand what is required by that

13  order.  They are not in actual compliance, as that term is properly understood.  They are not in

14  substantial compliance because they have not taken all reasonable steps available to them to

15  comply with that order.  Defendants did not address in these proceedings several reasonable

16  measures they themselves proposed in their most recent plan to achieve compliance with the

17  required staffing remedy, and plaintiffs have pointed to other reasonable measures that are and

18  have been available to defendants for an extended period.  Defendants presented no witness with

19  ultimate authority and responsibility to verify or credibly explain why these other reasonable

20  steps are not actually available.

21           Nor have defendants shown, by a preponderance of evidence, that compliance with the

22  court's order is impossible.  The equivocal language in their briefing signals an absence of the

23  "categorical[ ] and detail[ed]" showing required for an impossibility defense to succeed.  *See*,

24  *e.g.*, ECF No. 8019 at 28 ("Expert testimony therefore established that it is *likely* impossible to

25  comply with this Court's 90% fill rate threshold in light of the severe mental health provider

26  shortages that persist . . . ." (emphasis added)).  As explained above, defendant's expert did not

27  even purport to have an opinion regarding impossibility.  And no other defense witness testified

28  that compliance was impossible.

1        As set out above, the record is replete with evidence defendants have not brought the

2    necessary sense of urgency to completing the staffing remedy and often have taken costly detours,

3    diverting attention from the focus necessary to do so.  Despite clear direction from the court in

4    November 2020 that "[t]he COVID-19 pandemic did not excuse defendants' initial

5    noncompliance, nor does it fully excuse defendants' ongoing noncompliance with the October 10,

6    2017 order; it also does not provide a basis for permanent exemption from compliance," Nov. 4,

7    2020 Order at 2, ECF No. 6938,  defendants' mental health staffing vacancy rates have continued

8    to climb.  Even when faced with the court's directives in January and February of 2023, *see* ECF

9    Nos. 7699, 7742, it appears defendants did not promptly submit a request to the legislature for

10   funds necessary to begin implementing an expanded telemental health policy in aid of reducing

11   the mental health vacancy rate and adjusting staffing options in the post COVID-19 world, *see*

12   RT 10/4/23 at 94:5–9, ECF No. 8013-2 (testimony of Dr. Mehta).  As discussed above,

13   defendants' evidence shows that policy will take two years to implement and even then will not

14   come close to achieving the necessary reductions in mental health staffing vacancies.

15       The court finds by clear and convincing evidence that the CDCR defendants have violated

16   and continue to violate the court's October 10, 2017 order as modified, that the ongoing violation

17   is not "based on a good faith and reasonable interpretation of the order" and the violation far

18   exceeds what would be necessary for the court to find substantial compliance with the order.  *See*

19   *In re Dual-Deck*, 10 F.3d at 695.  The CDCR defendants are in contempt of court.

20       Given the CDCR defendants' ongoing non-compliance with the October 10, 2017 order,

21   over an extended period and continuing after the court threatened monetary sanctions in its

22   February 28, 2023 order, and the court's finding of contempt above, the court cannot countenance

23   further delay.  The staffing levels required by the October 10, 2017 order must be achieved for

24   defendants to fully remediate the ongoing Eighth Amendment violation in this case.  Given

25   defendants' contumacy, it is for the court to effect compliance.  *See Hutto*, 437 U.S. at 687 & n.9

26   (where court has issued orders to remedy identified constitutional violations, which orders remain

27   disobeyed, court  has "ample authority to go beyond earlier orders" and enter an order necessary

28   /////

1    to "bring an ongoing violation to an immediate halt"); *see also Stone*, 968 F.2d at 861 ("[W]hen

2    the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable.").

3         Because these are civil contempt proceedings, traditional equitable principles call for the

4    imposition of coercive sanctions.  *See, e.g.*, *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020)

5    ("character" of sanction imposed was "primarily coercive" where "district court explicitly stated

6    that the purpose of holding Defendants in contempt was to 'compel compliance' because the

7    'mere threat of monetary sanctions' in the Order to Show Cause was 'not sufficient'").

8    Defendants contend the court must provide defendants an opportunity to purge any contempt

9    before any sanctions are collected.  *See* ECF No. 7951 at 12–13; ECF No. 8019 at 35–37.

10   Plaintiffs disagree, contending the court already has provided defendants' "ample opportunity to

11   purge."  *See* ECF No. 8021 at 18–21.

12        "[T]he ability to purge is perhaps the most definitive characteristic of coercive civil

13   contempt."  *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (citing

14   *Bagwell*, 512 U.S. at 829).  The authority is mixed regarding whether a court must always provide

15   the opportunity to purge before it can require payment of sanctions imposed following a finding

16   of civil contempt.

17        Defendants argue *Bagwell* is controlling here.  *Bagwell* involved an injunction against

18   labor unions that prohibited striking unions and their members from numerous specified acts.

19   *Bagwell*, 512 U.S. at 823.  Following contempt proceedings, the trial court, in relevant part,

20   announced a schedule of prospective fines for any future infractions; it characterized those fines

21   as civil in nature.  *Id*. at 824.  Thereafter, in seven contempt hearings "the court found the union

22   in contempt for more than 400 separate violations of the injunction" and imposed fines based on

23   the previously announced fine schedule.  *Id*.  The United States Supreme Court held the fines

24   were criminal in nature, rather than civil, and that the unions were entitled to the procedural

25   protections attendant to criminal proceedings.  *E.g., id*. at 837–38.  The Court rejected the

26   argument that the trial court's announcement of a prospective fine schedule, which gave the

27   unions and their members an opportunity to avoid fines by complying with the underlying

28   injunction, necessarily rendered the fines civil in nature.  *Id*. at 836–37.  Instead, it concluded the

1    fines in that case were "not coercive day fines, or even suspended fines, but . . . more closely

2    analogous to fixed, determinate, retrospective criminal fines which petitioners had no opportunity

3    to purge once imposed." *Id*. at 837.  Several factors influenced the Court's conclusion that the

4    sanctions were criminal in nature, in particular that the contemnors' misconduct had not occurred

5    "in the court's presence or otherwise implicate[d] the court's ability to maintain order and

6    adjudicate the proceedings before it." *Id*.  Instead, the trial court had "levied contempt fines for

7    widespread, ongoing, out-of-court violations of a complex injunction.  In so doing, the court

8    effectively policed petitioners' compliance with an entire code of conduct that the court itself had

9    imposed" and, consequently, assessed "serious" fines, "totaling over $52 million." *Id*.  The

10   precise holding of *Bagwell* relevant to the question before this court is that a court's

11   announcement of a prospective fine schedule and therefore the opportunity to avoid fines through

12   conforming conduct does not automatically render fines subsequently imposed using that

13   schedule "coercive and civil as a matter of constitutional law." *Id*.

14        *Bagwell* is distinguishable from this case and the circumstances leading to the civil

15   contempt sanction the court will impose in this order.  The *Bagwell* Court expressly left

16   "unaltered the longstanding authority of judges to adjudicate direct contempts summarily, and to

17   enter broad compensatory awards for all contempts through civil proceedings." *Id*. at 838 (citing

18   *Sheet Metal Workers v. EEOC*, 478 U.S. 421 (1986)).  *Sheet Metal Workers* arose from findings

19   that a union had engaged "in a pattern and practice of discrimination against black and Hispanic

20   individuals" in violation of federal law.  *Sheet Metal Workers*, 478 U.S. at 426.  The court

21   ordered the union "to end their discriminatory practices, and to admit a certain percentage of

22   nonwhites to union membership" by a date certain.  *Id*.  When the union failed to obey the orders,

23   the court found it in civil contempt two years in a row.  *Id*.  Following the first contempt finding,

24   the court "imposed a $150,000 fine to be placed in a fund designed to increase nonwhite

25   membership in the apprenticeship program and the union," ordered an administrator it had

26   appointed earlier in the proceedings to "propose a plan for utilizing the fund" and "deferred

27   imposition of further coercive fines pending receipt of the administrator's recommendations . . . ."

28   *Id*. at 435.  Following the second contempt proceedings, "[t]he court ordered petitioners to pay for

1    a computerized recordkeeping system to be maintained by outside consultants" and again

2    deferred ruling on additional contempt sanctions. *Id*. at 436. Ultimately, the court adopted the

3    fund proposed by the administrator "to 'be used for the purpose of remedying [the]

4    discrimination.'" *Id*. (internal citation omitted). Confirming the longstanding principle that

5    "sanctions in civil contempt proceedings may be employed 'for either or both of two purposes: to

6    coerce the defendant into compliance with the court's order, and to compensate the complainant

7    for losses sustained,'" *id*. at 443 (internal citations omitted), the Supreme Court held the sanctions

8    imposed by the district court "were clearly civil in nature," *id*. In particular, the Court held that

9    the fund created by the sanctions the court imposed was for use in aid of securing compliance

10   with the court's earlier orders, and that "[u]nder the terms of the Fund order, petitioners could

11   purge themselves of the contempt by ending their discriminatory practices and by achieving the

12   court-ordered membership goal; they would then be entitled, with the court's approval, to recover

13   any moneys remaining in the Fund." *Id*. at 444. The Supreme Court found the sanctions imposed

14   in that matter were "clearly designed to coerce compliance with the court's orders, rather than to

15   punish petitioners for their contemptuous conduct." *Id*.

16        *Sheet Workers* is controlling here. As explained below, the court will impose monetary

17   sanctions and require defendants to deposit funds in the Court's Registry to establish a fund for

18   those sanctions. The fund will be used exclusively for steps necessary to come into compliance

19   with the court's staffing orders. This approach addresses the fact that defendants were not

20   sufficiently motivated by the possibility that fines would be imposed under the fine schedule the

21   court set in its February 28, 2023 order to act to preclude enforcement proceedings; fines

22   accumulated immediately for three consecutive months, *see* ECF No. 7742 at 7, and the fines

23   accruing since then have not had sufficient coercive effect to moot the hearing or its outcome.

24   Through the end of September 2023, when the hearing began, a total of $58,224,504.00 in fines

25   had accumulated, and the monthly accumulations had risen steadily. *See* ECF Nos. 7789, 7824,

26   7849, 7866, 7898, 7933, 7984, 8043. By the end of April 2024, the last report available prior to

27   this order, a total of $111,939,244.00 has accumulated. *See* ECF No. 8254 at 23. This amount

28   /////

1   directly reflects defendants' failure to comply with the court's orders to remedy constitutionally

2   inadequate mental health staffing levels.

3        Plaintiffs argue persuasively that defendants' demonstrated lack of urgency suggests that

4   fines alone "are not likely to bring about compliance" and that additional orders may be required.

5   ECF No. 8021 at 21.  As the court explained in the October 10, 2017 order, "further orders

6   requiring specific remedial measures would in a number of instances be redundant and, more

7   importantly, would tip the balance" the court until now has carefully struck in this action

8   "between identification of constitutional deficiencies and deference to the exercise of the wide

9   discretion enjoyed by prison administrators in the discharge of their duties."  ECF No. 5711 at 27

10   (quoting *Coleman v. Wilson*, 912 F. Supp. at 1301).  Defendants' lack of urgency, however, must

11   now be countered by concrete and prompt action.

12        Given the length of defendants' noncompliance and their lack of urgency in implementing

13   the additional remedial steps they are considering or taking, the court below imposes an initial

14   sanction in the amount of $111,939,244.00, which represents the total amount of fines that have

15   accumulated since April 1, 2023.  Defendants will be ordered to deposit the amount of the initial

16   sanctions into the Court's Registry within thirty days.  Going forward, the funds will be disbursed

17   by court order subject to fully transparent procedures to be explained in future orders.

18        Also, going forward, unless otherwise ordered by the court, defendants shall continue to

19   calculate and report a monthly and accumulating total of additional fines, preparing the amount of

20   fines in accordance with the court's January 23, 2024 Order, ECF No. 8116, and depositing the

21   additional accumulated sanctions into the Court's Registry contemporaneously with the filing of

22   each monthly report.  To ensure those with ultimate responsibility understand their duties with

23   respect to this order, the court clarifies that the requirements of the October 10, 2017 order apply

24   to all defendants in this action, including Governor Gavin Newsom, DSH Director Stephanie

25   Clendenin, and Director of the California Department of Finance Joe Stephenshaw, who shall

26   forthwith and continuing until further order of the court take all steps within their respective

27   authorities that are necessary to enable CDCR to come into complete compliance with the staffing

28   ratios in the 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's

1   June 13, 2002 order.  Beginning with the monthly vacancy report to be filed on or about June 30,

2   2024, and for each report thereafter each of these defendants shall certify they have reviewed the

3   data in the report and provide a summary of the steps within their respective authority they have

4   taken in the preceding month to address mental health understaffing in CDCR.

5          The court will address next steps in a separate order, to be issued soon.

6   **VI.   CONCLUSION**

7          Defendants cannot meet their Eighth Amendment obligations to the plaintiff class until

8   adequate mental health staffing levels are achieved and durably maintained.  This has been clear

9   for more than thirty years, and the court until now has granted defendants wide latitude and

10  appropriate deference in their attempts to cure this ongoing Eighth Amendment violation.  Still,

11  defendants have not complied with the court's order of October 17, 2017, focusing enforcement

12  proceedings.  Six years have passed since the order was entered and significant mental health

13  staffing vacancies continue.  Defendants have not taken all reasonable steps they could have taken

14  to achieve compliance with that order, the steps they have taken are not marked by the urgency

15  required, and the ongoing violations of the court's order are neither technical nor inadvertent.

16  Even faced with avoiding substantial fines on a showing of compliance, defendants have not

17  significantly moved the staffing needle.

18         The court recognizes there are many CDCR employees – even if not sufficient numbers of

19  those employees – working diligently every day to try to provide adequate mental health services

20  to class members.  The dedication of those employees must be matched by the administration's

21  will and determination to effect the policy and operational changes needed to achieve full

22  compliance.  The standard for contempt is an objective one.  Objectively, the reason the court

23  finds defendants in contempt of court is straightforward: they have violated the court's

24  October 10, 2017 order for six years.  For purposes of formal civil contempt, they have continued

25  to violate that order since March 31, 2023.  They have not taken all reasonable steps available to

26  them to come into compliance with that order, nor have they shown compliance is impossible.

27  The court therefore takes this action to enforce its lawful orders and ensure the constitutional

28  rights of members of the plaintiff class are honored and protected.

1    Accordingly, for the reasons explained in this order, IT IS HEREBY ORDERED:

2    1.    The court finds defendants Jeff Macomber, Diana Toche, and Amar Mehta in

3    contempt of this court's orders to come into full compliance with defendants' 2009 Staffing Plan

4    and the ten percent maximum mental health staffing vacancy rate required by the June 13, 2002

5    order.

6    2.    Within thirty days from the date this order is filed defendants shall deposit into the

7    Court's Registry fines in the amount of one hundred eleven million nine hundred thirty-nine

8    thousand two hundred forty-four dollars ($111,939,244.00).

9    3.    Beginning with the monthly staff vacancy report due June 30,  2024 and

10    continuing thereafter until further order of the court, defendants shall deposit additional

11    accumulated monthly fines as reported in each monthly staff vacancy report into the Court's

12    Registry concurrently with the filing of the monthly vacancy report.

13    4.    The court expressly clarifies the requirements of the October 10, 2017 order apply

14    to all defendants in this action, including Governor Gavin Newsom, Director of California State

15    Hospitals Stephanie Clendenin, and Director of the California Department of Finance Joe

16    Stephenshaw, who shall forthwith and continuing until further order of the court take all steps

17    within their respective authority necessary to enable CDCR to come into complete compliance

18    with the staffing ratios in the 2009 Staffing Plan and the maximum ten percent vacancy rate

19    required by the court's June 13, 2002 order.

20    5.    Beginning with the monthly vacancy report to be filed on or about June 30, 2024,

21    and for each report thereafter, defendants Newsom, Clendenin, and Stephenshaw shall certify

22    they have reviewed the data in the report and include a summary of the steps they have taken in

23    the preceding month to address mental health understaffing in CDCR prisons.

24    6.    Plaintiffs' October 19, 2023 Request for Judicial Notice, ECF No. 8020, is

25    DENIED as unnecessary.

26     DATED:  June 25, 2024.

CHIEF UNITED STATES DISTRICT JUDGE

72