Attachment A

Order filed 10/10/2017

Document # 5711

1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                        No.  2:90-cv-0520 KJM DB P

12              Plaintiffs,

13       v.                                         ORDER

14   EDMUND G. BROWN, JR., et al.,

15              Defendants.

16

17

18              In an order filed August 9, 2016, the court once again outlined "seven general

19   goals" that remain for defendants to achieve compliance with the Constitution and thereby the

20   end of federal court oversight.  ECF No. 5477 at 2-3 (quoting ECF No. 4124 at 85).[1]  One of the

21   necessary goals is full implementation of defendants' staffing plans.  *See*, *e.g,* ECF No. 4539 at

22   24 (citing ECF No. 4232 at 5 n.3).  The California Department of Corrections and Rehabilitation

23   (CDCR) defendants filed their mental health staffing plan on September 30, 2009.  ECF

24   No. 3693.  The Department of State Hospitals (DSH) defendants are under court order to

25   implement their staffing plan, to do so "in coordination with CDCR's development of its own

26

27          [1] All references to page numbers are to the page number assigned by the court's Electronic
     Case Filing (ECF) system located at the top of the page.
28

                                                 1

1   mental staffing plan, and within the context of the . . . meet-and-confer process with the *Coleman*

2   parties," as well as to provide the Special Master with monthly updates on implementation of

3   their staffing plan.  ECF No. 5573 at 3.

4          Mental health staffing is now before the court on a report from the Special Master

5   on the status of implementation of CDCR's staffing plan.  ECF No. 5564.  For the reasons set

6   forth in this order, the court will issue specific direction to the parties to guide resolution of

7   outstanding issues related to mental health staffing, to ensure coordination between the DSH and

8   CDCR defendants in resolution of any outstanding issues related to implementation of the DSH

9   defendants' staffing plan.  The court's direction is intended to move the staffing component of

10  compliance from its present posture to full and complete remediation, including, if necessary,

11  through issuance of an enforcement order.

12  I.      BACKGROUND

13         In 1995, the court found that California's prison system was "significantly and

14  chronically understaffed in the area of mental health care services."  *Coleman v. Wilson*,

15  912 F. Supp. 1282, 1307 (E.D. Cal. 1995).  At that time, the evidence showed that defendants

16  were "understaffed in the range of some three hundred members deemed necessary to deliver

17  adequate care to mentally ill inmates; this number is higher when the vacancy rate in authorized

18  positions is considered."  *Id.* at 1318.  One defendant "acknowledged serious problems with

19  recruitment and retention of psychiatrists and psychologists" at prison institutions, and attributed

20  the problems "to non-competitive salaries, undesirable geographical locations and clientele, and

21  inadequate incentives."  *Id*.  Evidence at trial showed defendants had "'known [about and

22  repeatedly acknowledged] the serious problem with understaffing at least since . . . 1985.'"  *Id*. at

23  1315 n.47 (quoting Findings and Recommendations filed June 6, 1994, at 75-76).

24         The constitutional deficiencies identified at trial have plagued efforts to remediate

25  constitutionally inadequate mental health staffing levels for more than twenty years.  This history

26  and the extensive remedial efforts undertaken in an effort to address inadequate mental health

27  staffing levels are set out in detail in the Special Master's report.  *See* ECF No. 5564 at 2-6.

28

1   Since 2002, defendants have been under a court order to limit to ten percent the

2   vacancy rate among psychiatrists, psychologists and social workers, including contractors. *Id*. at

3   3 & n.2 (citing ECF No. 1383 at 4). Since 2010, necessary mental health staffing levels have

4   been determined by staffing ratios contained in a staffing plan developed by defendants in

5   response to an order filed June 18, 2009, as part of a coordinated effort to plan for, develop and

6   activate mental health beds sufficient to meet short-term, intermediate and long-range need. *See*

7   ECF No. 3613, *passim*. The staffing plan (hereafter 2009 Staffing Plan) was filed September 30,

8   2009, ECF No. 3693, and approved by the Special Master on March 4, 2010. *See* ECF No. 5564

9   at 31-32. The plan provides staffing ratios for the programs at each level of defendants' Mental

10  Health Services Delivery System (MHSDS) and other ancillary programs. *See* ECF No. 3693 at

11  12-33. These ratios are expressed as one mental health staff person per x number of inmate

12  patients. *See id*.

13  On January 4, 2010, the court gave final approval to most parts of defendants'

14  long-range mental health bed plan. ECF No. 3761. In relevant part, the court ordered full

15  activation of mental health care units in a new prison health care facility at Stockton[2] by the end

16  of 2013. *Id*. at 4. In 2014, defendants came to the court seeking, *inter alia*, relief from the 2013

17  deadline on the ground that "difficulties with recruitment and retention of staff psychiatrists are

18  preventing the opening of five remaining mental health units." ECF No. 5116 at 2. In granting

19  the requested extension, the court signaled its agreement "with defendants' judgment that they

20  should not house seriously mentally ill inmates in hospital units unless those units are sufficiently

21  and adequately staffed." *Id*. at 6. In addition, defendants agreed to conduct a review of their

22  then-current salary schedule for psychiatrists to determine whether that schedule was

23  "competitive both within California and nationally" and they were ordered to file the results of

24  that review. *Id*. at 7, 12. On March 24, 2014, defendants reported to the court that the salaries for

25  prison psychiatrists were "'within the range of comparable private and public sector salaries for

26

27  [2] The facility is referred to in the order as "[d]efendants' proposed Consolidated Care
    Center." ECF No. 3761 at 4. It is now known as the California Health Care Facility (CHCF).

28

1    psychiatrists within California and nationally' and they ha[d] the authority to 'offer newly hired

2    psychiatrists salaries in excess of the minimum starting salary in the State pay scale range.'" ECF

3    No. 5171 at 2-3 (quoting ECF No. 5123 at 3).

4                      On June 19, 2014, the court issued an order requiring defendants to

5
6
> revisit and, as appropriate, revise their existing mental health staffing plan in order to resolve the ongoing problem of mental health staffing shortages and come into compliance with the requirements of th[e] court's June 13, 2002 order (ECF No. 1383) concerning maximum mental health staff vacancy.

7

8    ECF No. 5171 at 4.  Defendants were ordered to report to the court on the results of that review

9    by September 12, 2014. *Id.*

10                   As the Special Master reports:

11
12
13
14
> After receiving an extension of time, defendants filed their "Report on Review of Mental Health Staffing" on February 2, 2015, in which they conceded that the vacancy rate among psychiatry positions, including the use of contract staff, was nearly 20 percent. ECF No. 5269 at 6. As a remedy for staffing deficits for both psychiatrists and psychologists, defendants proposed a four-pronged approach, which included:

15
16
> 1. The creation of a psychiatric medical assistant classification to perform clerical tasks currently performed by psychiatry staff.

17
> 2. The expansion of their psychologist internship program and reactivation of a fellowship program for psychiatrists.

18
19
> 3. Offering differential pay for civil service psychiatrists and increasing contract rates for contract psychiatrists to work in hard to recruit locations.

20
> 4. Continuing the recently expanded telepsychiatry program.

21                *Id*. at 6-10.

22    ECF No. 5564 at 4-5.  In their report, defendants represented that CDCR would "not change any

23    staffing ratios for psychiatrists" "[u]ntil the effectiveness" of the new psychiatric medical

24    assistant (PMA) classification could "be established."  ECF No. 5269 at 7.  In objections to the

25    defendants' report, plaintiffs expressed concern that defendants' "clear goal" in developing the

26    PMA classification was to use those positions "to justify a unilateral reduction in the total number

27    of allocated psychiatry positions systemwide."  ECF No. 5281 at 3.

28

1    On May 18, 2015, the court ordered defendants to move forward with the four

2    proposals made in their report. ECF No. 5307 at 6. Crediting the "serious questions" raised by

3    plaintiffs "about a reduction in psychiatry positions once the new PMA positions are established

4    and filled", the court required defendants to "seek the approval of the Special Master and leave of

5    court before making any changes to the staffing ratios under which the mental health program is

6    currently operating." *Id*. at 5, 6. The court also ordered the Special Master to report to the court

7    on the status of defendants' implementation of their four proposals and to make "such

8    recommendations as may be necessary to address any ongoing mental health staffing

9    deficiencies." *Id.* at 6. The court was clear then, as it is now, that it is time to "finally and fully"

10   remedy the problem of inadequate staffing that have "plagued the remedial phase of this litigation

11   since its inception" more than twenty years ago. *Id*. at 5.

12   The Special Master's report required by the court's May 18, 2015 order was

13   included in his Twenty-Sixth Round Monitoring Report. *See* ECF No. 5439 at 28 (citing ECF

14   No. 5377). In its order on the Twenty-Sixth Round Report, the court discussed the staffing

15   recommendations:

16       With respect to staffing, the Special Master recommends that
         (1) defendants be required to provide him with monthly updates on
17       the implementation of their staffing plan and that they be required
         to meet with the Special Master monthly "to discuss and consider
18       strategies and initiatives, including but not limited to potential
         clustering of higher-acuity mentally ill inmates at those institutions
19       where it has been shown that mental health can be more readily
         attracted and retained, all to resolve the problem of mental health
20       staffing in CDCR prisons in a thorough and lasting way;" (2) that
         he be ordered to file a stand-alone report on the status of mental
21       health staffing and defendants' implementation of their plan within
         120 days; and (3) that defendants be directed to complete and
22       implement the new peer review process. ECF No. 5439 at 141-42.

23   ECF No. 5477 at 5. The court went on to pointedly lay out its expectations:

24       In making the foregoing recommendations, the Special Master
         demonstrates more patience than this court would accept absent his
25       long experience and strenuous efforts in this remedial process. The
         Twenty-Sixth Round Monitoring Report describes in great detail
26       the "long and tortured" history of "CDCR's struggle to implement a
         viable staffing plan for the provision of adequate mental health
27       treatment" and the absence of improvement in the "[c]hronic
         understaffing of CDCR mental health positions" and the
28       "stagnat[ion]" of "CDCR's implementation of its most recent

5

mental health staffing plan." ECF No. 5439 at 16, 22-43. The Special Master reports that "[v]acancies in the key mental health clinical disciplines of psychiatry and psychology remained problematic and were nearly unchanged from rates in 1998. . . ." *Id.* at 16 (emphasis added).

Several factors appear to be at work in defendants' failed efforts to hire and retain sufficient numbers of mental health staff, including but not limited to the geographic locations in which defendants continue to house significant numbers of seriously mentally ill inmates. The ongoing rise in the numbers of mentally ill inmates in California's prisons, *see* ECF No. 5439 at 134-135, compounds defendants' difficulties, as staffing levels are based on inmate/staff ratios, *see, e.g.,* ECF No. 5269 at 6. Defendants have reported to the court that "its pay for psychiatrists is competitive with other private and public employers." ECF No. 5269 at 9. As of February 2015, they planned to nonetheless pursue "differential pay" for psychiatrists working in "hard-to recruit" institutions. *Id.* It is not at all clear to this court that additional pay will solve this deepseated problem and the court can no longer sanction the continued pursuit of remedial strategies that have not worked in the past. While the court will adopt the Special Master's recommendation, it will give defendants four more months to work with him to devise a meaningful strategy that will, finally, mean mentally ill inmates are located in institutions that are adequately staffed with mental health staff competent to meet their treatment needs. To be clear: the court expects more than a mere plan. The court requires that the report from the Special Master demonstrate clear action in accordance with planned steps and a measurable timeline by which those steps will be completed.

ECF No. 5477 at 5-6.

The staffing report currently before the court, ECF No. 5564, is the one required by the August 9, 2016 order. The parties have responded, extensively, to the report. On March 30, 2017, plaintiffs filed objections, ECF No. 5590, and defendants filed a response, ECF No. 5591. On April 13, 2017, defendants filed evidentiary objections and a motion to strike a declaration filed with plaintiffs' objections, ECF No. 5600, and a reply to plaintiffs' objections, ECF No. 5601. Plaintiffs also filed evidentiary objections, ECF No. 5602, and a reply to defendants' response, ECF No. 5603. On April 21, 2017, plaintiffs filed a response to defendants' motion to strike. ECF No. 5611. On April 27, 2017, defendants filed a response to plaintiffs' evidentiary objections, ECF No. 5612, and more evidentiary objections and a motion to strike a second declaration, ECF No. 5613. On May 4, 2017, plaintiffs filed a response to the second motion to strike. ECF No. 5614.

1  II.      SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

2            The Special Master reports on the results of a series of workgroup meetings he has

3  held to focus on staffing with members of his staff, plaintiffs' counsel, defendants' counsel and

4  representatives of the CDCR defendants.  ECF No. 5564 at 7.  The workgroup met for the first

5  time in June 2016 and continued to meet for seven months.  *Id*.   Discussions centered on the four

6  proposals contained in defendants' February 2, 2015 plan as well as a number of other proposals

7  "including, cash for on-call compensation for all clinicians, dual appointments, psychiatric nurse

8  practitioners, utilization management, establishing a mental health academy for new mental

9  health staff, salary increases for psychiatrists and clustering."  *Id*.  The Special Master reports that

10  "[d]uring the course of the meet and confer process, it was determined that certain staffing

11  proposals were complex and thus required additional time to plan and bring into fruition."  *Id*.

12  For that reason, the Special Master sought and received a sixty day extension of time to file his

13  stand-alone staffing report.  *Id*.; ECF Nos. 5523, 5530.

14            The proposals discussed by the workgroup resulted in an updated staffing plan

15  presented by defendants to the Special Master on January 10, 2017.  ECF No. 5564 at 8 & Ex.  B.

16  This staffing plan includes the following elements as remedial measures:

17                 Use of medical assistants to assist psychiatrists

18                 Internship and Fellowship programs

19                 Increased pay rates for contract psychiatrists

20                 Telepsychiatry

21                 Cash for on-call compensation for all clinicians

22                 Dual appointments at additional institutions

23                 Psychiatric Nurse Practitioners

24                 Utilization Management

25                 Proposition 57

26                 Establishment of a Mental Health Academy

27                 Salary increases for psychiatrists

28                 Bed planning (clustering)

7

1   *Id*.

2           The Special Master reports on each element of the latest plan and recommends the

3   court adopt it in part and reject it in part.  *Id*.  Specifically, the Special Master recommends

4           That the Court enter an order directing defendants to proceed
            with the implementation of their staffing plan proposals related to
5           medical assistants, internship and fellowship programs, increased
            rates for contract psychiatrists, telepsychiatry, cash for on-call
6           compensation, dual appointments, psychiatric nurse practitioners,
            utilization management relating to 3CMS inmates, Proposition 57,
7           and the Mental Health Academy, which includes the above
            recommendations;
8
            That the Court reject defendants' staffing plan proposals on
9           utilization management related to EOP inmates, salary increases for
            psychiatrists, and clustering, and that the Court enter an order that
10          defendants be required to develop a supplemental plan to address
            those areas, which includes the above recommendations; and
11
            That the Court enter an order directing the defendants and the
12          Special Master to meet and confer every 90 days until the staffing
            plan is fully implemented, including plaintiffs as appropriate, to
13          discuss the status of defendants' implementation of the adopted
            staffing plan proposals as outlined in the recommendations above.
14

15  *Id*. at 28-29.

16          On August 28, 2017, the court approved a stipulation filed by the parties informing

17  the court of their agreement on utilization management review for EOP inmates and that the EOP

18  review is underway.  *See* ECF No. 5668.  The Special Master's recommendation that the court

19  reject a prior proposal for EOP utilization management review is therefore moot, as are

20  defendants' objections to that recommendation.

21  III.    BRIEFING OF THE PARTIES

22          A.    Plaintiffs' Objections and Request for Additional Relief

23          Plaintiffs' principal objection to the Special Master's report is that it does not go

24  far enough in its recommendations concerning pay for psychiatrists.  Plaintiffs seek additional

25  orders requiring "targeted extra pay differentials for psychiatrists in hard-to-hire locations," and

26  requiring defendants "to complete and share a salary/compensation survey, in order to guide

27  future pay and  benefit increases designed to attract new hires and retain existing psychiatrists."

28  ECF No. 5590 at 7.  Plaintiffs also contend defendants' proposals concerning clustering and

8

1   telepsychiatry are inadequate to resolve the "severe" staffing shortages among psychiatrists.  *Id*.

2   at 23.  Finally, plaintiffs ask the court to set a status conference "to devise a durable remedy to

3   this entrenched problem."  *Id*. at 7.

4          With their objections, plaintiffs present evidence of the vacancy rates in clinical

5   positions in January 2017.  Ex. E to Nolan Decl., ECF No.  5590-1 at 23.[3]  With limited

6   exceptions, all of those vacancy rates exceeded ten percent, and the vacancy rates among chief

7   psychologists and staff psychiatrists was almost thirty-three percent in each category.  *Id*.[4]

8          In reply, defendants contend (1) compensation for California's prison psychiatrists

9   is "among the highest in the nation"; and (2) they are providing constitutionally adequate mental

10  health care at current staffing levels.  ECF No. 5601 at 1-2.   As they also discuss in their

11  response to the Special Master's report, defendants contend the 2009 staffing ratios are

12  "outdated" and need to be revisited.  *Id*. at 1.  Defendants contend plaintiffs were part of the

13  discussion that led to the current clustering plan and plaintiffs' objections are "after the fact" and

14  untimely.  *Id*. at 9.

15         B.    Defendants' Response

16         Defendants object to the Special Master's concerns about the use of telepsychiatry

17  and argue they should be allowed to fully implement their telepsychiatry program.  ECF No. 5591

18  at 5-9.  Defendants also contend additional salary increases for psychiatrists are not warranted, *id*.

19  at 11-13, and that they are adequately meeting patient needs even with existing vacancies, *id*. at

20  13-15.  Finally, they contend the Special Master "recently clarified" that his recommendation

21  concerning clustering "is intended to move *Coleman* class members out of High Desert State

22  Prison [(High Desert)] in particular"; defendants contend closing High Desert's mental health

23

24         [3] Defendants object to, and move to strike, ¶¶ 14, 18, and 20-25 of the Nolan Declaration,
       and Exhibits D and F to that declaration.  For purposes of this order, the court has relied on only
25     ¶ 9 of the Nolan Declaration and Exhibit E, authenticated by ¶ 9.  Defendants' motion to strike
       will be denied without prejudice and their other evidentiary objections will be disregarded.

26
           [4] In their brief, plaintiffs contend the evidence shows "the overall vacancy rate for staff
27     psychiatrists in CDCR was 45.8%."  ECF No. 5590 at 5.  This conclusion is not obvious from the
       cited evidence.
28

program "presents serious problems." *Id*. at 16.  More broadly, defendants contend requiring

clustering would "violate the Prison Litigation Reform Act's prohibition on orders requiring

construction of prisons," that "the recommendation is not supported by data or evidence," and

that "[d]efendants are concerned that further clustering of high-acuity patients may negatively

impact care, particularly at prisons with more complex missions, and negatively impact the staff."

*Id*. at 16-17.

In response, plaintiffs argue that "[d]efendants' rejection of meaningful

compensation increases for psychiatrists is overly fatalistic about solving the problem, and at

odds with any common sense understanding of market forces and the laws of supply and

demand." ECF No. 5603 at 4.  Plaintiffs add that "[t]he current nationwide psychiatrist shortage

makes raising pay even more essential, not futile, as reflected in Defendants' decision to increase

compensation for registry psychiatrists and medical doctors in hard-to-hire locations." *Id*.

Plaintiffs contend defendants' position on the use of telepsychiatry

> is at odds with professional standards, with their own tele-
> psychiatry policy's cautionary statements that on-site psychiatrists
> are preferred for higher levels of care, with this Court's prior
> admonishment that "there may be class members not susceptible to
> this method of care," and with their own statewide Chief
> Psychiatrist's acknowledgement that he and his staff could not
> locate any good studies on the efficacy of tele-psychiatry in the
> prison context.

*Id*. at 4-5.  In addition, plaintiffs urge the court to reject defendants' objection to the Special

Master's criticisms of defendants' clustering plan, which plaintiffs contend "ignores and

exacerbates the risks of operating high-acuity mental health programs at facilities that cannot

recruit and retain clinical staff. . ." *Id*. at 5.

IV.    <u>ANALYSIS</u>

The court begins by acknowledging the effort of the Special Master and the parties

reflected in the latest series of meetings, planning and reporting.  This effort has served to narrow

and focus the issues that require resolution in order for defendants to meet their Eighth

Amendment obligation to "employ mental health staff in 'sufficient numbers to identify and treat

1   in an individualized manner those treatable inmates suffering from serious mental disorders.'"

2   *Coleman v. Wilson*, 912 F. Supp. at 1306 (internal citation omitted).

3           At the same time, the plan provided by defendants to the Special Master that forms

4   the basis for his current report does not satisfy an important requirement of the August 9, 2016

5   order:  it does not include a timeline by which the steps outlined in the plan will be completed.

6   *Cf.* ECF No. 5477 at 6 ("The court requires that the report from the Special Master demonstrate

7   clear action in accordance with planned steps and a measurable timeline by which those steps will

8   be completed.").  It is past time for defendants to complete the task of hiring sufficient mental

9   health staff to come into compliance with the Eighth Amendment and orders of this court.  For

10  the reasons explained below, the court will provide defendants one year from now to come into

11  compliance with the required staffing ratios and the court's June 13, 2002 order.  It will be for

12  defendants, working under the guidance of the Special Master, to complete all steps necessary to

13  meet that goal; many of those steps are included in the proposals discussed in the Special

14  Master's current report.

15          Defendants also have not provided the Special Master with any substantive

16  information on the proposal contained in their February 2, 2015 staffing plan to implement pay

17  differentials for psychiatrists at "hard-to-recruit locations."  ECF No. 5564 at 12.  The court

18  clearly directed defendants in the August 9, 2016 order to work with the Special Master "to

19  devise a meaningful strategy that will, finally, mean mentally ill inmates are located in

20  institutions that are adequately staffed with mental health staff competent to meet their treatment

21  needs."  ECF No. 5477 at 6.  The court also directed that the Special Master's report

22  "demonstrate clear action in accordance with planned steps and a measureable timeline by which

23  those steps will be completed."  *Id.*  Yet the updated staffing plan defendants provided to the

24  Special Master on January 10, 2017 "dropped any specific mention of pursuing pay differentials."

25  ECF No. 5564 at 14.  Defendants instead simply informed the Special Master "that the pay

26  differential would be handled through the collective bargaining process."  *Id.* at 14; *see also id.* at

27  24.

28

11

1          The failure to provide the Special Master with meaningful information necessary

2    to full consideration of the role of psychiatrist salaries in remedying the ongoing constitutional

3    violation in this action violates the spirit, if not the letter, of the court's August 9, 2016 order.  It

4    also violates several paragraphs of the December 11, 1995 Order of Reference, ECF No. 640,

5    requiring defendants and their staff to cooperate fully with the Special Master in the performance

6    of his duties, including by responding to "requests for the compilation or communication of oral

7    or written information" and to provide the Special Master with "unlimited access to the records,

8    files and papers maintained by defendants" to the extent such access is related to the Special

9    Master's performance of his required duties.  *Id*. at 5-6.

10          It should not have to be said again:  It is defendants' responsibility to meet their

11    constitutional obligations.  To that end, they are required to continue working under the guidance

12    of the Special Master to meet their responsibility, and the Special Master must have full and

13    complete access to all information necessary for him to do his job.  In the next year, defendants

14    must work closely and in full cooperation with the Special Master in a focused effort to resolve

15    all outstanding obstacles to achievement of constitutionally adequate levels of mental health

16    staffing.  Existing court orders in fact require this cooperation.

17          Defendants also ask the court to revisit the existing staffing ratios for psychiatrists.

18    *See*, *e.g.*, ECF No. 5591 at 4.  Defendants have not sought or obtained the approval of the Special

19    Master for such a change, *cf*. ECF No. 5307 at 6, nor do they make a specific proposal for how

20    those ratios should be changed.  *See* ECF No. 5591, *passim*.  Nonetheless, before addressing the

21    parties' objections to the Special Masters' report on elements of defendants' proposals for

22    meeting their staffing obligations, the court addresses whether the staffing ratios for psychiatrists

23    set in 2009 Staffing Plan should be revisited.

24        A.    <u>Staffing Ratios</u>

25          In their response to the Special Master's report, defendants contend "it is time to

26    reevaluate the need and feasibility of the outdated staffing ratios from the 2009 staffing plan. . . ."

27    ECF No. 5591 at 4.  In spite of the broad language of defendants' objection, its focus is on

28    staffing ratios for psychiatrists.

1       Defendants acknowledge that their "average fill rate" for psychiatry positions for

2  the last three years has been seventy-five percent, well below the ninety percent required by the

3  June 13, 2002 order, ECF No. 1383.  *Id.*  Defendants attribute this lapse "in large part [to] the

4  acute nationwide shortage of psychiatrists that exists today. . . exacerbated by the fact that a large

5  portion of California's board-certified psychiatrists are already employed by CDCR and . . .

6  DSH."  *Id.*  Defendants question whether the staffing ratios for psychiatrists contained in their

7  2009 plan "can ever be realistically satisfied."  *Id.* at 13.  They present evidence that CDCR and

8  DSH "employ more psychiatrists combined than the number of psychiatrists working in all but

9  ten states," that "[i]n 2014 the 713 psychiatrists employed by DSH and CDCR represent nearly

10  17.4 percent of California's board certified psychiatrists and placed the two agencies as largest

11  employer among all states in the Country" and that the salaries offered by the two agencies "are

12  already among the highest in the nation."  *Id.*  Defendants also contend they "are unaware of other

13  health-care systems that require as rich a staffing level for psychiatrists as is mandated" by this

14  court.  *Id.*  Finally, they argue generally that they are providing adequate mental health care to

15  class members in spite of the ongoing staffing vacancies.  *Id.* at 13-15.  To support this

16  contention, defendants present (1) evidence of "systemic, statewide compliance with [their]

17  medication-administration measure total[ing] ninety-six percent over the past twelve months; and

18  (2) evidence that eleven institutions with staffing vacancy rates above ten percent nonetheless

19  "achieved greater than ninety percent compliance rate for psychiatry services."  *Id.* at 14 (citing

20  Tebrock Decl. ¶¶ 8, 11 & Exs. 1, 2).

21       Plaintiffs oppose the request to reevaluate the staffing ratios, and object to the

22  evidence tendered by defendants in support of the request.  ECF Nos. 5603 at 14-19; ECF No.

23  5602 at 5-7.  Plaintiffs contend "[t]he time for raising objections to the psychiatrist staffing ratios

24  passed in 2015, when Defendants submitted their staffing plan in response to the Court's 2014

25  order directing them to review their 2009 staffing plan."  ECF No. 5603 at 14.   Plaintiffs also

26  observe that defendants have not sought approval of the Special Master to revise existing staffing

27  ratios, as required by this court's February 18, 2015 order.  *Id.* at 15.  Finally, plaintiffs present

28  evidence to rebut defendants' evidence, and they also point to findings from the Special Master's

13

1    Twenty-Sixth Round Monitoring Report concerning harm to the plaintiff class from ongoing

2    shortages among psychiatrists.  *Id*. at 17-20.

3              There are several flaws in defendants' request.  First, defendants have not

4    presented either the Special Master or this court with a specific proposal for new staffing ratios.

5    The court's May 18, 2015 order was clear:  any revision to existing staffing ratios requires

6    approval of the Special Master.  ECF No. 5307 at 6.  That approval is a precondition to seeking

7    leave from this court, also required, before changing any mental health staffing ratio.  *Id*.

8              Moreover, defendants face a heavy burden in attempting to persuade either the

9    Special Master or this court that the staffing ratios for psychiatrists should be revisited.  In

10   January 2013, defendants moved to terminate this action.  ECF No. 4275.  In that motion,

11   defendants made arguments concerning ongoing mental health staffing vacancies remarkably

12   similar to those raised in their objections to the Special Master's staffing report:  they

13   acknowledged the ongoing vacancies but contended the vacancies did "not 'significantly impair

14   the level of care being provided to inmates, and that "the clinical care itself places CDCR in the

15   upper echelon of state prison mental health systems."'"  ECF No. 4539 at 54 (quoting ECF

16   No. 4275-1 at 25 (quoting ECF No. 4275-5 at 1, 14 and citing ECF No. 4205 at 41)).  In its

17   April 5, 2013 order denying the termination motion, the court found that several necessary

18   remedial goals,  including "full implementation of defendants' mental health staffing plan", ECF

19   No. 4232 at 5 n.3, "are tied to constitutional deficiencies described by the United States Supreme

20   Court in its 2011 Opinion affirming the three-judge court's population reduction order,"

21   including:

22              [u]nacceptably high staffing vacancy rates when measured against
               the state's staffing formula, with expert testimony showing that the
23             staffing need had been significantly underestimated. . . .  Mental
               health staff "managing far larger caseloads than is appropriate or
24             effective" and a prison psychiatrist reporting that they are "doing
               about 50% of what we should be doing to be effective.
25

26   ECF No. 4539 at 25-26 (citing *Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910, 1932 & n.5

27   (2011)).

28

                                          14

1         The April 5, 2013 order includes a ten page discussion of staffing.  In relevant

2    part, the court discussed the development of the 2009 Staffing Plan, as follows.

3         In 2009, pursuant to this court's June 18, 2009 order (ECF
     No. 3613), defendants developed a staffing allocation plan (ECF
4    No. 3693) (2009 Staffing Plan).  Defendants' 2009 Staffing Plan
     sets forth how defendants' mental health delivery system is to be
5    staffed.  *See* Declaration of Diana Toche, filed January 7, 2013
     ("Decl. Toche") (ECF No. 4275-3) ¶ 6.  The 2009 Staffing Plan is
6    driven by ratios of clinical and support staff to inmate population at
     each level of the mental health care delivery system.  *See* 2009
7    Staffing Plan (ECF No. 3693), *passim*.  Defendants' experts opine
     that the 2009 Staffing Plan "will provide adequate resources to
8    meet the mental health needs of inmates in a reasonable manner and
     within the standard of care."  Clinical Exp. Rpt. (ECF No. 4275-5)
9    at 14.  That opinion comports with defendants' representation to the
     California Legislature that full implementation of that plan was
10   necessary.

11        Prior to development of defendants' 2009 Staffing Plan,
     expert testimony showed that the state had underestimated its
12   mental health staffing needs.  *See Brown v. Plata*, 131 S. Ct. at
     1932 n.5.  After submitting the 2009 Staffing Plan to this court,
13   defendants, at the end of 2009, submitted a budget change proposal
     to the California Legislature to "fully implement" the staffing
14   model described in the 2009 Staffing Plan.  Exhibit K to
     Declaration of Jane E. Kahn in Support of Plaintiffs' Response to
15   Defendants' Motion to Strike or Modify Portions of the Twenty-
     Fifth Round Monitoring Report of the Special Master, filed
16   February 11, 2013 (Ex. K to Decl. Kahn) (ECF No. 4325) at 93.
     The budget change proposal described the critical flaws in
17   defendants' prior staffing model, *and represented that the 2009
     Staffing Plan identifies appropriate staffing levels to meet
18   constitutional standards. . . .*"  *Id.* at 95.

19   ECF No. 4539 at 54-55 (emphasis added).  In a footnote, the court observed that the budget

20   change proposal also asserted that the 2009 Staffing Plan "would allow defendants to 'provide the

21   quantity and quality of Resources needed to achieve compliance with policies and procedures

22   contained in the . . . Revised Program Guide' and was 'consistent with models for program

23   staffing in similarly situated models in other states.'  Ex. K to Decl. Kahn at 98."  *Id.* at 55 n.46.

24   /////

25   /////

26   /////

27   /////

28   /////

15

1    Finally, the court held that "[e]ven if it were proper for defendants to back away

2  from the 2009 Staffing Plan," defendants had not proved they could "meet their constitutional

3  obligations with the existing levels of staffing vacancies."  *Id*. at 61.  As the court summarized,

4        evidence cited by the United States Supreme Court showed that a
         previous staffing plan was inadequate.  Defendants represented to

5        the state legislature that the 2009 Staff Plan would meet their
         constitutional obligations.  As described in the text, defendants have

6        failed to show how they can meet their constitutional obligations by
         retreating from the current plan.

7

8  *Id*. at 61 n.47.

9    The April 5, 2013 order established a number of matters relevant to the issues now

10  before the court.  First, the 2009 Staffing Plan was developed to remedy previous staffing levels

11  described as constitutionally deficient by the United States Supreme Court.  Second, defendants

12  represented to the California Legislature at least that the staffing levels in the 2009 Staffing Plan

13  were "appropriate" and necessary to meet constitutional standards.[5]  Third, defendants were not

14  meeting their constitutional obligations at the vacancy levels that existed at the time the

15  termination motion was filed.  Finally, in the 2009 Staffing Plan and the Budget Change Proposal

16  cited in the 2013 order, defendants represented to this court and to the California Legislature that

17  staffing levels in other jurisdictions were considered in developing the 2009 Staffing Plan, and

18  that the 2009 Staffing Plan "was 'consistent with models for program staffing in similarly situated

19  models in other states.'  Ex. K to Decl. Kahn at 98."  *Id*. at 55 n.46; *see also* ECF No. 3693 at,

20  *e.g.*, 8.  In view of this record and the findings accompanying the 2013 order, defendants may

21  wish to reconsider their representation that they "are unaware of other health-care systems that

22

23    [5] The 2009 Staffing Plan contains a footnote in which defendants stated they did not
      "concede that all of the programs and/or staffing identified in the Plan are required by the

24  Coleman Court" nor that "the proposed staffing and services are constitutionally required," nor
     that the "Plan would satisfy the Prison Litigation Reform Act's requirements that prospective

25  relief be narrowly drawn, extend no further than necessary to correct the alleged violation of the
     federal right, and be the least intrusive means necessary to correct the alleged violation."  ECF

26  No. 3693 at 7 n.1.  This disclaimer notwithstanding, the Staffing Plan was developed in response
     to a court order to "resolve all outstanding staffing allocation issues" to remedy an ongoing

27  constitutional violation.  ECF No. 3613 at 2.

28

16

1    require as rich a staffing level for psychiatrists as is mandated" by this court, particularly given

2    their express reliance on staffing levels in other jurisdictions as an aid to development of the 2009

3    Staffing Plan.

4              Defendants do not even mention the April 5, 2013 order or its discussion of

5    staffing in their objections.  Under the law of the case doctrine "a court is generally precluded

6    from reconsidering an issue that has already been decided by the same court, or a higher court in

7    the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (citing *Milgard*

8    *Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir.1990)).

9
> The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion. *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). A court may have discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.  Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion. *Thomas v. Bible*, 983 F.2d at 155.

15   *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).  Defendants have not even begun

16   to meet their burden of showing why the conclusions of the April 5, 2013 order, listed above,

17   should be revisited.

18             Defendants' burden is compounded by the fact that for most programs the 2009

19   Staffing Plan increased the caseload for prison psychiatrists.  Specifically, the 2009 Staffing Plan

20   revised then-existing staffing ratios for prison psychiatrists as follows:

| Department | From | To |
|---|---|---|
| Correctional Clinical Case Management Services – General Population (CCCMS-GP) Staff Psychiatrist | 1:315 | 1:280 |
| CCCMS – Reception Center (RC) Intake and Screening; Staff Psychiatrist | -- | 1:33 |
| CCCMS-RC Treatment Staff Psychiatrist | 1:301 | 1:200 |

| | | |
|---|---|---|
| CCCMS – Administrative Segregation Unit (ASU) and Condemned Unit<br>Staff Psychiatrist | 1:98 | 1:125 |
| CCCMS—Segregated Housing Unit (SHU)<br>Staff Psychiatrist | 1:149 | 1:200 |
| Enhanced Outpatient Program (EOP) – GP<br>Staff Psychiatrist | 1:99 | 1:120 |
| EOP – RC<br>Staff Psychiatrist | 1:99 | 1:120 |
| EOP – ASU and Condemned Unit<br>Staff Psychiatrist | 1:58 | 1:64 |
| Psychiatric Services Unit (PSU)<br>Staff Psychiatrist | 1:64 | 1:64 |
| Mental Health Crisis Bed (MHCB)<br>Clinical Psychologist<br>Staff Psychiatrist<br>Senior Psychiatrist, Supervisor | 1:6<br>1:8<br>1:133 | 1.18:10<br>2.5:25<br>1:50 |
| Mental Health Outpatient Housing Unit (MH-OHU)<br>Staff Psychiatrist<br>Senior Psychiatrist, Supervisor | --<br>-- | 1:9<br>1:150 |
| Desert Institutions<br>Staff Psychiatrist | .4/institution | .5/institution |

ECF No. 3693 at 12-24.  With the exception of certain programs at the CCCMS level of care, the 2009 Staffing Plan increased the number of inmate-patients per staff psychiatrist.[6]  The 2009 Staffing Plan was a comprehensive reworking of all mental health staffing ratios, and included creation of a few new positions.  *See* ECF No. 3693 at 12-33.  The fact that the 2009 Staffing Plan increased most psychiatrist/inmate-patient ratios does not compel a conclusion that constitutional deficiencies in prior staffing ratios remained uncured by the ratios in the 2009 Staffing Plan.  At the same time, however, defendants have a heavy burden going forward to justify further increases in these ratios.

---

[6]  The new ratios also decreased the caseload for senior psychiatrist supervisors in MHCB units.

1          Defendants' heavy burden is even further compounded by the fact that, as

2    plaintiffs point out, in 2014 defendants were ordered to "revisit and, as appropriate, revise their

3    existing mental health staffing plan to resolve the ongoing problem of mental health staffing

4    shortages and come into compliance" with the June 13, 2002 order, ECF No. 1383.  ECF No.

5    5171 at 4.  Defendants completed their review and filed a report on February 2, 2015.  ECF

6    No. 5269.  The proposals in defendants' report focused on increasing retention of psychiatrists by

7    creating a new psychiatric medical assistant (PMA) classification, assisting with both recruitment

8    and retention through internships, fellowships and differential pay and increased contract rates in

9    "hard-to-recruit institutions," ECF No. 5269 at 9, as well as increased use of tele-psychiatry.  *Id*.

10   at 9-10.  After completion of the thorough review required by the 2014 order, defendants did not

11   come to the court requesting a change in the psychiatrist staffing ratios:  they proposed additional

12   steps to meet the requirements of those ratios.

13          Defendants' request now can only be construed as a request to increase the

14   existing caseload of prison psychiatrists.  For all of the foregoing reasons, there is scant evidence

15   in the record to suggest this change would advance remediation of the Eighth Amendment

16   violation in this case; rather, there is strong evidence that such a change would slow progress

17   toward the end of federal court oversight.

18          Defendants have signaled to the Special Master that once the PMA program is

19   implemented across all institutions "it may be necessary to review and, if appropriate, modify the

20   ratios in the 2009 staffing plan."  ECF No. 5564 at 40.  At this point, the court is skeptical that

21   full implementation of the PMA program will justify increasing the caseload of prison

22   psychiatrists.  Defendants have consistently represented that the PMA program is intended to

23   improve recruitment and retention of psychiatrists, not to support an increase in their caseload,

24   which would seem at cross-purposes with retention efforts.  *See* ECF No. 5269 at 7; ECF No.

25   5564 at 40.  At the same time, the court will not preclude defendants from raising with the Special

26   Master the issue of whether full implementation of the PMA program supports a change in the

27   staffing ratios for psychiatrists.  However, that issue must be raised, if at all, so that it can be

28   resolved by the Special Master and presented to the court within the time frame set in this order

19

1    for resolution of all outstanding issues related to mental health staffing and achievement of

2    adequate mental health staffing levels.

3              The court now turns to the Special Master's recommendations concerning specific

4    elements of defendants' plan to which one or both parties have objected or responded, noting

5    there are no objections to several of the proposals or the Special Master's recommendations.

6         B.    Telepsychiatry

7              In its February 2015 staffing plan, defendants proposed "the continuance of a

8    statewide tele-psychiatry program." ECF No. 5269 at 6. At that time, the CDCR defendants

9    were using tele-psychiatry at nine institutions and had twenty-eight staff psychiatrists working out

10   of three satellite offices, twenty-six full-time and two half-time. *Id*. at 9 & n.2. Approximately

11   eighteen of the twenty-eight had been hired in the nine month period that preceded the report. *Id*.

12   At that time, the CDCR defendants indicated it was their "preference to use on-site psychiatry

13   whenever possible" and, therefore, "when an institution is able to fill a position for an on-site

14   psychiatrist, the tele-psychiatrist is moved elsewhere in favor of the on-site doctor." *Id*. at 9-10.

15   The CDCR defendants represented that "[t]ele-psychiatrists are able to treat patients at all levels

16   of care at institutions where recruitment is more difficult or temporary staffing shortages require

17   relief." *Id*. at 10.

18             Plaintiffs objected "to the alleged absence of 'adequate policies and procedures

19   governing the appropriate use of telepsychiatry.'" ECF No. 5307 at 3 (quoting ECF No. 5281 at

20   7). In its May 18, 2015 order, the court observed that defendants "apparently are broadening their

21   reliance on telepsychiatry while the development of positions and procedures for this method of

22   care, and assessment of its adequacy, is ongoing" and that "[t]his is troubling, particularly

23   because there may be class members not susceptible to this method of care." *Id.* at 5.

24             The Special Master reports that "[b]y January 2017, the telepsychiatry staff had

25   grown to 48 providing services to 18 institutions with an intended expansion to 100 working in

26   three locations." ECF No. 5564 at 15. Full expansion will require new office space which will

27   not be completed until next year. *Id*. Plaintiffs raised several objections to the proposed

28   expansion with the Special Master. *Id*.

1       The Special Master reports that he and his experts agree that "telepsychiatry is a

2 viable method for the delivery of mental health services", *id*. at 16, and he recommends "the

3 continued expansion of the telepsychiatry program", *id*. at 17, with the following caveats:

4      •  "Telepsychiatry should serve as a supplement for on-site psychiatry, not as a

5         substitute and should only be utilized when institutions are unable to recruit

6         psychiatrists to work on-site."

7      •  CDCR should be required to continue its recruitment effort at all institutions.

8      •  "The convenience of telepsychiatry should . . . not serve as a reason to allow

9         on-site psychiatrists to migrate to the comfort of remote off-site offices. *It*

10         *cannot be emphasized enough that telepsychiatry should not replace on-site*

11         *psychiatry.*"

12      •  Telepsychiatry should not be a "frontline approach" for psychiatric services

13         "for inmates with the most intensive or emergent needs."

14         ○  For CCCMS level of care, telepsychiatry "is an appropriate option with

15            the requirement that the telepsychiatrist work on-site at least twice per

16            year at the designated institutions and more frequently if feasible."

17         ○  While not recommending permanent use of telepsychiatry at the EOP

18            level of care due to inadequate assessment of its efficacy, the Special

19            Master does recommend "that a psychiatrist be on-site at least quarterly

20            to treat EOP inmates, given the frequency of psychiatric contacts

21            required by the Program Guide."

22         ○  Telepsychiatry is not appropriate for the MHCB level of care except

23            "as a last resort or in emergency situations when an on-site psychiatrist

24            is not available."

25 ECF No. 5564 at 15-17 (emphasis added).

26       Defendants object to the Special Master's recommendations concerning limitations

27 on the use of telepsychiatry for inmates at EOP and higher levels of care. ECF No. 5591 at 5-9.

28 They present a declaration from Michael Golding, M.D., Chief Psychiatrist for CDCR, in support

21

of their objections to the recommended parameters, ECF No. 5591-1, which they contend

supports a finding that telepsychiatry is as effective as on-site psychiatric interactions "in most

applications." *Id*. at 6.

Plaintiffs object to a substantial amount of Dr. Golding's declaration. *See* ECF

No. 5602. Significantly, plaintiffs note that Dr. Golding avers that he and his research team

"were unable to locate any well-controlled studies evaluating telepyschiatry vs. onsite psychiatry

within a prison setting." ECF No. 5591-1, Golding Decl. ¶ 2. Dr. Golding instead reasons from

"findings published from studies on telepsychiatry in other settings," which he describes as

"informative and corroborat[ing] its usefulness in providing mental health treatment to patients

who need it." *Id*. Plaintiffs object to this extrapolation on a number of grounds. Specifically,

plaintiffs object to the latter as "expert opinions that cannot be offered in a Declaration submitted

under Rule 601" and to Dr. Golding's "sweeping assertions about the meaning of the studies as a

whole . . . [as] outside the province of a lay witness" under Federal Rules of Evidence 701 and

702. ECF No. 5602 at 3. Although it is not entirely clear, it appears plaintiffs' Rule 601

objection may be related to their contention that Dr. Golding's table summarizing the studies on

which he relied is without sufficient indicia of reliability and personal knowledge to support its

admission and, therefore, that the opinions he offers are inadmissible. While the merits of

plaintiffs' objections are unclear, it makes no difference because the court gives the declaration

little weight.

Upon review, the court concludes the evidence tendered by defendants is

insufficient to demonstrate that use of telepsychiatry is appropriate for all *Coleman* class

members at every level of care in the MHSDS. In his Twenty-Sixth Round Monitoring Report,

the Special Master reported to the court that "[t]elepsychiatry was first conceived almost two

decades ago as a proposed remedy to alleviate the psychiatry staffing shortage. It is primarily an

option for treatment of inmates at the 3CMS level of care and a less desirable option for inmates

at higher levels of care." ECF No. 5439 at 30. In their response to his report, defendants rely on

the Special Master's review of their telepsychiatry program in support of their argument that the

program can and should be expanded. ECF No. 5591 at 8. The court is persuaded that the

1   Special Master's monitoring of CDCR's use of telepsychiatry and the conclusions of his experts

2   concerning its efficacy for class members based on that monitoring is more relevant to a

3   determination of the appropriate use of telepsychiatry for members of the plaintiff class than are

4   the studies cited by Dr. Golding.

5          Given the experience with telepsychiatry to date, the time has come for the

6   adoption of an addendum to the Revised Program Guide that will govern the use of telepsychiatry

7   and the extent to which telepsychiatrists may provide mental health services in place of on-site

8   psychiatrists going forward.  With one clarification, the recommendations of the Special Master

9   will be adopted at this time.  The clarification is to the first recommendation, confirming that

10  telespsychiatry should serve as a supplement, rather than a substitute, for on-site psychiatry and

11  should only be used when institutions are unable to recruit psychiatrists or have short-term

12  vacancies that cannot be filled by contract psychiatrists.  Moreover, it is important to note that

13  this recommendation is qualified by the ones that follow concerning the use of telepsychiatry at

14  specific levels of the MHSDS.

15         These recommendations, as clarified, shall form the basis of the addendum to the

16  Revised Program Guide, subject to modification as appropriate as a result of ongoing monitoring

17  of defendants' telepsychiatry program.  The addendum to the Revised Program Guide shall be

18  developed and finalized with the guidance of the Special Master and his experts, with input from

19  plaintiffs' counsel at the discretion of the Special Master.  This task shall be completed on a

20  timeframe set by the Special Master so that it can be implemented prior to the one year deadline

21  set by this order.

22         C.       Salary Increases for Psychiatrists

23         Defendants' February 2, 2015 plan included proposals to increase pay for contract

24  psychiatrists and differential pay for civil service psychiatrists at hard-to-recruit institutions.  ECF

25  No. 5269 at 9.  As noted above, the Special Master reports that defendants "left out any specific

26  mention" of differential pay for civil service psychiatrists in their January 10, 2017, updated

27  staffing plan.  ECF No. 5564 at 12.  He also reports that "[t]hroughout the recent meet and confer

28  process, defendants repeatedly asserted that the issue of salary increases was being addressed

1    through the collective bargaining process and they could provide no further information on the

2    subject." *Id*. at 24.  A collective bargaining agreement was reached after the Special Master filed

3    his report.  *See* Ex. G to Decl. of Nolan, ECF No. 5590-1.  At the time defendants' objections

4    were filed, the agreement was still "subject to union ratification and subsequent approval by the

5    legislature."  ECF No. 5591 at 11 n.11.  As a consequence of defendants' meager and insufficient

6    presentation to the Special Master, he found this aspect of their staffing plan "unacceptable" and

7    not in line with "the Court's stated directive that defendants present more than a 'mere plan' and

8    'demonstrate clear action in accordance with planned steps and a measurable timeline by which

9    those steps will be completed.'"  ECF No. 5564 at 25 (quoting ECF No. 5477 at 6).  As a result,

10   the Special Master recommends that the court decline to adopt defendants' proposals with respect

11   to psychiatrist pay and, instead, that defendants be required to develop a supplemental plan to

12   address psychiatrist pay and to take the following recommended steps:

13
- Include in the supplemental plan detailed information about
14        the timing and the amount of the increase in contractor rates.

15   - Defendants be required to monitor the effect of salary rate
          increases on the usage of registry hours in order to
16        determine whether further rate increases are necessary to
          assist in the recruitment and retention of psychiatry registry
17        staff and report to the Special Master on a quarterly basis.

18   - Within 90 days, defendants be directed to inform the Special
          Master "of the results of final collective bargaining
19        agreements with all categories of mental health and medical
          staff that impact the delivery of mental health services, with
20        a focus on any changes in existing terms of collective
          bargaining agreements that may enhance or impede future
21        recruitments in each category," as required by the June 13,
          2002 order. ECF No. 1383 at 4. If the collective bargaining
22        process remains ongoing, defendants should be required to
          develop a benchmark that can be adopted by the Court, or in
23        the alternative, develop a salary survey for the Court to
          consider.

24   *Id*. at 13, 26, 28.

25            Plaintiffs' chief objection to the Special Master's report is that it does not go far

26   enough on the question of pay for psychiatrists.  Plaintiffs seek an order requiring defendants to

27   "significantly increase minimum psychiatrist salaries, offer the 15% recruitment and retention

28   differential to psychiatrists on the same terms offered to physicians and surgeons, and devise a

24

1    long-term plan to address staffing shortages." ECF No. 5590 at 26. Defendants contend higher

2    salaries alone will not solve the problem and that plaintiffs' "proposal is an unsustainable solution

3    for providing long term care to mentally ill inmates housed in state prisons." ECF No. 5601 at 2.

4    Defendants contend they should, instead, "be allowed to implement their 2017 Staffing Plan and

5    work with the Special Master to revisit the previously-ordered staffing ratios to determine if these

6    ratios are feasible or even necessary." *Id.*

7         It is clear from the Special Master's report that he is of the view that revisiting the

8    existing salary structure for psychiatrists would greatly aid achievement of a complete remedy.

9    Plaintiffs agree but do not think his recommendation goes far enough. Defendants appear, in

10   essence, to hedge their bets, hoping the other provisions of their staffing plan will close the

11   vacancy gap and that the court will permit revisiting of the staffing ratios. For the reasons

12   discussed below, the court declines to make any further specific orders governing psychiatrist

13   pay. It is clear that defendants know that increasing pay for psychiatrists is an option available to

14   them to comply with the orders of this court. What is apparently less clear, but will now be made

15   explicit, is that defendants must, within the next year, organize and locate the programs in their

16   MHSDS so that those programs are staffed according to the ratios in the 2009 Staffing Plan,

17   absent a change to those ratios approved by the Special Master and this court within the next year,

18   and the June 13, 2002 order. Increasing pay for psychiatrists may be one tool defendants use to

19   achieve this requirement. It is up to them.

20         D.    Bed Planning (Clustering)

21         In the August 9, 2016 order, the court directed defendants to meet and confer

22   monthly with the Special Master to discuss, among other options, "potential clustering of higher-

23   acuity mentally ill inmates at those institutions where it has been shown that mental health staff

24   can be more readily attracted and retained, all to resolve the continuing problem of mental health

25   staffing in CDCR prisons in a thorough and lasting way." ECF No. 5477 at 8-9.

26         The clustering plan defendants presented to the Special Master expands EOP beds

27   at all institutions with EOP programs, with the exception of Pelican Bay, "which was closed to

28

25

1  EOP inmates because it was a hard to recruit location."  ECF No. 5564 at 26.  The Special Master

2  reports that

> the EOP bed expansion plan as currently designed does not address the core of the Court's order regarding clustering, which is to consider placing "higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained." ECF No. 5477 at 8. True clustering, for example, would be closing a hard-to-recruit institution such as High Desert State Prison to intake, and placing those MHSDS inmates in an institution that has the ability to recruit and retain mental health staff. At its core, all defendants' plan does is dramatically expand EOP beds at a number of institutions that defendants themselves described as hard-to-recruit institutions in their February 2, 2015 staffing plan, particularly in psychiatry, which was discussed earlier. For example, the vacancy rates in November 2016 for both on-site and telepsychiatry for Kern Valley State Prison, California Substance Abuse Treatment Facility, California State Prison/Los Angeles County, and California State Prison, Corcoran were 54 percent, 46 percent, 47 percent, and 33 percent respectively.  [Footnote omitted.] The EOP clustering plan offered by defendants is inadequate; it does not resolve the issue of recruiting and retaining staff in its current iteration.

14  *Id.* at 27-28.  The Special Master recommends that defendants be required to develop, within

15  ninety days, a clustering plan "that expressly demonstrates how defendants propose to recruit and

16  retain mental health staff at each designated cluster institution in order to resolve the long-

17  standing staffing problems in CDCR."  *Id.* at 28.

18  The Special Master's recommendation is sound, particularly given the long-

19  standing problem of recruiting psychiatrists at several of the institutions defendants themselves

20  have identified as locations where it is hard to recruit psychiatrists.  Given the deadline the court

21  will impose in this order, defendants are well-advised to take the Special Master's

22  recommendation and work closely with him to develop a more robust clustering plan than the one

23  presented during the workgroup discussions that led to his current report.  If defendants choose to

24  cluster programs to comply with this order, they will be required to work with the Special Master

25  as they refine their clustering plan.

26      E.   <u>Conclusion</u>

27  Over the past two decades a sufficient number of orders have been issued to guide

28  defendants in meeting their constitutional obligations, including the Eighth Amendment

26

1  obligation to hire mental health staff in sufficient numbers to treat the mentally ill inmate

2  population.  More than twenty years into the remedial phase of this action, the ways to meet this

3  obligation have been the subject of numerous court orders as well as extensive planning efforts by

4  defendants under the supervision of the Special Master and with input from plaintiffs.

5          It is fundamental that "in cases challenging conditions of prison confinement,

6  courts must strike a careful balance between identification of constitutional deficiencies and

7  deference to the exercise of the wide discretion enjoyed by prison administrators in the discharge

8  of their duties." *Coleman v. Wilson*, 912 F. Supp. at 1301 (citing *Toussaint v. McCarthy*, 801

9  F.2d 1080, 1086-87 (9th Cir. 1986)); *see also Coleman v. Schwarzenegger*, 922 F. Supp.2d 822,

10  963-64 (E.D. Cal. and N.D. Cal. 2009) ("institution-by-institution approach to population

11  reduction would interfere with the state's management of its prisons more than a single

12  systemwide cap. . .").  At this juncture, further orders requiring specific remedial measures would

13  in a number of instances be redundant and, more importantly, would tip the balance unacceptably

14  toward micromanagement and substitute this court's judgment for that of prison administrators.

15  The court has repeatedly identified the constitutional deficiencies in staffing and has issued

16  several orders aimed at remedying the deficiencies.  As with transfers to inpatient care, which the

17  court is addressing separately, defendants have a wide range of options available to meet their

18  constitutional obligations to hire sufficient numbers of prison psychiatrists.  These include, but

19  are not limited to, raising salaries and clustering programs in locations where psychiatrists can be

20  more easily recruited.  Defendants may use a combination of these options and others in a focused

21  effort to finally remedy ongoing staffing shortages.  If defendants' optimism that Proposition 57

22  will reduce the population of mentally ill inmates, that reduction also will aid in achieving

23  compliance with required staffing levels.  What defendants cannot do is continue to fail to meet

24  their obligation to hire a sufficient number of psychiatrists to meet their constitutional obligations.

25          It is no secret that the court recently issued an enforcement order intended to bring

26  defendants into full and permanent compliance with Program Guide timelines for transfer to

27  inpatient care.  ECF No. 5610.  More than a decade had passed since defendants were ordered to

28  "'immediately implement'" those timelines.  ECF No. 5583 at 3 (quoting ECF No. 1773).  When

1    the court reviewed the record concerning Program Guide timelines for transfer to inpatient care, it

2    was clear that "defendants have sufficient options to allow them to comply now, fully and

3    permanently," with those timelines.  ECF No. 5583 at 8.

4           With respect to staffing, the stark reality of the record before this court is that

5    defendants have for fifteen years been under orders to keep their mental health staff vacancy rate

6    below ten percent.  For most of that fifteen year period, and for several classifications of mental

7    health staff, defendants have been in violation of that order.  As is clear from the Special Master's

8    most recent report, defendants are still in violation of the court's order, particularly with respect

9    to psychiatrists.  *See* ECF No. 5590-1 at 23.  The long history of failure to hire a sufficient

10   number of psychiatrists, combined with defendants' position on the matters before the court on

11   the Special Master's report, raises a question about whether defendants will ever be able to hire

12   sufficient staff to meet their constitutional obligations to members of the plaintiff class, as long as

13   the size of the seriously mentally ill inmate population in California's prison system remains at

14   current levels or continues to grow.  The time is now to resolve that question.

15          This court is committed to bringing this action to a conclusion sooner rather than

16   later, to achieve the long deferred requirements of constitutional compliance.  *See, e.g.*, ECF

17   No. 5477 at 1-2.  The Special Master's report makes clear defendants must do more to address

18   ongoing mental health staffing shortages, particularly among psychiatrists, in order to achieve

19   long-overdue complete remediation.  Defendants' latest plan, presented to the Special Master in

20   January 2017 and the subject of his current report, articulates some goals, but does not follow the

21   court's direction to develop a timeline by which all steps in the plan will be complete.  Because

22   defendants have not developed the timeline required by the August 9, 2016 order, the court will

23   set a one year deadline by which all outstanding issues pertaining to achieving adequate mental

24   health staffing levels must be resolved and the required staffing levels achieved.  The court will

25   set a status conference six months from now to hear from defendants on their progress.  A second

26   status conference will be set thirteen months from now to address, as necessary, any required

27   enforcement orders and the time staffing levels must be maintained at court-ordered levels, under

28

1    court supervision, in order for the court to be satisfied the remedy has been achieved and is

2    durable.

3              Finally, as the court noted at the start of this order, the DSH defendants are

4    currently required by a March 8, 2017 order to work on and implement their staffing plan, to do

5    so "in coordination with CDCR's development of its own mental staffing plan, and within the

6    context of the same meet-and-confer process with the Coleman parties" and to provide to the

7    Special Master monthly updates on implementation of their staffing plan.  ECF No. 5573 at 3.

8    The March 8, 2017 order giving rise to that requirement will be modified by this order to require

9    DSH defendants to complete development and full implementation of their mental health staffing

10   plan within the one year time frame set by this order.

11             In accordance with the above, IT IS HEREBY ORDERED that:

12             1.  The findings in the Special Master's February 6, 2017 Report on the Status of

13                 Mental Health Staffing and the Implementation of Defendants' Staffing Plan are

14                 adopted in full.

15             2.  The recommendations of the Special Master are adopted, with modifications, as

16                 follows:

17                      a.  Defendants shall report to the Special Master at such regular intervals as

18                          he may set on the implementation of their staffing plan proposals related to

19                          medical assistants, internship and fellowship programs, increased rates for

20                          contract psychiatrists, telepsychiatry, cash for on-call compensation, dual

21                          appointments, psychiatric nurse practitioners, utilization management

22                          related to 3CMS inmates, utilization management related to EOP inmates,

23                          Proposition 57, and the Mental Health Academy; and

24                      b.  Defendants and the Special Master shall meet and confer not less than

25                          every 90 days for the next year, including plaintiffs as appropriate, to

26                          discuss the status of defendants' progress toward compliance with this

27                          order.

28

3. Within one year from the date of this order, the CDCR defendants shall take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order.

4. Under the guidance of the Special Master, defendants shall develop an addendum to the Revised Program Guide to govern the use of telepsychiatry and the extent to which telepsychiatrists may provide mental health services in place of on-site psychiatrists. Telepsychiatry should serve as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists. The Special Master's recommendations concerning the use of telepsychiatry, as clarified by this order, shall form the basis of that addendum, subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program. The addendum shall be developed and finalized with the guidance of the Special Master and his experts, and with input from plaintiffs' counsel at the discretion of the Special Master. The addendum shall be completed on a timeframe to be set by the Special Master so that it can be implemented prior to the deadline set in paragraph 2 of this order.

5. Paragraph two of the court's March 8, 2017 order, ECF No. 5573, is amended to require complete implementation of the DSH defendants' staffing plan within one year from the date of this order.

6. Defendants' April 13, 2017 motion to strike, ECF No. 5600, and defendants' April 27, 2017 motion to strike, ECF No. 5613, are denied without prejudice.

7. This matter is set for status conference on **April 12, 2018 at 10:00 a.m.**, in Courtroom No. 3. Not later than fourteen days prior to the status conference, the parties shall file a joint status report addressing the CDCR defendants' progress toward compliance with paragraph 3 of this order, including but not limited to the status of implementation of the PMA program, the status of the addendum to the

30

1   Revised Program Guide governing telepsychiatry, psychiatrist salaries, clustering
2   and any other issues relevant to an understanding of defendants' progress toward
3   such compliance.  The joint status report shall also address the DSH defendants'
4   progress toward compliance with paragraph 5 of this order.

5   8.  This matter is set for further status conference on **October 11, 2018 at 10:00**
6   **a.m.**, in Courtroom No. 3.  Not later than thirty days prior to the status conference,
7   the parties shall file a joint status report addressing, as necessary, issues pertaining
8   to enforcement of this order and to durability of the staffing remedy.

9   DATED:  October 10, 2017.

UNITED STATES DISTRICT JUDGE

31