DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
ADRIENNE SPIEGEL – 330482
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REVISED 2022 ANNUAL SUICIDE REPORT (ECF NO. 8264)** |
| v. | |
| GAVIN NEWSOM, et al., | Judge: Hon. Kimberly J. Mueller |
| Defendants. | |

[4517284.2]

1

**TABLE OF CONTENTS**

**Page**

2

3    INTRODUCTION ................................................................................................ 1

4    I.    THE REPORT'S ANALYSIS OF QIPS IS INADEQUATE ................................... 3

5         A.    The Report's Analysis of QIP Efficacy Is Deficient ..................................... 4

6         B.    The Report Does Not Contain Sufficient Information Regarding
               Whether the QIPs Have Been Fully Implemented. ....................................... 6

7
         C.    The Report Contains An Inadequate Review of Underlying Problems
8              that Led to QIPs .................................................................................................. 8

9    II.   THE REPORT'S ANALYSIS OF EMERGENCY RESPONSE ISSUES IS
           DEFICIENT ......................................................................................................... 10
10
     III.  THE REPORT'S ANALYSIS OF LEVEL-OF-CARE ISSUES IS NOT
11         COMPARABLE TO THAT FOUND IN PRIOR SPECIAL MASTER
           REPORTS ............................................................................................................. 12
12
     CONCLUSION ............................................................................................................. 12
13
     CERTIFICATION ......................................................................................................... 13
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

## <u>CASES</u>

4

5

*Brown v. Plata*,
      563 U.S. 493 (2011) ................................................................................................ 2, 3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2          CDCR's revised 2022 annual suicide report ("Revised Report" or "Report") is

3     Defendants' latest attempt to perform the annual suicide reporting function in accordance

4     with the pilot process approved by the Court.  *See* Not. of Submission of CDCR's Revised

5     2022 Annual Suicide Report (June 7, 2024), ECF No. 8264; Special Master's Report and

6     Recommendation Regarding CDCR's Proposal for Assuming the Annual Suicide

7     Monitoring Report ("Suicide Reporting Plan"), ECF No. 7574; Order (Jul. 25, 2022), ECF

8     No. 7592.  The Revised Report updates the 2022 annual suicide report Defendants filed on

9     October 24, 2023 (ECF No. 8027), and contains updates only to account for a twentieth

10    2022 suicide that was identified shortly before Defendants filed their original report.

11    Revised Report at 2.  Plaintiffs filed objections to Defendants' original 2022 Suicide

12    Report, but the Court deferred consideration of any objections until after Defendants filed

13    their Revised Report.  Order (March 19, 2024), ECF No. 8162; Plaintiffs' Objections to

14    Defendants' 2022 Suicide Report (Oct. 30, 2023), ECF No. 8042.  Because Defendants did

15    not address in the Revised Report most of the issues to which Plaintiffs objected in the

16    original report, Plaintiffs here reassert the majority of their original objections.

17          Defendants' 2022 Report suffers from several of the same key failings present in

18    their 2021 suicide report that led the Court to order Defendants to file a revised 2021

19    report.  Order (Dec. 15, 2022), ECF No. 7681 ("Dec. 15, 2022 Order").  Defendants'

20    analyses of Quality Improvement Plan ("QIP") efficacy, QIP implementation, and the

21    underlying problems that led to issuance of QIPs—all of which are essential components

22    of the analysis of QIPs—are deficient despite Defendants' earlier promises, and the

23    Court's expectation, that Defendants would improve reporting on QIPs in their 2022

24    suicide report.  *See id.* at 5-7;[1] Not. of Submission of CDCR's 2021 Annual Report to the

25    Legislature on Suicides in CDCR and 2021 Annual Suicide Report (Sept. 29, 2022), ECF

26    No. 7615 ("Defendants' 2021 Suicide Report") at 7, 9-10.  The Suicide Reporting Plan

27    _____

28    [1] Page citations to documents on the docket are based on ECF pagination.

1   requires this analysis as a replacement for the determinations of foreseeability and

2   preventability that have long provided a systemic examination of gaps in Defendants'

3   suicide prevention efforts. *See Brown v. Plata*, 563 U.S. 493, 504 (2011). Other sections

4   in Defendants' Report addressing analyses of emergency response issues and level-of-care

5   problems are not comparable to the analyses found in prior Special Master reports, as

6   required by the Suicide Reporting Plan. Defendants chose not to fully address these

7   deficiencies despite the fact that Plaintiffs first identified them over ten months ago and,

8   given the filing of Defendants' Revised Report, Defendants have had two opportunities to

9   do so. *See* Revised Report at 37-50 (Plaintiffs' August 23, 2023 letter regarding

10  Defendants' Draft 2022 Suicide Report).

11      Diligent and rigorous analysis and reporting on suicides in CDCR is now more

12  critical than ever. The 2019, 2020, and 2023 suicide rates were the highest in CDCR since

13  at least 1990. *See* The Sixth Re-Audit and Update of Suicide Prevention Practices in the

14  Prisons of CDCR and Re-Audit of Suicide Prevention Practices in the Psychiatric Inpatient

15  Programs (March 1, 2024), ECF No. 8143-1 ("Hayes's Sixth Re-Audit Report") at 86; An

16  Audit of Suicide Prevention Practices in the Prisons of the CDCR (Jan. 14, 2015), ECF

17  No. 5259 at 3-4; Annual Report on Suicide Prevention and Response Within CDCR (Oct.

18  1, 2020), *available at* https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2019-

19  SB-960.pdf, at 7. In addition, the Court is poised to initiate contempt proceedings against

20  Defendants for their failure to fully implement nearly half of Special Master expert

21  Lindsay Hayes's suicide prevention recommendations since the Court ordered them to do

22  so nearly a decade ago. *See* Order (Feb. 28, 2023), ECF No. 7743 at 3-5. Although

23  Defendants filed their Revised Report well into 2024, it fails to acknowledge either the

24  continued growth of the suicide rate in 2023 or the pending contempt proceedings.

25      Given this deeply troubling context and the serious deficiencies in Defendants'

26  Report, including failing to provide clear and robust reporting on QIPs in the Report

27  despite now having the infrastructure in place to do so, Plaintiffs are very concerned that

28  Defendants are not prepared to take on this important reporting function on a permanent

1  basis.  The Court should require Defendants to file a further revised 2022 Report that fully

2  complies with the requirements of the Suicide Reporting Plan, including by addressing the

3  deficiencies identified below.  Defendants' willingness to incorporate such content into

4  their annual suicide reports in the first instance will likely animate the parties' discussions

5  in the court-ordered meet and confer process regarding whether to make the Suicide

6  Reporting Plan permanent.  See December 15, 2022 Order at 2, 10-11.  If QIP reporting is

7  again deficient in Defendants' 2023 Suicide Report, Plaintiffs will likely seek further relief

8  from the Court, including termination of the Suicide Reporting Plan and reversion of the

9  annual suicide reporting function to the Special Master.

10  **I.      THE REPORT'S ANALYSIS OF QIPS IS INADEQUATE**

11          The foreseeability and preventability standards have historically provided specific

12  guidance to CDCR on how to identify and fix practices and lapses that increase risk of

13  suicides.  *See Plata*, 563 U.S. at 504.  The parties agreed in the Suicide Reporting Plan that

14  Defendants' reports may forego that analysis, but must instead include an enhanced and in-

15  depth analysis of CDCR's system to remedy suicide prevention deficiencies through

16  Quality Improvement Plans (QIPs).  The Plan requires Defendants' suicide report to

17  include several elements in its QIP analysis, including but not limited to, (1) "an analysis

18  of the efficacy of the QIPs," (2) "a review of the identified areas for improvement within

19  the suicide case reviews that lead to the assignment of QIPs," and (3) "discussion about

20  whether the QIPs have been fully implemented, and if not, what the delays and barriers are

21  to full implementation."  Suicide Reporting Plan at 13-14.

22          Each of these components of the QIP analysis are key tools for reporting on the

23  efficacy of CDCR's existing suicide prevention practices and CDCR's efforts to improve

24  those practices to resolve identified deficiencies.  Plaintiffs' agreement to the closely-

25  negotiated pilot process was premised on Defendants' willingness to include the specific

26  components of the QIP analysis required by the Suicide Reporting Plan.

27          The QIP analysis in Defendants' 2021 Suicide Report, Defendants' first report

28  pursuant to the Plan, lacked analyses of QIP efficacy and QIP implementation.  *See*

[4517284.2]

3

*generally* Defendants' 2021 Suicide Report, ECF No. 7615.  Defendants promised to provide a more robust analysis in their 2022 Report when, according to Defendants, their monitoring and reporting infrastructure would have been in place long enough to produce the required analysis.  *Id.* at 7, 9-10; *see also* Defendants' Redacted Amended 2021 Suicide Report (Jan. 30, 2023), ECF No. 7710.  The Court extended the provisional Suicide Reporting Plan for another year to give Defendants an opportunity to demonstrate that they can and will comply with the Plan's requirements regarding the specific components of the QIP analysis.  Dec. 15, 2022 Order at 5.  Unfortunately, Defendants' 2022 Suicide Report again lacks a meaningful analysis of QIP efficacy, and other components of the QIP analysis in the Report are inadequate.

### A.    The Report's Analysis of QIP Efficacy Is Deficient

Defendants are required to analyze the efficacy of the QIPs in the report, "including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPs as designed were appropriate to effectively address the problems in the first instance and that sustained improvement has been made."  Suicide Reporting Plan at 14; *see also* Dec. 15, 2022 Order at 5.

The efficacy analysis in the Revised Report is inadequate.  It does not clearly state which or how many QIPs were effective—that is, how many QIPs addressed the deficiency they were meant to correct, such that subsequent auditing and review from regional and local suicide prevention teams has not identified continued issues with that problem at that institution.  *See* Revised Report at 102-16.  The Report suggests that, aside from one QIP that resulted in a corrective action plan ("CAP") due to ongoing problems, two headquarters QIPs that are still being rolled out, and two other QIPs in Region III that remain open for monitoring, all other mental health-related QIPs were effective, but it offers no specific information to support that conclusion.  *Id.* at 104-05, 115-16.  To address this issue, the Report should include much more detail regarding the efficacy of the implemented QIPs in the region-by-region efficacy section, including: a report on how many QIPs in each region corrected the deficiency that they were issued to correct (per

4

1   regional audits); how many QIPs were not effective in each region; for how many QIPs in

2   each region Defendants cannot yet determine efficacy; and the basis for Defendants'

3   efficacy determinations for each QIP or each group of similar QIPs.

4       The Report also entirely omits an analysis of the efficacy of nursing and custody

5   QIPs.  Plaintiffs raised this issue in their comments on Defendants' draft of their original

6   Report.  Revised Report at 40.  In response, Defendants asserted that they "increased the

7   discussion on the efficacy of custody and nursing QIPs related to the delay on activating

8   emergency medical services."  *Id.* at 17.  But delays in emergency services are not the only

9   category of QIPs directed at custody and nursing staff, even though the language that

10  Defendants added into the originally filed Report only addresses that category.  *See*

11  Revised Report at 107-08 (noting four total categories of custody QIPs and two categories

12  of nursing QIPs issued in response to the 2022 suicides, including "ASU Policy/CDCR

13  114 issues," "staff actions," and "checks/rounds," which do not appear to be emergency

14  response-related); *id.* at 144-45 (in the list of QIP descriptors, listing "ASU Policy/CDCR

15  114 issues," "Staff Actions Concern," and "Nursing Checks/Rounds" separately from 911

16  activation and emergency response issues).  Moreover, the added discussion in the Report

17  does not actually address the efficacy of the nursing and custody QIPs, including what

18  steps CDCR took to ascertain whether the changes required by the QIPs had been made,

19  and what the results of their inquiries were.  *Id.* at 114-15.  Instead, it only describes the

20  reasons the QIPs were initiated and the actions taken to implement the QIPs, including a

21  training program for nursing staff through the Emergency Medical Response Program,

22  which started in 2021, before the 2022 suicides occurred.  *Id.*  The Report contains no

23  meaningful analysis of whether the QIPs from the 2022 suicides have improved the issues

24  with delays in emergency response activation at the relevant institutions, nor whether and

25  how CDCR has made that determination.  *See Id.*

26      The Report briefly describes the new monitoring process the regional Suicide

27  Prevention Coordinators use to track QIPs, including how they determine if a QIP was

28  effective.  *See* Revised Report at 103 ("[a]n institution is determined to be compliant if,

1  after two consecutive onsite visits, the issue appears to have been resolved in a sustained

2  manner.").  However, the Report fails to provide enough detail about what criteria the

3  Regional staff use to determine that a deficiency leading to a QIP "appears to have been

4  resolved in a sustained manner" and about their methodology for monitoring QIP efficacy.

5  It also omits any accounting of how many of the 2022 QIPs the Coordinators determined

6  to have been effective through their monitoring, and why.

7       Plaintiffs raised questions and concerns about CDCR's vague standard for

8  determining QIP efficacy in their comments on the draft of Defendants' original Report.

9  *Id.* at 40.  Defendants revised this discussion in their original filed Report and did not

10  change it further in their Revised Report.  *See id.* at 103-04; ECF No. 8027 at 7, 89-90.

11  The revised discussion, which asserts that "[e]ach case is unique," and therefore the

12  required follow-up and standards of compliance differ depending on the QIP, does not

13  provide sufficient insight into how Defendants determine whether each QIP has been

14  effective or whether or why Defendants determined that any of the 2022 QIPs were

15  effective.  Revised Report at 103.

16       Before adopting Defendants' Revised Report, the Court should require Defendants

17  to further revise the Report by including: (1) additional detail about the criteria the regional

18  staff use to evaluate QIP efficacy and their methodology for monitoring QIP efficacy; and

19  (2) additional information in the QIP efficacy section of the Report regarding how many

20  2022 QIPs Defendants deemed effective, how many 2022 QIPs Defendants deemed

21  ineffective, and for how many QIPs Defendants cannot yet determine QIP efficacy—both

22  overall and on a region-by-region basis.

23       **B.    The Report Does Not Contain Sufficient Information Regarding Whether the QIPs Have Been Fully Implemented.**

24

25       Defendants' Report must "contain[ ] a full discussion of whether QIPs approved

26  during the reporting year have been fully implemented and, if not, what the barriers to such

27  implementation are." Dec. 15, 2022 Order at 7.  QIP implementation is different from QIP

28  efficacy.  A QIP is fully implemented when the relevant actors, either QIP or headquarters,

1  have taken all actions required by the QIP, regardless of whether those actions ultimately

2  correct the underlying deficiency.

3       The Revised Report briefly describes how many mental health-related QIPs have

4  been "completed" or "closed" for three of the four regions. *See* Revised Report at 115-16.

5  As to Region 2, however, it is impossible to tell how many of the 31 QIPs initiated in

6  response to 2022 suicides in that region were fully implemented by the time the Report

7  was finalized. *Id.* at 116. The Report also entirely fails to report the total number of QIPs

8  that have been fully implemented and the total number of QIPs that remain open for the

9  disciplines of custody and nursing, and it is therefore impossible to tell the total number of

10 "closed" and "open" QIPs across all disciplines. *Id.* The table on pages 107 and 108 does

11 not even purport to give this breakdown because it does not list all QIPs, only those that

12 "were identified more than twice." *Id.* at 107-08. This information would be valuable to

13 inform the Court, Plaintiffs, and the public about how responsive custody and nursing have

14 been to implementing suicide prevention Measures.

15      The Revised Report's discussion regarding actions taken in response to many QIPs

16 is also so vague as to be of minimal use. Revised Report at 107-08, 114-16. The Report

17 states that many of the QIPs resulted in audits and training, but it does not summarize audit

18 findings and does not identify who was trained, what the training covered, whether all

19 relevant staff were trained (a point of concern in prior Special Master Reports), or whether

20 the training or audits resulted in changes to relevant practices or procedures. *Id.*; Report

21 on Suicides Completed in CDCR in 2020 (Dec. 21, 2021), ECF No. 7405-1 ("Special

22 Master's 2020 Suicide Report") at 30 ("What was not possible to determine from the

23 responses submitted was whether all required staff actually received the training.");

24 Special Master's Report on His Expert's Report on Suicides Completed in CDCR in 2019

25 (Jul. 16, 2021), ECF No. 7239 ("Special Master's 2019 Suicide Report") at 35 (describing

26 same). Plaintiffs raised the concerns listed above in their August 2023 comments on

27 Defendants' draft Report. Revised Report at 40. However, Defendants declined to revise

28 both their originally filed Report and their Revised Report to address these concerns. *See*

1  *id.* at 17, 107-08, 115-16.

2  Finally, the Report notes that five "989" investigations were initiated related to

3  2022 suicides.  Revised Report at 103.  However, the Report appears to provide

4  information regarding the status or outcome of only two of these investigations.  *See id.* at

5  106, 114.  In addition, the Report fails to state whether pending Office of Internal Affairs

6  ("OIA") investigations arising from the 2022 suicides prevented implementation of any

7  QIPs and, if so, how many, as prior Special Master reports have done.  *See* Special

8  Master's 2020 Suicide Report at 30-31; Special Master's 2019 Suicide Report at 36.

9  The Court should require Defendants to file a further revised version of their Report

10  containing: (1) a concise statement regarding the total number of 2022 QIPs that have been

11  fully implemented, the total number of 2022 QIPs that have not been fully implemented,

12  the total number of nursing and custody QIPs that have been fully implemented, and the

13  total number of nursing and custody QIPs that have not been fully implemented, as well as

14  a summary of the barriers to full implementation of QIPs that have not yet been fully

15  implemented; (2) additional detail regarding actions taken in response to QIPs for which

16  Defendants have not already included this information; and (3) the status or outcome of all

17  five 989 investigations that arose from the 2022 suicides, as well as whether any of the

18  OIA investigations prevented implementation of any QIPs and, if so, how many.

19  **C.    The Report Contains An Inadequate Review of Underlying Problems**
20  **that Led to QIPs**

21  The Suicide Reporting Plan requires that Defendants' Report include a "review of

22  the identified areas for improvement within the suicide case reviews that lead to the

23  assignment of QIPs."  Suicide Reporting Plan at 13.  The Plan also requires that

24  Defendants' Report include analysis comparable to that in the Special Master's prior

25  suicide reports.  *Id.*  The Special Master's prior reports contain a concise list of every

26  specific underlying problem common to more than one suicide that led to a QIP in each

27  year, such as "[f]ailure to conduct confidential contacts" or "[f]ailure to make adequate

28  custody checks," and how many cases involved each problem.  *See, e.g.*, App'x B4 to

1   Special Master's 2020 Suicide Report, ECF No. 7405-2 at 167; *see also* App'x B4 to

2   Special Master's 2019 Suicide Report, ECF No. 7239-1 at 207.  This list is crucial in

3   identifying trends in suicide prevention deficiencies across institutions in a single year, and

4   over time.

5          Defendants' Revised Report does not include an analysis of underlying deficiencies

6   comparable to that found in the Special Master's prior annual suicide reports.  First,

7   although the Report contains some information regarding underlying problems that led to

8   QIPs, nowhere does the Report contain a concise list that clearly identifies every

9   underlying problem common to more than one suicide that gave rise to a QIP, as prior

10  Special Master reports have done.  Revised Report at 107-116.  Table 21 on pages 107 and

11  108 of the Report addresses only issues that were identified "more than twice," not *more*

12  *than once* as was done in prior Special Master reports.  *Id.*; App'x B4 to Special Master's

13  2020 Suicide Report, ECF No. 7405-2 at 167; App'x B4 to Special Master's 2019 Suicide

14  Report, ECF No. 7239-1 at 207.

15         Second, many of the descriptions of the underlying problems in the Revised Report

16  are so vague that they fail to convey the essence of the problems.  Revised Report at 107-

17  12 (vague descriptions of problems, including "level of care," "staff action response," and

18  "emergency response").  In response to this concern in Plaintiffs' August 2023 comments

19  on the draft of Defendants' original Report, Defendants point to Appendix B to their

20  Report, but Appendix B does not describe the trends in QIPs in 2022; it is simply a list of

21  the types of deficiencies suicide reviewers *may* identify that would merit generating a QIP.

22  *See* Revised Report at 17, 143-46.  The Report makes no attempt to relate the more

23  specific categories of QIPs in Appendix B to the actual set of QIPs utilized in response to

24  the 2022 suicides, and it is impossible to tell from the cursory descriptions in Table 21

25  which of the specific QIP deficiencies in Appendix B pertain to each set of QIPs described

26  in Table 21.  *Id.* at 107-08, 143-46.  For example, "level of care" in Table 21 could be a

27  reference to the QIP listed in Appendix B of "Clinical Decision Making Concerns – […] no

28  consideration of LOC change or no rationale for LOC change," or it could reference

[4517284.2]

9

1  "Continuity of Care/Clinician to Clinician Contacts," "Program Guide Timelines," "MH

2  Referrals (e.g., failure to refer, failure to document response to referral adequately […])," or

3  something else.  *Id.*

4      Clearly and comprehensively identifying the common underlying deficiencies that

5  led to QIPs is necessary for Defendants to identify and fix the policy violations or gaps that

6  contributed to suicides in 2022—especially across institutions or programs—and to discern

7  whether specific suicide prevention measures are in need of improvement.  The Court

8  should require Defendants to further revise this section of their report to be consistent with

9  the analysis in the Special Master's prior reports.  The Report should include a clear and

10  comprehensive list of all underlying problems common to more than one suicide that gave

11  rise to a QIP and clearer, more-detailed descriptions of the underlying problems that led to

12  the QIPs.

13  **II.   THE REPORT'S ANALYSIS OF EMERGENCY RESPONSE ISSUES IS**
14  **DEFICIENT**

15      The Suicide Reporting Plan requires that Defendants report on "emergency

16  response factors" in a manner comparable to the analysis in the Special Master's prior

17  annual suicide reports.  Suicide Reporting Plan at 13; Dec. 15, 2022 Order at 7.  To track

18  the content and analysis in the Special Master's prior reports, the Report must specifically

19  discuss how many cases involved application of cuffs or restraints to patients before or

20  during administration of emergency medical care, as well as the trend over years in the

21  number of such cases.  *See* Special Master's 2020 Suicide Report at 27-28; Special

22  Master's 2019 Suicide Report at 33-34.

23      The Revised Report does not address whether any 2022 cases involved application

24  of restraints to patients before or during provision of emergency medical care, or the trend

25  over years.  *See* Revised Report at 114-15.  This is true even though Plaintiffs identified

26  four 2022 suicides involving the improper use of restraints by staff during the emergency

27  response in a May 1, 2023 letter to Defendants and in an updated version of that letter

28  dated September 30, 2023, to which Plaintiffs received no response.  Plaintiffs requested

1   that Defendants add this information into the final Report.  Revised Report at 43.

2   Defendants implied that they revised the Report to address this issue, *see* Revised Report

3   at 18, but the Revised Report still contains no discussion of the application of restraints to

4   patients before or during provision of emergency medical care, including on the pages on

5   which Defendants claim to have "modified their discussion."  *Id.* (referencing pp. 50, 56-

6   57 of internal report [109, 115-116 of ECF pagination].)

7           The absence of this discussion is not a mere technical violation of the Suicide

8   Reporting Plan.  Reporting on restraining unconscious or barely conscious patients before

9   providing them with emergency medical care is important because it runs contrary to

10  CDCR policy and it is a problem that has plagued Defendants' emergency responses for

11  years.  *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide

12  Report at 33-34.  The Program Guide requires "[a]ll peace officers who respond to a

13  medical emergency […] to provide immediate life support, if trained to do so, until

14  medical staff arrives to continue life support measures." MHSDS Program Guide (Sep. 29,

15  2021), ECF No. 7333-1 at 188.  First responders may delay provision of life-sustaining

16  emergency measures only in specific circumstances, including to "neutralize any

17  *significant* security threats." *Id.* (emphasis added); *see also* Health Care Department

18  Operations Manual § 3.7.1-1 at 4, https://cchcs.ca.gov/wp-content/uploads/sites/60/HC

19  /HCDOM-ch03-art7.1-1.pdf (custodial practices may not "unreasonably delay medical

20  care during a medical emergency unless the safety of staff, patient, or the general public

21  would be compromised"). Unconscious patients in the middle of a suicide attempt are not

22  "security threats," much less "significant security threats," because they cannot

23  realistically harm anyone.  As such, the Program Guide does not permit responding

24  officers to handcuff such patients before initiating the provision of potentially life-saving

25  medical treatment.

26          The Court should require Defendants to incorporate this analysis into their 2022

27  Suicide Report before the Court adopts it.

28

III.   **THE REPORT'S ANALYSIS OF LEVEL-OF-CARE ISSUES IS NOT COMPARABLE TO THAT FOUND IN PRIOR SPECIAL MASTER REPORTS**

Defendants' analysis of level-of-care issues is also not comparable to that found in the Special Master's prior reports.  The Revised Report includes brief and vague information about level of care issues.  Revised Report at 89, 107-09, 114-15.  However, the Report does not explain whether the level-of-care issues specifically involved failures to refer patients to higher levels of care, as opposed to other level-of-care deficiencies, as prior Special Master Reports have done.  Special Master's 2020 Suicide Report at 26-27; Special Master's 2019 Suicide Report at 32; Report on Suicides Completed in CDCR in 2018 (May 13, 2021) ("Special Master's 2018 Suicide Report"), ECF No. 7161-1 at 24.

Plaintiffs raised this concern in their comments on Defendants' draft Report, but this deficiency remains in the Revised Report despite Defendants' assertion that Defendants addressed it.  Revised Report at 18.  The Court should direct Defendants to revise this section before adopting the Report to ensure that the Report "track[s] the contents and analysis found in the reports written by the Office of the Special Master."  Suicide Reporting Plan at 13; *see also* Order (Aug. 29, 2022), ECF No. 7609 at 10 n.4 (providing that "[t]he content and analysis of the annual suicide reports will continue to cover the same topics").

## CONCLUSION

Plaintiffs respectfully request that the Court decline to adopt Defendants' 2022 Report as drafted and order Defendants to file a second revised 2022 suicide report that contains all the content and analysis required by the Suicide Reporting Plan, including: (1) a clear and robust analysis of QIP efficacy; (2) a clear and comprehensive list of common underlying problems that led to issuance of QIPs; (3) a clear summary of QIP implementation; and (4) an analysis of emergency response problems and level-of-care issues comparable to those found in the Special Master's annual suicide reports.  Only with these necessary changes can the parties and Special Master engage in a meaningful discussion of Defendants' capability to permanently take over annual suicide reporting, as contemplated by the Court's December 15, 2022 order.

1

**CERTIFICATION**

2     Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

3  filing: ECF Nos. 8162, 7743, 7681, 7609, 7592, *Brown v. Plata*, 563 U.S. 493 (2011).

4

5  DATED:  June 26, 2024          Respectfully submitted,

6                                 ROSEN BIEN GALVAN & GRUNFELD LLP

7                                 By: */s/ Michael S. Nunez*

8                                     Michael S. Nunez

9                                 Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28