1   Rob Bonta, State Bar No. 202668
    Attorney General of California
2   Monica N. Anderson, State Bar No. 182970
    Senior Assistant Attorney General
3   Damon McClain, State Bar No. 209508
    Supervising Deputy Attorney General
4   Elise Owens Thorn, State Bar No. 145931
    Namrata Kotwani, State Bar No. 308741
5   Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone:  (916) 210-7318
    Fax:  (916) 324-5205
8   E-mail:  Elise.Thorn@doj.ca.gov
    *Attorneys for Defendants*
9

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS-GONZÁLEZ ,
SBN 321994
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:    925-746-8460
Facsimile:    925-746-8490
*Attorneys for Defendants*

10                    **UNITED STATES DISTRICT COURT**

11                    **EASTERN DISTRICT OF CALIFORNIA**

12                    **SACRAMENTO DIVISION**

13

14   RALPH COLEMAN, et al.,                    Case No. 2:90-CV-00520- KJM-DB

15              Plaintiffs,                     **DEFENDANTS' RESPONSE TO PLAINTIFFS' RESPONSE TO MAY 16, 2024 ORDER (ECF No. 8282)**

16         v.

17   GAVIN NEWSOM, et al.

18              Defendants.                    Judge:    Hon. Kimberly J. Mueller

19

20

21

22

23

24

25

26

27

28

Case No. 2:90-CV-00520- KJM-DB
DEFENDANTS' RESPONSE TO PLAINTIFFS' RESPONSE TO MAY 16, 2024 ORDER

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   STANDARD OF REVIEW .................................................................................1

III.  RESPONSE TO PLAINTIFFS' INTRODUCTION ............................................2

IV.  RESPONSE TO PLAINTIFFS' RESPONSE TO MAY 16, 2024 ORDER ..........3

      A.    Question 1: Should the Court proceed with its contemplated contempt
             proceedings? ...........................................................................................4

            1.      Recommendation 3: Suicide Prevention Training ........................5

            2.      Recommendation 7: Adequacy of Intake Screening Process ........6

            3.      Recommendation 8: Confidentiality/Privacy of Intake Screening ...............6

            4.      Recommendation 9: Suicide-Risk Evaluation Training ...............6

            5.      Recommendation 10: Completion of Suicide-Risk Evaluations ...................6

            6.      Recommendations 12 & 13: Use of Suicide-Resistant Cells for
                   Newly Admitted IPs in Administrative Segregation .....................7

            7.      Recommendation 17: Adequate Safety Planning Upon Discharge
                   from MHCBs and Alternative Housing .........................................7

            8.      Recommendation 18: Safety Planning Training ...........................7

            9.      Recommendation 21: Suicide Watch and Suicide Precaution
                   Observation ...................................................................................8

            10.    Recommendation 28: Custody Checks of IPs Discharged from
                   MHCBs or Alternative Housing ....................................................8

            11.    Recommendation 29: Clinician Checks of IPs Discharged from
                   MHCBs or Alternative Housing ....................................................8

            12.    Recommendation 31: Effectiveness of Local SPRFITs .................8

            13.    Recommendation 32A: MHCB Practices for Inmate-Patient
                   Possessions and Privileges ............................................................9

            14.    Recommendation 32B: Continuous Quality Improvement ("CQI") ..............9

            15.    Recommendation 32C: Reception Center Practices.......................9

      B.    Question 2: Do Defendants' objections suggest the need for the Special
             Master's expert to conduct a re-audit of any institutions? .......................10

      C.    Question 3: Does the ongoing mental health understaffing explain the
             Special Master's expert's findings of non-compliance with any suicide

20937296.4

       prevention recommendations?................................................................................11

D.  Plaintiffs' additional responses to Defendants Specific objections are not
sufficient to overcome those objections and Defendants' objections should
be sustained. .........................................................................................................13

    1.   Recommendations 7 and 8 .............................................................13

    2.   Recommendation 10.........................................................................13

    3.   Recommendations 12 and 13 .........................................................14

    4.   Recommendation 18.........................................................................15

    5.   Recommendation 21.........................................................................15

    6.   Recommendations 28 and 29 .........................................................16

    7.   Recommendation 31.........................................................................17

    8.   Recommendation 32A......................................................................18

    9.   Recommendation 32B......................................................................19

E.  Plaintiffs' response to the Special Master's expert's recommendations
regarding suicide prevention practices in CDCR's PIPs are fundamentally
flawed because they rely on the wrong standard of review. ...................................19

    1.   Suicide Resistant Beds ....................................................................19

    2.   Recommendations to retrofit SVSP with second floor barriers ...................20

    3.   Plaintiffs' request for verification of completed retrofit work at
SVSP ...............................................................................................20

    4.   Verification of Suicidal Patient Observation CAP.........................20

    5.   Behavioral Suicide Watch at CIW-PIP ..........................................21

    6.   Daily Suicide Observations at SVSP-PIP .....................................21

    7.   Clothing and Possessions at CHCF-PIP and CMF-PIP .............................21

    8.   Out-of-Cell Activities......................................................................22

    9.   PIP IDTT Quality ...........................................................................22

    10.  Safety Planning ...............................................................................22

    11.  SPRFIT Quorums in the PIPs.........................................................23

    12.  Tracking prior CAPs .......................................................................23

V.    PLAINTIFFS' REQUEST THAT THE COURT ADOPT THE SPECIAL
MASTER'S EXPERT'S REPORT IN FULL.................................................................23

VI.     CONCLUSION ................................................................................................24

VII.    CERTIFICATION.............................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Cooter & Gell v. Hartmax Corp.*,
    496 U.S. 384 (1990) ................................................................................................ 24

*Gen. Signal Corp. v. Donallco, Inc.*,
    787 F.2d 1376 (9th Cir. 1986) ............................................................................... 14

*Int'l Union, United Mine Workers of America v. Bagwell*,
    512 U.S. 821 (1994) ................................................................................................ 12

**Other Authorities**

Fed. R. Civ. P.
    11(b)(1) ................................................................................................................... 24
    11(b)(2) ................................................................................................................... 24

20937296.4

## I.   INTRODUCTION

On May 16, 2024, the Court ordered Plaintiffs to respond to three specific questions related to Defendants' objections to the Special Master's expert's Sixth Re-Audit of CDCR's Suicide Prevention Practices (hereafter "Sixth Re-Audit Report"). ECF No. 8238. The Court also gave Plaintiffs leave to respond to Defendants' specific objections within that same timeframe. *Id*. Defendants were granted fourteen days to respond to Plaintiffs' response. *Id.*[1]

As demonstrated below, Plaintiffs' response corroborates Defendants' concerns with the Special Master's expert's Sixth Re-Audit Report. One primary concern that cannot be ignored is that the Sixth Re-Audit Report, like any audit, is merely a snapshot of CDCR's suicide prevention measures trapped in amber—conclusions about noncompliance based on points in time that fail to account for evidence of compliance produced after the audits but before the final report was filed with the Court.

Upon conducting a *de novo* review of the Sixth Re-Audit Report, compared against Defendants' evidence of compliance, the Court can and should sustain Defendants' objections and order the Special Master's expert to revise his findings accordingly in the Sixth Re-Audit Report.

## II.   STANDARD OF REVIEW

In their response, Plaintiffs use the clear error standard of review to support various of the Special Master's expert's findings. ECF No. 8282 at 9:23, 66:10-11, 67:16, 68:2, 69:1 & 28, 73:6.[2] That is not the correct standard because the Special Master filed his expert's report directly with the Court without first giving Defendants an opportunity to review and present him with informal objections. ECF No. 4925 at 1 n. 1.[3]

---

[1] Defendants note that they only had thirty days to respond to the entirety of the Sixth Re-Audit Report (including both their general and specific objections) which they filed on April 1, 2024. Meanwhile—and considering that Plaintiffs have had Defendants' objections since April 1st— Plaintiffs had a total of seventy-seven days to prepare and file their response to Defendants' specific objections. Their brief is over seventy-pages long.

[2] Page citations are to the ECF assigned page numbers at the top of each document.

[3] Plaintiffs' counsel's certification shows that the signatories did not review ECF No. 4925 when preparing their response. ECF No. 8282 at 79:10-11.

1    Plaintiffs' use of the clear error standard, which amounts to a challenge to this Court's

2    prior order on the applicable standard of review for Special Master reports filed directly with the

3    Court, is improper. If Plaintiffs wish to seek relief from the applicable standard of review, they

4    must move for relief from the Court's prior order establishing the *de novo* standard of review for

5    reports filed directly with the Court in accordance with the December 24, 2020 Order (ECF No.

6    7003). *Compare* ECF No. 8282 at 69:17-20 (Plaintiffs making the same argument regarding

7    Defendants' relief from prior orders). Since Plaintiffs have not done so, the applicable standard is

8    *de novo*. And because Plaintiffs present no arguments as to why the Special Master's expert's

9    various findings withstand *de novo* review, they have forfeited those arguments. *See id. passim*

10    (making no showing that the Special Master's expert's findings are sustainable on *de novo*

11    review).

## III.    RESPONSE TO PLAINTIFFS' INTRODUCTION

13    Defendants write separately to respond to Plaintiffs' introduction, which aims to paint a

14    bleak picture of CDCR's suicide prevention program and gives zero credit to the frontline staff

15    that have dedicated their careers to care for the Plaintiff class, including during a global pandemic.

16    The framing of the issues in this way is unfair and disingenuous.

17    To be precise, Plaintiffs say that "little has changed" at CDCR in more than a decade since

18    the Court ordered them to implement a constitutionally adequate suicide prevention program. ECF

19    No. 8282 at 7:8. But, the record shows that a lot has changed since 2013. CDCR has demonstrated

20    a long-term commitment to address and mitigate the risks of suicide within its facilities that

21    includes education, training, and policy implementation. Plaintiffs themselves admit CDCR has

22    implemented over half of the Special Master's expert's suicide prevention recommendations with

23    over 90-100% compliance. The remaining fourteen recommendations have also been implemented

24    at varying levels close to, or arguably at, substantial compliance.

25    Whether they realized it or not, Plaintiffs have essentially called into question the efficacy

26    of the Special Master's expert's suicide prevention recommendations. If the Court were to take

27    Plaintiffs' introduction at face value, it would have to find that over half of the Special Master's

28    expert's suicide prevention recommendations have proven to be ineffective and have changed

"little" at CDCR. But, of course, that cannot be what Plaintiffs meant.

That leaves Plaintiffs' critique of the suicide rate at CDCR. As Defendants previously explained, the increase in suicides in recent years is not unique to CDCR. Despite a significant decrease in the rate of deaths by suicide in state prison systems from the 1980s to the early 2010s, over the past 10 years there has been nearly a doubling of the suicide rate in state prisons in the United States. ECF No. 8180-3 ¶¶ 17-19. All systems, even the most progressive, struggle with this issue and many have recently realized significant increases in the overall rate of suicide. *Id.* Between 2000 and 2013, the suicide rate for incarcerated individuals within state prison systems was fairly consistently found between 14 and 17 per 100,000. *Id.* Beginning in 2014, a steady increase in this rate began. *Id.* The most recent data available from the Department of Justice Bureau of Justice Statistics (BJS) is from 2019, with a rate of 27 suicides per 100,000. *Id.* There is no data available from the BJS since 2019, so the effects of COVID, significant decreases in the overall incarceration rate in California, and the increased incarceration of individuals who committed violent offenses (84.3% in California), have not been analyzed. *Id.* Accordingly, it is conclusory to correlate any recent increased rate in suicides to CDCR's implementation of the Special Master's expert's various recommendations.

## IV.     RESPONSE TO PLAINTIFFS' RESPONSE TO MAY 16, 2024 ORDER

The Court's May 16th Order asks Plaintiffs three questions:

(1) "Do some or all of Mr. Hayes's findings of non-compliance with these recommendations or any other of the fourteen outstanding suicide prevention recommendations support contempt proceedings because defendants would remain out of compliance even if the court were to sustain all of their specific objections to Mr. Hayes's findings as to particular suicide prevention recommendations? If so, which ones?"

(2) "Do any of defendants' specific objections suggest the need for a further re-audit by Mr. Hayes as to one or more of the outstanding recommendations. If so, which ones, and what is the most expeditious and fully effective method for completing any necessary re-audit?"

(3) "Is defendants' non-compliance with one or more of the specific recommendation(s) attributable to the ongoing mental health understaffing the court is addressing in separate orders so

as to suggest the non-compliance with a recommendation is solely a consequence of defendants'
contempt of the court's orders to remedy mental health understaffing in California's prisons?"
ECF No. 8238 at 5.

Plaintiffs' responses to these questions are overly simplistic, fail to adequately account for
Defendants' multi-faceted objections, and include proposals that are not viable in light of the
history of this case leading up to the current proceedings. Defendants address each of the Court's
questions in turn.

**A.      Question 1: Should the Court proceed with its contemplated contempt proceedings?**

The Court's first question to Plaintiffs essentially asks that, even if it sustains all of
Defendants' specific objections, should it proceed with its contemplated contempt proceedings on
suicide prevention, and if so, on which specific recommendations. *See* ECF No. 8238 at 5:5-18.
Plaintiffs answer the question in the affirmative and provide a table that purportedly summarizes
the fourteen remaining recommendations paired with institutions that they claim remain non-
compliant.[4] ECF No. 8282 at 11-13. Plaintiffs are incorrect.

Contempt proceedings are not ripe until the Court conducts a *de novo* review and rules on
Defendants' various objections to the Sixth Re-Audit Report. Plaintiffs themselves admit that the
Special Master's expert's findings of non-compliance for several recommendations rise and fall on
how the Court rules on Defendants' general and specific objections. *Id.* at 10 n. 2 (noting that if
the Court sustains Defendants' general objections, it would negate the Special Master's experts
findings of non-compliance with recommendations 7, 8, 9, 10, 17, and 31). As for the specific
objections, Defendants have demonstrated with competent evidence that various institutions are

---

[4] Plaintiffs use the phrase "alternative data" to describe Defendants' evidence of compliance when
they introduce their Table 1 summary of allegedly undisputed non-complaint institutions, and also
throughout all of the tables in their response. ECF No. 8282 at 11:10; *see also*, *id.* at tables 2-14.
Defendants take exception to the use of this phrase which is a subtle dog whistle to the phrase
"alternative facts." Defendants presented the Court with competent evidence collected at a later
time, from distinct SPRFIT audits, performed by clinicians, that demonstrate compliance with
various suicide prevention recommendations at distinct institutions. Despite Plaintiffs' choice
terminology, Defendants did not fabricate evidence as they suggest. *See*, *also*, *id.* at p. 7:20
(referring to Defendants' objections as "baseless" despite the fact that their objections were
supported with competent rebuttal evidence).

1  compliant with various suicide prevention recommendations that are otherwise reported as non-

2  compliant in the Sixth Re-Audit Report. ECF No. 8179. If Defendants' objections are sustained,

3  and if as a result 90% of facilities are deemed to be in compliance with any one or more

4  recommendations, then applying the current practice of finding compliance, the Special Master's

5  experts should report that CDCR is compliant with the recommendation. *See id.* at 20:18-6

6  (describing the Special Master's expert's current practice of finding CDCR in compliance based

7  on a systemwide review). Contempt proceedings regarding those recommendations for which

8  CDCR is deemed to be compliant would be improper.

9         The Court should rule on Defendants' objections. Only thereafter can it consider whether

10 contempt proceedings are still appropriate based on CDCR's compliance with any outstanding

11 recommendations.

12        Defendants write separately to address Plaintiffs' various statements regarding the status of

13 the fourteen remaining recommendations in the Sixth Re-Audit Report:

14        1.       Recommendation 3: Suicide Prevention Training[5]

15        Plaintiffs state that the Sixth Re-Audit Report shows that 11 of the 21 institutions audited

16 were non-compliant with Recommendation 3 because they had annual suicide prevention training

17 completion rates under 90 percent for at least one of three disciplines in 2022. ECF No. 8282 at

18 13:18-21. Their brief highlights two problems with holding contempt proceedings based on this

19 data. *First*, the Special Master's expert's data is based on trainings conducted in 2022 and fails to

20 account for the evidence showing Defendants' more recent compliance with Recommendation 3

21 that was filed with their objections to the Sixth Re-Audit Report. *Second*, the hyper technical view

22 of constitutional compliance disqualifies an entire institution from receiving a finding of

23 compliance if one of three disciplines misses the 90% threshold. This is true even if two of the

24 three disciplines show 100% compliance. *See*, *e.g.*, ECF No. 8143-1 at 124 (CIW reporting 100%

_____

[5] Throughout their brief, Plaintiffs claim that Defendants "admit" they have failed to achieve
compliance with various recommendations. *E.g.* ECF No. 8282 at 14:6-7. That is false.
Defendants do not make any admissions as to their "non-compliance" with any recommendation,
and do not believe that the question of non-compliance can be adjudicated until the Court rules on
Defendants' general and specific objections.

1   compliance for its Custody and Mental Health Disciplines). It is contradictory to say that an

2   institution showing 100% compliance with 2/3 of its disciplines is contemptuous of the Court's

3   orders requiring suicide prevention training. Contempt proceedings on Recommendation 3 are not

4   proper at this time.

5       2.      Recommendation 7: Adequacy of Intake Screening Process[6]

6           Resolution of Defendants' compliance with Recommendation 7 is dependent on the

7   Court's adjudication of the Defendants objections (both general and specific). Accordingly,

8   Recommendation 7 is not ripe for contempt proceedings until those objections are adjudicated.

9       3.      Recommendation 8: Confidentiality/Privacy of Intake Screening

10          This recommendation is tied to Defendant's compliance with Recommendation 7. *See* ECF

11  No. 7636 at 23-24 ("Upon completion of the steps outlined for Recommendation 7 above, to

12  include the screening process completed outside the presence of custody personnel, compliance

13  with the implementation of Recommendation 8 will be achieved."). For the reasons stated above,

14  Recommendation 8 is not ripe for contempt proceedings.

15      4.      Recommendation 9: Suicide-Risk Evaluation Training

16          Resolution of Defendants' compliance with Recommendation 9 is dependent on the

17  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

18  Recommendation 9 is not ripe for contempt proceedings until those objections are adjudicated.[7]

19      5.      Recommendation 10: Completion of Suicide-Risk Evaluations

20          Resolution of Defendants' compliance with Recommendation 10 is dependent on the

21  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

22

23

---

24  [6] The adequacy of the intake screening process recommendation is also discussed in Defendants'
    objections to the Special Master's proposed resolution regarding data remediation indicators
25  SP10E/SP10. ECF No. 8273.

26  [7] Defendants do not admit that they have failed to achieve compliance with Recommendation 9 at
    nine institutions. ECF No. 8282 at 20:19-20. Whether or not Defendants' are deemed to be
27  compliant with Recommendation 9 depends in part on how the Court rules on Defendants' general
    objections.
28

1    Recommendation 10 is not ripe for contempt proceedings until those objections are adjudicated.[8]

2           6.       **Recommendations 12 & 13: Use of Suicide-Resistant Cells for Newly Admitted IPs in Administrative Segregation**

3

4           If the Court credits Defendants' evidence of compliance, and it should, only one institution

5    would be deemed non-compliant with Recommendation 13—RJD. That means that 19 out of 20

6    audited institutions are compliant with Recommendations 12 and 13, and therefore the Special

7    Master's expert would have to amend his report to show over 90% compliance with these

8    recommendations. As a result, and in response to the question the Court posed to Plaintiffs, these

9    recommendations would not be ripe for contempt proceedings.

10           7.       **Recommendation 17: Adequate Safety Planning Upon Discharge from MHCBs and Alternative Housing**

11

12           Resolution of Defendants' compliance with Recommendation 17 is dependent on the

13    Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

14    Recommendation 17 is not ripe for contempt proceedings until those objections are adjudicated.[9]

15           Recommendation 17 is also not ripe for contempt proceedings because, as Plaintiffs admit,

16    the Special Master's expert did not specify the compliance levels for various institutions. *See* ECF

17    No. 8282 at 28-30 (table 8 reporting information from the Special Master's expert's report that

18    lack specificity). Defendants should be put on notice of the Special Master's expert's specific

19    findings before being forced into contempt proceedings as a result of those findings.

20           8.       **Recommendation 18: Safety Planning Training**

21           If the Court were to sustain Defendants' objections to Recommendation 18, it would mean

22    that 18 out of the 21 audited institutions are compliant with the recommendation (or >85%). That

23    figure does not evidence a contempt for the Court's orders that warrants the initiation of contempt

24

25    [8] Defendants do not admit that they have failed to achieve compliance with Recommendation 10.

26    ECF No. 8282 at 23:23. Whether or not Defendants are deemed to be compliant with Recommendation 10 depends in part on how the Court rules on Defendants' general objections.

27    [9] Plaintiffs' footnote 8 included in their section regarding Recommendation 17 is unintelligible as

28    it does not relate to Recommendation 17.

20937296.4

1  proceedings.

2       9.      Recommendation 21: Suicide Watch and Suicide Precaution Observation

3       Resolution of Defendants' compliance with Recommendation 21 is dependent on the

4  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

5  Recommendation 21 is not ripe for contempt proceedings until those objections are adjudicated.[10]

6       10.     Recommendation 28: Custody Checks of IPs Discharged from MHCBs or
                Alternative Housing
7
8       Resolution of Defendants' compliance with Recommendation 21 is dependent on the

9  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,
10
   Recommendation 21 is not ripe for contempt proceedings until those objections are adjudicated.[11]
11
        11.     Recommendation 29: Clinician Checks of IPs Discharged from MHCBs or
                Alternative Housing
12
        Resolution of Defendants' compliance with Recommendation 29 is dependent on the
13
14  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

   Recommendation 29 is not ripe for contempt proceedings until those objections are adjudicated.[12]

15      12.     Recommendation 31: Effectiveness of Local SPRFITs

16      Resolution of Defendants' compliance with Recommendation 31 is dependent on the

17  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

18

19

20  ─────────────────────────

21  [10] Defendants do not admit that they have failed to achieve compliance with Recommendation 21 at eighteen institutions. ECF No. 8282 at 33:7-8. Whether or not Defendants are deemed to be
22  compliant with Recommendation 21 depends in part on how the Court rules on Defendants' general objections.

23  [11] Defendants do not admit that they have failed to achieve compliance with Recommendation 28
24  at seven institutions. ECF No. 8282 at 35:3-4. Whether or not Defendants are deemed to be compliant with Recommendation 28 depends in part on how the Court rules on Defendants'
25  general objections.

26  [12] Defendants do not admit that they have failed to achieve compliance with Recommendation 29
27  at nine institutions. ECF No. 8282 at 38:3-4. Whether or not Defendants are deemed to be compliant with Recommendation 29 depends in part on how the Court rules on Defendants'
28  general objections.

1   Recommendation 31 is not ripe for contempt proceedings until those objections are adjudicated.[13]

2       13.     **Recommendation 32A: MHCB Practices for Inmate-Patient Possessions and**
                **Privileges**
3

4       Resolution of Defendants' compliance with Recommendation 32 is dependent on the

5   Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

6   Recommendation 32 is not ripe for contempt proceedings until those objections are adjudicated.[14]

7       14.     **Recommendation 32B: Continuous Quality Improvement ("CQI")**

8       Plaintiffs' response related to Recommendation 32B illustrates Defendants' concern about

9   the remedy in this case expanding with each Special Master report that the Court adopts "in full."

10  As Plaintiffs admit, the Special Master's expert's report on Defendants' CQI process "goes

11  beyond the steps that the Special Master laid out for Defendants to achieve compliance in the Fifth

12  Re-Audit." ECF No. 8282 at 47:2-5. To avoid the difficult discussion regarding the shifting

13  goalposts in this case, Plaintiffs simply say that they "do not now seek contempt proceedings for

14  this subpart of Recommendation 32." *Id*.

15      Defendants agree with Plaintiffs that Recommendation 32B is not ripe for contempt

16  proceedings.

17      15.     **Recommendation 32C: Reception Center Practices**

18      Resolution of Defendants' compliance with Recommendation 32C is dependent on the

19  Court's adjudication of the Defendants' objections (both general and specific). Accordingly,

20  Recommendation 32C is not ripe for contempt proceedings until those objections are

21

22

23  _____

    [13] Defendants do not admit that they have failed to achieve compliance with Recommendation 31
24  at fourteen institutions. ECF No. 8282 at 41:2-3. Whether or not Defendants are deemed to be
    compliant with Recommendation 31 depends in part on how the Court rules on Defendants'
25  general objections.

26  [14] Defendants do not admit that they have failed to achieve compliance with Recommendation
    32A at five institutions. ECF No. 8282 at 44:8-9. Whether or not Defendants are deemed to be
27  compliant with Recommendation 32A depends in part on how the Court rules on Defendants'
    general objections.
28

1    adjudicated.[15]

2    **B.    Question 2: Do Defendants' objections suggest the need for the Special Master's**
3    **expert to conduct a re-audit of any institutions?**

4            The Court's second question essentially asks whether it should order the Special Master's

5    expert to re-audit institutions for which there is a factual dispute regarding compliance. Plaintiffs

6    answer this question in the affirmative, while simultaneously requesting that the Court move

7    forward with contempt proceedings on all other recommendations for which there are no factual

8    disputes regarding compliance. ECF No. 8282 at 49:1-5. This position is untenable.

9            To start, and as Defendants stated above, whether or not an institution is deemed to be

10   compliant with any one recommendation rises and falls with the Court's adjudication of

11   Defendants' objections. However, and more to the point, a re-audit will not resolve Defendants'

12   factual disputes due to the frequency of which the Special Master's expert conducts his

13   institutional audits when compared to the audits conducted by CDCR's SPRFIT Coordinators. By

14   the time the Special Master's expert reports his findings, they will be stale and likely superseded

15   by CDCR's own SPRFIT audit reports. Thus, there will always be factual disputes. Additionally,

16   Defendants have raised concerns with the fact that the Special Master's expert lacks clinical

17   expertise to audit components of recommendations implicating clinical judgment.

18           Thus, Defendants believe that instead of yet another re-audit by the Special Master's expert

19   that could result in further factual disputes, the Court should: (1) order the parties to meet and

20   confer and provide the Court with a single document outlining how compliance for each court-

21   ordered recommendation is measured; (2) order the Special Master's expert to apply those

22   measures in his future re-audits; (3) order the Special Master's expert to utilize Defendants'

23   suicide prevention CQI guidebook to audit CDCR's institutions—which the Special Master's team

24   helped create; and, (4) order the Special Master's expert to use the SPRFIT Coordinators' reports

25

26   _____
     [15] Defendants do not admit that they have failed to achieve compliance with Recommendation 32C
27   at CCWF and NKSP. ECF No. 8282 at 48:3-4. Whether or not Defendants are deemed to be
     compliant with Recommendation 32C depends in part on how the Court rules on Defendants'
28   general objections.

                                                10                    Case No. 2:90-CV-00520- KJM-DB

1  as a source of up to date data that should be incorporated into any filing with the Court.

2      These steps are consistent with CDCR's CQI monitoring system specifically designed for

3  CDCR's suicide prevention program. Plaintiffs' critique of Defendants' CQI monitoring system

4  does not negate CDCR's progress in establishing and deploying a self-monitoring quality

5  improvement tool. *See* ECF No. 8282 at 44:28-45:5 (criticizing CDCR's monitoring system

6  because data remediation is not complete ). CDCR's monitoring system includes:

7      • Over 60 Key Performance Indicators (KPIs) per the SPRFIT Measurement Plan

8        that are measured continuously;

9      • Eight indicators of emerging suicide risk measured continuously;

10     • Local SPRFIT Coordinator and monthly SPRFIT team meetings;

11     • A standardized model of system surveillance employed by all institutional

12       SPRFITs;

13     • Dashboards that trend compliance, and red-amber-green labels and support

14       assessments of deficiencies;

15     • Numerous reports that support drill-downs on various areas of CDCR's suicide

16       prevention program;

17     • Two types of retrospective reviews to support the identification of deficiencies

18       (suicide case reviews and either detailed reviews or root cause analyses (RCAs));

19     • Locally initiated performance improvement projects;

20     • Quarterly regional audits resulting in Corrective Action Plans (CAPs); and,

21     • Monthly Headquarter level monitoring.

22  (Supplemental Declaration of Travis Williams (Williams Declaration) ¶ 3.)

23  **C.   Question 3: Does the ongoing mental health understaffing explain the Special Master's expert's findings of non-compliance with any suicide prevention recommendations?**

24

25      The Court's third question asks if the ongoing mental health understaffing explains the

26  Special Master's expert's findings of non-compliance with any suicide prevention

27

28

1  recommendations.[16] ECF No. 8238 at 5:23-27. Plaintiffs say that non-compliance with

2  Recommendations 3, 9, 10, 17, 18, 29, 31, and 32B can be attributed to mental health

3  understaffing—based largely on what they describe as "reasonable inferences"—meanwhile non-

4  compliance with Recommendations 7, 8, 12, 13, 21, 28, 32A, and 32C appear to be independent of

5  mental health understaffing.[17] ECF No. 8282 at 51:12-17. Defendants believe that Plaintiffs'

6  conclusions on which recommendations may be affected by mental health understaffing are

7  speculative.

8        Notwithstanding, the larger concern raised both by the Court's third question and

9  Plaintiffs' response is that, at a minimum, the Court cannot proceed with contempt proceedings for

10 any recommendations whose non-compliance can be attributed to mental health staffing vacancies.

11 To do so would penalize Defendants twice for its staffing vacancies: once for the contempt

12 sanctions derived from the staffing contempt proceedings; and, once again for the contempt

13 sanctions contemplated in relation to the suicide prevention contempt proceedings. Such an

14 outcome would be punitive and, at a minimum, may require adequate procedural safeguards

15 associated with criminal contempt proceedings. *See Int'l Union, United Mine Workers of America*

16 *v. Bagwell*, 512 U.S. 821, 833-34 (1994).

17       Finally, Defendants note the paradox with Plaintiffs' response in that they attribute non-

18 compliance with important suicide prevention measures on staffing vacancies, while

19 simultaneously fighting CDCR's efforts to implement telepsychiatry and other forms of tele-

20 mental health in order to mitigate the impact of staffing vacancies. If Defendants' non-compliance

21 with one or more of the recommendations are attributed to the ongoing mental health staffing

22 vacancies the Court is addressing in separate orders, then before the Court initiates contempt

23 proceedings related to the recommendations, it must give Defendants an opportunity to purge their

24 contempt—including through the further use of telepsychiatry and full implementation of the tele-

25

26 [16] Although the Court uses the term "understaffing," Defendants do not believe there is currently a dispute as to CDCR's allocated staffing levels for its mental health program. Defendants interpret the Court's use of the word "understaffing" to mean staffing vacancies.

27

28 [17] Plaintiffs make the latter statement in conclusory fashion and without any supporting evidence.

1  mental health policy. ECF No. 7951 at 12:9-13:22 (discussing civil coercive contempt and the

2  opportunity to purge requirement).

3  **D.      Plaintiffs' additional responses to Defendants specific objections are not sufficient to overcome those objections and Defendants' objections should be sustained.**

4

5      Plaintiffs separately responded to Defendants' specific objections. ECF No. 8282 at 49:10-

6  66:4. Defendants respond to those points to the extent they have not been previously addressed in

7  the briefing regarding Defendants' general objections. *See* ECF No. 8208, 8249.

8      1.      Recommendations 7 and 8

9      Defendants argued that the Special Master's expert's findings of noncompliance for eight

10  institutions were based on statistically insignificant samples to draw a conclusion of systemic

11  noncompliance. Plaintiffs claim that an identical objection was made to the Special Master's

12  expert's Fifth Re-Audit Report, and overruled by the Court. ECF No. 8282 at 56:1-8. This

13  argument ignores that the Court must apply a *de novo* standard of review to Defendants'

14  objections to the Sixth Re-Audit report. It also ignores that the Sixth Re-Audit report is a new and

15  distinct report from the Fifth Re-Audit report, and therefore Defendants must re-state their

16  objections to the new findings in order to preserve the objections for appellate review. *See* Ninth

17  Cir. R. 28-2.5 (requiring as to each issue raised on appeal that the appellant state where in the

18  record on appeal the issue was raised, preserved, and ruled on).

19      2.      Recommendation 10

20      Defendants presented competent evidence from a licensed clinician, Dr. Joel T. Andrade,

21  PhD, LICSW, CCHP-MH, showing that the use of a Columbia-Suicide Severity Rating Scale (C-

22  SSRS) as a suicide risk screening tool is clinically appropriate. The C-SSRS is a suicide risk

23  evaluation that includes an assessment of risk levels consistent with California statewide

24  guidelines. (Supplemental Williams Decl. ¶ 4.) Plaintiffs respond by pointing to the opinion of a

25  non-clinician in order to argue that compliance requires the exclusive use of the Suicide Risk

26  Assessment and Self-Harm Evaluation (SRASHE) form. They argue that because the Program

27  Guide prescribes that SRASHEs be used to conduct suicide risk assessments, a C-SSRS—which

28  Plaintiffs admit was used without objection during the COVID-19 pandemic—is improper even if

1    clinical judgment indicates otherwise. Plaintiffs go as far as to seek the exclusion of Dr. Andrade's

2    opinion, saying it is "irrelevant" and "besides the point." *Id.* at 57:12-17.

3            Any discussion of contempt will necessarily include a discussion of substantial

4    compliance—and not just substantial compliance with fixed, numerical, compliance thresholds,

5    but also technical deviations from the Court's orders such as utilizing a clinically appropriate C-

6    SSRS in lieu of a SRASHE to conduct suicide risk evaluations. *Gen. Signal Corp. v. Donallco,*

7    *Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) ("If a violating party has taken 'all reasonable steps' to

8    comply with the court order, technical or inadvertent violations of the order will not support a

9    finding of civil contempt."). Plaintiffs agree on the law as to technical deviations. *See*, ECF No.

10   8282 at 61:11-15. Accordingly, Dr. Andrade's opinion is on point and supports Defendants'

11   objection to the finding of non-compliance with Recommendation 10. Defendants' objections

12   should be sustained.

13           3.       Recommendations 12 and 13

14           Plaintiffs admit that Recommendations 12 and 13 do not require "ASU Door Tags."

15   Plaintiffs also admit the remediated audit measure that covers Recommendations 12 and 13

16   requires auditors to have a visual inspection of the cells being scrutinized. ECF No. 8282 at 58:10-

17   59:7. Yet, they say the Court should still overrule Defendants' objections based on these

18   undisputed facts because the Special Master's expert has the discretion to change his methodology

19   for measuring compliance at will, or even follow different auditing practices than those which he

20   has remediated for use by Defendants' auditors.[18] *Id.*

21           This response reinforces Defendants' need for insight into the Special Master's expert's

22   methodology, because even when they think there is a common baseline for how audits should be

23   conducted (*i.e.*, through the remediation process for Defendants' own CQI guidebook), the

24   standards change. The standards should be transparent and complied consistently. Because the

25

26   ─────────────────────

     [18] This calls into question the foundation of the data remediation process. If the Special Master's
27   expert can change his methodology and reopen remediated indicators, then data remediation may
     never end, and a common factual basis for CDCR's data may never be established. *See* ECF No.
28   8274 at 7:3-9.

Special Master's expert's finding of non-compliance is based on deviations from established and agreed upon auditing practices, Defendants' objections should be sustained.

### 4.    Recommendation 18

Plaintiffs admit that Defendants' staff were not expected to complete safety plan training before June 16, 2023. ECF No. 8282 at 53:10-24. Yet, they seek to have the Court punish Defendants for non-compliance with the training requirement between April 1, 2023 and June 16, 2023. However, Defendants explained that the new training was issued to the Field on March 16, 2023 and institutions were given a reasonable period of 90 days to complete the training. ECF No. 8179 at 68:15-19. Based on the undisputed facts regarding the timing for completing the training, Defendants' objections should be sustained.

### 5.    Recommendation 21

The entirety of Plaintiffs' response to Defendants' objection regarding Recommendation 21 is speculative and conjectural. As Defendants explained in their objections, the Program Guide states that *"[w]hen clinically indicated*, an inmate with active suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precaution or Suicide Watch." ECF No. 7333-1 at 182 (emphasis added). Because the Special Master's expert is not a clinician, he must presume that if a clinician did not place a patient in an MHCB Suicide Precaution (SP) or Suicide Watch (SW), it was because the placement was not clinically indicated. Alternatively, if the Special Master's expert wants to verify if a placement was or was not clinically indicated, he must speak with the clinicians to confirm their clinical judgments. *See*, *id.*

Without any supporting evidence, Plaintiffs try to justify the Special Master's expert's recommendation. ECF No. 8282 at 60:7-10 ("However, Mr. Hayes's monitoring did not involve him making independent clinical judgments. He reviewed the charts of several patients at KVSP and RJD and found several instances of patients being kept on normal 30-minute observation in the MHCB despite report of those patients consistently reporting active suicidal ideation.") However, the Special Master's expert could not have determined that a CAP was necessary to ensure that patients are placed on SP an SW when *clinically indicated* without first consulting with clinicians and confirming that placements were contraindicated (which he did not do), or without

1  making his own clinical judgments about the patients' placements (which he cannot do). *See* ECF

2  No. 7333-1 at 182.

3      Finally, Defendants' write to correct Plaintiffs' misstatement of the Program Guide. They

4  claim that "To be compliant with the Program Guide requirement regarding the placement of

5  patients on SP or SW status, CDCR staff must justify why they are not placing patients with active

6  suicidal ideation on one of those statuses" and cite to the Program Guide (ECF No. 7333-1 at 182)

7  for that proposition. ECF No. 8282 at 60:12-15. But nothing at page 182 of the Program Guide

8  requires anyone to justify why they are not placing patients with active suicidal ideation on SP or

9  SW. The language from the Program Guide is reproduced below for the Court's convenience.

---

**Suicide Prevention and Response**       **Mental Health Services Delivery System**

Suicide Precaution and Suicide Watch

When clinically indicated, an inmate with active suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precaution or Suicide Watch. These are methods used to provide a safe environment and prevent the inmate from harming him or herself or others. Suicide Watch and Suicide Precaution procedures shall be a joint responsibility of custody and health care staff. A close working relationship shall be maintained between custody and health care staff to ensure the safety and security of the inmate.

The preferred location to place an inmate on Suicide Precaution or Watch status is in the MHCB, or in the OHU pending transfer to MHCB. The use of Suicide Precaution or Suicide Watch in any non-medical location shall be a temporary, short-term approach until an inmate can be moved to an OHU or MHCB, and shall require constant direct visual observation.

A psychiatrist, licensed psychologist, physician, or nurse practitioner shall review, modify, and/or renew the order for Suicide Precaution and/or Watch at a minimum of every 24 hours with input from at least one other member of the IDTT, such as the RN on duty.

Inmate-patients that are placed in an OHU for continued assessment of suicide risk, or in an MHCB for active suicidal ideation, threats, or attempt, shall have a note regarding progress toward the treatment plan goals and objectives recorded *daily* by a treating clinician in the Interdisciplinary Progress Notes section of the UHR.

---

24  ECF No. 7333-1 at 182.

25      6.    Recommendations 28 and 29

26      Plaintiffs do not agree that 85% compliance with Recommendations 28 and 29 amount to

27  substantial compliance for purposes of objecting to the Sixth Re-Audit Report, but admit that it is

28  an appropriate defense to contempt proceedings. ECF No. 8282 at 60:18-61:20. This ignores that

1    Defendants' objections to the Sixth Re-Audit Report is their opportunity to demonstrate

2    compliance with the suicide prevention recommendations in order to avoid contempt proceedings.

3    ECF No. 7743 at 4. Thus, Defendants' objections are the appropriate venue to raise the issue of

4    substantial compliance at 85%. The objection should be sustained.

5           7.      Recommendation 31

6           Plaintiffs' response to Defendants' objection regarding the necessary number of members

7    to constitute a quorum is conjectural. They suggest, without any direct evidence, that "Mr. Hayes

8    is auditing by way of *Defendants'* definition of quorum and its requirements, not his own." ECF

9    No. 8282 at 62:7-8. To do so, they point to circumstantial evidence that the Special Master's

10   expert "describes" CDCR's "Enhancements to the Suicide Prevention and Response Focused

11   Improvement Teams" memorandum issued in February 2018 in his report when discussing the

12   quorum requirement to suggest that he is simply applying CDCR's quorum definition. However,

13   they do not consider that CDCR issued its February 2018 memorandum *after* the Special Master's

14   expert had suggested in 2017 that CDCR add the word "all" to the quorum definition in the local

15   SPRFIT policy. Declaration of Nicholas Weber ¶¶ 2-3, Ex. A ("Under Attendance Requirements,

16   the narrative of 'A quorum consists of the above listed mandatory members' has historically been

17   confusing to local SPR-FITs who interpret a quorum differently, ranging from "all" mandatory

18   members to a "majority" of mandatory members. To eliminate the confusion, I would suggest

19   adding the word "all" to the definition."); *see*, *also*, ECF No. 5672 at 18 (OSM recommendation

20   on quorum definition). Thus, CDCR's 2018 memorandum defined quorum as "all" members in

21   order to be consistent with the Special Master's 2017 suggestion and monitoring expectations. The

22   unanimous quorum requirement comes from the Special Master's expert, not from Defendants.

23          Further, Plaintiffs admit that monitoring for the presence of up-to-date local operating

24   procedures (LOPs) has no real connection to whether a SPRFIT Committee is functioning

25   adequately. ECF No. 8282 at 62:13-16. And they do not dispute that the underlying purpose of a

26   CAP is to make changes that will reduce the risk of patient harm. *Compare*, ECF No. 8179 at

27   81:5-15, *with* ECF No. 8282 at 62:21-28. Thus, because SPRFIT committees prioritize

28   improvement projects to address current patient needs above years-old corrective action

1    recommendations, and because there is no evidence of a connection between the presence of up-

2    to-date LOPs and whether a SPRFIT Committee is functioning properly, Defendants' objection to

3    the finding of non-compliance with Recommendation 31 should be sustained.

4        8.    Recommendation 32A

5        It is *uncontested* that neither the Special Master's Recommendation 32A nor CDCR's

6    Program Guide policy sets any minimum out-of-cell time hours requirement. ECF No. 8282 at

7    63:15 ("While the policy does not explicitly state a minimum out-of-cell times hours…"). This is

8    another example of Plaintiffs relying on "re-audit" reports—*i.e.* reports that are supposed to re-

9    audit compliance with established recommendations—to expand the remedy in this case without

10   making an affirmative motion that requires them to meet their burden of proof under the Prison

11   Litigation Reform Act (PLRA).[19]

12       Separately, Plaintiffs suggest that it is appropriate for the Special Master's expert to

13   recommend the issuance of CAPs even after Defendants have already corrected problems

14   associated with suicide prevention recommendations. ECF No. 8282 at 64:16-17. To be clear,

15   Plaintiffs are saying that it is appropriate for Defendants to be found non-compliant with a suicide

16   prevention recommendation because they have not implemented a corrective action plan for an

17   issue that has already been fixed. *Id.* Defendants disagree. While it may be appropriate for the

18   Special Master's expert to recommend the creation of certain CAPs based on his monitoring,

19   CDCR's failure to create a CAP for an issue that has already been fixed should not be sufficient

20   grounds to find Defendants' non-compliant with a suicide prevention recommendation.

21       Finally, Defendants reiterate that their policy regarding phone access privileges is clear,

22   and continue to object to the recommendation that a clarifying memo is necessary. ECF No. 8282

23   at 64:18-25. As this Court has previously noted, the Court must defer to the exercise of the wide

24   discretion enjoyed by prison administrators in the discharge of their duties during the remedial

25   phase of this litigation. ECF No. 4539 at 30 n. 29. Because there is no showing that the perceived

---

26

27   [19] Some of the issues related to Recommendation 32A are currently being litigated via Defendants'
     objections to the Special Master's proposed resolution regarding data remediation indicators

28   SP15.1/SP15.1E. ECF No. 8274.

20937296.4

1    issues with Defendants' policy regarding phone access privileges rise to the level of a

2    constitutional magnitude—and because it strains logic to say that phone access privileges in an

3    inpatient unit is an obstacle to an adequate suicide prevention program—the Court must defer to

4    Defendants' discretion on this issue and sustain their objections.

5           9.      Recommendation 32B

6        Plaintiffs admit that Defendants have achieved compliance with incorporating all of the

7    Special Master's expert's 19 suicide prevention Audit Checklist measures into their CQI

8    guidebook, and ensuring that all CQI audit reports are formatted to contain data on all 19 suicide

9    prevention measures. ECF No. 8282 at 65:8-12. They also state that because the Sixth Re-Audit

10    Report has expanded compliance requirements from those included in the Fifth Re-Audit Report,

11    they do not seek contempt proceedings for this recommendation. *Id.* at 47:2-5.

12        The Court should take Plaintiffs at their word. Defendants have complied with what was

13    required of them under prior re-audit reports. Therefore, a finding of non-compliance with

14    Recommendation 32B is improper. Defendants' objections should be sustained.

15    **E.**    **Plaintiffs' response to the Special Master's expert's recommendations regarding**
               **suicide prevention practices in CDCR's PIPs is fundamentally flawed because they**
16            **rely on the wrong standard of review.**

17        Plaintiffs' response to the Special Master's expert's recommendations regarding suicide

18    prevention practices in the PIPs are all flawed because they rely on the clear error standard of

19    review. ECF No. 8282 at 66:9-11. As explained above, the appropriate standard of review for the

20    Sixth Re-Audit Report is *de novo.* Thus, it does not matter that the PIP recommendations are not

21    clearly erroneous because the Court must consider whether each recommendation can stand on its

22    own, without any deference to the Special Master's expert. As explained below, many of the

23    recommendations are improper and should be rejected.

24           1.      Suicide Resistant Beds

25        As explained in their objections, the Special Master's expert does not explain how use of

26    dorms or multi-person cells for suicide precaution (as opposed to suicide watch) is "clearly

27    wrong." Plaintiffs offer post-hoc rationalizations—unsupported by expert testimony, literature, or

28    research—regarding attachment points that patients can use to hang themselves. But they fail to

Case No. 2:90-CV-00520- KJM-DB

20937296.4

consider the mitigating factor that is provided by placing an inmate on suicide precautions in a group setting. As Defendants explained, there could be clinical utility in conducting suicide precautions with cell mates present that can discourage a patient from committing suicide. Because neither Plaintiffs' lawyers nor the Special Master's expert are clinicians, their criticism on the use of dorms or multi-person cells for suicide precaution by CDCR's licensed clinicians should be disregarded.

### 2.    Recommendations to retrofit SVSP with second-floor barriers

Plaintiffs support the Special Master's expert's recommendation that SVSP retrofit tiers C-5 and C-6 with a barrier to prevent someone from jumping from the second floor. ECF No. 8282 at 67:21-68:18. Despite the Special Master's finding in the Fifth Re-Audit Report that the second tier in C-5 and C-6 poses a jumping risk, there is no finding that a physical barrier is the only way to protect a patient from jumping. As Defendants explained in their objections, SVSP PIP has procedures in place to prevent suicidal inmates from accessing and jumping from the second tier of SVSP PIP's C-5 and C-6 housing units. And, as Plaintiffs admit, no one has jumped from C-5 or C-6. Accordingly, the recommendation to install a physical barrier, despite SVSP's current practices that have a proven track record of zero jumping incidents, should be rejected. That said, Defendants are not insensitive to the need for physical barriers when, based on the exercise of their wide discretion in the discharge of their duties, they determine that barriers are needed. ECF No. 4539 at 30 n. 29.

### 3.    Plaintiffs' request for verification of completed retrofit work at SVSP

Plaintiffs separately ignore that Defendants have already verified that the retrofit of cells at SVSP PIP is complete. ECF No. 8179 at 105:8-9. Defendants are also willing to provide Plaintiffs and the Special Master with an update when the cells in TC1 And TC2 are completed. However, that is a request that can be made informally and that does not need to be constitutionalized with a Court order. Defendants' objections on these grounds should be sustained.

### 4.    Verification of Suicidal Patient Observation CAP

Plaintiffs again elevate form over substance. Despite data from the Sixth Re-Audit Report showing that compliance rates with suicide observation requirements at four out of five PIPs were

1   at or above 90% before the December 31, 2023 deadline, Plaintiffs want a Court order requiring

2   verification that Defendants are complying with the Suicidal Patient Observation CAP at 100%.

3   ECF No. 8282 at 69:5-21. No further orders are necessary.

4        5.      Behavioral Suicide Watch at CIW-PIP

5        Plaintiffs ask that the Court order Defendants to verify that CIW-PIP has stopped using

6   "Behavioral Suicide Watch" despite the fact that Defendants already verified—via the declaration

7   of a licensed clinician—that CIW-PIP has ceased using "Behavioral" suicide watch. ECF No.

8   8282 at 70:17-21. They also ask the Court to discredit all of the SPRFIT Reports from Defendants'

9   licensed clinicians because the Special Master's expert expressed "extensive concerns about the

10  quality and accuracy of Defendants' SPRFIT audits." ECF No. 8282 at 71:8-14 citing ECF No.

11  8143-1 at 57-63. However, nowhere in pages 57-63 does the Special Master's expert make any

12  statement regarding the "quality" or "accuracy" of Defendants' SPRFIT audits. Rather, the Special

13  Master's expert shared discreet concerns and a handful of other examples where SPRFIT

14  Coordinators reported disparate findings based on "comparable review periods." ECF No. 8143-1

15  at 63. That is not enough to discredit all of the SPRFIT Coordinator audits. Plaintiffs' request also

16  flies in the face of the Special Master's expert's own conclusion that "regional SPRFIT

17  coordinator monitoring of suicide prevention practices utilizing the Suicide Prevention On-Site

18  Audit Guidebook remains a very promising and evolving process." *Id.*

19       6.      Daily Suicide Observations at SVSP-PIP

20       Plaintiffs also ask that the Court order Defendants to verify that SVSP-PIP patients are

21  always seen on a daily basis while on suicide observation. ECF No. 8282 at 70:22-71:14.

22  However, by Plaintiffs' own admission, Defendants have already provided the requested

23  verification. *Id.* at 71:1-4. For the reasons stated above, the Court should credit the verification

24  provided by Defendants' SPRFIT Coordinators.

25       7.      Clothing and Possessions at CHCF-PIP and CMF-PIP

26       Plaintiffs request further orders regarding the CAPs on clothing and possessions at CHCF-

27  PIP and CMF-PIP. ECF No. 8282 at 71:15-72:25. However, as Defendants explained in their

28  objections, Defendants' Regional SPRFIT Coordinators are regularly auditing this item and noting

1  deficiencies. When those are found, corrective action is taken. Thus, further orders and

2  verification on this issue are not needed.

3       8.     Out-of-Cell Activities

4       Plaintiffs request further orders regarding the CAPs to ensure that suicidal patients have

5  access to out-of-cell activities. ECF No. 8282 at 72:26-74:4. However, as Defendants explained in

6  their objections, Defendants' Regional SPRFIT Coordinators are regularly auditing this item and

7  noting deficiencies. When those are found, corrective action is taken. Thus, further orders and

8  verification on this issue are not needed.

9       9.     PIP IDTT Quality

10       Plaintiffs take issue with Defendants' objection that the Special Master's expert is not a

11  clinician, and therefore should not be providing opinions on the quality of PIP IDTTs. ECF No.

12  8282 at 74:5-75:3. There is no dispute that the Special Master's expert is not a clinician. His

13  experience monitoring implementation of suicide prevention recommendations does not allow him

14  to make findings on the clinical quality of treatment team meetings.

15       While it is true that similar findings were made in the Fifth Re-Audit Report without

16  objection, that does not constitute a waiver by Defendants allowing the Special Master's expert to

17  make clinical judgements in all re-audit reports moving forward. As the Sixth Re-Audit report is a

18  new and distinct report from the Fifth Re-Audit report, Defendants must, and do, state their

19  objections to the new findings in order to preserve the objections for appellate review. Plaintiffs'

20  position ignores that the Court must apply a *de novo* standard of review to Defendants' objections

21  to the Sixth Re-Audit report.

22       10.     Safety Planning

23       Plaintiffs request further orders regarding the Safety Planning. ECF No. 8282 at 72:26-

24  74:4. However, as Defendants explained in their objections, adequacy of safety planning is

25  monitored by licensed clinicians via CDCR's Chart Audit Tool as well as a remediated data

26  indicator, Quality of Safety Planning to Reduce Suicide Risk (SP3.4.). ECF No. 8179 at 110:14-

27  18. Supervisory reviews are completed on a statewide SharePoint which requires that supervisors

28  identify if modifications were needed for the safety plan. *Id.* CDCR continues to assess the

1  effectiveness of the SharePoint system. *Id.* Thus, no further orders are necessary.

2        11.     SPRFIT Quorums in the PIPs

3        Plaintiffs request further orders regarding SPRFIT Quorums in the PIPs. ECF No. 8282 at

4  76:13-77:10. However, as Defendants explained in their objections, CDCR's Regional SPRFIT

5  Coordinators attend local SPRFIT meetings and audit their meeting minutes. ECF No. 8179 at

6  111:22-25. They use the SP CQI Guidebook to audit SPRFIT committees and their minutes. *Id.* As

7  part of their audit, they look at whether the "all mandatory members, or authorized designees

8  [were] present." *Id.* Thus, no further orders are necessary.

9        12.     Tracking prior CAPs

10        Plaintiffs request further orders regarding tracking prior CAPs in the PIPs. ECF No. 8282

11  at 77:11-78:23. However, as Defendants explained in their objections, CDCR's Regional SPRFIT

12  Coordinators attend local SPRFIT meetings and audit their notes. ECF No. 8179 at 112:27-113:4.

13  They utilized the SP CQI Guidebook to audit SPRFIT committees. *Id.* As part of their audit, they

14  look at whether the "committee engage[d] in qualitative discussion of system surveillance of the

15  institution's suicide prevention practices, including…[c]orrective action plans for identified

16  deficiencies found by the SPRFIT." *Id.* A similar audit is conducted of meeting minutes. *Id.* Thus,

17  no further orders are necessary.

18  **V.    PLAINTIFFS' REQUEST THAT THE COURT ADOPT THE SPECIAL MASTER'S EXPERT'S REPORT IN FULL**

19

20        Despite acknowledging various obvious errors with the Sixth Re-Audit report (*e.g.*, ECF

21  No. 8282 at 13 n. 4 (identifying discrepancy between report and appendices), *id.* at 32 n. 9

22  (agreeing with Defendants that the Sixth Re-Audit report erroneously states compliance rates for

23  Suicide Precaution and Suicide Watch observation), *id.* at 47:2-5 (admitting that the Sixth Re-

24  Audit Report goes beyond the steps laid out for Defendants to achieve compliance in the Fifth Re-

25  Audit Report)), Plaintiffs still request that the Court "adopt the Special Master's and Mr. Hayes's

26  reports in full." *Id.* at 79:7-8. Consistent with the standard of review, these errors—and any other

27  errors, improper findings and recommendations, and any other matter not supported by the

28  record—must be corrected before the Court enters an order on the Sixth Re-Audit Report.

23
Case No. 2:90-CV-00520- KJM-DB

# VI.   CONCLUSION

The Court should sustain Defendants' objections. And the contemplated contempt proceedings regarding suicide prevention should be deferred until the Court resolves Defendants' objections to the Sixth Re-Audit Report.

# VII.   CERTIFICATION

In preparing this filing, Defendants' counsel certify that they have reviewed the following relevant orders: 640, 4539, 4925, 5726, 6973, 7003, 7696, 7743, 7754, 8147, 8192, and 8238. This brief sets forth arguments that have not been resolved by prior court orders as they are specifically tailored to address the merits of Plaintiffs' response to the May 16, 2024 order. Counsel make this filing under their obligation to represent their clients zealously. Counsel certify that they have conducted a reasonable inquiry and have determined that this filing is well grounded in fact, legally tenable, and not presented for an improper purpose, to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1); *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 393 (1990). Each factual contention made in this filing is supported by a reference to evidence in the record and the legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.  Fed. R. Civ. P. 11(b)(2).

DATED: July 1, 2024

ROB BONTA
Attorney General of California


By:_____*s/ Elise Owens Thorn*_____
DAMON MCCLAIN
Supervising Deputy Attorney General
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

1    DATED: July 1, 2024                      HANSON BRIDGETT LLP

2

3                                       By:      *s/ Paul B. Mello*

4                                              LAWRENCE M. CIRELLI
                                               PAUL B. MELLO
5                                              SAMANTHA D. WOLFF
                                               KAYLEN KADOTANI
6                                              DAVID C. CASARRUBIAS-GONZÁLEZ
                                               *Attorneys for Defendants*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:90-CV-00520- KJM-DB
20937296.4              DEFENDANTS' RESPONSE TO PLAINTIFFS' RESPONSE TO MAY 16, 2024 ORDER