DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312960
ALEXANDER GOURSE – 321631
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED TELEMENTAL HEALTH POLICY [ECF NO. 8253]** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:   Hon. Kimberly J. Mueller |

[4524870.6]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

RESPONSES TO DEFENDANTS' GENERAL OBJECTIONS ......................................... 3

I.    THE SPECIAL MASTER'S RECOMMENDED TELEMENTAL HEALTH
      POLICY COMPLIES WITH THE ORDER OF REFERENCE, RULE 53,
      AND THE PLRA.................................................................................. 3

      A.    The Special Master Is Complying with the Order of Reference ................... 3

      B.    The Court Has Authority to Issue Orders to Enforce Existing
            Remedies, Including By Adopting the Recommended Revisions ................. 4

            1.    Chronic Understaffing and Provision of Adequate Treatment ........... 5

            2.    Suicide Prevention Practices ................................................. 7

            3.    Staff Misconduct, Use of Force, and Other Disciplinary
                  Measures ......................................................................... 8

            4.    The Screening of Incarcerated Patients for Higher Levels of
                  Care ............................................................................. 10

      C.    The Proper Standard Under the PLRA is Not Whether Telemental
            Health Violates the Constitution, But Whether the Special Master's
            Recommendations Are Necessary, Narrowly Tailored and the Least
            Intrusive Means Necessary to Correct Constitutional Violations n the
            Delivery of Mental Health Care ................................................... 11

II.   DEFENDANTS EXAGGERATE THE ACADEMIC SUPPORT FOR
      TELEHEALTH IN CORRECTIONS. .................................................... 14

III.  DEFENDANTS ATTACK THE CREDENTIALS OF THE SPECIAL
      MASTER TEAM WITHOUT EVIDENCE AND INSTEAD OFFER
      EXPERT TESTIMONY THAT THE COURT SHOULD DISREGARD.............. 16

RESPONSES TO DEFENDANTS' SPECIFIC OBJECTIONS ...................................... 18

I.    THE SPECIAL MASTER'S LITERATURE REVIEW SUPPORTS A
      CAUTIOUS APPROACH TO REPLACING ONSITE WITH REMOTE
      CLINICIANS..................................................................................... 18

II.   TELEMENTAL HEALTH IS NOT CLINICALLY-APPROPRIATE AT
      THE MHCB AND PIP LEVELS OF CARE, EXCEPT IN EMERGENCY
      SITUATIONS .................................................................................... 20

III.  THE SPECIAL MASTER'S INFORMED CONSENT PROVISIONS ARE
      NECESSARY FOR APPROPRIATE CARE OF CDCR'S PATIENTS ................. 23

IV.   TELEMENTAL HEALTH PATIENTS MUST BE PERMITTED TO ASK
      THAT THE TELEPRESENTER NOT BE PRESENT DURING THERAPY ........ 25

[4524870.6]

i

V.    THE SPECIAL MASTER'S RECOMMENDATIONS TO PREVENT
      COMPLETE ELIMINATION OF ONSITE CLINICIANS ARE
      APPROPRIATE ................................................................................ 26

      A.    EOP Requires a Significant Onsite Presence ................................. 26

      B.    The Special Master's and Plaintiffs' Proposed Limits on Telemental
            Health in CCCMS Programs are Appropriate .............................. 30

      C.    The Requirement For At Least One Full-Time On-Site Case Manager
            in RHU Units is Appropriate in the Absence of a Requirement that All
            RHU Care Be On Site .................................................................. 32

VI.   THE SPECIAL MASTER'S RECOMMENDATION FOR TELEMENTAL
      HEALTH CASE MANGERS TO HAVE MULTIPLE ANNUAL SITE
      VISITS AT THEIR ASSIGNED INSTITUTIONS IS NEEDED TO MEET
      THE STANDARD OF CARE AND ENSURE CULTURAL
      COMPETENCE ............................................................................... 33

VII.  THE SPECIAL MASTER APPROPRIATELY CONCLUDED THAT
      CELL-FRONT TELEMENTAL HEALTH CONTACTS SHOULD NOT
      COUNT TOWARDS MANDATORY CLINICAL CONTACTS IN
      *COLEMAN* AND THAT CELL-FRONT CONTACTS SHOULD NOT BE
      PERMITTED IN HIGH-RISK RHU UNITS ..................................... 35

VIII. SPECIAL PURPOSE CONTACTS .................................................. 37

      A.    Emergent/Urgent Referrals and Suicide Risk Assessments .......... 37

      B.    Group Treatment ......................................................................... 39

      C.    Five-Day Follow-Ups ................................................................ 39

      D.    Use-of-Force Incidents .............................................................. 40

      E.    Mental Health Crisis Bed Discharges ........................................ 41

IX.   SPECIAL MASTER'S CHART NO. 1 .............................................. 41

X.    DEFENDANTS' ADDITIONAL OBJECTIONS ................................ 41

      A.    Licensing .................................................................................... 41

      B.    "Purpose" Statement ................................................................... 41

      C.    References to the Americans with Disabilities Act and *Armstrong* ... 41

      D.    References to Equipment, Physical Environment and Telepresenters. ... 41

DISCUSSION OF PENDING APPEALS ................................................... 42

I.    APPEAL NO. 23-15755, TELEPSYCHIATRY, FULLY BRIEFED, SET
      FOR ARGUMENT AUGUST 12, 2024. ........................................... 42

II.   APPEAL NO. 23-2485, PIP MINIMUM TREATMENT STANDARDS,

FULLY BRIEFED, SET FOR ARGUMENT AUGUST 12, 2024.......................... 42

III.    APPEAL NO. 24-2263, FALCON EXPERT TOURS, OPENING BRIEF
        DUE JULY 29, 2024. ................................................................................ 43

IV.     APPEAL NO. 24-2939, PIP MAX CUSTODY REVIEW POLICY,
        OPENING BRIEF DUE JULY 26, 2024. .................................................. 43

V.      APPEAL NO. 24-3707, PERSONALITY DISORDER PROGRAM,
        OPENING BRIEF DUE SEPTEMBER 4, 2024. ....................................... 43

VI.     APPEAL NO. 24-4023, STAFFING CONTEMPT, OPENING BRIEF DUE
        SEPTEMBER 20, 2024. ............................................................................ 43

CONCLUSION............................................................................................................. 43

CERTIFICATION ........................................................................................................ 44

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
TELEMENTAL HEALTH POLICY [ECF NO. 8253]

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Armstrong v. Brown,*
    768 F.3d 975 (9th Cir. 2014) .................................................................................... 12

*Armstrong v. Newsom,*
    58 F.4th 1283 (9th Cir. 2023) ................................................................................. 12

*Armstrong v. Newsom,*
    No. 94-CV-02307 CW, 2021 WL 933106 (N.D. Cal. Mar. 11, 2021), *aff'd in
    part, vacated in part*, 58 F.4th 1283 (9th Cir. 2023) ................................................. 9

*Armstrong v. Schwarzenegger,*
    622 F.3d 1058 (9th Cir. 2010) .......................................................................... 13, 25

*Balla v. Idaho State Bd. of Corr.,*
    595 F. Supp. 1558 (D. Idaho 1984) ........................................................................ 6

*Brown v. Plata,*
    563 U.S. 493 (2011) ....................................................................................... 12, 13

*Coleman v. Brown,*
    2013 WL 6071977 (E.D. Cal., Nov. 13, 2013) ......................................................... 5

*Coleman v. Brown,*
    28 F. Supp. 3d 1068 (E.D. Cal. 2014) ............................................................ passim

*Coleman v. Brown,*
    428 F. App'x 743 (9th Cir. 2011) ........................................................................... 14

*Coleman v. Brown,*
    756 F. App'x 677 (9th Cir. 2018) ........................................................................... 14

*Coleman v. Brown,* 938 F. Supp. 2d 955, 981 (E.D. Cal. 2013) ........................ 6, 10, 11, 44

*Coleman v. Brown,*
    No. 2:90-cv-0520, 2013 WL 3773963 (E.D. Cal., July 12, 2013) ........................... 4

*Coleman v. Wilson,*
    912 F. Supp. 1282 (E.D. Cal. 1995) ................................................................ passim

*Coleman v. Wilson,*
    933 F. Supp. 954 (E.D. Cal. 1996) ................................................................... 4, 44

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
    601 U.S. 42 (2024) ................................................................................................ 12

*Gilmore v. People of the State of Calif.,*
    220 F.3d 987 (9th Cir. 2000) ................................................................................. 13

[4524870.6]

iv

*Hoptowit v. Ray,*
    682 F.2d 1237 (9th Cir. 1982) ................................................................ 6

*Hutto v. Finney,*
    437 U.S. 678 (1978) ............................................................................ 12

*Jensen v. Shinn,*
    609 F. Supp. 3d 789 (D. Ariz. 2022) ....................................................... 18

*Jones-El v. Berge,*
    374 F.3d 541 (7th Cir. 2004) .................................................................. 5

*Morales Feliciano v. Rullan,*
    378 F.3d 42 (1st Cir. 2004) ................................................................... 12

*Parsons v. Ryan,*
    912 F.3d 486 (9th Cir. 2018) .................................................................. 4

*Rufo v. Inmates of Suffolk Cnty. Jail,*
    502 U.S. 367 (1992) ............................................................................ 12

*Sharp v. Weston,*
    233 F.3d 1166 (9th Cir. 2000) ................................................................ 12

*Stone v. City and Cnty. Of San Francisco,*
    968 F.2d 850 (9th Cir. 1992) ................................................................. 12

## STATUTES

18 U.S.C. § 3626 ................................................................................... 3, 4, 11

## RULES

Fed. R. Civ. P. 53 ........................................................................................ 3

## REGULATIONS

Cal. Code Regs., tit. 15, § 3999.98 ................................................................ 24

1

**INTRODUCTION**

2      In opposing every single one of the Special Master's proposed revisions to their

3  Telemental Health Policy, Defendants protest that the Special Master's proposals will hurt

4  their ability to fill vacant positions.  Defendants' Response to Special Master's Report and

5  Proposed Telemental Health Policy ("Defendants' Objections"), ECF No. 8253 at 7.[1]  This

6  prediction is overblown, and not supported by the evidence.  The Special Master's recom-

7  mendations are the bare minimum necessary to ensure that telemental health's expansion

8  remains consistent with the other remedial measures in this case.  The Special Master

9  modeled his proposed revisions on the limitations contained within Defendants' telepsy-

10  chiatry policy, *see* Special Master's Report and Proposed Telemental Health Policy

11  ("Special Master Telemental Health Policy Report"), ECF No. 8165 at 37—a policy that

12  Defendants admit has been "successful" in improving psychiatrist staffing levels.

13  Defendants' Objections at 22.

14      The Special Master and the Court have been in favor of Defendants' expansion of

15  telemental health "through appropriate means," *see* June 26, 2024 Order, ECF No. 8295 at

16  2, and the Special Master's proposed revisions reflect this supportive approach:  Even with

17  his alterations to their policy, CDCR will be able to have as much as 80 percent of their

18  allocated clinician positions work via telehealth at the general-population Correctional

19  Clinical Case Management System (CCCMS) level of care, and have as much as 60

20  percent of their allocated clinician positions work via telehealth in the residential-treatment

21  Enhanced Outpatient (EOP) setting.  *See* Special Master Telemental Health Policy Report

22  at 28-30.  The Special Master's other proposed revisions will have little if any effect on

23  Defendants' ability to solve their staffing woes.  The sky did not fall when similar

24  safeguards were implemented for telepsychiatry; it will not fall with the same safeguards

25  in place for telemental health.

26      Defendants remain far from compliance with many of their constitutional obliga-

27

28  ――――――――――――――――
[1] Citations to documents in the docket are based on ECF pagination.

[4524870.6]

1

1    tions.  *See, e.g.*, Special Master's 30th Round EOP Monitoring Report, ECF No. 8095 at

2    11 (Special Master's findings "paint a bleak picture of defendants' progress toward a

3    durable remedy"); Special Master's Suicide Prevention Report, ECF No. 8143 at 16-17

4    (revealing Defendants' "deeply concerning" failure to implement fourteen outstanding

5    suicide prevention recommendations nearly a decade after they were issued); June 25,

6    2024 Order, ECF No. 8291 at 71 (finding that it "has been clear for more than thirty years"

7    that "Defendants cannot meet their Eighth Amendment obligations to the plaintiff class

8    until adequate mental health staffing levels are achieved and durably maintained").  While

9    telehealth can help ease the staffing shortages that are a cause of these problems, a

10   wholesale replacement of onsite care with remote care to fill staffing vacancies would be

11   dangerous and counterproductive.

12       The Court has the power to prevent these dangers by adopting the Special Master's

13   recommendations.  These recommendations are necessary to enforce the Court's prior

14   remedial orders.  They are also the least intrusive and narrowest means necessary to ensure

15   that Defendants provide minimally humane mental health care to the Plaintiff class.  The

16   issues raised by this litigation are also distinct from the issues raised by the litigation over

17   Defendants' telepsychiatry policy that is currently pending on appeal.

18       In opposing the Special Master's proposed revisions, Defendants rely heavily on

19   evidence on how telehealth works in the community, but concede that there is little

20   evidence on how it works in prisons.  The Special Master correctly relied on his team's

21   expertise and extensive experience monitoring California's correctional mental health care

22   system—including an 18-month intensive monitoring period of the implementation of

23   CDCR's telepsychiatry program. *See* Special Master's Report and Recommendation on a

24   Final Proposed Telepsychiatry Program, ECF No. 7682.  The Special Master concluded

25   that "[i]f telemental health is introduced on an unprecedented scale without minimal

26   safeguards, there could be unintended collateral consequences inapposite to the objective

27   of bringing defendants into compliance with the court-ordered remedy in this matter."

28   Special Master Telemental Health Policy Report at 1-2.  The Court should adopt that

1  finding and order Defendants to revise their policy.[2]

2  　　　The headings in this document track Defendants' objections, except where

3  subsections are added for clarity, and with an additional section regarding the Court's

4  direction to include "discussion of whether any issues raised by the briefing is pending on

5  appeal." June 25, 2024 Order, ECF No. 8295 at 3.

6  　　　　　　　**RESPONSES TO DEFENDANTS' GENERAL OBJECTIONS**

7  **I.    THE SPECIAL MASTER'S RECOMMENDED TELEMENTAL HEALTH**
   **POLICY COMPLIES WITH THE ORDER OF REFERENCE, RULE 53,**
8  **AND THE PLRA**

9  　　　**A.    The Special Master Is Complying with the Order of Reference**

10  　　　Defendants contend that the recommendations violate the Order of Reference's

11  prohibition on directing CDCR "to take or to refrain from taking any specific action to

12  achieve compliance." Defendants' Objections at 9-10 (quoting Order of Reference, ECF

13  No. 640 at 7-8). The Special Master has not "directed" Defendants to do anything. He has

14  done what the Court ordered: supervise the meet-and-confer process; file a short report on

15  the outcome of those discussions; and include a recommended policy with the report.

16  Dec. 15, 2023 Order, ECF No. 8087 at 2. His mere recommendation of a policy is not in

17  conflict with the Order of Reference, Federal Rule of Civil Procedure 53, or the Prison

18  Litigation Reform Act. *See* ECF No. 640; Fed. R. Civ. P. 53(c); 18 U.S.C. § 3626(f).

19  　　　The Order of Reference gives the Special Master the following duty: "To advise the

20  court concerning any modification to the remedial plan that is requested by a party or that

21  appears necessary to effectuate the purposes of the remedial plan." ECF No. 640 at 5. The

22  remedial plan, known in this case as the *Coleman* Program Guide, depends entirely on the

23  presence of mental health staff in the institutions to screen and treat class members.

24  Defendants' proposal to have these remedial plan functions performed by remote staff over

25

26  _____
   [2] While Plaintiffs support the Court's power to adopt the Special Master's proposed
27  revisions, Plaintiffs contend that the Special Master's proposals did not go far enough, *See*
   Plaintiffs' Objections to the Special Master's Proposed Telemental Health Policy, ECF No.
28  8252.

1  video connections is a major modification, on which the Special Master has a duty to

2  advise the Court.  Switching from onsite to remote clinicians impacts all aspects of the

3  remedy, including: suicide prevention; the proper identification of incarcerated persons

4  with serious mental illness to ensure that they receive higher levels of mental health care

5  when necessary; staffing; ensuring that custody staff use force appropriately in their

6  interactions with incarcerated persons with serious mental illness and do not engage in

7  misconduct; and ensuring that disciplinary measures are appropriate for incarcerated

8  persons with serious mental illness, among other functions addressed in the *Coleman*

9  Program Guide.  The Court's direction to the Special Master to work with Defendants to

10  ensure that their telemental health policy can function as part of the *Coleman* Program

11  Guide is thus consistent with his duties under the Order of Reference.

12  **B.    The Court Has Authority to Issue Orders to Enforce Existing Remedies, Including By Adopting the Recommended Revisions**

13

14     Defendants contend that the Court cannot adopt the Special Master's proposed

15  revisions without making the need-narrowness-intrusiveness findings required for

16  prospective relief under the PLRA at 18 U.S.C. § 3626(a)(1)(A).  *See* Defendants'

17  Objections at 10-14.  They are incorrect.  Where an order enforces compliance with an

18  existing remedy, it does not constitute prospective relief under the PLRA, and, therefore,

19  does not require new PLRA findings.  *See, e.g.*, *Parsons v. Ryan*, 912 F.3d 486, 501 (9th

20  Cir. 2018) (holding that orders issued to "enforce compliance" with an existing remedy do

21  not themselves constitute prospective relief under the PLRA); *Coleman v. Wilson*, 933 F.

22  Supp. 954, 956-57 (E.D. Cal. 1996) (distinguishing between orders that govern the "means

23  of facilitating relief" and those that impose "relief itself," and concluding that the former

24  do not constitute prospective relief under the PLRA); *Coleman v. Brown*, No. 2:90-cv-

25  0520, 2013 WL 3773963 at *3 n.8 (E.D. Cal., July 12, 2013) ("To the extent that this order

26  directs specific action by defendants or the Special Master, it implements a remedy that

27  has already been ordered by the Court. For that reason, the court is not required to make

28  the findings set forth in 18 U.S.C. § 3626(a)(1)."); *Coleman v. Brown*, No. 2:90-cv-0520,

2013 WL 6071977 at *1-2 (E.D. Cal., Nov. 13, 2013) (holding that a separate finding of constitutional violations is not required for further order in aid of remedy required by older order finding liability); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1108 (E.D. Cal. 2014) (noting that "the orders contained herein are in aid of the remedy required by the court's 1995 order"); *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004) (holding that enforcement of existing orders "is not the kind of 'prospective relief' considered by § 3626(a).").

The next several subsections address the specific remedial provisions that would be impacted, including orders attempting to remedy constitutional violations related to understaffing and the provision of adequate treatment, suicide prevention, use of force and staff misconduct against patients, and the screening of incarcerated patients for higher levels of care.

### 1.    Chronic Understaffing and Provision of Adequate Treatment

The Court's finding regarding telepsychiatry's impact on the remedy applies with equal force to telemental health.  *See* Sept. 20, 2018 Order, ECF No. 5928 at 11 ("Because use of telepsychiatry is part of defendants' plan to remedy the Eighth Amendment violation in this case, it is not for the court to separately find, implicitly or otherwise, that defendants' expansion of its use, proposed or otherwise violates the Eighth Amendment."). Understaffing in all areas of mental health services is an issue that has plagued Defendants since the inception of this case and continues to this day.  *See Coleman v. Wilson*, 912 F. Supp. 1282, 1306-08 (E.D. Cal. 1995) (describing CDCR as "significantly and chronically understaffed"); June 25, 2024 Order, ECF No. 8291 (finding Defendants in contempt of orders regarding adequate mental health staffing).  Defendants have admitted that "telemental health is an important component of Defendants' efforts to address psychologist and social worker staffing vacancies," *see* Joint Report in Response to Aug. 3, 2023 Order on Defendants' Telemental Health Services Policy, ECF No. 7935 at 2-3, and that the "goal of telemental health is to fill vacant provider roles and also to help retain existing on-site providers … [to] significantly improve staffing fill rates among

1  psychologists and social workers."  Defendants' Closing Brief of Staffing Contempt

2  Proceedings, ECF No. 8019 at 21.

3         But mental health staff are not just there so that Defendants can plug numbers into

4  monthly staffing vacancy reports.  They are there to provide the mental health care set

5  forth in the remedial plan, the *Coleman* Program Guide.  Understaffing violates the

6  Constitution because Defendants must be able to "employ mental health staff in 'sufficient

7  numbers *to identify and treat in an individualized manner those treatable inmates suffering*

8  *from serious mental disorders*."  *Coleman*, 912 F. Supp. at 1306 (emphasis added)

9  (quoting *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984)); *see*

10  *also Coleman v. Brown,* 938 F. Supp. 2d 955, 981 (E.D. Cal. 2013) ("[T]he relevant

11  requirement is defendants' constitutional obligation to provide 'a system of *ready* access to

12  *adequate* [mental health] care.'") (emphasis in original) (quoting *Hoptowit v. Ray*, 682

13  F.2d 1237, 1253 (9th Cir. 1982)).

14         Defendants seek carte blanche to replace onsite clinicians with remote clinicians.

15  Defendants disclaim full replacement of onsite care, but at the same time vigorously resist

16  any safeguards to prevent such a result.  Unlike the telepsychiatry policy or the Special

17  Master's proposed revision to the telemental health policy, Defendants' telemental health

18  policy contains no provision indicating that tele-clinicians are only meant to "supplement"

19  on-site providers.  *Compare* ECF No. 8165-2 (Ex. D) at 67-74 *with* ECF No. 6539 at 5, 7

20  ("Telepsychiatry may supplement on-site psychiatry at the EOP level of care, but it should

21  not replace on-site psychiatry" and defining "supplement" as meaning that "at least 1.0

22  personnel year … equivalent on-site psychiatrist shall be assigned to each EOP program …

23  per yard at each institution") *and* ECF No. 8165-1 (App'x A) at 2 ("Telemental health

24  provides a supplement to onsite providers of mental health services at" the CCCMS and

25  EOP levels of care.).  Defendants' telemental health policy also does not put *any* limitation

26  on the number of clinicians that must remain on site at both the CCCMS and EOP levels of

27  care.  *Compare* ECF No. 8165-2 (Ex. D) at 70 ("Telemental health providers will be

28  assigned to the CCCMS and EOP levels of care.") *with* ECF No. 6539 at 5, 7 (requiring

minimum numbers of onsite psychiatrists at the EOP level of care) *and* ECF No. 8165-1 (App'x A) at 6 (requiring a minimum of 20% of allocated provider positions to be on site for CCCMS and a minimum of 40% of allocated provider positions to be on site for EOP).

Under Defendants' current policy, CDCR will be free to hire teleclinicians to the point that the entire Mental Health Services Delivery System (MHSDS) is run by teleclinicians at both the CCCMS and EOP levels of care—accounting for 96% of the *Coleman* class.[3]  Since the current telepsychiatry policy allows for Defendants to staff its CCCMS program strictly with telepsychiatrists, the potential also exists, under Defendants' policy, for CDCR to have a completely remote mental health staff to serve nearly three-quarters of its population.  To enforce its earlier remedial orders ensuring that there is proper collaboration between mental health and custody staff, the Court can and should put in place the safeguards suggested by Plaintiffs or, at the very least, the reasonable safeguards offered in the Special Master's proposed policy.  The Court acts within its power to enforce the existing remedy when it issues orders regarding how far Defendants can go in replacing onsite staff with remote staff.

## 2.    Suicide Prevention Practices

As with understaffing, this Court in 1995 identified Defendants' suicide prevention practices as one of the major areas in which Defendants were providing constitutionally inadequate care.  912 F. Supp. at 1315.  In the subsequent nearly-thirty years, Defendants have continually failed to implement court-ordered reforms of their suicide prevention practices to the point that contempt proceedings appear to be imminent, *see generally* May 16, 2024 Order, ECF No. 8238, while CDCR's suicide rate remains close to the highest it has been since the inception of this case.  *See* Plaintiffs' Response to May 16, 2024 Order, ECF No. 8282 at 7 (noting 2019, 2020, and 2023 suicide rates within CDCR

---

[3] As of July 2023, the *Coleman* class included 33,596 individuals, 25,143 in CCCMS and 7,090 in EOP, 265 in MHCB, 327 in the APP inpatient units, and 771 in the ICF inpatient units.  The EOP and CCCMS together accounted for 32,233 of the 33,596 individuals in the class, or 96%.  (ECF No. 8291-3 at 8.)

were highest since at least 1990).  The Court has the power to ensure that new staffing

practices such and telehealth do not jeopardize whatever gains in suicide prevention have

already been achieved.  The suicide prevention parts of the Special Master's

recommendations are addressed in detail below in Sections VIII.A,  VIII.C and VIII.E.

### 3.    Staff Misconduct, Use of Force, and Other Disciplinary Measures

The 1995 trial court also found that California's prison system was engaged in "the

inappropriate use of disciplinary and behavioral control measures directed towards the

members of plaintiff class" and that "mentally ill inmates who act out are typically treated

with punitive measures without regard to their mental status."  *Coleman*, 912 F. Supp. at

1319-20.  Similar findings emerged from an evidentiary hearing in 2014.  *Coleman*, 28 F.

Supp. 3d at 1068.  The Court found that Defendants were still violating the Plaintiff's

constitutional rights with regard to uses of force, and it issued an enforcement order

requiring, among other remedies, Defendants to reform their policies and practices relative

to uses of force to ensure "(1) consideration of the role of mental illness in an inmate's

ability to comply with staff directives; (2) adequate guidance concerning the role of mental

health clinical judgments in use of force on class members and when, if ever, those

judgments may be overridden by custody staff; and (3) alternatives to use of force on

seriously ill inmates where there is no imminent threat to life and force is contraindicated

by the inmate-patient's mental health."  *Id.* at 1087.  Defendants developed revised policies

that were approved by the Court, with a directive to the Special Master to monitor the

"[implementation of the plans and policies] approved by this order … in accordance with

his monitoring and reporting duties in this action."  Aug. 11, 2014 Order, ECF No. 5196 at

3.

Part of the remedy for these violations is found in the 2016 order that led to the

Custody Mental Health Partnership Project (CMHPP).  *See* Aug. 9, 2016 Order, ECF No.

5477 at 6; *see generally* Defendants' Report on Status of Implementation of the CMHPP,

ECF No. 5916.  The CMHPP mandates a variety of collaborative activities between

custody and mental health staff designed to foster a therapeutic culture in CDCR, including

1   joint rounding between the two disciplines, partnership roundtables and training, and

2   regular joint "huddles"—efforts that Defendants have admitted are "necessary to facilitate

3   access to care and maintain an environment supportive of inmates' treatment goals,

4   particularly in mental health settings."  Defendants' Report on Status of Implementation of

5   the CMHPP, ECF No. 5916, at 11-19.  The Court affirmed the importance of the CMHPP

6   in early 2019, when it ordered the program expanded to include CCCMS programs and

7   explained that the CMHPP "requirement extends to all levels of mental health care in the

8   prison system, and the remedy must be available to all staff who interact with mentally ill

9   inmates at least until the cultural conflicts that plague full remediation are resolved."

10  Feb. 20, 2019 Order, ECF No. 6095 at 4.  The CMHPP is the subject of several Court

11  orders, and the key 2016 and 2019 CMHPP orders are part of the Program Guide

12  Compendium.  *See* 2021 Program Guide Compendium, ECF No. 7333-2 at 6 (listing

13  August 9, 2016 Order Adopting Five Recommendations from the Special Master's

14  Twenty-Sixth Round Report—including ordering the CMHPP, and the February 20, 2019

15  Order Regarding Defendants' Custody and Mental Health Partnership Plan, ECF No.

16  6095).

17          Staff misconduct against the mentally ill persists in CDCR. *See Armstrong v.*

18  *Newsom*, No. 94-CV-02307 CW, 2021 WL 933106 (N.D. Cal. Mar. 11, 2021), *aff'd in*

19  *part, vacated in part*, 58 F.4th 1283 (9th Cir. 2023)).  The *Armstrong* Court found credible

20  several allegations of incarcerated persons who stated that staff had "threatened,

21  intimidated, or coerced them when they requested reasonable accommodations" for their

22  disability, including several *Armstrong* class members who suffered from mental illness.

23  *Id.* at *7-9.  The Special Master's recent monitoring has also revealed various instances of

24  institution staff being in non-compliance with the CMHPP's requirements.  ECF No. 8252

25  at 12-13 (citing ECF No. 8095; Special Master's 29th Round EOP Monitoring Report,

26  ECF No. 7715).  The evidence shows an urgent and continuing need for custody-mental

27  health collaboration.

28          The use of force recommendations are examined in more detail in Section VIII.D

below.

### 4. The Screening of Incarcerated Patients for Higher Levels of Care

Just as the original 1995 order found that Defendants did not have a "systematic program for screening and evaluating inmates in order to identify those who require mental health treatment," 912 F. Supp. at 1305, the Court identified in 2012 (and, in 2013, reaffirmed) several "critically important" goals that are necessary to remedy the Eighth Amendment violations in this case, including "ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive necessary higher levels of care." *Coleman*, 938 F. Supp. 2d at 969 (quoting Aug. 30, 2012 Order, ECF No. 4232 at 5 n.3).

The Special Master's recommended revisions to Defendants' Telemental Health Policy are based in part on recognition that the clinician-patient relationship "involve[s] discussion of highly sensitive and private matters" that come out of the counseling/therapy sessions in which clinicians engage their patients. *See* Special Master's Telemental Health Report at 23. The relative frequency of clinical contacts required by the Program Guide and the job descriptions of clinicians also reveal them to be at the front line of identifying appropriate treatment plans—including the appropriate level of care—for their patients. *Id.* at 23-24. Identifying the necessary treatment, diagnosis and level of care for a patient is not as simple as reviewing an x-ray or test results; in the realm of mental health treatment, those vital tasks require developing trust between the clinician and the patient and building an appropriate therapeutic relationship with the patient. If clinicians are not able to build that relationship due to various barriers that the use of telemental health presents, it follows that proper identification of patients' appropriate treatment plans and levels of care will not occur. The Court can and should adopt the reasonable requested safeguards as part of its duty to enforce its previous orders that CDCR create a functioning system to properly identify and treat its patients, especially in determining which patients require more intensive treatment.

1
2
3

**C.    The Proper Standard Under the PLRA is Not Whether Telemental Health Violates the Constitution, But Whether the Special Master's Recommendations Are Necessary, Narrowly Tailored and the Least Intrusive Means Necessary to Correct Constitutional Violations in the Delivery of Mental Health Care**

4    The PLRA provides that a court "shall not grant or approve any prospective relief

5    unless the court finds that such relief is narrowly drawn, extends no further than necessary

6    to correct the violation of the Federal right, and is the least intrusive means necessary to

7    correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Defendants contend

8    that the Court cannot make these PLRA findings unless that Court finds that telemental

9    health itself constitutes cruel and unusual punishment. Defendants' Objections at 10. This

10   framing is incorrect. If the Court does find that that this PLRA provision applies, the

11   relevant inquiry is not whether Defendants' use of telemental health care violates the

12   Eighth Amendment, but, rather, whether the Special Master's recommended safeguards are

13   necessary, narrowly tailored and the least intrusive means to correct the Eighth

14   Amendment violations that this Court already found and that persist to this day.

15   The answer to that question is clearly yes: As noted above, the Court found nearly

16   30 years ago that Defendants' provision of mental health care violated the constitution in

17   several aspects. *Coleman*, 912 F. Supp. at 1296-97. Defendants themselves developed a

18   remedial plan, the Program Guide, to address the constitutional deficiencies, and they have

19   made no claim that they are now in compliance with the Program Guide. When

20   Defendants attempted to establish that these constitutional violations had been remedied,

21   the Court found again in 2013 that Defendants were still violating the Plaintiff class's

22   constitutional rights and that each of the Court's outstanding orders remained necessary to

23   correct ongoing violations in the delivery of adequate mental health care. 938 F. Supp. 2d

24   at 989-90. Since that point, the Court has issued several additional remedial orders in an

25   attempt to bring Defendants into compliance. *See, e.g.*, *Coleman*, 28 F. Supp. 3d 1068

26   (E.D. Cal. 2014) (granting motion for enforcement regarding use-of-force and segregation

27   policies); Oct. 10, 2017 Order, ECF No. 5711 (requiring Defendants to come into

28   compliance with 2009 staffing plan within one year). The violation of the federal right in

[4524870.6]

11

1   question is the Defendants' ongoing denial of Plaintiffs' right to constitutional mental
2   health care.

3          The Court must analyze the need-narrowness-intrusiveness of a given action in the
4   context of the prior remedial efforts in this case.  "[W]hen a district court 'has previously
5   tried to correct the deficiencies' in prison operations 'through less intrusive means, and
6   those attempts have failed, relief prescribing more specific mechanisms of compliance is
7   appropriate.'"  *Armstrong v. Newsom*, 58 F.4th 1283, 1297 (9th Cir. 2023) (quoting
8   *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014); *see also Brown v. Plata*, 563 U.S.
9   493, 516 (2011) ("reasonableness must be assessed in light of the entire history of the
10  court's remedial efforts"); *Hutto v. Finney*, 437 U.S. 678, 687 (1978) *abrogated on other*
11  *grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024) ("In
12  fashioning a remedy, the District Court had ample authority to go beyond earlier orders"
13  particularly when the court has "given the Department repeated opportunities to remedy
14  the cruel and unusual conditions"); *Morales Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir.
15  2004), (finding that court's order for privatization of prison's health care system met need-
16  narrowness-intrusiveness inquiry where progress had been slow over course of two
17  decades of reform failures).  In long-running institutional reform cases such as this one, the
18  trial court's determination of what relief is necessary—particularly when a party's attempts
19  to complete reform have repeatedly failed—is entitled to "special deference."  *Sharp v.*
20  *Weston*, 233 F.3d 1166, 1173-74 (9th Cir. 2000) (quoting *Hutto*, 437 U.S. at 688); *Stone v.*
21  *City and Cnty. Of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (citing *Rufo v. Inmates*
22  *of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) (O'Connor, J., concurring)) ("[D]eference to the
23  district court's exercise of discretion is heightened where the court has been overseeing a
24  large, public institution for a long period of time.").

25         Contrary to Defendants' contentions, the PLRA does not require that the Court view
26  the telemental health recommendations in isolation.  On the contrary, they must be viewed
27  in light of their impact on the existing remedy:

28         Prospective relief for institutions as complex as prisons is a necessarily

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
TELEMENTAL HEALTH POLICY [ECF NO. 8253]

1       aggregate endeavor, composed of multiple elements that work together to
     redress violations of the law. This is all the more true when relief must be
2       narrow and minimally intrusive: courts often must order defendants to make
     changes in several different areas of policy and procedure in order to avoid
3       interjecting themselves too far into any one particular area of prison
     administration. In such circumstances, the necessity of any individual
4       provision cannot be evaluated in isolation.  What is important, and what the
     PLRA requires, is a finding that the set of reforms being ordered—the
5       'relief'—corrects the violations of prisoners' rights with the minimal impact
     possible on defendants' discretion over their policies and procedures.

6

7  *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010).  Likewise, in

8  *Plata*, the Supreme Court affirmed that "[t]he PLRA should not be interpreted to place

9  undue restrictions on the authority of federal courts to fashion practical remedies when

10  confronted with complex and intractable constitutional violations" and noted that "[o]nly a

11  multifaceted approach aimed at many causes … will yield a solution."  563 U.S. at 526.

12       Defendants correctly look to telehealth to address CDCR's persistent staffing

13  shortage.  Sufficient staffing is not an end in and of itself, however; the point of staff is to

14  be able to "identify and treat in an individualized manner those treatable inmates suffering

15  from serious mental disorders."  *Coleman*, 912 F. Supp. at 1306.  Adequate staffing is a

16  *necessary* predicate to achieving constitutional care, but it is not *sufficient*; if increased

17  staffing comes with a total removal of onsite clinicians from CDCR's prisons, it is

18  doubtful whether Defendants will be able to provide an adequate system of care—a

19  conclusion at which the Special Master and his team of national experts have arrived via

20  their experience monitoring this prison system and other prison systems across the country,

21  including targeted monitoring of Defendants' telepsychiatry practices over the last several

22  years.

23       Defendants contend that each component of the Special Master's recommendations

24  needs its own need-narrowness-intrusiveness finding.  Defendants' Objections at 13-14.

25  This is not correct.  "[T]he language of the PLRA does not suggest that Congress intended

26  a provision-by-provision explanation of a district court's findings."  *Armstrong*, 622 F.3d

27  at 1070; *see also Gilmore v. People of the State of Calif.*, 220 F.3d 987, 1007-08 (9th Cir.

28  2000) (PLRA analysis "requires real adjudication—the careful application of law to fact—

1    not the wooden ratification of a legislatively prescribed conclusion"). Here, despite

2    Defendants' protestations, the Special Master's safeguards are quite limited. Even under

3    the Special Master's recommendations, 80 percent of CCCMS clinicians and 60 percent of

4    EOP clinicians would be permitted to work via telehealth, leaving Defendants free to fill

5    all of their vacant positions with tele-clinicians, while still ensuring *some* onsite presence.

6    The Special Master's other proposed revisions are also limited, including restrictions on

7    telehealth in relatively rare, high-intensity situations (e.g., uses of force or crisis

8    intervention for suicidal patients) and the modification of the language surrounding the use

9    of telehealth in MHCBs and PIPs so that it is reserved for emergencies and triggers a

10   notification requirement to the other parties after prolonged use of telehealth at those levels

11   of care. In all, the Special Master's proposed revisions are modest. The potential serious

12   harm to or delay in the remedies already approved in this case are grave. Thus, the Special

13   Master's recommendations are appropriately "proportional" to the scope of the violation—

14   i.e., the failure to provide even basically humane mental health care, through inadequate

15   staffing and treatment, deficits in improper suicide prevention, improper uses of force and

16   staff misconduct, and failures to identify patients' need for higher levels of care.

17        Ultimately, just as the 9th Circuit found in upholding several of this Court's other

18   remedial orders, the PLRA analysis permits the Court to rely on the Court's "orders on the

19   expansive record in this case, spanning over two decades and thousands of entries,"

20   *Coleman v. Brown*, 428 F. App'x 743, 744-45 (9th Cir. 2011), and to order relief where

21   there is evidence of "substantial risk of serious harm." *Coleman v. Brown*, 756 F. App'x

22   677, 679 (9th Cir. 2018). The Defendants are infringing upon the constitutional rights of

23   the Plaintiff class in several areas; it is reasonable for the Court to make findings that slight

24   revisions to Defendants' telemental health policy are necessary and sufficiently narrow to

25   ensure that Defendants are still on the path to remedying those violations going forward.

26   **II.    DEFENDANTS EXAGGERATE THE ACADEMIC SUPPORT FOR
          TELEHEALTH IN CORRECTIONS.**

27

28        Defendants contend that "[t]he overwhelming evidence supports CDCR's

[4524870.6]

14

Telemental Health Policy." Defendants' Objections at 14. Defendants' "overwhelming evidence" is a set of academic studies with very limited application to corrections. *See id.* at 14-15 (citing Mehta Decl., ¶¶ 14-22 and Penn Decl., ¶¶ 42, 49-50). The Special Master found, correctly, that "there is little research on the use of telemental health in correctional settings" and "the literature does not provide any definitive answer concerning the efficacy and impact of the widespread use of telemental health to provide treatment to tens of thousands of seriously mentally ill incarcerated persons in a large prison system like CDCR." Special Master Telemental Health Policy Report at 22. Defendants' objections to this finding are meritless.

Defendants point to a set of articles reviewed by Dr. Mehta that they claim supports the use of telemental health in prison. *See* Mehta Decl., ECF No. 8253-2 ¶ 15; ECF No. 8253-3; ECF No. 8253-4. Out of the 37 additional articles reviewed by Dr. Mehta, only **four** touch on a carceral setting. And all four of those articles either caution against the generalization of their studies or caution against the widespread implementation of telehealth for incarcerated populations. In Batastini and Morgan (2016), for example, the authors looked at the use of telehealth for high-security, administratively-segregated inmates in the Kansas Department of Corrections and found that, while there were no statistically-significant difference between in-person and telehealth groups, "some evidence indicated that telepsychology was less preferred than in-person sessions" and that, ultimately, "a number of limitations associated with program implementation and study design suggest that results be interpreted with caution." ECF No. 8253-2 at 185. The meta-analyses of the relevant research regarding the use of telehealth for incarcerated populations that were cited by Dr. Mehta are even more stark: A review of the research on tele-mental health programs done by Richardson et al (2009) stated that "research with this particular special population [incarcerated patients] of telemental health users is fraught with methodological limitations, including limited outcome evaluations, small sample sizes, and lack of controlled trials." ECF No. 8253-2 at 218. Likewise, a 2015 systematic review of the literature regarding telepsychological services with criminal justice and

1   substance abuse clients done by Batastini et al. led the authors to conclude that "[t]he most
2   compelling discovery from this review was not only the scarcity of scientifically sound
3   evidence, but also the rarity of any evidence whatsoever."  ECF No. 8253-3 at 116; *see*
4   *also* ECF No. 8253-2 at 233-37 (fourth study involving carceral setting cited by Dr. Mehta
5   where authors found the results encouraging for the use of telehealth for incarcerated
6   populations but noted several limitations of the study, including statistically nonsignificant
7   results, small sample size, a number of variables, and likely selection bias).

8       Compared with patients in the community, incarcerated patients "have higher rates
9   of trauma, more serious treatment needs, and live in a much more challenging environment
10  for clinicians in terms of the ability to establish rapport and trust, keep patients safe, and
11  maintain confidentiality."  Stewart Decl. ¶ 50.  A policy that allows wholesale replacement
12  of onsite care with remote care for this population would be an experiment that has never
13  been attempted on such a wide scale, with no research to back it up.

14  **III.   DEFENDANTS ATTACK THE CREDENTIALS OF THE SPECIAL
        MASTER TEAM WITHOUT EVIDENCE AND INSTEAD OFFER EXPERT
15      TESTIMONY THAT THE COURT SHOULD DISREGARD**

16      Defendants dispute the qualifications of the Special Master's experts.  Defendants'
17  Objections at 17.  They argue that the Special Master's experts lack specialized expertise
18  in telehealth or telepsychiatry.  The objections are not well taken.  The Special Master's
19  experts have decades of experience in correctional mental health care, including direct
20  experience providing services in correctional settings.  The extensive experience of the
21  Special Master expert team includes:

22      •   Mary Perrien, PhD, who has worked as a licensed clinical psychologist in
23          correctional settings for at least 25 years, including through the provision of
24          therapeutic services for several years at California State Prison-Corcoran and
25          through oversight of all mental health programs for all of Idaho's
26          Department of Corrections.  See ECF No. 2162 at 1-10 (CV).

27      •   Maria Masotta, PsyD, who has over 15 years of experience working as a
28          licensed clinical psychologist in a variety of settings, including through the

1    provision of psychotherapy to incarcerated individuals at several different

2    institutions and supervising a team of clinicians as the Mental Health

3    Director at a Massachusetts prison.  See ECF No. 5192 at 21-28 (CV).

4    •    Brian Main, PsyD, who worked for several years as a licensed clinical

5    psychologist at CDCR institutions where he provided group and individual

6    therapy to incarcerated individuals, including as the Inpatient Unit Clinical

7    Director at Richard J. Donovan (RJD) Correctional Facility.  See ECF No.

8    6308 at 17-20 (CV).

9    •    Marcus Patterson, PsyD, who managed all behavioral health services for

10    Washington, D.C.'s Department of Corrections and has extensive experience

11    as a licensed clinical psychologist providing therapeutic services to

12    individuals in both correctional and non-correctional settings.  See ECF No.

13    7440 at 8-12 (CV).

14    •    Sharen Barboza, PhD, who has managed the provision of mental health care

15    in several different correctional systems across the country.  See ECF No.

16    6461 at 22-32 (CV).

17    •    Brett Johnson, MD, who served as the Chief Psychiatrist of RJD, where he

18    supervised all psychiatrists in that institution, as well as all psychologists and

19    social workers who worked in MHCBs at RJD.  See ECF No. 7391 at 14-21

20    (CV).

21    •    Kerry Hughes, MD, who has worked as a correctional psychiatrist since at

22    least 1990 and has served as a consultant or monitor in correctional cases in

23    at least five other jurisdictions apart from this case.  See ECF No. 5399 at

24    60-64 (CV).

25    •    Jeffrey Metzner, MD, who has worked in correctional psychiatry for over 40

26    years, has served as a monitor, court expert, or consultant in correctional

27    cases in at least 19 jurisdictions, and has written or edited hundreds of

28    publications on correctional mental health care, including the Oxford

[4524870.6]

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
TELEMENTAL HEALTH POLICY [ECF NO. 8253]

1   Textbook of Correctional Psychiatry.[1]  See Id. at 66-81 (CV).

2   While Defendants wrongly criticize the credentials of the Special Master's team,

3   they simultaneously laud Dr. Joseph Penn's own credentials in describing his approval of

4   their current policy.  Defendants' Objections at 16.  Yet, they fail to mention that another

5   federal court has already found Dr. Penn's testimony to be so lacking in credibility that it

6   repeatedly criticized him for having "opinions unworthy of any weight."  *Jensen v. Shinn,*

7   609 F. Supp. 3d 789, 858 (D. Ariz. 2022).  The *Jensen* court found that Dr. Penn's

8   opinions were "not based on an accurate and careful analysis of the population's needs,"

9   *id.* at 843; "reflects a profound lack of concern" for incarcerated patients, *id.* at 848; that

10  his opinions on class members' care had "no merit," *id.* at 853; and that his analysis of

11  various medical records was "ambiguous, inconsistent and of no value," *id.* at 856.  The

12  court also found that his endorsement of the care provided in the Arizona prisons was

13  "appalling and overwhelmingly contradicted by the evidence at trial," *id.* at 857, and that

14  his "indifference" to incarcerated patients "was devastating to his credibility and renders

15  his opinions unworthy of any weight." *Id.* at 857-58.

16  Plaintiffs offer the testimony of Dr. Pablo Stewart, an expert in the field of

17  correctional mental health care.  Having practiced extensively as a telepsychiatrist as an

18  on-call psychiatrist in Honolulu, Hawaii, and having observed telepsychiatry sessions as a

19  monitor or court expert in several different correctional systems, Dr. Stewart is qualified to

20  testify regarding the benefits and downsides of telemental health.  *See* Stewart Decl. ¶¶ 3-

21  9.  Dr. Stewart cautions against the implementation of a telemental health policy without

22  appropriate safeguards.  Stewart Decl. ¶ 14.

23  **RESPONSES TO DEFENDANTS' SPECIFIC OBJECTIONS**

24  **I.   THE SPECIAL MASTER'S LITERATURE REVIEW SUPPORTS A
      CAUTIOUS APPROACH TO REPLACING ONSITE WITH REMOTE**
25  **CLINICIANS.**

26  The fact that there is so little quality academic literature regarding the implemen-

27  tation of telemental health programs in carceral settings should counsel against the

28  widespread implementation of the use of tele-clinicians within CDCR.  A lack of scientific

1  support for a proposed course of action leaves an entity with two options:  It can use that

2  lack of evidence as a green light to implement a telehealth program on a wide scale, with

3  few safeguards, or it can move more slowly, imposing reasonable policy safeguards until

4  there is more evidence that removing onsite clinicians completely from the care of 96

5  percent of patients will not harm the provision of care. It was reasonable for the Special

6  Master to recommend the latter course, and, given the many ways in which Defendants'

7  telemental health program affects their ability to comply with other remedial orders in this

8  case, it is reasonable for the Court to choose the same course.

9      Defendants' criticism of the Special Master's reliance on the American Psychiatric

10  Association's *Resource Document on Telepsychiatry for Adults in Jails and Prisons* is also

11  baseless.  They claim that this document is not a "standard" merely because it contains

12  stock language indicating that "[t]he findings, opinions, and conclusions of this report do

13  not necessarily represent the views of the officers, trustees, or all member of the American

14  Psychiatric Association."  Defendants' Objections at 18-19.  But the Resource Document

15  explicitly notes that it was "[a]pproved by the Joint Reference Committee" in February

16  2023, meaning that the APA's Joint Reference Committee has reviewed the document,

17  agrees with it, and has allowed for it to be released as an official APA Resource

18  Document.  *See* Am. Psychiatric Assoc., "Joint Reference Committee," available at

19  https://www.psychiatry.org/about-apa/meet-our-organization/board-of-trustees/joint-

20  reference-committee (last accessed July 9, 2024) (noting that the Joint Reference

21  Committee reviews positions statements and resource documents and can refer them back

22  to the authors for further review if necessary).

23      Defendants' implication that the Special Master's citation to the document is

24  somehow improper simply because one of the co-authors is Special Master expert

25  Dr. Jeffrey Metzner is ridiculous.  The document in question was drafted by Dr. Metzner

26  *along with ten other experts in the field of psychiatry* and was approved by the APA Joint

27  Reference Committee; for Defendants to imply that this document was written simply

28  because it was at a time that the issues regarding telepsychiatry and telemental health

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
TELEMENTAL HEALTH POLICY [ECF NO. 8253]

1  "were being litigated" defies common sense.  Rather, the fact that Dr. Metzner took part in

2  the drafting of this guidance document published by one of the preeminent governing

3  bodies of psychiatry merely reflects Dr. Metzner's deep and wide-ranging experience in

4  correctional health care, as discussed above.  *See* Stewart Decl. ¶ 21.

5    Defendants also dispute the Special Master's finding that telepsychiatry studies

6  have limited application to the work of remote psychologists and social workers.

7  Defendants' Objections at 23.  The Special Master is correct that the roles of psychiatrists

8  are different from the other clinicians in CDCR.  The focus of psychiatric work in CDCR

9  is medication management and diagnostic clarification, not individual therapy.  Stewart

10  Decl., ¶ 15.  As the Special Master found, the differences in the roles between psychiatrists

11  and clinicians is reflected in the much higher caseloads that psychiatrists carry compared

12  to clinicians.  Special Master Telemental Health Policy Report at 23.  The fact that a

13  psychiatrist is assigned to 120 EOP patients, compared to 26 patients for a primary

14  clinician, reveals that primary clinicians are expected to have more frequent contacts and

15  spend more time during each contact with each of their patients.  *Id.*  Moving to telehealth

16  when a psychiatrist is having a short conversation about the effects of medication is quite

17  different from a shift to telehealth for clinicians who are having repeated hour-long therapy

18  sessions remotely, especially in a prison setting where confidentiality and trust-building

19  are more important and more difficult to come by.  Stewart Decl. ¶¶ 35-36, 38.

20  **II.    TELEMENTAL HEALTH IS NOT CLINICALLY-APPROPRIATE AT THE
          MHCB AND PIP LEVELS OF CARE, EXCEPT IN EMERGENCY
21          SITUATIONS**

22    Defendants object to the Special Master's proposed safeguards on the use of

23  telemental health in the highest level of care programs in CDCR's Mental Health Services

24  Delivery System (MHSDS)—the MHCB and PIP units.  Defendants' Objections at 18-19.

25  The Special Master recommends that telemental health be permitted for "emergency use

26  only" in MHCB and PIP programs "as a last resort … consistent with the Telepsychiatry

27  Policy."  Special Master Telemental Health Policy at 28.  Defendants argue that their

28  existing policy, which states that "CDCR will not use telemental health in lieu of on-site

[4524870.6]                                    20

1  mental health providers at the inpatient levels of care for any reason other than a lack of

2  availability of on-site mental health providers," is "clearer and easier to understand" than

3  the Special Master's more restrictive recommended language.  Defendants' Objections at

4  23-24.  Defendants also argue that the Special Master's preferred language requires each

5  individual patient's situation to become an "emergency situation" before clinicians can

6  work via telehealth at these levels of care.  *Id*. at 24.

7        The latter argument is a red herring.  The "emergency use only" language in the

8  Special Master's recommendation is clearly intended to make the policy consistent with

9  the existing Court-approved Telepsychiatry Policy, which it closely resembles.  *Compare*

10  ECF 8165-1 (App'x A) at 6 (Proposed Telemental Health Policy re MHCBs), *with* ECF

11  6539 at 7-8 (existing Telepsychiatry Policy).  As used in both policies, "emergency use"

12  means that the remote clinical resource may only be used during a temporary period of

13  clinician unavailability, and only for a limited period of time.  That is why both policies

14  specify that "[i]f a [telepsychiatrist or telemental health clinician] is required to serve in an

15  MHCB for greater than 14 consecutive calendar days, this would not be consistent with

16  this policy's objective" and why both policies require CDCR to develop a formal plan in

17  such circumstances to address the underlying staffing issue.  *Id*.  Both policies also

18  stipulate that CDCR may use remote clinicians in "emergency situations when an onsite

19  [psychiatrist, psychologist or social worker] is not [assigned to the program or not

20  available]."  *Id*.  There is clearly no requirement that each individual patient's condition

21  turn into an emergency before the use of remote clinical resources.

22        Defendants' proposed language, by way of contrast, would allow use whenever on-

23  site staff is "unavailable."  This language is vague and open-ended.  It would permit

24  ongoing use of remote clinical resources in prisons located in areas without available

25  mental health staff, and it would not require Defendants to develop a special plan to

26  address the onsite staffing problem if telepsychiatry or telemental health is used

27  continually in an MHCB or PIP.  For that reason, given the importance of the in-person

28  clinical care provided in these highest-level inpatient treatment units, Defendants'

1  proposed policy language must be rejected.

2  As Plaintiffs' expert, Dr. Stewart, explains, "onsite psychology should always

3  overwhelmingly predominate at the MHCB and PIP levels of care."  Stewart Decl. ¶ 42.

4  Dr. Stewart, who provides care via telepsychiatry, notes that his "personal experiences also

5  lead [him] to conclude that inpatient care should be provided by in-person clinicians" and

6  that, "[d]ue to the intensity of the mental health needs at the MHCB and PIP levels of care,

7  in-person clinicians are better equipped to manage and treat the population."  *Id.*  ¶ 46.

8  Moreover, the evidence base for the use of telepsychiatry or telemental health in

9  inpatient programs—even in the community, yet alone in the understudied prison setting—

10  is weak, as a number of literature reviews and resources on telepsychiatry and telemental

11  health note.  For example, the American Psychiatric Association's online Telepsychiatry

12  Practice Guidelines and Toolkit, which was cited by Dr. Penn and Dr. Mehta favorably,

13  acknowledges that "the development of inpatient [t]elepsychiatry programs has lagged

14  behind that of outpatient programs."  *See* Am. Psychiatric Ass'n, "Telepsychiatry Toolkit:

15  Inpatient Settings," (last accessed July 12, 2024), available at

16  https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/inpatient-settings.

17  Because of this, the APA cautions that "more research is needed on implementation,

18  outcomes, and guidelines for inpatient … settings."  *See* Hilty, Donald M., "Telepsychiatry

19  Toolkit: Evidence Base", Am. Psychiatric Ass'n, (last accessed July 12, 2024), available at

20  https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/evidence-base.

21  Similarly, in reviewing evidence-based telepsychiatry guidance for clinicians during the

22  height of the COVID-19 pandemic, Smith, Ostinelli, Macdonald, & Cipriani (2020) found

23  that several important populations were not missing from the literature, including those

24  with psychosis and personality disorders, and that settings less well-studied by scholars

25  included prisons and inpatient units.  *See* Smith et al., "COVID-19 and Telepsychiatry:

26  Development of Evidence-Based Guidance for Clinicians," JMIR Mental Health (Aug.

27  2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7485934/.

28  In addition, the February 2023 APA Resource Document on Telepsychiatry in Jails

[4524870.6]

22

1  and Prisons cautions against the use of telepsychiatry in higher levels of care, explaining

2  that "[i]t is the opinion of the authors that telepsychiatry in higher levels of care be used as

3  a last resort or in very specific situations, such as when in-person recruitment is not

4  successful."  *See* APA Resource Guide on Telepsychiatry in Jails and Prisons (February

5  2023) at 4, available at https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-

6  90ba-5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf.

7  Dr. Stewart agrees with this opinion and with the conclusion of the Special Master, based

8  on his literature review, that research in recent years into telemental health "shows lack of

9  replication of results, and minimum investigation of correctional settings."  Stewart Decl.

10  ¶ 23; *see also* Special Master Telemental Health Policy Report at 22 (describing "minimal

11  research regarding telemental health in correctional settings").  Dr. Stewart also cites a

12  number of reviews and studies concluding that the literature is particularly sparse on

13  inpatient settings, for use in crisis services, and in carceral settings more generally.  *Id.*

14  ¶¶ 22-26, 42-46.  Given the expert evidence expressing concerns about and the lack of

15  support for using telepsychiatry and telemental health in these settings, the Special

16  Master's proposed safeguards regarding telemental health in these high-risk inpatient

17  settings is clearly necessary, narrowly tailored, and appropriate to protect the current

18  Program Guide remedy.

19  **III.   THE SPECIAL MASTER'S INFORMED CONSENT PROVISIONS ARE
       NECESSARY FOR APPROPRIATE CARE OF CDCR'S PATIENTS**
20

21       Defendants object to the Special Master's revisions to their informed-consent

22  process.  In its current policy, CDCR clinicians are only required, at the beginning of the

23  patient's first telemental health contact, to "explain[] the treatment modality, including a

24  description of the role of the telepresenter and a plan for a response to interruption in

25  services."  ECF No. 8165-2 (Ex. D) at 68.  This bare verbal informed consent is

26  inadequate.  First, it is not "consent" in any sense of the word.  Defendants admit that their

27  "informed consent" process does not give the patient a choice at all:  Their policy provides

28  that "[i]f a patient refuses treatment via telemental health, the patient's telemental health

1  provider may meet with the other members of the patient's treatment team to consider

2  mental health reasons … or any other relevant factors to determine whether telemental

3  health is an appropriate delivery method for the patient."  ECF No. 8165-2 (Ex. D) at 69.

4  But the choice is left to CDCR staff, not the patient.  This is not in accord with the

5  standard of care.  Stewart Decl. ¶ 77-85.

6        Defendants' preferred informed-consent process is inadequate in other ways as

7  well. It does not require disclosure of potential risk to confidentiality and privacy that

8  comes with remote treatment, fails to require the clinician to explain the risks and benefits

9  of telemental health generally, fails to allow the patient to ask that the telepresenter not be

10  in the room during therapy sessions, and fails to include the patient's right to revoke their

11  informed consent at any time.  All of these elements are part of the standard of care.  *See*

12  Stewart Decl. ¶¶ 77-85.  Defendants' policy also does not comply with Regulations, Title

13  15, of the California Code, which states the patient must be "made aware of risks, benefits,

14  and alternatives to proposed treatment" and must be "able to agree and clearly agrees to

15  the recommended treatment."  Cal. Code Regs., tit. 15, § 3999.98 (definition of informed

16  consent).  The current policy contains none of these provisions.

17        Defendants discuss ethical guidelines from the National Association of Social

18  Workers (NASW) and the American Psychological Association.  Defendants' Objections

19  at 28.  The NASW guidelines support the Special Master's recommendations in that they

20  state that social workers are expected to provide their patients with a choice: They must

21  explain the client's right to refuse or revoke consent, should obtain informed consent

22  specific to the use of telehealth when it is in use, and assist them with finding an in-person

23  provider when patients do not give consent to the use of telehealth.  Special Master

24  Telemental Health Policy Report at 26 (citing NASW Code of Conduct, available at

25  https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-

26  English/Social-Workers-Ethical-Responsibilities-to-Clients).  These guidelines confirm

27  what is obvious: Informed consent requires the ability to opt out of the modality that is

28  being offered.

[4524870.6]

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S PROPOSED
TELEMENTAL HEALTH POLICY [ECF NO. 8253]

Similarly, the American Psychological Association's guidelines regarding the use of telepsychology do not, as Defendants claim, support taking away this choice from the patient. The cited guidelines merely indicate the American Psychological Association's concerns with telemental health and their appropriateness, or lack thereof, for each individual client. Stewart Decl. ¶¶ 83-84. The assertion that individual preference is not the sole determination in deciding whether telehealth is appropriate is more about making sure that the patient understands the benefits and risks of telehealth and that his or her consent is not unwisely given—which is in line with the Special Master's proposed policy. *Id.* The guideline at no point indicate that a patient should be forced to engage in telepsychology if they want to receive any psychological services at all.

Defendants speculate that requiring informed consent will encourage "clinician-shopping." Defendants' Objections at 29. Even if patients opt out of receiving telemental health care, they would have no greater ability to choose the particular clinician that they are seeing than they do presently; it would merely permit them to choose broadly between two different modalities. Stewart Decl. ¶ 83. On the other hand, forcing patients to receive mental health care in a modality that they do not find effective is only going to harm the patient-provider therapeutic relationship, a relationship that already comes with more barriers to establishing successfully in the prison setting. *Id.*

Defendants contend that the Court can only modify Defendants' informed-consent policy if it finds that "the Eighth Amendment *requires*" patient choice. Defendants' Objections at 28-29. As noted above, "the language of the PLRA does not suggest that Congress intended a provision-by-provision explanation of a district court's findings." *Armstrong*, 622 F.3d at 1070.

## IV.    TELEMENTAL HEALTH PATIENTS MUST BE PERMITTED TO ASK THAT THE TELEPRESENTER NOT BE PRESENT DURING THERAPY

Defendants also object to the recommendation that as part of the informed consent process, the patient "will be informed at every session that they can choose not to have a telepresenter in the room during any counseling/therapy session that will be documented in

a progress note." Special Master Telemental Health Policy Report at 27. Defendants assert that they generally agree with the Special Master that not having the telepresenter in the room should be an option for the patient, or the clinician, but they believe that it is important for "the telemental health provider to have the final say regarding the presence of the telepresenter in certain situations for patient safety." Defendants' Objections at 24.

Allowing the patient to choose not to have the telepresenter in the room for the full visit does not mean the telepresenter cannot assist at the beginning of the meeting before the therapy session starts. Moreover, the presence of a third party in the room, without consent, inhibits open communication and interferes with the establishment of a therapeutic relationship. Stewart Decl. ¶ 87. It also raises concerns for the patient about confidentiality, which is more pressing in prisons than the community. *Id.*

## V.    THE SPECIAL MASTER'S RECOMMENDATIONS TO PREVENT COMPLETE ELIMINATION OF ONSITE CLINICIANS ARE APPROPRIATE

### A.    EOP Requires a Significant Onsite Presence

Defendants also object to the Special Master's proposed requirement that each EOP program must maintain at least 40 percent of its on-site case manager positions to provide in person, face-to-face treatment. *See* Defendants' Objections 31-34; Special Master Telemental Health Policy Report at 28-30 ("[T]here shall be a minimum of … 40 percent allocated provider positions for EOP filled by onsite clinicians present at the facility."). This restriction is weaker than what Plaintiffs requested, which is a requirement that 80 percent of clinical case manager positions be mandated on-site. *See* ECF No 8252 at 7-15.

Plaintiffs' and the Special Master's proposed requirements are necessary to ensure to achieve the purposes of the EOP. *See* Special Master Telemental Health Policy Report at 28 (quoting 30th Round EOP Report finding that "[w]ithout the advocacy of mental health clinicians—on-site, fully immersed in the carceral environment their patients reside in, and empathic to the impact of that environment—the daily lives of many *Coleman* class members may likely be very different than it is today"); *id.* at 29 (noting that balancing "these 'distinct needs' [of custody and mental health treatment] requires ongoing collabo-

ration between mental health staff and their partners in custody, for instance, through the Court-ordered" CMHPP.  The EOP, and the specific elements identified by the Special Master as requiring onsite clinicians, are critical components of the existing remedy.

The EOP is precisely the type of setting where the telemental health research advises caution.  For example:

- Barnett, P., et al (2021), cited by Dr. Penn, notes in an umbrella review of systemic reviews of telemental health that "[w]e also did not find substantial evidence on settings of particular interest, such as mental health inpatient services."  Barnett et al, "Implementation of Telemental Health Services Before COVID-19: Rapid Umbrella Review of Systematic Reviews," J. Med. Internet Research, 23:7 (2021), at 29, available at https://www.jmir.org/2021/7/e26492/PDF.  The review also references clinician reports of "therapeutic alliance [being] poorer with telemental health." *Id.* at 28.

- Sugarman, D.E. et al (2023), also cited by Dr. Penn, noted in a narrative review of telemental health literature that "there are several clinical populations or treatment modalities under-represented in this literature (e.g., children/adolescents, psychotic disorders, personality disorders, group therapy)."  Sugarman D.E. et al, "Telemental Health for Clinical Assessment and Treatment, British Medical Journal (BMJ) State of the Art Review (2023), at 7, available at https://www.bmj.com/content/bmj/380/bmj-2022-072398.full.pdf.

- Hilty, D.M., et al (2018), also cited by Dr. Penn, noted that "more research is need for inpatients, those who are incarcerated or in emergency rooms."  Hilty, D.M., et al, "An Update on Telepsychiatry and How It Can Leverage Collaborative, Stepped, and Integrated Services to Primary Care," Psychosomatics, 59:3 (2018), at 237, available at https://www.sciencedirect.com/science/article/pii/S0033318217302670?via

1          %3Dihub.

2     •     Shore (2020) opines that all psychiatrists need to "understand a technology's

3          effect on clinical processes," specifically "rapport, communication, and

4          treatment outcomes."  *See* Shore, Jay H., "Managing Virtual Hybrid

5          Psychiatrist-Patient Relationships in a Digital World," JAMA Network

6          Insights, 77:5 (March 2020), at 1, available at

7          https://jamanetwork.com/journals/jamapsychiatry/article-abstract/2762527.

8          "For some patients, telepsychiatry "can create a sense of emotional or virtual

9          distance," which is why it is important to continuously assess "the best

10         adaption of a technology to a patient's clinical circumstances in the context

11         of administrative and operational considerations." *Id.*

12         EOP units are functionally inpatient units.  Stewart Decl.  ¶¶ 28, 33.  As Dr. Stewart

13   explains, EOP programs are virtually synonymous with an inpatient setting.  EOP patients

14   are a high0risk, mentally ill population with serious mental disorders such as psychotic

15   disorders, including schizophrenia, schizoaffective disorder, psychotic disorders, bipolar

16   disorders, and substance-induced psychotic disorders.  Many patients in the EOP programs

17   decompensate even with the EOP level-of-care treatment supports available, and go back

18   and forth to Acute, MHCB, and Intermediate PIP programs." *Id.*  The February 2023 APA

19   Resource Document on Telepsychiatry in Jails and Prisons specifically includes

20   "residential treatment units" like the EOP in CDCR, in the category of settings, along with

21   inpatient units, where "it is the opinion of the authors that telepsychiatry … should be used

22   as a last resort or in very specific situations."  APA Resource Document at 4.  The

23   Resource Document notes that concerns with using telemental health at these levels of care

24   include the ability to interact with other staff (clinical and custody), awareness about

25   "milieu issues and risks to patient safety," and "control of the therapeutic environment."

26   *Id.*  Dr. Stewart agrees with these concerns.  Stewart Decl. ¶ 40.

27         Defendants' proposal puts limits on replacing onsite with remote care in inpatient

28   units.  Mehta Decl., ECF No. 8253-2 ¶ 25.  Defendants, however, would permit fully

1  remote care in EOP programs.  Functionally, this makes no sense.  Stewart Decl. ¶ 33  ("In

2  my opinion, the CDCR EOP programs are not easily distinguished from the inpatient and

3  crisis units where CDCR agrees that on-site providers are preferred.")  Like the PIP and

4  MHCB programs, the EOP is an intensive, residential treatment program for individuals

5  with serious and severe mental illnesses.  *Id.*  Like inpatient patients, EOP patients live in

6  and receive treatment in separate, specifically-designated housing units.  *Id.*  Like inpatient

7  patients, EOP patients often also have their own yard and work and education programs,

8  and eat in their own dining halls.  *Id.*  These are all key characteristics that EOP programs

9  share with PIP and MHCB programs.  *Id.*  Moreover, EOP patients have serious mental

10  health disorders and some will have clinical contraindications for the use of telemental

11  health.  *Id.* ¶ 41.

12      The modest limitations recommended by the Special Master on how many EOP

13  case managers may be remote are important safeguards that the Court should approve, if it

14  declines to adopt Plaintiffs' request for even stricter limits. Onsite clinicians are essential

15  in the EOP.  They perform vital functions, such as collecting collateral information about

16  their patients, educating custody and nursing staff about mental health conditions and

17  patient needs, engaging in informal interactions with patients, advocating for patients to

18  address safety concerns or custody concerns, and supporting other clinical staff doing the

19  difficult work of correctional mental health.  Stewart Decl. ¶ 31.  The APA Resource

20  Document raises similar concerns about remote mental health workers, noting that "[a]

21  challenge to remote working arrangements is the diminished opportunity to build

22  important relationships with coworkers."  APA Resource Document at 6.  The Resource

23  Document explains that "[t]elepsychiatrists who are off-site are not part of the

24  conventional flow of information through the day, which often includes informal

25  conversations with staff and other patients as well as patient observations outside of

26  appointments (Kaftarian, 2019)."  *Id.*  The same dynamic holds true for tele-clinicians, and

27  Defendants have not provided any evidence that they have put in place procedures to

28  overcome these problems, yet alone to show that such procedures work.

[4524870.6]

29

1   Defendants argue that the Special Master's concerns about the impact of remote

2   workers on the therapeutic milieu of mental health units are speculative.  See Defendants'

3   Objections at 32.  However, the Special Master's reporting on telemental health grounds

4   these concerns in specific factual findings from the 29th and 30th rounds discussed above.

5   ECF No. 8252 at 12-13 (citing ECF No. 8095; Special Master's 29th Round EOP

6   Monitoring Report, ECF No. 7715).  And the Special Master has also made concrete

7   factual findings now adopted by the Court about the failure of remote workers to

8   participate in the CMHPP.  *Id.*  In the Special Master's 30th Round Report on EOP

9   institutions, for example, he reported that *staff* at SVSP "believed that telepsychiatrists

10  generally did not fully grasp safety and security issues, as well as staff and patient

11  experiences."  ECF 8095 at 230.  Moreover, mental health leadership at SVSP "reported

12  that many telepsychiatrists viewed the facility as 'out of sight, out of mind.'"  *Id.*  The

13  Special Master also interviewed telepsychiatrists for his 2022 report on telepsychiatry and

14  found that some "interviewed telepsychiatrists were unfamiliar with the Program Guide

15  and several could not name any correctional officers at the institution."  ECF 7682 at 41.

16  That evidence shows that many telepsychiatrists have not been having a positive impact on

17  the treatment milieu inside CDCR prisons.

18  The proposed limits recommended by the Special Master and Plaintiffs on remote

19  EOP clinicians are critical to maintaining the therapeutic nature of EOP programs, to

20  implementing the CMHPP, to protecting EOP patients, and to ensuring appropriate

21  therapeutic alliances between patients and providers.  *See* Stewart Decl. ¶¶ 29, 31, 35-36.

22  **B.     The Special Master's and Plaintiffs' Proposed Limits on Telemental
          Health in CCCMS Programs are Appropriate**

23

24  The Special Master recommends that "there shall be a minimum of 20 percent of

25  allocated provider positions for 3CMS" programs.  Special Master Telemental Health

26  Policy Report at 29-30.  Some onsite case managers are necessary to perform the key

27  functions the Special Master's recommends be required to be done by onsite clinicians,

28  including suicide assessments, cell-front assessments of patients who are refusing to come

1    out for appointments, use of force de-escalation efforts, therapeutic groups, and five-day

2    follow up check ins.  *Id.* at 30-35.

3         The CCCMS section of the 2009 Staffing Plan described the functions of CCCMS

4    case managers as to "monitor the clinical needs and movement of MHSDS inmate-patients

5    within and between CDCR institutions," through regular contact with patients,

6    interdisciplinary treatment team reviews, and group treatment.  ECF No. 3693 at 11-12.

7    Although CCCMS patients are lower-level acuity patients than EOP patients, they

8    experience periodic decompensation, suicidality, and other serious mental health crises.

9    Shifting their care entirely to remote case managers, and leaving no core of onsite

10   clinicians, will hinder CDCR's ability to move toward compliance with the *Coleman*

11   remedy.  Stewart Decl. ¶ 50-52.

12        The Special Master's safeguards are a pragmatic attempt to preserve crucial parts of

13   the *Coleman* remedy, including the CMHPP plan, and to ensure enough onsite clinicians in

14   these units to maintain an appropriate balance between custody staff and clinical staff.  *See*

15   *generally* Special Master Telemental Health Policy Report at 28-29.  The same in-person

16   huddles, joint rounding, and shift change consultations that are necessary in the EOP are

17   also necessary in CCCMS.  *See* Feb. 20, 2019 Order, ECF No. 6095 at 6.  The Special

18   Master's 29th and 30th Round Monitoring Reports found significant problems with

19   CHMPP implementation in CCCMS units.  *See* Twenty-Ninth Round CCCMS Monitoring

20   Report - Part D, ECF 7716 at 79-80 (noting failures related to joint rounding and huddles

21   and that "only four institutions conducted monthly joint supervisory 3CMS program areas

22   tours"); *id.* at 82 ("There was a considerable need to increase collaboration between the

23   disciplines and thereby effectively implement monthly inmate advisory council (IAC)

24   meetings," as required by the CMHPP); *id.* at 84 ("[A]s for attendance at off-post

25   partnership and quarterly partnership round table training, most institutions either reported

26   noncompliance or compliance could not be determined.").

27

28

C.    **The Requirement For At Least One Full-Time On-Site Case Manager in RHU Units is Appropriate in the Absence of a Requirement that All RHU Care Be On Site**

The Special Master's Report recommends a requirement that every Restricted Housing Unit (RHU) "have at least one [full-time] on-site primary clinician assigned to the unit and present during regular workdays and hours."  Special Master Telemental Health Policy Report at 32.  Plaintiffs sought a ban on telemental health treatment in RHUs and objected to the Special Master's Report for failing to recommend such a ban.  *See* ECF No. 8252 at 15-18.

CDCR's segregation units, now called RHU units, "are very high-risk units" where "[i]individuals with pre-existing mental health conditions often decompensate in the harsh, locked-down conditions in segregation units."  Stewart Decl. ¶ 91.  "[P]lacement of seriously mentally ill inmates in California's segregation units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide." *Coleman*, 28 F. Supp. 3d at 1095.  More than 23 percent of the suicides completed in CDCR between 2019 and 2023 took place in RHU units.  *See* Lindsay Hayes's Sixth Re-Audit of CDCR's Suicide Practices, ECF No. 8143-1 at 86.

The general lack of programming and activity in segregated units makes them dangerously isolating for people with serious mental health conditions.  Stewart Decl. ¶ 91.  Having onsite clinicians is important to decrease patient isolation and to facilitate informal wellness checks on patients who are struggling and to respond to crises.  *Id*.  Having onsite clinicians is also important to establish regular out-of-cell follow-up with these vulnerable patients, and to engage with those who initially refuse to come out for treatment.  *Id*.

The Special Master's recommendation is crucial to maintain the safety of patients in these units and to provide them with adequate care.

**VI.    THE SPECIAL MASTER'S RECOMMENDATION FOR TELEMENTAL HEALTH CASE MANGERS TO HAVE MULTIPLE ANNUAL SITE VISITS AT THEIR ASSIGNED INSTITUTIONS IS NEEDED TO MEET THE STANDARD OF CARE AND ENSURE CULTURAL  COMPETENCE**

The Special Master's Report recommends that telemental health providers visit their assigned institutions and meet with patients in person when there.  *See* Special Master Proposed Telemental Health Policy Report at 30.  The frequency of the visits is the same as in the telepsychiatry policy:  CCCMS telemental health workers must conduct two one-day site visits per year, and EOP telemental health workers must conduct four one-day site visits per year.  *Id.*  Defendants' policy would require one visit per year at all levels of care, with no patient meetings.  Defendants' Objections at 34-36.

Frequent onsite visits by telemental health workers to the prisons where they work are critical to educate remote telemental health clinicians about the culture and conditions of the prisons in which their patient's reside.  Stewart Decl. ¶ 60. As Dr. Stewart explains, "telemental health workers, just as all other mental health clinicians, have certain clinical obligations to their patients, which include being knowledgeable about the culture and environments in which they are providing care."  *Id.* ¶ 61.  The American Psychiatric Association, in its online Telepsychiatry Practice Guidelines and Toolkit, which Defendants' experts both cite favorably and extensively,[4] recommends that telepsychiatrists practicing in any type of cross-cultural setting conduct "periodic site visits" and ensure they are "informed of events occurring in the communities in which patients are located."  *See* Shore, Jay, "Use of Telepsychiatry in Cross-Cultural Settings," Am. Psychiatric Ass'n, available at https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/use-of-telepsychiatry-in-cross-cultural-settings.  As one scholar explained it, telepsychiatrists (and by extension telemental health workers) need to be aware of "resources, cultural issues, and environmental factors affecting patients in remote environments with which clinicians may not have familiarity" in order to properly manage

---

[4] *See* Mehta Decl., ECF No. 8253-2 ¶ 21; Penn Decl., ECF 8253-1 ¶ 48.

the clinician-patient relationship.  Shore, Jay H., "Managing Virtual Hybrid Psychiatrist-Patient Relationships in a Digital World," JAMA Network Insights, 77:5 (March 2020), at 1, available at https://jamanetwork.com/journals/jamapsychiatry/article-abstract/2762527. This kind of cultural competence is part of the standard of care in the community.  Stewart Decl. ¶ 61-62.  Prisons have their own cultures and their own cultural problems, as the Court noted in approving the CMHPP.  *See* ECF No. 5477 at 6 ("Constitutionally adequate mental health care requires not only sufficient staff. … [I]t also requires a collaborative culture between custody and mental health staff in each prison institution that houses mentally ill inmates.")

Compared to patients in the community, patients in prison tend to have "substantially higher acuity of medical and mental illness" and "they are also subjected to … objective stressors that are profound and singular."  Stewart Decl. ¶ 62.  Their movements are restricted, their choices are limited, and incarceration itself leads to further psychiatric decompensation.  *Id*. ¶ 63.  Prison is a "unique reality … that most psychologists and social workers are not familiar with."  *Id*.  One one-day visit a year is not enough to gain adequate knowledge of a prison and its culture and conditions.  *Id*.

Dr. Mehta argues that, in the community, the standard of care does not require mental health clinicians to visit institutions housing patients, "even in situations where the patient's environment would be less familiar to the clinician and potentially more relevant than living in prison (e.g., patients who live in shelters, patients who live in rural versus suburban areas, etc.)."  Mehta Decl., ECF 8253-2 ¶ 41. But the APA Toolkit, quoted above, would appear to recommend site visits in these community settings listed by Dr. Mehta, as well as in prisons.

Experts in correctional mental health services endorse building up the kind of local knowledge best gained through in person visits.  As Kaftarian (2020) explains in his article on telemental health in rural correctional institutions, remote providers such as telepsychi-atrists "should be cognizant of some of the limitations to being located remotely.  This includes potential challenges to accessing information that may be more readily available

to onsite staff about activities of the facility.  Events such as riots, racial tension, or suicides may adversely affect the mental and emotional condition of patients.  Without the knowledge of these events and familiarity of the dynamics of the facility, telemental health staff may potentially be at a disadvantage."  Kaftarian, E., 'Telemental Health in Rural Correctional Institutions," Mhealth, 6:23 (2020), at 2, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7327283/pdf/mh-06-2019.12.05.pdf. Frequent site visits are also helpful because they can help integrate the remote clinician into the treatment team.  Stewart Decl. at ¶ 66.

Cultural competence also requires clinicians to interact with some patients face-to-face during these site visits.  Stewart Decl. ¶ 65.  Such interaction is necessary so that the clinician can gain insight into the ways in which prison impacts a patient's state of mind in ways that are not possible over a video connection.  *Id.*

## VII.   THE SPECIAL MASTER APPROPRIATELY CONCLUDED THAT CELL-FRONT TELEMENTAL HEALTH CONTACTS SHOULD NOT COUNT TOWARDS MANDATORY CLINICAL CONTACTS IN *COLEMAN* AND THAT CELL-FRONT CONTACTS SHOULD NOT BE PERMITTED IN HIGH-RISK RHU UNITS

The Special Master's Report recommends that "consistent with the court-approved Telepsychiatry Policy," cell-front telemental health contacts not count towards Program Guide compliance.  Special Master Telemental Health Policy Report at 30-31.  The Special Master also recommends that cell-front telemental health contacts not be permitted in Restricted Housing Units (RHUs).  ECF No. 8165-1 (App'x A) at 6 (Special Master's proposed policy, stating that "[c]ell-front telemental health contacts in RHU are not permitted).  Plaintiffs had sought a ban on all telemental health treatment for patients in RHUs.  ECF 8252 at 15-18.

The Court has long recognized the importance of in-person interactions for *Coleman* class members, particularly in RHUs.  In the April 10, 2014 Enforcement Order on segregation issues, the Court noted the need of patients in RHUs for "interaction with others" in order to "ameliorate the anti-therapeutic effects of isolation on the mentally ill patient."  *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1103 (E.D. Cal. 2014) (quoting from

1   the Special Master's 25th Round Monitoring Report, ECF No. 4298 at 37.).  The Program

2   Guide's controlled use-of-force policy also requires that "every institution shall ensure a

3   mental health clinician (Psychologist, Psychiatrist, or Clinical Social Worker) *is present*

4   during all controlled use of force incidents (cell extractions)."  ECF 7333-1 at 573

5   (emphasis added).

6        But even outside a segregation unit, while a patient's refusal to leave their cell for

7   an in-person evaluation in a confidential setting can be for a variety of reasons, almost all

8   of them tend to reflect some type of clinical deterioration.  Stewart Decl. ¶ 67.  In some

9   cases, individuals refusing to leave their cells are experiencing mental health

10  decompensation and becoming "cell dwellers" whose self-care ability and mental health

11  functioning can spiral downwards.  *Id.* ¶ 68.  As Dr. Stewart explains, when this happens, a

12  clinician at the cell front performs many vital tasks, including attempting to convince the

13  patient to leave the cell, assessing danger to self or others, and assessing whether the need

14  for treatment is so urgent as to justify bringing the patient out by force.  *Id.*  As Dr. Stewart

15  explains, while cell front treatment is always inferior due to the lack of confidentiality and

16  difficulty of communicating, "cell-front assessments may sometimes be necessary to

17  ensure that mentally ill individuals do not harm themselves" or others.  *Id.* ¶ 69.  In these

18  circumstances, a live human being is better able to communicate through CDCR cell

19  doors, and better able to minimize the disclosures of confidential information—for

20  example, by pitching his or her voice at the just the right level to be heard, or talking

21  though the opening at the side of the door.  *Id.* ¶¶ 71, 73.  "The remote nature of telemental

22  health inhibits such assessments at cell front, especially when someone is decompensating

23  or in crisis."  *Id.* ¶ 69.

24       These concerns support an outright ban on cell-front telemental health contacts.  *Id.*

25  ¶72.  The Special Master's recommendation is not to count such contacts toward the mini-

26  mum contact frequency necessary to meet the Program Guide requirements.  This is neces-

27  sary to ensure that the patient does not go for a long period of time with no clinical contact

28  other than seeing a person on a laptop screen through the cell door while the patient is in

1  crisis.  *See* Special Master Telemental Health Policy Report at 31.  These same concerns

2  also lend support to the Special Master's requirement that patients who refuse two

3  telemental health contacts will be referred for a contact with an onsite clinician.  *Id*.

4  **VIII.   SPECIAL PURPOSE CONTACTS**

5         **A.     Emergent/Urgent Referrals and Suicide Risk Assessments**

6         The Special Master's revisions to Defendants' policy would bar the use of

7  telemental health for suicidal patients "except as a last resort in emergency situations when

8  the institution's assigned on-site crisis clinician (i.e., psychologist and/or licensed clinical

9  social worker (LCSW) personnel are not available."  Special Master Telemental Health

10 Policy at 33; ECF 8165-1 (App'x A) at 6-7.  As the Special Master notes, this is consistent

11 with the July 8, 2021 Crisis Intervention Teams Policy, which requires suicidal patients to

12 be seen "in-person."  Special Master Telemental Health Policy at 33 n.20.

13        Restricting remote telemental health treatment of suicidal patients as the Special

14 Master has done is appropriate to preserve the current remedy and reduce the high suicide

15 rate in CDCR.  *See generally* ECF No. 7333-1 at 168-196 (chapter on suicide prevention);

16 ECF 8143-1 at 86 (noting recent high annual suicide rates in CDCR).  The Program Guide

17 requires a "face-to-face evaluation" of suicidal individuals by an onsite clinician whenever

18 possible, and requires that the evaluation be taken over by another onsite clinician the

19 primary clinician is not present.  *See* ECF 7333-1 at 175.  Shifting this "face-to-face"

20 contact to a video contact would be a major modification of the remedy.

21        In-person care is the safest and most effective mode of providing treatment to

22 suicidal individuals.  Stewart Decl. ¶ 54.  An increased risk to self or others is a "clinical

23 red flag" that should trigger an urgent, in-person consultation.  *Id*.; s*ee also* Smith et al.,

24 "COVID-19 and Telepsychiatry: Development of Evidence-Based Guidance for

25 Clinicians," JMIR Mental Health (Aug. 2020), available at

26 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7485934/ (noting UK guidance that "face-

27 to-face treatment may be preferable when there are complex needs or higher risk…" and

28 Singapore Medical Association guidance that clinician "be aware of clinical 'red flags,'

1  which would trigger the need for urgent in-person consultation, such as increased acute

2  risk to self or others.").  The APA Resource Document on Telemental Health for Adults in

3  Jails and Prisons similarly cautions that "patients who self-injure may be at higher risk in a

4  clinical session where the psychiatrist cannot immediately intervene."  APA Resource

5  Guide on Telepsychiatry in Jails and Prisons (February 2023) at 8, available at

6  https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-

7  5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf.

8       Onsite providers are better able to conduct an evaluation of severely agitated

9  individuals. Stewart Decl. ¶ 55. They are also better able to deescalate the situation and

10 take steps to keep the patient safe.  *Id*.  As Dr. Stewart explains, when someone is suicidal,

11 "[p]lacing that individual in front of a computer screen and telling him to talk to the doctor

12 is clinically inadequate when there is an in-person alternative."  *Id*; *see also* Stoll, Sadler,

13 and Trachsel, "The Ethical Use of Telepsychiatry in the Covid-19 Pandemic," Frontiers in

14 Psychiatry (July 2020), at 2, available at

15 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7371958/pdf/fpsyt-11-00665.pdf

16 (providers needed to "ensure that telepsychotherapy is appropriate for the patient in

17 question. For example, this approach may not be suitable for patients with concrete

18 suicidal ideation because rapid reaction to emergency situations may be hindered by

19 physical distance").

20       Defendants argue that the Special Master's requirement for an onsite case manager

21 to take over primary care when someone is suicidal "would disrupt continuity of care" with

22 the patient's primary clinician.  Defendants' Objections at 38.  This argument is mistaken.

23 It presumes a strong therapeutic relationship using telemental health, which is not always

24 the case.  Stewart Decl. ¶ 57.  Also, this argument ignores the fact that when an onsite

25 clinician takes over, the remote primary clinician generally is still available for

26 consultation.  *Id*.  Dr. Stewart reports that when treating suicidal patients using

27 telepsychiatry, he always turns "the primary management of the suicidal patient over to

28 any available mental health or medical clinician on the scene, so that the patient can be

given the most best care possible, which I believe requires an in-person clinician whenever possible." *Id*. ¶ 58.

## B.    Group Treatment

Defendants also object to the Special Master's requirement that group treatment should be done by in-person clinicians. *See* Defendants' Objections at 38-39. While virtual group therapy may be a "mainstay" in the community, Mehta Decl. ¶ 53, prison is different. In the community, each participant is at their own computer. Stewart Decl. ¶ 96. In a prison, the participants would be in a room together with the clinician remote, making it harder for the group leader to track interactions between the group, and making it difficult to see everyone in the group through the clinician's screen. *Id*. Dr. Stewart has observed EOP groups in person and, in his opinion, these groups present "the mental health provider with numerous challenges to group engagement and therapeutic progress. Managing these challenging groups through a video connection, in my opinion, simply would not work, and is a fool's errand." *Id.* ¶ 97.

## C.    Five-Day Follow-Ups

The Special Master's recommendations restrict the use of telemental health for five-day follow-ups, which are the daily check-ins required when suicidal patients are returned to their regular housing after an incident. *See* Special Master Telemental Health Policy at 33. Specifically, the policy requires that "telemental health shall not be utilized for 5-day clinical follow ups except as a last resort in emergency situations when the institution's on-site [clinicians] are not available." ECF No. 8165-1 (App'x A) at 7. The Special Master's Report explains that this restriction to in-person 5-day follow ups is required because "the assigned clinician must evaluate the patient at their new level of care, observe their condition, and conduct the contact cell-front." Special Master Telemental Health Policy at 33.

The Program Guide includes specific instructions that require the clinician conducting a five-day follow up to describe the condition of the patient's cell, something that is effectively done only by an in-person, onsite clinician. *See* ECF 7333-1 at 395

1  (instructions for five-day follow-up form requiring clinician to "indicate the patient's cell

2  condition (e.g., clean, messy, dirty, etc.).");  *see also* Stewart Decl. ¶ 94 (noting that during

3  this kind of follow up "it is crucial for the clinician to see inside the cell and assess how

4  the patient is doing in the new environment").

5  **D.      Use-of-Force Incidents**

6       The Program Guide's Controlled Use of Force Policy mandates that "every

7  institution mental health program shall ensure a mental health clinician (Psychologist,

8  Psychiatrist, or Clinical Social Worker) *is present* during all controlled use of force

9  incidents (cell extractions)."  ECF 7333-1 at 573 (emphasis added).  The Special Master

10  revised Defendants' policy to recommend "that clinicians involved in use of force

11  incidents be on-site."  Special Master Telemental Health Policy Report at 34.  Defendants

12  argue that if the primary clinician is remote, then the patient is better off speaking with a

13  known remote clinician rather than an unknown live clinician.  *See* Defendants' Objections

14  at 39.  But Defendants' objections fail for several reasons.  First, nothing in the Special

15  Master's recommendations prevents the primary telemental health clinician from assisting

16  or consulting the onsite clinician during de-escalation efforts.  Second, as Dr. Stewart

17  explains "[i]n a cell extraction, the physical presence of the clinician alone is an important

18  factor in limiting the potential for staff misconduct.  Moreover, de-escalation of the

19  patient's emotions is unlikely to be effective over a video connection."  Stewart Decl. ¶ 93.

20  As the Special Master explains, Defendants have not presented any evidence "that utilizing

21  telehealth technology at cell front or in similar contained areas of the prison is as effective

22  as in-person clinical intervention to de-escalate and avert a controlled use of force."

23  Special Master Telemental Health Policy Report at 34.  An onsite clinician can "quickly

24  modify the intervention," and [i]t is important for the clinician to be able to clearly observe

25  the entire area where the person is contained to identify risks and other data that can be

26  incorporated in the intervention."  *Id*.  Defendants have not met their burden of presenting

27  evidence to change this mandated, clear requirement of the remedy in this case.

28

E.     **Mental Health Crisis Bed Discharges**

The Special Master recommends that MHCB discharges must be done by onsite clinicians.  ECF No. 8165-1 (App'x) A at 6.  This is part of the Special Master's section on MHCB safeguards, and is consistent with the rest of the policy.  Defendants' objection is baseless.  *See* Stewart Decl. ¶ 95.

## IX.     SPECIAL MASTER'S CHART NO. 1

Defendants' current mode of scorched-earth litigation appears to require objections to every mark on the page.  The Special Master's report clearly states that Figure 1 "summarizes the major components" of his proposed policy.  *See* Special Master Telemental Health Policy Report at 35.  "Major" does not mean "all."  There is nothing misleading about this.

## X.     DEFENDANTS' ADDITIONAL OBJECTIONS.

A.     **Licensing**

Defendants assert remote unlicensed psychologists and social workers should be treated the same as onsite unlicensed clinicians.  Defendants' Objections at 36.  As Dr. Stewart, an experienced medical educator, explains, "given the inherent difficulty of supervising a new, unlicensed clinician online," this restriction is reasonable.  Stewart Decl. ¶ 98.

B.     **"Purpose" Statement**

The Special Master properly added references to relevant *Coleman* court orders and federal law.

C.     **References to the Americans with Disabilities Act and *Armstrong***

Communications across video connections present special challenges for persons with vision and hearing disabilities.  The Special Master's recommendation references to disability laws appropriately reflect this.

D.     **References to Equipment, Physical Environment and Telepresenters.**

The Special Master's experts have witnessed first-hand the challenges with bringing telehealth equipment into CDCR prisons.  It is perfectly appropriate for the Special Master

1   to recommend that the policy include attention to these challenges.

2   **DISCUSSION OF PENDING APPEALS**

3   The Court ordered "discussion of whether any issues raised by the briefing is

4   pending on appeal." June 26, 2024 Order, ECF No. 8295 at 3. There are six pending

5   appeals. Only one, the telepsychiatry brief, has any factual points in common with the

6   instant dispute. The issues on appeal, however, are distinct, and do not overlap with the

7   issues in the instant briefing.

8   **I.    APPEAL NO. 23-15755, TELEPSYCHIATRY, FULLY BRIEFED, SET FOR
        ARGUMENT AUGUST 12, 2024.**
9

10   In the telepsychiatry appeal, No. 23-15755, the Defendants framed five issues.

11   Defendants' Opening Brief, No. 23-15755, ECF No. 012 at 10-11. In summary, the issues

12   are (1) jurisdiction; (2) whether the district court properly held that changes in the

13   telepsychiatry policy require a motion to modify the 2017 and 2018 telepsychiatry orders;

14   (3) whether the law of the case doctrine restricts reconsideration of the 2017 and 2018

15   orders; (4) whether the 2017 and 2018 orders provide for modification of the

16   telepsychiatry policy; and (5) whether the court can review the telepsychiatry policy under

17   its inherent authority to reconsider the 2017 and 2018 orders. *Id* at 10-11; *see also id.* at

18   18-24 (describing the 2017 and 2018 telepsychiatry orders). The 2017 and 2018

19   telepsychiatry orders addressed only remote work by psychiatrists, not by the

20   psychologists and social workers who are covered by the telemental health policy. The

21   issues raised in the instant briefing are thus not pending in Appeal No. 23-15755.

22   **II.   APPEAL NO. 23-2485, PIP MINIMUM TREATMENT STANDARDS,
        FULLY BRIEFED, SET FOR ARGUMENT AUGUST 12, 2024.**
23

24   Defendants framed two issues concerning application of the PLRA to the Court's

25   order requiring at least 20 hours per week of treatment in the Psychiatric Inpatient Units,

26   and a third issue regarding whether the Defendants' PIP program complied with the

27   Program Guide, state law and national standards. Defendants' Opening Brief, No. 23-

28   2485, ECF No. 018.1 at 11-12. The issues are distinct from those in the instant briefing.

**III.  APPEAL NO. 24-2263, FALCON EXPERT TOURS, OPENING BRIEF DUE JULY 29, 2024.**

Plaintiffs anticipate the appeal will address issues regarding the Court's authority to manage discovery.

**IV.  APPEAL NO. 24-2939, PIP MAX CUSTODY REVIEW POLICY, OPENING BRIEF DUE JULY 26, 2024.**

Plaintiffs anticipate the appeal will address issues regarding the Court's authority to order the Special Master to address whether the MAX custody policy should be included in key performance indicators.

**V.  APPEAL NO. 24-3707, PERSONALITY DISORDER PROGRAM, OPENING BRIEF DUE SEPTEMBER 4, 2024.**

Plaintiffs anticipate the appeal will address issues regarding whether the remedy requires a program to address class members with personality disorders.

**VI.  APPEAL NO. 24-4023, STAFFING CONTEMPT, OPENING BRIEF DUE SEPTEMBER 20, 2024.**

Plaintiffs anticipate the appeal will address issues regarding whether the factual record supports the Court's contempt findings.

## CONCLUSION

Replacing onsite clinicians with remote clinicians will have a major impact on nearly every aspect of the *Coleman* remedy.  The Special Master's recommended safeguards are the minimum necessary to ensure that such wholesale replacement does not interfere with efforts to bring the CDCR into compliance with the Constitution.  The Court possesses the power to order Defendants to revise their policy in accordance with the Special Master's recommendation, or with the Plaintiffs' request for stricter limits in various areas.

/ / /

/ / /

/ / /

1

**CERTIFICATION**

2

Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

3

filing: ECF Nos. 640, 4232, 5196, 5477, 5711, 5850, 5928, 8087, 8291, 8295, 933 F. Supp.

4

954 (E.D. Cal. 1996), 938 F. Supp. 2d 955 (E.D. Cal. 2013), 28 F. Supp. 3d 1068 (E.D.

5

Cal. 2014).

6

7

DATED:  July 12, 2024                  Respectfully submitted,

8

ROSEN BIEN GALVAN & GRUNFELD LLP

9

By:  */s/ Thomas Nolan*

10

Thomas Nolan

11

12

By:  */s/ Jared Miller*

13

Jared Miller

14

Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28