1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

9  Attorneys for Plaintiffs

10

11            UNITED STATES DISTRICT COURT

12           EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,

15            Plaintiffs,

16       v.

17  GAVIN NEWSOM, et al.,

18            Defendants.

19

20

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY**

Judge:   Hon. Kimberly J. Mueller

21

22

23

24

25

26

27

28

[4512456.4]

Case No. 2:90-CV-00520-KJM-DB

DECL. OF PABLO STEWART, M.D. IN SUPPORT OF PLS.' RESPONSE TO DEFS.' OBJECTIONS TO
SPECIAL MASTER'S REPORT & RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

SUMMARY OF KEY OPINIONS IN THIS MATTER ...................................... 5

I.    MY EXPERIENCES WITH TELEPSYCHIATRY ILLUSTRATE THE NEED FOR APPROPRIATE LIMITATIONS ON TELEMENTAL HEALTH TREATMENT IN CDCR ........................................................... 10

II.   THE SPECIAL MASTER'S RECOMMENDED TELEMENTAL HEALTH POLICY PLACES CLINICALLY-APPROPRIATE LIMITATIONS ON THE USE OF TELEPSYCHIATRY AT HIGHER LEVELS OF CARE, INCLUDING LIMITS ON TELEMENTAL HEALTH IN MHCB, INPATIENT, AND EOP PROGRAMS ................................................................. 12

      A.    Sufficient On-Site Primary Mental Health Clinicians Must Be Maintained to Preserve a Therapeutic Milieu in EOP Programs, and to Cover High Acuity Situations Such as Suicidality or Decompensation Among EOP Patients. ........................................................................ 14

      B.    Telemental Health Is Not Clinically Appropriate At The MHCB And PIP Levels Of Care, And Its Use Should Be Limited To Being A Last Resort In Emergency Situations, Consistent with the Special Master's Recommendations ............................................................................... 20

      C.    Current Academic Literature Supports the Special Master's Proposed Restrictions On The Use Of Telemental Health At Higher Levels of Care including EOP Care ....................................................................... 21

III.  THE SPECIAL MASTERS' MODEST PROPOSED LIMITS ON TELEMENTAL HEALTH IN CCCMS PROGRAMS ARE APPROPRIATE ....... 23

IV.   TELEMENTAL HEALTH SHOULD NOT BE USED FOR SUICIDAL PATIENTS ........................................................................................................ 23

V.    IT IS CLINICALLY NECESSARY FOR CDCR TELEMENTAL HEALTH CASE MANAGERS TO CONDUCT FREQUENT SITE VISITS AT THEIR ASSIGNED INSTITUTIONS, AS RECOMMENDED BY THE SPECIAL MASTERS REPORT AND RECOMMENDED POLICY ................... 25

VI.   THE USE OF TELEMENTAL HEALTH FOR CELL-FRONT EVALUATIONS IS NOT APPROPRIATE AND IT IS MY OPINION THAT CELL-FRONT TELEMENTAL HEALTH CONTACTS SHOULD NOT COUNT TOWARDS MANDATORY CLINICAL CONTACTS IN *COLEMAN* ...................................................................................................... 28

VII.  TELEMENTAL HEALTH CLINICIANS HAVE A CLINICAL OBLIGATION TO THEIR PATIENTS TO OBTAIN A SPECIFIC WRITTEN INFORMED CONSENT FOR TELEMENTAL HEALTH WHICH SHOULD INCLUDE ALLOWING THE PATIENT TO CHOOSE AN IN PERSON PRIMARY MENTAL HEALTH CLINICIAN ........................... 30

[4512456.4]

i

Case No. 2:90-CV-00520-KJM-DB

DECL. OF PABLO STEWART, M.D. IN SUPPORT OF PLS.' RESPONSE TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S REPORT & RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY

1    VIII.   TELEMENTAL HEALTH PATIENTS MUST BE PERMITTED TO ASK
             THAT THE TELEPRESENTER NOT BE PRESENT DURING THERAPY
2            SESSIONS ................................................................................................ 33

3    IX.     THE REQUIREMENT FOR AT LEAST ONE FULL-TIME, ON-SITE
             CASE MANAGER IN RHU UNITS IS APPROPRIATE IN THE
4            ABSENCE OF A REQUIREMENT THAT ALL RHU CARE BE ON SITE ........ 34

5    X.      THE SPECIAL MASTER'S OTHER SAFEGUARDS FOR PARTICULAR
             HIGH RISK TASKS TO IN PERSON CLINICIANS ARE CLINICALLY
6            APPROPRIATE ...................................................................................... 35

7    XI.     THE REQUIREMENT THAT GROUP TREATMENT MUST BE DONE
             BY IN PERSON CLINICIANS IS CRITICAL FOR ADEQUATE PATIENT
8            CARE...................................................................................................... 36

9    XII.    THE LIMITATION IN THE SPECIAL MASTER'S PROPOSED POLICY
             THAT TELEMENTAL HEALTH PROVIDERS MUST BE LICENSED IS
10           APPROPRIATE ...................................................................................... 36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

1.      I am a board-certified psychiatrist and Clinical Professor at the John A. Burns School of Medicine, University of Hawaii Department of Psychiatry.  My *curriculum vitae* is attached hereto as **Exhibit A**.

2.      I have over 38 years of experience in correctional mental health care, including serving as the court's expert in class action cases challenging the provision of mental health care to incarcerated persons.  After medical school, I completed my psychiatric residency at the University of California, San Francisco ("UCSF") in part as a Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and the San Francisco Veterans Affairs Medical Center, including service at the VA's Substance Abuse Inpatient Unit.  During my residency, I also practiced at several community health programs.  Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of UCSF, which was located at San Francisco General Hospital.  In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco.  Between August 1988 and December 1989, I was the Director of Forensic Psychiatric Services for the City and County of San Francisco.  In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the incarcerated person population in San Francisco at both the county jails and in the locked inpatient treatment unit at San Francisco General Hospital.

3.      From 1990 to 1998, I served as the medical and psychiatric monitor in a case about medical and mental health care at the California Medical Facility, a CDCR prison in Vacaville, California, as part of the class action lawsuit *Gates v. Deukmejian*, ED Ca. Case No. C-1V-S-87-1636 LKK/JFM.

4.      From September 2006 to July of 2018, I served as a Clinical Professor at the University of California, San Francisco, School of Medicine.  From 1990 through 1996, I served in various medical leadership posts at the Department of Veterans Affairs Medical

DECL. OF PABLO STEWART, M.D. IN SUPPORT OF PLS.' RESPONSE TO DEFS.' OBJECTIONS TO
SPECIAL MASTER'S REPORT & RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY

1  Center, San Francisco, including as Chief of the Substance Abuse Inpatient Unit, Chief of

2  the Intensive Psychiatric Community Care Program, focusing on services for homeless

3  veterans, and Medical Director of the VA's Comprehensive Homeless Center.  From

4  February 2018 to the present, I have served as a Clinical Professor of Psychiatry at the

5  University of Hawaii.

6      5.      From 1996 to the present, I have served as a psychiatric consultant to

7  governmental and private agencies on a variety of psychiatric, forensic, substance abuse

8  and organizational issues, with a focus on correctional psychiatry.  I have served as a

9  psychiatric expert or consultant to various federal courts, the United States Department of

10  Justice, and other organizations evaluating the provision of mental health treatment and

11  implementing remedial decrees covering the provision of mental health care in correctional

12  institutions.  From May 2016 to July of 2022, I served as the court-appointed monitor in

13  *Rasho v. Baldwin*, No. 1:07-CV-1298 (C.D. Ill.), a class action covering mental health care

14  throughout the Illinois State Prison System.

15      6.      I estimate that I have observed over 100 telepsychiatry sessions in

16  correctional intuitions, primarily at jails and prisons in California, Arizona, and Illinois.

17  On December 19, 2017, I testified at an evidentiary hearing in *Rasho* as to my opinion of

18  the use of telepsychiatry in correctional institutions.

19      7.      I have also participated in numerous telepsychiatry sessions myself during

20  the last 16 months.  Since early 2023, I have been involved in providing on call care via

21  telepsychiatry for the Queen's Health System in Honolulu, Hawaii.  The Queen's Health

22  System operates hospitals on every island in Hawaii.  Because of the complete lack, or

23  near complete lack of psychiatrists on a number of the more remote Hawaiian Islands, we

24  frequently use telepsychiatry for remote emergency room consultations, and for inpatient

25  consultations.  I estimate that I have provided care to at least 75 patients using this

26  modality since I was directed to start using this approach in early 2023.

27      8.      Although in my opinion delivering care by this modality is better for patients

28  than the alternative of them not having any access to a qualified psychiatrist, my experi-

1  ences with delivering care in this manner have only heightened my previous concerns

2  about the need for appropriate limits on the use of telepsychiatry and telemedicine, as

3  discussed in more detail below.  I have submitted a number of declarations in connection

4  with *Coleman v. Newsom* on the adequacy of mental health care in the California Depart-

5  ment of Corrections and Rehabilitation ("CDCR"), including a number of declarations

6  about telepsychiatry that remain very relevant to this issue in this briefing about telemental

7  health.  *See, e.g.*, 1/17/23 Declaration of Pablo Stewart in Support of Plaintiffs' Response

8  to Special Master's Report and Recommendation on a Final Proposed Telepsychiatry

9  Policy, ECF No. 7703-1.[1]  Also, in August 2018, I provided a declaration regarding

10  CDCR's telepsychiatry policy at the time, which was filed with the Court as part of

11  ongoing negotiations between the parties on the issue.  *See* Expert Report of Pablo Stewart,

12  M.D., ECF No. 5873 at 8-82.

13        9.       I have conducted numerous tours of CDCR prisons in the last 25 years.  My

14  first experience with CDCR was in 1990s, when I was appointed by the Federal Court as a

15  court expert monitoring medical and psychiatric issues at the California Medical Facility

16  ("CMF"), a CDCR prison in Vacaville, California, as part of the *Gates v. Deukmejian* case.

17  In 2013, I toured six prisons as Plaintiffs' expert witness in opposing the termination

18  motion filed by Defendants in this matter.  I also provided several declarations and gave

19  testimony in several live hearings before Judge Karlton in support of subsequent

20  enforcement motions filed by Plaintiffs later in 2013, after the termination motion was

21  denied.  I also testified on behalf of Plaintiffs in the overcrowding proceedings that took

22  place in this case starting in around 2007.  In the overcrowding and termination phases of

23  this case alone, I have spoken with well over 150 CDCR patients, toured numerous

24  prisons, and reviewed scores of patient medical and custody records for patients in CDCR.

25  My most recent tours of CDCR prisons took place in April 2023 when I toured the

26  Psychiatric Inpatient Programs at three California prisons.

27  _____

28  [1] References to documents in the docket are to ECF pagination.

10.     My publications and presentations address a broad range of treatment and assessment problems for mentally ill patients in both community and institutional settings. In compliance with Rule 26(a)(2)(B), my CV at **Exhibit A** lists my publications authored at pages 24 through 25.

11.     Attached hereto as **Exhibit B** is a list of cases in which I have testified at trial or deposition during the previous 5 years.

12.     My compensation to be paid in this case is $400 per hour for general work related to the case, and $600 per hour for depositions and court testimony.

13.     In preparing this report I have reviewed the articles, studies, guides and resource documents listed in the Declarations of Defendants' expert declarants Dr. Penn and Dr. Mehta.  In addition to this large group of articles, guides, studies, and literature reviews on telepsychiatry and telemental health, I reviewed the following:

(a)     CDCR's July 21, 2023 draft telemental health policy, which was filed with the Court as part of the March 21, 2024 Special Master's Report and Proposed Telemental Health Policy, ECF No. 8165 at Exhibit B, ECF 8165-2 at p. 45-53.

(b)     The parties' joint statement regarding the draft telemental health policy and the parties' areas of agreement and disagreement with respect to the policy, which was filed with the Court on September 5, 2023.  See ECF No 7935.

(c)     CDCR's final telemental health policy, which was issued to the field on September 21, 2023.  ECF No. 8165-2 at Exhibit D, at 65-74.

(d)     A letter dated February 7, 2024 from Plaintiffs and setting forth their positions and proposed modifications to the telemental health policy after negotiations on this issue, which was filed with the Court by the Special Master on March 21, 2024.  *See* ECF No 8165-2 at Exhibit E, ECF pages 76-81.

(e)     The Special Master's Report and Proposed Telemental Health Policy

1   ("Telemental Health Report"), filed March 21, 2024. *See* ECF
2   No. 8165.

3    (f)    Defendants' Response to the Special Master's Report and Proposed
4   Telemental Health Policy ("Defendants' Objections"), filed on
5   May 28, 2024, ECF No. 8253.

6    (g)    The May 28, 2024 Declaration of Joseph Penn, MD, In Support of
7   Defendants' Response and Objections to Special Master's Report and
8   Proposed Telemental Health Policy, ECF No. 8253-1

9    (h)    The May 28, 2024 Declaration of Amar Mehta, M.D. in Support of
10   Defendants' Objections to Special Master's Report and Proposed
11   Telemental Health Policy, ECF No. 8253-2.

12   My findings and conclusions regarding these documents are discussed below.

13   **SUMMARY OF KEY OPINIONS IN THIS MATTER**

14   14.    I have been asked to give my opinion regarding the Special Master's Report
15   and Proposed Telemental Health Policy, and regarding the evidence presented by
16   Defendants in their Objections to the Special Master's Telemental Health Report.  My
17   opinions are summarized below:

18    (a)    Academic studies and scholarly articles on the use of telepsychiatry
19   and telemental health are generally not relevant to the use of
20   telemental health in prison and jail settings.  In particular, I reviewed
21   the 37 publications attached to Dr. Mehta's Declaration which
22   Dr. Mehta contends support the use of telemental health without any
23   of the limitations proposed by the Plaintiffs or by the Special Master,
24   as well as the many publications cited by Dr. Penn.  Having reviewed
25   these studies, which are overwhelmingly about telepsychiatry in the
26   community and not about telemental health in prisons, I agree with
27   the Special Master's conclusion little research exists for telemental
28   health in prisons, and that community studies are not generally

1    transferrable to prisons.

2    (b)    I also agree that the existing research into the benefits of telemental

3    health is generally of limited utility in understanding the use of this

4    method of treatment in correctional settings, because the studies are

5    most often measures of patient or provider satisfaction, because they

6    are frequently conducted in settings where there is no alternative to

7    telemental health, because they are mostly community studies and not

8    prison studies, and because they generally do not include rigorous,

9    replicable study results using random assignment and control groups

10    where the study is employing objective and robust outcome measures.

11    (c)    The studies and, in particular, the scholarly literature reviews that I

12    have reviewed in many cases suggest caution in using both

13    telepsychiatry and telemental health within correctional settings,

14    especially for emergencies like evaluating and treating suicidal

15    patients as well as in the provision of mental health services at higher

16    levels of care.  Safeguards like those recommended by the Special

17    Master team, and the additional safeguards requested by Plaintiffs in

18    their objections are, in my opinion, necessary to prevent harm in cases

19    of emergencies and at higher levels of care.

20    (d)    Due to the high level of isolation and agitation among clients in a

21    correctional environment, the overall oppressive nature of correctional

22    setting, and the high incidence of pre-existing trauma among the

23    population, in-person treatment is generally the best modality,

24    particularly for individuals at higher levels of care, individuals in

25    segregated units, and individuals experiencing suicidality or other

26    crises.  Based upon my experiences providing mental health care in a

27    correctional environment and the aforementioned factors, it is

28    extremely challenging to establish a functioning doctor-patient

relationship in these settings even when in person.  This is made even more difficult when one is using telemental health or telepsychiatry.

(e)    Appropriate cautions adopted by the Special Master team include (1) ensuring that patients can give informed consent specifically to treatment by telemental health and have both the option to refuse telemental health treatment in favor of in-person therapy, as well as the option to have telemental health without the presence of a medical assistant in the room; (2) limiting the use of telemental health at higher levels of care, including MHCB and inpatient levels of care; (3) requiring at least 20 percent of allocated provider positions at the CCCMS level of care are filled by onsite clinicians, and at least 40 percent of allocated provider positions at the EOP level of care are filled by onsite clinicians; (4) requiring in-person visits by telemental health providers to the institutions where they practice, including two one-day visits annually for remote CCCMS practitioners and four one-day visits annually for remote EOP practitioners; (5) limiting cell-front telemental health for patients who refuse two telemental health contacts by requiring a referral to an on-site clinician for an assessment regarding whether to switch the individual to on-site care, although I would adopt more stringent limitations on cell-front telemental health than those adopted by the Special Master; (6) requiring that each restricted housing unit (RHU) have one on-site primary clinician covering the RHU unit during regular weekday work hours; and, (7) requiring that remote providers are not permitted to conduct emergency referrals and suicide risk assessments, group treatment, five-day follow-up visits, use of force interventions, and MHCB discharges.  I am in agreement with all of these limitations and would support additional ones, such as Plaintiffs' request that the

1    policy require in-person evaluations for individuals shortly after they

2    have made a PREA complaint and potentially had a medical

3    evaluation for evidence of sexual assault, and Plaintiffs' request for

4    more stringent on-site minimums of 80 percent of case managers in

5    EOP units and 60 percent of case managers in CCCMS units.

6    (f)    CDCR's Enhanced Outpatient Program ("EOP") is a residential

7    treatment program.  Telemental health should supplement on-site

8    psychiatric staff at the EOP level of care, and CDCR should ensure

9    that a solid majority of on-site clinicians remains on site to provide

10   direct care.  The quality of psychiatric care in EOP programs would

11   substantially deteriorate if Defendants removed the requirement in the

12   Special Master's policy for at least 40 percent of the psychologist and

13   social worker case managers to remain on site in each EOP program.

14   (g)    On-site care should overwhelmingly predominate in the Mental

15   Health Crisis Bed ("MHCB") and Acute and Intermediate Psychiatric

16   Inpatient Program ("PIP") levels of care, with telemental health used

17   only as a last resort in emergency situations.  Shifting to telemental

18   health in these high-level programs would be clinically harmful and

19   needlessly risky.

20   (h)    Defendants' proposal to reduce the number of site visits required by

21   telemental health clinicians is clinically inappropriate.  As the Special

22   Master recommends, CDCR telemental health providers should

23   conduct frequent site visits to their assigned institutions, in order to

24   visit patients face-to-face and to get to know the on-site conditions in

25   the institutions where their patients reside.  The recommended

26   requirements in the Special Master's proposed policy—two one-day

27   visits a year for Correctional Clinical Case Management System

28   ("CCCMS") telemental health providers and four one-day visits a year

1    for EOP telemental health providers—are the same as those in the

2    telepsychiatry policy and are clinically appropriate.  I also agree with

3    the requirement that clinicians meet in person with patients while on

4    site at the institution.

5    (i)    I agree with the Special Master that cell-front telemental health

6    contacts should not count towards Program Guide compliance.  I also

7    agree with the Special Master that cell-front contacts should not be

8    performed by telemental health clinicians in RHUs.  Defendants'

9    opposition to these policies ignores the clinical reality that telemental

10    health clinicians cannot perform medically-adequate, equivalent

11    evaluations at a patient's cell front.  Many CDCR cell doors are solid

12    and are difficult to communicate through even when in person, under

13    the best of circumstances, and it is easier to limit the volume of

14    confidential information shared between the provider and patient

15    when visiting the patient in person at cell front.

16    (j)    Defendants' proposal to remove the protections with respect to

17    informed consent in the Special Master's proposed modifications to

18    the telepsychiatry policy is medically unsound.  Telemental health

19    practitioners have the same clinical and ethical obligations to their

20    patients as any other psychologist or social worker, and they should

21    preserve patient autonomy and dignity by fully disclosing the

22    conditions of treatment, and by allowing the patient to choose to be

23    seen by an in-person case manager.  It is widely accepted in the field

24    of psychiatry that informed consent "facilitates physician-patient

25    collaboration in treatment and may permit more knowledgeable

26    participation in and adherence to treatment by the patient."  *See*

27    American Psychiatric Association ("APA") Resource Document on

28

1        Principles of Informed Consent in Psychiatry (1997) at 123[2].

2    (k)    I disagree with Dr. Penn's statement that the above-described

3        limitations are not in line with community standards of care.  The

4        standard of care in the community is to provide in-person emergency

5        care, in-person inpatient care, in-person care for suicidal patients, and

6        informed consent whenever possible, with exceptions for telemental

7        health for these services in emergencies when in-person mental health

8        care is not available.  The standard in the community for therapy with

9        individual patients is to have confidential sessions with the provider

10        and patient alone without a third party in the room whenever possible.

11        Whatever the standard of care is with respect to group therapy in the

12        community, telemental health group therapy in prisons presents

13        particular challenges and in my opinion such groups are not as

14        effective as in-person groups in prison.

15 **I.    MY EXPERIENCES WITH TELEPSYCHIATRY ILLUSTRATE THE NEED
      FOR APPROPRIATE LIMITATIONS ON TELEMENTAL HEALTH
16      TREATMENT IN CDCR**

17        15.    Like the *Coleman* Special Master and his experts, I am of the opinion that

18 telepsychiatry and telemental health are similar treatment modalities and should be subject

19 to similar protocols, with the caveat that in some respects the need to protect in-person

20 treatment by mental health case managers doing therapy is in some respects higher than for

21 psychiatrists doing medication management work.  *See* Special Master Telemental Health

22 Report, ECF No. 8165 at 23-24 and Defendants' Objections, ECF No. 8253 at 23.

23 Although I agree with Defendants that psychiatrists do have a therapeutic alliance with

24 their patients and do perform some of the same kinds of therapeutic tasks as psychologists

25 and social workers, in addition to medication management, the focus of psychiatric work

26

27 _____

28 [2] Page cites to academic studies and articles are included throughout this declaration when
pagination is provided by their authors and/or publishers.

DECL. OF PABLO STEWART, M.D. IN SUPPORT OF PLS.' RESPONSE TO DEFS.' OBJECTIONS TO
SPECIAL MASTER'S REPORT & RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY

1    in CDCR is medication management and diagnostic clarification, not individual therapy.

2    Because the focus of case management by social workers and psychologists in CDCR has

3    a stronger emphasis on individual therapy, the occasion to discuss sensitive and private

4    matters is higher and requires confidential, in-person care, particularly if the patients

5    chooses in-person care.

6        16.    As noted above, I have been working using telepsychiatry as a modality

7    during the last 18 months, for emergency and inpatient assessments in the community for

8    the Queens Health System in Hawaii, for patients who do not have access to an in-person

9    psychiatrist on remote islands.

10        17.    In my opinion, for people in underserved areas lacking access to in-person

11    psychiatrists or other mental health clinicians, telepsychiatry and telemental health services

12    are better than having no access to a psychiatrist, social worker or psychologist at all.

13        18.    However, based on my experiences with providing telepsychiatry, there are

14    some significant limitations to this method of delivering treatment, even in the community,

15    which is a far more therapeutic environment for doing this work than a prison setting.

16    First, it is far easier to establish rapport and trust with patients during in-person, face-to-

17    face encounters.  Rapport and trust are a critical parts of successful mental health treat-

18    ment.  Second, due to the nature of telepsychiatry, one is unable to complete a compre-

19    hensive examination of the patient without the presence of a third party in the room with

20    the patient; however, the presence of a third party interferes with the ability of the patient

21    to have an open and honest conversation with the telepsychiatrist.  For example, the

22    management of suicidality, or the nuanced assessment of someone with a serious psychotic

23    or mood disorder, is impaired by being done over a computer screen.

24        19.    My personal observations about telepsychiatry and telemental health are

25    similar to the concerns noted in the February 2023 APA Resource Document on

26    Telepsychiatry in Jails and Prison, which notes some of the concerns about telepsychiatry

27    supported in the research, as follows:

28        Studies have also revealed concerns about privacy (Myers et al., 2005), and

1

2

3

> unauthorized access to confidential information (Miller et al., 2005), along with an impact on therapeutic rapport (Khalifa et al., 2008). One study reported that patients with thought disorders appeared more satisfied with telepsychiatry than those with affective disorders and personality disorders (Magaletta et al., 2000).

4  APA Resource Document at 2. The APA Resource Document also notes correctional

5  specific environmental concerns, explaining that:

6

7

8

> Correctional settings have unique issues related to lack of autonomy (e.g. escorted movements, restricted access to the internet, schedules that are limited by custody programs), lack of confidentiality and privacy, and potential for limited to no provider familiarity with the environment in which care is provided.

9  *Id.* I agree that these concerns support the modest limitations that the Special Master

10  Recommends be added to Defendants Telemental Health Policy.

11    20.    I am aware that CDCR states that the APA Resource Document on

12  Telepsychiatry for Adults in Jails and Prisons should not be relied upon because of a legal

13  disclaimer in the APA Operations Manual. I have no opinion on the legal effect of such

14  disclaimers. As a psychiatric practitioner, however, I do not look to such disclaimers, but

15  rather to the qualifications and experience of the authors, and the soundness of the

16  methodology. In my opinion the APA Resource Document is entitled to substantial weight

17  as the considered opinion of highly qualified and experienced experts.

18    21.    I am also aware that CDCR has criticized the Special Master's reliance on

19  the APA Resource Document on Telepsychiatry in Jail and Prison because Dr. Metzner,

20  who is on the Special Master's team, participated in the committee of 11 prominent

21  national experts in correctional psychiatry in drafting the document. In my opinion,

22  Dr. Metzner's participation in drafting the APA Resource Document increases its

23  reliability due to Dr. Metzner's wide ranging experience in correctional mental health.

24  **II.    THE SPECIAL MASTER'S RECOMMENDED TELEMENTAL HEALTH POLICY PLACES CLINICALLY-APPROPRIATE LIMITATIONS ON THE**

25  **USE OF TELEPSYCHIATRY AT HIGHER LEVELS OF CARE, INCLUDING LIMITS ON TELEMENTAL HEALTH IN MHCB,**

26  **INPATIENT, AND EOP PROGRAMS**

27    22.    In general, there is not sufficient evidence in the literature on telemental

28  health to support the unlimited use of telepsychiatry or telemental health in carceral

populations with serious mental illness.  During the process of compiling and reviewing evidence-based telepsychiatry guidance for clinicians during the height of the COVID-19 pandemic, Smith, Ostinelli, Macdonald, & Cipriani (2020) found that several important populations were missing from the literature, including those with psychosis and personality disorders, and that settings less well-studied by scholars included prisons and inpatient units.  Based on my review of articles for this declaration, and based on my experiences with telepsychiatry as a clinician, I agree with those findings about the limited evidence supporting the use of telemental health or telepsychiatry with these populations.

23.    I agree with the Special Master's finding that existing telemental health research shows lack of replication of results, and minimum investigation of correctional settings.  The existing research uses community samples, including college students, who are not comparable to correctional populations.  Where the existing research does address comparable populations, such as persons facing acute behavioral problems and suicidality, the research supports relying primarily on on-site services.  For example, Verma et al. (2022) found in their recent survey of telepsychiatry at specialty clinics for patients with developmental disorders that "[m]anagement of acute behavioral dysregulation or suicidality were especially challenging when patients were not in-person, therefore confirming the location of the patient and accessible care providers was essential at every appointment."  (5284).

24.    I also agree with the February 2023 APA Resource Document on Telepsychiatry for Adults in Jails and Prisons position on the use of telepsychiatry (and by analogy telemental health) at higher levels of care.  That document states that "it is the opinion of the authors that telepsychiatry in higher levels of care be used as a last resort or in very specific situations, for example when in person recruitment is not successful." (4). In discussing higher levels of care in this section, the APA Resource Document specifically includes "residential treatment units" like the EOP programs in CDCR.  *Id.*

25.    Particularly relevant to CDCR's EOP, MHCB, and PIP programs, the literature is sparse as to the use of telepsychiatry or telemental health at higher levels of

1  care in correctional settings.  A 2021 review of the literature on telemental health by

2  Barnett, P. et al. (2021), which was cited by Dr. Penn in his literature review, similarly

3  noted that "we did not find substantial evidence on settings of particular interest, such as

4  mental health inpatient services (including the use of telemental health in compulsory

5  detention processes) and crisis services."  (29).  The review also notes clinician reports of

6  "therapeutic alliances [being] poorer with telemental health."  (28).

7       26.     It is my professional opinion that the safeguards set forth in the Special

8  Master's Proposed Policy on the use of telemental health in CDCR as to patients in EOP,

9  MHCB, and PIP programs are appropriate, prudent limitations given the risks of this

10  untested, novel treatment modality.  Moreover, it is my opinion that given CDCR's high

11  suicide rate and other problems, CDCR should not be the place to test a wholesale shift

12  from on-site to remote mental health.

13       **A.     Sufficient On-Site Primary Mental Health Clinicians Must Be
            Maintained to Preserve a Therapeutic Milieu in EOP Programs, and to
14          Cover High Acuity Situations Such as Suicidality or Decompensation
            Among EOP Patients.**

15

16       27.     I have toured many EOP units within CDCR and am very familiar with these

17  programs and the incarcerated persons in them, who are generally suffering with serious

18  mental illness, including major mental disorders in addition to frequent personality

19  disorders.  I can state confidently and without reservation that, based on my experience, it

20  is clinically indicated that these programs have at least 40 percent, and ideally 80 percent

21  of allocated case manager position on site, working in the unit, and available at all times.

22       28.     EOP programs are intensive residential treatment programs in sheltered units

23  where EOP level of care individuals are housed with only other EOP patients.  These units

24  are virtually synonymous with an inpatient setting.  EOP patients are a high-risk, mentally

25  ill population with serious mental disorders such as psychotic disorders, including schizo-

26  phrenia, schizoaffective disorder, psychotic disorders, bipolar disorders, and substance-

27  induced psychotic disorders.  Many patients in the EOP programs decompensate even with

28  the EOP level-of-care treatment supports available, and go back and forth to Acute,

1  MHCB, and Intermediate PIP programs.

2      29.    Due to the high level of care and the high acuity of mental illness among the

3  EOP patients I have observed in CDCR, I would not recommend relying heavily on

4  telemental health in this setting.  Having most clinicians on-site is critical to maintaining

5  the therapeutic nature of these units and to ensuring adequate staff are on site to treat and

6  protect EOP patients who require onsite in person care to best address their periodic

7  suicidality, decompensation, or other acute mental health crises.

8      30.    On-site case managers, who in CDCR can be psychologists or social

9  workers, are necessary for a residential treatment program to function properly.  EOP

10  patients need at least 10 hours a week of structured therapeutic treatment.  To be effective,

11  such treatment must include clinically substantive in-person talk therapy groups led by

12  case managers.  These groups are less common than recreational therapy groups, but more

13  important for EOP patients, and they simply do not work as well with an online clinician

14  and in person patients.  For one thing, the on-line clinician is inevitably challenged to fully

15  hear and follow the interactions between the patients during groups.  For that reason, I

16  agree with the Special Master's limitation of group therapy to in person clinicians.

17      31.    Other significant benefits from having a solid core of onsite case manager

18  clinicians include the following:

19          (a)    a better ability on the part of on-site clinicians to collect collateral

20                 information about patients informally from on-site custody and

21                 nursing staff, who may not be available for formal scheduled meetings

22                 like huddles and treatment team meetings.

23          (b)    a better ability to affect the therapeutic milieu of the EOP unit through

24                 informal interactions with, and education of, custody and nursing staff

25                 regarding mental health conditions and therapeutic approaches to

26                 patients.

27          (c)    a better ability to have informal daily check-ins with patients whom

28                 the case manager may know to be struggling or particularly at risk.

For example, some EOP programs in CDCR maintain high-risk lists of patients who are thought to be at risk of suicide or decompensation. On site clinicians are better able to check informally and quickly on such patients on a daily or routine basis, without having to schedule a meeting and wait for the patient escorted to a video conferencing room.

    (d)    a better ability to advocate for patients to help address psychological stressors like safety concerns or problems with a cell-mate by working with custody formally and informally to address such problems.

    (e)    a better ability for clinical staff to support each other in the difficult work of providing treatment to mentally ill individuals in carceral settings.

32.    Researchers have identified significant gaps in the literature regarding telemental health in settings like the EOP. For example, Batastini, King, Morgan & McDaniel (2016) highlighted in their systematic literature review of telepsychological services to criminal justice and substance abuse clients the fact that unanswered questions remained as to "whether *intensive intervention services* could be successfully provided through audio-video equipment, especially for justice-involved clients." (28) (ECF 8253-3 at 117) (emphasis added).

33.    In my opinion, the CDCR EOP programs are not easily distinguished from the inpatient and crisis units where CDCR agrees that on-site providers are preferred. Like the inpatient programs, the EOP is an intensive, residential treatment program in prison for individuals with serious and severe mental illnesses. My understanding is that the vast majority of patients in the higher level inpatient programs come from EOP programs for shorter periods of even more intensive inpatient treatment when they are in a crisis that cannot be adequately managed in an EOP setting. EOP patients live and receive treatment in separate, specifically-designated EOP housing units. The purpose of these specialized EOP units is to separate EOP patients from non-mentally ill incarcerated persons for safety

and to provide enhanced treatment.  EOP patients often also have their own yard and work and education programs, and eat in their own dining halls, particularly at higher custody levels where there is greater danger from the other incarcerated individuals who do not have serious mental health conditions.  These are all key characteristics that EOP programs share with CDCR's higher intensity inpatient treatment programs.

34.     Other facilities providing similar intensive mental health treatment have been cautious in adopting telepsychiatry and telemental health.  In a study using national data regarding the use of telepsychiatry in U.S. mental health facilities, Spivak et al. (2020) found that in 2017, of the mental health facilities that offered telepsychiatry, 90.5% were provided to outpatient programs, as compared to only 11.6% of residential-type inpatient treatment settings.  *Id*. at Table 1.

35.     Because many EOP patients are at high risk of decompensating, and many such patients go back and forth to Acute and Intermediate PIP level of care, it is especially important to have on-site psychologists and social workers who can more easily identify signs and symptoms of decompensation.  During each psychological evaluation of a patient, the case manager seeks to obtain an accurate assessment as well as engage the patient's cooperation in treatment.  Doing so requires a working therapeutic relationship— a therapeutic alliance—between the patient and provider.  In a therapeutic alliance, the patient trusts the provider such that he is willing to open up and honestly describe the symptoms of his mental illness.  It can be difficult to establish a therapeutic alliance for any given patient, but it is especially hard to do so in a prison setting, and it is especially hard for patients in the throes of severe mental health decompensation.  Psychiatric symptoms are the type of thing that people are reluctant to talk about even on a good day.  People in general are exceedingly unwilling to talk about deeply personal issues such as suicide, depression, trauma, and psychosis.  For those EOP patients who are decompensating, or at a high risk of decompensating, on-site providers are in a better position to identify symptoms, immediately intervene, establish therapeutic rapport and trust, and recommend a higher level of care when necessary.

1    36.    This therapeutic alliance is important for both psychiatrists and case

2    managers who are psychologists or social workers.  However, in my experience it is

3    potentially even more important for a case manager doing ongoing therapy with a patient,

4    for example when working on childhood trauma or other deeply personal and painful

5    historical incidents that have lasting mental health sequalae.

6    37.    Psychologists and social workers also use their senses of sight, hearing,

7    smell, and touch to identify the signs and symptoms of a mental health disorder and to

8    assess changes in levels of functioning.  For example, the smell of alcohol on a patient's

9    breath may be an indication of intoxication or withdrawal, which can be associated with

10    somnolence.  Pungent body odors including the smell of urine and/or feces signal that a

11    medical or mental illness is interfering with the patient's Activities of Daily Living

12    ("ADLs").  It is particularly imperative that psychologists and social workers in EOP

13    programs be able to perform this type of physical evaluation given the strong prevalence of

14    EOP patients with severe mental illness.

15    38.    My opinion is not unique in the field of psychiatry or psychology.  In

16    advising providers on how to manage virtual psychiatrist-patient relationships in a digital

17    world, Shore (2020) opined that all psychiatrists need to "understand a technology's effect

18    on clinical processes," specifically "rapport, communication, and treatment outcomes."

19    For some patients, telepsychiatry "can create a sense of emotional or virtual distance,"

20    which is why it is important to continuously assess "the best adaption of a technology to a

21    patient's clinical circumstances in the context of administrative and operational

22    considerations." (1) (*Id.*)

23    39.    Many EOP patients may have treatment needs or diagnoses that are adverse

24    to the use of telepsychiatry or telemental health.  For example, scholars have found that

25    patients who are acutely psychotic or paranoid may present difficulties in being treated

26    remotely through telepsychiatry and may be unable to give consent to participate in this

27    treatment modality.  *See* APA, Psychiatric Services in Correctional Facilities, Third

28    Edition (2016).  In a cohort study evaluating the use of telepsychiatry for older adults in

1    Southern Australia, Dham et al. (2018) received concrete feedback from treating

2    psychiatrists that had difficulty engaging with patients with behavioral symptoms and/or

3    cognitive difficulties, and expressed doubts regarding telepsychiatry over an in-person

4    consultation for these types of patients.  And in a qualitative study of telepsychiatry in

5    emergency departments across Western Australia conducted by Saurman, Kirby, & Lyle

6    (2015), telepsychiatry was considered for "almost every mental health presentation except

7    those particularly violent or under the influence of substances."  (6).

8         40.    The February 2023 APA Resource Document on Telepsychiatry for Adults

9    in Jails and Prisons includes residential treatment units – like the EOP units in CDCR – as

10   among the higher level of care programs "about which more research is needed and where

11   the most psychiatrically vulnerable patients reside."  APA Resource Document at 4.  The

12   Resource Document notes that concerns with using telemental health at these levels of care

13   include the ability to interact with other staff (clinical and custody), awareness about

14   "milieu issues and risks to patient safety," and "control of the therapeutic environment."

15   *Id.*  I agree with these concerns and agree that they support the limitations on telemental

16   health care in EOP units recommended by the Special Master and Plaintiffs' Counsel.

17        41.    Because of the unique nature of the EOP as an intensive residential treatment

18   program, the acute mental illness of many EOP patients, the very real possibility that many

19   EOP patients will have clinical contraindications for the use of telemental health, the

20   advantages that on-site case managers have in identifying signs and symptoms of mental

21   health decompensation, the advantages of conducting substantive clinical therapy groups

22   in person, and the positive impact of EOP case managers on the therapeutic milieu of EOP

23   programs CDCR should be required to maintain 80 percent of the EOP case manager

24   positions at a given institution as on site positions, or at the very least to maintain 40

25   percent of such positions in person as recommended by the Special Master in his report.

26

27

28

**B.**    **Telemental Health Is Not Clinically Appropriate At The MHCB And PIP Levels Of Care, And Its Use Should Be Limited To Being A Last Resort In Emergency Situations, Consistent with the Special Master's Recommendations**

42.    As recommended by the Special Master, on-site psychology should always overwhelmingly predominate at the MHCB and PIP levels of care.  Telemental health in these settings should be reserved only as a last resort in in such programs.

43.    The literature around telepsychiatry and telemental health in inpatient settings is sparse.  The APA notes in the organization's online Telepsychiatry Practice Guidelines and Toolkit, which is cited by Dr. Penn, that "the development of inpatient [t]elepsychiatry programs has lagged behind that of outpatient programs."  *See* Am. Psychiatric Ass'n, "Telepsychiatry Toolkit: Inpatient Settings," (last accessed July 12, 2024), available at https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/inpatient-settings.  Because of this, the APA cautions that "more research is needed on implementation, outcomes, and guidelines for inpatient…settings." *See* Hilty, Donald M., "Telepsychiatry Toolkit: Evidence Base", Am. Psychiatric Ass'n, (last accessed July 12, 2024), https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-base.

44.    It is therefore not surprising that Spivak et al.'s (2020) study using national data found that, in 2017, of the U.S. mental health facilities that offered telepsychiatry, only 15.6% were inpatient compared to 90.5% being outpatient programs.  (Table 1).  And that the APA has instead focused its guidance on telepsychiatry's utility "in situations where short-term coverage is needed," such as when providers are unavailable due to vacation or illness.  *See* https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/inpatient-settings.

45.    The APA Resource Document on Telepsychiatry in Jails and Prison supports similar restrictions at higher levels of care, noting that "It is the opinion of the authors that telepsychiatry in higher levels of care be used as a last resort or in very specific situations, such as when in-person recruitment is not successful."  See APA Resource Document at 4.

46.    My personal experiences also lead me to conclude that inpatient care should be provided by in-person clinicians.  Due to the intensity of the mental health needs at the MHCB and PIP levels of care, in-person clinicians are better equipped to manage and treat the population.  My experiences are echoed by the cohort study conducted by Dham et al. (2018), where they found that individuals in inpatient settings receiving psychiatric treatment via telepsychiatry "were significantly less satisfied with wait times and visual clarity compared to outpatients," which the authors believed "could be because of *subjective differences in needs/expectations or illness severity*."  (10) (emphasis added). Another study on an acute inpatient unit by Grady & Singleton (2011) also showed lower satisfaction across all clinical domains in patients with a psychotic illness compared to those without psychosis.  Patients at the inpatient level of care, in my experience, are far more likely to have psychotic illness, and also more likely to be experiencing decompensation or suicidal ideation, than patients at other levels of care in CDCR.

**C.    Current Academic Literature Supports the Special Master's Proposed Restrictions On The Use Of Telemental Health At Higher Levels of Care including EOP Care**

47.    I am aware that Dr. Penn has stated that he has found no published literature that describes harms or risks of harms through the use of telemental health.  I disagree with Dr. Penn's general assessment of the literature.  There are a number of articles, reviews and studies that suggest the presence of risk in certain settings like those discussed in this declaration, and the need to further study telemental health in its applications to correctional settings, crisis care and other higher levels of care.

48.    It is true that there is no clear research-based evidence of any significant differences between telepsychiatry and in-person psychiatric care in the community.  But the absence of research-based evidence is not the same as having positive findings in the literature showing there are no differences – what one reviewer called "evidence of nonexistent differences."  Batastini, King, Morgan, & McDaniel (2016) at 28.  Moreover, the community evidence with respect to individuals at high clinical risk and in crisis is very limited and many commentators suggest caution and note the weak evidentiary

1  support for using telemental health with such individuals, including for people in prisons

2  and jails.  For example, Santesteban-Echarri, Piskulic, & Addington (2020) reviewed a set

3  of 14 original research studies which involved individuals with a schizophrenia-spectrum

4  disorder receiving treatment via videoconferencing technology in the community, inpatient

5  units, and at least one prison facility.  They found no study reporting on videoconferencing

6  interventions for individuals at "clinical high risk." (48).

7    49.    We do not know that telemental health and on-site case management by

8  psychiatrists and social workers lead to equivalent treatment outcomes, especially for

9  individuals at higher levels of care with severe psychiatric disorders within correctional

10  settings like CDCR.  The current literature also has serious methodological limitations,

11  including small sample sizes and a lack of randomized control trials.  As Hewson et al.

12  (2021) note in their article on remote consultations in prison mental healthcare in England

13  during the COVID-19 pandemic, most of the data we do have in the context of forensic

14  psychiatry and telemental health comes from case reports, descriptive studies, and

15  uncontrolled trials.  (1).  It is far too soon in the development of telemental health as a

16  treatment modality to make any definitive assertions about its utility for all patients.

17    50.    I am aware that Dr. Penn has stated that it is reasonable to treat community-

18  based studies as strong evidence that telemental health will work equally well in prisons.  I

19  disagree with this statement.  Prisons are very different environments than mental health

20  treatment in the community.  The patients have higher rates of trauma, more serious

21  treatment needs, and live in a much more challenging environment for clinicians in terms

22  of the ability to establish rapport, trust, keep patients safe and maintain confidentiality.

23  The existing clinical evidence does not support wholesale replacement of on-site clinicians

24  with remote clinicians for patients at higher levels of care, including patients who are

25  acutely ill, patients with severe psychotic symptoms, patients who are in the throes of

26  mental health decompensation, and patients at grave risk for self-harm or harm to others.

27

28

## III.    THE SPECIAL MASTERS' MODEST PROPOSED LIMITS ON TELEMENTAL HEALTH IN CCCMS PROGRAMS ARE APPROPRIATE

51.    Although CCCMS patients are lower-level acuity patients, in my experience in CDCR, these individuals do experience periodic decompensation, suicidality, and other serious mental health crises, and on-site mental health clinicians also play a critical role in CCCMS units in helping educate custody staff and other clinical staff including nursing staff about mental health issues and strategies for working with mentally ill individuals. This kind of education and collaboration takes place most easily and effectively when done informally and in person.  In my experience, CCCMS clinicians also play an important role as advocates for their clients in these units, which is also at times best done informally and in person.  I am aware of the CDCR Custody Mental Health Partnership Plan (CMHPP), which requires huddles, collaboration, and cross-trainings between custody and mental health staff at CDCR prisons in order to help create a therapeutic culture for mental health patients in CDCR.  In my opinion such interactions require on-site clinical presence to be effective.

52.    Because of these routine needs in CCCMS yards, I believe that the plaintiffs' request for a requirements that CDCR maintain at least 40 percent of its on-site case manager staff in CCCMS treatment programs is appropriate.

53.    Maintaining a core of on-site CCCMS case managers is also important for the other functions mandated to be on site under the Special Master's Recommended policy, including five-day follow ups, group therapy, treating suicidal patients, and working to deescalate the situation during mandatory cooling off periods before any use of force incidents.  *See* Special Master's Report and Proposed Telemental Health Policy, ECF No. 8165 at 31-35.

## IV.    TELEMENTAL HEALTH SHOULD NOT BE USED FOR SUICIDAL PATIENTS

54.    Even when a suicidal patient is not housed in an inpatient unit, telemental health should not be used to evaluate and manage the suicidal patient's condition, if there

1    is an in person clinical resource available.  I and other commentators consider any

2    increased acute risk to self or others is a "clinical red flag" that triggers the need for an

3    urgent, in-person consultation.  *See, e.g.*, Smith, Ostinelli, Macdonald, & Cipriani (2020).

4    In person care is the safest and most effective mode for providing treatment to suicidal

5    individuals and is generally the standard of care in the community when possible.  As the

6    APA Resource Document on Telepsychiatry for Adults in Jails and Prisons notes, "patients

7    who self-injure may be at higher risk in a clinical session where the psychiatrist cannot

8    immediately intervene."  APA Resource Document at 8.  Given the high rate of suicide in

9    the CDCR, I would be particularly concerned about allowing telemental health workers to

10   manage the treatment of suicidal patients in CDCR.

11        55.    I have evaluated thousands of patients who were suicidal, typically in the

12   throughs of a period of acute crisis or mental health decompensation.  Behaviors accom-

13   panying such suicidal patients consistent with crisis may include sobbing, crying, specific

14   self-injurious behaviors (cutting, banging, slapping, hitting selves), lack of cooperation,

15   and extreme behaviors, notably agitation that runs from mild to severe.  The expression of

16   such behaviors makes it very difficult to perform an adequate evaluation to identify the

17   underlying reasons for the patient's presentation.  The provider must deescalate the

18   situation in order to conduct a thorough evaluation and facilitate assessment of the

19   condition, and keep the patient safe.  Where a patient finds himself in a situation where

20   taking his own life seems like a reasonable action, human intervention is required.  Placing

21   that individual in front of a computer screen and telling him to talk to the doctor is

22   clinically inadequate and ridiculous when there is an in-person alternative.  In their article

23   discussing the ethical use of telepsychiatry during the COVID-19 pandemic, Stoll, Sadler,

24   and Trachsel (2020) opined that providers needed to "ensure that telepsychotherapy is

25   appropriate for the patient in question. For example, this approach may not be suitable for

26   patients with concrete suicidal ideation because rapid reaction to emergency situations may

27   be hindered by physical distance." (2).

28        56.    Once the patient is calm, an evaluation can be performed.  To effectively

1  evaluate the patient undergoing crisis and to fully and effectively assess the underlying

2  condition, the provider must be physically present to properly observe all aspects of their

3  presentation.  In doing so, the in person provider has access to all of her senses of seeing,

4  hearing, smelling, and touching.  The use of telemental health is inadequate for the task, as

5  it does not allow the provider the full use of her hearing or sight, and necessarily prohibits

6  the use of her smell and touch.

7       57.    I am aware that Dr. Penn and Dr. Mehta have stated their concern that

8  requiring an onsite manager to respond to a crisis, rather than the patient's telemental

9  health primary clinician, would disrupt continuity of care.  This is not a valid concern

10  during a psychiatric emergency.  Also, it presumes a strong therapeutic relationship using

11  telemental health, which in my opinion is not always the case.  Moreover, this concern

12  ignores the fact that when an onsite clinician takes over, the remote primary clinician is

13  still available for consultation.

14       58.    When I have treated suicidal patients using telepsychiatry in Hawaii, after

15  doing my clinical assessment and treatment recommendations, I always turn the primary

16  management of the suicidal patient over to any available clinician on the scene, so that the

17  patient can be given the best care possible, which I believe requires an in-person clinician

18  whenever possible.  My experience with care delivered to some outer islands is that, unlike

19  prisons, there is no local mental health clinician who could even potentially do the

20  assessment done over telepsychiatry.

21       59.    I do consult with the on-site clinician, as needed, once turning over care, and

22  potentially follow up with the patient once the crisis is resolved or the individual is

23  stabilized.

24  **V.    IT IS CLINICALLY NECESSARY FOR CDCR TELEMENTAL HEALTH CASE MANAGERS TO CONDUCT FREQUENT SITE VISITS AT THEIR ASSIGNED INSTITUTIONS, AS RECOMMENDED BY THE SPECIAL MASTERS REPORT AND RECOMMENDED POLICY**

25

26

27       60.    In my opinion, frequent on site visits by telemental health workers to the

28  prisons where they work are critical because they educate clinicians about the prison

1    culture and housing conditions of the prison units in which their patients live.  However, I

2    do not believe a single one day visit is sufficient for the teleclinician to become

3    appropriately familiar with the prison environment of his or her patients.

4         61.    Moreover, telemental health workers, just as all other mental health clini-

5    cians, have certain clinical obligations to their patients, which include being

6    knowledgeable about the culture and environments in which they are providing care.  This

7    is why the APA, in its online Telepsychiatry Practice Guidelines and Toolkit, recommends

8    that telepsychiatrists practicing in any type of cross-cultural setting consider conducting

9    "periodic site visits" and ensure they are "informed of events occurring in the communities

10   in which patients are located."  *See* APA Telepsychiatry Toolkit, Use of Telepsychology in

11   Cross Cultural Settings, (Shore 2020) at

12   https://www.psychiatry.org/Psychiatrists/Practice/Telepsychiatry/Toolkit/Use-of-

13   Telepsychiatry-in-Cross-Cultural-Settings.  That is, telepsychiatrists need to be aware of

14   "resources, cultural issues, and environmental factors affecting patients in remote

15   environments with which clinicians may not have familiarity" in order to properly manage

16   the psychiatrist-patient relationship.  *Id.*  I believe this kind of cultural competence is part

17   of the standard of care in the community and in prisons.

18        62.    The APA Toolkit advice about cross cultural settings is certainly applicable

19   and especially crucial when it comes to telemental health clinicians seeing patients in

20   correctional settings.  Patients in such settings are simply not comparable to community-

21   based patients.  Not only do incarcerated patients have substantially higher acuity of

22   medical and mental illness, they are also subjected to non-comparable conditions and

23   objective stressors that are profound and singular.

24        63.    For example, many incarcerated patients have recently entered prison and are

25   coping with adjustment to a harsh and frightening environment.  Their movements are

26   restricted, their choices are limited, and incarceration itself often leads to further

27   psychiatric decompensation.  This unique reality is one that most psychologists and social

28   workers are not familiar with, and it will undoubtedly take more than just one visit a year

1   to build up such familiarity.

2      64.    Experts in the field of correctional mental health services echo my concerns.

3   As Kaftarian (2020) explains in his article on telemental health in rural correctional

4   institutions, remote providers such as telepsychiatrists "should be cognizant of some of the

5   limitations to being located remotely.  This includes potential challenges to accessing

6   information that may be more readily available to onsite staff about activities of the

7   facility.  Events such as riots, racial tension, or suicides may adversely affect the mental

8   and emotional condition of patients.  Without the knowledge of these events and

9   familiarity of the dynamics of the facility, telemental health staff may potentially be at a

10  disadvantage..." (2)

11     65.    Cultural competence and having adequate contextual knowledge of the

12  patient's setting and location means not just frequent site visits, but also requiring

13  telepsychiatrists to interact with their patients face-to-face during these site visits.  Due to

14  the unique setting of a prison, there is no way a telepsychiatrist can truly understand how

15  her patient's state of mind is affected without seeing the setting in person herself and

16  speaking with the patient in person about the setting and hearing their perspective about

17  the prison setting and culture.

18     66.    Finally, even scholars who have fully embraced telepsychiatry emphasize the

19  importance of integrating the remote psychiatrist into a patient's treatment team.  That is,

20  "the telepsychiatrist must feel that (s)he belongs to the community and has an equal voice,

21  despite being in a different geographical location."  *See* Kaftarian (2019) at 6.  Although

22  such integration can be done through constant communication via emails, telephone calls,

23  or videoconferences, frequent site visits only serve to further facilitate a culture of

24  teamwork, which in turn will be a tremendous benefit to the patient under the care of the

25  interdisciplinary treatment team.

26

27

28

**VI. THE USE OF TELEMENTAL HEALTH FOR CELL-FRONT EVALUATIONS IS NOT APPROPRIATE AND IT IS MY OPINION THAT CELL-FRONT TELEMENTAL HEALTH CONTACTS SHOULD NOT COUNT TOWARDS MANDATORY CLINICAL CONTACTS IN *COLEMAN***

67.     As a clinical matter, a patient's refusal to leave their cell for an in-person evaluation in a confidential setting can be for a variety of reasons, but almost all of them tend to reflect some type of clinical deterioration—some worsening of existing mental health issues or the development of new, more serious mental health concerns that increase the risks of using telemental health.

68.     Not infrequently, for example, vulnerable mentally ill individuals will decompensate under the stress of living in a locked-down, punitive administrative segregation setting. When these individuals decompensate, they often become "cell dwellers" who refuse to leave their cells to go to yard, showers, or mental health appointments. Cell-front clinical contacts with such patients are critical to attempt to convince the patient to leave the cell, or to assess the degree to which the patient is a danger to him or herself or to others, or gravely disabled. Such cell-front interactions may be needed to assess whether a patient's situation is so dire that he or she needs to be cell-extracted by custody staff in order to be provided urgent mental health treatment, assuming the patient cannot be convinced by the clinician to voluntarily leave the cell for treatment.

69.     While I do not agree that conducting clinical treatment is ever appropriate cell-front due to the lack of confidentiality and the difficulty of communicating effectively with the patient in this setting, cell-front assessments may sometimes be necessary to ensure that mentally ill individuals do not harm themselves, staff, or other incarcerated persons; suffer harm from an undiagnosed medical illness; become victimized; or engage in problematic behavior that causes or exacerbates operational difficulties. The remote nature of telemental health inhibits such assessments at cell front, especially when someone is decompensating or in crisis. In my opinion, remote cell-front evaluations are not substantive clinical contacts.

70.     Because they are not physically present in the prison with the patient,

1  telemental health clinicians, by themselves, cannot sufficiently identify the signs of
2  medical and mental illness during cell-front interactions.

3      71.    I am also be concerned about the efficacy of any cell-front telemental health
4  technology.  Many housing units in CDCR are extremely noisy, and even with a
5  microphone inserted into the cell, my belief is that a human being present at the doorway,
6  able to look at the patient and speak through the door, would be better able to
7  communicate and certainly more able to engage in a therapeutic conversation about what
8  problems the patient is experiencing.

9      72.    My concerns about cell-front telemental health apply to all housing units, but
10 I view this modality as being unacceptable for use in restrictive housing.  Restrictive
11 housing settings are especially dangerous for people with serious mental illness and on site
12 clinicians are best able to identify and address signs and symptoms of mental illness and
13 decompensation.

14     73.    In my opinion, a mental health provider who is physically present will be
15 better able to connect to and treat the patient in this setting.  Even in the best of
16 conditions, my experience with telepsychiatry and telemental health is that the
17 connection quality can often be a problem and detract from the quality of the clinical
18 interaction.  Even when there is good connectivity, the quality of the clinical connection
19 between the doctor and patient is significantly impaired by the technology.  I also have
20 serious concerns about confidentiality in using cell-front technology.  That is also a
21 problem with in-person cell-front visits, but in-person clinicians may be able to minimize
22 any privacy problems by pitching their voice at the volume that can be heard by the
23 patient but by as few others in surrounding cells as possible or by speaking through the
24 opening at the side of the door.

25     74.    In my opinion, cell-front meetings and evaluations with mental health
26 patients should be done in-person rather than by a remotely-based provider.  Cell-front
27 telepsychiatry contacts should not count as Program Guide-compliant clinical contacts.

28     75.    In my opinion, any attempts at cell-front treatment or evaluation should be

1  in-person.  I am aware that the Special Master has not taken this approach, but rather has

2  recommended that such contacts not be used to satisfy Program Guide requirements for

3  frequency of contacts.  In my opinion, this is the minimal safeguard necessary regarding

4  cell front contacts, because it ensures some follow-up in order to meet the Program Guide

5  requirements for frequency of contacts.

6        76.    In my opinion, the Special Master is correct to recommend that patients who

7  refuse two consecutive telemental health appointments must be assessed by an onsite

8  clinician for consideration of changing the patient's treatment modality to in-person

9  treatment.  Consecutive refusals for telemental health appointments are likely the result of

10  an exacerbation of the patient's pre-existing mental illness, and therefore the patient should

11  be given a face-to-face evaluation.  This is an important safety measure even in cases

12  where the patient has consented in the informed consent process to telemedicine.

13  **VII.  TELEMENTAL HEALTH CLINICIANS HAVE A CLINICAL
       OBLIGATION TO THEIR PATIENTS TO OBTAIN A SPECIFIC
14       WRITTEN INFORMED CONSENT FOR TELEMENTAL HEALTH
       WHICH SHOULD INCLUDE ALLOWING THE PATIENT TO CHOOSE
15       AN IN PERSON PRIMARY MENTAL HEALTH CLINICIAN**

16        77.    Informed consent is a foundational tenet in the fields of psychiatry,

17  psychology and social work.  Patients have a right to be informed and actively involved in

18  their mental health care.  Informed consent protects a person's dignity and autonomy by

19  ensuring that patients have the right to make decisions about their psychiatric treatment,

20  "including their right to refuse unwanted treatments."  *See* Neilson & Chaimowitz (2015)

21  at 11.

22        78.    I have reviewed CDCR's proposed informed consent provision for

23  telemental health and in my opinion it is not adequate because it fails to give the patient

24  the option of refusing to give consent to telemental health and opt for in-person care.  It

25  also fails to require disclosure of potential risk to confidentiality and privacy that comes

26  with remote treatment, fails to require the clinician to explain the risks and benefits of

27  telemental health generally, fails to allow the patient to ask that the telepresenter not be in

28  the room during therapy sessions, and fails to include the patient's right to revoke their

1  informed consent at any time.  I have also reviewed the Special Master's proposed

2  revision, which includes these necessary elements.

3      79.    I am aware that Dr. Penn has endorsed the CDCR's proposed informed

4  consent provision as meeting the standard of care.  I disagree.  In my experience, informed

5  consent in the community generally includes a description of the ability of the patient to

6  revoke their informed consent, and generally allows the patient to opt for in-person

7  treatment where such treatment is available.  The standard of care in the community is to

8  obtain written informed consent from the patient, and that should be the standard in prisons

9  as well.  Incarcerated persons should have the same rights as people in the community

10  when it comes to informed consent.  There are risks to telemental health that are not

11  present with in-person care, and for that reason, patients should be permitted to choose in

12  person care, and there should be a specific, separate informed consent process for

13  telemental health.

14      80.    Informed consent, whether in the community or in prison, should involve

15  engaging in dialogue with the patient in addition to a mental health clinician's evaluation

16  of a patient's appropriateness for telemental health or telepsychiatry.  In praising the use of

17  telepsychiatry during the COVID-19 pandemic, O'Brien and McNicholas (2020)

18  nevertheless emphasize the clinical importance of psychiatrists obtaining informed consent

19  by explaining "the nature and purpose of the interaction…together with the known

20  limitations such as inability to perform a physical examination or to identify other cues that

21  might be relevant to making a diagnosis."  Psychiatrists who conduct in-person initial

22  evaluations have access to more information—and more opportunities to observe signs of

23  mental illness—than telepsychiatrists.  Patients should be aware of this and other key

24  differences between telemental health clinicians and on-site clinicians so they can make a

25  fully-informed decision about the risks of telemental health and whether to proceed with it

26  or whether to opt for in-person treatment.

27      81.    In addition, O'Brien and McNicholas astutely observe that the "failure to

28  object or refuse in itself does not constitute consent…."  The fact that patients are aware

[4512456.4]                                31                    Case No. 2:90-CV-00520-KJM-DB

DECL. OF PABLO STEWART, M.D. IN SUPPORT OF PLS.' RESPONSE TO DEFS.' OBJECTIONS TO
SPECIAL MASTER'S REPORT & RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY

1  they are proceeding with treatment via telemental health—given that they are speaking

2  with their psychiatrist through videoconferencing technology—does not mean they have

3  provided informed consent.  They must also be given the information necessary to "allow

4  the patient to make a careful decision about the advantages and disadvantages of

5  telepsychiatry."  *See* Stoll, Sadler, & Trachsel (2020) at 2.  This includes an explanation by

6  the telemental health provider of the conditions under which a patient may be clinically

7  contraindicated for telemental health and instead need in-person mental health care, and a

8  discussion of the risks of using the technology.

9         82.    Not all patients will want to use telemental health to receive treatment, nor

10  will all patients equally benefit from and engage with a telemental health clinician.  Freuh

11  et al. (2007) conducted a small study comparing the efficacy of telepsychiatry and same-

12  room treatment of combat-related post-traumatic stress disorder using cognitive,

13  behavioral therapy in 14 weekly sessions.  The same-room group reported more comfort in

14  talking with their provider, and they were more likely to have completed homework

15  assignments, which as the study's authors noted, is perhaps evidence of higher treatment

16  engagement.

17         83.    I am aware that Dr. Penn has stated a concern about patients abusing the

18  informed consent process to engage in "clinician shopping."  Penn Decl., ¶ 63.  In my

19  opinion, this concern is not well grounded.  Patients would not have the ability to control

20  the selection of their on-site or telehealth provider under the Special Master's proposed

21  informed consent policy.  Even if a patient opts out of telemental health, they would have

22  no greater ability to choose the particular clinician that they are seeing than they do

23  presently.  Moreover, allowing patients some degree of input in choosing their clinician is

24  often helpful in establishing a strong therapeutic alliance.  Most of the time in the

25  community, patients have the ability to choose a clinician, unless they are in a severely

26  underserved area, and even then, they can choose among different tele-clinicians.  Even if

27  patients in CDCR do not have the ability to choose their clinician, allowing them to have

28  input over the mode that they receive mental health care can similarly be helpful in

1  establishing an effective clinical alliance between the clinician and the patient.

2        84.    Dr. Penn refers to the American Psychological Association guidance on the

3  issue of patient preference, which he notes says that "considering patient preference for

4  such service is important" while explaining that it may not be solely determinative.  Penn

5  Decl., ¶ 65.  In my reading of the relevant section of the American Psychological

6  Association Guidance cited by Dr. Penn, the association clearly shares my concerns and

7  those animating the Special Master's recommendations regarding telemental health.  For

8  example, the guidelines state:  "Moreover, psychologists are encouraged to reflect on

9  multicultural considerations and how best to manage any emergency that may arise during

10  the provision of telepsychology services."  See

11  https://www.apa.org/practice/guidelines/telepsychology (last accessed on July 2, 2024).

12  The assertion that individual preference is not the sole determination, in context of these

13  guidelines, appears more about making sure the patient's consent to telemental health

14  services is not unwisely given.  For example, the guidelines state that psychologists using

15  telemental health should "consider the client's/patient's familiarity with and competency

16  for using the specific technologies in providing the particular telepsychology service."

17        85.    Informed consent is meant to empower patients to make knowing,

18  appropriate decisions about their mental health care.  This is as important a right in

19  carceral setting as it is in the community, if not more so, and the ethical informed consent

20  rules should not be weakened for incarcerated persons in the manner CDCR is proposing.

21  **VIII.  TELEMENTAL HEALTH PATIENTS MUST BE PERMITTED TO ASK**

          **THAT THE TELEPRESENTER NOT BE PRESENT DURING THERAPY**

22            **SESSIONS**

23        86.    In my opinion, it is important for the patient to have the choice to ask the

24  telepresenter to leave the room for clinical reasons.  There may be a few moments at the

25  beginning of the session where the telepresenter is in the room and the telepresenter

26  provides clinically relevant information, and this can in some instances provide important

27  information to the remote clinician.  But this information can generally be obtained quickly

28  before the therapy discussions with the clinician begins.  For example, the telepresenter

1  could quickly note whether the patient is malodorous and/or disheveled and record that in

2  the record for the psychologist or social worker.  But beyond some quick in person

3  assessment, the telepresenter's presence is clinically detrimental most of the time,

4  particular where the telepresenter is a low-level medical assistant.

5         87.    Having a third party in the room can cause serious detriment to the quality of

6  care provided by mental health staff for several reasons.  First, the presence of third party

7  inhibits open, free flowing communication, particularly if the medical assistant acting as a

8  telepresenter changes from session to session.  Second, the presence of a third party

9  interferes with the establishment of a therapeutic relationship.  Third, the presence of a

10  third party telepresenter who is often less well known to the patient than the clinician,

11  often raises concerns about confidentiality.  This is particularly true in prison, where the

12  fear of breaking confidentiality is more pervasive than in the community given prison

13  politics and the close living environments of prison.

14         88.    For all of these reasons, I support the Special Master's Report and Proposed

15  Policy provisions allowing the patient to request that the telepresenter leave the room

16  during the therapy discussions.

17  **IX.    THE REQUIREMENT FOR AT LEAST ONE FULL-TIME, ON-SITE CASE
        MANAGER IN RHU UNITS IS APPROPRIATE IN THE ABSENCE OF A**
18  **    REQUIREMENT THAT ALL RHU CARE BE ON SITE**

19         89.    In my opinion, all care in CDCR's Restrictive Housing Units should be

20  provided on-site.  If that is not possible, then at a minimum RHU unit have at least one

21  full-time on site case manager.

22         90.    I am familiar with CDCR segregation units, including CDCR's specialized

23  mental health segregation units for CCCMS and EOP patients.  I have toured these units

24  many times and spoken with EOP and CCCMS patients in these units and reviewed their

25  treatment records.

26         91.    These units are very high-risk units.  Individuals with pre-existing mental

27  health conditions often decompensate in the harsh, locked-down conditions in segregation

28  units.  I understand from Plaintiffs' counsel that CDCR continues to have a high rate of

suicides in segregation units, despite years of efforts to make these units safer for people with mental health concerns. The general lack of programming and activity in segregated units makes them dangerously isolating for people with serious mental health conditions. Having on-site clinicians is important to decrease isolation and to facilitate informal wellness checks on patients who are struggling and to respond to crises. Having on-site clinicians is also important to establish regular out-of-cell follow-up with these vulnerable patients, and to engage with those who initially refuse to come out for treatment.

## X.    THE SPECIAL MASTER'S OTHER SAFEGUARDS FOR PARTICULAR HIGH RISK TASKS TO IN PERSON CLINICIANS ARE CLINICALLY APPROPRIATE

92.    I have reviewed the Special Master's recommendations regarding certain high-risk tasks, specifically: (1) use-of-force incidents, (2) five-day follow-up visits after someone is released from a MHCB units, and (3) MHCB discharges. In my opinion clinicians should perform these tasks onsite, not remotely.

93.    Use of Force. It is also important for in-person clinicians to perform the clinician duties of the case manager during a cell extraction and other use of force incidents. In these situations, the physical presence of the clinician alone is an important factor in limiting the potential for staff misconduct. Moreover, de-escalation of the patient's emotions is unlikely to be effective over a video connection.

94.    Five-Day Follow Ups. I am familiar with the role of these follow-ups in the CDCR's suicide prevention program. In my opinion, in order to ensure a patient does not return to suicidality and has truly recovered from their crisis, it is crucial for the clinician to see the inside of the cell and assess how the patient is doing in the new environment. The in-person clinician is best able to see the condition of the cell, smell the patient and the cell (as lack of self-care is often a sign of decompensation), and collect collateral information informally from custody and potentially from a cellmate or other patients on the unit. That cannot be done well with cell-front telemental health and cannot be done at all if the patient is escorted to a treatment room with a video screen.

95.    MHCB Discharges. With respect to MHCB discharges, in my opinion, it

1  makes sense to restrict this to on-site staff, given that MHCB care in general is restricted to

2  on-site staff.

3  **XI.  THE REQUIREMENT THAT GROUP TREATMENT MUST BE DONE BY
       IN PERSON CLINICIANS IS CRITICAL FOR ADEQUATE PATIENT
4      CARE**

5      96.     I am aware that Dr. Mehta has stated his opinion that "virtual group therapy

6  has become a mainstay in community mental health treatment." Mehta Decl. ¶ 53. In my

7  opinion this statement exaggerates the role of virtual therapy in the community, and its

8  potential uses in the very different setting of prison. While the pandemic may have made

9  on-line resources more attractive, in my opinion, it remains the case that group therapy is

10 best done in person. For one thing, virtual group therapy is more challenging the way it

11 would be done in prison, with the patients together in a room and the psychologist online.

12 When done in the community, each participant is typically at home with their own

13 computer and camera. In prison, there would be a single camera and microphone in the

14 group room with all the participants in person together and the leader remote. That is a

15 much more challenging environment for the therapist as far as hearing everything and

16 tracking the reactions and interactions in the room.

17     97.     In addition to the difficult technology issues, in person contact with the

18 clinician is an important part of group therapy in CDCR. This is particularly true because

19 CDCR uses "caseload groups" where the primary clinician checks in with a group of their

20 patients. I have observed EOP groups in classroom settings in CDCR. Based on my

21 observations, even having a live clinician in the room presented the mental health provider

22 with numerous challenges to group engagement and therapeutic progress. Managing these

23 challenging groups through a video connection, in my opinion, simply would not work,

24 and is a fool's errand.

25 **XII.  THE LIMITATION IN THE SPECIAL MASTER'S PROPOSED POLICY
        THAT TELEMENTAL HEALTH PROVIDERS MUST BE LICENSED IS
26      APPROPRIATE**

27     98.     I have reviewed the Special Master's recommendation that telemental health

28 providers to be licensed. Given the risks of using telemental health described throughout

1  this report, and given the inherent difficulty of supervising a new, unlicensed clinician

2  online, in my opinion this is a reasonable limitation.  The challenges of having the

3  clinician and the supervisor not in the same place at the same time also may inhibit the

4  adequacy of supervision and training provided to the unlicensed clinician.

5  / / /

6  / / /

7  / / /

8  / / /

9  / / /

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

DECL. OF PABLO STEWART, M.D. IN SUPPORT OF PLS.' RESPONSE TO DEFS.' OBJECTIONS TO
SPECIAL MASTER'S REPORT & RECOMMENDATIONS RE PROPOSED TELEMENTAL HEALTH POLICY

1    I declare, under the penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct to the best of my knowledge, and that this

3 declaration is executed at Honolulu, Hawaii this 12th day of July 2024.

4

5                                        Pablo Stewart, M.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

<u>CURRICULUM VITAE</u>

**_PABLO STEWART, M.D._**
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**(808) 352-8074**
**(415) 264-0237**
**e-mail: pablo.stewart.md@gmail.com**
**(Updated June 2024)**

| | |
|---|---|
| <u>Personal Statement:</u> | As evidenced in my CV, my psychiatric career is based on several guiding principles. These include, but are not limited to, a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone. |
| <u>Language Competency:</u> | Fluent in both Spanish and English. |
| <u>EDUCATION:</u> | University of California, San Francisco, Teaching Certificate in General Medical Education, 2017 |
| | University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986 |
| | University of California, San Francisco, School of Medicine, M.D., 1982 |
| | United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| <u>LICENSURE:</u> | California Medical License #GO50899 |
| | Hawai'i Medical License #MD-11784 |
| | Federal Drug Enforcement Administration #BS0546981 |
| | Hawaii Controlled Substances Certificate of Registration #E14341 |
| | Diplomate in Psychiatry, American Board of |
| | Psychiatry and Neurology, Certificate #32564 |

<u>ACADEMIC APPOINTMENTS:</u>

| | |
|---|---|
| September 1, 2021-Present | <u>Academic Appointment:</u> Clinical Professor/Psychiatrist, Queens University Medical Group (QUMG), University of Hawaii, John A. Burns School of Medicine. |
| July 1, 2019-August 31, 2021 | <u>Academic Appointment:</u> Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine. |

1

| | |
|---|---|
| February 22, 2018-<br>June 30, 2019 | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine. |
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco.<br>School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019-<br>Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I present a lecture series to the psychiatric residents regarding Forensic Psychiatry. I also serve as an Attending Psychiatrist in the Emergency Department, the Psychiatric Inpatient Unit and the Medical and Surgical Units at the Queens Medical Center. |
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities Project.</u>  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court  Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco.</u> Overall responsibility for the medical and psychiatric services at the Homeless Center. |

2

| | |
|---|---|
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts, admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 - | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u> |

| | |
|---|---|
| July 1985 | Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 - November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u>   Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982- July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u> Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 - July 1978 | <u>Infantry Officer - United States Marine Corps.</u> Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 2020 | Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient of the 2019-2020 Excellence in Teaching Award-Psychiatry. |
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |

| | |
|---|---|
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students at the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |

| | |
|---|---|
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University<br>of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional<br>Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health<br>Report.* |
| May 2001-<br>September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco<br>Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department<br>Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory<br>Committee, Department of Human Services, City and County of<br>San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's<br>Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006;<br>February 2017-<br>October 2018 | Member of Human Services Commission, City and County of<br>San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of<br>San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>2017 | President, Human Services Commission, City and County of<br>San Francisco. |
| January 2019- present | Death Doula and Medical Aid In Dying practitioner. In these<br>roles, I attend to dying patients to help them achieve a dignified,<br>painless death. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020-<br>Present | Member of the John A. Burns School of Medicine, University of<br>Hawaii Scholarship Committee. |

| | |
|---|---|
| June 2020-<br>Present | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2019-<br>present | Present a lecture series to the psychiatric residents of the Department of Psychiatry, JABSOM, University of Hawaii on forensic psychiatry and Medical Aid In Dying. Psychotherapy supervisor and career mentor Department of Psychiatry, JABSOM, University of Hawaii. |
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |

| | |
|---|---|
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 -<br>August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |

9

| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital,  Department of Psychiatry.  Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
|---|---|
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital.  Teach and supervise medical residents in interviewing and communication skills.  Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

## COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| February 2019- Present | Forensic psychiatric consultant to the British Charity, Reprieve. In this role, I have conducted postconviction, capital mitigation assessments. I have done this work in Indonesia and Malawi. |
|---|---|
| May 2016- July 2022 | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
| June 2015- May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014- October 2018 | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012- December 2021 | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007- Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state |

10

prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011).

| | |
|---|---|
| July/August 2008-<br>July 2016 | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).   This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.  This Project aids programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs.  NCCD ceased to be the monitoring agency for this project in June 1999.  At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency.  The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997- | Technical Assistance Consultant, Center for Substance |

| | |
|---|---|
| Present | Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville. A major portion of this consent decree also involved establishing a program for the identification and treatment of inmates with Mental Retardation (currently referred to as Intellectual Disability.) |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support group. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |

12

| | |
|---|---|
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary<br>School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance<br>Abuse issues to the student body, Hidden Valley Elementary<br>School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12.   Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.   Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.   Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.   Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.   University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17.   National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.   Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.   Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.   First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.   Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.   Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.   The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25.   American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26.   American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27.	Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.	International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.	Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30.	Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31.	Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.	Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.	DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34.	The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35.	The California Council of Community Mental Health Agencies Winter Conference, Keynote Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.	American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.	"Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc. sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38.	"AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.	Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.	Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.    Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.    "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.    9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.    Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.    Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.    California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.    California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.    Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.    1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.    "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.    Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.    "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.    Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59.    American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60.    "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61.    "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62.    "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63.    "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64.    Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71.     11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?"

"Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89.    "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90.    "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91.    "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92.    "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93.    "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94.    "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95.    "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96.    "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97.    "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98.    "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99.    "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101.   "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.   National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.   "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.   "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.   (6/29 & 7/27/00)

105.   "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.   Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.   "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109.   "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.   "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.   "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues.   2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.   "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."   County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.   "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.   "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.   Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.   National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117.   Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118.   Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120.   First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121.   The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122.   Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123.   3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124.   New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125.   Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126.   California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127.   Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.   Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.   "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131.  "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Pasadena, California.  (4/2/04)

132.  Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.  San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.  "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.  "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.  Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.  Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.  "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.  Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.  "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.  "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.  "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.  "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.  "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.  "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.  "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.  "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.    Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for

Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163.    Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

164.    Mental Health & Death Penalty Training, Blantyre, Malawi, October 6, 2023.


PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.* Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)    Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)    Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002). *Treatment Is A Right, Not A Privilege. Chapter in the book, Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)    Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Fifth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

11)    James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* <u>National Institute of Corrections</u>, Accession Number 019468.

12)    Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.</u>*

13)    Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

14)    Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, <u>*Uppers, Downers, All Arounders, Seventh Edition,*</u> CNS Publications, Inc., Ashland, Oregon.

15)    Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)    Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)*    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.

# Exhibit B

*PABLO STEWART, M.D.*
**Psychiatric Consultant**
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**808-352-8074**
**pablo.stewart.md@gmail.com**

---

## TESTIMONY/DEPOSITIONS January 2000-Present

1. People versus Juan Duarte Gonzales (Lincoln County, Washington, January 2000)
2. People versus Jerry Lane Davis (Stanislaus County, California, September 2000)
3. James Andrew Melton versus Arthur Calderon, et al. (United States District Court, Los Angeles, California, December 2000)
4. Fremont Unified School District versus James Parks (Deposition taken in San Francisco, California, April 2001)
5. People versus Pablo Lomeli (Douglas County, Arizona, August 2001)
6. Dunlap versus County of Mendocino (Deposition taken in Oakland California, September 2001)
7. Maxwell Hoffman versus A.J. Arave, Warden, et al. (Deposition taken in San Francisco, October 2001)
8. People versus Michelle Michaud (Alameda County, California, April 2002)
9. People versus David Attias (Santa Barbara County, California, May/June 2002)
10. People versus Larry Christopher Graham (Contra Costa County, California, October 2002)
11. People versus Miguel Enrique Diaz (San Mateo County, California, November/December 2002)
12. United States versus Eugene Frederick Boyce, III (District Court, Honolulu, Hawai'i December 2002)
13. People versus Robert Daniel Weston (Stanislaus County, California, April/July 2003)
14. People versus Vincent Sanchez (Ventura County, California, August 2003)
15. Armstrong Petition JW01-6450 (San Francisco Juvenile Court, December 2003)
16. People versus Daniel Mugnolo (San Francisco City and County, December 2003)
17. Brandon Astor Jones versus Frederick Head, Warden (Deposition taken in San Francisco, January 2004)
18. David Perkins versus Frederick Head, Warden (Deposition taken in San Francisco, March 2004)
19. People versus Marino Hernandez (San Mateo County, California, June 2004)
20. Raphael Camargo versus Larry Norris, Director, Arkansas Department of Correction (Deposition taken in San Francisco, July 2004)
21. People versus Ronald Mathews (King County, Washington, August 2004)
22. People versus Huberto Mendoza (Stanislaus County, California, December 2004)
23. People versus James Essick (San Diego County, California, June 2005)

24. People versus Jesse Ignacio Sanchez Gomez (Ada County, Idaho, July/August 2005)
25. People versus Adrian Camacho (San Diego County, California, October 2005)
26. People versus Huberto Mendoza (Stanislaus County, California, November 2005)
27. People versus Paul Speer (Maricopa County, Arizona, January 2006)
28. People versus Mark Thigpen (San Mateo County, California, January 2006)
29. United States versus Tommy Ray Elam (District Court, Los Angeles, California, February 2006)
30. Enrique Arevalo versus Frederick Head, Warden (Deposition taken in San Francisco, March 2006)
31. United States versus Danny Lee Jones (District Court, Phoenix, Arizona, March 2006)
32. People versus Omar Dent, III (Los Angeles County, California, May 2006)
33. People versus Delaney Marks (Alameda County, California, May 2006)
34. People versus Angel Maturino Resendiz (Harris County, Texas, June 2006)
35. People versus Antonio Nicolosi (San Mateo County, California, July 2006)
36. Gregory Paul Lawler versus Frederick Head, Warden (Deposition taken in San Francisco, July 2006)
37. United States versus Todd Sarver (District Court, San Francisco, California, August 2006)
38. United States versus Eugene Frederick Boyce, III (United States District Court, Honolulu, Hawaii, October 2006)
39. Arthur Torlucci versus W.A. Duncan, (District Court, Santa Ana, California, November 2006)
40. Joaquin Enrique Arevalo versus William Terry, Warden, (Butts County, Georgia, December 2006)
41. People versus Jerry Cabonce, (San Mateo County, California, January 2007)
42. People versus Rodrigo Paniagua, (Santa Clara County, California, February 2007)
43. Gregory Paul Lawler versus William Terry, Warden, (Butts County, Georgia, February 2007)
44. United States versus Francisco Rodriguez, (District Court, Santa Ana, California, April 2007)
45. People versus O'Neal Durgin, (San Mateo County, California, June 2007)
46. Sepulveda versus Beard et al., (Bartonsville, Pennsylvania, June 2007)
47. Webster versus Ayers et al., (District Court, Sacramento, California, September 2007)
48. Ronald Deere versus Jeanne Woodford, et al., (District Court, Los Angeles, California, October 2007)
49. People versus Eric V. Hall (Ada County, Idaho, October 2007)
50. Rickey Dale Newman versus Larry Norris, Director, Arkansas Department of Correction (District Court, Fort Smith, Arkansas, November 2007
51. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, December 2007)
52. People versus Matthew Cunningham (Maricopa County, Arizona, January & February 2008)
53. People versus Alfredo Prieto (Fairfax County, Virginia, February 2008)

54. People versus Edward Gutierrez (Santa Clara County, California, May 2008)
55. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants. (Deposition taken in Phoenix, Arizona, July 2008). A supplemental deposition was also taken in July 2008 approximately 2 weeks after the initial deposition.
56. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, August 2008)
57. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, California, September 2008)
58. United States versus Naeem Williams (District Court, Honolulu, Hawaii, November 2008)
59. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Three Judge Panel, District Court, San Francisco, California, December 2008)
60. United States versus Michael Behenna (United States Army Court Marshall, Fort Campbell, Kentucky, February 2009)
61. United States versus Steven Green (District Court, Paducah, Kentucky, May 2009)
62. People versus Francisco Merino (San Mateo County, California, July 2009)
63. Milton Lewis versus State of California (District Court, Sacramento, California, October 2009)
64. People versus Adrian Sedano (San Mateo County, California, November 2009)
65. United States versus Noshir S. Gowadia (District Court, Honolulu, Hawaii, November 2009)
66. Johnny A. Johnson versus State of Missouri (St. Louis, Missouri, December 2009)
67. Martin Kipp versus State of California (District Court, Los Angeles, California, December 2009)
68. David Welch versus State of California (Martinez, California, September 2010)
69. State of Arizona versus Eddy Rose (Phoenix, Arizona, September 2010)
70. State of Delaware versus Gary Ploof (Dover, Delaware, October 2010)
71. State of Arizona versus Steven Ray Newell (Phoenix, Arizona, March 2011)
72. State of Arkansas versus Ricky Lee Newman (Fort Smith, Arkansas, March 2011)
73. People versus Kerri Livingston (San Mateo County, California, March 2011)
74. People versus Alexander Youshock (San Mateo County, California, April 2011)
75. United States versus Francisco Rodriguez (District Court, Santa Ana, California, May 2011)
76. State of Connecticut versus Robert Breton (Hartford, Connecticut, July 2011)
77. United States versus Billie Allen (St. Louis, Missouri, December 2011)
78. People versus Mohammed Ali (San Mateo County, California, February 2012)
79. Clemency Hearing re: Robert Towery (Florence, Arizona, March 2012)
80. United States versus Danny John, Jr. (Prescott, Arizona, March 2012)
81. State of Ohio versus Abdul H. Awkal (Cleveland, Ohio, June 2012)
82. People versus Monica McCarrick (Solano County, California, June 2012)
83. People versus Robert Hall (Ada County, Idaho, October 2012)
84. People versus Alamoti Finau (San Mateo County, California, November 2012)
85. United States versus Merrell Hobbs (District Court, Philadelphia, Pennsylvania, November 2012)

86. Ex Parte Juan Lizcano, W05-59563-S(A) (Dallas, Texas, November 2012)
87. People versus David Vanalstine (San Mateo County, California, December 2012)
88. Sinisterra versus the United States (District Court, Kansas City, Missouri, January 2013)
89. People versus Jing Hua Wu (San Jose, California, February & March 2013)
90. Coleman versus Brown (Deposition taken in San Francisco, California, March 2013)
91.  Coleman versus Brown (District Court, Sacramento, CA, June 2013)
92.  Tate versus Humphrey (Deposition taken in San Francisco, California, June 2013)
93. Coleman versus Brown (District Court, Sacramento, CA, October 2013)
94. People versus Alegria (Tucson, Arizona, October 2013)
95. Commonwealth v. Michael Pruitt (Reading, PA, November 2013)
96. Coleman versus Brown (District Court, Sacramento, CA, December 2013)
97. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, March 2014)
98. Deposition taken in Parsons, et al v. Ryan. March 28, 2014, San Francisco, CA.
99. Evidentiary hearing in State of Arizona v. Albert Martinez Carreon. Phoenix Arizona, April 21 & 22, 2014.
100.  United States v. Naeem Williams, (District Court, Honolulu, HI, April 29 & 30, and June 3, 2014
101.  Deposition taken in Hernandez v. County of Monterey, San Francisco, CA, July 8, 2014
102.  United States v. Thomas Steven Sanders, (District Court, Alexandria, LA, September 22 & 23, 2014)
103.  Deposition taken in Kurian David, et al., plaintiffs v. Signal International, LLC, defendant, San Francisco, California, October 2014)
104.  People v. Dennis McGraw (Vallejo, California, November 2014)
105.  People v. Leticia Serna (San Jose, California, December 2014)
106.  Wilridge v. Marshall, (District Court, San Francisco, California, February 2015)
107.  People v. Hugo Munguia-Hernandez (Redwood City, California, July 2015)
108.  Deposition taken in Goddard v. State of California, et al., San Mateo, California, September 2015.
109.  People v. Bryan Thomas (Redwood City, California, October 2015)
110.  Carlos Gutierrez v. E.K. McDaniel, Warden, et al. (Reno, Nevada, January 2016)
111.  State of Arkansas v. Rickey Dale Newman (Fort Smith, Arkansas, January 2016)
112.  Deposition taken in Roscoe Walker v. Ford Motor Company, et al., San Mateo, California, February 2016.
113.  People v. Philip Law (Boise, Idaho, May 2016)
114.  United States v. Joel Manuel Taylor, (District Court, San Francisco, CA, March 18, April 25 & May 25, 2016)
115.  United States v. Henry Cervantes, et al, (District Court, Oakland, CA, June 28, 2016)

116. Manual Camacho v. State of Arkansas, (District Court, Fort Smith, Arkansas, November 8, 2016)

117. The People of Guam vs. Mark Anthony Torre, Jr. (Superior Court of Guam, Agana, Guam, February 22, 2017)

118. Kevin Webb, et. al., v. Brad Livingston, et. al. (civil action no. 4:14-cv-03302). Deposition taken in San Francisco, California, June 2, 2017)

119. State of Missouri v. Marvin Rice (11DE-CR00590-2), video deposition taken in Honolulu, HI, July 20, 2017.

120. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, December 18 & 19, 2017)

121. United States v. Nna Alpha Onuoha, (District Court, Riverside, California, January 24, 2018)

122. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 27 & 28, March 1, and August 27-30, 2018)

123. United States v. Alfonso Rodriguez, Jr. Deposition taken in Honolulu, HI, September 6, 2018.

124. People v. Omar Pettigen (Superior Court, Alameda County, CA, July 22, 2019)

125. United States v. Roger Trent Skaggs (District Court, Cincinnati, Ohio, July 25, 2019)

126. Parsons, et al v. Shin (District Court, Phoenix, AZ, November 3, 2021)

127. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 1, 2022)

128. Joseph O'Malley v. Hawaii Department of Safety (Superior Court, Honolulu, HI, February 3, 2022)

129. Barrientos v. Core Civic (Deposition), April 14, 2022.

130. State of Missouri v. Marvin Rice (11DE-CR00590-2), (Superior Court, Clark County, MO, March 31, 2022)

131. United States v. Jason Solatario Brown (District Court, Guam, January 6, 2023)

132. Daniels v. Jeffreys (Deposition), March 1, 2023.

133. Washington v. Essex, Banyas (Deposition), November 9, 2023.

134. State of Idaho v. John Cody Hart, McCall, Idaho, December 4, 2023.