ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS-GONZALEZ,
SBN 321994
SAMANTHA M. BACON, SBN 351561
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S TELEMENTAL HEALTH REPORT AND REVISED POLICY**<br><br>Judge: The Honorable Kimberly J. Mueller |

## INTRODUCTION

At a time of nationwide shortages of mental health professionals, the California Department of Corrections and Rehabilitation (CDCR) has taken the appropriate and necessary step of expanding its use of telemental health. CDCR's telemental health program will increase patients' access to mental healthcare, improve CDCR's ability to compete with other employers, comports with workers' expectations, and if the success of CDCR's limited telepsychiatry program is any indicator, will increase staffing levels through both recruitment and retention. The telemental health policy comports with long established requirements (including the Program Guide),

1

provides sensible and realistic safeguards for the use of the modality, and is well within the standard of care. The use of telemental health in CDCR's prisons is supported by the overwhelming majority of the research and literature on the subject, standards created by professional organizations, and community practices for the delivery of care through this modality.

Despite this, Plaintiffs and the Special Master have proposed unreasonable and onerous restrictions on the use of telemental health that are not supported by evidence, community practices, or applicable standards of care. And Plaintiffs' response to the Special Master's report on telemental health asks the Court to impose—with virtually no evidentiary support—an even more restrictive injunction on the use of telemental health than that proposed by the Special Master. Both Plaintiffs' requested injunction and the Special Master's recommendations relating to the telemental health policy fall far short of satisfying Prison Litigation Reform Act (PLRA) requirements because CDCR's telemental health policy is not unconstitutional. Even if the policy were found to be unconstitutional, Plaintiffs' proposed injunction is not narrowly drawn, extends further than necessary to correct any constitutional violation, and is not the least intrusive means for correcting a constitutional violation.

## DISCUSSION

### I.  PLAINTIFFS ARGUE FOR THE WRONG STANDARD OF REVIEW.

Plaintiffs correctly acknowledge that the Order of Reference adopted a clearly erroneous standard of review for *findings of fact*. The Order of Reference, however, does not apply the same clearly erroneous standard to *recommendations* made by the Special Master. (See ECF No. 640 at 8:18-20.) The Special Master's report on telemental health is a recommendation that the Court order Defendants to adopt the Special Master's proposed telemental health policy in lieu of their own policy. Thus the clearly erroneous standard does not apply.

Additionally, the Court has previously ordered that when a report is filed directly with the Court, and not first provided by the Special Master to the parties in accordance with the Order of Reference, then Rule 53(f)(3)'s de novo standard of review applies. (See ECF No. 4925 at 1 n.1.) Here, the Special Master did not provide Defendants with a draft of his report before he filed it

2

directly with the Court. Accordingly, even if the Special Master's report were comprised of findings of fact—which it is not—under the Court's previous order, the standard of review would be de novo, not clearly erroneous.

Lastly, even if the Special Master's report were essentially comprised of findings of fact and were provided to the parties before being filed with the Court, Rule 53 was "revised extensively" in 2003, and notably, the standard of review was changed for findings of fact made or recommended by a master. *See* Fed. R. Civ. P. 53(f) advisory committee's note to 2003 amendment. Rule 53(f)(3) now states that "[t]he court must decide de novo all objections and findings of fact made or recommended by a master, unless the parties, with the court's approval," stipulate otherwise. The parties have not done so here; consequently, even if the Special Master's report consisted of findings of fact, the standard of review would be de novo.

## II. PLAINTIFFS' ARGUMENTS FOR MINIMUM ON-SITE REQUIREMENTS ARE BASED ON FALSE PREMISES AND SPECULATION.

Plaintiffs fail to present any evidence in support of their argument that the Court should adopt their preferred requirement for a minimum number of on-site clinicians. Instead they cite to a speculative passage with no supporting evidence from a previous report by the Special Master concerning the *possible* impact of CDCR's policy on the treatment milieu. (ECF No. 8252 at 7[1] (quoting ECF No. 8095 at 49).) In addition to being speculative, the cited passage is based on the following false premises: (1) that CDCR intends to replace all on-site primary clinicians with telemental health clinicians; (2) that telemental health clinicians will not be empathetic to their patients; (3) that telemental health clinicians will never step foot inside a prison; and (4) that telemental health clinicians will not advocate for their patients. (ECF No. 8095 at 49; ECF No. 8253-2, Decl. Mehta ¶¶ 9, 34; ECF No. 8253-1 (Decl. Penn) ¶¶ 75-78; ECF No. 7772-1 (Decl. Kaftarian) ¶¶ 68-70.) Even having adopted these mistaken assumptions, the Special Master could only go so far as to say that the impact telemental health will have on the treatment milieu "remains an open question." (*Id.*) This conclusion is far from a demonstration that CDCR's telemental health policy would violate the Eighth Amendment or that the proposed

---

[1] All citations to filed documents refer to the ECF page numbers in the header of the documents.

3

Defs.' Resp. Pls.' Objections Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

1   restrictions satisfy the PLRA's other requirements, and it therefore provides no basis for an
2   injunctive order precluding CDCR from implementing its chosen telemental health policy.  This
3   is especially true given that the overwhelming majority of research and literature conclude that
4   telemental health is as effective as in-person treatment.  (Decl. Penn ¶¶ 42, 47-51; ECF No. 8253-
5   2, Decl. Mehta ¶¶ 14-22; *see also* Decl. Kaftarian ¶¶ 88-91.)

      Throughout their response to the Special Master's report, Plaintiffs similarly make blanket assertions of fact with no citations to evidence (e.g., "A rapid migration to remote work by CDCR's psychologists and social workers . . . will undermine the already tenuous therapeutic culture of CDCR's mental health units" and "moving the vast majority of clinicians to remote work will only serve to further stall any progress made in improving the treatment milieu within CDCR.")  (ECF No. 8252 at 7-8.)  These types of baseless and speculative statements do not support the imposition of any restrictions on CDCR's telemental health policy.  Moreover, Defendants have presented affirmative evidence demonstrating that these speculative concerns are invalid.  (Decl. Penn ¶¶ 52, 75-78; ECF No. 8253-2, Decl. Mehta ¶¶ 34-36; Decl. Kaftarian ¶¶ 24-25, 36-37, 52-55.)

      As discussed in Defendants' objections to the Special Master's report on telemental health, existing literature and studies provide strong evidence that CDCR's telemental health policy will safely and effectively deliver high quality care to patients.  (Decl. Penn ¶¶ 42, 47-51; ECF No. 8253-2, Decl. Mehta ¶¶ 14-22; Decl. Kaftarian ¶¶ 88-91.)  But Defendants acknowledge that only the full implementation of CDCR's telemental health policy will allow for an assessment of its adequacy.  After implementation of CDCR's telemental health policy is complete, if it can be shown that the policy results in constitutionally inadequate care, it may be appropriate for the Court to intervene.  Unless and until such events come to pass, the Court should not interfere with CDCR's implementation of its chosen policy.

      **A.**    **History of Staff Misconduct**

      In support of their preferred on-site clinical staff requirement, Plaintiffs extensively discuss past reports of misconduct by custody staff.  (ECF No. 8252 at 8-12.)  But they fail to present any evidence that telemental health either causes or exacerbates custody-staff misconduct.  In fact, all

4

Defs.' Resp. Pls.' Objections Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

of the historical custody-staff misconduct that Plaintiffs point to happened before a telemental health program had been implemented. In other words, it happened when nearly all care provided by psychologists and social workers was on site. Thus, that history does not speak to the impact, if any, that telemental health will have on custody-staff misconduct.

Plaintiffs also repeat the false assertion that telemental health clinicians will never step foot inside a prison, and contend—with no supporting evidence—that these clinicians will not be able to advocate for their patients, form working relationships with custody staff, or de-escalate conflicts. (ECF No. 8252 at 8-12.) These contentions run counter to the experience CDCR has built over decades with telepsychiatry, and which has shown that teleproviders do advocate for their patients on a daily basis, form working relationships with custody staff, and are able to de-escalate conflicts involving their patients (having a familiar clinician assist in de-escalating their own patient via teleconnection is arguably superior to calling in another clinician with less patient familiarity merely because they happen to be on site). (Decl. Mehta supp. Defs.' Response Pls.' Objections ¶ 2.)

**B.    Custody-Mental Health Partnership Plan**

Plaintiffs next falsely contend that the Custody-Mental Health Partnership Plan (CMHPP) would be undermined if CDCR's telemental health policy were implemented. (ECF No. 8252 at 12-15.) Plaintiffs offer no evidence to support the claim.

Plaintiffs falsely assert that the CMHPP requires in-person participation. (*Id.* at 12.) The CMHPP does not specify that in-person attendance is required for activities such as huddles, quarterly roundtables, and annual training, and Plaintiffs provide no evidence of this purported requirement. (*See* ECF No. 5916 (CMHPP); ECF No. 6278 (Updated CMHPP).) Plaintiffs also failed to submit evidence demonstrating that these activities would not be effective—or that the CMHPP would be undermined—if participants attended remotely. Indeed, CDCR's experience with telepsychiatry demonstrates that this claim is false. (ECF No. 8253-2, Decl. Mehta ¶¶ 34-36.) Plaintiffs' position seems to be based on the false premise that all on-site clinicians will be replaced with telemental health clinicians under CDCR's policy. This assumption is flatly contradicted by Dr. Mehta. (ECF No. 8253-2, Decl. Mehta ¶¶ 9-10 (CDCR's telemental health

5

policy is not intended to replace all on-site staff and recruitment efforts for on-site staff are ongoing).)

Plaintiffs complain that some quarterly roundtable meetings under the CMHPP have been cancelled due to staffing vacancies. (ECF No. 8252 at 12-13.) But this point—which is unrelated to any issue with the modality of telemental health—only supports the implementation of CDCR's telemental health policy, which will increase staffing levels and enable better implementation of the CMHPP.

Plaintiffs present no admissible evidence that the implementation of CDCR's telemental health policy would have any adverse impact on the CMHPP, much less an impact so severe that it would result in unconstitutional care, and this argument therefore lends no support to their proposed restrictions on CDCR's use of telemental health.

> **C.     Telemental Health in Restricted Housing Units**

The Special Master's report concluded that telemental health should be permitted in the Restricted Housing Units (RHUs), but only if RHUs "have at least one FTE [full-time equivalent] on-site primary clinician assigned to the unit and present during regular workdays and hours." (ECF No. 8165 at 32; ECF No. 8165-1 at 16.)

Plaintiffs object to any services in the RHUs being provided via telemental health and argue that the Special Master's proposal for one full-time equivalent on-site primary clinician is insufficient to address their concerns. (ECF No. 8252 at 15-18.) Plaintiffs claim that a ban on telemental health in RHUs is necessary because there is a demonstrated need for human interaction in RHU settings. (*Id.* at 12-13.) Plaintiffs generally cite studies concerning the impact of solitary confinement and the deprivation of human interaction on incarcerated persons. (*Id.*) But Plaintiffs argument does not account for the provision of substantial weekly out-of-cell time, recreation time, structured therapeutic treatment, and group treatment that are included in the newly revised RHU regulations (*see* ECF No. 8257 at 9-13), and which address concerns about excessive isolation in RHUs.

Plaintiffs' argument also presents no evidence supporting their claim that patient contacts via telemental health instead of in-person contacts will somehow harm RHU patients. On the

6

contrary, as noted above, the clinical literature overwhelmingly finds that outcomes for telemental health are equivalent to in-person treatment. Nor did plaintiffs present evidence that human interactions via telemental health do not have the same benefits as in-person interactions or are somehow inferior to in-person contacts in the RHU setting. Plaintiffs' argument also ignores the fact that by improving staffing and enhancing access to care, CDCR's telemental health policy should increase the number of clinician-patient contacts in the RHUs and reduce feelings of isolation. (*See* Decl. Kaftarian ¶ 28.)

Plaintiffs cite the American Psychiatric Association's (APA) 2023 *Resource Document on Telepsychiatry for Adults in Jails and Prisons* (Resource Document)[2] in support of their position on RHUs. (ECF No. 8252 at 14.) As discussed in Defendants' objections to the Special Master's report, reliance on this document is problematic for several reasons. (ECF No. 8253 at 18-19.) First, Plaintiffs falsely characterize the Resource Document as an APA warning about the use of telemental health in segregation settings. (*Id.* at 17.) In fact, the Resource Document does not represent the opinion, guidance, or a standard of the APA. (Decl. Mehta ¶ 19.) The Resource Document itself cautions that "'[t]he findings, opinions, and conclusions of this report do not necessarily represent the views of the officers, trustees, or all members of the American Psychiatric Association. Views expressed are those of the authors.'" (Resource Document at 1.) And the APA's Operations Manual clearly states that resource documents do not represent APA policy. (ECF No. 8253-2, Decl. Mehta ¶ 19.) Thus, Plaintiffs' characterization of the document as an APA warning is false and misleading. In fact, the APA Toolkit on Telepsychiatry, which was prepared by an official APA workgroup and sets forth official APA positions and guidance[3], is extremely positive about the evidence supporting all manner of telepsychiatry and even other forms of teletherapy or telemental health. (ECF No. 8253-2, Decl. Mehta ¶ 21.)

---

[2] American Psychiatric Association Resource Document on Telepsychiatry for Adults in Jail and Prisons at 1 (https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf), last accessed on May 15, 2024.

[3] American Psychiatric Association Telepsychiatry Toolkit (https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit), last accessed on July 12, 2024.

7

Defs.' Resp. Pls.' Objections Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

Additionally, the Resource Document cites no evidence or studies demonstrating that the use of telemental health in segregated settings is problematic or harmful to patients. (Resource Document at 4-5.) Instead, it only speculates that it could be problematic or harmful. (*Id.*) It is telling that the best support Plaintiffs can find for their position is an assertion in an article that is based on speculation and not scientific evidence.

Lastly, it is not clear from the Resource Document that any of the authors have any direct or extensive experience practicing in telemental health that would provide them with a proper foundation to opine on the tele-modality. (ECF No. 8253-2, Decl. Mehta ¶ 20.) One psychiatrist who was invited to be part of the writing committee for the Resource Document has extensive knowledge and expertise regarding telepsychiatry. But he ultimately asked the committee to remove his name as coauthor due to his concerns that the Resource Document (1) had reached inaccurate conclusions, (2) alleged—without citing sufficient evidence—that telepsychiatry is inferior to in-person care for acute levels of care, and (3) advocated unrealistic guidelines for site visits that were not consistent with the standard of care and the common practice of telepsychiatry nationwide. (Decl. Kaftarian ¶ 2.)

Defendants agree with Plaintiffs that the Special Master's proposed requirement that one full-time equivalent on-site primary clinician be assigned to each RHU unit is problematic, but for different reasons. First, a restriction on telemental health in RHUs does not rest on any evidence or common community standards, and in fact runs counter to some standards, such as the continuity of care. (Decl. Mehta supp. Defs.' Response Pls.' Objections ¶ 3.) Second, per the Special Master's proposed policy, the total number of FTE clinicians assigned to the RHU should be based on "the number of RHU beds in a particular institution." (ECF No. 8165 at 32; ECF No. 8165-1 at 16.) This contradicts the 2009 Staffing Plan, which bases staffing ratios on the patient population, not on the number of beds in a particular unit. (ECF No. 3693 at 20, 31, 33, 39, 41 (noting the ratios are based on the number incarcerated persons with a certain housing unit classification).) Therefore, allocating clinician positions to each RHU based on the number of beds would be inconsistent with the 2009 Staffing Plan.

### D. Ban on all virtual treatment teams at Enhanced Out Patient (EOP) level of care

Plaintiffs argue that no treatment teams for EOP patients should be comprised of both a telepsychiatrist and a telemental health primary clinician despite the Special Master's conclusion that this should be permitted. (ECF No. 8252 at 15.) In support of their position, Plaintiffs assert that it is a "fact that having an all-virtual treatment team will have negative effects on the provision of mental health care—particularly at the EOP level of care." Given that Plaintiffs assert this is a fact, one might expect they would cite research or studies supporting the contention that EOP patients cannot be adequately treated through the telemodality. But Plaintiffs cite no such evidence. Instead they reference a few reported anecdotes of teleproviders not perceiving physical symptoms and telepresenters not reporting the same. (ECF No. 8252 at 16-17.) But these anecdotes at most only demonstrate instances of particular individuals making mistakes—something that can happen with on-site providers too. As Dr. Mehta testified, these types of issues are related to the engagement of the treatment team members, not to the telemodality. (ECF No. 8253-2, Decl. Mehta ¶ 34.) Such issues can be addressed with training, support, and supervision, as they have long been addressed for on-site providers. The anecdotes Plaintiffs reference do not demonstrate that telemental health is a flawed modality for EOP patients.

Plaintiffs similarly argue that having a telepsychiatrist and telemental health clinician is inappropriate for EOP patients with disorders such as schizophrenia and bipolar, but again, they cite no evidence supporting their claim. Defendants, on the other hand, presented affirmative evidence that telemental health is effective for treating seriously mentally ill patients:

> A majority of patients who have serious mental illnesses (SMI) —such as schizophrenia, schizoaffective disorder, bipolar disorder, or other chronic psychotic disorders, and non-SMI such as mood/depressive disorders, anxiety disorders, PTSD,—or other mental disorders and who are clinically stable (i.e., do not require an acute inpatient level of psychiatric care) do very well with telepsychiatry and telemental health.

(Decl. Penn ¶ 68.) An article referenced in the Special Master's report shows that even patients with acute psychosis can be effectively treated via videoconferencing.[4] And the American

---

[4] Ian Sharp et al., The Use of Videoconferencing with Patients with Psychosis: A Review of the Literature, Annals of General Psychiatry (2011).

9

Psychological Association agrees that telemental health is effective in treating a wide variety of serious mental health disorders.[5] (ECF No. 8253-2, Decl. Mehta ¶ 22.)

Plaintiffs next refer to reported opinions of staff questioning the appropriateness of telemental health for the EOP population. (ECF No. 8252 at 17.) But these opinions only demonstrate a common "bias against telehealth that has historically slowed the adoption of telemedicine in this country" to the detriment of patients. (Decl. Kaftarian at ¶ 38.) With respect to CDCR's telepsychiatry program, initial biases against telepsychiatry were later replaced with enthusiastic support of the program once staff and leadership fully appreciated the benefits and effectiveness of the modality. (Decl. Kaftarian at ¶¶ 39-41.)

Plaintiffs' position ignores that adopting their proposed restrictions could potentially lead to some EOP patients receiving less care overall, when they could have received high-quality care from a telepsychiatrist and a telemental health primary clinician. Given that there is no evidence that a treatment team comprised of a telepsychiatrist and a telemental health primary clinician would be any less effective at treating EOP patients, much less that it would amount to a constitutional violation, Plaintiffs' proposed restrictions are unnecessary, would be harmful to patients, and would hurt their access to mental healthcare.

E.  **Requirement for on-site staff member at all Interdisciplinary Treatment Team meetings (IDTTs)**

Plaintiffs ask the Court to require that at least one of each patient's psychiatrist or primary clinician appear at each IDTT in person at all levels of care. (ECF No. 8252 at 21.) The Special Master concluded that this was not necessary so long as an EOP supervising psychologist is in attendance on-site for EOP patients' IDTTs. (ECF No. 8165 at 29 n.17.) Neither requirement is necessary for providing a constitutional level of care.

Plaintiffs first suggest that decisions regarding patients' mental healthcare cannot be made without an in-person examination of the patient. (ECF No. 8252 at 21.) This bald assertion contradicts abundant evidence provided by Defendants establishing that telemental health and telepsychiatry are safe and effective modalities for providing mental healthcare to patients. (ECF

---

[5] *See* https://www.apa.org/practice/telehealth-telepsychology (last accessed on May 20, 2024.)

10

Defs.' Resp. Pls.' Objections Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

No. 8253-2, Decl. Mehta ¶¶ 14-15, 18, 21-22; Decl. Penn ¶¶ 47-50, 56; Decl. Kaftarian ¶¶ 88-89, 91.) And Plaintiffs cite no studies or standards of care that would require in-person attendance at IDTTs.

Plaintiffs further argue that patients are less likely to attend their IDTTs if their primary clinicians do not attend in-person, but they cite no evidence in support of this contention. (ECF No. 8252 at 21.) Instead they cite a report from the Special Master noting that some patients at one prison decided not to attend their IDTTs when they realized their primary clinicians were absent. (ECF No. 8095 at 291.) But that report has no bearing on Plaintiffs' argument because under CDCR's telemental health policy, primary clinicians will not be absent—they will be in attendance and participating in the IDTTs virtually.

Lastly, Plaintiffs suggest that requiring in-person attendance at IDTTs for CCCMS patients would not be burdensome because they typically have only one IDTT per year. (ECF No. 8252 at 21-22.) In fact, CCCMS patients may have more than one IDTT per year. (Decl. Mehta supp. Defs.' Response Pls.' Objections ¶ 4.) Nonetheless, Plaintiffs' point might be valid if telemental health clinicians only cared for one or two patients, but like virtually all clinicians they carry significant caseloads. (*Id.*) Annual IDTTs are often based on transfer dates and are therefore scattered throughout the year. (*Id.*) Forcing a teleclinician to travel across the state to an institution repeatedly over the course of the year to do individual IDTTs for their entire caseload would be an extremely inefficient way to deliver healthcare and would likely hurt retention rates for telemental health providers. (*Id.*) Huge amounts of potential patient time would be lost to travel, significant additional expenditures would accrue that do not contribute to salaries and in fact decrease the quality of life for these clinicians, and all for a practice that has absolutely no basis in evidence or common standards. (*Id.*)

### F. In-person clinician requirement for PREA Evaluations

The Special Master's proposed policy permits telemental health providers to conduct Prison Rape Elimination Act (PREA) consultations (ECF No. 8165 at 33.), but Plaintiffs ask the Court for an order prohibiting them from doing so. (ECF No. 8252 at 22.) Again, Plaintiffs provided no evidentiary support for their request and there is no standard of care that would prohibit

11

telemental health providers from conducting PREA consultations. Neither PREA nor the national standards that implement it require that a PREA consultation be conducted in-person or ban telemental health providers from conducting the consultations. (Decl. Mehta supp. Defs.' Response Pls.' Objections ¶ 5.) In the community, hospitals and emergency rooms frequently use telepsychiatrists and telemental health providers to provide emergency care and conduct evaluations in crises situations. (ECF No. 8253-2, Decl. Mehta ¶ 56; Decl. Penn ¶¶ 85, 90; Decl. Kaftarian ¶¶ 35, 61.) Thus, there is no evidentiary basis for this requested restriction on the use of telemental health.

## CONCLUSION

Plaintiffs' response to the Special Master's report on telemental health and their request for injunctive relief are not supported by admissible evidence and do not satisfy PLRA requirements. Furthermore, at a time when the Court is fining CDCR on a monthly basis for its inability to satisfy *Coleman* staffing requirements, the Court should not construct roadblocks to a telemental health program that promises to significantly improve mental health staffing levels and increase access to care.

## CERTIFICATION

In preparing this filing, Defendants' counsel certify that they have reviewed the following relevant orders: ECF Nos. 640, 1773, 5711, 5850, 6230, 6539, 7807, 7830, 7901, 8087, and 8239. This response sets forth arguments that have not been resolved by prior court orders as they are specifically tailored to address the merits of Plaintiffs' response to the Special Master's March 21, 2024 report on telemental health. Counsel acknowledges this Court's prior orders concerning telepsychiatry (ECF Nos. 5711, 5850, 6539, 7807, and 7830), but those orders do not foreclose this response. Counsel make this filing under their obligation to represent their clients zealously under their right to relief under Fed. R. Civ. P. 62(c), *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988), and to satisfy Federal Rule of Appellate Procedure 8(a)(1)(A)'s requirement. Counsel certify that they have conducted a reasonable inquiry and have determined that this filing is well grounded in fact, legally tenable, and not presented for an improper purpose, to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

12

Defs.' Resp. Pls.' Objections Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

Fed. R. Civ. P. 11(b)(1); and *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 393 (1990) (internal quotation marks omitted). Each factual contention made in this filing is supported by a reference to evidence in the record and the legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. Fed. R. Civ. P. 11(b)(2).

Dated: July 12, 2024

ROB BONTA
Attorney General of California

*/s/ Damon McClain*
Damon McClain
Supervising Deputy Attorney General
*Attorneys for Defendants*

HANSON BRIDGETT LLP

*/s/ Samantha D. Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
*Attorneys for Defendants*

CF1997CS0003

# CERTIFICATE OF SERVICE

Case Name:  **Coleman v. Newsom, et al.,**     No.  **2:90-cv-00520 KJM-DB (PC)**

I hereby certify that on July 12, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S TELEMENTAL HEALTH REPORT AND REVISED POLICY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 12, 2024, at San Francisco, California.

|  G. Guardado  |  /s/ *G. Guardado*  |
|---|---|
| Declarant | Signature |

CF1997CS0003