DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>             Plaintiffs,<br><br>       v.<br><br>GAVIN NEWSOM, et al.,<br><br>             Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' CLOSING BRIEF REGARDING SPECIAL MASTER'S PROPOSED TELEMENTAL HEALTH POLICY**<br><br>Judge:   Hon. Kimberly J. Mueller |

[4532150.2]

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................. 1

I. THE COURT SHOULD APPLY A CLEAR ERROR STANDARD OF REVIEW BUT SHOULD ADOPT THE SPECIAL MASTER'S PROPOSED POLICY REGARDLESS OF THE STANDARD APPLIED .............. 2

II. TELEMENTAL HEALTH IS NOT THE CONSTITUTIONAL VIOLATION; LACK OF ADEQUATE MENTAL HEALTH CARE IS THE CONSTITUTIONAL VIOLATION ................................................................. 4

III. THE SPECIAL MASTER'S RECOMMENDATIONS REQUIRING A MINIMUM NUMBER OF CLINICIANS AND ADDITIONAL SITE VISITS AT EACH LEVEL OF CARE ARE NECESSARY ................................... 5

IV. THE SPECIAL MASTER'S RECOMMENDATIONS REGARDING INFORMED CONSENT AND THE CHOICE TO REMOVE THE TELEPRESENTER ARE IN LINE WITH ETHICAL GUIDELINES AND STATE REGULATIONS ............................................................................ 6

V. THE SPECIAL MASTER'S OTHER REVISIONS ARE NARROW AND DESIGNED TO ENSURE THAT TELEMENTAL HEALTH IS NOT USED WHERE THE SPECIAL MASTER'S EXPERTS HAVE DETERMINED IT IS RISKY OR INAPPROPRIATE ........................................... 6

CONCLUSION ....................................................................................................................... 7

CERTIFICATION ................................................................................................................... 8

# INTRODUCTION

During this briefing, Defendants have never contested one central fact: There is no evidence demonstrating the efficacy of the wholesale replacement of onsite mental health clinicians with tele-clinicians in any large prison system anywhere in the world. *See* Special Master's Report and Proposed Telemental Health Policy, ECF No. 8165 at 36-37[1]. While Defendants repeatedly claim that they do not "intend[] to replace on-site primary clinicians" in such large numbers, *see* Defendants' Response to Special Master's Report, ECF No. 8253 at 9; *see also* Defendants' Response to Plaintiffs' Objections, ECF No. 8332 at 3, their policy, as currently constituted, allows for exactly that. *See* Plaintiffs' Response to Defendants' Objections, ECF No. 8331 at 13 (noting that Defendants' proposed policy allows the California Department of Corrections and Rehabilitation (CDCR) to hire teleclinicians exclusively to treat nearly 96% of the *Coleman* class).

The Special Master correctly recognized that clinicians are the lifeblood of a functioning correctional mental health system. ECF No. 8165 at 23-24. To be effective, they must form trusting relationships with their patients and be able to advocate for their patients with custody staff. Suicide prevention, the abatement of staff misconduct against the mentally ill, and the appropriate treatment of mental health disorders all depend on the presence of clinicians in the prisons. ECF No. 8331 at 10-16. Remote clinicians also have a vital role to play, but they cannot entirely replace onsite clinicians. Even with the Special Master's revisions, CDCR will be able to have as much as 80 percent of their allocated clinician positions work via telehealth at the general-population Correctional Clinical Case Management System (CCCMS) level of care, and have as much as 60 percent of their allocated clinician positions work via telehealth at the residential-treatment Enhanced Outpatient (EOP) setting. ECF No. 8331 at 7 (citing ECF No. 8165 at 28-30). Plaintiffs maintain their argument that these percentages are too lenient. *See* Plaintiffs' Objections to

---

[1] Page citations to documents in the docket are based on ECF pagination.

Special Master's Report, ECF No. 8252 at 7-15.  But both Plaintiffs and Special Master understand what the Court has long recognized—that "[c]onstitutionally adequate mental health care requires not only sufficient staff. … [I]t also requires a collaborative culture between custody and mental health staff in each prison institution that houses mentally ill inmates."  Aug. 9, 2016 Order, ECF No. 5477 at 6.  Defendants can argue that teleclinicians can perform this role adequately, *see* ECF No. 8332 at 5-6, but the available evidence, and common sense, says otherwise.  *See* ECF No. 8252 at 12-14 (detailing concerns with teleclinicians' ability to positively affect the treatment milieu).

The Special Master's other revisions to Defendants' policy either are based in professional standards (such as his revisions to the informed-consent policy) or are limited to certain situations where the use of telehealth is untested or potentially dangerous (such as his revisions to the provisions regarding the use of telehealth in inpatient settings or in emergent situations).  Defendants have established a false dichotomy by arguing that they will only be able to solve their chronically inadequate clinician staffing if their proposed telemental health policy is left untouched.  *See, e.g.,* ECF No. 8253 at 7; ECF No. 8332 at 12.  And, yet, they have provided no actual evidence supporting the idea that the Special Master's and Plaintiffs' proposals will restrict their ability to accomplish constitutionally-adequate staffing levels.  Under the revised policy, Defendants are still able to use telehealth to recruit hundreds on mental health professionals to fill vacant positions.  The revised policy merely puts limits on Defendants' ability to turn their system into a totally remote apparatus, preventing harm to the Plaintiff class in the process.  Changes to Defendants' policy are thus necessary to ensure that the progress of the Court's remedial plan is not impaired by the widespread introduction of an untested modality.  The Court should order Defendants to revise their policy accordingly.

## I. THE COURT SHOULD APPLY A CLEAR ERROR STANDARD OF REVIEW BUT SHOULD ADOPT THE SPECIAL MASTER'S PROPOSED POLICY REGARDLESS OF THE STANDARD APPLIED

In their response to Plaintiffs' objections to the Special Master's proposed policy, Defendants argue that the Special Master's report should be reviewed *de novo* on the

grounds that, according to Defendants, it contains only recommendations and no findings. ECF No. 8332 at 2-3.  Defendants overlook the many findings of fact that underlie the Special Master's proposed policy.  For example, the Special Master's experts conducted an extensive literature review and found that "professional standards reflect a patient-centered approach to providing telemental health services in an ethical and professional manner"— which support his recommendations regarding informed consent.  ECF No. 8165 at 19-20. The Special Master also found that "[r]esearch into the benefits of telemental health … is characterized by the lack of replication of results and minimal research regarding telemental health in correctional settings," and that the research does not "demonstrate that its largely unfettered use is safe and effective"—which supports his recommendations for installing limitations on Defendants' widespread adoption of the modality.  *Id.* at 22. Moreover, the Special Master's recommendations are largely supported by his experts' monitoring of Defendants' use of telework since the inception of this case and, particularly, their focused monitoring of Defendants' telepsychiatry program.  *Id.* at 4-10 (describing history of Special Master's monitoring of Defendants' telepsychiatry program); *see also* Special Master's 30th Round EOP Monitoring Report, ECF No. 8095 (describing further monitoring of Defendants' use of telepsychiatry).  The Special Master utilized this experience to find that "[i]f telemental health is introduced on an unprecedented scale without minimal safeguards, there could be unintended collateral consequences inapposite to the objective of bringing defendants into compliance with the court-ordered remedy in this matter."  ECF No. 8165 at 1-2.  Likewise, his findings that "the telemental health providers' relative disconnection from their patients' uniquely challenging environment of care will impede the clinicians' ability to positively impact the treatment milieu," *id.* at 29, as well as his findings regarding potential problems with the use of telehealth in specific settings or for specific purposes, *id.* at 31-35, are all findings of fact that are based on the Special Master team's expertise and monitoring experience. They are entitled to the Court's longstanding "clearly erroneous" standard of review.

      Defendants also argue that because the Court ordered a direct report to the Court

[4532150.2]

3

PLAINTIFFS' CLOSING BRIEF REGARDING SPECIAL MASTER'S
PROPOSED TELEMENTAL HEALTH POLICY

without a draft phase, the standard of review must be *de novo* under Rule 53(f)(3). ECF No. 8332 at 2-3. Defendants cite a 2013 order in which the Court applied the Rule 53(f) standard to a directly-filed report. Nov. 13, 2013 Order, ECF No. 4925 at 2 n.1. More recently, however, the Court has applied the Order of Reference clearly erroneous standard to directly-filed reports on at least two occasions. *See* Feb. 1, 2024 Order, ECF No. 8121 at 3, 5 (adopting directly-filed data remediation report, ECF No. 8011, and using clearly erroneous standard); July 1, 2021 Order, ECF 7216 at 6, 14 (adopting directly-filed CQIT key indicators report, ECF No. 7151, and using clearly erroneous standard). This is in addition to several directly-filed reports throughout the history of this case where a *de novo* standard was not used. *See* Plaintiffs' Response to Defendants' General Objections to Sixth Suicide Prevention Re-Audit Report at 5-6 (citing examples).

Even if the Court does not find the Order of Reference's standard of review applies in this instance, the Court should still adopt the Special Master's report and his proposed policy, if not Plaintiffs' more stringent proposals, for the reasons cited below and in Plaintiffs' previous pleadings on the issue. *See* ECF No. 8252; ECF No. 8331.

## II. TELEMENTAL HEALTH IS NOT THE CONSTITUTIONAL VIOLATION; LACK OF ADEQUATE MENTAL HEALTH CARE IS THE CONSTITUTIONAL VIOLATION

In both of their filings, Defendants have stated that the Court may only order a revised policy if it finds that Defendants' preferred policy itself is "unconstitutional." ECF No. 8253 at 10-14; ECF No. 8332 at 2. Defendants are wrong. The Court can adopt revisions to Defendants' policy through its authority to issue orders to enforce existing remedies, including orders related to chronic understaffing and the provision of adequate mental health treatment, orders related to suicide prevention practices, orders related to staff misconduct and uses of force, and orders related to the screening of incarcerated patients for higher levels of care. ECF No. 8331 at 10-16. The Court can also adopt the revisions because there is sufficient evidence that the Special Master's recommended safeguards are necessary, narrowly tailored and the least intrusive means to correct the many Eighth Amendment violations that have persisted for the past 30-plus years. *Id.* at 17-20.

## III. THE SPECIAL MASTER'S RECOMMENDATIONS REQUIRING A MINIMUM NUMBER OF CLINICIANS AND ADDITIONAL SITE VISITS AT EACH LEVEL OF CARE ARE NECESSARY

Keeping a minimum number of clinicians onsite at the CCCMS and EOP levels of care is necessary because "telemental health providers' relative disconnection from their patients' uniquely challenging environment of care will impede the clinicians' ability to positively impact the treatment milieu." ECF No. 8165 at 29. Through his team's monitoring of Defendants' expansion of its telepsychiatry program, the Special Master has seen multiple instances of telepsychiatrists being disconnected from the environment in which their patients lived, to the extent that none of the telepsychiatrists interviewed by the Special Master's team were familiar with the court-ordered Custody and Mental Health Partnership Plan (CMHPP) and others could not name any correctional officer at the institution to which they were assigned. *See* ECF No. 8252 at 13-14 (citing ECF No. 8095 at 230; Special Master's Report and Recommendations on Final Proposed Telepsychiatry Policy, ECF No. 7682 at 41); *see also* Declaration of Pablo Stewart, ECF No. 8331-1 ¶¶ 31, 51-52 (opining that minimum numbers of onsite clinicians at both the EOP and CCCMS levels of care are necessary to help educate and collaborate with custody staff); *id.* ¶ 18 (opining that it is far easier for clinicians to establish rapport with patients in an in-person setting). Given this experience and clinicians' more frequent contact with patients and more integral role in the treatment team, *see* ECF No. 8165 at 23-24, it was reasonable for the Special Master to ensure that there are sufficient onsite clinicians to positively affect the environment in which patients live.

The Special Master's findings also weigh heavily in favor of additional required onsite visits for teleclinicians. As noted in Plaintiffs' previous briefing, the Special Master was correct to find that teleclinicians visiting their assigned institutions for one single day, once per year, was insufficient to mitigate the concerns highlighted above, and that the policy should instead require two visits per year for CCCMS clinicians and four visits per years for EOP clinicians, with required in-person appointments with patients. ECF No. 8331 at 39-41. Defendants admit that their telehealth policy applies to clinicians who

are working remotely on a full-time basis, rather than in a hybrid role.  ECF No. 8253 at 34.  The fact that these clinicians will not have any regular opportunity to interact face-to-face with custody staff, their colleagues, and their patients makes the need to include multiple institutional visits even more necessary.  The Special Master's determination that a single annual, one-day visit is insufficient was reasonable.

### IV.  THE SPECIAL MASTER'S RECOMMENDATIONS REGARDING INFORMED CONSENT AND THE CHOICE TO REMOVE THE TELEPRESENTER ARE IN LINE WITH ETHICAL GUIDELINES AND STATE REGULATIONS

As discussed previously, Defendants' current "informed consent" policy is not consent at all:  It mandates that a clinician must explain the telehealth modality but does not permit the patient to choose an alternative to telehealth.  ECF No. 8331 at 29-31.  This formulation of "consent" does not comply with Title 15 of the California Code Regulations, the National Association of Social Workers ethical guidelines, or the American Psychological Association guidelines.  *Id.*  By not giving patients the choice to remove telepresenters from therapy sessions, the policy also risks harming the client-patient relationship.  *Id.* at 31-32.  The Special Master's revisions to both of these polices are necessary to ensure that the Court's remedial aims are achieved.

### V.  THE SPECIAL MASTER'S OTHER REVISIONS ARE NARROW AND DESIGNED TO ENSURE THAT TELEMENTAL HEALTH IS NOT USED WHERE THE SPECIAL MASTER'S EXPERTS HAVE DETERMINED IT IS RISKY OR INAPPROPRIATE

The Special Master's remaining revisions are confined to limited situations that will not affect Defendants' ability to fill vacant positions.  Rather, they are changes that the Special Master has determined are necessary to preserve the current remedy in this case, based on the Special Master team's extensive experience and expertise as correctional mental health professionals—particularly given the paltry evidence base for the use of telemental health in prisons.  For example, the parties all agree that the use of telemental health should be restricted in Mental Health Crisis Beds (MHCBs) and Psychiatric Inpatient Programs (PIPs).  *See* ECF No. 8253 at 23-24.  The only differences between the

1 Defendants' policy and the Special Master's revised policy are the different language
2 regarding when it may be used ("circumstances when on-site care is not available" vs.
3 "emergency situations when the assigned on-site psychologist and/or licensed clinical
4 social worker (LCSW) is not available"), and the mechanism included in the revised policy
5 that requires notification to the parties when a telemental health provider works in these
6 settings for a certain period of time.  *See* ECF No. 8165-1 (App'x A) at 17 (redline
7 comparing Defendants' policy and Special Master's revised policy).  Practically, the
8 language in each version regarding when telehealth is permitted in these inpatient settings
9 is not very different; the revised language only makes clear that the use of telehealth in
10 these settings should be an actual last resort.  The notification mechanism then ensures that
11 the policy has some teeth and does not permit Defendants to use telehealth whenever they
12 merely claim a "lack of availability."  *See* ECF No. 8253 at 23-24.  The changes are the
13 narrowest possible way to ensure that the use of telemental health in inpatient settings only
14 occurs in a situation where there truly is no other alternative.  The changes are also made
15 necessary by evidence contrary to the use of telemental health in inpatient settings.  *See*
16 ECF No. 8331 at 28-29.

17       Likewise, the requirement to have at least one full-time clinician in restricted
18 housing units (RHUs), as well as the bans on using telemental health for cell-front in
19 RHUs, for performing suicide risk assessments, for group treatment, for five-day check-ins
20 on previously-suicidal patients, for use-of-force incidents, and for MHCB discharges are
21 all are reasonable, narrow limitations that have support in the literature and the Special
22 Master team's monitoring and experience.  *See* ECF No. 8331 at 38, 41-47.  They all cover
23 either high-risk (suicidality), emergent (use of force), or untested (group treatment in a
24 prison setting) situations.  *Id.*  Proceeding with caution before using telemental health in
25 these situations is certainly prudent and should be adopted.

26 **CONCLUSION**

27       The dearth of evidence supporting the widespread implementation of telehealth in a
28 prison mental health system weighs heavily in favor of caution.  The Special Master's

recommended safeguards are the minimum necessary to ensure that these changes do not interfere with efforts to bring the CDCR into compliance with the Constitution. The Court possesses the power to order Defendants to revise their policy in accordance with the Special Master's recommendations, or with the Plaintiffs' requests for stricter limits in various areas. It should exercise that power and make the appropriate findings regarding the necessity of these safeguards.

DATED: July 26, 2024          Respectfully submitted,

                              ROSEN BIEN GALVAN & GRUNFELD LLP


                              By: /s/ Jared Miller
                                  Jared Miller

                              Attorneys for Plaintiffs


## CERTIFICATION

Plaintiffs' counsel certifies that he reviewed the following orders in preparing this filing: ECF Nos. 640, 4925, 4577, 7216, 7901, 8087, 8121, 8291, 8295, 933 F. Supp. 954 (E.D. Cal. 1996), 938 F. Supp. 2d 955 (E.D. Cal. 2013), 28 F. Supp. 3d 1068 (E.D. Cal. 2014).

DATED: July 26, 2024          Respectfully submitted,

                              ROSEN BIEN GALVAN & GRUNFELD LLP


                              By: /s/ Jared Miller
                                  Jared Miller

                              Attorneys for Plaintiffs

[4532150.2]