1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No.
    182970
3   Senior Assistant Attorney General
    DAMON MCCLAIN, State Bar No. 209508
4   Supervising Deputy Attorney General
    ELISE OWENS THORN, State Bar No. 145931
5   NAMRATA KOTWANI, State Bar No. 308741
    Deputy Attorneys General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone: (916) 210-7318
8    Fax: (916) 324-5205
     E-mail: Elise.Thorn@doj.ca.gov
9   Attorneys for Defendants

    HANSON BRIDGETT LLP
    LAWRENCE M. CIRELLI, SBN 114710
    PAUL B. MELLO, SBN 179755
    SAMANTHA D. WOLFF, SBN 240280
    KAYLEN KADOTANI, SBN 294114
    DAVID C. CASARRUBIAS-GONZALEZ,
    SBN 321994
    SAMANTHA M. BACON, SBN 351561
     1676 N. California Boulevard, Suite 620
     Walnut Creek, CA 94596
     Telephone: (925) 746-8460
     Fax: (925) 746-8490
     E-mail:
     PMello@hansonbridgett.com
    Attorneys for Defendants

10

11                IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13                        SACRAMENTO DIVISION

14

15   **RALPH COLEMAN, et al.,**                2:90-cv-00520 KJM-DB (PC)

16                            Plaintiffs,      **DEFENDANTS' CLOSING BRIEF**
                                               **RE THE SPECIAL MASTER'S**
17        **v.**                               **TELEMENTAL HEALTH**
                                               **REPORT AND REVISED POLICY**
18   **GAVIN NEWSOM, et al.,**
                                               Judge:     The Honorable Kimberly
19                            Defendants.                  J. Mueller

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3      Introduction.............................................................................................1

Discussion..............................................................................................3

4          I.      Factual and Procedural Background .....................................3

5          II.     Expert Testimony.................................................................4

6          III.    The Court Must Comply with the PLRA If It Issues an
                   Injunction on Telemental Health. .......................................7

7                  A.     The Court Must Find That Defendants Telemental Health
                          Policy Violates the Eighth Amendment Before Enjoining

8                          Implementation of the Policy. ....................................7

9                  B.     Even If the Court Finds That CDCR's Policy Addresses a
                          Previous Violation, the Court Must Still Make the

10                         Requisite PLRA Findings Before Enjoining Its
                           Implementation and Ordering the Implementation of the

11                         Special Master's Policy. ...........................................9

12         IV.     No Competent Evidence Demonstrates That Prohibiting CDCR
                   from Implementing Its Telemental Health Policy Is Necessary to

13                 Enforce Compliance with a Previous Remedial Order.......................12

          V.      Plaintiffs Mischaracterize the Literature on which Defendants

14                 Rely. .............................................................................14

15         VI.     The Special Master's Literature Review ...............................16

          VII.    Telemental Health at PIP and MHCB Levels of Care ......................17

16         VIII.   Informed Consent Provisions..............................................19

17         IX.     Right to Ask Telepresenters to Leave....................................21

18         X.      Minimum On-Site Requirement ...........................................22

                   A.     The EOP Program Is Not Equivalent to Inpatient

19                         Programs. .........................................................25

20                 B.     CCCMS Minimum On-Site Presence..........................28

                   C.     RHU—One Full Time On-Site Requirement ................29

21         XI.     Minimum Annual Site Visits ..............................................30

22         XII.    Cell Front Visits ............................................................33

23         XIII.   Special Purpose Contacts..................................................36

                   A.     Urgent/Emergent Referrals and Suicide Risk Assessments.....36

24                 B.     Group Treatment..................................................39

25                 C.     Five-Day Follow-Ups ............................................40

                   D.     Use of Force Incidents ..........................................41

26                 E.     MHCB Discharges.................................................41

27         Pending Appeals ................................................................42

          Conclusion........................................................................42

28

i

# TABLE OF CONTENTS
### (continued)

**Page**

Certification .................................................................................................. 42

1

# TABLE OF AUTHORITIES

2

**Page**

3    CASES

4    *Armstrong v. Newsom*
5        58 F.4th 1283 (9th Cir. 2023) ...............................................................11

6    *Armstrong v. Schwarzenegger*
7        622 F.3d 1058 (9th Cir. 2010) ..............................................................11

8    *Coleman v. Wilson*
9        912 F. Supp. 1282 (E.D. Cal. 1995) .............................................*passim*

10   *Coleman v. Wilson*
11       933 F. Supp. 954 (E.D. Cal. 1996) .......................................................10

12   *Conroy v. Centurion*
         No. CV-2100685-PHX-DJH, 2021 WL 12141333 (D. Ariz. Aug.
13       30, 2021) .....................................................................................................9

14   *Cooter & Gell v. Hartmax Corp.*
15       496 U.S. 384 (1990) .................................................................................43

16   *Estelle v. Gamble*
17       429 U.S. 97 (1976) ...................................................................................20

18   *Gilmore v. California*
19       220 F.3d 987 (9th Cir. 2000) ....................................................................9

20   *Jackson v. McIntosh*
         90 F.3d 330 (9th Cir. 1996) .....................................................................20
21

22   *Jones-El v. Berge*
         374 F.3d 541 (7th Cir. 2004) ...................................................................10
23

24   *Operating Engineers Pension Trust v. A-C Co.*
         859 F.2d 1336 (9th Cir. 1988) .................................................................43

25   *Parsons v. Ryan*
26       912 F.3d 486 (9th Cir. 2018) ...............................................................9, 10

27   *Sanchez v. Vild*
28       891 F.2d 240 (9th Cir. 1989) ...................................................................20

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

STATUTES

4

18 U.S.C.

5
   § 3626(a) .................................................................. 10

6
   § 3626(a)(1)(A) ........................................................... 8
   § 3626(g)(7) ................................................................ 9

7

Cal. Bus. Prof. Code § 2290.5(b) ...................................... 21

8

9
Cal. Code Regs., Title 15, § 3999.202 ............................... 19

10
Prison Litigation Reform Act ................................................*passim*

11

CONSTITUTIONAL PROVISIONS

12

Eighth Amendment ............................................. 7, 8, 9, 20

13

COURT RULES

14

Fed. R. Civ. P.

15
   11(b)(1) ..................................................................... 43

16
   62(c) ......................................................................... 43

17
Fed. R. Evid. 702(b) .......................................... 31, 36, 40, 41

18
Federal Rule of Appellate Procedure 8(a)(1)(A)'s ............. 43

19

OTHER AUTHORITIES

20

21
https://psychiatryonline.org/books/guidelines ................... 16

22
https://www.ncbi.nlm.nih.gov/books/NBK430827/ ............. 19

23
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7327283/pdf/mh-06-
   2019.12.05.pdf ......................................................... 32

24

25
 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7485934/ ... 39

26
https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-
   5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-

27
   and-Prisons.pdf ................................................... 16, 26

28

# TABLE OF AUTHORITIES
### (continued)

Page

https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit
/best-practices ................................................................................. 16, 32

https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit
/inpatient-settings ................................................................................. 18

**INTRODUCTION**

Telemental health is an accepted modality of treatment for all levels of mental illness.  For more than a decade, the California Department of Corrections and Rehabilitations (CDCR) has used a version of it—telepsychiatry—to improve access to care for patients and reduce staffing vacancies.  Building on this success, CDCR developed a telemental health policy to expand the tele-modality's use to psychologists and social workers.  This policy (1) improves access to care for mental health patients; (2) provides safeguards through reasonable restrictions on the use of telemental health even though the overwhelming evidence shows that telemental health is a nationally accepted method of delivering mental health treatment; (3) expands the pool of mental health clinicians who will work for CDCR and helps ensure retention of clinicians who already work for CDCR; and (4) comports with the requirements of the remedy in this case.

During a discussion about telemental health at a November 2023 status conference, the Court characterized Defendants' concerns about unnecessary restrictions being placed on CDCR's telemental health program as an overreaction, and assured Defendants that any referral of the matter to the Special Master "would make clear no artificial limitations" on the program.  (Tr. 45:10-48:19, Nov. 2, 2023.)  And yet, this is precisely what the Plaintiffs and the Special Master have now asked the Court to impose.

While the Special Master and Plaintiffs claim to support the use of telemental health to provide care to CDCR's patients, the cumulative effect of their proposed restrictions and barriers to the use of the modality would prevent telemental health providers from performing the full scope of the duties and responsibilities of psychologists and social workers in CDCR's system, and in doing so, would overly burden on-site staff, making it more difficult for CDCR to hire and retain them. The proposed policy revisions would greatly diminish the potential for telemental health to improve access to care and Program Guide compliance.  And at a time

1

1    when the Court has held CDCR in contempt and imposed fines in excess of

2    $120,000,000 for its inability to comply with Court mandated staffing levels, the

3    policy revisions will hurt CDCR's ability to hire additional mental health staff,

4    improve access to care, and provide relief for institutions that thus far have been

5    unable to hire the requisite staff on-site.

6         Plaintiffs and the Special Master ask the Court to prejudge CDCR's telemental

7    health policy, prohibit its full implementation, and instead order implementation of

8    the Special Master's proposed policy based on speculative concerns rather than

9    assessing CDCR's policy's performance following implementation.  By definition,

10   such an injunction could not be narrowly tailored and the least intrusive option for

11   addressing an actual violation of a federal right—as the Prison Litigation Reform

12   Act (PLRA) requires—because the injunction would be issued without evidence

13   that CDCR's policy either violates a federal right or adversely impacts the remedy

14   in this case.  Such an injunction would also be detrimental to the *Coleman* class

15   because delaying or significantly restricting the adoption of proven treatment

16   modalities based on unfounded speculative concerns does not protect patients, but

17   rather causes real harm by preventing them from receiving care.  Speculative

18   concerns should not be the basis for imposing restrictions on the use of a proven

19   modality for delivering mental healthcare.

20        The Court can and should direct the Special Master to monitor CDCR's

21   telemental health policy and report on any adverse impacts it has on the delivery of

22   mental healthcare or the remedy in this case.  If Plaintiffs' and the Special Master's

23   speculative concerns come to pass, then the Court can make PLRA-compliant

24   remedial orders to address those impacts.  But in the first instance, CDCR should

25   have the opportunity to fully implement its thoughtfully crafted telemental health

26   policy, which on its face is lawful, does not violate a federal right, and does not

27   conflict with the remedial orders in this case.

28

1    **DISCUSSION**

2    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

3    There is a nationwide shortage of mental health professionals, and the shortage

4    acutely affects prison systems like CDCR.  (Decl. Penn, ECF No. 8253-1, Ex. D

5    (Secretariat Expert Report) at 4-26.)[1]  Other healthcare organizations have also had

6    issues recruiting and retaining mental health providers.  (*Id.* at 26-29.)  Further

7    exacerbating this situation, during the COVID-19 pandemic, CDCR's staffing

8    levels for psychologists and social workers drastically plummeted.  (ECF No. 8165

9    at 1, n.1, 10.)  By contrast, the telepsychiatry program successfully improved

10   historically low psychiatrist staffing levels.  (Decl. Mehta, ECF No. 8253-2 at ¶ 3.)

11   In response to Defendants' inability to reach full compliance with staffing

12   requirements, the Court held contempt proceedings in September and October

13   2023, and ultimately found Defendants Jeff Macomber, Diana Toche, and Amar

14   Mehta in contempt and imposed over $120,000,000 in fines, with additional fines

15   accruing each month CDCR remains out of compliance.  (ECF No. 8291 at 72.)

16   In 2023, on its own initiative, CDCR developed a telemental health policy for

17   psychologists and social workers and provided it to the Plaintiffs and the Special

18   Master.  (ECF No. 8165 at 11-12.)  CDCR began implementing that policy in

19   September 2023 with Plaintiffs' assent.  (ECF No. 7935 at 3; Decl. Mehta, ECF No.

20   8253-2 at ¶ 4.)  The goal of CDCR's telemental health policy is to increase patients'

21   access to mental healthcare, improve recruitment and retention of psychologists and

22   social workers, and improve psychologist and social worker staffing levels.  (*Id.* at

23   ¶ 13.)

24   The Court ordered Defendants to meet and confer with Plaintiffs and the

25   Special Master about CDCR's telemental health policy, and directed the Special

26   Master to file a report and a new proposed telemental health policy "for the Court's

27   ───────────────
     [1] Throughout this brief, citations to page numbers in documents filed in the
28   Court's Electronic Case Filing (ECF) system are to the page numbers assigned by
     ECF and located in the upper right hand corner of the page.

3

approval." (ECF No. 8087 at 1-2.) The Special Master filed his report and proposed policy on March 21, 2024. (ECF Nos. 8165, 8165-1, 8165-2. The Special Master made extensive substantive revisions to the policy. (ECF No. 8165-1 at 12-22.)

Defendants and Plaintiffs filed objections to the Special Master's report and proposed telemental health policy on May 28, 2024, and responses to each other's objections on July 12, 2024.[2] (ECF Nos. 8252, 8253, 8331, 8332.)

## II.   EXPERT TESTIMONY

Before the Court is testimony from three expert witnesses. Defendants have presented testimony from two experts—Dr. Mehta and Dr. Penn—who each possess many years of direct and extensive experience in the provision of mental-health services through the tele-modality in prison settings. Importantly, both Dr. Mehta and Dr. Penn also have direct and extensive experience overseeing large complex mental-health programs in two of the nation's largest prison systems (California and Texas), including the provision of services through telepsychiatry and telemental health. (Decl. Mehta, ECF No. 8253-2 at ¶¶ 1-2; Decl. Penn, ECF No. 8253-1 at ¶¶ 1-3.) Dr. Mehta's and Dr. Penn's credentials—both in correctional mental healthcare and the provision of mental healthcare through the tele-modality—are beyond question.

Plaintiffs argue that the Court should disregard Dr. Penn's testimony, despite his credentials, experience, training, and expertise, based on an order in an Arizona case—*Jensen*—that concerned different issues, in a different context, and required expert work and evaluations of a completely different character. (ECF No. 8331 at 24.) The *Jensen* order has no bearing on Dr. Penn's telemental health opinions in *Coleman*. His credibility on the matters at issue here is bolstered by the fact that he

---

[2] Because Plaintiffs presented legal arguments and evidence in support of their position on telemental health for the first time in their response to Defendants' objections, this closing brief is Defendants first and only opportunity to respond to those arguments and evidence.

4

1    has dedicated his career to the provision of mental healthcare to incarcerated

2    persons, provided his services to various courts during his career, presented at

3    multiple judicial conferences to educate the judiciary on issues related to mental

4    health, and provided expert testimony in 26 cases from 2017 through 2023.  (Decl.

5    Penn, ECF No. 8253-1 at 42-43, 54-58, 66-69.)  His training, experience,

6    participation in professional and academic organizations, published work, and in

7    particular his focus and expertise on the provision of mental health services through

8    the tele-modality, make him eminently qualified to offer credible expert opinions

9    on CDCR's telemental health policy.  (ECF No. 8253-1, Decl. Penn at ¶¶ 2-37, Ex.

10   A at 33-64.)

11       Plaintiffs present no challenge to Dr. Mehta's expertise or credibility, and both

12   Dr. Mehta and Dr. Penn share the view that CDCR's telemental health policy will

13   safely and effectively improve access to care for CDCR's patients.  (Decl. Mehta,

14   ECF No. 8253-2 at ¶ 8; Decl. Penn, ECF No. 8253-1 at ¶ 45.)

15       On the other hand, Plaintiffs have presented the testimony of Dr. Stewart, who

16   has limited experience over a sixteen-month period providing "on-call"

17   telepsychiatry services to patients on remote Hawaiian Islands, which Plaintiffs

18   characterize as having "practiced extensively as a telepsychiatrist."  (Decl. Stewart,

19   ECF No. 8331-1 at ¶ 7.)  He estimates that he has provided telepsychiatry services

20   to about 75 patients (about five patients per month).  (*Id.*)  For context, CDCR's

21   telepsychiatrists often have 75 or more patient contacts in a roughly two-week

22   period.  (Decl. Mehta Supp. Closing Br. ¶ 4.)  And for comparison, Dr. Mehta has

23   seen over 1,300 distinct patients in CDCR at multiple levels of care via

24   telepsychiatry, many for repeated regularly scheduled contacts over periods of up to

25   six years.  (*Id.*)  Dr. Stewart has also observed telepsychiatry sessions in his

26   capacity as an expert in several correctional settings, but he does not provide

27   specifics as to the dates or locations of those observations, nor did he specify

28   whether he ever observed telepsychiatry in a CDCR institution.  (Decl. Stewart,

5

Defs.' Closing Br. Re Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

1    ECF No. 8331-1 at ⁋ 6.)  This is a significant omission because the technology has

2    improved greatly in recent years.  (Decl. Mehta Supp. Closing Br. ⁋ 5.)  Dr. Stewart

3    does not claim to have any experience running large complex correctional mental

4    health programs like those run by Dr. Penn and Dr. Mehta.  He does not claim to

5    have any personal experience providing mental health services via telemedicine in

6    correctional settings.  And he does not claim to have any experience overseeing or

7    managing telepsychiatry or telemental health programs in any setting.

8    Consequently, his foundation to opine on most of the topics related to the subject of

9    telemental health is lacking.  (Decl. Mehta Supp. Closing Br. ⁋⁋ 4-5.)

10        To the extent Dr. Stewart's opinions purport to be based on his observations

11    and experiences touring CDCR's prisons, they are so stale as to be of no value.

12    Although Dr. Stewart appears to have toured CDCR's prisons on a number of

13    occasions, most of those visits were in the distant past.  He did visit three CDCR

14    psychiatric inpatient units in April 2023.  (Decl. Stewart, ECF No. 8331-1 at ⁋ 9.)

15    But those visits did not involve tours of entire prisons—they were limited to the

16    inpatient units where he interviewed a total of six patients during his visits.  (Decl.

17    Stewart, ECF No. 7838-1 at ⁋ 11.)  He could not have observed any telemental

18    health sessions, much less observed telemental health cell-front contacts, during

19    those visits because there was no telemental health happening in those inpatient

20    units.  (Decl. Mehta Supp. Closing Br. ⁋ 5.)  Nor could he have assessed treatment

21    or programming for Correctional Clinical Case Management (CCCMS) level-of-

22    care patients, Enhanced Outpatient (EOP) level-of-care patients, or patients in

23    Restricted Housing Units (RHU) during those visits to inpatient units.  It appears

24    that his next most recent visits occurred when he toured six prisons in 2013—more

25    than ten years ago.  (Decl. Stewart, ECF No. 8331-1 at ⁋ 9.)  And before that it

26    appears he may have toured some of CDCR's prisons around 2007 and in the

27    1990s.  (*Id.*)  Dr. Stewart does not claim that he observed telemental health

28    treatment in CDCR's prisons during any of these visits.  (*Id.*)

6

1   Plaintiffs vigorously object to Defendants comment that, based on their court-
2   filed credentials, the Special Master's team of experts also appear to lack direct or
3   extensive experience providing mental health services through the tele-modality,
4   unlike Dr. Mehta and Dr. Penn.  (ECF No. 8331 at 22.)  And while Plaintiffs
5   characterize this as a broad "attack" on the credentials of the Special Master's team,
6   that does nothing to show they have the appropriate expertise on the discrete subject
7   of telemental health.  Nor is it an "attack."  It is simply an observation that they lack
8   the necessary experience and expertise to authoritatively opine on that specific
9   subject.  Plaintiffs do not demonstrate that the Special Master's experts have the
10  appropriate expertise on the discrete subject of telemental health.  As with any
11  expert on any issue, their level of experience and expertise with a given subject is
12  relevant to the weight their opinions should be given and consideration afforded by
13  the Court.

14  ### III.  THE COURT MUST COMPLY WITH THE PLRA IF IT ISSUES AN INJUNCTION ON TELEMENTAL HEALTH.
15
16  #### A.    The Court Must Find That Defendants Telemental Health Policy Violates the Eighth Amendment Before Enjoining Implementation of the Policy.
17

18  As discussed above, CDCR designed and implemented the telemental health
19  policy of its own accord in order to increase patients' access to mental healthcare,
20  improve recruitment and retention of psychologists and social workers, and
21  improve psychologist and social worker staffing levels.  (Decl. Mehta, ECF No.
22  8253-2 at ¶ 13.)  Nevertheless, Plaintiffs and the Special Master ask the Court to
23  issue an injunction prohibiting CDCR from continuing the implementation of its
24  telemental health policy, and to instead implement a policy containing numerous
25  restrictions and barriers to the use of telemental health.  But the Court cannot issue
26  such a prohibitory injunction without satisfying PLRA requirements:

27      Prospective relief in any civil action with respect to prison conditions
        shall extend no further than necessary to correct the violation of the
28      Federal right of a particular plaintiff or plaintiffs. The court shall not

7

1     grant or approve any prospective relief unless the court finds that such
2     relief is narrowly drawn, extends no further than necessary to correct the
    violation of the Federal right, and is the least intrusive means necessary
3     to correct the violation of the Federal right.

4     18 U.S.C. § 3626(a)(1)(A).

5        Per the plain language of the PLRA, courts may only take remedial action if

6 they find a violation of a federal right. (*Id.*) Thus, the threshold inquiry for this

7 Court is whether CDCR's telemental health policy violates a federal right before it

8 can issue an injunction prohibiting CDCR from continuing its implementation.

9 (*Id.*) But the Court has never found that the provision of mental-health services

10 through the tele-modality violates the Eighth Amendment or any other federal right,

11 nor has it ruled that the policy violates or undermines *Coleman* remedial orders.

12 And neither Plaintiffs nor the Special Master have demonstrated that CDCR's

13 telemental health policy somehow falls short of Eighth Amendment standards.

14        To be sure, the 1995 judgment found that California prisons provided

15 inadequate mental healthcare. *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

16 1995). But the judgment did not discuss or address telemental health, subsequent

17 *Coleman* remedial orders have never required or prohibited the implementation of a

18 telemental health program, and this Court has never found that such a program is

19 necessary to remedy a constitutional violation. Thus, while the 1995 judgment

20 made Eighth Amendment findings regarding CDCR's mental-health programs

21 generally, that order did not (and could not) consider whether CDCR's telemental

22 health policy was constitutional. Accordingly, without any finding that the policy

23 violates the Eighth Amendment, an order enjoining CDCR's implementation of the

24 policy would violate the PLRA. 18 U.S.C. § 3626(a)(1)(A).

25

26

27

28

**B.    Even If the Court Finds That CDCR's Policy Addresses a Previous Violation, the Court Must Still Make the Requisite PLRA Findings Before Enjoining Its Implementation and Ordering the Implementation of the Special Master's Policy.**

If the Court disagrees that it needs to make the predicate finding that CDCR's policy violates the Eighth Amendment, in order to reject CDCR's policy, the Court would still need to conduct a PLRA analysis, including identifying how CDCR's policy falls short of remedying an Eighth Amendment violation.  Further, before the Court orders implementation the Special Master's proposed policy, it must analyze whether it satisfies the PLRA's need-narrowness-intrusiveness requirement. Indeed, if the Court were to issue an injunction requiring CDCR to implement the Special Master's proposed policy in lieu of CDCR's policy—without any evidence that CDCR's policy violates patients' constitutional rights or any findings that the Special Master's plan complies with the PLRA—such a ruling would exceed the Court's authority and improperly substitute the Special Master's judgment for CDCR's.  *See Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("[i]t is clear that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial quiescence" that the federal judiciary not be involved with the problems of state-run prisons.).

Nevertheless, Plaintiffs contend that a prohibitory injunction halting CDCR's telemental health policy and a mandatory injunction requiring CDCR to implement the Special Master's telemental health policy would not constitute "prospective relief," and that the Court is therefore not required to satisfy PLRA requirements—including the need-narrowness-intrusiveness requirement—before imposing such relief.  (ECF No. 8331 at 10.)  Plaintiffs are wrong.  The PLRA defines "prospective relief" broadly as "all relief other than compensatory monetary damages."  18 U.S.C. § 3626(g)(7); *see, e.g, Conroy v. Centurion*, No. CV-2100685-PHX-DJH, 2021 WL 12141333, at *1 (D. Ariz. Aug. 30, 2021) ("Further, under the Prison Litigation Reform Act, injunctive relief, prohibitory or mandatory,

9

1  must be narrowly drawn and be the least intrusive means necessary to correct the

2  harm.").

3       In support of their argument, Plaintiffs cite *Parsons v. Ryan*, 912 F.3d 486 (9th

4  Cir. 2018), but *Parsons* stands for the unremarkable proposition that when an

5  injunction addresses an ongoing violation, the court need not make new findings

6  regarding the same constitutional violation. *Parsons*, 912 F.3d at 501. It does not

7  stand for the proposition that injunctive relief in such a situation need not satisfy the

8  PLRA's need-narrowness-intrusiveness requirement. In fact, *Parsons* confirmed

9  that those findings remain a distinct requirement by reiterating that a court may not

10 order "any prospective relief [with respect to prison conditions] unless the court

11 finds that such relief is narrowly drawn, extends no further than necessary to correct

12 the violation of the Federal right, and is the least intrusive means necessary to

13 correct the violation of the Federal right." *Id.*

14      Plaintiffs also cite a *Coleman* order—*Coleman v. Wilson*, 933 F. Supp. 954,

15 956-57 (E.D. Cal. 1996)—that likewise fails to support their position. This order

16 concerns whether the compensation paid to a special master constitutes prospective

17 relief governed by the PLRA. *Id.* at 956. The Court found that there is a distinction

18 between the relief ordered and the appointment of a special master. *Id.* at 957. This

19 ruling has no bearing on whether an injunction prohibiting CDCR from

20 implementing its telemental health policy and requiring that it implement a different

21 policy constitutes prospective relief governed by the PLRA.

22      Plaintiffs cite *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004)—and

23 several other *Coleman* orders—for the proposition that enforcement of existing

24 orders "is not the kind of 'prospective relief' considered by § 3626(a)." (ECF No.

25 8331 at 10-11.) But here, there are no existing orders either prohibiting or requiring

26 telemental health, and CDCR's telemental health policy does not conflict with the

27 remedial orders. Thus, the contention that an order prohibiting CDCR's telemental

28 health policy and requiring implementation of a different policy somehow enforces

1   an existing order is untenable.  If Plaintiffs' reading of *Jones-El* were correct—i.e.,

2   that once a violation of a federal right has been found, a Court need never comply

3   with PLRA's requirements again when ordering new prospective injunctive relief—

4   then the PLRA's prospective-relief provision would be meaningless.

5       A recent Ninth Circuit decision confirms that Plaintiffs' argument is wrong

6   and that district courts must undertake the need-narrowness-intrusiveness analysis,

7   even when fashioning new relief for an ongoing violation.  *Armstrong v. Newsom*,

8   58 F.4th 1283, 1301 (9th Cir. 2023).  In *Armstrong*, the Ninth Circuit applied the

9   PLRA analysis to new remedial orders issued by the district court, affirming certain

10  orders that satisfied the PLRA requirements, and reversing remedial orders that did

11  not satisfy PLRA requirements.  (*Id.*)  The Court must do the same here if it decides

12  to impose the new injunction requested by Plaintiffs and proposed by the Special

13  Master.

14      Plaintiffs cite *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir.

15  2010) for the proposition that the PLRA does not require a court to make provision-

16  by-provision explanations of its findings.  (ECF No. 8331 at 19.)  But Defendants

17  have not argued that the Court must make provision-by-provision explanations of

18  findings; the court has not yet made any findings at all.  Regardless, *Armstrong v.

19  Schwarzenegger* provides several helpful guiding principles that the Court should

20  consider when ruling on the current dispute: (1) allowing defendants to develop

21  their own policies and procedures to reach constitutional compliance is the

22  appropriate process in a prison litigation case, (2) the "core concern" of the PLRA

23  intrusiveness inquiry is "whether the district court has enmeshed itself into the

24  minutia of prison operations beyond what is necessary to vindicate plaintiffs'

25  federal rights", and (3) "[w]hat is important, and what the PLRA requires, is a

26  finding that the set of reforms being ordered—the relief—corrects the violations of

27  prisoners' rights with the minimal impact possible on defendants' discretion over

28  their policies and procedures." *Id.* at 1071 (internal quotation marks omitted).  As

11

described below, the injunction recommended by the Special Master and urged by the Plaintiffs comes nowhere close to meeting these principles. One need only review the Special Master's red-lined revisions to CDCR's policy to see that little to no deference was given to CDCR's discretion over its telemental health policies and procedures. (ECF No. 8165-1 at 12-22.)

## IV. NO COMPETENT EVIDENCE DEMONSTRATES THAT PROHIBITING CDCR FROM IMPLEMENTING ITS TELEMENTAL HEALTH POLICY IS NECESSARY TO ENFORCE COMPLIANCE WITH A PREVIOUS REMEDIAL ORDER.

Aside from Plaintiffs' misguided beliefs about the legal framework, Plaintiffs' position ignores the factual history of this issue. In 2023, of its own accord, CDCR developed a telemental health program, and provided a draft policy to Plaintiffs and the Special Master. (Decl. Mehta, ECF No. 8253-2 at ¶ 4.) The primary goal of the policy is to increase access to mental healthcare, improve recruitment and retention of psychologists and social workers, and improve compliance with Program Guide and staffing requirements. (*Id.* at ¶ 8.) CDCR's telemental health policy complies with all Program Guide requirements and all other aspects of the *Coleman* remedy. (*Id.* at ¶ 6.) Yet, Plaintiffs and the Special Master claim that the Court must impose strict limitations on CDCR's use of telemental health to enforce "compliance with existing remedies." As discussed below, no competent evidence supports that claim.

Plaintiffs assert that an injunction prohibiting CDCR from implementing its telemental health policy would enforce compliance with existing remedies that require Defendants to (1) provide adequate mental healthcare; (2) reform suicide prevention practices; (3) reform use of force and discipline, and address staff misconduct; and (4) improve screening of incarcerated patients for higher levels of care. (ECF No. 8331 at 11-16.) But their assertion is based on unfounded concerns and speculation that CDCR's telemental health policy *might* negatively impact these remedies, not evidence that it has actually done so or proof that it ever will.

12

1      CDCR has been implementing its telemental health policy since September
2  2023, and neither the Plaintiffs nor the Special Master have presented evidence that
3  the modality itself has adversely impacted the provision of adequate mental
4  healthcare, adversely affected suicide prevention efforts, caused an increase in staff
5  misconduct against class members, or adversely impacted screenings for higher
6  levels of care.  Conversely, Defendants have presented evidence that telemental
7  health is a widely used, safe and effective modality for providing mental health
8  services that is on par with in-person treatment, and expert testimony that CDCR's
9  telemental health policy already has reasonable safeguards and will improve access
10  to care.  (Decl. Mehta, ECF No. 8253-2 at ¶ 14-15; Decl. Penn, ECF No. 8253-1 at
11  ¶¶ 42, 45, 68.)

12      Plaintiffs contend that the Court must consider CDCR's policy in light of its
13  impact on the existing remedy.  (ECF No. 8331 at 18.)  There is a simple and
14  reasonable way to do this: allow CDCR to fully implement its telemental health
15  policy and monitor and report on any adverse impacts it has on the remedy.  That
16  approach, unlike Plaintiffs' and the Special Master's, would also comply with the
17  PLRA, as it would be far less intrusive than placing numerous restrictions and
18  barriers on CDCR's use of telemental health that are unnecessary and based on
19  theoretical concerns.  Moreover, this approach would allow the Court to issue
20  evidence-based and appropriately narrow orders to specifically address any adverse
21  impact on the remedy, as opposed to ordering a broad swath of restrictions and
22  limitations based on speculative concerns.  In short, this approach would comply
23  with the PLRA's need-narrowness-intrusiveness requirements while Plaintiffs'
24  proposed approach of ordering numerous restrictions and barriers without evidence
25  of their necessity would not.

26
27
28

1    **V.    PLAINTIFFS MISCHARACTERIZE THE LITERATURE ON WHICH
         DEFENDANTS RELY.**

2

3        Plaintiffs provide misleading, partial, and cherry-picked quotations from the

4    literature that Defendants presented concerning telemental health for incarcerated

5    patients and ignore key conclusions from those papers.  For example, Plaintiffs

6    misleadingly included only the italicized portion of the following quote from

7    Batastini (2016) but leave out the remainder of the sentence: "Furthermore, *a*

8    *number of limitations associated with program implementation and study design*

9    *suggest that results be interpreted with caution* **and should not be used to**

10   **discount the use of telepsychology as a viable treatment delivery option.**"

11   (Decl. Mehta, Ex. A, ECF No. 8253-2 at 185.)  And Plaintiffs ignored the key take-

12   away of that paper:

13           Within criminal justice settings, telepsychology has not only
             demonstrated better cost-effectiveness compared with traditional in-
14           person services, but it is also associated with high satisfaction among
             correctional clients and providers, good to excellent interrater reliability
15           across both forensic and clinical assessment outcomes, as well as
             improvements in mental health functioning over time.  Furthermore,
16           while no studies have yet examined the effectiveness of group therapy for
             inmates via telepsychology, there is evidence of positive clinical and
17           process-related outcomes among noncorrectional samples.

18   (Decl. Mehta, Ex. A, ECF No. 8253-2 at 186, internal citations omitted.)

19       Plaintiffs also omitted the sentences preceding their quote from the Richardson

20   (2009) meta-analysis, which stated:

21           Descriptions of tele-mental health programs with incarcerated patients
             suggest this medium may provide increased clinician safety, cost savings,
22           privacy, and an expanded range of services, including
             neuropsychological and competency assessments, diagnosis, and
23           treatment.  Data also support the reliability of tele-mental health
             assessments in this population.
24
     (Decl. Mehta, Ex. A, ECF No. 8253-2 at 218, internal citations omitted.)
25

26       In quoting Batastini (2015), Plaintiffs again ignored a key conclusion of the

27   paper concerning correctional telemental health in the paragraph preceding their

28   quoted language:

                                          14

> Overall, results suggested that the application of videoconferencing to mental health service provision is associated with assessment and treatment outcomes that are grossly equivalent to traditional in-person approaches. That is, being physically present in the room with a client does not appear to be a necessary therapeutic component for gathering adequate clinical information or producing desired treatment effects. In addition, the use of videoconferencing alone does not seem to inhibit clients' willingness to participate and engage in services.

(Decl. Mehta, Ex. A, ECF No. 8253-3 at 116.)

And Plaintiffs give short shrift to the key conclusion of Morgan (2008):

> This study represented an empirical investigation from the field and clearly indicated that the modality used for providing mental health services (i.e., telemental health vs. face-to-face) did not negatively impact key elements of the treatment experience. Specifically, the therapeutic relationship with the mental health professional, postsession mood, or overall satisfaction with services received were not different between telemental health and face-to-face treatment modalities.

(Decl. Mehta, Ex. A, ECF No. 8253-2 at 236.) These four papers represent a tiny fraction of the extensive literature Defendants rely on that demonstrates the effectiveness of the tele-modality for the provision of mental healthcare. (Decl. Mehta, ECF No. 8253-2 at ¶¶ 14-15.)

Regarding the Special Master's and Plaintiffs' contention that the non-prison literature supporting the telemental health modality is of little value, both Dr. Mehta and Dr. Penn explained that medicine functions by drawing reasonable inferences regarding the demonstrated safety and effectiveness of healthcare interventions in a multitude of different settings. (Decl. Mehta, ECF No. 8253-2 at ¶ 18; Decl. Penn, ECF No. 8253-1 at ¶ 51.) Such inferences are commonly drawn in the medical field because studies cannot be conducted in every possible environment or under every possible set of circumstances. (*Id.*) And Dr. Mehta observed: "Importantly, nearly all of the telemental health studies converge on a single conclusion: that telemental health is effective and equivalent to on-site treatment." (Decl. Mehta, ECF No. 8253-2 at ¶ 18.)

To wait for further studies supporting the use of telemental health to provide treatment to incarcerated patients before lifting restrictions and barriers to the

1    modality's use would require CDCR to wait too long and at the expense of

2    providing needed care to patients.

3    **VI.  THE SPECIAL MASTER'S LITERATURE REVIEW**

4         Plaintiffs contend that the Special Master's report correctly referred to the

5    American Psychiatric Association's (APA) *Resource Document on Telepsychiatry*

6    *for Adults in Jails and Prisons* (*Resource Document*) as an APA standard.  (ECF

7    No. 8331 at 25.)  To the contrary, the APA does not issue standards, it issues

8    guidelines and best practices.  For example, the APA Telepsychiatry Toolkit is

9    comprised of APA guidelines and best practices for the use of telepsychiatry.[3]

10   APA guidelines go through a rigorous review process that includes "establishing

11   transparency, managing conflicts of interest, composing work groups, using

12   systematic reviews of evidence, articulating and rating recommendations in

13   guidelines, obtaining external review, and updating."[4]

14        Resource documents are not APA guidelines.  As the *Resource Document*

15   plainly states, "The findings, opinions, and conclusions of this report do not

16   necessarily represent the views of the officers, trustees, or all members of the

17   American Psychiatric Association. Views expressed are those of the authors."[5]

18   Plaintiffs claim, despite this language, that the *Resource Document* is an APA

19   standard.  They base this assertion on the fact that the *Resource Document* states it

20   was approved by the Joint Reference Committee and contend that this means the

21   committee agrees with the *Resource Document*.  Of course, approving a paper for

22   publication does not mean that the committee agrees with its conclusions, but even

23   if that were true, it does not support the claim that the *Resource Document*

24   constitutes an APA standard or an APA guideline.  The *Resource Document* is

25   _____

     [3]

26   https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/best-
     practices, last visited on July 21, 2024.

27        [4] https://psychiatryonline.org/books/guidelines, last visited on July 21, 2024.
          [5] https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-
     5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf,

28   (citing the APA Operations Manual.), last visited on July 21, 2024.

1   exactly what it purports to be—a published article that represents the views of its

2   authors.  Stating otherwise is misleading and inaccurate.

3   **VII. TELEMENTAL HEALTH AT PIP AND MHCB LEVELS OF CARE**

4       Defendants object to the Special Master's proposed revisions concerning

5   telemental health in psychiatric inpatient units (PIPs) and in mental health crisis

6   beds (MHCBs) because CDCR's telemental health policy already contains a

7   reasonable, clear, common-sense restriction: "The use of telemental health services

8   in the MHCB and PIP levels of care is restricted to only circumstances when on-site

9   care is not available and shall be used for the shortest duration of time as

10  necessary."  (CDCR's policy, ECF No. 8165-2 at 49.)  This language demonstrates

11  CDCR's strong preference for on-site treatment in the PIPs and MHCBs while

12  ensuring that patients at those levels of care continue to receive treatment even if

13  on-site clinicians are not available.

14      Plaintiffs contend that the Special Master's proposed revision limiting the use

15  of telemental health to "emergency situations when the assigned on-site

16  psychologist and/or licensed clinical social worker (LCSW) is not available" is

17  better because it is more consistent with the telepsychiatry policy.  (ECF No. 8331

18  at 26-27; ECF No. 8165-1 at 27.)  Plaintiffs assert that the "emergency situations"

19  language does not really mean that telemental health can only be used in emergency

20  situations—rather it means that it can only be used when there is no on-site

21  clinician to provide care.  (*Id.*)  This is precisely why CDCR's policy language is

22  superior—it clearly states what it means.  If Plaintiffs are correct that the Special

23  Master does not intend that patients be in crisis before they can receive needed care

24  readily available from a telemental health clinician, then the "emergency situation"

25  language is misleading and inappropriate.

26      The remainder of the Special Master's proposed language regarding the use of

27  telemental health in the PIPs and MHCBs is unnecessary.  To date, no telemental

28  health clinicians have worked in those higher levels of care at all, much less for 30

17

1    days.  (Decl. Mehta Supp. Closing Br. ℙ 22.)  Plaintiffs' speculation that there *might*

2    be widespread use of telemental health clinicians in the PIPs and MHCBs for

3    excessive periods is not sufficient grounds for mandating a change to CDCR's

4    policy.

5          Plaintiffs cite the APA Toolkit's recognition that the development of inpatient

6    telepsychiatry programs have lagged behind that of outpatient programs as though

7    that is evidence that telepsychiatry is inappropriate at higher levels of care.  But

8    they failed to explain that the Toolkit also noted that a major reason for this is the

9    inadequacy of reimbursement structures for inpatient telepsychiatry.[6]  Importantly,

10    the Toolkit's video presentation on inpatient telepsychiatry also includes the

11    following points regarding its use in inpatient settings that Plaintiffs did not

12    mention:

13    - It is simply a matter of time before staffing realities dictate more
14      widespread adoption of this potentially valuable intervention modality;

15    - Most patients find the experience to be equal or superior to in-person care;

16    - The telepsychiatrist's effectiveness in inpatient settings is enhanced by the
      instantaneous connections now possible from hospitals offices and homes;
17      and

18    - The increasing ubiquity of remotely accessible electronic medical records
      further reduces barriers to bringing care originating at distance into the
19      inpatient setting.[7]

20    These statements can hardly be interpreted as discouraging the use of telepsychiatry

21    in inpatient settings.

22          There is no evidence that the allowance of telemental health in the PIPs and

23    MHCBs under very limited circumstances and for the shortest duration necessary

24    violates a federal right or conflicts with the remedy in this case.  Nor is there

25    evidence that telemental health providers will be widely and indiscriminately used

26    _____

          [6]

27    https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/inpatient-
      settings, last visited on July 21, 2024.

28          [7] (*Id.*)

18

1    in the PIPs or MHCBs for extended periods.  Consequently, an order imposing the

2    Special Master's policy language would not comply with the PLRA's need-

3    narrowness-intrusiveness requirement.

4    **VIII.  INFORMED CONSENT PROVISIONS**

5         Plaintiffs essentially fault CDCR's telemental health policy for not containing

6    a lengthy informed-consent script, and mischaracterize the policy's informed

7    consent requirement.  (ECF No. 8331 at 29-30.)  As Defendants explained in their

8    objections, informed consent is a medical term of art that means "the process in

9    which a health care provider educates a patient about the risks, benefits, and

10   alternatives of a given procedure or intervention."[8]  Informed consent does not

11   require that a provider offer a patient multiple treatment options, as Plaintiffs and

12   Dr. Stewart contend—it simply requires consent for the offered treatment.  (Decl.

13   Mehta Supp. Closing Br. ¶ 23; Decl. Mehta, ECF No. 8253-2 at ¶¶ 26-28; Decl.

14   Penn, ECF No. 8253-1 at ¶¶ 61-63.)

15        CDCR's telemental health policy requires that informed consent be obtained

16   from patients, and CDCR's mental health clinicians are well versed in the

17   requirements of informed consent.  (Decl. Mehta, ECF No. 8253-2 at ¶¶ 26-27.)

18   Telemental health providers, like all mental health providers, must obtain informed

19   consent in compliance with policies and regulations.

20        Plaintiffs contend that CDCR's informed-consent provision does not comply

21   with CDCR regulations.  *See* Cal. Code Regs., tit. 15, § 3999.202.  Again, they are

22   wrong.  Plaintiffs fail to grasp that the use of the term *informed consent* in CDCR's

23   telemental health policy requires compliance with CDCR's informed-consent

24   regulations.  The regulations define informed consent so that it is clear what the

25   term means with respect to the provision of medical and mental healthcare in

26   CDCR.

27   ───────────────

       [8] National Institutes of Health, National Library of Medicine at

28   https://www.ncbi.nlm.nih.gov/books/NBK430827/, last accessed on May 15,
     2024.

                                          19

1    Dr. Stewart finds fault with CDCR's informed-consent policy because he

2    claims it does not allow a patient to refuse treatment.  (Decl. Stewart, ECF No.

3    8331-1 at ⁋ 78.)  This is completely false.  All of CDCR's medical and mental

4    health patients have the right to refuse offered treatment by not giving their consent

5    to treatment.  Cal. Code Regs., tit. 15, § 3999.202; (Decl. Mehta Supp. Closing Br.

6    ⁋ 23.)  Moreover, CDCR's policy has a robust provision that addresses refusal

7    situations, should they arise, that ensures patients' needs are appropriately

8    addressed.  (CDCR's Policy, ECF No. 8165-2 at 69.)

9    Dr. Stewart further criticizes the policy because it does not require that

10    patients be offered an alternative treatment option—i.e., in-person treatment.  (Decl.

11    Stewart, ECF No. 8331-1 at ⁋ 78.)  But this is not a requirement for obtaining

12    informed consent.  (Decl. Mehta Supp. Closing Br. ⁋ 23; Decl. Penn, ECF No.

13    8253-1 at ⁋ 63.)  There is no standard of care that requires mental health clinicians

14    to offer multiple alternative forms of treatment to a patient, as Dr. Stewart claims.

15    (*Id*.)

16    Furthermore, the Constitution does not require that incarcerated patients be

17    provided the mental health treatment option of their choice.  *Estelle v. Gamble*, 429

18    U.S. 97, 107 (1976) (no Eighth Amendment violation when the course of treatment

19    offered was not what a plaintiff preferred); *Sanchez v. Vild*, 891 F.2d 240, 241-242

20    (9th Cir. 1989) (no Eighth Amendment violation where patient wanted surgery but

21    received alternative treatments for his condition); *Jackson v. McIntosh*, 90 F.3d

22    330, 332 (9th Cir. 1996) (to establish an Eighth Amendment violation, a plaintiff

23    must prove that the offered course of treatment was medically unacceptable).  The

24    Constitution only requires that incarcerated patients be offered an adequate form of

25    care.  (*Id*.)  Plaintiffs' failure to address this fatal problem with their position head-

26    on is telling.

27    To the extent Plaintiffs conflate their argument for mandatory treatment

28    options with situations where telemental health is contraindicated for a patient

20

1  because of medical or mental health reasons, CDCR's telemental health policy
2  already contains provisions that ensure such patients receive the mental healthcare
3  they need, including in-person treatment.  (Decl. Mehta, ECF No. 8253-2 at ¶ 30;
4  CDCR's policy, ECF No. 8165-2 at 48.)

5      Dr. Stewart wrongly asserts that the standard of care requires written informed
6  consent.  Again, he is incorrect.  In California, state law explicitly allows either
7  written or oral informed consent.  Cal. Bus. Prof. Code § 2290.5(b) (allowing
8  informed consent for telehealth to be provided either orally or in writing).

9      CDCR's informed consent provision does not violate a federal right or conflict
10  with the remedy in this case.  An order imposing the Special Master's informed
11  consent policy language, therefore, would not comply with the PLRA's need-
12  narrowness-intrusiveness requirement.

13  **IX.  RIGHT TO ASK TELEPRESENTERS TO LEAVE**

14      The Special Master's and Plaintiffs' proposed requirement that a patient must
15  be able to override a telemental health clinician's judgement that a telepresenter
16  should stay in the room is potentially dangerous.  (Decl. Mehta, ECF No. 8253-2 at
17  ¶ 31; Decl. Penn, ECF No. 8253-1 at ¶ 73.)  It is important that the telemental
18  health provider have the final say in any given session regarding the presence of the
19  telepresenter for patient safety, which is the reason for the policy's language.  (*Id.*)
20  There may be clinical circumstances—such as a patient who is in crisis and in need
21  of observation—that require the presence of a telepresenter based on the clinician's
22  judgment.  (*Id.*)  Moreover, the proposed revision to the policy is unnecessary
23  because CDCR has already agreed that telepresenters do not need to be in the room
24  for the entirety of an appointment and included that language in the policy.  (Decl.
25  Mehta, ECF No. 8253-2 at ¶ 31.)  This is to allow either the patient or the clinician
26  to request that the telepresenter leave the room.  (*Id.*)  And, in fact, the current
27  telemental health practice generally does not have the telepresenter in the room for
28  the entire session.  (Decl. Mehta Supp. Closing Br. ¶ 24.)

21

Because CDCR's telepresenter provision does not violate a federal right or conflict with the remedy in this case, an order imposing the Special Master's policy language would not comply with the PLRA's need-narrowness-intrusiveness requirement.

## X.   MINIMUM ON-SITE REQUIREMENT

Plaintiffs' argument in favor of the Special Master's proposed minimum on-site staff restrictions is largely based on the false premise that it is necessary "to prevent complete elimination of on-site clinicians." (ECF No. 8331 at 32.) Plaintiffs contend that CDCR's policy is incautious because it will result in the wholesale replacement of all on-site staff with telemental health staff and imply that this is CDCR's goal. (ECF No. 8331 at 8, 12, 22, 49.) Neither of these assertions are true. CDCR's telemental health policy does not call for the replacement of all on-site staff at any level of care and CDCR has no intention of doing so. (Decl. Mehta, ECF No. 8253-2 at ¶ 9.) Nor have CDCR's actions to date given any indication of an intent to replace all on-site staff. CDCR's most recent staffing adjustments, which issued on July 10, 2024, only allocate 60 out of a total of 823 line-staff psychologist positions to telepsychology, and only 40 out of a total of 451 total line-staff social worker positions to telesocial worker, despite robust interest from candidates in the program. (Decl. Mehta Supp. Closing Br. ¶ 26.) This is wholly consistent with CDCR's intended use of telemental health to maintain on-site staff at the institutions as much as possible. (*Id*.) CDCR is carefully monitoring for any issues that arise as a result of the modality, and welcomes the Special Master to monitor and assess the system as it continues to progress. (*Id.*)

As previously explained by Dr. Mehta, the Special Master's proposed minimum on-site requirement is impracticable and unmonitorable due to clinicians' workloads not being as clearly defined as the Special Master seems to assume. (Decl. Mehta, ECF No. 8253-2 at ¶ 38.) But even more problematic is the fact that these restrictions would prioritize compliance with arbitrarily chosen numbers over

22

1    ensuring the delivery of mental healthcare at the EOP and CCCMS levels of care.

2    (Decl. Mehta Supp. Closing Br. ¶ 25.)  CDCR's Mental Health Services Delivery

3    System is responsible for staffing 31 prisons with unique and varied needs, such as

4    custody or security levels, available rehabilitative programs, different physical

5    plants, different mission sizes, and other variables that lead to different staffing

6    challenges, which is another reason the one-size-fits-all nature of the proposed

7    minimum on-site requirement is unworkable.  (*Id.*)  As CDCR continues to

8    implement its policy, there may be locations where higher numbers of telemental

9    health providers are needed to ensure the delivery of care.  (*Id.*)  It makes no sense

10   to place arbitrary restrictions on the number of telemental health providers when

11   doing so would prevent access to care.  (*Id.*)  Such a restriction is not grounded in

12   evidence and potentially decreases the amount of care patients receive.  (*Id.*)

13        In support of the minimum on-site requirement, Plaintiffs and the Special

14   Master claim that because telepsychiatrists and telemental health providers are not

15   fully immersed in the carceral environment, they are not empathetic to the impact

16   of the environment or their patients.  (ECF No. 8331 at 33.)  This is absolutely false

17   and discounts the professionalism, dedication, skill, and character of the providers

18   practicing through this modality, many of whom have dedicated their careers to

19   treating incarcerated patients.  (Decl. Mehta Supp. Closing Br. ¶ 9; Decl. Penn,

20   ECF No. 8253-1 at ¶ 76.)  It ignores the fact that CDCR mandates that telemental

21   health providers engage in a robust on-boarding process, training, and education

22   concerning the prison environment and the unique population they serve.  (Decl.

23   Mehta Supp. Closing Br. ¶ 9)  And it also ignores the fact that CDCR's telemental

24   health providers are required to visit their assigned prisons when they begin

25   working for CDCR, and annually thereafter.  (Decl. Mehta, ECF No. 8253-2 at ¶

26   34.)  CDCR's telepsychiatry and telemental health providers absolutely have

27   empathy for their patients, their circumstances, and their physical environment.

28   (Decl. Mehta Supp. Closing Br. ¶ 9, 12.)

23

1    Plaintiffs and Dr. Stewart claim that only CDCR's on-site clinicians can

2    maintain collaboration with custody staff through the Custody and Mental Health

3    Partnership Plan (CMHPP)—another false claim—and one that Dr. Stewart has no

4    foundation to make.  Based on Dr. Mehta's experience overseeing telepsychiatry

5    and telemental health in CDCR, telepsychiatrists and telemental health providers

6    can and do interact with custody staff and impact the treatment milieu through their

7    relationships and interactions with custody staff, their frequent and required

8    attendance at meetings, huddles, and IDTTs, and their day-to-day involvement in

9    the provision of mental health treatment at their assigned institutions.  (Decl.

10   Mehta, ECF No. 8253-2 at ¶¶ 35-36; Decl. Mehta Supp. Closing Br. ¶ 15.)

11   Dr. Stewart expresses skepticism that telepsychiatrists and telemental health

12   providers can achieve rapport, trust, and good therapeutic relationships with their

13   patients in a correctional setting.  (Decl. Stewart, ECF No. 8331-1 at ¶¶ 18, 35, 57.)

14   Given Dr. Stewart's attitude toward telepsychiatry and his limited experience

15   providing telepsychiatry consultations in emergency room settings and inpatient

16   consultations, it is perhaps not surprising that he has this opinion concerning

17   telepsychiatrist-patient relationships.  (Decl. Mehta Supp. Closing Br. ¶ 7.)  By

18   contrast, most of CDCR's telepsychiatrists and telemental health providers fully

19   understand the modality and its effectiveness and are enthusiastic about the

20   opportunity to provide services using the modality.  (*Id.*)  A therapeutic relationship

21   is established when there is trust between the telemental health provider and the

22   patient.  (Decl. Mehta Supp. Closing Br. ¶ 8.)  CDCR's telepsychiatrists and

23   telemental health providers can and do develop rapport, trust, and excellent

24   therapeutic relationships with their patients.  (*Id.*)  A provider's ability to develop

25   good therapeutic relationships depends predominantly on the provider's skill,

26   experience, and engagement, not on the modality for delivering care.  (*Id.*)  The

27   literature, Dr. Mehta's personal direct experience providing such services in a

28   correctional setting, and his extensive experience overseeing the delivery of

24

1  telepsychiatry and telemental health care in CDCR demonstrates that Dr. Stewart's

2  skepticism is unfounded.  (*Id.*)

3      **A.    The EOP Program Is Not Equivalent to Inpatient Programs.**

4      Plaintiffs again imply that CDCR intends to replace all on-site mental-health

5  staff in EOP programs—a demonstrably false claim.  (ECF No. 8331 at 34-35.)

6  And Plaintiffs' expert further asserts that the enhanced *outpatient* programs are

7  actually inpatient programs—another false claim.  (*Id.*)  Dr. Stewart is on shaky

8  ground making this claim given that he has not visited a CDCR EOP unit in over

9  ten years.  In fact, EOP units are not remotely equivalent to inpatient programs.

10 Psychiatric inpatient unit commitments require legal proceedings and significant

11 restrictions on liberty that clearly do not apply to EOP units.  (Decl. Mehta Supp.

12 Closing Br. ¶ 20.)  CDCR's psychiatric inpatient units function very differently

13 from its EOP units.  (*Id.*)  CDCR's inpatient psychiatric units are typically locked

14 or otherwise contained, and inpatient treatment generally occurs in the same

15 building where patients are housed or in locations that non-inpatients do not access.

16 (*Id.*)  EOP patients, on the other hand, are most similar to outpatients because they

17 participate in education programs, work assignments, and other opportunities along

18 with incarcerated residents who are not EOP patients.  (*Id.; see also* Decl. Penn,

19 ECF No. 8253-1 at ¶ 68.)  They are not restricted within EOP facilities.  (*Id.*)  The

20 drafters of the Program Guide accurately used the words enhanced *outpatient* to

21 describe this level of care.  (*Id.*)

22     Having wrongly concluded that EOP programs are inpatient programs,

23 Plaintiffs cite several articles that noted less research has been conducted on the use

24 of the tele-modality in inpatient settings.  (ECF No. 8331 at 33-34.)  Tellingly, none

25 of their cited references contend that telemental health is contraindicated for higher

26 levels of care.  Regardless, their citations are not germane to the appropriateness of

27 telemental health in CDCR's EOP units, which are not inpatient units.

28

25

1       Plaintiffs again cite the *Resource Document* for the contention that telemental

2 health is not appropriate for residential or inpatient units. As Defendants' briefing

3 has previously discussed, the *Resource Document* contains no citations to studies or

4 evidence supporting that contention, it does not assert that telepsychiatry is

5 completely contraindicated for residential or inpatient programs, and it in fact

6 allows for its use in situations where on-site recruitment is not successful.[9] Nor, as

7 discussed above, is the Resource Document an APA Guideline.

8       Plaintiffs refer to an incomplete Kaftarian (2019) quote contained in the

9 Resource Document for the proposition that telepsychiatrists are not in

10 conventional flow of information at the prisons where they work. (ECF No. 8331

11 at 35.) But the Kaftarian article went on to say: "Fortunately, this problem is easily

12 remedied with regular check-ins and communication protocols. Onsite staff who

13 are engaged with and supportive of telepsychiatrists can be incentivized to provide

14 collateral information to remote doctors. As the relationship between telepsychiatry

15 and onsite staff develops, so will the flow of valuable collateral information."

16 (Decl. Mehta Supp. Closing Br. ¶ 13; Kaftarian, E. (2019), *Lessons learned in*

17 *prison and jail-based telepsychiatry*, Current Psych. Reps., 21, 15.)

18       Plaintiffs point out that some EOP patients might have "clinical

19 contraindications for the use of telemental health." (ECF No. 8331 at 35.) This

20 very well may be true, which is why CDCR's telemental health policy has a

21 provision addressing such inmates and ensuring that they get the care they need.

22 (CDCR's policy, ECF No. 8165-2 at 69.) Plaintiffs express concern that mental

23 health staff need to collect collateral information about their patients, educate

24 custody and nursing staff about mental health conditions, advocate for patients, and

25 support other clinical staff. CDCR's policy addresses these concerns by mandating

26 that telemental health clinicians:

27       [9] https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-
5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf,
28 (citing the APA Operations Manual.), last visited on July 21, 2024.

- participate in Interdisciplinary Treatment Team meetings;
- participate to the same extent as on-site primary clinicians in all meetings and huddles relevant to their patients;
- communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team;
- have access to all necessary clinical information via the patient's health record; and
- visit their assigned institutions.

(CDCR's policy, ECF No. 8165-2 at 69, 73.)

Plaintiffs point to previous findings from the Special Master regarding telepsychiatry based on a visit to the telepsychiatry hubs, a visit to a particular prison, and discussions with a handful of staff as evidence that telemental health providers will not be able to have a positive impact on the treatment milieu. (ECF No. 8331 at 36.) Plaintiffs ask the Court to extrapolate those findings to all telepsychiatrists and all telemental health providers. (*Id.*) As Dr. Mehta has testified, the level of engagement among mental health staff varies regardless of whether they work remotely or on-site. (Decl. Mehta, ECF No. 8253-2 at ⁋ 34-35; Decl. Mehta Supp. Closing Br. ⁋ 8.) And the Special Master's limited anecdotal findings are not consistent with Dr. Mehta's extensive experience providing care as a telepsychiatrist and his day-to-day experiences overseeing telepsychiatry program and telemental health programs. (Decl. Mehta, ECF No. 8253-2 at ⁋⁋ 35-36; Decl. Mehta Supp. Closing Br. ⁋ 15.)

There is no evidence before the Court that CDCR's telemental health policy has had an adverse effect on the remedial plan, an adverse effect on EOP patients, or has violated EOP patients' federal rights. Nor is there any evidence that requiring the arbitrary forty-percent on-site requirement would be the least intrusive and most narrowly tailored approach to addressing violations if there were any. Only after full implementation and monitoring would such findings even be

27

1  possible.  Consequently, the Special Master's proposed restrictions on the use of

2  telemental health for EOP patients would not satisfy PLRA requirements.

3      **B.   CCCMS Minimum On-Site Presence**

4      Plaintiffs again fear monger that all on-site mental health staff at the CCCMS

5  level of care will be replaced by telemental health.  (ECF No. 8331 at 37.)  CDCR

6  has every intention of maintaining on-site staff at its prisons.  (Decl. Mehta, ECF

7  No. 8253-2 at ¶ 9; Decl. Mehta Supp. Closing Br. ¶ 26.)  Plaintiffs contend the

8  Special Master's twenty-percent on-site minimum for CCCMS is necessary because

9  only on-site staff should perform suicide assessments, cell-front assessments of

10 patients, use of force de-escalation efforts, therapeutic groups, and five-day follow

11 up contacts.  (ECF No. 8331 at 30-31.)  But as discussed below and in Defendants

12 prior briefing, it is not true that only on-site staff can effectively perform these

13 duties.

14     Plaintiffs further argue that the twenty-percent requirement is necessary

15 because CCCMS patients may decompensate or have a serious mental health crisis.

16 (ECF No. 8331 at 37.)  This ignores that CDCR's telemental health policy has a

17 provision addressing emergency situations that requires immediate notification to

18 all appropriate institution staff, coordination with institutional mental health

19 leadership, and as appropriate may include coordinating arrangements for the

20 patient to be seen by an on-site psychologist or social worker, arrangements for safe

21 holding, transport to an emergency triage area, communication with local

22 emergency team members, and placing emergency orders as needed.  (CDCR's

23 policy, ECF No. 8165-2 at 49.)  Plaintiffs' position also ignores that in the

24 community, emergency departments and other acute care settings commonly rely

25 on telemental health to conduct crisis evaluations, including suicide risk

26 assessments.  (Decl. Mehta, ECF No. 8253-2 at ¶ 50.)

27     Plaintiffs again raise compliance with the CMHPP as a reason supporting

28 minimum on-site requirements and cite two Special Master reports in support of the

1    assertion.  (ECF No. 8331 at 37 (citing 29th and 30th Round Monitoring Reports).

2    But their argument is flawed.  First, telemental health could not have been a cause

3    of the any noncompliance with CMHPP requirements during those rounds of

4    monitoring because CDCR's telemental health policy had not yet been

5    implemented.  Second, as Plaintiffs noted in their previous filing objecting to the

6    Special Master's telemental health report, the Special Master attributed the

7    noncompliance to staffing vacancies.  (ECF 8252 at 12-13.)  To the extent staffing

8    vacancies are resulting in noncompliance with the CMHPP, CDCR's telemental

9    health program should improve compliance by increasing staffing levels.

10    Once again, there is no evidence before the Court that the Special Master's

11    minimum on-site requirement for CCCMS patients is necessary to correct a federal

12    right, nor can the arbitrary twenty-percent on-site requirement satisfy the PLRA's

13    need-narrowness-intrusiveness requirement.

14    **C.    RHU—One Full Time On-Site Requirement**

15    The Special Master's proposed requirement that one full-time equivalent on-

16    site primary clinician be assigned to each RHU unit is problematic.  The

17    requirement does not rest on any evidence or common community standards, and in

18    fact runs counter to some standards, such as the continuity of care.  (Decl. Mehta,

19    ECF No. 8332-1 at ¶ 3.)  Based on Dr. Mehta's experience, an on-site provider

20    would not necessarily be better than someone more familiar with the patient's past

21    behavior, or the history of medications and other treatments, such as the patient's

22    assigned telemental health provider.  (*Id.*)

23    Second, per the Special Master's proposed policy, the total number of FTE

24    clinicians assigned to the RHU should be based on "the number of RHU beds in a

25    particular institution." (ECF No 8165 at 32; ECF No. 8165-1 at 16.)  This

26    contradicts the 2009 Staffing Plan, which bases staffing ratios on the patient

27    population, not on the number of beds in a particular unit. (ECF No. 3693 at 20, 31,

28    33, 39, 41 (noting the ratios are based on the number incarcerated persons with a

29

1    certain housing unit classification).)  Therefore, allocating clinician positions to

2    each RHU based on the number of beds would be inconsistent with the 2009

3    Staffing Plan.  (Decl. Mehta, ECF No. 8332-1 at ¶ 3.)

4         Plaintiffs' and their expert's argument that the harshness and isolation of

5    CDCR's segregation units necessitates the Special Master's proposed revision is

6    based on information predating the newly revised RHU regulations (*see* ECF No.

7    8257 at 9-13), which address these concerns through the provision of substantial

8    weekly out-of-cell time, recreation time, structured therapeutic treatment, and group

9    treatment activities.  And Dr. Stewart, who has not visited a CDCR RHU for more

10   than a decade, does not have the foundation to assess their current status or their

11   impact on the mental-health needs of their residents.

12        There is no evidence before the Court that the Special Master's RHU

13   requirement is necessary to address a violation of a federal right caused by CDCR's

14   policy, nor can the proposed requirement satisfy the PLRA's need-narrowness-

15   intrusiveness requirement.

16   **XI.  MINIMUM ANNUAL SITE VISITS**

17        CDCR's telemental health policy already requires telemental health clinicians

18   visit their assigned institution within 30 days of assignment and no less than

19   annually thereafter.  (CDCR's policy, ECF No. 8165-2 at 50.)  During the visits

20   they must spend at least one day at their assigned institution and participate in the

21   Interdisciplinary Treatment Team (IDTT) meeting, meet with necessary health care

22   staff, and attend staff meetings if applicable on that day.  (*Id.*)  They may also see

23   patients in person.  (*Id.*)

24        Plaintiffs and Dr. Stewart claim that the Special Master's proposed minimum

25   site visits (two one-day site visits per year for CCCMS clinicians and four one-day

26   site visits per year for EOP clinicians) are necessary to educate telemental health

27   clinicians about the culture and conditions of the prisons in which their patients

28   reside and so that they understand the environments in which they are providing

                                        30

1    care.  (ECF No. 8331 at 39.)  But they provide no evidence that the number of visits

2    mandated by the Special Master's proposal are supported by the literature or the

3    standard of care.  And once again, Dr. Stewart—having never practiced or

4    supervised correctional telepsychiatry or telemental health—has no foundation to

5    opine on what frequency or duration of visits is adequate.[10]  He is merely

6    guessing—incorrectly—about the adequacy of these visits, and he is not qualified

7    to opine on this specific issue as a purported expert witness.  *See* Fed. R. Evid.

8    702(b) (an expert may testify in the form of an opinion only if he demonstrates to

9    the court that his testimony is "based on sufficient facts or data," among other

10   requirements).

11        Furthermore, it is not true that site visits are the only way for telemental health

12   providers to learn about the culture and conditions of the prisons.  CDCR's

13   telemental health staff also gain insight into their patients' lives by talking to on-

14   site prison staff who see the patients in settings outside of appointments.  (Decl.

15   Mehta, ECF No. 8332-1 at ¶ 4.)  And by listening to their patients and considering

16   information about the environment for many hours every day, they become highly

17   aware and acculturated to the prison environment.  (*Id.*)

18        Dr. Stewart contends that there is no way telemental health providers can truly

19   understand their patients' state of mind without meeting them in person in the

20   prison setting.  (Decl. Stewart, ECF No. 8331-1 at ¶ 65.)  Dr. Stewart has no basis

21   for concluding that providers cannot understand their patients without treating them

22   in person at a prison and he cites no evidence backing up this claim.  Dr. Mehta

23   confirms, based on extensive experience with the modality, that the claim is false

24   and that telemental health providers can gain a deep understanding of their patients

25   and the impact of their environments.  (Decl. Mehta, ECF No. 8253-2 at ¶ 34; Decl.

26   Mehta Supp. Closing Br. ¶¶ 7-9; Decl. Penn, ECF No. 8253-1 at ¶ 76.)

27        ───────────────

          [10] Dr. Stewart's declaration does not explain if he ever—during the sixteen
28   months he practiced telepsychiatry—conducted a site visit of the locations where he
     provided care.

31

Plaintiffs assert that the APA tool kit "recommends" that telepsychiatrists practicing in cross-cultural settings conduct "periodic site visits" and imply that this is a standard of care, contrary to Dr. Mehta's testimony. Not true. The actual language from the tool kit states: "Be knowledgeable and educated about the culture(s) and environments in which they are providing care. This may include periodic site visits as well as keeping informed of events occurring in the communities in which patients are located."[11] This is far from a requirement, but it is noteworthy that CDCR's telepsychiatry and telemental health programs do accomplish these things by providing education and training to the providers and by requiring that they periodically visit their assigned institutions. (Decl. Mehta Supp. Closing Br. ⁋ 9.) And the toolkit's section on Child and Adolescent Telepsychiatry makes the following relevant statement regarding cultural issues: "Telepsychiatrists should not assume that a difference in social, economic, income, geographic, racial, ethnic or cultural backgrounds with their patients precludes ability to establish rapport and a therapeutic relationship through videoconferencing."[12]

In another exercise of selective quoting, Plaintiffs cite Kaftarian (2020) for the proposition that telepsychiatrists may be at a disadvantage with respect to knowledge of significant events in a prison and familiarity with the dynamics of the facility. (ECF No. 8331 at 40-41.) But they failed to include the very next sentence in which he stated: "Nevertheless, these are not insurmountable obstacles. With proper communication and working relationships with onsite staff, telemental health clinicians can be kept abreast of important factors in the facility that can affect patients."[13] CDCR's telemental health policy ensures proper communication

---

[11] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/best-practices, (emphasis added) last visited on July 25, 2024.

[12] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/best-practices, (emphasis added) last visited on July 25, 2024.

[13] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7327283/pdf/mh-06-2019.12.05.pdf, last visited on July 26, 2024.

1    and working relationships with onsite staff.  (CDCR's policy, ECF No. 8165-2 at

2    47-48.)

3         The Special Master's proposed visit requirements would hurt CDCR's

4    telemental health recruitment efforts.  (Decl. Mehta, ECF No. 8253-2 at ⁋ 45; Decl.

5    Mehta Supp. Closing Br. ⁋ 6.)  CDCR is competing with many other employers

6    who correctly see no benefit to imposing such requirements on their telemental

7    health staff.  (*Id.*)  The Special Master's proposed revisions would require the

8    disruption of personal and family lives of telemental health staff who may be

9    seeking telemental health employment precisely to avoid such disruptions.  (*Id.*)

10   Ultimately, the proposed revisions would make telemental health employment with

11   CDCR less attractive and hinder efforts to fill vacant positions and retain staff.

12   (*Id.*)

13        CDCR's requirement that telemental health staff visit their assigned prisons

14   once per year does not violate any federal right, nor is there evidence that the

15   Special Master's proposed visit requirements are the least intrusive and narrowest

16   means for addressing a violation of a federal right.  Accordingly, the proposed

17   requirements would not satisfy PLRA requirements.

18   **XII. CELL FRONT VISITS**

19        Plaintiffs argue that the Special Master's recommendation that telemental

20   health cell-front visits not count as patient contacts is appropriate, and rely almost

21   exclusively on Dr. Stewart's opinions to support their position.  (ECF No. 8331 at

22   41.)  Dr. Stewart's primary objection to cell-front visits is that a telemental health

23   provider would not be able to see or hear well enough to adequately conduct the

24   visit.  (ECF No. 8331 at 39.)  But Dr. Stewart has no foundation to make this claim

25   or any other claim about the adequacy of cell-front visits.  He does not claim to

26   have ever conducted or observed a telemental health cell-front visit, much less a

27   cell-front visit using CDCR's current technology accompanied by a trained

28   telepresenter.

Cell-front consultations via the tele-modality are effective and can be clearer and more confidential than in-person consultations because of the directional nature of the technology. (Decl. Mehta, ECF No. 8253-2 at ¶ 4; Decl. Penn, ECF No. 8253-1 at ¶¶ 81-82.) And in most cases the telemental health provider can assess the appearance of the patient and the cell, but regardless, the telepresenter can relay additional information observed at the cell to the provider. (Decl. Mehta Supp. Closing Br. ¶ 16.)

To Dr. Stewart's concern about a patient who may be decompensating or otherwise in crisis during a telemental health cell-front visit, he does not demonstrate familiarity with CDCR's policy, which provides that in such urgent or emergent situations, the telemental health provider shall immediately notify the appropriate institution staff, coordinate with institutional mental health leadership, and take other steps as needed, such as coordinate arrangements for the patient to be seen by an on-site psychologist or social worker, coordinate arrangements for safe holding, coordinate arrangements for transport to an emergency triage area, communicate with local emergency team members, and place emergency orders. (CDCR's Policy, ECF No. 8165-2 at 49.) In other words, under CDCR's policy, telemental health providers have a host of potential options to exercise, depending on the situation, to adequately and efficiently address a patient's needs.

Regarding whether a telemental health cell-front visit should count as a patient contact, the Special Master's proposed policy revisions state that if a patient does not refuse an appointment in person, the telemental health clinician must "go to the patient to encourage the patient to participate in a confidential contact, confirm the refusal, discuss the risks associated with refusing treatment, and discuss the reasons for refusal." (ECF No. 8165 at 31.) But under the Special Master's revisions, these cell-front visits only count towards Program Guide requirements for on-site clinicians, not for telemental health clinicians. (*Id.*) The Special Master provides no rationale, supporting evidence, or standard of care that would justify this

34

1     arbitrary rule.  There is no clinical basis for only counting towards compliance

2     completion of these required cell-front visits by on-site clinicians.  (Decl. Mehta,

3     ECF No. 8253-2 at ¶ 47; Decl. Mehta Supp. Closing Br. ¶ 16; Decl. Penn, ECF No.

4     8253-1 at ¶¶ 81-82.)  The Special Master's revision prioritizes counting numbers of

5     contacts over the provision of care.  A contact is a contact, whether provided in

6     person or through telemental health.  The revision is arbitrary and internally

7     inconsistent with goals of continuity of care.  (Decl. Mehta, ECF No. 8253-2 at ¶

8     47.)

9         The Special Master's revisions would also ban cell-front contacts by

10    telemental health providers in RHUs.  (ECF No. 8165 at 30-31.)  The Special

11    Master provides no rational basis for this ban and there is no clinical evidence to

12    support such a ban, which would prevent telemental health clinicians from

13    performing vital wellness checks on their own patients and observing the condition

14    of their patients and the state of their cells.  (Decl. Mehta, ECF No. 8253-2 at ¶ 48.)

15    Clinicians can build rapport over time with their patients through wellness checks,

16    but the Special Master's ban on RHU telemental health wellness checks would

17    preclude telemental health providers from doing so with their patients.  (*Id.*)  The

18    Special Master's prohibition on telemental health cell-side visits would hamper

19    telemental health providers' ability to perform duties essential to their role, and

20    would cause unnecessary disruptions to continuity of care.  (*Id.*)

21        There is no competent evidence that telemental health cell-front visits harm

22    patients or otherwise violate patients' federal rights.  Nor is there evidence that

23    restrictions or bans on telemental health cell-front visits are constitutionally

24    required.  Neither a rule that telemental health cell-front check cannot count as

25    patient contacts, nor a total ban on them in RHUs would satisfy the PLRA's need-

26    narrowness-intrusiveness requirement.

27

28

1  **XIII. SPECIAL PURPOSE CONTACTS**

2      **A.   Urgent/Emergent Referrals and Suicide Risk Assessments**

3         Plaintiffs support the Special Master's recommendation that would prevent a

4  telemental health provider from treating their own patients, with whom they have a

5  therapeutic relationship, when they are urgently or emergently referred for

6  treatment due to incidents involving danger to self, suicidality, or self-harm, except

7  as a last resort if there is no on-site clinician available.  (ECF No. 8331 at 43.)  The

8  Special Master's policy would also prohibit telemental health clinicians from

9  conducting suicide risk assessments for their own patients in these situations.

10  (Special Master's policy, ECF No. 8165-1 at 7.)  This proposed restriction is not

11  based on evidence, not consistent with the use of telemental health in other settings,

12  and damaging to the patient-clinician relationship.  (Decl. Mehta, ECF No. 8253-2

13  at ⁋ 49-50.)  Community emergency departments and other acute care settings

14  commonly rely on telemental health to conduct crisis evaluations, including suicide

15  risk assessments.  (*Id.*)

16         Dr. Stewart opines that the effectiveness of in-person treatment in these types

17  of correctional situations is superior.  (ECF No. 8331 at 44.)  But again, he has no

18  foundation for making that comparison.  He has never practiced or supervised the

19  delivery of telepsychiatry or telemental health in correctional settings and his

20  experience with community telepsychiatry is sparse.  His opinions are therefore

21  unpersuasive.  *See* Fed. R. Evid. 702(b).

22         Dr. Stewart asserts that placing a suicidal patient "in front of a computer

23  screen and telling him to talk to the doctor is clinically inadequate and ridiculous."

24  (Decl. Stewart, ECF No. 8331-1 at ⁋ 55.)  Again, Dr. Stewart's opinion here is

25  likely the result of his limited experience with telepsychiatry and his complete lack

26  of experience regarding telemental health.  (Decl. Mehta Supp. Closing Br. ⁋ 32.)

27  He fails to understand that CDCR's telemental health providers have assigned

28  patients who they see repeatedly for multiple sessions.  (Decl. Mehta Supp. Closing

1  Br. ⁋ 32.)  CDCR's telemental health providers have rapport and therapeutic

2  relationships with their patients and know their patients' backgrounds and mental

3  health histories.  (Decl. Mehta Supp. Closing Br. ⁋ 32.)  These things can be

4  especially valuable, even critical, when working with a patient through a mental

5  health crisis.  (Decl. Mehta Supp. Closing Br. ⁋ 32.)  In short, a patient's assigned

6  telemental health provider is often in the best position to help that patient during

7  these types of urgent and emergent situations.  (Decl. Mehta Supp. Closing Br. ⁋

8  32.)  And as discussed above, they have abundant on-site resources at their disposal

9  if they need them to ensure the safety of their patients.

10      Plaintiffs contend that CDCR's policy would require a "major modification to

11  the remedy" with respect to the *face-to-face* language in the Program Guide related

12  to suicide risk assessments.  (ECF No. 8331 at 43.)  Plaintiffs interpret the *face-to-*

13  *face* language to require on-site staff to perform these duties, but this is not how the

14  parties and the Special Master have interpreted Program Guides references to the

15  term *face-to-face* in other contexts, and there is no basis for adopting an

16  inconsistent interpretation of those words here.  (Decl. Mehta Supp. Closing Br. ⁋⁋

17  29-31.)  The Program Guide language at issue is:

18      Any CDCR employee who becomes aware of an inmate's current
   suicidal ideation, threats, gestures, self-injurious behaviors or suicide
19      attempts shall immediately notify a member of the health care staff. The
   inmate shall be placed under direct observation, per local custody
20      operating procedure, until a clinician trained to perform a suicide risk
   assessment (psychiatrist, psychologist, clinical social worker, primary
21      care physician, nurse practitioner, or RN) conducts a face-to-face
   evaluation.
22

23  (Program Guide, ECF No. 7333-1 at 174.)

24      There are other sections of the Program Guide that require face-to-face

25  contacts, such as initial PC contact for CCCMS patients (*Id.* at 41) and routine PC

26  contacts for CCCMS patients (*Id.* at 48), but the parties and Special Master have

27  not interpreted this to mean that all initial and routine PC contacts for CCCMS

28  patients must be performed in-person by on-site clinicians.  (Decl. Mehta Supp.

37

1    Closing Br. ¶¶ 29-31.)  The parties and the Special Master's team agree that these

2    requirements are satisfied by telemental health contacts, and there has been no

3    proposed restriction on the use of telemental health for these services or allegations

4    that CDCR is modifying those parts of the remedy.  (*Id.*)

5        Similarly, the 2020 Clinical Contacts Memo (which is part of the Program

6    Guide) states "An appointment is considered refused if: 1. The mental health

7    clinician speaks with the patient face to face and the patient refuses…" (Program

8    Guide, ECF No. 7333-1 at 637.)  In the extensive discussions of refusals in

9    meetings, neither the Plaintiffs nor the Special Master have taken the position that if

10   a patient refused an appointment to a telemental health provider at the beginning of

11   a telemental health contact, the refusal would not count as an appropriate refusal,

12   nor have they indicated that they believe it is a Program Guide modification to

13   count these face-to-face refusals via telemental health.  (Decl. Mehta Supp. Closing

14   Br. ¶¶ 29-31.)

15       The *face-to-face* language has also been discussed in the Business Rules

16   Methodology Review with stakeholders and has been interpreted to include

17   telemental health.  (*Id.*)  While most of the contact indicators are not yet finalized,

18   the parties have agreed to count suicide risk evaluations completed by

19   telepsychiatrists as a Mental Health Crisis Bed Daily Contact.  (*Id.*)

20   Telepsychiatrists already conduct urgent and emergent contacts and complete

21   suicide risk assessments via telehealth.  (*Id.*)  There is no restriction against

22   telepsychiatrists completing certain contacts or suicide risk assessments in the

23   court-approved telepsychiatry policy, and there is no basis for such a restriction on

24   telemental health.  (*Id.*)

25       Plaintiffs quote a research article's recitation of guidance from the United

26   Kingdom suggesting that face-to-face treatment *may* be preferable when there are

27   complex needs or higher risk.  (ECF No. 8331 at 43, quoting Smith et al., "COVID-

28   19 and Telepsychiatry: Development of Evidence-Based Guidance for Clinicians,"

38

1  JMIR Mental Health (Aug. 2020)[14].)  But Plaintiffs again failed to inform the Court

2  of key conclusions in this paper:

> Despite evidence that e-therapy is equivalent to face-to-face therapy in terms of therapeutic alliance, there remains a concern from clinicians that telepsychiatry, in general, may not be as effective as "in-person" mental health care. In addition, clinicians are concerned that telepsychiatry cannot replace the team assessment and multidisciplinary approach that are at the center of modern mental health care provision. It is also often assumed that patients may be reluctant or unable to engage with the technology involved. Mental health care provision, especially in the United Kingdom, has previously reflected this view, and although telepsychiatry has been introduced in the United Kingdom in some more remote areas, this has been, to at least some extent, out of necessity rather than preference.
>
> *In fact, the evidence, especially from the United States shows the opposite. Telemedicine and telepsychiatry are well-established fields and are preferable in many areas such as for patients on the autistic spectrum and those with anxiety symptoms.* It can add value, for example, in bringing together subspecialty expertise in an easier and quicker way than in-person assessment, and in completing home and nursing home assessments more rapidly and efficiently. *There is strong evidence of effectiveness and acceptability across different settings and many disciplines of psychiatry including older adult, child, and adolescent psychiatry, and across different cultures.*

15  (*Id.*, internal citations omitted, emphasis added.)  As this paper confirms, the

16  concerns raised by Dr. Stewart are not uncommon, but they are simply not borne

17  out by the evidence.

18      Neither Plaintiffs nor the Special Master have established that the provision of

19  telemental health during urgent or emergent situations—a practice that is common

20  in community settings—violates the Constitution, nor have they demonstrated that

21  the Special Master's proposed policy revisions are the narrowest and least intrusive

22  means of addressing any violation of a federal right.

23      **B.    Group Treatment**

24      Plaintiffs support the Special Master's proposed ban on telemental health

25  group treatment.  (ECF No. 8331 at 45.)  Again, Plaintiffs rely entirely on Dr.

26  Stewart's opinion to support their position despite the fact that he has no experience

27  with telemental health or telemental health group treatment.  *See* Fed. R. Evid.

28      _____
      [14] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7485934/

39

Defs.' Closing Br. Re Special Master's Telemental Health Report & Revised Policy (2:90-cv-00520 KJM-DB (PC))

702(b).  This is apparent based on his assumption that the only way group treatment could work in prison is with a group of patients in a room and a remote clinician. (Decl. Mehta Supp. Closing Br. ⊮ 28.)  There are other potential configurations for remote group therapy.  (*Id*.)  And as noted in Batastini's 2016 article, remote group therapy is supported by community evidence of positive clinical and process-related outcomes.  (Decl. Mehta, Ex. A, ECF No. 8253-2 at 185; Decl. Mehta Supp. Closing Br. ⊮ 28.)

    As CDCR is not currently using telemental health group treatment, the Special Master and Plaintiffs have no basis for asserting that any such practice is violating patients' federal rights.  Nor have they demonstrated that CDCR's policy, as written, will lead to violations of patients' rights by the use of group therapy. Accordingly, there is no basis for adopting the Special Master's ban on telemental health group therapy and such a ban would not satisfy PLRA requirements.

**C.    Five-Day Follow-Ups**

    Plaintiffs support the Special Master's proposed restrictions on telemental health for five-day follow-up appointments for previously suicidal patients who have returned to their housing units.  (ECF No. 8331 at 45.)  The Special Master's position seems to be based on his mistaken assumption that these appointments must be conducted cell-front.  (ECF No. 8165 at 33; Decl. Mehta, ECF No. 8253-2 at ⊮ 55.)  Regardless, as discussed above, there is no basis for restricting telemental health cell-front contacts, there is no clinical rationale to support the Special Master's prohibition, and it is internally inconsistent with other stated goals, such as continuity of care.  (Decl. Mehta, ECF No. 8253-2 at ⊮ 54-55.)  It would also prevent telemental health providers from performing five-day follow-ups in a confidential office space with their assigned patients.  (*Id.*)

    There is no evidence that a telemental health provider conducting a five-day follow-up contact with their patient, either cell-front or in a confidential space, violates patients' federal rights, nor would a prohibition of telemental health five-

40

1  day follow-ups be the narrowest and least intrusive way to remedy a violation if

2  there were one.  Accordingly, the proposed restriction does not satisfy PLRA

3  requirements.

4      **D.    Use of Force Incidents**

5      On the Special Master's prohibition of telemental health for use-of-force

6  incidents, Plaintiffs offer Dr. Stewart's opinion that a telemental health provider is

7  unlikely to be able to de-escalate a patient.  (ECF No. 8331 at 46.)  Dr. Stewart has

8  no foundation for his opinion given his complete lack of correctional telemental

9  health experience.  *See* Fed. R. Evid. 702(b).  And he offers no evidence supporting

10 his claim that the virtual presence of a telemental health provider would not have

11 the desired impact on staff conduct during a cell extraction.  (*Id.*)  Telemental

12 health providers can play an important role in these situations, particularly if they

13 have strong therapeutic bonds with their patients.  (Decl. Penn, ECF No. 8253-1 at

14 ⁋ 91.)

15     The Special Master's prohibition is not necessary to address a violation of a

16 federal right and does not satisfy PLRA requirements.

17     **E.    MHCB Discharges**

18     As explained in Defendants' objections to the Special Master's proposed

19 policy revisions, the revision prohibiting telemental health providers from

20 discharging patients from MHCBs is unnecessary.  CDCR's policy already places

21 limitations on the use of telemental health in MHCBs.  (Decl. Mehta, ECF No.

22 8253-2 at ⁋ 56.)  Additionally, discharge from a MHCB is an IDTT decision, not a

23 unilateral decision on the part of one clinician.  (*Id.*)  This recommendation is also

24 not based in clinical evidence and goes against community standards, where

25 telemental health is often used in emergency room settings to assess, admit, and

26 discharge patients.  (*Id.*)

27     The Special Master's proposed revision is not necessary to remedy a

28 constitutional violation, nor would it satisfy PLRA requirements.

41

**PENDING APPEALS**

Defendants' inadvertently omitted the discussion of pending appeals that the Court directed the parties include in their responses to each side's objections to the Special Master's telemental health report. Defendants agree with Plaintiffs that the issues raised by the telemental health briefing are not directly raised in the pending appeals. (ECF No. 8331 at 48-49.)

**CONCLUSION**

The Special Master's proposed revisions to CDCR's telemental health policy are not supported by competent evidence that they are required to remedy a violation of a federal right or that they satisfy the PLRA's need-narrowness-intrusiveness requirement. Furthermore, at a time when the Court has imposed fines exceeding $120,000,000 for CDCR's inability to satisfy *Coleman* staffing requirements, and continues to impose fines on a monthly basis, the Court should not impose roadblocks to a telemental health program that promises to significantly improve mental health staffing levels and increase access to care. Instead, the Court should permit CDCR to continue implementation of its telemental health policy, allow the Special Master to monitor the telemental health program, and if necessary, issue orders that specifically address any issues identified through monitoring, in accordance with PLRA requirements.

**CERTIFICATION**

In preparing this filing, Defendants' counsel certify that they have reviewed the following relevant orders: ECF Nos. 640, 1773, 5711, 5850, 6230, 6539, 7807, 7830, 7901, 8087, and 8239. This response sets forth arguments that have not been resolved by prior court orders as they are specifically tailored to address the merits of Plaintiffs' response to the Special Master's March 21, 2024 report on telemental health. Counsel acknowledges this Court's prior orders concerning telepsychiatry (ECF Nos. 5711, 5850, 6539, 7807, and 7830), but those orders do not foreclose this response. Counsel make this filing under their obligation to represent their

42

1   clients zealously under their right to relief under Fed. R. Civ. P. 62(c), *Operating*

2   *Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988), and to

3   satisfy Federal Rule of Appellate Procedure 8(a)(1)(A)'s requirement.  Counsel

4   certify that they have conducted a reasonable inquiry and have determined that this

5   filing is well grounded in fact, legally tenable, and not presented for an improper

6   purpose, to harass, cause unnecessary delay, or needlessly increase the cost of

7   litigation. Fed. R. Civ. P. 11(b)(1); and *Cooter & Gell v. Hartmax Corp.*, 496 U.S.

8   384, 393 (1990) (internal quotation marks omitted).  Each factual contention made

9   in this filing is supported by a reference to evidence in the record and the legal

10  contentions are warranted by existing law or by a nonfrivolous argument for

11  extending, modifying, or reversing existing law or for establishing new law. Fed. R.

12  Civ. P. 11(b)(2).

13

14

15  Dated:  July 26, 2024                      Respectfully submitted,

16                                             ROB BONTA
                                               Attorney General of California
17

18                                             */s/ Damon McClain*
                                               Damon McClain
19                                             Supervising Deputy Attorney General
                                               *Attorneys for Defendants*
20

21                                             *HANSON BRIDGETT LLP*

22                                             */s/ Samantha D. Wolff*
                                               *PAUL B. MELLO*
23                                             *SAMANTHA D. WOLFF*
                                               *DAVID C. CASARRUBIAS*
24                                             *Attorneys for Defendants*

25  CF1997CS0003
    66966806.docx
26

27

28

43

# CERTIFICATE OF SERVICE

Case Name:  __Coleman v. Newsom, et al.,__       No.   __2:90-cv-00520 KJM-DB (PC)__

I hereby certify that on <u>July 26, 2024,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANTS' CLOSING BRIEF RE THE SPECIAL MASTER'S TELEMENTAL HEALTH REPORT AND REVISED POLICY**

2. **DECLARATION OF AMAR MEHTA, M.D. IN SUPPORT OF DEFENDANTS' CLOSING BRIEF ON TELEMENTAL HEALTH POLICY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 26, 2024,</u> at Los Angeles, California.

<table>
<tr><td>J. Sissov</td><td>/s/ J. Sissov</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

CF1997CS0003
66966838.docx