| | |
|---|---|
| ROB BONTA, State Bar No. 202668<br>Attorney General of California<br>MONICA N. ANDERSON, State Bar No. 182970<br>Senior Assistant Attorney General<br>DAMON MCCLAIN, State Bar No. 209508<br>Supervising Deputy Attorney General<br>ELISE OWENS THORN, State Bar No. 145931<br>NAMRATA KOTWANI, State Bar No. 308741<br>Deputy Attorneys General<br>  455 Golden Gate Avenue, Suite 11000<br>  San Francisco, CA 94102-7004<br>  Telephone: (415) 510-4431<br>  Fax: (415) 703-5843<br>  E-mail: Namrata.Kotwani@doj.ca.gov<br>*Attorneys for Defendants* | HANSON BRIDGETT LLP<br>PAUL B. MELLO, State Bar No. 179755<br>SAMANTHA D. WOLFF, State Bar No. 240280<br>KAYLEN KADOTANI, SBN 294114<br>DAVID C. CASARRUBIAS, SBN 321994<br>CARSON R. NIELLO, SBN 329970<br>  1676 N. California Boulevard, Suite 620<br>  Walnut Creek, CA 94596<br>  Telephone: (925) 746-8460<br>  Fax: (925) 746-8490<br>  E-mail: PMello@hansonbridgett.com<br>*Attorneys for Defendants* |

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                   Plaintiffs,<br><br>   v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                  Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF AMAR MEHTA, M.D. IN SUPPORT OF DEFENDANTS' CLOSING BRIEF ON TELEMENTAL HEALTH POLICY**<br><br>Judge: The Honorable Kimberly J. Mueller |

1

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

# DECLARATION OF AMAR MEHTA, M.D.

I, Amar Mehta, M.D., declare:

1. I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR). My background and credentials—including my extensive experience with the provision of mental health services through the tele-modality—are set forth in my declaration filed on May 28, 2024 (ECF No. 8253-2). I also submitted a declaration in support of Defendants' response to Plaintiffs' objections to the Special Masters telemental health report (ECF No. 8332-1). I submit this declaration in support of Defendants' closing brief on the telemental health policy. I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2. I have reviewed Plaintiffs' response to Defendants' objections to the Special Master's telemental health report and the declaration submitted by Pablo Stewart, M.D., in support of that document.

3. In my experience it is not uncommon for mental health professionals who have limited or no direct experience with correctional or community telepsychiatry and telemental health to have many of the concerns expressed by Dr. Stewart. But the literature and evidence demonstrate that the stated concerns are either overstated or invalid. Furthermore, CDCR's own extensive experience with this modality demonstrates that many of his opinions are simply incorrect.

4. Based on his declaration, it appears that Dr. Stewart has no direct experience providing telepsychiatry services in a correctional setting, and limited telepsychiatry experience in any setting. I am aware that Plaintiffs claim Dr. Stewart has extensive experience providing telepsychiatry services in the community. But his declaration indicates his experience is limited to his work over the past sixteen months treating about 75 patients on remote Hawaiian Islands for emergency room and inpatient consultations. For context, CDCR's telepsychiatrists often have 75 or more patient contacts in a roughly two-week period. For comparison, I have seen over 1,300 distinct patients in CDCR at multiple levels of care via telepsychiatry, many for repeated regularly scheduled contacts over periods of up to 6 years. In my opinion, Dr. Stewart's level of

2

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

recent community telepsychiatry inpatient experience is not extensive, nor would it give Dr. Stewart a sufficient basis to assess the adequacy of CDCR's correctional telepsychiatry and telemental health programs.

5. Dr. Stewart appears to have toured CDCR's prisons on a number of occasions, but most of his experiences are outdated and do not reflect the recent status or conditions at CDCR. Most recently, he visited three CDCR psychiatric inpatient units in April 2023. (Decl. Stewart ¶ 9.) But those visits did not involve tours of entire prisons—they were limited to the inpatient units where he interviewed a total of six patients during his three visits. He did not observe any telemental health sessions or tele-cell-front contacts during those visits because telemental health was not occurring in the inpatient units. Nor did he assess treatment or programming for Clinical Correctional Case Management System (CCCMS) patients, Enhanced Outpatient (EOP) patients, or patients in Restricted Housing Units (RHUs). It appears that his next most recent visits occurred when he toured six prisons in 2013—more than ten years ago. (*Id.*) And before that it appears he may have toured some of CDCR's prisons around 2007 and in the 1990s. (*Id.*) Dr. Stewart does not claim that he observed telemental health treatment in CDCR's prisons during any of these visits. The Court has overseen much progress over the last 30 years since the 1990s, and major changes such as the 2009 Staffing Plan occurred after 2007. The current iteration of the telepsychiatry department started around 2013, with the first Telepsychiatry Policy being released in 2015 and an updated version in 2020, accompanied by significant process and procedure changes, technology upgrades, the introduction of an electronic medical records system, and many more major transformations. Dr. Stewart says he has observed over 100 telepsychiatry sessions in correctional institutions, but he does not provide specifics as to the dates or locations of those observations. This is a significant omission because the technology has improved greatly over the years as the tele-modality has become more widely accepted and used.

6. Dr. Stewart's declaration asserts that the Special Master's revisions to CDCR's telemental health policy are modest. They are not. Dr. Stewart has no experience managing a large and complex mental-health system like CDCR's Mental Health Services Delivery System,

3

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

1    indeed few people in the country do have experience with a program serving 35,000 patients at all
2    levels of care.  He does not appreciate the impact of the revisions proposed by Plaintiffs and the
3    Special Master on a functioning program and recruitment or retention.  While the Special Master
4    and Plaintiffs claim to support the use of telemental health to provide care to CDCR's patients,
5    their proposed restrictions and barriers to the use of the modality would prevent telemental health
6    providers from performing the full scope of the duties and responsibilities of psychologists and
7    social workers in CDCR's system or to the full scope of their licenses.  This would greatly
8    diminish the potential for telemental health to improve access to care and Program Guide
9    compliance.  Dr. Stewart does not seem to recognize this or that the Special Master's proposed
10   policy revisions would make it more difficult to recruit and retain on-site staff by overburdening
11   them with unfamiliar patients in acute situations where the treating telemental health provider is
12   available and the most appropriate clinician to manage their own patient.
13        7.    Despite his own continued treatment of patients through this modality, Dr. Stewart
14   expresses skepticism that telepsychiatrists and telemental health providers can achieve rapport,
15   trust, and good therapeutic relationships with their patients in any setting, and specifically the
16   correctional setting, despite no telepsychiatry experience in a correctional environment.  (Decl.
17   Stewart ¶¶ 18, 35, 57.)  Dr. Stewart's declaration appears to reflect a pre-conceived bias against
18   telepsychiatry despite limited experience or applicable supporting evidence.  He also makes it
19   clear that he was "directed to" provide telepsychiatry services, rather than choosing to practice
20   telepsychiatry.  (Decl. Stewart ¶ 7.)  This is in stark contrast to most of CDCR's telepsychiatrists
21   and telemental health providers who fully understand the modality and its effective
22   implementation, are enthusiastic about the opportunity to provide services using the modality, and
23   provide constant informed feedback to capture developing issues and improve policy.  Given Dr.
24   Stewart's attitude toward telepsychiatry and his limited experience providing telepsychiatry
25   consultations restricted to emergency room and inpatient "consultations" in the community, his
26   opinion concerning telepsychiatrist-patient relationships is not unexpected.  (*Id.*)
27        8.    A therapeutic relationship is established when there is trust between the telemental
28   health provider and the patient.  I agree with Dr. Stewart on the importance of therapeutic

4

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

relationships, but the literature, my extensive experience overseeing the delivery of telepsychiatry and telemental health care in CDCR, and my personal direct experience providing such services in a correctional setting all demonstrate that his skepticism is unfounded. In my experience CDCR's telepsychiatrists and telemental health providers can and do develop rapport, trust, and excellent therapeutic relationships with their patients. A provider's ability to develop good therapeutic relationships depends of the provider's skill, experience, and engagement, not predominantly on the modality for delivering care.

9. Plaintiffs and the Special Master claim that because telepsychiatrists and telemental health providers are not fully immersed in the carceral environment, they are not empathetic to the impact of the environment or their patients. This is absolutely false and discounts the professionalism, dedication, skill, and character of the providers practicing through this modality, many of whom have dedicated their careers to treating incarcerated patients. It ignores the fact that CDCR provides telepsychiatrists and telemental health providers with a robust on-boarding process, training, and education concerning the prison environment and the unique population they serve. And it also ignores the fact that CDCR's telemental health providers are already required under CDCR's policy to visit their assigned prisons when they begin working for CDCR, and annually thereafter.

10. Clinicians working in-person in the community also don't typically visit the settings where their patients live, but are still able to relate to their patients and provide mental health care. Telemental health providers in CDCR have far greater access to fine-grained records of our patients exact whereabouts and activities at virtually all times of the day, healthcare professionals who can evaluate our patients with a high frequency, collateral information through communication with custody and other staff that observe the patient in a wide variety of contexts including their living environment, and a far better support network of other healthcare professionals to raise concerns to than providers treating comparable levels of care in the community. These are only some of the added benefits our telemental health providers have over those in the community. The APA Toolkit comment that it "may include periodic site visits" among many other options is a far cry from a requirement, let alone at anything approaching the

5

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

frequencies being discussed in this matter. It is telling that a review of APA affiliated literature on cultural competence does not yield recommendations for site visits, nor does a review of the American Psychological Association's Multicultural Toolkit Resources.[1]

11. Cultural competence is a standard course in training programs. Importantly, the APA Toolkit includes resources for other forms of telepsychiatry that are relevant here, including Child and Adolescent Telepsychiatry, for which they state:

- "Telepsychiatrists should not assume that a difference in social, economic, income, geographic, racial, ethnic or cultural backgrounds with their patients precludes ability to establish rapport and a therapeutic relationship through videoconferencing.
- "Discordant beliefs between the youth and care takers are frequently related to family distress, rather than related to the family's location, ethnicity, cultural heritage, or religious affiliation. The telepsychiatrist should not stereotype but specifically inquire about the individual views of both the youth and family.
- "Establishing social, political, and cultural awareness and competence with both the youth and family through videoconference requires the psychiatrist to take extra care to convey understanding of the youth's and family's needs.
- "Telepsychiatrists are part of a local team. Establishing strong working relationships with the team can help telepsychiatrists to develop cultural and social competence and facilitate interventions. This may take more time and skill when collaborating through videoconferencing. The investment will yield benefits for the psychiatrist, team members, youth, family, and community."[2]

It is notable that site visits are not recommended here, even as an option.

12. It is a basic tenet of the California and Norway models that all incarcerated settings should endeavor to provide care as identical as possible to the community. In my

---

[1] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/best-practices, last visited on July 25, 2024.
[2] *Id.*

6

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

experience overseeing CDCR's telepsychiatry and telemental health programs, providers absolutely have empathy for their patients, their circumstances, and their physical environment.

13. Plaintiffs quote the *Resource Document* commenting about participation in "the conventional flow of information through the day" to state that telepsychiatrists may be subject to the same limitations. (ECF No. 8331 at 35.) The article being quoted (Kaftarian 2019) actually states "Fortunately, this problem is easily remedied with regular check-ins and communication protocols. Onsite staff who are engaged with and supportive of telepsychiatrists can be incentivized to provide collateral information to remote doctors. As the relationship between telepsychiatry and onsite staff develops, so will the flow of valuable collateral information."[3]

14. Plaintiffs also draw upon another quote (Kaftarian 2020) stating "telepsychiatrists 'should be cognizant of some of the limitations to being located remotely . . . . Without the knowledge of these events and familiarity of the dynamics of the facility, telemental health staff may potentially be at a disadvantage." (ECF No. 8331 at 40-41.) But they omit the rest of that paragraph, which states "Nevertheless, these are not insurmountable obstacles. With proper communication and working relationships with onsite staff, telemental health clinicians can be kept abreast of important factors in the facility that can affect patients." Plaintiffs then go on to state "Frequent site visits are also helpful because they can help integrate the remote clinician into the treatment team," but only cite the opinion of Dr. Stewart, who has little telepsychiatry experience in any setting, and does not base his opinions on any discernible evidence or peer-reviewed publications.

15. Similarly, Dr. Stewart asserts that telemental health providers cannot effectively advocate for their patients, positively impact the treatment milieu, or collaborate with custody staff as required under the CMHPP. Based on his limited experience with telepsychiatry in the community, and total lack of experience practicing correctional telepsychiatry or overseeing telemental health programs in community or correctional settings, the basis for his opinion is unclear. Regardless, my direct experience both overseeing the provision of telepsychiatry and

---

[3] Kaftarian, E. (2019), *Lessons learned in prison and jail-based telepsychiatry*, Current Psychiatry Reports, 21, 15.

7

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

telemental health services in CDCR and practicing telepsychiatry directly contradicts this and rests on a firm foundation. These providers can and do impact the treatment milieu, advocate for their patients, and collaborate with custody staff under the CMHPP.

16. Dr. Stewart asserts that telemental health providers cannot assess patients through cell-front consultations. (Decl. Stewart ¶ 69.) I disagree. Again, it is likely Dr. Stewart's lack of correctional telemental health experience—and in this, case lack of experience conducting cell-front consultations remotely—leads him to this conclusion. In my experience, cell-front consultations via the tele-modality are effective and in a demonstration with the Special Master's team and plaintiffs, it was noted that communication can be clearer and more confidential than in-person consultations because of the directional nature of the technology. Another of Dr. Stewart's objections is that the telemental health provider cannot clearly see the patient or the cell. In reality, this not generally the case. In most cases the telemental health provider can assess the appearance of the patient and the cell, but regardless the telepresenter can also relay additional information to the provider.

17. Dr. Stewart cites papers by Stoll and Verma regarding problems associated with telemental health providers not knowing a patient's location or an inability to take emergency action for patients who are physically distant or in unknown locations. (Decl. Stewart ¶¶ 23, 55.) It is concerning that Dr. Stewart uses an irrelevant community argument without understanding the environment that our CDCR patients are in, and the resources and policies that are available to all of our telemental health providers. These particular concerns are not applicable to CDCR's patients. CDCR's telemental health policy already requires a telemental health provider to immediately notify on-site institution staff in the event of an emergency. And unlike a community patient who could be in any number of locations during a tele-appointment, CDCR's telemental health providers know exactly where their patients are located during treatment and have ready, 24-hour access to on-site telepresenters, custody staff, mental-health staff, and medical staff if there is an emergency that requires on-site staff assistance to ensure a patient's safety. In this regard, correctional telemental health is superior to community telemental health, where providers often may not know where their patient is located during a tele-appointment and

8

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

1  have no access to on-site personnel wherever the patient might be. In my experience overseeing
2  telepsychiatry and telemental health at CDCR, there have been no issues with telemental health
3  providers being unable to appropriately manage these types of emergency situations, including
4  through the readily available assistance of on-site staff.

5        18.    Dr. Stewart cites a paper by Shore (2020) describing a need for telepsychiatrists to
6  understand a technology's effect on clinical processes, rapport, communication, and treatment
7  outcomes, and the importance of assessing the best adaptation of a technology to a patient's
8  clinical circumstances in the context of administrative and operational considerations. I agree
9  with these points, and through training and experience, CDCR's telemental health providers have
10 been establishing this for well over a decade, and they do understand the tele-modality's effect on
11 these important aspects of clinical processes and assess the appropriateness of the tele-modality in
12 light of their patients' clinical circumstances.

13       19.    Dr. Stewart endorses the Special Master's proposed policy with respect to patient
14 refusals to attend telemental health. But he does not discuss the robust provisions already
15 contained in CDCR's policy for addressing patient refusals or provide an opinion that CDCR's
16 approach to refusals is inadequate. Dr. Stewart does not appear to understand that refusals may
17 occur from the yard, school, a work assignment, or other locations. Dr. Stewart does not
18 recognize that in our correctional environment, refusals can occur for a wide variety of reasons
19 and the ability of a familiar clinician to assess a patient at cell-side is important to understand the
20 reasons.

21       20.    Dr. Stewart asserts that there is little difference between the enhanced outpatient
22 (EOP) level of care and inpatient care. I note that Dr. Stewart has not visited an EOP unit in well
23 over ten years. His assertion is incorrect. Being committed to an inpatient psychiatric unit
24 requires legal proceedings and restrictions on liberty that we clearly do not exercise for EOP
25 patients. CDCR does have inpatient units, and they function very differently than EOP units.
26 Treatment in inpatient psychiatric units typically occurs in the same building where they are
27 housed or in locations that non-inpatients do not access; EOP patients, on the other hand, are most
28 similar to other outpatients in CCCMS because they routinely leave their housing units to

participate in treatment, education programs, work assignments, and other activities along with incarcerated persons who are not EOP patients. Restrictions on where EOP patients are housed are due to the correctional environment, rather than mental health needs. The drafters of the Program Guide accurately used the words enhanced **outpatient** to describe this level of care.

21. I understand that Plaintiffs have argued that telemental health cannot be effectively used at higher levels of care because there is a lack of evidence that the modality is appropriate at those levels. This is not entirely true. The APA Toolkit on Telepsychiatry states "The experience other mental health clinicians using telemedicine (i.e., telemental health), is consistent with, and further substantiates the diagnostic, therapeutic and outcome evidence base," with multiple references.[4] Clinical practice routinely relies on close analogues, with the closest analogue here being telepsychiatry, which is commonly used in rural and urban community crisis and emergency department settings. In most of these settings, the primary clinician is the psychiatrist, so much of the literature concerning telepsychiatry in these settings does translate to CDCR's telemental health program, though primary clinicians in CDCR are primarily psychologists and social workers. Regardless, in my extensive literature review, I found no evidence of absolute contraindication for the use of telemental health for inpatients. And importantly, it is not and clearly never has been CDCR's intention to use telemental health in the PIPs or MHCBs, except under extreme circumstances approved in past policies.

22. To date, no telepsychologists or telesocial workers have been assigned to work at the PIPs or MHCBs. This is consistent with the CDCR telemental health policy's strong preference for on-site clinicians at those higher levels of care. CDCR's policy only allows telemental health clinicians to work at those levels of care if on-site clinicians are not available to provide needed care, and only for the shortest duration necessary. CDCR's policy changes here are only intended to be more clearly and narrowly defined than the more vague prior terms. In light of this, the Special Master's many additional proposed requirements are unnecessary and inconsistent with prior and existing approved policies.

---

[4] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/evidence-base, last visited July 25, 2024.

10

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

23. Dr. Stewart claims CDCR's informed-consent policy does not allow a patient to refuse treatment. This is nonsensical; CDCR has no capability to compel participation in treatment aside from involuntary medications. All of CDCR's medical and mental health patients have the right to refuse offered treatment. If we assigned a patient to a clinician who happened to be on-site, we would not offer that patient the option of a telemental health clinician based simply on preference, nor do we offer patients the options to choose a male or female clinician, a clinician of a particular race, a clinician on a different yard, or the option to pick among different individual clinicians in the same program. This is not a requirement for obtaining informed consent as that term is defined in the medical and mental health fields. Explaining the elements of consent is a standard medical practice.

24. Regarding telepresenters, as I have previously explained, CDCR's policy already allows them to leave the room at the request of a patient, but the policy allows the telemental health provider to have the final say for safety reasons. We had previously been told by the Special Master and his team of experts that a telepresenter should be present at all times for telepsychiatry, but we have been happy to change this and it is already a general practice for telepresenters not to be in the room for an entire telemental health appointment.

25. As I explained in my previous declaration, the Special Master's proposed minimum on-site requirement is impracticable and unmonitorable due to clinicians' workloads not being as clearly defined as he assumes. But even more problematic is the fact that this restriction would prioritize compliance with arbitrarily chosen numbers over ensuring the delivery of mental healthcare. CDCR's Mental Health Services Delivery System is responsible for staffing 31 prisons with unique and varied needs, such as custody or security levels, available rehabilitative programs, different physical plants, different mission sizes, and other variables that lead to different staffing challenges. This is another reason the one-size-fits-all nature of the proposed minimum on-site requirements is unworkable. As CDCR continues to implement its policy, there may be locations where higher numbers of telemental health providers are needed to ensure the delivery of care. It makes no sense to place arbitrary restrictions on the number of

1  telemental health providers when doing so would prevent access to care.  Such a restriction is not
2  grounded in evidence and potentially decreases the amount of care patients receive.

3        26.    CDCR has noted multiple times in filings and discussions that it does not intend
4  the "wholesale replacement" of on-site clinicians with telemental health, though it appears this
5  has fallen on deaf ears.  Like in telepsychiatry, CDCR has been progressing its telemental health
6  program through cautious growth without external direction, assigning telemental health
7  providers at a pace that the system can absorb.  CDCR's most recent staffing adjustments, which
8  issued on July 10, 2024, only allocate 60 out of a total of 823 line-staff psychologist positions to
9  telepsychology, and only 40 out of a total of 451 total line-staff social worker positions to
10 telesocial worker, despite robust interest in the program.  This is wholly consistent with CDCR's
11 intended use of telemental health to supplement on-site staff and its intent to maintain on-site staff
12 at the institutions as much as possible.  We are carefully monitoring for any issues that arise as a
13 result of the modality, and we welcome the Special Master to monitor and assess the system as it
14 continues to progress.

15       27.    Dr. Stewart asserts that the Special Master's prohibition on unlicensed clinicians
16 working remotely is reasonable because of the difficulty of supervising unlicensed clinicians
17 remotely.  It is unclear what foundation Dr. Stewart uses to make such an assertion, given that he
18 is referring to unlicensed psychologists and social workers without claiming any experience
19 supervising these classifications, and psychiatrists are not hired to deliver clinical care without a
20 license.  As I discussed in a previous declaration, CDCR does not currently intend to hire
21 telemental health clinicians working towards licensure, but it may do so in the future.  The
22 Program Guide itself states "Use of unlicensed psychologists and clinical social workers during
23 the period they are gaining qualifying experience for licensure is governed by Section 1277 of the
24 Health and Safety Code, and Section 5068.5 of the Penal Code."  (ECF No. 7333-1 at 13.)  Based
25 on my experience overseeing all of CDCR's mental health programs, it is not uncommon to
26 remotely supervise clinicians working toward licensure.  This is explicitly permitted by
27 California's Board of Psychology (Business and Professions Code sec. 2914) and the Board of
28 Behavioral Sciences (Business and Professions Code sec. 4980.43.2(b)(2)).

12

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

28. Dr. Stewart supports the Special Master's ban on using the telemental health modality to facilitate group therapy. Although CDCR does not currently have plans to implement tele-group therapy, a blanket ban would stifle any future configuration. It does not appear that Dr. Stewart has experience with remote group therapy or the various ways it can be provided, some of which are commonly practiced in the community. His opinion is based on an assumption about how group therapy would work, which is that a group of patients would be in a room and the group leader would be remote. There are other potential configurations for remote group therapy. As noted in Batastini's 2016 article, remote group therapy is supported by community evidence of positive clinical and process-related outcomes. (Decl. Mehta, Ex. A, ECF No. 8253-2 at 185.) Accordingly, a ban on tele-group therapy is not appropriate.

29. The Plaintiff's focus on "face-to-face" requirements for evaluation of suicidal patients is selective. There are other sections of the Program Guide that require "face-to-face" contacts, such as the initial PC contact for CCCMS patients (ECF No. 7333-1 at 41.) and routine PC contacts for CCCMS patients (*Id*. at 48.), but no one has interpreted these to mean that all initial and routine PC contacts for CCCMS patients must be performed by on-site clinicians. The parties and the Special Master's team agree that these requirements are satisfied by telemental health contacts, and there has been no proposed restriction on the use of telemental health there or allegations that CDCR is modifying those parts of the remedy.

30. Similarly, the 2020 Clinical Contacts Memo (which is part of the Program Guide) states "An appointment is considered refused if: 1. The mental health clinician speaks with the patient face to face and the patient refuses…" (ECF No. 7333-1 at 637.) In the extensive discussion of refusals, neither the Plaintiffs or the OSM have taken the position that if the patient refused to a telemental health provider at the beginning of a contact, then it would not count as an appropriate refusal, nor have they indicated that they believe it is a Program Guide change to allow these "face-to-face" refusals via telemental health.

31. "Face-to-face" has also been discussed in the Business Rules Methodology Review with stakeholders and has been interpreted to include telemental health. While most of the contact indicators are not yet finalized, the parties have agreed to count suicide risk

13

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

1  evaluations completed by telepsychiatrists as a Mental Health Crisis Bed Daily Contact.
2  Telepsychiatrists already conduct urgent and emergent contacts and complete suicide risk
3  assessments via telehealth.  There is no restriction against telepsychiatrists completing certain
4  contacts or suicide risk assessments in the court-approved telepsychiatry policy, and there should
5  not be similar restrictions for telemental health.

7  / / /

11 / / /

15 / / /

19 / / /

23 / / /

27 / / /

14

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1

32. Dr. Stewart asserts that placing a suicidal patient "in front of a computer screen and telling him to talk to the doctor is clinically inadequate and ridiculous when there is an in-person alternative." (Decl. Stewart, ECF No. 8331-1 at ¶ 55.)  While this may sound catchy, it is notable that the only reference he provides does not support his claim.  The article referenced states this approach may not be suitable for patients with concrete suicidal ideation because rapid reaction to emergency situations may be hindered by physical distance."  It is written from the perspective of delivering care during the COVID-19 pandemic, without resources and support structures that are foundational components of CDCR's program.  If a telemental health provider is more familiar to the patient, it could absolutely make more sense to utilize that provider with an established relationship.  Again, Dr. Stewart's opinion on this is likely the result of his limited experience with telepsychiatry and his complete lack of experience regarding telemental health.  He fails to understand that CDCR's telemental health providers have assigned patients who they see repeatedly for multiple sessions.  CDCR's telemental health providers have rapport and therapeutic relationships with their patients and know their patients backgrounds and mental health histories.  These things can be especially valuable, even critical, when working with a patient through a mental health crisis.  A patient's assigned telemental health provider would often be in the best position to help their own patients during these types of urgent and emergent situations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 26th day of July, 2024, at San Francisco, California.

　　　　　　　　　　　　　　　　　　　　　*/s/ Amar Mehta*
　　　　　　　　　　　　　　　　　　　　　Amar Mehta

15

Decl. Mehta Supp. Defs.' Closing Br. Telemental Health Policy (2:90-cv-00520 KJM-DB (PC))

19900160.1