MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
ALEXANDER GOURSE – 321631
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
MARGOT MENDELSON – 268583
 1917 Fifth Street
 Berkeley, CA 94710
 Telephone: (510) 280-2621
 Fax: (510) 280-2704
E-mail: dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: 415-777-3200
Pmello@hansonbridgett.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br>   Plaintiffs, <br><br>   v. <br><br> GAVIN NEWSOM, et al. <br><br>   Defendants. | Case No. 2:90-CV-00520- KJM-DB <br><br> **THE PARTIES' JOINT RESPONSE TO ORDER TO SHOW CAUSE RE APPOINTMENT OF RECEIVER** <br><br> Judge:   Hon. Kimberly J. Mueller |

## I. INTRODUCTION

This is a unique and truly extraordinary moment in the 30-year history of this case. After decades of litigation over compliance with the Program Guide and the Constitution, the parties see a unique opportunity to complete the work of building and operating a mental healthcare system that satisfies the Eighth Amendment by appointing J. Clark Kelso as receiver in this case. Everyone has observed that the Receivership in *Plata* has accomplished what the Court and the parties desperately want—a well-functioning healthcare system and a path towards a durable remedy that will end that case. The parties also recognize that the tremendous progress that has been made in *Plata* is largely due to the structure of the Receivership as well as the authority, direction, and guidance granted by the *Plata* court and the work of Mr. Kelso, the *Plata* Receiver. In fact, the *Plata* Receivership has successfully transformed medical care in the CDCR prisons and has been able to delegate authority back to the CDCR Secretary over 26 of 33 prisons and has a schedule in place to determine whether the remaining prisons' medical care systems meet the requirements for delegation. Declaration of Donald Specter ("Specter Decl.") ¶ 5; Declaration of Diana Toche, D.D.S. ("Toche Decl.") ¶ 3. That is the primary reason why the parties agree that the Court should appoint him as the receiver in this case, if he and Judge Tigar so consent. Declaration of Secretary Jeff Macomber ("Macomber Decl.") ¶ 3; Declaration of David Sapp ("Sapp Decl.") ¶¶ 5-6; Toche Decl. ¶ 8; Declaration of Michael W. Bien ("Bien Decl.") ¶ 8. And that is why the parties have agreed not to appeal an order that is reflective of their agreement, as described in detail below.

There are other reasons as well. Mr. Kelso is well-known and trusted by the parties. *See* Specter Decl. ¶¶ 2-12; Bien Decl. ¶¶ 8-10; Toche Decl. ¶¶ 5-6; Macomber Decl. ¶ 3; Sapp Decl. ¶ 4. He is able to work with state agencies and the Legislature to procure the necessary resources with the backing of the Court but without the need for a court order, even in challenging economic circumstances. Toche Decl. ¶ 5; Specter Decl. ¶ 7; Bien Decl. ¶ 8. He has now gained a tremendous amount of experience in setting up and monitoring healthcare systems in a custodial environment that is unlikely to be duplicated by any other person. *See generally* Specter, Bien, Macomber, and Toche declarations. And because of that experience, his learning curve will surely

be much shorter than any other outsider.  *See* Toche Decl. ¶ 6.  He has improved record-keeping and quality management systems in CDCR's healthcare system, has responded promptly to crises and has successfully adapted to changes in the healthcare industry and the economy more broadly. Specter Decl. ¶ 6; Toche Decl. ¶¶ 5-6.  And he has accomplished all of this without the need for regular court intervention.  Specter Decl. ¶¶ 7-9.  Mr. Kelso already exercises authority over certain areas where medical and mental health systems overlap, such as pharmacy, nursing staffing, and the electronic healthcare records system, *see* Bien Decl. ¶ 4, and the parties strongly believe that appointing him as *Coleman* receiver would both bring Defendants into compliance with the *Coleman* remedy and create a more efficient, unitary medical-mental health system that better serves *Coleman* and *Plata* class members.  *See generally* Macomber, Toche, Bien, Specter declarations.  By appointing Mr. Kelso, the Court will ensure that there is a minimum of duplication and the maximum amount of coordination between the two cases.  Macomber Decl. ¶ 2; Toche Decl. ¶ 7; Bien Decl. ¶ 9.

It is for all of these reasons that together, the parties strongly and independently recommend that Mr. Kelso be appointed as the receiver.  The parties agree that the Court should define the scope and powers of the receivership as follows:

**II.     JOINT STATEMENT BY THE PARTIES**

    **A.     Plaintiffs and Defendants Both Support the Appointment of Clark Kelso as Receiver Over CDCR's Entire Medical and Mental Health Services Delivery System.**

Together, the parties would jointly support this court's appointment of Clark Kelso as the *Coleman* Receiver over CDCR's Mental Health Services Delivery System (MHSDS) if Judge Tigar agrees[1] and Mr. Kelso accepts the appointment.  As noted, Mr. Kelso possesses unique credentials, experience, and expertise, as well as a successful track record that sets him apart and shifts the landscape, such that the parties would not appeal an order appointing him as receiver, as discussed below.

---

[1] The parties will inform the *Plata* Court by sending a courtesy copy of this joint response after it is filed.

[4537622.1]21006453.10

JOINT RESP TO OSC RE APPOINTMENT OF RECEIVER

2

Case No. 2:90-CV-00520- KJM-DB

Moreover, his appointment would create efficiencies as medical and mental health patients are not distinct—there is just one system and set of patients.  Macomber Decl. ¶ 2; Toche Decl. ¶¶ 4, 7; Bien Decl. ¶ 9.  It also would avoid the inevitable confusion, inconsistencies, and inefficiencies that would result from the appointment of a separate receiver overseeing a large portion of CDCR's medical care system, who would nonetheless have to work closely with Mr. Kelso and might make conflicting decisions.  *Id.*

          1.    <u>Scope and Terms of Mr. Kelso's Appointment</u>

The parties agree that Mr. Kelso's authority as receiver in *Coleman* should mirror his powers in *Plata* in order for him to be successful.  This means that he must "have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the [mental health] delivery component of the CDCR."  *Plata v. Schwarzenegger*, No. 01-1351 TEH, ECF No. 473 at 2:15-17 (Order Appointing Receiver) (N.D. Cal. Feb. 14, 2006).  In other words, Mr. Kelso would stand in the shoes of the Secretary regarding the delivery of mental health care, as well as all other issues covered by *Coleman* and its remedies, including, but not limited to, custodial, housing, restricted housing, discipline, and program access.  His appointment would not be limited to discrete issues or tasks.

The parties further agree that Mr. Kelso's duties and powers as *Coleman* Receiver would extend only to CDCR's MHSDS, including the Secretary's authority under Penal Code section 2684 to refer certain class members to the Department of State Hospitals for inpatient treatment, but would not extend in any other way to the operation of the Department of State Hospitals.  Mr. Kelso would continue to report to Judge Tigar on medical care issues and would report to this court on mental health issues.  Mr. Kelso would report to both courts on issues that overlap, such as hiring, electronic medical records, and pharmacy.[2]

The parties believe this Court would simply need to issue an order with appropriate findings supporting the appointment of Mr. Kelso as *Coleman* Receiver.

---

[2] The parties agree that, in order to maintain continuity of monitoring under the receivership, the Special Master should continue his work on this matter at the direction and discretion of the Court and in consultation with the Receiver.

2. <u>The Parties Agree Mr. Kelso is Uniquely Positioned to Assume this Role.</u>

During his time as the *Plata* Receiver, Mr. Kelso has developed an extensive understanding of State processes and has learned to work within State structures to improve the delivery of medical care to CDCR's incarcerated population. *See* Specter Decl. ¶ 7; Toche Decl. ¶ 5; Sapp Decl. ¶ 4. He has created an entire State agency charged with the delivery of medical care in CDCR institutions, and effectively established a durable system to ensure the constitutional delivery of care long into the future. Toche Decl. ¶¶ 5-6. Because of his proven track record and history of success in implementing medical care reforms throughout CDCR's institutions, the parties are confident that Mr. Kelso would effectively and efficiently address remaining issues in *Coleman*. Macomber Decl. ¶¶ 2-3; Toche Decl. ¶ 6; Bien Decl. ¶ 9; Sapp Decl. ¶ 5.

In addition to Mr. Kelso's significant professional achievements as *Plata* Receiver, he is the logical choice to be appointed as *Coleman* Receiver given his current role overseeing the delivery of medical care statewide. CDCR does not provide services to mental health patients separately from medical patients; rather, it is one system and one set of patients. Having this singular health care system overseen by the same individual and the structure and staff he has built—delivering both medical and mental health care to patients in a coordinated manner—will create efficiencies and undeniably aid CDCR in its ultimate resumption of control over this health care system in the future when both the *Plata* and *Coleman* courts determine it is appropriate to do so. Macomber Decl. ¶¶ 2-3; Toche Decl. ¶¶ 4, 6; Bien Decl. ¶¶ 9-11. And the fact that Mr. Kelso is already located in the Sacramento/Elk Grove area is further conducive to an efficient transition to receiver over mental health care, given that in-person attendance at regular onsite meetings would be critical to this role. Toche Decl. ¶ 4. Finally, the parties have developed a constructive working relationship with Mr. Kelso as the *Plata* Receiver and believe that dynamic would be replicable, and help advance progress in the long-standing case, if he is appointed receiver in *Coleman*. Macomber Decl. ¶ 3; Toche Decl. ¶ 8; Specter Decl. ¶ 8; Bien Decl. ¶¶ 10-11; Sapp Decl. ¶ 5.

/ / /

/ / /

## III. DEFENDANTS' SEPARATE STATEMENT

Defendants do not concede that the appointment of a receiver other than Mr. Kelso, on the terms described above, is otherwise appropriate. Defendants acknowledge and share the Court's frustration where we are at in this litigation after almost three decades. But significant progress has been made in the intervening years, and the Mental Health Services Delivery System that is now in place bears no resemblance to what little care existed in 1990 when this case was first filed. This progress has, at times, been slow, but it cannot be disputed how far the system has come. Whereas there was previously no mental health screening for incoming incarcerated persons, little access to treatment, sparse mental health records, and no quality assurance program, robust programs and systems now exist to address these issues.

Defendants acknowledge that work remains, but at this stage in the litigation, Defendants do not believe that a receiver is the appropriate or necessary next step. Defendants do, however, share Plaintiffs' view that, given Mr. Kelso's unique qualifications, experience, and track record of success, appointing him as receiver over the mental health care system would jumpstart progress on the outstanding areas of compliance in this case. Defendants welcome this chance to move this case forward constructively and therefore would not appeal an order appointing Mr. Kelso on the terms described above. To the extent this Court intends to proceed with the appointment of a receiver other than Mr. Kelso, or imposes additional or different terms from those set forth jointly above, Defendants request that an evidentiary proceeding be held for the presentation of evidence, including expert and lay testimony.

### A. Relevant Factual Background

#### 1. The Court's 1995 Findings

Three years after the Plaintiff class first filed this lawsuit, Magistrate Judge Moulds presided over a 39-day bench trial and subsequently issued detailed Findings and Recommendations. (ECF No. 547.) Magistrate Judge Moulds concluded that CDCR's mental health system lacked elements that were essential to a constitutionally adequate mental health care system, and found that "the evidence of defendants' deliberate indifference [was] manifest; defendants have for years ignored the considered advice of their own experts about the woeful

deficiencies in their system." (ECF No. 547 at 16:10-13.)

Magistrate Judge Moulds outlined six essential components of a constitutionally adequate mental health care system: (1) a systemic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide. (*Id.* at 14:13-24; *see also Balla v. Id. State Bd. Of Corrections*, 955 F. Supp. 1558, 1577 (D. Id. 1984).) Magistrate Judge Moulds found that CDCR was lacking in each of these essential areas.

Specifically, he found that CDCR had no system in place to screen and identify mentally ill inmates, and that as a result, "[t]hese inmates either go undetected and without care, or they come to the attention of staff only when they behave in bizarre and inappropriate ways." (ECF No. 547 at 30:7-9.) And when they did behave bizarrely or inappropriately, they were often punished, rather than treated. (*Id.* at 30:9-11.) CDCR was also "significantly and chronically understaffed in the area of mental health care," resulting in lengthy waits for necessary treatment. (*Id.* at 30:12-15.) Whereas the Scarlett Carp consultants, who were retained by Defendants, determined that 732 staff positions would be necessary to adequately staff a system of 119,000 inmates, CDCR's budget only authorized 376.6 positions. (*Id.* at 37:7-12.) Nor did CDCR have an effective quality assurance or peer review program to assess the competence of its mental health care staff, and Defendants' own expert opined that a large system like CDCR's "could probably not provide adequate mental health care without some sort of management information system and some form of quality assurance." (*Id.* at 41:1-7; 41:23-42:1.) CDCR also had a "profoundly inefficient medical recordkeeping system," and, in some instances, no records of treatment were kept. (*Id.* at 30:15-20.)

In terms of the actual care received, the court found that there were "significant and unacceptable delays at each level of care," and that "[f]requently, such inmates receive no care at all or only medication; they are often housed in administrative segregation or security housing

units while awaiting care." (ECF No. 547 at 44:5-11.)  In November 1991, there was a backlog of over 400 inmates waiting to transfer to other institutions for psychiatric evaluations. (*Id.* at 46:23-26.)  This meant that inmates waited several weeks or months, during which time they received no psychiatric treatment other than medication. (*Id.* at 47:22-48:1.)  Even so, medication management practices were severely lacking, and the court found that "Defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring." (*Id.* at 50:10-17.)

The court described myriad concerns and inadequacies in the system that then-existed.  In light of those findings, the Magistrate Judge recommended the appointment of a special master to "monitor defendants' compliance with the court-ordered injunctive relief." (ECF No. 547 at 77:13-23.)

### 2. Defendants Have Made Significant Progress in Implementing a Mental Health Delivery System that Now Bears No Resemblance to its Predecessor.

Defendants have made great strides in establishing a robust mental health care system since this court's finding of unconstitutionality in 1995.  Through this case, extensive, meaningful, and lasting reforms have been implemented.  As it relates to the six critical areas first identified by Magistrate Judge Moulds in his 1995 Findings and Recommendations, CDCR has undeniably implemented a systemic program for screening and evaluating inmates to identify those in need of mental health care; dramatically improved staffing; established a treatment program that involves more than segregation and close supervision; maintains accurate, complete and confidential mental health treatment records; properly administers psychotropic medication; and created a basic program to identify, treat, and supervise inmates at risk for suicide.

Defendants have also successfully implemented robust screening procedures.  Chapter 2 of the Program Guide (ECF No. 7333-1 at 23) requires all incarcerated persons to undergo intake screening within 24 hours of arrival and mental health screening within the first seven days.  No one leaves the reception center without intake screening as it is now part of standard processing.

Implementation of this requirement is evidenced by the simple growth of the *Coleman* class. The growth of the class's size (*see, e.g.*, ECF No. 8291 at 4:1-5 (noting a more than doubling of the class's size)) is, at least in part, attributable to the effectiveness of that screening.

Further, notwithstanding the fact that this court recently held Defendants in contempt for failing to comply with prior staffing orders, objectively, CDCR has dramatically improved staffing since the 1995 Findings and Recommendations were issued. CDCR has increased allocated mental health provider positions by a factor of 8.5[3] since this case was filed, even as the size of the class has grown by a factor of just over 2.0 and the incarcerated population dropped significantly. Of course, allocated positions do not equate to filled positions, but even in the context of filled positions, CDCR now employs over 1,300 *more* mental health clinicians than it did at the time of the 1995 Findings and Recommendations. *Compare* ECF No. 8303 at 22 (indicating a total of 1,611.08 positions filled with civil service and registry providers across all classifications) *with* ECF No. 547 at 37:7-12 (indicating 376.6 total allocated positions of which 25% were vacant, i.e., a total of approximately 280 filled positions). The issue of staffing challenges has already been extensively briefed and argued before this court and will not be repeated here, but CDCR has objectively come a long way in terms of its mental health provider staffing.

Further, CDCR's MHSDS now provides its patients with robust treatment at various levels of care, follows strict timeframes for the transfer of patients to higher levels of care when needed, and no longer punishes patients with administrative segregation for exhibiting conduct that is merely a manifestation of a mental health disorder. Indeed, CDCR's recent Restrictive Housing Unit (RHU) policy demonstrates how far CDCR has come, stating that the purpose of the policy is "[t]o assure all incarcerated individuals have access to mental health services while housed in a restrictive housing unit setting," and to provide MHSDS patients with "enhanced mental health services to prevent decompensation." (ECF No. 8337 at Ex. B, p. 1.)

As it relates to mental health records, the *Plata* Receiver previously reported in his Forty-

---

[3] 2023-24 State Budget, Department of Corrections and Rehabilitation, available at https://ebudget.ca.gov/budget/2023-24EN/#/Department/5225.

1  First Tri-Annual Report that the Electronic Health Records System (EHRS) "was successfully
2  implemented at all institutions statewide as of November 2017." (ECF No. 6171 at 8.)
3        Additionally, with respect to the administration of psychotropic medication, Defendants
4  developed, in coordination with the *Plata* Receiver and *Coleman* Special Master, the Medication
5  Administration Process Improvement Program (MAPIP).  MAPIP is an audit tool that has "been
6  implemented at all CDCR institutions by the time of the Twenty-Seventh Monitoring Report and
7  was in use at all institutions during the Twenty-Eighth Monitoring Round." (ECF No. 7074 at 125
8  (OSM 28th Round Report).)  Additionally, in 2012, the state enacted Penal Code section 2602,
9  setting a permanent process for initiating involuntary medication for incarcerated persons.
10        Finally, with respect to the implementation of a "basic" suicide prevention program, the
11  Special Master's suicide prevention expert conducted an audit of CDCR's suicide prevention
12  practices in 2013 and made 33 recommendations. (ECF No. 8143 at 2.)  Three of those
13  recommendations were later withdrawn, and the Special Master's suicide prevention expert
14  recently found that Defendants still need to implement 14 recommendations. (*Id.* at 3, 8.)  While
15  this recent finding is currently pending with the court, it is clear that the Special Master's suicide
16  prevention expert believes more work remains.  Nonetheless, the suicide prevention program that
17  is currently in place is far more robust, thorough, and extensive than whatever may have existed in
18  1995.  Indeed, "a strength of CDCR's suicide prevention system [is] the Suicide Case Review
19  process" (ECF No. 8180-3 at ¶ 23), which the Special Master's expert has described as
20  "comprehensive," noting that "thoughtful and targeted QIPs" are included to correct deficiencies
21  and improve suicide prevention practices. (ECF No. 8143-1 at 64.)

      **B.**      **The Appointment of a Receiver is Not Necessary or Justifiable.**

23        Defendants do not believe that the Court should initiate proceedings regarding the
24  appointment of a receiver, nor do they believe that the Court will be able to make findings
25  necessary to justify the appointment of one.  Federal courts undeniably possess the power to
26  appoint receivers in order to remedy constitutional violations; however, courts should "exercise
27  restraint," use the "least possible power adequate to the end proposed," and be "mindful of the
28  interests of state and local authorities in managing their own affairs." *Plata v. Schwarzenegger*,

2005 WL 2932243 at *6 (Case No. 01-1351 TEH, N.D. Cal. May 10, 2005), citing, *e.g.*, *Dixon v. Berry*, 967 F. Supp. 535, 550 (D. D.C. 1997). Indeed, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). Thus, before imposing drastic equitable relief, a court must first "assure itself that no permissible alternative would have accomplished the required task." *Id.*, quoting *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971).

Additionally, the Prison Litigation Reform Act (PLRA) imposes strict requirements with respect to the implementation of prospective relief in prison condition cases. 18 U.S.C. § 3626(a)(1)(A). The PLRA provides that prospective relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." *Id.* Because the appointment of a receiver would constitute prospective relief, compliance with these PLRA mandates is required. *See Plata*, 2005 WL 2932243 at *6.

Further, and specific to the appointment of a receivership, courts generally look to see if two conditions have been met: (1) there is a grave and immediate threat or actuality of harm to plaintiffs, and (2) the imposition of less extreme measures would be futile. *Plata*, 2005 WL 2932243 at *7. Courts also look to see whether "continued insistence that compliance with the Court's orders would lead only to confrontation and delay," whether there is a lack of leadership, whether there is bad faith, whether resources are being wasted, and whether a receiver would likely provide a quick and efficient remedy. *Id.*

Here, Defendants do not believe that this court will be able to make the requisite findings to support the appointment of a receiver. Defendants are "ready, willing, and … able to remedy the deprivation of constitutional rights themselves." *Jenkins*, 495 U.S. at 51. While this court has extensively noted its frustration with the pace in which reforms have been implemented in this case, as demonstrated above, significant reforms have objectively occurred throughout this litigation. Institutional reform is not always fast, particularly where, as here, an entire mental health delivery system has been created from the ground up. And unlike the circumstances in *Plata*, where the district court appointed a receiver in 2005, this case is not "at a point of

maximum futility," nor has "the State [ ] publicly confessed its inability to grapple with the problem in any appreciable systemic manner for what is likely to be years to come." *Plata*, 2005 WL 2932243 at *8. At this stage of the litigation, and in light of the progress accomplished to date and Defendants' commitments to address the work that remains, Defendants do not believe that the appointment of a receiver is either appropriate or necessary. Instead, the parties should be directed to continue their work, under the supervision of the Special Master, to implement any remaining reforms forthwith.

To the extent this court nonetheless determines that it is appropriate to proceed with the appointment of a receiver in this case, it should "creat[e] an evidentiary record upon which to ground any further remedial action." *Plata*, 2005 WL 2932243 at *10. The parties should be permitted to present evidence and cross-examine the court experts (to the extent the court intends to rely upon their findings in support of a receiver's appointment), as was permitted in *Plata*. *Id.* Interests of due process and fairness mandate that Defendants be given this opportunity to be heard and to confront the evidence presented against them.

## IV. PLAINTIFFS' SEPARATE STATEMENT

Plaintiffs write separately to make three additional points: *First*, the Court must make findings to justify the appointment of a receiver regardless of whether Defendants consent to the appointment. *Second*, there is no need for a further evidentiary hearing on the question of whether to appoint a receiver because the existing record is more than sufficient to justify such an appointment. And *third*, in light of this record, the Court should appoint a receiver even if it does not select Mr. Kelso for that role, though Plaintiffs strongly encourage the Court to appoint Mr. Kelso.

### A. The Court Must Make Factual Findings to Justify its Appointment of a Receiver Regardless of Whether Defendants Consent to the Appointment.

"[R]eceiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution[.]" *Plata v. Schwarzenegger*, 602 F.3d 1088, 1093-94 (9th Cir. 2010). "The test" for appointment of a receiver "is one of reasonableness under the circumstances." *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *see also Shaw v.*

*Allen*, 771 F. Supp. 760, 762 (S.D.W.Va. 1990); *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005). In assessing whether it would be reasonable to appoint a receiver in this case, the court must consider at least the following factors, giving "predominant weight" to the first two factors:

> (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;
>
> (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;
>
> (3) Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;
>
> (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;
>
> (5) Whether there is bad faith;
>
> (6) Whether resources are being wasted; and
>
> (7) Whether a receiver is likely to provide a relatively quick and efficient remedy.

*Plata*, 2005 WL 2932253, at *23; *United States v. Hinds County*, No. 3:16-cv-489-CWR-BWR, 2023 WL 1186925, at *4-5 (S.D. Miss. Jan. 30, 2023).

The Court should consider and make findings under these factors to support its appointment of a receiver regardless of whether Defendants consent to the appointment. *See Sterling Savings Bank v. Citadel Development Corp.*, 656 F. Supp. 2d 1248, 1260-61 (D. Or. 2009) (consent of the parties not dispositive as to propriety of receivership under federal law). The Court should also make separate findings under the Prison Litigation Reform Act, demonstrating why under the circumstances here, a receivership is a narrowly drawn remedy that extends no further than necessary to correct the underlying Eighth Amendment violations, is the least intrusive means necessary to correct those violations, and will not have an adverse impact on public safety or the operation of the state's criminal justice system. *See* 18 U.S.C. § 3626(a)(1)(A); *Hinds County*, 2023 WL 1186925, at *2.

Here, all seven factors weigh strongly in favor of appointing a receiver. Analysis of these factors also confirms that an order appointing a receiver would satisfy the requirements of 18

U.S.C. § 3626(a)(1)(A). *See Hinds County*, 2023 WL 1186925, at *15.

### 1. There is a Grave and Immediate Threat of Harm to the Plaintiff Class.

The Order to Show Cause correctly notes that "the record is replete with evidence of both threatened and actual harm to members of the plaintiff class as a result of defendants' ongoing non-compliance" with various orders. ECF No. 8330 at 12. In 1995, the Court concluded after a lengthy trial that *Coleman* class members "daily face an objectively intolerable risk of harm as a result of the gross systemic deficiencies that obtain throughout the department." *Coleman v. Wilson*, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995). In 2013 and again in 2014, the Court found that class members continued to face a substantial risk of serious harm due to Defendants' failures to remedy these deficiencies. *See Coleman v. Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013); *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014). More recently, the Court has adopted in full the Special Master's findings that Defendants' continued failures to comply with their remedial obligations "present[s a] grave and unacceptable risk of harm to *Coleman* patients across levels of care," ECF No. 8095 at 37; that these failures "have pervasive, negative impacts on the *Coleman* class," ECF No. 7833 at 43; and that "the potential harm to members of the *Coleman* class—especially those class members whose illness requires inpatient hospitalization—who go without needed treatment due to [staffing] vacancies is unacceptable," *id. See* ECF No. 7854 (adopting ECF No. 7833 in full); ECF No. 8239 (adopting ECF No. 8095 in full). Indeed, Defendants' most recent annual report on suicides in CDCR concedes that inadequate mental health staffing plays a significant role in the unusually and unacceptably high suicide rate among people incarcerated in CDCR institutions. *See* ECF No. 8064 at 12, 15,18; *see also* ECF No. 8282 at 51-55 (citing further evidence that directly links Defendants' non-compliance with suicide-prevention requirements to understaffing). This is more than sufficient to conclude that the first factor weighs in favor of appointing a receiver.

### 2. The Court has Exhausted All Available Less-Extreme Measures and Continued Reliance on Such Measures Would be Futile.

The Order to Show Cause also correctly notes that "the court has exhausted virtually every mechanism for prodding Defendants to finally achieve compliance," including issuing "dozens of

orders directing less extreme measures." ECF No. 8330 at 2-7. The Court has appointed a Special Master "to supervise development and implementation" of remedial measures. *Id.* at 8; *Coleman*, 912 F. Supp. at 1324 . As part of a three-judge court convened pursuant to 18 U.S.C. § 3626(a), the Court has ordered Defendants to reduce overcrowding to levels that make it feasible to provide constitutionally adequate mental health care. *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. & N.D. Cal 2009), *aff'd sub nom. Brown v. Plata*, 563 U.S. 493 (2011). And most recently, the Court first threatened and then imposed more than $100 million in coercive civil contempt sanctions because Defendants had not taken all reasonable steps to remedy severe and worsening staffing shortages in their outpatient programs, *see* ECF No. 8291, and initiated contempt proceedings regarding two other areas of long-term non-compliance: implementation of suicide prevention measures and inpatient staffing, *see* ECF No. 8330 at 3-7. None of these measures has brought Defendants into compliance, and Defendants have not proposed any alternative measures that could realistically do so. This is more than sufficient to justify appointment of a receiver. *See Plata*, 2005 WL 2932253, at *26-28; *see also Plata*, 563 U.S. at 511 ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.").

### 3. Remaining Factors.

There is little question that the remaining factors weigh in favor of a receivership as well. The long and tortuous history of this case—which has been marked, among other things, by Defendants' intransigence across multiple administrations and a steadfast resistance to change even when faced with more than $100 million in contempt fines—clearly indicates that Defendants will not "turn the tide within a reasonable period of time" and that continued insistence that Defendants comply with the Court's orders "will lead only to further confrontation and delay." ECF No. 8330 at 12. Indeed, in the past decade alone, the Court has found that Defendants have violated ethical rules regarding *ex parte* communication with represented parties, *see Coleman v. Brown*, 938 F. Supp. 2d 955, 962-69 (E.D. Cal. 2013); knowingly presented misleading information to the Court and to the Special Master, *Coleman v. Newsom*, 424 F. Supp. 3d 925 (E.D. Cal. 2019); and pursued a "distracting and costly scorched earth litigation strategy"

for improper ends, *see* ECF No. 8330 at 12 (quoting ECF No. 7699 at 3-4).  Regardless of whether the Court labels this pattern of behavior "bad faith"—and it need not do so in order to justify a receivership, *see Plata*, 2005 WL 2932253 at *30—this too weighs in favor of appointing a receiver.  Given the alternative of continued adversarial litigation, a receivership would clearly conserve resources and provide a comparatively quick and efficient remedy as well.

In sum, the existing record in this case includes more than enough evidence to justify the appointment of a receiver under both the reasonableness-under-the-circumstances test and the needs-narrowness-intrusiveness standard codified at 18 U.S.C. § 3626(a)(1)(A).

### B. No Further Hearing is Required Because the Existing Record in this Matter Amply Supports the Appointment of a Receiver.

Defendants believe that an additional evidentiary hearing is necessary before the Court appoints a receiver if the Court does not appoint Mr. Kelso. But they have not indicated what factual disputes such a hearing would help the Court to resolve.  And the Court "may approve of the appointment of a receiver without a hearing where the record discloses sufficient facts to warrant it."  *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1189 (11th Cir. 1991); *see also Sterling Savings Bank*, 656 F. Supp. 2d at 1259-60 (rejecting claim that evidentiary hearing was required for appointment of receiver where parties received notice and opportunity to be heard on the matter); *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 178 Mich. App. 634, 661-62 (1989) (appointing receiver without a hearing where monitoring reports disclosed "fully adequate facts" to support the appointment).

There is no need for a hearing in this case because the record discloses more than enough facts to warrant a receivership.  *See* Section IV.A, *supra*.  The Order to Show Cause provided the parties with sufficient notice that the Court is considering a receivership, including notice of its tentative reasoning for appointing a receiver.  *See* ECF No. 8330.  The Court also provided the parties with an opportunity to be heard on the matter through written submissions.  *Id.*  Defendants have filed declarations in support of their written submission, and the Court can consider those declarations in its decision as well.  Absent a material factual dispute that necessitates live testimony, the Court need not hold a hearing before appointing a receiver.

### C. The Court Should Appoint a Receiver Regardless of Whether it Selects Mr. Kelso for that Role.

The parties agree that the Court should appoint Mr. Kelso as Receiver. *See* Section II, *supra*. Unlike Defendants, however, Plaintiffs maintain that the record in this matter fully supports the appointment of a receiver even if Mr. Kelso is unavailable and/or the Court chooses not to select Mr. Kelso for that role. The analysis in section IV.A, *supra*, does not turn on the identity of the receiver. Each of these factors weighs in favor of appointing a receiver regardless of whom the Court appoints. And while Plaintiffs support the appointment of Mr. Kelso for the reasons discussed in the Parties' Joint Statement above, *see* section II, *supra*, as well as the accompanying declarations of Michael W. Bien and Donald Specter, there are undoubtedly other candidates who could also serve in this role. In the event the Court does not appoint Mr. Kelso, Plaintiffs request that the Court issue the findings required to appoint a receiver and then provide the parties with an opportunity to assist the process by identifying additional candidates.

## V. CONCLUSION

This case could undeniably benefit from a sea change. In an important moment of unity, the parties have come together to jointly propose that significant change, which they believe could move this case forward and finally achieve compliance. Together, the parties propose the appointment of J. Clark Kelso as receiver on the terms set forth above. Mr. Kelso is uniquely qualified for this role because of his extensive history in achieving institutional reform and current role as *Plata* Receiver, overseeing CDCR's medical care delivery system. Stated another way, the most effective and efficient means of creating a durable and sustainable mental health program is to create a single integrated health care system now, and the parties agree that the appointment of Mr. Kelso as Receiver over the mental health care system will substantially advance that goal.

1  DATED: August 2, 2024                    ROSEN BIEN GALVAN & GRUNFELD LLP

2

3                                           By:      /s/ Michael W. Bien
                                                  MICHAEL W. BIEN
4                                                 ERNEST GALVAN
                                                  LISA ELLS
5                                                 JENNY YELIN
                                                  *Attorneys for Plaintiffs*
6

7

8  DATED: August 2, 2024                    PRISON LAW OFFICE
9

10

11                                          By:      /s/ Donald Specter
                                                  DONALD SPECTER
12                                                STEVEN FAMA
                                                  *Attorneys for Plaintiffs*
13

14  DATED: August 2, 2024                    ROB BONTA
                                             Attorney General of California
15

16

17                                          By:      /s/ Damon McClain
18                                                DAMON MCCLAIN
                                                  Supervising Deputy Attorney General
19                                                ELISE OWENS THORN
                                                  Deputy Attorney General
20                                                *Attorneys for Defendants*

21

22  DATED: August 2, 2024                    HANSON BRIDGETT LLP

23

24                                          By:      /s/ Samantha Wolff
                                                  LAWRENCE M. CIRELLI
25                                                PAUL B. MELLO
                                                  SAMANTHA D. WOLFF
26                                                *Attorneys for Defendants*

27

28