# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**

    **Plaintiffs**

        **v.**　　　　　　　　**No. 2:90-cv-0520-KJM-SCR**

**GAVIN NEWSOM, et al.,**

    **Defendants**


**THIRTIETH ROUND MONITORING REPORT – PART D: SPECIAL MASTER'S MONITORING REPORT ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION INSTITUTIONS WITH CORRECTIONAL CLINICAL CASE MANAGEMENT PROGRAMS COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
August 16, 2024

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| AA: | Alcoholics Anonymous |
| ADA: | Americans with Disability Act |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADL: | Activities of Daily Living |
| AGPA: | Associate Governmental Program Analyst |
| AIMS: | Abnormal Involuntary Movement Scale |
| APP: | Acute Psychiatric Program |
| ASP: | Avenal State Prison |
| ASU: | Administrative Segregation Units |
| BPH: | Board of Parole Hearing |
| C&PR: | Classification and Parole Representative |
| Cal HR | California Department of Human Resources |
| CAP: | Corrective Action Plans |
| CAT: | Chart Audit Tool |
| CBC: | Complete Blood Count |
| CBT: | Cognitive Behavioral Therapy |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CC III: | Correctional Counselor III |
| CCAT: | Coordinated Clinical Assessment Team |
| CCCMS: | Correctional Clinical Case Management System |

| | |
|---|---|
| CCHCS: | California Correctional Health Care Services |
| CCI: | California Correctional Institution |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEO: | Chief Executive Officer |
| CHCA: | Correctional Health Care Administrator |
| CHCF: | California Health Care Facility |
| CHSA II: | Correctional Health Services Administrator II |
| CIM: | California Institution for Men |
| CIT: | Crisis Intervention Team |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMH: | Chief of Medical Health |
| CMHPP: | Custody and Mental Health Partnership Plan |
| CMP: | Comprehensive Metabolic Panel |
| CNA: | Certified Nursing Assistant |
| CNE: | Chief Nurse Executive |
| COVID-19: | Coronavirus Disease 2019 |
| CPAP: | California Program Assessment Process |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |

| | |
|---|---|
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CSR: | Classification Services Representative |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CTP: | Community Transition Program |
| DAI: | Division of Adult Institutions |
| DAPO: | Division of Adult Parole Operations |
| DAR: | Daily Activity Reports |
| DD1: | Developmental Disability Level 1 |
| DD2: | Developmental Disability Level 2 |
| DD3: | Developmental Disability Level 3 |
| DDP: | Developmental Disability/Disabled Program |
| DNA: | Deoxyribonucleic acid |
| DOT: | Directly Observed Therapy |
| DSH: | Department of State Hospitals |
| DSH-Atascadero: | Department of State Hospitals-Atascadero |
| DUI: | Driving Under the Influence |
| EHRS: | Electronic Health Records System |
| EKG: | Electrocardiogram |
| EMRRC: | Emergency Medical Response Review Committee |
| EOP: | Enhanced Outpatient Program |
| EPRD: | Earliest Possible Release Date |

| | |
|---|---|
| eUHR: | Electronic Unit Health Record |
| FBI: | Federal Bureau of Investigation |
| FIT: | Focused Improvement Team |
| FLA: | Field Liaison Analyst |
| FSP: | Folsom State Prison |
| FTE: | Full-Time Equivalent |
| GED: | General Equivalency Diploma |
| GP: | General Population |
| GRC: | General Resource Center |
| HCAQ: | Health Care Access Quality |
| HCPOP: | Health Care Placement Oversight program |
| HDSP: | High Desert State Prison |
| HLOC: | Higher Level of Care |
| HPS I: | Health Program Specialist I |
| HPS II: | Health Program Specialist II |
| HQ: | Headquarters |
| HS: | *Hora Somni*; Hour of Sleep |
| I/P: | Inmate-Patient |
| IAC: | Inmate Advisory Counsel |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |

| | |
|---|---|
| IMHPC: | Institutional Mental Health Pre-Release Coordinator |
| IPOC: | Interdisciplinary Plan of Care |
| IRU: | Inpatient Referral Unit |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training |
| ISUDT: | Integrated Substance Use Disorder Treatment |
| KOP: | Keep On Person |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LGB: | Local Governing Body |
| LOC: | Level Of Care |
| LOP: | Local Operating Procedure |
| LOS: | Length of Stay |
| LSD: | Lysergic acid diethylamide |
| LTRH: | Long-Term Restricted Housing |
| LVN: | Licensed Vocational Nurse |
| MAPIP: | Medication Administration Process Improvement Project |
| MAR: | Medication Administration Record |
| MAT: | Medication Assisted Treatment |
| MCA: | Medication Court Administrator |
| MCRP: | Male Community Reentry Program |
| MDMA: | Methylenedioxymethamphetamine (a/k/a "ecstasy") |
| MEPD: | Minimum Eligible Parole Date |

| | |
|---|---|
| MERD: | Minimum Eligible Release Date |
| MHA: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHMD: | Psychiatrist |
| MHPC: | Mental Health Placement Chrono |
| MHPS: | Mental Health Program Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| ML: | Main Line |
| MSF: | Minimal Support Facility |
| NA: | Nurse Administered |
| NCCHC: | National Commission on Correctional Health Care |
| NDS: | Non-Disciplinary Segregation |
| NKSP: | North Kern State Prison |
| NLTG: | Nursing-Led Treatment Groups |
| OAH: | Office of Administrative Hearings |
| OC: | Oleoresin Capsicum |
| OHU: | Outpatient Housing Unit |
| OLA: | Office of Legal Affairs |
| OMHD: | Offender Mental Health Disorder |
| OSS I: | Office Services Supervisor I |
| OSS II: | Office Services Supervisor II |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |

| | |
|---|---|
| PIP: | Psychiatric Inpatient Program |
| PIWP: | Performance Improvement Work Plan |
| PPE: | Personal Protective Equipment |
| PREA: | Prison Rape Elimination Act |
| PReP: | Pre-Release Planning |
| PRN: | *pro-re-nata* (Take) As Needed |
| PRPA: | Pre-Release Planning Assessments |
| PSR: | Program Status Report |
| PSU: | Psychiatric Services Unit |
| PT: | Physical Therapy |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QM: | Quality Management |
| QMC: | Quality Management Committee |
| R&R: | Receiving & Release |
| RAC: | Rehabilitative Achievement Credit |
| RC: | Reception Center |
| RCA: | Root Cause Analysis |
| RCGP: | Restricted Custody General Population |
| RHU: | Restricted Housing Unit |
| RJD: | Richard J. Donovan Correctional Facility |

| | |
|---|---|
| RN: | Registered Nurse |
| RN II: | Registered Nurse II |
| ROI: | Release Of Information |
| RT: | Recreational Therapist |
| RVR: | Rules Violation Report |
| SCC: | Sierra Conservation Center |
| SHO: | Senior Hearing Officer |
| SHU: | Security Housing Unit |
| SNY: | Special Needs Yard |
| SOMS: | Strategic Offender Management System |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRASHE: | Suicide Risk and Self-Harm Evaluation |
| SRE: | Suicide Risk Evaluation |
| SRMP: | Suicide Risk Management Program |
| SSA: | Social Security Administration |
| SSI: | Supplemental Security Income |
| SSRI: | Selective Serotonin Reuptake Inhibitor |
| STA: | Structured-Therapeutic Activities |
| STG: | Security Threat Group |
| STRH: | Short Term Restricted Housing |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |

TTA:            Triage and Treatment Area

TTM:            Therapeutic Treatment Module

UCC:            Unit Classification Committee

VA:             Veteran's Administration

VSP:            Valley State Prison

WSP:            Wasco State Prison

## <u>TABLE OF CONTENTS</u>

ACRONYMS AND ABBREVIATIONS ..................................................................... i

THE *COLEMAN* SPECIAL MASTER'S THIRTIETH ROUND MONITORING
REPORT – PART D ........................................................................................ 1

I.      INTRODUCTION ............................................................................... 1

        Special Master's Response to Defendants' Objections to Draft Report ............................ 3

        A.      Status of Ongoing Mental Health Staffing Crisis in CDCR ................................ 14

        B.      EOP Population Growth: New EOP Bed Activations ........................................... 20

        C.      Update on Special Master's Monitoring of Defendants' Heat Plan
                Implementation ........................................................................ 31

II.     SUMMARY OF THE SPECIAL MASTER'S FINDINGS ............................................. 32

        A.      Mental Health Vacancy Rates Overall and by Disciplines During the
                Thirtieth Monitoring Round................................................................ 32

        B.      Quality Management...................................................................... 41

        C.      Overall Quality of Care.................................................................. 45

        D.      Clinical Services & Programming ....................................................... 56

        E.      Medication Management ................................................................. 65

                1.      Psychiatry Measures ......................................................... 68

                2.      Clozapine Institutions ....................................................... 71

                3.      Continuity, Compliance, Observation, and Administration Matters ........ 71

                        a.      Continuity of Medication Upon Arrival at Reception Center....... 71

                        b.      Continuity of Medication for Inter-Institutional Transfers at
                                R&R ........................................................................... 72

                        c.      Continuity of Medication with Intra-Institutional Transfers ........ 72

                        d.      Continuity of Medication following MHCB, Community
                                Hospital, or DSH Transfer, or Parole or Community
                                Transfer ..................................................................... 72

                        e.      *Hora Somni*/Hour of Sleep (HS) Medications ............................ 73

4. A.M./P.M. Medications ........................................................ 73

    a. Psychiatrist-Prescribed Chronic Care Medications ...................... 74

    b. Psychiatrist-Prescribed Outpatient Provider New Medication Orders ......................................................... 74

    c. Medication Compliance for PC 2602 Involuntary Medication Orders ......................................................... 74

    d. PC 2602 Involuntary Medication Order Petitions ........................ 75

    e. Medication Lines ............................................................... 76

F. Access to Higher Levels of Care ........................................................ 77

G. Custody and Mental Health Partnership Plan ...................................... 81

H. Mental Health Referrals .................................................................. 89

I. Pre-Release Planning ...................................................................... 90

J. Review of the RVR Process ............................................................... 91

K. Use of Force ................................................................................. 95

L. Program Access ............................................................................. 96

M. MHSDS Patients in Segregated Housing ............................................ 102

N. Reception Centers .......................................................................... 106

CONCLUSION ....................................................................................... 108

APPENDIX A  INSTITUTIONAL SUMMARIES .............................................. 110

APPENDIX A – 1 CALIFORNIA INSTITUTION FOR MEN (CIM) ......................... 111

APPENDIX A – 2 HIGH DESERT STATE PRISON (HDSP) ................................ 135

APPENDIX A – 3 CALIFORNIA CORRECTIONAL INSTITUTION (CCI) ............. 163

APPENDIX A – 4 SIERRA CONSERVATION CENTER (SCC) ............................. 186

APPENDIX A – 5 PELICAN BAY STATE PRISON (PBSP) .................................. 207

APPENDIX A – 6 CALIFORNIA STATE PRISON/SOLANO (CSP/Solano) ............. 234

APPENDIX A – 7 AVENAL STATE PRISON (ASP) .......................................... 260

APPENDIX A – 8 PLEASANT VALLEY STATE PRISON (PVSP)........................... 282

APPENDIX A – 9 CALIFORNIA REHABILITATION CENTER (CRC).................. 303

APPENDIX A – 10 CORRECTIONAL TRAINING FACILITY (CTF) ..................... 325

APPENDIX A – 11 FOLSOM STATE PRISON (FOLSOM) ..................................... 352

APPENDIX A – 12 WASCO STATE PRISON (WSP)................................................ 378

APPENDIX A – 13 NORTH KERN STATE PRISON (NKSP)................................. 415

APPENDIX B  CLINICAL CASE REVIEWS ......................................................... 449

APPENDIX B – 1 CALIFORNIA INSTITUTION FOR MEN (CIM)........................ 450

APPENDIX B – 2 HIGH DESERT STATE PRISON (HDSP) ................................... 474

APPENDIX B – 3 CALIFORNIA CORRECTIONAL INSTITUTION (CCI).............. 504

APPENDIX B – 4 SIERRA CONSERVATION CENTER (SCC)............................... 524

APPENDIX B – 5 PELICAN BAY STATE PRISON (PBSP)..................................... 534

APPENDIX B – 6 CALIFORNIA STATE PRISON/SOLANO (CSP/Solano)............. 571

APPENDIX B – 7 AVENAL STATE PRISON (ASP)................................................. 594

APPENDIX B – 8 PLEASANT VALLEY STATE PRISON (PVSP)........................... 620

APPENDIX B – 9 CALIFORNIA REHABILITATION CENTER (CRC).................. 640

APPENDIX B – 10 CORRECTIONAL TRAINING FACILITY (CTF)...................... 666

APPENDIX B – 11 FOLSOM STATE PRISON (FOLSOM) ..................................... 684

APPENDIX B – 12 WASCO STATE PRISON (WSP)................................................ 695

APPENDIX B – 13 NORTH KERN STATE PRISON (NKSP)................................. 740

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.,

    Plaintiffs,

    v.                                                  No. 2:90-cv-0520-KJM-SCR

GAVIN NEWSOM, et al.,

    Defendants.

## THE *COLEMAN* SPECIAL MASTER'S
## THIRTIETH ROUND MONITORING REPORT – PART D

### I.    INTRODUCTION

This is the fourth installment of the *Coleman* Special Master's Thirtieth Round Monitoring Report ("Report"). The Special Master filed the first installment (Part A) of the Thirtieth Round Monitoring Report, covering the California Department of Corrections and Rehabilitation (CDCR) institutions with psychiatric inpatient programs (PIPs), on May 11, 2023. *See generally* ECF No. 7833; *see also* June 8, 2023 Order, ECF No. 7854 (adopting Special Master's Thirtieth Round Monitoring Report – Part A in full). The Special Master filed his Thirtieth Round Monitoring Report Part B, reporting on his paper review of the three California Department of State Hospital (DSH) institutions with beds designated for *Coleman* class members, on December 15, 2023. *See generally* ECF No. 8085.[1] Finally, the Special Master

---

[1] Following a session with the Ninth Circuit Mediator on April 12, 2024, the parties indicated they agreed that two items should be removed from the agenda for the April 26, 2024 Status Conference. *See* Minutes for April 12, 2024 Mediation, ECF No. 8197. The Court directed the parties "to file a joint proposal" as to an appropriate date to revisit the deferred topics. *Id.* The parties submitted their responsive joint proposal on April 15, 2024 wherein they requested "Defendants' Least Restrictive Housing policy and other steps to enhance class members' access to the Department of State Hospitals and Defendants' compliance with staffing requirements" in CDCR's PIPs be "revisited at a future status conference" because these topics were being discussed in "ongoing court-ordered mediation." ECF No. 8200 at 1. The Court's April 18,

filed his report on CDCR's Enhanced Outpatient Program (EOP) institutions on December 22, 2023. *See generally* ECF No. 8095; *see also* May 16, 2024 Order, ECF No. 8239 (adopting Thirtieth Round Monitoring Report – Part C in full).

This Report includes the monitor and monitor's expert's findings from on-site monitoring tours of the remaining 13 CDCR institutions' mental health programs: Avenal State Prison (ASP); California Correctional Institution (CCI); California Institution for Men (CIM); California Rehabilitation Center (CRC); California State Prison/Solano (CSP/Solano); Correctional Training Facility (CTF); Folsom State Prison (Folsom); High Desert State Prison (HDSP); North Kern State Prison (NKSP); Pelican Bay State Prison (PBSP); Pleasant Valley State Prison (PVSP); Sierra Conservation Center (SCC); and Wasco State Prison (WSP).

The Special Master's Thirtieth Round Monitoring Report covers defendants' compliance with the plans, policies, and protocols provisionally approved by this Court in 1997, known as the Mental Health Services Delivery System (MHSDS) Program Guide. The Program Guide has been subsequently revised, updated, and re-approved by the Court several times, most recently in 2021. *See* ECF Nos. 7033, 7033-1, and 7033-2; *see also* Special Master's Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 42-47 (discussing developments related to the 2021 Program Guide Update).[2]

---

2024 Order granted the parties' joint request and called for briefing by the parties as to "their respective positions regarding whether the court should defer ruling on some or all of the findings and some or all of the recommendations in the Special Master's Thirtieth Round Monitoring Report – Part B" in light of the ongoing mediation. ECF No. 8205 at 2. In their May 2, 2024 Joint Response to the Court's April 18, 2024 Order, the parties indicated their agreement that the Court should defer ruling on the Thirtieth Round Monitoring Report – Part B while the parties engage in mediation. ECF No. 8224 at 2. Further, defendants reported that they had "committed to Plaintiffs that the recommendations noted within the Special Master's report will be the subject of discussion at the upcoming mediation on May 10, 2024." *Id.*

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF)

The monitoring focus areas in this Report include: Mental Health Staffing Vacancies, Quality Management, Quality of Care, Clinical Services, Medication Management, Access to Higher Levels of Care, Custody and Mental Health Partnership Plan (CMHPP), Mental Health Referrals, Pre-Release, Rules Violation Report (RVR) Process, Use of Force, Program Access, MHSDS Patients in Segregated Housing, and Reception Centers.

The summaries of the monitoring focus areas appear below in Part II. Appendix A is comprised of institution-by-institution summaries of the monitor's findings during the respective monitoring tours. Appendix B is comprised of the Special Master's clinical reviews of individual patient cases. Appendix C summarizes the Special Master's activities since the filing of the Thirtieth Round Monitoring Report – Part C.

**<u>Special Master's Response to Defendants' Objections to Draft Report</u>**

On May 29, 2024, the Special Master provided the *Coleman* parties with a draft version of the Thirtieth Round Monitoring Report – Part D ("Draft Report"). As required by the Order of Reference, ECF No. 640 at 4-5, 8, defendants provided their preliminary comments and objections to the Draft Report on June 28, 2024. *See* Letter from Elise Thorn, Esq., Deputy Attorney General, to Special Master Lopes (June 28, 2024), attached hereto as Exhibit A. Plaintiffs did not provide comments to the Draft Report.

The Special Master carefully reviewed defendants' comments and objections to the Draft Report and revised the final version as described below.

In addition, the Special Master revised the introduction section of the Report to include updates on developments related to defendants ongoing efforts to increase the number of EOP

---

system are to page numbers assigned by the ECF system. References to page numbers in the Report are to page numbers at the bottom of each page.

beds, *see infra* notes 17 and 23, as well as the Special Master's plan to conduct monitoring tours focused on defendants' implementation of their heat plan.  *See infra* Part I.C.  The Special Master also updated the report to responsd to defendants' suggestion in recent filings that his clinical experts lack experience in telemental health.  *See infra* note 27.  These updates are based on developments that occurred after the distribution of the Draft Report and are included herein to provide the Court with current information about conditions in the field and the Special Master's monitoring schedule.

1. *Defendants Standing Objections*

In their preliminary objections to the Draft Report, defendants noted "several concerns regarding the Draft Report's findings of 'adequacy' of care, parsing of staffing data, sample sizes, and compliance thresholds."  Exhibit A at 23.[3]  Defendants correctly acknowledged the Court's prior disposal of the substance of these objections in prior orders but "re-state[d] their objections to avoid waiver/forfeiture concerns as to the Draft Report."  *See* Exhibit A at 2; *see also* ECF No. 8239 at 7.  Except as specifically noted in the sections below, the Special Master

---

[3] Within this section of their preliminary objections, defendants offer a legal argument to which the Special Master does not have a response but reproduces here for the record:

> Defendants maintain the appropriate standard of review for the Special Master's reports is a de novo review due to the extensive revisions to Rule 53 of the Federal Rules of Civil Procedure after the issuance of the Order of Reference.  Defendants acknowledge the standard of review is a matter for the Court, not the Special Master, but includes this in our informal objections to preserve the argument for formal objections before the District Court and Ninth Circuit if necessary.

Exhibit A at 7.

relies on his prior responses to defendants' objections[4] and did not substantively revise the Draft Report based on them.

    a.   <u>Objection to Draft Report's Summary of Special Master's Expert's Individual Patient Case Reviews</u>

       Defendants restated their objection to the criteria and terminology the Special Master's experts use to assess and report on adequacy of mental health care delivered to *Coleman* class members through detailed individual patient record reviews. *See* Exhibit A at 2-3.[5] Consistent

---

[4] Regarding, use of the terms "adequate," "marginally adequate," and "inadequate" in the Special Master's expert's case reviews, see Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 29-30 and Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 22-23. Regarding defendants' objections to the Special Master's "parsing" of staffing data, see Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 18-19. Regarding sample sizes, see Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 25 n.7 and Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 23. Regarding application of a 90 percent threshold to MAPIP measures and sub-measures, see Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 24. *See also* April 13, 2023 Order, ECF No. 7808 (adopting Twenty-Ninth Round Monitoring Report Parts C and D in full) and May 16, 2024 Order, ECF No. 8239 (adopting Thirtieth Round Monitoring Report – Part C in full).

[5] Within this section of their correspondence, defendants specifically requested that, "going forward, institutions and providers be notified immediately of any specific 'inadequacies' that may undermine quality of care so that they can promptly address them." Exhibit A at 3. As to the Special Master's expert's individual patient record reviews, these reviews are conducted retrospectively and not contemporaneously with the Special Master's monitoring tours; as such, notification of inadequacies in care would be after-the-fact. With respect to deficiencies identified during monitoring tours, the Special Master notes that his monitors and experts, by well-established and commonly understood practice, regularly provide real-time feedback to institutional mental health staff, leadership, as well as CDCR's regional and headquarters staff and counsel who attend the Special Master's monitoring tours. For instance, the Special Master's monitoring teams provide feedback regarding concerns with the institution's satisfaction of Program Guide requirements, quality of care, clinical and custodial practices inconsistent with the delivery of adequate mental health care, and specific-patient related concerns throughout monitoring tours, as well as during informal debriefs and formal exit meetings following conclusion of a monitoring tour. This practice, of course, is intended to communicate the Special Master's preliminary findings to CDCR staff at all levels so that defendants can promptly effectuate corrective action and alleviate patient suffering. The Special Master will continue to follow this practice in an effort to provide as much real-time feedback to defendants as possible so they can act swiftly to correct deficiencies.

with their prior objections, defendants argued, for example, that the Draft Report "fail[ed] to provide any detail with respect to how adequacy was determined." *Id.* As the criteria and terminology utilized by his experts remains the same and as the Court has overruled this objection in prior orders, the Special Master did not revise the final Report based on this objection. *See* May 16, 2024 Order, ECF No. 8239 at 5.[6]

b. Objections to Draft Report's Discussion of Staffing Vacancy Rates

While acknowledging the calculations underlying the vacancy rates included in the Draft Report were "factually accurate," *see* Exhibit A at 4, defendants nonetheless repeated their objection to what they characterize as the Draft Report's "improper[] pars[ing]" of staffing data. Exhibit _ at 3. In addition to defendants' acknowledging the Report's accuracy, the Court previously resolved this objection[7] and, as a result, the Special Master did not revise the Report.

---

[6] *See* ECF No. 8239 at 3 and orders cited therein ("Defendants next object to terms the Special Master uses to report on the quality of mental health care defendants provide as measured by Program Guide requirements. As the Special Master notes and plaintiffs show, the court has already rejected this objection. Defendants also contend the Report does not 'include detailed information regarding the methodology or criteria the Special Master used to make these determinations.' The court has repeatedly rejected this position, which defendants raise yet again, nonetheless. This objection is summarily overruled.").

[7] *See* ECF No. 8239 at 3 and orders cited therein ("Defendants' base this objection on two assertions: that the Special Master has improperly separated vacancy rates among 'civil service line staff' from 'overall vacancy rates including registry staff,' and that the 30C Report 'misstates the functional vacancy rates for staff psychiatrists by not including' psychiatric nurse practitioners (PNPs) and 'separat[ing] telepsychiatry positions from on-site psychiatry positions.' The first part of this objection flies in the face of the fact that defendants' themselves report both civil service and functional vacancy rates to the court in their monthly vacancy reports and the additional fact that the 30C Monitoring Report plainly and clearly reports overall vacancy rates (also referred to as 'functional vacancy rates'), expressly using those vacancy rates as the basis for the Special Master's crucial finding that 'except for staff psychiatry, overall vacancy rates for all disciplines for the 15 EOP institutions exceeded ten percent.' The second part of this objection is, as plaintiffs correctly observe, a reiteration of the objection defendants raised to the Special Master's draft 30C report and which the Special Master responded to by correcting the 30C Report before he filed it with the court. Defendants do not acknowledge the Special Master's response. Both aspects of this objection are frivolous and are overruled.").

c.  Objections Related to Sample Sizes Utilized in Draft Report

Next, defendants restated their objection to the Special Master's use of a sample size of 20 patients per level of care to evaluate each institution's satisfaction of Program Guide requirements for timeliness of initial and routine clinical contacts and IDTTs.  Exhibit A at 5-6. As has been the case since the Twenty-Eighth Monitoring Round, the Special Master transparently identifies the number of patients reviewed for each level of care within the relevant sections of the Report and it is clear that the findings are based on the sample reviewed. Additionally, the Special Master notes that his recent practice of assessing timeliness of clinical contacts via manual review of patient records was necessitated by what the Court found to be defendants' presentation of misleading data regarding timeliness of psychiatric contacts, *see* ECF No. 6427 at 40-41; the Special Master looks forward to reviewing global data derived from the relevant remediated indicators measuring these critical Program Guide requirements.  As defendants acknowledged, the Court has previously overruled similar objections[8] and the Special Master did not revise the final Report in response to this objection.[9]

---

[8] *See* ECF No. 8239 at 6 and orders cited therein (describing similar prior request related to sample sizes and related issues as a "thinly disguised reiteration of previous defense requests to require the Special Master to provide material related to his monitoring, which the court has rejected.  Overall, this request misperceives the processes by which data remediation will be completed and the finalized CQIT tool will be implemented, all of which the court has established in prior orders.  The request is denied.").

[9] Defendants also requested patient information for the samples reviewed to assess timeliness of clinical contacts.  Exhibit A at 5-6.  The Special Master has agreed to provide this information beginning in the next monitoring round.  To date, the Special Master has provided the requested information for the cases reviewed during the Special Master's focused review of new EOP housing units.

d. <u>Objections to Application of 90 Percent Threshold for MAPIP Measures</u>

Finally, defendants again objected to the Draft Report's "application of a 90 percent threshold for both MAPIP sub-measures and composite measures because the indicators count patient refusals as non-compliant." Exhibit A at 7. As the Special Master noted in the third installment of the Thirtieth Round Monitoring Report, "[h]ere, defendants appear to be objecting to how *their own data is measured and reported*, specifically with respect to patient refusals." ECF No. 8095 at 24 (emphasis added). Similar to the other "standing objections" discussed above, the Court has overruled this objection previously[10] and the Special Master did not revise the Report based on this objection.

2. *Defendants' Objections to Draft Report's Discussion of their New Objections to the Special Master's Requests for Documents*

The Draft Report included a discussion of the Special Master's ongoing focused monitoring tours of CDCR's newly opened EOP housing units as well as defendants' response to a "truncated" request for documents the Special Master sent in advance of the first of those monitoring tours. *Infra* I.B. Specifically, defendants objected to the Draft Report's discussion of their newly announced "standing objections" to the Special Master's routine requests for documents and information he is entitled to under the Order of Reference. *See* Exhibit A at 8. For the reasons explained in the Draft Report (and below), the Special Master concluded that

---

[10] *See* ECF No. 8239 at 5 and orders cited therein ("It is settled that the proper focus of monitoring in this action is 'tracking compliance…from zero to 100 percent' and that '[t]he court will resolve ultimate questions of constitutional compliance…. To the extent defendants' objection seeks to exclude patient refusals from certain MAPIP measures, the 30C Report is based on data defendants themselves provide to the Special Master. Moreover, as the Special Master correctly observes, 'many MAPIP measures are going through the data remediation process…and defendants' concerns are best addressed in that forum.' Once again, defendants' objection ignores well-established principles for reporting compliance in this case. It is overruled.").

these new objections to his requests for documents were part of a "pattern of behavior" on the part of defendants that "comes dangerously close to the obstruction of the Special Master's performance of his court-ordered responsibilities." *Infra* pp. 30-31. Moreover, the Special Master expressed concern that these objections may reflect defendants' desire to use the ongoing data remediation process to limit the scope of information provided to the Special Master and Court for monitoring purposes. *Infra* pp. 28 (noting "it appears that the data remediation process is being weaponized as a means to hinder the Special Master's access to needed information").

In response, defendants asserted that they "do not now and never have intended to obstruct the Special Master's ability to monitor compliance pursuant to the Order of Reference." Instead, defendants maintain their "standing objections" to the Special Master's requests for basic information regarding *Coleman* class members and the mental health services they receive within CDCR's prisons were intended to initiate "a conversation" and "assist the Special Master in completing his obligations by providing the most transparent, accurate, and consistent data possible." Exhibit A at 9. Defendants requested that the Special Master exclude this discussion from the final report, or alternatively revise the final report to include the additional information delineated in defendants' objections.

Here, defendants responded provocatively to the Special Master's routine request for information and are now "dismayed" that the Special Master deemed it necessary to reveal the same in this Report. Exhibit A_ at 8. Defendants' dismay notwithstanding, nothing in the Draft Report's discussion was "inaccurate" or "inflammatory." Exhibit A at 8. Moreover, the Special Master's analysis of defendants' response to the focused EOP document request has not changed after reviewing their preliminary objections. At times, defendants' correspondence acknowledges the significant disparity between their responses to the Focused EOP Review

Document Request and prior document requests, exemplifying what caused the Special Master such concern in the first place: that defendants' response was, at minimum, out-of-the-ordinary and came in the form of new, formal legal objections to the Special Master's routine requests for information: "Customarily, CDCR has discussed document requests with the Special Master's team, including asking for clarification where needed, notifying the Special Master of requests for which CDCR did not have responsive data, and requesting changes based on available data. Although these discussions may have been more informal than the letter provided in response to the focused EOP review request, they routinely occurred without Defendants being accused of obstruction." The Special Master agrees with this assessment, which is part of the reason he initially expressed serious concern that his limited-scope document request was met with new, baseless "standing objections" from defense counsel and, as a result, respectfully urged "an abrupt change in course." *Infra* p. 31.

Consequently, with one exception, described below, the Special Master did not remove or revise this section of the final Report. The Special Master added a sentence indicating that, with respect to the focused EOP reviews, defendants' standing objections did not ultimately result in the withholding of documents or information from the Special Master that he is otherwise entitled to under the Order of Reference. *Infra* note 25. Otherwise, the Special Master has left this section of the Report unchanged as it – and the correspondence announcing defendants' "standing objections" – speak for themselves. Similarly, the Special Master left the portion of the Draft Report referencing certain data remediation related correspondence intact. Exhibit A at

11-12 (requesting removal of discussion of data remediation correspondence from Draft

Report).[11]

3. *Defendants' Objections to Various References to Program Guide Requirements and Timeframes*

Defendants identified several references to Program Guide timeframes in the Draft

Report which required correction. Exhibit A at 12-14. The Special Master has reviewed and

corrected these references as appropriate. *See infra* pp. 124, 149.

As requested, the Special Master revised the final version of the Report to note the data

remediation stakeholders' recent agreement to define "weekly" as occurring "at least once per

calendar week, but not to exceed ten days between contacts" for purposes of measuring clinical

contact timeframes but did not change the assessment of weekly contacts within the Report

because the referenced agreement occurred after the review periods for the respective monitoring

tours. *See infra* note 36; *see also* ECF No. 8090 at 2. Similarly, the Special Master declined to

revise the Draft Report's discussion of initial psychiatry contacts in MHCBS and initial IDTTs in

---

[11] Since the distribution of the Draft Report, defendants have expressed concern with the Special Master's data expert's communications to CDCR's technical staff regarding technical issues with indicator documentation. *See* Email from Melissa Bentz to Deputy Special Master Walsh and Henry Dlugacz (August 6, 2024), attached hereto as Exhibit B. Defendants assert concerns regarding transparency and request that Dr. Daniel Potter's communications regarding these technical concerns be shared with plaintiffs and defendants in the first instance. While the Special Master shares the goal of transparent communications regarding indicator documentation, he notes that it is longstanding practice in this case for his experts (including clinical, suicide prevention, data) to, from time to time, work directly with their subject matter counterparts within CDCR and for the Special Master to bring plaintiffs to the table at a later date as needed. This practice has promoted the free flow of information between the Special Master's experts and defendants' clinical staff and helped prevent clinical and technical discussions from becoming unnecessarily mired in litigation. The Special Master views Dr. Potter's recent email communication to defendants' technical staff as an extension of this long standing practice.

Reception Centers, *see* Exhibit A at 16, because the data remediation agreements defendants refer to were reached after the review periods covered in this Report.

In response to defendants' other requests in this section of their preliminary objections, the Special Master made clarifying revisions regarding confidentiality of psychiatry and primary clinician contacts and patient attendance at IDTT. Exhibit A at 14-15 (see revisions *infra* pp. 102-04).

Regarding defendants' objections to the Draft Report's discussion of yard time offered in STRH, Exhibit A at 15-16, the Special Master declined to make the requested revision (revising references to "yard time" to "out of cell exercise time" to align with the Program Guide requirement) because the data defendants' provide to demonstrate their satisfaction of the policy requirement in fact records hours of "yard" time offered as opposed to a more general reference to "out-of-cell exercise time." Thus, the Draft Report's references to yard time offered are accurate and require no revision.

Regarding defendants' objections to the Draft Report's discussion of confidentiality of IDTTs, *see* Exhibit A at 16-17, the Special Master did not revise the final Report but provides the following additional context regarding the relevant findings. Regarding the Special Master's finding that the cameras in the IDTT rooms at NKSP and WSP compromised confidentiality, defendants contend that there were no audio capabilities enabled on the cameras in the room where IDTTs were being held at WSP. However, as noted in the Draft Report, questions about audio capabilities could not be confirmed during the on-site review and no further information was provided. Defendants' contention that the cameras at NKSP were "not functional" does not resolve the issue of whether these cameras have audio capabilities. Thus, at both facilities, the findings of the Special Master's monitor resulted in concerns about confidentiality secondary to

the presence of cameras.  Further, patient perception was that the cameras inhibited

confidentiality, and this remains a concern as the patients' level of comfort in discussing private,

mental health issues should be primary during IDTTs.

As to the issue of correctional officer presence at IDTTs, defendants correctly noted, "[a]

confidential setting affords confidentiality of sight and sound from other inmates and

confidentiality of sound from staff members…." Program Guide, ECF No. 7333-1 at 636.  While

correctional officer participation in IDTT meetings could be useful, as noted in the Draft Report,

the two custody officers who stood in the room during IDTT meetings at WSP walked in and out

of the room during the meeting, which resulted in the door to the room being opened and closed,

breaching confidentiality.  *Infra* p. 393.  In addition, these officers did not contribute to the IDTT

process and provided no information.  *Infra* p. 393.  As noted by defendants, staff "who have

direct knowledge of the inmate-patients are encouraged to attend or provide information…," but

here it was not apparent that these officers possessed useful information or had knowledge

regarding the patient.  In fact, as noted in the Draft Report, after the IDTT meetings, one of the

custody officers asked the Special Master's expert if their presence in the room was acceptable,

as the custody officer had concerns that they should not be present during these meetings.  *Infra*

p. 393.  It was clear that the presence of these officers was not in keeping with the Program

Guide's definition of confidentiality or its conception of meaningful correctional officer

participation in the IDTT.  The issue was not the officers' presence, it was their lack of

involvement in the IDTT process and movement in and out of the room by opening and closing

doors that impaired confidentiality.

Regarding group treatment, the Special Master modified references to "clinical groups"

to "clinician-led" groups.  *See* Exhibit A at 17.

4. *Defendants' Additional Requests for Clarifications*[12]

The Special Master revised the final version of the Report in response to defendants' requests for clarification and additional information regarding FSP, Exhibit A at 17 (see revisions *supra* p. 2); initial PC assessments at CIM, Exhibit A at 18 (see revisions *infra* p. 59); PSU transfers, Exhibit A at 18 (see revisions *infra* p. 81); job assignments, Exhibit A at 18 (see revisions *infra* p. 96 ); telepsychiatry coverage, caseloads, and alternative housing at SCC, Exhibit A at 18 (see revisions *infra* pp. 186, 190, 195, 196); and sustainability reviews at CSP/Solano, Exhibit A at 18 (see revisions *infra* p. 242).

A.    **Status of Ongoing Mental Health Staffing Crisis in CDCR**

In the preceding installment of the Thirtieth Round Monitoring Report, the Special Master observed that the "bona fide mental health staffing emergency" identified during the Twenty-Ninth Round had "continued virtually unabated" in the 15 EOP institutions.  ECF No. 8095 at 32.  Among the EOP institutions, "[s]ince the Twenty-Ninth Monitoring Round, the overall vacancy rates for both primary clinician classifications [psychologists and clinical social workers] had in fact gotten worse."  *Id.*  Specifically, the Special Master reported that, compared to the Twenty-Ninth Round, "functional vacancy rates among staff psychologists increased at 13

---

[12] In response to defendants concerns regarding the staffing data reported in institution summaries, see Exhibit A at 17, the Special Master notes institutional summary staffing data reflects, as it has for many rounds of monitoring, staffing vacancy rates as of the time of the monitoring tour.  These rates are calculated from the staffing data provided to the Special Master in response to his document request in advance of the monitoring tours and is sometimes supplemented with additional, clarifying staffing data when defendants' mental health staff identify discrepancies in the institution's response to the document request.  As noted in the Draft Report and previously filed reports, the vacancy rates reported in the Section II(A) reflect a later point in time. *E.g.*, *infra* note 26. The Special Master will consider defendants request to include specific identification of the point-in-time to which the vacancy rates reported in institutional summaries apply going forward.

of the 15 EOP institutions" and, among clinical social workers, "had increased at seven of the 15 EOP institutions." *Id.*

Unfortunately, the Special Master's monitoring of the 13 institutions reviewed in this Report revealed similarly high functional vacancy rates among primary clinician classifications. As discussed below, across the 13 institutions, the staff psychologist functional vacancy rate increased from 34 percent to 40 percent compared to the preceding monitoring round. *Compare infra* Part II(A), *with* ECF No. 7716 at 34. Similarly, the clinical social worker functional vacancy rate increased compared to the preceding monitoring round. *Compare infra* Part II(A) (reporting 23 percent functional vacancy rate among clinical social workers), *with* ECF No. 7716 at 34 (reporting 21 percent functional vacancy rate among clinical social workers).

Only two institutions (CRC and FSP) reported functional vacancy rates among staff psychologists below ten percent. Similarly, two institutions (CIM and FSP) reported fully staffing their clinical social worker allocations and NKSP reported a functional vacancy rate below ten percent; the remaining ten institutions reported functional vacancies in excess of ten percent. *See infra* Part II(A). Finally, compared to the preceding monitoring round, functional vacancy rates among staff psychologists increased at eight of 13 reviewed institutions and, among clinical social workers, at seven of 13 institutions, as displayed in the figures below.

**Figure 1**



**Figure 2[13]**



While separate review of vacancies among the individual classifications of psychologists and clinical social workers is instructive, it is important to note that these classifications both serve as PCs in CDCR's MHSDS. Thus, to understand the magnitude of the mental health staffing crisis among PCs, it is important to examine the combined vacancy rate among

---

[13] For Twenty-Ninth Round data in Figures 1 and 2, see ECF No. 7716 at 32 and sources cited therein. For Thirtieth Round data, see ECF No. 8177 (defendants' monthly mental health vacancy report for February 2024).

psychologists and clinical social workers.  During the monitoring round, across the 13

institutions reviewed in this Report, 35 percent of allocated PC positions (staff psychologist plus

clinical social worker) were functionally vacant.  A third or more allocated PC positions were

functionally vacant in nine of the 13 institutions reviewed in this report; more than half of

allocated PC positions were vacant in three institutions.

**Table 1**

|  | Combined Allocated PC | Combined Filled PC | Combined PC Functional Vacancy Rate |
|---|---|---|---|
| **ASP** | 25 | 16.13 | 35.5% |
| **CCI** | 19.5 | 12.6 | 35.4% |
| **CIM** | 35 | 31 | 11.4% |
| **CRC** | 24 | 21.38 | 10.9% |
| **CTF** | 15 | 12.5 | 16.7% |
| **FSP** | 8.5 | 9 | -5.9% |
| **HDSP** | 21 | 9.83 | 53.2% |
| **NKSP** | 44.5 | 20.08 | 54.9% |
| **PBSP** | 18 | 12.02 | 33.2% |
| **PVSP** | 12.5 | 8 | 36.0% |
| **SCC** | 5.5 | 3 | 45.5% |
| **CSP/Sol** | 17 | 8.29 | 51.2% |
| **WSP** | 60 | 34.44 | 42.6% |
| ***Total*** | *305.5* | *198.27* | *35.1%* |

**Figure 3**[14]



Consistent with the Special Master's findings regarding the 15 EOP institutions, the ongoing "staffing crisis impacted virtually all institutions discussed" in this Report.  ECF No. 8095 at 37.  For instance, while most of the 13 reviewed institutions had significant staffing limitations, at least four institutions operated under emergency triage plans[15] due to critically low mental health staffing, including the two male RC institutions (NKSP and WSP).  While the institutions' prioritization of patients in higher acuity and higher risk settings like MHCB and STRH resulted in improved quantitative compliance for required minimum contacts in those

---

[14] The data from Table 1 and Figure 3 were taken from defendants' monthly mental health staffing vacancy report for the month of February 2024, ECF No. 8177, and include allocated and filled tele-mental health providers in the vacancy rate calculation.  See related discussion *infra* pp. 37-39.

[15] As the Special Master reported in the Thirtieth Round Monitoring Report – Part C, defendants have "responded to severe staffing shortages by instituting staffing triage plans whereby limited staffing resources were directed to only the most urgent critical patient needs."  ECF No. 8095 at 35-36.  Moreover, "[w]hile the specific mental health program modifications varied across institutions according to the severity of their respective mental health staffing crises, these triage plans, unilaterally imposed by defendants, all shared at least one commonality: they all called for and authorized institutions to provide *less* than the minimum level of services mandated by the Program Guide."  *Id.* at 13.

settings, this redirection of limited staff resources had profoundly negative impacts on access to required and clinically indicated mental health services for patients in the male RCs and ML 3CMS programs. *See infra* Part II(D).

At the reviewed institutions, the mental health staffing crisis interfered with the delivery of adequate mental health care in a variety of ways. For instance, clinical contacts and IDTTs in the ML 3CMS and RC programs were frequently completed outside of Program Guide mandated minimum timeframes. *See infra* Part II(D) (reporting 11 of 13 institutions were noncompliant with timely primary clinician initial assessments; 8 of 13 institutions were noncompliant with timely routine primary clinician contacts). In addition, institutions' responses to urgent and routine mental health referrals were noncompliant, which staff attributed to high vacancy rates. *See infra* Part II(H) (reporting timely response to 81 percent of urgent referrals 75 percent of routine referrals).

Within CDCR's two male RCs, staffing affected timeliness of mental health assessments for determining MHSDS inclusion and appropriate program placement and transfers of identified class members to appropriate institutions within Program Guide required timeframes. *See infra* Part II(L). At NKSP's reception center, 69 percent of the initial mental health assessments were overdue. *See infra* Part II(D). Staffing shortages also interfered with defendants' full implementation of the court-ordered CMHPP, s*ee infra* Part II(G), and a lack of pre-release groups for 3CMS patients in most institutions. *See infra* Part II(I).

Finally, the monitor's expert's reviews of individual patient records raised serious concerns regarding mental health service quality, as only 37 percent of reviewed patients received adequate care. *See infra* Part II(C).

B.     **EOP Population Growth: New EOP Bed Activations**

In his Thirtieth Round Monitoring Report – Part C, the Special Master reported on the

dramatic growth in the EOP population in recent years, ECF No. 8095 at 41-45, noting that this

portion of the plaintiff class had grown 41 percent since the time of the Three-Judge Court

population reduction proceedings.  *Id.* at 43.  The Special Master noted, "the growth in the EOP

population in particular continues to 'raise[] a question about whether defendants will ever be

able to hire sufficient staff to meet their constitutional obligations to members of the plaintiff

class.'"  *Id.* at 44 (quoting ECF No. 5711 at 28).  The Special Master also reported on

preliminary discussions in August-September 2023 within an internal CDCR workgroup aimed

at "provid[ing] proposals to mental health leadership regarding which institutions would be

suited to add EOP patients to their mission."  *Id.* at 44 n. 33.

Since that time, defendants have moved forward with activating new EOP housing units

in several institutions.  In an October 26, 2023 letter to the Special Master and plaintiffs'

counsel, CDCR announced the planned activation of 650 new EOP beds across seven housing

units in six institutions, with projected activation dates ranging from November 1, 2023 to

January 1, 2024.  *See* Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to

Special Master Lopes and plaintiffs' counsel (October 26, 2023), attached hereto as Exhibit C.[16]

The October 26, 2023 letter indicated that 250 of the new EOP beds would be Level II; the

remaining 400 would be Level IV beds.  *Id.*

On March 7, 2024, CDCR sent a follow-up letter indicating the new EOP housing units

had been activated, with updated activation dates as depicted in the table below:

---

[16] The Special Master and parties discussed these proposed mission changes during a BRMR meeting on October 31, 2023.

**Table 2: Newly Activated EOP Housing Units[17]**

| Institution | Bed Type | Housing Unit | Number of Beds | Date |
|---|---|---|---|---|
| KVSP | EOP IV | C6 | 80 | Nov. 1, 2023 |
| CCI | EOP IV | A7 | 80 | Dec. 18, 2023 |
| HDSP | EOP IV | D1 | 80 | Jan. 29, 2024 |
| HDSP | EOP IV | D2 | 80 | Jan. 29, 2024 |
| PBSP | EOP IV | B3 | 80 | Jan. 22, 2024 |
| CIM | EOP II | C-Alpine | 150 | Feb. 12, 2024 |
| SQ | EOP II | B H3 | 100 | Feb. 5, 2024 |

Letter from Sundeep Thind, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (March 7, 2024), attached hereto as Exhibit D.

Notably, the four institutions with newly activated EOP units covered in this Report[18] struggled to maintain adequate levels of staffing either prior or subsequent to the activation of these new housing units, as depicted in the tables below.[19]

---

[17] Since the Special Master distributed the Draft Report to the parties, CDCR announced mission changes resulting in an additional net increase of 140 EOP beds. Specifically, CDCR plans to add 100 level II EOP beds at PVSP and 40 level II EOP beds at CRC. *See* Letter from Sundeep Thind, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and Plaintiffs' Counsel (June 5, 2024), attached hereto as Exhibit E; *see also* Letter from Sundeep Thind, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and Plaintiffs' Counsel (June 21, 2024), attached hereto as Exhibit F.

[18] These four institutions – CCI, CIM, HDSP, and PBSP – have not operated EOP units in recent years. Thus, in the next monitoring round, the Special Master's findings regarding these four institutions will be included in the installment of his monitoring round report covering CDCR institutions with EOP programs.

[19] Functional vacancy rate data in these figures were taken from defendants' monthly mental health staffing vacancy reports for the months of September 2023 and February 2024. *See* ECF Nos. 8043 (September 2023) and 8177 (February 2024).

**Table 3:  Institutions with Newly Activated EOP Units: Psychiatry Functional Vacancy Rates**[20]

| Institution | Psychiatry – Sept 2023 | Psychiatry – Feb 2024 |
|:---:|:---:|:---:|
| CCI | 0% | 0% |
| HDSP | 6% | 37% |
| PBSP | 0% | 8% |
| CIM | 0% | 34% |

**Table 4:  Institutions with Newly Activated EOP Units: Psychology Functional Vacancy Rates**[21]

| Institution | Psychology – Sept 2023 | Psychology – Feb 2024 |
|:---:|:---:|:---:|
| CCI | 40% | 34% |
| HDSP | 50% | 67% |
| PBSP | 24% | 38% |
| CIM | 0% | 21% |

**Table 5: Institutions with Newly Activated EOP Units: Social Worker Functional Vacancy Rates**

| Institution | Social Worker – Sept 2023 | Social Worker – Feb 2024 |
|:---:|:---:|:---:|
| CCI | 52% | 37% |
| HDSP | 17% | 29% |
| PBSP | 14% | 20% |
| CIM | 0% | 0% |

---

[20] Functional vacancy rates included in Table 3 reflect the combined psychiatry functional vacancy rate, including civil service and registry psychiatrists, telepsychiatrists, and PNPs.

[21] Functional vacancy rates included in Tables 4 and 5 reflect the combined staff psychologist and clinical social worker functional vacancy rates, including civil service, registry, and tele-mental health positions for these classifications.

**Table 6: Institutions with Newly Activated EOP Units: Medical Assistant Functional Vacancy Rates**

| Institution | MAs – Sept 2023 | MAs – Feb 2024 |
|:---:|:---:|:---:|
| CCI | 0% | 33% |
| HDSP | 77% | 73% |
| PBSP | 50% | 75% |
| CIM | 100% | 50% |

At the time of the monitoring tours of the four institutions with newly activated EOP units covered in this Report, defendants had made limited progress filling newly allocated staff positions to support the new EOP activations. *See* Appendix A-3 at 3; *see also* Appendix A-5 at 1 n.3. More recent staffing data, *see supra* Tables 3-6 and sources cited, indicates significant functional vacancies among mental health staff continue to exist in these institutions. Notably, during the HDSP monitoring tour, "[l]eadership and staff noted concerns [about the EOP activation] given their limited staffing and frequent incidents of violence on the same yard proposed to house EOP patients." Appendix A-2 at 1 n.1.

While the Special Master appreciates CDCR's recognition of the need for additional beds for the growing EOP population, he has reservations about introducing this more intensive mental health program to already understaffed and, in some cases, geographically remote, institutions (i.e., HDSP and PBSP).[22] It is imperative that defendants ensure sufficient staff and

---

[22] Relatedly, shortly after the new EOP units were activated at PBSP and HDSP, CDCR provided notice to the Special Master and plaintiffs that these institutions were unable to assign at least 1.0 PY on-site psychiatry coverage to the new EOP programs and, thus, telepsychiatry was in use. *See* Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs to Special Master Lopes and plaintiffs' counsel (February 16, 2024), attached hereto as Exhibit G (providing notice of telepsychiatry use at PBSP B yard); *see also* Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (March 6, 2024), attached hereto as Exhibit H (providing notice of telepsychiatry use at HDSP D Yard).

space to provide adequate quality mental health care to patients residing in these newly activated programs.[23]

To begin assessing the roll-out of these new EOP units, the Special Master will begin the next monitoring round with a series of focused monitoring tours of each of the new programs. The first of these focused EOP tours is scheduled to occur from May 29-31, 2024 at PBSP.

The Special Master notified the parties of the first of these focused EOP site visits at PBSP via email on April 25, 2024.  *See* Email from Deputy Special Master Williams to parties (April 25, 2024), attached hereto as Exhibit I.  Attached to the email notice was a truncated version of the document request the Special Master has historically sent to defendants in advance of each monitoring tour, totaling less than three pages.  *See* "Focused EOP Review Document Request," appended to Deputy Special Master Williams' April 25, 2024 email (Exhibit I), and attached hereto as Exhibit J.  This streamlined document request asked for information regarding patient census, patient arrival dates, housing, mental health staffing and patient caseloads, initial and routine clinical contacts and IDTTs, lists and schedules of group treatment activities, transfers to higher levels of care, medication management, and transfers to RHU.  All of these

---

[23] Since the Special Master's distribution of the Draft Report to the parties, he has concluded his focused EOP monitoring tours of new EOP housing units at the following institutions:  PBSP (May 29-31, 2024); CIM (Jul 9-11, 2024); HDSP (July 9-11, 2024); KVSP (July 15-17, 2024); CCI (July 23-25, 2024); SQ (July 30-August 1, 2024).

The Special Master will include findings from these focused monitoring tours in the 31st Round Monitoring Report but notes here his ongoing, profound concern with CDCR's continued operation of HDSP's EOP.  Based on the monitoring team's preliminary findings, as communicated to the parties during the July 11, 2024 exit meeting following the focused tour at HDSP, this program was ill-conceived from the start and defendants have failed to adequately staff the program, putting patients at risk.  The Special Master notes that CDCR closed HDSP's EOP to intake as of July 15, 2024.  *See* Email from Melissa Bentz, Esq, CDCR Office of Legal Affairs, to Special Master Lopes and Plaintiffs' Counsel (July 18, 2024), attached hereto as Exhibit K.

requests were specific only to the newly opened EOP housing units and applied to a shorter-than-typical review period (three months as opposed to six months) given the fact that these programs were just recently activated. Except for minor changes in nomenclature, in the focused areas where information was requested, the scope and content of the requests were identical to the information that the Special Master has *for decades* requested in preparation of his tours and has been routinely provided by defendants in response.

As has been the case with all previous document requests, the subject matter covered in the truncated document request is essential to the Special Master's ability to evaluate these programs so that he can fulfill his duties to "… monitor defendants' implementation of and compliance with any remedial plan [the] court may order", "…make interim reports to the court on the progress of the remedial plan", "…prepare and file with the court periodic reports assessing defendants' compliance with such remedial plan as the court may order", and to fulfill his responsibility "…to provide expert advice to defendants" regarding the provision of mental health care to class members…" *See* Order of Reference, ECF No. 640 at 4.

Further, the request is squarely within the Special Master's authority under the Order of Reference in this matter which orders, in relevant part, that the powers of the Special Master are:

A. To enter, at any reasonable time, with or without advance notice, any part of any facility at any California Department of Correction [and Rehabilitation] institution…

B. To interview, on a confidential basis or otherwise, correctional staff, employees, and appointees of the CDC[R] for the purpose of performing his duties under this Order of Reference. Defendants shall provide suitable facilities and arrange for such interviews to be conducted under conditions satisfactory to the special master. In addition, the special master may engage in informal conferences with CDC[R] staff, employees, and appointees, and such persons shall cooperate with the special master and respond to inquiries and requests related to the performance of his duties, including requests for the compilation or communication of oral or written information.

C.  To interview, confidentially or otherwise, inmates housed at any CDC[R] institution…as may be necessary to perform his duties under the Order of Reference. …

D.  To attend formal institutional meetings and proceedings at CDC[R] headquarters or at any CDC[R] institution … as may be necessary to perform his duties under this Order of Reference.

E.  To have unlimited access to the records, files, and papers maintained by defendants to the extent that such access is related to the performance of the special master's duties under this Order of Reference.  Such access includes all departmental, institutional, and inmate records, including but not limited to central files, medical records, and mental health records.  The special master may obtain copies of all such relevant records, files, and papers.

Order of Reference, ECF No. 640 at 5-6.

In short, nothing in the truncated document request was out of keeping with the Special Master's well-established practices. As such, the Special Master had no expectation that it would elicit anything other than the routine production of the required information as it has in the past.

Unfortunately, the anticipation that this request would be handled in the customary manner was mistaken. In response to the Special Master's less-than-three-page document request, CDCR's Office of Legal Affairs replied with a 12-page letter outlining myriad demands, questions, concerns, and "*objections*."[24]  *See* Letter from Melissa Bentz, CDCR Office of Legal Affairs, to Deputy Special Master Williams (May 1, 2024), attached hereto as Exhibit L (emphasis added). Citing no authority, counsel's correspondence indicates that defendants will object to any and all requests for information from the Special Master which fall "outside of the scope of the provisionally approved key indicators" going forward.  Exhibit L at 4.

---

[24] The letter uses the word "object" or "objection" on no less than ten occasions.

During a regularly scheduled meeting between the Special Master's team and defendants on May 2, 2024, defense counsel acknowledged the Special Master's entitlement to the requested information under the Order of Reference and explained that these were "standing objections" going forward. During a subsequent exchange of emails, the Special Master requested that "…CDCR send whatever data and information they are able to produce in response to the document request. Once we receive the documents, we will be able to assess what has been produced and where the production may be lacking, if at all." Email from Deputy Special Master Kerry Walsh to Melissa Bentz, CDCR Office of Legal Affairs (May 3, 2024), attached hereto as Exhibit M.[25]

Defendants' "objections" to the document request for the focused EOP tour suggest that their aggressive litigation tactics may have crossed the line into resistance to (and the impeding of) the Special Master's performance of his basic, court-ordered duties.

In this context, the reasons giving rise to the need for data remediation, the purpose of data remediation, and the role of the Special Master in this process bear mentioning. As the court summarized:

> Since 2020, defendants have been working *under the Special Master's supervision* and with plaintiffs' participation to remediate data about mental health care to the plaintiff class. The main purpose of this remedial work is *to ensure defendants' reports are transparent and accurate.* This remedial work became necessary after the court learned defendants had *knowingly presented misleading data to the court and Special Master.*

May 23, 2023 Order, ECF No. 7847 at 1. (Emphasis added)

---

[25] Ultimately, Defendants' standing objections did not result in the withholding of documents or information from the Special Master that he is otherwise entitled to under the Order of Reference with respect to the recently concluded focused EOP monitoring tours.

Lamentably, contrary to the purpose of transparency, it appears that the data remediation process is being weaponized as a means to hinder the Special Master's access to needed information.

Were this an isolated incident devoid of history and context, it could be viewed as mere posturing or a momentary lapse in judgment unworthy of treatment in the Special Master's report to the Court. It is not uncommon for court-annexed monitoring to involve an element of tension. Where this reflects periodic, good-faith differences in perspectives, the Special Master and his predecessor have always taken them in stride and worked with the parties to resolve them productively.

The current situation appears to be no routine matter of differing perspectives.  The recent series of events described above, instead, harkens back to Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master (ECF No. 4312) and to their Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master (ECF No. 4314) filed just after their motion for termination.  In those filings, as noted by plaintiffs, defendants made "…inappropriate personal attacks against the Special Master….[that were] an affront to the dignity and decorum of this Court…" ECF 4323 at 4. The Court, in its Order to Show Cause issued February 13, 2013, noted that it "…can only be dismayed by the cavalier manner in which defendants, signed by their attorney of record, level a smear against the character and reputation of the Special Master, without any apparent regard for whether the attack is consistent with defense counsel's obligations under Rule 11…" ECF No. 4335 at 2. The Order to Show Cause provided defendants with two options:

> 1.      Within five days from the date of this order defendants shall show cause in writing, if any they have, why plaintiffs' motion [to strike the portion of their

28

objections making an unsupported attack on the integrity of the Special Master]
should not be granted; and

2.    In the alternative, defendants may moot plaintiffs' motion by refiling within
five days their objections omitting the material [plaintiffs requested be stricken
from the record] together with a request to the Clerk of the Court to remove
documents 4312 and 4313 from the record in this action.

*Id.*

Ultimately, "[i]n order to focus resources on Defendants' termination motion, the

State…mooted this issue by refiling its objections without the offending language…" ECF No.

4349 at 2.

More recently, this resistance to the court-ordered duties of the Special Master and his

role as an "arm of the court" has permeated data remediation, a process born out of the

defendants' presentation of misleading data to the court.  In this process, which is to take place

under the guidance and supervision of the Special Master, defendants set deadlines for the

Special Master's team and plaintiffs while eschewing requests for estimates of when the other

stakeholders might expect them to complete a task. Documents are "released" for stakeholder

review noting, for example "The following item(s) are now open for stakeholder review. Access

to these items will be removed **on Monday, April 15th, 2024 at 2pm.**" *See* Email from Sundeep

Thind, CDCR Office of Legal Affairs, to Special Master and plaintiffs' counsel (April 8, 2024),

attached hereto as Exhibit N.

In its most recent permutation, in an email dated May 9, 2024, after noting delay in

receiving a response from the Special Master's team, counsel for defendants stated "[p]lease let

us know if there are any further concerns with [the] indicators by May 15. If we do not hear

anything by that date, CDCR/CCHCS will move these items forward to the next step in data

remediation".  *See* Email from Melissa Bentz, CDCR Office of Legal Affairs to Deputy Special

Master Kerry Walsh (May 9, 2024), attached hereto as Exhibit O.

29

In this contorted landscape, defendants "object" to the Special Master's document requests made in preparation for his on-site inspections, defendants set deadlines for the Special Master (and plaintiffs) to adhere to and require that the Special Master (and plaintiffs) request "extensions" of time to review and comment on documents fundamental to data remediation.

As recently as the April 26, 2024 status conference, the court felt compelled to strike a footnote defendants added to a joint filing concerning the personality disorder treatment program (*see* ECF No. 8209, footnote 3) noting that it was but one facet of defendants' corrosive approach and was unprofessional. *See* April 26, 2024 Transcript of Proceedings, ECF No. 8244 at 18; *see also* May 20, 2024 Order, ECF No. 8242 at 7 ("Given the potential for constructive collaboration and agreement represented by this effort, the improper arguments of defense counsel in their portion of the Joint Statement are extremely disappointing and far below the high level of dignity and professionalism called for by this important long running case.").

There appears to be a through-line from the ultimately stricken comments made in defendants' objections to the Special Master's Twenty-Fifth Round Monitoring Report, the stricken footnote contained in the recent joint filing, and the issues briefly outlined above concerning defendants' response to the Special Master's document request and their comportment during data remediation: apparently, there is the mistaken belief that the Special Master is yet another litigant in this matter, not the neutral arm of the court that he is, and that it is acceptable to utilize aggressive tactics to thwart his ability to efficiently fulfil his duties to the court under the Order of Reference.

Taken together, defendants' pattern of behavior comes dangerously close to the obstruction of the Special Master's performance of his court-ordered responsibilities. The

Special Master does not make this statement lightly. Never before has he thought it necessary to bring such a concern to the Court's attention but effective and efficient monitoring of the mental health care provided to the 34,000 people with serious mental illness currently incarcerated by the state of California, the provision of a complete and accurate factual record to the court, and the alleviation of suffering among the *Coleman* class all demand an abrupt change in course.

**C.    Update on Special Master's Monitoring of Defendants' Heat Plan Implementation**

Developing plans to monitor incarcerated persons on psychotropic medications for risks related to heat exposure is a foundational remedial requirement in this action and the Special Master has monitored defendants' heat plans throughout the mastership. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1309-11 (E.D. Cal., Sept. 13, 1995) ("Plaintiffs originally sought a preliminary injunction in this action on August 1, 1991, following the heat and medication related deaths of three inmates on psychotropic medication.").

During the recently concluded Focused EOP reviews, the Special Master's team identified several concerning practices and policy violations related to defendants' heat plan implementation. As a result of these preliminary findings and due to the excessive heat impacting the State of California as of the time of this writing, on July 23, 2024, the Special Master notified the parties of his intent to conduct monitoring tours of seven institutions focused on heat plan implementation. *See* Email from Deputy Special Master Williams to *Coleman* Parties (July 23, 2024), attached hereto as Exhibit P. As of the time of this writing, the Special Master's focused heat plan tours are scheduled as follows:

- SATF –August 19-20, 2024

- CSP/Corcoran—August 20-21, 2024

- CCWF—August 21-22, 2024

- CIW – August 26-27, 2024

- CSP/Sac – August 26-27, 2024

- CSP/LAC--August 27-28, 2024

- MCSP—August 27-28, 2024

*Id.*

## II.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A.    Mental Health Vacancy Rates Overall and by Disciplines During the Thirtieth Monitoring Round[26]

During the Thirtieth Monitoring Round, the 13 3CMS institutions continued to report high staffing vacancy rates.  With the exception of psychiatry staff, where the use of registry staff reduced the functional vacancy rate to less than ten percent, the overall vacancy rates for all disciplines exceeded ten percent.

Overall, vacancy rates for the chief psychiatrist and staff psychiatrist positions were concerning at 38 and 51 percent, respectively.  However, as stated above, the use of registry staff reduced the staff psychiatrist functional vacancy rate to zero, although the on-site staff psychiatry positions allocated at HDSP and SCC remained vacant.  Of the seven institutions utilizing telepsychiatry, just two had vacancy rates of less than ten percent, while the overall telepsychiatry vacancy rate was 22 percent.

The institutions reported overall chief psychologist and senior psychologist vacancy rates of 38 and 22 percent, respectively.  The staff psychologist vacancy rate increased from 40 to 45

---

[26] All data (except for psych techs) reflects Defendants' February 2024 Monthly Mental Health Staffing Vacancy Reports (ECF No. 8177).  Because psych tech staffing data was not included in the monthly report, the reported psych tech staffing data was obtained from the individual institutional reports for the Thirtieth Monitoring Round.  Regarding staffing vacancy data reported in the individual institutional summaries (Appendices A1-A13), see *supra* note 12.

percent since the Twenty-Ninth Monitoring Round.  The use of registry staff reduced the staff psychology functional vacancy rate to 40 percent.

Additionally, the institutions reported an overall functional vacancy rate of 23 percent for social workers, 35 percent for recreation therapists, and 38 percent for medical assistants.  The institutions reported an overall vacancy rate of 11 percent for psych techs.

Chief Psychiatrists

At the 13 institutions, eight chief psychiatrist positions were filled, reflecting a 38 percent vacancy rate.  Chief psychiatry positions were vacant at ASP, CCI, CIM, NKSP, and PBSP. These positions were also vacant at ASP, CCI, NKSP, and PBSP during the Twenty-Ninth Monitoring Round.  No positions were filled by registry staff.

Senior Psychiatrists

There was one senior psychiatrist position allocated at WSP; however, the position was vacant.  No other institution had an allocated senior psychiatrist position.

Staff Psychiatrists

The 13 institutions reported a total of 47.5 on-site staff psychiatry positions; 23.5 were filled for a 51 percent vacancy rate.  The use of 25.44 registry staff reduced the functional vacancy rate to zero.

CSP/Solano reported a zero percent vacancy rate among on-site psychiatry positions, while CRC and FSP had more on-site staff psychiatrists than allocated.  Five institutions – CIM, CTF, PBSP, PVSP, and WSP, reported vacancy rates above 50 percent, while CCI reported a vacancy rate of 20 percent.  Four institutions – ASP, HDSP, NKSP, and SCC did not fill any on-site psychiatry staff positions with civil servants.  However, the use of 25.44 registry staff

eliminated the functional vacancy rates at ASP, CCI, CTF, NKSP, PVSP, and WSP and lowered

the functional vacancy rate at CIM to 30 percent.

<u>Telepsychiatrists</u>

It is well-documented that the Special Master has long supported telepsychiatry as a tool

to help address CDCR's staffing crisis.  "For years, the Special Master and his expert have

recognized that, when utilized within reasonable parameters, telepsychiatry can be an effective

means of delivering psychiatric care to many *Coleman* class members."  Special Master's Report

and Recommendation on a Final Proposed Telepsychiatry Policy, ECF No. 7682 at 5.  *See also*

Special Master's Thirtieth Round Monitoring Report – Part C: Special Master's Monitoring

Report pertaining to Defendants' Compliance with Enhanced Outpatient Programs (EOP)

Provisionally Approved Plans, Policies, and Protocols, ECF No. 8095 at 48  ("…the

Telepsychiatry Policy, inclusive of the aforementioned safeguards, has had a positive impact on

defendants' psychiatry staffing levels…") and Special Master's Report and Proposed Telemental

Health Policy, ECF No. 8165 at 2  ("[the use of telepsychiatry] in accordance with the policy

recommended by the Special Master and approved by the Court has been successful overall in

reducing vacancies among staff psychiatry positions.")   Likewise, the Court has permitted

CDCR's use of telepsychiatry with the inclusion of some minimal, basic safeguards.  October 10,

2017 Order, ECF No. 5711, at 20-23; July 3, 2018 Order, ECF No. 5850, at 4-7; April 12, 2023

Order, ECF 7807.

The court-approved Telepsychiatry Policy permits unrestricted use of telepsychiatry for

3CMS patients.  *See* ECF No. 8095 at 48.  ("[T]he Telepsychiatry Policy…allows defendants to

utilize telepsychiatry without limitation for 3CMS patients, who comprise the vast majority of

the *Coleman* class."  However, as observed during this current review of 3CMS programs and

documented in the Special Master's Thirtieth Round Monitoring Report – Part C and the Special

Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy, CDCR is not

utilizing telepsychiatry to its full extent as provided for in the policy.  *See* ECF No. 7682 at 41

("[T]he findings… indicated variability in CDCR's implementation of the Provisionally

Approved Telepsychiatry Policy."  *See also* ECF No. 8095 at 45-46 (quoting ECF No. 7682 at

41).  ("During the monitoring round, the use of telepsychiatry varied across institutions and,

consistent with what the Special Master reported in his December 15, 2022 Report and

Recommendation on a Final Proposed Telepsychiatry Policy, there remained 'variability in

CDCR's implementation of the' Telepsychiatry Policy.").[27]

---

[27] Relatedly, in multiple filings since the distribution of the Draft Report, defendants have called the Special Master's experts' telemental health experience into question.  *See* ECF No. 8253 at 17 and ECF No. 8343 at 13. In addition to being baseless, defendants' contentions diminish the Special Master's experts' vast experience with all aspects of mental health services, including both on-site and remote delivery of services in correctional settings.  Furthermore, defendants' argument misses the wider context: telemental health is not a modality of treatment per se; instead, it is a means of making a provider accessible to the incarcerated person in order to deliver mental health treatment. Seen in this light, the Special Master's experts' vast experience with mental health treatment within correctional institutions is precisely what is needed to understand how telemental health services fits into the delivery system and may impact the overall provision of mental health treatment to incarcerated people and the treatment milieu. To clarify the record going forward, the Special Master notes that his experts' collective experience spanning decades developing, providing, supervising, monitoring, auditing, and researching telepsychiatry and telemental health program in jurisdictions across the country includes but is not limited to the following:

- Providing direct care to patients via telemental health/telepsychiatry in multiple jurisdictions;
- Facilitating implementation of telepsychiatry in rural community health clinics;
- Serving as member of American Psychiatric Association work group that authored the resource document entitled "Resource Document on Telepsychiatry in Jails and Prisons" (2023);
- Participating in the development of a research study of the use of telepsychiatry services within a large midwestern department of corrections, surveying both patients and providers regarding satisfaction with this delivery modality;

The Thirtieth Monitoring Round review revealed that, in contrast to the preceding monitoring round when there were more telepsychiatrists than allocated positions,[28] CDCR had difficulty filling telepsychiatry positions at some institutions.  During the review period, seven institutions—CCI, CIM, HDSP, NKSP, PBSP, PVSP, and WSP—were allocated a total of 18.5 telepsychiatrist positions, an increase of two positions since the preceding monitoring round. However, of those, 14.42 positions were filled, resulting in a 22 percent overall vacancy rate. While PBSP and PVSP reported no telepsychiatry vacancies, CIM and CCI reported vacancy rates at 50 and 89 percent, respectively.  This is a stark change from the preceding review period, when CIM reported no telepsychiatry vacancies and CCI had more telepsychiatrists than allocated.  HDSP, NKSP, and WSP reported vacancy rates between 20 and 25 percent, whereas during the preceding review period, HDSP's vacancy rate was at eight percent, NKSP had more

---

- Providing input into the 2017 updated to the "Use of Telemedicine Technology in Correctional Facilities" position statement published by the National Commission of Correctional Health Care that same year;
- Participating in task force that oversaw conversion of a large nonprofit multistate behavioral health agency's onsite mental health programming to telemental health during the COVID-19 pandemic;
- Assisting with development of all policies and procedures related to the delivery of telepsychiatry and telemental health in custodial settings, ensuring adherence to national standards, and developing related training for telehealth staff;
- Overseeing behavioral health services across the country as part of leadership team for private correctional healthcare company.  At that time, the company was providing telepsychiatry and telemental health services in five state correctional systems and offering an average of 3,300 contacts monthly.  By 2018, the company expanded to provide telepsychiatry and telemental health services in 12 correctional and justice settings across the country, offering an average of 7,500 contacts monthly;
- Organizing, developing, and instituting a comprehensive tele-health system for court clinics, spearheading the implementation of this system, which became especially crucial during the COVID-19 pandemic. This work involved coordinating with court personnel, setting up the necessary hardware in courthouse lockups, and ensuring that social workers and psychologists could conduct forensic evaluations remotely with minimal disruption.

[28] During the Twenty-Ninth Monitoring Round, 17.25 telepsychiatrists covered 16.5 allocated telepsychiatry positions.  *See* ECF No. 7716 at 35.

telepsychiatrists than allocated, and WSP reported no telepsychiatry vacancies.  No registry staff provided coverage.

While the Special Master and the Court support the use of telepsychiatry and acknowledge that it has been helpful in reducing psychiatry vacancies, if CDCR is unable to fill and maintain a low vacancy rate for all of the allocated positions in the 3CMS programs where they are permitted by the court-approved policy to use it freely, it is clearly not a panacea but only one aspect of what needs to be a larger more comprehensive strategy to reduce psychiatry vacancies.

Combined Staff Psychiatry Vacancies

Accounting for on-site psychiatry (civil service and registry), telepsychiatry, and psychiatric nurse practitioners, seven institutions (ASP, CCI, CRC, CTF, FSP, PVSP and SCC) had more combined staff psychiatry positions filled than authorized and CSP/Solano filled all staff psychiatry positions.  Three institutions (NKSP, PBSP, and WSP) had combined staff psychiatry vacancy rates less than ten percent.  Finally, combined staff psychiatry vacancy rates exceeded ten percent at two institutions (CIM and HDSP).

Chief Psychologists

All 13 institutions reported having two allocated chief psychologist positions for a total of 26 positions.  Sixteen chief psychologist positions were filled, resulting in a 38 percent overall vacancy rate.  Three institutions – ASP, CIM, and FSP, reported no chief psychology vacancies. The ten remaining institutions – CCI, CRC, CTF, HSDP, NKSP, PBSP, PVSP, SCC, CSP/Solano, and WSP, each filled one chief psychologist position for a 50 percent vacancy rate. Registry staff did not fill any positions.

<u>Senior Psychologists</u>

At the 13 institutions, 37 of 47.5 authorized senior psychologist specialist and supervisor positions were filled, for a 22 percent overall vacancy rate. Six institutions – ASP, CCI, CRC, CTF, SCC, and CSP/Solano, reported no senior psychologist vacancies. Five other institutions – FSP, HDSP, PBSP, PVSP, and WSP, reported vacancy rates between 20 and 33 percent. Concerningly, CIM and NKSP reported senior psychologist vacancy rates of 45 and 75 percent, respectively. No registry staff provided additional coverage.

<u>Staff Psychologists</u>

There were 173 allocated staff psychologist positions, of which 94.5 were filled for a 45 percent overall vacancy rate. The use of 9.96 registry staff reduced the overall functional vacancy rate to 40 percent.

Only two institutions – CRC and FSP, had vacancy rates below ten percent and reported no staff psychologist vacancies. CTF reported a functional vacancy rate of 13 percent. Four institutions – CCI, CIM, PBSP, and PVSP reported staff psychology functional vacancy rates between 20 and 35 percent. Three other institutions—ASP, SCC, and WSP—reported functional vacancy rates of 42, 43, and 45 percent, respectively. Staff psychology functional vacancy rates exceeded 50 percent at three institutions as follows: HDSP at 57 percent, NKSP at 73 percent, and CSP/Solano at 58 percent.

<u>Tele-Psychologists</u>

Four institutions – HDSP, NKSP, PBSP, and WSP, reported 11 allocated tele-psychology positions; however, none were filled. Including the vacant tele-psychology positions in the functional vacancy rate calculation resulted in higher functional vacancy rates at four institutions: HDSP (increased from 57 to 67 percent functional vacancy rate); NKSP (increased

from 73 to 76 percent functional vacancy rate; PBSP (increased from 27 to 38 percent functional vacancy rate); and WSP (increased from 45 percent to 49 percent functional vacancy rate). The remaining nine institutions did not have any allocated tele-psychologist positions.

Social Workers

For social workers, 89 of 119.5 allocated positions were filled for a 26 percent overall vacancy rate. The use of 2.96 registry staff reduced the overall functional vacancy rate to 23 percent.

CIM had more social workers than allocated positions, while FSP reportedly filled all social worker positions. Including the use of registry staff, NKSP's functional vacancy rate was compliant at ten percent. The remaining ten institutions reported functional vacancy rates that exceeded ten percent. Specifically, CCI, CRC, and CTF, reported functional vacancy rates between 17 and 20 percent. Four institutions – ASP, HDSP, PBSP, and WSP reported functional vacancy rates between 26 and 35 percent. CSP/Solano's functional vacancy rate was 43 percent. The social worker functional vacancy rate was equaled or exceeded 50 percent at two institutions: PVSP (78 percent) and SCC (50 percent).

Tele-Social Workers

CCI was allocated two tele-social worker positions; both positions were vacant. Three 3CMS institutions (HDSP, PBSP, and PVSP) filled a total of 1.85 tele-social worker positions. If allocated and filled tele-social worker positions are included in the functional vacancy rate calculation, four institutions require adjustments, as follows: CCI (revise upward from 17 percent to 38 percent); HDSP (revise downward from 33 percent to 29 percent); PBSP (revise downward from 30 percent to 20 percent); and PVSP (revise downward from 78 percent to 56 percent).

Psych Techs

The 11 institutions that reported psych tech positions indicated a total of 116.7 positions, of which 103.8 were filled for an 11 percent vacancy rate.[29] Five institutions – CIM, CTF, PVSP, SCC, and CSP/Solano reported no psych tech vacancies. Two institutions – NKSP and WSP reported psych tech vacancies below ten percent. Four other institutions – CCI, FSP, HDSP, and PBSP, reported psych tech vacancies between 14 and 56 percent. No registry staff provided additional coverage.

Recreation Therapists

For the twelve institutions with recreation therapists, there were 33.5 allocated positions, of which 20 were filled, reflecting a 40 percent overall vacancy rate. Registry staff provided 1.84 recreation therapist positions at CCI, reducing the functional vacancy rate to 35 percent across the 12 institutions. Notably, five institutions – ASP, CRC, FSP, PVSP, and SCC each had a recreation therapist fill an unallocated position. For the remaining seven institutions, HDSP, NKSP, and CSP/Solano reported vacancy rates between 25 and 50 percent, while CCI, CIM, PBSP, and WSP reported concerning vacancy rates of 67, 60, 78, and 64 percent, respectively.

Medical Assistants

Of the seven institutions, namely CCI, CIM, HDSP, NKSP, PBSP, PVSP, and WSP, who allocated 32 medical assistant positions, 18 were filled for a 44 percent vacancy rate. Two institutions, HDSP and NKSP, used 0.88 and 0.90 registry staff, respectively, which reduced the overall functional vacancy rate across the seven institutions, to 38 percent. Both PVSP and WSP filled all allocated positions. The remaining five institutions – CCI, CIM, HDSP, NKSP, and PBSP, reported vacancy rates between 33 percent (CCI) and 86 percent (HDSP).

---

[29] *See supra* note 12.

**Summary – Staffing**

The 13 reviewed institutions continued to report unacceptably high vacancy rates during the Thirtieth Monitoring Round.  Even with the use of registry staff, functional vacancy rates exceeded 22 percent for all disciplines except for staff psychiatrists.  Yet, two institutions, including HDSP, which has recently begun treating 160 level IV EOP patients, *see* Letter from Sundeep Thind, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (March 7, 2024), attached hereto as Exhibit D, remain without an on-site psychiatrist, registry or otherwise.  Otherwise, including registry staff where applicable, the 13 institutions overall reported functional vacancy rates of 38 percent for chief psychiatrists, 22 percent for tele-psychiatrists, 38 percent for chief psychologists, 40 percent for staff psychologists, 23 percent for clinical social workers, 35 percent for recreation therapists, and 38 percent for medical assistants.

**B.    Quality Management**

During the Thirtieth Monitoring Round, quality management structures and processes remained in place at the 13 institutions with 3CMS programs.  Institutional quality management bodies continued to meet regularly and address relevant mental health program matters.  Several institutions utilized CAPs or other improvement plans as part of their quality management process.  While no institutions chartered QITs or FITs during the reporting period, two institutions reported conducting studies as part of their quality management efforts.  As reported during the preceding monitoring round, peer review remained limited.

Of the 13 institutions with 3CMS programs, six – CSP/Solano, HDSP, NKSP, PBSP, PVSP, and WSP – had local governing bodies.  All local governing bodies met regularly during the review period, with HDSP, NSKP, and WSP meeting monthly, while CSP/Solano, PBSP,

and PVSP met quarterly.  Quorums were consistently met.  A review of meeting minutes from each institution indicated discussion of relevant and appropriate topics.

During the review period, monthly quality management committee meetings were held at ASP, CIM, CRC, CSP/Solano, CTF, Folsom, HDSP, NKSP, PVSP, SCC, and WSP.  At PBSP, the quality management committee met twice monthly.  Quality management committee meetings were well attended, with quorums regularly achieved at ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom, HDSP, NKSP, PBSP, PVSP, and WSP.  Reviewed quality management committee meeting minutes were detailed and revealed comprehensive agendas, with mental health topics discussed as appropriate.

Mental health subcommittee meetings were scheduled monthly at all 13 of the reviewed institutions during the reporting period.  Meeting attendance was good overall.  Meeting minutes across institutions were sufficiently detailed and displayed varied mental health program updates and discussions.

Several institutions utilized CAPs and other improvement plans as part of their quality management process.  ASP had a CAP related to timely completion of SRASHEs that resulted in noted improvement, which was reported as sustained during the review period.  Two CAPs were initiated at CCI, one addressed why a patient's psychotropic medications had been renewed for a year without psychiatric contact, the other related to the completion of initial screens of non-MHSDS individuals within 72 hours of placement in the ASU.  CRC used CAPs to address issues related to RVR mental health assessments, assigned provider attendance during IDTTs, and TTA log documentation.  CRC also implemented a process improvement effort to ensure all urgent and emergent mental health referrals during the weekends were identified and timely resolved.  At CSP/Solano, three CAPs were initiated during the review period regarding low

42

compliance rates for safety planning, noncompliance with timely response to mental health referrals, and improving timely responses to SRASHEs.  CTF targeted a pattern of deficient ASU pre-screens for both a performance improvement work plan and a CAP.  Although the compliance rate improved over time, it proved difficult to sustain.  HDSP had active "green belt" projects focused on ASU prescreening, Q11 and Q30 checks, and supervisory checks of timely MHCB discharge follow-ups at the time of the site visit.  PBSP had a quality improvement project related to ASU prescreens and a performance improvement work plan on the completion of emergency medical response forms.  PVSP initiated a "green belt" project in response to a year-long pattern of poor patient attendance for treatment in STRH.

No institutions reported chartering QITs or FITs during the reporting period.

Two institutions reported the conduct of a study or audits as part of their quality management efforts during the reporting period.  At ASP, a 2021 study to better understand the increase in crisis intervention services continued throughout the reporting period.  The study revealed that the increase in crisis interventions appeared to be the result of newly transferred patients who were not appropriate for 3CMS placement but, instead, required a higher level of care.  No concerns related to the crisis intervention process at ASP were identified.  The audit process at HDSP involved the review of performance reports to identify problem areas and their causes.

A review of meeting minutes showed EMRRCs were meeting during the review period at CCI, CSP/Solano, Folsom, PBSP, and PVSP.  There were no reported problems with attendance, with the exception of PBSP where the absence of psychiatry was cause for concern.  There were no mental health-related topics discussed during EMRRC meetings at CSP/Solano or PVSP.  CCI's EMRRC reviewed emergency response delays and emergency drill results.  At Folsom,

agenda items included overdoses, suicide attempts, emergency medical devices, and emergency drills. PBSP's EMRRC also followed the standard statewide template.

As reported during the preceding monitoring round, peer review continued to be limited. Clinician peer review remained on hold per a headquarters directive at CIM, CRC, CSP/Solano, CTF, HDSP, NKSP, PBSP, and PVSP. During the reporting period, peer review was conducted for psychiatrists at CIM, CTF, NKSP, PVSP, and WSP. Peer review was conducted for MHCB psychologists and psychiatrists at CIM and PBSP. At CCI, in lieu of CDCR's formal peer review process there was an individualized peer review process for psychiatric providers to obtain accreditation with the NCCHC. Psychiatry peer review LOPs were reviewed for ASP, CIM, and CRC. At CSP/Solano, psychiatrists began development of a LOP during the review period.

CCI reported that information regarding quality management projects and findings were shared with staff during routine meetings. CIM also reported that quality management information was provided to line staff. Interviewed staff at CTF were unaware of quality management projects. It was unclear how quality management information was provided to line staff at Folsom, PBSP, or PVSP.

<u>**Summary – Quality Management**</u>

Quality management systems remained in place at the reviewed institutions with the required institutional committees functioning at all facilities. Most appeared to be functioning well. Institutions were utilizing CAPs and other improvement plans to address identified issues related to mental health treatment. In response to concerns raised during the preceding monitoring round, CRC implemented quality management interventions focused on quality, utility, and standardization. HDSP also reported the quality management process had undergone

improvements since the preceding monitoring round.  At PBSP, one noted area for improvement was the lack of psychiatry presence in QMC meetings, the concern being the review and approval of LOPs governing prescribing and monitoring psychiatric medications being performed without the presence of psychiatry representation.  At WSP, identified deficiencies in various areas included detailed information regarding origin with appropriate responses.  The clinician peer review process remained on hold per headquarters directive.

### C.    Overall Quality of Care

During the Thirtieth Monitoring Round, the adequacy of mental health care across 3CMS institutions was reviewed through detailed healthcare record reviews.  In addition to analyses of treatment planning, treatment delivery, and documentation, an overall assessment of the adequacy of mental health treatment was provided for each case reviewed.  A total of 283 patient records were reviewed across levels of care, including MHCB, STRH, and 3CMS, and within reception centers (RCs), the RC EOP level of care.  Of the records reviewed, 81 patients, or 29 percent, received adequate care.  An additional 25 patients, or nine percent, received care that was marginally or minimally adequate, meaning that the monitor's expert found concerns within the cases that bordered on inadequacy (e.g., absence of required IDTT meetings, failure to provide clinical contacts required by the Program Guide, little evidence of adequate clinical interventions beyond medications).  The majority of patients (177 cases, or 63 percent) received inadequate care.  The table and graph that follow illustrate the assessed quality of care at the institutions reviewed.[30]

---

[30] Percentages may not equal 100 percent due to rounding issues with data.

|  | ASP | CCI | CIM | CRC | CTF | FSP | HDSP | NKSP | PBSP | PVSP | SCC | SOL | WSP | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adequate** | 25% | 25% | 47% | 30% | 32% | 80% | 33% | 22% | 54% | 19% | 17% | 10% | 13% | **29%** |
| **Marginally Adequate** | 15% | 0% | 0% | 10% | 21% | 10% | 4% | 8% | 4% | 14% | 8% | 0% | 16% | **9%** |
| **Inadequate** | 60% | 75% | 53% | 60% | 47% | 10% | 63% | 69% | 43% | 67% | 75% | 90% | 71% | **63%** |



Across levels of care, the majority of patients received inadequate care, with no level of care revealing adequacy in the majority of cases. Specifically, of the 176 cases for patients at the 3CMS[31] level of care, the majority of cases, 101 or 58 percent, were determined to be receiving

---

[31] Patients assigned to the 3CMS level of care who were temporarily placed in Administrative Segregation Units (ASUs)/Restricted Housing Units (RHUs) were assessed generally for the adequacy of care in those settings, using Program Guide requirements for 3CMS patients in ASU. As such, these patients were considered within the general 3CMS category and not STRH.

inadequate care.  Twenty cases (11 percent) were marginally adequate, and the remaining 55

cases (31 percent) were assessed to have received adequate care.  Of the 46 MHCB patients

reviewed, 34, or 74 percent, received inadequate care, nine, or 20 percent, received adequate

care, and the remaining three, or six percent, received marginally adequate treatment.  The

majority of the 31 STRH patients reviewed received inadequate care (19 patients, or 61 percent),

while the remaining 12 patients (39 percent) received adequate care.  Finally, of the 30 RC EOP

patients reviewed at NKSP and WSP, 23 patients, or 77 percent, received inadequate care.  Five

patients, or 17 percent, received adequate care; the remaining two patients (six percent) received

marginally adequate care.

**<u>Treatment Planning Concerns</u>**

The Program Guide clearly underscores the central importance of IDTT treatment

planning and provides that individualized treatment plans specify measurable goals and

objectives, address problems, prescribe intervention modalities including treatment

frequency/duration, and identify the staff member responsible for providing service (*See* PG 12-

3-2).  Treatment planning concerns noted across 3CMS institutions and programs findings from

the Twenty-Ninth Monitoring Round.  Concerns included treatment goals that did not align with

patients' identified symptoms and/or treatment targets; vague or generic goals; nonspecific or a

lack of identified treatment interventions; and diagnostic concerns.  Two additional concerns

were noted during the current review: IDTT meetings that included clinicians who had not met

the patient prior to the IDTT and a lack of adequate justification for the patient's assigned level

of care.  These were especially problematic within the RC EOP and MHCB levels of care.

<u>Treatment Goals</u>

During the review period, CDCR transitioned from the use of Interdisciplinary Plans of Care (IPOCs) toward the use of measurable and individualized treatment goals. This transition was ongoing during the Thirtieth Monitoring Round; thus, both IPOCs and treatment goals written outside of the IPOC section of the treatment plan were reviewed. Despite the monitor's expert attempting to locate treatment goals in multiple locations, treatment goals were frequently absent or, when present, did not address the patients' documented symptoms and/or treatment targets in 115, or 41 percent, of cases reviewed. Across levels of care, the absence or inadequacy of treatment goals was noted in 60 percent of RC EOP cases (18 of 30 cases), 48 percent of cases at the MHCB level of care (22 of 46 cases), 37 percent of 3CMS cases (65 of 176 cases), and 32 percent of STRH cases (10 of 31 cases).

At the institutional level, goals that did not match reported symptoms and/or treatment targets or were simply absent from records were noted in the majority of cases reviewed at WSP (71 percent), CRC (65 percent), and NKSP (56 percent). Specifically, at WSP, 27 of the 38 cases reviewed were noted to have issues with the lack of treatment goals or goals that addressed the patients' needs. These included 12 patients at the 3CMS level of care (WSP Patients L, N, O, Q, R, S, T, Z, AA, BB, CC, and DD), eight patients at the RC EOP level of care (WSP Patients B, C, D, E, F, U, W, and X), and seven patients at the MHCB level of care (WSP Patients EE, GG, HH, II, JJ, KK, and LL). At CRC, 13 of the 20 cases reviewed, all at the 3CMS level of care, were noted to have these issues (CRC Patients A, B, C, D, E. F. G, H, I, J, K, M, and N). Lastly, NKSP evidenced 20 of 36 cases without treatment goals or goals that inadequately addressed patient needs: 10 at the 3CMS level or care (NKSP Patients M, O, P, Q, V, W, X, Y, and Z) and 10 at the RC EOP level of care (NKSP Patients B, D, E, F, H, J, BB, DD, EE, and

FF).  Additionally, seven of the 15 cases reviewed at CIM (47 percent) included goals that did not match reported symptoms and/or treatment targets or were simply absent from records.  The majority of these cases, six of the seven, were noted at the MHCB level of care (CIM Patients C, D. E, G, H and J), and the last case (CIM Case M) was at the 3CMS level of care.

Vague, non-specific, or non-objective goals and IPOCs were frequently seen, especially in MHCB cases, where this occurred in 20 of 46, or 43 percent, of cases.  These included six cases at SOL (SOL Cases C, D, E, G, I and J), four at NKSP (NKSP Cases GG, HH, II and JJ), three cases at PBSP (PBSP Cases Z, AA and CC), three cases at WSP (WSP Cases EE, FF, and II), two cases at CIM (CIM Patients D and E), and two cases at HDSP (HDSP Cases F and H).  At the institutional level, treatment goals lacked specificity in eight of 20 cases, or 40 percent, at both SOL and CRC.

Treatment Interventions

IDTT documentation displayed multiple concerns, including non-specific, inappropriate, or entirely absent treatment goals.   The importance of treatment plan interventions, which direct patient care and support continuity of care across the IDTT, is magnified in light of staffing shortages and a high frequency of staff turnover.  These concerns were evident in 132 of the 283 cases reviewed, or 47 percent.  Within levels of care, a lack of specific and appropriate treatment interventions was noted in the majority of cases in the STRH (19 of 31, or 61 percent) and the MHCB (24 of 46 cases, or 52 percent), as well as 43 percent of cases at both the 3CMS (76 of 176) and RC EOP (13 of 30) levels of care.  At the institutional level, nonspecific, inappropriate, or absent treatment interventions were noted in the majority of cases at CRC (17 of 20, or 85 percent), SOL (13 of 20, or 65 percent), HDSP (13 of 24, or 54 percent), and CIM (8 of 15, or 53 percent).

49

Diagnostic Concerns

Treatment planning and continuity of care are predicated upon clear diagnoses and diagnostic rationale. A number of cases reviewed displayed diagnostic concerns, including poor diagnostic rationale or the need for diagnostic clarification due to unaddressed discrepancies among IDTT members. Discrepancies among team members risked confusion about treatment targets. While some difference of opinion is likely across individual clinicians, it is noteworthy that in the identified cases, IDTTs did not acknowledge or discuss these discrepancies. Among the 283 case reviews completed, diagnostic concerns were noted in 109 cases or 39 percent. Within levels of care, diagnostic concerns were present in 25 of the 46 MHCB cases (54 percent), 13 of the 30 RC EOP cases (43 percent), and 65 of the 176 3CMS cases (37 percent). Across institutions, these concerns were pervasive, with only ASP, FSP, PBSP and SCC having less than 30 percent of cases noted to have diagnostic concerns. On the other hand, at least half of the cases reviewed at CIM (nine of 15, or 60 percent), NKSP (21 of 36, or 58 percent), and WSP (19 of 38, or 50 percent) were noted to have unresolved diagnostic concerns.

Primary Clinicians or Psychiatrists Had Not Met with Patients Prior to IDTT Meetings

One issue identified during the Thirtieth Round, which had not been noted as problematic during previous monitoring rounds, was the fact that the primary clinicians and/or psychiatrists in attendance at IDTT meetings had not met the patients prior to the meeting. In many cases, the individual who completed the patients' initial assessments was not the patient's assigned clinician or psychiatrist. Conversely, when the assigned primary clinician and/or psychiatrist completed the initial assessments, these individuals were not present at the IDTT meetings. During site visits, it was reported that this division of duties was driven by staffing shortages and competing responsibilities. This issue was noted in 60 of the 283 cases reviewed during the

Thirtieth Monitoring Round, or 21 percent overall.  At the institutional level, the issue was noted in over a third of cases reviewed at ASP (seven of 20 3CMS cases, or 35 percent), CCI (seven of 20 3CMS cases, or 35 percent), and PVSP (seven of 21 cases, or 33 percent).

Level of Care Rationale

As a routine part of treatment planning, IDTTs are expected to document the clinical rationale for the patient's recommended level of care.  This is especially important during periods of transition, including reception center assessments and at the time of discharge from a higher level of care such as the MHCB.  During the current reviews, 13 of the 30 RC EOP cases reviewed (43 percent) and 19 of the 46 MHCB cases reviewed (41 percent) lacked adequate rationale for the patient's assigned level of care.  Specifically, this concern was noted in nine of the ten MHCB cases (90 percent) reviewed at SOL (SOL Cases A, B, C, D, E, F, H, I and J), five of the eight MHCB cases (63 percent) reviewed at WSP (WSP Cases EE, FF, GG, II and KK), nine of the 15 RC EOP cases (60 percent) reviewed at NKSP (NKSP Cases B, C, D, E, F, G, H, I and J), and four of the 15 RC EOP cases (27 percent) at WSP (WSP Cases A, D, E, and U).  At the institutional level, concerns with adequate rationale for the patient's assigned level of care were evident in ten of the 20 cases (50 percent) at CCI, all of which were at the 3CMS level of care (CCI Cases A, B, C, D, H, I, L, N, P and S).

**Delivery of Treatment**

The provision of effective and adequate mental health treatment services is essential to the delivery of adequate overall care.  Effective mental health treatment services include the delivery of treatment interventions in keeping with patients' treatment plans; provision and timing of treatment to meet the patients' needs; addressing germane issues noted in the

healthcare record or by referral; continuity of care; and confidential clinical contacts.  Each of these areas was problematic across institutions and/or levels of care.

Treatment Interventions in Keeping with the Treatment Plan

Across a number of institutions and levels of care, treatment interventions contained within patients' treatment plans were not documented as being provided to patients.  Overall, this concern was noted in 84 of the 283 cases reviewed or 30 percent.  At the MHCB level of care, concerns with planned treatment interventions not being documented were noted in 20 of the 46 cases reviewed, or 43 percent (CIM Cases A, B, D, and F; HDSP Cases F and H; PBSP Cases C, Y, Z, AA, BB, and CC; SOL Case B; and WSP Cases EE, FF, GG, H, II, JJ, and KK); and at the RC EOP level of care, the issues was noted in 12 of the 30 cases reviewed, or 40 percent (NKSP Cases B, D, E, F, G, I, J, and DD; and WSP Cases E, H, V and W).  Across institutions, this concern was noted in the majority of cases at CTF (10 of 19, or 53 percent) as well as large portions of reviewed cases at NKSP (15 of 36 cases, or 42 percent), SCC (five of 12 cases, or 42 percent), CIM (six of 15 cases, or 40 percent), and WSP (13 of 38 cases, or 34 percent).

Treatment Interventions in Keeping with Patients' Identified Needs

The monitor's expert noted a number of cases where the treatment team was not responsive to the needs of patients, as evidenced by the nature of the contact (e.g., failing to address identified concerns or following-up on previously identified issues), timing of contacts, failing to meet with patients about medication changes, or failing to meet with patients in a timely manner in response to referrals.  Overall, this concern was noted in 90 of the 283 cases reviewed, or 32 percent.  Specifically, 11 of the 30 RC EOP cases (37 percent), 16 of the 46 MHCB cases (35 percent), 55 of the 176 3CMS cases (31 percent), and eight of the 31 STRH cases (26 percent) had concerns related to treatment interventions being responsive to patients'

needs.  At the institutional level, this concern was noted in the majority of cases at CCI (12 of the 20 cases, or 61 percent) and a third or more of cases at other institutions, including nine of 20 cases as ASP (45 percent), nine of 20 cases at SOL (45 percent), seven of 20 cases at CRC (35 percent) and six of 19 cases at CTF (32 percent).

<u>Continuity of Care</u>

Continuity of care deficits, including frequent clinician changes, failure to address patient concerns identified within the healthcare record, and inadequate termination, were noted across institutions and levels of care.  While all institutions displayed this concern, the majority of cases (12 of 20, or 60 percent) of the 3CMS cases at ASP were noted to have concerns related to poor continuity of care.  Similarly, the concern was noted across levels of care, but was most often noted at the MHCB level of care, where 16 of the 46 cases, or 35 percent, were noted to lack continuity of care (CIM Cases F, G, and I; HDSP Case F; PBSP Cases B, X and CC; SOL Cases A, C, G, and I; and WSP Cases FF, II, JJ, KK, and LL).

Specific continuity of care concerns, which indicated that adequate record reviews had not been completed, as evidenced by clinicians failing to acknowledge or follow up on previously identified issues, were also noted.  These concerns were noted in 55 percent (six of 11) of the STRH cases reviewed at PVSP, 35 percent (seven of 20) of the 3CMS cases reviewed at ASP, and 33 percent (ten of 30) of the cases reviewed at the RC EOP level of care.

<u>Confidentiality</u>

All institutions were noted to have held clinical contacts with patients in non-confidential locations for reasons other than patient refusal (e.g., lack of space, lack of escorts, modified programming).  The overall rate was 34 of the 283 cases or 12 percent.  The issue was noted to be extremely concerning within the RC EOP programs, where 16 of the 30 cases reviewed, or 53

percent, had incidents of non-confidential contacts with patients by the primary clinician or psychiatrist. This included nine of the 15 cases reviewed at WSP (60 percent) and seven of the 15 cases reviewed at NKSP (47 percent).

## Documentation Issues

Initial primary clinician and/or initial psychiatric assessments were not updated or were not completed prior to a patient's initial IDTT meeting in a number of cases reviewed. Initial PC assessments were absent, not updated, or not completed timely for patients at the RC EOP level of care (14 of 30 cases, or 47 percent) and the MHCB level of care (14 of 46 cases, or 30 percent). Initial psychiatric assessments were absent, not updated, or not completed timely frequently within the STRH (14 of 31 cases, or 45 percent) and within the RC EOP (11 of 30 cases, or 37 percent). By institution, HDSP evidenced concerns with both initial psychiatric assessments (14 of 24, or 58 percent) and initial primary clinician assessments (nine of 24, or 38 percent). WSP (18 of 38, or 47 percent), SOL (nine of 20, or 45 percent), and PVSP (seven of 21, or 33 percent) evidenced concerns specifically with initial psychiatric assessments.

One final documentation issue noted in previous monitoring rounds was inaccurate or inconsistent information being documented within a patient's record. This resulted from documentation copied from previous notes or entries, such that it no longer applied to the current clinical contact, internal inconsistencies within the same document of a single clinician, or clinically relevant discrepancies across clinicians other than diagnostic discrepancies. In each of these identified cases, the inconsistencies resulted in confusion as to the clinical status of the patient, the treatment provided to the patient, or the ongoing needs of the patient. In the current review, copied documentation that was unchanged over more than one clinical contact was noted in 40 of 283, or 14 percent of cases reviewed. At the institutional level, copied documentation

was noted frequently at CTF (six of 19 cases, or 32 percent), CCI (five of 20 cases, or 25 percent), and SOL (five of 20 cases, or 25 percent).

Clear inconsistencies within a single document or across documentation for a single patient resulting in challenges in understanding the patient's clinical status were noted in 59 of the 283 cases reviewed, or 21 percent, with the most concerns evident at the MHCB (14 of 46 cases, or 30 percent) and RC EOP (eight of 30 cases, or 27 percent) levels of care. Inconsistent documentation at WSP (13 of 38 cases, or 34 percent), ASP (six of 20 cases, or 30 percent), CCI (six of 20 cases, or 30 percent), and PVSP (six of 21 cases, or 29 percent) rendered the clinical picture difficult to understand in nearly a third of the cases reviewed.

## Summary – Overall Quality of Care

During the Thirtieth Round, across levels of care, the majority of patients received inadequate care. In total, 63 percent of 283 reviewed patients received inadequate mental health care. At no level of care did the reviewed 3CMS institutions provide adequate care to a majority of patients. Fifty-eight percent of 3CMS patients were determined to have received inadequate care, with 74 percent of MHCB cases, 61 percent of STRH cases, and 77 percent of RC EOP cases determined to have received inadequate care. In addition to the continued presence of treatment planning concerns identified in the preceding monitoring round, the monitor's expert identified new concerns during the current review, including IDTT meetings that included clinicians who had not met the patient prior to the initial IDTT and a lack of adequate justification for the patient's assigned level of care. In addition, all reviewed 3CMS institutions were noted to have challenges maintaining continuity of care and, further, held clinical contacts in nonconfidential locations for reasons other than patient refusals.

D. **Clinical Services & Programming**

Referenced within this section are the Special Master's findings for treatment and programming within the various MHSDS programs at CIM, HDSP, CCI, SCC, PBSP, CSP/Solano, Folsom, CTF, PVSP, ASP, NKSP, WSP, and CRC. Of these institutions, MHCB programs were active at CIM, HDSP[32], PBSP, CSP/Solano, NKSP, and WSP; STRH programs were active at HDSP, PBSP, PVSP, and WSP; GP or Mainline 3CMS programs were active at CIM, HDSP, CCI, SCC, PBSP, CSP/Solano, Folsom, CTF, PVSP, ASP, NKSP, WSP, and CRC; and RC-3CMS and RC-EOP programs were active at NKSP and WSP.

The MHSDS Program Guide encourages clinical judgment in mental health providers' decisions regarding contact frequencies, but also sets forth required minimum contact frequencies based on level of care or program placement. Program placement is first determined at the time of initial assessment, subsequently monitored during follow-up contacts, and then routinely discussed and decided in interdisciplinary treatment team (IDTT) meetings. All of these required contacts are instrumental for timely identification of mental illness/decompensation and determinations regarding interventions, such as changes in level of care, referrals, safety precautions, monitoring levels, clinically indicated contact frequencies, and interventions to reduce mental suffering, violence and suicide risk. Therefore, while Court mandated required minimums may serve as useful reminders; institutions should be sufficiently staffed to follow up with patients based on clinically indicated timeframes, which may include weekly therapy for a brief period following the death of a loved one or to prevent a crisis. However, the majority of institutions discussed in this report had significant staffing limitations, with several operating under emergency triage plans that required routine redirection of limited

---

[32] HDSP's MHCB was active during the review period but closed for construction during the site visit.

staff to the highest acuity and highest risk programs (e.g., MHCB and STRH) and resulted in poor compliance with required minimum contacts and an inability to offer more frequent clinically indicated contacts to patients in ML 3CMS programs.

The Special Master's monitoring of clinical services and programming was comprehensive and involved both quantitative audits to determine compliance with Program Guide required minimum services, as well as qualitative audits inclusive of onsite service observations, healthcare record reviews, and class member and CDCR employee interviews.

The quantitative audits of compliance for required minimum contacts in the MHCB and STRH programs suggested that local leadership prioritized patients in higher acuity and higher risk programs by redirecting available staff; however, the redirection of limited resources had the unfortunate consequence of limiting treatment access in the ML 3CMS and Reception Center Programs. Notably, although the redirection of mental health providers to these higher risk programs resulted in better quantitative results for Program Guide required minimum contacts in the MHCB and STRH programs, qualitative reviews of mental health services revealed mental health care inadequacies across reviewed programs and levels of care (MHCB, STRH, ML 3CMS, RC Programs). That said, some institutions with less dire staffing concerns continued to offer group treatment to ML 3CMS patients based on clinical need.

As previously indicated, patients in the ML 3CMS program were significantly impacted by staffing limitations. For example, the lowest and most concerning compliance rates for timely PC initial assessments were identified at HDSP (47%), SCC (33%), CTF (50%), and NKSP (40%). Compliance for ML 3CMS initial IDTTs was below 90 percent at all institutions discussed in this report except for PVSP. Annual or routine IDTT compliance was lowest at HDSP (66%), CSP/Solano (57%), CTF (50%), and NKSP (60%). Further, the quality or

effectiveness of observed ML 3CMS IDTTs was adequate at only five of 13 institutions (CIM, PBSP, CSP/Solano, Folsom, and CRC).

NKSP had very high primary clinician vacancies and the lowest compliance rates for PC initial assessments (40%) and PC 3CMS routine contacts (42%). NKSP's Chief of Mental Health explained that due to critically low staffing levels among primary clinicians, PCs were no longer required to complete initial assessments for reception center patients that were prescribed psychotropic medication unless they required a higher level of care than 3CMS. It was unclear, however, how new arrivals' service and level of care needs were identified without PC initial assessments. Further, at the time of the monitoring visit on March 13, 2024; NKSP had 508 unresolved initial assessments, of which 348 or 69 percent were overdue.

More detailed findings from the monitoring teams' quantitative and qualitative reviews of MHCB, STRH, ML 3CMS, ASU/RHU, and RC Programs are as follows:

Assessments & Follow Up Contacts

### *MHCB Level of Care*

The six institutions with MHCBs discussed in this report included CIM, HDSP, NKSP, WSP, PBSP, and CSP/Solano. Regarding compliance for MHCB assessments and routine contacts; MHCB psychiatrists' initial assessment and routine follow-up contact compliance was at or above 90 percent at CIM, HDSP, NKSP, and WSP. PBSP and CSP/Solano maintained compliance above 90 percent for routine psychiatry contacts in the MHCB, whereas compliance for initial psychiatric assessments at these institutions was at 80 and 85 percent respectively. Compliance for PC initial assessment and routine follow-up contacts was at or above 90 percent in the MHCBs at CIM, HDSP, PBSP, and NKSP. At WSP and CSP/Solano, MHCB PCs

completed routine follow-up contacts timely; however, timeliness for PC initial assessments was at 70 and 45 percent respectively.

### 3CMS in STRH/ASU/RHU

Regarding the monitored institutions with STRH programs discussed within this report (HDSP, PBSP, PVSP, and WSP); contact compliance audits resulted in ratings below 90 percent for initial psychiatric assessments at HDSP (88%), as well as for weekly follow-up PC contacts in the STRH programs at HDSP (88%), PVSP (87%) and WSP (72%).

### 3CMS Level of Care (Mainline/GP Housing)

Regarding timely ML 3CMS initial assessments, compliance for psychiatric initial assessments was above 90 percent at SCC, PBSP, CTF, PVSP, and ASP; below 90 percent at HDSP (87%), CCI (78%), NKSP (80%), and CRC (83%); and alarmingly low at CIM (50%), CSP/Solano (63%), Folsom (44%), and WSP (50%).  Compliance for timely primary clinician initial assessments was below 90 percent in all ML 3CMS programs discussed within this report, except for CIM, PBSP and PVSP.  The lowest and most concerning compliance rates for timely initial PC assessments were identified at HDSP (47%), SCC (33%), CTF (50%), and NKSP (40%).

Regarding mental health provider routine follow-up contacts in ML 3CMS programs, compliance for routine psychiatry follow-up contacts was above 90 percent at CIM, CCI, Folsom, CTF, PVSP, ASP, and CRC, but below benchmark at HDSP (81%), SCC (82%), and NKSP (88%).  Timely routine psychiatric follow-up contacts were most concerning at PBSP (65%) and WSP (60%).  Primary clinician routine follow-up compliance in ML 3CMS programs was above 90 percent at CIM, CCI, Folsom ASP, and CRC; whereas compliance for routine PC contacts ranged from 72 to 88 percent at HDSP, SCC, PBSP, CTF, PVSP, WSP, and

CSP/Solano.  Compliance for NKSP's PC routine follow-up contacts (42%) was equally as alarming as their compliance for PC initial assessments (40%).

Structured Therapeutic Activities (STAs)/Group Services

The MHSDS Program Guide does not set forth requirements for structured therapeutic activity (STA) hours for ML 3CMS and MHCB programs; however, there are established minimum STA hour requirements for RC-EOP and STRH programs.  Patients in the STRH programs require at least 90 minutes of weekly STAs, whereas patients awaiting transfer in RC-EOP programs require a minimum of five-hours of weekly STAs.

For RC-EOP patients, WSP was compliant with required minimums by offering more than five-hours of weekly STAs.  However, refusals for these groups were very high, with patients attending only 1.1 of 5.1 weekly hours offered.  NKSP offered RC EOP patients an average of 5.34 hours of structured treatment weekly, of which they attended 3.6 hours.  An observed RC-EOP group at NKSP was described as adequate, but confidentiality and noise disruptions were noted as concerns.

For the institutions with STRH programs discussed within this report (HDSP, PBSP, PVSP, and WSP), WSP was the only institution to provide requested STRH treatment hour data to determine whether compliance in offering 90-minutes of weekly structured therapeutic activity (STA) hours was achieved.  WSP's data suggested that they maintained compliance throughout the review period.  As for HDSP, PVSP, and PBSP, these institutions failed to provide the requested STRH treatment hour data for determining compliance.  At PVSP, the expert specifically noted that the institution was unable to report whether STRH patients were offered required minimum STA hours.  At HDSP, interviewed STRH patients reported that they

were offered the required minimum hours of STAs; however, the institution failed to provide sufficient proof of practice to demonstrate compliance for the entire review period.

While NKSP did not have ASU EOP hub or STRH programs, the institution offered group treatment to class members in the ASU throughout the review period.  NKSP's treatment hour data indicated that, while temporarily housed in the segregation unit; EOP and RC-EOP patients were offered 5.3 weekly hours of STAs, and that 3CMS patients were offered an average of 1.6 hours of STAs.  The ASU EOP patients attended an average of 2.5 of 5.3 weekly hours, and the ASU 3CMS patients attended an average of .9 of 1.6 hours.

Regarding the Special Master's expert's assessment of STA quality in the STRHs; they were only able to observe one STRH group at PVSP, which solely consisted of a game that lacked therapeutic benefit.  At WSP and PBSP, the expert was unable to observe STRH groups, as they did not occur as planned.  At HDSP, the expert was unable to observe an STRH group due to the institution "repeatedly providing the monitor's expert with an incorrect schedule."

While not required, several CDCR institutions discussed in this report offered STAs or treatment groups to ML 3CMS patients based on clinical need and staff interest.  For example, treatment groups or STAs were routinely offered in ML 3CMS programs at CTF, Folsom, PVSP, ASP, CCI, SCC, CRC, and CIM.  CSP/Solano reported that they attempted to offer a few clinically indicated groups when staffing resources allowed.

Regarding pre-release program services, low staffing levels led to a lack of adequate pre-release services.  Only five of 13 or 38 percent of reviewed institutions (CCI, CRC, Folsom, HDSP, and NKSP) offered pre-release planning groups.

Interdisciplinary Treatment Team (IDTT) Meetings

### *IDTTs in MHCBs*

As previously indicated, the institutions with MHCBs discussed in this report included CIM, PBSP, HDSP, CSP/Solano, NKSP, and WSP.  Compliance for timely MHCB initial IDTTs was at or above 90 percent at CIM, HDSP, and PBSP.  Initial IDTTs in the MHCBs at CSP/Solano, NKSP, and WSP were timely for 85 percent of required encounters.  Routine or follow-up MHCB IDTTs were compliant at HDSP, PBSP, and WSP, but below 90 percent at CIM (86%), CSP/Solano (82%), and NKSP (80%).  Notably, NKSP's MHCB staff explained that coverage options for PCs in the unit were extremely limited, and routine IDTTs were often cancelled when a PC had planned or unplanned leave.

Based on the experts' on-site qualitative audits, adequate MHCB IDTTs were identified at only NKSP and WSP.  CIM's MHCB IDTTs were inadequate based on numerous factors, including lack of focus on treatment planning.  CSP/Solano's MHCB IDTTs solely relied on one PC to provide necessary information and to determine next steps in care; in part, due to the institutional staff psychiatrists' long-standing practice of rotating through the MHCB on a weekly basis which resulted in a lack of patient familiarity.  At PBSP, only one of the two completed MHCB IDTTs during the monitoring visit was adequate.  HDSP's MHCB was closed at the time of the monitoring visit.

### *IDTTs in Short Term Restricted Housing (STRH) & ASU/RHU*

The four institutions with STRH programs were able to maintain compliance near or above benchmark for timely initial and follow-up IDTTs.  With the exception of HDSP's initial IDTTs at 88 percent, compliance for initial and routine IDTTs in all other STRH programs was above 90 percent.

The Special Master's experts observed STRH IDTTs at PBSP, PVSP, and WSP. Notably, the experts were unable to observe STRH IDTTs at HDSP due to the institution's failure to provide accurate schedules during the monitoring visit.  IDTTs in all three of the STRH programs at these institutions were inadequate based on numerous deficiencies that rendered them largely ineffective for collaborative care planning.  At PBSP, IDTTs failed to sufficiently address treatment goals, clinical interventions, treatment progress, functional impairments, level of care justification, and case conceptualizations.  WSP's STRH IDTTs were described as noncollaborative, with teams failing to discuss relevant information for effective treatment planning, including measurable goals, case conceptualizations, symptoms, functional impairments, as well as diagnostic and level of care justifications.

The Special Master's experts also observed IDTTs for 3CMS patients temporarily housed in ASU/RHUs, including at CSP/Solano, CIM, and SCC.  While the ASU 3CMS IDTTs at CSP/Solano were adequate with effective team collaboration and "exceptional" input from custody, IDTTs in the ASU/RHU at CIM and SCC were inadequate based on numerous deficiencies which compromised their overall effectiveness.

### IDTTs in Mainline 3CMS Programs

In ML 3CMS programs, compliance for timely initial IDTTs was below 90 percent at all institutions discussed in this report except for PVSP.  Compliance for timely initial IDTTs ranged from 75 to 86 percent at PBSP, Folsom, CTF, ASP, and CRC.  More concerning compliance rates for initial IDTTs were identified at CSP/Solano (63%), WSP (63%), SCC (67%), CIM (67%), CCI (60%), NKSP (40%), and HDSP (7%).  Regarding required minimum follow-up IDTTs in ML 3CMS programs (at least annually); compliance was above 90 percent at CIM, Folsom, PVSP, ASP, WSP, and CRC, but below benchmark at CCI (80%), SCC (73%),

and PBSP (89%). Annual IDTT compliance was lowest at HDSP (66%), CSP/Solano (57%), CTF (50%), and NKSP (60%).

The Special Master's experts observed ML 3CMS IDTTs at all institutions discussed within this report. The experts, however, found that the quality or effectiveness of observed IDTTs was adequate at only five of 13 institutions (CIM, PBSP, CSP/Solano, Folsom, and CRC). At NKSP, only two IDTTs occurred in the ML 3CMS program, and only one of the two was adequate. Regarding the inadequate ML 3CMS IDTTs observed at HDSP, CCI, SCC, CTF, PVSP, ASP, and WSP; common themes included inadequate treatment planning, insufficient level of care rationales, lack of interdisciplinary collaboration, missing case conceptualizations, and insufficient diagnostic justifications (e.g., review of symptoms and functional impairments).

## Summary – Clinical Services & Programming

The reviewed institutions' responses to mental health staffing shortages resulted in disparate quantitative compliance with Program Guide timeframes for initial assessments and routine clinical contacts. Specifically, institutions' prioritization of patients in higher acuity and higher risk settings, like MHCB and STRH, resulted in higher compliance rates in these settings. Specifically, initial psychiatric assessments and routine psychiatric contacts were compliant or nearly compliant in the six MHCBs reviewed in this report. Likewise, while two of six institutions were noncompliant with initial PC assessments, routine PC contacts in the six MHCBs were compliant. Similar results were found in the four STRHs reviewed in this Report. The redirection of limited staff to higher acuity, higher risk settings resulted in low quantitative compliance in the 13 ML 3CMS programs reviewed. Initial psychiatric assessments were noncompliant with Program Guide timeframes in 8 of 13 institutions; initial PC assessments were noncompliant in 11 of 13 institutions. Routine psychiatry contacts were noncompliant in

seven institutions, while routine PC contacts were noncompliant in eight of the 3CMS institutions.

### E.   **Medication Management**

The court's decision in *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal 1995) found CDCR's medication management to be in violation of the Eighth Amendment.  Since that time, the rectification of those deficiencies has been a pillar for the creation of a sustainable remedy in this case.  Joint efforts by the *Coleman* Special Master and the *Plata* Receiver to improve mental health's medication management requirements led to the creation of the Medication Administration Process Improvement Program (MAPIP) audit tool.  As summarized in the Twenty-Eighth Round Monitoring Report, MAPIP's mental health medication management "focuses on specific medication compliance measures that report performance in each area, and identifies problematic medication management administration issues requiring attention by an institution."  ECF No. 7074 at 125 (citing ECF No. 5779 at 78).

During the Thirtieth Monitoring Round, all 13 3CMS programs utilized MAPIP to evaluate medication management compliance.  Some areas of monitoring showed improvement from the prior monitoring round; however, other areas demonstrated interval worsening with inconsistent progress in medication management practices.  As was noted in both the Twenty-Ninth Monitoring Round 3CMS Report, and the Thirtieth Monitoring Round EOP Report, none of the 13 institutions reported sustained compliance for all diagnostic monitoring measures during the review period.  Areas of compliance included the monitoring of lamotrigine (all institutions with sustained compliance), antidepressant monitoring (seven institutions), and carbamazepine (six of the seven institutions requiring this metric had sustained compliance).  As was noted in the findings of the Twenty-Ninth Monitoring Round, institutions struggled with required monitoring of several classes of critically important medications; those medications

required close monitoring to reduce the risk of harmful side effects, and in some cases fatality. No institutions demonstrated sustained compliance with mandated monitoring of atypical antipsychotics, while two institutions each were fully compliant with monitoring the mood stabilizing medications Depakote and lithium.

As an additional analysis, the months of compliance for all diagnostic monitoring metrics were examined by each institution; institutions ranged from 44 to 97 percent compliance, with an average of 80 percent. Of note, only two institutions, CRC and NKSP, achieved greater than 90 percent compliance. HDSP was the lowest performing institution, with the rate of noncompliant months exceeding compliant months (56 percent and 44 percent, respectively).



Additionally, MAPIP also measured medication administration metrics. During the reporting period, some areas of sustained compliance included psychiatry chronic care medications (11 institutions compliant), new medication orders (nine institutions compliant), and HS medications (nine institutions compliant).

Institutions displayed poor performance with sustained measures of medication continuity upon change in placement or level of care. Those transitions represented periods of increased risk of worsened mental health for patients; thus, discontinuity of medications was concerning and posed risk for decompensation. Five institutions were fully compliant with continuity of medications upon MHCB discharge. Only one institution was compliant for DSH or medical hospital discharges. Scarcely better, only two institutions demonstrated sustained compliance with measures of medication continuity at R&R. Of the 11 institutions reporting data on medication continuity upon placement in ASU/PSU/SHU, only four were fully compliant. Of particular concern, the two reception centers evaluated in this report, NKSP and WSP, were noncompliant for all months for continuity of medications upon arrival at a reception center.

When months of compliance for medication administration metrics were examined; institutions ranged from 31 to 96 percent compliance, with an average of 69 percent. Only two institutions, ASP and CRC, displayed greater than 90 percent compliance with required metrics. Four institutions (CCI, CSP/Solano, NKSP, and WSP) reported greater than 50 percent noncompliance with mandated metrics.

## Medication Administration Compliance



While most institutions had medication line durations under required time limits; many reported challenges with providing protection from the elements for patients while waiting in the medication line, and patient's often reported that this issue was a barrier to medication adherence.

### 1. **Psychiatry Measures**

Psychiatry measures assessed compliance with laboratory testing and other matters required for patients who were prescribed psychotropic medications. Monthly institutional data addressed compliance with diagnostic monitoring for antidepressants, atypical antipsychotics, carbamazepine, Depakote, lamotrigine, lithium, and for clozapine at institutions that were authorized to initiate or to maintain treatment with clozapine. MAPIP compliance of 90 percent or more for a psychiatry measure indicated compliance. Notably, not one of the 13 institutions reported compliance with all applicable psychiatry measures for every month of the review

period. Performance with antidepressant, lamotrigine, and carbamazepine monitoring was relatively better compared with other metrics, such as antipsychotic, Depakote, and lithium monitoring.

Regarding the specific measures, seven institutions indicated compliance for all required diagnostic measures for antidepressants during the reporting period (CIM, CTF, and PVSP with four measures; and CRC, FSP, NKSP, and PBSP with three measures). CCI, CSP/Solano, and WSP were compliant with three of the four measures. ASP and SCC were compliant with two of the three measures. HDSP was compliant with one of the four measures.

No institution reported compliance with all 11 diagnostic measures for atypical antipsychotics for all months of the reporting period. Those measures included monitoring for critically important side effects, such as potentially permanent movement disorders, and increased risk of cardiovascular disease. CRC demonstrated sustained compliance with ten measures, while NKSP had nine sustained measures in compliance. Three institutions, CTF, PBSP, and WSP, were compliant with seven measures. ASP, CCI, CIM, FSP, and SCC showed compliance for six measures. PVSP displayed compliance with five measures; HDSP had compliance with four measures, and CSP/Solano was compliant with three measures.

The four required components of carbamazepine monitoring included, among other items, monitoring for potentially fatal low blood cell counts. Seven institutions required measures. CCI, CIM, and CRC were compliant with all four measures; SCC and WSP were compliant with all three required metrics, and PBSP was compliant with the one required measure. NKSP was compliant with two of three required measures.

As was noted in prior monitoring rounds, reported compliance with the four psychiatric measures for patients prescribed Depakote remained low. Measures included monitoring for

blood cell count abnormalities, organ damage, and elevated medication levels that posed a greater risk of toxicity. FSP and SCC were consistently compliant with all four measures, while HDSP and PBSP were compliant with three. Five institutions, CCI, CIM, CRC, NKSP and WSP, were compliant with one measure. ASP, CSP/Solano, CTF, and PVSP were compliant with none of the measures.

Regarding obtaining medication consents for lamotrigine, all institutions showed sustained compliance for all months of the review period.

The five psychiatric measures for patients prescribed lithium contained several critical components to monitor for toxicity, including screening for kidney damage and monitoring therapeutic medication levels. Only CRC had sustained compliance with all five metrics; SCC was compliant with the one required metric. ASP, CSP/Solano, CTF, NKSP, and PVSP were compliant with three measures. CCI and FSP were compliant with two metrics; while CIM and PBSP were compliant with one. HDSP was compliant with one of the four required metrics.

Each institution's diagnostic monitoring data in aggregate was examined by measuring the number of months of compliance for all diagnostic monitoring for the required number of months. The institutions demonstrated an average compliance of 80 percent. The compliance rates demonstrated substantial variance, from a high of 97 percent at CRC, to a low of 44 percent compliance at HDSP. Notably, CDCR decided to activate new EOPs at HDSP and PBSP; as EOP patients were typically prescribed more complex medication regimens requiring close monitoring, future monitoring rounds must closely surveil the metrics at those remote locations. Institutions reported patient refusals as a leading cause for low-performing metrics.

70

## 2.  **Clozapine Institutions**

While clozapine was a life-saving medication that was often effective when other medications failed; it required close monitoring to avoid potentially fatal side effects.  Of the 3CMS institutions, only NKSP was a designated clozapine institution during the reporting period.  NKSP reported compliance with all ten of the required measures.  While not a clozapine institution, CIM reported one patient prescribed clozapine who was transferred for medical placement in an OHU; CIM reported compliance with seven of the 11 required metrics.

## 3.  **Continuity, Compliance, Observation, and Administration Matters**

In addition to diagnostic monitoring measures, medication administration metrics were the other key aspect of MAPIP.  Those measures included medication continuity following arrival at reception centers, for inter-institutional transfers at R&R, for NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU and a similar metric for ASU/SHU/PSU transfers, for MHCB transfers, upon discharge/transfer from a community hospital and/or DSH or a CDCR PIP, and following parole/transfer to the community.  Additional measures included monitoring of the preparation and administration of HS and AM/PM medications, psychiatrist-prescribed chronic care medications, outpatient provider new medication orders, and compliance with PC 2602 involuntary medications.  Attainment of 90 percent or above for a measure indicated compliance.  The report also addresses PC 2602 petitions and medication lines.

### a.  **Continuity of Medication Upon Arrival at Reception Center**

This critical metric measured patients continuing on medications upon arrival at CDCR.  NKSP and WSP were the two reception centers covered in the report.  Of concern, both institutions reported noncompliance for the entire review period.

**b.**   **Continuity of Medication for Inter-Institutional Transfers at R&R**

Of the 13 institutions under review, only two institutions, ASP and CRC, reported compliance for all six months of the review period.  PVSP was compliant for five months; and CIM, CTF, HDSP, and PBSP were compliant for three months.  FSP was compliant for two months.  CCI, CSP/Solano, NKSP, SCC, WSP were compliant for only one month.

**c.**   **Continuity of Medication with Intra-Institutional Transfers**

The majority of institutions did not report compliance for all six months of the review period for continuity of NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU, and to the ASU/SHU/PSU.

ASP, CIM, CRC, and CTF reported compliance with NA/DOT medication continuity following intra-institutional transfers excluding ASU/SHU/PSU for all six months.  In contrast, CSP/Solano indicated compliance for three months, while HDSP, PBSP, and PVSP reported compliance for two months.  FSP and NKSP reported compliance for one month.  CCI, SCC, and WSP failed to achieve compliance for a single month.

For medication continuity upon intra-institutional transfers to ASU/SHU/PSU; HDSP, PBSP, PVSP, and WSP reported compliance for all months of the review period.  CIM, CSP/Solano, CTF, NKSP, and SCC reported compliance for five months, while CCI and FSP reported compliance for four months.  ASP and CRC had no restricted housing during the review period, thus no cases were reported.

**d.**   **Continuity of Medication following MHCB, Community Hospital, or DSH Transfer, or Parole or Community Transfer**

FSP, CTF, ASP, HDSP, and PVSP reported compliance for medication continuity following transfers from the MHCB for all required months of the review period.  CRC was compliant for five months, and PBSP was compliant for four months. NKSP and WSP were

compliant for two months. SCC was compliant for three of four months. CCI and CIM were compliant for three of five required months. CSP/Solano was compliant for one of the five required months.

Only one institution, PVSP, indicated compliance for medication continuity for all six months of the review period following discharge/transfer from a community hospital and/or DSH or a CDCR PIP. On the other hand, CIM, CRC, and SCC noted compliance for five months; and ASP, FSP, HDSP, and PBSP reported compliance for four months. CTF and WSP reported compliance for three months, and CSP/Solano and NKSP reported compliance for two months. CCI was compliant for one month.

Institutional compliance with medication continuity upon parole or release/transfer to the community was a relative strength. ASP, CIM, CRC, CSP/Solano, FSP, NKSP, and SCC were compliant for the duration of the review period. CTF, HDSP, PBSP, and WSP were compliant for five months, while CCI and PVSP were compliant for four months.

### e. *Hora Somni*/Hour of Sleep (HS) Medications

Nine institutions that included ASP, CIM, CRC, CTF, FSP, HDSP, PBSP, PVSP, and SCC reported compliance with observation of the preparation and administration of HS medications for all six months of the reporting period. WSP reported compliance for four months, and NKSP was compliant for three months. CCI and CSP/Solano were noncompliant for the duration of the review period.

Institutions were largely compliant with the required administration of HS medications after 8:00 p.m.

### 4. A.M./P.M. Medications

ASP, CIM, CRC, and FSP reported compliance with the observation of medication preparation for AM and PM medications for the duration of the review period. CTF reported

compliance for five months, while HDSP reported compliance for four months.  SCC reached

compliance for two months, and PVSP was compliant for one month.  Five institutions that

included CCI, CSP/Solano, NKSP, PBSP, and WSP were noncompliant for all six months.

### a. **Psychiatrist-Prescribed Chronic Care Medications**

As was observed in the EOP report, most institutions reported compliance with

psychiatrist-prescribed chronic care medication orders during all six months of the review

period.  Specifically, all institutions reported sustained compliance, except for WSP (compliant

for five months), and NKSP (compliant for three months).

### b. **Psychiatrist-Prescribed Outpatient Provider New Medication Orders**

ASP, CIM, CRC, CTF, FSP, HDSP, PBSP, PVSP, and SCC reported compliance for the

duration of the review period.  WSP was compliant for four months, NKSP was compliant for

two months, and CSP/Solano was compliant for one month.  CCI was noncompliant for the

duration of the review period.

### c. **Medication Compliance for PC 2602 Involuntary Medication Orders**

The *Coleman* court has long recognized the critical role that involuntary medications play

in the treatment of class members.  Despite this, CDCR institutions failed to maintain consistent

MAPIP compliance regarding the provision of PC 2602 involuntary medications.  MAPIP

monitored two interrelated aspects of the PC 2602 process, namely the presence of a court

involuntary medication order in the healthcare record, and the presence of a psychiatrist

involuntary medication order.  Regarding the court order in the healthcare record, CIM reported

compliance for two months, and NKSP reported compliance for one month.  CSP/Solano and

CTF reported compliance for the one required month, while CCI and HDSP were noncompliant

for the one required month. ASP, CRC, FSP, PBSP, PVSP, SCC, and WSP reported that no data were required for that metric.

Regarding the presence of the psychiatrist's involuntary medication order in the healthcare record; CIM was compliant for two months, and NKSP was compliant for one month. CCI, CSP/Solano, and CTF were compliant for the one required month. ASP, CRC, FSP, HDSP, PBSP, PVSP, SCC, and WSP reported that no data was required for that measure.

Despite its clear importance, many institutions struggled to provide requested information regarding PC 2602 involuntary medication issues.

Institutions reported no uses of force to administer PC 2602 involuntary medications during the review period.

During monitoring visits, some institutions reported the number of patients who received medications pursuant to PC 2602 involuntary medication orders for at least some portion of the review period: CCI (eight), CSP/Solano (one), CTF (one), HDSP (one), NKSP (58), PBSP (one), and WSP (two). CIM reported unclear data regarding the number of patients who received medications pursuant to PC 2602 involuntary medication orders.

### d.    PC 2602 Involuntary Medication Order Petitions

CCI reported two renewal petitions, while HDSP and PBSP both filed one renewal petition. CIM filed nine initial petitions; of which six were emergent, and three were nonemergent. CSP/Solano filed one initial nonemergent petition, and one case was lost to follow-up. CTF filed one nonrenewal petition. NKSP filed 12 petitions, of which ten were initial emergent, and two were initial nonemergent. WSP filed two initial nonemergent petitions. Concerningly, WSP reported that both petitions were lost to follow-up when the patients transferred to PIPs.

e.    **Medication Lines**

Institutions reported compliance with individual patient wait times under 30 minutes, and total medication line duration of under two hours.  In the rare instances when medication lines exceeded two hours, delays in patient release were attributed to the long medication lines.  While ASP audit results showed patient wait times under 30 minutes, on-site staff reported that medication lines often lasted over 40 minutes or longer during third watch.  This was reportedly due to having only one medication line nurse and the number of MAT prescriptions.

With the exception of CRC and SCC, institutions reported limited protection from the elements while patients waited in line.  ASP and NKSP reported that canopies were purchased that were awaiting installation.  FSP and PBSP reported moving medication line indoors during inclement weather.  No institution reported weather as a barrier to medication administration.  Patients reported being cold while waiting for medications at SCC, but the institution stated that all incarcerated persons had jackets.  CSP/Solano issued ponchos for inclement weather.

**Summary – Medication Management**

Although all 13 institutions with 3CMS programs used MAPIP to assess and report about medication management during the Thirtieth Monitoring Round; reported results again reflected variability and several domains of noncompliance for the review period.  Concerningly, not one of the 13 institutions reported compliance for all psychiatry measures during all months of the review period.  Diagnostic monitoring compliance displayed substantial inter-institutional variance.  Demonstrating scant change since the preceding monitoring round, the low rate of medication continuity measures raised concerns about *Coleman* class members receiving consistent medication treatment during periods of increased vulnerability to psychiatric destabilization.  As observed in prior reports, institutions were more likely to report compliance for the administration of HS medications on or after 8:00 p.m., psychiatrist-prescribed chronic

care medications, new medication orders, medication line length, and individual patient wait times.  Taken in total, several essential aspects of medication management within CDCR failed to meet required benchmarks.  The activation of new EOPs in already under performing 3CMS institutions raised significant concern, requiring close attention in the subsequent monitoring round.

### F.    <u>Access to Higher Levels of Care</u>

<u>Transfers to Inpatient Care</u>

<u>Transfers to Acute Inpatient Care</u>

Seven institutions–CIM, CSP/Solano, HDSP, NKSP, PBSP, PVSP, and WSP–referred patients to acute inpatient care during the review period.  All acute inpatient care transfers from HDSP, PVSP, and WSP were timely.  The remaining four institutions–CIM, CSP/Solano, NKSP, and PBSP–were noncompliant with the ten-day transfer requirement.  At CSP/Solano and NKSP 75 and 71 percent of patients, respectively, were timely transferred, while CIM and PBSP timely transferred 38 and nine percent of patients.

<u>Transfers to Intermediate Inpatient Care</u>

Five institutions–CIM, CSP/Solano, NKSP, PBSP, and WSP–referred patients to intermediate inpatient care during the review period.  All transfers from NKSP and WSP were timely, while CIM, CSP/Solano, and PBSP were noncompliant with the 30-day transfer requirement.  CSP/Solano had 75 percent of patients transferring timely, while CIM and PBSP both had compliance rates of 25 percent.

<u>MHCBs</u>

<u>Transfers to MHCBs and Bed Availability</u>

Transfers to MHCBs must occur within 24 hours of referral in accordance with Program Guide requirements.  Eleven institutions–ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom,

HDSP, NKSP, PVSP, and SCC–met this compliance standard; notably, all MHCB transfers from Folsom, NKSP, and PVSP were timely.  At WSP, 88 percent of MHCB transfers were timely, while transfers from PBSP were 75 percent timely.

MHCB Clinical Lengths of Stay

The Program Guide provides for a clinical length of stay of up to ten days in the MHCB. Of the six institutions with MHCBs during the review period[33], three–HDSP, NKSP, and WSP– had average clinical lengths of stay of ten days or less.  CIM and CSP/Solano neared compliance with average clinical lengths of stay of 11 and 11.5 days, respectively, while the average clinical length of stay at PBSP was 14 days.

The percentage of patients whose MHCB stays exceeded ten days during the review period included CIM with 39 percent, CSP/Solano with 57 percent, HDSP with 66 percent; NKSP with 16 percent, PBSP with 61 percent, and WSP with 23 percent.

Restricted Housing

Transfers to Psychiatric Services Unit (PSU)

PSU transfers must occur within 60 days of endorsement in accordance with Program Guide requirements.  PBSP had one PSU transfer which exceeded timeframes by 36 days; NKSP reported not maintaining PSU transfer data; and the remaining 11 institutions did not report any PSU transfers during the review period.

Transfers to Administrative Segregation Unit EOP Hubs

Patients transferring to administrative segregation EOP hubs must do so within 30 days of administrative segregation placement in accordance with Program Guide requirements.  Five

---

[33] HDSP's MHCB was open for one month of the review period.

institutions[34]–CCI, CIM, PBSP, SCC, and WSP–transferred patients to administrative segregation EOP hubs.  CIM and SCC were compliant with transfer timeframes, with all patients from both institutions transferring timely.  CCI, WSP, and PBSP reported 66, 64, and 53 percent compliance, respectively; NKSP reported not maintaining data regarding administrative segregation EOP hub transfers.  The remaining seven institutions did not report any administrative segregation EOP hub transfers during the review period.

### Transfers to Long-Term Restricted Housing (LTRH)

The Program Guide requires that patients transfer to LTRH within 30 days of endorsement.  Four institutions–CCI, PBSP, PVSP, and WSP–reported transferring patients to LTRH during the review period.  PBSP and PVSP both reported 100 percent compliance.  At CCI, 33 percent of LTRH transfers were timely, and the one LTRH transfer from WSP exceeded timeframes by 99 days.  For the remaining nine institutions, CIM reported that 74 percent of transfers to LTRH or STRH were timely but was unable to distinguish its data between LTRH and STRH transfers.  Seven institutions–ASP, CRC, CSP/Solano, CTF, Folsom, HDSP, and SCC–reported no LTRH transfers; and NKSP did not maintain LTRH transfer data.

### Transfers to Short-Term Restricted Housing (STRH)

The Program Guide requires that 3CMS patients transfer to STRH within 30 days of administrative segregation placement.  Of the six institutions that reported STRH transfers during the review period–CCI, CSP/Solano, CTF, Folsom, SCC, and WSP–only CTF and WSP complied with transfer timelines, reporting 98 and 100 percent compliance, respectively.  Folsom neared compliance with 89 percent timely STRH transfers; CCI, CSP/Solano, and SCC reported

---

[34] While PVSP's documentation indicated zero administrative segregation EOP hub transfers, staff on-site reported multiple administrative segregation EOP hub transfers during the review period.

60 percent, 73 percent, and 50 percent, respectively.  For the remaining seven institutions, as noted above, CIM reported that 74 percent of transfers to LTRH or STRH were timely but was unable to distinguish its data between LTRH and STRH transfers; CRC reported no STRH transfers; ASP and NKSP did not track their STRH transfers; and HDSP, PBSP, and PVSP reported admitting patients to their on-site STRHs without delay.

Transfers to Mainline EOP

The Program Guide requires that patients transfer to mainline EOP programs within 60 days of their level of care change.  Eleven institutions–ASP, CCI, CRC, CSP/Solano, CTF, Folsom, HDSP, NKSP, PBSP, PVSP, and SCC–reported transferring patients to mainline EOPs during the review period; CIM and WSP were unable to provide data regarding the same.  Seven institutions–ASP, CCI, CRC, CTF, NKSP, PVSP, and SCC–all reported compliance with Program Guide timeframes.  All transfers from these institutions were timely, except for one patient at CTF, resulting in 91 percent compliance for that institution.  Folsom neared compliance with 85 percent timely transfers; HDSP and PBSP reported 79 and 82 percent compliance, respectively; and CSP/Solano reported 50 percent compliance.

## Summary -- Access to Higher Level of Care

CDCR's compliance was poor across all areas of access to higher levels of care for 3CMS institutions.  Only three of seven, or 43 percent, of institutions that made acute care referrals met timeframe guidelines; similarly, only two of five, or 40 percent, of institutions that made intermediate care referrals met timeframe guidelines.  Eleven of 13 or 85 percent of institutions reported compliance with transferring patients to MHCBs within 24 hours; however, of the six institutions that operated MHCBs during the review period, only three or 50 percent reported average clinical lengths of stay of ten days or less.

Regarding restricted housing transfers, PBSP reported one PSU transfer which exceeded timeframes by 36 days and NKSP reported not maintaining PSU transfer data, while the remaining 11 institutions reported no PSU transfers. Only two of five, or 40 percent, of institutions that reported administrative segregation EOP hub transfers reported compliance; NKSP reported not maintaining administrative segregation EOP hub transfer data. For LTRH transfers, two of four institutions reported compliance with transfer timeframes; NKSP reported not maintaining LTRH transfer data. Even worse, however, were STRH transfers, for which only two of six or 33 percent of institutions reported compliance with transfer timelines, while ASP and NKSP reported not maintaining STRH transfer data. CIM reported 74 percent compliance for LTRH and STRH transfers but was unable to report these transfers separately.

Seven of 11 or 64 percent of institutions reported compliance for transfers to mainline EOP programs; every mainline EOP transfer from those seven institutions, except for one CTF patient, was timely.

### G.    Custody and Mental Health Partnership Plan

The components of the CMHPP were implemented with varying degrees of compliance across the 13 3CMS institutions; noncompliance was frequently attributed to a lack of staff.

Alignment of Institutional CMHPP LOPs with the Headquarters' Partnership Plan

CMHPP LOPs were current and in alignment with headquarters' partnership plan directive at all 13 institutions.

Executive Leadership Joint Rounding

Executive leadership joint rounding occurred monthly at 11 institutions, namely ASP, CCI, CIM, CRC, CSP/Solano, CTF, NKSP, PBSP, PVSP, SCC, and WSP. Folsom and HDSP conducted the rounding for five of six and three of six months, respectively. Required staff attended all roundings that occurred.

Reviewed rounding documentation revealed that staff were interviewed during each rounding at all 13 institutions, and patients were interviewed during each rounding at ten of 13 institutions, namely ASP, CCI, CIM, CRC, CTF, HDSP, NKSP, PBSP, SCC, and WSP; patients were interviewed during five of six months at PVSP, four of five months at Folsom, and two of six months at CSP/Solano. Nine institutions – ASP, CCI, CIM, CRC, CSP/Solano, CTF, HDSP, NKSP, and PVSP–reported positive relations between custody and mental health staff.

Discussion of executive leadership joint rounding was frequently missing from the warden's executive staff meeting minutes, quality management committee minutes, and mental health subcommittee minutes. For the warden's executive staff meeting minutes, only four institutions – CCI, CIM, HDSP, and PBSP – discussed the rounding for each month that it occurred; HDSP and PBSP provided minimal detail regarding the same. The minutes from five institutions – ASP, CRC, CSP/Solano, SCC, and WSP – did not report the rounding; the remaining four institutions – CTF, Folsom, NKSP, and PVSP – did not produce minutes.

The quality management committee minutes for six institutions – CCI, CIM, CRC, NKSP, PBSP, and WSP – discussed the roundings in sufficient detail for all months that it occurred; minutes from Folsom discussed the roundings in sufficient detail for five of six months; PVSP's minutes discussed the roundings in sufficient detail for one of six months; and HDSP's minutes acknowledged that the roundings occurred but did not provide further detail. ASP, CSP/Solano, CTF, and SCC reported that their quality management committee meetings did not acknowledge the roundings.

Finally, mental health subcommittee minutes discussed the roundings in sufficient detail for all months that it occurred at seven institutions, namely CCI, CIM, CRC, HDSP, NKSP, PVSP, and WSP, and for five of six months at Folsom and PBSP. CSP/Solano's minutes

acknowledged that the rounding occurred during one of six months but provided no further detail. ASP, CTF, and SCC failed to provide minutes that addressed the roundings.

Huddles

The monitor reviewed huddle forms from seven institutions – CCI, CIM, CSP/Solano, HDSP, NKSP, SCC, and WSP – and observed huddles at six institutions, namely HDSP, NKSP, PBSP, PVSP, SCC, and WSP. The monitor attempted to view RHU huddles at Folsom, but the institution was unable to provide an accurate schedule.

Reviewed Huddle Forms

Of the seven institutions for which huddle forms were reviewed, CCI, CIM, and CSP/Solano[35] reported the occurrence of daily huddles in all applicable programming areas with required staff in attendance and demonstrated a substantive and collaborative discussion of relevant topics. Staffing shortages impacted staff attendance at SCC and WSP, with reception center EOP huddles not occurring at WSP as a result. At NKSP, reviewed huddle forms from the three weeks prior to the site visit indicated that mental health staff was frequently not in attendance. HDSP reported that daily huddles occurred in the STRH with required staff present and substantive and collaborative discussion; in the MHCB, staff attendance was compliant, but there were minimal to no details of discussed topics.

Observed Huddles

Huddles were observed at six institutions, namely HDSP, NKSP, PBSP, PVSP, SCC, and WSP. The monitor attempted to view RHU huddles at Folsom, but the institution was unable to provide an accurate schedule.

---

[35] CSP/Solano reported use of specialized bed huddle forms in its MHCB.

For all observed huddles at HDSP, PVSP, and SCC, all staff were in attendance and discussions were collaborative and substantive.  At NKSP, all staff attended the reception center EOP and RHU huddles, though mental health staff did not attend the MHCB huddle; similarly, at WSP, all staff attended the RHU huddle, but mental health staff did not attend the MHCB huddle.  At PBSP, while all staff attended the observed MHCB and RHU huddles, the RHU huddle lacked collaboration and mostly consisted of a single staff member reading the patients' medical charts aloud with no other input from other staff.

Weekly 3CMS Program Supervisory Meetings

Weekly 3CMS program supervisory meetings were held throughout the review period with varying degrees of compliance at 12 of 13 institutions.  At HDSP, the meetings did not occur due to insufficient staff; however, informal remote huddles were held daily between mental health staff and the program sergeant for each mainline 3CMS housing unit.

CIM held the meetings weekly throughout the review period with required staff in attendance and, according to reviewed documentation, included collaborative and substantive discussions about patients.  ASP also held the meetings weekly with required staff in attendance for 93 percent of those meetings; collaborative and substantive discussions were noted at each meeting.  WSP held the meetings for all but five weeks of the review period; attendance by required staff and collaborative and substantive discussions were noted at each meeting.

CTF and PVSP each held the meetings weekly with required staff in attendance, while Folsom held the meetings for all but three weeks with required staff in attendance for all but one meeting.  However, meeting reports from all three institutions often provided minimal to no detail aside from attending staff's signatures and identifying patients who were new arrivals or required mental health services.

The remaining six institutions did not meet various requirements of the weekly 3CMS program supervisory meetings. While PBSP reported that the meetings occurred throughout the review period, no documentation was otherwise provided. Meetings were not reported on one or more facilities for most weeks of the review period at CCI, CRC, NKSP, and SCC; required staff at CRC frequently did not attend meetings. At CSP/Solano required mental health staff did not attend any meetings. Minimal to no details regarding the discussions held during the meetings were provided by any of the six institutions.

<u>Monthly Joint Supervisory 3CMS Program Area Tours</u>

Twelve of the 13 institutions held the monthly joint supervisory 3CMS program area tours during the review period; the tours did not occur at HDSP due to limited staffing.

The tours occurred monthly at eight of 12 institutions, ASP, CIM, CRC, CTF, NKSP, PVSP, SCC, and WSP; during five of six months at CCI; four of six months at PBSP; three of six months at Folsom; and one of six months at CSP/Solano. CCI and CSP/Solano both reported that tours did not occur due to lack of staffing.

Required staff attended all tours that occurred at nine of 12 institutions – ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom, NKSP, and PBSP. Mental health staff attended all but one tour at PVSP and WSP, respectively, while a mental health representative did not attend the July Facility C and administrative segregation tours or the August and September Facility B tours at SCC.

Documentation from each tour had appropriate detail regarding topics discussed during the tour.

<u>3CMS Orientation Brochure</u>

All 13 institutions reported distributing the 3CMS orientation brochure to new 3CMS patients and provided copies of the same to the monitor.

<u>Inmate Advisory Council</u>

IAC meetings occurred for all six months at six institutions – ASP, CRC, CSP/Solano, Folsom, NKSP, and PVSP; for five of six months at five institutions – CCI, CIM, CTF, HDSP, and PBSP; four of six months at WSP; and three of six months at SCC. Mental health and patient-specific issues were reported at each meeting that occurred.

<u>Staff Misconduct</u>

All 13 institutions reported staff misconduct complaints against custody, mental health, or medical staff during the review period. For complaints against custody staff, there were 88 at CCI, 35 at CRC, 18 at CTF, 119 at PBSP, 47 at PVSP, and 132 at SCC; none of these six institutions reported complaints against mental health staff. CSP/Solano reported one complaint against mental health staff and was unable to provide complaints against custody staff. For the remaining six institutions, the classification of staff was not specified, but there were 92 misconduct complaints filed against staff at ASP; 105 at CIM; 46 at Folsom; 259 at HDSP; 54 at NKSP; and 99 at WSP.

As for investigations of staff misconduct not initiated through the appeals process, there was one at Folsom; seven at HDSP; ten at NKSP; 15 at WSP; and none at the other nine institutions. No staff were reassigned due to staff misconduct complaints.

Concerningly, staff misconduct complaints filed during the review period were frequently still pending at the time of the site visit. More than half of the filed complaints were still pending at five institutions – CRC, HDSP, NKSP, SCC, and WSP. There were 29 of 35 or 83 percent of

complaints still pending at CRC; 140 of 259 or 54 percent at HDSP; 35 of 54 or 65 percent at NKSP; 81 of 132 or 61 percent at SCC; and 73 of 99 or 74 percent at WSP. At five institutions – ASP, CCI, CIM, Folsom, and PVSP – nearly half of the filed complaints were still pending: there were 42 of 92 or 46 percent still pending at ASP; 36 of 88 or 41 percent at CCI; 46 of 105 or 44 percent at CIM; 22 of 46 or 48 percent at Folsom; and 23 of 47 or 49 percent at PVSP. Five of 18 or 28 percent of filed complaints were still pending at CTF, while eight of 119 or seven percent were still pending at PBSP. The one reported complaint from CSP/Solano was closed by the time of the site visit.

<u>Annual Partnership Off-Post Training</u>

Five institutions – ASP, CRC, Folsom, PVSP, and WSP – reported compliance for attendance by required custody and mental health staff at the annual partnership off-post training. Of the remaining eight institutions, CTF, NKSP, and SCC reported compliance for attendance by required custody staff, while CCI, CIM, CSP/Solano, HDSP, and PBSP reported noncompliance; seven of those eight institutions reported noncompliance for attendance by required mental health staff, and HDSP was unable to provide the related data.

For the five institutions that reported noncompliance for attendance by required custody staff, CSP/Solano and PBSP neared compliance with 87 and 82 percent attendance, respectively, while CCI, CIM, and HDSP reported 60, 63, and 71 percent attendance, respectively.

For the seven institutions that reported noncompliance for attendance by required mental health staff, CTF and NKSP neared compliance with 84 and 83 percent, respectively; CCI and CSP/Solano reported 68 and 77 percent; SCC reported 55 percent; and CIM and PBSP reported 46 and 35 percent, respectively.

## Summary – Custody and Mental Health Partnership Plan

All institutional CMHPP LOPs were current and aligned with headquarters' directive. Twelve institutions conducted executive leadership joint rounding for at least five months of the review period, although the minutes from the warden's executive staff meeting, quality management committee, and mental health subcommittee frequently contained insufficient or no acknowledgment of the roundings.

Reviewed huddle forms mostly reflected their daily occurrence, with most–but not all–containing sufficient detail. Observed huddles typically revealed the same, as well as adequate collaboration among staff; occasionally, however, the required staff was not present. Notably, lack of staffing was often cited as the reason for huddles not occurring or staff failing to attend.

While 12 of 13 institutions held weekly 3CMS program supervisory meetings throughout the review period, seven of those 12 institutions reported the meetings not occurring on one or more facilities for most or all weeks of the review period. Required staff typically attended the meetings that occurred, though documentation mostly provided minimal to no detail regarding discussions held during the meetings. These meetings did not occur at HDSP due to a lack of staffing.

Monthly joint supervisory 3CMS program area tours occurred with required staff in attendance at eight of the 12 institutions where tours occurred during the review period. Notably, tours did not occur at HDSP and only for one of six months at CSP/Solano due to limited staffing; lack of staffing was also the cited reason for the one month that the tours did not occur at CCI.

All 13 institutions distributed the 3CMS orientation brochure to new 3CMS patients and provided copies of the same to the monitor.

IAC meetings were held for at least five months at 11 of 13 institutions and for three or more months at all 13 institutions. Mental health-related and patient-specific issues were reported in documentation from each meeting.

Staff misconduct complaints were reported at all 13 institutions. Four institutions reported investigations of staff misconduct not initiated through the appeal process. No staff were reassigned due to staff misconduct complaints. Concerningly, over 50 percent of staff misconduct complaints initiated during the review period were not resolved at the time of the site visit at five institutions, and over 40 percent were not resolved at the time of the site visit at an additional five institutions.

Only five institutions reported compliance for attendance by required custody and mental health staff at the annual partnership off-post training; three additional institutions reported compliance by custody staff.

### H.    Mental Health Referrals

The 13 institutions included in this report received a total of 27,259 mental health referrals during the monitoring period. Of these, 8,756, or 32 percent, were to psychiatry, with 18,503, or 68 percent, to primary clinicians. Of the total number of referrals, 1,854, or seven percent, were emergent, 3,405, or 12 percent, were urgent, and 22,000, or 81 percent, were routine.

Of the 27,259 referrals, 18,744, or 69 percent, were completed timely. Specifically, 1,631 of 1,854 emergent referrals, or 88 percent, were timely; 2,756 of 3,405, or 81 percent of urgent referrals were completed timely; and 16,565 of 22,000, or 75 percent, of routine referrals were completed timely.

Compliance with timely response to referrals varied substantially among institutions. Several institutions reported that staffing vacancies directly contributed to the non-compliance

with timely referrals.  Institutions below 90 percent included CIM (88 percent), HDSP (87 percent), WSP (62 percent), and NKSP (60 percent).  CSP/Solano reported a Corrective Action Plan to address low compliance with timely referrals.  WSP noted the problem was particularly challenging with routine referrals due to the need to prioritize emergent and urgent referrals.

## I.    **Pre-Release Planning**

Pre-Release information was collected for the 13 institutions that provided 3CMS level of care to MHSDS patients.  All 13 institutions had at least one assigned Institutional Mental Health Pre-Release Coordinator (IMHPC), with CIM and CRC also having backup pre-release coordinators.  Of the 13 institutions, nine IMHPCs were licensed clinical social workers, one was a clinical psychologist, and the positions held by the pre-release coordinators at CTF, HDSP, and SCC were unknown.  The IMHPC at eight institutions had additional responsibilities and/or assigned duties.  For instance, the IMHPCs at CSP/Solano, CTF, FSP, PVSP, SCC, and WSP all had mental health caseloads assigned to them, and at CCI, the pre-release coordinator also covered CIT and suicide prevention assessments.

The IMHPC at CCI, CRC, CSP/Solano, FSP, HDSP, SCC, PVSP, and WSP provided data on the number of Pre-Release Planning Assessments (PRPAs) completed for patients pending release.  In addition, CCI and WSP were able to report the number of ROIs completed for patients discharging to probation, while the pre-release coordinators at CCI, CSP/Solano, CTF and NKSP were able to provide data on a patient's ability to obtain Cal-IDs.

Four institutions – CCI, FSP, CRC, and NKSP held pre-release groups during the reporting period.  CCI and CRC both reported using CDCR headquarters' curriculum.  The remaining institutions, ASP, CIM, CSP/Solano, CTF, HDSP, PBSP, PVSP, SCC, and WSP did not have pre-release groups scheduled during the reporting period.  The lack of scheduled pre-release groups at some institutions was reportedly due to insufficient staffing (ASP, WSP, and

PBSP) and inadequate treatment space (CIM and WSP). HDSP reported the inability to hold pre-release groups during the reporting period due to an influx of patients. The Special Master's expert and monitor were able to observe a pre-release group at CCI, where the patients reported they found the group to be helpful and informative.

The Transitional Case Management Program (TCMP), a contract agency, provided services to patients at all 13 institutions toured. TCMP services were provided by case managers assigned to institutions who assisted mental health patients with benefit applications for Medi-CAL, SSI, and VA benefits, along with other miscellaneous tasks.

## Summary – Pre-Release Planning

All 3CMS institutions had staff who held the position of IMHPC, and except for one who was a clinical psychologist, most were held by licensed clinical social workers, as required by CDCR pre-release policy. Overall, there were limited resources provided for the 3CMS population at the institutions visited. The collection of data with regards to the completion of PRPAs, as well as ROIs for patients scheduled for release to Probation was inconsistent across the 3CMS institutions. Only four of the 13 institutions toured reported pre-release groups had occurred during the reporting period. The lack of groups was most often attributed to insufficient staffing and inadequate treatment space. Notably, TCMP assisted mental health patients with applications for Medi-CAL, SSI, and VA benefits at all 13 3CMS institutions visited.

### J.     Review of the RVR Process

With a 38 percent increase in the number of RVRs issued to MHSDS patients since the preceding reporting period, CDCR continued to struggle to achieve compliance with the requirements of the RVR process. Compliance remained low for both custody and mental health staff completing the mental health assessment training, timely requests for and completion of

mental health assessments, completion of mental health assessments in a confidential setting, and senior hearing officers considering the mental health assessment and using it to mitigate penalties. Additionally, alternative discipline was not used when clinically indicated.

For custody staff training on the RVR mental health assessment process, eight institutions, ASP, CCI, CRC, Folsom, HDSP, NKSP, SCC, and CSP/Solano reported compliance with staff attendance. Five institutions reported non-compliance, including CIM, CTF, PBSP, PVSP, and WSP. However, WSP approached compliance with 89 percent, while CTF and PBSP each reported 80 percent compliance. CIM and PVSP reported low compliance with 33 and 52 percent custody staff completion, respectively.

For mental health staff training on the RVR mental health assessment process, only CCI and PBSP reported compliance with staff attendance. Nine institutions, including ASP, CIM, CRC, CTF, Folsom, NKSP, SCC, CSP/Solano, and WSP all reported non-compliance, while HDSP and PVSP were unable to report the number of staff required to attend the training and thus compliance could not be assessed. ASP and Folsom reported compliance rates of 61 and 67 percent, respectively, CTF reported 32 percent, and CIM and CRC reported eight and three percent, respectively. Four institutions, including NKSP, CSP/Solano, SCC, and WSP reported no mental health staff attendance.

There were 25,342 RVRs issued at the 13 reviewed institutions during the reporting period, which was a 43 percent increase from the Twenty-Ninth Monitoring Round. Of these, 8,142, or 32 percent were issued to MHSDS patients; a 38 percent increase since the preceding reporting period. There were 20 RVRs issued to patients in acute or intermediate care, 152 issued to MHCB patients, 261 issued to EOP patients, and 7,709 issued to 3CMS patients.

Reviewed samples revealed that only CRC demonstrated compliance with custody staff timely requesting completion of mental health assessments within two calendar days of discovery of the information leading to the charge.  Four institutions, ASP, CCI, PVSP, and SCC, reported between 50 and 80 percent compliance.  While eight institutions, including CIM, CTF, Folsom, HDSP, NKSP, PBSP, CSP/Solano, and WSP, reported less than 50 percent compliance; CSP/Solano was the lowest with 18 percent.  Of the 224 reviewed RVRs, custody staff timely requested completion of the mental health assessment in 118 or 53 percent of cases.

From the reviewed samples, mental health clinicians at nine institutions, including ASP, CCI, CRC, CTF, Folsom, HDSP, NKSP, PBSP, and SCC were compliant for timely completing and returning the mental health assessments to custody staff within eight calendar days of receipt.  CIM, PVSP, and WSP reported compliance rates between 85 and 89 percent, while CSP/Solano reported 55 percent compliance.

Only four institutions, including CIM, CRC, CTF, and SCC, were compliant with completing confidential mental health assessments, while nine institutions – ASP, CCI, Folsom, HDSP, NKSP, PBSP, PVSP, CSP/Solano, and WSP were noncompliant.  Specifically, Folsom, HDSP, PBSP, and CSP/Solano reported between 70 and 82 percent compliance, while ASP, NKSP, and PVSP reported between 56 and 62 percent compliance.  CCI and WSP reported compliance rates of 20 and 44 percent, respectively.  Of the 224 reviewed RVRs, only 152 or 68 percent had mental health assessments completed confidentially; eight refusals were noted at ASP, CRC, Folsom, and PVSP.

Ten institutions, namely CIM, CRC, CTF, Folsom, HDSP, NKSP, PBSP, PVSP, SCC, and WSP, achieved compliance with the senior hearing officer documenting consideration of the

mental health assessment. ASP and CSP/Solano were noncompliant at 78 and 81 percent. CCI fell out of compliance since the prior monitoring round with 75 percent compliance.

Of the 13 institutions, ASP, CRC, Folsom, NKSP, and PVSP achieved compliance with the senior hearing officer appropriately documenting penalty mitigation based on the recommendation of the reviewing mental health clinician. The remaining eight institutions did not. Compliance rates ranged from 75 to 85 percent at CCI, CIM, PBSP, CSP/Solano, and WSP, while CTF and SCC reported compliance rates of 67 and 73 percent, respectively. HDSP had the lowest compliance rate at 43 percent. Notably, the senior hearing officer at four institutions, including CRC, Folsom, PVSP, and SCC, mitigated penalties in an additional 18 cases where the primary clinician did not recommend penalty mitigation.

Of the reviewed RVRs across the 13 institutions, one RVR at NKSP was recommended to be documented in an alternative manner due to the clinician's belief that the patient's behavior was strongly influenced by mental illness. However, the reviewing hearing officer's decision did not reflect the clinician's judgement, reasoning that the patient was fully aware of his actions and should be held fully accountable despite the clinician's recommendation.

All six reviewed classification committee actions at ASP and Folsom included consideration of mental health factors when assessing SHU terms during the review period.

### Summary – RVR Process

As the number of RVRs substantially increased from the prior reporting period, the 13 3CMS institutions continued to reflect noncompliance with Program Guide and CDCR policy requirements. One institution was compliant with custody staff making timely requests for completion of the mental health assessment, while nine institutions were compliant with the

timely completion and return of the mental health assessment.  Alternative discipline was recommended and not used.

### K.    Use of Force

Eleven of 13 institutions that housed 3CMS patients reported custody staff's compliance with attendance at the mandatory use of force training during the review period.  Five of 13 institutions were compliant with required training of mental health staff.  Two institutions, CCI and PBSP, reported controlled use of force incidents involving mental health patients.  A review of those incidents indicated compliance with applicable policy.  Additionally, a reviewed sample of immediate use of force incidents involving mental health patients revealed compliance with applicable policy.

#### Training

CDCR's use of force policy required training on the controlled and immediate uses of force.  Eleven of 13 or 85 percent of institutions with 3CMS programs were compliant with custody staff training.  CTF and CSP/Solano trained 100 percent of custody staff, CCI and PVSP trained 99 percent, ASP, FSP, and WSP trained 98 percent, NKSP trained 97 percent, CIM trained 95 percent, and CRC and SCC trained 93 percent.  PBSP and HDSP trained 75 percent and 70 percent of their custody staff respectively.

Only five institutions with a 3CMS program —CCI, FSP, PVSP, SCC, and CRC— reported compliance with use of force training for mental health staff, a stark 50 percent decrease from the preceding reporting period.  ASP, CTF, HDSP, and SOL reported compliance above 76 percent; PBSP, WSP, CIM, and NKSP reported compliance rates of 67 percent, 49 percent, 13 percent, and six percent, respectively.

<u>Controlled Use of Force</u>

Of the 13 reviewed institutions, two institutions, PBSP and CCI, reported controlled use of force incidents involving mental health patients. All five controlled use of force incidents at PBSP and the two at CCI were reviewed and reflected compliance with applicable policy.

<u>Immediate Use of Force</u>

All 13 institutions with 3CMS programs reported a total of 1,072 immediate uses of force as follows: ASP (117), CCI (152), CIM (12), CRC (186), CTF (26), FSP (49), HDSP (74), NKSP (15), PBSP (82), PVSP (90), SCC (6), CSP/Sol (77), and WSP (186).

The monitor's review of a sample of 147 immediate use of force incidents indicated compliance with applicable policy at all 13 institutions.

<b><u>Summary – Use of Force</u></b>

There was compliance by 11 of 13, or 85 percent of reviewed 3CMS institutions with custody training requirements for the revised use of force policy. However, only five of 13, or 38 percent, complied with the mental health training requirement, which was concerning.

Two institutions reported controlled use of force incidents during the reporting period. A review of all controlled use of force incidents revealed compliance with applicable policy. All 13 institutions reported immediate use of force incidents; those reviewed indicated compliance with relevant policies.

**L.     Program Access**

Similar to the preceding review period, non-MHSDS incarcerated persons held more job assignments than MHSDS patients at the 13 reviewed institutions. EOP patients, who comprised a small percentage of the overall population at these 3CMS institutions, held the least amount of job assignments, with only three patients employed at two institutions. A total of five EOP patients were enrolled in academic assignments at three of the 13 institutions, while one EOP

patient at one institution held a substance abuse treatment assignment. However, 3CMS patients and non-MHSDS incarcerated persons held a comparable percentage of assignments for academic assignments, vocational education, voluntary education, and substance abuse treatment. Overall, 11 institutions reported information about milestone credits; however, only nine reported patients' eligibility to earn them. Two EOP patients were housed out-of-level across the 13 institutions, and 24 percent of the 3CMS population were housed out-of-level.

Job Assignments

Similar to preceding reporting periods, non-MHSDS incarcerated persons continued to hold more job assignments than mental health caseload patients. Two of the 13 3CMS institutions employed EOP patients, with CRC employing two and CTF one. No institution employed more than half of their 3CMS patients. Six institutions, ASP, CIM, CTF, PBSP, PVSP, and SCC, employed between 40 and 49 percent of 3CMS patients. Four other institutions, CSP/Solano, CRC, Folsom, and HDSP employed between 30 and 39 percent of 3CMS patients. Twenty-eight percent of 3CMS patients at CCI held job assignments. At NKSP and WSP, eight percent of the 3CMS population held job assignments.

As previously stated, non-MHSDS incarcerated persons held more job assignments than MHSDS patients. Three institutions, ASP, CIM, and PBSP employed between 51 and 57 percent of the non-mental health caseload. Six other institutions, CSP/Solano, CRC, CTF, FSP, HDSP, and PVSP reported that between 40 and 49 percent of non-MHSDS incarcerated persons were employed. CCI indicated employing 38 percent of the non-mental health caseload. The remaining three institutions, NKSP, SCC, and WSP employed between ten and 19 percent of non-MHSDS incarcerated persons.

Academic Assignments

Three institutions, ASP, CCI, and CSP/Solano reported that one to two EOP patients held academic assignments.  Overall, 3CMS patients and non-MHSDS incarcerated persons held a similar percentage of academic assignments.  For 3CMS patients, CCI and PBSP reported that 61 and 43 percent of 3CMS patients held academic assignments, respectively.  Eight institutions, ASP, CIM, CSP/Solano, CRC, CTF, Folsom, HDSP, and PVSP indicated that between 20 and 29 3CMS patients held academic assignments.  At SCC, 19 percent of 3CMS patients held them.  NKSP reported eight patients and WSP reported one patient held academic assignments.

CCI and PBSP reported that 83 and 51 percent of non-MHSDS incarcerated persons held academic assignments, respectively.  Three institutions, ASP, CRC, and CTF indicated that between 30 and 39 percent of non-mental health caseload incarcerated persons held academic assignments.  Five other institutions, CIM, CSP/Solano, FSP, HDSP, and PVSP reported that between 20 and 29 percent of non-MHSDS incarcerated persons held them.  At SCC, 13 percent of non-mental health caseload incarcerated persons held academic assignments.  NKSP and WSP, reported that seven and three percent of non-MHSDS incarcerated persons held academic assignments.

Vocational Assignments

Vocational education programs included carpentry, computer repair, heating, welding, painting, plumbing, electrical, ventilation and air conditioning, and other additional programs.  No EOP patients were enrolled in vocational education programs.  Overall, 3CMS and non-MHSDS incarcerated persons held a comparable percentage of vocational education assignments.  Notably, 14 percent of CCI's 3CMS patients held these assignments.  The remaining 12 institutions, ASP, CIM, CSP/Solano, CRC, CTF, FSP, HDSP, NKSP, PBSP,

PVSP, SCC, and WSP enrolled less than ten percent of 3CMS patients in vocational education assignments.

CTF enrolled ten percent of non-MHSDS incarcerated persons in vocational education. The 12 remaining institutions – ASP, CCI, CIM, CSP/Solano, CRC, FSP, HDSP, NKSP, PBSP, PVSP, SCC, and WSP – reported that less than ten percent of the non-mental health caseload population had vocational assignments.

<u>Voluntary Education</u>

College courses that are offered to the incarcerated population are considered voluntary education assignments. No EOP patients were enrolled in voluntary education. However, 3CMS patients and non-MHSDS incarcerated persons held a comparable percentage of voluntary education assignments. SCC reported that 31 percent of 3CMS patients held voluntary education assignments. Three institutions, CIM, CRC, and PVSP enrolled between 20 and 29 percent of 3CMS patients in these programs. Five other institutions – ASP, CSP/Solano, FSP, HDSP, and PBSP – reported enrolling ten to 19 percent of 3CMS patients in voluntary education. The remaining four institutions, CCI, CTF, NKSP, and WSP enrolled less than ten percent of 3CMS patients in voluntary education.

For non-MHSDS incarcerated persons, CRC reported that 43 percent were enrolled in voluntary education. Three institutions, Folsom, PBSP, and PVSP indicated enrolling between 20 and 29 percent of non-mental health caseload incarcerated persons in these programs. Four other institutions, ASP, CIM, CSP/Solano, and HDSP enrolled between ten and 19 percent of the non-MHSDS population in voluntary education. The remaining five institutions – CCI, CTF, NKSP, SCC, and WSP – reported that less than ten percent of the non-MHSDS incarcerated person population held voluntary education assignments.

Substance Abuse Treatment

One EOP patient at CRC held a substance abuse treatment assignment; 3CMS and non-MHSDS incarcerated persons held a similar percentage of substance abuse treatment assignments. For 3CMS patients, five institutions, ASP, CCI, CSP/Solano, CRC, and CTF, reported that ten to 19 percent of 3CMS patients had these assignments. Seven other institutions, CIM, Folsom, HDSP, NKSP, PBSP, PVSP, and SCC, enrolled less than ten percent of 3CMS patients in substance abuse treatment.

Four institutions, ASP, CCI, CSP/Solano, and CTF, reported enrolling between ten and 19 percent of non-MHSDS incarcerated persons in substance abuse treatment. The remaining eight institutions, CIM, CRC, Folsom, HDSP, NKSP, PBSP, PVSP, and SCC, enrolled less than ten percent of the non-mental health incarcerated caseload population in these assignments. WSP did not assign any patients substance abuse treatment assignments.

Milestone Credits

Patients could qualify for a reduction in their length of incarceration by actively engaging in or completing in-prison rehabilitation programs, including academic, substance abuse programs, and vocational education. Of the 13 reviewed institutions, nine – ASP, CIM, CSP/Solano, CRC, CTF, FSP, PVSP, SCC, and WSP, provided the number of patients who were eligible for and earned milestone credits. Overall, at these institutions, 67 percent of eligible EOP patients earned milestone credits, as did 17 percent of eligible 3CMS patients and 29 percent of eligible non-MHSDS individuals. CCI and NKSP did not provide any milestone credit information. Additionally, HDSP and PBSP did not report the number of eligible patients but revealed the number of patients who earned milestone credits. For EOP patients, CIM and WSP, reported one and five EOP patients, respectively, earned milestone credits.

For 3CMS patients, CIM reported that 92 percent earned milestone credits. PVSP and SCC indicated that 16 and 38 percent of 3CMS patients, respectively, earned the credits. Four institutions – CSP/Solano, CRC, CTF, and Folsom, reported 3CMS patients earned between one to four percent of milestone credits. HDSP and PBSP each indicated that only one 3CMS patient earned credit. At ASP and WSP, no 3CMS patients earned credits.

For non-MHSDS incarcerated persons, all who were eligible earned milestone credits at CIM and WSP. Two institutions, PVSP and SCC, reported that 20 and 36 percent of non-MHSDS incarcerated individuals earned milestone credits. Four institutions, CSP/Solano, CRC, CTF, and Folsom, reported between one to three percent of non-MHSDS incarcerated persons earned milestone credits. The three remaining institutions – ASP, HDSP, and PBSP reported that no non-MHSDS individuals earned milestone credits.

<u>Out-of-Level Housing</u>

During the review period, all 13 institutions housed patients out-of-level; specifically, patients were housed at a custody security level that was inconsistent with their housing classification score. Overall, the institutions housed a total of three EOP patients and 24 percent of 3CMS patients out-of-level. ASP reported one, and CRC reported two EOP patients were housed out-of-level. For 3CMS patients, CSP/Solano, PVSP, and SCC indicated housing between 40 and 45 percent of 3CMS patients out-of-level. Five institutions, CCI, CRC, HDSP, NKSP, and WSP housed from 21 to 29 percent of 3CMS patients out-of-level. The five remaining institutions, ASP, CIM, CTF, FSP, and PBSP reported housing between 13 to 19 percent of 3CMS patients out-of-level.

ADA Reasonable Accommodation and Grievance Procedures

All 13 institutions indicated implementation of the Americans with Disabilities Act (ADA) reasonable accommodation and grievance procedures.

**Summary – Program Access**

Comparable to previous review periods, non-MHSDS incarcerated persons continued to hold more job assignments than MHSDS patients. Five EOP patients were enrolled in academic assignments and one EOP patient held a substance abuse assignment. 3CMS patients and non-MHSDS incarcerated persons held a similar percentage of assignments for academic assignments, vocational education, voluntary education, and substance abuse treatment.

During the review period, 11 of the 13 institutions reported that patients earned milestone credits, although only nine institutions reported information about patients' eligibility to earn them. Two EOP patients were housed out-of-level, as were 24 percent of the 3CMS population. Additionally, all 13 institutions indicated implementation of the ADA reasonable accommodation and grievance procedures.

**M.      MHSDS Patients in Segregated Housing**

During the Thirtieth Monitoring Round, three of the reviewed institutions – HDSP, PBSP, and PVSP, had STRH units, and another two institutions – NKSP and WSP, had RC STRH units.

To end federal court oversight, CDCR must achieve compliance with the requirements for the treatment of MHSDS patients in administrative segregation. ECF No. 5779. All three institutions with STRH units achieved compliance for timely initial primary clinician contacts, routine psychiatry contacts, and routine IDTTs. PBSP and PVSP achieved compliance for initial psychiatry contacts and initial IDTTs. However, only PBSP complied with timely routine

primary clinician contacts.  All three institutions struggled to provide confidential psychiatry and primary clinician contacts.

At NKSP and WSP, all the observed IDTTs were inadequate and did not meet Program Guide requirements.  On a positive note, both institutions reported offering the required weekly structured group therapeutic activity and weekly offering of out-of-cell activities.

Short-Term Restricted Housing

PBSP and PVSP reported that all psychiatry and primary clinician caseloads were within the required staffing ratios.  HDSP reported that primary clinician caseloads were within the required staffing ratios, but psychiatry caseloads exceeded the required staffing ratios.

PBSP and PVSP were compliant with timely initial psychiatry contacts; HDSP was close to compliance at 88 percent.  PBSP provided confidential initial psychiatry contacts in more than 90 percent of reviewed cases, while initial psychiatry contacts at HDSP and PVSP were confidential in 82 and 53 percent of cases, respectively.  The reported reason for noncompliance was patient refusals.  For timely routine psychiatry contacts, HDSP, PBSP, and PVSP were all in compliance.  HDSP and PBSP provided confidential routine psychiatry contacts in more than 90 percent of reviewed cases; routine psychiatry contacts at PVSP were confidential in only 40 percent of reviewed cases.  The institution reported the reason for noncompliance was patient refusals.

Similar to the preceding reporting period, all three institutions – HDSP, PBSP, and PVSP, complied with timely initial primary clinician contacts.  For timely routine primary clinician contacts,[36] PBSP achieved compliance, while HDSP and PVSP neared compliance at 88

---

[36] In their objections to the Draft Report, defendants noted an agreement among the data remediation stakeholders to define "weekly" as occurring "at least once per calendar week, but not to exceed ten days between contacts."  Exhibit A at 14.  Defendants requested that the

and 87 percent, respectively.  PBSP provided confidential initial primary clinician contacts in more than 90 percent of reviewed cases.  Initial primary clinician contacts at HDSP and PVSP were confidential in 54 and 47 percent of reviewed cases, respectively.  The reason reported for non-confidentiality was patient refusals.  Routine primary clinician contacts at PBSP were held in a confidential setting for 68 percent of reviewed cases, while HDSP and PVSP each reached 43 percent.  The institutions reported that patient refusals, patients' disruptive behavior, and unavailable conference space were the reasons for non-confidentiality.

For IDTTs, PBSP and PVSP were compliant with timely initial IDTTs, and HDSP was near compliance at 88 percent.  All three institutions achieved compliance with the timely completion of routine IDTTs.

Each institution met compliance for the required staff's attendance for initial and routine IDTTs.  At PBSP, more than 90 percent of patients attended initial and routine IDTTs.  For initial IDTTs, patient attendance reached 53 percent at HDSP and 42 percent at PVSP.  For routine IDTTs, patients attended 50 percent at HDSP; no patients attended at PVSP.  Reported reasons for non-attendance were patient refusals.

All three institutions achieved compliance for the required weekly offerings of out-of-cell activities, including yard.  HDSP and PBSP offered the required 90 minutes of weekly structured group therapeutic activity; PVSP could not report whether patients were offered the same.

---

Special Master revise the Draft Report to utilize the newly agreed-upon definition of weekly.  The Special Master declines to make the requested revisions to the final version of this Report as the review periods for each institution pre-dated the data remediation compromise referred to in defendants' correspondence.  However, the Special Master notes that he will utilize this definition of "weekly" in the Thirty-First Monitoring Round.

RC Short-Term Restricted Housing/Administrative Segregation

NKSP and WSP reported that primary clinicians had caseloads within established Program Guide staffing ratios. Psychiatry caseloads were within established staffing ratios at NKSP; however, WSP did not provide psychiatry staffing ratio data.

The monitor's expert observed two IDTTs at NKSP and seven IDTTs at WSP. All nine IDTTs were presented by the assigned primary clinicians and all required staff were in attendance. Patients attended both IDTTs at NKSP; however, only two of the seven patients at WSP attended the IDTTs, while the five remaining IDTTs were held *in absentia*. Each IDTT was held in a confidential treatment space. All the observed IDTTs were inadequate and did not meet Program Guide requirements. Additionally, none of the IDTTs were collaborative, and treatment goals were either omitted or not individualized for each patient. Similarly, level of care was identified but the rationale for the level of care was not discussed in any of the IDTTs and these discussions also lacked informed treatment planning.

Similar to the preceding reporting period, NKSP and WSP reported offering 90 minutes of weekly structured group therapeutic activity. Both institutions complied with the required weekly offerings of out-of-cell activities, including yard.

The monitor observed nine ICCs each at NKSP and WSP. All 18 ICCs were adequate and collaborative, with all required staff in attendance. Additionally, the mental health clinicians participated and offered appropriate feedback regarding each patient's mental health.

Non-Disciplinary Segregation

During the review period, seven institutions – CCI, CIM, CSP/Solano, HDSP, PBSP, SCC, and WSP – placed patients on non-disciplinary segregation (NDS) status. Four institutions – CSP/Solano, HDSP, PBSP, and WSP achieved compliance with timely transfers of patients

placed on NDS status; CCI's compliance rate was 75 percent. Folsom and PVSP did not provide NDS data.

<u>**Summary—MHSDS Patients in Segregated Housing**</u>

During the review period, CDCR did not consistently provide timely psychiatry contacts, primary clinician contacts, and IDTTs for patients in STRH and RC STRH. Additionally, the lack of confidentiality of all contacts and patient attendance in IDTT remained an issue for defendants. CDCR achieved compliance with offering weekly out-of-cell activities and structured group therapeutic activities to patients in STRH and RC STRH.

**N.     Reception Centers**

The reception centers at NKSP and WSP were assessed during the 3CMS monitoring tours. Reliable transfer data for both institutions was difficult to obtain as it was incomplete, inaccurate, or missing. Similar to the preceding monitoring round, mental health staffing shortages created challenges to delivering adequate treatment for reception center patients at both the 3CMS and EOP levels of care. Treatment space for individual treatment in both facilities was inadequate due to office space being in disrepair and non-confidential. Both facilities were able to provide an average of 5.33 hours of structured treatment per week to reception center EOP patients, but the group topics were inadequate. Observed IDTT meetings lacked confidentiality, and the quality of those meetings was inadequate.

Reception center transfer data from NKSP and WSP was generally incomplete and unreliable. NKSP did not provide any length of stay data for reception center EOP patients. WSP patient transfer data revealed that 70 percent of the reception center EOP population had been waiting longer than 60 days, with an average length of stay of 100 days before being transferred. WSP reception center 3CMS patient transfer data revealed that 28 percent of patients were beyond the 90-day transfer timeline with an average length of stay of 110 days.

Reasons for delays included delayed endorsement dates and patients waiting weeks to transfer after receiving endorsement dates.

Staffing issues at both NKSP and WSP impacted mental health care. NKSP patients who were on medications who were not at the EOP level of care did not receive initial assessments. Four social workers and one psychiatrist provided care to NKSP reception center EOP patients, although one psychiatrist occasionally provided coverage in the MHCB as needed. Due to reception center EOP staffing vacancies at WSP, one clinician completed all initial mental health primary clinician assessments, and a second clinician completed all initial IDTTs. The four primary clinicians assigned to WSP reception center 3CMS patients all carried caseloads exceeding the established staffing ratios. In addition to their regular caseloads, WSP staff were also assigned an additional ten to 12 patients daily for individual contacts.

Finding space for conducting confidential, individual contacts was challenging at both NKSP and WSP. Due to space limitations at both facilities, many individual contacts were not confidential, and patients were seen at tables set up in the dayroom at NKSP and cell front at WSP. Offices at WSP were in disrepair and rendered unusable.

Patients at both NKSP and WSP were offered 5.34 and 5.33 hours of structured treatment, respectively, each week. At NKSP, the three weekly recreation groups were held in non-confidential spaces and all patients were offered the same groups regardless of their mental health needs. At WSP, group space was limited to one dedicated group room and the chapel on Facility B, which was only available a few hours a week. Observed WSP groups lacked confidentiality due to the door of the room being left open and correctional officers' presence during groups. The reception center EOP groups at WSP consisted of three recreation therapy groups and two NLTG groups.

Observed IDTT meetings at NKSP and WSP included all required staff in attendance. Meetings were not confidential, as there was a camera in the rooms at NKSP and WSP and officers stood in the room at WSP. Although all staff members at NKSP actively participated and patients at WSP actively participated, observed IDTTs were inadequate. Inadequate discussion of patients' diagnoses, functional impairment, and psychotropic medications impaired NKSP's IDTTs. Issues at WSP included vaguely stated treatment goals, generic interventions discussed for every patient, limited level of care discussion for each patient, and an absence of case conceptualizations.

### Summary – Reception Centers

Transfer data was difficult for both institutions to produce. The data that was reviewed revealed patients remaining at the reception centers longer than mandated transfer timelines allowed. Similar to the preceding reporting period, staffing challenges were present at both NKSP and WSP reception centers. Caseload ratios for NKSP reception center EOP patients were within the established ratio, and both institutions were above the established ratio for reception center 3CMS patients. Treatment space for individual and group treatment was inadequate at both facilities. Finally, observed IDTT meetings were attended by all required team members but lacked confidentiality and adequate substantive treatment discussions.

### CONCLUSION

The Special Master's collective findings reported in the Thirtieth Monitoring Round Report leave no doubt that "the historically high vacancy rates among mental health staff…had a detrimental impact on the plaintiff class." ECF No. 8095 at 137. CDCR's MHSDS remains "significantly and chronically understaffed in the area of mental health services" and, as a result, CDCR struggled to achieve compliance with defendants' remedial plan, the Program Guide. *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal., Sept. 13, 1995).

The Special Master reiterates his admonition that "the mental health staffing crisis should not be allowed to normalize a standard of care that falls short of what the Program Guide requires" and that CDCR must expeditiously "reorient its system to providing Program Guide compliant mental health services to the plaintiff class."  ECF No. 8095 at 139.

The Special Master will begin the next monitoring round with a paper review of the three DSH institutions with designated *Coleman* beds.  Simultaneously, as alluded to above, the Special Master will conduct focused reviews of the newly activated EOP housing units as well as defendants' heat plan implementation.  The Special Master will keep the parties apprised of his plan to monitor the PIPs and CDCR institutions during the Thirty-First Round in the coming weeks.

The Special Master offers no formal recommendations and makes no request for additional court orders.  Going forward, the Special Master cautions defendants against continuing the pattern of resistance that borders on obstruction of his court-ordered monitoring.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

August 16, 2024

# **APPENDIX A**

# **INSTITUTIONAL SUMMARIES**

**APPENDIX A – 1**
**CALIFORNIA INSTITUTION FOR MEN (CIM)**
Site Visit:  October 10, 2023 – October 12, 2023
Review Period:  December 1, 2022 – May 31, 2023

Census:

On October 6, 2023, CIM housed 2,360 incarcerated persons, which was a ten percent decrease since the previous review period.  The mental health caseload population of 827 patients represented 35 percent of the total population and was a 25 percent decrease since the prior reporting period.

The MHCB housed 17 patients.

There were three mainline EOP and 781 mainline 3CMS patients.

The administrative segregation population included three EOP and 23 3CMS patients.

Staffing:

The chief psychiatrist position was filled.  Four of eight psychiatry positions were also filled for a vacancy rate of 50 percent.  The use of 1.96 contractors reduced the functional vacancy rate to 25 percent.

The two telepsychiatry positions were filled.  Both telepsychiatry medical assistant positions were vacant during the review period but were filled at the time of the site visit.

One of two chief psychologist positions and two of four senior psychologist supervisor positions were filled.  Nineteen of 19.5 psychologist positions were filled, reflecting a three percent vacancy rate.  Three psychologists were unlicensed.

The supervising social worker position was filled.  Twelve of 14.5 clinical social worker positions were filled, for a 17 percent vacancy rate.  One social worker was on an extended leave, increasing the functional vacancy rate to 24 percent.  All social workers were licensed.

Interviewed mental health leadership explained that unlicensed primary clinicians required one hour of supervision weekly; all primary clinicians had satisfied their license requirements for supervision.

Five of six recreation therapist positions were filled, for a 17 percent vacancy rate.

Both senior psych tech positions were filled.  Twenty-five psych techs covered 22.7 positions, though two were on extended leave.

Sixteen supervising registered nurses covered 15.2 positions.  Of 75.01 MHSDS registered nurse (RN) positions, 61.6 were filled, reflecting an 18 percent vacancy rate; one RN was on extended leave, for a 19 percent functional vacancy rate.  Ten of 11.8 CNA positions were filled, for a 15 percent vacancy rate.

The OSS II position, HPS I position, and SSA position were all filled.  The CHCA position was vacant.  CIM had one AGPA, but no established position.

For custody staffing, 812 of 822 positions were filled for a one percent vacancy rate; filled positions included the warden, chief deputy warden, all six associate wardens, all five captains, all 24 lieutenants, 70 of 77 sergeant positions, seven of nine CC II positions, 20 of 21 CC I positions, and all 678 correctional officer positions.

Telepsychiatry:

Two telepsychiatrists each provided services 40 hours per week to 3CMS patients for individual treatment and IDTTs.  Telepsychiatry was not used in the MHCB or ASU.

The two telepsychiatrists were assigned to one office on one facility which limited their flexibility to support other yards or caseloads as needed.

Telework:

During the reporting period, the chief psychiatrist and one chief psychologist worked remotely for one day weekly. Additionally, one senior psychologist supervisor, ten MHSDS clerical staff, one OSS II, one AGPA, and one HPS I worked remotely two days weekly.

Staff Recruitment:

The chief of mental health reported that CIM did not have difficulties filling vacant positions. Further, all mental health vacancies were advertised using the Cal HR website. Additionally, psychiatry vacancies were advertised using Management Solutions for potential registry psychiatrists. CIM indicated that all mental health vacancies had been filled quickly except staff psychiatrists and medical assistant positions.

Quality Management:

CIM did not operate a licensed CTC and thus did not require a local governing body during the review period.

The quality management committee met each month during the six-month review period. All QMC meetings achieved quorums and regularly discussed mental health-related matters including CAPs, access to care, mismanagement of staff resources, and mission and leadership changes as well as CMHPP, dashboard compliance, patient safety, self-harm incidents, MHCB referrals, transfer delays, administrative segregation prescreens, non-formulary prescriptions, and various interdisciplinary quality improvement projects. A quality management staff member reported one unresolved action item where outdated and inaccurate allowable items and level of observation orders remained posted on MHCB patients' doors despite ongoing process improvement efforts by nursing.

The mental health program subcommittee meetings convened monthly with required quorums.  Meetings focused on data review and examinations of mental health program process improvement needs.  The MHPS meeting minutes were sufficiently detailed and referenced SPRFIT meeting summaries, discussions regarding staffing, clinical contact frequencies, MAPIP data, administrative segregation prescreens, backlogs for unprocessed safety concerns that did not occur within 30 days, staff training, and various ongoing quality improvement initiatives. Several action items were carried forward from November 2022 due to lack of resolution, including outdated and inaccurate suicide watch orders in the MHCB, ongoing problems with SRASHE audit criteria, and ASU mental health program transfer delays.  Other quality management projects in process addressed mismanagement of staffing schedules and workload distribution, higher level of care referrals, care continuity concerns, IDTT deficiencies, and ASU mental health program transfer delays.

There were no PIWPs, QITs, or FITs during the review period.

CIM reported that outpatient peer review was on hold pursuant to headquarters' directive. The peer review process, however, remained active for MHCB psychiatrists and psychologists. The psychiatry peer review policy was last updated in May 2023.  The peer review policy for non-psychiatry staff was last updated in November 2022.

Interviewed leadership and line staff confirmed that quality management information was disseminated to line staff for transparency and accountability.

Medication Management:

CIM provided MAPIP results from December 2022 to May 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated that CIM was compliant for all six months of the review period with blood pressure, height, weight, medication consents, and thyroid tests. Additionally, the institution was compliant for the two required months of EKG monitoring. The institution was compliant for four months and was noncompliant for two months with obtaining the AIMS. Additionally, CIM was compliant for three months and was noncompliant for three months with monitoring CBCs with platelets. CIM reached compliance for two months and was noncompliant for four months regarding the measures of glucose and CMPs. The institution was compliant for one month and was noncompliant for five months with lipid monitoring. No improvement plan was developed for the monitoring of atypical antipsychotic medications.

CIM was not an approved clozapine initiation or maintenance institution during the monitoring period. Despite this, one patient prescribed clozapine was transferred from RJD to CIM for placement in the OHU. All required metrics were compliant; specifically, they were compliant all six months for weight and blood pressure, five months for CBC, and two months for height and medication consents. No tests were required for glucose, EKG, lipids, and thyroid tests. During the monitoring visit, no patients at CIM were prescribed clozapine.

For required monitoring of antidepressants, CIM reported compliance for six months with obtaining medication consents, thyroid function tests, and monitoring blood pressure for patients prescribed venlafaxine. No EKGs were required during the monitoring period.

For patients prescribed carbamazepine, CIM was compliant for all required monitoring which included therapeutic medication levels for three months, CBC for two months, CMP for one month, and medication consents for one month.

115

For patients prescribed Depakote, CIM indicated compliance for six months with obtaining medication consents. The institution was compliant for three months and was noncompliant for three months with obtaining CMP; they were compliant for two months and noncompliant for four months for monitoring CBC with platelets, and they were compliant for one month and noncompliant for five months for obtaining therapeutic medication levels.

For lamotrigine, CIM noted compliance in obtaining medication consents for all six months.

Regarding lithium, the institution was compliant for six months with obtaining kidney function tests. CIM reached compliance for five months and was noncompliant for one month with obtaining medication consents and thyroid function tests. The institution was compliant for three months and was noncompliant for three months with obtaining EKGs. Finally, there was compliance for two of five required months for therapeutic medication levels.

Regarding medication metrics reported by mental health headquarters, CIM was compliant for all six months for continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity upon parole/transfer to the community, observation of medication preparation at AM and PM, observation of medication at HS, chronic care medications historical administration, and outpatient provider new medication orders. CIM was compliant for five months and noncompliant for one month with continuity of medications for intra-institutional transfer to ASU/SHU/PSU, and continuity of medications upon discharge/transfer from a community hospital and/or DSH. The institution reached compliance for three months and was noncompliant for three months with continuity of medications upon inter-institutional transfer at receiving and release. Regarding continuity of medications for MHCB transfers, CIM was

compliant for three months and was noncompliant for two months; no data was required for one month.

In response to the above metrics, CIM initiated a CAP for continuity of medications upon inter-institutional transfers. This CAP identified a lack of nursing documentation regarding the steps taken when medications were unavailable. While the CAP stated that it would address the lapses with the nurses involved, no further information regarding this CAP was provided.

CIM reported that psychiatrists provided medication prescriptions for a maximum of 180 days. The institution did not report the length of bridge order prescriptions.

CIM reported 490 patients who were prescribed 929 psychiatric medications.

Seven patients were prescribed eight KOP medications, with one prescription deviating from policy for KOPs.

There were 97 medication line audits during the reporting period. Overall, the duration of medication lines was under two hours. Audits of individual patient wait times were suspended due to COVID-19 precautions from December 2022 to April 2023. During May 2023, audits reported that all patients received their medications in less than 30 minutes. Regrettably, medication line audits repeatedly reported a lack of protection from the elements on Facility A.

There were no reported conflicts with medication distribution and mental health programming.

CIM reported an average nonformulary rate of approximately three percent. Nonformulary medication prescriptions did not require secondary review or approval.

During the reporting period, CIM indicated that 352 polypharmacy reviews were required. While the exact percentage of timely completion of required reviews was not provided, document review demonstrated a high rate of compliance.

CIM reported that 184 patients received 311 HS medications. With rare exception, CIM administered HS medications at 8:00 P.M.

During the monitoring period, CIM submitted nine initial petitions, including six emergent and three non-emergent petitions for PC 2602 involuntary medications. There were no renewals, non-renewals, denials, or withdrawn petitions; and none of the petitions were lost due to administrative reasons.

CIM was compliant for both required months for the two related PC 2602 involuntary MAPIP metrics of compliance with the presence of a current PC 2602 court order for involuntary medications present in the EHRS and with the presence of a current physician's order in the EHRS for a medication to be given per PC 2602 court order.

No uses of force were required to administer PC 2602 involuntary medications.

During the site visit, no CIM patients were administered PC 2602 involuntary medications.

Transfers:

During the review period, there were no sustainability reviews completed for CIM. However, the inpatient coordinator continued completing the monthly referral and non-referral audits, which revealed compliance rates above 90 percent. CIM's inpatient coordinator had been in this position for one and a half years. The inpatient coordinator used protocols to expedite DSH referrals when clinically indicated, contacting IRU when applicable, and explained the rationale for the patient recommendation if the treatment team believed that a referral should be expedited. There was no clinician-to-clinician contact between CIM and the inpatient programs when a patient returned from a higher level of care.

During the review period, there were 536 instances of patients considered but not referred to a higher level of care. While the MHCB treatment teams provided clinically sound rationales and treatment modifications, rationales and documentation in the outpatient setting for nonreferrals were not always adequate. Concerningly, clinicians documented rejections in the medical record but recorded them as rescissions in the referral log. Staff indicated that leadership instructed them to rescind a referral when the patient was rejected, even when they did not fully agree; staff did not regularly appeal such rejections.

CIM reported 55 referrals to acute care; eight were rescinded and seven were pending. One of 51 or two percent of referral packets were timely completed within two working days of identification; data was not provided for the remaining four patients. Fifteen of 40 or 38 percent of acute care transfers were timely completed within ten days. However, 35 of 40 or 88 percent transferred within 72 hours of a bed assignment.

There were 21 referrals to intermediate care; 12 were rescinded and one was pending transfer. Five of 17 or 29 percent of intermediate care referral packets were timely completed within five working days of identification; data was not provided for the remaining four patients. Of the eight patients who transferred to intermediate care, two or 25 percent timely transferred within 30 days. Six of eight or 75 percent of patients transferred within 72 hours of a bed assignment.

There were no *Vitek* hearings held during the review period.

CIM referred 95 patients to the MHCB; one referral was rescinded. Of these 94 MHCB referrals, 90 patients were admitted to CIM's MHCB, two patients were admitted to CSP/LAC's MHCB, and two patients were admitted to WSP's MHCB. All but one patient was admitted to the MHCB within 24 hours of referral. Six patients had three or more MHCB admissions.

No patients transferred to a PSU during the review period.

All 26 CIM patients requiring EOP hub placement were timely transferred to EOP hubs.

There were 150 referrals to STRH or LTRH; CIM did not track these referrals separately. Of those, 111 or 74 percent of STRH or LTRH referrals transferred timely. Reasons for delays included delays by the admitting institution and patients being out to court. One patient timely transferred to an EOP program.

CIM was unable to report patients who transferred to mainline EOP programs.

During the review period, no patients' level of care was reduced from EOP to 3CMS and 36 patients' level of care was increased from 3CMS to EOP.

Programming:

MHSDS Patients in Administrative Segregation:

During the site visit, 27 3CMS and three EOP patients were housed in the ASU. Two staff psychologists, one psychiatrist, and two interns were assigned to ASU. While CIM did not have an STRH or LTRH, clinicians attempted to meet with ASU MHSDS patients for individual contacts at least weekly.

The monitor's expert observed six IDTTs in the ASU; all required members were present. Ongoing technology issues prevented mental health staff from accessing patient information during the IDTT; however, the counselor accessed SOMS through desk-top computers.

All observed IDTTs were significantly deficient in determining diagnoses, treatment planning, and level of care. Level of care justifications were not provided for any patients, and treatment goals were not stated in measurable terms. Additionally, inaccurate information was given to patients during IDTTs, including an incorrect amount of treatment hours that the patient would receive after transferring to an STRH. The lack of correction or clarification within the

room, even by the psychiatrist or another PC assigned to the unit, raised concerns about the impact on the IDTTs' level of care decisions.

In response to the monitor's concerns about IDTT quality, mental health leadership and the regional team reported that they were aware of the deficiencies and planned to utilize the regional team's resources for training and monitoring until these issues were resolved; however, this issue had not been brought to the attention of the various QM committees for interdisciplinary action and accountability.

The monitor observed six ICC meetings during the site visit. Required mental health staff were in attendance and provided adequate input for all ICCs.

Unclothed body searches were required upon exiting and entering the administrative segregation unit. Searches were conducted in holding cells; privacy screens were utilized and custody staff used metal detectors when conducting these searches.

Non-Disciplinary Segregation:

During the review period, two MHSDS patients were designated NDS status. Neither patient required accelerated transfer. One patient received privileges and property and the other patient was released from ASU the same day he was placed on NDS status. At the time of the site visit, no MHSDS patients were on NDS status.

MHCB:

During the review period, CIM operated a 34-bed unlicensed MHCB.

CIM's MHCB's average daily census was 25.8 during the review period.

There were 3.5 psychiatrists, three psychologists, three unlicensed psychologists, 1.25 social workers, and one recreation therapist assigned to the MHCB. CIM did not provide caseload ratios for the review period; however, leadership reported that estimated MHCB

caseload ratios for both psychiatry and primary clinicians were within established caseload requirements.

CIM made 95 MHCB referrals during the review period, of which one was rescinded; there were 320 admissions from other institutions. Clinical stays averaged 11 days and ranged from two to 88 days. CIM reported that 161 patients or 39 percent had stays longer than ten days. The average physical length of stay was 13 days, with a range of one to 49 days. Data provided indicated that most lengthy physical stays were due to the need to transfer the patient to inpatient care. Data also revealed that 47 patients transferred beyond 72 hours of clinical discharge and averaged 311 hours, ranging from 91 to 1,023 hours.

All required disciplines attended four observed IDTTs. While team members participated when called upon by the primary clinician, staff did not spontaneously interact and seemed cautious in their participation. All treatment team members knew the patients and had reviewed their records before the IDTT. While the treatment team discussed the patient's level of care, considerations for referral to a higher level of care were not adequately reviewed as a team. Treatment teams also did not consistently provide the clinical conceptualization of the patient's status or were too vague to be clinically useful. Finally, the treatment teams did not discuss one of the most critical aspects of a treatment team – the treatment interventions that will be utilized with the associated targets of treatment and treatment goals. The treatment teams were inadequate in that they failed to adequately address primary components to treatment planning.

One treatment team meeting was especially concerning. The patient had been referred to intermediate care but was rejected by the endorsed facility due to staff there not agreeing that he met intermediate care criteria. CIM changed the patient's level of care to EOP and the patient repeatedly expressed high levels of anxiety and significant safety concerns about his prior

facility, fearing staff and peers.  The patient was clearly extremely distressed and pleaded with staff for help.  CIM responded by informing the patient that he would be discharged back to the facility he feared and should report his concerns when he arrived at receiving and release.  All responsibility was placed on the patient and the treatment team did not provide any support plan.

CIM maintained adequate space for treatment with offices for seven mental health staff within the MHCB and separate treatment space for individual contacts.  There was also a room for groups with six modules that were large enough so that groups could be held in the room without having to place non-maximum custody patients into the treatment modules.  Mental health staff reported that the space was primarily utilized by the recreation therapist.  Patients reported that they had rarely or never been in a treatment group in the MHCB.   Treatment in the MHCB was not adequate due to the lack of actual treatment interventions in group and individual settings, problematic IDTTs that did not adequately address all aspects of treatment planning, failure to consistently complete adequate safety plans when indicated, and the use of unlicensed staff.

Patients also reported that the MHCB was a clean, structured, calmer place to be than their housing units and that staff, particularly custody staff, were polite to them and had a better understanding of their mental health struggles in comparison to unit officers.

Reviewed cases revealed that patients generally received their history and physical and initial assessments timely, though initial assessments were not always confidential.  Treatment plans varied by team and provider.  When interventions were properly included in the treatment plans, there was a lack of documentation that any interventions were implemented during clinical contacts.

While a recreation therapist was assigned to the MHCB during the review period, there was little utilization of recreational therapy. Consequently, patients spent most of their time in their cells and reported during interviews that they would prefer to be out of cell more often and believed that they would benefit greatly from recreational therapy. During the review period, only 11 occurrences of recreational therapy were recorded in the appointment data and programming provided. Ten of those occurred in the group room with one contact/activity occurring on the yard.

Twenty MHCB patients were randomly selected to have their healthcare records reviewed to assess Program Guide compliance. All had timely initial psychiatry evaluations. Thirteen or 65 percent were conducted in a confidential setting; the reason for non-confidentiality was patient refusals. Telepsychiatry was not used for initial psychiatry contacts.

Seventy of 71 or 99 percent of routine psychiatry contacts occurred twice weekly as required. Forty-six or 65 percent were confidential. Reasons for non-confidentiality included modified programming and patient refusals.

All 20 initial primary clinician evaluations occurred timely within 24 hours of arrival and before the initial IDTT. Fourteen of 20 or 70 percent were conducted confidentially. Reasons for non-confidentiality included modified programming and patient refusals. No initial contacts were conducted via telehealth.

For routine primary care contacts, 99 percent were completed timely, though only 72 percent were conducted in confidential settings. Reasons for non-confidentiality included modified programming and patient refusals. No routine contacts were conducted via telehealth.

All 20 required initial IDTTs were timely.  Required staff attended 17 or 85 percent, while patients attended 16 of 20 or 80 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

Twenty-five of 29 or 86 percent of patients who required routine IDTTs received them timely.  Required staff attended 20 or 69 percent and patients attended 28 or 97 percent.

Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, however assignment was not clearly discernable for all cases.

Reviewed 114-As for MHCB patients revealed that they were offered adequate out-of-cell time, showers, weekly linen exchange, and weekly phone calls.

<u>Seclusion and Restraint:</u>

There were no incidents of restraint or seclusion during the review period.

<u>Crisis Intervention Team:</u>

CIM had a current LOP for the establishment and activation of the CIT that aligned with statewide policy.

One clinician was assigned full-time to CIT from Monday through Friday on third watch. Two part-time clinicians provided backup coverage for the primary CIT clinician, though the LOP indicated there was no backup during these hours.  Instead, the LOP directed staff to contact the physician on call if the evening clinician was unavailable.  During regular work hours, primary clinicians were responsible for responding to crisis calls in their respective program areas.  There was no CIT during weekends and holidays, with crisis call response falling to the psychiatrist on call.  If MHCB primary clinicians were on site during weekends or

holidays, they were expected to be available to the physician on call for assistance and for on-site evaluations as needed.

During the review period, CIM utilized the physician on call from midnight to 8:00 P.M. However, in June 2023, CIM was provided with a "night float" or a changing telepsychiatrist who functioned as the physician on call from 6:00 P.M. to 7:00 A.M. The telepsychiatrist was the first point of contact during those hours for crisis calls. CIM also provided four state-employed psychiatrists as the second point of contact for after-hours crisis calls with the acting chief of psychiatry as the final point of contact.

There were 19 CIT referrals during the review period. Eleven or 58 percent of the referrals resulted in patients referred to MHCB, six or 32 percent were returned to the same housing, and two or 11 percent were moved to administrative segregation unit at CIM.

3CMS:

The two telepsychiatrists, two psychiatrists, four of five psychologists, and seven social workers providing treatment to the 3CMS population maintained caseloads within established rations. One psychologist exceeded ratios with a caseload of 107 patients.

The monitor's expert observed the two scheduled IDTTs during the site visit. All required disciplines were present. A telepsychiatrist who was providing coverage for the assigned psychiatrist used a laptop to communicate (not the preferred equipment). The telepsychiatrist was prepared, reviewed the patient's records before the IDTT, provided valuable input, and collaborated with team members. The primary clinician was familiar with her patients, presented useful background information, referenced progress towards treatment goals, and praised patients on their participation in treatment, programming, and completion of mental health homework assignments provided between sessions. The primary clinician offered a useful

summary of the patient's stay at CIM and respectfully answered the patient's questions. Overall, the treatment team members operated collaboratively toward treatment planning and generally addressed all necessary elements for meaningful and adequate IDTT reviews.

CIM provided group access to 3CMS and non-MHSDS incarcerated individuals, including those facilitated by clinicians, recreational therapists, nurses (NLTGs), student interns, and peer mentors. Patients reported that mental health groups had long waitlists, and one patient on A yard stated that he had been on the group waitlist for more than six weeks. Patients, including those housed in the administrative segregation, were also offered family-involved treatment services, which they reported was very beneficial.

Interviewed patients who were prescribed psychiatric medications confirmed that psychiatry staff spent sufficient time with them, provided necessary information about the risks and benefits of psychiatric medication, and assessed for common medication side effects. Patients further reported that primary clinicians generally met with them more often than every 90 days in confidential settings, adding that the contacts lasted 45-60 minutes and were meaningful and therapeutic.

Patients further reported their telepsychiatry visits were confidential and that the medical assistant offered to leave the room for confidential treatment, though some patients said they generally did not go into the same detail with telepsychiatrists like they would with in-person clinicians due to the medical assistant being in the room.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays. One patient required an initial psychiatry evaluation and received it timely, before the initial IDTT, and in a confidential setting. Telepsychiatry was not used for initial psychiatry contacts.

Routine psychiatry contacts occurred at least every 90 days and were timely.  All were conducted in a confidential setting.  Telepsychiatry was used for 38 percent of routine psychiatric contacts.

The one patient who required an initial primary clinician evaluation received it timely.

For routine primary clinician contacts, 96 percent timely occurred at least every 90 days.  All were conducted in a confidential setting.  No primary clinician contacts were conducted via telehealth.

Two of three patients had timely initial IDTTs within 14 working days of arrival or a level of care change.  Required staff and patients attended all initial IDTTs.

All ten patients who required annual IDTTs received them timely, with all required staff in attendance.  All required staff attended.  Eight of ten or 80 percent of patients attended routine IDTTs.  Reasons annual IDTTs were held *in absentia* included a patient being at an offsite clinic for a medical appointment and COVID-19.

Of note, the Program Guide requires the attendance of the assigned psychiatrist and primary clinician at both the initial and routine IDTTs, however, assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

CIM's pre-release coordinator was a licensed clinical social worker with no other clinical responsibilities.  He was assisted by a backup pre-release coordinator who ran a weekly group in addition to other duties.  While the pre-release coordinator reported a myriad of pre-release responsibilities, they could not answer questions regarding the number of patients served, how

many times patients were seen for prelease planning, or how often patients were connected to any particular services.

There were no pre-release groups conducted during the reporting period. The pre-release coordinator indicated that it was difficult to conduct groups due to insufficient treatment space at CIM.

Program Access:

a.    Job and Program Assignments

During the reporting period, CIM reported 1,205 job assignments; none were held by EOP patients, and 379 3CMS patients or 49 percent of the 3CMS population held them as well as 826 or 56 percent of non-MHSDS individuals.

For the 467 academic assignments, EOP patients held none and 159 or 20 percent of 3CMS patients held them, as did 308 or 21 percent of non-MHSDS individuals.

Of 112 vocational education assignments, EOP patients held none; 29 or four percent of 3CMS patients held them, as did 83 or six percent of non-MHSDS individuals.

Of 392 voluntary education assignments, EOP patients held none and 156 or 20 percent of 3CMS patients held them, as did 236 or 16 percent of non-MHSDS individuals.

There were 51 substance abuse treatment assignments; none were held by EOP patients, and 18 or two percent of 3CMS patients held them, as did 33 or two percent of non-MHSDS individuals.

b.    Milestone Credits

CIM reported that one of four eligible EOP patients received milestone credits during the reporting period. Of 814 3CMS patients, 50 were eligible to earn milestone credits, and 46 or 92 percent earned them. Of the 1,504 non-MHSDS population, all five individuals who were eligible for milestone credits earned them.

c.     <u>Out-of-Level Housing</u>

During the reporting period, there were 109 custody Level II 3CMS patients in Level I housing, two designated temporary level-housed 3CMS patients in Level II housing, and three Level II 3CMS patients in Level III housing.  Neither CIM nor the regional custody officers could explain their designation of temporary leveled housing.

d.     <u>ADA Reasonable Accommodation and Grievance Procedure</u>

CIM produced the revised ADA accommodation and grievance procedures and provided a copy of the updated CDCR Form 1824 Desk Reference manual.

<u>"C" Status</u>:

CIM reported that four 3CMS patients were on "C" Status during the review period due to their classification as program failures.  During the site visit, there was one 3CMS patient on "C" Status.  CIM did not provide data indicating how long patients remained on "C" status.

<u>Case-by-Case Reviews</u>:

No patients required case-by-case reviews during the review period.

<u>Mental Health Referrals</u>:

CIM reported 1,849 mental health referrals, excluding PREA referrals.  There were 436 psychiatry referrals and 1,413 referrals to primary clinicians.  There were 101 emergent, 175 urgent referrals, and 1,573 routine referrals.

There were timely responses to 100 percent of emergent psychiatry referrals and 82 of 97 or 85 percent of emergent primary clinician referrals.  For urgent referrals, there were timely responses to 10 of 14 or 71 percent of psychiatry referrals and 142 of 161 or 88 percent of primary clinician referrals.  For routine referrals there were timely responses to 368 of 418 or 88 percent of psychiatry referrals and 1,028 of 1,155 or 89 percent of primary clinician referrals.

<u>Custody and Mental Health Partnership Plan</u>:

The institution's custody and mental health partnership LOP was current and last revised in March 2023 and comported with statewide policy.

Executive leadership joint rounding occurred during all six months of the review period and used the correct form.  Rounding documentation indicated required staff's attendance and interviews of staff and patients.  Staff routinely reported a good working relationship between mental health and custody staff.  Patients reported knowing their primary clinician and routinely getting adequate and timely care.

CIM provided executive staff meeting agendas, quality management committee minutes, and mental health subcommittee minutes for all six months.  Agenda items included the 50-bed MHCB construction project, COVID-19 related issues, ADA updates, business services reports, complex unit reports, healthcare access units, and various staff reports.  All reviewed agendas and meeting minutes referenced rounding in detail.

Daily huddle sheets were provided for the ASU, MHCB, and 3CMS units for all weeks of the review period.  The required form was utilized and huddle sheets indicated required staff's attendance.

CIM conducted weekly 3CMS supervisory meetings during each week of the review period; required staff attended all meetings.  Agenda items included patients returning from higher levels of care, patients new to the unit, patients exhibiting unusual behavior, medication concerns, individual patient concerns, and program operations.

Monthly joint supervisory 3CMS program area tours occurred monthly with required staff in attendance.  Reviewed documentation reflected that staff routinely reported a good working relationship between mental health and custody staff.  Additionally, patients reported

positive comments regarding their individual mental health treatment plans and their relationships with mental health and custody staff.

CIM distributed the 3CMS orientation brochure to new patients and provided a copy of the same to the monitor.

IAC meeting minutes were provided for five of six months of the review period. The IAC meetings addressed mental health issues, medical issues, patient concerns, patient reports; documentation revealed that mental health staff attended IAC meetings.

Patients filed 105 staff misconduct complaints during the review period. CIM did not indicate whether the complaints were filed against mental health, medical, or custody staff. Fifty-nine or 56 percent of complaints were closed. Staff reported that all misconduct investigations were initiated through the appeal process. No staff were reassigned due to a staff misconduct complaint.

CIM reported that 120 of 260 or 46 percent of required mental health staff and 514 of 810 or 63 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

The LOP was up to date and comported with headquarters' directive.

The CIM review period was outside of the Heat Plan activation months. CIM reported that temperatures never reached heat plan activation levels during the review period.

Interviewed housing unit officers were knowledgeable of all heat plan stages. Handheld thermometers were readily available in each unit, and officers explained that during a Stage I heat alert, they would routinely take tier and cell temperatures. During the site visit, officers in each unit produced heat logs and current heat medication patient lists.

One hundred and twenty-six of 790 or 16 percent of custody staff and 100 percent of mental health staff completed the required heat related pathologies training.

RVRs:

CIM issued 836 RVRs during the review period, including 460 or 55 percent to MHSDS patients and 376 or 45 percent to non-MHSDS incarcerated persons. There were two RVRs issued to acute care patients, 14 issued to MHCB patients, seven issued to EOP patients, and 437 issued to 3CMS patients.

Thirteen randomly selected RVRs were reviewed for compliance with CDCR policy and procedure. Of those, none were documented in an alternative manner. Four patients were assigned a staff assistant, and all but one reviewed mental health assessment indicated that interviews were conducted confidentially.

Custody staff timely referred RVRs to mental health staff in five of 13 or 38 percent of cases. Mental health assessments were timely returned to custody staff in 11 or 85 percent of cases. The SHO documented consideration of the MHA-115 information in every case and mitigated the penalty in five of six or 83 percent of instances where the clinician recommended mitigation.

The mental health assessment training was attended by 36 of 108 or 33 percent of custody staff, and one senior psychologist, and two staff psychologists.

Use of Force:

CIM reported 12 immediate uses of force involving 12 mental health patients, and no controlled use of force incidents; two of the 12 incidents involved MHCB patients. Review of all incidents indicated compliance with CDCR policy.

133

Use of force training was attended by 783 of 825 or 95 percent of custody staff, and 24 of 183 or 13 percent of mental health staff.

Lockdowns/Modified Programs:

Review of PSRs indicated that there was a program lockdown on Facilities B and C on December 23, 2022 due to a COVID-19 quarantine.  Normal programming resumed on January 5, 2023.  On January 12, 2022, the institution was placed on a modified program due to a missing 50-foot piece of rope.  Normal programming continued under escort for all movement.  On January 13, 2023, normal programming resumed.

Access to Care:

A review of monthly Health Care Access Quality reports from December 2022 through May 2023 reflected the issuance of 86,331 mental health ducats and add-on appointments.  Of those, 77,447 or 90 percent were completed, and 8,884 or ten percent were not completed.  Of the non-completed appointments, none were due to custody factors, 5,197 or 58 percent were due to non-custody factors, and 3,687 or 42 percent were due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CIM did not provide data for an MSF.

*Coleman* Postings:

*Coleman* posters in English and Spanish were properly displayed in all toured housing units except for Unit C, Upper.

**APPENDIX A – 2**
**HIGH DESERT STATE PRISON (HDSP)**
Site Visit: October 17, 2023 – October 19, 2023
Review Period: March 1, 2023 – August 31, 2023

Census:

On October 16, 2023, HDSP housed 2,445 incarcerated individuals.  The 733 MHSDS

patients represented 30 percent of the institution's population and was a 76 percent increase from

the previous site visit.

The MHCB was closed–although leadership reported it was scheduled to reopen in

January 2024–and no patients were in alternative housing.

There was one mainline EOP[37] and 699 mainline 3CMS patients.

One EOP patient was housed in the ASU awaiting transfer to a PSU.  The STRH housed

32 3CMS patients.

Eleven 3CMS patients and one EOP patient were designated NDS status.

Sixty-two non-MHSDS incarcerated persons were housed in administrative segregation.

Staffing:

On October 18, 2023, the chief psychiatrist position was filled.  The 0.5 in-person staff

psychiatry position was vacant.

All four telepsychiatry positions were filled.

One of two chief psychologist positions were filled, as were all three senior psychologist

positions.

---

[37] An EOP program is scheduled to open at HDSP in 2024.  Leadership and staff noted concerns
regarding the same given their limited staffing and frequent incidents of violence on the same
yard proposed to house EOP patients.

Four of 11 staff psychology positions were filled for a 64 percent vacancy rate; an additional staff psychologist was on long-term leave for a functional vacancy rate of 73 percent.

The supervising social worker position was filled. Five of six social worker positions were also filled, reflecting a vacancy rate of 17 percent; however, three social workers were on extended leave for a functional vacancy rate of 66 percent.

All primary clinicians were licensed.

Three of four recreation therapist positions were filled, reflecting a 25 percent vacancy rate. However, one recreation therapist was on long-term leave, resulting in a 50 percent functional vacancy rate.

One of the 1.2 supervising RN II positions was filled for a 17 percent vacancy rate. Similarly, of 1.2 registered nurse positions, one was filled for a 17 percent vacancy rate.

The one senior psych tech position was filled, as were eight of 10.6 psych tech positions for a 25 percent vacancy rate.

Five of seven MHSDS clerical positions were filled for a 29 percent vacancy rate. One of the 1.5 HPS I positions was filled for a 33 percent vacancy rate and the OSS II position was filled. The correctional health services administrator II position was vacant.

Regarding custody staff, HDSP reported that, on September 26, 2023, 806.2 of 878.4 custody staff positions were filled for an eight percent vacancy rate. The warden and chief deputy warden positions, four of five associate warden positions, all six captain positions, 29 of 30.4 lieutenant positions, 75 of 76 sergeant positions, the one CC III position, five of six CC II specialist positions, all six CC II supervisor positions, all 17 CC I positions, and 663.2 of 731 correctional officers were filled.

Telepsychiatry:

Four telepsychiatrists treated mainline 3CMS patients.  To maintain continuity of care, assigned mainline telepsychiatrists continued to treat those patients who were placed in the STRH.

Telework:

At the time of the site visit, the chief psychiatrist was fully remote.  For senior psychologists, one teleworked one day per week, and one teleworked two days per week.  The HPS I typically teleworked two to three days per week.  Two MHSDS clerical staff teleworked three days weekly.  Notably, the institution was planning to implement tele-mental health in the upcoming months.

Staff Recruitment:

HDSP reported participating in various job fairs but otherwise did not note any staff recruitment efforts.  Multiple psychology positions had been vacant for at least two years; the chief psychologist position had been vacant since 2014.  At the time of the site visit, there were no pending applicants for vacant positions.

Despite staffing shortages, any major backlog was mitigated by the diversion of MHCB staff while it was temporarily closed and by supervisory staff's assistance with clinical responsibilities which, while useful, detracted from supervisory responsibilities.

Quality Management:

Local governing body, quality management committee, and mental health program subcommittee meetings were held monthly throughout the review period and quorums were met at each meeting.  Review of meeting notes indicated discussion of relevant and appropriate

topics, including staffing efforts, the MHCB flooring project, and routine internal audits of several clinical functions and areas.

HDSP's quality management program was managed by a senior psychologist specialist who oversaw quality management across various healthcare departments, including mental health, dental, medical, and nursing. This manager reported that the overall quality management process had improved since the previous monitoring round but emphasized that the staffing shortage was "the biggest hurdle" to compliance and that the mental health staffing shortage had the most significant impact on initial assessments and continuity of care. Furthermore, quality management reporting accuracy was negatively affected by technical "disconnects" in the system due to SOMS and Cerner not working well together and incorrectly flagging various clinical data points and indicators.

HDSP did not charter or discontinue any QITs or FITs during the review period, though several Green Belt projects were in progress at the time of the site visit. The active Green Belt projects focused on nursing protocols, including ASU prescreening, Q11 and Q30 checks, and supervisory checks of timely MHCB discharge follow-ups. Staff reported that mental health leadership and staff utilized corrective action plans (CAPs) to address mental health programming deficiencies and problem areas. There were no open CAPs for mental health treatment and programming during the site visit, but several open CAPs for MAPIP (medication management) concerns; two CAPs were on hold due to the MHCB closure and would resume when the MHCB reopened.

Quality management monitored approximately 30 different areas related to the mental health program. The audit process involved close review of performance reports to analyze data

for yellow and red performance indicators and subsequently "drilling down" on specific reports and problem areas to determine causes and whether any CAPs were necessary.

There was no active peer review for primary clinicians at the time of the site visit and HDSP was awaiting direction and implementation of a statewide policy and procedure from headquarters.

Medication Management:

HDSP provided MAPIP results from March 1, 2023 to August 31, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics revealed compliance for six months with monitoring blood pressure, height, weight, and thyroid tests. HDSP was compliant for one of three required months for obtaining EKGs; regrettably, they were noncompliant all six months for monitoring the Abnormal Involuntary Movement Scale (AIMS), glucose, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), lipids, and obtaining medication consents.

HDSP was not an approved clozapine initiation or maintenance facility, and no patients were prescribed either clozapine or carbamazepine.

For required monitoring of antidepressants, HDSP was compliant for the one month requiring EKGs. HDSP was compliant for five of six months with monitoring blood pressure for patients prescribed venlafaxine. HDSP was compliant for four of six months with monitoring thyroid tests. The facility was non-compliant for all six months with obtaining medication consents.

For patients prescribed Depakote (divalproex, valproic acid), HDSP was compliant for two of three months of required medication consents. The facility was compliant for two months

and non-compliant for four months with monitoring CBC with platelets and CMP.  Regarding monitoring therapeutic blood levels, the facility was compliant for a mere one out of five required months.

HDSP complied with obtaining medication consents for lamotrigine for all three required months.

Regarding lithium, HDSP was compliant for two of three required months with both kidney tests and monitoring therapeutic medication level, the one required month for monitoring thyroid functioning, and noncompliant for the one required month for obtaining medication consent forms.  No EKGs were required during the monitoring period.

HDSP reported multiple improvement plans regarding required monitoring of patients on antipsychotic medications.  These were initiated in October 2021 and remained open during the review period; although data from 2023 revealed difficulties in meeting compliance with these metrics.  HDSP reported that this was due to an influx of patients onto B yard where updated diagnostics were not performed.

For medication management metrics reported by headquarters, HDSP was compliant for all six months with continuity of medications with intra-institutional transfer to ASU/SHU/PSU, observation of medication preparation HS, chronic care medications historical administration, and outpatient provider new medication orders; five months for continuity of medications upon parole/transfer to the community; four months for continuity of medications from discharge/transfer from a community hospital and/or DSH and observation of medication preparation AM and PM; three months for continuity of medications upon inter-institutional transfer at receiving and release (R&R); three of five required months for continuity of medications for MHCB transfers; and two months for continuity of nurse administered (NA) and

direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU).

HDSP reported neither the number of patients taking psychiatric medications nor the number of psychiatric prescriptions.

Psychiatric prescriptions were ordered for a maximum of 180 days, and the psychiatrist determined the actual length of the prescription based on clinical factors. Bridge orders were provided for up to 30 days. For verbal and telephone orders, nursing staff were required to "read back" the order to the prescriber, and psychiatry subsequently reviewed the order. HDSP did not specify a process, timeframe, or tracking system regarding signing verbal or telephone orders.

Psychiatrists prescribed KOP SSRIs to 15 3CMS patients.

There were 51 medication line audits during the reporting period. With rare exception, audits covered second and third watches on all yards; May 2023 did not include D yard for second watch, and June 2023 did not include D yard for second or third watch. HDSP reported that D yard was on lockdown for May 2023 and June 2023, with nursing administering medications at the cell front. Audit documentation revealed that patients received their medications in less than 30 minutes and that the duration of medication lines was under two hours. The rare instances of exceeding these timeframes were due to medical emergencies.

There was an awning above the medication line window to shield patients during medication administration; accordingly, HDSP did not report any issues with lack of protection from inclement weather for patients waiting in medication lines. Medication distribution occurred in pill lines on the yards except for restricted housing or during lockdowns or quarantines.

HDSP opened a CAP for medication administration in March 2023 which closed in June 2023. While nursing staff administered doses of medications, produced data did not reflect this. Leadership reported that this was due to the nurses not properly scanning the medication at the time of administration. Produced documentation indicated that by June 2023, nurses scanned all medications appropriately. HDSP reported that most of the noncompliance during the monitoring period resulted from the influx of new patients on B yard.

In December 2022, HDSP chartered a CAP regarding no-shows for medications which was in the monitoring phase during the review period; the CAP identified custody not releasing patients for medication administration as an issue. HDSP reported that communication between custodial and nursing staff had substantially improved. The CAP noted an interval improvement from January 2023 when there were 4,278 no-shows, to August 2023 when there were four no-shows. Interventions included staff training, revising the LOP for the medication administration process, and evaluation of medications for possible discontinuation if frequently refused. This CAP closed in September 2023; subsequently, nursing staff reviewed a monthly report to monitor the same. Supervisors provided staff with training and feedback as needed.

HDSP reported no conflicts between medication distribution and mental health programming.

In accordance with statewide policy, non-formulary prescriptions no longer required secondary review and approval; accordingly, the institution did not report average non-formulary medication rates during the monitoring period.

HDSP reported that pharmacy tracked the medication registries; and when indicated, completed a record review and progress note of their findings. Pharmacy then sent these notes to

primary care or psychiatry if any issues required attention. HDSP reported that 123 of the required 127, or 97 percent, of polypharmacy reviews were completed timely.

HDSP did not report the number of patients prescribed medications at HS, nor the total number of HS prescriptions; however, they did report a list of all doses of medications administered at HS. This report included mental health and non-mental health medications. With rare exception, HDSP was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

HDSP was noncompliant for the one required month with PC 2602 involuntary medication court orders, and no data was required for the related metric of compliance with PC 2602 involuntary medication orders. HDSP reported that the reason for this difference was that the psychiatrist did not deem a medication clinically necessary at the time despite the PC 2602 involuntary medication court order in place.

HDSP filed no initial PC 2602 petitions and one renewal petition. No petitions were denied or withdrawn. As of October 16, 2023, HDSP reported that one 3CMS patient received PC 2602 involuntary medications. At the time of the site visit, there were no pending PC 2602 petitions.

Regarding the involuntary medication process, a psychiatrist initiated the paperwork for PC 2602 petitions which was then sent to the senior psychologist specialist who served as the MCA. HDSP reported close monitoring of PC 2602 patients which included checking on a weekly basis to ensure that those patients had not transferred to another institution. If transferred, the MCA alerted the receiving facility's MCA. HDSP denied any challenges with the PC 2602 involuntary medication process and reported working well with CDCR's Office of Legal Affairs and the Office of Administrative Hearings.

No uses of force were necessary to administer PC 2602 involuntary medications.

Transfers:

HDSP was not an EOP institution; accordingly, there were no sustainability reviews or ASU EOP hub certifications during the review period.

HDSP's inpatient coordinator was a senior psychologist specialist and had held that position for nine years.  The backup inpatient coordinator was also a senior psychologist specialist.  The inpatient coordinator noted no significant concerns with inpatient transfers.

During the review period, seven patients were considered for, but not referred to, inpatient care.  A review of the inpatient non-referral log, healthcare records, and discussion with staff indicated that five patients whose levels of care were appropriately elevated to 3CMS or from 3CMS to EOP were erroneously placed on the log.  The non-referral rationales were not documented.  A clinical review for the two patients who were not referred for inpatient care indicated that documentation for one patient was insufficient to determine clinical appropriateness, and the non-referral for the other patient was appropriate with sufficient treatment accommodations.  Of note, the three patients who were in the MHCB during the month of March warranted inclusion on the inpatient non-referral log but were not included.

HDSP reported one acute and no intermediate care referrals; the one patient transferred timely.

At the time of the site visit, no patients were pending transfer to inpatient care.

No patients with complex medical needs were transferred to acute or intermediate care during the review period.

No *Vitek* hearings were held during the review period.

HDSP made 53 MHCB referrals during the review period resulting in 42 transfers and 11 rescinded referrals. Forty-one of the 42 transfers, or 98 percent, occurred timely within 24 hours of alternative housing placement. Reasons for the delayed transfer were not provided.

No patients were transferred to a PSU, EOP hub, or LTRH during the review period.

Patients requiring STRH placement were moved to the on-site STRH without delay.

HDSP transferred 14 patients to EOP programs; 11 or 79 percent transferred timely within 60 days of their EOP level of care designation. Two delays were due to patient refusal to transfer and enemy concerns. The third delay was reportedly due to awaiting adjudication of an RVR in violation of the EOP hub transfer policy.

HDSP made 73 MSF placements for 54 patients during the review period. Each patient had a job assignment prior to their MSF admission. Six or 11 percent of the 54 patients returned to a non-MSF facility and one had a higher level of care change.

Programming:

STRH:

During the review period, 147 patients had a total of 174 stays in HDSP's STRH. The average length of stay was 47 days and ranged from one to 399 days. There were two EOP patients and 35 3CMS patients housed in STRH at the time of the site visit.

Two psychologists treated patients in the STRH and maintained caseloads within established ratios, but psychiatry caseloads exceeded the required staffing ratios.

Four weeks of 114As were reviewed for all patients housed in the STRH at the time of the site visit. Patients were offered at least three showers per week and had weekly linen exchanges for each reviewed week and were offered a range of 12 to 19 hours of yard time in weeks reviewed. Reasons for the range in yard time offered included patients being released

from STRH and newly admitted patients not being eligible for yard until their initial ICC. Additionally, 114As had recently transitioned from paper to electronic documents; this new electronic format did not account for phone calls offered or whether patients were receiving initial ICCs. However, custody staff provided ICC information for two weeks prior to the site visit which indicated that newly placed STRH patients received timely ICCs. Custody staff also provided a separate weekly call log which revealed compliance for offered phone calls for each STRH patient.

Unclothed body searches at HDSP were conducted in accordance with headquarters' directive and were routinely completed upon patient departure from the STRH in a secluded cell with cement walls for privacy. Visual inspection during unclothed body searches lasted approximately one minute and were head-to-toe examinations, including body cavities and any extensions of the body, including prosthetic appliances, canes, and walkers, when necessary. Hand-held metal detection devices were used regularly as well.

Observed treatment space in the STRH consisted of one group therapy room with eight secure desks for patients and three small individual treatment rooms, each containing a TTM, desk, and computer for the clinician. All areas were confidential. Treatment space was also available in the medical services clinic adjacent to the STRH building.

The monitor's expert was unable to observe STRH IDTTs due to staff repeatedly providing the monitor's expert with an incorrect schedule.

During the review period and at the time of the site visit, HDSP offered STRH patients three groups per week, including one coping and two social skills groups. The group topics and content were appropriate for the population. Reviewed documentation revealed that recreation

146

therapists typically facilitated groups; however, social workers provided additional coverage when necessary.

The monitor's expert observed a recreation therapist facilitated social skills group with three patients in attendance. The quality of the group was adequate and the patients appeared to benefit from attending. There was good rapport among the patients and facilitator who demonstrated passion and enthusiasm while facilitating the group.

The monitor's expert also interviewed five 3CMS patients at cell-front in the STRH. These patients reported receiving required weekly out-of-cell time and being offered one 90-minute group per week and three hours of yard six days per week. The patients also reported receiving timely clinical contacts in confidential settings and provided generally positive feedback about their clinicians and the quality of care they received in the STRH. Additionally, the patients reported that psych techs conducted daily rounds and provided therapeutic packets and activities when requested. While patients reported receiving timely IDTTs, they also reported receiving ICCs prior to their IDTTs, which did not comply with Program Guide requirements.

One interviewed STRH primary clinician reported a positive and collaborative relationship with custody staff and no issues with access to patients.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Seventeen patients required initial psychiatry evaluations; of those, 15 or 88 percent timely occurred before the initial IDTT and 14 or 82 percent were conducted in confidential settings. Non-confidential contacts were attributed to patient refusals. Fourteen or 82 percent of initial psychiatry contacts utilized telepsychiatry.

Six STRH patients required routine psychiatry contacts.  Of those, 100 percent were completed timely and in confidential settings.

All 17 initial primary clinician evaluations timely occurred within ten working days of arrival and before the initial IDTT.  Eight or 47 percent were conducted in confidential settings.  Non-confidential contacts were attributed to patient refusals.

Eighteen STRH patients required routine primary clinician contacts.  Of those, 88 percent were timely and occurred at least every seven calendar days.  Forty-three percent of reviewed primary clinician routine contacts were conducted in confidential settings.  Non-confidential contacts were attributed to patient refusals.

Seventeen STRH patients required initial IDTTs; 15 or 88 percent occurred within 14 working days of placement in the STRH.  Required staff attended 16 or 94 percent and patients attended nine or 53 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

All five patients who required routine IDTTs every 90 calendar days received them timely.  Of the six reviewed routine IDTTs, required staff attended all six and patients attended three or 50 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.

<u>Non-Disciplinary Segregation</u>:

During the review period, three 3CMS patients were designated NDS status, one of whom was NDS 200 and transferred timely.  The two other patients were designated NDS 102 status and did not require accelerated transfer.  At the time of the site visit, 11 patients were designated NDS status, including one EOP and ten 3CMS patients.

The monitor observed two NDS ICCs.  Both patients had been placed in restricted housing due to safety concerns and were retained pending transfer.  Required staff attended both observed ICCs and adequately participated, as required.

MHCB:

The ten-bed MHCB was closed for five of six months of the review period and remained closed at the time of the site visit due to a flooring project.  Staff anticipated that the MHCB would reopen in January 2024.

HDSP admitted three patients to the MHCB during the one month of the review period that it was open.  The average clinical length of stay was seven days and the average physical length of stay was 11 days and ranged from eight to 15 days.  Two patients had stays longer than ten days.  The average daily census was two patients.

The monitor's expert reviewed the three patients' healthcare records, revealing various deficiencies in each case and a lack of individualized treatment planning in all cases.

The monitor also reviewed the healthcare records of the three MHCB patients treated during the review period to assess compliance with Program Guide timeframes during their stays.

All three patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of arrival.  All three utilized telepsychiatry, and two were conducted in confidential settings; the reasons for non-confidentiality were patient refusals.

All nine twice weekly routine psychiatry contacts were timely, and seven, or 78 percent, were conducted in confidential settings.  Non-confidential contacts were attributed to patient refusals.  Telepsychiatry conducted all reviewed routine contacts.

All three initial primary clinician evaluations were completed within 24 hours of patient admission, and two were conducted in a confidential setting.  Non-confidential contacts were attributed to patient refusals.

All three MHCB patients required routine primary clinician contacts.  One hundred percent of contacts were timely, and 14 or 56 percent were conducted in confidential settings. Non-confidential contacts were attributed to patient refusals.

All three initial IDTTs occurred within 72 hours of patient arrival.  Required staff attended two, and patients attended all three.

All three patients who required routine IDTTs received them timely, or every seven calendar days following the initial IDTT.  Of the four reviewed routine IDTTs, required staff attended all four and patients attended three or 75 percent.  *In absentia* IDTTs were attributed to patient refusals.

<u>Seclusion and Restraint</u>:

No patients were placed in seclusion or clinical restraints during the review period.

<u>Crisis Intervention Team</u>:

HDSP's CIT operated seven days a week between 7:00 A.M. and 4:00 P.M.  The institution did not have a designated CIT clinician; the patient's assigned clinician was the clinician of choice to meet with the patient for emergent referrals.  After 4:00 P.M., the on-call clinician or telepsychiatrist was contacted.  Staff reported that CIT members (nurse, clinician, and lieutenant) met in advance of the assessment of the patient, but the patient was not evaluated by team members as a group.

<u>3CMS</u>:

The HDSP mainline 3CMS population was housed on Facilities A through D and the MSF, with the majority of 3CMS patients housed in Facilities A and B. Recreation therapists facilitated one weekly activities group on Facility A and two weekly groups on Facility B.

The two psychologists and four telepsychiatrists who treated the mainline 3CMS population all maintained caseloads within established ratios. Of the four social workers who treated mainline 3CMS patients, three carried caseloads within the established ratio, while one exceeded the ratio with a caseload of 120 patients. Additionally, the supervising social worker carried a caseload of 46 patients, and the two senior psychologists carried caseloads of 35 and 148 patients, respectively.

At the time of the site visit, one psychologist and three social workers who treated mainline 3CMS patients were on long-term leave; the other mainline 3CMS psychologist and social worker, and the two psychologists who treated STRH patients, covered their caseloads.

The monitor's expert observed seven IDTTs across Facilities A, B, and C, and the MSF. While treatment collaboration varied across teams, each team was attentive and treated patients with respect and empathy. Additionally, correctional counselors were actively involved and provided useful information to the patients.

Overall, IDTT discussions needed more specificity and alignment in discussion of pertinent psycho-social information with case conceptualization to aid in treatment planning, including treatment summary over the previous year for routine IDTTs. Diagnoses were stated, but the supportive symptoms and functional impairments were not. Treatment goals were not clearly stated and, when identified, were not individualized but, rather, stated in global terms

such as "depression."  These observations were consistent with patients' lack of awareness of treatment goals.  Corresponding interventions to achieve treatment goals were rarely discussed.

The monitor's expert interviewed a randomly selected group of 11 3CMS patients from Facilities A and B regarding their experiences in the 3CMS program at HDSP.  The regional administrator was in attendance as well.  Patients expressed satisfaction with their mental health care, which they reported receiving timely.  They reported additional access to mental health staff if they required more frequent contacts which they reported occurred in confidential settings.  Custody staff responses to urgent requests for mental health were reportedly timely as well.  Treatment team members were attentive and contacts with primary clinicians were useful, consisting of talking about stressors and provision of various resources (self-help handouts and journals).  There were mixed reports regarding IDTT attendance, and few patients were aware of their treatment goals.  Patients on B yard also noted that some individuals "slipped through the cracks" and needed a higher level of care.

Twenty patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.  One patient was placed in STRH immediately upon arrival to HDSP and, therefore, was screened out of the review process.

Fifteen patients required initial psychiatry evaluations; 13 or 87 percent timely occurred before the initial IDTT, and all were conducted in confidential settings via telepsychiatry.

Fourteen patients required routine psychiatry contacts; 81 percent were timely and occurred at least every 90 days.  All reviewed routine contacts were conducted in confidential settings via telepsychiatry.

Fifteen patients required initial primary clinician evaluations; seven or 47 percent were completed within ten working days of arrival or change in level of care.  All were conducted in confidential settings.

Fifteen patients required routine primary clinician evaluations; 76 percent were timely and occurred at least every 90 days.  Of the reviewed routine contacts, 92 percent were conducted in a confidential setting.  Non-confidential contacts were attributed to patient refusals, which resulted in cell-front contacts.

Fifteen 3CMS patients required initial IDTTs; one or seven percent occurred within 14 working days of arrival or level of care change.  Twelve of the 14 patients who did not receive a timely initial IDTT waited an average of 68 days before receiving one, and the range was 30 to 134 days.  Two patients never received an initial IDTTs.  All patients and required staff attended the initial IDTTs.

Two of three patients who required annual IDTTs received them timely.  All required staff were in attendance and patients attended two of the three.  Annual IDTTs held *in absentia* were attributed to patient refusals.

Other Issues:

Pre-Release Planning:

HDSP had one pre-release coordinator who provided patients with release of information forms (ROI's) and resources for their respective commitment counties and, when applicable, their approved out of county or state residence.  HDSP staff also facilitated program placement and housing needs when requested by patients and also provided pre-release packets.

The HDSP pre-release coordinator reviewed the pre-release report daily; at the time of the site visit, 110 patients were on this list.  The pre-release coordinator reported that she created

a 90 days of release report and that the HDSP records department provided her with a weekly ten days of release report.

The TCMP reported that 109 MHSDS patients received pre-release planning services during the review period, including one EOP and 108 3CMS patients; pre-release planning assessments and screenings for benefit eligibility were completed for each patient. Medi-Cal applications were submitted for 104 or 95 percent of patients. Additionally, two patients had access to other insurance, one patient was out to court, and two patients refused services.

Applications were submitted for all 19 3CMS patients eligible for SSI. Three patients were eligible for veterans' benefits; one accessed the benefits, one was denied, and one refused services.

During the review period, pre-release groups occurred weekly on all facilities but were stopped temporarily during the review period due to an influx of patients at HDSP. The pre-release coordinator reported that, prior to this influx, pre-release rosters of patients who required services ranged from 12 to 15 patients but, after the influx, ranged from 68 to 77 patients. The pre-release coordinator reported that pre-release groups on one facility resumed the week before the site visit and that groups on a second facility were scheduled to resume in November 2023. Groups on a third facility would follow.

Program Access:

a.    Job and Program Assignments

On September 5, 2023, HDSP reported that, of 1,105 jobs, 283 3CMS patients or 35 percent of the 3CMS population held job assignments and 822 non-MHSDS incarcerated individuals or 47 percent of the non-MHSDS population held job assignments.

Of 561 academic assignments, 171 3CMS patients or 21 percent of the 3CMS population held academic assignments, while 390 non-MHSDS incarcerated individuals or 22 percent of the non-MHSDS population held academic assignments.

Of 201 vocational education assignments, 55 3CMS patients or seven percent of the 3CMS population, and 146 non-MHSDS incarcerated individuals or eight percent of the non-MHSDS population held these assignments.

Of 402 voluntary education assignments, 105 3CMS patients or 13 percent of the 3CMS population held assignments, while 297 non-MHSDS individuals or 17 percent of the non-MHSDS population held assignments.

There were 140 substance abuse treatment program assignments; 39 3CMS patients or five percent of the 3CMS population held them, as did 101 non-MHSDS incarcerated individuals or six percent of the non-MHSDS population.

b.    Milestone Credits

Concerningly, HDSP reported that only one 3CMS patient earned one milestone credit during the review period; no other documentation regarding milestone credits was provided.

c.    Out-of-Level Housing

As of September 7, 2023, HDSP reported that 117 3CMS custody Level I patients were housed in Level II housing, 15 3CMS custody Level II patients were in Level I housing, 52 3CMS custody Level II patients were in Level III housing, five 3CMS custody Level III patients were placed in Level II housing, six 3CMS custody Level III patients were in Level IV housing, and 25 3CMS custody Level IV patients were in Level III housing.

d.    ADA Reasonable Accommodation and Grievance Procedure

HDSP provided a copy of the CDCR Form 1824 Reasonable Accommodation Request

Process manual and produced training rosters for custody and mental health staff confirming the

implementation of the revised ADA accommodation and grievance process.

"C" Status:

On October 11, 2023, 53 incarcerated persons were designated "C" Status; 23 were

3CMS patients, and 30 were general population incarcerated individuals.  Reviewed

classification chronos revealed that, of the 23 3CMS patients, 19 or 83 percent received multiple

serious RVRs within 180 days and, thus, were deemed program failures.

Case by Case Reviews:

HDSP scheduled four patients for 150-day case-by-case reviews during the review

period.  Review of those four patients' case notes revealed compliance with CDCR policy.

Specifically, all four patients were determined by mental health staff to not be at risk for

decompensation due to extended segregated housing.  Additionally, each patient received a 90-

day ASU extension and they were all scheduled for another meeting with the associate director.

HDSP provided information for three patients that satisfied the criteria for the 120-day

pre-MERD review.  An ICC review was completed for all three patients with projected or active

SHU terms.  All three cases were referred to the CSR for review.  Two patients were granted

NDS status, and the remaining patient was to receive a recommendation for NDS status during

his next scheduled ICC.

<u>Mental Health Referrals</u>:

During the reporting period, HDSP made 1,725 mental health referrals, including 465 to psychiatry and 1,260 to primary clinicians.  There were 129 emergent referrals, 175 urgent referrals, and 1,421 routine referrals.

Three of six or 50 percent of emergent psychiatry referrals and 108 of 123 or 88 percent of emergent primary clinician referrals had timely responses.  For urgent referrals, six of eight or 75 percent of psychiatry referrals and 139 of 167 or 83 percent of primary clinician referrals were timely.  For routine referrals, 896 of 970 or 92 percent of primary clinician referrals and 357 of 451 or 79 percent of psychiatry referrals were timely.

<u>Custody and Mental Health Partnership Plan</u>:

HDSP's custody and mental health partnership LOP was last revised in March 2023 and aligned with headquarters' directive.

HDSP did not meet the monthly requirement for executive leadership joint rounding during the review period.  The rounding occurred only in three of six months, including one month on Facility B and two months in the STRH; HDSP reported that executive rounding did not occur in March, May, or July 2023 due to the MHCB closure.  Required staff attended each rounding.

The executive rounding team interviewed both staff and patients and reported their findings on the appropriate form.  In the STRH, mental health staff noted good communication across all programs and provided examples of mental health and custody staff responding to emergent referrals collaboratively.  Patients on both Facility B and in the STRH reported receiving timely mental healthcare appointments and requested increased programming.

Executive rounding was mentioned in the executive meeting minutes and quality management committee minutes but was not described in sufficient detail. The mental health program subcommittee minutes, on the other hand, described the rounding in extensive detail and even copied the rounding forms verbatim into the minutes.

Reviewed MHCB huddle logs for one full week while it was open during the review period indicated that huddles occurred daily on second and third watch with required staff present for 13 of 14 or 93 percent of huddles. Each reviewed huddle form reflected insufficient mental health-related detail for patients and did not provide any evidence of comprehensive or collaborative discussion. No additional comments or details were provided on any reviewed MHCB huddle forms.

One full week of STRH huddle logs reflected that daily huddles occurred on second and third watch with the required staff present. Sufficient detail was provided regarding patient activities and evaluations of patient care from the prior shift and most forms provided evidence that a comprehensive discussion occurred. An observed STRH huddle was collaborative and discussed individualized patient concerns from the prior and current shift, each patient's current mental health status, and goals for short-term and long-term care while in restricted housing.

Although HDSP reported that, due to staffing issues, weekly 3CMS supervisory meetings did not occur during the review period, mental health staff in each mainline 3CMS housing unit completed remote daily huddles with a program sergeant, mental health supervisor, primary clinician, and psych tech. Meeting forms and the observed remote meeting revealed a comprehensive discussion of relevant topics regarding patient care including those exhibiting bizarre and unusual behaviors, medication changes, and patients awaiting transfer to higher

levels of care. However, the mental health supervisor was the only staff member who spoke during the observed meeting, with no input from custody or other mental health staff members.

Leadership reported that monthly supervisory program area tours did not occur during the review period due to staffing shortages.

HDSP produced a copy of the 3CMS orientation brochure that was distributed to new 3CMS patients.

During the review period, HDSP held IAC meetings on all facilities in May, June, and August, Facility C in March, and Facility A in April. No IAC meetings occurred in July 2023. Notably, in May, June, and August, all IAC meetings were held institution-wide with patients and staff from all facilities appearing remotely at the same time. Meeting minutes were extensive and reflected discussion of both mental health-related and non-mental health-related issues.

Patients filed 259 complaints against mental health and custody staff, though the institution was unable to specify whether the complaints were filed against mental health or custody staff. Of the 259 complaints, one case was reopened, four were identified as duplicate reports for the same incident, 13 were identified as a subsequent source to a prior report, 101 were resolved, and 140 were in progress. HDSP also reported seven investigations of staff misconduct towards a patient that were not initiated through the appeal process; of those, six were closed and one was in progress. No HDSP staff were moved to another post due to an allegation of staff misconduct.

Eight total mental health staff members completed the annual off-post training in the twelve months prior to the site visit. However, HDSP could not report the number of mental

health staff that were required to complete the annual training; therefore, compliance could not be assessed. For custody staff, 556 of 783 or 71 percent completed the annual off-post training.

Heat Plan:

HDSP's heat plan LOP was last revised in April 2023 and followed headquarters' directive.

While the heat plan was in effect from May through August of the review period, HDSP indicated following heat plan protocols year-round. During the review period, there were 26 Stage I heat alerts, two Stage II heat alerts, and no Stage III heat alerts. No patients were seen for heat-related illnesses during the review period.

Interviewed officers were knowledgeable regarding heat plan procedures and were aware of patients in the units who were prescribed heat-sensitive medications. Reviewed temperature logs indicated that indoor and outdoor temperatures were recorded as required. Officers in the STRH also reported that heat plan activations were noted in heat-sensitive patients' 114As. All housing units had functional wall-mounted electronic thermometers in the highest feasible position of the housing unit.

RVRs:

HDSP issued 1,798 RVRs during the review period, including 755 or 42 percent to MHSDS patients and 1,043 or 58 percent to non-MHSDS incarcerated persons. There were five RVRs issued to MHCB patients, eight to EOP patients, and 742 to 3CMS patients.

The monitor reviewed 24 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment to mental health in 11 of 24 or 46 percent of cases. Mental health staff timely completed and returned the assessment to custody in 23 of 24 or 96 percent of cases. Of the 24 conducted MHAs, 19 or 79 percent were confidential. The SHO

documented consideration of the mental health assessment in all 24 reviewed cases and mitigated penalties in three of seven or 43 percent of instances where the clinician recommended mitigation. Three patients were assigned a staff assistant.

None of the reviewed RVRs indicated that the patient's mental illness "strongly influenced" the behavior documented in the RVR. However, three RVRs revealed that patients' mental health contributed to the behavior that led to the RVR. All three patients were found guilty as charged. The SHO mitigated penalties for the two patients where the clinician recommended mitigation. The remaining patient did not warrant mitigation.

Mental health assessment training was attended by 72 of 75 or 96 percent of required custody staff, including all four correctional administrators, both captains, all 21 lieutenants, and 45 of 48 sergeants; for mental health staff, HDSP was unable to provide how many staff were required to receive the training and, thus, compliance could not be assessed.

Use of Force:

HDSP reported 74 immediate and no controlled use of force incidents involving MHSDS patients during the review period. Ten immediate use of force incidents were randomly selected to assess compliance with policy guidelines; this review revealed reasonable and appropriate uses of force by custody staff in each instance. The reviewed incidents included multiple attempted homicides, participation in a riot, and batteries on peace officers and other incarcerated individuals, resulting in the use of physical force, pepper spray and OC grenades by custody staff. Appropriate decontamination was afforded to all patients as needed.

Regarding the annual use of force training, 538 of 767 or 70 percent of custody staff and all required mental health except for all four telepsychiatrists completed the annual use of force training.

161

Lockdowns/Modified Programs:

HDSP reported five modified programming periods initiated from May through August 2023. Three were the result of STG-related concerns on Facility D and lasted 13, 14, and 77 days. The remaining two modified programming periods stemmed from full institutional searches and lasted one and 14 days, respectively. Mental health services were not affected by any of the modified programming periods.

An additional modified programming period stemming from STG-related concerns on Facility D was entered approximately one week before the site visit and closed one week later. Access to mental health care was not affected.

Access to Care:

A review of HDSP's monthly Health Care Access Quality reports from March through August 2023 indicated a total of 9,988 issued mental health ducats and add-on appointments, of which 6,852 or 69 percent were completed, and 3,136 or 31 percent were not completed. Of the non-completed ducats and appointments, 12 or less than one percent were not completed due to custody factors, 2,325 or 74 percent were not completed due to non-custody factors, and 799 or 25 percent were not completed due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

HDSP's MSF was closed in 2021 and reopened in March 2023. During the review period, 73 patients were transferred into the MSF and 29 patients were housed there at the time of the site visit.

*Coleman* Postings:

*Coleman* posters in both English and Spanish were observed in all toured housing units.

**APPENDIX A – 3**
**CALIFORNIA CORRECTIONAL INSTITUTION (CCI)**
Site Visit: November 7, 2023 – November 9, 2023
Review Period: March 1, 2023 – August 31, 2023

Census:

On November 7, 2023, CCI's total incarcerated population was 1,708, which was a 43 percent decrease from the prior review period.  The mental health caseload population of 644 had decreased by 42 percent since the previous reporting period and represented 38 percent of the institution's population.

CCI did not house EOP patients.

There were 598 mainline 3CMS patients, which had decreased by 45 percent since the last review period.

The OHU housed six 3CMS patients.

The restricted housing population of 72 included 40 3CMS patients.

Staffing:

The chief psychiatrist position was vacant; it was also vacant during the prior site visit.

One of 2.5 psychiatry positions was filled for a 60 percent vacancy rate.  The use of 2.53 psychiatry contractors eliminated the psychiatry functional vacancy rate.

The one established telepsychiatrist position was filled.  Both medical assistant positions were filled as well.

One of two chief psychologist positions was filled; the vacant position was due to cost savings.  The chief psychologist was designated as the chief of mental health.  Positions for two senior psychologist specialists and two senior psychologists were filled.

Of 9.5 psychology positions, 6.5 were filled, for a 32 percent vacancy rate.  All psychologists were licensed.

The supervising social worker position was filled.

Four of 8.5 social worker positions were filled, for a 53 percent vacancy rate. All social workers were licensed.

One of two MHSDS registered nurse positions was filled.

One of two senior psych tech positions was filled. Four of seven psych tech positions were also filled, for a 43 percent vacancy rate.

One recreation therapist covered the 0.5 position.

All seven office technician positions were filled.

The OSS II position was filled. The 1.5 HPS I positions were vacant. There was one HPS II but no allocated position and the CHCA position was vacant.

As for custody staffing, the warden's position was filled, as was one of two chief deputy positions, and three of five associate warden positions. All five captain positions were filled, as were 24 of 26.2 lieutenant positions, 61 of 67 sergeant positions, and 616 of 620 correctional officer positions. Regarding correctional counselors, 14 CC Is covered 12 positions, eight CC IIs filled ten positions, and the one position for a CC III was filled.

Telepsychiatry:

Although there was one telepsychiatrist at the time of the site visit, during the review period, CCI's employed 2.25 telepsychiatrists who conducted 530 IDTT meetings and 1,228 other appointments, which were primarily individual clinical contacts. Specifically, there were 219 telepsychiatry contacts in April 2023, 225 in May 2023, 232 in June 2023, 217 in July 2023, 192 in August 2023, and 143 in September 2023.

Staff did not report any connectivity issues during the review period. However, the institution's ability to conduct telepsychiatry appointments was largely dependent on the

availability of medical assistants.  CCI reported that when a medical assistant was absent or otherwise unavailable, telepsychiatry appointments were often hampered as medical assistants were matched one-to-one with a telepsychiatrist.

Telework:

Three office technicians teleworked one day weekly, three teleworked three days weekly, and one teleworked five days weekly.  Telework was not offered to clinical staff.

Staff Recruitment:

CCI's significant staffing shortages negatively impacted the timely delivery of mental health treatment and staff retention during the reporting period.  High patient caseloads, inadequate work and treatment space, and the institution's geographic location impeded CCI's ability to recruit and retain mental health staff.  CCI did not undertake its own staff recruitment initiatives but exclusively relied on headquarters to recruit staff.

Regarding staff recruitment for the activation of the 80-bed EOP, CCI hired 1.94 registry recreation therapists.[38]  Otherwise, CCI was in the process of attempting to hire additional staff.

Quality Management:

CCI had an adequate and effective quality management system in place to address issues related to mental health treatment during the review period.   CCI did not have a local governing body.

The quality management committee (QMC) met monthly between April and August 2023.  Quality management committee minutes were not produced for September 2023.  A quorum was attained at each meeting held.  Agenda items included review of programs and local

---

[38] CCI began an 80-bed Level IV EOP program in December 2023 as part of an EOP mission change to reduce housing capacities across CDCR institutions.

operating procedure (LOP) updates, performance improvement work plan projects, and findings from executive leadership joint rounding. Notably, the suicide prevention LOP was due to be approved during each month of the review period and was still not approved as of the site visit. Six subcommittees, including mental health, reported to the QMC on various metrics and other significant issues.

The mental health program subcommittee met monthly with a quorum in attendance at each meeting. Agenda items included the mental health primary counselor-to-primary clinician contacts for patients transferring into the administrative segregation unit (ASU), lack of confidential group treatment space, the timeliness of ASU IDTTs, psych tech participation in ASU morning meetings, and review of metrics from the OnDemand performance reports. It was reported that information regarding quality management projects and findings were shared with staff during routine meetings.

A "green belt" project was initiated during the review period to examine why CCI was not completing timely initial psychiatric assessments. Concerns related to patient refusals, especially with telepsychiatry, were targeted for improvement. Notably, in August 2023, the green belt committee made the decision to reduce the compliance threshold from 95 to 85 percent, a departure from the longstanding court approved compliance rate of 90 percent. The institution met the 85 percent threshold for two months, and the issue was considered resolved. During the site visit, staff explained that originally the plan was to achieve a higher than required rate of compliance (e.g., 95 percent) but the green belt committee chose to move the threshold to 85 percent after a few months.

Another issue raised in the mental health program subcommittee minutes stemmed from the SPRFIT coordinator reporting that the Crisis Intervention Team (CIT) program's

implementation was delayed until custody staff could attend necessary training.  In July 2023, the CIT program was initiated.

Emergency medical response review committee (EMRRC) minutes were produced for April and May 2023.  The chief of mental health, senior psychologist specialist for the quality management support unit, and a senior psychologist supervisor were present.  Emergency response delays and emergency drill results were reviewed in the minutes.

No mental health QITs or FITs were chartered during the review period, but two corrective action plans (CAPs) were initiated.  One CAP was in response to a National Commission on Correctional Health Care (NCCHC) accreditation review and addressed why a patient's psychotropic medications had been renewed for a year without psychiatric contact.  A methodologically appropriate study was initiated which revealed that there were no further issues.  The second CAP was initiated in August 2023 at the request of the SPRFIT regional coordinator regarding a psych tech's failure to consistently complete initial screens of non-MHSDS individuals within 72 hours of placement in ASU.

CCI indicated that it did not have an institutional peer review process but had an individualized peer review process with psychiatric providers to obtain accreditation with the NCCHC rather than CDCR's formal process.

Medication Management:

In assessing compliance for psychiatric diagnostic monitoring and medication management, CCI provided MAPIP results for the review period.

For required monitoring of antidepressants, CCI was compliant for all six months with obtaining medication consents, thyroid function tests, and monitoring blood pressure for patients prescribed venlafaxine.  For EKGs, the institution was compliant for one of two required months.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that measurements for monitoring blood pressure, height, weight, thyroid function tests, and medication consents were compliant for all months of the review period. Additionally, the facility was compliant with obtaining EKGs for the two required months. CCI was compliant for only two months with performing the AIMS examinations, and non-compliant for four months. Notably, CCI was compliant for only one month and non-compliant for five months with the following measures: blood sugar, CBC with platelets, CMP, and lipid monitoring.

CCI was not an authorized clozapine initiation or maintenance facility during the monitoring period.

For patients prescribed carbamazepine, the facility was compliant with medication monitoring for all required months, including two months for CBC and medication consents, and one month with monitoring therapeutic medication levels and CMP.

For patients prescribed Depakote, CCI was compliant with obtaining medication consents for all six months. The facility was compliant with obtaining CMP for four of five required months and compliant with obtaining CBC with platelets for three of five required months. CCI was non-compliant for all five required months of monitoring therapeutic medication levels.

For lamotrigine, the institution indicated compliance in obtaining medication consents for both required months.

Regarding lithium, CCI obtained medication consents for all four required months and EKGs for the one required month. There was compliance with obtaining kidney function tests for four of five required months. For monitoring therapeutic medication levels, the facility was compliant for three of four required months. Finally, regarding thyroid function tests, CCI indicated compliance for two of three required months.

For medication management metrics reported by mental health headquarters, CCI was noncompliant for most of the review period.  CCI reached compliance for all six months with chronic care medications historical administration.  The institution reported compliance for four months and non-compliance for two months with continuity of medications with intra-institutional transfer to ASU/SHU/PSU, and upon parole/transfer to the community.  There was compliance for three of five required months for medication continuity for MHCB transfers.  For continuity of medications from discharge/transfer from a community hospital and/or DSH, the facility was compliant for one month, and non-compliant for five months.

Five metrics were non-compliant for the entire duration of the review period: continuity of medications upon inter-institutional transfer at receiving and release; continuity of nurse administered (NA) and directly observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU); observation of medication preparation AM and PM; observation of medication preparation HS; and outpatient provider new medication orders.  CCI performed analyses on some measures to elucidate the reasons for non-compliance.  For continuity of medications upon inter-institutional transfer at receiving and release, continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), and outpatient provider new medication orders, all non-compliance was due to patient refusal or no-show.

CCI reported that 335 patients were prescribed 564 psychiatric medications.  CCI reported that prescriptions were ordered for a maximum of 180 days.  Bridge orders were determined by the psychiatrist's clinical judgment and were usually provided until the time of the next psychiatry appointment.  For verbal and telephone orders, nursing staff were required to

"read back" the order to the prescriber.  The facility did not specify the process for tracking and signing verbal or telephone orders.  No patients were prescribed KOP medications.

The facility reported 39 medication line audits across all yards during the reporting period; those audits indicated that all patients received their medications in less than 30 minutes. The total duration of the medication lines was under two hours.  Patients in restricted housing and in the OHU received their medications at the cell front.  CCI reported that protection from the elements was not provided on any yards during inclement weather.  There were no reported barriers to patients receiving medications or conflicts between the medication distribution times and mental health programming.

CCI reported a non-formulary rate from 3.4 to seven percent.  Non-formulary medications did not require secondary review or approval.

CCI completed 139 polypharmacy reviews during the monitoring period; all occurred timely.

CCI reported that 150 patients received 216 mental health HS medications; almost all doses were administered after 8 p.m.

As of November 6, 2023, eight 3CMS patients received PC 2602 involuntary medications.  No initial PC 2602 involuntary medication petitions were submitted during the monitoring period, but there were two renewal petitions; both were approved.  No petitions were denied or withdrawn due to administrative reasons. CCI was noncompliant for the one required month of compliance with the presence of a current PC 2602 court order for involuntary medications present in the eUHR.  For the related measure of compliance with the presence of a current physician's order in the eUHR for a medication to be given per PC 2602 court order, CCI

was compliant for the one required month.  Use of force was not required to administer any PC 2602 involuntary medications.

Transfers:

Sustainability reviews were not required at CCI during the review period.

Three patients were considered for but not referred to inpatient care.  The monitors expert noted that all three patients had adequate HLOC non-referral rationales.  During the site visit, no CCI patients were pending inpatient care transfer.

CCI referred 29 patients to the MHCB; 21 patients were admitted, and eight referrals were rescinded.  Twenty of 21 or 95 percent of patients were admitted to the MHCB within 24 hours of referral.

All four patients who were referred to mainline EOP programs transferred timely.  At the time of the site visit, the one patient pending EOP transfer was within the transfer timeline.

During the review period, two of three patients who were referred to the EOP hub timely transferred; CCI did not provide a reason for the delayed transfer.  No patients were pending EOP hub transfer at the time of the site visit.

CCI did not transfer any patients to the PSU, and no patients were pending PSU transfer at the time of the site visit.

Twelve of 20 or 60 percent of 3CMS patients timely transferred to STRH.  CCI did not provide reasons for delayed transfers.  During the site visit, all three patients pending STRH transfer were all within transfer timelines.

During the review period, only one of three 3CMS patients timely transferred to LTRH. CCI did not provide reasons for delayed transfers.  No patients were pending LTRH transfer at the time of the site visit.

Nine patients transferred to mainline EOP programs; all transfers were timely.

Six patients whose level of care was reduced from EOP to 3CMS transferred to CCI during the review period.  As of the site visit, all of these patients remained at the 3CMS level of care.

Programming:

MHSDS Patients in Administrative Segregation:

During the reporting period, CCI placed 163 3CMS patients and one EOP patient in administrative segregation.  For those patients, the average length of stay was 25 days as compared to 49 days for non-MHSDS incarcerated individuals.  At the time of the site visit, there were 72 incarcerated individuals housed in administrative segregation; 40 or 56 percent were 3CMS level of care.   At the time of the site visit, there were 12 3CMS patients in administrative segregation for more than 30 days; all were held due to safety or enemy concerns.

There was one on-site psychiatrist, one psychologist, and one licensed clinical social worker assigned to the ASU; all carried caseloads within established ratios.  A part-time staff psychologist and an additional licensed clinical social worker provided additional coverage when needed.

CCI's unclothed body search procedure was consistent with headquarters' directive and was completed each time the patient exited the cell.  Patients were placed into TTMs located in the center of the housing unit and completed a head to toe examination.  A privacy screen was used to shield the patient.

Non-Disciplinary Segregation:

During the review period, there were 52 3CMS patients designated as NDS status. Twenty-eight patients were approved for accelerated transfer; 21 or 75 percent transferred within

72 hours.  Of the patients who were not transferred within 72 hours, transfer timelines ranged from four to 29 days.  Delays past 72 hours were due to deficiencies in the C&PR's classification chrono that needed correction.  The remaining 24 patients who were not approved for accelerated transfer were approved for privileges and property, although the institution did not track whether the patient received them.

Seclusion and Restraint:

There were no episodes of seclusion or restraint during the review period.

Crisis Intervention Team:

The CIT was re-activated in June 2023, and operated during weekdays, while on-call clinical coverage was used on weekends and holidays.  Clinician, custody, and nursing staff responded to CIT referrals on each of their respective facilities.

During the reporting period, there were 26 referrals to the CIT, of which five patients were referred to the MHCB; seven were subsequently relocated to different housing; and 13 patients returned to the same housing level.  The outcome for one patient was unknown.

3CMS:

Two psychiatrists and one telepsychiatrist treated mainline 3CMS patients and had caseloads within established ratios.  Of the four psychologists assigned to 3CMS patients, two maintained caseloads that exceeded the established ratio with 116 and 205 patients, respectively. Additionally, one licensed clinical social worker who treated mainline 3CMS patients maintained a caseload of 129 patients, which exceeded the established ratio of one to 97.

Eight mainline 3CMS IDTT meetings were observed on Facility C.  Due to scheduling issues, the monitor's expert was unable to observe IDTT meetings on Facilities A or B.  The

assigned primary clinician and assigned psychiatrist were present for all observed IDTTs.  It was unclear whether the correctional counselor was the patient's assigned counselor.

The IDTT meeting space was adequate, however a noisy ventilation system made hearing difficult at times.  Computer access was available to all staff.  Confidentiality was compromised by a partial wall separating a space where additional staff sat who did not participate in the IDTT.  The additional space was not visible during the IDTT meetings.

Patients attended all IDTT meetings except for one, the reason for which was not discussed during the meeting.  The meetings were largely collaborative as the primary clinicians engaged the patients and included them in discussions about functioning, current symptoms, and treatment planning.  The correctional counselor was silent in all but one meeting involving the counselor's patient.  The psychiatrist did not consistently engage with the patients directly, but instead talked about them in the third person in many of the observed meetings.  Case conceptualizations were rarely discussed in any of the observed meetings and psychiatric histories were often superficial.  For the four patients who were prescribed psychotropic medications, the medications were specifically named in two of the meetings.  In one meeting, the psychiatrist chose to focus on the patient's lack of compliance with seizure medications and never discussed the patient's psychotropic medications.  Patients' diagnoses and symptoms were discussed; however, treatment goals and interventions were mentioned cursorily in the meetings. Goals were not explicit, and interventions were vague.

In all observed IDTT meetings, functional impairments were discussed with the patient. The level of care justification was explicitly discussed in most of the meetings.  In three instances, the need for a change in level of care was deferred to a later date for further evaluation.  This was communicated with the patients clearly and effectively.

Other than pre-release planning groups, recreation therapy groups were the only groups offered to mainline 3CMS patients during the reporting period.  Staffing shortages and large caseloads prevented clinician-led groups from occurring at CCI.  Recreation therapy groups were offered at least twice weekly on each facility and did not have waitlists.

Two recreation therapy groups were observed in the Facility B visiting area; one included a single patient and the other included three patients.  The groups began with discussion of current events.  Patients were then allowed to engage in recreational activities alone or with others, including games, artwork, or engaging in conversation.  Several groups were being held at the same time resulting in movement and noise in the large open area.

Mental health staff reported that time for meaningful clinical engagement during appointments with mainline 3CMS patients was severely limited during the review period.  Staff reported pressure to complete clinical sessions quickly so that indicators were kept "in the green" by maintaining contact with their caseload and completing other responsibilities as necessary.  Further, given the anticipated EOP mission change in December 2023, staff at CCI expressed concerns about increased caseloads leading to further disruption in their current patients' therapeutic schedules.

Twenty mainline 3CMS patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes.  One patient was screened out as their length of stay did not require contacts during the review period.

Nine patients required initial psychiatry evaluations.  Seven or 78 percent timely occurred before the initial IDTT.  Seventy-eight percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry was utilized for 56 percent of initial psychiatry evaluations.

175

Twelve patients required routine psychiatry contacts.  There were 29 expected timeframes; 28 or 97 percent were timely and occurred at least every 90 days and 23 of 36 or 64 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry conducted 53 percent of reviewed routine psychiatry contacts.

Nine patients required initial primary clinician evaluations; seven or 78 percent were completed within ten working days of arrival or a change in level of care.  Sixty-seven percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals.

Fifteen patients required routine primary clinician contacts.  There were 29 expected timeframes; all were timely and occurred at least every 90 days.  Of 39 reviewed routine contacts, 22 or 56 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.

Ten 3CMS patients required initial IDTTs; six, or 60 percent, occurred within 14 working days of arrival or a level of care change.  Required staff attended all, and patients attended nine of ten initial IDTTs.

Five patients required annual IDTTs.  There were five expected timeframes and six total routine IDTTs reviewed; four or 80 percent were timely.  Required staff attended all six and patients attended four or 67 percent.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Four patients on Facility B were interviewed about the care provided at CCI.  Patients reported receiving timely and confidential clinician contacts, adequate lengths of time spent in treatment, and engaging in helpful and therapeutic discussions with their clinicians.  Patients also

reported that cell-front contacts often occurred between scheduled visits and in response to health care requests.

Two patients on one housing unit noted that they did not always receive ducats to attend mental health appointments and groups. They reported that this primarily occurred when two specific correctional officers were working on their units.

Multiple patients indicated that when they missed a telepsychiatry appointment due to COVID-19 or custody related reasons, their medications were discontinued and were not restarted until their next psychiatry appointment. Record reviews corroborated these patient complaints and indicated wait times in excess of one month at times for medication renewal. Additional psychiatric contacts were then required to re-start medications, thus hampering psychiatry caseloads.

Other Issues:

Pre-Release Planning:

The pre-release planning local operating procedure was last updated in February 2023 and aligned with headquarters' directive.

The pre-release coordinator was a licensed clinical social worker and maintained additional responsibilities at CCI including CIT coverage and suicide prevention assessments.

The pre-release coordinator initiated pre-release planning assessments (PRPA) for all mental health patients and forwarded them to the patients' primary clinicians for completion. During the reporting period, 56 patients were scheduled for release from CCI; the PRPA was completed for 51 patients.

The pre-release coordinator offered weekly pre-release groups on all facilities and utilized headquarters' curriculum. Group participation was voluntary, and priority was given to

patients with upcoming release dates.  Two patients were present at an observed pre-release group on Facility C.  Both patients reported that the group was informative and helpful.

In addition to weekly pre-release groups, patients scheduled for release were also invited to participate in the community transition program (CTP), making them eligible for assistance with housing, food, clothing, education, and substance abuse programs upon release.

There were two TCMP case workers assigned to CCI with offices located at the institution.  TCMP case workers assisted MHSDS patients with benefit applications including Medi-Cal, social security, and veteran's benefits.  During the review period, no patients were eligible for SSI or veteran's benefits; however, 37 patients submitted Medi-Cal applications.  Additionally, 54 patients completed Cal-ID documentation.

Program Access:

a.    Jobs and Program Assignments

On October 2, 2023, CCI reported that of 591 available jobs, 188 3CMS patients or 28 percent of the 3CMS population held job assignments and 403 non-MHSDS individuals or 38 percent of the non-MHSDS population held job assignments.

Of 1,284 academic assignments, two EOP patients held academic assignments, 404 3CMS patients or 61 percent of the 3CMS population held academic assignments, and 878 non-MHSDS individuals or 83 percent of the non-MHSDS population held academic assignments.

Of 192 vocational education assignments, 92 3CMS patients or 14 percent of the 3CMS population held vocational education assignments and 100 non-MHSDS individuals or nine percent of the non-MHSDS population held vocational education assignments.

Of the 34 voluntary education assignments, ten 3CMS patients or two percent of the 3CMS population held these assignments and 24 non-MHSDS individuals or two percent of the non-MHSDS population held voluntary education assignments.

Of the 187 substance abuse treatment assignments, 76 3CMS patients or 11 percent of the 3CMS population held assignments and 111 non-MHSDS individuals or ten percent of the non-MHSDS population held assignments.

b.    <u>Milestone Credits</u>

CCI did not report earned milestone credits during the review period.

c.    <u>Out-of-Level Housing</u>

As of October 2, 2023, ten custody Level I 3CMS patients were housed in Level II housing.  Nineteen custody Level II 3CMS patients were housed in Level III housing.  One custody Level III 3CMS patient was placed in Level II housing.  Seventeen custody Level III 3CMS patients were placed in Level IV housing.  One hundred and one custody Level IV 3CMS patients were placed in Level III housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedure</u>

CCI confirmed the implementation of the revised ADA accommodation and grievance process.

<u>"C" Status</u>:

At the time of the site visit, there were 39 incarcerated individuals on "C" Status, including 21 3CMS patients.  Review of classification committee chronos for the 3CMS patients revealed that all 21 had generated a significant disciplinary history and were deemed to be program failures.

Case-by-Case Reviews:

No CCI patients met the requirement for a 150-day case review.  Five MHSDS patients met the requirement for 120-day pre-MERD review, which were completed as required.  All five patients were retained in administrative segregation pending the RVR adjudication process.  No patients were retained beyond their MERD.  No patients were placed on NDS status.

Mental Health Referrals:

During the reporting period, CCI made 1,926 mental health referrals; there were 431 referrals to psychiatry and 1,495 referrals to primary clinicians.  The 96 emergent referrals included 27 to psychiatry and 69 to primary clinicians.  Of the 44 urgent referrals, six were to psychiatry and 38 were to primary clinicians.  The 1,786 routine referrals included 398 to psychiatry and 1,388 to primary clinicians.  For psychiatry, the institution reported 70 percent compliance with emergent referrals, 50 percent compliance with urgent referrals, and 79 percent compliance with routine referrals.  For primary clinicians, CCI reported 86 percent compliance with emergent referrals, 89 percent compliance with urgent referrals, and 91 percent compliance with routine referrals.

Custody and Mental Health Partnership Plan:

CCI's custody and mental health partnership LOP was last revised in January 2023 and aligned with headquarters' directive.

Executive leadership joint rounding occurred in all six months of the review period on Facilities A, B, and C.  Rounding forms indicated that all required staff were present during each session and interviewed both staff and patients.  Mental health staff noted good communication with custody, which facilitated timely mental health appointments and indicated responses to

custody requests.  Patients reportedly received timely mental health appointments and good relationships with mental health staff.

Executive rounding was discussed in the executive meeting minutes and mental health program subcommittee minutes with sufficient detail and included action plans to correct any notable issues.  The rounding forms were copied verbatim in the QMC minutes.

Mental health staff completed daily huddles with a primary clinician, psych tech, and program sergeant in the ASU during the reporting period.  Discussion topics were documented in the ASU isolation logbook and signed by all present staff.

Of the 26 weeks of the review period, 3CMS supervisory meetings occurred in 21 of 26 weeks on Facility A, B, and C, and eight of 26 weeks on Facility D.  Although the required staff was in attendance for all meetings, the 3CMS supervisory huddle forms did not demonstrate a substantive discussion of relevant topics.

CCI completed monthly joint supervisory program area tours on Facilities A, B, C, and D for all months of the review period except for April 2023 due to staff unavailability.  All required supervisory staff were present, interviewed both staff and patients, and reported their findings on the appropriate form.

CCI produced a copy of the 3CMS orientation brochure in both English and Spanish and indicated that it was distributed to new 3CMS patients in the initial primary clinician evaluation.

CCI did not meet the requirement of monthly IAC meetings as they were held in four of six months on Facility A, one of six months on Facility B, and five of six months on Facility C. The institution could not produce meeting minutes for Facility D.  An observed IAC meeting comprehensively covered a list of issues, including laundry services, food sales, tablets,

education supplies, and visitation.  In accordance with the LOP, five 3CMS patients were in attendance in addition to two mental health representatives and three custody officers.

There were 88 allegations of misconduct against custody staff during the reporting period.  Of those, 52 were closed and 36 were still in progress.  There were no custody staff moved because of misconduct during the reporting period.  There were no complaints against mental health staff during the review period.  There were no allegations of staff misconduct that were not initiated through the appeal process.

CCI was not required to complete quarterly partnership round table training.

Seventy-six of 112, or 68 percent of mental health staff and 47 of 78 or 60 percent of custody staff completed the annual off-post training in the twelve months prior to the site visit.

Heat Plan:

CCI's heat plan LOP was last revised in May 2023 and was consistent with headquarters' directive.

The heat plan was in effect from May through September of the review period with 20 Stage I heat alerts, no Stage II heat alerts, and no Stage III heat alerts.  No patients experienced heat-related illnesses during the review period.  Reviewed daily activity reports did not reflect that heat-sensitive patients were given alternative day room activities or alternative yard hours during Stage I heat alerts.

Custody staff in the toured housing units demonstrated varying levels of awareness of heat plan policy and procedure.  According to several housing units, heat medication lists were distributed weekly on Mondays.  Custody officers in the ASU and Facility A1 could not describe what temperatures activated the heat plan or their assigned custody responsibilities at each stage.  Staff recorded internal temperatures of the day room using an infrared thermometer.  Internal

thermometers were also observed in the highest feasible point of each housing unit and were in working order. Custody staff indicated that the accuracy of the internal thermometers was checked monthly.

CCI did not report the number of staff who were required to complete the training, and therefore, compliance could not be assessed.

RVRs:

CCI issued 1,757 RVRs during the review period, of which 875 or 50 percent were for MHSDS patients; 882 were issued to non-MHSDS incarcerated individuals.

Twenty randomly selected RVRs issued to 3CMS patients were reviewed to assess compliance with policy guidelines. Of the sample reviewed, the mental health assessment (MHA) was timely requested in 13 of 20, or 65 percent of cases and timely returned to custody in 19 of 20, or 95 percent of cases. Of the 20 MHAs reviewed, four were completed confidentially. None of the reviewed MHAs recommended that the RVR be documented in an alternative manner. Staff assistants were appointed in two cases.

The primary clinician recommended penalty mitigation in all 20 cases and the SHO mitigated penalties in 15 or 75 percent of instances.

All required custody staff attended inmate disciplinary mental health assessment training during the review period. Although no mental health clinicians were required to attend the training, one psychologist attended.

Use of Force:

During the reporting period, there were two controlled use of force incidents involving 3CMS patients and 152 immediate use of force incidents which involved 125 3CMS patients.

Two controlled and 18 immediate use of force incidents were randomly selected to assess compliance with policy guidelines. The two controlled use of force incidents were cell extractions due to the patients' refusals to transfer to another institution. All policy requirements for each controlled use of force incident were met, including appropriate cool down periods, mental health clinician intervention, video footage of the incident, multiple attempts to gain compliance with vocal orders, and nursing review for exposure to chemical agents. Chemical agents were used in one of two incidents and the appropriate opportunities for decontamination were given.

All 18 immediate use of force incidents reflected that custody staff used a reasonable and appropriate amount of force. The reviewed incidents included assaults between patients and other incarcerated individuals, as well as assaults on correctional staff. Reviewed body-worn camera video and advanced video security system video for seven of the 18 immediate use of force incidents were consistent with the written reports and did not reveal any inappropriate uses of force.

All mental health staff and all but one of the 569 custody staff, including all custody administrators, attended the annual use of force training. Sixty-six of 80 or 83 percent of mental health nursing staff attended as well.

Lockdowns/Modified Programs:

There were four instances of modified programming during the review period. The first occurred on Facility B due report of an STG group manufacturing weapons. The PSR began prior to the review period on July 14, 2022, and extended to April 5, 2023; mental health care was accessed via priority ducats with custody escorts only; however, medication distribution continued uninterrupted at the clinic. The second and third PSRs occurred from May 14 through

May 22, 2023 on Facility B, and June 7, 2023, on Facility A due to a contraband search for missing pieces of metal.  Access to mental health programming and medication distribution continued uninterrupted throughout that period.  Also, on June 7, 2023, there were multiple suspected overdoses on Facility A, resulting in modified programming through August 11, 2023. Access to mental health services was by priority ducats only, and medication distribution occurred at cell front.

Access to Care:

A review of monthly Health Care Access Quality reports from April through September 2023 reflected the issuance of 11,763 mental health ducats and add-on appointments, of which 4,922 or 42 percent were completed, and 6,841 or 58 percent were not completed.  Of the non-completed appointments, less than one percent were due to custody factors, 64 percent were due to non-custody factors, and 36 percent were due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CCI did not maintain an MSF during the reporting period.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 4**
**SIERRA CONSERVATION CENTER (SCC)**
Site Visit: November 7, 2023 – November 9, 2023
Review Period: April 1, 2023 – September 30, 2023

Census:

On November 3, 2023, SCC's total incarcerated population was 4,258, which was a 69 percent increase from the prior reporting period. The mental health population of 253 patients had increased by 21 percent since the previous review period and represented six percent of SCC's total population. This MHSDS population consisted of 240 mainline 3CMS patients and 12 3CMS patients housed in administrative segregation. There was also one patient in alternative housing.

Staffing:

The chief psychiatrist position was filled, but the one staff psychiatrist position was vacant.

There was one registry psychiatric nurse practitioner but no established position.

SCC had no telepsychiatry positions, although the statewide telepsychiatry program provided after-hours on-call coverage.

The positions of one of two chief psychologists and one of two senior psychologists were filled. The 0.5 senior psychologist supervisor position was also filled.

One of three psychologist positions was filled; the psychologist was licensed.

Two social workers covered 1.5 positions. Both social workers were licensed.

There was one recreation therapist but no established position.

The supervising RN II position was filled. Positions for one CNA and 20 LVNs were also filled.

All three psych tech positions were filled.

186

One of the 1.5 office technician positions was filled.

Positions for the HPS II and the HPS I were both filled.

The CHSA II position was vacant.

As for custody staffing, 821 of 848.6 positions were filled for a three percent vacancy rate; filled positions included the warden, chief deputy warden, all four associate wardens, all seven captains, 55 of 57.2 lieutenants, 94 of 99.8 sergeants, all 13 CC IIs, 27 of 28 CC Is, and 619 of 637.6 correctional officers.  Notably, the warden, chief deputy warden, one associate warden, one captain, two sergeants, and five correctional officers were acting out of class.

Telepsychiatry:

SCC did not have an established telepsychiatry position.

Telework:

No SCC staff teleworked.

Staff Recruitment:

During the review period, SCC participated in a recruitment event with two other CDCR institutions, but no psychiatrists, psychologists, or social workers were hired.  The institution's mental health leadership also attended monthly meetings with a recruiting agency in an attempt to fill clinical positions.

Quality Management:

SCC conducted monthly QMC and MHPS meetings, with the MHPS achieving quorums. Meeting minutes were reviewed and reflected summaries of addressed topics and the origin of deficits.

Similar to the prior review period, no QITs or FITs were chartered during the reporting period, and there were no other audits.

Staff reported a recent influx of 3CMS patient admissions from the reception center. Approximately half of these patients were unaware of the rationale for their 3CMS placement or indicated they were in the 3CMS program due to MHSDS placement during a prior CDCR term.

SCC did not conduct peer review for psychiatry staff.

Suicide Prevention:

SCC's SPRFIT LOP was revised in July 2023 and contained all the appropriate suicide prevention requirements and training.

The institution's SPRFIT coordinator started in the position approximately one month prior to the site visit and also served as the inpatient, training, and DDP coordinator. The SPRFIT coordinator had worked for CDCR for over 17 years in various roles at different institutions.

A review of SPRFIT minutes from April through September 2023 indicated that R&R screens, the suicide risk management program, patients on suicide watch/precaution, psych tech rounds, deaths and suicides, trainings, and other substantive topics were addressed. SPRFIT minutes from April 2023 reported that suicide watch rounds, R&R screenings, and psych tech rounds were at 100 percent for the previous month. However, SPRFIT minutes for May 2023 reflected a decrease in compliance for suicide watch rounds to 82 percent; the remaining percentages remained the same. The June 2023 SPRFIT meeting minutes revealed 100 percent compliance for all screenings and mental health trainings.

For July 2023, the SPRFIT minutes revealed only 83 percent compliance for suicide watch observation. Further, the July 2023 SPRFIT minutes noted only 54 percent compliance for the IST annual suicide prevention training. The August 2023 SPRFIT minutes reported 86 percent compliance for suicide watch rounds, 55 percent compliance for the IST annual suicide

188

prevention training for custody, medical, and mental health staff, and 100 percent compliance for all other reported measures.  The September 2023 SPRFIT minutes further indicated that the suicide watch rounds had increased to 91 percent, while the annual IST suicide prevention training had increased to a still noncompliant 63 percent.

A review of compliance for custody checks revealed 85 percent for April 2023, 100 percent for May and June 2023, and between 86 and 88 percent compliance for July through September 2023.  SCC reported 100 percent compliance for timely SREs following MHCB referral, discharge, and/or rescission.

SCC reported one death by suicide due to hanging that occurred on April 21, 2023.

SCC further reported that all nurses, except those on extended leaves, were current with CPR training, as were 99 percent of custody staff.

Observed psych tech rounds in administrative segregation were adequate.

SCC reported 84 percent compliance for completion of pre-placement screens and 93 percent compliance for completion of the 12-item screens.

SCC conducted emergency preparedness and mock code drills on various yards and during various watches during the review period.

On November 9, 2023, the monitor's expert interviewed the R&R nurse, who was awaiting the arrival of a bus.  The RN reviewed the incoming patients' medication and medical and mental health histories in the EHRS.  The RN reported the importance of confidentiality and spending appropriate time with patients to solicit honest answers during screenings.  Further, the RN was familiar with the timelines for emergent, urgent, and routine mental health referrals.  The monitor's expert was not able to observe R&R screenings during the site visit.

<u>Alternative Housing</u>:

SCC's alternative housing LOP was dated April 2023  and the institution identified 12 alternative housing cells .  The monitor's observation confirmed that 12 intake cells in administrative segregation were utilized for alternative housing for patients and that these intake cells were suicide resistant.

During the reporting period, there were 57 alternative housing placements, of which 38 or 67 percent of patients were admitted to MHCBs at other institutions, and 19 MHCB referrals were rescinded.

At the time of the site visit, there was one patient in alternative housing on suicide watch; the patient was awaiting transport to an MHCB.  Nursing staff had a direct line of vision of the patient, was aware of the patient's activities of daily living, and knew the patient's transfer status.

<u>Medication Management</u>:

SCC provided MAPIP results from April to September 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Overall, the institution demonstrated sustained compliance for medication monitoring requirements for all required months of the review period for carbamazepine, Depakote, lamotrigine, and lithium.  There was partial compliance for the monitoring of antidepressants, with two of three metrics indicating compliance, while there was compliance for six of 11 metrics for atypical antipsychotic medications.

For required monitoring of antidepressants, SCC reported compliance for obtaining medication consents and monitoring blood pressure for patients who were prescribed venlafaxine

for all six months of the review period.  There was also compliance for five months and non-compliance for one month for monitoring thyroid function tests.  No EKGs were required.

SCC was not a clozapine initiation or maintenance facility.  No patients were prescribed clozapine at SCC during the reporting period or at the time of the site visit.

Diagnostic monitoring for patients who were prescribed atypical antipsychotics indicated that SCC was compliant for all six months of the review period for blood pressure, height, weight, and medication consents.  SCC was compliant for the one required month for obtaining EKGs and thyroid function tests.  The institution was compliant for five months and noncompliant for one month for monitoring AIMS and glucose.  SCC was compliant for four months and noncompliant for two months with monitoring Complete Blood Count (CBC) with platelets and Comprehensive Metabolic Panel (CMP).  There was compliance for three months of six months with monitoring lipids.

For patients prescribed carbamazepine, SCC reported compliance for both required months for CMP, and for the one required month for CBC and therapeutic medication levels.  No medication consent forms were required.

For patients prescribed Depakote, SCC was compliant for the one required month for obtaining CBC with platelets, CMP, therapeutic medication level, and medication consents.

For lamotrigine, there was compliance for obtaining medication consents for the one required month.

Regarding lithium, SCC reported compliance for the one required month with monitoring therapeutic medication levels.  No medication consents, kidney or thyroid function tests, or EKGs were required.

SCC performed robust evaluations of the reasons that required metrics were noncompliant, which frequently included medication or laboratory refusals.

For the ten medication administration metrics that were required during the review period; SCC only demonstrated compliance for four metrics, whereas there was compliance for six metrics during the prior review period.  Similar to the previous reporting period, four other measures were partially compliant during this review period.  The remaining two measures were consistently noncompliant during this reporting period, while no measures were consistently noncompliant during the prior review period.

For medication management metrics reported by mental health headquarters, SCC was compliant for all six months with continuity of medications upon parole/transfer to the community, observation of medication preparation HS, chronic care medications historical administration, and outpatient provider new medication orders.  SCC was compliant for five months and non-compliant for one month with medication continuity with intra-institutional transfer to ASU/SHU/PSU, and following discharge/transfer from a community hospital and/or DSH.  There was compliance for three of four required months for continuity of medications for MHCB transfers.  SCC was compliant for two of six months for observation of medication preparation A.M. and P.M.  Regrettably, SCC was noncompliant for the entire review period for two measures; namely, medication continuity upon inter-institutional transfer at receiving and release (R&R), and continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU).

SCC conducted corrective action plans for the two measures that reported noncompliance for the entire review period.  For medication continuity upon inter-institutional transfer at R&R, SCC performed drilldowns that determined that the most common reasons for noncompliance

included vaccinations provided after the due date, refused medications and vaccinations, provided medications that were not timely documented, and patients arriving without medication.  As for DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), the main underlying reasons for noncompliance included vaccine refusals, and medications and vaccines provided after the due date.  For the actual CAP submitted for these two metrics; both centered on hepatitis vaccinations.

SCC reported prescribing 156 patients a total of 291 psychiatric medications.  Twenty-four 3CMS patients were prescribed KOP medications; specifically, SSRIs or duloxetine, pursuant to policy.

Psychiatric prescriptions were ordered for a maximum 180 days, with bridge orders provided until the next psychiatry appointment.  Nursing staff were required to "read back" orders to the prescriber for verbal and telephone orders.  The orders were then sent to the providers utilizing EHRS for signature.  Although there was no specific timeframe to sign them; providers signed the orders within 24 hours.  Other than sending a message using EHRS, SCC did not specify the process for tracking signed verbal or telephone orders.

There were 39 medication line audits which revealed an average patient wait time of three minutes, and all patients received their medications in less than 30 minutes.  Except for restricted housing and quarantine/isolation units, SCC administered medications on the yards. While there was protection from the elements on Facilities A and B for patients waiting in line and during medication administration; Facility C lacked those protections.

SCC denied any conflict between medication distribution and mental health programming.

SCC's non-formulary rate averaged 2.6 percent during the review period; five patients were prescribed a total of five non-formulary medications.

The institution timely conducted 19 required polypharmacy reviews, which indicated 100 percent compliance for all but one month when there was 95 percent compliance.

Seventy-five patients were prescribed a total of 98 medications written at HS. With rare exception, HS medications were administered at 8:00 P.M. or later.

There were no SCC patients who received PC 2602 involuntary medications during the review period or at the time of the site visit. Nonetheless, SCC had an HPS II who was the institution's assigned PC 2602 coordinator in case a new patient was prescribed involuntary medications. SCC further reported that the last PC 2602 involuntary medication petition was submitted approximately four years ago.

Transfers:

SCC's inpatient coordinator was also the SPRFIT coordinator and had recently been hired on October 2, 2023; the coordinator previously served as the inpatient coordinator at two other institutions. There was no backup for the position.

During the review period, no patients were considered for, but not referred to, inpatient care, and there were no inpatient care referrals. During the site visit, no patients were pending inpatient care transfer. No patients returned to SCC from inpatient care.

SCC made 57 MHCB referrals, of which 38 patients transferred and 19 referrals were rescinded. Thirty-seven of 38 or 97 percent of MHCB referrals timely transferred within 24 hours of referral.

One patient who transferred to an ASU EOP hub transferred timely.

No patients transferred to the PSU or LTRH during the review period.

Two patients transferred to STRH.  One patient transferred timely, and the other transferred four days beyond the 30-day timeframe requirement.

One patient timely transferred to an EOP program.

No patient's level of care was reduced from EOP to 3CMS.

SCC made no MSF placements during the review period.

Programming:

Administrative Segregation/Restricted Housing Unit:

The primary clinician assigned to administrative segregation had a caseload of 10 patients, which was within required staff-to-patient ratios.  Another 3CMS primary clinician provided administrative segregation coverage as needed but did not have a caseload.

A total of 757 incarcerated individuals had 873 stays in administrative segregation during the review period, including 42 stays for 35 3CMS patients and two stays for a patient whose level of care increased from 3CMS to EOP.  The MHSDS patients' stays averaged 31 days, ranging from three to 125 days, while non-MHSDS incarcerated persons' stays averaged 26 days, ranging from one to 634 days.

The monitor's expert observed four IDTTs during the site visit.  Required staff attended all observed IDTTs but participated to varying degrees.  Staff interactions with patients were appropriately professional and conveyed patience and empathy.  However, for treatment planning, all IDTTs needed improvement in reviewing relevant clinical information, such as psychiatric history, symptoms, functioning, case conceptualization, treatment interventions, and level of care rationale.  Case presentations for IDTTs conducted *in absentia* also needed further discussion, as the clinician merely indicated that treatment goals would continue without further discussion with or between IDTT members.

Three interviewed patients who were prescribed medications indicated knowing their psychiatrist, while eight others reported that someone came to see them weekly, although they were unclear of these individuals' titles. None of the interviewed patients indicated being suicidal or expressed concern with their mental health care.

Review of one week of 114-As for 20 patients revealed the offering of a minimum of 18.5 weekly hours of yard and weekly linen exchanges. Nineteen of 20 or 95 percent of these patients were also offered three weekly showers.

Interviewed custody officers reported that unclothed body searches occurred in TTMs using privacy screens, which observation indicated were properly used. Otherwise, these searches were conducted in patients' cells, with cell mates instructed to face the cell wall during the searches.

Non-Disciplinary Segregation:

During the review period, all four patients whom SCC designated as NDS were identified for accelerated transfer and transferred within 72 hours.

Crisis Intervention Team:

SCC did not have a CIT. During the day, available clinical staff handled mental health emergencies. After hours, the statewide telepsychiatry program provided on-call coverage.

3CMS:

Facility C housed most 3CMS patients. The 3CMS primary clinician who typically treated 3CMS patients had a 128-patient caseload, which exceeded the established ratio. The psychiatric nurse practitioner assigned to the 3CMS program had a 245-patient caseload, which was within the staff-to-patient ratio.

Seven observed Facility C IDTTs were all conducted confidentially, with the assigned primary clinician and correctional counselor in attendance.  The chief psychiatrist also attended for the assigned psychiatric nurse practitioner, which was a long-standing practice that was attributed to the scheduling needs of the provider and custody staff.  The chief psychiatrist was the IDTTs' clinical strength; in addition to conveying empathy, the chief psychiatrist synthesized clinical information.

Overall, two primary clinicians' reviews of clinically relevant information were insufficient.  Although healthcare records were reviewed prior to the IDTTs, one primary clinician acknowledged no prior contact with newly assigned patients before the IDTTs, including two patients who were discharged from the 3CMS program per their request.  The observed IDTTs also rarely identified treatment goals and diagnoses; when a diagnosis was stated, there was a lack of discussion about identified symptoms and functional impairments to support the diagnosis.  The level of care rationale was also not clearly addressed, and there was minimal discussion of relevant clinical information to assist with treatment planning.

A recreation therapist offered multiple groups to mainline 3CMS patients.  Although non-MHSDS patients could also request groups, 3CMS patients were reportedly prioritized.  While most Facility C group participants were 3CMS patients, the majority of Facility B group participants were not MHSDS patients.  Group topics addressed victim mentality, anxiety, anger, self-mastery, criminal thinking, and depression.  A recreation therapist capably facilitated an observed victim mentality group, exhibiting good rapport with the patients, who were attentive and actively engaged.

Interviewed group participants, including four MHSDS participants, reported overall satisfaction with the mental health program and access to mental health services.  Patients also

indicated benefitting from individualized interactions and felt that staff were knowledgeable and cared about them.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

All six patients who required an initial psychiatry evaluation timely had one before the initial IDTT and all were confidential. Telepsychiatry conducted one initial psychiatry evaluation.

Twenty-three of 28 or 82 percent of required routine psychiatry contacts timely occurred at least every 90 days. Ninety-five percent were conducted confidentially. Non-confidential contacts were attributed to patient refusals. Telepsychiatry conducted four percent of reviewed routine psychiatry contacts.

Two of six or 33 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. One hundred percent were conducted confidentially. Telehealth was not utilized for any initial PC evaluations.

Eighteen of 25 or 72 percent of routine primary clinician contacts timely occurred at least every 90 days. Eighty-nine percent were conducted in confidential settings. Non-confidential contacts were attributed to patient refusals. Telehealth was not used for any routine PC contacts.

Four of six or 67 percent of initial IDTTs timely occurred within 14 working days of arrival or a level of care change. Required staff and patients attended 100 percent of initial IDTTs.

Eight of 11 or 73 percent of required routine IDTTs timely occurred at least annually. Required staff attended 100 percent; patients attended 82 percent. Reasons routine IDTTs were held *in absentia* included patient refusals. Of note, while the Program Guide required attendance

of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

SCC leadership reported that the pre-release coordinator carried a caseload and performed other duties, with less than ten percent of responsibilities spent on pre-release coordinator duties.

The pre-release coordinator's responsibilities included conducting patient appointments prior to release, attending biweekly ISUDT pre-release meetings, and attending monthly statewide pre-release program meetings. Reviewed documentation reflected ten patients who had completed pre-release contacts during the review period. SCC did not provide pre-release groups.

During the review period, the TCMP provided services for 20 3CMS patients, of whom 18 applied for Medi-Cal. No patients applied for SSI or VA benefits.

Program Access:

a.      Job and Program Assignments

On October 2, 2023, SCC's 850 job assignments were held by 103 or 41 percent of 3CMS patients and 747 or 18 percent of non-MHSDS incarcerated persons.

The 598 academic assignments were held by 47 or 19 percent of 3CMS patients and 551 or 13 percent of non-MHSDS incarcerated persons.

The 113 vocational education assignments were held by three or one percent of 3CMS patients, and 110 or three percent of non-MHSDS incarcerated individuals.

The 324 voluntary education assignments were held by 77 or 31 percent of 3CMS patients, and 247 or six percent of non-MHSDS incarcerated persons.

The three substance abuse treatment assignments were held by three or zero percent of non-MHSDS patients; no 3CMS patients held these assignments.

      b.    <u>Milestone Credits</u>

Of 249 3CMS patients, 233 were eligible to earn milestone credits, with 88 patients earning the credit.  As for the non-MHSDS population, 3,959 of 3970 or almost 100 percent of incarcerated persons were eligible to earn milestones credits, with 1,439 patients earning them.

      c.    <u>Out-of-Level Housing</u>

SCC reported that 17 3CMS custody Level I patients were in Level II housing, and two 3CMS custody Level I patients were in Level III housing.  There were also 50 3CMS custody Level II patients in Level III housing and 28 custody Level IV patients in Level III housing.

      d.    <u>ADA Reasonable Accommodation and Grievance Procedure</u>

SCC confirmed implementation of the revised ADA reasonable accommodation and grievance procedures and provided a copy of the 1824 Desk Reference Manual.

<u>"C" Status</u>:

On November 3, 2023, 31 incarcerated individuals, including one 3CMS patient, were designated "C" Status.  Review of the 3CMS patient's classification chrono revealed that he received multiple serious RVRs within 180 days and, thus, was deemed a program failure.

<u>Case-by-Case Reviews</u>:

SCC did not conduct any 150-day reviews, and no SCC patients required a 120-day pre-MERD review.

<u>Mental Health Referrals</u>:

During the review period, SCC made 849 mental health referrals, including 193 referrals to psychiatry, 641 referrals to primary clinicians, and 15 PREA referrals.  Excluding the PREA referrals, there were 80 emergent, 173 urgent, and 581 routine referrals.

Psychiatry timely responded to three of 13 or 23 percent of emergent, 13 of 17 or 76 percent of urgent, and 150 of 163 or 92 percent of routine referrals.  Primary clinicians timely responded to 28 of 67 or 42 percent of emergent, 126 of 156 or 81 percent of urgent, and 346 of 418 or 83 percent of routine referrals.

The monitor's tour of housing units revealed the availability of MH-5 referral forms in all visited units.  Interviewed custody officers were also familiar with the mental health referral process for patients.

<u>Custody and Mental Health Partnership Plan</u>:

SCC's custody and mental health partnership plan LOP was current and compliant with statewide policy.

Reviewed executive leadership joint rounding forms reflected monthly rounding during all months of the review period; Facility B was rounded on four occasions, and Facility C was rounded twice.  Analysis of the rounding forms reflected the required staff's attendance and patient and staff interviews.  Staff expressed concerns about daily staffing shortages, inadequate space, and program stoppages due to custody issues.  Patients noted concerns about the temperature in specific units and their treatment by custody staff.

SCC reported that executive staff meetings, the quality management committee, and the mental health program subcommittee did not address the executive rounding.

Reviewed reporting period huddle documentation indicated inconsistent attendance by the mental health clinician, reportedly due to the lack of staff. An observed huddle in administrative segregation revealed collaborative discussion between mental health and custody staff. All required staff attended and provided input about discussed patients, including extensive detail about a suicide watch patient.

Documentation reflecting monthly joint supervisory 3CMS program area tours revealed that they were held for Facility B and C's mainline programs and the administrative segregation unit during every month of the review period; Facility A was also toured during May and June. Required staff attended most tours; however, a mental health representative did not attend the July program area tour of Facility C and administrative segregation, and the August and September Facility B tour. Identified staff concerns included custody officers who "tend not to care" about patients and "turmoil" and fighting due to new arrivals. Patients also similarly reported concerns with new arrivals and indicated a disinterest in speaking with mental health as MHSDS patients could not get sent to fire camp.

Weekly 3CMS program supervisory meetings only occurred during August and on three other occasions during the review period. Required staff attended all meetings. Discussed issues included fighting among new arrivals, access to care issues, and patients exhibiting unusual and bizarre behavior. However, reviewed documentation did not provide details beyond identifying the issue topic or patient.

SCC distributed the 3CMS orientation brochure to new patients and provided a copy to the monitor.

Inmate advisory council meetings occurred during three months of the review period. Reviewed minutes for these three months reflected discussions about technological issues with tablets and canteen operations.

There were 132 staff misconduct complaints filed against custody staff, but none against mental health or medical staff.  Of these complaints, 81 were in progress, 39 were resolved, six were created in error, two were "duplicates," and four were labeled "subsequent source."  All misconduct investigations were initiated through the appeal process.  No staff members were reassigned to another post due to misconduct complaints.

SCC reported that 52 of 95 or 55 percent of mental health staff and 751 of 811 or 93 percent of custody staff attended the annual partnership off-post training.  Thirty-three of 76 nurses also completed the training.

<u>Heat Plan</u>:

SCC's heat plan LOP was current and in compliance with statewide policy.  The heat plan was in effect throughout the review period, when there were 86 Stage I heat alerts, 27 Stage II heat alerts, and 11 Stage III heat alerts.

The monitor toured housing units and interviewed custody staff about heat plan policies and protocols.  Interviewed officers from Facilities B and C were knowledgeable of the heat plan's stages and had ready access to an updated list of patients prescribed heat-sensitive medications.  Toured housing units contained appropriately placed thermometers, and temperatures were recorded as required.  Facility B officers used hand-held thermometers to record in-cell temperatures.

RVRs:

SCC issued 5,588 RVRs during the review period, of which 272 were issued to MHSDS patients, including four to MHCB patients, two to EOP patients, and 266 were issued to 3CMS patients.  There were 5,316 RVRs issued to non-MHSDS patients.

The monitor reviewed a sample of 11 RVRs issued to one EOP patient, four 3CMS patients, and six non-MHSDS patients; all of which received a mental health assessment.  Of the 11 RVRs, the mental health assessment (MHA) was timely requested in seven or 64 percent of cases and timely returned to custody in 10 or 91 percent of cases.  Late referrals to mental health ranged from two to eight days overdue and the late MHA was completed one day late; SCC did not provide reasons for delays.  All 11 MHAs were completed confidentially.  None of the reviewed MHAs recommended that the RVR be documented in an alternative manner.

No RVRs were issued for self-injurious or suicidal behaviors or in connection with being placed in mental health restraints or seclusion.

A staff assistant was assigned in one reviewed RVR.  All patients were timely served a classified copy of their RVR and at least 24 hours prior to their hearing date.

The senior hearing officer (SHO) appropriately considered clinical input based upon each patient's mental health assessment in all examined RVRs.  The reviewing clinician recommended penalty mitigation in only two of the eleven cases; however, the SHO mitigated penalties in eight cases.

SCC reported that all correctional administrators, captains, and lieutenants and 97 percent of sergeants completed the required mental health assessment training.  No mental health staff completed the training.

Use of Force:

During the review period, there were six immediate and no controlled use of force incidents involving MHSDS patients. All immediate use of force incidents were reviewed for compliance with policy guidelines; all six reflected that custody staff used a reasonable and appropriate amount of force.

All six incidents resulted from patient fights, and OC spray was used in all cases. Custody officers utilized batons in two of the incidents after OC spray did not result in patient compliance. Patients were offered clean clothes and water to decontaminate and were taken to the TTA for examination.

The warden, chief deputy warden, all four correctional administrators, all seven captains, 53 of 54 lieutenants, 78 of 81 sergeants, and 590 of 624 correctional officers attended use of force training. All mental health staff completed use of force training.

Lockdowns/Modified Programs:

SCC reported one 14-day modified programming period during the review period due to a COVID-19 outbreak. Mental health services were not interrupted.

Access to Care:

A review of monthly Health Care Access Quality reports from April through September 2023 indicated the issuance of 3,887 mental health ducats and add-on appointments, of which 3,228 or 83 percent were completed, and 659 or 17 percent were not completed. Of the non-completed appointments, two were not completed due to custody reasons, 624 or 95 percent were not completed due to non-custody reasons, and 33 or five percent were not completed due to patient refusals.

_Coleman_ Postings:

The monitor observed _Coleman_ postings in both Spanish and English in all toured housing units.

**APPENDIX A – 5**
**PELICAN BAY STATE PRISON (PBSP)**
Site Visit: November 14, 2023 – November 16, 2023
Review Period: April 1, 2023 – September 30, 2023

Census:

On November 9, 2023, PBSP housed 1,581 incarcerated individuals.  The mental health caseload population of 422 represented 27 percent of PBSP's total population and had increased by 33 percent since the previous site visit.

The MHSDS population included one EOP patient and 369 3CMS patients; of those, 353 were mainline 3CMS, and 16 were mainline restricted custody general population (RCGP).

The MHCB housed four patients.

The STRH housed 48 3CMS patients.

Staffing:[39]

 On October 20, 2023, the chief psychiatrist position was vacant; leadership reported that it had been vacant for over a decade.  The one psychiatry position was filled.

No telepsychiatry positions were allocated to the institution.  However, headquarters assigned two telepsychiatrists to PBSP.  One of two medical assistant positions assigned to telepsychiatry were filled.

One of two chief psychologist positions were filled, reflecting a 50 percent vacancy rate. The senior psychologist and both senior psychologist specialist positions were filled.

---

[39]  A November 13, 2023 memo from headquarters indicated that PBSP anticipated the activation of a new EOP program with a target date of January 2024.  Additional staffing allocations for this program included 0.5 senior psychologist supervisor; 1.0 staff psychiatrist; 2.5 clinical psychologists; 1.0 clinical social worker; 1.5 office technicians; and 2.0 recreational therapists. None of the positions were filled at the time of the site visit.

Eight of 10.5 psychologist positions were filled for a 24 percent vacancy rate. Two psychologists were on extended leaves, leaving a functional vacancy rate of 43 percent. Two psychologists were unlicensed.

Three social workers filled the 3.5 allocated positions for a 14 percent vacancy rate. Two social workers were unlicensed.

Two of four recreational therapist positions were filled for a 50 percent vacancy rate.

Ten of 10.7 supervising RN positions were filled, reflecting a seven percent vacancy rate. For registered nurses, 23 of 48 positions were filled for a 52 percent vacancy rate.

The CNA position was filled.

Ten of 30.2 LVN positions were filled for a 67 percent vacancy rate.

Six of 13.6 psych tech positions were filled for a 56 percent vacancy rate.

Three of five MHSDS clerical positions were filled for a 40 percent vacancy rate.

The HPS I position was filled and the OSS II position CHCA position were vacant.

For custody staff, 735 of 918.2 positions were filled for a 20 percent vacancy rate. The warden position was vacant but filled by an acting warden, the chief deputy warden and all five associate warden positions were filled, and five of six captain positions, 28 of 31.4 lieutenant positions, 73 of 79.6 sergeant positions, all 12 CC I positions, and 12 of 13 CC II positions were filled. For correctional officers, 599 of 769.2 positions were filled for a 22 percent vacancy rate.

Telepsychiatry:

No telepsychiatry positions were allocated to the institution, though headquarters assigned two telepsychiatrists to PBSP.

Telework:

No staff teleworked.

208

<u>Staff Recruitment</u>:

Psychology vacancies were recruited through CCHCS; all clinician vacancies were recruited by CCHCS headquarters.

<u>Quality Management</u>:

The local governing body met quarterly with a quorum in attendance at all meetings. Reviewed meeting minutes reflected the discussion of staff appointments, unusual occurrences, PIWP, dashboard metrics, admission trends, disaster drills, budgetary issues, and audits. Additionally, meeting minutes noted concerns that the HDSP MHCB closure for construction would cause the PBSP MHCB "to be heavily impacted." Furthermore, while the local governing body meetings appeared useful, it was unclear how leadership disseminated the information to line staff.

The quality management committee met twice monthly and achieved quorums. Reviewed meeting minutes reflected agenda items that included the approval of the previous meeting minutes, review of health care access unit reports, subcommittee reports, joint executive rounding, suicide prevention, safety plan training, out of compliance measures, quality improvement projects, and changes to LOPs. Although the meeting minutes were comprehensive and useful in content, the minutes did not specify how or if this information was relayed to staff.

The monitor's expert noted multiple concerns with the lack of psychiatry presence in QMC meetings. Specifically, QMC minutes indicated that issues with monitoring patients on lithium were reported to headquarters "as a supervisory issue." Furthermore, the medication management subcommittee reported on the rate of non-formulary usage for medical medications, and no report was provided for psychiatric medications. Of particular concern was the review

and approval of LOPs governing prescribing and monitoring psychiatric medications which were performed without the presence of psychiatry representation.

PBSP reportedly had multiple quality improvement projects during the review period, including urgent ambulance transit times, asthma care, and ASU prescreens. Performance improvement work plans included the availability of durable medical equipment and the completion of emergency medical response forms.

Reviewed mental health program subcommittee meeting minutes for five months were also comprehensive. Agenda items included approval of meeting minutes, improvement projects, quality management reports, results of RVR audits and subsequent mitigation by custody when recommended by the mental health assessment, special treatment plans, higher level of care reports, custody and mental health partnership, audits, root cause analyses, the approval of local operating procedures, suicide prevention topics, peer review, staffing and training issues, and recommendations to the QMC.

The EMRRC met twice monthly and attained quorums. While the chief of mental health was present, the absence of psychiatry was concerning given the number of medically focused issues routinely discussed in the EMRRC.

The EMRRC followed the standard statewide template. Reviewed meeting notes were comprehensive and addressed several areas of importance to mental health, including suicide attempts, treatment of opiate overdoses, and emergency transports to outside hospitals.

PBSP did not have any QIT, FITs, or CAT audits during the monitoring period.

The institution complied with timely peer review for MHCB psychiatrists and psychologists. All reviewed MHCB clinicians met the "standard of care." PBSP reported that

the reviewer discussed the results with the clinician; however, no minutes were provided for the mental health peer review committees. Additionally, outpatient peer review remained on-hold.

<u>Medication Management</u>:

PBSP provided MAPIP results from April 1, 2023 to September 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated that PBSP was compliant for all six months for blood pressure, height, weight, medication consents, and the Abnormal Involuntary Movement Scale (AIMS). The institution was compliant for the five required months for monitoring thyroid function tests, and for the one required month for monitoring EKGs. There was compliance for two months and noncompliance for four months for glucose, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), and lipids.

PBSP was not a clozapine initiation or maintenance facility during the monitoring period. The facility reported no patients prescribed clozapine during the monitoring period or at the time of the monitoring tour.

For required monitoring of antidepressants, the institution reported compliance for six months with obtaining medication consents, thyroid function tests, and monitoring blood pressure for patients taking venlafaxine. PBSP reported that no EKGs were required during the monitoring period.

For patients prescribed carbamazepine, PBSP was compliant for the one required month with obtaining medication consents. PBSP reported that no CBC with platelets, CMP, or therapeutic medication levels were required during the reporting period.

Regarding Depakote, PBSP was compliant for the five required months in obtaining medication consents and with monitoring CBC with platelets and CMP.  Of the five months requiring monitoring of therapeutic medication levels, PBSP was compliant for four months and non-compliant for one month.

For lamotrigine, the institution was compliant for obtaining medication consents for the one required month.

Regarding lithium, PBSP was compliant for the four required months with obtaining medication consents.  For checking kidney function tests, the institution was compliant for three of four required months.  PBSP was compliant for two of three required months for thyroid function tests, and for one of three required months for monitoring therapeutic medication levels. The institution was noncompliant for the one required month for monitoring EKGs.

For medication management metrics reported by mental health headquarters, PBSP was compliant for all six months of the review period with continuity of medications with intra-institutional transfer to ASU/SHU/PSU, observation of medication preparation HS, chronic care medications historical administration, and outpatient provider new medication orders.  The institution was compliant for five months and non-compliant for one month with continuity of medications upon parole/transfer to the community. PBSP was compliant for four months and noncompliant for two months for continuity of medications for MHCB transfers, and continuity of medications upon discharge/transfer from a community hospital and/or DSH. The institution was compliant for three months and noncompliant for three months with continuity of medications upon inter-institutional transfer at receiving and release.  There was compliance for two months and noncompliance for four months with continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding

ASU/SHU/PSU). PBSP was noncompliant all six months for observation of medication preparation A.M. and P.M.

PBSP reported 347 patients who were prescribed 1,457 psychiatric medications.

Psychiatric prescriptions were ordered for a maximum of 180 days, and bridge orders were provided for a maximum of 72 hours.

No patients were prescribed KOP medications.

For verbal and telephone orders, nursing staff were required to "read back" the order to the prescriber. Health information management tracked the signature of those orders in the electronic medical record system.

During the review period, there were 36 medication line audits. Audits occurred on Facilities A, B, and D during second and third watches. The average individual patient wait time was ten minutes with all wait times under 30 minutes as required by policy. PBSP reported that the total duration of medication lines was approximately one hour, with none exceeding two hours as required by policy.

PBSP revealed that Facility D medication administration routinely occurred indoors; and during inclement weather, the other yards moved medication administration indoors as well. Inclement weather was not a barrier to patients taking their prescribed medications.

Patients in the CTC and RHU received medications at the cell-front.

The institution denied any conflicts between medication administration and mental health programming.

During the review period, PBSP reported an average nonformulary rate of three percent.

PBSP reported that polypharmacy reviews occurred in "PCP Meetings", and that 187 of 191, or 98 percent of reviews occurred timely. The institution provided minutes from a monthly

meeting that was chaired by the chief medical executive or chief physician and surgeon. The notes stated that mental health clinicians were invited to this meeting "but did not participate."

PBSP reported that 336 patients received 1,448 medications prescribed at HS. With rare exception, PBSP was compliant with the requirement to administer HS medications at 8:00 p.m. or later.

PBSP indicated that no data was required during the reporting period for the PC 2602 involuntary medication metrics of compliance with the presence of a current PC 2602 court order for involuntary medications present in the eUHR and with the presence of a current physician's order in the eUHR for a medication to be given per PC 2602 court order. The facility submitted one renewal PC 2602 petition during the monitoring period which was granted, but no initial PC 2602 petitions were submitted. PBSP reported no petitions were denied, withdrawn, or lost to follow-up. There were no use of force incidents to administer PC 2602 involuntary medications.

During the site visit, PBSP reported that one 3CMS patient received PC 2602 involuntary medications.

A CC II served as the medication court administrator (MCA). Of note, the MCA submitted a monthly PC 2602 report to the chief of mental health. This report detailed essential information, such as petitions submitted, renewed, non-renewals, and cases which transferred from the institution prior to the PC 2602 hearing.

Transfers:

PBSP's inpatient coordinator was a senior psychologist specialist who held the position for four years. The inpatient coordinator acknowledged that inpatient transfers were delayed for most of the review period due to a lack of bed space but that this problem had alleviated in recent months; reviewed data confirmed this.

There were 89 instances of 53 patients who were considered but not referred to inpatient care; non-referral rationales were not documented. A review of healthcare records for ten of these patients revealed that seven of the eight MHCB non-referrals and one of two 3CMS non-referrals were appropriate. The MHCB case subsequently required acute level of care referral the following IDTT, by which time the patient had already been in the MHCB for 18 days. While the 3CMS non-referral case reviewed may have been appropriate on clinical grounds, the justifications listed were insufficient.

During the review period, there were 22 acute care referrals; only two of the 22 or nine percent were timely transferred within ten days. PBSP timely submitted 18 of 22 or 82 percent of referral packets within two working days of identification.

There were four intermediate care referrals; one of four or 25 percent of intermediate care transfers were timely. Three of four or 75 percent of intermediate care referral packets were timely completed within five days of identification.

One *Vitek* hearing was held for one acute care patient. The patient did not prevail.

At the time of the site visit, one patient was pending transfer to acute care and was within transfer timelines.

No patients with complex medical needs were transferred to inpatient care during the review period.

PBSP referred 12 patients to outside MHCBs; nine or 75 percent transferred within 24 hours of alternative housing placement. Lack of bed space was provided as some of the reasons for delays; however, others provided no reason.

One patient was transferred to a PSU. This patient transferred 36 days beyond Program Guide timeframes due to a lack of available PSU bed space.

Fifteen patients were transferred to an administrative segregation EOP hub during the review period; eight or 53 percent transferred timely. All transfer delays were attributed to the lack of available bed space and ranged from six to 69 days.

For 3CMS patients, transfers to the on-site STRH were timely.

PBSP transferred five patients to LTRH; all patients transferred timely.

PBSP transferred 11 patients to EOP programs; nine or 82 percent transferred timely. Reasons for the delays were not provided.

No patients' level of care changed from EOP to 3CMS during the review period.

PBSP made no MSF placements during the review period.

Programming:

STRH:

Two psychologists, one social worker, and the on-site psychiatrist provided services to the STRH; all had caseloads within the established ratios. During the review period, the STRH housed 241 MHSDS patients, including four MHCB, ten EOP, and 227 3CMS patients. The average length of stay for MHSDS patients in STRH was 51 days and ranged from one to 267 days.

The monitor's expert observed three IDTTs in the STRH. Patients attended two of three IDTTs and the remaining IDTT was held *in absentia*. The IDTTs were inadequate and did not meet Program Guide requirements. The primary clinician who conducted the IDTTs was not the assigned primary clinician for either patient. All required staff did not attend the IDTTs; the primary clinician and psych tech asked the attending lieutenant whether a CC I would be in attendance and the lieutenant incorrectly asserted that the policy only required that a member of

216

custody participate in IDTTs and that this member did not need to be a CC I or CC II specifically.

The IDTTs consisted of the primary clinician reading the clinical summary from the patient's chart and the psych tech and telepsychiatrist offering brief input. There were no meaningful contributions from custody. Furthermore, the IDTTs did not address treatment goals, interventions, progress, functional impairments, level of care justification, case conceptualization, or an update of treatment progress.

Five interviewed STRH 3CMS patients reported that they received timely initial IDTTs and timely weekly primary clinician contacts. Patients also reported that they received daily psych tech rounds, were offered weekly groups and daily yard time, and received in-cell activities upon request. They described the mental health treatment team as being "supportive" and "attentive." Patients did not express any concerns for areas of improvement regarding STRH mental health services.

Ten observed ICCs for six 3CMS patients and four non-MHSDS incarcerated persons had all required staff in attendance. Individuals were placed in the STRH due to safety concerns, fighting, battery on a peace officer, and possession of weapons. Two patients had their MERDs suspended and were released to the general population. The eight remaining individuals were retained in the STRH pending transfer or awaiting RVR resolution; two of those eight patients received NDS status.

During the review period and at the time of the site visit, the STRH offered six clinically based groups and patients were able to choose between the six groups. Specifically, eight total groups were held per week, and each patient was allowed to attend two groups per week. Group topics included stress management, symptom management, and coping.

The monitor's expert was unable to observe a 3CMS group in STRH during the site visit because only one patient attended the scheduled group. Group room space in the STRH was adequate and contained eight "restart chairs" for group participants. The space was also used for IDTTs.

Review of a sample of 24 weeks of 114-As for 20 STRH patients indicated 100 percent compliance for offering patients at least 18.5 weekly hours of yard, three showers per week, and weekly phone calls and linen exchanges.

Interviewed STRH custody staff explained that unclothed body searches were conducted prior to patients exiting their cells. They revealed that patients were normally under constant supervision during escorts and did not require an additional search prior to reentering their cell. Metal detectors were also utilized.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.

All 20 patients who required initial psychiatry evaluations had timely contacts before the initial IDTT. Ninety percent were conducted confidentially. Non-confidential contacts were attributed to patient refusals. Telepsychiatry was not used for any initial psychiatry contacts.

All 40 routine psychiatry contacts timely occurred at least every 90 calendar days. Thirty-seven of 40 or 93 percent were conducted confidentially. Non-confidential contacts were attributed to patient refusals. Telepsychiatry conducted four or ten percent of reviewed routine psychiatry contacts.

All 20 initial primary clinician evaluations timely occurred within ten working days of arrival and before the initial IDTT. Nineteen of 20 or 95 percent were conducted in confidential

settings.  Non-confidential contacts were attributed to patient refusals.  Telehealth was not used for any initial primary clinician contacts.

For routine primary clinician evaluations, 99 percent occurred timely at least every seven calendar days; 68 percent were conducted in confidential settings.  Non-confidential contacts were attributed to patient's disruptive behavior, patient refusals, and unavailable conference space.  Telehealth was used to conduct one routine primary clinician contact.

All 20 initial IDTTs timely occurred within 14 working days of arrival.   Required staff attended all initial IDTTs; patients attended 19 of 20 or 95 percent.  The reason attributed to initial IDTTs held *in absentia* was patient refusals.

All 22 routine IDTTs occurred timely every 90 days.  Required staff attended all routine IDTTs; patients attended 20 of 22 or 91 percent.  The reason attributed to routine IDTTs held *in absentia* was patient refusals.

Non-Disciplinary Segregation:

During the review period, PBSP designated 13 MHSDS patients as NDS status, including six EOP patients and seven 3CMS patients.  All six EOP patients were NDS 200 and required accelerated transfer; each patient transferred timely.  All seven 3CMS patients were NDS 100.  During the site visit, there were five 3CMS NDS 100 patients and one NDS 100 non-MHSDS incarcerated person.

MHCB:

PBSP operated a ten-bed MHCB within the licensed CTC.  MHCB staff included two psychologists and one psychiatrist from Monday through Friday and one psychologist on the weekend.  Telepsychiatry was used in the MHCB only when the onsite psychiatrist was

unavailable. The caseloads of the MHCB psychiatrist and clinicians were all within established ratios.

Since the time of the preceding monitoring round, PBSP reported an increase in referrals due to the closure of the HDSP MHCB.

During the review period, PBSP's admitted 94 patients to the MHCB for a total of 101 stays. The average daily census was eight patients. Clinical stays averaged 14 days and ranged from one to 38 days, with 62 clinical stays exceeding ten days.

The monitor's expert observed initial IDTTs; all required staff and both patients attended. The IDTT room was large, had adequate light, and was set to a comfortable room temperature. The room had a TTM; however, both patients sat in a chair outside of the TTM. One IDTT was adequate. The second IDTT inadequately addressed the patient's reported concerns regarding the patient's safety from self-harm. The patient stated that he did not feel safe if he were provided clothing and was removed from his safety smock. In response, the treatment team stated that they would give him clothing anyway. The regional psychologist and the monitor's expert both expressed concerns about this decision. The treatment team then agreed to keep the patient in his safety smock.

Reviewed 114-As for MHCB patients revealed that they were offered adequate out-of-cell time, showers, weekly linen exchange, and weekly phone calls. The examination did not include review of Privilege Group allowances.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

Sixteen of 20 or 80 percent of MHCB patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission. Eighteen of 20 or 90 percent

were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry conducted one of the reviewed initial psychiatry contacts.

Fifty-five of 57 or 96 percent of twice weekly routine psychiatry evaluations timely occurred.  Forty-nine of 56 or 88 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, cell front, and yard contacts.  Telepsychiatry conducted six of 56 or 11 percent of reviewed routine psychiatry contacts.

All 20 initial primary clinician evaluations timely occurred within 24 hours of patient admission.  Eighteen of 20 or 90 percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals and cell-front contacts.  Telehealth was utilized for three of 20 or 15 percent of initial primary clinician contacts.

For routine primary clinician contacts, 99 percent timely occurred and 77 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, modified programming, and cell-front and yard contacts.  Telehealth was utilized for three or two percent of reviewed routine primary clinician contacts.

All 20 initial IDTTs occurred within 72 hours of patients' arrival.  Required staff attended 100 percent of initial IDTTs; patients attended 18 of 20 or 90 percent.  The reason attributed to initial IDTTs held *in absentia* was patient refusals.

All 26 routine IDTTs occurred timely or every seven calendar days following the initial IDTT.  Required staff attended 25 of 26 or 96 percent of routine IDTTs; patients attended 23 of 26 or 88 percent.  The reason attributed to initial IDTTs held *in absentia* was patient refusals.

Seclusion and Restraint:

PBSP reported that no patients were placed in clinical restraints or seclusion during the review period.

Crisis Intervention Team:

PBSP did not have a CIT and no referrals were made during the monitoring period. Mental health staff reported that a mental health supervisor or an MHCB clinician managed crisis calls from Monday through Friday from 7:00 A.M. to 5:00 P.M.  Further, MHCB staff managed crises on weekends and holidays from 7:00 A.M. to 5:00 P.M.  Outside of these hours, the facility used on-call telepsychiatry.

3CMS:

Two psychologists, two social workers, one psychiatrist, and two telepsychiatrists provided services to the 3CMS program; all had caseloads within the established ratios.

Six observed IDTTs were adequate and met Program Guide requirements.  Required staff and patients attended all six.  Each patient's primary clinician led the observed Facility D IDTTs in a confidential space.  There were no technical difficulties observed with the video and audio connections and all participants were able to be seen and heard.  For each observed IDTT, the treatment team demonstrated a collaborative approach with all attendees participating meaningfully.  The primary clinician provided appropriate clinical and psychosocial histories and case conceptualizations for each patient and diagnoses, functional impairments, and safety concerns were discussed for each patient.  Additionally, medications were discussed as appropriate, and level of care discussion and justification was provided for each patient. Furthermore, goals and interventions were discussed and appropriate for each patient's clinical presentation.

Several of the observed IDTTs were provided for patients who were new arrivals to PBSP from WSP.  These Level II patients were in the process of discharging from the 3CMS

program and were anticipating moving down to Level I custody status to then be housed in the MSF that opened at PBSP just prior to the site visit.

PBSP did not offer groups to 3CMS patients during the review period or at the time of the site visit due to recreation therapist staffing vacancies. Similarly, PBSP did not provide NLTG groups.

Eight interviewed patients provided feedback regarding the 3CMS program. They overwhelmingly reported that the mental health staff were caring, supportive, and had genuine intentions for the patients. However, patients also indicated that the efforts by mental health staff to provide care were routinely "sabotaged" by the historical institutional culture at PBSP and CDCR policies, which they believed restricted the quality and quantity of services available.

The interviewed patients also reported several deficiencies in the 3CMS program. Specifically, all interviewed patients reported they had never received or seen the 3CMS orientation brochure and that they were not fully aware of what services they were entitled to at the 3CMS level of care. They indicated that clinical contacts with their primary clinician and psychiatrist were not always timely and that there were frequent changes in the primary clinicians who were providing services, which resulted in a severe deficiency of continuity of care. Several patients reportedly withdrew from mental health programming and treatment due to the lack of continuity of care. Furthermore, multiple patients expressed dissatisfaction with the quality of IDTTs, reporting that the majority of IDTTs were perfunctory, did not involve actual treatment planning, and were essentially a "rubber stamp" process.

On a more positive note, each patient revealed that clinical contacts were always provided in a confidential setting. They also indicated that the psychiatrist for Facility D was

"very consistent" and provided positive feedback regarding the psychiatric care. Notably, all the interviewed patients had jobs, were enrolled in education, or both.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their 3CMS stays. Two patients were eliminated from the assessment because they were each discharged from mainline 3CMS within two days of their arrival at PBSP.

Four patients required initial psychiatry evaluations; all four were timely before the initial IDTT. All were conducted in confidential settings. Telepsychiatry was used for all initial psychiatry evaluations.

For routine psychiatry contacts, 65 percent timely occurred at least every 90 days; 96 percent were conducted in confidential settings. Non-confidential contacts were attributed to patient refusals. Telepsychiatry conducted 100 percent of reviewed routine psychiatry contacts.

All four patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. All were conducted in confidential settings. No initial primary clinician contacts were conducted via telehealth.

For routine primary clinician contacts, 73 percent timely occurred at least every 90 days and 89 percent were conducted in confidential settings. Non-confidential contacts were attributed to patient refusals. No routine. primary clinician contacts were conducted via telehealth.

Three of four initial IDTTs occurred within 14 working days of patient arrival or a level of care change. Required staff and patients attended all initial IDTTs.

Eight of nine or 89 percent of patients had timely annual IDTTs. Required staff attended all annual IDTTs; patients attended six of nine or 67 percent of the reviewed annual IDTTs. The reason attributed to annual IDTTs held *in absentia* was patient refusals.

Other Issues:

Pre-Release Planning:

The PBSP pre-release coordinator was a senior psychologist specialist who had been in the role for one year and had completed the statewide mental health pre-release coordinator training.

The pre-release coordinator reported that patients were provided with release of information forms (ROIs) and resources for their respective commitment counties. The coordinator received an updated bi-weekly list from headquarters of all patients who were within 60 days of release. Patients were also provided with a pre-release packet.

The pre-release coordinator reported that she had a working relationship with the TCMP supervisor and attended the monthly headquarters call for pre-release coordinators. The ISUDT bi-weekly pre-release meeting was attended by another clinician.

During the review period, PBSP was unable to offer pre-release groups due to staffing shortages.

The TCMP reported there were 29 3CMS patients released from PBSP during the review period; all but one of these patients were screened for benefit eligibility; that patient was unavailable for screening. Reviewed TCMP data indicated that Medi-Cal applications were submitted for 27 or 93 percent of the patients released. Additionally, one patient had access to other insurance and one patient was documented as unavailable.

For the 11 3CMS patients who were eligible for SSI, applications were submitted for ten; one patient refused services. Three patients were eligible for Veterans' benefits, including one patient who already had access to the benefits, one patient who was been denied access to the benefits, and one patient who refused services.

Program Access:

a.    Job and Program Assignments

PBSP reported that its 819 job assignments were held by 152 3CMS patients or 40 percent of the 3CMS population, and 667 or 57 percent of non-MHSDS incarcerated persons.

The 764 academic assignments were held by 162 or 43 percent of 3CMS patients and 602 or 51 percent of non-MHSDS incarcerated persons.

Of the 55 vocational education assignments, seven or two percent of 3CMS patients held them, as did 48 or four percent of non-MHSDS incarcerated persons.

The 300 voluntary education assignments were held by 40 or 11 percent of 3CMS patients and 260 or 22 percent of non-MHSDS incarcerated persons.

The 93 substance abuse treatment assignments were held by 21 or six percent of 3CMS patients and 72 or six percent of non-MHSDS incarcerated persons.

b.    Milestone Credits

PBSP reported that one 3CMS patient was awarded one milestone credit.  The institution did not report the number of eligible 3CMS patients or incarcerated persons for the credits. Notably, leadership erroneously stated that they did not need to offer the credits to 3CMS patients.

c.    Out-of-Level Housing

On October 2, 2023, PBSP reported that 13 3CMS custody Level I patients were in Level II housing, 12 3CMS custody Level III patients were in Level II housing, and six 3CMS custody Level III patients were in Level IV housing.

d.    ADA Reasonable Accommodation and Grievance Procedure

PBSP provided attendance sheets for training on accommodations and grievance

procedures but did not provide an updated reference training manual for ADA accommodations.

"C" Status:

As of November 8, 2023, no MHSDS patients and one general population incarcerated

person was designated "C" status.  During the review period, three 3CMS patients were on "C"

status; review of those patients' classification chronos revealed that two patients were deemed

program failures after receiving multiple serious RVRs within a 180-day period.

Case-by-Case Reviews:

PBSP reported that five patients met the criteria for 150-day case-by-case reviews.

Review of case notes for those patients revealed compliance with CDCR policy; all five patients

were not at risk for decompensation due to extended segregated housing, each received a 90-day

ASU extension, and they were all due back for another meeting with the associate director.

Forty-one patients met the criteria for 120-day pre-MERD review.  All 41 patients

received a timely ICC review.  Twenty-six patients were referred to the CSR for review and were

pending completion of the RVR hearing or a decision by the district attorney regarding

prosecution.  Ten cases were referred to C&PR for non-adverse transfer.  For the remaining five

cases, three patients were pending transfer, one patient was released to PBSP general population,

and one patient was transferred to CSP/Corcoran SHU.  Seven patients were granted NDS status.

Mental Health Referrals:

During the reporting period, PBSP made 839 mental health referrals; there were 210

referrals to psychiatry and 629 referrals to primary clinicians.  There were 72 emergent referrals,

75 urgent referrals, and 692 routine referrals.

All four emergent psychiatry referrals and 60 of 68 or 88 percent of emergent primary clinician referrals had timely responses.  For urgent referrals, there were timely responses to six of seven or 86 percent of psychiatry referrals and to 60 of 68 or 88 percent of primary clinician referrals.  Routine referrals had timely responses to 478 of 493 or 97 percent of primary clinician referrals and 170 of 199 or 85 percent of psychiatry referrals.

Custody and Mental Health Partnership Plan:

PBSP's custody and mental health partnership plan LOP aligned with statewide policy and was revised in April 2023.

Executive leadership joint rounding occurred during each month of the review period. The rounding occurred in the MHCB in April and July, the STRH in May and August, and Facility B in June and September.  The produced rounding forms indicated that required staff attended and that staff and patients were interviewed each month.  Staff noted concerns regarding a need for more custody staff due to population increases as well as requests for an additional patient telephone in the STRH.  Patients noted their desire for additional programming and their concerns regarding the temperature in certain housing units which could be either very hot or very cold, which made patients uncomfortable.

PBSP provided executive staff meeting agendas and quality management committee meeting minutes for each month of the review period and mental health program subcommittee meeting minutes for five of six months.  While executive joint rounding was a line item on each executive staff meeting agenda, no details regarding any related discussion were provided. However, the quality management committee and mental health program subcommittee meeting minutes discussed executive joint rounding in detail.

228

The monitor attended huddles in the MHCB and RHU[40].  Both huddles were attended by required staff, all of whom signed the huddle form in accordance with policy.  The MHCB huddle was highly collaborative and all attending staff reflected a thorough knowledge of the patients, including their health and medication histories, and other applicable issues.  The RHU huddle, on the other hand, lacked collaboration and mostly consisted of one staff member reading patients' medical charts aloud with little to no contribution from any other staff attendees.

During the review period, monthly joint supervisory program area tours did not occur monthly as required but, rather, occurred during four of six months.  The tours occurred on Facility D in April, Facility B in May and June, and Facility A in August; required staff attended all tours.  Staff frequently reported positive relations between custody and mental health and their only noted concern related to the facility-wide power outage.  Interviewed incarcerated persons reported receiving timely ducats and no scheduling issues.  The only noted patient concern was one individual did not feel comfortable reporting mental health issues to custody staff.

Weekly 3CMS supervisory meetings occurred as required during the reporting period; however, documentation was not provided for review.

PBSP reported distributing the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for Facilities A, B, and D for five of six months of the review period.  The meetings did not occur in August due to power

---

[40] In accordance with emergency regulations, the STRH transitioned to RHU on November 1, 2023.

outages across the institution.  Discussion topics included canteen, the need for building repairs, occasional issues with patients receiving property, and dietary concerns.  Required staff attended each reviewed IAC meeting.

During the review period, patients filed 119 staff misconduct complaints against custody staff and none against mental health staff.  Of the 119 custody staff misconduct complaints, only eight were open, and the remaining 111 were either referred to the appropriate entity or not sustained or rejected.  There were no investigations for misconduct towards a patient not initiated through the appeal process.  No mental health staff were reassigned due to a staff misconduct complaint.

PBSP reported that 17 of 49 or 35 percent of mental health staff and 556 of 676 or 82 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

PBSP's heat plan LOP was revised in April 2023 and complied with CDCR policy.  The heat plan was in effect for four months of the reporting period.  There were no Stage I, Stage II, or Stage III heat alerts.  No patients experienced heat-related illness during the review period.

Interviewed officers from Facilities A, B, and D the MHCB and RHU demonstrated varying knowledge of the heat plan.  For example, multiple interviewed officers could not recall all three levels of the heat plan.  However, some officers had resources that displayed the appropriate temperatures and procedures for each stage of the heat plan.  Additionally, although the site visit occurred outside of the months when the heat plan was active, some interviewed officers did not know to reference the list of patients who were prescribed heat-sensitive medications the heat plan was activated, or that this list needed to be updated daily.

Observed thermometers were in working order and appropriately located.

The annual mandatory heat-related pathologies training was attended by 563 of 711 or 79 percent of custody staff and 34 of 44 or 77 percent of required mental health staff including seven of eight psychologists, two of three social workers, and 25 of 33 RNs.

RVRs:

PBSP issued 1,019 RVRs during the review period; 343 or 34 percent were issued to MHSDS patients including eight to acute care patients, three to intermediate care patients, 27 to MHCB patients, 11 to EOP patients, and 294 to 3CMS patients.

Review of 23 RVRs issued to MHSDS patients revealed that the MHA was confidentially completed in 16 of 23 or 70 percent of cases. Custody staff timely referred the MHA to mental health in nine of 23 or 39 percent of cases. Mental health staff timely completed and returned the MHA to custody in all 23 cases.

Patients were assigned a staff assistant in 13 cases. Patients timely received the required RVR documentation prior to the hearing in 100 percent of reviewed RVRs, and patients were present for 19 of 23, or 83 percent of hearings.

The SHO documented consideration of the patients' mental health information in all 23 reviewed RVRs. The SHO mitigated the penalty based on the mental health recommendation in 15 of 18 or 83 percent of instances where the assessment recommended mitigation.

None of the reviewed MHAs recommended that the RVR be documented in an alternative manner. However, nine RVRs indicated that patients' mental health contributed to the behavior which led to the RVR, and the reviewing officers found all nine patients guilty as charged.

The mental health assessment training was attended by 89 of 111 or 80 percent of required custody staff and 15 of 16 or 94 percent of mental health staff including the chief

psychologist, chief psychiatrist, all three senior psychology/psychiatry/social work supervisors, seven of eight psychologists, the one psychiatrist, and all three social workers.

Use of Force:

PBSP reported five controlled and 82 immediate use of force incidents. All five controlled and 60 or 73 percent of immediate uses of force incidents involved MHSDS patients.

Review of the five controlled uses of force indicated staff's compliance with CDCR policy including adequate cool down periods, videorecording of the incidents, and reasonable efforts to deescalate the situation.

Review of 14 immediate use of force incidents involving MHSDS patients also revealed compliance with CDCR policy and appropriate use of force in each case.

PBSP reported that 532 of 712 or 75 percent of custody staff and 33 of 49 or 67 percent of mental health staff attended the mandatory use of force training.

Lockdowns/Modified Programs:

PBSP reported four modified programming periods during the review period ranging from five to 12 days in duration. The four modified programming periods resulted from investigations and searches for inmate-manufactured weapons on B yard in two instances and both A and B yards in one instance. The fourth modified programming period was initiated due to an institutional power outage. Mental health services were not significantly interrupted due to modified programming.

Access to Care:

A review of PBSP's monthly Health Care Access Quality reports from April through September 2023 reflected the issuance of 6,787 mental health ducats and add-on appointments, of which 4,217 or 62 percent were completed and 2,570 or 38 percent were not completed. Of

the non-completed appointments, three or one percent were due to custody factors, 31 percent were due to non-custody factors, and 68 percent were due to patient refusals.

*Coleman* Postings:

*Coleman* posters in English and Spanish were observed in all toured housing units.

**APPENDIX A – 6**
**CALIFORNIA STATE PRISON/SOLANO (CSP/Solano)**
Site Visit: November 28, 2023 – November 29, 2023
Review Period: April 1, 2023 – September 30, 2023

Census:

On November 27, 2023, CSP/Solano's total incarcerated population was 3,739, which was a 13 percent increase from the prior review period.  The mental health caseload population of 783 was a 31 percent increase since the previous reporting period and represented 21 percent of the institution's population.  The MHSDS population consisted of eight MHCB patients and 750 mainline 3CMS patients, which was a 27 percent increase from the previous monitoring round.  There were two EOP and 23 3CMS patients in administrative segregation.

Staffing:

The chief psychiatrist position was filled.  Three of 3.5 psychiatry positions were filled, for a 14 percent vacancy rate.

The one telepsychiatry position was vacant, but the position for the medical assistant assigned to telepsychiatry was filled.

One of two chief psychologist and two of three senior psychologist positions were filled.  Six of 8.5 psychologist positions were also filled, for a 29 percent vacancy rate.  The use of 0.25 contractors reduced the functional vacancy rate to 26 percent.  All psychologists were licensed.

For the supervising social worker position, 0.5 of one was filled.  For clinical social workers, 2.5 of 5.5 positions were filled indicating a 55 percent vacancy rate.  All social workers were licensed.

One of 1.5 recreation therapist positions was filled, for a 33 percent vacancy rate.

The senior psych tech position and all seven psych tech positions were filled.

Five of six MHSDS clerical positions were filled, for a 17 percent vacancy rate.

234

The OSS II position was filled. The CHCA position was vacant. One of the 1.5 HPS I positions was filled, for a 33 percent vacancy rate.

All ten supervising registered nurse positions were filled, as was the CNA position.

As for custody staffing, 747 of 794.2 positions were filled for a six percent vacancy rate; filled positions included the warden and chief deputy warden, three of six associate wardens, four of six captains, 22 of 26 lieutenants, 59 of 65.2 sergeants, 22 of 27 CC I's, nine of ten CC IIs, and 626 of 652 correctional officers.

Telepsychiatry:

Telepsychiatry was used for one month of the review period in September 2023. In addition to providing on-call coverage, the telepsychiatrist worked 20 hours per week and treated mainline 3CMS and administrative segregation patients. There was no telepsychiatrist on staff at the time of the site visit.

Telework:

In addition to utilizing telepsychiatry, CSP/Solano allowed the chief psychologist, two senior psychologist specialists, and the HPS I to telework up to two days per week.

Staff Recruitment:

During the review period, the institution struggled with staff recruitment. Job availability was advertised through human resources and handled by CDCR headquarters. Although openings were available and interviews were completed, recruitment efforts had limited success, as office technicians were the only staff hired during the review period. These continued staffing shortages caused leadership to deny time-off requests from existing staff members.

Quality Management:

CSP/Solano's local governing body met quarterly in June and August 2023, with a quorum in attendance at each meeting. Mental health-related topics included a discussion of MHCB transfer timelines to higher levels of care.

The quality management committee (QMC) met monthly during the review period with required quorums in attendance for each meeting. No mental health-related topics were discussed other than in June 2023 when issues were elevated from the mental health program subcommittee; these issues included quarterly SPRFIT information, two new corrective action plans (CAPs), mental health staffing challenges and staff recruitment updates, and issues with denying time-off requests due to staffing shortages. No additional information was provided to address these elevated issues.

The mental health program subcommittee met monthly during the review period with quorums in attendance for each meeting. Agenda items included review of previous discussion topics and QMC reports, patient contact reviews, mental health performance measure report reviews, CAPs, dashboard review, effective communication audits, custody and mental health partnership updates, local operating procedure updates, and staffing resource updates.

Notable discussion topics included a decrease in compliant psychiatry contacts from 91 to 71 percent during the review period. Primary clinician contacts and IDTT attendance were both reported at above 90 percent compliance.

The emergency medical response review committee (EMRRC) met every two weeks and required quorums were achieved at each meeting. No significant MHSDS events were discussed during the review period.

No mental health QITs or FITs were chartered during the review period, though three CAPs were initiated. One CAP was in response to low compliance rates for safety plan training

attendance; by September 2023, CSP/Solano had increased the training attendance from 42 to 100 percent of staff. A second CAP was in response to noncompliance with timely mental health referrals. Staff absences across all disciplines contributed to this decrease; however, after three consecutive months above 85 percent compliance, the CAP was considered complete. The third CAP was in response to improving timely responses to SRASHEs. Further research into this issue revealed that performance was timely, but there was a delay in clinician signatures, which led to untimely completion.

Similar to the previous reporting round, institutional peer review was on hold. No definitive date was given for the peer review process to begin; however, throughout the review period, psychiatrists began to develop a peer review local operating procedure (LOP).

Medication Management:

CSP/Solano provided MAPIP results from April 1, 2023 to September 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, the institution was compliant for all six months with obtaining thyroid function tests and monitoring blood pressure for patients prescribed venlafaxine, and for the one required month for EKGs. Regarding medication consents, the institution was compliant for three months and was noncompliant for three months.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CSP/Solano was compliant with monitoring blood pressure, weight, and thyroid function tests for six months. The institution was compliant for five months and was noncompliant for one month with monitoring height and obtaining medication consents. CSP/Solano was compliant with performing the AIMS for three months and was noncompliant for three months. Additionally, the institution was compliant with measuring glucose for two months and was

noncompliant for four months. The institution was compliant for one of two required months for monitoring EKGs. CSP/Solano was compliant for one month and was noncompliant for five months with performing the CMP and was noncompliant for all six months with monitoring lipids and CBC with platelets.

No patients were prescribed carbamazepine during the review period.

For patients prescribed Depakote, CSP/Solano was compliant for five months and was noncompliant for one month with monitoring therapeutic medication levels and for obtaining medication consents. The institution was compliant for three months and was noncompliant for three months with monitoring CBC with platelets and CMP.

For lamotrigine, the institution was compliant in obtaining medication consents for the two required months of the monitoring period.

Regarding lithium, the institution was compliant for the three required months for obtaining medication consents, the two required months for thyroid function tests, and the one required month for EKGs. The institution was compliant for four months and was noncompliant for one month; no tests were required for the remaining month for kidney function tests and the monitoring of therapeutic medication levels.

For medication management metrics reported by mental health headquarters, CSP/Solano was compliant for six months with continuity of medications upon parole/transfer to the community and chronic care medications historical administration. The institution was compliant for five months and was noncompliant for one month with continuity of medications with intra-institutional transfer to ASU/SHU/PSU. The institution reached compliance for three months and was noncompliant for three months for continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU). They were compliant for two months

and noncompliant for four months with continuity of medications upon discharge/transfer from a community hospital and/or DSH. CSP/Solano was compliant for one of two required months for continuity of medications upon MHCB transfers. The institution was compliant for one month and was noncompliant for five months with outpatient provider new medication orders. Curiously, the analogous metric for medical providers was fully compliant. The institution stated that this difference was due to a higher rate of refusal for MHSDS patients.

The institution was noncompliant for all six months with three measures: continuity of medications upon inter-institutional transfer at R&R, observation of medication preparation at HS, and observation of medication preparation at AM and PM.

From January to June 2023, CSP/Solano had one PIWP for the MAPIP-related measure of obtaining EKGs for patients taking medications requiring monitoring. This was a joint project between psychiatry and medical. A Health Program Specialist I alerted psychiatry and medical leadership when a patient required an EKG. The baseline compliance rate was 84 percent, and that rate improved to 100 percent by June 2023.

CSP/Solano reported 320 patients who were prescribed 393 psychiatric medications.

Psychiatric prescriptions were ordered for a maximum of 180 days, except in the MHCB where orders were limited to 30 days. Bridge orders were rarely used, and the length of the prescription was determined by the psychiatrist's discretion.

For verbal and telephone orders, the nursing staff were required to "read back" the order to the prescriber. The institution specified a clear process for the psychiatrist to sign off on the orders no later than the next working day, and oversight was provided by the chief psychiatrist.

One 3CMS patient was prescribed one KOP medication which was an SSRI that was in accordance with policy.

CSP/Solano reported 51 medication line audits across all yards during second and third watches; the audits indicated that all patients received their medications in less than 30 minutes, and most patients received their medications in two to three minutes. The duration of medication lines was under two hours.

CSP/Solano had a small awning to provide protection from the elements during medication administration; however, the awning provided no protection from the elements while patients waited in the medication line. Custody staff provided the patients with ponchos in the event of rain. CSP/Solano did not report the lack of protection to be a barrier to patients' compliance with taking prescribed medications. A project was in place to explore providing misting devices near the medication dispensing windows on all yards to address heat-related concerns.

The institution reported that medication administration did not interfere with mental health programming.

CSP/Solano was not a clozapine initiation or maintenance institution and reported no patients prescribed clozapine.

CSP/Solano reported a nonformulary rate of two percent. Those prescriptions did not require secondary review or approval.

CSP/Solano reported approximately 260 polypharmacy reviews that were due during the monitoring period, with an average timely completion rate of 99 percent. Pharmacists reviewed the medications, completed required documentation, and informed the psychiatrist by an EHRS message of any recommendations.

CSP/Solano reported that 198 patients received 334 medications prescribed at HS. With rare exception, CSP/Solano was compliant with the requirement to administer HS medications after 8 P.M.

CSP/Solano was compliant for the one required month for the related medication administration metrics of compliance with the presence of a current PC 2602 court order for involuntary medications present in the EHRS and with the presence of a current physician's order in the EHRS for a medication to be given per PC 2602 court order. The institution had a robust and detailed PC 2602 involuntary medication local operating procedure which was in accordance with statewide policies.

CSP/Solano filed one non-emergent initial PC 2602 petition which was granted. There were no initial, emergent, or renewal petitions filed.

At the time of the monitoring visit, CSP/Solano had one 3CMS patient who had received PC 2602 medications since 2010. Although the patient transferred into a CTC medical bed at CSP/Solano within timelines required for PC 2602 petition renewal and notice was provided by the sending institution, the CSP/Solano staff overlooked the renewal; they reported that this omission occurred due to multiple other responsibilities. The staff discovered the case during the document production for the monitoring tour. CSP/Solano reported that they would allow the patient a chance to take medications voluntarily and to reevaluate the need for PC 2602 involuntary medications should the patient refuse medication doses. The expert reviewed the case after the date of the PC 2602 petition expiration, and the patient appeared to be compliant with the prescribed psychiatric medications.

The institution reported no use of force incidents regarding administration of PC 2602 medications.

Since 2019, a psychologist served as the MCA, and those responsibilities reportedly occupied approximately five percent of their time. The MCA reported no problems with receiving petitions from the psychiatrist, upload of documentation, the review process with OLA and OAH, or interfacing with the Administrative Law Judge.

<u>Transfers</u>:

The institution conducted monthly audits of timely referrals and acceptable nonreferral documentation which revealed compliance rates below 80 percent during five of six months of the review period. Similar to the prior reporting period, CSP/Solano's chief of mental health managed all higher level of care transfers but did not independently track this information and relied on headquarters documentation.

There were 156 instances of patients who were considered but not referred to inpatient care. The monitor's expert noted problematic HLOC nonreferral rationales, including plans for medication adjustments and waiting for the patient's next IDTT despite documentation suggesting the appropriateness of the HLOC transfer. The inpatient referral recission practices were also concerning. In some reviewed cases, treatment teams withdrew or rescinded referrals in response to IRU's feedback or requests for additional or supplemental information as opposed to pursuing those referrals until formal rejection or they were no longer clinically indicated.

There were 24 acute care referrals; 12 could not be assessed for compliance with transfer timelines due to incomplete document production that omitted both transfer and inpatient admission dates. Leadership at CSP/Solano indicated that it relied on data from headquarters and did not independently track this information. Of the 12 acute care referrals, nine or 75 percent were timely transferred within ten days. The three remaining patients were transferred no more than two-days late.

There were four referrals to intermediate care; three timely transferred. The fourth referral could not be assessed for compliance with transfer timelines again due to incomplete document production and CSP/Solano not tracking this information independently.

During the site visit, one acute and three intermediate care patients were awaiting transfer; all were within transfer timelines.

There were no *Vitek* hearings during the review period.

CSP/Solano referred 22 patients to the MHCB; 21 were admitted and one referral was rescinded. Nineteen of 21 or 90 percent of MHCB admissions were timely within 24 hours of referral. No patients had three or more MHCB admissions.

No patients transferred to a PSU or ASU EOP hub.

CSP/Solano referred 15 patients to STRH, of which 11 or 73 percent were admitted timely. The four remaining transfers exceeded timelines by a range of four to 21 days due to bus seats and capacity issues. At the time of the site visit, nine patients were pending transfer to STRH.

No patients transferred to LTRH during the review period. No patients were pending transfer to LTRH at the time of the site visit.

Twelve patients were referred to EOP programs during the review period; six transferred timely. Of the six patients who were not timely transferred, one patient's level of care was reduced to 3CMS, one patient had an extended stay in the MHCB, and four were related to endorsement dates.

Programming:

MHSDS Patients in Administrative Segregation:

There were 153 MHSDS patients housed in the administrative segregation unit during the review period.  The average length of stay was 19 days and ranged from one to 116 days. During the site visit, the administrative segregation unit housed two EOP patients and 23 3CMS patients; one EOP patient transferred during the site visit, and the other patient was within the 30-day transfer window.  During the site visit, four 3CMS patients were housed in the administrative segregation unit for more than 30 days, with stays ranging from 37 to 59 days. Delays were attributed to due to administrative errors in transfer requests.

Three on-site psychiatrists and one psychologist rotated coverage in administrative segregation.  A senior supervising social worker also treated 3CMS patients in administrative segregation and maintained a caseload within the established ratio.

Three initial IDTTs for 3CMS patients in administrative segregation were observed. Although the room size was adequate, it was not confidential.  All required staff members were present, and the patient was present for one of three cases.  In one case, the patient had not met with the psychiatrist prior to the IDTT; in another case, the psychiatrist who completed the initial evaluation was not the psychiatrist in the IDTT.

While the IDTTs produced limited information due to lack of patient attendance, the teams were adequately informed about each patient.  The primary clinician made quality interactions with the one patient in attendance and was extremely thorough when reviewing the two remaining cases.  Mental health and custody demonstrated extensive collaboration and appropriate knowledge of cultural barriers to the treatment for each patient.  Of note, the

language translation services that a custody officer provided to the one patient in attendance was exceptional.

Ten ICC meetings were also observed during the site visit; these meetings were also held in a nonconfidential space. Required staff was in attendance for all ICCs, and the mental health clinician provided adequate input regarding the patients' treatment. Of the ten ICC meetings, seven patients were pending further investigations into their RVR, and three patients were pending transfer to non-designated restricted housing.

Interviewed custody staff reported that unclothed body searches were conducted privately prior to patients exiting their holding cells. Custody staff further reported that metal detectors were utilized during unclothed body searches.

Non-Disciplinary Segregation:

Twenty-five 3CMS patients were designated NDS status during the reporting period; 22 were approved for accelerated transfer, and all transferred within 72 hours. The institution was unable to report whether the three remaining patients were granted appropriate privileges and property. At the time of the site visit, two EOP patients who were approved for accelerated transfer and nine 3CMS patients were afforded their property and privileges.

MHCB:

During the review period, CSP/Solano continued to have nine MHCBs located in the 15-bed CTC. Staffing relied on clinicians otherwise assigned to mainline caseloads to assist on a rotating basis, including all three on-site psychiatrists and one psychologist. Additionally, there was one full-time psychologist and a 0.25 FTE psychologist who treated only MHCB patients, each of whom maintained a caseload within the established ratio.

One hundred patients were admitted to the MHCB during the review period.  The average clinical length of stay was 11.5 days while the average physical length of stay was 14 days and ranged from one to 75 days.  The average daily census in the MHCB was 7.6 patients.  Fifty-seven patients had stays longer than ten days.

Five MHCB IDTTs were observed during the site visit; all required members and patients were present, including a nurse.  The IDTTs appropriately reviewed the reason for admission, psychiatric diagnoses, safety concerns, suicide and self-help concerns, progress toward discharge, level of care, involuntary medication needs, and barriers to discharge.  The primary clinician was familiar with all five patients and reported plans to follow up on patients' specific requests.  The primary clinician consistently discussed each patient's level of care and referred one patient for intermediate care during observation.

On the other hand, there was an overall lack of collaboration during MHCB IDTTs.  Only the primary clinician was consistent in providing meaningful input and determining treatment plans.  The primary clinician's recommendations did not involve input from other IDTT members, including when determining diagnosis, level of care, discharge, and monitoring level.  The counselor provided minimal to no input.

Clinical treatment groups were not offered in the MHCB during the review period.  Recreation activities were held in either the designated yard or in a TTM located in a hallway due to space limitations within the CTC.  Like prior rounds, staff raised concerns about the yard provided for recreation therapy, including the amount of bird feces, noise from generators, and malodourous smells which impacted service quality.  MHCB staff indicated that there had been no significant improvements in yard conditions resulting in the recreation therapist wearing ear plugs during yard activities.

Twenty MHCB patients were selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes.  All 20 required initial psychiatry evaluations.  Of those, 17 or 85 percent occurred before the initial IDTT and within 24 hours of MHCB arrival.  One patient did not receive an initial psychiatry evaluation.  Fourteen of 19, or 74 percent of reviewed initial psychiatry contacts were confidential.  Reasons for non-confidentiality included refusals and lack of treatment space.  Telepsychiatry was not utilized for initial psychiatry evaluations.

Twenty MHCB patients required two weekly routine psychiatry contacts.  Of those, 97 percent were timely and 75 percent were conducted in confidential settings.  Reasons for non-confidentiality included refusals, safety concerns, and custody modified programming.  Telepsychiatry was not used for routine contacts.  Notably, some psychiatry contacts occurred concurrently with IDTTs and were not counted towards compliance.

Twenty MHCB patients required initial primary clinician evaluations; nine, or 45 percent were completed within 24 hours of admission.  One patient did not receive an initial primary clinician evaluation.  Thirteen, or 65 percent were confidential.  Reasons for non-confidentiality included refusals and custody modified programming.  Telehealth was not utilized for initial primary clinician evaluations.

Twenty MHCB patients required routine primary clinician contacts.  Of those, 96 percent were timely, and 57 percent were completed in a confidential setting.  Reasons for non-confidentiality included refusals, safety concerns, custody modified programming, and a lack of custody escorts.  Telehealth was not utilized for routine primary clinician contacts.

Twenty MHCB patients required initial IDTTs; 17, or 85 percent occurred within 72 hours of patient arrival.  All 17 initial IDTTs were attended by required staff and patients.

Twenty-three of 28 or 82 percent of expected routine IDTTs occurred every seven calendar days following the initial IDTT.  Required staff were in attendance for all 27 routine IDTTs that occurred and patients attended 26 or 96 percent; reasons for the patient's absence was not provided.  Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases due to a lack of psychiatric continuity of care.

Reviewed 114-As for MHCB patients revealed that they were offered adequate out-of-cell time, showers, weekly linen exchange, and weekly phone calls.

Seclusion and Restraint:

There were no episodes of seclusion or restraint during the review period.

Crisis Intervention Team:

CSP/Solano reported that due to staffing shortages and low numbers of crisis calls, they did not have a dedicated CIT during the review period.  Instead, the institution relied on supervisory staff to assign clinicians to cover crisis calls as needed.  After-hours crisis response was covered by the on-call psychiatrist.  There were no CIT referrals during the reporting period. Following initial consultation, patients were placed into alternative housing until a mental health evaluation could be completed during business hours.

3CMS:

Due to the staffing shortage, clinical staff rotated coverage of other programs in addition to maintaining their mainline caseloads.  Specifically, three on-site psychiatrists, who rotated coverage in administrative segregation and MHCB, treated mainline 3CMS patients and maintained caseloads within the established ratio.  During September of the reporting period, a 0.5 FTE telepsychiatrist treated mainline 3CMS patients and carried a caseload within the established ratio.  Four psychologists treated mainline 3CMS patients, and all but one had a

caseload that exceeded the established ratio. One psychologist treated mainline 3CMS patients in addition to restricted housing and MHCB patients; her caseload was within the established ratio. There were also three licensed clinical social workers who treated mainline 3CMS patients; all carried caseloads within established ratios.

Six mainline 3CMS IDTTs were observed on Facility D. A primary clinician, psychiatrist, and supervising senior psychologist specialist were all present. The CC I was present via telephone. Patients attended all six meetings, which were largely collaborative as the primary clinician and psychologist engaged with the patients clearly and with simplistic language. Goals were established with each patient, along with a discussion about the appropriate interventions for each patient's specific diagnosis. The psychiatrist demonstrated active listening techniques when she asked the patient about his interpretation of his therapeutic interventions and plans. The psychologist and psychiatrist agreed on diagnoses in front of the patient appropriately. Although the CC I participated by telephone, he was also actively involved with each patient. The supervising senior psychologist specialist was instrumental in guiding the psychologist through two of the six IDTTs using open-ended questions when suitable. A higher level of care referral was appropriately discussed for one patient, and the team recommended that the patient may need memory care in addition to a higher level of mental health care.

CSP/Solano offered one recreation therapy group and one clinician-led group to 3CMS patients every week during the review period. The "personal transformation" clinician-led group was facilitated by two psychologists who created the curriculum in 2018 and trained clinicians in the curriculum at three other institutions. The group's goal was to address the stigmas associated with mental illness in the prison environment. The observed group had 15 participants, including

both 3CMS and non-MHSDS incarcerated individuals.  There was open discussion about racial issues, gang violence, drug abuse, and other relevant topics to the institution.

CSP/Solano experienced significant staffing shortages and had a high number of clinicians on extended leave; accordingly, staff on site were responsible for covering the caseloads of the individuals on leave.  In June 2023, these staffing shortages necessitated a change from normal treatment procedures to a triage plan that prioritized mental health consults and referrals, initial intake evaluations, initial IDTTs, followed by other appointments including routine contacts, RVR evaluations, and other clinician-based tasks.

Interviewed 3CMS patients expressed similar observations related to mental health staffing levels.  Patients indicated wanting more clinician-led groups and more mental health-related content on their tablets and also reported not always seeing the same clinician for their contacts.

The monitor randomly selected and reviewed the healthcare records of 20 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

Eight patients required initial psychiatry evaluations, of which five or 63 percent occurred before the initial IDTT.  All eight were conducted confidentially.  Telepsychiatry was utilized for three or 38 percent of initial psychiatry evaluations.

Five patients required routine psychiatry contacts; only one occurred timely.  All of the reviewed routine contacts were conducted confidentially.  Telepsychiatry conducted three or 43 percent of reviewed routine psychiatry contacts.

Eight patients required initial primary clinician evaluations; six or 75 percent were completed within ten working days of arrival or a change in level of care and all eight were conducted confidentially.

Sixteen patients required routine primary clinician contacts.  Of those, 81 percent were timely and occurred at least every 90 days.  All routine primary clinician contacts were conducted confidentially.

Eight 3CMS patients required initial IDTTs; five or 63 percent occurred within 14 working days of arrival or a level of care change.  Required staff attended all eight and patients attended six or 75 percent.

Four of seven or 57 percent of patients who required annual IDTTs received them timely.  Required staff and patients attended all six reviewed routine IDTTs.  Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

The pre-release coordinator was an LCSW and maintained additional responsibilities, including managing a caseload of patients as a primary clinician.  The pre-release coordinator indicated spending approximately 25 percent of her time each week on pre-release planning services.

The pre-release coordinator acted as the facilitator for pre-release services by alerting the patient's dedicated primary clinician of pre-release planning requirements.  It was then the primary clinician's responsibility to conduct the required pre-release meeting with the patient and to connect the patient with the required services upon release.  The pre-release coordinator would then track the outcomes of the meetings and create a thorough community needs assessment.  According to leadership, eight to 15 patients were discharged monthly.

There were no pre-release groups offered during the review period.

CSP/Solano reported completing 132 pre-release planning assessments during the reporting period; all were completed by the patient's primary clinician.  There were 95 Cal-ID applications and 96 Medi-Cal applications submitted during the reporting period.  Collaboration with TCMP caseworkers and the pre-release coordinator was minimal and limited to monthly coordination phone calls.

Program Access:

a.      Jobs and Program Assignments

On October 2, 2023, CSP/Solano reported that of 1,551 available jobs, 290 3CMS patients or 37 percent of the 3CMS population held job assignments, as did 1,261 or 43 percent of the non-MHSDS population.

For the 862 academic assignments, two of four EOP patients, 182 or 23 percent of 3CMS patients, and 678 or 23 percent of the non-MHSDS population held them.

Of the 151 vocational education assignments, 30 or four percent of 3CMS patients and 121 or four percent of non-MHSDS individuals held them.

Of 638 voluntary education assignments, 122 or 16 percent of 3CMS patients and 516 or 18 percent of the non-MHSDS population held them.

For the 412 substance abuse treatment assignments, 87 or 11 percent of 3CMS patients and 325 or 11 percent of non-MHSDS individuals held them.

b.      Milestone Credits

CSP/Solano indicated that neither of the two EOP patients were eligible to earn milestone credits during the review period.  Of the 750 3CMS patients who were eligible to earn milestone credits, 30 or four percent earned them.  Additionally, of the 2,957 non-MHSDS incarcerated individuals who were eligible to earn milestone credits, 89 or three percent earned them.

c.    <u>Out-of-Level Housing</u>

As of October 2, 2023, there were 84 custody Level II 3CMS patients and 86 custody Level III 3CMS patients in custody Level I housing, 28 custody Level III 3CMS patients in custody Level II housing, 37 custody Level II 3CMS patients in Level III housing, and 99 custody Level III 3CMS patients in custody Level IV housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedure</u>

CSP/Solano provided a copy of the CDCR Reasonable Accommodation Request Process manual and produced training rosters for custody and mental health staff confirming the implementation of the revised process.

<u>"C" Status</u>:

During the review period, the institution reported that 17 patients were on "C" status, including six 3CMS patients and 11 non-MHSDS individuals.  The UCC determined that all six 3CMS patients were program failures but could not indicate their lengths of placement.  During the site visit, two 3CMS patients and four non-MHSDS individuals were placed on "C" status.

<u>Case-by-Case Reviews</u>:

CSP/Solano reported that one patient required a 150-day case review during the reporting period.  Case notes indicated that the patient was retained in ASU due to safety concerns and possession of a deadly weapon.  The ICC suspended the patient's SHU term, and the patient received an ASU extension because the patient was pending transfer.

Eight patients required 120-day ICC pre-MERD reviews during the reporting period; all eight received timely ICC reviews.  Three cases were referred to the CSR for review and were awaiting RVR resolution or SHU term extension.  Four patients were released to the general population.  One patient's SHU term was suspended; however, he received two RVRs for refusal to house while in the ASU.  One patient was granted NDS status.

<u>Mental Health Referrals</u>:

During the reporting period, CSP/Solano made 868 mental health referrals; there were 160 referrals to psychiatry and 708 referrals to primary clinicians. There were 42 emergent, 86 urgent, and 740 routine referrals. Additionally, there were timely responses to four of five, or 80 percent of emergency psychiatry referrals and 32 of 37, or 86 percent of emergent primary clinician referrals. For urgent referrals, there were timely responses to six of seven, or 86 percent of psychiatry referrals and 69 of 79, or 87 percent of primary clinician referrals. Routine referrals reflected compliance as there were timely responses to 138 of 148, or 93 percent of psychiatry referrals and 531 of 592, or 90 percent of primary clinician referrals.

<u>Custody and Mental Health Partnership Plan</u>:

CSP/Solano's custody and mental health partnership LOP aligned with headquarters' directive; it was last revised in February 2023.

Executive leadership joint rounding occurred in all six months of the review period on Facilities A through D, administrative segregation, and the MHCB. Required staff were present during each session, though patients were not interviewed in April through July. Interviewed custody and mental health staff reported good communication with each other, especially when responding to patient crises. Mental health staff also indicated receiving the patients timely for their appointments. Observed executive leadership joint rounding was thorough and included interviews with staff and patients.

Executive rounding was not mentioned in the executive meeting minutes or the quality management committee minutes. Executive rounding was briefly mentioned in September 2023's mental health subcommittee meeting minutes, which reflected only that rounding occurred with no further details.

Specialized bed huddle forms were used in the MHCB and included comprehensive detail of medication distribution, patient behaviors, self-harm tendencies, and mental health irregularities during MHCB admission.  Reviewed second watch huddle forms from each month of the review period indicated that the required staff attended each meeting.

Weekly 3CMS supervisory huddle forms were reviewed for all four mainline 3CMS yards.  All reviewed forms included only a digital signature from the program sergeant with no mental health staff member signature and no further details or discussion of relevant topics.  The chief of mental health conducted the observed 3CMS supervisory meeting remotely from his office.  Custody staff communicated in a written chat format and did not offer any relevant or significant concerns for any yards.  There was no collaboration between the chief of mental health and the custody staff.

The institution indicated that monthly joint supervisory area program tours only occurred on Facilities A and B in May 2023 and did not occur on any other facility due to limited staffing during the review period.

A copy of the 3CMS orientation brochure was provided in both English and Spanish. Staff reported that the brochure was distributed to new 3CMS patients following their initial primary clinician evaluation.

Monthly IAC meetings were held for all housing units during the review period and both mental staff and medical staff attended.  Issues addressed during the meetings included both mental health and medical related topics such as medication distribution issues, recreation therapy groups, and alternative treatment options other than medication or therapy.  Reviewed minutes indicated that there was appropriate staff and patient representation at all meetings.

There was one allegation of misconduct against mental health staff in April 2023; no policy violation was found.  The institution was unable to produce staff misconduct allegations against custody staff.  There were no investigations of staff misconduct toward a patient not initiated through the appeals process.  No mental health staff were moved to another post because of a patient filing a mental health staff misconduct complaint.

One hundred and six of 137, or 77 percent of mental health staff completed the annual off-post training as well as 692 of 791.2, or 87 percent of custody staff.

Heat Plan:

CSP/Solano's heat plan LOP was last revised in May 2023 and followed headquarters' directive.  The heat plan was in effect from May through September of the review period with 43 Stage I heat alerts, 23 Stage II heat alerts, and one Stage III heat alert.  No patients experienced heat-related illness during the review period.  Alternative programming occurred in the day room during heat plan activation with modified yard time if appropriate.

Interviewed custody staff in Facilities A through D did not demonstrate an adequate understanding of heat plan policy and procedures.  Custody officers were generally uninformed about what temperature activated each stage of the heat plan and their responsibilities at each stage.  In all yards, custody officers were aware of patients who were prescribed heat-sensitive medication but indicated using a weekly, rather than daily, medication list.

Toured housing units contained two working thermometers each, and temperatures were logged at appropriate time intervals.  Custody staff did not have hand-held thermometers to take readings in cell temperatures but reported that cells were warmer than the main dayroom area from where the logged temperatures were recorded.  The MHCB was air-conditioned and had a backup generator, which was tested routinely.

Six hundred and forty-eight of 651 or over 99 percent of custody staff and 89 of 136 or 65 percent of mental health staff completed the required heat-related pathologies training.

RVRs:

CSP/Solano issued 1,888 RVRs during the review period, including 472 or 25 percent to MHSDS patients and 1,416 or 75 percent to non-MHSDS incarcerated persons.  There were three RVRs issued to acute care patients, 11 to MHCB patients, three to EOP patients, and 455 to 3CMS patients.

Eleven randomly selected RVRs issued to 3CMS patients were reviewed to assess compliance with policy guidelines.  Of the sample reviewed, the MHA was timely requested in two of 11 or 18 percent of cases and timely completed and returned to custody in six of 11, or 55 percent of cases.  Of the 11 MHAs reviewed, nine or 82 percent were completed confidentially.  No reviewed MHAs recommended that the RVR be documented in an alternative manner.

None of the reviewed MHAs indicated that the patient's mental illness "strongly influenced" the behavior documented in the RVR.  However, five MHAs indicated that patients' mental health contributed to the behavior which led to the RVR.  Based upon these findings, the primary clinician recommended penalty mitigation in eight cases and the SHO mitigated penalties in six of the eight or 75 percent of instances.

Of the reviewed RVRs, staff assistants were appointed in five cases.  All patients timely received the required RVR documentation prior to the hearing and patients were present in nine of 11, or 82 percent of hearings.

As for attendance at the annual mental health assessment training, 73 of 79 or 92 percent of required custody staff and no mental health staff attended.

<u>Use of Force</u>:

CSP/Solano reported no controlled and 77 immediate use of force incidents during the review period. Of those, 41 involved 3CMS patients.

Ten immediate use of force incidents were selected to assess compliance with policy guidelines. The reviewed incidents included threats against staff, battery on incarcerated individuals, resisting an officer, and fighting. All ten incidents reflected that custody staff used a reasonable and appropriate amount of force, including physical force, pepper spray, and OC grenades, and were within policy guidelines. Appropriate decontamination was afforded to all patients as required.

CSP/Solano reported that all required custody staff and all required mental health staff except for the chief psychologist and one staff psychologist completed the annual use of force training.

<u>Lockdowns/Modified Programs</u>:

There were three instances of modified programming at CSP/Solano during the review period. The first occurred on Facilities A and B from April 27 through April 29, 2023 due to a contraband search. The second and third occurred on Facility D from April 30 to May 6, 2023 and from May 8 to June 1, 2023 due to COVID-19 outbreaks. Impacted patients used priority ducats to access mental health services and were escorted to mental health treatment during all three modified programming periods. Staff conducted rounds in the housing unit on Facility D during outbreak status and all-day room and yard time was suspended until the PSR was closed. Medication was distributed cell side for patients on Facility D during the COVID-19 outbreaks, while normal medication lines were conducted on facilities A and B during the contraband search.

<u>Access to Care</u>:

A review of monthly Health Care Access Quality reports from April through September 2023 reflected the issuance of 6,535 mental health ducats and add-on appointments, of which 4,928 or 75 percent were completed and 1,607 or 25 percent were not completed. Of the non-completed appointments, seven were due to custody factors, 1,467 or 91 percent were due to non-custody factors, and 133 or eight percent were due to patient refusals.

<u>Placement of 3CMS Patients into Minimum Support Facilities</u>:

CSP/Solano did not maintain an MSF during the reporting period. There were no transfers to an MSF during the reporting period.

<u>*Coleman* Postings</u>:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 7**
**AVENAL STATE PRISON (ASP)**
Site Visit: December 5, 2023 – December 7, 2023
Review Period: April 1, 2023 – September 30, 2023

<u>Census</u>:

On December 5, 2023, ASP's total incarcerated population was 4,611, which was a 14 percent increase from the prior reporting period. The mental health population of 1,387 MHSDS had increased by eight percent since the previous review period and represented 30 percent of ASP's total population. The MHSDS population consisted of five mainline EOP patients and 1,382 mainline 3CMS patients.

<u>Staffing</u>:

The chief psychiatrist position was vacant, though a 0.5 registry psychiatrist provided coverage for a 50 percent functional vacancy.

All 5.5 psychiatry positions were vacant; however, five registry psychiatrists provided coverage, resulting in a nine percent functional vacancy rate.

There were no allocated telepsychiatry positions.

There were no allocated psychiatric nurse practitioner positions.

The two chief psychologists, two senior psychologist supervisor, and two senior psychologist specialist positions were filled.

Of the 11.5 staff psychologist positions, 5.25 were filled for a 54 percent vacancy rate; registry staff covered 0.75 positions, which reduced the functional vacancy rate to 48 percent. One psychologist was unlicensed.

The social worker supervisor position was filled. Nine of the 14.5 social worker positions were filled for a 38 percent vacancy rate. Four social workers were unlicensed.

There was one recreation therapist but no established position.

Thirty-seven of 44 LVN positions were filled for a 16 percent vacancy rate. All three CNA positions were filled.

The OSS II position and HPS II positions were filled. One of the 2.5 HPS I positions was filled for a 60 percent vacancy rate. The CHCA position was vacant.

ASP reported that all custody positions were filled; 810 custody staff filled 786.4 positions.

Telepsychiatry:

While ASP did not have a telepsychiatry program or allocated telepsychiatry positions, all five psychiatrists provided both in-person and remote clinical services.

Telework:

In addition to the five psychiatrists, ASP allowed one primary clinician per week to work from home on a rotating basis during the review period. The chief psychologist also teleworked four days per week and eight MHSDS clerical workers, the OSS II, the HPS I, and the HPS II teleworked two days per week.

Staff Recruitment:

Leadership reported that ASP experienced a shortage of applications for all vacant mental health positions throughout the review period. Clinical and support staff were recruited and hired by CDCR headquarters and the Region III office; ASP leadership participated in job fairs organized by headquarters as well.

Quality Management:

ASP conducted monthly QMC and MHPS meetings; quorums were achieved for all meetings. Review of QMC and MHPS meeting minutes revealed a myriad of topics discussed. QMC topics included approval of prior meeting minutes and subcommittee minutes,

improvement projects, routine system surveillance, and LOP approvals. Representatives of various subcommittees provided reports during the QMC meetings on a quarterly basis. MHPS minutes included a review of topics, including improvement work, system surveillance, administrative items, and new topics. Audits completed during the review period included Chart Audit Tool (CAT) items related to SRASHEs, primary clinician contacts, release of information requests for new arrivals, ASU initial screenings, alternative housing processes, five-day follow-ups, and groups offered to 3CMS patients. Additional topics included monitoring of patient transfers to and from higher levels of care, SPRFIT reports, pre-release planning reports, recreation therapist reports, review and approval of LOPs, psychiatry reports, psychology, office services, and leadership.

One CAP related to timely completion of SRASHEs began in April 2023; improvement was noted and sustained during the review period.

The only active QIT or FIT during the review period was the SPRFIT which had been reviewing the quality of IDTT meetings and documentation; those reviews were placed on hold due to staffing limitations.

A study initiated in 2021 to better understand the increase in crisis intervention services at ASP continued throughout the reporting period. The study revealed that the increase in crisis interventions appeared to be the result of newly transferred patients who were not appropriate for 3CMS placement but, instead, required a higher level of care. No concerns related to the crisis intervention process at ASP were identified.

ASP also initiated the use of KOP medications in January 2023 with a successful pilot program. A policy was developed, and the KOP program for these medications was initiated throughout the entire facility on July 17, 2023.

The peer review process at ASP had been postponed due to recent increases in the 3CMS population and staffing vacancies.  There was an LOP addressing psychiatry peer review and a description of the outpatient primary clinician peer review process that complied with the statewide process despite not being active during the review period.

Suicide Prevention:

ASP's LOP titled "Suicide Prevention Plan" was dated July 2023 and complied with policy requirements.  This LOP also contained the institution's SPRFIT LOP provisions.  A separate LOP titled "Notification of Inmate Bad News" was also provided and included the necessary procedures to ensure that patients were seen emergently following the receipt of bad news.

All required SPRFIT committee meetings occurred during the review period.  Meeting topics included approval of the prior minutes, a review of the status of current improvement projects, the status of prior action items, system surveillance for new quality problems, a review of the number of patients enrolled in the Suicide Risk Management Program (SRMP), number of incidents of self-harm/suicide attempts, five-day follow-up timeliness, quality of SRASHEs, CAT Audit results, MHCB referrals and transfers, and emergency response for self-injurious episodes.  Incidental concerns were also identified and addressed as needed each month.

With respect to current improvement projects, the active PIWP for CDCR Form 7497 was thoroughly discussed.  This PIWP had been ongoing for years and there did not appear to be any effective action taken to improve the completion of these packets.

During the review period, the following SRASHEs were timely completed: 14 of 16 or 88 percent for emergent referrals following statements of suicidality; the one emergent referral for suspected overdose; both urgent consults for statements of suicidality; all 36 at the time of

MHCB referral; 54 of 55 or 98 percent for rescinded MHCB referrals; and 33 of 34 or 97 percent following MHCB discharge.  A record review of SRASHEs completed during the review period revealed mostly adequate evaluations, though there were multiple instances where the rationale for rescinding an MHCB referral was not documented adequately.

There were five serious self-harm/suicide attempts during the reporting period; none were considered lethal or resulted in serious injury and, therefore, no clinical reviews or root cause analyses were completed.  In four of the five cases, the patients reported an intent to die by suicide.  There were no deaths by suicide at ASP during the reporting period and, thus, no required CAPs.

Six patients required five-day follow-ups following MHCB discharge during the review period; all had timely five-day follow-up contacts on the first day, though in one case the documentation was signed late and, therefore, recorded as noncompliant.  Thirteen patients required five-day follow-ups after rescinded MHCB referrals.  In three cases, the patients were seen timely but documentation was signed late, resulting in reported compliance for only ten cases.  Five-day follow-up contacts varied in adequacy; safety plans were clearly reviewed in some cases but not reviewed at all in others.  In other cases, the plan was reviewed with the patient, but the safety portion was incomplete, or the content of the plan was inadequate and needed modification.  In all reviewed cases, five-day follow-ups were completed as required.

No patients were on suicide watch status during the site visit.

As of November 2023, annual suicide prevention training was completed by 30 of 38 or 79 percent of mental health staff and 665 of 772 or 86 percent of custody staff.  The remainder of the staff was not yet due for annual training, which was based on their birth month, resulting in 100 percent compliance with annual suicide prevention training at the time of reporting.  CPR

training was completed by 740 of 760 or 97 percent of custody staff, and nursing staff was 100 percent compliant with Basic Cardiac Life Support training during the reporting period. Twenty-one of 26 or 81 percent of mental health staff completed SRASHE training, and 24 of 26 or 92 percent were mentored pursuant to the SRE Mentoring Program requirements.

Minutes from the EMRRC were produced for all six months of the reporting period. A quorum was achieved at each meeting, and a member of the mental health team was present for all meetings except in September 2023. Topics covered included approval of prior meeting minutes, improvement projects, routine system surveillance of emergent, urgent, and non-send outs, including individual case discussions, and other topics as needed. Monthly reporting was reviewed. The minutes evidenced follow-up on identified issues.

ASP provided proof of emergency response drills across shifts and housing units. The drills occurred every month during the reporting period in addition to quarterly drills. Both mock code drills and tabletop exercises were completed. Concerns raised and issues identified during the drills were appropriately addressed.

There were no new patient transfers to ASP during the site visit; accordingly, to assess the adequacy of the screening process, records of ten patients who transferred to ASP within the previous three months were reviewed.

EHRS documentation did not indicate whether initial health screenings were conducted in confidential settings. In all cases, all mental health and suicide-related screening questions were documented as being asked, though the responses were inconsistent with the patient's history. In six of the ten cases reviewed, nursing staff documented all "no" responses to the mental health questions despite evidence in the record of the patient being actively prescribed psychotropic medications, having a history of suicide attempts, or both. There was no

documentation in the initial health screening form of referrals to mental health despite the need for the patient to be seen. In two reviewed cases, there was evidence that an urgent referral was generated secondary to the patient's report of recent suicidal behavior.

All patients were seen for an initial primary clinician evaluation. Most clinicians also documented reviewing the patients' jail records. SRASHEs were completed for all patients, which was standard practice at ASP, given the acuity of patients arriving at ASP and the inadequacy of initial mental health assessments completed prior to transfer.

Emergency response equipment and inventory sheets were reviewed for compliance in 12 housing units. All were compliant, as all required items were in the cut-down kit, and the daily inventory sheet for second and third watch was current with no missed days for December 2023.

Alternative Housing:

During the review period, 59 patients were placed in alternative housing. Stays averaged 10.75 hours and ranged from two to 24.5 hours; one patient's length of stay was 29 minutes beyond the 24-hour timeframe. No patients were in alternative housing at the time of the site visit.

ASP's alternative housing LOP indicated that they had two alternative housing cells located in the OHU, both of which were observed. They were both wet cells with windows and safety mattresses which could be removed if necessary. All patients were required to be seen in a confidential clinician office in the OHU. Custody staff observed sessions through a door window to maintain confidentiality.

Staff assigned to alternative housing included one psychiatrist and one primary clinician seven days per week to address emergent and urgent consults. When clinically indicated,

consults were redirected to the primary clinician.  After working hours, the on-call psychiatrist completed all crisis evaluations and referrals.

Medication Management:

ASP provided MAPIP results from April 1, 2023 to September 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, ASP sustained compliance for six months with obtaining medication consents and monitoring blood pressure for patients prescribed venlafaxine.  The institution was compliant for four months and was noncompliant for two months with monitoring thyroid function tests.  No EKGs were required during the monitoring period.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that ASP was compliant for six months with monitoring blood pressure, height, weight, thyroid function tests, and obtaining medication consents.  ASP was also compliant with EKG monitoring that was required for four months.  ASP was compliant for four months and was noncompliant for two months with AIMS, glucose, CMP, and lipids.  The institution was compliant for two months and was noncompliant for four months with CBC with platelets.

ASP had no patients prescribed carbamazepine or clozapine.

For patients prescribed Depakote, ASP was compliant for five months and was noncompliant for one month with obtaining medication consents.  The institution was compliant for four months and was noncompliant for two months with CBC with platelets and CMP and was compliant for three months and was noncompliant for three months with monitoring therapeutic medication levels.

For lamotrigine, the institution was compliant in obtaining medication consents for all six months.

Regarding lithium, the institution was compliant for six months with obtaining kidney function tests and medication consents, and for the four required months for obtaining EKGs. ASP reached compliance for five months and was noncompliant for one month with therapeutic medication levels and thyroid function tests.

The institution was aware of the noncompliant metrics and developed improvement plans to address them. Unfortunately, those plans did not consistently list the reasons for the underperforming metrics. Furthermore, most improvement plans were generic and identical.

ASP displayed a high degree of compliance with required medication administration metrics. For medication administration metrics reported by mental health headquarters, ASP was compliant for six months with the following metrics: continuity of medications upon inter-institutional transfer at R&R, continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications upon parole/transfer to the community, observation of medication preparation at A.M. and P.M., observation of medication preparation at HS, chronic care medications historical administration, and outpatient provider new medication orders. ASP displayed compliance for all three required months for continuity of medications with MHCB transfers.

The institution was compliant for four months and was noncompliant for two months with continuity of medications upon discharge/transfer from a community hospital and/or DSH.

ASP stated that psychiatrists provided medication prescriptions for a maximum of 180 days. Bridge orders were provided for up to 120 days. For verbal and telephone orders, the nursing staff were required to "read back" the order to the prescriber. The psychiatrist received a

message in the EHRS that a verbal or telephone order required signature "asap." The institution did not specify the process for tracking signing verbal or telephone orders.

ASP reported 905 patients who were prescribed NA/DOT psychiatric medications. The institution provided the total number of medication doses given instead of the requested number of prescriptions.

ASP reported that 70 patients were prescribed 70 KOP medications; all were 3CMS patients who were prescribed SSRIs or duloxetine, in accordance with policy.

There were 72 medication line audits performed during the reporting period. The audits indicated that the duration of the medication lines was over two hours for two yards in April 2023, and one yard in June 2023. The reasons listed for the long lines included patients not reporting to the medication line and slower release of patients from a housing unit under quarantine. Medication line audits did not note any patients waiting longer than 30 minutes for medications; however, leadership stated that patients reported waiting in medication line up to 40 minutes on second watch and "much longer" during third watch. The institution reported that they closely monitored the third watch medication lines due to having only one medication nurse for each line and due to the increased prescribing of buprenorphine/naloxone as MAT for opioid use disorder.

Protection from the elements was limited. The institution reported that each medication line had a small awning providing protection while nursing staff dispensed medications. During the monitoring period, no protection was provided in the yards for patients waiting in medication line; on a positive note, the institution reported that they were in the process of purchasing canopies for all yards.

The institution denied any conflict between medication administration times and mental health programming.

ASP was neither a clozapine initiation nor maintenance institution during the monitoring period. The institution reported no patients prescribed clozapine during the monitoring period or at the time of the monitoring tour.

ASP reported an average nonformulary rate of approximately 2.5 percent during the monitoring period. Nonformulary medications did not require secondary review or approval.

ASP had an overall average of 97 percent compliance with polypharmacy reviews. The institution monitored the Polypharmacy Dashboard daily, and a mental health CNA alerted the "lead psychiatrist[41]" if a patient prescribed psychiatric medications required review. The "lead psychiatrist" then completed the necessary reviews.

ASP reported that 626 patients received 1,157 medications prescribed at HS. ASP fully complied with the requirement to administer HS medications at 8:00 P.M. or later.

No patients received involuntary PC 2602 medications during the review period or at the time of the monitoring visit.

Transfers:

During the review period, no patients were considered but not referred to inpatient care and no acute or intermediate care referrals were made.

ASP referred 59 patients to MHCBs; 40 or 68 percent were admitted, and the remaining 19 referrals were rescinded. All but two patients were timely admitted within 24 hours of referral; both delayed admissions were just under three hours late and reasons for the delays were not provided. No patients had three or more MHCB admissions.

---

[41] "Lead psychiatrist" was the term used by ASP.

No patients transferred to a PSU, ASU EOP hub, or LTRH.

Transfer timelines for patients who required STRH placement were not tracked.

Seventeen patients transferred to EOP programs; all 17 transferred timely.

ASP did not track patients' whose level of care was reduced from EOP to 3CMS.

Fifteen 3CMS patients transferred to an MSF during the review period.

Programming:

　Crisis Intervention Team:

ASP did not have a CIT during the review period.  All crisis intervention contacts were completed by a rotating mental health clinician or psychiatrist during regular business hours and an on-call psychiatrist after regular business hours, weekends, or holiday.

　3CMS:

3CMS patients were housed across all yards and staff had access to confidential space for individual treatment contacts in different locations as needed.

Of the 4,827 individual primary clinician contacts scheduled during the reporting period, 3,412, or 71 percent occurred; the remaining 1,415 or 29 percent were cancelled due to clinician unavailability, scheduling conflicts, scheduling errors, and other unspecified reasons.  Patients were seen every 61 days, on average, by a primary clinician.  Less than one percent of primary clinician contacts (31 of 3,412) occurred beyond 90 days.

Of the 3,691 psychiatric contacts scheduled during the review period, 3,082 or 84 percent were held, and 600 or 16 percent were cancelled, though reasons for those cancellations were not provided; nine contacts, or less than one percent were cancelled due to patient refusal.  On average, patients were seen every 67 days by a psychiatrist during the reporting period and only 22 patients, or less than one percent, exceeded 90 days for their routine appointment.

The monitor's expert observed nine IDTT meetings; all occurred in confidential locations with adequate space. Required staff and patients were present for all meetings. However, one patient's IDTT did not include the patient's assigned correctional counselor, primary clinician, or psychiatrist. Observed IDTTs were largely collaborative, and quality custody participation was noted in six of nine meetings. While staff had access to computers, in three observed meetings, the correctional counselor could not access relevant information due to the lack of internet connection. Patients and clinical staff were engaged in the meetings.

The patient's psychiatric history was reviewed in seven of nine observed meetings, though these discussions were typically brief and did not support a comprehensive understanding of the patient's needs or treatment progress. Adequate case conceptualizations were lacking in most observed meetings. While treatment goals were identified in seven meetings, the goals were neither objective nor measurable and rarely individualized for the patient. Additionally, there was little discussion of specific treatment interventions beyond meeting with the patient and, in four cases, discussing medication adherence. During most meetings, the patients' diagnoses were stated, and the described symptoms supported the diagnoses. Patients' current levels of functioning were consistently reviewed as well.

Treatment progress, barriers to treatment, and rationales for retaining the patient at the 3CMS level of care were rarely discussed. Despite several patients having upcoming release dates, pre-release planning was only discussed in two cases.

Of concern, in one case, the IDTT included a correctional counselor who was not assigned to the patient, a primary clinician with little familiarity with the patient, and a psychiatrist who had never met the patient previously. The psychiatrist noted that the patient had not been seen by a psychiatrist since April of 2022 despite the requirement that patients be seen

by a psychiatrist within the 90-day period prior to the annual IDTT, regardless of medication status. This case was selected for review and revealed inadequate care during the review period.

Group treatment space was available on all facilities, though Facilities A and B shared a group room and Facilities E and F shared a group room. Facility D's group treatment space was limited due to computers in the middle of the room.

One psychotherapy group titled "Cage Your Rage" was offered weekly to patients housed on Facility E. Patients reported this group to be extremely helpful and engaging and also expressed gratitude for this group, given that staffing shortages have prevented other clinician-led groups from occurring.

The recreation therapist ran groups once a week on Facility C and twice weekly on all other yards. There was a waitlist for all recreational therapy groups.

Twenty mainline 3CMS patients were randomly selected to have their healthcare records reviewed for compliance with Program Guide timeframes during their stays.

Seven patients required initial psychiatry evaluations; all seven timely occurred before the initial IDTT and were confidential.

Fourteen patients required routine psychiatry contacts. All reviewed routine psychiatry contacts timely occurred at least every 90 days and were conducted in confidential settings. Psychiatrists provided services remotely in five or 15 percent of reviewed routine psychiatry contacts.

Seven patients required initial primary clinician evaluations; six or 86 percent were timely completed within ten working days of arrival or a change in level of care. The one untimely initial primary clinician evaluation was one day late. All seven were conducted confidentially.

Eighteen patients required routine primary clinician contacts.  All routine primary clinician contacts timely occurred at least every 90 days; all were conducted confidentially.  Three or seven percent of routine primary clinician contacts were conducted via telehealth.

Seven 3CMS patients required initial IDTTs; six or 86 percent occurred within 14 working days of arrival or a level of care change.  The one untimely initial IDTT was one day late.  Required staff and patients attended all seven initial IDTTs.

All four patients who required annual IDTTs received them timely.  All four were attended by required staff and patients.

Twenty-two 3CMS patients were interviewed in groups during the site visit.  Almost all patients reported seeing their primary clinicians at least every 90 days, with most reporting contacts every 60 days.  Patients reported consistently seeing their assigned psychiatrists and primary clinician timely and with rare clinician substitutions.  Interviewed patients on Facility D reported more frequent turnover in clinicians and that the frequent changes made rapport-building difficult.  All patients reported attending an initial and subsequent IDTTs annually and were aware of their treatment goals.

Notably, patients reported that mental health staff were "overworked" and "overburdened" and some indicated their desire for more opportunities for mental health groups and programming.  Otherwise, mental health staff were accessible and patients knew how to contact staff when needed.  Patients also mentioned the length of pill lines, the widespread use of buprenorphine-naloxone in the facility (including misuse and the subsequent problems arising from drug use and drug sales), and the arrival of new patients suffering from severe mental illness who seemed inappropriate for placement at ASP.

Other Issues:

Pre-Release Planning:

ASP's pre-release coordinator was a full-time social worker who did not carry a caseload during the review period.  The institution tracked patients who were 120 days from release; the pre-release coordinator began pre-release planning between 45 and 60 days from the patients' release.  The planning included a 30-minute meeting with the patient.

The pre-release coordinator also tracked all patients seen prior to release; however, the date of the PRPA or ROI completion was not recorded.  The pre-release coordinator was also responsible for attending ISUDT meetings and monthly statewide headquarters calls.

During the review period, 491 patients received pre-release planning services; 214 patients were paroled, and 277 patients were released to probation.  All patients were seen by the pre-release coordinator.

Additionally, 450 patients received TCMP services, while 39 refused those services. TCMP services included 332 Medi-Cal applications, 12 SSI applications, and nine VA benefits applications.  Thirty-nine patients refused to submit Medi-Cal applications.

There were no pre-release groups during the review period or at the time of the site visit due to inadequate staffing.

Program Access:

a.    Job and Program Assignments

On October 2, 2023, ASP reported that 2,229 job assignments were held by 586 or 41 percent of 3CMS patients and 1,643 or 51 percent of non-MHSDS incarcerated persons.

The 1,297 academic assignments were held by one or 50 percent of EOP patients, 331 or 23 percent of 3CMS patients, and 965 or 30 percent of the non-MHSDS population.

The 280 vocational education assignments were held by 64 or four percent of 3CMS patients and 216 or seven percent of non-MHSDS incarcerated persons.

The 751 voluntary education assignments were held by 226 or 16 percent of 3CMS patients and 525 or 16 percent of non-MHSDS incarcerated persons.

The 638 substance abuse treatment assignments were held by 257 or 18 percent of 3CMS patients and 381 or 12 percent of non-MHSDS persons.

      b.    <u>Milestone Credits</u>

ASP reported that six EOP patients, 1,354 3CMS patients, and 3,098 non-MHSDS incarcerated persons were eligible to earn milestone credits; however, no MHSDS patients or non-MHSDS incarcerated persons earned milestone credits during the review period.

      c.    <u>Out-of-Level Housing</u>

ASP reported that one EOP and 225 3CMS custody Level II patients were housed in Level I housing, 37 3CMS custody Level II patients were housed in Level III housing, and one 3CMS custody Level II patient was housed in Level IV housing.

      d.    <u>ADA Reasonable Accommodation and Grievance Procedure</u>

ASP confirmed implementation and provided copies of the ADA reasonable accommodation operating procedure and the CDCR Form 1824 reasonable accommodation request process manual.

<u>"C" Status</u>:

During the review period, one EOP, ten 3CMS, and nine non-MHSDS incarcerated persons were placed on "C" status due to program failure. The durations of their "C" Status designations ranged from 90 to 180 days.

<u>Case by Case Reviews</u>:

ASP did not have an administrative segregation unit during the review period; all incarcerated persons requiring segregation placement were immediately transferred to PVSP.

<u>Mental Health Referrals</u>:

During the reporting period, ASP made 2,244 mental health referrals, including 714 to psychiatry and 1,530 to primary clinicians. There were 230 emergent referrals, 228 urgent referrals, and 1,786 routine referrals. Over 98 percent of all responses to referrals were timely.

All interviewed custody staff members had ready access to the MH-5 form and were knowledgeable of how to process it based on their independent observation of the patient.

<u>Custody and Mental Health Partnership Plan</u>:

ASP's custody and mental health partnership LOP was current and in alignment with statewide policy requirements.

Executive leadership joint rounding was conducted for all six months of the review period, with the required form completed and required staff in attendance. Staff and patients were interviewed and reported on a good working relationship between custody and mental health staff. Patient concerns included lack of groups and medical issues. The institution was not compliant with reporting the results of the rounding at the executive staff meeting, quality management committee, or mental health subcommittee.

Weekly 3CMS supervisory huddle documentation was reviewed and three huddles were observed during the site visit. Of the 42 reviewed 3CMS supervisory huddle reports, 39 or 93 percent documented the presence of the mental health and custody supervisors and included patient information regarding new arrivals, patients receiving bad news, and MH-5s submitted

during the past week. Observed huddles were thorough and covered similar topics as the reviewed huddle forms.

The monthly supervisor program tours were completed for all six months of the review period and documented on the required form. Patients requested additional material/resources for groups and reported good working relationships with mental health clinical staff.

ASP produced English and Spanish copies of the 3CMS orientation brochure, which was distributed to new 3CMS patients.

IAC meetings were held and documented on each facility for each month of the review period. Meeting minutes reflected that mental health staff was present, and mental health issues were typically discussed in detail and were often an agenda item.

ASP reported that 92 staff complaints were filed by MHSDS patients during the review period, with 42 "in progress" and 50 resolved. Of the 50 resolved complaints, 45 were not sustained, four were sustained, and one had no finding. The staff complaint allegations included 55 complaints for employee performance, one PREA allegation, and 32 with no category identified. No mental health staff were reassigned because of a staff complaint, and there were no staff misconduct allegations not initiated through the appeals process.

Nineteen of 21 or 90 percent of mental health staff attended the annual off-post training, including one of two chiefs, all four mental health supervisors, five of six psychologists, and all nine social workers. For custody staff, 702 of 769 or 91 percent attended the training.

<u>Heat Plan</u>:

The institution's heat plan LOP was last revised in May 2023 and was consistent with statewide policy.

ASP reported 88 Stage I, 13 Stage II, and no Stage III heat alerts during the review period.  No patients were seen for heat-related illness during the reporting period.

Interviewed custody staff in the 12 toured housing units were generally knowledgeable of heat plan policies and procedures; however, 50 percent of interviewed custody staff reported that the inmate heat alert list was produced weekly as opposed to daily.

All housing units had working thermometers located on the second tier, and temperatures were recorded every three hours during the heat risk months.  During the Stage I and II heat alerts, heat risk patients had unlimited access to the housing unit dayroom, showers, and drinking water.

The heat plan training was attended by 653 of 769 or 85 percent of custody staff and 97 of 118 or 82 percent of mental health and nursing staff.

RVRs:

ASP issued 1,535 RVRs during the review period, of which seven were issued to MHCB patients, three were issued to EOP patients, 781 or 51 percent were issued to 3CMS patients, and 744 or 48 percent were issued to non-MHSDS incarcerated individuals.

Nine RVRs were reviewed for compliance with policy guidelines.  Of those, the MHA was timely referred in seven or 78 percent of cases and timely completed in all nine cases; the two non-compliant referrals were made two-days late.  Five or 56 percent were conducted confidentially; three patients refused and one patient received an unexplained cell-front assessment.  None of the nine reviewed MHAs recommended that the RVR be documented in an alternative manner.

Staff assistants were required in two of the nine reviewed cases; a staff assistant was assigned to both.  Patients timely received the required RVR documentation prior to the hearing in all nine reviewed cases, and patients were present at all nine hearings.

The SHO documented their consideration of the patient's MHA in seven of nine or 78 percent of reviewed RVRs.  In the remaining two cases, the SHO copied the MHA response into the RVR adjudication document without any additional statement.  The SHO mitigated penalties in all three instances where the clinician recommended mitigation.

Two ICC SHU term assessment chronos were reviewed for documentation of consideration of the MHA information when assessing the SHU term.  Both ICC chronos clearly documented consideration of the MHA information.  For both patients the ICC elected to assess, impose, and suspend the SHU terms.

All but one required custody staff member completed the inmate disciplinary process mental health assessment training during the review period.  For mental health staff, 10 of 16.5 completed the required training.  Notably, of the nine MHAs reviewed, only one was completed by a clinician who had attended the required MHA training.

Use of Force:

During the review period, ASP reported no controlled and 117 immediate use of force incidents, which involved 79 MHSDS patients and 38 non-MHSDS incarcerated individuals.

Five immediate use of force incidents were reviewed for compliance with policy guidelines; all five reflected that custody staff used a reasonable and appropriate amount of force.

The annual use of force training was attended by 755 of 771 or 98 percent of custody staff and 21 of 24 or 88 percent of mental health staff, including the chief of mental health and

chief psychologist; all three psychology, psychiatry, and social worker supervisors; all six psychologists; three of five psychiatrists; and eight of nine social workers.

Lockdowns/Modified Programs:

ASP experienced eight periods of modified programming during the review period; four were related to COVID-19 outbreaks, two were due to threats of weapons, one was due to a housing search, and one was due to a power outage.  Access to mental healthcare was not interrupted.

Access to Care:

A review of monthly Health Care Access Quality (HCAQ) reports from April 2023 through September 2023 reflected the issuance of 79,779 mental health ducats and add-on appointments, of which 67,673 or 85 percent were completed, and 12,106 or 15 percent were not completed.  Of the non-completed appointments, 13 or less than one percent were due to custody factors, 11,836 or 98 percent were due to non-custody factors, and 257 or two percent were due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

ASP did not have an MSF during the review period.

*Coleman* Postings:

All 12 toured housing units contained up-to-date *Coleman* posters in English and Spanish.

**APPENDIX A – 8**
**PLEASANT VALLEY STATE PRISON (PVSP)**
Site Visit: December 5, 2023 – December 6, 2023
Review Period: April 1, 2023 – September 30, 2023

Census:

On December 1, 2023, PVSP housed 2,566 incarcerated individuals, a five percent decrease since the previous monitoring period.  However, the 486 MHSDS patients represented 19 percent of the institution's population; a seven percent increase since the Twenty-Ninth Round Monitoring Report.  The MHSDS population included three mainline EOP and 438 mainline 3CMS patients.  The STRH housed 45 3CMS patients.

Staffing:

On October 30, 2023, the chief psychiatrist position was filled.  One of the two staff psychiatrist positions was filled; the second was covered by a registry psychiatrist, eliminating any functional vacancy.

The 0.5 telepsychiatry position was filled, as was the one medical assistant position was filled.

The chief psychologist and two senior psychologist specialist positions were filled.

Six of 8.5 staff psychologist positions were filled, reflecting a 29 percent vacancy rate; one psychologist was on long-term leave for a functional vacancy rate of 41 percent.  One psychologist was unlicensed.

Four social workers filled the 4.5 allocated positions for an 11 percent vacancy rate.

Two of three recreation therapist positions were filled for a 33 percent vacancy rate.

No CNA positions were allocated, though two contract CNAs provided services at PVSP.

All 10.6 psych tech positions were filled.

Three of the 4.5 MHSDS clerical positions were filled for a 33 percent vacancy rate.

The OSS II, HPS I, and HPS II positions were filled.

For custody staff, 817 of 855 positions were filled for a four percent vacancy rate; filled positions included the warden and chief deputy warden, three of four associate wardens, four of six captains, 28 of 29 lieutenants, 64 of 72 sergeants, 17 of 20 CC Is, all six CC IIs, and 693 of 716 correctional officers.

Telepsychiatry:

During the review period and at the time of the site visit, the 0.5 telepsychiatrist maintained a caseload of 188 3CMS patients, which exceeded established staffing ratios.  PVSP utilized headquarters-provided telepsychiatry for late-night, on-call coverage.  Staff and patients reported that they did not experience technological or connectivity issues with the telepsychiatrist.

Telework:

The chief psychologist, senior psychologist, four MHSDS clerical workers, and the OSS I all teleworked one day per week; the two senior psychologist specialists teleworked two days per week; five staff psychologists, all four social workers, and both recreational therapists teleworked 0.5 days per week; and the HPS I and HPS II teleworked three days per week.

Quality Management:

PVSP's local governing body met quarterly during the review period with a quorum in attendance at each meeting.  Reviewed meeting minutes indicated that relevant mental health-related topics were discussed.  Non-mental health topics were also discussed.

The QMC met monthly during the review period with required quorums in attendance at each meeting.  Discussion topics included improvement work, the status of various metrics and greenbelt projects, various policies and operating procedures, and new business.  Areas of

concern were identified in the meeting minutes; however, the QMC did not document steps toward resolution or indicate dissemination of information to line staff.

MHPS meetings occurred monthly with a quorum in attendance. Agenda items included but were not limited to, improvement work, system surveillance of various metrics and audit summaries, and new business. Audit summaries included clinical contacts, huddle completion, and custody collaboration meeting completion. The minutes also included a detailed review of the results of acute and intermediate referral timeline monitoring.

In April 2023, a greenbelt project was initiated in response to a year-long pattern of poor patient attendance for treatment in STRH. The project's goal was to improve attendance from 59 percent to 95 percent by identifying critical areas that impacted attendance, including group topics and schedule conflicts; documentation did not indicate whether this goal was achieved during the review period.

Although there was mental health staff representation in the emergency medical response review committees during four of six months, mental health-related topics were not discussed in any monthly meetings.

There were no QITs or FITs, additional audits, or CAPs implemented during the review period.

There were no identified peer review issues for psychiatry staff. No clinician peer reviews were conducted during the reporting period.

Medication Management:

PVSP provided MAPIP results from April 1, 2023 to September 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, PVSP was compliant for six months with obtaining medication consents, thyroid function tests, and monitoring blood pressure for patients prescribed venlafaxine, and for the one required month of monitoring EKGs.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that PVSP was compliant for all six months with AIMS, blood pressure, height, and weight, and for the four required months of measuring thyroid function tests. Medication consents were compliant for five months and were noncompliant for one month. The institution was compliant with monitoring CMP for four months and was noncompliant for two months. PVSP was compliant for three months with monitoring glucose and lipids and was noncompliant for three months. The institution was compliant for one month with monitoring CBC with platelets and was noncompliant for five months. Finally, the institution was compliant for one of the two required months for EKG monitoring.

PVSP reported no patients prescribed carbamazepine or clozapine during the review period.

Regarding Depakote, PVSP was compliant with obtaining medication consents for five months and was noncompliant for one month. Additionally, PVSP was compliant with obtaining CBC with platelets and therapeutic medication levels for three of the four required months. The institution was compliant with monitoring CMP for two of three required months.

For lamotrigine, the institution was compliant in obtaining medication consents for the two required months.

Regarding lithium, the institution was compliant for the five required months with kidney function tests and therapeutic medication levels, and for the one required month of monitoring EKGs. PVSP was compliant for five months and was noncompliant for one month with

285

obtaining medication consents. Additionally, the institution was compliant for four of the five required months for monitoring thyroid function tests.

PVSP reported that most medication monitoring deficiencies resulted from newly arrived patients who were already noncompliant for required measures at the time of arrival. The institution reported that a psychiatrist saw all new arrivals who were prescribed psychiatric medications within 14 days and ordered any required measures. The chief psychiatrist reviewed and monitored all psychiatric medication registries.

Regarding medication management metrics, the institution demonstrated sustained compliance for all six months with the following metrics: continuity of medications with intra-institutional transfer to ASU/SHU/PSU, continuity of medications upon discharge/transfer from a community hospital and/or DSH, observation of medication preparation at HS, chronic care medications historical administration, and outpatient provider new medication orders. PVSP was compliant for the three required months with continuity of medications for MHCB transfers.

Regarding continuity of medications upon inter-institutional transfer at receiving and release (R&R), the institution was compliant for five months and was noncompliant for one month. PVSP was compliant for four months and was noncompliant for two months with continuity of medications upon parole/transfer to the community. The institution was compliant for two months and was noncompliant for four months with continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU). PVSP was compliant for one month and was noncompliant for five months with observation of medication preparation at A.M. and P.M.

PVSP reported no medication-related CAPS during the monitoring period.

Psychiatrists at PVSP prescribed 365 medications to 218 patients. In a concerning practice, PVSP psychiatry discontinued medications for some patients due to noncompliance without at face-to-face assessment; psychiatry then scheduled a follow-up appointment after the medication discontinuation. The expert discussed concerns regarding this practice to the institutional leadership; those concerns included the risk of patient decompensation and an inability to timely explore the barriers to medication nonadherence with the current practice.

PVSP reported that three 3CMS patients were prescribed three KOP medications. Two of the prescriptions were for an SSRI, in accordance with policy. The third prescription was for atomoxetine, a medication traditionally used to treat ADHD. During the monitoring visit, the mental health leadership was informed that this practice deviated from statewide policy.

PVSP reported that both standard prescriptions and bridge prescriptions were provided for a maximum of 180 days. For verbal and telephone orders, nursing staff were required to "read back" the order to the prescriber prior to entering the order into the EHRS for signature by the psychiatrist. The chief psychiatrist also copied the message to allow for the tracking of signature.

The institution reported 36 medication line audits across all yards during the reporting period. Audits indicated that all patients received their medications in less than 30 minutes but did not specify the length of time that patients waited in medication lines. The duration of the medication lines was under two hours.

Audits from C and D yards noted a lack of protection from the elements while patients waited to receive their medications; it was unclear if protection from the elements was provided on A and B yards.

The nursing staff administered medications at the cell front to patients in restricted housing.

PVSP reported no conflicts between medication distribution and mental health programming.

PVSP reported an average non-formulary rate of approximately six percent during the monitoring period.  Nonformulary medications did not require secondary review or approval.

PVSP reported that 63 of 64, or 98 percent of required polypharmacy reviews were completed timely.

PVSP reported that 121 patients received 135 medications prescribed at HS. With rare exceptions, PVSP was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

Reportedly, due to the lack of nursing staff, patients housed in the MSF had their medication orders changed from at HS to P.M. administration.  The expert voiced concerns to the institutional leadership about this practice, as many psychiatric medications were usually administered at HS due to the risk of sedation.  PVSP did not report any adverse events resulting from those changes in medication administration.

PVSP did not have any patients receiving involuntary PC 2602 medications during the monitoring period or at the time of the monitoring tour.

While leadership estimated that it had been at least three years since a patient received PC 2602 ordered medications, an assigned MCA was in place should the need arise.  The MCA was a psychiatric technician who had been in that role for over ten years.

<u>Transfers</u>:

Sustainability reviews were not required during the reporting period.

PVSP's inpatient coordinator was a senior psychologist specialist who held the position for three years. The inpatient coordinator was also the SPRFIT and training coordinator; there was no backup for this position.

One patient was considered for but not referred to inpatient care during the review period. The monitor's expert noted that the HLOC non-referral rationale for this patient was inadequate, and the clinical documentation and patient symptoms warranted an HLOC referral.

During the review period, there was one acute care referral, which resulted in a timely transfer. There were no intermediate care referrals. A *Vitek* hearing was held for the acute care patient, though the patient did not prevail. At the time of the site visit, no patients were pending transfer to inpatient care.

No patients with complex medical needs were transferred to inpatient care during the review period.

PVSP made 74 MHCB referrals during the review period; 48 patients were admitted to MHCBs and all transferred within 24 hours of alternative housing placement. Twenty-six referrals were rescinded.

No patients were transferred to a PSU during the review period.

There were conflicting reports regarding transfers to ASU EOP hubs. While documentation indicated zero transfers, staff reported multiple transfers during the review period.

PVSP transferred two patients to LTRHs; both transferred timely.

There were no placement delays into PVSP's on-site STRH.

PVSP transferred 19 patients to EOP programs; all transferred timely.

No patients' level of care changed from EOP to 3CMS during the review period.

PVSP did not track placements of MHSDS patients into its MSF.

<u>Programming</u>:

<u>STRH</u>:

Three EOP and 530 3CMS patients were housed in STRH during the review period. The average length of stay was 23 days, ranging from one to 349 days. At the time of the site visit, 45 3CMS patients were housed in STRH.

One psychiatrist treated STRH patients in addition to maintaining a mainline 3CMS caseload. One psychologist and two LCSWs also treated STRH patients. All of the providers' caseloads met the required staffing ratios.

The monitor's expert observed two initial and four routine IDTTs during the site visit. All patients were at the 3CMS level of care; one was elevated to EOP during the IDTT. The IDTTs were held confidentially with appropriate temperature, lighting, and space. All required IDTT staff members were present and had appropriate access to computers during the meeting. Three of the six patients refused to participate.

The primary clinicians and psychiatrist were the patients' assigned clinicians and had met with them before the IDTT. The team clearly knew each patient, and all members actively participated in a collaborative and patient-centered manner. Medication choices were logical and based on presenting symptoms and current clinical presentation. Custody participation was appropriate and resulted in a positive clinical impact in the IDTT.

Limitations noted during the observed IDTTs included the lack of clearly stated diagnoses, treatment goals, interventions, case formulations, and case conceptualizations. In the two cases, patient goals were neither objective nor measurable; however, the interventions offered to achieve these goals were appropriate.

Recreation therapy groups were offered to patients two days per week in addition to a life skills and process group.  The monitor's expert observed one recreation therapy group comprised of four STRH patients.  The patients were active and engaged and appeared to enjoy the holiday Jeopardy-style activity.  Although beneficial to patients' socialization and interaction with others, the group lacked overt clinical benefit.

Interviewed patients reported good interactions with mental health staff, felt heard by their clinicians, and met with them within the required timeframes.  Patients understood their treatment goals and knew how to submit requests to see clinicians sooner if needed.

Treatment space included a large room with seven restart chairs conducive to group therapy.  There were two confidential rooms with TTMs for patient interviews.  Staff reported that the treatment space was adequate but required coordination of schedules for use.

The monitor reviewed 114-A forms for 119 patients housed in STRH from November 27, 2023, to December 3, 2023; 97 of those patients were housed for an entire week.  Ninety-six of those 97 patients or 99 percent were offered 18.5 hours of yard and all 97 were offered three weekly showers and weekly linen exchange.  PVSP could not report whether patients were offered 1.5 weekly hours of structured therapeutic activity.

PVSP's unclothed body search procedure was consistent with headquarters directive and was completed when the patient exited their cell.  Patients were placed into TTMs in the center of the housing unit with a privacy screen that was used to shield the patient.

Twenty STRH patients' health care records were selected to assess compliance with Program Guide timeframes during their stays. One patient was screened out because he was in PVSP's STRH for only two days; therefore, EHRS reviews were completed for 19 cases.

Fifteen patients required initial psychiatry evaluations; 14, or 93 percent, occurred before the initial IDTT and eight or 53 percent, were confidential.  Non-confidential contacts were attributed to patient refusals.  Telepsychiatry was not utilized during initial psychiatry evaluations.

Seven patients required routine psychiatry contacts, all of which occurred at least every 90 calendar days.  Of the ten reviewed routine psychiatry contacts, four were confidential.  Non-confidential contacts were attributed to patient refusals.  Telepsychiatry was not utilized for any routine psychiatry contacts.

Thirteen patients required initial primary clinician evaluations.  Twelve or 92 percent were completed within ten working days of patient arrival and before the initial IDTT; seven or 54 percent were confidential.  Non-confidential contacts were attributed to patient refusals.  No primary clinician evaluations utilized telehealth.

Fifteen patients required routine primary clinician contacts, 87 percent of which occurred at least every seven calendar days.  Of the 53 reviewed routine primary clinician contacts, 23 or 43 percent were confidential.  Non-confidential contacts were attributed to patient refusals.  Telehealth was not utilized for any routine primary clinician contacts.

Twelve patients required initial IDTTs; all occurred within 14 working days of arrival, and all required staff attended.  Patients attended five or 42 percent of initial IDTTs.  IDTTs held *in absentia* were attributed to patient refusals.

All three patients who required routine IDTTs received them timely.  Required staff attended all routine IDTTs; however, patients were not in attendance for any due to patient refusal.  Of note, the Program Guide requires the attendance of the assigned psychiatrist and

primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Non-Disciplinary Segregation:

Like in the prior reporting period, PVSP could not generate a report of MHSDS patients who were approved for NDS status.  PVSP did not have an LOP for NDS status and followed STRH LOP guidelines for all privileges and property.  At the time of the site visit, no patients were classified as NDS status in STRH.

Seclusion and Restraint:

There were no episodes of seclusion or restraint during the review period.

Crisis Intervention Team:

PVSP did not have a crisis intervention team during the review period.  However, clinicians assigned to each facility, including the on-site psychiatrists, the 0.5 telepsychiatrist, and primary clinicians, responded to crisis calls during business hours.  During the evenings, weekends, and holidays, four specific primary clinicians rotated coverage.  Additionally, PVSP used a headquarters' assigned telepsychiatrist for all after-hours crisis calls.  Each on-site psychiatrist rotated coverage when the headquarters' assigned telepsychiatrist was unavailable.

3CMS:

During the reporting period, the mainline 3CMS population was housed at all facilities, including the MSF.  Two on-site psychiatrists, one telepsychiatrist, four psychologists, and two LCSWs treated mainline 3CMS patients; all maintained caseloads within established ratios except for one psychologist, who had a caseload of 101 patients. Treatment space on all yards was confidential.

Seven mainline 3CMS IDTTs were observed on Facilities B and C during the site visit; all required staff and four of seven patients attended.  Although the primary clinicians provided a

summary of the patient's mental health history, discussion of specific symptoms, functioning, diagnosis, medication response, and treatment progress were limited in both facilities. Level of care discussions were variable, and when stated, rationale was not provided. There was no discussion of case conceptualization or treatment planning. The psychiatrist's and correctional counselor's participation was minimal in both facilities. Notably, a majority of the IDTT content was not interpreted for several patients who required language assistance.

During the review period, one NLTG group was available on each yard. Recreation therapy groups were available twice weekly on Facility A, although access to group space was inconsistent.

Interviewed patients across all yards were satisfied with PVSP's mental health programming. Their clinical contacts were confidential and helpful. Patients on Facility D were seen by telepsychiatry and expressed that, although they preferred an on-site provider, virtual treatment was helpful. Patients denied any connectivity or technology issues or barriers to accessing mental health for emergency or non-emergency needs, though they requested more group access and self-help resources.

The monitor randomly selected and reviewed the healthcare records of 20 mainline 3CMS patients to assess compliance with Program Guide timeframes.

Six patients required initial psychiatry evaluations, all of which occurred timely before the initial IDTT and were confidential. Non-confidential contacts were attributed to patient refusals. Telepsychiatry was utilized for five or 83 percent of initial psychiatry evaluations.

Ten patients required routine psychiatry contacts; all occurred at least every 90 days. All reviewed routine psychiatry contacts were conducted confidentially. Telepsychiatry was utilized for 11 or 38 percent of reviewed routine psychiatry contacts.

Six patients required initial primary clinician evaluations; all were completed within ten working days of arrival or level of care change. Five or 83 percent were conducted confidentially. Non-confidential contacts were attributed to patient refusals. Telehealth was not used for primary clinician evaluations.

Seventeen patients required routine primary clinician contacts; 88 percent timely occurred at least every 90 days and 97 percent were confidential. Non-confidential contacts were attributed to patient refusals. Telehealth was not used for routine primary clinician contacts.

Six 3CMS patients required initial IDTTs, all of which occurred within 14 working days of arrival or level of care change. All required staff attended, and patients attended five or 83 percent. Initial IDTTs completed *in absentia* were attributed to patient refusal.

All nine patients who required annual IDTTs received them timely, with all required staff in attendance. Patients attended eight of nine or 89 percent of routine IDTTs. Routine IDTTs completed *in absentia* were attributed to patient refusal. Of note, the Program Guide requires the attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not discernable for all cases.

Other Issues:

Pre-Release Planning:

The pre-release planning local operating procedure was last updated in April 2023 and aligned with headquarters' directive. The pre-release coordinator was a licensed clinical social worker who maintained a caseload of 38 patients.

The pre-release coordinator reported working with internal and external agencies, including county mental health providers, the Division of Adult Parole Operations (DAPO),

parole services agents, and post-release community services.  Weekly, she reviewed a list of patients within 120 days of release for whom she scheduled an appointment within 60 days of their release.  Prior to that appointment, the pre-release coordinator reported monthly meetings with the primary clinician to discuss the patient's current mental health functioning and complete a portion of the PRPA.  No pre-release groups were offered during the review period or at the time of this site visit.

Fifty-seven 3CMS patients were eligible for pre-release services during the reporting period.  Of those, 49 or 86 percent received their PRPA and pre-release planning meeting.  Two patients refused to complete their PRPA or attend the pre-release planning meeting.

TCMP caseworkers at PVSP were contracted through the University of California at San Diego.  They provided remote pre-release benefit assistance, including Medi-Cal, Social Security Administration, and Veterans' Administration (VA) benefit application assistance to all eligible incarcerated persons.  Of the 57 3CMS patients eligible for pre-release services during the review period, 55 or 96 percent submitted applications for Medi-Cal, seven or 12 percent submitted applications for SSI benefits, and one patient applied for VA benefits.

Program Access:

a.    Jobs and Program Assignments

PVSP reported that 1,322 job assignments were held by 246 3CMS patients, or 46 percent of the 3CMS population, and 1,076, or 47 percent of non-MHSDS incarcerated persons.

The 730 academic assignments were held by 117 or 22 percent of 3CMS patients and 613 or 27 percent of non-MHSDS incarcerated persons.

Of the 197 vocational education assignments, 46 or nine percent of 3CMS patients held them, as did 151 or seven percent of non-MHSDS incarcerated persons.

The 598 voluntary education assignments were held by 128 or 24 percent of 3CMS patients and 470 or 20 percent of non-MHSDS incarcerated persons.

The 41 substance abuse treatment assignments were held by six or one percent of 3CMS patients and 35 or two percent of non-MHSDS incarcerated persons.

      b.      <u>Milestone Credits</u>

PVSP reported that, of 536 3CMS patients, 513 were eligible for milestone credits, and 80 or 16 percent earned the credits.

      c.      <u>Out-of-Level Housing</u>

On October 31, 2023, PVSP reported that 12 3CMS custody Level I patients were in Level III housing, 20 3CMS custody Level II patients were in Level I housing, and 97 3CMS custody Level II patients were in Level III housing. Forty-eight 3CMS custody Level IV patients were in Level III housing.

      d.      <u>ADA Reasonable Accommodation and Grievance Procedure</u>

PVSP provided packets and attendance sheets for training on accommodations and grievance procedures but did not provide an updated reference training manual for ADA accommodations.

<u>"C" Status</u>:

On December 1, 2023, 22 3CMS patients and 27 non-MHSDS incarcerated persons were designated "C" status. Review of the 22 3CMS patients' classification chronos revealed that 18 or 82 percent were deemed program failures after receiving multiple serious RVRs within 180 days.

<u>Case-by-Case Reviews</u>:

Fifteen 3CMS patients required 150-day case-by-case reviews during the reporting period. Eleven of 15 or 73 percent were completed timely. Fourteen of 15 or 93 percent had a

determinate SHU term.  Mental health considerations were documented in the decision to retain the patient in segregated housing in 14 of 15 or 93 percent of reviews.  PVSP could not indicate the number of patients who required and completed a 120-day ICC pre-MERD review.

Mental Health Referrals:

During the reporting period, PVSP made 834 mental health referrals, including 254 to psychiatry and 580 to primary clinicians.  There were 25 emergent, 70 urgent, and 739 routine referrals.  Psychiatry timely responded to three of four emergent, two of three urgent, and 246 of 247 routine referrals.  Primary clinicians timely responded to 20 of 21 emergent, 63 of 67 urgent, and 484 of 492 routine referrals.

Custody and Mental Health Partnership Plan:

PVSP's custody and mental health partnership plan LOP was up to date and aligned with statewide policy.

Executive leadership joint rounding occurred monthly in accordance with policy during the review period, including twice on Facility A and once on Facilities B, C, D, and STRH.  Rounding forms indicated that required leadership was present during each session, and staff were interviewed accordingly.  Patients were interviewed in all months except in June.  Although staff interview notes were sparse, rounding forms frequently indicated positive relations between custody and mental health staff.  Patients noted their satisfaction with the mental health services provided and asked for more groups.

PVSP did not provide executive staff meeting minutes.  Executive joint rounding was discussed in QMC meeting minutes for one of six months and discussed in detail in each month's MHPS minutes.

The monitor attended one STRH huddle and one weekly 3CMS supervisory meeting. Required staff attended each, and there was a collaborative discussion between custody and mental health staff, as well as a thorough knowledge of patient issues.

During the review period, 3CMS supervisory meetings occurred weekly as required on Facilities A through D.  Required staff attended; however, the provided documentation did not include sufficient details aside from new patient arrivals and patients exhibiting unusual or bizarre behavior.

As required, joint supervisory program area tours occurred monthly on each facility during the review period.  The mental health program supervisors attended all tours except for one month on Facility B.  Staff reported positive relations between custody and mental health. Custody staff frequently noted their understanding of how to access mental health services. Incarcerated individuals did not report any barriers to accessing mental health services.

PVSP distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for all six months for Facilities A, C, and D and five of six months on Facility B.  Discussion topics included the development of the therapeutic program in conjunction with horses and animals in the MSF, assigning an additional recreational therapist to the 3CMS population, and concerns regarding delayed laundry exchanges, limited gym access, and lack of groups.

Regarding staff misconduct complaints, 47 complaints were filed against custody staff and none against medical or mental health staff during the review period.  Of the 47 custody staff misconduct complaints, 24 were resolved, and 23 were still in progress.  There were no

investigations for misconduct towards a patient not initiated through the appeal process, and no custody or mental health staff members were reassigned because of misconduct complaints.

PVSP reported that 91 of 97 or 94 percent of mental health staff and 782 of 800 or 98 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

PVSP's heat plan LOP was last updated in May 2023 and followed headquarters' directive. The heat plan was in effect from May through September of the review period, during which there were 88 Stage I and no Stage II or Stage III heat alerts. No patients experienced heat-related illness during the reporting period. Reviewed daily activity reports (DARs) revealed that it only offered day room programming as an alternative to yard during heat plan activation.

Interviewed custody staff was knowledgeable regarding the heat plan except for the frequency requirement of updating the heat medication patient list. Observed thermometers were located in the highest feasible areas in housing units, and internal temperatures were taken and logged as required.

PVSP reported that 563 of 783 or 72 percent of custody staff and 88 of 95 or 93 percent of mental health staff completed the required heat plan training.

RVRs:

PVSP issued 1,499 RVRs during the review period, including six issued to MHCB patients, two issued to EOP patients, 423 or 28 percent issued to 3CMS patients, and 1,068 or 71 percent issued to non-MHSDS incarcerated persons. No RVRs resulted in documentation in an alternative manner.

Eighteen randomly selected RVRs issued to 3CMS patients were reviewed to assess compliance with policy guidelines. Of those, MHAs were timely requested in 15 or 83 percent of cases. Mental health clinicians timely completed and returned the MHAs in 16 or 89 percent

of cases. Ten or 56 percent were completed confidentially. Six of the eight MHAs not conducted in a confidential setting were attributed to patient refusals. In the reviewed sample, no clinicians recommended that the RVR be documented in an alternative manner. Further, none of the reviewed MHAs indicated that the patient's mental illness "strongly influenced" the behavior documented in the RVR or that a patient's mental health contributed to the behavior that led to the RVR. The SHO documented consideration of the MHA in all 18 cases. The reviewing clinician recommended penalty mitigation in one or six percent of cases, though the SHO mitigated penalties in six or 33 percent of cases.

For annual mental health assessment training, 51 of 99 or 52 percent of required custody staff attended the training. PVSP did not report attendance by mental health staff.

Use of Force:

PVSP reported 90 immediate use of force incidents involving 52 3CMS patients during the review period. There were no controlled use of force incidents involving MHSDS patients. The monitor's review of ten immediate use of force incidents did not reflect any issues with the use of force. The reviewed incidents included fights, assaults on correctional officers, attempted murder, and a riot. Appropriate decontamination was completed as necessary.

For the annual use of force training, 738 of 745 custody officers and all 12 mental health staff attended the training.

Lockdowns/Modified Programs:

One modified programming period was initiated on April 7, 2023 due to ongoing STG-related concerns and remained in effect at the time of the site visit. The warden noted that Facility C had been intermittently on bifurcated programming for four years before April 2023 and would likely not resolve soon. In accordance with the bifurcated programming plan, each

incarcerated person was designated to one of two groups that did not integrate.  Access to mental health services was not interrupted.

Access to Care:

A review of PVSP's monthly Health Care Access Quality reports from April through September 2023 indicated 8,370 issued mental health ducats and add-on appointments, of which 6,484 or 77 percent were completed and 1,886 or 23 percent were not.  Of the non-completed appointments, one or less than one percent were not completed due to custody factors, 728 or 39 percent were not completed due to non-custody factors, and 1,157 or 61 percent were not completed due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

PVSP began placing 3CMS patients in the MSF in September 2023.  At the time of the site visit, there were 155 incarcerated individuals housed in the MSF, including 38 3CMS patients.  The MSF had adequate treatment space, including a group therapy room and multiple confidential treatment offices.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 9**
**CALIFORNIA REHABILITATION CENTER (CRC)**
Site Visit: January 23, 2024 – January 24, 2024
Review Period: June 1, 2023 – November 30, 2023

<u>Census</u>:

On January 22, 2024, CRC's total population was 3,068, an 18 percent increase from the preceding site visit.  The MHSDS population of 1,303 patients represented 42 percent of CRC's total population and was a 15 percent increase from the preceding site visit.  There were three EOP patients and 1,300 3CMS patients in the MHSDS.

<u>Staffing</u>:

As of January 23, 2024, the chief psychiatrist position was filled, and five psychiatrists filled 4.5 positions.

One of two chief psychologist positions was filled; the position remained vacant at headquarters' direction for cost savings.  The senior psychologist supervisor was on long-term leave; an out-of-class staff psychologist filled this position.  Both senior psychologist specialist positions were filled.  Although all 9.5 staff psychologist positions were filled, one acted out-of-class as the senior psychologist supervisor, leaving an 11 percent functional vacancy rate.  One psychologist was unlicensed.

The supervising social worker position was filled.  Eleven of 14.5 social worker positions were filled, resulting in a 24 percent vacancy rate; using one contractor reduced the functional vacancy rate to 17 percent.  All social workers were licensed.

CRC employed one recreation therapist, although there was no established position.

Of 8.5 clerical positions, 7.5 were filled for a 12 percent vacancy rate.  The OSS II, CHCA, and one of two HPS I positions were filled.

The one certified nurse assistant position was filled and 7.3 of 7.8 medical assistants were filled for a six percent vacancy rate.

For custody staff, 641.6 of 649 positions were filled for a one percent vacancy rate. The warden, chief deputy warden, all three associate wardens, all four captains, 23.6 of 24.6 lieutenants, 51 of 57.4 sergeants, all 21 CC Is, all four CC IIs, and all 533 correctional officer positions were filled.

Telepsychiatry:

The institution did not have an established telepsychiatrist position during the reporting period. However, headquarters-based telepsychiatry was used after hours on Wednesday and Saturday nights as needed.

Telework:

During the review period and at the time of the site visit, five MHSDS clerical staff and one OSS II teleworked two days per week. Additionally, an HPS I and CHCA both teleworked one day per week. No other mental health staff teleworked during the review period.

In addition to their CRC patient caseloads, primary clinicians provided teletherapy to Region Four desert institutions that experienced staffing shortages during the review period. Leadership and staff indicated that this did not disrupt CRC patient treatment and was closely monitored to ensure patient care was not impacted within their institution.

Staff Recruitment:

CRC maintained low staffing vacancies across provider disciplines during the review period. Even with multiple clinicians on long-term leave throughout the review period, the institution used contract providers and unlicensed staff to fill vacancies as needed. Staff indicated that the hiring process took longer than in prior years.

Quality Management:

In response to concerns raised in the Twenty-Ninth Round Monitoring Report, CRC implemented quality management interventions to improve quality, utility, and standardization during the review period.

CRC did not have a Local Governing Body, as there were no licensed inpatient units at the facility.

During the review period, CRC's QMC, MHPS, SPRFIT, and EMRRC met monthly with all required members in attendance, except for the chief psychiatrist/designee in the MHPS during June 2023. Committee meeting minutes appropriately referenced a myriad of routine mental health department updates and discussions, including trainings, LOPs, compliance data, obstacles to care, patient care processes, QIPs, and local audits. QMC and MHPS meeting minutes indicated the appropriate elevation of relevant information from subcommittees to the higher-level committees for oversight, accountability, and intervention when indicated.

The reviewed QMC minutes were detailed, and action items remained in the meeting minutes until sustained improvements or resolutions were demonstrated. Specifically, during the review period, a CAP was implemented to ensure all 1:1 watch orders were consistently documented in the TTA log with primary and secondary assessments; this was monitored until sustained compliance was demonstrated.

Similarly, MHPS meeting minutes were comprehensive, suggesting appropriate attention to compliance monitoring and addressing obstacles to care. For example, CRC implemented a process improvement effort to ensure all urgent and emergent mental health referrals during the weekends were identified and resolved timely. The MHPS continued to monitor compliance for

six months after implementation.  Telehealth services provided to desert institutions were also routinely discussed during MHPS meetings.

CRC did not charter QITs or FITs during the review period.  Corrective action plans in process during the monitoring visit aimed to increase compliance for timely RVR mental health assessment requests and assigned provider attendance during IDTTs.

CRC did not have an active peer review program for psychiatrists or primary clinicians. Regarding psychiatry-specific peer reviews, CRC leadership finalized its policy in January 2023 and partnered with CIM for them.  Peer reviews for psychologists and social workers remained on hold and had not been conducted at CRC since 2017.

Suicide Prevention:

CRC's suicide prevention program policy was last updated in August 2023, while the notification of inmate bad news policy was last updated in March 2023.  CRC did not house any patients who met criteria for Suicide Risk Management Program (SRMP) placement during the review period.

The SPRFIT met monthly throughout the review period.  Meeting minutes covered relevant suicide prevention topics, compliance data, training needs, CAPs in progress or executed, and relevant process improvement efforts.  Meeting minutes also indicated that the SRE mentoring LOP was revised during July 2023 and that the regional SPRFIT coordinator had reduced the frequency of their onsite audits to annually based on CRC's performance during prior reviews.

During the review period, CRC implemented interventions to improve communication with nursing staff regarding 1:1 observation orders, tracking urgent and emergent referrals for timely completion during weekends and holidays, and areas of concern identified during the

headquarters suicide death review process.  CRC also implemented training to improve the quality of suicide risk evaluations ("SRASHE Core Competency Building").

During the reporting period, CRC had no serious suicide attempts that required the completion of a root cause analysis (RCA) but did have six self-harm incidents that were all assessed as minor injuries; five involved 3CMS patients.  All but one were referred to the MHCB, while one patient was brought to an outside hospital.  Notably, all 49 SRASHEs were timely completed during the reporting period.

One patient died by suicide at CRC in July 2023.  CRC's SPRFIT coordinator explained that the initial draft report resulted in four recommended corrective action items, two for custody and two for mental health.  Specifically, the draft report recommended corrective actions to address the lack of PPE donned during response, an officer's noncompliance with suicide prevention follow-up training, the on-call psychiatrists' recommendation to send the patient to his housing unit with an urgent referral after returning from an outside hospital for suspected overdose instead of alternative housing placement, and a clinician's underestimation of acute risk during evaluation the following day.

Although the final report did not include a CAP for underestimating risk, CRC had already implemented the recommended CAP from the draft report to address this concern before receiving the final version.  All CAPs from the death review process were completed prior to the site visit.

Interviewed clinicians spoke positively about the post-suicide debrief process that was provided to both the incarcerated individuals and the CRC staff, adding that many general population incarcerated persons subsequently requested follow-ups with mental health staff.

Prior to the July 2023 suicide, CRC had not experienced a suicide in over a decade, and interviewed staff reported that the event motivated innovative ideas for access to mental health services for both caseload and non-caseload patients, such as open lines or walk-in clinics.

CRC custody staff were compliant with 24 of 25 or 96 percent of 30-minute discharge checks following recent stays of patients in MHCB and alternative housing during the review period.

The annual suicide prevention training was completed by 634 of 677 or 94 percent of custody staff and 121 of 169 or 72 percent of medical staff; mental health staff training data was not provided.  CPR and first aid recertification training was completed by 632 of 690 or 92 percent of custody staff; medical staff training data was not provided.  All 33 mental health staff received the SRASHE training and were current with the training due dates.  Non-receipt of suicide prevention training for mental health staff and CPR training for medical staff was problematic.

Alternative Housing:

During the review period, 109 referrals were made to alternative housing, 104 of which resulted in MHCB admissions.  Five referrals were rescinded.  Stays averaged 5.23 hours and ranged from 50 minutes to 35 hours.  The one patient who stayed for 35 hours was rescinded from MHCB placement.  Of the five patients who were rescinded from MHCB placement, four received a timely SRASHE.  No patients were in alternative housing during the site visit.

CRC utilized alternative housing cells in the OHU and R&R.  Because most OHU cells were not sufficiently suicide resistant, CRC utilized one retrofitted "wet cell" in OHU that was equipped to allow for constant observation as the first option for alternative housing placement. The other OHU cells were utilized as secondary options when the wet cell was occupied.  If

needed, four cells in R&R were also used for alternative housing during the review period. These cells were capable of 1:1 observation with a 360-degree view of the patient.

Confidential Treatment space was available in the OHU across the hall from the wet and dry cells. Patients from R&R cells were escorted to the OHU for treatment.

One primary clinician was assigned to alternative housing from 7:00 A.M. to 5:00 P.M. During after-hours, weekends, and holidays, alternative housing was handled by on-call clinicians.

Medication Management:

CRC provided MAPIP results from June 1, 2023 to November 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, CRC was compliant for six months with obtaining medication consents, monitoring thyroid function tests, and for monitoring blood pressure of patients prescribed venlafaxine. No EKGs were required.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CRC was compliant for six months with performing the AIMS examination, blood pressure, glucose, CBC with platelets, CMP, height, weight, lipid panels, thyroid function tests, and obtaining medication consents. The institution was compliant for three of the four required months of EKG monitoring.

For patients prescribed carbamazepine, CRC was compliant for the one required month of monitoring therapeutic medication levels, CBC, CMP, and obtaining medication consents.

CRC was not a clozapine initiation or maintenance institution. No patients were prescribed clozapine during the monitoring period or at the time of the site visit. No patients who were prescribed clozapine transferred to CRC in error.

For patients prescribed Depakote, CRC was compliant for six months with obtaining medication consents. The institution was compliant for five months and was noncompliant for one month with monitoring CBC with platelets, CMP, and therapeutic medication levels.

For lamotrigine, the institution was compliant in obtaining medication consents for the three required months.

Regarding lithium, the institution was compliant for all required months in obtaining kidney function tests and thyroid function tests; additionally, they were compliant with monitoring therapeutic medication levels (six months), medication consents (five months), and EKGs (three months).

For medication management metrics reported by mental health headquarters, CRC was compliant for six months with continuity of medications upon inter-institutional transfer at R&R, continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications upon parole/transfer to the community, observation of medication preparation at A.M. and P.M., observation of medication preparation at HS, chronic care medications historical administration, and outpatient provider new medication orders.

CRC was compliant for five months and was noncompliant for one month for continuity of medications with MHCB transfers and continuity of medications upon discharge/transfer from a community hospital and/or DSH.

As CRC did not have a reception center or an RHU, no data was required for continuity of medications at reception center or continuity of medications with intra-institutional transfer to ASU/SHU/PSU.

CRC performed analyses of underperforming medication management metrics, and most deficiencies resulted from patient refusals. CRC reported no systemic issues requiring CAPs.

CRC reported 827 patients who were prescribed 1,675 psychiatric medications. Of those, 44 patients were prescribed KOP medications. All patients received mental health services at the 3CMS level of care, and all were prescribed SSRIs or duloxetine in accordance with policy.

CRC reported that prescriptions were provided for a maximum of 180 days. Bridge orders were provided for up to 30 days. For verbal and telephone orders, nursing staff was required to "read back" the order to the prescriber; psychiatrists then had 24 hours to sign the order. In addition, the chief psychiatrist reviewed huddle reports and EHRS to identify any unsigned orders, and the psychiatrists were prompted to sign them when indicated. The institution did not specify the process for tracking whether verbal or telephone orders were signed.

The institution conducted 87 medication line audits during the reporting period, and the audits indicated that all patients received their medications in less than 30 minutes. The audits indicated that 82 of 87, or 94 percent of medication lines were under two hours in duration and were compliant with policy. The reasons provided for noncompliance included delays in patient release. While CRC did not identify any systemic issues requiring CAPs, one additional medication line was opened to address the length of lines. CRC reported no conflicts between medication administration and mental health programming.

Protection from the elements, including shade, was provided at all three medication administration areas.

CRC reported an average nonformulary rate of approximately four percent during the monitoring period.

CRC reported that 378 of 381, or 99 percent of polypharmacy reviews were completed timely. Pharmacy initiated the polypharmacy reviews that were then forwarded to medical providers. If any psychiatric medications were involved, psychiatrists were required to review the list and to complete the justification information.

CRC reported that 427 patients were prescribed HS medications. With rare exceptions, CRC was compliant with the requirement to administer HS medications at 8:00 P.M. or later. Cases in which HS medications were not administered timely were reportedly due to patient refusal.

CRC had no patients who received PC 2602 involuntary medications during the monitoring period or at the time of the site visit. The institutional leadership estimated that the last patient receiving PC 2602 medications occurred over five years prior. There was no designated MCA. The institution reported that should a patient require involuntary medications, CRC would work to transfer the patient, as the leadership reported lack of sufficient staff at CRC to address the treatment needs of those patients.

Transfers:

Sustainability reviews were not required during the review period.

CRC's inpatient coordinator was a senior supervising psychologist who had held the position since 2019, as well as the SPRFIT coordinator, DDP coordinator, and training coordinator positions. As CRC did not have an administrative segregation unit, the inpatient coordinator also participated in ICC at CIM on behalf of CRC patients prior to STRH, LTRH, or ASU EOP hub placement.

Five 3CMS patients and one non-MHSDS individual were considered for, but not referred to, inpatient care during the review period. The monitor's expert noted that HLOC nonreferral rationales were adequate and did not warrant corrective action.

312

No patients were referred to acute or intermediate care during the review period or were awaiting placement at the time of the site visit.

No patients with complex medical needs were transferred to inpatient care during the reporting period.

CRC made 109 referrals to MHCBs, resulting in 104 admissions and five rescissions. All but one transferred to an MHCB within 24 hours of referral; the delayed transfer occurred five hours beyond policy timelines.

No patients were transferred to a PSU, ASU EOP hub, LTRH, or STRH during the review period.

There were 32 EOP patients and 109 3CMS patients transferred to the administrative segregation unit at CIM during the review period; all transferred within 24 hours.

Of 19 patients requiring transfer to EOPs, 18 transferred timely, while one was transferred to an MHCB prior to his transfer date. Three patients were pending transfer to EOP programs at the time of the site visit; all were within policy timelines.

No patient's level of care changed from EOP to 3CMS during the reporting period.

CRC transferred two 3CMS patients to MSFs at WSP and NKSP.

Programming:

Crisis Intervention Team:

CRC's CIT was comprised of a mental health clinician, a supervising registered nurse or designee, and a correctional lieutenant or designee. Crisis response was provided every day from 7:00 A.M. to 10:00 P.M.; outside of these hours, referrals were directed to the on-call psychiatrist or headquarters-based telepsychiatrist on Wednesday and Saturday nights.

When clinicians received a crisis call, they individually responded and contacted other disciplines based on the nature of the crisis, as opposed to formally responding to crisis referrals with all required members in accordance with statewide policy.   Concerningly, these contacts were not considered a formal CIT intervention, not tracked, and no CIT-specific documentation was completed other than a progress note and a suicide risk assessment when indicated.  Mental health staff noted that the primary obstacle to formal CIT activation was the lack of available nursing and custody staff, particularly during third watch.

Only six official CIT activations occurred during the review period, including four for safety concerns, one for a report of a homicidal patient, and one for a report of a hostile patient. Following CIT activation, two patients were transferred to MHCBs, two were moved to different housing at CRC, one was returned to his same housing, and one was transferred to administrative segregation at CIM.

3CMS:

Five psychiatrists, ten psychologists, and 12 LCSWs treated mainline 3CMS patients. All five psychiatrists and four psychologists maintained caseloads within established ratios; of the remaining six psychologists, four did not maintain caseloads and assisted in alternative housing, pre-release planning, and supporting clinicians on leave.  Two psychologists exceeded caseload ratios with 99 and 107 patients, respectively.  For LCSWs, four of 12 had caseloads within established ratios, six had caseloads ranging from 99 to 106 patients, and two did not maintain caseloads and assisted in different areas throughout the institution.

The monitor's expert observed eight IDTTs; all required team members and a clinical supervisor were in attendance.  The IDTTs began on time and occurred in a spacious and confidential room.  Clinicians used computers to access patient information as necessary.  All attendees actively participated in the IDTT discussions, offering valuable discipline-specific

input, answering patients' questions, collaboratively determining next steps in care, and expressing a willingness to advocate or follow up on behalf of patients when indicated. The IDTTs routinely discussed group and education opportunities, level of care rationales, and pre-release planning as needed. In addition to the IDTTs recommending groups based on patients' needs, each patient was provided a list of groups from which to choose based on their interests during their initial IDTTs. Although one of the observed primary clinicians in IDTTs would likely benefit from additional treatment planning and resources training, the supervisor appropriately intervened when necessary to ensure all areas were addressed.

In response to quality issues identified during the prior monitoring round, CRC implemented curriculum-based groups, and patients received incentive-based certificates after completing a group cycle. CRC leadership reported that there were 29 treatment groups during the review period; a clinician facilitated 14 or 48 percent, while the recreation therapist facilitated the remaining 15. Clinician-led group topics included coping and problem-solving, mood management, anger management, criminal thinking, substance abuse, and leisure activities. Groups were not observed during the site visit due to clinician unavailability.

Interviewed patients reported their desire for more mental health programming, including more rehabilitative achievement credit (RAC) groups throughout the year. Patients discussed their frustration with long waitlists for RAC groups as well. Interviewed clinical staff reported similar concerns and indicated that patients were less likely to participate in mental health treatment groups due to the lack of credit.

Twenty healthcare records of mainline 3CMS patients were randomly selected to assess compliance with Program Guide timeframes during their stays. Six patients required initial

psychiatry evaluations; five or 83 percent occurred before the initial IDTT. All six were conducted confidentially. Telepsychiatry was not utilized during initial psychiatry evaluations.

Fourteen patients required routine psychiatry contacts; 100 percent occurred timely at least every 90 days. All routine psychiatry contacts were conducted confidentially. Telepsychiatry was not utilized for routine psychiatry contacts.

Seven patients required initial primary clinician evaluations; six or 86 percent were completed within ten working days of arrival or change in level of care. All initial primary clinician contacts were completed in a confidential setting. Nineteen patients required routine primary clinician contacts; all occurred timely, at least every 90 days, and all were conducted confidentially.

Of the seven 3CMS patients who required initial IDTTs, six or 86 percent occurred within 14 working days of arrival or level of care change; all required staff and patients were in attendance. Of the 13 patients who required annual IDTTs, all 13 were timely, and all required staff and patients were in attendance. Telehealth was not utilized during any of the reviewed initial or routine IDTTs. Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

CRC's pre-release coordinator was an LCSW who worked full-time in the position for the past two years. The backup pre-release coordinator started in May 2023 and assisted in pre-release planning for approximately 90 percent of the work week, covering crisis calls for the remaining time.

CRC enhanced its pre-release programming since the prior monitoring round. The pre-release office was moved to an area of the facility where patients had greater access. In addition to appointments, patients were offered walk-in opportunities to address their pre-release concerns. The coordinator maintained an information board for patients with relevant services and resources that could also be reviewed.

There were 514 3CMS patients scheduled to be released during the review period; all had their PRPA completed prior to their release date. To complete the PRPA, the pre-release coordinator drafted the first section with the patient and then alerted the patient's dedicated primary clinician to complete the second part with the patient within 30 to 45 days of release. In addition to completing the PRPA, the pre-release coordinator facilitated transportation chronos, the release of information for counties to begin their planning, and connected patients to the TCMP coordinator for any further services needed.

The CRC pre-release coordinator reported that the TCMPs automatically scheduled patients approximately three to four weeks prior to release due to a backlog of providing services. Collaboration with TCMP caseworkers and the pre-release coordinator was minimal and limited to the TCMP supervisor only. The institution was unable to provide TCMP data at the time of the site visit.

Three weekly pre-release groups were offered during the review period. They utilized a pre-release state curriculum and ran continuously to allow patient placement at any time. One observed pre-release group was well-facilitated, as the clinician engaged the patients and prompted more withdrawn participants. All eight patients in the group gave positive reviews of the group and the pre-release process.

Program Access:

a.  Jobs and Program Assignments

On December 1, 2023, CRC reported that of 1,144 available jobs, two or 66 percent of EOP patients, 372 or 30 percent of the 3CMS population, and 770 or 44 percent of the non-MHSDS population held job assignments.

For the 802 academic assignments, 279 or 23 percent of 3CMS patients and 523 or 30 percent of the non-MHSDS population held them.

Of the 162 vocational education assignments, 63 or five percent of 3CMS patients and 99 or six percent of non-MHSDS individuals held them.

Of 1,008 voluntary education assignments, 245 or 20 percent of 3CMS patients and 763 or 43 percent of the non-MHSDS population held them.

For the 282 substance abuse treatment assignments, one of three EOP patients, 121 or ten percent of 3CMS patients, and 160 or nine percent of non-MHSDS individuals held them.

b.  Milestone Credits

CRC reported that four EOP patients were eligible to earn milestone credits during the review period, but no patients earned them.  Of the 1,263 3CMS patients eligible to earn milestone credits, eight or 0.6 percent earned them.  Additionally, one of the 1,748 eligible non-MHSDS incarcerated individuals earned the credits.

c.  Out-of-Level Housing

As of December 7, 2023, two custody Level II EOP patients and 267 custody Level II 3CMS patients were in custody Level I housing, and 51 custody Level II 3CMS patients were in custody Level III housing.

d.    ADA Reasonable Accommodation and Grievance Procedure

CRC provided a copy of the CDCR Reasonable Accommodation Request Process manual and produced training rosters confirming the implementation of the revised process.

"C" Status:

During the review period, CRC placed 156 individuals on "C" status, though the institution was unable to indicate how many were MHSDS patients.  At the time of the site visit, 90 incarcerated individuals were on "C" status, including one EOP patient, 48 3CMS patients, and 41 non-MHSDS individuals.  A review of 20 MHSDS patients' classification chronos revealed that all were deemed program failures after receiving multiple serious RVRs within 180 days.

Case-by-Case Reviews:

As CRC does not have an ASU or STRH, the institution did not complete case-by-case reviews during the review period.

Mental Health Referrals:

During the reporting period, CRC made 1,551 mental health referrals; there were 429 referrals to psychiatry and 1,122 referrals to primary clinicians.  There were 142 emergent, 290 urgent, and 1,119 routine referrals.  There were timely responses to all nine emergent psychiatry referrals and 119 of 133 or 89 percent of emergent primary clinician referrals.  For urgent referrals, there were timely responses to 38 of 44, or 86 percent of psychiatry referrals, and 229 of 246 or 93 percent of primary clinician referrals.  Routine referrals reflected compliance as there were timely responses to 368 of 376, or 98 percent of psychiatry referrals, and 736 of 743, or 99 percent of primary clinician referrals.

<u>Custody and Mental Health Partnership Plan:</u>

CRC's custody and mental health partnership LOP was last revised in October 2023 and aligned with headquarters' directive.

Executive leadership joint rounding occurred during all six months of the review period, as required, including three times on the Facility B and C shared treatment space and three times on Facility D.  Leadership staff interviewed both custody and clinical staff as well as patients during each month of rounding and noted their findings on the required form.  Mental health and custody staff indicated good collaboration with no issues in getting patients to their appointments on time and working together when responding to urgent and emergent issues.  Patients reported receiving their ducats and indicated positive relationships with custody and mental health staff.

Executive rounding was mentioned in the QMC and MHPS meeting minutes with sufficient detail.  However, no findings were mentioned in the executive meeting minutes.

All weekly 3CMS supervisory huddle forms were reviewed across the mainline 3CMS yards for compliance with Program Guide requirements during the review period.  CRC was not compliant with the required weekly 3CMS supervisory meetings.  Of the 26 required weeks, meetings only occurred during five weeks on Facility B, four weeks on Facility C, and 24 weeks on Facility D.  All reviewed forms lacked sufficient detail and did not demonstrate a substantive discussion of relevant topics.  Like the prior reporting period, responses routinely indicated little, if any, pertinent information.  Additionally, not all required staff signed the huddle forms.

The institution held monthly joint supervisory area program tours during all six months of the review period with the required staff in attendance.  Facility D was toured during five of six months of the review period, while Facilities B and C were toured in November 2023. Rounding forms indicated that mental health clinicians received timely referrals from custody

staff, and patients reported receiving their ducats on time.  Patients also stated they had no issues with staff responding to crises.

CRC produced a copy of the 3CMS orientation brochure in English and Spanish and indicated that it was distributed to new 3CMS patients following the initial primary clinician evaluation.

CRC complied with the monthly IAC meetings requirement; they were held on all facilities during all months of the review period.  The meetings were held jointly with mental health and medical staff, and discussions included "walk-in" mental health appointments, vaccine updates, wild animal bites, and dental services.  The required staff and patients were present for each meeting.

During the review period, MHSDS patients made 35 allegations of staff misconduct against custody staff, of which 29 were pending, five were not sustained, and one was rejected.  There were no allegations of staff misconduct against mental health staff during the review period.  There were no investigations of staff misconduct toward a patient that was not initiated through the appeals process.  No mental health or custody staff were moved to another post because of a staff complaint.

For the annual off-post training, 663 of 689 or 96 percent of custody staff and 112 of 125 or 90 percent of mental health staff completed the training in the 12 months prior to the site visit.

<u>Heat Plan</u>:

CRC's heat plan LOP was last revised in May 2023 and followed headquarters' directive.  The heat plan was in effect from June through November of the review period and there were 54 Stage I, 57 Stage II, and 19 Stage III heat alerts.  One patient experienced heat-related illness during the review period; CRC did not provide additional details about the incident.  Daily

Activity Reports confirmed that alternative programming occurred in the day room and gym during heat plan activation with modified yard time if appropriate.

Interviewed custody staff in Facilities B through D demonstrated an adequate understanding of heat plan policies and procedures and stages of the heat plan. In all yards, custody officers produced the daily updated list of patients prescribed heat-sensitive medications.

Each toured housing unit contained two working thermometers. Staff took temperatures at the appropriate times and logged them accordingly.

For heat related pathologies training, 602 of 645 or 93 percent of custody staff and 104 of 119 or 87 percent of mental health staff completed the training.

RVRs:

CRC issued 1,838 RVRs during the review period, including 989 to MHSDS patients and 849 to non-MHSDS incarcerated individuals. Thirteen RVRs were issued to patients awaiting MHCB transfer, six to EOP patients, 970 to 3CMS patients, and 849 to non-MHSDS patients.

Twenty randomly selected RVRs issued to 3CMS patients were reviewed to assess compliance with policy guidelines. Of the sample reviewed, the MHA was timely requested in 18 or 90 percent of cases and timely completed and returned to custody in 19 or 95 percent of cases. Of the 20 MHAs reviewed, 18 or 90 percent were completed confidentially; two patients refused a confidential assessment. No reviewed MHAs recommended that the RVR be documented in an alternative manner.

There were no instances where the patient's mental illness was found to have "strongly influenced" the behavior documented in the RVR. However, one of the MHAs indicated that the patient's mental health contributed to the behavior that led to the RVR. The SHO documented consideration of the mental health assessment in 18 of 20 or 90 percent of cases. The primary clinician recommended penalty mitigation in 12 cases; the SHO mitigated penalties consistent

with the clinician's recommendation in all 12 cases and also mitigated penalties in four additional cases.

Of the reviewed RVRs, staff assistants were appointed in eight cases; four additional patients were offered but refused a staff assistant. All patients timely received the required RVR documentation prior to the hearing and patients were present at all hearings.

As for attendance at the annual disciplinary process mental health assessment training, all 59 required custody staff and one of 32 or three percent of required mental health staff were in attendance.

Use of Force:

CRC reported no controlled and 186 immediate use of force incidents during the review period; 37 involved 3CMS patients.

Sixteen immediate use of force incidents were selected to assess compliance with policy guidelines. The reviewed incidents included threats against staff, battery on incarcerated individuals, and fighting. All 16 incidents reflected that custody staff used a reasonable and appropriate amount of force, including physical strength and holds, pepper spray, and OC grenades. Appropriate decontamination was afforded to all patients as needed.

CRC reported that the warden, chief deputy warden, all three correctional administrators, all three captains, all 22 lieutenants, 43 of 48 or 90 percent of sergeants, and 529 of 567 or 93 percent of all correctional officers completed the annual use of force training. For mental health staff, only four of five or 80 percent of psychiatrists, eight of nine or 89 percent of psychologists, and all 12 social workers completed the training.

Lockdowns/Modified Programs:

There were three instances of modified programming at CRC during the review period. The first and second instances occurred on Facilities B and C on May 22, 2023 and from June 1, 2023, to June 15, 2023, due to a contraband search. Impacted patients used priority ducats to access mental health services and were escorted to mental health treatment; otherwise, there were no interruptions for mental health services. The third instance occurred from October 5, 2023, through October 9, 2023, due to a battery on a staff member. Affected patients were escorted to the pill line and mental health appointments until regular programming resumed.

Access to Care:

A review of monthly Health Care Access Quality reports from June through November 2023 reflected the issuance of 12,941 mental health ducats and add-on appointments; 11,044 or 85 percent were completed, and 1,897 or 15 percent were not completed. Of the non-completed appointments, 183 or ten percent were due to custody factors, 1,582 or 83 percent were due to non-custody factors, and 132 or seven percent were due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CRC did not have a MSF during the review period.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

APPENDIX A – 10
**CORRECTIONAL TRAINING FACILITY (CTF)**
Site Visit: January 23, 2023 – January 25, 2023
Review Period: June 1, 2023 – November 30, 2023

Census:

On January 22, 2024, the total population at CTF was 4,127, which was a three percent increase from the preceding reporting period. The MHSDS population of 885 represented 21 percent of CTF's population and was a six percent decrease from the previous reporting period.

There were 882 mainline 3CMS patients.

The ASU had a population of 105, including three 3CMS patients awaiting transfer.

Staffing:

The chief psychiatrist position was filled. Of the 3.5 staff psychiatrist positions, one was filled, leaving a 71 percent vacancy rate. Registry staff filled an additional two positions, reflecting a 14 percent functional vacancy rate. No telepsychiatry positions were allocated at CTF during the review period or at the time of the site visit.

One of two chief psychologist positions was filled; the other position remained vacant for salary savings. The senior psychologist position and both senior psychologist specialist positions were filled.

Six of eight psychologist positions were filled, reflecting a 25 percent vacancy rate. Contractors filled an additional 0.5 position for a 19 percent functional vacancy rate. One psychologist was unlicensed.

The supervising social worker position was filled. Six of 7.5 social worker positions were filled, reflecting a 20 percent vacancy rate.

The senior psych tech and the 3.5 psych tech positions were filled.

The RN position was filled.

A total of 7.5 MHSDS clerical staff covered 6.5 positions. CTF employed one HPS II, though there was no established position. The OSS II and HPS I positions were filled.

For custody staff, 684 of 705.2 positions were filled for a three percent vacancy rate. This included the warden and chief deputy warden, all four associate wardens, all six captains, all 28 lieutenants, 54 of 62.2 sergeants, all 31 CC Is, all ten CC IIs, and 551 of 562 correctional officers.

Telepsychiatry:

CTF did not have any established telepsychiatry positions. However, a headquarters telepsychiatrist covered evening hours on Wednesdays and Saturdays.

Telework:

During the review period and at the time of the site visit, the chief psychiatrist, chief psychologist, senior psychologist, senior psychologist specialists, and supervising social worker teleworked one day weekly. HPS I staff were permitted to telework two days weekly, while the HPS II and MHSDS clerical staff teleworked one day weekly.

Staff Recruitment:

The institution continued to utilize registry to fill primary clinician vacancies. Requests for dual appointments were approved. CTF had one dual appointment for psychology and one for social work, both worked one day per week.

Quality Management:

Similar to the Twenty-ninth Monitoring Round, CTF maintained a well-functioning quality management program. A local governing body was not required at CTF. Additionally, sustainability reviews and hub certification reviews were not required at the facility.

The QMC met monthly and achieved quorums.  Reviewed QMC minutes revealed that agenda items included action item review, subcommittee reports, and open forum. Documentation provided an in-depth summary of each content area, including problem identification, analysis, and response.

The MHPS also met monthly and achieved quorums.  Agenda items included compliance measures, coordinator's report, action items, patient safety, and new business.  Reviewed documentation indicated a thorough summary of topic areas, backlog monitoring, and staffing updates.  Notably, since the re-opening of the ASU in December 2022, a pattern of deficient ASU pre-screens was targeted for a performance improvement work plan.  The deficiency was also targeted as a CAP at the request of regional staff.  Following multidisciplinary meetings, the compliance rate improved over time from below 70 percent to over 90 percent in October, November, and December 2023.  However, during the site visit, staff reported that the compliance rate was difficult to sustain.

There were no QITs, FITs, or additional audits conducted during the reporting period.

Documentation indicated that peer reviews were conducted for psychiatric staff. Clinician peer reviews remained on hold.

Interviewed staff were unaware of quality management projects.

Suicide Prevention:

CTF's LOP for Suicide Prevention was updated in March 2023.  This LOP indicated that patients placed in alternative housing must be placed under constant observation on suicide watch status with property limited to a safety smock, safety mattress, and safety blanket. Additionally, the LOP revealed that patients must be maintained on 1:1 and not 2:1 status.  These

changes were recommended by the Special Master's suicide prevention expert during the previous monitoring round.

At the time of the site visit, there were no new admissions to the R&R area.  A sample of patient records who were transferred into CTF during the reporting period was reviewed; all had initial health screenings, which included responses to every question documented in the mental health/suicide risk section.

A current SPRFIT LOP was in effect, as were LOPs consistent with the following three required CCHCS policies from 2021 related to the SPRFIT: "Local Operating Procedure for Inmate-Patients Receiving Bad News;" "Crisis Intervention Team Policy and Procedure;" and "Suicide Risk Management Program Policy and Procedure."

During the review period, SPRFIT meetings were held each month.  Reviewed minutes indicated agenda items included SRE Mentoring Training, SPRFIT Measurement Plan Findings, quality issues, Custody Inpatient Discharge Checks Audit, SPRFIT Priorities and Project Pipeline, ASU pre-placement screenings, Suicide Prevention in-service training, and SRASHE training.

The SPRFIT coordinator reported that information from the SPRFIT committee meetings was shared with staff during routine monthly staff meetings.  She reported that one of the biggest challenges facing the suicide prevention program at CTF was the limited availability of staff who could provide training to other staff members.  For example, she indicated that, while staff were provided the required mentoring related to the SRASHE, enhanced and ongoing mentoring would be beneficial, but was not possible.

The monitor reviewed CDCR MH-7497 custody monitoring forms for 20 patients who were recently discharged from an MHCB or alternative housing placement.  Eighteen of 20 or 90 percent were fully completed and compliant.

While CTF reported that, during the reporting period, eight of ten SRASHEs were completed timely in response to emergent referrals, the monitor's review revealed that 11 SRASHEs were required and only seven, or 64 percent, were completed timely.

In one case, CTF reported that a required emergent SRASHE was three hours late; however, the patient was not seen until 14 hours after the referral was submitted by custody, rendering it ten hours late.  There were several concerns with this case.  The officer documented on the MH-5 form that the referral was urgent–not emergent–and that the patient's suicidal comments appeared to be made "in a joking manner but out of character" for the individual.  The MH-5 form was completed at 2100 hours and there was no indication as to when it was received by healthcare providers or how it was triaged.  Protocols related to patients making statements about self-harm should have resulted in an emergent referral, with the patient being placed under 1:1 observation in alternative housing until he could be seen the following morning.  At the very least, the patient should have been seen and assessed by nursing staff, who should have telephoned an on-call provider.  Instead, documentation indicated that mental health staff was not notified that the patient needed to be seen until 0800 the following morning, 11 hours after the emergent referral was placed by custody.  Subsequently, the patient was evaluated by mental health staff at 1115 hours, resulting in a delay of 14 hours.

In the case where the SRASHE was completed 91 hours late, the patient was seen within three hours of the emergent consult being submitted, although the patient refused to participate in

the SRASHE.  The SRASHE was not entered into EHRS until five days later without explanation and was not documented as a late entry, which represented noncompliance.

In the third case, a custody officer submitted an emergent referral at 0600 hours, noting that the patient wrote a letter regarding suicide and a recent suicide attempt.  There was no indication on the form about when it was received by healthcare staff, but EHRS documentation noted that mental health staff were informed at 0845 hours.  The patient was evaluated by a mental health primary clinician at 1350, five hours after receipt of notification and nearly eight hours after the MH-5 was submitted.

The fourth case was a SRASHE required in response to what CTF reported as an urgent referral, which was completed in a timely manner.  However, upon review of the patient's record, it was noted that the MH-5 was submitted as an *emergent* referral as the patient was talking to himself and talking about committing suicide by jumping off the third tier.  A sergeant completed the MH-5 at 1650 hours.  There was no indication on the form regarding when it was received by healthcare staff, although the patient was escorted to the TTA at 1753 hours.  Staff contacted the on-call psychiatrist at 1800 hours, who ordered that the patient be placed in alternative housing and offered an injection, which the patient refused.  The psychiatrist spoke with the patient over the telephone, and after the call, the patient denied suicidal ideation.  According to a nurse's documentation, the psychiatrist cancelled the alternative housing order and said the patient could return to his housing unit.  No SRASHE was completed, and there was no evidence of the on-call psychiatrist's documentation in the healthcare record.  The patient was not seen for a SRASHE until 1347 hours the following day, nearly 21 hours after the emergent referral was submitted.  This review revealed that the urgent referral was miscategorized and

should have been identified as an emergent referral. Completion of the SRASHE was outside of timeframes for emergent referrals.

The monitor reviewed 13 random records of patients whose MHCB referrals were rescinded. Of those, three instances were found where documentation of the five-day follow-up contact was entered into the record one day late. All cases included a SRASHE completed as required.

CTF reported one serious suicide attempt and one death by suicide during the reporting period. The clinical case review of the serious suicide attempt was adequate. A subsequent review of the patient's record revealed thoughtful treatment planning and interventions. As for the death by suicide, two CAPs were required to be completed by CTF. The first involved a failure to place the patient under constant visual observation until he could be evaluated by a clinician after the facility received a phone call from the patient's friend indicating that the patient stated he intended to kill himself. The CAP was not completed as the incident was under investigation as of December 15, 2023. The second CAP was required to address a delay in activating a 9-1-1 emergency call for nine minutes. This was identified as a joint nursing/custody concern. Custody did not complete a CAP, citing that the incident was under investigation as of December 15, 2023.

The nursing CAP was completed, and training was provided for the nurse involved in the event which failed to confirm that 9-1-1 was called. Alarm activations were also routinely reviewed as part of the EMRRC with issues addressed as they arose. It was unclear why nursing was able to complete an investigation and address the issue with nursing staff, while custody was unable to do so. The SPRFIT coordinator reported that she was not aware of why the response to the CAP that the incident was still under investigation was sufficient for headquarters. The

SPRFIT coordinator reported that the CAP was considered closed by headquarters and required no further follow-up.

In addition to the death by suicide and serious suicide attempt that occurred during the reporting period, another patient died by suicide in January 2024. The case was under review; however, the SPRFIT coordinator reported that similar to the previous death by suicide, the patient had expressed an intent to die by suicide during a phone call. However, in this case, the individual on the phone did not contact the institution to report a concern. There were no concerns regarding timely 9-1-1 activation in this death by suicide.

CTF reported that six patients were returned to CTF after being placed at the MHCB level of care for suicidality and all received the required five-day clinical follow-up contacts as required. However, during record reviews, the monitor's expert found at least three additional records of patients who returned from the MHCB level of care after admission for suicidality. Fortunately, all three cases included completed five-day follow-up contacts as required. This finding raised concerns about other cases being missed by CTF's tracking system, potentially leading to an inability to identify concerns should they arise.

According to training records, 100 percent of custody and 98 percent of nursing staff were currently certified in CPR. Custody and mental health staff were 100 percent compliant with annual suicide prevention training; however, 241 out of 267 medical staff, or 90 percent, were compliant with annual suicide prevention training. Finally, 93 percent of the mental health clinicians were compliant with the SRE mentoring program. A part-time contractor was scheduled to complete SRE mentoring by January 31, 2024.

All intake cells in the RHU were visually inspected by the monitor's expert while on-site and were retrofitted, including the one cell that required a faucet replacement following the previous audit by the Special Master's suicide prevention expert.

It was reported that ASU pre-placement screenings were completed by nursing staff in R&R upon arrival at CTF. This was previously a problem but was addressed through training of R&R staff. For patients placed in ASU from CTF mainline, ASU pre-placement screenings were reportedly completed in TTA. However, custody staff was not always aware that the screens needed to occur prior to the patients arriving at the ASU; this was addressed through ongoing education.

A sample of records for patients who transferred into the ASU from within CTF and other institutions were reviewed for compliance with expectations regarding pre-placement screening and 72-hour screening questionnaire completion. In all cases reviewed, the forms were completed in accordance with requirements. Additionally, a review of the sign-in log in the ASU revealed that psych techs routinely placed check marks next to the names of all patients who were seen on rounds. The use of the 114-Isolation Logbook was discontinued, and SOMS was used for other tracking purposes.

An interview with psych techs working in ASU revealed that the current staffing matrix was believed to be inadequate. Specifically, there were several shifts when only one psych tech was assigned to CTF. It was reported that this scheduling did not allow for ASU rounds, passing medications, and completing all required pre-placement screenings and 72-hour screenings during the shift. Psych techs also reported that they were required to work overtime or an LVN or RN was required to assist with medication passes or other requirements during the shift. A supervisor reported that staff in R&R had been trained to complete ASU screenings when a

patient arrived from another facility. This was helpful in ensuring that all required screenings were completed.

The monitor's expert observed psych tech rounds during the site visit. The rounds were completed as required, and the psych tech demonstrated familiarity with the patients, the procedures, and the required questions. Of concern was the fact that there was no computer available for use by psych techs during ASU rounds, which required them to document all rounds on paper and then transfer the written documentation into EHRS. The duplicate documentation was time-consuming and increased the risk of documentation errors. The supervisor reported that orders had been placed for carts and computers; however, they had not yet arrived.

Alternative Housing:

CTF's alternative housing LOP was current and compliant with headquarters' directive. Central Facility, O wing cells 230, 231, 232, and 233 within an enclosed space separate from the 17-bed infirmary were the preferred locations to house patients in alternative housing.

The monitor and monitor's expert toured the alternate housing during the site visit. The cells contained a toilet, sink, permanent cement bedframe, and mattress. They also had open bars in the front of the cells, and one cell had a handicap railing inside the cell. Both issues were identified as problematic during the previous audit by the Special Master's suicide prevention expert. The chief of mental health reported that work orders were submitted for these issues and they were denied. She also reported that nursing staff who completed observations of individuals did not sit directly in front of the open-barred alternate housing cells but instead sat in the large hallway beyond the room where the cells were located. It was not clear that this position would allow for unobstructed visual observations of individuals in all four cells.

The current LOP no longer allows nurses to observe two individuals at the same time. All observations of individuals in alternate housing were completed 1:1, as required for individuals on suicide watch status.

During the review period, 70 patients were admitted to alternative housing. Stays averaged nine hours. Two patients were placed in alternative housing for more than 24 hours and were overdue by nine hours and 11 hours, respectively; reasons for these delays were not provided. There were no patients housed in alternative housing during the site visit.

Medication Management:

CTF provided MAPIP results from June 1, 2023 to November 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, CTF was compliant for six months with obtaining medication consents, thyroid function tests, and for monitoring blood pressure for patients prescribed venlafaxine; additionally, the institution was compliant for the two required months for EKG monitoring.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CTF was compliant for six months with obtaining medication consents and for monitoring blood pressure, glucose, height, weight, and thyroid function tests. The institution was also compliant for the one required month of monitoring EKGs. CTF was compliant for five months and was noncompliant for one month with monitoring the AIMS and lipids. CTF reached compliance for four months and was noncompliant for two months with monitoring CBC with platelets and CMP.

CTF reported no patients who were prescribed carbamazepine or clozapine during the review period.

For patients prescribed Depakote, CTF was compliant for five months and was noncompliant for one month with obtaining medication consents. CTF was compliant for four months and was noncompliant for two months with monitoring CMP and therapeutic medication levels. Of the five required months, the institution was compliant for three months and was noncompliant for two months with obtaining CBC with platelets.

For lamotrigine, the institution was compliant in obtaining medication consents for all three required months.

Regarding lithium, the institution was compliant for six months with monitoring therapeutic medication levels, for the five required months with monitoring kidney function tests, and for the four required months in obtaining medication consents. CTF was compliant for four of the five required months for thyroid function testing, and for three of the four required months for EKG monitoring.

For medication management metrics reported by mental health headquarters, CTF was compliant for six months with continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), observation of medication preparation at HS, chronic care medications historical administration, and outpatient provider new medication orders. The institution was compliant for the five required months with continuity of medications for MHCB transfers. CTF was compliant for five months and was noncompliant for one month with continuity of medications with intra-institutional transfer to ASU/SHU/PSU, continuity of medications upon parole/transfer to the community, and observation of medication preparation at A.M. and P.M. The institution was compliant for three months and was noncompliant for three months with continuity of medications upon inter-institutional transfer at R&R, and continuity of medications upon discharge/transfer from a community hospital and/or DSH.

CTF performed monthly drilldown of MAPIP data when MAPIP measures scored below 90 percent. CTF did not create CAPs to address those deficiencies, as the institution determined that small sample sizes and not systemic barriers resulted in the underperforming measures.

CTF reported that 456 patients were prescribed 801 psychiatric medications, including 518 NA/DOT, seven parole medications, and 276 KOP medications. All KOP medications were SSRIs or duloxetine in accordance with policy; however, CTF did not specify the level of care of those patients, as only 3CMS patients were allowed KOP medications per policy. CTF reported that 87 patients received 159 psychiatric medications prescribed at HS. With rare exception, CTF was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

Psychiatrists wrote prescriptions for a maximum of 180 days; the institution did not have a specific policy regarding bridge prescriptions, but the orders were provided from 14 to 30 days. For verbal and telephone orders, nursing staff were required to "read back" the order to the psychiatrist. The psychiatrist had 48 hours, or the next business day, to sign the order. As a backup system when psychiatrists were out, the chief psychiatrist was also copied on the refill requests. The institution did not specify the process for tracking whether verbal or telephone orders were signed.

The institution reported 125 medication line audits during the reporting period. Audits reported that all patients received their medications in less than 30 minutes and that the total duration of the medication lines was under two hours. Protection from the elements was lacking on North A and North B yards; however, an awning had been purchased and was awaiting installation. The West Central yard had medication lines that were located indoors. The nursing staff dispensed medications at the cell front in the RHU.

Medication administration did not impact mental health programming.

CTF reported a nonformulary rate of approximately 6.5 percent for the period of July 2023 to December 2023; they did not report an average rate for the reporting period of June 2023 to November 2023.

CTF conduced polypharmacy reviews in their Population Management meetings. Psychiatry leadership reviewed the cases, and cases were sent to the treating psychiatrist when indicated.

CTF reported one patient endorsed and housed at the institution who received involuntary PC 2602 medications. The psychiatrist did not renew the PC 2602 petition, as the patient reportedly no longer met the involuntary medication criteria. CTF did not file any initial or renewal PC 2602 petitions.

CTF was compliant for the one required month with the related metrics of the presence of a current PC 2602 court order for involuntary medications present in the EHRS and with the presence of a current physician's order in the EHRS for a medication to be administered per PC 2602 court order. CTF did not have an MCA but instead used a neighboring institution's MCA when required. CTF denied any barriers in the PC 2602 process. No patients required the use of force to administer PC 2602 medications.

Transfers:

CTF's inpatient coordinator was a senior psychologist specialist who had been in that position for three years. The backup coordinator was a senior psychologist supervisor.

There were five patients listed on the non-referral log; however, the inpatient coordinator reported that the patients were listed in error and that no patients were considered but not referred to inpatient care during the review period. It was reported that when these errors were discovered, there was no way to adjust the data. It was also reported that CTF provided training

and consultation to appropriate staff and the program supervisor. A review of those healthcare records reflected that patients' level of care was appropriately increased to 3CMS and EOP when indicated, and no patient needed an inpatient level of care at that time.

During the review period, there were no acute care or intermediate care referrals.

CTF referred 53 patients to MHCBs; 48 or 91 percent transferred within 24 hours of alternative housing placement. Reasons for the delays included a lack of bus seats, and one patient required ambulance transport for medical accommodations.

No patients transferred to a PSU, ASU EOP hub, or LTRH during the review period.

There were 54 transfers to STRH; 98 percent transferred timely. The one late transfer was overdue by two days, but reasons for the delay were not provided.

CTF transferred 11 patients to EOP programs; ten or 91 percent transferred timely. The one delay was due to a bus issue.

No patients' level of care changed from EOP to 3CMS during the review period.

CTF made no MSF placements during the review period.

Programming:

Crisis Intervention Team:

Similar to the Twenty-Ninth Monitoring Report, CTF reported that there was not sufficient volume for a CIT. Mental health leadership described a reasonable approach to crisis management. Specifically, when a crisis arose during business hours, attempts were made for the patient to meet with their assigned primary clinician. When the primary clinician was unavailable, the patient was seen by the mental health clinician assigned to cover crisis-related referrals, which varied by day. After-hours coverage was provided by a designated headquarters

telepsychiatrist two nights a week who simultaneously covered multiple institutions; CTF psychiatrists provided coverage on the remaining evenings.

3CMS:

Four psychologists, six social workers, and three psychiatrists provided treatment to the 3CMS program. Three primary clinicians' caseloads exceeded ratio requirements, with 1:114, 1:110, and 1:99. The remaining primary clinicians and psychiatrists carried caseloads within the established ratios.

Observed treatment and IDTT space in North and Central Facilities was confidential. However, there were a few instances of female clinicians leaving office doors open during primary clinician contacts on North Facility due to safety concerns.

Psychiatrists were individually assigned one day of the week to conduct IDTTs and, therefore, were not routinely in attendance for their assigned patients' IDTTs. Notably, this was the case for the three IDTTs observed during the site visit. The chief of mental health reported that a plan to improve continuity of care would be developed once a newly hired psychiatrist completed the onboarding process. Relatedly, primary clinicians expressed concern about a high level of disengagement of psychiatrists during IDTTs, including working on crossword puzzles or disruptive behavior, such as talking on the phone.

The monitor's expert observed one Central Facility and two North Facility IDTTs; all three were inadequate and did not meet Program Guide requirements. Required staff and patients attended all three. While all attendees participated in the IDTT at Central Facility, the process was not collaborative. At North Facility, the process was somewhat collaborative, though the primary clinician spoke for most of the meeting. Additionally, as noted above, none of the psychiatrists were the assigned providers for the patients but referenced clinical

documentation.  Also, at North Facility, the correctional counselor was not the assigned counselor for the patients.

The Central Facility staff were attentive and empathic to the patient's various stressors, though pertinent clinical information such as relevant historical information, case conceptualization, diagnosis, functional impairments, and rationale for level of care were not discussed.  On a positive note, psychiatric medications were consistently identified.  Also, the patient's goal to discharge from 3CMS was discussed, but discharge planning or treatment goals that targeted symptoms, functional impairments, and relevant interventions were not.

At North Facility, the IDTT clearly identified a patient's treatment goals and interventions during one of the meetings but not the other.  While case formulations were not discussed, release planning was appropriately covered in both meetings at North Facility.  Diagnoses, symptoms, and medications were clearly identified during the meetings.

One psychologist-facilitated group was held at CTF.  The "writing" group contained 12 attendees, eight of whom were 3CMS patients.  All members of the group were individuals who had been convicted of sexual crimes and had completed a peer-facilitated group related to sexual offending.  This was the only criterion for attending the group.  The group was mostly peer-facilitated, with individuals reading what they had written for homework and receiving feedback from the other members of the group.  The group was scheduled to run for 12 weeks and was in its seventh session at the time of the site visit.  The psychologist reported that several individuals were interested in joining the group, but it was not yet known how future groups would be offered.

A second sex offender group was also scheduled to start.  The chief of mental health reported that the topic was not a priority treatment need for the MHSDS population at CTF.

However, the chief approved the group in consideration of clinician specialty in the face of the staffing shortage and retention needs.

Healthcare record reviews indicated that group refusals were rare. Line staff reported that custody staff was instrumental in ensuring patient attendance or in-person refusals. This was a testament to the positive culture and working relationship between custody and mental health.

During the site visit, the monitor was alerted to and verified a safety issue for mental health staff in Central Facility. When a code was initiated, the door to the mental health office area locks from the outside, including when staff are meeting with patients. This prohibits staff and patients from leaving the area. The chief of mental health was aware of this issue, and a joint effort by custody and mental health was made to address it, although it remained unresolved.

NLTG groups were not offered at the CTF.

Twelve patients were interviewed in groups regarding mental health services in Central Facility. Patients reported seeing their assigned primary clinicians every 90 days in confidential settings. Some patients indicated that it seemed longer than 90 days at times, and others reported that they saw their primary clinician more frequently when they were working on significant issues. Two patients revealed that they were seeing their primary clinicians every few weeks. A few patients indicated having to see covering clinicians during periods of absence of their assigned clinicians, but rarely.

Patients reported that psychiatric sessions were held with patients on medications at least every 90 days, and patients not prescribed medications revealed seeing their psychiatrist annually prior to their IDTT meetings. IDTT meetings and individual contacts were held in confidential settings. Some patients indicated that their assigned psychiatrists did not attend their IDTT

meetings.  Many patients noted that their assigned correctional counselors were not the individuals present during their IDTT meetings, which was frustrating as they thought it was important for their assigned counselor to understand their mental health needs.

Some patients revealed being aware of their treatment plans and treatment goals, while others reported not knowing their goals.  Patients reported that sessions with their assigned primary clinicians varied in terms of addressing their mental health needs versus covering other topics, but most patients indicated that they eventually covered relevant mental health topics during treatment sessions.  All patients noted that they were aware of how to contact mental health staff between sessions and reported no barrier to accessing mental health staff when needed.

Patients reported that, while they used to have access to mental health groups weekly, no groups had been available for over four years.  Patients believed that groups were not available due to staffing shortages.  A recently transferred patient reported that he was oriented to available mental health services upon arrival.

A group interview with 15 patients on North Facility indicated variability in the benefit of primary clinician and psychiatric contacts.  They described some provider contacts as very useful and helpful, while other provider interactions were experienced as primarily focused on an assessment of self-harm or psychiatric medication.  Most patients were unaware of treatment goals and did not find their IDTTs useful.  Some noted their perception of IDTTs as a forum to discuss the continued need for treatment, including psychiatric medication.  Many patients asked for contacts to occur more frequently than 90 days, mental health treatment groups, and treatment for post-traumatic stress disorder.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their 3CMS stays.

Two patients required initial psychiatry evaluations; both were timely before the initial IDTT and conducted in confidential settings.  Telepsychiatry was not used for either evaluation.

For routine psychiatric contacts, 91 percent occurred timely within 90 days and complied with Program Guide requirements.  All routine contacts occurred in confidential settings.  Telepsychiatry was not used for routine psychiatry contacts.

Two of four initial primary clinician evaluations occurred timely within ten working days of arrival or a level of care change.  All were conducted in confidential settings.  No evaluations were conducted via telehealth.

For routine primary clinician contacts, 81 percent timely occurred at least every 90 days, and 95 percent were conducted in confidential settings.  The reasons for non-confidential contacts were not provided.  No routine primary clinician contacts were conducted via telehealth.

Three of four initial IDTTs occurred timely within 14 working days of patient arrival or a level of care change.  Required staff attended three, and patients attended all initial IDTTs.

Three of six patients who required annual IDTTs received them timely; required staff attended all six, and patients attended five of six or 83 percent.  The annual IDTT was held *in absentia* due to the patient being over an hour late for their scheduled appointment.

Other Issues:

Pre-Release Planning:

CTF had one pre-release coordinator.  Due to mental health staffing shortages, for the first three months of the reporting period, the pre-release coordinator was assigned a 90-patient 3CMS caseload.  During that time, pre-release planning functions were reduced to crisis

assessment and signing and transmitting release of information forms only for incarcerated persons releasing to probation.

The institution provided Cal ID data for three of six months during the review period. Of 38 incarcerated persons, 24 or 63 percent had a Cal ID held in trust at release, and one had a Cal ID application pending at release. The remaining 13 were not eligible, refused, or had no application on file.

CTF did not offer pre-release groups during the review period.

The TCMP reported that one EOP and 101 3CMS patients were released from CTF during the review period; the TCMP screened each patient, but only 91 benefit applications were submitted. During the review period, there were 86 applicants for Medi-Cal, four for SSI, and one for Veterans' benefits. Nine patients had access to other insurance. The remaining five patients refused services.

Program Access:

a.     Job and Program Assignments

CTF reported that its 2,002 job assignments were held by one EOP patient or 100 percent of the EOP population, 376 3CMS patients or 42 percent of the 3CMS population, and 1,625 or 49 percent of non-MHSDS incarcerated persons.

The 1,277 academic assignments were held by 234 or 26 percent of 3CMS patients and 1,043 or 31 percent of non-MHSDS incarcerated persons.

The 402 vocational education assignments were held by 81 or nine percent of 3CMS patients and 321 or ten percent of non-MHSDS incarcerated persons.

The 135 voluntary education assignments were held by 42 or five percent of 3CMS patients and 93 or three percent of non-MHSDS incarcerated persons.

The 474 substance abuse treatment assignments were held by 122 or 13 percent of 3CMS patients and 352 or 11 percent of non-MHSDS incarcerated persons.

    b.    <u>Milestone Credits</u>

CTF reported that two EOP patients were eligible for milestone credits; neither patient earned credits.  Additionally, all 894 3CMS patients were eligible for milestone credits and one percent of patients received the credits.  Notably, all 3,316 non-MHSDS incarcerated persons were eligible for credits, and two percent received them.

    c.    <u>Out-of-Level Housing</u>

On December 7, 2023, CTF reported that 106 3CMS custody Level II patients were in Level I housing, and 18 3CMS custody Level II patients were in Level III housing.

    d.    <u>ADA Reasonable Accommodation and Grievance Procedure</u>

CTF provided attendance sheets for training on accommodations and grievance procedures and a copy of the training manual for ADA accommodations.

<u>"C" Status</u>:

During the review period, three 3CMS patients were designated "C" status.  At the time of the site visit, two 3CMS patients were on "C" Status after receiving two serious RVRs within a 180-day period.

<u>Case-by-Case Reviews</u>:

CTF reported that, during the review period, no patients met the criteria for 150-day case-by-case reviews or 120-day pre-MERD reviews.

<u>Mental Health Referrals</u>:

During the review period, CTF made 776 mental health referrals, including 86 referrals to psychiatry and 690 to primary clinicians. There were 44 emergent referrals, 608 routine referrals, and 124 urgent referrals.

Psychiatry responded timely to the two emergent referrals and 79 of 83 or 95 percent of routine referrals. Psychiatry did not respond timely to the one urgent referral during the review period. Primary clinicians timely responded to 39 of 42 or 93 percent of emergent, 104 of 123 or 85 percent of urgent, and 480 of 525 or 91 percent of routine referrals.

<u>Custody and Mental Health Partnership Plan</u>:

CTF's custody and mental health partnership plan LOP was up to date and aligned with statewide policy.

Executive leadership joint rounding occurred during each month of the review period, as required. The rounding occurred on Central Facility in June, July, August, September, and October, and North Facility in June, July, September, October, and November. Reviewed rounding forms indicated that required staff attended and that staff and patients were interviewed each month. Neither staff nor patients noted any concerns regarding the mental health program. Patients indicated that they appreciated the services offered by mental health, and staff noted that patients' access to mental health care had been good.

CTF reported that joint rounding was not discussed in executive staff meetings or QMC or MHPS meetings.

Monthly joint supervisory program area tours occurred for all six months of the review period, as required. The tours occurred on North Facility in June, August, September, October, and November, and Central Facility in July, August, September, October, and November.

Required staff attended all tours.  Staff frequently reported that they had no concerns related to the mental health program.  Notably, staff reported that recent ASU arrivals created a lot of after-hours urgent referrals on Central Facility.  Interviewed incarcerated persons generally reported no issues.  However, one patient on North Facility explained that he filed a 7362 form one month prior to the patient interview and that he was never seen by mental health.  No patient interviews occurred on Central Facility during either tour.

CTF provided documentation indicating that the weekly 3CMS supervisory meetings occurred for each week of the reporting period in accordance with policy with required staff in attendance.  Huddle forms from Central and North Facilities addressed patients returning from HLOC, patient concerns, potential or actual barriers to access to care, and other significant issues.  Notably, there were multiple huddle forms from North Facility that only contained staff signatures and no additional information regarding the huddle.

CTF distributed the 3CMS orientation brochure to new patients and provided a copy of the same to the monitor.

Inmate advisory council meeting minutes were produced for Central and North Facilities for five of six months of the review period, thus reflecting noncompliance with the monthly requirement.  The meetings did not occur on Central Facility in July and on North Facility in September due to custody staff cancelling the meetings.  Discussion topics included canteen, the need for additional clothing, the timeliness of patients receiving property or additional person items, and dietary concerns.

No patients filed staff misconduct complaints against mental health staff.  There were 18 misconduct complaints against custody staff due to alleged discrimination and excessive use of force.  Of these 18 complaints, five were pending resolution at the time of the site visit and the

remaining 13 were resolved with no action taken.  There were no investigations for misconduct towards a patient not initiated through the appeal process.  No mental health staff were reassigned due to a staff misconduct complaint.

CTF reported that 129 of 154 or 84 percent of mental health staff and 658 of 693 or 95 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

CTF's heat plan LOP was revised in April 2023 and complied with CDCR policy.  The heat plan was in effect for all six months of the reporting period.  There was one Stage I heat alert in August 2023 and three in October 2023; there were no Stage II or Stage III heat alerts during any reviewed months.  No patients experienced a heat-related illness during the review period.

Interviewed officers from nine housing units and the ASU demonstrated adequate knowledge of the heat plan.  Additionally, all officers had resources that displayed the appropriate temperatures and procedures for each stage of the heat plan.  Observed thermometers were in working order and appropriately located.

The annual mandatory heat-related pathologies training was attended by 587 of 648 or 91 percent of custody staff and 250 of 299 or 84 percent of required mental health staff.

RVRs:

CTF issued 952 RVRs during the review period; 268 or 28 percent were issued to MHSDS patients, including 12 to MHCB patients, two to EOP patients, and 254 to 3CMS patients.

Review of 13 RVRs issued to MHSDS patients revealed that the MHA was confidentially completed in 12 of 13 or 92 percent of cases, timely referred to mental health by custody staff in

three of 13 or 23 percent of cases, and timely completed and returned to custody by mental health staff in 12 of 13 or 92 percent of cases.

One patient was assigned a staff assistant. Patients timely received the required RVR documentation prior to the hearing in 100 percent of reviewed RVRs and patients were present for 12 of 13 or 92 percent of hearings.

The SHO documented consideration of the patients' mental health information in all 13 reviewed RVRs. The SHO mitigated the penalty based on the mental health recommendation in two of three or 67 percent of instances where the assessment recommended mitigation.

None of the reviewed MHAs recommended that the RVR be documented in an alternative manner. However, two RVRs indicated that patients' mental health contributed to the behavior which led to the RVR and the reviewing officers found both patients guilty as charged.

The mental health assessment training was attended by 67 of 84 or 80 percent of required custody staff and seven of 22 or 32 percent of mental health staff.

Use of Force:

CTF reported no controlled and 26 immediate use of force incidents; nine or 35 percent involved MHSDS patients.

No video recordings of incidents were available because CTF did not utilize body cameras, and no controlled uses of force occurred during the review period.

Review of 13 immediate use of force incidents involving MHSDS patients indicated staff's compliance with CDCR policy and appropriate use of force in each case.

CTF reported that all 644 or 100 percent of custody staff and 19 of 22 or 86 percent of mental health staff attended the mandatory use of force training.

Lockdowns/Modified Programs:

There was one modified programming period on Facility C from July 20, 2023 through July 31, 2023 due to a facility-wide search for contraband. This modified program did not result in any significant interruptions in the delivery of mental health services.

Access to Care:

A review of CTF's monthly Health Care Access Quality reports from July 2023 through November 2023 reflected the issuance of 56,662 mental health ducats and add-on appointments, of which 51,666 or 91 percent were completed, and 4,996 or nine percent were not completed. Of the non-completed appointments, 12 or one percent were due to custody factors, 90 percent were due to non-custody factors, and nine percent were due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CTF's MSF remained closed.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 11**
**FOLSOM STATE PRISON (FOLSOM)**
Site Visit: January 23, 2024 – January 25, 2024
Review Period: June 1, 2023 – November 30, 2023

<u>Census</u>:

On January 19, 2024, Folsom housed 2,791 incarcerated individuals.  The 395 MHSDS patients represented 14 percent of the institution's population, which was a 40 percent decrease from the previous monitoring round.

There were 395 3CMS patients, including 51 3CMS patients housed in the MSF, and one 3CMS patient in the RHU awaiting transfer.

<u>Staffing</u>:

As of December 21, 2023, the chief psychiatrist position was filled.  There were 1.5 allocated on-site psychiatry positions, though Folsom employed 3.5 on-site psychiatrists.  One psychiatrist was on long-term leave.  There were no allocated senior psychiatrist or telepsychiatry positions during the review period or at the time of the site visit.

The chief psychologist, senior psychologist, senior psychologist supervisor, and all five staff psychologist positions were filled.

The one supervising social worker position was vacant.  Four of 4.5 social worker positions were filled for an 11 percent vacancy rate.

One recreation therapist filled the 0.5 allocated position.

All 14 supervising RN positions were filled.  No MHSDS registered nurse or psychiatric nurse practitioner positions were allocated.

The one CNA position was vacant, though two registry CNAs eliminated the functional vacancy rate.  Twenty of 21 LVN positions were filled for a five percent vacancy rate; the use of two contracted LVNs eliminated the vacancy.

The one senior psych tech position was vacant. Three of 3.5 psych tech positions were filled for a 14 percent vacancy rate.

All three MHSDS clerical positions, the OSS II position, and the HPS I and HPS II positions were filled. No OSS I positions were allocated.

No clinical staff were unlicensed.

For custody staff, 518 of 565.8 positions were filled for an eight percent vacancy rate. The warden position was vacant; the chief deputy warden position was filled; and all four associate wardens, 23 of 25.6 lieutenants, 57 of 60.2 sergeants, four of five captains, 18 of 20 CC Is, all 10 CC IIs, and 401 of 439 correctional officer positions were filled.

Telepsychiatry:

No telepsychiatrists were allocated to Folsom, though the statewide telepsychiatry pool provided on-call and crisis coverage after hours from 6:00 P.M. to 7:00 A.M. daily.

Telework:

The chief psychiatrist teleworked one day per week, three MHSDS clerical workers and the HPS I teleworked two days per week, and the HPS II teleworked three days per week.

Staff Recruitment:

Folsom advertised jobs on the CAL HR website, though applicants for open positions had decreased over the last several years.

Quality Management:

Folsom had no CTC and, thus, did not have a Local Governing Body.

The QMC met monthly during the reporting period; a quorum was achieved at each meeting. The CEO served as the chairperson of the QMC. Mental health representation included the voting members of chief of mental health, chief psychiatrist, and a senior

psychologist specialist.  Each QMC meeting had at least two representative voting members from mental health.  Custody representation was appropriate, including the warden and the associate warden for healthcare.

A review of meeting minutes revealed QMC agenda items included a review of the previous meeting minutes, improvement projects, ISUDT, and subcommittee reports, including MHPS, SPRFIT, EMRRC, Patient Safety, Nursing Program, Medication Management, Dental Program, Institutional Utilization Management, and CMHPP audits.   The QMC minutes were comprehensive and encouraged submissions from staff for quality improvement ideas; however, the mechanism for dissemination of QMC information to staff was not specified.

The MHPS met monthly during the review period; a quorum was achieved at each meeting.  The chief of mental health chaired the MHPS.  Custody representation included the associate warden for healthcare.  The MHPS reported to the QMC.

MHPS discussion topics included a review of prior meeting minutes, action items, peer and supervisory reviews, improvement priorities, LOPs, staffing, training, program functioning, review of caseloads, CMHPP, custody updates, and SPRFIT.  The minutes revealed detailed exploration and plans to address underperforming metrics; these topics were revisited at subsequent MHPS meetings and frequently had interval improvement.  Particular attention was given to the completion of SRASHEs with rationales when they were rarely not at goal.  While the minutes were comprehensive in both scope and detail, they did not explain how the information was disseminated to staff.

The EMRRC met monthly during the review period.  The chief physician and surgeon chaired the EMRRC.  The EMRRC reported to the QMC.  Mental Health representation included the chief of mental health and the chief psychiatrist.  Topics followed the statewide template and

included approval of prior meeting minutes and review of transports, overdoses, suicide attempts, emergency medical devices, and drills. Meeting minutes were adequate and conveyed useful information; however, they did not specify how the information was conveyed to staff.

Folsom provided proof of practice for both "tabletop" and live fire, disaster, and evacuation drills.

The were no QITs, FITs, or studies during the monitoring period.

Suicide Prevention:

The monitor's expert observed the R&R screening of the one incarcerated person who arrived from another CDCR institution. The evaluation space was dedicated and confidential. Nursing asked all required mental health screening questions, with emphasis on safety and suicidality. The nurse knew the process of submitting urgent and emergent referrals to mental health and reviewed how to access services via the medical request form (7362) process. Folsom's LOP 92A "Suicide Prevention Program Coordinator" enumerated the responsibilities of the SPRFIT coordinator and aligned with statewide policies. A senior psychologist specialist served as the SPRFIT coordinator (as well as the inpatient coordinator).

Folsom held monthly SPRFIT meetings throughout the review period. Topics discussed included approval of minutes, discussion of workgroups, review of mental health, nursing, and custody metrics relevant to suicide prevention, review of self-harm and suicide attempts, review of patients raised to the EOP level of care, completion of ASU screens and R&R screens, SRASHE audits, timely admissions to MHCB, and review of updates to germane LOPs. Minutes reported an improvement in compliance with ASU pre-screens due to close collaboration between custody and medical staff.

For the monitoring period, Folsom completed 252 of 273, or 92 percent, of ASU pre-screens in a timely manner.

In contrast to other months, the October 2023 minutes revealed low compliance with timely completion of Suicide Watch documentation. This was attributed to "some confusion on staff redirection," most notably around hand-off between the TTA RN and the unit LVN. Interventions included staff education, which were reportedly effective. One additional issue reported was that custody 1:1 observation for suicide watch was not documented in EHRS; nursing leadership raised this issue to mental health headquarters as a systemic issue.

Folsom achieved high compliance for custody inpatient housing discharge follow-ups in all months of the review period except during August 2023. During that month, Folsom reached 88 percent compliance due to cases in which they did not complete the 30-minute check. Particular challenges were noted with the 11:30 P.M. and midnight checks due to a misplaced log. Subsequent minutes noted interval improvement.

Similar to all QM minutes discussed above, the SPRFIT minutes contained limited information on how the information was disseminated to staff.

Folsom's LOP 92J "Suicide Prevention-Suicide Risk Management Program (SRMP)" was dated July 2022 and, thus, was overdue for annual review and revision. The LOP appropriately covered the criteria for both enrollment and removal from SRMP. Two patients were enrolled in the SRMP at the time of the site visit.

No patients were on suicide watch during the monitoring tour.

Folsom's LOP 92B, "Suicide Prevention: Suicide Watch," dated January 2023, stated that patients determined to be at risk for suicide shall be placed on suicide precaution *or* suicide watch pending transfer to MHCB. This was a serious LOP deviation from policy, which states

356

that only 1:1 Suicide Watch was permitted for patients awaiting MHCB placement; suicide precautions were only permitted within the MHCB. The monitor's expert independently interviewed mental health, nursing, and custody staff, as well as onsite leadership; all confirmed that only 1:1 Suicide Watch was employed for patients awaiting evaluation or MHCB placement. The SPRFIT coordinator and the CMH began modifications of this LOP prior to the end of the site visit.

Folsom's LOP 92I, "Notification of Inmate Bad News," was current and aligned with policy. This LOP contained detailed processes for the screening of patients who have received bad news, including from court proceedings or the Board of Parole Hearings. The LOP clearly spelled out the roles of various staff members including custody, nursing, and mental health clinicians.

Folsom's LOP 92H "Suicide Prevention-Suicide Risk and Self-Harm Assessment" was current and covered risk factors for suicide, SRASHE mentoring, and completion. All 19 mental health clinicians received SRASHE training. Folsom reported that 51 of 54, or 94 percent, of SRASHEs for urgent/emergent referrals for suicidal ideation or self-harm were responded to timely.

There were 14 five-day follow-ups during the monitoring period. The documentation provided did not specify the degree of completion; however, the monitor's review of five randomly selected cases demonstrated 100 percent compliance.

Six suicide attempts were reported, all with intent to die, with two resultant deaths. Two of these six attempts were by MHSDS patients, including one 3CMS patient's death by hanging on August 23, 2023. The resultant investigation did not reveal any mental health or custody concerns. One nursing deficiency was noted, requiring staff education.

Folsom did not perform any root cause analyses for serious suicide attempts; however, clinical reviews were completed.

The remaining four attempts, one of which resulted in death on October 22, 2023 by jumping from a high tier, were of non-MHSDS incarcerated persons. The resultant QIP did not identify any mental health or nursing concerns; however, the report noted there have been four suicides by jumping in the same housing unit since 2000 and requested the institution draft a plan to address this risk.

Given these concerns, the monitor's expert toured all housing units. Folsom had three housing units with five tiers, of which only one had extensive protective railings to reduce the chance of jumping. On-site and regional leadership stated they were unclear on why this building had protection while the others did not. The remaining two housing units had flexible wires that were easily moved and would allow access to jumping from the tier. The plan to have improvements made, including larger bar rails put into place, had been submitted; however, Folsom reported that this would likely be in the 2027-2028 capital outlay. The monitor's expert expressed concerns about the delay in correcting this danger and urged the institution to explore more expedient options, even if these were a temporary measure until more permanent physical plant changes could be made.

Mental health leadership reported concerns that four of the six suicide attempts, or 67 percent, were non-MHSDS incarcerated persons. Folsom noted peers pressured groups of incarcerated persons to not participate in the MHSDS. In an innovative approach to address this issue, the institution continued to provide a "GP Resource and Guidance Center," staffed with a social worker. Participation in the MHSDS was not required to access services; referrals to mental health were made when indicated. Additional interventions included active involvement

with the IAC and the creation of suicide prevention training to be available for all incarcerated persons.

The monitor's expert met with the IAC to discuss mental health, custody, and suicide prevention, among other topics. Representatives underscored the institution's emphasis on the importance of suicide prevention and reported a proactive mental health department and a good working relationship between mental health and custody. Members repeatedly stated that they felt comfortable approaching mental health and custody for any mental health concerns. The IAC drew particular attention to the suicide prevention efforts, including trainings and films slated to be provided to all incarcerated persons in the near future. The IAC also expressed appreciation for mental health's response after the deaths by suicide, including offering support and services to affected incarcerated individuals.

The suicide cut-down kits and inventory sheet were reviewed on Units 2 and 3 and the RHU; all contained the required items and up-to-date inventory sheets.

The monitor reviewed records of 15 patients who returned to GP or ASU/RHU; all received the required 30-minute checks, including Guard One documentation and supervisory review and signature as required. Mental health staff completed the daily CDCR Form 7497 review and removed patients from the 30-minute checks after at least 24 hours after arrival in the housing unit.

Folsom reported that 530 of 537 or 99 percent of custody staff, 83 of 86 or 97 percent of nursing staff, and 18 of 19 or 95 percent of mental health staff completed annual suicide prevention training. For CPR training, 499 of 509 or 98 percent of custody staff and all 86 nursing staff attended. Nineteen mental health clinicians completed the SRASHE training at the time of the site visit.

Alternative Housing:

In RHU, cells A4-B1-001 through A4 B1-008 were identified as "Intake" cells; all were retrofitted and unoccupied at the time of the site visit. The intake cells did not have electricity. Radios were issued to all new arrivals.

Folsom's alternative housing LOP was up to date and complied with statewide policy.

During the reporting period, there were 25 alternative housing placements; 22 or 88 percent resulted in transfers to MHCBs, two referrals were rescinded, and one patient was admitted directly from an outside hospital to an MHCB. For the two rescinded referrals, both patients had SRASHEs completed and were placed on five-day follow-ups. No patients were housed in alternative housing longer than 24 hours.

Various mental health staff provided coverage to patients in alternative housing, including three psychiatrists, a senior psychologist specialist, a senior psychologist supervisor, five staff psychologists, and four social workers.

Medication Management:

Folsom provided MAPIP results from June 1, 2023 to November 30, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, Folsom demonstrated compliance for six months with obtaining medication consents, monitoring thyroid function tests, and for monitoring blood pressure for patients prescribed venlafaxine. No EKGs were required.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that Folsom was compliant for six months with blood pressure, height, weight, thyroid function tests, and medication consents; additionally, Folsom was compliant for the one required month of EKG monitoring. Folsom was compliant for five months and was noncompliant for one month with

performing the AIMS examination.  The institution was compliant for three months and was noncompliant for three months with monitoring lipid panels.  Folsom was compliant for two months and was noncompliant for four months with monitoring glucose and CBC with platelets.  The institution was compliant for one month and was noncompliant for five months with monitoring CMP.

Folsom did not have any patients prescribed carbamazepine or clozapine during the monitoring period.  Folsom was not a clozapine initiation or maintenance institution.  No patients on clozapine were transferred in error to Folsom.  Additionally, no patients were prescribed clozapine at the time of the site visit.

For patients prescribed Depakote, Folsom was compliant with all required months of monitoring CBC with platelets (five months), therapeutic medication levels (four months), CMP, and obtaining medication consents (three months).

For lamotrigine, Folsom was compliant in obtaining medication consents for all three required months.

Regarding lithium, the institution was compliant for the one required month with obtaining EKGs and medication consents.  Folsom was compliant for two of the three required months of monitoring kidney function tests, and for one of the two required months of therapeutic medication levels and thyroid function tests.

The chief psychiatrist performed a detailed analysis of underperforming metrics.  Folsom reported improvement since the time of the preceding monitoring round when 73 healthcare records had deficiencies; 20 deficiencies were noted during the current monitoring period.  While no formal CAPs were created, Folsom reviewed healthcare records that were noncompliant.

Most deficient metrics were explained by patient refusal or tests performed after the due date, and fewer deficiencies resulted from psychiatrists not ordering the laboratory tests.

For medication management metrics reported by mental health headquarters, Folsom was compliant for six months with the following measures: continuity of medications with MHCB transfers, continuity of medications upon parole/transfer to the community, observation of medication preparation A.M. and P.M., observation of medication preparation at HS, chronic care medications historical administration, and outpatient provider new medication orders.

The institution was compliant for four months and was noncompliant for two months with continuity of medications with intra-institutional transfer to ASU/SHU/PSU and continuity of medications upon discharge/transfer from a community hospital and/or DSH. Folsom was compliant for two months and was noncompliant for four months with continuity of medications upon inter-institutional transfer at R&R.  Folsom was compliant for one month and was noncompliant for five months with continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU).

Folsom reported 256 patients who were prescribed psychiatric medications.  The number of prescribed medications was not provided.  At the time of the site visit, 226 patients received psychiatric medications by DOT.  An additional 30 patients were prescribed KOP medications; all received mental health services at the 3CMS level of care, and all were prescribed SSRIs or duloxetine in accordance with policy.

Folsom reported that prescriptions were provided for a maximum of 180 days.  The maximum length of bridge orders was not specified.  For verbal and telephone orders, the nursing staff was required to "read back" the order to the prescriber.  The psychiatrist reviewed

and signed the order within 48 hours. The institution did not specify the process for tracking whether verbal or telephone orders were signed.

The institution conducted 60 medication line audits during the reporting period. Audits showed that Folsom conformed to both policies of individual patient wait time of less than 30 minutes and total duration of medication line under two hours. Medication lines did not interfere with mental health programming.

During inclement weather, Folsom reported that medication lines were moved to inside the clinics. The observed medication lines provided protection from the elements during medication administration, but no protection was provided for patients waiting in the medication line. Medications in RHU were dispensed at cell front.

Folsom reported an average nonformulary rate of approximately 1.5 percent during the monitoring period.

Folsom completed 47 of 49, or 96 percent of polypharmacy evaluations timely.

Folsom reported that 57 patients received psychiatric medications prescribed at HS. The number of HS medication prescriptions was not provided. Folsom was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

Folsom did not file any PC 2602 petitions or have any patients receiving involuntary PC 2602 medications during the monitoring period or at the time of the site visit. Folsom did have a process in place involving the use of the MCA at CSP/Sac should a patient require a PC 2602 order.

Transfers:

Folsom's inpatient coordinator had served in that position for over a year and previously held the same position at CSP/Sac. The inpatient coordinator also served as the institution's

SPRFIT, training, quality management, and DDP program coordinator.  The chief of mental health served as the backup.

During the review period, nine instances of eight patients considered for but not referred to inpatient care occurred.  There were no inpatient care referrals during the review period, and at the time of the site visit, no patients were pending transfer to inpatient care.

Folsom made 25 MHCB referrals during the review period, resulting in 22 MHCB transfers.  All transfers occurred timely within 24 hours of alternative housing placement.

No patients were transferred to a PSU, EOP hub, or LTRH during the review period.

Eighteen patients transferred to an STRH during the review period; 16 or 89 percent transferred timely.  The two remaining patients were transferred four and five days late due to the lack of available bed space at CSP/Sac and CSP/Corcoran.

Thirteen patients were transferred to EOP programs; 11 or 85 percent transferred timely. Folsom did not provide reasons for these delays.

Programming:

Administrative Segregation/Restricted Housing Unit:

During the monitoring period, Folsom operated a GP ASU, which transitioned to a GP RHU as of November 1, 2023.  RHU staff reported a collaborative working relationship between mental health and custody, felt supported by local leadership, and stated that the treatment space available was adequate.  Treatment space consisted of two offices, each with TTMs.  Both appeared appropriate for the purpose and allowed for confidentiality.

Staff reported that the facility's age presented challenges; however, they employed creative solutions to address these issues.  Because there was no group space in the RHU, the RT provided both in-cell and out-of-cell activities.  While the cells lacked electrical outlets, the

patients had crank radios, and television sets were staggered along the tiers.  Access to tablets was limited due to vendor issues.

The RHU had designated retrofitted intake cells (B1-101 through 108).

The monitor's expert toured the RHU.  In response to the Twenty-eighth and Twenty-ninth Round Monitoring Reports, Folsom no longer housed *Coleman* class members in the isolated cells with antechambers.  Custody staff reported that the cells were rarely used for any incarcerated person and reported a plan to remove the wall to the antechamber, pending architectural and engineering review.

The monitor's expert was unable to observe the IDTT for the one patient in RHU, as it did not occur at the scheduled time that was provided by Folsom.  IDTT space was confidential.

Folsom's LOP 101C, "Correctional Clinical Case Management System- Administrative Segregation," was up-to-date and comprehensive.  One primary clinician was assigned to administrative segregation/RHU and maintained a caseload within the established ratio.  One psychiatrist treated patients in administrative segregation/RHU and mainline 3CMS patients during the review period.

Eighty-nine MHSDS patients, including nine EOP and 80 3CMS, were housed in administrative segregation/RHU during the review period.  The average length of stay for those patients was 20 days with a range of two to 47 days; non-MHSDS incarcerated persons had an average length of stay of 64 days.

A review of the one 3CMS patient's 114-A for a one-week period reflected full compliance with offerings of 57 hours of out-of-cell time, three showers, one phone call, and one linen exchange.

Folsom's LOP #11 regarding unclothed body searches did not comply with statewide policy. The LOP did not address escorts/appointments within the unit, if the incarcerated person was under constant custody supervision, or an alternate location to conduct the unclothed body search.

Patients transferring to Folsom's administrative segregation/RHU from other institutions were not transported with the state-issued tablet. Folsom staff reported that tablets were issued to patients within a couple of weeks of arrival based on the vendor's ability to provide one.

The monitor observed seven RHU ICCs, including one for a 3CMS patient. All were attended by required staff consisting of the chief deputy warden, psychologist, CC I, CC II, and five custody staff including one sergeant serving as the staff assistant. The attending staff demonstrated a collaborative relationship and extensive knowledge of each incarcerated individual and the psychologist participated adequately. Patient history, pending RVRs and transfers, and less restrictive housing options were thoroughly discussed with each patient. The chief deputy warden also confirmed whether each individual had any questions and if they understood the outcome of their ICC.

Non-Disciplinary Segregation:

Folsom reported that they did not track NDS patients and was unable to provide data regarding NDS patients during the review period.

Crisis Intervention Team:

Folsom did not have a CIT. During regular business hours, the patient's assigned clinician responded to crisis calls. For evenings, weekends, and holidays, on-call coverage was assigned on a voluntary basis for psychologists, LCSWs, and psychiatrists. Due to the small number of psychiatry staff, Folsom integrated CSP/Sac psychiatry staff into the on-call rotation

as well.  Headquarters telepsychiatry was used for on-call coverage from 6:00 P.M. to 7:00 A.M. daily.  During after-hours crisis calls, the on-call primary clinician was notified first and would contact the on-call psychiatrist when medication issues arose.

3CMS:

Three psychiatrists treated mainline 3CMS patients during the review period; all maintained caseloads within established ratios.  Two of the three psychiatrists also treated MSF and administrative segregation/RHU patients.  The senior psychologist supervisor, three staff psychologists, and two LCSWs treated mainline 3CMS patients and maintained caseloads within the established ratios.  In addition to leading the general population guidance and resource center, one additional LCSW treated mainline 3CMS patients when available but did not carry a caseload.  Another LCSW acted as the pre-release coordinator and carried a caseload of seven Spanish-speaking mainline 3CMS patients.

The monitor's expert observed two initial and six annual mainline 3CMS IDTTs.  Four primary clinicians, the chief psychiatrist, who provided coverage for staff psychiatrists on leave, a recreation therapist, and a CC I all attended all IDTTs.  The observed IDTTs were adequate and aligned with Program Guide requirements.  Treatment plans, goals, and interventions were individualized and specific to each patient, and each patient was referred to appropriate groups based on their clinical needs and goals.

The treatment team demonstrated a highly collaborative approach when meeting with each patient.  All four primary clinicians remained in the room for each IDTT, knew their patients well, and provided appropriate updates to clinical statuses and treatment plans.  The patients were highly engaged in treatment, participated in multiple groups, and reported overall

satisfaction with their programs and treatment.  Folsom distributed 3CMS orientation brochures to patients during initial IDTTs.

During the review period and site visit, Folsom offered a variety of primary clinician-led clinical-based therapy groups to mainline 3CMS patients.   Offered group topics included anger management, mindfulness, mood management, meditation, veteran's support, existential (process group), grief and loss, parenting, coping with family estrangement, lifer's group, cognitive behavioral therapy, positive psychology, personal insight exploration, stress management through leisure, and general recreation.  The recreation therapist also provided recreation therapy groups during the review period.  Each group had a very long waitlist, with some extending several months due to high demand.

The monitor's expert observed two clinician-led groups during the site visit.  Both were well-facilitated, and the patients appeared to benefit from the experiences.  A staff psychologist ran an anger management group with five patients in attendance.  All patients engaged appropriately in clinical-based discussions and demonstrated a good rapport with the psychologist.  An LCSW facilitated a parenting group and demonstrated a compassionate and empathetic approach towards the patients.  The facilitator provided weekly reading materials and homework to the group participants.

Notably, a licensed clinical social worker operated a General Resource Center (GRC) which provided services to non-MHSDS incarcerated individuals who would benefit from mental health support and services without officially engaging with mental health services.  The GRC provided workshops, classes, and seminars focused on various topics, including grief and loss, coping skills, and healthy living.

The monitor randomly selected and reviewed the healthcare records of 20 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

Nine patients required initial psychiatry evaluations; four or 44 percent timely occurred before the initial IDTT and eight or 89 percent were conducted in a confidential setting. Telepsychiatry was not utilized for initial psychiatry evaluations.

Nine patients required routine psychiatry contacts. All occurred at least every 90 days, and all were conducted in confidential settings. Telepsychiatry was not used for routine psychiatry contacts.

Nine patients required initial primary clinician evaluations; eight or 89 percent were completed within ten working days of arrival or a change in level of care; all nine were conducted confidentially. No initial primary clinician evaluations were conducted utilizing telehealth.

Twenty patients required routine primary clinician contacts; 97 percent timely occurred at least every 90 days. All routine primary clinician contacts were conducted in confidential settings. No routine primary clinician contacts were conducted utilizing telehealth.

Nine 3CMS patients required initial IDTTs; seven or 78 percent occurred within 14 working days of arrival or level of care change. All required staff and patients attended.

All four patients who required annual IDTTs received them timely; the required staff attended all four, and patients attended two. Reasons annual IDTTs were held *in absentia* included custody issues on blocks and patient refusal. Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

Folsom's pre-release coordinator was a licensed clinical social worker who also maintained a caseload of less than ten Spanish-speaking 3CMS patients. The pre-release coordinator completed PRPAs in consultation with the appropriate clinicians; additional duties included tracking all patients within 365 days of release, conducting confidential mental health pre-release interviews, preparation and dissemination of ROIs to the appropriate parties, EHRS documentation, and facilitation of pre-release groups.

There were 436 pre-release contacts for 110 patients during the review period. Of those 110 patients, 109 received PRPAs. Folsom offered pre-release groups weekly. Of the 78 MHSDS patients who were screened for benefits applications, 71 or 91 percent submitted applications, including 70 Medi-Cal applications, six SSI applications, and two VA applications; data regarding Cal-IDs was not provided. At the time of the site visit, 51 patients were within 120 days of release.

Program Access:

a.    Job and Program Assignments

Folsom reported that, on December 7, 2023, 1,154 job assignments were held by 171 3CMS patients or 38 percent of the 3CMS population, and 983 or 41 percent of non-MHSDS incarcerated persons.

The 686 academic assignments were held by 103 or 23 percent of 3CMS patients and 583 or 24 percent of non-MHSDS incarcerated persons.

Of the 184 vocational education assignments, 17 or four percent of 3CMS patients held them, as did 167 or seven percent of non-MHSDS incarcerated persons.

The 578 voluntary education assignments were held by 67 or 15 percent of 3CMS patients and 511 or 21 percent of non-MHSDS incarcerated persons.

The 244 substance abuse treatment assignments were held by 33 or seven percent of 3CMS patients and 211 or nine percent of non-MHSDS incarcerated persons.

b.      Milestone Credits

As of December 26, 2023, all three EOP patients were eligible to earn milestone credits, but none earned the credits; all 413 3CMS patients were eligible, and nine or two percent earned the credits; and 2,794 of 2,795 non-MHSDS individuals were eligible and 43 or two percent earned the credits.

c.      Out-of-Level Housing

On December 22, 2023, Folsom reported that 29 3CMS custody Level II patients were in Level I housing, 25 3CMS custody Level I and three 3CMS custody Level III patients were in Level II housing, and four 3CMS custody Level II and 13 3CMS custody Level IV patients were in Level III housing.

d.      ADA Reasonable Accommodation and Grievance Procedure

Folsom provided an internal memorandum providing direction for custody staff interacting with disabled incarcerated persons, attendance sheets for training on accommodations and grievance procedures, and an updated reference training manual for ADA accommodations.

"C" Status:

As of January 19, 2024, 20 incarcerated individuals were designated "C" status; 11 were 3CMS patients.  Their classification chronos revealed that four received multiple serious RVRs within 180 days and were deemed program failures.  Folsom was unable to provide "C" status data for the review period.

Case-by-Case Reviews:

No MHSDS patients were retained in administrative segregation/RHU for more than 150 days during the review period, and no case-by-case reviews were required or conducted.

Mental Health Referrals:

During the reporting period, Folsom made 678 mental health referrals, consisting of 146 to psychiatry and 532 to primary clinicians.  There were 41 emergent, 182 urgent, and 455 routine referrals.  Responses were timely to seven of eight or 88 percent of emergent psychiatry referrals and 30 of 33 or 91 percent of emergent primary clinician referrals.  For urgent referrals, there were timely responses to 41 of 43 or 95 percent of psychiatry referrals and 128 of 139 or 92 percent of primary clinician referrals.  For routine referrals, there were timely responses to 85 of 95 or 89 percent of psychiatry referrals and 355 of 360 or 99 percent of primary clinician referrals.

Custody and Mental Health Partnership Plan:

Folsom's custody and mental health partnership plan LOP was compliant with statewide policy and up to date.

Executive leadership joint rounding forms were produced for only five of six months of the reporting period, resulting in noncompliance.  The rounding occurred twice, and two separate sets of rounding forms were produced in September.  Rounding forms indicated that required leadership staff interviewed staff during each month, while patients were interviewed in four of six months.  Staff noted patient-specific concerns, patients arriving on time to appointments, and tablet functionality.  Patients indicated concerns regarding the temperature in certain units and the size of the cells.

Folsom did not maintain executive staff meeting agendas; however, executive leadership joint rounding was discussed in detail in the quality management committee minutes and mental health program subcommittee minutes in all months except July 2023.

Monthly joint supervisory program area tours took place in three of six months of the review period, reflecting noncompliance. These tours occurred in Building 5 in July, Building 2 in August, and Building 3 in September. Required staff attended each tour. Staff noted concerns with patient overdoses but otherwise reported great relations between custody and mental health staff. Patients noted that they occasionally had to wait for their appointments to start but otherwise were satisfied with the care provided.

Weekly 3CMS supervisory meetings occurred during all but three weeks of the review period. Required staff attended all but one meeting for which the mental health program supervisor did not attend. Aside from attending staff signatures, the huddle reports provided minimal to no detail or information. Two patients who were elevated to EOP status were noted for one week in June; one patient's MHCB discharge was noted for one meeting in July; and, in August, recognition of an ongoing modified program was mentioned in one week, and a patient with a recent suicide attempt was noted for another week.

The monitor attempted to observe the morning RHU huddle; unfortunately, after arriving in the RHU, it was revealed that the huddle did not occur and would not be occurring until after ICCs took place. No other huddle documentation was provided.

Folsom distributed the 3CMS orientation brochure to new patients and provided a copy of the same to the monitor.

Inmate advisory council meeting minutes were produced for each month of the review period. Discussed topics included cell searches, law library access, and requests for extended

telephone hours. The monitor's experts also met with the IAC during the site visit, which consisted of general population incarcerated individuals as well as 3CMS patients. The IAC reported a "very pro-mental health culture" and described the mental health staff as "way more involved" at Folsom compared to other facilities and "almost too aggressive" when encouraging patients to engage in treatment and mental health programs.

Forty-six staff misconduct complaints were filed during the review period; the type of staff was not specified. Of those 46 complaints, 22 were in progress, 23 were resolved, and one was labeled "subsequent source." One staff misconduct complaint was not initiated through the appeal process; this case was still pending review at the time of the site visit. No staff members were reassigned due to misconduct complaints.

Annual partnership off-post training was attended by 104 of 106 or 98 percent of mental health staff and 527 of 531 or 99 percent of custody staff.

Heat Plan:

The institution's heat plan was current with a last revision date of May 2023. During the review period, there were 72 Stage I, 13 Stage II, and no Stage III heat alerts. There were no heat-related illnesses during the review period. Thirteen custody staff from four different housing units were interviewed regarding heat plan requirements; all staff were knowledgeable of the heat plan's policies and requirements.

Regarding heat plan training, 494 of 505 or 98 percent of custody staff and 16 of 17 or 94 percent of mental health staff attended.

RVRs:

Folsom issued 1,114 RVRs during the review period; of those, two were issued to MHCB patients, two to EOP patients, and 247 or 22 percent of total issued RVRs to 3CMS patients.

The monitor reviewed 11 RVRs and MHAs for compliance with policy. Custody staff timely referred the RVR to mental health staff for completion of an MHA in four of 11 RVRs or 36 percent of cases; overdue RVR referrals ranged from one to ten days late. Mental health staff timely completed the MHA and returned it to custody staff in ten of 11 or 91 percent of cases. The MHA was completed in a confidential setting in nine of 11 or 82 percent of reviewed MHAs; two patients refused the confidential setting and agreed to a cell front interview.

The assignment of a staff assistant was within policy guidelines for all 11 RVRs reviewed. The SHO documented their consideration of the MHA information in all 11 cases. The primary clinician recommended penalty mitigation in two cases; the SHO mitigated penalties consistent with the clinician's recommendation and mitigated penalties in three other cases. No reviewed MHAs recommended that the RVR be documented in an alternative manner.

A review of four ICC actions regarding the assessment of a RHU term was conducted, and all four ICC actions included the assessment, imposing and suspending of an RHU term, and referring the patient for transfer to a general population setting. In all four ICC chronos the chairperson documented their consideration of the MHA information in the assessment of the RHU term.

Regarding MHA training, 81 of 88 or 92 percent of required custody staff and 11 mental health staff attended; Folsom tried to assign all MHAs to one mental health clinician unless that clinician was assigned to the patient.

<u>Use of Force</u>:

Folsom reported no controlled and 49 immediate use of force incidents during the review period. Of the 49 immediate incidents, 20 had completed the use of force review process and were closed. Three closed immediate use of force incidents were reviewed; all complied with

policy.  Two reviewed incidents involved general population incarcerated persons, and one involved a 3CMS patient.  All three incidents involved resisting a peace officer, resulting in staff using physical force.

Use of force training was attended by 495 of 504 or 98 percent of custody staff and all 102 mental health staff.

Lockdowns/Modified Programs:

One modified programming period was initiated during the review period.  It stemmed from an increase in overdoses; accordingly, Facility A was placed on modified programming for six days while a mass search was conducted.  Mental health programming was not interrupted.

There were no modified programming periods from the end of the review period until the time of the site visit.

Access to Care:

A review of Folsom's monthly Health Care Access Quality reports from June through November 2023 indicated a total of 6,377 issued mental health ducats and add-on appointments, of which 5,151 or 81 percent were completed and 1,226 or 19 percent were not completed.  Of the non-completed appointments, all 1,226 were due to non-custody factors; notably, no patient refusals were reported for the entire review period.

Placement of 3CMS Patients into Minimum Support Facilities:

During the review period, 59 3CMS patients were housed in Folsom's MSF.  Eight patients were prescribed KOP medications.  Four or seven percent returned to non-MSF facilities, and four or seven percent were referred to a higher level of care.  All 279 required custody and mental health staff completed the MSF training.

One initial IDTT was observed for a 3CMS patient housed in the MSF. This patient was scheduled for release within the next three months. The IDTT was adequate and met Program Guide requirements. It was attended by the MSF primary clinician, chief psychiatrist, CC I, and the patient. The goals and interventions provided for that patient were appropriately focused on pre-release, transition planning, and strategies to cope with the stressors and anxiety related to his upcoming release. The chief psychiatrist, who provided coverage at this IDTT, was highly engaged in the treatment planning process for the patient.

*Coleman* Postings:

The monitor observed *Coleman* postings in English and Spanish in all toured units.

**APPENDIX A – 12**
**WASCO STATE PRISON (WSP)**
Site Visit: February 5, 2024 – February 8, 2024
Review Period: July 1, 2023 – December 31, 2023

Census:

On February 2, 2024, WSP's total incarcerated population was 2,739, a 23 percent decrease since the preceding monitoring round.  The MHSDS population of 1,125 patients represented 41 percent of WSP's population and was a 14 percent decrease from the prior reporting period.

The MHCB housed four patients.

There were 243 mainline 3CMS patients; one was housed in alternative housing.

The reception center housed 129 RC EOP patients and 720 RC 3CMS patients.

Additionally, nine RHU EOP and 20 RHU 3CMS non-RC patients were in the RC STRH.

Staffing:

The longstanding vacant chief psychiatrist position was filled two weeks prior to the site visit.  Two of 11.5 psychiatry positions were filled for an 83 percent vacancy rate; registry staff covered 4.75 positions, resulting in a 41 percent functional vacancy rate.

No telepsychiatry positions were allocated at WSP; however, headquarters' telepsychiatrists covered 4.0 positions.  With the use of telepsychiatry, the functional vacancy rate for psychiatry was six percent.

There were no psychiatric nurse practitioner allocations at WSP.

All five medical assistant positions were filled, though one was on extended leave, resulting in a 20 percent functional vacancy rate.

One of two chief psychologists and two of three senior psychologist positions were filled.  Thirteen of 40.5 staff psychologist positions were filled, for a 68 percent vacancy rate.  One

378

psychologist was on long-term leave.  Registry staff covered 5.88 positions, resulting in a functional 56 percent vacancy rate.  One psychologist was unlicensed.

The supervising social worker position was filled.  Of the 17.5 social workers, 15.5 were filled, for an 11 percent vacancy rate.  One social worker was on extended leave, and one contractor covered one position, resulting in an 11 percent functional vacancy rate.  Five social workers were unlicensed.

Two of the 5.5 recreation therapist positions were filled for a 64 percent vacancy rate.

For nursing, 11 of 14.2 supervising RN positions were filled, reflecting a 23 percent vacancy rate; one supervising RN was on extended leave, resulting in a 30 percent functional vacancy rate.  Fifty-six of 64 RN positions were filled for a 12 percent vacancy rate; one RN was on extended leave, resulting in a functional vacancy rate of 14 percent.

Ten of 10.6 CNA positions were filled for a six percent vacancy rate.  However, one was on extended leave, resulting in a functional vacancy rate of 15 percent.

Forty-seven of 47.6 LVN positions were filled for a one percent vacancy rate; three LVNs were on extended leaves, resulting in an eight percent functional vacancy rate.

The senior psych tech position was filled, as were 17 of the 17.7 psych tech positions, for a four percent vacancy rate.  One psych tech was on extended leave, reflecting a functional vacancy rate of ten percent.

There were no CHCA or AGPA positions.

Two of 2.5 HPS I positions were filled for a 20 percent vacancy rate.  The HPS II position was filled.

Of 13 MHSDS clerical positions, 11.5 were filled for a 12 percent functional vacancy rate.  The OSS II position was filled.

For custody staff, 853 of 856.2 positions were filled for a one percent vacancy rate. The warden, chief deputy warden, and all six associate warden positions were filled; one associate warden was acting out of class. All six captains and all 29 lieutenant positions were filled; three captains and one lieutenant were acting out of class. Sixty-five of 66.6 sergeant positions were filled, and four sergeants were acting out of class. All 45 CC I positions were filled, and one CC I was on extended leave; 11 CC Is were acting out of class. Eleven of 12 CC II positions were filled; one was on extended leave, and four were acting out of class. For correctional officers, 689 of 689.6 positions were filled.

Telepsychiatry:

Like during the previous reporting period, WSP used an average of 160 hours of headquarters-provided telepsychiatry services per week for the RC and mainline 3CMS programs during the review period and at the time of the site visit. Telepsychiatry was also used to complete night shift crisis evaluations every night of the week except Wednesday from 6 P.M. to 7 A.M.

Notably, telepsychiatrists were not assigned to the MHCB or RC EOP, though they were routinely utilized to provide services to those patients. This was unchanged from the previous monitoring round.

Telework:

The chief psychiatrist teleworked two days per week. The chief psychologist, two senior psychologists, the supervising social worker, the OSS II, and the HPS II teleworked one day per week each. One senior psychologist teleworked five days per week. Ten MHSDS clerical staff teleworked two days per week. The OSS II and three HPS Is teleworked two to three days per week.

<u>Staff Recruitment and Retention</u>:

WSP reported that chronic staffing shortages affected how mental health programs were provisioned.  The institution further explained that cross-coverage and "triage" of care were consistently utilized to ensure that patients at the highest acuity of need were seen.  Crisis team members were also utilized to complete cross-coverage.  Furthermore, although cross-coverage was occurring, WSP reported significant challenges in maintaining program compliance with routine referrals, routine clinical contacts, routine IDTTs, initial evaluations, and, most recently, RC EOP groups.  Notably, crisis management was the top priority, negatively impacting all other programs due to staffing shortages.

<u>Quality Management</u>:

Overall, WSP had a reasonable quality management program.  Identified deficiencies in various areas included detailed information regarding origin with appropriate responses.

Monthly LGB meeting minutes indicated that a quorum was consistently attained.  The minutes reflected routine agenda items, including approval of previous meeting minutes, pending action items, local operating procedure approval, credentialing, and open forum.

QMC meetings occurred monthly and a quorum was met for each meeting.  Regular agenda items included approval of previous meeting minutes, improvement work, system surveillance, and program administration.  Documentation reflected an overview of systemic functioning, including quarterly mental health review of program metrics.

The MHPS met monthly with a quorum in attendance.  Routine agenda items included previous action items, system surveillance, program administration, open forum, and meeting wrap-up.  Provided documentation reflected comprehensive discussions of the status of mental health programs with a heavy emphasis on program metrics.  An explanation of deficient areas

was documented, primarily attributed to staffing shortages followed by administrative or data entry errors. The MHPS committee reported to the QMC.

WSP did not complete additional audits, QITs, or FITs during the review period. The only discipline for which peer review was completed was psychiatry, which occurred for 14 psychiatrists between July and November 2023.

Medication Management:

WSP provided MAPIP results from July 1, 2023 to December 31, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, the institution was compliant for six months with obtaining medication consents, thyroid function tests, and blood pressure for patients prescribed venlafaxine. The institution was compliant for one of three required months with obtaining EKGs.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that WSP was compliant for six months with blood pressure, glucose, CMP, height, weight, thyroid function tests, and obtaining medication consents. WSP was compliant for five months and was noncompliant for one month with monitoring the AIMS and CBC with platelets. WSP was compliant for three months and was noncompliant for three months with monitoring lipids. EKG monitoring was compliant for two months and was noncompliant for four months.

For patients prescribed carbamazepine, WSP was compliant for all three required months for monitoring CBC with platelets and was compliant two months for monitoring CMP and therapeutic medication levels. No medication consent forms were required.

WSP was not a clozapine initiation or maintenance institution. There were no patients who were prescribed clozapine during the review period nor at the time of the site visit.

For patients prescribed Depakote, WSP was compliant for six months with obtaining medication consents. The institution was compliant for five months and was noncompliant for one month with monitoring CBC with platelets. WSP was compliant for three months and was noncompliant for three months with monitoring therapeutic medication levels.

For lamotrigine, the institution was compliant in obtaining medication consents for the five required months.

Regarding lithium, the institution was compliant for six months with obtaining medication consents and thyroid function tests. WSP was compliant for four months and was noncompliant for two months with monitoring EKGs. WSP was compliant for two months and was noncompliant for four months with monitoring kidney function tests and therapeutic medication levels.

For medication management metrics reported by mental health headquarters, WSP was compliant for six months with continuity of medications with intra-institutional transfer to ASU/SHU/PSU. The institution was compliant for five months and was noncompliant for one month with continuity of medications upon parole/transfer to the community and chronic care medications historical administration. WSP was compliant for four months and was noncompliant for two months with observation of medication preparation HS and outpatient provider new medication orders. The institution was compliant for three months and was noncompliant for three months with continuity of medications upon discharge/transfer from a community hospital and/or DSH. WSP was compliant for two months and was noncompliant for four months with continuity of medications for MHCB transfers.

WSP was noncompliant for all six months with the following measures: continuity of medications upon arrival at a reception center, continuity of medications upon inter-institutional

transfer at R&R, continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), and observation of medication preparation at A.M. and P.M.

WSP performed analyses of underperforming metrics and found that most were due to patient refusals. Despite multiple MAPIP measures that were noncompliant, the CAP stated that there was no action in progress, indicating that the noncompliant issues were not addressed.

WSP reported that 969 patients were prescribed DOT psychiatric medications; an additional one 3CMS patient was prescribed an SSRI as KOP, in accordance with policy. The total number of psychiatric prescriptions was not provided in a readily usable format. WSP reported that prescriptions were provided for a maximum of 180 days, with bridge orders permitted up to 30 days. For verbal and telephone orders, the nursing staff was required to "read back" the order to the prescriber, who was required to sign the order within 48 hours. The institution did not specify the process for tracking whether verbal or telephone orders were signed.

Twenty-one audits were conducted during a three-month portion of the reporting period. Data from the other months was not provided. The audits indicated compliance with the policy that all patients received their medications in less than 30 minutes, and the total duration of medication lines was under two hours.

Although outside the reporting period, the nursing leadership reported that medication lines were longer in January 2024 due to the conversion of medication administration in the reception center EOP from the housing unit to a centralized location.

While awnings were present on the yards at the site of medication administration, no protection was provided from the elements while patients waited in line.

WSP reported that medication administration did not impact mental health programming.

Patients reported that their medications expired and were only refilled upon the submission of a 7362 medical request form.  The nursing and psychiatric staff reported that this issue had recently improved due to the chief psychiatrist instructing psychiatrists regarding the use of a centralized report that alerted the provider regarding upcoming medication expirations.

WSP reported an average nonformulary rate of ten percent during the monitoring period.

The primary care providers initiated the polypharmacy review that was forwarded to a designated psychiatrist, when indicated.

WSP reported that 823 patients received 1,415 medications prescribed at HS.  WSP was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

At the time of the site visit, two patients were receiving involuntary PC 2602 medications.

A senior psychologist specialist had long served as the MCA; however, information was not provided regarding the percentage of time devoted to that role.  No barriers were reported in the process of filing the PC 2602 petition, or in interfacing with OAH or OLA.  The administrative law judge's availability had increased since the use of remote conferencing equipment.  Barriers that were reported included the inability to access PC 2602 petitions at other institutions and coordination challenges with some institutions.

Examples were provided regarding difficulties with coordination of care between institutions that resulted in two missed petitions.  WSP reportedly began the initial stages for two initial, nonemergent PC 2602 petitions; both patients transferred to a PIP prior to their hearing. The MCA reported that the receiving institution was contacted by email; however, "neither of these patients petitions went any further."  The MCA reportedly followed up with the receiving institution and was informed by that institution that the chief psychiatrist also needed to be

included in the e-mail notices.  The expert reviewed the healthcare record for both cases and noted concerns that included inconsistent documentation of initiating the PC 2602 process and lack of documentation of coordination between the institutions.

WSP reported that there were no initial emergent or renewal petitions, and no petitions were denied, withdrawn, or lost to follow-up; however, it should be noted that the two cases previously discussed resulted in cases that were lost to follow-up at the receiving institution.  No use of force incidents were required to administer PC 2602 involuntary medications.

Transfers:

WSP's inpatient coordinator was a senior psychologist supervisor who also supervised the MHCB and CIT.  The inpatient coordinator reported no issues or barriers with the referral process.

During the review period, there were 62 instances of 43 patients considered for, but not referred to, inpatient care.  WSP's higher level of care audits revealed between 73 to 100 percent compliance for adequate rationales for non-referral.  The monitor's expert reviewed the charts of nine patients with ten instances of non-referral to inpatient care.  All rationales for non-referral were appropriate except for one patient who was readmitted to MHCB after a two-day stay at a lower level of care and then was discharged to EOP.  He was then admitted to the MHCB seven days later, at which time he was referred to the acute level of care.

WSP made 13 referrals to acute care and eight referrals to intermediate care during the review period.  All patients transferred within transfer timeframes.  However, only 11 of 13 or 85 percent of acute care transfers and five of eight or 63 percent of intermediate care transfers occurred within 72 hours of endorsement.  The inpatient coordinator stated that these delays

were due to patients being endorsed prior to institutions deciding whether to accept or reject the patient.

At the time of the site visit, one patient was pending transfer to intermediate care; the patient was within transfer timelines.

There were 21 instances of 19 patients with complex medical needs who transferred to inpatient care during the review period.

Seven *Vitek* hearings were held; no patients prevailed.

During the review period, WSP made 204 transfers to outside MHCBs; 88 percent occurred within 24 hours of alternative housing placement. Late transfers ranged from one minute to 25 hours; reasons for delays were not provided.

No patients transferred to a PSU during the review period.

For EOP ASU hub transfers, seven of 11 or 64 percent transferred timely.

One patient transferred to an LTRH; this transfer was 99 days late. WSP reported that the delay was due to the lack of an available bus seat, as well as adjudication of a pending RVR, which is not an allowable exception for a delayed transfer.

Six 3CMS patients transferred to mainline STRH; all six transferred timely.

WSP was unable to provide data regarding patients transferred to mainline EOP programs and did not track patients' level of care changing from EOP to 3CMS.

Programming:

Reception Center:

During the review period, 3,761 patients were processed through the reception center, with a total of 4,048 stays; 682 were EOP patients, and 3,366 were 3CMS patients.

Upon arrival, RC EOP patients were housed separately from non-EOP patients on Facility B. WSP's reception center transfer for the review period was unreliable, as many of the patient's arrival dates were inaccurate. At the time of the site visit, 47 of 67 or 70 percent of the RC EOP patients had been waiting longer than 60 days to transfer; their average length of stay was 100 days. Reasons for delays included patients being redirected due to lack of housing and/or bus seats, patients pending endorsements, patients placed in the RHU for various reasons, and some patients requiring complex safety concerns investigations.

At the time of the site visit, 650 RC 3CMS patients were awaiting transfer. The monitor reviewed a random sample of 50 RC 3CMS patient charts that revealed that 14 or 28 percent were beyond 90 days to transfer with an average length of stay of 110 days. Reasons for delays included patients receiving delayed endorsement dates, patients taking weeks to transfer after receiving their endorsements and pending CSR endorsements.

Forty-six RC EOP patients were paroled during the review period.

WSP reported that 3.5 primary clinicians, one psychiatrist, and two recreation therapists were assigned to the RC EOP. Recreation therapists were not dedicated solely to the RC EOP population but also covered the needs of patients in the RHU and MHCB. RC EOP patients reported being routinely seen by two different psychiatrists. There were four Access to Care Officers assigned to the RC EOP. These officers provided escorts and group supervision and participated in IDTT meetings.

RC 3CMS staff included at least one psychiatrist; WSP was unable to provide a caseload for RC 3CMS psychiatry. Four primary clinicians provided treatment to RC 3CMS patients; all carried caseloads of 270 RC 3CMS patients, exceeding established staffing ratios.

Due to the RC EOP staffing vacancies, one clinician completed all initial mental health primary clinician assessments; a second clinician completed all initial IDTTs.  Once completed, primary clinicians were assigned and conducted weekly clinical contacts.  Newly arrived patients reported contacts with two to three different clinicians since their arrival, while patients with longer stays reported seeing the same primary clinician most weeks.  In addition to their caseloads, staff were assigned an additional ten to 12 patients daily for individual contacts.

Due to staffing vacancies, RC EOP patients did not receive routine follow-up IDTTs during the review period or at the time of the site visit.  This was particularly troubling given that more than 50 percent of RC EOP patients had stays beyond the Program Guide mandated 60-day transfer requirement and since patients who were EOP during previous periods of incarceration were automatically made EOP at the time of re-incarceration; accordingly, other than during the initial IDTT, patients were not receiving re-evaluation of level of care needs by the IDTT.

Treatment space was problematic in the RC for both EOP and 3CMS patients.  For RC EOP patients, many offices were in disrepair, including flooding and crumbling ceiling tiles.  Staff reported that work orders were placed, though repairs had not been completed.

For RC 3CMS patients, primary clinicians and psychiatrists shared offices on the housing units.  Again, many of those offices were in disrepair and unusable.  For example, there were water leaks in offices in both B and C yards.  During the site visit, one office was in use despite wet ceiling tiles and visible fogging obscuring the window.  To address these space limitations, some patients were escorted to a trailer on C-yard for treatment.

WSP completed 3,889 RC EOP primary clinician contacts during the reporting period; 3,818 of 3,889 or 98 percent occurred timely, and 325 or eight percent were conducted cell front.  For cell-front contacts, 57 percent were due to custody issues (e.g., modified program, no

escorts), 33 percent were due to patient refusals, and five percent were due to the lack of confidential space.

Of the 4,051 psychiatric contacts completed during the reporting period, 3,339 or 82 percent occurred timely.  Documentation revealed that 14 psychiatric contacts, or less than one percent, were completed cell front due to patient refusals; however, patient and staff reports contradicted this data and indicated that psychiatric contacts were often held cell front.

The monitor's expert also reviewed the charts of ten randomly selected RC 3CMS patients.  All had the preliminary mental health screening completed within the seven-day mandated timeframe.  For those patients requiring a full initial evaluation, nine of ten were completed within the 18-day mandated timeframe.  However, chart reviews for patients receiving initial PC evaluations revealed multiple concerns, including delays in referring patients on medication to the psychiatrist for evaluation, no referral of a patient to psychiatry despite a history of multiple prior psychiatric medications, carrying over prior documentation which rendered determining current information difficult, inadequate initial treatment planning, delay in enrollment in 3CMS after evaluation indicated enrollment was required, and inconsistent documentation such as the initial screen stating that a full mental health evaluation was not required, only for one to be completed shortly thereafter which documented the patient screened positive on the initial mental health screen.

While the reviewed charts were largely compliant with timeframes, at the time of the site visit, WSP reported that seven of 205 mental health screens, or three percent, and 57 of 230 initial assessments, or 25 percent, were past the mandated timeframes.

The monitor's experts interviewed 47 RC EOP patients regarding treatment received at WSP.  Most reported having weekly individual contacts with a primary clinician.  Most – but not

all – reported seeing the same primary clinician for individual contacts; some, on the other hand, reported not seeing a primary clinician in over two weeks.  Patients reported seeing a psychiatrist monthly; however, at times, it was not the same psychiatrist.  One psychiatrist frequently held contacts at cell front, and some patients reported occasionally receiving psychiatric contacts via telepsychiatry.  Most individual contacts were reportedly held in a confidential space.

Patients reported attending an initial IDTT, though most were not aware of their mental health treatment goals; few patients reported having had more than one IDTT.  Patients were reportedly offered five groups per week, and some patients reported that they would like access to more groups with more varied content and a choice of which groups to attend.  Patients also reported feeling cared for by the mental health staff.

Patients were aware of how to access mental health staff during an emergency as well as for routine needs.  A small number of patients reported that custody officers were not always responsive to requests for emergency access to mental health staff and, thus, would report suicidality or engage in self-injury to be seen more emergently.

Group space for RC EOP patients was limited to one dedicated group room and the chapel on Facility B which was only available for groups a few hours per week.  The group room was of adequate size; however, a loud sound from the ventilation system made it difficult to hear.  Since October 2023, chapel access has been limited due to increased religious services, resulting in modified group schedules that did not include daily groups as required and limited group capacity.   Given recent vacancies in recreation therapy positions, daily rounding with patients not enrolled in groups did not occur.

The weekly RC EOP group schedule included 20 NLTGs facilitated by registered nurses and psychiatric technicians and 25 recreation therapy groups.  The NLTGs included modules

from the standard NLTG curriculum, while recreational therapy groups included coping skills, daily living skills, symptom management, mood management, and stress management. The institution did not track the percentage of EOP patients assigned to NLTGs as part of their treatment plan.

During the reporting period, patients in RC EOP were offered an average of 5.33 hours per week of structured therapeutic activities. Out of the 2,274 patient weeks of the reporting period, patients were offered at least five hours of treatment per week for 1,616 or 71 percent of reviewed weeks. No patients were designated as being on a modified EOP program (EOP Mod) during the reporting period. During the site visit, patients reported consistently being offered five hours of group per week.

Upon arrival at WSP, RC EOP patients were assigned to recreation therapy groups. WSP staff reported that once patients completed the mental health reception process, they were moved from the recreation therapy groups to the NLTG groups. Consequently, newly arrived patients did not receive clinically relevant groups during their first few weeks at WSP. The obstacles to the provision of therapeutic activities included a lack of program space, correctional officers' presence during groups, and the lack of clinician availability to offer therapeutic groups.

The monitor's expert observed five RC EOP groups: four in the group treatment room and one in the chapel. The four groups in the group room were not confidential, as two to three correctional officers were present for reported safety reasons. Also, other officers entered the room to access office space in the back. The correctional officers' radios were not silenced and were heard throughout the group sessions. The one group observed in the chapel was conducted with doors open and, thus, also lacked confidentiality; however, custody staff was not present.

The five RC EOP groups consisted of two NLTGs and three recreational therapy groups. The content was adequate, and the psychiatric technician who facilitated the groups enlisted participation from all patients, including those who were hesitant.

The monitor's expert observed eight RC EOP initial IDTT meetings.  Of note, three of these meetings were the second time the patient had an "initial" IDTT due to the patient transferring to RHU or MHCB and returning to RC EOP after those placements.  While the IDTT space was of adequate size, a loud piece of electronic equipment related to the camera installed in the room limited the ability to hear.  Confidentiality was impaired by the camera's presence and two custody officers who stood in the room and occasionally walked in and out during the meeting; these officers did not contribute to the IDTT process.  After the meeting, one of the custody officers asked the Special Master's expert if their presence in the room was acceptable, as the custody officer had concerns that they should not be present during these meetings.

All observed IDTT meetings included a psychiatrist, a primary clinician, and a correctional counselor.  The psychiatrist was not assigned to all of the patients seen, and the primary clinician and correctional counselor were not assigned to any of the patients seen.  In most cases, the psychiatrist had not met the patient prior to the meeting, and the primary clinician was the clinician assigned to complete initial IDTTs (as mentioned herein above).  Patients attended six of eight meetings observed; two patients refused.  While the patients in attendance actively participated in the IDTT process, staff spoke directly to the patients and not necessarily to each other.  The correctional counselor's participation was minimal.

The observed IDTT meetings included an adequate review of the patient's history, symptoms, medications, and functional impairments.  The primary clinician completed the EOP

functional evaluation and asked patients about their preferred learning style, hope for the future, and personal strengths. While treatment goals were stated in most meetings, the goals were often vague and did not include objective and measurable outcomes. Interventions were rarely discussed beyond psychotropic medications and offering weekly contacts and groups. There was only one IDTT where a treatment modality was mentioned.

The patient's group participation was discussed in most meetings, as was pre-release planning when appropriate. While the patient's level of care was discussed in each of the meetings, the rationale for retaining the patient at the EOP level of care was limited to discussing that the patient did not meet criteria for a higher level of care, with no discussion of how the patient met EOP criteria. Case conceptualizations were absent from the discussions. Additionally, safety plans were only reviewed for two of five applicable cases.

The monitor also observed three ICCs; all required staff attended and participated.

During the review period, WSP conducted 6,722 initial mental health screenings, of which 6,422, or 96 percent, were timely. Since the preceding monitoring round, WSP had opened a new diagnostics building where initial mental health screenings occurred. While six offices were dedicated to mental health staff, only four were used by mental health staff for initial diagnostic evaluations and CIT; the remaining two rooms were used by medical and nursing staff.

Twenty EOP patients housed in WSP's reception center were randomly selected to have their healthcare records reviewed for compliance with Program Guide requirements.

Nine patients required mental health screens; all were confidential and completed within seven days of arrival at the institution.

Nineteen of 20 patients required an initial primary clinician evaluation; all were timely completed and 16 or 84 percent were completed confidentially.  Reasons for non-confidentiality included a lack of available treatment space and patient refusal.

All 20 patients required routine primary clinician contacts; 66 percent were timely, and 79 percent were completed in a confidential setting.  Reasons for non-confidentiality included patient refusal, lack of custody escort, lack of available treatment space, and periods of modified programming in December 2023 and January 2024.

Of the 19 patients who required an initial psychiatry evaluation, 17 or 89 percent were timely completed prior to the patient's initial IDTT.  Of those, 79 percent were completed confidentially.  Reasons for non-confidentiality included patient refusal, lack of custody escorts, and modified programming.

Nineteen patients required an evaluation for continuation of psychiatric medication upon admission; six or 32 percent were evaluated within 24 hours of their date of arrival.

Nine patients required routine psychiatry contacts; 23 percent occurred timely every 30 days.  Five patients did not receive routine psychiatry contacts.  Seventy-five percent of routine psychiatry contacts were conducted in confidential settings.  Reasons for non-confidentiality included the lack of custody escorts and patient refusal.

Nineteen patients required initial IDTTs; all were completed timely, and all required staff and patients attended.

None of the nine patients who required routine IDTTs received them.

Administrative Segregation/Restricted Housing Unit:

During the review period, the RHU housed 296 MHSDS patients, including two acute care, one intermediate care, 19 MHCB, 68 EOP, and 206 3CMS patients.  The average length of

stay for MHSDS patients in the RHU was 31 days and ranged from one to 271 days. At the time of the site visit, 11 EOP and 28 3CMS patients were housed in RHU. WSP did not provide information on the length of stay.

WSP did not provide caseload data for RHU psychiatrists. The two primary clinicians assigned to the RHU had caseloads within established staffing ratios.

The RHU had adequate, confidential treatment space that the psychiatrist and primary clinicians shared. Staff reported that sharing the space did not disrupt the provision of mental health care.

At the time of the site visit, three to five groups were scheduled daily between 8:30 A.M. and 2:30 P.M. and offered separately according to the following designation: RHU 3CMS non-designated programming assignment; RHU 3CMS GP; RHU EOP SNY; and RHU EOP GP. RC 3CMS and mainline 3CMS patients attended groups together during the reporting period and followed the November 2023 RHU guidelines. The psychiatric technician, recreation therapist, and mental health nurse facilitated all groups; primary clinicians facilitated none. Group topics included mood management, current events, daily living skills, medication education, recreation therapy, coping and health issues, and leisure activities.

During the site visit, cameras were installed in the group room at the direction of DAI despite the chief of mental health's request that cameras be excluded from treatment spaces. The cameras' audio capabilities were queried but reportedly unknown.

Four attempts were made to observe groups during the site visit. Two groups did not occur due to patient refusals, and two did not occur due to the camera installations. Patients reported being offered the groups in question, although staff reported that patients had to choose between yard and group.

For RHU EOP patients, from June 26, 2023 through December 31, 2023 of the 5.9 weekly scheduled STA, 0.8 hours were cancelled weekly. Of the 5.1 weekly average offered STA, patients attended an average of 1.1 hours weekly. Consistent with on-site observations, the refusal rate was high as data indicated that patients refused four hours weekly.

Regarding the average weekly STA for the RHU 3CMS population between June 26, 2023, and December 31, 2023, patients were scheduled for 2.2 hours weekly. Of that scheduled time, on average, patients were offered 1.6 hours and attended 0.7 hours weekly. Patients refused 0.9 hours of weekly treatment. Of the average weekly 2.2 hours of scheduled treatment, 0.5 hours were cancelled.

The monitor's expert observed IDTTs for seven patients in RHU, including six initial IDTTs and one routine IDTT. Two patients attended, and the remaining five IDTTs were held *in absentia*. Two assigned primary clinicians presented all observed IDTTs. Other staff in attendance included the assigned correctional counselor, assigned psychiatrist, psychiatric technician, and the program supervisor. Apart from a custody officer in attendance, all staff spoke directly to the patient; however, the process was not collaborative, given that staff did not interact with each other regarding the patient's treatment needs. Additionally, the team did not ask the patient about treatment goals. The IDTTs were held in a confidential treatment space.

For the two IDTTs attended by patients, the purpose of IDTT was explained, followed by a brief assessment of the patient and review of relevant psychosocial history, including diagnosis. However, the rationale for diagnosis, such as supporting symptoms and impact on functioning, were not discussed. While the patient was offered an opportunity to ask questions, psychiatric input was limited to a discussion of medication side effects. Areas omitted from the discussion included case conceptualization, specificity of treatment goals and interventions, and

rationale for level of care.  Outside of standard activities offered by the psychiatric technician during rounds, there was no discussion of the provision of in-cell therapeutic activities as required.

The five IDTTs held *in absentia* were insufficient.  Discussion was limited to a brief overview of the patient's current medication and symptoms with variable review of mental health history and diagnosis.  Level of care was identified but neither rationale nor treatment planning were discussed.

The monitor observed nine ICCs, including three EOP patients, three 3CMS patients, and three non-MHSDS incarcerated persons; all were adequate and collaborative with all required staff in attendance.  The mental health clinician provided adequate input.

The monitor reviewed four weeks of 114-A forms for 70 incarcerated individuals housed in the RHU at the time of the site visit.  The review revealed one hundred percent compliance for weekly offerings of at least 18.5 hours of yard, phone calls, and linen exchanges.  Three weekly showers were offered to 67 of 70 or 96 percent of patients.

Interviewed RHU custody staff explained that unclothed body searches were conducted on the RHU patio or within TTMs.  Privacy screens and metal detectors were utilized to assist with unclothed body searches.

The monitor randomly selected and reviewed the healthcare records of 20 patients who had STRH stays during the review period to assess compliance with Program Guide timeframes during their stays.

Twenty STRH patients required initial psychiatry evaluations.  Of those, 18 or 90 percent occurred timely before the initial IDTT.  Three or 15 percent were conducted in confidential settings; reasons for non-confidentiality included patient refusals, unavailable custody escorts,

and unavailable confidential space.  Telepsychiatry did not conduct any initial psychiatry contacts.

Nine STRH patients required routine psychiatry contacts; all nine timely occurred at least every 90-calendar days.  Of the nine reviewed routine contacts, two or 22 percent were conducted in confidential settings.  Reasons for non-confidentiality included unavailable custody escorts and unavailable confidential space.  Telepsychiatry did not conduct any routine contacts.

Nineteen STRH patients required initial primary clinician evaluations; all 19 were completed within ten working days of arrival and before the initial IDTT.  Five or 26 percent were conducted in confidential settings; reasons for non-confidentiality included patient refusals. No initial contacts were conducted via telehealth.

Seventeen STRH patients required routine primary clinician evaluations; 72 percent timely occurred at least every seven calendar days.  Thirteen or 76 percent were conducted in confidential settings; reasons for non-confidentiality included patient refusals, modified programming, and unavailable custody escorts.  No routine contacts were conducted via telehealth.

Twenty STRH patients required initial IDTTs; all 20 occurred within 14 working days of arrival to the STRH.  All were attended by required staff, while patients attended seven or 35 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals and unprovided rationales.

The two patients who required IDTTs every 90-calendar days received them timely. Required staff attended both, while patients attended one of the two.  Reasons routine IDTTs were held *in absentia* included patient refusal.

Non-Disciplinary Segregation:

During the review period, WSP designated six MHSDS patients as NDS 100, including one EOP patient and five 3CMS patients. No patients were designated NDS at the time of the site visit.

MHCB:

WSP operated a six-bed MHCB. Changed from the Twenty-ninth Monitoring Report, WSP no longer utilized swing beds in the CTC. Consequently, all beds were designated fully medical or mental health. Treatment space was limited to one room with a TTM and was appropriate for individual treatment. No groups were held in the MHCB.

The MHCB also had a large yard with covered and uncovered portions and an ADA-compliant TTM for patients on maximum custody status. While medical patients mixed on the yard, MHCB patients were brought out individually unless one patient was on maximum custody status and was in the TTM; WSP reported that prior altercations between MHSDS patients triggered this difference.

MHCB staff included one full-time contract psychiatrist, one full-time and two part-time psychologists, and one full-time social worker. The primary clinicians also covered additional responsibilities such as CIT, initial assessments and routine contacts for non-MHCB patients, and RVR mental health assessments. The supervisor of the MHCB also had other supervisory responsibilities, including CIT and inpatient coordinator. The MHCB team also covered medical patients requiring mental health contacts in the CTC.

On February 6, 2024, the MHCB housed five patients. The average daily census was 5.3 patients during the review period, and 11 patients had three or more MHCB stays.

WSP made 312 MHCB referrals during the review period; 277 were admitted, including 73 at WSP and 204 at outside MHCBS.  Thirty-five referrals were rescinded.  In addition to the 73 MHCB admissions resulting from referrals generated by WSP, there were 30 referrals resulting in admissions from other institutions for a total of 103 MHCB admissions at WSP during the review period.  MHCB staff reported that factors in the RC EOP led directly to more frequent crisis evaluations and MHCB admissions.  Those factors included missed transfer timelines to ML EOP institutions and the lack of clinical staff to provide timely services to the RC EOP patients.

Clinical stays in the MHCB averaged eight days and ranged from five to 14 days; four patients had clinical lengths of stay longer than ten days.  The average physical length of stay was 9.7 days, ranging from six to 28 days; 24 patients had physical lengths of stay longer than ten days.  Fifteen patients' physical discharges occurred more than 72 hours after clinical discharge.

On February 6, 2024, the monitor's expert observed one initial and one routine IDTT in the MHCB.  The space was appropriate for the purpose, with adequate light and a comfortable temperature.  Patients sat in a chair outside of the TTM unless they were on maximum custody status.  All required treatment team members were present; all had computers and actively used them during the IDTT except for nursing, which had printed information and provided updated germane information.  Both IDTTs were adequate, yet with several limitations, including an initial overemphasis on custodial rather than clinical factors and the lack of case conceptualizations and measurable treatment goals.  The assigned primary clinician and psychiatrist were present and completed their initial evaluations prior to the IDTT meeting.  The

psychiatrist was actively engaged and provided clinically useful information; however, they used language that was too advanced for the patients' clinical status.

Reviewed 114-As for MHCB patients revealed that they were offered adequate out-of-cell time, showers, weekly linen exchange, and weekly phone calls.

The monitor randomly selected and reviewed the healthcare records of 20 MHCB patients to assess compliance with Program Guide timeframes during their stays.

Twenty MHCB patients required initial psychiatry evaluations.  Of those, 18 or 90 percent timely occurred before the initial IDTT and within 24 hours of arrival.  Seventeen or 85 percent were conducted in confidential settings; reasons for non-confidentiality were unknown.  Telepsychiatry was not used for initial psychiatry evaluations.

Twenty MHCB patients required two weekly routine psychiatry contacts; all contacts were timely.  Patients also received contacts in addition to what was required.  Of the 79 reviewed routine psychiatry contacts, 58 or 73 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusal, lack of custody, and modified program.  Telepsychiatry was not used for routine contacts.

Twenty MHCB patients required initial primary clinician evaluations; 14 or 70 percent were completed within 24 hours of patient admission, and 18 or 90 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusal and modified program.  No initial contacts were conducted utilizing telehealth.

Twenty MHCB patients required routine primary clinician contact; all were timely completed, and 86 percent were conducted in confidential settings.  No routine contacts were completed utilizing telehealth.

Twenty MHCB patients required initial IDTTs; 17 or 85 percent occurred within 72 hours of patient arrival.  Required staff attended 17 or 89 percent of initial IDTTs; the RN was absent in two of the three instances where the required staff was not in attendance.  Patients attended 18 or 90 percent of initial IDTTs.  One patient was out to court and did not receive an initial IDTT, and it was not discernable from the EHR whether another patient attended his initial IDTT.

Nineteen or 95 percent of patients who required routine IDTTs received them timely every seven calendar days following the initial IDTT.  Required staff attended 17 or 85 percent of routine IDTTs; the correctional counselor was absent for two of the three IDTTs that did not have required staff in attendance.  Patients attended 19 or 95 percent of routine IDTTs; the one IDTT was held *in absentia* due to the patient being out to court.

Seclusion and Restraint:

Two patients had one restraint incident during the review period and a third required seclusion.  The monitor's expert reviewed the three cases; each had a clear clinical rationale for the use of seclusion or restraints, with patients removed as clinically appropriate.

Crisis Intervention Team:

WSP had an active CIT that responded to crises daily.  During the review period, there were 208 CIT activations; 169 CIT referrals were returned to custody, and 39 referrals were referred to MHCBs.

3CMS:

WSP did not provide caseloads for the three psychiatrists who treated mainline 3CMS patients.  The only primary clinician assigned to the mainline 3CMS program and the MSF had a caseload of 241 patients, exceeding established staffing ratios.

Unchanged from the Twenty-Ninth Monitoring Report, confidential office space remained unavailable in the mainline 3CMS program. Primary clinician and telepsychiatry contacts occurred in office space on housing units, which was insufficient for meaningful and therapeutic contacts. Of note, reviewed psychiatric documentation rarely indicated that psychiatric contacts occurred via telepsychiatry.

While the office space on Unit A1 had a solid door that closed, it was not fully confidential as peers in the dayroom could easily see into the office, which was located in a centralized location. Further, the office was not immune to noise from peers in the dayroom and the housing unit, which disrupted treatment. Supervisory staff reported that offices in other housing units on the mainline 3CMS yard were comparable and non-confidential.

Groups were not offered to mainline 3CMS patients.

The monitor's expert observed three initial IDTTs led by the sole clinician assigned to the mainline 3CMS yard. The meeting room was small but confidential; the correctional counselor sat behind the patient during the IDTT due to the physical constraints of the space. All required disciplines attended, including a covering telepsychiatrist, a correctional counselor, and the program supervisor. Of note, correctional counselors were assigned to IDTTs by date and, therefore, were not always the patient's assigned correctional counselor. The observed correctional counselor had access to SOMS, was able to answer patient questions, and educated patients on how to access their assigned correctional counselor.

IDTT staff were professional and attentive during patient interactions and the primary clinician evidenced good rapport with the patients. However, the discussions were not collaborative, and clinical content needed improvement. Relevant psychosocial information and case conceptualization were not discussed in any observed IDTTs. Reviewed information lacked

404

specificity for treatment planning, and symptoms were discussed in generic terms such as

"anxiety" or "depression" (anxiety can be experienced as excessive worrying for one patient and

hypervigilance for another patient, which in turn would result in different treatment goals).

Impact on functioning was limited to sleep and appetite, and there were insufficient criteria to

support identified diagnoses.  Psychiatric input was limited to medication side effects or an

assessment of the patient for which IDTT was not the appropriate forum and, in one case, was

disruptive to the IDTT process.  Treatment goals, which did not consistently target identified

symptoms, were not explained in detail, and treatment interventions were not discussed.

Rationale for level of care was not discussed.

Interviewed patients reported that mental health contacts occurred in designated office

space on the housing unit with the door closed.  The majority reported a positive experience with

mental health providers.  Those prescribed psychiatric medications reported delays in medication

receipt when their medications expired.  Patients requested group treatment, program access, and

time off their sentences.

The monitor randomly selected and reviewed the healthcare records of 20 mainline

3CMS patients to assess compliance with Program Guide requirements.  One patient was

screened out of the review process as his program placement began within ten days of review.

Eight patients required initial psychiatry evaluations; four or 50 percent occurred before

the initial IDTT and seven or 88 percent were conducted confidentially.  One patient did not

receive an initial psychiatry evaluation at all.  Telepsychiatry was utilized in five or 63 percent of

initial psychiatry evaluations.

Thirteen patients required routine psychiatry contacts; 61 percent timely occurred at least

every 90 days, two exceeded timeframes, and seven did not occur at all.  Of the 19 reviewed

routine contacts, 16 or 84 percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals resulting in cell-front contacts.  Telepsychiatry conducted eight or 42 percent of reviewed routine psychiatry contacts.

Eight patients required initial primary clinician evaluations; six or 75 percent were completed within ten working days of arrival or a change in level of care.  Six or 75 percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals resulting in cell-front contacts.  Telehealth was not utilized for initial primary clinician contacts.

Sixteen patients required routine primary clinician contacts; 84 percent timely occurred at least every 90 days.  Twenty-five or 68 percent were conducted confidentially.  Reasons for non-confidentiality included periods of modified programming and patient refusals resulting in cell-front contacts.  Telehealth was not utilized for routine primary clinician contacts.

Eight 3CMS patients required initial IDTTs; five or 63 percent occurred within 14 working days of arrival or a level of care change.  Required staff and patients attended all initial IDTTs.

One patient required an annual IDTT and received it timely; all required staff and the patient were in attendance.  Of note, the Program Guide requires the attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

The pre-release coordinator was a licensed clinical social worker who had worked at WSP for 13 years.  The pre-release coordinator maintained an RC EOP caseload and allotted approximately 30 percent of his time to pre-release planning.

The coordinator met with all EOP, DDP, and RHU patients at least once 60 days before their release.  If the patient requested more meetings, the coordinator provided follow-up opportunities.  Although, there was limited pre-release coordination with 3CMS patients due to staffing shortages.

The pre-release coordinator worked with internal and external agencies, including county mental health providers, probation, the Division of Adult Parole Operations (DAPO), and other community or state programs as needed.  He also attended local meetings every two weeks to discuss all patients who were paroling within 120 days and attended monthly state pre-release meetings where policies and trends were discussed.

There were no pre-release groups at WSP due to insufficient treatment space and insufficient staff to run programs.

Ninety-seven or 95 percent of the 102 MHSDS patients scheduled for release to parole during the reporting period received pre-release planning.  Sixty of 65 or 92 percent of MHSDS patients were released to probation during the review period with a signed release of information. The pre-release coordinator notified the county where the patient was being released if the release of information was not signed.

The coordinator completed the PRPA with each RC EOP patient who participated in the planning.  Patients releasing sooner than 120 days were prioritized.

Three TCMP caseworkers contracted for WSP and worked with RC EOP patients. TCMP caseworkers met with patients 120 days from their release date.  During the review period, 390 Medi-Cal applications, one VA, and 73 applications for SSI were submitted.

Program Access:

a.     Job and Program Assignments

On January 3, 2024, WSP reported that 117 of the 1,434, or eight percent of the 3CMS population, and 2,254, or 17 percent of non-MHSDS incarcerated persons held the 498 available jobs.

The 93 academic assignments were held by 20 or one percent of 3CMS patients and 73 or three percent of non-MHSDS incarcerated persons.

The 27 vocational assignments were held by 12 or 0.8 percent of 3CMS patients and 15 or 0.6 percent of non-MHSDS incarcerated persons.

Thirty-two, or two percent, of 3CMS patients and 176, or eight percent, of non-MHSDS incarcerated persons held the 208 available voluntary assignments.

b.     Milestone Credits

WSP reported five EOP patients and one non-MHSDS incarcerated person were eligible to earn milestone credits during the review period; all earned the credits.

c.     Out-Of-Level Housing

As of January 19, 2024, 29 custody Level I and seven custody Level III 3CMS patients were in Level II housing, and 16 custody Level III 3CMS patients were in Level IV housing.

d.     ADA Reasonable Accommodation and Grievance Procedure

WSP provided a copy of the CDCR Reasonable Accommodation Request Process manual and produced training rosters for custody and mental health staff, confirming the implementation of the revised process.

"C" Status:

At the time of the site visit, 16 incarcerated persons were on "C" status, including six 3CMS patients and ten non-MHSDS incarcerated persons; WSP was unable to provide their "C" status timeframes.

Case-by-Case Reviews:

WSP reported that 24 patients met the criteria for 150-day case-by-case reviews. Review of case notes for those 24 patients indicated compliance with CDCR policy; specifically, six patients were awaiting resolution of an RVR and/or district attorney referral, five patients were released to the general population, 11 patients had their RVR SHU terms suspended and were released to the general population pending CSR review for transfer, one patient was retained pending completion of RC processing, and one patient was retained pending the issuance of a SHU term.

No patients met the requirement for a 120-day pre-MERD review.

Mental Health Referrals:

During the reporting period, WSP made 6,527 mental health referrals, including 3,448 to psychiatry and 3,079 to primary clinicians. There were also 499 emergent referrals, 635 urgent referrals, and 5,393 routine referrals.

WSP timely responded to two of seven or 29 percent of emergent psychiatry referrals and 483 of 492 or 98 percent of emergent primary clinician referrals. For urgent referrals, WSP timely responded to 103 of 135 or 76 percent of psychiatry referrals and 472 of 500 or 94 percent of primary clinician referrals. Responses to routine referrals were timely for 1,772 of 3,306 or 54 percent of psychiatry referrals and 1,197 of 2,087 or 57 percent of primary clinician referrals.

<u>Custody and Mental Health Partnership Plan</u>:

WSP's custody and mental health partnership plan LOP was compliant with statewide policy and up to date.

Executive leadership joint rounding occurred during each month of the review period. The produced rounding forms indicated that required staff attended and staff and patients were interviewed monthly. Staff noted concerns regarding specific patients, maintenance issues, lack of staff, and a desire for more mental health-related trainings; patients did not report any notable concerns and indicated satisfaction with their mental health services.

Executive staff meeting agendas were provided for each month of the review period; none discussed the rounding. QMC and MHPS meeting minutes were also provided for each month, and each discussed the rounding in detail.

Monthly joint supervisory program area tours took place each month on the mainline A Yard, MSF, and RC. Required staff attended each tour except for the MSF in October 2023. Staff noted issues regarding specific patients and the physical facility; issues noted by patients included a lack of available clothing, maintenance issues, and timely ducats receipt.

Weekly 3CMS supervisory meetings occurred during all but five weeks of the review period. Required staff attended all meetings. Documentation reflected that units on COVID-19 isolation, patients returning from higher levels of care, patients in mental health crises, and new patient admissions were consistently noted.

Daily huddle sheets were provided for the ASU and MHCB for most weeks of the review period. The required form was used, and huddle sheets indicated the required staff attendance. RC EOP huddles were not held due to limited staffing.

The required staff attended an observed RHU huddle. The proper huddle form was used.

The monitor observed one MHCB huddle; mental health staff did not attend. Review of MHCB huddle forms from the previous three weeks reflected that mental health was not attending daily.

WSP distributed the 3CMS orientation brochure to new patients and provided a copy to the monitor.

IAC meeting minutes were produced for four of six months of the review period for Facility A, the RC, and Facility M. Issues with the physical facility, canteen, and laundry were frequently discussed.

Ninety-nine staff misconduct complaints were filed during the review period; the type of staff was not specified. Of those 99 complaints, 73 were pending, and 26 were resolved. Notably, pending complaints included complaints filed in July 2023. Fifteen staff misconduct complaints were not initiated through the appeal process; one was sustained, one was exonerated, six were not sustained, and seven were still pending investigation. No staff members were reassigned due to misconduct complaints.

Annual partnership off-post training was attended by 188 of 203 or 93 percent of mental health and 857 of 875 or 98 percent of custody staff.

<u>Heat Plan</u>:

WSP's heat plan LOP was last revised in April 2023 and followed headquarters' directive. The heat plan was in effect during four months of the review period, although custody staff reported following heat plan procedures throughout the year.

Interviewed custody staff demonstrated an adequate understanding of heat plan policies and procedures; temperatures were also appropriately logged, and each toured unit had a working thermometer.

There were 79 Stage I heat alerts and no Stage II or State III alerts initiated during the reporting period.  Two patients experienced heat-related illnesses; they were given hydration measures and sent back to their cells after feeling better and medically cleared.

Five hundred eighty-eight of 600 or 98 percent of custody staff and 117 of 137 or 85 percent of mental health staff completed the required heat plan training.

RVRs:

WSP issued 2,653 RVRs during the review period; 1,190 or 45 percent were issued to MHSDS patients, including three to acute care patients, 18 to MHCB patients, 109 to EOP patients, and 1,060 to 3CMS patients.

Review of 25 RVRs issued to MHSDS patients revealed that custody staff timely referred the MHA to mental health in 12 of 25 or 48 percent of cases.  Mental health staff timely completed and returned the MHA to custody in 22 of 25 or 88 percent of cases.  Of the 25 MHAs reviewed, 11 or 44 percent were completed confidentially, and patients were present for all 25 hearings.

Staff assistants were assigned in 16 cases.  Patients timely received the required RVR documentation prior to the hearing for all reviewed RVRs.

The SHO documented consideration of the patient's mental health information in all 25 reviewed RVRs.  Further, the SHO mitigated the penalty based on the mental health recommendation in 20 of 25 or 80 percent of instances where the assessment recommended mitigation.

None of the reviewed MHAs recommended that the RVR be documented in an alternative manner.  However, six RVRs indicated that patients' mental health contributed to the behavior that led to the RVR, and the reviewing officers found all six patients guilty as charged.

Ninety-one of 102, or 89 percent of required custody staff, attended the mental health assessment training. No mental health staff attended the training; leadership provided documentation indicating that this was per the October 11, 2021 HQ memo, "Inmate Disciplinary Process, Mental Health Assessment Review Policy and Expectations," which noted that mental health clinicians were not required nor directed to enroll in this training.

Use of Force:

WSP reported 186 immediate and no controlled uses of force involving MHSDS patients during the review period. Fifteen immediate use of force incidents were randomly selected to assess compliance with policy guidelines. Reasonable and appropriate force was used by custody staff in each instance. Reviewed incidents included fighting, battering custody officers and other incarcerated individuals, and resisting staff. These incidents resulted in the use of physical force, OC spray, and discharge of 40mm rounds by custody staff. Appropriate decontamination was afforded to all patients as needed.

The annual use of force training was attended by 796 of 809 or 98 percent of custody staff and 90 of 185 or 49 percent of mental health staff.

Lockdowns/Modified Programs:

There were two modified programming periods during the reporting period. One lasted for five days due to an outbreak of norovirus; the second, which lasted eight days, stemmed from a riot. Mental health programming was not interrupted in either instance.

Access to Care:

A review of monthly Health Care Access Quality reports from July 2023 through December 2023 reflected the issuance of 40,966 mental health ducats and add-on appointments; of those, 21,836 or 53 percent were completed and 19,130 or 47 percent were not completed. Of

the 19,130 non-completed appointments, 15,058 or 79 percent were not completed due to non-custody factors and 4,072 or 21 percent were not completed due to patient refusals.

<u>Placement of 3CMS Patients into Minimum Support Facilities</u>:

In a change since the preceding monitoring round, WSP placed ML 3CMS patients in the MSF. There were 133 patient admissions during the review period; 51 were prescribed KOP medications.

On January 30, 2024, 64 of the 149 incarcerated persons in the MSF, or 43 percent, were ML 3CMS. Mental health staff included one psychiatrist and one primary clinician, who both covered patients on other yards. Mental health did not have dedicated treatment space; however, the clinicians used space within the classroom and the library. These spaces were large and appropriate for clinical treatment, but their use was limited when needed for other activities.

Leadership reported no difficulties staffing the MSF nurses; however, line staff nurses reported that nurses were pulled from other yards to cover the MSF, as there were no specific posts for the MSF. Nursing staff reported no difficulties with excess wait times for medications or administering HS (nighttime) medications, as reported at other institutions.

<u>*Coleman* Postings</u>:

All toured housing units contained *Coleman* postings in English and Spanish in areas accessible to patients.

**APPENDIX A – 13**
**NORTH KERN STATE PRISON (NKSP)**
Site Visit:  March 11, 2024 – March 15, 2024
Review Period:  August 1, 2023 – January 31, 2024

Census:

On March 11, 2024, NKSP housed 2,892 incarcerated individuals, a 30 percent decrease from the previous monitoring round.  The mental health caseload population of 826 represented 29 percent of the institution's population.

The MHSDS population included 215 mainline 3CMS patients, ten MHCB patients, and one patient in alternative housing.  The reception center housed 64 RC EOP patients and 523 RC 3CMS patients.

The RHU housed 87 incarcerated individuals, including 13 3CMS patients.

Staffing:

On February 12, 2024, the chief psychiatrist position was vacant.  All 5.5 psychiatry positions were filled by registry staff.

Three of four allocated telepsychiatry positions were filled, reflecting a 25 percent vacancy rate.  Three of seven allocated positions for medical assistants assigned to telepsychiatry were filled for a 57 percent vacancy rate; one contractor reduced the functional vacancy rate to 43 percent.

One of two chief psychologist positions were filled for a 50 percent vacancy rate.  Both senior psychologist supervisor positions were vacant.  One of two senior psychologist specialist positions were filled, leaving a 50 percent vacancy rate.  For psychologist positions, 7.5 of 27.5 were filled for a 73 percent vacancy rate; one additional contractor reduced the functional vacancy rate to 69 percent.  Two psychologists were unlicensed.

The supervising social worker position was filled.  Twelve of 14 social worker positions were filled for a 14 percent vacancy rate, and 1.1 contractors reduced the functional vacancy rate to six percent.  Three social workers were unlicensed.

Two of four recreation therapist positions were filled for a 50 percent vacancy rate.

The supervising RN position was filled, as were all seven MHSDS registered nurse positions.

All 10.62 CNA positions were filled.

The one LVN position was filled.

For psych techs, 16.7 of 17.7 positions were filled for a six percent vacancy rate.

Nine of 11 MHSDS clerical positions were filled for an 18 percent vacancy rate.

The OSS II, HPS I, and both HPS II positions were filled.  The CHCA position was vacant; leadership reported that headquarters required that this position be kept vacant.

For custody staff, 814 of 840.6 positions were filled for a three percent vacancy rate.  The warden, chief deputy warden, all six associate wardens, five of six captains, 27 of 29 lieutenants, 65 of 69.4 sergeants, all 44 CC Is, all five CC II specialists, all eight CC II supervisors, and 652 of 671.2 correctional officer positions were filled.

<u>Telepsychiatry</u>:

Telepsychiatry provided services to the mainline 3CMS program for an average of 120 hours per week.  In addition to the three allocated telepsychiatrists on staff, three headquarters telepsychiatrists provided night-shift coverage generally from 6:00 P.M. to 7:00 A.M.

416

Telework:

During the review period and at the time of the site visit, nine MHSDS clerical workers teleworked two days per week, the OSS II teleworked five days per week, and the HPS I and one of two HPS IIs teleworked two days per week.

Staff Recruitment:

NKSP was working with the Field Liaison Analyst (FLA) and the Regional Hiring Unit to advertise positions and hold interviews. However, there was a backlog of scheduling interviews due to the FLA position changing personnel three times over the past year.

Quality Management:

The local governing body met monthly with a quorum in attendance. Reviewed meeting minutes indicated a high-level overview of program administration, including discussion of CTC policy and procedure, approval of local operating procedures, program updates, and staffing updates.

The quality management committee met monthly and achieved quorums. QMC meeting minutes reflected agenda items that included an improvement project to address delays to urgent psychiatry consults, custody and mental health partnership activities, and deficient mental health metrics.

Reviewed mental health subcommittee meeting minutes revealed that meetings were held monthly with a quorum in attendance. Agenda items included various clinical deficient metrics, which were updated across monthly meetings. The provided documentation was a useful overview of the system and included contributing factors related to staffing issues; however, other contributing factors were not consistently identified.

The institution did not complete additional audits, QITs, or FITs during the review period.

NKSP had a peer review process for the inpatient and outpatient psychiatrists. The institution did not have a peer review process for primary clinicians and they were waiting for direction from headquarters. The chief of mental health reported that psychiatrists had one peer review committee meeting, although it was prior to the review period.

Medication Management:

NKSP provided MAPIP results from August 1, 2023 to January 31, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, NKSP was compliant for six months with obtaining medication consents, monitoring thyroid function tests, and blood pressure for patients prescribed venlafaxine. No EKGs were required.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that NKSP was compliant for six months with obtaining blood pressure, height, weight, glucose, CBC with platelets, CMP, thyroid function tests, and medication consents. NKSP was compliant for the five required months with obtaining EKGs. The institution was compliant for five months and was noncompliant for one month with performing the AIMS examination. NKSP was compliant for four months and was noncompliant for two months with monitoring lipid panels.

For patients prescribed carbamazepine, NKSP was compliant for the two required months of monitoring CBC and CMP. The institution was compliant for one of the two required months with monitoring therapeutic medication levels.

NKSP was fully compliant with clozapine monitoring, which included four months of compliance with glucose, CMP, height, and lipid panels; three months of compliance with AIMS

examinations, blood pressure, CBC, weight, and medication consents; and one month of compliance with obtaining EKGs.  No thyroid function tests were required.

NKSP was not a clozapine initiation or maintenance institution; however, as a reception center, the institution continued clozapine for those patients entering CDCR on that medication. The institution had a process for the continuation of patients prescribed clozapine that entailed R&R nursing staff identifying those patients and notified nursing, pharmacy, and psychiatry. The patient was then brought to the TTA for stat laboratory studies, and a psychiatric evaluation would be completed within 72 hours.  Additionally, the patient would be placed on a medical hold to prevent inadvertent transfer to a non-clozapine designated institution.  While the process included the role of the senior psychiatrist supervisor; NKSP did not have a chief psychiatrist or a senior psychiatrist supervisor, and they did not respond to inquiry regarding the completion of that workflow process in the absence of those critical supervisors.  NKSP did not supply the number of patients prescribed clozapine during the monitoring period.  Additionally, the data submitted for the number of patients prescribed clozapine at the time of the site visit was unclear.

For patients prescribed Depakote, NKSP was compliant for six months with obtaining medication consents.  The institution was compliant for four months and was noncompliant for two months with monitoring CBC with platelets, CMP, and therapeutic medication levels.

For lamotrigine, the institution was compliant in obtaining medication consents for the five required months.

Regarding lithium, the institution was compliant for six months with performing EKGs, thyroid function tests, and medication consents.  NKSP was compliant for four months and was noncompliant for two months with monitoring kidney function tests and therapeutic medication levels.

For medication management metrics reported by mental health headquarters, NKSP was compliant for six months with continuity of medications upon parole/transfer to the community. NKSP was compliant for five months and was noncompliant for one month with continuity of medications with intra-institutional transfer to ASU/SHU/PSU. The institution was compliant for three months and was noncompliant for three months with observation of medication preparation at HS and chronic care medications historical administration. NKSP was compliant for two months and was noncompliant for four months with continuity of medications with MHCB transfers, continuity of medications upon discharge/transfer from a community hospital and/or DSH, and outpatient provider new medication orders. The institution was compliant for one month and was noncompliant for five months with continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU).

The institution was fully noncompliant with the following measures: continuity of medications upon arrival at reception center; continuity of medications upon inter-institutional transfer at R&R; and observation of medication preparation at A.M. and P.M.

Regarding the measure of continuity of medications upon arrival at reception center, NKSP reported that the measure was "impossible to meet due to 24 hours beginning" at the time of the patient's arrival in R&R, and they reported that barriers included the A.M. medication administration after the day of arrival. Additional delays reportedly resulted from patients being released by individual building, patient classification, and security concerns. For many of the metrics, NKSP stated that they had addressed the issues that were under their control. The institution performed quality improvement studies, provided additional staffing to R&R, and elevated their methodology to CDCR/CCHCS headquarters.

NKSP did not submit data regarding the number of patients prescribed psychiatric medications or the number of prescriptions provided by psychiatry. Additionally, NKSP did not report details regarding KOP medications, including the number of patients prescribed KOP medications, the level of care of patients prescribed KOP medications, and the types of KOP medications prescribed. For those reasons, it was impossible to determine the degree of compliance with existing policies.

NKSP reported that psychiatric prescriptions were prescribed for a maximum of 360 days. As this greatly exceeded the policy of a maximum of 180 days, the expert requested clarification; however, no clarification was provided by NKSP. Bridge orders were provided for up to 30 days. For verbal and telephone orders, the nursing staff was required to "read back" the order to the prescriber. The institution did not specify the process for tracking whether verbal or telephone orders were signed.

The institution conducted 84 medication line audits during the reporting period. Audits indicated that all patients received their medications in less than 30 minutes. The duration of medication lines was under two hours.

NKSP reported that protection from the elements was provided while medications were administered; however, there was no protection for patients waiting in the medication line. As was noted in the prior monitoring round, NKSP reported that this issue was elevated to the Regional CNE.

NKSP reported an average non-formulary rate of three percent during the monitoring period.

NKSP reported the timely completion of polypharmacy reviews in 99 percent of cases. Pharmacy tracked the registry, completed record reviews, and entered a progress note; subsequently, they notified primary care and psychiatric providers of issues requiring review.

NKSP reported that 1,923 patients received 121,972 doses of HS medications; however, they did not supply the number of prescriptions that those patients received.  With rare exception, NKSP was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

NKSP was compliant for the one required month for the related medication administration metrics of compliance with the presence of a current PC 2602 court order for involuntary medications present in the EHRS and with the presence of a current physician's order in the EHRS for a medication to be given per PC 2602 court order.

At the time of the site visit, two patients received involuntary PC 2602 medications; a total of 58 patients received PC 2602 medications during a portion of their stay at NKSP.  The institution submitted ten initial emergent petitions, two nonemergent initial petitions, and no renewal petitions; no petitions were withdrawn or denied.  NKSP reported no uses of force to administer PC 2602 medications.

The institution reported that a psychiatrist initiating a PC 2602 petition sent the information to a senior psychologist who served as the MCA.  NKSP reported no difficulties with the PC 2602 process including uploading documents, OLA/OAH review, or with the administrative law judge hearing.

Transfers:

NKSP's inpatient coordinator was a senior psychologist specialist who had held the position for two and a half years and had been at NKSP for six years.  She also served as the

422

SPRFIT coordinator and training coordinator. There was no backup inpatient coordinator. The inpatient care coordinator conducted monthly audits of nonreferral documentation for patients with positive referral indicators. The audit results indicated that NKSP maintained compliance above 90 percent for "acceptable" nonreferral documentation throughout the review period.

There were 127 instances of patients considered for, but not referred to, inpatient care. The monitor's expert's review of non-referral rationales from the inpatient coordinator's logs suggested non-referral rationales were appropriate; however, several initial rationales would require formal record reviews for confirmation of adequacy. Notably, none of the patients on the HLOC log met criteria for three or more MHCB admissions within a six-month period.

During the review period, there were 28 acute care referrals; 20 of 28 or 71 percent were timely transferred within ten days.

There were six intermediate care referrals; all six intermediate transfers occurred timely. At the time of the site visit, two patients were awaiting intermediate care transfer; both were within transfer timelines.

Four patients with complex medical needs transferred to inpatient care during the review period.

Five *Vitek* hearings were held for acute care patients; no patients prevailed.

NKSP referred 250 patients to the MHCB, resulting in 147 admissions and 103 rescissions; all MHCB transfers occurred within 24 hours of alternative housing placement.

NKSP did not maintain PSU, ASU EOP hub, LTRH, or STRH transfer data, or MSF placements for the review period.

One patient transferred to a mainline EOP program; this patient transferred timely.

No patients' levels of care changed from EOP to 3CMS.

Programming:

Reception Center:

Notably, on March 11, 2024, 348 of 508 or 69 percent of pending initial assessments were overdue. The chief of mental health noted that patients on medications who were not at the EOP level of care or higher did not receive initial assessments. The backlog of late initial RC assessments suggested that NKSP was unable to manage its primary mission of timely identifying patients' mental health service and level of care needs with their current staffing. Further, this backlog raised concern that positively screened patients were either retained in the reception center longer than necessary or that patients would transfer to a mainline institution that did not offer a level of care or program consistent with their mental health needs.

NKSP reported that approximately 90 patients were in the RC EOP during the reporting period. However, NKSP did not provide length of stay data for this population and was unable to provide much of the requested RC data; the data that was produced was generally incomplete, inaccurate, or required multiple revisions during the site visit.

Four social workers and one psychiatrist provided care to RC EOP patients; all maintained caseloads within established ratios. The one psychiatrist occasionally provided coverage in the MHCB as needed.

Space available for conducting individual contacts with patients was challenging for RC EOP patients. The unit multipurpose rooms were often used as custody and correctional counselor offices, leaving little space for individual contacts on these units. On Unit D5, the multipurpose rooms on both the A and B sides were chronically plagued by water leaking and puddling on the floor, making these spaces unusable. Furthermore, the administration noted that the "pill rooms" on the housing units could be used for individual contacts. The monitor's expert

inspected this space and found that the small, closet-like rooms were inadequate for use as a confidential treatment space. The rooms were windowless closets, mostly packed with boxes and cleaning supplies.

Due to the limited space, mental health staff set up tables in the day room, which allowed full visibility by individuals on the unit and discussions could be overheard by custody staff or anyone nearby.

The monitor's expert observed eight IDTTs: two RC EOP Facility B patients and six RC EOP Facility D patients. All IDTTs were held in the chapel, which was adequate in size but included a camera in the corner. Required staff were present for all eight IDTTs, and all had access to a computer. While all patients attended on Facility D, both from Facility B refused to attend the IDTT.

All of the observed IDTTs were inadequate. None of the discussions included a review of the patient's functional impairments or clear rationale for including the patient in the EOP level of care. In most of the cases, the patients were placed at the EOP level of care as a result of level of care placements during previous periods of incarceration, which, in some cases, were years earlier. The patients' psychiatric and social histories were consistently reviewed during the meetings; in some cases, these reviews were cursory and, in others, more comprehensive. Psychotropic medications, while discussed, were not clearly identified during all of the meetings.

In all cases, the patients received initial primary clinician and psychiatric assessments prior to the meeting; however, in one case, a different psychiatrist than the one who completed the initial psychiatric assessment attended and, thus, had not previously met the patient. Diagnoses, while mentioned, were not discussed, nor were the symptoms supporting the

diagnosis. The team had no collaborative discussion regarding diagnostic agreement or a need for diagnostic clarification.

In most but not all the meetings, treatment goals were stated, though they did not always meet the needs of the patients. For example, in one case, the patient was overly talkative, jovial, and tangential during the meeting, yet his goal was noted as reducing his level of depression, which was not evident as a current problem for the patient. Additionally, the provided treatment interventions were vague at best, and all patients were enrolled in the same groups, which were solely based on the availability of groups, not the patients' needs.

All staff members actively participated in the meetings and provided useful input. Safety planning discussions occurred when necessary but were cursory. Release planning was not discussed in any cases, even though four patients were due to be released in the coming months.

It appeared the primary clinicians could benefit from training on conducting IDTT meetings to include meaningful and individualized treatment plans; explicit review of the patients' functional deficits and barriers to progress; patient strengths; and clear discussion of the rationale for placement at the current level of care rather than reasons why the patient did not need a higher level of care.

NKSP offered groups to RC EOP patients daily. On Facility D, patients were offered three recreation therapy groups held in the chapel, one-yard group held outside, and one held in the dayroom of the housing units each week. The chapel location typically included approximately 20 patients per group and covered coping skills.

During the reporting period, RC EOP patients were offered 5.34 hours of structured treatment per week and attended 3.6 hours per week, on average. No patients were on modified programming.

426

Though the recreation therapist, pre-release coordinator, and nurse worked hard to provide relevant and clinically useful information the groups offered to RC EOP patients were minimally adequate. Topics did not necessarily meet the needs of the patients, and all patients were offered the same groups, regardless of mental health needs. Also, at least two hours of groups offered per week were unstructured leisure activities held in the yard or in the dayroom on units where non-EOP patients were present.

The monitor's expert observed one coping skills group of 19 patients during the site visit. The group space was not confidential as the door was open, and a custody officer remained outside the door; the officer's radio could be heard throughout the group. Additionally, there was a camera in the room about which the patients' reported concerns. The group's content was adequate and included relaxation skills facilitated by a video along with music videos with meaningful lyrics. The recreation therapist facilitated discussion after each video, and several patients participated in the discussions, which were relevant and appropriate.

The monitor's expert observed one RC EOP group facilitated by the pre-release coordinator on Facility B; three patients attended the group. The topic was related to addiction and included an educational video and discussion following the video. While the room was confidential, two correctional officers remained in the room for the duration of the group. One of the officers engaged in the discussions and offered useful input. The group was appropriate and included clinically useful information as well as a discussion about managing one's addiction upon release from prison. Further, at the start of the group, the pre-release coordinator provided information to one of the patients requested during the previous group session, evidencing good continuity.

The monitor's expert interviewed 22 RC EOP patients; 19 were housed on Facility D, and three were housed on Facility B. Patients reported weekly contacts with a primary clinician; however, many patients on Facility D reported being seen at cell front or in other non-confidential locations such as the dayroom. Patients on Facility B reported being seen in a confidential space consistently. Patients reported seeing a psychiatrist routinely. Some patients reported concern about cameras in the rooms where they were seen, but staff had assured them that there was no audio. The patients reported a consistent offering of five hours of group each week but the groups consisted of yard time and leisure activities, such as watching movies, which were not clinical and did not necessarily address their mental health needs. Some patients reported that they wanted access to more treatment groups. No patients reported having access to educational programs or work assignments.

Many patients reported being aware that an initial IDTT had been held when they arrived, although they were not present for the meeting. They reported that the primary clinician informed them that a meeting was occurring but that the patient could not attend due to quarantine status, given their recent arrival from county jail.

Twenty EOP patients housed in NKSP's reception center were randomly selected to have their healthcare records reviewed for compliance with program guide requirements.

Ten patients required mental health screens; seven were timely completed within seven days of arrival at the institution and five were confidential.

Nineteen of 20 patients required an initial primary clinician evaluation. Eighteen of 19 or 95 percent were timely completed within 18 days of arrival and seven or 37 percent were completed confidentially. Reasons for non-confidentiality included lack of available treatment space and patient refusals.

Nineteen of 20 patients required routine primary clinician contacts and 66 percent occurred timely; 21 percent were completed confidentially.  Reasons for non-confidentiality included lack of available treatment space and patient refusals.

Of the 19 patients who required initial psychiatry evaluations, all were completed timely, and 11 or 58 percent were completed confidentially.  NKSP reported that non-confidentially was due to COVID-19 precautions.

Of the 14 patients already prescribed psychiatric medications upon admission, eight or 57 percent were evaluated for continuation of their medications within 24 hours of arrival.

Sixteen patients required routine psychiatry contacts.  Of 22 expected timeframes, 18 or 82 percent timely occurred within 30 days; all 21 reviewed routine contacts were confidential.

Twenty patients required initial IDTTs; ten or 50 percent were completed within 14 days of the patients' arrival.  All required staff were in attendance, and patients attended seven or 35 percent.

Thirteen patients required routine IDTTs, but only eight received them.  Further, one of those eight patients did not receive their second required routine IDTT.  Of the eight routine IDTTs reviewed, required staff attended all, and patients attended three or 38 percent.

For the RC 3CMS program, NKSP reported that they processed 2,843 RC 3CMS patients during the review period.  The average length of stay for those patients was 83 days, ranging from less than one day to 1,566 days; 926 or 33 percent of patients had stays over 90 days.

Two social workers, four psychologists, and six psychiatrists provided care to RC 3CMS patients; all had caseloads exceeding established ratios.

There were no RC 3CMS IDTTs to observe during the monitoring visit.  Notably, RC patients were placed in RC 3CMS without an IDTT and generally transferred prior to a required annual IDTT.

Seven RC 3CMS patients were interviewed.  All seven had completed the reception process, including their initial mental health assessments.  The patients reported receiving information on mental health services available at the institution during the R&R process and were generally aware of how to contact mental health staff.  Additionally, they indicated receiving timely responses after requesting mental health services, their contacts were confidential, they timely received medications, and they had a timely continuation of medication following their transfer from county jails.  Notably, some patients revealed that accessing mental health services was not acceptable among certain racial populations.

Administrative Segregation/Restricted Housing Unit:

During the review period, NKSP reported that 278 patients were in ASU/RHU for a total of 376 stays, including seven acute care, one intermediate care, 35 MHCB, 92 EOP, and 241 3CMS patients.  The average length of stay was 30 days and ranged from one to 245 days.

During the review period, 173 patients were placed in the RC STRH.  The average length of stay was 23 days and ranged from one to 204 days.

One psychologist and one psychiatrist provided services to the RHU; their caseloads were within the established Program Guide requirements.

During the review period, ASU/RHU EOP patients were offered 5.3 hours of structured treatment per week and attended 2.5 hours per week, on average.  ASU/RHU 3CMS patients were offered 1.6 hours of structured treatment per week and attended 0.9 hours per week.

The monitor's expert observed two initial IDTTs in the RHU which the patients' assigned primary clinician led. Required staff and patients attended. The IDTTs were inadequate and did not meet Program Guide requirements. The clinician discussed relevant identifying information, diagnosis, and treatment history within CDCR. However, treatment needs were identified in broad terms, such as "depression," but lacked specificity for individualized treatment planning and were not collaboratively developed with the patient or treatment team members. Additionally, the treatment team did not make any determinations regarding the provision of in-cell therapeutic activities as required.

Furthermore, after the primary clinician's presentation, each team member briefly engaged with the patient and briefly summarized their interactions with the patient. Notably, while neither patient was prescribed psychiatric medication, the psychiatrist provided useful information regarding psychiatric medication.

The strength of the IDTTs was the confidential nature of the room, which had sufficient space for all attendees and access to computers. While some psycho-social information was reviewed, the information was overly narrow and did not fully address each patient's specific treatment needs, such as relevant treatment history, not just limited to CDCR, recent or current symptoms and impact on functioning, symptoms to support diagnosis, adjustment to RHU, and lacked a case conceptualization that informed treatment planning.

As noted, treatment goals and interventions were identified but were not individualized. While each team member interacted with the patient, the overall process was not collaborative, and the patient was not involved in goal development. Custody officers were present, but participation was minimal. While it was indicated that patients did not meet higher level of care indicators, rationale for level of care was not discussed.

The monitor's expert interviewed five MHSDS RHU patients, including three EOP and two 3CMS patients. All five patients were approached during tier walks, and three individuals were willing to engage at cell front. These individuals reported having routine access to showers and possession of a radio. Two of the three patients reported varying access to confidential contacts.

As identified during the previous monitoring round, confidential treatment space remained an issue in the RHU. There was one small room that contained three therapeutic modules. This room was used for group treatment and individual primary clinician and psychiatric contacts. When this room was unavailable for individual contacts, staff met with patients in therapeutic modules located in a non-confidential area in the housing unit. Specifically, staff reported that a partition was used to improve privacy but was not fully confidential.

There was no office space for assigned psychiatric technicians or the assigned primary clinician. These staff completed their work at tables in the housing unit dayroom.

The monitor observed one initial and eight subsequent ICCs for one EOP patient and seven non-MHSDS incarcerated persons. Required staff attended all eight ICCs. All ICCs were collaborative, and the mental health clinician adequately participated and offered appropriate feedback regarding each individual's mental health.

The psychologist assigned to RHU facilitated 3CMS groups in the unit. One group occurred during the site visit. Staff reported that the first half hour of the 90-minute group was reserved for patients to discuss any areas of concern, and the remainder of the group was used to watch a movie.

The RHU psych tech facilitated RHU EOP groups. The monitor's expert was unable to observe any groups as patients consistently refused the group throughout the tour. NKSP documentation indicated that group topics were psycho-educational and included a variety of topics including, but not limited to, breathing techniques for stress, medication compliance, exercise, building a support system, self-esteem, coping skills, and sleep hygiene.

Reviewed 114-As for four weeks each for 72 RHU patients indicated that patients were offered at least three showers per week, at least 20 hours of yard time weekly, and weekly linen exchanges for all reviewed weeks. Patients were also offered weekly phone calls for 92 percent of reviewed weeks.

Non-Disciplinary Segregation:

NKSP reported that no patients were designated NDS status during the review period or at the time of the site visit.

MHCB:

NKSP operated a ten-bed MHCB within the licensed CTC. The MHCB staff included two psychologists, one psychiatrist, four social workers, and two recreation therapists, all of whom had caseloads within established ratios.

During the review period, NKSP admitted 141 patients to the MHCB for a total of 147 stays. The average daily census was nine patients. Clinical stays averaged nine days and ranged from two to 18 days; 23 clinical stays exceeded ten days.

The monitor's expert observed five IDTTs over two days; all required staff and patients attended. All five observed IDTTs were adequate. All attendees had access to computers to access patient information. The IDTTs were collaboratively led by the psychiatrist, primary clinician, and MHCB supervisor. The various disciplines provided valuable patient information,

which resulted in well-informed and collaborative care decisions regarding the patients' treatment plans. For example, one IDTT appropriately justified extended lengths of stay and demonstrated the appropriate use of the CCAT process for disputing one of their rejected inpatient referrals. The monitor also learned that the patient was accepted for inpatient care based on the IDTT's updated case presentation during the scheduled CCAT.

NKSP reported that they attempted to prioritize coverage in the MHCB. However, the monitor's expert was informed that staffing limitations, including planned and unplanned leave, have resulted in cancelled IDTTs during the reporting period.

OnDemand data indicated compliance for daily MHCB provider contacts was maintained above 90 percent during the review period. While interviewed MHCB staff reported that space limitations interfered with their ability to routinely offer out of cell individual contacts, the staff and patients reported that their assessments were confidential and that providers attempted to offer confidential contacts whenever space allowed. Although several interviewed MHCB patients were new arrivals to the unit, none reported concerns with their providers or the assessments and care offered during their admission.

Healthcare record reviews indicated that providers were not consistently documenting whether contacts were confidential; one provider documented a contact as "confidential" when the location was at "bedside." Diagnostic clarification and follow-up diagnostic discussions did not occur when indicated, including for patients with extended lengths of stay or more than one admission. The CCAT process was utilized appropriately and was consistent with on-site observations. Additionally, treatment targets and interventions were sufficient, although treatment goals were not measurable. Further, while IPOCs were not useful, providers often developed better-quality treatment plans in narrative sections or progress notes.

The monitor's expert observed an MHCB morning huddle during the site visit; all relevant disciplines working within the CTC attended. All staff present during the huddle provided important patient and unit-related updates, asked follow-up questions during the meeting, and collaborated in a manner consistent with the whole patient care model; the custody sergeant in attendance also provided valuable patient information during this meeting.

Reviewed 114-As for ten MHCB patients revealed they were offered adequate out-of-cell time, showers, weekly linen exchange, and weekly phone calls.

There were no changes to treatment space within the MHCB since the preceding monitoring visit. MHCB staff continued sharing one small multipurpose room for assessments, individual mental health encounters, IDTTs, individual recreation therapy services, and other confidential interviews. Leadership confirmed that competing demands and limited confidential space in the CTC sometimes prevented providers from offering out of cell routine contacts. Additionally, assessments and IDTTs were generally prioritized over daily routine contacts. MHCB providers confirmed they had a separate workspace outside the MHCB to attend to clinical documentation.

While space limited the MHCB staff's ability to offer confidential out of cell contacts consistently, leadership reported that the CTC had sufficient custody officer coverage for escorting patients when space was available. The CTC yard used for MHCB and medical patients was divided into three areas, allowing RTs to provide services to more than one patient at a time.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

Eighteen of 20 or 90 percent of MHCB patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission. Ten of 20 were conducted in confidential settings. Reasons for non-confidentiality included modified programming, unavailable confidential space, unplanned contacts, and patient refusals. Telepsychiatry was not used for initial psychiatry evaluations.

All 76 weekly routine psychiatry evaluations timely occurred. Twenty-two of 76 or 29 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, unavailable confidential space, unplanned contacts, and yard contacts. Telepsychiatry was not used for routine psychiatry contacts.

All 20 initial primary clinician evaluations timely occurred within 24 hours of patient admission. Thirteen of 20 or 65 percent were conducted confidentially. Reasons for non-confidentiality included unavailable confidential space and modified programming. No initial contacts were conducted utilizing telehealth.

For routine primary clinician contacts, 94 percent timely occurred and 39 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, unavailable confidential space, modified programming, unplanned contacts, and yard contacts. No routine contacts were conducted utilizing telehealth.

Seventeen of 20 or 85 percent of initial IDTTs occurred within 72 hours of patients' arrival. Required staff and patients attended 100 percent of initial IDTTs.

Sixteen of 20 or 80 percent of routine IDTTs occurred timely or every seven days following the initial IDTT. Required staff and patients attended 100 percent of routine IDTTs.

Seclusion and Restraint:

The CTC had seclusion and restraint cells, but they were not used during the review period.

Crisis Intervention Team:

NKSP's CIT hours were 7:00 A.M. to 6:00 P.M. Monday through Friday and 6:00 A.M. to 5:00 P.M. on weekends and holidays. The CIT referral log indicated 421 CIT activations during the review period. Of the 234 CIT referral resolutions, one referral was sent to an outside hospital, 54 or 13 percent of the referrals resulted in patients being referred to MHCB, 132 or 31 percent were returned to the same housing, and 47 or 11 percent were moved to a different housing unit.

3CMS:

One psychologist, two social workers, and one telepsychiatrist provided services to the 3CMS program; all had caseloads within the established ratios.

The monitor's expert observed IDTTs for two 3CMS patients; one of the two was adequate. The primary clinician was out sick, and the supervising psychiatric social worker conducted the two IDTTs.

The first IDTT was an initial. Though the supervisor discussed the predisposing factors, precipitating, perpetuating, and protective factors, no measurable goals were discussed. Further, no interventions were documented by the primary clinician. Rapport was not established, and there was no continuity of care because the patient was seen by three different clinicians with differing objectives within one week.

The second IDTT was appropriately modified due to the patient's highly agitated state and anger due to not feeling heard and that his services were not being individualized. The

supervisor focused on the patient's needs, which included receiving spiritual guidance. The chaplain saw the patient since NKSP did not have a Native American healer. The chaplain met with the patient for 40 minutes and reached out to a retired Native American healer and mental health leadership to see if they could assist the patient. Another IDTT was scheduled to discuss the need for a possible higher LOC.

The monitor's expert interviewed 16 3CMS patients in two groups. None of the patients knew about the *Coleman* case. Nine patients were at NKSP for more than one year, and the remaining seven were housed there for nine months or less. Two groups of patients were interviewed, and each group had eight patients.

All eight patients in the first group knew what a therapist/clinician and a psychiatrist were, and six of the eight had seen both a primary clinician and a psychiatrist at least once since their arrival. Two patients reported not being seen by either a clinician or psychiatrist at any time during their stay; the names of both individuals were given to the chief of mental health. Patients reported clinical sessions lasted between 5 to 15 minutes. Five of the six patients reported not talking about their concerns but only answering questions during their contacts. No patients reported seeing their primary clinicians every 90 days.

The second group of eight patients reported seeing their clinician every 90 days and indicated between 15 to 30-minute encounters discussing their goals and concerns. The patients also revealed that if they needed to see a clinician, they would see them the next day and had no obstacles to care.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their 3CMS stays.

Of the ten patients that required initial psychiatry evaluations, eight had them timely before the initial IDTT; one initial psychiatry evaluation never occurred. Of the nine that occurred, five or 56 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, unavailable confidential space, and cell front contacts. Telepsychiatry was used for five or 56 percent of initial psychiatry evaluations.

For routine psychiatry contacts, 88 percent timely occurred at least every 90 days; 57 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and cell front contacts. Telepsychiatry conducted eight or 57 percent of reviewed routine psychiatry contacts.

Four or 40 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a change in level of care. Eight or 80 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and day room contacts. No initial primary clinician evaluations were conducted utilizing telehealth.

For routine primary clinician contacts, 42 percent timely occurred at least every 90 days. Six routine primary clinician contacts never occurred. Twelve or 75 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, dayroom, and yard contacts. No routine primary clinician contacts were conducted via telehealth.

Four of ten initial IDTTs occurred within 14 working days of patient arrival or a level of care change. Required staff attended all ten initial IDTTs; patients attended 70 percent of initial IDTTs. Initial IDTTs held *in absentia* were due to patient refusals.

Three of five patients or 60 percent had timely annual IDTTs. Required staff attended all annual IDTTs; patients attended four of five or 80 percent of annual IDTTs. The reason attributed to annual IDTTs held *in absentia* was patient refusals.

Mental health staff workspace was toured due to multiple reports of unhygienic work conditions. Designated workspace in Facility B visiting, referred to as the 'cave,' was reportedly unkempt and a tour of this area revealed that the space had not been cleaned for a significant period of time. Bathrooms in this area were also unkept, and staff reported that they have resorted to sometimes cleaning the bathrooms themselves. Similarly, the mental health administration building also needed a regular cleaning schedule. In addition to similar findings inside, four large trash bins outside the building overflowed.

Staff reported mold in various treatment areas, including the multipurpose room in unit C1. While there was no obvious indication of visible mold, the ceiling had what appeared to be a large water stain. The layout of this multipurpose room was comparable to other multipurpose rooms used for 3CMS patient contacts throughout NKSP. There was a significant concern regarding confidential contacts as these multipurpose rooms were located off the side of the day room in the housing unit, which allowed complete visibility of the patient and clinician. Similarly, the proximity of the noisy day rooms did not allow for a therapeutic treatment space.

Other Issues:

Pre-Release Planning:

The pre-release LOP was revised in March 2023 and was accurate except for the term CCAT. Headquarters pre-release staff no longer used the name CCAT and changed it to PReP which stands for Pre-Release Planning meeting.

The NKSP pre-release coordinator was a licensed clinical social worker. Due to staffing shortages, the supervising social worker provided backup. The pre-release coordinator worked with multiple disciplines, internal and external agencies, and other community and state programs as needed. Additional duties included conducting pre-release planning groups on

Mondays and Wednesdays, 1:1 pre-release assessments, internal and external clinician-to-clinician contacts, and communication with Offender Mental Health Disorder (OMHD) evaluators and TCMP contractors.

Notably, the pre-release coordinator did not have an office or confidential space to interview and assess patients and explained that this was a barrier to adequate communication with the patients. Also, the coordinator reported difficulties with correctional counselors collaborating with patients for the completion of Cal-ID applications. While the pre-release coordinator reported many patient refusals for Cal-ID, interviewed patients reported that they were never given the option to fill out their Cal-ID application.

Reviewed pre-release assessment and treatment data indicated that 315 patients received pre-release services 90 days prior to their parole and 289 of these patients paroled directly from NKSP.

The TCMP reported 44 EOP and 316 3CMS patients released from NKSP during the review period. Reviewed TCMP data revealed that 272 patients timely submitted applications for Medi-Cal. Additionally, 58 patients had access to other insurance, six submitted their applications late, 16 were unavailable, and eight refused services. For SSI, 66 patients were eligible; 51 patients submitted applications, and 15 patients refused services. Of the seven eligible patients for Veterans' benefits, five patients submitted applications, one patient had already applied, and one patient was denied.

Program Access:

a.    Job and Program Assignments

NKSP reported that, on February 2, 2024, its 448 job assignments were held by 91 3CMS patients or eight percent of the 3CMS population and 357 or 13 percent of non-MHSDS incarcerated persons.

The 288 academic assignments were held by 82 or eight percent of 3CMS patients and 206 or seven percent of non-MHSDS incarcerated persons.

Of the 27 vocational education assignments, two or less than one percent of 3CMS patients held them, as did 25 or one percent of non-MHSDS incarcerated persons.

Three or less than one percent of 3CMS patients and 15 or one percent of non-MHSDS incarcerated persons held the 18 voluntary education assignments.

The 100 substance abuse treatment assignments were held by 36 or three percent of 3CMS patients and 64 or two percent of non-MHSDS incarcerated persons.

b.    Milestone Credits

NKSP was unable to report the number of 3CMS patients or non-MHSDS incarcerated persons eligible for milestone credits or who earned the credits.

c.    Out-of-Level Housing

On February 6, 2024, NKSP reported that 16 3CMS custody Level II patients were in Level I housing and nine 3CMS custody Level II and 21 3CMS custody Level IV patients were in Level III housing.

d.    ADA Reasonable Accommodation and Grievance Procedure

NKSP provided its up-to-date reasonable accommodation LOP and an updated reference training manual for ADA accommodations.

<u>"C" Status</u>:

At the time of the site visit, six 3CMS patients and 12 non-MHSDS incarcerated persons were designated "C" status.  During the review period, six 3CMS patients and 24 non-MHSDS incarcerated individuals were placed on "C" status.  All patients were designated "C" status due to being classified as program failures.

<u>Case-by-Case Reviews</u>:

During the review period, one patient had a 150-day case-by-case review.  Reviewed documentation indicated that the patient postponed his RVR hearing, received a referral to the CSR for a 90-day ASU extension, and was pending transfer due to safety concerns.

NKSP did not maintain historical data on MHSDS patients who had 120-day pre-MERD reviews.

<u>Mental Health Referrals</u>:

During the reporting period, NKSP made 6,608 mental health referrals; there were 1,784 referrals to psychiatry and 4,824 referrals to primary clinicians.  There were 353 emergent referrals, 1,148 urgent referrals, and 5,107 routine referrals.

NKSP responded in a timely manner to 17 of 26 or 65 percent of emergent psychiatry referrals and 266 of 327 or 81 percent of emergent primary clinician referrals.  For urgent referrals, NKSP timely responded to 11 of 17 or 65 percent of psychiatry referrals and 729 of 1,131 or 64 percent of primary clinician referrals.  For routine referrals NKSP timely responded to 1,470 of 1,741 or 84 percent of psychiatry referrals and 1,497 of 3,366 or 44 percent of primary clinician referrals.

Custody and Mental Health Partnership Plan:

NKSP's custody and mental health partnership plan LOP complied with statewide policy and was revised in March 2023.

Executive leadership joint rounding occurred during each month of the review period in accordance with policy. The produced rounding forms indicated that required staff attended and staff and patients were interviewed monthly. Staff did not report any issues and noted positive relations between custody and mental health staff. Patients reported positive relations with mental health staff but noted that certain custody officers did not take mental health issues as seriously as they felt necessary.

NKSP was unable to provide agendas for executive staff meetings. Monthly QMC and MHPS meeting minutes were provided as required and each discussed joint rounding in detail.

Monthly joint supervisory program area tours occurred for all six months on Facilities B, C, and D, and three of six months on Facilities A and M. Required staff attended each tour. Staff noted concerns regarding inadequate staffing and patients not being seen for mental health treatment timely. Patients noted maintenance-related concerns, a desire for more groups and programming, and programming concerns with respect to SNY individuals being moved to general population yards.

Weekly 3CMS supervisory meetings occurred in November and January, all but one week in August and October, two weeks in December, and only one week in September. While the provided documentation revealed that required staff attended each meeting, no further details were provided for any meetings.

Daily huddle sheets were provided for the ASU, MHCB, and RC EOP for most–but not all–weeks of the review period.  The required form was used and indicated the required staff's attendance.

MHCB, RHU, and RC EOP huddles were observed during the site visit.  Required staff attended the RHU and RC EOP huddles, and they consistently reflected a thorough knowledge of their patients.  The monitor also observed an MHCB huddle; mental health did not attend.  Review of MHCB huddle forms from three weeks prior to the site visit reflected that mental health frequently did not attend.

NKSP distributed the 3CMS orientation brochure to new patients and provided a copy to the monitor.

Inmate advisory council meeting minutes were produced for each month of the review period for Facility A.  Topics discussed included the provision of medical and dental care, proposed improvements to the visitor centers, and canteen issues.

Fifty-four staff misconduct complaints were filed during the review period; the type of staff was not specified.  Of those, 35 were in progress, and 18 were resolved.  Ten staff misconduct complaints were not initiated through the appeal process; NKSP could not provide any other information regarding these ten complaints.  No staff members were reassigned due to misconduct complaints.

Annual partnership off-post training was attended by 142 of 171 or 83 percent of mental health and 813 of 851 or 96 percent of custody staff.

<u>Heat Plan</u>:

NKSP's heat plan LOP was revised in December 2023 and complied with CDCR policy.  The heat plan was in effect for four months of the reporting period.  There were 29 Stage I and

one Stage II heat alerts in July 2023, 21 Stage I heat alerts in August 2023, 12 Stage I heat alerts in September 2023, and four Stage I heat alerts in October 2023. No Stage III heat alerts occurred, and no patients experienced heat-related illness during the review period.

Knowledge of the heat plan among Interviewed correctional officers across the institution varied. For example, some officers did not know the third stage of the heat plan, but other officers were able to recall all three stages. Custody officers had resources that listed the appropriate procedures and temperatures for each stage of the heat plan. Furthermore, interviewed officers knew to reference the list of patients prescribed heat-sensitive medications whenever the heat plan was activated. However, some officers did not know that the heat-sensitive medication list must be updated daily.

The monitor observed appropriately placed working thermometers in all toured housing units.

The annual mandatory heat-related pathologies training was attended by 699 of 758 or 92 percent of custody staff and 99 of 170 or 58 percent of required mental health staff.

RVRs:

NKSP issued 2,865 RVRs during the review period; 1,045 or 36 percent were issued to MHSDS patients, including 30 to MHCB patients, 96 to EOP patients, and 919 to 3CMS patients.

Review of 26 RVRs issued to MHSDS patients revealed that the MHA was confidentially completed in 16 of 26 or 62 percent of cases. Custody staff timely referred the MHA to mental health in 12 of 26 or 46 percent of cases. Mental health staff timely completed and returned the MHA to custody in 24 of 26 or 92 percent of cases.

Patients were assigned a staff assistant in 21 cases. Patients timely received the required RVR documentation prior to the hearing in 100 percent of reviewed RVRs, and patients were present for 24 of 26, or 92 percent of hearings.

The SHO documented consideration of the patients' mental health information in all 26 reviewed RVRs. The SHO mitigated the penalty based on the mental health recommendation in all six instances where the assessment recommended mitigation.

One of the reviewed MHAs recommended that the RVR be documented in an alternative manner. The RVR was not documented in an alternative manner. Rather, the SHO's reasoning for conducting the RVR hearing was that the patient was fully aware of his actions and should be held fully accountable. Notably, the patient pleaded guilty and took full responsibility for his actions. There were two RVRs indicating that patients' mental health contributed to the behavior which led to the RVR, and the reviewing officers found both patients guilty as charged.

The mental health assessment training was attended by 99 of 106 or 93 percent of the required custody staff. For mental health staff, none of the 22 required staff attended the training.

Use of Force:

NKSP reported no controlled use of force incidents during the review period but was unable to report the number of immediate use of force incidents. However, a review of 15 immediate use of force incidents involving MHSDS patients revealed appropriate use of force by custody staff in each instance; appropriate decontamination was afforded to all patients as needed.

The annual use of force training was attended by 760 of 785 or 97 percent of custody staff and 11 of 172 or six percent of mental health staff.

<u>Lockdowns/Modified Programs</u>:

NKSP initiated two modified programming periods during the review period.  One period stemmed from a murder on Facility A which resulted in searches on that Facility for 11 days. The other period resulted from an institutional search that lasted nine days for unspecified reasons.  Mental health services were not interrupted in either instance.

Between the end of the review period and the time of the site visit, NKSP initiated one additional modified programming period as a result of multiple attempted murders on Facility A. A six-day-long investigation followed; mental health services were not interrupted.

<u>Access to Care</u>:

A review of NKSP's monthly Health Care Access Quality reports from August 2023 through January 2024 indicated a total of 29,344 issued mental health ducats and add-on appointments, of which 6,511 or 22 percent were completed and 22,833 or 78 percent were not completed.  Of the non-completed appointments, none were due to custody factors, 20,279 or 89 percent were due to non-custody factors, and the remaining 2,554 or 11 percent were due to patient refusals.

<u>Placement of 3CMS Patients into Minimum Support Facilities</u>:

During the review period, 20 3CMS patients were housed in the MSF.  On March 12, 2024, 34 3CMS patients were housed in the MSF.

<u>*Coleman* Postings</u>:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX B**

**CLINICAL CASE REVIEWS**

**APPENDIX B – 1**
**CALIFORNIA INSTITUTION FOR MEN (CIM)**
Site Visit:  October 10, 2023 – October 12, 2023
Review Period:  December 1, 2022 – May 31, 2023

**Patient A**

This 54-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

While receiving treatment at CIM at the 3CMS level of care, the patient required placement at the MHCB level of care on April 2, 2023, and was physically admitted to the MHCB on April 3, 2023.  The reason for admission was suicidal ideation with a plan to overdose in the context of auditory hallucinations and paranoia.  The patient reportedly was hesitant to allow treatment of his psychosis.

The patient had no prior history of treatment at the EOP, MHCB, intermediate, or acute levels of care.  The patient received treatment at the 3CMS level of care from 2009 to 2017; he was not included in the MHSDS from 2017 to 2022.  He returned to the 3CMS level of care from February 10, 2022 until time of admission to the MHCB.

A SRASHE on April 2, 2023 assessed the patient with moderate chronic and high acute suicide risk.  He had a possible suicide attempt in 2021 by overdose, which reportedly had not previously been disclosed.

The initial MHCB evaluations provided difficult to discern information regarding the patient's diagnoses.  Those diagnoses included depression, auditory hallucinations, and substance use.  A diagnosis of unspecified bipolar disorder was added by the treatment team.

The patient was prescribed mirtazapine for depression, and olanzapine and chlorpromazine for psychosis.  He also received MAT with buprenorphine/naloxone for substance use disorder.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting.  Of note, the initial PC evaluation contained valuable clinically meaningful information in the history of present illness and case formulation sections.  In both evaluations, it was difficult to discern the patient's diagnoses.  The IDTT meetings included all required members, including the patient.  The treatment goals included reducing suicidal thoughts and auditory hallucinations.  The treatment interventions included learning positive coping skills and encouraging the patient to engage in treatment programming.

The progress notes indicated that the treatment team would use specific dialectical behavioral therapy and CBT for psychosis techniques.  The routine psychiatric and PC contacts occurred timely.  The documentation indicated that the PC engaged collateral sources of support and information.  Although the documentation mentioned psychotherapy techniques, it was unclear how those interventions were actually implemented.

A repeat SRASHE prior to the MHCB discharge assessed the patient with high chronic and moderate acute suicide risk.

The patient stabilized and was discharged to VSP at the EOP level of care. The psychiatric discharge summary was completed timely. Clinical discharge occurred on April 11, 2023, and physical discharge occurred on April 13, 2023. The five-day follow-up contacts were appropriately completed.

**Findings**

The care provided to this CIM MHCB patient was adequate.

The patient received timely initial evaluations, IDTT meetings, and routine contacts. Medication management was appropriate, with adequate rationale provided. The patient's clinical MHCB stay was within the ten-day timeframe. The PC appropriately contacted the patient's outside source of support for collateral information.

Although the overall care was adequate, some issues of concern were noted. The patient's diagnosis in the original documentation was difficult to discern, and rather than including diagnoses, psychiatric symptoms were listed instead. It was unclear how the interventions stated in the treatment plan and mentioned in the plan sections of progress notes were actually utilized in clinical sessions.

**Patient B**

This 46-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

On April 5, 2023, while receiving treatment at the 3CMS level of care at CIM, the patient required placement in the MHCB due to paranoid delusional thinking. He was promptly admitted to the MHCB. The patient had a history of treatment at the 3CMS level of care with no treatment documented at the EOP, MHCB, intermediate, or acute levels of care.

The SRASHE completed on April 2, 2023 assessed the patient with low chronic and acute suicide risk.

The patient was provided a diagnosis of unspecified psychosis and was prescribed the antipsychotic medication olanzapine.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The initial psychiatric evaluation contained scant information traditionally included in psychiatric evaluations but contained enough information to support the stated diagnosis. The initial PC evaluation did not include a definitive diagnosis. The IDTT meeting included all required participants, including the patient.

The treatment goals included developing coping skills, establishing a therapeutic alliance, and anger management. The treatment interventions included psychoeducation regarding substance use treatment.

The routine psychiatric and PC contacts occurred timely. The documentation reflected unclear use of the interventions stated in the treatment plan, and the efficacy thereof. While substance

use was reportedly a significant contributor to the patient's MHCB admission, no substance use diagnosis was provided.

Multiple treatment sessions occurred at the cell front. While most notes stated that this occurred due to patient refusal, some documentation also mentioned that the patient was seen at the cell front due to modified programming. While still in the MHCB, the patient was seen by the PC who would be assigned to him after discharge. While commendable and beneficial for continuity of care, the session was conducted at the cell front for unclear reasons. This was particularly concerning, as sensitive information such as substance use issues were discussed.

The patient stabilized and was discharged to CIM at the 3CMS level of care on April 12, 2023. The discharge SRASHE assessed low chronic and acute suicide risk. The discharge summary was completed timely. The five-day follow-up contacts were completed appropriately.

**Findings**

The care provided to this CIM MHCB patient was adequate.

Positive aspects regarding the care provided included the timely completion of the initial evaluation, routine contacts, and IDTT meetings. Of note, the treatment team also had the patient's PC who would treat him after discharge meet the patient while he was still in the MHCB. Medication management appeared consistent with the stated diagnosis and the patient's clinical presentation.

Nevertheless, some limitations were also noted. The PC evaluation contained no definitive diagnosis. Despite treatment goals including educating the patient on substance use, the patient had no clearly defined substance use disorder diagnosis. The patient refused multiple confidential sessions, and interventions to address this treatment barrier were sorely lacking in the documentation reviewed. Concerningly, some sessions occurred at the cell front for the nebulous reason of modified programming.

**Patient C**

This 29-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient had no prior treatment in the MHSDS. He was referred from Calipatria due to suicidal ideation with a plan to cut himself. On December 13, 2022, the patient was placed at the MHCB level of care, arriving at CIM on the same date.

The SRASHE on December 13, 2022 assessed the patient with low chronic and high acute suicide risk.

The patient was provided diagnoses of opioid use disorder, methamphetamine use disorder, and anxiety.

The patient was prescribed hydroxyzine PRN for anxiety, but declined to take other medications. The patient participated in the MAT program and was prescribed buprenorphine/naloxone.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. Of note, the case formulation appropriately included cultural considerations that were relevant in treatment. The initial IDTT meeting included all required participants, including the patient. The initial and follow-up treatment plans included goals from nursing staff, but no goals developed by mental health clinicians.

The routine psychiatric and PC contacts occurred timely. A December 16, 2022 progress note stated that the patient would remain in the MHCB for further assessment, and that the patient "has not maximized services at MHCB at this time." A December 19, 2022 note stated that the patient would remain in the MHCB until the IDTT meeting occurred.

A December 19, 2023 SRASHE assessed the patient with low chronic and acute suicide risk. The patient stabilized and was clinically discharged on December 20, 2023. He was physically discharged to PVSP at the 3CMS level of care on December 23, 2023. The five-day follow-up contacts were completed appropriately.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

Positive aspects of the patient' care included the consideration of cultural considerations in his treatment. Additionally, the patient physically discharged from the MHCB within mandated timeframes.

As a fundamental deficiency, the treatment plans did not contain any mental health goals. The treatment notes included ambiguous statements such as the patient had not "maximized services at MHCB," but no clear rationale for further MHCB treatment was provided. Additionally, the statement that the patient would remain in the MHCB until the IDTT met argued against the core feature of individualized treatment, as the patient's presentation should have guided discharge considerations, rather than a fixed schedule of when the treatment team scheduled the IDTT meetings.

**Patient D**

This 32-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient was referred from the RJD EOP to the MHCB due to danger to self after setting his cell on fire. On May 8, 2023, the patient was placed at the MHCB level of care, arriving at CIM timely on the same date.

Since the time of his most recent CDCR incarceration in 2018, the patient received treatment at the EOP level of care. During a prior incarceration, he received treatment at the EOP, MHCB, and acute levels of care. His sole MHCB and subsequent acute care admission occurred in 2013.

The SRASHE completed on May 8, 2023 assessed the patient with moderate chronic and high acute suicide risk. The patient had one prior severe suicide attempt in 2013, which required cardiopulmonary resuscitation.

The patient was provided diagnoses of psychosis, major depressive disorder, and anxiety.

He was prescribed olanzapine for psychosis, atomoxetine for attentional impairment, oxcarbazepine for mood stabilization, venlafaxine for depression, and buspirone for anxiety.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting.

The initial psychiatric evaluation included confusing information. The documentation listed "psychosis" under the assessment and plan, while the problem list included major depressive disorder and unspecified bipolar disorder; these were two diagnoses which were mutually exclusive.

The initial IDTT meeting occurred timely and included all required participants, including the patient. However, treatment goals were inconsistent with other documented information. For example, an initial goal was to address the patient's thoughts of harming himself; however, the PC progress note of the same date stated that the patient had no suicidal ideation. The treatment interventions were vague, such as using CBT to increase acceptance and tolerance of emotional pain.

The routine psychiatric and PC contacts, as well as the routine IDTT meetings, occurred timely. The documentation indicated that the treatment team frequently saw the patient at cell front, with most due to patient refusal. On May 28, 2023, the documentation indicated that the patient was seen at cell front due to modified programming. The patient intermittently refused to attend the IDTT meetings. While the treatment plan narratives indicated the treatment modifications to be provided while the patient was awaiting transfer to the intermediate level of care, such as encouraging the patient to practice one distress tolerance skill daily and the use of reality testing, the documentation reflected inconsistent use of these interventions.

No MHCB discharge summary was located in the healthcare record.

Due to the patient's continued symptoms and impairment, the treatment team referred the patient to the intermediate level of care on May 17, 2023. He transferred to the CMF intermediate care program on June 1, 2023, where he was treated until September 9, 2023. The patient discharged to RJD at the EOP level of care, where he remained at the time of the review.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

The psychiatric evaluation was internally inconsistent, including contradictory diagnoses which were mutually exclusive and inconsistent. At the time of the initial assessment, the psychiatrist initiated treatment with atomoxetine, a medication traditionally used for treatment of ADHD. The justification for treatment with this medication when the patient was admitted for erratic behavior and psychosis was perplexing, while adequate rationale for this treatment departure was not documented. While the patient was prescribed buspirone for anxiety, there were no goals or treatment interventions to address this symptom. The initial PC evaluation included statements such as the patient "appears to be attending to basic ADLs," even though he had recently set his cell on fire due to delusional thinking. The case formulation was not updated. The treatment

plans also stated that the patient would be retained at the EOP level of care, despite his placement in the MHCB.

Despite these issues of concern, the patient was appropriately referred to a higher level of care.

**Patient E**

This 57-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

On March 15, 2023, while receiving treatment at the RJD EOP, the patient was placed at the MHCB level of care after self-laceration with extensive blood loss. He arrived timely at the CIM MHCB on March 16, 2023. The patient had a history of treatment at the 3CMS level of care during a prior CDCR incarceration. At the time of his most recent incarceration on May 25, 2022, the patient was soon placed at the 3CMS level of care with subsequent placement in the EOP. The patient had two prior MHCB admissions during June and November 2022, and one prior acute care admission from December 12, 2022 to February 18, 2023. After discharge from the acute level of care, the patient was placed in the RJD EOP; he subsequently required MHCB placement on March 15, 2023.

The initial MHCB SRASHE on March 16, 2023 assessed the patient with high chronic and acute suicide risk. The patient had three prior suicide attempts, with two having occurred in the six months prior to this MHCB admission.

The patient's diagnoses differed in the psychiatric and PC evaluations. Those diagnoses included schizoaffective disorder, bipolar type, major depressive disorder with psychotic features, antisocial personality disorder, alcohol use disorder, and methamphetamine use disorder.

The patient was prescribed ziprasidone and olanzapine PRN; both were antipsychotic medications. Due to cardiac side effects, the psychiatrist discontinued ziprasidone and started chlorpromazine. This change was not documented at the time of the medication change but was documented in subsequent progress notes. The patient was also prescribed benztropine for side effects to antipsychotic medications.

The initial PC evaluation occurred timely prior to the initial IDTT meeting. However, the initial psychiatric evaluation was not completed prior to the initial IDTT meeting. The psychiatric evaluation dated March 17, 2023 indicated that the patient was seen during the IDTT meeting for the initial psychiatric assessment. The initial IDTT meeting occurred timely and included all required participants, including the patient. The initial treatment plan did not contain any information in the goals or interventions sections; however, the case formulation mentioned helping the patient to find one reason to live and develop coping skills and emotional regulation through distress tolerance skills. Subsequent treatment plans noted difficulty in establishing patient goals, due to the patient being adamant that he wanted to die. The treatment plan subsequently reflected a goal of reducing the patient's level of suicidal thinking below a certain number on a rating scale. The treatment interventions included the use of CBT to increase acceptance and tolerance of emotional pain.

The routine psychiatric and PC contacts occurred timely. The barriers to treatment included the patient's reluctance to engage in treatment. The documentation reflected that attempts to engage the patient were generally unsuccessful, frequently resulting in cell-front contacts due to refusal of confidential contacts.

Due to the patient's continued symptoms and impairment, the treatment team referred the patient to the acute level of care on March 22, 2023. On March 28, 2023, the patient physically discharged to the CMF acute care program. No psychiatric CIM MHCB discharge summary was located in the healthcare record. The patient remained in the CMF acute care program at the time of this review.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

Multiple fundamental deficiencies were noted regarding the care provided to this patient. The initial psychiatric evaluation was inappropriately conducted in a group setting during the initial IDTT meeting. In addition to the completion of this important initial assessment in a nonconfidential setting, the evaluation did not occur timely prior to the initial IDTT meeting. The psychiatrist and PC provided disparate diagnoses, and there was no documentation that attempts were made to reconcile the differing assessments. The initial treatment plan did not include mental health goals. The patient's reluctance to engage in treatment was a clear barrier to treatment; despite this, no clear treatment plan goals or interventions were noted to address this treatment barrier.

The psychiatrist changed the patient's medication due to cardiac side effects. The rationale for any medication change required documentation in the healthcare record at the time of the medication change. The importance of this was amplified given the potentially fatal nature of the patient's cardiac medication side effects. Additionally, the expert had concerns regarding the starting dose of the antipsychotic medication chlorpromazine.

Positive aspects of this case included the appropriate referral to the acute level of care, and the patient's transfer occurring within mandated time frames.

**Patient F**

This 43-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient had no prior treatment in the MHSDS. His current CDCR prison term began on September 22 2022. The patient was housed at ISP and was not a participant in the MHSDS when on April 19, 2023, he was placed at the MHCB level of care due to suicidal ideation with a plan to cut himself. He transferred to the CIM MHCB on the same day.

A SRASHE completed on April 19, 2023 assessed the patient with low chronic and high acute suicide risk. The patient had prior suicidal ideation but had no suicide attempts or prior self-injury.

The patient was provided diagnoses of adjustment disorder with anxiety, unspecified depressive disorder, and major depressive disorder. He was prescribed oxcarbazepine for mood stabilization.

The initial psychiatric and PC evaluations timely occurred prior to the initial IDTT meeting. The initial IDTT meeting also occurred timely and included all required members, including the patient. The treatment goals included no thoughts of death or suicide for one week and displaying behavior appropriate for a lower level of care. The treatment interventions included the therapist utilizing CBT to "increase acceptance and tolerance of emotional pain." This intervention contradicted the treatment plan that noted that the patient denied symptoms of psychological distress.

The routine psychiatric and PC contacts occurred timely. The PC notes stated in the plan section that the patient required monitoring and stabilization of psychotic symptoms; however, the notes did not indicate the presence of any psychotic symptoms, and a psychotic disorder diagnosis was not provided. Both PC and psychiatric notes contained scant reference to the treatment plan directed interventions. One PC progress note indicated the use of "cognitive reorientation" and that the patient was receptive to this intervention, but further details were not provided.

A repeat SRASHE completed on April 25, 2023 assessed the patient with low chronic and moderate acute suicide risk.

The patient stabilized and was clinically discharged on April 26, 2023, with physical discharge to NKSP at the 3CMS level of care on April 27, 2023. The psychiatric discharge summary was completely timely. The five-day follow-up contacts were completed appropriately. The patient remained at NKSP at the 3CMS level of care at the time of this review.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

The psychiatrist provided an initial diagnosis of adjustment disorder with anxiety; however, the patient reported feelings of depression and sadness, and was admitted to the MHCB due to suicidal ideation. It was unclear why the psychiatrist did not initially provide a mood disorder diagnosis; additionally, the psychiatrist's diagnosis was inconsistent with the initiation of the mood stabilizing medication oxcarbazepine. The psychiatrists who later treated the patient did provide a diagnosis of depressive disorder, although the specific diagnosis differed from the medication treatment initiated. The justification for such non-traditional use of medications required justification in the healthcare record.

The treatment plan contained vague and generic interventions that did not appear to be individualized. The progress notes failed to consistently reflect the use of interventions specified in the treatment plan. Additionally, several notes were internally inconsistent, noting that the patient did not have psychotic symptoms only to state later that the patient required additional stabilization for psychosis.

The monitor's expert also had concerns about the poor continuity of care provided to the patient while in the MHCB. During his short stay there from April 19 - 26, 2023, the patient saw two psychiatrists, with another psychiatrist present in the initial IDTT meeting. Of additional concern, the patient was seen by three different PCs.

**Patient G**

This 33-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient had not been included in the MHSDS since his incarceration in 2006. Despite this, he had met with a PC approximately every five to six weeks for ongoing support since October 2021. On April 23, 2023, the patient reported suicidal ideation and was placed at the MHCB level of care; he was admitted timely to the CIM MHCB on the following day.

The SRASHE on April 24, 2023 assessed the patient with moderate chronic and high acute suicide risk. The patient had a history of suicidal ideation during childhood but had no reported suicide attempts or self-harm incidents.

The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed mirtazapine for depression and anxiety, and hydroxyzine PRN for anxiety; however, the patient stated that he did not want to take psychotropic medications. The psychiatrist noted that the patient did not meet the criteria for a PC 2602 involuntary medication order.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The psychiatrist who performed the initial assessment was not the psychiatrist present in the IDTT meeting. All required participants were present at the meeting, including the patient. The treatment goals included the resolution of thoughts of death and suicide by the time of the next IDTT meeting. The treatment interventions included encouraging the patient to work on goal setting, developing a safety plan, and encouraging the patient to engage in appropriate unit programming. Of note, a progress note from the same PC who completed the treatment plan on the date of the initial IDTT meeting noted that the patient no longer reported suicidal thoughts.

The routine psychiatric and PC contacts occurred timely; however, the patient saw three different PCs during his brief treatment course in the MHCB. The documentation reflected work on coping skills and the use of CBT to reduce symptoms of depression; however, further details were not specified. Other notes reflected the use of motivational interviewing, as well as active listening to address the patient's concerns about housing, which was a significant stressor for him. The PC notes stated that mental health staff were unable to recommend single-cell status for the patient, and that the patient should discuss this issue with custody staff.

The patient stabilized and was clinically discharged to the 3CMS level of care on May 2, 2023. The patient physically discharged to CSP/LAC on May 3, 2023, where he remained at the time of this review. The discharge summary was completed timely. The five-day follow-up contacts were completed appropriately.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

Several areas of concern were noted regarding the care provided to this patient. While a central treatment goal was to resolve the patient's suicidal ideation, the patient denied suicidal thoughts on the day of the initial IDTT meeting. Although the documentation reflected the presence of anxiety symptoms, the treatment plan did not sufficiently address them. The documentation also noted the use of CBT, an evidenced-based treatment for depression; however, the specific interventions used in treatment sessions were vaguely documented. One of the most pressing concerns the patient reported was about his housing; for this reason, the PC's documented response that this was a custody matter that the patient should discuss with them was inadequate. Although housing was ultimately a custodial matter, mental health's input might have been useful and important.

Positive aspects of the care provided included timely MHCB admission, assessments, routine visits, IDTT meetings, discharge summary, and physical discharge from the MHCB.

**Patient H**

This 43-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient received treatment at CSP/LAC at the EOP level of care. On February 7, 2023, the patient experienced suicidal ideation, and was placed at the MHCB level of care with transport to the CIM MHCB. A trigger for this episode was the recent death by suicide of an incarcerated person. The patient had multiple prior MHCB placements, with his most recent evaluation for MHCB placement on January 14, 2023.

The SRASHE on February 7, 2023 assessed the patient with moderate chronic and high acute suicide risk. The documentation noted that the patient had a history of one or two prior suicide attempts. He also had a history of self-harm by cutting.

The patient's diagnoses were difficult to discern from the initial psychiatric evaluation but appeared to include major depressive disorder without psychotic features, opioid use disorder, adult antisocial behavior, alcohol use disorder, cannabis use disorder, PTSD, and stimulant use disorder.

The patient was prescribed oxcarbazepine, venlafaxine, and prazosin. At the time of the MHCB admission, the psychiatrist discontinued lamotrigine due to lack of efficacy, a long titration period, and the patient's intermittent adherence. The patient was also treated for opiate use disorder with buprenorphine/naloxone for MAT. His relevant medical conditions included bilateral deafness, and his primary communication method was sign language.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. Of note, the initial PC evaluation was comprehensive and provided useful clinical information. The

psychiatrist who performed the initial psychiatric evaluation was not the psychiatrist present at the initial IDTT meeting. The initial IDTT meeting included all required participants, including the patient. The treatment goals included the resolution of thoughts of death and suicide, using CBT to increase acceptance and tolerance of emotional pain, developing a safety plan, and engaging the patient in appropriate unit programming. The treatment team noted that the patient met the higher level of care referral consideration criterion for having five MHCB admissions in six months. He was not referred to a higher level of care as this was his initial IDTT meeting, and the IDTT stated that he had not received maximum benefit from his current treatment setting.

The routine psychiatric and PC contacts occurred timely. The progress notes intermittently listed utilized interventions and the patient's response to them. Examples included redirecting his negative thoughts, and the use of coping skills, such as grounding and distress tolerance skills. The documentation also indicated that the patient wanted to work on anxiety and trauma-related concerns.

The patient stabilized and was clinically discharged to the EOP level of care on February 15, 2023, with physical discharge to the CSP/LAC EOP hub on the following day. The psychiatric discharge contained clinically useful information and was completed timely. The five-day follow-up contacts were completed appropriately. The patient subsequently transferred to RJD at the EOP level of care prior to parole on July 29, 2023.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

Positive aspects of the care provided to this patient included timely admission, initial PC and psychiatric evaluations, IDTT meetings, routine contacts, and physical discharge. Additionally, some PC notes specified the use of specific techniques used in treatment sessions.

As was observed in other reviewed cases at CIM, it was difficult to discern the patient's diagnoses from the clinical documentation. The link between the patient's reported diagnoses and the use of a mood stabilizing medication was unclear. At the time of the initial psychiatric evaluation, the psychiatrist made three changes that included initiating two medications and discontinuing one medication. That number of simultaneous medication changes prevented a clear understanding of each medication's benefit or side effects. Despite multiple progress notes mentioning the patient's anxiety and medication treatment for anxiety, no anxiety disorder diagnosis was provided.

The initial IDTT's goal of resolving the patient's suicidal ideation was clinically appropriate; however, there was a lack of documentation of specific interventions to achieve this goal. Additionally, on the date of the initial IDTT meeting, the patient denied suicidal ideation. However, he reported high levels of depression and moderate levels of anxiety. As was noted in other reviewed CIM cases, the treatment goals were generic, such as the use of CBT to address emotional pain. Despite the initial SRASHE noting substance use, PTSD, and anxiety as risk factors for suicide for this patient, those concerns were not directly addressed in the goals and

interventions documented.  While the clinical decision not to refer the patient to a higher level of care appeared appropriate, a stronger justification for nonreferral was required.

**Patient I**

This 46-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient was not included in the MHSDS during prior CDCR incarcerations.  His most recent incarceration began on June 15, 2022.  The patient was included in the MHSDS at the 3CMS level of care while at WSP on July 7, 2022.  He subsequently transferred to CIM.  On December 21, 2022, the CIT evaluated the patient due to danger to self and referred him to the MHCB.

The SRASHE on December 21, 2022 assessed the patient with high chronic and moderate acute suicide risk.  The patient had a history of three prior suicide attempts in 2012.

The patient was provided a diagnosis of adjustment disorder.  At the time of the MHCB admission, the patient was not prescribed psychotropic medications.  The documentation reported that he had taken oxcarbazepine and fluoxetine in the past; it was noted that the patient indicated that the medications were effective, but he stopped taking them due to problems associated with the pill line.  The psychiatrist resumed oxcarbazepine for mood, depression, and anxiety, fluoxetine for depression and anxiety, and olanzapine for augmentation treatment of depression and anxiety.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting; however, the evaluations were internally inconsistent.  The initial psychiatric evaluation stated that the patient was paranoid and delusional; however, the only psychiatric disorder listed was adjustment disorder, and no psychotic diagnosis was provided.  The initial PC evaluation noted a history of suicide attempts under the suicide and self-harm history; later in the same document, the PC stated that the patient had no history of suicide attempts.

The initial IDTT meeting included all required participants, including the patient.  The treatment goals included addressing hallucinations, displaying behavior appropriate for a lower level of care, reducing suicidal ideation, being free from self-harm, learning more appropriate coping strategies other than self-harm, reducing anxiety below a certain level, and being able to tolerate anxiety for specified timeframes.  The treatment interventions included monitoring hallucinations by diaries, the use of reality testing from thought records and behavioral experiments, and addressing overestimated threat and underestimation of the patient's resources.  The case formulation in the treatment plan included minimal information and did not fully summarize the patient's clinical presentation.

The routine psychiatric and PC contacts occurred timely, yet many of the visits occurred at cell front.  While the most commonly documented reason for nonconfidential contacts was patient refusal, some notes stated that the patient was "seen cell front due to escort officers being unavailable (modified program)."  The documentation intermittently reflected encouraging the

461

patient to engage in treatment and using coping skills.  The patient saw four different PCs during his MHCB stay.

A repeat SRASHE completed on December 28, 2022 assessed the patient with low chronic and acute suicide risk.  In contrast to the initial SRASHE prior to the MHCB admission, this assessment noted that the patient's chronic risk was low, and that the patient did not have any history of self-injury or suicide attempts.

The patient stabilized and was discharged to CIM at the 3CMS level of care on December 28, 2022, with physical discharge on the same day.  The discharge summary was completed timely.  The five-day follow-up contacts were completed appropriately.  The patient was released from the CDCR on January 26, 2023.

**Findings**

The care provided to this CIM MHCB patient was inadequate.

Several clinical concerns were noted regarding the care provided to this patient.  The provided diagnoses were inconsistent, contradictory, and had tenuous links to the medications prescribed.  Basic issues such as the patient's history of suicide attempts were inconsistently documented in the healthcare record.

As was seen in other CIM cases, there was poor continuity of care regarding the PCs who saw the patient.  Concerningly, during his treatment from December 21 – 28, 2023, the patient was seen by four different MHCB PCs.

Positive aspects of the care provided to this patient included timely admission, initial PC and psychiatric evaluations, IDTT meetings, routine contacts, and physical discharge.  Additionally, the patient's 3CMS PC met with the patient in the MHCB prior to discharge to assist in continuity of care.

**Patient J**

This 21-year-old patient was randomly selected for healthcare record review to assess the MHCB care provided at CIM.

The patient received mental health services at the 3CMS level of care at CRC.  On December 3, 2022, the patient was assessed due to suicidal ideation.  He reportedly had difficulty adjusting to prison as this was his first prison term, as well as concerns after reportedly being attacked by patients at CRC.  The patient transferred to the CIM MHCB timely.

The SRASHE on December 3, 2022 assessed the patient with low chronic and high acute suicide risk.  He had no history of suicide attempts or self-injury.

The patient was provided a diagnosis of anxiety. He had a prior diagnosis of unspecified schizophrenia spectrum disorder, but this diagnosis was discontinued at the time of MHCB admission.

He was prescribed mirtazapine and hydroxyzine for anxiety and insomnia.

The initial psychiatric and PC evaluations timely occurred prior to the initial IDTT meeting. The initial IDTT meeting included all required participants, including the patient. The case formulation was cogent and provided useful clinical information and the rationale for interventions. The treatment goals included resolution of suicidal ideation. The treatment interventions included using goal setting, developing a safety plan, and encouraging programming in unit activities.

The routine psychiatric and PC contacts occurred timely. The progress notes reflected the use of CBT and relaxation techniques for anxiety, as well as encouragement to attend sessions. The treatment sessions generally occurred in confidential settings. On December 8, 2023, the PC note stated that custody was "responding to an incident and modifying the program," which indicated that the patient was not seen in a confidential setting for this contact.

The SRASHE on December 12, 2023 assessed the patient with low chronic and acute suicide risk.

The patient stabilized and was discharged to the EOP level of care on December 12, 2022. The patient timely physically discharged to RJD on December 14, 2022. The five-day follow-up contacts were completed appropriately. The patient's level of care was decreased to 3CMS on April 17, 2023. At the time of this review, the patient remained at RJD at the 3CMS level of care.

**Findings**

The care provided to this CIM MHCB patient was adequate.

The patient was timely admitted to the MHCB and timely transferred from the MHCB upon discharge. Additionally, initial evaluations, IDTT meetings, and routine follow-up visits occurred timely. The PC notes documented interventions which were clinically appropriate and based on the patient's diagnosis and clinical presentation. The psychotropic medications prescribed were logically based on the patient's clinical diagnosis and presentation.

While the overall care was adequate, some issues of concern were noted. While the patient reported prior traumas, including some that reportedly contributed to his MHCB admission, those issues were inconsistently addressed in treatment planning and progress notes. Additionally, some mental health staff contacts occurred at cell front due to unavailable custody staff.

**Patient K**

This 78-year-old patient was randomly selected for healthcare record review to assess the quality of the 3CMS care and treatment provided at CIM.

The patient's current period of incarceration began in 1984.  He was initially included in the MHSDS in 1997.  Since that time, the patient received mental health services at the 3CMS level of care that included periods of removal from the MHSDS.  The patient had no history of treatment at the EOP, MHCB, intermediate, or acute levels of care.  On November 1, 2022, the patient transferred from CSATF to CIM at the 3CMS level of care.

The SRASHE on July 4, 2022 assessed the patient with low chronic and acute suicide risk.  He had no reported history of suicide attempts.

The patient was provided with a diagnosis of adjustment disorder with anxiety.  He was not prescribed psychotropic medications.

The most recent IDTT meeting occurred on November 17, 2022.  All required participants were in attendance, including the patient.  The treatment goals centered on reducing anxiety.  The treatment interventions were generic and nonspecific, only stating that the therapist would foster a therapeutic alliance by empathizing with the patient's feelings of distress.

A routine PC contact occurred timely on February 10, 2023.  Of note, the PC discussed the use of interventions such as thought reframing and family involvement.

The patient remained at CIM at the 3CMS level of care at the time of review.

**Findings**

The care and treatment provided to this CIM 3CMS patient were adequate.

The initial PC evaluation and IDTT meeting occurred timely.  The PC progress note also indicated consideration of specific interventions such as cognitive reframing and exploring family involvement in the patient's treatment.

While the overall care was adequate, concerns were noted about the treatment plan.  While the goals were appropriate, the interventions documented to achieve them were insufficient.

**Patient L**

This 49-year-old patient was randomly selected for healthcare record review to assess the quality of the 3CMS care and treatment provided at CIM.

The patient's sole CDCR incarceration began in 2009.  He was included in the MHSDS in 2014 and received treatment at the 3CMS level of care except for an evaluation for the MHCB level of

464

care in 2016.  On September 7, 2022, the patient transferred from CSATF to CIM.  The patient had no history of treatment at the EOP, intermediate, or acute levels of care.

The SRASHE on December 29, 2016 assessed the patient with low chronic and acute suicide risk.

The patient was provided diagnoses of adjustment disorder with anxiety and depressed mood and a history of alcohol use disorder.  He was prescribed mirtazapine PRN for anxiety and insomnia.

The IDTT meetings at CIM occurred on October 25, 2022 and October 17, 2023.  The required PC and psychiatric follow-up visits occurred timely.  While the initial IDTT meeting did not occur timely, this meeting did not occur during the review period.  That IDTT meeting was mentioned here, as it governed the provision of treatment during the review period.  The treatment plan goals included reduction of anxiety and depressive symptoms below a certain level and challenging one dysfunctional thought weekly to address depressive symptoms.

The PC and psychiatric progress notes provided useful clinical information.  While the PC progress notes mentioned the treatment plan goal of reducing anxiety and depression below a certain level, the progress notes did not document the current rating of the patient's anxiety and depression.  The PC notes documented the use of supportive mental health services but did not specify what those services included.

The patient remained housed at CIM, where he received mental health services at the 3CMS level of care at the time of review.

**Findings**

The care and treatment provided to this CIM 3CMS patient were adequate.

The quality of the documentation of the PC and psychiatric progress notes enabled a clear clinical conceptualization of the patient.  Additionally, the PC and psychiatric contacts occurred timely.

Issues of concern included the use of vague goals in the treatment plan and unclear linking of those goals to specific treatment interventions.  As was seen in other CIM cases, the expert was concerned about the use of the antidepressant mirtazapine on a PRN basis for anxiety and insomnia, as this medication was traditionally prescribed on a scheduled basis.  The reason for this deviation from approved and traditional prescribing practice merited additional explanation and justification.

**Patient M**

This 34-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CIM.

The patient's sole CDCR incarceration began on June 6, 2022, with subsequent inclusion in the MHSDS at the 3CMS level of care shortly thereafter. On August 3, 2022, the patient transferred from the WSP reception center to CIM, at the 3CMS level of care. The patient had no history of treatment at the EOP, MHCB, intermediate, or acute levels of care.

The SRASHE on July 17, 2022 assessed the patient with low chronic and acute suicide risk. The patient had no reported history of suicide attempts.

He was provided a diagnosis of major depressive disorder, and was prescribed mirtazapine for depression and anxiety.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The PC and psychiatric follow-up visits also occurred timely. The treatment goals included the reduction of anxiety below a certain level and maintaining anxiety symptoms in remission. The only intervention specified in the initial treatment plan was fostering a therapeutic alliance. There were no documented goals to address the provided diagnosis of depression. Notably, despite the treatment plan that centered on anxiety and the psychiatrist prescribing mirtazapine to address anxiety and depression, the patient was not provided an anxiety disorder diagnosis.

The patient paroled from the CDCR on March 24, 2023.

**Findings**

The care and treatment provided to this CIM 3CMS patient were inadequate.

Positive aspects of the care provided included timely PC and psychiatric contacts and appropriate psychiatric medication management.

However, the stated diagnosis was inconsistent with the treatment plan goals, which centered on anxiety. Additionally, despite frequent mentions of anxiety, no formal anxiety disorder was documented. The treatment plan included inadequate interventions, such as the generic intervention of fostering a therapeutic alliance. The progress notes did not consistently correlate with the treatment plan goals.

**Patient N**

This 66-year-old patient's healthcare record was reviewed to assess the quality of care provided in the 3CMS program at CIM. The patient arrived at CIM on or around November 23, 2022. The patient's healthcare record indicated a history of multiple suicide attempts with the majority of them occurring in 1978.

The PC conducted the initial assessment at cell front, as the patient refused to attend a confidential appointment. The PC assessment included consultation with the housing unit officer, who reported no concerns about the patient's behavior or participation in programming. Upon initial PC assessment, the patient received initial diagnoses of PTSD and major depressive

disorder, recurrent, moderate. The patient continued to refuse almost all subsequent mental health contacts until early January 2023.

The IDTT convened twice at CIM with all required members in attendance. In December 2022, the IDTT noted that the patient was last seen on September 29, 2022, when he reportedly continued to exhibit bizarre delusional thinking regarding the FBI watching him. Despite that observation, the PC opined that the patient had not exhibited symptoms that would hinder adequate programming or necessitate transfer to a higher level of care. Despite documenting interventions to address psychosis with delusional thinking, the patient's diagnoses were not changed on that date.

The 3CMS treatment plan dated December 6, 2022 outlined goals for the patient, including displaying appropriate behavior for a lower level of care, adhering to treatment, and actively participating in unit programming daily for an unspecified period. The sole intervention mentioned in that treatment plan was "patients are taught to review paranoid/delusional thinking rather than just accepting them."

Fortunately, the IDTT reconvened soon after on January 10, 2023, and the patient's level of care was elevated to EOP with a plan to provide weekly PC contacts until his eventual transfer to an EOP program.

Of note, the CIM psychiatrist did not complete an initial assessment; however, there were several psychiatric contacts initiated by PC referrals that occurred before the patient ultimately transferred to a different institution in February 2023. The most recent psychiatric contact occurred one week after the level of care change on January 18, 2023; this contact was also in response to a PC referral. On that date, the psychiatrist provided a diagnosis of schizophrenia and documented the presence of grandiose and bizarre delusional thinking. The patient, however, declined to accept treatment with psychotropic medication while at CIM.

Despite the PC documenting a plan to follow-up with the patient weekly and the patient's engagement in out-of-cell individual contacts after the change in the level of care, there was a two-week gap between PC appointments in early February 2023. Both the PC and psychiatric progress notes continued to reference persistent psychotic symptoms that justified placement at the EOP level of care.

**Findings**

The care and treatment provided to this patient was adequate.

The patient was seen more often than was minimally required for the 3CMS level of care. The PC diligently conducted follow-up contacts with the patient at cell front when the patient refused appointments, and he was seen confidentially when he eventually agreed to engage in treatment. Within a two-month period following his arrival at CIM, the PC had met with the patient either at cell front or in a confidential office on at least six occasions. The PC appropriately submitted psychiatric referrals and scheduled a special IDTT meeting less than one month after the initial IDTT to increase the patient's level of care. Although the treatment plan lacked specificity and

measurable goals, the PC documented meaningful therapeutic interventions during confidential contacts, and the patient became more engaged in treatment over time. Documentation in the PC progress notes provided valuable insights into the patient's mental status. Of note, the psychiatrist should have completed an initial assessment as required, either by direct patient interview or by healthcare record review and PC consultation.

**Patient O**

This 55-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the 3CMS program at CIM. The patient was serving a life sentence with the possibility of parole for murder and was transferred to CIM from ISP on or around November 17, 2021. Prior to his incarceration, the patient had no history of mental health treatment in the community; however, he requested services in November 2021 due to the loss of familial support.

The patient was provided a diagnosis of major depressive disorder, mild. He declined to accept treatment with psychotropic medication during his time at CIM. His documented psychiatric symptoms included increased helplessness, hopelessness, isolation, anxiety, sadness, low energy, and difficulty concentrating.

The initial PC assessment occurred on December 1, 2021, and noted that the patient had no history of self-harm or prescribed psychotropic medication. This initial assessment rated the patient's depression at a six of ten on a ten-point scale. There were no initial psychiatric assessments or SRASHEs documented for the patient during his CIM stay. However, while psychotropic medication was not prescribed, the psychiatrist met with the patient on at least eight occasions after his initial MHSDS inclusion in November 2021.

The IDTT meetings occurred timely on December 7, 2021 and December 6, 2022. The most recent treatment plan dated December 6, 2022 included IPOCs aimed at addressing the patient's depressed mood. The plan indicated that the therapist would work on reducing the patient's depression to a certain level by establishing a therapeutic alliance and empathizing with the patient's feelings of distress.
All routine PC contacts occurred timely. The PC progress notes were sufficiently detailed and included reference to meaningful interventions and treatment progress over time.

**Findings**

The care and treatment provided to this patient was adequate.

The IDTT meetings and individual contacts with mental health providers occurred timely. The PC progress notes indicated the provision of meaningful therapy and included treatment interventions that were appropriate for the patient's symptoms and consistent with the treatment plan. The IDTT decision to retain the patient at the 3CMS level of care was also appropriate. Overall, it appeared that the patient's mental health needs were being met in the 3CMS program at CIM as indicated by his documented progress over time and his response to the treatment interventions.

**Patient P**

This 60-year-old patient was provided diagnoses of major depressive disorder, recurrent episode, moderate, and alcohol use disorder, moderate, in sustained remission. He was prescribed paroxetine and was fully medication adherent. The patient's case was randomly selected for review of the treatment provided at the 3CMS level of care.

No IDTT meeting occurred during the reporting period, so the last treatment plan that was completed in November 2022 was reviewed for context. The plan was adequate with specific goals and interventions, as well as updates on the patient's functioning. The patient was seen nearly monthly from February to May 2023 with evidence of the implementation of appropriate therapeutic interventions outlined in the treatment plan. A psychiatrist saw the patient at least every 90 days, and the documentation of those encounters was adequate.

**Findings**

The care and treatment provided to this patient were adequate.

**Patient Q**

This 38-year-old patient was provided diagnoses of major depressive disorder, recurrent episode, in partial remission; PTSD; unspecified anxiety disorder; opioid use disorder, moderate; and amphetamine-type substance use disorder, moderate. He was not prescribed psychotropic medication but was prescribed buprenorphine-naloxone as MAT. The patient's case was randomly selected for review of the treatment provided at the 3CMS level of care.

The patient was housed in the general population at the beginning of the reporting period until March 14, 2023, when he was placed in the ASU. While housed in the general population, the patient was seen by his psychiatrist and MHPC consistent with required timelines, and the documentation of those encounters was adequate.

Upon placement in the ASU, a clinician-to-clinician contact occurred, and the patient was seen timely for the initial psychiatric and MHPC assessments. An initial contact was also made with a recreation therapist who provided in-cell packets. The MHPC initial assessment was comprehensive and identified the patient's needs with consideration of his ASU placement. The patient, who was not prescribed psychotropic medication, refused his initial psychiatric assessment. The psychiatrist completed and documented an adequate healthcare record review.

The patient was present for the initial IDTT meeting on March 28, 2023, and required staff attended the meeting. The treatment plan was consistent with the patient's identified needs, and an IPOC for anxiety was added to the pre-existing IPOCs addressing substance use and depressed mood. The goals and planned interventions were adequate.
The patient was seen weekly by his assigned MHPC until his transfer to another facility on April 10, 2023. While housed in the ASU, the patient was offered recreation therapy packets and the opportunity to attend groups. He attended one group in which he actively participated. The psych tech rounds were not documented on March 29, 2023.

**Findings**

The care and treatment provided to this patient were adequate.

However, the psych tech rounds were not documented as required.

**Patient R**

This 40-year-old patient was provided diagnoses of unspecified depressive disorder and adjustment disorder, with mixed anxiety, and depressed mood. He was not prescribed psychotropic medication. The patient's case was randomly selected for review of the treatment provided at the 3CMS level of care.

During the reporting period, the patient was housed in the OHU following a kidney transplant on April 3, 2022. The MHPC contacts occurred routinely and included evidence of treatment interventions that were consistent with the treatment plan. The patient was seen by unlicensed pre-doctoral interns, and their documentation was appropriately co-signed by a supervisor. In February 2023, one of the interns noted termination with the patient, and there was documentation of clinician-to-clinician contact prior to the newly assigned intern beginning treatment with the patient.

An annual routine IDTT meeting occurred on March 29, 2023 that included all required staff and the patient. Of note, the psychiatrist had not met with the patient prior to the IDTT meeting; in fact, there had been no psychiatric contact with the patient since October 3, 2022 when the psychiatrist documented a plan to see the patient in the next two to three months or sooner if needed. A follow-up psychiatric contact did not occur, and none appeared to have been scheduled in EHRS. The treatment plan was adequate and included an IPOC related to anxiety. The patient's engagement in treatment and treatment progress were clearly documented.

The patient was last seen by an MHPC on the date of the IDTT meeting, and the progress note indicated a plan to follow-up with the patient within 30 days. The patient was not seen again prior to the end of the reporting period. While this was not inconsistent with the requirements for a contact at least every 90 days, the lack of contact was not consistent with the planned follow-up documented by the MHPC. The treatment plan indicated that the patient would be seen as clinically indicated, and the clinical indication was documented to be within 30 days.

Of concern were ten documented interactions with a recreation therapist who noted the provision of a newsletter to the patient during cell-front contacts. In all instances, the encounters were documented as a 60-minute contact with the patient. It was unclear how providing the patient with a newsletter was considered a 60-minute contact.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not seen at intervals that were consistent with the planned treatment frequency, and the patient was not offered a session with a psychiatrist prior to the IDTT meeting in March 2023. Additionally, the documentation of recreation therapy contacts was questionable.

## Patient S

This 24-year-old patient was provided diagnoses of depressive disorder due to another medical condition, with mixed features and unspecified anxiety disorder. The patient was fully adherent with his prescribed mirtazapine. The patient's case was randomly selected for review of the treatment provided at the 3CMS level of care.

The patient transferred to CIM from another institution on December 16, 2022; however, it should be noted that on December 14, 2022, a referral was submitted by a nurse at the prior institution indicating that the patient presented with flat affect and depression. The initial health screening completed at CIM noted that the patient was prescribed mirtazapine and that he reported experiencing hallucinations. The patient also denied depressive symptoms. A routine referral to mental health was generated. There was no documentation that there was recognition at CIM at the time of intake of the mental health referral by a nurse from the sending institution.

The patient was initially seen by mental health staff on December 30, 2022 for an initial MHPC assessment. The diagnosis of depressive disorder due to another medical condition, with mixed features, was continued; however, there was no indication regarding the specific medication condition that triggered the depression, and the patient had no medical diagnoses listed in the EHRS other than seasonal allergies and asthma. The initial MHPC assessment noted the patient's upcoming release date of February 17, 2023. The MHPC documented that the patient wanted to start medications; this despite the presence of an active order for mirtazapine. The MHPC referred the patient to a psychiatrist.

Despite the referral and the patient receiving prescribed psychotropic medications, the patient was not seen for an initial psychiatric assessment prior to the initial IDTT meeting on January 5, 2023. All required staff and the patient were present at the IDTT meeting. IPOCs for depressed mood and anxiety were initiated, yet the goals were targeted to be achieved "by the next IDTT" or a "period of three months;" this despite the patient's scheduled release from prison in six weeks. Additionally, no IPOC for release planning was initiated, despite documentation indicating that the correctional counselor discussed the patient's upcoming release during the IDTT meeting. The clinical summary was taken directly from the MHPC initial assessment that included inaccurate information about the patient's current psychotropic medication status. The IDTT documentation, however, noted the active prescription for mirtazapine elsewhere in the healthcare record.

An initial psychiatric assessment was conducted by the patient's assigned telepsychiatrist on January 6, 2023 and was noted to be late "due to overflow reception." The psychiatrist provided a diagnosis of depression with anxious distress versus a diagnosis of unspecified depressive disorder and made no mention of the diagnoses present in the healthcare record. The psychiatrist increased the patient's medication dose at his request. The psychiatrist documented the patient's

upcoming release date yet scheduled the patient to be seen again in 90 days, which would occur after his release date.

The patient was seen for a release planning meeting on January 17, 2023.  Follow-up treatment in the community was discussed, and release of information were obtained.  The patient was released to the community on February 17, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

A referral made by a nurse prior to the patient's transfer to CIM was not appropriately addressed. The patient was not seen for an initial psychiatric assessment prior to the initial IDTT meeting. The initial MHPC assessment inaccurately documented the patient's current psychotropic medication status and failed to explain his diagnosis.  The initial IDTT documentation did not include an IPOC for release planning despite the patient's upcoming release, and goals were created that would be assessed after the patient's prison release date.  The psychiatrist increased the patient's medication dosage six weeks prior to his release and did not schedule the patient to be seen prior to his release from prison.

**Patient T**

This 49-year-old patient was provided diagnoses of recurrent major depression and other specified anxiety disorder.  He was prescribed hydroxyzine PRN and mirtazapine, and was medication adherent.  The patient's case was randomly selected for review of the treatment provided at the 3CMS level of care.

No IDTT meeting occurred during the reporting period.  As such, the patient's most recent IDTT documentation from October 2022 was reviewed for context.  Required staff were present at the meeting; however, the patient declined to attend.  IPOCs for depressed mood and anxiety were initiated that included adequate treatment goals and interventions.

The patient was seen twice by the MHPC during the reporting period.  Both contacts occurred in confidential settings and reflected the interventions noted in the treatment plan.  The psychiatrist saw the patient more frequently than minimally required due to medication dosage modifications.  Of note, the MHPC consistently documented that the patient wanted to function without medications, and conversely, the psychiatrist consistently documented that the patient reported that he did not want to lower his medication dose or switch to another medication. There was no documentation that this discrepancy was addressed by the MHPC and the psychiatrist.

**Findings**

The care and treatment provided to this patient were adequate.

There was, however, conflicting documentation regarding the patient's desire to remain on psychotropic medication, and there should have been documentation that this issue was discussed collaboratively by the MHPC and the psychiatrist.

**APPENDIX B – 2**
**HIGH DESERT STATE PRISON (HDSP)**
Site Visit: October 17, 2023 – October 19, 2023
Review Period: March 1, 2023 – August 31, 2023

**Patient A**

This 31-year-old patient was randomly selected for healthcare record review to assess the quality of STRH care provided at HDSP.

The patient had a history of treatment at the 3CMS level of care during a prior incarceration. His most recent period of incarceration began on July 22, 2021, with subsequent inclusion in the MHSDS at the 3CMS level of care shortly thereafter. The patient transferred to HDSP at the 3CMS level of care on September 9, 2021. On May 1, 2023, the patient was involved in a physical altercation with resultant significant injuries requiring airlift for emergency medical care. Upon his return on May 2, 2023, the patient was placed in STRH pending investigation of the incident. The patient had no history of treatment at the EOP, MHCB, intermediate, or acute levels of care.

The SRASHE on September 22, 2021 assessed the patient with moderate chronic and low acute suicide risk. The patient had one prior suicide attempt at age ten by overdose of medications.

The patient was provided diagnoses of schizoaffective disorder; unspecified bipolar disorder; unspecified disruptive, impulse-control, and conduct disorder; major depressive disorder; acute stress disorder; alcohol use disorder; cannabis use disorder; and cocaine use disorder. He was prescribed lurasidone for psychosis and mood stabilization, and benztropine for side effects to antipsychotic medications.

The initial PC evaluation was completed timely. The evaluation contained useful clinical information and created a clear clinical picture of the patient; however, the case formulation was repeated from prior evaluations.

An initial psychiatric evaluation was not completed prior to the IDTT meeting as required. On May 24, 2023, a progress note stated that the patient refused the psychiatric assessment. The telepsychiatrist saw the patient for the only psychiatric contact during the patient's housing in STRH on June 14, 2023, and he was seen in response to medication nonadherence. It should be noted that the same psychiatrist had seen the patient on May 1, 2023, when the patient was housed in general population.

The initial IDTT meeting occurred timely and contained all required members, including the patient. The treatment goals were appropriate regarding the presence of mood symptoms, but the goals did not directly address psychosis or trauma-related symptoms. Concerningly, despite the patient's multiple substance abuse diagnoses and reported consumption of alcohol on May 1, 2023, no substance use treatment goals or interventions were provided. The only treatment intervention was the generic intervention of fostering a therapeutic alliance by empathizing with the patient's feelings of distress.

474

The follow-up PC sessions occurred timely. The PC contact on May 16, 2023 noted that the patient had an increase in auditory hallucinations. The documentation included clinically useful information and contained interventions such as practicing distress tolerance skills and assigning homework. The patient struggled with his continued retention in STRH. Multiple progress notes indicated that the patient requested access to his tablet. As of May 30, 2023, the patient did not have his tablet; the PC spoke to the sergeant about this issue, and the patient was provided the tablet on June 6, 2023.

On June 22, 2023, the patient transferred from STRH to the 3CMS mainline program at HDSP, where he remained at the time of review.

**Findings**

The care and treatment provided to this HDSP STRH patient was inadequate.

Positive aspects of the care provided included a timely initial PC assessment which contained clinically useful information, and PC sessions which intermittently included the use of distress-tolerance skills.

However, several significant clinical concerns were noted about the treatment provided. There was no documentation that an initial psychiatric evaluation was performed, and the first documented attempt to complete this evaluation was overdue. While the psychiatrist was the same psychiatrist who treated the patient in general population, the patient had experienced a significant traumatic event of being attacked and requiring airlift to an outside hospital. This event, as well as placement in restrictive housing, represented significant clinical changes which required psychiatric evaluation and close follow-up and monitoring. The next documented psychiatric attempt to see the patient occurred on June 14, 2023 due to medication nonadherence.

The diagnoses were difficult to discern in the documentation. The treatment goals were appropriate for mood symptoms but failed to address trauma, psychosis, or substance abuse issues. The treatment plan interventions were generic and inadequate.

**Patient B**

This 27-year-old patient was randomly selected for healthcare record review to assess the quality of STRH care provided at HDSP.

The patient's only CDCR incarceration began in October 2019. He was not included in the MHSDS until September 20, 2021, when he was placed at the 3CMS level of care. The patient had one prior stay in restricted housing from June 10 through November 7, 2022. On April 28, 2023, the patient reported a fall with loss of consciousness and subsequent emergency transport to an outside hospital. Upon his return, the patient was placed in the HDSP STRH due to safety concerns. The documentation was unclear about the details of the events leading to STRH placement. The patient had no prior treatment at the EOP, MHCB, intermediate, or acute levels of care.

A SRASHE completed on February 15, 2023 assessed the patient with low chronic and acute suicide risk.  The patient denied any history of suicide attempts or self-harm.

The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood and opioid use disorder.  He was not prescribed psychotropic medications; however, he was prescribed buprenorphine-naloxone for MAT to treat his opioid use disorder.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting.  The PC case formulation remained unchanged from prior PC assessments.  The initial psychiatric evaluation contained scant details necessary for an initial psychiatric assessment.

The initial IDTT meeting did not occur timely.  All required members were present at the meeting except the patient, who was at a dental appointment.  The treatment goals centered on tolerating anxiety generating situations and learning coping skills.  The treatment interventions were deficient, and only included the generic intervention of fostering a therapeutic alliance by empathizing with the patient's feelings of distress.

The routine psychiatric and PC contacts generally occurred timely.  The sessions occurred in confidential settings except when rarely refused by the patient, when they occurred at cell front.

The documentation indicated that there were multiple delays in transporting the patient to another facility.  A note on July 18, 2023 indicated worsening of the patient's symptoms, due to "classification errors and paperwork errors."  The PC documented how those delays translated to concerns for the patient's mental health.  The PC advocated for the patient, including elevating the issue to senior mental health leadership.

The patient left the HDSP STRH on August 30, 2023, when he transferred to the CSP/Sac general population at the 3CMS level of care.

**Findings**

The care and treatment provided to this HDSP STRH patient was inadequate.

Positive aspects of provided treatment included timely initial evaluations and routine sessions.  The PC clearly documented the impact that prolonged stay in STRH had on the patient's mental health and appropriately elevated this matter to appropriate institutional staff.

However, the initial IDTT meeting did not occur timely.  The patient was unable to attend that meeting due to a conflicting appointment.  While treatment goals were appropriate, the treatment intervention listed was generic and unlikely to achieve the stated goals.  The documentation of the treatment provided during clinical sessions varied in how it connected to treatment plan goals.  While the patient's lengthy stay in STRH was due to custodial factors, the progress notes clearly indicated that the restricted housing placement resulted in the patient's clinical worsening.

**Patient C**

This 31-year-old patient was randomly selected for healthcare record review to assess the quality of STRH care provided at HDSP.

The patient's only CDCR incarceration began at WSP on February 1, 2023, and the patient was included in the MHSDS at the 3CMS level of care shortly thereafter. The patient transferred to the HDSP STRH on March 21, 2023. The reason for the STRH placement was unclear from review of both the initial PC and psychiatric evaluations.

The SRASHE on February 7, 2023 assessed the patient with moderate chronic and low acute suicide risk. The patient had one prior suicide attempt by ingestion of medication at age 21.

The patient was provided diagnoses of adjustment disorder with anxiety, opioid use disorder, and other (or unknown) substance use disorder. The patient also had a history of a diagnosis of schizoaffective disorder. He was prescribed long-acting injectable aripiprazole for mood stability and psychosis, and buspirone and hydroxyzine for anxiety. The patient requested that buspirone and hydroxyzine be discontinued at the initial psychiatric evaluation; the aripiprazole was also subsequently discontinued due to the patient's medication refusal. The patient also received MAT with buprenorphine-naloxone for opioid use disorder.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The patient did not participate in the initial PC evaluation; however, the evaluation documented a mental status examination. The patient requested discontinuation of medications and removal from the MHSDS. The IDTT meeting occurred timely and included all required participants except the patient, who refused. The initial and follow-up treatment plans contained no goals or interventions. The patient reported no goals other than removal from the MHSDS. The routine psychiatric and PC contacts also occurred timely. The PC sessions generally occurred at cell front due to patient refusal.

The patient was released from STRH on July 26, 2023 to CTF at the 3CMS level of care. He was released from CDCR on September 14, 2023.

**Findings**

The care and treatment provided to this HDSP STRH patient was inadequate.

Positive aspects of the care provided to this patient included timely initial PC and psychiatric evaluations, IDTT meetings, and follow-up sessions.

Multiple areas of concern were noted in the care provided to this patient. While the initial PC evaluation was refused, it contained a mental status examination which included information that could only be obtained by a patient interview and not by simple observation. The treatment plan contained no goals or interventions. Although the patient requested removal from the MHSDS, this did not preclude the treatment team from crafting supportive goals which may have included increasing the patient's willingness to participate in treatment.

**Patient D**

This 33-year-old patient was randomly selected for healthcare record review to assess the quality of STRH care provided at HDSP.

The patient entered the CDCR at NKSP on May 22, 2018, and was soon included in the MHSDS at the 3CMS level of care. The patient transferred to HDSP on August 27, 2018, where he remained, except for a brief return to NKSP in 2020. The patient was housed in general population until May 30, 2023, when he was placed in STRH pending an investigation.

The SRASHE on September 6, 2018 assessed the patient with low chronic and acute suicide risk.

The patient's diagnoses were difficult to discern from the initial PC evaluation due to a lengthy list of problems and diagnoses. It appeared that he was provided diagnoses of generalized anxiety disorder, PTSD, and depression. He was prescribed fluoxetine for depression and anxiety, and hydroxyzine PRN for anxiety.

The initial PC evaluation occurred timely on June 7, 2023. The patient reportedly declined to attend a confidential session; however, it was unclear if a nonconfidential evaluation occurred. The note contained a mental status examination which indicated the patient's thought content and thought processes. The PC evaluation contained outdated information in the history of present illness section; this appeared to be information copied from a prior evaluation. The psychiatric evaluation did not occur prior to the initial IDTT meeting. Later on the same date as the IDTT meeting, a note from a psychiatrist who was not present at the IDTT meeting indicated that the patient refused an initial evaluation. Notably, the psychiatrist who attempted to meet with the patient had previously treated him, with the last evaluation occurring on April 20, 2023.

The PC met with the patient on June 14, 2023 at cell front due to patient refusal. The PC met with the patient again on June 21, 2023; the progress note indicated that the discussion related to custodial factors such as the reasons for incarceration and placement in restricted housing.

The initial IDTT meeting occurred on June 14, 2023, and all required members were present except for the patient, who reportedly refused to attend. All treatment goals centered on depression, and there was no emphasis on treatment goals to address anxiety or trauma. All treatment outcomes and interventions were copied from prior sessions as remote as September 2, 2022. The only intervention listed was to foster a therapeutic alliance; this intervention had been present since September 2, 2022. The treatment plan noted "no significant barriers to progress," despite the patient refusing the initial PC and psychiatric evaluations, IDTT meeting, and intermittent medication refusals.

The patient's medication nonadherence resulted in a psychiatric session on June 21, 2023; however, the patient reportedly refused to see the psychiatrist. The psychiatrist subsequently changed the fluoxetine from daily scheduled dosing to PRN without seeing the patient.

The PC note on June 28, 2023 noted interventions of adaptive problem solving. The July 5, 2023 note focused on possible release and included contacting the pre-release coordinator, helping the

patient to obtain resources, and working with the patient on communication skills. The July 12, 2023 PC note stated that the patient wanted to make a phone call, as it was his wedding anniversary. The PC stated that due to his STRH placement for disciplinary reasons, the call was unlikely to occur; further, the PC stated that they could not advocate on the patient's behalf.

On July 12, 2023, the patient submitted a health care services request form requesting that his medications be given on a scheduled rather than PRN basis. On July 19, 2023, the telepsychiatrist met with the patient and returned the medication to scheduled administration.

The patient was released from STRH on July 20, 2023, and transferred to general population at HDSP, where he continued to receive mental health services at the 3CMS level of care.

### Findings

The care and treatment provided to this HDSP STRH patient was inadequate.

Although the initial IDTT meeting and PC follow-up sessions occurred timely, there were multiple alarming fundamental inadequacies noted in the treatment provided to this patient.

The diagnoses were difficult to discern from healthcare record documentation. It was unclear if an initial PC evaluation actually occurred after the patient refused a confidential session. There was no documentation that an initial psychiatric evaluation was completed. While a note stated that the patient refused a confidential contact on June 14, 2023, there was no documentation of follow-up attempts for the telepsychiatrist to meet with the patient.

Based on documentation of patient refusals, the psychiatrist changed the patient's medication to PRN without meeting with the patient. There was no clinical justification documented for prescribing fluoxetine, a medication usually administered daily, on a PRN basis. It should be noted that ordering the medication on a PRN basis would not trigger the need for subsequent required medication nonadherence appointments. The patient was only seen by the psychiatrist after submitting a service request form to have his medication returned to scheduled administration. The psychiatric note on July 19, 2023 labeled as a MHMD routine consult was adequate for a follow-up note, but was insufficient for an initial psychiatric evaluation.

The treatment plan goals and interventions were copied from previous plans, failed to address the patient's apparent anxiety and PTSD diagnoses, and stated that there were no barriers to treatment, despite the patient's multiple treatment refusals.

### Patient E

This 38-year-old patient was randomly selected for healthcare record review to assess the quality of STRH care provided at HDSP.

During prior incarcerations, the patient was treated at the 3CMS, EOP, MHCB, and intermediate levels of care. The patient's most recent CDCR incarceration began in June 2019, with placement at the EOP level of care. In June 2020, the patient's level of care was lowered to the

3CMS level of care.  He had two evaluations for MHCB placement in July 2022.  On March 1, 2023, the patient transferred to the HDSP STRH to attend court proceedings.  The patient was treated at the 3CMS level of care in STRH from March 2 through June 14, 2023; he was subsequently placed at the EOP level of care.  The patient remained in STRH at the EOP level of care for 42 days until July 26, 2023, when he required MHCB placement.

The SRASHE on May 9, 2023 assessed the patient with moderate chronic and low acute suicide risk.  The patient had a history of a suicide attempt in 2001 and self-injurious behavior by cutting.  On July 26, 2023, prior to MHCB placement, the patient was assessed with low chronic and acute suicide risk.

The patient's diagnoses were difficult to discern, as they varied in the healthcare record.  He was provided diagnoses of PTSD, schizoaffective disorder, amphetamine-type substance use disorder, inhalant use disorder, and other hallucinogen use disorder.  The patient was not prescribed psychotropic medications, as he refused.  The psychiatrist opined that the patient did not meet the criteria for a PC 2602 involuntary medication petition.

The initial psychiatric and PC evaluations were scheduled timely; however, the patient declined to participate.  The psychiatrist's next documented attempt to see the patient occurred on July 7, 2023.

The initial IDTT meeting on March 22, 2023 did not occur timely.  The follow-up IDTT meeting on June 14, 2023 was timely and resulted in the treatment team increasing the patient's level of care to the EOP.  All required members of the treatment team attended the IDTT meetings except for the patient.  The treatment goals included dealing with stressful memories, maintaining sobriety, and engaging in treatment.  The treatment interventions included the therapist using goal setting and providing education.  These interventions were not updated, despite the patient requiring the EOP level of care.

The routine PC contacts generally occurred at cell front due to patient refusal.  The documentation reflected ongoing worsening of psychotic symptoms, including paranoia.  For example, on June 7, 2023, the patient was described as exhibiting increasing signs of psychosis, which affected his decision-making.

Due to the patient's continued symptoms and impairment, the treatment team referred the patient to the MHCB level of care.  On July 26, 2023, the patient transferred to the SQ MHCB.  The MHCB team subsequently referred the patient to the intermediate level of care.  The patient remained at the SVSP PIP at the intermediate level of care at the time of review.

**Findings**

The care and treatment provided to this HDSP STRH patient was inadequate.

The telepsychiatrist did not meet with the patient during his STRH stay, even after the patient required placement at the EOP level of care.  The patient refused an initial psychiatric

evaluation, and the next documented attempt to see the patient did not occur until several months later.  It should be noted that HDSP had no on-site psychiatrist during the review period.  The patient did not transfer timely after placement at the EOP level of care.  Subsequently, the patient displayed further clinical decompensation which required MHCB and eventual intermediate levels of care.

**Patient F**

This 60-year-old patient anticipated an EOP transfer but instead was transferred to HDSP.  Shortly thereafter, he experienced suicidal ideation and was admitted to the HDSP MHCB on March 13, 2023.  He was discharged to the 3CMS level of care on March 21, 2023.  His healthcare record was reviewed to assess the adequacy of the care provided at HDSP.

Upon admission to the MHCB, the patient was placed on suicide precautions due to suicidal ideation with a plan to hang himself.  The rationale provided for the level of suicide observation and the termination of suicide precautions on the following day was appropriate and included pertinent collateral information.  A SRASHE was completed at the time of the MHCB placement.  Although completed in a nonconfidential setting, the assessment was thorough and provided a thoughtful description of the patient's protective and risk factors; the patient was assessed with moderate chronic and low acute suicide risk.

The IDTT documentation was based on the primary clinician initial assessment, which lacked a thorough description of the patient's presenting problem.  It was unclear if the initial assessment by the telepsychiatrist was completed in advance of the IDTT meeting.  Nevertheless, the telepsychiatrist provided detailed information about the precipitating factors for the patient's distress, which was not included in the IDTT documentation.  Relatedly, the recreation therapy initial assessment was clinically useful but was not integrated into treatment planning.

The IPOCs established during the initial IDTT meeting targeted danger to self and irritability.  The rationale provided to reduce the patient's irritability to six on a ten-point scale was unclear; specifically, the patient rated his irritability as "somewhat" bothersome.  The use of a Likert scale of zero to ten in which ten was extreme irritability indicated that a description of "somewhat" bothersome suggested that the symptom scored less than six and indicated that this treatment goal had already been achieved.  Additionally, generic treatment goals varied in measurability and were not clearly aligned with identified treatment needs, including distress tolerance.

The diagnoses provided by clinicians varied, except for the diagnosis of unspecified bipolar disorder and related disorder.  Specifically, psychiatric diagnoses included disruptive mood regulation disorder and borderline traits, while the primary clinician identified major depressive disorder in the initial PC assessment.  The rationale for the diagnoses provided was not documented in the healthcare record.

As for medication management during the MHCB stay, Trileptal was changed to Abilify at the time of the initial psychiatric assessment; however, the rationale for this medication change was not documented.  The patient's mental status and psychosocial stressors were assessed daily.  The daily clinician notes included a templated summary of treatment interventions; however,

individualized and targeted treatment was not utilized. The documentation indicated that the patient was perceived as reporting suicidal ideation to affect his housing; however, his underlying distress was not appropriately addressed. During the MHCB stay, the patient's suicidal ideation subsided, and his depression improved; however, staff did not assess the rationale for that change to assist in treatment planning and relapse prevention.

The discharge SRASHE again assessed the patient with moderate chronic and low acute suicide risk. The safety plan was overly focused on the patient's report of situational stressors, and that focus would not be useful to the patient during times of distress.

The MHCB psychiatric coverage was an area of concern. The telepsychiatrist that attended the initial and discharge IDTT meetings was a different provider than the psychiatrist who completed the initial and daily assessments.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment planning was generic and insufficient. The documentation indicated that the treatment provided in the MHCB appeared to consist of a medication change that occurred without documenting a clinical rationale, and the patient did not receive individualized treatment. His requests for EOP placement and symptom resolution were not addressed, nor was his report of a mistaken prison transfer investigated. The safety plan was not clinically useful, and suicide risk assessments likely underestimated his suicide risk. Diagnostic clarification with clinical rationale was needed. Additionally, psychiatric continuity of care was poor in the MHCB.

**Patient G**

This 38-year-old patient was admitted to the MHCB on March 9, 2023 due to psychiatric decompensation with bizarre and grandiose delusional thinking that included paranoid and sexual content involving CDCR staff. He was provided a diagnosis of unspecified psychotic disorder. His healthcare record was reviewed to assess the adequacy of the care provided at HDSP.

The patient was referred for an urgent consult by a STRH ICC after he made bizarre statements. He was subsequently referred to the MHCB for stabilization of his psychotic symptoms. The timeliness of the initial assessment by the telepsychiatrist was unclear; while the documentation included a thorough summary of the patient's current clinical presentation, relevant psychosocial and psychiatric history was not provided. The patient was prescribed Zyprexa, an antipsychotic medication, during that visit. The primary clinician initial assessment was completed late, after the IDTT meeting; this assessment included documentation of relevant mental health history but lacked a summary of his substance use and psychosocial history.

The initial IDTT meeting occurred timely, but no IPOCs were established by the mental health clinicians. The IPOCs that targeted delusions and grave disability were not established until the discharge IDTT meeting on March 14, 2023. The goals were measurable but lacked specificity and individualization for the patient's treatment needs.

The documentation of daily contacts between March 11 and the MHCB discharge on March 14, 2023 indicated that the patient remained disorganized with delusional thinking and refusal to take prescribed psychotropic medication.  On March 11, 2023, nursing staff documented that the patient was standing in his cell wearing only boxers and shorts, and was washing his blanket in the toilet and cleaning the water on the floor with his shirt.  During the daily assessment on March 12, 2023, the patient continued to discuss delusional content and stated, "(t)hey put their DNA in me and it made me sick…"  The clinician determined that due to impaired reality, the patient was not appropriate for therapy or psychoeducation and indicated that the psychiatric provider should consider initiating a PC 2602 involuntary medication order.  During a cell-front telepsychiatry contact on the following day, the telepsychiatrist noted that the patient remained with overt paranoid and persecutory delusional thinking and poor insight.  His thinking was described as circumstantial and tangential, and his speech was pressured.  The patient was encouraged to take his prescribed psychotropic medication and was assessed as being unable to function at the outpatient level of care.  Although the telepsychiatrist documented that there was no indication for pursuing a PC 2602 order, no clinical rationale for this determination was provided.  The telepsychiatrist documented a plan to "continue mental health crisis bed due to grave disability."

Despite these assessments of impaired reality testing and psychosis, the patient was subsequently assessed as having made progress and was discharged from the MHCB to the EOP on March 14, 2023.  The primary clinician discharge summary incorrectly indicated that the patient was cooperative with the majority of services offered, including individual and recreation therapy, and psychotropic medication adherence.  The PC documented that the patient attended to his ADLs, maintained his cell, and had not harmed himself.  Conversely, nursing documentation of three days prior described the patient as confused with disorganized behavior; this information was not included in the discharge summary.  Concerningly, the collateral information from nursing in the MHCB discharge IDTT documentation indicated that the patient was functioning well with no concerns noted.

Pending discharge from the MHCB, the patient was seen for daily contacts; however, he remained with delusional thinking and poor insight regarding his mental illness when seen during cell-front contacts.

The coverage provided by the telepsychiatrists was an area of concern.  The telepsychiatrist who attended the initial and discharge IDTT meetings was different from the telepsychiatrist who completed the initial and daily assessments.

**Findings**

The care and treatment provided to this patient were inadequate and concerning.

The patient exhibited acute psychosis and poor insight, and was not appropriately treated in the MHCB; additionally, transfer to a higher level of care was not appropriately considered.  Given this patient's poor reality testing and psychosis, it was unlikely that he could adequately function in the EOP, and his subsequent placement in restricted housing only aggravated and prolonged his suffering and lack of appropriate treatment.  Additionally, psychiatric continuity of care was poor in the MHCB.

Of note, the patient was admitted to the PIP during June 2023, pursuant to an April 26, 2023 court order for restoration of competency to stand trial with approval of involuntary administration of antipsychotic medication. In addition, it was documented that the patient "lacks the capacity to make decisions regarding antipsychotic medication," and if not treated with antipsychotic medication, "it is probable that serious harm to the physical or mental health of the patient will result."

## Patient H

On March 18, 2023, this 29-year-old patient was admitted to the HDSP MHCB from STRH after he destroyed property in his cell and threatened suicide. His healthcare record was selected for review to assess the adequacy of the care provided.

Healthcare record documentation indicated that in the days prior to admission, the patient was observed with possibly hypomanic symptoms or was engaging in impression management given an upcoming transfer. Relatedly, the primary clinician initial assessment stated that the patient had a "history of volatile interpersonal interactions where there is an instrumental aspect to demands…" As to the quality of the initial assessment, outdated documentation from July 2022 and additional undated background documentation were copied into the document with no organized summary of the patient's previous mental health treatment or recent functioning. An initial contact by a telepsychiatrist was attempted but was never completed due to the patient's refusals to engage with the provider.

At the time of the MHCB admission, a SRASHE assessed high acute and moderate chronic suicide risk; this was likely an underestimation of chronic risk given the patient's impulsive behavior and history of suicide attempts. Various diagnoses were present in the healthcare record including narcissistic personality disorder, opioid use disorder, unspecified bipolar disorder, and mood disorder.

The IPOCs established at the initial IDTT meeting targeted irritability and danger to self. The goals and interventions were not individualized to the patient's treatment needs. The initial IDTT documentation included collateral nursing documentation that stated that the patient got out of bed, and seemingly without reason, urinated on the door, returned to bed, and then refused to change cells.

Throughout his MHCB stay, the patient was variably engaged with others. When he engaged with staff, he reported multiple symptoms including excessive anger, suicidal ideation, auditory hallucinations, anxiety, and depression. He talked about his difficulty managing restricted housing placement, and requested a higher level of care. He used a staple to harm himself, resulting in a superficial injury.

Throughout the MHCB stay, the patient was monitored and assessed daily; however, individualized, targeted treatment to decrease distress tolerance was not utilized. On occasion, the daily clinician notes included a standard summary of treatment interventions that was also observed in another patient's healthcare record.

For most of his MHCB stay, the patient was prescribed Vistaril. He was nonadherent with prescribed Zyprexa that was prescribed to address his reported auditory hallucinations, and he was minimally adherent with Remeron, a medication that he requested.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient needed evidence-based treatment to address his behavioral dyscontrol, poor emotional regulation, and poor distress tolerance. Case conceptualization was also needed to address concerns regarding impression management and to aid in treatment planning and diagnostic clarification.

**Patient I**

This 43-year-old patient transferred to HDSP during 2020. He was provided diagnoses of antisocial personality disorder and persistent depressive disorder. He was prescribed Trileptal. His healthcare record was randomly selected to assess the adequacy of care provided at HDSP.

The clinical contacts by the PC and telepsychiatrist occurred timely. Joint provider contacts occurred, but the primary clinician also met with the patient separately. The documentation included an assessment of symptoms, functioning, and institutional stressors, and indicated that the patient was actively involved in various programs including education and ISUDT. He also served as a men's advisory council representative.

In addition to medication management, the telepsychiatrist documented the use of supportive counseling. The primary clinician documentation included a current summary of the patient's functioning, mental status, and management of stressors; however, much of the documentation included treatment interventions that remained unchanged since July 2022.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The patient's mental health needs and functioning were appropriately assessed and monitored by the treatment team; however, the primary clinician documentation lacked individualized treatment interventions and updated documentation.

**Patient J**

This 51-year-old patient transferred to HDSP on March 29, 2023; he was housed on B yard. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of the care provided at HDSP.

The PC and telepsychiatry initial assessments were inadequate. The primary clinician initial assessment did not include a comprehensive mental health history or current treatment needs. Further, there was conflicting information about the patient's recent treatment history. Specifically, it was documented that the patient was recently treated for psychotic symptoms, but

later documentation noted that he was treated for anxiety and poor sleep. The documentation also indicated that the patient was treated in the community for schizophrenia and bipolar disorder; however, for unclear reasons, he was provided a diagnosis of generalized anxiety disorder at HDSP.

The psychiatric initial assessment was similarly inadequate, as documentation in the assessment was more reflective of a routine psychiatric contact rather than a comprehensive assessment of the patient's psychosocial and mental health treatment history. The patient's primary complaint was impaired sleep, and he requested sleep medication. The telepsychiatrist determined that the request was not clinically appropriate; however, sleep hygiene was not addressed, as was clinically indicated. For unclear reasons, the patient was provided diagnoses of unspecified mood disorder and antisocial personality disorder.

The initial IDTT meeting was delayed and did not occur until July 2023. No IPOCs were developed, and the IDTT documentation was limited to discussion about the patient's disclosure of "angst," which was attributed to the ISUDT. The patient was scheduled for parole in October 2023, but discharge planning was not included as an IPOC.

Excluding initial assessments and the IDTT meeting, the only documented mental health contact occurred during an urgent referral in June 2023. At that time, the patient was referred to mental health from the ISUDT clinician due to reports of anxiety and restlessness. Despite no clear indications of anxiety during the contact, he was provided a diagnosis of adjustment disorder with anxiety and possible diagnoses of bipolar disorder, schizophrenia, and schizoaffective disorder. It should be noted that those diagnoses were provided by the same clinician who completed the initial assessment when a diagnosis of generalized anxiety disorder was provided. Additionally, the possible diagnoses under consideration of bipolar disorder, schizophrenia, and schizoaffective disorder were not identified as such in the healthcare record but were documented as current diagnoses.

The patient was seen for pre-release planning the day before he was released from prison on parole. Most of the documentation was incomplete. The patient lacked housing after prison release; while he was provided education about housing, active assistance was not provided.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial assessments, treatment planning, and discharge planning were insufficient. The patient was identified as needing treatment at the 3CMS level of care; however, no actual treatment was provided. Diagnostic variability and the lack of clinical justification for providing major psychiatric diagnoses was of significant clinical concern. Discharge planning to assist the patient in a successful transition to the community did not occur timely, nor was it useful for the patient.

**Patient K**

This 31-year-old patient transferred to HDSP on March 7, 2023. His healthcare record was randomly selected to assess the adequacy of the care provided at HDSP.

The primary clinician initial assessment indicated that the patient denied any current mental health needs and requested removal from the MHSDS. He was placed at the 3CMS level of care at the reception center when he was provided a diagnosis of major depressive disorder. The initial psychiatric assessment included similar content. He was not prescribed psychotropic medication.

At the time of review on October 6, 2023, no IDTT meeting had occurred since his March 2023 HDSP placement; and no further clinical follow-up occurred, including follow-up to address the patient's request for removal from the MHSDS.

**Findings**

The care and treatment provided to this patient were inadequate.

An IDTT meeting to assess the patient's continued need for mental health treatment or to address his request to terminate treatment was long overdue. Similarly, routine clinical contact to assess the patient's mental status did not occur.

**Patient L**

This 40-year-old patient transferred to HDSP on August 9, 2023. His healthcare record was selected to assess the adequacy of the care provided for this patient pending transfer to an EOP institution.

The initial psychiatric assessment relied heavily on the patient's report about his mental health history and lacked evidence of a healthcare record review of his more recent functioning. The primary clinician initial assessment included information about current functioning, as well as previous documentation regarding the patient's mental health history; however, it was unclear when that information was documented. The patient had a long history of substance abuse. He reported a history of intermittent auditory hallucinations with an onset that coincided with his substance use. The patient was resistant to treatment with antipsychotic medication and was prescribed Cymbalta and BuSpar for depression and anxiety. He was provided diagnoses of substance-induced psychotic disorder by history and unspecified anxiety disorder. The documentation indicated that the patient was clinically stable.

Prior to the initial IDTT meeting, the patient was seen for a routine consult after he experienced a panic attack in the dining hall. During the contact, the clinician appropriately reviewed coping skills with the patient. During the initial IDTT meeting, an IPOC to reduce anxiety was established, but it lacked individualization. The sole treatment intervention was to foster a therapeutic alliance. There were no IPOCs for depression or management of auditory hallucinations, which were clinically indicated.

After the initial IDTT meeting, the patient was seen for an emergent consult, and one week later for a routine consult. During both consults, the patient reported anxiety that interfered with his ability to house with a cellmate, and to attend education and the dining hall; the patient requested accommodations for his anxiety symptoms. Although the treatment team planned to schedule the patient for an IDTT meeting to discuss EOP placement, treatment interventions to assist him in the interim were not offered.

During the IDTT meeting, the patient was placed at the EOP level of care. No additional IPOCs or treatment interventions were added. Following the level of care change, weekly contacts with the primary clinician occurred; however, treatment interventions were not utilized. Although the patient reported an increase in symptoms that included daily angst, fear of others, and command auditory hallucinations, he was not seen by a psychiatrist to review his medication regimen.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial assessments and treatment planning were insufficient. Targeted interventions to address symptoms and to improve distress tolerance were not utilized during two of the three consults or during routine primary clinician contacts. A routine psychiatric contact was clinically indicated but did not occur.

**Patient M**

This patient transferred to HDSP on March 29, 2023. He was provided a diagnosis of adjustment disorder with mixed anxiety and depression. He was not prescribed psychotropic medication. His healthcare record was selected to review the adequacy of the care provided after observation of his IDTT meeting during the site visit.

The psychiatric initial assessment was thorough and indicated an assessment of current mental health symptoms considering the patient's request for discharge from the MHSDS. In contrast, the primary clinician initial assessment provided a disjointed, brief summary of the patient's treatment history; the assessment described the patient as stable with a plan to address his request for MHSDS removal at the IDTT meeting. The patient was removed from the MHSDS at the initial IDTT meeting; however, collaborative treatment team discussion and decision-making were not documented.

Less than one month after his removal from the MHSDS, a SRASHE was completed after the patient made a suicidal statement. He recanted the statement and indicated an ability to resolve the precipitating issue with the sergeant. There was no documentation that indicated that the patient's healthcare record was reviewed, and no further mental health follow-up was scheduled.

The patient requested mental health contacts in August and October 2023 due to institutional stressors. The documentation of interventions was similar for both contacts and was not clearly individualized. An IDTT meeting was scheduled to address the patient's request to resume mental health treatment at the 3CMS level of care.

The primary clinician initial assessment was minimally changed from earlier documentation, and documentation that was copied from prior assessments was not noted as such. A review of the IDTT documentation indicated that a baseline assessment of anxiety and depression occurred during the meeting to establish IPOCs; however, those treatment goals did not involve patient input and were not individualized. Psychiatric input was not included in the IDTT documentation, nor had an initial psychiatric assessment been completed at the time of review.

**Findings**

The care and treatment provided to this patient were inadequate.

The decision to return this patient to the 3CMS level of care was appropriate; however, treatment planning was inadequate. The documentation of multidisciplinary treatment team input was lacking for both the discharge and initial IDTT meetings, and patient input was needed to develop treatment goals. Further, clinical follow-up with the patient after he made the suicidal statement soon after his removal from the MHSDS was clinically indicated but did not occur.

**Patient N**

This patient transferred to HDSP on May 9, 2023, and was housed on B yard. The psychiatrist provided a diagnosis of schizophrenia; however, multiple differing diagnoses were included in the healthcare record. The patient was prescribed Remeron, Abilify, and BuSpar. His healthcare record was selected from the CIT roster to assess the adequacy of the care provided at HDSP.

The primary clinician initial assessment noted that the patient reported a history of depression that was currently stable. He had a history of auditory hallucinations that was partly attributed to substance use and was managed with psychotropic medications. The documentation included a summary of prior treatment, but an assessment of his current treatment needs to assist with treatment planning was not clearly documented.

While both PC and telepsychiatry initial assessments occurred on June 1, 2023, and prior to the IDTT meeting, both assessments did not occur timely. The initial assessments were conducted together, as did routine PC and psychiatric contacts. Much of the same information was documented in both evaluations, but the psychiatric assessment was less thorough regarding the patient's mental health history. The psychotropic medications were continued except for Wellbutrin, which was determined to be contraindicated given the patient's history of schizophrenia and current symptoms of insomnia and anxiety. The patient was described by both providers as "irate" concerning the discontinuation of Wellbutrin.

The patient was seen in response to an emergency request on June 26, 2023 due to suicidal ideation, and his distress was prompted by the tapering of his Wellbutrin. Most of the documentation was copied from previous providers. The discrepancy between the patient's report of suicidal ideation that prompted the contact, and his subsequent denial of suicidal ideation, was not appropriately assessed, nor were skills provided to manage his distress regarding the medication change. A suicide risk assessment in the PC note assessed the patient with low acute and chronic suicide risk; this assessment differed from a prior SRASHE when the patient was assessed with high chronic and low acute suicide risk.

A CIT was activated four days later on June 30, 2023, after the patient's cellmate submitted a healthcare request that indicated that the patient was suicidal and not taking his psychotropic medications. The documentation indicated that the patient denied suicidal ideation and was agitated about the cellmate's submission. Collateral information from the cellmate was not sought. A SRASHE was completed that assessed high chronic and low acute suicide risk, and the patient was returned to housing. Treatment interventions were not utilized during this or a subsequent routine PC contact.

An IDTT meeting did not occur until July 19, 2023, and the meeting did not include the patient due to COVID-19 modified programming. The IDTT documentation was not updated; this despite the two suicide risk assessments that had recently been completed, and IPOCs were not developed.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC and psychiatric assessments needed improvement, including diagnostic clarification with clinical rationale. The completion of an already delayed IDTT meeting without the development of IPOCs and awareness that the patient could not attend the meeting was inadequate; it would have been better to ensure that the patient could attend and participate. The patient was not offered clinical interventions during emergent/CIT contacts or at routine clinical contacts to assist him in managing distress. The suicide risk assessments also needed improvement. The rationale for joint telepsychiatric and PC assessments and contacts was unclear and should have been documented.

**Patient O**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of the mental health care and treatment provided at the HDSP STRH. The patient was serving his second CDCR prison term, and arrived at CDCR for his current term in February 2014 to serve a 12-year sentence with an EPRD of November 1, 2025. He was placed at the 3CMS level of care in May 2014 due to grief concerns. He was removed from the MHSDS in December 2014, but returned to the 3CMS level of care in May 2017. He received 3CMS mental health services since that time, and had no history of treatment at higher levels of care. The patient also had no history of self-injurious behavior or suicide attempts. He was placed in STRH on May 4, 2023 due to battery on an inmate and was retained for 74 days until he was released to the general population on July 11, 2023. He was provided a diagnosis of adjustment disorder with depressed mood prior to arrival at the HDSP STRH, and that diagnosis was continued during his STRH stay.

One IDTT meeting occurred during the review period on May 17, 2023. This initial IDTT occurred timely and was attended by required staff, but the patient declined to attend. The treatment plan provided IPOCs for depressed mood and anger; the IPOC for depressed mood was continued from the previous treatment plan. That IPOC contained adequate treatment goals but did not provide substantive or meaningful interventions to achieve them. The IPOC for anger was initiated at this initial STRH IDTT meeting, and it contained individualized and clinically appropriate goals and interventions for the patient. The IDTT noted that the patient did not meet criteria for consideration of referral to a higher level of care, and the level of care justification was provided and was appropriate. A SRASHE assessed the patient with low chronic and acute suicide risk.

The initial PC assessment occurred timely on May 5, 2023. The assessment was conducted by healthcare record review due to the patient's refusal to participate in the evaluation. Most sections of the assessment document were completed, and the assessment was documented

appropriately.  Review of the PC progress notes revealed that the patient received timely weekly contacts with his PC.  Most of the contacts occurred in a confidential setting, and the contacts that occurred at cell front were due to the patient's refusal to attend a confidential session.  The PC contacts were well documented and indicated that the patient and clinician worked on coping skills and improving the patient's frustration tolerance.  The clinician documented providing dialectical behavior therapy and mindfulness techniques and appropriately recorded the patient's IPOCs.

During the review period, the patient demonstrated stability and did not present with imminent or acute suicide risk.  He was offered weekly groups while housed in STRH; he attended one group and signed refusals or did not show for other offered weekly groups.

The initial psychiatric assessment occurred timely on May 10, 2023.  The patient reported poor sleep and an increase in depressive symptoms, and the psychiatrist increased the Remeron to address the increase in depressive symptoms.  The initial psychiatric assessment was documented appropriately.  The patient was scheduled for a subsequent psychiatric contact on July 5, 2023.  The progress note indicated that the patient refused that appointment, and his medications were continued unchanged.  He was not seen for another psychiatric contact before his release from STRH to the general population.

**Findings**

The care and treatment provided to this patient at HDSP was adequate.

The IDTT meeting occurred timely, and the treatment plan contained appropriate IPOCs and level of care justification.  Although the initial treatment plan did not contain specific goals, this was largely due to the patient's refusal to participate in the initial PC evaluation, and appropriate goals were added to the treatment plan at subsequent PC contacts.  The patient was also seen timely for the initial psychiatric and PC initial assessments, as well as for routine PC contacts during his STRH stay.  The documentation reflected appropriate therapy interventions for the patient's clinical presentation, and the patient appeared to develop good rapport with his primary clinician and was engaged during weekly sessions.  The patient was also offered weekly groups.

**Patient P**

This 34-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care and treatment provided in the HDSP STRH.  The patient was placed at the 3CMS level of care on July 10, 2020, and did not receive mental health services at higher levels of care.  He arrived at HDSP from CSP/LAC in November 2020.  The patient had a history of depressive symptoms, but did not have a documented history of self-injurious behavior or suicide attempts. He was not prescribed psychotropic medications, and documentation indicated that he rarely engaged in sessions with his primary clinician prior to STRH placement.  He was previously provided diagnoses of unspecified depressive disorder and anxiety disorder due to a medical condition (alopecia).  He was placed in STRH on March 29, 2023, and was removed from the MHSDS on July 12, 2023, while still housed in STRH.

The initial IDTT meeting occurred timely on April 12, 2023; the necessary staff and the patient attended, but the patient reportedly left the meeting prematurely. The treatment plan included an IPOC for anxiety that contained appropriate goals and interventions. The IDTT indicated that the patient did not meet criteria for higher level of care referral. It also indicated consideration of removing the patient from the MHSDS, and appropriate discharge criteria were documented. The patient reported mild sleep concerns and low mood; he indicated that he wanted to work on his depression and anxiety in individual therapy, and was not interested in taking psychotropic medications. It was noted that the patient rarely participated in scheduled PC appointments.

An initial PC evaluation occurred on April 6, 2023. The evaluation was timely; however, the patient declined to attend, and the assessment was completed by healthcare record review. The evaluation included a thorough mental health history, as well as an updated clinical summary and case formulation. The documentation indicated that the patient was seen weekly for cell-front contacts due to his refusal to attend confidential sessions with the PC. He attended one session with the primary clinician during the review period on July 6, 2023. The patient consistently denied mental health symptoms and demonstrated stable presentation, and the PC progress notes consistently indicated that the patient did not demonstrate significant mental health symptoms or distress; however, the progress notes were poorly written as they were copied and pasted at each encounter without an update or change. The patient rarely attended groups; however, clinicians generally obtained signed refusals when the patient did not attend his groups.

The initial psychiatric assessment was scheduled for May 17, 2023, which was over one month late and occurred well after the initial IDTT meeting. The patient refused to attend that appointment and was not seen by the psychiatrist before removal from the MHSDS at the July 12, 2023 IDTT meeting.

A quarterly IDTT meeting occurred on July 12, 2023; this meeting included the necessary participants and the patient. The IPOCs and treatment plan remained unchanged from the prior IDTT meeting. The patient reported no new symptoms, and the IDTT noted that he again did not meet the criteria for referral to a higher level of care. The IDTT recommended removal from the MHSDS due to the patient's general stability and lack of significant mental health symptoms. The IDTT also noted the patient's minimal treatment participation and the lack of psychotropic medication treatment during the past six months.

**Findings**

The care and treatment provided to this patient at HDSP was inadequate.

Although the patient remained psychiatrically stable during his STRH stay, the care and treatment provided was inadequate due to poor clinical documentation and lack of timely psychiatric initial assessment and contact. The initial psychiatric evaluation occurred almost two months after the patient was placed in STRH and approximately five weeks after the initial IDTT. The PC notes were copied unchanged from contact to contact and did not contain any updates about the provision of treatment. Despite this, the patient was appropriately removed from the MHSDS at the July 12, 2023 IDTT meeting.

**Patient Q**

This 59-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care and treatment in the HDSP STRH.  The patient was serving his fifth CDCR prison term with an EPRD in April 2049.  The patient received mental health services primarily at the 3CMS level of care; however, he was also treated at the EOP and MHCB levels of care.  Most recently, he was not included in the MHSDS until he was returned to the 3CMS level of care at the initial STRH IDTT meeting on April 12, 2023.  The patient's history was also significant for prior treatment with antipsychotic medication and ECT, and the patient incurred traumatic brain injury in 1973 and 2003.  The patient did not have a history of suicide attempts or self-injurious behaviors.

The patient was placed in STRH during the review period on March 30, 2023 to serve a 131-day term.  A mental health consult was requested on March 30, 2023 during the patient's ICC due to the patient demonstrating what was described as profound confusion and disorientation.  The patient was described with cognitive impairment and decreased cognitive functioning; these observations were also noted at the initial IDTT meeting on April 12, 2023.  At the initial IDTT, the patient was provided diagnoses of adjustment disorder with anxiety, antisocial personality disorder, unspecified neurocognitive disorder, and cannabis use disorder, mild.  The initial treatment plan was adequate, although the treatment goals were not individualized.  The patient reported a history of difficulty with aggression and poor memory.  The treatment plan provided appropriate justification for placing the patient at the 3CMS level of care, and the treatment team planned to refer the patient for a neuropsychological evaluation for diagnostic clarification and treatment planning.  The initial IDTT meeting included the necessary participants including the patient, and he agreed with placement at the 3CMS level of care.

The initial PC assessment occurred timely prior to the initial IDTT meeting on April 5, 2023.  The patient was noted to have scored six of 30 on the Montreal Cognitive Assessment, which suggested significant cognitive impairment.  Overall, the initial PC assessment was appropriately conducted and well documented.  The patient was seen timely for weekly PC contacts.  The PC also appeared to develop good rapport and was engaged with the patient.  Most PC contacts occurred in a confidential environment, with cell-front contacts provided when the patient declined the confidential session.

The patient was offered weekly groups during his stay in STRH.  He attended his groups consistently, and review of the group progress notes indicated that he was an active participant.

A subsequent IDTT meeting occurred on April 26, 2023; this meeting included the necessary staff, but the patient declined to attend.  The treatment team added IPOCs for concentration and attention to the treatment plan.  The treatment goals were appropriate; however, the interventions were not individualized for this patient.  The justification for continuing the patient at the current level of care was appropriate and referenced the patient's significant cognitive impairments in processing and memory.

A quarterly IDTT meeting occurred on July 19, 2023 that included necessary staff and the patient.  The patient was retained at the 3CMS level of care and agreed with his treatment plan.

The treatment team added an IPOC for worthlessness and guilt, which contained appropriate goals but again lacked specific interventions. There were no new symptoms reported, and the patient's functional impairments were noted as low to moderate. The patient was reportedly active in treatment during the previous 90 days and demonstrated memory problems but was future oriented. He reportedly attended to his ADLs appropriately and was well groomed.

The initial psychiatric assessment occurred late on May 24, 2023. At that assessment, the patient reported frustration and sleep difficulty to the psychiatrist. He also reported occasional auditory hallucinations, but indicated that the voices were not bothersome. He declined treatment with psychotropic medications, and the psychiatrist noted that medication treatment was not currently indicated. The next psychiatric contact occurred on July 5, 2023, when the patient reportedly demonstrated positive mood and future orientation. His presentation was described as much improved since the previous psychiatric contact, and the patient was engaged in treatment and denied significant mental health symptoms. A mini-mental status examination administered by the psychiatrist on July 12, 2023 noted that the patient demonstrated cognitive impairment.

**Findings**

The care and treatment provided to this patient at HDSP was adequate.

The initial PC assessment, initial IDTT meeting, and weekly PC contacts all occurred timely. Although the initial psychiatric assessment did not occur timely, the patient was not prescribed psychiatric medications for several months prior to his placement in STRH and was otherwise stable. The weekly PC notes documented and reflected the provision of appropriate treatment and therapy. The patient was offered and attended weekly groups and appeared to be consistently engaged in treatment with his providers.

**Patient R**

This 45-year-old patient's healthcare record was reviewed to evaluate the quality of the mental health care and treatment provided in the HDSP STRH. The patient entered the CDCR in July 2002 to serve a 31-year term with an EPRD in August 2026. He had received MHSDS services at the 3CMS level of care since October 2015, and had no history of EOP placement or inpatient treatment. His history was not significant for self-injurious behaviors or suicide attempts. The most recent SRASHE assessed low acute and chronic suicide risk. The patient was housed in the STRH from April 28 to July 11, 2023. He was provided a diagnosis of persistent depressive disorder.

The initial STRH IDTT meeting occurred late on May 17, 2023. The meeting included necessary staff; however, the patient refused to attend, but reportedly contributed to the treatment goals. IPOCs targeting anger and depressed mood were established. The goals and interventions provided to address the patient's anger were adequate; however, the IPOC for depressed mood contained generalized goals and lacked specific interventions. The IDTT noted that the patient did not meet the criteria for higher level of care referral consideration, and the justification for non-referral was brief but adequate. The clinical summary was copied unchanged from previous

treatment plans. Overall, the treatment plan was inadequate, as it lacked specific interventions to address the patient's mental health concerns.

The initial PC assessment occurred timely; however, the patient declined to participate in the assessment, and it was completed by healthcare record review. Although most of the assessment was completed appropriately, the patient's diagnosis was not clearly stated. The mental status examination was completed and reflected normal mental status. No significant functional impairments were identified. The documentation indicated that the patient was seen weekly at cell front for PC contacts due to his consistent refusal to attend confidential sessions. Despite his refusal, the PC documented ongoing attempts to encourage the patient to participate in confidential sessions.

The patient attended and actively participated in a social skills group in STRH during his STRH stay; he was not offered group therapy during two weeks of his stay. The documentation also indicated that the patient was seen daily for PT rounds, and in-cell activities and packets were provided.

The initial psychiatric assessment was scheduled on May 17, 2023, but the patient reportedly declined that appointment; the patient signed a refusal form for the appointment, but the assessment was not rescheduled. He was not prescribed psychotropic medication prior to or during his STRH stay.

**Findings**

The care and treatment provided to this patient at HDSP was inadequate.

The documentation indicated that clinical contacts did not always occur timely, and several treatment planning deficiencies were noted. The initial IDTT meeting and the initial psychiatric assessment did not occur timely, and the initial psychiatric assessment was not rescheduled after the patient refused. Although the PC contacts generally occurred timely, progress notes were frequently copied unchanged between contacts without substantive or meaningful updates. There were also two weeks during which the patient was not offered group therapy. Additionally, the treatment plan was inadequate, as no specific treatment interventions were provided to address the patient's depressive symptoms.

**Patient S**

This 28-year-old patient's healthcare record was reviewed to evaluate the quality of the mental health care and treatment provided in STRH at HDSP. The patient entered CDCR for his current term in November 2014 with an EPRD of September 26, 2023. The patient was included in the MHSDS upon CDCR entry and reportedly had a history of mental health treatment in the community prior to his incarceration. He was previously provided diagnoses of schizophrenia, paranoid type; antisocial personality disorder; major depressive disorder, recurrent, with psychotic features; opioid use disorder; and amphetamine use disorder. His symptoms included degrading auditory hallucinations that were not intrusive. He had no history of self-injurious behaviors or suicide attempts while in the CDCR; however, he reported two suicide attempts in

the community at approximately age 18 by attempted overdose and attempting to shoot himself, but his mother intervened on both occasions. While in CDCR, he received treatment at the 3CMS level of care with intermittent periods when he was not included in the MHSDS.

The patient was placed in STRH on April 14, 2023 to serve a 90-day term. The initial IDTT meeting occurred late on May 3, 2023; the meeting included the required participants, but the patient refused to attend but was reportedly aware of his treatment goals. The treatment plan included an IPOC for depressed mood that was continued from the previous treatment plan. The goals and interventions were inadequate; however, the treatment team included new goals of improving the treatment goals, weekly PC meetings, and psychiatric contacts as scheduled. The IDTT did not identify any criteria indicating that the patient should be considered for a higher level of care. He was prescribed Remeron and Geodon prior to his arrival to STRH.
The initial PC assessment was completed timely; however, the patient declined to participate in this assessment, and it was completed by healthcare record review. The patient previously reported paranoia and irritability as primary symptoms. The assessment was generally adequate. The clinical summary was appropriate and informed the IDTT. The documentation indicated that the patient generally was seen timely for weekly PC contacts that were provided in a confidential setting unless the patient declined. The patient also demonstrated willingness to engage with the PC to address his treatment goals, and the PC appropriately added additional goals and an IPOC for substance use to the treatment plan soon after initiating treatment. The PC contacts were consistently well documented and reflected appropriate patient engagement.

The patient was offered ten groups during his STRH stay. He attended six of ten, and he reportedly had excellent group participation.

An initial psychiatric assessment was not completed, but the patient was seen for a psychiatric consult on April 27, 2023, 13 days after his STRH placement. The patient reported depressed mood and an increase in anxiety, and the psychiatrist added Zoloft to the patient's medication regimen of Geodon, Remeron, and Suboxone. The patient refused the next two scheduled psychiatric follow-up appointments on May 8 and May 10, 2023, and he next met with the psychiatrist on May 31, 2023. At that visit, the patient reported experiencing two panic attacks since his last appointment and requested discontinuation of the Zoloft. The psychiatrist discontinued the Zoloft and prescribed Effexor. This was the last documented psychiatric contact while the patient was housed in STRH.

**Findings**

The care and treatment provided to this patient at HDSP was adequate.

Although the initial IDTT meeting was five days late, the patient was seen timely for the initial and routine PC contacts. The PC contacts were well documented in the progress notes, and the PC provided appropriate treatment interventions and homework for the patient. Most PC contacts were provided in a confidential setting. The PC also added additional IPOC goals and interventions to the treatment plan after the initial IDTT meeting, which improved the patient's treatment outcomes. The psychiatrist appropriately scheduled and rescheduled appointments for the patient with appropriate medication management.

**Patient T**

This 43-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at HDSP. The patient arrived at the CDCR for his current term in July 2010 with a MEPD of January 15, 2030. The patient arrived at HDSP from KVSP on November 20, 2019. He entered the MHSDS in 2011 due to symptoms of obsessive compulsive disorder and increased anxiety, and his primary goal at the time he entered the MHSDS was to decrease those symptoms. He was provided diagnoses of unspecified anxiety disorder and unspecified depressive disorder. Past treatment plans focused on reducing anxiety and psychotropic medication management. He was previously prescribed Remeron, Paxil, and Effexor. The documentation indicated that the patient did not have significant functional impairment or symptoms of severe mental disability.

The annual IDTT meeting occurred on December 21, 2022; this meeting occurred timely and was attended by the patient's PC, psychiatrist, and CC I. The patient attended this IDTT meeting and reportedly contributed to his treatment goals. The treatment plan contained an IPOC for anxiety which included generic goals and did not identify any meaningful interventions. The documentation indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The treatment plan noted that the patient was retained at the 3CMS level of care to monitor his psychotropic medications, to improve sleep, and to teach mindfulness exercises to reduce anxiety. The patient also received MAT to address his methamphetamine addiction.

The patient was seen consistently for clinical contacts with his PC and psychiatrist. The PC and psychiatrist met with the patient together for clinical contacts and referred to themselves as the "clinical care team" in the healthcare record documentation. They met with the patient on February 9, 2023 for a routine quarterly contact. At that time, the patient reported overall improvement in depressed mood since the December 2022 IDTT meeting, demonstrated normal mental status, and was enrolled in college courses. The clinicians noted that the patient had medical concerns that included lung nodules and severe back pain. Remeron was discontinued at that visit, and Effexor was increased. The psychiatrist also changed the timing of the patient's Paxil administration from evening to morning to encourage better adherence. On February 14, 2023, the patient was seen for a psychiatric consult when he requested resumption of Remeron to assist in improving his sleep; the psychiatrist then restarted Remeron at a lower dose than was previously prescribed.

The next routine quarterly contact with his clinical care team occurred on May 3, 2023. At that time, the patient was reportedly working in the kitchen and functioning well overall; he did request an increase in Remeron due to ongoing sleep difficulties, and the psychiatrist increased the Remeron and decreased the Paxil dosages. At the next contact with the psychiatrist and PC on July 11, 2023, the patient reported mild panic attacks. He requested discontinuation of Remeron once again and reported that he was considering discontinuing all prescribed psychotropic medications. The patient signed an updated medication consent form, and the psychiatrist began to taper his medications; he was prescribed melatonin to address his sleep difficulties. At the final contact with the clinical care team during the review period on August 3, 2023, the patient reported anxiety because he was being considered for transfer to another

facility which would result in a further distance from his family and support.  His mental status was described as normal, and he reported improvement in sleep after treatment with melatonin.

**Findings**

The care and treatment provided to this 3CMS patient at HDSP was adequate.

Although the treatment plan did not include specific interventions, treatment interventions including medication management and quarterly counseling sessions were provided throughout the review period.  The PC and psychiatrist provided routine contacts together, which appeared to be an efficient method for treatment planning and collaboration.

**Patient U**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at HDSP.  He was serving his third CDCR prison term, and he was scheduled for parole in October 2024.  He entered CDCR for his first term in October 2004 and paroled several times prior to beginning his current term on September 19, 2012; he was not a participant in the MHSDS initially, but he was placed at the 3CMS level of care on November 11, 2012.  He remained at the 3CMS level of care until his level of care was increased to EOP on June 11, 2014.  His level of care was reduced to 3CMS approximately one year later on January 14, 2015, and he continued to receive mental health services at the 3CMS level of care since that time.  The patient had no history of alternative housing placements, MHCB, PIP or DSH hospitalizations.  His history was significant for two suicide attempts that occurred at age 16 by suffocation and at age 22 by overdose; however, he had no history of suicide attempts or self-injurious behaviors while in the CDCR.  His history was significant for mood instability and auditory hallucinations; however, he did not experience auditory hallucinations during the review period.  He was prescribed Lexapro and Trileptal with medication adherence, and he reportedly had overall adequate programming.

The annual IDTT meeting occurred on March 1, 2023, and the IDTT meeting was attended by the appropriate staff including the patient.  The treatment team identified primary goals of preparing for upcoming parole and assisting with entry into a transitional program in the community.  The treatment plan included an IPOC for depressed mood which contained adequate and appropriate goals and interventions; although, the treatment goals were generally broad and not individualized.  The level of care justification was appropriate, and individualized goals were identified in this section of the treatment plan.  At that IDTT meeting, the patient was provided diagnoses of unspecified anxiety disorder, unspecified mood disorder, and antisocial personality disorder.  The treatment plan documentation was adequate.

The PC contacts occurred timely during the review period.  At a routine PC contact on March 1, 2023, the patient was described as stable with no concerns noted.  The next routine PC contact occurred on May 17, 2023, when the patient was described as stable; although, he reported that his anxiety was seven of ten on a ten point scale.  He was also reportedly medication adherent.  At a July 31, 2023 routine contact, the patient met with his PC and stated that he was not

interested in participating in talk therapy at that time, but he reviewed breathing exercises with the PC to help manage his anxiety symptoms.

The patient was seen timely for psychiatric contacts during the review period. He was seen on February 21, 2023 for a routine psychiatric contact when the psychiatrist noted that the patient had missed two doses of Lexapro. The patient reported that the medication was effective, and he stated that he had missed the two medication doses because it was cold, and he did not want to go to the medication pill line. He rated his depression and anxiety at five to six of ten on a ten point scale, and the psychiatrist increased the Lexapro dosage. The psychiatrist also documented medication adherence notes on March 1 and March 28, 2023, as well as updated medication consent forms for Lexapro and Trileptal on May 9, 2023. A psychiatric progress note on May 30, 2023 indicated that the patient reported stable mood and positive response to the Lexapro dosage increase. At an August 22, 2023 psychiatric contact, the patient denied significant depressive symptoms and reported no problems with his medications.

**Findings**

The care and treatment provided to this 3CMS patient at HDSP was adequate.

The patient was seen timely for the annual routine IDTT meeting, PC and psychiatric contacts, and the contacts were appropriately documented in the progress notes. His mental status remained stable during the review period, and he did not require increased clinical contacts or crisis management. The patient and treatment team appeared appropriately focused on preparing the patient for his upcoming parole.

**Patient V**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at HDSP. The patient arrived at CDCR for his current term on October 11, 2017 at WSP and was placed in the MHSDS at the 3CMS level of care on October 23, 2017. He transferred to HDSP on February 20, 2018. His EPRD was in 2041. The patient had recently returned to HDSP on January 23, 2023 after placement in the Orange County jail for three years to attend court. He had a history of military service from 2002 to 2014, and a history of PTSD. He did not have a history of suicidal or homicidal ideation, suicide attempts, or self-injurious behavior. He was prescribed Remeron and Zoloft when he arrived at HDSP in February 2018, but he was prescribed gabapentin while at the county jail which was reportedly more effective in addressing his PTSD symptoms.

The initial IDTT meeting upon his return to HDSP occurred on February 8, 2023, which was three days late. The IDTT meeting included the required staff and the patient. The patient stated that his primary goal was to focus on his depression and to develop coping strategies for his depressive symptoms. The treatment plan included an IPOC for depressed mood, but the IPOC goals were not individualized and lacked interventions. The treatment plan indicated that the PC would use CBT and mindfulness interventions. He was prescribed Zoloft and Remeron, and the level of care justification was adequately documented. The treatment planning appeared

adequate, and it noted that treatment goals would be further developed as the treatment team developed rapport with the patient.

The initial PC assessment occurred timely on February 2, 2023; the assessment was appropriately documented and provided a clinical history for the patient. He was seen for a routine PC contact on March 2, 2023; this contact occurred in a confidential setting, and the progress note noted a focus on trauma, grief, and PTSD symptoms. The progress note also indicated that the only prescribed psychotropic medication at that time was gabapentin. At a routine confidential contact on March 20, 2023, the patient requested in-cell therapeutic packets and activities. He was next seen for a confidential PC contact on April 13, 2023, when they addressed PTSD symptoms including flashbacks, sleep difficulties, and hypervigilance. The patient continued to report sleep problems and severe PTSD symptoms, but he was described with normal mental status, was engaged with the PC, and he discussed his treatment appropriately. At a PC contact one week later on May 9, 2023, the patient continued to report severe PTSD symptoms. He received an anger management packet from the PC and reportedly asked the psychiatrist to prescribe Wellbutrin; however, the psychiatrist instead prescribed Lexapro. The next PC contact occurred at the request of the patient on June 22, 2023. At that session the PC provided psychotherapy, and the patient reportedly attempted to process and to seek amends for his crime. He met with the psychiatrist and PC on June 27, 2023 when he reported no significant concerns, and the psychiatrist started treatment with Cymbalta. At the final PC contact of the review period on July 11, 2023, the patient reported no new symptoms, was coping adequately, was in college and had a job.

The patient was seen timely for psychiatric contacts during the review period. The initial psychiatric assessment occurred on January 26, 2023, when the patient reportedly demonstrated normal mental status; the psychiatrist noted that the patient had recently arrived at HDSP from a county jail and was prescribed gabapentin. The patient was described as stable and was generally treatment adherent. At the next psychiatric contact on March 8, 2023, the patient was also described as stable, and he denied acute symptoms. He was next seen by the psychiatrist on April 18, 2023 when the timing of his gabapentin doses was adjusted. On May 9, 2023, the patient requested Wellbutrin but was instead prescribed Lexapro. On June 21, 2023, the patient was described as partially adherent with Lexapro, as he had missed six doses in 30 days. At a June 27, 2023 psychiatric contact, Lexapro was discontinued due to side effects of nausea, and the patient was prescribed Cymbalta.

**Findings**

The care and treatment provided to this 3CMS patient at HDSP was adequate.

The patient was seen timely for the initial clinical assessments and routine clinical contacts. The PC progress notes indicated that the patient participated in psychotherapy sessions and developed good rapport with his PC. His medications were adjusted in response to his symptoms and side effects. The patient remained stable during the review period, and his overall mental status appeared to improve in response to the treatment provided.

**Patient W**

This 37-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at HDSP. The patient entered the CDCR for his current and second term on March 1, 2021 and was transferred to HDSP from the NKSP reception center. He was placed at the 3CMS level of care on March 19, 2021, and he was receiving mental health services at that level of care at the time of review. He had no history of EOP placement, DSH admissions, or MHCB referrals. The patient also had no history of suicide attempts or self-injurious behavior while in the CDCR. His history was significant for receiving 10 RVRs during his current term; most of the RVRs were for fighting with other incarcerated individuals, and he was placed on C-status for most of the review period. He reported that he had been provided a diagnosis of PTSD and had historically struggled with depression, anger, anxiety, and substance use difficulties including opiate dependence. During the review period, he was provided diagnoses of other specified depressive disorder, antisocial personality disorder and opioid use disorder.

The annual IDTT meeting occurred timely on August 9, 2023, and the IDTT meeting was attended by the appropriate staff and the patient. The treatment plan noted the patient's primary goal to be released from prison and that he wanted to work on his depression, anxiety, anger, and opioid dependence in individual therapy. The treatment plan included IPOCs for substance abuse and anger; both IPOCs contained appropriate goals, but treatment interventions were inadequate or absent. The clinical summary was copied and pasted into the level of care justification section, and the treatment plan did not identify the patient's prescribed psychotropic medications. The treatment plan developed at the annual IDTT meeting was inadequate.

The PC contacts occurred timely and were well documented during the review period. The documentation indicated that the patient was provided appropriate therapy interventions which aligned with his treatment goals; for example, at a PC contact on March 16, 2023, the patient reported moderate to severe anger and demonstrated little to no insight. The PC documented attempts to provide anger processing strategies and techniques with the patient, and the interventions were well documented in the progress note. An April 12, 2023 PC progress note in response to an urgent PC consult indicated that the patient reported that he had been on hunger strike since April 9, 2023, because he did not have access to all the applications on his tablet due to his placement on C-status. The contact was well documented and indicated that the patient was using the hunger strike as a grievance regarding his tablet, and that his behavior was not the result of mental illness. The patient was provided education from the medical staff. The next PC contact occurred on June 7, 2023 after the patient went on a hunger strike from June 1 to June 4, 2023 in protest for not being allowed to go to canteen, again due to C-status restrictions. This contact was also well documented and indicated that the patient engaged in talk therapy with the PC regarding his stressors and concerns. The final PC contact of the review period occurred on August 31, 2023; the patient refused a confidential PC contact but reported no difficulties. He denied any active mental health symptoms, and his stability had reportedly improved over time.

The patient was seen for two psychiatric contacts during the review period; all psychiatric contacts for HDSP 3CMS patients were provided by telepsychiatry during the review period. The psychiatric progress note on March 23, 2023 indicated that the patient was stable and noted

that he hoped for transfer to another institution soon. He was prescribed Vistaril and prazosin PRN with no reported problems with his medications. The next psychiatric contact occurred two months later on August 9, 2023. The patient was described as future oriented at that time, was no longer on C-status, and was no longer on hunger strike. He reportedly took his medication as ordered PRN and denied significant symptoms.

**Findings**

The care and treatment provided to this 3CMS patient at HDSP was inadequate.

The treatment planning at the annual IDTT meeting was inadequate, as the treatment plan contained generic treatment goals, no specific or appropriate treatment interventions, and did not identify prescribed psychotropic medications or a psychiatric care plan. The routine psychiatric contact during the review period did not occur timely. The PC contacts did occur timely, were well documented, and reflected that the PC provided appropriate interventions and support; although those interventions were not identified in the actual treatment plan.

**Patient X**

This 58-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at HDSP. He originally entered the CDCR in September 1987 and paroled several times before beginning his current sentence in June 1999. The patient primarily received treatment at the 3CMS level of care; however, he also had no fewer than seven MHCB admissions between November 2016 and December 2021 due to repeated instances of suicidal ideation, homicidal ideation, and self-injurious behavior. He arrived at HDSP on May 1, 2019. His history was also significant for violent interpersonal related RVRs, victimization of other patients including sexual assault, and using reports of suicidal ideation and self-injury to influence his level of care and privileges. His chronic suicide risk was assessed as high, and his acute suicide risk was assessed as low.

The most recent annual IDTT meeting occurred prior to the review period on January 25, 2023. That treatment plan included an IPOC for impulsive behavior that contained inadequate and nonspecific goals and interventions, and the clinical summary was pulled forward unchanged from the prior February 15, 2022 treatment plan. The patient reported ongoing depressive symptoms, but there were no treatment goals or interventions provided to address depression. A special IDTT meeting was convened on July 5, 2023 after the patient requested a new PC; this meeting included the patient, PC, and psychiatrist, but no CC1 was present as the treatment team determined that CC1 involvement was not necessary as the purpose of the IDTT meeting was to consider a PC change. The patient reportedly had refused to meet with or communicate with his PC. The PC and psychiatrist noted that since being assigned to the PC, the patient had not received any RVRs and had completed several treatment and academic programs. There was documentation that the patient was consistently belligerent towards the PC, and he stated that he planned to continue to work with the psychiatrist but would avoid all contact with the PC. Due to this conflict, the patient's PC was changed on July 26, 2023.

502

The initial PC made timely and well documented attempts to engage the patient despite his reluctance and repeated refusals during the review period, and the PC consistently described the patient's overall functioning as stable. He refused to engage with the PC for scheduled contacts on April 7, 2023 and June 14, 2023; however, his engagement in treatment increased significantly after the PC was changed on July 26, 2023. At the first contact with the new PC on August 15, 2023, the patient was described as engaged, and he participated in supportive and insight-oriented therapy. The PC progress note indicated plans to meet every 90 days to develop CBT and mindfulness techniques. The patient reportedly demonstrated improved mood and was motivated for treatment.

The patient was seen timely for psychiatric contacts during the review period. At a March 9, 2023, psychiatric contact, he was provided diagnoses of antisocial personality disorder, borderline personality disorder and bipolar II disorder. The patient reported a stable mood and no significant symptoms; he was reportedly adherent with prescribed Lamictal. The psychiatrist also noted that the patient demonstrated a generally normal and stable mood. He was subsequently seen by the psychiatrist on May 25, 2023, and August 15, 2023. On both occasions, the patient was described as stable and medication adherent.

**Findings**

The care and treatment provided to this 3CMS patient at HDSP was adequate.

Although improvement was needed regarding the treatment plan goals and interventions; the treatment was otherwise appropriate. The PC contacts occurred timely and were well documented. The initial PC demonstrated diligent and consistent efforts to engage with the patient despite the patient's reluctance and hostility. After the change in PC, the patient's treatment engagement increased significantly, and he demonstrated more motivation and treatment participation. Psychiatric contacts also occurred timely, and the patient appeared to respond well to psychotropic medication treatment with good adherence.

**APPENDIX B – 3**
**CALIFORNIA CORRECTIONAL INSTITUTION (CCI)**
Site Visit: November 7, 2023 – November 9, 2023
Review Period: March 1, 2023 – August 31, 2023

**Patient A**

This 32-year-old patient was provided diagnoses of major depressive disorder, recurrent, mild; antisocial personality disorder; amphetamine-type substance use disorder; and adjustment disorder with anxiety. Of note, the adjustment disorder diagnosis was recorded in the patient's healthcare record since October 17, 2019, despite being a diagnosis of short-term duration. Further, psychiatric providers included diagnoses of antisocial personality disorder, narcissistic personality disorder, unspecified depressive disorder, severe methamphetamine use disorder, severe opioid use disorder, moderate alcohol use disorder, and severe cannabis use disorder; yet these diagnoses were never officially entered into the record or noted in the MHPC or IDTT documentation. The patient was prescribed mirtazapine and sertraline. He was mostly adherent with the mirtazapine but did not routinely take the sertraline as prescribed. The patient's case was chosen for review from a list of patients who had recently been reduced from the EOP to the 3CMS level of care. The documentation indicated that the patient was placed at the 3CMS level of care on March 3, 2023, and transferred to CCI on May 16, 2023.

Upon arrival at CCI, the patient was seen for an initial health screening. The patient reported during the screening that his father died less than three weeks prior and that he had spoken to mental health staff about his loss. The patient also reported suicidal ideation and a suicide attempt during the past two weeks. Despite these responses, a routine referral was submitted for the patient to be seen by mental health staff within five days.

An initial MHPC assessment was completed on May 22, 2023. During that assessment, the patient reported a sense of foreshortened future and recklessness/carelessness regarding his own safety, including passive suicidal ideation and ambivalence about living. He also reported engaging in self-harm two weeks prior. The patient reported isolating himself from others and not engaging in activities that he previously enjoyed. Suicidal triggers and coping strategies were documented in the healthcare record as "PER RECORDS," so it was unclear whether these issues were discussed with the patient during the assessment. The patient also reported using fentanyl the day prior to his transfer to CCI. The patient noted that he was interested in receiving more frequent contacts than were routinely offered at the 3CMS level of care. The MHPC noted that a SRASHE was not completed because the patient's "thoughts of not making it out of prison are fleeting;" this rationale for not completing a SRASHE was inadequate, as the patient reported passive suicidal ideation and a sense of foreshortened future during the MHPC assessment. The patient was not taking his medication as prescribed, and stated that he was unlikely to submit a request to see mental health if he felt that he needed to be seen between scheduled contacts.

The patient refused his initial contact with the psychiatrist on May 25, 2023. A healthcare record review and a brief nonconfidential contact were completed instead. Collateral contacts and verification attempts were made about the death of the patient's father, and the death could not

be confirmed.  The psychiatrist also noted the patient's medication nonadherence, as well as his limited engagement in offered treatment when the patient was previously in the EOP.

An initial IDTT meeting occurred with the patient and all required staff on May 30, 2023.  An IPOC was initiated to address treatment nonadherence, yet the interventions and outcomes were vague and included generic entries with frequencies and timeframes omitted.  The documentation included comments by the patient about depression and suppressing his emotions, but neither of those comments were included in the treatment plan.  It was noted that the patient reported hope regarding working with his attorney toward release and having positive relationships with his family.  The patient appeared motivated to return to the EOP level of care.  Despite this, the treatment team noted that the patient's medications would be discontinued, and he would be seen for an IDTT meeting again in six months when discharge from the MHSDS would be considered.  On June 27, 2023, a second "initial" IDTT meeting occurred with required staff but without the patient due to his refusal to attend.  The documentation indicated that higher level of care indicators had not been properly addressed during the previous IDTT, so the meeting was conducted to "redo his initial IDTT."  Minimal changes were made to the IDTT documentation other than noting the patient's multiple MHCB referrals/admissions in prior months.  The IPOCs remained vague and nonspecific, and the plan to discharge the patient from the MHSDS in the next six months was retained.

Over subsequent months, the patient refused most contacts offered by the telepsychiatrists, on-site psychiatrists, and MHPCs, even when the patient was to be seen in response to his requests for mental health services.  Most contacts occurred at cell front due to his treatment refusals.  Of note, the patient was also seen for "wellness checks" in response to requests for services; however, no rationale was provided for the nonconfidential nature of these contacts.  The patient was prescribed medications by covering psychiatrists, but did not take them as prescribed, and the medications were discontinued.

On September 7, 2023, the patient reported swallowing a razor blade but refused to engage with medical staff or the CIT.  The patient was allowed to remain in his cell with his window covered.  The following day, the patient was again seen by the CIT after again reporting that he swallowed razor blades, and was moved to the ASU due to reported safety concerns.  The SRASHEs completed during those contacts were inadequate, as they failed to include adequate justification for a low acute suicide risk rating despite evidence of imminent warning signs.  Safety planning was also clinically indicated at various points during the patient's treatment, but no safety plan was ever developed.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient consistently reported the need for increased mental health support to manage his depression and passive suicidal ideation, and stated that he was leery of engaging with mental health staff as previous staff were unreliable and not trustworthy.  The mental health staff determined that the patient did not require referral to a higher level of care and dismissed his reported mental health needs secondary to his frequent refusals of services.  Even when the patient reported that he had engaged in self-harm, the staff dismissed his distress.  The treatment

planning was inadequate, and there was no evidence of any attempts to engage the patient in psychotherapeutic interventions. Additionally, the psychiatric care was inconsistent, and diagnostic clarification was needed.

**Patient B**

This 27-year-old patient was provided diagnoses of schizoaffective disorder, bipolar type and unspecified bipolar and related disorder. He was not prescribed psychotropic medications. The patient's case was selected from a list of patients who reportedly had been transferred from the EOP to the 3CMS level of care. In this patient's case, he was elevated to the EOP level of care from the 3CMS on June 13, 2023, but returned to the 3CMS level of care on June 22, 2023. The patient remained at CCI during that period.

The patient arrived at CCI on May 12, 2023, and was referred for a routine mental health contact at the time of the initial screening. He was seen for an initial MHPC assessment on May 17, 2022, when the patient was provided scales to measure his level of anxiety and depression. Both scales indicated clinically elevated scores. The MHPC assessment was comprehensive.

An initial psychiatric assessment was completed on May 18, 2023 and was adequate. An initial IDTT meeting occurred on May 25, 2023, and included all required staff and the patient. An IPOC was initiated to address anxiety. The rationale for retaining the patient at the 3CMS level of care was adequate; however, the IDTT documentation mentioned PTSD, which was not recorded as a diagnosis of record. The case formulation was not individualized.

On May 28, 2023, a custody staff member submitted a referral due to concerns that the patient was vulnerable; the referral also indicated that other individuals were taking advantage of the patient. This was notable as the patient transferred to CCI due to abuse by a prior cellmate. The MHPC who completed the consult referred the patient for a DDP evaluation and referred the patient to the psychiatrist for evaluation of the need for medication treatment given possible evidence of psychosis. The documentation of that psychiatric encounter was disjointed and included contradictory information; additionally, the contact did not result in the psychiatrist prescribing medication for the patient or include any additional information about possible diagnoses. A DDP evaluation was not initiated during the reporting period.

Another referral was submitted regarding the patient's victimization on June 7, 2023. He was seen by a MHPC on June 12, 2023, and it was documented that the patient would be elevated to the EOP level of care. This MHPC was not the patient's assigned clinician, and there was no documentation that an IDTT occurred. An initial MHPC EOP assessment was completed by this clinician. The patient was seen for a weekly EOP MHPC contact by this same clinician on June 19, 2023, yet the note was sparse and included no interventions. A psychiatric progress note was entered into the healthcare record on June 20, 2023, and was indicated to be an "intake evaluation;" yet it appeared to be copied almost entirely from the previous psychiatric progress note. An IDTT meeting occurred on June 22, 2023 that included the patient's assigned clinician and other required staff. The documentation indicated that the patient advocated to remain at the 3CMS level of care and denied any victimization. The decision was made to return the patient to

the 3CMS level of care. The IDTT documentation did not mention the custody concerns, the patient's previous psychotic presentations, or collateral information.

An initial IDTT meeting was conducted with the patient and a newly assigned MHPC in attendance on June 29, 2023. The initial MHPC assessment was completed prior to the IDTT meeting, but the initial psychiatric assessment was not completed timely prior to the IDTT meeting. The rationale for retaining the patient at the 3CMS level of care was unchanged from the prior IDTT meeting, and the IPOC remained unchanged with no reference to the patient's progress related to his anxiety.

The patient was not seen again by any mental health professional until September 11, 2023, when he reported the absence of anxiety and adequate functioning.

**Findings**

The care and treatment provided to this patient were inadequate.

There were several concerns noted regarding the care provided to this patient that included the failure to provide continuity of care, lack of documented treatment interventions, and an inadequate rationale for level of care changes. The patient transferred to CCI after victimization from his cellmate. Subsequently, there were reports of victimization at CCI, and staff attempts to intervene were inconsistent. There was no documentation of the completion of a DDP evaluation, despite a referral that was submitted four months prior. Further, diagnostic clarification was needed.

**Patient C**

This 38-year-old patient was provided diagnoses of unspecified depressive disorder, amphetamine-type substance use disorder, and other substance-induced psychotic disorder. The patient was not prescribed psychotropic medication; however, he was prescribed olanzapine previously during the review period, but was generally nonadherent. The patient's case was selected from the list of patients whose level of care was reduced from EOP to 3CMS during the reporting period.

This patient transferred to CCI on June 30, 2023. He was seen for an initial MHPC assessment on July 13, 2023, despite being referred to be seen within five days following his initial health screening. The assessment was adequate. The patient refused his initial telepsychiatric assessment on July 14, 2023, so he was seen at cell front. He reported that he wanted to have his olanzapine discontinued in the evenings but would continue taking it at midday, and this medication dosage change occurred.

The patient was seen for a routine MHPC contact and a 90-day follow-up SRASHE on July 27, 2023, following an inpatient discharge in August 2022. His chronic and acute suicide risk were assessed as low. There was no documentation regarding discussion of the events that precipitated the previous inpatient placement. The progress note was essentially a status note, as

no treatment plan was active at the time of the contact.  The patient again refused a telepsychiatry contact on July 28, 2023.

An initial IDTT meeting occurred on August 8, 2023; this meeting occurred significantly later than timelines required.  Necessary staff was in attendance, but the patient did not attend.  An IPOC for depressed mood was initiated, but the rationale for retaining the patient at the 3CMS level of care was generic and inadequate.  The rationale indicated that the patient was prescribed psychotropic medications, but the patient's medications had been discontinued.  The patient refused his subsequent psychiatric appointment and was not offered any MHPC appointments following the initial IDTT meeting.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT meeting occurred significantly later than required and did not address the patient's previous treatment or progress to date.  His antipsychotic medications were discontinued secondary to refusal without an adequate assessment of the patient; this despite an inpatient placement less than one year prior and a recent decrease in level of care from EOP to 3CMS.  The documentation indicated that the IDTT did not have a comprehensive understanding of the patient's history or treatment needs.

**Patient D**

This 29-year-old patient was provided diagnoses of unspecified depressive disorder, antisocial personality disorder, and opioid use disorder.  He was not prescribed psychotropic medications but was prescribed buprenorphine-naloxone for MAT.  His case was selected to assess the care of patients recently reduced from the EOP to the 3CMS level of care.

Upon arrival to CCI on April 24, 2023, the patient was referred to mental health for a routine assessment within five days.  Despite this, he was not scheduled for an MHPC initial assessment until May 3, 2023.  The patient refused this contact.  The assessment was not updated other than inclusion of the patient's reported anxiety symptoms and a mental status examination, which was completed at cell front.  Based on review of the contents of the initial assessment, it appeared that this was the patient's first assessment at the 3CMS level of care since transition from the EOP on February 22, 2023.  The documentation indicated that the MHPC did not recognize this fact in the assessment.  The patient also refused his initial telepsychiatric assessment on May 5, 2023, and was seen at cell front.  The documentation was minimal and noted that the patient would be rescheduled; however, the next attempted contact was not documented for over seven weeks.

On May 9, 2023, an initial IDTT meeting occurred with required staff members present, but the patient refused to attend.  An IPOC was initiated for anxiety that included appropriate interventions and goals.  The rationale for retaining the patient at the 3CMS level of care was generic and inadequate.  Much of the IDTT documentation was pulled forward from prior documents.

The patient submitted a request to see mental health regarding his PRN mirtazapine on June 21, 2023; however, the medication had been discontinued prior to his transfer to CCI. In response to the request, the MHPC conducted a "wellness check" at cell front on the same date. The patient was told that he would be referred to a psychiatrist. A SRASHE was completed during that cell-front contact with minimal updates provided. It was documented that the patient refused to be seen in a confidential setting. The SRASHE was apparently a routine 90-day follow-up after an MHCB admission in October 2022, but this was not explicitly stated.

The patient refused the scheduled telepsychiatric contact on June 26, 2023, and was seen at cell front. He denied wanting his medications to be restarted.

On July 10, 2023, the patient was scheduled to be assessed after receiving an RVR for possession of alcohol; however, he failed to show for the encounter despite having left his housing unit to attend. Mental health factors were determined not to be a factor for this RVR.

The patient was seen for an initial telepsychiatric assessment in a confidential setting on July 20, 2023. He was provided diagnoses of agoraphobia and generalized anxiety disorder without explanation or rationale. The assessment was otherwise adequate, and the patient was restarted on hydroxyzine at his request. For the following two weeks, nursing staff submitted nonadherence reports. On August 15, 2023, a routine referral was generated after the patient presented with confusion, hostility, severe mood swings, and bizarre behavior including throwing away his clothing, and not remembering conversations. Before the patient was seen in response to this referral, he was assessed again for an RVR for alcohol possession, and a psychiatrist discontinued the hydroxyzine without seeing the patient. The patient refused to be seen for a consult on August 23, 2023, and the response to that referral was late. Collateral information confirmed ongoing behavioral concerns; however, the cell-front contact failed to yield concerns for the MHPC. The patient was seen for a subsequent confidential contact with the MHPC on August 28, 2023. The documentation of that contact included no interventions, and the content reflected a status note with normal functioning and no additional collateral reports of concerning behavior. The patient reported wanting to restart medications but refused subsequent psychiatric appointments.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not seen timely for his initial psychiatric assessment, the IDTT documentation was inadequate, medications were discontinued without the patient being seen, and there were delays in responses to referrals. It should be noted that the patient's refusal to engage with the IDTT limited the ability to provide needed care.

**Patient E**

This 62-year-old patient was provided a diagnosis of unspecified depressive disorder. He was prescribed mirtazapine early in the reporting period but was not adherent; subsequently, the

medication was changed to PRN. He was prescribed aripiprazole in June 2023 and was generally nonadherent; the patient took the medication less than 60 percent of the time over the subsequent months. The patient's healthcare record was randomly chosen to assess the treatment provided at the 3CMS level of care.

An annual IDTT meeting was conducted in June 2023 which included all required staff members, but the patient did not attend. The documentation did not include any discussion of the patient's treatment progress or response to treatment. Instead, it noted that the patient's medications had been discontinued in April 2023, and the patient would be seen for "at least one more" contact before consideration of removal from the MHSDS. The issue of removing the patient from the caseload was not documented in any subsequent progress notes; however, his medications were resumed less than two weeks after the IDTT meeting. The IPOC, goals, and interventions appeared adequate.

The patient was seen more frequently than minimally required by the psychiatrists during the reporting period, and all but one contact occurred with his assigned psychiatrist. Of note, the covering psychiatrist changed the mirtazapine to PRN on April 19, 2023, and the assigned psychiatrist documented that he did not want the medication prescribed as PRN; however, the medication order was never corrected. Other concerns noted with psychiatric care included a medication consent and order for the initiation of aripiprazole on June 27, 2023, without any contact with the patient documented on that date. There was a note entered by the psychiatrist on June 28, 2023, without any mention of why the medication was initiated. On July 17, 2023, the medication administration record showed that the aripiprazole was discontinued; however, there was no documentation entered by the psychiatrist on that date. The medication was resumed following contact with the patient on July 25, 2023. On July 31, 2023, the psychiatrist completed an Abnormal Involuntary Movement Scale (AIMS); however, there was no psychiatric contact with the patient documented on that date, so it was unclear how the psychiatrist could have assessed the patient for this examination that required clinical contact. Consistently, the assigned psychiatrist documented in progress notes that the patient's mirtazapine was prescribed nightly, yet the medication administration record reflected that the medication was ordered PRN.

The patient was seen on two occasions by his assigned MHPC during the reporting period. Neither contact reflected the use of interventions or indicated an assessment of patient treatment progress.

**Findings**

The care and treatment provided to this patient were inadequate.

Concerns were noted regarding the psychiatric care provided, including medication changes and assessments completed without documented contact with the patient. Additionally, the MHPC contacts did not include the use of treatment interventions, and patient progress toward goals was never assessed.

**Patient F**

This 25-year-old patient was transferred to CCI on July 18, 2023 at the 3CMS level of care. He was provided a diagnosis of other specified schizophrenia spectrum and other psychotic disorder. He was not prescribed psychotropic medications. His healthcare record was randomly selected for review of the treatment provided.

Upon arrival at CCI, it was noted that the patient was prescribed olanzapine with a PRN order for diphenhydramine. A routine referral to mental health was generated. The patient was seen by a psychiatrist on July 26, 2023 when an adequate initial assessment was completed, and informed consent for olanzapine and diphenhydramine was obtained. The psychiatrist noted that the patient likely met criteria for a diagnoses of bipolar spectrum disorder or ADHD, but no changes were made to the patient's diagnosis of record.

An adequate initial MHPC assessment was completed on July 31, 2023, which noted the patient to be an unreliable historian. The patient reported to the MHPC that he had stopped taking the olanzapine secondary to side effects and had recently experienced auditory hallucinations. The patient was noted to be rocking in his chair throughout the assessment. The case formulation was not updated and included language which indicated that the patient declined mental health treatment and would not be included in the MHSDS. This statement was confusing, as the patient was receiving mental health services at the 3CMS level of care and was prescribed psychotropic medications.

As was noted in other cases reviewed at CCI, the psychiatrist completed an AIMS on July 31, 2023 without any documented contact with the patient on that date.

An initial IDTT meeting occurred on August 2, 2023 with required staff and the patient in attendance; however, neither of the psychiatrists who attended the meeting were the psychiatrist who had completed the initial assessment. An IPOC was initiated to address hallucinations, yet there were no interventions included in the treatment plan. It appeared that the patient's medications were discontinued due to nonadherence on August 1, 2023; however, there was no documentation that the patient was seen by a psychiatrist for that purpose. The patient requested to have his medications restarted, but the covering psychiatrist indicated that he would refer the patient to his assigned psychiatrist for that to occur.

The patient's assigned psychiatrist saw him on August 7, 2023 for a medication nonadherence contact; this was also confusing, as the patient was not prescribed psychotropic medications on that date. The patient denied the need for medications, and the psychiatrist noted discontinuation of medications; however, no medications had been prescribed. Of note, much of the content of the progress note was copied from the previous note.

The patient was not seen again by any mental health professional during the reporting period.

**Findings**

The care and treatment provided to this patient were inadequate.

The psychiatric documentation was inadequate and confusing, including medication management and AIMS examinations completed without evidence of patient contacts. There was little evidence that the assigned psychiatrist reviewed the healthcare record. The IDTT documentation included no interventions and the treatment requested by the patient during the IDTT was delayed, as the patient's assigned psychiatrist was not present. Finally, it was concerning that antipsychotic medications were discontinued for this patient with a diagnosed psychotic illness, and he was not seen again for psychiatric assessment until nearly two months following the medication discontinuation.

**Patient G**

This 37-year-old patient was provided diagnoses of borderline personality disorder, PTSD, and adjustment disorder with mixed disturbance of emotions and conduct. He was adherent with his prescribed fluoxetine. The patient was also treated with buprenorphine-naloxone for MAT. The patient's case was randomly selected to assess the adequacy of the treatment provided at the 3CMS level of care.

The patient was seen by both his MHPC and the psychiatrist more frequently than minimally required. The responses to patient requests and referrals were addressed timely; however, the psychiatrist did not always address the issue noted in referrals and requests. For example, the patient was referred to the psychiatrist after feeling overly activated by his antidepressant medication, but the psychiatrist did not address this issue in the documentation. The MHPC progress notes evidenced the delivery of interventions outlined in the treatment plan, and continuity of care was adequate.

Two IDTT meetings occurred during the reporting period with all required staff and the patient present. The plan included adequate goals and interventions; however, patient progress was not discussed, and much of the content was copied from previous IDTT meetings with minimal changes.

**Findings**

The care and treatment provided to this patient were adequate; however, deficiencies in psychiatric and IDTT documentation were noted.

**Patient H**

This 48-year-old patient's case was randomly selected to assess the adequacy of the treatment provided at the 3CMS level of care. He was provided diagnoses of unspecified anxiety disorder, uncomplicated bereavement, and opioid use disorder, moderate. He was not prescribed psychotropic medications.

The patient's most recent IDTT meeting occurred prior to the reporting period on March 7, 2023. The IDTT documentation noted that the patient had a diagnosis of PTSD; however, this was not documented elsewhere in the healthcare record. The plan included marginally adequate treatment goals and interventions. There was no discussion of patient progress and limited

rationale for continuing the patient at the 3CMS level of care. The patient was not seen timely during the review period by his assigned MHPC. When the patient was seen, the contacts included interventions that were appropriate to the patient's treatment needs. The patient was offered a pre-release planning group in July 2023, but he refused and stated that he had no need for continued mental health treatment after release from prison.

There were no psychiatric contacts documented during the reporting period.

**Findings**

The care and treatment provided to this patient were adequate.

Despite this, the MHPC contacts were late by two weeks. There was also a need for diagnostic clarification, as the patient's diagnosis in the treatment plan was inconsistent with his diagnosis of record.

**Patient I**

This 39-year-old Spanish speaking patient was provided a diagnosis of adjustment disorder with anxiety, and was not prescribed psychotropic medications. His case was randomly selected for review of the treatment provided at the 3CMS level of care.

No IDTT meetings occurred during the reporting period, so the documentation from the most recent IDTT meeting on March 23, 2023 was reviewed. The patient's goals and interventions were minimally adequate, and there was no review of patient progress. The rationale for retaining the patient at the 3CMS level of care was also minimally adequate, noting that the patient was anxious and had stopped taking medications in January 2023.

The patient was seen as required by his assigned MHPC. There was a change in the assigned MHPC, and no explanation or evidence of appropriate transition was documented. Both MHPCs were Spanish speaking. The clinical contacts evidenced the use of treatment interventions. The patient was scheduled to see his assigned psychiatrist every 90 days; however, the psychiatrist documented during each encounter that the patient could not be assessed secondary to needing an interpreter and would be rescheduled. The patient was not rescheduled but was seen again in 90 days without an interpreter. During the patient's entire stay at CCI beginning on January 26, 2023, the patient was never adequately assessed by a psychiatrist, despite the patient not taking his prescribed medication since two days after his transfer to CCI. No initial psychiatric assessment was documented.

**Findings**

The care and treatment provided to this patient were inadequate.

While the two MHPC contacts with the patient during the reporting period included the use of clinical interventions, this patient's care was inadequate overall. The IDTT documentation lacked specificity, did not document patient progress, and failed to provide clinical rationale for

continued treatment. The required psychiatric contacts did not occur; as repeatedly, no interpreter was made available to facilitate sessions with the psychiatrist.

## Patient J

This 27-year-old patient transferred to CCI on June 26, 2023, and was treated at the 3CMS level of care. He was provided diagnoses of unspecified bipolar and other related disorder; other (or unknown) substance-induced psychotic disorder, with moderate or severe use disorder; and cannabis use disorder, moderate in early remission. He was prescribed olanzapine, fluoxetine, and mirtazapine, and was moderately adherent. The patient's case was randomly selected for review of the care and treatment provided.

Upon arrival at CCI, the patient was urgently referred to mental health after screening positive for suicidal ideation. He was seen the same day, and a SRASHE was completed. While the SRASHE included an adequate review of the patient's suicide and self-harm history, both chronic and acute suicide risk were rated as low; this appeared to be an underestimation of risk given his history, his recent statements of suicidal ideation, and the presence of acute suicide risk factors. A safety plan was not completed. An initial MHPC assessment was completed on July 3, 2023, which was adequate. The patient was not seen again for an MHPC appointment during the reporting period.

The psychiatrist saw the patient for an initial assessment on July 10, 2023, and his medications were continued without any documentation of discussion of the medication nonadherence which had been flagged intermittently since the patient's arrival at CCI.

An initial IDTT meeting occurred on July 20, 2023, which did not occur timely. The required staff were present, as was the patient. An IPOC was initiated for depressed mood, but no interventions were listed. Despite ongoing medication nonadherence, that issue was not addressed other than the patient reporting no medication side effects.

The patient was seen by the psychiatrist due to ongoing medication nonadherence on August 15, 2023, and the patient reported that he wanted to remain on his medications. Beyond this single statement, the content of the progress note was largely copied from the prior note and included little new information. All medications were continued at that visit.

## Findings

The care and treatment provided to this patient were inadequate.

An initial SRASHE was inadequate, and it underestimated the patient's chronic and acute suicide risk based on the patient's history and current presentation. The patient's ongoing medication nonadherence was not adequately addressed, and psychiatric progress notes were copied from prior psychiatric treatment sessions. The initial IDTT meeting and treatment plan did not occur timely, and the treatment plan did not include treatment interventions.

**Patient K**

This 28-year-old patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, amphetamine-type substance-induced psychotic disorder, cannabis use disorder, and alcohol use disorder. He was not prescribed psychotropic medication. The patient's healthcare record was selected for review of the treatment provided to patients at the 3CMS level of care who were housed in the CCI ASU for more than 30 days.

The documentation indicated that the patient was assaulted on May 10, 2023 and sustained injuries to his face and forehead. He was placed in the ASU on the same date, yet his pre-placement screening incorrectly noted that the patient was "GP" and not receiving mental health services at the 3CMS level of care. Despite this, the patient's placement in the ASU was acknowledged by a MHPC on the following day, and a clinician-to-clinician contact was requested. There was no documentation in the healthcare record that a response to this request was received.

An initial MHPC assessment was attempted on May 17, 2023, but the patient refused. Collateral information with custody staff revealed that the patient had not left his cell, was refusing meals, and had not turned in his items for laundry since his arrival. Custody staff expressed that this was likely due to safety concerns, as the reason for his ASU placement was for an assault possibly related to his sexual offense history. The initial assessment was comprehensive despite the patient's refusal to cooperate, and it noted a prior history of the patient being found incompetent to stand trial. He was provided a diagnosis of adjustment disorder at that time. An initial psychiatric assessment was attempted on the same date, and the patient again refused to leave his cell. The psychiatrist documented a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder, and substance use disorders. The patient refused a follow-up contact with the MHPC on May 22, 2023 and asked to be removed from the 3CMS level of care. The MHPC progress note mentioned the diagnoses provided by the psychiatrist.

An initial IDTT meeting occurred on May 23, 2022 with required staff present; however, the patient did not attend. It could not be determined from the documentation whether an ICC occurred before or after this initial IDTT meeting. An IPOC for anxiety was created, and the rationale for retaining the patient at the 3CMS level of care was clinically appropriate.

The patient was offered weekly contacts with a MHPC but consistently refused to leave his cell. A request for records regarding his hospital stay for incompetence to stand trial was sent to DSH, but a response was not received prior to the patient's transfer on June 25, 2023. The healthcare record documentation included daily rounding by psych techs.

**Findings**

The care and treatment provided to this patient at CCI was adequate.

The treatment was assessed as adequate despite the patient's refusal to engage with mental health staff. Identified concerns that were not determined to result in inadequate care included an inaccurate level of care documented at the time of ASU placement, failure of a clinician to

respond to the request for clinician-to-clinician contact, and a diagnostic discrepancy that was not fully addressed.

**Patient L**

This 28-year-old patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed mirtazapine and was consistently adherent. He was also prescribed clonidine PRN and buprenorphine-naloxone. His healthcare record was selected for review of the treatment provided to 3CMS patients who were housed in the CCI ASU for more than 30 days.

The patient was discharged from the CSP/Sac MHCB to the CCI ASU on April 21, 2023 following an overdose of fentanyl. The patient required three doses of naloxone for resuscitation. At the time of the MHCB admission, the patient reported that the overdose was a suicide attempt after an upsetting phone call with his wife and receiving an RVR for having a manufactured weapon. By the time of the MHCB discharge, the patient reported that the overdose was not a suicide attempt but was accidental, as he was trying to hide the drugs from custody.

Upon arrival at CCI, the receiving psychiatrist requested a clinician-to-clinician contact, and information was conveyed via an EHRS message. Five-day follow-up contacts were completed as required, and a comprehensive psychiatric progress note and SRASHE were completed on day two. An initial MHPC assessment was completed on April 25, 2023, and a formal initial psychiatric assessment was completed on April 28, 2023. An initial IDTT meeting occurred on May 9, 2023 that included the required staff, but the patient chose not to attend. No IPOCs were created for the patient, and the rationale for retaining the patient at the 3CMS level of care was "medical necessity," as he was prescribed psychotropic medication. This determination appeared clinically inaccurate, as the patient had several psychological issues with which he was struggling including substance use, conflict with his wife, recently dropping out of a gang, RVRs, and a recent nearly lethal suicide attempt. The case formulation was not updated from the prior treatment plan.

The patient was offered weekly individual contacts with an MHPC which he routinely refused. He was assessed to be psychiatrically stable but was increasingly distressed while awaiting transfer. He was finally transferred to SVSP on June 30, 2023. Daily rounding by a psych tech was not documented on April 30 and May 20, 2023.

**Findings**

The care and treatment provided to this patient at CCI was inadequate.

The IDTT documentation failed to include treatment goals or consideration of the patient's treatment needs considering his recent serious suicide attempt and stressors. The IDTT documentation included an inadequate rationale for retaining the patient at the 3CMS level of care, and there was a failure to update the patient's case formulation despite changes since his MHCB discharge. Additionally, psych tech rounds were not documented daily as required.

**Patient M**

This 44-year-old patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood and antisocial personality disorder.  He was not prescribed psychotropic medications but was receiving buprenorphine-naloxone as MAT; however, he was not provided a diagnosis of a substance use disorder.  His healthcare record was selected for review of the treatment provided to 3CMS patients who were housed in the CCI ASU for more than 30 days.

The patient was placed in the CCI ASU on May 18, 2023.  A clinician-to-clinician contact request resulted in little information provided about the patient; however, there was reference to the patient being prescribed medication and last being seen by a MHPC in December 2022.  A review of the healthcare record revealed that this information was incorrect; the patient was seen by his MHPC on April 19, 2023, and by a psychiatrist on May 4, 2023.

An initial MHPC assessment was completed on May 24, 2023.  The patient reported symptoms of anxiety, and the assessment included relevant updates.  An initial psychiatric assessment was attempted on May 26, 2023, but the patient refused to participate; however, an adequate healthcare record review was completed.  An initial IDTT meeting occurred on May 30, 2023 that included the required staff; however, the MHPC was not the clinician who completed the initial assessment.  An IPOC was created to address depressed mood despite the patient reporting symptoms of anxiety and reporting no depressive symptoms when seen at cell front by the psychiatrist.  His anxiety symptoms were noted in the IDTT documentation as the rationale for retaining the patient at the 3CMS level of care.

The patient was offered weekly sessions with the MHPC but refused most of them.  There was documentation of one confidential contact which included no evidence of a therapeutic interaction.  The patient was transferred on July 11, 2023.

**Findings**

The care and treatment provided to this patient at CCI was inadequate.

The information provided in the clinician-to-clinician contact was inadequate and inaccurate, the IDTT failed to address the patient's primary symptoms, continuity of care was poor, and there was no evidence of the provision of therapeutic interventions during the only confidential session with the patient.

**Patient N**

This 40-year-old patient was provided a diagnosis of antisocial personality disorder, adjustment disorder by history, and cannabis use disorder.  He was not prescribed psychotropic medications.  His healthcare record was selected for review of the treatment provided to 3CMS patients who were housed in the CCI ASU for more than 30 days.

The patient was placed in the ASU on May 24, 2023 due to safety concerns.  He was seen for an initial MHPC assessment on June 1, 2023.  The content of this assessment was adequate and

noted that the patient struggled with anxiety and anger.  The patient refused his initial psychiatric assessment on June 2, 2023, resulting in a cell-front contact and healthcare record review.  The documentation of that assessment was adequate.  An initial IDTT meeting occurred on June 6, 2023; all required staff were present, but the patient refused to attend.  An IPOC to address anxiety was initiated without clear treatment goals and vague interventions.  The rationale for retaining the patient at the 3CMS level of care was generic.  The patient was seen for weekly cell-front contacts, as he refused to attend confidential sessions.  The documentation for those contacts was brief and generally focused on the patient's desire for transfer to another facility.

**Findings**

The care and treatment provided to this patient at CCI was adequate.

The clinical staff had difficulty in treating this patient given his chronic refusal to engage with clinicians in a confidential setting; this was necessary to develop an adequate treatment plan and for engagement in therapeutic interactions.

**Patient O**

This 31-year-old patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood; amphetamine-induced psychotic disorder, with mild use; and amphetamine-induced depressive disorder, with mild use.  He was not prescribed psychotropic medication.  His healthcare record was selected for review of the treatment provided to 3CMS patients who were housed in the CCI ASU for more than 30 days.

The patient was placed in the ASU on July 26, 2023, on the same date that a referral was made to mental health regarding his allegations of being a victim of sexual harassment and abusive sexual contact.  He was seen on July 27, 2023 for an assessment and SRASHE, but the patient refused to leave his cell.  The quality of the SRASHE was limited by the patient's refusal to engage, but he reported no suicidal ideation or concerns about his previous cellmate.  There were no objective signs of distress noted, and the clinician suspected that the patient was attempting to obtain a cell change.  A clinician-to-clinician contact was attempted, but the responding clinician referred the ASU clinician to the healthcare record without further elaboration; the healthcare documentation referenced was sparse at best.

Initial MHPC and psychiatric assessments were attempted on August 1, 2023 and August 2, 2023, respectively, but the patient refused confidential contacts resulting in assessments completed by a healthcare record review.  The assessments were adequate given the limitations due to the patient's refusal to engage.  The patient refused to attend the initial IDTT meeting on August 8, 2023, but the required staff were present.  An IPOC for depressed mood was initiated.  The rationale for retaining the patient at the 3CMS level of care was adequate.
The patient was seen weekly at cell front.  The patient refused all confidential contacts; however, on one occasion, it was noted that the clinician did not offer a confidential contact due to responding to a crisis.  The patient asked the MHPC for a referral to see the psychiatrist about restarting medication, and the patient was instructed to complete a healthcare request.  The patient never completed a request form.  The patient was consistently noted by the MHPC and

custody officers to be sleeping most of the day.  He was transferred to another facility on September 14, 2023.

**Findings**

The care and treatment provided to this patient at CCI was adequate.

**Patient P**

This 24-year-old patient was provided a diagnosis of adjustment disorder with depressed mood. He was generally adherent with his prescribed fluoxetine and mirtazapine.  The patient's case was randomly selected for review of the mental health treatment provided at the 3CMS level of care.

The patient was assigned a new MHPC in April 2023, and the initial contact included a comprehensive review of the patient's history, as well as the documentation of treatment interventions.  Another newly assigned MHPC attempted to see the patient on June 12, 2023, but the patient refused.  The patient was offered a session with his assigned MHPC on August 28, 2023.  The progress note included several contradictions.  The note stated that the patient was seen confidentially in a mental health office; however, it also stated that the patient had refused the session and was seen at cell front.  The note also indicated that the patient was not prescribed psychotropic medications; however, it also stated that he reported taking his medications as prescribed.  There was no documentation that treatment interventions were provided to address the patient's depression as outlined in his treatment plan.

A telepsychiatrist saw the patient every two to three months.  The documentation of the contacts was adequate and included a review of the patient's general functioning and his medication response.  Of concern was the fact that nursing staff reported that the patient had missed three doses of his mirtazapine in the evenings during July 2023.  A review of the MAR revealed that other than those three doses, the patient had consistently taken the medication daily.  In response to the refusal of these three medication doses, the psychiatrist discontinued the medication on July 28, 2023; this occurred without the psychiatrist seeing the patient and the patient having resumed taking the medication after the three missed doses.  When the patient was seen again in September 2023 by another psychiatrist, it was noted that the patient had missed the three mirtazapine doses because he was ill with COVID-19 symptoms.  The medication was restarted on September 7, 2023, and appropriate informed consent was obtained.

A routine IDTT meeting occurred on August 1, 2023 with the required staff present; however, the patient refused to attend.  An IPOC to address depressed mood was included with an appropriate goal, yet the interventions were vague and were not evidenced-based.  The clinical summary referenced the use of cognitive behavioral therapy intervention but made no mention of the fact that the patient had refused his individual sessions since June 2023.  There was no input included from the patient, as he had not been seen by the primary clinician for a confidential session since April 2023.  A decision to retain the patient at the 3CMS level of care was included in the documentation, and the rationale provided was that the patient was prescribed psychotropic medications.  The documentation made no mention of the fact that the patient had

recently received an RVR for battery on an inmate or that his prescribed mirtazapine had been discontinued a few weeks prior.

**Findings**

The care and treatment provided to this patient were inadequate.

There were changes in the patient's assigned MHPC, and inconsistent documentation made continuity of care difficult. There was no evidence that the patient was provided with or offered treatment interventions since April 2023. The patient's medication was discontinued after he missed three doses while ill with symptoms of COVID-19. Of concern was the lack of documentation indicating that the psychiatrist attempted to meet with the patient prior to the medication discontinuation.

**Patient Q**

This 27-year-old patient was provided a diagnosis of adjustment disorder with depressed mood. He was prescribed sertraline, and was generally medication adherent until September 2023, when he missed at least one-third of the medication doses. The patient's case was randomly selected for review of the mental health treatment provided at the 3CMS level of care.

During the reporting period, the patient was seen for his annual IDTT meeting on July 18, 2023. The patient's assigned MHPC had not seen the patient prior to the IDTT, as the last MHPC contact occurred on May 12, 2023, and was provided by another clinician. Similarly, the patient had not been seen by a psychiatrist since May 18, 2023. The required staff and the patient were present at the IDTT meeting. An IPOC for depressed mood was continued, yet no description of the patient's progress or response to treatment over the course of the prior year was documented. The rationale provided for retaining the patient at the 3CMS level of care was adequate.

The patient was seen by two different MHPCs during the review period, and, due to patient refusal, only one of these contacts occurred in a confidential setting. When the patient was seen for a confidential session in May 2023, there was documentation of the provision of clinical interventions. The patient was seen by three different psychiatrists between May and September 2023. There were also three progress notes from the patient's assigned telepsychiatrist discontinuing the patient's medications after one or two missed doses, and there was no documentation that the telepsychiatrist saw the patient at the time of medication discontinuation. Each time the telepsychiatrist discontinued the medications, the patient was subsequently seen by an on-site psychiatrist who restarted the medications. Of note, the patient reported increased symptoms following the medication discontinuation, and also reported that his nonadherence was in part due to depressive symptoms and lack of motivation. These significant symptoms would have been recognized had the telepsychiatrist met with the patient rather than discontinuing the medication after one or two missed doses without clinical contact.

The patient was offered weekly RT groups, and occasionally attended them.

**Findings**

The care and treatment provided to this patient were inadequate.
The patient's medications were discontinued after he had only missed one or two doses and without any psychiatric contact with the patient. The patient reported an increase in symptoms following the medication discontinuation; on at least one occasion, he reported that his nonadherence was due to an increase in symptoms. Additionally, the IDTT documentation failed to document the patient's progress or response to treatment. The lack of continuity of care was also concerning.

**Patient R**

This 33-year-old patient was provided diagnoses of unspecified depressive disorder and opioid dependence. He was generally adherent with his prescribed mirtazapine. The patient's case was randomly selected for review of the mental health treatment provided at the 3CMS level of care.

No IDTT meeting occurred during the reporting period, and the patient's treatment plan from March 2023 was reviewed for context. The patient had refused to attend the IDTT, and an IPOC for depression was initiated. No treatment interventions were included in the treatment plan. The patient was subsequently seen by the MHPC in May and August 2023. Of note, the May 18, 2023 contact was not entered into the healthcare record until October 5, 2023 without explanation other than noting that the content was taken from clinical notes. Neither of the MHPC contacts evidenced the provision of treatment interventions with the patient.

A psychiatrist saw the patient in April, May, June, and July 2023. These contacts were brief and often occurred in response to the patient's request that his psychotropic medications be resumed. On two occasions, the patient missed one or two doses of mirtazapine, and the medication was discontinued by the psychiatrist without documentation of clinical contact with the patient. On June 24, 2023, the patient was taken to the emergency department after an overdose of opioids. Neither the MHPC nor the psychiatrist noted this incident in their documentation or discussed the incident with the patient in subsequent contacts.

**Findings**

The care and treatment provided to this patient were inadequate.

As was noted in many other cases at CCI, this patient's medications were discontinued after one or two missed doses without documentation that the patient was seen by the psychiatrist. The patient reported that two of the missed doses were due to losing his identification card; therefore, he could not receive his medications. The documentation by the patient's MHPC did not evidence the provision of treatment interventions, and one session was not documented in the healthcare record for nearly five months. Finally, the patient was transported to the emergency department following an overdose on June 24, 2023, and this important incident was not recognized or addressed by his MHPC or psychiatrist in subsequent clinical contacts.

**Patient S**

This 30-year-old patient was provided a diagnosis of adjustment disorder with depressed mood. He was prescribed escitalopram on September 14, 2023, and was generally medication nonadherent during September 2023. The patient's case was randomly selected for review of the mental health treatment provided at the 3CMS level of care.

This patient was serving a sentence of life without the possibility of parole. He transferred to CCI on March 8, 2023 with active prescriptions for escitalopram and prazosin, yet it was noted that he had been refusing these medications since February 2023. The medications were discontinued on March 10, 2023 pending a psychiatric appointment, without documentation of psychiatric contact. The patient was not seen for an initial psychiatric assessment until April 14, 2023, more than one month after transfer. The assessment was conducted by a telepsychiatrist, and the patient reported that he did not need the medication and that he wanted to be removed from the 3CMS level of care. An initial MHPC assessment was conducted timely on March 22, 2023 that was comprehensive and included a rating scale for assessing the patient's depressive symptoms.

An initial IDTT meeting occurred late on April 18, 2023. The MHPC who completed the initial assessment was not the patient's assigned MHPC who facilitated the IDTT. The assigned MHPC documented that no prior contact with the patient had occurred. The required staff were present at the initial IDTT meeting, but the patient refused to attend. The rationale for retaining the patient at the 3CMS level of care was generic and appeared to be templated language that was not individualized for the patient. The IPOC for depressed mood contained adequate goals and treatment interventions.

The patient was seen for routine follow-up by his MHPC on June 1 and August 7, 2023. Both contacts occurred at cell front, as the patient refused to attend confidential sessions. The patient reported that he was functioning well, and was assessed as stable. On September 14, 2023, the patient was seen by a telepsychiatrist in response to a request that his medications be restarted. An adequate assessment was completed, and the patient was prescribed escitalopram. After missing his medications, the patient was seen by a different telepsychiatrist on September 27, 2023 at cell front, as he refused a confidential contact. The patient reported nausea after taking the medication and was encouraged to eat prior to taking the medication. He agreed, and the medications were continued.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment and initial IDTT meeting occurred late, and the IDTT was conducted by an MHPC who had not previously met with the patient. The rationale for retaining the patient at the 3CMS level of care in the IDTT documentation was also inadequate.

**Patient T**

This 24-year-old patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and adjustment disorder, unspecified. He was not prescribed psychotropic medications. The patient's case was randomly selected for review of the mental health treatment provided at the 3CMS level of care.

The patient transferred to a mainline 3CMS program on March 9, 2023 after placement in the ASU for four days. Prior to that brief ASU stay, the patient had been in the mainline 3CMS program since August 29, 2022. An initial MHPC assessment was completed on March 24, 2023, and the MHPC erroneously documented that the assessment was related to the patient's recent transfer to the facility. The content of the assessment was otherwise adequate. An initial psychiatric assessment was completed late on April 12, 2023 by a telepsychiatrist. This assessment was adequately documented.

As the initial psychiatric assessment was late, the initial IDTT meeting also occurred later than required on April 18, 2023. The required staff were present, but the patient refused to attend. An IPOC for release planning was initiated, as the patient reported the possibility of release from prison in 2024 despite having a documented earliest possible release date of April 2043. No information was provided by the correctional counselor regarding a change in the patient's release date; however, the correctional counselor noted that the patient had two pending RVRs for possession of a dangerous weapon and fighting. Diagnostic hypotheses and discrepancies between the MHPC and telepsychiatrist were discussed and were documented appropriately.

The patient was seen by his MHPC at cell front on May 31, 2023, after the patient arrived at the clinic for a confidential session; however, no space was available for the confidential session to occur. The patient was provided with a parenting workbook and a request form for enrollment in the parenting program. On August 11, 2023, the patient was seen for a confidential session with his MHPC; however, there was no documentation that there was discussion about the parenting workbook and no evidence of the provision of treatment interventions. There was also no documentation that attempts were made to verify the symptoms related to the varied diagnoses that were mentioned during the IDTT meeting.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment and initial IDTT meeting were delayed, and there was poor continuity of care and follow-up regarding previous contacts. It was also unclear whether the patient's belief that he could be released in 2024 was reality-based. Given his history of a psychotic disorder, further verification of his release date appeared warranted prior to initiating an IPOC for pre-release planning, and this issue should have been discussed at the IDTT where the patient's correctional counselor was present.

**APPENDIX B – 4**
**SIERRA CONSERVATION CENTER (SCC)**
Site Visit: November 7, 2023 – November 9, 2023
Review Period: April 1, 2023 – September 30, 2023

**Patient A**

This 40-year-old patient transferred to SCC on August 16, 2023 from a reception center. He was provided a diagnosis of adjustment disorder with depression and was prescribed Remeron. His healthcare record was randomly selected to assess the adequacy of provided mental health treatment.

The initial psychiatric assessment conducted by a psychiatric nurse practitioner appropriately assessed the patient's psychiatric history and current symptoms. While the patient denied experiencing anxiety symptoms with the nurse practitioner, anxiety was documented as a symptom by the primary clinician, and the patient reported feeling trapped and hopeless to the primary clinician. Overall, the patient presented as stable with improved adjustment after his transfer from the county jail to CDCR.

As anxiety was identified as a major symptom, it was unclear why the only IPOC targeted depression. The goals and interventions in the treatment plan were generic and were not clearly individualized to the patient's treatment needs. The identified treatment needs documented in the case formulation section of the IDTT document that included processing behavior related to his index offense, coping skills and anger management were not considered in treatment planning.

The IDTT documentation indicated that the assigned psychiatric nurse practitioner attended the IDTT meeting; however, accompanying documentation was completed by the chief psychiatrist, who was not identified as an attendee. There was documentation that the patient discussed an interest in reducing or discontinuing his psychotropic medication during the IDTT, but no plan to address this issue was documented.

**Findings**

The care and treatment provided to this patient were marginally adequate.

However, there were concerns noted about the lack of individualized treatment goals and interventions for depression, and the exclusion of anxiety, anger management, coping skills, and consideration of his index offense in treatment planning, despite identification of those concerns.

**Patient B**

This 50-year-old patient was housed at SCC since 2015. He was provided a diagnosis of PTSD. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of provided mental health treatment.

The patient was evaluated by his assigned psychiatric nurse practitioner in advance of the IDTT meeting, although the chief psychiatrist attended the IDTT. The April 2023 annual IDTT meeting provided a useful summary of the patient's treatment engagement and noted improvement in managing stressors and depression. An IPOC that targeted anxiety with associated measurable and objective goals established in 2022 was continued.

Most of the primary care clinician contacts occurred monthly. The documentation indicated the assessment of stressors and regular utilization of appropriate treatment interventions including evidence-based treatment strategies. The patient also attended two sessions of cognitive behavioral therapy groups during the reporting period.

**Findings**

The care and treatment provided to this patient were adequate.

Overall, the patient received appropriate treatment for his identified treatment needs. However, the treatment planning needed improvement regarding the alignment of treatment goals and interventions with the provided treatment.

**Patient C**

This 31-year-old patient transferred to SCC on May 23, 2023. He was provided a diagnosis of schizophrenia, and was prescribed Remeron and Thorazine. His healthcare record was randomly selected to assess the adequacy of provided mental health treatment.

The psychiatric and PC assessments appropriately documented the patient's community inpatient treatment, his family history of mental illness, self-harm history, substance abuse, and current symptoms, which he reported were well managed with psychotropic medication treatment. His current symptoms included auditory hallucinations, thought insertion, and paranoia. As such, an IPOC for hallucinations with a goal to decrease the frequency was established; however, baseline measures to assess treatment progress were not documented. Cognitive behavioral therapy to address paranoia was established as a treatment intervention, but medication management was not included as a treatment intervention. The initial IDTT documentation was unclear about the attendance of a psychiatric provider, as no provider was identified in the initial IDTT documentation; however, the chief psychiatrist completed the accompanying documentation.

Without explanation, a routine primary clinician contact occurred in August 2023 with a different clinician than the clinician who completed the initial assessment and initial IDTT documentation. The documentation indicated that the patient presented with a change in functioning compared to his presentation three months prior. He was described as distracted, and presented with response to internal stimuli and questionable thought disorder. No plan was documented for psychiatric consultation or clinical follow-up sooner than 90 days.

During a psychiatric follow-up in September 2023, the patient's clinical presentation was described as unremarkable. There was no indication that the psychiatric provider was aware of the patient's recent decline in functioning.

**Findings**

The care and treatment provided to this patient with a serious mental illness were inadequate.

Although the initial assessments and treatment planning documentation were appropriate, follow-up care indicated concerns with needed provider collaboration. In addition to the primary clinician's failure to alert the psychiatric provider of a change in the patient's mental health status with possible psychotic decompensation, the clinician failed to reassess the patient in a clinically appropriate timeframe.

**Patient D**

This 25-year-old patient transferred to SCC after discharge from an MHCB. He was provided diagnoses of major depressive disorder and PTSD. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of provided mental health treatment.

The patient had a history of depression that resulted in placement at the 3CMS level of care in January 2023. His depressive symptoms worsened, and he experienced suicidal ideation in February 2023 after learning of his mother's hospitalization. He was admitted to the MHCB and was discharged to SCC on March 6, 2023. IPOCs were established during the initial IDTT meeting to reduce depression.

Although psychotropic medications were discontinued prior to transfer to SCC, the patient was appropriately monitored by the psychiatric nurse practitioner. Between April and October 2023, primary clinician contacts generally occurred monthly by various providers. In contrast to his goal of discontinuing mental health services, he consistently presented with distress regarding various institutional and family stressors. The documentation of clinical contacts was descriptive, but clinical interventions were rarely offered or utilized. Further, although the patient's clinical presentation suggested possible increased symptomatology, the documentation was unclear whether the clinicians appropriately considered the patient's possible decompensation.

In October 2023, the patient was placed in restricted housing. Shortly thereafter, he was removed from the MHSDS.

**Findings**

The care and treatment provided to this patient were inadequate.

His removal from the MHSDS, despite persistent distress that was documented during monthly clinician contacts and soon after placement in restricted housing, a high-risk environment, was inappropriate. Further, there was a lack of continuity of care, and the patient was rarely offered treatment to manage ongoing distress during clinician contacts.

**Patient E**

This 53-year-old patient was housed at SCC since 2019. He had a long-standing diagnosis of adjustment disorder, unspecified. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of provided mental health treatment.

During the April 2023 annual IDTT meeting that was attended by the chief psychiatrist rather than the assigned psychiatric provider, IPOCs that targeted irritability were continued with no update made to the associated treatment goals and interventions. The IDTT documentation was sparse in content and did not include a summary of the patient's symptoms, functioning, or response to treatment during the previous year.

During the two primary clinician contacts that occurred timely after the annual IDTT meeting, the patient was described as stable with programming attendance. A recent RVR and family loss were referenced with minimal treatment response provided by the clinician; specifically, the only noted treatment intervention was to provide the patient a grief/loss handout, but it was unclear if the plan was implemented.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment goals and treatment summary were not updated, and there was a lack of treatment provided for this patient. Diagnostic clarification with clinical rationale was needed and was important for this patient who was consistently provided a diagnosis of an adjustment disorder; however, the diagnostic criteria for that diagnosis was time limited.

**Patient F**

This 43-year-old patient transferred to SCC in 2020. His healthcare record was randomly selected to assess the adequacy of the provided mental health treatment.

A long-standing IPOC to reduce depression and an IPOC that targeted anxiety were documented during the annual IDTT meeting in August 2023. The chief psychiatrist attended the annual IDTT meeting instead of the assigned psychiatric nurse practitioner. Treatment goals were generic and included the goal of symptom resolution. The treatment interventions for both IPOCs were the utilization of empathy and a therapeutic alliance with cognitive behavior therapy added for the depression IPOC. The IDTT documentation was minimal and did not include a summary of the patient's symptoms, functioning, or response to treatment in the previous year.

During primary clinician contacts between April and October 2023, the patient discussed various stressors including the loss of his son. The documentation of these PC contacts did not include the utilization of treatment interventions, except for the provision of a grief pamphlet.

Various diagnoses without sufficient clinical justification were documented in reviewed provider progress notes; these diagnoses included adjustment disorder with mixed anxiety and depressed mood, ADHD, bipolar II disorder, PTSD, and uncomplicated bereavement.

The psychiatric contacts were provided by a psychiatric nurse practitioner who appropriately documented the patient's symptoms and functioning.  The patient was prescribed Strattera during most of the review period; this medication was discontinued at his request.

**Findings**

The care and treatment provided to this patient were inadequate.

Diagnostic clarification with clinical justification was needed.  Treatment planning was not individualized or appropriately updated, and PC contacts were inadequate given the lack of sufficient treatment interventions provided to assist the patient in managing his distress.

**Patient G**

This 30-year-old patient transferred to SCC in February 2023.  He was provided a diagnosis of adjustment disorder with depressed mood.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of the provided mental health treatment.

The initial IDTT meeting on April 4, 2023 was delayed.  The assigned psychiatric provider was not in attendance; instead, the chief psychiatrist attended.  The IDTT documentation indicated that the patient had a history of anxiety, although he presented with stability at the time of the IDTT meeting.  A goal to maintain anxiety at a mild level with the utilization of cognitive behavior therapy was established.  It was anticipated that the patient would be discharged from the MHSDS in six months.

The patient presented with stability during his only routine primary clinician contact on June 23, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

In addition to a delayed initial IDTT meeting, the primary clinician contact to assess the patient's mental health status and functioning was long delayed at the time of healthcare record review.  With the goal to discharge the patient from the MHSDS, relapse prevention skills were needed as an IPOC with follow-up during primary clinician contacts that did not occur.

**Patient H**

This 49-year-old patient had been housed at SCC since 2018.  He was provided a diagnosis of PTSD.  He was prescribed Trileptal and Zoloft.  His healthcare record was randomly selected to assess the adequacy of provided mental health treatment.

An IPOC that targeted depression with a goal to maintain depression at a mild level with the utilization of cognitive behavioral therapy was established during the annual IDTT meeting in August 2023.  The summary provided of the patient's symptoms, functioning, and response to treatment in the previous year was minimal and insufficient.  In lieu of the assigned psychiatric nurse practitioner, the IDTT meeting was attended by the chief psychiatrist.

The patient's symptoms and functioning were evaluated by the psychiatric nurse practitioner, and he was reportedly stable on his prescribed psychotropic medications.  The only primary clinician contact between April 2023 and the date of this review on November 10, 2023 occurred on June 15, 2023; the documentation indicated that the contact was adequate.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not seen timely by the primary clinician, so the provision of treatment plan driven interventions were not implemented.

**Patient I**

This 27-year-old patient was housed in restricted housing.  His healthcare record was randomly selected to assess the adequacy of provided mental health treatment after his IDTT meeting was observed during the site visit.

The patient entered CDCR in July 2023.  He was screened at a reception center and was not initially placed in the MHSDS.  He transferred to SCC on October 17, 2023, and was placed in restricted housing for safety reasons.

On November 1, 2023, the patient was referred to mental health by custody and nursing staff, who indicated that he was acting odd and not following directions.  Upon evaluation, the patient stated that he was fine, but he was not fully oriented, provided irrelevant responses to evaluator questions, and appeared to be responding to internal stimuli.  His level of care was subsequently changed to 3CMS.  No documentation of psych tech rounds were noted after the level of care change.

An initial psychiatric assessment was completed by the psychiatric nurse practitioner on November 3, 2023.  The patient denied current psychiatric distress or mental health treatment history, and declined psychotropic medication.  He stated that his goal was to "get comfortable and enjoy (himself) at the beach every other week."

A primary clinician initial assessment was completed on November 7, 2023.  The documentation was limited, stating that the patient presented with grave disability, and the supporting data noted his unkempt cell and inability to follow directions.  During the initial IDTT meeting, it was reported that there was food on the patient's cell floor.  The only other documentation stated "unable to assess due to I/P being disorganized and unable/unwilling to answer questions.  Possible CLARK candidate and will refer for DDP screening."  He was described as disheveled, confused, and not oriented to time.

Although the monitor's expert observed the November 8, 2023 IDTT meeting, no IDTT documentation for that meeting was located in the healthcare record.  During the IDTT meeting, the patient presented with confusion and disheveled appearance.  The expert recommended that the IDTT obtain collateral information from his family and refer the patient to a higher level of care; however, staff indicated that they wanted to pursue a *Clark* evaluation first.  The correctional counselor indicated that she had observed that the patient was unable to turn his light on in his cell.

During the site visit, the monitor's expert indicated concern about the patient's decompensated clinical presentation and lack of appropriate disposition with the chief of mental health.  The patient was subsequently evaluated by the SPRFIT and the DDP coordinator, and was referred to an MHCB for further evaluation and treatment due to grave disability.

**Findings**

The care and treatment provided to this patient were inadequate.

The primary clinician initial assessment documentation was insufficient, and the IDTT documentation had not been completed as of this review on November 15, 2023.  It was unclear what a DDP assessment would offer, and the assessment that the patient's clinical presentation was due to a developmental disability was inconsistent with his functioning without incident in CDCR since his incarceration in July 2023.  It was concerning that the IDTT only referred the patient to the MHCB after intervention by the monitor's expert and recommendation by the chief of mental health.

It was unclear why the patient was placed in the 3CMS prior to the IDTT determination of a level of care change, and it was also unclear why psych tech rounds were not completed in restricted housing.

**Patient J**

This 34-year-old patient transferred to SCC from a reception center in January 2023.  His healthcare record was selected to assess the adequacy of provided mental health treatment, as his level of care was changed from 3CMS to EOP during the review period.

The patient was assessed at the reception center in December 2022 when he presented with stability and without a reported history of mental health treatment.  He was not placed in the MHSDS and functioned without incident for several months.

The patient was placed in restricted housing on March 11, 2023. Two weeks later, he was referred to the psych tech by custody staff, who indicated that his peers expressed concern about his behavior. Specifically, it was reported that the patient was engaging in bizarre and unusual behavior at night. The patient also reported that his radio changed stations unassisted, and he heard different radio stations playing simultaneously. It was unclear why this change in functioning resulted in a routine rather than urgent or emergent referral, and the inappropriate submission of a routine referral resulted in a delay in assessment until March 30, 2023.

At that assessment, the patient disclosed receiving community mental health treatment for bipolar and schizoaffective disorders, and that he had not taken psychotropic medication for several months. Collateral healthcare record review indicated a history of psychosis and paranoia. Consistent with nursing documentation, the patient expressed concern about weight loss; however, concerns about institutional food were not assessed. The patient was resistant to 3CMS placement at that time but was agreeable to mental health follow-up in one week.

One week later on April 3, 2023, the patient submitted a request to see mental health that was disorganized and indicative of acute psychosis. The request was received by mental health on April 6, 2023, and the patient was seen for an urgent consult by the psychiatric nurse practitioner on April 8, 2023. At that time, it was documented that custody had found a noose in his cell, and this information had been relayed to the psych tech. It was also documented that the patient had been talking loudly to himself on the previous night. The patient denied making a noose or any mental health symptoms. For reasons that were unclear, an initial psychiatric assessment was not completed, psychotropic medication was not offered, a SRASHE was not completed, the patient was not placed in alternative housing, and consultation with custody staff did not occur. A primary clinician urgent consult was ordered but did not occur until April 12, 2023.

During the initial psychiatric assessment, the patient presented with delusional thinking, disorganization, and psychosis, and was agreeable to taking Zyprexa, an antipsychotic medication. The patient acknowledged his response to auditory hallucinations, and was agreeable to 3CMS placement with a plan to complete the primary clinician initial assessment and the initial IDTT meeting.

The primary clinician initial assessment and initial IDTT meeting were completed on April 12, 2023. The documentation noted the patient's pattern of minimizing symptoms and psychiatric distress, and indicated a steady decline in his mental status and functioning. It was also noted that the patient lacked self-care with poor ADLs. His level of care was changed to EOP, and he was transferred to an EOP hub on April 18, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

There were multiple delays in the appropriate assessment of this patient, who presented with significant disorganization, response to auditory hallucinations, and delusional thinking. A SRASHE was not completed when appropriate, nor was the appropriate treatment provided or a clinically indicated referral to a higher level of care submitted timely. This was particularly

concerning for this psychotic patient who was decompensating in restricted housing, an environment that could exacerbate psychiatric distress.

It was also unclear why the patient was documented as placed in the 3CMS program prior to IDTT determination for placement or why a clinically indicated inpatient referral was not considered during the IDTT.

## Patient K

This 38-year-old patient transferred to SCC on August 23, 2023.  His healthcare record was randomly selected to assess the adequacy of provided mental health treatment after his initial IDTT meeting was observed during the site visit.

The patient transferred to SCC from a reception center, where he was assessed as needing further evaluation at the 3CMS level of care.  The primary clinician initial assessment was consistent with the reception center documentation that noted a history of treatment for depression during a previous term a few years prior, a history of a suicide attempt while in a county jail 15 years prior, and a lengthy sentence with an EPRD in 2037.  In all provider assessments at the reception center and at SCC, the patient denied any current mental health symptoms.

Consistent with his initial assessment, during the initial IDTT the patient requested removal from the MHSDS.  Although a different clinician than the provider who completed the initial assessment facilitated the IDTT, relevant history was included in the IDTT documentation and was discussed during the IDTT meeting, and the patient was appropriately discharged from the 3CMS program.

### Findings

The care and treatment provided to this patient were adequate.

The treatment team reviewed the patient's relevant clinical history, and the decision to discharge the patient was collaborative and clinically appropriate.

## Patient L

This 28-year-old patient transferred to SCC from a reception center on August 23, 2023.  He was provided a diagnosis of adjustment disorder, and was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of provided mental health treatment after his initial IDTT meeting was observed during the site visit.

The patient was referred to the 3CMS level of care at the reception center due to depression and disturbed sleep, for which he was prescribed psychotropic medication.  During the primary clinician initial assessment at SCC, the patient reported that his depressive symptoms had remitted, and he had discontinued the psychotropic medication at the reception center.  Although the psychiatric documentation in the healthcare record indicated that the medications were

discontinued on July 29, 2023, this information was not verified by the primary clinician that completed the initial assessment.

While the patient denied mental health symptoms and presented with adequate adjustment during the initial psychiatric assessment, the recent discontinuation of psychotropic medication was not addressed in the documentation.

The initial IDTT meeting was facilitated by a different clinician than the clinician who completed the initial assessment and was attended by the chief psychiatrist in lieu of the assigned psychiatric nurse practitioner.  During the IDTT meeting, the patient requested removal from the MHSDS.  He reported that despite ongoing mild to moderate depression, he was managing adequately and would access mental health if his symptoms worsened.  Although a history of treatment with psychotropic medication was reported during the IDTT meeting, the recent discontinuation of medication was not discussed during the meeting.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient remained with depressive symptoms; however, he was not appropriately followed by psychiatry for six months following medication discontinuation.  He was inappropriately removed from the MHSDS without the provision of relapse prevention skills for his ongoing depressive symptoms.

**APPENDIX B – 5**
**PELICAN BAY STATE PRISON (PBSP)**
Site Visit: November 14, 2023 – November 16, 2023
Review Period: April 1, 2023 – September 30, 2023

**Patient A**

This 56-year-old patient's healthcare record was reviewed to assess the quality of care provided while in the PBSP MHCB. The patient was provided with a diagnosis of major depressive disorder, recurrent episode, mild. He was fully adherent with his prescribed mirtazapine and sertraline.

The patient was placed at the MHCB level of care on September 27, 2023, after reporting suicidal ideation to custody when he was told that he would receive a cellmate. The SRASHE completed at that time was adequate and reflected satisfactory assessment of recent events, including discharge from the MHCB several days prior.

The initial assessments by a psychiatrist, MHPC and recreational therapist were completed on September 28, 2023. Each assessment was adequate considering the patient's current presentation, and the assessments evidenced adequate review of the documentation from his recent MHCB placement.

On September 29, 2023, the patient was seen for an individual session with the MHPC, when an updated safety plan was completed. The content of that plan was adequate. An initial IDTT meeting was conducted later that day that included all required staff and the patient. The treatment plan was adequate and reasonable and noted that the patient denied suicidal ideation and stated that custody staff was "messing" with him.

The patient was seen daily in a confidential setting by his MHPC who completed a SRASHE prior to the patient's planned discharge on October 2, 2023. The SRASHE and discharge summary were adequate, and the patient was discharged to the 3CMS level of care with appropriate clinical rationale provided.

**Findings**

The care and treatment provided to this patient were adequate.

**Patient B**

This 40-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP MHCB. The patient was provided diagnoses of major depressive disorder, recurrent episode, moderate; antisocial personality disorder; borderline personality disorder; exhibitionistic disorder and opioid use disorder, moderate. He was prescribed olanzapine, oxcarbazepine, and venlafaxine as well as hydroxyzine and olanzapine PRN. He was generally medication adherent; however, he occasionally refused his olanzapine.

The patient was admitted to the PBSP MHCB on August 2, 2023, after reporting suicidal ideation at his previous facility. The patient had recently been placed in restricted housing and was receiving mental health services at the EOP level of care prior to the MHCB admission. It was documented that a clinician-to-clinician discussion occurred at the time of transfer. The initial psychiatric and MHPC assessments were completed the following day. The MHPC initial assessment was marginally adequate, as the bulk of the information was pulled forward from June 2023 documentation with little evidence of attempts to update the information beyond indicating the patient's reason for MHCB placement. The initial psychiatric assessment was adequate. During the patient's daily contact on August 4, 2023, the telepsychiatrist documented a plan to taper the patient's venlafaxine due to medication side effects with a plan to consider treatment with an SSRI antidepressant medication.

An initial IDTT meeting occurred on August 4, 2023, with all required staff and the patient present; however, the clinicians who completed the initial assessments were not the clinicians present at the initial IDTT meeting. The telepsychiatrist had met the patient earlier on that date, but there was no documentation that the MHPC had met the patient prior to the IDTT meeting. The treatment plan was adequate and noted that the patient had received three RVRs in the past 90 days but was not being considered for a higher level of care as he had just been admitted to the MHCB. An initial recreational therapy assessment was completed after the IDTT meeting.

The patient was offered daily contacts which he attended intermittently by either an MHPC or psychiatrist; although, he usually refused the psychiatric contacts. Of note, several MHPCs provided individual sessions rather than one consistent clinician. The patient refused most recreational therapy appointments that were offered.

An IDTT meeting occurred on August 11, 2023; an MHPC was present at the meeting who had met the patient earlier that day but not previously. The IDTT decided to retain the patient in the MHCB, as he continued to experience suicidal ideation. The IDTT provided a rationale for not transferring the patient to a higher level of care; they indicated that they wanted to allow more time to implement treatment interventions at the MHCB level of care. It was unclear how an additional 10 days would benefit the patient without a change in medications or a change in treatment interventions. An updated safety plan was created on that date with input from the patient which was adequate. Following this IDTT meeting, the patient continued to refuse to attend psychiatric sessions and reported an increase in distress and suicidal thoughts when seen by the MHPC. On August 18, 2023, the IDTT met and decided to refer the patient to acute care. The rationale provided was adequate, and a SRASHE completed on the same date accurately justified an assessment of high suicide risk.

**Findings**

The care and treatment provided to this patient were inadequate.

While the interventions provided by the MHPCs were clinically sound; the decision to defer an inpatient referral was not adequately justified after the patient failed to progress in treatment during the first week of MHCB treatment. Additionally, it was concerning that the patient was never offered treatment with an SSRI medication; despite the tapering and discontinuation of

venlafaxine with a stated plan to begin treatment with an SSRI, and the patient demonstrated increased depressive symptoms during the antidepressant medication taper.

**Patient C**

This 25-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP MHCB. The patient was provided diagnoses of affective disorder, bipolar and related disorder, bipolar II disorder, polysubstance dependence, PTSD, and unspecified depressive disorder. He was prescribed mirtazapine PRN.

The patient was admitted to the MHCB from the 3CMS level of care on May 16, 2023, after expressing suicidal ideation and severe depression following a death in his family and the ongoing stress of incarceration. An adequate SRASHE was completed prior to placement in the MHCB. The patient was seen for the initial MHPC, psychiatric, and recreational therapy assessments on May 17, 2023. During the initial MHPC assessment, the patient reported that there had been no deaths in his family, but that he had reported suicidal ideation to be removed from the yard due to safety concerns. The document was internally inconsistent, as it continued to refer to the patient's loss and the need for stabilizing treatment in the MHCB, despite the patient's report that his previous statements were false. The initial psychiatric and recreational therapy assessments were adequate.

An initial IDTT meeting occurred that included all required staff and the patient on May 17, 2023. An IPOC for danger to self was initiated with a goal of the patient reporting a reduction in suicidal ideation; this was concerning as the patient reported that he was not experiencing suicidal ideation. An appropriate plan to prevent future MHCB admission by discussing safety concerns with custody staff was included in the IDTT documentation. There was documentation that the patient would remain in the MHCB while his safety concerns were investigated. The interventions listed in the treatment plan appropriately targeted the patient's use of appropriate coping skills rather than his risk of danger to himself.

The patient was offered daily contacts with either an MHPC or psychiatrist. He refused one contact with the MHPC and one contact with the psychiatrist. During MHPC contacts, there was little documentation that treatment interventions were offered. The patient attended recreational therapy. On May 20, 2023, the patient reported that he had been interviewed by custody, and there was a plan to place him in restricted housing while an investigation was completed. The patient reported that he was ready to leave the MHCB that day but was informed that he had to wait until his scheduled IDTT meeting on May 22, 2023.

A safety plan was completed with the patient on May 21, 2023. The content was inadequate, as all information provided by the MHPC was copied and pasted from prior documentation with the same text that was not always relevant to the sections of the safety plan that it was intended to address.

An IDTT meeting occurred on May 22, 2023, when a decision was made to discharge the patient to the 3CMS level of care; and an appropriate rationale was provided. A SRASHE was

completed prior to the MHCB discharge that was adequate regarding risk determination and rationale, but it included the poorly completed safety plan without an update.

**Findings**

The care and treatment provided to this patient were inadequate.

The IPOC and safety plan were poorly developed and not fully consistent with the needs of the patient. Improvements were also needed regarding diagnostic clarity and documentation of clinical interventions by an MHPC while the patient was housed in the MHCB.

**Patient D**

This 34-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP STRH. The patient was provided diagnoses of unspecified mood disorder and unspecified anxiety disorder. He was generally adherent with his prescribed mirtazapine and was also prescribed hydroxyzine PRN.

The patient transferred to the STRH on September 12, 2023. Upon arrival, the patient reported feeling depressed and anxious as well as experiencing the recent loss of his grandmother. The nurse completing the initial health screening urgently referred the patient to mental health. Despite the urgent referral, the patient was not seen until September 18, 2023, when he was seen for an initial MHPC assessment. The assessment was internally inconsistent primarily due to much of the content being pulled forward, unchanged, from prior assessments, making it difficult to discern what information was current and what was previously documented. The clinical summary was not updated. An initial psychiatric assessment was completed timely by a telepsychiatrist and was adequate. The patient refused to attend his initial IDTT meeting that occurred on September 26, 2023. The required staff were in attendance, except the MHPC participating in the IDTT meeting who was not the patient's assigned MHPC and had not met with the patient previously. The documentation of the treatment plan was adequate. One routine MHPC contact occurred during the reporting period, and documentation of the session and the interventions were adequate.

The patient attended a 90-minute cognitive behavioral therapy group with a clinician on September 22, 2023, but refused to attend a stress management group offered on September 29, 2023. Psychiatric technician rounds were documented weekly and were adequate.

**Findings**

The care and treatment provided to this patient were adequate.

The patient, however, was not seen timely in response to an urgent referral at the time of transfer to PBSP. Additionally, the patient's assigned MHPC did not participate in the patient's IDTT meeting.

**Patient E**

This 27-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP STRH. The patient was provided diagnoses of PTSD and opioid use disorder. He was adherent with his prescribed mirtazapine and was also prescribed hydroxyzine PRN and buprenorphine-naloxone.

The patient was placed in restricted housing on May 31, 2023. Two ASU pre-placement screenings were completed for the patient; one which indicated, incorrectly, that the patient was not included in the MHSDS, and the other which noted that the patient was placed at the 3CMS level of care. Neither screening noted any concerns from the patient.

The patient submitted a healthcare request on June 7, 2023, when he requested to speak to someone about his sleep difficulties. An initial MHPC assessment was completed on June 8, 2023, that was marginally adequate. This initial assessment did not mention the healthcare request, but the patient did discuss his sleep concerns during the session. Several diagnoses and diagnostic considerations were included in the documentation of this initial assessment without rationale provided.

An initial psychiatric assessment was completed on June 13, 2023, by a telepsychiatrist. The decision was made to begin treatment with mirtazapine. An initial IDTT meeting occurred on June 14, 2023, that included all required staff and the patient. An IPOC was initiated for impulsive behavior; despite assessments and contacts noting that the patient struggled primarily with symptoms of anxiety and sleep disturbance. Anxiety management was, however, addressed in a discussion of the patient's planned group attendance. Overall, the IDTT documentation was marginally adequate.

The patient was offered weekly contacts with his assigned MHPC eight times during the reporting period, and he attended all but one contact. The contacts included evidence of the provision of therapeutic interventions as outlined in the treatment plan, as well as the patient's response to those interventions. The patient was seen cell-front by covering clinicians on five occasions. Cell-front contacts also occurred with his assigned MHPC for two sessions due to limited staffing and a county-wide fire.

The patient was offered telepsychiatry appointments twice in June 2023, and he attended one of those sessions. Weekly 90-minute groups were offered to the patient by recreational therapists, and the patient attended approximately eight or 50 percent of group sessions. Of note, the patient requested specific group topics, and efforts appeared to have been made to offer the patient groups regarding those topics.

A quarterly IDTT meeting occurred on September 5, 2023, that included the required staff and the patient. Despite continuation of the IPOC for impulsivity, all other references to impulsivity were removed from the treatment plan, and it was noted that the treatment focus would be on the patient's anxiety. There was no mention of the patient's treatment progress to date. The rationale provided for retaining the patient at the 3CMS level of care was unchanged from the previous meeting.

Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were adequate.

There were, however, several weeks when the patient was offered cell-front contacts due to staffing limitations and other nonclinical factors. Also, improvements were needed in the IDTT documentation, specifically regarding IPOCs and the clarity of treatment targets.

**Patient F**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP STRH. The patient was provided a diagnosis of unspecified personality disorder. He was adherent with his prescribed mirtazapine and fluoxetine.

The patient transferred to PBSP and was placed in the STRH on August 8, 2023. The initial assessments completed by nursing staff indicated no acute needs, and the patient was routinely referred to mental health. The patient refused his initial psychiatric assessment on August 11, 2023, and the documentation by the telepsychiatrist consisted of a single line that indicated that the patient refused the appointment and was adherent with his medications.

No further documentation of history or healthcare record review was documented in the initial psychiatric assessment.

An initial MHPC assessment was completed on August 15, 2023. This assessment was adequate and included a review of the patient's current treatment needs. The initial IDTT meeting occurred on August 22, 2023, and included the required staff, but the patient did not attend due to "systemic power failures." No IPOCs or treatment goals were developed for the patient. Within the section of the treatment plan related to discharge, it was noted that the patient would be eligible for discharge after demonstrating coping skills to increase distress tolerance and an ability to make appropriate decisions despite heightened emotions. He was maintained at the 3CMS level of care due to depressed mood and suicidal ideation, yet no goals were developed to address those identified needs.

The patient was seen weekly by his MHPC during his first month in the STRH, and there was evidence that treatment interventions were provided to address the patient's anxiety and rumination. Groups were offered weekly, and the patient attended approximately half of the offered groups.

The patient submitted a healthcare request to see the psychiatrist on September 5, 2023, and he was seen on the following day by the telepsychiatrist. The dosage of mirtazapine was increased at the request of the patient. He submitted another healthcare request on September 10, 2023, to see his MHPC, but a scheduled medical procedure at a community hospital occurred on the following day. He was seen at the cell-front for a MHPC contact on September 14, 2023, due to

treatment refusal and an inability to communicate well following nasal surgery. The patient refused an MHPC contact on September 19, 2023. The patient was seen by the telepsychiatrist on September 20, 2023, when he agreed to start treatment with an antidepressant medication. On September 28, 2023, during a routine MHPC contact, the patient reported suicidal ideation with a plan and was referred to an MHCB. The SRASHE completed at that time was adequate. The patient transferred to the MHCB on that date.

Psychiatric technician rounds were documented daily while the patient was housed in the STRH.

**Findings**

The overall care and treatment provided to this patient were inadequate.

Although the treatment interventions provided to the patient were clinically sound, the overall treatment was determined to be inadequate due to the absence of an initial psychiatric assessment, the lack of contact with a psychiatrist prior to the initial IDTT meeting, and the lack of identified treatment goals and interventions documented in the treatment plan.

**Patient G**

This 54-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP STRH. This 54-year-old patient was provided diagnoses of unspecified mood disorder and antisocial personality disorder.

The patient was seen for an initial MHPC assessment on April 5, 2023, after placement at the 3CMS level of care and transferred to the STRH on March 27, 2023. That assessment was adequate. The patient noted that he did not have any mental health needs, but he was angry about property issues which resulted in his acting out behavior. He stated that the correctional officers referred him to mental health to have him moved from his housing unit.

An initial psychiatric assessment was completed prior to the reporting period on March 30, 2023, and was adequate. The initial IDTT meeting occurred on April 12, 2023, and included all required staff. An IPOC to address anger was initiated with appropriate goals and interventions. The rationale to retain the patient at the 3CMS level of care was adequate, and the patient expressed agreement with the plan.

The patient was seen weekly by his MHPC, and the content of those clinical sessions was adequate and evidenced the provision of interventions consistent with the treatment plan. The patient was consistently offered 90 minutes of groups weekly, but he refused to attend. Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were adequate.

**Patient H**

This 35-year-old patient's healthcare record was reviewed to assess the quality of care provided in the PBSP STRH. The patient was provided a diagnosis of unspecified depressive disorder and was prescribed mirtazapine; he was generally medication adherent until July 2023, when he stopped taking the medication consistently.

The patient was offered weekly individual contacts with his MHPC during the reporting period. Overall, those sessions occurred in a confidential setting and included the provision of appropriate clinical interventions consistent with the treatment plan. There was one occasion when the patient was not offered a confidential session due to the clinician's workload on that day, and the patient was seen briefly cell front instead. The psychiatric contacts were offered every 60 days and were adequate. Weekly 90-minute groups were offered to the patient by a psychologist, and the documentation of those groups was adequate; however, improvement was needed in individualizing the documentation of the patient's engagement in the groups.

A quarterly IDTT meeting occurred on May 10, 2023, that included all required staff. The IPOCs and interventions listed in the treatment plan were appropriate to the patient's identified needs. The rationale for retaining the patient at the 3CMS level of care was adequate.

In July 2023, the patient stopped attending groups and refused his individual MHPC sessions. He also stopped taking his prescribed medication regularly. He was seen cell front by his MHPC, and no acute mental health concerns were noted. The patient did attend a session with the telepsychiatrist on July 13, 2023, when he requested a reduction in his medication dosage. The patient also refused to attend his quarterly IDTT meeting on August 1, 2023. All required staff were present at the IDTT meeting. Of concern, the IDTT documentation made no mention of the patient's recent disengagement from individual and group treatment. Changes to the treatment plan were not made, and progress toward established treatment goals was not documented. Of note, the patient had a release date in April 2023 which was extended during the review period. There was no mention of the patient's response to that change or consideration of whether the loss of his parole date affected his treatment engagement or his overall mental health stability.

Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were inadequate.

During most of the reporting period, the patient was seen routinely and was offered treatment consistent with requirements and the patient's treatment needs. However, starting in July 2023, the patient disengaged from all treatment. This disengagement was not recognized or addressed in the clinical documentation or during the IDTT meeting, resulting in inadequate care due to a failure to recognize and to address significant changes in the patient's presentation and mental health needs. Additionally, there was no mention of the change in the patient's release date which likely impacted his functioning and mental health symptomatology.

**Patient I**

This 61-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at PBSP. He was provided diagnoses of major depressive disorder and PTSD and was not prescribed any psychotropic medication during the review period. This level 2 patient was serving a life sentence without parole. The patient received mental health services at the 3CMS and EOP levels of care placements, and he had four MHCB placements. He was placed at the 3CMS level of care since 2019 and was housed at PBSP since July 2021. His most recent MHCB admission occurred in 2013. He had a documented history of five suicide attempts while in CDCR. The most recent SRASHE in December 2022 assessed high chronic and low acute suicide risk.

An annual IDTT meeting occurred on July 6, 2023. The IDTT meeting occurred timely and was attended by the required staff. The treatment plan included an IPOC for depressed mood, and the IPOC identified limited but appropriate goals and interventions. The patient did not identify any new goals and did not report any new symptoms or problems. The IDTT did not identify any criteria for consideration of referral to a higher level of care, and the discharge criteria were appropriate. The treatment plan clinical summary was updated and included an adequate clinical formulation. The patient reportedly agreed with his treatment plan, and the treatment plan was adequate given the patient's clinical presentation, overall stability, and protective factors.

The patient was seen timely for PC contacts during the review period, and they occurred in a confidential setting on March 24, 2023 and June 21, 2023. The IPOCs identified in the treatment plan differed from the IPOCs in the PC progress notes which included IPOCs addressing anxiety and impulsive behaviors; they contained appropriate goals that were tracked over time. The patient reported frustration due to lack of continuity of care regarding the PCs who saw him for individual contacts, and he reported that he had not met with his assigned PC since his arrival at PBSP in July 2021 due to multiple appointment no-shows and cancelations. The documentation confirmed that the patient met with a different PC at each contact since his PBSP arrival.

The progress note indicated a plan to continue the use of CBT techniques to address mild PTSD symptoms. At the June 21, 2023 PC contact, he reported moderate attention difficulties and being easily distracted but denied any acute symptoms, suicidal or homicidal ideation. The PC reported providing "reflective listening" and an "empathic environment" as primary therapeutic interventions and assisted the patient with processing his stressors and discussed healthy coping skills. The patient reportedly occupied his time with structured programming, working as a clerk in the programming office, learning guitar, and teaching crochet to other incarcerated persons. He did report that his depression levels remained generally high. He was not seen for another PC contact during the review period. The PC noted that the patient remained appropriate for the 3CMS level of care due to ongoing intrusive depressive symptoms.

The patient was not seen for psychiatric contact during the review period and was not prescribed psychotropic medication.

**Findings**

The care and treatment provided to this patient at PBSP were generally adequate.

The patient was seen timely for the annual IDTT meeting, and PC contacts generally occurred timely. Those contacts were provided in a confidential setting and were well documented. The patient consistently presented as stable, future-oriented, and was involved in programming and several activities. There were however documentation concerns noted, as the IPOCs in the PC progress notes did not match the IPOCs in the treatment plan; and there was poor continuity of care, as the patient was seen by different PCs at each clinical contact.

**Patient J**

This 51-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at PBSP. The patient was provided a diagnosis of major depressive disorder, recurrent episode, and he was generally described as stable with good programming. He was prescribed Vistaril PRN. The patient arrived at CDCR for his current term in April 1998 to serve a life sentence without parole. The patient was not included in the MHSDS until April 2015, when he entered the MHSDS at the 3CMS level of care due to depression with resulting sleep disturbance. He was removed from the MHSDS in 2018, and he re-entered the MHSDS at the 3CMS level of care on September 23, 2021 due to anxiety concerns. The patient did not have a history of higher levels of care placements. His clinical history was significant for anxiety, panic attacks, and sleep difficulties.

The most recent IDTT meeting occurred outside the review period on December 8, 2022. The patient reportedly declined to attend the IDTT meeting but was seen in the dayroom on that date when he reported that he was doing well. The IDTT` meeting occurred timely and was attended by the necessary staff. The treatment plan contained an IPOC for anxiety. The IPOC goals were appropriate and individualized; however, the treatment interventions were limited to building a therapeutic alliance and goal setting. Higher level of care indicators were completed appropriately, and the treatment plan included appropriate level of care rationale and discharge criteria. The patient was retained at the 3CMS level of care to continue treatment for depression and anxiety with medication management, CBT to increase coping skills and to reframe cognitions, and goal setting to improve functioning. The patient was reportedly medication adherent, and custody reported no concerns. The treatment plan was adequate with the documentation of appropriate interventions, including CBT and medication management to address the patient's symptoms.

Two PC contacts occurred during the review period. The most recent PC contact occurred prior to the review period on January 20, 2023. At that contact, the patient reported that medication treatment was effective in addressing his symptoms, and he programmed without issues and attended college courses. The documentation described the patient as stable with normal mental status. The next PC contact occurred on June 21, 2023, and this contact occurred two months late. The patient was seen by a covering PC, and the progress note indicated that the patient discussed his early childhood experiences and his goal to take responsibility for his previous actions. The patient reportedly did not demonstrate any signs or symptoms of distress. The subsequent PC contact occurred timely on September 19, 2023. The patient reportedly was

coping well and managing anxiety-provoking situations appropriately. He was enrolled in truck driving school and was optimistic about an upcoming court date. The IPOCs were updated in this progress note, and it was noted that a treatment goal of decreased anxiety was met. Although the PC contacts were well documented and appeared to have been beneficial; each contact was provided by a different PC, and the contact on June 21, 2023 did not occur timely.

The patient was seen for five psychiatric contacts during the review period. He was prescribed Remeron and was reportedly stable with medication adherence. At an April 5, 2023 psychiatric contact, the patient reported symptoms of long COVID-19 syndrome consisting of body pain and headaches. He reported normal energy and denied fatigue or depressed mood. The patient endorsed anxiety symptoms at this contact, and the psychiatrist prescribed Zoloft. An on-call note dated April 10, 2023 indicated that on April 8, 2023, the patient reported a possible allergic reaction to Zoloft; the on-call psychiatrist discontinued Zoloft at that time. The patient saw his regular psychiatrist on the following day; and although his psychiatrist indicated that Zoloft was likely not the cause of the patient's reaction, he deferred that decision to medical and did not restart the medication. The next psychiatric contact occurred on July 5, 2023; at that visit, the patient reported intermittent debilitating back pain. He denied any anxiety or mood disturbance but requested an increase in Remeron to help with insomnia. The psychiatrist increased the Remeron at his request. He was seen on September 29, 2023 by the psychiatrist when he reported improvement in his back pain and denied any mental health difficulties. His medications were continued unchanged.

**Findings**

The care and treatment provided to this PBSP 3CMS patient were adequate.

The treatment goals were appropriate for the patient's clinical presentation and symptoms, and he appeared to meet several treatment goals during the review period. The clinical contacts were appropriately documented, and progress notes reflected appropriate clinical interventions with positive patient response. Continuity of care was a concern, as each PC contact was provided by a different PC; additionally, one of the PC contacts did not occur timely. The psychiatric treatment and care occurred timely and were appropriate. Medical and psychiatric staff responded appropriately when the patient had an adverse reaction after treatment with Zoloft, and the patient's overall presentation and mental status appeared to improve during the review period.

**Patient K**

This 66-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at PBSP. He was provided a diagnosis of major depressive disorder, recurrent, in partial remission; he also had an extensive history of alcohol abuse and dependence. The patient was prescribed Zyprexa and was reportedly medication adherent; he had previously been prescribed Prozac and Seroquel. The patient was serving his first CDCR prison term. The patient entered CDCR in December 2016 via SQ with an EPRD of May 7, 2026, and he was included in the MHSDS at that time. The patient had since received mental health services at the 3CMS level of care with no higher level of care placements. The

documentation indicated that the patient's depression appeared to be in full remission after medication treatment.

The IDTT meetings occurred timely during the review period.  An annual IDTT meeting occurred timely on April 20, 2023; the meeting included the necessary participants and the patient.  The treatment plan included an IPOC for depressed mood.  The treatment goals were generalized but appropriate for the patient's clinical presentation.  The documented primary goal was to discontinue medication treatment with subsequent removal from the MHSDS.  The patient was described as appropriately stable for discharge, but that stability was heavily dependent upon medication treatment.  The patient did not identify any additional goals, and no new symptoms were reported.  The level of care justification was thorough and appropriate, and the treatment plan contained an adequate clinical summary.  The patient was noted to have several positive coping skills, and he agreed with the treatment plan.

Two PC contacts occurred during the review period.  March 15, 2023 PC contact occurred timely in a confidential setting.  The patient reported no new complaints or issues and reportedly demonstrated stable mood and presentation.  The progress note indicated that the PC provided an empathic environment, assessed for symptoms, and helped the patient to process current stressors using coping skills.  The patient was reportedly on the waitlist for NA because AA was not available at PBSP, and he was planning for parole in several years.  The IPOC goals were documented appropriately in the progress note.

The next PC contact occurred one month late on July 11, 2023.  The visit occurred in a confidential setting, and the patient's mental status and presentation remained unchanged from the previous contact.  The patient reported that he was on the waitlist for the ISUDT.  He reported abstinence from alcohol and drugs, and that he had met his IPOC goal for a decrease in his depressive symptoms.

The patient's next PC contact occurred timely on October 2, 2023 in a confidential setting.  The patient had recently discontinued psychotropic medications, and he reported improvement in his mood.  He had recently begun ISUDT classes, and he was reportedly committed to sobriety.  His depressive symptoms reportedly remained minimal.

The patient was seen timely for psychiatric contacts during the review period.  A telepsychiatry contact on February 28, 2023 occurred timely in a confidential setting.  The patient reported ongoing drowsiness and requested a reduction in his Zyprexa dosage; the psychiatrist reduced the dosage as requested.  At the next psychiatric contact on May 23, 2023, the patient reported nightmares; as the patient reported that Zyprexa was more effective than Remeron and prazosin, the psychiatrist prescribed Zyprexa PRN to address the patient's concerns.  The patient reported that he was otherwise doing well and functioning appropriately.  At the subsequent psychiatric contact on August 16, 2023, the patient requested discontinuation of the Zyprexa, and the psychiatrist complied.  The patient was described as stable, and he was informed how to contact the psychiatrist in the future if necessary.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were adequate.

The patient achieved several of his treatment goals.  He was able to discontinue his psychotropic medications without adverse effects.  The clinical contacts were well documented and occurred timely, except for one late PC contact.

**Patient L**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at PBSP.  He was provided diagnoses of adjustment disorder with anxiety and opioid use disorder, mild, by history.  He was prescribed Remeron and Vistaril and was reportedly medication adherent.  His EPRD was in 2026.  He had received mental health services at the 3CMS level of care since January 24, 2021, and he had no higher level of care placements.

The documentation indicated that the patient was engaged in treatment, and he consistently attended sessions with his PC and psychiatrist as scheduled.  He reportedly had not received a serious RVR in the past year.

The annual IDTT meeting occurred timely on August 10, 2023; the meeting included the necessary participants, but the documentation was unclear whether the patient attended.  The treatment plan included an IPOC for impulsive behavior; it included appropriate but generalized treatment goals and interventions, such as the patient learning three positive coping skills.  The level of care justification in the treatment plan was appropriate, and the overall plan indicated that the patient would continue to develop coping strategies with his PC and to remain medication adherent.  The discharge criteria provided in the treatment plan were appropriate.

The PC contacts occurred timely during the review period.  The patient was seen by the PC on April 12, 2023 in a confidential setting.  At that session, the patient denied concerns about his mood and mental health.  No functional impairments were noted.  The documentation indicated that the patient was assigned to and attended education and the ISUDT, and he reportedly maintained his sobriety.  The plan provided in the progress note was appropriate and included goals for the patient to enroll in self-help groups, to develop coping skills, to look for and maintain a job, and to use CBT techniques to reduce symptoms.

The next PC contact occurred on June 15, 2023, and this contact was described as a brief routine session.  The documentation indicated that the patient had no current concerns, and the treatment plan was maintained.

At the next PC contact on September 11, 2023, the patient reportedly was working to complete his GED and was described as generally stable and committed to programming.  The PC provided appropriate supportive and therapeutic interventions.  The IPOCs were updated in the progress note.  The patient reportedly had not yet accomplished the goal of learning three coping skills, but he was stable and demonstrated no problems or symptoms with the support of medication treatment and therapy.

The patient was seen timely for psychiatric appointments during their review period. He was seen in a confidential session with his psychiatrist on April 13, 2023, after he previously declined meeting in a confidential setting on March 30, 2023. The patient reported that his depression and anxiety had stabilized, and he denied any major distress. The patient also denied any medication side effects and stated that the medications adequately addressed his symptoms. The psychiatrist noted the provision of cognitive and behavioral skills for emotional regulation and noted that the patient was medication adherent, enrolled in a GED program, and was awaiting a job assignment.

At the next psychiatric contact on June 29, 2023, the patient was reportedly doing well, working in the kitchen, and preparing to complete his GED program. He stated that his symptoms had resolved and that his medications were working well without medication side effects. The subsequent psychiatric contact occurred on September 27, 2023, and patient was described as stable; his medications were continued for another 90 days at that visit.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were adequate.

The patient was seen timely for clinical contacts with the psychiatrist and PC in confidential settings. The annual IDTT meeting also occurred timely, and the treatment plan was appropriate for the patient's goals and clinical presentation. The treatment plan included appropriate level of care and discharge criteria and noted that the patient actively participated in treatment. The PC progress notes indicated the provision of appropriate clinical and therapeutic support. The psychiatrist encouraged the patient to attend confidential sessions, and the patient responded well to that encouragement. The psychiatric progress notes also indicated that the psychiatrist provided coping skills and CBT skills training as well as medication management.

**Patient M**

This 25-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care and treatment provided at PBSP. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood and was prescribed Remeron PRN for depressive symptoms with medication adherence. The patient originally entered CDCR in 2017 and was placed at the 3CMS level of care at WSP. After a period of time when he was not included in the MHSDS, he was returned to the 3CMS level of care on December 2, 2021 for treatment of mood symptoms. The patient did not have a history of higher level of care placements. During the review period, the patient went out to court for resentencing and returned to PBSP on May 31, 2023; while out to court, his sentence was reduced from 85 years to life to 33 years and eight months.

The initial IDTT meeting occurred timely on June 15, 2023 and was attended by the necessary staff and the patient. The IDTT included an IPOC for depressed mood which contained appropriate and individualized goals and interventions. The level of care justification was thorough and appropriate. The patient was assigned to work as a unit porter and barber during the review period. The CC1 reported that, although the patient had a history of serious RVRs including a SHU term in February 2022, he was added to multiple programming waitlists

including ADA worker, canteen worker, recycling crew, and support services.  The initial treatment plan was adequate and appropriate for the patient's clinical presentation.

The initial PC assessment and routine clinical contact occurred timely during the review period.  At the initial PC assessment on June 8, 2023, the PC noted that the patient had no history of self-harm or self-injurious behaviors, and the document was completed appropriately with the assessment information informing the clinical summary of the treatment plan.  He was seen for a routine PC contact on September 5, 2023 that occurred in a confidential setting.  The PC noted that the patient was medication adherent and did not demonstrate any functional impairments.  He was assigned to a kitchen job and was awaiting additional activities, as he remained on the waitlist for several programming opportunities.  The progress note documentation was appropriate, and IPOCs were tracked in the progress notes.  The PC progress note noted that the patient had achieved his treatment goal of reduction of depressive symptoms.

The patient was also seen timely for the initial psychiatric assessment and routine psychiatric contacts during the review period.  The initial psychiatric assessment occurred on June 13, 2023; it documented that the patient reported that he was managing well but with depressive and anxiety symptoms, and he requested medication adjustments to address those symptoms.  Remeron was increased to address the patient's sleep disturbance related to his depression and anxiety.

The subsequent psychiatric contact occurred on August 22, 2023.  At that visit, the patient reported resolution of his depression and anxiety and interest in more programming including the ISUDT program.  The patient denied any distress and reported no medication side effects.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were adequate.

The patient was seen timely for clinical contacts, including the initial PC and psychiatric assessments and the initial IDTT meeting.  The treatment plan and clinical contacts were well documented and reflected individualized care.  The patient was provided support and access to appropriate programming, and his medications were effective in reducing and eventually eliminating his significant symptoms.

**Patient N**

This 50-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PBSP.  He was provided diagnoses of unspecified depressive disorder and adjustment disorder with anxiety.  He was prescribed Vistaril and Depakote.

The patient was serving a life sentence with the possibility of parole and entered CDCR for his current term in 1995.  He intermittently received mental health services at the 3CMS level of care, and he had remained at the 3CMS level of care since May 5, 2016.  He did not have a history of inpatient placements or a history of suicidal ideation or behavior.  He was housed in the PBSP STRH for 39 days from February 19, 2023 to March 30, 2023 due to safety concerns

after he was a victim of battery with a deadly weapon.  During the review period, the patient was housed in general population on the B yard.

The initial PC assessment occurred timely on April 11, 2023.  The assessment occurred in a confidential setting, and the document was thoroughly completed with the appropriate sections updated to reflect current information.

The patient was also seen timely for the initial psychiatric assessment on April 11, 2023, and the assessment occurred in a confidential setting.  The assessment provided a detailed clinical history of the patient and identified paranoia and increased worrying as primary symptoms resulting from his recent assault.  The patient reported good results from treatment with Vistaril and did not want to change his medications.  The patient reportedly demonstrated normal mental status but with increased anxiety.

The initial IDTT meeting occurred timely upon the patient's return to general population from the STRH.  The IDTT meeting included the necessary participants including the patient.  The treatment team provided IPOCs for anger, anxiety, depressed mood, and impulsive behavior.  The treatment plan was well developed and included individualized treatment goals and interventions.  No higher level of care indicators were identified for the patient, and the level of care justification was thorough and appropriate.  His primary issue of concern was sleep disturbance which lead to irritability and short temper, and he was prescribed Vistaril PRN for those symptoms.  The clinical summary included information from the initial PC assessment and was informative and appropriate.  Additionally, the treatment plan was appropriately updated to reflect recent events.

The patient was seen for two timely routine PC contacts during the review period on June 12, 2023 and September 5, 2023 that occurred in a confidential setting.  At the June 12, 2023 contact, the patient discussed concerns about having a cellmate.  In response, the PC provided counseling and located a previous single-cell recommendation which was provided to the custody staff.  The documentation indicated that the PC consistently updated the patient's progress toward his treatment goals.  At the September 5, 2023 PC contact, the patient reported recent depression after listening to other patients talk about their problems.  The PC provided counseling regarding boundary setting and compartmentalization for stress management.  His mental status was described as normal, and the patient continued to meet his treatment goals.

The patient was seen by the psychiatrist on June 14, 2023 in a confidential setting after he requested a medication adjustment.  The patient reported increased anger, irritability, mood swings, and anxiety.  He also reported recent exposure to violence and conflicts with his roommate.  The psychiatrist prescribed Depakote and recommended continued sessions with the PC regarding coping strategies.  At the next psychiatric contact on August 29, 2023, the patient reported feeling calm and stable and indicated that the medications were effective.  He reported medication adherence and no medication side effects.  Laboratory testing indicated appropriate blood Depakote levels, and the patient's medications were continued unchanged.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were adequate.

The patient was seen timely for confidential clinical contacts with his providers. The treatment plan contained appropriate goals and interventions, and the patient's mental status and symptoms improved in response to treatment. The prescribed psychotropic medications were effective in addressing the patient's symptoms. The documentation included timely and clinically appropriate initial assessments, treatment planning and goals, and the treatment progress was well documented.

**Patient O**

This 28-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided a diagnosis of unspecified anxiety disorder and was prescribed Zoloft.

This was the patient's first CDCR incarceration, and he entered CDCR on June 6, 2022 with an EPRD of July 6, 2024. He was included in the MHSDS on April 4, 2023 due to anxiety symptoms and insomnia. His symptoms included racing thoughts, excessive worry, and sleep disturbance, and he had not previously sought treatment for those symptoms.

The initial PC assessment occurred timely on April 4, 2023. The information in the initial PC assessment informed the initial treatment plan, and much of the information in the initial assessment was repeated in the treatment plan. At that visit, the patient's mental status was described as normal and stable.

The initial psychiatric assessment occurred timely on April 12, 2023. At that assessment, the patient reported ongoing daily anxiety but was otherwise described as stable, and he was prescribed Zoloft to address his anxiety symptoms at that visit.

The initial IDTT meeting occurred timely on April 20, 2023 and was attended by the necessary participants and the patient. No specific IPOCs were developed, but the documented goal was to reduce anxiety and sleep disturbance. The patient did not identify any other treatment goals. The level of care justification section was brief in content but was adequate. He was prescribed Zoloft, and the primary treatment goals were to stabilize the anxiety symptoms and to identify and to bolster coping skills and grounding techniques. The patient agreed with the treatment goals, and the treatment plan was generally adequate.

The patient was seen for a timely routine PC contact on July 14, 2023, when he was reportedly stable. He reported improvement in his anxiety but continued sleep disturbance. The PC provided counseling regarding coping skills, and the progress note included IPOCs with measurable and appropriate goals. At the next routine PC appointment on October 10, 2023 just after the review period, the patient requested discontinuation of his medications, as he believed that they were no longer effective. He reported ongoing sleep disturbance but denied other

symptoms or difficulties.  The patient was reportedly scheduled for prison release in approximately seven months, and he was described as stable during that visit.

The patient was seen for a psychiatric contact on July 18, 2023 by telepsychiatry.  At that visit, he reported that the medications had decreased his anxiety, but he had continued sleep difficulties.  He reported no medication side effects, and the medication dosage was increased.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were adequate.

He was seen timely for the initial PC and psychiatric assessments and the initial IDTT meeting. The treatment plan and clinical interventions provided were appropriate for the patient's clinical needs, and the treatment was documented appropriately.  The treatment team appeared responsive to the patient's concerns and goals, and medication treatment appeared effective at reducing anxiety symptoms.

**Patient P**

This 53-year-old 3CMS patient's healthcare record was reviewed to evaluate the quality of mental care provided at PBSP.  The patient was provided diagnoses of anxiety disorder; alcohol use disorder, moderate; and cannabis use disorder, moderate.  The patient had not been prescribed psychotropic medication since 2021.

The patient entered CDCR for his third term in 1999 with a sentence of 175 years to life.  The patient was a participant in the MHSDS at the 3CMS level of care since 2008 with no higher level of care referrals or placements and no history of suicidality.  The patient arrived at PBSP on June 17, 2021.

He also experienced hyperhidrosis when nervous or anxious.  The most recent SRASHE occurred routinely in 2018 with an assessment of low chronic and acute suicide risk.

The annual IDTT meeting occurred six days late on July 6, 2023; the meeting was attended by the necessary participants.  An IPOC for anxiety included appropriate treatment goals and interventions that were specific and individualized.  The interventions included a specific intervention to teach the patient the skill of "recognizing overestimation of threat and underestimation of patient's resources."  The patient wanted to continue learning CBT and relaxation techniques to address ongoing symptoms of anxiety that included intermittent mild to moderate anxiety and relatively frequent panic attacks.  The patient reportedly did not want to take psychotropic medications.  The level of care justification was appropriate, and treatment goals were identified to reduce anxiety and to improve stability.  The clinical summary lacked substantive update.  The patient participated in the development of the treatment plan and was provided a diagnosis of anxiety disorder.

The patient was not seen for a routine PC contact during the review period.  He was seen for a PC contact prior to the review period on January 26, 2023.  The next PC contact was scheduled

for June 21, 2023, which was two months late.  The patient did not show for the appointment and signed a refusal form; however, the appointment was never rescheduled.  The patient was not seen for a PC contact until after the review period, on November 11, 2023.

The patient was not prescribed psychotropic medications during the review period, and his most recent psychiatric contact occurred on July 14, 2021.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were inadequate.

The patient received no treatment nor individual clinical contacts for a ten-month period other than the annual IDTT meeting that did not occur timely.  Diagnostic clarification was also needed, as the patient's prominent panic symptoms suggested the possibility of a diagnosis of panic disorder.

**Patient Q**

This 47-year-old 3CMS patient's healthcare record was reviewed to evaluate the quality of care provided at PBSP.  The patient arrived at PBSP from PVSP on June 14, 2021.  He was placed in the MHSDS soon after his arrival on June 30, 2021 and was provided with a diagnosis of adjustment disorder with mixed anxiety.  The patient was not prescribed psychotropic medications and was not seen by the psychiatrist during the review period.

The patient had one MHCB admission in 2021 due to safety concerns, and the documentation indicated ongoing concerns and fears of being attacked by other incarcerated persons.  He was housed in the PBSP STRH immediately prior to the review period due to safety concerns and returned to general population on April 7, 2023.

The initial IDTT meeting occurred timely on April 27, 2023, and included the necessary participants and the patient.  An IPOC for anxiety included appropriate and individualized goals for the patient.  The goals were measurable, realistic, and included appropriate interventions and psychoeducation.  The patient denied acute symptoms and was described as generally stable and coping well.  He reported that he effectively utilized coping skills including exercise and meditation, and he actively sought additional programming.  The treatment team noted their intention to assess the patient for removal from the MHSDS at the next IDTT meeting.

The patient was seen timely for PC contacts during the review period, including a timely initial PC assessment and routine PC contacts.  At the initial PC assessment on April 21, 2023, the patient's mental status was described as stable.  The assessment was completed appropriately and informed treatment planning.  He was seen for a confidential PC contact on July 18, 2023.  The patient reported no new issues or complaints, and he participated in several programs and groups.  He began preparing for the BPH, and the PC noted that the patient demonstrated increased accountability and insight regarding his commitment offense.

**Findings**

The care and treatment provided to this 3CMS patient at PBSP were adequate.

He was seen timely for the initial PC assessment and initial IDTT meeting after return to general population from the STRH. The treatment plan was adequate, and the goals and interventions were individualized. Subsequent PC contacts occurred timely and were well documented; additionally, the patient appeared to utilize the coping skills learned during the sessions to effectively manage his symptoms.

**Patient R**

This 48-year-old patient's healthcare record was reviewed to assess the quality of care provided at the PBSP STRH. The patient entered CDCR for his current term on December 21, 2016 and was scheduled to parole on August 6, 2023. He recently arrived at PBSP from HDSP, and upon arrival he reported suicidal ideation and safety concerns while housed in general population. He was referred and admitted to the MHCB on March 22, 2023 after reporting command auditory hallucinations to kill himself. The patient also reported recent depression, anxiety, mood-congruent auditory hallucinations, and he stated that he had experienced those symptoms for the past several years. He also reported illicit substance use immediately prior to transfer from HDSP. The patient had no history of EOP, PIP, or DSH placements.

The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depression and was prescribed Zyprexa while in the MHCB. He was discharged from the MHCB on April 3, 2023 at the 3CMS level of care and was placed in the PBSP STRH for safety reasons after he reported ongoing fear that he would be killed in general population. He was seen timely for five-day follow-up contacts after the MHCB discharge.

The initial PC assessment occurred on April 5, 2023. The assessment noted that the patient did not endorse significant problems other than his safety concerns, and his mental status was described as normal. The clinical summary was adequate, and it informed treatment planning. He was seen for a confidential PC contact on April 11, 2023, where he reported substance cravings and requested referral for MAT. The PC provided reflective listening and coping skills interventions.

The initial psychiatric assessment occurred on April 6, 2023 by telepsychiatry. The patient requested an increased dosage of Zyprexa, as he denied significant improvement in his symptoms. He denied anxiety, mood disturbance, suicidal ideation, and auditory hallucinations at that time.

The initial IDTT meeting occurred timely on April 12, 2023 and was attended by the appropriate staff and the patient who actively participated in the meeting. The treatment plan did not include any IPOCs, and the initial treatment plan section merely stated, "refer to IDTT." The patient reported no new symptoms, and he was not included in the SRMP. The most recent SRASHE that was completed in the MHCB on March 29, 2023 assessed low chronic and moderate acute suicide risk. An appropriate level of care justification and discharge criteria were provided. The

patient was offered one 90-minute group weekly, and he was encouraged to participate in self-help groups in addition to the mental health treatment offerings.

The patient was offered weekly groups during his STRH stay, but he did not attend any of the offered groups.

The patient declined his next three scheduled PC appointments on April 18, 2023, April 28, 2023, and May 2, 2023. At each cell-front check-in, the patient reported minimal depression and no new concerns. The patient attended a confidential PC session on May 11, 2023 when he appeared stable. He refused the next two scheduled PC contacts on May 16, 2023 and May 25, 2023 but reported no new issues or concerns and little to no depression. At a confidential PC contact on June 1, 2023, the patient discussed suicidal ideation related to general population housing. The patient was seen at cell front during the remainder of June and July, 2023, as he refused to attend a confidential session. At each contact, the patient denied any mental health symptoms or concerns and reported a positive and optimistic outlook as he approached his parole date. Subsequently, the patient was admitted to the MHCB on July 28, 2023, after he reported suicidal ideation and command auditory hallucinations.

The patient was seen for a routine psychiatric contact on May 2, 2023 by telepsychiatry. His diagnoses were noted as adjustment disorder and atypical psychosis. The patient reportedly experienced significant hyponatremia, and his medication was changed from Zyprexa to Risperdal. He refused his next scheduled psychiatric contact on May 16, 2023, but the psychiatrist noted his ongoing hyponatremia and planned to taper and discontinue Risperdal. The progress note indicated the patient had begun MAT since the last contact.

The next routine psychiatric contact occurred on May 23, 2023, and the patient agreed to discontinue Risperdal to assess his baseline sodium levels. At his next psychiatric contact on June 21, 2023, Risperdal had been discontinued for 11 days, and the patient's sodium level had returned to normal. He denied any anxiety, mood disturbance, suicidal ideation or auditory hallucinations. He was not seen for a psychiatric contact prior to admission to the MHCB on July 28, 2023.

A routine IDTT meeting occurred on June 24, 2023 that included the necessary staff, but the patient refused to attend. The PC reported that the patient presented with future-oriented thinking during individual sessions, with primary goals to manage his anxiety and depression. The treatment plan contained an IPOC for depressed mood that included appropriate goals but inadequate interventions that was limited to goal setting. No new symptoms were reported since the last IDTT meeting, but the patient continued to report moderate anxiety and depression as well as difficulties with sleep and coping with his STRH placement. He reported a more positive and optimistic outlook since his STRH placement, and he reported that his STRH term was extended at the ICC due to safety concerns. He also reported decreased suicidal ideation, anxiety, and depression.

**Findings**

The care and treatment provided to this PBSP STRH patient were inadequate.

The initial treatment plan did not include any IPOCs, although IPOC goals were documented in subsequent progress notes. The PC contacts did not always occur timely, and several were provided by a covering clinician. Many of the PC contacts occurred cellfront, including six consecutive cell-front contacts prior to the July 28, 2023 MHCB admission. There was no documentation that the PC explored the patient's reason for refusing to attend confidential sessions that might have allowed better assessment of his clinical condition and perhaps early detection of decompensation that resulted in his MHCB admission.

The patient's mental health symptoms appeared to respond well to antipsychotic medication treatment; however, Zyprexa and Risperdal were discontinued, as they appeared to contribute to hyponatremia. There was no documentation that the psychiatrist considered treatment with other antipsychotic medications to address the patient's auditory hallucinations that ultimately led to his MHCB admission. Additionally, there was no documentation that the patient was encouraged to attend his assigned groups or evidence that the IDTT explored his reasons for treatment nonadherence.

**Patient S**

This 34-year-old patient's healthcare record was reviewed to assess the quality of care provided at the PBSP STRH. The patient began his current term in 2013 and was housed at PBSP since October 12, 2022. He was housed in the PBSP STRH from April 17, 2023 to July 20, 2023. He was intermittently a participant in the MHSDS at the 3CMS level of care, and he had one MHCB admission with no history of EOP, PIP, or DSH placements.

The only MHCB admission occurred from April 6, 2023 to April 17, 2023 immediately prior to the STRH placement. In the MHCB, he was provided diagnoses of unspecified disruptive impulse control and conduct disorder, unspecified personality disorder, adjustment disorder, mixed and a provisional diagnosis of major depressive disorder.

The patient's assigned PC provided timely and appropriately documented five-day follow-up contacts after the MHCB discharge to the STRH, and the documentation of those contacts indicated no concerns. The patient refused to participate in the initial PC assessment provided on April 17, 2023, thus the assessment was completed by healthcare record review. The document was completed appropriately and included relevant history and clinical information. The patient was offered weekly confidential PC contacts during his time in the STRH.

The initial psychiatric assessment occurred timely on April 12, 2023, but the patient refused to participate. The note indicated that the patient had recently discontinued Prozac and was prescribed Vistaril. The psychiatrist provided diagnoses of adjustment disorder; major depressive disorder, recurrent, moderate; mood disorder; and opioid use disorder.

The initial IDTT meeting occurred timely on April 26, 2023; the meeting included the necessary participants, but the patient refused to attend or to participate in treatment planning. The treatment plan included one IPOC targeting impulsive behavior. The IPOC included appropriate, measurable treatment goals, but the interventions were limited to encouraging mindfulness and demonstrating empathy. The IDTT did not note that the patient met any of the criteria for consideration of referral to a higher level of care. The discharge criteria were appropriate. The

treatment goals were provided in the safety plan and indicated that the patient would receive motivational interviewing, dialectical behavior therapy, and goal setting. The patient's primary symptoms were anxiety and depression, and he had recently discontinued Prozac and was prescribed Vistaril for sleep. He was also in the ISUDT program and was prescribed Suboxone. The psychiatric technician indicated that the patient was stable in the STRH.

The patient was offered weekly groups during his stay in the STRH. He attended group therapy on April 17, 2023, but he did not attend any subsequent groups during his STRH stay.

The patient declined to attend the weekly scheduled PC sessions in the STRH from placement to June 3, 2023. At the confidential session on June 3, 2023, the patient stated that he did not like being placed in a TTM for sessions; and he denied significant difficulties. He attended the next confidential PC session on June 6, 2023 when he processed family concerns; but he reported nervousness about continuing PC sessions due to concerns about confidentiality. During subsequent weekly PC sessions, the patient was occasionally seen in a confidential setting, but some contacts occurred cell front due to refusal. He generally presented with stability.

The patient refused his psychiatric appointment on April 14, 2023, and his Vistaril was changed to PRN. Vistaril was discontinued when he refused the subsequent psychiatric appointment on May 3, 2023. The patient attended a May 10, 2023 psychiatric session when he told the psychiatrist that he was unaware that he was required to meet with the psychiatrist to continue medication treatment, and Vistaril was restarted. The patient was not seen for another psychiatric contact prior to his STRH release.

**Findings**

The care and treatment provided to this PBSP STRH patient were adequate.

The IDTT meeting occurred timely, and the treatment team provided appropriate goals and interventions given the patient's lack of participation in both the initial provider assessments and IDTT meeting. The PC and psychiatric appointments occurred timely, and cell-front contacts occurred with the PC when the patient refused to attend. The PC documentation indicated the provision of treatment interventions and progress appropriately. The patient was offered group therapy weekly, although he did not attend after the first group. During his STRH stay, the patient remained stable and appeared to benefit from the services and contacts provided by the IDTT.

**Patient T**

This 39-year-old patient's healthcare record was reviewed to assess the quality of care provided at the PBSP STRH. The patient received mental health services at the 3CMS level of care intermittently during this and past CDCR terms, and he had no history of MHCB admissions or higher level of care placements. He had a history of suicide attempts in the community as well as a history of chronic pain. The patient was a participant in the ISUDT and was prescribed Suboxone.

The initial PC assessment occurred on April 18, 2023. During the encounter, the patient reported a PREA incident that occurred at CRC in 2020 where he was reportedly the victim of a sexual

assault, and the PC documented the report.  The patient was reportedly otherwise stable.  The initial assessment was well documented and informed treatment planning.

At a PC contact on April 20, 2023, the patient discussed his time in prison and the PREA allegation.  He reported no significant distress at that time.  At the next PC contact on April 24, 2023, he reported mild to moderate depression and was otherwise coping well.  At the next PC contact on May 1, 2023, the PC worked with the patient regarding challenging his cognitive distortions and assisting with reality testing.

The initial psychiatric assessment occurred on April 28, 2023.  The patient was prescribed Trileptal, Vistaril, and Suboxone to address his reported increase in stress, anxiety, and difficulty sleeping.  This was the only psychiatric contact during the patient's STRH stay.

The initial IDTT meeting occurred three days late on May 3, 2023; the meeting included the necessary participants, and the patient participated in treatment planning.  The treatment plan included IPOCs to address anxious and depressed mood.  The IPOC for anxiety was adequate and contained appropriate goals and interventions, while the IPOC for depressed mood contained appropriate goals, the interventions were more generalized.  The patient reported that his primary concerns were ongoing stress, anxiety, and fear regarding possible transfer to a dorm setting when he transferred from the STRH.  No higher level of care indicators were noted by the IDTT.  The discharge criteria and level of care justification were provided and were appropriate.

The patient was seen timely for confidential PC routine contacts while housed in the STRH.  The documentation indicated that the patient actively participated during the clinical contacts.  At a May 5, 2023 PC contact, the patient discussed stressors and difficulties related to prison but reportedly expressed optimism for the future.  The PC provided relaxation skills training that appeared to be beneficial.  During the next PC contact on May 12, 2023, the patient reported stress and anxiety regarding his upcoming ICC and potential housing placement, and the PC provided appropriate interventions.  The patient continued to report anxiety regarding his housing during subsequent PC contacts, and the PC provided coping skills and reality testing techniques.  The patient was transferred to general population on May 19, 2023.

**Findings**

The care and treatment provided to this PBSP STRH patient were adequate.

Although the initial IDTT occurred several days late, treatment planning was well documented, and the treatment goals and interventions were appropriate for the patient's clinical needs and presentation.  The patient was seen timely for PC contacts that occurred in a confidential setting, and the PC provided appropriate clinical interventions during those sessions.  The psychiatric care appeared appropriate.

**Patient U**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided at the PBSP STRH.  The patient was housed in the STRH from May 16, 2023 to July 6, 2023.  He was placed in the MHSDS at the 3CMS level of care when he entered the reception center; as he arrived at CDCR from a county jail with prescriptions for Remeron, Zoloft, and Prazosin and

was provided diagnoses of PTSD and depression.  The patient stated that he was dishonest at the county jail in reporting that he had mental health symptoms and prior treatment for housing placement purposes but denied any mental health concerns upon arrival to CDCR.  He denied any history of mental health treatment in the community and denied any history of self-harm, suicide attempts or suicidal ideation.  He had reportedly discontinued Remeron on May 4, 2023 and was not prescribed psychotropic medication when he arrived at the STRH, but he requested to restart Remeron for mild issues with sleep and appetite disturbances.

The initial PC assessment occurred timely on May 23, 2023.  The patient's presenting concerns were anxiety and depressed mood due to a potential RVR and potential transfer away from his family.  He was provided a diagnosis of adjustment disorder, and he was prescribed Remeron.  The initial assessment was completed appropriately, and it informed the IDTT and treatment planning.

The initial psychiatric assessment occurred on May 25, 2023.  The assessment included appropriate clinical history and information.  The psychiatrist restarted Remeron to address the patient's depression and anxiety, and the patient responded well to the medication.

The initial IDTT meeting occurred one day late on May 31, 2023, and the meeting was attended by the patient and the necessary staff.  The treatment plan included an IPOC for depressed mood to address intermittent moderate depression.  The IPOC contained limited goals and interventions and focused on "hopes for the future" and reducing the patient's depressed mood to remission.  No custody or medical issues were identified.  The patient was assigned to one coping skills group weekly, and the CCII suggested that the patient explore additional self-help and self-improvement activities and groups.  Despite the limited scope of goals and interventions, the IDTT and treatment plan documentation were adequate and consistent with the patient's clinical needs and presentation.

The patient was offered six recreational therapy groups while in the STRH.  He attended four of six groups with good participation.

The patient was seen timely for confidential PC contacts while in the STRH, and he generally presented with stability.  On June 14, 2023, the patient reported increased anxiety due to a delay in his ICC after being found not guilty of the RVR for which he was placed in the STRH.  On June 20, 2023, he reported increasing frustration, but only mild depression that he remained in the STRH.  The PC reportedly contacted the CC1 to obtain updated information regarding continued STRH housing.  The final PC contact in the STRH occurred at cell-front by a covering PC on July 3, 2023, when the patient was provided a handout on coping skills.  The patient was released from the STRH to general population on July 6, 2023.

**Findings**

The care and treatment provided to this PBSP STRH patient were adequate.

The patient was seen timely for the initial clinical assessments and routine contacts while in the STRH.  The patient and PC developed good rapport, and the PC provided appropriate interventions and coping skills training.  The medication treatment appeared to be effective, and the patient remained generally stable and engaged in treatment while in the STRH.

**Patient V**

This 26-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the PBSP STRH.  The patient entered CDCR for his current term on July 16, 2021 with an EPRD of August 2, 2024.  He was placed at the 3CMS level of care when he transferred to the ASU on April 24, 2023.  The patient was admitted to the MHCB on May 23, 2023 while in the ASU due to suicidal ideation, auditory hallucinations, and depression.  He discharged from the MHCB to the PBSP STRH on May 31, 2023, with a diagnosis of adjustment disorder with depressed mood.  The patient previously reported depressive symptoms that included sadness, agitation, and unhappiness.  He denied a history of suicide attempts, and he reported a history of polysubstance use with ongoing opiate cravings.

The patient was seen timely with appropriate documentation of five-day follow-up contacts after his MHCB discharge to the STRH.

The initial PC assessment occurred timely on June 6, 2023.  The assessment was completed appropriately and identified mild depression as the patient's primary presenting problem.

The initial psychiatric assessment also occurred timely on June 8, 2023; however, the patient refused to attend that assessment.  He was subsequently seen for a wellness check, and he was encouraged to attend a confidential appointment.  He was prescribed BuSpar and Remeron; he was noted as medication nonadherent reportedly due to medication side effects.

The initial IDTT meeting occurred timely and was attended by the appropriate staff and the patient who participated in treatment planning.  He was described as future-oriented and expressed his primary goal to maintain low levels of anxiety and depression.  The IPOC section of the treatment plan was incomplete, and the discharge criteria were generalized; however, the level of care justification was appropriate.

The patient was seen by a covering PC on June 12, 2023, when he was reportedly stable and adjusting well to STRH housing.  The patient refused to attend confidential weekly PC sessions for the remainder of his time in the STRH, and those contacts occurred timely at cell front.  The patient was consistently described as stable and denied any problems or concerns.

The patient was seen for a second initial PC assessment when he returned from an outside hospital for hand surgery.  He refused to participate in that assessment, and it was completed by healthcare record review.  He was reportedly stable when seen for subsequent cell-front PC contacts, as he refused to attend confidential sessions.

The patient attended a rescheduled initial psychiatric appointment on June 13, 2023; at that session, the psychiatrist discontinued BuSpar and increased the patient's Remeron.  The next psychiatric appointment was an initial assessment that occurred on August 11, 2023, after the patient returned from an outside hospital on July 26, 2023.  The patient reported that he discontinued Remeron due to taking prescribed opioid pain medication after hand surgery, and he was concerned about the mixture of medications.  The Remeron prescription was, however, continued.  At a psychiatric contact on August 31, 2023, the patient reported that he had not resumed Remeron, as he wanted his hand to fully heal prior to taking the medication.  He was noted as otherwise stable.

Another initial IDTT meeting occurred on August 18, 2023, upon the patient's return from the outside hospital, and the meeting occurred one week late. The IDTT noted that the patient continued with depression associated with his imprisonment and separation from family. The treatment plan included an IPOC for depressed mood; however, the treatment goals and interventions were generic and limited. He reported that he had taken Remeron consistently for the past two months with beneficial effects but continued occasional sleep disturbance. His diagnosis of adjustment disorder with depressed mood was maintained.

**Findings**

The care and treatment provided to this PBSP STRH patient were inadequate.

Although this patient remained psychiatrically stable, and he generally received timely clinical contacts; treatment planning was inadequate, as it lacked specific and individualized goals and interventions to address the patient's continued depressive symptoms, and there was not documentation of a PC contact during the week of August 7 to August 11, 2023.

**Patient W**

This 32-year-old patient's healthcare record was randomly selected from the MHCB roster to assess the adequacy of care provided. The patient was placed in the PBSP MHCB on August 20, 2023; prior to admission, he received mental health services at the 3CMS level of care. He was referred to the MHCB due to suicidal ideation after the termination of a romantic relationship. He was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed Zoloft and Vistaril.

The initial psychiatric assessment documentation was appropriate, and relevant mental health history of treatment approximately two years prior for depression while in the county jail was included. The patient had one suicide attempt by overdose, and the reason for that attempt also resulted from relationship difficulties. The psychiatrist continued treatment with Vistaril, and treatment with an antidepressant medication was initiated.

The initial primary clinician assessment included the reason for admission and the context for the patient's distress; however, information regarding previous treatment was limited and was copied from prior assessments with the most recent information dated four months prior. The clinician's awareness and consideration of the patient's full treatment history was unknown.

While the patient's assigned providers were not present at the IDTT meeting; the providers in attendance at the initial IDTT meeting knew the patient, as they had completed the patient's MHCB initial assessments. Different providers, who met with the patient for daily routine contacts, attended the discharge IDTT meeting.

The IDTT documentation required improvement. Mental health IPOCs were not documented during the initial IDTT meeting, including depression and anxiety that were identified by the psychiatrist or suicidal ideation that precipitated the MHCB admission. The documentation, however, indicated that an IPOC targeting danger to self was developed the day after the initial IDTT meeting. The patient reportedly did not meet any criteria for consideration of referral to a higher level of care, and the rationale provided for the level of care was reasonable. The IDTT

and primary clinician discharge documentation did not provide a useful summary for continuity of care.

The presence or absence of suicidal ideation was not consistently documented in the initial primary clinician assessment, initial IDTT documentation or routine primary clinician documentation. Relatedly, there was conflicting documentation regarding the completion of a safety plan in the initial IDTT documentation. The safety plan completed on August 27, 2023 was thorough and individualized, and the patient was appropriately assessed with low acute and moderate chronic suicide risk. Of note, the patient's history of substance use was not included in the assessment of suicide risk.

There was a lack of continuity of care regarding daily clinical contacts; the patient was seen by five different providers between August 22, 2023 and August 28, 2023, including two psychiatrists and three different primary clinicians. The documentation of three of four primary clinician contacts was indicative of meaningful treatment contacts, and the psychiatric contacts appeared appropriate. The patient was receptive to and engaged in treatment. His depression and anxiety improved during treatment, as his self-ratings decreased from the severe to moderate range.

Of concern was the patient's discharge to the sending institution where his previous partner resided. The patient was not adequately prepared during treatment regarding maintaining stability, despite a likely encounter with this individual. Further, his expressed concerns regarding his anticipated upcoming prison release were not appropriately addressed.

**Findings**

The care and treatment provided to this MHCB patient were marginally adequate.

The goal of the MHCB admission was met, as the patient's emotional distress improved, and he stabilized. However, concerns were noted and improvement was indicated in the documentation and treatment regarding treatment planning, routine primary clinician assessment of suicidal ideation, continuity of care and discharge to the sending institution.

**Patient X**

This 26-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of schizoaffective disorder, bipolar type; antisocial personality disorder; borderline personality disorder; and cannabis use disorder. He was prescribed quetiapine for psychosis and mirtazapine for depression. Medication changes while housed in the MHCB included the addition of the antipsychotic medication chlorpromazine.

The patient had a history of treatment at the 3CMS, EOP, MHCB, and intermediate levels of care. On March 16, 2023, while in the CSP/Sac ASU EOP, the patient was placed at the intermediate level of care. He was admitted to the MHCB on April 3, 2023, due to suicidal ideation and auditory hallucinations in the context of medication nonadherence. The patient reported that one trigger for his suicidal thoughts was the length of time to transfer to an

intermediate care program. The patient transferred to PBSP MHCB within mandated timeframes.

The SRASHE on April 3, 2023 assessed the patient with high chronic and acute suicide risk. The patient had a history of multiple suicide attempts, including overdose, cutting, and hanging; additionally, he had a history of self-injury by cutting.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The initial psychiatric evaluation was succinct and provided for a clear initial clinical picture of the patient. As was seen in other cases, the assessment and plan section of the evaluation only listed medical diagnoses.

The initial PC evaluation noted that the patient did not participate in the evaluation, and the evaluation was thus based on a healthcare record review and brief interaction at cell front. Of note, the clinical summary was cogent and helpful. The case formulation was limited due to the patient's limited interaction with the PC.

The initial IDTT meeting occurred timely and included all required participants, including the patient. The initial treatment plan only contained nursing but not mental health goals. The psychiatric master treatment plan listed the patient's prescription for quetiapine, but not mirtazapine.

The patient began a hunger strike on April 8, 2023, either due to the belief that patients from CSP/Sac were trying to kill him, or in an attempt to die. Prior to the routine IDTT meeting on April 10, 2023, treatment plan goals were created and included reducing feelings of distress and suicidal ideation. Inconsistently, one goal was to display behavior appropriate for a lower level of care, despite the referral to the intermediate level of care at the time of MHCB admission and a referral to the acute level of care made on April 10, 2023. The mental health interventions only included generic ones, such as building therapeutic alliance and working with the patient on goal setting.

As required, the patient had daily contact with mental health clinicians including at least two weekly meetings with the psychiatrist. All clinical contacts were provided by onsite psychiatrists and PCs. The progress notes failed to consistently document the interventions utilized and how they connected to the treatment plan goals. The progress notes did include clinically beneficial information from the morning huddles.

Despite the patient's limited medication adherence, templated notes were not completed in entirety regarding the patient's medication adherence.

On April 17, 2023, the patient reported suicidal ideation with a plan to hang himself. The patient used strips of clothing to fashion a noose, but he subsequently gave the materials to nursing staff. The patient transferred to the acute level of care on April 21, 2023. No MHCB discharge summary was located in the healthcare record.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was seen timely for the initial psychiatric and PC evaluations, daily contacts, and IDTT meetings. Additionally, the initial assessments contained clinically useful information. The treatment team also made a timely and clinically appropriate referral to the acute level of care.

Despite those positive aspects of care, areas of concern were noted. The treatment planning was inadequate. No goals were established by the time of the initial IDTT meeting. The IDTT developed treatment goals that were reasonable, such as reducing hallucinations and suicidal ideation; however, the interventions were generic, not individualized, and were unlikely to address the magnitude of the patient's mental health challenges. Also of note, one goal was for the patient to display behavior appropriate for discharge to a lower level of care. That goal was incongruent with the referral to the acute level of care. The PC progress notes failed to consistently document interventions used and how they connected to treatment plan goals. The psychiatric justification for medication changes was inadequately documented. In addition, the psychiatric notes contained blank spaces and templated information, including critical aspects such as medication adherence; this was particularly important given the patient's history of inconsistent medication adherence and in the determination of the appropriate level of suicide observation and issuance of clothing and room items.

**Patient Y**

This 61-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient's diagnoses included unspecified schizophrenia spectrum and other psychotic disorder, and a history of schizophrenia. The psychiatrist prescribed aripiprazole for psychosis, benztropine for side effects to antipsychotic medication, and hydroxyzine for insomnia and anxiety. During the MHCB stay, the psychiatrist changed the aripiprazole to olanzapine due to reported prior efficacy.

The patient received mental health services at the 3CMS level of care while housed at CTF. On April 3, 2023, the patient was placed at the MHCB level of care due to bizarre behavior, grave disability, and worsening psychotic symptoms including command auditory hallucinations to kill himself. The patient transferred timely to the PBSP MHCB, arriving on April 4, 2023. Relevant medical conditions included diabetes mellitus and an elevated cholesterol level for which the patient received metformin and rosuvastatin respectively.

The documentation of an initial emergent consult from the on-call telepsychiatrist was inadequate. The incomplete template contained blank spaces, including critical aspects such as the plan for treatment. The patient denied any suicidal ideation at the time of the evaluation at CTF. The SRASHE on April 4, 2023 assessed the patient with high chronic and low acute suicide risk. The patient had several prior suicide attempts and the last attempt occurred in 2005.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting.

The PC evaluation contained clinically valuable information and an adequate clinical summary; however, the case formulation was inadequate. The information included in the psychiatric evaluation was confusing due to carried over historical information, yet the documentation included enough information to form a clinical picture of the patient. Due to lack of efficacy of aripiprazole, the psychiatrist changed the medication to olanzapine, documenting that this medication was effective in the past.

The initial IDTT meeting occurred timely and included all required participants, including the patient. The documented treatment goals were largely provided by nursing staff and not mental health. The treatment plan documented discussion of risk and privileges such as recreation yard and telephone calls. Some goals were unclear, such as reducing psychotic symptoms to a level of four or less, and no context was provided to base that rating scale. The therapeutic interventions were vague, including forging a therapeutic alliance.

The patient received daily clinician contact and met with the psychiatrist as required. The PC and psychiatric notes displayed an overall lack of clear interventions and how they connected to the treatment plan goals. The patient discharged to SQ at the EOP level of care.

**Findings**

The care provided to this MHCB patient was inadequate.

Although evaluations, follow up visits, and IDTT meetings occurred timely, the treatment plan goals were vague, and progress notes displayed limited patient-specific interventions that were unlikely to result in meaningful clinical improvement. While the psychiatrist indicated that olanzapine was prescribed due to prior efficacy; the choice of that medication required stronger justification, as the patient had diabetes and an elevated cholesterol level, and olanzapine was associated with those disorders.

**Patient Z**

This 50-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of depression and PTSD. Although the psychiatrist considered treatment with paroxetine for depression, as the patient took this medication in the past with benefit; the patient declined to take the medication for longer than one month, which was an inadequate time to gauge full clinical benefit.

The patient was initially housed at CHCF at the 3CMS level of care. The patient reported suicidal ideation necessitating MHCB placement on April 9, 2023, and the admission was due in part to reported family deaths. The patient transferred timely to the PBSP MHCB, arriving on April 10, 2023.

The SRASHE on April 10, 2023 assessed the patient with low chronic and high acute suicide risk. That nonconfidential assessment at CHCF was incomplete, due to patient refusal.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The initial PC evaluation contained useful information but did not have a sufficient case formulation. The psychiatric evaluation and notes were unclear regarding the provided diagnoses; and as was seen in other cases, the assessment and plan section of the evaluation only listed medical diagnoses and a statement that the patient was at risk for self-harm.

The initial IDTT meeting occurred timely and included all required participants, including the patient. The interventions were generic and templated, and they were nearly identical to those seen in the other patients' healthcare records by this same PC. The treatment plan goals were largely generic, but one did include the use of cognitive behavioral therapy to increase acceptance and tolerance of emotional pain.

The routine daily contacts occurred as required. The follow-up notes inconsistently documented the interventions used and how they connected to treatment plan goals; however, some notes reflected useful interventions such as safety planning, reading, and journaling.

Despite notes for several days indicating that the patient had no suicidal ideation, no acute distress and that his crisis behaviors had resolved; the rational for continued treatment in the restrictive setting of the MHCB was unclear. On April 17, 2023, the patient discharged to CTF at the 3CMS level of care.

**Findings**

The care provided to this MHCB patient was inadequate.

As the SRASHE at the referring institution was incomplete and conducted in a nonconfidential setting due to patient refusal; the risk assessment should have been repeated upon arrival at PBSP. The assessment, however, was repeated prior to the MHCB discharge. The psychiatric evaluation and progress notes were unclear regarding the patient's diagnoses. The treatment plan goals were vague and not individualized, and they mirrored goals seen in other healthcare record reviews at this institution. Most notes did not specify clear interventions and how those interventions connected to the treatment plan goals. The rationale for maintaining the patient at the MHCB level of care was unclear, given that the patient reported no suicidal thoughts, and the progress notes documented the resolution of the crisis which prompted the MHCB admission.

**Patient AA**

This 41-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of bipolar 1 disorder and opioid use disorder. He was prescribed olanzapine for psychosis, divalproex for mood stabilization, and venlafaxine for depression. An additional PRN medication included benztropine for side effects to antipsychotic medications. While traditionally prescribed on a regular basis, the patient was also prescribed prazosin PRN for nightmares and sleep.

The patient had prior treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care.  On April 25, 2023, while in the PBSP STRH, the patient reported suicidal ideation with a plan to cut his wrists; subsequently, he was admitted to the PBSP MHCB timely.

A SRASHE assessed the patient with high chronic and acute suicide risk.  The patient had prior suicide attempts at age 15 and six years prior.  A trigger for the MHCB admission was the recent death of his cellmate.  The patient had five prior RVRs within the six months preceding the MHCB admission.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting.  The PC evaluation was comprehensive; however, important components such as the case formulation were carried forward from prior evaluations, and thus neglected information such as the crisis which prompted the MHCB admission.  While the initial psychiatric evaluation contained clinically useful information and presented a clear clinical picture of the patient, the diagnoses were difficult to determine.  The assessment and plan section listed medical diagnoses and opioid use disorder.  In contrast, the problem list documented bipolar I disorder, substance use, and trauma and stressor related disorder.  As of May 1, 2023, bipolar I disorder was listed in the assessment and plan section.

The initial IDTT meeting occurred timely and included all required participants including the patient.  The treatment plan included only goals developed by nursing.  The treatment plan was confusing, as it stated that a safety plan was not required; however, the prior safety plan was noted as imported into the healthcare record but stated "nothing documented in original." The discharge goal in the treatment plan stated that a goal was to rate suicidal ideation at a four or below; however, this differed from the initial evaluation which noted that the goal was a reduction to two or below.  This goal was unclear, as no basis for those numerical determinations was documented.  The IDTT documented consideration of referral to a higher level of care as well as observation and property provision levels.

The patient was seen for daily clinical contacts, including at least two weekly psychiatric contacts.  Several contacts occurred cell side due to lack of available confidential space.  The clinical progress notes intermittently included treatment interventions.  As seen in other case reviews, the PC notes reflected generic interventions that were not individualized.  The psychiatrist adjusted the olanzapine dose, but the rational for that change was unclear as the patient denied psychotic symptoms.  While that medication had other clinical indications, the rationale for the dosage change was not documented.  Although medication adherence was a concern at the time of the MHCB admission, the patient's medication adherence improved during the MHCB stay.

A repeat SRASHE prior to discharge assessed the patient with high chronic and moderate acute suicide risk.

The patient stabilized and was discharged to the PBSP STRH at the EOP level of care on May 4, 2023, where he remained for 83 days until transfer to the appropriate setting at the MCSP ASU EOP hub.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial evaluations, IDTT meetings, review of higher level of care indicators, and daily clinical contacts occurred timely.

Treatment goals and the interventions that would realistically achieve those goals were lacking. The psychiatric notes displayed confusing documentation regarding the patient's diagnoses. The rationale for increasing the dosage of olanzapine, an antipsychotic medication, for this patient who denied psychotic symptoms was puzzling. While the medication had other indications, such as mood stabilization, the documentation did not include that or any rationale for the medication increase. Additionally, the rationale for the use of prazosin, a medication traditionally prescribed nightly for trauma-induced nightmares, on a PRN basis deviated from standard practice and required stronger documented justification.

**Patient BB**

This 32-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at PBSP. Although difficult to discern, it appeared that the patient was provided diagnoses that included opioid use disorder, bipolar II disorder, and methamphetamine use disorder. At the time of the MHCB admission, he was prescribed oxcarbazepine for mood stabilization, and prazosin and melatonin PRN for sleep.

The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care. On April 27, 2023, while at the 3CMS level of care at PBSP, the patient required MHCB placement due to suicidal ideation, and the patient made a rope three days prior. On the date of MHCB placement, the patient had a fight with his cellmate that resulted in an RVR.

The SRASHE on April 27, 2023 assessed the patient with high chronic and acute suicide risk.

The patient's diagnosis was difficult to determine in the initial PC and psychiatric evaluations. While opioid use disorder and suicidal thoughts were listed under the assessment and plan, the problem list included diagnoses of bipolar II disorder, methamphetamine use disorder, and opioid use disorder. The psychiatrist continued the medications at time of the MHCB admission, including oxcarbazepine, and prazosin and melatonin PRN. Later in the patient's treatment course, the psychiatrist added the antidepressant and antianxiety medication mirtazapine PRN for anxiety; that medication was traditionally prescribed on a routine basis. The patient also received buprenorphine/naloxone as MAT for opioid use disorder.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The initial IDTT meeting also occurred timely, and included all required participants including the patient. The treatment goals were primarily provided by nursing; although, a goal of reducing suicidal ideation to a four or less was later documented. While the treatment interventions listed were comprehensive, they were generic and not individualized.

Routine and timely clinician contacts occurred in a confidential setting, except when the patient refused. The patient saw three PCs during his treatment course. Goals of reducing depression and suicidal ideation were added to the treatment plan. Other goals were generic and not patient-specific; and examples included an incompletely templated goal of learning three coping skills, with both the frequency and timeframes not completed. Additionally, the plan noted a vague goal of displaying behavior appropriate for a lower level of care, without specifying what that entailed. Similarly, interventions remained overly broad and generic.

The psychiatric progress notes mentioned missed medication doses but did not specify which medication. The note also stated Remeron when it appeared that melatonin was the intended medication. The diagnosis of adjustment disorder was added to the problem list, but clear justification for that change was not provided.

On May 3, 2023, the patient took an overdose of oxcarbazepine pills after showing the pills in his mouth to nursing staff. The on-call telepsychiatrist's plan was not completed, and was incompletely templated, and follow-up was recommended with the medical service. The subsequent day, the regular psychiatrist ordered oxcarbazepine as a liquid preparation, and the other medications were ordered crushed.

On May 5, 2023, the patient requested an increase in his level of care to EOP at time of discharge; however, the treatment team indicated their belief that the request was driven by non-clinical factors and did not agree with the request. Documentation on May 12, 2023 showed that the treatment team consulted with the chief of mental health, and the decision was made to discharge the patient. The patient reported thoughts of harming an incarcerated person who reportedly stole his property; however, the PC note stated that there was no clearly identified target. Due to continued symptoms, the treatment team ultimately referred the patient to the acute level of care where he transferred timely.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient was seen timely for evaluations, follow up visits, and IDTT meetings; he received fractured continuity of care, receiving treatment with at least three PCs during his MHCB course. The treatment plan goals were vague. The documentation reflected few patient-specific interventions, and the intervention documented was unlikely to address the degree of the patient's psychiatric symptoms. The templated goals and progress notes were incomplete and contained blank areas. A diagnosis of adjustment disorder was added without a rationale provided. The psychiatrist prescribed the antidepressant mirtazapine on a PRN basis for anxiety; however, the rationale for prescribing this medication PRN rather than as a regular dosage was lacking. An additional concern was the patient's report of thoughts of harming a specific person who reportedly stole his property. While the PC noted that there was "no specific threat," the documentation was inadequate for a proper safety assessment.

**Patient CC**

This 28-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at PBSP. He was provided diagnoses of adjustment disorder and opioid use disorder. The patient was not prescribed psychotropic medications at time of the MHCB admission, and he declined medications during the MHCB stay. The patient was prescribed buprenorphine-naloxone for opioid use disorder.

This incarcerated person at PBSP was not a participant in the MHSDS prior to May 7, 2023, when he was admitted to the MHCB by the on-call telepsychiatrist due to suicidal ideation. He transferred to the PBSP MHCB timely.

On May 8, 2023, the patient was assessed with low chronic and acute suicide risk; however, the PC noted that triggers for suicidal thoughts as well as protective factors could not be assessed due to patient refusal.

The initial MHCB psychiatric evaluation and one follow-up visit on May 10, 2023 were conducted at cell front by telepsychiatry. The initial evaluations by the telepsychiatrist and the on-site PC were inadequate and included insufficient information to formulate a clinical presentation of the patient. The psychiatric notes were unclear regarding the patient's diagnoses.

The IDTT meeting included all required disciplines; however, the telepsychiatrist in the IDTT meeting differed from the telepsychiatrist who completed the initial assessment. The IDTT documentation contained confusing information about continued evaluation of PC 2602 by his regular psychiatrist. Despite multiple refusals of confidential sessions with both PC and psychiatrist, the treatment plan was not substantially updated to address this issue of concern. Goals in the initial treatment plan included reducing suicidal ideation to a six or below, fostering a therapeutic alliance, use of goal setting, and encouraging the patient to report treatment concerns to staff. Later in the document, interventions listed included the use of motivational interviewing and supportive therapy to establish rapport and to motivate change, and the use of skills to improve distress tolerance, relaxation techniques to reduce anxiety, and solution-focused problem skills to get his needs met. The patient was to identify two skills and three relaxation techniques within one week. The treatment team documented consideration of referral to a higher level of care. The correctional counselor noted that the patient's security level allowed no restrictions on telephone use or use of the walk-alone yard. The patient reported safety concerns, and the mental health documentation revealed that an apparently appropriate investigation of those concerns was ongoing.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

The initial psychiatric evaluation and one follow-up visit were conducted at cell side by telepsychiatry, which was not permitted by policy. The initial psychiatric and PC assessments contained insufficient information required for a comprehensive intake examination. The initial SRASHE assessed low suicide risk, while stating that the PC was unable to assess triggers or

protective factors.  While this initial suicide risk assessment did not include those crucial elements, it was understandable and clearly documented that this was due to the patient's refusal. The MHCB treatment team should have conducted a repeat SRASHE including those essential elements necessary to determine risk of suicide or self-harm.  While all required disciplines were in attendance, the initial treatment team did not contain the psychiatrist who completed the initial psychiatric evaluation.  The refusal of multiple confidential sessions was a significant barrier to care; however, the treatment plan was not updated to address that significant area of concern.

**APPENDIX B – 6**
**CALIFORNIA STATE PRISON/SOLANO (CSP/Solano)**
Site Visit: November 28, 2023 – November 29, 2023
Review Period: April 1, 2023 – September 30, 2023

**Patient A**

This 36-year-old patient's healthcare record was reviewed to assess the adequacy of care provided during MHCB admission at CSP/Solano. Prior to the current MHCB placement, the patient was housed in the ASU at CTF pending investigation for murder of another incarcerated person. The patient transferred from the CTF ASU to the CSP/Solano MHCB due to danger to self and grave disability on September 20, 2023. On the date of the MHCB admission, the patient was described as confused, disoriented, withdrawn, hostile, assaultive, sad, and unpredictable. The patient was also assessed with high acute and moderate chronic suicide risk and was placed on one-to-one suicide watch upon admission.

The MHCB primary clinician completed their initial assessment on September 22, 2023. There was no documentation that a formal initial psychiatric assessment was completed during the MHCB stay. One MHCB psychiatrist did, however, label a progress note "initial assessment note" on September 22, 2023; but, the note did not include a complete biopsychosocial assessment, case formulation, or diagnostic justification. The MHCB psychiatrist documented a provisional diagnosis of schizophrenia and prescribed Vistaril PRN. Of note, the patient was treated by at least four different psychiatrists during the current MHCB stay due to the practice at CSP/Solano of rotating all line staff psychiatrists through the MHCB every four to five days.

Early during this MHCB stay, the patient boarded up the windows of his cell and would not respond to custody staff; he maintained the belief that other incarcerated persons were in the attic and that officers were watching him through the back of his MHCB cell. During the current MHCB stay, the patient continued to refuse all psychotropic medication and remained acutely psychotic. Clinicians suggested that the patient's paranoia prevented him from leaving his cell for yard, showers, and healthcare appointments. Further, the patient's fixed belief that he was always being watched reportedly resulted in a lack of bowel movements from September 20, 2023 to October 5, 2023.

The MHCB IDTT convened on September 22, September 29, and October 6, 2023. The treatment plans referenced a plan to target "psychosis, paranoia" with medication management. On September 28, 2023, a psychiatrist filed a nonemergent PC 2602 petition due to ongoing acute psychotic symptoms and reported limited functioning; however, the involuntary medication order was not granted until after the patient transferred to CHCF for inpatient care on or around October 26, 2023.

On September 29, 2023, the IDTT documented that the patient had not left his cell or showered since his MHCB admission date on September 20, 2023 due to ongoing paranoia. The patient also had not had a documented bowel movement since admission due to delusional thinking. Further, the patient was on his ninth day in the MHCB without any sign of discharge readiness, had been referred for involuntary medication due to ongoing grave disability concerns one day

571

prior, and had met the higher level of care referral indicators of requiring inpatient psychiatric care with 24-hour nursing supervision and being unable to adequately function in the outpatient setting due to a major mental disorder. However, despite clear evidence that the patient required inpatient care on that date, the IDTT documented only that they "may refer to PIP at next IDTT."

During a scheduled IDTT meeting one week later, on October 6, 2023, the IDTT referred the patient to a higher level of care. The patient transferred to CHCF for inpatient care on or around October 12, 2023. On or around October 26, 2023, the PC 2602 involuntary medication order was granted due to grave disability.

**Findings**

The care and treatment provided to this patient was inadequate.

He was not timely referred to a higher level of care as was clinically indicated. The psychiatrist did not complete a thorough initial assessment, and there was poor continuity of care among psychiatric providers due to the current CSP/Solano MHCB rotation practice. Treatment plans were insufficient and ineffective and were not appropriately modified to meet the patient's presenting problems. Higher level of care nonreferral rationales also were inappropriate. Despite recognizing significant impairments resulting from the patient's psychotic symptoms, the IDTT noted only that they might refer the patient to a PIP at the next IDTT meeting. Further, despite acknowledging that the patient met the criteria for involuntary medication and required ongoing 24-hour care in the MHCB setting beyond ten-days; the IDTT did not indicate whether they had considered acute or intermediate care on the ninth day of admission or provide a rationale for delaying access to clinically indicated inpatient care.

**Patient B**

This 49-year-old patient's healthcare record was reviewed to assess the quality of care provided in the CSP/Solano MHCB. The MHCB preadmission SRASHE completed on August 6, 2023, assessed the patient with low chronic and high acute suicide risk. The patient reported a plan of jumping from the upper tier or hanging himself with a sheet to end his life on that date. Precipitants to the patient's suicidal thoughts included a pending divorce and a PREA investigation.

The patient transferred to CSP/Solano for MHCB placement on August 7, 2023. The primary clinician completed their initial assessment on August 7, 2023. The psychiatrist completed their initial assessment on August 8, 2023, and prescribed Abilify and Zoloft.

The patient's psychiatric diagnosis was not clarified prior to MHCB discharge, despite the IDTT documenting a plan to address diagnostic uncertainties during the current admission. The IDTT specifically noted that they were in the process of ruling out "Bipolar, Depression, and Schizoaffective Disorder," while psychiatric diagnoses documented in various progress notes during the MHCB placement variably included adjustment disorder, unspecified depression, and unspecified psychosis.

MHCB IDTT meetings occurred on August 8, August 15, and August 20, 2023. The treatment plan targeted suicidal thoughts, indicating that suicidal ideation would be reduced by "fostering a therapeutic alliance by empathizing with the patient's feelings of distress." On August 15, 2023, the IDTT appropriately acknowledged positive higher level of care referral indicators, and the nonreferral rationale stated that they were focusing on medication management. On August 22, 2023, the IDTT attributed their decision not to refer the patient for inpatient care to a pending investigation of the patient's reported safety concerns. The IDTT also documented that they had arranged for a sergeant to meet with the patient for an investigative interview the following day on August 23, 2023.

Progress notes suggested that the patient actively participated in mental health services during the MHCB stay and had stabilized during the 28 days in the MHCB. The SRASHE and safety plan were updated prior to discharge. The IDTT discharged the patient to the EOP level of care on or around August 29, 2023.

Despite retaining the patient in the MHCB for three weeks, the IDTT did not clarify the patient's psychiatric diagnosis or appropriately modify the treatment plans. Of note, various psychiatric symptoms documented prior to and during the MHCB placement suggested that the patient met the criteria for diagnoses of major depressive disorder, anxiety disorder, and PTSD; and that opinion was shared by the receiving treatment team at San Quentin following the patient's MHCB discharge and transfer.

**Findings**

The overall care and treatment provided to this MHCB patient was adequate.

The IDTT implemented interventions to address self-harm concerns, safety concerns, and medication needs. Additionally, although treatment planning was vague; progress notes suggested that the PC implemented appropriate therapeutic interventions during clinical contacts. The treatment team, however, should have followed through with the IDTT plan to clarify the patient's diagnosis during the three-week admission; this clarification was important, as it would result in identifying specific treatment needs or objectives and in developing effective treatment plans. Further, MHCB clinicians needed documentation training with supervisory oversight; specifically, to address higher level of care nonreferral rationales, clinical summaries, and treatment planning.

**Patient C**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the CSP/Solano MHCB. The preadmission evaluation, dated July 19, 2023, described the patient as incoherent and delusional; and the patient transferred to CSP/Solano for MHCB admission due to grave disability concerns on or around July 20, 2023.

The MHCB primary clinician completed their initial assessment timely on July 20, 2023. While psychiatry completed a more detailed initial progress note on that date, a complete initial psychiatric assessment was not located in the healthcare record. The patient was seen by several

different psychiatrists during the extended MHCB placement; however, they consistently declined treatment with psychotropic medication.

The MHCB provider progress notes consistently referenced psychotic symptoms that were distressing to the patient and resulted in agitation toward custody and healthcare staff.  The MHCB staff routinely documented objective signs of response to internal stimuli, disruptive behaviors, grandiose, paranoid and distressing delusions, hallucinations, impaired functioning, and victimization concerns due to his mental status if discharged to the outpatient setting. Clinicians also consistently documented the presence of paranoid delusional thinking and other perceptual disturbances involving custody staff; they noted that the patient became increasingly agitated when officers walked by his cell window.  A common perceptual disturbance reported by the patient during MHCB admission involved custody officers "eating babies," and the patient would at times become agitated with mental health staff for not acknowledging the perceived incidents.

On August 4, 2023, the IDTT referred the patient to an acute care program.  However, on August 7, 2023 (day 19 in the MHCB), the acute care referral was rescinded after receiving feedback from the IRU.  On that date, a provider indicated that the referral was rescinded as the diagnosis of schizophrenia was provisional, and there was the opinion that the patient did not meet the criteria for referral based on his attention to ADLs.  Although the IDTT submitted a referral for intermediate care on August 7, 2023, this referral was also reportedly rescinded in response to IRU feedback.  Yet, despite providers continuing to suggest that they believed the patient required a higher level of care, inpatient referrals were not pursued any further, and there was no reference to an attempt to coordinate a CCAT to address the observed concerns.  Of note, the MHCB documentation intermittently described both referrals as "rejected" and "rescinded."  For example, during September 2023, the IDTT included in their higher level of care nonreferral rationale, "rejected referrals for APP and ICF."

Also on August 7, 2023, an MHCB clinician documented that further treatment was needed to address delusions and medication nonadherence; the clinician further stated that the patient might require an evaluation for a PC 2602 involuntary medication order However, despite MHCB staff documentation of ongoing grave disability concerns, distressing psychotic symptoms, and treatment refusals for more than 30 days in the MHCB; psychiatry did not pursue an involuntary medication order until more than one month after the current MHCB admission.  Additionally, the IDTT had not clarified the patient's diagnosis during the extended MHCB admission, despite a clinician listing the lack of diagnostic clarification as one barrier to successfully referring the patient to a higher level of care.

On August 16, 2023, the IDTT noted that psychiatry intended to pursue a nonemergent involuntary medication order.

During late August and early September 2023, MHCB progress notes continued to reference distressing psychotic symptoms and increased agitation toward staff.  For example, on September 5, 2023, a clinician documented the patient's report that he observed officers outside his window consuming babies and demanded that the clinician "stop playing fucking stupid and do something about it." The MHCB IDTT documentation during this period continued to suggest

that a higher level of care was indicated; however, no referral was pursued. A September 2023 IDTT note referenced the treatment team's contemplation of submitting another referral while alluding that the reluctance to submit a new referral stemmed from the past perceived rejections, which upon clarification were actually rescissions.

Of note, the treatment plan modification following the rescinded referrals stated only that providers would continue to offer medications and opportunities for treatment adherence to reduce the patient's impairing psychosis and to evaluate discharge to a lower level of care.

More than two months after the current MHCB admission on September 19, 2023, the involuntary medication order was granted due to grave disability. The patient reportedly exhibited improvement in response to medication treatment. Although his delusions remained, they were reportedly less distressing. The patient was discharged to the EOP level of care on October 5, 2023. Of note, the MHCB IDTT neither clarified the patient's diagnosis prior to discharge, recommended diagnostic clarification in the discharge summary, or explained the lack of diagnostic clarification after over two months of observation in the MHCB.

Following MHCB discharge, the patient transferred to CMC and was placed in the ASU EOP hub. The CMC treatment team changed his diagnosis to schizoaffective disorder, bipolar type, during the initial IDTT meeting.

**Findings**

The care and treatment provided to this MHCB patient was inadequate.

Diagnostic uncertainties were not resolved after two months of observation in the MHCB, treatment plans were insufficient, involuntary medication was not pursued timely, and inpatient referrals were not appropriately pursued to the point of rejection and or CCAT/appeals process. Further, the higher level of care referrals should not have been rescinded given the patient's continued psychosis and lack of improvement. The IDTT continued to suggest that, but for the rescissions or perceived rejections, they would have submitted another referral for a higher level of care.

Additionally, the higher level of care non-referral rationales were also consistently inadequate and raised concerns about providers' clinical judgment and willingness to advocate appropriately for patients under their care. For example, on August 16, 2023, the higher level of care nonreferral rationale provided by the IDTT conveyed the psychiatrist's intention to pursue a nonemergent involuntary medication order; however, this nonreferral rationale was insufficient given the patient's persistent instability, substantial length of the MHCB stay for nearly one full month in the most restrictive setting, and the average time for organizing a nonemergent hearing. Uncertainty appeared to surround both the anticipated outcomes of the involuntary medication hearing and the patient's potential response to psychotropic medication.

As a result of the IDTT's failure to appropriately pursue inpatient care or a CCAT, this acutely psychotic patient remained in a very restrictive housing setting without access to adequate care for over 60 days.

**Patient D**

This 35-year-old patient's healthcare record was reviewed to assess the quality of care provided in the CSP/Solano MHCB. The patient was transferred from San Quentin to the CSP/Solano MHCB due to danger to self on or around July 12, 2023. During the preadmission evaluation, the patient informed the mental health staff that his wife and son were killed in a motor vehicle accident one day prior.

According to the patient's healthcare record, his suicide history was significant for attempting to end his life with a gun in 2016 or 2017. The evaluating clinician added that the reported suicide attempt followed a skull fracture in 2016. The MHCB preadmission SRASHE completed at San Quentin resulted in high ratings for both chronic and acute suicide risk. Conversely, a subsequent SRASHE completed by CSP/Solano MHCB staff resulted in a low chronic risk assessment, and that discrepancy was not addressed in the documentation.

The CSP/Solano primary clinician completed their initial assessment in the MHCB timely on July 12, 2023. At the time of the initial PC assessment, the patient reported active thoughts of harming someone else and passive thoughts of harming himself. The PC also described the patient as tearful throughout the interview. The MHCB initial psychiatric assessment was not located in the healthcare record.

The patient was provided diagnoses that included mood disorder and anxiety disorder. He was prescribed low-dose Lexapro for anxiety and Trazodone PRN for insomnia during the current MHCB admission. The treatment team convened for the initial IDTT meeting on July 13, 2023. The initial treatment plan targeted grief, noting that the patient would be provided space to be vulnerable and to process his feelings. At the time of the initial IDTT meeting, the primary clinician documented one positive higher level of care indicator, noting that the patient was not referred due to his new arrival status in the MHCB.

On July 20, 2023, the IDTT convened again and retained the patient in the MHCB. A clinician documented on this date that the patient continued to report symptoms which would make it difficult to program at a lower level of care. Of note, the IDTT had not updated the clinical summary or the treatment plan, despite documenting an overall lack of progress during the eight days in the MHCB. In fact, they did not document any plans for care on that date, including whether they were considering referral to a higher level of care.

A review of PC progress notes suggested that all but one PC contact occurred at the cell front between July 13 and July 31, 2023. Only one of those PC progress notes referenced implementation of a therapeutic intervention. Of note, on July 28, 2023, the cell-front contact by the PC was attributed to a lack of available custody officers for escorting.

On July 27, 2023, day 15 of the current MHCB admission; the IDTT determined that the patient's presentation and lack of progress during the extended admission warranted referral for acute care. Although the treatment plan in the higher level of care section was updated to include measurable and clearer objectives on that date, the IDTT failed to include therapeutic interventions in the treatment plan.

The acute referral for this patient was rejected by the CMF-PIP on August 2, 2023. A CCAT occurred on August 4, 2023, to discuss the rejection, and the verbal argument by the CSP/Solano clinicians was persuasive and resulted in CMF-PIP's acceptance of the referral.

The patient transferred to the CMF-PIP on or around August 7, 2023, where he was retained through November 16, 2023.

**Findings**

The overall care and treatment provided to this patient during the three-week MHCB placement at CSP/Solano was inadequate.

While the IDTT referred the patient to a higher level of care on day 15 of his MHCB placement and appropriately utilized the CCAT process following the initial rejection; the IDTT did not modify treatment plans or refer the patient to a higher level of care timely to address his lack of progress toward stabilization. The initial treatment plan was vague and was not updated until after the patient was referred to a higher level of care; clinical summaries were not updated as required, and therapeutic interventions beyond medication management were largely absent. Additionally, the MHCB psychiatric staff did not complete a formal initial psychiatric assessment. Lastly, the expert found it difficult to identify new information in the PC's progress notes due to their practice of pulling forward a significant amount of text from prior documents.

**Patient E**

This 37-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at the CSP/Solano MHCB. The healthcare record referenced a significant history of psychotic illness with poor insight regarding his mental illness and the need for psychotropic medication treatment. Prior to the current MHCB admission, the patient had two recent MHCB admissions at CMF with lengths of stay exceeding 10 days. Progress notes also indicated that his outpatient psychiatrist had considered pursuing an involuntary medication order but did not have time to observe the patient in the outpatient setting due to his frequent MHCB admissions. The two recent CMF MHCB admissions were prompted by concerns of psychosis and danger to others, both were initiated based on referrals from housing unit nursing staff. The outpatient nursing staff at CMF had referred the patient after observing him shouting at unseen people, exhibiting erratic and threatening behaviors, refusing medication, annoying other inmates, and being disruptive in the housing unit.

The first of the three recent MHCB admissions due to grave disability and danger to others occurred from April 14, 2023, to May 15, 2023, and the second admission occurred from May 24, 2023, to June 10, 2023. During those two CMF MHCB placements, the MHCB nursing staff documented that while the patient denied psychiatric symptoms, he was observed responding to internal stimuli/auditory hallucinations. Further, the patient had not participated in MHCB services, continued to exhibit active and distressing psychotic symptoms, refused medication, and had not stabilized or achieved his treatment goals. It was also documented that the CMF psychiatrist had considered but did not pursue an involuntary medication order prior to the

MHCB discharge.  Ultimately, despite evidence in support of a higher level of care referral and an involuntary medication order, the CMF MHCB IDTT did not pursue either, and the patient was discharged based upon opinions that his psychotic symptoms were at baseline.

Prior to completing the post-MHCB discharge five-day follow-up contacts after the second admission, the patient transferred to CSP/Solano for his third MHCB admission within a two-month period on June 13, 2023.  The patient had no active psychotropic medication prescribed at the time of the MHCB admission.  A diagnosis of schizophrenia was continued.

The initial CSP/Solano MHCB IDTT clinical summary dated June 14, 2023, indicated only that the patient denied mental health symptoms and stated that he did not need medications.  During the initial IDTT meeting, it was noted that the patient remained actively psychotic and met at least two higher level of care referral indicators, including three MHCB admissions and requiring 24-hour nursing supervision.  Notably, the documentation suggested that the patient also demonstrated that he was unable to function in the outpatient setting due to his psychosis and related risks of harm to himself and others.  While there was sufficient documented evidence to support an inpatient referral and pursuit of involuntary medication at the time of the initial MHCB IDTT during this third admission; the nonreferral rationale by the IDTT indicated only that the patient was retained for further assessment through June 21, 2023.

The patient did not participate in MHCB services and continued to refuse psychotropic medication during the first week of his MHCB admission.  However, on June 21, 2023, the patient agreed to take medication to avoid transfer to an inpatient care facility.  On this date, he was prescribed Zyprexa, and the patient was described as medication adherent during the remainder of the MHCB stay.

The patient was retained in the MHCB for an additional week of monitoring.  He was ultimately discharged to the EOP level of care and transferred to San Quentin on or around June 28, 2023.  The discharge summary suggested that his psychotic symptoms and functioning had improved prior to discharge.

**Findings**

The overall care and treatment provided to this patient was inadequate.

The documentation suggested that the patient should have been referred to a higher level of care and that an involuntary medication order for grave disability and danger to others should have been pursued prior to his third MHCB admission at CSP-Solano.  The CSP/Solano MHCB IDTT should have submitted the higher level of care referral at the time that the patient met HLOC criteria; rather than initially treating the third admission as the first chance to monitor his need for inpatient care.  A higher level of care referral could be rescinded if a patient stabilized during the MHCB stay or remain in place for timely transfer if the patient remained unstable for discharge to the outpatient setting.  Of note, all three recent MHCB admissions were extended beyond ten days due to the patient's instability and lack of progress during the first week of MHCB placement.

Additionally, the MHCB treatment plans remained vague and did not include measurable goals or clear interventions. Higher level of care nonreferral rationales were insufficient for addressing the positive referral indicators. While the threat by the MHCB IDTT for inpatient referral proved effective in obtaining medication adherence; there was an absence of subsequent interventions during individual encounters to increase the patient's insight and intrinsic motivation for medication adherence post-MHCB discharge.

**Patient F**

This 39-year-old patient's healthcare record was reviewed to assess the quality of care provided at CSP/Solano's MHCB. The patient was admitted to the MHCB due to suicidal ideation with a plan which he attributed to prolonged placement in restricted housing. He was provided diagnoses of antisocial personality disorder, borderline personality disorder, unspecified anxiety, unspecified schizophrenia spectrum and other psychotic disorder and amphetamine-induced psychotic disorder. He had not been prescribed psychotropic medication in the past two years.

The patient denied suicidal ideation and plan during initial assessments by the PC and psychiatrist, and he indicated surprise that he was admitted to the MHCB from the PSU. He reported that he had experienced peer stressors while housed in the PSU. During the initial IDTT meeting, an IPOC that targeted danger to self was initiated with an associated goal of learning appropriate methods for meeting his needs. Interventions of utilizing goal setting and cognitive behavior therapy to address distress tolerance were established.

This was the patient's fifth MHCB admission in 2023, and the third MHCB admission in six months; however, those higher level of care indicators were not noted by the IDTT. There was no documentation that the IDTT considered the multiple MHCB admissions and any underlying reasons that might have contributed to the multiple admissions. The rationales provided for maintaining the patient at his current level of care and nonreferral to a higher level of care were insufficient and merely noted that this was the initial IDTT meeting and that the patient would be retained for further assessment and treatment.

While daily clinical contacts were conducted by four different providers, the clinical documentation of those contacts was sufficient for the provision of continuity of care. It should be noted, however, that the September 8 and September 10, 2023 psychiatric documentation was relatively unchanged. The patient denied mental health concerns during clinical contacts, including suicidal ideation. Within four days of the MHCB admission, the patient requested discharge. The documentation indicated that clinical interventions were rarely offered, and much needed dialectical behavior skills were only discussed during one clinician contact.

The MHCB discharge IDTT meeting that occurred on September 14, 2023 did not provide a sufficient summary of the course of treatment or the patient's treatment needs during the MHCB stay. Specifically, it was documented that the patient denied suicidal or homicidal ideation and noted that the patient had appropriate behavior, no RVRs and was generally compliant with staff requests. The documentation further noted that the IDTT assessed the patient to be appropriate for discharge to the EOP level of care and that five-day follow-up contacts would occur.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient did not require prolonged housing in the MHCB and should have been discharged once stabilized. Further, the patient's treatment needs in the context of multiple MHCB admissions were not appropriately considered, nor did he receive much needed evidence-based dialectical behavior therapy for a long-standing pattern of poor distress tolerance and emotion dysregulation during the MHCB stay. Additional support and consultation, such as a CCAT meeting, was needed to discuss the patient's functioning and care during the past year and to develop a targeted treatment plan to assist him with improvement in distress tolerance, impulsivity and emotion dysregulation skills. This was particularly important in the context of the patient's lengthy restricted housing placement. Lastly, the discharge documentation was not useful for the provision of continuity of care.

**Patient G**

This 33-year-old patient's healthcare record was reviewed to assess the quality of care provided at CSP/Solano MHCB. He was provided a diagnosis of amphetamine-type substance induced psychotic disorder and unspecified schizophrenia spectrum and other psychotic disorder. The patient was not prescribed psychotropic medication prior to the MHCB admission, but he was prescribed Remeron soon after admission for which he was adherent.

The patient was admitted to the MHCB due to psychotic and disorganized behavior; the inpatient consult noted that the patient presented with yelling, disruptive, argumentative and unpredictable behavior, rapid speech, and persecutory delusional thinking. Further, he was unable to respond appropriately to questions, made inappropriate sexual comments and engaged in "throat singing and reciting the pledge of allegiance." He made vague threats and requested transfer to the secure housing unit. He denied suicidal ideation and initially refused treatment with psychotropic medication.

The initial clinical assessment documentation focused on the patient's functioning prior to the MHCB admission; documentation regarding his previous mental health history and current clinical presentation was limited. The initial psychiatric assessment documentation regarding auditory hallucinations was discrepant; although it was documented that the patient was vague in his description of the hallucinations that he experienced, the documentation also stated that the patient had no auditory or visual hallucinations. Some information in the PC initial assessment was copied from other sources without identification that the information was historical. The sole IPOC targeted treatment nonadherence but was not individualized to the patient's treatment needs. Needed treatment areas were not targeted, and the goals associated with the treatment nonadherence IPOC were generic.

Daily contacts were provided by various providers. Most of the documentation was overly brief and did not produce a sufficient description of the patient's functioning, and the documentation was not indicative of a therapeutic clinical contact. The patient refused several clinical contacts and was seen at the cell front; however, no assessment of the reason for refusal was documented to determine if paranoia contributed to the treatment refusal.

The discharge IDTT documentation did not provide a summary of the MHCB treatment course or treatment progress, and much of the clinical documentation remained unchanged from the initial treatment plan. Further, some documentation was erroneous; despite clearly refusing daily contacts between September 10, 2023 and September 14, 2023, the IDTT documentation indicated the patient had attended his mental health appointments. The patient was discharged from the MHCB to the EOP level of care.

**Findings**

The care and treatment provided to this patient were inadequate.

Diagnostic clarification with rationale for the provision of diagnoses was needed to better determine whether the patient's psychosis was substance related and to direct treatment planning. In addition, the initial assessments were inadequate, and the initial treatment plan was not individualized. Daily provider contacts did not include treatment interventions and were generic when documented. Further, sufficient clinical information for treatment planning or continuity of care was lacking. The lack of useful clinical documentation was particularly concerning, as the patient was seen by multiple providers for initial assessments, IDTT meetings and daily contacts. Additionally, the discharge IDTT documentation was insufficient and not useful in the provision of continuity of care.

**Patient H**

This 57-year-old patient's healthcare record was reviewed to assess the quality of care provided at CSP/Solano MHCB.

The patient had a long history of mental illness with treatment at various levels of care in CDCR, as well as a history of receiving his medications by a PC 2602 involuntary medication order. He was referred to the MHCB due to manic symptoms and threatening others; the patient also reported that he planned to shoot himself when he was paroled on October 13, 2023, less than a month away. It was documented that the patient had recently been discharged from an MHCB due to a similar clinical presentation.

The initial psychiatric assessment was comprehensive and included relevant psychosocial history. The patient had a long-term diagnosis of schizophrenia; for this reason, it was unclear why the diagnosis was changed to depression with a provisional diagnosis of bipolar II disorder, without clinical rationale provided during the initial psychiatric evaluation. Of note, this diagnosis was not updated in EHRs where the diagnosis of schizophrenia remained. Cymbalta was changed to Abilify with sufficient clinical rationale for this medication change provided.

The primary clinician initial assessment lacked sufficient detail regarding the patient's clinical presentation upon MHCB admission. Much of the documentation was copied from the referring clinician or pre-populated from an unknown source. The brief case conceptualization that the patient's history of drug use possibly contributed to his mental health symptoms was insufficient. No IPOCs were initiated by mental health during the initial IDTT meeting.

Daily contacts generally occurred with the assigned provider, and the documentation was clinically useful; although, treatment interventions other than medication management were

needed. During the MHCB stay, the patient continued to report a suicidal plan upon prison release; however, those declarations lessened. The day prior to MHCB discharge, the patient reported that the urgency he felt regarding suicide had subsided. The documentation noted that the patient "may shoot himself if things don't work out in the community;" however, it was also noted that the patient was future oriented and anticipated continued mental health treatment upon release from prison. The patient also discussed plans for managing his remaining time in CDCR.

The patient was discharged to the EOP level of care on September 29, 2023. The primary clinician discharge summary provided a useful summary of the MHCB treatment course; although, that information was not included in the discharge IDTT documentation, nor was rationale for MHCB discharge documented. A SRASHE was completed that assessed moderate chronic risk, which was likely an underestimation of risk; and the assessment of acute risk was unclear, as it was noted as both low and moderate. The safety plan failed to consider that some protective factors could also be experienced as risk factors. Insufficient clinical rationale was provided for the discharge diagnosis of schizoaffective disorder.

As the patient's CDCR release date was imminent, clinician to clinician telephone contact was clinically indicated to highlight the urgency of the patient's discharge planning and need for treatment to enhance his coping skills upon release; however, no contact was documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient's symptom acuity improved; although, his plan for suicide remained a possible option. Throughout his MHCB stay, he did not receive needed treatment for his distress associated with prison release. The decision to discharge the patient from the MHCB with approximately two weeks remaining on his prison sentence was an area of concern given his lack of support and treatment needs. The IDTT did not document consideration of continued care in the MHCB, nor was there evidence that staff at the receiving institution were contacted to ensure appropriate individualized treatment and continuity of care considering the imminent prison release.

Additional areas of concern included the primary clinician initial assessment, treatment planning and IDTT documentation that were all insufficient. The suicide risk assessment and safety planning also required improvement.

**Patient I**

This 49-year-old patient was admitted to the MHCB on September 13, 2024. He was prescribed Celexa, BuSpar and Vistaril for symptoms of anxiety and depression. He was provided diagnoses of antisocial personality disorder and major depressive disorder, in partial remission. His healthcare record was selected from the MHCB admission roster to assess the adequacy of care provided.

The patient returned to CDCR in July 2022, after he was released on parole in 2017. He was admitted to the MHCB after making a homicidal statement when he was told that he would share a cell with a peer. During the primary clinician initial assessment, he reported increased anxiety

and depression regarding his current life sentence. He reported that he was unable to manage life with a cell mate and would hurt someone to facilitate single cell placement.

The documentation of provider initial assessments was not comprehensive. The primary clinician initial assessment included outdated clinical data; documentation from the reception center assessment in August 2022 was copied into the document, and a summary of the patient's functioning between August 2022 and September 2023 when he was admitted to the MHCB was not included. The initial psychiatric assessment was overly brief in content and was similarly outdated.

An IPOC for danger to others was appropriately initiated; although, associated goals were generic, and no interventions were developed. Although anxiety, depression and grief were identified as treatment needs, no such IPOCs were developed. Similarly, aside from psychotropic medication treatment, no clinical interventions were offered. Further, during a September 16, 2023 PC contact, the clinician documented that the patient was encouraged to address distress tolerance and grief with his next clinician; the clinician failed to address those treatment needs with the patient during that contact.

The four daily provider contacts occurred with three different clinicians. Shortly after MHCB admission, the patient reported improved mood and coping and indicated regret for making the homicidal statement. However, contributing factors for his improved mental state were not assessed. Of note, on September 15, 2023, the daily provider contact occurred at the cell front at the request of custody "due to difficult behaviors in previous 2 days;" however, the details of that behavior were not documented.

At the MHCB discharge IDTT meeting on September 18, 2023, the patient was discharged to the 3CMS level of care.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial assessments, treatment planning and treatment offered were insufficient. The rationale for the cell front contact and discharge to the 3CMS level of care was needed.

**Patient J**

This 26-year-old patient's healthcare record was reviewed to assess the quality of care provided at CSP/Solano's MHCB. He was admitted to the MHCB due to continued suicidal ideation with a plan. The patient had a long history of opioid and methamphetamine use. He was provided diagnoses of unspecified depressive disorder and opioid use disorder.

The patient was treated at a different MHCB between August 24, 2023 and September 2, 2023 due to suicidal ideation that occurred after a fight with a peer with whom there was a previous PREA allegation. The patient reported that he was fearful for his life and would harm himself before allowing someone else to harm him. During that previous MHCB stay, despite requesting treatment, he was generally treatment resistant including refusal of psychotropic medication. His safety concerns were assessed but were not substantiated by custody staff. At the time of MHCB

discharge, the patient continued to report suicidal ideation that was determined to be manageable at the EOP level of care. Shortly after arrival to the EOP institution, he reported chest pain and was cleared by medical staff; however, he subsequently reported suicidal ideation. A SRASHE documented the presence of conditional suicidal ideation that would subside if the patient was provided a single cell and his tablet. The following day, the patient again reported suicidal ideation with a plan and increased distress; this resulted in the current MHCB admission.

The provider's initial assessments included brief information regarding the patient's current mental status and familial stressors; however, a sufficient review of recent and historical mental health treatment was not documented. Vistaril was continued at the time of the initial psychiatric assessment; however, there was no documentation that discussion regarding alternative medication treatment occurred. An IPOC for danger to self was appropriately initiated; however, associated goals were not individualized, and treatment interventions were not established. IPOCs for anxiety and/or depression, although clinically indicated, were not initiated.

Early in the MHCB stay, the patient reported continued suicidal ideation with a plan to overdose with heroin. As with his previous MHCB admission, he indicated a need for treatment but was unable to specify his specific needs. He continued to express concern about return to the sending institution which remained a possible discharge placement. On September 7, 2023, he engaged in head banging and was prescribed oral Ativan and Zyprexa. On September 8 and September 11, 2023, the patient reported auditory hallucinations; although, documentation on September 11, 2023 noted that he did not appear responsive to internal stimuli.

During the September 12, 2023 IDTT meeting, the patient was referred to the ICF level of care, and no rationale was provided for the ICF referral. The inpatient referral documented the patient's ongoing suicidal ideation with plan, as well as institutional stressors including the PREA incident and safety concerns; however, the symptoms documented in the inpatient referral were not representative of the clinical presentation around the time of the ICF referral, including documentation of suicidal ideation with a plan, expressed hopelessness and feeling trapped. The daily provider contacts continued pending the ICF transfer, and the documentation noted improvement in the patient's mental status.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient's treatment needs were not appropriately addressed. The initial assessments were insufficient for adequate conceptualization of the patient's treatment needs, and the MHCB IDTT did not sufficiently offer treatment interventions for stressors and symptoms. There was a lack of multidisciplinary collaboration, assessment and problem solving regarding reported safety concerns, which were the documented impetus for the patient's suicidal ideation. The rationale for ICF referral was unclear, and the referral documentation was inconsistent with the patient's clinical presentation at the time of referral. It was also unclear how an ICF admission would address the underlying, situational factors that contributed to the patient's distress.

**Patient K**

This 28-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CSP/Solano. The patient was provided a diagnosis of unspecified anxiety disorder. The patient was not prescribed psychotropic medications.

The patient entered CDCR for his first incarceration at WSP reception center on November 29, 2022 with an EPRD of May 29, 2024. He arrived at CSP/Solano from WSP on January 23, 2023. Upon his arrival at CSP/Solano, he was provided a diagnosis of adjustment disorder with anxiety. At the time of arrival, the patient reported racing thoughts, difficulty concentrating, chronic worrying, irritability, anger, and aggression. He was placed at the 3CMS level of care at WSP and did not have a history of community mental health treatment prior to his incarceration. He denied any history of suicide attempts or self-harm behaviors.

The initial PC assessment occurred timely on January 31, 2023 in a confidential setting. The assessment was completed appropriately and included a comprehensive psychosocial history. The assessment informed the treatment plan. The patient was described as stable.

The initial psychiatric assessment occurred in a confidential setting on February 1, 2023. The patient reported that he entered the MHSDS due to racing thoughts and depression. He denied anxiety and reported that he coped with his symptoms by reading, working, and listening to music. The patient was described as stable, and he declined treatment with psychotropic medications.

The initial IDTT meeting occurred timely on February 1, 2023, and the meeting included the necessary participants and the patient. The PC and psychiatrist were physically present at the IDTT meeting. Although outside the review period, the IDTT meeting was reviewed to provide context. The IDTT updated the patient's diagnosis to unspecified anxiety disorder, and the treatment plan included an IPOC for anxiety. The treatment goals were measurable and appropriate and included reduction and management of anxiety symptoms through identification and development of healthy coping skills and emotional regulation strategies. Specific theoretical modalities and interventions were not provided in the treatment plan. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The treatment team provided appropriate level of care justification and discharge criteria. There were no concerns reported by custody staff.

During the review period, the patient was seen twice for routine PC contacts. The PC contact on May 1, 2023 occurred timely but it did not occur in a confidential setting due to quarantine. The PC contact on August 7, 2023 occurred in a confidential setting but occurred six days late. The patient reported minimal symptoms during the PC contacts; and the PC provided support and appropriate counseling to the patient that assisted in processing his feelings effectively. There was appropriate documentation and tracking of IPOCs and treatment goals during the PC contacts.

The patient was not required to be seen for routine psychiatric contact during the review period.

The patient did not acquire any RVRs or unusual incidents during the review period and remained generally stable and engaged with his PC.

**Findings**

The care and treatment provided to this 3CMS patient were adequate.

Although one of the PC contacts occurred late, the patient was seen timely for the initial PC and psychiatric contacts. The treatment plan included appropriate goals for the patient's presentation and symptoms and included appropriate level of care justification, discharge criteria, and clinical summary. The PC contacts were well documented, and the treatment goals and progress were updated appropriately.

**Patient L**

This 67-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CSP/Solano. The patient was provided a diagnosis of persistent depressive disorder. He was prescribed Celexa and Vistaril.

The patient was incarcerated in CDCR since 2006, and he entered the MHSDS at the 3CMS level of care in 2008. He had no history of higher level of care placements or referrals. His primary symptoms included sadness, anxiety, lack of concentration, and insomnia particularly around the anniversary of the death of his son. His history was significant for one episode of suicidal ideation when he was initially incarcerated, but he denied suicidal ideation since that time and never attempted suicide while in CDCR.

No IDTT meetings were scheduled during the review period; the most recent IDTT occurred on January 18, 2023, and the documentation of that IDTT was reviewed for context. The treatment plan included an IPOC for depressed mood with individualized treatment goals and interventions that were appropriate and measurable. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. Level of care justification and discharge criteria were appropriate, and the patient reported motivation to continue participation in treatment.

One routine psychiatric contact occurred during the review period. The psychiatric contact occurred in a confidential setting. The patient was reportedly stable without medication concerns. The patient and psychiatrist discussed the patient's coping skills and activities. The psychiatrist continued the patient's medications unchanged with planned follow-up in 90-days. Another routine psychiatric contact should have occurred prior to the end of the review period; however, that contact did not occur until November 7, 2023.

Two routine PC contacts occurred during the review period, and neither PC contact occurred timely. At each of the PC contacts, the patient was reportedly stable; however, the treatment goals and IPOCs were not updated in the PC progress notes, but the documentation did indicate the provision of therapeutic interventions in the treatment plan.

The patient was not offered groups during the review period.

**Findings**

The care and treatment provided to this 3CMS patient were inadequate.

The PC and psychiatric contacts did not occur timely. Additionally, the PC progress notes did not include updates to the treatment plan goals at each contact.

**Patient M**

This 41-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care at CSP/Solano. The patient was provided diagnoses of antisocial personality disorder, PTSD, unspecified anxiety disorder, and unspecified depressive disorder. He was prescribed Remeron and prazosin.

The patient arrived at CDCR for his third term in July 2021, and he arrived at CSP/Solano from SVSP on November 2, 2022. He entered the MHSDS at the 3CMS level of care at reception in August 2021 due to receiving mental health treatment in a county jail. The patient's primary symptoms included anxiety, depressed mood, nightmares, flashbacks, and hypervigilance. He also reported occasional fleeting suicidal thoughts but denied recent suicidal ideation or a history of suicide attempts.

The patient was seen for three psychiatric contacts during the review period; those contacts occurred timely in a confidential setting. It appeared from the progress notes that the routine psychiatric contacts on April 10, 2023 and June 10, 2023 were provided in-person by the patient's treating psychiatrist; however, the psychiatric contact on September 29, 2023 was provided by a covering telepsychiatrist. The progress notes completed by the patient's treating psychiatrist were very brief and did not include informative updates to the patient's subjective presentation, and most of the notes were pulled forward from previous notes. The documentation by that psychiatrist revealed a pattern of inadequate documentation. For example, the notes indicated that the patient was not medication adherent but do not include details about the reasons for the nonadherence, and an April 10, 2023 note only stated "Patient did not have his medications renewed on March 25 when they expired, here to have his medications renewed today" with no further explanation or rationale provided. The progress note by the covering telepsychiatrist was much more comprehensive and provided appropriate and relevant clinical information.

The patient was seen for two timely PC contacts during the review period on April 18, 2023 and June 22, 2023; however, subsequent PC contacts did not occur timely. The PC contacts during the review period occurred in-person in a confidential setting. The contact on April 18, 2023 focused on ensuring that the patient received his medications, and the June 22, 2023 progress note indicated that the patient processed trauma related to his PTSD and was provided appropriate therapeutic support as well as psychoeducational PTSD reading materials. The progress note did not include updates to the treatment goals or the status of the IPOCs. At both contacts, the patient was described as stable.

The patient was not offered groups during the review period.

**Findings**

The care and treatment provided to this 3CMS patient were inadequate.

The psychiatric progress note documentation was inadequate and poorly completed. The progress notes did not include any subjective observations or narrative about the content of the sessions, even when the patient demonstrated medication nonadherence resulting in medication discontinuation. When the patient's medications were restarted, no explanation or rationale was documented regarding the nonadherence. The patient was not seen timely by the PC during the latter portion of the review period, and the PC progress notes did not include updates to the patient's treatment progress or the IPOC status.

**Patient N**

This 38-year-old 3CMS patient's healthcare record was selected to assess the care provided at CSP/Solano. He was provided diagnoses of schizophrenia and cannabis use disorder, moderate, and was prescribed Abilify. The patient arrived at CSP/Solano from NKSP on September 28, 2023, at the 3CMS level of care.

The patient was seen timely by his PC for an initial assessment on October 10, 2023. The assessment noted that the patient was placed at the 3CMS level of care as he was prescribed psychotropic medication while at a county jail. Additionally, he was provided a diagnosis of schizophrenia following a brief community hospitalization after a suicide attempt. The CSP/Solano PC continued the diagnosis of schizophrenia but documented that the patient's primary complaint was anxiety that he subjectively rated less than his depression.

The patient was not seen by his assigned psychiatrist until after the initial IDTT meeting. During that psychiatric contact on October 19, 2023, the patient reported three psychiatric community placements. He continued to report high levels of depression and intermittent auditory hallucinations. The patient presented with delusional thinking at both the psychiatric and PC initial assessments, with paranoid ideation that the spirits of people wanting to harm him emanated from a reality television show that appeared in the form of custody staff. Reportedly, when taking Abilify, the patient experienced side effects; after a decrease in the medication dosage, he reported improvement in his hallucinations.

The initial IDTT meeting occurred on October 11, 2023, and the meeting included the assigned PC and psychiatrist, a correctional counselor, and the patient. The treatment plan was limited by the use of inappropriate and subjective treatment goals and extremely limited interventions. For example, while establishing a therapeutic rapport was an appropriate foundational goal; encouraging the patient to work on improved functioning was not actually an intervention linked to any of the problem areas. Additionally, those interventions would have been better characterized as goals with specific evidence-based interventions such as CBT to address irrational thoughts underling perceived threat. The IDTT did not include pre-release planning in

the treatment plan, despite the patient's upcoming release date. The treatment plan did include the development of a recovery plan as a goal of treatment for substance abuse.

The patient was only seen once by the assigned PC and psychiatrist following the initial IDTT meeting, and both contacts occurred late; the psychiatric contact occurred five days late, and the PC contact occurred approximately one month late. The documentation indicated that those clinical contacts were essentially brief check ins without the provision of any substantive intervention beyond basic medication management.

**Findings**

The care provided to this 3CMS patient was inadequate.

No clinical rationale was provided by the providers for the diagnosis of schizophrenia beyond stating that the patient had prior psychiatric hospitalizations. Diagnostic clarification was needed, particularly due to the focus on anxiety in the treatment plan despite a lack of clinical specificity in the documentation regarding anxiety. While the patient was seen by the PC prior to the initial IDTT meeting, the psychiatrist did not see him until after the initial IDTT meeting; that delay would significantly limit the psychiatrist's ability to make meaningful contributions in treatment planning. The treatment plan was inadequate, likely due at least in part to the failure to complete a comprehensive assessment and documentation of psychiatric symptoms. Additionally, as baseline measures were never established, the treatment goals were not individualized and were inadequate in addressing the symptoms of schizophrenia which were not fully addressed.

**Patient O**

This 28-year-old 3CMS patient's healthcare record was selected to assess the care provided at CSP/Solano. The patient arrived at CSP/Solano with a diagnosis of schizoaffective disorder, bipolar type, and he was prescribed Zyprexa.

The patient arrived at CSP/Solano on September 28, 2023 from NKSP. Zyprexa was continued by the CSP/Solano psychiatrist at a reduced dosage. The patient had an upcoming release date of January 30, 2024.

The patient was seen before the initial IDTT meeting but one day late by his PC for the initial assessment on October 13, 2023. During that assessment, the patient reported treatment with Zyprexa in the community at age 16. The initial PC assessment documentation was incomplete in some sections, while other sections were of minimal value due to insufficient documentation.

The initial psychiatric assessment also occurred late on November 15, 2023 and after the initial IDTT meeting; this limited the meaningful contribution of the psychiatrist to treatment planning, as the patient was not known to the psychiatrist. The intake assessments indicated that the patient reported that both parents had a diagnosis of schizophrenia, and he was reared in foster care. The patient was uncooperative during the initial psychiatric assessment. Rather than

responding directly to the questions posed by the psychiatrist, the patient repeatedly stated that he was fine and that he did not want to talk.

The initial IDTT meeting occurred on October 18, 2023, and the assigned PC and a covering psychiatrist were present as well as the correctional counselor and the patient. The treatment plan was vague and did not address the patient's specific symptoms and functional deficit. The documentation suggested that the PC justified the minimal information provided and the lack of evidence-based clinical interventions as due to only completing initial assessments and initial treatment planning. That explanation was inadequate, as the treatment plan did not include plans for additional assessment and focus on diagnostic clarity and understanding of the patient's functional deficits. Additionally, the treatment plan did not indicate that the patient would be reevaluated prior to the next annual IDTT meeting in one year, when the treatment plan was due for update.

Not surprisingly, ongoing clinical contacts did not support the utilization of clinical interventions other than medication management.

The patient was seen on December 4, 2023 and January 18, 2024 by different psychiatrists due to medication nonadherence. The patient noted the reason for nonadherence as his displeasure at going to the medication window. The psychiatrist provided psychoeducation to the patient to gain medication adherence. When the patient was seen for follow up on January 18, 2024, he reported that he wanted to continue treatment with Zyprexa. The patient was not seen again by a psychiatrist prior to his prison release.

The PC saw the patient on January 18, 2024 for a routine contact and to complete pre-release planning; that contact occurred only 12 days prior to his release. That was the last PC contact documented prior to the patient's release from prison.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was a lack of continuity in psychiatric care provided to the patient. No clinical rationalization was provided for the diagnosis provided, nor were there documented efforts to obtain prior psychiatric records to clarify the diagnosis. Medication adherence was not included in treatment planning, despite medication nonadherence documented as a consistent issue of concern. Additionally, pre-release planning was not included in treatment planning, despite the patient's upcoming prison release date.

**Patient P**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CSP/Solano. The patient was provided a diagnosis of adjustment disorder with anxiety. He was prescribed Vistaril. The patient arrived at CSP/Solano on September 28, 2023 from WSP.

The initial PC assessment occurred timely on October 6, 2023 prior to the initial IDTT meeting. The initial psychiatric assessment, completed on November 13, 2023, did not occur timely and occurred two weeks after the initial IDTT meeting.

The initial IDTT meeting occurred on October 18, 2023, and the meeting was six days overdue. The assigned PC and psychiatrist were present, as well as a correctional counselor and the patient. The treatment plan focused on anxiety as a target of treatment; although, the treatment team indicated that the patient experienced symptoms consistent with depression and PTSD in addition to anxiety. No actual clinical interventions were included in the treatment plan.

Ongoing clinical contacts documented the provision of minimal therapeutic interventions, and the PC contacts appeared to be brief check-ins. The last PC contact on February 12, 2024 occurred one month late and was not completed by the assigned PC.

During the last psychiatric appointment of the review period, Remeron was ordered PRN. Minimal mental health documentation was present in the healthcare record; this was likely due to the lack of mental health contacts.

**Findings**

The care provided to this 3CMS patient was inadequate.

The mental health care that was provided did not occur timely; and when provided, it was inadequate. For example, the patient reported several symptoms that were not addressed in treatment planning or during clinical contacts. The documentation suggested the need for diagnostic clarification; however, that issue was not addressed in treatment planning or other mental health documentation. The treatment plan required revision to address the patient's most significant psychiatric symptoms rather than only anxiety and should have included actual clinically relevant interventions.

**Patient Q**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CSP/Solano. The patient was provided a diagnosis of opioid use disorder, severe. He was not prescribed psychotropic medications at the time of review.

The patient was seen by mental health prior to the initial intake assessment on October 3, 2023, due to psychotropic medication concerns that the patient expressed, and he was referred to see the psychiatrist.

The patient arrived at CSP/Solano on September 28, 2023 from WSP. The initial PC assessment occurred timely on October 9, 2023, when the patient denied all current psychiatric symptoms. He reported a history of past treatment with psychotropic medications only prescribed for sleep; however, the documentation identified past medication treatment for psychosis and bipolar disorder.

The healthcare record included prior diagnoses of bipolar disorder and ADHD; additional diagnoses were also present in the healthcare record, including other specified bipolar and related disorder, unspecified opioid use disorder, and unspecified amphetamine use disorder.  The patient was not consistently cooperative with mental health staff, and he refused to participate in some or all mental health assessments.  This presented challenges to the IDTT; however, much of the documentation indicated more significant diagnoses than an adjustment disorder.

The initial IDTT meeting occurred on October 11, 2023, when the patient indicated that he wanted to be removed from the MHSDS.  He indicated that he was stable and was not in need of mental health services due to preferred housing and work opportunities.  During the IDTT meeting, the patient denied current symptomatology and functional deficits.  Because of the lack of a qualifying diagnosis and the patient's seemingly adequate functioning; the IDTT discharged the patient from the MHSDS at the initial IDTT meeting.  The patient continued to receive MAT for his opioid use disorder.

The healthcare record documentation was confusing, as there was no internal transfer document or initial health screen in accordance with new arrival requirements.  The clinical documentation did not reconcile previous diagnoses and symptoms with the patient's perceived current level of functioning.  Some mental health documents seemed to conflict with other documents; although ultimately it appeared that the IDTT reviewed the patient's history and was aware of his previous diagnoses.  Despite those discrepancies, the IDTT decided to discharge the patient from the MHSDS due to his request for removal and reported stability.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient was only housed at CSP/Solano for 13 days when he was discharged from the MHSDS.  A review of the healthcare record should have directed the IDTT to conduct further assessment of the patient when he was agreeable.  While the PC documentation suggested that the patient might not require ongoing mental health treatment, there was insufficient clinical documentation in that short period of time to support MHSDS discharge.  The IDTT should have scheduled a follow-up IDTT meeting in one month to allow both the PC and psychiatrist to obtain additional information, to possibly consult with WSP mental health staff, and to assess the patient more fully over time to determine if discharge was appropriate.  If discharge was appropriate, a discharge plan should have been developed and implemented.

**Patient S**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CSP/Solano.  He was provided diagnoses of unspecified anxiety disorder and unspecified opioid use disorder at the time of arrival to CSP/Solano, and he was prescribed Elavil.

The patient arrived at CSP/Solano on September 28, 2023.  The patient was seen by the assigned PC for the initial intake assessment on the same day as the initial IDTT meeting.  It was unclear

if the initial PC assessment and the initial IDTT meeting occurred at the same time. The patient reported that he was provided a diagnosis of PTSD after he was shot, and he reported PTSD symptoms. No diagnosis was provided in the initial PC assessment; however, on October 19, 2023, the psychiatrist provided diagnoses of PTSD and unspecified opioid use disorder. The psychiatrist discontinued Vistaril at the patient's request, and Elavil was continued.

The initial IDTT meeting occurred on October 11, 2023, and the IDTT noted that the primary focus of treatment was anxiety. The treatment plan, however, was not individualized, utilized subjective ratings as outcomes, and was identical to other patient's treatment plans. The treatment plan did not include medication management or any actual clinical interventions.

When seen by the psychiatrist on January 24, 2024, the patient expressed a strong desire to be assigned to treatment groups; however, no treatment groups were included in the treatment plan. The patient was informed that there was a long waiting list for mental health groups.

There was also a lack of continuity in primary clinicians. The last PC contact during the review period on February 20, 2024 reflected that lack of continuity, and the documentation indicated that the contact was essentially an assessment and brief check-in. The documentation also did not indicate implementation of the initial treatment plan or that individual sessions included therapeutic interventions not specified in the treatment plan.

**Findings**

The care provided to this 3CMS patient was inadequate.

Treatment planning was deficient, as only generalized anxiety was addressed in the treatment plan; other PTSD symptoms were not included, and there was no clinical rationale to exclude those symptoms. Even the patient's anxiety was not adequately addressed; instead, the treatment team framed treatment goals as treatment interventions. The treatment plan itself was vague and lacked appropriate individualization to allow providers to implement and to monitor the clinical interventions for effectiveness.

**APPENDIX B – 7**
**AVENAL STATE PRISON (ASP)**
Site Visit: December 5, 2023 – December 7, 2023
Review Period: April 1, 2023 – September 30, 2023

**Patient A**

This 32-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided a diagnosis of bipolar I disorder, most recent episode manic with psychotic features. He was not prescribed psychotropic medications.

On August 3, 2023, the patient's IDTT discharged him from the EOP level of care at his request at his previous prison. He was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and adjustment disorder with mixed anxiety and depressed mood at that time. He was not prescribed psychotropic medications and had not attended programming. On August 28, 2023, two MH-5 routine referrals were submitted by custody officers who noted that the patient was acting bizarrely with evidence of response to auditory hallucinations and social withdrawal.

Prior to being seen by mental health for this referral, the patient was transferred to ASP on August 31, 2023. The initial health screening was completed but failed to recognize that the patient was diagnosed with a mental health condition and was currently receiving mental health services. No referral to mental health was documented in the initial health screening.

Fortunately, the mental health staff at ASP saw the patient on September 3, 2023 in response to the referrals generated at his previous facility. The MHPC noted that the patient had recently transferred to the 3CMS level of care from the EOP. The patient denied symptoms and was assessed with a normal mental status examination. The documentation indicated that the patient would be seen again in 60 to 90 days. On September 6, 2023, an MH-5 referral was submitted by a correctional counselor who noted that the patient was observed pounding his chest and talking to himself. The patient also submitted a request to see mental health staff on the same day "to talk to the mental health lady when the last time I was here in Avenal State Prison."

The patient was seen for an initial psychiatric assessment on September 8, 2023. The patient was presented with symptoms of mania/hypomania and possible psychosis. He refused to take psychotropic medications. The psychiatrist noted that the patient did not meet the criteria for referral to a higher level of care but planned to see the patient again within one week. On September 11, 2023, the patient was seen by an MHPC for an initial assessment and in response to the MH-5 submitted five days earlier. The patient was described with tangential and pressured speech, and he was difficult to redirect. He was provided diagnoses of unspecified mood disorder and unspecified schizophrenia spectrum and other psychotic disorder. The documented plan was to "monitor at CCCMS LOC", and the rationale provided was that the patient did not appear to be in distress or to be responding to internal stimuli. It was documented that the patient appeared motivated to be cleared for transfer to a minimum security yard. A SRASHE was completed and assessed the patient with low chronic and acute suicide risk. The rationale provided for that assessment was adequate.

On September 13, 2023, a mental health request was submitted by another incarcerated individual on behalf of the patient. The request noted that the patient demonstrated "restless erratic behavior followed by bouts of lethargy." The request also noted that the patient wanted to attend groups and to be transferred to the A Yard. The peer included his name and CDCR number and stated that he was willing to speak with the mental health staff about the patient.

An initial IDTT meeting occurred on September 14, 2023 that included the required staff and the patient. An IPOC for impulsive behavior was initiated; however, the goal was not individualized for the patient, and no goals were developed to address his elevated mood and psychotic symptoms. The disposition provided was for the patient to remain at the 3CMS level of care to monitor his symptoms. It was also determined that the patient was not appropriate for a gate pass.

On September 15, 2023, two mental health requests were received that were written by other incarcerated individuals regarding the patient. Both requests noted that the patient exhibited bizarre behavior, including being disconnected from his surroundings, "flaying" his arms, arguing with others who were not visible, not eating and creating a dangerous situation for himself by using inflammatory language. Those requests were referred to mental health by the nursing staff. The patient was seen by the psychiatrist on September 15, 2023; the psychiatrist recommended medications, but the patient declined. The psychiatrist recommended transferring the patient to the EOP level of care at his next IDTT meeting. The psychiatrist provided a diagnosis of bipolar I disorder, most recent episode manic with psychotic features. A clinician who was not the patient's assigned MHPC saw him on the same date in response to the referrals. The recommendation was for the patient to be referred to the EOP level of care; this resulted in the patient becoming "rageful", as he did not agree with the plan. Another MH-5 was submitted on September 17, 2023; the patient was assessed on the same date, and a SRASHE was completed. The decision was made to refer the patient to the MHCB level of care due to grave disability with a recommendation for placement at the EOP level of care upon MHCB discharge. The patient was placed in alternative housing for less than two hours before transfer to the MHCB.

**Findings**

The care and treatment provided to this patient were adequate.

There was a concern, however, that the initial health screening failed to accurately assess the patient's mental health level of care and mental health treatment history.

**Patient B**

This 58-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided a diagnosis of unspecified bipolar and related disorder. He was prescribed buspirone and olanzapine and was moderately adherent. The medications were discontinued within two weeks of his arrival at ASP.

The patient transferred to ASP on July 18, 2023 at the 3CMS level of care. The patient was placed at the 3CMS level of care from the EOP in April 2023. The initial health screening accurately identified the patient's mental health needs and current psychotropic medications, yet there was no documentation that a routine referral to mental health was generated on the screening form. An ASU pre-placement screening on September 20, 2023 noted that the patient was talking to himself with restless behavior. The documentation incorrectly did not note that the patient was a participant in the MHSDS. Of note, a second ASU pre-placement screening was completed less than five minutes later with the accurate level of care noted. An additional screening was completed, and the patient was emergently referred to mental health after reporting feelings of hopelessness and wishing that he was dead. The patient reported that he was not prepared to be housed in a dorm setting and reported suicidal ideation. He was placed on suicide watch in alternative housing under constant observation. He was evaluated by an MHPC on the following morning when a SRASHE was completed that assessed the patient with low chronic and acute suicide risk. The patient credibly acknowledged that he reported suicidal ideation to affect a housing change, and he was assessed to have few suicide risk factors. The patient reported having sexual offense charges and had been pressured by peers for his paperwork. He was placed on five-day follow-up and was scheduled for initial assessments. No safety plan was completed, as the patient was assessed with low acute suicide risk. He was seen daily for five days, and the documentation was mostly adequate; however, the daily documentation stated that the safety plan was reviewed with the patient, yet no safety plan was located in the healthcare record. On the fourth day of the five-day follow-up, it was documented that custody staff reported that the patient had not been observed showering or socializing with others. He was also observed talking to himself and staring out the window for long periods of time.

During the five-day follow-up period, the patient was seen for an initial MHPC assessment and SRASHE. While the SRASHE was mostly adequate, the initial assessment was inadequate. The initial assessment included limited updated information beyond a current mental status examination. There was no mention of the patient's recent placement in alternative housing, his status during the five-day follow-ups, or the concerning reports by custody staff about his behavior. An initial psychiatric assessment was completed on July 30, 2023, when the patient reported moderate depression and anxiety but requested to have his medications discontinued. The patient reported feeling safe, and his request to have medication discontinued was honored. Of note, the patient had an upcoming release date of September 26, 2023.

An initial IDTT meeting occurred on August 3, 2023 that included the required staff. An IPOC for pre-release planning was initiated; but the goals were not individualized, and no interventions were listed. The remainder of the IDTT documentation was inadequate and evidenced limited updated information.

On August 6, 2023, an ASU pre-placement screening was completed. The patient was emergently referred to mental health after reporting suicidal ideation, speaking incoherently, expressing bizarre thoughts, experiencing hallucinations, and was noted to be unable to sit still. The patient was described as generally uncooperative with nursing assessments. He was placed on suicide watch and ordered olanzapine PRN. On the following morning, he was assessed by a psychiatrist who documented that the patient had suicidal ideation with a plan, was agitated, had

recently stopped his medications, and was mildly disheveled. A SRASHE was completed adequately considering the patient's level of agitation. The patient was referred to the MHCB and was transferred the same day.

**Findings**

The care and treatment provided to this patient were inadequate.

The MHPC initial assessment and IDTT documentation were not updated to reflect the patient's current level of functioning. The IDTT documentation included inadequate goals and no treatment interventions. The five-day follow-up documentation indicated daily review of a safety plan, yet there was no safety plan in the healthcare record. Concerns from a custody officer documented during a five-day follow-up contact were not addressed and could have assisted in the identification of the patient's needs prior to the need for crisis intervention.

**Patient C**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided a diagnosis of unspecified depressive disorder. He was prescribed duloxetine and was adherent.

On March 20, 2023, the patient who was not a participant in the MHSDS, submitted a request to see a mental health clinician because he was "very depressed." At that time, his only diagnosis was opioid use disorder, and he was prescribed buprenorphine-naloxone. He was seen within two days by an MHPC who referred the patient for further assessment by a psychiatrist. An initial psychiatric assessment was completed on March 27, 2023 that was comprehensive. The decision was made to prescribe duloxetine and to see the patient again within one month. An initial MHPC assessment was subsequently completed on April 5, 2023 that was also adequate. An adequate SRASHE was completed that assessed low chronic and acute suicide risk.

The initial IDTT meeting occurred on April 12, 2023; however, neither the MHPC or the psychiatrist present at the meeting were the individuals who completed the initial assessments. The patient was not present for the meeting. An IPOC for depressed mood was initiated that included adequate goals and interventions; however, it was documented that the IDTT information was addressed with the patient previously without evidence that this had occurred. In fact, during the previous session with the MHPC; it was documented that the patient's mood was impacted by trauma and that cognitive reframing would be used with the patient along with understanding his triggers for substance use. Those statements were not included in the patient's treatment plan. The plan noted that the patient would be offered groups and would be seen within 90 days. Of note, the patient had an upcoming release date of July 19, 2023; this important information was not included in the treatment plan.

The patient was seen for routine follow-up on May 6, 2023 by the psychiatrist who attended his IDTT meeting, and the patient reported good response to the medication treatment. The medication dose was increased at the patient's request. The patient was seen for a pre-release planning assessment on June 13, 2023 which appeared adequate. Release of information forms

for continuity of care were obtained.  An MHPC who had not been involved in the patient's care to date saw the patient on June 28, 2023 for a routine appointment.  No interventions were provided, and the note indicated that the patient would be seen again in 90 days, despite his pending release within three weeks.  The patient was seen by a psychiatrist with whom he had not had prior contact on June 29, 2023, when his medications were increased at his request.  The psychiatrist noted the patient's pending release, yet a psychiatric follow-up appointment was scheduled for one month.

There was no documentation that the patient was offered group therapy as indicated in the treatment plan, and the patient was released from prison on July 18, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

There was poor continuity of care, failure to develop a treatment plan consistent with previous assessments, and failure to provide the treatment documented in the treatment plan.  There was also no goal to assist the patient with release planning, and the MHPCs who saw the patient did not recognize his upcoming release.

**Patient D**

This 28-year-old patient's healthcare record was reviewed to assess the quality of care provided at ASP.  This patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and adjustment disorder with anxiety.  The patient was prescribed risperidone but had refused medications since his arrival at ASP.  His healthcare record was selected for review after the Special Master's expert attended his IDTT meeting.  Due to the patient's presentation, the case review was expanded to include the assessment completed prior to his transfer to ASP.

The patient arrived at the NKSP reception center on August 30, 2023 from the Los Angeles County Jail, where records noted diagnoses and problems of anxiety, bipolar disorder, schizophrenia, auditory hallucinations, and suicidal ideation.  He was noted to be transitioning from olanzapine to risperidone at the time of reception intake, and those medications were bridged appropriately upon his arrival.  The initial mental health screening was noted as being completed in the dayroom, a nonconfidential setting, and the positive screening resulted in a referral for further evaluation and placement at the 3CMS level of care.  A release of information form was completed and sent to the patient's community mental health provider.  An initial mental health assessment was not completed until October 15, 2023.

The patient received an RVR, and the documentation noted that he was placed in restricted housing at the time of the assessment; however, EHRS did not include an ASU pre-placement screening or any other documents associated with restricted housing placement.  The assessment documented that the patient had an adjustment disorder and a self-reported history of psychosis but did not note his history of being diagnosed with psychosis or the other diagnoses documented by the county jail.  Further, the assessment included an inaccurate date of arrival.  The initial

psychiatric assessment included a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. No initial IDTT meeting occurred prior to his transfer to ASP, despite his placement at NKSP for nearly 90 days.

The patient arrived at ASP on November 20, 2023. Although the initial health screening was positive for mental health concerns; there was no documentation of a referral to mental health for further evaluation on the initial health screening form. The patient was seen by a psychiatrist for an initial assessment on November 28, 2023. The psychiatric assessment was marginally adequate, as it relied primarily on the patient's self-report. The patient requested discontinuation of his risperidone without tapering; the psychiatrist complied, as the patient had refused the medication since his ASP arrival. The psychiatrist noted that the patient should be seen again in 30 to 45 days. Of note, the psychiatrist who completed the initial assessment was not the patient's assigned psychiatrist.

An initial MHPC assessment and SRASHE were completed on December 5, 2023. The SRASHE was marginally adequate; as the rationale for the assessment of moderate chronic and low acute suicide risk was not well justified, and many of the patient's responses were illogical and reflective of active psychosis. The initial mental health assessment was adequate but included a low chronic suicide risk assessment which was inconsistent with the SRASHE.

An initial IDTT meeting occurred on the following day which was attended by the Special Master's expert. The patient's assigned psychiatrist attended the meeting but had not met with the patient previously. An IPOC was created for hallucinations with adequate goals and interventions. Of concern was the fact that much of the documentation was pulled forward from the initial MHPC assessment; it did not capture much of the discussion during the IDTT meeting and carried forward the inaccurate chronic suicide risk rating. Additionally, there was no clear rationale provided for retaining the patient at the 3CMS level of care.

**Findings**

The care and treatment provided to this ASP patient were marginally adequate.

The initial psychiatric assessment was not completed by the assigned psychiatrist, and the assigned psychiatrist had not met the patient prior to the IDTT meeting. There was inconsistent documentation of suicide risk levels, and the IDTT documentation failed to capture the content of the IDTT meeting.

Additionally, the intake process and subsequent treatment provided at NKSP was clearly inadequate.

**Patient E**

This 55-year-old patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, unspecified anxiety disorder, and opioid use disorder. He was prescribed olanzapine and mirtazapine as well as buprenorphine-naloxone.

His healthcare record was selected for review from a list of patients who required a higher level of care soon after arriving at ASP.

The patient arrived at ASP on July 3, 2023. An initial health screening was completed and included accurate information about the patient's mental health needs; however, no referral to mental health was noted on the form. On July 7, 2023, an emergent consult was placed by nursing staff after the patient was observed with bizarre, hostile behavior and expressed thoughts of hurting others. He was placed in alternative housing. The following morning, the patient was assessed by two MHPCs, and both assessments were comprehensive. A referral to psychiatry was made as well as an initial recommendation to rescind the MHCB referral and instead to refer the patient to the EOP level of care. The patient exhibited paranoid and bizarre delusional thinking, tangentiality of thought, and loose associations. Later, the decision was made to refer the patient to the MHCB level of care due to worsening disorganization and agitation. An IDTT meeting occurred several hours later, and the initial psychiatric assessment was completed during the meeting. An IPOC for hallucinations was created. Although it appeared necessary to address the patient's agitation and danger to others in treatment planning as well; those issues were not addressed. The decision was, however, made to refer the patient to the MHCB level of care to address his dangerousness. He was transferred to the MHCB within the next several hours.

**Findings**

The care and treatment provided to this patient were adequate.

**Patient F**

This 29-year-old patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided a diagnosis of schizophrenia, yet psychiatric notes provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was not prescribed psychotropic medications.

The patient was seen for individual contacts with his assigned MHPC within established timelines and was seen on several other occasions by MHPCs in response to requests and staff referrals. In progress notes, it was noted that the patient had an IPOC to address danger to self; yet there was no history of self-injury, suicide attempts, or reference to treatment provided to address this concern in the healthcare record. The only references to suicidality in the documentation were comments made by the patient to influence housing while in a county jail, and when he filed a grievance about missing some books he ordered in July 2023 at ASP. Instead, all documentation of contacts with the patient mentioned guardedness and limited engagement with clinicians; this likely reflected negative symptoms of a psychotic disorder. Additionally, there were referrals from staff indicating bizarre behavior by the patient and at least two occasions of physical altercations with other incarcerated individuals. It was noted that the patient was seen by multiple MHPCs and even appeared to have a change in assigned MHPCs during the reporting period; however, there was no documentation of any transition or termination discussions with the patient. The psychiatric contacts occurred at least every 90

days. The psychiatrists noted the presence of psychosis was not of severity to warrant involuntary medications, and the patient denied the need for medication treatment.

An IDTT meeting occurred during September 2023 to increase the patient's level of care to EOP following an increase in referrals and bizarre behavior in recent months. Despite the documentation indicating that the patient was being treated for schizophrenia; no IPOCs were created to address the symptoms of this condition, and there was no documentation that treatment was provided to target symptoms of schizophrenia during clinical contacts. In fact, the IPOC addressing danger to self, remained in the treatment plan. The rationale provided for increasing the patient's level of care was adequate. There was documentation that the patient was actively using drugs and was enrolled in the MAT program and treated with buprenorphine-naloxone, yet MHPCs and psychiatrists failed to note this fact repeatedly and even documented that the patient wished to start MAT even though he was already in the program.

Of concern, on July 7, 2023 the patient was placed in a suicide smock with removal of his shoes after he submitted a grievance that he would kill himself if he did not receive books that he ordered. The mental health staff did not order suicide watch status and were not involved in any way in the removal of the patient's clothing and placement in a suicide smock.

**Findings**

The care and treatment provided to this patient were inadequate.

While the patient was seen more often than minimally required, and the decision to increase his level of care was clinically sound; treatment planning was inadequate. The treatment planning included treatment of symptoms that the patient did not have and no treatment for symptoms identified, there was no documentation that treatment interventions were provided to the patient, and continuity of care was poor. Of additional concern, the patient was placed on suicide precaution status with his clothing removed without any involvement by mental health staff.

**Patient G**

This 39-year-old patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided a diagnosis of generalized anxiety disorder. He was not prescribed psychotropic medications. His case was selected for review as the Special Master's expert observed his annual IDTT meeting and had concerns regarding the frequency of clinical contacts by his treatment team. The treatment provided during 2023 was reviewed.

During 2023, the patient was seen at least every 90 days; however, only two of those contacts occurred with the assigned primary clinician, in March and November 2023. In May and August 2023, the patient was seen by two different clinicians. This was particularly concerning for this patient, as the treatment plan noted benefit from reliable and consistent relationships to build trust and to reduce his anxiety, which was the target of treatment. The contacts with the patient's primary clinician did not reflect the use of interventions nor address the goals of the treatment plan.

No psychiatric contacts were documented in 2023. The last psychiatric contact occurred in April 2022. The patient was not seen by a psychiatrist within 90 days of his annual IDTT as required. An IDTT meeting occurred on December 6, 2023, and the documentation of that meeting was adequate and appeared to address the patient's needs with goals and appropriate interventions.

**Findings**

The care and treatment provided to this patient were inadequate.

There was poor continuity of care, failure to consistently document treatment interventions consistent with the treatment plan, and no psychiatric contact prior to the annual IDTT meeting.

**Patient H**

This 41-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was provided a diagnosis of major depressive disorder, recurrent episode, mild and was not prescribed psychotropic medications; he was prescribed buprenorphine-naloxone. His case was selected for review, as his IDTT meeting was observed. During the IDTT meeting, the patient was removed from the 3CMS level of care.

The patient transferred to ASP from a reception center on March 27, 2023 with prescriptions for mirtazapine and trazodone as well as buprenorphine-naloxone. An initial psychiatric assessment was completed on April 2, 2023 which was comprehensive. The decision was made to discontinue the trazodone and to increase the mirtazapine. An initial MHPC assessment and SRASHE were completed timely, and both assessments were adequate. The initial IDTT meeting occurred on April 12, 2023. The MHPC and psychiatrist present at the meeting were noted to be his assigned clinicians, but they were not the individuals who completed the initial assessments. The patient did not attend the meeting. An IPOC for depressed mood was initiated with marginally adequate goals and interventions. As the patient was not present at the meeting, it was documented that the goals would be reviewed with him during the next clinical contact. There was no documentation that this occurred.

On May 8, May 10, and May 11, 2023, the patient submitted requests to discontinue mirtazapine. There was also a referral to the psychiatrist due to mirtazapine nonadherence. The patient was seen for follow-up by a covering psychiatrist on May 12, 2023, when he reported that he had refused his mirtazapine because the pill line was too long, and the medication was not working. The medication was discontinued as requested with a plan for follow-up in 45 days. A follow-up occurred with a different psychiatrist who had not seen the patient previously on June 2, 2023. The psychiatrist noted that the patient's symptoms had resolved and that follow-up would occur as needed. On June 29, 2023, the patient was seen by a clinician who was not his assigned clinician and not the clinician who completed the initial assessment. At that visit, the patient reported moderate anxiety and depressive symptom episodes that lasted for approximately one week. There was no documentation of treatment interventions and no acknowledgment that the patient's medications had been discontinued. The treatment plan was not discussed as indicated in the IDTT documentation.

The patient was seen by his assigned psychiatrist on July 11, 2023 when he requested removal from 3CMS level of care. He reported mild anxiety and depression with adequate functioning. The patient was seen by a newly assigned MHPC on September 26, 2023 and again requested to be removed from the MHSDS. He reported moderate depressive symptoms and mild anxiety but reported adequate functioning. The patient was informed that he needed to be followed for six months without medications prior to removal from the MHSDS. The plan was to see the patient again in 60 days and then to schedule an IDTT for discharge from the MHSDS. The patient was seen again on November 11, 2023 when he reported mild symptoms but no significant problems or concerns. An IDTT meeting occurred on December 6, 2023 with his assigned MHPC and a covering psychiatrist present; the patient attended the meeting. The treatment progress section of the plan was not updated to reflect progress toward treatment goals and continued to state that the patient was prescribed psychotropic medication. The rationale provided for removal from the MHSDS was marginally adequate.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was seen by several different MHPCs and psychiatrists which made the establishment of a therapeutic alliance nearly impossible and was reflective of poor continuity of care. Although interventions were provided in the initial treatment plan, there was no documentation that any therapeutic interventions were provided to the patient.

**Patient I**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at ASP. This patient was prescribed diagnoses of unspecified anxiety disorder; unspecified depressive disorder; attention-deficit/hyperactivity disorder, combined presentation; and schizotypal personality disorder. The patient was prescribed atomoxetine and escitalopram, and he was fully adherent.

The patient was seen every 90 days by an MHPC and every 60 days by a psychiatrist. The patient was seen by a covering MHPC on one occasion and by a covering psychiatrist on two occasions during the reporting period. As an IDTT meeting was not required during the reporting period; the most recent IDTT documentation completed in March 2023 was reviewed for context. The patient's treatment goals and IPOCs addressed distractibility, which was reportedly controlled by medication treatment. It was unclear why those goals were continued, as they had been achieved.

During routine contacts, the patient reported symptoms of anxiety and depression. He reported that his emotions were experienced "like a roller coaster" at times, yet those symptoms were not addressed by the MHPC during any treatment session. In fact, there was no documentation that any psychotherapeutic interventions were provided to the patient, other than a comment by the covering MHPC that support and psychoeducation was provided without any specific details or the patient's response. The psychiatric documentation was mostly adequate; however, of concern was the poor continuity of care provided, as the documentation did not accurately reflect

prior psychiatric encounters.  The patient's diagnoses varied across clinicians' notes, and diagnostic clarification appeared warranted.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment goals did not appear to address the patient's identified needs, diagnostic clarification was warranted, and there was no documentation that treatment interventions were provided during the MHPC contacts.

**Patient J**

This 49-year-old patient's healthcare record was reviewed to assess the quality of care provided at ASP.  This primarily Spanish-speaking patient was provided a diagnosis of anxiety disorder and was prescribed hydroxyzine PRN.

No IDTT meeting was required during the reporting period, so documentation from IDTT meetings in November 2022 and November 2023 was reviewed for context.  The meetings included the required staff and the patient.  The treatment goal and interventions were unchanged with no discussion of the patient's progress during the prior year.  In fact, the treatment plan documentation was unchanged from 2022 to 2023.  There was no recognition that the patient had achieved his singular treatment goal of rating his depression as six or less on a ten-point scale. Significantly, the patient had not rated his anxiety greater than three during 2023, and this was not mentioned in the IDTT documentation.

The patient was seen as required for contacts at least every 90 days with his assigned MHPC. Documentation for those contacts reflected no clinical interventions, but instead were brief notes related to the patient's mental status and functioning.  The notes reflected that the patient routinely declined an interpreter but did request an interpreter during one contact in June 2023. Of note, in November 2023 the patient submitted a healthcare request to see a specific clinician who was not his assigned MHPC, as the requested clinician spoke Spanish.  When the patient was seen by his assigned MHPC, who did not speak Spanish, in response to this request; the patient reported that he found it more beneficial to meet with a Spanish-speaking clinician rather than using an interpreter.  The patient asked for support in understanding a recent parole board decision and assistance in developing a relapse prevention plan.  The contact with the Spanish-speaking clinician in December 2023 clearly reflected a responsive approach to the patient's needs and evidenced the use of appropriate clinical interventions to assist the patient.

Psychiatric contacts occurred twice during the review period with two different psychiatrists. During those contacts, it was documented that the patient refused the use of an interpreter. Documentation of those contacts was adequate.

**Findings**

The care and treatment provided to this patient were inadequate.

The MHPC failed to document the use of treatment interventions consistent with the treatment plan, no changes to the treatment plan occurred from the previous year, and there was no recognition that the patient had achieved the treatment goals outlined in the treatment plan. From a positive standpoint, contact with a Spanish-speaking clinician in December 2023 reflected an appropriate and effective intervention for the patient.

**Patient K**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on February 8, 2023 from WSP. There was discrepancy between the diagnoses provided by the psychologist and the psychiatrist that was unresolved at the initial IDTT meeting; the psychologist provided diagnoses of opioid use disorder, moderate, in early remission, and methamphetamine use disorder, while psychiatry provided diagnoses of unspecified depressive disorder and unspecified anxiety disorder. The patient was prescribed Remeron upon arrival to ASP.

This was the patient's first CDCR incarceration; he reportedly had a stable work history, working 20 years at Caltrans; however, he was an unreliable historian. His stated work history was questionable given his significant 10-year history of substance abuse that included two convictions for driving under the influence and daily intravenous drug use. In addition, the patient reported having four children during the initial psychiatric contact, but he reported having only one child during the initial psychological assessment. Clinicians noted that prior records indicated that the patient reported that his father had died when he was young; however, he told ASP clinicians that his father died when he was nearly 30 years of age. The patient denied a prior history of suicidal behavior; although, healthcare documentation indicated that he reported a suicide attempt by hanging as a teenager.

The initial mental health assessment at ASP was completed on February 21, 2023, and the patient denied any mental health concerns at that time. He also denied receiving prior mental health treatment other than substance abuse treatment. His PC conceptualized his drug use as an avoidant strategy that resulted in increased anxiety and depression when he could not use substances. He used methamphetamine and heroin daily with intravenous usage. During the assessment, the patient reported anxiety symptoms that increased during substance use withdrawal. He also reported receiving Ativan and Xanax that was prescribed by his primary care physician in the community. The patient requested discontinuation of Vistaril prior to his arrival at ASP, as he stated that he no longer needed the medication.

An initial psychiatric assessment was completed on February 10. The patient reported that he had been prescribed Vistaril, BuSpar, and Remeron while withdrawing from substances in the county jail, and those medications were continued upon his transfer to the CDCR. BuSpar was discontinued on February 10, 2023 at the patient's request due to medication refusal.

The initial IDTT meeting occurred timely, and the meeting included the necessary participants. The treatment plan was minimal in content and did not include treatment goals and interventions or an appropriate plan for discharge. The only treatment goal listed was to refer the patient to the parole outpatient clinic when he was within 90 days of prison release.

The patient was seen regularly by the psychiatrists and his assigned PC. The psychiatric progress notes included inconsistent information regarding medication discontinuation on February 23, 2023; he was seen by different psychiatrists which may have contributed to the incorrect information. The psychiatric contacts were characterized by the patient requesting that his psychotropic medications be discontinued and then resumed. As he approached his release date of October 1, 2023, he continued to decline psychotropic medications; he was, however, a participant in MAT for his opioid use disorder.

The PC clinical contacts were brief check-ins that were completed by different PCs. The documentation indicated that the clinicians did not adequately address the patient's anxiety or depression; and the notes indicated that review of the psychiatric progress notes was questionable. It was not noted that the patient's anxiety had increased as was noted by the psychiatrist; however, it appeared that the PC was aware when the patient had restarted BuSpar.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the PC noted that the patient appeared high functioning, he reported significant anxiety on multiple occasions necessitating the resumption of psychotropic medication treatment. The patient would have benefitted from brief behavioral therapy and/or CBT to address anxiety and depressive symptoms. The treatment plan only included a referral to the TCMP, and no intervening treatment goals or plans were developed to assist the patient with discharge planning. The provided treatment appeared to primarily consist of intermittent medication management.

**Patient L**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient transferred to ASP on March 8, 2023 from WSP. He was visually impaired which required wearing an identifying vest. The initial assessments noted that the patient was a poor historian, and he answered numerous historical questions by responding "I don't know." He was provided with diagnoses of unspecified schizophrenia and other psychotic disorders and cannabis use disorder. Additionally, the patient reported a history of significant alcohol use. The mental health staff described the patient with minimization of his psychiatric symptoms and poor insight regarding his mental illness. He exhibited a flat affect and demonstrated psychomotor movements consistent with extra-pyramidal symptoms. The patient refused psychotropic medication during his initial psychiatric contact and was not prescribed psychotropic medications prior to his prison release in July 2023.

The patient was seen timely for the initial psychiatric assessment on March 12, 2023 and the initial psychological assessment on March 15, 2023. Both initial assessments noted that the patient did not believe that he needed mental health services, despite documentation of his extensive mental health treatment in the community. On March 17, 2023, the custody staff referred the patient to mental health due to "flat responses" and poor hygiene.

The initial IDTT meeting occurred timely and included the necessary participants. The treatment plan focused on the patient's negative symptoms and included appropriate clinical goals and interventions; however, the goals could have been improved by including more objective

behaviorally-based criteria. While the discharge section of the treatment plan noted that the patient could be discharged from the MHSDS due to the lack of current symptoms, the treatment plan summary indicated that he would be maintained at the 3CMS level of care to monitor for decompensation and the need for a higher level of care referral.

On May 24, 2023, the patient was referred to the TTA by the custody lieutenant because the patient had exhibited bizarre behaviors, was not eating or showering, and said the same words repeatedly, apparently in response to internal stimuli. The on-call psychiatrist decided not to admit the patient to the MHCB and submitted an urgent referral for the PC to see the patient. The patient was seen on the following day by a PC who was not his assigned clinician, and it was noted that the patient was not brushing his teeth or washing his clothes and that he had been confronted in the unit by peers due to his foul body odor. When queried regarding his hygiene, he reported that he showered every seven days and "I do what I do." The custody staff confirmed that the patient was malodorous. The patient denied any symptoms, and the clinician determined that he did not meet the criteria for grave disability.

Another referral was submitted by the custody staff on May 30, 2023; this referral indicated that the patient was unable to care for himself, was confused/disoriented/withdrawn, and that he had been taken advantage of by other incarcerated individuals. The patient responded to those concerns with his standard statement "I do what I do." He was also seen the same day in response to a referral for pre-release planning. The patient was described by that clinician as not malodorous and was wearing clean clothes. The clinician did not reconcile the information with the custody housing unit report to determine if he had been provided new clothes and told to shower, or if he had initiated those improvements. The patient was seen by his PC the following day who confirmed with custody that other than personal hygiene, the patient was able to function in the unit. He was motivated to remain at ASP and did not want his mental health level of care to change which would result in a transfer. When reminded of possible transfer, the patient was reportedly compliant with custody instructions. The primary clinician consulted with another clinician to determine if referral to a higher level of care was warranted for the patient, and it was determined that the patient did not require referral at that time.

The patient was not seen again prior to prison release, and no pre-release planning services beyond an assessment of need were provided to the patient.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient did not receive ongoing treatment to target his functional impairments which resulted in conflict with peers and intervention by custody staff. He did not receive adequate pre-release planning services consistent with his functional impairment. The clinical contacts occurred primarily to address custody referrals and impaired ADLs and did not include actual clinical interventions or address pre-release services. The patient would have benefitted from more intensive pre-release services prior to release and should have been seen by his PC prior to release.

The patient was referred to mental health on several occasions due to bizarre behavior and poor hygiene, but the treatment team did not reconvene to review his functioning in the context of possible referral to a higher level of care. His PC indicated that the patient was maintained in the MHSDS to monitor for decompensation; however, he was not seen at more frequent intervals than the 90-day minimum that would be required for adequate monitoring except in response to a referral. The patient would have benefitted from more frequent contact and observation in his housing unit as well as collaboration between the treating clinicians and the housing unit staff to adequately monitor his functional impairments and the need for a higher level of care. The treatment plan included clinically-sound interventions, but they did not appear to be fully implemented during individual contacts.

**Patient M**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on December 15, 2022 from WSP. There was discrepancy between the diagnoses provided by the psychologist and the psychiatrist that was unresolved at the initial IDTT meeting; the psychiatrist provided a diagnosis of unspecified mood disorder while the PC provided a diagnosis of generalized anxiety disorder with a provisional diagnosis of bipolar I disorder. The patient reported a community hospitalization for schizoaffective disorder for one month. This information was not incorporated into the diagnostic formulation by his treatment team. The patient reported a closed head injury from a motorcycle accident with subsequent coma for four months and subsequent seizures. Past healthcare records were not requested regarding either of those hospitalizations. Upon parole, the patient was prescribed Vistaril PRN, naloxone, levetiracetam, and phenytoin.

The initial assessments occurred timely; the patient was seen by his PC on December 22, 2022, and he was seen by the psychiatrist on December 27, 2022. During the initial assessments, the patient reported intermittent use of alcohol, amphetamine, and marijuana. He also reported depression and anxiety due to being in prison away from his family. Upon arrival at ASP, the patient was prescribed Remeron, but that medication was tapered and discontinued on December 27, 2022 due to metabolic concerns.

The initial IDTT meeting occurred timely and included the necessary participants including the patient. The treatment plan focused on a treatment goal of reducing anxiety but did not include behaviorally based objective goals or evidence-based clinical interventions. The treatment plan instead simply indicated that the clinician would develop a therapeutic rapport and utilize goal-setting to reduce anxiety.

The patient was seen two months later by the treating psychiatrist for follow-up and medication reevaluation. The patient reported an overall improvement in his mood with a reduction in anxiety, insomnia, and depression; this improvement was reported despite no psychotropic medication being prescribed. The patient acknowledged intermittent and infrequent use of Vistaril, but he wanted to continue this medication PRN. The psychiatrist continued Vistaril, and it was provided to the patient upon parole.

The patient was seen by the TCMP on February 22, 2023. He was seen approximately six days later for a routine PC contact by a clinician who was not his assigned PC; it appeared that the

contact primarily consisted of information gathering without the implementation of clear treatment interventions. The patient reported minimal intermittent depressive symptoms and sleep disturbance that were brief in duration. A pre-release planning assessment was completed by a different mental health clinician on April 7, 2023. A Medi-Cal application was submitted by the TCMP, and a social security insurance application was submitted as part of the mental health pre-release assessment on April 7, 2023. The patient was seen within 90 days prior to parole by his psychiatrist when Vistaril PRN was continued. The patient was not seen again by his PC prior to parole.

**Findings**

The care and treatment provided to this patient were minimally adequate.

Although the patient was followed consistently by the treating psychiatrist with appropriate treatment and follow-up provided; he was not seen consistently by his PC, and the treatment plan did not adequately address his reported symptoms and functional impairment at the time of the initial IDTT. Despite that, the patient reported symptom reduction during clinical contacts with his psychiatrist and was viewed as stable throughout his time at ASP. He received pre-release services from the ASP pre-release social worker that included a social security insurance application, resource materials for transportation and housing, and TCMP services that included a Medi-Cal application. The patient was also provided parole medications as indicated.

The patient would have benefitted from brief behavioral therapy and/or CBT for his depression and anxiety which were not provided. He was also seen by different PC providers during his ASP stay which negatively impacted continuity of care and the ability to implement meaningful therapeutic interventions.

**Patient N**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on March 15, 2023 from WSP. He was provided diagnoses of PTSD, generalized anxiety disorder, unspecified mood disorder and opioid use disorder. He was prescribed Remeron and Suboxone. The patient was paroled on August 15, 2023, and his parole medications included Remeron, Suboxone, and naloxone.

The patient was seen timely for the initial psychiatric and psychological assessments. He reported past mental health treatment for depression, anxiety, and PTSD. The patient denied alcohol use but reported heroin and fentanyl use for the last five years. While he denied having a DUI during the initial psychiatric assessment, the psychological assessment indicated that he had a prior CDCR sentence for DUI and hit and run causing injury. He also admitted to his PC that he began abusing substances when he was age 14 or 15 that also included methamphetamine, ecstasy, hallucinogens, and marijuana. He reported that his longest period of abstinence was one year while incarcerated. The patient reported hospitalization in the community due to a 72-hour hold, but no further information was provided regarding the reason for that hold, and both initial assessments indicated no prior suicide attempts or suicidality.

The initial IDTT meeting occurred six days late, and the psychiatrist and psychologist who completed the initial assessments were not present at the meeting; the meeting otherwise

included the necessary participants. The treatment plan focused on the treatment target of reducing depressed mood; however, it did not include evidence-based interventions, and merely stated that the treatment provider would foster a therapeutic relationship with the patient. While therapeutic rapport was necessary for effective treatment, it was not sufficient to reduce the patient's psychiatric symptoms or to maintain remission. The IDTT determined that the patient did not meet the criteria for discharge from the MHSDS, as he was prescribed psychotropic medication for his mental illness. The psychiatrist did note at the time of initial IDTT meeting that the correctional counselor reported that the patient had been found with unauthorized Suboxone and that a disciplinary hearing was pending. When seen for psychiatric follow-up, the patient reported that he had received a "10-day write up," but he remained on Suboxone. The patient was seen by a different PC for his 90-day contact, and the clinical interventions included identifying triggers for substance use, depression, and anxiety as well as problem-solving coping strategies.

The patient received pre-release planning from the TCMP and ASP pre-release social worker that included submission of a Medi-Cal application and identification of housing. He was seen by his PC and psychiatrist prior to release on parole.

**Findings**

The care and treatment provided to this patient were adequate.

While he may have benefitted from a more comprehensive treatment plan that specified actual clinical interventions, review of progress notes indicated that CBT strategies were incorporated into PC contacts. In addition, the patient was seen by the psychiatrist consistently when appropriate medication management occurred.

**Patient O**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on May 15, 2023 from NKSP. His psychiatric diagnoses were not resolved during the initial IDTT meeting; he was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorders by his PC, and he was provided a diagnosis of substance induced mood/anxiety/psychotic disorder by his psychiatrist. He was prescribed Thorazine and Remeron while in the reception center, but Thorazine was discontinued upon arrival at ASP due to medication nonadherence; the patient reported medication side effects as his reason for nonadherence. He was then prescribed Abilify, BuSpar, and Remeron. During the initial assessment, the psychiatrist indicated that the patient's thinking was goal directed with no evidence of disorganization or thought disorder; hence, the psychiatrist indicated that prior psychotic symptoms were substance-induced. Despite that, Abilify was prescribed for psychotic symptoms.

The patient was seen timely for the initial psychiatric and psychological assessments. He described an extensive substance use history beginning when he was approximately age 17 that included alcohol, amphetamine, cocaine, opioids, and marijuana. The patient reported that he had been taking Suboxone from other incarcerated individuals for his addiction.

The initial IDTT meeting also occurred timely; however, the PC and psychiatrist present were not the same clinicians who completed the initial assessments. The treatment plan was minimal in content with no behaviorally based objective treatment goals and no evidence-based interventions. The only treatment goal was a generic one to reduce subjective ratings of depressed mood by the next IDTT meeting by establishing a therapeutic rapport. The patient was not referred to or waitlisted for any psychotherapeutic treatment groups.

The patient was seen approximately one month after his arrival at ASP by the psychiatrist due to nonadherence with Remeron and Abilify. Those medications were discontinued at the patient's request, as he believed that the medications resulted in restlessness. The BuSpar dosage was also decreased at patient's request.

On July 15, 2023, the patient was prescribed Suboxone. He was seen by the psychiatrist again on July 26, 2023 after refusing his BuSpar. He reported to his psychiatrist that he was doing fine and wanted to discontinue BuSpar. He also reported that his prior psychotic symptoms only occurred while using illicit substances. He was seen within 30 days for psychiatric follow-up when he continued to report no psychiatric symptoms and no need for medication treatment. The patient was seen for his quarterly PC contact on August 16, 2023, when he continued to state that he was doing well and experienced no psychiatric symptoms in the absence of psychotropic medication treatment.

The patient continued to be seen by the clinicians for ongoing monitoring. He reported continued stability and appeared appropriate to begin review of a plan for removal from the MHSDS. The PC continued to see the patient for check-in appointments but did not implement any treatment interventions or a discharge plan.

**Findings**

The care and treatment provided to this patient were adequate.

The determination of adequacy of treatment was made despite inadequate treatment planning. The psychiatrist conceptualized the patient's functional impairments as the result of substance use, but treatment planning was not consistent with that conceptualization. The treatment plan did not focus on medication management or include any clinical therapeutic interventions. The treatment plan would have been improved by incorporating all provider input including the role of substance use in the patient's presentation and a plan to monitor for continued stability with reduction in the patient's level of care should he remain in remission. The treatment plan was also not updated after the patient remained with high functioning without therapeutic interventions (individual or group) or psychotropic medication treatment.

**Patient P**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on April 17, 2023 from WSP. He had one reported suicide attempt that occurred approximately 15 years prior and suicidal ideation four years prior. His diagnoses were not reconciled at the initial IDTT meeting; he was provided diagnoses of unspecified depressive disorder versus persistent depressive disorder and amphetamine use disorder by the psychiatrist, and the PC minimally completed the initial assessment and did not

provide a diagnosis. The psychiatric assessment noted substance use beginning at age 14 that included marijuana, cocaine, alcohol, LSD, and his current drug of choice, methamphetamine. The patient reported feeling depressed since age 13; however, he indicated that he did not want to take psychotropic medications.

The patient was seen timely for the initial psychiatric and psychological assessments; although, the documentation of those assessments was fairly brief and did not result in an adequate case conceptualization. The patient was described by the PC as having no functional impairments despite reporting continued feelings of depression.

The initial IDTT meeting also occurred timely, but a different PC and psychiatrist attended the meeting. Depressed mood was identified as a treatment target, but no behaviorally based objective treatment goals were included, only a subjective self-rating of depressed mood. There was an absence of evidence-based interventions; the only intervention included in the treatment plan stated that the therapist would encourage the patient to work on improved functioning. No treatment groups or other activities were recommended for the patient.

The patient was seen timely for follow-up psychiatric and PC contacts; however, he was seen by different providers than those seen previously, resulting in a lack of continuity of care. The patient continued to refuse psychotropic medications, and he reported that he was doing fine despite the presence of mild symptoms of anxiety and depression. During a routine PC contact, the PC used CBT techniques to challenge the patient's irrational beliefs and negative cognitive schemas and provided a coping strategy exercise. The subsequent routine PC contact on October 19, 2023 was brief in duration and appeared to be a check-in with no clinical interventions implemented.

## Findings

The care and treatment provided to this patient were inadequate.

While he was seen timely for initial assessments, the initial IDTT meeting, and routine follow-up psychiatric and PC contacts; the patient was seen by a different provider each time. This negatively impacted continuity of care. The documentation suggested that all contacts were relatively brief and superficial in content and duration. The patient refused psychotropic medication treatment, and the psychiatrists appropriately saw the patient for follow-up to ensure stability and to determine if the patient would agree to psychotropic medication treatment. Only one PC implemented any clinical interventions and/or provided any therapeutic resources for the patient. The treatment plan was inadequate given the patient's self-report of chronic depressive symptoms. If the patient was truly stable with no functional impairments, his treatment team should have been monitoring him for removal from the 3CMS level of care. The documentation indicated that there was no actual treatment plan for this patient, and no treatment team member appeared to take responsibility for coordination of care, exacerbating the poor continuity of care.

## Patient Q

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on March 15, 2023 from WSP. He was provided diagnoses of unspecified depressive disorder, unspecified anxiety disorder, and opioid use disorder. At the

time of transfer, he was prescribed Vistaril and Suboxone.  The patient also had hepatitis C.  The patient reported during his initial assessments that he had used many different illicit substances during the last 10 years, primarily alcohol, methamphetamine, and heroin.  He denied the presence of mental health symptoms when not using illicit substances.

The initial clinical assessments occurred timely.  The psychiatric provider provided a diagnosis of adjustment disorder with anxiety, and Vistaril was discontinued at the patient's request as he wanted to be removed from the MHSDS.  The initial PC assessment primarily contained information from a prior assessment with little current information added beyond the patient's request to be removed from the MHSDS.

The initial IDTT meeting occurred six days late.  The treatment team included the evaluating PC but a different psychiatrist was present at the meeting.  The treatment plan did not address the patient's reported stability, absence of symptoms, and lack of functional impairment, nor did it address the patient's request for removal from the MHSDS.  The only treatment target listed was depressed mood, and the treatment goals were not objective or behaviorally based.  Instead, the treatment plan focused on subjective ratings by the patient and did not operationalize remission as a goal.  There were also no evidence-based clinical interventions specified in the plan.  The only intervention listed was that the therapist would encourage the patient to improve his functioning through goal setting.

The patient was seen timely by the psychiatric providers, but he was seen by different providers.  He continued to request removal from the 3CMS program.  The patient was also not seen by the same PC for routine contacts.  On June 19, 2023, a PC documented referring the patient to his primary PC for follow-up regarding the patient's request for removal from the MHSDS.  The patient was not seen until July 24, 2023 by his PC when he was to be scheduled for an IDTT meeting on August 9, 2023 for removal from the MHSDS.  That IDTT meeting did not occur until August 16, 2023, when his assigned providers were present, and he was discharged from the MHSDS with little additional documentation provided.  The treatment plan was primarily copied unchanged from the prior treatment plan with changes only in the discharge plan.

The patient was seen by the TCMP for assessment of entitlement eligibility and by the ASP pre-release coordinator for a release needs assessment on July 20, 2023.  Applications and requests were submitted for Cal-ID, Medi-Cal, and SSI.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient arrived at ASP requesting removal from the 3CMS level of care.  Vistaril was discontinued at the initial psychiatric assessment at his request to facilitate removal from the MHSDS.  The treatment plan, however, did not address the patient's request nor did it adequately address his lack of functional impairment, stability, and likelihood of discharge.  The patient was not included in the MHSDS due to medical necessity, and the treatment plan did not specify the criteria for MHSDS discharge.  The treatment plan should have documented a plan for MHSDS discharge if the IDTT determined that discharge was possible and included a plan for monitoring the patient to confirm stability and discharge readiness.  Instead, the patient was seen by different

providers for brief encounters.  Despite these omissions in care, the patient appropriately received pre-release assessments and assistance in discharge planning.

**Patient R**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP.  The patient arrived at ASP in April 2022 from NKSP.  He transferred to another facility on May 26, 2023.  He was provided diagnoses of schizoaffective disorder, depressive type, and major depressive disorder, recurrent, moderate but was not prescribed psychotropic medication.

The documentation indicated that the patient was not seen by his psychiatrist after February 1, 2023.  He submitted an emergent request to see the psychiatrist on May 22, 2023 due to symptoms of mind control, thought insertion, and an inability to cope with his symptoms of schizophrenia.  Unfortunately, the patient transferred before he was seen by the psychiatrist.  An April 2022 treatment plan was inadequate; it only targeted depressed mood without providing clinical interventions, and the plan was not updated even after the patient exhibited symptoms of decompensation including multiple RVRs, increased mental health referrals due to bizarre behavior, disorientation, and cognitive impairment.

The patient was referred to mental health on several occasions beginning in February 2023, because he stated that he wanted to have sex with his daughter and wanted to impregnate her.  The sergeant who referred the patient to mental health indicated that he thought that the patient believed that a staff member was his daughter.  The patient was described as responsive to auditory hallucinations and with paranoid delusional thinking.  The patient also received two RVRs on the same date as the last mental health referral due overfamiliarity; however, his behavior was considered bizarre and unusual by custody, and he received a mental health assessment.  When seen by a PC in response to the referrals, the patient exhibited delusional thinking.  He explained that he did not believe that it was incest or rape for him to have sex with the person whom he thought was his daughter, but he thought that it was incest or rape if others had sex with her.  He also reported to the PC that his family did not believe that he had a daughter, instead telling him that she was his cousin.  He stated that he believed that she worked at the prison, and he indicated that his mental illness had nothing to do with those thoughts and beliefs.  Despite the delusional thinking, lack of insight, and bizarre behavior noted by custody; the PC documented that the patient showed no evidence of a thought disorder and did not schedule plans for follow-up with the patient sooner than 90 days unless the patient submitted a request.  The same PC completed the RVR assessments, despite policy requiring that the assessment be completed by a non-treating provider; this occurred without regard to the clinical inappropriateness of his treating PC completing the RVR assessments.  Unfortunately, the PC concluded that mental health was not a factor in the patient's behavior and associated RVRs, despite the clearly delusional thinking that precipitated the behavior.

The patient was subsequently assaulted on March 6, 2023, requiring treatment at an outside hospital for imagery, assessments, and treatment.  The patient was transferred to a more acute, larger hospital where he remained overnight.  The nursing staff noted blunt trauma to his nose, back, and head.  The patient also had a hemorrhage in the left parietal lobe and a fractured nose.  Upon his return to ASP, he was placed in the OHU for observation by medical staff.

The patient was not seen by a mental health clinician until April 1, 2023 when he was seen by a different PC. The clinician did not inquire about the assault and did not appear to have been aware that the patient was a victim of assault requiring an outside medical hospitalization and OHU admission upon return. The documentation provided by that PC indicated the presence of no cognitive deficits or evidence of a thought disorder, and stated that the patient appeared to be within normal limits across assessment areas.

The patient received another RVR for alcohol possession on May 1, 2023 and was referred for a mental health assessment related to that RVR. It appeared that two assessments were completed, one by a licensed psychologist and one by an unlicensed social worker. They both found that mental health was not a factor in the behavior and that there was nothing to consider if the patient was found guilty. The patient was then seen by another PC due to an urgent referral from custody that the patient had engaged in bizarre behavior with peers and custody staff, with confusion, disorientation, and forgetfulness. The patient had no insight regarding the behavior that caused the referral, and he told the PC that his behavior was normal. The patient did report to that PC that he was assaulted when he arrived on the yard, but he was not queried regarding the possible reasons for the assault. The patient minimized his mental illness despite reporting that he was provided a diagnosis of schizophrenia during a community hospitalization. The clinician indicated that the patient would be seen in 60 to 90 days and recommended that he increase his coping skills such as exercise. The patient was not seen again prior to transfer to another facility.

**Findings**

The care and treatment provided to this patient were grossly inadequate.

Although the patient refused treatment with psychotropic medication, he appeared to rapidly decompensate in 2023 prior to transfer. His level of care was never reviewed, and he was not seen by psychiatry to attempt to convince him to take psychotropic medication for his increasingly distressing thoughts, delusions, and hallucinations. The treatment plan was wholly inadequate for his functional impairment and observed symptoms. As custody staff repeatedly referred the patient to mental health and provided increasing levels of concerning information about his behavior; the patient was seen by different PCs who accepted his minimization of symptoms and reassurances that he would behave appropriately.

Subsequently, the patient was severely assaulted, and the role of his psychiatric symptoms and problematic behavior in the housing unit and yard was not analyzed as a potential contributing factor. Additionally, the RVR mental health assessments failed to adequately evaluate the patient's severe psychotic symptoms in the determination of his mental illness on the RVR behaviors. This patient should have been considered for referral to a higher level of care; however, no IDTT meeting was convened to address his treatment needs. The provision of care by different providers also negatively impacted the continuity of care provided and likely contributed to the inadequacy of the mental health services provided to this patient.

**Patient S**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP.  The patient arrived at ASP on February 21, 2023 from NKSP; he then transferred to another facility on June 27, 2023.  Upon arrival at ASP, he was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood.  He was not prescribed psychotropic medication.

The patient was seen timely for his initial clinical assessments.  He reported that he initially received mental health treatment in the county jail in 2021 for treatment of schizophrenia; he stated that he heard voices talking to him and experienced paranoid delusional thinking that people wanted to harm him.  The patient also reported depressive symptoms including feelings of sadness, anhedonia, feelings of hopelessness and worthlessness, sleep disturbance, anergia, and poor concentration.  He stated that he consumed alcohol, heroin, and methamphetamine, and his most recent use occurred immediately prior to arrest.  His diagnoses were updated to include schizoaffective disorder, depressed type; alcohol use disorder; stimulant use disorder, and opioid use disorder.  The patient was offered and refused treatment with antipsychotic and antidepressant medications, and he stated that he preferred to address his difficulties with psychotherapy.

The initial IDTT meeting occurred one day late; however, the meeting included the treating providers and the other necessary participants.  Depressed mood and hallucinations were identified as treatment targets.  While the treatment plan failed to incorporate objective behaviorally based treatment goals, it did include some appropriate treatment interventions including specific CBT techniques and homework to minimize the patient's irrational thoughts and to increase his willingness to utilize psychotropic medication to assist in symptom management.  Similar appropriate treatment interventions were identified to assist the patient in managing his hallucinations.

On April 3, 2023, the patient was referred to mental health by the ISUDT program social worker due to his frequent hallucinations.  The treating PC saw the patient the following day when the patient reported that he had used heroin on the street to treat his mental health and Suboxone in jail to treat his addiction and mental illness.  The patient reported that his irritability had increased because he had argued with the voices; he was, however, able to articulate several coping strategies such as talking to a small group of incarcerated individuals in his housing unit whom he trusted as a distraction technique and talking to his mother who could assist in reality testing.  The patient reported a willingness to accept treatment with psychotropic medications for the hallucinations, and he was seen by the psychiatrist on the following day when Abilify and Remeron were prescribed.

The patient was next seen by his PC on May 15, 2023 for routine follow-up and in response to a self-referral due to increasing paranoia and other symptoms.  An IDTT meeting occurred on May 17, 2023 for consideration of referral to a higher level of care in the EOP.  The IDTT noted that the patient's symptoms had increased despite medication treatment, and it was determined that EOP placement was indicated.

The patient was seen two days later by the psychiatrist when the dosage of Abilify was increased. He was next seen by his treating PC on May 23, 2023, and the PC noted that the patient would be seen weekly prior to transfer; however, he was not seen by any mental health staff after that date and prior to transfer.

**Findings**

The care and treatment provided to this patient were adequate.

The patient was consistently seen by the same providers which was beneficial in the timely identification of psychotic decompensation. He was then prescribed psychotropic medications for his psychotic and depressive symptoms. As he continued to decompensate, the IDTT convened timely, and his level of care was appropriately increased to the EOP. His antipsychotic medication was also increased to address his psychotic symptoms, particularly the hallucinations that had increased in frequency. The treatment plan pending transfer was appropriate.

The patient was not seen weekly prior to transfer as recommended, and he was only seen once after the IDTT meeting when he was placed in the EOP. While this was concerning, he was transferred approximately 30 days following the increase in level of care and had been monitored well prior to that time. The patient should have been seen weekly by his PC pending transfer and would have benefitted from implementation of the treatment plan while awaiting transfer.

**Patient T**

This case was selected to review the care and treatment provided at the 3CMS level of care at ASP. The patient arrived at ASP on April 27, 2023 from NKSP; he subsequently transferred from ASP on August 24, 2023. Upon arrival at ASP, he was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder and was prescribed Abilify. He received mental health treatment in the community since 2019 and had reportedly sought admission to a hospital due to his mental illness.

The patient was seen timely for his initial clinical assessments. He reported significant anxiety and depression in addition to auditory hallucinations and delusional thinking that included thought broadcasting, ability to hear thoughts through water and radio waves, and paranoia that people were judging him. At the time of his initial psychiatric assessment, the patient reported that he had refused his Abilify due to the belief that the medication caused anxiousness. The patient had a history of substance use including alcohol, marijuana, methamphetamine, and heroin. The psychiatrist modified his diagnoses to include major depressive disorder, PTSD, and panic disorder. It was unclear from the assessment how the patient's psychotic symptoms were captured in the revised diagnoses. The patient declined treatment with psychotropic medication, and Abilify was discontinued. The patient told his psychiatrist that he wanted to manage his mental illness through therapy and other means rather than medication treatment.

The initial IDTT meeting occurred two days late, but the necessary participants attended the meeting. Depressed mood, anxiety, and hallucinations were identified as treatment targets; however, no objective, behaviorally-based treatment goals were identified. The development of coping skills was added as a treatment goal. The documentation indicated that the treatment team relied on the patient's subjective ratings of depressed mood, anxiety, and feelings of distress

due to hallucinations. The only treatment target for which interventions were specified was for the presence of hallucinations. It appeared that the treatment team attempted to identify CBT techniques useful for addressing hallucinations such as reality testing and utilizing behavioral experiments; however, the intervention only stated that the patient would "review" the hallucinations. There was an absence of appropriate, evidence-based clinical interventions provided, including psychotropic medication for the treatment targets identified in the treatment plan.

The IDTT met at least every 30 days; however, it was unclear from treatment plans why the IDTT met so frequently. On June 6, 2023, the IDTT met to evaluate the patient's appropriateness for placement in an MCRP; however, the treatment plan was not modified as a result of this IDTT meeting. The patient did, however, begin treatment with Suboxone shortly thereafter.

The patient was also seen frequently by his PC and psychiatrist. He continued to refuse psychotropic medication but did participate in clinical contacts. During PC individual contacts, the PC implemented various appropriate CBT techniques to address the patient's multiple symptoms.

He was seen on July 19, 2023 in response to a self-referral. During that session, the patient reported that he had been minimizing his symptoms in the hopes of transfer to an MCRP but acknowledged that his symptoms were more intense than previously disclosed. He also acknowledged that he was fearful with increased paranoia, and he requested transfer to the EOP. He stated that his symptoms had increased since he was assaulted; the clinician did not document whether the assault occurred at ASP, or if it had been verified. The patient reported increased distress because he connected the cause of his assault to responding to internal stimuli while around others.

Approximately five days after the July 19, 2023 contact; the patient submitted another request to see both his PC and psychiatrist due to increased paranoia that included the belief that he would be stabbed on the yard and voices telling him that he should kill himself. He was seen the following day by his psychiatrist who started treatment with Zyprexa; however, the patient declined treatment with any additional psychotropic medications. The IDTT met on the following day on July 26, 2023, when the patient's level of care was increased to the EOP due to increased symptoms. The patient was seen by his PC weekly for two of the three weeks after his EOP placement. He was subsequently transferred to an EOP.

**Findings**

The care and treatment provided to this patient were minimally adequate.

He was seen frequently by his treatment providers and was eventually willing to consider psychotropic medication treatment to assist in the management of his symptoms. However, the treatment plan failed to identify adequate clinical interventions to address the identified treatment targets. Despite that, when meeting with his PC; CBT clinical interventions were appropriately implemented. As the patient failed to improve with therapeutic contacts and medication; his level of care was increased to the EOP, and he was timely transferred to an EOP. The patient

would have benefitted from a treatment plan that included objective, behaviorally-based treatment goals and evidence-based interventions.

**APPENDIX B – 8**
**PLEASANT VALLEY STATE PRISON (PVSP)**
Site Visit: December 5, 2023 – December 6, 2023
Review Period: April 1, 2023 – September 30, 2023

**Patient A**

This 56-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS.

The patient was housed at PVSP since 2021 and was provided with diagnoses that included major depressive disorder and generalized anxiety disorder; however, the primary clinician documentation also included a diagnosis of bipolar disorder. He was prescribed Prozac for anxiety and depression.

The patient began treatment with a new clinician in July 2023 when the clinician engaged in a rapport-building exercise with the patient. The rationale for the clinician change was not documented. The patient signed a refusal for two subsequent scheduled appointments in September 2023. He was described as stable by the custody officer after the first refusal, and the patient denied mental health concerns at the time of the second refusal. There was no documentation that indicated that there were no further attempts to assess the patient's mental status until a routine contact on December 13, 2023.

Documentation by a telepsychiatrist briefly addressed the patient's ADLs, mood and functioning. The patient refused a psychiatric appointment in September 2023, which he attributed to being tired when seen for a cell-front assessment. He was rescheduled to be seen a few days later when he reportedly presented as stable.

**Findings**

The care and treatment provided to this patient was adequate.

He was timely scheduled for routine PC and psychiatric contacts and psychiatric follow-up after refusals. Diagnostic clarification was, however, needed. Although clinically appropriate, the primary clinician did not engage in any further follow-up of this newly assigned patient's mental status after two consecutive refusals. Such follow-up could have included consultation with custody or psychiatry prior to the required ninety-day contact or scheduling an appointment before the required ninety days.

**Patient B**

This 28-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS. The patient was transferred to PVSP on June 20, 2023, following discharge from an MHCB.

Various diagnoses were provided in clinical documentation that included adjustment disorder, bipolar I disorder, and unspecified bipolar disorder; alternatively, elsewhere in the EHRS, a diagnosis of unspecified depressive disorder was provided. No rationale for the various diagnoses was provided. He was prescribed Lamictal for mood lability.

Prior to incarceration, the patient had a history of depression with a suicide attempt during adolescence. While housed at PVSP, he was transferred to the MHCB due to suicidal ideation with a plan. Upon his return to the institution, five-day follow-up contacts occurred timely. Most of those contacts were completed by his primary clinician and were comprehensive and clinically appropriate. The safety plan was appropriately individualized, and a required ninety-day SRASHE was completed timely.

There was no documentation that initial clinical assessments were completed; specifically, the initial primary clinician assessment prior to the initial IDTT meeting was not documented, and the initial psychiatric assessment was comparable to a routine contact rather than a comprehensive assessment. The IDTT documentation was similarly deficient. The clinical summary section of the treatment plan was unchanged from prior treatment plans, despite the patient's recent MHCB placement.

An IPOC for depression was established during the initial IDTT meeting. The treatment interventions and goals were not clearly individualized. Further, a goal for depression was unrealistic, as it included remission of symptoms in six months for this individual with chronic depression. No IPOC for suicidal ideation was established despite ongoing passive suicidal ideation and recent MHCB placement for suicidal ideation.

Primary clinician contacts occurred timely and were indicative of meaningful therapeutic clinical contact. The patient's mood improved, and his suicidal ideation remitted; those improvements were attributed to psychosocial changes. The psychiatric follow-up contacts did not occur timely. Although the psychiatric documentation was succinct; it addressed the patient's symptoms and functioning, and medication adjustments occurred in response to reported symptoms.

**Findings**

The care and treatment provided to this patient was marginally adequate.

Positive aspects of the care provided included the prompt response to the patient's suicidal ideation with MHCB referral, timely and comprehensive five-day follow-up contacts, and appropriate routine care. Deficiencies were, however, noted which included the lack of an initial primary clinician assessment, insufficient initial psychiatric assessment and IDTT documentation, and a lack of provider coordination and documentation of symptoms to support the provided diagnoses.

**Patient C**

This 51-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS. This patient transferred to PVSP on October 28, 2022. He was not prescribed psychotropic medication.

Diagnostic clarification was needed; as the primary clinician provided a diagnosis of unspecified depressive disorder, while the psychiatrist provided a diagnosis of adjustment disorder with anxiety and depressed mood. During the IDTT meeting, an IPOC for anxiety that was provided at the previous annual IDTT meeting was continued without explanation. The documentation of the patient's symptoms, functioning and treatment engagement since the prior IDTT meeting lacked clinical utility. The patient was seen timely for clinical assessment as required prior to the annual IDTT meeting that occurred in November 2023.

The patient was seen by the primary clinician for routine contacts monthly, which exceeded the minimum requirements for clinical contact. The clinical documentation was comprehensive and indicated that meaningful therapeutic contact occurred, and sufficient detail was provided to facilitate continuity of care.

**Findings**

The care and treatment provided to this patient was marginally adequate.

The documentation indicated that the primary clinician provided routine care that was individualized and addressed the patient's management of psychosocial stressors. Treatment planning, however, was not sufficiently updated or descriptive of the patient's treatment needs, and diagnostic clarification with clinical rationale was needed.

**Patient D**

This 43-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS. This patient transferred to PVSP on April 6, 2023. He was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was not prescribed psychotropic medication.

The two reviewed primary clinician contacts indicated that the patient was seen within sixty days, which exceeded minimum contact requirements. The primary clinician documentation was indicative of a therapeutic clinical contact and addressed the patient's treatment needs.

The patient had previously been prescribed psychotropic medication that was discontinued just prior to transfer to PVSP; the patient had not taken the medication for several months, and he had reportedly been stable. Following medication discontinuation, he was appropriately followed for six months with continued stability.

**Findings**

The care and treatment provided to this patient was adequate.

The patient was seen timely by the PC and psychiatrist with adequate follow-up and monitoring.

**Patient E**

This 44-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS. The patient was housed at PVSP since 2022.

An IPOC for depression from the previous annual IDTT meeting in 2022 that included generic goals and interventions was continued without any update or rationale. Similarly, the IDTT documentation of symptoms, functioning, and treatment engagement remained unchanged since 2022.

The patient's psychotropic medication was discontinued in October 2022, and psychiatric contacts subsequently occurred quarterly. The documentation of those contacts was brief in content but was clinically appropriate. The patient was seen for routine primary clinician contacts at a frequency that exceeded minimum requirements, and treatment refusal was appropriately documented.

During November 2023, the patient's mental status changed from his baseline functioning. Specifically, on November 10, 2023, he presented with bizarre thinking and paranoia which impacted his sleep and appetite. Drug use was suspected, and while consultation with custody staff indicated no significant changes; the clinician did not consult with psychiatry or medical before returning the impaired patient to general population. Two days later, on November 12, 2023, he was referred to mental health from medical after feeling lightheaded in the visiting room. The patient presented with guarded behavior during the contact but did acknowledge the presence of auditory hallucinations. He agreed to be seen by the psychiatrist and his primary clinician. The following day, he was seen for an urgent consult and was assessed with minor perceptual disturbances due to the residual effects of methamphetamine use which he acknowledged.

The patient was seen jointly by the primary clinician and psychiatrist on November 15, 2023, when he remained paranoid with disorganized thinking that was again attributed to the residual effects of substance use. He declined treatment with psychotropic medication to assist in symptom management. Neither provider documented a plan for follow-up, closer monitoring, or consideration of alternative housing options.

**Findings**

The care and treatment provided to this patient was inadequate.

The patient was not appropriately monitored, and necessary consultation by psychiatry, medical, and ISUDT did not occur after a change in his mental status. Of additional concern was the

continuation of housing in general population for this disorganized patient without consideration of alternative housing options. Routine treatment planning was insufficient and inadequate, as it was not individualized to the patient's treatment needs and was not clinically beneficial.

**Patient F**

This 24-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS. The patient transferred to PVSP in May 2022 from the reception center. He was provided a diagnosis of unspecified depressive disorder, and he was prescribed Prozac.

An IPOC for depression that was developed during the initial IDTT meeting in June 2022 was continued at the subsequent IDTT meeting without changes to the generic treatment goals and interventions. Most of the clinical summary section of the treatment plan, which prompts the clinician to provide a summary of symptoms, functioning, and treatment participation, was copied from the treatment plan developed at the prior annual IDTT meeting; and the limited new documentation was not clinically useful.

The psychiatric contacts occurred timely; however, the quality of the documentation varied by provider. Overall, the documentation was brief in content, and only two of the three reviewed contacts provided clinically useful information.

The primary clinician contacts occurred every other month which exceeded the minimum requirements for clinical contacts, and the content of the documentation was clinically relevant.

**Findings**

The care and treatment provided to this patient was marginally adequate.

The patient was appropriately monitored by providers despite the lack of sufficient and individualized treatment planning and variable psychiatric documentation.

**Patient G**

This 22-year-old, Spanish-speaking patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS since his transfer on November 22, 2023. His healthcare record was randomly selected to assess the adequacy of mental health care and treatment provided after his IDTT that was conducted in absentia was observed.

The initial primary clinician assessment did not provide sufficient information to support documentation that the patient "adopted a non-participatory stance with mental health, likely due to negative influence of yard prison gangs." In addition, discrepancies were noted in the initial assessment; the clinical summary section was discrepant with documentation in the presenting problem section of the assessment.

Regarding treatment planning, an IPOC for anxiety was not developed, despite an indication of the presence of anxiety during the initial assessment and a diagnosis of unspecified anxiety. Further, an IPOC for depression was developed despite no clear indication of the presence of depression during the initial provider assessments.

The patient was adherent with prescribed psychotropic medication until he transferred to PVSP. After missing medications for four consecutive days from November 22, 2023 to November 26, 2023, he resumed medication on November 27, 2023. However, on the following day; prescribed Zoloft and Trazodone were discontinued without a face-to-face psychiatric assessment. This was additionally concerning as the patient was due for an initial psychiatric assessment. The documentation provided for the medication termination was as follows: "Refusing meds, stopped to be addressed."

The patient was seen for an initial psychiatric assessment one week later on December 5, 2023. The documentation of that initial assessment was more indicative of a brief routine follow-up contact than a comprehensive initial assessment. The patient reported that his mood and sleep were stable since the medication was discontinued. The reasons for the patient's medication nonadherence, the rationale for medication discontinuation, and the potential for symptom return were not appropriately addressed during that assessment. The psychiatrist provided a diagnosis of unspecified anxiety that differed from the primary clinician's diagnosis.

## Findings

The care and treatment provided to this patient was inadequate.

The patient's primary language was Spanish, necessitating the use of an interpreter; however, there was no indication that this language barrier likely impacted his treatment engagement and medication adherence upon arrival to a new facility. The discontinuation of psychotropic medication without a clinical face-to-face assessment was a significant issue of concern. When the initial psychiatric assessment did occur, the content of the documentation was overly brief, and medication nonadherence and informed consent were not appropriately addressed. In addition, the initial primary clinician assessment was not clinically useful. Lastly, treatment planning did not address the patient's treatment needs, and diagnostic rationale and clarification was needed.

## Patient H

This 43-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS since his placement in November 2022. He was provided diagnoses of antisocial personality disorder and major depressive disorder. The patient was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of mental health care and treatment provided after his IDTT was observed, and he was discharged from the 3CMS level of care at his request.

The documentation regarding the patient's request for removal from the MHSDS was from a March 14, 2023, psychiatric contact that was copied into the primary clinician contact

documentation of April 28, 2023. Conversely, the primary clinician documented that the patient did not request MHSDS discharge. Similarly, during a subsequent primary clinician contact in July 2023; the documentation indicated that the patient would be retained at the 3CMS level of care until his scheduled release in November 2024. The same content was also documented in September 2023.

The various primary clinician contacts provided limited documentation of the patient's mental status, symptoms, and functioning. No treatment interventions were documented, including relapse prevention, termination, or discharge planning; those needed interventions would have been appropriate when contemplating discontinuation of mental health treatment.

During the IDTT meeting, the patient was removed from the MHSDS, and the documentation indicated that the patient was stable and that the medical necessity for care no longer persisted. The documentation further indicated that the patient had met his treatment goal of reduced depression, but the current status of his depression was not formally assessed during the IDTT meeting.

The patient was not evaluated by the psychiatrist prior to the annual IDTT meeting.

**Findings**

The care and treatment provided to this patient was inadequate.

There was insufficient clinical documentation to support the decision to discharge him from the MHSDS. Relatedly, the patient was not adequately assessed prior to the final annual IDTT meeting. In addition to the lack of psychiatric assessment prior to the IDTT meeting; the most recent primary clinician contact occurred three months prior to the IDTT meeting. Of additional concern was the patient's long history of depression with the possible need for future treatment and the lack of appropriate preparation for MHSDS discharge.

**Patient I**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at PVSP mainline 3CMS since his transfer in December 2022. He was provided diagnoses of delusional disorder, adjustment disorder with depressed mood, and persistent depressive disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of mental health care and treatment provided after his IDTT meeting was observed; the IDTT meeting was conducted in absentia due to his refusal to attend.

The patient's mental status and functioning was unknown, as the patient refused scheduled contacts on May 12, 2023, July 28, 2023, and October 20, 2023, during the monitoring period; and it was noted that his treatment refusal likely resulted from gang pressures. Despite a pattern of treatment refusals, the clinician did not seek collateral information from custodial or medical staff regarding the patient's mental status and functioning. Relatedly, limited clinical information was known, as he refused provider initial assessments.

The patient also refused a mental health assessment for an RVR for falsification of a document which could likely negatively affect his prison term. With a diagnosis of a major mental illness, it was unclear how the clinician was able to make conclusive findings regarding the RVR behavior given the lack of clinical documentation and lack of engagement with primary clinician. The clinician who conducted the RVR mental health assessment determined that there were no mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and indicate the need for a staff assistant, that his behavior was not influenced by a mental illness, and that there was no evidence to suggest that a mental illness and/or developmental disability contributed to the behavior that led to the RVR.

The subsequent IDTT documentation did not include any information regarding the recent RVR. IPOCs for depression were continued. No IPOCs for delusions or treatment nonadherence were developed; although those were primary concerns expressed by his treatment providers. The patient was continued at the 3CMS level of care, but there was no documented plan to increase his treatment engagement or to increase understanding of his mental health needs.

The patient was not evaluated by a psychiatrist prior to the IDTT meeting.

**Findings**

The care and treatment provided to this patient was inadequate.

The IDTT did not appropriately monitor the patient's mental status or functioning. He was not assessed prior to the IDTT meeting by the psychiatrist. While he was scheduled for clinical contacts as required by the primary clinician; there were no attempts to seek collateral information which was critical given the patient's treatment nonadherence. Of additional concern were the findings in the RVR mental health assessment that were determined without supporting clinical data and information. Further, treatment planning did not adequately address the patient's treatment needs.

**Patient J**

This 34-year-old patient's healthcare record was selected from the nonreferral log to be reviewed to assess the quality of care provided at PVSP mainline 3CMS since his transfer in September 2023. He was provided a diagnosis of delusional disorder and schizophreniform disorder.

During the initial primary clinician assessment, the patient was identified as having a mental illness with reported paranoid ideation, mildly euphoric or manic-like symptoms, loud speech, and inappropriate laughter. He also exhibited impaired concentration, diminished focusing, and cognitive tracking. It was documented that the patient was "operating on a schizo-affective-paranoid continuum of disturbance." The clinicians expressed concern that the patient was unable to manage with his gang-involved peers, and it was documented that his capacity to process his circumstances and options might be impaired. The IDTT documented that the patient would be considered for referral to a higher level of care or for continued monitoring at the 3CMS level of care.

The patient reportedly met the higher level of care indicator of inability to adequately function at his current level of care due to a major mental disorder; however, the rationale for nonreferral was inadequate, as it indicated that the patient was not referred as he refused active treatment and denied mental illness.  It was further stated that the IDTT would observe for the need for EOP placement, and that the patient's willingness to engage in treatment required clarification before proceeding further.  The documented treatment modifications were to improve the patient's insight.  Despite the patient's concerning clinical presentation and the provider's documented concern regarding the patient's ability to safely function; there was no documented plan to increase the frequency of clinical contacts more than what was minimally required.

The initial psychiatric assessment was overly brief in content and was completed after the IDTT meeting.  During the assessment, the patient presented with delusional thinking, paranoid ideation, and inappropriate laughter.  He reported that the Russian government wanted him to be released from prison, and he believed that he was being secretly monitored.  His thinking was disorganized, and his insight and judgment were assessed as poor.  The patient refused treatment with psychotropic medication and was provided a diagnosis of delusional disorder.

Of concern, less than one month later, the patient was attacked on the yard.  The documentation indicated that he received multiple stab wounds to his back, neck, flanks, and hand; and he required life-flight transport to an outside hospital.

The patient returned to PVSP two weeks later after medical treatment.  During subsequent evaluations, he remained paranoid and delusional, refusing to engage with mental health staff and requesting discharge from the 3CMS level of care.  Collateral information regarding the patient's functioning was not sought, and he was not considered for a higher level of care.

**Findings**

The care and treatment provided to this patient was grossly inadequate.

The patient's mental illness was appropriately identified during the initial primary clinician assessment; however, based on the initial PC assessment clinical documentation, the patient's mental status warranted immediate referral to an MHCB.  Further, the treatment team failed to refer him to a higher level of care during the subsequent IDTT meeting.  Documented concerns about his ability to safely navigate with his peers were not appropriately discussed with custody; subsequently, the patient was severely injured requiring emergency transport to an outside hospital for medical treatment and stabilization.  Upon the patient's return to PVSP, he was not appropriately considered for a higher level of care, and trauma symptoms from the significant assault were not clearly assessed or considered.

**Patient K**

This 32-year-old patient's healthcare record was selected from the nonreferral log to be reviewed to assess the quality of care provided at PVSP STRH since his transfer in March 2023 after receiving an RVR for battery that caused serious injury.  He was provided a diagnosis of

unspecified schizophrenia and other psychotic disorders. He was not prescribed psychotropic medication.

This patient had a long history of mental health treatment including treatment at the EOP, MHCB, acute, and intermediate levels of care. The IDTT documentation that was copied from the initial primary clinician assessment indicated the presence of current delusions and paranoia; the patient believed that he was telepathic and engaged in aggressive behavior toward others because he was triggered by their thoughts. He also believed he was frequently being followed; and he was involved in fights, as he was looking for sex offenders and attempting to harm them. He further believed that there was a group of sex offenders that was killing and eating children in Los Angeles. The initial psychiatric assessment conducted on the same day as the IDTT meeting indicated that the patient denied psychotic symptoms. The provider's contrasting assessments were not addressed in the IDTT documentation, nor was there documentation of consideration of referral to a higher level of care, given the clinician's findings of active psychotic thought processes.

After the IDTT meeting, the patient refused to attend weekly primary clinician contacts. While psychiatric technician documentation was reviewed by the PC, additional collateral information was not sought. Based on limited cell front contacts, the patient's mental status was generally described as unremarkable until April 25, 2023, when he was highly agitated, argumentative, and threatening. Of note, he was described as similarly belligerent during a medical encounter on April 19, 2023.

Documentation from another clinician on April 28, 2023, indicated that the patient's level of care was expected to be increased to EOP in the upcoming one to two weeks. The rationale for the anticipated level of care change was not documented, and it was unclear why there was any delay in changing the patient's level of care.

On May 3, 2023, an IDTT meeting occurred, and the patient was referred to the acute level of care. The documentation indicated that he was referred for acute care due to increased paranoia, delusional thinking, violence, and vague/passive threats to staff, with a recent staff assault that resulted in another RVR.

**Findings**

The care and treatment provided to this patient was inadequate.

There were unnecessary delays in referring this patient to a higher level of care; he presented with active psychosis and a long history of mental illness. The treatment team failed to consider a higher level of care referral during the initial IDTT meeting. In addition, when the need for a level of care was identified on April 28, 2023, there was a delay in doing so. Additionally, despite the patient's psychotic presentation, the clinician did not seek collateral information from custody or healthcare staff after the patient's pattern of treatment refusals.

**Patient L**

This 50-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH.  The patient was provided diagnoses of major depressive disorder, recurrent, with psychotic features and opioid use disorder.  The patient was adherent with his prescribed venlafaxine.  He was also prescribed buprenorphine-naloxone.

The patient was seen weekly for his primary clinician contacts; however, he often refused to attend and was seen at cell front.  When the patient agreed to be seen in a confidential space, there was evidence of adequate clinical intervention.  His assigned primary clinician documented that all contacts were completed with the patient in Spanish; yet the documentation indicated that the patient's primary language was English, and no other staff noted problems communicating with the patient in English.  During April 2023, the patient reported paranoid ideation and increased depression and anxiety regarding his housing in the STRH.  The primary clinician responded by completing an initial assessment, changing the patient's diagnosis from an adjustment disorder to major depression with psychotic features, and scheduling an IDTT meeting to change his level of care from 3CMS to EOP.  The assessment and justification for the changes were adequate.  An initial psychiatric evaluation to assess the level of care change was completed at cell front secondary to patient refusal and was adequate given the location of the assessment.

An IDTT meeting occurred on May 3, 2023 with all required staff present, however, the patient refused to attend.  The documentation of the rationale for the change in level of care was adequate, however, treatment goals and interventions were vague and did not specifically address the patient's paranoia which precipitated the placement at a higher level of care.  An EOP functional analysis was completed and noted that the patient required an interpreter given his primary language was Spanish.  Again, this contradicted information found elsewhere in the healthcare record.  The psychiatrist noted an intention to explore the addition of an antipsychotic medication during the next individual psychiatric session.  Unfortunately, the next session occurred with a covering psychiatrist who did not appear to have reviewed the IDTT documentation or the primary clinician documentation, and thus it included an incorrect diagnosis and failure to discuss the addition of a new medication.

The patient was offered weekly primary clinician contacts while awaiting transfer to the EOP but refused most contacts.  The patient was consistently offered 90 minutes of groups by a recreational therapist weekly but did not attend.  Psychiatric technician rounds were consistently documented at least daily until June 1, 2023; however, there was no documentation of daily rounds after that date.

The patient transferred to another institution to receive mental health services at the EOP level of care on June 9, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the patient was seen as required and a level of care change occurred when clinically indicated; there was contradictory documentation about the patient's primary language, a vague treatment plan, and poor continuity of care by a covering psychiatrist. Additionally, it was unclear why psychiatric technician rounds ceased after June 1, 2023.

## Patient M

This 23-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided by PVSP STRH. The patient was provided a diagnosis of adjustment disorder, unspecified. The patient was not prescribed psychotropic medication.

The patient transferred to PVSP on August 16, 2023, and was placed immediately in the ASU. An ASU pre-placement screening was completed which noted that the patient received mental health services at the 3CMS level of care. There were no indications that an urgent consult was needed. The initial psychiatric and primary clinician assessments were completed timely; however, both assessments were completed at cell front, as the patient refused to engage in the assessments. Both assessments were limited in content and updates given the patient's refusal to engage but included an adequate review of the healthcare record. An initial IDTT meeting occurred on August 30, 2023 with all required staff present; however, a covering psychiatrist was present who had not met the patient previously, and the patient refused to attend. Goals were established to address the patient's anxiety with adequate interventions listed. Several sections of the treatment plan were not updated given the patient's refusal to engage in the process.

The patient was offered initial psychiatric and primary clinician assessments again on September 13, 2023, and he attended both. The assessments were generally adequate; however, the primary clinician assessment did not include an updated clinical summary. The patient requested removal from the MHSDS. An IDTT occurred on the following day with the required staff and the patient present. The patient was removed from the MHSDS with adequate rationale for removal provided.

While housed in the STRH, the patient was offered a 90-minute group weekly which he refused to attend. He was also offered individual primary clinician contacts which he also refused. Psychiatric technician rounds were documented daily.

### Findings

The care and treatment provided this patient were adequate.

Although the patient refused most clinical contacts and programming; there was documentation that he was offered appropriate treatment, and the rationale for the decision to remove him from the MHSDS was appropriate.

## Patient N

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided diagnoses of unspecified anxiety disorder;

major depressive disorder, single episode, unspecified; somatoform disorder; and schizophreniform disorder. The patient was not prescribed psychotropic medications.

The patient was placed in the ASU on June 12, 2023, and a pre-placement screening indicated no need for an urgent mental health consult. The ASU placement was precipitated by an altercation with a peer. An initial psychiatric assessment was completed on June 19, 2023 at cell front, as the patient refused to attend. Most of the content included material that was pulled forward from previous assessments; this included diagnoses which were inconsistent with the diagnoses of record.

A primary clinician initial assessment was completed on June 23, 2023, but the patient refused to engage. The assessment was adequate given the patient's refusal and included a review of the patient's history. Both assessments indicated that the patient was discharged from the MHCB in late March 2023, that he had somatic delusions, and that his psychotropic medications were discontinued. An initial IDTT meeting occurred timely with the required staff present, but the patient refused to attend. IPOCs for delusions and depression were initiated targeting distress and included adequate interventions. A schizophreniform diagnosis was provided.

The patient was offered individual primary clinician sessions and groups weekly but refused all contacts. Of concern was the fact that the primary clinicians documented patient complaints that were similar in content to material that had previously been identified as delusional and warranted placement in MHCB; however, they failed to identify the content as concerning. Similarly, cell front psychiatric contacts included documentation of outdated diagnoses and failed to identify somatoform symptoms as such.

Daily psychiatric technician rounds were consistently documented. The patient was transferred to another institution on August 15, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the patient was offered sessions that were timely, clinicians failed to recognize that the patient presented with probable psychotic symptoms. While primary clinicians and the psychiatrists who saw the patient often copied documentation from previous sessions; it did not appear that they reviewed the content of the copied notes, as there was no continuity of care to address the patient's needs. There were also no documented efforts to engage with the patient or to develop a therapeutic alliance to facilitate adequate assessment and treatment.

**Patient O**

This 39-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided a diagnosis of unspecified anxiety disorder and severe opioid use disorder. Of note, the psychiatrist consistently documented a diagnosis of

major depressive disorder without support or explanation. The patient was not prescribed psychotropic medications but was prescribed buprenorphine-naloxone.

The patient was seen for routine weekly contacts with a primary clinician that occurred in a confidential setting, except when the patient refused. The contacts were well-documented; however, most described the patient's status and included little to no evidence of the provision of mental health interventions or treatment. With each PC contact, much of the documentation appeared to be copied and was unchanged.

On May 11, 2023, the patient was found unresponsive in his cell, and an overdose was suspected. He received naloxone and was sent to an outside hospital and returned the same day. Upon his return, he was placed on suicide watch by a psychiatrist who did not evaluate the patient but was told that the patient denied that the overdose was a suicide attempt. The patient was agitated, so the psychiatrist offered hydroxyzine; but the patient calmed down and did not take any medication. The patient was seen later that day by his primary clinician who noted that the patient had taken fentanyl to get high, but he accidentally overdosed, and "was embarrassed." No SRASHE was completed, and there was no previous SRASHE located in the healthcare record.

A quarterly IDTT meeting occurred on May 17, 2023 with the required staff and the patient present. The treatment plan to address anxiety was adequate; however, the documentation made only a passing reference to the drug overdose, and substance use was not included in the treatment plan. In subsequent weeks, the patient continued to use drugs, experienced another overdose and began refusing groups after he had previously attended regularly. The primary clinician noted the patient's decompensation and increased communication by the patient regarding suicidality with discussion of a prior suicide attempt. Despite this, no SRASHE was completed; and during a quarterly IDTT meeting on July 26, 2023, no additional goals were created for the patient. Additionally, treatment progress was not reviewed at that meeting, yet there was mention by the lieutenant that the patient had decompensated. Rather than referring the patient to a higher level of care, it was noted that the patient would be recommended for single cell status due to his safety concerns.

The patient appeared to steadily decompensate over the following weeks, and the primary clinician acknowledged the patient's need for a higher level of care but did not make the change, as the patient had safety concerns and believed that he would not have access to a tablet to call his family in an ASU EOP hub. Further, no referrals to psychiatry were made, and there was no evidence of consultation with a psychiatrist about the patient's decompensation. During the reporting period, the patient was offered psychiatric sessions on three occasions, refusing them all. The psychiatrist saw the patient at cell-front, and the documentation of those contacts was minimal. There was no evidence that the patient's healthcare record was reviewed beyond prior psychiatric notes.

Groups were offered as required; however, during the latter half of the review period, the patient rarely attended. Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were inadequate.

Despite weekly primary clinician contacts that included lengthy documentation about the patient's status, there was no documentation that treatment was provided, and there was a failure to refer the patient to a higher level of care despite decompensation. The treatment plan did not address the patient's substance abuse, and there was no assessment of the patient's suicide risk despite at least two overdoses during the review period. Further, there was inadequate collaboration among the treatment team and diagnostic discrepancies that were not acknowledged or addressed.

## Patient P

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood and opioid use disorder. The patient was not adherent with his prescribed hydroxyzine for sleep.

Just prior to the review period, the patient transferred to the ASU at PVSP while on five-day follow-up status after having overdosed on drugs on March 26, 2023. The patient denied suicidal ideation. He was seen for an initial primary clinician assessment on April 3, 2023 which was adequate but failed to note the patient's recent placement on five-day follow-up contacts. An initial psychiatric assessment was completed on April 5, 2023, and it was minimally adequate. The psychiatric assessment appeared to have occurred during the patient's initial IDTT meeting and not prior to that meeting. The IDTT meeting included the required staff, and the patient was present. Goals included reducing anxiety and "processing past trauma;" however, the therapeutic interventions were vague.

Two weekly primary clinician contacts occurred over the following three weeks. The patient was described as agitated with plans to "act out" and to go on a hunger strike in response to issues regarding his property. The primary clinician attempted to rationalize with the patient, but no formal interventions were documented. The patient was offered groups but refused to attend. Additionally, the patient was not taking his medication as prescribed, despite receiving an increase in medication dose at his request during the IDTT meeting.

Psychiatric technician rounds were documented daily. The patient was removed from the STRH on May 1, 2023.

## Findings

During his brief stay in the STRH, the care and treatment provided to this patient were inadequate.

Treatment planning included vague interventions and did not address the patient's substance use. The initial psychiatric assessment did not occur prior to the initial IDTT meeting, and the patient was not seen for weekly primary clinician contacts.

## Patient Q

This 22-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. The patient was not prescribed psychotropic medication.

The patient was placed in the ASU on August 29, 2023. He refused to answer questions related to suicidality during the pre-placement screening, so he was referred urgently to mental health. Additionally, the patient presented with an altered mental status and reported ingesting methamphetamines, MDMA, and amphetamines in a large quantity and was taken to the community hospital emergency room later that day. The patient returned to PVSP on August 31, 2023 and was placed under constant observation until evaluated by mental health. A SRASHE was completed in a nonconfidential setting within an hour of the patient's return. The patient appeared anxious but reported that he did not intend to overdose and denied suicidal ideation. He was assessed with low acute and chronic suicide risk, which appeared to be an underestimation of risk given that the patient had recently been placed in ASU for possession of a deadly weapon and had recently overdosed on drugs. The justification for that risk determination relied solely on the patient's self-report.

The patient remained in the TTA until September 5, 2023, when he was placed in the ASU. An initial primary clinician assessment was completed on September 7, 2023 that was adequate. A primary clinician contact by a covering clinician occurred at cell-front due to patient refusal on September 11, 2023. The patient also refused to attend his initial psychiatric assessment on September 13, 2023; that assessment was inadequate, as it included copied text from a prior note that was inaccurate. An initial IDTT meeting occurred later that day with the required staff present, but the patient refused to attend. A goal was developed to address the patient's "symptoms" and "management of them" without specific interventions or documentation of the symptoms that were to be targeted. Confidential sessions with the primary clinician occurred on September 21 and September 27, 2023, which did not document the provision of mental health interventions. The patient was offered one group weekly but did not attend. Psychiatric technician rounds were documented daily.

## Findings

The care and treatment provided to this patient were inadequate.

There was no documentation that mental health interventions were provided to the patient during primary clinician contacts, and treatment planning was poor. Further, the SRASHE included an underestimate of the patient's suicide risk, and the assessment was based upon the patient's self-report. The initial psychiatric assessment was also inadequate.

**Patient R**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood. The patient was adherent with his prescribed sertraline and buspirone.

The patient was transferred to PVSP on August 1, 2023. An initial primary clinician assessment was completed on August 2, 2023 that was adequate. The initial psychiatric assessment completed on August 8, 2023 noted that the requested discontinuation of his medications was due to gang influences; and the patient additionally requested transfer to a non-designated facility, so he could remain on his medications. The psychiatrist did not discontinue the medications and informed custody of the patient's transfer request.

An initial IDTT meeting occurred that included the required staff and the patient on August 8, 2023. The treatment plan was adequate and addressed the patient's desire for a transfer as well as his ongoing treatment needs. The patient was placed in the STRH on the same date pending transfer to a non-designated facility. An initial psychiatric assessment was completed on August 16, 2023 that was minimally adequate.

The patient transferred to another facility on the following day. He was offered one group during his STRH stay but did not attend. Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were adequate.

**Patient S**

This 29-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. The patient was not prescribed psychotropic medications.

The patient was placed in the ASU on July 17, 2023 secondary to safety concerns. He was not included in the MHSDS at that time. The patient submitted a request for mental health services on July 24, 2023, noting that this was his first time in prison, and he needed support. He was seen by a primary clinician on July 28, 2023 who referred the patient for placement at the 3CMS level of care.

An initial psychiatric assessment was attempted on July 31, 2023, but the patient refused to attend. At cell front, the patient reported that he preferred non-medication interventions to cope with his adjustment to prison. The initial primary clinician assessment completed on August 2, 2023 was adequate. The initial IDTT meeting occurred timely with the required staff and the patient present. The treatment plan was adequate and targeted anxiety. The patient was seen for weekly primary clinician contacts; however, the documentation did not include the provision of interventions consistent with the treatment plan. The notes were brief in content and only

included a description of the patient's current status.  The patient was seen on August 21, 2023 after giving a note to a custody officer asking to be seen by mental health.  The patient was having issues with his cellmate and wanted to be rehoused.

The patient was not offered a group until September 6, 2023, despite being housed in the STRH for nearly one month.  The patient did not attend the group.  Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were inadequate.

The weekly primary clinician contacts did not evidence the provision of clinical interventions, and groups were not offered to the patient consistent with requirements.

**Patient T**

This 41-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH.  The patient was provided diagnoses of PTSD and unspecified schizophrenia and other psychotic disorder.  The patient was not prescribed psychotropic medication but was prescribed buprenorphine.

The patient arrived at PVSP on August 24, 2023, and he was housed in the ASU.  The patient had recently been placed at the 3CMS level of care due to delusional symptoms which were noted after he was stabbed in the yard by his peers.  It was believed that the stabbing may have been related to the patient expressing his delusional thinking to others on the yard.  The ASU pre-placement screening did not indicate a need for an urgent mental health referral.  The patient was seen for an initial psychiatric assessment on August 28, 2023, but he refused and was seen cell front.  The assessment was minimally adequate given the patient's refusal.  An initial primary clinician assessment was completed on August 31, 2023 that was adequate.  The patient continued to express delusional ideation but denied the need for mental health services.  It was documented that the patient was released from the STRH on that date.

The patient was stabbed again on a general population yard on September 5, 2023.  Of note, the prior stabbing occurred at a different institution.  He returned to the ASU on September 8, 2023.  An initial psychiatric assessment was documented on September 13, 2023 that was inadequate, as it contained a single line of updated material that was generic and made no mention of the patient's recent assault.  The patient was seen at cell-front by a covering primary clinician on September 15, 2023, but no initial primary clinician assessment was completed.

An initial IDTT meeting occurred on September 20, 2023 that included the required staff, but the patient refused to attend.  The primary clinician had not met the patient previously.  The treatment plan included a goal for treatment nonadherence, as the patient had refused all appointments to date and did not report any symptoms or the need for mental health services.  He was continued at the 3CMS level of care pending further evaluation, which appeared appropriate.

The patient was seen at cell-front following the IDTT meeting, and he engaged minimally with the primary clinician. Despite what appeared to be a brief contact, a full mental status examination was documented, including a statement that the patient was "cooperative," showed a "full range of emotions," and "the ability to focus on the conversation throughout;" despite the clinician documenting that the patient did not put down his tablet during the entire time and minimally engaged during the contact. The patient was offered an individual primary clinician contact the following week but refused to engage. Again, a full mental status was documented with many of the same elements listed above, despite the brief contact. There was no documentation that the primary clinician attempted to motivate the patient to engage in treatment.

The patient was offered weekly groups but refused to attend. Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were inadequate.

While challenging due to the patient's refusal; clinical contacts were superficial, and the documentation of those contacts was sparse and internally inconsistent. There were no efforts to engage the patient in treatment, despite treatment goals to do so. Also, there was no initial primary clinician assessment completed following the patient's placement in the ASU in September 2023. Further, there was no consideration of referral to a higher level of care, despite the patient's propensity for victimization which was likely related to his mental illness.

**Patient U**

This 52-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at PVSP STRH. The patient was provided diagnoses of adjustment disorder with anxiety, and opioid use disorder. The patient was prescribed buprenorphine-naloxone but no psychotropic medications.

The patient transferred to the ASU at PVSP on May 31, 2023 after receiving RVRs for assault on a police officer and possession of a deadly weapon. The ASU pre-placement screening did not indicate a need for an urgent referral to mental health. The patient was seen for a SRASHE on June 2, 2023 but refused to participate. It was noted that the SRASHE was required as a routine 90-day follow-up after inpatient discharge. There was no information regarding the inpatient placement within the SRASHE other than a comment that the patient denied a history of suicidal ideation or attempts, but that it was "just an overdose." The patient commented that he was struggling with his adjustment to the ASU housing. His chronic and acute suicide risk were assessed as low with minimal rationale provided. Further, the presence of protective factors could not be assessed due to the patient's refusal to engage.

An initial psychiatric assessment was attempted on June 7, 2023; but the patient refused, and the content of the documentation was minimal. An initial primary clinician assessment was completed on the same date. The patient reported several symptoms including anxiety, disturbed

sleep, social withdrawal, decreased appetite, and increased craving for illicit substances. Another SRASHE was completed that assessed low acute and chronic suicide risk levels, yet the assessment noted that his risk might increase given the patient's increased anxiety.

An initial IDTT meeting occurred on June 14, 2023 that included the required staff and the patient. The primary clinician had not met the patient previously. The treatment plan made vague references to goals but did not include therapeutic interventions.

The patient was seen by a covering primary clinician on June 16, 2023. Despite expressing anxiety and mild hopelessness, the clinician stated that the patient was at low risk of decompensating without providing any rationale for that determination. The patient was seen by a different covering primary clinician on June 19, 2023 but refused the contact.

The patient attended weekly groups, but he did not attend groups on June 19, 2023. He was released from the STRH on June 22, 2023.

Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were inadequate.

Treatment planning was poor, the patient was seen by different primary clinicians resulting in poor continuity of care and inhibition of developing a therapeutic alliance, and a SRASHE included poor justification for assessed suicide risk levels. Despite those concerns, the patient was offered weekly groups which were facilitated by a recreational therapist and a clinician.

**APPENDIX B – 9**
**CALIFORNIA REHABILITATION CENTER (CRC)**
Site Visit: January 23, 2024 – January 24, 2024
Review Period: June 1, 2023 – November 30, 2023

## Patient A

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. He was provided diagnoses of bipolar I disorder, current or most recent episode depressed, mild; unspecified substance-related disorder, and adjustment disorder with mixed anxiety and depressed mood. At the time of arrival, the patient was prescribed Remeron and Zyprexa. During the initial psychiatric contact on November 28, 2023, it was noted that the patient reported medication side effects that were attributed to Zyprexa; Zyprexa was discontinued, and Trileptal was prescribed. The patient arrived at CRC on November 20, 2023 from Wasco State Prison with a release date of March 2, 2024. He was seen by a psychiatrist who was not his treating psychiatrist in response to a self-referral. The patient was seen for the initial PC assessment on November 30, 2023, and he was ultimately seen for the initial psychiatric assessment on December 11, 2023.

The initial IDTT meeting did not occur timely and was conducted 22 days after CRC arrival on December 12, 2023. The necessary staff attended the IDTT meeting; however, it was unclear if the CCI in attendance was the assigned CCI. The master treatment plan indicated that the patient did not fully participate in the assessment and treatment planning process; however, that issue was not addressed in his diagnosis or in the course of treatment. The patient was described as entitled, and he refused to accept responsibility for his behavior. Anxiety was identified as a treatment focus; however, the treatment goals were subjective or vague. Those subjective goals were particularly problematic, as the patient reportedly provided negative information to the clinical staff. Another treatment goal of "poor social skills" was identified; however, interventions were not provided. The treatment plan was brief in content without the inclusion of actual clinical interventions. Important and pertinent interventions, such as medication management and pre-release planning were not included in the treatment plan.

A release of information was completed by nursing staff for the Transitions Care Network that appeared related to the patient's impending prison release. A mental health pre-release assessment was completed on January 4, 2024 that was based on a healthcare record review, and patient contact did not occur. The CRC pre-release coordinator indicated that she completed the pre-release portion of the assessment; the PC was responsible for completing additional information in the assessment. However, it should be noted that the PC had not seen the patient as of January 24, 2024, despite the patient's March 1, 2024 release date. Of concern was the lack of enrollment of the patient in pre-release groups, in-person assessment by the pre-release coordinator or the PC, and the patient's lack of involvement in any pre-release activities. Documentation in the healthcare record indicated that the patient was scheduled to see the PC for the pre-release assessment the day after the site visit on January 25, 2024.

The patient was last seen by the psychiatrist on January 22, 2024, when he was seen by a different psychiatrist for an "initial evaluation" on January 22, 2024.

## Findings

The care and treatment provided to this patient were inadequate.

The patient was not seen timely for the initial psychiatric intake assessment, nor was he seen timely for the initial IDTT meeting. The patient arrived at CRC with a release date in approximately three and one-half months. Despite this, he had not been seen by his PC since the initial assessment and IDTT meeting. He was seen by psychiatry; however, he was not seen by his treating psychiatrist which resulted in poor continuity of care. The treatment plan did not include pre-release planning or actual clinical interventions for the problem areas identified.

## Patient B

This 37-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. The patient was alternately provided diagnoses of a mood disorder or substance-induced mood disorder and opioid use disorder for which he was prescribed buprenorphine. The patient was housed at CRC for approximately two years with an upcoming prison release date.

The annual IDTT meeting occurred on December 28, 2023. Progress notes and the most recent treatment plan referenced the presence of depressive symptoms, but no actual diagnosis of depression was provided. Although group therapy was not documented in the treatment plan, the patient was enrolled in a process group that included areas such as criminal thinking; the patient did not consistently attend that group. The treatment plan also failed to identify pre-release planning as a treatment target despite the patient's imminent release date.

Progress notes indicated that the patient was consistently seen by his PC and psychiatry with good continuity of care. He also reportedly was medication adherent with Abilify which was discontinued at the patient's request. At an August 23, 2023 psychiatric appointment, the psychiatrist encouraged the patient to resume treatment with Abilify; however, he declined and indicated that this would result in losing his job in plant operations due to heat-related concerns. The psychiatrist noted at one appointment that the patient had tested positive for marijuana and alcohol.

In September 2023, the PC stressed the importance of medication adherence. The documentation of that contact indicated the presence of no mental health disorder; however, it confirmed the diagnosis of opioid use disorder and drug-induced constipation. The psychiatrist met with the patient monthly during the review period; and after stabilization, the patient was seen quarterly by the psychiatrist and PC. An IPOC was completed at each PC contact.

On December 12, 2023, the patient was seen by a new PC. This PC described the patient as stabilized with greater insight regarding his behavioral symptoms. The patient acknowledged that illicit substance use was a significant obstacle for him, and he noted that his depression worsened with substance use. Substance abuse and mood management were maintained as the primary obstacles to improvement.

The patient was interviewed during the site visit when it was noted that he required pre-release planning; he was unaware that CRC had a pre-release coordinator, and he was uninformed regarding pre-release resources or how to access his psychotropic medications in the community.

After a recommendation from the expert, he was referred for pre-release planning. The patient met with the pre-release coordinator who provided current resources as well as education about the release process. The patient was later seen by his PC who focused on guided meditation and structured problem-solving. The patient was released from prison on February 20, 2024, and he was provided with discharge medications upon release.

**Findings**

The care and treatment provided to this patient were minimally adequate.

While improvement was needed regarding diagnostic clarification and treatment planning, the progress notes indicated that therapeutic interventions were implemented during individual clinical contacts, and substance abuse and depressive symptoms were targeted in the treatment plan. The patient was seen by the psychiatrist with adequate management of increased symptomatology, and the psychiatrist worked with the patient regarding medication management. While the patient declined one psychotropic medication recommendation, he was maintained on antidepressant medications with reported positive improvement and eventual stabilization. The frequency of psychiatric and PC contacts decreased appropriately as the patient stabilized.

Improvement was needed regarding the provision of pre-release planning and services. He was seen for pre-release services after referral by the regional psychologist and the expert, and it should be noted that the patient had not previously been informed of discharge resources or the pre-release process. An initial pre-release assessment was completed, but it did not include the patient. It was unclear if the patient would have been seen without the referral, as no pre-release appointment was scheduled despite a release date in less than 30 days. Fortunately, the patient was seen quickly after referral.

**Patient C**

This 33-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. He was provided diagnoses of bipolar disorder and methamphetamine use disorder, and he was prescribed Wellbutrin, Vistaril, and trazodone. The patient was interviewed during the monitoring visit when it was noted that he had not received pre-release planning despite having an imminent release date.

The patient had an imminent release date of February 2, 2024, and the pre-release assessment was completed by the pre-release coordinator without the patient being seen on December 26, 2023. The documentation indicated that the benefit status across numerous areas was unknown. The patient was seen on January 5, 2024 by TCMP; however, no follow-up information with the patient was documented regarding his status.

An initial psychiatric assessment was completed on December 11, 2023 that noted that the patient reported symptom improvement since his psychotropic medications were changed while at WSP during November 2023. The CRC psychiatrist noted that the patient needed treatment for anxiety to help with his sleep difficulties, and the patient was educated regarding the benefits of exercise for his type I diabetes and sleep problems. The initial mental health assessment was completed on December 8, 2023, when the patient was described as combative and unwilling to

discuss his prior mental health concerns; this presentation appeared consistent with other clinical encounters, and it may have resulted from poorly controlled diabetes. The patient was sent to an outside hospital for hypoglycemia the day prior to his PC appointment and was treated again on December 13, 2023. The patient had difficulty maintaining appropriate blood sugar levels as documented by repeated medical contacts and interventions that were documented in the healthcare record.

The IDTT meeting occurred timely on December 14, 2023, but his assigned PC was not present at the meeting. The IDTT documentation noted that substance abuse and depressed mood were treatment targets. The treatment plan included treatment outcomes; however, they were vague and not individualized. Clinical interventions were not documented in the treatment plan nor was a treatment target or goal identified for pre-release planning despite an imminent release date of February 20, 2024. An example of the lack of individualization of the treatment plan was the standard treatment goal timing of "within three months," despite the patient's scheduled release date in two months. The patient had poorly controlled diabetes that was difficult to identify, as he was reportedly asymptomatic. Although CRC had a treatment group that was provided by mental health and nursing that focused on diabetic self-care; the treatment plan did not include the patient's participation in that group.

The patient was seen by his assigned PC on January 10, 2024 to complete the pre-release assessment; however, he was not seen again prior to his release. He was seen by his assigned psychiatrist on February 2, 2024, approximately two months following the initial assessment. The psychiatric documentation did not note the patient's upcoming release date. The patient was never enrolled in the pre-release group.

During the few clinical contacts that the CRC mental health staff had with this patient, he continued to report depressive symptoms including intermittent awakening and difficulties with illicit substance use. His treatment was not modified nor were clinical contacts increased to stabilize the patient prior to release.

The patient was seen on January 26, 2024 for pre-release planning following a referral to the pre-release coordinator from the regional psychologist and the expert.

**Findings**

The care and treatment provided to this patient were inadequate.

Although his unstable diabetic status may have impacted his mental status and functioning, the IDTT did not interface with medical staff or incorporate this into treatment planning. CRC had established an interdisciplinary treatment group specific to diabetics but did not enroll this patient in the treatment group. The patient was only seen twice by the psychiatrist that included the initial intake assessment. The patient was never seen for an individual therapeutic session; instead, he was seen by his assigned PC only for intake and pre-release assessment that involved the completion of the pre-release form. Of concern, the patient was never referred to the pre-release group despite arriving with an imminent release date of approximately 60 days, and he was not seen by the pre-release coordinator prior to a referral precipitated by the site visit when he had less than 30 days to release. The patient had no knowledge of the resources available to

him for release, how to access those resources, or the services to expect for pre-release.  The treatment plan was inadequate, did not include actual clinical interventions, and was not appropriately individualized.  Additionally, the IDTT was facilitated by a PC who was not the patient's assigned PC.  The patient was not seen consistently for his symptoms and functional needs.

**Patient D**

This 27-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC.  The PC provided a diagnosis of major depressive disorder, recurrent, with psychotic features.  The patient arrived at CRC from NKSP reception center.  Approximately five hours after his initial health screening at CRC, the patient was taken to the TTA by four custody officers as he presented with altered consciousness, increased heart rate, incoherent speech, agitation, and aggressive behavior toward officers.  He was thought to be under the influence of illicit substances and was transferred to an outside hospital for treatment.  The emergency room records indicated that the patient reported smoking spice with no memory of events until arrival in the emergency room.  Upon his return to CRC, he was returned to housing.

The initial PC intake assessment occurred on November 6, 2023.  The PC documented that the patient reported significant anxiety and depression as well as fears related to his release in May 2024.

The initial psychiatric evaluation occurred on November 7, 2023 in a confidential setting.  The psychiatrist described the patient as a poor historian who overreported symptoms but could not elaborate on those symptoms when queried.  It was unclear whether the psychiatrist had reviewed the PC initial assessment that established a diagnosis of major depressive disorder, recurrent, with psychotic features; the psychiatrist provided diagnoses of unspecified mood disorder, unspecified psychosis, and polysubstance abuse.  The patient was prescribed Abilify, Paxil, and Remeron.  The rationale for the change in clinical diagnoses was not documented.  Neither the documentation by the psychiatrist nor PC noted that the patient had received treatment at an outside hospital due to altered mental status and bizarre behavior.

The initial IDTT meeting occurred on November 14, 2023; the appropriate staff were in attendance.  The treatment plan included hallucinations as a target of treatment; however, the interventions listed for all treatment targets described the clinician as "assisting" rather than including actual evidence-based interventions.  The documentation indicated that the treatment team failed to address the need for diagnostic clarification.  The treatment goal of learning three coping skills was vague and did not indicate how that goal would improve the patient's functional level or decrease his symptoms, and the other goals for addressing anxiety, hallucinations, and depressed mood were also inadequate.  The treatment plan also did not incorporate any actual clinical interventions.  Additionally, the treatment plan failed to identify pre-release planning as a target for treatment which was important, as the patient had an upcoming release date in approximately six months.

The patient was referred to mental health four days after the IDTT meeting on November 18, 2023, and he was seen by a clinician who was not his assigned PC; he was referred by custody staff, as he was observed during medication administration as tearful with bleeding scratches on

his hand.  The custody staff also indicated that the patient was agitated and appeared responsive to internal stimuli.  The SRASHE and associated progress note noted the patient's history of prior suicide attempts and community-based involuntary commitments due to suicidality.  The patient displayed disorganized thinking and word salad.  The patient was observed by the clinician to be responsive to internal stimuli with delusional thinking.  The clinician further documented that the custody staff did not believe that the patient had engaged in any illicit substance use.  The patient was ultimately referred to the MHCB at another institution with subsequent discharge to an EOP.

**Findings**

The care and treatment provided to this patient were inadequate.

Although he was appropriately referred to the MHCB by a crisis clinician who was not his treating PC; the assigned PC and psychiatrist failed to investigate the patient's referral to an outside hospital due to altered mental status and agitation upon CRC arrival, and it was unclear if the documentation regarding that incident was reviewed.  The medical staff appeared to accept the patient's statement that he had smoked spice; although, there was no other documentation to support that statement, and the patient never received an RVR.  Diagnostic clarification was needed, and the IDTT did not address those diagnostic discrepancies in treatment planning.  The treatment plan was inadequate given the patient's history, diagnoses, and acuity, and did not include pre-release planning despite an upcoming release date.

**Patient E**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC.  He received MAT for opioid use disorder and was additionally prescribed Abilify, and Cymbalta was prescribed for pain by his primary care provider.  The patient arrived at CRC on October 25, 2023 to serve his first prison term.  He reported hearing voices that began around age 20.

The initial PC assessment occurred on November 1, 2023; the PC did not provide a diagnosis for the patient but noted the presence of auditory hallucinations.  The initial psychiatric assessment occurred on the following day when he was provided a diagnosis of unspecified mood disorder and unspecified schizophrenia spectrum and other psychotic disorder.  The patient reported a long history of mental illness that began at age 18 or 19.  He reported that his sister took him to a community psychiatric hospital because his family could no longer manage his behavior.  His presentation during the CRC initial psychiatric assessment suggested that the patient was stable on his medication regimen.

The initial IDTT meeting occurred three days late; the assigned PC and psychiatrist were present, although neither completed the initial assessments.  Treatment goals were established for substance abuse, hallucinations, and anxiety; however, as was noted for other CRC patients, the treatment goals were subjective with no clear connection to how they would lessen the patient's symptoms or improve his functional ability.  No actual clinical interventions were included in the treatment plan beyond "therapist will foster therapeutic relationship" and "encourage" patient. The treatment goals were the same for hallucinations as for anxiety and involved the patient

645

somehow improving decision-making skills and problem-solving without specific interventions provided.

The patient was next seen by yet a different PC on January 30, 2024.  No treatment interventions were implemented during the confidential individual session.  The patient was not seen timely for follow-up routine PC contacts and medication management.

**Findings**

The care and treatment provided to this patient were inadequate.

He was seen by different providers at each mental health clinical contact resulting in poor continuity of care.  The treatment plan was inadequate, as it did not contain appropriate treatment goals and evidence-based interventions.  The patient did appear to be relatively stable on his prescribed Abilify, but he was not seen timely by the psychiatrist for medication management.

**Patient F**

This 33-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC.  He was not prescribed psychotropic medications at the time of his arrival.  The patient arrived at CRC from WSP on October 26, 2023.  He had an upcoming release date in February 2024.

The initial PC assessment occurred on November 7, 2023, when the patient reported a history of treatment with Remeron, Haldol, and Zyprexa in a county jail.  He told the PC that he received psychotropic medication at WSP; however, there was no documentation of that treatment in the healthcare record.  The patient reported that he experienced side effects from his prior psychotropic medications but that he was doing well and did not need mental health services.  The PC documented that the patient declined to participate further in the intake assessment.  The PC reviewed the county jail records and noted that the patient was provided a diagnosis of adjustment disorder with depressed mood.

The initial psychiatric assessment occurred on the following day when the patient again reiterated that he was doing fine and declined mental health services.  Despite that, he ultimately revealed to the psychiatrist that he experienced auditory hallucinations in the past after communicating with a "higher being," and occasional hallucinations of voices who predicted the future.  The patient reported that he was generally distrustful of people, and it was noted that he experienced past beliefs that people were conspiring against him, including mental health and medical professionals.  The psychiatrist did not provide a diagnosis and did not prescribe psychotropic medication but did note that he would meet with the patient again to clarify his diagnosis.

The patient was seen one day late for the initial IDTT meeting on November 9, 2023; the meeting was facilitated by a different PC than the one who completed the initial assessment, although the assigned psychiatrist was present at the meeting.  During the IDTT meeting, the patient reported that his prior treatment for psychosis was unwarranted, and he denied psychotic symptoms.  The history of a diagnosis of adjustment disorder was noted in the treatment plan,

but no diagnosis was provided by the IDTT.  The treatment team also did not include diagnostic clarification as a treatment goal; instead, only depressed mood was identified as a treatment target.  While treatment goals remained subjective, the IDTT did establish a baseline of symptomatology in the treatment summary.  Pre-release planning was not addressed in the treatment plan, despite the patient's pending release date.  No clinical interventions were identified in the treatment plan, making it unclear how the treatment goals would be achieved.

The patient had an earliest release date of February 5, 2024; however, at the time of the healthcare record review, that date was moved to 2026.  An initial pre-release screening was completed by the pre-release coordinator on December 7, 2023.  That assessment was completed by his PC on January 3, 2024, and the patient was seen by the treating psychiatrist on the same date.  The patient continued to deny mental health concerns but was noted by the psychiatrist to persist in his previous beliefs including that he was "set up" by Riverside police and the California Highway Patrol for his arrest.  No diagnostic clarification was documented in the psychiatric note.  The patient was seen again on February 2, 2024 in anticipation of his release, and the PC documented that the patient had declined to sign a release of information for the county and continued to insist that he did not need mental health services.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment plan was vague and not individualized.  Pre-release planning was not included, despite an upcoming release date.  There was diagnostic confusion amongst treating clinicians that was unresolved.  The patient was not referred to a pre-release group or any other mental health treatment group.

**Patient G**

This 20-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC.  The patient arrived at CRC on November 1, 2023 from WSP where he was provided a diagnosis of adjustment disorder with anxiety, and he was prescribed melatonin by psychiatry.  The patient was convicted of a sexual offense and was serving his first term with a release date of April 17, 2024.

The initial PC assessment on November 17, 2023 did not occur in timely, and the patient was not seen by a psychiatrist prior to the initial IDTT meeting.  During the initial PC assessment, the patient reported a history of trauma that included placement in foster care and his biological father who abused illicit substances.  He also reported that his grandmother was hospitalized for depression and anxiety; he denied a history of community psychiatric hospitalizations.  He reported placement on suicide watch at the county jail prior to transfer, but he denied that he was suicidal at that time.  He also denied the use of illicit substances.  His mental status was described as normal, and he denied symptoms except anxiety, restlessness, and impaired sleep.  The clinical summary indicated that the patient was placed at the 3CMS level of care as he was prescribed a psychotropic medication; however, melatonin was not considered a psychotropic medication.  While no diagnosis was documented in that assessment, the patient was noted to have experienced adjustment difficulties due to incarceration.

The initial IDTT meeting on November 21, 2023 was not attended by the patient's assigned psychiatrist or PC; however, an alternate PC and psychiatrist were present with the CCI. The treatment plan referenced early drug use, but the initial PC assessment did not include that report. Further, the treatment plan also noted that the patient had panic attacks that were identified as a problem area, but no supporting documentation was provided that the patient had a panic disorder or experienced panic attacks. The other problem area identified was "stress." IPOCs were initiated for sleep disturbance and anxiety. The treatment goals were unrealistic; for example, the patient reported sleeping five to six hours nightly, and a treatment goal was established for eight to nine hours of sleep nightly despite his report that the housing unit was noisy. The patient did report beneficial effects from melatonin; however, a treatment goal for nine hours of sleep in a prison dormitory setting appeared unrealistic. The only treatment interventions included in the treatment plan were that the PC would "maintain" the therapeutic alliance; this was also questionable, as the patient had met with two different PCs. No plans were documented to provide clinical interventions regarding the patient's adjustment problems, and no treatment goal was documented regarding pre-release services despite an upcoming release date.

The initial psychiatric assessment did not occur until December 1, 2023, which was thirty days after his CRC arrival. The psychiatrist maintained the diagnosis of adjustment disorder with anxiety. No medications were ordered based on the psychiatrist's progress note; instead, melatonin was noted as a past prescription. A follow-up progress note indicated that the psychiatrist had continued melatonin by a bridge order. Despite the lack of a treatment goal regarding pre-release planning, a preliminary pre-release assessment was completed by the pre-release coordinator in February 2024; however, the patient was not seen for that assessment.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient did not appear to meet the criteria for inclusion in the MHSDS; in fact, the documentation indicated that he was placed at the 3CMS level of care as he was prescribed melatonin by a psychiatrist at WSP. Melatonin was not considered a psychotropic medication, and participation at the 3CMS level of care was not required to receive that medication.

The patient was not seen timely for initial assessments or the initial IDTT meeting. There was internally inconsistent information documented by providers without attempts to reconcile the disparate information; no substance use was documented at the initial PC assessment, but early drug use was noted by a different PC during the IDTT meeting. The treatment plan was inadequate, failed to provide short-term treatment for sleep hygiene, failed to address discharge planning, and failed to include a treatment goal for pre-release planning.

The patient's prescription for melatonin was also problematic, as the psychiatrist did not note melatonin as a current medication or note that the medication would be continued in the initial psychiatric assessment. In a subsequent psychiatric note six weeks later, the psychiatrist documented that he had continued the medication which appeared inconsistent with the documented need for a bridge order 17 days after the initial psychiatric assessment.

The patient should have received a comprehensive assessment to determine the need for mental health services and for diagnostic clarification.

## Patient H

This 22-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. He was provided a diagnosis of unspecified depressive disorder and was prescribed Remeron PRN for anxiety. The patient arrived at CRC on September 21, 2023, after being out to court for approximately one month.

The initial PC assessment occurred on October 2, 2023, and the initial psychiatric assessment occurred late on October 6, 2023, which was three days after the initial IDTT meeting. The psychiatrist adjusted the Remeron dosage and maintained the diagnosis of unspecified depressive disorder; conversely, the PC documented a diagnosis of adjustment disorder.

The initial IDTT meeting occurred on October 3, 2023; the treating PC and the chief psychiatrist who was covering for the assigned psychiatrist were present at the meeting as was the CCI and the patient. Significant portions of the treatment plan that included the clinical summary and case conceptualization were copied from the October 22, 2022 treatment plan, and the case formulation merely stated "CCCMS LOC." The master treatment plan did include new treatment goals; however, those goals were subjective and vague. No clinical interventions were included in the treatment plan. Although the patient had an imminent parole date; pre-release planning was not identified as a treatment focus, and the patient was not assigned to any pre-release or other treatment groups.

The initial pre-release assessment was completed without the patient present on November 21, 2023, 60 days prior to his release date. The patient was next seen by his PC on December 14, 2023 to complete the remainder of the pre-release assessment, approximately one month before release.

The patient saw different psychiatrists for the initial IDTT meeting, initial psychiatric assessment, and in response to a health services request. He was seen by a covering psychiatrist on November 22, 2023, as he reported difficulty with sleep with a request to increase his Remeron dosage. The patient was seen by the same covering psychiatrist on December 4, 2023 in response to another health services request when he had not received the increased medication dosage. He was last seen by his assigned psychiatrist on January 3, 2024, when Remeron was discontinued.

The patient was seen by his PC on January 4, 2024 in response to a referral from the assigned psychiatrist for parole planning. The PC indicated that the patient was provided resources and information that he requested during that brief contact.

## Findings

The care and treatment provided to this patient were inadequate.

The treatment plan was wholly inadequate, and most of the information was copied unchanged from an IDTT meeting more than one year prior. Continuity of psychiatric care was poor as

reflected by the seemingly arbitrary changes to Remeron that was prescribed on a PRN basis. Only minimal pre-release services were provided.

**Patient I**

This 39-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. The patient was provided a diagnosis of opioid use disorder, moderate and amphetamine-type substance use disorder, moderate. He was prescribed Seroquel, and he received MAT for opioid use disorder. The patient arrived at CRC on October 11, 2023 from WSP with a release date of January 23, 2024. A bridge order was provided on the day after arrival to prevent medication discontinuity.

The initial PC assessment occurred on October 18, 2023 when a history of treatment at the Veteran's Administration was documented for PTSD; additionally, he had a history of ADHD, however, no release of information was documented to obtain the past medical records that were not located in the healthcare record. The patient declined to provide a release of information for the county jail records during the reception center intake process. The reception center documentation noted placement at the 3CMS level of care. The patient's only mental health concern was sleeping difficulty, and the PC appeared to conclude that his sleep difficulties were not related to any mental health diagnosis. Further, the PC documented that the patient's placement in the MHSDS was due to having been prescribed psychotropic medications. The PC hypothesized that the patient might have minimized or suppressed his symptoms due to his background and/or lack of insight.

The initial psychiatric assessment on October 19, 2023 was completed by a psychiatrist who was not the assigned psychiatrist; the patient reportedly noted a long history of treatment with Seroquel which the psychiatrist noted was not clinically indicated. The psychiatrist recommended tapering rather than immediate medication discontinuation given the patient's high functional ability, extensive history of taking Seroquel, and reported decompensation when off the medication. Because the patient disagreed with the psychiatrist's recommendation and did not want to discontinue the medication, the psychiatrist continued the Seroquel prescription as prescribed with the intent to taper and discontinue the medication in the future. The psychiatrist maintained the substance use diagnoses only.

The initial IDTT meeting occurred one day late on October 26, 2023. While the assigned PC was present, a psychiatrist who was not assigned to the patient and had not seen the patient before was present at the meeting. The presence of the alternate psychiatrist might have been the reason why the treatment goal of titrating the patient off Seroquel was not included in the treatment plan, despite the assigned psychiatrist's documentation of the importance of the medication discontinuation. The treatment plan indicated that the patient would be maintained at the 3CMS level of care to address illicit substance use and sleep issues. The treatment plan established substance abuse as a treatment target; however, the treatment goals were unrealistic, did not establish a current base rate for the behavior targeted, and were subjective. The treatment plan also failed to incorporate the need for pre-release planning. The patient was not assigned to any treatment groups or substance abuse treatment groups provided by mental health; additionally, the MAT that was provided by medical staff was not coordinated with his mental health care.

A pre-release assessment conducted by the pre-release coordinator occurred on November 26, 2023 that did not include the patient. The pre-release assessment was completed by the assigned PC with the patient on December 11, 2023. The patient refused to provide a release of information to allow CDCR to provide county mental health with his medical records. The patient was seen by his assigned psychiatrist on January 9, 2024 for a brief contact when Seroquel was continued, despite no qualifying diagnosis, and no clinical rationale provided for prescribing Seroquel.

On November 13, 2023, the patient met with a primary care provider regarding his ongoing MAT and a request for a lower bunk chrono. The patient was examined, and the physician documented that no new track marks, scars, or other injuries were noted. The patient, however, was seen in response to a health services request on December 5, 2023, when the nursing staff noted an abscess wound near his elbow from suspected intravenous drug use which the patient denied. The wound became infected requiring extensive treatment from the wound care clinic; the wound did not heal until early January 2024.

The patient was seen by his PC on January 11, 2024; however, the PC failed to note the treatment for the abscess and the suspected intravenous drug use as well as the impact of that behavior on his ability to adequately function in the community. The patient reportedly stated that he had been successful in remaining substance free and that he had no drug cravings. As the PC had obviously not reviewed the healthcare record, those statements went unchallenged.

**Findings**

The care and treatment provided to this patient were inadequate.

Despite the patient having no qualifying diagnosis for inclusion in the MHSDS and refusing to allow the release of prior mental health records to support his self-report of PTSD, ADHD, and treatment with Seroquel; the patient was prescribed psychotropic medication. The patient did not meet the criteria for inclusion in the MHSDS; however, clinicians did not directly address that concern with the patient. Psychotropic medication was continued despite one psychiatrist indicating the importance of discontinuation of the medication. There was also a lack of continuity of care and poor coordination of care.

**Patient J**

This 23-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. At the time of arrival, he was provided a diagnosis of schizophrenia, but he was not prescribed psychotropic medication. The patient arrived at CRC on October 18, 2023 from NKSP and was serving his first prison sentence with a release date on February 4, 2024.

The initial psychiatric assessment at CRC occurred on October 30, 2023 and was completed by a covering psychiatrist; the patient declined medication treatment. The psychiatrist provided diagnoses of unspecified psychosis, unspecified mood disorder, and history of polysubstance use disorder.

During the initial PC assessment on October 26, 2023, the patient reported a history of auditory hallucinations which he said began at age six. He reported receiving significant mental health

treatment in the community due to behavioral problems. Much of the information in the PC assessment was copied unchanged from a June 2023 assessment completed at another institution. The patient was assessed as high functioning with minimal symptoms.

The initial IDTT meeting occurred one day late on November 2, 2023; the meeting included the assigned PC, a psychiatrist who was not assigned to the patient and a CCI, and the patient refused to attend. Hallucinations, depressed mood, and impulsive behaviors were identified as treatment targets, despite the assessments documenting that the hallucinations were infrequent and had not occurred during the prior six months despite no medication treatment. Skills development was the primary focus of the treatment plan. Based on the description of the treatment interventions, it appeared that the PC planned to use cognitive behavioral treatment techniques, but those interventions were not explicitly included. No treatment goal was included for pre-release planning, and the patient was not referred to any treatment groups. The interventions included in the treatment plan were unclear, and more specificity was needed.

A preliminary pre-release assessment was initiated by the pre-release coordinator on December 7, 2023 without clinical contact with the patient. The pre-release assessment was finalized on January 3, 2024 by the PC with the patient.

The patient was seen by his assigned psychiatrist on January 9, 2024, when he denied current symptoms, declined medication treatment, and was observed to function at an adequate level. The patient was not seen again by his PC but did meet with the pre-release coordinator when he was informed of his acceptance to a community residential program; that contact occurred one day prior to release.

**Findings**

The care and treatment provided to this patient was inadequate.

The initial PC assessment was poor and relied primarily on outdated information. The treatment plan was inadequate considering the patient's reported history. The patient's lack of insight regarding his mental illness and pending release from prison were not addressed in treatment. Additionally, there was clearly confusion regarding the patient's diagnosis that the IDTT failed to address.

**Patient K**

This 58-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. He was given a provisional diagnosis of schizophrenia spectrum and other psychotic disorder. The patient's history was significant for at least one suicide attempt while intoxicated. The patient arrived at CRC on or around August 23, 2023.

The primary clinician completed their initial assessment on August 30, 2023. A psychiatrist completed a timely but brief version of an initial assessment on a progress note. Notably, providers initially suspected that the patient's prior psychotic symptoms were substance-induced.

The IDTT convened on September 5, 2023. The treatment plan developed on that date targeted anxiety, depression, and delusions. Substance abuse was not addressed in the treatment plan, despite providers documenting that the patient's substance use likely contributed to his suicidal thoughts and exacerbated his mood, psychosis, and anxiety symptoms. The clinician also referenced a prior suicide attempt that occurred while the patient was intoxicated. The treatment plan indicated that the intensity of anxiety and depression would be reduced to a self-rating of two or below by the next IDTT interval. The one intervention for anxiety and depression involved "fostering a therapeutic alliance by empathizing with the patient's feelings of distress." Regarding delusions, the treatment plan stated only that, "patients are taught to review paranoid delusional thinking rather than just accepting them."

During October 2023, the patient reported thoughts of suicide after the death of his sister, and he was referred to the MHCB for suspected substance use and danger-to-self concerns. Following MHCB discharge on or around October 25, 2023, the patient returned to the 3CMS level of care at CRC where his post-discharge five-day follow-up was completed in accordance with policy. However, despite the patient's inadequate initial treatment plan, recent admission, and discharge from the MHCB level of care, suspected substance use, and return to the 3CMS level of care; the IDTT did not reconvene or update the treatment plan after September 5, 2023.

A DDP screening evaluation conducted in November 2023 indicated that the patient had a serious mental illness but did not have an apparent cognitive disability. Beyond the DDP screening, neither the PC nor the psychiatrist sought diagnostic clarification.

Primarily in response to staff and patient referrals, the CRC psychiatrist met with the patient twice monthly during July, August, and September, and monthly in October and November 2023. The psychiatrist adjusted the patient's medications in response to his nonadherence during this timeframe. Abilify was prescribed briefly during September 2023; however, the patient reported taking the medication for only a few days. During November 2023, the patient declined all psychotropic medications, and the psychiatrist encouraged him to submit requests for appointments as needed.

The PC completed at least six contacts between July 2023 and January 2024, four contacts were in response to referrals. The PC's mental status updates during this period continued to reference bizarre persecutory delusions, auditory hallucinations, tactile hallucinations, and impaired judgment. The patient's delusional thinking involved beliefs that he was being "gang stalked" and had a "neural receiver" that sent others' messages from his body. During PC encounters, the clinician implemented interventions for anxiety, but not for grief, psychosis, depression, recent suicidal thoughts, or substance use issues that were clinically indicated.

**Findings**

The care provided to this patient was inadequate.

The frequency of patient and staff referrals, symptom severity, medication nonadherence, recent MHCB admission, and diagnostic uncertainty suggested that providers should have scheduled an IDTT to consider referral to a higher level of care, to develop a more comprehensive and

effective treatment plan, to clarify the patient's diagnoses, and to increase contact frequencies for closer monitoring and care. Instead, the treatment plans remained deficient and were not updated as required or indicated. The interventions implemented during PC encounters failed to address the patient's depression, grief, psychosis, medication nonadherence, and suspected substance use. Clinical notes suggested that no consultation occurred between the treating providers or collateral contact with housing unit officers to determine whether the patient's psychotic symptoms impaired his ability to function in the dorm setting. Further, despite the PC describing the patient's judgment as impaired, the psychiatrist planned to rely on the patient's judgment to request future psychiatric contacts after medication discontinuation during November 2023.

**Patient L**

This 52-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC from August 24, 2023 to December 29, 2023. The patient's initial psychiatric diagnoses at CRC included adjustment disorder with mixed anxiety and depressed mood, opioid use disorder, and amphetamine-type substance use disorder. The rationale for those initial diagnoses was not documented in the healthcare record, and the diagnoses failed to account for the patient's history of treatment for a serious mental illness, ongoing psychotic symptoms, and prescribed antipsychotic medication.

The initial treatment plan targeted hallucinations and anxiety with vague interventions. For example, the IDTT stated that hallucinations would be addressed through journaling and that anxiety would be addressed through "fostering a therapeutic alliance by empathizing with the patient's feelings of distress."

The initial psychiatric assessment was completed timely during August 2023. The psychiatrist prescribed BuSpar, chlorpromazine, and mirtazapine. The psychiatrist also referenced recent incidents of medication diversion by the patient at the reception center and appropriately ordered administration by crush and float and oral disintegration. At CRC, the patient was reportedly medication adherent.

The psychiatrist subsequently met with the patient on three occasions during the four-month period that he remained at CRC. On October 4, 2023, the CRC psychiatrist changed the patient's diagnosis from adjustment disorder to schizophrenia due to ongoing auditory hallucinations and delusional thinking. No medication changes occurred on that date.

The CRC primary clinician met with the patient four times during October 2023, once during November 2023, and once during December 2023. During an October 3, 2023 PC contact, the clinician described the patient as disheveled with uncontrollable shaking, poor judgment, and insight. On that date, the PC documented a plan for follow-up within seven days. The PC subsequently saw the patient on October 11 and October 19, 2023; no improvement was noted in his mental status. During the October 11, 2023 contact, the PC indicated that they were considering referral to a higher level of care, and the patient was referred to see the psychiatrist.

The psychiatrist saw the patient in response to the PC referral when they referenced worsening mood symptoms, a recent RVR for receiving a "coil" from another inmate, and a plan to increase the dosages of BuSpar and Remeron.

In response to a mental health referral, a covering PC met with the patient on October 19, 2023; the PC documented that the patient feared that he would be referred to a higher level of care and expressed his desire to avoid a level of care change and transfer. The patient also stated that he was able to manage his symptoms during that contact.

The PC subsequently saw the patient on November 29, 2023, and again indicated that the patient was being considered for the EOP level of care. On that date, the PC contacted a dorm housing officer for additional collateral information. The officer described the patient as "spaced out," isolative, and requiring frequent prompting for showers and attendance at scheduled appointments. The officer added that the patient had minimal personal items and no television in his property.

The IDTT convened to review the patient's level of care on December 5, 2023. The patient's level of care was changed to EOP on that date, and he transferred to an EOP institution during January 2024.

Of note, during November and December 2023, PC contacts were offered monthly. No PC contacts were offered during January 2024.

**Findings**

The care provided to this patient was inadequate.

During August 2023, the IDTT failed to provide an appropriate diagnosis that acknowledged the presence of a serious mental illness and accounted for the patient's symptom severity, antipsychotic medication treatment, and psychiatric history. Likely related to diagnostic inaccuracy and insufficient case formulation, the treatment plans remained incomplete and ineffective. Fortunately, by October 2023, staff referrals resulted in the providers correcting the patient's diagnosis, consulting with other staff, and identifying signs of decompensation and inability to function adequately in the general population 3CMS dorm housing. Clinical contact frequencies were initially increased and the providers recognized the need for referral to a higher level of care. However, despite documenting a sufficient case for the EOP level of care during October 2023; the IDTT did not convene to review and change the level of care until December 5, 2023, and the PC contact frequencies were reduced to monthly after October 2023 instead of increased to weekly based on clinical indications and the appropriate level of care.

**Patient M**

This 51-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. He was provided a diagnosis of schizoaffective disorder, bipolar type. He arrived at CRC with prescriptions for Zyprexa and Depakote but requested discontinuation of all

psychotropic medications during July 2023. The patient was housed at CRC from June 12, 2023 to November 13, 2023.

During early August 2023, the patient informed his PC that he was experiencing worsening anxiety, auditory hallucinations, paranoid ideation, and interpersonal issues in the dorm setting. The PC documented that the patient presented with hypomania and hyperverbal speech and reported hearing a woman's voice when not distracted by conversations with others. The PC recommended transfer to the EOP level of care on that date and documented a plan to schedule an IDTT for a level of care review.

On August 8, 2023, the IDTT convened to review the patient's level of care but retained the patient at the 3CMS level of care without a clear clinical rationale provided or a sufficiently enhanced care plan in lieu of EOP placement. For example, instead of planning for increased contact frequencies at the 3CMS level of care, the IDTT stated that 90-day contacts would be maintained, and that the patient would continue to be observed for possible placement at the EOP level of care. Further, despite providers documenting that hygiene concerns and interpersonal issues impacted the patient's ability to function in the dorm setting, those concerns were not addressed in the treatment plan or during clinical encounters. While hypomania was listed as a treatment target, the planned intervention was limited to "fostering a therapeutic alliance through empathy."

Approximately three days after the August 8, 2023 IDTT meeting, a housing unit officer submitted an urgent mental health referral indicating that the patient was responding to auditory hallucinations, presenting with withdrawn and confused behavior, exhibiting poor hygiene, and engaging in bizarre behaviors that annoyed others in the dorm.

A PC met with the patient in response to the custody referral on August 11, 2023. On that date, the PC documented that while the patient denied psychotic symptoms, he presented with pressured speech, psychomotor agitation, limited insight regarding his mental illness, lack of motivation for treatment, and a tendency to minimize the severity of his symptoms. The patient also reported that he refused to wash his socks, used foot powder on his mattress, and slept directly on the mattress without a bedsheet. The patient further indicated that he feared his involvement in the mental health program would delay his release date or result in an OMHD commitment.

On August 15, 2023, the PC discussed treatment with psychotropic medication and transfer to the EOP level of care with the patient; however, the patient again voiced concern that psychotropic medication and the EOP level of care would increase the likelihood of an OMHD commitment at the time of his release. Of note, the providers did not document a clinical rationale for retaining the patient at the 3CMS level of care during August 2023.

After discussing EOP level of care with the patient, the PC noted that he subsequently denied symptoms and interpersonal issues including during a PC contact on August 22, 2023. However, during a psychiatric contact on August 30, 2023, the patient admitted to the psychiatrist that he continued to experience interpersonal problems in the dorm setting and claimed that others were

trying to have him removed.  Unfortunately, there was no documentation of follow-up inquiries in response to that claim.

After the custody referral on August 11, 2023, the providers did not document communications with housing unit officers for updated collateral information regarding the patient's functioning in the dorm.

Fortunately, on August 30, 2023, the psychiatrist convinced the patient to restart treatment with Zyprexa for psychosis and hydroxyzine pamoate for anxiety.  On September 9, 2023, the patient agreed to an increase in the Zyprexa dosage.  The psychiatrist also referenced the patient's self-reported benefits from the medication on that date.

The PC met with the patient on at least seven occasions within a five-month period.  The most recent PC contact occurred on September 29, 2023, when the patient continued to deny psychiatric symptoms and interpersonal issues in the dorm setting.  Of concern was the failure of the PC to corroborate this information by communicating with housing unit officers.

On November 8, 2023, the psychiatrist documented that the patient was awaiting transfer to DSH-Atascadero for an OMHD commitment.  On that date, there were no references to collateral contacts with housing unit officers or information about the patient's response to the civil commitment.

**Findings**

The overall care provided to this patient was inadequate.

During August 2023, the PC appropriately recommended transfer to the EOP level of care and arranged for an IDTT; however, the IDTT retained the patient in the 3CMS program with a plan for maintaining 90-day PC contact intervals.  The IDTT did not provide a clear rationale for opposing the PC's recommendation for EOP placement or develop a sufficient enhanced care plan in lieu of transfer to the EOP.  After the August 8, 2023 IDTT, new information from the patient, staff, and PC suggested that the IDTT should have reconvened to discuss the appropriate level of care, treatment plan, and contact frequencies; however, this never occurred.  While PC contact frequencies increased in response to the patient's concerning presentation; the PC and psychiatrist continued to rely on the patient's self-report in determining progress despite the PC previously documenting that the patient lacked insight regarding his mental illness and minimized his symptoms to avoid an OMHD commitment.  The PC also failed to document meaningful clinical interventions during their encounters, including addressing hygiene practices, interpersonal difficulties, disruptive behavior in the unit, and anxiety surrounding OMHD commitment.  While it was promising to learn that the psychiatrist convinced the patient to accept medication; neither the PC nor the psychiatrist documented contact with the housing unit officers after they reported concerns about the patient's symptoms, behaviors, and ability to function in the dorm setting.  Instead, the providers continued to rely on the patient's self-report regarding medication benefits and other improvements.

**Patient N**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. At CRC, the patient was provided a diagnosis of unspecified anxiety disorder and was prescribed Abilify, Lexapro, and hydroxyzine. Abilify, however, was appropriately discontinued during the subsequent psychiatric contact due to lack of evidence of the presence of a mood disorder or psychosis. The patient was only prescribed hydroxyzine in June 2023.

The patient was housed at CRC from April 13, 2022 until the date of his release from prison on October 12, 2023. The patient had no history of self-harm or suicide attempts, and he had not participated in a level of care higher than 3CMS during incarceration. The most recent SRASHE, completed on March 9, 2022, assessed the patient with low chronic and acute suicide risk.

The annual routine IDTT meeting occurred timely on April 12, 2023. The clinical summary on that date offered valuable information about the patient's treatment and psychosocial history, custodial factors, current symptoms, and level of functioning. The IPOCs were inadequate, as the only intervention listed for depressed mood was a generic statement indicating that the therapist would "foster a therapeutic alliance by empathizing with the patient's feelings of distress." The IDTT did, however, document a more individualized treatment plan in the transfer discharge planning and recommendations section of the master treatment plan form. The patient reportedly did not meet any higher level of care referral criteria while housed at CRC.

On August 14 and September 7, 2023, the patient participated in mental health pre-release planning assessments, and the corresponding documentation suggested that his discharge planning needs were met. The documentation indicated the patient also participated in an addiction and criminal thinking group while housed at CRC.

Both the psychiatrist and the PC met with the patient on at least ten occasions from July 7, 2022 to September 12, 2023. The PC progress notes referenced evidence-based interventions implemented to address the patient's anxiety and maladaptive thoughts. The interventions included practicing deep breathing, progressive muscle relaxation, mindfulness exercises, and pre-release planning. The progress notes also suggested that the patient benefitted from those interventions and remained relatively stable in the 3CMS program until his prison release.

**Findings**

The care provided to this patient was adequate.

While IPOCs were not utilized appropriately, the IDTT documented and implemented a treatment plan that addressed the patient's mental health and pre-release planning needs. Both the primary clinician and psychiatrist met with the patient more frequently than minimally required. The clinical notes included descriptions of progress over time and suggested that the patient benefitted from the providers' clinical interventions.

**Patient O**

This 63-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC.  At CRC, the patient was provided diagnoses of depressive disorder, not otherwise specified; substance-induced psychosis versus psychotic disorder, not otherwise specified; methamphetamine dependence; and alcohol dependence.  The psychiatrist prescribed Zyprexa and BuSpar.  While the psychiatrist referenced a history of psychotic symptoms, the patient reportedly attributed prior perceptual disturbances to methamphetamine use.
The patient was housed at CRC from September 1, 2023 to November 12, 2023.

According to the healthcare record, the patient was previously provided a diagnosis of schizoaffective disorder, depressive type, had a history of involuntary psychiatric hospitalizations in the community, and reported at least two self-harm incidents or suicide attempts.

The initial PC assessment was completed on September 13, 2023, and the psychiatrist completed a brief initial assessment on a progress note dated September 14, 2023.  The initial and only IDTT meeting at CRC occurred on September 19, 2023.  The clinical summary completed on that date was brief but included some meaningful information that was pulled forward from prior records.   The treatment plan targeted depressed mood with a goal of reducing depressed mood to a rating of two or below by the next IDTT interval.  Planned clinical interventions were absent from the treatment plan.

In response to referrals from nursing, the primary clinician met with the patient on two more occasions during September 2023 and November 2023.  On November 11, 2023, the patient was evaluated in response to suicidal ideation and command auditory hallucinations.  The patient was prescribed a low dose of Zyprexa while at CRC; however, the patient perceived that the medication was ineffective.  The evaluating clinician noted that the patient previously managed his symptoms with Seroquel; however, Seroquel was not available for treatment at the patient's current level of care.  On that date, the patient reported a plan to overdose on any medication he had in his possession and thoughts of pouring scalding water into the ear of a peer to instigate a fight.  The patient further reported that his psychotic symptoms increased with environmental triggers of witnessing fights in the bathroom; additionally, he reported command auditory hallucinations instructing him to assault a peer with a tablet.

The patient was appropriately referred to the MHCB level of care on November 11, 2023, with a recommendation for discharge to the EOP level of care.  The SRASHE completed on that date assessed the patient's chronic suicide risk as moderate and acute suicide risk as high.  Although the patient denied prior suicide attempts, the evaluating clinician referenced prior self-harm or suicidal behaviors that were documented in the healthcare record.

After the patient transferred to an MHCB on or around November 12, 2023, he did not return to CRC.  The documentation indicated that he subsequently transferred to San Quentin.

**Findings**

The care provided to this patient was adequate.

The initial assessments and IDTT meeting occurred timely. While the treatment plan was incomplete, not clinically useful, and suggested that additional training was indicated; the clinical interventions implemented during referral encounters were appropriate. The patient was also timely and appropriately assessed and referred to the MHCB level of care with a recommendation for EOP placement upon discharge. Further, the patient transferred to an MHCB within the required 24-hour timeframe.

**Patient P**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. The patient was provided diagnoses of anxiety disorder and substance use disorder. The treatment plan clinical summary stated that the patient had anger issues. The most recent SRASHE completed at the reception center on March 20, 2023 assessed the patient with low chronic and acute suicide risk. The patient was housed at CRC from May 18, 2023 to October 13, 2023.

At CRC, the initial psychiatric assessment was documented on a progress note rather than the appropriate form that was dated May 22, 2023. The initial PC assessment was completed on June 1, 2023, and the IDTT convened to develop an initial treatment plan on June 7, 2023. The patient was not prescribed psychotropic medication while housed at CRC, but he did receive a follow-up psychiatric contact one month after the initial IDTT meeting on July 7, 2023.

On June 7, 2023, the IDTT developed an IPOC for anxiety with a generic intervention indicating that the therapist would "foster a therapeutic alliance by empathizing with the patient's feelings of distress." Fortunately, a more individualized treatment plan was located in the level of care rationale section of the same form. The IDTT noted in that section that cognitive restructuring would be utilized to assist the patient in identifying, challenging, and replacing at least three harmful automatic thoughts and to develop at least one self-soothing technique, such as deep breathing, progressive muscle relaxation, and mindfulness. The IDTT also reviewed mental health group options with the patient and provided a 3CMS orientation brochure on that date.

The PC progress notes confirmed that additional individualized treatment interventions were implemented during clinical encounters.

Regarding the patient's pre-release planning needs, a related IPOC was developed during June 2023; the patient participated in two pre-release planning assessments, and the PC referenced specific discharge planning interventions during individual encounters which occurred more frequently than minimally required.

On August 29, 2023, the PC referenced the second pre-release planning assessment, parole plans, and community resources. The PC also documented a plan to work with custody on a housing unit change to address a concern discussed during the session. Further, the PC noted specific

interventions implemented to reduce negative thoughts and to teach self-soothing. On September 13, 2023, the PC progress note indicated that the patient discussed a distressing situation wherein he utilized mindfulness techniques to effectively manage his anxiety.

**Findings**

The care provided to this patient was adequate.

The treatment plan clinical summary offered a sufficient synopsis of current symptoms, functional impairments, relevant custodial factors, treatment and psychosocial history. The provider contact frequencies for individual sessions were appropriately based on clinical need that exceeded minimum requirements.

As was noted at other CDCR institutions, IPOCs were not effectively utilized at CRC. For this patient, however, the IDTT developed a more individualized care plan in a different section of the master treatment plan form. The PC progress notes confirmed that the individualized treatment plan was consistently implemented during routine encounters, and that interventions effectively addressed the patient's anxiety, anger, and pre-release planning needs.

**Patient Q**

This 27-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. During April 2023, the CRC psychiatrist provided a diagnosis of antisocial personality disorder and noted substance use issues as well. A separate section of the psychiatric documentation referenced a working diagnosis of unspecified bipolar and related disorder, methamphetamine use disorder, cannabis use disorder, and alcohol use disorder.

While the PC also provided a diagnosis of antisocial personality disorder, they referenced a history of unspecified depressive disorder. The patient was previously prescribed Seroquel, Wellbutrin, Risperdal, and Depakote; however, no psychotropic medications were prescribed at CRC. The provider progress notes suggested that the patient was primarily retained at the 3CMS level of care based on the recent discontinuation of medications and the need for further observation.

According to the healthcare record, the patient was housed at CRC on at least two occasions prior to his most recent return on January 31, 2023.

The initial PC assessment was completed on February 6, 2023, and the IDTT convened on February 15, 2023 to develop the initial treatment plan. The CRC psychiatrist completed their initial assessment on a progress note instead of the approved initial assessment form. The psychiatrist documented a history of medication "cheeking" and indicated that the patient was doing well without psychotropic medications while housed at CRC.

The treatment plan clinical summary provided a useful synopsis of current symptoms, custodial factors, functional impairments, and relevant treatment/psychosocial history. The treatment plan included an IPOC for depressed mood. The documented intervention stated only that the

clinician would "foster a therapeutic alliance by empathizing with the patient's feelings of distress." There was also an IPOC for substance abuse with goals of learning five triggers for alcohol and drug use, identifying three positive coping skills, and remaining clean and sober for six months. The IDTT further indicated that 3CMS contact frequencies would occur every 30 to 90 days.

The primary clinician met with the patient on four occasions between January and June 2023. The PC referenced meaningful interventions during clinical contacts, including cognitive behavior therapy for reducing maladaptive negative thoughts and recidivism, and interventions for pre-release planning. The patient also participated in formal pre-release planning assessments on May 30 and June 15, 2023.

The patient was released from CRC to the community on or around July 20, 2023.

**Findings**

The care provided to this patient was adequate.

The patient was appropriately retained at the 3CMS level of care for further observation after his psychotropic medications were discontinued. While the IDTT documentation suggested a lack of diagnostic discussion among providers and the need for additional training on treatment planning, the patient's primary presenting problems appeared to be addressed during PC encounters. The PC contacts occurred more frequently than minimally required, and the PC progress notes referenced relevant and meaningful interventions for pre-release planning, including teaching skills and providing resources to prepare the patient for community release and to reduce the likelihood of recidivism.

**Patient R**

This 54-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. The patient arrived at CRC on October 31, 2018. Psychiatric diagnoses included "depression" and amphetamine-type substance use disorder. The patient declined treatment with psychotropic medications while housed at CRC, and he did not participate in psychiatric contacts.

The PC contacts occurred more frequently than minimally required, and the documentation of those contacts suggested that the patient benefitted from the therapeutic interventions and remained relatively stable without psychotropic medication treatment.

The treatment plans were updated timely. The most recent treatment plan targeted the patient's feelings of worthlessness and guilt, indicating that the patient would identify five benefits of increased self-esteem within an unspecified time frame and that feelings of worthlessness and guilt would remain in remission for a period of three months. The intervention for this target was limited to the therapist "fostering a therapeutic alliance by empathizing with the patient's feelings of distress." The treatment plan also included an IPOC for substance abuse, for which the goal was to identify three ways of improving decision-making skills within an unspecified

time frame.  The documented intervention for substance use stated, "encourage patients to put time in between the impulse and the action."  The patient reportedly did not meet any criteria for consideration of referral to a higher level of care while housed at CRC.

On October 12, 2023, the IDTT granted the patient's request for removal from the 3CMS level of care.  The level of care section of the treatment plan indicated that the patient programmed, had no RVRs, and remained stable and sober without psychotropic medication treatment for over 10 years.  The IDTT further indicated that the patient remained optimistic about his future, had completed his parole plan, maintained strong support from family and friends, and demonstrated insight and the use of appropriate coping strategies to deal with stressors.

**Findings**

The care provided to this patient was adequate.

The PC contacts occurred more frequently than minimally required for 3CMS patients, reflecting appropriate consideration of clinical need.  While treatment plans were inadequate and suggested the need for additional training; the patient appeared to benefit from the therapeutic interventions, and the decision to remove the patient from the MHSDS was appropriately justified.  Further, the patient appeared to benefit from the various parole planning services offered through mental health and other programs at CRC.

**Patient S**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC.  The patient transferred from the reception center to CRC during July 2023, where he remained through the date of review on March 3, 2024.

According to the healthcare record, the patient had one inpatient psychiatric hospitalization and received treatment for depression and anxiety in the community.  There was no documentation of a history of self-harm or suicide attempts.

At CRC, the patient participated in two psychiatric contacts on July 7, 2023 and December 18, 2023.  The psychiatrist noted that the patient's Prozac was discontinued at his request during the initial contact in July 2023.

The initial PC assessment was completed timely, and the patient was seen at least monthly from July 2023 to December 2023.

The initial IDTT meeting occurred timely during July 2023.  The IDTT noted that the patient presented with objective signs of depression, was unwilling to accept psychotropic medication treatment, was unable to self-identify mental health treatment goals, had no family support, and reported feelings of guilt and negative thoughts of prior deeds.  The IDTT appropriately recommended PC contacts every two to four weeks based on the patient's presentation at that time.

The PC met with the patient on six occasions during his initial six-month period at CRC. Although the patient was resistant to engage with mental health staff, the PC continued to offer contacts based on clinical need, and the PC progress notes offered meaningful mental status updates. The patient's reluctance to engage limited the PC's ability to intervene beyond conducting mental status examinations.

On January 18, 2024, the PC documented that the patient requested to sign a refusal form, explaining that he wanted to be left alone. The patient stated to the PC that he was doing okay and denied any mental health problems on that date. The clinician appropriately contacted the patient's housing unit for collateral information on that date and documented a plan to follow up in two weeks. Of note, the housing unit officer did not report significant concerns.

In a progress note dated February 8, 2024, the PC indicated that the patient appeared rushed and wanted to end the session as quickly as possible. On that date, the clinician again documented no concerns regarding the patient's mental status. As a result of the patient's relatively stable presentation and ongoing lack of interest in mental health services, the PC recommended retaining the patient at the 3CMS level of care with a change in contact frequency to every 90-days.

**Findings**

The care and monitoring provided to this patient at CRC was adequate.

While the treatment plan required improvement, and the patient's resistance to engage with mental health staff prevented the PC from implementing treatment interventions; the IDTT appropriately developed and implemented a plan for monitoring the patient more closely based on clinical indications during the first six months of his incarceration. Further, instead of relying on the patient's self-report, the PC appropriately contacted a housing unit officer for additional collateral information prior to reducing PC contact frequencies to 90-day intervals. The psychiatrist also appropriately saw the patient for follow-up after psychotropic medications were discontinued during July 2023.

**Patient T**

This 62-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CRC. His historical diagnoses included PTSD, bipolar I disorder, obsessive compulsive disorder, generalized anxiety disorder, and adjustment disorder. His CRC diagnoses included adjustment disorder, unspecified PTSD, and unspecified bipolar disorder. The patient was prescribed antipsychotic, antidepressant, and mood stabilizing medications. The patient was housed at CRC from September 11, 2023 to January 18, 2024.

The most recent SRASHE dated August 14, 2023, assessed low acute and chronic suicide risk and indicated no known history of self-harm or suicide attempts. In response to inquiries regarding over 25 psychiatric hospitalizations due to danger to self in the community, the patient reported that he experienced suicidal thoughts in the context of substance use.

The initial PC assessment was completed timely on September 27, 2023. The psychiatrist documented their initial assessment on a progress note dated October 5, 2023. The IDTT initially convened on September 27, 2023. The treatment plan included IPOCs for mania and substance abuse with goals of reducing mania and cravings for substances to a rating of two or below by the next IDTT interval. Neither of those IPOCs included corresponding interventions. The level of care rationale indicated that the patient would be retained at the 3CMS level of care to focus on his treatment goals of mania and substance abuse.

The PC met with the patient on three occasions while he remained housed at CRC. While the PC appropriately noted consults with dorm housing unit officers, provided detailed mental status updates, and referenced medication adherence; the PC did not document therapeutic interventions during clinical encounters, including addressing the patient's goals regarding substance use and mania or in response to anxiety after his September 8, 2023 release date was extended.

During October 2023, the patient was reportedly found eligible for placement in the Male Community Re-entry Program (MCRP). The patient also participated in mental health pre-release planning assessments on December 20, 2023 and December 21, 2023.

The most recent PC progress note dated December 13, 2023, indicated that the patient remained stable on his psychotropic medication and was hopeful that he would be released soon. Again, no therapeutic interventions were referenced at this PC encounter.

The most recent psychiatric appointment occurred on January 3, 2024. On that date, the psychiatrist documented that the patient reported feeling fine, remained medication adherent with no apparent side effects, and exhibited a positive response to treatment with mood-stabilizing medications.

**Findings**

The overall care provided to this patient was minimally adequate.

The treatment plan was inadequate, and clinical interventions were not offered in accordance with the treatment goals or in response to the patient's extended prison release date.

Despite those concerns, the required clinical contacts occurred timely, and the PC closely monitored the patient through collateral contacts and a higher frequency of PC encounters. The clinical documentation also suggested that the patient's pre-release planning needs were eventually addressed and that he responded well to psychopharmacological interventions. Further, clinical documentation indicated that the patient was found eligible for a CDCR program (MCRP) that offered various rehabilitative services, including for substance use treatment, mental health care, employment, education, and housing.

**APPENDIX B – 10**
**CORRECTIONAL TRAINING FACILITY (CTF)**
Site Visit: January 23, 2023 – January 25, 2023
Review Period: June 1, 2023 – November 30, 2023

**Patient A**

This 29-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF.  The patient was provided diagnoses of unspecified anxiety disorder, unspecified depressive disorder, and PTSD.  He was generally adherent with his prescribed sertraline; and the patient was also prescribed buprenorphine-naloxone.

No IDTT meeting was scheduled for the patient during the reporting period, so his most recent treatment plan from February 2023 was reviewed for context.  The plan included IPOCs addressing depression and anxiety with documentation indicating that treatment was focused on reducing depression.  The patient was seen twice by his MHPC during the reporting period, once in July and once in August 2023.  The sessions occurred in a confidential setting, and the documentation included generic reference to clinical interventions used during the sessions.  The reference to clinical interventions was the same copied statements in both notes.  The patient was seen by a psychiatrist in June and August 2023 with adequate documentation of those encounters.  The patient was transferred to another institution on September 8, 2023.

**Findings**

The care and treatment provided for this patient were adequate.

The documentation of clinical interventions during therapeutic sessions, however, required improvement.

**Patient B**

This 55-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF.   The patient was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder.  He was not prescribed psychotropic medications.

A few days prior to the start of the review period on May 22, 2023, the patient was discharged from the MHCB where he was placed after reporting substance-induced auditory hallucinations telling him to kill himself with paranoia and panic, as well as safety concerns.  The initial MHPC and psychiatric assessments were completed timely upon his return to the 3CMS level of care, and both were adequate in content.  A SRASHE was completed on June 1, 2023, that was also adequate.  Five-day follow-up contacts were completed as required.  Of note, the MHPC noted that the patient's symptoms were consistent with a psychotic disorder, rather than a substance-induced psychosis; and as a result, his diagnosis was changed.  The psychiatric providers also documented that the patient had a psychotic disorder rather than substance-induced psychosis.

An initial IDTT meeting occurred on June 8, 2023.  The required staff were present at the meeting; however, the psychiatrist at the meeting was not the psychiatrist who had completed the initial psychiatric assessment, and there was no indication that the psychiatrist had met the patient previously.  An IPOC was initiated to address hallucinations.  Given the role of substance use in recent crisis episodes; abstinence from substance use and staff support were included as measures to avoid future MHCB placement.  The decision to retain the patient at the 3CMS level of care was adequately supported.

The patient was seen by a psychiatrist on June 28, 2023, when he reported a recent recurrence of psychotic symptoms.  The psychiatrist noted their intention to change the patient's medications if the symptoms continued and noted a plan to see the patient again in one month.  The patient was not seen within one month but was seen by another psychiatrist on September 30, 2023.  During that contact, the patient denied all symptoms and requested discontinuation of his medication.  The olanzapine was discontinued as requested with a plan to see the patient within four weeks.  The patient was seen on October 10, 2023, as he had consistently refused his mirtazapine since the prior psychiatric appointment.  The patient reported that he thought that all medications were discontinued.  The psychiatrist discontinued the mirtazapine, and no plans to see the patient again were documented; instead, the psychiatrist indicated that the patient should request to be seen should his symptoms recur.  The patient was not seen by a psychiatrist following that contact.

During the reporting period, the patient was not seen by his MHPC for any routine therapeutic contacts.  The patient was seen by his assigned MHPC on August 4, 2023 and November 1, 2023 for completion of the 90-day follow-up SRASHEs; those assessments were inadequate due to limited updated information included in the assessments.  There was no documentation of the discussion and provision of any treatment interventions during those contacts.  The first individual MHPC contact documented in the healthcare record following the patient's transfer to CTF occurred on December 28, 2023 with a newly assigned MHPC.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient arrived at CTF after discharge from the MHCB where he was placed due to command auditory hallucinations to harm himself, and he was started on antipsychotic medications in the MHCB.  The initial MHPC assessments noted that the patient's symptoms were indicative of a psychotic disorder rather than substance-induced as had previously been reported.  His diagnoses were changed to reflect this finding and were confirmed by psychiatric staff.  Despite those determinations, the patient was not seen routinely by his MHPC for therapeutic interventions, and he was seen only to complete SRASHEs which were not adequately updated.  The psychiatric staff did not see the patient as ordered, and all medications were discontinued, without any psychiatric follow-up provided.  This course of treatment was clinically contraindicated for a patient with a psychotic disorder.

**Patient C**

This 58-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient was provided with a diagnosis of other specified schizophrenia spectrum and other related disorder. He was not prescribed psychotropic medications.

No IDTT meeting occurred during the reporting period, so the patient's most recent treatment plan dated March 9, 2023 was reviewed for context. The treatment plan targeted the patient's paranoid delusions with a goal of reducing distress and learning coping skills. The documentation noted that the patient endorsed mood swings, anxiety, irritability, disturbed sleep, weight loss and low mood, yet none of those symptoms were addressed in the treatment plan. Also, despite a noted history of substance use and self-injurious behavior, those issues were also not addressed in treatment planning. The IDTT documentation noted that the patient declined treatment with psychotropic medication.

During the reporting period, the patient was seen by two different MHPCs, on June 27, 2023 and October 2, 2023. During the June contact, the patient was distressed about not being able to transfer to another prison, and there was evidence that his coping skills were supported during the session. The documentation for the October session was internally inconsistent; however, the documentation did indicate that support for coping skills were provided during the session.

**Findings**

The care and treatment provided to this patient during the review period were adequate.

The documentation, however, required improvement to clearly indicate what specific mental health interventions were provided and how they were consistent with the treatment goals. The IDTT documentation and treatment plan needed improvement as well.

**Patient D**

This 42-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient was provided diagnoses of major depressive disorder, recurrent episode, mild; persistent depressive disorder; unspecified anxiety disorder and opioid use disorder. He was fully adherent with his prescribed escitalopram. He was also prescribed buprenorphine-naloxone.

No IDTT meetings were scheduled during the reporting period, so his most recent treatment plan dated May 5, 2023 was reviewed for context. The treatment plan included goals to address the patient's depression; however, the interventions listed were generic in nature. The documentation noted the patient's substance use history and his participation in ISUDT, but no formal goal addressing the patient's substance use needs was included.

The patient was seen within required timeframes by his MHPC and psychiatrist during the reporting period. The MHPC contacts reflected adequate assessment and the provision of evidence-based interventions to address the patient's depression. Referrals were made to

medical and ISUDT staff when indicated. The psychiatric contacts were adequate as well. Both the MHPC and psychiatric provider included discussions of the patient's mental health and substance use treatment needs and overall functioning in their documentation.

**Findings**

The care and treatment provided to this patient were adequate.

The therapeutic interventions that were provided by the clinicians addressed the patient's mental health needs.

**Patient E**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF RHU. The patient was diagnosed with PTSD and adjustment disorder with mixed anxiety and depressed mood. He was prescribed hydroxyzine and melatonin PRN.

The patient was seen by his psychiatrist in July 2023, and the documentation of that contact was adequate. Two weeks later, he submitted a request to see his MHPC "asap" and was seen within three days. He was seen by a new MHPC, as it was documented that his previous MHPC no longer worked at the institution. The documentation by the newly assigned MHPC was thorough and included a review of the limits of confidentiality, the patient's diagnosis, current treatment plan, and addressed the patient's current needs.

The patient was next seen by his psychiatrist on September 22, 2023. The documentation was minimally adequate, as it included copied text from the prior note that was no longer accurate. The patient's medication dose was increased at his request with a plan for psychiatric follow-up in 30 days. Two weeks later, the patient submitted a healthcare request to see the psychiatrist but was instead seen by his MHPC seven days later for both a routine contact and in response to the request. The contact was adequate and included reference to the provision of interventions; however, there was no documentation that the patient was referred to his psychiatrist for his concerns of nightmares and lack of effectiveness from the medication change.

The patient was placed in restricted housing on October 19, 2023 due to charges of battery on a peace officer. He was seen following an urgent referral for anxiety and fear on October 20, 2023. The response by the MHPC was adequate to address the patient's needs. The patient submitted a healthcare request on October 23, 2023. He was seen for an initial psychiatric assessment on the following day. The assessment was completed by the psychiatrist to whom the patient was assigned in general population. The documentation of that initial psychiatric assessment was made within a standard progress note and contained little information more than what the psychiatrist documented in prior notes. The documentation was also internally inconsistent and included two different doses for the patient's currently prescribed medications. Melatonin was added to assist the patient with sleep. An initial MHPC assessment and SRASHE were completed on October 25, 2023, and both assessments were adequate.

An initial IDTT meeting occurred on November 1, 2023 with the required staff present. The patient's previous IPOC addressing anxiety was pulled forward which included a goal to "tolerate uncomfortable social situations such as group three times per week" which was irrelevant to the patient's current situation and restricted housing. There was no mention of the patient's on-going concerns regarding nightmares and overall sleep disturbance. The interventions listed were generic but addressed the patient's needs. The plan included weekly contacts with his MHPC while in restricted housing.

The patient was seen on the following week by the MHPC. The progress note of that contact was internally inconsistent, as it noted the patient's primary complaint was sleep disturbance but then noted later that the patient denied current issues with sleep. The patient indicated that he wanted to be seen by the psychiatrist for his sleep concerns. There was no documentation of the provision of therapeutic interventions during the session. The patient was seen on the following day by the psychiatrist when his melatonin dosage was increased. The patient was seen by a different MHPC on November 15, 2023, and there was documentation that therapeutic interventions and support for the patient's needs were provided. The patient transferred later that same day.

Psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment planning failed to reference the patient's targeted symptoms and primary complaints; a request to see the psychiatrist was not addressed timely or adequately, and both MHPC and psychiatric documentation was poor with multiple examples of documentation that was internally inconsistent and inaccurate due primarily to the copying of prior documentation.

**Patient F**

This 33-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient was provided diagnoses of generalized anxiety disorder and social anxiety disorder. He was prescribed escitalopram with medication adherence.

No IDTT meeting occurred during the review period, and the most recent treatment plan dated March 2023 was reviewed for context. An IPOC addressing anxiety was included in the treatment plan with the goal of tolerating uncomfortable social situations such as group therapy three times weekly. The planned interventions were vague and generic.

The patient was seen by the providers as required during the reporting period. None of the MHPC sessions included documented interventions, but instead included brief descriptions of the patient's current status. The psychiatric documentation was minimal but adequate; however, the notes were very similar in content and appeared to be copied from one session to the next.

**Findings**

The care and treatment provided to this patient were inadequate.

There was no documentation of the provision of therapeutic interventions beyond medication management to assist the patient with his symptoms of anxiety. The documentation of clinical contacts was also largely inadequate to support the provision of continuity of care.

**Patient G**

This 43-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided by CTF RHU. The patient was provided with a diagnosis of unspecified bipolar and related disorder. He was prescribed mirtazapine and was medication adherent.

On June 9, 2023 while at another institution, the patient was placed in restricted housing when he reported symptoms of depression. He was assessed and was determined to require placement at the 3CMS level of care; however, the patient transferred to CTF on June 19, 2023 before the change in level of care was completed.

Upon arrival at CTF, he was placed in restricted housing. He was seen for an initial MHPC assessment and a SRASHE on the following day. The SRASHE was completed, as the patient reported to custody staff that he had thoughts of harming himself while housed in restricted housing. When seen by the MHPC, the patient reported that he made those statements to be seen sooner and to be placed at the 3CMS level of care where he could receive treatment with psychotropic medications. He denied experiencing suicidal ideation. The MHPC assessment and SRASHE were adequate and noted the intention to place the patient at the 3CMS level of care, to refer the patient for MAT due to his reports of drug addiction, and to refer the patient to the psychiatrist for a medication consult. The initial psychiatric assessment was completed later that same day. The assessment was adequate, and the patient was prescribed divalproex sodium.

The patient was seen for follow-up by a different MHPC on July 5, 2023, prior to the initial IDTT meeting. The IDTT meeting occurred later that day, and all required staff were present. An IPOC for depressed mood was initiated. The planned interventions appeared appropriate to address the patient's needs. Later that same day, the psychiatrist documented that the patient had refused eight of the 15 doses of medications offered due to side effects. It was unclear why this information was omitted from the IDTT documentation, as the psychiatrist noted that the side effects were reported by the patient during the IDTT meeting. The psychiatrist discontinued the divalproex sodium and started the patient on mirtazapine. Of note, on July 3, 2023, the patient submitted a healthcare request form stating that the medication caused dizziness; however, the form was not reviewed and placed into EHRS until July 6, 2023. This issue appeared to have been resolved during the psychiatric contact on July 5, 2023.

The patient was seen at the cell front on July 13 and July 19, 2023, as he refused to attend confidential sessions. No concerns were noted at that time. The psychiatrist saw the patient on July 18, 2023 for a brief contact when the patient reported beneficial effects from the medication treatment. The patient transferred from CTF on July 28, 2023.

**Findings**

The care and treatment provided to this patient were adequate.

**Patient H**

This 37-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided by CTF.  The patient was provided diagnoses of schizoaffective disorder, depressive type; major depressive disorder, recurrent episode, in partial remission; disruptive mood dysregulation disorder; and unspecified depressive disorder.  The patient's MHPC noted schizoaffective disorder as the patient's diagnosis, but the psychiatrist documented diagnoses of unspecified depressive disorder, non-psychotic auditory hallucinations, and cannabis use disorder in remission.  The patient was fully adherent with his prescribed sertraline.

The patient was seen for routine contacts by his assigned MHPC in June and November 2023.  Those contacts noted ongoing auditory hallucinations and mild depressive symptoms.  The mental status examination was lengthy; however, it remained largely unchanged for each clinical contact.  An annual assessment including a SRASHE was completed in August 2023 by another MHPC, and the assessments were adequate; however, a safety plan was documented as being clinically indicated, yet no rationale was provided, and the content of the plan was inadequate.

The psychiatrist saw the patient in August and October 2023.  The psychiatrist stated the belief that the patient did not have psychotic symptoms other than auditory hallucinations which were described as atypical.

An annual IDTT meeting occurred on August 8, 2023, and the required staff attended; however, the MHPC in attendance was not the patient's assigned clinician.  The treatment plan documentation did not include discussion of the patient's progress toward treatment goals.  Further, no reference to the diagnostic discrepancies among team members was included in the documentation.  The rationale for retaining the patient at the 3CMS level of care was adequate, and the poorly created safety plan was inserted unchanged into the IDTT documentation.

On the evening of November 25, 2023, a sergeant submitted an emergent referral to mental health indicating that the patient appeared confused, disoriented, withdrawn, hostile, and assaultive.  The sergeant also indicated that the patient had poor self-control, unpredictable and bothersome behavior toward others, and that the patient appeared to possibly be experiencing hallucinations with suicidal ideation.  The sergeant documented that the patient stated that he would jump from the third tier.  An hour later, the patient was seen in the TTA where he reported that he was hearing voices telling him to hit his head and to harm others.  The psychiatrist on-call reportedly ordered placement in alternate housing, an injection of haloperidol, diphenhydramine, and lorazepam, and a urine toxicology screen.  The patient refused the medication and the toxicology screen, stating that he believed the medications to be poisonous.  The on-call psychiatrist reportedly talked with the patient by phone, and the patient denied thoughts of harming himself or others.  The psychiatrist cancelled the placement in alternate housing and cleared the patient to return to his housing.  The nursing staff documented the psychiatrist's

672

orders and noted the plan for mental health staff to see the patient in the morning. There was no documentation of the completion of a SRASHE that was required given the situation. No documentation of the on-call psychiatric contact was located in the healthcare record.

The patient was not seen by a mental health clinician until 20 hours later, during the afternoon of the following day. The patient's assigned MHPC completed a SRASHE and noted an assessment of moderate acute suicide risk. It was determined that an IDTT would be convened to review the patient's treatment plan. As of January 2024, no IDTT had occurred. A safety plan was developed, and the patient was placed on five-day follow-up contacts.

The patient's assigned psychiatrist saw him on November 27, 2023. The documentation acknowledged the patient's apparent decompensation yet continued to include text copied from previous notes stating that the patient's voices did not interfere with his functioning. The psychiatrist offered treatment with antipsychotic medication which the patient refused and documented an intention to see the patient again in 90 days. The five-day follow-up documentation was completed adequately.

On January 14, 2024, a radio call indicated that the patient was found unresponsive. When medical staff arrived, the patient was alert and refused a medical examination. The patient was assessed by his assigned MHPC. The documentation of the patient's mental status was largely unchanged from previous documentation, yet the clinician stated that the patient had a possible catatonic episode with suspected acute decompensation. It was noted that the patient denied symptoms, and a SRASHE was completed; although, it was unclear why that occurred, as the patient was not suicidal. The plan section of the note indicated that the patient was placed on five-day follow-up contacts; those contacts did not occur. The patient was seen by another psychologist on January 17, 2024. The documentation included mostly copied documentation from previous contacts with other clinicians. The patient's mental status was described as unremarkable.

**Findings**

The care and treatment provided to this patient were grossly inadequate.

The patient's assigned MHPC and psychiatrist disagreed regarding the patient's diagnoses, and there was no indication of any attempt for diagnostic clarification.

There were two episodes when the patient presented with acute decompensation, yet there was no adequate rationale provided for not considering the need for referral to a higher level of care.

The documentation by both the MHPC and psychiatrist was repetitive and often copied unchanged for each contact resulting in inaccuracies and inconsistencies, including references to plans that did not occur, such as the provision of five-day follow-up contacts. Further, the MHPC documented that an IDTT would occur in November 2023; however, it did not occur.

Of additional concern was the response to an emergent referral for expressed suicidality and probable psychotic decompensation that was inappropriately addressed by the on-call psychiatrist.

**Patient I**

This 53-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient was provided diagnoses of major depressive disorder, recurrent episode, with psychotic features; other substance-induced depressive disorder, with moderate or severe use disorder; and antisocial personality disorder. The patient was adherent with his prescribed buspirone; he was also prescribed hydroxyzine PRN. The psychiatrist noted that the patient was also prescribed oxcarbazepine and gabapentin by the primary care provider for a seizure disorder. This patient's case was selected to assess the mental health treatment provided, as his IDTT meeting was observed during the onsite visit.

The patient was seen by his MHPC more frequently than every 90 days; he requested to be seen every 45 days, and the psychologist was able to accommodate his request. The documentation of the MHPC contacts made generic references to interventions provided with limited details to support the provision of continuity of care.

The psychiatrist saw the patient at least every 90 days. The psychiatric documentation was similar across contacts and included brief descriptions of the patient's functioning and medication adherence. Prior to the IDTT meeting, the MHPC completed an annual SRASHE and mental health assessment; the content of the assessments was adequate.

The observed IDTT meeting included the assigned MHPC, but a covering psychiatrist and a covering correctional counselor were present, as was a supervisor. The patient was present at the meeting. The IDTT discussion included a review of the patient's current symptoms and functioning, as well as his progress in treatment. The patient talked about how he spent his time and how he experienced his psychiatric symptoms. He stated his request to begin planning for a board hearing that would occur in a few years. A review of the documentation from the IDTT meeting revealed little update of the documentation and did not include any of the discussion regarding the patient's current activities and expectations regarding the board hearing. No mention of the patient's progress was included in the treatment plan.

**Findings**

The care and treatment provided to this patient were minimally adequate.

While the observed IDTT meeting indicated that the patient may have received adequate care, there was no evidence to support that assessment of care in the IDTT documentation; the IDTT documentation included little information that was discussed in the meeting and did not support continuity of care. The documentation of routine contacts was also poor. Further, treatment progress and updated treatment goals were absent from the clinical documentation.

**Patient J**

This 67-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient was provided with a diagnosis of major depressive disorder, recurrent, moderate. He was adherent with his prescribed atomoxetine and buspirone.

The MHPC and psychiatrist saw the patient at least every 90 days. The documentation of both clinicians was similar for each session with limited details provided beyond mental status and a brief description of the patient's functioning. The MHPC did not document the use of therapeutic interventions with any content or context beyond a list of the types of interventions used. The documentation did not support the provision of continuity of care. The diagnoses documented by the psychiatrist and MHPC within progress notes included unspecified anxiety disorder, unspecified depressive disorder, and a number of substance use disorders in remission with no reference to the diagnosis of record. It was unclear why the diagnosis of record was not consistent with the working diagnoses of the IDTT. The psychiatrist consistently documented that the patient was prescribed atomoxetine "off label" for depression and that this medication had been prescribed by the patient's prior psychiatrist. Adequate rationale for the continued off label use of that medication was not present in the healthcare record.

Prior to the IDTT meeting, the MHPC completed an annual SRASHE and mental health assessment. The mental health assessment made no reference to the diagnostic discrepancies and included only the diagnosis of record. The SRASHE was adequate.

During the observed IDTT meeting, the patient and his assigned MHPC were present; however, neither the psychiatrist nor the correctional counselor present were assigned to the patient. The discussion at the IDTT meeting was collaborative but was void of any discussion of treatment goals or therapeutic interventions.

The patient expressed concerns about an upcoming board hearing scheduled for February 2024. A review of the documentation from the IDTT meeting revealed inadequate documentation. There was no mention of the patient's reported anxiety or the upcoming board hearing. In fact, very little information in the IDTT documentation was updated.

**Findings**

The care and treatment provided to this patient were inadequate.

The clinical documentation did not include any discussion of treatment interventions beyond medication management, did not mention treatment progress, and did not include information that addressed the patient's most recently expressed mental health concerns. Additionally, no clinical rationale was provided for the current medication regimen. Overall, the documentation was inadequate to support the provision of continuity of care.

**Patient K**

This 49-year-old patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient was provided diagnoses of persistent depressive disorder, opioid use disorder and stimulant use disorder. He was not prescribed psychotropic medication.

The annual IDTT meeting occurred in July 2023. During the previous year, the patient dealt with significant stressors including the dissolution of his marriage and delays in his appeal. It was documented that he had a long history of anxiety and depression after witnessing and being the victim of domestic violence. IPOCs for depression and anxiety that had been in place since 2022 were continued without change. The associated goals were generic and outdated, as the patient's rating of his baseline symptoms was lower than the identified target goal. Further, the sole intervention, to foster a therapeutic alliance, was long outdated as his PC had worked with the patient since 2021.

The primary clinician documentation from the two required primary clinician contacts during reviewed dates was appropriately descriptive of the patient's psychosocial stressors and their impact on his symptoms and indicated multidisciplinary documentation review. The documentation was indicative of a therapeutic contact, and appropriate clinical interventions were offered.

**Findings**

The care and treatment provided to this patient were adequate.

Despite the need for individualized updated treatment planning documentation, the patient received appropriate treatment during his routine contacts.

**Patient L**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CTF. The patient had a history of substance use, anxiety, and depression. The diagnosis that was documented in the EHRS was unspecified anxiety disorder; this diagnosis differed from the primary clinician diagnosis of "anxio dysphoria adjustment disorder in full remission" provided during December 2023. The patient was not prescribed psychotropic medication.

An IPOC for depression established during the May 2023 IDTT meeting was not targeted during the primary clinician contacts. During the review period, two different primary clinicians met with the patient on four occasions, and those contacts did not occur timely. The patient reportedly remained stable during the review period.

The primary clinician documentation from one of the two providers during July and September 2023 was essentially unchanged, and it included mostly copied documentation; the documentation was not indicative of a therapeutic contact. During December 2023, the other PC documented that the patient was programming and expressed readiness for discharge from the MHSDS. The documentation in advance of a discharge IDTT meeting that included a SRASHE and an updated primary clinician assessment was completed on January 14, 2024. That

documentation did not indicate the utilization of individualized relapse prevention or discharge planning for the patient.

At the time of the monitoring visit, a discharge IDTT meeting had not occurred.

**Findings**

The care and treatment provided to this patient were inadequate.

This long-term 3CMS patient was not adequately prepared for discharge from the MHSDS, nor did he receive individualized treatment consistent with his treatment plan. An issue of concern was the discrepancy between the primary clinician and EHRS diagnoses, and the use of diagnostic terminology that was not supported by the Diagnostic and Statistical Manual.

**Patient M**

This 52-year-old patient's healthcare record was reviewed to assess the quality of care provided at CTF. The diagnoses provided by the psychiatrist of generalized anxiety disorder and major depressive disorder differed from the EHRS diagnoses of depressive disorder, atypical, persistent depressive disorder, and panic disorder. He was prescribed Zoloft and Vistaril.

The IDTT documentation from July 2023 indicated that an IPOC for depression remained unchanged since implementation in 2020. Similarly, an intervention to foster a therapeutic alliance remained unchanged since 2020. The treatment plan did not take into consideration documentation from his primary clinician annual assessment that indicated that the patient was at his baseline with ongoing depression, feelings of worthlessness and hopelessness. This clinical presentation differed from psychiatric documentation one month prior, but the psychiatric input was not included in the IDTT documentation. A SRASHE provided an assessment of moderate chronic and low acute suicide risk.

The primary clinician contact documentation provided a summary of the patient's psychosocial stressors, and his management of stressors and functioning; however, the documentation lacked targeted clinical interventions to assist him in managing distress.

Although the patient discontinued his psychotropic medications in November 2022; his medications were resumed at his request in May 2023. He was seen for psychiatric contacts more frequently than was minimally required. The documentation of those contacts was brief in content but indicated progressive improvement of symptoms following resumption of psychotropic medication treatment.

**Findings**

The care and treatment provided to this patient was marginally adequate.

The psychiatric care was appropriate, however, the documentation and care provided by the primary clinician were insufficient. Specifically, other than medication management, clinical interventions to assist the patient in managing distress were not utilized. In addition, the

treatment planning was outdated, generic, and lacked provider collaboration. Lastly, diagnostic clarification with clinical rationale was needed.

**Patient N**

This 51-year-old patient's healthcare record was reviewed to assess the quality of care provided at CTF. He was provided diagnoses of major depressive disorder, in remission and substance use disorder, in remission. He was prescribed Prozac and Vistaril.

The primary clinician and IDTT documentation lacked a summary of the patient's symptoms, functioning, and response to treatment since the previous IDTT meeting. Much of the documentation was copied from previous documentation without indication that the information was not original. The IPOC for depression, associated goals, and the sole therapeutic intervention were generic and were continued from the initial IDTT meeting in 2018, five years prior.

Overall, the patient was presented with stability during routine contacts. The psychiatric documentation was brief in content; however, the contacts occurred timely and indicated appropriate psychotropic medication treatment. The psychiatric and primary clinician documentation were relatively unchanged across reviewed contacts. The September 1, 2023, November 15, 2023 and January 23, 2024 PC documentation referenced a plan to utilize clinical interventions such as CBT, positive psychology, and motivational interviewing; however, there was no indication that those interventions were utilized.

**Findings**

The care and treatment provided to this patient were inadequate.

The lack of individualization in provider documentation adversely impacted the provision of continuity of care. Specifically, the psychiatric documentation of provided care was unchanged during a seven-month duration, and the primary clinician documentation remained relatively unchanged. There was no clear utilization of clinical interventions except medication treatment. The treatment planning was generic and outdated.

**Patient O**

This 57-year-old patient's healthcare record was reviewed to assess the quality of care provided at CTF. He was provided diagnoses of major depressive disorder and anxiety disorder, unspecified. He was prescribed Lexapro.

The primary clinician's initial assessment included relevant psychosocial information and current symptoms. A SRASHE was completed that assessed the patient with low chronic and acute suicide risk despite reports of passive suicidal ideation. The initial psychiatric assessment occurred outside the review period. The initial IDTT meeting did not occur timely, as it occurred approximately two months after placement at CTF. A different primary clinician was present at the initial IDTT meeting than the clinician who completed the initial PC assessment. An IPOC for depression was established that included generic associated goals and treatment interventions.

Passive suicidal ideation that was identified during the primary clinician initial assessment and anxiety that was identified during the initial psychiatric assessment were not included as IPOCs.

The psychiatric contacts occurred more frequently than minimally required, and the psychiatric documentation focused on the patient's depressive symptoms.  Medication adjustments were discussed, and the psychiatrist addressed concerns that were presented by the patient.  The patient consistently reported depressive symptoms to the psychiatrist; however, at times he denied those symptoms when seen by the primary clinician.  Treatment interventions to assist the patient in managing symptoms or stressors were not offered during the routine primary clinician contacts.

**Findings**

The care and treatment provided to this patient were inadequate.

The assessment of suicide risk was underestimated, treatment planning was not individualized or inclusive of treatment needs, and diagnostic rationale was needed.  While the psychiatrist appropriately followed the patient, there was no coordination of care or provider consultation regarding the patient's varying clinical presentation to providers.

**Patient P**

This 58-year-old patient's healthcare record was reviewed to assess the quality of care provided at CTF.  The diagnoses of major depressive disorder and unspecified anxiety disorder that were provided by the psychiatrist conflicted with the EHRS diagnosis of unspecified bipolar and related disorder.  Additional diagnoses that were provided included cocaine and alcohol use disorders and consideration of an unspecified personality disorder.  He was prescribed Zoloft, Remeron, and Depakote.

The annual IDTT documentation noted a symptom of anxiety and the patient's participation in "talk therapy," but the documentation lacked specificity necessary for the provision of continuity of care.  The documentation also excluded consideration of the psychiatric documentation which indicated treatment of irritability and mood dysregulation.  Similarly, the IPOC that targeted anxiety lacked individualization.

The psychiatric documentation focused on the patient's response to psychotropic medication treatment.  His irritability and mood dysregulation improved with medication adjustments.  In contrast, the primary clinician documentation indicated that the focus of treatment was anxiety.  The PC documentation provided a summary of the patient's functioning, but individualized treatment interventions were not utilized.

**Findings**

The care and treatment provided to this patient were inadequate.

There was a lack of coordination of care between providers that resulted in both providers documenting differing assessments and response to the patient's treatment needs during routine contacts and treatment planning.  Further, the treatment plan documentation was not

individualized nor did the patient receive individualized clinical interventions other than psychotropic medication treatment. Diagnostic clarification and clinical rationale for the provided diagnoses was needed.

**Patient Q**

This 40-year-old patient's healthcare record was reviewed to assess the care provided at CTF. He was provided a diagnosis of major depressive disorder that the psychiatrist indicated was in remission.

The patient had a long history of treatment with psychotropic medication for depression; this was appropriately identified as a treatment need during the annual IDTT meeting. The psychiatric documentation focused on the patient's positive response to Zoloft, and there was documentation of a plan to decrease the medication at the patient's request given his prolonged period of symptom stability. While the documentation identified the patient's symptoms and functioning, it was minimally changed across three routine contacts between June and December 2023. Overall, the primary clinician documentation indicated a responsiveness to the patient's treatment needs and was indicative of a meaningful therapeutic contact.

**Findings**

The care and treatment provided to this patient was marginally adequate.

Although the patient's treatment needs were appropriately addressed during routine primary clinician contacts; the psychiatric documentation was minimally changed with each contact which made it was difficult to determine whether the patient's treatment needs were addressed.

**Patient R**

This 35-year-old patient's healthcare record was reviewed to assess the care provided at CTF. He was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed Vistaril PRN for anxiety and insomnia.

According to the primary clinician initial assessment, the patient had no history of mental health treatment until he had two MHCB placements between February 8, 2023 and February 21, 2023 and February 24, 2023 and March 2, 2023. He was subsequently placed at the 3CMS level of care. The most recent documentation attributed the MHCB placements to the patient's attempts to affect his housing. At the time of the MHCB admissions, the patient presented with distressed demeanor and expressed suicidality. The patient denied mental health needs during the primary clinician initial assessment and indicated a goal to discharge from the 3CMS level of care. Overall, the documentation identified relevant historical information, but documentation regarding the patient's functioning since March 2023 was not included.

The initial psychiatric assessment included relevant psychosocial and mental health treatment history. Anxiety was identified as a treatment need; although, specific symptoms were not identified.

The IDTT meeting was not attended by the assigned providers, and the providers attending the meeting differed from the providers who completed his initial assessments. A treatment goal to reduce anxiety was noted, but no treatment goal was provided for depression, despite a diagnosis that included depression. The intervention of teaching coping skills was generic and was not connected to the case formulation.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The treatment planning did not fully target the patient's treatment needs, including relapse prevention or discharge planning. There was also a lack of rationale documented regarding the provided diagnosis.

**Patient S**

This 29-year-old patient's healthcare record was reviewed to assess the quality of care provided at CTF. He transferred to the RHU on November 2, 2023, after he discharged from the MHCB; he was not included in the MHSDS upon MHCB discharge. The MHCB admission was due to grave disability, and the patient was described as hostile and uncooperative. He had no history of MHSDS participation since his CDCR arrival in 2013.

Five-day follow-up contacts occurred as required from November 3, 2023 to November 7, 2023, and those contacts variably occurred at cell-front due to patient refusal. While generally described as stable, there were indications of mental health symptomatology, including paranoia and rapid speech.

Between November 6, 2023 and November 23, 2023, the patient was seen for four urgent consults. He was also seen for two routine consults on November 27, 2023, and five routine consults on December 4, 2023. The reasons for referral included unpredictable, assaultive and antagonizing behavior; anger; poor self-control; bizarre, unusual or uncharacteristic behavior; and confusion with isolation. He reportedly was observed talking to himself and hitting the walls, and he believed that his food was poisoned. During this period, the patient also had multiple medical codes for chest pains for which he had a pattern of refusing treatment.

Consistent with the multiple referrals, the mental health assessments indicated a pattern of poor emotion regulation and distress tolerance. On November 17, 2023, the patient was observed banging on his cell door, yelling, and using profanity; however, his behavior was assessed as not influenced by mental health factors. On November 23, 2023, consultation with custodial staff indicated that the patient maintained behavioral control when speaking with his family. However, it was also documented that the patient might be exhibiting decompensation due to housing placement and additional treatment should be considered. On November 27, 2023, he was initially calm when discussing difficulty managing his housing in the RHU but then became frustrated. Two days later he declared a hunger strike reportedly to advocate for his rights, which continued until December 4, 2023.

On December 6, 2023, the patient was briefly evaluated by a psychiatrist; although, the reason for referral was not documented. The patient denied any problems with sleep, appetite, energy,

mood, and mental focus.  Collateral information was not sought.  A diagnosis of possible adjustment disorder was provided.  He was seen again on January 5, 2024, when diagnoses of unspecified mood disorder, histrionic and personality traits, and possible psychosis were documented.  It was documented that the patient did not want to be included in the MHSDS, and no further follow-up was planned or completed.

On January 9, 2024, the patient was referred for emergent evaluation after a suicidal statement. Upon assessment, he denied suicidal ideation; however, no further explanation of the suicidal statement was provided in the documentation.  A SRASHE was completed that assessed low chronic and acute suicide risk; this assessment was likely an underestimate of his suicide risk given his prolonged history of probable decompensation.

On January 11, 2024, the patient was transferred to another institution.

**Findings**

The care and treatment provided to this patient were grossly inadequate.

The patient's pattern of poor behavioral control, particularly in the context of a recent MHCB admission for grave disability, warranted further evaluation.  At a minimum, the patient needed provider initial assessments and an IDTT to discuss his treatment needs, possible inclusion in the MHSDS, and consideration of referral to a higher level of care.  While the patient denied any need or interest in mental health treatment, his behavior suggested otherwise; and an assessment of his competency to refuse treatment was warranted.

**Patient T**

This 43-year-old transgender patient's healthcare record was reviewed to assess the quality of care provided at CTF.  In October 2023, her level of care was changed from 3CMS to EOP.  Her healthcare record was selected from the mental health referrals log to assess the adequacy of care provided.

Between July 18, 2023 and September 26, 2023, she was seen nine times by mental health in response to referrals; one of those referrals was emergent, and the remainder were urgent and routine referrals.  Often, at the time of the mental health contact, she reported that her level of distress had decreased since the referral was submitted.  Given the frequency of the mental health contacts and her ongoing distress, discussions regarding an EOP referral occurred in early September 2023.  At the end of September 2023, she agreed to the level of care increase, in part to change housing.  Her level of care was changed to EOP during an IDTT meeting on October 5, 2023.  She was provided a diagnosis of depression which did not fully account for her poor distress tolerance; additionally, her trauma symptoms were not fully considered following a PREA incident.

Mental health contacts occurred with various clinicians.  Overall, the clinicians appropriately addressed her concerns; one clinician was particularly responsive, thoughtful, and regularly utilized meaningful therapeutic interventions to assist the patient in distress management.

Of note, on August 16, 2023, the patient was evaluated for suicidal ideation. She acknowledged fleeting suicidal ideation but no plan to harm herself. The SRASHE was appropriate, and multidisciplinary outreach was initiated to address underlying factors contributing to her distress. Relatedly, her primary clinician was alerted, and a recommendation was documented to increase her clinical contacts.

**Findings**

The care and treatment provided to this patient were adequate.

Overall, the patient's treatment needs were addressed during the mental health contacts. The decision to increase her level of care was reasonable and appropriate; alternatively, it also would have been reasonable to treat her poor distress tolerance and emotion dysregulation at the 3CMS level of care with increased mental health contacts and dialectical behavioral therapy on a short-term basis. Diagnostic clarification was needed.

**APPENDIX B – 11**
**FOLSOM STATE PRISON (FOLSOM)**
Site Visit: January 23, 2024 – January 25, 2024
Review Period: June 1, 2023 – November 30, 2023

**Patient A**

This 61-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom.  He was provided diagnoses of adjustment disorder, alcohol disorder, cocaine use disorder and cannabis use disorder.  The patient entered CDCR for his current term on November 29, 2005.  He was placed at the 3CMS level of care on October 31, 2017, and he had no history of DSH, MHCB or PIP admissions or referrals.  He reportedly self-referred to the MHSDS in October 2017 due to stress, anger, anxiety, and depression.  The patient did not have a history of community mental health treatment.  His history was also significant for an overdose as a teenager.

The annual IDTT meeting occurred timely on August 11, 2023; the meeting did not include the patient's assigned PC or psychiatrist.  The treatment plan included IPOCs for anxiety, impulsive behavior, and depressed mood; the IPOCs were appropriate for the patient's clinical concerns, and the goals and interventions were appropriate.  No new symptoms were reported since the previous IDTT meeting in September 2022.  The treatment team utilized standardized measures to track the patient's symptoms and progress over time, and the ongoing treatment focused on appropriate and individualized goals including parole planning.  The patient reportedly was actively involved in programming, completed a CBT group, and requested to remain at the 3CMS level of care to continue individual counseling and group therapy.  The IDTT indicated that, although the patient no longer met diagnostic criteria for a serious mental illness, the patient would remain in the MHSDS to maintain stable functioning and to continue learning additional coping skills and stress management techniques.  The patient was not prescribed psychotropic medication during the review period.  The most recent SRASHE in October 2017 assessed the patient with low acute and moderate chronic suicide risk.

The routine PC contacts occurred timely during the review period.  The July 20, 2023 PC documentation indicated that the patient completed a CBT group and was placed on the waitlist for other groups.  He reportedly demonstrated a positive outlook, and the PC provided supportive counseling, psychoeducation regarding coping skills, and handouts to assist in stress reduction.  At his next PC contact on August 21, 2023, the patient reported that he was in the positive psychology group, and he focused on maintaining his self-care routine including daily exercise and meditation.  In addition to supportive counseling and psychoeducation regarding coping skills, the PC recommended the patient's involvement in the ISUDT to address historical polysubstance issues.  The final PC contact of the review period occurred on November 3, 2023 and was characterized as a brief wellness check.  The patient reported no acute distress or concerns, appeared stable, and did not require further follow-up at that time.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The IDTT developed a robust, clinically appropriate, and individualized treatment plan. The patient's symptoms and progress were tracked regularly using standardized measures, and the patient remained stable and an active participant in programming throughout the review period. He was offered several treatment modalities to address his concerns, including individual counseling, group therapy, and substance abuse programming.

It was questionable, however, why the patient was continued in the MHSDS, as he did not meet the criteria for inclusion; preparation for removal from the MHSDS should have occurred.

## Patient B

This 45-year-old 3CMS patient's healthcare record was reviewed to evaluate the quality of care provided at Folsom. He was provided diagnoses of adjustment disorder with depressed mood and PTSD. The patient arrived at Folsom on November 10, 2016; he entered CDCR for his current term in 2004. He entered the MHSDS at the 3CMS level of care on March 23, 2016 due to stress and PTSD related symptoms. The patient did not have a history of higher level of care referrals or placements, and he denied history of suicidality.

The annual IDTT meeting occurred on June 28, 2023, and the necessary staff attended including the patient. The treatment plan included an IPOC for depressed mood, and the IPOC contained extensive goals and interventions that were individualized. The goals were objective and measurable, and the IPOC included specific interventions targeting the patient's distorted thinking and resistance to psychotropic medication treatment. The discharge criteria and level of care justification were appropriate, and no new problems or concerns were reported by custody, medical, and nursing staff. During the IDTT meeting, the patient reported that he was doing well. The IDTT noted the treatment focus of helping the patient to build and maintain positive coping skills to manage depression and continued treatment at the 3CMS level of care. The patient was not prescribed psychotropic medication and was resistant to consideration of medication treatment to address his symptoms.

The PC contacts during the review period occurred timely in confidential settings; however, the documentation of those contacts was generally copied unchanged without significant update. For each PC progress note only the first sentence in the new issues/complaints section of the document was changed to include a quote or generalized statement about the patient's current concerns or functioning, and the remainder of the content was essentially unchanged between contacts. The patient was consistently noted as stable, and the treatment plan IPOCs were tracked and updated appropriately.

## Findings

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The IDTT meeting and PC contacts occurred timely, and treatment planning was appropriate. The patient was enrolled in and benefitted from group therapy. Although the PC documentation of routine contacts was poorly updated regarding subjective information, the treatment plan

IPOCs were tracked and updated appropriately, and the patient appeared to benefit from the treatment provided.

**Patient C**

This 46-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom. He was provided a diagnosis of depressive disorder. He entered CDCR for his current term in 2003, and he was housed at Folsom since 2006. The patient had no history of higher level of care referrals or placements and was not prescribed psychotropic medications during the review period. The patient reported one previous suicide attempt in 1994 as a teenager when he attempted to overdose using aspirin. During the review period, the patient's primary focus was preparing for the parole board in October 2023.

The annual IDTT meeting occurred on August 30, 2023; the meeting included the necessary participants except the CCI. The treatment plan included an IPOC for depressed mood that included limited but appropriate goals including increasing the patient's personal insight in preparation for the board of parole hearing. No interventions were provided aside from the therapist encouraging the patient to work on improved functioning by using goal setting. The patient did not request any new treatment goals during the IDTT meeting and did not report any new symptoms or problems since the last meeting. The level of care justification and discharge criteria were appropriate, and the treatment plan included specific goals and interventions that were not identified in the IPOCs. The interventions included teaching coping skills, building interpersonal skills and self-esteem, building insight in preparation for the parole board hearing, and assisting with release planning. Overall, the treatment plan included specific and appropriate goals and interventions to support the patient as he prepared for his upcoming board of parole hearing.

The PC contacts occurred timely in confidential settings during the review period. The May 30, 2023 PC note indicated that the patient focused on personal growth and insight and discussed elements of his childhood. The PC noted the patient had completed a review of written material on pyromania as his controlling offense involved arson. He was seen by a covering PC on August 3, 2023 when he reported very mild anxiety regarding the board of parole hearing on October 12, 2023. At the October 20, 2023 PC contact, the patient reported he was granted parole at the board hearing. The patient reportedly demonstrated euthymic mood and normal affect. At each PC contact, the IPOCs were tracked and updated appropriately.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were generally adequate.

The treatment plan included specific and individualized goals and interventions. The PC worked with the patient regarding the primary treatment focus of developing insight and coping skills in preparation for the board of parole hearing.

**Patient D**

This 58-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom.  Upon arrival at CDCR, he was provided a diagnosis of schizoaffective disorder and was most recently prescribed Abilify; but that medication was discontinued in November 2021, and the patient remained stable without medication since that time.  The patient arrived at CDCR for his current term on March 9, 2017.  This was the patient's first incarceration, and he had no prior criminal history.  The patient did not have a history of higher level of care referrals.  His primary language was Chaldean; however, he was fluent in Arabic and was able to communicate efficiently in English.

The annual IDTT meeting occurred timely on July 5, 2023, and the necessary participants were in attendance.  The treatment plan included IPOCs to address hallucinations and depressed mood.  The treatment goals were appropriate and individualized; however, the interventions were vague and somewhat generic.  Level of care and discharge criteria were appropriate indicating that the patient would remain at the 3CMS level of care to continue monitoring of his symptoms and to provide support.  The IDTT clinical summary was inadequate, as it was copied unchanged from the previous two annual IDTT meetings.

The PC contacts occurred timely, and the patient was seen more than minimally required as he was seen bi-weekly during the review period.  The PC progress notes documented work with the patient regarding his history of complex trauma.  The patient was also involved in programming and participated in clinical mental health groups and education including a personal insight exploration group and a computer literacy class.  The progress notes also indicated that there was discussion regarding preparation for an upcoming board of parole hearing in January 2024 and discharge plans.  His treatment later shifted to focus on the patient's mental health relapse prevention plan, reducing avoidance and procrastination of tasks and reinforcement of coping skills.  The IPOC progress was tracked in the progress notes and was updated appropriately.  The patient attended a psychologist-led process group during the review period with good attendance and participation.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The annual IDTT meeting occurred timely with the necessary participants, and the treatment goals were appropriate.  Although the treatment plan interventions were vague and limited; review of PC progress notes indicated that the patient was seen for bi-weekly contacts, and the sessions focused on clinically appropriate concerns and treatment interventions.  The patient was also enrolled in clinician-led groups that appeared beneficial.

**Patient E**

This 50-year-old 3CMS patient's healthcare record was reviewed to evaluate the quality of care provided at Folsom.  The patient entered CDCR on October 21, 1993 for his first term, and he

was housed at Folsom since 2013.  He entered the MHSDS at the 3CMS level of care on October 17, 1996.  The patient did not have a history of higher level of care referrals or suicidality.

The annual IDTT meeting occurred timely on July 3, 2023.  The treatment plan included an IPOC for anxiety; the IPOC included individualized treatment goals and interventions that were measurable and specific.  The patient provided a new goal to earn his GED.  No new symptoms were reported, and no acute issues were reported by custody, education, vocation, medical, or nursing staff.  The level of care and discharge criteria were thorough and individualized.  The rationale for retaining the patient at 3CMS level of care was to monitor his anxiety symptoms and mental status for warning signs of decompensation and to assist in developing new coping skills and improved insight.  The clinical summary was updated appropriately, and the patient agreed with the IDTT decision for continued treatment at the 3CMS level of care.

The patient was seen timely for quarterly PC contacts during the review period, and the contacts occurred in a confidential setting.  The patient presented with stability during PC contacts, and he interacted with the PC regarding current stressors and concerns.

The patient was not prescribed psychotropic medications and did not attend any clinical mental health groups during the review period.

## Findings

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The annual IDTT meeting and PC contacts occurred timely, and the treatment plan included goals and interventions that were individualized and measurable.

## Patient F

This 63-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom.  The patient arrived at Folsom on July 19, 2023, when he was provided a diagnosis of adjustment disorder with depressed mood and opioid use disorder.  He was prescribed Remeron PRN which was continued upon arrival at Folsom.  The patient entered CDCR on November 15, 1988, and he entered the MHSDS at the 3CMS level of care on May 28, 2021 while incarcerated at WSP.  He was removed from the MHSDS on September 2, 2022, but was returned to the 3CMS level of care on February 9, 2023.  His history was negative for suicidality or higher level of care placements.  The most recent SRASHE on March 1, 2023 assessed low acute and chronic suicide risk.

The initial PC assessment occurred on July 27, 2023.  The assessment occurred timely and was comprehensive and occurred in a confidential setting.

The initial psychiatric assessment occurred timely on July 31, 2023.  The patient requested discontinuation of the Remeron with expressed interest in eventual removal from the MHSDS; Remeron was discontinued at that time.

The initial IDTT meeting occurred timely on August 1, 2023, and the necessary participants were in attendance. The treatment plan included IPOCs for depressed mood and anxiety. The treatment goals and interventions were limited but were appropriate for the patient's clinical presentation and lack of acute symptoms. The patient reported no significant difficulties except chronic impaired sleep. The level of care and discharge criteria were appropriate. The clinical summary was updated appropriately, and it was informed by the initial PC assessment.

The patient was also seen timely in a confidential setting for the routine PC contact on October 24, 2023, when he was reportedly stable.

The patient was seen for a follow-up psychiatric contact on September 5, 2023, when the patient denied current difficulties and remained opposed to psychotropic medication treatment.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The initial PC and psychiatric assessments, as well as the initial IDTT meeting, occurred timely with adequate documentation of appropriate treatment planning.

**Patient G**

This 67-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom. The psychiatrist provided a diagnosis of unspecified anxiety disorder. The patient reported mild sleep difficulties and possible medication side effects; the psychiatrist provided psychoeducation regarding a possible medication side effect from Vistaril. The patient entered CDCR on November 7, 1978, and he transferred from CIM to Folsom on July 6, 2023; the transfer was precipitated by the patient's use of a CPAP machine that caused problems with his cellmates. The patient had a history of polysubstance use including alcohol, cannabis, and heroin, and he received MAT at CIM. He received mental health services at the 3CMS level of care since March 2018 with no history of MHCB referrals or higher level of care placements.

The initial PC assessment occurred timely on July 14, 2023. The presenting problem section of the assessment was not completed; however, information about the patient's current clinical status, clinical history, and psychosocial history was documented in the clinical summary and was comprehensive. It was used to inform treatment planning. The patient's mental status was described as normal, but he demonstrated poor judgment and insight.

The initial IDTT meeting occurred timely on July 14, 2023. The patient reported that his primary concerns were sleep disturbance and depressive symptoms, and testing indicated moderate depression. The patient also reported anxiety related to concern about his elderly mother's health, and he was provided a diagnosis of adjustment disorder with anxiety and depressed mood. The treatment plan included IPOCs targeting sleep disturbance, depressed mood, and anxiety. The goals provided in each IPOC were clinically appropriate for the patient's needs; however, the interventions were generic and were limited to the PC fostering a therapeutic alliance and teaching the patient to create a thought record to address automatic

thoughts related to anxiety. The patient identified several goals, including stabilizing his mood, learning new coping skills, improving his sleep, and working to prepare for his second BPH hearing in 2026 by attending mental health groups and being active in prison programming. The level of care justification and discharge criteria were appropriate and specifically included the use of standardized tools to measure the patient's progress.

The initial psychiatric evaluation did not occur timely and was completed after the initial IDTT meeting on July 18, 2023. The patient requested discontinuation of Suboxone, but he indicated that he wanted to remain in the ISUDT.

The patient was seen for three PC contacts at Folsom during the review period, and each PC contact occurred in a confidential setting. At the first routine PC contact, the patient reported anxiety regarding his mother's health and difficulties with his cellmate. At the next visit, he was seen by a newly assigned PC when he was reportedly stable, and he presented with stability at subsequent visits.

The patient was seen for psychiatric follow-up on September 12, 2023. He reported improved sleep but ongoing medication side effects; however, he requested that his medication remain unchanged with decreased usage, as it was ordered PRN. He was scheduled for a follow-up in 90 days.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The treatment plan was individualized for the patient's needs and included goals developed collaboratively between the patient and the IDTT. The clinical contacts occurred timely in a confidential setting. Although he had some depressive and anxiety-related symptoms, the patient remained relatively stable. Medication management appeared responsive to the patient's symptomatology, and psychoeducation was provided as indicated. The documentation of clinical contacts was adequate, and the IPOCs were updated appropriately at each PC contact. The initial psychiatric assessment, however, did not occur timely prior to the initial IDTT meeting.

**Patient H**

This 41-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom. He was provided diagnoses of major depressive disorder, recurrent, with anxious distress; unspecified depressive disorder; unspecified anxiety disorder; and opioid use disorder. The patient entered CDCR for his current term on May 2, 2023 at the WSP reception center, and he arrived at Folsom during July 2023. The patient did not have a history of suicidality or higher level of care referrals.

The initial PC assessment occurred timely in a confidential setting on July 27, 2023. The assessment was comprehensive, and the patient was described as stable. The clinical summary was updated appropriately, and it informed treatment planning.

The initial psychiatric evaluation also occurred in a confidential setting on July 28, 2023.  The patient was reportedly stable without medication side effects from Remeron, and a follow-up was scheduled for 90 days.

The initial IDTT meeting occurred timely on August 2, 2023, and it was attended by the necessary participants.  Standardized measures were utilized to assess the patient's anxiety and depression which were described as minimal.  The treatment plan included IPOCs for depressed mood and anxiety.  The IPOC treatment goals were not individualized, and the treatment interventions were generic and were limited to the PC developing therapeutic alliance for depressed mood and teaching the patient thought records to address anxiety.  The patient identified several treatment goals and priorities, including mood management and improved sleep.  The level of care justification and discharge criteria were appropriate and relevant to the patient and included consistent use of standardized measures to assess symptom severity.

The next PC contact occurred on October 11, 2023; an RVR mental health assessment was also completed on that date, as the patient had received two RVRs related to two consecutive instances of possession of a controlled substance.  The PC indicated that the patient appeared possibly under the influence of an illicit substance; however, the patient denied substance use.  The PC indicated that change to the EOP level of care was considered if his current level of care was insufficient to address his treatment needs with recommended follow-up in one to two weeks.  At the subsequent PC follow-up contact, the patient indicated that he would be transferred to CSP/LAC in the upcoming weeks due to the RVRs.  He was described as appropriate during this visit, which was unlike the prior contact when he appeared possibly intoxicated.

A psychiatric contact occurred on October 18, 2023, when the patient was described as stable.  The psychiatrist maintained the patient's medication regimen at that visit.

**Findings**

The care and treatment provided to this 3CMS patient were inadequate.

Of concern was the failure to adequately address the patient's possible intoxication and drug use considering two recent RVRs for possession of a controlled substance.  The patient was prescribed Suboxone for MAT, but it did not appear that there was coordination with ISUDT staff regarding the issue or a change in treatment planning.  The treatment plan should have included interventions to address those concerns, but those interventions were not developed or included in the treatment plan.  Additionally, there was a lack of documentation that this important issue was addressed by the PC or psychiatrist in treatment.

**Patient I**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at Folsom.  He was provided diagnoses of PTSD, unspecified depressive disorder, and opioid use disorder, severe.  The treatment plan clinical summary was updated appropriately, and

it was informed by the initial PC assessment. He entered CDCR for his current term on June 8, 2023 and arrived at Folsom from NKSP on September 18, 2023. He was placed at the 3CMS level of care upon reception. It appeared the patient's mental health symptoms and concerns were significantly exacerbated by his polysubstance dependence and poor coping skills.

The initial PC assessment occurred on September 25, 2023, and during the assessment, the patient reported ongoing concerns about substance use relapse as he adjusted to Folsom. He also reported that he experienced suicidal ideation at the reception center, but he now indicated that he was stable. The PC reviewed coping skills for depressive thinking, hopelessness, and suicidal thoughts with the patient. The PC also encouraged the patient to participate in mental health groups, MAT, and other substance-related groups to address his polysubstance dependence. The clinical summary in the treatment plan was updated and provided appropriate information to inform the patient's treatment.

The initial psychiatric evaluation occurred in a confidential setting on September 25, 2023. The patient reported sobriety for approximately 30 days, and he noted his coping skills of reading, exercising, and prayer. The psychiatrist continued the Remeron unchanged, and he reduced Prozac to minimize reported medication side effects.

The initial IDTT meeting occurred timely on September 27, 2023 after the patient's arrival at Folsom, and the meeting included the necessary participants. The patient reported that his primary concern was substance use relapse, as at the time of the IDTT meeting he had been sober for less than 30 days. The treatment plan included IPOCs targeting his depressed mood and anxiety. The IPOCs contained measurable goals and interventions relevant to most of the patient's concerns and clinical needs. The patient reported no new symptoms since his arrival at Folsom. The level of care justification and discharge criteria were brief but appropriate.

All PC contacts occurred timely in the mental health clinic in a confidential setting. The patient was described as stable during routine PC contacts. He did report ambivalence regarding psychotropic medication adherence, as he noted improvement in his depressive symptoms.

The patient was seen for a follow-up routine psychiatric contact on November 1, 2023 when he was noted with persistent medication nonadherence, and the psychiatrist had administratively discontinued both medications on October 27, 2023. The patient stated that he did not think that medications were necessary, and he discontinued the medications. The psychiatrist noted that the patient was concerned that he would be removed from the MHSDS if he was not prescribed psychotropic medication, but he was reassured that he could continue to receive services even if not prescribed medication.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were minimally adequate.

The patient was seen timely for clinical contacts and assessments by the PC and the psychiatrist. He appeared to respond quickly to treatment; and during the course of the review period, his mental health stabilized and he was able to utilize several coping skills including reading,

exercise, and using his tablet for various activities. His psychotropic medications were discontinued without an increase in symptoms or a decline in functioning.

Despite the patient's diagnosis of severe opioid use disorder and his identification of substance use relapse as a primary concern, it did not appear that the patient's substance abuse concerns were adequately addressed in treatment. Although the PC and psychiatrist noted the patient's ongoing substance abuse concerns, and the PC encouraged continued involvement in substance abuse-related group therapy; treatment planning should have specifically addressed the patient's substance use concerns.

**Patient J**

This 58-year-old 3CMS patient's healthcare record was reviewed to evaluate the quality of care at Folsom. He was provided diagnoses of adjustment disorder, unspecified; antisocial personality disorder; and borderline personality disorder. The patient entered CDCR for his current term in 1996 to serve a life sentence. His history was significant for trauma and illicit substance use; however, he had no MHCB admissions or higher level of care placements.

The annual IDTT meeting occurred timely on June 7, 2023, and the meeting included the necessary participants. The treatment plan included an IPOC for depressed mood. The IPOC included appropriate treatment goals focused on reducing the frequency and intensity of depression and improving the patient's coping skills; however, the IPOC lacked specific interventions for the PC to provide. The content of the new symptoms/problems section of the treatment plan was copied and pasted from the most recent PC progress note of May 22, 2023. The clinical summary was updated appropriately, and the patient reported benefit from treatment with improved insight and some depressive symptoms. The discharge criteria and level of care justification were brief but appropriate, indicating that the patient would be considered for discharge when he was able to program effectively without medication and with improvement in distress assessed by standardized measures for at least six months. The patient declined treatment with psychotropic medication.

The patient was seen monthly for routine PC contacts in a confidential setting during the review period, and those contacts were well documented and noted the patient's active engagement in psychotherapy primarily utilizing the acceptance and commitment therapy model. Subsequent PC contacts documented continued utilization of the acceptance and commitment therapy, work with the patient concerning his anxiety regarding an upcoming BPH hearing, and review of group options and expectations.

**Findings**

The care and treatment provided to this 3CMS patient at Folsom were adequate.

The patient was seen timely for the annual IDTT meeting and more than minimally required for routine PC contacts. The treatment plan included appropriate goals targeting the patient's depressive symptoms but lacked specificity regarding treatment interventions. The PC progress notes documented the provision of acceptance and commitment therapy model interventions and

support, and the patient responded well to treatment.  He was seen for monthly PC contacts during the review period where treatment goals were addressed, and the patient maintained stability and was ultimately successful in obtaining a release date at his October 25, 2023 parole hearing.

**APPENDIX B – 12**
**WASCO STATE PRISON (WSP)**
Site Visit: February 5, 2024 – February 8, 2024
Review Period: July 1, 2023 – December 31, 2023

**Patient A**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed olanzapine, venlafaxine, risperidone, mirtazapine, and benztropine and was fully adherent with prescribed medications. He was also prescribed buprenorphine-naloxone. This case was selected based on a referral from the plaintiffs' attorneys who expressed concern about possible inadequate screening, referral, and level of care placement upon reception at WSP.

Upon arrival at WSP on November 15, 2023, the patient was seen for an initial health screening. The patient arrived with active prescriptions for olanzapine, mirtazapine and benztropine. The patient reported a history of schizophrenia and one suicide attempt in March 2022. That screening resulted in referral of the patient to be seen by mental health within five days.

A mental health screening was completed timely. During that screening, it was documented that his suicide attempt occurred in March 2023 rather than March 2022; yet the psychologist noted that an emergent/urgent referral was not needed, as the attempt occurred over one year prior. Those contradictions were not addressed. The psychologist noted that the patient refused to sign a release of information to access prior treatment records. A DDP screening was conducted on the same date and revealed no need for further evaluation.

On November 21, 2023, a healthcare services request was received from the patient asking for a decrease in his medication dose at night and to be prescribed bupropion. The patient was next seen on November 26, 2023 for his initial primary clinician assessment and SRASHE; those assessments were adequate given that the patient refused to engage in the assessments. The primary clinician noted that the patient was not fully adherent with his medication regimen and noted his desire for a change in medication. An initial psychiatric assessment was completed on November 28, 2023. The psychiatrist noted the patient's interest in changing medications; subsequently, venlafaxine was prescribed, and olanzapine and hydroxyzine that were administered in the evening were discontinued with plans to monitor the patient for changes in psychotic symptoms. The psychiatrist, however, did not document when the follow-up would occur. The patient was formally placed at the 3CMS level of care on that date.

The patient was placed in the ASU on November 28, 2023; and an ASU pre-placement screening, which did not document the patient's placement at the 3CMS level of care, was completed. On November 30, 2023, a clinician-to-clinician contact was requested within EHRS; however, it was unclear if the contact ever occurred. The patient was seen for another initial primary clinician assessment and SRASHE on December 5, 2023, and the patient again refused to engage in the assessment and much of the content of those assessments was copied from the previous assessment. An initial psychiatric assessment was also completed on that date which

was adequate and included working diagnoses of schizoaffective disorder, opioid use disorder, ADHD, and generalized anxiety disorder. Although, the psychiatrist noted some concerns regarding the patient's mental status; only routine psychiatric follow-up was documented.

An initial IDTT meeting occurred on December 6, 2023 with all required staff present, but the patient refused to participate. It was documented that the patient was placed in the RHU secondary to safety concerns. The rationale for retaining the patient at the 3CMS level of care was his refusal to participate in his assessments and his treatment with psychotropic medication. He was noted with a provisional diagnosis of adjustment disorder, and there was no mention of the diagnoses provided by the psychiatrist the day prior. An IPOC for depressed mood was initiated that included vague goals. There was no documentation that the patient was evaluated regarding the need for a higher level of care. The IDTT documentation also included an inaccurate statement that the patient had no prior suicide attempts.

The patient was next seen on December 13, 2023 by a psychiatrist who had not met the patient previously. The documentation of that contact was inadequate and included only a superficial mental status examination and a note indicating that the patient would be seen for follow-up in 90 days.

The patient refused weekly recreational therapy groups and primary clinician contacts but was seen at the cell front, and no concerns were documented during the following month. The patient was adherent with his medication regimen. The primary clinician contact documentation described the patient as "programming adequately with his peers;" although, it was unclear what programming was described, as the patient was housed in the RHU and refused to attend offered recreational therapy groups. Of note, the patient attended a substance use treatment assessment appointment.

On January 12, 2024, the patient reported feeling suicidal and experiencing auditory hallucinations telling him to hit his head on the wall. The CIT responded, and the patient confirmed suicidal ideation, auditory hallucinations, sleep disturbance, and poor appetite. A SRASHE was completed that was adequate. The patient was referred to and placed in the MHCB. He remained in the MHCB until January 22, 2024, when he was discharged to the EOP with goals of medication adherence, attending individual and group treatment to decrease depression, learning "new skills," and attending to his ADLs. During his MHCB stay, medication adjustments occurred, and he was provided a diagnosis of schizoaffective disorder. A discharge SRASHE was completed on January 21, 2024 that included reference to the patient's recent report of suicide attempts in both 2022 and 2023 by drinking bleach. The suicide risk determinations were adequately justified, and a safety plan was developed.

Five-day follow-up contacts were conducted upon discharge, and the safety plan was reviewed daily. An initial primary clinician assessment was completed on January 26, 2024; and while mostly adequate, the content was copied from prior assessments and failed to identify the diagnosis provided to the patient at the time of the MHCB discharge. Instead, a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder was entered into EHRS; however, there was no documentation regarding the rationale for the provision of that diagnosis. A SRASHE was completed that was minimally adequate. Of concern, the safety plan was not

reviewed or incorporated into the SRASHE, despite the patient's recent MHCB discharge due to thoughts of self-harm. On January 27, 2024, the patient submitted a healthcare request reporting that his visual hallucinations had returned. Those concerns were, however, not documented during the five-day follow-up contacts. He was seen by a primary clinician on January 29, 2024, and the five-day follow-up contacts were extended for an additional three days. The patient was also referred to the psychiatrist who saw the patient two days later. The patient was seen at the cell front; as reportedly, there was no space available for the patient to be seen in a confidential setting. The patient refused to engage with the psychiatrist at the cell front and later wrote a healthcare request stating that he wanted to see a different psychiatrist, as he felt dismissed and unheard by the one who came to his cell.

An initial IDTT meeting occurred on February 1, 2024, prior to the completion of an initial psychiatric assessment; the required staff and the patient were present. The documentation of the meeting was adequate. The patient was seen for a weekly primary clinician contact the following week but was not seen again by a psychiatrist prior to his transfer on February 6, 2024, despite his healthcare request.

The patient was offered and attended daily recreational therapy groups while at the EOP level of care.

**Findings**

The assessment and care provided to this patient were minimally adequate.

Despite the determination of adequacy, concerns were noted regarding the care provided to the patient. The early assessments were challenging, as the patient refused to engage with clinicians and provided inconsistent information. Yet, concerns were noted regarding inaccurate information in the documentation which appeared to result from copied entries from earlier documents. Additionally, there was no recognition of disparate information and diagnostic discrepancies. Psychiatric contacts did not occur as required, and a safety plan appeared indicated but was not developed. Lastly, it did not appear that a review of the patient's need for a higher level of care was routinely conducted.

**Patient B**

This 62-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided diagnoses of unspecified mood disorder; major depressive disorder, recurrent episode, moderate; and opioid use disorder. He was prescribed aripiprazole, buspirone, mirtazapine, sertraline, and diphenhydramine, and he was variably medication adherent during the reporting period.

The patient was received at WSP on April 20, 2023 and was placed at the 3CMS level of care on April 27, 2023. On June 22, 2023, the patient was placed in alternate housing after reporting suicidal ideation. The following day, the patient was assessed by a psychiatrist who provided a diagnosis of unspecified mood disorder, prescribed aripiprazole and buspirone, and placed the patient at the EOP level of care with the patient's agreement. The patient was to be seen again in

two weeks, but follow-up did not occur as ordered. An initial primary clinician assessment was completed on the same date and was inadequate. The assessment was minimally updated and included a mental status examination and documentation copied from the psychiatric assessment without referencing that document. The SRASHE was adequate with satisfactory risk justification and a safety plan; however, there was substantial information copied from previous assessments making determination of current information challenging without referencing the prior documentation. The patient was placed on five-day follow-up contacts that were completed adequately.

The patient was seen for weekly primary clinician contacts which evidenced the use of appropriate interventions. The patient was seen by a psychiatrist on July 17, 2023, and medication adjustments occurred as requested by the patient. A comprehensive initial psychiatric assessment was not, however, completed.

An initial IDTT meeting did not occur until August 3, 2023, more than six weeks after the patient was placed at the EOP level of care. The patient's assigned primary clinician was not present at the meeting, and the psychiatrist had not seen the patient previously. The patient refused to attend. Treatment goals were developed to address anxiety that were consistent with the previous treatment plan. The rationale for retaining the patient at the EOP level of care was minimally adequate and generic. No psychiatric master treatment plan review was completed at the time of the initial IDTT meeting.

The patient engaged in weekly individual contacts with his assigned primary clinician as well as recreational and nursing-led treatment groups. On August 20, 2023, the patient made superficial cuts to his wrists, and the CIT was activated. The patient denied suicidal ideation and indicated that he wanted to be housed in another unit, and he was moved to another housing unit. A SRASHE was completed that appeared adequate. Of note, the patient had complained to his primary clinician that he had remained in the reception center for over 100 days and over 60 days since placement at the EOP level of care. The weekly primary clinician contacts included documentation that appropriate interventions were provided that were consistent with the patient's needs.

The CIT was activated again on September 1, 2023 by a custody sergeant. The patient reported hearing voices telling him to kill himself, and he had not taken his medications as prescribed. He was assessed with increased suicide risk and was referred to the MHCB. The SRASHE was adequate in content and justification of risk levels. The patient was seen as required in the MHCB, and medication adjustments occurred. The SRASHE completed prior to discharge was adequate and included a safety plan. The patient was discharged to the EOP level of care on September 11, 2023.

The patient was seen for five-day follow-up contacts for seven days to ensure stability. An initial primary clinician assessment and a SRASHE were completed on September 13, 2023; both assessments were adequate.

The initial psychiatric assessment was completed on September 19, 2023. The assessment was adequate and noted a plan for follow-up with the patient in one to two weeks. The patient

refused to attend his IDTT meeting on September 21, 2023. The required staff were present at the meeting; although, the assigned primary clinician was not present, and the patient refused to attend. A goal to reduce depression was added to the previous goal that addressed anxiety. No goals were developed to address the patient's recent self-injury, reported paranoia, or sleep disturbance. Later that day, the patient reported suicidal ideation due to paranoia and housing in the reception center for over six months. The patient was referred to the MHCB and was eventually placed at the inpatient level of care. He did not return to WSP.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT meeting occurred late, and an initial psychiatric assessment was not completed prior to the IDTT meeting. Additionally, the initial primary clinician assessments were not completed by the assigned primary clinician, and the assigned primary clinician did not attend the IDTT meetings. The psychiatric contacts did not occur monthly; and in one case, follow-up did not occur as ordered by the psychiatrist. Of concern was the delay in transferring the patient to a mainline EOP, which resulted in the patient engaging in self-injurious behavior to hasten transfer. The patient was, however, consistently offered recreational therapy and nursing-led treatment groups, and individual primary clinician contacts evidenced interventions targeting the patient's needs.

**Patient C**

This 62-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided a diagnosis of acute schizophrenia-like psychotic disorder. He was prescribed chlorpromazine, which was discontinued due to nonadherence and mirtazapine; but he was not consistently adherent with that medication either.

The patient arrived at WSP on June 14, 2023 and was placed at the 3CMS level of care. On June 16, 2023, he was seen for a mental health screening, initial primary clinician assessment and SRASHE. A safety plan was also completed. The documentation indicated that the patient was designated as DD3 based on his designation during a previous incarceration and was referred urgently for assessment by a mental health clinician.

The records revealed a history of inpatient hospitalizations. The patient reported passive suicidal ideation and presented with cognitive impairment with poor memory. The patient was urgently referred to psychiatry and was placed at the EOP level of care. A psychiatrist evaluated the patient and noted an active prescription for mirtazapine that was continued from the county jail. The patient requested treatment with chlorpromazine, and he reported a history of being provided with a diagnosis of schizophrenia. The requested medication was initiated, and the psychiatrist noted the patient's release date of January 25, 2024 and documented that the patient had no social supports and no housing upon prison release. The psychiatrist indicated that the patient should be seen again in seven to fourteen days.

A formal initial psychiatric assessment was completed on June 20, 2023 via telepsychiatry. The assessment was adequate given the patient's memory impairment. He was assessed with a designation of DD2 after a psychological assessment on June 20, 2023. His adaptive support needs were identified adequately.

The patient was offered "leisure packets" at the cell front upon arrival to the EOP prior to group enrollment. He began attending recreational therapy groups on June 26, 2023, and nursing-led treatment groups on June 30, 2023.

During an individual primary clinician contact on June 26, 2023, the patient requested referral to an inpatient setting, noting that he believed that to be a "better fit" for him. The primary clinician advised the patient regarding the process for assessing level of care needs. An initial IDTT meeting occurred later than required on July 6, 2023. The necessary staff were present as was the patient. The patient reported that he stopped taking his medications due to side effects. The safety plan was reviewed but was not updated as the patient had recently refused to take psychotropic medications, and medication treatment was prominently included in the safety plan. There was no documentation that the patient was adequately assessed for higher level of care needs. The IDTT documentation noted a diagnosis of major depressive disorder, recurrent episode, with psychotic features, but no rationale was provided for that diagnosis. The treatment plan included no specific mental health goals and did not mention the patient's prison release in less than six months.

The patient was seen weekly by his primary clinician who continued to document a diagnosis of acute schizophrenia-like psychotic disorder. The psychiatrist, who saw the patient on July 15, 2023, noted the same diagnosis. On that date, the chlorpromazine was discontinued at the patient's request, as he had stopped taking the medication. The psychiatrist noted that the patient appeared stable but indicated that a higher level of care might be necessary if he could not function at the EOP level of care. The patient transferred to another facility on July 18, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

This determination was made based on insufficient treatment planning, failure to update the safety plan considering changes in the patient's medication adherence, a delayed initial IDTT meeting, and diagnostic discrepancies that were not acknowledged or addressed. The patient was, however, seen for weekly primary clinician contacts and was offered groups daily.

**Patient D**

This 35-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided a diagnosis of schizoaffective disorder, depressive type. He was prescribed aripiprazole, buspirone, divalproex sodium, and diphenhydramine and was intermittently medication adherent.

The patient arrived at the reception center on July 17, 2023 with active prescriptions for the medications listed above and a diagnosis of schizoaffective disorder, depressive type.  A mental health screening, initial primary clinician assessment, and SRASHE were all completed on July 19, 2023.  The patient reported suicidal ideation and a recent suicide attempt by swallowing foreign objects, and he was referred for an emergent consult.  The patient was assessed with high chronic and acute suicide risk.  Upon arrival to the TTA, an x-ray confirmed the presence of eight pen fillers in his abdomen.  It should be noted that there was documentation by a recreational therapist, which appeared to be inaccurate, that an in-cell leisure packet was provided to the patient who was described as calm, appropriate, and not verbalizing any concerns while the patient was actually in the TTA having an x-ray.  The CIT was activated, and the patient was referred to the MHCB level of care.  A second SRASHE was completed, and the psychologist completing the SRASHE noted that it had not been updated fully given that the patient was seen hours earlier for a SRASHE and was not transferred to the MHCB.  The risk levels were adjusted to reflect moderate acute risk, as the patient denied suicidal ideation or intent.

The initial mental health and psychiatric assessments were completed on July 20, 2023, and an initial IDTT meeting occurred on the same date.  Goals to address the patient's self-harming behavior were initiated.  The patient also reported command auditory hallucinations and delusions.  The patient was seen daily while housed in the MHCB and was discharged on July 26, 2023 to the EOP level of care.  The discharge SRASHE and safety plan were adequate as was the rationale for discharge and the recommendations for follow-up treatment.  The patient was sent to an outside hospital for evaluation of the foreign bodies in his abdomen and was returned to WSP on the evening of July 27, 2023.

Due to misinformation, a telepsychiatrist placed the patient back on one-to-one suicide watch, placed the patient in a safety smock, and referred the patient to the MHCB upon his return from the hospital.  The documentation revealed that a nurse told the telepsychiatrist that the patient engaged in foreign body ingestion while in the MHCB resulting in transfer to the hospital.  It appeared that neither the nurse nor the telepsychiatrist reviewed the patient's healthcare record, and the telepsychiatrist had no contact with the patient.  On the following morning, it was noted that no approval was obtained from HCPOP to place the patient at the MHCB level of care on suicide watch status.  His level of care was returned to EOP, and he was transferred to the reception center EOP with 30-minute checks and plans for five-day follow-up contacts.  The five-day follow-up contacts were completed adequately; however, despite discontinuation of the follow-up contacts on day five, the patient was seen again on the following day.

The patient was seen for an initial primary clinician assessment on August 1, 2023 which was adequate and noted that the patient was not medication adherent.  The patient was seen for a routine primary clinician contact on August 2, 2023, when it was noted that he had resumed taking his medications.  The plan section of that progress note was generic and did not apply to the patient as it referenced "previously agreed upon treatment goals" which had not yet been established.

An initial psychiatric assessment was completed on August 3, 2023 and was adequate. Given the patient's recent medication nonadherence, he was placed on long-acting injectable aripiprazole. The patient consented to the medication change.

An initial IDTT meeting occurred on August 9, 2023 with the required staff present; however, neither the primary clinician or the psychiatrist were assigned to the patient or had met with him previously. The patient was present at the meeting. Goals were created to address the patient's foreign body ingestion, but the goals did not address his psychotic symptoms.

The patient was seen for weekly primary clinician contacts which were adequate and appeared to address the patient's needs. A psychiatrist attempted to see the patient for a monthly contact on September 3, 2023, but the patient refused. He was seen by the psychiatrist on September 6, 2023, and the documentation of that session was adequate. An urgent request for mental health services was entered into EHRS on September 8, 2023, yet it was dated September 5, 2023 and had been addressed during a primary clinician contact on September 6, 2023. The patient's primary clinician saw the patient on September 12, 2023 to ensure that he remained stable. At that visit, he requested an increase in his medication dosage, but he did not recall that his medication issues were addressed when he saw the psychiatrist on September 6, 2023.

Recreational therapists saw the patient at the cell front for the first week of his placement in the reception center EOP. On August 8, 2023, he attended his first group, and he typically attended the recreational therapy groups and nursing-led treatment groups that were offered to him.

The patient transferred to another facility on September 18, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

Concern was noted regarding failure by a telepsychiatrist and a nurse to review the healthcare record which resulted in the patient being placed inappropriately at a higher level of care. Additionally, treatment planning was poor, and there was inaccurate documentation about a recreational therapy cell-front contact that could not have occurred as the patient was in the TTA at that time.

**Patient E**

This 27-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided diagnoses of unspecified mood disorder and amphetamine-type substance-induced depressive disorder with mild use. He was prescribed sertraline and hydroxyzine and was medication adherent.

The patient arrived at WSP from a county jail on August 1, 2023 and was referred emergently to mental health. Despite the referral, the patient was not seen until three days later, on August 4, 2023 for a routine mental health screening, mental health assessment, SRASHE, and DDP

screening. The patient was previously incarcerated and had received mental health services at the EOP level of care, and this level of care was continued.

The initial primary clinician assessment indicated that further assessment was needed and was inadequate; as no EOP functional evaluation or case formulation was completed. Additionally, it was noted that the initial health screening was reviewed, yet there was no acknowledgement of the submission of an emergent referral. The SRASHE was minimally adequate, and the rationale for the assessment of low chronic and acute suicide risk levels was superficial.

The patient was seen for an initial psychiatric assessment on August 7, 2023 by a telepsychiatrist. The psychiatrist noted working diagnoses using outdated terminology including, "mood disorder, NOS; psychotic disorder, NOS; r/o stimulant use disorder; r/o cannabis use disorder' r/o opioid use disorder." The patient was prescribed sertraline and hydroxyzine to address depression and sleep disturbance. Although the telepsychiatrist indicated that the patient would be seen again within one week; he was not seen again by a psychiatrist until his initial IDTT meeting ten days later and was not seen by a psychiatrist for an individual contact prior to his transfer from WSP on September 7, 2023.

The patient was seen for rounding by the recreational therapist for the first two weeks following reception and was offered in-cell packets. The patient began attending nursing-led treatment groups and recreational therapy groups on August 14, 2023. He was offered groups daily.

An initial IDTT meeting occurred on August 17, 2023, yet the primary clinician and psychiatrist who attended the meeting were not the patient's assigned clinicians. A correctional counselor was present at the meeting as well as the patient. The patient reported an interest in working on anger and reported that his depression was minimal, yet a goal was developed to address the patient's level of depression and not his anger. An EOP functional evaluation was completed, however, a case formulation was not completed. The patient was seen weekly for primary clinician contacts; however, there was no documentation that therapeutic interventions were provided.

**Findings**

The care and treatment provided to this patient were inadequate.

He was not provided individual clinical interventions consistent with his treatment plan, and he was not seen as ordered by the psychiatrist or as required. Additionally, the patient was not seen timely in response to an emergent referral at the time of reception. Treatment planning did not address the patient's identified goals, and an adequate case formulation was not developed.

**Patient F**

This 52-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided diagnoses of major depressive disorder, recurrent episode, with psychotic features; generalized anxiety disorder; and polysubstance dependence.

He was prescribed bupropion and venlafaxine as well as hydroxyzine PRN, and he was medication adherent.

This patient was received at WSP on May 26, 2023 and was placed at the 3CMS level of care. On July 13, 2023, he was placed in the MHCB due to posing a danger to himself and was discharged to the 3CMS level of care on July 20, 2023. A SRASHE and safety plan were completed prior to his MHCB discharge and were adequate. The patient was seen for the first two days of five-day follow-up contacts when he reported concerns with his medications. On July 23, 2023, a CIT note was entered by a nurse supervisor indicating that the patient reported feeling depressed. A primary clinician completed a mental health assessment and SRASHE, as the patient was depressed and was observed crying by custody staff. The patient was also observed talking to himself and having trouble with other incarcerated individuals. The primary clinician increased the patient's level of care to EOP. The content of the assessment and SRASHE were adequate; although, the rationale for the assessment of low acute suicide risk was inadequate, especially given the assessment of moderate acute risk at the time of MHCB discharge four days prior. Additionally, the patient reported no social supports, was observed crying and talking to himself and evidenced delusional ideation during the interview. The clinician did note the continuation of the five-day follow-up contacts.

The CIT was activated five hours later, as the patient was again described as bizarre and talking to himself, and he reportedly made explicit hand gestures. The patient reported an intent to cut himself to die and was overwhelmed by unmanageable sadness. He was placed at the MHCB level of care and was transferred to another facility.

The patient returned to WSP on August 9, 2023 and was placed at the EOP level of care. There was confusion about his medications upon transfer; despite an active order for venlafaxine in the healthcare record, the nurse reported to the on-call psychiatrist that the order was no longer active, and that medication was not continued upon return to WSP. The initial health screening included an active order for venlafaxine. According to the medication administration record, a venlafaxine order was placed on August 11, 2023; however, no corresponding psychiatric entry in the healthcare record was documented to explain the order.

The patient was assessed by a primary clinician upon arrival when he was described as "sarcastic" but "not delusional." He was seen for five-day follow-up contacts. The documentation of those contacts was inadequate; because on August 11, 2023, the safety plan was not completed at all, despite the clinician indicating that it was reviewed with the patient. This blank safety plan was carried forward into subsequent five-day follow-up contacts with clinicians who also documented that the content was reviewed with the patient.

An initial primary clinician assessment and SRASHE were completed on August 11, 2023 and were adequate. A non-confidential RVR mental health assessment was completed on August 14, 2023 due to a fight that occurred prior to the patient's MHCB admission. The documentation indicated that no space was available to complete a confidential interview; however, the clinician determined that mental health symptoms did not contribute to the infraction. An initial psychiatric assessment was completed later than required, but the documentation was adequate.

No weekly primary clinician contacts were documented between August 11 and August 23, 2023.

An initial IDTT meeting occurred on August 23, 2023. The primary clinician who conducted the IDTT was not the patient's assigned clinician, and the psychiatrist who was present had completed the initial psychiatric assessment but was not the patient's assigned psychiatrist. In fact, there was no evidence that the patient's assigned psychiatrist saw the patient at any point during his stay in the reception center EOP. The IDTT documentation was adequate; however, the safety plan did not pull forward into the IDTT documentation, as the safety plan was blank and not previously completed during the five-day follow-up contacts. Therefore, a safety plan was not reviewed or created during the IDTT meeting, even though this was the patient's first IDTT meeting following MHCB discharge where he had been placed due to danger to self. No treatment goals were included in the IDTT documentation. The patient was seen for two primary clinician contacts during the following week, and neither contact documented the use of therapeutic interventions.

The patient engaged in a fight with a peer on September 2, 2023 and was pepper-sprayed by custody staff. A primary clinician contact on September 4, 2023 referred to the altercation but evidenced no therapeutic interventions and did not document discussion of the altercation with the patient. Subsequent primary clinician contacts, which were provided by several different clinicians, appeared to be status checks with no evidence of the provision of therapeutic interventions with one exception of a clinician documenting "Rogerian interpersonal supportive therapy was attempted," and reference to release planning.

On September 26, 2023 while being seen by a covering clinician, the patient asked to be seen by the psychiatrist. Of note, there had been no contact with a psychiatrist since the IDTT meeting on August 23, 2023, and no individual psychiatric contact since an initial psychiatric assessment nearly six weeks prior. The primary clinician noted that a psychiatrist appointment was scheduled; however, there was no documentation of that appointment in the healthcare record, and the patient was not seen again by psychiatry prior to his transfer to a mainline institution on November 7, 2023.

Recreational therapists completed cell-front rounding and provided in-cell packets until August 22, 2023, when the patient was placed in groups. He was offered groups daily and attended most groups.

**Findings**

The care and treatment provided this patient were inadequate.

There was exceptionally poor continuity of care as evidence by inadequate medication reconciliation upon transfer, no contact with the patient's primary psychiatrist during his reception center EOP stay, no routine psychiatric contacts while the patient was housed in the reception center EOP, and contacts with various primary clinicians with no documentation of the provision of therapeutic interventions to address the patient's symptoms. Additionally, the safety plan was not appropriately pulled forward in the healthcare record during the five-day follow-up

contacts, resulting in no safety plan included in subsequent contacts, including the patient's IDTT meeting.  Treatment planning was also inadequate.

**Patient G**

This 61-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP.  The patient was provided diagnoses of unspecified depressive disorder; amphetamine-type substance use disorder, severe, in early remission; and opioid use disorder.  He was prescribed risperidone and venlafaxine and was medication adherent.

The patient arrived at the WSP reception center on October 5, 2023.  A mental health screening was completed on October 10, 2023, when it was noted that he had been placed at the EOP level of care during a previous incarceration; consequently, a SRASHE and initial primary clinician assessment were completed as well.  The documentation of those assessments was adequate, except for the notation in both the SRASHE and the initial assessment that the patient was currently prescribed psychotropic medications when he was not.  The patient requested treatment with psychotropic medications.

On October 12, 2023, an initial IDTT meeting occurred, despite the lack of completion of an initial psychiatric assessment.  While the treatment plan addressed the patient's depression through an IPOC; therapeutic interventions included medication management and documentation noting that the psychiatrist reviewed the patient's medications and side effects during the meeting.  This was concerning, as the patient was not prescribed psychotropic medications at the time of the IDTT meeting.  An initial psychiatric assessment was completed by a covering psychiatrist on October 14, 2023.  The assessment was adequate and resulted in treatment with risperidone and venlafaxine.

A covering primary clinician saw the patient on October 17, 2023 and noted a diagnosis of "unspecified schizophrenia spectrum disorder" which was inconsistent with the previous clinician's entries in the healthcare record or the diagnosis included in the healthcare record.  The patient submitted a healthcare request to have his medication dose increased, and he was seen timely to address that issue.  During weekly primary clinician contacts, the patient reported frustration that his cell floor was flooded with sewage, and he had not been moved.  The primary clinician facilitated communication with a custody officer about his concerns.  Primary clinician contacts occurred weekly and included documentation of the provision of therapeutic interventions as well as discussion about release planning.  Two cell-front contacts occurred, one secondary to not having officers on the unit, and the other because the patient refused to attend a confidential session.  The patient was consistently seen by the same primary clinician.  A covering psychiatrist saw the patient on December 18, 2023, nearly two months after the last psychiatric contact.  The documentation was comprehensive and addressed the patient's needs.  The patient was transferred to a mainline institution on December 20, 2023.

Recreational therapists completed cell-front rounding and provided in-cell packets through October 19, 2023.  The patient was placed into groups on October 23, 2023.  He was offered nursing-led treatment groups or recreational therapy groups daily and typically attended groups

but not consistently. The patient preferred to attend recreational therapy groups rather than the nursing groups.

**Findings**

The care and treatment provided to this patient was inadequate.

The patient was not seen as required by psychiatry. There were also inconsistencies in the initial assessment and IDTT documentation. Otherwise, the patient was consistently seen by the same primary clinician who provided interventions consistent with the patient's needs, and groups were offered daily.

**Patient H**

This 49-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided a diagnosis of schizophrenia. He was prescribed haloperidol and was medication adherent. This case was selected for review, as his IDTT was observed, and it was noted that he transferred to the MHCB level of care and returned to the WSP reception center EOP rather than placement at a mainline institution.

The patient arrived at WSP on November 17, 2023 with active prescriptions for haloperidol and benztropine. He was seen for a mental health screening, initial assessment, DDP screening, and SRASHE on November 20, 2023. It was noted that the patient had been incarcerated previously when he was placed at the EOP level of care, and the decision was made to retain him at that level of care. The documentation of the assessments was adequate; however, the case formulation was generic. An initial psychiatric assessment was completed on November 23, 2023 and was comprehensive. An initial IDTT meeting occurred on November 29, 2023 that included the required staff; however, none of the clinicians had met the patient previously or were assigned to the patient. The treatment plan was adequate.

The patient was seen weekly by a primary clinician; however, he was not seen by the same clinician each time. On one occasion, the contact occurred at the cell-front, because there were no custody staff available. The primary clinician contacts were status checks, and there was no documentation of the provision of therapeutic interventions. The patient was offered nursing-led treatment groups daily and attended consistently.

On January 1, 2024, the patient reported suicidal ideation, command auditory hallucinations telling him to kill himself, and fear for his safety. He appeared to be in distress and was referred to the MHCB. He was transferred to another facility where he continued to report safety concerns if returned to WSP. On January 22, 2024, the patient was informed that the individual with whom he had safety concerns was no longer housed at WSP, and he would be returned there.

He returned to WSP on January 25, 2024. Five-day follow-up contacts occurred upon his return. The safety plan was reviewed by the primary clinicians; however, on the fifth day, the safety plan was blank despite the clinician documenting that it was reviewed with the patient. This

appeared to have occurred as a SRASHE was completed without a safety plan earlier that day. The safety plan was not completed as the patient's acute and chronic suicide risk was assessed as low. Those determinations appeared to be an underestimation of risk, and the justification for those assessments was inadequate as evidenced by the fact that the patient reported a history of multiple self-harm behaviors that he had not discussed during previous evaluations. Upon discharge from the MHCB, the patient was assessed with high chronic and low acute suicide risk.

An initial primary clinician assessment was completed on January 29, 2024. While generally adequate, several sections were not updated, including the previous generic case formulation. An initial psychiatric assessment was completed on February 6, 2024 and was adequate.

The initial IDTT meeting occurred on February 7, 2024 and was observed by the Special Master's expert. The psychiatrist present at the meeting had completed the initial psychiatric assessment but was not the patient's assigned psychiatrist. Also, the primary clinician at the meeting was not assigned to the patient and was not the individual who completed the initial assessment. The IDTT documentation indicated that the patient did not require a safety plan based on the previous risk assessment. The treatment plan was adequate.

The patient was offered daily recreational therapy groups, and he routinely attended.

**Findings**

The care and treatment provided to this patient were adequate.

There were, however, concerns noted about an underestimation of suicide risk regarding the most recent SRASHE, poor continuity of care due to multiple clinicians and psychiatrists seeing the patient, and a generic case formulation.

**Patient I**

This 54-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided diagnoses of unspecified schizophrenia spectrum and other disorder, unspecified mood disorder, and amphetamine-type substance use disorder, severe. He was not prescribed psychotropic medications. This case was selected for review, as the patient was interviewed during the onsite visit and reported that he had not transferred to a mainline institution timely.

The patient arrived at the WSP reception center on October 4, 2023, when he reported anxiety symptoms. He was seen for a mental health and a DDP screening on October 9, 2023. It was determined that he required further assessment for his mental health needs but not for any intellectual deficits. He was seen for a primary clinician assessment on October 20, 2023. The patient was placed at the EOP level of care with adequate rationale provided, but it was noted that the patient refused referral to see the psychiatrist for medication management and assessment. An adequate SRASHE was also completed with clear rationale provided for risk levels. An adequate safety plan was documented.

The patient was seen in response to an urgent referral due to reported depression due to his medical issues.  The patient reported chronic pain due to lung and renal cancer and frustration and irritability due to not receiving proper medical care.  The patient was seen for an initial psychiatric assessment on October 27, 2023.  The assessment was adequate, and the patient continued to state that he did not want medication treatment.  The initial IDTT meeting occurred on November 2, 2023.  The individual conducting the IDTT meeting was not the patient's assigned primary clinician and had not met the patient previously.  Other required staff and the patient were present at the meeting.  The IDTT documentation was minimally adequate, however, treatment planning was vague.

The patient was seen for weekly individual primary clinician contacts, and most occurred in a confidential setting.  One session occurred at the cell front due to a lack of security coverage.  The patient was typically seen by his assigned clinician.  The documentation of those contacts did not include specific therapeutic interventions but included vague references to therapeutic modalities.  The patient was offered daily groups and attended many, however, it appeared that he missed some groups due to medical appointments.

**Findings**

The care and treatment provided to this patient were adequate.

Improvement was, however, needed in the documentation of specific therapeutic interventions.  Additionally, the primary clinician documented that the patient was medication adherent; however, that statement was erroneous, as the patient was not prescribed psychotropic medications.

**Patient J**

This 40-year-old trans-female EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP.  The patient was provided diagnoses of gender dysphoria, PTSD, unspecified anxiety disorder, and unspecified depressive disorder.  She was prescribed oxcarbazepine, mirtazapine, and buspirone and was medication adherent.  This case was randomly selected to review the care provided.

The patient was originally received at WSP in May 2023, was placed at the MHCB level of care in June 2023, and returned to WSP at the EOP level of care after discharge from the MHCB on June 23, 2023.  Although the patient was seen for five-day follow-up contacts; there was a lack of documentation that the safety plan was reviewed with the patient during the first four days.  On the fifth day, the documentation indicated that the safety plan was reviewed; however, the plan itself was blank.  This appeared to have occurred as a SRASHE was completed with the patient on day four when she was assessed with low acute suicide risk; therefore, no safety plan was documented.  The patient had an extensive history of self-injury and suicide attempts and was recently discharged from the MHCB with an assessment of moderate acute suicide risk.  It appeared that even if the patient's acute risk was low, a safety plan was clinically indicated.  The initial primary clinician assessment was completed adequately and timely.

An initial psychiatric assessment was attempted on July 2, 2023, but the patient refused. An initial IDTT meeting occurred on July 5, 2023 that included the required staff and the patient. The primary clinician at the meeting was not assigned to the patient. The treatment plan was adequate; however, given the patient's history, a safety plan appeared warranted but was not created. The patient was seen for weekly primary clinician contacts; however, one contact occurred at the cell front due to lack of custody coverage. She was offered daily groups while in the reception center EOP.

On July 24, 2023, the patient was placed in the RHU due to fighting.

**Findings**

The care and treatment provided to this patient during her brief placement in the reception center EOP were adequate.

A safety plan, however, was not created when it appeared to be clinically indicated upon return to WSP from the MHCB. Further, the safety plan created when the patient was discharged from the MHCB was not reviewed during the five-day follow-up contacts.

**Patient K**

This 37-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP. He was provided with a diagnosis of generalized anxiety disorder. He was not prescribed psychotropic medication.

The annual IDTT meeting occurred in November 2023 and was attended by the assigned primary clinician and psychiatrist. The IDTT and primary clinician documentation on October 17, 2023 indicated that the treatment goal to reduce anxiety was already achieved. The documentation indicated that chronic sleep disturbance was present but was not considered in treatment planning. In contrast, the routine primary clinician documentation indicated that the patient did not have sleep difficulties.

The primary clinician contacts were timely but brief in content and lasted less than fifteen minutes. Most of the documentation was copied unchanged for each contact, and there was minimal documentation regarding the patient's current symptoms and functioning other than the documentation of a mental status examination. The copied documentation included a standard paragraph regarding treatment interventions that were also present in other patients' healthcare records.

**Findings**

The care and treatment provided to this patient were inadequate.

The documentation indicated that this stable patient was appropriate for consideration of discharge from the MHSDS. The documentation of treatment planning was outdated and did not

represent the patient's current level of functioning. The documentation of primary clinician contacts indicated the occurrence of brief wellness checks and was not individualized.

**Patient L**

This 29-year-old 3CMS patient's healthcare record was reviewed to assess the care provided at WSP.

The initial primary clinician assessment included relevant psychosocial and mental health history, as well as documentation of current symptoms of anxiety, depression, and disturbed sleep. Relatedly, the initial psychiatric assessment was thorough with treatment focused on anxiety and disturbed sleep. The patient was prescribed Remeron and melatonin PRN.

During the initial IDTT meeting, the treatment planning targeted depression. The rationale for interventions that included goal setting and testing distorted thinking about medications was not supported in the documentation. No treatment goals were established for identified symptoms of anxiety or disturbed sleep, and psychotropic medication treatment was not included as a therapeutic intervention.

The provided diagnoses varied in the documentation, and the clinical rationale for those diagnoses was not documented. The psychiatrist provided an initial diagnosis of adjustment disorder with mixed anxiety; however, at a subsequent routine psychiatric appointment, the diagnoses were changed to depressive disorder, not otherwise specified and anxiety disorder, not otherwise specified. A subsequent diagnostic change occurred during the following psychiatric contact, when the diagnosis of anxiety disorder, not otherwise specified, was removed, and obsessive-compulsive personality disorder was added. The EHRS diagnoses of major depressive disorder, obsessive-compulsive disorder, and unspecified depressive disorder remained unchanged.

The provider contacts occurred timely, and the documentation of those contacts was appropriate for the provision of continuity of care.

**Findings**

The care and treatment provided to this patient were marginally adequate.

Although the patient's treatment needs were only partially targeted in the IDTT documentation, his treatment needs were addressed during subsequent provider contacts. Diagnostic clarification with clinical rationale was needed.

**Patient M**

This 27-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was transferred to WSP in 2021.

During the review period, the patient was seen on three occasions for psychiatric contacts that occurred timely with two different psychiatrists. On July 24, 2023, the patient's medication nonadherence with Vistaril and Remeron was addressed, which the patient attributed to his work

schedule.  Vistaril was discontinued, and Remeron was continued; however, the rationale for those medication changes was not clearly documented.  Medication nonadherence was again addressed during an August 2023 psychiatric contact; again, the patient attributed his nonadherence to his work schedule.  During the most recent psychiatric contact on November 2, 2023, Remeron was discontinued, as the patient stated that he did not need the medication.

Overall, the patient presented with stability.  The primary clinician contacts occurred timely; although, they were brief in duration, ranging from six to seventeen minutes.  During the primary clinician contacts, the patient's functioning and mental status were assessed, and individualized treatment techniques were utilized.

The EHRS diagnoses included adjustment disorder, with mixed anxiety and depressed mood; ADHD; generalized anxiety disorder; and major depressive disorder with psychotic features.  The provided psychiatric diagnoses varied by provider and included unspecified depressive disorder, unspecified schizophrenia spectrum disorder, depressive disorder, not otherwise specified and anxiety disorder, not otherwise specified.  The clinical rationale provided for the various diagnoses was insufficiently documented.

**Findings**

The care and treatment provided to this patient were adequate.

The patient received appropriate treatment by providers, including utilization of treatment techniques by the primary clinician.  Psychiatric continuity of care, particularly given the use of telepsychiatry, needed improvement.  Diagnostic clarification with clinical rationale was needed.

**Patient N**

This 33-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP.  He was prescribed Buspar and Vistaril PRN.

Between July 2023 and the monitoring visit in February 2024, routine primary clinician contacts occurred in August and October 2023.  Treatment interventions to address stressors were utilized.  A routine primary clinician contact should have occurred in January 2024; however, there was no documentation that a contact occurred at that time.

The annual IDTT meeting occurred timely in November 2023.  For reasons that were unclear, an initial IDTT meeting also occurred in January 2024.  The documentation of both IDTT meetings was minimally changed from the initial IDTT documentation in August 2022; as a result, no summary was provided of the patient's treatment progress during the previous year.  Although the new version of the treatment plan was used; goals were not established in the treatment plan.

The only psychiatric contact during the review period occurred in September 2023.  During that contact, the patient reported feeling miserable, which he attributed to being away from his family.  He declined a medication change or adjustment.  Psychiatric documentation was completed on January 3, 2024 to refill expired medication.

The diagnoses provided in the EHRS were mood disorder and unspecified anxiety disorder. The diagnoses provided by the psychiatrists were anxiety and depressive disorders, not otherwise specified with a provisional diagnosis of adjustment disorder. In contrast, diagnoses in the initial treatment plan that were copied until January 2024 included depression, anxiety, schizophrenia and bipolar disorder.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient was not appropriately followed by providers, and the treatment plan was not updated with individualized treatment goals. His psychotropic medications expired, and he was not seen timely for psychiatric contacts. Diagnostic clarification with clinical rationale was needed.

**Patient O**

This 35-year-old patient's health care record was reviewed to assess the quality of care provided at WSP CTC.

The patient was prescribed prazosin that was continued when he transferred to WSP in November 2023. Shortly thereafter, he was sent to an outside hospital for medical treatment; upon return to the WSP CTC, prazosin was continued, and Wellbutrin that was prescribed at the hospital was also continued.

The initial psychiatric assessment occurred timely but was overly brief regarding the patient's mental health history and rationale for diagnosis and medication changes; this contact was not indicative of an initial psychiatric assessment. Despite the documentation of a seven-year history of treatment with Wellbutrin, the medication was discontinued without explanation. Prazosin was continued, and Remeron and Trileptal were added. During a subsequent psychiatric contact on February 13, 2024, it was documented that Trileptal was prescribed by medical for pain management. During that contact, the patient stated that his mood was good with improved sleep. He was provided diagnoses of PTSD and unspecified mood disorder. The diagnoses of record in the EHRS were depression, anxiety, and PTSD.

The initial primary clinician assessment was comprehensive with appropriate documentation of relevant psychosocial history and the patient's significant substance abuse history. Regarding current mental health needs, the documentation noted moderate depression and anxiety but did not provide details regarding specific symptoms or the impact on functioning. Although the patient requested EOP placement reportedly to facilitate transfer to RJD, the clinician indicated that the 3CMS level of care was more clinically appropriate. The case conceptualization was copied from documentation of a previous 2021 incarceration and was outdated.

The patient and assigned providers attended the initial IDTT meeting; although, the primary clinician was a different clinician than the one who completed the initial assessment. The identified treatment goal was to reduce depression using CBT; although this was an appropriate approach to treating depression, it was not clearly aligned with the case conceptualization as was clinically appropriate and required by the treatment plan document. The patient's anxiety was not targeted as a treatment goal.

713

After the IDTT meeting, the patient was seen in response to a routine consult by a clinician he had not seen before. Treatment interventions were used to address his trauma history, substance use, and parental attachment. A plan was documented to utilize cognitive processing therapy and motivational interviewing that were appropriate interventions but were different than those identified in the treatment plan.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The initial psychiatric assessment was insufficient. The provision of care by various primary clinicians, including the initial assessment, IDTT, and subsequent mental health contact, negatively impacted treatment planning and did not fully target the patient's treatment needs. However, at a subsequent primary clinician contact, the provided treatment was individualized.

Regarding concerns noted by the plaintiffs' attorneys, the current documentation indicated that the patient was stable and any PTSD-related symptoms could effectively be treated at the 3CMS level of care.

**Patient P**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP. He had not been a participant in the MHSDS since 2019.

Approximately one year after his January 10, 2023 transfer to WSP, the patient submitted a mental health request, as he had concerns that he might have cancer. He stated that he had been drinking contaminated water at WSP, and he stated that it caused him to think and feel crazy thoughts. Prior to this request, he was evaluated by medical for various physical symptoms that he attributed to the institution's water. The medical provider documentation indicated that the institution's water was a known issue of concern. A review of the medical documentation indicated no cancer diagnosis.

In response to his request, a mental health clinician appropriately assessed the patient's symptoms and functioning. He was described as highly anxious and moderately depressed with disturbed sleep and appetite which he attributed to anxiety that drinking institutional water would cause cancer. He was appropriately referred for initial provider assessments.

The initial psychiatric assessment documented relevant psychosocial history and current symptoms. The patient reported that after he read a memo in September 2023 that the institution's water could have cancer-causing elements, he began having persistent anxiety, particularly at bedtime that he would die of cancer and attributed various physical symptoms to the institution's water. His physical symptoms were evaluated by medical, and he was treated symptomatically but was otherwise cleared of medical concerns. He requested medication to assist with his anxiety, disturbed sleep, and appetite. Medication options were discussed, and Remeron was initiated. During the initial IDTT meeting that was not attended by the assigned psychiatrist, the patient reported improved functioning which he attributed to the medication treatment.

The initial primary clinician assessment documentation was comprehensive. The patient indicated that he became anxious about his health upon arrival to WSP, and the anxiety was heightened after reading the memo about the institution's water. In contrast to psychiatric documentation, the primary clinician documented that patient was treated for eight years at an inpatient psychiatric hospital.

Prior documentation of that treatment was not sought.

The patient was placed at the 3CMS level of care, and the treatment goal to reduce anxiety was appropriate. The treatment interventions were evidence-based; although, they were not tied to the case conceptualization, which needed improvement.

The patient was provided a diagnosis of adjustment disorder with anxious mood with a provisional diagnosis of obsessive-compulsive disorder. The primary clinician documentation provided diagnoses of "anxiety" and "depression." The diagnosis of record in EHRS was generalized anxiety disorder.

**Findings**

The care and treatment provided to this patient were adequate.

While improvements were needed in treatment planning and continuity of psychiatric care; the patient's treatment needs were appropriately evaluated, and he was timely placed at the 3CMS level of care. Diagnostic clarification with clinical rationale was needed.

**Patient Q**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP since his transfer on January 23, 2024. His healthcare record was selected from the 3CMS length of stay roster to assess the adequacy of care provided.

The patient refused the initial primary clinician assessment which resulted in documentation that was copied from a previous June 2023 initial primary clinician initial assessment. The current assessment, however, failed to summarize the patient's symptoms, functioning, and mental health participation between June 2023 and transfer to WSP.

The initial psychiatric assessment was not sufficiently comprehensive and was indicative of a routine psychiatric contact. At the patient's request, Abilify and Vistaril were continued.

The documentation noted a history of a diagnosis of unspecified schizophrenic spectrum and other psychotic disorder; this diagnosis, coupled with a lack of clinical rationale, made the documented diagnoses in the initial primary clinician assessment unclear. Despite this, the IDTT and EHRS documentation noted a diagnosis of unspecified schizophrenia spectrum and other psychotic disorders.

The IDTT meeting was attended by a telepsychiatrist who was different from the provider who completed the initial psychiatric assessment. No treatment plan was documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial assessments lacked pertinent information necessary for treatment planning, there was a lack of psychiatric continuity of care, and treatment planning was not completed.

**Patient R**

This 38-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP. He was housed at WSP since 2019. He had two years remaining on a fifteen-year prison sentence.

After 13 years of incarceration, the patient accessed mental health services in July 2023 to address trauma symptoms. He reported that his symptoms began in January 2023 and were exacerbated after his brother's recent murder. The patient was evaluated by mental health and was referred for a psychiatric evaluation. The documentation of the psychiatric contact indicated that the contact was not a comprehensive initial psychiatric assessment and was more indicative of a routine contact. He was prescribed Remeron for disturbed sleep, grief, and anxiety. The documentation indicated that the patient reported PTSD-related symptoms.

An initial primary clinician assessment was subsequently completed which included relevant information. Despite his report of trauma-related symptoms, the patient was provided diagnoses of major depression and obsessive-compulsive disorder which were documented in the EHRS.

For reasons that were unclear, the patient was subsequently seen for another initial psychiatric assessment, and the documentation of that contact conflicted with the previous psychiatric contact. This psychiatric contact also occurred in response to medication nonadherence; although, the patient's reasons for nonadherence were not addressed. It did not appear that the prior psychiatric documentation was considered, and the patient was provided a diagnosis of adjustment disorder with depressed mood.

The initial IDTT treatment goals and interventions that targeted depression were generic and not individualized. Moreover, the patient's treatment needs, such as trauma symptoms and grief that brought him to treatment, were not addressed in treatment planning or during his one scheduled routine contact.

Approximately one month after the second initial psychiatric assessment, another psychiatric contact occurred to address medication nonadherence. The patient reported that he did not need the medication daily, and Remeron was ordered PRN. For reasons that were unclear, he was scheduled for another psychiatric contact six days later; however, he was reportedly not seen, as the internet connection was unavailable. While not documented as such, it was presumed that this was a telepsychiatry contact. He was scheduled to see the psychiatrist three days later when he was reportedly stable with reported improved sleep and anxiety that was attributed to medication treatment. No medication changes occurred at that visit.

There was a lack of psychiatric continuity of care; as different providers completed the initial assessment, attended the IDTT meeting, and met with the patient for routine psychiatric contact.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the patient was seen consistently by treatment providers, his treatment needs were not fully addressed in treatment planning or during the routine primary clinician contact. The psychiatric continuity of care was poor, and there was a lack of collaboration between treatment providers which negatively impacted diagnostic clarification and treatment planning. As such, diagnostic clarification with clinical rationale was needed.

**Patient S**

This 49-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP since his transfer in December 2022.

The documentation of routine primary clinician contacts indicated that the contacts occurred timely with a duration of between twenty and fifty minutes. The documentation consistently provided an overview of the patient's mental status and functioning. The clinical interventions were supportive in nature for this stable patient with documented anxiety and depression.

The annual IDTT meeting occurred in December 2023. The clinical summary documentation and case conceptualization were copied from previous documentation and did not provide information regarding the patient's functioning since July 2023 or his progress in treatment. The clinical summary was copied from the initial assessment one year prior and included diagnoses of delusional disorder, unspecified anxiety disorder, and unspecified depressive disorder. The treatment plan was not completed.

The documentation by a telepsychiatrist for the one routine psychiatric contact during the review period was appropriate. The patient was prescribed Vistaril PRN for anxiety and insomnia.

The EHRS diagnosis of generalized anxiety disorder was not supported by recent clinical documentation or the case conceptualization that indicated that the patient had a psychotic disorder. In contrast, the psychiatric documentation noted diagnoses of unspecified schizophrenia spectrum disorder and unspecified mood disorder.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the care provided during routine primary clinician contacts was adequate, the patient was not appropriately followed by psychiatry. Further, the IDTT documentation did not address the patient's treatment needs and was insufficient for the provision of continuity of care. A treatment plan, which was critical for the provision of mental health services, was not developed. Provider diagnostic discrepancy indicated a lack of collaborative treatment planning and the need for diagnostic clarification with supporting clinical rationale.

**Patient T**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at the WSP reception center. The patient subsequently transferred to the general population yard.

The patient transferred to WSP from a county jail where he was prescribed Prozac. During the initial psychiatric assessment, the patient was described as stable, and Prozac was discontinued at the patient's request. He was provided diagnoses of adjustment disorder and anxiety disorder, not otherwise specified. There was no documentation that the patient was seen for psychiatric follow-up in the subsequent six months after psychotropic medication discontinuation as required. Additionally, an initial psychiatric assessment was not completed prior to the initial IDTT meeting.

The general population initial primary clinician assessment included relevant psychosocial history for this patient with reported mild anxiety. The PC provided diagnoses of "stress/anxiety" as well as depression that were inconsistent with the patient's current clinical presentation; it was noted that the patient rated his depression as nonexistent at the initial IDTT meeting. For reasons that were unclear, his diagnosis was then changed to persistent depressive disorder which was consistent with the EHRS diagnosis. Relatedly, the sole IPOC targeted depression. The clinical documentation did not support the provision of a depression diagnosis.

The one required routine primary clinician contact lasted approximately twenty minutes. During that contact, the patient discussed a recent fight with a peer which was appropriately addressed by the clinician. The provision of therapeutic interventions was documented; although, more specificity was needed for the provision of continuity of care. The documented plan and disposition included treatment modalities; although, the plan was not appropriately individualized.

Of concern, the patient had a suspected overdose on January 4, 2024, and he was also found unresponsive on January 12, 2024. He refused medical treatment after both incidents. There was no documentation indicating that the information was communicated to mental health.

**Findings**

The care and treatment provided to this patient were inadequate.

Although positive aspects of treatment were noted in the care provided during the primary clinician's routine contacts, the patient was not appropriately followed by psychiatry after psychotropic medication discontinuation. Additionally, the rationale for depression IPOCs in treatment planning was unclear and was inconsistent with the patient's reported symptoms of mild anxiety. Further, the diagnosis of a depressive disorder absent supporting symptoms and clinical rationale was an area of concern. Mental health notification of this MHSDS patient's overdose was clinically indicated.

**Patient U**

This 30-year-old patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient reentered CDCR in November 2023 and was placed at the EOP level of

care, as he presented with bizarre and malodorous appearance and behavior. A diagnosis of schizophrenia and unspecified schizophrenia spectrum and other psychotic disorder was provided in the EHRS. His healthcare record was selected for review as he was observed with disorganization during the monitoring visit.

Within one month of reception center placement, the patient transferred to another institution's MHCB due to ongoing bizarre behavior. The MHCB discharge IDTT documentation indicated that the patient continued to make odd statements which could be addressed at the EOP level of care. Upon return to WSP, he was placed in restricted housing after he spontaneously and without known provocation engaged in battery on a peace officer. The mental health RVR assessment opined that there was a nexus between his mental health symptoms and the RVR behavior.

The initial provider assessments described the patient with disorganization. The psychiatrist indicated that the patient was malodorous. He was prescribed Zyprexa for psychosis and Vistaril for anxiety. The psychiatric documentation indicated that the patient did not meet the criteria for a PC 2602 involuntary medication order; although, clinical rationale for that determination was not provided. The patient's medication adherence was not documented by the psychiatrist; however, review of the medication administration record indicated that the patient was medication nonadherent.

Mental health treatment goals were not established during the initial or routine IDTT meetings. During the routine IDTT meeting, the rationale for not referring the patient to a higher level of care was that the IDTT determined that the patient's treatment refusal was due to his own motivations and desire to be left alone. They further indicated that his current RHU functioning did not warrant a higher level of care, as they did not believe that he met the higher level of care referral criteria solely based on treatment refusal.

The weekly primary clinician contacts documentation noted that the patient refused confidential contacts and was seen at cell front. The documentation indicated that the patient's mental status remained unchanged with nonsensical and incoherent speech, agitation, and focus on his property. The documentation further indicated that the patient remained medication nonadherent. Multi-disciplinary consultation was not documented.

The psychiatric follow-up was poor given the patient's decompensated clinical presentation and medication nonadherence. The initial psychiatric assessment, routine psychiatric assessments, and routine IDTT meeting all were provided by different psychiatric clinicians. On February 7, 2024, the patient was seen at cell front for a routine psychiatric contact due to a refusal; however, he was sleeping. The psychiatric documentation indicated that the psychiatrist was unclear whether the patient was medication adherent; despite the presence of documentation of medication nonadherence and indication that the healthcare record was reviewed. With the exception of the medication reference, the February 7, 2024 psychiatric documentation was almost identical to documentation from the same provider on November 5, 2023. As of February 23, 2024, the patient had not been evaluated by the psychiatrist since January 2, 2024, and the pattern of medication nonadherence had not been addressed.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment team failed to refer the patient to a higher level of care as was clinically indicated. As a result, his mental status remained unchanged, and his psychosis remained untreated. Given the limited ability to fully assess the patient due to recurrent cell-front contacts, the primary clinician failed to consult with custodial staff regarding the patient's functioning. The psychiatric care was insufficient and lacked continuity. There was no documentation that consultation with the psychiatrist regarding medication nonadherence and unchanged mental status occurred. Additionally, treatment goals were not established.

**Patient V**

This 33-year-old patient's healthcare record was reviewed to assess the quality of care provided at WSP. This patient returned to CDCR on November 20, 2023 and was placed in the reception center EOP after evaluation. He was provided diagnoses of bipolar I disorder, brief psychotic disorder, and unspecified bipolar and related disorder.

Within one month of CDCR arrival at WSP, the patient was placed into restricted housing after fighting with a peer. He was released shortly thereafter but returned on December 30, 2023, after he received an RVR for battery on a peace officer.

The initial primary clinician assessment that was conducted at cell-front due to patient refusal indicated that the patient presented with bizarre behavior, paranoia, and hyperverbal speech. The documentation of that contact was thorough and provided a useful summary of the patient's recent mental health functioning and noted a history of inpatient care during his previous CDCR term. In contrast, the initial psychiatric assessment documentation was not detailed and was more indicative of a routine contact rather than a comprehensive initial assessment. The documentation indicated that the patient was not prescribed psychotropic medication at his request; no medications were prescribed at the subsequent routine psychiatric contact that occurred timely.

The initial IDTT documentation included treatment goals that targeted treatment participation with psychoeducation as an intervention which was reasonable.

The routine primary clinician contact documentation during the review period indicated that the patient consistently refused to attend a confidential session in the restricted housing unit and was subsequently seen at cell front. He also refused to attend group sessions. The documentation indicated that the patient presented with paranoia, hyperverbal speech, poor insight, and consistent denial of mental health symptoms. Collateral consultation, although warranted, was not documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment was insufficient. Cell-front contacts continued to occur without intervention for this decompensated patient, and the clinicians should have attempted to provide psychoeducation as included in the treatment plan or appropriately address his treatment refusals. Multidisciplinary consultation was needed to fully assess this patient's functioning and mental status given his pattern of primary clinician refusals that resulted in limited assessment. Additionally, a higher level of care was not appropriately considered for this patient who presented with significant mental health symptomatology.

**Patient W**

This patient's healthcare record was reviewed to assess the quality of care provided since his placement at WSP. This reception center EOP patient was placed in restricted housing in early January 2024 and his IDTT meeting was observed during the monitoring visit.

The initial primary clinician assessment indicated that during previous CDCR terms, the patient received mental health services at every level of care and had multiple suicide attempts; although, details were not provided, nor was a history of community mental health treatment noted. The patient reported anxiety, and a diagnosis of PTSD was retained; although, the clinical criteria to support the diagnosis was not documented and was inconsistent with the EHRS diagnoses of major depressive disorder, schizoaffective disorder, depressive type, and an unspecified personality disorder.

An initial psychiatric assessment was not documented. There was a lack of psychiatric continuity of care, as the patient was seen by three different providers for four contacts between January 9 and February 7, 2024. Of note, the February 7, 2024 documentation indicated that the contact occurred during the IDTT meeting and did not occur during a separate routine contact. Three of the four contacts occurred at cell front; two of which were due to refusals, and one cell-front contact occurred because a custody escort was unavailable. The psychiatric providers made appropriate attempts to meet with the patient after he twice requested to meet with psychiatry and then refused. He was prescribed Zyprexa, Wellbutrin, Remeron, prazosin, and Cogentin.

The patient attended primary clinician contacts and discussed his psychosocial stressors. The documentation of those contacts indicated appropriate assessment of the patient's symptoms and functioning; although, therapeutic interventions to assist with symptoms were not utilized. The patient's minimal group attendance was addressed by the IDTT and was noted to have improved in a subsequent primary clinician contact.

During provider contacts, the patient reported various symptoms including anxiety, mood lability, auditory hallucinations, and fears about his family's safety that did not appear reality based. During an IDTT meeting, the patient requested treatment for nightmares. None of those symptoms were addressed in the initial or routine treatment plan which was not completed. The routine IDTT documentation did not provide a representative summary of the patient's mental status, functioning, treatment participation, or treatment response which were key clinical factors necessary for treatment planning and continuity of care.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was presented with stability during his routine IDTT meeting; despite his report of various clinical symptoms in the weeks preceding the IDTT meeting. This disparate clinical presentation made the lack of diagnostic clarification with clinical rationale even more concerning. While the patient was appropriately monitored by the primary clinician, targeted treatment interventions were not utilized. Treatment planning was not completed, and the routine IDTT documentation was insufficient. The patient did not receive an initial psychiatric assessment, and there was a lack of psychiatric continuity of care.

**Patient X**

This 48-year-old patient's healthcare record was reviewed to assess the quality of care provided at WSP. This patient was previously housed in the reception center where he received mental health services at the EOP level of care, and he was placed in restricted housing on December 16, 2023. He was provided a diagnosis of schizoaffective disorder, bipolar type. He was prescribed Seroquel, Vistaril, BuSpar, Cogentin, Remeron, and prazosin.

The initial primary clinician assessment did not include documentation regarding the patient's mental status and functioning while in the reception center EOP since his previous assessment in October 2023 and placement in the RHU. The documentation indicated a history of multiple suicide attempts but failed to indicate that the most recent attempt occurred several months prior by hanging and resulted in an involuntary assessment and evaluation by WIC 5150. The patient reported auditory hallucinations, poor sleep, and had not been attending yard. He attended most routine primary clinician contacts where treatment interventions were utilized.

The initial psychiatric assessment documentation was brief in content and was comparable to a routine contact rather than a comprehensive initial psychiatric assessment. A description of the patient's symptoms and functioning were not included in the documentation. The contact did not occur in a confidential setting; however, the reason that the session did not occur in an appropriate setting was unclear. The documentation of subsequent routine psychiatric contacts with three different providers was also brief, was variably conducted at cell front, and lacked sufficient detail for the provision of continuity of care. The patient consistently reported auditory hallucinations, and medication adjustments occurred; however, the rationale for those medication changes was not clearly documented.

The initial IDTT documentation identified symptoms of significant anxiety, chronic paranoia and trauma symptoms that impacted the patient's functioning and sleep. Given his recent suicide attempt, safety planning should also have been identified as a treatment need. Despite those multiple treatment needs, the treatment plan was not completed during the initial or routine IDTT meetings.

**Findings**

The care and treatment provided to this patient were inadequate.

Although primary clinician contacts appeared to be therapeutic, the lack of treatment planning, insufficient initial and routine psychiatric contacts documentation, nonconfidential psychiatric contacts, and the lack of psychiatric continuity of care resulted in the assessment of inadequacy.

**Patient Y**

This 33-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at WSP.  The patient was placed in restricted housing due to battery with a deadly weapon on December 6, 2023.  He was released from restricted housing to the reception center near the end of January 2024.  His healthcare record was selected from the weekly treatment summary roster to assess the adequacy of care provided.

The patient refused the initial primary clinician assessment; and consequently, most documentation consisted of select content copied from previous providers.  Other than assessing the patient's anxiety and depression as moderate, the documentation did not include information regarding his functioning, mental status, and treatment engagement prior to restricted housing placement.  The mental health history documentation was also limited; and this was significant, as the patient had discharged from the ICF level of care less than one year prior to his CDCR term.

Although the initial psychiatric assessment was comparable to a brief routine psychiatric contact; sufficient clinical information was provided regarding the patient's symptoms and functioning, and a mental status examination was completed.  It was unclear why the contact occurred in a nonconfidential setting.  Relatedly, two subsequent routine psychiatric contacts were also overly brief in content.  Both contacts also occurred cell front; one due to the lack of an escort, and the other due to patient refusal.  On both occasions, the patient was reluctant to engage; and during the latter contact, he was unwilling to turn on the cell light.  The patient was prescribed Depakote, Zyprexa, Zoloft, and Vistaril; however, he was poorly adherent.  He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder.  The patient's medication nonadherence was not appropriately addressed.  The documentation also indicated a history of psychosis with disorganized thinking and behavior.

The primary clinician contacts also occurred at cell front due to refusals.  A PC note on December 27, 2023 indicated that the patient's cell had piles of trash and was in disarray.  When he requested discharge from the EOP, the primary clinician appropriately addressed his inability to maintain his ADLs or to clean his cell.  In response, the patient requested a trash bag, but he reportedly stopped speaking when encouraged to clean his cell.  He was described with poor insight regarding his mental illness.  During subsequent PC contacts, the patient presented with hostility and refusal to engage or to turn his light on.  On January 8 and January 18, 2024, he was described with poor grooming and hygiene.

A goal that targeted paranoia from an IDTT prior to RHU placement was continued at the initial IDTT meeting; although, the patient's current treatment needs were not documented, and that goal was continued at the subsequent routine IDTT meeting.  The routine IDTT documentation did not sufficiently describe the patient's decompensation or indicate consideration of referral to a higher level of care.

**Findings**

The care and treatment provided to this patient were inadequate.

Several significant concerns were noted regarding the care provided to this patient with serious mental illness and probable psychotic decompensation while housed in restricted housing. Provider collaboration and consideration of referral to a higher level of care was clinically indicated for this patient; however, it did not occur. The patient was nonadherent with provided treatment, including psychotropic medication, and showed significant signs of decompensation. The psychiatric documentation was insufficient for the provision of continuity of care; this was a significant issue for this patient who was seen by multiple treatment providers. The clinical assessments were insufficient for treatment planning that was not individualized and updated to address the patient's current treatment needs.

**Patient Z**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided since his transfer to WSP on November 28, 2023. He was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. This patient's IDTT meeting was observed during the monitoring visit.

The patient transferred to restricted housing on February 3, 2023 due to safety concerns and was released on February 7, 2023. The initial primary clinician assessment identified current symptoms of anxiety and paranoia; however, the symptom description lacked specificity. The documentation indicated a history of being found incompetent to stand trial on two occasions; however, details regarding his mental health treatment were not documented. There was no evidence that a release of information was sought or that additional information was obtained from the patient.

The initial psychiatric assessment was brief in content and was comparable to a routine psychiatric contact. He was prescribed Zyprexa and Depakote as well as a long-acting Risperdal injection, and those medications were continued as the patient indicated stability with that medication regimen. At the patient's request, Remeron was added to address poor sleep. Documentation regarding the patient's history of community mental health treatment, with the exception of reference to treatment at Patton State Hospital, was not provided.

The treatment plan did not fully address the patient's treatment needs, as identified treatment needs of anxiety, paranoia, and sleep disturbance were not targeted. For reasons that were unclear, IPOCs were established rather than utilizing the updated treatment plan that was in current use. Further, it was unclear why IPOCs targeted delusions that were not clearly documented or discussed in the IDTT meeting.

**Findings**

The care and treatment provided to this patient were inadequate.

The clinical assessments and treatment planning were inadequate, and the initial provider evaluations were not sufficiently comprehensive. The treatment plan did not target identified treatment needs and was not appropriately individualized or updated.

**Patient AA**

This 34-year-old patient's healthcare record was selected from the weekly treatment summary report and reviewed to assess the quality of care provided at WSP. The patient was placed in restricted housing on August 29, 2023 due to battery on an inmate resulting in serious bodily injury. He was provided a diagnosis of unspecified bipolar and related disorder. He was prescribed Lamictal, Vistaril, and Remeron.

The patient was seen cell front for the initial primary clinician assessment due to refusal to attend a confidential session. Most of the documentation of that assessment consisted of select content copied from previous providers. The patient denied any psychiatric distress. The initial psychiatric assessment lacked detail regarding the patient's history of mental health treatment and current symptoms. The patient reported that Remeron, initially prescribed for depression and insomnia, was effective, and the medication was continued.

The initial IDTT clinical summary documentation contained conflicting information that impacted IPOCs, which appeared in part related to the primary clinician's absence from the initial IDTT meeting. The initial IDTT documentation indicated that the patient rated his depression at five on a one to ten scale, and he noted that this level of depression was normal for him. This contrasted with his depression rating of zero during the initial primary clinician assessment. Regardless, IPOCs established during a previous May 2023 IDTT meeting that targeted depression with a goal to reduce depression to a four or lower were continued without consideration of the previously mentioned discrepancy. The rationale for the sole intervention to work with the patient on goal setting was unclear, as this had not been documented as an area of concern during the provider assessments. The assigned primary clinician was also not present for the routine IDTT meeting, and the clinical summary did not sufficiently reflect the patient's symptoms, functioning, or lack of treatment engagement. The treatment plan utilizing the new form was not completed.

During the review period, the patient was seen cell front for primary clinician routine contacts due to refusals which were not appropriately assessed or addressed during routine contacts or the IDTT meeting. The documentation indicated assessment of relevant symptoms and functioning but was representative of a brief wellness check rather than a therapeutic contact. The patient denied any mental health symptoms during most of the contacts. In contrast to his refusals with the assigned primary clinician, the patient attended a confidential contact during the only contact provided by a different clinician. The documentation of that contact indicated the provision of individualized treatment regarding the patient's stressors and the use of appropriate therapeutic techniques. The patient consistently attended group treatment.

The five reviewed psychiatric contacts occurred with four different providers. The documentation of those contacts varied by provider; the documentation of two providers was brief in content, and the documentation by the other two providers was more thorough and comprehensive regarding the patient's clinical presentation and functioning which was useful for the provision of continuity of care.

**Findings**

The care and treatment provided to this patient were inadequate.

A clinical rationale was not provided for the diagnosis provided, and this was important as the patient was presented with contrasting clinical presentations with his assigned primary clinician and psychiatric providers.  The treatment plan was not updated or individualized to the patient's treatment needs.  The chronic and extended pattern of treatment refusals was not appropriately addressed, and multidisciplinary consultation regarding the patient's functioning was not sought.  The patient's consistent group attendance and engagement in treatment during one primary clinician contact contrasted with the chronic refusals with his assigned primary clinician and warranted review.

**Patient BB**

This 37-year-old patient's healthcare record was reviewed to assess the quality of care provided at WSP's restricted housing unit.  He was placed in restricted housing due to battery causing serious injury.

The patient was seen cell front for the initial primary clinician assessment due to refusal to attend a confidential session.  The patient denied any mental health distress, and he indicated resolution of his anxiety and depression.  Select content from previous providers was copied into the document rather than the completion of an individualized and updated summary.  The patient had recently discontinued Wellbutrin but was not seen for an initial psychiatric assessment.

The patient did not attend the initial IDTT meeting; however, an IPOC from July 2023 was continued with a goal to reduce depression.  The continuation of that IPOC was concerning, as the patient denied depression during the initial primary clinician assessment.  Treatment interventions were not established.  At the subsequent routine IDTT meeting, the documentation was not updated and did not include a summary of the patient's functioning, symptoms, or lack of treatment engagement.  The treatment plan was not completed.

The patient was seen for a routine psychiatric contact in October 2023 after a request to resume psychotropic medication treatment; he was seen by the same psychiatric provider who evaluated him when he was housed in the reception center.  At his request, Wellbutrin was restarted, and Remeron was prescribed to address poor sleep.  The patient was seen one week later by a different psychiatric provider when the dosage of Remeron was increased to address continued poor sleep.  The following week, the same provider increased the Remeron and added Vistaril.  The medications remained unchanged during subsequent psychiatric contacts.  Of note, psychiatric contacts in November 2023 and January 2024 occurred cell front due to a lack of custody escorts.

Weekly primary clinician cell front contacts with the assigned provider in restricted housing occurred due to refusals, and the documentation of those contacts was indicative of brief wellness checks.  Except for two contacts, the patient rated his anxiety and depression lower than his established treatment goals.  Of note, during the two contacts when he rated anxiety in the moderate range, treatment interventions were not utilized.  Two contacts with two different

clinicians who were not his assigned provider occurred in a confidential space. The patient sporadically attended group treatment.

Although the psychiatrist provided diagnoses of unspecified mood disorder and unspecified anxiety disorder; the diagnosis of record in the EHRS was unspecified bipolar and related disorder.

**Findings**

The care and treatment provided to this patient were inadequate.

An initial psychiatric assessment was not completed. The initial treatment plan was not updated, and the routine treatment plan was not completed. The patient had a lengthy period of refusals with the assigned primary clinician, in contrast to other primary clinicians and groups, which warranted review. Relatedly, treatment refusals were not appropriately assessed or addressed. Diagnostic clarification and rationale were needed.

**Patient CC**

This 40-year-old patient's healthcare record was reviewed to assess the quality of care provided at WSP's restricted housing unit. He was placed in restricted housing due to restricted housing placement during his prior CDCR prison term. He was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood.

The patient refused the initial primary clinician assessment which was subsequently conducted cell front. The assessment included relevant psychosocial information including a history of depression and anxiety, treatment at the EOP and MHCB levels of care during previous prison terms, and a suicide attempt history with the most recent attempt in 2021.

The initial psychiatric assessment was also conducted at cell front, which was attributed to the lack of an escort officer. The patient reported disturbed sleep, anxiety, and depression; Remeron and Vistaril were continued at that assessment. For reasons that were unclear, the patient was seen two days later for a routine psychiatric contact that also occurred cell front due to the unavailability of the escort officer. At that visit, the patient was reportedly stable, and no medication changes occurred. The subsequent psychiatric contact also occurred cell front, as the escort officer was unavailable. The Remeron was increased at the patient's request; although, the rationale for that medication change was not documented.

The patient did not attend his initial IDTT meeting. The initial treatment plan was not completed.

Primary clinician contacts with the assigned provider consistently occurred cell front due to patient refusals. The rationale for those refusals was not assessed, nor was the pattern of refusals addressed. The documentation of those contacts was indicative of brief wellness checks. The patient's anxiety and depression were assessed as nonexistent or very low during most of those contacts.

The patient refused all offered groups; that treatment refusal was addressed on one occasion by the primary clinician.

**Findings**

The care and treatment provided to this patient were inadequate.

The routine psychiatric contacts should have been scheduled when an escort officer was available to allow for a confidential contact, and the unavailability of escort officers was an issue of concern. The treatment planning was not completed for this patient. Additionally, the pattern of treatment refusals was not appropriately addressed by the primary clinician.

**Patient DD**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at WSP's restricted housing unit. He was placed in restricted housing due to battery with a deadly weapon. He entered CDCR for his first term in June 2023.

The patient refused the initial primary clinician assessment; that treatment refusal was attributed to gang-related prison politics, and that pattern was consistent with his behavior prior to the RHU placement. The documentation of that assessment did not include a useful overview of the patient's mental health history or support for a diagnosis of unspecified schizophrenia.

An initial psychiatric assessment was not completed. Instead, a routine contact was conducted prior to the initial IDTT meeting. The contact occurred cell front, which was, again, attributed to prison politics. Previous documentation that had been copied into the note indicated that the patient had a lengthy history of mental illness and had resumed treatment with Invega and Seroquel which was prescribed at a county jail but was discontinued in July 2023 due to the patient's involvement in prison politics.

The initial IDTT meeting occurred without the patient present, as he refused to attend. The treatment plan was not completed.

The patient refused to attend confidential primary clinician contacts, and he was seen cell front. He was described as stable; however, given his reported history of serious mental illness, consistent consultation with custody regarding his functioning was needed. In February 2024, the patient requested removal from the 3CMS level of care; and it was decided that due to his continued stability without psychotropic medication treatment, an IDTT meeting would be scheduled to address his request. The documentation indicated that the patient was not escorted to the IDTT meeting when first scheduled; however, he attended a second IDTT meeting that was scheduled.

**Findings**

The care and treatment provided to this patient was marginally adequate.

The rationale to remove the patient from the MHSDS was adequate. However, given the patient's report of a major mental illness, current placement in restricted housing, and his first

728

CDCR term; collateral documentation, including county records and regular custodial consultation, should have been sought prior to removing him from the MHSDS.

**Patient EE**

This 31-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided a diagnosis of unspecified bipolar and related disorder, and other (or unknown) substance-induced bipolar and related disorder, with mild use disorder. He was adherent to his prescribed olanzapine and hydroxyzine PRN.

The patient was placed at the MHCB level of care on August 23, 2023, when he presented with labile mood, response to internal stimuli, loose associations, and inability to function adequately in his housing unit, including poor sleep and disruptive behavior. He was not prescribed psychotropic medications at the time of his admission to the MHCB.

The initial psychiatric and primary clinician assessments were completed on the day of the MHCB admission. Both assessments were adequate given the patient's impaired mental status and resistance to answering questions. The psychiatrist assessed the patient as either manic or intoxicated and ordered a urine toxicology screen for further assessment. The psychiatrist also ordered olanzapine and hydroxyzine PRN. The primary clinician's assessment was largely based on the patient's documented history.

An initial IDTT meeting occurred on the following day with the required staff and the patient present. An IPOC was created to reduce the patient's grave disability to a rating of four as measured by a clinician, without any reference to objective criteria to be used to assess grave disability. The only intervention listed was to assist the patient with his self-care goals. Neither the goal nor the interventions on the IPOC were specific to the needs of the patient that resulted in his inability to care for himself which appeared to be due to psychosis and possible mania. Later in the documentation, there was a reference to encourage the patient to take his medications and to engage in therapy sessions to address his psychosis without specific evidence-supported methods to accomplish those goals. The patient reportedly took his medications as prescribed.

The patient was seen for daily contacts by either a primary clinician, a psychiatrist, or both. The psychiatrist noted that the patient's drug screen was positive for buprenorphine, which was not prescribed to the patient. The primary clinician notes indicated that the patient was seen in a confidential setting, yet there was no documentation that therapeutic interventions were provided during those sessions.

A discharge IDTT meeting occurred on August 30, 2023, and an IPOC review for grave disability was completed that showed no signs of grave disability. The patient's changes in behavior while in the MHCB were adequately described; however, there was limited discussion of the interventions provided or the impact of those interventions. The patient was discharged to the EOP level of care without clear rationale provided for placement at that level of care or recommendations for treatment in EOP. Of note, the daily progress note written by the primary clinician on the day of the MHCB discharge outlined treatment recommendations for the EOP

staff which were clinically appropriate; however, it was unclear how the receiving EOP clinicians would know to review that note rather than the IDTT or discharge summary.

Recreational therapeutic activities were offered to the patient occasionally with variable responses. The patient engaged in activities near the end of his MHCB stay.

**Findings**

The care and treatment provided to this MHCB patient were marginally adequate.

The patient was seen timely as required and stabilized during his time in the MHCB; however, treatment planning was vague and did not necessarily address the patient's needs. Further, there was no evidence that the interventions listed in the treatment plan were provided to the patient. Treatment recommendations for receiving clinicians would have been more appropriately included in the discharge summary rather than in a daily progress note.

**Patient FF**

This 29-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. He was adherent to his prescribed olanzapine and was also prescribed hydroxyzine PRN.

The patient was admitted to the MHCB immediately upon reception at WSP on September 12, 2023, after presenting with high levels of self-reported depression, disorganized and tangential thinking, and suicidal statements. The initial psychiatric, primary clinician, and recreational therapy assessments were completed on the following day. The initial psychiatric assessment was adequate; however, the patient arrived at WSP with prescriptions for two antipsychotic medications, and only one medication was continued without rationale provided for the discontinuation. The patient refused to engage with the primary clinician and recreational therapist, so those assessment were completed primarily by healthcare record review and by having the psychiatrist ask certain questions on their behalf; as the patient would not talk with the female clinicians, only to the male psychiatrist.

It appeared that the initial IDTT meeting was completed at the same time as the initial assessments, given similar descriptions of interactions and patient statements present in those documents. An IPOC for grave disability was initiated with a vague goal and unrelated interventions. The treatment plan also included goals of 100 percent medication adherence and individual therapy to address suicidal ideation, depression, anxiety, and psychosis without further specifics provided necessary to guide treatment interventions. Recreational therapy was also listed to teach the patient coping skills which were not further defined or explained.

The patient was seen daily by either the psychiatrist, primary clinician, or both. On September 15, 2023, the assigned psychiatrist added oxcarbazepine, and chlorpromazine PRN to address the patient's symptoms of agitation and mood dysregulation with appropriate rationale provided. The patient refused to engage with covering psychiatrists. The primary clinician contacts occurred in confidential locations, but the documentation did not evidence the use of any

therapeutic interventions.  The patient denied the presence of a mental illness and appeared difficult to engage during his MHCB stay.

On September 19, 2023, a SRASHE was attempted to prepare the patient for discharge, but the patient refused to engage.  The SRASHE stated that the patient had reached his baseline, yet it was unclear how the clinician could be aware of the patient's baseline given that the patient had only arrived at the facility from a county jail seven days prior.  Additionally, the rationale provided for an assessment of low acute suicide risk was inadequate and appeared to significantly underestimate the patient's suicide risk given his history of multiple suicide attempts, active psychotic process, poor insight, paranoia, and inability to care for himself as evidence by ongoing problems with his hygiene.  Both the psychiatrist and the primary clinician documented that the patient eagerly anticipated discharge from the MHCB, denied suicidal ideation, and was partially cooperative with his treatment.

The patient typically refused to engage with the recreational therapist when offered both in-cell and out-of-cell activities.

On September 20, 2023, the patient was discharged to the EOP level of care after reaching the "maximum benefit" of his placement in the MHCB.  A discharge IDTT meeting occurred that included the required staff and the patient present.  The rationale for discharge was based mainly on the patient's denial of symptoms and the absence of an acute crisis.  The IDTT noted that the patient was ready for discharge to the EOP without further explanation.  A safety plan was created that was clinically adequate.  The discharge summary included limited recommendations for follow-up that were generic and not related to the patient's primary treatment needs.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

The treatment planning did not include specific goals or interventions to address the patient's needs, no therapeutic interventions were provided to the patient beyond medications, and the decision to discharge the patient to a lower level of care was not adequately explained.  Furthermore, the suicide risk assessment was inadequate, and the assessment of low acute suicide risk was not adequately justified.

**Patient GG**

This 35-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at WSP.  He was provided a diagnosis of bipolar I disorder, current or most recent episode depressed, unspecified.  He was adherent to his prescribed aripiprazole, buspirone, sertraline and trazodone.

The patient was placed at the MHCB level of care on December 18, 2023, after expressing suicidal ideation with an intent to hang himself to avoid being killed by his peers.  The patient reported that he was a gang dropout who took psychotropic medication that placed him at risk of harm from gang members.  Additionally, his arm was in a sling causing him to feel vulnerable.

The initial psychiatric and primary clinician assessments and the initial IDTT meeting were completed on December 19, 2023.  The initial psychiatric assessment was adequate and included updated diagnoses of unspecified bipolar and related disorder, and a new medication was added to the medication regimen.  The initial primary clinician assessment was adequate; however, the clinical summary was not updated and included outdated and inaccurate information.

The initial IDTT meeting included the required staff.  There was a notation in the healthcare record that a safety plan was created "in ADHOC form," but the reviewer was unable to locate it in the healthcare record.  The inability of the reviewer to locate the safety plan meant that it was likely unavailable to any staff member who needed to review it in the future.  An IPOC was initiated to address the patient's danger to self with a goal of learning three positive coping skills, and the intervention listed was the use of CBT to help the patient to increase acceptance and tolerance of emotional pain.  Additionally, there were goals listed to reduce depression and to reduce impulsive behaviors from distress of auditory hallucinations with interventions including CBT, positive affirmations, medication, and grounding techniques.  Generally, the plan appeared adequate to address some of the patient's needs; however, suicidal ideation was not addressed, nor were the patient's vulnerability, anxiety or fear, all of which precipitated his MHCB placement.

The individual primary clinician sessions did not evidence the use of any interventions listed in the treatment plan.  After December 23, 2023, the patient was seen by three different psychiatrists, none of whom were the patient's assigned psychiatrist.  There were no contacts with a primary clinician after December 22, 2023 until the day of his MHCB discharge on December 26, 2023.  On that date, the patient was seen by a covering primary clinician who completed a SRASHE which was adequate; however, the safety plan was only marginally adequate, as the questions related to safety concerns were left blank, which was inappropriate given that the patient's suicidal ideation was directly related to safety concerns which prompted the MHCB admission.

The discharge IDTT meeting included the required staff and the patient.  The treatment plan made no reference to the patient's progress toward treatment goals; in fact, progress toward goals was noted as "in progress."  The rationale for discharge appeared to be that the patient reported feeling better than he did on the day that he was admitted.  The patient was discharged to the EOP level of care; however, the rationale for that level of care was not included in the IDTT documentation or the discharge summary.

The patient was offered and attended one out-of-cell recreational therapy session while in the MHCB.  No other in-cell or out-of-cell sessions were offered during the eight-day MHCB stay.  Of note, both the primary clinician and psychiatrist referred to the interventions provided by the recreational therapist as necessary for the patient to acquire coping skills, yet neither referenced the fact that recreational therapist contacts did not occur.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

Other than medication management, the patient did not receive treatment as indicated in his treatment plan, and there was no evidence that the patient's needs were addressed during therapy sessions. Additionally, the patient did not receive recreational therapy, despite indications that it was necessary for him to achieve his treatment goals. The rationale for the patient's MHCB discharge and his placement at the EOP level of care was unclear. Lastly, it was documented that a safety plan was created with the patient at the time of MHCB admission, but it was not included in the patient's healthcare record.

**Patient HH**

This 36-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at WSP. He was provided diagnoses of major depressive disorder, recurrent episode; anxiety disorder; and amphetamine-type substance use disorder, severe. He was inconsistently adherent to his prescribed fluoxetine and diphenhydramine. He was also prescribed hydroxyzine PRN.

The patient was placed at the MHCB level of care on September 16, 2023, after reporting suicidal ideation with a nonspecific plan; this occurred after placement in the ASU related to allegations that he sexually assaulted a peer. The patient was seen by a psychiatrist on September 17, 2023, and while not documented on an initial assessment form, the documentation was complete and included a review of the patient's psychosocial and psychiatric history. An initial primary clinician assessment completed on the same day was mostly adequate; however, the clinical summary was not updated and included outdated and inaccurate information. An initial recreational therapy assessment was completed by healthcare record review without rationale provided why the assessment did not include the patient, and the content of the documentation was generic and not individualized for the patient. When the assigned psychiatrist saw the patient on September 18, 2023, a diagnosis of unspecified depressive disorder was provided as well as a provisional diagnosis of adjustment disorder.

The initial IDTT meeting occurred on September 18, 2023, with the required staff and the patient present. An IPOC for danger to self was initiated with goals to reduce suicidal ideation and to identify ways to improve decision making skills. The listed intervention of fostering a therapeutic alliance through empathy with the patient was not an evidence-supported intervention to assist the patient to achieve those goals. The patient expressed a desire to address his anxiety, but no goal setting was developed other than to decrease the numerical rating of the patient's depression and anxiety prior to MHCB discharge. No interventions were included to address that goal. The diagnostic discrepancies were not acknowledged or addressed.

During individual therapy sessions with a primary clinician, there was a single reference to the use of a therapeutic intervention without specifics provided or indication of the patient's response. Otherwise, no interventions nor reference to the patient's progress toward treatment goals were documented. The patient was seen by a psychiatrist at a frequency that was more than minimally required, and the documentation consistently reflected the patient's lack of improvement in treatment. The patient continued to report suicidal ideation with a plan; however, he refused to disclose the specifics of the plan until September 24, 2023, when he

stated that he would hang himself.  A SRASHE was completed on that date, and the decision was made to refer the patient to an acute inpatient setting.  The following day, an IDTT meeting was conducted with the required staff and the patient present.  The plan identified the patient's lack of improvement and continued suicidal ideation, agitation, and anxiety.  The rationale for referral to an inpatient setting was adequate.

Four recreational therapy sessions, which occurred in the courtyard, were provided to the patient. They included services to assist the patient in managing his anxiety.  The patient was also seen cell-front on two occasions, but the rationale for the cell-front visits was not provided.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

The treatment plan was inadequate and did not provide for adequate interventions to address the patient's needs.  Although there was evidence that the recreational therapist and psychiatrist attempted to address the patient's anxiety, no therapeutic interventions addressing the patient's identified treatment goals were provided by the primary clinician.

**Patient II**

This 28-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at WSP.  The patient was provided a diagnosis of major depressive disorder with psychotic features and was adherent to his prescribed mirtazapine and mostly nonadherent to his prescribed venlafaxine.  He was also prescribed hydroxyzine PRN, which the patient did not take during his MHCB stay.

The patient was admitted to the MHCB on October 15, 2023, after reporting intense anxiety and feelings of depression as well as thoughts of killing himself by swallowing razors.  He reported that his current coping skills were inadequate to manage his level of distress.  During an initial primary clinician assessment on the day of the MHCB admission, the patient denied suicidal ideation but reported experiencing auditory hallucinations, paranoia, depression, and anxiety. The assessment was adequate.  An initial psychiatric assessment was completed timely and was adequate.  The psychiatrist adjusted the patient's medication regimen.

An initial IDTT meeting occurred on October 16, 2023, with the required staff and the patient present.  An IPOC for danger to self was initiated, despite both initial assessments indicating that the patient no longer experienced active suicidal ideation or thoughts of harming himself. Instead, the patient reported experiencing high levels of anxiety and depression as well as evidenced paranoid ideation.  The treatment plan was inadequate and did not include objective goals to target the patient's symptoms or adequate interventions to address the patient's needs.

The patient was seen daily by either a primary clinician, a psychiatrist, or both; however, there were a variety of clinicians and psychiatrists who saw the patient during the MHCB stay.  One primary clinician contact evidenced the use of evidence-based therapeutic interventions, yet all other PC sessions did not.  The psychiatric contacts were adequate; however, on October 23,

2023, the psychiatrist changed the patient's venlafaxine from morning to noon administration. It appeared that due to his MHCB discharge that same day, the patient was not provided venlafaxine after his discharge related to the medication dosage change.

The patient was seen for recreational therapy contacts four times during his nine-day MHCB stay. Three sessions were provided out-of-cell, and one included the provision of in-cell materials due to time constraints. The content of the sessions was consistent with the patient's treatment needs.

A discharge SRASHE was completed on October 23, 2023; it included a safety plan and was adequate, although the assessment of low chronic suicide risk appeared to be an underestimation of the patient's long-term suicide risk. On the same date, a discharge IDTT meeting occurred with the required staff and the patient present. The rationale for the MHCB discharge was adequate; however, the rationale provided for placing the patient at the EOP level of care was minimally adequate.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

The initial treatment plan did not adequately address the patient's treatment targets with appropriate goals or interventions. Further, individual primary clinician contacts did not evidence the use of therapeutic interventions except for a single session. The rationale for placement of the patient at the EOP level of care was unclear. Lastly, it appeared that there were missed orders, as the patient was not provided with a prescribed medication after the MHCB discharge.

**Patient JJ**

This 32-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at WSP. The patient was provided diagnoses of persistent depressive disorder, antisocial personality disorder, and possible PTSD. The patient was adherent to his prescribed venlafaxine, and he was also prescribed hydroxyzine PRN.

The patient transferred to the MHCB at WSP on October 4, 2023, after reporting suicidal ideation with a vague plan as well as a nonspecific report of thoughts of killing custody staff. He was seen for initial primary clinician and psychiatric assessments on October 5, 2023, which were completed at cell front, as the patient refused to engage out of his cell. The psychiatrist provided a diagnosis of unspecified mood disorder and referenced the fact that the patient exposed himself to a female staff member who was conducting constant watch of the patient overnight. An initial primary clinician assessment was attempted on the same date, but the patient refused. Both assessments were adequate given the patient's lack of engagement. An IEX assessment was completed adequately, and the assessment indicated that the patient did not meet the criteria for exhibitionistic disorder.

An initial IDTT meeting occurred on October 6, 2023, with the required staff and the patient present.  An IPOC to address self-harm was initiated with a goal of attending programming daily and included an intervention to educate the patient about the benefits of engaging in treatment.  Neither of those were appropriate in addressing self-harming behavior.  It was documented that the patient denied all symptoms at the time of the IDTT meeting, making treatment planning difficult.

The patient was seen daily by either a primary clinician, psychiatrist, or both.  The documentation of those contacts was primarily status updates with little evidence that treatment was provided to the patient other than medication management.   Several primary clinicians saw the patient during his MHCB stay.

The patient began reporting that he was ready for discharge on his second day in the MHCB.  On October 11, 2023, a discharge SRASHE was completed that was adequate as well as an adequate safety plan.  A discharge IDTT meeting occurred on October 12, 2023, with the required staff and the patient present.  The IDTT documentation was appropriate and included a description of the patient's progress in treatment; although, not in relation to the goal established at the time of the MHCB admission.  The patient was discharged to the EOP level of care with adequate rationale provided.

**Findings**

The care and treatment provided to this MHCB patient were marginally adequate.

Improvements were indicated regarding the documentation of therapeutic interventions provided by the primary clinicians, as well as treatment goals consistent with the patient's needs at the time of the MHCB admission.

**Patient KK**

This 54-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at WSP.  The patient was provided a diagnosis of adjustment disorder with anxiety; however, several other diagnoses provided by various clinicians during the patient's MHCB stay were present in the healthcare record without evidence of reconciliation.  The patient was nonadherent to his prescribed mirtazapine and did not routinely take his hydroxyzine that was ordered PRN.

The patient was referred to the CIT on October 25, 2023, after reporting thoughts of suicide with an intent to hang himself secondary to safety concerns.  The patient requested placement in the ASU, but the custody staff reported that they were unable to move the patient.  An adequate SRASHE was completed which assessed the patient's acute suicide risk as high, thus he was transferred to the MHCB.  Of note, while the documentation indicated that the CIT responded to the emergent request, only response by a psychologist was documented in the patient's healthcare record.  The patient was not included in the MHSDS at the time of his MHCB admission.

The initial psychiatric and primary clinician assessments were completed on October 26, 2023. The psychiatric assessment was basic but adequate, and it included a diagnosis of unspecified mood disorder and noted that the patient reported that he was no longer suicidal and was experiencing mild anxiety. The patient was prescribed hydroxyzine PRN. The primary clinician assessment was inadequate. Despite including a comprehensive history, no diagnosis was specified, and both the clinical summary and clinical formulation were pulled forward from 2021 without update.

An initial IDTT meeting occurred later that day which included all required staff and the patient. No diagnosis was included in the treatment plan. An IPOC was created to address suicidal ideation, yet the patient denied suicidal ideation during both the psychiatric and PC initial assessments. The patient reported that his goal was to remain safe. No treatment goals to address anxiety and no interventions beyond monitoring and providing empathy were listed in the treatment plan. Although a safety plan was appropriately created with the patient during the IDTT meeting; the content was inadequate and included the same entry throughout which was to help the patient build his coping skills and to advocate for himself.

A recreational therapy initial assessment was completed on October 26, 2023 which was adequate but generic.

Daily contacts were made with the patient by either the primary clinician, psychiatrist, or both. The primary clinician progress notes included a plan that was copied unchanged for each session that was inconsistent with the IDTT documentation; that plan instead listed goals of medication compliance, therapy for anxiety, and recreational therapy for coping skills. On October 27, 2023, the primary clinician recorded a diagnosis of adjustment disorder with anxiety and noted that the patient requested medications to assist with anxiety. A note from the psychiatrist earlier that day indicated that the patient was satisfied with the response to treatment with hydroxyzine. The following day, the patient was seen by a covering psychiatrist who additionally prescribed mirtazapine. The patient requested that all medications be discontinued on the following day due to side effects. The mirtazapine was subsequently discontinued, but the hydroxyzine ordered PRN remained active. The psychiatrist documented a diagnosis of unspecified depressive disorder without rationale provided for that diagnosis.

A covering primary clinician saw the patient on October 29 and October 30, 2023, and the PC stated that the patient's treatment goals were "covered" during the session without evidence of the provision of therapeutic interventions. A discharge SRASHE was completed on October 31, 2023, which was adequate; however, an accompanying progress note by the primary clinician documented that the patient's improvement was due to medications and therapy, despite the patient's refusal of medications and no evidence of the provision of therapy beyond two recreational therapy sessions which evidenced coping skills development.

A discharge IDTT meeting occurred on November 1, 2023, that included the required staff and the patient in attendance. Again, the IDTT documentation inaccurately noted that the patient was medication adherent. He was discharged to the 3CMS level of care without rationale provided to support discharge to that level of care. The discharge summary included a list of interventions that were provided to the patient during his MHCB stay, despite no evidence of those

interventions elsewhere in the healthcare record. The discharge summary included goals for the patient upon placement at the 3CMS level of care.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

The treatment plan did not adequately address the patient's identified needs, and no relevant interventions were included. The documentation by the IDTT varied regarding diagnoses, medication adherence, and treatment goals; and there was no evidence that team members reviewed the patient's healthcare record to identify those discrepancies. Conversely, the recreational therapist engaged with the patient by assisting with coping skills.

**Patient LL**

This 34-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at WSP. The patient was provided a diagnosis of major depressive disorder, single episode, severe. He was generally adherent to his prescribed fluoxetine, mirtazapine, and hydroxyzine, as well as hydroxyzine that was ordered PRN.

On September 1, 2023, the patient was seen by the CIT after reporting suicidal ideation and ingesting 12 ibuprofen pills. Both a nurse and a clinical social worker documented the CIT intervention. Of note, the social worker's signature line indicated that the clinician was licensed, but the body of the progress note included a statement that the clinician was unlicensed. No countersignature by a supervisor was present in the progress note. A SRASHE was completed by the same clinician which was adequate yet also was not countersigned.

The patient was admitted to the MHCB. The initial psychiatric contact on September 2, 2023 did not include a full initial assessment; and the patient was noted to have been seen in his cell with a custody officer present, as he refused to leave his cell for the contact. The note included a documented diagnosis of adjustment disorder with depressed mood in the healthcare record, yet the psychiatrist documented diagnoses of both mood disorder and major depressive disorder, severe within the body of the progress note without clarification provided for the discrepancy.

An initial primary clinician assessment was completed on September 3, 2023, but the patient refused to participate. The assessment was minimally adequate given the patient's refusal to participate. The assessment noted a diagnosis of major depressive disorder, single episode, severe; yet the diagnosis of adjustment disorder with depressed mood remained in the healthcare record as well. The primary clinician documented a plan which listed medication compliance, therapy for depression and anxiety, recreational therapy to teach coping skills, and compliance with activities of daily living, as an initial treatment plan. A limited safety plan was documented on September 3, 2023 as well. The following day, the patient was seen by the psychiatrist and primary clinician in a joint session. The patient was described as uncooperative with attempts to provide meaningful therapy. The patient refused a recreational therapy initial assessment. The patient was seen by a different psychiatrist on September 5, 2023, who noted a diagnosis of unspecified depressive disorder and began treatment with fluoxetine while discontinuing the olanzapine due to dizziness.

An initial IDTT meeting occurred later than required on September 5, 2023.  The required staff and the patient were present; however, neither of the primary clinicians present at the meeting had met the patient previously.  An IPOC was initiated to address the patient's suicidal ideation with a vague intervention of empathizing with the patient's distress.  The patient reported wanting to work on anxiety and relapse prevention, and he was described as "fixated" on "sentiments of depression and how to reduce anxiety;" yet those goals were not targeted in the treatment plan.  A separate "treatment plan" which included the generic items listed in the primary clinician's progress note from September 3, 2023 was also present in the healthcare record.  The text included in the clinical summary section of the IDTT documentation was a progress note copied from a primary clinician session also dated September 5, 2023 that was inadequate in addressing the clinical summary expectations.

The patient refused to engage in individual sessions with the psychiatrist or primary clinician; however, he did leave his cell to attend a recreational therapy session on September 6, 2023.  During a confidential primary clinician contact on the following day, there was evidence of appropriate therapeutic engagement and interventions with the patient that were consistent with the treatment plan.  The patient engaged with the primary clinician and recreational therapist on September 8, 2023 as well.  The patient participated in a SRASHE on September 10, 2023, which was adequate regarding the assessment of the patient's suicide risk level and justification and included an adequate safety plan.

A discharge IDTT meeting occurred on September 11, 2023, with the required staff and the patient present.  The IDTT documentation was adequate with appropriate rationale provided for placement of the patient at the 3CMS level of care upon discharge; however, the goal setting section of the document noted that the patient provided verbal consent for placement at the EOP level of care.  This appeared to be an error, as EOP placement was not located elsewhere in the MHCB documentation.

**Findings**

The care and treatment provided to this MHCB patient were inadequate.

Despite engagement with the patient in meaningful interventions near the end of his MHCB stay, there was no initial psychiatric assessment documented, the initial IDTT meeting occurred late, treatment goals did not adequately address the patient's identified needs, the initial IDTT documentation was inadequate, and the diagnoses required clarification.  Conversely, the SRASHE, safety plan and IDTT documentation completed at the time of discharge were adequate and helpful in planning ongoing care for the patient.

**APPENDIX B – 13**
**NORTH KERN STATE PRISON (NKSP)**
Site Visit:  March 11, 2024 – March 15, 2024
Review Period:  August 1, 2023 – January 31, 2024

**Patient A**

This 29-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of treatment provided.  The patient was provided diagnoses of schizoaffective disorder, bipolar type and adjustment disorder with anxiety and depressed mood.  He was prescribed olanzapine, divalproex sodium, and hydroxyzine and was not consistently medication adherent.

The patient arrived at CDCR on June 8, 2023 and was placed at the MHCB level of care after presenting with what appeared to be symptoms of mania including grandiose delusions, bizarre and assaultive behavior, and lack of sleep soon after his arrival.  He was returned to the EOP level of care on June 23, 2023, and was placed directly into the ASU secondary to an RVR for assault on a peace officer which precipitated his placement in the MHCB.

The patient was released from the ASU to the reception center EOP and was seen for an initial psychiatric assessment on August 7, 2023, which was adequate.  The initial primary clinician assessment was adequate and timely.  An initial diagnosis of adjustment disorder with anxiety and depressed mood was added due to this assessment.

An initial IDTT meeting occurred on August 17, 2023, with the required staff and the patient present.  The treatment plan was updated and adequate with goals and interventions to address the patient's delusional thinking.  Input from treatment team members was evident, including information that the patient was not consistently taking medications as prescribed and was not consistently attending groups.  The EOP functional evaluation was completed and noted no significant impairments.  The determination was made that the patient's level of care was appropriate with adequate rationale provided.

The patient was offered weekly sessions with his primary clinician; however, one session occurred in a nonconfidential setting in the dayroom.  The rationale provided for conducting the session in a nonconfidential setting was that the appointment occurred "as planned".  The clinical contacts occurred timely.  No routine psychiatric appointments occurred prior to the patient's transfer on August 28, 2023.  The patient was routinely offered group therapy, however, he attended only intermittently.

**Findings**

The care and treatment provided to this reception center EOP patient was adequate.

**Patient B**

This 27-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of treatment provided.  He was provided a diagnosis of unspecified schizophrenia

spectrum and other psychotic disorder.  He was adherent with his prescribed aripiprazole and hydroxyzine.

The patient arrived at CDCR on August 1, 2023.  The initial health screening noted that the patient had a mental illness and was prescribed aripiprazole and diphenhydramine but had arrived from the county jail without any medications.  The initial mental health screening noted a history of bipolar disorder, but records from the county jail and the progress note written during the screening process noted a diagnosis of schizophrenia.  The clinician indicated that no release of information was requested without adequate rationale provided for that decision.  The patient was offered in-cell EOP activities starting on August 7, 2023, despite not having had any initial assessments nor an initial IDTT meeting.

The initial psychiatric and primary clinician assessments were completed on August 8, 2023; however, both were completed cell front, as the patient was on quarantine.  The psychiatric assessment was adequate and noted a diagnosis of psychosis, not otherwise specified, and minor medication adjustments were made.  The initial primary clinician assessment was wholly inadequate, as it contained information pulled forward from 2021 with minimal updates.  The primary clinician stated that the patient would be retained at the EOP level of care without rationale or explanation provided as to why or when he was placed at the EOP level of care.  There was documentation of a history of self-injurious behavior and passive suicidal ideation, yet no SRASHE was completed.

An initial IDTT meeting occurred on August 9, 2023 with all required staff present.  The patient was not present, and it was noted that he refused to attend during a previous appointment.  No treatment goals or interventions were included in the treatment plan.  Additionally, it was difficult to determine what information was pulled forward from prior documentation and what information was current.  There was a notation in the primary clinician's initial assessment that the patient would work on increasing his ability to work with distressing emotions, while noting that the patient was not in distress.

A routine IDTT meeting occurred on September 6, 2023 that included all required staff and the patient present.  An IPOC, which was initiated on August 9, 2023, noted a goal to reduce the patient's level of depression.  Interventions were listed that could have been adequate; however, there was no evidence that those interventions were used during any primary clinician contacts to date.  Input from the psychiatrist was documented as well as a plan to address the patient's needs regarding medication management.  The treatment plan also noted additional goals, which appeared appropriate, yet interventions were not listed to help the patient achieve those goals.

The patient was seen weekly by the primary clinician; however, the documentation of those contacts was generic and rarely included evidence of the provision of therapeutic interventions to assist the patient in achieving his goals.  The patient's symptoms were routinely assessed during those contacts.  Routine psychiatric contacts occurred as required and were adequate.  The patient was offered group therapy consistent with requirements, and he routinely attended.

**Findings**

The care and treatment provided to this reception center EOP patient was inadequate.

The initial primary clinician assessment was not updated, and subsequent clinical sessions were poorly documented and generic. There was little evidence that treatment was provided to the patient beyond medications and recreational therapy groups which consisted primarily of exercise, movie-viewing, and other leisure activities.

**Patient C**

This 50-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of treatment provided. He was provided a diagnosis of schizoaffective disorder, bipolar type. He was adherent to his prescribed benztropine, haloperidol, divalproex sodium, and Prazosin.

The patient arrived at CDCR on July 5, 2023. The initial health screening noted an active order for psychotropic medications and a history of suicide attempts. There was an emergent consult request which resulted in a CIT contact. The consult included a SRASHE that documented that the patient had paroled at the inpatient level of care and was placed at the EOP level of care "per policy" without clinical rationale provided.

During the reporting period, all primary clinician and psychiatric contacts occurred cell front as the patient had shingles. Of note, the patient continued to attend group sessions during the same period. There was no evidence that treatment interventions were provided to the patient other than medications. The diagnoses documented by the psychiatrist did not match those in the healthcare record, and there was no acknowledgement of the discrepancy. Further, the symptoms targeted by the medications prescribed by the psychiatrist were not included in the treatment plan.

A routine IDTT meeting occurred on August 10, 2023. The patient's goal was identified as reducing anxiety, and appropriate interventions were listed. No clear rationale was provided for retaining the patient at the EOP level of care, as no functional impairments were noted. There was no documentation of the patient's response to treatment or progress toward goals.

The following day, the patient was seen for an emergent consult in response to reports of suicidal ideation and feeling overwhelmed. He also reported paranoia, impaired reality testing, auditory hallucinations, and feeling as if he was on the verge of a panic attack. A SRASHE was completed that assessed his chronic and acute suicide risk as high with adequate rationale provided. The patient was placed at the MHCB level of care. Upon arrival at the MHCB, the patient identified safety concerns as the reason for his MHCB placement.

The patient was seen for five-day follow-up contacts upon his return to the EOP, and four of the five contacts were completed by his primary clinician. Despite the presence of a safety plan in the healthcare record, the plan was not reviewed with the patient during those contacts.

The initial primary clinician and psychiatric assessments were completed timely. The psychiatric assessment was adequate; however, the primary clinician assessment was largely unchanged, and it was difficult to discern current from historical information. There was no mention of the patient's recent placement in the MHCB in the assessment or in a subsequent progress note completed on the same date. The patient was transferred to another institution on August 30, 2023.

**Findings**

The care and treatment provided to this reception center EOP patient was inadequate.

The initial primary clinician assessment was wholly inadequate, there was a lack of clinical interventions, diagnostic discrepancies were not addressed, and the treatment plan did not appear to address the needs of the patient.

**Patient D**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided, as his IDTT was observed during the onsite visit, and the IDTT discussion was unclear regarding the patient's recent MHCB admission and ongoing treatment needs.

The patient was provided diagnoses of major depressive disorder, recurrent episode, severe; antisocial personality disorder; and polysubstance dependence. He was prescribed hydroxyzine PRN and sertraline, and he was fully medication adherent.

This patient arrived at NKSP on February 1, 2024. During the initial health screening, he reported depression but not suicidal thoughts. He was not prescribed psychotropic medication while at the county jail. The mental health screening was completed on February 15, 2023, not within the first seven days of arrival as required. The patient screened positive for mental health needs based on his history and his request for treatment with psychotropic medications for depression and anxiety. The following morning, the patient was observed with his cell window covered, and he demanded to see a sergeant while tying a sheet around his neck. When the patient refused to comply with instructions to lie on the ground, custody officers pepper-sprayed him. The patient was placed on one-to-one suicide watch in alternate housing by an on-call psychiatrist who did not evaluate the patient. He was referred to the CIT, and a SRASHE was completed but no other CIT documentation was included in the healthcare record. The patient reported suicidal ideation and hopelessness, and he was tearful. His history included self-injurious behavior and suicide attempts while incarcerated in CDCR in the past, as well as DSH admissions. He was assessed with high chronic and acute suicide risk and was placed at the MHCB level of care and transferred to another institution. The patient was discharged from the MHCB to the EOP level of care on February 28, 2024.

Upon arrival at NKSP, the patient reported during the initial health screening that he had current thoughts of being "better off dead;" an emergent consult was ordered, and the patient was placed under observation in a safety cell. The patient was not seen until the following morning when a primary clinician stated that "an erroneous system triggered emergent mental health consult" had

been initiated the day prior.  It was unclear how the clinician determined that the consult was an error.  During the contact which did not occur in a confidential setting, the patient denied suicidal ideation but refused to engage in the SRASHE as he was upset about placement on suicide watch.  Protective factors were discussed, and the patient was placed at the EOP level of care and returned to housing.  The patient was assessed with low acute suicide risk, despite the SRASHE completed at the time of MHCB discharge that noted moderate acute risk the previous day.  The low assessment of suicide risk rationale appeared to rely solely on the patient's self-reported absence of suicidal ideation, and no safety plan was completed nor was the safety plan reviewed with the patient that was developed at the time of MHCB discharge.  Five-day follow-up contacts were completed in non-confidential settings, and none included development or review of a safety plan, despite the patient's extensive history of engaging in self-injury and reporting suicidal ideation when under stress.

The patient was seen for an initial psychiatric assessment on March 3, 2024, which was adequate.  The psychiatrist noted moderate symptoms of depression and anhedonia, along with mild anxiety.  Medication adjustments were made.  An initial primary clinician assessment was completed on March 7, 2024 that was also adequate.

An initial IDTT meeting occurred on March 14, 2024 that included the required staff and the patient.  The expert observed the IDTT meeting.  Measurable short and long-term goals were developed which were relevant to the patient's depressive symptoms with adequate interventions listed; however, the plan made no mention of the patient's self-harming behavior in response to stress, and no safety plan was discussed nor documented.  The rationale for retaining the patient at the EOP level of care was vague.

The patient began attending groups on March 1, 2024; however, the group topic for the first group was coping with seizures, and the group was not appropriate for the patient's treatment needs.  Another group topic was pre-release planning; the patient was assigned to that group despite not being scheduled for prison release until July 2025.  Additional group topics included coping skills and leisure activities.  The patient was consistently offered one group daily for at least five hours weekly.  He was seen for one primary clinician session after returning to NKSP, and some therapeutic interventions were documented.

**Findings**

The care and treatment provided to this EOP patient at NKSP was inadequate.

The patient was not seen timely for the initial mental health screening, there was no CIT documentation other than a SRASHE, there was delay in responding to an emergent referral which was documented as an error without clear indication of such, and the patient's history appeared to indicate the need for a safety plan; yet one was not created nor reviewed.  The patient was offered group therapy consistent with requirements; however, the topics of those groups were not responsive to the patient's needs.  Additionally, treatment planning failed to address the patient's self-harm behaviors.

**Patient E**

This 44-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of treatment provided. The patient was provided a diagnosis of bipolar disorder, unspecified. He was adherent with his prescribed divalproex sodium.

The patient arrived at NKSP on January 18, 2024 with a reported history of mental health needs and a suicide attempt within the prior four months. An urgent mental health referral was generated. The patient was placed in the RHU on January 18, 2024, due to his security level and another urgent mental health referral was initiated from the pre-placement screening. The patient was not seen in response to those referrals, and no initial mental health screening was completed at the time of reception. Instead, the patient was seen for an initial primary clinician assessment on January 23, 2024 in response to his RHU placement. The clinician noted that the patient was placed at the EOP level of care; however, that was unclear, as the ASU pre-placement screening noted a 3CMS level of care, and there was no contact with a mental health clinician since the patient's arrival at NKSP. The patient was released from the RHU on January 25, 2024.

On January 26, 2024, an initial mental health screening was completed; despite, the patient's placement at NKSP for more than one week, his placement at the EOP level of care, and the completion of primary clinician and psychiatric initial assessments as well as an initial IDTT meeting while he was housed in the RHU. An initial primary clinician assessment was completed on January 29, 2024 that was adequate. An initial psychiatric assessment was completed on February 4, 2024 that was also adequate. Both the primary clinician and the psychiatric assessments evidenced review and incorporation of previous assessments.

A CIT was initiated for the patient on February 12, 2024, due to the patient reporting suicidal ideation. Upon assessment, the patient reported safety concerns which were addressed by the sergeant who was present, and the patient subsequently denied suicidal ideation. A SRASHE was completed adequately; however, it did not include a safety plan despite being clinically indicated, as the patient's acute risk was assessed as "low to moderate," and the patient expressed suicidal thoughts in response to safety concerns with a history of similar behaviors in the past. A routine primary clinician contact was completed on February 15, 2024 that noted the CIT event, but no interventions were documented to assist the patient in managing his distress. The following weekly contact included almost identical information contained in the note from February 15, 2024. A subsequent contact evidenced minimal changes but some evidence of the provision of treatment interventions. Routine psychiatric contacts were adequate.

The initial IDTT meeting on February 22, 2024 did not occur timely; the required staff and the patient were in attendance. The IDTT documentation included an outdated IPOC targeting release planning dated from 2021, and no treatment goals or interventions were specified for the current needs of the patient. The patient was noted to have no functional impairments, and no rationale was provided for retaining the patient at the EOP level of care beyond "promote MH stability" and the lack of need for referral to a higher level of care.

The patient was offered a group at least daily, with topics occasionally relevant to the patient's needs.

**Findings**

The care and treatment provided to this reception center EOP patient was inadequate.

The initial screening and initial IDTT meeting were delayed upon placement at the reception center EOP. The treatment plan did not include treatment goals or therapeutic interventions, and no rationale was provided for the patient's placement at the EOP level of care. The primary clinician documentation was redundant and did not include appropriate interventions to address the patient's needs.

**Patient F**

This 37-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided. The patient was provided a diagnosis of schizoaffective disorder, unspecified. He was prescribed divalproex sodium and haloperidol, and he was generally medication nonadherent.

After his arrival at NKSP, the patient was placed at the 3CMS level of care on August 8, 2023. On November 20, 2023, an officer urgently referred the patient to mental health as the patient appeared with confusion, disorientation, and withdrawn behavior; additionally, the patient appeared to need a psychotropic medication review, and he reportedly was responsive to internal stimuli and stopped showering. A primary clinician saw the patient timely on November 21, 2023 and documented that the urgent referral was changed to a routine referral; the reason for that change was unclear. Nonetheless, a confidential assessment was completed that concluded with the clinician increasing the patient's level of care to the EOP and working with custody to relocate the patient to a cell rather than dorm housing. Later that evening, there was nursing documentation that the on-call psychiatrist was contacted due to concerns regarding danger to self and possible suicidality, and the patient was placed in alternative housing. No additional information was documented regarding that incident.

The following day, two SRASHEs were documented by the same clinician. The first appeared to be completed related to the issues that occurred the night prior; however, no specifics regarding the incident were documented. Instead, the SRASHE was based entirely on the patient's self-report of no current suicidal ideation or intent. The patient reported that he did not like the new cellmate whom he had been placed with the previous evening. The patient was assessed with low chronic and acute suicide risk, despite the presence of several risk factors, the recent urgent referral, and a recent increase in his level of care. The risk levels appeared to be based entirely on the patient's denial of current suicidal ideation.

The patient was placed on five-day follow-up contacts. Four hours later, another SRASHE was completed by the same clinician. It appeared that the patient reported suicidal ideation after being placed in a cell without an operational toilet. His risk levels were again assessed as low, and no safety plan was created. The patient was seen for five-day follow-up contacts over the next six days; the contacts were misnumbered, resulting in one additional day. All six contacts indicated that a safety plan was reviewed with the patient, yet the safety plan in the healthcare

record was blank.  Additionally, at least four of the six contacts were conducted in nonconfidential locations.  Three of the contacts noted that the patient was seen in the open day room, but the PC stated that no other incarcerated individuals were in the vicinity making that location a confidential setting.  It was concerning that a primary clinician viewed contacts in that setting as confidential.

The patient was seen for an initial psychiatric assessment on December 3, 2023, which was adequate and included medication adjustments with appropriate rationale provided.  On December 5, 2023, the patient reported taking his cellmate's vitamins to kill himself.  He later urinated into the hallway from his holding cell, but then apologized to the incarcerated individuals who were tasked with cleaning the urine.  A clinician completed a SRASHE and described the patient as hypomanic.  His chronic suicide risk was increased to moderate without rationale, and his acute risk was assessed as low with a rationale that was unchanged from the previous assessment.  The SRASHE was inadequate regarding the assessment and rationale for determining suicide risk levels.

The patient was seen almost weekly by his primary clinician.  He was not seen for an individual contact between December 4 and December 11, 2023, and when he was seen on the December 11, there was no mention of the incident of attempted overdose on December 5, 2023.  The documentation of primary clinician contacts was largely unchanged from session to session; much of the same documentation and the content reflected the patient's status without any indication of active treatment interventions.

An initial IDTT meeting occurred on December 21, 2023; this was the first IDTT meeting conducted since the patient was referred to the EOP level of care 30 days prior.  It was noted during the IDTT meeting that the patient was not consistently participating in at least 50 percent of the groups offered.  The patient reported disinterest in the groups.  Despite reported suicidal ideation, attempted overdose, medication nonadherence, and group refusals; the patient was described as stable and appropriate for continued placement at the EOP level of care.  Treatment modifications were documented to assist the patient in increasing adherence to his treatment program that appeared appropriate.  The IDTT determined that the patient did not require a safety plan, which appeared inaccurate given his recent behavior.  No treatment goals were created for the patient, nor were interventions listed in the treatment plan.  Instead, an IPOC addressing negative symptoms was created despite clinical contacts noting a hypomanic presentation, active auditory hallucinations, recent impulsivity, and self-harming behavior without mention of the presence of negative symptoms.  No functional deficits were documented.

On December 28, 2023, the patient was referred to the MHCB level of care after it was reported by custody staff that he had not showered, had maintained poor living conditions, had not slept, talked to himself, and was unable to care for himself appropriately in the EOP housing unit.  He was also described as aggressive and bizarre with his peers, and no one reportedly wanted to socialize with him.

The patient was routinely offered a group session daily but did not attend consistently.

**Findings**

The care and treatment provided to this EOP patient was inadequate.

No initial primary clinician assessment was completed after the patient was placed at the EOP level of care, and his initial IDTT meeting occurred 30 days after placement at the EOP level of care. Clinical contacts with the primary clinician were inadequate, repetitive, and failed to recognize significant changes in the patient's presentation that were likely indicative of decompensation. The IDTT documentation was also inadequate, as no goals were created, and the targets for treatment were inconsistent with the patient's identified needs. The SRASHE risk levels were based largely on the patient's self-report, and the five-day follow-up contact documentation indicated review of a safety plan that did not exist.

**Patient G**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided. The patient was provided a diagnosis of bipolar affective disorder, current episode, depressed. He was adherent to his prescribed buspirone, divalproex sodium, mirtazapine, and olanzapine.

The patient arrived at NKSP from a county jail on November 6, 2023 with active prescriptions for buspirone, divalproex sodium, mirtazapine, and olanzapine which were continued at the time of reception. The initial health screening noted that the patient attempted suicide twice at the county jail, and the most recent attempt occurred less than 12 months prior; thus, an urgent consult was placed to mental health. The patient was seen the following day in a nonconfidential space in an open dayroom. No SRASHE was completed despite being clinically indicated given the patient's history and report that his medications were not working optimally. The patient was referred to a psychiatrist, and he was seen for an initial assessment on November 10, 2023. The psychiatrist documented that the patient was not seen for a confidential contact as he was on quarantine status. The assessment was adequate, and medication adjustments were made. The diagnoses documented by the psychiatrist differed from the diagnoses of record and included depression, not otherwise specified; psychosis, not otherwise specified; and anxiety, not otherwise specified. Provisional diagnoses of schizophrenia and PTSD were also documented.

An initial primary clinician assessment was completed on November 9, 2023, which noted that the psychiatrist had seen the patient prior to the primary clinician; however, that was inconsistent with documentation by the psychiatrist which noted that the psychiatric contact occurred on the following day. The assessment was completed in the dayroom due to a lack of confidential space. Much of the historical information in the assessment was pulled forward from 2017 with minimal updated information. The assessment noted that the patient would be placed at the EOP level of care without rationale provided. No SRASHE was completed, despite a documented and reported suicide attempt at the county jail less than three months prior.

The mental health screening was completed on November 12, 2023, which was timely but unnecessary given that the patient already had full initial assessments and was placed at the EOP level of care. The screening did not include evidence that a healthcare record review had

occurred, as it stated that a primary clinician initial assessment would be completed in the coming weeks, rather than noting that it was completed three days earlier.

An initial IDTT meeting occurred on November 16, 2023 with the required staff present, however the patient refused to attend. The decision to retain the patient at the EOP level of care was documented without rationale provided. The treatment goals to reduce depression and anxiety symptoms were documented, and appropriate clinical interventions were listed.

The patient was seen for weekly primary clinician contacts, most of which occurred in a dayroom and were documented as status checks without the provision of therapeutic interventions. No documentation was provided that indicated that the PC engaged with the patient regarding significant events that occurred during his stay; those events included reported suicidal ideation in November, engaging in a fight in December 2023, drinking cleaning solution and requiring medical transport to a community hospital, and failure to attend any group programming for several months. This lack of acknowledgment of the patient's inadequate functioning by the primary clinician was evident in the routine IDTT meetings where most of those issues were not mentioned. The only issue identified by the IDTT was the lack of engagement in EOP groups, but the treatment modifications to address that issue were inadequate.

On November 28, 2023, the patient reported suicidal ideation and was placed in a holding cell. The CIT responded and noted that the patient reported suicidal ideation for a cell change, and he requested to be moved to another cell. The patient denied suicidality upon assessment. The patient was not seen in a confidential setting, and he refused to participate in the completion of a SRASHE. The SRASHE was inadequate, as it contained information pulled forward from 2017 without adequate updates; further, the risk assessment determined moderate chronic and low acute suicide risk and appeared to be an underestimation of the patient's risk. Specifically, the clinician inaccurately noted that the patient participated in programming, failed to recognize that pacing, which the patient reported, was noted as a risk factor for the patient, and recorded a protective factor that the patient had children; yet those children were adopted by others creating distress for the patient. The patient was returned to his cell without planned follow-up beyond weekly primary clinician contacts, the next of which occurred at the patient's cell door.

The patient engaged in self-harm on December 25, 2023 by drinking cleaning solution. A SRASHE was completed by a telepsychiatrist who assessed the patient with moderate acute and chronic suicide risk, despite not identifying some risk factors, and the patient was referred to the MHCB level of care. The following day, an onsite clinician conducted another SRASHE; the clinician assessed the patient with low acute suicide risk, and the only justification provided was the patient's denial of suicidal ideation. The MHCB referral was rescinded, and the patient was placed on five-day follow-up contacts. No safety plan was created.

The five-day follow-up contacts were conducted in nonconfidential locations, and the documentation was repetitive in content and did not reflect comprehensive assessments. Additionally, the documentation indicated that a safety plan was reviewed with the patient when the safety plan was blank.

The patient was discovered to be diverting his medications on December 31, 2023, and he was placed on an order to crush and float his medications by the psychiatrist; however, that issue was not addressed in any subsequent clinical contacts with the patient.

The patient was offered groups daily but did not attend until January 2024.

**Findings**

The care and treatment provided to this EOP patient was inadequate for a multitude of reasons.

The treatment planning was inadequate, did not include review of patient progress and failed to adequately identify or address major incidents in the patient's life. The primary clinician contacts were superficial, occurred in nonconfidential locations, and similarly did not adequately address the patient's needs or major events in his life. When the patient engaged in self-harm or verbalized suicidal ideation, the suicide risk assessments were inadequate and inaccurate, and failed to result in appropriate safety planning and follow-up.

**Patient H**

This 42-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided diagnoses of depression, not otherwise specified; adjustment disorder with anxiety; and amphetamine-type substance use disorder, severe. He was prescribed mirtazapine and hydroxyzine but was transferred to the MHCB level of care before the medications were initiated.

The patient arrived at NKSP on August 14, 2023, and he did not screen positive for further mental health assessment at the time of screening based on his lack of inclusion in the MHSDS during his previous incarceration. His history was positive for previous mental health treatment and suicide attempts as a juvenile.

On August 29, 2023, the patient was seen by the CIT in a nonconfidential location after reporting suicidal ideation with a plan to overdose on drugs. Upon evaluation, the patient reported taking over 30 pills and later tried to tie an intravenous tube around his neck while in the TTA. The patient was immediately taken to a community hospital and was placed on suicide watch upon his return to NKSP. The patient then made a PREA allegation with reported safety concerns. A SRASHE was completed that underestimated the patient's acute suicide risk as low despite warning signs and risk indicators. The low rating appeared to be based solely on the patient's self-reported denial of suicidal ideation. The SRASHE indicated a plan to place the patient at the EOP level of care. No safety planning was completed, and the patient was placed on five-day follow-up contacts.

At the initial five-day follow-up contact, when the clinician documented review of a safety plan that was blank, the patient reported suicidal ideation with a plan to hang himself. He also reported safety concerns and an allegation that he was assaulted by a custody officer. A SPRFIT review noted that the behaviors were assessed as "impression management," and the patient's behaviors were described as "low risk high rescue"; subsequently, the patient was returned to his

750

housing with the placement decision left to be made by custody.  Subsequent five-day follow-up contacts were completed in nonconfidential locations and noted no concerns.

An initial psychiatric assessment was completed on September 3, 2023 in a nonconfidential location as the patient was on quarantine.  Diagnoses of depression, not otherwise specified and adjustment disorder with anxiety were noted by the psychiatrist, and no medications were prescribed.  The assessment was adequate despite occurring in a nonconfidential setting.

The first EOP primary clinician contact occurred at cell front and included contradictory information noting that the patient did not require inclusion in the MHSDS, yet also stated that the patient was doing well in the EOP.  The initial primary clinician assessment was not completed at that time but was completed later on September 12, 2023.  The assessment contained inconsistent information about the patient's history of involvement in the MHSDS during his previous incarceration.  Otherwise, the assessment was adequate, yet the rationale for retaining the patient at the EOP level of care was not clearly stated.

On September 13, 2023, the patient reported ingesting 25 pills with the intent to die.  He was sent to an outside hospital and was placed on suicide watch upon his return to NKSP.  On September 14, 2023, prior to the patient being evaluated by mental health staff; an IDTT meeting occurred without the patient present, as the patient was placed in alternate housing.  The IDTT developed a goal to address the patient's anxiety, but no goals were created to address the patient's self-injury or suicidal ideation.  There was documented rationale provided for retaining the patient at the EOP level of care.  When the patient was seen later for a SRASHE, he admitted taking pills but denied an intent to die and reported that he wanted a change in housing.  The SRASHE was generally adequate, and a safety plan was created with the patient, as it was clinically indicated.  The patient was returned to housing and seen for two days of the five-day follow-up contacts, but the safety plan was not reviewed with the patient during those contacts.

On September 16, 2023, the patient again reported ingesting several pills and was again taken to a community hospital.  Upon return, a SRASHE was completed when the patient continued to endorse suicidal ideation and reported a desire to change housing and to be removed from the EOP, as his EOP designation was the reason that he was returned to undesirable housing.  The patient was not referred to a higher level of care, and a safety plan was created.  The SRASHE was generally adequate; however, there continued to be an underestimation of acute suicide risk.

The patient was seen on the following day by his psychiatrist who prescribed mirtazapine and hydroxyzine.  The patient reported that he wanted to remain in the EOP.  Later that day, the patient reported wanting to die by cutting his wrists, and he engaged in head-banging behavior.  The patient was transferred to the MHCB level of care.

The patient was consistently offered groups daily and attended the majority of them when available to do so.

**Findings**

The care and treatment provided to this EOP patient was inadequate.

751

The IDTT failed to develop a treatment plan to address the patient's primary needs of self-harm, reporting suicidal ideation, and inability to tolerate distress.  Due to the patient's self-harm and reported suicidal ideation, routine engagement in individual primary clinician contacts was limited; however, there was no evidence that clinicians used five-day follow-up contacts or other clinical encounters to engage the patient in treatment interventions.  Several of the SRASHEs were completed with variable adequacy; however, most appeared to underestimate the patient's risk for suicide.  The psychiatric contacts were adequate.

**Patient I**

This 35-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP.  The patient was provided a diagnosis of unspecified depressive disorder and was adherent with his prescribed mirtazapine and sertraline.

The patient arrived at NKSP on September 28, 2023 from a county jail with active prescriptions for mirtazapine and sertraline which were continued upon arrival.  He was placed immediately into the EOP level of care due to his EOP placement at the time of CDCR prison release in 2014.  The patient was initially placed in the ASU but was released to mainline housing on October 5, 2023.

The initial psychiatric and primary clinician assessments were completed timely and were adequate.  A mental health screening was completed after those assessments and failed to note the completion of the initial assessments despite indicating that the patient's healthcare record was reviewed.

An initial IDTT meeting on November 1, 2023 did not occur timely, but included the required staff; the patient refused to attend.  Treatment goals were documented; however, therapeutic interventions were not documented.  While there were no indications of the need for referral to a higher level of care, there was no clear rationale provided for retaining the patient at the EOP level of care.

The patient was seen weekly by a primary clinician, and the contacts appeared adequate; however, the documentation was very similar across contacts, as much of the documentation was copied from session to session.  There was minimal indication that treatment interventions were provided during the PC sessions.  Daily groups were offered to the patient.  The routine psychiatric contacts were adequate.

A routine IDTT meeting occurred on November 28, 2023 that noted progress in the patient's symptom reduction.  All required staff and the patient were present at the meeting.  Again, there were no indications of the need for referral to a higher level of care, yet no clear rationale was provided for retaining the patient at the EOP level of care.  The patient was transferred to another institution on December 11, 2023.

**Findings**

The care and treatment provided to this reception center EOP patient was adequate.

Improvement, however, was needed in clearly documenting the patient's need for continued treatment at the EOP level of care. Additionally, the treatment plan required improvement regarding clinical interventions necessary to support the patient's attainment of treatment goals.

## Patient J

This 49-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided diagnoses of schizophrenia and adjustment disorder with mixed anxiety and depressed mood. He was prescribed buspirone, olanzapine, and valproic acid.

The patient arrived at NKSP on January 26, 2024, with active prescriptions for buspirone, divalproex sodium, and olanzapine which were continued at the time of reception. Of note, the patient's release date was February 29, 2024.

The patient was placed at the EOP level of care for unknown reasons; his initial primary clinician contact on February 1, 2024 noted that level of care without explanation. An initial primary clinician assessment was not completed at that time. An initial psychiatric assessment was completed on February 3, 2024, which was adequate. The patient reported low energy, difficulty concentrating, and auditory hallucinations, but denied experiencing visual hallucinations. A medication dosage adjustment occurred to assist with anxiety reduction.

A pre-release assessment was completed with the patient on February 5, 2024, which appeared adequate and included a reference to the patient living with his mother upon release as well as documentation that MediCal, SSI, and VA benefits applications were completed. Follow-up documentation by the pre-release coordinator indicated attempts to verify housing, which was not agreed upon by his mother; and follow-up occurred with the patient about alternative housing options.

An initial primary clinician assessment was completed on February 7, 2024 which was adequate; however, the patient presented quite differently than he had during other clinical encounters with perseveration, frequent changes in topic, vague and evasive responses, and difficulty with redirection. The patient endorsed both visual and auditory hallucinations and made requests for specific medications. There was no acknowledgment by the primary clinician that this presentation was not consistent with previous contacts. The assessment was adequate otherwise; however, there was no rationale provided for the patient's placement at the EOP level of care. Later that day, the patient was observed diverting his medications, and the psychiatrist made adjustments to reduce diversion that included substitution with liquid medications and with crush and float of other medications.

An initial IDTT meeting occurred timely on February 8, 2024 with the required staff present. The patient refused to attend. The treatment goals and interventions were generic and did not

include what was being targeted in treatment or why. No rationale was provided for the patient's inclusion at the EOP level of care beyond his lack of need for referral to a higher level of care. No treatment goals or interventions were included to address the patient's upcoming release to the community. No functional impairments were identified. Additionally, there was no mention of the differences in the patient's presentation between clinicians or his recent medication diversion.

The patient was seen by his primary clinician the following week. The documentation of that contact did not include the use of treatment interventions and did not mention that the pre-release coordinator was unable to verify the patient's housing upon release. A SRASHE was completed due to "initial assessment," but it was unclear why a SRASHE was completed on that date. The assessment was internally inconsistent, and it appeared that documentation was copied from prior assessments making it unclear what information was current or historical. The assessment of risk levels was minimally supported. Subsequent weekly contacts included generic documentation without any discussion of the patient's pending release other than the patient's anticipation of his release from prison.

The patient was offered daily groups which he attended intermittently.

The patient was released to the community on February 29, 2024.

**Findings**

The care and treatment provided to this reception center patient was inadequate.

Treatment planning was vague and did not specifically address what was being targeted in treatment. The primary clinician documentation was generic and did not address significant issues that occurred with the patient and did not evidence useful interventions.

**Patient K**

This 35-year-old 3CMS RHU patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at NKSP-RC. He was provided a diagnosis of bipolar disorder, unspecified with depression and anxiety. He was prescribed Abilify and Remeron.

The patient entered CDCR for his current and second prison term on February 1, 2024, and he was immediately placed in ASU as he was on maximum custody status when his previous prison term ended. The patient was initially placed in the MHSDS at the 3CMS level of care in 2016 during a prior prison term, and he had no history of EOP, MHCB or DSH placements. He also had no history of suicidality. A SRASHE completed on February 6, 2024 assessed low acute and chronic suicide risk.

The initial PC assessment occurred timely on February 6, 2024. The PC noted that the patient's primary concern was distress from delusional thinking. The assessment included detailed clinical history and psychosocial information and reflected a thorough assessment process. The patient's significant stressors were identified as difficult court proceedings, returning to prison,

RHU placement, and limited contact with his family. His mental status was described as normal; however, his insight and judgment were assessed as poor. The initial PC assessment was appropriately completed, and it informed the IDTT and treatment planning.

The initial psychiatric assessment occurred timely on February 6, 2024. The patient reported concern about his RHU placement, poor sleep and appetite. The psychiatrist documented discussion regarding the patient's medication regimen, and the patient reported satisfaction with his medication regimen. Abilify and Remeron were continued at that visit.

The initial IDTT meeting occurred timely on February 14, 2024, and the necessary participants were in attendance. At the IDTT meeting, the patient was provided a diagnosis of unspecified bipolar disorder, and his primary symptoms were identified as mood instability consisting primarily of depressive episodes. The treatment plan included an IPOC targeting anxiety; however, the IPOC was carried forward from a previous treatment plan in 1997 and was not updated. The treatment goal was to reduce the severity of depression, and interventions included replacing poor coping skills with effective coping skills using CBT techniques and psychiatric medication adherence. The treatment team indicated that the patient did not meet the criteria for consideration of referral to a higher level of care, and the level of care justification was appropriate. The discharge criteria were brief but appropriate, and they included functioning without psychotropic medications and resolution of depressive symptoms for three to six months.

The PC contacts occurred timely in the RHU. The patient was initially seen by the PC in response to an urgent consult, as the patient reported high levels of anxiety and depression with difficulty sleeping. He requested to see the psychiatrist to discuss medication treatment. He denied suicidal or homicidal ideation but endorsed safety concerns regarding other incarcerated persons.

The patient was seen by the PC in a confidential setting on February 21, 2024, when he reported normal sleep and appetite with mild depression. He was seen by the PC on February 29, 2024 in a confidential session when he was reportedly doing well. At a confidential PC session on March 5, 2024, he presented with dysphoria regarding his perceived delay in release from the RHU. He presented with stability at subsequent PC contacts, and the documentation of those contacts contained limited updates and were essentially unchanged other than the inclusion of a quote from the patient regarding his current mood.

The patient consistently attended clinician led groups where he was an active participant.

The patient was seen for a cellfront check-in by the psychiatrist on February 22, 2024; the patient declined a confidential contact, and he denied current difficulties. The patient's medications were continued unchanged at that session.

**Findings**

The care and treatment provided to this 3CMS RHU patient were marginally adequate.

The clinical contacts including an initial IDTT meeting, PC contacts, and psychiatric contacts all occurred timely. The PC contact documentation required appropriate update. Although the treatment plan goals and interventions were generally appropriate for the patient's clinical needs and presentation; the IPOC required update. The PC contacts occurred in a confidential setting, and the patient was provided appropriate group therapy.

**Patient L**

This 29-year-old 3CMS RHU patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at NKSP. The patient was provided a diagnosis of unspecified depressive disorder, and he was prescribed Zoloft.

The patient arrived at CDCR for his current term on May 5, 2022 to serve a five-year sentence with an EPRD of June 19, 2024. He was placed in the RHU on February 21, 2024 due to reported enemy concerns in his housing unit. He was initially placed in the MHSDS at the 3CMS level of care on February 28, 2024, and he had no history of EOP, MHCB, DSH placements or suicidality. The patient had a history of heroin use, and his last use was reportedly on February 20, 2024, just prior to RHU placement.

The initial PC assessment occurred timely on February 28, 2024. The assessment occurred in a confidential setting, and the patient's primary concern was depression. The initial PC assessment provided clinical and psychosocial information that was incorporated into the treatment plan. The assessment also noted that the patient was prescribed Zoloft to address his depressive symptoms, and he was prescribed Suboxone for opioid use disorder. His mental status was described as normal but with impaired insight and judgement.

The initial psychiatric assessment also occurred timely on March 5, 2024. The patient requested medication treatment for depression, and he was prescribed Zoloft.

The initial IDTT meeting occurred timely on March 6, 2024, and the meeting included the necessary participants and the patient. The treatment plan appropriately included an IPOC for depressed mood, and the treatment goals and interventions were appropriate but generalized and not individualized.

The patient attended clinician led groups on March 4, 2024 and March 12, 2024, but did not attend a clinician led group on March 7, 2024. He was seen timely for PC contacts in a confidential setting, and he reported mild to moderate depressive symptoms during the sessions. The sessions also reportedly included discussion regarding stressors related to the patient's safety concerns as well as development of coping skills to address his avoidant behaviors.

**Findings**

The care and treatment provided to this 3CMS RHU patient were adequate.

The initial PC and psychiatric assessments and routine contacts occurred timely and reflected the documentation of comprehensive psychiatric history and discussion of the patient's clinical

presentation and needs. The initial IDTT meeting also occurred timely and included appropriate, although generalized, treatment goals and interventions. The documentation of the psychiatric assessment indicated discussion regarding medication options, and the patient was actively involved in those discussions. Additionally, the patient was appropriately provided weekly clinician led groups.

**Patient M**

This 57-year-old 3CMS RHU patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at NKSP. He was provided diagnoses of major depressive disorder, anxiety, opioid dependence and schizophrenia, unspecified. He was initially prescribed Zoloft and Zyprexa.

The patient entered CDCR for his eighth term to serve a four-year sentence on December 29, 2023 and was immediately placed in ASU due to his maximum custody status during his prior term. He had a long history of placement in the MHSDS at the 3CMS level of care.

The initial PC assessment occurred timely on January 2, 2024. The patient's primary concern was depressed mood, and the assessment also noted a history of daily opioid use since age 19; the patient was, however, not included in the ISUDT. His mental status examination was described as normal but with limited insight and fair judgment.

The initial IDTT meeting occurred on January 3, 2024; the patient refused to attend the IDTT meeting, but the necessary staff were in attendance. The treatment team noted the patient's significant stressors that included a difficult court proceedings, return to prison, RHU status, and limited contact with his family. No IPOCs were provided in the initial treatment plan. The level of care justification and discharge criteria were generalized but appropriate.

At a routine PC contact that occurred on January 10, 2024, when the patient reported no distress or concerns and mild depression. He was offered a group that same day but did not attend. The patient was next seen cellfront on January 18, 2024, after he refused a confidential session; the PC contact occurred one day late. The patient was seen cellfront on several subsequent occasions due to refusing to attend a confidential session; however, he was described as stable. He remained stable throughout the review period, however, the PC progress notes were generally unchanged and did not include substantive updates. The patient was offered weekly to biweekly groups, but he never attended any offered RHU groups.

The initial psychiatric assessment occurred timely on January 3, 2024, and the assessment occurred cellfront after the patient declined to attend a confidential session. Most of the initial assessment was completed by healthcare record review due to the patient's treatment refusal. The psychiatrist attempted to complete the initial assessment again on January 11, 2024, when the patient again refused to participate. The psychiatrist noted the patient had also refused required laboratory studies and was provided psychoeducation that the medications would be discontinued if he refused the testing again. At subsequent psychiatric contacts that occurred at cellfront due to the patient refusing to leave his cell for a confidential contact, the patient was again reminded of the need for laboratory studies. As he continued to refuse, Zyprexa was

tapered and discontinued.  When seen on February 14, 2024, the patient reported mild depression, and the psychiatrist discussed the need for treatment adherence to resume treatment with Zyprexa.  At the next psychiatric contact at cellfront on March 12, 2024, the psychiatrist restarted Zyprexa.

**Findings**

The care and treatment provided to this 3CMS RHU were inadequate.

The PC contacts, although conducted weekly, exceeded the seven-day requirement for timeliness.  The patient's treatment nonadherence with attending confidential contacts to allow for adequate assessment and treatment, as well as his refusal to allow necessary laboratory studies was not adequately addressed in subsequent clinical contacts or in treatment planning.

**Patient N**

This 33-year-old 3CMS RHU patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at NKSP.  He was provided a diagnosis of unspecified anxiety disorder.  He was not prescribed psychotropic medications at the time of review.

The patient entered CDCR for his current term on August 17, 2023 to serve a seven-year sentence.  He was placed in the NKSP RHU after receiving RVRs on November 16, 2023 for assault on a peace officer and battery on a prisoner; he had additionally also received an RVR on November 6, 2023 for battery on a prisoner.  The patient reported no previous mental health treatment and entered the MHSDS on November 30, 2023 at the 3CMS level of care.

The initial PC assessment occurred timely on November 30, 2023, and the patient's primary concern was anxiety.  The assessment included adequate clinical and psychosocial histories and mental status examination, and the patient was described as stable.  The clinical summary was appropriate, and the assessment informed treatment planning.

The initial psychiatric assessment occurred timely on December 5, 2023.  The patient was reportedly stable, and he declined psychotropic medication treatment.  He was not seen for psychiatric contact again during the review period.

The initial IDTT meeting occurred timely on December 6, 202, and the meeting included the necessary participants who were present at the meeting.  The treatment plan indicated that the patient was included at the 3CMS level of care due to anxiety symptoms, and primary stressors included recent return to prison, conflicts with other incarcerated individuals, RHU placement, limited contact with family, and adjustment to prison.  The treatment plan included an IPOC targeting anxiety.  The IPOC goals were appropriate but brief and generalized, and the provided intervention was generic and limited to the PC fostering a therapeutic alliance by empathizing with the patient's feelings of distress.  The discharge criteria was appropriate.

A second initial IDTT meeting occurred on January 3, 2024.  It was unclear from the documentation what the reason for this second initial IDTT was; however, it was noted that the

RHU placement referenced at this IDTT was due to safety concerns rather than the recent RVRs. The patient refused to attend the IDTT meeting, and the assigned PC and psychiatrist were not present but alternate PC and psychiatrist were present. Telehealth was not used during the IDTT meeting. The treatment plan remained unchanged from the prior treatment plan developed on December 6, 2023.

The patient was not seen by the PC until January 11, 2024, after his second RHU placement on December 28, 2023. He was seen weekly for individual PC contacts during the review period. The location of two of the PC contacts was not documented. A PC contact on January 31, 2024 was provided by a covering PC, and it occurred cellfront. The patient was generally described as stable during the contacts.

The patient was offered but did not attend weekly PC groups during his RHU stay.

**Findings**

The care and treatment provided to this 3CMS RHU patient were inadequate.

The clinical contacts did not occur timely, and the PC progress note documentation was inadequate. The treatment plan lacked specific and individualized interventions, and the PC progress notes did not document the utilization of any clinical interventions. The PC progress notes did not provide the location of the contact and lacked substantive updates about the patient's functioning and clinical status.

**Patient O**

This 47-year-old 3CMS RHU patient's healthcare record was reviewed to assess the quality of mental healthcare and treatment provided at NKSP. He was provided a diagnosis of schizophrenia, and his primary symptom was paranoid delusional thinking. He was not prescribed psychotropic medication at the time of the review.

The patient entered CDCR for his current prison term on February 22, 2023 to serve a six-year sentence. He was placed in the NKSP RHU due to enemy concerns. The patient initially entered the MHSDS at the 3CMS level of care in 2014 during a previous prison term, and he had no history of higher level of care placement or suicidality. The patient had two RHU placements during the review period, both were related to safety concerns. The initial placement occurred from November 1, 2023 to approximately November 17, 2023, and he was quickly returned to the RHU on November 19, 2023, when he was the victim of an attempted murder.

Initial PC assessments were completed on November 13, 2023 and November 21, 2023. The PC assessments were essentially identical and did not contain any updated information aside from mentioning that the patient was the victim of an attempted murder. The information documented in the initial PC assessments informed treatment planning.

A timely cellfront initial psychiatric assessment occurred on November 14, 2023. The patient declined a confidential session, declined to participate in the assessment, and reported that he was not interested in psychotropic medication treatment.

An initial IDTT meeting occurred on November 15, 2023; the patient refused to attend, but the necessary staff attended. The patient's primary symptoms were identified as distress from paranoid delusional thinking and significant stressors including recent return to prison, conflict with other incarcerated persons, disciplinary problems, RHU placement, limited contact with family, and general stressors associated with prison. The treatment plan included IPOCs for hallucinations and delusions. Both IPOCs were carried forward from previous treatment plans and lacked update or specific interventions to address the patient's current presentation. Additionally, treatment planning did not address the patient's treatment resistance and nonadherence. The clinical summary indicated that the PC would assist the patient in replacing unproductive coping skills with more effective coping skills, including CBT coping techniques. The IDTT did not identify any criteria for consideration of referral to a higher level of care.

A second initial IDTT meeting occurred timely on November 29, 2023 after the patient's return to the RHU. The treatment plan was unchanged from the prior initial treatment plan developed on November 15, 2023.

The initial psychiatric assessment occurred timely on November 28, 2023 after the patient returned to the RHU. The patient again declined to participate or to take psychotropic medications. The psychiatrist again attempted to complete the initial psychiatric assessment on December 19, 2023, January 11, 2024, and January 30, 2024; however, at each attempt, the patient refused a confidential contact, refused to participate in a full assessment, and declined to consider medication treatment.

The patient declined confidential PC contacts during the review period, and PC contacts occurred cellfront. The PC contacts did not occur timely with eight to nine day lapses between offered contacts. The PC contacts were poorly documented, did not include substantive updates, and did not appear to implement interventions provided in the treatment plan. The only intervention documented was generally limited to encouraging the patient to develop a daily routine.

The patient was offered clinician led groups during the review period. The patient attended one group on January 22, 2024.

**Findings**

The care and treatment provided to this 3CMS RHU patient were inadequate.

Treatment planning was inadequate, and PC contacts did not occur timely and were poorly documented. The treatment plan did not include any updated or current IPOCs and relied upon IPOCs from previous treatment plans. The treatment plan contained only generic treatment goals and interventions, and no interventions were not applied during PC contacts.

**Patient P**

This 45-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP.  The diagnosis of record for this patient was major depression with psychotic features which differed from psychiatric diagnoses of substance-induced psychotic disorder and adjustment disorder with anxious and depressed mood; both diagnoses were noted as resolved.  The patient was prescribed Zoloft and Vistaril.

The patient was seen for two PC contacts during the review period; those contacts were provided by two different clinicians.  During August 2023, the documentation indicated that the patient continued to experience depression due to grief and auditory hallucinations, but no treatment interventions were offered.  The next PC contact that occurred during January 2024 did not occur timely.  During that contact, the patient expressed concerns regarding his cellmate due to anxiety and reported discomfort with him.  The PC documented discussion regarding interventions such as "due process, self-advocacy [sic] and increasing coping skills"; however, specific details regarding those coping skills were not documented.

The psychiatric contacts occurred timely, and the patient was seen by the same provider.  The documentation indicated assessment of symptoms and functioning as well as medication management.  The September 28, 2023 psychiatric progress note indicated that Vistaril had expired since the previous visit, but the medication was renewed at that visit.

The clinical summary in the annual IDTT documentation did not include a summary of the patient's symptoms, functioning, or treatment response since the previous IDTT meeting.  The only new documentation since the previous IDTT was documentation that was copied from a recent primary clinician contact.  Additional psychosocial information that the writer noted was copied from previous documentation indicated that the historical information was discussed at the IDTT meeting; however, the copied information made it difficult to determine what information was current and what was historical.  This was particularly noteworthy as the copied information noted diagnoses of unspecified depressive disorder, unspecified schizophrenia spectrum and other psychotic disorder that differed from the psychiatric diagnoses.  The documentation also failed to include the psychiatric assessment that the patient's hallucinations were primarily attributed to illicit substance use.  Other important clinical information, such as patient strengths, treatment goals, and the treatment plan, were not documented.

**Findings**

The care provided to this 3CMS patient was marginally adequate.

Although it appeared that the psychiatric care provided was adequate; insufficient primary clinician care and treatment planning were noteworthy.  There was a lack of continuity of care of primary clinicians, and the care provided by the primary clinicians was inconsistent.  One of the contacts did not occur timely, the documentation required improvement, and the PC did not provide an appropriate clinical response to the patient's symptoms.  Additionally, the IDTT documentation did not reflect collaboration between treatment providers, particularly regarding the patient's psychotic symptoms.  The documentation also failed to accurately represent the

patient's functioning and mental status during the prior year or to update treatment planning accordingly. Diagnostic clarification with clinical rationale was needed.

**Patient Q**

This 24-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. There was also discrepancy regarding the psychiatric diagnoses and the diagnoses of record. The psychiatrist provided a diagnosis of adjustment disorder with anxious mood and possible PTSD; whereas, the diagnoses of record were adjustment disorder with mixed anxiety and depressed mood and unspecified depressive disorder. The patient was prescribed Vistaril PRN.

The patient was seen for two PC contacts during the review period; those contacts were provided by two different clinicians. It appeared that the treatment focus was the patient's depressive symptoms, and documentation in August 2023 indicated that he denied depression but reported anxiety due to recent RVRs. Additional details were not provided, and no treatment interventions were offered.

In January 2024, the patient was seen in preparation for the upcoming IDTT meeting. His current symptoms included anxiety and trauma-related flashbacks for which he was referred to psychiatry; although, interventions were not offered by the PC. The PC did not document the impact of the patient's symptoms on his functioning, a mental status examination was not documented, and the documentation was not indicative of a meaningful therapeutic contact. The patient requested continued supportive therapy at the 3CMS level of care.

The patient was seen for an initial psychiatric assessment; however, the psychiatric documentation was not comprehensive and inclusive of the details necessary for an initial psychiatric assessment. No other symptoms were reported by the patient.

The annual IDTT meeting was completed by a covering clinician, and the patient did not attend. The IDTT documentation did not include a summary of the patient's symptoms, the impact of his symptoms on his functioning, or treatment engagement during the past year. The treatment plan section of the IDTT documentation was not completed, and the rationale for continued treatment at the 3CMS level of care was grossly inadequate.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was a lack of primary clinician continuity for IDTT meetings and routine contacts, and the documentation of PC contacts was not indicative of meaningful therapeutic contact. Interventions to assist the patient in managing distress were not offered, even though clinically indicated. An initial psychiatric assessment was not completed, despite the patient being seen for an initial psychiatric contact. The IDTT documentation was not clinically useful for continuity of care or treatment planning, and treatment goals were not identified. Diagnostic clarification with sufficient rationale was needed.

**Patient R**

This 44-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided a diagnosis of unspecified mental health disorder. He was not prescribed psychotropic medication.

During the review period, one PC contact occurred during January 2024; however, the documentation indicated that the session was not indicative of a meaningful therapeutic contact. The most recent contact prior to that contact occurred in May 2023. The focus of the January 2024 contact was to prepare for the IDTT meeting. At the session, the patient denied any mental health symptoms, and it was documented that he was motivated to be removed from the MHSDS.

The patient was removed from the 3CMS level of care during the annual IDTT meeting on January 16, 2024, which according to the IDTT roster lasted only seven minutes. No summary of the patient's symptoms or functioning during the past year was documented. Relatedly, there was no indication of how the IPOC for treatment nonadherence that was developed during the prior IDTT meeting was addressed, or what led to the decision to remove the patient from the MHSDS. The rationale for the diagnosis of unspecified mental health disorder included in the brief IDTT note was not documented. Elsewhere in the EHRS, the patient was provided a diagnosis of opioid use disorder.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient did not receive timely primary clinician contacts. While his removal from the MHSDS may have been appropriate, there was insufficient documentation to support the decision to discharge him. In addition, the patient did not receive relapse prevention skills or appropriate discharge planning; both necessary interventions to provide prior to terminating mental health treatment.

**Patient S**

This 43-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided with various diagnoses in the document of record and by the psychiatrist. The EHRS included diagnoses of adjustment disorder with anxiety and depressed mood, PTSD, unspecified anxiety disorder and unspecified depressive disorder; however, the psychiatrist only provided a diagnosis of adjustment disorder with anxiety and depressed mood. The patient was prescribed Prazosin and Remeron.

Two of three primary clinician contacts during the review period occurred timely. Each primary clinician contact occurred with a different provider. The documentation varied by provider; but consistently, the documentation did not indicate the provision of an individualized assessment of the patient with targeted treatment interventions. The January 2024 contact that occurred in preparation for the discharge IDTT meeting did not document the completion of a mental status examination.

The patient was seen for three psychiatric contacts that occurred with two different providers. The documentation of those contacts was generally useful and addressed symptoms and the patient's functioning. The patient reported that his medication assisted with his PTSD-related symptoms of insomnia, nightmares, flashbacks, and avoidance behavior. The patient presented with stability and medication adherence at each contact.

The IDTT documentation was insufficient and not useful for continuity of care, as the documentation did not include a summary of the patient's symptoms, functioning, or response to treatment, including psychiatric treatment during the prior year. Instead, the primary clinician contact documentation in advance of the IDTT meeting was copied into the clinical summary section; this resulted in information that only included the patient's most recent clinical presentation and was not representative of the treatment provided during the prior year. Regarding the IPOC that targeted anxiety, the patient's progress during the prior year was not discussed. The treatment plan section was not completed. The only rationale provided for continued treatment at the 3CMS level of care was due to continued medication management.

**Findings**

The care provided to this 3CMS patient was inadequate.

Continuity of psychiatric care was poor, despite the use of telepsychiatry in the 3CMS program. Primary clinician routine contacts and the IDTT documentation did not sufficiently address the patient's individualized treatment needs, and the treatment was provided by various clinicians. The IDTT documentation was insufficient, including the lack of a useful clinical summary since the previous IDTT meeting, a lack of treatment planning, and poor rationale for continued treatment at the 3CMS level of care. The IDTT failed to consider the benefit of the provision of clinical interventions by the primary clinician. Additionally, diagnostic clarification with clinical rationale was needed.

**Patient T**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided with diagnoses of adjustment disorders with mixed anxiety and depressed mood, depression, and unspecified anxiety disorder.

The annual IDTT meeting occurred in November 2023. IPOCs that targeted treatment nonadherence and depression from November and September 2022 respectively were continued. The treatment goals were not updated to include paranoia and PTSD; despite the patient's report of those treatment needs in a contact prior to the IDTT meeting. The content of that contact was copied into the subsequent IDTT documentation. A summary of the patient's symptoms, functioning, and treatment engagement that were necessary to inform treatment planning was not included in the IDTT documentation.

Primary clinician contacts occurred in July and November 2023. A PC contact was required by February 7, 2024; however, as of March 5, 2024, that contact had not occurred. Neither primary clinician contact was indicative of a meaningful therapeutic contact based upon the PC contact documentation.

Three psychiatric contacts occurred with three different providers during the review period. The patient responded well to treatment with Remeron which was continued to address mild depression and anxiety. The patient's report of paranoia and PTSD during the IDTT meeting was not addressed by the psychiatrist who attended the meeting or during the subsequent psychiatric contact. Overall, the psychiatric documentation was brief in content; but useful information regarding symptoms, mental status examination, and functioning were included.

**Findings**

The care provided to this 3CMS patient was inadequate.

The primary mode of treatment for this patient was medication management. Continuity of psychiatric providers was poor, and collaboration between the primary clinician and the psychiatrists was also poor as evidenced by the lack of follow-up regarding the patient's report of paranoia and PTSD symptoms during the IDTT meeting. Additionally, the patient was not timely monitored by the primary clinician nor were treatment interventions utilized during routine PC contacts. The treatment planning documentation and goals were not updated according to the patient's current treatment needs. Diagnostic clarification with rationale was needed.

**Patient V**

This 28-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. Various diagnoses were present in the healthcare record; the psychiatrist provided a diagnosis of adjustment disorder with anxious mood that was resolved and a possible diagnosis of panic disorder. Those diagnoses varied from the diagnoses of record in EHRS of adjustment disorder with anxiety, unspecified anxiety disorder, and unspecified depressive disorder. The patient was prescribed Vistaril.

The only primary clinician contact that occurred during the review period was the initial PC assessment that was completed during October 2023. The documentation from the September 2023 reception center initial assessment was copied into that mainline 3CMS PC initial assessment; however, the material was not indicated as copied from another source. The copied documentation stated that the patient experienced adjustment related panic symptoms, depersonalization, hypervigilance, insomnia, paranoid and racing thoughts that had a mild to moderate impact on his prison functioning when encountering elevated stress. A current assessment of the status of those symptoms and the impact on functioning or any additional symptoms with impact on functioning was not documented by the mainline 3CMS clinician. The clinical summary section indicated that the patient denied mental health symptoms; however, it was noted that he rated his symptoms as three on a ten-point scale in which ten indicated the most severe symptoms. The note did not explain that discrepancy. Despite a lack of supporting documentation, the patient was provided diagnoses of unspecified depressive disorder, and unspecified anxiety; provisional diagnoses of anxiety disorder, PTSD, and depressive disorder were also documented.

An initial psychiatric assessment in August 2023 was completed while the patient was housed in the reception center, and there was no documentation that an initial psychiatric assessment was

completed by the mainline psychiatrist after transfer from the reception center. The patient was seen for a routine psychiatric contact prior to the initial IDTT meeting when he denied depressive or anxiety-related symptoms. At his request, Effexor was discontinued, and Vistaril was continued. During a subsequent routine psychiatric contact, the patient presented with stability. He requested discontinuation of Vistaril, as he had not been taking the medication. The documentation of the contact was clinically useful and included the rationale for medication changes.

An IPOC established during the initial IDTT meeting targeted anxiety; however, the rationale for that IPOC was unclear given the lack of clear clinical need identified in the provider documentation.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the care provided during one of the psychiatric contacts was adequate, the overall care was problematic. The initial primary clinician assessment was not individualized, and routine primary clinician care was not provided. An initial psychiatric assessment was not completed. The rationale for treatment goals was not supported by the provider documentation, and there was a lack of provider collaboration in treatment planning. Diagnostic clarification was needed.

**Patient W**

This 29-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided a diagnosis of unspecified anxiety disorder by the psychologist and of schizophrenia spectrum disorder, adjustment disorder with anxiety and depressed mood and PTSD by the psychiatrist. The patient was prescribed Prozac, Zyprexa, and Prazosin. The only PC contacts for this patient while housed in the mainline population occurred during the initial PC assessment and the IDTT meeting in October 2023. The documentation noted a history of suicide attempts, depression, anxiety, auditory hallucinations, and diagnoses of bipolar disorder, PTSD and anxiety. The patient's current status and the impact on functioning of those identified treatment needs were not documented in the initial PC assessment, and the documentation merely indicated that the patient reported that his primary treatment need was poor sleep. The PC changed his diagnosis from adjustment disorder with mixed anxiety and depressed mood to unspecified anxiety disorder without sufficient clinical indication documented for that change. Despite the diagnostic change, both diagnoses were documented in EHRS.

The initial psychiatric assessment occurred in August 2023 when the patient was housed in the reception center; however, no initial psychiatric assessment was completed prior to the initial IDTT meeting after the patient was moved to the mainline. A routine psychiatric contact did not occur until February 7, 2024. The documentation of that contact included assessment of symptoms and ADLs and a mental status examination; although, a description of the patient's overall functioning was not included. The patient's symptoms included depression, anxiety, panic attacks, trauma related nightmares, paranoia and hallucinations. The psychiatrist continued treatment with Prozac, Zyprexa and Prazosin at that session. The psychiatrist also provided diagnoses of schizophrenia spectrum disorder, adjustment disorder with anxiety and depressed

mood, and PTSD; those diagnoses conflicted with the diagnoses of record in EHRS and the primary clinician diagnosis.

The sole IPOC targeted sleep disturbance.  The documentation did not include recognition of the symptoms identified during the initial reception center psychiatric assessment that included auditory hallucinations, delusions of reference and racing thoughts.

**Findings**

The care provided to this 3CMS patient was inadequate.

The provider contacts did not occur timely including a delayed routine primary clinician contact after the initial IDTT meeting and long intervals between psychiatric contacts.  Further, the patient was not seen for an initial psychiatric assessment prior to the initial IDTT meeting as required.  The treatment planning narrowly targeted sleep disturbance but failed to consider significant symptoms identified during the initial reception center psychiatric assessment.  Diagnostic clarification and provider collaboration was needed.

**Patient X**

This 40-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP.  The diagnosis of record in EHRS was adjustment disorder, unspecified.  The patient was not prescribed psychotropic medication.  The patient was transferred to NKSP from another institution in September 2023.

During the initial primary clinician assessment in October 2023, the patient denied the need for mental health treatment and stated the goal of discharge from the 3CMS level of care.  Further information was not provided.  Historical information was copied from a June 1, 2023 assessment completed at a different reception center.  The documentation indicated a denial of community mental health treatment, psychotropic medication treatment, and suicide attempts.  The only identified treatment need was insomnia.  It was documented that the patient was prescribed Remeron upon arrival at CDCR from a county jail in June 2023 to assist with heroin withdrawal-related sleep disturbance.  The medication was discontinued at his request on July 24, 2023.  The patient was informed that he needed to maintain stability for six months for consideration of removal from the MHSDS.

The patient presented with stability during the initial psychiatric assessment.  The documentation of that contact indicated an assessment of pertinent clinical areas.  A routine psychiatric contact on December 16, 2023 with another provider indicated that the patient was doing well without psychotropic medication treatment.

For reasons that were unclear, an IPOC that targeted treatment nonadherence was developed during the initial IDTT meeting.  The annual IDTT meeting occurred on January 2, 2024, and the providers in attendance had not previously seen the patient.  The documentation was not updated since the initial IDTT meeting, and the treatment plan section of the documentation was not completed.  The patient was continued at the 3CMS level of care, and the rationale provided was that the patient had no current or worsening symptoms related to mental illness and was not treated with psychotropic medication; however, he had not maintained mental health stability for

at least six months.  The documentation further indicated that the patient would be seen on or after January 24, 2024, when the six months would have lapsed.

**Findings**

The care provided to this 3CMS patient was inadequate.

Despite the appropriateness of the initial psychiatric assessment, there were concerns with the lack of provider continuity and involvement in treatment planning.  The initial primary clinician assessment lacked a summary of the patient's symptoms and functioning since June 2023.  IPOCs developed during the initial IDTT meeting were outdated, and a treatment plan was not completed during the annual IDTT meeting.  Treatment planning should have targeted relapse prevention.  It was also unclear why the patient was scheduled for a routine IDTT meeting rather than a primary clinician routine contact.  During a routine contact, the patient's current status could have been assessed, and he could have been prepared for MHSDS discharge.  This assessment could have been followed by a routine IDTT meeting to discharge him from the MHSDS as he requested.

**Patient Y**

This 64-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP.  He was provided diagnoses that included unspecified depressive disorder, borderline personality disorder and persistent depressive disorder.  The patient was not prescribed psychotropic medications.  The patient transferred to NKSP in August 2023 from another institution.

The patient had a release date of 2030, and he was convicted of voluntary manslaughter of his wife.  During the initial PC assessment, he became tearful and emotional when discussing his wife.  The documentation of that contact, that was copied from a previous unknown provider, indicated that regarding his wife's murder; the patient reported that the murder resulted from voices that instructed him to do it, and he began crying and abruptly ended the interview.  Other than his tearfulness when discussing his wife, the patient reported being happy and denied other symptoms; however, it was noted that he presented with mood lability.

The patient denied any mental health symptoms during the initial psychiatric assessment when he requested discharge from the MHSDS.  He reported that he was previously prescribed Zyprexa for sleep and denied any history of psychosis or paranoia.  It was unclear if documentation copied into the psychiatric assessment was reviewed by the provider, as the copied documentation indicated a history of treatment with Zyprexa for psychosis which was discontinued in 2016 due to metabolic syndrome.

A different psychiatrist attended the initial IDTT meeting.  An IPOC for depression was established which was tenuously related to the patient's clinical presentation during the initial assessment.  Additionally, mood lability was not considered, and the patient's grief and guilt were not further assessed.  The primary intervention of fostering a therapeutic alliance was generic and not individualized.

The patient was seen for five primary clinician contacts between September 2023 and February 2024. The documentation from two of the contacts focused on case management that included signing a release of information form and providing the patient with a chrono, and the contacts were not indicative of a meaningful therapeutic contact. Two of the three remaining primary clinician contacts occurred timely in confidential settings and were completed by the same provider. The documentation of those contacts indicated that the clinician provided supportive assistance for the patient's current stressors. Two additional contacts occurred in January 2024 with another PC which were therapeutic in nature.

**Findings**

The care provided to this 3CMS patient was inadequate.

Overall, routine primary clinician contacts were supportive but not therapeutic. There was a lack of individualized treatment planning and continuity of psychiatric providers. Improvement was needed in psychiatric documentation, as it was unclear whether the psychiatrist reviewed or considered documentation copied into the psychiatric assessment. Diagnostic clarification with clinical rationale was also needed.

**Patient Z**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided at NKSP. Various anxiety and depression-related diagnoses were present in the healthcare record, and diagnostic clarification was needed. He was not prescribed psychotropic medication.

The patient was housed at NKSP since 2021. The annual IDTT meeting occurred in July 2023. The clinical summary included a brief review of the patient's more recent functioning but did not include a summary of symptoms, functioning, and response to treatment during the prior year. The sole IPOC that targeted depression with a goal to reduce depression remained unchanged since 2021. The sole intervention to foster a therapeutic alliance was also unchanged. An IPOC for anxiety was not added, despite documentation that the patient experienced anxiety regarding his sister's possible upcoming visit.

Routine primary clinician contacts occurred with the same clinician, and those contacts were supportive and therapeutic in nature. Timely PC contacts between late November 2023 and March 5, 2024 occurred two to four times monthly, and the patient was described as stable and actively engaged in therapy.

In July 2023, the patient was placed on a waitlist for the personal insight exploration group that was inactive due to staffing limitations.

**Findings**

The care provided to this 3CMS patient was adequate.

The frequency of primary clinician contacts exceeded minimum requirements. Although the treatment plan documentation was outdated, the routine primary clinician documentation was

generally indicative of collaborative, individualized treatment.  The patient was not prescribed psychotropic medication and denied any psychiatric symptoms.

**Patient AA**

This 53-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP.  The documentation of background clinical information was limited and indicated a diagnosis of unspecified schizophrenia without providing sufficient clinical support for that diagnosis.

The initial primary clinician assessment, which was completed at cell front as the patient refused to attend a confidential session, was insufficient.  The patient's primary concern was impulsive behaviors that led to RVRs.  The documentation that was copied from a December 20, 2023 document indicated that the patient had a history of inpatient hospitalization due to grave disability and danger to self and a history of poor insight regarding his mental illness and lack of treatment adherence.

The patient refused the initial psychiatric assessment and was subsequently briefly assessed at cell front.  The psychiatric documentation appropriately indicated that the examination was limited due to the patient's refusal to participate in a full mental health assessment.

The treatment plan section of the initial IDTT documentation was not completed.  The documentation in the clinical summary section stated that treatment would target reduction and constructive management of impulsive behaviors, and it stated that the goal would be achieved by replacing unproductive coping skills with more effective coping skills, including cognitive behavioral coping techniques.  It was unclear why this was the focus of treatment, as there was insufficient documentation regarding the patient's impulsive behavior.  Additionally, the documentation prior to RHU placement indicated that the patient had a pattern of isolation and refusal of mental health contacts; those treatment needs should have instead been targeted.

Consistent with his pattern of refusals, the patient refused the only required PC contact since RHU placement on March 5, 2024, and he was seen cell front.  The PC documented that the patient had recently shaved his beard, which was a positive indication of attention to his hygiene.  The patient reportedly minimally engaged with the PC prior to walking away from his cell door.  The PC documentation indicated that the patient's cell was adequately clean and organized; that observation was consistent with the daily psychiatric technician documentation that described his cell as fair.  The PC documentation also indicated that the patient would be considered for referral to a higher level of care if he exhibited decompensation.

**Findings**

The care provided to this reception center EOP patient was marginally adequate.

The initial PC assessment was not sufficiently individualized and updated to include the patient's functioning from his CDCR arrival to his EOP placement.  Additionally, treatment planning was not individualized.  Despite the limited individualized clinical documentation, it appeared that the clinician appropriately monitored the patient for decompensation with consideration of referral to a higher level of care if indicated.

**Patient BB**

This 39-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The primary clinician provided a diagnosis of unspecified bipolar disorder; however, insufficient documentation was provided to support that diagnosis.

The patient returned to CDCR on January 2024 and was placed in the RHU approximately one month later due to battery causing serious injury.

The initial PC assessment occurred cell front due to the patient refusing to attend a confidential session. The PC indicated that the patient's mental health need was impulsivity that led to RVR incidents, but no additional information was provided; that same statement was also used for another RHU patient at NKSP, and it indicated a lack of individualized assessment of the patient's treatment needs. The assessment of the patient's mental health history was limited and was copied from a 2020 initial assessment. That previous documentation indicated the presence of daily auditory hallucinations and treatment with Zyprexa and Depakote.

It was also noted that in the documentation in another RHU patient's healthcare record, the treatment plan section in the initial IDTT documentation was not completed. Similarly, the documentation in the clinical summary section stated verbatim that treatment would target "reducing and constructively managing impulsive behaviors" and would be "achieved by replacing unproductive coping skills with more effective coping skills, including cognitive behavioral coping techniques." The use of that repetitive terminology in several patients' healthcare records indicated that the treatment provided was not individualized.

The initial psychiatric assessment occurred cell front due to the patient refusing to attend a confidential session. There was no documentation that attempts were made to encourage the patient to attend the session. The patient was not prescribed psychotropic medication and denied any psychiatric symptoms. The psychiatric documentation appropriately indicated that the examination was limited due to the patient's refusal to participate in a full mental health assessment.

The two required routine primary clinician contacts occurred cell front due to the patient refusing to attend a confidential session. There was also no documentation that attempts were made to encourage the patient to attend the session. During both contacts, the patient indicated that he did not have any mental health treatment needs and requested removal from the EOP. No further assessment or discussion was documented by the PC.

**Findings**

The care and treatment provided to this reception center EOP patient was inadequate.

The PC and psychiatric contacts occurred exclusively at the cell without assessment of the reasons for refusal or encouragement provided for the patient to attend treatment in a confidential setting. The initial PC assessment did not adequately document the patient's mental health history and treatment needs; relatedly, treatment planning did not target the patient's treatment needs. Further assessment of the patient's reason for requesting discharge from the EOP was indicated.

**Patient CC**

This 25-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP. He was provided a diagnosis of major depressive disorder; however, sufficient clinical criteria or rationale were not provided for the provision of that diagnosis. The patient was not prescribed psychotropic medication.

The patient was placed in the RHU on March 8, 2024 upon return to CDCR, as he was classified as max custody status at the time of his previous prison release.

The patient was referred to the CIT on March 8, 2024, reportedly due to the need for clearance for RHU placement. During the SRASHE, the patient reported suicidal ideation in the past month but no suicidal ideation or plan at the time of the assessment. He was assessed with moderate chronic and low acute suicide risk and was placed in RHU. The documentation indicated that he reported feeling severely depressed and anxious with disturbed sleep. Clinical interventions were not offered to assist the patient in managing his distress. He declined a psychiatric referral; however, the clinician submitted a referral if the patient changed his mind.

The initial PC assessment documentation indicated that the patient's primary treatment need was depression. Documentation from a prior CDCR term in 2021 was copied into the initial PC assessment; however, no conceptualization or integration of that history with the patient's current status occurred.

The patient refused the initial psychiatric assessment, and he was seen at cell front. The psychiatric documentation did not include a sufficient review of the patient's mental health history or recent mental health documentation, despite the patient's previous CDCR incarceration.

Of note, the county jail documentation and initial health screening indicated the presence of auditory hallucinations; however, that important information was not referenced in any mental health documentation, and it was unclear if the mental health providers were aware of that information.

The treatment plan section of the IDTT documentation did not include the development of treatment goals and interventions. A generic plan to target depression and passive suicidal ideation was included in the body of the IDTT documentation.

**Findings**

The care provided to this reception center RHU EOP patient was inadequate.

Although the patient was appropriately referred for a CIT assessment; the clinician failed to provide clinical interventions to assist the patient in managing his distress upon placement in restricted housing. The initial PC and psychiatric assessments lacked sufficient detail to aid in treatment planning, and treatment goals and interventions were not appropriately individualized. An adequate rationale was needed for the provided diagnosis.

**Patient DD**

This 26-year-old transgender EOP patient's healthcare record was reviewed to assess the quality of care provided at NKSP. Various diagnoses were present in the healthcare record. The PC provided a provisional diagnosis of major depressive disorder, recurrent with psychotic features. In contrast the diagnoses of record in EHRS were borderline personality disorder and unspecified ADHD. Additionally, the psychiatric diagnoses varied by provider and included unspecified schizophrenia spectrum and other psychotic disorder, anxiety, psychosis, and ADHD, with a provisional diagnosis of seasonal affective disorder, bipolar type. The patient was prescribed Celexa and Strattera.

The patient returned to CDCR on December 8, 2023 and was placed in the RHU on December 15, 2023 after she received an RVR for battery on a peace officer.

The initial psychiatric assessment was thorough and included relevant clinical information and a useful clinical summary of the patient's current presentation. Celexa and Strattera were continued at that visit. The patient was followed consistently with routine psychiatric contacts, and her medications were adjusted as needed with documented rationale for medication changes.

The initial PC assessment documented the patient's history of psychosis, delusions and suicidal ideation and behavior. Despite those treatment needs, the initial RHU PC assessment stated that her primary treatment need was problematic impulsive behavior. Additionally concerning was similar documentation regarding the patient's treatment needs that was also documented in another RHU patient's healthcare record that stated plans for "reducing and constructively managing impulsive behaviors" that would be "achieved by replacing unproductive coping skills with more effective coping skills, including cognitive behavioral coping techniques." The treatment plan section in initial IDTT documentation was not completed. In the absence of adequate clinical documentation; it appeared that the primary clinician contacts were not indicative of meaningful therapeutic contacts or useful for continuity of care.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The patient's treatment needs were not targeted in treatment; instead, treatment planning was not individualized with the use of generic and formulaic language that was observed in other patients' healthcare records. Diagnostic clarification with clinical rationale was indicated.

**Patient EE**

This 40-year-old reception center EOP patient's healthcare record was reviewed to assess the quality of care provided. He was provided a diagnosis of unspecified anxiety disorder. The patient was not prescribed psychotropic medication.

The patient transferred to NKSP on December 14, 2023, and two weeks later, he was placed in the RHU.

This patient's current treatment needs were unable to be determined from the clinical documentation. The initial PC assessment completed on January 2, 2024 included limited information regarding the patient's current treatment needs. Further, there were wide discrepancies between primary clinician assessments that were completed less than two weeks apart without explanation. The patient's primary complaint was documented as depression by the RHU clinician. For reasons that were unclear, he was provided a diagnosis of unspecified anxiety disorder. In contrast, the reception center initial PC assessment completed on December 22, 2023 documented a diagnosis of major depressive disorder, severe, with psychotic features with documented symptoms of impulsivity, grandiosity, depression, reckless behavior and insomnia.

The patient refused the initial psychiatric assessment, and the documentation of that contact noted the limited nature of the assessment. Documentation regarding the patient's treatment needs and history was limited and included copied documentation from 2020. Review of the patient's psychiatric history, performed by review of documentation from previous terms, was not completed.

Goals and interventions were not included in the treatment plan section of the IDTT documentation. Instead, a generic goal that targeted depression was documented in the clinical summary section of the IDTT documentation.

The patient was released from the RHU soon after the IDTT meeting.

**Findings**

The care provided to this reception center EOP patient housed in the RHU was inadequate.

The clinical information regarding the patient's historical and current treatment needs was insufficient for treatment planning and continuity of care. The treatment planning was not individualized and was very similar to documentation found in other patients' healthcare records. Diagnostic clarification with sufficient clinical rationale was not documented.

**Patient FF**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care provided after his IDTT was observed. He was provided a diagnosis of unspecified depressive disorder without sufficient rationale for that diagnosis, and there appeared to be no consideration or recognition of an additional EHRS diagnosis of unspecified anxiety disorder. The patient was not prescribed psychotropic medication.

The patient transferred to NKSP in 2022 and was placed in the RHU on March 8, 2024 due to enemy concerns.

There was a lack of clinical information documented in the initial PC assessment regarding the patient's current treatment needs. His primary complaint was documented as depression; however, no details were provided, or discussion documented regarding the impact on the patient's current and recent functioning. There was also no documentation regarding the

patient's treatment during the past year in the mainline 3CMS program which focused on anxiety.

The patient attended his initial psychiatric assessment, and the documentation indicated an appropriate assessment of current symptoms and mental status. Psychoeducation was provided by the psychiatrist. Although the psychiatric documentation was identified as an initial assessment, the documentation did not include a review of the patient's mental health history.

The IDTT documentation was generic and did not include the patient's complaint that his treatment needs were not met while housed in general population. The treatment plan section of the IDTT documentation did not include goals or interventions. Instead, generic language that was also present in other NKSP RHU patients' healthcare records that targeted depression was included in the clinical summary of the IDTT documentation.

The patient was not due for a routine PC contact at the time of the healthcare record review.

**Findings**

The care provided to this 3CMS RHU patient was inadequate.

The treatment planning was not individualized, and the patient's prior treatment needs for anxiety were not addressed. The rationale for the provided diagnosis was lacking and discrepant with the EHRS diagnosis. The initial psychiatric assessment was analogous to a routine psychiatric contact, as it lacked the comprehensive information required for an initial assessment.

**Patient GG**

This 38-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at NKSP. Prior to the MHCB admission, the patient received mental health services at the EOP level of care. He was provided a diagnosis of schizoaffective disorder, bipolar type. At NKSP, he was diagnosed with mood disorder and opioid use disorder and was prescribed Seroquel and Vistaril.

The patient was admitted to NKSP MHCB on or around October 25, 2023 due to danger to self concerns. The patient reported a desire to hang himself or to overdose on fentanyl, and he informed the evaluating clinician that he was being targeted by custody staff for filing a lawsuit during a prior term.

The patient's reported psychiatric symptoms included depression, hopelessness, and auditory hallucinations. He also received MAT and was prescribed Suboxone.

The required MHCB contacts occurred timely, including the initial and routine PC, psychiatric, and IDTT encounters. Clinical progress notes provided updates regarding the patient's presentation, including significant behavioral concerns; however, the patient refused nearly all clinical contacts during the MHCB stay, including attempts to engage with him at cell front. Notably, the clinicians at times attempted more than one contact daily, but the patient continued

to refuse.  Progress notes also suggested de-escalation interventions were implemented when indicated.

Regarding IDTT meetings, there was no documentation that an initial IDTT meeting occurred in the MHCB.  On November 8, 2023, the IDTT convened for a routine review or "update."  All required disciplines were present on that date.  The IDTT indicated that the patient met higher level of care criteria due to an MHCB length of stay beyond ten days, being unable to function at his current level of care, requiring highly structured psychiatric care with 24-hour nursing supervision, and participating in less than 50 percent of treatment.  The IDTT further indicated that an acute care referral was submitted on November 3, 2023 "based on the totality of the [patient's] assessment and criteria for HLOC…".

While IDTT treatment plans included appropriate targets and interventions; the goals were not stated in measurable terms, and the plans were not modified to include interventions for motivating treatment adherence.  Further, there was no reference to the providers' plans or attempts to clarify the diagnosis, to assess the function of the patient's undesirable behaviors, or to identify the underlying reasons for treatment refusals.

During the 23-day length of stay, the MHCB providers documented the following ongoing concerns: the patient's unwillingness to engage in treatment; persistent endorsement of depression, anxiety, and psychotic symptoms; the creation of a noose in his cell that required new orders for suicide watch; statements about plans for self-harm and/or thoughts of hurting others; inability to identify protective factors; unwillingness to develop a safety plan; and impaired functioning that the IDTT perceived "inhibited his ability to receive treatment and be discharged to a lower level of care."

The documentation indicated that the acute care referral was initially rejected; however, the IDTT appropriately utilized the CCAT process with subsequent acute care acceptance.  On or around November 17, 2023, the patient transferred to the CHCF PIP for acute care.

**Findings**

The overall care provided to this MHCB patient was adequate.

While treatment plans lacked specific interventions to motivate treatment adherence, to clarify his diagnosis, and to understand the underlying motivations for the patient's undesirable behaviors and treatment refusals; the patient's unwillingness to engage with providers at cell front or in a confidential setting limited the effectiveness of several appropriate interventions that were documented in the treatment plans.  All required MHCB contacts were completed timely, and the interventions for ensuring the safety of the patient were appropriate, for example, updating the orders for suicide watch.  The IDTT also referenced meaningful collateral contacts with other MHCB staff, which indicated good collaboration among the various disciplines.  Further, the treatment team appropriately referred the patient to a higher level of care after recognizing that their efforts did not result in progress toward readiness for discharge to outpatient care.

**Patient HH**

This 40-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at NKSP.  The patient was provided diagnoses of "depression" and opioid use disorder; provisional diagnoses of atypical psychosis and unspecified mood disorder were also documented.  He was prescribed Zyprexa, Cogentin, and mirtazapine; and those medications were adjusted in response to the patient's requests and to motivate adherence during the MHCB admissions.  The patient was serving his second CDCR prison term with an EPRD of October 1, 2024.

According to the healthcare record, the patient was admitted to the MHCB on two occasions, both occurred due to danger to self, danger to others, and safety concerns.  The first MHCB admission occurred on February 28, 2024.  The second admission occurred within two days of MHCB discharge to the EOP level of care on March 14, 2024.  On the date of the second MHCB admission, the patient allegedly assaulted another incarcerated individual without provocation.  While the patient endorsed auditory and visual hallucinations, the MHCB staff did not document objective signs of psychosis during either admission.

The MHCB treatment plan included pertinent information about the patient's history, mental status, functioning, progress over time, and perceived obstacles to discharge.  Although IPOCs were not clinically useful, the IDTT developed more individualized treatment plans with appropriate interventions and targets in a narrative section of the form.  The treatment goals, however, were not stated in measurable terms.

The PC and psychiatrist completed their initial assessments timely during both MHCB admissions.  The documentation indicated that there was a missed initial IDTT meeting for the first MHCB admission and a missed daily provider contact on March 10, 2024.  Otherwise, daily contacts and IDTT meetings occurred timely with all required disciplines present.  The custody sergeant and the MHCB acting supervisor also attended the IDTT meetings.

Individual provider progress notes offered detailed updates regarding the patient's reported symptoms, as well as provider's observations that supported or conflicted with the patient's self-report.  Progress notes also confirmed that interventions were implemented in accordance with treatment plans, including for medication adjustments, teaching distress tolerance skills, completing a safety investigation, and developing a suicide prevention safety plan.  The patient's response to those interventions was also routinely updated.

Five SRASHEs were completed between February 28, 2024 and March 21, 2024, the most recent assessed the patient's acute and chronic suicide risk as moderate.  Safety plans were completed, updated, and routinely reviewed.  Post discharge five-day follow-up contacts were also completed daily in the outpatient setting; although notably the patient was readmitted to the MHCB on day one of the first set of discharge follow-ups, and the patient was on day two of the second set of five-day follow-up contacts at the time of review.

During the first MHCB admission, the IDTT documented that the patient's safety concerns mentioned on March 7, 2024 resulted in seeking approval for an extended MHCB stay beyond

ten days to allow for the completion of the custody investigation process. As a result, the IDTT appropriately documented a detailed HLOC non-referral rationale with a corresponding enhanced care plan in lieu of a higher level of care referral. During the second MHCB admission, the patient voiced more general safety concerns on the yard that did not warrant a formal custody investigation. Still, the IDTT collaborated with the custody sergeant to complete an interview and to provide information prior to the second MHCB discharge.

Mental health clinicians completed two RVR MHAs during the MHCB admissions. Both evaluators found that the patient's symptoms did not influence his behavior during the RVR incidents. Notably, the first RVR MHA interview occurred at cell front for reasons that were not documented.

The IDTT recommended EOP level of care at the time of both MHCB discharges. At the time of the second discharge, the IDTT also added the patient to the SRMP list for closer monitoring. The two MHCB discharge summaries included detailed descriptions of observations and progress during the MHCB stays, sufficient justifications to support discharge readiness, and relevant treatment recommendations for the outpatient team to consider. Unfortunately, the MHCB providers did not clarify the patient's diagnosis, despite extended periods of close observation during MHCB placements.

## Findings

The care provided to this patient during the two MHCB placements was adequate.

The interventions implemented during the MHCB stays were appropriate for the patient's presenting problems, and appeared to be effective in addressing the patient's safety concerns, adjustment issues, and risk of harm to self and others. Further, the clinical documentation provided useful updates on progress over time, which supported the IDTT decisions regarding treatment, monitoring, and level of care placement.

Although improvement was indicated regarding measurable goals in treatment planning, for diagnostic clarification, and in the completion of two contacts; those departures were not so significant that they affected the adequacy of care.

## Patient II

This 33-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient discharged from an intermediate care program on or around August 17, 2023 with four MHCB placements between January 19, 2024 and March 15, 2024. During the NKSP MHCB stays, the patient was provided diagnoses of schizophrenia and unspecified schizophrenia spectrum and other psychotic disorder. His documented symptoms included acute suicidal ideation, auditory hallucinations, hopelessness, anxiety, and depressed mood. He was prescribed Zyprexa, Cogentin, BuSpar, and Vistaril with medication adherence.

On February 9, 2024, the patient transferred from WSP to NKSP for a 12-day MHCB admission due to danger to self concerns. On February 21, 2024, he discharged to the EOP level of care and returned to WSP; however, after 12 days in the outpatient setting, he reported significant distress, hopelessness, and suicidal thoughts with a plan to hang himself. He was readmitted to the NKSP MHCB for a nine-day stay.

The MHCB PC and psychiatrist completed their initial assessments timely. Daily contacts occurred as required, and progress notes for those contacts were sufficiently detailed with pertinent information that allowed for tracking the patient's response to treatment interventions. IDTT meetings also occurred timely, with all required members attending in person.

The IDTT documentation included updated clinical summaries that referenced meaningful collateral information from other disciplines during the MHCB huddles. The IDTT treatment plans targeted distress tolerance, depression, anxiety, and suicidal thoughts. The IDTT appropriately acknowledged positive higher level of care referral indicators of three or more MHCB referrals within a six-month period and treatment refusals. The higher level of care nonreferral rationale was appropriate as were the enhanced care plans developed in lieu of a higher level of care referral. The enhanced care plan included relevant interventions such as teaching mindfulness, grounding techniques, and diaphragmatic breathing. The treatment goals were relevant to the patient's presenting problems but were not consistently measurable.

On March 15, 2024, the IDTT documented a detailed narrative summary of progress and indicated that the patient would again discharge to the EOP level of care. The discharge summary indicated that the patient responded well to therapeutic and pharmacological interventions during the MHCB stay, that his acute symptoms had resolved with stated readiness to engage in EOP treatment at a mainline institution. Further, the IDTT explained that the patient developed a personalized safety plan, wherein he identified protective factors and coping skills, such as his use of faith practices, physical exercise, willingness to engage in treatment, and focus on future goals.

After his second discharge from the NKSP MHCB on March 13, 2024, the patient transferred to a mainline EOP at CIM.

**Findings**

The overall care provided to this MHCB patient at NKSP was adequate.

The MHCB contacts occurred timely, and the clinical documentation provided valuable information, allowing adequate tracking of changes in mental status, responses to treatment intervention, development and implementation of new skills, and overall progress toward discharge. Further, level of care and discharge decisions were justified in the clinical documentation, and enhanced care plans developed in lieu of higher level of care referrals included interventions that addressed the positive referral indicators. While conflicting diagnoses remained unresolved after two MHCB admissions, and goals were not stated in measurable terms; progress notes suggested that providers implemented effective interventions that resulted in stabilization and preparedness for discharge to the outpatient setting.

**Patient JJ**

This 33-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at NKSP. This patient was in the DDP with a designation of DD1. The patient was provided diagnoses of bipolar 1 disorder, antisocial personality disorder, ADHD, and PTSD. Notably, the MHCB diagnoses and rationale were not consistent with the IDTT description of psychotic symptoms or related grave disability concerns during the current admission. He was prescribed Abilify, Cymbalta, Strattera, and Vistaril.

Prior to the MHCB admission, the patient discharged from an intermediate care program at CMF during March 2023. On or around December 23, 2023, NKSP received the patient for MHCB admission due to danger to self, psychosis, and grave disability.

The PC and psychiatrist completed their initial assessments on December 24, 2023. On that date, the patient endorsed grief, depression, command auditory hallucinations to self-harm, and suicidal thoughts involving hanging. The MHCB providers documented grave disability concerns based on the patient's presentation. The IPOC developed on that date indicated that depression would be reduced to four of ten by the next IDTT meeting through fostering a therapeutic alliance.

The initial IDTT meeting and all but one PC contact occurred at cell front during the MHCB stay. The psychiatric progress notes did not indicate whether the contacts occurred at cell front or in a confidential setting.

The patient refused to attend the initial MHCB IDTT meeting at NKSP on December 27, 2023. The IDTT occurred with all required members in attendance. The IDTT notes referenced collateral information from interdisciplinary huddles that indicated that the patient urinated on the floor in his cell. On that date, the patient met three criteria for consideration of referral to a higher level of care, including three or more MHCB admissions within a six-month period, receiving three or more RVR MHAs within a three-month period, and participating in less than 50 percent of treatment. Despite the IDTT documenting multiple HLOC referral indicators, ongoing treatment refusals, worsening mental status during MHCB admission, and apparent inability to function in the outpatient setting based on the frequency of MHCB admissions; the IDTT did not refer the patient to a HLOC, and their nonreferral rationale focused primarily on the patient's newly admitted status.

The enhanced treatment plan developed in lieu of a higher level of care referral on December 27, 2023 listed appropriate targets and interventions, including addressing concerns regarding the patient's inattention to his ADLs. The goals, however, were not consistently stated in measurable terms.

On December 30, 2023, the PC completed a cell front contact and documented that the patient was observed at the back of the cell responding to internal stimuli as they approached the cell and described the patient as manic during the brief cell front encounter. The patient was seen by the psychiatrist on the following day when a brief note was documented indicating that they were "awaiting appropriate duration of successful symptom management." The PC also completed

another cell front contact on that date and documented that the patient was depressed, worried, and stated that other inmates in his unit were banging on the walls, speaking through the vents, and threatening harm or provoking him to harm himself.

The following day, on January 1, 2024, the patient began stating that he was ready for discharge from the MHCB, adding that he was bored in the cell, and stating that he would participate in treatment and take medication if discharged. The PC documented improved cell conditions and attention to ADLs, but there was a lack of sufficient evidence to suggest that the patient's psychotic symptoms had stabilized and that he was ready for discharge to the outpatient setting, especially considering his decompensated mental status during the preceding two-day period.

On January 3, 2024, the IDTT convened for a second time to discharge the patient to EOP level of care. The IDTT meeting did not occur timely, but the patient did attend as well as all required members. During that IDTT meeting, the providers observed that the patient was missing his eyebrow hair and noted that in response to being asked about his eyebrows; the patient became defensive and stated that it was unrelated to a mental health issue. Notably, there were no follow up questions to explore the patient's concerning statements two days prior or further questions to understand the underlying reason for his missing eyebrows and defensive response. The IDTT also did not discuss or modify the patient's diagnoses on that date. The IDTT documented that the patient met three HLOC referral indicators with the addition of an MHCB length of stay beyond ten days. The IDTT indicated that the patient's length of stay beyond ten days was due in part to staffing limitations during the holidays.

The patient was discharged from the NKSP MHCB to the EOP level of care on January 3, 2024. Approximately one day later, the patient was re-referred to the MHCB level of care while at CSP-Corcoran. By March 2024, the patient transferred to the CHCF PIP for intermediate care due to decompensated mental status, which included acute psychotic symptoms and impaired functioning.

**Findings**

The care provided to this MHCB patient was inadequate.

Based on this review, it was not surprising to learn that the patient was re-referred to the MHCB one day after discharge and subsequently referred for intermediate care. Despite the IDTT documenting that the patient was stable and ready for discharge, progress notes leading up to that date suggested otherwise. The patient's diagnoses were not clarified, he had not participated in treatment, he was observed responding to internal stimuli and described as manic three-days prior, and he presented as depressed, anxious, paranoid, and delusional only two-days prior. The MHCB providers' assessments and interventions were limited by cell front encounters, and they failed to ask necessary follow-up questions, including determining the status of the patient's psychotic symptoms prior to discharge and exploring whether the content of the patient's perceptual disturbances increased his risk of harm to himself or others. Further, the follow-up IDTT meeting did not occur timely, and the level of care rationales including HLOC nonreferral rationales were insufficient. There was a strong case for a HLOC referral at the time of the

initial IDTT meeting; however, this was seemingly ignored based on the patient's new arrival status.

**Patient KK**

This 50-year-old MHCB patient's healthcare record was reviewed to assess the quality of care provided at NKSP. The patient was provided diagnoses of schizoaffective disorder bipolar type versus depressive type and PTSD. He was prescribed medications to address psychotic, mood, and PTSD related symptoms, including Haldol, Cogentin, Depakote, and prazosin. Those medications were adjusted during the MHCB stay, and Vistaril was subsequently prescribed for anxiety.

The patient discharged from the SVSP PIP intermediate care program to the EOP level of care during March 2021. He arrived at NKSP on or around July 5, 2023, and was admitted to the NKSP MHCB on August 11, 2023 due to danger to self. Prior suicide risk assessments described the patient as a poor historian, explaining that while there were no recorded or confirmed self-harm incidents or suicide attempts; the patient previously reported a serious suicide attempt in 2012 or 2013, when he cut his neck artery.

During the MHCB admission evaluation, the patient endorsed suicidal thoughts, safety concerns that exacerbated his psychiatric symptoms, and severe symptoms of anxiety and depression. At that time, the patient self-rated his depression and anxiety at nine of ten, with ten representing the highest intensity level. Progress notes also referenced intermittent endorsement of auditory hallucinations, but the treatment team did not observe objective signs of psychosis. The patient attributed his PTSD symptoms which included flashbacks, insomnia, and avoidance behaviors, to prior assaults when he was homeless in the community. Regarding the patient's safety concern, he explained that two gang members threatened him based on the nature of a prior conviction.

The PC completed their initial assessment timely on August 11, 2023. The MHCB psychiatrist completed their initial assessment on a progress note dated August 13, 2023. Required routine MHCB contacts also occurred timely, including the IDTT meetings, PC and psychiatric contacts.

On August 12, 2023, the IDTT convened with all required members in attendance and developed one IPOC for danger to self with a plan to reduce the severity of suicidal thoughts to a rating of two or below by the next IDTT meeting. On August 14, 2023, the IDTT also developed a discharge planning IPOC. The patient met one positive HLOC referral indicator on that date, and the IDTT documented an enhanced care plan in lieu of an inpatient referral. That plan primarily focused on addressing the patient's safety concerns through collaboration with the custody sergeant. Although the master treatment plan form did not include an adequate care plan, a more comprehensive treatment plan with relevant interventions was included in the providers' daily progress notes.

Records confirmed that on or around August 14, 2023, a custody sergeant completed an investigative interview with the patient. The patient subsequently reported to his PC that he was grateful for the opportunity to speak with the sergeant, and the intensity of his reported symptoms decreased during subsequent encounters.

The MHCB clinical documents suggested that the patient regularly attended to his ADLs, actively participated in treatment, and remained medication adherent. After meeting with the psychiatrist on August 14, 2023, the patient consistently denied thoughts of self-harm. By the date of his MHCB discharge on August 21, 2023; the patient had developed a detailed and personalized safety plan with the PC, expressed motivation to continue participating in mental health services at the EOP level of care, and had reportedly evidenced positive coping mechanisms such as meditation, deep breathing, grounding mechanism, mindfulness, and gratitude.

Regarding confidentiality, all but one of the routine PC contacts were completed at cell front during the patient's ten-day MHCB stay. While the PC attributed cell front encounters to the patient's quarantine status through August 15, 2023, the cell front contacts continued despite the MHCB psychiatrist intermittently documenting confidential contacts beginning on August 16, 2023. While the PC did not consistently document a reason for the ongoing cell front contacts after August 15, the PC did indicate in one note that it was due to a lack of available confidential space. The MHCB psychiatrist met with the patient in a confidential setting on August 16, August 20, and August 21, 2023, but did not indicate whether the session occurred in a confidential setting on August 19, 2023.

The discharge SRASHE, completed on August 20, 2023, assessed the patient with high chronic and low acute suicide risk. The safety plan was reviewed and updated on that date as well.

The IDTT discharged the patient to the EOP level of care on or around August 21, 2023. The level of care decision was justified and based on goal attainment. The discharge summary provided a sufficient summary of the patient's MHCB stay and included recommendations for the outpatient treatment team to consider.

The required discharge five-day follow up contacts were completed timely at NKSP after the patient discharged from the intermediate care program during July 2023 and after his MHCB discharge during August 2023.

**Findings**

The overall care provided to this MHCB patient was adequate.

This review revealed problems with IDTT treatment plan documentation and confidential contacts, as well as doubt regarding the effectiveness of the PC's interventions implemented at cell front throughout the MHCB admission. Notably, some but not all cell front contacts occurred due to the patient's quarantine status. However, mental health contacts occurred timely, and progress notes provided meaningful updates regarding the patient's mental status. The clinical documentation also confirmed that the patient's safety concerns were addressed through coordination with the custody sergeant, that medications were adjusted and monitored, and that prior to discharge the patient voiced readiness for EOP care, resolution of safety concerns, and improvements in symptoms based on self-ratings. The PC also developed a

detailed and personalized safety plan with the patient prior to discharge, and discharge five-day follow-up contacts were completed timely at NKSP.

As patients had a right to privacy during mental health encounters, NKSP providers should have consistently documented nonconfidential encounter reasons and attempted to follow up later when the one confidential mental health office in the MHCB was occupied.

## **APPENDIX C**

## **SPECIAL MASTER'S ACTIVITIES**

**ACTIVITIES OF THE SPECIAL MASTER <u>SINCE</u> THE FILING OF THE THIRTIETH ROUND MONITORING REPORT – PART C: ON DECEMBER 22, 2023, ECF NO. 8095**

**DATA REMEDIATION ACTIVITIES**

- Business Rules and Methodology Review Workgroup – 39 meetings
- <u>Indicator Status</u> (as of August 16, 2024)
  - o  Remediated (Validated and Verified):    160
  - o  Not yet in BRMR:    17
  - o  In BRMR    42
  - o  After BRMR    40
  - o  Pending Remediation    6
  - o  Disputes Pending    2
  - o  Total Number of KPIs:    267

**COURT COORDINATION MEETINGS**

- Four meetings

**CDCR POLICIES/MEMOS RELEASED IN 2024**

- *Update to the Process for Conducting Supervisory Reviews of Inpatient Discharge Safety Plans*, Issued to the field February 1, 2024
- *Use of Psychology Practicum Students and Social Work Interns in the Provision of MH Services*, Issued to the field February 15, 2024
- *Keep On Person Medication at Minimum Support Facilities*, Issued to the field May 8, 2024
- *Documentation Expectations for Suicide Risk Assessment and Self-Harm Evaluation Following Emergent and Urgent Mental Health Consultations*, Issued to the field May 29, 2024

**SPECIAL MASTER REPORTS ISSUED IN 2024**

- Special Master's Report on His Expert's Sixth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Re-Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs, Filed March 1, 2024, ECF No. 8143
- Special Master's Report and Proposed Telemental Health Policy, Filed March 21, 2024, ECF No. 8165