# EXHIBIT A

**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:  (916) 445-9555
Telephone:  (916) 210-7318
Facsimile:  (916) 324-5205
E-Mail:  Elise.Thorn@doj.ca.gov

June 28, 2024

*VIA ELECTRONIC MAIL*

Matthew A. Lopes
*Coleman* Special Master
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1201 Atwood Avenue
Johnston, RI 02919

RE:     *Coleman v. Newsom*, Case No.2:90-CV-00520 KJM-DB (PC)
        Defendants' Objections to the Draft Thirtieth Round Monitoring Report – Part D

Special Master Lopes:

Defendants are in receipt of the Special Master's draft Thirtieth Round Monitoring Report – Part D ("Draft Report") pertaining to the California Department of Corrections and Rehabilitation (CDCR) Institutions with Correctional Clinical Case Management System (CCCMS) Programs compliance with Provisionally Approved Plans, Policies, and Protocols. The Draft Report's findings in Part D are based on site visits at 13 CDCR institutions. (Draft Report at 2.)[1] The Special Master did not provide any formal recommendations and did not request the Court to issue any additional orders.

Defendants offer the following comments and requests that the Draft Report be revised accordingly.

---

[1] The thirteen institutions are: Avenal State Prison (ASP); California Correctional Institution (CCI); California Institution for Men (CIM); California Rehabilitation Center (CRC); California State Prison – Solano (SOL); Correctional Training Facility (CTF); Folsom State Prison (FSP); High Desert State Prison (HDSP); North Kern State Prison (NKSP); Pelican Bay State Prison (PBSP); Pleasant Vallery State Prison (PVSP); Sierra Conservation Center (SCC); and Wasco State Prison (WSP).

Matthew A. Lopes
June 28, 2024
Page 2

I.  Defendants Maintain Several Standing Objections to the Special Master's Monitoring
     Round Reports.

Defendants have several concerns regarding the Draft Report's findings of "adequacy" of care, parsing of staffing data, sample sizes, and compliance thresholds.  The below objections include some new and renewed objections based on the facts and findings presented in the Draft Report.  Defendants do not intend to run afoul of the Court's order precluding the reiteration of past objections by raising the below standing objections now.  However, Defendants respectfully re-state their objections to avoid waiver/forfeiture concerns as to the Draft Report.

A.  The Special Master's Draft Report Improperly Relies on "Adequacy" of Care
     to Determine Defendants' Compliance with the Program Guide.

Defendants object to the Special Master's statements regarding adequacy of care as it conflicts with prior Court orders which specify that the Special Master's role is to measure compliance with remedial plans and not the quality of care, which could only be relevant as used as a proxy for constitutional compliance.  In its February 27, 2013 order, the Court ruled that "the Special Master is not tasked with assessing whether the State's prison mental health care system satisfies constitutional standards."  (ECF No. 4361 at 2) (internal quotations and citations omitted.)  The Court further clarified, "that assessment is for this court. . . [and] the Special Master's task is to measure the State's compliance with 'any remedial plan that this court may order.'" (*Id.*) (*quoting* Order of Reverence at ¶¶ 4-5.)  Yet, in the Draft Report, the Special Master purports to evaluate the constitutionality of the mental health care provided by Defendants in direct contradiction to the Court's order specifically directing otherwise.

Defendants do not dispute that the Coleman remedial plans, including the Program Guide, instruct the Special Master's evaluation; however, any comments regarding the adequacy of care are inappropriate given the Court's directive that only the Court makes those determinations. (*See* ECF No. 4361 at 9 ["Because the Revised Program Guide is the operative remedial plan in this action, the degree to which defendants have implemented the requirements of the Revised Program Guide is extremely relevant and useful to assessment of whether they are meeting their constitutional obligations."].)

The Draft Report contains many findings of "inadequacy" or "non-compliance" without an explanation of the standard used to make such a determination. For example, Section II(C) of the Draft Report provides the Special Master's summary of the overall quality of care reflected in case reviews. The Draft Report states:

> Of the records reviewed, 81 patients, or 29 percent, were determined to have received adequate care. An additional 25 patients, or nine percent, were found to have received care that was marginally or minimally adequate, meaning that the monitor's expert found concerns within the cases that bordered on inadequacy (e.g., absence of required IDTT meetings, failure to provide clinical contacts required by the Program Guide, little evidence of adequate clinical interventions beyond medications). The majority of patients (177 cases, or 63 percent) received inadequate care.

Matthew A. Lopes
June 28, 2024
Page 3

(Draft Report at 31.)

To fully understand the Special Master's findings, the parties and the Court must understand what criteria must be met for the Special Master's experts to determine whether a patient received "adequate" or "marginally or minimally adequate" care. Presumably those determinations are connected to compliance with Program Guide requirements. But whether that is so and if so, what level of Program Guide compliance is necessary for care to be adequate, marginally or minimally adequate, or inadequate remains unclear. As a result, Defendants find themselves at a significant disadvantage when required to object to the Draft Report.

Despite failing to provide any detail with respect to how adequacy was determined, the Special Master declared that "[a]cross levels of care, the majority of patients received inadequate care." (Draft Report at 32.) It is unclear to Defendants whether these alleged inadequacies are based on the Program Guide, patient harm, or some other metric. To the extent the Special Master has based these findings on patient harm, Defendants respectfully find that, going forward, institutions and providers be notified immediately of any specific "inadequacies" that may undermine quality of care so that they can promptly address them. Defendants are unaware that any such notifications have been provided. Moreover, statements in the Draft Report related to "adequacy" of care are primarily based on "detailed healthcare record reviews", not generally accepted objective measures of appropriate care. (*See* Draft Report at 31.) Other factors, including discussions with providers and patients, must also be considered and it is not clear based on the Draft Report whether the Special Master's experts engaged in those critical discussions.

To provide complete transparency and allow the parties and the Court to fully understand whether the Special Master's findings are supported by the facts, the Draft Report should be revised to provide the specific criteria used to determine whether each patient or requirement reviewed was "adequate," "minimally/marginally adequate," "inadequate," "compliant," or "non-compliant" and how each of those findings/ratings align with the determinations that the Special Master is charged by the Court with making regarding compliance with the Program Guide.

    B. The Draft Report Improperly Parses Registry and Telemental Health Positions from Overall Fill Rates.

Defendants file comprehensive staffing vacancy reports each month. Those reports provide the specific number of allocated mental health staff positions at each institution along with the data that shows the number of filled positions. See e.g. ECF Nos. 8177 and 8254. The monthly reports also provide the total number of statewide vacancies; this is the number used to assess compliance and that actually shows where staff are needed. Since at least 2002, the Court has approved Defendants' use of registry staff to fill vacant positions. (ECF Nos. 1383 and 1774.) Despite this long-standing approval, the Draft Report highlights for the first time civil servant staff vacancies that are actually filled with registry staff and that, as a result, are not in fact vacant positions. Defendants object to the exclusion of registry providers from the vacancy rate calculation.

Section II(A) of the Draft Report titled "Mental Health Vacancy Rates Overall and by Discipline During the Thirtieth Monitoring Round" parses staffing data between on-site civil

service, on-site registry, and telemental health positions which presents different versions of vacancy rates for no apparent purpose. For example, the Draft Report contains statements such as "[t]he 13 institutions reported a total of 47.5 on-site staff psychiatry positions; 23.5 were filled for a 51 percent vacancy rate. The use of 25.44 registry staff reduced the functional vacancy rate to zero." (Draft Report at 20.) This parsing of data, while factually accurate, paints an inaccurate picture of psychiatry staffing at the institutions that does not square with the facts as civil service and registry staff count equally towards CDCR's fill rate. Registry staff counts the same as on-site staff for purposes of calculating vacancy rates under the Program Guide. Use of registry staff is longstanding and accepted by the court. There is no reason to exclude registry providers from any vacancy rate calculation.

Defendants also objects to the parsing of telemental health positions from on-site positions. Several statements in the Draft Report ignore how telemental health and telepsychiatry positions are allocated and filled. All psychiatry, psychology, and social worker line staff positions are determined by applying the ratios required by the 2009 Staffing Plan. Of the positions required, CDCR then allocates those positions as either on-site or telemental health positions based on the historical needs of the institution. Telemental health clinicians are not additional allocations, but rather part of the required line staff allocations. The positions allocated to an institution, either as on-site or telemental health, are fungible and can be used for either on-site or telemental health regardless of which program the positions are allocated to.

Despite CDCR's flexible approach to allocating and filling telemental health positions, the Draft Report attempts to parse those positions from those allocated on-site. For example, the Draft Report states that including the vacant telemental health positions results in a higher functional vacancy rate for the institutions. (*See* Draft Report at 24.) While this is factually accurate, the statements' framing make it seem as if telemental health is creating additional vacant positions when in fact the on-site positions were simply shifted to the Telemental Health Program. Under the 2009 Staffing Plan, the vacancy rate would be the same regardless of whether the positions were allocated as on-site or to the Telemental Health Program.

Defendants also object to statements that incorrectly suggest CDCR is having difficulty recruiting and retaining staff through the Telepsychiatry Program and do not accurately reflect the positive impact telepsychiatry has on the overall psychiatry fill rate. The Draft Report finds that "CDCR had difficulty filling telepsychiatry positions at some institutions…. resulting in a 22 percent overall vacancy rate." (*Id*. at 22.) The Draft Report specifically notes that "CIM and CCI reported vacancy rates at 50 and 89 percent, respectively" and that "HDSP, NKSP, and WSP reported vacancy rates between 20 and 25 percent…." (*Id*.) The Draft Report then acknowledges that the Court and the Special Master support the use of telepsychiatry and that it has been helpful in reducing psychiatry vacancies, but in the next breath states that "if CDCR is unable to fill and maintain a low vacancy rate for all of the allocated position in the 3CMS programs where they are permitted by the court-approved policy to use it freely, it is clearly not a panacea but only one aspect of what needs to be a larger more comprehensive strategy to reduce psychiatry vacancies." (*Id*. at 23.) This conclusion is not factually correct and fails to recognize that the matter concerning Defendants' ability to use telepsychiatry to its fullest extent is not settled.

In February 2024, the fill rate for line staff psychiatrists, including on-site (civil service and registry), telepsychiatry, and Psychiatric Nurse Practitioners, at the thirteen institutions included in the Draft Report was 98 percent. (ECF No. 8177 at 5.) This means that across the thirteen institutions there were only 1.26 psychiatry positions vacant. With an overall vacancy rate of two percent, it is clear that any statement that psychiatry staffing is inadequate or that CDCR is struggling to hire psychiatrists is unsupported. While it is correct that there was a 22 percent vacancy rate for telepsychiatry positions at the thirteen institutions combined, this percentage ignores the fact that several institutions hired more on-site staff than allocated. For example, CCI, which is highlighted in the Draft Report as having an 89 percent vacancy rate for telepsychiatrists, had a line staff psychiatrist fill rate of 119 percent in February 2024. (*Id.*) CCI had 4.07 on-site psychiatrist positions filled, despite only being allocated 2.50 positions. (*Id.*) The sole position allocated to telepsychiatry was filled with a 0.11 telepsychiatrist. (*Id.*) Similarly, both NKSP and WSP hired more on-site psychiatrists than they were allocated, resulting in fewer telepsychiatry positions being filled. (*Id.*) Regardless, NKSP and WSP had line staff psychiatry fill rates of 99 percent and 95 percent respectively. (*Id.*) Thus, any vacancies in the allocated telepsychiatry positions do not reflect a challenge in filling psychiatry positions. The Draft Report overlooks that the telepsychiatry vacancies at most institutions are a direct result of CDCR having more onsite psychiatrists, something CDCR always prioritizes and which CDCR understood was the Special Master's (and Plaintiffs') preference.

The Draft Report's conclusion also misconstrues the court-approved Telepsychiatry Policy. The Telepsychiatry Policy does not allow free use of telepsychiatry at the CCCMS level of care. Instead, the Telepsychiatry Policy states that "[t]elepsychiatry may replace on-site psychiatry at the CCCMS level of care provided all other conditions pertaining to the CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue." (ECF No. 7826-1 at 4.) CDCR continues to take good faith efforts to recruit on-site psychiatrists at all levels of care as evidenced by institutions continuing to hire on-site staff above what is allocated and is in fact abiding by that policy.

Defendants object to the parsing of telepsychiatry vacancy rate from the total psychiatry fill rate because it ignores CDCR's flexible use of telepsychiatry and the success in filling more on-site staff than allocated. Defendants also object to the misstatement about the court-approved Telepsychiatry Policy and the psychiatry fill rates across the thirteen institutions. Defendants request that the Draft Report be revised to remove the criticisms regarding telemental health fill rates and the unsupported conclusions regarding CDCR's use of telepsychiatry and that program's level of success in increasing the staffing fill rates.

C. The Draft Report Should Clarify Whether the Sample Size was Adequate to Provide a Representative Sample of the Population in Question.

Sample sizes have been a topic of numerous discussions in data remediation. While discussions are ongoing, the Special Master's data expert has generally recommended that the sample size for each indictor include review of at least 30 patients or requirements per institution (and sometimes level of care) to provide a representative sample from which conclusions can be drawn. And he has cautioned that a sample smaller than 30 runs the risk of providing information that is not representative of what is happening across the population in question.

Despite the data expert's recommendations regarding sample sizes, many of the findings in the Draft Report are based on a review of only 20 patients per level of care. Even then, in many instances not all 20 patients in the sample required the contact or service measured, so the sample size was further reduced. For instance, in the Special Master's team's review of 20 CCCMS patients at CRC, only seven patients required initial primary clinician evaluations. (Draft Report at 302.) And of those seven, six were completed timely, resulting in an 86 percent compliance score. (*Id.*) Thus, the Special Master concluded that CRC was 86 percent compliant with CCCMS initial primary clinician evaluations based on a review of only seven patients, although the CCCMS population at CRC on January 22, 2024 (the day before the Special Master's tour began) was 1,300 patients. (*Id.* at 289.)

Some sample sizes were even smaller. Only two CCCMS patients of the 20 reviewed at CTF required an initial psychiatry evaluation and were evaluated to determine timely compliance with this requirement, despite CTF having a population of 882 mainline CCCMS patients shortly before the Special Master's monitoring tour. (*Id.* at 311, 330.) And only three CCCMS patients of the twenty reviewed at CIM required an initial Interdisciplinary Treatment Team (IDTT) and were evaluated to determine timely compliance with this requirement, despite CIM having a population of 781 mainline CCCMS patients shortly before the Special Master's monitoring tour. (*Id.* at 97, 114.) All compliance findings related to timeliness of initial and routine primary clinician and psychiatry contacts, as well as initial and routine IDTTs were based on a review of twenty patients or fewer. In some cases, such as Mental Health Crisis Beds (MHCB), this may be a sufficient sample size, but in most cases the sample size falls well below what has been recommended by the Special Master's own data expert. Yet, despite the small sample size, these reviews were used to support generalized findings across the levels of care and institutions. The Draft Report should be revised to include an explanation for the use of that sample sizes smaller than what the data expert recommends, and how that number meaningfully represents what is happening in the institution or population in question.

In addition to the above, the Draft Report omits any information regarding the identity of the 20 or fewer patients reviewed at each level of care at each institution. Therefore, CDCR is unable to confirm the findings of fact in the report or correct the record, where necessary. This is especially concerning for institutions such as at WSP where the Special Master found that thirteen mainline CCCMS patients required routine psychiatry contacts and seven of those contacts did not occur at all. (Draft Report at 391.) Also, at SOL, where the Special Master found that one MHCB patient of the 20 reviewed did not receive an initial primary clinician evaluation, yet all 20 patients received routine primary clinician contacts and 96 percent of those were timely. (*Id.* at 233.) Without information regarding which patients were reviewed, including the timeframe of the review and the level of care, CDCR does not have the information available to properly review and comment on the Draft Report. Defendants request the Special Master provide the names, CDCR numbers, institution, timeframe, and level of care for each patient reviewed to assess compliance with Program Guide timeframes. Defendants also reserve the right to provide additional objections once this information has been provided and reviewed.

    D.   The Draft Report Should Revise References to Medication Administration
Process Improvement Program (MAPIP) Measures to Remove the 90 Percent
Threshold and More Thoroughly Explain the Methodology.

As noted in the Draft Report, "joint efforts by the Coleman Special Master and the Plata
Receiver to improve medication management requirements led to the creation of the Medication
Administration Process Improvement Program (MAPIP) audit tool." (Draft Report at 51.)
Similar findings about the development of MAPIP are found in past monitoring reports,
including the Twenty-Second, Twenty-Third, Twenty-Fourth, Twenty-Seventh, Twenty-Eight
and Thirtieth Round, Part C. (ECF Nos. 3990 at 305, 4124 at 18, 4205 at 25, 5779 at 77, 7045 at
125-126, and 8095 at 83.) Thus, the Special Master's team is very familiar with the MAPIP
measures.

In total, there are currently at least 10 Medication Management indicators and 42
Diagnostic Monitoring indicators that are part of MAPIP. Per the Draft Report, "MAPIP
compliance of 90 percent or better for a psychiatry measure indicated compliance." (Draft
Report at 54.) Instead of looking at the composite indicators available and determining overall
compliance, the Special Master requires 90 percent compliance with each individual measure for
each month of the review period. (*Id.* at 54-55. ("Notably, not one of the 13 institutions reported
compliance with all applicable psychiatry measures or every month of the review period.")

Defendants object to the application of a 90 percent threshold for both MAPIP sub-
measures and composite measures because the indicators count patient refusals as non-
compliant. This is clear in the documentation for each MAPIP measure which is available on the
CCHCS Dashboard Glossary. (Dashboard-Glossary - CCHCS (ca.gov)) (last visited June 27,
2024.) For example, the definition for the Diagnostic Monitoring Measure for Antipsychotics:
Blood Sugar indicator is the "[p]ercentage of patients prescribed Antipsychotics who received
appropriate blood sugar (Hemoglobin A1c, Fasting Blood Glucose, or Random Blood Glucose)
monitoring that came due within the measurement period." (*Id.* (emphasis added.)) Patients
generally have a right to refuse medical tests or treatment, and such a refusal should not be
counted as part of Defendants' compliance. Staff could do all that is required of them and still
be counted as non-compliant if the patient refused the medication or lab work. Such a high and
unreasonable threshold for compliance with these measures is inappropriate.

    E.   The Standard of Review for Special Master Reports is a *De Novo* Review.

Defendants maintain the appropriate standard of review for the Special Master's reports
is a *de novo* review due to the extensive revisions to Rule 53 of the Federal Rules of Civil
Procedure after the issuance of the Order of Reference. (*See* ECF No. 8179 at 11-12.)
Defendants acknowledge the standard of review is a matter for the Court, not the Special Master,
but include this in our informal objections to preserve the argument for formal objections before
the District Court and Ninth Circuit as necessary.

    II.    Defendants are not Intentionally Impeding the Special Master's Ability to Monitor
Compliance.

Defendants understand and respect the role the Special Master plays in this case.
Defendants do not now and never have intended to obstruct the Special Master's ability to

Matthew A. Lopes
June 28, 2024
Page 8

monitor compliance pursuant to the Order of Reference, but rather aim to assist the Special Master in completing his obligations by providing the most transparent, accurate, and consistent data possible, and to move data remediation towards completion.  CDCR continues to develop methods to improve its responses to the Special Master's requests for data in advance of prison tours and looks forward to using remediated data once the data remediation process concludes.  But Defendants object to the Special Master's implication that CDCR is intentionally impeding his ability to monitor compliance, especially with respect to the recent document requests associated with the recently commenced focused EOP tours.  Specifically, Defendants' internal deadlines and prior objections to document requests were not intended to "obstruct[] . . . the Special Master's performance of his court-ordered responsibilities" (Draft Report at 18.), and the former were intended to move the process forward expeditiously, as the Court has urged.

At the end of federal court oversight, Defendants will be required to operate the Statewide Mental Health Program following the court-ordered data remediation process and its results.  CDCR has continued to work with the Special Master's team in response to the focused EOP document requests and has committed to creating a more robust review process for the production to ensure consistency and accuracy of the data and documentation.  CDCR also continues with routine data remediation meetings and emails to remediate indicators as quickly as possible and to resolve disputes at the lowest level possible.  CDCR will continue to work in good faith with the Special Master.  As such, Defendants respectfully request that the Special Master revise the Draft Report to exclude pages 8 to 19 of Section I(B).  Alternatively, if the Special Master decides such a discussion is necessary, the Draft Report should be revised to include the necessary context as detailed below.

    A.  The Draft Report Should Exclude Discussion of the Focused EOP Document Request Discussions or Be Revised to Include Historical Context of How Documents Are Produced.

The Draft Report contains a multipage discussion of the correspondence and discussion regarding the Special Master's recent document request for the focused EOP review tours.  The Draft Report concludes that "defendants' pattern of behavior comes dangerously close to the obstruction of the Special Master's performance of his court-ordered responsibilities." (Draft Report at 18.)

Defendants take the comments about obstruction seriously and are dismayed by the tone and posture taken in the Draft Report that compares Defendants' attempts to clarify and reconcile the Special Master's requests to prior litigation.  While CDCR objects to the use of non-remediated data for items where remediated data is available, it has not withheld any documentation that the Special Master has requested or is entitled to access.  Accordingly, Defendants request that the Special Master remove this discussion, which is both inaccurate and inflammatory.

The Draft Report recounts the Special Master's notice to the parties of the focused EOP tours and the truncated document request, noting the anticipation that "this request would be handled in the customary manner…." (Id. at 14.)  Customarily, CDCR has discussed document requests with the Special Master's team, including asking for clarification where needed, notifying the Special Master of requests for which CDCR did not have responsive data, and

requesting changes based on available data. Although these discussions may have been more informal than the letter provided in response to the focused EOP review request, they routinely occurred without Defendants being accused of obstruction. CDCR's intent with the May 1st letter was not to obstruct the Special Master, but to have a conversation about the document request, as has historically happened, to gain clarity and to provide the most accurate, transparent, and responsive information possible. However, even with these clarifying discussions, the "customary manner" of providing responsive data to prior document requests has led to missing data and inconsistent document and data production between institutions. This was highlighted in recent monitoring reports, including the Draft Report. (Id. at 46, 66; ECF No. 8095 at 145, 188, 278.)

The "customary manner" of providing responsive data also resulted in the production of data that was not remediated and had underlying business rules that the parties and the Special Master had not reviewed or agreed to. Over the last several years, the parties and the Special Master have been consumed with data remediation; a massive undertaking to "ensure defendants' reports are transparent and accurate." (ECF No. 7847 at 1.) The work done in data remediation has changed all stakeholders' understanding of data and has collectively increased data intelligence. Through this undertaking, as of June 24, 2024, 144 of the currently identified 269 provisionally approved key indicators have been remediated by the Special Master's data expert. Each of those 144 indicators have been exhaustively reviewed and discussed, from the scope of the indicator and the various business rules for the different levels of care, to the sample size for each indicator, and even the underlying questions for the on-site or manual quarterly audits. In addition to the 144 remediated indicators, numerous indicators have been completed validation and programming that are available and could be used to provide transparent and accurate data to the Special Master even while they await remediation.

To provide the most accurate and transparent data in response to the Special Master's most recent document and data request, CDCR sought to provide remediated or at least validated data whenever possible. However, as noted in CDCR's May 1, 2024 letter in response to the Special Master's document request, the document request as drafted was not aligned with how remediated indicators were created in data remediation. (Draft Report Exhibit G.) For example, instead of seeking a summary statistic, such as the percent of IDTTs in a confidential setting with the underlying data, the Special Master requested a spreadsheet by patient name and CDCR number with the dates of all specified contacts, including IDTTs during the reporting period and the confidential or non-confidential nature of the contact. There is a remediated indicator that accurately and transparently provides the topline summary statistic including drill down information that would allow the parties and the Special Master to have consistent and agreed upon data.

Part of CDCR's requests for clarity included standing objections to several of the Special Master's requests. The objections were presented to alert the Special Master to the fact that certain requests fall outside the provisionally approved key indicator list. The Special Master states the "data remediation process is being weaponized as a means to hinder the Special Master's access to needed information." (Draft Report at 15.) CDCR's intent is not to hinder the Special Master, but to provide the most accurate and transparent data possible. The Special Master's data request did not align with the remediated indicators, and CDCR believed it was

incumbent on CDCR to make that clear.  Defendants are concerned that the accusations in the Draft Report suggest the view that Defendants cannot legitimately engage in discourse aimed at providing transparent and remediated data.  To the extent the tone of the communication is the source of concern, Defendants would welcome dialogue with the Special Master and his team about how to improve communication going forward.

The currently identified key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient remedial requirements. (ECF No. 7216.)  Therefore, the 269 currently identified indicators should encompass the information necessary to appropriately monitor CDCR's compliance with the Program Guide and remedial requirements. And Defendants not only have a right to voice concerns as they arise but must do so to preserve future objections, as any delay in raising concerns may be seen as a waiver.

Defendants acknowledge that the Special Master is entitled to records, files, and papers maintained by CDCR under the Order of Reference.  (Draft Report at 14-15.)  During the May 2, 2024 discussion between the Special Master's team and defense counsel, CDCR was clear that the requested information would be provided to the Special Master despite CDCR's objections if the Special Master did not wish to modify the request.  In fact, shortly after that discussion, CDCR provided a requested report that was not part of the data remediation process.  (*See* Exhibit 1, e-mail from Melissa Bentz to Patricia Williams dated May 2, 2024, RE: PBSP and HDSP Current EOP Census.)

CDCR also provided responsive data to the Special Master's requests prior to the focused EOP tour at Pelican Bay State Prison (PBSP).  The Special Master team did not raise any concerns with the document production until the tour exit when the team indicated that it was missing data in response to part of one request and was seeking alternative data for another request.  During the exit, CDCR counsel agreed to look into the issues raised and provide responsive information as soon as possible.  On June 19, 2024, the data discussed in the exit call was provided to the Special Master.  (*See* Exhibit 2, e-mail chain between Melissa Bentz and Patricia Williams dated June 28, 2024 Re: Coleman PBSP Document Production.)  During an internal review of the data, CDCR noticed that a piece of responsive data was inadvertently excluded from the PBSP document request.  Within a day of realizing this unintentional omission, CDCR provided the information to the Special Master's team. (*Id.*)

The Draft Report does not note the historic discussions between the Special Master and CDCR regarding changes to the document requests.  Nor does the Draft Report state CDCR provided the requested data where possible.  CDCR's attempt to provide data that has been validated in the data remediation process cannot be fairly characterized as obstruction, especially where CDCR provides responsive data notwithstanding CDCR's concerns.[2]  Defendants request

---

[2] In response to Defendant's objection that the Special Master should use remediated indicators in future monitoring, the Special Master stated that "he expected Defendants to provide remediated data derived from the provisionally approved key indicators upon conclusion of the data remediation process…." (ECF No. 8095 at 31.) Defendants see no need to wait to provide validated or remediated data when available.

Matthew A. Lopes
June 28, 2024
Page 11

that the Draft Report be revised to exclude discussion of the focused EOP document requests or be revised to remove accusatory language and to include important context.

B. The Draft Report Should Exclude Discussion of the Data Remediation Emails Referenced in Exhibits I and J or Be Revised to Include Additional Relevant Facts.

The Draft Report raises concerns regarding CDCR setting deadlines for requests as part of the data remediation process and paints such actions as an attempt to obstruct the Special Master's monitoring. But the Draft Report omits necessary context on this point. The data remediation process, including the required steps and the proposed timelines were created under the guidance of the Special Master and with input and agreement by Plaintiffs' counsel, including the week-long timeline for review of items released for stakeholder review. *See* Defendants' September 29, 2021 Data Activation Schedule for Data Remediation included the one week timeline. (ECF No. 7334 at 27.) The Special Master's team reviewed the data activation schedule prior to the filing and did not have any concerns with the agreed upon timeline. Defendants have consistently sent emails such as that provided in Exhibit I of the Draft Report over the span of the last two and a half years since CDCR began releasing indicators for stakeholder review as a part of the data remediation process. These deadlines, when taken together, were intended to meet the Court's global deadline for the completion of data remediation. The Special Master's team previously did not raise any concerns regarding the practice or the agreed upon timeline for review. In fact, the Special Master and Plaintiffs generally have provided feedback within the requested week-long window without any complaints. CDCR is disappointed the Special Master waited until now, several years after CDCR began sending out emails with the agreed upon deadline began, to bring forth these concerns and to do so in a draft report without first having raised the concern directly with CDCR.

The purpose of the agreed upon week-long review period is to keep the data remediation process moving along as CDCR cannot complete its' internal review and bring the item to Business Rule and Methodology Review (BRMR) meetings until stakeholder comments from the Plaintiffs' counsel and Special Master are received. However, as more than a year of data remediation meetings has demonstrated, this deadline is flexible. Stakeholder review items are regularly available beyond the agreed upon deadline if either Plaintiffs' counsel or the Special Master's team need more time to review. In fact, the item sent for stakeholder review, AC5.1 Glossary Potential Data Entry Error, was not closed to comments on April 15, 2024. CDCR did not receive comments by the agreed upon date, despite sending several unanswered emails asking if the Special Master intended to provide feedback, so the item was left open for review. (*See* Exhibit 3, May 21, 2024 e-mail from Sundeep Thind to the Special Master team Re: BRMR SM/SH Review Access.) Almost one month after the item was opened for review, the Special Master's team had still not provided comments on the item. (*Id*.) On May 3, 2024, CDCR reached out to the Special Master's team, including the Special Master's data expert, for guidance as to whether the item should be held open so they could add comments or whether the item should be closed so that Plaintiffs' comments could be reviewed. (*Id*.) CDCR did not receive a response.

On May 21, 2024, CDCR reached out again seeking guidance regarding whether the Special Master's team would provide comments on the AC5.1 Glossary item. (*Id.*) On May 28, 2024, CDCR raised the question of what to do with AC5.1 in BRMR, as a response was not received to either of the above emails. The Special Master's data expert stated that no comments were forthcoming as the Special Master's team wanted to take a different approach to all items related to AC5. The item has since been placed on pause while the Special Master determines what group of indicators will be reviewed next.

Similarly, the May 9, 2024 email attached to the Draft Report at Exhibit J was sent over a month after the initial email requesting confirmation that the medication management indicators, which had been in BRMR for over a year and a half, were ready to continue on to the next steps of the data remediation process. After several meetings between CDCR, CCHCS, and the Special Master's team, CDCR and CCHCS were under the impression there were no further concerns regarding the indicator documentation. With the expiration of the Court's March 31, 2024 deadline and the focus of all stakeholders and the court on moving data remediation forward, CDCR was anxious to move these complex items onto programming and verification as those steps were likely to take several months to complete. (Draft Report at Exhibit J.)

In the complex data remediation process, all stakeholders have had delays in responding to requests, emails, or outstanding questions. The goal of setting agreed upon deadlines for all steps of the process is to try to keep it moving forward, not to foreclose discussion of any indicator. As designed, the data remediation process allows review and comments by the Special Master's team and Plaintiffs' counsel at nearly every step. (*See* ECF Nos. 8273 and 8274.) Thus, discussions occur at numerous stages of the process. Ultimately, regardless of a requested response date, indicators do not move forward without agreement from all stakeholders.

CDCR also regularly requests review of other items by a certain date. For example, there is an informal agreement between the parties and the Special Master that policies will be reviewed within 30 days. The Special Master has never raised concerns regarding CDCR's request for comments within 30 days of provision of a draft policy.

The Draft Report does not include any of the above context for the attached emails, including the historical practice of requesting comments by a certain date and the agreed upon one week stakeholder review period. CDCR requests that the Draft Report exclude discussion of the emails attached as Exhibits I and J to the Draft Report or be revised to include all of the facts.

III.    The Draft Report Applies Incorrect Thresholds for Determining Compliance

Several findings in the Draft Report rely on incorrect timelines or requirements. CDCR requests the Draft Report be revised to apply the appropriate Program Guide requirements to the below referenced findings.

A.    MHCB Initial Psychiatry Contacts.

Several individual institution summaries note that timely initial psychiatry contacts for MHCB patients were compliant if they occurred before the initial IDTT and within 24 hours of

arrival. (Draft Report at 135, 206, 233, 388, and 422.)  However, that is not the appropriate standard for initial psychiatry contacts in the MHCB.

The Program Guide requires that a psychiatrist "evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues."  (ECF No. 7333-1 at 85.)  And initial IDTTs for MHCB patients "shall meet within 72 hours of an inmate-patient's admission…." (Id. at 83.)  Title 22, section 79749(a)(2), which set the standard for mental health treatment in licensed Correctional Treatment Centers, requires patients to be evaluated "not later than seventy-two (72) hours from the time staff determines that the inmate-patient requires or may require psychotropic medication."  Neither the Program Guide nor Title 22 require a psychiatrist to conduct an initial contact within 24 hours of patient admission.

Notably, the timeline for initial psychiatry contacts in MHCBs was discussed in the data remediation process in 2023.  All stakeholders, including the Special Master's team agreed that the Program Guide and Title 22 supported an initial psychiatric contact timeline of 72 hours.  The business rule regarding initial psychiatry contacts in MHCB completed BRMR discussions in November 2023.

Defendants request that the Special Master apply the agreed upon and supported timeline for initial psychiatry contacts in the MHCB and correct those findings in the Draft Report.

B.  MHCB Routine Psychiatry Contacts.

As explained above, the Program Guide requires a psychiatrist to "evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues." (ECF No. 7333-1 at 85.)  But the CIM institution summary states that "[s]eventy of seventy-one or 99 percent of routine [MHCB] psychiatry contacts occurred timely every 90 days."  (Draft Report at 110.)  Similarly, the HDSP institution summary states "[a]ll nine weekly routine psychiatry contacts were timely…" (Id. at 135.)  It is unclear whether these statements were simply drafting errors or whether the incorrect standard was applied.  Regardless, CDCR requests that the Special Master ensure the appropriate twice weekly standard was applied and that the Draft Report be revised accordingly.

C.  MHCB Initial Primary Clinician Evaluations.

It is undisputed that initial primary clinician contacts are required in the MHCB within 24 hours of patient admission.  However, the individual institution summary for CIM states that "[a]ll 20 [MHCB] initial primary clinician evaluations occurred timely within 10 working days of arrival and before the initial IDTT."  (Draft Report at 110.)  It is unclear whether this was simply an error in the drafting of the report or whether the incorrect standard was applied.  Regardless, CDCR requests that the Special Master ensure the appropriate 24-hour standard was applied and that the Draft Report be revised accordingly.

### D. Short-Term Restricted Housing (STRH) Routine Primary Clinician Contacts.

The Draft Report finds that of the STRH programs reviewed, "only PBSP complied with timely routine primary clinician contacts." (Draft Report at 89.) However, the institutional summaries make clear that the Special Master applied a 7-day timeline for routine primary clinician contacts in the STRH. (Id. at 134 ("Eighteen STRH patients required routine primary clinician contacts. Of those, 88 patients were timely and occurred at least every seven calendar days."); at 205 ("For routine primary clinician evaluations, 99 percent occurred timely at least every seven calendar days…"); at 278 ("Fifteen patients required primary clinician contacts, 87 percent of which occurred at least every seven calendar days."); and at 385 ("Seventeen STRH patients required routine primary clinician evaluations; 72 percent timely occurred at least every seven calendar days.").)

The Program Guide requires that "[a]ll patients shall be offered a weekly clinical contact with their primary clinician." (ECF No. 7333-1 at 444.) As the Special Master knows, there was a dispute over the definition of "weekly" in the context of primary clinician contacts. (See ECF Nos. 8041; 8057; 8069.) After months of discussion and briefings, CDCR accepted the Special Master's proposal that "weekly" contacts be required to occur "at least once per calendar week, but not exceed ten days between contacts." (ECF No. 8090 at 2.)

The question regarding whether the same definition of "weekly" should apply to routine primary clinician contacts in the STRH/RHU CCCMS was discussed in March 2024. On March 27, 2024, CDCR's Office of Legal Affairs notified the Special Master and Plaintiffs' counsel of CDCR's agreement to apply the definition of weekly contacts previously agreed to RHU CCCMS primary clinician contacts. (See Exhibit 4, e-mail dated June 12, 2024 Re: CDCR Bring back #9.) All stakeholders confirmed agreement with this definition again during the June 12, 2024 BRMR meeting. (Id.)

Given the stakeholder agreements, the Special Master should apply the agreed upon definition of "weekly" for routine primary clinician contacts in the STRH. Alternatively, at a minimum, the Draft Report should be revised to note that the timeline used does not comport with the recently agreed upon definition of "weekly."

### E. Confidentiality of Psychiatry and Primary Clinician Contacts.

The Draft Report states that "[a]ll three institutions [HDSP, PBSP, and PVSP] struggled to achieve compliance with confidential contacts for both psychiatry and primary clinicians." (Draft Report at 89.) The Draft Report also found that some of the three institutions were non-compliant with the confidentiality requirements for initial and routine psychiatry and primary clinician contacts. (Draft Report at 89-90.) Yet, the Draft Report also notes that all non-confidential psychiatry and primary clinician contacts at HDSP and PVSP were attributable to patient refusals. (Id. at 89-90, 133-134, and 278.) Non-confidential psychiatry contacts and initial primary clinician contacts at PBSP were attributable to patient refusals. (Id. at 204-205.) Non-confidential routine primary clinician contacts were attributed to patient refusals, as well as patient's disruptive behavior and unavailable conference space, but a breakdown of how many of

Matthew A. Lopes
June 28, 2024
Page 15

the non-confidential contacts were attributable to something other than patient refusal was not provided.  (*Id.* at 205.)

Non-confidential contacts are still Program Guide compliant if conducted in response to a patient refusal.  (ECF No. 7333-1 at 636 ("Each patient shall be offered individual treatment in a confidential setting. To be considered a clinical contact that meets . . . Program Guide requirements, patients must be seen: 1. In a confidential setting, OR 2. In a non-confidential setting in response to: a. The patient's refusal.")  The findings in the Draft Report regarding compliance with confidential contacts should be consistent with the Program Guide and count non-confidential contacts in response to patient refusals as compliant, unless those contacts were completed by a telepsychiatrist.  However, it is unclear in the Draft Report how many of the non-confidential contacts were completed by a telepsychiatrist.  Accordingly, the Draft Report should be revised to count non-compliant contacts due to patient refusal as compliant.

F.   Patient Attendance at IDTT.

The Draft Report discusses patient attendance at IDTTs as follows:

> "Only PBSP achieved compliance for patient attendance for both initial and routine IDTTs. For initial IDTTs, patient attendance reached 53 percent at HDSP and 42 percent at PVSP. For routine IDTTs, patients attended 50 percent at HDSP; no patients attended at PVSP. Reported reasons for non-attendance were patient refusals."

(Draft Report at 90.)

While patient IDTT attendance may be a useful metric for quality improvement purposes, it is not an approved or required compliance standard.  Patients have a right to refuse treatment.  Therefore, patient attendance due to patient refusals, as noted above, should not be treated as a compliance measure.  The Draft Report should be revised to remove statements regarding compliance with patient attendance at IDTT.

G.   STRH Yard Time.[3]

The Draft Report includes a finding that "[r]eview of a sample of 24 weeks of 114-As for 20 STRH patients indicated 100 percent compliance for offering patients at least 18.5 weekly hours of yard…."  (Draft Report at 204.)  Per the January 15, 2015 policy regarding STRH, "[i]nmates placed into a designated CCCMS-STRH will be offered 18.5 hours per week of exercise out of their cell."  (ECF No. 7333-1 at 452.)  The policy does not limit the required out-

---

[3] The Draft Report finds that MHCB patients were provided "adequate out of cell time" in several places but does not define the term "adequate."  CDCR objects to the application of any out-of-cell time minimum threshold as detailed in Defendants' recent objections to the 6th Re-Audit by the Special Master's suicide prevention expert and to the Special Master's proposed resolution of the data remediation dispute regarding SP15.1 (ECF Nos. 8179 and 8274.)

of-cell time to yard.  The above statement should be revised to indicate that at least 18.5 weekly hours of exercise time was provided.

       H.  Reception Centers (RC) Initial IDTTs.

The Draft Report states "[n]otably, RC patients were placed in RC 3CMS without an IDTT and generally transferred prior to a required annual IDTT." (Draft Report at 416.)  That RC patients were placed in 3CMS without an IDTT is not notable and is misleading as it conflicts with the Program Guide that does not require initial IDTTs for RC CCCMS patients. This was discussed in detail during the review of AC4: Timely IDTTs in data remediation in early 2023 and early 2024.  All stakeholders agreed that RC CCCMS patients are excluded from the initial IDTT business rule in April 2023.

It is also not notable that RC CCCMS patients transfer prior to the required annual IDTT. Per the Program Guide, RC CCCMS patients should transfer to a mainline CCCMS program within 90 days of referral or 60 days, if clinically indicated.  (ECF No. 7333-1 at 19.)  The Draft Report should be revised to remove the above statement

       I.  Confidentiality of IDTTs.

The Draft Report states that the observed IDTTs "were not confidential, as there was a camera in the rooms at NKSP and WSP and officers stood in the room at WSP." (Draft Report at 93.)  This finding disregards the Program Guide.  Placement of the fixed camera in the IDTT room does not render the IDTT non-confidential.  Per the Program Guide "[a] confidential setting affords confidentiality of sight and sound from other inmates and confidentiality of sound from staff members…." (ECF No. 7333-1 at 636.)  Generally, fixed cameras in treatment spaces do not have audio capabilities enabled.  CDCR has confirmed that the audio capabilities of the fixed cameras in the IDTT spaces at WSP are not enabled and the fixed cameras at NKSP were not functional at the time of the monitoring tour.  Therefore, the setting was still confidential as staff members reviewing the footage would only have a visual of what occurred.

Officer attendance at the IDTT at WSP also does not render the IDTT non-confidential. The Program Guide includes custody officers as appropriate attendees at the IDTT.  (ECF No. 7333-1 at 42 ("Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information: Licensed Psychiatric Technicians; Custody Officers."); and at 56 ("Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information: Licensed Psychiatric Technicians; Custody Officers. Recreation Therapists (RT), Registered Nurses (RN), Licensed Vocational Nurses, LPT, and the housing custody officers will also normally participate).)  Attachment A to the Program Guide specifically discusses attendance of custody officers at IDTT and the duty to maintain confidentiality of the content of the discussion.  (Id. at 205 ("All staff that intentionally, accidentally or inadvertently overhears confidential communications (arising from clinical contacts such as cell front visits) is also responsible for maintaining confidentiality of the communication.  There are many familiar situations where strict and traditional healthcare confidentiality is compromised, such as during pill lines, during Interdisciplinary Treatment Teams (IDTT) meetings because the team composition includes custody officers, and during cell front visits. Custody officers, correctional

counselors, and other staff who are members of an IDTT are bound to not discuss health-related inmate-patient information with anyone other than the team members.").)

Because neither the placement of a fixed camera nor the attendance by custody staff rendered the IDTTs at NKSP and WSP non-confidential, the Draft Report should be revised to remove the above findings as well as any other statements regarding a lack of confidentiality in similar circumstances.

J.    Mainline CCCMS Group Treatment.

The Draft Report states the following:

> Other than pre-release planning groups, recreation therapy groups were the only groups offered to mainline 3CMS patients during the reporting period. Staffing shortages and large caseloads prevented clinical groups from occurring at CCI

(Draft Report at 161.)

While CDCR strives to provide as much mental health treatment as possible to the incarcerated population, group treatment is not required in CCCMS programs.  The above statement implies that CCI's mental health program is deficient because it does not provide "clinical groups," which, although not defined in the Draft Report, likely means groups led by primary clinicians or psychiatrists.  Instead of criticizing CCI's provision of group treatment as lacking because it is not led by a psychiatrist or PC, this voluntary effort should be lauded.  CDCR requests the above statement be revised to reflect that CCI is providing care above and beyond what is required by the Program Guide.

IV.    The Draft Report Requires Certain Clarifications or Additional Information.

Defendants request that the Draft Report be revised to address the following issues:

1.    The Draft Report references Folsom Women's Facility (FWF).  However, FWF closed on January 11, 2023.  All references to FWF should be removed.

2.    The staffing data in Sections I(A) and II(A) of the Draft Report largely comes from Defendants' February 2024 Staffing Reports.  (ECF No. 8177.)  Yet, the staffing information provided in the institutional summaries does not always match the information provided in Sections I(A) and II(A).  For example, the WSP institutional summary states that no telepsychiatry positions were allocated, although telepsychiatrists filled 4.0 positions.  (Draft Report at 364.)   Yet, Section II(A) notes that WSP was allocated telepsychiatry positions and reported vacancies in those positions. (Id. at 22.)  Defendants' February 2024 Staffing Report shows WSP was allocated 5.0 telepsychiatry positions and 4.0 were filled and that WSP had a staff psychiatry fill rate of 95 percent.  (ECF No. 8177 at 5.)  Other allocated and filled positions numbers in the WSP institutional summary are inconsistent with Defendants' February 2024 Staffing Report.  Defendants requests that the report be revised to align the staffing information

Matthew A. Lopes
June 28, 2024
Page 18

in all institutional reports with the February 2024 Staffing Report or provide the date of the staffing data so that CDCR can compare the information to the filed staffing reports, which are the agreed upon source of truth.

3. Page 43 of the Draft Report finds that CIM was only 50 percent compliant with timely Primary Clinician initial assessments in the mainline CCCMS program. Page 45 similarly states that "[c]ompliance for all initial assessments was below 90 percent in all ML 3CMS programs discussed within this report, except for PBSP and PVSP." However, the CIM institution summary finds that of the 20 CCCMS patients randomly selected to have their healthcare records reviewed the "one patient who required an initial primary clinician evaluation received it timely." (*Id.* at 113-114.) Therefore, per the findings in the institutional summary, CIM was 100 percent compliant with timely PC initial assessment in the mainline CCCMS program. CDCR requests the Draft Report be revised accordingly.

4. Page 67 of the Draft Report states that "[f]or restricted housing transfers, no institutions reported compliance–or even a single timely transfer–for patients transferred to PSUs." Yet the sentence that follows explains that only one PSU transfer was reported between all thirteen institutions for the reporting periods. The above language appears out of place and may have been cut and pasted from an earlier report. In any event, it does not accurately represent what was monitored and should be deleted from the Draft Report or revised accordingly.

5. Page 83 of the Draft Report finds that "EOP patients held the least amount of job assignments, with only three patients employed at two institutions." The Draft Report goes on to state that "five EOP patients were enrolled in academic assignments at three of the 13 institutions, while one EOP patient at one institution held a substance abuse treatment assignment." (Id.) However, these findings omit that the reviewed institutions did not have EOP programs and had only a handful of EOP patients at a time. In fact, per the institutional summaries, not one of the reviewed institutions had more than a total of 10 mainline or restricted housing EOP patients on the first day of the Special Master's monitoring tours. (Id. at 97, 121, 149, 172, 193, 220, 246, 268, 289, 311, 338, 364, 401.) The Draft Report should be revised to either delete the statements regarding program assignments for EOP patients at non-EOP institutions or to include the necessary context that the listed institutions are not EOP institutions.

6. Appendix A-1 of the Draft Report lists CIM as California Institute for Men. Defendants request that the Draft Report include the correct name which is the California Institution for Men.

7. Page 172 of the Draft Report states that "SCC had no telepsychiatry positions, although the statewide registry telepsychiatry program provided after-hours on-call coverage." The statement regarding the "statewide registry telepsychiatry program" is repeated at page 182 of the Draft Report. The Telepsychiatry Program did not have any registry telepsychiatrists covering the night shift during the reporting period. Those positions were filled solely by civil service staff. The Draft Report should be revised to delete the "registry" language.

Matthew A. Lopes
June 28, 2024
Page 19

8. Page 176 of the Draft Report states that "SCC's alternative housing [Local Operating Procedure] LOP was not current, and the alternative housing cells were not identified." This is incorrect. The LOP provided in response to the Special Master's document request was dated April 2023, which was current for the review period. Further, the alternative housing cells were identified in the document uploaded in response to Tab J1(b) of the Special Master's document request. The Draft Report should be corrected to note that the requested information was provided and up to date.

9. Page 181 of the Draft Report states "[t]he primary clinician assigned to administrative segregation had a caseload of 113 patients, which exceeded the staff-to-patient ratio." This is inconsistent with the next paragraph that states there were only "42 stays for 35 3CMS patients" in SCC's administrative segregation unit (ASU) during the reporting period. (Id.) The statement is also inconsistent with the caseload information provided. SCC provide clinician caseload information in response to Tab B2(b) of the Special Master's document request. The information provided shows there were two primary clinicians assigned to the ASU at the time the data was pulled. One clinician had a caseload of 10 patients and the other did not carry a caseload. CDCR requests the Draft Report be corrected to reflect the caseload information provided by the institution.

10. Page 288 of the Draft Report states "[t]here were no major or minor sustainability reviews during the reporting period." This is correct because sustainability reviews are not required at SOL and other similar institutions without EOP housing units. The inclusion of a statement concerning sustainability reviews is confusing and misleading. Given that these reviews are not required, this finding should be deleted from the Draft Report.

V.     Conclusion.

Defendants appreciate the opportunity to provide comments on the Draft Report. Please reach out if there are any questions or if additional information is needed. Defendants are committed to resolving issues at the lowest possible level and are hopeful that many of these concerns can be resolved through this informal process.

Sincerely,

*/s/ Elise Owens Thorn*

ELISE OWENS THORN
Deputy Attorney General

For     ROB BONTA
Attorney General

EOT: et

Enclosures
cc:     Plaintiffs' Counsel

# Exhibit 1

**Elise Thorn**

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
| **Sent:** | Thursday, May 2, 2024 2:25 PM |
| **To:** | Patricia.Williams |
| **Cc:** | Walsh Kerry F.; Ryan, Jr., Michael F.; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Elise Thorn; Owens, Teresa@CDCR; Minter, Daisy@CDCR; Cartwright, Steven@CDCR; Worrell, Wendy; Leung, Pak Yan@CDCR; Gribbin Rachel; Irizarry, Cristina; Gonzalez, Janissa H. |
| **Subject:** | RE: PBSP and HDSP Current EOP Census |
| **Attachments:** | Length of Stay.zip; Instructions for Running Length of Stay for all EOP patients-5.2.24.pdf |

Good afternoon,

During our 1pm meeting today, your team reiterated the request for the date of arrival for EOP patients at PBSP, HDSP, KVSP, CCI, CIM, and SQ. As we discussed, the report that includes the requested date of arrival information is not part of the data remediation process. Please find the requested reports attached as well as the instructions CDCR used to pull the reports.

Please let me know if you have any questions.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Thursday, May 2, 2024 10:19 AM
**To:** Patricia Williams <harconwil@gmail.com>
**Cc:** Walsh Kerry F. <kwalsh@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Owens, Teresa@CDCR <Teresa.Owens@cdcr.ca.gov>; Minter, Daisy@CDCR <Daisy.Minter@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Leung, Pak Yan@CDCR <PakYan.Leung@cdcr.ca.gov>; Gribbin Rachel <rgribbin@pldolaw.com>; Irizarry, Cristina <cirizarry@pldolaw.com>; Gonzalez, Janissa H. <jgonzalez@pldolaw.com>
**Subject:** RE: PBSP and HDSP Current EOP Census

Good morning,

Attached is the requested census information for PBSP, HDSP, KVSP, CCI, CIM, and SQ from the RH22: Census (CQIT) report. I have also included the instructions CDCR followed to pull the data. As noted in my letter from yesterday, the RH22 report has completed validation in the data remediation process. The agreed upon report does not include the date of arrival. There is not report or indictor in the data remediation process that provides the requested information in the form requested.

CDCR does have an operational report that includes the patient's date of arrival. CDCR will provide the operational report if requested, but the report is not validated and is not part of the data remediation process.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



CALIFORNIA DEPARTMENT *of*
CORRECTIONS AND REHABILITATION

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Patricia Williams <harconwil@gmail.com>
**Sent:** Wednesday, May 1, 2024 9:23 AM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Cc:** Walsh Kerry F. <kwalsh@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Owens, Teresa@CDCR <Teresa.Owens@cdcr.ca.gov>; Minter, Daisy@CDCR <Daisy.Minter@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Leung, Pak Yan@CDCR <PakYan.Leung@cdcr.ca.gov>; Gribbin Rachel <rgribbin@pldolaw.com>; Irizarry, Cristina <cirizarry@pldolaw.com>; Gonzalez, Janissa H. <jgonzalez@pldolaw.com>
**Subject:** Re: PBSP and HDSP Current EOP Census

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Melissa,

Thank you for your quick response. You are correct, and we will **not** be including CSP/Sac. My apologies as that was my error when reviewing the Mission Change letter.

Thank you again,

Patricia Williams, Esq.
Deputy Special Master

On Wed, May 1, 2024 at 12:17 PM Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> wrote:

Good morning, Trish,

We are working on your request and will provide the requested information soon for PBSP, HDSP, KVSP, CCI, CIM and SQ. Can you please confirm that you need a roster for SAC? If so, can you please explain why? I did not think that SAC would be part of these focused tours.

Respectfully,

*Melissa C. Bentz*

Attorney IV, Class Action Team

Office of Legal Affairs

California Department of Corrections and Rehabilitation

Email: Melissa.Bentz@cdcr.ca.gov

Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Patricia Williams <harconwil@gmail.com>
**Sent:** Wednesday, May 1, 2024 9:04 AM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Cc:** Walsh Kerry F. <kwalsh@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Owens, Teresa@CDCR <Teresa.Owens@cdcr.ca.gov>; Minter, Daisy@CDCR <Daisy.Minter@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Leung, Pak Yan@CDCR <PakYan.Leung@cdcr.ca.gov>; Gribbin Rachel <rgribbin@pldolaw.com>; Irizarry, Cristina <cirizarry@pldolaw.com>; Gonzalez, Janissa H. <jgonzalez@pldolaw.com>
**Subject:** PBSP and HDSP Current EOP Census

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning, Melissa,

I am writing to follow up on my request for the rosters of EOP patients currently housed in the newly activated EOP beds at PBSP and HDSP.  In an effort to maximize efficiency, we would like to review some patients prior to our arrival.  To that end, would you please also send the patient rosters for the new EOP beds at KVSP, CCI, CIM, CSP/Sac, and San Quentin?

Please include the Patient Name, CDCR#, and Date of Arrival to the EOP at that facility.

Thank you for your assistance.


Patricia Williams, Esq.

Deputy Special Master

# Exhibit 2

**Elise Thorn**

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
| **Sent:** | Friday, June 28, 2024 12:52 PM |
| **To:** | Patricia.Williams |
| **Cc:** | Walsh Kerry F. |
| **Subject:** | RE: Coleman PBSP Document Production |

Tricia,

CDCR conducted an internal review of the documents provided in response to the PBSP request and noticed that the initial and routine IDTT dates for EOP patients during the reporting period was inadvertently omitted from the Appointments Report in response to Request 7. CDCR has uploaded the report with the IDTT information to the Round 31 SharePoint.

We are working internally to shore up the document request response process so we can provide complete, consistent, transparent, and accurate data to the Special Master's requests. Please let me know if you find that anything is missing during your review of the documents or if you have any questions.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385


CALIFORNIA DEPARTMENT *of*
CORRECTIONS AND REHABILITATION

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Patricia Williams <harconwil@gmail.com>
**Sent:** Thursday, June 20, 2024 7:45 AM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Subject:** Re: Coleman PBSP Document Production

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Melissa,

Thank you, this is very helpful.  Have a great day.

Tricia Williams, Esq.

On Wed, Jun 19, 2024 at 5:15 PM Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> wrote:

Tricia,

Prior to the Pelican Bay State Prison (PBSP) tour, CDCR provided information responsive to the Special Master's document request as available. As detailed in my May 1, 2024 letter, CDCR had several questions regarding the document request. Unfortunately, the Special Master's team was unable to discuss those questions with CDCR prior to the PBSP tour and instead requested that we provide what we had, noting that the team would follow up on-site if there were questions. We did so. However, during the PBSP exit call, Dr. Barboza noted that the Special Master's team was missing some information that was in the document request. I agreed to look into the issue and provide the responsive information as available as soon as possible.

As of yesterday, CDCR has uploaded all of the remaining documents responsive to the PBSP request. Please let us know if there are any questions or if you feel there is anything missing.

During our review of the document production, I noticed that the link provided to SharePoint in the General Information cover sheet was not active. The SharePoint includes information regarding global data limitations, key indicators in various stages of the data remediation process, key indicator documentation, and the instructions CDCR used to pull data from sources outside the data remediation process. Please use the following link to access the SharePoint: Coleman Monitoring - Home (sharepoint.com). We will be sure to update the cover sheets moving forward with a working link.

Please let us know if there is anything missing from future document productions, if you receive links that are not working, or if you have issues accessing any of the documents or information.

Respectfully,

*Melissa C. Bentz*

Attorney IV, Class Action Team

Office of Legal Affairs

California Department of Corrections and Rehabilitation

Email: Melissa.Bentz@cdcr.ca.gov

Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# Exhibit 3

**Elise Thorn**

| | |
|---|---|
| **From:** | Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov> |
| **Sent:** | Tuesday, May 21, 2024 12:41 PM |
| **To:** | Dan Potter; Walsh Kerry F.; Coleman Team - RBG Only; Coleman Special Master; 'Steve Fama' |
| **Cc:** | Bentz, Melissa@CDCR; Weber, Nicholas@CDCR; Kirby, Melissa@CDCR; Garland, Latoya@CDCR; Nguyen, Tiffany@CDCR; Worrell, Wendy; Yip, Jonathan@CDCR |
| **Subject:** | RE: Coleman: BRMR SM/SH Review Access Granted 4/8/2024 - 4/15/2024 |

Kerry & Henry,

I am following up on my email below from May 3rd. CDCR has been holding the item sent for stakeholder review on April 8th open for over a month now and we have not received comments from your team. Please advise if your team still intends to provide comments or if the below glossary item is sufficient as presented in the documentation crafted by CDCR.

Thank you,

*Sundeep Thind*
Attorney III
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

---

**From:** Thind, Sundeep@CDCR
**Sent:** Friday, May 3, 2024 2:08 PM
**To:** Dan Potter <dpotter@alumni.brown.edu>; Kerry.Walsh <kwalsh@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; 'Steve Fama' <sfama@prisonlaw.com>
**Cc:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Nguyen, Tiffany@CDCR <Tiffany.Nguyen@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Yip, Jonathan@CDCR <Jonathan.Yip@cdcr.ca.gov>
**Subject:** RE: Coleman: BRMR SM/SH Review Access Granted 4/8/2024 - 4/15/2024

Kerry & Dan,

We noticed that the Special Master's team has not provided any feedback in response to the item released below on April 8. This item was supposed to be closed out over two weeks ago and moved to internal review so it could be brought forward for discussion at BRMR. Does your team anticipate providing comments on this item, or does your team believe this item is sufficient as it is? Please let us know so we can either close this item off to evaluate Plaintiffs' feedback

internally or hold it open for a little longer. Please also let us know when to expect your team's feedback, if any, so we can adequately plan out next steps.

Thank you,

*Sundeep Thind*
Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

---

**From:** Thind, Sundeep@CDCR
**Sent:** Monday, April 8, 2024 3:30 PM
**To:** Dan Potter <dpotter@alumni.brown.edu>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; 'Steve Fama' <sfama@prisonlaw.com>
**Cc:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Nguyen, Tiffany@CDCR <Tiffany.Nguyen@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>
**Subject:** Coleman: BRMR SM/SH Review Access Granted 4/8/2024 - 4/15/2024

All,

The following item(s) are now open for stakeholder review. Access to these items will be removed **on Monday, April 15th, 2024 at 2pm.**

- AC5.1 Glossary Potential Data Entry Error

This documentation is now published for the below Indicators, they have passed verification and are ready for your review.
- None

**All published documentation is located in the following links:**
- KPI: MH Reporting KPI
- BR: MH Reporting Business Rules
- DE: MH Reporting Data Elements

Please let us know if you have any further questions.

Thank you,

*Sundeep Thind*
Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

# Exhibit 4

**Elise Thorn**

| | |
|---|---|
| **From:** | Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov> |
| **Sent:** | Wednesday, June 12, 2024 1:04 PM |
| **To:** | Coleman Special Master; Coleman Team - RBG Only; 'Steve Fama'; Dan Potter |
| **Cc:** | Bentz, Melissa@CDCR; Weber, Nicholas@CDCR; Worrell, Wendy; Nguyen, Tiffany@CDCR; Kirby, Melissa@CDCR; Garland, Latoya@CDCR; Worrell, Wendy; Cartwright, Steven@CDCR |
| **Subject:** | RE: Coleman: CDCR Bring back # 9- Definition of "Weekly" for AC2.1 Timely PC Contacts for RHU CCCMS |

All,

As noted below in CDCR's March 27th email, Defendants agreed "weekly" means "once per calendar week, not to exceed 10 calendar days between contacts" for RHU CCCMS PC contacts. During our BRMR meeting today, all stakeholders confirmed agreement to this definition.

Thank you,

*Sundeep Thind*
Attorney III
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

---

**From:** Thind, Sundeep@CDCR
**Sent:** Wednesday, March 27, 2024 1:50 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; 'Steve Fama' <sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>
**Cc:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Nguyen, Tiffany@CDCR <Tiffany.Nguyen@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>
**Subject:** Coleman: CDCR Bring back # 9- Definition of "Weekly" for AC2.1 Timely PC Contacts for RHU CCCMS

All,

Drs. Worrell and Cartwright raised some clinical concerns with limiting the definition of "weekly" to something other than a calendar week for "weekly" RHU CCCMS PC contacts. For example, if we were to use CDCR's current operationalization of a calendar week to define "weekly" for these PC contacts, it would not exceed 11 calendar days between contacts. However, in the spirit of compromise, CDCR will extend the interpretation of "weekly" that the stakeholders negotiated in the context of weekly PC contacts for EOP patients to apply to weekly PC contacts for RHU

CCCMS patients. Thus, "weekly" for RHU CCCMS PC contacts will be operationalized to mean— "once per calendar week, not to exceed 10 calendar days between contacts."

Thank you,

*Sundeep Thind*

Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

**Pronouns – She, her, hers**

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

# EXHIBIT B

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Walsh Kerry F.; Thind, Sundeep@CDCR; Weber, Nicholas@CDCR; Yip, Jonathan@CDCR; Nguyen, Tiffany@CDCR; Garland, Latoya@CDCR; Cartwright, Steven@CDCR; hdlugacz@blhny.com; Walsh Kerry F.; Gribbin Rachel; Coleman Special Master; "Lisa Ells (LElls@rbgg.com)"; Jenny Yelin; Coleman Team - RBG Only; Worrell, Wendy; Kirby, Melissa@CDCR; "Steve Fama" |
| Cc: | Walsh Kerry F.; hdlugacz@blhny.com; jeffrey.metzner@cuanschutz.edu; trougeux@hotmail.com; lhayesta@msn.com; karenrea01@gmail.com; Dan Potter; Ryan, Jr., Michael F.; Gribbin Rachel |
| Subject: | RE: CMHPP Indicators |
| Date: | Tuesday, August 6, 2024 12:48:45 PM |
| Attachments: | image002.png |

Kerry,

CDCR is reviewing and revising CM1.2 and CM5.1 as necessary to address Dr. Potter's concerns. We will send out separate emails with any responses or proposed changes once we have completed our internal review.

CDCR provided a response to Plaintiffs' concerns regarding CM1.1 on July 26th and Plaintiffs provided Dr. Potter with their final review on the same day. Similarly, CDCR provided a response to Plaintiffs' concerns regarding CM4.1 on August 1st. CDCR believes both indicators are ready for remediation assuming no further changes are requested.

We appreciate Dr. Potter's review of the remaining CM indicators that were pending remediation; however, from the below email it appears that additional changes are being requested. Dr. Potter is requesting that CDCR document how its audit-based indicators aggregate results for different reporting periods and make the numerator and denominator language for the CM indicators more consistent. CDCR agrees such documentation and revisions are appropriate, although we are considering how best and where to document the first request. However, if an indicator requires further revision, it should not be marked off as remediated.

Remediation should only occur "when the indicators and their business rules complete the five-step validation and verification process, and there are no outstanding stakeholder disputes…" (ECF No. 8181 at 2.) While CDCR is hopeful the requested changes will not lead to any disputes, that is unknown until the requested changes are fully discussed and implemented. Until that is complete, these indicators should not be marked off as remediated.

CDCR will consider how best to implement the appropriate revisions requested by the Special Master's team regarding CM2.1, CM3.1, CM3.2, CM5.2, CM5.4, and CM5.5. Once we have made revisions, we provide those to the Special Master's team and Plaintiffs' counsel by email or we will add the items to an upcoming BRMR agenda.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

**CALIFORNIA DEPARTMENT *of*
CORRECTIONS AND REHABILITATION**

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Friday, July 26, 2024 12:59 PM
**To:** Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Yip, Jonathan@CDCR <Jonathan.Yip@cdcr.ca.gov>; Nguyen, Tiffany@CDCR <Tiffany.Nguyen@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; hdlugacz@blhny.com; Walsh Kerry F. <kwalsh@pldolaw.com>; Gribbin Rachel <rgribbin@pldolaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; 'Lisa Ells (LElls@rbgg.com)' <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; 'Steve Fama' <sfama@prisonlaw.com>
**Cc:** Walsh Kerry F. <kwalsh@pldolaw.com>; hdlugacz@blhny.com; jeffrey.metzner@cuanschutz.edu; trougeux@hotmail.com; lhayesta@msn.com; karenrea01@gmail.com; Dan Potter <dpotter@alumni.brown.edu>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Gribbin Rachel <rgribbin@pldolaw.com>
**Subject:** CMHPP Indicators

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon all:

Attached please find the spreadsheet for Dr. Potter's suggested numerator and denominator improvements and comments for all 15 CMHPP indicators included in CDCR's denominator and numerator spreadsheet of June 18, 2024. We are also providing an update for the ten CMHPP indicators pending remediation as of last Friday. (Please see the attached spreadsheet for comments on the other 5 CMHPP indicators).

Dr. Potter has marked off CMHPP indicators 1 through 6 below based on our understanding that:

- CDCR will document how its audit-based indicators aggregate results for different reporting periods; and
- CDCR will make the numerator and denominator language for audit-based indicators more consistent.

1. CM2.1 Custody Staff CMHPP Annual Training, effective 4/26/2024.

2. CM3.1 <u>Required Staff Attendance of Quarterly Partnership Round Table Training</u>, effective 7/19/2024.
3. CM3.2 <u>Quarterly Partnership Round Table Training Completed as Required</u>, effective 7/10/2024.
4. CM5.2 <u>ML CCCMS and RC CCCMS Weekly Supervisory Meetings with Required Attendees</u>, effective 5/3/2024.
5. CM5.4 <u>ML CCCMS and RC CCCMS CMHPP Monthly Joint Supervisory Program Tours</u>, effective 7/19/2024.
6. CM5.5 <u>ML CCCMS and RC CCCMS CMHPP Monthly Joint Supervisory Program Tours with Required Attendees</u>, effective 7/19/2024.

Regarding,

7. CM1.1 <u>CMHPP MH Huddle Documentation of Required Attendees</u>
8. CM4.1 <u>CMHPP Monthly Executive Leadership Joint Rounding</u>

Dr. Potter will need to review the final documentation for these indicators once the defendants have addressed any questions or concerns plaintiffs may have, if any, after they have reviewed the documentation.

Regarding,

9. CM1.2 <u>CMHPP MH Huddle Documentation of Supervisor Attendees</u>

When stakeholders provided comments and discussed CM1.2, its questions were included in the same audit that collects data for CM1.1 and CM1.3, which gathers data per housing unit weekly. Please advise how CDCR will gather supervisor attendance data for this indicator.

Regarding,

10. CM5.1 <u>ML CCCMS and RC CCCMS CMHPP Weekly Supervisor Meetings</u>

Dr. Potter cannot mark this indicator off at present because he has yet to see documentation on how the data system would be able to determine the value for the denominator for CM5.1. Please provide access to such documentation. Alternatively, he suggests that CDCR revise this denominator into a form that can be operationalized.

Thank you.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT C

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Special Master; RBGG Dist List; Steven Fama; Elise Thorn; Namrata Kotwani; Damon McClain; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Paul B. Mello (Pmello@hansonbridgett.com); "Samantha Wolff" |
| **Subject:** | RE: Coleman - Mission Changes |
| **Date:** | Thursday, October 26, 2023 11:02:54 PM |
| **Attachments:** | Ltr. NW-ML re Mission Change 10.26.23 Revised.pdf |

All,

Please see a revised mission change letter. Additional EOP housing unit activations were added to the table in section 1(b) and a new section 1(c), regarding housing unit swaps on CSP-Sacramento's B facility has been added.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
(916) 217-1949
1515 S Street, Suite 314S
Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Weber, Nicholas@CDCR
**Sent:** Tuesday, October 17, 2023 4:12 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; RBGG Dist List <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama <sfama@prisonlaw.com>; Elise Thorn <elise.thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Paul B. Mello (Pmello@hansonbridgett.com) <Pmello@hansonbridgett.com>; 'Samantha Wolff' <SWolff@hansonbridgett.com>
**Subject:** Coleman - Mission Changes

All,

Please see attached mission change letter for mental health RHU and EOP beds.

Nick Weber

Attorney

Department of Corrections & Rehabilitation

(916) 217-1949

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 26, 2023

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding mission changes and crisis and inpatient bed closures.

1.  Mission Changes

    a.  Restricted Housing Units Mission Changes

On November 1, 2023, CDCR will implement its Restricted Housing Unit program.  Accordingly, CDCR will convert the segregation units to mental health RHUs.   Those changes, with the exception of those at California State Prison, Sacramento, are in the following table:

| Institution | Segregation | Beds[1] | Restricted Housing |
|---|---|---|---|
| CCWF | ASU EOP Hub | 13 | EOP RHU |
| CCWF | STRH | Variable | CCCMS RHU |
| CHCF | ASU EOP Hub | 50 | EOP RHU |
| CIW | PSU | 10 | EOP RHU |
| CIW | ASU EOP Hub | 10 | EOP RHU |
| CIW | STRH | Variable | CCCMS RHU |
| CMC | ASU EOP Hub | 100 | EOP RHU |
| CMF | ASU EOP Hub | 58 | EOP RHU |
| COR | ASU EOP Hub | 100 | EOP RHU |
| COR | STRH | 125 | CCCMS RHU |
| COR | LTRH | 206 | CCCMS RHU |
| HDSP | STRH | 125 | CCCMS RHU |
| KVSP | STRH | 125 | CCCMS RHU |
| LAC | STRH | 125 | CCCMS RHU |
| LAC | ASU EOP Hub | 100 | EOP RHU |

---

[1] Denotes assigned housing unit capacity. Standalone STRH/CCCMS RHUs can utilize different wings for different populations.

Special Master Lopes
Page 2

| MCSP | ASU EOP Hub | 62 | EOP RHU |
|------|-------------|-----|---------|
| NKSP | RC STRH | Variable | CCCMS RHU |
| PBSP | STRH | 125 | CCCMS RHU |
| PVSP | STRH | 125 | CCCMS RHU |
| RJD | ASU EOP Hub | 63 | EOP RHU |
| SATF | STRH | 125 | CCCMS RHU |
| SVSP | STRH | 125 | CCCMS RHU |
| WSP | RC STRH | Variable | CCCMS RHU |

California State Prison, Sacramento is undergoing changes with respect to its mental health RHUs. On November 1, 2023, CDCR will convert one PSU housing unit (B7) to level II housing.

| Institution | Segregation Unit | Beds | RHU |
|-------------|------------------|------|-----|
| SAC | PSU A1 | 64 | EOP RHU |
| SAC | PSU A2 | 20 | NDRH |
| SAC | PSU A2 | 44 | EOP RHU |
| SAC | ASU Hub A5 | 64 | EOP RHU |
| SAC | PSU B7 | 44 | NDPF II |
| SAC | NDS B7 | 20 | NDPF II |
| SAC | STRH | 125 | CCCMS RHU |

    b.  EOP Mission Changes

CDCR will reduce the crowding capacity for all level four EOP housing units from 150% design capacity to 125% design capacity statewide.  In addition, CDCR expects increased population demand on level four housing because of the reduction in RHU population.  Accordingly, CDCR plans the following bed activations over the next two months.

| Institution | Bed Type | Housing Unit | Number of Beds | Date |
|-------------|----------|--------------|----------------|------|
| KVSP | EOP IV | C6 | 80 | Nov. 1, 2023 |
| CCI | EOP IV | A7 | 80 | Dec. 1, 2023 |
| HDSP | EOP IV | D1 | 80 | Jan. 1, 2024 |
| HDSP | EOP IV | D2 | 80 | Jan. 1, 2024 |
| PBSP | EOP IV | B3 | 80 | Jan. 1, 2024 |
| CIM | EOP II | C-Alpine | 150 | Jan. 1, 2024 |
| SQ | EOP II | B H3 | 100 | Jan. 1, 2024 |

    c.  SAC Housing Unit Swaps

CDCR will swap four housing units on SAC's B facility in December 2023.  This will not add beds but will result in its EOP housing units being located in B5 and B6.

Special Master Lopes
Page 3

| Institution | Housing Unit | From/To | Date |
|---|---|---|---|
| SAC | B1 | EOP IV to NDPF II | Dec. 1, 2023 |
| SAC | B5 | NDPF II to EOP IV | Dec. 1, 2023 |
| SAC | B6 | NDPF II to EOP IV | Dec. 1, 2023 |
| SAC | B8 | EOP IV to NDPF II | Dec. 1, 2023 |

2. Crisis and Inpatient Beds

The following is a list of closed or scheduled to be closed crisis beds or inpatient beds.

| Institution | Deactivation | Cells | Reason | Activation Date |
|---|---|---|---|---|
| PVSP MHCB | February 19, 2019 | 6 | CTC Repair | Jan 2024 |
| CMF PIP | April 29, 2019 | 17 | Staffing | TBD |
| SVSP C5/C6 PIP | February 2023 | 8 | ADA Retrofits | Oct 2023 |
| HDSP MHCB | April 6, 2023 | 10 | Flooring | Jan. 1, 2024 |

a. Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms. As a result of the damage, the interior of the building was severely damaged. The work was temporarily stalled during much of 2020 due to COVID 19. The two outstanding projects are the fire alarm system and the nursing call station. The last of those projects is scheduled to be completed in January 2024.

During a recent walk-through it was determined that additional suicide prevention retrofits may be necessary, again changing the activation date. At this time, no decisions have been made as to when to begin those projects.

b. California Medical Facility Psychiatric Inpatient Program

Due to staffing vacancies, California Medical Facility (CMF) Psychiatric Inpatient Program (PIP), has taken seventeen beds offline. Nine of those beds have been offline since April 2019. In addition, CMF PIP took down eight dorm beds in unit A3, in order to achieve physical distancing due to COVID 19. Two were taken down in April 2020 and an additional six in October 2020. Those beds now remain offline due to staffing.

c. Central California Women's Facility Mental Health Crisis Bed

On November 8, 2021 CDCR deactivated the crisis bed at Central California Women's Facility (CCWF) for suicide prevention retrofits. CDCR reactivated the unit on October 13, 2023.

d. SVSP PIP C5/C6 ADA Retrofits

In February 2023, CDCR began ADA retrofits of several cells in SVSP PIP's C5 and C6. The project will require both units to deactivate ten beds each for four weeks, one housing unit at a

Special Master Lopes
Page 4


time so that no more than ten beds will be deactivated at a time.  The project will be completed on October 20, 2023

        e.  High Desert State Prison Crisis Bed

High Desert State Prison's crisis bed was deactivated on April 6 for a flooring replacement.  The flooring will be replaced in the entire Central Health Services Building which impacts the ability of the institution to provide care in the crisis bed while that project is ongoing.  The reopening date is January 2024.


Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

# EXHIBIT D

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



March 7, 2024

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding mission changes and crisis and inpatient bed closures.

1. Mission Changes

On November 1, 2023, CDCR implemented its Restricted Housing Unit program.
Accordingly, CDCR has activated the following beds since sharing our previous Mission Change
update.

| Institution | Bed Type | Housing Unit | Number of Beds | Date |
|---|---|---|---|---|
| KVSP | EOP IV | C6 | 80 | Nov. 1, 2023 |
| CCI | EOP IV | A7 | 80 | Dec. 18, 2023 |
| HDSP | EOP IV | D1 | 80 | Jan. 29, 2024 |
| HDSP | EOP IV | D2 | 80 | Jan. 29, 2024 |
| PBSP | EOP IV | B3 | 80 | Jan. 22, 2024 |
| CIM | EOP II | C-Alpine | 150 | Feb. 12, 2024 |
| SQ | EOP II | B H3 | 100 | Feb. 5, 2024 |

2. Crisis and Inpatient Beds

The following is a list of closed or scheduled to be closed crisis beds or inpatient beds.

| Institution | Deactivation | Cells | Reason | Activation Date |
|---|---|---|---|---|
| PVSP MHCB | February 19, 2019 | 6 | CTC Repair | TBD |
| CMF PIP | April 29, 2019 | 17 | Staffing | TBD |
| SVSP C5/C6 PIP | February 2023 | 8 | ADA Retrofits | April 21, 2023 |
| SVSP C5/C6 PIP | Sept. 25, 2023 | 5 | Suicide Retrofits | Dec. 14, 2023 |
| SVSP TC1/TC2 PIP | Dec. 18, 2023 | 2-16 | Suicide Retrofits | July 2024 |

Special Master Lopes
Page 2

| HDSP MHCB | April 6, 2023 | 10 | Flooring | March 25, 2024 |
| WSP MHCB | March 26, 2024 | 6 | ADA retrofits | August 2024 |

     a. Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's (PVSP) Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms. As a result of the damage, the interior of the building was severely damaged. The work was temporarily stalled during much of 2020 due to COVID 19. The two outstanding projects are the fire alarm system and the nursing call station. PVSP's regional manager is working with local plant operations to address issues for the outstanding projects.

During a recent walk-through it was determined that additional suicide prevention retrofits may be necessary, again changing the activation date. At this time, no decisions have been made as to when to begin those projects.

     b. California Medical Facility Psychiatric Inpatient Program

Due to staffing vacancies, California Medical Facility (CMF) Psychiatric Inpatient Program (PIP), has taken seventeen beds offline. Nine of those beds have been offline since April 2019. In addition, CMF PIP took down eight dorm beds in unit A3, in order to achieve physical distancing due to COVID 19. Two were taken down in April 2020 and an additional six in October 2020. Those beds now remain offline due to staffing.

     c. Central California Women's Facility Mental Health Crisis Bed Treatment Space

On November 16, 2023, Central California Women's Facility's commenced a project to create a treatment space within its mental health crisis bed unit. This project was completed, and the treatment space was opened on February 29, 2024.

     d. SVSP PIP C5/C6 ADA Retrofits & C5/C6 and TC1/TC2 Suicide Retrofits

In February 2023, CDCR began ADA retrofits of several cells in SVSP PIP's C5 and C6. The project required both units to deactivate ten beds each for four weeks, one housing unit at a time so that no more than ten beds are deactivated at a time. In CDCR's previous mission change letter[1], we mistakenly reported this project was still pending completion, however this project was unintentionally conflated with the suicide retrofit project for SVSP PIP's C5 and C6 which is detailed in the paragraph below. ADA retrofits of the several cells inside C5 and C6 were completed on April 21, 2023.

On September 25, 2023, CDCR began suicide retrofits for cells in SVSP PIP's C5 and C6. This project was completed on December 14, 2023. On December 18, 2023, CDCR began suicide retrofits for cells inside SVSP PIP's TC1 and TC2 units. For TC1, construction will be completed

---

[1] Mission Change Letter from Nick Weber to Special Master Lopes (October 17, 2023).

Special Master Lopes
Page 3

in two small segments; 12 rooms will be deactivated for the first segment, and one room will be deactivated for the second segment.  For TC2, construction will be completed in five small segments with a maximum deactivation of two cells for the first four segments; 16 cells will be deactivated during the last segment due to the fire sprinkler impact.  This project is anticipated to be completed by the end of July 2024.

      e.  High Desert State Prison Crisis Bed

High Desert State Prison's (HDSP) crisis bed was deactivated on April 6, 2024 for a flooring replacement.  The flooring will be replaced in the entire Central Health Services Building which impacts the ability of the institution to provide care in the crisis bed while that project is ongoing. The California Department of Public Health plans to inspect HDSP's crisis beds on March 19, 2024.  Once the inspection is completed, CDCR hopes HDSP's crisis beds will be reactivated without further delay.

      f.  Wasco State Prison Crisis Bed

Wasco State Prison plans to deactivate its crisis beds for ADA retrofitting once HDSP's crisis beds are reopened. The estimated start date for this project is March 26, 2023, or the day after HDSP's crisis beds reopen, whichever comes first. This project's estimated completion date is by the end of August 2024.


Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney
Office of Legal Affairs

# EXHIBIT E

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 5, 2024

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding mission changes and crisis and inpatient bed closures.

1.  Mission Changes

| Institution | Current Bed Type | Bed Type After Conversion | Housing Unit | Number of Beds | Date |
|---|---|---|---|---|---|
| **PBSP** | EOP IV | GP IV | B3 | 64 | July 8, 2024 |
| **PBSP** | RC GP | EOP IV | B2 | 64 | July 8, 2024 |
| **PVSP** | SNY III | EOP II | D4 | 100 | August 2024 |
| **RJD** | EOP IV | EOP III | C14 | 100 | September 2024 |
| **RJD** | EOP IV | EOP III | C15 | 100 | September 2024 |

2.  Crisis and Inpatient Beds

The following is a list of closed or scheduled to be closed crisis beds or inpatient beds.

| Institution | Deactivation | Cells | Reason | Activation Date |
|---|---|---|---|---|
| **PVSP MHCB** | February 19, 2019 | 6 | CTC Repair | December 2024 |
| **CMF PIP** | April 29, 2019 | 17 | Staffing | TBD |
| **CMF PIP** | September 2024 | 32 | Mobility Retrofits | April 2025 |
| **SVSP TC2 PIP** | Dec. 18, 2023 | 8 | Suicide Retrofits | March 15, 2024 |
| **SVSP TC1 PIP** | Dec. 18, 2024 | 5 | Suicide Retrofits | October 2024 |
| **HDSP MHCB** | April 6, 2023 | 10 | Flooring | April 8, 2024 |
| **WSP MHCB** | April 29, 2024 | 6 | ADA retrofits | December 2024 |

   a.  Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's (PVSP) Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms. Two outstanding projects remain,

Special Master Lopes
Page 2

which are the fire alarm system and the nursing call station. Both projects should be completed in August 2024, and once the California Department of Public Health (CDPH) approves, the crisis bed is projected to be reactivated by the end of this year.

### b. California Medical Facility (CMF) Psychiatric Inpatient Program (PIP)

Due to staffing vacancies, CMF PIP took seventeen beds offline. Nine of those beds have been offline since April 2019. In addition, CMF PIP took down eight dorm beds in unit A3, to achieve physical distancing due to COVID 19. Two were taken down in April 2020 and an additional six in October 2020. Those beds still remain offline due to staffing.

In June 2023, *Armstrong* Plaintiffs informed CDCR that there are beds four inches above ground in CMF's PIP that *Armstrong* patients have difficulty getting in and out from. As a result, 32 beds in P-1 will be taken offline in September 2024 for repairs and to increase the height of the beds. CDCR anticipates all 32 beds will be reactivated sometime in April 2025.

### c. Salinas Valley State Prison (SVSP) PIP TC1/TC2 Suicide Retrofits

On December 18, 2023, CDCR began suicide retrofits for cells inside SVSP PIP's TC1 and TC2 units. The suicide retrofits for TC2 were completed on March 15, 2024, and TC2 has been reactivated. The suicide retrofits in TC1 should be completed in July 2024, and with CDPH approval, CDCR hopes to reactivate TC1 by the end of October 2024.

### d. High Desert State Prison (HDSP) Crisis Bed

HDSP's crisis bed was reactivated on April 8, 2024 and is currently open to intake.

### e. Wasco State Prison (WSP) Crisis Bed

On April 29, 2024, WSP deactivated its crisis beds for ADA retrofitting. This project should be completed by the end of 2024.

### f. California Institution for Men (CIM) Crisis Bed

CDCR is in the process of constructing a new 50-bed project to augment CIM's crisis beds. Construction is anticipated to be completed by August 2025, and with CDPH's approval CDCR hopes to activate the beds before the end of December 2025.

Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney
Office of Legal Affairs

# EXHIBIT F

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 21, 2024

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write to supplement my June 5, 2024 Mission Change letter to announce an additional mission change and provide two additional updates.[1]

1.  Mission Changes

| Institution | Current Bed Type | Bed Type After Conversion | Housing Unit | Number of Beds | Date |
|-------------|------------------|---------------------------|--------------|----------------|------|
| **CRC** | PF II | EOP II | D408 | 40 | July 8, 2024 |

2.  Inpatient Beds Closure

Below are two additional updates.

| Institution | Deactivation | Cells | Reason | Reactivation Date |
|-------------|--------------|-------|--------|-------------------|
| **CMF** | July 1, 2024 | 36 | CTC Repair | December 2024 |
| **SVSP TC1 PIP** | Dec. 18, 2023 | 5 | Suicide Retrofits | October 2024 |

a.  California Medical Facility (CMF)

Thirty-six (36) beds in CMF's P2 (Acute PIP unit) will be closed for installation of outlets. The project is anticipated to take up to four months. Currently, there are 12 patients in CMF P2. The beds will close to intake as patients are discharged from the Acute Psychiatric Program level of care or transferred to another Psychiatric Inpatient Program with all 36 beds closed by July 1st. CMF plans to install outlets in all PIP cells. Once the project in P2 is complete, another PIP unit

---

[1] A copy of the referenced Mission Change letter is enclosed as Attachment A.

Special Master Lopes
Page 2

may be taken offline to allow the necessary construction. We will provide notice once we know which unit will be next.

      b.  Salinas Valley State Prison (SVSP) PIP TC1 Suicide Retrofits

On December 18, 2023, CDCR began suicide retrofits for cells inside SVSP PIP's TC1. The suicide retrofits were complete and reactivated on June 5, 2024. However, four (4) of the regular cells in TC1 were converted to observation cells as a result of this project; this reduces the overall capacity of SVSP PIP from 246 cells to 242 cells. The California Department of Public Health is scheduled to conduct their site visit of TC1 on June 26, 2024.

Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney
Office of Legal Affairs

# Attachment A

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 5, 2024

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding mission changes and crisis and inpatient bed closures.

1.  Mission Changes

| Institution | Current Bed Type | Bed Type After Conversion | Housing Unit | Number of Beds | Date |
|---|---|---|---|---|---|
| **PBSP** | EOP IV | GP IV | B3 | 64 | July 8, 2024 |
| **PBSP** | RC GP | EOP IV | B2 | 64 | July 8, 2024 |
| **PVSP** | SNY III | EOP II | D4 | 100 | August 2024 |
| **RJD** | EOP IV | EOP III | C14 | 100 | September 2024 |
| **RJD** | EOP IV | EOP III | C15 | 100 | September 2024 |

2.  Crisis and Inpatient Beds

The following is a list of closed or scheduled to be closed crisis beds or inpatient beds.

| Institution | Deactivation | Cells | Reason | Activation Date |
|---|---|---|---|---|
| **PVSP MHCB** | February 19, 2019 | 6 | CTC Repair | December 2024 |
| **CMF PIP** | April 29, 2019 | 17 | Staffing | TBD |
| **CMF PIP** | September 2024 | 32 | Mobility Retrofits | April 2025 |
| **SVSP TC2 PIP** | Dec. 18, 2023 | 8 | Suicide Retrofits | March 15, 2024 |
| **SVSP TC1 PIP** | Dec. 18, 2024 | 5 | Suicide Retrofits | October 2024 |
| **HDSP MHCB** | April 6, 2023 | 10 | Flooring | April 8, 2024 |
| **WSP MHCB** | April 29, 2024 | 6 | ADA retrofits | December 2024 |

a.  Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's (PVSP) Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms. Two outstanding projects remain,

Special Master Lopes
Page 2

which are the fire alarm system and the nursing call station. Both projects should be completed in August 2024, and once the California Department of Public Health (CDPH) approves, the crisis bed is projected to be reactivated by the end of this year.

   b.  California Medical Facility (CMF) Psychiatric Inpatient Program (PIP)

Due to staffing vacancies, CMF PIP took seventeen beds offline.  Nine of those beds have been offline since April 2019.  In addition, CMF PIP took down eight dorm beds in unit A3, to achieve physical distancing due to COVID 19.  Two were taken down in April 2020 and an additional six in October 2020.  Those beds still remain offline due to staffing.

In June 2023, *Armstrong* Plaintiffs informed CDCR that there are beds four inches above ground in CMF's PIP that *Armstrong* patients have difficulty getting in and out from. As a result, 32 beds in P-1 will be taken offline in September 2024 for repairs and to increase the height of the beds. CDCR anticipates all 32 beds will be reactivated sometime in April 2025.

   c.  Salinas Valley State Prison (SVSP) PIP TC1/TC2 Suicide Retrofits

On December 18, 2023, CDCR began suicide retrofits for cells inside SVSP PIP's TC1 and TC2 units.  The suicide retrofits for TC2 were completed on March 15, 2024, and TC2 has been reactivated. The suicide retrofits in TC1 should be completed in July 2024, and with CDPH approval, CDCR hopes to reactivate TC1 by the end of October 2024.

   d.  High Desert State Prison (HDSP) Crisis Bed

HDSP's crisis bed was reactivated on April 8, 2024 and is currently open to intake.

   e.  Wasco State Prison (WSP) Crisis Bed

On April 29, 2024, WSP deactivated its crisis beds for ADA retrofitting. This project should be completed by the end of 2024.

   f.  California Institution for Men (CIM) Crisis Bed

CDCR is in the process of constructing a new 50-bed project to augment CIM's crisis beds. Construction is anticipated to be completed by August 2025, and with CDPH's approval CDCR hopes to activate the beds before the end of December 2025.

Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney
Office of Legal Affairs

# EXHIBIT G

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Friday, February 16, 2024 12:54 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Genetin, Arianna@CDCR <Arianna.Genetin@cdcr.ca.gov>; Martello, Toni@CDCR <Toni.Martello@cdcr.ca.gov>; Morrison, Nicole@CDCR <Nicole.Morrison@cdcr.ca.gov>; Le, Sophia@CDCR <Sophia.Le@cdcr.ca.gov>
**Subject:** Coleman: Notice of Use of Telepsychiatry at PBSP B Yard

Good morning,

Per the court ordered Telepsychiatry Policy, at least 1.0 PY on-site psychiatrist shall be assigned to each EOP program per yard at each institution. CDCR is required to provide notice to the Special Master and Plaintiffs' counsel if this requirement is not met and telepsychiatry is in use. As of today, PBSP B yard has had less than a 1.0 PY on-site psychiatrist and used telepsychiatry for 30 consecutive days. Consistent with the court ordered Telepsychiatry Policy, CDCR will provide a plan to address the use of telepsychiatry at PBSP B yard within 60 calendar days from the provision of notice.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT H

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Wednesday, March 6, 2024 12:46 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Genetin, Arianna@CDCR <Arianna.Genetin@cdcr.ca.gov>; Martello, Toni@CDCR <Toni.Martello@cdcr.ca.gov>; Morrison, Nicole@CDCR <Nicole.Morrison@cdcr.ca.gov>; Le, Sophia@CDCR <Sophia.Le@cdcr.ca.gov>
**Subject:** Coleman: Notice of Use of Telepsychiatry at HDSP D Yard

Good morning,

Per the court ordered Telepsychiatry Policy, at least 1.0 PY on-site psychiatrist shall be assigned to each EOP program per yard at each institution. CDCR is required to provide notice to the Special Master and Plaintiffs' counsel if this requirement is not met and telepsychiatry is in use. As of Saturday, March 2nd, HDSP D yard has had less than a 1.0 PY on-site psychiatrist and used telepsychiatry for 30 consecutive days. Consistent with the court ordered Telepsychiatry Policy, CDCR will provide a plan to address the use of telepsychiatry at HDSP D yard within 60 calendar days from the provision of notice.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: <u>Melissa.Bentz@cdcr.ca.gov</u>
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# EXHIBIT I

| | |
|---|---|
| **From:** | Patricia Williams |
| **To:** | Toche, Diana@CDCR; Dr. Joseph@CDCR"; Amar@CDCR"; Michael W. Bien; Lisa Ells; Steven Fama; Elise Thorn; Weber, Nicholas@CDCR; Owens, Teresa@CDCR; Minter, Daisy@CDCR |
| **Cc:** | Lopes Matthew; Walsh Kerry F.; Ryan, Jr., Michael F.; Gribbin Rachel; Irizarry, Cristina; Gonzalez, Janissa H.; Tavares, Zelia M |
| **Subject:** | Focused EOP Tours |
| **Date:** | Thursday, April 25, 2024 1:48:43 PM |
| **Attachments:** | Focused EOP Review Document Request.4.25.24 .docx |

Dear Colleagues:

The *Coleman* Special Master will conduct an onsite focused review of compliance by the California Department of Corrections and Rehabilitation (CDCR) with the plans, policies, and protocols of the Mental Health Services Delivery System Program Guide (Program Guide) and relevant court orders and policies of the newly activated EOP at the below-listed institution. Please make responses to our document request available on or before the dates listed.

| <u>CDCR Institution</u> | <u>Review Period</u> | <u>Responses Due</u> |
|---|---|---|
| PBSP – May 29 – 31, 2024 | Jan 1, 2024 – Mar 31, 2024 | May 17, 2024 |

Our tours will start at 9:00 a.m. on the first day.

The onsite reviews will focus specifically on the newly activated EOP beds as outlined in the attached *Focused EOP Review Document Request*.

As with prior site visits, documents submitted in response to the document request will be submitted to the Special Master's office via SharePoint. Please make the responses available on or before the dates provided above and inform Kerry Walsh, Esq. (kwalsh@pldolaw.com), Patricia Williams, Esq. (harconwil@gmail.com), Michael Ryan, Esq. (mryan@pldolaw.com), and Rachel Gribbin (rgribbin@pldolaw.com) when they are available.

Access to the SharePoint site should be provided to Kerry Walsh (kwalsh@pldolaw.com), Michael Ryan (mryan@pldolaw.com), Patricia Williams (harconwil@gmail.com) and Rachel Gribbin (rgribbin@pldolaw.com). Also, as with past site visits, responses to the document request and proof of practice binders should be available onsite in hard copies, which we may retain for our records. Any additional documents not previously uploaded to the SharePoint should be provided onsite in hard copy and electronic format where available for review by the *Coleman* team. We understand that such documents will subsequently be uploaded to the SharePoint.

In an effort to maximize on-site efficiency, please upload all programming, group treatment, IDTT, and ICC schedules by Friday, May 24, 2024.

*The document request in no way precludes the Coleman Special Master from requesting additional documents not included in the document requests while on site.*

Finally, as in prior rounds, plaintiffs' counsel may provide a monitoring memorandum for our tours.

Please contact me if you have questions.

Patricia Williams, Esq.

> This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT J

**Focused EOP Review Document Request**
**April, 2024**

1. Provide a brief description of the EOP program(s) at your institution, including:
    a. the housing location, the security level,
    b. capacity,
    c. average patient census since opening the unit.

2. Provide a narrative of any EOP housing and/or programming with non-EOP patients, including the type and reasons since activation of the EOP.

3. Provide a census of all EOP patients placed in your program since opening, including patient name, CDCR number, date of arrival at your institution's EOP, sending institution, and assigned PC and Psychiatrist.

4. Please provide mental health staffing specific to the EOP, including allocation, filled, vacant, long-term leave, and registry staff. Please indicate if staff are assigned onsite or virtually. Additionally, indicate the number of days staff teleworked, where applicable.

5. Please provide custody staffing/allocations for housing and escort officers in the EOP. Please include filled, vacant, and long-term leave.

6. Please provide EOP caseloads of all PCs and Psychiatrists. Please indicate whether onsite or telepsychiatry/telemental health clinician. If you do not assign EOP caseloads to providers, please explain how patients are assigned/appointments are covered.

7. Provide information in a spreadsheet by name and CDCR numbers, and include the following:

    a. Date of arrival;
    b. Institution transferred from;
    c. Dates of initial primary clinician contacts;
    d. Dates of routine primary clinician contacts;
    e. Dates of initial psychiatric contacts;
    f. Dates of routine psychiatric contacts;
    g. Dates of initial and subsequent IDTTs
    h. Whether patients were designated EOP-Mod (include date of placement on EOP mod and date of removal where applicable)
    i. Attendance of required disciplines at the IDTTs.
    j. Confidential or non-confidential nature of contact
    k. Location of contact (clinic or cell front)

8. Provide a list of therapeutic activities available to EOP patients, including individual therapy and psycho-educational groups, substance abuse treatment, recreation and occupational therapy.

1

9. Provide a schedule of therapeutic activities available to EOP patients, including individual and group therapy and psycho-educational groups, substance abuse treatment, recreation and occupational therapy.

10. **Note: Must be run within 72 hours of visit.** Provide a list in a spreadsheet of current EOP patients who were offered 10 hours of therapeutic treatment activities that includes work and/or education.

11. **Note: Must be run within 72 hours of visit**. Provide a list in a spreadsheet of the EOP patients currently (within 72 hours of site visit) assigned fewer than 10 hours of therapeutic activities a week per the recommendation of their treatment team. Please indicate for each patient the length of time and reason they have remained on modified programming. Please indicate percentage of timely IDTTs for patients on mod-EOP.

12. **Note: Must be run within 72 hours of visit**. Provide a list in a spreadsheet of the EOP patients currently **(within 72 hours of site visit)** refusing more than half of all offered therapeutic activities, and describe what additional clinical interventions, if any, are extended to these patients.

13. Excluding patients on modified EOP programming, provide the average weekly hours of structured therapeutic activities per patient per week since the opening of the program:
    a. scheduled
    b. offered
    c. attended
    d. refused
    e. cancelled (include reason for cancellations)

14. For patients on modified EOP programming, provide the average weekly hours of structured therapeutic activities per patient since the opening of the program:
    a. scheduled
    b. offered
    c. attended
    d. refused
    e. cancelled (include reason for cancellations)

15. For each month since the EOP opened, calculate and report on the percentage of eligible EOP patients (meaning NOT placed on "EOP Mod" by the IDTT) who were offered less than the required minimum hours of weekly structured therapeutic activities. Provide a written explanation for the non-compliance and indicate whether corrective actions were implemented to improve compliance.

16. Provide transfer timeline for all EOP patients that were placed in your program since opening that were transferred to a HLOC including MHCB, PIP and DSH.

17. Provide the number and percentage of any EOP patients held in EOP overflow units,

    a.   provide the location of any overflow units,

    b.   the length of time each patient has remained in the overflow unit, and

    c.   a brief description of the treatment received by any patients in overflow units, including if/how treatment and programming opportunities are limited by their current housing.

18. Provide a narrative that identifies the location for EOP patients in need of quarantine or isolation and the mental health services available to these patients during quarantine/isolation.

    a.   **Note: Must be run within 72 hours of visit**. Provide a spreadsheet of current EOP patients on quarantine.  Please include patient name, CDCR number, reason for quarantine, date of placement, and housing location.

    b.   **Note: Must be run within 72 hours of visit**. Provide a spreadsheet of current EOP patients on isolation.  Please include patient name, CDCR, reason for isolation, date of placement, and housing location.

19. **Note: Must be run within 72 hours of visit**.  Provide a list of all patients currently receiving PC 2602 involuntary medications or clozapine.  For PC 2602 patients, include a list of any initial or renewal petitions submitted.

20. Please provide a narrative of any impacts to medication management or MAPIP monitoring that activation of the EOP has had at the institution.

21. Provide a roster of all EOP patients placed in your program since opening whose level of care was changed to 3CMS.

22. Please provide a list of CIT referrals of EOP patients, including patients' names, CDCR numbers and outcome of the referrals.

23. Please provide a copy of all RHU lock-up orders for EOP patients placed in the RHU since activation of the new EOP.

    a.   For institutions without EOP RHUs, include a list of EOP patients transferred to EOP RHUs, including date of lock-up order, date transferred and reasons for any transfer delays.

3

# EXHIBIT K

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Coleman Team - RBG Only; Coleman Special Master; Lopes Matthew |
| Cc: | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Christian Georgely; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR |
| Subject: | Coleman: HDSP EOP |
| Date: | Thursday, July 18, 2024 12:14:12 PM |
| Attachments: | image001.png |

All,

CDCR has closed the HDSP EOP to intake as of Monday, July 15th. We are assessing next steps will keep this group informed.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT L

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
| **Sent:** | Wednesday, May 1, 2024 11:37 PM |
| **To:** | harconwil@gmail.com |
| **Cc:** | Cartwright, Steven@CDCR; Elise Thorn; Gribbin Rachel; Irizarry, Cristina; Leung, Pak Yan@CDCR; Ryan, Jr., Michael F.; Minter, Daisy@CDCR; Owens, Teresa@CDCR; Tavares, Zelia M; Thind, Sundeep@CDCR; Walsh Kerry F.; Weber, Nicholas@CDCR; Worrell, Wendy; Gonzalez, Janissa H.; Lopes Matthew |
| **Subject:** | RE: Focused EOP Tours |
| **Attachments:** | MCB-ML Response to EOP Review Document Request- 5.1.24.pdf |

Good evening,

As requested, attached please find CDCR's letter regarding the document request provided on April 25th. We look forward to discussing during our 1pm meeting tomorrow.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Monday, April 29, 2024 2:43 PM
**To:** Patricia Williams <harconwil@gmail.com>
**Cc:** Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Gribbin Rachel <rgribbin@pldolaw.com>; Irizarry, Cristina <cirizarry@pldolaw.com>; Leung, Pak Yan@CDCR <PakYan.Leung@cdcr.ca.gov>; Michael Ryan <mryan@pldolaw.com>; Minter, Daisy@CDCR <Daisy.Minter@cdcr.ca.gov>; Owens, Teresa@CDCR <Teresa.Owens@cdcr.ca.gov>; Tavares, Zelia M <ztavares@pldolaw.com>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Walsh Kerry F. <kwalsh@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; jgonzalez@pldolaw.com; mlopes@pldolaw.com
**Subject:** RE: Focused EOP Tours

I don't know if we will be able to get our concerns into writing before our Thursday meeting, but we'll try. We have several other competing priorities, including court deadlines, before then.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



CALIFORNIA DEPARTMENT *of*
CORRECTIONS AND REHABILITATION

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD
COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Patricia Williams <harconwil@gmail.com>
**Sent:** Monday, April 29, 2024 2:39 PM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Cc:** Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Gribbin Rachel <rgribbin@pldolaw.com>; Irizarry, Cristina <cirizarry@pldolaw.com>; Leung, Pak Yan@CDCR <PakYan.Leung@cdcr.ca.gov>; Michael Ryan <mryan@pldolaw.com>; Minter, Daisy@CDCR <Daisy.Minter@cdcr.ca.gov>; Owens, Teresa@CDCR <Teresa.Owens@cdcr.ca.gov>; Tavares, Zelia M <ztavares@pldolaw.com>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Walsh Kerry F. <kwalsh@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; jgonzalez@pldolaw.com; mlopes@pldolaw.com
**Subject:** Re: Focused EOP Tours

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon,

Melissa, could you please provide your specific concerns and questions regarding the document request in writing prior to our already scheduled meeting this Thursday?

Regarding the request for the current patients at the facilities, I will be sure to include everyone going forward.

Respectfully,

Patricia Williams, Esq.
Deputy Special Master

On Mon, Apr 29, 2024 at 5:21 PM Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> wrote:

Good afternoon,

CDCR is reviewing the document request and has several questions and concerns. We would like to set up a meeting early next week to discuss. We anticipate providing a letter before then with our questions and concerns. Is there a time on Monday or Tuesday next week that would work for the Special Master's team?

Also, to the extent you have any requests regarding upcoming tours, such as the recent request for census information, please provide those requests to all CDCR personnel on this email.


Respectfully,


*Melissa C. Bentz*

Attorney IV, Class Action Team

Office of Legal Affairs

California Department of Corrections and Rehabilitation

Email: Melissa.Bentz@cdcr.ca.gov

Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Patricia Williams <harconwil@gmail.com>
**Sent:** Thursday, April 25, 2024 10:48 AM
**To:** Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Steven Fama <Sfama@prisonlaw.com>; Elise Thorn <elise.thorn@doj.ca.gov>; Weber, Nicholas@CDCR

<Nicholas.Weber@cdcr.ca.gov>; Owens, Teresa@CDCR <Teresa.Owens@cdcr.ca.gov>; Minter, Daisy@CDCR <Daisy.Minter@cdcr.ca.gov>

**Cc:** Lopes Matthew <Mlopes@pldolaw.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Gribbin Rachel <rgribbin@pldolaw.com>; Irizarry, Cristina <cirizarry@pldolaw.com>; Gonzalez, Janissa H. <jgonzalez@pldolaw.com>; Tavares, Zelia M <ztavares@pldolaw.com>

**Subject:** Focused EOP Tours

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dear Colleagues:

The *Coleman* Special Master will conduct an onsite focused review of compliance by the California Department of Corrections and Rehabilitation (CDCR) with the plans, policies, and protocols of the Mental Health Services Delivery System Program Guide (Program Guide) and relevant court orders and policies of the newly activated EOP at the below-listed institution. Please make responses to our document request available on or before the dates listed.

| CDCR Institution | Review Period | Responses Due |
|---|---|---|
| PBSP – May 29 – 31, 2024 | Jan 1, 2024 – Mar 31, 2024 | May 17, 2024 |

Our tours will start at 9:00 a.m. on the first day.

The onsite reviews will focus specifically on the newly activated EOP beds as outlined in the attached *Focused EOP Review Document Request*.

As with prior site visits, documents submitted in response to the document request will be submitted to the Special Master's office via SharePoint. Please make the responses available on or before the dates provided above and inform Kerry Walsh, Esq. (kwalsh@pldolaw.com), Patricia Williams, Esq. (harconwil@gmail.com), Michael Ryan, Esq. (mryan@pldolaw.com), and Rachel Gribbin (rgribbin@pldolaw.com) when they are available.

Access to the SharePoint site should be provided to Kerry Walsh (kwalsh@pldolaw.com), Michael Ryan (mryan@pldolaw.com), Patricia Williams (harconwil@gmail.com) and Rachel Gribbin

([rgribbin@pldolaw.com](mailto:rgribbin@pldolaw.com)). Also, as with past site visits, responses to the document request and proof of practice binders should be available onsite in hard copies, which we may retain for our records. Any additional documents not previously uploaded to the SharePoint should be provided onsite in hard copy and electronic format where available for review by the *Coleman* team. We understand that such documents will subsequently be uploaded to the SharePoint.

In an effort to maximize on-site efficiency, please upload all programming, group treatment, IDTT, and ICC schedules by Friday, May 24, 2024.

*The document request in no way precludes the Coleman Special Master from requesting additional documents not included in the document requests while on site.*

Finally, as in prior rounds, plaintiffs' counsel may provide a monitoring memorandum for our tours.

Please contact me if you have questions.

Patricia Williams, Esq.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



May 1, 2024

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

**VIA EMAIL ONLY**

Special Master Lopes,

I write in response to the document request received on April 25, 2024, regarding the upcoming focused review of newly activated Enhanced Outpatient Programs (EOPs). The California Department of Corrections and Rehabilitation (CDCR) has several questions and concerns regarding the use of remediated key performance indicators and the specific document request, as detailed below.

    A.  The Special Master Should Rely Upon Remediated Key Performance Indicators for All Future Monitoring.

The upcoming monitoring of the new EOP units will be the first time the Special Master can rely upon remediated data in his monitoring to ensure a common factual basis and understanding with the parties. All remediated indicators have been documented, validated, verified, and remediated with agreement by all stakeholders, including the Special Master, as a monitoring and quality improvement tool. Now that nearly half of the currently identified key indicators are remediated, the Special Master should rely upon remediated data whenever possible.

CDCR's goal is to provide the Special Master with the most reliable and consistent data available, including remediated data when available. All indicators with available data that are remediated or pending remediation will be accessible to the Special Master's team through the Mental Health On Demand Suite. CDCR will add indicators to the folder as they are remediated and will indicate when remediated data is available retroactively. In those cases, CDCR will notify the Special Master of how they can pull historical remediated data so that it can replace any non-remediated data that may be relied on during the tours.

The Special Master's team already has access to this dashboard, but CDCR anticipates creating a specific folder for remediated indicators or indicators pending remediation, so the items are easily identifiable. CDCR will provide the location of these indicators prior to the first

monitoring tour. Please let us know as soon as possible if the Special Master or members of his team have any issues accessing the Mental Health On Demand Suite.

Many of the indicators that are remediated or pending remediation are on-site audits. This means that there will not be data available until the audits are conducted and input into the Continuous Quality Improvement (CQI) Tool. As part of data remediation, the stakeholders, including the Special Master's team, agreed not only to the questions in the remediated audits, but also to the areas to be audited and the audit instructions. The Special Master should use the remediated audits and indicators in all future monitoring. CDCR will provide a list of remediated indicators and the most recent audit Guidebook prior to each monitoring tour so the Special Master has the most up to date information.

Please confirm the Special Master will use the agreed upon remediated indicators, and the underlying audits, for all future monitoring.

    B.  The Special Master Should Revise the Document Request to Account for Remediated
         Key Performance Indicators.

Generally, key indicators have been created to answer certain questions. For example, QC1: IDTT Required Staffing was created to answer whether staff required by the Program Guide attended Interdisciplinary Treatment Team (IDTT) meetings. Similarly, FEC1: Adequate Group Treatment Spaces was created to have an approved and consistent assessment of whether the institution has adequate group treatment space. As you know, some of the indicators are automated, some are document or on-site reviews that are conducted quarterly, and some only occur during on-site CQI tours.

In order to provide remediated data or to assist the Special Master in using the correct remediated audit, CDCR must understand what question the Special Master's team seeks to ask during their monitoring. However, the document request received on April 25, 2024, requests underlying data without a clearly defined goal for the use of the data. The document request for this and future monitoring should be revised to account for remediated indicators, or in the alternative, to ask CDCR questions that can be answered with appropriate remediated data. As noted in detail below, the current structure of the document request makes it impossible for CDCR to provide remediated data in response to what is requested, as, in many cases, the Special Master has asked for information that is either not available in a key indicator or information that is available, but not in one unified report. This will lead to confusion and use of inconsistent non-remediated data, when remediated data may be available.

The Special Master has also asked for several data points that do not have comparable key indicators. The key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient Program Guide requirements. Yet, there is no comparable key indicator for several of the below requests. CDCR objects to requests for data or documents outside of the scope of the provisionally approved key indicators.

Special Master Lopes
Page 3

Given the changing landscape, the Special Master should revise future document requests to reflect the work done in data remediation and the currently available remediated indicators. This may result in significant revisions. CDCR is willing to work with the Special Master to review the document request and determine which indicators can provide the appropriately responsive information for each area of monitoring. Please let us know if the Special Master is willing to work with Defendants to create an agreed upon document request that relies upon remediated indicators as much as possible.

C.  Comments and Questions Regarding Specific Document Production Requests

Below are CDCR's comments and questions regarding the Special Master's request for documents and data. Please note that the below comments, questions, and responses are based on a quick initial review of the document request. CDCR reserves the right to provide additional comments and questions or to change the proposed source of the data as we receive more information. CDCR will notify the Special Master if the source of the responsive data changes.

Also, please note data from different reports and sources may not match due to the application of different methodologies or business rules used in the creation of the reports. Also, all data sources may suffer from data entry errors such as incorrect use of Power Forms and workflows, incorrectly checked boxes, and delayed data entry. CDCR has initiated many internal checks to limit and identify data entry errors when possible. However, human error or computer bugs are still possible regardless of how expeditiously we work to catch and correct them.

i.  Request 1(c)

Request 1(c) asks for the average patient census since opening the EOP unit. CDCR does not have an automated way to gather any average census requested. The census data available in the RH22: Census (CQIT) report[1] provides point-in-time and historical data per day but does not aggregate the data in the way requested. CDCR can provide several point-in-time reports so an average can be calculated depending on the timeframe you are requesting. Please clarify whether the request is for per week or per month or some other timeframe.

ii.  Request 2

Request 2 asks for a narrative of any EOP housing and/or programming with non-EOP patients, including type and reasons since activation of the EOP. First, the Program Guide restricts co-mingling EOP patients with patients at other levels of care in the same housing unit. However, after incorporation of *Hecker*, EOP and non-EOP patients are permitted to interact together in almost every other location throughout the institutions, including work and education assignments.

---

[1] RH22 completed programming on April 24, 2023. It is currently in the verification stage.

Special Master Lopes
Page 4

Second, the key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient Program Guide requirements. Yet, there is no comparable key indicator for this request. CDCR objects to requests for data or documents outside of the scope of the provisionally approved key indicators. Please let us know if this request is related to a key indicator or which Program Guide requirement this seeks to measure.

Finally, if the Special Master continues to request this information despite CDCR's objection, please describe what type of activities fall under "programming."

      iii.    Request 3

Request 3 asks for a census of all EOP patients placed in the EOP program since opening, including patient name, CDCR number, date of arrival, sending institution, and assigned PC and Psychiatrist. CDCR will provide data from RH22: Census (CQIT). RH22: Census (CQIT) report was created to look at patient census at an institution or program either point-in-time or historically per day. RH22 has completed validation and programming. It is currently in verification, but data is available and is at present the most reliable data available.

As agreed by the parties and the Special Master's team, the validated report includes the institution, program, subprogram, mental health indicator (MHI), CDCR number, patient name, cell bed, and count. It does not include the other information requested by the Special Master, including the date of arrival, sending institution, and assigned Primary Clinician (PC) and Psychiatrist. There is no report or indicator in the data remediation process that provides all the requested information. CDCR will provide the information available in the RH22 report, but objects to piecing together other information from other, non-validated sources.

It is possible there is an indicator in the data remediation process that provides responsive information for the question the Special Master seeks to answer with this data request. However, that question is not obvious from the current request. Please provide information clarifying what the Special Master is trying to monitor or review with the requested information so CDCR can determine if responsive information is available through an indicator or how best to provide it.

      iv.    Request 4

Request 4 asks for mental health staffing specific to the EOP, including allocation, filled, vacant, long-term leave, and registry staff; whether staff are assigned on-site or virtually; and the number of days staff teleworked, where applicable.

All the non-PIP staffing reports have been validated, verified, and remediated by the Special Master's data expert.[2] The remediated reports include allocated, filled, and vacant positions for psychiatrists, social workers, psychologists, recreational therapists, and medical assistants and

---

[2] SPTSR1.4.8: Allocated and Filled Psychiatrist Positions was remediated on December 26, 2022 and SPTSR2.3.5.7.9.10.11.14: Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants was remediated on April 25, 2024.

Special Master Lopes
Page 5

their supervisors. As agreed by all stakeholders and made clear in the report documentation, employees formally categorized as being on long-term leave are excluded from the reports. The reports also delineate between registry and civil service staff and between those on-site and in the Telemental Health program.

The reports break down staffing by the institution and specific classification, but not by staffing at each level of care within an institution. The reports also do not include information regarding on-site staff who telework. CDCR will provide the remediated reports in response to the Special Master's request regarding staffing.

v.    Request 5

Request 5 asks for custody staffing/allocations for housing and escort officers in the EOP, including filled, vacant, and long-term leave. The key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient Program Guide requirements. Yet, there is no comparable key indicator for this request. CDCR objects to requests for data or documents outside of the scope of the provisionally approved key indicators. Please let us know if this request is related to a key indicator.

vi.    Request 6

Request 6 asks for EOP caseloads of all PCs and Psychiatrists, including whether the clinician is on-site or in the Telemental Health program. The key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient Program Guide requirements. Yet, there is no comparable key indicator for this request. CDCR objects to requests for data or documents outside of the scope of the provisionally approved key indicators. Please let us know if this request is related to a key indicator.

vii.    Request 7

Request 7 asks for a spreadsheet by patient name and CDCR number, including the following:

a. Date of arrival;
b. Institution transferred from;
c. Dates of initial primary clinician contacts;
d. Dates of routine primary clinician contacts;
e. Dates of initial psychiatric contacts;
f. Dates of routine psychiatric contacts;
g. Dates of initial and subsequent IDTTs
h. Whether patients were designated EOP Modified Program (EOP Mod) (include date of placement on EOP mod and date of removal where applicable)
i. Attendance of required disciplines at the IDTTs.
j. Confidential or non-confidential nature of contact
k. Location of contact (clinic or cell front)

Special Master Lopes
Page 6

First, there is no single report that provides all the requested information. CDCR objects to the request to create a single spreadsheet that pulls data together from separate sources. CDCR will provide the available requested information in the various formats described below. In the future, much of the requested data will be available as part of remediated indicators, including AC2.1: Timely PC Contacts, AC3: Timely Psychiatry Contacts, and AC4: Timely IDTT. Once the responsive indicators are remediated, CDCR will ask the Special Master to revise the data request as necessary to rely upon remediated data.

Second, please clarify the time frame for this data request. For example, is this request for all patients since the program opened? If so, RH22 data provided in response to Request 3 should be the source of truth for the patient count, patient name, CDCR number, and EOP modified designation, as it is a remediated report.

Third, to the extent the Special Master looks at the confidentiality of IDTTs, this information is available in AC11: IDTTs in a Confidential Setting which was remediated on July 5, 2022. CDCR will provide this information and it should be used as the source of truth. Please confirm if the Special Master will rely on this remediated data.

Fourth, the information requested in subsections (c), (d), (e), (f), (g), (j), and (k) is available in CDCR's operational Appointments Report. Please note this is not a validated or remediated report and is not part of the data remediation process. However, until the appropriate indicators are validated and programmed, the Appointments Report is the most accurate source for the requested information, except in the case described above regarding the confidentiality of IDTTs. CDCR will provide this report in response to this request.

Fifth, as part of data remediation the stakeholders, including the Special Master's team have agreed that "weekly" in the context of EOP PC contacts means once per calendar week, but not to exceed 10 days. Please confirm that the Special Master will use this agreed upon definition during monitoring.

Sixth, QC1: IDTT Required Staffing was created to measure whether Program Guide required staff attend IDTTs. QC1 has completed validation and programming. It is currently paused pending completion of QC1E: IDTT Required Staffing in the PIPs, but data for non-PIPs is available. CDCR will provide the available data for QC1 in response to item (i).

Finally, the information requested in items (a) and (b) is not readily available in any indicator in data remediation. Items (a) and (b) are available via one of CDCR's operational reports and CDCR will provide the requested information, but the report is not validated and is not part of data remediation.

      viii.    Request 8

Request 8 asks for a list of therapeutic activities available to EOP patients. CDCR does not have any concerns with this request, although it seems duplicative of Request 9 below. Please let us know if there are differences in the information sought in Requests 8 and 9.

Special Master Lopes
Page 7

      ix.    Request 9

Request 9 asks for a schedule of therapeutic activities available to EOP patients. Please confirm what period the schedule should cover. Also, please note that individual therapy for patients will not be part of the overall schedule provided, as those contacts are completed based on individual patient and clinician schedules. It is possible that the schedule will include reservation of treatment space for individual contacts, but the details of the contacts during those times, including the patient or clinician name, will not be provided.

      x.    Request 10

Request 10 asks for a spreadsheet of current EOP patients who were offered 10 hours of therapeutic treatment activities including work and/or education. First, please confirm the time period for this request. For example, should the list include only EOP patients who were offered 10 hours of structured treatment for the last full week prior to pulling the data?

Second, this request seems duplicative of some of the information in Request 13 below. The only difference is the timeframe for which the information is pulled. Please describe why both requests are necessary or if there is a way to align the two. For the sake of efficiency and to limit contradictions in the data, duplicative data will not be provided.

Please note, CDCR will use the current Treatment Offered indicator to provide the requested information as it is currently the most reliable source for the requested information. The current indicator follows CDCR's original design and does not include the agreements made in data remediation as the revised AC5: Treatment Offered has not completed all BRMR discussions. Once AC5: Treatment Offered has been validated and completed programming, CDCR will begin providing remediated data from those indicators in response to future document requests.

      xi.    Request 11

Request 11 asks for a spreadsheet of EOP patients assigned fewer than 10 hours of therapeutic activities per week per the recommendation of their treatment team, the length of time and reason the patient has remained on modified programing, and the percentage of timely IDTTs for EOP Mod patients. First, please confirm that the Special Master is looking for patients on EOP Mod status. The use of "assigned" in the above request is confusing.

Second, please confirm the period for this request. For example, should the list include only EOP Mod patients who were scheduled or offered less than 10 hours of structured treatment for the last full week prior to pulling the data?

Third, information regarding patients on EOP Mod, including their date of placement on EOP Mod, and the date of their IDTTs will be included in the responsive information for Request 7(d) and (e). The length of time a patient is EOP Mod can also be gleaned from the daily RH22 reports provided in response to Requests 1 and 3 above. Please describe whether producing this

Special Master Lopes
Page 8

information in Request 11, as well as in response to other requests, is necessary. For the sake of efficiency and to limit contradictions in the data, duplicative data will not be provided.

Finally, the reason a patient continues on EOP Mod is not readily available in any CDCR report or indicator and would require a manual review of each patient's file.

xii.    Request 12

Request 12 asks for a spreadsheet of EOP patients currently refusing more than half of all offered therapeutic activities, and a description of what additional clinical interventions, if any, are extended to patients. First, please confirm the Special Master's team is seeking information regarding EOP patients refusing more than half of all structured treatment, not all therapeutic activities, which could include yard or dayroom.

Second, please confirm the time period for this request. For example, should the list include only EOP patients who were offered 10 hours of structured treatment for the last full week prior to pulling the data?

Third, please note, CDCR will use the current Treatment Refused indicator to provide the requested information. The current indicator follows CDCR's original design and has not completed all BRMR discussions. Once AC24.1: Treatment Refused has been validated and completed programming, CDCR will begin providing remediated data from those indicators in response to future document requests.

Finally, please confirm that the Special Master does not want a patient level description of what additional clinical interventions are extended to *each* patient who refuses more than half of the offered structured treatment. The requested information is not available in any CDCR report or indicator and would require a manual review of each patient's file.

xiii.    Request 13

Request 13 asks for the average weekly hours of scheduled, offered, attended, refused, and cancelled (including reason for cancellation) structured therapeutic activities per patient per week for EOP patients since the opening of the program. CDCR will provide this information using the Treatment Scheduled, Offered, Attended, Refused, and Cancelled indicators. The current indicators follow CDCR's original design and have not completed all BRMR discussions. Once the treatment indicators have been validated and completed programming, CDCR will begin providing remediated data from those indicators in response to future document requests.

The Treatment Cancelled indicator does not provide the reason for cancellation of appointments. However, AC17: Appointments Cancelled Due to Custody, remediated on January 13, 2023, will provide information on all Electronic Health Records System (EHRS) Appointments cancelled due to custody reasons. CDCR will provide this information and it should be used as the source of truth. Please confirm that the Special Master will rely on this remediated data as necessary.

xiv.     Request 14

Request 14 asks for the average weekly hours of scheduled, offered, attended, refused, and cancelled (including reason for cancellation) structured therapeutic activities per patient per week for EOP mod patients since the opening of the program. First, please confirm the time period for this request. For example, is the requested average per week over the entire reporting period?

Second, as discussed in BRMR, EOP Mod patients are not included in all of the treatment indicators. Therefore, as there are currently no remediated indicators looking at this issue, CDCR will provide information from our operational Weekly Treatment Hours report. The report relies upon CDCR's original methodologies used for the treatment indicators and is not a validated or remediated report. The report is not part of the data remediation process as other indicators are being discussed to review treatment for EOP Mod patients. However, until the appropriate indicators are validated and programmed, the Weekly Treatment Hours report is most accurate source for the requested information.

Finally, as noted in Request 13, the reason for cancellation of appointments is not included in Weekly Treatment Hours report. However, AC17: Appointments Cancelled Due to Custody, remediated on January 13, 2023, will provide information on all EHRS Appointments cancelled due to custody reasons. CDCR will provide this information and it should be used as the source of truth. Please confirm that the Special Master will rely on this remediated data as necessary.

xv.     Request 15

Request 15 asks for a calculation and report on the percentage of eligible EOP patients who were offered less than the *required* minimum hours of weekly structured therapeutic activities for each month since the program opened. The request also calls for a written explanation for the non-compliance and whether corrective actions were implemented.

First, CDCR objects to the assumption that offering a patient less than 10 hours of structured treatment per week is non-compliant. As discussed in BRMR, there are many times when an EOP patient may not be eligible for 10 hours of structured treatment due to temporary departures, new arrival, or changes in level of care. The Special Master should consider these scenarios when looking at the data provided and apply the exceptions agreed upon in BRMR. Please revise the language in the document request to address these concerns.

Second, please confirm that the Special Master is looking for a compliance statistic for the first part of this request and not the underlying data.

Finally, please note, CDCR will use the current Treatment Offered indicator to provide the requested information. The current indicator follows CDCR's original design and does not include the agreements made in data remediation as the revised AC5: Treatment Offered has not completed all BRMR discussions. Once AC5: Treatment Offered has been validated and

Special Master Lopes
Page 10

completed programming, CDCR will begin providing remediated data from those indicators in response to future document requests.

xvi.    Request 16

Request 16 asks for transfer timelines for all EOP patients at the institution that were transferred to a higher level of care, including MHCB, PIP, and DSH. Please confirm that the Special Master is only asking for the 24-hour, 10-day, and 30-day transfer timelines.

xvii.    Request 17

Request 17 asks for information regarding EOP overflow housing. This will not be an issue for Pelican Bay State Prison as they have not run EOP mainline overflow housing since inception of the program. That will likely be the case for many, if not all, of the institutions with new EOP programs. CDCR reserves the right to raise questions and concerns regarding this request at a future date.

xviii.    Request 18

Request 18 asks for a narrative that identifies the location for EOP patients in quarantine or isolation as well as the mental health services available to these patients. The Special Master also requests spreadsheets for EOP patients in quarantine and isolation with specific information, including patient name, CDCR number, reason for quarantine or isolation, date of placement, and housing location.

CCHCS has reports available that include the CDCR number, patient last name, cell bed, and the quarantine or isolation order start date. It is possible the quarantine or isolation start date may differ from the order start date, but this is unlikely. The report does not provide all reasons for patient quarantine or isolation. All of the quarantine orders are related to COVID, but several of the isolation orders are not specific to any particular illness. Please clarify whether the Special Master is requesting quarantine or isolation information for all EOP patients or just those quarantined or isolated due to COVID.

xix.    Request 19

Request 19 asks for a list of all patients currently receiving PC 2602 involuntary medications or clozapine, including a list of any initial or renewal petitions submitted. MM12: Involuntary Medication Court Orders has completed validation, programming, verification, and currently available to statewide users. Plaintiffs completed their final review of this report on April 30, 2024 and it is ready for remediation. Please note that the agreed upon report does not specify medications for PC 2602 patients and CDCR does not have a report or indicator that provides this information for PC 2602 patients. CDCR will provide the validated and verified report in response to this request. Please confirm that the Special Master will rely upon this agreed upon data.

Special Master Lopes
Page 11

xx.    Request 20

Request 20 asks for a narrative response regarding any impacts to medication management or MAPIP monitoring the activation of the EOP has had at the institution. This request is vague and ambiguous. Please provide more information regarding what the Special Master is seeking.

xxi.    Request 21

Request 21 asks for a roster of all EOP patients placed in the program since the opening whose level of care changed to CCCMS. First, the key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient Program Guide requirements. Yet, there is no comparable key indicator for this request. CDCR objects to requests for data or documents outside of the scope of the provisionally approved key indicators. Please let us know if this request is related to a key indicator.

Second, CDCR does not have a report or indicator that currently provides the requested information. CDCR may be able to provide responsive information if the Special Master clarifies what is being monitoring through the requested data.

xxii.    Request 22

Request 22 asks for a list of CIT referrals for EOP patients, including patient names, CDCR numbers, and outcomes of the referrals. First, the key indicators were selected by the Special Master and provisionally approved by the Court as measuring the most salient Program Guide requirements. Yet, there is no comparable key indicator for this request. CDCR objects to requests for data or documents outside of the scope of the provisionally approved key indicators. Please let us know if this request is related to a key indicator.

xxiii.    Request 23

Request 23 asks for a copy of all lock-up orders for EOP patients placed in the Restricted Housing Unit (RHU) since the activation of the EOP. The Special Master's team also requests a list of EOP patients transferred to an EOP RHU, including the date of the lock-up order, date of transfer, and reason for any transfer delays. First, the information regarding EOP patients placed in the RHU since activation of the program will be available in the RH22 report provided in response to Request 3.

Second, please provide more information regarding what question(s) the Special Master's team is trying to answer with the requested information. There are several remediated audits that measure RHU requirements, including non-disciplinary status, and remediated indicators that measure other requirements, such as ASU screenings.

Special Master Lopes
Page 12

    D.  General Requests for Upcoming Tours

To make the upcoming tours as smooth and transparent as possible, please agree to provide the following information:

- A list of attendees from the Special Master's team as soon as possible.
- Prior to the beginning of each touring day, please provide a general overview of what will be reviewed, including the area and sub-areas that will be visited, the treatment or contacts that will be monitored, and any other activities the Special Master's team anticipates conducting or participating in.
- Please provide the names, CDCR numbers, and date range for any case reviews completed as soon as possible.
- For traceability purposes, please provide the area, sub-area, and date of any on-site audits. Please also include the name and CDCR number of any patient reviewed and what was being reviewed (e.g. IDTT observation, group treatment observation, patient interview) within two weeks of the tour.
- Please provide all on-site document requests to the Regional Mental Health Administrators or their assigned designee so they can review the request and confirm if there is responsive validated or remediated data or audits.

    E.  Conclusion

CDCR appreciates the opportunity to comment on the Special Master's document request. We look forward to discussing these concerns so the document request can be finalized as soon as possible.

Respectfully,

*/s/ Melissa C. Bentz*

MELISSA C. BENTZ
Attorney IV
Office of Legal Affairs
California Department of Corrections and Rehabilitation

# EXHIBIT M

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Friday, May 3, 2024 12:15 PM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Cc:** harconwil@gmail.com; hdlugacz@blhny.com; Walsh Kerry F. <kwalsh@pldolaw.com>; McClendon-Hunt, LaTri-c-ea <lmcclendonhunt@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>
**Subject:** RE: EOP Document Request

Melissa – I have to extend my apologies to you.  We are now unable to meet today due to unforeseen circumstances.  I think the best course of action at this time, and probably the most efficient, is to keep this process moving forward and have CDCR send whatever data and information they are able to produce in response to the document request.  Once we receive the documents, we will be able to assess what has been produced and where the production may be lacking, if at all. Thank you and have a great weekend.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Friday, May 3, 2024 10:00 AM
**To:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Cc:** Walsh Kerry F. <kwalsh@pldolaw.com>; harconwil@gmail.com; hdlugacz@blhny.com
**Subject:** Re: EOP Document Request

Yes. That works.

Get Outlook for iOS

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Friday, May 3, 2024 6:46:41 AM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Cc:** Walsh Kerry F. <kwalsh@pldolaw.com>; Patricia.Williams <harconwil@gmail.com>; hdlugacz@blhny.com <hdlugacz@blhny.com>
**Subject:** EOP Document Request

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Melissa – we can be available at 12:00 p.m. PST to discuss the EOP document request.  Can you let me know if that works for you.  Thank you.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123


**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT N

| From: | Thind, Sundeep@CDCR |
|---|---|
| To: | Dan Potter; Coleman Team - RBG Only; Coleman Special Master; "Steve Fama" |
| Cc: | Bentz, Melissa@CDCR; Weber, Nicholas@CDCR; Kirby, Melissa@CDCR; Garland, Latoya@CDCR; Nguyen, Tiffany@CDCR; Worrell, Wendy |
| Subject: | Coleman: BRMR SM/SH Review Access Granted 4/8/2024 - 4/15/2024 |
| Date: | Monday, April 8, 2024 6:31:17 PM |

All,

The following item(s) are now open for stakeholder review. Access to these items will be removed **on Monday, April 15th, 2024 at 2pm.**

- **AC5.1 Glossary Potential Data Entry Error**

This documentation is now published for the below Indicators, they have passed verification and are ready for your review.
- None

**All published documentation is located in the following links:**
- KPI: MH Reporting KPI
- BR: MH Reporting Business Rules
- DE: MH Reporting Data Elements

Please let us know if you have any further questions.

Thank you,

*Sundeep Thind*
Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email: Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT O

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Walsh Kerry F.; Coleman Special Master; Coleman Team - RBG Only; Steven Fama (sfama@prisonlaw.com); Dan Potter; karenrea01@gmail.com; trougeux@hotmail.com; hdlugacz@blhny.com; Millham, Sofia A.; Ryan, Jr., Michael F.; jeffrey.metzner@cuanschutz.edu; Lopes Matthew |
| Cc: | Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Cartwright, Steven@CDCR; Worrell, Wendy; Garland, Latoya@CDCR; Kirby, Melissa@CDCR; Selby, Michael@CDCR; Walsh Kerry F.; hdlugacz@blhny.com; Dan Potter; Ryan, Jr., Michael F. |
| Subject: | Re: Coleman: MM Items Ready to Move Forward in Data Remediation |
| Date: | Thursday, May 9, 2024 9:59:35 AM |
| Attachments: | image003.png |

Kerry,

It has been a month since I initially reached out on the MM5-9 indicators to confirm there were no further documentation changes required. It is CDCR and CCHCS's understanding, after several meetings with the Special Master's team, that these items are ready to go forward in the process. The MM5-9 measures are complicated and will likely take several months to complete programming and verification and CCHCS would like to begin this work.

Please let us know if there are any further concerns with the MM5-9 indicators by May 15th. If we do not hear anything by that date, CDCR/CCHCS will move these items forward to the next step in data remediation.

Get Outlook for iOS

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Wednesday, May 1, 2024 10:03:51 AM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>; karenrea01@gmail.com <karenrea01@gmail.com>; trougeux@hotmail.com <trougeux@hotmail.com>; hdlugacz@blhny.com <hdlugacz@blhny.com>; Millham, Sofia A. <smillham@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; jeffrey.metzner@cuanschutz.edu <jeffrey.metzner@cuanschutz.edu>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Lopes Matthew <mlopes@pldolaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Selby, Michael@CDCR <Michael.Selby@cdcr.ca.gov>; Walsh Kerry F. <kwalsh@pldolaw.com>; hdlugacz@blhny.com <hdlugacz@blhny.com>; Dan Potter <dpotter@alumni.brown.edu>; Ryan, Jr., Michael F. <mryan@pldolaw.com>
**Subject:** RE: Coleman: MM Items Ready to Move Forward in Data Remediation

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Melissa – I hope to have an answer to you shortly.  Thanks.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

---

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Tuesday, April 30, 2024 6:13 PM
**To:** Walsh Kerry F. <kwalsh@pldolaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>; karenrea01@gmail.com; trougeux@hotmail.com; hdlugacz@blhny.com; Millham, Sofia A. <smillham@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; jeffrey.metzner@cuanschutz.edu; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Lopes Matthew <mlopes@pldolaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Selby, Michael@CDCR <Michael.Selby@cdcr.ca.gov>
**Subject:** RE: Coleman: MM Items Ready to Move Forward in Data Remediation

Kerry,

Please confirm that there are no further documentation changes for the MM5-9. CDCR would like to move these forward in the data remediation process.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Wednesday, April 17, 2024 9:07 PM
**To:** Walsh Kerry F. <kwalsh@pldolaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>; karenrea01@gmail.com; trougeux@hotmail.com; hdlugacz@blhny.com; Millham, Sofia A. <smillham@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; jeffrey.metzner@cuanschutz.edu; Ryan, Jr., Michael F. <mryan@pldolaw.com>; Lopes Matthew <mlopes@pldolaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Selby, Michael@CDCR <Michael.Selby@cdcr.ca.gov>
**Subject:** RE: Coleman: MM Items Ready to Move Forward in Data Remediation

Kerry,

Thank you for your response. We have seen Dr. Potter's questions and comments regarding MM20/22 and responded in the spreadsheet sent on April 15th. Please let us know when MM20/22 will be remediated.

I apologize if my email regarding the other MM indicators was unclear. I was trying to ascertain whether there were any further documentation changes required to MM5-9 (including splits) using CDCR's methodology. It is my understanding that the Special Master's team has not requested any further changes. If that is not correct, please let us know as soon as possible what changes are requested.

If there are no further changes required to the documentation, CDCR will move these items forward to the next step of the data remediation process. While we understand Dr. Potter's thoughts on creating one unified set of documentation for the timely compliance methodology (TCM) indicators that includes both CDCR's methodology and the Special Master's, we disagree at this stage for all the reasons Dr. Cartwright has explained in the various BRMR meetings. As Dr. Cartwright has said repeatedly, we are open to streamlining the documentation in the future once we better understand the Special Master's methodology and what documentation is required.

We have never understood Dr. Potter's request to mean that the indicators using CDCR's methodology could not continue to move through the data remediation process until the documentation for the Special Master's methodology was complete. This would potentially create a backlog in programming and verification as the teams would have to program and verify both methodologies for each indicator simultaneously. This is also inconsistent with the approach we have taken for other indicators. For example, on January 3, 2024, I sent an email regarding moving forward with certain TCM indicators. In that email, I explained CDCR's position regarding separate documentation for CDCR and the Special Master's methodologies and identified 18 indicators using the opportunity-based methodology that were ready to move out of validation. I noticed the Special Master's team and Plaintiffs' counsel in that email that we were moving the identified indicators forward in the process, which we did. The Special Master's team did not recommend pausing those indicators at that time.

As to your second point, the court's order to show cause was specifically targeting the patient-wise version of the TCM indicators. It did not extend to the indicators using CDCR's methodology. Regardless, the focus of the order to show cause was to move data remediation forward. To pause these indicators as requested seems contrary to the spirit of what the court wants.

Finally, you mention technical concerns Dr. Metzner raised in a telephone call with Dr. Cartwright on April 9th. During that conversation, Dr. Metzner questioned which of the existing MAPIP measures would be discontinued now that we have the revised MM indicators. Dr. Cartwright informed Dr. Metzner that CDCR and CCHCS could discuss what non-key indicators should be decommissioned. But that does not impact the MM indicators and should not result in any delay to those indicators.

Given all of this, CDCR intends to move MM5-9 to the next step of data remediation if there are no further documentation changes required. As mentioned above, it is our understanding that no further changes have been requested. Please let us know as soon as possible if that is correct.

Respectfully,

*Melissa C. Bentz*

Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



CALIFORNIA DEPARTMENT *of*
CORRECTIONS AND REHABILITATION

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Walsh Kerry F. <kwalsh@pldlaw.com>
**Sent:** Thursday, April 11, 2024 12:15 PM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Coleman Special Master <colemanspecialmaster@pldlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>; karenrea01@gmail.com; trougeux@hotmail.com; hdlugacz@blhny.com; Millham, Sofia A. <smillham@pldlaw.com>; Ryan, Jr., Michael F. <mryan@pldlaw.com>; jeffrey.metzner@cuanschutz.edu; Ryan, Jr., Michael F. <mryan@pldlaw.com>; Lopes Matthew <mlopes@pldlaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Selby,

Michael@CDCR <Michael.Selby@cdcr.ca.gov>
**Subject:** RE: Coleman: MM Items Ready to Move Forward in Data Remediation

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon Melissa - in your emails of April 5th and 9th you inquire as to whether "CDCR's version the MM [medication management] indicators are ready to move out of BRMR and onto the next steps of data remediation". Dr. Potter raised some questions concerning MM20-22 in our comments concerning the 41 indicators (see spreadsheet sent on April 11) which should be readily answered. At that point, they are ready to move forward given that no further discussion is required as far as the Special Maser's data team is concerned.

However, we continue to strongly recommend that you consider not moving CDCR's version of these indicators forward at this time separately from the preparation of documentation of the TCM indicators (which include the medication management indicators). We base our recommendations on the following reasons:

1. It continues to be Dr. Potter's firm professional opinion that creating separate documentation for the two methodologies is unnecessarily time-consuming, less efficient, and more prone to error than creating unitary documentation for the two methods;

2. As we are all aware, the question of how the TCM indicators will be addressed is currently pending before the court (ECF No. 8181);

3. There are the technical concerns Dr. Metzner raised in a telephone call with Dr. Cartwright on April 9th.

Thank you.


**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com • Legal Disclaimer

---

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Tuesday, April 9, 2024 12:25 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com)

<sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>; karenrea01@gmail.com; trougeux@hotmail.com; hdlugacz@blhny.com; Walsh Kerry F. <kwalsh@pldolaw.com>; Millham, Sofia A. <smillham@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; jeffrey.metzner@cuanschutz.edu
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Selby, Michael@CDCR <Michael.Selby@cdcr.ca.gov>
**Subject:** RE: Coleman: MM Items Ready to Move Forward in Data Remediation

Good morning,

I am writing to follow up on the below email as it may impact whether some of the 41 indicators pending remediation are ready for Plaintiffs' final review or not. Please confirm whether CDCR's version of the MM indicators are ready to move out of BRMR and onto the next steps of data remediation.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



CALIFORNIA DEPARTMENT *of* CORRECTIONS AND REHABILITATION

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Friday, April 5, 2024 4:42 PM
**To:** Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; Dan Potter <dpotter@alumni.brown.edu>; PHN MSN FNP Karen Rea (karenrea01@gmail.com) (karenrea01@gmail.com) <karenrea01@gmail.com>; trougeux@hotmail.com; hdlugacz@blhny.com; Kerry.Walsh <kwalsh@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Michael Ryan <mryan@pldolaw.com>; Metzner, Jeffrey <jeffrey.metzner@cuanschutz.edu>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>;

Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Garland, Latoya@CDCR
<latoya.garland@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Selby,
Michael@CDCR <Michael.Selby@cdcr.ca.gov>
**Subject:** Coleman: MM Items Ready to Move Forward in Data Remediation

All,

The Special Master's team, CCHCS, and Mental Health had another meeting today regarding the
MM items. It is our understanding that the MM items using CCHCS's methodology are now ready to
move out of BRMR and continue through the data remediation process. Please confirm this is correct
so we can move these items forward.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385



ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT P

| From: | Patricia Williams |
|---|---|
| To: | Toche, Diana@CDCR; Dr. Joseph@CDCR"; Amar@CDCR"; Michael W. Bien; Lisa Ells; Weber, Nicholas@CDCR; Elise Thorn; Steven Fama; Owens, Teresa@CDCR; Minter, Daisy@CDCR; Melissa Bentz |
| Cc: | Lopes Matthew; Walsh Kerry F.; Ryan, Jr., Michael F.; LaTri-c-ea McClendon-Hunt; Gribbin Rachel; Irizarry, Cristina |
| Subject: | Focused Heat Plan Tours |
| Date: | Tuesday, July 23, 2024 1:47:58 PM |

Dear Colleagues:

Due to the excessive heat and various concerns regarding Heat Plan implementation, the *Coleman* Special Master will conduct an onsite focused review of compliance at the following seven institutions:

SATF –August 19-20, 2024
CSP/Corcoran—August 20-21, 2024
CCWF—August 21-22, 2024

CIW – August 26-27, 2024
CSP/Sac – August 26-27, 2024

CSP/LAC--August 27-28, 2024
MCSP—August 27-28, 2024

Our tours will start at 9:00 a.m. on the first day.

The onsite reviews will focus specifically on the Heat Plan. To that end, please have the current LOP, unit logs, Daily Activity Reports, monthly reports sent to Headquarters, and any documentation regarding heat-related incidents of class members since May 1, 2024, available for review on the first day of the tour. Additionally, the monitors will be interviewing patients and staff during the tour. There will be no pre-site documentation production required; however, if necessary, the *Coleman* Special Master may request additional documentation while on site.

Please contact me if you have questions.


Patricia Williams, Esq.
Deputy Special Master


This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.