1        UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF CALIFORNIA

3   RALPH COLEMAN, et al.,      ) Case No. 2:90-CV-00520-KJM-DB
                                )
4            v.                 ) Sacramento, California
                                ) August 20, 2024, 10:04 a.m.
5   GAVIN NEWSOM, et al.,       )
                                ) Re: Order to Show Cause Hearing
6            Defendants.        )

7        TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE KIMBERLY J. MUELLER
8       CHIEF UNITED STATES DISTRICT JUDGE

9   APPEARANCES:

10  For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                            MS. LISA ELLS
11                          MR. MICHAEL BIEN
                            MS. JENNY YELIN
12                          101 Mission Street, Sixth Floor
                            San Francisco, California  94105
13
14  For the Defendants:     HANSON BRIDGETT, LLP by
                            MR. PAUL B. MELLO
15                          MS. SAMANTHA WOLFF
                            425 Market Street, 26th Floor
16                          San Francisco, California  94105

17                          OFFICE OF THE ATTORNEY GENERAL
                            DEPARTMENT OF JUSTICE by
18                          MS. ELISE OWENS THORN
                            1300 I Street, Suite 125
19                          Sacramento, California  95814

20              MARYANN VALENOTI, RMR, CRR
                    Official Court Reporter
21                 501 I Street, Suite 4-200
                    Sacramento, CA 95814
22                mvalenotiRMRCRR@gmail.com
                      (916)930-4275

23  Proceedings reported via mechanical steno - transcript produced
    via computer-aided transcription
24

25

1    APPEARANCES CONTINUED:

2    For the Defendants:      OFFICE OF THE ATTORNEY GENERAL
                              DEPARTMENT OF JUSTICE by
3                             MR. DAMON GRANT MC CLAIN
                              455 Golden Gate Avenue, Suite 11000
4                             San Francisco, California  94102

5    Also Present:            Matthew Lopes, Special Master
                              Donald Specter
6                             David Sapp
                              Jeff Macomber
7                             Diana Toche
                              Donald Specter
8                             Alex Gourse

9                                 --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA, TUESDAY, AUGUST 20, 2024

2                              --oOo--

3          (In open court.)

4          THE CLERK:  All rise.  Court is now in session.  Chief

5     Judge Kimberly J. Mueller now presiding.

6          Thank you.  You may be seated.

7          Calling civil case 90-520, Coleman, et al. versus

8     Newsom, et al.  This is on calendar for a order to show cause

9     hearing.

10          THE COURT:  Good morning.  Appearances, please, for

11     the plaintiff.

12          Is that microphone working?  I don't think that's on.

13          MR. BIEN:  There we go.  Michael Bien, Lisa Ells,

14     Jenny Yelin, Alex Gourse from Rosen, Bien, Galvan, Grunfeld,

15     and Donald Specter from Prison Law Office.

16          THE COURT:  All right.  Good morning to you all.  And

17     for the defense.

18          MR. MELLO:  Good morning, Your Honor.  Paul Mello and

19     Samantha Wolff from Hansen Bridgett.  Damon McClain and Elise

20     Thorn from the Attorney General's office, and also seated at

21     counsel table is David Sapp, legal affairs secretary for the

22     Governor.

23          THE COURT:  All right.

24          MR. MELLO:  In the audience I have the secretary for

25     CDCR, Mr. Macomber and the Undersecretary Diana Toche.  Thank

1    you.

2         THE COURT:  Good morning to you all.  Special Master

3    Lopes is present.

4         I do have several questions based on the parties'

5    joint response to the order to show cause.  So assume for the

6    sake of argument that I am prepared to entertain the parties'

7    joint position as to the receiver in *Plata*.  I realize you have

8    differences of opinion as to whether or not a receiver, if not

9    that receiver, should be appointed now, but assuming I'm

10   prepared to entertain that position as to the receiver in *Plata*

11   seriously, but also assume I'm not prepared to anoint, or

12   rubber stamp, that suggestion.  I need to understand what your

13   thoughts are, if you do have thoughts, about a process for

14   clarifying the details related to such an appointment.

15        I know you say, Well, the receiver would report to

16   this Court.  The Special Mastership would continue exactly as

17   now.  Is there a thought that the *Plata* receiver would come

18   forward with a detailed plan for this Court to review before I

19   made a final decision as to whether or not to appoint him and

20   would that be in a fully open process?

21        I have follow-up questions, but let's start there, Mr.

22   Bien.

23        MR. BIEN:  First, I think that the details would be --

24   two kind of details would be important to be worked through:

25        One would be an actual order of reference establishing

1    the receivership powers, duties, responsibilities.  And, again,

2    assuming that this Court entertains the appointment of Mr.

3    Kelso, and that Mr. Kelso and Judge Tigar are also agreeable,

4    the idea that -- my position would be that there would be a

5    process where the new receiver would develop a plan to address

6    the continuing deficiencies in complying with this Court's

7    orders, and that period of time would be -- could be informed

8    by the Court's orders, by of course the Special Master and his

9    experts and their experience, and in terms of, you know,

10   consulting with the defendants and the plaintiffs about their

11   perspectives.

12            In that interim period, we feel like the remedial

13   process that exists should go forward.  It shouldn't be

14   delayed, but perhaps there would be some choices about

15   proceedings that would be prioritized because certainly there

16   would be some investment in this process to -- and, again,

17   we're looking back on the history, and Mr. Specter could help

18   address that about what happened in *Plata*, was that there was a

19   period of time where the receiver came up with a plan to

20   address going forward.

21            THE COURT:  I looked back at Judge Henderson's orders,

22   so I've familiarized myself with that.  I have some general

23   familiarity with it, but I reviewed his specific orders as

24   could be relevant here.

25            MR. BIEN:  Yeah.

1    THE COURT:  He had a pro bono adviser.  Would you

2 foresee the role of someone like that here?

3    MR. BIEN:  I don't know -- I know that he brought in

4 various people to assist him in the process.  I mean, to some

5 extent, you have some of the expertise in terms of the Special

6 Master and the team, but, you know, I think that there are

7 resources out there available to assist obviously both the

8 appointed receiver and the Court.

9    The last part of the question you asked was can I wait

10 and see for this plan before I make a decision about

11 appointment.

12    What I would suggest is certainly you have the power

13 at any point to remove a receiver.  Of course that happened

14 with Judge Henderson, he chose to replace the receiver with

15 another receiver.  I would suggest that the Court make an

16 appointment of the existing *Plata* receiver so the receiver

17 would be reporting to both courts, and whatever, you know,

18 orders we all work on and you think are appropriate.  If it

19 doesn't work out, that's something always within your power

20 down the road.  We think that this is the most efficient,

21 effective way of moving the remedy forward, and it's taking

22 advantage of an existing structure.

23    I do think the most important point for me favoring

24 this path is that the State is fully behind it, and I know that

25 in my view, rightly or wrongly, the State is not cooperating

1  with the existing remedial process in my opinion, and it's a

2  hindrance.

3  I do think the fact that the State is endorsing a

4  process and will be behind it is a -- makes it far more likely

5  to work, and that's one reason that I endorse this process.  I

6  think that no matter what you do, you can't drag someone into a

7  remedial process.  If they are resistant, it doesn't work.  And

8  I do think that they sincerely want it to work and believe that

9  this process gives them a framework where they can move

10  forward.  Again, without criticizing the existing system, I

11  think we've given it the best.

12  THE COURT:  Well, something needs to change, that's

13  why we are here.

14  MR. BIEN:  Yes.

15  THE COURT:  It's helpful.  It doesn't make sense to

16  appoint subject to the ability to remove within a short period

17  of time.  The idea is to get this right from the get-go.

18  Do you think there is a problem if this Court were to

19  ask -- subject, of course -- I mean, I can't -- I'm not going

20  to order the *Plata* receiver to appear in my court, but it would

21  be a mistake to ask that person to come forward and make a

22  detailed proposal first so the Court could understand if it was

23  prepared to issue an order of reference?

24  MR. BIEN:  I don't know.  I haven't talked to the

25  *Plata* receiver about this at all, and I don't know, but I do

1    think that that -- I really have trouble answering that

2    question.

3            I do think that to the extent -- that would certainly

4    take some investment both by the receiver and others around us

5    to do it, but it might be -- that may be another path.

6            THE COURT:  All right.  For the defense, who's going

7    to address the same questions?

8            MR. MELLO:  Good morning, Your Honor.  Paul Mello for

9    defendants.

10           Generally speaking, defendants agree with what Mr.

11   Bien just said.  This is a unique opportunity afforded to us.

12   We do have the backing.  Of course we would qualm with some of

13   the statements about compliance with the remedial plan and

14   efforts and good faith efforts, but we're here.  At this moment

15   in time we agree.

16           I think it would be appropriate to make an order

17   appointing the receiver as opposed to having some period to

18   come up with a plan, because he's going to have to invest time

19   to get up to speed on Coleman and come up with a plan.  It

20   makes sense to have the receiver invest that as opposed to

21   somebody who may become the receiver, somebody who's trying out

22   for the job, especially when the parties are so supportive of

23   this opportunity.  But generally speaking, we are in agreement.

24   Defendants are in agreement with what Mr. Bien suggests.

25           THE COURT:  All right.  Including parallel track,

1    remedial process stays on track until a plan?

2         MR. MELLO:  Absolutely, and the case doesn't stop.

3    There is remedial orders in remedial plan and defendants

4    understand that they have to comply with those and continue to

5    work with those.  They just deem this to be the most efficient

6    means based upon the unique expertise, the infrastructure that

7    the state agency that Mr. Kelso has built.  This is that

8    opportunity.  This is that moment in time, but no, the remedial

9    plan does not stop and defendants do not assume it stops.

10        THE COURT:  All right.  So to ask the different

11   question based on what the Court originally had contemplated, I

12   just want to make certain I understand your thoughts, if you do

13   have them, about an alternative approach, which is to have a

14   fully competitive process encouraging the *Plata* receiver to

15   participate in that process, but ask others who may be

16   interested to come forward and apply to serve as the Coleman

17   receiver, not ruling out in any way the possibility of the

18   *Plata* receiver being identified as the best fit; that is what

19   the Court originally had contemplated.

20        Again, I'm taking seriously what you've said, but I

21   haven't ruled out that alternative in my mind subject to

22   hearing from you.

23        So, it appears to me the plaintiffs would not oppose

24   something like that while they are clearly supporting the *Plata*

25   receiver's appointment.  But if the Court were to engage in a

1  competitive process, would I follow whatever process Judge

2  Henderson followed to the extent I can discern that from the

3  documentary record?  Do you have thoughts about that, Mr. Bien?

4       MR. BIEN:  Again, as you know, we would think there is

5  a quicker, more effective path of using Mr. Kelso, but I

6  haven't thought that much about a competitive open process.

7       I don't -- I don't know how public the process was

8  with Judge Henderson, and Mr. Specter could tell you more about

9  it, but I do think that he considered various candidates and

10  the parties had some input as I recall.

11       THE COURT:  *Plata*, very different culture.  This would

12  be an open process.  These days it seems as if people even

13  apply for jobs, public jobs in open fora, I don't know, that

14  was my -- I think there would be a professional headhunter,

15  identify people nationwide, at least nationwide, and some kind

16  of open process, transparent -- as transparent as possible.

17       MR. BIEN:  I do think that -- again, we do support the

18  idea of a receiver.

19       THE COURT:  I understand that, and you support the

20  *Plata* receiver.

21       MR. BIEN:  Yeah, but -- Again, I do think that another

22  reason we support it is we need to end up with a single entity

23  that functions effectively to deliver healthcare for California

24  prisons so the cases can end.

25       THE COURT:  I understand that.  That's noted.  I have

1   some related questions, but we'll get to those in just a

2   moment.

3          Just so it's clear, it's not just in this context,

4   this court, I have a very strong philosophical bent towards

5   never anointing an internal candidate, as it were, and

6   believing that even if internal candidates are elevated -- not

7   quite the right words in this context -- it is better if they

8   earn that appointment.  Sometimes appointing authorities can

9   learn through competitive processes.  So that's a philosophical

10  bent that I've applied in every possible context when I've been

11  part of a hiring process.

12         Mr. Mello, anything to say about this?  I know you

13  only support a receiver if it's the *Plata* receiver, I got that.

14  But anything else you would say?

15         MR. MELLO:  Yeah.  I would just add that I'm not sure

16  what the RFP process would look like and how candidates could

17  apply to become the Coleman receiver.  They would have to take

18  the time to come up to speed.

19         One of the things that Mr. Bien in the papers makes

20  clear is we built upon 16 years of learning how to operate

21  within government, learning how to interact with the

22  legislature, learning how to build the system, and we lose all

23  that if we don't take this opportunity.

24         Mr. Kelso is anything but an internal candidate.  He

25  is -- for example, most of the headquarters' functions have not

1  been delegated back to the state.  He is the receiver.  So he

2  is not an internal candidate.

3       So I think it would not only delay the selection of a

4  receiver, it would also delay the receiver starting to take

5  action, and it would further be compounded by the fact that he

6  or she would have to build their own systems, which it's hard

7  for us to wrap our heads around how two receivers would

8  operate.  I think that's really important.

9       Then backing up, I mean, this Court's own order

10 contemplated further proceedings, and we're saying we'll forego

11 those further proceedings if this agreement is honored -- if

12 this opportunity is honored.

13      Thank you.

14      THE COURT:  I understand.  Well, just thinking about

15 how Coleman retains its separate identity and isn't just a

16 stepchild, the Court has long had that concern, and it would be

17 heightened here if there is a single receiver for both cases.

18      So my questions -- I'm happy to hear whatever people

19 may be thinking about how Coleman retains its separate identity

20 other than having a separate judge to whom a receiver would

21 appoint.

22      It would be essential that this Court be convinced

23 that the receiver for Coleman is truly independent, and I noted

24 with interest some of the language in the defense declarations.

25 I mean Secretary Macomber gives weight, I'm not saying

1   improperly, that could the *Plata* receiver's many years in state

2   service, that could cut both ways.

3          Undersecretary Toche, also understandably on the one

4   hand, it's important for the receiver to be at headquarters to

5   be successful.  So how would this court be assured that the

6   receiver serving Coleman is truly independent while recognizing

7   efficiencies to be achieved in full coordination with the *Plata*

8   case?

9          How would Coleman retain its separate identity and

10  importance?

11         Mr. Bien, your thoughts about that?

12         MR. BIEN:  At this point if the *Plata* receiver

13  accepted this, and this Court made this appointment, *Plata*

14  would be the stepchild.

15         I mean, that case is far, far along.  This would be

16  taking on a real process that has far more challenges and far

17  more obstacles at this moment, and I think -- I think that --

18  again, we don't know -- I don't know that Mr. Kelso would be

19  willing to do this.

20         THE COURT:  But I have done nothing to assess that

21  possibility, just so it's clear.

22         MR. BIEN:  Yeah, and so I do think that there is --

23  that he is a very distinguished attorney who would understand

24  if he took on a duty, that he would have a duty to you and to

25  this Court and to this case that he would be accepting.

1          THE COURT:  It's not about me, it's about the Court.

2          MR. BIEN:  The Court, of course, and that he would

3     have a whole new set of responsibilities and obligations to

4     achieve a constitutional system for the Coleman class which

5     overlaps with, but is different from the *Plata* class.

6          In addition, this Court, he would be reporting to the

7     Court, and you would retain the Special Mastership to monitor

8     not only the delivery of care in the system, but what is

9     happening in headquarters and otherwise.  Plus we would be --

10    we are duty bound as plaintiffs' counsel to keep you informed

11    and to know what's going on at all times.

12         So, the difference here is that -- think about -- for

13    me the difference is that the receiver will be standing in the

14    shoes of the secretary in terms of the legal responsibility to

15    make decisions on behalf of CDCR dealing with mental

16    healthcare.  So the kind of struggles that we've had about

17    whether something gets done, when it gets done, how it gets

18    done, should be resolved.  It doesn't mean that he's going to

19    snap his fingers and everything's going to happen, but it

20    should be a much more transparent process.  If there is an

21    obstacle, we're going to know what it is, and it would be

22    presented to the Court if it can't be resolved informally.

23         So it's a different remedial process, and he would be

24    the person responsible for that.  I don't think that there

25    is -- again, if he accepts -- that there's any chance of this

1  case being a stepchild.

2         THE COURT:  Help me understand.  One of my questions

3  was at this point is there an expected timeline for *Plata*

4  wrapping up?  I know there's a number of institutions.  I heard

5  Mr. Mello say "headquarters' functions."

6         MR. BIEN:  I could have Mr. Specter address that if I

7  could.

8         THE COURT:  Okay.  Mr. Specter, so when would you

9  expect -- you left your coat at home, I guess?

10         MR. SPECTER:  Yes, that's exactly right.  Sorry about

11  that.  I got in the car without thinking about my jacket.

12         THE COURT:  All right.  Well, noted.

13         MR. SPECTER:  The delegation process, are you familiar

14  with that?

15         THE COURT:  Yes, I just used that word myself.

16         MR. SPECTER:  It's going very well, there are 26

17  prisons that have been delegated.

18         THE COURT:  Out of 33.

19         MR. SPECTER:  Something like that.

20         THE COURT:  But is there a separate delegation of

21  headquarters' authorities that even if all 33 are delegated

22  back?

23         MR. SPECTER:  Well, one of the things that we are

24  discussing with the defendants is how to structure the

25  delegation of the headquarters' responsibilities so that it's a

1    sustainable process, and that discussion is ongoing now, but

2    it's high on Judge Tigar's radar.  It's high on our radar.

3            THE COURT:  If you had to predict, how long would that

4    take to complete the delegation process in full?

5            MR. SPECTER:  2026 possibly.

6            THE COURT:  Institutions plus headquarters?

7            MR. SPECTER:  Yes, because the institutions, once

8    there is a delegation by Mr. Kelso, then we monitor it for a

9    year to see if the process is sustained, and so even if all the

10   prisons are delegated this year, there would be another year of

11   monitoring, and in that time we would also be talking about how

12   to delegate the headquarters process and how to transition from

13   a receiver back to the state.

14           THE COURT:  So if there is complete delegation, *Plata*

15   remediation complete in full, and I'll ask Mr. Bien this

16   question as well, then the receiver would become a Coleman

17   receiver only?

18           MR. SPECTER:  Yes, that's right.  That's exactly

19   right.  While I am here could I address a couple other points?

20           THE COURT:  You may.

21           MR. SPECTER:  In terms of planning, in 2015 the

22   receiver did a transition plan, and based upon his progress up

23   to that point, I think it's a good example of what you could

24   expect if he were appointed to be a receiver, the kind of

25   detail and thoughtfulness.  I think it was March 2015, it's on

1    the electronic docket.  So it's a good example of the way he

2    approaches things and might give you some clarity about how he

3    would proceed if he is appointed.

4            The second point I wanted to make is about the hiring

5    process.  You know, of course, that Judge Henderson -- Mr.

6    Kelso's the second person appointed to be a receiver.  The

7    first person was as a result of an open-hiring process.  The

8    judge hired a firm, a headhunter firm.  We all interviewed the

9    candidates.  Judge Henderson made the final decision, but I

10   could tell you we all unanimously liked the first person that

11   he hired, and that turned out not to work very well.

12           THE COURT:  I have some insights into that.  I'm met

13   that receiver.  I know what he accomplished, and I understand

14   the history.

15           MR. SPECTER:  Right.  I'm just saying that what you

16   get with Mr. Kelso is somebody who you know is competent, who

17   you know works effectively with the state government, who you

18   know now understands healthcare, prison healthcare, which he

19   didn't 15 years ago, and I think in my opinion that's worth

20   very much knowing that you have like a bird in the hand rather

21   than if you hire somebody who you don't know how they have

22   performed or they will perform, it's a much bigger risk.

23           THE COURT:  I've read your declaration, and I

24   understand that position.

25           MR. SPECTER:  Thank you.

1          MR. MELLO:  Your Honor.

2          THE COURT:  Yes, Mr. Mello.

3          MR. MELLO:  So I think the question was how does the

4    Coleman receiver maintain its separateness, and I think the

5    answer is there is an order of reference that sets forth Mr.

6    Kelso's duties and responsibilities if he is selected as the

7    receiver, and he, of course, will answer to this Court, so this

8    Court maintains the power.

9          So I think he will be a separate receiver except that

10   you get the benefit of it's not one -- they're not separate

11   patients.  It's not a separate prison system.  It's one system

12   and it brings efficiencies.

13         The alternative is two receivers which is really hard

14   to figure out how that would work, and how there wouldn't be

15   potential conflicts between the two courts unnecessarily.  This

16   just affords so many opportunities as Mr. Bien and Mr. Specter

17   have indicated and as papers suggest.  I think this would be a

18   separate Coleman receiver because that person would be subject

19   to this Court's authority.

20         Thank you.

21         THE COURT:  So does it also mean that the defense is

22   saying it would make affirmatively clearer it's accepting the

23   law of the case here, it's accepting the program guide, that

24   when undersecretary talks about completing the work of building

25   and operating a mental healthcare system, it's completing it

1    based on the foundation this Court has ordered?

2            MR. MELLO:  So, Your Honor, I mean, to be clear, the

3    goal of the Coleman court is to create a constitutionally

4    adequate system that is durable and that is everybody's goal.

5    I'm not qualming about law of the case, I guess we'd have to

6    know -- of course we'd have to comply with this Court's orders,

7    and the Court has made clear we have to comply with this

8    Court's orders and has made contempt findings.  I don't think

9    anybody here is suggesting they don't have to remedy the

10   constitutional violations, but that's not our position.  We

11   understand that the receiver will come in with the goal of

12   implementing a constitutionally adequate system that is

13   sustainable; that's everybody's goal here.

14           THE COURT:  How much is this being seen as an

15   opportunity?

16           I mean, how much is this being seen as an opportunity

17   to rewrite some of the foundational rules?

18           MR. MELLO:  I think this is an opportunity to move the

19   case forward in a way that's never been afforded the parties.

20   That's the opportunity that's seen here.  This is the

21   opportunity to have one patient one system.  This is the

22   opportunity to have somebody with 16 years of experience

23   building a system infrastructure in place far along the

24   learning curve to push us towards completion.  That's the

25   opportunity.  I don't think this is a means to get out of

1    anything.  This is a means to move the case forward; a unique

2    moment that I hope is not lost, and defendants hope it's not

3    lost.

4         THE COURT:  All right.  Mr. Bien on that last point,

5    anything to say?  The assumption is the *Plata* receiver would

6    accept all of this Court's orders and work faithfully to

7    implement them?

8         MR. BIEN:  Yes, I mean, and again, just as the Special

9    Master and plaintiff's counsel and this Court have allowed

10   amendments to the program guide or amendments where

11   appropriate, but the framework you begin with is the program

12   guide and this Court's orders, which still, as we know, raises

13   challenges in terms of implementation, but I think our

14   assumption -- and we have had conversations about this, so my

15   understanding is that there is an acceptance, this is not an

16   evasive maneuver, nor are we permitted an evasive maneuver or

17   would the Court.

18        Any issues that do arise, they are always issues

19   within the program guide that arise, right, interpretations,

20   things like that.  For me, the advantage of the Court's

21   decision to have a receiver is that the dispute resolution

22   process will be far more effective and efficient.  Now, that

23   would be true whether it was Mr. Kelso or any receiver.

24        THE COURT:  Any receiver, understood.

25        MR. BIEN:  Yeah, but we don't see this as an evasive

1    maneuver.

2         THE COURT:  In terms of separate identity for Coleman,

3    Judge Henderson had an advisory committee, it lapsed for a

4    while.  Judge Tigar's revived some kind of advisory committee,

5    is that a one mechanism for clarifying Coleman's separate

6    identity?

7         MR. BIEN:  I mean, I think that is one of the tools

8    that the Court could consider.  I do think that the Special

9    Master and the team are another thing.  I would assume that Mr.

10   Kelso -- again, I haven't spoken to him, but he would need

11   mental health expertise of his own, that he would be adding

12   staff.

13        THE COURT:  That would be for a receiver to propose.

14   Whatever the structure is, I'm not putting ideas out there to

15   micromanage that.

16        MR. BIEN:  Right, right, but it seems to me that there

17   are a number of ways that this Court can assure that this

18   Court's priority as reflected in the Court's orders, it will be

19   addressed, and I think that regular reporting, regular

20   communication, and then, you know, our obligation as counsel to

21   monitor and report on what's going on.

22        THE COURT:  All right.  Well, just going back to one

23   of the earlier -- let's assume this Court is having a really

24   difficult time with the notion of just signing an order of

25   reference as the next step and then waiting to see a plan

1  because of the types of questions I've asked this morning and

2  the concerns.  I mean, I could pick up the phone and call Judge

3  Tigar.  I've done that.  I see Judge Tigar at judges'

4  conferences.  Again, the culture of Coleman is to be

5  transparent.  Different from what has happened in *Plata* at

6  various junctures as I understand it.

7         So, I mean, the question really would be:  Would the

8  *Plata* receiver entertain an invitation from this Court to come

9  to court and give me some sense of how he would proceed if I'm

10  prepared to go there without engaging in the competitive

11  process that I strongly believe in?

12         I hear you both saying, You shouldn't have to do that,

13  but let's say this Court can't get there to sign an order of

14  reference without some questions answered not just by counsel

15  here today, so do I call up Judge Tigar and ask permission to

16  invite the receiver to come to my courtroom and have an open

17  discussion?

18         MR. BIEN:  I think we assumed that the next step, if

19  the Court would be to communicate with Judge Tigar formally or

20  informally, and request an opportunity to consult with Mr.

21  Kelso, you have to feel comfortable with this person, whoever

22  you appoint, and I don't think either party was suggesting that

23  it has to be done without you being fully engaged in the

24  process.

25         So, certainly I don't think there's any harm in taking

1    that next step and starting down that road.  It doesn't have to

2    happen right away.  You expressed something earlier today,

3    Let's get this right.  You have to be comfortable with the

4    process, and I think --

5         THE COURT:  I'll telling you, yes, I understand that,

6    and I'm going to make certain I am.  I'm not going to anoint,

7    I'm not going to rubber stamp.  I'm just trying to think

8    through -- you know, think through this process and put

9    aside -- put aside my ego.  What is best for this case is what

10   has been my goal for a long time here, and I'm trying to think

11   it through very carefully.

12        MR. BIEN:  I think we appreciate that the Court is

13   open to considering this.  I think to all of us it wasn't the

14   first thing that you were thinking about.

15        THE COURT:  I assumed the receiver would compete in a

16   process, that's what I assumed.  Certainly never ruled out that

17   possibility.

18        MR. BIEN:  But I think the idea that you just

19   suggested is a good one to help you move forward on this, is to

20   take the next step.  Again, we don't know what Judge Tigar's

21   position is about this, and we don't know what Mr. Kelso's

22   position is on it.  So I do think that that would be the most

23   appropriate next steps in whatever way the Court thinks it's

24   appropriate.

25        THE COURT:  I've interacted with the *Plata* receiver in

1  some coordination meetings.  Those meetings don't involve the

2  judges, just so it's clear, and not involved the judges for

3  quite some time, so I could ask for minutes of those meetings,

4  but there's not really coordination at the judge level at this

5  point.

6         All right.  So would it be a strategic mistake to

7  invite the receiver by reaching out to Judge Tigar to come to

8  an open session, Mr. Mello, and have a discussion with this

9  Court?

10        MR. MELLO:  I don't think so.  I don't think it would

11 be a mistake.  I think defendants also agree in a transparent

12 process.  Not the only means for a transparent process, there's

13 an RFP process and public interviews.  You know, there are many

14 options for which this Court can obtain information about Mr.

15 Kelso.

16        There could be a joint meeting with the parties and

17 the two courts and Mr. Kelso.

18        There could be a meeting with the Court, Mr. Kelso and

19 the parties.

20        There could be what you suggest.

21        I think we're open to anything, and I think there's

22 lots of ways for things to be done in a transparent fashion so

23 that this Court is comfortable that it is getting a Coleman

24 receiver in Mr. Kelso.

25        THE COURT:  All right.  Those are all my questions.

1  Is there anything else anyone else wants the Court to know at

2  this time, Mr. Bien?

3          MR. BIEN:  No, Your Honor.  Thank you.

4          THE COURT:  Mr. Mello?

5          MR. MELLO:  No, Your Honor.  Thank you.

6          THE COURT:  All right.  Thank you very much.  I'll

7  think about what you said.

8          THE CLERK:  Court is in recess.

9      (Proceedings adjourned at 10:51 a.m.)

10

11              C E R T I F I C A T E

12

13    I certify that the foregoing is a true and correct

14  transcript of the proceedings in the above-entitled matter.

15

16

17  MARYANN VALENOTI, RMR, CRR          August 21, 2024
    Official Court Reporter                DATE
18  CA CSR #11266

19

20

21

22

23

24

25